**B104 (FORM 104) (08/07)**                                                                                  **EDVA**

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| | |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| | |

| PARTY (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor       □ Other<br>□ Trustee | PARTY (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor       □ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
□ 11-Recovery of money/property - §542 turnover of property
□ 12-Recovery of money/property - §547 preference
□ 13-Recovery of money/property - §548 fraudulent transfer
□ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
□ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
□ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
□ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
□ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
□ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
□ 61-Dischargeability - §523(a)(5), domestic support
□ 68-Dischargeability - §523(a)(6), willful and malicious injury
□ 63-Dischargeability - §523(a)(8), student loan
□ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
□ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
□ 71-Injunctive relief – imposition of stay
□ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
□ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
□ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
□ 01-Determination of removed claim or cause

**Other**
□ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
□ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR | BANKRUPTCY CASE NO. | |
| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 104, the Adversary Proceeding Cover Sheet, *unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 104 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

*Per LBR 7003-1, in the EDVA, a properly completed Adversary Proceeding Cover Sheet is required.

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy:  (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083)
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy:  (804) 783-0178

*Counsel to Plaintiff, Trustee of the*
*Circuit City Stores, Inc. Liquidating Trust*

*Counsel to Plaintiff, Trustee of the*
*Circuit City Stores, Inc. Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CIRCUIT CITY STORES, INC., <u>et al.</u>, | : | Case No. 08-35653-KRH |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |
| | : | Adv. Pro. No. 12-_____ |
| ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ZOOM HOLDINGS, A CALIFORNIA GENERAL PARTNERSHIP, AND ZOOM TELEVISION, INC., A CALIFORNIA CORPORATION, | : | |
| | : | |
| Defendants | : | |
| | : | |

## THE LIQUIDATING TRUST'S COMPLAINT FOR DECLARATORY RELIEF REGARDING VALIDITY AND EXTENT OF INTERESTS AND TURNOVER AND RELEASE OF <u>PROPERTY OF THE TRUST</u>

Alfred H. Siegel, the duly appointed trustee (the "Trustee" or "Plaintiff") of the

Circuit City Stores, Inc. Liquidating Trust (the "Trust"), pursuant to the Second Amended Joint

Plan of Liquidation of Circuit Stores, Inc. and its Affiliated Debtors and Debtors in Possession

and its Official Committee of Creditors Holding General Unsecured Claims (the "Plan"), for his

complaint (the "Complaint") against Zoom Holdings and Zoom Television, Inc. (collectively, the

"Defendants" and each a "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.      The Trustee brings this action against Defendants to recover, and to have

released to the Trust, funds totaling $4,835,439 plus any interest thereon (the "Segregated

Proceeds") held in a segregated account maintained by the Trust, comprised of the net proceeds

of the Bankruptcy Court approved sale by the Trust of certain patents, patent applications and

other assets of the Trust, which assets were initially owned by a nondebtor defunct entity, Digital

Video Express, L.P. (the "LP" or "Partnership"), of which certain Debtors were interest holders

and creditors.  In approving this sale, the Court directed the establishment of a segregated

account in which the Trust would hold the Segregated Proceeds.  As discussed herein, the

Segregated Proceeds constitute property of the Trust, and consistent with applicable

nonbankruptcy law, should be released and distributed to the Trust as successor to the Debtors,

which were interest holders and creditors of the LP.

## THE PARTIES

2.      The Trustee is the duly appointed trustee of the Circuit City Stores, Inc.

Liquidating Trust, which was created pursuant to the Plan.  As provided in Articles II and III of

the Liquidating Trust Agreement, the Trustee has the sole authority to, among other things,

pursue claims transferred to the Trust by the Debtors through the Plan.

3.    Prior to the Effective Date of the Plan, Circuit City Stores, Inc. and its

affiliated debtors in possession (collectively "Circuit City" or the "Debtors")[1] were corporations

that maintained their respective principal places of business in the locations set forth below, and

were the debtors in the above-captioned chapter 11 bankruptcy cases.

4.    Upon information and belief, Defendant Zoom Holdings is a general

partnership organized under the laws of the State of California, and no longer conducts any

operations.

5.    Upon information and belief, Defendant Zoom Television, Inc. ("Zoom

Television") is a corporation organized under the laws of the State of California, has been

dissolved, and prior to such dissolution, was a general partner of Zoom Holdings (Zoom

Holdings and Zoom Television are referred to herein as "Zoom").

## JURISDICTION AND VENUE

6.    This Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157

and 1334.

7.    This is a core proceeding under 28 U.S.C. § 157(b).

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Circuit City Stores, Inc. (3875), Circuit City Stores West Coast, Inc. (0785), InterTAN, Inc. (0875), Ventoux International, Inc. (1838), Circuit City Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC Distribution Company of Virginia, Inc. (2821), Circuit City Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796), Sky Venture Corp. (0311), PRAHS, Inc.(n/a), XSStuff, LLC (9263), Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics, LLC (3360), and Circuit City Stores PR, LLC (5512).  The address for Circuit City Stores West Coast, Inc. was 9250 Sheridan Boulevard, Westminster, Colorado 80031.  For all other Debtors, the address was 9950 Mayland Drive, Richmond, Virginia 23233.

8.      Venue of these chapter 11 cases and this adversary proceeding in this district and before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

9.      The statutory and legal predicates for the relief requested by the Complaint are sections 105, 363, 541, and 542 of title 11, United States Code (the "Bankruptcy Code"), Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and 28 U.S.C. § 2201.

## PERTINENT FACTS

### A.      General Case Background

10.     On November 10, 2008 (the "Petition Date"), the Debtors, including Debtor Sky Venture Corporation ("SVC"), filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code, and until the effective date of the Plan, continued to operate as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

11.     On November 12, 2008, the Office of the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors (the "Creditors' Committee").

12.     On January 16, 2009, the Court authorized the Debtors to, among other things, conduct going out of business sales at all of the Debtors' retail locations (the "Stores") pursuant to an agency agreement (the "Agency Agreement") between the Debtors and a joint venture, as agent (the "Agent").  On January 17, 2009, the Agent commenced going out of business sales at the Stores pursuant to the Agency Agreement.  As of March 8, 2009, the going out of business sales at the Debtors' stores were completed.

13.    On August 9, 2010, the Debtors and the Creditors' Committee filed the Plan, which provides for the liquidation of the Debtors' assets and distribution of the proceeds thereof under chapter 11 of the Bankruptcy Code.

14.    On September 10, 2010, the Court entered its Findings of Fact, Conclusions of Law and Order (the "Confirmation Order") Confirming Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession and its Official Committee of Creditors Holding General Unsecured Claims (the "Plan").  Among other matters provided for in the Confirmation Order, in paragraphs 11-16 thereof, a Liquidating Trust was established to effectuate the Plan, and for the benefit of creditors, to collect, administer, distribute and liquidate the assets of the Debtors' estates that are to be transferred to the Liquidating Trust on the Effective Date in accordance with the Plan and Liquidating Trust Agreement.

15.    The Plan became effective on November 1, 2010 (the "Effective Date"), and pursuant to the Plan and Liquidating Trust Agreement approved therewith, the Trust assumed the right and responsibility to liquidate the Debtors' remaining assets, analyze, investigate, and if appropriate, object to claims, and distribute the proceeds to satisfy the allowed claims of creditors.  Except as otherwise expressly provided therein, the Confirmation Order (including paragraph 6, p. 24, therein) and the Plan (including Sections V.F.6, p. 29-32, V.I, p. 33)  provide that generally, as of the Effective Date, the assets of the Consolidated Debtors' estates vested in the Trust free and clear of all liens, claims, encumbrances and interests and may be disposed of by the Trust in its discretion free of any restrictions of the Bankruptcy Code and Bankruptcy Rules.  The Debtors' senior secured lenders were paid in full under the Plan.

**B.**     **The Defunct Limited Partnership and Sale of Patent Rights**

16.     Immediately before the Petition Date, former Debtor SVC was the sole

general partner of a non-debtor defunct entity, Digital Video Express, L.P. (the "LP" or

"Partnership"), a Delaware limited partnership; no other general partner has been appointed.  On

the Petition Date, and continuing to the Effective Date, the LP had two limited partners: Debtor

Circuit City Stores, Inc. ("CCS") and Zoom.

17.     The terms and conditions of the LP were governed by an Agreement of

Limited Partnership dated May 5, 1995, as amended (the "LP Agreement").  The purpose of the

LP, which had been formed in 1995, was to "acquire, finance, develop, manufacture, market, and

distribute the Zoom System and related products" (LP Agreement, sec. 2.3) -- a multimedia

system which allowed for incremental purchase of the use of movies and other intellectual

properties and/or the remote catalog sale of goods.  The LP acquired the Zoom System in

connection with its formation, at which time its partners transferred all of their Zoom System

intellectual property to the LP.   As of the Effective Date, the assets vesting in the Trust included,

without limitation, any and all interests in or claims against the Partnership that may have been

held by CCS and SVC, as creditors and partners of the LP, including the rights and powers of

Debtor SVC to carry out any actions necessary or appropriate to complete the final liquidation

and distribution of the dissolved LP's assets.

18.     The LP was not a Debtor, but the chapter 11 petition filing by SVC

triggered a dissolution of the LP under the LP Agreement and applicable Delaware law (LP

Agreement, sec. 15.1 & Delaware Revised Uniform Limited Partnership Act, sec. 17-801

(bankruptcy of the last remaining general partner of the LP causes a dissolution of the LP)).  (A

copy of the LP Agreement is attached hereto as <u>Exhibit C</u>.)  Under the LP Agreement and

applicable law, SVC as general partner was responsible for carrying out the dissolution and wind

up of the LP's affairs, including liquidation of the LP's assets, which includes the Patent Rights

(defined and described below), and distribution of the proceeds in order of priority of claims and

interests.[2]  (Section 15.3(a), LP Agreement, sections 15.1, 15.3(a).)   As noted above, such

powers and management rights vested in the Trust pursuant to the Plan and Confirmation Order.

      19.    Upon an amended motion filed by the Trust on August 12, 2011 (the "<u>Sale</u>

<u>Motion</u>"),[3] and after a Court-approved bidding and auction process, the Court entered its *Order*

*Approving Sale of Certain Patents and Other Intellectual Property and Related Assets as Being*

*Free and Clear of All Liens, Claims and Interests* on August 29, 2011 (the "<u>Sale Order</u>", a copy

of which is attached hereto as <u>Exhibit A</u>), authorizing the Trust to cause the sale and transfer (the

"<u>Patent Rights Sale</u>") of certain patents, patent applications and other assets of the Trust as

further described and referred to as the "<u>Patent Rights</u>" in that certain August 12, 2011 letter

agreement (subject to the Sale Order, the "<u>Agreement</u>"), from the Partnership to the Trust and

from the Trust to Innovative Video Security LLC (the "<u>Buyer</u>"), free and clear of liens, claims

---

[2]  Generally, as discussed further herein, the order of priority is:  First, to the payment of the LP's debts and obligations to its creditors (excluding loans to the LP by its partners), including sales commissions and other expenses incident to any sales of the assets of the LP; second, to the establishment of and addition to such reserves as SVC may deem appropriate; third, to the payment of the LP's debts and obligations to the partners in their capacity as creditors (including loans to the LP by partners, pro rata according to the relative amounts of such unpaid loans); fourth, to the partners, to the extent of and in proportion to their respective positive Capital Account balances (adjusted for all distributions and allocations for all periods ending on or before the date of the distribution).

[3]  Out of an abundance of caution, the Trust filed the Motion, amending its initial motion filed on July 21, 2011, to clarify that (i) at that point, the Patent Rights were held by the LP, and (ii) prior to (or concurrently with) the consummation of the sale of the Patent Rights, the Trustee, as successor in interest to SVC, would, consistent with principles of Delaware limited partnership dissolution law, implement and carry out the liquidation and distribution of the LP's assets by selling and transferring the Patent Rights to the Trust, which would then sell and transfer the same, free and clear of all claims, liens and interests pursuant to Bankruptcy Code section 363(f), to the ultimate buyer.

and encumbrances.  Pursuant to the Agreement, the Buyer agreed to a purchase price of

$6,025,000.  This transaction was consummated at the closing of the Agreement on or about

September 8, 2011.

20.    As set forth in the Sale Order, as evidenced by the proofs of service filed

with the Court, the Court found, among other things, proper and sufficient notice of the Motion

and the sale of the Patent Rights was given to, among others, potential creditors of the LP and the

non-debtor limited partner of the LP, Zoom.  (Sale Order, para. B.)

## C.    The Segregated Proceeds and Rights Thereto

21.    Section 4 of the Sale Order provided:

At the closing of the sale of the Patent Rights to the Buyer (the "Closing"), subject to the
terms and conditions of the Agreement, except as may be expressly provided therein, the
Buyer shall acquire all right, title and interest in the Patent Rights free and clear of all
Encumbrances, with all such Encumbrances, if any, of any kind or nature whatsoever
attaching to the net proceeds of the sale (the "Proceeds") ultimately attributable to the
property against or in which the holder of an Encumbrance claims or may claim an
interest in the order of their priority, with the same validity, force and effect which they
now have, subject to any claims and defenses the Trust, the Debtors and/or the
bankruptcy estates may possess with respect thereto.  *Subject to the foregoing, the
Proceeds shall be deposited into a segregated account and administered and distributed
by the Trust to the creditors and interest holders of the LP in accordance with applicable
nonbankruptcy law.*

(Sale Order, § 4 (italics added).)  In accordance with the Sale Order, the Proceeds of $4,835,439

(this amount, together with any interest thereon, is referred to herein also as the "Segregated

Proceeds") were deposited into and remain in a segregated account maintained by the Trust.

22.    Upon information and belief, based upon the LP Agreement, Kenneth

Ziffren and Harry Brittenham (both of whom are partners of the law firm Ziffren Brittenham

LLP) owned the controlling interest in Zoom Television, which, as set forth above, was a general

partner of Zoom Holdings.  (*See, e.g.*, LP Agreement, p. 7 ( "'ZTV' means Zoom Television,

Inc., a California corporation, the controlling interest of which is held as of the date hereof by

Kenneth Ziffren and Harry M. Brittenham") and signature page (showing Harry Brittenham

signing on behalf of Zoom Television and Zoom Holdings); Amendment No. 2 to LP

Agreement, signature page (showing Kenneth Ziffren signing on behalf of Zoom Television, as

general partner of Zoom Holdings).)  Subsequent to the entry of the Sale Order, the Trust's

counsel repeatedly attempted to contact Kenneth Ziffren ("Ziffren"), including by letters from

the Trust's counsel faxed to Ziffren on December 9, 2011 and January 18, 2012.  True and

correct copies of the Trust's counsel's letters are attached hereto as Exhibit B.  In the December

2011 letter, the Trust's counsel explained the instant matter and the Trust's desire to proceed

with the administration and distribution of the Segregated Proceeds to creditors and interest

holders in accordance with applicable nonbankruptcy law.  Ziffren did not respond to the Trust's

counsel's correspondence.

> 23.     As explained in the Trust's December 2011 correspondence, the LP

Agreement, which governs the LP, provides in pertinent part:

> [T]he Liquidator [*i.e.*, the Liquidating Trust, as successor to SVC] shall liquidate the assets of the Partnership, and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:
>
> (i)     First, to the payment of the Partnership's debts and obligations to its creditors (excluding loans to the Partnership by Partners), including sales commissions and other expenses incident to the sale of the assets of the Partnership.
>
> (ii)     Second, to the establishment of and additions to such Reserves as the Liquidator may deem necessary or appropriate.
>
> (iii)     *Third, to the payment of the Partnership's debts and obligations to the Partners in their capacity as creditors (including loans to the Partnership by Partners,* pro rata according to the relative amounts of such unpaid loans).

  (iv)  *Fourth, to the Partners*, *to the extent of and in proportion to their respective positive Capital Account balances* (adjusted for all distributions and allocations pursuant to Article IV for all periods ending on or before the date of the distribution), in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2).

(LP Agreement, Sec. 15.3(c) (italics added).)

  24.  Upon information and belief, Zoom is no longer in existence and, as a result, Zoom is unable to pursue any claims or interests, if any, it may have in the Segregated Proceeds.  Further, while, under the LP Agreement, claims of third parties are to be paid ahead of Partners' claims, Debtor CCS (the other former limited partner of the LP) was the only remaining creditor of the LP as of the Petition Date because, prepetition, during the term of the LP, CCS essentially assumed the LP's liabilities and made substantial loans or advances well in excess of $100 million to the LP to pay off the LP's other creditors; in contrast, the records of the Debtors and the LP do not reflect that Zoom made any advances or other contributions to the LP beyond its initial equity contribution.  Consequently, under the LP Agreement's liquidation priority scheme (in which loans to Partners (including CCS) are to be repaid in full before Capital Account balances), all of the net proceeds from the sale of the LP's assets, including the Patent Rights, should properly be distributed to the Trust, as successor to CCS, on account of the CCS loans/advances.

  25.  By the Complaint, the Trust seeks the release and distribution of the Segregated Proceeds to itself, as successor to the Debtors and bankruptcy estate.[4]   All of the

---

[4] Although the Trust itself controls the Segregated Proceeds, it is restricted from releasing and using said funds pursuant to the Sale Order, and thus, this action under, *inter alia*, section 542 has been brought.

Segregated Proceeds properly should be distributed to the Trust, as successor to the Debtors,

pursuant to the terms of the LP Agreement governing the distribution of assets of the LP.

<u>COUNT I</u>

<u>DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS
THAT SEGREGATED PROCEEDS CONSTITUTE THE SOLE PROPERTY OF THE
TRUST, AS SUCCESSOR TO THE BANKRUPTCY ESTATE – 28 U.S.C. § 2201</u>

26.     The Trustee repeats and realleges each of the allegations set forth above as

if fully set forth herein.

27.     Pursuant to the LP Agreement, the Segregated Proceeds, including any

accumulated interest thereon, constitute property of the Trust, as successor to the Debtors and

their bankruptcy estate.

28.     An actual controversy exists in that Zoom has not responded to Plaintiff's

inquiries described above regarding the distribution of the Segregated Proceeds.

29.     Pursuant to the LP Agreement, any claim, if any, of Defendants to all or

some portion of the Segregated Proceeds is baseless.

30.     Plaintiff is entitled to an order and judgment under 28 U.S.C. § 2201

declaring that the Defendants have no claim to or interest in the Segregated Proceeds, and such

Segregated Proceeds are the sole property of the Trust, as successor to the Debtors and the

bankruptcy estate.

## COUNT II

## TURNOVER PURSUANT TO 11 U.S.C. §§ 541 AND 542 OF
## SEGREGATED PROCEEDS TO THE TRUST

31.    The Trustee repeats and realleges each of the allegations set forth above as if fully set forth herein.

32.    The Segregated Proceeds, including any accumulated interest thereon, constitute property of the Trust, as successor to the Debtors and the bankruptcy estate, that can be used and administered by Plaintiff pursuant to sections 363 and 541 of the Bankruptcy Code.

33.    Plaintiff, as Trustee of the Trust, has the power and authority to take exclusive possession and control of the Segregated Proceeds.

34.    Plaintiff is entitled to the turnover and release of the Segregated Proceeds, including any accumulated interest thereon, to the Trust for its exclusive benefit and use.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests and prays that the Court:

1.    Pursuant to Count I, enter judgment against all Defendants declaring that Defendants have no claim to or interest in any of the Segregated Proceeds, and that such Segregated Proceeds are property of the Trust;

2.    Pursuant to Count II, enter judgment authorizing and directing the turnover, release and delivery of the Segregated Proceeds exclusively to the Trust; and

3.    Grant the Trustee such other and further relief the Court deems just and proper.

Dated: Richmond, Virginia
       June 6 , 2012

TAVENNER & BERAN, PLC

 /s/ Lynn L. Tavenner
Lynn L. Tavenner (VA Bar No. 30083)
Paula S. Beran (VA Bar No. 34679)
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
(804) 783-8300

- and -

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, California 90067-4100
(310) 277-6910

*Counsel to Plaintiff, Trustee of the Circuit City
Stores, Inc. Liquidating Trust*

# **EXHIBIT A**

**(Sale Order)**

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy: (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy: (804) 783-0178

*Counsel for the Circuit City Stores, Inc.*
*Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

In re

CIRCUIT CITY STORES, INC., et al,[1]

        Debtor.

Chapter 11

Case No. 08-35653-KRH

(Jointly Administered)

## ORDER APPROVING SALE OF CERTAIN PATENTS AND OTHER
## INTELLECTUAL PROPERTY AND RELATED ASSETS AS BEING
## FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS

Upon the Amended Motion [Docket No. 11122] (the "Motion")[2] of the Circuit City

Stores, Inc. Liquidating Trust (the "Trust") for an Order Approving the Sale of Certain Patents

and Other Intellectual Property and Related Assets as Being Free and Clear of All Liens, Claims

and Interests; and the Court having reviewed the Motion; and the Court having determined that

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax
identifications numbers, are as follows: Circuit City Stores, Inc. (3875), Circuit City Stores West Coast,
Inc. (0785), InterTAN, Inc. (0875), Ventoux International, Inc. (1838), Circuit City Purchasing Company,
LLC (5170), CC Aviation, LLC (0841), CC Distribution Company of Virginia, Inc. (2821), Circuit City
Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott Advertising Agency, Inc. (4659),
Patapsco Designs, Inc. (6796), Sky Venture Corp. (0311), Prahs, Inc. (n/a), XSStuff, LLC (9263),
Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics, LLC (3360), and Circuit City
Stores PR, LLC (5512).

[2] Capitalized terms not otherwise defined herein shall have the meanings and definitions ascribed to such
terms in the Motion.

the relief requested in the Motion is in the best interests of the Trust, the beneficiaries thereof,
and other parties in interest; and upon the record herein; and after due deliberation thereon; and
good and sufficient cause appearing therefor, it is hereby.

**FOUND AND DETERMINED THAT[3]:**

A.    At the conclusion of the auction of the Purchased Assets, the Trust
determined that the bid for the Purchased Assets submitted by Innovative Video Security LLC
(the "Buyer") was the highest and best bid for the assets that are the subject of the Motion,
pursuant to the Letter Agreement, dated August 12, 2011, a copy of which is annexed as Exhibit
"A" hereto (the "Agreement"). The Agreement and the transactions contemplated thereby and
otherwise under this Order, including the sale and transfer of the Patent Rights (as defined in the
Agreement) from the LP to the Trust, were negotiated and have been and are each undertaken by
the Trust, the Buyer and the LP, respectively, at arm's length without collusion or fraud, in good
faith, for reasonably equivalent value, and in a manner consistent with applicable law. The
Buyer is not affiliated in any way with the Trust or the Debtors.

B.    As evidenced by the proofs of service filed with the Court, proper and
adequate notice of the Initial Motion and Amended Motion and the sale of the Patent Rights has
been given, including to any entities known to have asserted any Encumbrance (as defined
below) against the Patent Rights, the known creditors of the LP, and the non-debtor limited
partner of the LP, Zoom. No other or further notice is necessary.

C.    The Plan became effective on November 1, 2010, and pursuant to the Plan
and Liquidating Trust Agreement approved therewith and the Confirmation Order, except as
otherwise expressly provided in the Plan or Confirmation Order, the Consolidated Debtors'

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of
law pursuant to Bankruptcy Rule 7052. If and to the extent that any of the following findings of fact are
determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of
law. If and to the extent that any of the following conclusions of law are determined to be findings of fact,
they are adopted, and shall be construed and deemed, as findings of fact. All statements by the Court at
the hearing on the Motion shall constitute additional findings of fact and conclusions of law, as
applicable.

estates' assets vested in the Trust free and clear of all liens, claims (as defined under section 101(5) of the Bankruptcy Code), encumbrances, assertions of ownership, or any other rights or interests of any kind ("Encumbrances"), and thus, any and all assets of the Trust may be disposed of by the Trust free of any Encumbrances of any nature whatsoever, including any arising under nonbankruptcy law.

D.   Subject to the entry of this Order, the Trust: (i) has full power and authority to execute the Agreement and all other documents contemplated thereby, including the transfer of all right, title, and interest in the Patent Rights to the Trust and the subsequent transfer of all right, title, and interest in the Patent Rights to the Buyer; (ii) has all of the power and authority necessary to consummate the transactions contemplated by the Agreement, and (iii) has taken all company action necessary to authorize and approve the Agreement, and related documents, and the sale of the Patent Rights.  Except as expressly provided for in the Agreement or this Order, no consents or approvals, including without limitation from the non-debtor limited partner of the LP, Zoom, are required for the Trust to consummate the sale of the Purchased Assets under the Agreement.

E.   Notwithstanding the foregoing, in the event that any party continues to assert or may assert an Encumbrance against the Patent Rights, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied.  Those holders of Encumbrances who did not object or who withdrew their objections to the sale of the Patent Rights or the Initial Motion or Amended Motion are deemed to have consented to such sale and the Motion (including all transfers contemplated thereby) pursuant to Bankruptcy Code section 363(f)(2).  Those holders of any Encumbrances who did object fall within one or more of the other subsections of Bankruptcy Code section 363(f), and all such objections are without merit. It is therefore

**ORDERED, ADJUDGED AND DECREED** that:

1.   The Amended Motion is GRANTED.  All objections to the Amended Motion are hereby overruled.

A/74492007.1

2.      If and to the extent that Court approval may be required, the transactions and actions contemplated by the Trust as described in the Amended Motion, including, without limitation, the Trustee's sale and transfer of all right, title and interest in the Patent Rights from the LP to the Trust and the Trust's sale and transfer of all right, title and interest in the Patent Rights to the Buyer, are consistent with and authorized by the Plan and applicable non-bankruptcy law, and are approved and authorized by the Court.

3.      The Trust may sell the all right, title and interest in the Patent Rights to the Buyer free and clear of all Encumbrances, pursuant to the Agreement.

4.      At the closing of the sale of the Patent Rights to the Buyer (the "Closing"), subject to the terms and conditions of the Agreement, except as may be expressly provided otherwise therein, the Buyer shall acquire all right, title and interest in the Patent Rights free and clear of all Encumbrances, with all such Encumbrances, if any, of any kind or nature whatsoever attaching to the net proceeds of the sale (the "Proceeds") ultimately attributable to the property against or in which the holder of an Encumbrance claims or may claim an interest in the order of their priority, with the same validity, force and effect which they now have, subject to any claims and defenses the Trust, the Debtors and/or the bankruptcy estates may possess with respect thereto.  Subject to the foregoing, the Proceeds shall be deposited into a segregated account and administered and distributed by the Trust to the creditors and interest holders of the LP in accordance with applicable nonbankruptcy law.

5.      The Trust, the Buyer and their respective agents may take all reasonable and necessary actions to implement this Order and consummate the transactions contemplated hereunder and the Amended Motion.

6.      The Agreement, and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby.

A/74492007.1

7.    This Order is and shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report any title or state of title in or to the Purchased AssetsPatent Rights.  All such entities described above in this paragraph are authorized and specifically directed to strike all recorded Encumbrances against the Patent Rights from their records, official or otherwise.

Dated:_____            _____
         Richmond, Virginia                             The Honorable Kevin R. Huennekens
                                                                    United States Bankruptcy Judge


**WE ASK FOR THIS:**

/s/ Lynn L. Tavenner_____
Lynn L. Tavenner (VA Bar No. 30083)
Paula S. Beran (VA Bar No. 34679)
TAVENNER & BERAN PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: 804-783-8300
Facsimile: 804-783-0178

-and-

Richard M. Pachulski (CA Bar No. 90073)
Jeffrey N. Pomerantz (CA Bar No. 143717)
Andrew W. Caine (CA Bar No. 110345)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd. 11th Floor
Los Angeles, California 90067-4100
Telephone: 310-227-6910
Facsimile: 310-201-0760

Counsel for the Circuit City Stores, Inc.
Liquidating Trust

## CERTIFICATION

I hereby certify that the foregoing proposed Order has been either served on or endorsed by all necessary parties.

/s/ Lynn L. Tavenner
Lynn L. Tavenner, Esquire (Va. Bar No. 30083)
Tavenner & Beran, PLC
20 N. 8th Street, Second Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy: (804) 783-0178

EXHIBIT A

Innovative Video Security LLC
c/o Bingham McCutchen LLP
2020 K Street NW
Washington, DC 20006-1806

August 12, 2011

Circuit City Stores, Inc. Liquidating Trust
200 Westgate Parkway
Suite 100
Richmond, VA 23233

RE:    Agreement to Purchase Certain Intellectual Property Assets of Circuit City Stores, Inc., Circuit City Stores West Coast, Inc., Circuit City Purchasing Company, LLC, CC Aviation, LLC, CC Distribution Company of Virginia, Inc., Circuit City Stores PR, LLC, Circuit City Properties LLC, Orbyx Electronics, LLC, Kinzer Technology, LLC, Courchevel, LLC, Abbott Advertising Agency, Inc., Mayland MN, LLC, Papsco Designs, Inc., Sky Venture Corp., XSStuff, LLC, and PRAHS, Inc. (collectively, the "**Debtors**"), currently the subject of Chapter 11 bankruptcy proceedings pending in the United States Bankruptcy Court for the Eastern District of Virginia as Case No. 08-35653-KRH ("**Bankruptcy Court**" and "**Bankruptcy Case**", respectively), under the control of Circuit City Stores, Inc. Liquidating Trust, through Alfred H. Siegel, as trustee of the Circuit City Stores, Inc. Liquidating Trust, and not in any individual capacity (the "**Trustee**")

Dear Sir or Madam:

This letter agreement ("**Agreement**") outlines the terms and conditions of a purchase by Innovative Video Security LLC, a Delaware limited liability company ("**Purchaser**"), of certain of the assets of the Debtors, all as set forth below.

1. **DEFINITIONS**

1.1    For purposes of this Agreement, in addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"**Assignment of Patent Rights**" means the Assignment of Patent Rights in the form attached hereto as Exhibit C.

