# EXHIBIT 1

EXECUTION COPY



**SPROUTS FARMERS MARKET
LEASE**

**AT**

**111 E. EL CAMINO REAL**

**(City of Sunnyvale, California)**

**BY AND BETWEEN**

**EEL MCKEE LLC,**
a California limited liability company
**("LANDLORD")**

**AND**
**SPROUTS FARMERS MARKETS, LLC,**
an Arizona limited liability company
**("TENANT")**

<u>**Santa Clara County/California**</u>

## TABLE OF CONTENTS

**Page**

ARTICLE 1 FUNDAMENTAL LEASE PROVISIONS ......................................... 1
ARTICLE 2 DEFINITIONS AND LOCATION OF ADDITIONAL DEFINED TERMS ......... 11
ARTICLE 3 PREMISES ................................................................ 18
ARTICLE 4 TERM .................................................................... 20
ARTICLE 5 RENT .................................................................... 21
ARTICLE 6 COMMON AREAS ........................................................ 24
ARTICLE 7 USE ..................................................................... 24
ARTICLE 8 UTILITIES ............................................................... 29
ARTICLE 9 INDEMNITY AND INSURANCE ........................................... 30
ARTICLE 10 SIGNS AND ADVERTISING MEDIA ...................................... 32
ARTICLE 11 REPAIR/MAINTENANCE/REPLACEMENT, ALTERATIONS, LIENS
          AND ENTRY ............................................................ 33
ARTICLE 12 FIXTURES AND PERSONAL PROPERTY ................................. 35
ARTICLE 13 TRANSFERS ............................................................ 36
ARTICLE 14 DAMAGE OR DESTRUCTION ............................................ 39
ARTICLE 15 TENANT DEFAULTS AND LANDLORD REMEDIES ....................... 40
ARTICLE 16 LANDLORD DEFAULT AND TENANT REMEDIES ....................... 44
ARTICLE 17 ATTORNEYS' FEES, WAIVER OF JURY TRIAL, ENFORCEMENT
          COSTS ................................................................. 44
ARTICLE 18 EMINENT DOMAIN ...................................................... 45
ARTICLE 19 RETURN OF POSSESSION AND HOLDOVER .............................. 46
ARTICLE 20 SUBORDINATION, ATTORNMENT AND ESTOPPEL CERTIFICATES ....... 47
ARTICLE 21 NOTICES ............................................................... 49
ARTICLE 22 MISCELLANEOUS ....................................................... 49

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Site Plan |
| Exhibit A-1 | - | Restricted Area Site Plan |
| Exhibit B | - | Legal Description of Prime Premises |
| Exhibit C | - | Form of Guaranty |
| Exhibit D | - | Tenant's Certificate of Rent Commencement Date; |
| Exhibit E | - | Intentionally Omitted |
| Exhibit F | - | Intentionally Omitted |
| Exhibit G | - | Intentionally Omitted |
| Exhibit H | - | Form of Waiver of Landlords' Lien |
| Exhibit I | - | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit J | - | Generic List of Sprouts' FF&E |
| Exhibit K | - | Memorandum of Lease |
| Exhibit L | - | Definition and Procedure for Determination of Market Rate |
| Exhibit M | - | Tenant's Standard Signage |
| Exhibit N | - | Form of Lease Recognition Agreement |
| Appendix 1 | - | Tenant Improvements (Standard List) |

649206.3

## SHOPPING CENTER LEASE
## (SPROUTS FARMERS MARKET AT 111 E. EL CAMINO REAL, SUNNYVALE, CA)

This Shopping Center Lease ("**Lease**") shall be binding when it is executed by both parties. Except as otherwise provided, the express covenants of this Lease shall supersede any statutory provisions or covenants implied by law on the same subject matter. In consideration of the mutual promises contained in this Lease and other valuable consideration, the receipt and adequacy of which are forever acknowledged, Landlord and Tenant agree as follows:

## ARTICLE 1
## FUNDAMENTAL LEASE PROVISIONS

**Article 1** summarizes basic information about the Lease and constitutes a part of this Lease but does not constitute the entire Lease. It defines some capitalized terms and uses other defined terms in **Article 2** and elsewhere in the Lease. It incorporates by reference the provisions of pertinent articles, sections and all exhibits. In the event of any conflict between this **Article 1** and the balance of the Lease, the balance of the Lease shall control. Landlord and Tenant acknowledge that each has read all of the provisions contained in the entire Lease and all exhibits which are a part thereof and that this Lease, including the fundamental lease provisions and all exhibits reflect the entire understanding and reasonable expectations of Landlord and Tenant regarding the Premises.

1.1    **Date of this Lease**: (i.e. mutual execution of the Lease); *Sept 10*, 2009.

1.2    **Shopping Center**: The real property generally depicted on **Exhibit "A"** (the "**Site Plan**"), located at the northwest corner of El Camino Real and Cezanne Drive in the City of Sunnyvale (the "**City**"), County of Santa Clara, State of California, together with all existing improvements and future Alterations.

1.3    **Premises**: The approximately 2.62 acre parcel of real property depicted and legally described on **Exhibit "B"** (the "**Land**") together with all improvements located thereon, including, without limitation, a building containing approximately 32,350 square feet of Floor Area, located at 111 E. Camino Real, Sunnyvale, California (the "**Building**"). The Land and the Building shall be referred to for all purposes under this Lease as the "**Premises**". Landlord owns the Building but leases the Land upon which the Building is located, as depicted and more particularly described on **Exhibit "B"** (the "**Prime Premises**"), as the successor to the tenant's interest under that certain Ground Lease (as defined in **Article 2**) from the Owner (as defined in **Article 2**). The property leased by Landlord under the Ground Lease is part of the Shopping Center and Landlord has the right to use the Common Areas (as defined in **Article 2**) in accordance with the Declarations (as defined in **Article 2**) but does not own or Control the Shopping Center as a whole.

1.4    **Landlord**: Eel McKee LLC, a California limited liability company.

1.5    **Tenant**: Sprouts Farmers Markets, LLC, an Arizona limited liability company.

1

1.6    **Trade Name**: Sprouts Farmers Market.

1.7    **Term**: The "**Term**" of this Lease shall commence on the Rent Commencement Date and shall terminate on October 19, 2032.

1.8    **Commencement Date**: The "**Commencement Date**" shall occur as of the Date of this Lease provided Landlord has prepared the Premises and delivered the Premises in accordance with the requirements of **Section 1.17**.

1.9    **Minimum Annual Rental; Ground Lease Rental**: Subject to adjustment pursuant to **Article 5.1** below, the amounts of Minimum Annual Rental shall be payable from time to time pursuant to the following schedule:

| *Months* | *Per Square Foot Annual Rental* | *Minimum Annual Rental* | *Monthly Installment of Minimum Annual Rental* |
|---|---|---|---|
| 1 through 60 | $24.00 per square foot | $776,400.00 | $64,700.00 |
| 61 through 120 | $26.00 per square foot | $841,100.00 | $70,091.67 |
| 121 through 180 | $28.00 per square foot | $905,800.00 | $75,483.33 |
| 181 through 240 | $32.00 per square foot | $1,035,200.00 | $86,266.67 |
| 241 through end of Term | $34.00 per square foot | $1,099,900.00 | $91,658.33 |

Notwithstanding the foregoing, effective as of the commencement of the 181st month of the Term, Landlord shall be entitled, at its sole election, to increase the Minimum Annual Rent set forth above to an amount equal to seventy five percent (75%) of the then Market Rate of the Premises as determined pursuant to the procedure set forth on **Exhibit "L"** attached hereto.

**Note:** To the extent applicable, the Minimum Annual Rental figures stated above shall be adjusted pursuant to **Section 5.1**.

In addition to the Minimum Annual Rental, Tenant shall, commencing on the Rent Commencement Date, pay directly to Owner, monthly rent payments due under the Ground Lease (which amounts shall be prorated for any partial month) ("**Ground Lease Rental**"). Tenant acknowledges that the current annual Ground Lease Rental under the Ground Lease through and including October 18, 2012, equal Twenty Six Thousand Four Hundred Fifty Five and No/100 Dollars ($26,455.00), payable in equal monthly installments of Two Thousand Two Hundred Four and 58/100 Dollars ($2,204.58). Tenant further acknowledges that under the terms of the Ground Lease, Ground Lease Rental will be adjusted on October 19, 2012 and on October 19, 2022 based upon the percentage increase in the Consumer Price Index on each date, but any such adjustment shall not exceed fifteen percent (15%) of the then payable Ground Lease Rental, as set forth in Section 2.2 of the Ground Lease.

1.10    **Permitted Use of Premises**:  The operation of a grocery store/supermarket and all lawful uses related and incidental thereto, including, but not limited to, the sale of fresh produce, meats, poultry and seafood, vitamins/supplements, health and beauty aids, cosmetics (including natural products), sushi, deli, bakery, beer and wine, floral, natural or homeopathic pharmacy, and any other lawful retail use not in conflict with any Existing Tenant exclusives or Prohibited Uses restricting or encumbering the Premises as of the date of this Lease or as of the date Tenant first commences such use in the Premises.    Subject to compliance with the Declarations, Tenant may, without Landlord's consent, grant concessions, allow temporary vendor sales demonstrations, health clinic events and health/beauty educational lectures, product displays or demonstrations, and similar presentations to be conducted within the Premises. Tenant shall also have the right, in compliance with and subject to (i) all applicable Governmental Requirements and (ii) the Declarations, to provide outdoor displays of items which are for sale within the Premises and to conduct outdoor seasonal events; provided, however, such outdoors displays or seasonal events are located within or on the sidewalks directly in front of the Premises or on the walkways immediately adjacent thereto in the area designated as the Outdoor Sales Area pursuant to **Section 7.2**; provided, however, no such outdoors displays or seasonal events shall be permitted which might impede any loading/drop-off areas, fire-lanes, "no-parking" areas, or ingress/egress generally or in front of any other Co-Tenant's premises or any other parcel within the Shopping Center.  All of the foregoing is collectively referred to as "**Permitted Use.**" Landlord represents and warrants to Tenant that it has provided a true, complete, and accurate copy of the Declarations and the Ground Lease and any other document that does or may restrict Tenant's operation of its business in the Premises. Landlord further represents and warrants to Tenant that none of the provisions set forth in the Declarations, the Ground Lease, or any other existing Tenant Exclusives or restrictions prevents or adversely impairs Tenant from operating a typical Sprouts Farmers Market store as is operated by Tenant as of the Date of this Lease in compliance with the terms of this Lease. Notwithstanding the foregoing or anything else in this Lease to the contrary, Tenant acknowledges that Landlord is providing no assurances and making no warranties or representations related to Tenant's right to use any portions of the Premises located outside the Building including but not limited to the Outdoor Sales Area for purposes of conducting sales, displays or related events as described above and Tenant's duties hereunder shall not depend upon any such right to so use said outside areas.

1.11    **Address for Rent Payments**:

(a)    **Minimum Annual Rental**.

Eel McKee, LLC
P.O. Box 309
Paicines, CA  95043

(b)    **Ground Lease Rental**.

John S. Lewis, Trustee of the Margaret E. Reed 1987 Living Trust
FBO Louise Smith
2266 Rosita Avenue
Santa Clara, CA  95050

3

1.12   **Address for Notices**:

*To Landlord:*

Eel McKee LLC
P.O. Box 309
Paicines, CA  95043
Facsimile: (831) 636-8002

*With a copy at the same time to:*

W. Russell Davis, Esq.
530 Oak Grove Avenue, Suite 205
Menlo Park, CA  94025
Telephone: (650) 323-2529
Facsimile: (650) 323-2526

*To Owner:*

John S. Lewis, Trustee of the Margaret E. Reed 1987 Living Trust FBO Louise Smith
2266 Rosita Avenue
Santa Clara, CA  95050

*With a copy at the same time to:*

Phillip J. Nielsen
Anastasi & Nielsen
255 North Market Street, Suite 150
San Jose, CA  95110-2439
Telephone: (408) 294-9700
Facsimile: (408) 294-9948

*To Tenant:*

Mr. Seth Brown
Sprouts Farmers Markets, LLC
11811 N. Tatum Boulevard, Suite 2400
Phoenix, AZ 85028
Telephone: (480) 814-8016, ext. 309
Facsimile: (480) 814-8017

*With a copy at the same time to:*

Mr. Shon Boney
Sprouts Farmers Markets, LLC
11811 N. Tatum Boulevard, Suite 2400
Phoenix, AZ 85028
Telephone: (480) 814-8016, ext. 401
Facsimile: (480) 814-8017

*And a copy at the same time to:*

Mark P. Goss, Esq.
Bryan Cave LLP
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004-4406
Telephone: (602) 364-7112
Facsimile: (602) 364-7070

1.13    **Broker**: Cornish & Carey Commercial (Jim Randolph), representing Tenant as a transaction broker and hereinafter referred to as "**Tenant's Broker**."

1.14    **Tenant Allowance.**

(a)    **Tenant Allowance**.    Upon the Delivery Date (as defined in **Section 1.17**), Tenant shall have the right to make such additional improvements to the Premises as shall be necessary for Tenant to operate a typical Sprouts Farmers Market at its sole cost and expense (collectively, the "**Tenant Improvements**"). A description and listing of the typical improvements for Tenant's Sprouts Farmers Market stores are attached hereto on **Appendix "1"**, however, such Tenant Improvements shall be modified or supplemented to conform to the particular requirements of the size of the Premises, the structural characterization of the Premises, the requirements of the Declarations, the characteristics of the Building and all applicable Governmental Requirements. In this regard, Tenant agrees to commence and to complete the work (hereinafter "**Tenant's Work**") for the Tenant Improvements to the Premises as outlined in this **Section 1.14**. As a material inducement to Tenant entering into this Lease, Landlord has agreed to reimburse Tenant, in accordance herewith, for costs incurred by Tenant in completing the Tenant Improvements in the form of a construction allowance for Tenant's Work in an amount not to exceed Twenty and No/100 Dollars ($20.00) multiplied by the total square feet of Floor Area comprising the Premises (the "**Tenant Allowance**"). The Tenant Allowance may be applied toward costs and expenses actually incurred by Tenant in the architectural and engineering design and drawings, construction drawings, permitting and construction of the Tenant Improvements but shall not be applicable toward the costs of Sprouts FF&E (as defined in **Section 12.1**), personal property or any other costs or expenses not related to permanent improvements to the Premises. Said Tenant Allowance shall be paid to Tenant by Landlord within thirty (30) days (a "**Payment Date**") after receipt by Landlord of Tenant's written request for any installment (which request cannot be sent to Landlord prior to the occurrence of the conditions that correspond to each such installment), in the following installments: (i) one half (½) upon (A) the issuance of a certificate of occupancy (or its local equivalent) by the applicable governmental authority having jurisdiction over the Premises; (B) submission to Landlord of copies of final unconditional waivers of mechanic's,

materialmen's and supplier's liens for Tenant's Work from Tenant's general contractor and all subcontractors and suppliers with contracts or amounts of $25,000.00 or greater; and (C) Tenant is open for business; and (ii) the remaining one half (½) of the Tenant Allowance shall be applied as rent credits against the monthly installment of Minimum Annual Rental payable as of the Rent Commencement Date until the remaining balance of such Tenant Allowance has been utilized. The payment request for payment pursuant to **Section 1.14(a)(i)** must be submitted with a written statement verifying that the Tenant's Work evidenced by such invoice has been completed, and that such services as evidenced by invoice have been performed for Tenant's Work. All such verifications shall be issued by Tenant's architect and submitted by Tenant's representative, except that request for payment relating to costs, fees and expenses not charged by contractors, subcontractors or materialmen may be verified by a representative of Tenant. Notwithstanding the foregoing, Tenant shall have no obligation to provide any documentation pertaining to the completion of such Tenant Work to be entitled to receive the rent credits applicable for the remaining one half (1/2) of the Tenant Allowance set forth in **Section 1.14(a)(ii)** if Tenant has satisfied all conditions required to receive payment for the first installment of the Tenant Allowance and provided that the costs incurred by Tenant in completing the Tenant Improvements equal or exceed the amount of the Tenant Allowance. If Landlord fails to reimburse Tenant for any installment of the Tenant Allowance by the Payment Date, then, such amount shall accrue interest at the Default Rate commencing from the Payment Date until repaid and such failure shall constitute a material default by Landlord under this Lease, and in additional to any other remedies allowed under this Lease, at law or in equity, Tenant shall have the right to offset said amount, plus accrued interest at the Default Rate from the Minimum Annual Rental and Additional Rent next becoming due thereunder and thereafter, until reimbursement or full satisfaction of such amount by credit and/or such offset.

(b)    **Tenant Improvements**.  The Tenant Improvements shall be constructed in accordance with plans and specifications which shall be approved by the parties in the manner hereinafter set forth. Once approved, such elements may not be altered in any material way without first obtaining Landlord's prior written approval, such approval not to be unreasonably withheld, conditioned or delayed; provided, however, Landlord shall be entitled to receive Notice after-the-fact with respect to any non-material alterations made that deviate from the plans approved by Landlord. Tenant shall make no structural changes to the Premises or penetrate the roof without Landlord's prior written approval of Tenant's engineering, architectural and exterior detail plans (including, without limitation, any elevation plans), which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Tenant shall have the right to have skylights installed in the roof at the Premises so long as the contractor selected by Tenant to perform such work is a contractor acceptable to Landlord. Approval of the plans and specifications for the Tenant Improvements shall be in accordance with the following:

(i)    Within ten (10) days after the Date of this Lease, Landlord shall provide to Tenant such current plans of the Premises, including mechanical, engineering and plumbing drawings together with current elevations of the Premises as are in Landlord's possession ("**Landlord's Plans**").

(ii)    Within four (4) weeks after Landlord has provided Tenant with the items listed in **Section 1.14(b)(i)** above, Tenant shall prepare and cause to be submitted to Landlord, Tenant's fixturization plan for the Premises; provided, however, that if Landlord is unable to provide Tenant with all of the items set

forth in **Section 1.14(b)(i)** above, the time period for delivery of the fixturization plan shall be extended from four (4) weeks to eight (8) weeks. Within ten (10) days after receipt of such fixturization plan, Landlord shall provide Notice to Tenant of its approval or disapproval of Tenant's fixturization plan (and if disapproved, specifying with reasonable particularity the reasons for such disapproval and the corrective actions necessary to secure Landlord's approval). Tenant shall incorporate Landlord's reasonable comments into a revised fixturization plan and resubmit the same to Landlord within ten (10) days of receipt of Landlord's disapproval, and Landlord shall have five (5) days to approve or disapprove the revised fixturization plan. In the event Landlord disapproves such revised fixturization plan, the procedure set forth in this **Section 1.14(b)(ii)** for the fixturization plan review shall be followed until such time as Landlord has approved the revised fixturization plan. Landlord's failure to provide Notice within any specified time periods of its approval or disapproval of the fixturization plan or any revised fixturization plan shall be deemed as Landlord's approval of the same.

(iii)    Following approval of the fixturization plan, within sixty (60) days thereafter, Tenant shall cause to be prepared and submitted its construction drawings for the Tenant Improvements to the Premises and shall submit the same to Landlord and the City (it being agreed that such submittal to the City shall be for the purpose of obtaining all permits and approvals necessary to perform Tenant's Work) simultaneously for its review and approval. Landlord shall have ten (10) days after receipt of such first submittal of the construction drawings to review and approve or disapprove the first submittal of such construction drawings (and in the event Landlord disapproves such construction drawings, specifying with reasonable particularity the reasons for such disapproval and the corrective actions necessary to secure Landlord's approval). When Tenant has received from the City its comments to the first submittal of such construction drawings, Tenant shall promptly forward the City's comments to Landlord. Landlord shall have ten (10) days after receipt of the City's comments to respond and comment to any of the City's comments to Tenant's first submittal of such construction drawings (and in the event Landlord disapproves or objects to any of the City's comments, Landlord shall specify with reasonable particularity the reasons for such disapproval or objection and the corrective actions necessary to secure Landlord's approval). Thereafter, Tenant shall incorporate Landlord's reasonable comments, together with the City's comments into a revision of the construction drawings within ten (10) days after comments are received from Landlord to the City's comments and resubmit the same for a second submittal to the City. If and to the extent Landlord disapproves or objects to any of the City's comments, Tenant shall have the right, in order to resolve any conflict, inconsistency or contradiction between Landlord's comments and the City's comments, to accept the City's comments for purposes of preparing and processing the second submittal of such construction drawings to the City and Tenant shall submit such second submittal to the City with a copy thereof to Landlord. Subject to the provisions of **Section 1.18(c)**, in the event Landlord still disapproves of such second submittal of the construction drawings, the procedures

set forth in this section shall be followed for such construction drawing review until such time as Landlord has approved the revised construction drawings. Landlord's failure to provide Notice within any specified time periods of its approval or disapproval of the construction drawings shall be deemed as Landlord's approval of the same. The final plans and specifications constituting the construction drawings of the Tenant Improvements for the Premises, as approved (or deemed approved, if applicable) by each of Tenant, Landlord and the City in writing, are hereinafter referred to as the "**Approved Construction Drawings**".

(iv)    Landlord and Tenant shall, in a commercially reasonable manner, review and approve (or disapprove), process and perform any obligation pursuant to this Lease concerning approval of the fixturization plans, construction drawings, and change orders or concerning construction of the Premises with all due diligence and reasonable speed, including without limitation, approvals, reviews, shop drawings, change orders, subcontractor bids, value engineering and inspections, with the objective of facilitating the construction of the Premises as quickly as reasonably possible.

1.15    **Exhibits**:    The following agreements, drawings and special provisions are attached to and incorporated by reference in their entirety as an integral part of this Lease:

(a) **Exhibit "A"** – Site Plan;

(b) **Exhibit "A-1"** – Restricted Area Site Plan

(c) **Exhibit "B"** - Legal Description of Prime Premises;

(d) **Exhibit "C"** – Form of Guaranty;

(e) **Exhibit "D"** – Tenant's Certificate;

(f) **Exhibit "E"** –Intentionally Omitted;

(g) **Exhibit "F"** – Intentionally Omitted;

(h) **Exhibit "G"** – Intentionally Omitted;

(i) **Exhibit "H"** – Form of Waiver of Landlord's Lien;

(j) **Exhibit "I"** – Subordination, Non-Disturbance and Attornment Agreement;

(k) **Exhibit "J"** – Generic List of Sprouts FF&E;

(l) **Exhibit "K"** – Memorandum of Lease;

(m) **Exhibit "L"** – Definition and Procedure for Determination of Market Rate;

(n) **Exhibit "M"** – Tenant's Standard Sign Plan;

(o) **Exhibit "N"** – Form of Lease Recognition Agreement; and

(p) **Appendix "1"** – Tenant Improvements (Standard List)

1.16    **Rent Commencement Date**:  Subject to the terms and conditions of this Lease, the "**Rent Commencement Date**" and the payment of Minimum Annual Rental, Additional Rent and Ground Lease Rental shall commence on the earlier of (a) the date that Tenant opens for business to the public in the Premises, or (b) the date that is one hundred eighty (180) days from the Commencement Date.  Notwithstanding the foregoing, if the Rent Commencement Date occurs between October 15th of any given year and January 2nd of the following year (the "**Blackout Period**"), then Tenant shall not be obligated to open for business to the public within the Blackout Period and, in such event, and unless Tenant elects to open for business to the public during the Blackout Period, the Rent Commencement Date shall be the first business day following the Blackout Period, and Tenant shall have no obligation to pay any Minimum Annual Rental or any Additional Rent during the Blackout Period, provided, however that if Tenant elects to open the Premises for business to the public during the Blackout Period, Tenant shall then commence paying all Rent due under the Lease as of the date of such opening.

1.17    **Delivery of Premises**:  Landlord shall deliver to Tenant the Premises within three (3) business days after the execution hereof (the "**Delivery Date**") (a) in a clean, broom swept condition, and (b) void of Hazardous Materials in any reportable quantities under any Environmental Law or in violation of Governmental Requirements.   Notwithstanding the occurrence of the Commencement Date, Tenant shall be entitled within sixty (60) days after the Delivery Date to receive and evaluate the results of any reports in order to verify compliance by Landlord with subpart (b) of the foregoing sentence before Tenant shall be deemed to have accepted delivery of the Premises and to notify Landlord if the Premises do not comply with its requirements.  If Tenant notifies Landlord that Hazardous Materials are present at the Premises in reportable quantities and which require remediation, Landlord shall cause the removal or remediation of any Hazardous Materials in violation of subpart (b) above within thirty (30) days after receipt of Tenant's notice.   If Landlord's removal or remediation of any Hazardous Materials in violation of subpart (b) above takes longer than thirty (30) days after receipt of Tenant's Notice to Landlord , then the Rent Commencement Date shall be extended by one (1) day for each one (1) day after said thirtieth (30th) day until said Hazardous Material has been removed or remediated.  Subject to the foregoing, the Premises shall be delivered to Tenant in "**as is**" "**where as**" condition, subject to the terms of this Lease.

1.18    **Lease Contingencies:**    The effectiveness of this Lease, and the parties' obligations hereunder, shall be contingent upon the timely satisfaction of each of the following contingencies (the "**Lease Contingencies**"):

(a)     On or before the Date of this Lease, approval by Tenant's Real Estate Committee of: (i) the Site Plan (**Exhibit "A"**), and (ii) the Restricted Area Site Plan, including parking plan (**Exhibit "A-1"**).

