# EXHIBIT 2

MARSHALLS
SANTA CRUZ, CA
FALL 2010

# LEASE AGREEMENT

### BY AND BETWEEN

### REDTREE PROPERTIES, LP, LANDLORD

### AND

### MARSHALLS OF CA, LLC, TENANT

### DATED: August 5 , 2010

## TABLE OF CONTENTS

Page

ARTICLE I......................................................................................................................1
   PREMISES .................................................................................................................1
ARTICLE II....................................................................................................................1
   INTER-RELATIONSHIPS ...........................................................................................1
ARTICLE III...................................................................................................................2
   CONSTRUCTION ......................................................................................................2
   PRE-TERM OCCUPANCY AND UTILITIES TRANSFER ............................................2
ARTICLE IV...................................................................................................................3
   OPTIONS .................................................................................................................3
   INDUCEMENTS.........................................................................................................6
   OPERATIONS ...........................................................................................................6
ARTICLE V....................................................................................................................6
   MINIMUM RENT .......................................................................................................6
ARTICLE VI...................................................................................................................7
   TAXES ....................................................................................................................7
ARTICLE VII..................................................................................................................9
   PERCENTAGE RENT.................................................................................................9
ARTICLE VIII...............................................................................................................11
   TENANT'S REPAIRS ...............................................................................................11
   LANDLORD'S REPAIRS ..........................................................................................11
   SPECIAL REPAIRS .................................................................................................12
   UTILITIES ..............................................................................................................12
   UTILITIES EASEMENTS .........................................................................................12
ARTICLE IX.................................................................................................................12
   ALTERATIONS .......................................................................................................12
ARTICLE X..................................................................................................................15
   FIRE AND OTHER CASUALTY ................................................................................15
ARTICLE XI.................................................................................................................17
   EMINENT DOMAIN .................................................................................................17
ARTICLE XII................................................................................................................19
   INDEMNIFICATION .................................................................................................19
ARTICLE XIII...............................................................................................................20
   DEFAULT ...............................................................................................................20
ARTICLE XIV...............................................................................................................22
   SELF-HELP ............................................................................................................22
ARTICLE XV................................................................................................................22
   WAIVER OF SUBROGATION ..................................................................................22
ARTICLE XVI...............................................................................................................23
   MORTGAGE SUBORDINATION ..............................................................................23
ARTICLE XVII..............................................................................................................23
ARTICLE XVIII.............................................................................................................24
   INTERPRETATION .................................................................................................24
   SUCCESSORS AND ASSIGNS ...............................................................................24
   DELAYS ................................................................................................................24
   HOLDING OVER .....................................................................................................24
   WAIVERS...............................................................................................................25
   DISPUTES .............................................................................................................25
   QUIET ENJOYMENT ...............................................................................................25
   NOTICES ...............................................................................................................25
   COST AND EXPENSE .............................................................................................26
   THIS INSTRUMENT................................................................................................26
   MARGINAL NOTES.................................................................................................26
   BROKERS..............................................................................................................26
   INVESTMENT CREDIT ............................................................................................26
   DISCLOSURE ........................................................................................................26
   RULES OF CONSTRUCTION ..................................................................................28

SCHEDULE A – Description of Shopping Center and Demised Premises
SCHEDULE B – Common Arease
SCHEDULE B-1 – Toys R Us Signage on Exterior of Demised Premises
SCHEDULE B-2 – Title Matters
SCHEDULE C – Tenant's Work
SCHEDULE D – Recognition and Attornment Agreement from Mortgagee
SCHEDULE E – Non-Disturbance, Recognition and Attornment Agreement from Fee
            Owner/Parent Landlord
SCHEDULE F – Exclusives and Prohibited Uses
SCHEDULE F-1 – Toys R Us Waiver
SCHEDULE G – Intentionally Omitted
SCHEDULE H – Intentionally Omitted
SCHEDULE I – Pylon Rendering

Lease dated __August 5__, 2010, between Redtree Properties, LP, a Delaware limited partnership as landlord (hereinafter referred to as "Landlord"), and MARSHALLS OF CA, LLC, a Delaware limited liability company, as tenant (hereinafter referred to as "Tenant").

# ARTICLE I

PREMISES

1.1  In consideration of the rents, agreements and conditions herein reserved and contained on the part of Tenant to be paid, performed and observed, Landlord does hereby demise and lease to Tenant, for the term hereinafter set forth, the premises described in Schedule A attached hereto as the Demised Premises (the "Demised Premises") within the shopping center described in Schedule A as the Shopping Center (the "Shopping Center").  The Shopping Center is comprised of (i) a certain parcel of land owned by Landlord, described on Schedule A attached hereto and identified as the Landlord's Parcel on the Lease Plan (the "Landlord's Parcel"), (ii) a certain parcel of land adjacent to Landlord's Parcel ground leased to Toys R Us described on Schedule A attached hereto and identified as the Toys R Us Parcel on the Lease Plan (the "TRU Parcel").  The Landlord's Parcel and the TRU Parcel have been developed and are operated as integral parts of an integrated retail shopping complex. If the ground lease between Landlord and Toys expires and is not renewed, or otherwise terminates during the term of this lease, then throughout this lease wherever the term Landlord's Parcel appears, it shall be deemed to mean the entire Shopping Center, including the TRU Parcel.

1.2  Landlord warrants to Tenant that Tenant, while operating a retail store in the Demised Premises in accordance with the terms of this lease, will not be in violation of any agreements which Landlord may have with lenders, governmental entities or any other parties, and Landlord further warrants that as of the date hereof: (i) the Demised Premises are zoned to permit use of the Demised Premises as a retail store, as of right (having previously obtained any required  permit, approval, variance or other waiver), (ii) except as disclosed in that certain report entitled "Phase I Environmental Site Assessment", dated February 14, 1997 prepared by PSI Service Industries, Inc. (the "Environmental Report"), to Landlord's current, actual knowledge, the real property described in Schedule A, including groundwater, is free from contamination by any hazardous or toxic substances, waste, or constituents, including, but not limited to asbestos containing materials (collectively, "Hazardous Substances"), and (iii) no building, health, safety, or environmental laws, ordinances or regulations of public authorities having jurisdiction prohibits the conduct of a retail store throughout the Demised Premises. Landlord hereby indemnifies Tenant against any claims or damages suffered or claimed to be suffered by any third party as a result of any breach of the foregoing warranties or as a result of the presence of Hazardous Substances at the time of lease execution, including, without limitation, any Hazardous Substances disclosed in the Environmental Report.

# ARTICLE II

INTER-
RELATIONSHIPS

2.1  The Demised Premises are demised subject to and with the benefit of the easements, rights, restrictions, agreements and encumbrances set forth in Paragraph 9 of Schedule B hereto (collectively called "Title Matters").  Schedules A, B, C, D, E, F, G, H and I attached hereto are hereby made a part hereof and incorporated herein to the same extent as if fully set forth herein.

2.2  The parties hereto agree not to record or register this lease but agree that a short form lease or notice of lease may be recorded in the official records of Santa Cruz County.  Simultaneously with the execution of this lease Landlord and Tenant shall execute an instrument, recordable in form, setting forth the parties, a description of the Demised Premises and the Shopping Center, the term of this lease and such other provisions of this lease as may be reasonably requested by either party to constitute a "short form lease" or other instrument adequate, in the opinion of Tenant, for recording purposes, which short form lease may be recorded by either party hereto, provided that such instrument shall not contain any of the economic terms of this lease.  After the Commencement Date shall be fixed, within thirty (30) days after receipt of the written request of either Landlord or Tenant, Landlord and Tenant will enter into an amended "short form lease" or other such instrument (such as a Commencement Date Agreement) to fix the Commencement Date which amended short form of lease may be recorded, by either party hereto.  The party recording any

such short form lease and/or amended short form lease shall bear the cost of doing so.

# ARTICLE III

CONSTRUCTION

3.1 (A) Landlord agrees that the work described below as "Landlord's Delivery Obligations" will be commenced promptly after the execution hereof, that the same will be prosecuted to completion with due diligence and that said work will be done at its own cost and expense. Landlord's Delivery Obligations shall mean (a) preparing the Pylon Sign (defined in Paragraph 3(A) of Schedule B to this lease) for installation of Tenant's panel, (b) putting the Demised Premises into so-called "broom clean" condition and (c) delivering possession of the Demised Premises free of leaks, structurally sound and free of all occupants and their property (trade fixtures, personal property and signs).

(B) Landlord warrants to Tenant that the Demised Premises (including the roof) is free of all asbestos containing materials ("ACMs"). The foregoing representation shall be in addition to any other obligation of the Landlord hereunder and shall survive the delivery of the Demised Premises hereunder. Landlord agrees to save Tenant harmless from, indemnify and defend Tenant against any and all injury, loss or damage or claims, injury, loss or damage of whatever nature to any person in the Demised Premises (excluding those brought into the Demised Premises by Tenant, its contractors of agents). If any Hazardous Substances other than ACMs are found within the Demised Premises (excluding those brought into the Demised Premises by Tenant, its contractors or agents) prior to the Commencement Date in amounts in violation of applicable law or that are required by applicable law to be removed for the performance of Tenant's Work (hereinafter defined), Tenant shall not be obligated to commence Tenant's Work until such Hazardous Substances have been removed by Landlord and the date in 4.3 (A) (i) of this lease will be tolled until such work is completed. It will be Landlord's responsibility to either contain or remove the Hazardous Substances in the manner and by a procedure consistent with the requirement of applicable federal, provincial, and local laws, ordinances and regulations and Landlord shall save Tenant harmless from and indemnify and defend Tenant against any and all injury, loss or damage or claims of injury, loss, or damage of whatever nature to any person or property caused by or resulting from the removal or abatement of such Hazardous Substances from the Demised Premises. In any event, all such work shall be performed at Landlord's expense with no cost to Tenant. During any such removal or abatement all rent and other charges due under the Lease shall abate to the extent operations in the Demised Premises are affected thereby.

(C) The date on which Landlord shall have completed Landlord's Delivery Obligations and shall deliver possession of the Demised Premises to Tenant in the condition required by this Section 3.1 is herein referred to as the "Delivery Date".

Other than performing the Delivery Obligations, Landlord shall have no obligations with respect to the Demised Premises for the period of time following the Delivery Date and prior to the Commencement Date. Tenant shall diligently perform any and all work necessary to open for business in the Demised Premises ("Tenant's Work"), including the Tenant's Work listed on Schedule C attached hereto, at Tenant's sole cost and expense, but subject to Tenant's receipt of the Construction Allowance (hereinafter defined).

PRE-TERM
OCCUPANCY AND
UTILITIES TRANSFER

3.2 Tenant shall have the right, without payment of rent or other charges, after the execution of this lease and prior to the "Commencement Date" (defined in Section 4.3 below), whenever Tenant shall deem it appropriate, to enter the Demised Premises to inspect the same, to make such improvements thereto as it shall have the right to make and install therein fixtures, supplies, merchandise and other property and to open a store for business therein. Tenant agrees that any such entry and the making of any such improvements and any such installations shall be done without unreasonably hampering the performance of Landlord's Delivery Obligations. No such entry by Tenant shall be deemed an acceptance of the Demised Premises. Until the Utilities Date (defined below), Landlord shall pay the cost of water, gas and electricity, used upon the Demised Premises, and until such time Tenant shall have the right to use, without charge, water, gas and electricity and other utilities available upon the Demised Premises. The "Utilities Date" shall be the Delivery Date. The

electric, gas and water services serving the Demised Premises are currently in Landlord's name. Effective as of the Utilities Date, Tenant shall have all utilities serving the Demised Premises switched into Tenant's name. Attached to this lease as Schedule C-1 are copies of bills from each applicable utility containing the account number and telephone number for each utility provider. Prior to the Commencement Date while Tenant may be making improvements to the Demised Premises or installing in the Demised Premises fixtures, supplies, merchandise and other property, as hereinabove provided, Tenant shall be in the Demised Premises at its own risk and the provisions of Section 12.1 below shall be applicable.

## ARTICLE IV

4.1  The original term of this lease shall be the period of ten (10) years and a fraction of a month commencing on the Commencement Date and terminating on the last day of the month during which the tenth (10th) anniversary of the Commencement Date shall occur, except, however, that if the Commencement Date shall be a first day of a calendar month then the original term of this lease shall be the period of ten (10) years commencing on the Commencement Date and terminating on the day preceding the tenth (10th) anniversary thereof.

OPTIONS

4.2  Tenant shall have the right, at its election, to extend the original term of this lease, or the original term as it may have been previously extended pursuant to the second sentence of this Section 4.2, for two (2) extension periods of five (5) years each, each commencing upon the expiration of the original term, or the original term as thus previously extended (each sometimes herein referred to as an "Extension Period"), provided that Tenant shall give Landlord notice of the exercise of such election (i) at least twelve (12) months prior to the expiration of the original term, or the original term as previously extended, as the case may be or (ii) within twenty (20) days after receipt of notice from Landlord to Tenant that Tenant has failed to exercise its option of extension within the period provided in (i) above, and the option(s) of extension shall not lapse until after the expiration of said twenty (20) day period following receipt of Landlord's notice. In addition, Tenant shall have the right, at its election, to extend the original term, or the original term as it may have been previously extended as aforesaid, for an extension period of a fraction of a year ending upon the January 31st next following the expiration of the original term, or the original term as previously extended, as the case may be (herein referred to as the "Extra Period"), provided that Tenant shall give Landlord notice of the exercise of such election (i) at least nine (9) months prior to the expiration of the original term, or the original term as previously extended, as the case may be or (ii) within twenty (20) days after receipt of notice from Landlord to Tenant that Tenant has failed to exercise its option of extension within the period provided in (i) above, and the option(s) of extension shall not lapse until after the expiration of said twenty (20) day period following receipt of Landlord's notice. The expression "the original term" means the period described in Section 4.1 as the original term prior to the exercise by Tenant of any of such elections to extend the original term. After the exercise by Tenant of any of such elections, the expression "the term of this lease" shall mean the original term as it may have been then extended. Except as expressly otherwise provided in this lease, all the agreements and conditions in this lease contained shall apply to each period or periods to which the original term shall be extended as aforesaid. If Tenant shall give notice of the exercise of any such election in the manner and within the time provided aforesaid, the term shall be extended upon the giving of such notice without the requirement of any further action on the part of Landlord.

COMMENCEMENT

4.3  (A)  An "Opening Day" shall be any Monday through Friday (except for legal holidays) between March 1 and the following April 30, and between August 1 and the following October 31. The "Commencement Date" shall be the first Opening Day after the later to occur of the following dates:

(1)  the ninetieth (90th) day after the later of (a) the Delivery Date or and (b) receipt by Tenant of permits for Tenant's Work; and

(2)  so long as the following condition (hereinafter referred to as the "Inducement Condition") remains fulfilled: a retail store operating under the trade name Toys R Us or Babies R US (the "Inducement Store") remains open for business

to customers in the Shopping Center in premises containing approximately 40,000 square feet of ground floor area; and

(3) the sixtieth (60th) day after Landlord shall have delivered to Tenant all of the fully executed and acknowledged (other than the signatures and acknowledgments required of Tenant) instruments referred to in Paragraph 8 of Schedule B to this lease; and

(4)  intentionally omitted;

(5)  intentionally omitted; and

(6)  intentionally omitted; and

(7)  intentionally omitted; and

(8)  intentionally omitted.

Notwithstanding the foregoing, if the Demised Premises shall be opened for business with customers prior to the Commencement Date determined as above provided, such date of opening shall be the Commencement Date.

Landlord shall cooperate with Tenant, at Tenant's sole cost and expense, in obtaining permits (including building permits) and certificates related to occupancy required to enable Tenant to construct improvements in the Demised Premises and open for business in the Demised Premises including all necessary permits that are needed so that Tenant can obtain demolition and/or building permits for Tenant's Work.  Notwithstanding the foregoing or anything to the contrary contained in this lease, if by September 1, 2010, Tenant shall not have obtained permits to construct the interior improvement necessary to operate a Marshalls store  in accordance with Tenant's plans and specifications, despite Tenant's diligent efforts, then Tenant shall have the right, at its election, prior to receipt of such permits, to terminate this lease by giving Landlord notice thereof on or before October 1, 2010, in which case this lease shall terminate on the date that is ten (10) days after the date of such notice, unless the required permits are obtained prior to said tenth day.  If Tenant does not give notice to Landlord that it has terminated this lease on or prior to October 1, 2010, then Tenant shall be deemed to have waived its right to terminate this lease for failure to obtain permits for Tenant's Work.  Notwithstanding the foregoing, if Tenant shall be unable to obtain a temporary or permanent certificate of occupancy (or local equivalent) for the Demised Premises because of any default by Landlord under Sections 3.1, 4.6 or 8.4 or because of the condition of the property Landlord is required to maintain (as defined in Section 8.2) and such condition is not due to any alteration made by Tenant or any default by Tenant hereunder then in such event (a) Landlord shall promptly correct such condition so that such certificate may be obtained, (b) Tenant shall then re-apply for such certificate, and (c) the Commencement Date shall be the first Opening Day that is more than thirty (30) days after such certificate is obtained.

(B)  Notwithstanding the foregoing or anything to the contrary contained in this lease, if the Inducement Condition has not been satisfied as required by Section 4.3(A)(2), then Tenant shall have the right, in its sole discretion, either to (i) postpone opening of the Demised Premises for business until the Inducement Condition is met or (ii) open the Demised Premises for business without the Inducement Condition being met ("Early Acceptance").  In the event Tenant decides to take Early Acceptance then the Commencement Date shall be the date the Demised Premises opens for business with customers; however, anything contained elsewhere in this lease to the contrary notwithstanding, from the Commencement Date until the date the Inducement Condition is met, no minimum rent shall be payable under Section 5.1 and no percentage rent shall be payable under Section 7.3, and in lieu thereof Tenant shall pay to Landlord on or before the twentieth (20th) day after the end of each calendar month or fraction thereof included in such period, an amount equal to the lesser of either the monthly installment of minimum rent which otherwise would have been payable for said month under Section 5.1 or two percent (2%) of Gross Sales (as defined in Section 7.2) for said month ("Alternate Rent").  In the event that (i) the opening of the Demised Premises has been postponed for one (1) year under this Paragraph (B) because the Inducement Condition has not been satisfied, or (ii) the Inducement

Condition has not been satisfied during the one (1) year period following a Commencement Date occurring pursuant to an Early Acceptance, then in either such event, Tenant may terminate this lease by giving Landlord written notice thereof within thirty (30) days following the expiration of such one (1) year period, in which event this lease shall be terminated upon the delivery of such notice (or if Tenant has opened for business, the term of this lease shall then terminate on the date therefor set forth in said notice, which date shall not be more than ninety (90) days following the date of Tenant's notice, unless the Inducement Condition is fulfilled prior to said termination date in which event the Tenant's termination notice shall be deemed rescinded), and upon such termination, the parties shall have no further obligation one to the other except for obligations accruing prior to the date of such termination; provided, however, that if Tenant does not deliver such termination notice to Landlord (or if such termination notice is deemed rescinded), then Tenant shall commence payment of minimum rent provided for under Section 5.1 of this lease and percentage rent as provided for under Section 7.3 of this lease as of the first day of the second (2nd) calendar month following the expiration of the one (1) year period described above (and in the event the Commencement Date has not yet occurred, it shall be deemed to have occurred as of such date), and the termination right described herein shall be null and void and of no further force or effect. For purposes of determining the beginning of the one (1) year period under the circumstance described in clause (i) above, said period shall be deemed to have begun on the date that would have been the Commencement Date under Section 4.3(A) above if not for the failure of the Inducement Condition to have been satisfied on such date.

