THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| In re:<br><br>CIRCUIT CITY STORES INC., et al., <br><br>Debtors. | Case No. 08-35653 (KRH)<br>Jointly Administered<br><br>Chapter 11 |

## SECOND AMENDED RESPONSE TO LIQUIDATING TRUST'S FOURTEENTH OMNIBUS OBJECTION TO CLAIMS

WCC Properties, LLC ("WCC") by counsel, respectfully again objects to the Liquidating Trust's proposed treatment of its claims, Nos. 13836 and 13480, for the further reasons set forth below:

1.      The Liquidating Trust's Fourteenth Omnibus Objection (the "Objection") reduces WCC Properties' Claim Number 13836 from $63,818.93 to $33,133.32 based upon "$14,682.39 of other administrative rent that is not owed, $7,085.97 of taxes and $8,812.26 of repair charges".

2.      WCC has since filed an Amended Request for Administrative Expenses, reducing its claim from $63,818.93 to $49,518.72. A copy of the Amended Claim is attached as Exhibit 1.

DOUGLAS A. SCOTT, PLC
1805 Monument Avenue, Suite 311
Richmond, Virginia 23220
Counsel for WCC Properties, LLC

## I.   UNSPECIFIED REDUCTIONS.

3.      It is difficult to respond to the Trustee's objection that "$14,682.39 of other administrative rent that is not owed…" because the Trustee cites no factual or legal basis whatsoever for the proposed reduction.

## II.   DISPUTED TAXES.

4.      The Trustee also objects that "$7,085.97 of taxes" are not owed. Exhibit A-1 to Exhibit 1 lists $15,683.76 in various taxes chargeable to the estate. This is a reduction of $5,454.73 from the initial Claim.

5.      The Lease between the parties required the Tenant to pay certain items of expense as "Additional Rent." *See* SECTION 4.02. Among these items are taxes. *See* ARTICLE VI and SECTION 6.02 more specifically. A copy of the pertinent sections of the Lease is attached as Exhibit 2.

6.      This Court, in *In re Circuit City Stores, Inc.*, 447 B.R. 475, 508 (Bankr. E.D. Va. 2009), cited with approval a case from the United States Court of Appeals for the Fourth Circuit interpreting § 365(d)(10)[1], which concluded that "a lessor is entitled to recover all payments due under the lease (including rent, taxes, interest, late fees, and

---

[1] Note 5 of this case says:

> The United States Court of Appeals for the Fourth Circuit provided this guidance. "Section 365(d)(10) is modeled on a very similar provision of the Code, § 365(d)(3), which requires that a trustee timely perform all obligations under a lease of nonresidential real property after an order for relief is entered. Notably, "[b]oth sections impose a duty of timely performance on debtor[s] . . . and both expressly specify that this duty exists 'notwithstanding section 503(b)(1)'of the Code." As a result, in construing § 365(d)(10), courts often look to decisions construing § 365(d)(3)." *CIT Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 234 (4th Cir. 2005) (internal citations omitted).

attorney's fees) as an administrative expense," but the lessor "must still assert its administrative expense claim under § 503(b)…" *CIT Comme'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 235, 236 (4th Cir. 2005).

## III.   DISPUTED REPAIR CHARGES.

7.   The Trustee also objects that $8,812.26 of repair charges are not owed. Exhibits A-2, A-3 and A-4 to Exhibit 1 set out the requested repair charges that, not surprisingly, total $8,812.26.

8.   Contractual Lease terms regarding the expenses of re-letting and repair of the leased premises upon lease termination are recoverable in the Eastern District of Virginia Bankruptcy Courts. In *In re Trak Auto Corp.*, 277 B.R. 655, 669 (Bankr. E.D. Va. 2002) *rev'd on other grounds*, 367 F.3d 237 (4th Cir. 2004), the Court held that:

> This holding also applies to damage repair costs that the lessor must incur from the debtor's use of the property. If the lease provides for the repair of any damages as a condition of vacating the premises or of ending the lease, however damages may be defined in the lease, we will uphold those provisions and enforce them if necessary. The same applies to any charges assessed due to debtor's noncompliance with the turnover terms of its lease.

9.   Section 18.01(a)(ii) of the Lease provides that the Landlord may deduct "all of Landlord's reasonable expenses" from any sums due to Tenant payable absent Lease termination in connection with re-letting the premises ("including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorney's fees and expenses, reasonable alteration costs and expenses of preparation for re-letting…").

10.    Exhibit A sets forth the precise amount of repair and re-letting costs incurred by WCC, which in all manner are appropriate and allowable costs under the lease.

## IV.    OBJECTIONS TO AMOUNT OF CLAIMS 13480 AND 15261 ARE NO LONGER RELEVANT

11.    The Trustee further objected to the proposed treatment of WCC's lease rejection claim, Proof of Claim No. 13480, filed June 23, 2009.  The Liquidating Trust purports to reduce the claim from $5,117,498 to $445,361.58 "according to the Debtors' records."

11.    Proof of Claim No. 13480 has been amended by Proof of Claim No. 15261 in the amount of $810,533.50, which the Trustee has further objected to in its 42nd and 43rd Omnibus Objections to Landlord Claims.  A Second Amended Lease Rejection Claim has been sent by overnight courier to the Trustee's Claims Agent that reduces the Claim to $465,466.00.

## V.    OBJECTION TO LATE FILED CLAIM.

12.    The Liquidating Trust also proposes to strike POC No. 13480 and No. 15261 entirely upon the grounds the POCs were filed after the bar date.

13.    On January 4, 2012, WCC filed a Motion to Allow Late Proof of Claim [Docket No. 11633].  An Amended Motion will be filed forthwith.

**THEREFORE**, WCC Properties respectfully moves the Court to dismiss the various Objections, and for such other and further relief as may be just and proper.

Respectfully submitted this the 26th day of June 2012.

4

/s/ Douglas Scott
Douglas Scott, VSB No. 28211
DOUGLAS A. SCOTT, PLC
805 Monument Avenue, Suite 311
Richmond, Virginia 23230
☎ 804.353.0287
BankruptcyCounsel@gmail.com

-and-

Clifford Altfeld, *pro hac vice*
Altfeld & Battaile, P.C.
250 North Meyer
Tucson, Arizona 85701
☎ 520.622.7733

Counsel for WCC Properties, LLC

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this day, a true and correct copy of the foregoing Amended Response of WCC Properties, LLC, to Liquidating Trust's 14nd Omnibus Objection to Landlord Claims was served electronically using the ECF system on all registered users of the CM/ECF system who have made an appearance in this matter.

\s\ Douglas Scott

Macintosh HD:Case Files:Case Files:W:WCC Properties LLC- Circuit City:Second Amended Response to Omni Obj FINAL.docx

DOUGLAS A. SCOTT, PLC
Douglas Scott (VSB 28211)
1805 Monument Avenue, Suite 311
Richmond, Virginia 23230
Telephone: (804) 353-0287
Email: bankruptcycounsel@gmail.com
*Attorney for Claimant WCC Properties*

**ALTFELD & BATTAILE P.C.**
Clifford B. Altfeld (ASB 005573/PCCN: 1360
20 North Meyer Avenue
Tucson, Arizona 85701
Telephone: (520) 622-7733
Facsimile: (520) 622-7967
Email: cbaltfeld@abazlaw.com
*Pro hac Attorneys for Claimant WCC Properties*

### THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| IN RE CIRCUIT CITY STORES, INC. | ) | No. 08-35653 (KRH) |
| | ) | **Chapter 11** |
| DEBTOR | ) | **Jointly Administered** |
| | ) | |
| | ) | |

### WCC PROPERTIES' AMENDED REQUEST FOR ADMINISTRATIVE EXPENSE

Claimant WCC Properties LLC (WCC), by counsel, hereby files its Amended Request

for Administrative Expense, and respectfully shows the Court as follows:

1. **Name and Address of Creditor:** WCC Properties LLC c/o ADI Properties,

   2750 Womble Rd., San Diego, CA 92106.

2. **Property Information:** Las Palmillas Shopping Center, Yuma, AZ 85365.

