# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is by and between WR Realty, LLC, a Maine limited liability company located at 74 Gilman Road, Bangor, Maine, 04401 (hereinafter referred to as "Buyer") and Sacco of Maine, LLC, a New York limited liability company located at 149-47 Powell's Cove Boulevard, Whitestone, New York 11357 (hereinafter referred to as "Seller").

RECITALS:

WHEREAS, Seller desires to sell its fee interest in certain improved real property along with certain related personal and intangible property, and Buyer desires to purchase said real, personal and intangible property on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the foregoing and the mutual undertakings set forth herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Buyer and Seller hereby agree as follows:

1. <u>Property Included in Sale</u>. Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase from Seller, the following:

    (a) Seller's fee interest in certain real property located at 668 Stillwater Avenue, Bangor, Maine and described in the attached Exhibit A (hereafter referred to as the "Real Property");

    (b) all improvements and fixtures located on the Real Property as of June 22, 2009 and as of the Closing, including, without limitation, all buildings and structures presently located on the Real Property, all apparatus, equipment and appliances used in connection with the operation or occupancy of the Real Property, such as heating and air conditioning systems and facilities used to provide any utility services, refrigeration, ventilation, garbage disposal, recreation or other services on the Real Property (all of which are collectively referred to as the "Improvements"); and

    (c) all personal property (the "Personal Property") located on or in the Real Property and Improvements as of June 22, 2009 and as of the Closing.

(All of the items referred to in subparagraphs (a), (b) and (c) above are hereinafter collectively referred to as the "Property.")

For purposes of this Agreement, "Agreement Date" shall be the later of the dates that Seller and Buyer have executed this Agreement.

2. <u>Purchase Price</u>. Subject to any adjustment and prorations hereinafter described, the purchase price (the "Purchase Price") for the Property is Two Million Five Hundred Thousand and 00/100 ($2,500,000) U.S. Dollars, payable as follows:

{EP - 00548353 - v5 }



(a) Contemporaneously with the signing of this Agreement, the Buyer shall deposit with CB Richard Ellis/The Boulos Company (the "Escrow Agent") the sum of Two Hundred Thousand and 00/100 ($200,000.00) U.S. Dollars as the earnest money deposit (the "Deposit"). Any interest earned by the Deposit shall be considered part of the Deposit. Except as otherwise provided in this Agreement, the Deposit shall be held by the Escrow Agent in a separate federally insured interest bearing account and applied against the Purchase Price at Closing. In the event of the Seller's non-acceptance, the Deposit shall be returned promptly to the Buyer. In the event the Buyer defaults hereunder and does not close due to no fault of Seller, Buyer and Seller hereby agree that Seller will be damaged thereby; therefore, Seller and Buyer hereby agree that the Deposit shall represent and be liquidated damages payable to Seller in such event as a fair and reasonable sum to recompense Seller in light of Seller's removal of the Property from the market and the costs incurred, labor and services performed and the loss of its bargain, all of which are difficult to ascertain. These liquidated damages shall constitute Seller's sole and exclusive remedy.

(b) The remaining balance after crediting of the Deposit shall be paid to Seller at the Closing in immediately available funds by check or wire transfer in accordance with wiring instructions provided by Seller within a reasonable time prior to the time of closing.

The provisions of paragraph (a) regarding liquidated damages, however shall not apply in the instance where Buyer duly terminates this Agreement as more specifically allowed for herein or if the Seller defaults under the Agreement.

3. Non-Disclosure: Each party to this Agreement acknowledges that it may receive after the Agreement Date information regarding the Property or the other party that is of a confidential or proprietary nature and each party agrees to maintain such information as confidential until the Closing, or one year from the Agreement Date, whichever occurs first. The parties shall treat all such information received after the Agreement Date that they may acquire in relation to each other or the Property as strictly confidential. Each party shall use the same degree of care to avoid the disclosure of confidential data and information of the other party as it uses to protect its own confidential data and information. Except as and to the extent required by law, each party, including its employees present and future, shall not make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of the existence of discussions regarding a possible transaction between the parties or any of the terms, conditions or other aspects of the transaction proposed hereunder. Notwithstanding the foregoing, Buyer may communicate such confidential information to its employees, agents, and contractors as it deems necessary for them to assist Buyer in its assessment and purchase of the Property.

