# EXHIBIT A

# LEASE

## BETWEEN

## MERIDIAN VILLAGE, LLC

## AND

## DEWAARD & BODE, INC. A WASHINGTON CORPORATION

1

## AFFIDAVIT

The undersigned has signed a lease dated ___July 8TH___, 2009, with Meridian Village, LLC, for the occupancy of Unit No ____, Meridian Village in Bellingham, WA.  The Lease business terms were negotiated with **Bromont Development Group**, as a representative of Landlord.  No representative, agent or employee of Landlord represented, suggested, promised or implied that the undersigned would be given an exclusive use in the Shopping Center for the operation of the business to be conducted in the Premises, or that Landlord would not lease space in the Shopping Center to a competing or other tenant, other than that provided for in the Lease.  No representative, agent or employee of Landlord made any representations, inducements or promises about the Premises or the entry into the Lease, unless expressly stated in the Lease.  No representative, agent or employee of Landlord made any representations, inducements or promises about the characteristics or conditions of or pertaining to the Premises or the Shopping Center, unless expressly stated in the Lease.  The undersigned has independently investigated the potential of the success of its operations in the Shopping Center and has not relied upon any representations, inducements or promises by Landlord's representatives, agents or employees, other than those contained in the Lease.

Dated this _8TH_ day of ___July___, 2009.

TENANT: **DeWaard & Bode, Inc, a Washington Corporation**

By:_____

    Jerry Roorda

Its:___President___

STATE OF ___WA___    )

                     ) ss.

COUNTY OF ___WHATCOM___   )

I certify that I know or have satisfactory evidence that Jerry Roorda, an individual, is the person who appeared before me, and said person acknowledged that he signed this instrument and acknowledged it to be his free and voluntary act for the uses and purposes mentioned in the instrument.

DATED this _8TH_ day of ___July___, 2009.

Signed Name:_____

Type/Print Name:___Kent McClelland___

Notary Public in and for said State ___WA___

Residing at ___WHATCOM___

My Commission expires ___Aug 5, 2010___

2

LEASE

THIS LEASE, entered into this _13th_ day of ___July___, 2009 by and between **Meridian Village, LLC,** a Delaware Limited Liability Company ("Landlord"), and **DeWaard & Bode Inc.,** a Washington Corporation ("Tenant").

WITNESSETH:

IN CONSIDERATION of the mutual covenants hereinafter contained, and each act performed hereunder by either of the parties, Landlord and Tenant agree as follows:

## I. BASIC LEASE PROVISIONS

A. This Article I is an integral part of this Lease and all of the terms hereof are incorporated into this Lease in all respects. In addition to the other provisions, which are elsewhere defined in this Lease, the following, whenever used in this Lease shall have the meanings set forth in this Article I:

1. **Shopping Center:** Meridian Village situated in the City of Bellingham, State of Washington (Article II).

2. **Premises:** 3944 Meridian Street Bellingham, WA 98226, containing approximately 36,818 square feet of gross floor area (Article II).

3. **Tenant's Trade Name:** DeWaard & Bode

4. **Permitted Use:** Except as otherwise set forth in Article IX, any and all retail and internet sales permitted under applicable zoning laws including, but not limited to, the sale of appliances, furniture, mattresses and related items. Additionally, any and all maintenance and/or repairs of the types of items sold (Article IX).

5. **Lease Term:** Twenty Three (23) years (Article III).

6. **Rent Commencement Date:** the actual Delivery of Possession Date (Article IV).

7. **Expiration Date:** Twenty Three (23) years following the Rent Commencement Date (Article III).

8. **Minimum Rent during Lease Term:** See Rent Schedule A (Article IV).

9. **Intentionally deleted.**

10. **Estimated Delivery of Possession Date:** July 15, 2009. (Article VI).

11. **Outside Opening Date:** September 15, 2009 (Article VI).

12. **Common Area Maintenance (CAM) Charge:** (Article VII). Proportionate share shall be determined by dividing the gross leasable area of the Premises by the current square feet of gross leasable area of the Shopping Center, and then multiplying the resulting quotient by total CAM expenses.

   **Initial Estimate:** $.86 per square foot, $2,636.02 per month, $31,632.00 per year

3

12. **Insurance:** $.33 per square foot, $1,015.48 per month, $12,185.76 per year (Article XII).

13. **Real Estate Tax Charge:** (Article V). Proportionate share determined by dividing the gross leasable area of the Premises by the current square feet of gross leasable area of the Shopping Center tax parcel, and then multiplying the resulting quotient by the total Real Estate Taxes, and any costs incurred by Landlord in accordance with Article V.

**Initial Estimate:** $.92 per square foot, $2,812.39 per month, $33,748.68 per year

15. **Intentionally deleted.**

16. **Security Deposit:**    $15,464.00 (Article XVIII).

17. **Options to Renew:** Three (3) successive Option periods of five (5) years each with rental increases equaling 10% over the previous year's rent and remaining flat through the Option Term(s). Tenant shall be obligated to provide Landlord 180 day's prior written notice of Tenant's intent to exercise the Option(s) (Article XXIII).

18. **Landlord:** Meridian Village, LLC
c/o SUHRCO Management, Inc.
2010 156 Ave. N.E., Suite 100
Bellevue, WA 98007
Federal I. D. # 30-0207309

19. **Tenant:**    DeWaard & Bode, Inc.
Jerry Roorda
3944 Meridian St.
Bellingham, WA 98226
Federal I.D. # 91-1257654

20. **Guarantor(s):** None

## II. PREMISES

A. Landlord leases to Tenant, and Tenant leases from Landlord, the premises described in Article I(A), Section 2 ("Premises"), as measured from the exterior face of any exterior walls and to the centerline of common walls and outlined in red on Exhibit "A". The Shopping Center is more particularly described on Exhibit "B" attached hereto, but shall not include any outlots or other parcels cross hatched on Exhibit "A-1".

B. Landlord reserves the right to maintain, repair, and replace utility lines under, over, upon or through the Premises as may be reasonably necessary or advisable for the servicing of the Premises or other portions of the Shopping Center.

4

## III. TERM

A. The Term of this Lease shall commence upon the date set forth in Article I(A), Section 6 of this Lease and shall expire on the last day of the last consecutive full lease year set forth in Article I(A), Section 7, following the Rent Commencement Date established pursuant to Article I(A), Section 6, unless sooner terminated. The term "lease year" shall mean a period of twelve (12) consecutive full calendar months. If the Rent Commencement Date does not occur on the first day of a calendar month, the first lease year shall include any partial calendar month.

## IV. RENT

A. **Rent.** Tenant agrees to pay to Landlord, at its office as designated in Section I(A)(18), above, or other place as Landlord may from time to time designate, as " Rent" for the Premises during the term of this Lease, without any deduction or setoff, the amount(s) set forth in Schedule A, in advance, on the first day of each calendar month. Rent and the amounts to be paid by Tenant pursuant to Articles V, VII, and VIII hereof shall be prorated on a per diem basis (based upon a thirty (30) day calendar month) for any partial month included in the first lease year.

## V. TAXES

A. **Real Estate Taxes and Assessments.** Tenant agrees to pay Tenant's proportionate share of all real estate taxes and assessments, both general and special, levied and assessed against the land, buildings, and all other improvements, which may be added thereto, or constructed with the Shopping Center ("Taxes"). The term Taxes shall be further defined as the amount set forth on any invoice or statement issued by the taxing authority for the Shopping Center which is due and payable by Landlord in the calendar month prior to the accrual of any penalties and/or interest. Tenant's proportionate share shall be the total amount of the Taxes, multiplied by a fraction, the numerator of which shall be the number of square feet of gross leasable area within the Premises, and the denominator of which shall be the gross leasable area of the existing buildings within the Shopping Center at the time the Taxes were levied or assessed, but excluding the gross leasable area of any buildings within the Shopping Center which are separately assessed for tax purposes and billed to an entity other than Landlord or paid directly by an entity other than Landlord, even though billed to Landlord.

Tenant shall pay to Landlord, monthly in advance on or before the first day of each calendar month, an amount equal to one-twelfth (1/12th) of Tenant's proportionate share of Landlord's estimate of Taxes for the current tax year together with all reasonable expenses incurred by Landlord in negotiating, reviewing, administering, appealing or contesting such taxes and assessments, including, but not limited to fees and/or expenses paid to independent third parties engaged by Landlord to contest Taxes, whose fees may be based on an hourly rate, a percentage of the tax savings or other reasonable fee structures. If Tenant's proportionate share of Taxes for any tax year exceeds the total amount paid by Tenant for such period, Tenant shall pay the difference to Landlord upon demand. If Tenant's proportionate share of Taxes with respect to any tax year is less than the total amount paid by Tenant for such period, the excess shall be credited against the

5

payments with respect to Taxes next becoming due. If Tenant's proportionate share of Taxes with respect to the final tax year of the Lease Term is less than the total amount paid by Tenant for such period, Landlord shall pay the difference to Tenant.

Upon written request by Tenant, Landlord shall provide Tenant with an accounting of the actual Taxes assessed during any tax year.

B. **Rental Taxes.**   If any governmental taxing authority levy, assess, or impose any tax, excise or assessment (other than income or franchise tax) upon or against the rents payable by Tenant to Landlord ("Rent Tax"), either by way of substitution for or in addition to any existing tax on land, buildings or otherwise, Tenant shall directly pay, or reimburse Landlord for, the Rent Tax, as the case may be.

C. **Impact Fees.**   Tenant shall pay all impact fees, including, without limitation, any commercial impact fees for water and sewer, attributable to Tenant's use of and/or square footage in the Premises. Tenant shall reimburse Landlord for any such fees previously paid by Landlord and attributable to the Premises.

## VI.  CONSTRUCTION

A. **Landlord's Work.**   Landlord shall have no obligation to perform or cause the performance of construction of any improvements to the Premises prior to delivery thereof to Tenant.

