# **<u>EXHIBIT B</u>**

HOUSTON, TEXAS

**LEASE**

between

**CIRCUIT CITY STORES, INC.,**

as Tenant

and

**RONUS MEYERLAND PLAZA, L.P.**

as Landlord

dated May 18, 2004

**MEYERLAND PLAZA SHOPPING CENTER**

423568 v7 (00051.00138.000)

# TABLE OF CONTENTS

Paragraph                                                                                          Page

1.   Leased Property .................................................................................................. 1

2.   Construction of Building and Improvements; Tenant Improvement Allowance................... 2

3.   Lease Term.......................................................................................................... 3

4.   Base Rent; Ground Rent ........................................................................................ 4

5.   Development of Shopping Center by Landlord ........................................................... 5

6.   Easements ........................................................................................................... 5

7.   Common Areas and Common Area Maintenance. ....................................................... 7

8.   Signs and Communications Equipment. .................................................................. 11

9.   Taxes................................................................................................................ 12

10.  Maintenance, Repairs and Replacements ............................................................... 14

11.  Utility Service Provider:  Payment of Utility Bills.................................................... 15

12.  Alterations......................................................................................................... 16

13.  Mechanics' Liens................................................................................................ 16

14.  Insurance. ......................................................................................................... 17

15.  Damages by Fire or Other Casualty....................................................................... 21

16.  Condemnation. ................................................................................................... 23

17.  Assignment and Subletting ................................................................................... 26

18.  Use. ................................................................................................................. 27

19.  Warranties, Representations and Covenants............................................................ 28

20.  Estoppel Certificates ........................................................................................... 33

21.  Subordination, Non-Disturbance and Attornment .................................................... 34

22.  Tenant's Financing ............................................................................................. 36

23.  Tenant's Property and Waiver of Landlord's Lien .................................................... 36

423568 v7 (00051.00138.000)

24.    Memorandum of Lease; Commencement Date Agreement...............................................36

25.    Expiration of Term and Holding Over..........................................................................37

26.    Force Majeure ...........................................................................................................37

27.    Events of Tenant's Default.........................................................................................37

28.    Landlord's Remedies...................................................................................................38

29.    Events of Landlord's Default; Tenant's Remedies. ........................................................41

30.    Waver........................................................................................................................44

31.    Compliance with Applicable Laws ................................................................................44

32.    Notices ......................................................................................................................44

33.    Brokers .....................................................................................................................45

34.    Miscellaneous ............................................................................................................45

35.    Effectiveness of Lease; Tenant's Right to Terminate .....................................................47

36.    Confidentiality ...........................................................................................................50

37.    Limitation of Right of Recovery...................................................................................50

38.    Cotenancy Requirement..............................................................................................50

## EXHIBITS

"A"    Site Plan

"A-1"    Shopping Center Legal Description

"B"    Index of Definitions

"C"    Construction Provisions

"C-1"    Design and Construction Specifications

"D"    Removable Trade Fixtures

"E"    Sign Plans

"E-1"    Pylon Sign

423568 v7 (00051.00138.000)

"F"      Permitted Encumbrances

"F-1"   Border's Letter Agreement

"G"     Subordination, Non-Disturbance and Attornment Agreement

"H"     Memorandum of Lease

"I"      Commencement Date Agreement

"J"      Indemnification Agreement

"K"     Prohibited Uses

"L"      OEA

423568 v7 (00051.00138.000)

**HOUSTON, TEXAS**

## LEASE

This LEASE is made as of the 18th day of May 2004, by and between **RONUS MEYERLAND PLAZA, L.P.**, a Georgia limited partnership, having an address at Piazza at Paces, 3290 Northside Parkway, Suite 250, Atlanta, Georgia 30327 ("Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

WITNESSETH:

The parties hereto agree as follows:

1.     <u>Leased Property</u>.  Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), when same are constructed or renovated on that approximately 33,862 square foot parcel (the "Land"), outlined in red on <u>Exhibit "A"</u> (the "Site Plan"), together with non-exclusive rights in the two (2) automobile loading spaces labeled "Customer Pick-Up" adjacent to the Premises as shown on the Site Plan, the non-exclusive rights to the six (6) parking spaces labeled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan and with the easements described in paragraph 6 below (Tenant shall be permitted to mark such spaces as indicated above, however, Landlord shall be under no obligation to enforce the same); all located in the Meyerland Plaza Shopping Center (herein referred to as the "Shopping Center"), located at the northeast intersection of Jackwood Street and Endicott Street, in the City of Houston (the "City"), County of Harris, State of Texas (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on <u>Exhibit "A-1"</u> attached hereto.   All of the Shopping Center exclusive of the Premises is "Landlord's Premises". Landlord grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Operation and Easement Agreement dated to be executed by Landlord and Target Stores, Inc. ("Target") and to be recorded against record title of the Shopping Center (the "OEA") substantially in the form attached hereto as Exhibit "L".  Landlord agrees to use good faith, commercially reasonable efforts to consummate a final form of OEA with Target in the form attached hereto as Exhibit "L" and record same not later than the date that Landlord or its affiliate conveys fee simple title of a portion of the Shopping Center to Target.  Upon full

1

execution of the OEA, Landlord shall deliver to Tenant, for its review, a copy of same. Landlord shall deliver a copy of the final, executed OEA to Tenant on or before the fifth (5th) business day after date of the final execution of the OEA. If Tenant, in its commercially reasonable judgment, determines that the final executed version of the OEA differs from the current version thereof attached hereto as Exhibit "L" such that, as a result of such differences, Tenant's obligations under the OEA or this Lease are increased, Tenant's rights under such OEA or this Lease are decreased, or Tenant's operations at the Premises would be adversely affected, then in such case Tenant may terminate this Lease by delivery of written notice thereof to Landlord within ten (10) business days following the date of receipt unless Landlord, within 10 days of receipt of Tenant's notice, is able to amend the OEA to Tenant's reasonable satisfaction. The Lease is subject to the terms of the OEA and Tenant agrees that it will not take any action that will constitute a violation of the terms of the OEA. Landlord agrees that it will not consent to, approve, or otherwise agree to any modification of the OEA at any time during the term of this Lease which adversely affects Tenant's access, visibility, parking, or other rights under this Lease without Tenant's prior written approval (which may be withheld in Tenant's sole discretion), will enforce the terms of the OEA for Tenant's benefit, and will exercise all approval rights granted Landlord under the OEA in favor of enforcement of the terms hereof. Landlord further agrees that it will not consent to, approve or establish any rules and regulations applicable to the Shopping Center, as permitted under the OEA, without Tenant's prior consent, which will not be unreasonably withheld.]

2.    Construction of Building and Improvements; Tenant Improvement Allowance. Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall have the right to construct within the Land a one-story retail building, containing approximately 33,862 square feet of ground-floor gross leasable retail area ("GLA") (but in no event shall the size of the building increase or decrease more than 1,000 s.f.) plus mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, corridors, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion

423568 v7 (00051.00138.000)

with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. The Improvements and the Land are referred to herein as the "Premises".

