**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re ) | | Chapter 11 |
| ) | | |
| CIRCUIT CITY STORES, INC., et. al., ) | | Case No. 08-35653 (KRH) |
| ) | | |
| Debtors. ) | | Jointly Administered |
| ) | | |
| _____) | | |

**RESPONSE OF JOHNSON CITY CROSSING, L.P. TO LIQUIDATING TRUST'S**
**FORTY-FIRST OMNIBUS OBJECTION TO LANDLORD CLAIMS**
**(REDUCTION OF CERTAIN INVALID CLAIMS-MITIGATION)**
**(Claim No. 12564)**

Johnson City Crossing, L.P. ("JCC")), by and through undersigned counsel, hereby files its Response to the Circuit City Stores, Inc. Liquidating Trust's (the "Liquidating Trust") Forty-First Objection to Landlord Claims (the "41st Objection") (Doc. 11852). In the 41st Objection, the Liquidating Trust asserts that JCC's Proof of Claim No. 12564 (the "Claim"), which JCC timely filed on April 28, 2009 in the amount of $593,151.88 with JCC as a General Unsecured Creditor, should be reduced and allowed only in the sum of $47,974.23. *See* 41st Objection (Doc. 11852) at 21. JCC opposes the relief sought by the Liquidating Trust in the 41st Objection as to JCC and asks that the Claim be allowed in the full amount in which it was filed. In support of this Response, JCC states as follows:

1. The Liquidating Trust's 41st Objection asserts that JCC's Claim should be reduced to the extent that the Claim asserts "amounts for which the Debtors are not liable unless the claimant at issue [i.e., JCC] has met its applicable mitigation burden." *Id.* at 12.

17836248.1                                                       1

2.	The Liquidating Trust's 41st Objection thereafter lists a number of claims that the Liquidating Trust asserts should be reduced on the basis of mitigation. *See id.*, Ex. B.

3.	The Liquidating Trust offers no additional factual or legal support for its assertion that the various claims, including the JCC Claim, should be reduced. Notably, the Liquidating Trust offers no basis for alleging that JCC did not mitigate the losses asserted in the Claim. Furthermore, the Liquidating Trust cites no legal authority for the proposition that JCC has the burden of establishing or proving mitigation of damages or that JCC had any applicable legal obligation to even attempt to mitigate the damages set forth in the Claim. Therefore, as an initial matter, the Liquidating Trust has failed to overcome the primary validity of the JCC Claim pursuant to Federal Rule of Bankruptcy Procedure 3001(f) (providing that a "proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim"); *see also, e.g., In re Harford Sands Inc.*, 372 F.3d 637, 640-41 (4th Cir. 2004) ("The creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim. The burden then shifts to the [objecting party] to object to the claim. The [objecting party] **must introduce evidence to rebut the claim's presumptive validity**.") (emphasis added; internal citations omitted).

4.	The Liquidating Trust, again without any substantive discussion, asserts that the JCC Claim should be reduced from the as-filed amount of $593,151.88 to $47,974.23. Comparing these figures to the actual JCC Claim (attached hereto as Exhibit A for ease of reference, and previously filed as Claim No. 12564), it appears that the

Liquidating Trust has simply removed the entirety of JCC's asserted "Rejection Damages" from the JCC Claim to arrive at the amount to which the Liquidating Trust believes the Claim should be reduced.

5. JCC timely filed its Claim on April 28, 2009.  The JCC Claim involves losses incurred by JCC as a result of the Liquidating Trust's rejection of the unexpired lease between Circuit City Stores, Inc. and JCC regarding Circuit City Store Number 3247, located in the Johnson City Crossing Shopping Center in Johnson City, Tennessee (the "Lease").  *See* Lease, attached hereto as Exhibit B (without voluminous exhibits).  The Liquidating Trust rejected the Lease effective as of March 10, 2009, pursuant to Bankruptcy Code Section 365(d)(2) and the procedures approved by this Court.  *See* Doc. 2408 (Notice of Rejection of Unexpired Leases and Abandonment of Personal Property) (reference Exhibit A to same and Location Number 3247).

