**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| CIRCUIT CITY STORES, INC., *et al.* | ) | Case No. 08-35653-KRH |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**DECLARATION OF ANDREW W. HOFFMANN IN SUPPORT OF RESPONSE OF COSMO EASTGATE, LTD. IN OPPOSITION TO LIQUIDATING TRUST'S FORTIETH OMNIBUS OBJECTION TO LANDLORD CLAIMS (REDUCTION OF CERTAIN INVALID CLAIMS – MITIGATION)**

I, **ANDREW W. HOFFMANN**, being of sound mind and over the age of 18, depose and state as follows:

1. I am currently Vice President and Counsel of Cosmo Eastgate, Ltd. ("*Eastgate*"), owner and manager of Eastgate Shopping Center (the "Shopping Center") located in Mayfield Heights, Ohio.

2. I have B.A. and J.D. degrees from Case Western Reserve University.

3. As Vice President, my responsibilities for the Shopping Center include procuring tenants, negotiation of tenant leases and managing ongoing tenant issues and disputes. I was directly involved with and have personal knowledge of all matters included in this Declaration.

4. Beginning in May 26, 2004, Circuit City Stores, Inc., (the "*Debtor*") leased approximately 33,874 square feet of retail space (the "*Leased Premises*") in the Shopping Center, pursuant to a Lease Between Circuit City Stores, Inc., as Tenant and Cosmo-Eastgate, Ltd., as Landlord (the "*Lease*").

5. On November 10, 2008 (the "***Petition Date***"), the Debtor, along with several related entities and affiliates (collectively, the "***Debtors***") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

### *The Lease*

6. On December 31, 2008 (the "***Rejection Date***"), the Debtor rejected the Lease pursuant to Bankruptcy Code § 365(a).

7. The Lease provided for:

   a. A total term of 171 months extending from November, 2004 through and including January 31, 2019 (the "***Term***");

   b. A remaining 121 month term extending from Rejection Date through and including January 31, 2019 (the "***Remaining Term***");

   c. Annual rent of $543,677.00 for the 1 month period from the Rejection Date through January 31, 2009 (monthly payments of $45,306.42);

   d. Annual rent of $598,045.00 for the 60 month period from February 1, 2009 through January 31, 2014 (monthly payments of $49,837.08);

   e. Annual rent of $657,850.00 for the 60 month period from February 1, 2014 through January 31, 2019 (monthly payments of $54,820.83); and

   f. Monthly additional rent charges of $12,614.75 (totaling $1,526,384.15 for the entire Term), composed of common area maintenance, insurance charges, and real estate taxes (collectively, the "***Additional Rent***").

8. Under the terms of the Lease, for the Remaining Term, Eastgate was entitled to receive a grand total of $6,324,781.42 in standard rental payments, plus $1,526,384.15 in Additional Rent, for a total of $7,851,165.50 (the "***Base Rejection Damages***") for the entirety of the Remaining Term.

### *Mitigation of Lease Rejection Damages*

9. Eastgate anticipated the Debtor's rejection of the Lease even before it occurred. Upon hearing of the Debtor's bankruptcy filing, Eastgate immediately began searching for a

replacement tenant, including contacting a competitor of Debtor who was known to be considering relocation.  Eastgate also listed the Leased Premises with its normal broker, who attempted to locate a replacement tenant by listing the space and marketing the space as the broker would market any other retail space.  Despite those efforts and some preliminary negotiations with the aforesaid competitor, Eastgate could not find a tenant to lease the entirety of the Leased Premises.  Eastgate did lease a portion of the Leased Premises to a temporary tenant in the fall of 2009 to operate a seasonal holiday decoration and merchandise store, although that lease generated only $23,000 over two months before the temporary tenant vacated the Leased Premises.  Eastgate's market analysis indicated that starting in late 2008 and continuing to the present, retailers leasing large footprint space, such as the Leased Premises, faced significant economic pressures, and that the number of tenants seeking large leased spaces dwindled as those types of retailers either ceased operations or reduced the amount of retail space that they leased.  In addition, the leases of existing anchor tenants at the Shopping Center prohibited leasing the Leased Premises to non-retail use.

10.    In light of the lack of tenants expressing any interest in leasing a 33,874 square foot retail space, Eastgate instead started to look for smaller retailers or other business tenants to re-let portions of the Leased Premises.  Beginning in September 2011 and November 2011, Eastgate leased portions of the Leased Premises to two different, smaller retailers, who collectively currently lease approximately 26,000 square feet of the 33,874 square foot Leased Premises.

11.    From the Rejection Date through the date when Eastgate released portions of the Leased Premises, Eastgate suffered damages by virtue of rejection of the Lease in the amount of $1,590,256.00 in lost base rent, minus $23,000 received from a temporary tenant, plus

$368,057.10 in lost Additional Rent, for a total of $1,958,313.10 in pre-mitigation damages (the "***Pre-Mitigation Damages***").

12. The relevant terms of the leases with the two new tenants are as follows:

   a. During the first 5 years under the leases of the replacement tenants, the aggregate amount of fixed rent Eastgate receives from the two new tenants is $467,241.96 annually ($38,936.83 monthly);

   b. During the second 5 years under the leases of the replacement tenants, the aggregate amount of fixed rent Eastgate receives from the two new tenants is $513,700.00 annually ($42,808.33 monthly);

   c. The two new tenants collectively lease approximately 26,000 square feet of the 33,874 square feet previously leased by the Debtor; and

   d. Collectively, the two new tenants pay an amount of Additional Rent equal to or greater than the amount of Additional Rent the Debtor would have paid.

13. Even after finding new tenants to re-let portions of the Leased Premises, Eastgate continues to suffer lease rejection damages because the two new tenants pay less in rent than the Debtor would have paid had the Lease not been rejected. Based on the amount the Debtor would have paid over the course of the Remaining Term of the Lease and the amount the two new tenants will collectively pay over the same time period, I have determined that Eastgate will suffer lost fixed rent damages of $1,156.893.95 (the "***Rent Difference Damages***"). Thus, taking into account Pre-Mitigation Damages and Rent Difference Damages, Eastgate will lose a total of $3,115,187, after mitigation (the "***Mitigated Lost Rent Damages***").

### *Tenant Improvement Damages*

14. In addition to the total Mitigated Lost Rent Damages, Eastgate expended significant funds remitting tenant improvement allowances and remodeling as inducements and making improvements to the Leased Premises so that the new tenants could use the space they leased for retail purposes. In preparing the Leased Premises to be released to the two new

tenants, and maintaining the Leased Premises in the wake of the Debtor's rejection of the Lease, Eastgate expended a total of $2,100,000.00 (the "***Tenant Improvement Damages***"). The Tenant Improvement Damages include the total sum expended by Eastgate in tenant inducement allowances, construction costs, and other soft costs, including leasing, architectural, and legal fees. All of these damages resulted from the Debtor's termination of the Lease and therefore should be included in the calculation of Eastgate's damages.

I state that the foregoing is true to the best of my knowledge and belief.

Date: 6/25/12

_____
Andrew W. Hoffmann