"**Assignor**" means the Debtors, acting through the Trustee.

"**Business Day**" means any day of the year on which national banking institutions in San Francisco, California are open to the public for conducting business and are not required or authorized to close.

"**Closing**" has the meaning set forth in Section 8.

A/74488688.3

"**Closing Date**" has the meaning set forth in Section 8.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated pursuant thereto.

"**Docket**" means the Debtors' or their agents' list or other means of tracking information relating to the prosecution or maintenance of the Patent Rights throughout the world, including the names, addresses, email addresses, and phone numbers of prosecution counsel and agents, and information relating to deadlines, payments, and filings, which list or other means of tracking information is current as of the Closing Date.

"**Foreign Patents**" means the foreign patents, patent applications, and provisional patent applications listed on Exhibit B attached hereto.

"**Liabilities**" means any debt, liability, Tax or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs, Taxes and expenses relating thereto.

"**Lien**" means any lien (including attorneys' liens), claim (as defined in the Bankruptcy Code), interest, judgment, license, charge, option, pledge, mortgage, deed of trust, security interest or other encumbrance, defect in title or restriction of any kind.

"**Listed Patents**" means all U.S. Patents and all Foreign Patents.

"**Patents**", means, all (a) Listed Patents; (b) patents or patent applications (i) to which any of the Listed Patents claims priority, (ii) for which any of the Listed Patents forms a basis for priority, (iii) that were co-owned applications that incorporate by reference, or are incorporated by reference into, the Listed Patents, and/or (iv) which are subject to a terminal disclaimer with any of the Listed Patents; (c) reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, and registrations of any item in any of the foregoing categories (a) and (b); (d) national (of any country of origin) and multinational patents, patent applications and counterparts relating to any item in any of the foregoing categories (a) through (c), including, without limitation, certificates of invention and utility models; (e) rights provided by multinational treaties or conventions for any item in any of the foregoing categories (a) through (d); and (f) any item in any of the foregoing categories (b) through (d) whether or not expressly listed as Listed Patents and whether or not claims in any of the foregoing have been rejected, withdrawn, cancelled, or the like.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust, unincorporated organization, or other entity.

"**Sale Order**" has the meaning set forth in Section 6.

A/74488688.3

"**Taxes**" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, windfall profits, inventory, customs duties capital stock, license, withholding, payroll, employment, social security, unemployment, disability, excise, severance, registration, severance, stamp, occupation, property, add-on minimum, environmental (including taxes under Code §59A) and estimated taxes, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i), in either case, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement and all other agreements, documents, or instruments or certificates contemplated by this Agreement or to be executed by Assignor or Purchaser in connection with the consummation of the transactions contemplated hereby.

"**Transfer Taxes**" means sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the sale of the Patent Rights contemplated by this Agreement.

"**U.S. Patents**" means the U.S. patents, patent applications, and provisional patent applications listed on Exhibit A attached hereto.

1.2     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on all Schedules. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

A/74488688.3

<u>Headings</u>.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

<u>Herein</u>.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

<u>Including</u>.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

2.   **SALE OF PATENT RIGHTS; NO ASSUMPTION OF LIABILITIES**

2.1   <u>Purchase and Sale</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Assignor, and Assignor shall sell, transfer, assign, convey and deliver to Purchaser, all right, title and interest of Assignor in and to all of the following (collectively, the "**Patent Rights**"):

(a)   the Patents;

(b)   inventions, invention disclosures, and discoveries described in any of the Patents to the extent that such inventions, invention disclosures and discoveries could be claimed in any of the Patents;

(c)   rights to apply in any or all countries of the world for patents, certificates of invention and utility models, claiming any inventions, invention disclosures, and discoveries described in any of the Patents to the extent that such inventions, invention disclosures and discoveries could be claimed in any of the Patents; and

(d)   causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or the rights described in Section 2.1(c), including, without limitation, all causes of action and other enforcement rights for (i) damages, (ii) injunctive relief, and (iii) any other remedies of any kind for past, current and future infringement, and (iv) rights to collect royalties or other payments under or on account of any of the Patents and/or any of the foregoing.

2.2   <u>No Assumption of Liabilities</u>.  Except as provided in Section 10.1 of this Agreement, Purchaser shall not assume or become responsible for any Liabilities of the Debtors, whether relating to the Patent Rights or otherwise.

2.3   <u>Further Conveyances and Assumptions</u>.  From time to time following the Closing:

A/74488688.3

(a)     Assignor and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the other Transaction Documents and to otherwise make effective the sale of the Patent Rights and the transactions contemplated hereby and thereby; provided, however, that Assignor shall be under no obligation under this Section to refrain from or postpone the closing of the Bankruptcy Case, appeal any adverse order of the Bankruptcy Court, commence or maintain any legal proceeding, or to incur any material cost or expense;

(b)     Assignor authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Patent Rights in the name of Purchaser, as the assignee to the entire interest therein; and

(c)     Assignor will, at the reasonable request of Purchaser and without demanding any further consideration therefore, do all things necessary, proper, or advisable, including without limitation, the execution, acknowledgment, and recordation of specific assignments, oaths, declarations, and other documents on a country-by-country basis, to assist Purchaser in obtaining, perfecting, sustaining, and/or enforcing the Patent Rights.    Such assistance will include providing, and obtaining from the respective inventors, prompt production of pertinent facts and documents, giving of testimony, execution of petitions, oaths, powers of attorney, specifications, declarations or other papers, and other assistance reasonably necessary for filing patent applications, complying with any duty of disclosure, and conducting prosecution, reexamination, reissue, interference or other priority    proceedings,    opposition    proceedings,    cancellation proceedings, public use proceedings, infringement or other court actions and the like with respect to the Patent Rights.

2.4     <u>Pre- and Post-Closing and Transitional Matters</u>.  From and after the Closing, the Assignor shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Assignor's assets other than the Patent Rights.    Assignor shall provide all assistance reasonably requested by Purchaser to ensure a smooth transfer of the Patent Rights at the Closing; provided, however, that Assignor shall be under no obligation under this Section to refrain from or postpone the closing of the Bankruptcy Case, appeal any adverse order of the Bankruptcy Court, commence or maintain any legal proceeding, or to incur any material cost or expense.

**3.     PURCHASE**

3.1     In consideration of the transfer of all of the Patent Rights to Purchaser and the other undertakings set forth herein, Purchaser will pay to Assignor, at the Closing, Six Million Twenty Five Thousand Dollars ($6,025,000.00) (the "**Purchase Price**"). There is no financing or other contingency in this Agreement other than that set forth in Section 5 below.

3.2     Purchaser and Assignor acknowledge and agree that Purchaser has deposited Six Hundred and Two Thousand Five Hundred Dollars ($602,500.00) (the "**Deposit**") into a client trust account maintained by Pachulski Stang Ziehl & Jones LLP (the "**Firm**"). At the Closing, Purchaser will pay Assignor, by wire transfer of immediately available funds to an account designated by Assignor, an amount equal to the Purchase Price, less the Deposit.

## 4.    LIMITED WARRANTIES

Purchaser will purchase the Assignor's right, title and interest in and to the Patent Rights on an "as is" basis, without any representations or warranties of any kind, except as set forth in this Section 4. The Assignor represents and warrants as follows:

4.1     Subject to entry of the Sale Order, (a) Assignor will have the power, authority and legal capacity to execute and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby, (b) this Agreement will have been duly and validly executed and delivered by the Assignor, and (c) assuming the due authorization, execution and delivery by Purchaser, this Agreement constitutes the legal, valid and binding obligations of Assignor, enforceable in accordance with its terms.

4.2     As contemplated by the Liquidating Trust's Amended Motion for the Sale Order filed August 12, 2011, and subject to entry of the Sale Order, on or before the Closing, Assignor will acquire all right, title and interest of Digital Video Express, L.P., a Delaware limited partnership (the "**Partnership**"), in and to the Patent Rights and will file such executed instruments as are necessary to cause title of record for the Listed Patents to reflect the assignment of such Listed Patents to the Partnership and the assignment of the Listed Patents by the Partnership to Assignor, in each case as necessary to establish and perfect the right, title and interest of the Assignor therein.

4.3     Subject to entry of the Sale Order, the sale of the Patent Rights to Purchaser will be free and clear of all liens (including attorneys' liens), claims, mortgages, security interests or other encumbrances, and restrictions to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. Except for the Bankruptcy Case, there are no actions, suits, investigations, claims or proceedings threatened, pending or in progress relating in any way to the Patent Rights and, to Assignor's knowledge, formed after reasonable inquiry and investigation, except for the Bankruptcy Case, there are no actions, suits, investigations, claims or proceedings threatened, pending or in progress relating in any way to the Patent Rights relating to the Foreign Patents.

A/74488688.3

4.4     There are no existing contracts, agreements, licenses, options, commitments, proposals, bids, offers, or rights with, to, or in any person to acquire any of the Patent Rights relating to the U.S. Patents and, to Assignor's knowledge, formed after reasonable inquiry and investigation, there are no existing contracts, agreements, options, commitments, proposals, bids, offers, or rights with, to, or in any person to acquire any of the Patent Rights relating to the Foreign Patents.

4.5     No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Assignor in connection with the Sale, and no Person is entitled to any fee or commission or like payment from Assignor in respect thereof, other than Streambank, LLC, which payment shall not be payable by Purchaser.

Purchaser acknowledges and agrees that Purchaser and its representatives, before the agreement date, have had access to such information and documents relating to the Patent Rights that Assignor has provided, and that, in determining to acquire the Patent Rights, Purchaser has made its own investigation into the Patent Rights, using publicly available information at the U.S. Patent Office, and, based thereon, Purchaser has made its own independent judgment concerning the purchase of the Patent Rights.  It is therefore expressly understood and agreed that, except for any representations or warranties expressly given by Assignor in Section 4 of this Agreement, Purchaser accepts the condition of the Patent Rights "as is," "where is" and "with all faults" without any implied representation, warranty or guarantee as to merchantability, fitness for a particular purpose, prospects for the Patent Rights, or as to the condition, scope, extent, type, attributes or value of such property, and Assignor hereby expressly disclaims any and all such implied representations, warranties or guarantees.  The representations and warranties set forth in this Agreement or in any schedule, exhibit or instrument delivered pursuant to this Agreement by the Assignor shall terminate upon the Closing, which termination shall be without prejudice to any claims of Purchaser for intentional fraud or willful misconduct.

## 5.     NO DUE DILIGENCE; OTHER CONTINGENCIES

Purchaser has completed its due diligence with respect to the Patent Rights.  There is no due diligence or similar contingency.  However, the Closing is contingent upon satisfaction, or waiver by Purchaser in Purchaser's sole discretion, of the following conditions:

5.1     there has been no material adverse change in any of the Patent Rights between the date of this Agreement and the Closing Date;

5.2     the Sale Order has been entered, and there has been no appeal filed or, if an appeal has been filed, no stay pending appeal has been issued;

5.3     Purchaser is satisfied that, as of the Closing Date, the representations and warranties of Assignor contained in Section 4 are true and correct;

5.4     Purchaser is reasonably satisfied that Assignor has received all approvals and authorizations required and has complied with all obligations of the Circuit

City Stores, Inc. Liquidating Trust Agreement dated as of November 1, 2010 by and between Circuit City Stores, Inc. and its affiliated debtors and Alfred H. Siegel, the liquidating trustee (the "**Liquidating Trust Agreement**");

5.5   Assignor has provided to Purchaser satisfactory evidence that (a) Assignor has caused each of the U.S. Patents not held in the name of the Debtors as of the date of this Agreement to be transferred to the Debtors, (b) such transfers are free and clear of all liens, and (c) the Bankruptcy Court has approved such transfers;

5.6   Assignor has provided to Purchaser a statement, in the form set forth in Treasury Regulation Section 1.1445-2(b)(2), reasonably satisfactory to Purchaser and sufficient to prevent withholding of any portion of the Purchase Price under Section 1445 of the Code;

5.7   Assignor has notified all relevant governmental authorities of the transactions contemplated by this Agreement in the form and manner required by such governmental authorities if the failure to make such notifications or receive any available tax clearance certificate ("**Tax Clearance Certificate**") could result in Purchaser being liable under applicable law for any Taxes of the Debtors. Before the Closing, Assignor shall provide evidence to Purchaser that (i) all Tax Clearance Certificates have been obtained and (ii) any Tax liabilities related thereto have been paid in full or otherwise satisfied; and

5.8   Assignor has complied with all of its other obligations under this Agreement.

**6.   COURT APPROVAL OF SALE**

The sale of the Patent Rights contemplated by this Agreement is subject to entry by the Bankruptcy Court of an order approving both (a) the transfer of the Patent Rights into the name of the Assignor (as contemplated by Section 5.5) and (b) the sale of Patent Rights to Purchaser as being free and clear of all Liens, such order to be in a form reasonably satisfactory to Purchaser (such order, the "**Sale Order**").

**7.   COVENANTS**

7.1   <u>Reasonable Efforts</u>.   Each of the parties hereto agrees to use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to satisfy the conditions set forth herein as soon as practicable (including commercially reasonable efforts necessary to obtain all transfers of the Patent Rights to the name of the Assignor and to obtain the Sale Order) which are necessary or desirable in connection with the transactions contemplated by this Agreement; provided, however, that Assignor shall be under no obligation under this Section to refrain from or postpone the closing of the Bankruptcy Case, appeal any adverse order of the Bankruptcy Court, commence or maintain any legal proceeding, or to incur any material cost or expense. No party hereto will take any action for the purpose of delaying, impairing or impeding the receipt of any required consent, authorization, order or approval or the making of any required filing or registration.

7.2     <u>Confidentiality</u>.  Each party acknowledges that the confidential information provided to it in connection with this Agreement and the consummation of the transactions contemplated hereby, is subject to the terms and conditions of those certain Non-Disclosure Agreements, the first by and between Purchaser and the Trustee, dated as of May 27, 2011 and the second by and among Purchaser, the Trustee and certain other parties, dated as of August 12, 2011.

7.3     <u>Exclusivity</u>.  Subject to the provisions of Section 7.4, from the date of this Agreement to the earlier of the Closing, or the date on which this Agreement is terminated in accordance with its terms, each of the Assignor and Trustee covenants and agrees that they will not, directly or indirectly, solicit, initiate or encourage the submission of inquiries, proposals or offers from any Person other than Purchaser or Purchaser's affiliates or representatives relating in any way to (a) make any investment in any of the Patent Rights, (b) make any acquisition of any direct control of any of the Patent Rights, (c) purchase any of the Patent Rights, or (d) enter into any lease, exchange, mortgage, pledge, transfer or other disposition of any of any of the Patent Rights (each, a "**Patent Acquisition Proposal**").  Subject to the provisions of Section 7.4, each of the Assignor and Trustee shall cause its managers, members, employees, investment bankers, attorneys, accountants and other agents ("**Representatives**"), to immediately cease all discussions and negotiations that have taken place prior to the date hereof, if any, with any Persons with respect to any Patent Acquisition Proposal.  Subject to the provisions of Section 7.4, each of the Assignor and Trustee covenants and agrees that in the event either of them or any of their Representatives receive any Patent Acquisition Proposal, they shall promptly (and in any event, within two Business Days) notify Purchaser of same.

7.4     <u>Bid Process</u>.  The offer set forth herein is a competing bid in accordance with the bidding procedures set forth by the Trustee.  If Assignor selects Purchaser's bid as the highest and best bid at the auction provided by the bidding procedures (the "**Auction**"), then Assignor shall seek entry of the Sale Order by the Bankruptcy Court authorizing the sale to Purchaser.  In the event that Purchaser is not the successful bidder at the Auction and the Purchaser's bid is not in the backup position as the second highest bid, the Purchaser, in its sole and absolute discretion, can elect to do the following (a) immediately terminate its obligations under this Agreement on written notice to Assignor, whereupon the Deposit shall be forthwith returned to Purchaser or (b) continue to participate as a potential buyer.  In the event that Purchaser's bid is the second highest bid at the Auction (the "**Backup Bid**"), then this offer shall remain in a backup position prepared to consummate the transactions contemplated by this Agreement in the event that the highest bidder (the "**Highest Bidder**") fails to do so in accordance with the terms of such Highest Bidder's purchase agreement.

7.5     <u>Maintenance of Patent Rights</u>.  Except as otherwise expressly provided in or contemplated by this Agreement (including actions taken to effect a transaction with the Highest Bidder, if the Highest Bidder is not the

Purchaser), on or prior to the Closing Date, Assignor may not, without the prior written consent of Purchaser:

    (a)    sell, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber, or release or waive any right with respect to any Patent Rights;

    (b)    fail to pay any required filing, processing, maintenance or other fee, and use commercially reasonable efforts to maintain the validity of the Debtors' rights in, to, or under any Patent Rights (including, for the avoidance of doubt, the payment of any maintenance fee for which the fee is payable (e.g., the payment window opens) on or prior to the Closing Date even if the surcharge date or final deadline for payment of such fee would be after the Closing Date);

    (c)    enter into any contract or agreement related to the Patent Rights; or

    (d)    agree, whether in writing or otherwise, to do any of the foregoing.

## 8. CLOSING

Subject to satisfaction, or waiver by Purchaser in its sole discretion, of all of the conditions set forth herein, the closing of the sale of the Patent Rights ("**Closing**") will occur on the fifth business day after entry of the Sale Order, or on such other date as the parties may mutually agree (the "**Closing Date**").

8.1    At the Closing, Purchaser will deliver or cause to be delivered to Assignor:

    (a)    the Purchase Price, in accordance with Section 3.2; and

    (b)    such instruments, duly executed by Purchaser, as reasonably requested by Assignor as may be necessary to confirm Purchase's acceptance of the Patent Rights.

8.2    At the Closing, Assignor will deliver or cause to be delivered to Purchaser:

    (a)    the Assignment of Patent Rights, duly executed by Assignor, and such other papers as Purchaser may reasonably regard as necessary or desirable for effecting completely the consummation of the transactions contemplated by this Agreement and/or fully perfecting and conveying unto Purchaser the benefit of the transactions contemplated hereby; provided, however, that Assignor shall be under no obligation under this Section to refrain from or postpone the closing of the Bankruptcy Case, appeal any adverse order of the Bankruptcy Court, commence or maintain any legal proceeding, or to incur any material cost or expense;

    (b)    all reasonably available files and records in Assignor's or any of Assignor's agents' possession related to the Patent Rights, including, without limitation, the following items to the extent in the possession of Assignor:

(1)  For each item of the Patent Rights that is an issued patent, (i) the original ribbon copy or certificate issued by the applicable government, (ii) the original inventor assignment agreements and copies of all other assignments, and (iii) a copy of the Docket for such Patent Right; and

(2)  For each item of the Patent Rights that is a patent application, (i) a copy of the patent application, as filed, (ii) if unpublished, a copy of the filing receipt and the non-publication request, (iii) the original inventor assignment agreements and copies of all other assignments, (iv) a copy of the Docket for such Patent Right, and (v) all files, documents and relating to the investigation, evaluation, preparation, prosecution, maintenance, defense, filing, issuance, registration, assertion or enforcement of such patent applications;

(c)  Any correspondence, filings or other documents pursuant to which any Debtor has (i) put a third party on notice of actual or potential infringement of any of the U.S. Patents or Foreign Patents, (ii) formally invited any third party to enter into a license under any of the U.S. Patents or Foreign Patents, or (iii) initiated any enforcement action with respect to any of the U.S. Patents or Foreign Patents; and

(d)  such other instruments, duly executed by Assignor, as reasonably requested by Purchaser as may be necessary to confirm Assignor's transfer of the Patent Rights to Purchaser.

## 9.  TERMINATION

9.1  This Agreement may be terminated prior to the Closing as follows:

(a)  By mutual consent;

(b)  By either party, if (i) any of the conditions to the obligations of such party set forth in this Agreement shall have become incapable of fulfillment other than as a result of a breach by such party of this Agreement or (ii) the other party shall have materially breached this Agreement;

(c)  By either party, if the Closing shall not have occurred on or prior to 11:59 p.m. Eastern time on October 14, 2011; provided that neither Party may terminate this Agreement pursuant to this Section 9.1(c) if such Party has breached any provision of this Agreement, and provided further that Purchaser shall have the right to extend the date set forth this Section 9.1(c) if the Sale Order has not been granted as of such date.

9.2  In the event that this Agreement is validly terminated in accordance with this Section 9, this Agreement shall terminate and each of the parties shall be relieved of its respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Assignor; provided however, that the obligations of the parties set forth in this Section 9.2, Section 7.2, and Section 11 hereof

shall survive any termination of this Agreement and shall be enforceable hereunder. Except as set forth in the following sentence, if this Agreement terminates in accordance with its provisions Assignor shall cause the Firm to return the Deposit to Purchaser within three (3) Business Days following the date of such termination. If this Agreement is terminated by the Purchaser in breach of this Agreement, or is terminated by Assignor due to a material breach of this Agreement by Purchaser, the Purchaser shall forfeit the Deposit and Assignor shall be entitled to obtain the Deposit from the Firm (regardless of whether the Purchaser delivered the highest bid or the Backup Bid). Such forfeiture of the Deposit shall constitute liquidated damages and shall be Assignor's exclusive remedy for any such breach by Purchaser (regardless of whether the Purchaser delivered the highest bid or the Backup Bid). In the event of any dispute over any funds in such escrow, the Firm shall interplead such disputed funds with the Bankruptcy Court.

**10. TAX MATTERS**

10.1    Transfer Taxes. Purchaser shall be responsible for the payment of all Transfer Taxes associated with the purchase of the Patent Rights, if any. The Debtors, Assignor and their respective affiliates shall cooperate in filing any Tax Returns required to be filed in connection with any Transfer Taxes payable in connection with the transactions contemplated herein, or as may be necessary to permit any Transfer Tax to be assessed and paid on or prior to the Closing in accordance with any available pre sale filing procedure, as well as to obtain any exemption or refund of any such Transfer Tax. Assignor acknowledges that Purchaser shall not be responsible for the payment of any Taxes imposed on the Debtors or the Trustee under any U.S. federal, state or foreign Tax laws applicable to any income or proceeds received or realized by Assignor in respect of any consideration paid by Purchaser hereunder.

10.2    Prorations. All property Taxes or similar ad valorem obligations levied with respect to the Patent Rights for any taxable period that begins before and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between the Debtors and Purchaser as of 12:01 a.m. (California time) on the day following the Closing Date. The Debtors' portion of such Taxes shall be determined by multiplying the aggregate amount of such Taxes by a fraction, the numerator of which shall be the number of days from and including January 1 to, and including, the Closing Date, and the denominator of which shall be 365. Purchaser's share of such Taxes shall be the aggregate amount of all such bills less the Debtors' share. If the exact amount of any personal property Taxes is not known on the Closing Date, the apportionment shall be based upon a reasonable amount, without subsequent adjustment. Any refund of Taxes paid by the Debtors or Assignor, on the one hand, or the Purchaser, on the other, and received by the other party, shall promptly be paid over to such party.

10.3    Purchase Price Allocation. Within sixty (60) days after the Closing Date, Purchaser shall deliver to the Trustee an allocation detailing the allocation of the Purchase Price among the Patent Rights. If required by applicable law,

Purchaser and the Debtors will each file an Internal Revenue Service Form 8594 "Asset Acquisition Statement under Section 1060" at the times and in the manner as required by Treasury Regulation 1.1060-1 consistent with such certificate of allocation. The allocation will be conclusive and binding on the parties for all Tax purposes, including reporting and disclosure requirements under the Code and any foreign, state, or local Tax authority, unless otherwise required pursuant to a final determination within the meaning of Section 1313 of the Code.

**11.    MISCELLANEOUS**

11.1    <u>Expenses</u>.  Each of Assignor and Purchaser shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other Transaction Document and the consummation of the sale of the Patent Rights and the transactions contemplated hereby.

11.2    <u>Submission to Jurisdiction; Consent to Service of Process</u>.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the sale of the Patent Rights, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of California and any appellate court thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.7.

11.3    <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

11.4    <u>Entire Agreement</u>.  This Agreement (including the Schedules and Exhibits hereto and the Non-Disclosure Agreements referenced in Section 7.2) represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.

A/74488688.3

11.5   <u>Amendments and Waivers</u>. This Agreement may be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by both parties. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

11.6   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia applicable to contracts made and performed in Virginia, and, to the extent applicable, the Bankruptcy Code.

11.7   <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail (and no notice of failure of delivery was received within a reasonable time after such message was sent) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e mail addresses (or to such other address, facsimile number or e mail address as a party may have specified by notice given to the other party pursuant to this provision):

If to Assignor, to:

Circuit City Stores, Inc. Liquidating Trust
200 Westgate Parkway
Suite 100
Richmond, VA 23233
Attention: Jeff McDonald
E mail: jeffmcdonald@ccltrust.com

With a copy (which shall not constitute notice) to:

A/74488688.3

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, CA  90067-4100
Attention:  Andrew W. Caine, Esq.
Facsimile:  (310) 201-0760
E mail:  acaine@pszjlaw.com

If to Purchaser, to:

Innovative Video Security LLC
c/o Bingham McCutchen LLP
2020 K Street NW
Washington, DC 20006-1806
Attn: Mara Glaser McCahan
Facsimile: 202-373-6001
E mail: mara.glaser-mccahan@bingham.com

With a copy (which shall not constitute notice) to:

Bingham McCutchen LLP
2020 K Street NW
Washington, DC 20006-1806
Attn: Brent Salmons
Facsimile: 202-373-6001
E mail:  brent.salmons@bingham.com

11.8    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the sale of the Patent Rights contemplated by this Agreement is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the sale of the Patent Rights contemplated by this Agreement is consummated as originally contemplated to the greatest extent possible.

11.9    Third Party Beneficiaries.  No Person (other than the parties and their respective successors and affiliates) shall have or be construed to have any legal or equitable right, remedy or claim under or in respect of or by virtue of this Agreement or any provision herein.

11.10   Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Assignor, on the one hand, or Purchaser, on the other hand (by operation of law or otherwise), without the prior written

A/74488688.3

consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign any or all of its rights, interests, and obligations hereunder to one or more of its affiliates, provided, further, however, no such assignment shall relieve Purchaser of its obligations hereunder.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

11.11  Capacity.    Assignor's covenants, representations and warranties herein (including as made or qualified in the Schedules hereto) are made by the Assignor in the capacity of a liquidating trust, without personal liability to the trustee thereof, other than with respect to fraudulent or criminal activity with respect to the sale of the Patent Rights contemplated by this Agreement.