(b)     On or before the Date of this Lease, confirmation by Tenant from the City and other applicable governmental authorities that all permits necessary to complete Tenant's Work can reasonably obtained;

(c)     On or before the Date of this Lease, confirmation by Tenant from all applicable governmental authorities that a license to sell packaged beer and wine at the Premises can reasonably be obtained prior to Tenant opening for business;

(d)     Within thirty (30) days after the Date of this Lease, Tenant has obtained, at Tenant's sole cost and expense, an environmental report in Tenant's name effective as of the Delivery Date of the Premises to Tenant for the benefit of Tenant (and, if necessary, a Phase II Environmental Assessment Report has been prepared for Tenant) confirming that no Hazardous Materials exist on or about the Premises as of the Delivery Date;

(e)     Within thirty (30) days after the Date of this Lease, Tenant has obtained, at Tenant's sole cost and expense, an ALTA survey of the Shopping Center;

(f)     Within thirty (30) days after the Date of this Lease, Landlord shall have secured from the Owner under the Ground Lease for Tenant's benefit the Lease Recognition Agreement substantially in the form attached hereto as **Exhibit "N"** as provided in **Section 20.5** or such other form of lease recognition agreement as may be reasonably acceptable to Tenant; and

(g)     Concurrently with the execution and delivery of this Lease by Tenant to Landlord, Tenant shall cause in Guaranty in the form attached as **Exhibit "C"** to be executed and delivered to Landlord.

The Lease Contingencies set forth in **Sections 1.18(a), (b), (c), (d), (e)** and **(f)** are intended to benefit Tenant and the Lease Contingency set forth in **Sections 1.18(g)** are intended to benefit Landlord.

Each of the Lease Contingencies must be satisfied or waived by the party intended to be benefited by such Lease Contingency within the specified time periods as set forth above. Landlord and Tenant agree to use commercially reasonable, diligent efforts to satisfy the Lease Contingencies set forth above as soon as reasonably practicable, but in any event, no later than the applicable deadline set forth above. If any of the Lease Contingencies is not satisfied by the applicable deadline set forth above, then the party intended to be benefited by such unsatisfied Lease Contingency may elect to terminate and cancel this Lease by giving thirty (30) days' prior Notice to the other party (the **"Non-Notifying Party"**); provided, however, that if within said thirty (30) day period the Lease Contingency in question is satisfied by the Non-Notifying Party, then such termination shall be void, and this Lease shall continue in full force and effect. Should this Lease terminate pursuant to this provision, neither party shall have any further obligation to the other thereafter arising under this Lease except for any party's indemnification obligations under this Lease or any other obligations that survive the termination of this Lease according to its express terms.

## ARTICLE 2
### DEFINITIONS AND LOCATION OF ADDITIONAL DEFINED TERMS

2.1    **Defined Terms**.  When used in this Lease, the following capitalized terms shall have the meanings given to them below:

"**Additional Rent**" means all amounts payable by Tenant to Landlord under this Lease other than the Minimum Annual Rental, Ground Lease Rental, Taxes and Assessments, Insurance and Rental Tax (to the extent applicable).

"**Affiliate**" means any Person who, directly or indirectly, through one or more intermediaries, Controls or is Controlled by or is under common Control with another Person.

"**Alterations**" means any physical changes to the improvements comprising the Premises existing as of the Date of this Lease, including without limitation any addition, removal, remodeling or renovation.

"**Building Expenses**" means, collectively, all costs and expenses required to operate, insure, maintain or repair the Building and the Land.  Building Expenses shall include, without limitation, Common Area Expenses, the cost of repairing all structural, non-structural repairs, maintenance or replacement to the Building, including the foundation, walls and roof elements such as tile or other exposed covering, coatings and flashing, drains and gutters, membranes and decks; utility lines, systems and services; pest control and extermination; and premiums for insurance that Landlord is required or entitled to maintain under this Lease and/or the Ground Lease and commercially reasonable deductibles. Building Expenses shall not include any of the following costs or expenses:  (a) the repairs arising from latent defects in the design and construction of the Building (including the Premises), including, but not limited, structural defects, foundations, roof, walls, soil compaction or expansion; (b) payments of principal, interest, amortization of debt, loan fees, or any other costs of financing or refinancing of Landlord's debt service under any Mortgage; (c) any interest, penalties or fines assessed as a result of Landlord's violation of any Governmental Requirements; (d) amounts received from insurance claims (or amounts that would have been received from insurance claims under insurance policies Landlord is required to carry under the terms of this Lease if Landlord fails to carry such policies) and costs of repair and reconstruction related thereto to the extent of such insurance (other than deductible amounts under applicable insurance policies); (e) leasing commissions and advertising expenses; (f) organizational expenses associated with the creation and operation of the ownership entity which comprises Landlord; (g) any expenses to which Landlord receives reimbursement from any other source; (h) costs relating to remediation of Hazardous Materials except as provided in **Section 7.4**; and (i) any management fee or administration fee payable to Landlord or to any third party.

"**Common Area Expenses**" means, collectively, all costs and expenses with respect to the Common Areas which are paid by Landlord for the maintenance or repair of the Common Areas or allocated to the Prime Premises under the Declarations.

"**Common Areas**" means, collectively, the parking areas and other common area property specified in the Declarations that Landlord has the right to utilize in common with other tenants pursuant to Articles III and IV of the Declarations, together with any additional areas, facilities or equipment, if any, of the Shopping Center that may be made available from time to time for the non-exclusive joint use or enjoyment of tenants and occupants of the Shopping Center, Related Persons, customers and invitees, in accordance with the Declarations and any applicable rules and regulations, including without limitation vehicular and pedestrian pathways, paved and landscaped areas, utility lines and systems, mechanical and janitorial rooms, parking facilities and bus shelters, entrances, directional signs and markers, refuse receptacles and recycling containers, and the like.

"**Control**" (and terms correlative thereto) when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise resulting in the right to determine the outcome of management policies and decisions by any means.

"**Co-Tenant**" or "**Co-Tenants**" means, collectively, the operations of other tenants and their respective successors, assigns, subtenants, licensees, concessionaires and occupants that have entered into a lease, license or other occupancy arrangement of any portion of the Floor Area of the Shopping Center or Related Land, excluding the Premises. For purposes of **Section 7.5** of this Lease only, the term "**Co-Tenant**" shall mean any tenant of Landlord (other than Tenant) of any portion of the Shopping Center or any Related Land now or hereinafter owned or Controlled by Landlord, it's Affiliate(s), or their respective successors or assigns.

"**Declarations**" means, collectively, that certain Operation and Reciprocal Easement Agreement dated as of September 30, 1980 by and between Federated Department Stores, Inc., a Delaware corporation, Page Mill Equity Exchange, a California corporation, and M. Duckgeischel Reed, and recorded on October 1, 1980 as Instrument No. 6855285 of the Official Records of the Recorder's Office of Santa Clara County, California at F623, page 458, as amended by that certain First Amendment to Operation and Reciprocal Easement Agreement (undated) by and between Banmoor Group IV, a California limited partnership, and The Home Depot, Inc., a Delaware corporation, as successors in interest to Federated Department Stores, Inc., Marie C. Rohnert and Dorothy Rohnert Spreckels, as successors in interest to Page Mill Equity Exchange, and M. Duckgeischel Reed, and recorded on May 12, 1986 as Instrument No. 8780327 of the Official Records of the Recorder's Office of Santa Clara County, California at J688, Page 1922.

"**Default Rate**" means the greater of:  (a) ten percent (10%) per annum, or (b) four percent (4%) above the "prime rate" published from time to time by the *Wall Street Journal* or, if that prime rate should cease to be published, then the prime rate published from time to time by Wells Fargo Bank, N.A., or its successors, but not to exceed in any event to the maximum rate permitted under any Governmental Requirements, Prorated for any periods constituting less than twelve (12) calendar months.

"**Environmental Laws**" means, collectively, any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating

to protection of human health, relating to Hazardous Materials, relating to liability for or cost of damage to human health or the environment, including the following specified statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto:  (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601, *et seq.*; (b) the Toxic Substance Control Act, 15 U.S.C. § 2601, *et seq.*; (c) the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801, *et seq.*; (d) the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.*; (e) the Clean Water Act, 33 U.S.C. § 1251, *et seq.*; (f) the Safe Drinking Water Act, 42 U.S.C. § 300(f), *et seq.*; (g) the Clean Air Act, U.S.C. § 7401 *et seq.*; and (h) any other Governmental Requirements relating to or imposing liability or standards of conduct concerning releases into the environment.

"**Existing Tenant**" means any tenant of the Shopping Center (whether such tenant occupies its original premises or relocated and/or expanded its premises) (i) who is open for business prior to the Date of this Lease or (ii) whose lease is dated prior to the Date of this Lease or (iii) who is in possession of its premises pursuant to a renewal or extension of the lease of a tenant described in either of the immediately preceding clauses (i) or (ii) (whether or not such renewal or extension is pursuant to an express right to renew or extend in the lease), or (iv) who is an assignee, sublessee, or licensee of a tenant described in any of the immediately preceding clauses (i), (ii) and/or (iii).  Any lease or other occupancy agreement between the applicable owner of any portion of the Shopping Center and an Existing Tenant in the Shopping Center shall be defined as an "**Existing Lease**".

"**Floor Area**" shall mean the total number of rentable square feet of space of the Building measured in accordance with B.O.M.A./SIOR 2001 standards applicable to a single-tenant building.

"**GAAP**" shall mean generally accepted accounting principles consistently applied.

"**Governmental Requirements**" means, collectively, all laws, statutes, rules, regulations, codes, ordinances, guidelines, stipulations, permits, variances, judgments, decrees, writs, or order existing now or in the future of any national, federal, state, regional or local government or any political subdivision of the foregoing, in each case with jurisdiction over any Person or any portion of the Shopping Center exercising executive, legislative, judicial, regulatory or administrative functions.

"**Ground Lease**" means, collectively, that certain Ground Lease dated September 30, 1980, entered into by and between M. Duckgeischel Reed, as landlord, and Page Mill Equity Exchange, a California corporation, as tenant, a memorandum of which was recorded in the Official Records of the County Recorder of Santa Clara, State of California, on October 1, 1980 at Book F623, Page 450.

"**Guaranty**" means the Guaranty of Lease in the form attached hereto as **Exhibit "C"** to be executed by Premier Grocery, Inc., a California corporation and the manager of Tenant.

"**Hazardous Material**" or "**Hazardous Materials**" means, collectively, any matter that is:  (a) a pollutant or contaminant or a hazardous, toxic, radioactive or dangerous waste,

substance, chemical or material, as defined or otherwise identified in any Environmental Laws; (b) controlled by or subject to any reporting obligations or other liabilities imposed under any Governmental Requirements; (c) flammable, corrosive, radioactive, infectious, carcinogenic, mutagenic, phytotoxic or otherwise potentially injurious by itself or in combination with other matter or under certain conditions, or contains asbestos, polychlorinated biphenyls (PCBs), chlorofluorocarbons (CFC), radon or petroleum products, including without limitation crude oil or any fraction thereof, natural gas or synthetic fuel mixtures but excluding any substance typically found in the operation of a grocery store; (d) all of those materials and substances defined as "Toxic Materials" in Sections 66261.1 through 66261.126 of Title 22 of the California Code of Regulations, Article A4, Chapter 11, as the same shall be amended from time to time; and (e) all other substances designated as hazardous or toxic by the U.S. Environmental Protection Agency, the California Water Quality Control Board and the California Department of Health Services.  Notwithstanding the foregoing, Tenant shall be allowed to store, use, dispense and/or sell products, materials or substances which may in whole or in part constitute toxic or hazardous materials but consist of cleaning materials or solvents used in accordance with Environmental Laws and without the requirement of any permit or license (or if a permit or license is required, the same has been secured by Tenant) and/or consist of standard size amounts or quantities for general retail sale and use by individual consumers.

"**Indemnify" or "Indemnifies"** means covenants to and does hereby defend (using counsel reasonably acceptable to the indemnified Person), indemnify and hold harmless for, from and against any Losses (or any other specified matter), which obligation shall survive the expiration or earlier termination of this Lease.

"**Late Charge"** means Two Hundred Fifty and No/100 Dollars ($250.00) for the first late payment in any calendar year, Five Hundred and No/100 Dollars ($500.00) for the second late payment in any calendar year and five percent (5%) of the amount to which the charge applies for each subsequent late payment in any calendar year which is not cured within the time period set forth in **Section 15.1(a)**.  The parties acknowledge that such Late Charge is in the nature of liquidated damages to compensate Landlord for its additional administrative charges and interference with Landlord's cash flow, both of which would be difficult to quantify.  Landlord and Tenant agree that the amount of Late Charge is a reasonable estimate of such amounts.

"**Losses"** means any and all claims, suits, demands, liabilities, actions, proceedings, obligations, debts, awards, judgments, costs (including without limitation remedial and restoration costs), losses, damages and expenses (including without limitation reasonable attorneys' fees) and amounts paid in settlement of an action of whatever kind or nature (with prior Notice to the other party).

"**Mortgage"** means any mortgage, deed of trust, deed to secure rent, security agreement, financing statement or ground lease encumbering either the Owner's or Landlord's interest in the Building or Land in favor of any Person (such Person and any such Person's Transferee being defined as a "**Mortgagee**"), as the same may be amended, restated, consolidated, renewed, extended, replaced or Transferred.

"**Notice"** means written notice given in accordance with **Article 21**.

"**Owner**" means the current fee owner of the land upon which the Building is located and the holder of the landlord's interest under the Ground Lease. As of the Date of this Lease, Landlord certifies to Tenant that the current Owner is John S. Lewis, Trustee of the Margaret E. Reed 1987 Living Trust, dated June 19, 1987 FBO Louise Smith.

"**Person**" means a natural person, corporation, joint stock company, partnership, joint venture, limited liability company, trust, unincorporated association or other legal entity of any kind, including any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Prorated**" means apportioned on a daily basis, using a three hundred sixty-five (365) day year, or, when applicable, a three hundred sixty-six (366) day year.

"**Quiet Enjoyment**" means the right of Tenant, its permitted successors, assigns, licensees and concessionaires to hold, use, occupy and enjoy the Premises and the Common Areas for the Term, without hindrance and free of any adverse claims by any Persons claiming superior rights.

"**Related Land**" means any land comprising a part of the Shopping Center or any other real property located contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) if and to the extent the same is now or hereinafter owned or Controlled by Landlord or its Affiliate(s) or their respective successors and assigns.

"**Related Persons**" means all past, present and future officers, directors, shareholders, partners, joint venturers, members, trustees, beneficiaries, associates, employees, agents, contractors and representatives of a specified Person, that Person's Affiliates and their respective predecessors, heirs, successors and assigns

"**Rental Taxes**" means all transaction privilege taxes, rental occupancy taxes, sales taxes, use taxes, and similar excise taxes imposed at any time during the Term under any Governmental Requirements upon the gross income, gross revenues or gross proceeds derived from commercial leasing activity with respect to the Premises, including without limitation the rent payable under this Lease and any other consideration for Tenant's use and occupancy. Landlord's net income, franchise, capital stock, estate, gift, or inheritance taxes shall not be considered Rental Taxes. Landlord acknowledges and agrees that pursuant to the Ground Lease, no rent tax is payable to Landlord on the Ground Lease Rental and that Tenant shall not be obligated to pay any Rental Tax under this Lease on such Ground Lease Rental notwithstanding that the payment of such Ground Lease Rent is an obligation of Tenant under this Lease.

"**Taxes and Assessments**" means all primary and secondary ad valorem and special taxes, assessments, and similar amounts imposed at any time during the Term under any Governmental Requirements upon or with respect to the real property comprising the Premises and any possessory interests existing at the Shopping Center less any refunds received by Landlord of amounts that were originally contributed by Tenant. With respect to any assessment which under the laws then in force may be evidenced by improvement or other bond, and may be paid in annual installments, only the amount of such annual installment (with appropriate proration for any partial year) and interest thereon shall be included in the computation of Taxes

and Assessments for any Lease year. Landlord's net income, franchise, capital stock, estate, gift or inheritance taxes shall not be considered Taxes and Assessments.

"**Transfer**" means any transfer, sale, assignment, lease, sublease, hypothecation, mortgage, pledge, encumbrance, or the like, to any person (such Person being defined as a "**Transferee**"), either voluntarily, involuntarily or by operation of law.

2.2    **Location of Additional Defined Terms**.

| **Defined Terms** | **Location** |
| --- | --- |
| Additional Restrictions | **Section 7.1(b)** |
| Allowed Violation | **Section 7.1(c)** |
| Ancillary Product | **Section 7.1(b)** |
| Ancillary Product Sales | **Section 7.1(b)** |
| Approved Construction Drawings | **Section 1.14(b)(iii)** |
| Assignment Recapture Notice | **Section 13.6** |
| Blackout Period | **Section 1.16** |
| Book Value | **Section 13.6** |
| Building | **Section 1.3** |
| Change in Use Obligation | **Section 7.5(a)** |
| City | **Section 1.2** |
| Commencement Date | **Section 1.8** |
| Declaration Rights | **Section 3.2** |
| Delivery Date | **Section 1.17** |
| EBITDA | **Section 13.4** |
| Equipment Lessor | **Section 12.1(b)** |
| Estoppel Certificate | **Section 20.3** |
| Event of Default | **Section 15.1** |
| Excluded Tenants | **Section 7.5(a)** |

Extended Term ........................................................ **Section 4.2**

Force Majeure .......................................................... **Section 22.7**

GAAP ...................................................................... **Section 13.4**

Ground Lease Rental............…................................. **Section 1.9**

Improvement Allowance ........................................... **Section 1.9**

Income ..................................................................... **Article 16**

Land..................…………………………………….. **Section 1.3**

Landlord's Plans…………........................................ **Section 1.14(b)(ii)**

Landlord's Work…...... ............................................ **Section 1.17** and **Exhibit "C"**

Lease......................................................................... Introductory Paragraph

Lease Contingencies…............................................. **Section 1.18**

Lease Recognition Agreement .................................. **Section 20.5**

Lien Waiver Period .................................................. **Section 12.1(b)**

Market Rate.............................................................. **Exhibit "L"**

Material Modification .............................................. **Section 3.2**

Mechanics' Liens ..................................................... **Section 11.4**

Non-Notifying Party................................................. **Section 1.18**

Notice ...................................................................... **Article 21**

Outdoor Sales Area .................................................. **Section 7.2**

Payment Date……..... .............................................. **Section 1.14(a)**

Permitted Transfer.................................................... **Section 13.3**

Permitted Use…………............................................. **Section 1.10**

Plan Submittal Date.................................................. **Section 1.16**

Premises…………………………….. ...................... **Section 1.3**

Prime Premises......................................................... **Section 1.3**

Prohibited Uses ....................................................... **Section 7.1(b)**

Recapture Notice ...................................................... **Section 13.6**

Remedial Work ........................................................ **Section 7.4(b)**

Rent Commencement Date........................................ **Section 1.16**

Restricted Area......................................................... **Section 7.7**

Rogue Tenant .......................................................... **Section 7.1(c)**

Site Plan................................................................. **Section 1.2**

Sprouts FF&E.......................................................... **Section 12.1(b)**

SNDA ..................................................................... **Section 20.1**

Tenant Allowance.......... ........................................ **Section 1.14(a)**

Tenant's Exclusive .................................................. **Section 7.5(a)**

Tenant Improvements........... .................................. **Section 1.14(a)**

Tenant's Work.......................................................... **Section 1.14(a)**

Waiver of Landlord's Lien....................................... **Section 12.1(b)**

worth at the time of award........................................ **Section 15.2(d)**

## ARTICLE 3
## PREMISES

3.1    **Lease of Premises**. Landlord leases the Premises to Tenant, and Tenant leases the Premises from Landlord according to the terms and covenants and subject to the conditions of this Lease. Landlord represents that it has the sole and exclusive right to lease the Premises. So long as Tenant performs its obligations under this Lease, Landlord warrants that Tenant shall have Quiet Enjoyment of the Premises and a non-exclusive license to use the Common Areas of the entire Shopping Center pursuant to the terms and conditions of the Ground Lease, the Declarations and this Lease. Landlord reserves the absolute right to expand, contract and reconfigure the Building and to make Alterations to the Building, provided that such Alterations comply with the requirements and/or consents (if any) under Article VII of the Ground Lease, and to change or restrict utility providers, except that Landlord shall not:  (a) change the original location or Floor Area of the Premises without Tenant's prior written consent; (b) unreasonably interfere with access to the Premises; (c) take any action to reduce the current parking ratio for the Premises below four (4) spaces per 1,000 square feet of Floor Area of the Premises or reduce below one hundred (100) the number of parking spaces allocated for Tenant's primary use and designated as Tenant's **"Primary Parking Area"** as set forth in the Restricted Area Site Plan as attached hereto as **Exhibit "B"** (however, Tenant acknowledges

that such Primary Parking Area shall still be available by all other users of the Common Areas on a non-exclusive basis, subject to the terms of the Declarations); (d) make or consent to any changes to any area of the Common Areas reflected as Restricted Area on **Exhibit "B"**; or (e) construct any new building or other structure on the Premises without the prior written consent of Tenant, which consent Tenant may withhold in its sole and absolute discretion. So long as Landlord abides by these limitations, this Lease shall not be affected by any changes in use, occupancy or "tenant mix" at any portion of the Shopping Center owned or Controlled by Landlord.

3.2     **Declarations**.   Pursuant to the Declarations, Landlord or Owner may have certain rights and obligations thereunder by virtue of its ownership or leasing of the Premises in the Shopping Center and such rights include, but are not limited to, enforcement of certain restrictive covenants concerning the Shopping Center such as prohibited uses (collectively, the "**Declaration Rights**"). Landlord agrees to provide Tenant with Notice of any consent, request, amendment, modification or changes arising out of or requests made in connection with the Declarations or Declaration Rights, but only if such consent, request, amendment, modification or change would adversely affect all or any portion of the Premises or Tenant's use and operation thereof or any enjoyment in and to the Primary Parking Area or other Common Areas (a "**Material Modification**"). Landlord agrees not to enter into any Material Modification until and unless Tenant has provided Notice to Landlord of its approval thereof, which approval shall not be unreasonably withheld or delayed. Tenant shall respond to any request for approval within ten (10) business days of request therefore. If Tenant disapproves a request, Tenant shall specify in reasonable detail the reason for its disapproval. Landlord agrees to use commercially reasonable efforts to enforce any and all Declaration Rights on Tenant's behalf upon Notice from Tenant so long as Tenant pays the reasonable costs of such enforcement and agrees to Indemnify Landlord for any Losses arising from such enforcement. Landlord further agrees not to make any elections under the Declarations that may adversely affect the Premises, access to or parking for the Premises, or the reasonable operation of Tenant's business therein without Tenant's approval thereof, which approval shall not be unreasonably withheld or delayed. Tenant agrees to abide by all of the terms and conditions of the Declaration, applicable to Tenant's use and occupancy of the Premises.

3.3     **Ground Lease**.   Landlord represents, warrants and covenants to Tenant that: (a) Landlord has a leasehold interest in the Premises and the full right to enter into and make this Lease with Tenant; (b) the Ground Lease is in full force and effect as of the Date of this Lease and shall be in full force and effect as of the Rent Commencement Date and the entering into of this Lease by Landlord and Tenant shall not constitute a default under the Ground Lease; (c) Landlord, as tenant under the Ground Lease, is not, as of the Date of this Lease, in default under the Ground Lease and, to Landlord's knowledge, as of the Date of this Lease, the Owner is not in default under the Ground Lease or any other agreements between Landlord and Owner; (d) Tenant, its permitted successors, assigns, licensees and concessionaires shall have the right to hold, use, occupy and enjoy the Tenant's Premises and the Common Areas for the Term, without hindrance and free of any adverse claims by any persons claiming superior rights and free of any impermissible physical intrusions by Landlord, or any party claiming by, through, or under Landlord, subject, however, to the provisions of this Lease, the Ground Lease and the Declarations; Tenant recognizing that its right, title and interest to the Premises is and shall remain subject to the provisions of the Ground Lease and the Declarations. With respect to the

following specific provisions set forth in the Ground Lease, Landlord agrees: (i) that so long as this Lease is in effect, it shall not exercise any early termination right under Section 1.2(b) of the Ground Lease; (ii) with respect to any Rental Adjustment Date, Landlord shall provide to Tenant copies of all notices and correspondence relating to any such adjustments to the Basic Rent as defined and set forth in the Ground Lease and in the event of a dispute of the amount of Basic Rent under Section 2.2(a), Tenant shall have the right to participate in any such dispute; (iii) Landlord shall grant to Tenant on a non-exclusive basis during the term of this Lease all of Landlord's right, title and interest under Section 7.4 of the Ground Lease relating to utility easements ; (iv) Landlord grants to Tenant on a non-exclusive basis during the term of this Lease all rights under Section 9.2 relating to the right to any protest of any tax, assessment, lien or other imposition on the property; (v) Landlord grants to Tenant all rights under Section 9.6 of the Ground Lease relating to refunds applicable to taxes paid by Tenant; and (vi) Tenant shall not be obligated or bound by any amendment or modification to the Ground Lease without Tenant's prior written consent and Landlord covenants and agrees not to amend or modify in any way that would adversely impact Tenant or to terminate the Ground Lease during the Term of this Lease.  Landlord shall take no action which would cause a default under the Ground Lease or the Declarations and Landlord agrees to comply with and fully perform all of the requirements and obligations of Landlord under the Ground Lease and the Declarations insofar as they affect the Premises and except as delegated to Tenant hereunder.  Similarly, Tenant shall take no action which would cause a default under the Ground Lease or the Declarations and shall perform all duties under the Ground Lease or the Declarations to the extent such duties are delegated to Tenant hereunder.

## ARTICLE 4
## TERM

Provided all Lease Contingencies have been satisfied or waived by Tenant in writing, the Term shall commence on the Rent Commencement Date and shall be for the period set forth in **Exhibit 1.7**.  It is expressly acknowledged and agreed by the parties that this Lease and the terms and provisions hereof are binding in all respects when executed and delivered by the parties, notwithstanding that the Term does not commence and certain obligations, including the obligation to pay Minimum Annual Rental, Additional Rent and Ground Lease Rental, do not accrue until a later time as expressly provided elsewhere in this Lease.  Upon Landlord's request, Tenant shall execute a certificate acknowledging the Rent Commencement Date, and the amount and due dates of any initial Prorated installment and the first full installment of Minimum Annual Rental and Ground Lease Rental in the form of **Exhibit "D"** attached hereto. On the Rent Commencement Date or as soon thereafter as reasonably practical, Tenant shall diligently open for business, fully fixturized, stocked and staffed for the Permitted Use.  Tenant shall not open for business before satisfying all Governmental Requirements.  If Tenant violates the provisions of this **Article 4**, and the situation is not cured within ten (10) business days after Notice to Tenant from Landlord, Landlord shall be entitled to exercise all remedies available for an Event of Default under this Lease; provided, however, that notwithstanding any other provision contained in this Lease to the contrary, Tenant shall have the right to delay its obligation to open for business at the Premises for a period not to exceed one hundred eighty (180) days from the Rent Commencement Date upon Tenant delivering written Notice to Landlord of Tenant's election to so delay the opening for business at the Premises no later than ten (10) business days prior to the Rent Commencement Date; provided, however, that Tenant,

nevertheless, shall be obligated to pay all Minimum Annual Rental, Ground Lease Rental and Additional Rent as required under this Lease and provided, further, that Tenant shall be required to perform all other obligations required under this Lease other than opening for business.