4.4  Intentionally Omitted.

4.5  Intentionally Omitted.

4.6  Landlord agrees that upon the Commencement Date the Demised Premises and all rights of Tenant under this lease will be free and clear of all Title Matters, except as set forth in this lease (including Schedule B). Landlord represents that the Demised Premises and the Shopping Center including the Demised Premises were constructed in compliance with all laws, ordinances and regulations of public authorities then in effect (including, without limitation, zoning and building codes) and no existing violation of the Demised Premises or the Shopping Center of which Landlord has received written notice from the applicable authorities remains uncured as of the date hereof. Landlord agrees that if at any time or times any public authorities or insurance rating bureaus having jurisdiction shall complain that the Demised Premises or the Shopping Center were not constructed in compliance with any law, ordinance or regulation of any public authority, and if such failure to comply shall in any way adversely affect the use of the Demised Premises by Tenant or adversely affect any other rights of Tenant under this lease or impose any obligation upon Tenant not contained in this lease, then Landlord shall, upon receipt of notice of such complaint, cause such repairs, alterations or other work to be done or action to be taken so as to bring about the compliance requested. The provisions of the immediately preceding sentence shall not however, apply to any such complaint resulting from the actions of Tenant, its agents, contractors or employees. Landlord shall have the right to contest any such complaint provided the Tenant is not deprived of the use or enjoyment of the whole or any part of the Demised Premises or the Common Areas. If by reason of such failure of compliance or by reason of such repairs, alterations or other work done by Landlord, Tenant shall be deprived of the use of the whole or any part of the Demised Premises or the Common Areas (defined in Schedule B), all rent shall abate on a per diem basis in proportion to such deprivation. The provisions of two (2) immediately preceding sentences shall not be applicable to any complaint resulting from Tenant's manner of use of the Demised Premises or any work performed by Tenant in the Demised Premises exclusive of any work performed by Tenant pursuant to Section 14.2 below. If at any time during the term of this lease any person having a prior right to Tenant not set forth as a Title Matter in Schedule B shall cause an injunction to be entered against Tenant restricting Tenant's use of the Demised Premises or any right of Tenant under this lease and if such injunction shall not be dismissed within thirty (30) days after Tenant shall give Landlord notice thereof, then Tenant, without waiving any other rights Tenant may have on account thereof, may terminate this lease, by giving Landlord notice thereof. If at any time the applicable zoning shall not permit the retail sale of any of the Protected Merchandise (defined in Paragraph 4(B) of Schedule B) in the Demised Premises, and in fact, Tenant is prohibited from selling the Protected Merchandise and

Landlord fails to obtain the necessary variance or other type of approval for the operation of the Demised Premises for the retail sale of the Protected Merchandise within sixty (60) days after request by Tenant, then Tenant, without waiving any other rights Tenant may have on account thereof, may terminate this lease, by giving Landlord notice thereof.

**INDUCEMENTS**

4.7  If for any period of more than one hundred eighty (180) consecutive days the Inducement Condition (as modified by the last 2 sentences of this Section 4.7) shall not be fulfilled then (A) upon the expiration of each such period no minimum rent shall be payable under Section 5.1 and no percentage rent shall be payable under Section 7.3 and in lieu thereof Tenant shall pay to Landlord on or before the twentieth (20th) day after the end of each calendar month or fraction thereof included in such period, an amount equal to the lesser of either the monthly installment of minimum rent which otherwise would have been payable for said month under Section 5.1 or Alternate Rent. In addition, if the Inducement Condition remains unfulfilled for a period of three hundred sixty five (365) consecutive days in the aggregate, then at any time within sixty (60) days following the expiration of such three hundred sixty five (365) day period, Tenant may provide Landlord with a written notice of termination at any time  and the term of this lease shall then terminate on the date therefor set forth in said notice as of the date of termination (the "Termination Date") notwithstanding the fact that the Inducement Condition may again be fulfilled prior to said Termination Date.  In the event that Tenant fails to terminate this lease as provided in the immediately preceding sentence, the suspension of minimum rent and percentage rent and the payment by Tenant of Alternate Rent in lieu thereof shall expire and the payment of minimum rent pursuant to Section 5.1 and percentage rent pursuant to Section 7.3 shall be reinstated effective as of the first day of the calendar month following the expiration of the sixty (60) day period in which Tenant may terminate this lease.  Tenant's agreement to resume payment of minimum rent pursuant to Section 5.1 and percentage rent pursuant to Section 7.3 in accordance with the immediately preceding sentence shall in no way constitute a waiver of the applicability of this Section 4.7 to any future failure of the Inducement Condition.  From and after the date on which the Inducement Condition is initially fulfilled, for purposes of this Section 4.7, the Inducement Condition shall be deemed fulfilled so long as either the Inducement Store or a Qualified Replacement Store (hereinafter defined) shall be open for business to customers in the Shopping Center.  As used herein, a Qualified Replacement Store shall mean a retail store that is (a) operated by a regional or national retailer reasonably acceptable to Tenant, which retailer operates not less than twenty five (25) stores in California or fifty (50) stores in the United States, each under the same trade name as the trade name of the store to be located in the Shopping Center, (b) operating in at least ninety percent (90%) of the floor area of the premises in the Shopping Center previously occupied by the Inducement Store, (c) operating on a year-round, non-seasonal basis under a multi-year lease with Landlord, and (d) in compliance with all of the applicable provisions of this lease, including, without limitation, the provisions of Schedule B, Paragraph 4 below.

**OPERATIONS**

4.8  Nothing in this lease or otherwise shall require Tenant to keep the Demised Premises open for business at any time.

## ARTICLE V

**MINIMUM RENT**

5.1  (a)  From the Commencement Date until the fifth (5th) anniversary thereof, Tenant shall pay minimum rent to Landlord at the rate of Three Hundred Eighty Nine Thousand One Hundred Eighty Six Dollars  ($389,186) ($14.00 per square foot per year multiplied by the ground floor area of the Demised Premises).

(b)  From the fifth (5th) anniversary of the Commencement Date until the expiration of the original term of this lease, Tenant shall pay minimum rent to Landlord at the rate of Three Hundred Eighty Nine Thousand One Hundred Eighty Six Dollars  ($389,186) ($14.00 per square foot per year multiplied by the ground floor area of the Demised Premises).

(c)  During the first Extension Period, if any, Tenant shall pay minimum rent to Landlord at the rate of Four Hundred Sixty Seven Thousand Twenty Three Dollars and Twenty Cents ($467,023.20) ($16.80 per square foot per year multiplied

by the ground floor area of the Demised Premises).

(d) During the second Extension Period, if any, Tenant shall pay minimum rent to Landlord at the rate of Five Hundred Thirteen Thousand Seven Hundred Twenty Five Dollars and Fifty Two Cents ($513,725.52) ($18.48 per square foot per year multiplied by the ground floor area of the Demised Premises).

(e) During the Extra Period, if any, Tenant shall pay minimum rent to Landlord at the annual rate in effect immediately prior to the commencement of the Extra Period.

5.2  All minimum rent shall be payable in monthly installments of one-twelfth (1/12) the annual rate thereof then in effect, in advance, upon the first (1st) day of each calendar month included within the term of this lease.  All rent and other payments to be made by Tenant to Landlord shall be made payable to Landlord and sent to Landlord at the place to which notices to Landlord are required to be sent, unless Landlord shall direct otherwise by notice to Tenant.  Rent for any fraction of a month at the commencement or expiration of the term, or in which the rate thereof changes pursuant hereto, shall be prorated on a per diem basis.

## ARTICLE VI

**TAXES**

6.1  Tenant shall pay to Landlord the amount of the real estate taxes allocable to the Demised Premises (determined as below provided) for each tax year included within the term of this lease; for the first and last tax years included in part within the term of this lease, Tenant shall pay to Landlord a pro rata share of such taxes for such tax years, based upon the portions of such tax years included within the term of this lease.  The amount of real estate taxes allocable to the Demised Premises shall be equal to the total real estate taxes upon the Landlord's Parcel times a fraction whose numerator is the ground floor area in the Demised Premises and whose denominator is the total gross leaseable area in all buildings within the Landlord's Parcel (such fraction is hereinafter referred to as "Tenant's Fraction").  For purposes of this lease, total gross leaseable area includes all leaseable area whether the same is occupied or vacant.  Landlord warrants and represents that as of the date of this lease, the Demised Premises constitute the total gross leaseable area in all buildings within the Landlord's Parcel.  Tenant's Fraction shall be adjusted in the event Landlord constructs any additional leaseable area within the Landlord's Parcel or increases or decreases the ground floor area of the Demised Premises if Tenant no longer leases all of the leaseable area of the building in which the Demised Premises is located. Notwithstanding the foregoing, if the Demised Premises, or a portion of the Landlord's Parcel including the Demised Premises, is separately assessed, and if the real estate taxes on such separately assessed parcel multiplied by Tenant's Portion (hereinafter defined) is less than the amount determined in the preceding sentence, the amount determined by this sentence shall be the real estate taxes allocable to the Demised Premises.  Tenant's Portion is a fraction whose numerator is the ground floor area in the Demised Premises and whose denominator is the total gross leaseable area in all buildings within such separately assessed parcel.  If after the assessment date for the tax year in which the Commencement Date occurs, any new construction or remodeling shall occur within the Landlord's Parcel, then, to carry out the intent of the parties, an appropriate adjustment shall be made in the amount payable by Tenant under this Article VI with respect to any increase in the real estate taxes upon the Landlord's Parcel attributable thereto provided that a supplemental tax bill from the taxing authority has been issued after the assessment date and a copy thereof delivered to Tenant.  The expression "real estate taxes" used herein shall include all ad valorem taxes imposed or assessed upon or against real estate by any public authority having jurisdiction including solid waste disposal fees, storm drainage fees and other user fees for governmental services provided, however, real estate taxes shall not include any general, special or betterments assessments imposed or assessed upon or against the Shopping Center or any income, excess profits, estate, inheritance, succession, transfer, franchise, capital or other tax or assessment upon Landlord or upon the rentals payable under this lease (except as otherwise expressly provided in Section 6.6 below) , all of which shall be the obligation of Landlord.   If the real estate taxes of the Demised Premises for any year which commences after the Commencement Date shall be increased on account of a re-valuation of the Demised Premises because of any "change in ownership", Tenant shall not pay or be charged with any increase in the real estate taxes attributable to or arising from such change.  The provisions of the

immediately preceding sentence shall not be applicable to the first such change in ownership during the term hereof or thereafter to the first such change in ownership in any successive five year period during the term of this lease.

6.2  If there shall be more than one taxing authority, the real estate taxes for any period shall be the sum of the real estate taxes for such period attributable to each taxing authority. If the number of square feet of floor area of any building shall change during any tax year, the condition existing upon the day as of which the real estate taxes are assessed for such tax year shall control. The real estate taxes for any tax year shall mean such amounts as shall be finally determined to be the real estate taxes assessed and payable for such tax year as the same may be reduced by any reduction in the amount as originally assessed whether by abatement, refund, rebate or discounts obtained with respect thereto or otherwise. For the purpose of determining payments due from Tenant to Landlord in accordance with the provisions of this Article VI, (A) the real estate taxes for any tax year shall be deemed to be the real estate taxes assessed and payable for such tax year until such time as the same may be reduced by abatement, refund, rebate, discount or other reductions, (B) if any abatement, refund or rebate shall be made for such tax year, the real estate taxes for such tax year shall be deemed to be the real estate taxes as so reduced plus the expenses of obtaining the reduction (excluding any "administration fee" or similar charge which does not reflect actual out-of-pocket expenses incurred in obtaining such reduction), and (C) any penalties or interest resulting from Landlord's late payment of real estate taxes shall not be payable by Tenant; such shall be the sole responsibility of Landlord unless such late payment is the result of Tenant's late payment of real estate taxes due pursuant to this Article VI. An appropriate adjustment shall be made in the amount payable from or paid by Tenant to Landlord on account of real estate taxes pursuant to the immediately preceding sentence.

6.3  Landlord shall submit to Tenant copies of real estate tax bills for each tax year at least twenty (20) days prior to the expiration of the period by which such taxes may be contested. Tenant shall have such rights to contest the validity or amount of any real estate taxes as permitted to Landlord or Tenant by law, either in its own name or in the name of Landlord. Landlord shall cooperate with Tenant in any such contest and, in connection therewith, shall make available to Tenant such information in its files as Tenant may reasonably request. If any abatement, refund or rebate shall be obtained, the expenses of obtaining the same shall be a first charge thereon. Landlord agrees to provide Tenant with notice prior to instituting any contest with respect to the Landlord's Parcel.

6.4  Landlord shall bill Tenant for any amount that may be payable by Tenant pursuant to the provisions of this Article VI. Such bill shall be accompanied by (a) copies of all notices concerning assessments, changes of assessment and tax rates and (b) a computation of the amount payable together with supporting documentation reasonably satisfactory to Tenant relating to Landlord's calculation of Tenant's Portion or Tenant's Fraction (as defined above) if such computation changes from the computation as of the date of this lease. The amount payable by Tenant hereunder for any tax year shall be payable at least five (5) days prior to the time that Landlord is required to pay real estate taxes to the taxing authority for such tax year under the terms of this lease, but if Tenant shall not have received a bill therefor and the supporting documentation referred to above at least thirty (30) days prior to such time for payment, Tenant shall not be required to make payment until thirty (30) days after the receipt of such documentation. (If real estate taxes are payable to any taxing authority for any tax year in installments, the amount payable by Tenant hereunder shall be payable in similar installments. If real estate taxes are payable to different taxing authorities for any tax year at different times, an appropriate apportionment shall be made of the amount payable by Tenant for such tax year and the apportioned amounts shall be payable at such times.) Landlord agrees that real estate taxes upon the Landlord's Parcel shall be paid by Landlord prior to the last day that the same may be paid without penalty or interest. If a discount shall be available for early payment of taxes and Tenant pays Landlord the full amount of such taxes at least five (5) days prior to such date, then notwithstanding anything in this Article VI contained to the contrary, the amount payable by Tenant under this Section 6.1 shall be computed and payable as if Landlord had paid the real estate taxes upon the Landlord's Parcel prior to such day, and Tenant shall have the benefit of such discount, whether or not Landlord has, in fact paid the same by such day. Landlord shall submit to Tenant copies of the paid real estate tax bills and receipts for each tax year within thirty (30)

days after payment of such real estate taxes.

6.5 Landlord agrees that neither the Landlord's Parcel nor the construction therefor nor any expansion thereof, shall be financed by or subject to, any so-called "Tax Increment Financing" or similar financing which (a) results in the real estate taxes upon the Landlord's Parcel being increased above the amount of real estate taxes which would have been due with respect to the Landlord's Parcel if such financing had not been obtained or (b) requires or imposes any obligation on Tenant to file any reports, returns or invoices or provide other information to Landlord or any other entity.

6.6 Landlord shall not be responsible for any taxes upon Tenant's personal property, trade fixtures or any signs installed by Tenant and Tenant shall defend and indemnify Landlord against, and save Landlord harmless from, any loss and damage to Landlord resulting from any failure by Tenant to pay any taxes upon Tenant's personal property, trade fixtures or signs installed by Tenant in the Demised Premises.

## ARTICLE VII

**PERCENTAGE RENT**

7.1 A "lease year" is defined to mean any twelve (12) month period commencing on a February 1 and ending on the following January 31, except that

(a) if the Commencement Date shall occur on a day other than the first (1st) day of February, the first (1st) lease year shall commence on the Commencement Date and end on the last day of January which shall be more than six (6) months but not more than eighteen (18) months after the Commencement Date, and

(b) if the term of this lease shall terminate on a day other than the last day of January, the last lease year shall end on such termination day and commence on that first (1st) day of February which shall be more than six (6) months but not more than eighteen (18) months prior to such termination day. (If a lease year of more than twelve (12) months shall occur upon the termination of the term, any amount paid during such lease year for the first (1st) twelve (12) months of such lease year shall be deemed a payment on account).

7.2 The "Gross Sales" for any lease year shall be the total amount of all sales of merchandise and services made in, upon or from the Demised Premises during such lease year, in each case whether the same shall be made by Tenant or by any subtenant or concessionaire of Tenant, whether for cash or on credit, whether delivered from the Demised Premises or elsewhere, except that the following shall not be included in Gross Sales for such lease year or, if previously included in Gross Sales for any lease year, the same shall be deducted from Gross Sales for such lease year, as the case may be:

(a) The amounts of all discounts, refunds, credits, allowances and/or adjustments made to customers;

(b) The amounts of all sales taxes or other taxes in the nature of sales taxes, whether or not the same be called sales taxes, imposed by any governmental authorities, federal, state or local, irrespective of whether the same be imposed by present or future laws;

(c) The amount of all sales to employees of Tenant or of any subtenants or concessionaires of Tenant which are made at discounts from prices charged to customers;

(d) The amounts received for merchandise transferred to any other place of business of Tenant or any subtenant or concessionaire of Tenant or any business organization affiliated with Tenant wherever located, provided such merchandise is not used to fill a sale made in the Demised Premises, and amounts received for merchandise returned to suppliers for credit;

(e) Interest or other carrying charges on lease, credit or time sales;

(f) The amounts charged to customers for mailing, delivery, alterations or

other services where such services are rendered to the customer without profit;

(g) Unpaid balances of credit sales which are charged off as "bad debts", provided that if at any time after any such unpaid balance shall be so charged off, but prior to the expiration of the term of this lease, any amount shall be collected on account thereof, such amount shall then be included in Gross Sales;

(h) The amounts received from sales of distressed, damaged or obsolescent merchandise sold to other than retail customers, and amounts received from sales of used trade fixtures and store operating equipment;

(i) The amounts received from concessionaires of Tenant for occupancy, for services rendered to such concessionaires by Tenant or for supplies or equipment furnished to such concessionaires by Tenant; and

(j) The amount of fees and other charges paid by Tenant to credit card companies in connection with credit card sales.