3. **Debtor:** Circuit City Stores West Coast, Inc.

4. **Total Amount of Administrative Claim: $49,581.72**

5. **Summary of Administrative Claim (See Exhibits A-1 through A-5, attached):**



EXHIBIT
1

A.    Post-Petition Rent:

| Month | Administrative Period | Days | Amount |
|---|---|---|---|
| November 2008: | 11/10/08 - 11/30/08 | 21 | $16,235.99 |
| December 2008: | | | |
| January 2009 | | | |
| February, 2009 | 02/16/09 – 02/23/09 | 8 | $6,85.14 |
| Total: | | | $22,421.13 |

B.    Post-Petition CAM, insurance, sales tax, utilities, Arizona state taxes (pro-rated), Arizona
Transaction Privilege Tax (TPT) 2008-2009 (pro-rated), City of Yuma Improvement
Bond ("Bond Dist 68") 2008-2009 (pro-rated), Second installment property taxes 2008,
First installment property taxes 2009 (pro-rated) and sales tax on triple net (NNN)
charges:

| | | | |
|---|---|---|---|
| November, 2008 | 11/10/08 – 11/31/08 | 21 | $1,949.78 |
| December, 2008 | 11/10/08 – 12/31/08 | 52 | $7,699.38 |
| January, 2009 | 01/01/09 – 02/23/09 | 54 | $7,984.40 |
| February, 2009 | 02/13/09 – 02/23/09 | 8 | $714.77 |
| Total: | | | $18,348.33 |

C.    Additional Costs pursuant to the Lease:

| | |
|---|---|
| Removal of Circuit City Building signs: | $5,800.31 |
| Remove debris, carpet cleaning, remove electrical chase form, | |
| relocate hanging electrical wiring to top baskets: | $2,700.00 |
| Rekey locks | $311.95 |
| Total: | $8,812.26 |
| Grand Total: | $49,581.72 |

6. **Pursuant to this Court's Notice of Deadline:**

   a. This claim is in writing.

   b. The claims are denominated in lawful United States currency.

   c. The Debtor against which the entity asserts the administrative expense is Circuit City Stores West Coast, Inc.

   d. The legal and factual bases for the administrative expenses are set forth above.

   e. The lease between claimant and Debtor is attached hereto as **Exhibit B.**

   f. Supporting documentation is attached.

**WHEREFORE,** WCC Properties respectfully requests the Court that its Amended Administrative Claim be allowed in full, and for such other and further relief as may be just and proper.

Respectfully submitted this 25th day of April 2012.

\s\ Douglas Scott
Douglas Scott (VSB 28211)
DOUGLAS A. SCOTT, PLC
1805 Monument Avenue, Suite 311
Richmond, Virginia 23230
Telephone: (804) 353-0287
Email: bankruptcycounsel@gmail.com
*Attorney for Claimant WCC Properties*

**ALTFELD & BATTAILE P.**
Clifford B. Altfeld (ASB 005573/PCCN: 1360)
250 North Meyer Avenue
Tucson, Arizona 85701
Telephone: (520) 622-7733
Facsimile: (520) 622-7967
Email: cbaltfeld@abazlaw.com
*Pro Hac Attorneys for Claimant WCC Properties*

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on this day a true and correct copy of the foregoing was transmitted via the Court's ECF facility to counsel whose names appear below:

Lynn L. Tavenner, Esq.
Paula S. Beran, Esq.
TAVENNER & BERAN, PLC
20 N. Eighth St., 2nd Floor
Richmond, VA 23219

Richard M. Pachulski, Esq.
Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067-4100

Robert J. Feinstein, Esq.
John Morris, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, NY 10017

\s\ Douglas Scott

Macintosh HD:Case Files:Case Files:W:WCC Properties LLC- Circuit City:Amended Admin Claim[1].doc

# EXHIBIT A-1

Circuit City #3748
Las Palmillas Shopping Center - Yuma, AZ
Bankruptcy Claim

Revised As of
4/16/2012

Bankruptcy filing date: 11/10/2008
Lease Rejection Date: 2/23/2009
*Per attorney, prorate amount due including filing date*
**Unsecured:** Amount protected by filing prior to 11/10/2008 o rafter rejection date 2/23/09
**Administrative:** Amount due from Circuit City between filing date 11/10/08 and rejection date 2/23/09

| Date | Outstanding Charge | x | Charge Period | Total Days | Unsecured Days | Admin Days | Total Amount | Unsecured Amount | Admin Amount | |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/1/2008 | Rent (11/08) | x | 11/1-11/30/08 | 30 | 9 | 21 | 23,194.27 | 6,958.28 | 16,235.99 | |
| 11/1/2008 | Estimated CAM (11/08) | x | 11/1-11/30/08 | 30 | 9 | 21 | 1,527.00 | 458.10 | 1,068.90 | |
| 11/1/2008 | Insurance (11/08) | x | 11/1-11/30/08 | 30 | 9 | 21 | 361.00 | 108.30 | 252.70 | |
| 11/1/2008 | Utility (11/08) | x | 11/1-11/30/08 | 30 | 9 | 21 | 471.00 | 141.30 | 329.70 | |
| 11/1/2008 | Actual Rent AZ-TPT (11/08) | x | 11/1-11/30/08 | 30 | 9 | 21 | 394.30 | 118.29 | 276.01 | |
| 11/1/2008 | Est NNN AZ-TPT (11/08) | x | 11/1-11/30/08 | 30 | 9 | 21 | 32.10 | 9.63 | 22.47 | |
| | **Total** | | | | | | **$ 25,979.67** | **$ 7,793.90** | **$ 18,185.77** | |
| | | | | | | | | | | |
| 10/21/2008 | 1st Install - 2008 Property Taxes | x | 1/1-6/30/08 | 182 | 182 | 0 | 21,768.45 | 21,768.45 | - | (1) |
| 10/21/2008 | Actual PTAX AZ-TPT | x | 1/1-6/30/08 | 182 | 182 | 0 | 370.00 | 370.00 | - | (1) |
| 12/22/2008 | 2nd Install 2008 Bond Dist 60 (Int only) | x | 7/1-12/31/08 | 184 | 132 | 52 | 2,265.00 | 1,625.30 | 640.30 | (1) |
| | Actual Bond AZ-TPT | | 7/1-12/31/08 | 184 | 132 | 52 | 38.52 | 27.63 | 10.89 | (1) |
| 12/22/2008 | 2008 Bond Dist 60 (Principal) | x | 1/1-12/31/08 | 366 | 314 | 52 | 5,516.70 | 4,732.96 | 783.81 | (1) |
| | Actual Bond AZ-TPT | | 1/1-12/31/08 | 366 | 314 | 52 | 55.27 | 47.42 | 7.85 | (1) |
| | 2nd Install - 2008 Property Taxes | | 7/1-12/31/08 | 184 | 132 | 52 | 21,768.45 | 15,616.50 | 6,151.95 | (1) |
| | Actual PTAX AZ-TPT | | 7/1-12/31/08 | 184 | 132 | 52 | 370.00 | 265.40 | 104.59 | (1) |
| | 1st Install - 2009 Property Taxes | | 1/1-6/30/09 | 181 | 127 | 54 | 20,935.15 | 14,690.30 | 6,245.05 | (1) |
| | Actual PTAX AZ-TPT | | 1/1-6/30/09 | 181 | 127 | 54 | 355.90 | 249.72 | 106.18 | (1) |
| | 1st Install 2009 Bond Dist 60 (Int only) | | 1/1-6/30/09 | 181 | 127 | 54 | 2,297.45 | 1,612.02 | 685.43 | (1) |
| | Actual Bond AZ-TPT | | 1/1-6/30/09 | 181 | 127 | 54 | 39.06 | 27.41 | 11.65 | (1) |
| | 2009 Bond Dist 60 (Principal) | | 1/1-12/31/09 | 365 | 311 | 54 | 6,216.20 | 5,298.54 | 919.66 | (1) |
| | Actual Bond AZ-TPT | | 1/1-12/31/09 | 365 | 311 | 54 | 105.68 | 90.05 | 15.63 | (1) |
| | **Total** | | | | | | **$ 82,102.73** | **$ 66,438.95** | **$ 15,663.78** | |
| | | | | | | | | | | |
| 2/1/2009 | Base Rent (2/16-2/23/09) | x | 2/16-2/23/09 | 8 | 0 | 8 | 6,185.14 | - | 6,185.14 | (2) |
| 2/1/2009 | Estimated CAM (2/16-2/23/09) | x | 2/16-2/23/09 | 8 | 0 | 8 | 393.33 | - | 393.33 | (2) |
| 2/1/2009 | Insurance (2/16-2/23/09) | x | 2/16-2/23/09 | 8 | 0 | 8 | 94.07 | - | 94.07 | (2) |
| 2/1/2009 | Utility (2/16-2/23/09) | x | 2/16-2/23/09 | 8 | 0 | 8 | 113.33 | - | 113.33 | (2) |
| 2/1/2009 | Actual Rent AZ-TPT (2/16-2/23/09) | x | 2/16-2/23/09 | 8 | 0 | 8 | 105.15 | - | 105.15 | (2) |
| 2/1/2009 | Est NNN AZ-TPT (2/16-2/23/09) | x | 2/16-2/23/09 | 8 | 0 | 8 | 8.20 | - | 8.20 | (2) |
| | **Total** | | | | | | **$ 6,899.91** | **$ -** | **$ 6,899.91** | |
| | | | | | | | | | | |
| | **Overall Total** | | | | | | **$ 114,982.31** | **$ 74,212.85** | **$ 40,769.46** | |