4. Representations And Warranties Of The Seller. As a material inducement to the Buyer to enter into and perform its obligations pursuant to this Agreement, the Seller represents and warrants, as of the Agreement Date and the Closing Date, as follows:

{EP - 00548353 - v5 }

(a)     Organization and Good Standing. The Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York and possesses the power and authority to own and sell the Property.

(b)     Authority. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Articles of Incorporation or Operating Agreement of the Seller. This Agreement constitutes a legal, valid and binding obligation of the Seller and is enforceable in accordance with its terms. Execution and delivery of this Agreement by the Seller and the performance by the Seller of its obligations hereunder does not and will not (a) conflict with or result in a violation, breach or termination of, or default under (or result in such a conflict, violation, breach, termination or default with the giving of notice or passage of time) any term or provision of any agreement, instrument, order, judgment or decree to which either of the Seller is a party or by which either is bound; (b) violate any statute, rule, regulation or ordinance of any governmental authority, or; (c) result in the imposition of any lien, encumbrance, charge or claim upon the Property. The Seller has full power and authority to carry out its obligations under this Agreement without the consent of any other person or entity.

(c)     Title to Property. Seller has and will have on the Closing Date good and marketable title to the Property, free and clear of all encumbrances, liens, charges and tenancies of every kind and character other than the Permitted Encumbrances as defined herein and the tenancy of the "Halloween Store" by lease between Seller and _____ dated August 21, 2009..

(d)     Litigation. Other than the Bankruptcy action involving Circuit City, to the best of Seller's knowledge, no action, suit, proceeding, claim or investigation before any court or other governmental entity against or relating to the Seller or the Property is pending or threatened against or directly affects the Property. The Seller has no knowledge or reasonable grounds to know of any basis for any such action, or of any governmental investigation relative to the Property. The Seller has not received any notices of any violation at the Property of any applicable laws, ordinances or regulations, and knows of no such notices being sent to the prior owner. The Seller knows of no pending eminent domain takings that would affect the Property.

(e)     Government Licenses and Permits. To the best of Seller's knowledge, the Property has all licenses, permits, certificates or authorizations from governmental agencies and authorities that are necessary for the Property.

(f)     Hazardous Substances. To the best of Seller's knowledge, the Seller has obtained all permits, licenses and other authorizations which are required under federal, state, local and foreign laws relating to pollution or protection of the environment. The Seller is in compliance with all terms and conditions of the required permits, licenses and authorizations, and is also in compliance with all other requirements, obligations, schedules and timetables contained in those laws or in any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter

issued, entered, promulgated or approved thereunder relative to the Property. Seller is not aware of, nor has the Seller received notice of, any past or present events, conditions, circumstances, activities, practices, incidents, actions or plans which may interfere with or prevent compliance or continued compliance with those laws or any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder, or which may give rise to any common law or legal liability, or otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study or investigation, based on or related to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling, or the emissions, discharge, release or contaminant, chemical, or industrial, toxic or hazardous substance or waste. There is no civil, criminal or administrative action, suit, demand, claim, hearing, notice or proceeding pending or threatened against the Seller relating in any way to those laws or any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder.

5.    Buyer's Conditions to Closing. The following conditions are conditions precedent to Buyer's obligation to purchase the Property:

    (a)    Seller maintaining the Property in the same or better condition it was in as of June 22, 2009 until Closing. In the event that, prior to Closing, the Property, or any part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against the Property, Buyer shall have the right, exercisable by giving notice of such decision to Seller within ten (10) days after receiving notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, in which case neither party shall have any further rights or obligations hereunder. If Buyer elects to accept the Property in its then condition, all proceeds of any insurance or condemnation awards that may be payable to Seller by reason of such damage, destruction or condemnation shall be paid or assigned to Buyer.