B. **Delivery of Premises.**   Delivery of Possession Date set forth in Article I(A), Section 10, herein, in an "as is" condition, subject to delays caused by any circumstances beyond Landlord's reasonable control.   In no event shall Landlord be liable to Tenant for consequential damages related to or arising out of any failure or delay by Landlord in delivering the Premises to Tenant on the date set forth above.   In the event that the Landlord fails to deliver the Premises to Tenant on the Delivery of Possession Date, Tenant shall not be liable to pay Landlord Rent, Additional Rent, or any other charges under this Lease until such time as delivery of the Premises occurs.   Tenant hereby acknowledges that Landlord has made no representations or warranties to Tenant with respect to the condition of the Premises or the working order of any systems or improvements therein existing as of the date of delivery except for the following:

1.   The Premises' Heating, Ventilating, and Air Conditioning system is in good working order, fully operational, and free of any material defect;

2.   The Premises' doors are in good working order, fully operational, and free of any material defect; and

3.   The Premises' roof is in good working order, fully operational, and free of any material defect.

C. **Tenant's Construction.**   Within fifteen (15) days from the date of this Lease, Tenant shall prepare and deliver to Landlord detailed plans and specifications of the improvements to the Premises to be constructed by Tenant in compliance with Exhibit "C" attached hereto and made a part hereof.  Within ten (10) days following Landlord's receipt of Tenant's plans and specifications Landlord shall notify Tenant whether Tenant's plans and specifications are acceptable to Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed.  If Tenant's plans and specifications are

6

not acceptable to Landlord, Landlord will advise Tenant of the required modifications to Tenant's plans and specifications. Tenant shall modify and deliver to Landlord its revised plans and specifications within five (5) days from receipt of Landlord's required modifications. Landlord and Tenant will continue this process until Landlord has approved Tenant's plans and specifications ("Tenant's Work"). Within ten (10) days from receipt of Landlord's approval of Tenant's plans and specifications, Tenant will apply for any and all permits and other governmental approvals necessary to perform Tenant's work and Tenant will diligently prosecute such application(s) until approved. Tenant shall not modify Tenant's plans and specifications approved by Landlord without Landlord's prior written consent.

Upon Tenant's receipt of Landlord's notice that the Premises are available for Tenant to commence Tenant's Work, and provided Landlord has approved Tenant's plans and specifications, Tenant will commence construction of Tenant's improvements to the Premises in accordance with the approved plans and specifications. To the best of its ability, Tenant will complete construction of Tenant's improvements, fixture and stock the Premises and initially open for business to the public on or before the Outside Opening Date provided in Section 11 of the Basic Lease Provisions. The Outside Opening Date shall be extended by Landlord if, through no fault of Tenant's own, Tenant is unable to open for business on the Outside Opening Date, including but not limited to, due to delays in receiving all required permits and other governmental approvals necessary to perform Tenant's work. In no event shall the Outside Opening Date be extended as a result of Tenant's failure to deliver plans and specifications and any revisions thereto to the Landlord, file for permits or applications and/or to commence construction in accordance with the timetables set forth in this paragraph.

Notwithstanding the foregoing, Tenant shall be allowed to conduct non-structural improvements to the Premises' interior without receiving Landlord's consent. Non-structural interior improvements include, but are not limited to, (i) installation of non-load bearing partitions, (ii) installation of product displays, (iii) alterations to plumbing alterations, and gas lines necessary to support the displays.

Tenant shall not commence any work in the Premises until Tenant delivers to Landlord a policy of public liability and property damage insurance in accordance with the requirements of Article XII of this Lease.

D.  **Miscellaneous.**

    (i)  Tenant shall be required to reasonably control and retain noise, dust or other materials within the Premises, subject to directives from Landlord. Tenant shall be required to clean all H.V.A.C. filters clogged with dust, or other materials resulting from its construction activities.

    (ii)  To the extent the cost of Tenant's Work shall exceed Twenty-five Thousand and 00/100 Dollars ($25,000.00), Tenant's contractor shall furnish and maintain performance and payment bonds in an amount equal to one hundred twenty-five percent (125%) of the construction contract price and all additions thereto, and all obligations arising in connection therewith. The performance and payment bonds

shall name Landlord as obligees and will be in such a form and with such sureties as are reasonably satisfactory to Landlord.

## VII.  COMMON AREAS

A. **Common Areas.**   Landlord grants to Tenant and Tenant's customers and invitees the non-exclusive right to use the areas designated by Landlord from time to time as Common Areas.  The term "Common Areas" shall mean the parking areas, roadways, pedestrian sidewalks, loading docks, delivery areas, exterior surfaces of Shopping Center buildings, landscaped areas, service courts, open and enclosed courts and malls, fire corridors, meeting areas and public restrooms, and all other areas or improvements which may be provided by Landlord for the common use of the tenants of the Shopping Center. Landlord hereby reserves the following rights with respect to the Common Areas:

1.  To establish reasonable rules and regulations for the use thereof;

2.  To use or permit the use by others to whom Landlord may have granted such rights for promotional activities;

3.  To close all or any portion thereof as may be deemed necessary by Landlord to prevent a dedication thereof or the accrual of any rights to any person or the public herein;

4.  To change the layout of such Common Areas, including the right to reasonably add to or subtract from their shape and size, whether by the addition of building improvements or otherwise, and shall have the right to retain revenue from income producing events whether or not conducted for promotional purposes; and

5.  To operate, manage, equip, light, repair and maintain said Common Areas for their intended purposes in such manner as Landlord shall in its sole discretion from time to time determine.

B. **Common Area Charge.**   Tenant shall pay to Landlord as a "Common Area Charge" a proportionate share of all costs and expenses of every kind and nature paid or incurred by Landlord in operating, maintaining, repairing and managing the Common Areas, including but not be limited to, cleaning, lighting, repairing, painting, maintaining, and replacing all Common Area improvements within the Shopping Center; snow removal, landscaping and security; fire safety and protection systems, monitoring, testing and operating charges; restriping and overlay of the parking lot; painting of exterior surfaces of Shopping Center buildings;  total compensation and benefits (including premiums for Worker's Compensation and other insurance) paid to or on behalf of employees; personal property taxes; supplies; fire protection; utility charges; licenses and permit fees; reasonable depreciation of equipment used in operating and maintaining the Common Areas and rent paid for leasing such equipment, any fees paid or assessed by Landlord for management of the Shopping Center.  Notwithstanding the foregoing, Landlord shall not be entitled to charge Tenant for the repair, maintenance, or replacement of any roof of any building in the Shopping Center.  Notwithstanding the foregoing, Landlord shall not be entitled to charge an asset fee to Tenant as part of the Common Area Charge.

8

Each year, Landlord and Tenant shall agree on an annual budget for the reasonable Common Area Charges attributable to Tenant (the "CAM Budget"). If the Landlord and Tenant are unable to agree on the CAM Budget for any given year of the Lease, the CAM Budget shall equal that amount of actual Common Area Charges attributable to the Premises in the immediately preceding year. The Tenant shall not be liable for any Common Area Charges incurred in any given year exceeding the applicable CAM Budget by more than ten percent (10%).

Tenant's Common Area Charge shall be determined by multiplying the total cost incurred by Landlord by the ratio of the square feet within the Premises to the gross leasable area within all of the buildings in the Shopping Center existing at the time of such calculation excluding with respect to any item the square footage of any tenant in the Shopping Center which provides such item at its own expense for the portion of the Common Areas within such tenant's demised premises.

Tenant's Common Area Charge shall be paid in monthly installments on the first day of each month in an amount to be estimated by Landlord. Subsequent to the expiration of the period used by Landlord in estimating Landlord's cost, Landlord shall furnish to Tenant a statement of the actual amount of Tenant's proportionate share of such Common Area Charge for such period and within fifteen (15) days, Tenant shall pay to Landlord or Landlord shall remit to Tenant, as the case may be, the difference between the estimated amounts paid by Tenant and the actual amount of Tenant's Common Area Charge for such period as shown by such statement. In no case shall Tenant be required to pay Landlord for any Common Area Charges incurred in any given year exceeding the applicable CAM Budget by more than ten percent (10%).

Upon Tenant's written request to Landlord, Landlord shall provide an accounting to Tenant of the actual Common Area Charges incurred during the period shown on any statement of actual Common Area Charges.

## VIII. <u>UTILITIES AND RUBBISH DISPOSAL</u>

A. **Utility Charges.**    Commencing on the date Landlord delivers the Premises to Tenant, Tenant shall pay for all utilities provided to or for the benefit of the Premises, including but not limited to water/sewer, demand or reservation fees, gas, electricity, fuel, light, heat, power, telephone, cable, and trash and garbage removal, together with all taxes levied or other charges on such utilities and governmental charges based on utility consumption. Tenant shall, at its sole cost and expense, pay for the cost of installation of meters for the Premises and any and all related costs and expenses if such meters do not already exist at the Premises.

## IX. <u>USE OF PREMISES BY TENANT</u>

A. **Tenant's Use of Premises.**    Tenant shall use the Premises only for the uses set forth in Article I (A), Section 4, of this Lease and for no other purpose. Notwithstanding the forgoing, Tenant's use of the Premises and Common Areas shall be subject to such other exclusive and prohibited uses as set forth on Exhibit F.

B. **Operation of Business.**    Tenant agrees to open its store for business on or before the Outside Opening Date, fully fixtured, stocked and staffed and to continuously conduct in

100% of the Premises, at least, in any event, from 10:00 A.M. to 6:00 P.M., on all business days (except holidays) during the Term of this Lease and any renewal or extension thereof, the business described in Article I(A), Section 4, above, except where Tenant is prevented from doing so by strikes, casualty or other causes beyond Tenant's reasonable control.

## X.  TENANT'S COVENANTS WITH RESPECT TO OCCUPANCY

### A.  Tenant agrees:

1.  To occupy the Premises in a safe and careful manner and in compliance with all laws, ordinances, rules, regulations and orders of any governmental bodies having jurisdiction over the Premises, and without committing or permitting waste;

3.  To keep its show or display windows, canopy and interior electric signs lighted until at least 9:00 P.M;

4.  To permit no reproduction of sound which is audible outside the Premises nor permit odors to be unreasonably dispelled from the Premises;

5.  To place no sign on the exterior of the Premises or on the interior surface of any windows of the Premises without Landlord's prior written consent and in accordance with the requirements of Exhibit "D" attached hereto.  Landlord's consent shall not be unreasonably withheld, conditioned, or delayed. Tenant shall maintain all signs placed upon the Premises by Tenant in good condition and repair. Upon vacating the Premises, Tenant agrees to remove all signs installed by Tenant and repair all damage caused by such removal;

6.  To place no merchandise, sign or other thing of any kind in the vestibule or entry of the Premises or on the sidewalks or other Common Areas adjacent thereto;

7.  To park Tenant's vehicles and to require all employees to park only in such places as may be designated from time to time by Landlord for the use of Tenant and its employees, and specifically not to permit parking of any Tenant or employee vehicles in any service court area.  Landlord reserves the right to impose fines against Tenant for any violation of these parking restrictions by Tenant and/or Tenant's employees and to have towed, at Tenant's cost and expense, any automobile parked in violation of this Section;

8.  To keep any rubbish, garbage and waste generated by Tenant from the Premises in proper dumpsters provided by Tenant adjacent to the premises or such other area designated by  Landlord from time to time until such rubbish, garbage and waste is removed from the Shopping Center and to permit no refuse to accumulate around the exterior of the Premises;