    3.    <u>Lease Term</u>. Subject to paragraph 35, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the tenth (10th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for three (3) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, during the aforementioned one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

423568 v7 (00051.00138.000)

4.    <u>Base Rent; Ground Rent</u>.  During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses, but shall pay the cost of utilities consumed by it during its construction activities.  Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing on the date (the "Commencement Date") on which Landlord makes payment of the Tenant Improvement Allowance.  Reference is hereby made to Section 28(e) of this Lease for circumstances under which Ground Rent (as therein defined) may be payable by Tenant in lieu of Base Rent.  Notwithstanding the foregoing, until Landlord has completed, executed, and delivered to Tenant a W-9 form (the form of which will be delivered to Landlord by Tenant together with this Lease for execution), no Base Rent, Ground Rent or other sums shall be due Landlord by Tenant hereunder.  Tenant shall complete, execute, and deliver to Landlord a W-9 form.

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.  Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each succeeding calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(i)    <u>First Five Years</u>.  During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Five Hundred Seven Thousand Nine Hundred Thirty and No/100 Dollars ($507,930.00), payable in equal monthly installments of Forty-Two Thousand Three Hundred Twenty-Seven and 50/100 Dollars ($42,327.50).

(ii)    <u>Second Five Years</u>.  During Lease Years six (6) through ten (10), Tenant shall pay annual Base Rent in the amount of Five Hundred Thirty-Three Thousand Three Hundred Twenty-Six and 50/100 Dollars ($533,326.50), payable in equal monthly installments of Forty-Four Thousand Four Hundred Forty-Three and 87/100 Dollars ($44,443.87).

(iii)    <u>Adjustment in Base Rent</u>.  Notwithstanding the Base Rent provisions, in the event that the GLA the Building when constructed does not equal 33,862 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the

4

actual GLA the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above), multiplied by Fifteen and No/100 Dollars ($15.00).

(iv)    Increases in Base Rent.  Annual Base Rent shall increase on the first day of the sixth (6th) and every succeeding fifth Lease Year, over the initial Base Rent by $.75 per square foot of GLA.

5.    Development of Shopping Center by Landlord.  Landlord covenants to operate a first-class shopping center.  The location of buildings and other tenant space will only be within the "Permissible Building Areas" designated on the Site Plan.  The parking ratio for the Shopping Center shall be at least four and one-half (4.5) spaces per 1,000 square feet of GLA. All parking shall be at ground level.  Landlord shall construct or cause any new improvements to be constructed in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant □harmless from any loss or damage suffered by Tenant as a result of Landlord's new construction.  Landlord's construction shall not materially interfere with the conduct of Tenant's business.

6.    Easements.  Landlord also grants to Tenant those nonexclusive leasehold easements which shall run as covenants with Landlord's Premises and the Premises during the Term, over Landlord's Premises, which are useful and appropriate for the construction, operation and maintenance of the Premises, as follows:

(a)    Construction Easements.  During the Construction Term, any period of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area") in the location shown on the Site Plan for Tenant's use in constructing the Improvements, (ii) an easement to permit the Building to abut adjacent buildings, and the foundations, hallways, footings common walls, and roof projections to bear structurally upon Landlord's Premises (no tie-in or connections to the Building being permitted without Tenant's prior approval), (iii) an easement for such additional underground, public or private utility or cable, fiber optic or other easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises

5

subject to Landlord's consent, not to be unreasonably withheld, and in a mutually agreeable location. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility or other service provider shall, subject to the rights and restrictions of other tenants or occupants in the Shopping Center, have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord for the benefit of the Premises. Landlord, at Landlord's expense, shall have the right to relocate the Staging Area one (1) time during the Construction Term (after Tenant has enclosed the Building), or during any period of renovation or reconstruction thereafter upon Tenant's reasonable approval and upon sufficient prior notice so as not to delay Tenant's construction.

(b)    Common Area Easements.  Landlord does hereby additionally grant to Tenant a non-exclusive easement (the "Common Area Easement") to use the Common Area for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefor.  It is specifically agreed that with respect to the automobile loading stalls designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same (upon prior written approval of Landlord in its reasonable discretion) to other areas adjacent to the Improvements and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such automobile loading stalls shall be used by Tenant's customers, invitees and patrons.  Tenant shall have the right to install up to two (2) cart corrals within the parking area located in the Tenant's Preferred Area and as shown on the Site Plan (or other mutually agreeable location), and during business hours, Tenant shall be permitted to store its shopping carts outside of the Premises in such cart corrals.  Tenant agrees to use its best efforts to periodically remove its shopping carts from the Common Areas.  Tenant shall also have the right to use the area designated "Promotional Area" as shown on the Site Plan for promotional demonstrations (not for sales) not to exceed four (4) times per year and for a duration of not more than seven (7) consecutive days and the area designated on the Site Plan as Tenant's

423568 v7 (00051.00138.000)

"Customer Pick Up" for the exclusive use of Tenant's customers, invitees and patrons, provided, however in the event another tenant objects to Tenant's promotional demonstrations pursuant to a valid right to do so under an agreement inexistence as of the date hereof, then Tenant shall cease such promotional demonstrations within three (3) business days after receipt of written notice from Landlord.

(c)     Non-Dedication.   None of the easements granted by the parties to this Lease are intended, nor shall any of them be construed as a dedication of any portion of the Shopping Center for public use, and the parties shall refrain from taking any action which would cause such a dedication and shall take all steps reasonably necessary to avoid such dedication. Landlord shall have the right to temporarily block off access to the Common Areas, but no more often than is reasonably deemed to be legally necessary, based upon the legal opinion of an outside law firm, in order to avoid the implication of dedication of the Shopping Center for public use.

7.     Common Areas and Common Area Maintenance.(a)Definition of Common Areas. The term "Common Areas" shall be defined as the parking areas, lanes, drives, entrances, truck □passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, exterior lighting facilities and equipment, Landlord's pylon sign(s), elevators, common loading facilities, corridors, directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees.   Landlord shall be responsible for operating, maintaining, securing, repairing and replacing the Common Areas in a first-class manner, including without limitation, sweeping and cleaning, maintenance of Landlord's pylon and other sign structure(s) (but not the individual panels located thereon), including traffic directional signs, markers and lines and informational signs, snow removal and ice treatment, removal of Common Area trash, debris and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

7

(b)    CAM Charges.    For the purpose of this paragraph 7, (i) the cost of Common Area Maintenance (the "CAM Charges") shall include Landlord's reasonable and proper direct costs and expenses of operating, maintaining, purchasing equipment, and supplies, securing and repairing the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) which shall not exceed seven percent (7%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas).  Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction, defect or condition, to any interior mall space (but the maintenance and repair of any interior corridors and fire equipment located therein shall not be excluded) or to any buildings (including the roof or exterior walls thereof) or utility systems not part of the Common Areas;

(4)    repairs or replacements necessitated by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications or applicable law) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)    amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6)    amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)    premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