6. The JCC Claim includes "Rejection Damages" incurred as a result of the rejection of the Lease.  The damages JCC would be entitled to in the event of a tenant default, such as a Lease rejection in Bankruptcy, are specifically provided for in the Lease.  *See* Lease (Ex. B), Art. 30 (providing that JCC is entitled to continue the Lease and "shall have the right to collect Base Rent and other charges when due" and, with respect to mitigation, providing that tenant shall pay JCC any deficiency between amounts obtained as a result of reletting compared to what tenant would have paid as rent and other charges).  The Lease has an initial term of twenty (20) years, meaning that the rejection of the Lease in 2009 occurred in the thirteenth year of the Lease, leaving

approximately seven years of the original term remaining, during which JCC would have been entitled to collect over $2 Million in rent. *See id.*; Arts. 3, 4.

7. The Lease is governed by Tennessee law. *Id.*, Art. 36(j). The amount of JCC's damages arising out of the rejection of the Lease is determined by the terms of the Lease and in accordance with applicable non-Bankruptcy law regarding rejection of leases—in this case, Tennessee law. *See Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (property interests are determined by state law). Under Tennessee law, a landlord has a duty to mitigate damages caused by the rejection of the lease, which means that the landlord "must do what is fair and reasonable under the circumstances to reduce [the landlord's] damages." *Bellevue Properties, LLC v. United Retail, Inc.*, 1999 WL 1086221, *2 (Tenn. App. Dec. 3, 1999) (quoting *Nashland Assocs. v. Shumate*, 730 S.W.2d 332, 333 (Tenn. App. 1987)).[1] Notably, "the burden is on the breaching party to show a landlord's failure to so mitigate." *Id.* (citing *Hailey v. Cunningham*, 654 S.W.2d 392, 396 (Tenn. 1983)). The terms of the Lease are consistent with this Tennessee case law. *See* Lease (Ex. B), Art. 30. The Liquidating Trust has not met its burden to show that JCC did not properly mitigate its damages using objectively reasonable efforts. In fact, the Liquidating Trust provides no factual basis for even alleging that JCC did not attempt to or did not actually mitigate its damages regarding the Lease.

---

[1] JCC acknowledged this requirement of Tennessee law in the Lease itself by agreeing to the following language: "in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make) . . . ." Lease (Ex. B), Art. 30(a).

8.  JCC, though incurring over $2 Million in actual rejection damages as a result of the rejection of the Lease, submitted its "Rejection Damages" claim in only the amount of $545,177.65.  *See* JCC Claim (Ex. A.).  JCC's Claim is subject to the statutory cap on rejected lease damages found in 11 U.S.C. § 502(b)(6).  Other Bankruptcy Courts have held that mitigation is an irrelevant inquiry when claim damages are calculated using the limitations of Section 502(b)(6), provided that actual mitigation is considered in the calculation.  *See, e.g., In re Shane Co.*, 464 B.R. 32, 43-44 (Bankr. D. Colo. 2012).[2] As noted above, JCC's actual rejection damages, calculated in accordance with the terms of the Lease, far exceed the amount of JCC's Claim.  As noted below, JCC considered any applicable mitigation in this calculation because JCC was not able to acquire a replacement tenant for approximately six months after the rejection and even then was not able to obtain rent for as much as Circuit City was renting the space, despite using objectively reasonable efforts to locate a new tenant.

---

[2] "The effect of mitigation is an element of the calculation of damages under state law and is properly considered in the calculation of damages. But to import mitigation into the calculation of the cap set out in § 502(b)(6) would be to judicially amend a statute that is plain on its face. The statutory language is devoid of any reference to—or even logical suggestion of—taking mitigation into account in calculating the damages cap under § 502(b)(6).

The statute speaks of "the rent reserved by such lease" for one year or for 15% of the remaining term, whichever is greater, not to exceed three years. The calculations required under § 502(b)(6) are not complicated and may be accomplished solely by reference to the agreement between the parties.  It is only that agreement that is cited in the statute as the standard by which the damage cap is calculated.  If Congress had intended the courts to import mitigation into that calculation, it provided no evidence of that intent in the statutory language it chose." *Id.*

9. To the extent mitigation is relevant and, *assuming arguendo*, that it should be JCC's burden to demonstrate its mitigation, the JCC Claim should not be reduced because JCC was not able to find a new tenant for the location until the end of August 2009, approximately six months after the rejection of the Lease, and the rent obtained from the new tenant was substantially less than the rent under the Lease with Circuit City. The premises that Circuit City Stores, Inc. rented pursuant to the Lease was eventually re-let to H.H. Gregg, which began occupying the space at the end of September 2009 and began paying rent to JCC as of September 2010 (between September 2009 and August 2010, H.H. Gregg paid only insurance and taxes). As discussed above, the actual damages to JCC from the rejection of the Lease are significantly more than the damages presented in the Claim; however, the "Rejection Damages" in the JCC Claim were reduced pursuant to the cap in 11 U.S.C. § 502(b)(6).