11.12  Counterparts.  This Agreement may be executed in one or more counterparts (including by facsimile or electronic mail), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

A/74488688.3

AGREED TO BY:

**Innovative Video Security LLC**


By_____

Name: _____

Title: _____


**Acknowledged, Agreed, and Accepted**:

Circuit City Stores, Inc. Liquidating Trust
through Alfred H. Siegel, as trustee of the
Circuit City Stores, Inc. Liquidating Trust,
and not in any individual capacity

_____  8/18/2011

**AGREED TO BY:**

**Innovative Video Security LLC**

By: *Mara Glaser McCal*

Name: Mara Glaser McCahen

Title: Authorized Signatory

**Acknowledged, Agreed, and Accepted:**

Circuit City Stores, Inc. Liquidating Trust
through Alfred H. Siegel, as trustee of the
Circuit City Stores, Inc. Liquidating Trust,
and not in any individual capacity

## Exhibit A

## U.S. Patents

| Patent or application no. | Country | Filing Date | Title of Patent and First Named Inventors |
|---|---|---|---|
| 6078328 | US | 06/08/1998 | Compressed video graphics system and methodology<br><br>Schumann, Robert W. |
| 6285774 | US | 06/08/1998 | System and methodology for tracing to a source of unauthorized copying of prerecorded proprietary material, such as movies<br><br>Schumann, Robert W. |
| 6912661 | US | 01/15/1998 | Method and apparatus for encrypting and for decrypting data arranged in a data sector<br><br>Christopher, Lauren Ann |
| 6775915 | US | 08/13/2002 | Method and device for determining adequacy of space for television sets<br><br>Stephens, Robert |
| 6738905 | US | 04/14/1999 | Conditional access via secure logging with simplified key management<br><br>Kravitz, David W. |
| 6538969 | US | 06/04/1999 | System and method for implementing open and closed file systems on a storage medium<br><br>Vitkus, Richard A. |
| 6829618 | US | 06/04/1999 | Disc layout and optimization process<br><br>Abraham, Thomas D. |
| 7698570 | US | 10/11/2006 | Digital content distribution system and method<br><br>Schumann, Robert Wilhelm |
| 6658059 | US | 01/18/2000 | Motion field modeling and |

| | | | estimation using motion transform<br><br>Iu, Siu-Leong |
|---|---|---|---|
| 6975728 | US | 06/22/2000 | Hierarchical key management<br><br>Eye, Randy |
| 6957344 | US | 07/10/2000 | Manufacturing trusted devices<br><br>Goldshlag, David Moshe |
| 7464274 | US | 08/08/2005 | Manufacturing trusted devices<br><br>Goldshlag, David Moshe |
| 6628715 | US | 01/18/2000 | Method and apparatus for estimating optical flow<br><br>Iu, Siu-Leong |
| 6865747 | US | 03/31/2000 | High definition media storage structure and playback mechanism<br><br>Mercier, Guillaume |
| 6901514 | US | 06/01/2000 | Secure oblivious watermarking using key-dependent mapping functions<br><br>Iu, Siu-Leong |
| 09/763917 | US | 07/03/2001 | Watermarking system and methodology for digital multimedia content<br><br>Iu, Siu-Leong |
| 6240401 | US | 06/05/1998 | System and method for movie transaction processing<br><br>Oren, Joseph Eugene |
| 6907127 | US | 07/10/2000 | Hierarchical key management encoding and decoding<br><br>Kravitz, David William |
| 7170941 | US | 05/29/2002 | Temporal compression<br><br>Shives, Michael |
| 5822291 | US | 11/21/1995 | Mass storage element and drive unit therefor |

| | | | Brindze, Paul L. |
|---|---|---|---|
| 7162642 | US | 06/15/2001 | Digital content distribution system and method<br><br>Schumann, Robert Wilhelm |
| 7203955 | US | 12/22/2004 | High definition media storage structure and playback mechanism<br><br>Mercier, Guillaume |
| 6975728 | US | 06/22/2000 | Hierarchical Key Management<br><br>Eye, Randy |
| 2007/0140307 | US | 02/28/2007 | High Definition Media Storage Structure and Playback Mechanism<br><br>Mercier, Guillaume |
| 2008/0103913 | US | 10/26/2006 | System and method for guided sales<br><br>Leach, Brian Robert |

A/74488688.3

**Exhibit B**

**Foreign Patents**

| Patent or application no. | Country | Filing Date | Title of Patent and First Named Inventors |
|---|---|---|---|
| EP1086585 | EP | 06/07/1999 | System and methodology for tracing to a source of unauthorized copying of prerecorded proprietary material, such as movies  Schumann, Robert W. |
| JP4397123 | JP | 06/07/1999 | System and methodology for tracing to a source of unauthorized copying of prerecorded proprietary material, such as movies  Schumann, Robert W. |
| DE69806124 | DE | 01/15/1998 | Method and apparatus for encrypting and for decrypting data arranged in a data sector  Christopher, Lauren Ann |
| DK0954774 | DK | 01/15/1998 | Method and apparatus for encrypting and for decrypting data arranged in a data sector  Artigalas, Max |
| AR001408 | AR | 03/22/1996 | Interactive transaction management multimedia system  Brindze, Paul L. |
| CO4520177 | CO | 03/22/1996 | Mass storage element and drive unit therefor  Brindze, Paul L. |
| LV12057 | LV | 03/21/1996 | Interactive transaction management multimedia system  Brindze, Paul L. |
| MD980067 | MD | 03/21/1996 | Multimedia interactive system for transactions control  Brindze, Paul L. |

A/74488688.3

| | | | |
|---|---|---|---|
| MX9707261 | MX | 09/23/1997 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| OA10509 | OA | 09/19/1997 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| RO118098 | RO | 03/21/1996 | Multimedia interactive transactioning system<br><br>Brindze, Paul L. |
| TR97100797 | TR | 03/21/1996 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| ZA9602300 | ZA | 03/22/1996 | Interactive multi-media system<br><br>Brindze, Paul L. |
| CA2319538 | CA | 02/19/1999 | Information access control system and method<br><br>Kravitz, David W. |
| EP1057299 | EP | 02/19/1999 | Information access control system and method<br><br>Kravitz, David W. |
| ZA9901362 | ZA | 02/19/1999 | Information access control system and method.<br><br>Kravitz, David W. |
| EE9700322 | EE | 03/21/1996 | Interactive multimedia system for organizing transactions<br><br>Brindze, Paul L. |
| HU9900915 | HU | 03/21/1996 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| JP11502661 | JP | 03/21/1996 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| NO974351 | NO | 09/22/1997 | Interactive transaction control multi-media system |

| | | | Brindze, Paul L. |
|---|---|---|---|
| PL322408 | PL | 03/21/1996 | Interactive multimedia device, and a storage component for the interactive media device and method for producing an element of storage<br><br>Brindze, Paul L. |
| SI9620057 | SI | 03/21/1996 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| SK128497 | SK | 03/21/1996 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| TW432852 | TW | 02/20/1999 | Information access control system and method<br><br>Kravitz, David W. |
| AU4417199 | AU | 06/04/1999 | System and method for implementing open and closed file systems on a storage medium<br><br>Vitkus, Richard 1. |
| AT219583 | AT | 01/15/1998 | Method and apparatus for encrypting and for decrypting data arranged in a data sector<br><br>Christopher, Lauren Ann |
| AU6209998 | AU | 01/15/1998 | Method and apparatus for encrypting and for decrypting data arranged in a data sector<br><br>Christopher, Lauren Ann |
| EP0855638 | EP | 01/24/1997 | Method and apparatus for encrypting and for decrypting data arranged in a data sector<br><br>Christopher, Lauren Ann |
| EP0954774 | EP | 01/15/1998 | Method and apparatus for encrypting and for decrypting data arranged in a data sector |

| | | | Christopher, Lauren Ann |
|---|---|---|---|
| AU4317999 | AU | 06/07/1999 | System and methodology for tracing to a source of unauthorized copying of prerecorded proprietary material, such as movies<br><br>Schumann, Robert W. |
| AU2766599 | AU | 02/19/1999 | Information access control system and method<br><br>Kravitz, David W. |
| AU2959700 | AU | 01/05/2000 | Content distribution system and method<br><br>Schulman, Robert |
| AU3343400 | AU | 01/05/2000 | Digital content distribution system and method<br><br>Schumann, Robert |
| AU4408499 | AU | 06/07/1999 | Compressed video graphics sustem and methodology<br><br>Schumann, Robert |
| AU5371096 | AU | 03/21/1996 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| BG101987 | BG | 10/22/1997 | Interactive multimedia system for transactive control<br><br>Brindze, Paul L. |
| BR9607978 | BR | 03/21/1996 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| CA2215830 | CA | 03/21/1996 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| CZ9702995 | CZ | 03/21/1996 | Personalized control of transactions in interactive multi-media system |

| | | | Brindze, Paul L. |
|---|---|---|---|
| EP0815503 | EP | 03/21/1996 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| IL117565 | IL | 03/20/1996 | Interactive multimedia system<br><br>Brindze, Paul L. |
| LT97165 | LT | 10/22/1997 | Interactive transaction management multimedia system<br><br>Brindze, Paul L. |
| CA2437205 | CA | 08/13/2003 | Method and device for determining adequacy of space for television sets<br><br>Stephens, Robert |
| CA2566052 | CA | 10/30/2006 | System and method for guided sales<br><br>Janzer, Lisa Hendrickson |

A/74488688.3

<u>Exhibit C</u>

<u>**Form of Assignment of Patent Rights**</u>

This Assignment of Patent Rights is entered into pursuant to that certain Agreement dated as of August __, 2011 (the "**Purchase Agreement**") by and between Circuit City Stores, Inc. Liquidating Trust and Assignee (as defined below) and shall remain subject in all respects to the terms and conditions set forth therein and in the Sale Order. Without limitation, the Assignor (as defined below) and the Assignee hereby acknowledge and agree that the provisions of this Assignment of Patent Rights shall not affect or modify the scope or duration of any representations, warranties, covenants, terms and provisions of the Purchase Agreement, and that in the event of a conflict between the terms and provisions of this Assignment of Patent Rights and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall prevail, govern and control in all respects. All capitalized but undefined terms used herein shall have the meaning given such terms in the Purchase Agreement.

For good and valuable consideration, the receipt of which is hereby acknowledged, Circuit City Stores, Inc., Circuit City Stores West Coast, Inc., Circuit City Purchasing Company, LLC, CC Aviation, LLC, CC Distribution Company of Virginia, Inc., Circuit City Stores PR, LLC, Circuit City Properties LLC, Orbyx Electronics, LLC, Kinzer Technology, LLC, Courchevel, LLC, Abbott Advertising Agency, Inc., Mayland MN, LLC, Papsco Designs, Inc., Sky Venture Corp., XSStuff, LLC, and PRAHS, Inc. acting by and through Circuit City Stores, Inc. Liquidating Trust, its Chapter 11 trustee ("**Assignor**"), does hereby sell, assign, transfer, and convey to Innovative Video Security LLC, a Delaware limited liability company, having an address at _____ ("**Assignee**"), or its designees, all right, title, and interest of Assignor that exist today and may exist in the future in and to any and all of the Patent Rights.

Assignor hereby certifies to Assignee that (a) the representations and warranties contained in Section 4 of the Purchase Agreement are true and correct in all respect, on and as of the date hereof, and (b) Assignor has performed and complied with all agreements, obligations and conditions contained in the Purchase Agreement that are required to be performed or complied with by the Assignor on or prior to the date hereof.

Assignor hereby authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Patent Rights in the name of Assignee, as the assignee to the entire interest therein.

Assignor will, at the reasonable request of Assignee and without demanding any further consideration therefore, do all things necessary, proper, or advisable, including without limitation, the execution, acknowledgment, and recordation of

A/74488688.3

specific assignments, oaths, declarations, and other documents on a country-by-country basis, to assist Assignee in obtaining, perfecting, sustaining, and/or enforcing the Patent Rights. Such assistance will include providing, and obtaining from the respective inventors, prompt production of pertinent facts and documents, giving of testimony, execution of petitions, oaths, powers of attorney, specifications, declarations or other papers, and other assistance reasonably necessary for filing patent applications, complying with any duty of disclosure, and conducting prosecution, reexamination, reissue, interference or other priority proceedings, opposition proceedings, cancellation proceedings, public use proceedings, infringement or other court actions and the like with respect to the Patent Rights.

The terms and conditions of this Assignment of Patent Rights will inure to the benefit of Assignee, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at _____ on _____.

**ASSIGNOR:**

**Circuit City Stores, Inc. acting by and through Circuit City Stores, Inc. Liquidating Trust**

By:      _____
Name:  _____
Title:    _____

## ATTESTATION OF SIGNATURE PURSUANT TO 28 U.S.C. § 1746

The undersigned witnessed the signature of _____ to the above Assignment of Patent Rights on behalf of Circuit City Stores, Inc. acting by and through Circuit City Stores, Inc. Liquidating Trust and makes the following statements:

1.      I am over the age of 18 and competent to testify as to the facts in this Attestation block if called upon to do so.

2.      _____ is personally known to me (or proved to me on the basis of satisfactory evidence) and appeared before me on _____ __, 2011 to execute the above Assignment of Patent Rights on behalf of Circuit City Stores, Inc. acting by and through Circuit City Stores, Inc. Liquidating Trust.

A/74488688.3

3. _____ subscribed to the above Assignment of Patent Rights on behalf of Circuit City Stores, Inc. acting by and through Circuit City Stores, Inc. Liquidating Trust.

I declare under penalty of perjury under the laws of the United States of America that the statements made in the three (3) numbered paragraphs immediately above are true and correct.

EXECUTED on _____(date)

_____

Print Name: _____

# EXHIBIT B

**(Trust's Letters to Ziffren)**

```
                    ***  TX REPORT  ***
                    ************************


        TRANSMISSION OK

        TX/RX NO                2985
        CONNECTION TEL                13105537068
        SUBADDRESS
        CONNECTION ID
        ST. TIME                01/18 11:15
        USAGE T                 02'24
        PGS. SENT               8
        RESULT                  OK
```

# PACHULSKI STANG ZIEHL & JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 Santa Monica Blvd.
13th Floor
Los Angeles, California  90067-4100
**Tel: 310/277-6910**
Fax: 310/201-0760

## FACSIMILE COVERSHEET

**DATE:**    January 18, 2012

| RECIPIENT | FAX NO. | PHONE NO. |
|---|---|---|
| Kenneth Ziffren, Esq<br>Ziffren Brittenham LLP | (310) 553-7068 | |

**FROM:**    Andrew W. Caine          **PHONE:**    310.277.6910

**RE:**    In re Circuit City Stores

| CLIENT/MATTER NUMBER:  12304.003 | |
|---|---|
| NUMBER OF PAGES WITH COVER PAGE: 8 | ORIGINAL WILL NOT FOLLOW |

**MESSAGE:**

Please see attached correspondence.

```
                         ***   TX REPORT   ***
                         ***********************


        TRANSMISSION OK

        TX/RX NO              2922
        CONNECTION TEL                13105537068
        SUBADDRESS
        CONNECTION ID
        ST. TIME              12/09 15:59
        USAGE T               01'44
        PGS. SENT             5
        RESULT                OK
```

## PACHULSKI STANG ZIEHL JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 Santa Monica Blvd.
13th Floor
Los Angeles, California 90067-4100
Tel: 310/277-6910
Fax: 310/201-0760

# FACSIMILE COVERSHEET

**DATE:**    December 9, 2011

| RECIPIENT | FAX NO. | PHONE NO. |
|---|---|---|
| Kenneth Ziffren, Esq<br>Ziffren Brittenham LLP | (310) 553-7068 | |

**FROM:**   Andrew W. Caine        **PHONE:**   310.277.6910

**RE:**     In re Circuit City Stores

| CLIENT/MATTER NUMBER:  12304.003 | |
|---|---|
| NUMBER OF PAGES WITH COVER PAGE: 5 | ORIGINAL WILL NOT FOLLOW |

**MESSAGE:**

Please see attached correspondence.



**PACHULSKI
STANG
 З
ZIEHL
JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK
788 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

January 17, 2012          310.772.2357
                         acaine@pszjlaw.com

**By Fax:  310 553 7068**

Kenneth Ziffren, Esq.
Ziffren Brittenham LLP
1801 Century Park West
Los Angeles, California  90067

> **Re:**    In re: Circuit City Stores, Inc., et al.,
>            United States Bankruptcy Court for the Eastern
>            District of Virginia, Richmond Division
>            (Case No. 08-35653)

Dear Ken:

Happy New Year.  I hope that all is quite well with you.

At your convenience, I will look forward to hearing from you regarding my letter of December 8, 2011.  I have enclosed a copy of the letter for your ease of reference.  Thanks.

Very truly yours,

Andrew W. Caine

cc:  Richard Pachulski, Esq.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK
788 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

Andrew W. Caine          December 8, 2011          310.772.2357
                                                   acaine@pszjlaw.com

**By Fax: 310 553 7068**

Kenneth Ziffren, Esq.
Ziffren Brittenham LLP
1801 Century Park West
Los Angeles, California 90067

Re:    In re: Circuit City Stores, Inc., et al.,
       United States Bankruptcy Court for the Eastern
       District of Virginia, Richmond Division
       (Case No. 08-35653)

Dear Ken:

As counsel to the Circuit City Stores, Inc. Liquidating Trust (the "Trust"), I am writing to you, as former principal or representative of Zoom Television, Inc. ("ZTV"), regarding the distribution of the sale proceeds of certain intellectual property formerly owned by a limited partnership in which ZTV was a limited partner. The intellectual property was sold by the Trust on or about September 8, 2011 under order of the Bankruptcy Court (the "Bankruptcy Court") in the above-captioned case (the "Case").

In 1995, Circuit City Stores, Inc. ("CCS") and ZTV, a corporation controlled by or affiliated with your firm or its principals, formed a joint venture for the purpose of owning, developing, marketing and commercially exploiting the DivX technology. The joint venture entity was Zoom Partners, L.P., a Delaware limited partnership (the "Partnership").

When the Case was commenced on November 10, 2008, the Partnership consisted of Sky Venture Corporation ("SVC"), as the sole general partner, and CCS and ZTV, as the sole limited partners. The Partnership was not made a debtor in the Case, and dissolved on the commencement date of the Case by reason of the general partner's participation in the bankruptcy filing.

DOCS_LA:246978.2 12304-003



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

Kenneth Ziffren, Esq.
November 4, 2011
Page 2

      Notwithstanding its dissolution, the Partnership retained title to certain patents and related intellectual property (the "Patent Rights") throughout the Case and following confirmation of CCS's chapter 11 plan of liquidation. After determining that there was some residual value in the Patent Rights, the Trust conducted a marketing process for the sale of these assets. As a result of this process, the Trust entered into an asset purchase agreement with Innovative Video Security LLC (the "Buyer") providing for the sale of the Patent Rights for $6,025,000, subject to Bankruptcy Court approval (the "Agreement"). After entering into the agreement and confirming your non-objection to the sale, the Trust obtained an order of the Bankruptcy Court[1] on or about August 29, 2011, authorizing the Trust to cause the sale and transfer of the Patent Rights from the Partnership to the Trust and from the Trust to Innovative Video Security LLC. This transaction was consummated at the closing of the Agreement on or about September 8, 2011.

Section 4 of the Order provides as follows:

      At the closing of the sale of the Patent Rights to the Buyer (the "Closing"), subject to the terms and conditions of the Agreement, except as may be expressly provided therein, the Buyer shall acquire all right, title and interest in the Patent Rights free and clear of all Encumbrances, with all such Encumbrances, if any, of any kind or nature whatsoever attaching to the net proceeds of the sale (the "Proceeds") ultimately attributable to the property against or in which the holder of an Encumbrance claims or may claim an interest in the order of their priority, with the same validity, force and effect which they now have, subject to any claims and defenses the Trust, the Debtors and/or the bankruptcy estates may possess with respect thereto. *Subject to the foregoing, the Proceeds shall be deposited into a segregated account and administered and distributed by the Trust to the creditors and interest holders of the LP in accordance with applicable nonbankruptcy law.* [Italics added.]

---

[1] *See* Order Approving Sale of Certain Patents and Other Intellectual Property and Related Assets as Being Free and Clear of All Liens, Claims and Interests, entered August 29, 2011 (the "Order"), a copy of which is attached.

DOCS_LA:246978.2 12304-003



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Kenneth Ziffren, Esq.
November 4, 2011
Page 3

　　　　In accordance with the Order, the Proceeds were deposited into a segregated account and, at this time, the Trust would like to proceed with the administration and distribution of the Proceeds to creditors and interest holders in accordance with applicable nonbankruptcy law. The Agreement of Limited Partnership of the Partnership dated May 5, 1995, as amended (the "Partnership Agreement"), provides:

> [T]he Liquidator [*i.e.*, the Liquidating Trust, as successor to SVC] shall liquidate the assets of the Partnership, and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:
>
> (i)　　First, to the payment of the Partnership's debts and obligations to its creditors (excluding loans to the Partnership by Partners), including sales commissions and other expenses incident to the sale of the assets of the Partnership.
>
> (ii)　　Second, to the establishment of and additions to such Reserves as the Liquidator may deem necessary or appropriate.
>
> (iii)　　*Third, to the payment of the Partnership's debts and obligations to the Partners in their capacity as creditors (including loans to the Partnership by Partners,* pro rata according to the relative amounts of such unpaid loans).
>
> (iv)　　*Fourth, to the Partners, to the extent of and in proportion to their respective positive Capital Account balances* (adjusted for all distributions and allocations pursuant to Article IV for all periods ending on or before the date of the distribution), in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2).[2]

---

[2] Partnership Agreement, Sec. 15.3(c) (italics added).

PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Kenneth Ziffren, Esq.
November 4, 2011
Page 4

  Our understanding is that ZTV is no longer in existence and, as a result, there is substantial doubt as to whether ZTV is able to pursue any claims or interests it may have in the Proceeds, and if so, what individuals or persons (if any) have the authority to assert such claims on ZTV's behalf.   Furthermore, from a review of the related documents and discussions with former officers of the debtors, we understand that during the term of the Partnership CCS made well in excess of $100 million in advances or loans to the Partnership in order to satisfy the Partnership's debts as they came due, while ZTV did not make any advances or other contributions beyond its initial equity contribution.  As a result, it appears that under the Partnership Agreement's liquidation priority scheme (in which loans to Partners are to be repaid in full before Capital Account balances), all of the net proceeds from the sale of the Partnership's assets would go to CCS.

  We look forward to discussing this with you at your earliest convenience.

     Very truly yours,

     Andrew W. Caine

cc: Gary Stiffelman, Esq.
  Richard Pachulski, Esq.
  David Barton, Esq.

DOCS_LA:246978.2 12304-003



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON,DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

Andrew W. Caine          December 8, 2011          310.772.2357
                                                    acaine@pszjlaw.com

**By Fax:  310 553 7068**

Kenneth Ziffren, Esq.
Ziffren Brittenham LLP
1801 Century Park West
Los Angeles, California  90067

     Re:     In re: Circuit City Stores, Inc., et al.,
             United States Bankruptcy Court for the Eastern
             District of Virginia, Richmond Division
             (Case No. 08-35653)

Dear Ken:

        As counsel to the Circuit City Stores, Inc. Liquidating Trust
(the "Trust"), I am writing to you, as former principal or
representative of Zoom Television, Inc. ("ZTV"), regarding the
distribution of the sale proceeds of certain intellectual property
formerly owned by a limited partnership in which ZTV was a
limited partner.  The intellectual property was sold by the Trust on
or about September 8, 2011 under order of the Bankruptcy Court
(the "Bankruptcy Court") in the above-captioned case (the "Case").

        In 1995, Circuit City Stores, Inc. ("CCS") and ZTV, a
corporation controlled by or affiliated with your firm or its
principals, formed a joint venture for the purpose of owning,
developing, marketing and commercially exploiting the DivX
technology.   The joint venture entity was Zoom Partners, L.P., a
Delaware limited partnership (the "Partnership").

        When the Case was commenced on November 10, 2008, the
Partnership consisted of Sky Venture Corporation ("SVC"), as the
sole general partner, and CCS and ZTV, as the sole limited partners.
The Partnership was not made a debtor in the Case, and dissolved on
the commencement date of the Case by reason of the general
partner's participation in the bankruptcy filing.

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK
788 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

DOCS_LA:246978.2 12304-003

PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

Kenneth Ziffren, Esq.
November 4, 2011
Page 2

       Notwithstanding its dissolution, the Partnership retained title to certain patents and related intellectual property (the "Patent Rights") throughout the Case and following confirmation of CCS's chapter 11 plan of liquidation. After determining that there was some residual value in the Patent Rights, the Trust conducted a marketing process for the sale of these assets. As a result of this process, the Trust entered into an asset purchase agreement with Innovative Video Security LLC (the "Buyer") providing for the sale of the Patent Rights for $6,025,000, subject to Bankruptcy Court approval (the "Agreement"). After entering into the agreement and confirming your non-objection to the sale, the Trust obtained an order of the Bankruptcy Court[1] on or about August 29, 2011, authorizing the Trust to cause the sale and transfer of the Patent Rights from the Partnership to the Trust and from the Trust to Innovative Video Security LLC. This transaction was consummated at the closing of the Agreement on or about September 8, 2011.

Section 4 of the Order provides as follows:

       At the closing of the sale of the Patent Rights to the Buyer (the "Closing"), subject to the terms and conditions of the Agreement, except as may be expressly provided therein, the Buyer shall acquire all right, title and interest in the Patent Rights free and clear of all Encumbrances, with all such Encumbrances, if any, of any kind or nature whatsoever attaching to the net proceeds of the sale (the "Proceeds") ultimately attributable to the property against or in which the holder of an Encumbrance claims or may claim an interest in the order of their priority, with the same validity, force and effect which they now have, subject to any claims and defenses the Trust, the Debtors and/or the bankruptcy estates may possess with respect thereto. *Subject to the foregoing, the Proceeds shall be deposited into a segregated account and administered and distributed by the Trust to the creditors and interest holders of the LP in accordance with applicable nonbankruptcy law.* [Italics added.]

---

[1] *See* Order Approving Sale of Certain Patents and Other Intellectual Property and Related Assets as Being Free and Clear of All Liens, Claims and Interests, entered August 29, 2011 (the "Order"), a copy of which is attached.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Kenneth Ziffren, Esq.
November 4, 2011
Page 3

     In accordance with the Order, the Proceeds were deposited into a segregated account and, at this time, the Trust would like to proceed with the administration and distribution of the Proceeds to creditors and interest holders in accordance with applicable nonbankruptcy law. The Agreement of Limited Partnership of the Partnership dated May 5, 1995, as amended (the "Partnership Agreement"), provides:

> [T]he Liquidator [*i.e.*, the Liquidating Trust, as successor to SVC] shall liquidate the assets of the Partnership, and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:
>
> (i)    First, to the payment of the Partnership's debts and obligations to its creditors (excluding loans to the Partnership by Partners), including sales commissions and other expenses incident to the sale of the assets of the Partnership.
>
> (ii)    Second, to the establishment of and additions to such Reserves as the Liquidator may deem necessary or appropriate.
>
> (iii)    *Third, to the payment of the Partnership's debts and obligations to the Partners in their capacity as creditors (including loans to the Partnership by Partners,* pro rata according to the relative amounts of such unpaid loans).
>
> (iv)    *Fourth, to the Partners, to the extent of and in proportion to their respective positive Capital Account balances* (adjusted for all distributions and allocations pursuant to Article IV for all periods ending on or before the date of the distribution), in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2).[2]

---

[2] Partnership Agreement, Sec. 15.3(c) (italics added).

DOCS_LA:246978.2 12304-003

PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Kenneth Ziffren, Esq.
November 4, 2011
Page 4

Our understanding is that ZTV is no longer in existence and, as a result, there is substantial doubt as to whether ZTV is able to pursue any claims or interests it may have in the Proceeds, and if so, what individuals or persons (if any) have the authority to assert such claims on ZTV's behalf.  Furthermore, from a review of the related documents and discussions with former officers of the debtors, we understand that during the term of the Partnership CCS made well in excess of $100 million in advances or loans to the Partnership in order to satisfy the Partnership's debts as they came due, while ZTV did not make any advances or other contributions beyond its initial equity contribution.  As a result, it appears that under the Partnership Agreement's liquidation priority scheme (in which loans to Partners are to be repaid in full before Capital Account balances), all of the net proceeds from the sale of the Partnership's assets would go to CCS.

We look forward to discussing this with you at your earliest convenience.

Very truly yours,

Andrew W. Caine

cc:   Gary Stiffelman, Esq.
       Richard Pachulski, Esq.
       David Barton, Esq.

# EXHIBIT C

## (LP Agreement)

AGREEMENT OF LIMITED PARTNERSHIP

OF

ZOOM PARTNERS, L.P.

Dated as of May 5, 1995

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT OF LIMITED PARTNERSHIP HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  THE INTERESTS ARE BEING SOLD IN RELIANCE UPON EXEMPTIONS FROM SUCH REGISTRATION OR QUALIFICATION REQUIREMENTS.  SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

Page

### ARTICLE I
### DEFINITIONS

### ARTICLE II
### ORGANIZATIONAL MATTERS

| | | |
|---|---|---|
| 2.1 | Organization of Partnership | 8 |
| 2.2 | Name | 8 |
| 2.3 | Purpose | 8 |
| 2.4 | Principal Office; Registered Office | 8 |
| 2.5 | Term | 8 |

### ARTICLE III
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

| | | |
|---|---|---|
| 3.1 | General | 8 |
| 3.2 | Initial Capital Contributions of General Partners | 8 |
| 3.3 | Initial Capital Contributions of Limited Partners | 9 |
| 3.4 | Additional Capital Contributions of General Partners | 9 |
| 3.5 | Additional Capital Contributions of CCS | 10 |
| 3.6 | Termination of CCS's Additional Funding Obligations | 10 |
| 3.7 | Capital Contribution of Additional Partners | 13 |
| 3.8 | Voluntary Capital Contributions | 13 |
| 3.9 | Capital Accounts | 13 |
| 3.10 | Interest | 13 |
| 3.11 | No Withdrawal | 13 |
| 3.12 | Loans From Partners | 14 |

### ARTICLE IV
### DISTRIBUTIONS AND ALLOCATIONS

| | | |
|---|---|---|
| 4.1 | Distributions of Cash Flow | 14 |
| 4.2 | Allocations of Net Profits and Net Losses | 14 |
| 4.3 | Regulatory Allocations | 16 |
| 4.4 | Allocations Upon Transfer and Admittance | 17 |
| 4.5 | Tax Allocations | 17 |
| 4.6 | Partners' Shares of Excess Nonrecourse Liabilities | 18 |
| 4.7 | Curative Allocations | 18 |
| 4.8 | Indemnification and Reimbursement for Payments on Behalf of a Partner | 18 |

### ARTICLE V
### AUTHORITY OF GENERAL PARTNERS

| | | |
|---|---|---|
| 5.1 | General Authority | 19 |
| 5.2 | Specific Authority Granted to General Partners | 19 |
| 5.3 | Limitation on Delegation of General Partner Authority | 20 |
| 5.4 | Limitation on Authority of General Partners | 21 |
| 5.5 | Allocation of Responsibility | 21 |

[Table of Contents cont'd]                                                                       Page

5.6     Partnership Qualifications and Filings . . . . . . . . . . . . . . . . . . . . . . . . .   22
5.7     Compensation and Reimbursement of General Partners . . . . . . . . . . . . . . .   22
5.8     Partnership Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22
5.9     Dealings With Interested Parties and Competitors . . . . . . . . . . . . . . . . .   22
5.10    Relationship Between Partners and Partnership . . . . . . . . . . . . . . . . . . .   22
5.11    Limitations on Liability; Indemnification . . . . . . . . . . . . . . . . . . . . . .   23
5.12    Reliance by Third Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24


ARTICLE VI
MANAGEMENT
6.1     General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
6.2     Management Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
6.3     Voting; Quorum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
6.4     Deadlock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
6.5     Terminating Capital Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
6.6     Management Committee Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
6.7     Partnership Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30


ARTICLE VII
RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS
7.1     Limitation of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
7.2     Management of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
7.3     No Right of Partition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
7.4     Rights of Limited Partners Relating to the Partnership . . . . . . . . . . . . . . .   31
7.5     Development of the Zoom System. . . . . . . . . . . . . . . . . . . . . . . . . . .   31


ARTICLE VIII
RECORDS AND REPORTS
8.1     Records and Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
8.2     Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
8.3     Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35


ARTICLE IX
TAX MATTERS
9.1     Preparation of Tax Returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
9.2     Tax Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
9.3     Tax Controversies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
9.4     Information to Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37


ARTICLE X
AMENDMENTS
10.1    Amendments Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
10.2    Clarifying Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
10.3    Amendment of this Article . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

[Table of Contents cont'd]                                                      Page

ARTICLE XI
TRANSFER OF PARTNERSHIP INTERESTS

11.1    Transfer in General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38
11.2    Additional Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39
11.3    Transfer of a General Partnership Interest by a General Partner . . . . . . . . .    39
11.4    Transfer of Limited Partner's Partnership Interest With General Partner
        Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39
11.5    Security Assignment of Limited Partner's Right to Receive Distributions . . . .    40
11.6    Assignee's Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40
11.7    Right of First Offer, Right of First Refusal for Partnership Interests . . . . . . .    40


ARTICLE XII
ADMISSION OF SUBSTITUTED PARTNERS

12.1    Substituted Limited Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41
12.2    Admission of a Successor General Partner . . . . . . . . . . . . . . . . . . . . . . . . .    41
12.3    Representations of Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42


ARTICLE XIII
ADMISSION OF ADDITIONAL PARTNERS

13.1    Admission of Additional Financing Partners . . . . . . . . . . . . . . . . . . . . . . .    42
13.2    Voluntary Capital Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43
13.3    Restrictions on Additional Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44
13.4    Admission of Other Additional Partners . . . . . . . . . . . . . . . . . . . . . . . . . .    44
13.5    Conditions to Admission of Additional Partners . . . . . . . . . . . . . . . . . . . .    44


ARTICLE XIV
WITHDRAWAL OF PARTNERS

14.1    Withdrawal of a General Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45
14.2    Former General Partner's Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45
14.3    Withdrawal of Limited Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45


ARTICLE XV
DISSOLUTION AND LIQUIDATION

15.1    Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45
15.2    Election to Continue Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46
15.3    Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46
15.4    Distribution in Kind . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48
15.5    Cancellation of Certificate of Limited Partnership . . . . . . . . . . . . . . . . . . .    48
15.6    Reasonable Time for Winding Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48
15.7    Return of Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48


ARTICLE XVI
GENERAL PROVISIONS

16.1    Power of Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48
16.2    Change in Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49
16.3    Information Sharing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

[Table of Contents cont'd]                                                        Page

16.4     Title to Partnership Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50
16.5     Issuance of Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50
16.6     Addresses and Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50
16.7     Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    51
16.8     Third Parties; Creditors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    51
16.9     Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    51
16.10    Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    51
16.11    Applicable Law; Consent to Jurisdiction . . . . . . . . . . . . . . . . . . . . . . .    51
16.12    Invalidity of Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    51
16.13    Number and Gender . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    52
16.14    Further Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    52
16.15    Integration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    52
16.16    Including . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    52


EXHIBIT A   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    A-1
EXHIBIT B   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    B-1
EXHIBIT C   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    C-1
EXHIBIT D   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    D-1
EXHIBIT E   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    E-1
EXHIBIT F . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-1
EXHIBIT G   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    G-1

## AGREEMENT OF LIMITED PARTNERSHIP
## OF
## ZOOM PARTNERS, L.P.

This AGREEMENT OF LIMITED PARTNERSHIP is entered into as of the 5th day of May, 1995 by and among SKY VENTURE CORP., a Virginia corporation ("SVC"), and ZOOM TELEVISION, INC., a California corporation ("ZTV"), as General Partners, and CIRCUIT CITY STORES, INC., a Virginia corporation ("CCS"), and ZOOM HOLDINGS, a California general partnership ("Holdings"), as Limited Partners.