## ARTICLE 5
## RENT

5.1     **Minimum Annual Rental; Ground Lease Rental; Adjustments;.**

(a)     Subject to any applicable adjustment as hereinafter provided and further subject to any rent credits as provided in **Section 1.14(a)(ii),**, beginning on the Rent Commencement Date and on the first day of each calendar month thereafter throughout the remainder of the Term, regardless of whether Tenant has opened for business, Tenant shall pay the monthly installments of Minimum Annual Rental specified in the schedule set forth in **Section 1.9**, in advance.   If the Rent Commencement Date is not the first day of a calendar month, then the initial installment of Minimum Annual Rental and Additional Rent shall be Prorated.  Minimum Annual Rental shall be adjusted at the times and in the amounts as provided in the schedule set forth in **Section 1.9**.

(b)     Subject to any applicable adjustment as hereinafter provided, beginning on the Rent Commencement Date and on the first day of each calendar month thereafter throughout the remainder of the Term, regardless of whether Tenant has opened for business, Tenant shall pay the monthly installments of Ground Lease Rental directly to Owner as specified in **Section 1.9**, in advance. If the Rent Commencement Date is not the first day of a calendar month, then the initial installment of Ground Lease Rental shall be Prorated and Tenant shall pay such prorated amount to Landlord. Ground Lease Rental shall be adjusted at the times and in the amounts as provided in the Section 2.2 of the Ground Lease.

(c)     Within sixty (60) days following the Delivery Date of the Premises to Tenant, either Landlord or Tenant shall have the right to have the Floor Area of the Premises measured and verified by an architect licensed in the State of California or other licensed professional in the business of calculating Floor Area, such as Stevenson Systems, Inc., and upon completion of such measurement of the Floor Area of the Premises the same shall be certified by such architect or professional and sent to Landlord and Tenant.  Unless either party objects within twenty (20) days after receipt of such certification, the Floor Area of the Premises shall be as set forth in such architect's or such professional's certificate. If either party objects to such certified measurement of the Premises, such objecting party shall provide Notice thereof to the other party and such Notice shall contain with its objection, the Floor Area the objecting party believes the Premises contains.  Thereafter, the parties shall use reasonable efforts to resolve their differences. If, within twenty (20) days after receipt of the Notice of an objection, the parties have not resolved their differences, each shall name an architect within ten (10) days thereafter.  Within ten (10) days after being named, such architect shall name a third architect, who shall, within twenty (20) days measure the Premises.  The measurement of the third architect shall be averaged with either Landlord or Tenant's architect's measurement, whichever is closer thereto, which average shall be deemed the correct Floor Area of Premises. The party whose measurement was not averaged with that of the third architect shall pay the fees and expenses of the third architect, and each party shall pay the fees and expenses of its own architect.  If, as a result of such measurement by such architect or professional, the actual Floor Area of the Premises is more or less than the Floor Area specified in **Section 1.4** of this Lease, the Minimum Annual Rental, the

amount of the Tenant Allowance and any other applicable provisions of this Lease shall be reduced or increased, as appropriate, to conform to the actual Floor Area contained in the Premises as certified by such architect or professional, and **Section 1.9** shall be amended to reflect the actual Floor Area and the parties shall acknowledge the same in **Exhibit "D"** attached hereto.

5.2 **Taxes and Assessments**. Beginning on the Rent Commencement Date and on the first day of each calendar month for the remainder of the Term, Tenant shall pay to Landlord one-twelfth (1/12) of Landlord's estimate of Tenant's Pro Rata Share of Taxes and Assessments levied for that calendar year, Prorated for any partial calendar years and subject to annual reconciliation and adjustment in the manner set forth in **Section 5.7**. To the extent applicable, Taxes and Assessments that are evidenced by bonds or other indebtedness payable in installments shall be limited to the principal and interest accruing during the relevant calendar year. Taxes and Assessments shall be reduced by any deferral, abatement, rebate, refunds or other tax-lowering adjustment received by Landlord from any taxing authorities. Landlord grants to Tenant the non-exclusive right at Tenant's sole cost and expense to negotiate and contest the validity or amount of any Taxes and Assessments, in Tenant's sole discretion as agent for the Landlord by appropriate proceedings conducted in good faith, whereupon Landlord shall, at no cost to Landlord, reasonably cooperate with Tenant, execute any and all documents reasonably required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. Pending resolution of such contest, Tenant shall continue to pay such Taxes and Assessments as required by this Lease. Landlord shall pay all such Taxes and Assessments to the applicable governmental authority prior to the delinquency thereof. If, as a result of any contest or otherwise, any abatement or refund of Taxes and Assessments is received, Tenant shall be entitled to the entire amount thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expenses).

5.3 **Insurance**. Beginning on the Rent Commencement Date and on the first day of each calendar month for the remainder of the Term, Tenant shall pay to Landlord, one-twelfth (1/12) of Landlord's estimate of the premiums for insurance that Landlord is required or permitted to maintain under this Lease for that calendar year and any commercially reasonable deductibles payable with respect to any losses, Prorated for any partial calendar years and subject to annual reconciliation and adjustment in the manner set forth in **Sections 5.7**.

5.4 **Rental Tax**. In addition to and together with any and all installments of Minimum Annual Rental and Additional Rent, Tenant shall pay to Landlord all applicable Rental Tax (if applicable) for which Landlord may become liable on all amounts payable by Tenant to Landlord under this Lease.

5.5 **Time and Manner of Payment by Tenant**. All installments of Minimum Annual Rental and Additional Rent shall be due and payable on or before the dates specified in this Lease. Tenant shall make such payments without setoff, deduction or abatement, except as otherwise expressly provided under this Lease. If Tenant fails to make payment in full within five (5) business days after the due date, the unpaid amount shall accrue interest at the Default Rate from the due date until the payment date. In addition, if Tenant's non-payment is not cured within five (5) business days after Notice from Landlord specifying the unpaid amount, the Late Charge shall also become due and payable without further Notice, as liquidated damages and not

as a penalty, it being acknowledged that: (a) it would be impracticable to fix the actual damages suffered by Landlord as a result of Tenant's non-payment; and (b) the Late Charge is fair and reasonable compensation to Landlord for the additional administrative burden of processing late payments. If Tenant fails twice during any calendar year to pay rent installments due hereunder within five (5) business days after the due date thereof, then the Late Charge shall accrue and be payable thereafter if payment of any rent installment is not made on or prior to the first day of the month to which said installment applies without any requirement of Notice thereof from Landlord. If any check delivered by Tenant to Landlord is dishonored by the drawee bank for any reason that is not Landlord's fault, then, within ten (10) business days after Notice from Landlord, Tenant shall pay to Landlord as Additional Rent a service charge of Twenty-Five and No/100 Dollars ($25.00) plus any actual charges assessed by Landlord's bank as a result of the dishonored check.

   5.6   **Reconciliation and Adjustment by Landlord of Taxes and Assessments and Insurance by Landlord**. Within ninety (90) days after the end of each calendar year, Landlord shall give Tenant Notice containing a statement in detail reasonably satisfactory to Tenant (the "**Reconciliation Statement**"). The Reconciliation Statement shall: (a) specify the total Taxes and Assessments and Insurance amounts for that year as certified by Landlord's representative as being accurate; and (b) the total payments made by Tenant on account of Taxes and Assessments and Insurance during that year. If the Reconciliation Statement indicates that the Taxes and Assessments and Insurance amounts exceed Tenant's payments, Tenant shall pay Landlord the deficiency within thirty (30) days after that Notice. If the Reconciliation Statement indicates that Tenant's payments exceed the Taxes and Assessments and Insurance payments, Tenant shall be entitled to credit the excess against the next future payments toward Taxes and Assessments and Insurance payments under **Sections 5.2** and **5.3** as they become due and any uncredited excess shall be refunded along with the final Reconciliation Statement given after the end of the Term.

   5.7   **Tenant's Right to Audit**. Upon at least thirty (30) days prior Notice made to Landlord within one (1) year after receipt of the applicable Reconciliation Statement, Tenant or Tenant's independent certified public accountant shall have the right to audit Landlord's books and records, during normal business hours, with respect to the calendar year which is the subject of such Reconciliation Statement, at Landlord's offices, and to verify Landlord's calculation of, and any increase to, Taxes and Assessments, or the applicable Rental Tax. Landlord shall reasonably maintain its books and records relating to the Taxes and Assessments and Rental Taxes in a condition capable of being inspected and understandable by Tenant and upon receipt of Notice from Tenant, Landlord shall notify Tenant of the date when Landlord's books and records will be available for inspection. For any inspection performed by Tenant, the parties allowed to conduct any inspection may be one or more employees of Tenant, its attorneys and a certified public accountant. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor which Landlord in good faith does not reasonably dispute, Landlord shall promptly refund the overcharge to Tenant, and if the overcharge exceeds three percent (3%) of the Taxes and Assessments and Rental Taxes charged, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, interest shall accrue thereon at the Default Rate from the date such remittance is due until reimbursement. If there is any balance owed Tenant at the end of the Term, and Landlord fails to pay Tenant such

balance, Tenant shall have all rights and remedies to which it may be entitled under this Lease, at law or in equity, and the provisions of this Section shall survive the expiration of the Term. Landlord shall maintain all books and records pertaining to the calendar for at least three (3) years after it delivers to Tenant a Reconciliation Statement for such calendar year. If the audit shows that the amount Landlord charged Tenant for Taxes and Assessments, or Rental Taxes was less than the amount this **Article 5** obligates Tenant to pay, Tenant will pay to Landlord within thirty (30) days after receipt of the audit, as Additional Rent, the difference between the amount Tenant paid and the amount determined in the audit.  Tenant will continue to pay to Landlord the estimated Additional Rent in accordance with **Sections 5.2**, **5.3**, and **5.4**.  Tenant shall keep all information it obtains in any audit and the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Governmental Requirements, or to its accountants or attorneys.

**ARTICLE 6**
**COMMON AREAS**

Subject to the Declarations and the provisions of this Lease, including, but not limited to, those set forth in the Restricted Area Site Plan attached hereto as **Exhibit "A-1"** and **Article 3**, Tenant hereby expressly agrees and assumes Landlord's obligations to maintain, repair and replace, at Tenant's sole cost, the Common Areas for the Premises in accordance with the Declarations.  Tenant's right to use the Common Areas shall be non-exclusive.  Subject to the Declarations, applicable Governmental Regulations and the other provisions of this Lease, Tenant shall be permitted to conduct outdoor displays of items for sale within the Premises in the **"Outdoor Sales Area"** as marked on the Restricted Area Site Plan attached hereto as **Exhibit "A-1"** and to hold from time to time seasonal events in portions of the Common Areas in front of the Premises.  Tenant's designated "Primary Parking Area" shall be as shown on the Restricted Area Site Plan attached hereto as **Exhibit "A-1"**.

**ARTICLE 7**
**USE**

7.1    **Permitted Use of Premises**.

(a)    **Permitted Uses of Premises by Tenant**.  The Premises may be used and occupied for the Permitted Use as set forth and defined in **Section 1.10**.

(b)    **Prohibited Uses of Shopping Center**.  The prohibited uses in the Shopping Center shall be as set forth in the Declarations (collectively, **"Prohibited Uses"**).  In addition to the Prohibited Uses, if and to the extent any portion of the Shopping Center or Related Land is now or hereinafter owned or Controlled by Landlord, its Affiliate(s) or their respective successors and assigns, then, in such event, no portion of such portion of the Shopping Center or Related Land shall be permitted or used as a theater, educational facility (excluding educational lectures, product display demonstrations, health clinic events and similar presentations allowed under Tenant's Permitted Use), an arcade of any kind, a children's play center of any kind, including, but not limited to, Boomerang's, Funtastic, Jump Zone, Chuck E. Cheese and Peter Piper Pizza or similar stores with similar business plans and operations, or any other activity that would adversely affect Tenant's Primary Parking Area

or any of the other additional restrictions set forth in **Section 7.6** (collectively, the "**Additional Restrictions**"). The Prohibited Uses and, to the extent applicable, the Additional Restrictions, shall be applicable to new or prospective tenants or assignees and shall include and be applicable to any use changes of any Existing Leases at any portion of the Shopping Center or the Related Land owned or Controlled by Landlord, but only to the extent Landlord's consent or approval is required and may be withheld by Landlord under any Existing Lease or the Declarations for any such use changes.

7.2    **Outside of Premises**.  Upon compliance with any applicable Governmental Requirements, the Ground Lease and the Declarations, Landlord shall not object to Tenant's placement of outdoor displays and Tenant's conduct of outdoor sales of grocery store products (including but not limited to water product vending machines) in the area adjacent to the Building ("**Outdoor Sales Area**") which is shown on **Exhibit "A-1"**, but Tenant shall not otherwise display or sell merchandise or allow other objects to be stored or to remain outside the defined exterior walls or roof and permanent doorways of the Premises.  Shopping cart storage shall be permitted in the areas designated on **Exhibit "A-1"**.  No aerial, antenna, satellite dish or other device for the receipt or transmission of telecommunication signals shall be erected on the roof or exterior walls of the Premises without first obtaining, in each instance, the written consent of Landlord which consent shall not be unreasonably withheld, conditioned or delayed.

7.3    **Refuse Removal**.  Tenant shall promptly collect, sort and store for disposal all waste, recycling, packing materials, debris and other refuse (except for Hazardous Materials, which shall be governed by the provisions of **Section 7.4**) from the Premises, in compliance with Governmental Requirements and the Ground Lease, at Tenant's sole cost and expense, in neatly-maintained covered containers to be located in the trash collection areas designated by Landlord from time to time.  Tenant shall arrange for all refuse disposal at Tenant's sole cost and expense using a contractor selected by Tenant and reasonably satisfactory to Landlord.

7.4    **Hazardous Materials**.

(a)    **Regulated Activity**.  Landlord represents and warrants that as of Date of this Lease and as of the Delivery Date, (i) there are no environmental assessments or reports or other similar studies or analyses in the possession or control of Landlord relating to the Premises or the Shopping Center not previously provided to Tenant; (ii) to Landlord's actual knowledge, without investigation, there are no Hazardous Materials on or under the Premises; (iii) Landlord has received no written notice of and to Landlord's current, actual knowledge there is no violation of any Environmental Laws with respect to the Premises, however, upon Landlord's information and belief, there are and have been in the past several gas stations in the vicinity of the Premises that may have released Hazardous Materials into the underlying soils and ground waters in the area.  Tenant shall not allow any Hazardous Materials to be used, generated, released, stored, treated or disposed of on, under or about, or transported to or from the Premises, unless: (i) such activity is specifically disclosed to and approved by Landlord in writing prior to such use; and (ii) such activity is conducted in compliance with the provisions of this **Section 7.4**.  Landlord may allow such activity subject to reasonable conditions to protect the Premises and Landlord's interests.  Landlord may refuse to allow such activity if Landlord determines that such proposed use involves a material risk of a release or discharge of a Hazardous Material or a violation of any Environmental Laws or that Tenant has not provided reasonable assurances of its ability to remedy any such violation or otherwise fulfill its obligations under this **Section 7.4**.  Notwithstanding any provision contained herein to the contrary, Tenant shall

be allowed, without the consent of Landlord, to store, use, dispense and/or sell products, materials or substances which may in whole or in part constitute toxic or Hazardous Materials but (a) consist of cleaning materials or solvents used in accordance with Environmental Laws or (b) are typically sold or used in a grocery store without the requirement of any permit or license and/or consist of standardized amounts or quantities for general use and sale to individual retail customers.

(b)   **Compliance with Laws**.   Tenant, at Tenant's sole cost and expense, shall conduct its business in compliance with all Environmental Laws and shall promptly and thoroughly perform and document any disclosure, investigation, clean-up, removal and other remedial work (collectively, "**Remedial Work**") required as a result of the presence of Hazardous Materials affecting the Premises or the Shopping Center introduced by Tenant or Tenant's Related Persons or their respective assignees, subtenants, licensees, agents, contractors, or invitees.   Landlord shall conduct its business in compliance with all Environmental Laws and shall promptly and thoroughly perform and document any Remedial Work required as the result of the presence of Hazardous Materials affecting the Premises introduced by Landlord or Landlord's Related Persons or their respective assignees, agents, or contractors. Tenant shall obtain and maintain in full force and effect all permits, licenses and other governmental approvals required for Tenant's business at the Premises under any Environmental Laws.

(c)   **Notice; Reporting**.   Landlord and Tenant shall each give Notice to each other within five (5) business days after any of the following:   (i) actual knowledge (not imputed or constructive) of a release at the Premises or Shopping Center of any Hazardous Material in quantities that would otherwise be reportable to a public agency; (ii) receipt of any Governmental Requirements mandating that Remedial Work be performed at the Premises or Shopping Center pursuant to any Environmental Laws; (iii) receipt of any warning, notice of inspection, notice of violation or alleged violation, or Tenant's receipt of notice or actual knowledge of any proceeding, investigation of enforcement action with respect to the Premises or Shopping Center, pursuant to any Environmental Laws; or (iv) receipt of notice or actual knowledge of any claims made or threatened by any third party relating to Losses resulting from any Hazardous Material.

(d)   **End of Term**.   Upon the termination or expiration of this Lease, Tenant shall remove all personal property, trade fixtures and Alterations utilized in the generation, release, treatment, storage or disposal of Hazardous Materials and shall clean up, detoxify, repair and otherwise restore Premises to a condition free of Hazardous Materials introduced by Tenant or Tenant's Related Persons or their respective assignees, subtenants, licensees, agents, contractors, or invitees to such standard as is required or specified by applicable Environmental Laws.

(e)   **Indemnity**.   Tenant Indemnifies Landlord and Landlord's Related Persons for, from and against Losses, including without limitation the cost of any Remedial Work, diminution in value of the Building and loss of rental income to Landlord, arising out of or related to any violation of Environmental Laws, non-compliance with any provisions of this **Section 7.4** or the use, generation, release, storage, treatment, disposal or transportation of Hazardous Materials by Tenant or Tenant's Related Persons or their respective assignees, subtenants, licensees, agents, contractors, or invitees. Landlord Indemnifies Tenant and Tenant's Related Persons for, from and against Losses, including without limitation the cost of any Remedial Work, diminution in the rental value of the Premises, arising out of or related to any violation of Environmental Laws, non-compliance with any provision of this **Section 7.4** or the use, generation, release, storage, treatment, disposal or transportation of

Hazardous Materials by Landlord or Landlord's Related Persons or their respective assignees, subtenants, licensees, agents, contractors, or invitees.

       7.5    **Tenant's Exclusives**. If and to the extent any other portion of the Shopping Center or any Related Land is now or hereinafter owned or Controlled by Landlord, its Affiliate(s) or their respective successors or assigns, the following provisions of this **Section 7.5** shall be applicable:

       (a)    **Grant of Exclusive**. As a material inducement to Tenant to execute this Lease, and as except as otherwise provided herein, during the Term, so long as Tenant is operating a grocery store at the Premises and no Event of Default by Tenant exists and is continuing, Landlord covenants and agrees that Landlord shall not lease, rent, or occupy or permit any other real property owned or Controlled by Landlord in the Shopping Center or the Related Land to be occupied by any tenant, sublessee, assignee, licensee, or other occupant, or Landlord, for the operation, sale, rental or distribution, either singularly or in any combination, of any of the following activities and/or sale of merchandise: (i) the operation of a grocery store/supermarket, meat or seafood market, or produce market or the sale of any such items; (ii) sell vitamins and supplements, ethnic food, natural or health food, or ice cream (excepting a "scoop store" such as, by way of example only, a Cold Stone Creamery, a Baskin Robbins, or other similar operations; (iii) sell natural cosmetics, natural health or beauty products ("**Health and Beauty Products**"); or (iv) operate a full-service bakery or delicatessen, all which activities or sales of products as set forth in subclauses (i) through (iv) are hereinafter collectively referred to as "**Tenant's Exclusive**". Notwithstanding any provision contained in this **Section 7.5** to the contrary, Tenant acknowledges that Tenant's Exclusive shall only be applicable to any and all real property owned or Controlled by Landlord at the Shopping Center or the Related Land and that Landlord has no right to impose any such exclusives upon any Co-Tenant or any other owners of any portion of the Shopping Center that is not owned or Controlled by Landlord. As a result, all rights and remedies granted in connection with Tenant's Exclusive under this **Section 7.5** shall be applicable only to such real property owned or Controlled by Landlord or its Affiliate(s) at the Shopping Center or the Related Land.

       Landlord will not allow any Co-Tenant to violate Tenant's Exclusive. Landlord covenants and agrees to include in leases of all future tenants owned or Controlled by Landlord in the Shopping Center or any Related Land or provide prompt Notice to all such future tenants and non-Excluded Tenants of Tenant's Exclusive. For purposes of this Lease, the term "**Excluded Tenants**" shall mean all Existing Tenants under Existing Leases; provided, however, that in the event Landlord has the express right, pursuant to the terms of any Existing Lease, to withhold its approval of a proposed change in use by an Excluded Tenant which would violate an exclusive right granted another tenant or occupant of the Shopping Center or the Related Land owned or Controlled by Landlord and contained in a lease or occupancy agreement entered into after the date of the Existing Lease, then Landlord shall be obligated ("**Change in Use Obligation**") to refuse to grant such consent in connection with a proposed change in use by an Excluded Tenant which would violate Tenant's Exclusive. To the extent applicable, Tenant shall not violate any existing exclusives granted to other tenants under Existing Leases.

       (b)    **Ancillary Product Sales Exclusion**. Notwithstanding anything in to the contrary in **Section 7.5(a)**, Ancillary Products Sales (as hereinafter defined) by Co-Tenants will be allowed at the Shopping Center and any Related Land owned or Controlled by Landlord and shall not

be a violation of Tenant's Exclusive. For purposes of this Lease "**Ancillary Product Sales**" shall mean, for any Co-Tenant, the space dedicated to sale and display of the Ancillary Product consists of not more than three percent (3%) of such Co-Tenant's aggregate retail selling space dedicated to the sale of any combination of Ancillary Products and not more than two (2) linear feet in any single category of Ancillary Product. For purposes of this Lease, the term "**Ancillary Product**" shall mean any of the items which are otherwise the subject of Tenant's Exclusive except that there shall be no Ancillary Products Sales exception allowed for fresh meat, seafood and produce.

        (c)    **Violations**. In the event of any violation of Tenant's Exclusive by Landlord or any Co-Tenant other occupant of any portion of real property owned or Controlled by Landlord at either the Shopping Center or Related Land, Tenant shall give Notice to Landlord of such violation. If such violation does not cease within fourteen (14) days after Tenant has provided Notice to Landlord of such violation, Tenant shall have the following remedies under the following defined circumstances: (i) if such violation is not permitted under the applicable lease or occupancy agreement and is caused by a tenant, sublessee, assignee, licensee or other occupant which is not an Existing Tenant (a "**Rogue Tenant**"), then, in such event, and as Tenant's sole and exclusive remedy, Tenant's monthly installment of Minimum Annual Rental will be reduced by fifty percent (50%) for each day that such violation continues after such fourteen (14)-day period, until the violation ceases, and Landlord covenants and agrees thereafter to take all commercially reasonable action, including commencing commercially reasonable legal action, to enforce Tenant's Exclusive, or (ii) in the event any violation of Tenant's Exclusive by a tenant or occupant of any portion of real property owned or Controlled by Landlord of the Shopping Center or any Related Land, or any of its sublessees or assignees, which is not an Existing Tenant, and such violation is not prohibited by the terms of such tenant's or occupant's lease or occupancy agreement, or in the event of a violation resulting from Landlord's breach of the Change In Use Obligation respecting an Existing Tenant (an "**Allowed Violation**"), then, Tenant's monthly installment of Minimum Annual Rental (or a portion thereof) will be reduced by fifty percent (50%) for each day after such fourteen (14)-day period until the violation ceases, and, in addition, Tenant shall have such other rights and remedies as set forth in this Lease, at law or in equity, to address the violation of its exclusive rights under this Lease

        7.6    **Additional Restrictions**. If and to the extent any portion of the Shopping Center or the Related Land is now or hereinafter owned or Controlled by Landlord, its Affiliate(s) or their respective successors or assigns, the following provisions contained in this **Section 7.6** shall be applicable: Landlord covenants and agrees not to deviate, amend, alter or change the Site Plan for the Premises in the form attached hereto as **Exhibit "A"**, without Tenant's prior written approval as to size, height, scope and use, which approval Tenant may withhold in its sole and absolute discretion. If and to the extent any portion of the Shopping Center or the Related Land is now or hereinafter owned or Controlled by Landlord, its Affiliate(s) or their respective successors and assigns and as long as Tenant is operating primarily as a grocery store at the Premises, Landlord shall not lease said property to any so-called single price point variety or discount stores (such as Dollar Tree, .99 Cents and More, Family Dollar or any similar stores with a similar business plan and operation) to operate in the Shopping Center or on any Related Land owned or Controlled by Landlord. The areas designated by crosshatch (the "**Restricted Area**") on the Restricted Area Site Plan attached as **Exhibit "A-1"** shall be subject to the following restriction, in addition to the foregoing: (a) Landlord shall not allow any additional buildings to be constructed in the portion of the Shopping Center owned by Landlord that will adversely affect Tenant's visibility and parking area as set forth on **Exhibit "A-1"**; and (b)

Tenant shall have the right to designate the "**Employee Parking Only**" for Tenant on the Premises and the Common Areas located on the Premises.