7.3   Tenant shall pay to Landlord for each lease year during the term of this lease percentage rent equal to two percent (2%) of the amount, if any, by which the Gross Sales for such lease year shall exceed the "Breaking Point" for such lease year. From the Commencement Date until the fifth (5th) anniversary thereof, the Breaking Point shall be Nineteen Million Four Hundred Fifty Nine Thousand Three Hundred Dollars ($19,459,300) per year. From the fifth (5th) anniversary of the Commencement Date until the expiration of the original term of this lease, the Breaking Point shall be Nineteen Million Four Hundred Fifty Nine Thousand Three Hundred Dollars ($19,459,300) per year. During the first Extension Period, if any, the Breaking Point shall be Twenty Three Million Three Hundred Fifty One Thousand One Hundred Sixty Dollars ($23,351,160) per year. During the second Extension Period, if any, the Breaking Point shall be Twenty Five Million Six Hundred Eighty Six Thousand Two Hundred Seventy Six Dollars ($25,686,276) per year. During the Extra Period, if any, the Breaking Point shall be at the annual rate in effect immediately prior to the commencement thereof. The Breaking Point shall be increased or decreased proportionately for any lease year containing more or less than three hundred sixty-five (365) days.

7.4   On or before the one hundred twentieth (120th) day after the expiration of each lease year, Tenant shall submit to Landlord a statement showing the Gross Sales for such lease year, and at such time Tenant shall pay to Landlord the percentage rent, if any, due for such lease year. Tenant agrees that it will keep in its principal accounting office true and accurate records, in accordance with usual retail accounting practices, showing all sales made in, upon or from the Demised Premises, and that Landlord and its duly authorized agents may, from time to time and at reasonable times during Tenant's business hours, upon five (5) days written notice to Tenant, examine and audit such records for the purposes of verifying the aforesaid statements submitted by Tenant to Landlord. If Landlord does not give Tenant notice that it challenges any statement or payment within one (1) year after the expiration of the lease year to which such statement or payment relates, such statement or payment shall be deemed final and conclusive and the obligation of Tenant to keep available for Landlord's examination the sales records upon which such statement or payment was based shall cease. Landlord acknowledges that the information contained in Tenant's statements of Gross Sales and the records pertaining thereto are deemed by Tenant to be confidential proprietary information, and are being provided and/or made available to Landlord for the sole purpose of calculating and verifying Tenant's payments of percentage rent. Landlord specifically agrees that it shall not disclose, distribute, disseminate or publish in any fashion such statements of Gross Sales or related records or the contents thereof to any third person or entity without the express prior written consent of Tenant in each instance obtained, which consent may be withheld by Tenant in its sole discretion, provided however, that such Gross Sales may be disclosed by Landlord (i) to Landlord's mortgagee, prospective purchasers of the Landlord's Parcel and Landlord's accountants, attorneys and employees to the extent reasonably necessary for Landlord's business purposes, subject to the requirement that such third parties keep such information confidential, and (ii) pursuant to governmental or court order.

## ARTICLE VIII

**TENANT'S REPAIRS**

8.1  Tenant shall make all repairs, alterations and replacements to the property which Tenant is required to maintain, as hereinafter set forth, which may be necessary to maintain the same in as good repair and condition as the same are in on the Commencement Date, reasonable wear and tear excepted (provided, however, that Tenant's failure to perform routine maintenance and repair in accordance with the requirements of this lease shall not constitute normal wear and tear) and subject to Articles X and XI.  Tenant shall make all repairs, alterations and replacements to the property which Tenant is required to maintain as hereinafter set forth which may be required by any laws, ordinances or regulations of any public authorities having jurisdiction provided however Landlord shall be liable for violations of legal requirements applicable to the Demised Premises that exist on the Commencement Date.  Upon the expiration or other termination of the term of this lease, Tenant shall remove its goods and effects and those of all persons claiming under it and shall yield up peaceably to Landlord the Demised Premises with so much of the same as Tenant is obligated to maintain and repair pursuant to the provisions of this Section 8.1 in as good repair and condition as the same were in on the Commencement Date, reasonable wear and tear excepted and subject to Articles X and XI.  However, notwithstanding anything in this lease contained to the contrary, Landlord, not Tenant, shall make all repairs, alterations, and replacements to the property which Tenant is required to maintain which may be required as the result of repairs, alterations, replacements, other improvements or installations made after the Commencement Date by Landlord or Landlord's agents, unless done by Landlord pursuant to Section 14.1.  The property which Tenant is required to maintain is the heating, ventilation and air-conditioning system (the "HVAC") serving the Demised Premises, the interior of the Demised Premises, including, without limitation, all glass, windows, doors and all utilities conduits, life safety systems, fixtures and equipment within the Demised Premises or serving the Demised Premises exclusively, but excluding all property which Landlord is required to maintain as below provided.  If at any time during the last five (5) years of the term Tenant shall make any repairs or replacements to the HVAC that are not customarily included in a regular service and maintenance contract and are not required as a result of Tenant's failure to adequately maintain the HVAC, then Tenant shall be reimbursed by Landlord, upon demand, for an amount equal to the product of such cost multiplied by a fraction the denominator of which is one hundred twenty (120) and the numerator of which is one hundred twenty (120) minus the number of months between the date of the making of such repairs and/or replacements and the date of the termination of the term (the "Reimbursement").  Said Reimbursement may be effected by Tenant's deducting the amount thereof from the final payments of rent due and payable hereunder.  (If the term shall be extended subsequent to the making of any such repairs the "term" shall be deemed to be the term as so extended.)  If Landlord has provided all or any portion of the Reimbursement to Tenant prior to such time as Tenant exercises an option to extend the term of the Lease as described in the first sentence of Section 4.2, then Tenant shall return such portion of the Reimbursement to Landlord within thirty (30) days after such time as Tenant exercises such option.  Landlord is required to maintain due to the acts of negligence of Tenant, its agents or employees.  All repairs that Tenant makes pursuant to this lease shall be of good quality.

**LANDLORD'S REPAIRS**

8.2  Landlord shall make all repairs, alterations and replacements to the property which Landlord is required to maintain, as hereinafter set forth, which may be necessary to maintain the same in good repair and condition or which may be required by any laws, ordinances or regulations of any public authorities having jurisdiction, subject to Articles X and XI.  However, notwithstanding anything in this lease contained to the contrary, Tenant, not Landlord, shall make all repairs, alterations and replacements to the property which Landlord is required to maintain which may be required as the result of repairs, alterations, replacements, other improvements or installations made by Tenant or any subtenant or concessionaire of Tenant or the agents of any of them, unless done by Tenant pursuant to Section 14.2.  The property which Landlord is required to maintain is the foundation, slab floors, the roof, the structural portions of the exterior walls, the roof drainage system, the canopy, the structural parts of the Demised Premises, and, to the extent located within the walls, ceilings or floors of the Demised Premises and not readily accessible by means of removing sheetrock/plaster, removable panels, access doors or the like, all wiring, plumbing, pipes, conduits and other utilities and sprinkler fixtures, plus all Common Areas of the Shopping Center, and, to the extent not included in the foregoing, all

utilities conduits, fixtures and equipment serving the Demised Premises that also serve other premises or are located within the Shopping Center but outside the Demised Premises.  In addition, Landlord shall make any repairs to the property Tenant is required to maintain which are required as a result of a defect in, or failure of repair of, the property Landlord is required to maintain.

**SPECIAL REPAIRS**

8.3  Notwithstanding anything herein contained to the contrary, Landlord shall make all repairs, alterations and replacements (other than those required as the result of repairs, alterations, replacements, other improvements or installations made by Tenant or any subtenant or concessionaire of Tenant or the agents of any of them) to the property which Tenant is required to maintain which shall be required at any time during the term of this lease as a result of movement of the building upon which the Demised Premises is located such as settling, or as the result of settling of the Common Areas.

**UTILITIES**

8.4  Landlord agrees that as of the Commencement Date, the Demised Premises shall be connected to the electric and gas lines serving the municipality wherein the Demised Premises are located and to the water and sewer systems of such municipality shall be separately metered for each such utility service and shall be in such amounts per unit of time and  all such sewerage disposal facilities shall be of such capacity as shall be  engineered adequate for the operation of a retail store throughout the Demised Premises.  Landlord warrants and represents that all meters and controls for the utilities systems serving the Demised Premises are, or will be by the Delivery Date, completely situated within the Landlord's Parcel, provided, however, that Tenant acknowledges that the controls for the exterior lighting on Landlord's Parcel are located on the exterior wall of the Toys premises on the TRU Parcel.  Landlord shall not take, or permit any occupant of the Shopping Center or any person claiming under Landlord or any such occupant to take, any action which shall interrupt, or interfere with, any electric, gas, water, sewerage or telephone service to the Demised Premises.  Landlord, however, shall not be deemed to be liable pursuant to the provisions of the immediately preceding sentence with respect to any such interference resulting from any acts or omissions of public utility companies or any event or circumstance set forth in Section 18.3 below (except as caused by Landlord's negligence or willful misconduct).  Tenant agrees to save Landlord harmless from, and defend and indemnify Landlord against, all charges for utilities services consumed in the Demised Premises between the Utilities Date and the expiration of the term of this lease, except with respect to amounts expended by Landlord in performing its obligations under this lease.

**UTILITIES
EASEMENTS**

8.5  Subject to applicable laws and restrictions of record, Tenant shall have the right, license and easement within the Common Areas of the Landlord's Parcel to install, replace, maintain and use utilities conduits, communications conduits and/or equipment serving the Demised Premises provided such conduits and/or equipment shall be located only in areas subject to the reasonable approval of Landlord, and Tenant shall do the same in such manner as shall keep to a reasonable minimum any interference with the business of the Landlord's Parcel.

## ARTICLE IX

**ALTERATIONS**

9.1  Tenant agrees that any repairs, alterations, replacements, other improvements or installations made by Tenant to or upon the Demised Premises shall be done in a good and workmanlike manner and in conformity with all laws, ordinances and regulations of all public authorities having jurisdiction, that materials of good quality shall be employed therein, that the structure of the Demised Premises shall not be endangered or impaired thereby, that any exterior alterations to the Demised Premises shall not be inconsistent with any uniform architectural design of the exterior of other stores then existing in the Shopping Center, and that, except for signs, satellite antennae and heating, air-conditioning and utilities equipment Tenant is permitted to erect and maintain pursuant to the provisions of this lease, neither the perimeter of the Demised Premises nor the height of the Demised Premises shall be increased without the written consent of Landlord.  However, the immediately preceding sentence shall not prohibit Tenant from revising and/or altering the cosmetic fascia of the storefront of the Demised Premises so long as such cosmetic fascia of the storefront is not thereby made inconsistent with the uniform architectural design of storefronts, if any, then existing in the Shopping Center and so long as such alterations do not endanger or impair the structure of the Demised Premises.  Tenant agrees that

Tenant shall not, except as specifically provided in other provisions of this lease, make any alterations to the foundation, roof, exterior walls, gutters, downspouts, canopy, storefront, or any structural parts of the Demised Premises, without first submitting plans and specifications therefor to Landlord. Landlord shall have the right to disapprove of the same if, and only if, the same (a) are structural in nature and/or affect the structure of the Demised Premises), or (b) violate any of the preceding provisions of this Section 9.1, or (c) create a violation of the lease between Landlord and Toys. Failure of Landlord to give notice of approval or disapproval of such plans and specifications within thirty (30) days after receipt thereof shall be deemed approval. All salvage in connection with any work done by Tenant pursuant to provisions of this Section 9.1 may be disposed of by Tenant in accordance with all laws, ordinances and regulations. It is agreed and understood that, upon expiration of the term of this lease, Landlord shall accept possession of the Demised Premises as altered pursuant to the provisions hereof without any obligation upon Tenant to restore the Demised Premises to their former condition.

9.2 (A) Landlord agrees that Tenant may erect and maintain its signs, from time to time, upon the exterior of the Demised Premises with the maximum letter height permitted by code. Tenant shall provide Landlord with the permit applications and storefront sign designs for the exterior of the Demised Premises. Landlord shall return such applications and designs (including without limitation any necessary signatures or approval designations) to Tenant or Tenant's sign vendor within seven (7) business days after Landlord's receipt of the applications and/or sign designs from Tenant or Tenant's vendor. Landlord shall cooperate with Tenant, at no third party cost to Landlord, in obtaining all necessary governmental permits and approvals (including, without limitation, if necessary, a variance in order for Tenant's sign to be its prototypical size) for Tenant's installation and maintenance of Tenant's signs, including without limitation the Pylon Signs referred to in Paragraph 3 of Schedule B, Tenant acknowledging that the size of the Pylon Sign (hereinafter defined in Schedule B, paragraph 3) and the size of Tenant's panels thereon cannot be increased. Landlord agrees that Tenant may install grand opening banners and balloons on or attached to the Demised Premises for up to ten (10) days after the grand opening of the Demised Premises for business. Tenant shall be responsible for such exterior signs as if the same were inside the Demised Premises.

(B) Subject to applicable laws, regulations, ordinances and restrictions of record, Landlord agrees that Tenant may install (Tenant agreeing to use Landlord's roof contractor for such installation provided that such contractor (a) is unaffiliated with Landlord, and (b) charges fees in line with other roofing contractors performing similar work in the market in which the Demised Premises is located), operate and maintain mounted satellite dish antennae and a solar energy system including solar panels and related equipment (the "Equipment"), from time to time, upon the roof and/or exterior walls of the Demised Premises provided (a) the Equipment shall be located in a position so that it is not visible from the front of the Shopping Center, (b) the installation of the Equipment will not adversely affect the structural integrity or waterproofing of the roof, and (c) Tenant obtains all governmental permits and approvals required for such installation, maintenance and operation of the Equipment. Provided Landlord previously furnishes Tenant with a copy of Landlord's roof warranty and the name and telephone number of Landlord's roofer, Tenant's installation of said antennae shall not be performed in a manner which will void said roof warranty and the provisions of Section 12.1 below are hereby incorporated herein by reference. Tenant shall be responsible for such Equipment as if the same were inside the Demised Premises and shall be responsible for all costs resulting solely from the presence of the Equipment (as reasonably determined by a third party expert acceptable to both Landlord and Tenant) that are incurred by Landlord in performing its obligations under Section 8.2. Landlord shall cooperate with Tenant in obtaining all necessary governmental permits and approvals for Tenant's installation and maintenance of the Equipment. Tenant shall not lease the Equipment or any of the service capacity of the Equipment to third parties not occupying the Demised Premises.

9.3 All repairs, alterations, replacements, other improvements or installations made to or upon the Demised Premises which are so attached to the realty that the same shall be by law deemed to be a part of the realty shall (subject, however, to the provisions of Section 9.1 above and the provisions of the following sentence) be the property of Landlord and remain upon and be surrendered with the Demised Premises

as a part thereof upon the expiration or other termination of the term of this lease. Notwithstanding the foregoing, all trade fixtures, portable lighting fixtures, portable heating equipment, portable air-conditioning equipment (other than ducts), the Equipment and signs, whether by law deemed to be a part of the realty or not, installed at any time or times by Tenant or any person claiming under Tenant (at the sole cost and expense of Tenant or such other person without any contribution from or reimbursement by Landlord and which are not replacements of property installed by Landlord) shall remain the property of Tenant or persons claiming under Tenant and may be removed by Tenant or any person claiming under Tenant at any time or times during the term of this lease.  Tenant shall repair any damage to the Demised Premises occasioned by the removal by Tenant or any person claiming under Tenant of any property from the Demised Premises, except for necessary minor holes caused by nails, screws or other fasteners and other minor openings and unavoidable minor damage to plaster, sheetrock and painted surfaces resulting therefrom.  Any personal property of Tenant remaining in the Demised Premises ten (10) days after expiration of the term and delivery of possession of the Demised Premises to Landlord shall be deemed abandoned and may be disposed of by Landlord and Landlord may retain any proceeds of any sale thereof by Landlord hereunder unless Tenant shall have been denied access to the Demised Premises for purposes of removing such personal property therefrom.

9.4  Tenant shall procure, at Tenant's sole cost and expense, all necessary governmental permits before making any repairs, alterations, other improvements or installations to or upon the Demised Premises.  Landlord shall cooperate with Tenant in obtaining such permits.  Tenant agrees to save harmless and indemnify Landlord from any and all injury, loss, claims or damage to any person or property occasioned by or arising out of the doing of any such work.

9.5  Tenant shall permit no mechanic's, materialman's or other lien against the Demised Premises or property of which the Demised Premises are a part in connection with any materials, labor or equipment furnished, or claimed to have been furnished, to or for Tenant or any person claiming under Tenant; except, however, that if any such lien shall be filed against the Demised Premises or property of which the Demised Premises are a part Tenant shall cause the same to be discharged, provided, however, that if Tenant desires to contest any such lien it may do so as long as the enforcement thereof is stayed, but in any event Tenant shall either (i) cause any such lien to be discharged of record within ten days after written request of any mortgagee (or of Landlord because of any requirements of any mortgagee or prospective mortgagee), or (ii) cause such lien to be transferred to surety or cash bond.

9.6  Landlord shall permit no mechanic's, materialman's or other lien against the Demised Premises or property of which the Demised Premises are a part in connection with any materials, labor or equipment furnished, or claimed to have been furnished, to or for Landlord or any other occupant of premises in the Shopping Center; if any such lien shall be filed against the Demised Premises or property of which the Demised Premises are a part Landlord shall cause the same to be discharged, provided that if Landlord desires to contest any such lien Landlord may do so as long as the enforcement thereof is stayed.

9.7  Prior to performing any renovation, repaving or other remodeling work to the Landlord's Parcel or the Common Areas, Landlord agrees to provide Tenant with at least sixty (60) days prior written notice as to the nature of the work involved, the dates on which such work is scheduled to be performed and the anticipated time schedule to complete such work.  Landlord agrees to use commercially reasonable efforts to minimize interruption of Tenant's business operations during any such renovation or remodeling work.  If any work requires the removal of any of Tenant's signs, Landlord shall remove and reinstall said signs at Landlord's sole cost and expense.  If any of Tenant's signs are so removed, Landlord agrees to provide a temporary sign for Tenant at Landlord's sole cost and expense which sign shall be as large as and as visible from Commercial Way and the Common Areas as the sign which had been removed.

9.8  Notwithstanding any provision of this Lease to the contrary, Tenant shall not perform, nor permit to be performed, nor be obligated to perform, any construction, improvements, alterations repairs, replacements or maintenance to any portion of the Landlord's Parcel that: (i) could interfere with Toys' use and

occupancy of the TRU Site or the rights, benefits, privileges and easements, now or hereafter appurtenant thereto, during the months of October, November or December (other than emergency repairs to the Demised Premises or utilities serving the Demised Premises), without the prior written consent of Landlord, which Landlord may grant or deny in its sole and unfettered discretion, reasonably or unreasonably exercised; (ii) cause any obstruction to the visibility of any signage pylon on the Landlord's Parcel or on the TRU Site or any signage on the improvements located on the TRU Site; (iii) cause the Demised Premises to be anything other than a one story building, (iv) cause the Demised Premises to exceed a maximum height of thirty-five (35') feet as measured from the finished floor level to the highest point on the Demised Premises (inclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs and antennae), or (v) cause the floor area of the Demised Premises to increase.