(1) *Per Maya Kashak's instructions in email dated 3/2/2012, Property Taxes and Bond should only be included in Admin claim for accrued period between 11/10/08-2/23/09.*

(2) *Tenant moved out 2/15/09 and paid rent & NNN in full up to 2/15/09. However, per Cliff Allfeld, rent and NNN are due up to the Lease Rejection Date of 2/23/09.*

x   Posted to Tenant Ledger (date posted listed)
Note: *Charges for dates missing from this spreadsheet have been posted and paid in full by the tenant*

# EXHIBIT A-2

# PROPOSAL & CONTRACT

*Since 1946*

**PENN**
## NEON SIGN CO., INC.
DESIGNERS & MANUFACTURERS OF QUALITY SIGNS

| | |
|---|---|
| Proposal Date: | 2/25/09 |
| Proposal No.: | 3342 |
| Account No.: | 1468 |

707 West 8th Street Yuma, Arizona 85364 • (928) 782-2501 • Fax: (928) 343-4076 • E-Mail: sales@pennsigns.com

**SUBMITTED TO:** ADI PROPERTIES (RIO VISTA COMMER
**CONTACT:** GEORGE CODLING
**ADDRESS:** 1600 UNION STREET
4TH FLOOR
SAN DIEGO, CA 92101

**JOB NAME:** CIRCUIT CITY SIGN REMOVAL

**JOB LOCATION:** CIRCUIT CITY
YUMA, AZ

**PHONE / EXT:** (619)990-8510
**CELL NO.:** (619)  -
**FAX NO:** (619)231-8389
**E-MAIL:** ghc@adiproperties

**SITE CONTACT:**

## WE HEREBY SUBMIT SPECIFICATIONS AND ESTIMATES FOR:

| | | Price @ | Total: |
|---|---|---|---|
| Product Code | | $ 5,500.00 | $5,500.00 |
| Custom Project | | | |
| Description | REMOVE AND DISPOSE OF THREE (3) EXISTING 12' DIA. LOGO SIGNS & ONE (1) CAR INSTALL SIGN. | | |
| | PATCH & PAINT (INCLUDES DISASSEMBLY OF SIGNS ON SITE FOR TRANSPORT REMOVAL). | | |
| | CAP ALL ELECTRICAL. | | |
| | REMOVE & DISPOSE OF TWO (2) EXISTING PYLON SIGN FACES @ 50' & REPLACE WITH NEW WHITE | | |
| | LEXAN BLANK FACES. | | |

**Notes:**

TERMS 50% DOWN AND BALANCE DUE UPON INSTALLATION
ELECTRICAL TO SIGN LOCATION BY OTHERS
PERMITS AT COST (not included in prices)
PRICE IS CONTINGENT UPON  UNDERGROUND OBSTRUCTIONS AND OVERHEAD
ACCESS

| | |
|---|---|
| SUB TOTAL: | $5,500.00 |
| SALES TAX: | $300.31 |
| SHIPPING: | $0.00 |
| TOTAL: | $5,800.31 |

ACCEPTANCE OF PROPOSAL  The above prices, specifications
and conditions are satisfactory and are hereby accepted. You are authorized
to do the work as specified. Payment will be made as outlined above.

SALES ASSOCIAT Ron Contreras

Authorized Signature

_____          _____
Signature                                      Date

  

Page 1 of 1

# EXHIBIT A-3

# Kevin M. Kehl

2407 South Kathleen Avenue
Yuma, Arizona 85365
Office/Fax (928) 341-9247
ROC139203

DATE #########

Invoice No.   22509

## *INVOICE*

| Customer Information | | Property Information | |
|---|---|---|---|
| Name | ADI Properties | Name | Circuit City |
| Address | 1660 Union Street, 4th Floor | Address | Las Palmillas Shopping Center |
| | San Diego, CA 92101 | | Yuma, AZ 85365 |
| Phone | (619) 990-8510 | Phone | |
| | ATTENTION: George Codling | | |

| Qty. | Description | Unit Price | Total |
|---|---|---|---|
| 1 | **SCOPE OF WORK**<br>Remove and Haul Off Debris From Building<br>Vacuum Carpets<br>Mop Floors<br>Clean Bathrooms<br>Remove 5 each Electrical Chase Form Main Floor<br>Relocate all Hanging Electrial Wiring To Top Baskets<br><br>Note Price Includes Cost For The Following As Required:<br>    1. Dumpster Rentals<br>    2. Dump Fees<br>    3. Equipment Rental Fees | 2,700.00 | 2,700.00 |
| | Sub Total | | $2,700.00 |
| | Tax | | N/A |
| | TOTAL | | $2,700.00 |

MAKE CHECKS PAYABLE TO:
    Kevin Kehl
    2407 South Kathleen Avenue
    Yuma, AZ 85365

# EXHIBIT A-4

# Kevin M. Kehl

2407 South Kathleen Avenue
Yuma, Arizona 85365
Office/Fax (928) 341-9247
ROC139203

DATE  24-Feb-09

Invoice No.   22409

## *INVOICE*

### Customer Information

| | |
|---|---|
| Name | ADI Properties |
| Address | 1660 Union Street, 4th Floor |
| | San Diego, CA 92101 |
| Phone | (619) 090-8510 |
| | ATTENTION: George Codling |

### Property Information

| | |
|---|---|
| Name | Circuit City |
| Address | Las Palmillas Shopping Center |
| | Yuma, AZ 85365 |
| Phone | |

| Qty. | Description | Unit Price | Total |
|---|---|---|---|
| | **LABOR** | | |
| 1 | Basic Service Call | $65.00 | $65.00 |
| 2 | Remove and Reinstall 2 each Entry Lock Cylinders | $25.00 | $50.00 |
| 2 | Reprogram 2 each Combination Key pad Locks | $25.00 | $50.00 |
| 1 | Removed Pad Lock On Over Head Door | $12.50 | $12.50 |
| 1 | Remove Pad Lock On Roof Latch Hatch | $12.50 | $12.50 |
| | Labor Total | | 190.00 |
| | | | |
| | **MATERIAL** | | |
| 5 | Cut 5 Each New Entry Lock Keys | 3.50 | $17.50 |
| 5 | Cut 5 Each New Interior Lock Keys | 3.50 | $17.50 |
| 2 | 2 Each New Mortise Cylinder Key-Ways | 22.50 | $45.00 |
| 1 | ABUS Pad Lock On Over Head Door and Keyed To Entrance Locks | 32.50 | $32.50 |
| | Material Total | | 112.50 |

| | |
|---|---|
| Labor | $190.00 |
| Material | $112.50 |
| Sub Total | $302.50 |
| Tax | $9.45 |
| TOTAL | $311.95 |

MAKE CHECKS PAYABLE TO:
Kevin Kehl
2407 South Kathleen Avenue
Yuma, AZ 85365

# EXHIBIT A-5

2009-02-20 16:53                804-486-8248 >> 6192318389              P 1/2

# FAX

**Circuit City Stores, Inc.**
9950 Mayland Drive
Richmond, VA  23233-1464



fax

Date     February 20, 2009
Number of pages including cover sheet   2

To:                                             From:

Landlord                                        Property Management
                                                department

Phone                                           Phone
Fax Phone   (619)231-8389                        Fax Phone
CC:                                             E-mail:

**REMARKS:**
☐ Urgent     ☐ For your review     ☐ Reply ASAP     ☐ Please comment

RE:  Circuit City store #03748 – Yuma, AZ

Please find attached a REVISED letter to replace a letter included in a FedEx package your
office should have received today.  Thank you.



Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464

February 17, 2009


Re:   Store # 03748
      1232 SOUTH CASTLE DOME AVENUE
      LAS PALMILLAS SHOPPING CENTER
      YUMA, AZ 85365

Dear Landlord:

The property referenced above was included in a Rejection Motion made with the United States Bankruptcy Court, a copy of which you were previously provided. Enclosed please find a key or keys to the entrance to the store.

Accordingly, effective Monday, February 23, 2009, we will be turning off and discontinuing any and all services in our name for this property. This will include all utilities (see attached for list, if no attachment there are no utilities in our name), phone, alarm monitoring, etc. In addition, we will no longer include this property in our insurance coverage.

As a result of the foregoing, no alarm codes are being provided as the system will be disarmed.

The service for burglar alarm monitoring was being provided by Vector. If you wish to establish a new account with Vector, please contact Tracie Cline 704-938-5725. The service for fire alarm monitoring was being provided by ADT. To establish a new account with ADT, please contact 800-238-7887 OPTION 3. If you are interested in obtaining information with regard to the building automation system, please contact Tim Zimmerman of NOVAR at 800-348-1236.

Very truly yours,

CIRCUIT CITY STORES, INC.
PROPERTY MANAGEMENT DEPT.



## LEASE AGREEMENT

by and between

### WCC PROPERTIES, LLC

as Landlord

and

### CIRCUIT CITY STORES WEST COAST, INC.

as Tenant

Las Palmillas Shopping Center, Yuma, Arizona

ATI 32295763.9 / 37655-000001



EXHIBIT

2

## Table of Contents

|  |  | Page |
|---|---|---|
| ARTICLE I | FUNDAMENTAL LEASE PROVISIONS | 1 |
| SECTION 1.01 | Definitions: | 1 |
| ARTICLE II | LEASE OF PREMISES - TERM OF LEASE | 4 |
| SECTION 2.01 | Demise. | 4 |
| SECTION 2.02 | Extension Periods | 5 |
| SECTION 2.03 | Commencement Date and Landlord Reimbursement | 5 |
| SECTION 2.04 | Possession Date | 6 |
| SECTION 2.05 | Expected Possession Date | 7 |
| SECTION 2.06 | Possession Date During Slack Period Delivery | 8 |
| SECTION 2.07 | Delayed Possession | 8 |
| SECTION 2.08 | Early Entry | 8 |
| SECTION 2.09 | Measurement | 8 |
| SECTION 2.10 | Commencement Date Agreement | 9 |
| ARTICLE III | INITIAL CONSTRUCTION | 9 |
| SECTION 3.01 | Landlord's and Tenant's Work | 9 |
| ARTICLE IV | RENT | 9 |
| SECTION 4.01 | Annual Minimum Rent | 9 |
| SECTION 4.02 | Additional Rent | 10 |
| SECTION 4.03 | Rent; Method of Payment | 10 |
| ARTICLE V | COMMON AREA MAINTENANCE AND COST | 10 |
| SECTION 5.01 | Maintenance | 10 |
| SECTION 5.02 | Construction Clean-up and Post-Possession Work | 10 |
| SECTION 5.03 | CAM Costs | 11 |
| SECTION 5.04 | Tenant's Share of CAM Costs | 12 |
| SECTION 5.05 | Payment of CAM Costs | 12 |

ATI 32295763.9 / 37655-000001

Table of Contents
(continued)

Page

SECTION 5.06   CAM Costs Increases .................................................................... 13

ARTICLE VI   TAXES .......................................................................................... 13

SECTION 6.01   Taxes ................................................................................... 13

SECTION 6.02   Payment of Taxes ................................................................ 14

SECTION 6.03   Exclusions from Taxes ........................................................ 14

SECTION 6.04   Right to Contest ................................................................. 14

ARTICLE VII   UTILITIES ................................................................................. 15

SECTION 7.01   Utilities ............................................................................. 15

SECTION 7.02   Interruption ...................................................................... 15

ARTICLE VIII   USE OF PREMISES ................................................................ 15

SECTION 8.01   Permitted Use ................................................................... 15

SECTION 8.02   Conduct of Operations ..................................................... 15

SECTION 8.03   Leasing Restrictions .......................................................... 16

SECTION 8.04   Tenant's Exclusive ............................................................ 16

SECTION 8.05   Exclusives Applicable To Tenant ....................................... 19

SECTION 8.06   Ongoing Cotenancy .......................................................... 20

ARTICLE IX   REPAIRS .................................................................................... 20

SECTION 9.01   Landlord Obligations ......................................................... 20

SECTION 9.02   Tenant's Obligations .......................................................... 21

SECTION 9.03   Hazardous Materials .......................................................... 22

SECTION 9.04   Surrender of the Premises ................................................. 24

ARTICLE X   REQUIREMENTS OF LAW ......................................................... 24

SECTION 10.01   Landlord's Obligations ..................................................... 24

ii

Table of Contents
(continued)

Page

SECTION 10.02      Tenant's Obligations................................................................24

SECTION 10.03      Right to Contest ...................................................................24

ARTICLE XI      INSURANCE.................................................................................24

SECTION 11.01      Landlord's Insurance. ...........................................................24

SECTION 11.02      Tenant's Insurance. ..............................................................25

SECTION 11.03      Insurance Requirements Generally. ....................................26

SECTION 11.04      Landlord's Insurance Cost. ..................................................26

SECTION 11.05      Indemnity. ............................................................................27

SECTION 11.06      Mutual Waiver of Subrogation. ..........................................27

SECTION 11.07      Affiliate ................................................................................28

ARTICLE XII      DAMAGE OR DESTRUCTION.................................................28

SECTION 12.01      Landlord's Obligation to Rebuild ........................................28

SECTION 12.02      Tenant's Obligation to Rebuild............................................28

SECTION 12.03      Termination...........................................................................28

ARTICLE XIII      CONDEMNATION ....................................................................29

SECTION 13.01      Taking. ..................................................................................29

SECTION 13.02      Restoration and Rent Adjustment ........................................30

SECTION 13.03      Award....................................................................................30

ARTICLE XIV      ALTERATIONS AND MECHANICS' LIENS .........................31

SECTION 14.01      Tenant's Alteration Rights....................................................31

SECTION 14.02      Mechanics' Liens .................................................................32

ARTICLE XV      SIGNS.........................................................................................32

SECTION 15.01      Tenant's Signs.......................................................................32

iii



Table of Contents
(continued)

Page

SECTION 15.02       Pylon Signs ...............................................................................32

SECTION 15.03       Replacement...............................................................................33

ARTICLE XVI        TENANT'S PROPERTY.................................................................33

SECTION 16.01       Tenant's Property ........................................................................33

ARTICLE XVII       ASSIGNMENT AND SUBLETTING ..........................................33

SECTION 17.01       Assignment and Subletting Rights..............................................33

SECTION 17.02       Collateral Assignment.................................................................36

SECTION 17.03       Cure Rights of Original Tenant...................................................36

SECTION 17.04       Recognition Agreement ...............................................................36