    (b)    Delivery by Seller of a Non-Foreign Certification at Closing.

    (c)    Delivery by Seller of an Assignment of all Warranties, Guaranties and Service Contracts, said Assignment to be supplemented with an exhibit listing all warranties, guaranties and service contracts affecting the Property at Closing, the said exhibit to be provided within five (5) business days of the Agreement Date.

    (d)    Delivery of a Quit Claim deed with Covenant transferring Seller's fee interest in the Real Property to the Buyer at Closing.

    (e)    Delivery of a Warranty Bill of Sale transferring Seller's title in the Improvements and Personal Property at Closing.

    (f)    Termination by Seller of any leasehold interests in the Property, including, but not limited to, that of the former tenant known as Circuit City, except that the lease described in paragraph 4(c) above shall be assigned by Seller to Buyer.

    (g)    Each of the representations and warranties made by the Seller herein will be true and accurate in all material respects as of the Closing with the same effect as though made at that time except for changes allowed by this Agreement; the Seller will have performed and complied with all aspects, covenants and

{EP - 00548353 - v5 }

        conditions required by this Agreement to be performed and complied with by the Seller prior to or at the Closing.

(h)    All instruments and legal and other proceedings in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to Buyer and its counsel.

(i)    Title shall be satisfactory to Buyer as provided in paragraph 7 below.

(j)    The Property being vacant of all tenants other than the tenant identified in paragraph 4(c) above and Buyer having an opportunity to perform a walkthrough of the Property prior to Closing to confirm condition of the Property.

In the event any condition in this paragraph 5 is not satisfied, Buyer may elect as its sole discretion, to terminate this Agreement or waive satisfaction of the condition and close. In the event of such termination, the Deposit and interest thereon shall be returned to the Buyer.

6.    <u>Seller's Conditions to Closing.</u> The following conditions are conditions precedent to Seller's obligation to sell the Property:

(a)    Delivery by Buyer at Closing of the Purchase Price;

(b)    Delivery by Buyer of any and all documents required to be executed by Buyer to complete the herein transaction.

In the event that the conditions in this paragraph 6 are not satisfied, Seller may elect, at its sole discretion, to terminate this Agreement or waive satisfaction of the condition and close. In the event of such termination and Seller has satisfied all conditions of Paragraph 5, the Deposit shall be retained by Seller as Seller's sole and exclusive remedy and shall be non-refundable to the Buyer.

7.    <u>Title.</u> Within five (5) business days after the date of this Agreement Buyer shall obtain a commitment for title insurance (hereinafter the "Commitment") and, within five (5) business days after Buyer's receipt of the Commitment, Buyer shall send to Seller a notice (hereinafter "Buyer's Notice") of Buyer's objection to any matter which is disclosed in the Commitment which it finds objectionable (all items listed in Commitment not objected to by Buyer shall be a "Permitted Encumbrance"). Buyer shall also within the same time period provide Seller with a notice as to any title matters it objects to regarding the Improvements or Personal Property. Any objection to any title matter which is not timely raised by Buyer's Notice shall be deemed to have been waived by Buyer. Should Seller decline to cure any matter in the Commitment which is not a Permitted Exception or any title matter regarding the Improvements or Personal Property and to which Buyer objects within five (5) days of Buyer's Notice, Buyer may elect, by sending notice to Seller within five (5) days thereafter, to either: (a) terminate this Agreement and obtain a refund of the Deposit and any interest earned thereon; or (b) proceed to closing hereunder, without any deduction from the Purchase Price on account of any such objection to title.