10. To conduct no auction, fire, bankruptcy, liquidation or going-out-of-business sale without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed;

10

11. To permit Landlord, after receiving at least twenty-four (24) hours advance notice (except in the case of an emergency), free access to the Premises at all reasonable times for the purpose of examining or making repairs to the Premises that Landlord may deem necessary or desirable for the safety or preservation thereof;

12. To permit no lien, notice of intention to file lien or other charge, which might be or become a lien or encumbrance or charge upon the Premises or any part thereof;

13. To solicit no business in the Common Areas, nor distribute handbills or other advertising matter to customers in the Common Areas, nor place the same in or on automobiles in the Common Areas;

14. To comply with all reasonable rules and regulations which Landlord may from time to time establish for the use and care of the Premises and the Common Areas;

15. To advertise with a display-type advertisement a minimum of six (6) times during each lease year with a total of at least 120 column inches per lease year in the printed media;

16. To shut off all exhaust fans, if any, servicing the Premises at all times when Premises are closed; shall keep the Premises heated or air conditioned, as the case may be, to at least the same minimum temperature (in the case of heat) or at the same maximum temperature (in the case of air-conditioning) as Landlord shall attempt to maintain in such mall, if applicable;

18. To prohibit the operation on the Premises or in any part of the Shopping Center of any coin or token-operated vending machines, video games or similar devices;

19. To permit Landlord or its agents, during the ninety (90) day period preceding the expiration of the Term of this Lease, to show the Premises to potential tenants, and to place on the Premises notices offering the Premises for lease or sale; and

20. That it shall not make any penetrations through the roof of the Premises without the prior written consent of Landlord.

## XI.  REPAIRS AND ALTERATIONS

A.  **Repairs by Landlord.**  Landlord shall keep the foundations, roof, and structural portions of the outer walls of the Premises in good repair, except for repairs required thereto by reason of the acts of Tenant, Tenant's employees, agents, invitees, licensees, or contractors.  Notwithstanding anything herein to the contrary, some or all of these repairs will be subject to inclusion in Tenant's Common Area Charge, including, but not limited to, the cost of painting of the outer walls of the Shopping Center buildings including the Premises.  Landlord shall not be entitled to include the repair, maintenance, or replacement of any roof of any building in the Shopping Center in Tenant's Common Area Charge.  Tenant shall give Landlord written notice of the necessity for repairs coming to the attention of Tenant following which Landlord shall have a reasonable time to undertake and complete such repairs.  The provisions of this Article XI, Section A,

11

shall not apply in the case of damage or destruction by fire or other casualty or by Eminent Domain, in which events the obligations of Landlord shall be controlled by either Article XIII or Article XV hereof.

It is expressly understood that Landlord shall not be responsible for any portions of the Premises constructed by Tenant or any prior occupant of the Premises.

B. **Repairs by Tenant.**  Except as provided in Article XI, Section A, Tenant shall keep the Premises and any fixtures, facilities, signs or equipment contained therein, in good condition and repair, including, but not limited to, exterior and interior portions of all doors, door checks and operations, windows, plate glass, and showcases surrounding the Premises, the heating, air conditioning, electrical, plumbing and sewer systems, the exterior doors, window frames, and all portions of the store front area, and shall make any replacements thereof and of all broken and/or cracked plate and window glass which may become necessary during the term of this Lease, and any renewals thereof, excepting any repairs to items of Landlord's original construction made necessary by reason of damage due to fire or other casualty covered by standard fire and extended coverage insurance.   In connection with Tenant's obligation to maintain the HVAC system servicing the Premises, Tenant shall, during the Term of this Lease, and any renewals thereof, at its sole cost and expense, maintain a service contract for the routine performance of standard HVAC system maintenance, including but not limited to, periodic replacement of filters, oiling of mechanical components and inspection for wear and tear.   Tenant shall be liable for minor HVAC system repairs which are typically required on an annual basis.   Landlord reserves the right to designate an HVAC contractor with whom Tenant shall contract for such routine HVAC maintenance so long as the fee charged by Landlord's designated contractor shall be the same or less than the fee charged by Tenant's contractor for similar services.  If Tenant fails to commence or complete repairs promptly and adequately, Landlord may make or complete said repairs and Tenant shall pay the cost thereof to Landlord upon demand, together with the sum of fifteen percent (15%) of said costs for overhead and an additional sum equal to ten percent (10%) of said amount for profit.

C. **Alterations or Improvements by Tenant.**  Tenant shall not, without Landlord's prior written consent, make, nor permit to be made, any alterations, additions or improvements to the Premises, which Landlord can withhold in its sole discretion.   Any alterations which may be permitted by Landlord shall be based upon plans and specifications submitted by Tenant and approved by Landlord and upon the condition that Tenant shall promptly pay all costs, expenses, and charges thereof, shall make such alterations and improvements in accordance with applicable laws and building codes and ordinances and in a good and workmanlike manner, and shall fully and completely indemnify Landlord against any mechanic's lien or other liens or claims in connection with the making of such alterations, additions, or improvements.  Tenant shall promptly repair any damages to the Premises, or to the buildings of which the Premises are a part, caused by any alterations, additions or improvements to the Premises by Tenant.

Notwithstanding the foregoing, Tenant shall be allowed to conduct non-structural improvements to the Premises' interior without receiving Landlord's consent.   Non-structural interior improvements include, but are not limited to, (i) installation of non-

load bearing partitions, (ii) installation of product displays, (iii) alterations to plumbing and gas lines necessary to support the displays.

D. **Removal of Improvements.**   All items of Landlord's construction, all heating and air conditioning equipment, and all alterations, additions and other improvements by Tenant shall become the property of Landlord and shall not be removed from the Premises. All trade fixtures, furniture, furnishings, and signs installed in the Premises by Tenant and paid for by Tenant shall remain the property of Tenant and may be removed upon the expiration of the term of this Lease; provided (i) that any of such items as are affixed to the Premises and require severance may be removed only if Tenant repairs any damage caused by such removal and (ii) that Tenant shall have fully performed all of the covenants and agreements to be performed by Tenant under the provisions of this Lease. If Tenant fails to remove such items from the Premises prior to the expiration or earlier termination of this Lease, all such trade fixtures, furniture, furnishings, and signs shall become the property of Landlord unless Landlord elects to require their removal, in which case Tenant shall promptly remove same and restore the Premises to its prior condition.   In the event Tenant fails to remove all such trade fixtures, furniture, furnishings, and signs, within thirty (30) days after Landlord elects to require their removal, Landlord shall have the right to remove same and sell such trade fixtures, furniture, furnishings, and signs to pay for the cost of removal.

## XII.   INDEMNITY AND INSURANCE

A. **Indemnification by Tenant.**   Tenant will indemnify and hold Landlord harmless from and against all loss, cost, expense, and liability whatsoever (including Landlord's cost of defending against the foregoing, such cost to include attorney's fees) resulting or occurring by reason of Tenant's construction, use or occupancy of the Premises.

B. **Commercial General Liability Insurance.**   Tenant agrees to carry public liability insurance covering the Premises and Tenant's use thereof, together with contractual liability endorsements covering Tenant's obligations set forth in Article XII, Section A, above, in companies and in a form satisfactory to Landlord with an A.M. Best Rating or its equivalent of A-VIII or better, and with a minimum limit of Two Million and 00/100 Dollars ($2,000,000.00) on account of bodily injuries to or death or property damage for each occurrence and a minimum limit of Two Million Dollars ($2,000,000.00) general aggregate.   Tenant shall deposit with Landlord prior to the date of any use or occupancy of the Premises by Tenant certificates evidencing the required coverages.   Tenant's insurance policy shall name Landlord and such other parties as Landlord may from time to time designate in writing to Tenant as additional insureds under Tenant's insurance policy and shall bear endorsements to the effect that the insurer agrees to notify all additional insureds not less than thirty (30) days in advance of any modification or cancellation thereof.

C. **Landlord's Liability.**   Landlord shall not be liable (i) for any damage to Tenant's property located in the Premises, regardless of the cause of such damage, (ii) for any acts or omissions of other tenants of the Shopping Center, nor (iii) for any condition of the Premises whatsoever unless Landlord is responsible for the repair thereof, and has failed to make such repair after notice from Tenant of the need therefor, and expiration of a reasonable time for the making of such repair.

D. **Special Form Coverage Insurance.** Landlord agrees to carry policies insuring the improvements on the Shopping Center constructed by Landlord against fire and such other perils as are normally covered by extended coverage endorsements in the county where the Premises are located, in an amount equal to at least eighty percent (80%) of the insurable value of such improvements, together with insurance against such other risks (including, but not limited to, earthquake, flood, loss of rent and such other coverages as Landlord, in its reasonable discretion, deems appropriate for similarly located shopping centers) and in such amounts as Landlord reasonably deems appropriate. Tenant agrees that Tenant's contribution to the foregoing insurance shall be as provided for in Article I, Section 13 and Article XII, Section F, of this Lease and that Tenant shall pay its share of the foregoing insurance per said Articles. Landlord shall name Tenant as an additional insured under the foregoing insurance policy and shall bear endorsements to the effect that the insurer agrees to notify all additional insureds not less than thirty (30) days in advance of any modification or cancellation thereof. In the event any of Landlord's policies insures Premises or risks other than the Shopping Center or the rents therefrom, the statement of the insurer shall be conclusive as to the portion of the total premium attributable to the Shopping Center.

Tenant agrees to carry insurance against fire and such other risks as are, from time to time, included in standard extended coverage endorsements, insuring all leasehold and building improvements in the Premises which are originally constructed by Tenant, Tenant's stock-in-trade, trade fixtures, furnishings, special equipment, floor and wall coverings, and all other items of personal property of Tenant located on or within the Premises, such coverage to be in an amount equal to at least eighty percent (80%) of the replacement cost thereof. Prior to the Commencement Date of this Lease, Tenant shall furnish Landlord with a certificate evidencing such coverage.