423568 v7 (00051.00138.000)

(8)    repairs or replacements of a capital nature (whether or not capitalized);

(9)    improvements, repairs or replacements (other than patching, restriping and seal coating and similar periodic maintenance as necessary, and one (1) "overlay" every ten (10) years, as needed) to the parking lot or other paved or concrete areas during the first ten (10) "CAM Years" (as defined below);

(10)    reserves for anticipated future expenses;

(11)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12)    Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above, except for salaries and fringe benefits of Landlord's on-site employees and personnel directly performing a Common Area maintenance service if devoted full time to the Shopping Center;

(13)    amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions);

(14)    any new improvements to the Shopping Center or Common Areas, including but not limited to renovations to the facade of the Shopping Center and improvements to, but not maintenance of, landscaped areas of the Shopping Center;

(15)    amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains its own Premises;

(16)    holiday or other decorations; or

(17)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of comparable shopping centers of this nature (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)    Tenant Payments. Commencing on the earlier of the date Ground Rent becomes due and payable hereunder or opening by Tenant for business at the Premises, provided the Tenant Improvement Allowance is not then due and payable and remains unpaid (an escrow of the Tenant Improvement Allowance per subparagraph 28(e) below not to be considered

9

"unpaid"), Tenant shall pay to Landlord Tenant's Pro Rata Share (defined below) of CAM Charges, not to exceed $2.00 per square foot of GLA of the Building for the first CAM Year (hereafter defined). The annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, on the first day of each month during such CAM Year. Commencing with the third CAM Year, CAM Charges shall not exceed by more than five percent (5%) (the "CAM Cap") those in effect during the preceding CAM Year, on a cumulative basis. "On a cumulative basis" shall mean that if in any CAM Year the CAM Charges increase by more than the CAM Cap and Landlord, by the terms hereof, may only charge Tenant an amount up to the CAM Cap, thereby limiting the increase, in any subsequent CAM Year(s), if the CAM Charge increase is less than the CAM Cap, Landlord may include the increases which would have been billed in prior years but for the CAM Cap; provided, the total increase in any one CAM Year shall never exceed the CAM Cap. For any period within the Term which is less than a full CAM Year, Tenant's Pro Rata Share of CAM Charges shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of GLA in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party based upon the actual amount of CAM Charges paid by Landlord for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the GLA in the Building and the denominator of which is the number of square feet of the GLA (including the area of any outside sales area other than temporary sidewalk sales exclusive to a single occupant) actually built and in existence in the Shopping Center, but in no event shall the denominator be less than ninety percent (90%) of the GLA of the Shopping Center as shown on the Site Plan, except temporarily in the event of casualty or condemnation, or if any occupant of the Shopping Center separately maintains a portion or the Common Areas.

10

In determining the GLA of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The GLA of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share. The remainder of CAM Charges shall be borne by Landlord and/or other tenants. Notwithstanding the foregoing provisions, Tenants Pro Rata Share shall be appropriately adjusted in the event that any tenant of the Shopping Center provides separate insurance as to its preferred or immediately adjacent common area and/or provides its own common area maintenance services for a portion of the Shopping Center. In such event, but subject to the above stated CAM Cap, then for purposes of determining Tenant's Pro Rata Share as to the service in question or the insurance premiums, the denominator of the fraction described in the foregoing sentences shall be the GLA (expressed in square feet) of the buildings located in the Shopping Center (which denominator shall not be less than ninety percent (90%) of the GLA of the Shopping Center as shown on the Site Plan) less the GLA (expressed in square feet) of the buildings as to which tenant(s) are directly providing the insurance and/or services in question.

(d)   Examination of Landlord's Records. Tenant shall have the right, but not more often than once as to any CAM Year and no later than three (3) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within ten (10) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall request its auditors to keep the result of the audit confidential.

8.   Signs and Communications Equipment.

(a)   Signs. Landlord, at its sole cost and expense, no later than the date set forth on Attachment "1" to the Construction Provisions, shall construct and install upon the Common Areas at the location(s) so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon in the position shown on the

11

drawing thereof attached as <u>Exhibit "E-1"</u>, for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense. Tenant shall be responsible, at its expense, for the maintenance of its sign face panels. Tenant hereby approves the design and dimensions of the pylon sign shown on <u>Exhibit "E-1"</u> attached hereto. Attached as a portion of <u>Exhibit "E"</u> are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Any banners placed on the exterior of the Building shall be subject to Landlord's prior approval. Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled, but subject to Landlord's prior consent, not to be unreasonably withheld, and governmental requirements, to replace any and all of its signs with signage consistent with the then existing architectural theme of the Shopping Center.

(b)    <u>Communications Equipment</u>. Tenant may install, maintain and/or replace any satellite dishes, antennas cellular and PCS towers and poles on the roof of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof, roof warranty, or the structural elements thereof and provided same are properly screened or otherwise hidden from view on ground level.

9.    <u>Taxes.</u>

(a)    <u>Taxes Contemplated Hereunder</u>. The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax. Tenant shall be responsible for any tax upon the rent or other charges payable by Tenant under this Lease.

(b)    <u>Payment of Real Estate Taxes</u>. At such intervals as Landlord is required to pay the Real Estate Taxes, and subject to the provisions of 9(c), Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the

12

Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due and paid. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes, as calculated in accordance with 9(a) above, within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, and following thirty (30) days' notice to Landlord, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

(c)    Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within ten (10) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate, at no cost to Landlord, with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof at no cost to Landlord. Tenant shall

423568 v7 (00051.00138.000)

be responsible for posting any bonds or other security required by the applicable taxing authorities in connection with any such contest of taxes by Tenant, and shall not cause the Shopping Center to be in violation of any applicable law, or subject to levy or sale, as a result of such contest.

(d)    Payment Following Appeal.  Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment.

10.    Maintenance, Repairs and Replacements.  Except (i) for costs covered by Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building.  Notwithstanding the foregoing, so long as Tenant maintains the Premises in accordance with this paragraph, Tenant shall have no obligation to install or construct alterations or incur expenditures pursuant to this paragraph during the last five (5) years of the Lease Term unless required by applicable law; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term (taking into consideration the exercise of any additional Renewal Options), then Tenant shall be reimbursed by Landlord by that amount of the cost associated with such repairs, construction or alteration for the period beyond the remainder of the Term (without consideration to the exercise of any additional Renewal Options).  Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including, without limitation, the roof, roof structure, flooring system, floor slab, foundation, load bearing walls and exterior structural walls.  In addition, Landlord agrees to maintain the

14

Other Improvements (excluding Tenant's trash compactor which shall be Tenant's responsibility) immediately surrounding the Building, as well as sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall provide to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.     <u>Utility Service Provider: Payment of Utility Bills</u>. Following Landlord's initial construction and so long as there is no increased cost to Landlord, Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center. In the event that the provider of water services to the Premises will not allow the Premises to be separately metered, Tenant shall cause the

15

submeter to be installed and Tenant shall pay monthly upon receipt of an invoice from Landlord, Landlord's reasonable estimate of Tenant's charges for such services, with the amount of any excess or underpayment on account of estimated payment by Tenant hereunder being adjusted within sixty (60) days after receipt by Tenant of the actual bill for such utility from the utility provider.