10. JCC utilized objectively reasonable efforts to find a replacement tenant. Following the rejection of the Lease, JCC employed an outside broker, The Shopping Center Group, to immediately market the space to potential tenants. Among other things, the broker created a merchandising plan specifically tailored to the former Circuit City location, which was approximately 27,889 square feet and identified specific retailers that might be interested in leasing such a space, including H.H. Gregg, who was looking to enter the Tri-Cities Tennessee market. The Shopping Center Group placed two leasing signs on the property, placed the property on a MLS listing service, listed the property on The Shopping Center Group's website, and placed phone calls and sent e-mails to potential retailers and retail brokers who might need to rent a space the size of a former

Circuit City store. The specifically-targeted and aggressive approach of JCC's outside leasing broker resulted in JCC finding a new tenant for the space within approximately six months after rejection of the Lease—in fact, a remarkable turnaround given the economic environment at the time. Unfortunately, JCC was only able to obtain the new tenant with significant rent concessions. During the first year of the H.H. Gregg lease, H.H. Gregg paid no base rent and instead paid reimbursements for only its share of insurance and taxes. In year two of the H.H. Gregg lease (beginning September 1, 2010), H.H. Gregg paid base rent of $6 per square foot (as compared with Circuit City's Lease providing for base rent of $12.85 per square foot).

11. While JCC did everything available to find a new tenant for the rejected Lease's premises, JCC was not able to re-let the space for a period of six months after the Lease rejection, and JCC's new tenant did not provide JCC with the rental income JCC was entitled to pursuant to the Lease—resulting in actual rejection damages far exceeding the amount in JCC's Claim. Therefore, JCC was unable to mitigate its damages that the rejection of the Lease caused, and JCC is entitled to its "Rejection Damages" as set forth in the Claim, in accordance with the Lease and applicable Tennessee law.

12. The party with authority to discuss mitigation issues and the facts stated in this Response is the following:

> Nancy Morton
> Agent for Johnson City Crossing, L.P.
> Ronus Properties
> Piazza at Paces
> 3290 Northside Parkway
> Suite 250
> Atlanta, Georgia 30327
> Telephone: (678) 553-3900

nmorton@ronusproperties.com

WHEREFORE, JCC requests that the Court deny the Liquidating Trust's Objection to JCC's Claim No. 12564 and that the Claim be allowed by the Court in its entirety in the amount of $593,151.88.[3]

Respectfully submitted this 26th Day of June, 2012.

**SUTHERLAND ASBILL & BRENNAN LLP**

__/s/ *James J. Broidy*_____
James J. Briody, Virginia Bar No. 32128
1275 Pennsylvania Ave., NW
Washington, DC 20004-2415
Tel: (202) 383-0100
Fax: (202) 637-3593
jim.briody@sutherland.com

*Counsel for Johnson City Crossing, LP*

---

[3] As noted in the Objection of Johnson City Crossing, L.P. to Liquidating Trust's Ninth Omnibus Objection to Landlord Claims (Doc. 10413), the attorneys' fees incurred on behalf of JCC were split evenly between JCC and an affiliate entity, Ronus Meyerland Plaza, L.P.  The total amount outstanding on the invoices is $27,853.12, which split evenly results in $13,926.56 attributable to this landlord's lease.  Accordingly, pending resolution of that objection (which has not yet occurred), JCC intends to file an amended proof of claim including that amount of attorneys' fees rather than the $8,979.00 previously included.

## CERTIFICATE OF SERVICE

I, James J. Briody, hereby certify that on the 26th Day of June, 2012, a true and correct copy of the foregoing RESPONSE OF JOHNSON CITY CROSSING, L.P. TO LIQUIDATING TRUST'S FORTY-FIRST OMNIBUS OBJECTION TO LANDLORD CLAIMS (REDUCTION OF CERTAIN INVALID CLAIMS-MITIGATION) (Claim No. 12564) has been served electronically using the Court's CM/ECF System on all registered users of the CM/ECF System who have appeared in this matter.

　　　　　　　　　　　　　　　　　　__/s/ *James J. Broidy*_____
　　　　　　　　　　　　　　　　　　James J. Briody