### RECITALS

WHEREAS, prior to the date of this Agreement, the ZTV Partners have been developing a disc-based, home multimedia system;

WHEREAS, the CCS Partners have the technological capability to improve certain components of the Zoom System (as hereinafter defined) and desire to invest in the continued development of the Zoom System; and

WHEREAS, the Partners desire to set forth in this Agreement the terms and conditions of their joint undertaking and the manner in which the affairs of the Partnership will be conducted.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

### ARTICLE I
### DEFINITIONS

The following definitions shall be applied to the capitalized terms used in this Agreement for all purposes.

"Act" means the Delaware Revised Uniform Limited Partnership Act, as previously or hereafter amended.

"Additional Capital Contribution" means the Capital Contributions described in Sections 3.4 and 3.5.

"Additional Financing" has the meaning given in Section 13.1(a).

"Additional Financing Partner" means a Person admitted to the Partnership as a General Partner or Limited Partner pursuant to Section 13.1.

"Additional General Partner" means a Person admitted to the Partnership as a General Partner pursuant to Article XIII, including, without limitation, an Additional Financing Partner that is admitted as a General Partner.

4322:\cc\zoom-lpa.01k

"Additional Limited Partner" means a Person admitted to the Partnership as a Limited Partner pursuant to Article XIII, including, without limitation, an Additional Financing Partner that is admitted as a Limited Partner.

"Adjusted Capital Account" means the Capital Account of a Partner: (i) reduced for any items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6); and, (ii) increased for any amount such Person is obligated to contribute to the Partnership or is treated as being obligated to contribute to the Partnership pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) (relating to partner liabilities to a partnership) or 1.704-2(g)(1) and (i)(5) (relating to minimum gain).

"Affiliate" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. "Control" or "controlling" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person. The Partnership shall not be deemed an Affiliate of either of the General Partners for any purpose hereunder. For purposes of this Agreement, CCS and SVC are Affiliates of each other, and Holdings and ZTV are Affiliates of each other.

"Agreement" means this Agreement of Limited Partnership, as it may be amended, supplemented or restated from time to time.

"Ancillary Business Rights" means all right, title and interest in and to any contracts, agreements (including, without limitation, employment and consulting arrangements), business relationships (formal and informal), materials, know-how, business, goodwill and other assets (whether real or personal, tangible or intangible), other than Intellectual Property, entered into or otherwise arising in connection with the development of the Zoom System or the carrying out by the Partners of their obligations hereunder.

"Assignee" means a Person to whom a Partner (or assignee thereof) Transfers all or any part of its interest in the Partnership pursuant to Article XI, but who has not been admitted as a Partner pursuant to Section 12.1 or 12.2.

"Book Value" means, with respect to any Partnership property, the Partnership's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)(d)-(g).

"Business Day" means Monday through Friday of each week (determined by reference to Richmond, Virginia time), except that a legal holiday recognized as such by the government of the United States, the Commonwealth of Virginia or the State of California shall not be regarded as a Business Day.

"Capital Account" means the capital account maintained for a Partner or Assignee pursuant to Section 3.9.

"Capital Contribution" means, with respect to any Partner, the aggregate of any cash, cash equivalents, and the initial Fair Market Value of any other property that a Partner contributes or is deemed to have contributed to the Partnership pursuant to Articles III and XIII.

"Cash Flow" means, with respect to any relevant Fiscal Year or other Fiscal Period, all cash receipts of the Partnership that are in excess of the amount that the Management Committee

determines is required to satisfy the Partnership's obligations (including any obligations owed to any Partner or Affiliate), the Partnership's operating expenses and working capital requirements, and the restoration, increase or creation of Reserves.

"CCS Intellectual Property" means all Intellectual Property, other than Zoom System Intellectual Property, relating to the Zoom System and held by CCS.

"CCS Loan" has the meaning given in Section 3.12(b).

"CCS Partners" means SVC and CCS.

"Certificate of Limited Partnership" means the Partnership's Certificate of Limited Partnership as filed with the Delaware Secretary of State for the purpose of forming the Partnership as a Delaware limited partnership, and any duly authorized, executed and filed amendments and restatements thereof.

"Change in Control" means, with respect to any CCS Partner, the occurrence of any transaction or event, or series of transactions or events, the effect of which is to cause a CCS Partner not to be an Affiliate of CCS (or any successor to the entirety of CCS's business), and, with respect to any ZTV Partner, the occurrence of any transaction or event, or series of transactions or events, the effect of which is to cause a ZTV Partner not to be an Affiliate of ZTV.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Contribution Request" has the meaning given in Section 13.2(a).

"Controlling Interest" means, with respect to the CCS Partners or the ZTV Partners, as the case may be, the ownership of a Majority Interest of the Members of the Management Committee as the result of the exercise of the buy-sell procedure set forth in Section 6.4.

"Controlling Partner" means the Partner who alone and/or together with its Affiliates holds the Controlling Interest.

"Deliverables" means those components of the Zoom System set forth on Exhibit E hereto.

"Disinterested General Partner" means, with respect to any Interested Party Transaction, any General Partner (or former Original General Partner) (i) which is not an Interested Party, and (ii) none of whose employees, Affiliates or designated member of the Management Committee is an Interested Party.

"Distribution" means any amount distributed by the Partnership pursuant to Section 4.1, Section 15.3(c)(iv), or Section 15.4.

"Electing Limited Partner" has the meaning given in Section 13.2(b).

"Fair Market Value" means, with respect to any asset, its fair market value as determined by commercially reasonable means deemed appropriate by the General Partners or Liquidator, as applicable.

"Fiscal Period" means any interim accounting period established by the Management Committee within a Fiscal Year.

"Fiscal Year" means the Partnership's annual accounting period established pursuant to Section 8.2.

"General Partner" means SVC, ZTV, or any Successor General Partner or Additional General Partner, in its capacity as general partner of the Partnership.

"General Partnership Interest" means the entire interest in the Partnership held by a General Partner as a General Partner, including such General Partner's Partnership Interest and its rights and obligations as a General Partner under this Agreement.

"Holdings" means Zoom Holdings, a California general partnership, the controlling interest in which is held ZTV.

"Indemnified Party" has the meaning given in Section 5.11(b).

"Initial Capital Contribution" means the Capital Contributions described in Sections 3.2 and 3.3.

"Initial Operating Plan" means the Operating Plan, a copy of which is attached hereto as Exhibit F.

"Intellectual Property" means all rights, title and interest in and to any inventions, works of authorship, mask works, ideas or information relating to the Zoom System that are susceptible of patent or other forms of intellectual property protection throughout the world (including, without limitation, all patents, copyrights, trademarks, service marks and trade secret rights).

"Interested Party" has the meaning given in Section 5.9.

"Interested Party Transaction" has the meaning given in Section 5.9.

"Limited Partner" means any of the Persons listed as Limited Partners in the introduction to this Agreement, any Person admitted to the Partnership as a Substituted Limited Partner pursuant to Section 12.1, or any Person admitted as an Additional Limited Partner pursuant to Article XIII, in each case, in its capacity as limited partner of the Partnership.

"Limited Partnership Interest" means the entire interest in the Partnership held by a Limited Partner as a Limited Partner, including such Limited Partner's Partnership Interest and its rights as a Limited Partner under this Agreement.

"Liquidator" has the meaning given in Section 15.3.

"Majority Interest" means, with respect to matters requiring approval of a Majority Interest of the members of the Management Committee, Partners owning more than fifty percent (50%) of the Percentage Interests owned by all of the Partners who are represented on the Management Committee on the day for any determination requiring such approval, and with respect to other matters, Partners

owning more than fifty percent (50%) of the Percentage Interests owned by all of the Partners who are members of the class or other group of Partners entitled to act with respect to such matter.

"Management Committee" has the meaning given in <u>Section</u> 6.2.

"Maximum Contribution" means the ZTV Reimbursement plus the contribution by the CCS Partners of cash and Deliverables (or portions thereof) (valued as set forth on <u>Exhibit</u> E) equal to Thirty Million Dollars ($30,000,000).

"Minimum Contribution" means, and shall be deemed satisfied if, the sum of the ZTV Reimbursement <u>plus</u> CCS's actual costs and expenses relating to the development of Deliverables, <u>plus</u> the CCS Partners' cash contributions to the Partnership, equals or exceeds Twenty Million Dollars ($20,000,000).

"Net Development Cost" means with respect to the Deliverables, CCS's costs and expenses relating to the development, research and testing of the Deliverables minus the amount of such costs and expenses deducted or amortized by CCS for purposes of determining its consolidated federal income tax liability.

"Net Losses" has the meaning given in <u>Section</u> 4.2(c).

"Net Profits" has the meaning given in <u>Section</u> 4.2(c).

"Non-Electing Limited Partner" has the meaning given in <u>Section</u> 13.2(c).

"Operating Plan" means the operating plan and budget adopted by the General Partners for each Fiscal Year or other Fiscal Period, as the same may be modified or amended from time to time.

"Original General Partners" means ZTV and SVC, for so long as each remains a General Partner.

"Partner" means any General Partner or Limited Partner.

"Partnership" means the limited partnership organized pursuant to the Certificate of Limited Partnership.

"Partnership Interest" or "Interest" means the entire interest of a Partner in the Partnership at any particular time, including, without limitation, allocations of Net Profits and Net Losses (or items thereof), Distributions, any and all rights to vote and otherwise participate in the Partnership's affairs, and any and all benefits to which a Partner may be entitled under any provision of this Agreement, together with the obligation of such Partner to comply with all of the terms and provisions hereof.

"Partnership Minimum Gain" has the meaning given in Treasury Regulation Section 1.704-2(b)(2) and (d).

"Percentage Interest" means, with respect to each Partner, the percentage interest set forth opposite such Partner's name of <u>Exhibit</u> A, attached hereto and incorporated herein, as the same may be adjusted from time to time pursuant to this Agreement.

"Person" means and includes an individual or a corporation, partnership, limited liability company, trust, unincorporated organization, association, or other entity.

"Pretermination Commitments" has the meaning given in Section 3.6(a).

"Redeemed Interest" means the Partnership Interests of the CCS Partners redeemed pursuant to, and subject to the terms and conditions of, Section 3.6(b), and shall equal the entirety of SVC's Partnership Interest plus the difference between the entirety of CCS's Partnership Interest minus the Retained Interest.

"Reserves" means amounts set aside in a deposit account or otherwise allocated to provide for the Partnership's reasonable working capital requirements, and its estimated future operating expenses, debt service or capital expenditures (including reasonable amounts set aside for unforeseen and contingent liabilities).

"Retained Interest" has the meaning given in Section 3.6(b).

"Securities Act" means the United States Securities Act of 1933 and applicable rules and regulations thereunder, and any successor to such statute, rules, or regulations. Any reference herein to a specific section, rule, or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"Substituted Limited Partner" means any Person that is admitted as a Limited Partner of the Partnership pursuant to Section 12.1.

"Successor General Partner" means any Person that is admitted as a General Partner of the Partnership pursuant to Section 12.2.

"Taxable Year" means the Partnership's accounting period for federal income tax purposes determined pursuant to Section 9.2.

"Technology Transfer" has the meaning given in Section 3.6(a).

"Termination Notice" has the meaning given in Section 3.6.

"Termination Value" has the meaning given in Section 3.6(b).

"Terminating Capital Transaction" means the merger or consolidation of the Partnership with or into any other corporation, partnership, limited liability company or other Person, or the sale or other disposition of all or substantially all of the assets of the Partnership or a related series of transactions that, taken together, result in the sale or other disposition of all or substantially all of the assets of the Partnership.

"Transition Funds" has the meaning given in Section 3.6(a).

"Transition Period" has the meaning given in Section 3.6(a).

"Treasury Regulations" means the income tax regulations promulgated under the Code, as amended from time to time.

"Uncontributed Amount" has the meaning given in <u>Section</u> 13.2(c).

"Units" has the meaning given in <u>Section</u> 16.5.

"Voluntary Capital Contribution" means any Capital Contribution made by a Partner pursuant to <u>Section</u> 13.2(a).

"Working Capital Loan" means all loans made by CCS pursuant to a letter agreement dated November 23, 1994 to finance the continued development of the Zoom System, which loans equal, in the aggregate, $1,533,428.93.

"Zoom System" means the multimedia system which allows for incremental purchase of the use of movies and other intellectual properties and/or the remote catalog sale of goods as previously developed by ZTV and as further developed and implemented hereunder, including all technical sub-systems required for same, including without limitation (a) a transaction processing system, (b) a set top box, (c) a catalog authoring system, (d) movie encryption and security systems, and (e) special disc replication systems and all required supporting business activities, including, without limitation (i) movie and catalog acquisition, (ii) sales/marketing and distribution, (iii) manufacturing relationships, (iv) customer services activities and (v) future product and business development activities.  "Zoom System" also includes any and all future expansions, extensions and developments of same, whether now known or hereafter invented, including, without limitation, expansion into international markets; expansion into other platforms (PC's, Macintosh, Pippin, third party game boxes from Sega, Nintendo, Sony, etc.); expansion of the set top box through the adapter slot to service the game and information markets; expansion of services through use of "fax back" technologies for services, such as ticket sales, that might require printed receipts; expansion into business-to-business catalogs; advertising and database marketing based products such as interactive Yellow Pages, advertiser supported interactive magazines or products selling travel services; connections to on-line services; sales of TPS database information; and provisions for inter-home communications.

"Zoom System Intellectual Property" means all Intellectual Property made or conceived or reduced to practice by CCS or ZTV (or any Affiliate, or any of their employees, consultants, agents or subcontractors), independently or with the Partnership, in connection with the development of the Zoom System or the carrying out by the Partners of their obligations hereunder.

"ZTV" means Zoom Television, Inc., a California corporation, the controlling interest in which is held as of the date hereof by Kenneth Ziffren and Harry M. Brittenham.

"ZTV Intellectual Property" means all Intellectual Property, other than Zoom System Intellectual Property, relating to the Zoom System and held by ZTV.

"ZTV Partners" means ZTV and Holdings.

"ZTV Reimbursement" means the payment in the amount of $362,868.96 made by CCS to ZTV concurrently with the execution hereof in reimbursement of one-half of certain expenses paid or incurred by ZTV in connection with the start-up of the business to be conducted by the Partnership.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1    Organization of Partnership.  The Partners hereby agree to form and operate the Partnership as a limited partnership pursuant to the provisions of the Act.  Except as expressly provided herein to the contrary, the rights and obligations of the Partners and the administration and termination of the Partnership are and shall be governed by the Act.  In the event of any inconsistency between any provision of this Agreement and any non-mandatory provision of the Act, this Agreement shall govern.

2.2    Name.  The name of the Partnership is and shall be Zoom Partners, L.P.  The Management Committee in its discretion may change the name of the Partnership at any time and from time to time.  Notification of any such change shall be given to all Partners.  The Partnership's business may be conducted under its name or any other name or names deemed advisable by the Management Committee.  If the Partnership adopts any fictitious or assumed name, it shall file such fictitious or assumed name certificates as are required by law.

2.3    Purpose.  The purpose of the Partnership shall be to acquire, finance, develop, manufacture, market, and distribute the Zoom System and related products, and to engage in any other activities determined by the Management Committee to be necessary or desirable for the purposes set forth herein, and to exercise such powers as are necessary or appropriate in connection with the foregoing.

2.4    Principal Office; Registered Office.  The principal office of the Partnership shall be such place as the Management Committee may from time to time designate by written notice to all Partners.  The Partnership may maintain offices at such other place or places as the Management Committee deems advisable.  The Partnership shall continuously maintain a registered office and a duly qualified agent for service of process on the Partnership in the State of Delaware.

2.5    Term.  The Partnership shall commence upon the filing of the Certificate of Limited Partnership in accordance with the Act and shall continue in existence until 11:59 p.m. Delaware time on December 31, 2015, or until earlier termination pursuant to this Agreement.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1    General.  The names, addresses, Initial Capital Contributions and Percentage Interests of the Partners are set forth in Exhibit A attached hereto and incorporated herein.  All Partners acknowledge and agree that the Initial Capital Contributions set forth in Exhibit A represent the amount of cash and the initial Fair Market Value of all property (other than cash) contributed by the Partners before or simultaneously with the execution of this Agreement.

3.2    Initial Capital Contributions of General Partners.  Before or simultaneously with the execution of this Agreement:

(a)    ZTV, in its capacity as a General Partner, shall contribute as its Initial Capital Contribution to the Partnership's capital: all of its right, title, and interest in and to the Zoom System and all rights related thereto, including, without limitation, the ZTV

Intellectual Property (and, subject to the provisions of Sections 7.5(h) through (j), such documents as are necessary for the Partnership to practice the ZTV Intellectual Property in connection with the development, use, manufacturing, marketing, distribution and sale of the Zoom System) and all of the assets set forth on the Property Contributions Schedule attached to this Agreement as Exhibit B, and the Partnership shall assume all liabilities relating thereto set forth in Exhibit C. The Initial Capital Contribution of ZTV shall be made by any instrument of transfer or conveyance which is deemed necessary or appropriate by the Partnership.

(b)    SVC, in its capacity as a General Partner, shall have contributed as its Initial Capital Contribution to the Partnership's capital, cash in the amount equal to two percent (2%) of the outstanding balance of the Working Capital Loan (which amount shall be used by the Partnership to repay the Working Capital Loan).

3.3    Initial Capital Contributions of Limited Partners.    Before or simultaneously with the execution of this Agreement:

(a)    Holdings, in its capacity as a Limited Partner, shall contribute as its Initial Capital Contribution to the Partnership's capital: all of its right, title, and interest in and to the Zoom System and all rights related thereto, including, without limitation, the ZTV Intellectual Property (and, subject to the provisions of Sections 7.5(h) through (j), such documents as are necessary for the Partnership to practice the ZTV Intellectual Property in connection with the development, use, manufacturing, marketing, distribution and sale of the Zoom System) and all of the assets set forth on the Property Contributions Schedule attached to this Agreement as Exhibit B, and the Partnership shall assume all liabilities relating thereto set forth in Exhibit C. The Initial Capital Contribution of Holdings shall be made by any instrument of transfer or conveyance which is deemed necessary or appropriate by the Partnership.

(b)    CCS, in its capacity as a Limited Partner, shall contribute as its Initial Capital Contribution to the Partnership's capital:

(i)    all of its right, title, and interest in and to the assets set forth on the Property Contributions Schedule attached to this Agreement as Exhibit B;

(ii)    cash in an amount equal to ninety-eight percent (98%) of the outstanding balance of the Working Capital Loan (which amount shall be used by the Partnership to repay the Working Capital Loan).

The Initial Capital Contribution of CCS (other than cash) shall be made by any instrument of transfer or conveyance which is deemed necessary or appropriate by the Partnership.

3.4    Additional Capital Contributions of General Partners.    SVC, in its capacity as a General Partner, shall make Additional Capital Contributions, from time to time, in an amount equal to two and four hundredths percent (2.04%) of the amount of any Capital Contributions of CCS in excess of the amount of CCS's Initial Capital Contribution (including Additional Capital Contributions made by CCS pursuant to Section 3.5(b) and Voluntary Capital Contributions made by CCS pursuant to Section 13.2, but excluding (i) any Additional Capital Contributions made by CCS pursuant to

Sections 3.5(a) and 3.5(c) and (ii) any contributions or deemed contributions pursuant to Section 7.5 and (iii) any contributions made by CCS pursuant to Section 3.6. ZTV, in its capacity as a General Partner, shall make Additional Capital Contributions, from time to time, in an amount equal to two and four hundredths percent (2.04%) of the amount of any Capital Contributions of Holdings, in its capacity as a Limited Partner, in excess of the amount of Holdings' Initial Capital Contribution (including Voluntary Capital Contributions made by Holdings pursuant to Section 13.2), but excluding any contributions or deemed contributions pursuant to Section 7.5.

      3.5    Additional Capital Contributions of CCS. CCS shall contribute as Additional Capital Contributions to the Partnership's capital:

      (a)    Subject to Section 3.6, all of its right, title and interest in and to each Deliverable, all Zoom System Intellectual Property relating thereto, and (at the election of the Partnership) all or any part of the Ancillary Business Rights associated therewith, with the Deliverables having an agreed-upon Fair Market Value (upon contribution) equal to their Net Development Cost; provided that from and after such time as the CCS Partners shall have made the Maximum Contribution the Partnership shall pay CCS for the Deliverables (or portions thereof) contributed thereafter, valued as set forth on Exhibit E. Such contributions shall be deemed to occur pursuant to Section 7.5, without any action or documentation required on the part of any Person. Notwithstanding the foregoing, CCS shall execute, and cause to be executed, such instruments of transfer or conveyance as may reasonably be requested by the Partnership to further evidence such Additional Capital Contributions.

      (b)    Subject to Section 3.6, until such time as the CCS Partners have made the Maximum Contribution, ninety-eight percent (98%) of the cash needed by the Partnership from time to time as set forth in the Initial Operating Plan.

      (c)    A perpetual, non-exclusive, royalty-free license to use all CCS Intellectual Property in connection with the development, use, manufacturing, marketing, distribution and sale of the Zoom System (which license, subject to the provisions of subsections (h) through (j) of Section 7.5, will include the provision of such documents as are necessary for the Partnership to practice the CCS Intellectual Property within the scope of such license).

      3.6    Termination of CCS's Additional Funding Obligations. Notwithstanding any other provision of this Agreement, CCS shall have the right to terminate its (and SVC's) obligation to make Additional Capital Contributions to the Partnership's capital and its obligation to continue to fund the CCS Loan at any time, by providing written notice thereof ("Termination Notice") to the General Partners, subject to the following terms and conditions:

      (a)    CCS shall:

            (i)    advise ZTV of (1) the Deliverables that remain to be completed, (2) the progress it would expect to make with respect to development of the Deliverables during the period beginning on the date CCS provides its Termination Notice and ending ninety (90) days thereafter (the "Transition Period") and (3) its good faith estimate of the cost of continuing development of the Deliverables during the Transition Period;

(ii)    at the election of ZTV, if it is at that time a General Partner, either (1) contribute cash to the Partnership in an amount equal to Four Million Dollars ($4,000,000) (the "Transition Funds"), which amount has been agreed upon by the Partners as a reasonable estimate of the costs which will become due and payable by the Partnership during the Transition Period, in which event CCS shall have no obligation to continue development of the Deliverables during the Transition Period, or (2) continue in the normal course the development of the Deliverables during the Transition Period (the "Transition Development"), in which event CCS shall immediately after notice of the election of ZTV contemplated by this clause (ii) contribute cash to the Partnership in the amount equal to the amount, if any, by which $4,000,000 exceeds the costs estimated by CCS for performing the Transition Development as contemplated by clause (i) of this Section 3.6(a);

(iii)    contribute cash to the Partnership at such time as is required to fund Partnership obligations which become due and payable after the Transition Period, and which are attributable to written commitments made by the Partnership before CCS provided its Termination Notice and approved pursuant to a written consent executed by a member of the Management Committee that is affiliated with, or otherwise represents, the CCS Partners (the "Pretermination Commitments");

(iv)    contribute cash to the Partnership to fund Partnership obligations which are due and payable before CCS provided its Termination Notice (the "Outstanding Payables");

(v)    transfer and shall cause its Affiliates, agents, subcontractors and employees to transfer (both legally and physically) within ten (10) days after CCS provides the Termination Notice all Deliverables and (subject to Section 7.5 all other assets and property of the Partnership (including, without limitation, all Zoom System Intellectual Property (other than CCS Intellectual Property) and work-in-process in connection with the Deliverables, and (at the election of the Partnership) all or any part of the Ancillary Business Rights)) (a "Technology Transfer") to the Partnership or to the Partnership's designee (which designation shall be made in writing at least three (3) days prior to the expiration of such ten (10) day period);

(vi)    execute and cause to be executed such assignment documents and other instruments of transfer and conveyance as ZTV reasonably shall determine are necessary or appropriate to effect and facilitate the Technology Transfer;

(vii)    cooperate fully and dedicate such resources as reasonably may be necessary, to ensure a smooth transition of all work associated with the Deliverables, including, without limitation, cooperation reasonably necessary to transfer to the Partnership such employment contracts with respect to employees by the CCS Partners or Affiliates of the CCS Partners who were employed specifically to devote their efforts to performing work associated with the Deliverables as ZTV elects to have so transferred; provided that, for a period of three years following the delivery of the Termination Notice, none of ZTV,

the Partnership nor any of their Affiliates will employ or offer employment to the employees of CCS and its Affiliates identified on Exhibit G hereto; and

(viii)    at the request of the Partnership, continue maintaining the Partnership's books and records for a period extending no longer than the end of the Transition Period, at which time the CCS Partners shall transfer all Partnership books and records to the Partnership;

provided, that if at the time CCS gives a Termination Notice, the CCS Partners hold, in the aggregate, the Controlling Interest, the ZTV Partners shall have the option of purchasing from CCS for $2,500,000 the 1% interest constituting the Controlling Interest (so that, if exercised, neither the CCS Partners nor the ZTV Partners, immediately following such purchase, would hold the Controlling Interest); provided, further, that if the ZTV Partners do not exercise such option and close the purchase of such interest within seven (7) days after receipt of the Termination Notice, the Partnership shall be dissolved.

(b)    The Partnership shall redeem the Redeemed Interest within five (5) Business Days following the Technology Transfer.  Within such five (5) Business Days, the CCS Partners will convey to the Partnership all of the CCS Partners' right, title, and interest in and to the Redeemed Interest in exchange for $100 payable on the date of CCS Partners' transfer of such Redeemed Interest.  The CCS Partners shall execute such instruments of transfer or conveyance as ZTV shall reasonably determine are necessary or appropriate to effect such redemption.  For purposes of establishing the Redeemed Interest, the Retained Interest shall be determined as follows:

(i)    First, calculate the sum (the "Step 1 Sum") of:

(1)    the Termination Value (determined by reference to the "Contribution" set forth in Exhibit E) for each Deliverable completed by CCS prior to the Termination Notice; plus

(2)    the amount of the ZTV Reimbursement; plus

(3)    the sum of the Initial Capital Contributions of SVC and CCS pursuant to Sections 3.2 and 3.3(b); plus

(4)    the sum of any cash contributed by CCS and SVC as Additional Capital Contributions pursuant to Section 3.5(b) and Section 3.4, respectively, through the date of the Termination Notice; plus

(5)    the amounts necessary to fund the Outstanding Payables; plus

(6)    for each Deliverable (or portion thereof) not completed by CCS prior to the Termination Notice, the Termination Value corresponding to the Stage of Completion of such Deliverable (determined pursuant to Exhibit E);

(ii)    Second, multiply the Step 1 Sum by one-half (1/2) (the "Step 2 Sum");

(iii)    Third, calculate the sum (the "Step 3 Sum") of the Step 2 Sum and the following amounts:

       (1)    the $4,000,000 Transition Funds; <u>plus</u>

       (2)    the amounts necessary to fund the Pretermination Commitments; <u>plus</u>

       (3)    the actual, out-of-pocket costs and expenses incurred by the CCS Partners to unaffiliated third parties in connection with the CCS Partners' dedication of resources to ensure the smooth transition of work pursuant to <u>Section</u> 3.6(a)(v) and (vii);

(iv)    Fourth, divide the Step 3 Sum by Thirty Million Dollars ($30,000,000) (the "Step 4 Sum"); and

(v)    Fifth, multiply the Step 4 Sum by one-half (1/2) (the "Step 5 Sum").