7.7 **Covenant to Open and Operate; Tenant's Right to Go Dark**. Subject to any additional time period allowed to Tenant under **Section 1.16** and to the provisions of **Article 4**, Tenant shall open for business, fully fixturized, stocked and staffed for the Permitted Use on the Rent Commencement Date for not less than one (1) day. Tenant shall not open for business before satisfying all Governmental Requirements. Tenant shall have the right at anytime and from time to time to cease operations at the Premises for any reason provided Tenant continues to pay when due the Minimum Annual Rental, Ground Lease Rental and Additional Rent due hereunder and to perform its other obligations hereunder. In the event Tenant ceases to be open for business to the public for a period lasting more than one hundred eighty (180) consecutive days (exclusive of any closure due to diligently pursued remodeling, Force Majeure or casualty) during the Term, Landlord shall have the option, exercisable at any time thereafter, upon sixty (60) days' prior Notice to Tenant ("**Recapture Notice**"), to recapture possession of the Premises. Unless Tenant gives Landlord Notice that it will re-open and recommence operations in the Premises and, in fact, re-opens and recommences the operation of the Permitted Use in the Premises within such sixty (60) day period (in which event the Recapture Notice shall be nullified and of no force and effect), this Lease shall terminate and be of no further force and effect upon the occurrence of both of the following: (i) expiration of such sixty (60) day period, and (ii) Tenant's receipt from Landlord of payment equal to the unamortized cost of the Tenant Improvements (excluding the Sprouts FF&E) which shall be calculated using the following formula: (Total Tenant Improvement Cost-Tenant Allowance) X (Months of Term −Months Expired)/Months of Term. By way of example and in no way modifying the foregoing, if the Total Tenant Improvement cost is Two Million Dollars, and Landlord exercised the recapture right in the 91st month of the Term, then (2,000,000.00-647,000.00) x (274-90)/274 = $908,583.87. This payment obligation shall survive termination of this Lease. Upon any such termination, neither party shall thereafter have any further liability or obligation to the other hereunder (except for Minimum Rent and/or Additional Rent previously accrued and unpaid and except for any liability of either party which survives such termination).

## ARTICLE 8
## UTILITIES

8.1 **Cost of Utilities**. Tenant shall, at Tenant's sole cost and expense, pay for any and all utilities furnished to the Premises from and after the Commencement Date, including without limitation, electricity, water, sewer, trash collection, electricity, natural gas, telephone, cable television services consumed, the cost of installing any separate meters to measure such consumption, as well as associated assessments, fixture unit charges, connection fees, regulatory fees, surcharges, taxes, penalties and all similar amounts charged by the utility provider and directly related to the utilities consumed at the Premises.

8.2 **Interruption**. Landlord shall not be liable in damages or otherwise for any failure (including, without limitation, the bursting of equipment, rupture of lines, back-up, leakage or sudden discharge of water, sewage or energy in any form) or interruption (including without limitation any limitations imposed under any Governmental Requirements) of any utility service or failure of any mechanical system (including without limitation drainage and heating,

ventilating and air conditioning) serving the Premises unless such interruption or failure: (a) continues for twenty-four (24) consecutive hours without restoration of service, including without limitation restoration by temporary alternative means; (b) is the result of the active negligence or willful acts of Landlord or Landlord's Related Persons; and (c) has a material and adverse effect on Tenant's business at the Premises. In the event Landlord is liable under this **Section 8.2**, then, in such event, Landlord shall be in default under this Lease and Tenant shall have the right to pursue any right, remedy or option allowed under this Lease, at law or in equity.

## ARTICLE 9
## INDEMNITY AND INSURANCE

9.1    **Indemnity and Release**. Tenant Indemnifies Landlord and Landlord's Related Persons for, from and against Losses arising out of any and all occurrences on or about the Premises or directly arising out of the use or occupancy of the Premises or the Shopping Center by Tenant, Tenant's Related Persons or their respective assignees, subtenants, licensees, agents, contractors or invitees except to the extent caused by the intentional misconduct or active negligence of Landlord or Landlord's Related Persons. Landlord Indemnifies Tenant and Tenant's Related Persons for, from and against Losses arising out of any and all occurrences on or about the Premises and Common Areas resulting in bodily injury or death, personal injury, and/or loss or damage to property owned by Tenant or third parties caused by the active negligence or willful misconduct of Landlord or Landlord's Related Persons, or their respective assignees, tenants, licensees, agents, contractors or invitees subject to the limitations set forth in this Lease, except to the extent caused by the active negligence or intentional misconduct of Tenant or Tenant's Related Persons.

9.2    **Mutual Waiver**. In furtherance of the provisions of **Section 9.1**, Landlord and Tenant hereby waive their respective rights of recovery against each other and each other's Related Persons for Losses, of the other party and the other party's Related Persons arising out of the risk or perils which are to be insured under the insurance required of each party under this Lease or are actually insured against by such party. It is the intent of the parties that they shall look solely to their respective property insurers with respect to such Losses and that they shall cause those insurers to provide waivers of subrogation. This mutual waiver shall apply only if such waivers of subrogation are reasonably available to the waiving party in the marketplace and that no policy of insurance is invalidated thereby.

9.3    **Tenant's Insurance Policies**. From and after the Commencement Date (or any earlier entry by Tenant, Tenant's Related Persons or contractors that may be permitted by Landlord), Tenant shall maintain, at Tenant's sole cost and expense, the following types of insurance, in the forms and amounts specified:

(a)    Commercial general liability insurance covering Losses from bodily injury or death, personal injury and/or loss or damage to property occurring at or about the Premises, with blanket contractual liability premises and operations, products and completed operations and advertising and completed operations coverage, having limits of liability of not less than One Million and No/100 Dollars ($1,000,000.00) per person, Two Million and No/100 Dollars ($2,000,000.00) aggregate, and not less than Twenty Million and No/100 Dollars ($20,000,000.00) under an umbrella

or excess liability policy.  The policy shall also include a liquor liability endorsement having a per occurrence limit of not less than One Million and No/100 Dollars ($1,000,000.00);

(b)       Special form (formerly known as "all risk") property insurance, including without limitation coverage for vandalism and malicious mischief, with business income (covering a minimum of twelve (12) months) boiler and machinery and legal liability endorsements, in an amount equal to one hundred percent (100%) of the full replacement value of Tenant's Work, Alterations, trade fixtures, equipment, inventory and other personal property located on or used in connection with business conducted at the Premises together with such other insurance as may be reasonably required by any Mortgage or under any applicable Governmental Requirements.  Such insurance shall cover the storefront, plate glass, doors, casements with hardware at the Premises (or Tenant may self-insure these items);

(c)       Workers' compensation insurance in the minimum amounts imposed under any Governmental Requirements;

(d)       During Tenant's Work and any other construction by or for Tenant, Tenant will require contractor to carry builder's risk insurance, special form in the full amount of project, naming Landlord and management company as additional insured; and

(e)       Earthquake insurance if not carried by Landlord, it being understood that either Landlord or Tenant will carry such insurance.  Immediately upon the Commencement Date, Landlord and Tenant will collectively take all necessary and reasonable steps to determine in good faith whether it is more economical for Landlord or Tenant to carry earthquake insurance and will agree in good faith on the limits and terms of such coverage.  If Landlord and Tenant cannot agree on the items set forth in this subparagraph, then Landlord may, at its option, obtain and maintain such earthquake coverage as determined in Landlord's sole discretion.  Whether such coverage is obtained by Landlord or Tenant, the cost of such coverage shall be paid by Tenant in accordance with the provisions of **Section 5.3**.

All policies of insurance to be procured by Tenant shall be issued by insurance companies qualified to transact insurance business in the State of California and rated not less than A+VIII in the most current edition of *AM Best's Key Rating Guide*.  All such policies shall be issued in the name of Tenant, and shall name Landlord as an additional insured or loss payee as its interests may appear.  Tenant shall endeavor to provide executed copies of the policies of insurance or Acord Form 28 certificates (or its equivalent, for property insurance) and Acord Form 25 certificates (or its equivalent, for liability insurance) to Landlord prior to the Commencement Date and thereafter shall endeavor to provide executed copies of renewal policies or Acord Form 28 certificates or Acord Form 25 certificates (or their respective equivalents), as applicable, shall be delivered to Landlord prior to the expiration of the term of each such policy.  All policies of insurance delivered to Landlord must contain a provision that the company writing the policy will endeavor to give Landlord twenty (20) days Notice in writing in advance of any cancellation or lapse or the effective date of any reduction in the types or limits of coverage.  All commercial general liability and property policies shall be written as primary policies, not contributing with, and not in excess of coverage which Landlord may otherwise carry.

9.4    **Blanket Policies**.  Tenant's obligations to carry the insurance required by this **Article 9** may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; provided, however, that the coverage afforded Landlord is on a "per location basis" and will not be reduced or diminished by reason of the use of a blanket policy of insurance, and provided further that the requirements set forth in this **Article 9** are otherwise satisfied.  Tenant shall permit Landlord, at any reasonable time to inspect any policies of insurance of Tenant, which policies or copies thereof are not delivered to Landlord.

9.5    **Landlord's Insurance Obligations**.  Landlord shall maintain in effect a program of insurance (including without limitation commercially reasonable deductibles or self-insured retentions) covering Landlord's insurable interest in the Building and other improvements on the Premises (but not any Alterations, trade fixtures, equipment, inventory and other personal property located on or used in connection with business conducted at the Premises) in an amount not less than ninety percent (90%) of its insurable value from time to time (exclusive of the cost of excavations, foundations and footings), providing the following coverages:

(a)    Coverage against risks or perils generally included under a standard special form property insurance policy with rental income endorsement (covering any losses for a minimum of twelve (12) months) and additional coverage (including at Landlord's option flood insurance);

(b)    Commercial general liability insurance having limits of liability of at least Two Million and No/100 Dollars ($2,000,000.00) general aggregate and an umbrella or excess coverage in an amount of not less than Three Million and No/100 Dollars ($3,000,000.00) or such additional coverage with respect to Landlord's ownership, use, maintenance and operation of the Common Areas and other portions of the Project that Landlord determines is commercially reasonable or that Landlord's Mortgage requires Landlord to maintain;

(c)    Coverage to be provided by Landlord may be provided under any so-called blanket policy or policies of insurance carried and maintained by Landlord, provided that (i) the amount of the total insurance available shall be on a "per location basis" and at least the protection equivalent to separate policies in the amounts herein required; and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this **Article 9**; and

(d)    Worker's compensation insurance in the minimum amount imposed under any Governmental Requirements.

The provisions of this **Section 9.5** shall survive the expiration or earlier termination of this Lease.

## ARTICLE 10
## SIGNS AND ADVERTISING MEDIA

10.1    **Signs**.  Tenant shall have the right to install its standard signage, as set forth on **Exhibit "M"** hereto, at the Premises to the maximum size and number allowed in compliance with all applicable Governmental Requirements (or as obtained by variance), subject to any requirements of the Ground Lease and the Declarations, without obtaining Landlord's consent. To the extent allowed by the Ground Lease and Declarations, Tenant shall have the right to place

its standard signage on any pylon/monument located on the Premises. Tenant shall be responsible for the cost, design and maintenance of such pylon/monument signs. Landlord hereby assigns to Tenant all of its rights under the Ground Lease, Declarations or any other document relating to signage rights granted to Landlord. At the expiration or sooner termination of this Lease, Tenant shall remove all of its signs and repair and restore the portions of the Premises affected thereby to the condition existing prior to the installation of such signs, reasonable wear and tear excepted.

10.2    **Additional Restrictions**. Without Landlord's prior approval which shall not be unreasonably withheld, no advertising medium shall be utilized by Tenant on the Premises which can be heard or experienced outside the Premises, including without limitation costumed mascots or other live performers, strobe or search lights, flags or pennants, balloons or other decorations, printed or painted messages, amplified music or other sounds, and other audio or video presentations. Without Landlord's prior approval which shall not be unreasonably withheld, Tenant shall not affix, exhibit or distribute or cause to be affixed, exhibited or distributed any notices, placards, handbills, or other advertising media outside the Premises, including without limitation the posting of any bumper stickers on vehicles parked in the Common Areas. Tenant shall have the right to place professionally prepared advertising medium on the inside of the windows in the Premises even if visible from outside the Premises. In all events, however, Tenant's signage must conform to the requirements of the Ground Lease and the Declarations.

## ARTICLE 11
## REPAIR/MAINTENANCE/REPLACEMENT, ALTERATIONS, LIENS AND ENTRY

11.1    **Tenant's Repair, Maintenance and Replacement Obligations**. Effective as of the Commencement Date, at Tenant's sole cost and expense, Tenant shall be responsible for the repair, maintenance and replacement of all parts of the Premises other than those for which Landlord is obligated under this Lease, as necessary to keep the Premises in good and tenantable condition and in compliance with all applicable Governmental Requirements, including the payment of all Building Expenses. Among other things, Tenant shall be responsible, at its sole cost and expense, maintain, repair and replace as needed the Building's roof, the Premises' parking lot, exterior walkways, and other exterior common elements of the Premises as required hereby or by the Declarations, all heating, ventilation and air conditioning system components exclusively serving the Premises, plumbing (including the grease trap) the storefront and all exterior and interior glass, doors, door and window frames and hardware, locks and security devices, floor coverings (including without limitation hard surface and carpeting materials). Tenant shall also perform structural maintenance and repairs to the exterior walls and façade of the Building (including painting). If the repair work affects the exterior or any structural parts of the Building, its roof or any utilities or operating systems of the Building, or if the estimated cost of any item of repair exceeds Two Hundred Thousand and No/100 Dollars ($200,000), then Tenant shall first obtain Landlord's written approval of the scope of work, plans therefor, materials to be used and the contractor. If Tenant fails to commence necessary repairs, maintenance or replacements in a manner reasonably satisfactory to Landlord within thirty (30) days after Notice, then, and in addition to Landlord's other rights and remedies, Landlord shall have the right, but not the obligation, to cure Tenant's failure by having the necessary work performed on behalf of and for the account of Tenant. The cost of such work plus a five percent (5%) supervision fee shall be paid by Tenant, as Additional Rent, within thirty (30) days after

Notice from Landlord. As used herein, the term "structural" means exterior walls and other load bearing walls, foundations and other structural elements of the Building (which includes interior columns and footings), excluding the roof. As used herein, the term "roof" means the roof structure, roof membrane, gluelams, joists, purlins and subpurlins. Tenant hereby waives the benefit of any statute now or hereinafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Premises in good condition, order and repair. Tenant specifically waives all rights it may have under Sections 1932(1), 1941 and 1942 of the California Civil Code, and any similar or successor statute or law.

11.2 **Landlord's Repair, Maintenance and Replacement Obligations**. Landlord shall have no repair, maintenance or replacement obligations pertaining to the Premises, Building, Common Areas or the Shopping Center and shall have no obligation to pay for any portion of the Building Expenses.

11.3 **Tenant Alterations**. Tenant, at its sole cost and expense, may make non-structural Alterations to the interior of the Premises having a cumulative cost of less than Two Hundred Thousand and No/100 Dollars ($200,000.00) during any calendar year, provided that the value of the Premises is not thereby diminished, no penetration of the ceiling or roof is involved and no utility or mechanical systems are affected. Tenant shall provide Notice to Landlord prior to any making any of the foregoing Alterations. No other Alterations may be made without Landlord's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed. All Alterations shall be diligently prosecuted and completed in a good and workmanlike manner in compliance with all Governmental Requirements, without intruding into the Common Areas or disrupting other tenants or occupants of the Shopping Center. Tenant shall provide Landlord copies of all building permits and inspection reports pertaining to the Alterations within ten (10) days after receipt by Tenant.

11.4 **Liens**. Tenant shall pay or cause to be paid all costs for work done by Tenant or caused to be done by Tenant on the Premises, and Tenant shall keep the Shopping Center, the Premises, and Tenant's leasehold interest free and clear of all mechanics' and materialmen's liens and other liens on account of work done for or materials supplied to Tenant or Tenant's Related Persons or their design professionals, contractors and subcontractors ("**Mechanics' Liens**"). Tenant shall give Landlord copies of any notices and claims of Mechanics' Liens within ten (10) days after receipt. If, because of any act or omission of Tenant, any Mechanics' Lien or other lien, charge or order for the payment of money shall be filed against Landlord or any portion of the Shopping Center, Tenant shall, at its own cost and expense, cause the same to be discharged of record or bonded over within thirty (30) days after Notice from Landlord to Tenant of the filing thereof; and Tenant Indemnifies Landlord and Landlord's Related Persons for, from and against any and all Losses arising from or related to any Mechanics' Liens and any claims associated with professional services, labor, materials, equipment, or other goods or services furnished in connection with Tenant's Alterations. Upon bonding over such mechanic's liens, Tenant or its designee shall have the right to contest any such liens by legal proceedings, or in such other manner as it may deem suitable (which, if instituted, Tenant or its designee shall conduct promptly, at its own cost and expense). Notwithstanding the foregoing, Tenant shall promptly pay and remove all liens if, at any time, Landlord shall be subject to immediate

penalties, or if the Premises, or any part thereof shall be subject to immediate foreclosure as a result of non-payment thereof.

11.5    **Landlord's Right of Entry**.  Landlord shall have the right to enter the Premises at all times during customary business hours for the purposes of inspecting the Premises, posting notices of non-responsibility with respect to any Tenant Alterations, or performing repair, maintenance or replacement work to carry out Landlord's rights or obligations with respect to the Premises or the Shopping Center or to prevent waste or deterioration of the Premises or to complete Alterations for other tenants.  Landlord shall have the right to enter the Premises at other times without Notice in order to respond to any bona fide emergencies.  Landlord shall use commercially reasonable efforts to minimize any disruption of Tenant's business in connection with the exercise of such rights.

11.6    **End of Term**.  All of Tenant's Alterations and other items permanently affixed to the Premises (excluding, however, any Sprouts FF&E, as hereinafter defined) shall become the property of Landlord upon the expiration or earlier termination of this Lease, except that Tenant shall ascertain from Landlord within thirty (30) days before the end of the Lease term whether Landlord desires to have Tenant remove any of its Alterations (other than the Tenant Improvements which Tenant shall not be required to remove) and restore the Premises or any part or parts thereof to their condition and configuration existing prior to the installation or making of said Alterations, and if Landlord shall so desire, then Tenant shall remove the Alterations designated by Landlord and restore the Premises or such part or parts thereof to the condition designated by Landlord, at Tenant's sole cost.

## ARTICLE 12
## FIXTURES AND PERSONAL PROPERTY

12.1    **Ownership, Replacement and Removal**.

(a)    Any trade fixtures and other personal property of Tenant not permanently affixed to the Premises shall remain the property of Tenant and Tenant may, provided that rent is current and no Event of Default then exists, remove such items, including without limitation counters, shelving, showcases and mirrors and other movable personal property provided that any such items required to conduct the Permitted Use are immediately replaced with new items of comparable or better quality.  Tenant shall, at Tenant's sole cost and expense, immediately repair any damage to the Premises or the Shopping Center caused by the removal of any such property.  Tenant shall have the right to grant its lenders security interests in the property of Tenant at the Premises.

(b)    Landlord acknowledges that in connection with the improvement and fixturization of the Premises, Tenant will enter into certain equipment leasing arrangements with an equipment lessor ("**Equipment Lessor**") to secure necessary furniture, fixtures and equipment ("**Sprouts FF&E**"), a generic list of such Sprouts FF&E is attached hereto as **Exhibit "J"**.  A final list of the exact Sprouts FF&E will be provided to Landlord when the Waiver of Landlord's Lien (as provided below) is delivered to Landlord for signature and shall replace the current version of **Exhibit "J"**.  In connection with the leasing of the Sprouts FF&E from the Equipment Lessor, Equipment Lessor shall require that Landlord waive in writing any and all statutory, common law or other lien rights of any nature in and to the Sprouts FF&E.  In order that Tenant can timely lease and install the

Sprouts FF&E and, consequently, open the Premises for business as required by this Lease, Landlord hereby covenants to duly execute and deliver to Tenant and Equipment Lessor, within ten (10) business days of Notice by Tenant or Equipment Lessor (the "**Lien Waiver Period**"), a waiver of landlord's lien, substantially in the form attached hereto as **Exhibit "H"** (the "Waiver of Landlord's Lien") whereby Landlord shall waive, release and relinquish to Equipment Lessor all right, title, interest, claim and lien which Landlord has or may in the future have in, to or against any of the Sprouts FF&E, to the extent such Sprouts FF&E is now owned or hereafter acquired by Equipment Lessor and leased to Tenant or now owned or hereafter acquired by Tenant and pledged to Equipment Lessor as collateral security for obligations of Tenant to Equipment Lessor. The Sprouts FF&E does not include any real property or real property fixtures, and the Sprouts FF&E shall remain personal property and shall not become part of the Premises. The Sprouts FF&E shall not be subject to levy, sale, or distress for rent or to any claim, lien or demand of any kind by Landlord. In the event that Landlord fails to deliver to Tenant and Equipment Lessor the Waiver of Landlord's Lien during the Lien Waiver Period and provided such Notice specifies in bold type that the failure of Landlord to timely deliver said Waiver of Landlord's Lien shall result in rent credits accruing to Tenant's benefit under the Lease, then Tenant shall be entitled to a credit against Minimum Annual Rental equal to three (3) days' rent for each one (1) day beyond the Lien Waver Period that Landlord delays in delivering the Waiver of Landlord's Lien. Upon any failure of Landlord to deliver the Waiver of Landlord's Lien within the Lien Waiver Period, Tenant shall be obligated, as a condition to being entitled to any credit against Minimum Annual Rental provided in this **Section 12.1(b)**, to provide, promptly, and within two (2) business days after the expiration of the Lien Waiver Period, a second Notice to Landlord of its failure to deliver such Waiver of Landlord's Lien within the Lien Waiver Period and informing Landlord that rent credits are currently accruing under the Lease. By way of example only, if Landlord fails to deliver the Waiver of Landlord's Lien until the twelfth (12th) day after receiving Notice from Tenant or Equipment Lessor, Tenant shall be entitled to a credit of six (6) days' worth of Minimum Annual Rental, provided Tenant has sent to Landlord the additional Notice on or before the expiration of said twelfth (12th) business day of its failure to deliver the Waiver of Landlord's Lien as provided herein.

12.2    **End of Term**.  On or before the end of the Lease term or sooner termination of this Lease, Tenant shall remove all of Tenant's personal property and trade fixtures including but not limited to the Sprouts FF&E from the Premises, and, subject to the terms of any applicable Waiver of Landlord's Lien, all property not so removed shall be deemed abandoned by Tenant and title to same shall thereupon pass to Landlord without compensation to Tenant. Subject to the terms of any applicable Waiver of Landlord's Lien, upon termination of this Lease, Landlord may, at Tenant's sole cost, remove all moveable furniture and equipment or other personal property so abandoned by Tenant which Tenant has failed to remove as required hereby, repair any damage caused by such removal and store or dispose of such property as Landlord deems appropriate in its sole and absolute discretion.

## ARTICLE 13
## TRANSFERS

13.1    **Restrictions**.  Except as set forth in **Section 13.3**, no Transfer may be made without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. It shall be reasonable for Landlord to withhold its consent if the following criteria are not satisfied:  (a) the proposed Transferee has executed an acceptable Transfer instrument agreeing to assume Tenant's obligations under this Lease; (b) the use or occupancy of the

Premises by the proposed Transferee will not violate this Lease, the Ground Lease, the Declarations or any Governmental Requirements; (c) the proposed Transferee is capable of continuing to operate the same type of business at the Premises at substantially the same level and quality as that of a typical Sprouts Farmers Market as of the Date of this Lease; (d) the creditworthiness, business reputation and business experience of Transferee are no less than those of Tenant; and (e) and there is no uncured material Event of Default. Except as otherwise provided in **Section 13.4**, no Transfer with Landlord's consent under this **Article 13** shall relieve Tenant (or any subsequent Transferor) from primary liability under this Lease for both payment and performance of Tenant's obligations. Whenever Landlord's consent is required, Tenant shall pay to Landlord at the time such consent is requested, the sum of One Thousand and No/100 Dollars ($1000.00) as Additional Rent, to cover the legal and accounting fees to evaluate and document any proposed Transfer requiring an amendment or assignment to the Lease.

13.2    **Deemed Transfer**. If Tenant is a corporation, joint stock company, partnership, joint venture, limited liability company, trust, unincorporated association or other legal entity of any kind, which is not publicly listed and traded on a recognized national exchange, the Transfer of any equity interest or any other transaction resulting in a change in Control shall be deemed a Transfer requiring Landlord's consent under this **Article 13**.

13.3    **Permitted Transfer**. Notwithstanding anything to the contrary in this **Article 13**, Tenant shall have the right, without the need to secure the consent of Landlord, to Transfer this Lease to a corporation or entity that assumes Tenant's obligations under this Lease and (i) is an Affiliate of Tenant, or (ii) is the surviving entity in connection with any merger or consolidation of Tenant, or (iii) acquires substantially all of the assets of Tenant, or (iv) acquires all of Tenant's stock, ownership interests or assets located within California provided such Transferee is acquiring not less than fifteen (15) stores of Tenant, so long as such corporation or entity will operate a grocery store of similar quality as Tenant at the Premises. Additionally, Landlord consents to the assignment of the Lease and subletting of the Premises by Tenant in connection with any initial public offering of Tenant's shares on a recognized national stock exchange or the London Stock Exchange. Each such Transfer as described in this **Section 13.3** shall be defined as a "**Permitted Transfer**". In the event of a Permitted Transfer, Tenant shall give Landlord Notice of the details of such Transfer at least ten (10) days before it becomes effective.