## ARTICLE X

**FIRE AND OTHER CASUALTY**

10.1 If the Demised Premises or any part thereof or any part of the Common Areas shall be damaged or destroyed by fire, the elements, the act of any public authority or other casualty, then Tenant shall give notice thereof to Landlord and, except as hereinafter otherwise provided, Landlord shall, promptly thereafter, repair or restore the Demised Premises and the Common Areas to substantially the same condition they, respectively, were in immediately prior to such casualty, provided that Landlord shall have no obligation to repair or restore any improvements, installations or alterations made to the Demised Premises by Tenant or to repair or restore any of Tenant's fixtures or personal property. In no event shall Landlord be liable to Tenant by reason of any interference with Tenant's business arising by reason of Landlord's performance of its repair and/or rebuilding obligations with respect to the Demised Premises or the Common Areas necessitated by such casualty (except that Tenant shall have all of its enumerated rights set forth in this lease). If the damage to the Demised Premises or the Common Areas shall render the whole or any part thereof unsuitable for the use for which they were intended, a just proportion of the rent and all other amounts payable by Tenant pursuant to this lease, according to the nature and extent of the injury to Tenant's business, shall be suspended or abated until the fifteenth (15th) day after Landlord has substantially completed its repair and restoration obligation with respect to the Demised Premises and the Common Areas as set forth in this Section 10.1; rent and any such other amounts paid in advance for a period beyond the date on which the same were so rendered unsuitable for the use for which the same were intended shall be equitably apportioned and adjusted. If more than thirty percent (30%) of the ground floor area, in the aggregate, of all other premises in the Shopping Center shall, for any period, be closed for business as a result of such damage or destruction, then during any such period or periods no minimum rent or percentage rent shall be payable by Tenant under either Section 5.1 or Section 7.3, respectively, but, in lieu thereof, Tenant shall pay to Landlord, for such period, an amount equal to the lesser of either (i) the minimum rent which would have otherwise been payable by Tenant under Section 5.1 for said period or (ii) two percent (2%) of the Gross Sales for such period, payable monthly in arrears on or before the twentieth (20th) day after the end of each calendar month or fraction thereof included in such period. In addition, if Landlord shall fail to commence to repair or restore damage to the Demised Premises, Common Areas or damage to other premises in the Shopping Center as described in the previous sentence within one hundred twenty (120) days after the occurrence thereof or shall fail to complete the repair and restoration of such damage within one (1) year after the occurrence thereof then, in either such event, and prior to the commencement or completion thereof, as the case may be, Tenant may terminate this lease, at its election, by giving Landlord notice thereof and the term of this lease shall then terminate on the date specified therefor in such notice. Furthermore, if as a result of such damage or destruction for a period of more than thirty (30) consecutive days (when Tenant is open and operating for business in the Demised Premises):

(i) the Parking Areas shall cease to have reasonably satisfactory access for pedestrians and motor vehicles to and from Commercial Way, or

(ii) there shall cease to be reasonably satisfactory access for pedestrians between the Parking Areas and the main customer entrance of the Demised Premises, or

(iii) there shall cease to be reasonably satisfactory access for trucks to and from the service door(s) of the Demised Premises,

then Tenant may, if Tenant shall so elect, terminate the term of this lease, by giving Landlord written notice of the exercise of such election and the term of this lease shall then terminate on the date specified in such notice. Wherever in this lease it is provided that rent and any such other amounts shall be suspended or abated for any period according to the nature and extent of the injury to Tenant's business, Tenant's sales figures for comparable periods shall be considered, together with all other evidence. All insurance proceeds or damages recovered on account of any damage or destruction by fire, the elements, the act of any public authority or other casualty shall be made available to Landlord for the payment of the cost of the aforesaid repair or restoration.

10.2  It is agreed and understood that (1) if during the fourth (4th) semiannual period preceding the expiration of the term of this lease the Demised Premises shall be damaged or destroyed to the extent of twenty percent (20%) or more of their replacement cost, or (2) if during the third (3rd) semiannual period immediately preceding the expiration of the term of this lease the Demised Premises shall be damaged or destroyed to the extent of fifteen percent (15%) or more of their replacement cost, or (3) if during the second (2nd) semiannual period preceding the expiration of the term of this lease the Demised Premises shall be damaged or destroyed to the extent of ten percent (10%) or more of their replacement cost, or (4) if during the semiannual period immediately preceding the expiration of the term of this lease the Demised Premises shall be damaged or destroyed to the extent of five percent (5%) or more of their replacement cost, then either Landlord or Tenant may, if either shall so elect, terminate the term of this lease, by notice to the other within thirty (30) days after such damage or destruction. If Landlord shall give such notice of termination at a time when Tenant shall have the right to exercise an election to extend the term of this lease for an extension period of at least five (5) years and if within fifteen (15) days after Tenant shall receive such notice of termination from Landlord Tenant shall exercise such election, then such notice of termination shall become void and of no force or effect. In the event of any termination of the term of this lease pursuant to the provisions of this Section 10.2, the termination shall become effective on the twentieth (20th) day after the giving of the notice of termination, a just proportion of the rent and all other amounts payable by Tenant pursuant to this lease, according to the nature and extent of the injury to the Demised Premises or the Common Areas, shall be suspended or abated until the time of termination, rent and any such other amounts shall be apportioned as of the time of termination and proper adjustments shall be made, and neither Landlord nor Tenant shall be obligated to repair or restore any damage or destruction caused by such fire or other casualty.

10.3  From the date the Demised Premises are delivered to Tenant (the "Delivery Date") until expiration of the term of this lease, Landlord shall maintain with respect to the Demised Premises so-called "all risk" property insurance and flood coverage but excluding terrorism coverage provided that Landlord shall have no obligation to insure any improvements, installations or alterations to the Demised Premises made by Tenant or any fixtures or personal property of Tenant. Such insurance shall be in an amount equal to the full replacement value of the Demised Premises, except that such insurance may be written with a so-called eighty percent (80%) or ninety percent (90%) co-insurance clause, in which event sufficient insurance shall be carried so that the insured shall not be a co-insurer. ((Nothing herein contained, however, shall affect the obligations of Landlord, set forth in Section 10.1 above, to repair or restore the Demised Premises or other premises after damage or destruction by fire, the elements or other casualty). Such policies of insurance shall provide that no act or omission of any person named as insured thereunder shall invalidate the interest of, or be a defense against, any other person named as insured thereunder. Such insurance shall be written by insurance companies authorized to do business in the state wherein the Shopping Center is located having an A.M. Best rating of B+ or better and a financial size of at least VII or a comparable rating by another national rating organization if A.M. Best is no longer in existence. Landlord agrees that not less than ten (10) days prior to the Commencement Date and not less than ten (10) days prior to the expiration of each policy of such insurance Landlord shall deliver to Tenant certificates of such insurance or the renewals thereof, as the case may be. If the term of any policies of such insurance shall expire after the

termination of the term of this lease, then such policies shall be endorsed to release the interest of Tenant therein as of the date of such termination. Landlord agrees that such insurance shall cover not only the Demised Premises but also all improvements thereto and installations therein to the extent that such improvements and installations are customarily insurable as part of the realty and may be covered by Landlord's insurance but expressly excluding therefrom Tenant's merchandise, trade fixtures and other personal property. For the purposes of this Article X, such improvements and installations shall only be deemed "part of the realty" to the extent that Tenant has provided Landlord with a list of such improvements and installations and the costs thereof in sufficient specificity that would allow Landlord's insurer to insure such improvements and installations.

10.4  The annual premium paid upon the insurance Landlord is obligated to maintain pursuant to Section 10.3 is herein referred to as the "Annual Premium". Tenant shall pay the Annual Premium (including premiums for earthquake coverage and premiums for rental interruption insurance) to Landlord as part of the amount payable pursuant to and in accordance with Paragraph 10 of Schedule B of the Lease and after receipt by Tenant of the evidence required of Landlord under the immediately following sentence. Landlord shall submit to Tenant evidence of the Annual Premium in such detail as Tenant may reasonably require. If the insurance Landlord is obligated to maintain pursuant to Section 10.3 shall be included with insurance upon other premises then the Annual Premium shall be computed proportionately on a floor-area basis with all floor area covered by such insurance being deemed equal. The amount which Tenant is obligated to pay under this Section 10.4 shall not include any premiums payable as the result of any extra-hazardous or non-retail use in the Shopping Center or because all premises in the Shopping Center are not sprinklered or constructed and maintained in accordance with requirements of fire insurance underwriters or rating boards having jurisdiction for similar retail Shopping Centers or as the result of any improvements constructed by other occupants of the Shopping Center or as the result of any improvements (other than Common Areas and improvements constructed by Tenant) constructed after the Delivery Date or because any subsequent owner of the interest of Landlord in this lease shall not have the same insurance costs as Landlord due to differences in size, volume of business or similar reasons.

10.5  Landlord and Tenant each hereby waive the provisions of California Civil Code Sections 1932(2), 1933(4) and any other applicable existing or future law permitting the termination of a lease agreement in the event of damage or destruction under any circumstances other than as provided in this Article X.

## ARTICLE XI

EMINENT DOMAIN          11.1  If after the execution of this lease and prior to the expiration or other termination of the term of this lease the whole of the Demised Premises shall be appropriated by right of eminent domain, then the term of this lease shall cease as of the time the fee simple interest shall be vested in the taking authority and rent and all other payments under this lease shall be apportioned and adjusted as of the time of termination. Tenant shall have the right, at its election, to continue to occupy the Demised Premises, to the extent permitted by law, for all, or such part as Tenant may elect, of the period between the time of such appropriation and the time when physical possession of the Demised Premises shall be taken, subject to the provisions of this lease insofar as the same may be applicable to such occupancy by Tenant, but the amount, if any, charged to Tenant by the taking authority or its assigns for rent or use and occupancy shall be deductible from the rent paid or payable by Tenant hereunder.

11.2  If by right of eminent domain or any other act of public authority:

(i)  a part of the Demised Premises shall be appropriated and if as a result thereof the ground floor area of the Demised Premises shall be reduced to less than ninety percent (90%) of the ground floor area thereof set forth in Schedule A of this lease, or

(ii)  a part of the Common Areas of the Shopping Center shall be appropriated and if as a result thereof (taking into account any prior appropriation of any portion of the Shopping Center) the Parking Areas (defined in Paragraph 2 of Schedule B) shall be reduced in size by twenty percent (20%) or more, or

(iii) the Parking Areas shall cease to have a satisfactory access for pedestrians and motor vehicles to and from Commercial Way, or

(iv) there shall cease to be satisfactory access for pedestrians between the Parking Areas and the main customer entrance of the Demised Premises, or

(v) there shall cease to be satisfactory access for trucks to and from the service door(s) of the Demised Premises, or

(vi) any part of the Demised Premises shall be appropriated during the last year of the term of this lease,

then Tenant may, if Tenant shall so elect, terminate the term of this lease, by giving Landlord notice of the exercise of such election within thirty (30) days after the receipt by Tenant of notice from Landlord of such appropriation. If by right of eminent domain any part of the Demised Premises shall be appropriated during the last year of the term of this lease, Landlord may, if Landlord shall so elect, terminate the term of this lease by giving Tenant notice of the exercise of such election within thirty (30) days after the receipt by Landlord of notice of such appropriation. If Landlord shall give such notice of termination at a time when Tenant shall have the right to exercise an election to extend the term of this lease an extension period of at least five (5) years and if within fifteen (15) days after Tenant shall receive such notice of termination from Landlord Tenant shall exercise such election, then such notice of termination shall become void and of no force or effect. In the event of a termination under the provisions of this Section 11.2, the termination shall be effective as of the time that physical possession of the premises so appropriated shall be taken and rent and all other payments pursuant to this lease shall be apportioned and adjusted as of the time of termination, but the amount charged by the taking authority or its assigns for rent or use and occupancy between the time of appropriation and the time of termination shall be deductible from rent and other charges paid or payable hereunder. If there shall be an appropriation by right of eminent domain and if the term of this lease shall not be terminated as aforesaid, then the term of this lease shall continue in full force and effect and Landlord shall, within a reasonable time after physical possession is taken of the premises appropriated, restore what may remain of the Demised Premises and of the Common Areas to substantially the same condition they, respectively, were in prior thereto, subject to reduction in size thereof. A just proportion of the rent and all other amounts payable by Tenant pursuant to this lease, according to the nature and extent of the injury to Tenant's business, shall be suspended or abated until the fifteenth (15th) day after what may remain of the Demised Premises and the Common Areas shall be restored, as aforesaid, and thereafter a just proportion of the rent and any such other amounts, according to the nature and extent of the injury to Tenant's business, shall be suspended or abated for the balance of the term of this lease.

11.3   Landlord reserves to itself, and Tenant assigns to Landlord, all rights to damages accruing on account of any appropriation by eminent domain or by reason of any act of any public authority for which damages are payable. Tenant agrees to execute such instruments of assignment as may be reasonably requested by Landlord in any petition for the recovery of such damages, and to turn over to Landlord any damages that may be recovered in any such proceeding. It is agreed and understood, however, that Landlord does not reserve to itself, and Tenant does not assign to Landlord, any damages payable for trade fixtures installed by Tenant or any person claiming under Tenant at the sole cost and expense of Tenant or such other person or any damages which are considered "special damages" to Tenant, it being understood and agreed that the term "special damages" as used in this sentence shall not be construed to include any damage to Tenant arising solely from Tenant's loss of its leasehold interest herein as the result of any appropriation by eminent domain or any act of any public authority for which damages are payable. If any appropriation by right of eminent domain of any portion of the Demised Premises shall result in the termination of the term of this lease as above provided and if applicable law shall not permit a separate application therefor by Tenant, Landlord agrees that Tenant may participate in the award and present evidence of the amount expended by Tenant for leasehold improvements made by Tenant to the realty and Landlord shall cooperate with Tenant in connection therewith. If the court or public authority separately designates values for leasehold improvements which Tenant has installed in the

Demised Premises, Landlord shall pay to Tenant from the amount awarded to it as damages therefor an amount equal to the portion of the award which is designated by the court or public authority for leasehold improvements made by Tenant to the realty. However, if any appropriation by right of eminent domain of any portion of the Demised Premises results in the termination of this lease as provided herein and if the court or public authority does not breakdown the award to Landlord by designating values for leasehold improvements made by Tenant to the realty, Landlord shall pay to Tenant from the amount awarded to it as damages therefor an amount equal to {one half (1/2) of} the unamortized cost to Tenant of any leasehold improvements made by Tenant to the realty performed in connection with an expansion or remodel of the Demised Premises (excluding Tenant's trade fixtures, merchandise and other personal property), and in the event that any appropriation of the Demised Premises shall not result in the termination of the term of this lease as above provided and if applicable law shall not permit a separate application therefor by Tenant, Landlord shall pay to Tenant from the amount awarded to it as damages therefor an amount equal to {one half (1/2) of }the unamortized cost to Tenant of any leasehold improvements made by Tenant to the realty performed in connection with an expansion or remodel of the Demised Premises (excluding Tenant's trade fixtures, merchandise and other personal property) which shall not remain or be restored in the part of the Demised Premises not taken. The unamortized cost to Tenant of any leasehold improvement made by Tenant to the realty shall be determined in accordance with the straight-line method of amortization and the life expectancy of such improvement used by Tenant for federal income tax purposes. As used hereinbefore, "the cost to Tenant of any leasehold improvements" shall mean the actual cost to Tenant of making such improvements less any contribution thereto or reimbursement thereof made by Landlord to Tenant, including, without limitation, reimbursement effected by deductions from rent.

11.4 Landlord and Tenant each hereby waive the provisions of California Code of Civil Procedure Section 1265.130 and any other applicable law or future law allowing either party to petition for a termination of this lease upon a partial taking of the Demised Premises and/or the Common Areas under any circumstances other than as provided in this Article XI.

## ARTICLE XII

INDEMNIFICATION

12.1 Tenant shall save Landlord harmless from, and indemnify Landlord against, any and all injury, loss or damage, or claims for injury, loss or damage, of whatever nature, to any person or property (a) caused by or resulting from any breach of a covenant of this lease by Tenant, (b) caused by or resulting from any act, omission or negligence of Tenant or any subtenant or concessionaire of Tenant or any employee, contractor, invitee or agent of Tenant or any subtenant or concessionaire of Tenant, or (c) howsoever and by whomsoever caused, that occurs within the Demised Premises during the term of this lease, excepting claims described in this clause (c) to the extent they are caused by the negligent acts or omissions of Landlord or its employees, contractors, invitees or agents. It is a condition of this save harmless and indemnification that Tenant shall receive prompt notice of any such claim against Landlord.

12.2 Landlord shall save Tenant harmless from, and indemnify Tenant against, any and all injury, loss or damage, or claims for injury, loss or damage, of whatever nature, to any person or property caused by or resulting from any breach of a covenant of this lease by Landlord, any act, omission or negligence of Landlord or its employees, contractors, invitees or agents. It is a condition of this save harmless and indemnification that Landlord shall receive prompt notice of any such claim against Tenant.

12.3 The provisions of this Article XII shall be subject to the provisions of Section 15.1 below.

12.4 Except as specifically provided below, during the term of this lease Tenant shall maintain a policy of commercial general liability insurance with respect to the Demised Premises having a limit of Three Million Dollars ($3,000,000.00) and such insurance shall be written on an occurrence basis. Landlord shall be named as an additional insured under such policy. Tenant shall, upon request: (a) deliver certificates of such insurance to Landlord and give Landlord not less than ten (10) days' notice of cancellation or expiration thereof, and (b) pay the amount of any so-

called deductible applicable to any claim under such policy involving Landlord and Tenant. Tenant shall not be required to carry the foregoing coverage if the aggregate net worth of Tenant and business organizations affiliated with Tenant (as determined by generally accepted accounting principles) is then greater than One Hundred Million Dollars ($100,000,000.00), so long as (i) such business organizations affiliated with Tenant maintain a program of self insurance or a self insured retention covering Tenant while Tenant is affiliated with such organizations, and (ii) Tenant provides written certification from such affiliated business organization(s) meeting the minimum net worth requirement set forth in this clause (b) that Tenant is covered under the applicable self-insurance program.

12.5  Notwithstanding anything to the contrary set forth in this lease, Tenant agrees that all of the furnishings, fixtures, equipment, merchandise and other personal property of Tenant and of all persons claiming under Tenant which, during the term of this lease or any occupancy of the Demised Premises by Tenant or anyone claiming under Tenant, may be on the Demised Premises shall be at the sole risk and hazard of Tenant.

## ARTICLE XIII

DEFAULT

13.1  If (i) Tenant shall default in the payment of rent or any other sum of money payable by Tenant to Landlord under this lease and if Tenant shall fail to cure such default within ten (10) days after receipt of notice of such default from Landlord, or (ii) Tenant shall default in the performance or observance of any agreement or condition in Paragraph 5 of Schedule B of this lease, and shall fail to cure such default within thirty (30) days after receipt of notice of such default from Landlord specifying such default (provided, however, if this default is committed by a party other than Tenant, then Tenant shall not be in default hereunder if within such thirty (30) day period Tenant commences to cure such default by instituting appropriate legal or equitable action against the offending occupant(s) of the Demised Premises and thereafter prosecutes the action and the curing of such default to completion with due diligence), then Landlord may, without waiving any claim for breach of agreement, and in addition to all other rights and remedies set forth in this lease, at law or in equity (but subject to the limitations set forth in Section 13.2(B) below), (a) send notice to Tenant of the termination of the term of this lease, and on the fifth (5th) day next following the date of the sending of such notice, the term of this lease shall terminate, Tenant hereby waiving all rights of redemption, or (b) maintain Tenant's right to possession of the Demised Premises, in which case this lease shall continue in effect whether or not Tenant has vacated the Demised Premises; in such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this lease, at law or in equity, including the right to recover all minimum rent and other charges as they become due.