ARTICLE XVIII       DEFAULT ...................................................................................36

SECTION 18.01       Tenant's Default..........................................................................36

SECTION 18.02       Additional Landlord Remedies Due to Construction Delays by
Tenant              38

SECTION 18.03       Landlord's Default. .....................................................................38

SECTION 18.04       Additional Tenant Self-help, Equitable and Legal Remedies Due to
Construction Delays by Landlord ...............................................................................40

SECTION 18.05       Additional Tenant Remedies Due to Landlord's Failure to Pay the
Landlord Reimbursement..............................................................................................41

SECTION 18.06       Waiver; Non-Exclusive Remedies...............................................41

ARTICLE XIX        SUBORDINATION, TRANSFER OF INTEREST ......................41

SECTION 19.01       Subordination...............................................................................41

SECTION 19.02       Existing Mortgages and Ground Leases ......................................42

SECTION 19.03       Transfer of Interest......................................................................42

SECTION 19.04       Tenant Estoppel Certificates .......................................................42

SECTION 19.05       Landlord Estoppel Certificates ....................................................42

iv

Table of Contents
(continued)

Page

SECTION 19.06    Payments .................................................................................43

ARTICLE XX    LANDLORD'S REPRESENTATIONS, WARRANTIES AND
COVENANTS    43

SECTION 20.01    Quiet Enjoyment ......................................................................43

SECTION 20.02    Representations, Warranties and Covenants....................................43

SECTION 20.03    Site Covenants .......................................................................44

SECTION 20.04    Declaration...........................................................................45

ARTICLE XXI    HOLDING OVER ........................................................................47

SECTION 21.01    Holding Over .........................................................................47

ARTICLE XXII    NOTICE...................................................................................47

SECTION 22.01    Where and How Given.............................................................47

SECTION 22.02    When Given ...........................................................................48

ARTICLE XXIII    MISCELLANEOUS ....................................................................48

SECTION 23.01    Rent Proration .......................................................................48

SECTION 23.02    Construction..........................................................................48

SECTION 23.03    Section Headings ....................................................................48

SECTION 23.04    Partial Invalidity......................................................................48

SECTION 23.05    Waiver...................................................................................49

SECTION 23.06    Governing Law ......................................................................49

SECTION 23.07    Successors and Assigns............................................................49

SECTION 23.08    No Broker...............................................................................49

SECTION 23.09    Memorandum of Lease ............................................................49

SECTION 23.10    Entire Agreement ...................................................................49

SECTION 23.11    Relationship of Parties .............................................................49

v

ATI 32295763.9 / 37655-000001



Table of Contents
(continued)

Page

SECTION 23.12    Force Majeure ....................................................................50

SECTION 23.13    Limitation of Landlord's Liability ....................................50

SECTION 23.14    Limitation of Tenant's Liability........................................50

SECTION 23.15    Consents.............................................................................50

SECTION 23.16    Costs...................................................................................50

SECTION 23.17    Attorneys' Fees .................................................................51

SECTION 23.18    Survival of Obligations ....................................................51

SECTION 23.19    Joint and Several Liability ...............................................51

SECTION 23.20    Definition of Hereunder, Herein, etc. ..............................51

SECTION 23.21    Tenant's Trade Name.........................................................51

SECTION 23.22    Counterparts.......................................................................51

SECTION 23.23    Changes to Shopping Center..............................................51

EXHIBIT A-1      Site Plan
EXHIBIT A-2      Site Plan
EXHIBIT A-3      Site Plan
EXHIBIT B        Legal Description of the Shopping Center
EXHIBIT C        Site Design Requirements
EXHIBIT C-1      Possession Date Notice
EXHIBIT D        W-9 Form
EXHIBIT E        Commencement Date and Expiration Date Agreement
EXHIBIT F        Prohibited Uses
EXHIBIT G        Existing Leases
EXHIBIT H        Existing Exclusives
EXHIBIT I        Recognition Agreement
EXHIBIT J        Subordination, Non-Disturbance and Attornment Agreement
EXHIBIT K        Permitted Exceptions
EXHIBIT L        Memorandum of Lease
EXHIBIT M        Indemnity Agreement
EXHIBIT N        Declaration



## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease"), dated as of the _31_ day of March, 2006 ("Effective Date"), by and between WCC PROPERTIES, LLC, a Utah limited liability company ("Landlord") with an office at 1660 Union Street, 4th Floor, San Diego, California 92101, and CIRCUIT CITY STORES WEST COAST, INC. ("Tenant") with an office at 9950 Mayland Drive, Richmond, Virginia 23233.

## W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

## ARTICLE I

## FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01    Definitions:

A.    **Additional Charges:**

1. Initial Estimated CAM Costs: Two and 15/100 Dollars ($2.15) per square foot of Floor Area (as defined below), which includes the initial insurance cost of Forty Cents ($0.40) per square foot of Floor Area (the "Initial Insurance Cost").

2. Initial Estimated Taxes: Three and 10/100 Dollars ($ 3.10) per square foot of Floor Area.

B.    **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of tenth (10th) Lease Year (as defined in Section 1.01(J)) | $13.74 | $278,976.96 | $23,248.08 |

1



| | | | |
|---|---|---|---|
| 1st Extension Period (as defined in Section 1.01(F)): | $14.74 | $299,280.96 | $24,940.08 |
| 2nd Extension Period: | $15.74 | $319,584.96 | $26,632.08 |
| 3rd Extension Period: | $16.74 | $339,888.96 | $28,324.08 |
| 4th Extension Period: | $17.74 | $360,192.96 | $30,016.08 |
| 5th Extension Period: | $18.74 | $380,496.96 | $31,708.08 |

C.    **Alternative Rent:** An amount equal to fifty percent (50%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent.

D.    **Brokers:** Western Retail Advisors, LLC, for Tenant and Phoenix Commercial Advisors, LLC, for Landlord

E.    **Delivery Dates:**

    1.    Anticipated Possession Date:  May 1, 2006.

    2.    Outside Possession Date:  May 15, 2006.

F.    **Extension Periods:**  Five (5) periods of five (5) years each.

G.    **Floor Area:** The actual number of square feet of space (excluding janitorial and utility rooms and similar areas which are not leased to tenants) contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below), or in the Shopping Center, as applicable, and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one (1) or more tenants (other than loading dock areas, trash compactor areas, and trash container areas, and patios, play areas and other exterior areas on the Outparcels).  All measurements shall be from the exterior of outside walls or store front

2



and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H.   **Initial Lease Term:** Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.   **Key Tenants:**   At least two (2) nationally-recognized tenants (such as, but not limited to, Bed Bath & Beyond, Petco, Shoe Pavilion and Party City) occupying an aggregate square footage of not less than 38,000 square feet.

J.   **Lease Year:** Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

K.   **Minimum Initial Cotenancy Requirement:** At least two (2) National Tenants (as defined in Section 8.06), occupying an aggregate of 38,000 square feet of Floor Area, open for business during normal hours or actively installing fixtures or accepting deliveries of merchandise in preparation for such opening.

L.   **Minimum Ongoing Cotenancy Percentage:** Retail tenants, open for business during normal business hours, occupying at least sixty five percent (65%) of the Floor Area of the Shopping Center, exclusive of the Premises.

M.   **Minimum Parking Ratios:** Four and eight tenths (4.8) full-size parking spaces for each one thousand (1,000) square feet of Floor Area in the Shopping Center, with each parking space being at least nine (9) feet in width and eighteen (18) feet in length and for full-sized automobiles.

N.   **Opening Requirement:** The Minimum Initial Cotenancy Requirement is met.

O.   **Permitted Use:** The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other lawful retail use not specifically prohibited by the provisions of Section 8.01. The term "Products" shall include, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication



3

devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing.

P.    **Premises:**  The store building to be constructed by Tenant as part of Tenant's Work (as defined in Section 3.01), containing approximately 20,304 square feet of Floor Area, including 138 feet of frontage, as crosshatched on the site plan attached hereto as Exhibit A (the "Site Plan"), in the shopping center known as Las Palmillas Shopping Center, containing approximately ±150,000 (including Outparcel buildings) square feet of Floor Area and located to the north of the corner of Castle Dome Avenue and 12th Street in Yuma, Arizona (the "State"), as more particularly described in Exhibit B (the "Shopping Center").