8.    <u>The Closing.</u>

(a)    The Closing hereunder shall be held and delivery of all items to be made at the Closing under the terms of this Agreement shall be made at the offices of Buyer's

{EP - 00548353 - v.5 }

(b) attorney, Eaton Peabody, on or before fifteen (15) days from the Agreement Date (the "Closing Date").

(b) At or before the Closing, Buyer shall deliver to Eaton Peabody the remaining balance of the Purchase Price and Buyer and Seller shall deliver all documents as are required in the Agreement herein.

(c) Seller and Buyer shall each deposit such other instruments as are reasonably required by Eaton Peabody to close the transaction and consummate the purchase of the Property in accordance with the terms hereof.
The following items shall be prorated between the parties as of the date of closing: (1) real property taxes; (2) personal property taxes; and (3) tenant rent. Seller shall transfer to Buyer the security deposit, if any. All utilities shall be paid for by Seller as of the date of Closing.

(d) The costs incurred in this transaction shall be allocated as follows:
(1) Seller shall be responsible for Seller's counsel fees, costs and expenses in connection with this Agreement and Closing. Buyer shall be responsible for Buyer's counsel fees, costs and expenses in connection with this Agreement and Closing. Buyer shall be responsible for all of its inspection fees. The costs of title examination and title insurance fees for owner's policy and any survey update ordered by Buyer shall be paid by Buyer. The costs of transfer taxes and/or revenue stamps shall be paid as is customary.

(e) A portion of the Purchase Price shall be withheld at the Closing by the Buyer if required by 36 M.R.S.A. Section 5250-A.

9. Buyer's Consent to New Contracts Affecting the Property. After the date of Buyer's execution of this Agreement, Seller shall not enter into any lease, amendment of lease, contract or agreement or permit any tenant of the Property to enter into any sublease, assignment of lease, contract or agreement pertaining to the Property without obtaining Buyer's prior written consent thereto.

10. Possession. The Property shall be delivered to the Buyer at the time of closing free and clear of all tenancies or occupancies by any person or entity, except for the tenancy described in paragraph 4(c).

11. Tax-Deferred Exchange. Buyer and Seller agree that, at either party's election, this transaction shall be structured as an exchange of like-kind properties under Section 1031 of the Internal Revenue Code of 1486, as amended (the "Code"), and the regulations and proposed regulations thereunder. The parties agree that such election must be made prior to the Closing Date. If such an election is made by one of the parties hereto, the non-electing party shall reasonably cooperate with the electing party, provided any such exchange is consummated pursuant to an agreement that is mutually acceptable to Buyer and Seller and which shall be executed and delivered on or before the Closing Date. The electing party shall in all events be responsible for all costs and expenses related to the Section 1031 exchange and shall fully indemnify, defend and hold the non-electing party harmless from and against any and all liability, claims, damages, expenses (including reasonable attorneys' and paralegal fees and reasonable attorneys' and paralegal fees on appeal), proceedings and causes of action of any kind or nature whatsoever arising out of, connected with or in any manner related to such 1031

{EP - 00548353 - v5 }

exchange that would not have been incurred by the non-electing party if the transaction were a purchase for cash. The provisions of the immediately preceding sentence shall survive closing and the transfer of title to subject Property to Buyer. Any such Section 1031 exchange shall be consummated through the use of a facilitator or intermediary so that the non-electing party shall in no event be requested or required to acquire title to any property other than the Property.

12. <u>Condition of Property</u>. Seller has not made, and except as expressly set forth herein, and does not make any representations as to the physical condition, expense and operation of the Property including the Parking Lots or the fixtures, utilities, equipment, furnishings or personalty therein. The Buyer expressly acknowledges that no representations have been made other than those set forth in this agreement. The Improvements are being delivered "AS IS" on the Closing Date.