E. **Mutual Waiver of Subrogation.** All insurance policies required to be carried by either party covering the Premises, including but not limited to contents, fire, and casualty insurance, shall to the extent permitted by law expressly waive any right on the part of the insurer against the other party. The parties hereto agree that their policies will include such waiver clause or endorsement so long as the same shall be obtainable without extra cost, or if extra shall be charged therefor, so long as the other party pays such extra cost. If cost shall be chargeable therefor, each party shall advise the other thereof and of the amount of extra cost, and the other party, at its election, may pay the same, but shall not be obligated to do so. The failure of any insurance policy to include such waiver clause or endorsement shall not affect the validity of this Lease. Tenant and Landlord further agree to waive all claims, causes of action and rights of recovery against the other, and their respective agents, officers, and employees, for any injury to or death of persons or any damage or destruction of persons, property or business which shall occur on or about the Premises originating from any cause whatsoever including the negligence of either party and their respective agents, officers, and employees to the extent such injury, death or property damage is required to be covered by a policy or policies maintained by either Landlord or Tenant pursuant to this Lease. Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of subrogation herein contained shall

14

expressly extend to and include any uninsured loss paid by the insured in the form of a deductible or self-funded retention cost.

F. **Insurance Charge.** Tenant agrees to pay to Landlord, in monthly installments, in advance on the first day of each month, the amount specified in Article I, Section 13 as a contribution toward Landlord's cost of carrying public liability, property damage, fire and extended coverage and such other insurance as Landlord reasonably deems appropriate, including, but not limited to the cost of Landlord's insurance provided for in Article XII and any deductible or self-insured retention costs incurred by Landlord in connection with any loss. Such coverage shall be for those items set forth in Article XII, Section D, and shall specifically exclude Tenant's personal property.

G. **Additional Insured.** Landlord shall name Tenant as an additional insured on any and all general liability insurance policies covering the Premises and such policies shall bear endorsements to the effect that the insurer agrees to notify all additional insureds not less than thirty (30) days in advance of any modification or cancellation thereof.

## XIII. DAMAGE AND DESTRUCTION

In the event the Premises are damaged by any peril covered by standard policies of fire and extended coverage insurance, the damage shall, except as hereinafter provided, promptly be repaired by Landlord, at Landlord's expense but, that in no event shall Landlord be required to repair or replace Tenant's leasehold and building improvements in the Premises originally constructed by Tenant, Tenant's stock-in-trade, trade fixtures, furniture, furnishings, equipment or personal property, which shall be the obligation of Tenant to replace to at least equal condition immediately prior to such damage. In the event (a) the Premises are damaged to the extent of fifty percent (50%) or more of the cost of replacement of the Premises, (b) the buildings on the Shopping Center are damaged to the extent of seventy-five percent (75%) or more of the cost of replacement, notwithstanding the extent of damages to the Premises, or (c) any damage to the Premises occurs during the last three (3) years of the term of this Lease, Landlord may elect either to repair or rebuild the Premises or the buildings on the Shopping Center, as the case may be or to terminate this Lease upon giving notice of such election in writing to Tenant within ninety (90) days after the event causing the damage. If the casualty, repairing, or rebuilding shall render the Premises untenantable, in whole or in part, a proportionate abatement of the Rent in proportion to the sales floor area of the Premises rendered untenantable shall be allowed until the date Landlord completes the repairs or rebuilding.

## XIV. ASSIGNING AND SUBLETTING

Tenant shall not sublet the Premises or any part thereof nor assign this Lease, without in each case the prior written consent of Landlord, which consent Landlord may withhold in its sole discretion. Tenant shall not permit any business to be operated in or from the Premises by any concessionaire or licensee without the prior written consent of Landlord, which consent Landlord may withhold in its sole discretion. In the event Tenant shall request Landlord's consent to an assignment of this Lease or subletting of the Premises, Tenant shall pay Landlord, as a condition to obtaining Landlord's consent the reasonable costs and expenses incurred by Landlord to review and/or prepare documents in connection with such assignment or sublease (including Landlord's reasonable attorneys' fees) and, in addition, a consent fee of One Thousand and 00/100 Dollars ($1,000.00) per request, regardless of

whether such assignment or sublease is consummated by Tenant. No consent by Landlord shall operate to relieve Tenant and/or Guarantor, if any, from primary liability for the performance of Tenant's obligations under this Lease.

Notwithstanding the forgoing, Tenant shall be permitted to assign and/or sublet any or all parts of the Lease to any company which has an identical ownership group and/or structure as Tenant without Landlord's prior written consent. Tenant shall provide Landlord with sixty (60) days advance notice prior to assigning or subletting any portion of the Lease pursuant to this provision.

Any sale, assignment, transfer or other disposition of shares of Tenant's corporate stock which shall result in a change in the effective voting control of Tenant by the person or persons owning a majority of said corporate shares on the date of this Lease shall be deemed an assignment of this Lease requiring Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the forgoing, the stockholders of Tenant shall be allowed to transfer any and all shares of Tenant's corporate stock to the future heirs of the current stockholders, into trusts, family partnerships or family limited liability companies for estate planning purposes without receiving Landlord's consent.

## XV. EMINENT DOMAIN

In the event the Shopping Center or any part thereof shall be taken or condemned either permanently or temporarily for any public or quasi-public use or purpose by any authority in appropriate proceedings or by any right of eminent domain, the entire compensation award thereof, including, but not limited to, all damages as compensation for diminution in value of the leasehold, reversion and fee, shall belong to Landlord, without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all its right, title, and interest to any such award. Tenant shall have the right to recover from the condemning authority, but not from Landlord, such compensation as may be separately awarded to Tenant.

In the event of a taking under the power of eminent domain of (i) more than twenty-five percent (25%) of the Premises or (ii) a sufficient portion of the Shopping Center so that after such taking less than fifty percent (50%) of the leasable floor area within all buildings located on the Shopping Center (as constituted prior to such taking) are occupied by tenants, either Landlord or Tenant shall have the right to terminate this Lease by notice in writing given within ninety (90) days after the condemning authority takes possession, in which event all rents and other charges shall be prorated as of the date of such termination.

In the event of a taking of any portion of the Premises not resulting in a termination of this Lease, Landlord shall use so much of the proceeds of Landlord's award for the Premises as is required therefor to restore the Premises to a complete architectural unit and this Lease shall continue in effect with respect to the balance of the Premises, with a reduction of Minimum Rent in proportion to the portion of the Premises taken.

## XVI. DEFAULT BY TENANT

If Tenant defaults in the payment of Rent or other charges and such payment is not made within five (5) days following Landlord's written notice that same is due, or if Tenant shall default in the performance of any other of Tenant's obligations hereunder and Tenant fails to remedy such default within fifteen (15) days after written notice from Landlord, provided that in no event shall Landlord be obligated to provide Tenant with written notice of any default, monetary or otherwise, more than once per calendar year, or if a receiver of any property of Tenant on the Premises is appointed, or Tenant's interest in the Premises is levied upon by legal process, or Tenant be adjudged bankrupt and Tenant fails within thirty (30) days to cause the vacation of such appointment, levy or adjudication, or if Tenant files a voluntary petition in bankruptcy, disposes of all or substantially all of its assets in bulk, or makes an assignment for the benefit of its creditors, then and in any such instance, without further notice to Tenant, Landlord shall have the right to exercise any and all rights or remedies available to Landlord at law, in equity or otherwise, arising from such default, including but not limited to the right to (i) terminate this Lease, or (ii) enter upon the Premises without terminating this Lease and relet the Premises in Landlord's name for the account of Tenant for the remainder of the term upon terms and conditions reasonably acceptable to Landlord and immediately recover from Tenant any deficiency for the balance of the term, plus expenses of reletting. In addition to the foregoing, any time after such default and the lapse of any applicable notice period, to make such payments in default or perform such act in default for the account and at the expense of Tenant, and all unpaid Rent or other charges which are not paid when due and all sums paid by Landlord pursuant to this sentence, including reasonable attorneys' fees, shall accrue interest at the annual rate of (i) fifteen percent (15%), or (ii) five percent (5%) above the prime lending rate of Key Bank, Seattle, WA, whichever is greater, which shall constitute additional rent under this Lease and shall be payable upon demand. If Tenant shall issue a check to Landlord which is dishonored by Tenant's depository bank and returned unpaid for any reason, including without limitation, due to insufficient funds in Tenant's checking account, Tenant shall pay to Landlord in addition to any other rights or remedies available to Landlord at law, the sum of Seventy-five and 00/100 Dollars ($75.00) for Landlord's administrative expense in connection therewith.

Tenant's failure to pay Rent, Additional Rent, or any other Lease costs when due under this Lease may cause Landlord to incur unanticipated costs. The exact amount of such costs are impractical or extremely difficult to ascertain. Such costs may include, but are not limited to, processing and accounting charges and late charges that may be imposed on Landlord by any ground lease, mortgage, or deed of trust encumbering the Shopping Center. Therefore, if Landlord does not receive the Rent, Additional Rent, or any other Lease costs in full on or before the fifth (5th) day of the month it becomes due, Tenant shall pay Landlord a late charge, which shall constitute liquidated damages, equal to Fifty Dollars ($50.00) a day for each day rent is late after the first of the month ("Late Charge"), which shall be paid to Landlord together with such Rent, Additional Rent, or other Lease costs then in arrears. The parties agree that such Late Charge represents a fair and reasonable estimate of the cost Landlord will incur by reason of such late payment. All Late Charges and any returned check charges shall then become Additional Rent and shall be due and payable immediately along with such other Rent, Additional Rent, or other Lease costs then in arrears. Money paid by Tenant to Landlord shall be applied to Tenant's account in the following order: (i) to any unpaid Additional Rent, including, without limitation, Late Charges, returned check charges, legal fees and/or court costs legally chargeable to Tenant, and Common Area

Maintenance Charges, and then (ii) to unpaid Rent. Nothing herein contained shall be construed so as to compel Landlord to accept any payment of Rent, Additional Rent, or other Lease costs in arrears or Late Charge or returned check charge should Landlord elect to apply its rights and remedies available under this Lease or at law or equity in the event of default hereunder by Tenant. Landlord's acceptance of Rent, Additional Rent, or other Lease costs in arrears or Late Charge or returned check charge pursuant to this clause shall not constitute a waiver of Landlord's rights and remedies available under this Lease or at law or equity.

Tenant agrees to pay to Landlord upon demand, as additional rent, a sum equal to all costs and expenses (including attorney fees, professional fees, costs of investigation and disbursements) incurred by Landlord in enforcing any or all of its rights hereunder, specifically including the cost of collecting sums due, whether or not an action or proceeding is commenced, or levying and collecting on any judgment or arbitration award in Landlord's favor.

All rights and remedies of Landlord herein enumerated shall be cumulative, and none shall exclude any other remedies allowed at law or in equity.

## XVII. NOTICES

Any notice or consent required to be given by or on behalf of either party to the other shall be given in writing and mailed by certified mail, return receipt requested, or by overnight courier service which provides a receipt, at the addresses stated on Article I(A), Sections 18 and 19, of this Lease, or at such other address as may be specified, from time to time, by notice in the manner herein set forth. Notices shall be deemed given upon actual receipt or first rejection.