12.    Alterations.  During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent but subject to applicable law and consistency with the first class nature of the Shopping Center, to make any interior and non-structural alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores.  With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall otherwise have the right, at its sole cost, to otherwise alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements.  Landlord's withholding of consent as to any exterior or structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center.  Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work.  Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord.  As a condition to any deemed approval under this paragraph, the notice from Tenant must conspicuously state that a failure to respond during the stated approval period shall result in a deemed approval.  Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13.    Mechanics' Liens.  Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable,

423568 v7 (00051.00138.000)

against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.    Insurance.

(a)    Property Damage. During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction. During the Main Term and all Option Periods, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible. Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self-insurance fund to cover increased actuarial risks). Should Tenant's use of the Premises cause Landlord's insurance rate to increase, Tenant shall reimburse Landlord for any additional premiums directly attributable to Tenant's use. During any period in which Tenant is conducting construction activities in the Shopping Center, Tenant shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, workers' compensation insurance, automotive liability insurance and general liability insurance in form and amounts reasonably acceptable to

423568 v7 (00051.00138.000)

Landlord (but not exceeding those required for Landlord), together with any other insurance coverage that may be required by applicable law.

(b)    _Liability Insurance_.  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear.  The limits of such commercial general liability policy shall be not less than Three Million and No/100 Dollars ($3,000,000.00) combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)    _Workers' Compensation Insurance_.  To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    _Self-Insurance_.  Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Two Hundred Million and No/100 Dollars ($200,000,000.00).  If Tenant self-insures, then Tenant shall be responsible for paying the risks that would have been covered by the insurance that Tenant would otherwise have been obligated to maintain under this Lease.

(e)    _Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction_.  During the Term, Landlord shall keep or cause to be kept in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire and the perils (including flood insurance) covered under standard "all risk" or "special form" coverage, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage and such tenant has actually failed to maintain such coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to

as the "Additional Areas").  The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center, unless the tenants or occupants of such portions are directly responsible for maintaining insurance under their leases or other agreements with Landlord and are doing so.  Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests.  The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable.  The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such deductible amount exceed Five Thousand and No/100 Dollars □($5,000.00) for Common Area liability coverage.   Landlord shall assure that all of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with commercially reasonable (including self-insurance if subject to the same conditions as Tenant's) coverages, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame and to the extent set forth in paragraph 15.  During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)    Workers' Compensation - Statutory Limits;
       Employers Liability – Five Thousand and No/100 Dollars ($500,000.00);

2)    Automobile Liability for all vehicles with limits of Three Million and No/100 Dollars ($3,000,000.00); and

19

3)    Commercial   General   Liability   to   include   premises   operations   and products/completed operations coverage with limits of Three Million and No/100 Dollars ($3,000,000.00).

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction.  To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f)    Policy Provisions.  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VIII.  Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)    Waiver of Right of Recovery and Subrogation.  To the extent of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

423568 v7 (00051.00138.000)

(h) <u>Evidence of Insurance</u>. Subject to Tenant's right to self-insure hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance) and (iii) prior to expiration thereof, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

(i) <u>Indemnities</u>. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around ☐the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees.

15. <u>Damages by Fire or Other Casualty.</u>

(a) <u>Less Than Forty Percent (40%)</u>. In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas, Additional Areas and/or Shopping Center, which has a repair and reconstruction cost of less than forty percent (40%) of the then-total replacement cost of any of the Improvements, Common Areas, Additional Areas and/or Shopping Center, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof. Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete

423568 v7 (00051.00138.000)

reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and ninety (90%) of the GLA of the Shopping Center labeled "Restoration Area" on the Site Plan, to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof.  In the event, subject to force majeure, the Premises, Common Areas and not less than ninety percent (90%) of the GLA of the Shopping Center within the Restoration Area, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all insurance proceeds received by the non-performing party for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    Forty Percent (40%) or More.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas, Additional Areas and/or Shopping Center, which has a repair and reconstruction cost of forty percent (40%) or more of the then-total reconstruction cost of any of said areas, or in the event of any uninsured casualty other than a casualty event required by the terms of this Lease to be insured by Tenant, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord all insurance proceeds paid by the insurance carrier issuing the policy of fire and extended coverage insurance required to be maintained pursuant to paragraph 14(a) (to the extent such amount would have been payable under insurance as outlined herein).  In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not

22

self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures).   Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct or cause to be reconstructed all of the Common Areas and not less than ninety percent (90%) of the GLA of the Shopping Center within the Restoration Area, in the manner specified by subparagraph (a) above regardless of the amount of damage to same.

(c)      Last Two (2) Years of Main Term or Option Period.   Notwithstanding the foregoing, if any such damage or destruction occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive the proceeds of any insurance (together with any applicable deductible) which are paid with regard to such destruction or damage or, in the event Tenant self-insures, the amount necessary for reconstruction of the Improvements, to the extent such amount would have been payable under insurance as outlined herein.

16.     Condemnation.

(a)      Definition of Taking and Substantial Taking.   For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to

23

such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of three and three-quarters (3.75) spaces per 1,000 square feet of GLA or that ratio which is required by the zoning ordinance applicable to the Shopping Center, or below four and one-half (4.5) spaces per 1,000 square feet of GLA within the parking area shown on the Site Plan within Tenant's Preferred Area, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is impeded and Landlord fails to provide Tenant alternate access comparable to that available prior to the Taking within thirty (30) days following such Taking.

(b)     Tenant's Rights Upon Taking or Substantial Taking.  In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)     Tenant's Rights Upon Less Than Substantial Taking.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration.  If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

423568 v7 (00051.00138.000)

(d)    Landlord's Obligations Upon Any Taking.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas of the Shopping Center within the "Restoration Area", such that each constitute a complete architectural unit and serve the function originally intended. Additionally, Landlord shall assure that, in the event Tenant elects to maintain this Lease in force, at least ninety percent (90%) of the GLA of the Shopping Center within the "Restoration Area" will be reconstructed to its former condition within reasonable time.

(e)    Rights Upon Temporary Taking.  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding ninety (90) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be □payable to Landlord. Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)    Taking of the Pylon Sign(s).  In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide within ninety (90) days a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken at its sole cost.