The aggregate Percentage Interest retained by CCS as the Retained Interest shall equal the lesser of (x) the Step 5 Sum, or (y) 25% of the total Partnership Interests held by the ZTV Partners and the CCS Partners at the time the Termination Notice is given. All other Interests held by the CCS Partners (and any assignees thereof) shall be redeemed pursuant to this <u>Section</u> 3.6(b), after which SVC shall no longer be a Partner.

3.7    <u>Capital Contribution of Additional Partners</u>. Additional Limited Partners and Additional General Partners (including, without limitation, Additional Financing Partners) may be admitted to the Partnership pursuant to, and in accordance with, <u>Article</u> XIII. The amount of the Additional Financing or other Capital Contribution contributed by a Partner admitted to the Partnership pursuant to <u>Article</u> XIII shall be credited to such Partner's Capital Account in accordance with <u>Section</u> 3.9.

3.8    <u>Voluntary Capital Contributions</u>. In addition to the Additional Capital Contributions to be made by the Partners pursuant to <u>Sections</u> 3.4 and 3.5, the Limited Partners may, but shall not be required to, make Voluntary Capital Contributions pursuant to <u>Section</u> 13.2.

3.9    <u>Capital Accounts</u>. The Partnership shall establish a separate Capital Account for each Partner. The Capital Accounts shall be maintained according to the rules of Treasury Regulation Section 1.704-1(b)(2)(iv). For this purpose, the Partnership shall, upon the occurrence of the events specified in Treasury Regulation Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts according to the rules of such regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Partnership property.

3.10    <u>Interest</u>. No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

3.11    <u>No Withdrawal</u>. No Partner shall be entitled to withdraw any part of its Capital Contribution or Capital Account or to receive any Distribution from the Partnership, except as expressly provided herein.

3.12    Loans From Partners.

(a)      Except as expressly provided herein, Partners shall not be required or permitted to make loans to the Partnership unless approved by each General Partner. Loans by Partners to the Partnership shall not be considered Capital Contributions. If any Partner shall advance funds to the Partnership in excess of the amounts required hereunder to be contributed by it to the capital of the Partnership, the making of such advances shall not result in any increase in the Percentage Interest of such Partner. The amount of any such advances shall be a debt of the Partnership to such Partner evidenced by the Partnership's execution of a promissory note setting forth the terms of such advance, which terms shall be no less favorable to the Partnership as may be available from independent third parties, and shall be payable solely from the Partnership assets.

(b)      Subject to Section 3.6, after it has made the Maximum Contribution, CCS shall loan to the Partnership cash in an aggregate amount not to exceed $7,500,000 (the "CCS Loan"), to be applied for working capital needs as set forth in the Initial Operating Plan and to pay for the Deliverables (or portions thereof) (valued as set forth on Exhibit E) contributed after the Maximum Contribution. The CCS Loan shall be a debt of the Partnership, secured by a pledge of all of the assets of the Partnership, payable solely from the Partnership assets in accordance with, and subject to, the terms and conditions set forth in a Loan Agreement, which the parties agree to negotiate in good faith within sixty (60) days following the date hereof, and a copy of which will be attached hereto as Exhibit D.

(c)      If one of the Original General Partners holds the Controlling Interest, it or other Partners which are its Affiliates, may, but shall not be obligated to, make loans to the Partnership, subject to Section 5.9.


ARTICLE IV
DISTRIBUTIONS AND ALLOCATIONS

4.1      Distributions of Cash Flow. Except as otherwise provided in Article XV, Cash Flow for each Fiscal Period shall be distributed at such times as the Management Committee deems appropriate (subject to Section 5.2 (xiv)) to the Partners in proportion to their Percentage Interests. Any Distribution pursuant to this Section 4.1 shall be made to the Persons shown on the Partnership's books and records as Partners (or Assignees) as of the date of such Distribution.

4.2      Allocations of Net Profits and Net Losses.

(a)      Net Profits shall be allocated in the following order and priority:

(i)        first, to the General Partners in proportion to their respective Percentage Interests until the General Partners' Capital Account balances are equal to zero;

(ii)    second, to the Partners so that, to the extent possible, the balances in the Partners' Capital Accounts are in proportion to their respective Percentage Interests; and

(iii)    the balance, to the Partners in proportion to their respective Percentage Interests.

(b)    Net Losses shall be allocated in the following order and priority:

(i)    first, to the Partners so that, to the extent possible, the balances in the Partners' Capital Accounts are in proportion to their respective Percentage Interests;

(ii)    second, 98% to the Limited Partners in proportion to their respective Percentage Interests and 2% to the General Partners in proportion to their respective Percentage Interests until the Adjusted Capital Accounts balances of the Limited Partners are reduced to zero; and

(iii)    the balance, 100% to the General Partners in proportion to their respective Percentage Interests.

(c)    The terms "Net Profits" and "Net Losses" shall mean the net positive or negative sum of the items of income, gain, loss, and deduction of the Partnership (other than items required to be specially allocated under Section 4.3, as the case may be, for a period (or from a transaction) as determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be separately stated pursuant to Code Section 703(a)(1) shall be included) computed with the following adjustments:

(i)    items of income, gain, loss, and deduction shall be computed based upon the Book Values of the Partnership's assets rather than upon the asset's adjusted bases for federal income tax purposes, and in particular the amount of any deductions for depreciation or amortization with respect to an asset for a period shall equal such asset's Book Value multiplied by a fraction, the numerator of which shall be the amount of depreciation or amortization with respect to such asset allowable for federal income tax purposes for such period and the denominator of which shall be such asset's adjusted basis for federal income tax purposes (if such fraction is indeterminable, the Management Committee shall specify the fraction);

(ii)    any tax-exempt income received by the Partnership shall be included as an item of gross income;

(iii)    the amount of any adjustment to the Book Value of any assets of the Partnership pursuant to Code Section 743 shall not be taken into account except as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4);

(iv)    any expenditure of the Partnership described in Code Section 705(a)(2)(B) (including any expenditures treated as being described in Section 705(a)(2)(B) pursuant to the Treasury Regulations promulgated under Code Section 704(b)) shall be treated as deductible expense; and

(v)    upon adjustment of the Book Values of Partnership assets under Treasury Regulations Section 1.704-1(b)(2)(iv)(d) through (g), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset.

### 4.3   Regulatory Allocations.

(a)    Notwithstanding any provision of this Agreement to the contrary, Partnership losses, deductions, and Section 705(a)(2)(B) expenditures that are attributable to obligations that constitute partner nonrecourse debt within the meaning of Treasury Regulation Section 1.704-2(b)(4) shall be allocated to the Partner or Partners that bear the economic risk of loss for such debt, in accordance with Treasury Regulation Section 1.704-2(i)(1).  This Section 4.3(a) is intended to comply with the allocation provision of Treasury Regulation Section 1.704-2(i)(1) and shall be interpreted consistently therewith.

(b)    Notwithstanding any provision of this Agreement to the contrary, if there is a net decrease in Partnership Minimum Gain, then there shall be allocated to each Partner items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease in Partnership Minimum Gain (determined in accordance with Treasury Regulation Section 1.7042(g)).  The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 4.3(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(c)    Notwithstanding any provision of this Agreement (except Section 4.3(b)) to the contrary, if there is a net decrease in Partner Minimum Gain during any Fiscal Year, then, each Partner shall be allocated items of Partnership income and gain for such year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Partner's share, if any, (determined in accordance with Treasury Regulation Section 1.704-2(i)(4)) of the net decrease in Partner Minimum Gain.  The items to be so allocated shall be determined in accordance with the provisions of Treasury Regulation Section 1.704-2(i)(4).  This Section 4.3(c) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(i) and shall be interpreted consistently therewith.

(d)    To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or 743(b) of the Code is required to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated, as provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(m), as an item of income (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and such income or loss shall be specially

allocated to the Partners in a manner consistent with which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(e)    Notwithstanding any provision in this Agreement to the contrary, if during any Fiscal Year any Partner unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Partnership income and gain (including gross income) shall be specially allocated to such Partner in an amount and manner sufficient to eliminate the deficit balance in its Adjusted Capital Account, provided that an allocation hereunder shall be made if and only to the extent that such Partner would have a deficit in its Adjusted Capital Account after all other allocations provided in this Section 4.3 have been tentatively made as if this Section 4.3(e) were not in the Agreement created by such adjustment, allocation, or distribution as quickly as possible.

(f)    The allocations set forth in this Section 4.3 (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulation Sections 1.704-1(b) and 1.704-2. Notwithstanding any other provision of this Article IV (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss, and deduction among Partners so that, to the extent possible, the net amount of such allocations of other items and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to such Partner if the Regulatory Allocations had not occurred.

4.4    Allocations Upon Transfer and Admittance. Except as otherwise determined by the Management Committee, in the event that a Partner acquires an interest in the Partnership either by transfer from another Partner or by acquisition from the Partnership, an equal portion of the items of income or loss of the Partnership for the year in which such acquisition occurs shall be allocated to each day of such year, and the items of income or loss so allocated to the portion of the year before the date of the acquisition of the interest in the Partnership by the Partner shall be allocated among the Partners without giving effect to such acquisition, and the items of income or loss so allocated to the portion of the year from and after the date of the acquisition of such interest shall be allocated among the Partners by giving effect to such acquisition.

4.5    Tax Allocations.

(a)    Except as otherwise provided in this Section 4.5, for income tax purposes, all items of Partnership income, gain, loss, and deduction for each taxable period shall be allocated among the Partners in proportion to their respective shares of Net Profits or Net Losses, as the case may be.

(b)    Notwithstanding anything in Section 4.5(a) to the contrary, items of Partnership taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall be allocated among the Partners in accordance with the "traditional method" as described in Treasury Regulations Section 1.704-3(b) so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its Book Value.

(c)    If the Book Value of any Partnership asset is adjusted, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take

account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Regulations thereunder under any method chosen by the General Partners.

(d)     Allocations pursuant to this Section 4.5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Net Profits, Net Losses, Distributions, or other Partnership items pursuant to any provision of this Agreement.

4.6     Partners' Shares of Excess Nonrecourse Liabilities.  For purposes of determining the Partners' shares of excess nonrecourse liabilities under Treasury Regulation Section 1.752-3, the Partners' percentage interests in profits shall be equal to their Percentage Interests as of the time for determining such shares of excess nonrecourse liabilities.

4.7     Curative Allocations.  If the Management Committee determines, after consultation with competent tax counsel, that the allocation of any item of Partnership income, gain, loss, or deduction is not specified in this Article IV (an "unallocated item"), or that the allocation of any item of Partnership income, gain, loss, deduction or credit hereunder is clearly inconsistent with the Partners' economic interests in the Partnership (determined by reference to the general principles of Treasury Regulation Sections 1.704-1(b) and 1.704-1T(b) and the factors set forth in Treasury Regulation Section 1.704-1(b)(3)(ii)) (a "misallocated item"), then the Management Committee may allocate such unallocated items, or reallocate such misallocated items, to reflect such economic interests.

4.8     Indemnification and Reimbursement for Payments on Behalf of a Partner.

(a)     If the Partnership is obligated to pay any amount to a governmental agency (or otherwise makes a payment) because of a Partner's status or otherwise specifically attributable to a Partner (including, without limitation, federal withholding taxes with respect to foreign partners, state personal property taxes, state unincorporated business taxes, etc.), then such Partner (the "Indemnifying Partner") shall indemnify the Partnership in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payment).  Neither General Partner shall be required pursuant to the terms of this Section 4.8 to indemnify or reimburse the Partnership for costs incurred by either General Partner to qualify and remain qualified to conduct the business of the Partnership in any jurisdiction.  Such costs shall be an expense of the Partnership.

(b)     A Partner's obligation to indemnify the Partnership under this Section 4.8 shall survive the termination, dissolution, liquidation, and winding up of the Partnership, and for purposes of this Section 4.8, the Partnership shall be treated as continuing in existence.  The Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 4.8, including instituting a lawsuit to collect such indemnification obligation.

## ARTICLE V
## AUTHORITY OF GENERAL PARTNERS

5.1     General Authority.  Except as otherwise expressly provided in this Agreement (including without limitation, the terms of Section 5.4 and Article VI), the General Partners, to the exclusion of any other Partners or Persons, shall jointly, but only jointly, have the full and exclusive right to manage and control the business and affairs of the Partnership, to make all decisions regarding the management and operation of the Partnership and its business, and to take or cause to be taken any action which may be necessary or appropriate for or incidental to the management or operation of the Partnership and its business.  No Person in its capacity as a Limited Partner shall take part or otherwise participate in the management or supervision of the Partnership, nor shall such Person have the power to act for or on behalf of the Partnership.  Except as expressly provided in this Agreement or required by any non-waivable provision of the Act, no Limited Partner shall have the right to vote on or consent to any other matter, act or decision involving or otherwise relating to the Partnership or its business.

5.2     Specific Authority Granted to General Partners.  In furtherance of the general authority granted to the General Partners in Section 5.1, but without in any way limiting such general grant of authority, the General Partners jointly shall, in their sole discretion, and without the consent of the Limited Partners, have the full right, power and authority, from time to time and at any time, on behalf of the Partnership:

(i)     to negotiate, enter into, execute, acknowledge, deliver, modify, amend, extend, perform and terminate any and all contracts, agreements or other instruments to carry on the business of the Partnership as set forth herein;

(ii)    to borrow money and issue evidences of indebtedness and, as security therefor, to mortgage, pledge or otherwise encumber any and all assets of the Partnership, including the rights of the Partnership under any agreements;

(iii)   to lease, license or sell all or any part of the Partnership's assets and acquire or lease additional Partnership assets;

(iv)    to cause to be paid all amounts due and payable by the Partnership to any Person and to collect all amounts due to the Partnership;

(v)     to employ, engage, hire or otherwise secure or retain the services of agents, employees, managers, accountants, attorneys, consultants and other Persons to carry out the business and affairs of the Partnership, whether or not any such Persons so employed are affiliated with or related to any Partner, and to pay such fees, expenses, salaries, wages and other compensation to such Persons as the General Partners shall in their discretion determine;

(vi)    to appoint, from time to time, such officers and agents of the Partnership as the General Partners deem necessary or advisable, define and modify, from time to time, such officers' and agents' duties, and fix and adjust, as appropriate, such officers' and agents' compensation;

(vii)    to pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise, upon such terms as the General Partners may determine and upon such evidence as they may deem sufficient, any obligation, suit, liability, cause of action, right or claim, either in favor of or against the Partnership;

(viii)   to pay any fees and expenses incurred in connection with the Partnership's organization, and the management of the Partnership's business and affairs;

(ix)     to prosecute and defend or cause to be prosecuted and defended all proprietary rights and Intellectual Property, including all patents, copyrights, trade names, trademarks and service marks, and all licenses and permits and all applications with respect thereto, which may be held by the Partnership, and to prosecute and defend all rights of the Partnership in connection therewith;

(x)      to cause to be paid any and all taxes, charges and assessments that may be levied, assessed or imposed upon any of the assets of the Partnership, unless the same are contested by the General Partners in good faith;

(xi)     to establish, maintain and replenish Reserves;

(xii)    to establish one or more accounts for the Partnership in such financial institutions as the General Partners may from time to time designate;

(xiii)   to establish and purchase the types and amounts of insurance coverage to be carried by the Partnership;

(xiv)    to make Distributions periodically according to the provisions of this Agreement, but in no event less often than quarterly to the extent there is Cash Flow available for distribution;

(xv)     to maintain the books and records of the Partnership in accordance with this Agreement and in accordance with generally accepted accounting practices;

(xvi)    to take any action necessary or advisable to prevent the Partnership from being classified as other than a partnership for United States federal income tax purposes; and

(xvii)   to take such other actions as the General Partners may deem necessary, appropriate or advisable in connection with the operation and management of the Partnership, the conduct of its business or the furtherance of its purposes.

5.3    Limitation on Delegation of General Partner Authority.  Except to the extent expressly delegated to the Management Committee by the General Partners under Section 6.2, no Partner or Person other than the General Partners shall be an agent for the Partnership or have any right, power

or authority to transact any business in the name of the Partnership or to act for or on behalf of or to bind the Partnership.

5.4     Limitation on Authority of General Partners.

(a)     Notwithstanding any contrary provision of this Agreement, the General Partners shall not, without the written consent of Limited Partners holding a majority of the Percentage Interests held, in the aggregate, by all Limited Partners, have the authority to:

   (i)     Dissolve the Partnership;

   (ii)    Approve any Terminating Capital Transaction; or

   (iii)   Admit a Person as a partner except as provided in Article XIII.

(b)     Notwithstanding any contrary provision of this Agreement, the General Partners shall not, without the prior written consent of all of the Partners, have the authority to:

   (i)     Do any act in contravention of this Agreement;

   (ii)    Possess Partnership property or assign its rights in Partnership property for other than a Partnership purpose;

   (iii)   Increase or decrease the interest of any Partner in the assets, Net Profits, Net Losses or Distributions of the Partnership (other than a pro rata dilution resulting from the admission of an Additional General Partner or Additional Limited Partner pursuant to this Agreement), except as otherwise provided in this Agreement; or

   (iv)    Knowingly perform any act that would subject any Limited Partner to liability for the debts, liabilities or obligations of the Partnership.

5.5     Allocation of Responsibility.  Because of their respective expertise and abilities, the General Partners have allocated between themselves primary responsibility for managing certain aspects of the Partnership's business (subject at all times to the supervening authority and responsibility of the Management Committee), as follows:

(a)     SVC will have primary responsibility for managing the development of the Deliverables, including hardware technology development; development of catalog authoring system technology and functionality required to facilitate creative design; shipping and physical distribution of products (both hardware and software) to retail destinations; and retail hardware marketing and merchandising.

(b)     ZTV will have primary responsibility for development of studio relationships and transactions; disc replication and related technologies; entertainment and other software content; creative services; catalog agreements and sales; development of catalog authoring system creative design; and software wholesale and retail process (other than physical distribution).

21

All aspects of the Partnership's business not specifically allocated above shall be managed by the Management Committee.

5.6     Partnership Qualifications and Filings.  The General Partners shall cause to be filed such other certificates or documents as may be determined by them in their discretion to be necessary or appropriate for the continuation, qualification, and operation of the Partnership as a limited partnership (or a partnership in which the Limited Partners have limited liability) in the State of Delaware and any other jurisdiction in which the Partnership may elect to do business.

5.7     Compensation and Reimbursement of General Partners.  Except as expressly provided in this Agreement, no General Partner shall be compensated or otherwise reimbursed for its services as General Partner to the Partnership.

5.8     Partnership Funds.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the Management Committee and shall not be commingled with the funds of either General Partner.  All approved withdrawals from or charges against such accounts shall be made by the Management Committee.  Funds of the Partnership may be invested as determined by the General Partners, except in connection with acts otherwise prohibited by this Agreement.

5.9     Dealings With Interested Parties and Competitors.  The Partnership may contract with, transact business with, or otherwise deal with any Partner, any member of the Management Committee, or any of their respective employees or Affiliates (in any case, an "Interested Party") with respect to the provision of services to the Partnership, loans to or from the Partnership, transfers of assets to or from the Partnership, or with respect to other matters deemed necessary or appropriate in the General Partners' discretion (each, an "Interested Party Transaction"); provided that the Interested Party Transaction shall be (i) fair and reasonable to the Partnership and (ii) disclosed to each Disinterested General Partner.  The Partnership may deal with Persons who are engaged in business in direct competition with any Partner, any member of the Management Committee, or any of their respective employees or Affiliates (in any case, a "Competitor") with respect to the provision of services to the Partnership, loans to or from the Partnership, transfers of assets to or from the Partnership, or any other matters relating to the business of the Partnership (each, a "Competitor Dealing"); provided, that all such Competitor Dealings shall be (i) in good faith and in the best interest of the Partnership, and (ii) disclosed to each of the General Partners (or former Original General Partners, if any).

5.10    Relationship Between Partners and Partnership.  In all (a) dealings between any Partners (or Affiliates thereof) which relate in any way to the affairs or operation of the Partnership or to the Zoom System, (b) dealings between any Partner or Partners (or Affiliates thereof), on the one hand, and the Partnership, on the other hand (including, without limitation, pursuant to Section 5.9 and Section 7.5), and (c) actions and decisions by the General Partners or the members of the Management Committee for, or on behalf of, the Partnership:  each Partner shall (with respect to its actions and dealings as well as the actions and dealings of its Affiliates and members of the Management Committee) at all times be subject to, and comply with, the fiduciary duties generally owed by a general partner to the other partners and the partnership.

5.11   Limitations on Liability; Indemnification.

(a)   The General Partners shall not be liable for the return of any Capital Contribution made to the Partnership by a Limited Partner, and shall not be liable to the Limited Partners because any taxing authorities disallow or adjust any income tax deductions or credits.

(b)   The General Partners, their officers, directors, employees, agents, stockholders, and Affiliates, and any person who serves at the request of a General Partner or on behalf of the Partnership as a Partner, a member of the Management Committee, officer, director, employee or agent of the Partnership (hereinafter an "Indemnified Party") will not be liable to the Partnership or to the Partners for any act or omission, or from any losses, damages, claims, or expenses arising therefrom or in connection therewith, except to the extent such act or omission constitutes a breach of contract (including, without limitation, this Agreement) or a breach of fiduciary obligations, or is otherwise caused by or arising from the fraud, wilful misconduct, or gross negligence of such Indemnified Party. A General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and a General Partner shall not be responsible for any misconduct or negligence on the part of any such agent appointed by either General Partner in good faith.

(c)   The Partnership shall indemnify and hold each Indemnified Party harmless from any loss, damage, cost, fine, penalty, expense, judgment or amount paid in settlement, including attorneys' fees reasonably incurred, and other amounts arising from any and all third party claims, actions or proceedings (civil, criminal, administrative or otherwise), when and as incurred, which such Indemnified Party incurs by reason of its performance or nonperformance of any act concerning the activities of the Partnership or in furtherance of the Partnership's interests or purposes; provided, however, that an Indemnified Party shall not be indemnified for any such matters as to which, and to the extent, such Indemnified Party is finally adjudged by a court of competent jurisdiction to have been in breach of its fiduciary obligations, acting outside its authority under this Agreement, or guilty of fraud, gross negligence or wilful misconduct. If an Indemnified Party is finally adjudged by a court of competent jurisdiction to have been guilty of fraud, gross negligence, or wilful misconduct, such Indemnified Party shall reimburse the Partnership for any funds advanced or expended on such Indemnified Party's behalf in excess of the indemnification payments, if any, properly due it hereunder.

(d)   Expenses incurred in defending a civil or criminal action, suit or proceeding may be paid by the Partnership in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of an Indemnified Party to repay such amount if it shall ultimately be determined that it is not entitled to be indemnified by the Partnership as authorized herein.

(e)   The indemnification provided by this Section 5.11 shall not be deemed exclusive of any other rights to which an Indemnified Party may be entitled under any agreement, vote of the Partners or otherwise, and shall continue as to a Person who has ceased to

be an Indemnified Party and shall inure to the benefit of the successors, assigns, heirs, executors and administrators of such a Person.

(f)    The Partnership shall have the power at any time to purchase and maintain insurance on behalf of any Person who is or was an Indemnified Party against any liability which may be incurred by such Person as a Partner or an Indemnified Party or otherwise in connection with its actions on behalf of the Partnership or which could be asserted against such Indemnified Party and incurred by it in any such capacity, whether or not the Partnership would have the power to indemnify such Person against such liability under the provisions of this Section 5.11.

(g)    All judgments, fines, penalties, damages, amounts paid in settlement or other liabilities against the Partnership, or against the General Partners or an Indemnified Party for which a General Partner or an Indemnified Party is entitled to indemnification, shall be satisfied solely from the assets of the Partnership.  No Partner shall be subject to personal liability by reason of these indemnification provisions.

5.12    Reliance by Third Parties.  Any Person dealing with the Partnership shall be entitled to deal with the General Partners, or the Management Committee on behalf of the General Partners, as if the General Partners were the sole parties in interest in the Partnership's property, both legally and beneficially.  Each Partner hereby waives any and all defenses or other remedies that may be available against such Person (other than a Partner or Affiliate thereof) to contest, negate, or disaffirm any action of the General Partners, or the Management Committee on behalf of the General Partners, in connection with the Partnership's business or property.  Every agreement, instrument, or document executed by either of the General Partners or any member of the Management Committee shall, with respect to any business or property of the Partnership, be conclusive evidence in favor of any Person (other than a Partner or Affiliate thereof) relying thereon or claiming thereunder that:  (a) at the time of the execution or delivery thereof this Agreement was in full force and effect; (b) such agreement, instrument, or document was duly executed according to this Agreement and is binding upon the Partnership; and (c) the General Partners, or the member of the Management Committee on behalf of the General Partners, were duly authorized and empowered to execute and deliver such agreement, instrument or document for and on behalf of the Partnership.  This Section 5.12 shall not be construed as a waiver of any defenses or rights that a Partner may have against another Partner or any member of the Management Committee for exceeding the scope of their respective authority or otherwise.

## ARTICLE VI
## MANAGEMENT

6.1    General Partners.

(a)    The General Partners hereby delegate to the Management Committee, subject to the provisions of this Article VI, all rights, powers, duties and obligations of the General Partners for the management of the business of the Partnership under this Agreement and the exclusive right to exercise those rights, including without limitation the right to perform all of the matters set forth in Sections 5.2 and 5.6, except that the following actions shall not be delegated and shall require the consent of all General

Partners (which consent may be given or withheld, or made subject to such conditions, as are determined by the General Partners in their respective sole and absolute discretion):

(i)    Adopting the Operating Plan for each Fiscal Year or other Fiscal Period, and any amendments thereto;

(ii)    Approving variances in the Operating Plan which, individually, equals or exceeds $250,000 in the case of the employment of any individual or $1,000,000 with respect to all other matters;

(iii)    Approving, and establishing the terms and conditions for, borrowing funds from, or incurring indebtedness to, any Partner (or Affiliates thereof);

(iv)    Transferring any intellectual property rights or other rights relating to any technology of the Partnership, including without limitation, the Intellectual Property;

(v)    Failing to fully prosecute and defend, or failing to cause to be prosecuted and defended, on behalf of the Partnership, all proprietary rights and Intellectual Property, including all patents, copyrights, trade names, trademarks and service marks, and all licenses and permits and all applications with respect thereto, which may be held by the Partnership, or failing to prosecute and defend any rights of the Partnership in connection therewith; and

(vi)    Approving any pledge, mortgage or assignment of all or substantially all of the assets of the Partnership;

(vii)    Approving any Terminating Capital Transaction;

(viii)    Approving, and establishing the terms and conditions for, the admission of any Substituted Limited Partner, Successor General Partner, Additional Limited Partner and Additional General Partner (other than Additional Financing Partners and such other Additional Limited Partners as may be specifically provided for in Article XIII);

(ix)    Approving the Transfer of any Partnership Interest;

(x)    Dissolving the Partnership;

(xi)    Amending or waiving any provision of this Agreement;

(xii)    Confessing a judgment against the Partnership; and

(xiii)    Taking any action that would cause the Partnership to be classified as other than a partnership for United States federal income tax purposes;

(b)     Notwithstanding the foregoing, in the event either of the Original General Partners holds the Controlling Interest (the "Controlling Partner"), the members of the Management Committee representing the Controlling Partner may take any of the following actions after they shall have advised the other General Partners that they intend to take such action:

   (i)     Any of the actions listed in <u>Sections</u> 6.1(a)(i) through (iii) above;

   (ii)    Any of the actions listed in <u>Sections</u> 6.1(iv) and (v) above, if and to the extent such actions are taken in the ordinary course of the Partnership's business in furtherance of the acquisition, financing, development, manufacturing, marketing and/or distribution of the Zoom System;

   (iii)   Approving any pledge, mortgage or assignment of all or substantially all of the assets of the Partnership in connection with financing provided by a Person that is not an Affiliate of the Controlling Partner; <u>provided</u> that any pledge, mortgage or assignment of the assets of the Partnership shall be subordinate, both in right of payment and in time of payment, to the prior payment in full of all obligations under the CCS Loan; and

   (iv)    Approving any Terminating Capital Transaction, but only in compliance with the provisions of <u>Section</u> 6.5.

(c)     Notwithstanding the foregoing, in the event CCS has given the Termination Notice pursuant to <u>Section</u> 3.6, then ZTV shall not take any action listed in <u>Section</u> 6.1(a) without the consent of CCS, except that, without the consent of CCS or any other Partner, ZTV may take any of the following actions:

   (i)     Any of the actions listed in <u>Sections</u> 6.1(b)(i) through (iv);

   (ii)    Any of the actions listed in <u>Sections</u> 6.1(a)(viii) and (ix); and

   (iii)   Amending or waiving any provision of this Agreement other than (1) any amendment to <u>Section</u> 5.4 or this <u>Section</u> 6.1; (2) any amendment to Article VII that would have the effect of decreasing CCS's rights or increasing its obligations; (3) any amendment that would decrease the interest of CCS in the Net Profits, Cash Flow or Distributions of the Partnership or would increase the interest of CCS in the Net Losses of the Partnership, except pro rata with the decrease or increase, as the case may be, of the interest of Holdings in such items in connection with the admission of an Additional General Partner or Additional Limited Partner; or (4) any amendment that would have the effect of imposing on CCS any liability.

6.2     <u>Management Committee</u>.

(a)     The General Partners hereby establish a "Management Committee" to be governed by this <u>Section</u> 6.2.