13.4    **Release**. Following a Transfer under the provisions of this **Article 13**, Tenant shall be fully and completely released from any future liability or obligations under this Lease only in the event that Tenant reasonably demonstrates to Landlord that (a) either (i) the Transferee at the time of the Transfer primarily operates as a grocer and has a business worth equal to or greater than One Hundred Million and No/100 Dollars ($100,000,000.00), with said business worth being determined by taking said Transferee's earnings (earnings before interest, taxes, depreciation and amortization or "**EBITDA**") based upon GAAP and multiply said GAAP EBITDA by the then current market multiplier or generally accepted "cap rate" for Tenant's business which market multiplier as of the Commencement Date is six (6) (by way of example only, if the Transferee has annual GAAP EBITDA, Transferee of $17,000,000.00 and the then current market multiplier is six (6), Transferee would have a business worth of $102,000,000.00 ($17,000,000.00 x 6 = $102,000,000.00), or (ii) the Transferee at the time of the Transfer primarily has a business worth equal to or greater than One Hundred Fifty Million and No/100 Dollars ($150,000,000.00), with said business worth being determined by taking said

Transferee's EBITDA based upon GAAP and multiply said GAAP EBITDA by the then current market multiplier or generally accepted "cap rate" for Tenant's business (by way of example only, if the Transferee has annual GAAP EBITDA of $26,000,000.00, Transferee would have a business worth of $156,000,000.00 ($26,000,000.00 x 6 = $156,000,000.00). If Landlord disputes the business worth for any Transferee or the multiplier or "cap rate" utilized for Tenant's business in the calculation of such Transferee's business worth, Landlord and Tenant agree to submit such dispute to either Wells Fargo Bank, N.A. (or its successors or assigns), or JPMorgan Chase Bank, N.A. (or its successors or assigns), for determination of whether such banking entity agrees or disagrees that such Transferee's business worth is equal to or greater than the amounts set forth in subclauses (a)(i) or (a)(ii) and/or whether or not the market multiplier used for such calculation is current, accurate or appropriate, and the determination of such banking entity shall be final and binding on the parties. If Landlord and Tenant cannot agree as to whether Wells Fargo Bank, N.A. or JPMorgan Chase Bank, N.A., should be used, then Wells Fargo Bank, N.A. shall be contacted first, and if such banking entity is not willing or available to make such determination, then JPMorgan Chase Bank, N.A., shall be used; and (b) the Transferee assumes all of Tenant's obligations under the Lease

13.5    **Transfer by Landlord**. In the event of any Transfer of the Lease of the Premises by Landlord, the Transferee shall be deemed to have assumed and agreed to carry out such obligations without further Notice to Tenant, and Landlord shall be and is hereby entirely freed and relieved of further liability to Tenant for the performance of any obligations under this Lease (including without limitation any obligations to return or account for any Security Deposit) and for any occurrence after the date of such Transfer.

13.6    **Landlord's Recapture Right**. Notwithstanding anything herein to the contrary, if Tenant desires to transfer this Lease or to sublet all or any part of the Premises to a third party (or parties) for all or substantially all of the then remaining Term, and such Transfer does not constitute a Permitted Transfer, then Tenant shall provide Landlord written Notice of its intent to so assign or sublease, as provided in **Section 13.1** above, then, and in addition to the provision set forth in **Section 13.1**, Landlord may elect to cancel this Lease as to that portion of the Premises which is the subject of such assignment or sublease (the "**Assignment Recapture Notice**"). For purposes of this **Section 13.6**, the granting of licenses or concessions by Tenant or the creation of departments by Tenant (as described below) shall not be deemed to be an assignment or sublease. In order to exercise its election to cancel this Lease, Landlord shall provide Notice to Tenant, which Notice shall be given no later than fifteen (15) days after Landlord's receipt of Tenant's request for Landlord's consent to such assignment or subletting. In the event of any such election to cancel by Landlord, Tenant may elect to nullify such cancellation by giving Notice to Landlord within thirty (30) days after Tenant's receipt of Landlord's notice of cancellation that Tenant withdraws its request for Landlord's consent to such assignment or subletting. If Landlord's election to cancel is not vitiated by Tenant pursuant to the foregoing sentence, then such cancellation shall be effective on the proposed effective date of the assignment or sublease by Tenant. In the event of any such cancellation of this Lease, Landlord shall reimburse Tenant for the unamortized cost of the Tenant Improvements in the same manner as set forth in **Section 7.7**. In addition, Landlord and Tenant shall share equally in the cost of constructing the demising wall(s) required to be constructed within the Premises if Landlord cancels this Lease as just to a portion of the Premises which is the subject of such assignment or sublease.

## ARTICLE 14
## DAMAGE OR DESTRUCTION

14.1    **Insured Damage**.   In the event the Premises or the Building is damaged or destroyed during the Term by fire or other perils covered by Landlord's insurance and the proceeds of such insurance received by Landlord are sufficient to repair the damage, Landlord shall commence restoration of the Building as soon as is reasonably practical (but in any event, within one hundred eighty (180) days after the date of such destruction or damage) and diligently prosecute the repair and restoration of the Building within one (1) year after commencing such work, and this Lease shall continue in full force and effect.  However, if at least twenty-five percent (25%) of the Floor Area of the Premises is damaged by fire or other perils covered by Landlord's insurance during the last twelve (12) calendar months of the Term, Landlord or Tenant shall have the option to terminate this Lease by giving Notice to the other party within thirty (30) days after the date of the casualty.  In the event that (a) Landlord does not initiate and diligently prosecute such restoration work within such 180-day period, or thereafter fails to diligently pursue the completion of such repairs and restoration work; or (b) the required restoration is not substantially completed by Landlord in accordance with the provisions of this **Section 14.1** within one (1) year after commencing such work (which period may be extended by up to one hundred twenty (120) days by reason of Force Majeure, provided that Landlord gives Tenant Notice of its claim of Force Majeure in accordance with the provisions of **Section 22.7**), then, in either such events, Tenant shall have the right, at its sole option and discretion, to terminate this Lease by delivering at least thirty (30) days Notice thereof to Landlord. Landlord's duty to restore the Building shall be limited to the Building as provided to Tenant on the Delivery Date and shall not include restoration of the Tenant Improvements or any Alterations.  Notwithstanding the foregoing, Landlord shall be entitled to terminate this Lease by delivering Notice to Tenant of Landlord's election to so terminate within sixty (60) days after such casualty in the event the Building is damaged or destroyed by any peril and, because of the laws then in force, the Building (i) cannot be restored at reasonable cost or (ii) if restored, cannot be used for the same use being made thereof before such damage.

14.2    **Uninsured Damage**.   In the event the Premises shall be damaged or destroyed as a result of any casualty not covered by Landlord's insurance, Landlord may, within one hundred twenty (120) days following the date of the casualty, commence restoration of Landlord's Work, in which event this Lease shall continue in full force and effect, or within such one hundred twenty (120) day period elect to terminate this Lease by written Notice given during the one hundred twenty (120) day period; provided, however, that unless Landlord has commenced such restoration within said one hundred twenty (120) day period in the event Landlord fails to deliver such Notice to Tenant within said one hundred twenty (120) day period electing to terminate this Lease, Landlord shall be deemed to have elected to terminate this Lease.  Notwithstanding the foregoing, if at least twenty-five percent (25%) of the Floor Area of the Premises is damaged by fire or other perils not covered by Landlord's insurance during the last twelve (12) calendar months of the Term (taking into account any options to extend that have been exercised before the date of the casualty) either Landlord or Tenant shall have the option to terminate this Lease by giving Notice to the other party within thirty (30) days after the date of the casualty.

14.3    **Tenant Obligations**.   Upon Substantial Completion of any restoration of Landlord's Work pursuant to this **Article 14**, Tenant, at Tenant's sole cost and expense, shall

immediately commence and diligently complete the restoration of all items of Tenant's Alterations and signs in accordance with **Section 1.14**, **Section 11.3** and **Article 10** respectively. Tenant, at Tenant's sole cost and expense, shall promptly replace Tenant's trade fixtures and personal property and open for business for the Permitted Use.

14.4    **Abatement**.    During the restoration of Landlord's Work and Tenant's Work under **Section 14.3** following a casualty, the Minimum Annual Rental and Additional Rent shall be abated proportionately with the degree to which Tenant's use of the Premises is impaired commencing on the date of the casualty and ending on Substantial Completion. Tenant shall continue the operation of Tenant's business on the Premises during any such period to the extent reasonably practicable from the standpoint of prudent business management.

14.5    **Waiver**.    Subject to Landlord's compliance with the terms and provisions of this **Article 14**, Tenant hereby waives any statutory and common law rights of termination which may arise by reason of any partial or total destruction of the Premises that Landlord has the obligation to restore under this Lease including but not limited to the provisions of California Civil Code Sections 1932(2) and 1933(4) and any similar or successor statutes, and agrees that any such occurrence shall instead be governed by the terms of this Lease.

## ARTICLE 15
## TENANT DEFAULTS AND LANDLORD REMEDIES

15.1    **Event of Default**.    The occurrence of any one or more of the following events shall constitute a material breach and default of this Lease (each, an "**Event of Default**"):

(a)    Tenant's failure to pay Minimum Annual Rental, Ground Lease Rental, Additional Rent or any other charge when due, where such failure continues for five (5) days after Notice from Landlord to Tenant; or

(b)    Tenant's failure to perform or satisfy Tenant's obligations with respect to any term, condition or covenant of this Lease that is not provided for in **subparagraph (a)** above or in **subparagraphs (c)**, **(d)**, or **(e)** below where such failure continues for thirty (30) days after Notice from Landlord to Tenant specifying such failure, provided that if such failure is curable but not reasonably capable of being cured within such thirty (30) day period, an Event of Default shall not exist as long as Tenant shall commence to cure within thirty (30) days and diligently pursue such cure to completion; or

(c)    Tenant's failure to perform or satisfy Tenant's obligations with respect to any term, condition or covenant of this Lease that creates an imminent threat of serious loss to persons or property where such failure continues for more than two (2) business days after Notice from Landlord; or

(d)    Any of the following acts taken by or against Tenant: (i) the making of a general assignment for the benefit of creditors, or (ii) the filing of any proceeding under any insolvency or bankruptcy law, or (iii) the appointment of a trustee or receiver to take possession of assets located upon the Premises or to assume Tenant's interest in this Lease where such action is not dismissed within thirty (30) days; or

(e)    Tenant's failure to commence any of Tenant's Work within sixty (60) days after the Commencement Date unless delayed by the occurrence of any Force Majeure event, or to thereafter diligently prosecute such construction to completion and, subject to the provisions of **Article 4**, open for business in the Premises and to conduct its operations for a period of not less than one (1) day within the time periods required under this Lease and where such failure continues for ten (10) business days after notice from Landlord to Tenant.  Any Notice pursuant to this **Section 15.1** shall be in lieu of any statutory notices.

15.2    **Remedies**.

(a)    **Re-entry With and Without Termination**.  Upon and during the continuance of an Event of Default, at Landlord's option and without further Notice, Landlord may:

(i)    Declare the Term ended and recover possession of the Premises pursuant to applicable California law, whereupon Tenant shall have no further right, title or interest in or to the Premises; or

(ii)    Without declaring the Term ended, elect the remedy described in California Civil Code Section 1951.4, as same may be amended, supplemented or replaced from time to time, providing that Landlord may continue this Lease in effect after Tenant's breach of this Lease and abandonment of the Premises and recover Minimum Annual Rental, Ground Lease Rental and Additional Rent as it becomes due.  In connection therewith, Landlord shall have the right to file successive actions for the recovery of any delinquent rent or damages while Tenant remains in possession.  The parties acknowledge that in the event Landlord attempts to lease the Premises to any third party without terminating this Lease in an effort to mitigate damages and otherwise in accordance with California Civil Code Section 1951.4, that such attempted reletting shall not be considered as a termination of Tenant's right to possession of the Premises; or

(iii)    Even though Landlord may have previously made the election under California Civil Code Section 1951.4 to recover rent as it becomes due without terminating this Lease, thereafter elect to terminate this Lease pursuant to clause (i) hereinabove, whereupon Tenant shall have no further right, title or interest in or to the Premises; or

(iv)    Without declaring the Term ended and prior to doing so, make such payments and take such actions as may be required, in Landlord's sole discretion to cure such Event of Default on Tenant's account, in which case Tenant shall be obligated to reimburse Landlord for all costs or expenses so incurred plus a surcharge of ten percent (10%) as a supervision fee within ten (10) days after Notice from Landlord; or

(v)    Pursue any other rights or remedies available to Landlord at law or in equity, including, without limitation, the right to seek specific performance, injunctive relief or other equitable remedies to compel Tenant to perform its obligations.  Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law unless Landlord

notifies Tenant in writing that Landlord elects to terminate this Lease. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default. A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting. In addition to any other remedies available, each of Landlord and Tenant shall be entitled to all benefits and rights of a landlord or tenant, as applicable, pursuant to California Code of Civil Procedure § 1161.1.

(b)    **Express Termination Required**. No termination of this Lease may be implied or inferred from any act or omission other than the giving of Notice from Landlord to Tenant expressly stating that Landlord has elected to terminate this Lease.

(c)    **Damages Upon Termination**. If Landlord terminates this Lease, Landlord shall be entitled, at Landlord's election, to damages in the amount as set forth in Section 1951.2 of the California Civil Code, as same may be amended, supplemented or replaced from time to time. For purposes of computing damages pursuant to Section 1951.2 of the California Civil Code, (i) an interest rate equal to the Default Rate (or maximum interest rate allowed by law) shall be used where permitted, and (ii) the term "rent" includes all Minimum Annual Rental and all Additional Rent. Such damages shall include the following amounts:

(i)    The worth at the time of award of any unpaid Minimum Annual Rental, Ground Lease Rental or Additional Rent that had been earned as of the termination date; plus

(ii)    the worth at the time of award of the amount by which the unpaid Minimum Annual Rental, Ground Lease Rental and Additional Rent which would have been earned after the termination date until the time of award exceeds the amount of such

rental loss that Tenant proves could have been reasonably avoided; plus

(iii)     subject to the provisions of Section 1951.2(c) of the California Civil Code, the worth at the time of award of the amount by which the unpaid Minimum Annual Rental, Ground Lease Rental and Additional Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(iv)     any costs or expenses incurred by Landlord in:  (A) re-taking possession of the Premises, including reasonable attorneys' fees, (B) repairing, maintaining or securing the Premises after the occurrence of an Event of Default, (C) preparing the Premises for reletting to a new tenant, including repairs and Alterations to the Premises for such reletting, amortized on a straight-line basis over the term of the replacement lease and Prorated through the date that the Term would have expired had it not been terminated in the event that the Premises are relet for a longer period; and (D) paying any leasing commissions, allowances and incentives reasonably required for such reletting, amortized on a straight-line basis over the term of the replacement lease and Prorated through the date that the Term would have expired had it not been terminated in the event that the Premises are relet for a longer period; plus

(v)     any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform Tenant's obligations under this Lease, or which in the ordinary course of things would be likely to result therefrom.

(d)     **Definitions**.  As used in **subparagraphs 15.2(c)(i)** and **15.2 (c)(ii)**, above, the "**worth at the time of award**" is computed with interest at the Default Rate from the date the amounts were originally due. As used in **subparagraphs 15.2(c)(iii)** above, the "**worth at the time of award**" is computed by discounting such amount to present value at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one percent (1%).

(e)     **No Waiver**.  The waiver by Landlord of any breach of any term, covenant or condition of this Lease shall not be deemed to be a waiver of any other term, covenant or condition or any subsequent breach of the same term, covenant or condition.  The subsequent acceptance of Minimum Annual Rental, Additional Rent or other charges due hereunder shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular amount so accepted regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such amount.  No covenant, term, or condition of this Lease shall be deemed to have been waived by Landlord unless such waiver shall be in writing and signed by Landlord.

(f)     **Additional Rent**.  For purposes of any unlawful detainer action by Landlord against Tenant pursuant to California Code of Civil Procedure Sections 1161-1174, or any similar or successor statutes, Landlord shall be entitled to recover as Rent not only such sums specified herein as Minimum Annual Rental, Ground Lease Rental and Additional Rent as may then be overdue, but also all such additional sums of Rent as may then be overdue.

(g)    **Remedies Not Exclusive**. To the extent allowed under applicable law, no remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies herein provided or permitted at law or in equity.

## ARTICLE 16
## LANDLORD DEFAULT AND TENANT REMEDIES

Unless a shorter time period for Landlord to act is otherwise expressly provided for in this Lease, in the event Landlord should fail to perform or satisfy Landlord's obligations with respect to any of the terms, covenants, or conditions contained in this Lease, where such failure continues for thirty (30) days after receipt of Notice from Tenant to Tenant and any Mortgagee whose name and address have been given to Tenant, specifying such failure (or if more than thirty (30) days shall be required because of the nature of the failure, if Landlord shall fail to commence the curing of its default within the thirty (30) day period and proceed diligently thereafter to effect a cure), then Landlord shall be liable to Tenant for any foreseeable actual damages sustained by Tenant as a direct result, subject to Tenant's obligation to take reasonable steps to mitigate its damages to the extent such obligation is imposed under the applicable laws of the State of California. Notwithstanding anything to the contrary contained in this Lease, it is expressly understood and agreed that any money judgment against Landlord resulting from any default or other claim arising under this Lease shall be satisfied only out of the rents, issues, profits and other income (collectively "**Income**") actually received from the operation of the Premises, and Tenant waives any recourse against any other real, personal or mixed property of Landlord or Landlord's Related Persons, wherever situated, and no such property shall be subject to levy, attachment or other means of enforcement, satisfaction or collection of any judgment obtained against Landlord.

## ARTICLE 17
## ATTORNEYS' FEES, WAIVER OF JURY TRIAL, ENFORCEMENT COSTS

17.1    **Attorneys' Fees**. If Landlord or Tenant commences any legal action against the other arising out of or related to this Lease, the prevailing party shall be awarded from the non-prevailing party its reasonable attorneys' fees, expert witness fees and taxable costs incurred in preparing and prosecuting such action and an appropriate award shall be included in any judgment.

17.2    **Waiver of Jury Trial**. TO THE EXTENT ALLOWED BY APPLICABLE LAW, LANDLORD AND TENANT EACH WAIVE THEIR RESPECTIVE RIGHT TO ANY TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN THE RESOLUTION OF ANY DISPUTE OR CONTROVERSY, WHETHER IN AN ACTION AT LAW OR SUIT IN EQUITY, WHETHER SEEKING DAMAGES, POSSESSION OR OTHER REMEDY OR FORM OF RELIEF, WHETHER BASED IN CONTRACT, TORT, GOVERNMENTAL REQUIREMENTS OR OTHERWISE, WHETHER STATED AS AN AFFIRMATIVE CLAIM, DEFENSE, COUNTERCLAIM, CROSS-CLAIM OR THIRD-PARTY COMPLAINT, SO LONG AS THE DISPUTE OR CONTROVERSY ARISES OUT OF OR RELATES IN ANY WAY TO THIS LEASE, THE PREMISES OR THE RELATIONSHIPS OR LIABILITIES OF LANDLORD, TENANT OR ANY RELATED PERSONS.

17.3    **Enforcement Costs**.  Subject to providing any required Notice(s) and after the expiration of any applicable cure period(s), all reasonable costs and expenses incurred by any party in connection with collecting any amounts and damages owing by the other party pursuant to the provisions of this Lease or to enforce any provision of this Lease, including reasonable attorneys' fees, whether or not any action is commenced by such party, shall be paid by the other party to such party within thirty (30) days of receipt of a bill for the same.

## ARTICLE 18
## EMINENT DOMAIN

18.1    **Termination**.

(a)    **Entire Taking**.  In the event the entire Premises shall be appropriated or taken under the power of eminent domain or Transferred in lieu of condemnation, this Lease shall terminate and expire as of the date of such taking or Transfer, and all Minimum Annual Rent and Additional Rent shall be Prorated and paid through that date.

(b)    **Partial Taking**.  In the event more than twenty-five percent (25%) of the Floor Area of the Premises is taken under the power of eminent domain or Transferred in lieu of condemnation, or if by reason of any appropriation by any authority, regardless of the amount so taken, it is no longer practicable to conduct the Permitted Use because of a material impairment to the configuration of the Building or Common Areas or utilities serving the Premises, either party shall have the right to terminate this Lease as of the date of such partial taking or appropriation, by giving Notice to the other within thirty (30) days after Landlord gives Notice of such partial taking or appropriation.  All Minimum Annual Rental and Additional Rent shall be Prorated and paid through the termination date.

(c)    **Shopping Center**.  In the event more than twenty-five percent (25%) of the Common Area within the Premises or twenty-five percent (25%) of the Tenant's Primary Parking Area or any primary access to and from the Premises (from either East El Camino Real or Cezanne Drive) have been materially and adversely impacted or eliminated that Landlord or Tenant reasonably deems essential for the commercially reasonable operation of the Premises is taken under the power of eminent domain or Transferred in lieu of condemnation, regardless of whether the Premises are directly affected, then either Landlord or Tenant shall have the right to terminate this Lease as of the date of such taking or Transfer, by giving Notice to the other party within thirty (30) days after the date of such taking or Transfer.  All Minimum Annual Rental and Additional Rent shall be Prorated and paid through the termination date specified in such Notice.

18.2    **No Termination**.  If this Lease is not terminated as provided in this **Article 18**, Tenant shall remain in that portion of the Premises that shall not have been taken, Transferred or appropriated, the Minimum Annual Rental shall be reduced on an equitable basis, taking into account the relative value of the portion taken as compared to the portion remaining.  Landlord shall use the proceeds of any awards received by Landlord to restore the Premises as completely as reasonably possible to the quality existing before the date of the taking, Transfer or appropriation.

18.3    **Waiver**.  The rights of Landlord and Tenant regarding any taking or conveyance under power or threat of eminent domain shall be governed by the terms of this paragraph, and each party waives the provisions of California Civil Procedure Code Section 1265.130 and the provisions of any similar law hereinafter enacted allowing either party to petition the Superior Court to terminate this Lease in the event of a partial taking of the Premises.

18.4    **Award**.  Subject to the provisions of any Mortgage and the Ground Lease, Landlord shall be entitled to that portion of the award or compensation from the condemning authority, awarded as compensation for the taking of the value of the leasehold interest or as severance damages and for the Building and Tenant shall be entitled to an award or compensation from that portion of the award for moving and relocation benefits, the unamortized cost of Tenant's Work and Alterations, trade fixtures and personal property, and the goodwill of Tenant (which together comprise the business value of Tenant), which Tenant may initiate and pursue at Tenant's sole cost and expense.

## ARTICLE 19
## RETURN OF POSSESSION AND HOLDOVER

19.1    **Return of Possession**.  During the final six (6) months of the Term (i.e. six months prior to the expiration of the Lease or any sooner event of termination), Landlord and Landlord's Related Persons shall have the right to place "For Lease" signs on the inside of the Premises and in the Common Area free of any disturbance by Tenant and to show the Premises to prospective tenants during customary business hours, upon reasonable verbal notice to Tenant's onsite manager.  Upon expiration or earlier termination of this Lease, Tenant shall return the Premises to Landlord in good condition, free of refuse and debris, broom clean, ordinary wear and tear excepted.  The disposition of Tenant's Alterations, signs, trade fixtures and other personal property shall be governed by **Article 10, Article 11** and **Article 12**.

19.2    **Holdover**.  Tenant shall not remain in possession of the Premises after the expiration or earlier termination of this Lease without the express written consent of Landlord.  No acceptance of Minimum Annual Rental, Additional Rent or other charges and no other verbal statements or other conduct by Landlord's Related Persons shall be construed as consent to a holdover.  Should Tenant hold over without the express written consent of Landlord, such tenancy shall be at the sufferance of and immediately terminable by Landlord and in such case, Landlord shall be entitled to compensation in the amount of one hundred fifty percent (150%) of the Minimum Annual Rental, due pursuant to this Lease, Prorated for the period of such holdover, in addition to any other rights or remedies available at law or in equity.  In the event Tenant holds over, Tenant will be bound by all of the other terms, covenants and agreements of this Lease, including without limitation the obligation to pay Additional Rent, and Tenant Indemnifies Landlord against all Losses, including costs and damages incurred by Landlord for its inability to deliver possession of the Premises to a new tenant or to Owner.  Tenant's failure to return the Premises to Landlord in the condition required by this Lease upon the expiration of the Term hereof, including Tenant's failure to remove its personal property and the Sprouts FF&E, shall constitute a holdover by Tenant until the Premises are placed in the required condition; provided, however, that Tenant shall have thirty (30) days after such termination date within which to return the Premises to its required condition before any holdover rent is then accruing and if Tenant fails to remove any of its trade fixtures, furniture and other personal property upon the

expiration or sooner termination of this Lease, Landlord may, at Landlord's option after the expiration of said thirty (30) days and upon not less than ten (10) days' Notice to Tenant, in lieu of the provisions of California Civil Code §1980 *et seq.* (and any successor statutes) (i) retain all or any of such property, and title thereto shall thereupon automatically vest in Landlord, or (ii) Landlord may remove same from the Premises and dispose of all or any portion of such property in which later event Tenant shall, upon demand, pay to Landlord the actual expense of such removal and disposition together with the cost of repair and any and all damage to the Premises resulting from or caused by such removal. Tenant waives any and all rights it may have under California Civil Code §1980 *et seq.* and any successor statutes.

## ARTICLE 20
## SUBORDINATION, ATTORNMENT AND ESTOPPEL CERTIFICATES

20.1   **Subordination**. Unless the Mortgagee elects otherwise, this Lease and Tenant's right, title and interest in and to the Premises is and shall be automatically subject and subordinate to all Mortgages, without the necessity of any further instrument or act on the part of Tenant; provided, however, that as a condition to such subordination and as a condition of Tenant's obligation under this Lease, Tenant shall first receive from Landlord and its lender(s) a subordination, attornment and non-disturbance agreement ("SNDA") confirming the non-disturbance of Tenant in substantially the form of SNDA attached as **Exhibit "I"** hereto or such other commercially reasonable subordination, non-disturbance and attornment agreement as may be required by the Mortgagee and such other commercially reasonable subordination non-disturbance and attornment agreement is reasonably acceptable to Tenant. Upon request of Tenant, Landlord shall use commercially reasonable efforts to obtain the execution by Mortgagee of the SNDA; upon request of Landlord, not more than one (1) time per calendar year unless Landlord agrees to pay Tenant's reasonable attorneys' fees incurred for any additional SNDA, Tenant shall execute and deliver to Landlord the SNDA. Landlord represents that as of the Date of this Lease, the Prime Premises is not encumbered by any Mortgage.