13.2  (A)  In case of any such termination under clause 13.1(i) above, Tenant shall indemnify Landlord against all loss of rent and other payments provided herein to be paid by Tenant to Landlord between the time of the subject breach and the expiration of the term of this lease by conclusion of the agreed term of years specified in Article IV hereof when and as such rent and other amounts would have become due hereunder, and Tenant agrees that Landlord may but shall not be required to obtain one (1) judgment for the full amount of all such rent and other amounts less the amount of any loss of such rent and other amounts that Tenant proves could reasonably be avoided and shall not be required to sue each month, or from time to time, for such rents and other amounts, but that Tenant shall be required to pay such judgment, in installments, at the respective time such rent and other amounts would have become due under this lease thereafter if this lease had not then been terminated under Section 13.1 (provided, however, that if Landlord obtains a final, unappealable judgment from a court of competent jurisdiction as a result of Tenant's default pursuant to clause 13.1(ii) above, or for any other default under this lease by Tenant other than under Section 13.1(i) above, then any such judgment shall not be paid over the balance of the term of this lease, but shall be payable by Tenant as required by the court issuing such judgment).  It is understood and agreed that at the time of such termination or at any time thereafter Landlord may rent the Demised Premises, for a term which may expire before or after such expiration of the term of this lease specified in Section 4.1 hereof, without releasing Tenant from any liability

whatsoever, that Tenant shall be liable for any expenses incurred by Landlord in connection with any such reletting, including, reasonable attorneys' fees and reasonable brokers' fees, costs of removal (including the repair of any damage caused by such removal) and storage (or disposal) of Tenant's personal property, equipment, fixtures, alterations and any other items which Tenant is required under this lease to remove but does not remove, and that any monies collected from any reletting shall be applied first to the foregoing expenses and then to payment of rent and all other payments due from Tenant to Landlord.

(B) Landlord acknowledges that its rights to damages or payments from Tenant in the event of a termination of this Lease due to Tenant's default under Section 13.1 above are set forth in Section 13.2(A) above, and to the extent that Section 1951.2 of the California Civil Code grants Landlord additional or different rights to damages or payments upon such a termination of this Lease, Landlord hereby waives such additional or different rights. Notwithstanding anything to the contrary set forth herein, Landlord in all events shall have the benefit of California Civil Code Section 1951.4 (Landlord may continue lease in effect after Tenant's breach and abandonment and recover rent as it becomes due, if Tenant has right to sublet or assign, subject only to reasonable limitations). Except as expressly set forth to the contrary in this lease, with respect to any breach or default under this lease, each of Landlord and Tenant has the benefit of all rights and remedies available at law and equity.

13.3   After any assignment of Tenant's interest in this lease Landlord shall not exercise any rights or remedies under this Article XIII on account of any default in payment of any rent or other sum of money unless Landlord shall give notice to the tenant named herein, as well as the tenant in possession, of such default and the opportunity to cure each such default within the period of time after such notice as is provided in Section 13.1 above.  After such notice, if the term of this lease shall be terminated pursuant to the provisions of this Article XIII or pursuant to bankruptcy, the tenant named herein shall not be liable for the payment of any rent or for the performance or observance of any agreements or conditions to be performed or observed after the date of such termination unless about the time of such termination Landlord shall have offered to the tenant named herein a lease of the balance of the term of this lease upon the provisions of this lease contained.  If the Tenant shall accept such offer (i) Landlord shall have no obligation to commence litigation to evict the tenant in possession from the Demised Premises but Landlord shall, upon request, assign to the Tenant its right and cause of action so to evict, and the Tenant may proceed in the Tenant's name or in Landlord's name so to evict, at the Tenant's sole cost, and Landlord will cooperate with the Tenant in so doing, (ii) the Tenant shall cure all monetary defaults of the tenant-in-possession within thirty (30) days after receipt of notice thereof from Landlord, and (iii) the Tenant shall cure all non-monetary defaults of the tenant-in-possession of which the Tenant  shall have received notice from Landlord as soon as reasonably possible after regaining possession of the Demised Premises.

13.4   Landlord shall not have any lien, for the performance of any obligations of Tenant, upon any fixtures, machinery, equipment, goods, wares, merchandise or other personal property, owned or leased by Tenant or any subtenant or occupant of the Demised Premises, and Landlord hereby expressly waives the provisions of any law giving to Landlord such a lien.  However, the provisions of this Section 13.4 shall not be deemed to preclude Landlord's right to collect on an enforceable judgment which Landlord has obtained against the Tenant.

13.5   If any person to whom Tenant shall not then be paying rent under this lease shall demand payment of rent from Tenant, or any other amount payable by Tenant under this lease, alleging his or its right to receive such rent or other amount as a result of a transfer of Landlord's interest in this lease or otherwise, Tenant shall not be obligated to honor such demand unless Tenant shall receive written instructions to do so from the person to whom Tenant shall then be paying rent or shall otherwise receive evidence satisfactory to Tenant of the right of the person making the demand. The withholding of rent, or any other amount payable by Tenant under this lease, by Tenant pending the determination of the right of the party making the demand shall not be deemed to be a default on the part of Tenant, provided that Tenant is making

such payments to the party that Tenant reasonably believes is the then current landlord under this lease.

13.6  If either party shall be in default of any obligation to make any payments to the other party under this lease for more than ten (10) days after receipt of notice thereof from the other party, then thereafter interest shall accrue upon such payment, and be payable, at an annual rate equal to the so-called base or prime rate then announced, from time to time, by Citibank plus two percent (2%) per year (the "Default Rate").

## ARTICLE XIV

**SELF-HELP**

14.1  If Tenant shall default in the performance or observance of any agreement or condition in this lease contained on its part to be performed or observed, other than an obligation to pay money, and shall not cure such default within thirty (30) days after notice from Landlord specifying such default (or if such default cannot by its nature be cured within such thirty (30) day period, shall not within such period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Landlord may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of Tenant, and any amount paid or any contractual liability incurred by Landlord in so doing shall be deemed paid or incurred for the account of Tenant, Tenant agreeing to reimburse Landlord therefor.  Landlord may cure any such default as aforesaid prior to the expiration of said thirty (30) day period, but after notice to Tenant, if the curing of such default prior to the expiration of said thirty (30) day period is reasonably necessary to protect the real estate or Landlord's interest therein or to prevent injury or damage to persons or property.  If Tenant shall fail to reimburse Landlord upon demand for any amount paid for the account of Tenant hereunder, such amount shall be added to and become due as part of the next payment of rent due hereunder, together with interest accrued thereon from the date of expenditure at the Default Rate (defined in Section 13.6 above).

14.2  If Landlord shall default in the payment, performance or observance of any agreement or condition in this lease contained on its part to be paid, performed or observed or shall default in the payment of any tax or other charge which shall be a lien upon the Demised Premises or in the payment of any installment of principal or interest upon any mortgage which shall be prior in lien to the lien of this lease (unless Tenant shall have entered into a reasonably satisfactory subordination, non-disturbance and attornment agreement with the mortgagee under such mortgage, in which case this Section 14.2 shall not apply), and if Landlord shall not cure such default within thirty (30) days after notice from Tenant specifying the default (or, if such default cannot by its nature be cured within such thirty (30) day period, shall not within such period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord, Landlord agreeing to reimburse Tenant therefor.  Tenant may cure any such default as aforesaid prior to the expiration of said thirty (30) day period, but after notice to Landlord, if the curing of such default prior to the expiration of said thirty (30) day period is reasonably necessary to protect the Demised Premises or Tenant's interest therein or to prevent injury or damage to persons or property or to Tenant's business.  If Landlord shall fail to reimburse Tenant within thirty (30) days of demand for any amount paid for the account of Landlord hereunder or any other amount owed to Tenant under this lease, such amount may be deducted by Tenant from the next or any succeeding payments of minimum rent due hereunder, together with interest accrued thereon from the date of expenditure at the Default Rate (defined in Section 13.6 above).

14.3  Landlord specifically waives its rights under paragraph 3 of Section 1161 of the California Code of Civil Procedure.  Such waiver shall not affect Landlord's rights pursuant to Section 13.1 or Section 14.1 above.

## ARTICLE XV

**WAIVER OF**

15.1  Each of Landlord and Tenant hereby releases the other, to the extent of its

SUBROGATION

insurance coverage, from any and all liability for any loss or damage caused by fire or any of the extended coverage casualties or any other casualty insured against, even if such fire or other casualty shall be brought about by the fault or negligence of the other party or by any person claiming under such other party, provided, however, that this release shall be in force and effect only with respect to loss or damage occurring during such time as the releasor's policies of fire and extended coverage insurance shall contain a clause to the effect that this release shall not affect such policies or the right of the releasor to recover thereunder. Each of Landlord and Tenant agrees that its fire and extended coverage insurance policies shall include such a clause so long as the same is obtainable. For purposes of this Section 15.1, if Tenant elects to self insure its personal property Tenant shall be deemed to maintain insurance equal to the replacement value of its personal property in the Demised Premises and shall release Landlord to the extent of such amount. This Section 15.1 shall not limit the effectiveness of Section 12.5.

15.2 Except as provided in Section 12.5 and Section 15.1 above, nothing else in this lease contained shall be deemed to release either party hereto from liability for damages resulting from the fault or negligence of such party or its agents or from responsibility to make repairs necessitated thereby or necessitated by any default of such party under this lease.

## ARTICLE XVI

MORTGAGE
SUBORDINATION

16.1 Tenant shall, upon the request of Landlord, in writing, subordinate the lien of this lease from time to time to the lien of any future mortgage to a bank, insurance company, credit union, labor union, pension fund, university or similar institution, irrespective of the time of execution or time of recording of such mortgage, provided the holder of such mortgage shall enter into an agreement with Tenant, in recordable form, that in the event of foreclosure or other right asserted under such mortgage by the holder or any assignee thereof, this lease and the rights of Tenant hereunder shall continue in full force and effect and shall not be terminated or disturbed except in accordance with the provisions of this lease. Tenant shall, if requested by the holder of any such mortgage, be a party to such agreement and shall agree, in substance, that if the mortgagee or any person claiming under such mortgage shall succeed to the interest of Landlord in this lease Tenant shall recognize such mortgagee or person as its Landlord under the terms of this lease. Tenant shall, upon the request of Landlord, execute, acknowledge and deliver any and all instruments necessary to effectuate, or to give notice of, such subordination, provided such instruments do not alter the terms of this lease. The word "mortgage" as used herein includes mortgages, deeds of trust and similar instruments and any modifications, consolidations, extensions, renewals, replacements or substitutes therefor.

16.2 Landlord agrees that neither the Landlord's Parcel, nor the construction thereof, nor any expansion thereof, shall be financed by, or subject to, any so-called tax increment financing, economic development or industrial revenue bonds or similar debt instruments, or any security interest given in connection therewith, which shall, pursuant to any governmental laws, ordinances or regulations, require or impose (i) any restriction, condition or limitation whatsoever upon or with respect to any expenditures which may be made by Tenant and/or any business organization affiliated with Tenant or (ii) any obligation to file any reports or returns with respect thereto.

## ARTICLE XVII

ASSIGNMENT AND
SUBLETTING

17.1 Notwithstanding any assignment of Tenant's interest in this lease, or any subletting of the whole or any part of the Demised Premises, Tenant shall remain primarily liable for the performance of all agreements of Tenant hereunder, except as expressly otherwise provided in Section 13.3. No consent from Landlord shall be necessary with respect to any such assignment or subletting.

17.2 During the term of this lease, Tenant agrees that Tenant will not assign its interest in this lease, or sublet more than twenty-five percent (25%) of the floor area, in the aggregate, of the Demised Premises, to any person or business organization without first giving Landlord notice of the intended assignment or subletting and the intended date thereof and the name of the business organization involved and the effective date of the intended assignment or subletting and the amount of the unamortized cost hereinafter referred to. If within thirty (30) days after the giving of such notice by Tenant to Landlord of such intended assignment or subletting Landlord shall give notice to Tenant

that Landlord elects to terminate the term of this lease as of said intended date of said assignment or subletting then the term of this lease shall terminate on said intended date as if said intended date were the date originally fixed herein for the termination hereof. In the event that Landlord shall terminate this lease pursuant to this Section 17.2 then, simultaneously with the sending of notice thereof to Tenant, Landlord shall pay to Tenant an amount equal to the product of the cost to Tenant of improvements made to the Demised Premises by Tenant, from time to time, multiplied by a fraction the numerator of which is one hundred twenty (120) minus the number of months between the date of the making of such improvements and the date of termination of the term pursuant to this Section and the denominator of which is one hundred twenty (120).

17.3  Notwithstanding anything in this lease contained to the contrary, which provisions shall in no way limit the provisions of this Section 17.3, Tenant may, at any time, and without permitting Landlord the election to terminate the term of this lease pursuant to Section 17.2 assign its interest in this lease or sublet the whole or any part of the Demised Premises without any such notice or consent to (i) any business organization affiliated with Tenant, (ii) any business organization resulting from the consolidation or merger of Tenant with any other business organization or organizations, or (iii) any business organization which alone or together with affiliated business organizations shall acquire all or substantially all of the store operations of Tenant in the Santa Cruz metropolitan area

## ARTICLE XVIII

INTERPRETATION

18.1  It is agreed that if any provision of this lease or the application of any provision to any person or any circumstance shall be determined to be invalid or unenforceable, such determination shall not affect any other provisions of this lease or the application of such provisions to any other person or circumstance, all of which other provisions shall remain in full force and effect.  It is the intention of the parties hereto that if any provision of this lease is capable of two constructions one of which would render the provision valid, the provision shall have the meaning which renders it valid.

SUCCESSORS AND ASSIGNS

18.2  The words "Landlord" and "Tenant" and the pronouns referring thereto, as used in this lease, shall mean, where the context requires or admits, the persons named herein as Landlord and as Tenant, respectively, and their respective heirs, legal representatives, successors, assigns and subtenants, irrespective of whether singular or plural, or masculine, feminine or neuter.  The agreements and conditions in this lease contained on the part of Landlord to be performed and observed shall be binding upon Landlord (including if Landlord is a nominee trust, its trustees and beneficiaries) and its heirs, legal representatives, successors and assigns and shall inure to the benefit of Tenant and its successors and assigns, and the agreements and conditions on the part of Tenant to be performed and observed shall be binding upon Tenant and its successors and assigns and shall inure to the benefit of Landlord and its heirs, legal representatives, successors and assigns.  If either party shall be more than one person or entity, the obligations of such party hereunder shall be joint and several.

DELAYS

18.3  In any case where either party hereto is required to do any act (other than make a payment of money), delays caused by or resulting from Act of God, war, civil commotion, fire, the elements or other casualty, labor difficulties, general shortages of labor, materials or equipment, or other causes beyond such party's reasonable control, shall not be counted in determining the time when the performance of such act must be completed, whether such time be designated by a fixed time, a fixed period of time, or "a reasonable time". The provisions of this Section 18.3, however, shall not apply to the dates set forth in Articles IV, X and XI above.

HOLDING OVER

18.4  Tenant shall vacate the Demised Premises and deliver possession of the Demised Premises to Landlord in the condition required by this lease no later than the expiration or other termination of the term of this lease.  If Tenant or any person claiming under Tenant shall remain in possession of the Demised Premises or any part thereof after the expiration or other termination of the term of this lease without any agreement in writing between Landlord and Tenant with respect thereto, the person remaining in possession shall, prior to acceptance of rent by Landlord, be deemed a tenant at sufferance, and, after acceptance of rent by Landlord, the person remaining in possession shall be deemed a tenant from month to month subject to the provisions of this lease insofar as the same may be made applicable to a tenancy from month to month.

WAIVERS

18.5  No provisions of this lease shall be deemed waived by a party unless such waiver is in a writing signed by such party.  Failure of either party to complain of any act or omission on the part of the other party, no matter how long the same may continue, shall not be deemed to be a waiver by such party of any of its rights hereunder.  No waiver by either party at any time, express or implied, of any breach of any provision of this lease shall be deemed a waiver of a breach of any other provision of this lease or a consent to any subsequent breach of the same or any other provision.  Landlord's acceptance of any payments of rent due under this lease shall not be deemed a waiver of any default by Tenant under this lease (including Tenant's recurrent failure to timely pay rent) other than Tenant's nonpayment of the accepted sums, and no endorsement or statement on any check or payment or in any letter or document accompanying any check or payment shall be deemed an accord and satisfaction.  If any action by either party shall require the consent or approval of the other party, the other party's consent to or approval of such action on any one or more occasions shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion.  Any and all rights and remedies which either party may have under this lease or by operation of law, either at law or in equity, upon any breach shall be distinct, separate and cumulative and shall not be deemed inconsistent with each other, and no one of them, whether exercised by such party or not, shall be deemed to be in exclusion of any other.  Any two or more or all of such rights and remedies may be exercised at the same time.  Without limiting the generality of the foregoing, if any restriction contained in this lease for the benefit of either party shall be violated, such party, without waiving any claim for breach of agreement against the other party, may bring such proceedings as it may deem necessary, either at law or in equity, in its own name or in the name of the other party, against the person violating such restriction.

DISPUTES

18.6  It is agreed that if at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other party under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", such payment not being regarded as a voluntary payment, and there shall survive the right on the part of such party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of such party to pay such sum or any part thereof, such party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this lease together with interest thereon from the date of payment at the Default Rate.  If at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them under the provisions hereof, the party against whom the obligation to perform the work is asserted may perform such work and pay the cost thereof "under protest", the performance of such work in no event being regarded as a voluntary performance, and there shall survive the right on the part of such party to institute suit for recovery of the cost of such work.  If it shall be adjudged that there was no legal obligation on the part of such party to perform the same or any part thereof, such party shall be entitled to recover the cost of such work or the cost of so much thereof as such party was not legally required to perform under this lease together with interest thereon from the date of payment at the Default Rate.

QUIET ENJOYMENT

18.7  Landlord agrees that upon Tenant's paying the rent and performing and observing the agreements and conditions on its part to be performed and observed hereunder, Tenant shall and may peaceably and quietly have, hold and enjoy the Demised Premises and all rights of Tenant hereunder during the term of this lease without any manner of hindrance or molestation by persons claiming by, through or under Landlord.