*20,257*
*con't stch*

Q.    [Deleted.]

R.    [Deleted.]

S.    **Tenant's Share:**  A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Shopping Center. In no event shall the denominator of the fraction by which Tenant's Share is determined be less than ninety percent (90%) of the Floor Area of the building areas shown on the Site Plan.

T.    **Term:**  The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

U.    **Outparcels:**  The four (4) parcels shown as Lots 2, 3, 4 and 5 on the Site Plan.

## ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01    Demise.

(a)    Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises.

(b)    Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Shopping Center, to use all Shopping Center sidewalks, paved parking areas, paved service areas, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center, landscaping and landscaping containers and systems (collectively, the "Common Areas") now or hereafter made available or maintained by Landlord in the Shopping Center. Tenant's right to use the Common

4



Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents. Landlord shall provide Tenant with at least sixty (60) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations.

(c) Subject to the Laws, Tenant shall have the exclusive right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, three (3) customer pick-up parking spaces, six (6) car stereo installation parking spaces, four (4) web order customer pick-up parking spaces, four (4) cart corrals, trash compactor area and transformer pad area (collectively, the "Other Improvements"), all as shown on the Site Plan. Tenant shall have the right to erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo installation parking areas. Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces. In addition, Tenant shall have the right to have a truck or other vehicle parked in "Tenant's Preferred Area" as shown on the Site Plan ("Tenant's Preferred Area"), for up to five (5) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to five [5] days in duration is referred to as a "Tenant Promotion"), provided that Tenant shall not sell merchandise in such Tenant's Preferred Area. Tenant may have up to six (6) Tenant Promotions during Lease Year 1, and up to five (5) Tenant Promotions for each subsequent Lease Year.

SECTION 2.02     Extension Periods. Provided Tenant is not then in default of any material terms or provisions this Lease, after the lapse of all applicable grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving notice to Landlord (a) at least one hundred eighty (180) days prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.

SECTION 2.03     Commencement Date and Landlord Reimbursement. "Commencement Date" shall mean the date on which Landlord makes payment of the Landlord Reimbursement in accordance with this Lease. "Landlord Reimbursement" shall mean the sum of (i) the product obtained by multiplying Seventy Five and 00/100 Dollars ($75.00) by the ground floor Floor Area of the Premises as determined by the Floor Area Certification (as defined below) and (ii) the aggregate sum of all construction related governmental fees and assessments incurred by Tenant in the construction of the Premises, including, without limitation, costs of all construction permits, impact fees and utility connection fees paid by Tenant ("Construction Permitting Costs"). Notwithstanding the foregoing, Landlord agrees that Possession Date shall not be deemed to have occurred until all approvals and permits shall have been obtained and all fees, including but not limited to impact fees and assessments, shall have been paid by Landlord, if and to the extent that such approvals, permits and fees for Landlord's Work shall be prerequisites to the issuance of a building permit for the performance of Tenant's Work. Upon Substantial Completion (as defined in the site design requirements attached hereto as Exhibit C ["Site Design Requirements"]) and Tenant's furnishing to Landlord (a) the

5

certificates of insurance required under Section 11.02, (b) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction (provided, however, that if any such liens are recorded against the Premises, Tenant shall comply with Section 14.02), (c) a square footage building perimeter survey certified to Tenant and Landlord (the "Floor Area Certification"), (d) written notice to Landlord setting forth the Construction Permitting Costs, Landlord shall pay to Tenant the Landlord Reimbursement, (e) an estoppel certificate and (f) if required by Landlord's Mortgagee, a commercially reasonable form of SNDA. The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (a), (b), (c), (d), (e) and (f), above. However, if the Commencement Date shall occur prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the date on which the Opening Requirement is met. However, if Tenant elects, at its discretion, to open for business prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the date on which the Opening Requirement is met. In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant. Upon Substantial Completion and payment of the Landlord Reimbursement from Landlord to Tenant, Landlord shall be the owner of the Building (as defined in the Site Design Requirements, but not including any of Tenant's Property, as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes. Tenant shall have the right to deliver to Landlord, a bill of sale evidencing the conveyance of the Building from Tenant to Landlord. Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale and/or a deed to the Building. However, the conveyance of the Building shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered. Subject to Tenant's right to bond against any mechanics' liens which are disputed by Tenant, the Building shall be conveyed to Landlord free and clear of liens and encumbrances created or suffered by Tenant. If Tenant has not satisfied the conditions for the Landlord Reimbursement within 180 days after the Possession Date (as extended for Force Majeure, but not to exceed an aggregate of 30 days), and provided the Opening Requirement is met and Tenant has Substantially Completed Landlord's Work, then Landlord may, at its option, pay to Tenant the Landlord Reimbursement, in which event (a) the Commencement Date shall occur and the full Annual Minimum Rent and all other Rent shall commence to accrue, (b) Tenant shall concurrently deliver to Landlord such of the items listed above as Tenant is able to deliver and (c) Tenant shall use commercially reasonable best efforts to substantially Complete the Building and deliver the remaining items as soon as possible.

SECTION 2.04     Possession Date. "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)     Landlord shall have caused the Delivery of the Land (as defined in the Site Design Requirements) to occur;

(b)     Intentionally Omitted;

(c)     Intentionally Omitted;

6



(d)     Intentionally Omitted;

(e)     The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f)     Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g)     [Intentionally Omitted]

(h)     Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession Date, subject to the provisions of Section 2.05 below. In no event shall the Possession Date occur prior to the Expected Possession Date (as defined in Section 2.05).

SECTION 2.05     Expected Possession Date.

A.     Landlord shall give Tenant no less than thirty (30) days notice of the date on which the Possession Date (including, without limitation, the Delivery of the Land) shall occur, using the form of Possession Date Notice attached hereto as Exhibit C-1 (the "Possession Date Notice"). The date specified in such notice shall be defined as the "Expected Possession Date".

B.     If Landlord fails to accomplish the Possession Date by the Expected Possession Date (subject to Force Majeure, as defined in Section 23.12, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to the sum of: (i) Fifty Thousand Dollars ($50,000), plus (ii) an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed. If Landlord fails to Substantially Complete (as defined in Section 2.07) any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements), subject to Force Majeure (but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to two (2) days of Annual Minimum Rent for each day that such component of Landlord's Work is delayed. The foregoing liquidated

7



reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

SECTION 2.06   Possession Date During Slack Period Delivery. Anything contained in this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack Delivery Period, then Tenant may refuse to accept the Premises. In that event, the Possession Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including, without limitation, Sections 2.04 and 2.05).

SECTION 2.07   Delayed Possession. If the Possession Date does not occur before the Outside Possession Date (subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days, then Tenant shall have the right to (a) terminate this Lease effective on thirty (30) days notice, or (b) defer the Outside Possession Date for a period (to be specified in Tenant's notice) of not to exceed nine (9) months, which right shall be exercised by Tenant upon notice to Landlord at any time within thirty (30) days after the Outside Possession Date. If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000). Notwithstanding the foregoing, if the Possession Date occurs within thirty (30) days after Tenant's delivery of notice of termination, then this Lease shall not terminate. If Tenant elects to defer the Outside Possession Date, then Landlord shall use commercially reasonable best efforts to cause the Possession Date to occur on or before the date specified by Tenant. Landlord's Work shall be deemed Substantially Complete when the Common Areas have been completed in all material respects such that they can be used for their intended purposes and (b) Landlord has completed all of Landlord's Work to the extent that Tenant shall not be precluded from performing Tenant's Work (as defined in Section 3.01 hereof).

SECTION 2.08   Early Entry. Any time prior to the Delivery of the Land, Tenant shall have the right to enter the Premises to (a) inspect the physical condition of the Land (as defined in the Site Design Requirements) and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; provided, however, that such entry may not unreasonably interfere with Landlord's Work. Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof. Tenant's obligations under Section 11.05(u) shall apply to such entry.