13. <u>Failure to Close</u>.
   (a) <u>Buyer's Default</u>. If Seller has complied with all the covenants and conditions contained herein and is ready, willing and able to convey the Property in accordance with this Agreement and Buyer fails to consummate this Agreement and take title in breach of its duties hereunder, then the parties agree that the damages that Seller will sustain as a result thereof will be substantial, but difficult if not impossible to ascertain. THEREFORE, THE PARTIES AGREE THAT, IN THE EVENT OF BUYER'S DEFAULT, SELLER SHALL, AS ITS SOLE REMEDY, BE ENTITLED TO RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES, AND NEITHER PARTY SHALL HAVE ANY FURTHER RIGHTS OR DUTIES WITH RESPECT TO THE OTHER UNDER THIS AGREEMENT.
   (b) <u>Seller's Default</u>. In the event that Buyer has complied with all of the covenants and conditions contained herein and is ready, willing and able to take title to the Property in accordance with this Agreement, and Seller fails to consummate this Agreement and convey title as set forth herein in breach of its duties hereunder, then Buyer may employ all legal or equitable remedies including specific performance of this Agreement, or terminate this Agreement and recover the Deposit with the interest thereon. Provided, however, in the event Seller's failure to consummate this Agreement is due to its inability to negotiate a short sale payoff with the current mortgagee, then Buyer waives its right to employ all legal or equitable remedies, this Agreement shall terminate and Buyer shall receive back its Deposit plus accrued interest in full.
   (c) Notwithstanding any other provision of this Agreement, Escrow Agent shall have the right to require written releases from both parties prior to releasing the earnest money to either party. If a dispute arises between Buyer and Seller as to the existence of a default hereunder and/or the release of the earnest money and said dispute is not resolved by the parties within thirty (30) days, Escrow Agent may elect to file an action in interpleader and deposit the earnest money in the court to resolve said dispute, or otherwise disburse the earnest money pursuant to Maine Real Estate Commission regulations. Buyer and Seller, jointly and severally, shall indemnify Escrow Agent for all costs, losses, expenses, and damages, including reasonable attorneys' fees, incurred by Escrow Agent in connection with said action and/or in connection with any dispute relating to this Contract and/or the Deposit.

{EP - 00548353 - v5 }

14. <u>Auction</u>. If the Property or any portion thereof is placed up for auction prior to the Closing occurring, Buyer shall have the right to bid on and purchase the Property at the auction. This Agreement shall be terminated if the auction occurs prior to the Closing and the Deposit shall be refunded to the Buyer.

15. <u>Miscellaneous</u>.
    (a)    Notices. Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been received upon the earlier of (i) when delivered in hand received, (ii) three (3) business days after being mailed certified or registered mail, with postage prepaid, and addressed as follows or (iii) forty-eight (48) hours after deposit with a reputable overnight courier service, charges pre-paid and addressed as set forth herein:

    If to Seller:
    Sacco of Maine, LLC
    Attn: Camine Polito
    149-47 Powell's Cove Blvd.
    Whitestone, NY 11357

    With a copy to,
    Steven Bracco, Esq.
    5122 Avenue N
    Brooklyn, New York 11234
    Telephone: 718-377-2300
    Facsimile: 718-377-0771

    If to Buyer, with a copy to:
    WR Realty, LLC
    Attn: Woodrow Cross
    74 Gilman Road
    Bangor, Maine 04401

    With a copy to,
    Sarah S. Zmistowski, Esq.
    Eaton Peabody
    P.O. Box 1210
    Bangor, Maine 04402-1210

    Any other address as either party may from time to time specify in writing to the other.