## XVIII. DESIGNATED REPRESENTATIVE

Wherever the Landlord is required to grant its permission, consent, and/or permission under this Lease, such decision shall be made by Landlord's Designated Representative. The Landlord's Designated Representative is **(Walter Rector)**, or such other person as the Landlord shall from time to time designate by issuing prior written notice to Tenant pursuant to Section XVII, above.

## XIX. SECURITY DEPOSIT

Tenant shall deposit with Landlord the amount set forth in Article I, Section 16, herein (the "Security Deposit"). The Security Deposit shall be held by Landlord, without liability for interest, as security for the timely performance by Tenant of all the terms of this Lease, which are to be observed and performed by Tenant. Landlord shall not be obligated to hold the Security Deposit as a separate fund and may commingle the Security Deposit with other funds. If any sum payable by Tenant to Landlord is unpaid, including, but not limited to, utility charges and calendar year adjustments for Taxes and Common Area Charges, or if Landlord makes payments on behalf of Tenant, or performs any of Tenant's obligations under this Lease, then Landlord may, at its option and without prejudice to any other remedy which Landlord may have on account thereof, apply the Security Deposit as may be necessary to compensate Landlord toward the payment of the sum payable by Tenant to Landlord for loss or damage sustained by Landlord due to such breach on the part of Tenant, and Tenant shall, upon demand, restore the Security Deposit to the original sum deposited. If Tenant complies with all of the terms of this Lease, the Security Deposit shall be returned to Tenant within

sixty (60) days following the completion of year end net charge reconciliations for the Shopping Center for the calendar year in which this Lease expires or is terminated, less any sums payable by Tenant to Landlord, unless specifically prohibited by law. In the event of bankruptcy or other debtor/creditor proceedings against Tenant, the Security Deposit shall be deemed to be applied first to the payment of rent and other charges due Landlord for all periods prior to the filing of such proceedings. Landlord may deliver the Security Deposit to the purchaser of Landlord's interest in the Premises in the event that such interest be sold, and thereupon Landlord shall be discharged from any further liability with respect to the Security Deposit and this provision shall also apply to any subsequent transferees.

## XX. MORTGAGE SUBORDINATION

This Lease, and Tenant's rights hereunder shall be subject and subordinate to the lien of any mortgages or deeds of trust or other similar instrument that may now exist or may hereafter be placed upon the Shopping Center and all renewals, replacements, and extensions thereof without further notice or action on the part of Landlord or Tenant. Tenant agrees that, within thirty (30) days of the date of this Lease, and upon any future request of Landlord, it shall execute and deliver such instruments (including but not limited to a Memorandum of Lease and/or a Subordination, Non-Disturbance and Attornment Agreement in recordable form), which may be required by Landlord's mortgagee or trustee to evidence such subordination.

## XXI. ESTOPPEL CERTIFICATES

Within thirty (30) days of the date of this Lease, and at any time and from time to time, Tenant agrees, upon request in writing from Landlord, to execute and deliver to Landlord, for the benefit of such persons as Landlord names in such request, a statement in writing and in substance satisfactory to Landlord certifying to such of the following information as Landlord shall request:  (i) that this Lease constitutes the entire agreement between Landlord and Tenant and is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications); (ii) the dates to which the Rent and other charges hereunder have been paid, and the amount of any security deposited with Landlord; (iii) that the Premises have been completed on or before the date of such letter and that all conditions precedent to the Lease taking effect have been carried out; (iv) that Tenant has accepted possession, that the Lease term has commenced, that Tenant is occupying the Premises, that Tenant knows of no default under the Lease by Landlord and that there are no defaults or offsets which Tenant has against enforcement of this Lease by Landlord; (v) the actual commencement date of the Lease and the expiration date of the Lease; and (vi) that Tenant's store is open for business, provided such facts are true and ascertainable.

## XXII. QUIET ENJOYMENT

Landlord hereby covenants and agrees that if Tenant shall perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have the peaceable and quiet enjoyment and possession of the Premises without any hindrance from Landlord or any person or persons lawfully claiming the Premises.

## XXIII.  LIABILITY OF LANDLORD

Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Landlord, that if Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title, and interest of Landlord in the Shopping Center, including all rents paid to Landlord by any tenant(s) of the Shopping Center, as the same may then be encumbered, and neither Landlord nor any of its officers or shareholders shall be liable for any deficiency. It is understood that in no event shall Tenant have any right to levy execution against any property of Landlord other than its interest in the Shopping Center as hereinbefore expressly provided. In the event of the sale or other transfer of Landlord's right, title and interest in the Premises or the Shopping Center, Landlord shall be released from all liability and obligations under this Lease.

## XXV.  TENANT TERMINATION OPTION.

A.  If at any time during the term of the Lease the Shopping Center's Total Occupancy falls below Sixty Percent (60%), Tenant shall be permitted to terminate the Lease at its sole discretion upon Ninety (90) days written notice to Landlord. The Total Occupancy shall be calculated by dividing the total square footage of leased area within all of the buildings in the Shopping Center by the total gross leasable area within all of the buildings in the Shopping Center.

B.  If any other tenant of premises in the Shopping Center has an exclusivity clause relating to or concerning appliances, furniture, electronics, mattresses and/or other related items, Tenant shall be permitted to terminate the Lease at its sole discretion upon ten (10) days written notice to Landlord.

## XXVI.  EXCLUSIVITY.

A.  Landlord hereby covenants, warrants and represents to Tenant that Landlord has not leased, and will not lease, any retail portion of the Shopping Center, or any other premises within one (1) mile of the perimeter of the Shopping Center owned or controlled by Landlord, to, or allow the use of any such space by, any business whose retail function includes, in whole or in part, sale of appliances and/or mattresses or who conducts maintenance and/or repairs related to, or arising out of, the above referenced activities.

B.  Landlord hereby covenants, warrants and represents to Tenant that Landlord has not leased, and will not lease, any retail portion of the Shopping Center, or any other premises within one (1) mile of the perimeter of the Shopping Center owned or controlled by Landlord, to, or allow the use of any such space by, any business whose retail function includes, in whole or in part, sale of furniture or who conducts maintenance and/or repairs related to, or arising out of, the above referenced activity, without Tenant's prior written consent, which shall be granted or denied at Tenant's sole discretion.

## XXVII. MISCELLANEOUS PROVISIONS

A. **Accord and Satisfaction.**   No payment by Tenant, or anyone occupying the Premises by, through or under Tenant, or receipt by Landlord of a lesser amount than the rents stated herein shall be deemed to be other than on behalf of Tenant and on account of the next due rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided for in this Lease or available at law or in equity.

B. **Waiver.**   No waiver of any condition or legal right or remedy shall be implied by the failure of Landlord to declare a forfeiture, or for any other reason, and no waiver of any condition or covenant shall be valid unless it be in writing signed by Landlord.  No waiver by Landlord with respect to one or more tenants or occupants of the Shopping Center shall constitute a waiver in favor of any other tenant, nor shall the waiver of a breach of any condition be claimed or pleaded to excuse a future breach of the same condition or covenant.

C. **Broker's Commission.**   Tenant warrants that, except for any amounts payable by Landlord to its agent, there are no claims for broker's commissions or finder's fees in connection with its execution of this Lease and Tenant agrees to indemnify and save Landlord harmless from any liability that may arise from such claims, including reasonable attorney's fees.

D. **No Partnership.**  Landlord does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business, or otherwise, or a joint venturer or a member of a joint enterprise with Tenant.

E. **Lease Inures to the Benefit of Assignees.**   This Lease and all of the covenants, provisions, and conditions herein contained shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns respectively, of the parties hereto, provided, however, that no assignment by, from, through, or under Tenant in violation of the provisions hereof shall vest in the assigns any right, title, or interest whatever.

F. **Entire Agreement.**   This Lease and the exhibits attached hereto set forth the entire agreement between Landlord and Tenant, and all prior promises and agreements, oral or written, between them are merged into this Lease.  No amendment to this Lease shall be binding upon Landlord or Tenant unless in writing.

G. **Abandonment, Surrender and Holding Over**.  Tenant shall deliver up and surrender to Landlord possession of the Premises upon the expiration of the Lease Term, or its prior termination for any reason, in as good condition and repair as the same shall be at the commencement of said term (damage by fire and other perils covered by standard fire and extended coverage insurance and ordinary wear and decay only excepted).  At the time Tenant shall deliver and surrender possession of the Premises to Landlord, Tenant shall provide Landlord with a written statement from an HVAC contractor reasonably acceptable to Landlord who shall certify that the HVAC system servicing the Premises has been properly maintained and is in good working order.  In the event Tenant shall fail

21

to provide such statement to Landlord, Landlord shall have the right, but not the obligation to retain an HVAC contractor of Landlord's choosing who shall inspect the HVAC system servicing the Premises and report to Landlord as to the condition of said HVAC system. If such report discloses the need for repair or maintenance, Landlord shall have the right, but not the obligation, to cause such repairs or maintenance. Tenant shall reimburse Landlord for all costs and expenses so incurred by Landlord in performing the inspection, maintenance and/or repairs plus an additional ten percent (10%) of such cost for and as Landlord's overhead. If Tenant remains in possession of the Premises after any termination of this Lease, no tenancy or interest in the Premises shall result, but such holding over shall be an unlawful detainer and all such parties shall be subject to immediate eviction, and Tenant shall upon demand pay to Landlord, as liquidated damages, a sum equal to the greater of (i) double the fair market rental value of the Premises, as determined by Landlord, in its sole discretion, or (ii) two hundred percent (200%) of the Rent payable during the calendar month immediately preceding the expiration or earlier termination of this Lease for any period during which Tenant shall hold the Premises after the stipulated term of this Lease shall expire or may have terminated. If Tenant vacates the Premises prior to the scheduled expiration of the Lease Term, Tenant shall be in default of this Lease, and if Tenant has not re-entered the Premises and resumed the operation of the business set forth in Article IX, Section B, of this Lease for a period of thirty (30) consecutive days, Tenant shall be deemed to have abandoned the Premises, and Landlord shall have the right, but not the obligation, to take sole possession of the Premises on or after the tenth (10th) day following the expiration of said thirty (30) day period and Landlord may relet said Premises in accordance with the terms in Article XVI hereof.

H. **No Option.** The submission of this Lease by Landlord for review by Tenant does not constitute a reservation of or option for the Premises, and shall vest no right in Tenant. This Lease becomes effective as a Lease only upon execution and delivery thereof by the parties hereto.