(g)    Tenant's Right Upon Condemnation.  In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

423568 v7 (00051.00138.000)

17.    <u>Assignment and Subletting</u>. Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent. In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder (but not with respect to any change, modification or amendment to this Lease by Landlord and any transferee unless consented to by Tenant).    Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, may be effected without Landlord's consent, provided Tenant gives Landlord notice of such transfer.    Additionally, no assignment or subletting shall result in the Premises being divided into more than two (2) distinctly operating stores.  Notwithstanding the foregoing, in the event Tenant desires to assign or sublease all or a portion of the Premises to an unrelated third party, Tenant shall give Landlord written notice of such proposed assignment or sublease along with a copy of the proposed assignment of lease document or proposed sublease document and Landlord shall notify Tenant of its disapproval or approval of such proposed assignment or sublease within thirty (30) days of Landlord's receipt of said document.  If Landlord disapproves of such transaction within such thirty (30) day period, the Lease covering the portion of the Premises affected thereby shall be terminated and Landlord shall recapture all or such portion of the Premises in accordance with this paragraph 17.  Landlord's full or partial termination of this Lease pursuant to this paragraph 17 shall be effective sixty (60) days from the date Landlord notifies Tenant of its disapproval of Tenant's proposed assignment or sublease.  Tenant shall thereafter have no liability under this Lease with respect to the portion of the Premises recaptured by Landlord.  In the event of a partial termination of the Lease, this Lease shall be reformed to exclude the portion of the Premises that were recaptured by Landlord and Tenant's payment and other obligations hereunder shall be reformed to reflect the remainder of the Premises still occupied by Tenant. In the event Landlord exercises its option to terminate all or a portion of this Lease as provided in this paragraph 17, Landlord shall be obligated to pay Tenant its unamortized cost of the portion of the Building and Improvements recaptured by Landlord to the date of such termination, including the unamortized cost of all renovations made by Tenant to the applicable portion of the Building from and after the date hereof, not including, however, any costs previously reimbursed by Landlord through payment of the Tenant Improvement Allowance.

423568 v7 (00051.00138.000)

18.  <u>Use.</u>

(a)  Tenant may initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers, video and audio recorders and players, and cameras), computer hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes, and compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)  Thereafter, Tenant, its successors and assigns, shall have the right to use the Premises for any lawful, first-class retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants executed prior to this Lease and described on Exhibit "F", or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F" or the OEA.

(c)  Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.  In the event that Tenant ceases its business operations at the Premises for a period of two hundred forty (240) consecutive days, such cessation shall not be deemed to be an event of default hereunder, nor shall such cessation relieve Tenant of any of its liabilities or obligations under and pursuant to this Lease. Upon its determination to cease operation, Tenant shall notify Landlord in writing of such decision ("Tenant's Notice"), whereupon Landlord shall have the option of recapturing the Premises by terminating this Lease. Such option shall be exercisable by Landlord from and after the date of Tenant's Notice, provided that prior to exercise by Landlord of its option herein granted, Tenant has not (i) effected an assignment or subletting pursuant to paragraph 17 which obligates the transferee to open for business within one hundred eighty (180) days after such assignment or sublease or (ii) recommenced operations in the Premises. Landlord shall exercise such option by

27

delivering notice to Tenant that it intends to terminate this Lease (the "Landlord's Notice"), in which event this Lease shall terminate entirely on the date contained in Tenant's Notice unless the aforementioned assignment, subletting or recommencement has occurred. If Landlord fails to timely exercise said option to terminate, and Tenant (or any assignee or sublessee) thereafter reopens, Landlord shall once again have such right if the occupant of the Premises once again ceases operating for the two hundred forty (240) day period described above. Upon such termination, Tenant and Landlord shall be relieved of and from any and all further liability or obligation to the other under and pursuant to this Lease, and further, Landlord shall pay to Tenant the value of its unamortized improvements made to the Premises, which amount shall include, but not be limited to, the unamortized amount of Tenant Improvement Allowance only if Landlord has not paid such amount. Notwithstanding anything contained herein to the contrary, Landlord's obligation to reimburse Tenant for its unamortized improvements shall survive the expiration or termination of Lease. For purposes of this paragraph, "cessation" of operation at the Premises shall not mean or include any period during which Tenant is not operating within the Premises due to a casualty event, condemnation, reconstruction, alterations, modifications, maintenance or repair, or preparing the Premises for occupation by an assignee or subtenant.

    19.    <u>Warranties, Representations and Covenants.</u>

    (a)    Landlord represents, warrants and covenants to Tenant that:

    (i)    <u>Quiet and Peaceful Enjoyment.</u>    Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises, subject to the "Permitted Encumbrances" and Landlord's remedies provided in this Lease following an Event of Default by Tenant.

    (ii)    <u>Title.</u> Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would (i) prohibit Tenant's use of the Premises for the sale of Products, or (ii) would prohibit the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease.  There are no exiting utility lines, easements or facilities or other easements or any kind located or proposed to be located in, on or under the Building, other than a storm sewer line

423568 v7 (00051.00138.000)

and a sanitary sewer line (collectively the "Sewer Lines") currently existing underneath the Tenant's building pad area. Landlord hereby agrees that the use and occupancy of the Premises and the conduct of any business in the Premises shall not be interrupted or disturbed as a result of the Sewer Lines being located underneath the Building or the use of the Sewer Lines by those who are benefited therefrom. Notwithstanding the foregoing, if the use and occupancy of the Premises and the conduct of any business in the Premises shall nevertheless be interrupted or disturbed as a result thereof (unless such interruption or disturbance was caused by Tenant, and does not result from a casualty or condemnation thereof), then, in addition to any rights and remedies available to Tenant at law, in equity or under this Lease, Landlord shall pay to Tenant any and all costs, expenses or damages incurred by Tenant in connection therewith (including, without limitation, lost profits). To the extent feasible, Tenant shall use reasonable efforts to provide Landlord with advance notice of any problems arising from the Sewer Lines and an opportunity to promptly and diligently remedy such situation, provided, however, Tenant shall be under no obligation to do so. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage except for customary approvals by governmental authorities. This representation, warranty and covenant is a material inducement to Tenant's execution of this Lease.

(iii)    <u>Certificate of Authority</u>. Landlord covenants that it is a duly constituted limited partnership under the laws of the State of Georgia, and that its signatory in this Lease is duly authorized and empowered to act for and on behalf of the limited partnership. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the limited partnership, and (b) the authority of the signatory to bind the limited liability company as contemplated herein.

(iv)    <u>No Litigation</u>. Landlord has received no notice of and has no knowledge of any judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

423568 v7 (00051.00138.000)

(v)    <u>Hazardous or Toxic Materials</u>.  Except as disclosed by that certain Phase I Environmental Site Assessment Update, LAW Project 60160-8-5165-916, dated April 3, 1998, prepared by Law Engineering & Environmental Services, Inc., Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents, employees, contractors, invitees, sub-tenants, licensees or concessionaires), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity.  The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    <u>Tenant's Exclusive Use</u>.  So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on <u>Exhibit "K"</u>. Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant shall not be deemed a violation of the preceding sentence.  As used herein, "Incidental Sale" shall mean the lesser of (i) four hundred (400) square feet, or (ii) twenty percent (20%) of such occupant's or tenant's display area.  In the event Tenant shall have abandoned the foregoing use to which it has exclusive rights under this subparagraph, for twelve (12) consecutive months, such exclusive rights shall terminate, provided however, such rights shall not terminate if during such twelve (12) consecutive months, Tenant shall deliver written