(b)  Subject to the provisions of <u>Section</u> 6.1, the management of the business of the Partnership will be exclusively vested in the Management Committee, which is empowered to set policy for, and to make all decisions in respect of the business and operations of, the Partnership, to do on behalf of the Partnership all things which, in its discretion, are necessary or appropriate to carry out the Partnership's purpose, and to take all such other actions and exercise all such other rights and obligations that the General Partners hereby have delegated to the Management Committee under this Agreement, all subject to the limitations set forth in this Agreement.  The Management Committee may act through Partners, co-chairmen, officers, employees and other agents of the Partnership authorized by the Management Committee.  The acts of the Management Committee shall bind the Partnership when within the scope of its authority.

(c)  For so long as it remains a General Partner of the Partnership, each Original General Partner shall be entitled to appoint and retain two members to the Management Committee.  Each Original General Partner may appoint one or more alternates for each member appointed by it to the Management Committee.  Each alternate shall have all the powers of the regular Management Committee member in the regular Management Committee member's absence or inability to serve.  Each Original General Partner shall have the power to remove, replace, substitute and reappoint any member or alternative member of the Management Committee appointed by it by notice thereof to the Partnership and to the other Original General Partner.  Vacancies on the Management Committee shall be filled by the Original General Partner who appointed the Management Committee member previously holding the position that is then vacant.  No member of the Management Committee may be removed except (i) by the Original General Partner that appointed such member, or (ii) at such time as the Original General Partner appointing such member ceases to be a General Partner of the Partnership.  The initial members and alternates of the Management Committee shall be:

CCS Members:

Richard L. Sharp
Michael T. Chalifoux


ZTV Members:

Harry M. Brittenham
Kenneth Ziffren

6.3   <u>Voting; Quorum</u>.

(a)  All actions of the Management Committee shall require the affirmative vote of the members representing a Majority Interest at a duly noticed and called meeting.  For the purpose of this <u>Article</u> VI, (i) the members of the Management Committee representing SVC shall be deemed (but only for the purposes of voting rights) to represent the combined Percentage Interest of the CCS Partners and (ii) the members of the Management Committee representing ZTV shall be deemed (but only for the

purposes of voting rights) to represent the combined Percentage Interest of the ZTV Partners.

(b)    The Management Committee member or members representing a Partner at a meeting of the Management Committee shall be entitled to vote the Percentage Interest of such Partner and of any Affiliate of such Partner with respect to any decision to be made by the Management Committee.  At any duly noticed and called meeting of the Management Committee, the presence of all of the members (in person or by written proxy) shall constitute a quorum, except that, at any time at which there exists a Controlling Partner, the members of the Management Committee representing a Majority Interest shall constitute a quorum.

6.4    Deadlock.  If, at any time during which neither the CCS Partners nor the ZTV Partners hold the Controlling Interest, the members of the Management Committee, or with respect to those matters that are not within the authority of the Management Committee, the General partners, are unable in good faith to agree on a course of action with respect to the Partnership or its operations, then a member appointed by either Original General Partner may provide a member appointed by the other Original General Partner with a written notice (the "Deadlock Notice") detailing the matter in dispute (the "Deadlock"); provided, that the member selected by SVC may not send a Deadlock Notice unless CCS has satisfied the Minimum Contribution.  After the sending and receipt of the Deadlock Notice, the members of the Management Committee and other representatives of the Original General Partners shall make a good faith effort during the next five (5) days following receipt of the Deadlock Notice to resolve the Deadlock.  During such five-day period, the members of the Management Committee and representatives of the Original General Partners shall make themselves reasonably available to each other in order to attempt to resolve the Deadlock on the matter detailed in the Deadlock Notice.  If the members are unable to resolve the Deadlock within five (5) days of the receipt of the Deadlock Notice, the member of the Management Committee who sent the Deadlock Notice shall toss a coin selected by it (such coin shall be a United States Quarter Dollar, the "heads" side bearing a profile of George Washington and the "tails" side bearing a likeness of the American Bald Eagle with wings outstretched) at a meeting of the members of the Management Committee and such representatives of the Original General Partners as desire to attend.  Such meeting shall be at a time and place mutually agreeable to all members of the Management Committee.  Any member can request the President of the New York City office of the American Arbitration Association to appoint a single arbitrator who shall (i) establish a time and place for the coin toss, (ii) establish any rules deemed appropriate by the arbitrator relative to the coin toss, (iii) supervise the tossing of the coin and (iv) rule as to the outcome of the coin toss; all decisions of the arbitrator so appointed shall be final and binding on the parties and all fees and expenses of the arbitrator and the American Arbitration Association shall be borne equally by the Original General Partners.  Subject to the provisions of the preceding sentence, if applicable, the coin shall be tossed from a point not less than three feet above the ground, must ascend at least another three feet before beginning its descent, and must descend to the ground and come to a halt either "heads" facing up or "tails" facing up without touching any other objects, and, furthermore, the Original General Partner that did not appoint the member who sent the Deadlock Notice (the "Caller") must call either "heads" or "tails" after the coin is tossed and before the coin reaches the ground, in order to be a binding coin toss.  If the Caller neither calls "heads" or "tails" then the Caller shall be deemed to have called "heads."  If the Caller calls "heads" and the coin comes to a halt "heads" up, or the Caller calls "tails" and the coin comes to a halt "tails" up, the Original General Partner that appointed the Caller to the management Committee shall be deemed to have won the coin toss and the right to acquire (together with its Affiliates) a Controlling Interest in the Partnership, and if the Caller calls "heads"

and the coin comes to a halt "tails" up, or the Caller calls "tails" and the coin comes to a halt "heads" up, the tossing member's Original General Partner shall be deemed to have won the coin toss and the right to acquire (together with its Affiliates) the Controlling Interest in the Partnership. The Limited Partner that is an Affiliate of the prevailing member's Original General Partner shall purchase immediately from, and the Limited Partner that is an Affiliate of the Original General Partner that appointed the losing member shall sell immediately to the prevailing member's Limited Partner a one percent (1.0%) Limited Partnership Interest for a total price of $2,500,000, with transfer of the purchase funds to be completed no later than 1:00 p.m. New York City time on the date of the coin toss unless the arbitrator appointed pursuant to this <u>Section</u> 6.4 postpones such transfer to the next Business Day.

6.5    <u>Terminating Capital Transaction</u>. If a Controlling Partner wishes to effect a Terminating Capital Transaction between the Partnership and any other Person that is not an Affiliate of any Partner (or Affiliate thereof) or the Partnership in an arms'-length, bona fide transaction (an "Arms-Length Transaction"), it shall first give written notice (the "Terminating Transaction Notice") to the other Original General Partner (the "Non-Controlling Partner") setting forth in reasonable detail the parties and material terms of the proposed transaction. During the period of thirty (30) days following receipt of the Terminating Transaction Notice the Original General Partner receiving the Terminating Transaction Notice shall be entitled to deliver to the Controlling Partner an offer to purchase from the Controlling Partner and its Affiliates their entire Partnership Interests for an amount in cash equal to the amount to which such Controlling Partner (and Affiliate) would be entitled if the Partnership were to dissolve in accordance with <u>Article</u> XV and sell its assets at the value reflected by the terms of such Arms-Length Transaction as of the date of the Terminating Transaction Notice. Closing of the purchase of the Controlling Partner's and Affiliates' Partnership Interests shall occur within thirty (30) days of receipt by the Non-Controlling Partner of the Terminating Transaction Notice. In the event such purchase does not occur within such 30-day period, the Controlling Partner shall entitled to effect the Arms-Length Transaction during the period of 180 days following the delivery of the Terminating Transaction Notice on terms that are identical in all material respects as those set forth in the Terminating Transaction Notice. For purposes of this <u>Section</u> 6.5, ZTV shall be deemed a Controlling Partner, and CCS shall be deemed a Non-Controlling Partner, following the Termination Notice for so long as CCS remains a Partner.

6.6    <u>Management Committee Procedure</u>. The Management Committee shall meet at least once per calendar quarter. In addition, at any time, and from time to time, any member of the Management Committee may call meetings of the Management Committee. Written notice of any meeting shall be given to all members not less than ten (10) nor more than forty-five (45) days prior to the date of such meeting. Subject to the foregoing, the Management Committee shall conduct its business and the business of the Partnership in such manner and by such procedures as determined by the members of the Management Committee. In the event of the need for any action by the Management Committee other than at a properly noticed meeting, the member requesting such action shall send notice of such request to the other member. Such notice shall: (i) describe the action requested of the Management Committee; (ii) set forth the reasons that such action is in the best interests of the Partnership; and, (iii) state a reasonable deadline for response by the Management Committee. Management Committee members shall use their best efforts to respond to the request before the deadline set forth in the written notice described herein.

6.7   <u>Partnership Officers</u>.

(a)   The Management Committee, unless otherwise agreed, shall appoint officers to manage the day-to-day affairs of the Partnership and may delegate to such officers any part of the Management Committee's rights and duties under this Agreement. The officers shall have the authority to manage the affairs of the Partnership under the supervision of the Management Committee. The officers shall act at all times in accordance with the instructions of the Management Committee and the then-current Operating Plan. The acts of the officers shall bind the Partnership and Partners to the extent that such acts are within the scope of their authority. The officers shall be subject at all times to the direction of the Management Committee, and the officers shall keep the Management Committee informed as to all matters concerning the Partnership.

(b)   The officers shall be responsible for preparing updates for and status reports regarding the Operating Plan. The officers shall implement the programs contemplated in the Operating Plan and shall obtain the approval of the Management Committee or the General Partners, as applicable, for any changes thereto. The Chief Financial Officer shall in addition to all other duties and responsibilities herein contained be responsible for the management of all accounting functions (through the use of third party accounting firms or otherwise), the management of financial reporting systems, cash account management and reporting, including, without limitation, the duties of the General Partners set forth in <u>Article</u> VIII.

(c)   The Management Committee may terminate the officers at any time, with or without cause, and appoint replacement officers.

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

7.1   <u>Limitation of Liability</u>. Except as otherwise required by applicable law, a Limited Partner's liability for Partnership obligations, liabilities and Losses shall be limited to its undistributed Capital Contribution and its share of any undistributed Net Profits.

7.2   <u>Management of Business</u>. No Limited Partner shall participate in the control (within the meaning of the Act) of the Partnership's business or transact any business in the Partnership's name, unless such Limited Partner is also a General Partner or other Person employed or engaged to transact any such business by or on behalf of a General Partner or the Partnership The transaction of any such business by a Limited Partner employed or engaged to do so by or on behalf of a General Partner or the Partnership shall not be deemed to constitute participation in control of the Partnership and shall not affect, impair, or eliminate the limitations on the liability of a Limited Partner under this Agreement.

7.3   <u>No Right of Partition</u>. Prior to the dissolution and liquidation of the Partnership, no Limited Partner shall have the right to seek or obtain partition by court decree or operation of law of any Partnership property, or the right to own or use particular or individual assets of the Partnership.

7.4    Rights of Limited Partners Relating to the Partnership.  In addition to other rights provided by this Agreement or by applicable law (including the right to receive reports pursuant to Section 8.3), each Limited Partner shall have the right, for a proper purpose reasonably related to such Limited Partner's interest as a limited partner in the Partnership, upon reasonable notice and written request to the Management Committee:

    (i)    to obtain true and full information regarding the status of the Partnership's business and financial condition;

    (ii)    promptly after such information becomes available, to obtain a copy of the Partnership's United States federal, state and local income tax returns for each year, except that such Limited Partner shall not be entitled to obtain a copy of the various Schedule K-1s of other Partners that are exhibits to the Partnership's tax returns;

    (iii)    to obtain from the Partnership a copy of this Agreement and the Certificate of Limited Partnership and all amendments thereto;

    (iv)    to have a current list of the name and last known business, residence or mailing address of each Partner; and

    (v)    to inspect and copy (at such Limited Partner's expense) any of the Partnership's books and records and obtain such other information regarding the affairs of the Partnership as is just and reasonable.

Any and all information provided to or otherwise obtained by a Limited Partner with respect to the affairs of the Partnership and its business shall, except as may be required by law (including, without limitation, the Securities Act of 1933 and the Securities Exchange Act of 1934, and the rules and regulations of the Securities and Exchange Commission thereunder), be kept strictly confidential.

7.5    Development of the Zoom System.

(a)    Subject to all of the other provisions of this Agreement (including, without limitation, Section 3.6), CCS shall use commercially reasonable efforts to undertake and complete development of the Deliverables for, and on behalf of, the Partnership pursuant to, and in accordance with, Exhibit E hereto.  Any changes to Exhibit E must be approved by all General Partners.

(b)    Each Deliverable shall be contributed by CCS to the Partnership as set forth in Section 3.5(a); provided that from and after such time as the CCS Partners shall have made the Maximum Contribution the Partnership shall pay CCS for the Deliverables (or portions thereof) contributed thereafter, valued as set forth on Exhibit E.  Such contributions shall be deemed to occur automatically upon delivery by CCS and acceptance by the Management Committee of such Deliverable, without any action or documentation required on the part of any Person.  Notwithstanding the foregoing, CCS agrees to make, and cause to be made, any and all assignments, and execute, and cause to be executed, any and all agreements and other instruments of transfer and conveyance, as may reasonably be requested by the Partnership to further evidence such contribution.

(c)     CCS shall contribute all of its right, title and interest in all Zoom System Intellectual Property, all additions and improvements to the CCS Intellectual Property relating to the Zoom System, and all or any part of the Ancillary Business Rights (at the election of the Partnership) from time to time, as and when first made, conceived or reduced to practice. Such contributions shall be deemed to occur automatically, without any action or documentation required on the part of any Person. Notwithstanding the foregoing, CCS agrees to make, and cause to be made, any and all assignments, and execute, and cause to be executed, any and all agreements and other instruments of transfer and conveyance, as may reasonably be requested by the Partnership to further evidence such contribution.

(d)     The ZTV Partners, acting through, and on behalf of the Partnership, and not independently, shall use commercially reasonable efforts to negotiate and deliver studio agreements. The ZTV Partners agree to make, and cause to be made, any and all assignments, and execute, and cause to be executed, any and all agreements and other instruments of transfer and conveyance, as may reasonably be requested by the Partnership to further evidence the Partnership's ownership of all rights, title and interest in such studio agreements.

(e)     The ZTV Partners shall contribute all of their right, title and interest in all Zoom System Intellectual Property, all additions or improvements to the ZTV Intellectual Property and all or any part of the Ancillary Business Rights (at the election of the Partnership) from time to time, as and when first made, conceived or reduced to practice. Such contributions shall be deemed to occur automatically, without any action or documentation required on the part of any Person. Notwithstanding the foregoing, the ZTV Partners agree to make, and cause to be made, any and all assignments, and execute, and cause to be executed, any and all agreements and other instruments of transfer and conveyance, as may reasonably be requested by the Partnership to further evidence such contribution.

(f)     Subject to subsections (l) through (o) below, the Partnership shall own all right, title and interest in and to the Zoom System Intellectual Property and in all the Ancillary Business Rights relating to the Zoom System contributed to the Partnership pursuant to Sections 7.5(c) and 7.5(e).

(g)     Each partner shall, and shall cause its Affiliates to, take such actions as may be necessary to ensure that no employee, consultant, agent or subcontractor of such Partner (or Affiliate thereof) receives or retains any right or title to, or interest in, any Zoom System Intellectual Property.

(h)     As soon as practicable, and in any event no later than the first to occur of: (i) the contribution to the Partnership of Deliverables utilizing such Intellectual Property, (ii) the making of any commitment by the Responsible Partner (hereinafter defined) for, or on behalf of, the Partnership to use such Intellectual Property in connection with the Zoom System, or (iii) the taking of any action which has the practical effect of either (x) committing the Partnership to the use of such Intellectual Property in connection with the Zoom System or (y) requiring substantial modification or alteration of the design or development of any component of the Zoom System (as it

exists at such time) if such Intellectual Property was not used in connection therewith, the Partner that is to contribute such Intellectual Property shall:

    (1)    Undertake reasonable due diligence consistent with industry practice in seeking to determine: (x) whether any Person other than the Partnership holds any rights to, or interest in, such Intellectual Property which may, in any way, prohibit, restrict or otherwise condition the Partnership's power, authority or ability to use such Intellectual Property in connection with the development, use, manufacturing, marketing, distribution and sale of the Zoom System ("Third Party Rights") and (y) whether it is necessary for the Partnership to incur any costs (whether as lump sum payments, royalties or otherwise) ("Usage Costs") to obtain all rights to such Intellectual Property which may be needed by the Partnership in connection with the development, use, manufacturing, marketing, distribution and sale of the Zoom System.

    (2)    Advise the Management Committee of all Third Party Rights and Usage Costs of which such Partner becomes aware as a result of such reasonable due diligence, as well as any alternatives to the use of such Intellectual Property that are available to the Partnership, following which the Management Committee shall determine whether or not the Partnership shall endeavor to acquire such Third Party Rights and/or incur such Usage Costs.

    (i)    The Partner contributing such Intellectual Property (the "Responsible Partner") shall indemnify and hold harmless the Partnership and the other Partners for any costs, liabilities, expenses and other obligations (including, without limitation, reasonable attorneys' fees) incurred as a result of any claims, actions, suits, or causes of action relating to the existence of any Third Party Rights or Usage Costs of which the Management Committee was not timely advised pursuant to Section 7.5(h)(2) but of which the Responsible Partner was, or should have been, aware, based upon the reasonable due diligence required to have been undertaken pursuant to Section 7.5(h)(1).

    (j)    The Partnership shall indemnify and hold harmless the Responsible Partner for any costs, liabilities, expenses and other obligations (including, without limitation, reasonable attorneys' fees) incurred as a result of any claims, actions, suits, or causes of action relating to the existence of any Third Party Rights or Usage Costs of which the Responsible Partner was not, and should not have been, aware, based upon its reasonable due diligence pursuant to Section 7.5(h)(1); provided that any indemnification pursuant to this Section 7.5(j) shall be solely the obligation of the Partnership, and not of any Partner (or Affiliate thereof); provided, further that the Responsible Partner shall look solely to the assets of the Partnership for satisfaction of any obligation arising under this Section 7.5(j).

    (k)    The Partnership hereby grants to CCS, to the extent necessary for the development of the Deliverables, a non-sublicensable, non-transferable license to use all ZTV Intellectual Property to develop the Zoom System for the Partnership. The ZTV Intellectual Property may not be used by CCS for any other purpose, and may not be disclosed by CCS except to (i) consultants, agents or subcontractors of CCS or its Affiliates who first agree, in writing, to the provisions of this Section 7.5(k) and (ii)

employees.  CCS shall also use commercially reasonable efforts, consistent with CCS's current policies in similar matters, to ensure that its employees do not make any disclosure in contravention of this provision.

(l)    The Partnership hereby grants to CCS and ZTV a perpetual, royalty-free, non-exclusive, non-transferable, sub-licensable (but not further sub-licensable by such sub-licensee) license to use all Zoom System Intellectual Property for purposes which do not, either directly or indirectly, compete with, or substantially and detrimentally affect the success of, the Zoom System; provided, that neither CCS nor ZTV may disclose any Zoom System Intellectual Property not described in the claims of letters patent issued in the United States to any person except (i) consultants, agents or subcontractors of CCS, ZTV or their Affiliates who first agree, in writing, to the provisions of this Section 7.5(l) and (ii) employees.  CCS and ZTV shall also use commercially reasonable efforts, consistent with CCS's current policies in similar matters, to ensure that its employees do not make any disclosure in contravention of this provision.

(m)    The Partnership hereby grants to CCS and ZTV a perpetual, royalty-free, non-exclusive, non-transferable, sub-licensable (but not further sub-licensable by such sub-licensee) license to use all Ancillary Business Rights which are contributed to the Partnership pursuant to Section 7.5(c) and 7.5(e).

(n)    The licenses granted to CCS pursuant to Section 7.5(k) shall terminate, and be of no further force or effect, upon the termination (pursuant to Section 3.6 or otherwise) of CCS's obligations hereunder.

(o)    Notwithstanding any contrary provision of this Agreement, no Partner shall receive any right, title or interest in or to, or any license to use or otherwise exploit, any trade name, trademark or service mark of the Partnership.  Except as otherwise specifically provided herein, the Partnership and each of its Partners are free to use, without restriction or obligation, any information which is not susceptible of protection as Intellectual Property.

(p)    None of the CCS Partners, the ZTV Partners, nor an Affiliate of any of them, shall use or license others to use any ZTV Intellectual Property, CCS Intellectual Property, Zoom System Intellectual Property or Ancillary Business Rights other than in accordance with this Section 7.5.  The parties hereby declare that it is impossible to measure the damages which will accrue to a party by reason of a breach by another party of any obligations under this Section 7.5.  Therefore, if any party institutes any action or proceeding to enforce the provisions of this Section 7.5, any party against whom such action or proceeding is brought hereby waives the claim or defense therein that such plaintiff party has an adequate remedy at law, and such defendant party shall not urge in any such action or proceeding the claim or defense that such remedy at law exists.

(q)    Notwithstanding any contrary provision in this Agreement, but subject to the limitations on the use of Intellectual Property contained in this Section 7.5, nothing in this Agreement shall limit or affect in any way, any other activities by any Partner (or Affiliate thereof) in the ordinary course of such Partner's (or Affiliate's) business

(including, without limitation, the retail distribution by CCS and its Affiliates of electronics products), whether or not such activities relate to products that compete, directly or indirectly, with the Zoom System.

## ARTICLE VIII
## RECORDS AND REPORTS

8.1    Records and Accounting.  The Management Committee, or the Chief Financial Officer on its behalf, shall keep, or cause to be kept, appropriate books and records with respect to the Partnership's business, including all books and records necessary to provide any information, lists, and copies of documents required to be provided pursuant to Section 7.4 or pursuant to applicable laws.  All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the Management Committee or the Chief Financial Officer on its behalf.

8.2    Fiscal Year.  The Fiscal Year of the Partnership shall be the calendar year or such other annual accounting period as may be established by the Management Committee.

8.3    Reports.

(a)    The Management Committee, or the Chief Financial Officer on its behalf, shall deliver or cause to be delivered to each Partner, within 120 days after the end of each Fiscal Year, an annual report containing the following:

(i)    a Partnership balance sheet as of the end of such Fiscal Year, Partnership statements of income, cash flows, and changes in Partners' equity for such Fiscal Year, and a statement of changes in the Partner's Capital Account during the fiscal year, each of which shall be audited by a firm of independent public accountants; and

(ii)    a general description of the Partnership's activities during such Fiscal Year (including the result of any matters submitted to a vote of the Limited Partners during the last fiscal quarter of such Fiscal Year).

(b)    As soon as available, but in any event not later than fifteen (15) days after the last day of each month of each Fiscal Year, the Management Committee, or the Chief Financial Officer on its behalf, shall deliver or cause to be delivered to each Partner:

(i)    an unaudited Partnership balance sheet as of the end of such month and unaudited Partnership statements of income, cash flows, and changes in Partners' equity for such month and for the portion of the Fiscal Year through such date, all in reasonable detail; and

(ii)    a general description of the Partnership's activities during such month (including the result of any matter submitted to a vote of the Limited Partners during the month with respect to which the report is issued).

(c)     The Management Committee, or the Chief Financial Officer on its behalf, shall deliver or cause to be delivered to each Partner any time during such Fiscal Year all information necessary for the preparation of such Partner's United States federal income tax returns, including a Form 1065 Schedule K-1 as soon as is reasonably possible after the receipt by the Management Committee of all information required to prepare such form, but in no event later than 90 days following the end of the relevant Fiscal Year. The Chief Financial Officer shall also deliver or cause to be delivered to the Partners any additional information necessary for the preparation of any state, foreign, and local income tax returns which must be filed by such Partner.

(d)     Upon the request of any Partner, the Chief Financial Officer shall use reasonable efforts to deliver or cause to be delivered to such Partner, at least five days prior to each installment date specified in Code Section 6655(c)(2) (relating to estimated tax payments), information necessary for the payment of such Partner's United States federal estimated income tax attributable to the Partnership. The Chief Financial Officer may estimate the amount of the Partnership's Profit or Loss to be reported for the applicable installment period.

ARTICLE IX
TAX MATTERS

9.1     Preparation of Tax Returns. The Management Committee, or the Chief Financial Officer if one is designated on its behalf, shall arrange for the preparation and timely filing of all tax returns required to be filed by the Partnership.

9.2     Tax Elections. The Taxable Year shall be the Fiscal Year set forth in Section 8.2, unless the Management Committee shall determine otherwise in its discretion and in compliance with applicable laws. The Partnership shall make the election referred to in Code Section 754 upon the request of any Partner in connection with a transfer of the Partner's Partnership Interest unless the Management Committee determines that such election is not in the Partnership's best interests (for example, because the administrative costs to the Partnership of accounting for the adjustments required by the election would outweigh the likely tax benefit of the election to the transferor Partner and the transferee). The Management Committee shall, in its discretion, determine whether to make or revoke any other available election pursuant to the Code.

9.3     Tax Controversies. Until otherwise determined by the Management Committee, CCS is designated the "Tax Matters Partner" (as defined in Code Section 6231(a)(7)), and is authorized and required under the direction of the Management Committee to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the Tax Matters Partner and to do, or refrain from doing, any or all things reasonably requested by the Tax Matters Partner with respect to the conduct of such proceedings. The Management Committee shall have sole discretion to determine whether the Partnership (either on its own behalf or on behalf of the Partners) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. Any deficiency for taxes imposed on any Partner (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such

Partner, and if paid by the Partnership, shall be recoverable from such Partner pursuant to <u>Section</u> 4.8.

The Tax Matters Partner will give notice to all Partners, within 30 days (in advance, unless impossible), of:

<ol type="i">
<li>the receipt by the Partnership of notification, from the Internal Revenue Service of its intent to conduct an audit of the Partnership;</li>
<li>the receipt of final Partnership administrative adjustments pursuant to Code Section 6223;</li>
<li>any settlement by the General Partners with the Internal Revenue Service or any settlement by any other Partner with the Internal Revenue Service of which the Tax Matters Partner receives notice; <u>provided</u>, that the Tax Matters Partner will not enter into any settlement on behalf of the Partnership without the concurrence of the General Partners;</li>
<li>notice of the Partnership's filing of a petition for judicial review of any final Partnership administrative adjustment or an appeal of a judicial decision;</li>
<li>notice of the Partnership's decision not to file a petition for judicial review of any final Partnership administrative adjustment; and</li>
<li>any other information required by Code Section 6223(g).</li>
</ol>

9.4   <u>Information to Partnership</u>.  Each Partner shall timely provide to the Partnership all forms and information which such Partner is required to provide by applicable law, regulations, or tax forms, and shall also provide to the Partnership upon request such additional information or forms which the Chief Financial Officer may reasonably request with respect to the Partnership's compliance with applicable tax laws.

## ARTICLE X
## AMENDMENTS

10.1   <u>Amendments Generally</u>.  Subject to the provisions of <u>Section</u> 6.1(c), the General Partners, acting jointly, without the consent of any Limited Partner, may amend any provision of this Agreement, and execute, swear to, acknowledge, deliver, file and record whatever documents may be required in connection therewith to reflect such amendment; *except that*, without the consent of the Partners to be adversely affected, this Agreement may not be amended so as to (a) modify the limited liability of a Partner or (b) adversely affect the interest of a Partner in Net Profits, Net Losses, Cash Flow or Distributions (other than to reflect the admission of Additional Limited or General Partners).

10.2   <u>Clarifying Amendments</u>.  In addition to other amendments authorized herein, amendments may be made to this Agreement from time to time by the General Partners, without the consent of any other Partner: (a) to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement that are not inconsistent with the

provisions of this Agreement; (b) to delete or add any provision of this Agreement required to be so deleted or added by any federal or state official, which addition or deletion is deemed by such official to be for the benefit or protection of all of the Partners; (c) to take such actions as may be necessary (if any) to insure that the Partnership will be treated as a partnership for federal income tax purposes; or (d) to otherwise satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any United States federal or state agency or judicial authority or contained in any federal or state statute.

     10.3    Amendment of this Article.  This Article X shall only be amended with the approval by written consent or affirmative vote of all Partners.

## ARTICLE XI
## TRANSFER OF PARTNERSHIP INTERESTS

     11.1    Transfer in General.

     (a)    The term "Transfer," when used in this Article XI, means a transaction by which a Partner or Assignee assigns all or any portion of such Partner's or Assignee's Partnership Interest or any interest therein to another Person, and includes a sale, assignment, gift, pledge, encumbrance, hypothecation, mortgage, or exchange of all or any part of such Partnership Interest; provided, that a transaction by which a Partner or Assignee assigns all or any portion of its Partnership Interest or any interest therein to its Affiliate shall not be deemed a "Transfer" for purposes of this Article XI, except that (i) such transferee Affiliate shall be deemed an Assignee, and shall not become a Substituted Limited Partner or Successor General Partner, as appropriate, without the consent of the General Partners, in the case of a Substituted Limited Partner, pursuant to Section 12.1, or all Partners, in the case of a Successor General Partner, pursuant to Section 12.2 (in each case, with such consents being granted or withheld in the sole and absolute discretion of each Partner entitled to consent thereto); (ii) such transferee Affiliate agrees in writing to be bound as an Assignee to the terms and conditions of this Agreement, and (iii) such transferee Assignee remains an Affiliate of the transferor and also of CCS (if the Transferred Interest originally belonged to one of the CCS Partners) or of ZTV (if the Transferred Interest originally belonged to one of the ZTV Partners).

     (b)    Partnership Interests of a General Partner shall not be Transferred unless the Transfer is described in Section 11.3.  Partnership Interests of a Limited Partner shall not be Transferred unless the Transfer is described in Section 11.4 or Section 11.5.

     (c)    Any Transfer or purported Transfer of a Partnership Interest which is not described in Section 11.3, Section 11.4 or Section 11.5 shall be void and shall not bind or be recognized by the Partnership.  For purposes of this Agreement, the Partnership and the General Partners shall recognize the purported transferor as continuing to be the owner of the Partnership Interest Transferred or purported to be Transferred.