20.2   **Attornment**. At the election of Mortgagee, Tenant agrees to attorn to a Mortgagee or any Person acquiring Landlord's interest in the Building, the Premises or the Lease upon any Transfer in connection with the exercise of Mortgagee's rights or remedies under the Mortgage, so long as such Person agrees to recognize Tenant's rights under this Lease and not to disturb Tenant's possession of the Premises so long as no uncured Event of Default exists.

20.3   **Estoppel Certificates**. Tenant shall, from time to time, but no more than one (1) time per calendar year unless Landlord agrees to pay Tenant's reasonable attorneys' fees incurred for any additional Estoppel Certificates, within ten (10) business days after written request by Landlord, execute, acknowledge and deliver to Landlord a written statement ("**Estoppel Certificate**") in a form provided by Landlord certifying, among other things: (a) that this Lease is unmodified and in full force and effect (or, if modified, identifying all amendments and certifying that this Lease, as so modified, is in full force and effect); (b) the Commencement Date, the Rent Commencement Date and the expiration date of the Term and the number, length and status of any extension options, if any; (c) the current amounts of monthly installments of Minimum Annual Rental and Additional Rent: (d) the dates to which Minimum Annual Rental, Additional Rent and other charges have been paid; (e) the amount of any security deposit and any prepaid rent; (f) that Landlord's Work has been fully performed (or, if not, the specific

portions which remain to be performed); (g) that Tenant has accepted delivery of possession of the Premises and is operating its business for the Permitted Use; (h) that there is no Event of Default by Tenant and that there are not, to Tenant's knowledge, any uncured defaults by Landlord (or, if any are claimed, specifying such defaults) and (i) that Landlord has no outstanding payment liabilities to Tenant, and that Tenant is not entitled to any credits, offsets or other deductions from rent except as may be otherwise expressly provided for under this Lease. Any such statement may be relied upon by any prospective or existing Mortgagee or Transferee of all or any portion of the Shopping Center, the Premises or the Lease. Tenant's failure to deliver such statement within such time shall be conclusive upon Tenant (i) that this Lease is in full force and effect, without modification except as may be represented by Landlord; (ii) that there are no uncured defaults by either party; (iii) that Tenant has paid to Landlord the security deposit; (iv) that no more than one month's installment of Minimum Annual Rent or Additional Rent has been paid in advance; and (v) that Landlord's Work has been completed, that Tenant is in possession of the Premises, and that Tenant is not entitled to any payments, credits, offsets or other deductions from Landlord.

20.4    **Financial Information**.    Tenant represents and warrants that any financial information submitted to Landlord and any Mortgagee shall be complete and accurate in all material respects, as certified by Tenant's chief financial officer. Once each calendar year during the Term or at any time in connection with any proposed Transfer by Landlord (but in all events not more than twice each calendar year), upon ten (10) business days Notice from Landlord, Tenant shall provide from its Chief Financial Officer a certified balance sheet, income and cash flow statement, and statement of changes in equity, prepared in accordance with generally accepted accounting principles, for the most recent calendar year. Landlord shall at all times keep Tenant's financial information in strict confidence in accordance with the terms of **Section 22.11**.

20.5    **Lease Recognition Agreement**.    As a condition precedent to the obligations to Tenant under this Lease in accordance with **Section 1.18**, Landlord shall use commercially reasonable efforts to secure from the Owner under the Ground Lease a lease recognition agreement (the "**Lease Recognition Agreement**") in a commercially reasonable form satisfactory to Tenant. Landlord shall submit the form attached hereto as **Exhibit "N"** to Owner upon execution of this Lease, but Tenant shall accept and execute any commercially reasonable alternative Lease Recognition Agreement which may be required by the Owner. In the event that the Lease Recognition Agreement has not been delivered to Tenant fully-executed by Owner and Landlord in recordable form within thirty (30) days after the Date of this Lease, then, Tenant shall have the right, at its sole option, to be exercised within ten (10) business days after the expiration of said thirty (30) day period, to terminate this Lease upon delivery of Notice to Landlord of its election to so terminate whereupon this Lease shall thereafter be null and void and be of no force and effect whatsoever and the parties hereto shall have no further obligations to each other. If Tenant does not elect to terminate this Lease within said ten (10) business day period, then Tenant shall be deemed to have waived this condition and the parties shall proceed with the terms of this lease pursuant to the provisions herein.

## ARTICLE 21
## NOTICES

Wherever in this Lease it shall be required or permitted that notice, request, demand, approval, consent or other communication be given or served by either party, unless otherwise expressly stated in the Lease, such communication shall not be deemed to have been duly given or served unless in writing and delivered by (i) certified or registered mail,(ii) third party delivery (which may include local messenger or national courier service such as Federal Express, UPS and the like) or (iii) facsimile with a copy by certified or registered mail or third party delivery, at the addresses (or fax numbers) of the parties specified in **Section 1.12** (hereinafter, "Notice"). Either party may change such address upon ten (10) business days Notice given in accordance with this **Article 21**. Notice shall be deemed received when personally delivered or when delivery is refused.

## ARTICLE 22
## MISCELLANEOUS

22.1    **Warranty of Authority**.

(a)    **Tenant**:  If Tenant is not a natural Person, Tenant and each natural Person executing this Lease on behalf of Tenant, jointly and severally, represent and warrant to Landlord that (a) Tenant is duly organized, validly existing and in good standing under the Governmental Requirements of the place where it is created, and it is duly qualified to transact business in the State of California; (b) the Persons executing this Lease on Tenant's behalf have the power and authority to sign, deliver and cause the Lease to be performed by Tenant; (c) the signing, delivery and performance of the Lease by Tenant has been duly authorized by all requisite action on the part of Tenant, and all consents or approvals have been obtained; and (d) the signing, delivery and performance of the Lease by Tenant does not violate or conflict in any respect with Tenant's organizational documents, any other agreements by which Tenant is bound or any applicable Governmental Requirements.

(b)    **Landlord**:  If Landlord is not a natural Person, Landlord and each natural Person executing this Lease on behalf of Landlord, jointly and severally, represent and warrant to Tenant that (a) Landlord is duly organized, validly existing and in good standing under the Governmental Requirements of the place where it is created, and it is duly qualified to transact business in the State of California; (b) the Persons executing this Lease on Landlord's behalf have the power and authority to sign, deliver and cause the Lease to be performed by Landlord; (c) the signing, delivery and performance of the Lease by Landlord has been duly authorized by all requisite action on the part of Landlord, and all consents or approvals have been obtained; and (d) the signing, delivery and performance of the Lease by Landlord does not violate or conflict in any respect with Landlord's organizational documents, or other agreements by which Landlord is bound or any applicable Governmental Requirements.

22.2    **Entire Agreement**.  When executed by both parties, this Lease shall be binding upon and inure to the benefit of Landlord, Tenant and their respective successors and assigns, subject to the provisions of **Article 13**.  However, this Lease shall not confer any rights or remedies upon any other Person.  This Lease supersedes any and all prior or contemporaneous discussions, negotiations, arrangements, brochures, letters of intent, agreements and

understandings, written or oral between Landlord and Tenant or any Related Persons, including without limitation any information given to Tenant or Tenant's Related Persons with respect to the Shopping Center and the Premises; and none of the foregoing shall be used to interpret this Lease, which alone reflects the expectations of the parties with respect to the subject matter. Except as otherwise provided in this Lease, Tenant has not relied on the opening or continued operation of any other tenants or other occupants of the Shopping Center as an inducement to enter into this Lease.

22.3    **Time Is Of The Essence**. Time is of the essence with respect to the payment, performance and satisfaction of each term, condition and covenant of this Lease.

22.4    **Governing Law**. This Lease shall be governed by and construed in accordance with the substantive laws of the State of California pertaining to contracts made and to be performed entirely in the State of California. Any action arising out of or related to this Lease, the Premises, or the relationships or liabilities of Landlord, Tenant or any Related Persons shall be commenced and prosecuted in the California state or federal district court in the State of California with jurisdiction over the County of Santa Clara. The parties irrevocably consent to exclusive jurisdiction and venue in such court for such purposes and agree not to seek transfer or removal of any action commenced in accordance with the terms of this **Section 22.4**.

22.5    **Severability**. Each provision of this Lease shall be interpreted in such a manner as to be valid and effective to the maximum extent permitted by applicable Governmental Requirements. If any provision of this Lease is declared to be void or unenforceable, the remaining provisions shall nevertheless remain in full force and effect.

22.6    **Interpretation**. The language of this Lease shall be construed to its normal and usual meaning and not strictly for or against either Landlord or Tenant. Landlord and Tenant acknowledge and agree that each party has had an opportunity to have this Lease reviewed by counsel and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Lease. The Article, paragraph and subparagraph headings are intended for ease of reference only, and they shall not amplify, limit or otherwise define the substantive provisions of this Lease. The masculine, feminine or neuter gender, as well as the singular or plural number, shall be deemed to include the others whenever the context so requires. If more than one Person is named as Landlord or Tenant in this Lease and executes the same as such, then the words, "**Landlord**" or "**Tenant**" wherever used in this Lease are intended to refer to all such Persons, and the liability of such Person for payment, performance and satisfaction of all the terms, conditions and covenants of this Lease shall be joint and several. Nothing contained in this Lease shall be deemed or construed as creating an agency, partnership or joint venture relationship between Landlord and Tenant or between Landlord and any other party or cause Landlord to be responsible in any way for the debts or obligations of Tenant or any other party.

22.7    **Force Majeure**. Except as may be otherwise expressly set forth in this Lease, in the event any interference with the performance of any non-monetary obligations under this Lease due to strikes, lockouts, labor disputes, trade embargos, inability to obtain labor or materials, Governmental Requirements, war, terrorism, riots, civil commotion, hostilities, natural disasters, casualties and other causes beyond the reasonable control of the party obligated to

perform (collectively referred to herein as "**Force Majeure**") then the such party shall give the other party prompt Notice of any such delay and the performance of any such act shall be excused for the period of delay and the period of performance of any such act shall be extended for a period equivalent to the period of such delay. The failure by such party to give the other party Notice of such delay within ten (10) days after the occurrence of each such event of Force Majeure shall result in the waiver by the such party to claim any excuse of such performance or period of delay. Notwithstanding the foregoing, the financial inability of a party to perform its obligations under that Lease shall not constitute an event of Force Majeure.

22.8   **Broker**. Tenant warrants that Tenant has dealt with no brokers, leasing agents or finders in connection with this Lease other than Tenant's Broker, whose commission shall be paid by Landlord in the amount of $4.00 per square foot of Floor Area of the Premises pursuant to a separate agreement. Landlord's Broker shall be compensated by Landlord pursuant to a separate agreement. Tenant Indemnifies Landlord and Landlord's Related Persons against any breach of this warranty and any Losses from any other Person claiming any right to compensation as a broker, leasing agent or finder as a result of dealings for, through or on behalf of Tenant or Tenant's Related Persons.

22.9   **No Merger**. The doctrine of merger shall have no application to this Lease or Tenant's leasehold interest, unless otherwise stated in a written instrument signed by Landlord and Mortgagee. The termination of this Lease or Tenant's right to possession of the Premises shall, at Landlord's sole option, either terminate any or all existing subleases or subtenancies or operate as an assignment to Landlord of any or all of such subleases or subtenancies.

22.10   **No Recording**. This Lease shall not be recorded. Upon request of Tenant, Landlord will execute a memorandum of this Lease which may be recorded in the form of **Exhibit "K"** hereto. In the event a memorandum of this Lease is recorded by Tenant, Tenant shall execute and record at its expense a release and termination of such memorandum within thirty (30) days after the expiration or earlier termination of this Lease. The obligations of Tenant under this **Section 22.10** shall survive the expiration or earlier termination of this Lease.

22.11   **Confidentiality**. Except as essential to the consummation of the transaction contemplated by this Lease:

(a) Tenant and Landlord shall keep and maintain the terms of this Lease and the transactions contemplated by this Lease or any aspect of this Lease in strict confidence.

(b) Tenant or Landlord shall not make or allow any notices, statements, disclosures, communication, or news releases concerning this Lease, the terms of this Lease and the transaction contemplated by this Lease or any aspect of this Lease. Nothing provided herein, however, shall prevent Tenant or Landlord from disclosing to its legal counsel and/or certified public accountants, prospective purchasers, appraisers (but only appraisers retain for estate tax valuation purposes only) or lenders the existence and terms of this Lease or any transaction under this Lease, or any aspect of this Lease, or from complying with any government or court order or similar legal requirement which requires such party to disclose this Lease, the terms of this Lease, the transaction

contemplated by this Lease and/or any aspect of this Lease, provided that Tenant or Landlord uses diligent good faith efforts to disclose no more than is absolutely required to be disclosed by such legal requirement.

**[SIGNATURES ON THE FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed this Lease as of the dates set forth below their signatures.

**LANDLORD:**

EEL MCKEE LLC,
a California limited liability company

By: _Allison Roht_
Print Name: _Allison Rohnert_
Title : _Manager_
Date: _Sept 10, 2009_

**TENANT:**

SPROUTS FARMERS MARKET, LLC,
an Arizona limited liability company

By:     Premier Grocery, Inc.,
        a California corporation, Manager

By: _____
Shon Boney, President
Date: _9-2-09_

## EXHIBIT "A"

### SITE PLAN

### [SEE ATTACHED]



EXHIBIT "A"

1

**EXHIBIT "A-1"**

**RESTRICTED AREA SITE PLAN**

**[SEE ATTACHED]**

EXHIBIT "A-1"



**SUMMARY**

| | |
|---|---|
| LAND AREA | 148,844 SF (±) (3.4)ac |
| LAND/BUILDING RATIO | 3.8/1 – 20.85% |
| BUILDING AREA | 32,350 SF |
| LANDSCAPE AREA | ±26,060 SF (±17.4%) |
| PARKING PROVIDED | 180 STALLS (5.4/1000) |
| PARKING REQUIRED | 156 STALLS (5/1000) |

OLD SAN FRANCISCO ROAD

BUILDING

32,350 SF BLDG

Bank of Santa Clara

180 SPACES

EL CAMINO REAL

SITE PLAN

☐ Primary Parking Area/ Restricted Area

Outdoor Sales Area

SCOPE OF WORK

COMPACT

DIRECTIONAL ARROW    DIRECTIONAL ARROW    COMPACT SIGN

WHEEL STOP    DISABLE SYMBOL    DISABLE STALL SIGN

PARKING STALL    STALL @ CURB

DISABLE PARKING

DISABLE SIGN @ ENTRY    TREEWELL DETAILS

**EXHIBIT "A-1"**

## EXHIBIT "B"

## DEPICTION OF AND LEGAL DESCRIPTION OF PRIME PREMISES

Real property in the City of  Sunnyvale, County of Santa Clara, State of California, described as follows:

PARCEL ONE:

PARCEL 1 AS SHOWN UPON PARCEL MAP FILED FOR RECORD SEPTEMBER 16, 1980 IN BOOK 471 OF MAPS AT PAGES 26 AND 27, SANTA CLARA COUNTY RECORDS.

EXCEPTING THEREFROM ALL BUILDING, STRUCTURES AND IMPROVEMENTS SITUATED THEREON WHICH ARE AND SHALL REMAIN REAL PROPERTY, AS CONVEYED BY DEED RECORDED OCTOBER 1, 1980 AS BOOK F623, PAGE 442 OFFICIAL RECORDS.

PARCEL TWO:

A NON-EXCLUSIVE EASEMENT 50.00 FEET IN WIDTH FOR THE PURPOSE OF INGRESS AND EGRESS OF VEHICULAR AND PEDESTRIAN TRAFFIC, THE EASTERLY LINE OF SAID EASEMENT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF PARCEL 1 IN THE SOUTHERLY LINE OF OLD SAN FRANCISCO ROAD AS SAID PARCEL AND ROAD ARE SHOWN ON THAT CERTAIN MAP ENTITLED "PARCEL MAP", RECORDED SEPTEMBER 16, 1980 IN BOOK 471 OF MAPS, AT PAGES 26 AND 27, SANTA CLARA COUNTY RECORDS; THENCE FROM SAID POINT OF BEGINNING ALONG THE WESTERLY LINE OF SAID PARCEL 1, SOUTH 3° 25' 44" WEST 230.04 AND SOUTH 45° 54' 00" WEST 83.50 FEET TO THE NORTHEASTERLY LINE OF EL CAMINO REAL AND THE TERMINUS OF THIS EASEMENT.

PARCEL THREE:

EASEMENT RIGHTS AND BENEFITING RESTRICTIONS OVER THE PROPERTY DESCRIBED BELOW, CREATED BY THE OPERATION AND RECIPROCAL EASEMENT AGREEMENT DATED SEPTEMBER 30, 1980, BETWEEN FEDERATED DEPARTMENT STORES, INC., A DELAWARE CORPORATION, AND NOB HILL GENERAL STORES, INC., A CALIFORNIA CORPORATION, AND M. DUCKGEISCHEL REED, AN INDIVIDUAL, RECORDED ON OCTOBER 1, 1980 AS INSTRUMENT NO. 6855285, OFFICIAL RECORDS OF SANTA CLARA COUNTY, SAID PROPERTY BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL OF PARCEL 2, AS SHOWN UPON THAT CERTAIN PARCEL MAP FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA, ON SEPTEMBER 16, 1980 IN BOOK 471 OF MAPS, AT PAGES 26 AND 27.

APN: 211-01-045

EXHIBIT "B"

1



## SUMMARY

| LAND AREA | • 149,844 SF (±) (3.4)ac |
| LAND/BUILDING RATIO | • 3.8/1 - 20.85% |
| BUILDING AREA | • 32,350 SF |
| LANDSCAPE AREA | • ±28,060 SF (±17.4%) |
| PARKING PROVIDED | • 180 STALLS (5.4/1000) |
| PARKING REQUIRED | • 156 STALLS (5/1000) |

EXISTING 32,350 S.F. BLDG.

OLD SAN FRANCISCO ROAD

Bank of
Santa Clara

180 SPACES

EL CAMINO REAL

SITE PLAN
SCALE 1" = 30'

COMPACT

DIRECTIONAL ARROW    DIRECTIONAL ARROW    COMPACT SIGN

WHEEL STOP    DISABLE SYMBOL    DISABLE STALL SIGN

PARKING STALL    STALL @ CURB

DISABLE PARKING    DISABLE SIGN @ ENTRY    TREEWELL DETAIL

SCOPE OF WORK

EXHIBIT "B"

2

## EXHIBIT "C"

## FORM OF GUARANTY

<u>GUARANTY OF LEASE</u>

THIS GUARANTY OF LEASE is made as of _____, 2009, by Premier Grocery, Inc., a California corporation ("Guarantor"), for the benefit of the Eel McKee, LLC, a California limited liability company ("Landlord").

<u>RECITALS</u>:

A.    Sprouts Farmers Markets, LLC, an Arizona limited liability company ("Tenant"), is the Tenant under that certain lease (the "Lease") with Landlord of even date herewith, respecting certain premises (the "Premises") consisting of a parcel of real property of approximately 2.62 acres and a building thereon containing approximately 32,350 rentable square feet located at 111 E. El Camino Real, Sunnyvale, California, and described more particularly in the Lease.

B.    Guarantor will receive substantial benefit from the Lease and desires that Landlord and Tenant enter into the Lease.

C.    As a condition to entering into the Lease, Landlord requires that Guarantor guarantee the full performance of the obligations of Tenant under the Lease upon and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the execution of the Lease by Landlord and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor covenants and agrees as follows:

<u>AGREEMENT</u>

1.    <u>Guarantee; Term</u>.  Guarantor hereby absolutely and unconditionally guarantees (a) the full and faithful performance of all of the covenants, conditions, agreements and undertakings of Tenant to be kept and performed by Tenant under the Lease including, but not limited to, the payment when due of all rent, insurance, and other sums payable by Tenant under the Lease, and (b) the payment of all damages owing to Landlord by Tenant after the termination of the Lease or the exercise by Landlord of any other right or remedy of Landlord following a default by Tenant under the Lease (collectively the "Obligations").  Guarantor understands and agrees that this Guaranty is unconditional and continuing and is a guaranty of payment and performance and not of collection.  The term of this Guaranty shall expire as of the sooner to occur of (i) the fifth (5th) anniversary of the Rent Commencement Date under the Lease or (ii) Tenant's completion of a public stock offering and becoming publicly listed and traded on a recognized national stock exchange.

2.    <u>Independent Obligation</u>.  The liability of Guarantor hereunder is independent of the obligation of Tenant or any other person or entity and a separate action or separate actions may be brought and prosecuted against Guarantor whether or not any action is brought or prosecuted against Tenant or whether Tenant is joined in any such action or actions.

3.    <u>Modifications to Lease</u>.  Guarantor's obligations under this Guaranty of Lease shall not be extinguished, discharged, diminished or reduced in any way by any modification or amendment of the Lease including, but not limited to, any modification of payment dates or amounts, or any subsequent sublease or assignment of the Lease made with or without the consent of Landlord.  Guarantor hereby waives any right to approve any modification or amendment of the Lease.

4.    <u>Obligations of Guarantor Upon Default by Tenant</u>.  In the event that Tenant shall fail to pay when due rent, insurance premiums, or any other monetary sum or charge, or any portion thereof, accrued or due pursuant to the terms of the Lease after written notice by Landlord to Tenant of such default and the expiration of any applicable cure period, then, within five (5) days after written notice to Guarantor by Landlord, Guarantor shall pay to Landlord any and all such amounts as may be due and owing from Tenant to Landlord by reason of Tenant's failure to perform.  If Tenant shall fail to perform any covenant, term or condition of the Lease as required to be performed by Tenant, other than as provided for in the preceding sentence, then, after written notice by Landlord to Tenant of such default and the expiration of any applicable cure period, upon written notice to Guarantor by Landlord, as provided herein, Guarantor shall commence and complete performance of such condition, covenant or term within thirty (30) days after the date of Landlord's notice to Guarantor of such failure by Tenant to so perform, and in the event such performance by Guarantor cannot be completed within thirty (30) days, Guarantor shall commence performance within such time and diligently pursue completion thereof within a reasonable time thereafter.

5.    <u>Remedies</u>.  If Guarantor fails to perform any obligation under this Guaranty of Lease, then in addition to all other remedies provided at law or in equity, from time to time and without first requiring performance on the part of Tenant, and without being required to exhaust or proceed against any or all security held by Landlord for the performance of Tenant under the Lease, Landlord may enforce its rights to require performance by Guarantor of any or all of the obligations on the part of Guarantor to be performed under this Guaranty of Lease by action at law or in equity, or both.

6.    <u>No Waiver</u>.  No failure on the part of Landlord to pursue any remedy under this Guaranty of Lease or under the Lease shall constitute a waiver on the part of Landlord of its right to pursue such remedy on the basis of the same or a subsequent default.

7.    <u>Waiver of Exoneration</u>.  Guarantor waives any right to require Landlord to (a) proceed against Tenant, (b) proceed against or exhaust any security held from Tenant, or (c) pursue any other right or remedy available to Landlord, or (d) have the property of Tenant first applied to the discharge of the Obligations.  Guarantor further waives any defense it may acquire by reason of Landlord's election of any remedy against Guarantor or Tenant, or both, to the extent allowed under applicable law.

EXHIBIT "C"

2

8.     Waiver of Subrogation.   Until the obligations of Tenant under the Lease have been performed in full, Guarantor shall have no right of subrogation against Tenant, and Guarantor hereby expressly waives any right to enforce any remedy which Landlord now has or may hereafter acquire against Tenant, including but not limited to all benefits and defenses under California Civil Code Sections 2847, 2848 and 2849.  Guarantor hereby waives the benefit of, and any right to participate in, any security now or hereafter held by Landlord for the performance of the obligations of Tenant under the Lease.

9.     Waiver of Presentments.   Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and waives all notices of the existence, creation, or incurring of new or additional obligations.

10.     Other Guarantor Waivers.   Without limiting the generality of the preceding paragraphs, to the extent allowed under applicable law Guarantor hereby waives all rights and defenses to:

(a)     All defenses by reason of any lack of authority of Tenant, or based on any statute of limitations respecting obligations accruing under the Lease or this Guaranty;

(b)     Any and all rights it may have now or in the future to require or demand that Landlord pursue any right or remedy Landlord may have against Tenant or any other third party;

(c)     Any defense arising as a result of Guarantor's election of the application of Section 1111(b)(2) of the Bankruptcy Code or based on any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code;

(d)     Any defense as a surety, including, without limitation, California Civil Code sections 2819 (alteration of the obligation without the surety's consent), 2825 (discharge of the debtor), 2809 (guarantor's obligation may not be larger than the principal's obligation), 2810 (a guarantor's liability ceases if the principal is not liable), 2845 (requirement of pursuit of principal) and 2846 (equity of exoneration);

(e)     Any duty or obligation of Landlord to disclose to Guarantor any facts Landlord may now or hereafter know about Tenant, regardless or whether Landlord has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for being and keeping informed of the financial condition of Tenant and of any and all circumstances bearing on the risk of nonperformance of any Obligation; and

(f)     Any defense based upon an election of remedies by Landlord, including any election which destroys or impairs any right of subrogation, reimbursement or contribution

EXHIBIT "C"

3

640206.2

which Guarantor may have, or any rights or benefits under any provisions of California law in any way qualifying, conditioning or limiting the obligations of Guarantor based on any steps or procedures that landlords should take before proceeding against Guarantor.