NOTICES

18.8  Any notice, consent or approval provided for herein shall be deemed duly given by the sender thereof to the addressee thereof only if in writing and mailed to such addressee by registered or certified mail, postage prepaid and return receipt requested, or by sending the same via Federal Express or other nationally recognized overnight courier service which delivers only upon signed receipt of the addressee, at the "Notice Address" of such addressee and provides online tracking of delivery.  The time of the giving of any notice shall be the day of receipt thereof by the addressee or any agent of the addressee, except that in the event the addressee or such agent of the addressee shall refuse to receive any notice given above provided or there shall be no person available on the day of delivery thereof to receive such notice, the day of the giving of such notice shall be the day of such refusal or the time of such delivery (or, if such day is not a business day, the next succeeding business day), as the case may be.  The Notice

Address of Landlord shall be Redtree Properties, L.P. 1362 Pacific Avenue, Santa Cruz, California 95060, Attention: Doug Ley. The Notice Address of Tenant shall be 770 Cochituate Road, Framingham, Massachusetts 01701, Attention: Vice President-Real Estate and copies of default notices shall also be sent to 770 Cochituate Road, Framingham, Massachusetts 01701, Attention: Legal Department, Vice President, Legal – Real Estate except invoices and reconciliations of additional rent should be sent to Tenant c/o The TJX Companies, Inc., Lease Administration Department, Route 500A-1, 770 Cochituate Road, Framingham, MA 01701. If the sender of any notice to any addressee shall have previously been given notice by said addressee of a change of address of said addressee, such changed address shall thereafter as to such sender be deemed the Notice Address of such addressee.

**COST AND EXPENSE**

18.9  Wherever in this lease provision is made for the doing of any act by any person it is understood and agreed that such act shall be done by such person at its own cost and expense unless a contrary intent is expressed.

**THIS INSTRUMENT**

18.10  This lease is transmitted for examination only and does not constitute an offer to lease, and this lease shall become effective only upon execution and unconditional delivery thereof by both parties hereto.  This instrument contains the entire and only agreement between the parties and no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect. This lease shall not be modified in any way except by a writing subscribed by both parties.  Electronic mails (e-mails) shall not constitute signed writings for the purpose of amending this lease.

**MARGINAL NOTES**

18.11  The marginal notes used as headings for various provisions of this lease are used only as a matter of convenience for reference and are not to be considered a part of this lease or used in determining the intent of the parties to this lease.

**BROKERS**

18.12  Each of Landlord and Tenant warrant and represent to the other that the only brokers it has dealt with in connection with this lease are Thad Logan of Retail West and Jackie Copriviza of JR Parrish (collectively, the "Named Broker"), as brokers and agents for Tenant and Landlord.  Landlord shall indemnify and hold harmless Tenant from and against all commissions, fees and expenses, of the Named Broker, and all claims therefor, in connection with this lease.  Each party shall indemnify and hold harmless the other party from and against all commissions, fees and expenses, and all claims therefor, in connection with this lease of, or by, any broker other than the Named Broker alleging he, she or it has dealt with the indemnitor party.

**INVESTMENT CREDIT**

18.13  If any investment tax credit, new jobs credit, or other tax benefit in the nature of any such tax credit shall be available with respect to any property subject to this lease installed by or at the expense of Tenant, Landlord hereby waives such tax benefit and agrees that Tenant may claim the same to the extent that the tax laws permit the same to be "passed" to Tenant. Tenant shall provide Landlord with such forms as Landlord shall be required to file to effect the "passing" of such tax benefit to Tenant.

**DISCLOSURE**

18.14  Landlord and Tenant agree to keep the business terms of this lease confidential and shall cause its agents to do so and Landlord, and Tenant and their respective agents shall not disclose same to any other person not a party hereto (except to a potential assignee of Landlord's or Tenant's interest in this lease or to a subtenant of Tenant) without the prior written consent of the other (including without limitation, posting the terms of this lease or any part thereof on the internet or in any mailing or providing a copy to third parties via electronic mail), provided that each party may disclose the terms hereof without the other party's prior consent (i) to its respective accountants, attorneys, employees, and others in privity with it such as mortgagees, professional advisors, prospective mortgagees or prospective purchasers of the Shopping Center or prospective purchasers of Tenant to the extent reasonably necessary for either party's business purposes without such prior consent but subject to the confidentiality requirement hereof, (ii) pursuant to government order or court order, if necessary in conjunction with legal action to enforce Landlord's or Tenant's obligations under this lease, or (iv) in connection with a sublease of the Demised Premises or assignment of the lease.

**LANDLORD'S LIABILITY**

18.15  The Tenant agrees to look solely to the Landlord's then equity interest in the Landlord's Parcel, any proceeds of any judgment, sale, insurance or eminent domain

award, and any rents, profits or income derived therefrom at the time owned, or in which the Landlord holds an interest as lessee, for recovery of any judgment from the Landlord; it being specifically agreed that neither the Landlord (whether the Landlord be an individual, partnership, firm, corporation, trustee or other fiduciary) nor any of the partners comprising the Landlord, nor any beneficiary of any trust of which any person holding the Landlord's interest as trustee nor any successor in interest to any of the foregoing shall ever be personally liable for any such judgment, or for the payment of any monetary obligation to the Tenant. Nothing this Section 18.15 shall be construed as a bar to any injunctive or other equitable remedy available to Tenant.

ACCESS

18.16  Landlord and its designees shall have the right to enter the Demised Premises upon at least twenty four (24) hours prior notice, (or, in an emergency situation, such shorter period as is reasonable in light of the exigency), at reasonable hours accompanied by an employee of Tenant to inspect the Demised Premises, to show the Demised Premises to prospective buyers, lenders or investors, and to make any repairs required of Landlord under this lease, and during the period commencing ninety (90) days prior to the end of the term, for the purpose of exhibiting the same to prospective tenants, all without unreasonably interfering with Tenant's business.

ESTOPPEL

18.17  At the request of any existing or prospective mortgagee of the Landlord's Parcel which has issued a mortgage loan commitment to Landlord then in effect with respect to the Landlord's Parcel, or any prospective purchaser of the Landlord's Parcel which has executed a Purchase and Sale Agreement with Landlord then in effect with respect thereof, Tenant shall, within fifteen (15) days after receipt of such request, but no more than an aggregate of three (3) times during any one calendar year, deliver to such existing or prospective mortgagee or purchaser, as the case may be, a letter addressed thereto stating, if such be the case:  (a) that this lease is unmodified and is in full force and effect, or referring to any modifications thereof, (b) the Commencement Date, (c) the latest dates to which minimum rent has been paid, (d) that Tenant is then in possession of the Demised Premises, (e) that no security deposit has been paid to Landlord by Tenant, (f) that Tenant has neither given to, nor received from, Landlord any notice of default under this lease that, to the knowledge of Tenant, then remains uncured, or, if any, specifying any such defaults, and (g) that Landlord's Delivery Obligations have been fulfilled or specifying those that have not been fulfilled.  If such request shall be received prior to the Commencement Date then, notwithstanding the foregoing, such letter may omit the statements referred to in clauses (b), (c) and (d) of the immediately preceding sentence.  Landlord shall, within fifteen (15) days after receipt of Tenant's request, but no more than three (3) times during any one calendar year, deliver an estoppel letter setting forth the status of the lease including the statements in (a), (b), (c) and (e) and whether or not there are any known defaults under the lease and if so specifying the particulars of such default.

AUTHORITY

18.18  The parties hereto hereby represent and warrant that the individuals executing this Agreement on behalf of Landlord and Tenant respectively are empowered and duly authorized to so execute this Agreement on behalf of Landlord and Tenant.

ATTORNEYS FEES

18.19  In the event of any suit, action, or proceeding at law or in equity, by either of the parties hereto against the other by reason of any matter or thing arising out of this lease, the prevailing party shall recover from the non-prevailing party a reasonable attorney's fees and costs (to be fixed by the Court) for the maintenance or defense of said action or suit, as the case may be.

NON-DISCRIMINATION

18.20  Tenant herein covenants by and for Tenant and Tenant's personal representatives and assigns and all persons claiming under Tenant or through Tenant that this Lease is made subject to the condition that there shall be no discrimination against or segregation of any person or of a group of persons on account of status, race, color, religion, creed, sex, marital status, age, ancestry or national origin in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the Demised Premises leased nor shall the Tenant or any person claiming under or through the Tenant establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, or vendees in the Demised Premises herein leased.

**RULES OF
CONSTRUCTION**

18.21  Landlord and Tenant specifically acknowledge that they have had the opportunity to consult counsel of their choosing with respect to the negotiation of this lease and the rights and obligations set forth herein.  Any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this lease or any schedules or exhibits hereto.

Remainder of Page Left Intentionally Blank.

18.22  This lease may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one contract.  Furthermore, any counterpart that is signed and returned by facsimile or electronic transmission shall be deemed properly signed and delivered.

**IN WITNESS WHEREOF**, the parties hereto have caused this lease to be executed under seal as of the day and year first written.

WITNESS:                                    **REDTREE PROPERTIES, L.P.**, a Delaware
                                            limited partnership

                                            By:     Havermawr Inc., a California
                                                    corporation, its general partner

_____             By_____
                                            Name: Douglas P. Ley
                                            Its President

WITNESSES AS TO BOTH:                        **MARSHALLS OF CA, LLC**, a Delaware
                                            limited liability company

_____             By _____
                                            Ann McCauley
                                            Secretary

_____             By _____
                                            Jeffrey Naylor
                                            Vice President

18.22  This lease may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one contract.  Furthermore, any counterpart that is signed and returned by facsimile or electronic transmission shall be deemed properly signed and delivered.

**IN WITNESS WHEREOF**, the parties hereto have caused this lease to be executed under seal as of the day and year first written.

WITNESS:

**REDTREE PROPERTIES, L.P.,** a Delaware limited partnership

By:  Havermawr Inc., a California corporation, its general partner

By: _____
Douglas P. Ley
Its President

WITNESSES AS TO BOTH:

**MARSHALLS OF CA, LLC,** a Delaware limited liability company

By_____
Ann McCauley
Secretary

By_____
Mary B. Reynolds
Vice President/Treasurer

## SCHEDULE A

### DESCRIPTION OF SHOPPING CENTER AND DEMISED PREMISES

The Demised Premises consist of a one-story building, and contains twenty seven thousand seven hundred ninety nine (27,799) square feet of ground floor area having a frontage and width of and such other dimensions as shown upon the plan attached hereto (the "Lease Plan"), and are a portion of the premises within the Shopping Center referred to hereinbelow labeled AREA A on the Lease Plan. The Lease Plan shall not be modified in any way without Tenant's consent, which may be withheld at Tenant's sole and absolute discretion. In addition, Tenant shall have the exclusive right to use certain service areas adjacent to the Demised Premises which contain an exterior loading dock and trash storage area for Tenant's delivery and removal activities and for Tenant's compactor, dumpster and/or trash receptacles. It is expressly understood and agreed that said service areas shall not be included in computing minimum rent pursuant to Section 5.1 of the lease or Tenant's Fraction or Tenant's Portion (defined in Section 6.1) for purposes of Article VI and Paragraph 10 of Schedule B or for purposes of calculating other charges due under this lease. Notwithstanding anything to the contrary contained in this lease, in no event shall minimum rent, additional rent or other charges due under this lease be based on the Demised Premises containing anything other than twenty seven thousand seven hundred ninety nine (27,799) square feet of floor area. Landlord agrees that the name of the Shopping Center shall not contain the trade name of any business operated in the Shopping Center.

The Demised Premises are situated within a Shopping Center, located at 17th Avenue (together with Commercial Way, herein collectively referred to as the "Main Streets") in Santa Cruz, California. The Shopping Center is the land, together with the buildings and other structures from time to time thereon, shown on the Lease Plan, and is more particularly described as follows:

### LEGAL DESCRIPTION

SITUATE IN THE SECTIONS 8 AND 9, TOWNSHIP 11 SOUTH, RANGE 1 WEST, MOUNT DIABLO MERIDIAN, SANTA CRUZ COUNTY, CALIFORNIA AND BEING a part of Parcels Two, Three, Four, Five and Six of the lands conveyed to Redtree Properties, L.P., a Delaware Limited Partnership by corporation grant deed dated December 23, 1986, and recorded December 29, 1986 in Book 4088 of Official Records at Page 848 Santa Cruz County Records and a part of the lands conveyed to Redtree Properties, L.P., a Delaware Limited Partnership by grant deed dated March 2,1992 and recorded March 10,1992 in Volume 3990 of Official Records at Page 42 Santa Cruz County Records and more particularly bounded and described as follows to wit;

BEGINNING at a station in the northeastern Line of a "PROPOSED ACQUISITION FOR STATE HIGHWAY PURPOSES" from which a set 112 inch iron pipe LS 5513 at an angle point in the southwestern boundary of the aforesaid Parcel Three (100.00 feet right of Engineer's Station 323+41.13 as said angle point is shown and delineated on map entitled "State Highway Right of Way Map S.Cr. 56 E Sheet R44B.16 (R44.14)" on file in the Office of the County Surveyor of the County of Santa Cruz) bears South 63°45' East 180.88 feet distant and from said iron pipe a found 6 inch by 6 inch concrete monument (119.62 feet right of Engineer's Station 327+84.61) as shown on said map bears North 69°38'35" West 344.04 feet distant;

THENCE FROM SAID POINT OF BEGINNING leaving said line of proposed acquisition North 65°48' East 284.85 feet; thence North 89°32'30" East 99.43 feet; thence North 65°48' East 163.35 feet to a "PROPOSED STREET WIDENING LINE FOR SEVENTEENTH AVENUE"; thence parallel with and 2.00 feet northwesterly measured at right angles from the northwestern line of Seventeenth Avenue South 6°03'45" West 215.63 feet to an intersection with the northwestern line of Seventeenth Avenue being the southeastern boundary of the aforementioned Parcel Five; thence along said line and boundary South 12°30'15" West 0.58 feet to the beginning of a curve from which an old found thickwall ½ inch iron pipe untagged bears along said line of Seventeenth Avenue and boundary South 12°30'15" West 36.50 feet distant; thence leaving said last mentioned line and boundary and along the proposed street widening line southwesterly on a tangent curve to the right with a radius of 20.00 feet through a central angle of 54°37'24" a distance of 19.07 feet to a point of reverse curvature; thence southwesterly on a curve to the left with a radius of 37.00 feet through a central angle of 59°09'37" a distance of 38.20 feet to a non tangent intersection with the northwestern boundary of the lands conveyed to John Mel and Kimberly S. Mel, husband and wife as joint tenants by grant deed dated August 14, 1981, and recorded August 19, 1981, in Book 3361 of Official Records at Page 307 Santa Cruz County Records from which a found old thickwall ½ inch iron pipe untagged at the northeastern corner of said lands of Mel bears North 75°08' East 27.14 feet distant; thence along said boundary of Mel South 74°08' West 73.12 feet to a found ¾ inch iron pipe untagged at the northwestern corner of said last mentioned lands; thence along the northwestern boundary of said lands, parallel with the northwestern line of Seventeenth Avenue, South 12°30'15" East (at 40.00 feet a found ½ inch iron pipe untagged at the southwestern corner of said lands of Mel) 51.53 feet to an intersection with the southwestern boundary of the aforementioned lands conveyed to Redtree Properties by grant deed recorded in Volume 4990 of Official Records at Page 42 Santa Cruz County Records from which a set ½ inch iron pipe tagged LS 5513 at the southeastern corner of said last mentioned lands in the northwestern line of Seventeenth Avenue bears South 72°54'45" East 88.50 feet distant; thence along said last mentioned boundary North 72°54'45" West 217.20 feet to the aforementioned set ½ inch iron

pipe LS 5513 at an angle point in the southwestern boundary of the aforesaid Parcel Three (100.00 feet right of Engineer's Station 324+41.13) thence leaving said last mentioned boundary and along the northeastern line of the proposed State Highway Right of Way North 63°45' West 180.88 feet to the place of beginning, and

CONTAINING 86,152 square feel a little more or less

ACCESS to freeway from this parcel is not permitted at any point along the boundary southeasterly of the point of beginning to the southeastern corner thereof.

SURVEYED AND COMPILED IN OCTOBER 1995 THRU APRIL 1996 BY BOWMAN & WILLIAMS, CONSULTING CIVIL ENGINEERS, FILE NO. 20958-5

**LEASE PLAN**

See attached.



## SCHEDULE B

## COMMON AREAS

1. No buildings or structures other than canopies attached to store buildings, lighting equipment and directional and other signs permitted by the provisions of this lease may be built in the Landlord's Parcel other than in the areas shown on the Lease Plan as building areas. Subject to the ability of Toys to obtain any and all required governmental permits, Tenant acknowledges that Toys has the right to place a sign on the exterior of the Demised Premises of the size and in the location shown on Schedule B-1 attached hereto.

2. The areas of the Shopping Center shown on the Lease Plan as parking areas shall at all times be maintained as Parking Areas. The expression "Parking Areas" means parking spaces and driveways and pedestrian sidewalks, walkways and footways and includes the areas shown as parking areas on the Lease Plan plus such other areas as Landlord shall from time to time designate as Parking Areas. The paved areas in the Shopping Center currently used for service roads or delivery areas or labeled SERVICE upon the Lease Plan shall be maintained during the term hereof as service roads and areas (the "Service Areas"). The Parking Areas, the Service Areas, the entrances and exits of the Shopping Center and any landscaped areas within the Shopping Center are called the "Common Areas". Landlord agrees that at all times there will be free and uninterrupted access (i) for motor vehicles between each of the Main Streets and the Parking Areas and the service doors of the Demised Premises and (ii) for pedestrians between the Parking Areas and the main customer entrance of the Demised Premises (subject to Landlord's right to temporarily close off portions of the Common Areas as may be reasonably required to perform its Common Areas maintenance and repair obligations (in accordance with the requirements of Section 9.7 above)). The entrances and exits between all adjacent streets and the Parking Areas shall be maintained as shown on the Lease Plan to the extent permitted by applicable laws. If any highway median strip cross-over now existing near the Shopping Center shall be relocated, or if the installation of a highway median strip hereafter shall include a cross-over near the Shopping Center, then Landlord shall make such relocation of the entrances, exits and driveways of the Shopping Center and such changes in the traffic flow pattern of the Shopping Center as shall be reasonably necessary to conform the same to the new median strip cross-over. Landlord agrees that the Parking Areas within the Shopping Center will always contain at least five (5) parking spaces (some of which may be for compact automobiles), and driveways and footways incidental thereto, for each one thousand (1,000) square feet of floor area in the Shopping Center or such greater number of spaces as may be required by any applicable governmental regulation, code, special use or other zoning permit.

3. (A) The existing monument sign located on the corner of Commercial Crossing and Soquel Drive, including without limitation, the monument, the Shopping Center identification panel, the base, the utilities service therefor and all other appurtenances thereto is herein referred to as the "Pylon Sign". Tenant shall have the right to install, and thereafter to maintain, one single-sided identification panel upon the Pylon Sign, and Tenant's location and so-called "billing" thereon shall be in the position labeled "Tenant" on Schedule I attached hereto (former Circuit City Panel location). Notwithstanding the foregoing, Tenant acknowledges that Toys may, from time to time, redesign, modify, change, alter, remove and replace the Pylon Sign, without the consent of Landlord or Tenant and that Tenant's rights with respect to the Pylon Sign are subject to such rights of Toys.