SECTION 2.09   Measurement. If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(P), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises. Landlord and Tenant each agree to use commercially reasonable best efforts to

8

ensure that the actual Floor Area will be within 250 square feet of the Floor Area shown in Section 1.01(P).

SECTION 2.10      Commencement Date Agreement. When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01      Landlord's and Tenant's Work. Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work"). If the Possession Date does not occur by the deferred Outside Possession Date specified by Tenant, then this Lease shall terminate and Landlord shall reimburse Tenant as provided above. Tenant shall construct the Building and storefront sidewalk in accordance with the Site Design Requirements ("Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement. Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work.

Landlord shall construct the common block wall between the Premises and Major 2 (as shown on the Site Plan) which shall serve as the northerly wall of the Premises and the southerly wall of Major 2. Such wall shall be constructed by Landlord on or before the Possession Date. Tenant agrees to reimburse Landlord an amount equal to one-half (1/2) of the cost of construction of the wall within thirty (30) days after receipt of an invoice accompanied by reasonable supporting evidence of the cost.

In connection with the construction of Landlord's Work and Tenant's Work, Landlord and Tenant agree to reasonably cooperate in the performance and staging of such work so as not to unreasonably delay or interfere with each other's work.

## ARTICLE IV

## RENT

SECTION 4.01      Annual Minimum Rent. Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term. However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month. Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent, Ground Rent (as defined in Section 18.02(a)) or any other ground rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant

ATI 32295763.9 / 37655-000001



shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent, Ground Rent or the other ground rent.

SECTION 4.02     Additional Rent. The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent. The full Additional Rent shall be payable whether Tenant is paying Alternative Rent or Minimum Annual Rent. Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03     Rent; Method of Payment. The term "Rent" shall mean, collectively, Annual Minimum Rent (or Alternative Rent, if applicable) and Additional Rent. All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by written notice to Tenant, or by such other reasonable method of payment (such as by wire transfer) without offset or deduction except as expressly permitted in this Lease.

## ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01     Maintenance. Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first-class order, repair and condition. Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Common Areas and for the clearing of snow and ice from the Common Areas. Landlord may at any time, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking. However, between November 1 and January 1 (and provided Tenant is open for business in the Premises), Landlord may temporarily close parts of the Common Areas within Tenant's Preferred Area only to make repairs of an emergency nature, including repairs which are required by law or for safety reasons. However, in any instance of such emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner possible and in such a way and at such times as to cause the least interference possible with ingress and egress to and from the Premises. In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where feasible, and complete the permanent repairs after January 1.

SECTION 5.02     Construction Clean-up and Post-Possession Work. Following the Commencement Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition if any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

ATI 32295763.9 / 37655-000001



(a)     staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area;

(b)     Landlord shall use commercially reasonable best efforts to ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on the Site Plan, provided however, that for construction performed on Lot 4 and Lot 5 Landlord shall use the "Construction Access for Lots 4 and 5" as shown on Exhibit "A-3" of the Site Plan and for construction performed on Lot 2 and Lot 3 Landlord shall use the "Construction Access for Lots 2 and 3" as shown on Exhibit "A-3" of the Site Plan as an entrance/exit drive for construction, delivery and related vehicles engaged in the performance of such work;

(c)     Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d)     Landlord shall clear all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

SECTION 5.03     CAM Costs.  "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in operating, insuring and maintaining the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "Administrative Fee") not to exceed ten percent (10%) of the CAM Costs for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (to the extent otherwise permitted to be included in CAM Costs), the cost of electricity and other utilities, and the cost of insurance premiums.  In no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect, or (iii) relating to any improvements or utility systems not within the Common Areas (e.g. roofs, exterior walls, fire protection systems) except that repair and replacement of utility systems which serve the Premises as well as other premises in the Shopping Center and the cost of repainting or refinishing the exteriors of the buildings may be included; (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date, or to correct damage caused by subsidence or adverse or substandard soil conditions except that the cost repairs or replacements to the Common Areas which are required to conform to new laws or to changes in the established interpretation of existing laws shall be included; (f) amounts reimbursable from insurance

11



proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for insurance maintained by Landlord pursuant to Section 11.01 shall be included), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord, any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 11.01; (h) the cost of any replacements or capital improvements to the Common Areas, except for the costs referred to in (e), above, and except that the cost of repaving the parking areas of the Shopping Center may be included within CAM Costs so long as any such costs are otherwise permitted to be included within CAM Costs and are amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied, and are not incurred (i) prior to the expiration of the tenth (10th) full calendar year of the Term, or (ii) more than once during each ten (10) full calendar years of the Term; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee; (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) except as provided in (e), above, any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of the Shopping Center and improvements (as distinguished from repairs and replacements) to landscaped areas of the Shopping Center; (n) holiday or other decorations or other promotional expenses relating to the Shopping Center; or (o) any fees, costs or expenses not related to the operation, maintenance, insurance or repair of the Common Areas. Further, Landlord shall exclude from CAM Costs all costs or expenses in connection with any repairs or replacements to the Common Areas from the date that Landlord's Work is Substantially Completed through the first (1st) anniversary of the date that Landlord's Work is Substantially Completed, and Landlord shall also make an appropriate adjustment for the increase in CAM Costs attributable to tenants or occupants of the Shopping Center (including Tenant) operating between the hours of 10 p.m. and 9 a.m.

SECTION 5.04    Tenant's Share of CAM Costs.  Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term.  Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term.  The parties anticipate that Tenant's Share of CAM Costs in the first full calendar year of the Term (including the prior partial year, if any) shall be equal to the Initial Estimated CAM Costs.  If Landlord reasonably determines that any CAM Cost was incurred for work or a service which wholly or primarily benefits some tenants and not others (such as insurance on buildings or painting buildings), or if some tenants pay costs or perform work (such as painting their own building) which would otherwise be included in CAM Costs, then Landlord shall apportion such CAM Costs such that Tenant's Share (if any) shall be based on the ratio of the Floor Area of the Premises to the Floor Area of all premises that are benefited by the CAM Cost.

SECTION 5.05    Payment of CAM Costs.  Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month.  Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the

12

ATI 32295763.9 / 37655-000001



preceding calendar year, subject to immediate adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined. Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant). Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due. Any surplus paid by Tenant shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith. Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of three (3) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question. Tenant may, only during such three (3) year period, upon ten (10) days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records"). In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within ten (10) days of a request therefor. Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith and any undercharges shall be paid by Tenant within thirty (30) days after written notice to Tenant of such underpayment. If any such audit shows that Tenant's Share of CAM Costs have been overstated by more than four percent (4%), then Landlord shall immediately pay to Tenant the reasonable hourly based cost of such audit. Tenant agrees to keep the results of any such audit confidential and not disclose the same to other tenants or to other third parties (except accountants and attorneys or as necessary to enforce Tenant's legal rights).

SECTION 5.06      CAM Costs Increases. Notwithstanding anything contained in this Lease to the contrary, for all calendar years subsequent to the third (3rd) full calendar year of the Term, in no event shall Tenant's Share of CAM Costs (excluding snow removal, utilities, insurance, security (if any) and non-recurring expenses (e.g., parking lot refurbishment) increase, from any calendar year to the immediately succeeding calendar year, by more than five percent (5%).

## ARTICLE VI

## TAXES

SECTION 6.01      Taxes. Landlord shall pay when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Shopping Center. Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings which are separately assessed) of all real estate taxes and assessments (collectively, "Taxes") levied and assessed against the land, improvements and buildings comprising the Shopping Center. Such Taxes shall include the assessment levied in connection with the improvements to Castle Dome Avenue in connection with the construction of the Shopping Center. Tenant's Share of Taxes shall be equitably adjusted if the use or value of any portion (other than the Premises) of any buildings in the Shopping Center included in computing Tenant's allocation cause Taxes attributable to such buildings to be assessed at a disproportionately higher rate or if Taxes on any

*Imp Bnd*

13



parcel are separately paid. The parties anticipate that Tenant's Share of Taxes for the first full calendar year of the Term (including the prior partial year, if any) shall equal the Initial Estimated Taxes.