    (b)    Brokers and Finders- Neither party has had any contact or dealings regarding the Property, or any communication in connection with the subject matter of this transaction, through any licensed real estate broker, entity, agent, commission salesperson, or other person who will claim a right to compensation or a commission or finder's fee as a procuring cause of the sale contemplated herein, except for (i) James Defalco of James Defalco, Inc., whose commission shall be paid by Seller per separate agreement and (ii)

{EP - 00548353 - v5 }

Drew Sigfridson of CB Richmond Ellis/The Boulos Company, whose commission shall be paid by the Seller. In the event that any other company, firm, broker, agent, commission salesperson or finder perfects a claim for a commission or finder's fee based upon any such contract, dealings or communication, the party through whom the company, firm, broker, agent, commission salesperson or finder makes the claim shall be responsible for said commission or fee and all costs and expenses (including reasonable attorneys' fees) incurred by the other party in defending against the same. No commission shall be paid or become payable unless the Closing actually occurs. The provisions of this subparagraph (b) shall survive Closing and any termination, cancellation or rescission of this Agreement

(c)     Further Assurances: Power of Attorney. The parties hereto agree to execute and deliver any and all papers and documents which may be reasonably necessary to carry out the terms of this Agreement that may have not been delivered at Closing. To assist in the resolution of any matters that may arise after the Closing, Seller hereby irrevocably constitutes and appoints Buyer as its true and lawful attorney-in-fact in Seller's name or otherwise to hereunder act on behalf of the Seller to carry out any matters involving the Property or the fulfillment of the Agreement. . The provision of this subparagraph (c) shall survive Closing and any termination, cancellation or rescission of this Agreement.

(d)     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of, the parties hereto and their respective successors, heirs, administrators and assigns. Buyer reserves the right to take title to the Property in a name or assignee other than Buyer or to assign this Agreement to a related entity. The provisions of paragraphs 4 and 5 shall survive the Closing and the termination, cancellation or rescission of this Agreement.

(e)     Amendments and Terminations. Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer.

(f)     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of the location of the Property being purchased.

(g)     Merger of Prior Agreements. This Agreement supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

(h)     Time of the Essence. Time is of the essence of this Agreement.

(i)     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but such counterparts when taken together shall constitute but one Agreement.

(j)     Recordation. Neither Seller nor Buyer shall record this Agreement. The parties will at the request of the other agree to execute a memorandum thereof.

(k)     Proper Execution. The submission by Seller to Buyer of this Agreement in unsigned form shall have no binding force and effect, shall not constitute an option, and shall not confer any rights or impose any obligations upon either Buyer or Seller irrespective of any reliance thereon, change of position or partial performance until both Buyer and Seller shall have executed and delivered to the other party this Agreement. Notwithstanding the foregoing sentence, Buyer's submission to Seller of this Agreement shall be deemed withdrawn, revoked and incapable of being executed by Seller in the event Seller has not returned a duly executed original Agreement to Buyer within

{EP - 00548353 - v5 }

seventy-two (72) hours of it being delivered to Seller or its agent, via facsimile, email or other means.

(l)   Personal Liability. There shall be no personal liability imposed on the individuals who have executed this Agreement unless same has been signed in his or her individual capacity.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date written below.

DATED: 9-25-09                              Buyer:

                                            WR REALTY, LLC

                                            By: _____
                                            Its: Member

                                            Seller:

DATED: _____            SACCO OF MAINE, LLC


                                            By: _____
                                            Its: _____


                                            Escrow Agent:

DATED: _____            CBRE/THE BOULOS COMPANY


                                            By: _____
                                            Its: _____

{EP - 00548353 - v5 }

# EXHIBIT A

## Stillwater Avenue, Bangor

### PARCEL ONE:

A certain lot or parcel of land situated on the northwesterly side of Stillwater Avenue, so-called, in the City of Bangor, County of Penobscot and State of Maine, being more particularly bounded and described as follows:

> Beginning on the northwesterly sideline of said Stillwater Avenue at a point being North 31° 37' 12" East and a distance of 268.67 feet from the intersection of the northwesterly sideline of said Stillwater Avenue and the northeasterly sideline of Gilman Road, so-called;
>
> Thence North 58° 22' 48" West a distance of 321.24 feet to a point;
>
> Thence North 31° 37' 12" East a distance of 410.50 feet to a point;
>
> Thence South 58° 22' 48" East a distance of 321.24 feet to the northwesterly sideline of said Stillwater Avenue;
>
> Thence South 31° 37' 12" West along said Stillwater Avenue sideline a distance of 410.50 feet to the point of beginning.