I. **Additional Rent.** Any amounts to be paid by Tenant to Landlord pursuant to the provisions of this Lease, whether such payments are periodic or recurring, shall be deemed to be "Additional Rent" and otherwise subject to all provisions of this Lease and of law as to the default in the payment of rent.

J. **Power of Attorney.** In the event Tenant fails to deliver any documents required to be delivered to Landlord under the terms of Articles XIX and XX of this Lease within ten (10) days after Landlord's written request, Tenant does hereby make, constitute, and irrevocably appoint Landlord as its attorney-in-fact and in its place and stead to do so; however, Landlord shall be solely liable and responsible for the accuracy of any and all representations and warranties made therein.

K. **Financial Statements.** Tenant shall, within ten (10) days after receipt of a written request from Landlord, furnish to Landlord Tenant's current financial statement and such other financial information as Landlord may request. Landlord covenants that the financial information provided by Tenant shall be treated as confidential, except that Landlord may disclose such information to any prospective purchaser, prospective or existing lender or prospective or existing ground or underlying lessor upon the condition

that the prospective purchaser, prospective or existing lender or underlying lessor shall also covenant to treat such information as confidential.

L. **Severability.**   In the event that any provision or section of this Lease is rendered invalid by the decision of any court or by the enactment of any law, ordinance or regulation, such provision of this Lease shall be deemed to have never been included therein, and the balance of this Lease shall continue in effect in accordance with its terms.

M. **Option to Renew.**   Provided Tenant is not in default under any of the terms and provisions herein contained, Landlord hereby grants to Tenant the option to renew this Lease for the periods set forth in Article I, Section 17, commencing on the day following the expiration of the original term.  Any such Renewal Term shall be upon all the terms and conditions as the original Lease Term except that the Rent and the Percentage Rent shall be increased in accordance with the terms of Article I, Section 17.  It shall be a condition to Tenant's right to renew this Lease pursuant to this Section (M) that Tenant provide Landlord (i) Tenant's current financial statement within thirty (30) days following the date Tenant shall exercise the foregoing option to renew this Lease, and (ii) a statement certified by Tenant's chief financial officer of the annual Gross Sales made by Tenant in, on or from the Premises during the current Lease Term if Tenant is not otherwise required to report Gross Sales pursuant to Article IV, Section (B) of this Lease. Landlord covenants that any financial statements provided hereunder shall be treated as confidential and governed by subsection (K), above.

The foregoing option to renew shall be exercised by written notice to Landlord given not less than the number of days set forth in Article I, Section 17, above prior to the expiration of the original term of this Lease, or any renewal thereof.

O. **Counterparts.**   This Lease may be executed in multiple counterparts, each of which shall constitute an original and all of which shall constitute one document.

P. **Consents.**   With respect to any provision of this Lease which provides or infers, in effect, that Landlord shall not unreasonably withhold or unreasonably delay its consent or approval, Tenant, in no event, shall be entitled to make, nor shall Tenant make, any claim against Landlord for money damages, and Tenant hereby waives any claim or assertion by Tenant that Landlord has unreasonably withheld or unreasonably delayed any consent or approval, but Tenant's sole remedy shall be an action or proceeding to enforce any such provision of this Lease, or for specific performance, injunction or declaratory judgment.

Q. **Force Majeure.**   In the event Landlord or Tenant is prevented or delayed in the performance of any improvement or repair or fulfilling any other obligation required under this Lease due to delays caused by fire, earthquake, catastrophe, strikes or labor trouble, civil commotion, acts of God, governmental prohibitions or regulation, inability or difficulty to obtain materials or other causes beyond the performing party's reasonable control, the performing party shall, within five (5) days of the event causing such delay, provide written notice to the other party of the event causing the delay and the anticipated period of delay, and the period of such delay shall be added to the time for performance thereof.  The performing party shall have no liability by reason of such permitted delays. In the event the performing party fails to provide notice to the other party of the force

majeure delay within such five (5) day period, the performing party shall not be excused from the timely performance of such obligation regardless of the cause.

R. **Joint and Several Liability.** In the event Tenant shall be comprised of more than one (1) individual or business entity, each such individual or business entity comprising Tenant shall be jointly and severally liable for each and every obligation of Tenant under the terms of this Lease.

S. **Right to Relocate.** Intentionally deleted.

T. **Payment Under Protest.** All rent and other amounts payable hereunder shall be payable without demand, offset or deduction. If at any time a dispute shall arise as to any amount or sum of money to be paid by Tenant to Landlord under the provisions hereof, Tenant shall make such payment "under protest" and under no circumstances shall Tenant be entitled to withhold any payment due hereunder. If Tenant makes a payment "under protest" and it is subsequently determined that Tenant was not obligated to pay all or a portion of an amount paid "under protest," Landlord shall refund to Tenant the portion of the payment made "under protest" which Tenant was not obligated to pay including simple interest at fifteen percent (15%) per annum.

U. **Waiver of Trial By Jury.** To the extent permitted by applicable law Landlord and Tenant waive all right to trial by jury in any claims, action, proceeding or counterclaim by either Landlord or Tenant against each other or any matter arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant or Tenant's use or occupancy of the Premises.

V. **Labor Disputes.** Tenant shall take no action which would violate Landlord's union contracts, if any, affecting the Shopping Center nor create any work stoppage, picketing, labor disruption or dispute or any interference with the business of the Landlord or any tenant or occupant in the Shopping Center or with the rights and privileges of any customer or other person lawfully in and upon said Shopping Center, nor cause the impairment or reduction of the goodwill of the Shopping Center.

W. **Hazardous Materials.** Tenant shall not permit or cause the presence of Hazardous Materials in, on or under the Premises or any other portion of the Shopping Center. Tenant shall defend, protect, indemnify and hold Landlord harmless from and against any and all claims, causes of action, liabilities, damages, costs and expenses, including, without limitation, attorney fees, arising because of any alleged personal injury, property damage, death, nuisance, loss of business or otherwise, by Landlord, any employee of Landlord, or from and against any governmental act or enforcement, arising from or in any way connected with conditions existing or claimed to exist with respect to Hazardous Materials (as hereinafter defined) within the Shopping Center which are the result of Tenant's use, occupancy or operation of the Premises. As used herein the term "Hazardous Materials" shall be defined as any hazardous substance, contaminant, pollutant or hazardous release (as such terms are defined in any federal, state or local law, rule, regulation or ordinance, including without, limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended) and other said wastes. In the event Tenant shall cause or permit the presence of Hazardous Materials in, on or under the Premises or any other portion of the Shopping Center, Tenant shall promptly, at Tenant's sole cost and expense, take any and all action

necessary (as required by appropriate government authority or otherwise) to return the areas affected thereby to the condition existing prior to the presence of any such Hazardous Materials thereon, subject to Landlord's prior written consent.  The foregoing covenants shall survive termination of this Lease.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be signed, in triplicate, as of the date and year first above written.

| LANDLORD:<br>**Meridian Village, LLC**<br>**A Delaware Limited Liability Company**<br><br>**By: Meridian Village Holdings, LLC, a**<br>**Delaware Limited Liability Company**<br>**Its: Manager**<br><br>**By: Towne Square Apartments, LLC, a**<br>**Washington Limited Liability Company**<br>**Its: Manager** | TENANT:<br>**DEWAARD & BODE, INC., A**<br>**WASHINGTON CORPORATION** |
|---|---|
| By: _(signature)_<br>　　Lewis David Seiler | By: _(signature)_<br>　　Jerry Roorda |
| Its:　Manager | Its:　　President |

25

**LANDLORD**

STATE OF *Montana* )
                    )SS:
COUNTY OF *Ravalli* )

BEFORE ME, a Notary Public in and for said County and State, personally appeared *Lewis David Sailor*, known to me to be the *owner/manager* of Meridian Village, LLC, the company which executed the foregoing instrument, who acknowledged that he did sign and seal the foregoing instrument for and on behalf of said company being thereunto duly authorized that the same is his free act and deed as such officer and the free at and deed of said company.

*Montana* IN WITNESS WHEREOF, I have hereunto set my hand and official seal at ~~Scottsdale~~, *Darby* ~~Arizona~~ this *13th* day of *July*, 200*9*.

*Jody Smith*
Notary Public

JODY SMITH
NOTARY PUBLIC-MONTANA
Residing at Darby, Montana
My Comm. Expires Oct. 1, ~~2009~~ *2011*

NOTARIAL SEAL

**TENANT**
**CORPORATE**

STATE OF   *WA*   ,}
                  }ss.
COUNTY OF *WHATCOM*}

On this *8TH* day of *July*, 20 *09*, before me personally appeared **Jerry Roorda** to me known to be the **President of DeWaard & Bode, Inc.,** the corporation that executed the within and foregoing instrument and acknowledged the same instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, and on oath stated that they were authorized to execute said instrument.

IN WITNESS HEREOF, I have hereunto set my hand and affixed my official seal, the day and year first above written.

*Kurt McClelland*
Notary Public in and for the State of   *WA*

Residing at   *WHATCOM*
My Commission expires   *Aug 5, 2010*

KERT MCCLELLAND
COMMISSION EXPIRES
NOTARY
PUBLIC
AUG 5 2010
STATE OF WASHINGTON

26

**SCHEDULE A**

**Rent Schedule**

| Monthly Period | Monthly Rent | Annual Rent |
| --- | --- | --- |
| 1-3 | $0 | |
| 4-36 | $15,463.56 | $185,562.72 |
| 37-84 | $18,777.18 | $225,326.16 |
| 85-132 | $20,986.26 | $251,835.12 |
| 133-180 | $23.563.52 | $282,762.24 |
| 181-240 | $25,772.60 | $309.271.20 |
| 241-276 | $28,349.86 | $340,198.32 |

27





**MERIDIAN VILLAGE**
Bellingham, WA



**DISCLAIMER**

RITE AID

BLDG 3930

CIRCUIT CITY

BLDG 3960

OUTDOOR GARDEN CENTER

420

HOME DEPOT

GUIDE MERIDIAN

DEEMER ROAD

160 KEY BANK

MAIN BUFFET 222

300

MI MEXICO RESTAURANT

TELEGRAPH ROAD



# MERIDIAN VILLAGE
## Bellingham, WA

**EXHIBIT B**

LEGAL DESCRIPTION

Parcel A:

Portion of the North Half of Government Lot 2 of Section 18, Township 38 North, Range 3 East of W.M., more particularly described as follows:

Commencing at the Northwest corner of said Government Lot 2; thence South 88°01'19" East along the North line thereof, 358.00 feet to the true point of beginning; thence continuing South 88°01'19" East along said North line 978.51 feet to the Northeast corner of Government Lot 2; thence South 1°39'24" West along the East line of Government Lot 2, 596.74 feet to the point on the North right of way line of Telegraph Road; thence Westerly along said North right of way line along the arc of a curve to the right having a radius of 1,114.61 feet through a central angle of 10°13'59" a distance of 199.07 feet to a point of tangency; thence North 88°04'43" West along said North right-of-way line a distance of 1,101.43 feet; thence North 1°00'26" East, parallel with and 30.00 feet Easterly of the West line of Government Lot 2, 150.00 feet; thence South 88°01'19" East parallel with the North line of Government Lot 2, 328. 00 feet; thence North 1°00'26" East parallel with the West line of Government Lot 2, 465.87 feet to the point of beginning;

Except that portion conveyed to the State of Washington for highway purposes by Deed recorded under Auditor's File No. 1341625;

Parcel A-1:

A 30 foot non-exclusive access easement over that portion of the North Half of Government Lot 2 of Section 18, Township 38 North, Range 3 East of W.M., the centerline of which is more particularly described as follows:

Commencing at the Northwest corner of said Government Lot 2; thence South 88°01'19" East, 30.00 feet; thence South 01°00'26" West along the Easterly right of way of the Guide Meridian Road, 252 feet to the point of beginning; thence South 89°46'08" East, 327.98 feet to the terminus of said centerline;

Except any portion thereof within Guide Meridian;

And

Non-exclusive easements for vehicular and pedestrian ingress to and egress from said premises over and across the common area of tract adjacent to the West:;

30

All as set forth in Amended and Restated Reciprocal Easement Agreement recorded under Auditor's File No. 910119145 and Amendment thereto recorded under Auditor's file No. 1971202523;

Parcel A-2:

Easement for ingress and egress of vehicular and pedestrian traffic across the premises to the North of Parcel A, as set forth in Section 8 of Agreement entered into June 26, 1978, and recorded under Auditor's File No. 1323087;

Situate in Whatcom County, Washington.

Parcel B:

That portion of the North Half of Government Lot 2 of Section 18, Township 38 North, Range 3 East of W.M., more particularly described as follows:

Commencing at the Northwest corner of said Government Lot 2; thence South 88°01'19" East along the North line thereof, 358.00 feet; thence South 1°0'26" West, 57.00 feet to the true point of beginning; thence continuing South 1°0'26" West 153.00 feet; thence South 88°01'19" West, 2.70 feet; thence North 2°00'57" East, 153.16 feet to the true point of beginning;

Situate in Whatcom County, Washington.

Parcel C:

A tract of land situated in the Southeast Quarter of the Northwest Quarter of Section 18, Township 38 North, Range 3 East of W.M., more particularly described as follows:

Beginning at the Northwest corner of the said Southeast Quarter of the Northwest Quarter of said Section 18; running thence due East along the North line of said Southeast Quarter of the Northwest Quarter of said Section 18, a distance of 477.6 feet; thence due South to the North line of the county road known as Old Telegraph Road; thence along the North side of said county road in a Westerly direction to the West line of the said Southeast Quarter of the Northwest Quarter; thence due North along the West line of said Southeast Quarter of the Northwest Quarter to the place of beginning;

Except Deemer Road, County Road No. 503;

Also Except portion deeded to Whatcom County for road purposes by Quit Claim Deed recorded November 26, 1968, under Auditor's File No. 940081;

And Except Old Telegraph Road, County Road No. 63;

Situate in Whatcom County, Washington.

# EXHIBIT C

## (As-Is)

Space - _____
Tenants Trade Name: _____
Meridian Village Shopping Center

*This Exhibit shall set forth the division of responsibility for work, materials, and any other applicable costs and fees between the Landlord and the Tenant. Items designated under the heading "Work by Landlord" shall be performed by the Landlord, at Landlord's expense, according to all applicable codes, and the Landlord shall acquire all permits and inspections related to this work These items shall constitute the entire scope of Landlord work; and any and all other work; whether included in this list or not, required to complete the Tenant's premises per Tenant's requirements, Landlord's criteria or code requirements shall be by the Tenant at the Tenant's sole expense.*

I.       WORK BY LANDLORD

The Premises is being delivered to the Tenant in an "as-is" condition. The Landlord shall not be required to perform any work on the Premises.

Notwithstanding Section 6C of the Lease, the Landlord shall not be required to deliver outline plans and specifications to the Tenant, however, the Landlord will do so if requested and if such plans and specifications are available.

II.       WORK BY TENANT

   A.    General Requirements

      1.       Tenant shall deliver to Landlord, plans and specifications (including proposed storefront signage) for Tenant's work within the Premises. Such plans and specifications shall include proper safety measures, which insure that Hazardous Materials (as defined in the Lease) are not released in, on or under the Premises or any part of the Shopping Center during the Initial Construction of the Premises and during the term of this Lease. Tenant shall submit Tenant's plans and specifications within fifteen (15) days from date of execution of this Lease. Tenant shall submit three (3) sets of plans and specifications to the Landlord for review.

      Notwithstanding the foregoing, Tenant shall be allowed to conduct non-structural improvements to the Premises' interior without receiving Landlord's consent. Non-structural interior improvements include, but are not limited to, installation of non-load bearing partitions, product displays, plumbing alterations, and gas line alterations.

      2.       Tenant shall obtain written approval, from the Landlord, of all materials, equipment, fixtures, furnishings, etc., which become a permanent part of the structure. All work shall conform to all design criteria and construction guidelines established by the Landlord.

      Notwithstanding the foregoing, Tenant shall be allowed to conduct non-structural improvements to the Premises' interior without receiving Landlord's consent. Non-

structural interior improvements include, but are not limited to, installation of non-load bearing partitions, product displays, plumbing alterations, and gas line alterations.

3.    Tenant shall be responsible for obtaining all required construction document reviews with all governmental authorities in order to obtain all required permits, inspections, occupancy permits, operating licenses, etc., pertaining to the Tenant's work and nature of Tenant's business.

4.    Insurance.

a.    Tenant shall require its Contractor to provide and maintain the following insurance coverages:

1)    For all of its employees, Worker's Compensation insurance in the minimum amounts required by the state in which the Premises is located and to comply in all respects with the employment and payment of labor insurance required by any constituted authority having legal jurisdiction over the area in which the work is performed.

2)    Comprehensive General Liability insurance including Contractual and Contractor's Protective Liability coverage in the minimum amount of One Million Dollars ($1,000,000) single limit for bodily injury and/or wrongful death and a minimum of One Million Dollars ($1,000,000) single limit for property damage. This coverage shall include the hazards of explosion, collapse and underground damage, as well as contractual endorsements.

3)    Comprehensive Automobile Liability insurance, including hired and non-owned automobile coverage, with a minimum of One Million Dollars ($1,000,000) single limit for bodily injury and/or wrongful death and a minimum of One Million Dollars ($1,000,000) single limit for property damage.

4)    To the extent the cost of Tenant's Work shall exceed Twenty-five Thousand and 00/100 Dollars ($25,000.00), Tenant's contractor shall furnish and maintain performance and payment bonds in an amount equal to one hundred twenty-five percent (125%) of the construction contract price and all additions thereto, and all obligations arising in connection therewith. The performance and payment bonds shall name Landlord as obligees and will be in such a form and with such sureties as are reasonably satisfactory to Landlord.

b.    The Landlord shall be named an additional insured party on all insurance policies required hereunder and certificates of insurance evidencing complying with this paragraph shall be provided to Landlord prior to commencement of any work in the Premises. Certificates of insurance must contain an endorsement to the effect that Landlord shall be given at least thirty (30) days prior written notice in the event of cancellation or material change in such insurance coverage represented by the Insurance Certificate.

c.    It shall be the sole and exclusive responsibility of the Tenant to require its Contractor to carry its own Builder's Risk insurance covering materials and/or

    d.  All policies of insurance maintained by Tenant's Contractor shall be written by insurance companies qualified to do business and write coverage in the state where the Shopping Center is located having a minimum Best rating of A-/X.

5.      Landlord shall have the right to disapprove all contractors employed by the Tenant including, but not limited to, the roofing and sprinkler subcontractors. Landlords approval required herein shall not be unreasonably withheld, conditioned, or delayed.

6.      Tenant shall not begin Tenant's work until all required approvals have been granted by the Landlord.

7.      All work undertaken by the Tenant shall be at Tenant's sole liability and expense.

8.      Tenant's work shall not damage or compromise the structural integrity of the building. All work shall be done in a first-class workmanlike manner in accordance with all applicable building codes, laws, regulations and ordinances. The Tenant shall be held liable for any damage caused by the Tenant and/or Tenant's employees, vendors, and contractors.

9.      All work undertaken by the Tenant shall be coordinated with and completed so as not to interfere with the Landlord's construction schedule or any other tenant's activities. All contractors employed by the Tenant shall allow other contractors to work on the Premises without interference.

10.     Tenant shall be responsible for the cost and receipt of all deliveries and unloading of all materials pertaining to Tenant's work. All deliveries shall be made through the service door (where provided). Storage of equipment and materials shall be confined to the leased Premises.

11.     Prior to commencing Tenant's Work in the Premises, Tenant shall have:

    a.  Delivered to Landlord, Tenant's Contractor's insurance certificate(s) evidencing the insurance coverages as required hereunder.

    b.  Delivered plans for Tenant's Work to Landlord and obtained Landlord's written approval of such plans, except for those cases, set forth above, where Landlord's prior written approval is not require.

    c.  Transferred utility services for the Premises from the Landlord's account to the Tenant's account.

    d.  Deposited with Landlord and required security deposits required under the Lease.

    e.  Filed with Landlord a copy of the building permit (if applicable) for Tenant's Work.

12.    During the period of Tenant's work, Tenant shall provide and pay for connections, metering and consumption of all temporary utilities brought to such a point as determined by the Landlord.

13.    Tenant shall keep the Premises and Shopping Center common areas reasonably free from accumulations of debris caused by Tenant's employees, vendors and contractors. Tenant shall arrange for services to be provided for the removal of debris during the period of Tenant's work.

14.    Tenant shall clean HVAC filters clogged by dust or other debris resulting from Tenant's construction in premises.

15.    Tenant shall not cause or permit any Hazardous Materials (as defined in the Lease) to be released, spilled or otherwise permeated in, on or under the Premises or any portion of the Shopping Center while performing Tenant's Work.

16.    Tenant shall provide to the Landlord a copy of the Certificate of Occupancy (or local equivalent) issued for the Premises within seven (7) days of opening for business in the Premises from Tenant's work.

B.    Exterior Work

Tenant shall not perform any work, which would in any way alter or modify the appearance or structural integrity of the building without prior written approval from the Landlord.  Such approval shall not be unreasonably withheld, conditioned, or delayed.