423568 v7 (00051.00138.000)

notice to Landlord advising Landlord that Tenant will resume such use within six (6) months of the date of such notice and such use is resumed within such six (6) month period. Further, the exclusive granted Tenant shall not apply to, bind or restrict the operation of a national warehouse store, such as "Costco", or "Sam's Club", a full-line department store, such as a "JC Penny" or "Sears," or, a national home improvement store, such as a "Home Depot," or "Lowe's." In addition, Landlord shall be permitted to replace tenants under leases or other occupancy agreements existing as of the date hereof with tenants utilizing the approximately same size (not to increase more than 5%) for the same use as the prior tenant (e.g., Landlord shall be permitted to replace an existing tenant engaged in the primary business of selling cellular telephones with a replacement tenant whose primary business is selling cellular telephones), provided such replacement tenants shall not be relocated within three hundred feet (300') of the Premises. Notwithstanding anything contained herein to the contrary, in the event a tenant or occupant violates the foregoing restriction in breach of such tenant's lease or occupancy agreement or other written agreement with Landlord (a "Contractual Violation"), then Landlord shall not be in default hereunder so long as Landlord promptly and diligently pursues all commercially reasonable means to stop such violation (including the filing of legal or equitable action to enjoin such breach). If Landlord fails to promptly and diligently pursue a Contractual Violation or if another tenant or occupant of the Shopping Center violates the foregoing restriction and such violation is not in violation of such tenant's or occupant's lease or other occupancy agreement with Landlord (e.g., in a situation where Landlord has not included in such tenant's or occupant's lease or other occupancy agreement a restriction prohibiting such tenant or other occupant from engaging in the exclusive rights granted to Tenant hereunder) in addition to any other remedies which Tenant may have in connection with a violation of the exclusive use right granted Tenant herein, payment of Base Rent, Ground Rent, CAM Charges, Real Estate Taxes and all other sums due Landlord hereunder shall abate (and shall not accrue) during any time in which such violation exists.

(vii)    <u>Zoning and Subdivision</u>.  The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

423568 v7 (00051.00138.000)

(viii)   <u>Prohibited Activities</u>.   Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in Tenant Preferred Area or elsewhere in the Shopping Center for use for any of the prohibited uses set forth on <u>Exhibit "K"</u> attached hereto.

(ix)   <u>Site Covenants</u>.   With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the representations, warranties and covenants (the "Site Covenants") described on <u>Exhibit "K"</u>.

(x)   <u>Easements</u>.   Landlord shall not subdivide, parcel or otherwise divide the Shopping Center without burdening the divided tract with the terms of this Lease or create any easements affecting Tenant's rights hereunder or the Tenant Preferred Area or benefiting less than all the occupants of the Shopping Center without Tenant's prior written consent (except for access, utility and other easements granted to or from the owners of the outparcels shown on the Site Plan or Target).

(xi)   <u>Interference with Tenant's Reception/Transmission</u>.   Landlord shall take commercially reasonable measures to insure that no other tenant or person anywhere in the Shopping Center installs any structure or equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xii)   <u>Notices Affecting the Premises</u>.   Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xiii)   <u>Constructive Trust</u>.   Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(b)   Tenant represents, warrants and covenants to Landlord that:

423568 v7 (00051.00138.000)

(i)    Tenant's Authority.    Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)   Tenant's Warranty as to Hazardous or Toxic Materials.    As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above.   The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(iii)  Site Covenants.    Tenant agrees not to take any action in contravention of the Site Covenants.

(c)    In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

(d)    In addition to such other remedies as may be accorded Landlord at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or (ii) in the event that Landlord suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Tenant shall defend, indemnify and hold Landlord harmless from any of such loss, costs, liability or damage incurred as a result of Tenant's breach hereunder.

20.    Estoppel Certificates.    Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party

423568 v7 (00051.00138.000)

shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which  may reasonably be so requested.  In addition, without charge, at any time any from time to time hereafter, within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under any of its obligations under this Lease following the date of any assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant hereunder, including but not limited to the direct payment of rentals to Landlord.  Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    Subordination, Non-Disturbance and Attornment

(a)    Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to and any and all Mortgages (as defined below) encumbering the Shopping Center and placed thereon by Landlord, a non-disturbance and attornment agreement in the form of Exhibit "G" hereto attached, executed by the holder of such Mortgage ("Mortgagee").  In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement in the form of Exhibit "G" executed by Mortgagee with regard to all future Mortgages and with regard to all renewals, modifications, replacements and extensions of such Mortgages. Such Agreement shall contain, at a minimum, the following: (i) the Lease shall not terminate by reason of a foreclosure or deed in lieu thereof ("Foreclosure"), (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a

    423568 v7 (00051.00138.000)

party in any action for foreclosure, (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Shopping Center available for restoration of the Improvements in accordance with the terms hereof, and (vi) Tenant shall give to Mortgagee the same notice and opportunity to cure following a default as is given to Landlord hereunder.  Upon Tenant's receipt and execution of said non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Mortgage.  Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises, as set forth in paragraph 35(b) below.  As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or the Premises or any part thereof.  After the delivery by Landlord of the non-disturbance and attornment agreement issued by the Mortgagee providing the Tenant Improvement Allowance, Landlord agrees to pay Tenant's reasonable attorney's fees incurred in negotiating any additional non-disturbance and attornment agreements, reciprocal easement agreements or other documents required in the event Landlord sells, finances or refinances the Premises or Shopping Center, or enters into any other transaction requiring the execution of same, including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel for the provision of such services, the payment of which fees shall be a condition precedent to the effectiveness of Tenant's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document, not to exceed Five Thousand and No/100 Dollars $5,000.00).

(b)     So long as the sublease proposed by Tenant is for all of the Premises and upon terms the same or substantially similar to those of this Lease, (including, without limitation, rent terms calling for at least the same rents and other charges payable hereunder), Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants providing, in part, that, in the event of any termination of this Lease, all of the rights of any such subtenant(s) under its sublease will be recognized so long as any such subtenant is not in default under its sublease beyond notice and cure periods, provided that as a pre-condition thereto such subtenant agrees that it will attorn to Landlord and will execute and deliver such instrument as Landlord shall reasonably request to confirm such attornment.

423568 v7 (00051.00138.000)

22.    Tenant's Financing.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment subject to the terms of this Lease; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure).  In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 23 below.

23.    Tenant's Property and Waiver of Landlord's Lien.  All of the Personalty shall be and remain the personal property of Tenant and shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease.  Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the Personalty of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

24.    Memorandum of Lease; Commencement Date Agreement.  Landlord and Tenant agree, at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached as Exhibit "H", setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established.  Recording costs for such document shall be borne by the party requesting recordation of the same.  The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Commencement Date Agreement.

423568 v7 (00051.00138.000)

25.  <u>Expiration of Term and Holding Over</u>.  At the expiration or earlier termination of the Lease Tenant shall surrender the Premises in a broom clean condition.  Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty-five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

26.  <u>Force Majeure</u>.  Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) of this Lease.