11.2    <u>Additional Restrictions</u>.  Notwithstanding any contrary provision in this Agreement, any otherwise-permitted Transfer shall be null and void if:

(i)    such Transfer would cause a termination of the Partnership for federal or state, if applicable, income tax purposes;

(ii)    such Transfer would, in the opinion of counsel to the Partnership, cause the Partnership to cease to be classified as a partnership for federal or applicable state income tax purposes;

(iii)    such Transfer requires the registration of such Transferred Interest pursuant to any applicable federal or state securities laws;

(iv)    such Transfer causes the Partnership to become a "Publicly Traded Partnership," as such term is defined in Sections 469(k)(2) or 7704(b) of the Code;

(v)    such Transfer subjects the Partnership to regulation under the Investment Company Act of 1940, the Investment Advisers Act of 1940 or the Employee Retirement Income Security Act of 1974, each as amended;

(vi)    such Transfer results in a violation of applicable laws;

(vii)    such Transfer is made to any Person who lacks the legal right, power or capacity to own such Interest; or

(viii)    the Partnership does not receive written instruments in respect of such Transfer (including, without limitation, copies of any instruments of Transfer and such Assignee's consent to be bound by this Agreement as an Assignee) that are in a form satisfactory to the General Partners.

11.3    <u>Transfer of a General Partnership Interest by a General Partner</u>.

(a)    No General Partner may Transfer a Partnership Interest without the prior written consent of all Partners (which consent may be granted or withheld in the sole and absolute discretion of each Partner).

(b)    Any Transfer by a General Partner of all of its General Partnership Interest, if the Transfer is consented to by all Partners pursuant to <u>Section</u> 11.3(a) and upon the admission of the Assignee(s) as Successor General Partners, shall constitute a withdrawal for purposes of <u>Section</u> 14.1.

11.4    <u>Transfer of Limited Partner's Partnership Interest With General Partner Consent</u>.  No Limited Partner shall Transfer any of its Partnership Interest unless all of the following conditions are satisfied:

(a)    The General Partners shall have consented in writing to the proposed Transfer (except as provided in <u>Section</u> 11.5 with regard to the Transfer of a portion of a Limited

Partner's Partnership Interest).  Such consent may be granted or withheld in the sole and absolute discretion of the General Partners.

(b)      The transferor shall pay the Partnership a Transfer fee in an amount established by the Management Committee to pay the Partnership's reasonable expenses in connection with the Transfer.

11.5    Security Assignment of Limited Partner's Right to Receive Distributions.  The General Partners' consent shall not be required for any Limited Partner to make a conditional assignment to a lender as security for such Limited Partner's obligations to such lender, of such Partner's right to receive Distributions from the Partnership; provided that neither such conditional assignment, nor any realization thereupon, shall inhibit or restrict such Limited Partner's ability to satisfy its obligations under this Agreement, including, without limitation, pursuant to Section 3.6(b), provided further that so long as the CCS Loan is outstanding, no Partner may pledge, assign or hypothecate its interest in the Partnership or its right to receive Distributions without the prior written consent of CCS, except in connection with the acquisition of capital some or all of which is to be used to repay in full such CCS Loan..

11.6    Assignee's Rights.

(a)      A Transfer of a Partnership Interest described in Section 11.3, Section 11.4 or Section 11.5 shall be effective as of the date determined by the Management Committee, which date shall not be earlier than the first day of the calendar month during which such Transfer occurs, nor later than the first day of the calendar month following the calendar month during which it receives notice that such Transfer has occurred.  Net Profits, Net Losses and other Partnership items shall be allocated between the transferor and the Assignee according to Section 4.4.  Distributions made with respect to periods before the effective date of such Transfer shall be paid to the transferor, and Distributions made with respect to periods after such date shall be paid to the Assignee.

(b)      Unless and until an Assignee becomes a Partner pursuant to Article XII, such Assignee shall not be entitled to any of the rights granted to a Partner hereunder or under applicable law, other than the rights to receive allocations of Net Profits and Net Losses and Distributions and to Transfer the Assignee's Partnership Interest (subject to the conditions of this Article applicable to Limited Partners).  Further, such Assignee shall be bound by any limitations and obligations contained herein with respect to Limited Partners.

11.7    Right of First Offer, Right of First Refusal for Partnership Interests.

(a)      If a Limited Partner (the "Selling Partner") desires to Transfer its Partnership Interest (other than Pursuant to Section 11.4 or 11.5), in whole or in part (the "Offered Interest"), it shall first give written notice to the other Limited Partner (the "Other Partner") of its desire (the "Offer Notice"), and allow such Other Partner ten (10) days within which to submit an offer for the Offered Interest.  If the Other Partner fails to submit such an offer within such 10-day period, then it shall be deemed to have elected not to submit an offer in connection with that particular Offer Notice.

(b)     Provided the Selling Partner has complied with Section 11.7(a), the Selling Partner
shall have the right, subject to this Section 11.7(b), to seek to Transfer the Offered
Interest to third parties in a bona fide transaction. If the Selling Partner has agreed to
Transfer the Offered Interest to such a third party, it shall give written notice (the
"Refusal Notice") to the Other Partner. The Refusal Notice shall identify the
proposed transferee and the price and all material terms of the proposed Transfer to
such third party. If the proposed Transfer is evidenced by a written offer, letter of
intent or other writing, then a copy of such offer, letter or writing shall be included
with the Refusal Notice. The Other Partner shall have a period of ten (10) days after
receipt of the Refusal Notice and copy of the offer within which to agree, by notice to
the Selling Partner, to purchase the Offered Interest on the terms set forth in the
Refusal Notice. If the Other Partner gives such acceptance notice within such 10-day
period, then the Selling Partner and the Other Partner shall consummate the purchase
of the Offered Interest on such terms and on the closing date as are contemplated in
such Refusal Notice, but in no event shall the Other Partner be obligated to
consummate such purchase earlier than ten (10) days after the end of such 10-day
period. If the Other Partner fails to give such an acceptance notice within such
10-day period, then the Selling Partner shall be entitled to Transfer the Offered
Interest to the third party identified in the Refusal Notice, provided that such transfer
occurs within sixty (60) days after the date of the Refusal Notice and is concluded on
terms and conditions that are identical in all material respects to those set forth in the
Refusal Notice. If the Selling Partner fails to consummate such Transfer within such
60-day period then the Selling Partner shall again offer the Offered Interest to the
Other Partner on the terms set forth in the original Refusal Notice, and the Other
Partner shall have a new period of five (5) days after receipt of such offer to notify
the Selling Partner whether it agrees to purchase the Offered Interest on the terms set
forth above applicable to the original Refusal Notice.

(c)     Any Transfer of a Partnership Interest by a Limited Partner shall be void and of no
effect if the procedures set forth in this Section 11.7 shall not have been complied
with.

## ARTICLE XII
## ADMISSION OF SUBSTITUTED PARTNERS

12.1    Substituted Limited Partners. An Assignee of a Partnership Interest Transferred by a
Limited Partner pursuant to Section 11.4 or 11.7 may, together with the assignor of such Interest,
request that such Assignee be admitted as a Substituted Limited Partner on the form prescribed by the
Management Committee. Such Assignee shall become a Substituted Limited Partner only if (i) such
Assignee satisfies the requirements of Section 12.3 and (ii) the General Partners consent thereto
(which consent may be given or withheld in the General Partners' respective sole and absolute
discretion). Provided that the requirements of the foregoing sentence are met, such Assignee shall
become a Substituted Limited Partner on the date such admission is shown on the Partnership's books
and records. If the General Partners' consent is withheld, such transferee shall remain an Assignee.

12.2    Admission of a Successor General Partner. A Person shall be admitted as a Successor
General Partner if and only if: (i) the Person satisfies the requirements of Section 12.3, and (ii) all

Partners consent (which consent may be given or withheld in each Partner's sole and absolute discretion) to such admission.

12.3     Representations of Partners.  As a condition to becoming a Partner, each Person admitted to the Partnership as a Partner shall become a party to, and agree to be bound by, this Agreement.  Each Partner represents and warrants (and each Partner admitted after the date of this Agreement shall be required to represent and warrant) that:  (i) the Partner's interest in the Partnership is intended to be and is being acquired solely for the Partner's own account for the purpose of investment and not with a view to any sale or other disposition of all or any part thereof (provided the disposition of the Partner's property shall be within its control); (ii) the Partner is aware that interests in the Partnership have not been registered or qualified under the Securities Act or any state securities law, that such interests cannot be sold or otherwise disposed of unless they are registered thereunder or unless an exemption from such registration or qualification is available, that the Partnership has no present intention of so registering such interests under the Securities Act or any state securities law (and has no obligation to effect or assist in any such registration), and that accordingly such Partner is able and is prepared to bear the economic risk of making a Capital Contribution and to suffer a complete loss of investment; (iii) the Partner's knowledge and experience in financial and business matters are such that the Partner is capable of evaluating the risks of making a Capital Contribution; and (iv) the Partner has the necessary power and authority to make, and has obtained all necessary internal and external approvals for making, its Capital Contributions, free and clear of all liens, claims and encumbrances not expressly agreed to be excepted by the Partnership. The foregoing representations and warranties may be relied upon by the Partnership, and by the other Partners, in connection with each Partner's purchase of any Partnership Interest.

**ARTICLE XIII**
**ADMISSION OF ADDITIONAL PARTNERS**

13.1     Admission of Additional Financing Partners.

(a)     The Partners contemplate that the amount of the Capital Contributions described in Article III and the CCS Loan will be insufficient to finance the Partnership's continued operation.  As a result, the Partners anticipate that additional financing (the "Additional Financing") of approximately $50,000,000 will be necessary for the Partnership's business.  The date on which the Partnership will begin to seek such Additional Financing shall be determined by agreement of the General Partners.  At such time, the Management Committee shall be authorized to seek the Additional Financing by the admission of one or more Additional Financing Partners to the Partnership.  If an Additional Financing Partner is admitted to the Partnership in exchange for the Additional Financing, each of the Limited Partner's Percentage Interests shall be reduced proportionately, but no Limited Partner shall be reduced by more than twenty percent (20%) of the aggregate Percentage Interest held by such Limited Partner and the General Partner with respect to which it is an Affiliate.  If the Management Committee determines that the Additional Financing cannot be obtained by admitting Additional Financing Partners on acceptable terms within the limitations set forth in the preceding sentence, then the Management Committee nevertheless shall be permitted to seek the Additional Financing from Additional Financing Partners on such terms and conditions as the it deems appropriate; provided, that (1) in no event shall a Limited Partner's Percentage Interest be reduced by more than

thirty percent (30%) of the aggregate Percentage Interest held by such Limited Partner and the General Partner with respect to which it is an Affiliate in connection with the admission of any Additional Financing Partner without the consent of the Limited Partner whose Percentage Interest is so reduced, and (2) if Additional Financing Partners are to be admitted for less than all of the Additional Financing, then such Additional Financing Partners shall be required to contribute not less than $1,666,667 for every one percent (1%) Percentage Interest it is to receive in the Partnership.

(b)    If the Partnership raises the entire Additional Financing and, in connection therewith, the Percentage Interest of CCS is reduced by less than twenty percent (20%) of the aggregate Percentage Interest held by CCS and SVC (the "Reduction Percentage"), then, within ten (10) Business Days after the admission of any such Additional Financing Partner(s), CCS shall contribute cash to the Partnership in an amount equal to the lesser of (i) $375,000 times the difference between twenty percent (20%) and the actual Reduction Percentage, or (ii) $7,500,000; provided, that any Percentage Interest received by CCS or SVC (or any Affiliate) in connection with providing any of the Additional Financing shall be deemed not to be held by CCS or SVC for purposes of calculating the amount of Percentage Interest held by CCS after the Additional Financing; provided, further, that the provisions of this Section 13.1(b) shall not apply if at the time of such Additional Financing CCS has given a Termination Notice pursuant to Section 3.6.

13.2    Voluntary Capital Contributions

(a)    If, within ninety (90) days following the date on which the Partnership begins seeking the Additional Financing pursuant to Section 13.1, less than all of the Additional Financing has been raised from the admission of one or more Additional Financing Partners pursuant to Section 13.1, then either General Partner may provide CCS and ZTV with a written request (the "Contribution Request") that they make additional Capital Contributions (each, a "Voluntary Capital Contribution") equal to its proportionate share (determined in accordance with its Percentage Interests) of the excess Additional Financing needed by the Partnership over the Additional Financing raised from Additional Financing Partners (if any).

(b)    A Limited Partner that desires to contribute (or cause to be contributed) all or any portion of its Voluntary Capital Contribution (an "Electing Limited Partner") shall so notify the Management Committee within thirty (30) days of its receipt of the Contribution Request. Such Electing Limited Partner shall then make (or cause to be made) its Voluntary Capital Contribution within sixty (60) days following receipt of the Contribution Request. The General Partner that is an Affiliate of any Electing Limited Partner may designate, within the above-provided 60 day period, one or more other Persons to make some or all of such Electing Limited Partner's Voluntary Capital Contribution. In such event: (i) such other Person shall, upon making such Voluntary Capital Contribution and complying with Section 13.5, be entitled to become an Additional Limited Partner without any further action or consent on the part of any other Partner, and shall receive a Percentage Interest equal to a percentage, stated as a fraction, the numerator of which shall equal the amount of the Electing Limited Partner's Voluntary Capital Contribution made by such other Person, and the denominator of which shall equal $2,500,000; and (ii) such Electing Limited

Partner's Percentage Interest shall be reduced by the Percentage Interest received by
such other Person.

(c)     If any Limited Partner (a "Non-Electing Limited Partner") does not notify the
Management Committee of its intention to make its Voluntary Capital Contribution or
does not make or cause to be made all of its Voluntary Capital Contribution in
accordance with Section 13.2(b), then an Electing Limited Partner shall have the
right, but not the obligation, to make additional contributions equal to some or all of
that portion of the Non-Electing Limited Partner's Voluntary Capital Contribution
amount that has not been made (the "Uncontributed Amount") (so long as such
additional contributions are made in multiples of $2,500,000). If the Electing Limited
Partner contributes, in addition to its Voluntary Capital Contribution, some or all of
the Uncontributed Amount, then (i) the Partnership shall issue to the Electing Limited
Partner an additional one percent (1%) Percentage Interest in the Partnership for every
full $2,500,000 of the Uncontributed Amount contributed, and (ii) the Partnership
Interest of a Non-Electing Limited Partner shall be reduced by the aggregate amount
of additional Percentage Interest issued to the Electing Limited Partner pursuant to
clause (i) above.

13.3    Restrictions on Additional Financing. Notwithstanding any contrary provision in this
Agreement, if at any time the Partnership proposes to obtain the Additional Financing either the CCS
Partners (in the aggregate) or ZTV Partners (in the aggregate) hold the Controlling Interest, the
following shall apply:

(i)     The Original General Partner whose Affiliates hold the Controlling Interest
shall give to the other Original General Partner notice (the "Financing
Notice") setting forth the material terms of the Additional Financing;

(ii)    The Affiliated Partners not holding the Controlling Interest shall for a period
of thirty (30) days after receipt of the Financing Notice have an assignable
right of first refusal to contribute, in the aggregate, the portion (or such lesser
amount as they determine) of the Additional Financing equal to the fraction,
the numerator of which is the Percentage Interests capable of being voted by
the members on the Management Committee appointed by the Original
General Partner not holding a Controlling Interest and the denominator is the
total Percentage Interests capable of being voted by all members on the
Management Committee; and

(iii)   The Partnership shall be entitled to obtain the balance of the Additional
Financing not provided in accordance with the preceding clause from such
sources, including, without limitation the Controlling Partner and its
Affiliates, as the Controlling Partner shall determine.

13.4    Admission of Other Additional Partners. Except as otherwise provided in this Article
XIII, the admission to the Partnership of any Additional General Partner or Additional Limited
Partner shall require the consent of all General Partners.

13.5    Conditions to Admission of Additional Partners. As a condition to becoming an
Additional Limited Partner or Additional General Partner, a Person admitted to the Partnership as an

Additional Partner shall become a party to, and agree to be bound by, this Agreement as it may be amended and restated upon admission of such Partner. Further, any Person admitted as an Additional Partner shall make the representations and warranties described in Section 12.3.

## ARTICLE XIV
## WITHDRAWAL OF PARTNERS

14.1    Withdrawal of a General Partner.  No General Partner shall withdraw as a general partner of the Partnership, except that (a) a General Partner shall be deemed to have withdrawn as a general partner of the Partnership upon the effective date of the Transfer of all of its General Partnership Interest in a Transfer made in compliance with Section 11.3 and the admission of each Assignee thereof as a Successor General Partner, and (b) SVC shall be deemed to have withdrawn as a general partner of the Partnership upon provision of the Termination Notice.

14.2    Former General Partner's Liabilities.  A former General Partner shall not be liable for Partnership liabilities incurred after the effective date of the former General Partner's withdrawal as General Partner but shall continue to be liable for Partnership liabilities incurred before such effective date.

14.3    Withdrawal of Limited Partners.  No Limited Partner shall have any right to withdraw from the Partnership without the prior written consent of the General Partners.  Upon a Transfer of all of a Limited Partner's Interest in a Transfer made in compliance with Section 11.4, and the admission of each Assignee thereof as a Substituted Limited Partner, such Limited Partner shall cease to be a Limited Partner.  Without the written consent of the General Partners, the transferor shall not be released from liability to the Partnership for any obligation of such transferor to contribute cash or other property to the Partnership.

## ARTICLE XV
## DISSOLUTION AND LIQUIDATION

15.1    Dissolution.  The Partnership shall not be dissolved by the admission of Additional Limited Partners or Substituted Limited Partners, by the admission of Successor General Partners or Additional General Partners, or by the withdrawal, death, incompetency, dissolution, bankruptcy or termination of any Limited Partner.  If the withdrawal, death, incompetency, dissolution, bankruptcy or termination of any General Partner (other than the last remaining General Partner) is, for any reason, deemed to cause a dissolution of the Partnership, then the General Partners hereby agree to continue the business of the Partnership pursuant to their right to do so as provided in this Agreement. The Partnership shall dissolve, and its affairs shall be wound up, only upon:

        (i)    the expiration of its term as provided in Section 2.5;

        (ii)   the withdrawal, death, incompetency, dissolution, bankruptcy or termination of the last remaining General Partner, unless a Majority Interest of the remaining Partners elect to admit a new general partner and to continue the Partnership pursuant to Section 15.2;

(iii)   the occurrence of any other event that makes it unlawful for the Partnership's
existence to be continued;

(iv)   the occurrence of a Terminating Capital Transaction (except with respect to
the sale of a merger or consolidation in which the Partnership is the surviving
entity);

(v)   pursuant to the proviso following <u>Section</u> 3.6(a)(viii);

(vi)   the election to dissolve by all General Partners and Limited Partners holding a
majority of the Percentage Interests held, in the aggregate, by all Limited
Partners; or

(vii)   judicial dissolution.

15.2   <u>Election to Continue Partnership</u>.  Within ninety (90) days following the occurrence of
any event referred to in <u>Section</u> 15.1(ii), a Majority Interest of the remaining Partners may agree in
writing to continue the Partnership's business and to the appointment, effective as of the date of the
event referred to in <u>Section</u> 15.1(ii) (the "Withdrawal Date"), of one or more Additional General
Partners.  Unless an Additional General Partner is admitted to the Partnership within ninety (90) days
after the Withdrawal Date, the Partnership shall be liquidated pursuant to <u>Section</u> 15.3.  If an
Additional General Partner is admitted to the Partnership pursuant to this <u>Section</u> 15.2, then:  (i) the
Partnership shall continue until the end of the term set forth in <u>Section</u> 2.5 unless earlier dissolved
according to this <u>Article</u> XV and (ii) all necessary steps shall be taken to amend the Certificate of
Limited Partnership and this Agreement.

15.3   <u>Liquidation</u>.

(a)   Upon dissolution of the Partnership, the Management Committee shall be the
"Liquidator", unless and until a successor Liquidator is appointed as provided herein.
The Liquidator shall agree not to resign at any time without thirty (30) days' prior
written notice.  The Liquidator may be removed at any time, with or without cause,
by notice of removal and appointment of a successor Liquidator approved by a
Majority Interest.  If the Liquidator resigns, a successor Liquidator may be elected by
a Majority Interest.  The successor Liquidator shall succeed to all rights, powers, and
duties of the former Liquidator.  The right to appoint a successor or substitute
Liquidator in the manner provided herein shall be recurring and continuing for so
long as the functions and services of the Liquidator are authorized to continue under
the provisions hereof, and every reference herein to the Liquidator shall be deemed to
refer also to any such successor or substitute Liquidator appointed in the manner
herein provided.  Except as expressly provided in this <u>Article</u> XV, the Liquidator
appointed in the manner provided herein shall have and may exercise, without further
authorization or consent of any of the parties hereto, all of the powers conferred upon
the General Partners under the terms of this Agreement (but subject to all of the
applicable limitations, contractual and otherwise, upon the exercise of such powers) to
the extent necessary or desirable in the good faith judgment of the Liquidator to carry
out the duties and functions of the Liquidator hereunder, for and during such period
of time as shall be reasonably required in the good faith judgment of the Liquidator to
complete the winding up and liquidation of the Partnership as provided for herein.

The Liquidator shall receive as compensation for its services a reasonable fee plus out-of-pocket costs or such other compensation as a Majority Interest may approve.

(b)   Upon the occurrence of any event referred to in <u>Section</u> 15.1(b), the Liquidator shall establish reasonable rules and procedures for the nomination and election of a Additional General Partner pursuant to <u>Section</u> 15.2. Pending such election, the Liquidator shall continue to operate the Partnership's business in the ordinary course with a view to conserving the Partnership's assets. If no Additional General Partner is admitted to the Partnership pursuant to <u>Section</u> 15.2 within the time period specified therein, the Liquidator shall proceed with the liquidation of the Partnership's assets as provided in <u>Section</u> 15.3(c).

(c)   Except as provided in <u>Section</u> 15.4, the Liquidator shall liquidate the assets of the Partnership, and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

    (i)   First, to the payment of the Partnership's debts and obligations to its creditors (excluding loans to the Partnership by Partners), including sales commissions and other expenses incident to any sale of the assets of the Partnership.

    (ii)   Second, to the establishment of and additions to such Reserves as the Liquidator may deem necessary or appropriate.

    (iii)   Third, to the payment of the Partnership's debts and obligations to the Partners in their capacity as creditors (including loans to the Partnership by Partners, pro rata according to the relative amounts of such unpaid loans).

    (iv)   Fourth, to the Partners, to the extent of and in proportion to their respective positive Capital Account balances (adjusted for all distributions and allocations pursuant to <u>Article</u> IV for all periods ending on or before the date of the distribution), in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2).

(d)   If a General Partner has a deficit balance in its Capital Account at the time of the liquidation of the Partnership or the liquidation of its interest in the Partnership (after crediting allocations of income and debiting allocations of loss to its Capital Account), such General Partner shall be obligated to pay to the Partnership the amount of the deficit balance. This amount, upon the liquidation of the Partnership, shall be paid to the creditors of the Partnership or distributed to the other Partners in accordance with their respective positive Capital Account balances. The restoration and payment referred to herein shall be made in accordance with Section 1.704-1(b)(2)(ii)(b)(3) of the Treasury Regulations. No Limited Partner shall have an obligation to restore any deficit in its Capital Account.

(e)   The Reserves established pursuant to <u>Section</u> 15.3(c)(ii) shall be paid over by the Liquidator to a bank or other financial institution, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at

the expiration of such period as the Liquidator deems advisable, such Reserves shall be distributed to the Partners in the priorities set forth in Section 15.3(c).

15.4    Distribution in Kind.  The provisions of Section 15.3 which require the liquidation of the assets of the Partnership notwithstanding, but subject to the order of priorities set forth therein, if upon dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners, the Liquidator may, in its discretion, defer for a reasonable time the liquidation of any assets except those necessary to satisfy Partnership liabilities (other than loans to the Partnership by Partners) and Reserves and may, in its discretion, distribute to the Partners, in lieu of cash, as tenants in common and according to the provisions of Section 15.3(c), undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  The Liquidator shall determine the Fair Market Value of any property distributed.

15.5    Cancellation of Certificate of Limited Partnership.  Upon the completion of the distribution of Partnership property as provided in Sections 15.3 and 15.4, the Partnership shall be terminated, and the Liquidator (or the Limited Partners, if necessary) shall cause the cancellation of the Certificate of Limited Partnership and all qualifications of the Partnership as a foreign limited partnership in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.  The Partnership shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 15.5.

15.6    Reasonable Time for Winding Up.  A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Partnership and the liquidation of its assets pursuant to Section 15.3 in order to minimize any losses otherwise attendant upon such winding up.

15.7    Return of Capital.  The Liquidator shall not be personally liable for the return of Capital Contributions or any portion thereof, it being understood that any such return shall be made solely from Partnership assets.

## ARTICLE XVI
## GENERAL PROVISIONS

16.1    Power of Attorney.

(a)    Each Partner hereby constitutes and appoints the Management Committee, with full power of substitution, as the Partner's true and lawful agent and attorney-in-fact, with full power and authority in the Partner's name, place and stead, to:

(i)    execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (A) this Agreement, all certificates and other instruments and all amendments thereof which the General Partners (acting jointly) deem appropriate or necessary to form, qualify, or continue the qualification of, the Partnership as a limited partnership (or a partnership in which limited partners have limited liability) in the State of Delaware and in all other jurisdictions in which the Partnership may conduct business or own property; (B) all

instruments which the General Partners deem appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement; (C) all conveyances and other instruments or documents which the Liquidator deems appropriate or necessary to reflect the dissolution and liquidation of the Partnership pursuant to the terms of this Agreement, including a certificate of cancellation; and, (D) all instruments relating to the admission, withdrawal or substitution of any Partner pursuant to this Agreement; and

(ii)   sign, execute, swear to and acknowledge all ballots, consents, approvals, waivers, certificates and other instruments appropriate or necessary, in the Management Committee's discretion, to make, evidence, give, confirm or ratify any vote, consent, approval, agreement or other action which is made or given by the Partners hereunder or is consistent with the terms of this Agreement and/or appropriate or necessary (and not inconsistent with the terms of this Agreement), in the General Partners' discretion, to effectuate the terms or intent of this Agreement; provided that when required by any provision of this Agreement which establishes a percentage of the Limited Partners required to take any action, the General Partners or the Liquidator may exercise the power of attorney made in this subsection (ii) only after the necessary vote, consent or approval by the required percentage of the Limited Partners.

(b)   The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, incompetency, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Partner and the transfer of all or any portion of the Partner's General Partnership Interest or Limited Partnership Interest, as the case may be, and shall extend to such Partner's heirs, successors, assigns and personal representatives.

16.2   <u>Change in Control</u>.  There shall be no Change in Control with respect to any CCS Partner or ZTV without the written consent of each Original General Partner.  In addition, there shall be no transfer of a controlling interest in the voting stock of ZTV or of a controlling interest in Holdings (other than in connection with the death or incapacity of shareholders) until the first to occur of: (a) the Partnership begins to seek the Additional Financing pursuant to <u>Section</u> 13.1 and such transfer is in connection with such Additional Financing, (b) any time at which the ZTV Partners possess less than 50% of the voting interest in the Management Committee, or (c) June 1, 1997; <u>provided</u> that, if, pursuant to this <u>Section</u> 16.2, the transfer of a controlling interest in the voting stock of ZTV or a controlling interest in Holdings (in either case, other than in connection with the death or incapacity of shareholders) occurs while the ZTV Partners own 50% of the voting interest in the Management Committee and is in connection with the acquisition by the Partnership of the Additional Financing, then ZTV shall provide notice thereof (a "Change Notice") to SVC and the Partnership at least seven (7) Business Days before the proposed transfer.  Within seven (7) Business Days following receipt of a Change Notice, SVC shall, in its absolute discretion, approve or disapprove such transfer or it shall be deemed, on such seventh Business Day, to have approved the transfer.  If within such seven (7) Business Days CCS disapproves such transfer, it shall be deemed to have provided to ZTV a Deadlock Notice (and such Deadlock Notice shall be effective notwithstanding that the CCS Partners shall not as of such date made the Minimum Contribution).  In the event a Change of Control occurs with respect to either a CCS Partner or a ZTV Partner (the

"Defaulting Partner," as the case may be), the Defaulting Partner shall, at the election of the Original General Partner that is not an Affiliate of the Defaulting Partner, (in addition to any other remedies available under applicable law) be deemed to have invoked the procedure for resolution of a Deadlock set forth in Section 6.4 and to have lost the coin toss referred to therein, entitling the non-Defaulting Partner to acquire from the Defaulting Partner or its Affiliates the Controlling Interest as provided in Section 6.4. In the event of a transfer of a controlling interest in the voting stock of ZTV or a controlling interest in Holdings in contravention of this Section 16.2, ZTV shall be deemed the Defaulting Partner for purposes of the preceding sentence.

16.3    Information Sharing.  In addition to any other provisions herein relating to the provision, disclosure or sharing of information between or among the Partners, the CCS Partners, on the one hand, and the ZTV Partners, on the other hand, hereby agree as follows:

(i)    The General Partners (and each of their respective agents and Affiliates) shall be given reasonable access, during normal business hours, upon request at any time during the term of the Partnership (including the Transition Period), to each other's (and each of their respective Affiliate's) facilities, offices, files, premises, books, records and employees as such relates to the business and/or affairs of the Partnership and/or the development of any technology in connection therewith; and

(ii)    The General Partners shall establish, in their ordinary course of business, a standard operating procedure by which they (and their respective Affiliates) provide each other (and each other's agents), on a routine basis during the term of the Partnership (including the Transition Period), with (a) original or true and correct copies of all material documents, files, studies, reports and other information (whether of a technical, financial or other nature) as such matters relate to the business and/or affairs of the Partnership and/or the development of any technology in connection therewith, and (b) a current understanding of all work-in-process in connection with the Zoom System.