11.    Bankruptcy.    This Guaranty will continue unchanged by any bankruptcy, reorganization or insolvency of Tenant, or any successor or assignee thereof, or by any disaffirmance or abandonment by a trustee of Tenant.    Notwithstanding any modification, discharge or extension of the indebtedness or any amendment, modification, stay or cure of Landlord's rights which may occur in any bankruptcy or reorganization case or proceeding concerning Tenant whether permanent or temporary, and whether assented to by Landlord, Guarantor hereby agrees that it shall be obligated hereunder to pay and perform the Obligations in accordance with the terms of the Lease and the terms of this Guaranty. Guarantor understands and acknowledges that by virtue of this Guaranty, Guarantor has specifically assumed any and all risks of a bankruptcy or reorganization case or proceeding with respect to Tenant.

12.    Assignment of Lease.    As used herein, the term "Landlord" shall include any successor, assignee or transferee of Landlord.    Guarantor agrees that Landlord may, without notice to Guarantor, assign the Lease and this Guaranty of Lease in whole or in part and that no such assignment or transfer of the Lease and/or this Guaranty of Lease shall operate to extinguish or diminish the liability of Guarantor under this Guaranty of Lease.

13.    Obligations of Guarantor Are Primary.    Guarantor agrees that the liability of Guarantor under this Guaranty of Lease shall be primary and that in any cause or right of action which shall accrue to Landlord under this Guaranty of Lease, Landlord may, at its sole option, proceed against Guarantor without having commenced any action, or having obtained any judgment, against Tenant.    If Landlord has any enforceable rights against Tenant upon termination of the Lease, Landlord shall be entitled to enforce those rights against Guarantor without giving prior notice to Tenant or Guarantor, and without making any demand on either of them.

14.    Consideration.    Guarantor acknowledges that Guarantor will benefit by Landlord entering into the Lease with Tenant and that this Guaranty is delivered to Landlord in order to induce it to enter the Lease, and that Landlord will be relying on this Guaranty in entering the Lease.    Guarantors acknowledges receipt of good, adequate, and valuable consideration for its obligations under this Guaranty.

15.    Guaranty Continues if Payments are Avoided or Recovered by Tenant.    If all or any portion of the Obligations are paid or performed, Guarantor's obligations hereunder shall continue and remain in full force and effect in the event that all or any part of such payment or performance is avoided or recovered directly or indirectly from Landlord as a preference, fraudulent transfer, or otherwise, irrespective of (a) any notice of revocation given by Guarantor prior to such avoidance or recovery, and (b) payment and performance in full under the Lease.

16.    Interest.    Any sum required to be paid by Guarantor to Landlord pursuant to the terms of this Guaranty of Lease shall bear interest at the lower of ten percent (10%) or the highest rate then allowed by law, from the date due until paid in full.

EXHIBIT "C"

4

17.    <u>Attorneys' Fees</u>.  Guarantor agrees to pay Landlord's reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection, or in any negotiations relative to the obligations hereby guaranteed, or incurred enforcing this Guaranty against the Guarantor.  In addition, in the event of any dispute between the parties arising under this Guaranty of Lease, or the breach of any covenant or condition under this Guaranty of Lease, then the prevailing party shall be entitled to have and recover from the party not so prevailing the attorneys' fees and costs incurred by the prevailing party, whether such fees and costs are incurred in taking any action under this Guaranty of Lease, or in any judicial proceeding (including appellate proceeding).  "Prevailing party" for the purposes of this Paragraph 17 shall include, without limitation, the party who receives from the other party the sums allegedly due, performance of the covenants allegedly breached, consideration substantially equal to that which was demanded, or substantially the relief or consideration sought in any judicial proceeding whether or not such proceeding is prosecuted to final judgment, or a party who dismisses a judicial action in return for substantially the performance or relief sought or the payment of the sums allegedly due.

18.    <u>Time of the Essence</u>.  Time is of the essence with respect to the performance of each and every provision of this Guaranty of Lease.

19.    <u>Governing Law</u>.  This Guaranty of Lease shall be construed and interpreted in accordance with the laws of the State of California.

20.    <u>Examination of Lease</u>.  Guarantor acknowledges that it has (a) received a copy of the Lease, (b) read and understood the terms and provisions of the Lease including, but not limited to, the covenants, conditions, agreements and undertakings of Tenant to be kept and performed by Tenant under the Lease, (c) read and understood the provisions of this Guaranty of Lease, and (d) understood the obligations of Guarantor under this Guaranty of Lease, including the legal effect of such obligations and has been advised by legal counsel respecting such obligations.

21.    <u>Binding on Successors</u>.  Guarantor shall not assign any of its obligations hereunder by operation of law or otherwise, and any attempted assignment shall, at Landlord's sole option, be void.  Subject to the foregoing, the obligations of Guarantor under this Guaranty shall be binding on Guarantor's successors.

22.    <u>Partial Invalidity</u>.  If any provision of this Guaranty is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Guaranty shall continue in full force and effect and shall in no way be impaired or invalidated, and the parties agree to substitute for the invalid or unenforceable provision a valid and enforceable provision that most closely approximates the intent and economic effect of the invalid or unenforceable provision.

649206.3

**WE, THE UNDERSIGNED GUARANTOR, ACKNOWLEDGE THAT WE WERE AFFORDED THE OPPORTUNITY TO READ THIS DOCUMENT CAREFULLY AND TO REVIEW IT WITH AN ATTORNEY OF OUR CHOICE BEFORE SIGNING BELOW, AND THAT WE UNDERSTOOD THE MEANING AND EFFECT OF THIS DOCUMENT BEFORE SIGNING BELOW.**

IN WITNESS WHEREOF, Guarantor has executed this Guaranty of Lease as of the date first hereinabove set forth.

"**GUARANTOR**"

Premier Grocery, Inc.,
a California corporation


By: _____
Name: _____
Title: _____

# EXHIBIT "D"
## TENANT'S CERTIFICATE OF RENT COMMENCEMENT DATE

Date: _____, 200__.

Re:    _____

_____

Address

For Premises in:

_____

_____

Gentlemen:

The undersigned, as Tenant under that certain Shopping Center Lease dated, _____, 200___, made and entered into between _____, as Landlord, and the undersigned, as Tenant ("**Lease**"), hereby ratifies the Lease and certifies that (i) the undersigned has entered into occupancy and accepted possession of the Premises described in the Lease on _____, 200___; (ii) the monthly installment of Minimum Annual Rent in the amount of $_____ was payable from _____, 200__; (iii) the Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way (except by _____) (if none, so state); (iv) the Term commenced on_____, 200__, and ends on _____, 200__; (v) the Lease represents the entire agreement between the parties as to this leasing and the Premises; (vi) all conditions under the Lease to be performed by Landlord have been satisfied, all required contributions by Landlord to Tenant on account of Tenant's improvements have been received, and on this date there are no existing defenses or offsets which the undersigned has against the enforcement of the Lease by the Landlord; (vii) Landlord is not in default under the Lease and no event has occurred which, with the giving of notice and/or the passage of time, would constitute a default; (viii) Tenant is not in default under the Lease and no event has occurred which, with the giving of notice or the passage of time, would constitute a default; and (x) the monthly installment of Minimum Annual Rent for _____, 200__, has been paid.

Very truly yours,

_____

By:    _____

Its:    _____

EXHIBIT "D"

1

# EXHIBIT "E"

# [INTENTIONALLY OMITTED]

# EXHIBIT "F"

## [INTENTIONALLY OMITTED]

EXHIBIT "F"

1

# EXHIBIT "G"

## [INTENTIONALLY OMITTED]

EXHIBIT "G"

1

# EXHIBIT "H"

## FORM OF WAIVER OF LANDLORD'S LIEN

### CONSENT AND WAIVER
### BY OWNER, LANDLORD OR MORTGAGEE OF REAL ESTATE

Undersigned, _____
       NAME

of_____    _____    _____    _____
(NO. OF STREET)                (CITY OR TOWN)             (ST)       (ZIP)

confirms that Undersigned is the Owner – Landlord – Mortgagee (circle one) of certain real estate (the 'Premises") known as:

_____    _____    _____    _____
(NO. OF STREET)                (CITY OR TOWN)             (ST)       (ZIP)

and described in the attached Legal Description (Exhibit B).

Undersigned expects that the Premises is now or will be occupied by SPROUTS FARMERS MARKETS. LLC (the "Occupant") pursuant to a written lease for the Premises ("Real Estate Lease"). Undersigned confirms that it has been informed that Occupant will enter or has entered into a security agreement and/or a lease agreement (collectively, with all ancillary documents thereto, the "Instruments") with _____ ("_____"), whose mailing address is _____ _____, whereby Occupant has or will grant _____ a security interest in, and/or whereby _____ has or will own and lease to Occupant, the Equipment (as defined below). "Equipment" means all furniture, furnishings, machinery, trade fixtures, equipment and other tangible personal property which are acquired or purchased by Occupant before the date which is 12 months after the date of this Agreement, together with all additions, substitutions, replacements and improvements thereto, and which are installed or used and located at the Premises, and which have an acquisition cost that does not exceed $2,000,000.00. If a Schedule A-1 is attached hereto, then the parties hereto acknowledge that the attached Schedule A-1 contains a general list of the Equipment identified by Occupant as of the date of this Agreement to be located on the Premises and that such Schedule A-1 may not be an exhaustive list of all Equipment that will be located on the Premises.

FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which is hereby acknowledged, Undersigned hereby agrees as follows:
Undersigned consents to the installation of the Equipment on the Premises and agrees that the Equipment shall remain personal property notwithstanding the manner by which it is affixed to the Premises.

Undersigned waives and releases any right which Undersigned now has or may hereafter have under the laws of any state or by the terms of any lease, mortgage, deed of trust, security agreement or other agreement now or hereafter in effect to levy or foreclose upon the Equipment for any payment or other obligation or to claim or assert any title to, lien on or security interest in the Equipment.

EXHIBIT "H"
1

Undersigned agrees that any claims which _____ has or may hereafter have against the Equipment under the Instruments are superior to any lien, security interest or claim of any nature which Undersigned now has or may hereafter have to the Equipment by law, agreement or otherwise.

Upon 10 days' prior written notice to Undersigned, _____, at no cost and expense to Undersigned, may enter the Premises for the purpose of exercising its rights to inspect, repair, alter or remove the Equipment in accordance with _____'s agreements with Occupant; provided, that _____ warrants that it shall repair and restore any physical damage to the Premises or building of which the Premises are a part and appurtenances thereto caused by or resulting from _____'s entry, inspection, removal, replacement, repair or alteration of the Equipment. Upon Undersigned's prior written request, _____ shall describe in reasonable detail in advance to Undersigned its plan for any necessary repair, replacement or restoration. Notwithstanding the above, Undersigned, at its option, may select the persons to perform any repair, replacement or restoration and such person shall be subject to the reasonable approval of _____.

_____ agrees to indemnify, defend and save harmless Undersigned from any claim, damage, cost, expense or suit incurred by or brought against Undersigned to the extent caused by _____, its agents or contractors, during the removal, alteration, repair or replacement of the Equipment by _____ or its agents or contractors.

Undersigned acknowledges and agrees that Occupant is not and will not be an agent or contractor of _____ for purposes of the terms and conditions of Paragraphs 4 and 5 above.

The covenants of Undersigned contained in this agreement are expressly conditional upon _____'s fulfillment of its warranties and covenants set forth herein. Nothing contained herein shall impair Undersigned's right to pursue all remedies in law and equity for violation of any of _____'s covenants herein.

Upon written notice by Undersigned to _____ that the Real Estate Lease has expired or has been terminated upon a default by Occupant under the Real Estate Lease, _____ shall have the option to remove the Equipment from the Premises within 30 days of receipt of such written notice ("Removal Period"). In the event that _____ fails to remove the Equipment within such 30-day period, Undersigned may remove the Equipment from the Premises and store the Equipment; and such removal and storage shall be (i) at _____'s sole cost and expense if _____ has notified Undersigned in writing that _____ elects to remove the Equipment, and (ii) at Occupant's sole cost and expense if _____ has notified Undersigned in writing that _____ does not elect to remove the Equipment or if _____ has failed to give any notice of its election with respect to the removal of the Equipment. Undersigned shall not be liable for any damages, losses or claims resulting from the removal and storage of the Equipment except for damages, losses or claims primarily caused by the willful misconduct of Undersigned, its agents or contractors, during Undersigned's removal or storage of the Equipment.

If _____ has notified Undersigned in writing that _____ elects to remove the Equipment, then the Removal Period may be extended at _____'s option for up to a maximum of 10 additional days if _____ sends its written request to Undersigned for such an extension before the expiration of the initial 30-day Removal Period and said extended period of time for the removal of the Equipment by _____ shall be deemed the Removal Period. In the event _____ so

EXHIBIT "H"

2

extends the Removal Period, _____ agrees to pay Undersigned the Per Diem Rent (as defined below) for the number of days from and after the initial 30-day Removal Period until _____ removes the Equipment from the Premises. "Per Diem Rent" shall be based upon the monthly rent payable by Occupant to Undersigned under the Real Estate Lease just prior to the expiration or termination of the Real Estate Lease.

If _____ has notified Undersigned in writing that _____ elects to remove the Equipment and an order of any bankruptcy court or other court enjoins, restricts or prohibits _____'s right to remove the Equipment ("Court Ordered Prohibition"), then (i) _____ will have the right to remove the Equipment from the Premises within the later of (A) the expiration of the Removal Period or (B) the thirty (30) day period after _____ is notified that such Court Ordered Prohibition no longer enjoins, restricts or prohibits _____'s right to remove the Equipment ("Extended Removal Period"), and (ii) _____ agrees to pay Undersigned the Per Diem Rent commencing upon expiration of the initial 30-day Removal Period and until the date on which the Equipment is removed by _____ from the Premises. _____ shall use good faith, diligence and commercially reasonable continuous efforts to have any such Court Ordered Prohibition relieved, dissolved or otherwise removed.

As between Occupant and _____, in the event _____ elects to remove the Equipment from the Premises in accordance with the above terms, then Occupant agrees that (1) _____ may do so regardless of the provisions of any Instruments or any other contract or agreement between Occupant and _____, and (2) Occupant agrees to pay the out-of-pocket costs and expenses incurred by _____ related to removing the Equipment from the Premises and/or storing the Equipment and any Per Diem Rent paid by _____ to Undersigned.

This Agreement shall apply to any Equipment which is located now or hereafter on the Premises and/or which is now or hereafter subject to the Instruments. This Agreement inures to the benefit of _____ its successors and assigns and shall be binding upon Undersigned and Undersigned's heirs, personal representatives, successors and assigns.

[The next page is the signature page.]

EXHIBIT "H"
3

.649296.3

IN WITNESS WHEREOF, the Undersigned, Occupant and _____ have duly executed and delivered this Agreement as of _____, 20_____.

UNDERSIGNED AS OWNER, LANDLORD, MORTGAGEE:

_____

Name of Corporation or Partnership or LLC

By: _____

Title: _____

Witness: _____

"_____"

_____,

By: _____

Title: _____

Witness: _____

"OCCUPANT"
SPROUTS FARMERS MARKETS, LLC,

     By:  Premier Grocery, Inc.,
          a California corporation, Manager

     By: _____

     Title: _____

Witness: _____

EXHIBIT "H"
4

649296.3

SCHEDULE A-1

EQUIPMENT LIST

EXHIBIT "H"

EXHIBIT B

LEGAL DESCRIPTION

EXHIBIT "H"

649296.3

## EXHIBIT "I"

**WHEN RECORDED RETURN TO:**

_____
_____
_____
_____

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS AGREEMENT is made this ___ day of _____, 200__, between _____, having its principal office at _____, hereinafter referred to as "**Mortgagee**"; _____ whose address is _____, hereinafter referred to as "**Lessor**".

### W I T N E S S E T H :

WHEREAS, Mortgagee has made, intends to make or are the holder of a loan or loans (the "**Loan**") to or for the benefit of Lessor secured, among other things, by a Deed of Trust and Assignment of Rents (as amended, renewed, replaced, increased and extended, (the "**Mortgage**") encumbering the real property ("**Property**") described in **Exhibit "A"** attached hereto and incorporated herein by reference;

WHEREAS, Lessee has a leasehold interest in said real property by reason of a certain Lease with Lessor, dated _____ ("**Lease**"), affecting a portion of the Property ("**Leased Premises**") encumbered by the aforesaid Instruments; and

WHEREAS, it is the desire of Mortgagee that Lessee subordinate its interest in said Leased Premises by virtue of said Lease to the lien of said Mortgage.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements herein contained, the parties agree as follows:

1.     The Lease is and shall be at all times hereafter subject and subordinate in all respects to the Mortgage and the instruments and all advances made thereunder unless the holder(s) thereof shall otherwise elect.  Such subordination shall be effective as though the Lease shall have been executed after the execution of the Instruments and the due and proper recordation thereof.

2.     Provided Lessee is not in default under the terms of the Lease beyond any applicable cure period, then:

a.     The right of possession of Lessee to the Leased Premises and Lessee's rights arising out of the Lease shall not be affected or disturbed by Mortgagee in the

exercise of any of its rights under the aforesaid Mortgage or the note or any other obligation secured thereby, nor in any other way be deprived of its rights under the Lease;

        b.        In the event that Mortgagee or any other person acquires title to the Property pursuant to the exercise of any remedy provided for in the Mortgage, the Lease shall not be disturbed, terminated or affected by such foreclosure or sale or transfer in lieu of foreclosure or any such proceeding, and Mortgagee hereby covenants that any sale by it of the mortgaged premises pursuant to the exercise of any rights and remedies under the Mortgage or otherwise shall be made subject to the Lease and the rights of Lessee thereunder; and Lessee covenants and agrees to attorn to Mortgagee or such other person as its new Lessor, and the Lease shall continue in full force and effect as a direct Lease between Lessee and Mortgagee or such other person upon all the terms, covenants, conditions, and agreements set forth in the Lease. In the event of such attornment, such Mortgagee or other person shall not be liable for any breaches or defaults of Lessor or its successors with respect to the Lease and which occur prior to the date such Mortgagee or other person takes title to the mortgaged Premises; and

        c.        Neither the Mortgage nor any other security instrument executed in connection therewith shall cover or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Lessee or its sub-lessees or licensees on the Leased Premises regardless of the manner or mode of attachment thereof.

    3.      The parties hereto agree that rents and other monies due to Lessor under the Lease shall be paid to Lessor as stated above. Upon receipt from Mortgagee of written notice to pay all such rents and other monies to or at the direction of Mortgagee, Lessor authorizes and directs Lessee thereafter to make all such payments to or at the direction of Mortgagee, releases Lessee and Mortgagee of any liability to Lessor for any and all payments so made, and shall defend, indemnify, and hold Mortgagee harmless from and against any and all claims, demands, losses, or liabilities asserted by, through, or under Lessor (except by Mortgagee) for any and all payments so made. Any dispute between Mortgagee and Lessor as to the existence or continuance of a default by Lessor under the terms of the Note or Mortgage or with respect to the extent or nature of such default, or with respect to foreclosure of the Mortgage by Mortgagee, shall be dealt with and adjusted solely between Mortgagee and Lessor and Lessee shall not be made a party thereto or named therein except and solely to the extent required by law in order to enforce Mortgagee's rights and lien in and to the Property. If said Mortgagee, prior to its acquisition of Lessor's title to the Property, shall at any time receive any part of the rent or if said Mortgagee takes action to recover any part of the rent, said Mortgagee shall not thereby become obligated to lessee for the performance of any of the terms, covenants, conditions or agreements of Lessor under the Lease until and unless Mortgagee has secured title and possession to the Property.

    4.      Subject to the provisions hereof, said Lease shall be subject and subordinate to the lien of the Mortgage and to all the terms, conditions, and provisions thereof, to all advances

649296.3

made or to be made thereunder, and to any renewals, extensions, modifications, or replacements thereof.

        5.    The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of any party hereto. However, Lessee agrees to execute and deliver to Mortgagee, or to any person to whom or which Lessee herein agrees to attorn, such other instruments as either shall request in order to effectuate said provisions.

        6.    Unless permitted by the Mortgage and instruments related thereto, neither Lessor nor Lessee will, without the prior written consent of Mortgagee: (a) modify the Lease or any extension or renewal thereof; (b) terminate the Lease except as provided by its terms; (c) tender or accept a surrender of the Lease or make prepayment in excess of one (1) month of any rent thereunder; or (d) subordinate the Lease to any lien subordinate to the Mortgage.

        7.    This Agreement may, at the option of Mortgagee, be recorded in the appropriate recording office at or after the time the Mortgage and related security documents are recorded and/or filed.

        8.    This Agreement may not be modified in any manner other than by an agreement in writing executed by the parties hereto. In the event of a conflict between the Lease and this Agreement, the provisions of this Agreement shall govern. Lessee agrees to execute such other documents as Mortgagee may deem reasonably necessary to subordinate the Lease to the lien of the Mortgage and to confirm the other matters contained herein. This Agreement may be executed in counterpart, and if any provision of this Agreement shall be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed the day and year first above written.

By: _____

Name: _____

Its:    Vice President

"MORTGAGEE"

Tenant's Name

By: _____

Name: _____

Its:   _____

"LESSEE"

EXHIBIT "I"

3

Borrower's Name

By: _____

Name: _____

Its: _____

"BORROWER"


MORTGAGEE ACKNOWLEDGEMENT


STATE OF ARIZONA                )
                                ) ss.
County of Maricopa              )

On _____, 200__, before me, _____ a Notary Public in and for said State, personally appeared _____, personally known to me (or provided to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


_____
Notary Public

My commission expires: _____

## LESSEE/TENANT ACKNOWLEDGEMENT

STATE OF _____ )
                           ) ss.
County of _____ )

On _____, 200__, before me, _____ a Notary Public in and for said State, personally appeared _____, personally known to me (or provided to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

## LESSOR ACKNOWLEDGEMENT

STATE OF _____ )
                           ) ss.
County of _____ )

On _____, 200__, before me, _____ a Notary Public in and for said State, personally appeared _____, personally known to me (or provided to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____

EXHIBIT "I"

1

649296.3

# EXHIBIT "J"

## GENERIC LIST OF SPROUTS FF&E

| VENDOR | QTY | ITEM | PO AMOUNT |
|---|---|---|---|
| ALACO | 1 | VITAMIN LADDER | $ 2,816.24 |
| ALL ABOUT SIGNS | 1 | PER ATTACHED QUOTE INTERIOR SIGN PRODUCTION PKG | $ 25,190.84 |
| AMER MERCH | 1 | MOBILE CHICKEN MERCHANDISER | $ 2,943.00 |
| AMER MERCH | 1 | MOBILE CHICKEN MERCHANDISER 1 CASE LIGHTS | $ 2,943.00 |
| ASSEMBLED PROD. | 2 | ELECTRIC MART CART | $ 2,400.00 |
| BILL LEDBETTER | 1 | ANTIQUES -- PER ATTACHED QUOTE | $ 2,600.00 |
| BILOFF | 1 | ICE MERCHANDISER | $ 2,164.05 |
| BRADBURY | 24 | BARREL LINERS TL24 | $ 850.85 |
| BRADBURY | 17 | BUNYAN BARRELS 2430BB | $ 814.80 |
| BRADBURY | 30 | FS212 12 OZ FOOD SCOOPS | $ 756.00 |
| BRADBURY | 40 | LID W/SIGN HOLDER ML24 SH100 | $ 261.01 |
| BRADBURY | 17 | ML18 LIDS | $ 1,400.00 |
| BRADBURY | 24 | SMALL BARREL 1830B | $ 425.00 |
| BRADBURY | 30 | T100 RING TETHER WITH RING | $ 138.00 |
| BRADBURY | 17 | TL 18 SMALL BARREL LINERS | $ 187.50 |
| BRADBURY | 30 | WIRE HOLSTER W110 | $ 28.80 |
| CARLSON AIRFLO | 24 | 48' PRODUCE HUMP RACKS | $ 1,739.28 |
| FIRST DATA | 1 | OMNI 7000 PER QUOTE | $ 4,540.50 |
| FIRST DATA | 9 | OMNI 7000 SWIVEL/TILT STAND | $ 600.00 |
| GRAINGER | | EARLY DELIVERY- TO BE INSTALLED | $ 1,089.00 |
| GRAINGER | | FURNITURE | $ 2,513.31 |
| HILL PHOENIX | 2 | 03IM 12' ISLAND DELI/CHEESE CASE | $ 24,907.92 |
| HOBART | 1 | 20 QT MIXER TABLE TOP HL2012 | $ 985.00 |
| HOBART | 1 | 20 QT MIXER W/BOWL | $ 4,011.00 |
| HOBART | 1 | CONVECTION OVEN HR7-3 WITH ROTISSORIE | $ 10,537.00 |
| HOBART | 1 | DELI SLICER 2912-1 | $ 3,925.00 |
| HOBART | 4 | HAND WRAP STATION, TABLE TOP 625A-1 | $ 1,120.00 |
| HOBART | 12 | HANGING SCALE - LARGE | $ 4,440.00 |
| HOBART | 5 | HANGING SCALE - SMALL | $ 1,450.00 |
| HOBART | 1 | MEAT GRINDER - TABLE TOP | $ 2,361.00 |
| HOBART | 1 | MEAT SAW 6614-1 STAINLESS STEEL | $ 4,930.00 |
| HOBART | 1 | MEAT TENDERIZER 403-1 | $ 1,730.00 |
| HOBART | 1 | MIXER GRINDER HOBART 5 HP | $ 8,950.00 |

| VENDOR | QTY | ITEM | PO AMOUNT |
|---|---|---|---|
| HOBART | 2 | QUANTMP-1 PRINTER & SCALE | $ 10,772.00 |
| HOBART | 5 | QUANTUM SCALE PRINTER QUANTUM1-1 | $ 12,600.00 |
| HOBART | 1 | SANDWICH PREP TABLE UPT60-24LR | $ 2,780.00 |
| HOME DEPOT | 1 | GE SPACEMAKER® 4.4 CU. FT. COMPACT REFRIGERATOR | $ 143.10 |
| HOME DEPOT | 1 | MID-SIZE 1.2 CU.FT 1200 WATT MICROWAVE WITH AUTO COOK AND TURNTABLE | $ 99.00 |
| HONEYWELL | 1 | SECURITY MONITORING --PER ATTACHED QUOTE | $ 5,242.00 |
| HUBERT | 2 | 3-BASKET BAGUETTE DISPLAY | $ 294.00 |
| HUBERT | 12 | SAMPLER, RECTANGULAR PORTABLE | $ 3,000.12 |
| INTERTECH | 1 | HARDWARE | $ 12,879.43 |
| INTERTECH | 1 | VODIVI | $ 5,911.30 |
| INTERTECH | 1 | CABLING | $ 7,417.14 |
| INVATRON | 1 | E-PLUM LICENSES | $ 2,400.00 |
| JOHN BOOS | 1 | SINKS PER ATTACHED QUOTE | $ 7,166.16 |
| JOHN BOOS | 1 | TABLES PER ATTACHED QUOTE | $ 8,294.30 |
| JOHN BOOS | 2 | PREP SINKS WITH DRAIN BOARDS | $ 1,872.04 |
| KILLION | 1 | BAKERY COOLER CIL70-30-84-N-DM | $ 6,765.00 |
| KILLION | 8 | CHECKSTANDS | $ 22,400.00 |
| KILLION | 1 | LARGE 6 FT VITAMIN MERCHANDISER CAP7030-84-N | $ 6,725.00 |
| KRONOS | 1 | TIME CLOCKS  (PAID W/ CHECK #095949) | $ 7,991.06 |
| KYSOR PANEL SYS | 1 | WALK IN COOLERS -- PER ATTACHED QUOTE | $ 57,614.00 |
| LOZIER | 1 | PER ATTACHED QUOTE GONDOLAS | $ 20,819.28 |
| MASON WAYS | 35 | 48X22X12 POLY MIGHT DUNNAGE RACK | $ 2,292.50 |
| MASON WAYS | 2 | 48X18X12 POLY MIGHT DUNNAGE RACK | $ 120.00 |
| MUZAK | 1 | PER ATTACHED QUOTE | $ 6,833.50 |
| NATIONAL CART | 80 | 8040157      AL-SAS-SR-2448 SLD ADJ SANI SHELF | $ 3,508.80 |
| NATIONAL CART | 44 | 8040131      AL-SAS-T-2448 HD ADJ SANI SHELF | $ 1,315.16 |
| NATIONAL CART | 124 | 8040165      AL-SAS-P76 76" POLE | $ 1,199.08 |
| NATIONAL CART | 10 | 8040100      AL-UNAL-8-NAR  UNIVERSAL SHELF | $ 1,659.80 |
| NATIONAL CART | 80 | 5000026      P1230 PLASTIC MEAT PLATTERS, WHT | $ 405.60 |
| NATIONAL CART | 1 | 8040100      AL-UNAL-6-STD, UNIV STYLE 6 SHELF | $ 156.86 |
| NATIONAL CART | 6 | 5000027      P-1826, PLASTIC MEAT PLATTERS, WHT | $ 31.74 |