(B) If any additional identification sign identifying occupants of the Landlord's Parcel shall hereafter be constructed for the Landlord's Parcel then Tenant shall have the right to install, and thereafter to maintain, a double-sided identification panel, and all appurtenances thereto, upon such sign, and Tenant's location and so-called "billing" thereon shall be proportional to ground floor area occupied in the Landlord's Parcel by all lessees having panels upon such sign. No other occupant of space within the Landlord's Parcel shall have any greater rights than Tenant with respect to identification signs or use of the Common Areas. Landlord agrees that, if built, such sign shall at all times be sufficient in size, height and structural strength for installation of Tenant's panel thereon. Landlord shall cooperate, at no third party cost to Landlord, with Tenant in obtaining all permits and approvals as shall be required by law or other lessees for the installation of Tenant's identification panel upon such sign. If built, Landlord shall thereafter maintain such sign, and all appurtenances, in good condition and shall keep such sign adequately lighted and Tenant shall maintain its panel, if any, thereon in good condition.

(C) During the term of this lease, Landlord shall include the identity of all occupants of the Demised Premises on all directional signage within the Shopping Center (if such signage references occupants) as well as on all tenant and/or mall directories within the Shopping Center, if any.

(D) Landlord agrees that the visibility of Tenant's panel on the Pylon Sign shall not be obstructed by Landlord.

4. (A) Landlord agrees that the Landlord's Parcel (and at such time, if ever, that Landlord regains possession of the remainder of the Shopping Center, then this clause (A) shall apply to all or such portion of the remainder of the Shopping Center) shall not be used (a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail), or (b) for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, health club, massage parlor, sporting event, sports or game facility, off-track betting club (c) or for any establishment which sells or displays pornographic materials or (d) for any establishment which sells or displays used merchandise or second hand goods. No restaurants or establishments selling food prepared on premises for consumption on or off premises shall be located in the Landlord's Parcel. Collectively the uses described herein are referred to as the "Prohibited Uses".

(B) Landlord agrees that, from the date hereof until expiration or other termination of the term of this lease, no other premises in the Landlord's Parcel (and at such time, if ever, that Landlord regains possession of the remainder of the Shopping Center, then this clause (B) shall apply to all or such portion of the remainder of the Shopping Center) shall at any time contain more than (i) fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of apparel and related accessories, and/or (ii) seven thousand five hundred (7,500) square feet of floor area therein used or occupied for, or devoted to the sale or display of shoes, footwear and related accessories, and/or (iii) fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of furnishings for the home including the following categories of items: linens and domestics, window treatments, floor coverings, bathroom items, bedding, furniture, wall décor, housewares, table top goods, glassware, flatware, cookware, kitchen utensils, giftware and/or closet, shelving and storage items and home accessories (all of the foregoing hereinafter referred to as a "Competing Use" and the merchandise referred to therein as the "Protected Merchandise"). The computation of such floor area shall include one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of the Protected Merchandise.

(C) In addition to all other remedies available to Tenant at law and in equity for a breach of the covenants contained in Paragraphs (A) and (B) of this Paragraph 4, if an occupant or tenant in the Landlord's Parcel (and at such time, if ever, that Landlord regains possession of the remainder of the Shopping Center, then this clause (C) shall apply to all or such portion of the remainder of the Shopping Center) engages in a Competing Use or a Prohibited Use, Tenant shall be entitled to any of the following remedies on a non-exclusive basis: (i) Tenant may pay Alternate Rent (as defined in Section 4.3(B) of the lease) until such Competing Use or Prohibited Use ceases, except that Landlord shall have three (3) months to attempt cure before Tenant may pay Alternate Rent when Landlord has not consented to the Competing Use, (ii) Tenant may terminate this lease if the Competing Use or Prohibited Use continues for more than one hundred fifty (150) consecutive days by giving thirty (30) days notice to Landlord or (iii) Tenant may seek injunctive relief to enjoin or restrain such occupant or tenant from engaging in a Competing Use or a Prohibited Use. Notwithstanding anything to the contrary contained herein, so long as Landlord is using commercially reasonable efforts to diligently enforce the restrictions contained in this Paragraph 4 against any tenant or occupant engaged in the Competing Use or a Prohibited Use in violation of its lease, Tenant's termination right under this Paragraph 4(C) shall be stayed.

5. The Demised Premises shall not be used (a) for any of the Prohibited Uses set forth on Schedule F, or (b) in violation of any provision of any other lease existing on the date hereof of space in the Shopping Center which shall give the tenant thereunder an "exclusive" without the consent of such tenant, provided the use prohibited by such "exclusive" is then being conducted under such lease, and provided such exclusive is fully set forth in Schedule F attached hereto. Landlord warrants and represents that except for the Prohibited Uses and Exclusives set forth on Schedule F, there are no other exclusives or use restrictions which would in any manner be applicable to the Demised Premises. Landlord will indemnify and hold Tenant harmless from and against any losses, costs, liability, damages, fees or expenses of claims suffered or claimed to

be suffered as a result of any breach of or any inaccuracies in the representation and warranties set forth in the preceding sentence.

6. (A) Tenant and all persons having business with Tenant shall have the right, without charge, to use, in common with all other occupants of the Landlord's Parcel and all persons having business with such other occupants, and no other persons, all Common Areas of the Landlord's Parcel, for parking and access in connection with business in the Landlord's Parcel, and for no other purpose except that Landlord agrees that Tenant may conduct seasonal and promotional sales up to four times in any one calendar year for not more than one week duration each time on the sidewalks in front of the Demised Premises and in the area designated 'Promotional Sales Area' on the Lease Plan; provided that (i) there shall be no blockage or obstruction of any driveways or access routes in the Common Areas or the Shopping Center, and (ii) all trailers, temporary structures or loudspeakers involved in such promotional events shall be parked or located within the areas designated for such purposes on the Lease Plan, and (iii) no such promotional sales shall be conducted during the months of October, November or December of any year.

(B) Unless Tenant shall approve in writing, no land adjacent to the Shopping Center shall be integrated with the Shopping Center and no persons shall have any rights in the Common Areas of the Shopping Center other than occupants of the Shopping Center and persons having business with such occupants. Notwithstanding the foregoing, Tenant's approval shall not be required so long as: (i) Tenant's obligations under Paragraph 10 of this Schedule B or Article VI shall not be increased, (ii) the parking ratio established in Paragraph 2 of this Schedule B shall not be reduced, (iii) any structures to be built on said integrated land shall not exceed eighteen (18) feet in height, (iv) the proposed use of said integrated land shall not conflict with Tenant's use, or (v) Landlord shall obtain a Reciprocal Easement Agreement in form and substance acceptable to Tenant. If any persons having business upon any other land adjacent to or near the Shopping Center shall use the Common Areas of the Shopping Center, Landlord shall, upon request of Tenant, take such steps as are reasonably necessary to prevent motor vehicles and pedestrians from crossing said boundary. Notwithstanding the foregoing, Tenant acknowledges and agrees that the tenant of the TRU Parcel, its employees, contractors, agents and invitees shall have the right to use the Common Areas, provided that Tenant, its employees, contractors, agents and invitees have the right to use the parking areas, pedestrian walkways and driveways on the TRU Parcel.

7. Landlord, at all times, shall: (a) cause the Pylon Sign and all Common Areas on Landlord's Parcel and all directional signs, if any, therein to be kept in good order and condition, (b) keep the Common Areas on Landlord's Parcel suitably paved and marked for parking and traffic flow, (c) keep all Common Areas free of refuse and obstruction and free of snow and ice to the extent required by the business operations of the stores within the Shopping Center, (d) keep the Common Areas properly drained, and (e) at all times when the Demised Premises shall be open for business and for one (1) hour thereafter: (i) keep the Common Areas adequately lighted

8. Landlord shall, within thirty (30) days after the execution and delivery of this lease, deliver to Tenant a recognition agreement, in duplicate, from any mortgagee whose mortgage shall be prior in lien to the lien of this lease and, if Landlord shall hold a leasehold estate in all or part of the Landlord's Parcel rather than a fee interest, a recognition agreement from the fee owner. Each such recognition agreement shall be in recordable form and shall provide that this lease and all rights of Tenant hereunder shall not be disturbed except for a cause which would permit Landlord to disturb the same hereunder. Each such recognition agreement from a mortgagee shall also be in the form of Schedule D or in another form mutually acceptable to Tenant and such mortgagee. Each such recognition agreement from a fee owner shall also be in the form of Schedule E or another form mutually acceptable to Tenant and such fee owner. In the event that Landlord shall default under this Paragraph 8 and if the same shall not be cured within (30) days after receipt of notice from Tenant, Tenant shall have the right to terminate this lease at any time before the curing of such default.

9. The Demised Premises are demised to Tenant with the benefit of all of the rights contained in this lease and all of the rights appurtenant to this lease and to the Demised Premises by operation of law, and are demised subject to, and with the benefit of, the following:

(A) General Real Estate Taxes not yet due and payable,

(B) Easements for utilities serving the Shopping Center and not for general transmission lines serving other premises,

(C) The Mortgage, if any, referred to in Schedule D,

(D) The REA, if any (defined in Paragraph 12 hereof), and

(E) The additional Title Matters set forth on Schedule B-2.

Landlord warrants that none of the Title Matters adversely affect Tenant's rights under this lease or impose any additional obligation or restriction on Tenant not set forth in this lease nor do any easements pass through, under or over the Demised Premises.

10. As partial reimbursement to Landlord of (a) the cost to Landlord of performing the obligations of Landlord set forth in Paragraph 7 of this Schedule B (the "CAM Costs") and (b) the cost of insurance premiums with respect to the insurance required under Sections 10.3 and 10.4 and Paragraph 11 of this Schedule B (the "Insurance Costs"), Tenant shall pay Landlord for each year included in the term of this lease an amount equal to (1) "Tenant's CAM Contribution" (hereinafter defined), plus (2) "Tenant's Insurance Contribution" (hereinafter defined).

Tenant's CAM Contribution: From the Commencement Date until the first (1st) anniversary thereof, Tenant's CAM Contribution with respect to CAM Costs shall be Ninety Eight Cents ($0.98) per square foot in the Demised Premises per year ($27,243.02 per year, $2,270.25 per month), and on the first anniversary of the Commencement Date and each anniversary of the Commencement Date thereafter, Tenant's CAM Contribution shall be increased to one hundred three percent (103%) of Tenant's CAM Contribution for the immediately preceding year. During the Extra Period, Tenant's CAM Contribution shall be at the annual rate in effect immediately prior to the commencement of the Extra Period. Tenant's CAM Contribution shall be payable monthly, in advance and on account, at the times minimum rent is payable hereunder, in equal monthly installments of one-twelfth (1/12) of Tenant's CAM Contribution.

Tenant's Insurance Contribution: With respect only to Tenant's Insurance Contribution, from the Commencement Date until the first (1st) anniversary thereof, Tenant's Insurance Contribution with respect the Insurance Costs shall be Thirty Five Cents ($0.35) per square foot in the Demised Premises per year ($9,729.65 per year, $810.80 per month) and each year thereafter Tenant shall be responsible for Tenant's Fraction of the Insurance Costs, provided such costs are reasonable in the area in which the Shopping Center is located. Tenant's Insurance Contribution shall be payable monthly, on account, at the times minimum rent is payable hereunder, in equal monthly installments of one-twelfth (1/12th) of one hundred three percent (103%) of the annual amount of Tenant's Insurance Contribution actually payable by Tenant for the immediately preceding calendar year with the amount of any excess payment on account by Tenant hereunder being adjusted within ninety (90) days after the close of each year by Tenant withholding any such excess from the next succeeding monthly payments of the Tenant's Insurance Contribution thereafter becoming due on account hereunder, and the amount of any deficiency in monthly payments on account hereunder by Tenant being paid by Tenant within ninety (90) days after receipt by Tenant of the evidence required of Landlord under the immediately following sentence. Landlord shall submit to Tenant evidence of the Insurance Costs to Landlord and evidence of calculation of Tenant's Insurance Contribution in such detail as Tenant may reasonably require and said deficiency shall not be due and payable until such evidence has been furnished to Tenant. Should Landlord fail to provide Tenant with such evidence within sixty (60) days of Tenant's written request therefor, Tenant may thereafter continue to pay Tenant's Insurance Contribution at the rate in effect for the prior calendar year until such time as Landlord provides Tenant with the requested evidence, and Tenant shall not be deemed to be in default under this Lease, nor shall Tenant incur any other liability to Landlord, on account of such reduced payment. Landlord shall be responsible for providing Tenant with such reconciliation documents for the entire preceding calendar year regardless of whether or not Landlord owned the Shopping Center during such time period. Tenant's failure to pay any amount pursuant to this section shall not be deemed a default pursuant to Article XIII provided Tenant pays any amount which it does not in good faith dispute. At any time before or after the making of such payments, Tenant shall have the right to audit or cause to be audited Landlord's invoices, books and records pertaining to the Insurance Costs (and any real estate tax costs due under Article VI of this lease) and backup relating to calculation of Tenant's Insurance Contribution and if such audit fails to substantiate the amount of charges imposed or to be imposed by Landlord on Tenant, then Tenant shall be entitled to a reduction or refund. If such audit shows that the charges imposed by Landlord on Tenant with respect to Insurance Costs

were overstated by more than four percent (4%), Landlord shall promptly reimburse Tenant for the actual cost to Tenant of such audit. At Tenant's election, any such refund or reimbursement shall be paid in cash to Tenant or credited by Tenant against its next monthly installment(s) hereunder. If there has been an overcharge and a resulting overpayment by Tenant, such amount shall promptly be reimbursed by Landlord to Tenant; and if such reimbursement does not occur within thirty (30) days after Landlord has been given notice of the overcharge established by such audit or inspection, then Tenant shall have the right to offset the amount of such overcharge from rent and other charges thereafter accruing until, in such fashion, such overcharge shall have been recovered in full. As the number of square feet of floor area may change during any year, Tenant's Fraction may change during said year and the amount payable by Tenant for said year pursuant to the provisions of this Paragraph 10 shall reflect such changes in square footage. Tenant's Insurance Contribution shall not include any item not specifically set forth in Sections 10.3, 10.4, or Paragraph 11 of this Schedule B.

11. Landlord shall maintain with respect to the Common Areas from the date the Demised Premises are delivered to Tenant until expiration of the term of this lease a policy or policies of commercial general liability insurance in amounts of not less than Two Million Dollars ($2,000,000) combined single limit per occurrence for bodily injury and property damage and Three Million Dollars ($3,000,000) aggregate limit per location. Such policies of insurance to include Tenant as an additional insured thereunder and be issued for periods of not less than one (1) year by insurance companies with an A.M. Best rating of B+ or better and a financial size of at least VII (or a comparable rating by another national rating organization if A.M. Best is no longer in existence) and authorized to do business in the state in which the Demised Premises are located. Landlord shall deliver such policies to Tenant at least fifteen (15) days prior to the Commencement Date and each renewal policy at least ten (10) days prior to the expiration of the policy it renews. In lieu of delivering any policy of insurance to Tenant, Landlord may deliver to Tenant a certificate of the company issuing such policy. All such insurance policies shall provide that such policies shall not be canceled without at least ten (10) days prior written notice to Tenant.

12. (A) Reference is made to Declaration of Reciprocal Easements, Covenants and Restrictions, dated as of June 21, 1996, by Landlord with respect to the Shopping Center (herein referred to as the "REA"). Landlord does hereby grant and demise to Tenant the benefit of all easements, licenses, rights-of-way, and privileges which the parties therein referred to did thereby give and grant one to the other and to all persons claiming thereunder. Landlord shall not, without the prior consent of Tenant, execute, or otherwise agree to, any modification of the REA, nor waive any of its rights, nor grant or permit any indulgences by act or omission, thereunder. Landlord shall enforce all provisions of the REA. If Landlord shall default under this Paragraph 12 then, in addition to all other rights and remedies of Tenant as a result thereof, Tenant's rights with respect thereto under Section 14.2 shall include, without limitation, the right to bring suit in the name of Landlord and/or Tenant to enforce the REA and Landlord shall cooperate with Tenant in so doing.

(B) Although the Demised Premises and the rights of Tenant under this lease are necessarily subject to the REA the parties hereto agree that, as between the parties hereto, all provisions of this lease shall be superior and paramount to the REA. In the event of any inconsistency between the REA and this lease (a) as between the parties hereto and all such persons, the provisions of this lease shall prevail, and (b) if any right(s) of Tenant under this lease are disturbed and/or interfered with by any person claiming through or under the REA, the same shall be deemed a default by Landlord under this lease, including without limitation, Section 18.7 hereof, and Tenant shall have all rights and remedies with respect thereto as Tenant would have with respect to any other default by Landlord under this lease.

13. Intentionally Deleted.

14. Landlord will maintain the Common Areas of the Landlord's Parcel and conduct its business thereon in compliance with all federal, state or local laws and regulations relating to pollution control, hazardous or toxic wastes, substances and constituents, including hydrocarbonic substances, and other environmental and ecological matters, including but not limited to the Federal Water Pollution Control Act (33 U.S.C. Sect. 1251 et seq.), Resource Conservation & Recovery Act (42 U.S.C. Sect. 6901 et seq.), Safe Drinking Water Act (42 U.S.C. Sect. 300f et seq.), Toxic Substances Control Act (15 U.S.C. Sect. 2601 et seq.), the Clean Air

Act (42 U.S.C. Sect. 7401 et seq.), Comprehensive Environmental Response of Compensation and Liability Act (42 U.S.C. Sect. 9601, et seq.), and other comparable state laws ("Environmental Laws"). If Landlord shall receive: (a) any notice of any violation or administrative or judicial complaint or order having been filed or about to be filed against Landlord, or the areas of the Landlord's Parcel outside the Demised Premises alleging violations of any Environmental Law or requiring Landlord to take any action in connection with the release of any toxic or hazardous substance, waste or constituent, including any hydrocarbonic substance, into the environment, or (b) any notice from a federal, state or local governmental agency or private party alleging that Landlord may be liable or responsible for costs associated with a response or cleanup of a release of a toxic or hazardous substance, waste or constituent, including any hydrocarbonic substance, into the environment or any damages caused by that release, Landlord shall, within thirty (30) days of receipt thereof, provide Tenant with a copy of such notice and thereafter Landlord shall at Landlord's sole cost diligently proceed to take all actions necessary to correct such violation. Landlord agrees to indemnify and hold Tenant harmless from and against all causes, claims, demands, losses, liabilities, costs and expenses (including without limitation attorneys' fees) incurred, directly or indirectly, by Tenant as a result of or in connection with Landlord's failure to comply with any of the provisions of this Paragraph 14. The provisions of the immediately preceding sentence shall not apply to any such claims, demand, etc., resulting from any acts or omissions of Tenant, its contractors, agents or employees.