SECTION 6.02    Payment of Taxes. Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant proof of payment of Taxes by Landlord, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) ten (10) days before the same are due and payable, whichever is later.

*TAXES PAY ON ACTUALS*

SECTION 6.03    Exclusions from Taxes. Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the Possession Date, no portion of the Shopping Center is or will be (a) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord; (ii) taxes on rents (other than to the extent that such taxes are customarily paid (either directly or by expense reimbursement to Landlord) by retail tenants in the State, county or city where the Premises is located), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord, or more than once every five (5) years; or (v) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04    Right to Contest. Tenant may contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith. If Tenant initiates such contest, then Landlord shall cooperate with Tenant including, without limitation, executing any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, joining with Tenant in the prosecution thereof. If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are reimbursed to the party which incurred such expense). Tenant

14



11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance. If Tenant self-insures, the following conditions shall apply: (x) unless Tenant is a publicly traded company with shares listed on a major national exchange, Tenant shall provide to Landlord at Landlord's request, not more frequently than annually, financial statements certified by Tenant as true and correct, prepared in accordance with generally accepted accounting principles, demonstrating compliance with the foregoing net worth requirement and (y) Tenant's obligations to Landlord with respect to such self-insurance shall be the same as if Tenant had obtained the required insurance from a third party insurance company and shall not be subject to any offsets or defenses based on any alleged or actual default by Landlord under this Lease to the extent such offsets or defenses could not be asserted by a third party insurer.

SECTION 11.03     <u>Insurance Requirements Generally.</u>

(a)     All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above, respectively.

(b)     The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits and deductibles of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04     <u>Landlord's Insurance Cost.</u>

(a)     The reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a) shall be included as part of CAM Costs. If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)     If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Shopping Center, then the amount of such increase shall be excluded from CAM Costs. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been

26



included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)     The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05     Indemnity.

(a)     Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)     Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

(c)     The provisions of this Section 11.05 shall survive the expiration or earlier termination of this Lease.

SECTION 11.06     Mutual Waiver of Subrogation.

(a)     Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party.  If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)     Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that.

27



after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption. This is a lease of real property in a shopping center within the meaning of Subsection 365(b) (3) of the Bankruptcy Code.

SECTION 17.02    Collateral Assignment. In addition to Tenant's other rights set forth in this Article XVII, a collateral assignment of Tenant's interest in this Lease by the Original Named Tenant or by a Tenant with an Adequate Net Worth to one (1) or more Lenders (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith provided such documentation does not materially increase Landlord's obligations or materially decrease Landlord's rights under this Lease. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of the Original Named Tenant or a Tenant with an Adequate Net Worth a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. "Lender" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

SECTION 17.03    Cure Rights of Original Tenant. If Tenant assigns Tenant's interest in this Lease and the assignor remains liable under this Lease following such assignment, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named in this Lease or its Affiliate (collectively, the "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the right (but not the obligation) to cure such default, which cure period shall be thirty (30) days longer than the cure period applicable to Tenant.

SECTION 17.04    Recognition Agreement. If Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit I, in recordable form (the "Recognition Agreement"). However, Landlord shall not obligated to enter into the Recognition Agreement unless (a) the subtenant will be occupying 10,000 square feet of Floor Area or more within the Premises and the portion of the Premises not being sublet shall be in a configuration that would make same commercially leasable for retail purposes (as reasonably determined by Tenant and Landlord) at a rental comparable to the remaining Floor Area (e.g., it must have reasonable store front, access and signage space), and (b) the sublease is, or upon implementation of the Recognition Agreement will be, on terms and conditions which are no more onerous to the sublessor thereunder than those pertaining to Landlord under this Lease and are no more beneficial to the subtenant than those pertaining to Tenant under this Lease.

## ARTICLE XVIII

## DEFAULT

SECTION 18.01    Tenant's Default.

ATI 32295763.9 / 37655-000001



(a)    If Tenant defaults in the payment of any installment of Rent and such default is not cured within fifteen (15) days after receipt of notice from Landlord thereof, or if Tenant defaults under Sections 11.02, 11.03, 19.01, 19.02, 19.04 or 23.23 and if such default continues for more than five (5) business days after Landlord gives written notice of such default to Tenant, or if Tenant defaults in the observance of any other material covenant or agreement herein contained and Tenant shall not, within thirty (30) days after receipt of notice thereof from Landlord, cure such default or, if the default can be cured but cannot reasonably be cured within such 30-day period, if Tenant fails to commence the cure within such 30-day period and thereafter diligently and continuously prosecute the cure to completion (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Tenant within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default:

(i)    terminate this Lease, without any right by Tenant to reinstate its rights by payment of Rent or other performance of the terms and conditions hereof and upon such termination Tenant shall immediately surrender possession of the Premises to Landlord, and Landlord shall immediately become entitled to receive from Tenant, as liquidated, agreed final damages, an amount equal to the difference between the aggregate of all rentals reserved under this Lease for the balance of the Term, and the fair rental value of the Premises for that period (both discounted to present value at an annual interest rate equal to eight percent (8%)), determined as of the date of such termination; or

(ii)    with or without terminating this Lease, as Landlord may elect, re-enter and repossess the Premises, or any part thereof, and lease them to any third-party upon commercially reasonable terms and conditions, for a term within or beyond the Term; provided, however, that any such reletting prior to termination shall be for the account of Tenant, and Tenant shall remain liable for (y) Annual Minimum Rent, Tenant's Share of CAM Costs, Tenant's Share of Taxes, and other sums which would be payable hereunder by Tenant in the absence of such expiration, termination or repossession, less (z) the net proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds all of Landlord's reasonable expenses (which expenses shall be amortized over the term of the new tenant's lease and only the portion thereof allocable to the balance of the Term shall be so deducted by Landlord hereunder) in connection with such reletting (including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting); or

(iii)    Continue this Lease in effect and recover from Tenant the unpaid Rent from time to time.

(b)    If the Premises is at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Rent due hereunder. Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent. If, after the

37



lapse of all applicable grace periods, Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together with interest thereon at the rate of ten percent (10%) per annum (the "Default Rate").

(c)    Landlord shall also be entitled to all other rights and remedies available to Landlord at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set forth in Section 18.01(a)(i) above, (ii) any right to recover consequential or punitive damages as a result of a Tenant default or any other act or omission of Tenant unless such act is an intentional tort, and (iii) all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant. At the request of Tenant, Landlord shall promptly confirm such waiver(s) by a writing in form satisfactory to Tenant. Anything contained in this Lease to the contrary notwithstanding, unless Landlord elects the remedy in Section 18.01(a)(iii), above, Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of a Tenant default. Landlord shall not be deemed to have elected to terminate this Lease unless Landlord so notifies Tenant in writing.

(d)    Tenant's obligations under this Section 18.01 shall survive the expiration or other termination of this Lease.

SECTION 18.02    Additional Landlord Remedies Due to Construction Delays by Tenant.    In addition to Landlord's other remedies:

(a)    If Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following Delivery of the Land, then Landlord, at its option, upon prior written notice to Tenant, may require Tenant to commence payment of Ground Rent (as defined below) on the date which is two hundred forty (240) days following Delivery of the Land. "Ground Rent" shall mean Ninety Six Thousand Two Hundred Forty and 96/100 Dollars ($96,240.96) annually, shall be payable in lieu of Annual Minimum Rent, and shall be payable in equal monthly installments of 1/12 each and in the same manner as Annual Minimum Rent.

(b)    If Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, then Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant unless Tenant, within such sixty (60) day period, achieves Substantial Completion. If Landlord terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 18.03    Landlord's Default.

(a)    If Landlord shall (i) default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within fifteen (15) days (as to a monetary default) or thirty (30) days (as to a non-monetary default), as applicable, after notice thereof by Tenant (it

38



IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

LANDLORD:

Attest:

_____
Bruce R. Wallace

WCC PROPERTIES, LLC, a Utah limited liability company

By: _____
Name: Steven D. Gray

TENANT:

CIRCUIT CITY STORES WEST COAST, INC., a California corporation

By: _____
Name: _____



53