### PARCEL TWO:

With rights to an 80 foot wide access easement located along the southwesterly line of the above-described parcel and a 30 foot wide access easement located along the northwesterly line of the above-described parcel. The two access easements combined are further described as follows:

> Beginning on the northwesterly sideline of said Stillwater Avenue at the southerly corner of the above-described parcel;
>
> Thence North 58° 22' 48" West along the above-described parcel a distance of 321.24 feet to a point;
>
> Thence North 31° 37' 12" East along the above-described parcel a distance of 410.50 feet to a point;
>
> Thence North 58° 22' 48" West a distance of 30.00 feet;
>
> Thence South 31° 37' 12" West, being parallel to and thirty feet northwesterly of the northwesterly line of the above-described parcel, a distance of 490.50 feet to a point;
>
> Thence South 58° 22' 48" East, being parallel to and eighty feet southwesterly of the southwesterly line of the above-described parcel, a distance of 351.24 feet to the northwesterly sideline of said Stillwater Avenue;
>
> Thence North 31° 37' 12" East, along said Stillwater Avenue sideline, a distance of 80.00 feet to the point of beginning.

### PARCEL THREE:

With rights to a drainage easement located northerly of the above-described parcel and further described as follows:

Beginning at a point on the northwesterly line of the above-described parcel which is South 31° 37' 12" West and a distance of 76.50 feet from the northerly corner of the above-described parcel;

Thence North 10° 12' 25" East a distance of 109.67 feet to a point;

Thence North 21° 38' 39" West a distance of 190.00 feet to a point;

Thence North 51° 41' 14" East a distance of 172.16 feet to a point;

Thence South 25° 27' 59" East a distance of 63.83 feet to a point;

Thence North 66° 54' 10" East a distance of 157 feet, more or less, to a small brook;

Thence southerly along said brook, a distance of 20 feet, more or less, to a point being 20.00 feet perpendicular from the last described line;

Thence South 66° 54' 10" West a distance of 152 feet, more or less, to a point;

Thence South 25° 27' 59" East on an extension of an above-described line a distance of 82.92 feet to a point;

Thence South 40° 26' 24" West a distance of 180.77 feet to a point;

Thence South 10° 12' 25" West a distance of 57.38 feet to the northwesterly line of the above-described parcel;

Thence South 31° 37' 12" West, along said above-described parcel, a distance of 54.78 feet to the point of beginning.

### PARCEL FOUR:

The following 25 foot wide utility easement is a reciprocal easement to be used together and in common with others:

With rights to a 25 foot wide utility easement located along the northeasterly line of the above-described parcel. Said utility easement runs from said Stillwater Avenue a distance of 321.24 feet to an extension of the northwesterly line of the above-described parcel and whose southwesterly line follows the northeasterly line of the above-described parcel. Said easement was created in Easement Agreement recorded in Book 7004, Page 24, and as amended by Amendment to Easement Agreement dated May 3, 1999 and recorded in Book 7033, Page 174 of the Penobscot County, Maine Real Property Records.

SUBJECT to a 25 foot wide utility easement located along the northeasterly line of the above-described parcel. Said utility easement runs from Stillwater Avenue a distance of 321.24 feet to the northwesterly line of the above-described parcel and whose northeasterly line follows the northeasterly line of the above-described parcel.

Reference is made herein to survey prepared by Plisga & Day, Land Surveyors, Project No. 88542-A00 dated June 19, 2000 and revised in Project No. 88542-A01 dated February 6, 2001 and December 26, 2003; and to subdivision plans prepared by Plisga & Day dated June 6, 2000, recorded in the Penobscot County Registry of Deeds as Map File 2000-56 and revision dated April 3, 2001 and recorded in said Registry as Map File 2001-54.