C.    Interior Work

Tenant shall provide all necessary work according to Tenant's business and local code requirements.  This work shall include but not necessarily be limited to the following:

1.  All interior partition walls, doors, etc.

2.  Interior wall finishes including priming, painting, wall coverings, etc.

3.  Floor coverings and wall base.

4.  Plumbing.

      a.  All necessary plumbing work, other than that provided by the Landlord as previously referred to.

      b.  Tenant shall apply to the local utility company for water/sewer service and shall pay all tap, connection and impact fees attributable to Tenant's design and nature of Tenant's business.

      c.  Tenant shall pay for meter set and all related fees if applicable.  Meter or remote read-out device shall be installed in a location easily accessible for reading.

5. Electrical.

    a. All electrical work, other than that provided by the Landlord as previously referred to.

    b. At Tenant's option, Tenant may provide burglar alarm system, emergency generator, Muzak system, etc. as approved by the Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed.

    c. Tenant shall apply to the local utility company for metering and/or service and shall pay all related fees.

6. Heating, Ventilating and Air Conditioning.

    a. Installation of additional, or relocation of Landlord provided, rooftop HVAC units, supply air diffusers, and return air grilles as approved by the Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed.

    b. If applicable, Tenant shall apply to the local utility company for gas service and/or metering and shall pay all related fees. Meter or remote read-out device shall be installed in a location easily accessible for reading.

    c. Restaurants, food service, pet shop, hair/nail salons, barber shops, Laundromats and any other uses, which, in the sole reasonable opinion of the Landlord, produce odors, shall provide and exhaust system which will prevent such odors from entering the other tenant's spaces, enclosed Common Areas or any other portions of the Shopping Center. In the event Tenant's use requires an exhaust system, Tenant shall, unless otherwise approved in writing by Landlord, provide tempered make-up outside air up to ninety percent (90%) of all such exhaust.

7. Fire Protection.

    a. Any deviation from, or modification to, the regular standard grid layout of sprinkler heads within the leased Premises due to Tenant's design or nature of Tenant's business. The location, type, and number of sprinkler heads shall be based upon local codes and the Landlord's insurance underwriter requirements. All modifications to the standard grid layout must be performed by the project sprinkler contractor at Tenant's expense.

    b. Any fire alarm system and monitoring thereof as may be required by governing codes and authorities. Tenant's system and system components shall match and be compatible with Landlord's systems and requirements.

    c. Any special sprinkler heads, extinguisher systems, flame retardants, smoke/heat detectors, etc. as required by all applicable building codes, laws, regulations and ordinances due to Tenant's design or nature of Tenant's business.

    d. Two (2) 5 lb. ABC fire extinguishers properly maintained on a continued basis.

8. Miscellaneous.

a.   All trade fixtures, shelving, furnishings, signage, merchandise, etc.

b.   Toilet room accessories such as paper holders, soap dispenser, mirrors, shelves, etc.

c.   All curbs, lintels, flashings, pipes, ducts, vents, exhaust hoods, louvers, etc. necessary for Tenant's equipment requiring openings through roof and/or exterior walls.  All cutting, patching and flashing of the roof system must be performed by the Landlord's roofing contractor at Tenant's expense.

d.   All required safety, emergency, and handicap aid equipment within the leased Premises as required by Local, State and Federal authorities.

e.   Tenant shall insulate, to the extent required by the nature of Tenant's business, the demising walls, and ceiling so as not to permit sound, odors, etc., to emanate outside the leased Premises.

-END-

# EXHIBIT D

### SIGN CRITERIA - MERIDIAN

The following "Sign Criteria" has been established for the purpose of assuring a first class Shopping Center, and for the mutual benefit of all occupants. Conformity with the Sign Criteria shall be strictly enforced and any non-conforming or disapproved signs shall be brought into conformity at the expense of Tenant.

The Sign Criteria has been designed to give each Tenant flexibility in personalizing its own store and at the same time allow maximum creativity in sign design. Landlord reserves the right to waive the Sign Criteria for any tenant occupying at least five thousand (5,000) square feet of building area or which is nationally recognized.

## A.   GENERAL CRITERIA

1.   Prior to the installation of any sign in the Shopping Center, Tenant shall submit to Landlord for its approval, three (3) copies of a detailed shop drawing of its proposed sign, prepared by sign contactor, indicating conformance with the Sign Criteria. Such shop drawings shall include the building elevation to which the signs are attached, letter size, layout and color, including all copy and graphics. Approval of the proposed sign shall be in accordance with the provisions of this Exhibit D.

2.   Tenant shall pay all costs for its signs, including Installation and maintenance. Tenant or its sign contractor shall obtain and pay for all necessary permits and approvals.

3.   Tenant shall be responsible for fulfilling all requirements of the Sign Criteria.

4.   Tenant or its sign contractor shall be responsible for and shall repair any damage to any surface caused by its work.

5.   Animated, flashing, or audible signs are prohibited.

6.   Exposed raceway, crossovers, conduits, neon tube conductors, transformers, etc. are prohibited.

7.   The centerline of all signs shall be centered on the frontage of the leased premises. All signs in the Shopping Center shall also be centered horizontally.

8.   Temporary signs of any type are prohibited. Additional advertisement, i.e. flags, pennants, balloons, paint, cloth signs, banners, or similar devices on the building or on windows are prohibited, except as otherwise approved by Landlord prior to installation, which approval Landlord shall not unreasonably withhold, condition, or delay. Landlord shall have the right without liability to Tenant, to remove signs installed in violation of this paragraph without notice to Tenant.

9.   No decals shall be visible except as required by local codes and ordinances. A U.L. label shall be affixed to at least one (1) sign.

10.   Tenant shall have one (1) sign utilizing individual metal channel letters, not to exceed seventy percent (70%) of the linear front feet of leased frontage by eighteen inches (18")

38

11.    Any signs that (i) have not received Landlord's prior approval or (ii) do not comply with the Sign Criteria, may be removed by Landlord or its agent(s) at the expense of Tenant.

B.    SIGN DESIGN

1.  Signs located at the rear of any shop designating any individual shop location for delivery and emergency purposes only shall be in conformance with the following specifications:

    (a) Size: Four inches (4") high

    (b) Material: Black painted letters

    (c) Location: On rear door

    (d) Maximum number of signs: One (1) per tenant

2.  Tenant shall be permitted to place in the window panel on one side of each entrance to the Premises, not more than one hundred forty-four (144) square inches of Roman "stenos" lettering by Dennison (or equal) not to exceed two inches (2") in height, indicating hours of business, telephone, etc.  No other window signs will be allowed at any time, without prior approval of Landlord.

3.  Metal channel letters shall be internally Illuminated by 60 M.A. neon.

4.  Tenant copy shall have a letter height, as prescribed by Landlord prior to fabrication, with a limit of two (2) rows of copy, not to exceed maximum sign area specified in A.1O above.

5.  Color must be as prescribed by Landlord prior to fabrication of Tenant's sign.

6.  Trim Cap must be as prescribed by Landlord prior to fabrication of Tenant's sign.

7.  All exposed cabinet sheet metal shall be twenty-five (25) gauge, painted with one (1) coat of lead primer and two (2) coats of enamel to match the material color to which it is attached.

8.  The "copy" and "logo" criteria for each sign shall be as follows:

    (a) Tenant shall display only its established trade name or its basic product name including logo, if requested, i.e., "John's Shoes", or combination thereof.  No brand names of products shall be displayed.

    (b) The copy (letter type) and logos proposed shall be submitted to Landlord for specific approval.  Only approved copy, and logos shall be included in the signs. Landlord reserves the right, in its sole discretion, to disapprove the copy, including, but not limited to, non-English language words, characters or logos, included in Tenant's sign.

C.     SIGN PANEL ALLOTMENT.

1. Landlord shall keep and maintain, in a good state of repair, the Shopping Center panel signs currently existing, or hereinafter erected, on or near the Shopping Center for the purpose of advertising any business located in the Shopping Center including, but not limited to, those signs located on Meridian Street (shown in the photograph attached as Exhibit "E-1" and "E-2"), Telegraph Road (shown in the photograph attached as Exhibit "E-3" and "E-4 (collectively the "Shopping Center Signs").

2. Tenant shall have the right to occupy any and all spaces on the Shopping Center Signs for the Shopping Center currently occupied by Circuit City throughout the term of the Lease and any extension thereof. Tenant shall have the right to occupy the panels of the Telegraph Road sign, as shown in Exhibits E-3 and E-4. Tenant shall have the right to use at least one (1) panel on each face of any future Shopping Center Signs that either replace an existing Shopping Center Sign or are created in addition to current Shopping Center Signs.

3. Tenant shall design, obtain, and install a panel which complies with all reasonable design criteria established by this Exhibit D for each of the Shopping Center Signs.

D.     REAR BUILDING SIGN.

1. Tenant shall be permitted to remove the "Circuit City" sign currently installed on the back exterior wall of the Premises (the "Rear Building Sign"). A photograph of the Rear Building Sign is attached hereto as Exhibit "E-5." Tenant shall have the right to replace the Rear Building Sign, which replacement Rear Building Sign shall comply with all reasonably design criteria established by this Exhibit D.

E.     SIGN CONSTRUCTION

1 All signs shall be individual internally illuminated colored metal channel letters.

2. Except as otherwise provided herein, the colors of all letters and logos to be used on any sign shall be subject to the approval of Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed.

3. Tenant shall be fully responsible for all the actions of Tenant's sign contractor with respect to the installation of any sign in the Shopping Center.

4. All signs and their installation shall comply with all applicable building and electrical codes.

5. Tenant's shall be responsible for the fulfillment of all requirements and specifications, completing the installation in a workmanlike manner, clean up, patching and painting all surfaces damaged by it or its contractor(s), employee(s) or agent(s).

6. Attachment shall be completed in accordance with building codes and customary installation practices.

F.     To the best of Tenant's ability, all signs shall be fabricated and installed prior to Tenant commencing business in the Premises.

40

G.      Notwithstanding anything herein to the contrary, Tenant, in addition to the above signs, shall have constructed and installed one (1) under canopy sign, which shall meet the criteria as illustrated, if at all, in this Exhibit D.

H.      Notwithstanding Landlord's approval of Tenant's sign proposal, Tenant understands and agrees that no signs may be manufactured or installed without Tenant having obtained prior approval of all applicable governmental agencies with appropriate jurisdiction.  Tenant's sign shall conform to all rules, regulations and ordinances and all other restrictions or limitations that may presently exist or be imposed in the future by any and all local city and governmental agencies.

- END -