27.  <u>Events of Tenant's Default</u>.  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)  <u>Failure to Pay Rent; Breach</u>.  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue (which shall bear interest at the Default Rate); or (ii) Tenant's failure to observe or perform any other provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion.  In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

423568 v7 (00051.00138.000)

(b)    Bankruptcy.    Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

28.    Landlord's Remedies.    After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)    Continue Lease.    Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due.  Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.

(b)    Terminate Lease.    Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term.  In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)    The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)    The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

423568 v7 (00051.00138.000)

As used in this paragraph 28(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of eight percent (8%) for past due obligations, and a discount rate to net present value of eight percent (8%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation. In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings. Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)     Remedies Are Cumulative. The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

In addition to the foregoing remedies of Landlord, upon the occurrence of an Event of Default by Tenant respecting Tenant's failure to carry the insurance required by paragraph 14 ☐above only and provided that Tenant has not elected to self-insure pursuant to and in accordance with paragraph 14, then Landlord, at Landlord's option, may obtain such insurance on Tenant's behalf. In such event, Tenant shall reimburse Landlord, as additional rent hereunder, the actual cost of such insurance premium(s) within fifteen (15) days after Tenant's receipt of the required insurance policy(ies) and a paid receipt with respect to the insurance premium(s). Any reimbursement not paid when due shall accrue interest at the Default Rate from the date of outlay until fully paid.

(d)     Additional Landlord Remedies Due to Construction Delays by Tenant. If, subject to force majeure, Tenant shall fail to commence its construction by that date which is ninety (90) days following Delivery of the Land, Landlord at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and commence payment of

423568 v7 (00051.00138.000)

Ground Rent (as hereinafter defined) on the date which is two hundred ten (210) days following Delivery of the Land.

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

In the event, subject to force majeure, Tenant has failed to open for business to the public at the Premises within ten (10) months following Delivery of the Land, Tenant shall commence paying of Ground Rent until such opening occurs and shall thereafter pay Base Rent, Real Estate Taxes and CAM Charges, all as required under this Lease. Following Substantial Completion, Landlord may elect to pay to Tenant (or into escrow as hereinafter provided) the Tenant Improvement Allowance at any time, following which Tenant shall commence payment of Base Rent, Real Estate Taxes and CAM Charges (if Tenant has not previously commenced payment of these items). In the event Landlord elects to pay the amount of the Tenant Improvement Allowance into escrow, Landlord shall deliver to an escrow agent reasonably acceptable to Tenant cash in the amount of the Tenant Improvement Allowance pursuant to the terms of an escrow agreement acceptable to Landlord and Tenant, requiring that the escrow agent disburse the Tenant Improvement Allowance directly to Tenant immediately upon delivery by Tenant to the escrow agent of the TIA Requirements. The escrow agreement shall further provide that Tenant has the unrestricted right to withdraw the funds deposited as the Tenant Improvement Allowance immediately upon delivery to the escrow agent of the TIA Requirements. If the escrow agent or Landlord fails to pay Tenant the Tenant Improvement Allowance when due, Tenant shall have the right, in addition to any other rights or remedies available to Tenant hereunder, at law or in equity, to offset the entirety of the amount owing from future installments of Ground Rent, Base Rent, CAM Charges, Real Estate Taxes and other charges payable by Tenant under this Lease, until Tenant is reimbursed said installments in full, with interest at the Default Rate on the remaining balance from the date such payment was due until Tenant is fully reimbursed.

For purposes hereof, annual Ground Rent shall equal Two Hundred Fifty-Three Thousand Nine Hundred Seventy-Five and No/100 Dollars ($253,965.00), payable monthly in

equal installments of 1/12 each of the amount of the annual Ground Rent, in lieu of Base Rent, for so long as Tenant's failure continues.

    29.    <u>Events of Landlord's Default; Tenant's Remedies.</u>

    (a)    <u>Default by Landlord.</u>  Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of ☐money due Tenant or due any third party (without limiting Landlord's right to contest in good faith any such sum claimed due), including but not limited to the payment of the brokerage commissions pursuant to paragraph 33 hereof, within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date   at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.  Notwithstanding the foregoing, with respect to any event of default described in subparagraph (c) below, Tenant shall not be obligated to deliver any notice of default nor any opportunity to cure such default, it being agreed that with respect to the dates set forth therein time is of the essence.

    (b)    <u>Remedies Upon Landlord's Default.</u>  Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's actual cost of performance, including any and all transaction costs and reasonable attorneys' fees, plus interest at the Default Rate, against Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder; however, Tenant agrees to not offset more than half of each payment of Base Rent due unless the total amount to be offset exceeds the number of Base Rent payments remaining in the Term if only half of each

423568 v7 (00051.00138.000)

Base Rent payment were to be offset; or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest, transaction costs and attorney's fees specified in subsection (i) above, is cured by Landlord, or (iii) terminate this Lease (except if Landlord's breach does not impact Tenant's operation or business in the Premises) and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above.  If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein.  All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by non-judicial means available under State law, or any other applicable proceedings.  The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise.

   (c) <u>Additional Tenant Remedies Due to Construction Delays by Landlord</u>.  In the event, subject to force majeure, Landlord shall fail to complete the Site Delivery Work and accomplish Delivery of the Land in the condition specified herein by July 4, 2004 (the "Delivery Date"), Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by January 1, 2005.  Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay.

   In the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Land by the date which is fifteen (15) days following the Delivery Date, or to complete any subsequent element of the Landlord Work by the completion date established therefor in <u>Attachment "1"</u> of <u>Exhibit "C"</u> attached hereto (the Construction Schedule), Tenant, at its option and upon ten (10) days' prior written notice to Landlord, which notice may be given at any time after the applicable date for performance, may in addition to any other rights and remedies set

forth herein, enter the Shopping Center and perform any task required for Delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its actual costs thereof, including interest on such costs at the Default Rate. Landlord hereby grants Tenant the right to directly contact and contract with Landlord's contractors to complete such Landlord Work, all at Landlord's cost and expense. Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and CAM Charges otherwise due until such costs and accrued interest are reimbursed in full.

In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete Delivery of the Land to Tenant by the date which is thirty (30) days from the Delivery Date, Tenant shall be entitled upon ten (10) days' written notice to Landlord to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00).

In addition to the remedies set forth hereinabove, in the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to accomplish Delivery of the Land by the date which is fifteen (15) days following the Delivery Date, then Tenant shall receive two (2) "free" days of Base Rent for each day past said fifteenth (15th) day that Delivery of the Land occurs. Such days of "free" Base Rent shall occur at the beginning of the Lease Term.

(d)    Exercise of Remedies. Notwithstanding the foregoing, a delay by Tenant in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by Landlord. All sums owing to Tenant under paragraph 29 hereof shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due hereunder.

(e)    Time is of the Essence. Time is of the essence in this Lease.