16.4    Title to Partnership Assets.  Partnership assets shall be deemed to be owned by the Partnership as an entity, and no Partner, individually or collectively, shall have any ownership interest in such Partnership assets or any portion thereof.

16.5    Issuance of Units.  The General Partners, acting unanimously, may issue from time to time units of limited partnership interests ("Units") with such rights and preferences, including, without limitation, whether or not the holder of Units has voting rights, and if so the extent of such rights, as the General Partners shall determine, on the basis that 1,000,000 Units is equal to a one percent (1%) Partnership Interest; provided that any issuance of Units shall affect pro rata the holders of Partnership Interests and Units theretofore issued.

16.6    Addresses and Notices.  Any notice, demand, request or report required or permitted to be given or made to any Person under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by first class mail or by other commercially reasonable means of written communication (including delivery by an internationally recognized courier service or by facsimile transmission during normal business hours) to the Person at the Person's address as shown on the Partnership's books and records. An affidavit or certificate of mailing executed by any member of the Management Committee shall be conclusive (but not

4322.\cc\zoom-lps.01k                          50

exclusive) evidence of the date and fact of mailing of any such notice, demand, request or report. Any notice to the Partnership shall be deemed given if received by all members of the Management Committee at the Partnership's principal office designated pursuant to Section 2.4.

16.7    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

16.8    Third Parties; Creditors. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any Persons (including, without limitation, creditors of the Partnership or of any Partner) other than the Partners, in their capacity as such. Furthermore, none of the provisions of this Agreement shall be for the benefit of or enforceable by any Persons (including, without limitation, creditors of the Partnership or of a Partner) other than the Partners, in their capacity as such. No creditor who makes a loan to the Partnership may have or acquire at any time as a result of making the loan any direct or indirect interest in Partnership Net Profits, Net Losses, Distributions, capital or property other than as a secured creditor.

16.9    Waiver. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

16.10    Counterparts. This Agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, the fact that all such parties are not signatories to the original or the same counterpart notwithstanding.

16.11    Applicable Law; Consent to Jurisdiction. This Agreement shall be construed according to and governed by the internal laws of the State of Delaware, without regard to otherwise governing principles of conflicts of law. Each Partner agrees that any legal proceeding instituted against him with respect to the Partnership's business or property may be brought in any court of competent jurisdiction located in Delaware or in the place where the Partnership maintains its principal place of business, as selected by the Management Committee. Each Partner hereby irrevocably accepts and submits to the non-exclusive jurisdiction of each of the aforementioned courts in personam generally and unconditionally with respect to any such proceeding for himself and his property. If any such proceeding is brought in any such jurisdiction, each Partner hereby (a) waives any objection on the ground of venue or the convenience of the forum, and (b) agrees that any judgment obtained in any such proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and amount of the Partner's indebtedness. Service and notice of any such proceeding may be made by mailing any such service or notice to the Partner by certified United States mail, postage prepaid, to the Partner's address (determined according to Section 16.6).

16.12    Invalidity of Provisions. If any provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby.

16.13    Number and Gender.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

16.14    Further Action.  The parties shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

16.15    Integration.  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

16.16    Including.  Whenever the term "including" is used herein in connection with a listing of items included within a prior reference, such listing shall be interpreted to be illustrative only, and shall not be interpreted as a limitation on or exclusive listing of the items included within the prior reference.

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Agreement of Limited Partnership as of the date set forth above.

GENERAL PARTNERS:

ZOOM TELEVISION, INC.,                     SKY VENTURE CORP.,
a California corporation                          a Virginia corporation


By: _____          By: _____
Name: Harry M. Brittenham                      Name: Richard L. Sharp
Title: Chairman                                        Title: President



LIMITED PARTNERS:


ZOOM HOLDINGS, a California               CIRCUIT CITY STORES, INC.,
    general partnership                            a Virginia corporation
By Zoom Television, Inc.,
    general partner
By: _____          By: _____
Name: Harry M. Brittenham                      Name: Richard L. Sharp
Title: Chairman                                        Title: President

# AGREEMENT OF LIMITED PARTNERSHIP
## OF
## ZOOM PARTNERS, L.P.

### AMENDMENT NO. 1

This Amendment No. 1 to the Agreement of Limited Partnership of Zoom Partners, L.P. is executed on this 7th day of March, 1996 by the Partners who agree as follows:

1.      Article I of the Agreement is hereby amended to add the following new definitions:

"Class A Partners" means the Class A General Partners and the Class A Limited Partners and any respective transferees or assignees of their Partnership Interests.

"Class A General Partners" means Sky Venture Corp., a Virginia corporation, and Zoom Television, Inc., a California corporation. All other references in the Agreement to the "General Partners" shall now mean the Class A General Partners.

"Class A Limited Partners" means Circuit City Stores, Inc., a Virginia corporation, and Zoom Holdings, a California general partnership.

"Class B Partners" means those individuals directly or indirectly in the Partnership's service who purchase Class B Units pursuant to the Plan.

"Class B Units" means the Class B Limited Partnership Interests in the Partnership issuable under the Plan which shall represent an interest in the capital, profits and management of the Partnership in accordance with the provisions of the Limited Partnership Agreement as modified by Amendment No. 1.

"Incorporation" means the incorporation of the Partnership in connection with the initial public offering of shares of common stock of the corporate successor. The Incorporation shall be effected through the conversion of all the outstanding interests in the Partnership into shares of common stock of the corporate successor, including the conversion of the Class B Units issued or issuable under the Plan into shares of common stock of the corporate successor on the basis of the fair market value of those Class

B Units determined immediately prior to such Incorporation pursuant to the revaluation provisions of this Amendment.

"Partnership Capital" means the sum of all the Partners' Capital Accounts as adjusted pursuant to Section 3.9.

"Plan" means the Zoom Partners, L.P. 1996 Class B Limited Partnership Unit Option Plan, as in existence from time to time.

"Priority Return" means, as to any Class A Partner, a ten percent (10%) per annum return on such Partner's Unreturned Amount. The Priority Return shall be non-cumulative and, to the extent the Priority Return is not paid in any Fiscal Period, no Priority Return shall accrue for that Fiscal Period as a carry-over to any subsequent Fiscal Period. Each Class A Partner's entitlement to the Priority Return shall terminate immediately prior to the Incorporation of the Partnership.

"Unreturned Amount" means with respect to any Partner, such Partner's Capital Contribution less the sum of all distributions made to such Partner pursuant to Sections 4.1(b) or 4.1(c), provided, however, that the initial Unreturned Amount of SVC and ZTV shall be $600,000, and the initial Unreturned Amount of CCS and Holdings shall be $29,400,000.

2.    Section 3.9 is hereby amended in its entirety to read as follows:

3.9    Capital Accounts. The Partnership shall establish a separate Capital Account for each Partner. The Capital Accounts shall be maintained according to the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), and the Partnership shall, upon the occurrence of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), including Incorporation, increase or decrease the Capital Accounts of the Partners in accordance with such Treasury Regulations and the allocation provisions of this Agreement.

3.    Sections 4.1, 4.2(a) and 4.2(b) are amended in their entirety to read as follows:

4.1    Distributions of Cash Flow. Except as otherwise provided in Article XV, Cash Flow for each Fiscal Period shall be distributed at such times and in such amounts as the Management Committee deems appropriate (subject to Section 5.2(xiv)) in the order of priority set out below. Any Distributions pursuant to this Section 4.1 shall be made to the persons shown on the Partnership's books and records as Partners (or Assignees) as of the date of such Distribution.

(a)    First, to the Class A Partners in proportion to and to the

extent of the excess, if any, of (i) the Priority Return to which each Class A Partner is entitled for the Fiscal Period over (ii) the sum of all prior distributions made to that Class A Partner for such Fiscal Period pursuant to this Section 4.1(a);

(b)     Second, to the Class A Partners in proportion to and to the extent of their respective Unreturned Amounts;

(c)     Third, to the Class B Partners in proportion to and to the extent of their respective Unreturned Amounts; and

(d)     Finally, the balance to the Partners in proportion to their Percentage Interests.

4.2     Allocations of Net Profits and Net Losses

(a)     Subject to Sections 4.3(c) through 4.10, Net Profits shall be allocated in the following order and priority:

(i)     First, to the Class A General Partners in proportion to and to the extent of the negative balances in their Capital Accounts;

(ii)     Second, to the Class A Partners so that, to the extent possible, the balances in the Class A Partners' Capital Accounts are in proportion to their respective Percentage Interests;

(iii)     Third, to the Class A Partners in proportion to and to the extent that the sum of their Unreturned Amounts plus the Priority Return to which they are entitled for the Fiscal Period exceeds their Capital Accounts;

(iv)     Fourth, to the Class B Partners in proportion to and to the extent that their Unreturned Amount exceeds their Capital Accounts; and

(v)     Finally, the balance (if any) to the Class B Partners in the dollar amount per Class B Unit determined pursuant to the following formula:

$$X = Y \times \frac{\$3,000,000}{Z} \times .0000002, \text{ where}$$

X is the amount to be allocated per Class B Unit.

Y is the balance of the Net Profits to be allocated to the Class B Partners and the Class A Partners pursuant to this final allocation, and

Z is $60,000,000 plus any Capital Contributions of the Class A Partners in addition to those set out in Exhibit A

and the remainder to the Class A Partners in proportion to their Percentage Interests.

(b)    Subject to Sections 4.3(c) through 4.10, Net Losses shall be allocated in the following order and priority:

(i)    First, to the Class B Partners in proportion to and to the extent of the positive balances in their Adjusted Capital Accounts;

(ii)    Second, to the Class A Partners so that, to the extent possible, the balances in their Capital Accounts are in proportion to their respective Percentage Interests;

(iii)    Third, to the Class A Partners in proportion to and to the extent of the positive balances in their Capital Accounts; and

(iv)    Finally, the balance, if any, to the Class A General Partners in proportion to their Percentage Interests.

For purposes of these Sections 4.2(a) and 4.2(b), a Partner's Capital Account shall be increased by the amount of such Partner's share of Partnership Minimum Gain under Treasury Regulation Section 1.704-2(g)(1).

4.    Article IV is hereby amended to add new Sections 4.9 and 4.10:

4.9    Revaluation.    In the event of an Incorporation, the Partnership's assets (including intangible assets such as good will) shall, immediately prior to the Incorporation, be revalued, and the unrealized gain or

loss shall be treated as an increase or decrease (as the case may be) in Partnership Capital. Such unrealized gain or loss shall be allocated among the Class A and Class B Partners in a manner that results in (i) the Capital Account of each Class B Unit being equal to the amount determined pursuant to the following formula:

$$X = Y \times \frac{\$3,000,000}{Z} \times .0000002, \text{ where}$$

X is the amount to be allocated per Class B Unit,

Y is the total Partnership Capital (as revalued), and

Z is $60,000,000 plus any Capital Contributions of the Class A Partners in addition to those set out in Exhibit A

and (ii) the Capital Account of each Class A Partner being equal to Partnership Capital (as revalued) less the aggregate Class B Partners Capital Accounts, multiplied by each Class A Partner's Percentage Interest.

      4.10   Target Capital Accounts. The parties intend that the tax allocation provisions of this Agreement shall result in final capital account balances of the Partners ("Target Capital Accounts") which reflect the distribution priorities set forth in Section 4.1. Notwithstanding any provision of this Agreement to the contrary, to the extent that the tax allocation provisions of the Agreement would not produce such Target Capital Accounts, then gross income and deductions shall be allocated in a manner which produces such Target Capital Accounts, and, if necessary, prior tax returns shall be amended to reallocate gross income and deductions to produce such Target Capital Accounts. This Section shall control notwithstanding any reallocation of taxable income, taxable loss or items thereof by the Internal Revenue Service or any other taxing authority. This provision is intended to effect the plan of distribution provided for in this Agreement in compliance with Treasury Regulations Section 1.704, and shall be interpreted and applied consistent therewith.

      5.     Section 13.4 is hereby amended in its entirety to read as follows:

      13.4   Admission of Other Additional Partners. Class B Partners may be admitted pursuant to the terms of the Plan. Except for Class B Partners and as otherwise provided in this Article XIII, the admission to the Partnership of any Additional General Partner or Additional Limited Partner shall require the consent of all General Partners.

      6.     Except as specifically amended hereby, the Agreement shall remain in full

force and is hereby ratified and conformed.

7.     This Amendment may be executed in one or more original counterparts, and all such counterparts when taken together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the undersigned have executed this Amendment as of the date indicated above.

**GENERAL PARTNERS:**

ZOOM TELEVISION, INC.,                          SKY VENTURE CORP.,
a California corporation                             a Virginia corporation

By: _____                  By: _____
Name:   Harry M. Brittenham                     Name:   Richard L. Sharp
Title:     Chairman                                   Title:     President

**LIMITED PARTNERS:**

ZOOM HOLDINGS,                                   CIRCUIT CITY STORES, INC.,
a California general partnership                    a Virginia corporation
By Zoom Television, Inc.,
        general partner

By: _____                  By: _____
Name:   Harry M. Brittenham                     Name:   Richard L. Sharp
Title:     Chairman                                   Title:     President

AMENDMENT NO.2
TO
AGREEMENT OF LIMITED PARTNERSHIP
OF ZOOM PARTNERS, L.P.

This Amendment No. 2 to the Agreement of Limited Partnership of Zoom Partners, L.P. is entered into as of the 8th day of September, 1997, by the Partners.

## RECITALS

The Partners formed the Partnership pursuant to the Agreement of Limited Partnership dated as of May 5, 1995 (the "Original Agreement"), as amended by Amendment No. 1 dated as of March 7, 1996. Capitalized terms used herein and not defined herein have the meaning given such terms in the Original Agreement. Prior to the execution of this Amendment No. 2, CCS purchased from Zoom Holdings a portion of its interest in Zoom LP representing 2.58% of the outstanding interests in Zoom LP. The Partners have determined that the Partnership needs additional capital and CCS is willing to contribute to the capital of the Partnership, or to expend on behalf of the Partnership, $94,000,000 (the "Additional Contribution") in addition to the Maximum Contribution agreed to be made by it in the Original Agreement. The Partners have determined that as a consequence of CCS's commitment to make the Additional Contribution, (i) the interest of ZTV in the Partnership shall be converted to a limited partnership interest, and (ii) the Percentage Interest of CCS as a Limited Partner shall increase to 65.51%, and the Percentage Interests of the other Partners shall decrease proportionally.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Name. The first sentence of Section 2.2 is hereby amended to read:

The name of the Partnership is and shall be Digital Video Express, L.P.  ("DIVX")

2.    Conversion of ZTV Interest. The interest of ZTV in the Partnership shall be, and hereby is, converted from a General Partnership Interest to a Limited Partnership Interest. All references in the Original Agreement to ZTV as a General Partner are hereby deleted. As of the date of this Amendment No. 2, SVC shall be the sole General Partner of the Partnership. SVC, as General Partner, shall cause to be made in the state of Delaware and all other appropriate jurisdictions any and all filings which may be necessary or appropriate to effectuate the foregoing.

3.    Capital Contributions. (a) The references in Section 3.1 to "Initial Capital Contributions" are hereby replaced with "Existing Capital Contributions" and Exhibit A is hereby replaced with Exhibit A hereto. Article I is hereby amended by adding thereto the following:

**"Existing Capital Contributions"** means the amount of cash and the initial Fair Market Value of all property (other than cash) contributed by the Partners before the date hereof.

(b)  Sections 3.2 through 3.7 and Section 3.12 of the Original Agreement are hereby deleted, the following is added as Section 3.2, and the remaining Sections of Article are hereby renumbered accordingly:

"3.2    Additional Capital Contribution Commitment of CCS.  CCS agrees to contribute to the capital of the Partnership, or to expend on behalf of the Partnership, such additional sum that will cause the amount contributed by it to the Partnership, or expended by it on behalf of the Partnership, in excess of the Maximum Contribution required of it under the Original Agreement to equal $94,000,000.

(c)  All amounts contributed by CCS to the Partnership, or expended on behalf of the Partnership, on or before the date hereof in excess of the Maximum Contribution shall be deemed to be advances to the Partnership and not capital contributions; provided, that upon capitalization (as contemplated by Section 4 of this Amendment No. 2) any such advances shall be credited against CCS's capital contribution obligation under Section 3.2."

4.    Allocations and Distributions.  (a) The Capital Accounts of the Partners shall be adjusted in accordance with the Treasury Regulations to reflect a revaluation of the Partnership's assets as of the date hereof.  Immediately following such adjustment, all advances theretofore made by CCS to the Partnership shall be capitalized.

(b)  Section 4.2(a) of the Original Agreement is hereby amended by deleting the phrase "Class A General Partners in proportion to and to the extent of the negative balances in their Adjusted Capital Accounts" and inserting in lieu thereof the phrase "General Partner to the extent of the negative balance, if any, in its Adjusted Capital Account."

(c)  Section 4.2(b) of the Original Agreement is hereby amended to read as follows:

"(b)    Subject to Sections 4.3 (c) through 4.10,  Net Losses shall be allocated in the following order and priority:

(i)    First, an amount of Net Loss equal to the aggregate amount of additional contributions made by CCS to the Partnership pursuant to Section 3.2 hereof, as reduced by the cumulative amount of Net Losses allocated pursuant to this Section 4.2(b) in all prior years, shall be allocated to CCS;

(ii)    Second, to the Class B Partners in proportion to and to the extent of the positive balances in their Adjusted Capital Accounts;

(iii)    Third, to the Class A Partners so that, to the extent possible, the balances in their Capital Accounts are in proportion to their respective Percentage Interests;

      (iv)    Fourth, to the Class A Partners in proportion to and to the extent of the positive balances in their Adjusted Capital Accounts; and

      (v)    Finally, the balance, if any, to the General Partner."

    5.    <u>Management.</u>  (a) The first sentence of Section 5.1 is hereby deleted and replaced in its entirety with the following:

"Except as otherwise expressly provided in this Agreement (including without limitation, the terms of <u>Section</u> 5.4 and <u>Article</u> VI and Schedule 1 hereto), SVC as the sole General Partner shall have the right to manage and control the business and affairs of the Partnership, to make all decisions regarding the management and operation of the Partnership and its business, and to take or cause to be taken any action which may be necessary or appropriate for or incidental to the management or operation of the Partnership and its business."

(b) Unless the Section in which reference is made to the Management Committee is deleted in its entirety, throughout the Original Agreement all references to the Management Committee are hereby deleted and replaced with General Partner.   All references in the Original Agreement to action or decisions by the General Partners are hereby amended to refer to action or decisions by the - General Partner.   All references in the Original Agreement to action, decisions or consents by all Partners are hereby amended to refer to action, decisions or consents by all Class A Partners.

(c) Section 5.3 is hereby deleted and replaced in its entirety with the following:

"No Partner or Person other than the General Partner shall be an agent for the Partnership or have any right, power or authority to transact any business in the name of the Partnership or to act for or on behalf of or to bind the Partnership."

(d) Section 5.5 is hereby amended by (i) changing "General Partners" in the second line thereof to "Partners," (ii) by deleting all of clause (a) thereof after "managing" in the first line thereof and inserting in its place "all aspects of the Partnership other than as set forth in clause (b) hereof" and (iii) deleting all of clause (b) thereof after "transactions" in the second line thereof.

(e) Section 5.11 is hereby amended by substituting the term "Partners" for the term "General Partners" in subsection (b) thereof.

(f) All of Section 6.1 following the reference to "Sections 5.2 and 5.6 " and all of Sections 6.2 through 6.6 are hereby deleted; and Section 6.7 of the Original Agreement is hereby renumbered Section 6.2.

    6.    <u>Zoom System.</u>  Other than paragraphs (c) and (e), Section 7.5 of the Original Agreement is hereby deleted.

7.     Additional Partners. Sections 13.1 and 13.2 are hereby deleted and the remaining Sections of Article XIII are hereby renumbered accordingly.

8.     Dissolution. Clauses (iv), (v) and (vi) of Section 15.1 are hereby deleted and replaced in their entirety with the following:

> "(iv)   the election to dissolve by the General Partner and Limited Partners holding a majority of the Percentage Interests held, in the aggregate, by all Limited Partners; or"

9.     General Provisions. (a) Section 16.2 is hereby deleted and the remaining Sections of Article XVI are hereby renumbered accordingly.

> (b) The words 'on the basis that 1,000,000 units is equal to a one percent (1%) Partnership Interest" in Section 16.5 are hereby deleted.

10.     Amendments. Section 10.1 is hereby amended by replacing the phrase "without the consent of any Limited Partner" with the phrase "with the consent of ZTV, which consent shall not be unreasonably withheld or delayed, but without the consent of any other Limited Partner".

11.     Distributions in Kind. Notwithstanding any contrary provision herein or in the Original Agreement, no assets (other than cash) of the Partnership shall be distributed in kind (whether in liquidation of the Partnership or otherwise) without the unanimous consent of the Class A Partners unless such distributions in kind are made to the Class A Partners, as tenants in common, pro rata in accordance with their respective Percentage Interests.

12.     Technical Amendments. All cross references to Sections within the Original Agreement which are affected by the amendments effected hereby are hereby changed to the appropriate Section reference. All defined terms which are no longer relevant by reason of the amendments effected hereby are hereby deleted.

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their
behalf this Amendment No. 2 to the Agreement of Limited Partnership as of the date set forth
above.

GENERAL PARTNER:                        CONVERTING GENERAL PARTNER:

SKY VENTURE CORP.,                      ZOOM TELEVISION, INC.
a Virginia corporation                  a California corporation


By: _____          By: _____
Name: Richard L. Sharp                  Name:  Harry M. Brittenham
Title: President                        Title:


LIMITED PARTNERS:

ZOOM HOLDINGS, a California             CIRCUIT CITY STORES, INC.,
    general partnership                 a Virginia corporation
By Zoom Television, Inc.,
    general partner
                                        By: _____
By: _____          Name: Richard L. Sharp
Name: Kenneth Ziffren                   Title: President
Title:

# EXHIBIT A

## PARTNERS, ADDRESSES, CAPITAL CONTRIBUTIONS
### AND PERCENTAGE INTERESTS

| Name and Address of General Partners | Cash Contribution | Value of Contributed Property | Percentage Interest |
|---|---|---|---|
| Sky Venture Corp.<br>9950 Mayland Drive<br>Richmond, VA 23233 | $30,668.58 | - 0 - | 1% |
| Zoom Television, Inc.<br>2121 Avenue of the Stars<br>Suite 3200<br>Los Angeles, CA 90067 | - 0 - | - 0 - | 1% |
| | | | |

| Name and Address of Limited Partners | Cash Contribution | Value of Contributed Property | Percentage Interest |
|---|---|---|---|
| Circuit City Stores, Inc.<br>9950 Mayland Drive<br>Richmond, VA 23233 | $29,969,311.42 | - 0 - | 49% |
| Zoom Holdings<br>2121 Avenue of the Stars<br>Suite 3200<br>Los Angeles, CA 90067 | - 0 - | - 0 - | 49% |
| | | | |

**Schedule I**
**Minority Partner's Rights**

1.      Until the tracking stock program (as contemplated in the Restructuring Agreement) is completed, Zoom TV has approval rights over the admission of new partners, making of additional capital contributions or obtaining third party debt in excess of $5,000.000. This is not intended to apply to the grant or exercise of options, in the normal course of business, to employees or DIVX hardware manufacturers.

2.      CCS, as General Partner, will not enter into transactions with affiliates on behalf of DIVX on terms less favorable than market without approval from Zoom Holdings.

3.      Zoom Holding shall have joint approval over candidates hired for key positions of DIVX such as Chief Executive Officer, International Chief Executive Officer, and Marketing Officer.

AMENDMENT NO. 3
TO
AGREEMENT OF LIMITED PARTNERSHIP
OF DIGITAL VIDEO EXPRESS, L.P.

This Amendment No. 3 to the Agreement of Limited Partnership of Digital Video Express, L.P. (as previously amended, the "Agreement") is entered into as of the 2nd day of January, 1998, by Sky Venture Corp., as General Partner, with the consent of Zoom Television, Inc., and provides as follows:

1.     Article I of the Agreement is hereby amended by modifying the definition of the terms "Class B Units" and "Plan" to read as follows:

"Class B Units" means the Class B Limited Partnership Interests in the Partnership issuable under the Plan which shall represent an interest in the capital, profits and management of the Partnership in accordance with the provisions of the Agreement.

"Plan" shall mean the Digital Video Express, L.P. 1996 Class B Limited Partnership Unit Option Plan and the Digital Video Express, L.P. 1997 Class B Limited Partnership Unit Option Plan For Certain California Residents, as each is in existence from time to time.

2.     Except as specifically amended hereby, the Agreement shall remain in full force.

3.     This Amendment may be executed in original counterparts and all such counterparts taken together shall constitute one instrument.

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Amendment No. 3 to the Agreement as of the date set forth above.

GENERAL PARTNER:

SKY VENTURE CORP.,
a Virginia corporation

By: _____
Name:  Richard L. Sharp
Title:   President

Consented to by:

ZOOM TELEVISION, INC.
a California corporation

By: _____
Name:  Harry M. Brittenham
Title:   Chairman

January 19, 1998

<u>VIA FEDERAL EXPRESS</u>

Mr. Harry Brittenham
Zoom Television, Inc.
ADDRESS
ADDRESS

Dear Skip:

      We have revised the Divx 1996 Class B Limited Partnership Option Plan ("the 1996 Plan") for the restructuring changes from 9/97 and have created a new Divx 1997 Class B Limited Partnership Option Plan For Certain California Residents ("the 1997 Plan"). Enclosed you will find the following:

1. Amendment No. 3 to the Limited Partnership Agreement - Amendment No. 1 to the Partnership Agreement created the 1996 Plan and specifically refers to it as the only option plan. To validate the 1997 Plan, the Partnership Agreement needs to be amended to include the 1997 Plan as well as the 1996 Plan in the definition of the Plan in the Agreement. Please sign the amendment and federal express the original back to me.

2. Written Consent of General Partner to Adopt the 1997 Plan - This document is your copy so that you will have a full set of documents for the 1997 Plan.

3. Amendment and Restatement of the 1996 Plan - This document updates the original 1996 Plan for all restructuring changes from 9/97. This document is your copy so that you will have a full set of documents for the 1996 Plan.

Again, please sign amendment number three and return it to me as soon as possible. If you have any questions, please feel free to give me a call.

         Sincerely,

         Mike Chalifoux

AMENDMENT NO. 4
TO
AGREEMENT OF LIMITED PARTNERSHIP
OF DIGITAL VIDEO EXPRESS, L.P.

This Amendment No. 4 to the Agreement of Limited Partnership of Digital Video
Express, L.P. is entered into as of the first day of October 1998, by the Partners.

RECITALS

A. The Partners formed the Partnership pursuant to the Agreement of Limited
Partnership dated as of May 5, 1995 (the "Partnership Agreement"), as amended by Amendment
No. 1 dated as of March 7, 1996, Amendment No. 2 dated as of September 8, 1997 and
Amendment No. 3 dated as of January 2, 1998. Capitalized terms used herein and not defined
herein have the meaning given to such terms in the Partnership Agreement, as amended. Prior to
the execution of this Amendment No. 4, CCS provided certain guarantees for the benefit of the
Partners through August 31, 1998 (the "Guarantees"). The Partners have determined that as a
consequence of CCS making the Guarantees the number of Units in the Partnership shall be
increased by 17.69 Units to 158.07 Units and the number of Units held by CCS shall be
increased by 17.69 Units to 109.65 Units.

B. Concurrently with the execution of Amendment No. 2, the Partners entered into the
Restructuring Agreement dated as of September 8, 1997 (the "Restructuring Agreement")
wherein the Partners expressed their desire to continue the operations of the Partnership in the
form of a corporation rather than a partnership when appropriate to do so (the "Restructuring").
The transactions contemplated by the Restructuring Agreement were contemplated to be taken by
June 30, 1998, and have not been taken. The Partners have determined that if SVC, in its sole
discretion, determines that the Partnership should go forward with the Restructuring
contemplated by the Restructuring Agreement, the Partnership will do so pursuant to the terms of
Article II of the Restructuring Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of
which are hereby acknowledged, the parties hereto agree as follows:

1.       The number of Units in the Partnership shall be, and hereby is, increased by 17.69
Units to 158.07 Units.

2.       The number of Units held by CCS shall be, and hereby is, increased by 17.69
Units for a total of 109.65 Units held by CCS.

3.       Schedule 1 hereto sets forth the number of Units held by each of CCS, SVC, ZTV
and Holdings in the Partnership on the date hereof, after giving effect to this Amendment.

4.       In the event that SVC, in its sole discretion, determines that the Partnership

should go forward with the Restructuring contemplated by the Restructuring Agreement, SVC shall determine the date by which the Restructuring shall commence.

5.  In the event SVC determines that the Restructuring shall take place, the Restructuring shall be accomplished pursuant to the terms of Article II of the Restructuring Agreement.

6.  The Restructuring Agreement is hereby incorporated as Article XVII of the Partnership Agreement (a copy of which is attached hereto as Exhibit A), except that all references to June 30, 1998 shall be deleted and replaced by the date determined in 4 above.

7.  Except as specifically amended hereby, the Partnership Agreement shall remain in full force.

8.  This Amendment may be executed in original counterparts and all such counterparts taken together shall constitute one instrument.

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Amendment No. 4 to the Partnership Agreement as of the date set forth above.

GENERAL PARTNER

SKY VENTURE CORP.,
a Virginia corporation

By:_____
Name: Richard L. Sharp
Title:  President

Consented to by:

ZOOM TELEVISION, INC.
a California corporation

By:_____
Name: Harry M. Brittenham
Title:  Chairman

SCHEDULE 1

| | |
|---|---|
| CCS | 109.65 Units |
| SVC | 1.00 |
| ZTV | 1.00 |
| Holdings | 46.42 |
| TOTAL | 158.07 Units |

**EXHIBIT A**