EXHIBIT J

2

| VENDOR | QTY | ITEM | PO AMOUNT |
|--------|-----|------|-----------|
| NATIONAL CART | 8 | 8040894      AL-1012B BAKERY PAN CART | $      1,163.92 |
| NATIONAL CART | 3 | 8040010      AL-L-6 LUG CART | $      329.79 |
| NATIONAL CART | 1 | 8040402      AL-L-1-HD  LUG CART | $      71.67 |
| NATIONAL CART | 2 | 5000101      16-60 DD U-BOAT | $      244.44 |
| NATIONAL CART | 6 | 8000027      ST-1854-PC  UTILITY CART | $      800.82 |
| NATIONAL CART | 14 | 8000256      ST-2042 A FPB HD GALV STOCK TRUCK | $      2,132.04 |
| NATIONAL CART | 4 | 8000072      WPM-2542-GALV WET MOVER | $      596.00 |
| NATIONAL CART | 3 | 5000119      ASSOCIATE LOCKERS 12X12X12 | $      880.50 |
| NATIONAL CART | 44 | 8040131      AL-SAS-T-2448 HD ADJ SANI SHELF | $      1,315.16 |
| NATIONAL CART | 124 | 8040165      AL-SAS-P76 76" POLE | $      1,199.08 |
| NATIONAL CART | 10 | 8040100      AL-UNAL-8-NAR  UNIVERAL SHELF | $      1,659.80 |
| NATIONAL CART | 80 | 5000026      P1230 PLASTIC MEAT PLATTERS, WHT | $      405.60 |
| NAUMAN HOBBS | 1 | ELECTRIC PALLET JACK | $      4,200.00 |
| NAUMAN HOBBS | 1 | MANUAL PALLET JACK | $      557.75 |
| PRODEW MISTING | 1 | PRODUCE & MEAT MISTING SYSTEMS | $      3,575.00 |
| PTR | 1 | BALER TRASH COMPACTOR ---- PER ATTACHED QUOTE (NO ATTACHMENT) | $      18,597.00 |
| PTR | 1 | COMPACTOR | $      19,899.00 |
| QUANTUM STORAGE SYS | 5 | CHROME WIRE SHELVING UNITS (METRO RACK) | $      695.70 |
| RETAIL TECH | 1 | PRINTLAB SUITE 3.0 | $      995.00 |
| RETALIX | 1 | LICENSED SOFTWARE LPRODUCTS AND SUPPORT | $      9,230.00 |
| RSS PARTNERS | 1 | CURRENCY COUNTER | $      2,130.00 |
| SAFE VAULT | 1 | LARGE SAFE ACF4824DF-I-6120 W/ SLOT IN BACK | $      4,796.00 |
| SCOTTSMAN | 1 | ICE CUBER W/BAGGER CME1356RS-3 | $      5,330.94 |
| SCOTTSMAN | 1 | ICE MACHINE FLAKER FME1204RS-3B | $      4,804.26 |
| SIGN TECH | 1 | MONUMENT SIGN PER ATTACHED QUOTE | $      4,500.00 |
| SIGN TECH | 1 | BUILDING SIGNAGE PER ATTACHED QUOTE | $      21,195.00 |
| SOURCE | 1 | REFRIGERATION INSTALLATION | $      170,523.00 |
| SOURCE | 1 | MISTING SYSTEM INSTALLATION | $      1,450.00 |
| SOUTH BAY ABRAHMS | 1 | EARLY DELIVERY- TO BE INSTALLED | $      3,898.79 |
| SOUTH BAY ABRAHMS | 1 | DELI-EQUIPMENT  (RICE COOKER, MICROWAVE, SOUP WARMER) | $      854.92 |
| SOUTH BAY ABRAHMS | 1 | MEAT EQUIPMENT  (SAUSAGE STUFFER, | $      2,100.80 |

EXHIBIT J

3

| VENDOR | QTY | ITEM | PO AMOUNT |
|---|---|---|---|
| | | GRINDER PLATES, & BLADES) | |
| TRU-TEMP | 2 | TRUE BEVERAGE DRINK MERCHANDISER | $ 3,629.74 |
| SUPPLY CHAIN | 1 | PER ATTACHED QUOTE | $ 3,832.00 |
| SW PO | 1 | IT EQUIPMENT | $ 89,062.50 |
| TECHNIBILT | 200 | T2141 SHOPPING CARTS | $ 16,196.00 |
| TRADEFIXTURE | 1 | BULK SICE FIXTURE | $ 3,162.98 |
| TYLER | 1 | REFRIGERATION EQUIPMENT PER ATTACHED QUOTE | $ 266,271.00 |
| WELL BUILT | 1 | CUSTOM MILLWORK FIXTURES | $ 74,028.00 |
| | | | |
| | | | $ 1,092,770.28 |
| | | | Plus Tax and Freight |

EXHIBIT J
4

## EXHIBIT "K"

**RECORDING REQUESTED BY,**
**AND WHEN RECORDED RETURN TO:**

_____
_____
_____
_____

### MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is made and given this ___ day of _____, 200__, by _____, a[n] _____ ("**Landlord**") and _____ ("**Tenant**").

### WITNESSETH:

1.      Landlord leases to Tenant and Tenant leases from Landlord certain retail space ("**Premises**") as approximately depicted on **Exhibit "A"** attached hereto and by this reference incorporated herein, pursuant to that certain Lease of even date herewith ("**Lease**"). Capitalized terms used in this Memorandum but not defined shall have the meaning given in the Lease.

2.      The Premises is part of the Shopping Center legally described on **Exhibit "B"** attached hereto and by this referenced incorporated herein ("**Shopping Center**").

3.      The Lease provides for a Term of approximately ____ (__) years, commencing at the time specified in the Lease, with ___ option(s) to extend the Term by __ (__) additional period(s) of _____ (__) years each.

6.      Other terms and conditions pertaining to the Lease including exclusive use clauses, are set forth in the Lease, which are incorporated herein by this reference.

7.      This Memorandum may be executed in any number of counterparts, each of which shall be deemed as original, but all of which together shall constitute one in the same agreement.

8.      This Memorandum is a short form for recording purposes only, and is not a complete summary of the Lease. In the event of any inconsistency between the terms of this Memorandum and terms of the Lease, the terms of the Lease shall prevail.

### [SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned have executed this Memorandum as of the day and year first above written,

**TENANT:**

_____,

a[n] _____

By: _____
Name: _____
Its: _____

**LANDLORD:**

_____,

a[n] _____

By: _____
Name: _____
Its: _____

Exhibit "K"
2

STATE OF _____ )
                           ) ss.
County of _____ )

       On _____, 200__, before me, _____ a Notary Public in and for said State, personally appeared _____, personally known to me (or provided to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

       WITNESS my hand and official seal.

                                    _____
                                         Notary Public

My commission expires: _____

STATE OF _____ )
                           ) ss.
County of _____ )

       On _____, 200__, before me, _____ a Notary Public in and for said State, personally appeared _____, personally known to me (or provided to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

       WITNESS my hand and official seal.

                                    _____
                                         Notary Public

My commission expires: _____

Exhibit "K"
3

## EXHIBIT "L"

## DEFINITION AND PROCEDURE FOR
## DETERMINATION OF MARKET RATE

At Landlord's option, Minimum Annual Rental for the Term of this Lease commencing on the date of the 181st month of the Term (the "**Applicable Period**") shall be in an amount equal to seventy-five percent (75%) of the then-current Market Rate for the Premises as of the commencement of the Applicable Period, determined below.

(1)     Within sixty (60) days prior to the expiration of the 180th month under the Term, or within fifteen (15) days after Landlord gives Tenant Notice of Landlord's election to increase the Minimum Annual Rental as permitted by **Section 1.9**, whichever is applicable, Landlord shall deliver to Tenant Notice of Landlord's determination of Market Rate.

(2)     If Tenant disagrees with Landlord's determination of Market Rate as contained in Landlord's Notice, Landlord and Tenant shall attempt to resolve their differences within fifteen (15) days following Tenant's receipt of Landlord's Notice.

(3)     If Landlord and Tenant cannot agree on fair market rental value during such fifteen (15) day period, within fifteen (15) days after the end of such 15-day period Landlord and Tenant shall each appoint a licensed real estate broker experienced in marketing similar space in the county in which the Premises are located and give Notice of such appointment to the other party.  Each of said brokers shall be a licensed commercial real estate broker who shall have at least (10) years continuous experience in the business of commercial real estate brokerage in Santa Clara County, California, and shall be a member in good standing of such other trade group(s) or professional organization(s) as leading commercial real estate brokers in Santa Clara County, California, customarily participate in at such time.   Any broker whose firm then represents either of the parties or their Affiliates or whose firm has during the five (5) year period prior to its appointment hereunder represented either of the parties or their Affiliates shall not be qualified to determine the Market Rate for purposes of this Lease.  If either Landlord or Tenant shall fail timely to appoint a broker, then the single broker appointed by one party shall proceed to make the determination of fair market rental value.  Such broker(s) shall, within thirty (30) days after the appointment of the last of them to be appointed, complete their written determinations of Market Rate and furnish the same to Landlord and Tenant.  Each party shall pay the fees and costs of the broker appointed by it.  If the valuations vary by ten percent (10%) or less of the lower value, the Market Rate shall be the average of the two (2) variations.

(4)     If the valuations vary by more than ten percent (10%) of the lower value, the two brokers shall, within fifteen days after submission of the last Market Rate determination report, appoint a disinterested M.A.I. appraiser experienced in appraising similar space in the City of Sunnyvale and not representing or retained or having represented or been retained by either party during the previous five (5) year period.  If the two (2) brokers shall be unable to agree in a timely manner, then either broker, on behalf of both, may request appointment of such disinterested M.A.I. appraiser by the American Arbitration Association process.  Such appraiser shall, within thirty (30) days after appointment, select one of the two Market Rates submitted by the two brokers as such appraiser's determination of Market Rate, and shall submit such decision

649296.3

to Landlord and Tenant.  The Market Rate determined by the appraiser shall be controlling.  All fees and costs incurred in connection with the determination of Market Rate by the appraiser shall be paid one-half (1/2) by Landlord and one-half by Tenant.

(5)    Market Rate shall take into consideration all current market factors, including the quality, size, age and location of the Premises, the Ground Lease and the Ground Lease Rental, and all typical tenant incentives for similar transactions, as well as all Permitted Uses under the Lease and shall incorporate then market annual increases (or decreases) during the Applicable Period.

(6)    Once Market Rate has been determined, the parties shall mutually execute a memorandum stating such value, and establishing the Minimum Annual Rental (including annual increases) for the Applicable Period in accordance with **Section 1.9** of the Lease.

(7)    Notwithstanding anything to the contrary contained herein, in no event shall the Minimum Annual Rental payable by Tenant during each Applicable Period be less than the Minimum Annual Rental paid by Tenant for the year immediately preceding such Applicable Period.

# EXHIBIT "M"

## TENANT'S STANDARD SIGNAGE
[To be attached]

649296.3

## EXHIBIT "N"

## LEASE RECOGNITION AGREEMENT

THIS LEASE RECOGNITION AGREEMENT (the "Recognition Agreement") is made as of the ____ day of February, 2009, by and among **JOHN S. LEWIS, TRUSTEE of the Margate E. Reed 1987 Living Trust Dated June 19, 1987 FBO Louise Smith** ("Ground Lessor"); **EEL MCKEE LLC**, a California limited liability company ("Landlord"); and **SPROUTS FARMERS MARKETS, LLC**, an Arizona limited liability company ("Tenant").

## R E C I T A L S:

This Recognition Agreement is entered into with reference to the following facts:

A.    Ground Lessor and Landlord are presently landlord and tenant, respectively, pursuant to that certain Ground Lease dated September 30, 1980 covering certain leased premises located at 111 E. El Camino Real (the "Shopping Center"), in the City of Sunnyvale, Santa Clara County, California (the "Ground Lease"). The legal description of the Leased Premises under the Ground Lease is attached hereto as <u>Exhibit A</u>.

B.    Landlord and Tenant are presently landlord and tenant, respectively, pursuant to a Shopping Center Lease Agreement dated _____, 2009 (the "Effective Date") attached hereto as <u>Exhibit B</u> (the "Lease") covering all of the real property under the Ground Lease, including certain improvements (the "Premises").

C.    Landlord and Tenant have requested Ground Lessor to execute this Recognition Agreement for the purpose of assuring Tenant's possession of the Premises under the provisions of the Lease during the term of the Ground Lease.

D.    Ground Lessor is willing to provide Tenant such assurance subject, however, to the terms and provisions of this Recognition Agreement as hereinafter set forth.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the covenants and agreements contained in this Recognition Agreement, Ground Lessor, Landlord and Tenant hereby agree as follows:

1.    Ground Lessor acknowledges that it has received a copy of the Lease. Tenant acknowledges that it has received a copy of the Ground Lease and further acknowledges that the Lease is subject and subordinate to the terms and conditions of the Ground Lease.

2.    Landlord and Tenant represent and warrant to Ground Lessor that as of the Effective Date:

EXHIBIT "N"

1

(a)     Exhibit B accurately identifies and contains a true and complete copy of the Lease and all amendments, supplements, side letters and other agreements and memoranda pertaining to the Lease and the Premises.

(b)     Neither Landlord nor Tenant is in default under the Lease.

(c)     Neither Landlord nor Tenant has sent to, or received from, the other a notice of default under the Lease that has not been cured.

3.     Ground Lessor and Landlord represent and warrant to Tenant that as of the Effective Date:

(a)     Neither Ground Lessor nor Landlord is in default under the Ground Lease.

(b)     Neither Ground Lessor nor Landlord has sent to, or received from, the other a notice of default under the Ground Lease that has not been cured.

4.     Landlord is directly and primarily responsible for performance of all obligations of the lessee under the Ground Lease.

5.     Ground Lessor agrees to provide written notice to Tenant at the address set forth in Paragraph 10 hereof if Landlord defaults under the Ground Lease, and Tenant may cure such default and Ground Lessor shall accept such cure tendered by Tenant; provided, however, that if Tenant elects to undertake the cure of any default by Landlord under the Ground Lease, such cure must be performed within thirty (30) days after the cure or grace periods, if any, granted to the lessee under the Ground Lease.

6.     Subject to Paragraph 7 below, upon any expiration or termination of the Ground Lease, Tenant, shall, and hereby does, attorn to Ground Lessor as the landlord under the Lease, and Tenant shall be bound to Ground Lessor under all of the terms, covenants and conditions of the Lease for the balance of the Term and any extensions or renewal thereof, which may then or later be in effect under any validly exercised extension or renewal option contained in the Lease, subject to the provisions of the Lease and applicable provisions of this Recognition Agreement.

7.     Ground Lessor agrees that, during the term of the Ground Lease, Ground Lessor shall not terminate the Lease or prevent Tenant or its permitted successors and assigns from retaining the right of, and continuing as, the tenant under the Lease and in the possession and use of the Premises unless (i) Tenant, or its successor-in-interest, fails to cure any default under the Lease in accordance with the terms of the Lease and the applicable provisions of this Recognition Agreement, or (ii) the Term of the Lease has otherwise expired.  This non-disturbance shall be effective and self-operative without the execution of any further instruments upon Ground Lessor succeeding to the interest of the Landlord under the Lease and

EXHIBIT "N"

2

Ground Lessor will recognize Tenant, or any other successor to the Tenant's interest in the Lease as the Tenant under the terms of the Lease for all purposes thereunder, for the remaining term thereof; provided, however, that such recognition and non-disturbance of Tenant under the Lease shall be subject to the applicable provisions of this Recognition Agreement, including but not limited to, Paragraph 8 hereof.

8.     Nothing in this Recognition Agreement shall be deemed or construed to be an agreement by Ground Lessor to perform any covenant of Landlord as the landlord under the Lease, unless and until, Ground Lessor succeeds to the rights and obligations of the Landlord under the Lease or this Recognition Agreement. Neither Ground Lessor, nor any lender of Ground Lessor, as the landlord under the Lease, shall be liable or responsible for or be required to perform any of the following:

(a)     Any prior act, omission, or default by Landlord under the Lease occurring prior to Ground Lessor succeeding to the rights and obligations of Landlord under the Lease;

(b)     Any offsets or defenses that Tenant may have had against Landlord under the Lease and occurring prior to Ground Lessor succeeding to the rights and obligations of Landlord under the Lease; and

(c)     Any term or provision of the Lease, or any amendment thereto, or any other agreement or instrument pertaining or related to the Lease that consists of any of the following:

(i)     Any personal obligation of Landlord;

(ii)     Any provision of the Lease imposing any obligation requiring Ground Lessor to perform any construction or other work for or to the Premises, including, but not limited to, the obligations set forth in Exhibit C to the Lease; nor will Ground Lessor be liable or responsible for the maintenance, repair or replacement of any construction defects, whether latent or patent in connection with the improvements comprising any portion of the building comprising a portion of the Premises;

(ii)     Any representation or warranty made by Landlord to Tenant under the Lease.

9.     During the term of the Lease, Tenant covenants and agrees to abide by Section 11.4 of the Lease regarding Mechanic's Liens.

10.     All notices given under this Recognition Agreement shall be in writing and shall be given by personal delivery, overnight receipted courier, or by registered or

EXHIBIT "N"

3

certified United States mail, postage pre-paid, sent to the party at its address appearing below. Notices shall be effective upon receipt (or on the date when proper delivery is refused). Addresses for notices may be changed by any party by notice to all other parties in accordance with this Paragraph.

| | |
|---|---|
| If to Ground Lessor: | John S. Lewis, Trustee of the Margaret E. Reed 1987 Living Trust<br>FBO Louis Smith<br>2266 Rosita Avenue<br>Santa Clara, CA  95050<br>Telephone: _____ **[PLEASE PROVIDE]** |
| With a copy to: | Phillip J. Nielsen<br>Anastasi & Nielsen<br>255 North Market Street, Suite 150<br>San Jose, CA  95110-2439<br>Telephone: (408) 294-9700 |
| If to Landlord: | Eel McKee LLC<br>P.O. Box 309<br>Paicines, CA  95043<br>Telephone: _____ **[PLEASE PROVIDE]** |
| With a copy to: | W. Russell Davis, Esq.<br>530 Oak Grove Avenue, Suite 205<br>Menlo Park, CA  94025<br>Telephone: (650) 323-2529 |
| If to Tenant: | Sprouts Farmers Markets, LLC<br>11811 N. Tatum Boulevard, Suite 2400<br>Phoenix, Arizona  85028<br>Attention: Seth Brown<br>Telephone: (480) 814-8016 |
| With a copy to: | Bryan Cave LLP<br>One Renaissance Square<br>2 North Central Avenue<br>Phoenix, Arizona 85007<br>Attention: Mark P. Goss, Esq.<br>Telephone: (602) 364-7112 |

11.   Ground Lessor and Landlord hereby covenant and agree that so long as the Lease is in effect, neither Ground Lessor and Landlord shall amend, modify or change any of the terms or provisions of the Ground Lease in any manner that will adversely affect Tenant's rights under the Lease without Tenant's prior written consent, which consent will not be unreasonably withheld or delayed.

EXHIBIT "N"

4

12.  Ground Lessor, Landlord and Tenant acknowledge they and, if they so choose, their respective counsel have reviewed and revised this Recognition Agreement and the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Recognition Agreement.

13.  This Recognition Agreement contains the entire agreement between Ground Lessor, Landlord and Tenant pertaining to the subject matter hereof and may only be modified by written instrument signed by Ground Lessor, Landlord and Tenant.

14.  This Recognition Agreement inures to the benefit of Ground Lessor, Landlord, Tenant and their respective successors and assigns.

15.  If any lawsuit or arbitration is commenced that arises out of or relates to this Recognition Agreement, the prevailing party shall be entitled to recover from each other non-prevailing party such sums that the court or arbitrator may judge to be reasonable attorneys' fees, including in addition to costs and expenses otherwise allowed by law.

16.  Tenant hereby acknowledges that this Recognition Agreement satisfies any condition or requirement in the Lease relating to the Consent to Lease required from Ground Lessor.

17.  GROUND LESSOR, LANDLORD AND TENANT HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN GROUND LESSOR, LANDLORD AND TENANT ARISING OUT OF OR IN ANY WAY RELATED TO THIS RECOGNITION AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO GROUND LESSOR TO PROVIDE THIS RECOGNITION AGREEMENT.

18.  This Recognition Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to the conflict of laws principals (regardless of the place of business, residence, location or domicile of Ground Lessor, Landlord or Tenant or any principal thereof).

19.  This Recognition Agreement may be executed in any number of counterparts, each of which shall be an original, but all which shall constitute one and the same instrument.

20.  Notwithstanding any provision herein to the contrary, this Recognition Agreement shall terminate automatically upon termination of the Lease without any further action required on the part of any party hereto.  Upon such termination, Tenant covenants and agrees to execute and deliver within ten (10) business days after

EXHIBIT "N"

5

receipt of written request therefor such commercially reasonable documentation as is requested by Landlord and/or Ground Lessor evidencing termination and release of this Recognition Agreement. The obligations of Tenant under this Paragraph 20 shall survive the expiration or earlier termination of this Recognition Agreement.

[SIGNATURES ON FOLLOWING PAGES]

EXHIBIT "N"

649296.3

GROUND LESSOR SIGNATURE PAGE AND ACKNOWLEDGMENTS

**GROUND LESSOR:**

JOHN S. LEWIS, TRUSTEE OF THE MARGARET E> REED 1987 LIVING TRUST DATED JUNE 19, 1987 FBO LOUISE SMITH

_____
John S. Lewis, Trustee

CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

State of California
County of _____
On _____, 2009, before me, _____, personally appeared
                          Date                                 Here Insert Name and
Title of the Officer

_____
_____,
Name(s) of Signer(s)

Who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Place Notary Seal Above        Signature _____

LANDLORD SIGNATURE PAGE AND ACKNOWLEDGMENTS

**LANDLORD:**

EEL MCKEE LLC,
a California limited liability company

By: _____
Print Name: _____

EXHIBIT "N"
7

Title: _____

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

State of California
County of _____

On _____, 2009, before me, _____, personally appeared
                    Date                                   Here Insert Name and

Title of the Officer

_____,
Name(s) of Signer(s)

Who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.
WITNESS my hand and official seal.
Place Notary Seal Above         Signature _____

## TENANT SIGNATURE PAGE AND ACKNOWLEDGMENTS

TENANT:
Sprouts Farmers Markets, LLC,
an Arizona limited liability company

By: _____
Name: _____
Title: _____

STATE OF ARIZONA           )
                          ) SS:
COUNTY OF MARICOPA      )

EXHIBIT "N"
8

On _____, 200__, before me, _____ a Notary Public in and for said State, personally appeared _____, as _____, personally known to me (or provided to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the persons(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

My commission expires: _____


EXHIBIT "N"

9

**EXHIBIT A**
**To Lease Recognition Agreement**

EXHIBIT "N"
10

**EXHIBIT B**
**To Lease Recognition Agreement**

**LEASE**

[Attached]

EXHIBIT "N"

649296.3

## APPENDIX "1"



APPENDIX "1"

1