15.    Tenant will maintain the property which the Tenant is obligated to maintain under the provisions of this Lease and conduct its business in the Demised Premises in compliance with all Environmental Laws. If Tenant shall receive: (a) any notice of any violation or administrative or judicial complaint or order having been filed or about to be filed against Tenant with respect to the Demised Premises or the property which the Tenant is obligated to maintain under the provisions of this Lease alleging violations of any Environmental Law or requiring Tenant to take any action in connection with the release of any toxic or hazardous substance, waste or constituent, including any hydrocarbonic substance, into the environment with respect to the Demised Premises or, or (b) any notice from a federal, state or local governmental agency or private party alleging that Tenant or Landlord may be liable or responsible for costs associated with a response or cleanup of a release of toxic or hazardous substance, waste or constituent, including any hydrocarbonic substances, into the environment or any damages caused by that release with respect to the Demised Premises or the property which Tenant is obligated to maintain under the provisions of this lease, Tenant shall, within thirty (30) days of receipt thereof, provide Landlord with a copy of such notice and thereafter Tenant shall at Tenant's sole cost diligently proceed to take all actions necessary to correct such violation. Tenant agrees to indemnify and hold Landlord harmless from and against all causes, claims, demands, losses, liabilities, costs and expenses (including without limitation attorney's fees) incurred, directly or indirectly, by Landlord as a result of or in connection with Tenant's failure to comply with any of the provisions of this Paragraph 15. The provisions of the immediately preceding sentence shall not apply to any such claims, demand, etc., resulting from any acts or omissions of Landlord, its contractors, agents or employees.

SCHEDULE B-1 – TOYS R US SIGNAGE ON EXTERIOR OF DEMISED PREMISES

POTENTIAL LOCATION OF TOYS SIGNAGE ON DEMISED PREMISES



SCHEDULE B-2 – TITLE MATTERS

1.  The fact that the ownership of said land does not include any rights of access to the state freeway, said rights having been relinquished together with a waiver of any claims for damages, in the deed from Bert Brown, et ux., to the State of California, recorded March 21, 1947 in Book 541, Page 265, Official Records of Santa Cruz County.

2.  The fact that the ownership of said land does not include any rights of access to the state freeway, said rights having been relinquished together with a waiver of any claims for damages, in the deed from Lloyd Johnson, et ux., to the State of California, recorded February 1, 1947 in Book 544, Page155, Official Records of Santa Cruz County.

3.  Matters as shown upon that certain Record of Survey map filed for record January 19, 1982 in Book 71 of Maps, Page 36, Santa Cruz County Records.

    Reference is made to said document for full particulars.

4.  An agreement to which reference is made for full particulars by and between the Redevelopment Agency of the County of Santa Cruz and Redtree Properties, L.P., a Delaware Limited Partnership, recorded March 28, 1996 in Book 5822, Page 387, Official Records of Santa Cruz County Official Records of Santa Cruz County.

5.  The matters contained in an instrument entitled "Declaration of Reciprocal Easements, Covenants and Restrictions" dated June 21, 1996, by Redtree Properties, L.P., a Delaware Limited Partnership upon the terms therein provided recorded June 25, 1996 in Volume 5867, Page 221, Official Records of Santa Cruz County.

    Note: Section 12956.1 of the Government Code provides the following: If this document contains any restrictions based on race, color, religion, sex, sexual orientation, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

    Reference is made to said document for full particulars.

6.  An easement for anchors, guy wires and cables, guy stubs and fixtures and rights incidental thereto in favor of Pacific Gas and Electric Company as set forth in a document recorded December 11, 1996 in Volume 5950, Page 621, Official Records of Santa Cruz County, affects: Reference is made to said document for full particulars.

    No representation is made as to the present ownership of said easement.

7.  Terms and provisions of a lease executed by Redtree Properties, L.P., a Delaware Limited Partnership, as lessor, and Toys "R" Us, a Delaware Corp., as lessee as disclosed by an instrument recorded June 17, 1996 in Volume 5862, Page 832, Official Records of Santa Cruz County.

    The present ownership of the leasehold created by said lease and other matters affecting the interest of the lessee are not shown herein.

    A Memorandum of First Amendment to Lease was recorded March 3, 1997 as Instrument No. 1997-0009539, Official Records of Santa Cruz County.

    A Commencement Agreement affecting said lease, to which reference is made for full particulars, by and between Redtree Properties, L.P., a Delaware Limited Partnership and Toys "R" Us, Delaware Corp., recorded May 8, 1997 as Instrument No. 1997-0020518, Official Records of Santa Cruz County.

    Notwithstanding anytthing herein to the contrary, the lease described in this item number seven (7) shall only be deemed to be a "Title Matter" to the extent the terms and provisions of said lease affect the Demised Premised.

8.  The fact that the ownership of said land does not include any rights of access to the state freeway, said rights having been relinquished together with a waiver of any claims for damages, in the deed from Redtree Properties, L.P., a Delaware Limited Partnership, to the State of California, recorded January 14, 1997 as Instrument No. 1997-0002153, Official Records of Santa Cruz County.

9.  The matters contained in an instrument entitled "Notice of Non-Responsibility" dated June 4, 2002, by Redtree Properties, L.P., a Delaware Limited Partnership upon the terms therein provided recorded June 10, 2002 as Instrument No. 2002-0041600, Official Records of Santa Cruz County.

10. The matters contained in an instrument entitled "Notice of Non-Responsibility" dated July 29, 2008, by Redtree Properties, L.P., a Delaware Limited Partnership upon the terms therein provided recorded August 7, 2008 as Instrument No. 2008-0033641, Official Records of Santa Cruz County.

## SCHEDULE C

TENANT'S WORK

Tenant's Work shall include construction of a Marshalls store in accordance with Tenant's Outline Specifications, to the extent practicable given the shell of the building in which the Demised Premises are to be located. The "Outline Specifications" are a booklet entitled "TJX Companies, Inc. Specification No. 1180, Outline Specifications and Requirements for Remodel/Conversion Construction" dated 12/07/09 as amended by any addenda. For your information, below is a list of Tenant's "Prototype Plans" dated 12/07/09 for a Marshalls store.

The "Prototype Plans" are the following:

| Drawing No. | Title | Date |
|---|---|---|
| C-1 | Title Sheet | 12/7/09 |
| C-2 | Construction Plan | 12/7/09 |
| C-3 | Wall Sections and Misc. Details | 12/7/09 |
| C-4 | Interior Elevations | 12/7/09 |
| C-5 | Reflected Ceiling Plan | 12/7/09 |
| C-6 | Power Plan | 12/7/09 |
| C-7 | P.O.S., Reg. and Misc. Electrical | 12/7/09 |
| C-8 | Fixture Plan | 12/7/09 |

**SCHEDULE D**

**RECOGNITION AND ATTORNMENT AGREEMENT FROM MORTGAGEE**

    1.  Reference is made to Mortgage dated _____ from _____ _____("Landlord") to _____ ("Mortgagee") and Mortgagee's address is_____.

    2.  Reference is made to Lease dated _____, 200\_\_, between Landlord and MARSHALLS OF CA, a Delaware limited liability company ("Tenant"), as Tenant, of certain premises situated within the premises covered by said Mortgage.

    3.  In consideration of the agreements of Mortgagee contained herein, Tenant agrees that if the holder of said Mortgage, or any person claiming under said holder, shall succeed to the interest of Landlord in said Lease, Tenant will recognize, and attorn to, said holder, or such other person claiming under said holder, as its Landlord under the terms of said Lease.

    4.  In consideration of the agreements of Tenant contained herein, Mortgagee consents to said Lease and agrees that, in the event of foreclosure or other right asserted under said Mortgage by the holder thereof, said Lease and the rights of Tenant thereunder shall continue in full force and effect and shall not be terminated or disturbed, except in accordance with the provisions of said Lease.

    5.  The benefits and burdens of this agreement shall enure to and bind the successors and assigns of the respective parties hereto.

    IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed, both as of _____, 200\_\_\_.

**WITNESSES AS TO BOTH:**

                                               **MARSHALLS OF CA, LLC, a Delaware limited liability company**

_____      By_____
                                                   Ann McCauley
                                                   Secretary

_____      By_____
                                                  Mary B. Reynolds
                                                   Vice President/Treasurer

**WITNESSES AS TO BOTH:**                                   **[MORTGAGEE]**

_____      By_____
                                                  _____,
                                                  Vice President

_____      By_____
                                                  _____,
                                                  Ass't. Secretary

                              [Append Local Form of Acknowledgement]

**SCHEDULE E**

**NON-DISTURBANCE, RECOGNITION AND ATTORNMENT AGREEMENT
FROM FEE OWNER/PARENT LANDLORD**

Reference is made to lease dated _____, 200___, between_____ _____, a _____ corporation (hereinafter referred to as "Parent Landlord"), as Lessor, and _____ ("Landlord"), as Lessee, of certain premises in _____ (the "Entire Premises"). Said Lease is hereinafter referred to as the "Parent Lease".

Further reference is made to Sublease (the "Sublease") dated _____, 200___, between Landlord, as the sublessor, and MARSHALLS OF CA, a Delaware limited liability company as subtenant, (therein and hereinafter referred to as "Tenant") of a portion (the "demised premises") of the Entire Premises.

In consideration of the mutual covenants and agreements herein contained the parties hereto hereby agree as follows:

(1)  Parent Landlord does hereby warrant and represent to Tenant that the Parent Lease has not been amended and is valid and in full force and effect as of the date hereof, that the term of the Parent Lease has heretofore commenced, that there are no defaults by either party thereunder, that Landlord is, as of the date hereof, the Tenant under the Parent Lease and that nothing in the Parent Lease contained prohibits or restricts the execution and delivery of the Sublease or any term or condition contained in the Sublease.

(2)  Parent Landlord does hereby consent to the execution and delivery of the Sublease and all of the terms and conditions therein contained.  Parent Landlord does hereby recognize the Sublease and all of Tenant's rights thereunder.  Parent Landlord does hereby agree that, if the term of the Parent lease shall be canceled or shall terminate or expire prior to the expiration of the term of the Sublease, or Parent Landlord shall come into possession of all or any part of the demised premises described in the Sublease prior to the expiration of the term of the Sublease, the Sublease shall continue in full force and effect in accordance with its terms and Tenant's rights in the Shopping Center and the demised premises and Tenant's rights under the Sublease, including, without limitation, the provisions of the Sublease with respect to proceeds of insurance and actions of public authority by eminent domain, and Tenant's use, possession and enjoyment of the demised premises shall not be disturbed, except for such cause as would entitle Landlord to terminate the Sublease in accordance with the terms and conditions contained in the Sublease.  Parent Landlord shall take no action which shall in any way interfere with any right of Tenant under the Sublease, and the Shopping Center and the Demised Premises shall be and remain subject to the Sublease.

(3)  Upon the cancellation, termination or expiration of the term of the Parent Lease, prior to the expiration of the term of the Sublease as extended, whether the Parent Lease shall so terminate or expire, or be canceled, upon the expiration of its term as stated therein or on any other date, and whether upon the election of either Parent Landlord or Landlord hereunder, or in any other manner, Parent Landlord shall recognize Tenant as tenant of the demised premises for the balance of the term of the Sublease, as extended, in accordance with all of the provisions of the Sublease and Parent Landlord shall then and thereafter perform and observe all of the agreements and conditions on the part of landlord, as the landlord under the Sublease, to be performed or observed.

(4)  Tenant does hereby agree that, if the term of the Parent Lease shall be canceled or terminated prior to the expiration of the Sublease, Tenant shall recognize, and attorn to, Parent Landlord as the landlord under the Sublease in accordance with the terms and conditions contained in the Sublease, provided that Parent Landlord shall then assume in writing to Tenant to thereafter perform and observe all of the terms and conditions contained in the Sublease on the part of the landlord thereunder to be performed or observed.

(5)  References herein contained to the term of the Parent Lease and the term of the Sublease shall mean the term thereof as then extended pursuant to the provisions thereof.

(6)  The agreements contained herein shall be self-executing without the requirement of any further instrument or act by any party referred to herein.  The Agreement shall be binding upon, and inure to the benefit of, each of the parties hereto and its successors and assigns.

IN WITNESS WHEREOF, each of the parties hereto has caused this instrument to be executed and delivered all as of the _____ day of _____, 200___.

**WITNESSES AS TO BOTH:**                    **MARSHALLS OF CA, LLC, a Delaware limited liability company**

_____            By_____
                                               Ann McCauley
                                               Secretary

_____            By_____
                                               Mary B. Reynolds
                                               Vice President/Treasurer

WITNESSES AS TO BOTH:                       **[PARENT LANDLORD]**

_____            By_____
                                               _____,
                                               Vice President

_____            By_____
                                               _____,
                                               Ass't. Secretary

[Append Local Form of Acknowledgment]

## SCHEDULE F

## EXCLUSIVES AND PROHIBITED USES

1.    Any of the following uses ("Exclusives") except for "incidental" uses as defined below:

    (A)    a modern toy store, including, without limitation, a business selling any of the following:

    (i)    toys;

    (ii)    outdoor play & recreational equipment;

    (iii)    wheel goods;

    (iv)    layettes;

    (v)    infants & juveniles food, health & beauty aids;

    (vi)    infants, juveniles and children's books, records, cassette tapes, compact discs, CD-ROMs, and other visual and audio technological evolutions thereof;

    (vii)    infants, juveniles and children's clothing, apparel, shoes, accessories, furnishings, furniture, recreational equipment or sporting goods;

    (viii)    family and adult games;

    (ix)    computers and accompanying software;

    (x)    video, electronic and computer games and equipment including, without limitation, game cartridges and CD ROMs and other visual and audio technological evolutions thereof, consoles and other mechanical equipment necessary to play such games (collectively "Video Games");

    (xi)    candy.

For purposes hereof, "incidental" shall mean (except with respect to Video Games) a use for the sale, rental or distribution of such items individually or in the aggregate in an area of not greater than 1,500 square feet of sales and/or display area or ten (10%) percent of the sales and/or display area of any such store (whichever is less). For purposes hereof with respect to Video Games, "incidental" shall mean a use for the sale, rental or distribution of video Games individually or in the aggregate in an area of not greater than 400 square feet of sales and/or display area or ten (10%) percent of the sales and/or display area of any such store (whichever is less). The above restrictions shall not apply to a full-line consumer electronics, entertainment and appliance store.

**Notwithstanding the foregoing, it shall not be a breach of this lease for Tenant to engage in the foregoing uses for so long as (i) any such use complies with the terms and conditions of that certain letter agreement attached hereto as Schedule F-1 by and between Tenant and Toys R Us, dated as of August 3, 2010  (the "TRU Waiver"), (ii) the TRU Waiver has not been rescinded and remains in full force and effect, and (iii) any such use otherwise complies with the terms and condtions of this lease.**

2.    Any of the following uses (the "Prohibited Uses"):

    (A)    any use that emits or results in strong, unusual or offensive odors, fumes, dust or vapors;

    (B)    any use that emits objectionable noise or sound;

    (C)    any use that constitutes a public or private nuisance;

    (D)    a theater of any kind;

    (E)    a sports or other entertainment viewing facility (whether live, film, audio/visual or video);

    (F)    an automobile body and fender shop;

    (G)    an automobile repairs shop (mechanical or otherwise);

(H)     any business servicing motor vehicles, including, without limitation, any quick lube oil change services, tire centers;

(I)     any business storing or selling gasoline or diesel fuel at retail or wholesale;

(J)     a restaurant serving meals primarily for on-premises consumption;

(K)     a catering or banquet hall;

(L)     a fast food restaurant incorporating a coin or token operated amusement room;

(M)     a so-called "head shop";

(N)     a bowling alley;

(O)     a billiard or bingo parlor or any establishment conducting games of chance;

(P)     a sales office, showroom or storage facility for boats, automobiles or other vehicles;

(Q)     an establishment serving alcoholic beverages for on-premises consumption;

(R)     a pawn shop;

(S)     a dry cleaning or laundry plant (except for an establishment which receives and dispenses items for launder and/or dry cleaning but the processing of such items is done elsewhere);

(T)     a funeral parlor;

(U)     a massage parlor;

(V)     a discotheque or dancehall;

(W)     a recycling facility or stockyard;

(X)     a health spa, exercise facility, or similar type business;

(Y)     a recreation and fitness facility, whether providing exercise, recreational, educational, or fitness activities, or any combination of the foregoing;

(Z)     a skating rink;

(AA)    a car wash;

(BB)    a so-called "health clinic", "medical clinic", "urgent care facility", "walk-in care facility" or rehabilitative facility;

(CC)    an off-track betting establishment;

(DD)    a house of worship;

(EE)    an amusement arcade or game room;

(FF)    a business selling so-called "second hand goods";

(GG)    a junkyard;

(HH)    a so-called "flea market";

(II)    offices (excluding office space used in connection with an ancillary to a permitted retail use hereunder), including such governmental offices or service type uses such as motor vehicle offices;

(JJ)    industrial uses;

(KK)    factory uses;

(LL)    manufacturing uses;

(MM)    warehouse uses (excluding any warehousing incidental to the operation of permitted retail uses hereunder);

(NN)    hotel/motel or residential purposes;

(OO)    a training or educational facility, which for purposes hereof shall mean a beauty school, barber school, reading room, place of instruction, or any other activity, facility, school or program catering primarily to students or trainees as opposed to shoppers; or

(PP)    adult book store or a store selling or exhibiting pornographic materials.

SCHEDULE F-1
TOYS R US WAIVER

See attached.

**SCHEDULE G**

Intentionally Omitted.

**TOYS "R" US-DELAWARE, INC.
ONE GOEFFREY WAY
WAYNE, NEW JERSEY 07470
973-617-5717**

August 3, 2010

Marshalls of CA, LLC
770 Cochituate Road
Framingham, MA 01701
Attn: Vice President - Real Estate

Redtree Properties, L.P. ("Landlord")
1362 Pacific Avenue
P.O. Box 1041 Santa Cruz
California 95060
Attention: Doug Ley

Re:     Toys "R" Us Store #5843
        Lease between Landlord and Toys "R" Us, Inc. ("TRU"), dated March 26, 1996
        (the "TRU Lease")

        Shopping Center located at 1600 17th Avenue, Santa Cruz, California (the
        "Shopping Center")

Dear Sirs:

We understand that Marshalls of CA, LLC (Marshalls) is negotiating a lease with
Landlord for space in the Shopping Center consisting of 27,799 square feet of ground
floor area (the "Marshalls Premises") and that Marshalls has requested that TRU waive
the provisions of the exclusive contained within the TRU Lease with respect to the
Marshalls Premises.

Notwithstanding anything to the contrary contained in the TRU Lease, so long as the
Marshalls Premises is not primarily used for the sale of toys, infant and or juvenile items,
TRU hereby waives the provisions of its exclusive contained in Section 14.02(a) of the
TRU Lease with respect to the Marshalls Premises so long as (a) the Lease between
Landlord and Marshalls remains in full force and effect, and (b) the Marshalls Premises is
operating (i) as a typical Marshalls store or (ii) as a typical T. J. Maxx store, or (iii) as a
typical Home Goods store.

50247-5

## SCHEDULE H

Intentionally Omitted.

# SCHEDULE I

## PYLON RENDERING

### SCHEDULE I

#### COMMERCIAL CROSSING SIGN