    423568 v7 (00051.00138.000)

30.    Waver. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31.    Compliance with Applicable Laws. During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements and the Building, and of the board of fire underwriters (collectively, the "Lawful Requirements"), respecting Tenant's use and occupancy of the Improvements, and Landlord shall comply with all Lawful Requirements applicable to Landlord, the Shopping Center and the Improvements. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

32.    Notices. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

44                    423568 v7 (00051.00138.000)

If to Tenant:   CIRCUIT CITY STORES, INC.
        Deep Run I
        9950 Mayland Drive
        Richmond, Virginia 23233
        Attention: Vice President of Real Estate

with a copy to:   CIRCUIT CITY STORES, INC.
        Deep Run I
        9950 Mayland Drive
        Richmond, Virginia 23233
        Attention: Corporate Secretary

If to Landlord:   RONUS MEYERLAND PLAZA, L.P.
        Piazza at Paces
        3290 Northside Parkway, Suite 250
        Atlanta, Georgia 30327
        Attention: Director of Asset Management

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

   33. <u>Brokers</u>.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Claudia Hutchinson of Moody Rambin, which shall be paid a commission by Landlord pursuant to their separate written agreement, a copy of which Landlord agrees to deliver to Tenant on or before the Effective Date. Landlord agrees that Brokers are representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Brokers of the Broker's commission, the Brokers owe no fiduciary's, agent's or other duty whatsoever to Landlord.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any Real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

   34. <u>Miscellaneous</u>

     (a) <u>Headings and Gender</u>.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or

423568 v7 (00051.00138.000)

neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    Construction.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    Waiver of Jury Trial.  In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)    Relationship of Landlord-Tenant.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)    Entire Agreement; Merger.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)    Attorneys' Fees.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)    Partial Invalidity.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial

423568 v7 (00051.00138.000)

invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)     Consents.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)     Holidays.  If the day on which rent or any other payment due hereunder is payable falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

(j)     Applicable Law.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)     Successors and Assigns.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)     Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)     Trademarks and Trade Names.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)     Exhibits.  All of the exhibits to this Lease are hereby incorporated herein by reference for all purposes and are part of this Lease.

(o)     No Construction Against Either Party.  This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p)     Effective Date.  This Lease shall be effective on the date (the "Effective Date") on which it is fully executed by all parties.

35.   Effectiveness of Lease; Tenant's Right to Terminate.  Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties agree that the

423568 v7 (00051.00138.000)

effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Tenant's receipt, simultaneously with or prior to the execution hereof (except for the survey), of (i) a commitment for leasehold policy of title insurance for its leasehold interest in the Shopping Center, including all appurtenant easements thereto; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) within thirty (30) days of execution hereof, an ALTA survey of the Shopping Center, at Landlord's expense, in form and substance acceptable to Tenant, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land, (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without limitation, an Owner's Affidavit and Indemnity in form acceptable to the title company; and (v) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)    Landlord's delivery simultaneously the subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)    Landlord's Delivery of the Land by the date and in the condition specified in the Construction Provisions.

(d)    Tenant's obtaining: (i) written confirmation from appropriate local authorities that current zoning and use regulations allow construction of the Improvements on the Premises; and (ii) the required City, County, State and other necessary governmental agency permits and approvals to construct said Improvements on the Premises no later than July 1, 2004. Tenant agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(e)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of Delivery of the Land.

423568 v7 (00051.00138.000)

(f)    Tenant's obtaining satisfactory assurances, prior to execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

(g)    Tenant's obtaining satisfactory assurances that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, planned unit developmental boards and other necessary entities, and all necessary reciprocal use and easement agreements have been obtained prior to the date of execution hereof.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions.  In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.  All conditions contained in this paragraph except subparagraphs (a) and (g) unless previously waived or satisfied shall expire as of the date of Tenant's Substantial Completion.

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35.  It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt thereof by Landlord.  In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and thereupon Landlord shall be immediately obligated to return to Tenant all executed original

423568 v7 (00051.00138.000)

counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall thereafter be null and void.

36.    Confidentiality.    The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.    This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.    Any breach of this confidentiality agreement shall constitute an automatic Event of Default without notice or cure provided, for which either party may recover damages as their sole remedy and for which neither party can terminate this Lease.

37.    Limitation of Right of Recovery.    It is specifically understood and agreed that following payment to Tenant of the Tenant Improvement Allowance there shall be no personal liability of Landlord with respect to any of the covenants, conditions or provisions of this Lease. In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to Landlord's interest in the Shopping Center and Landlord's equity, including all rents, profits and proceeds (including, without limitation, those from insurance, condemnation, sales and financing or refinancing) in the Shopping Center for the satisfaction of Tenant's remedies.    Notwithstanding anything contained in this paragraph, however, the limitation of personal liability set forth herein shall not be applicable to events occurring due to Landlord's willful misconduct, fraud or intentional wrongful acts.

38.    Cotenancy Requirement.    Landlord acknowledges and agrees that it is a material inducement for Tenant to enter into this Lease that the majority of stores within the Shopping Center be open, occupied and operating for retail purposes at all times during the term of this Lease.    If sixty percent (60%) or more of the GLA shown on the Site Plan is not open, occupied and operating for six (6) months or more at any time during the term of this Lease (the "Co-Tenancy Trigger Event"), then Base Rent (or Ground Rent, as applicable) shall be reduced by fifty percent (50%) during such time. So long as Tenant is open an operating its business within the Premises at the time of the Co-Tenancy Trigger Event.    If, within one (1) year after the occurrence of the Co-Tenancy Trigger Event, replacement national or regional retailers reasonably acceptable to Tenant are not open and operating as required above, Tenant shall have

423568 v7 (00051.00138.000)

the right, but not the obligation, to terminate this Lease upon thirty (30) days written notice to Landlord. If Tenant has not yet terminated this Lease as set forth in the immediately preceeding sentence, then if, within two (2) years after the occurrence of the Co-Tenancy Trigger Event, then Landlord may terminate this Lease upon written notice to Tenant. Whereupon Landlord shall reimburse Tenant for the unamortized cost of improvements to the Premises (less the Tenant Improvement Allowance to the extent paid by Landlord).

423568 v7 (00051.00138.000)

WITNESS the following signatures and seals:

LANDLORD

**RONUS MEYERLAND PLAZA, L.P.,**
a Georgia limited partnership

By:   Ronus Meyerland, Inc.,
         a Georgia corporation, its general partner

Date: _____May 18, 2004_____

By: _____
Name: _____Richard S. Langhorne____
Title: _____Vice President_____

Landlord's counsel:

Hartman, Simons, Spielman & Wood, L.L.P.
6400 Powers Ferry Road, N.W.
Atlanta, Georgia 30339-2949
Attn: Peter Hartman, Esq.

423568 v7 (00051.00138.000)

TENANT

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

Date: _____4/26/04_____    By: _____
                                Thomas C. Nolan, Vice President


Tenant's counsel:                          Approved for Signature:

Kane, Russell, Coleman & Logan, P.C.       _____ Responsible Atty.
3700 Thanksgiving Tower                     _____ RE Manager
1601 Elm Street
Dallas, Texas 75201
Attn: Robert J. Riek, Esq.