GREEN 521 FIFTH AVENUE, LLC
c/o SL Green Realty Corp.
420 Lexington Avenue
New York, New York 10170

Direct Dial (212) 216-1760
E-mail. kathy.crocco@slgreen.com

August 3, 2010

BY FEDERAL EXPRESS

Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Attn: Austin S. Faberman, Esq.

Re:    Lease dated as of June 30, 2010 (the "Lease") between Green 521 Fifth Avenue, LLC
("Landlord") and Urban Outfitters, Inc. ("Tenant"), rentable portion of the ground level and
second level (the "Premises") in the building known as and located at 521 Fifth Avenue,
New York, New York (the "Building").

Dear Austin:

Reference is hereby made to the Lease. Terms not otherwise described herein shall have the same
meanings ascribed to them in the Lease.

This letter shall serve to confirm the correction of an inadvertent typographical error contained in the
Lease. Landlord and Tenant hereby agree that in the column titled "Initial Lease Term" set forth in
Paragraph N of the Schedule of Terms, the numbers "6-12" are hereby deleted and the following numbers
shall be substituted in their place and stead: "10-12".

Kindly confirm your acknowledgement of the foregoing and that an executed counterpart of this
letter sent by portable document format (pdf) or by facsimile shall be binding upon the parties, by executing
a counterpart of this letter where indicated below and returning an executed copy to the attention of Kathleen
A. Crocco, Esq. via electronic mail at kathy.crocco@slgreen.com via facsimile at (646) 293-1370, with the
original to follow by overnight mail to the above address. Thank you for your courtesy.

Very truly yours,

GREEN 521 FIFTH AVENUE, LLC,
as Landlord

By:
Name.
Title:        Kathleen A. Crocco
              Senior Vice President,
              Leasing Counsel

Acknowledged and Agreed:
URBAN OUTFITTERS, INC., as Tenant

By.
Name:
Title:

cc.    Steven Durels, SL Green Realty Corp.

L.   **RENT COMMENCEMENT DATE:** The date which is seven (7) months after the Commencement Date; subject, however, to the application of any Rent credits provided by the provisions of Section [3](g) hereof

M.   **EXPIRATION DATE:** 11 59 p.m. (New York, New York time) on the day immediately preceding the date which is fifteen (15) Lease Years after the Rent Commencement Date; subject, however, to Tenant's Options to Extend.

N.   **ANNUAL MINIMUM RENTAL RATE:**

| Lease Year | Annual Minimum Rental Rate | Monthly Installments |
|---|---|---|
| Initial Lease Term | | |
| 1-3 | $ 3,600,000 | $ 300,000 00 |
| 4-6 | 3,888,000 | 324,000.00 |
| 7-9 | 4,199,040 | 349,920 00 |
| 10-12 | 4,534,963 | 377,913 58 |
| 13-15 | 4,897,760 | 408,146.67 |
| First Extension Term | | |
| 16-20 | The "Market Rental Rate" as determined pursuant to the provisions of Section [8] hereof | One-twelfth (1/12) of the annual Market Rental Rate |
| Second Extension Term | | |
| 21-25 | The Market Rental Rate as determined pursuant to the provisions of Section [8] hereof | One-twelfth (1/12) of the annual Market Rental Rate |

O   **ADDITIONAL RENT:** All costs and charges other than Minimum Rent and Percentage Rent payable by Tenant to Landlord pursuant to the provisions of this Lease

P.   **PERCENTAGE RENT:** See Section [6] hereof

Q.   **BASE TAX YEAR:** July 1, 2010 through and including June 30, 2011

R.   **DEFAULT RATE:** One and one-half percent (1.5%) per month, but in no event higher than the maximum rate permitted by law.

S.   **PERMITTED USES:** Subject to Section [15] hereof, **Exhibit F** hereto and as may otherwise be provided in this Lease, any general retail use, including the display and sale of apparel, shoes and accessories, gifts, cards, furniture, home furnishings, housewares, pre-packaged food and food stuffs for off-premises consumption (in accordance with the Operating Standard, as defined below), plants, fresh and dried flowers, pots, containers

- II -

GREEN 521 FIFTH AVENUE LLC
c/o SL Green Realty Corp.
420 Lexington Avenue
New York, New York 10170

July __, 2010

Mr. Hector Pacheco
Senior Development Manager,
  Architecture & Design
Urban Outfitters, Inc.
5000 South Broad Street
Building 12
Philadelphia, PA  19112

Re:  Lease between Urban Outfitters, Inc. and Green 521 Fifth Avenue,<br>LLC (the "Lease") for "Premises" at 521 Fifth Avenue, New York,<br>New York

Dear Hector:

Reference is hereby made to the Lease. Terms not otherwise defined herein shall have the same meanings ascribed to them in the Lease.

Landlord is in receipt of the letter from you dated June 30, 2010, relating to substantial completion of Landlord's Work ("Landlord's Work Letter"). This letter shall confirm the agreement of Landlord and Tenant that, notwithstanding that Landlord's Work has been completed in accordance with the terms of the Lease, the following punch list items shall be performed by Landlord in the Premises:

1.   Landlord shall, promptly upon receipt of notice from Tenant, repair any gaps, floor penetrations or similar damage to the concrete floor slab, provided that any such gaps, penetrations and/or damage were not caused by Tenant;

2   Landlord shall, prior to the Commencement Date, perform any repairs necessary to make the elevator within the Premises operational and shall provide Tenant with reasonable documentation (such as, by way of example, an inspection certificate) evidencing that the elevator has been properly repaired; and

3.   Landlord shall not be able to sever the existing Class E notifier alarm system for the Premises from the Building system, pursuant to Paragraph II.13.d. of Exhibit C to the Lease, as doing so would be a code violation.

Landlord and Tenant acknowledge and agree that, other than as expressly set forth herein, Landlord shall have no obligation to perform any other work referenced in the

Landlord Work Letter; provided, however, this letter is not intended to alter the rights and responsibilities of Landlord or Tenant, as set forth in the Lease

Kindly evidence your acknowledgement of the foregoing, and that an executed counterpart of this letter sent by facsimile shall be binding upon the parties, by executing a counterpart of this letter where indicated below and returning an executed copy to the attention of Kathleen A Crocco, Esq. via facsimile at (646) 293-1370, with the original document to follow by overnight mail to the above address. Please feel free to contact us with any questions.

Sincerely,

Green 521 Fifth Avenue LLC

Name:
Title:
Steven M. Durels
Executive Vice President,
Director of Leasing and Real Property

Acknowledged and Agreed:

Urban Outfitters, Inc.

Name: Glen T. Senk
Title: Chief Executive Officer

cc: Austin S. Faberman, Esq.

PHBF/765911 2

<u>SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT</u>

This AGREEMENT made as of the 30th day of _____June_____, 2010, by and between URBAN OUTFITTERS, INC., a Pennsylvania corporation, having an address at 5000 South Broad Street, Philadelphia, Pennsylvania 19112 (hereinafter referred to as "Lessee") and ANGLO IRISH BANK CORPORATION LIMITED, formerly known as Anglo Irish Bank Corporation plc, a private limited company incorporated under the laws of Ireland, having its principal place of business at Stephen Court, 18/21 St. Stephen's Green, Dublin 2, Ireland (hereinafter referred to as "Mortgagee", and in Mortgagee's capacity as Agent for the Lenders)

WHEREAS, Mortgagee made a loan to 104-521 Fee LLC and 300-521 Fee LLC, each a Delaware limited liability company (collectively, the "Borrower"), secured by a certain Mortgage Consolidation and Modification Agreement, dated as of April 7, 2006, and recorded in the Office of the City Register, New York County on June 1, 2006 as CRFN# 2006000305808, as amended by that certain First Amendment to Mortgage Consolidation and Modification Agreement, dated as of January 2, 2008, and recorded in the Office of the City Register, New York County on March 19, 2008 as CRFN# 2008000112515 (collectively, the "Security Agreement"), on land owned by Lessor located at 521 Fifth Avenue in City of New York, New York County, State of New York (the "Premises"), upon which is situated an office building with attendant retail uses (hereinafter referred to as the "Building"). Any and all capitalized terms as used herein and not otherwise specifically defined shall have the same meaning herein as in the Security Agreement;

WHEREAS, Borrower has leased the entire Premises to Green 521 Fifth Avenue LLC (hereinafter referred to as "Lessor") pursuant to that certain operating lease, dated as of March 10, 2006, between Borrower, as landlord, and Lessor, as tenant, which operating lease provides that Lessor would be responsible for the day to day operation and management of the Premises; and

WHEREAS, Lessee has entered into a written lease, dated June 30, 2010 (the "Lease") with Lessor for a portion of the Building located on the ground floor and second floor, containing approximately 25,866 square feet of space (the "Demised Premises").

NOW, THEREFORE, in consideration of the mutual covenants herein contained, Lessee and Mortgagee do hereby agree as follows:

1.     Lessee and Mortgagee hereby consent and agree that:

(a)     the lien of the Lease shall be, and the same hereby is, made subordinate in each and every respect to the lien of the Security Agreement and to all advances made thereunder and to all extensions, renewals and modifications thereof and amendments thereto; and

(b)     any of the foregoing notwithstanding, if the interests of Lessor in the Premises shall be acquired by Mortgagee by reason of foreclosure of the Security Agreement or other proceedings brought to enforce the rights of Mortgagee, by deed in lieu of foreclosure or by any other method, or acquired by any other purchaser or purchasers pursuant to a foreclosure

sale (Mortgagee or such purchaser(s), as the case may be, being referred to as "Purchaser"), (i) the Lease and the rights of Lessee thereunder shall continue in full force and effect and shall not be terminated or disturbed, except in accordance with the terms of the Lease, and (ii) Mortgagee will not join Lessee as a party defendant in any action or proceeding to foreclose the Security Agreement for the purpose of terminating the Lease. Lessee shall be bound to Purchaser, and Purchaser shall be bound to Lessee, under all of the terms, covenants, and conditions of the Lease for the balance of the term thereof remaining, and any extensions or renewals thereof which may be effected in accordance with any option therefor contained in the Lease, with the same force and effect as if Purchaser were the lessor under the Lease; provided that·

> (i)     Lessee is not in default, beyond the expiration of any applicable grace or notice period, under any provision of the Lease or this Agreement at the time Mortgagee exercises any such right, remedy, or privilege;

> (ii)    the Lease at that time is in force and effect according to its original terms or with such amendments or modifications as Mortgagee shall have approved as provided below;

> (iii)   Lessee thereafter continues to fully and punctually perform all of its obligations under the Lease without default thereunder beyond the expiration of any applicable grace or notice period, and

> (iv)    Lessee attorns to Purchaser as provided below; and

(c)     in the event of any foreclosure of the Security Agreement by Mortgagee, its successors or assigns, or at the request of Mortgagee at any time pursuant to the assignment of the Lease to Mortgagee, Lessee will recognize Mortgagee, its successors and assigns, as the new lessor under the Lease and will attorn to and continue to be bound by each and every term of the Lease; and upon such attornment, the Lease and the rights of Lessee shall continue in full force and effect as if it were a direct Lease between Mortgagee, or any Purchaser, and Lessee upon all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining; provided however, Mortgagee, or any Purchaser, shall not be·

> (i)     liable for any act or omission of any prior landlord (including Lessor) unless of a continuing nature and provided Mortgagee has received notice of such act or omission pursuant to Paragraph 5 below, or

> (ii)    subject to any offsets or defenses which Lessee might have against any prior landlord (including Lessor); provided, however, Mortgagee or such Purchaser shall be bound by any offset or defense which may arise from any default of any landlord (including Lessor) which Mortgagee received notice of

pursuant to Paragraph 5 below, but failed to cure in accordance with such Paragraph 5; or

(iii)  bound by any rent or additional rent which Lessee might have paid for more than one (1) month in advance to any prior landlord (including Lessor); or

(iv)  bound by any material amendment or modification of the Lease without Mortgagee's written consent; or

(v)  liable for any security deposit or other sums held by any prior landlord (including Lessor) not actually received by Mortgagee, or

(vi)  required to rebuild or repair the Building or any part thereof in the event of casualty damage to or condemnation of any material portion of the Building or the Demised Premises (provided, however, that if Lessor is required to do so under the Lease, and Mortgagee or Purchaser elects not to fulfill such obligation, Tenant shall have the right, within sixty (60) days of receipt of written notice from Mortgagee or Purchaser stating its election not to fulfill such obligation, to terminate the Lease); or

(vii)  required, or liable for any obligation of Lessor under the Lease, to complete construction of or improvements to the Demised Premises and/or the Building (which limitation shall not apply to Lessor's maintenance and repair obligations); and

(d)  Mortgagee may at any time unilaterally subordinate (or cause to be subordinated) the lien of the Security Agreement on the Premises to the Lease.

2.  Lessee hereby: (a) acknowledges receipt of notice that pursuant to an Assignment of Leases and Rents from Lessor, all leases and rents involving the Building, including the Lease of Lessee, are assigned to Mortgagee as security for its loan; (b) acknowledges that it has received no notice of any sale, transfer or assignment of the Lease or of rentals thereunder, by Lessor, other than pursuant to said Assignment of Leases and Rents; and (c) agrees that it will not join in any material change or modification of the Lease, anticipate rentals thereunder or agree to terminate the Lease or surrender said Demised Premises (except pursuant to any express rights under the Lease), without the prior written consent of Mortgagee.

3.  Lessee hereby agrees that upon Mortgagee's demand, it will make all payments of rent then and thereafter due to Lessor directly to Mortgagee and not to Lessor or any independent rental agent which Lessor might at any time utilize.

4.  Lessee hereby agrees that the interest of the Lessor in the Lease has been assigned to Mortgagee solely as security for the purposes indicated in the said instrument of assignment,

and that, until such time as Mortgagee has taken possession of the Premises and exercised its rights under said Assignment, Mortgagee assumes no duty, liability or obligation whatever under the Lease, or any extension or renewal thereof, by virtue of said assignment.

5.    Lessee hereby: (a) agrees to notify Mortgagee, its successors and assigns, in writing at the notice address set forth above for Mortgagee, or at any other address specified in writing to Lessee, of any default on the part of Lessor under the Lease; and (b) grants to Mortgagee, its successors and assigns, the right and opportunity to cure any such default within the same grace period as is given to Lessor for remedying such default, plus, in each case, an additional period of thirty (30) days after the later of (i) the expiration of such grace period, or (ii) the date on which Lessee has served notice of such default upon Mortgagee, its successors or assigns.  Lessee's failure to so notify Mortgagee shall not constitute a default by Lessee, however, Lessee acknowledges that Mortgagee shall not be bound by any action taken on Lessee's behalf with respect to Lessor's default unless and until Mortgagee receives such notice and opportunity to cure such default.

6.    Any notice, request, demand, statement or consent made hereunder shall be in writing and shall be deemed to have been duly given upon receipt if delivered by hand (by professional messenger service) or two business days after the same is mailed, by registered mail, return receipt requested, postage prepaid, or one business day after the same is sent by a nationally recognized courier service that regularly maintains records of items picked up and delivered, as follows:

If to Lessee:

> Urban Outfitters, Inc.
> 5000 South Broad Street
> Philadelphia, PA  19112
> Attention: General Counsel

If to Lessor:

> Green 521 Fifth Avenue, LLC
> 420 Lexington Avenue
> New York, NY  10170
> Attention: Director of Leasing

If to Mortgagee:

> Anglo Irish Bank Corporation Limited
> Stephen Court
> 18/21 St. Stephen's Green
> Dublin 2, Ireland
> Attn:  Paula O'Reilly

Copy by ordinary
first class mail to:

Anglo Irish New York Corporation
222 East 41st Street, 24th Floor
New York, New York 10017
        Attn:  Kevin Kelly, Vice President

and

Sullivan & Worcester LLP
1290 Avenue of the Americas, 29th Floor
New York, New York 10104
Attn: Karen M. Kozlowski, Esq.

7.      This Agreement shall be binding upon and shall inure to the benefit of Lessee and Mortgagee and their respective heirs, executors, administrators, successors and assigns, as the case may be.

8.      Each person executing this Agreement on behalf of Lessee, Mortgagee and Lessor, respectively, has the full power, authority and legal right to execute this Agreement on behalf of such party.

9.      This Agreement may not be modified, amended, changed or terminated except by an agreement in writing signed by all the parties hereto.

10.     This Agreement may be executed in any number of duplicate originals and each such duplicate original shall be deemed to constitute but one and the same instrument.

11.     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflicts or choice of laws principles.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, under seal, as of the day and year first written above.

LESSEE.

URBAN OUTFITTERS, INC

By:

Name: Glen T. Senk

Title: Chief Executive Officer

LESSOR.

GREEN 521 FIFTH AVENUE LLC

By:

Name: Steven M. Durels

Title: Executive Vice President,
Director of Leasing and Real Property

MORTGAGEE·

ANGLO IRISH BANK CORPORATION LIMITED

By:

Name: Dominick D-Scali

Title: Vice President

COMMONWEALTH OF PENNSYLVANIA:
: SS:
COUNTY OF PHILADELPHIA            :

ACKNOWLEDGMENT

On the 30th day of ____June____, in the year 2010 before me, the undersigned, a Notary Public in and for said State, personally appeared __Glen Isaak__ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her individual and/or corporate capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument. [LESSEE]

Notary Public

NOTARIAL SEAL
MEREDITH L BOICE
Notary Public
PHILADELPHIA CITY, PHILADELPHIA COUNTY
My Commission Expires Feb 16, 2011

STATE OF New York            :
: SS:
COUNTY OF New York

ACKNOWLEDGMENT

On the 12th day of ____July____, in the year 2010 before me, the undersigned, a Notary Public in and for said State, personally appeared Steven M Duross personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her individual and/or corporate capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument [LESSOR]

Notary Public

LISA  MANNING
Notary Public, State of New York
No 4846914
Qualified in Westchester County
Commission Expires December 31, 20___

STATE OF _New York_ :
: SS
COUNTY OF _New York_ :

ACKNOWLEDGMENT

On the 2*nd* day of _August_, in the year 2010 before me, the undersigned, a Notary Public in and for said State, personally appeared _Domnick Scal:_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her individual and/or corporate capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument. [MORTGAGEE]

_____
Notary Public

ALEXANDER S. MEJEAN
Notary Public, State of New York
No 01ME6165451
Qualified in New York County
Commission Expires May 7, 2011

# LEASE

### by and between

## GREEN 521 FIFTH AVENUE, LLC, LANDLORD

### and

## URBAN OUTFITTERS, INC., TENANT

LEASED SPACE:    **Portion of Ground and Second Levels
521 Fifth Avenue
New York, New York 10175**

# TABLE OF CONTENTS

**Section**                                                                                           **Page**

SCHEDULE OF TERMS . . . . . . . . 1
[1]    LEASED SPACE . . . . . . . . . . . . . . 1
[2]    COMMON AREAS AND FACILITIES . . . . . . . . 1
[3]    TERM; COMMENCEMENT DATE; EFFECTIVENESS, PRIOR POSSESSION. 1
[4]    PURPOSE . . . . . . . . . . . 2
[5]    MINIMUM RENT . . . . . . . . . . 3
[6]    PERCENTAGE RENT . . . . . . . . . . 3
[7]    TAX ESCALATIONS . . . . . . . . . . 6
[8]    TENANT'S OPTIONS TO EXTEND . . . . . . . 8
[9]    UTILITIES AND SERVICES . . . . . . . . 9
[10]   AFFIRMATIVE AGREEMENTS OF TENANT . . . . . 10
[11]   NEGATIVE AGREEMENTS OF TENANT . . . . . . 14
[12]   AFFIRMATIVE AND NEGATIVE AGREEMENTS OF LANDLORD . . 15
[13]   SIGNS AND DISPLAYS . . . . . . . . 18
[14]   RUBBISH, ETC . . . . . . . . . 18
[15]   ASSIGNMENT AND SUBLETTING . . . . . . 19
[16]   INDEMNIFICATION, WAIVER OF SUBROGATION . . . . 24
[17]   ALTERATIONS AND IMPROVEMENTS . . . . . . 25
[18]   LIENS . . . . . . . . . . . 29
[19]   DAMAGE . . . . . . . . . . . 29
[20]   TAKING . . . . . . . . . . . 30
[21]   TENANT'S DEFAULTS . . . . . . . . 32
[22]   REMEDIES AND DAMAGES FOR TENANT'S DEFAULTS . . . 33
[23]   LANDLORD'S DEFAULTS AND TENANT'S REMEDIES, LOSS OF
       LEASEHOLD . . . . . . . . . 36
[24]   OWNERSHIP, ENCUMBRANCES AND COMPLIANCE WITH LAWS 36
[25]   SUBORDINATION OF LEASE, ATTORNMENT . . . . 37
[26]   ESTOPPEL CERTIFICATES . . . . . . . 37
[27]   SHORING . . . . . . . . . . 37
[28]   NON-WAIVER OF DEFAULT; DARKENING OF WINDOWS . . 37
[29]   AGENT . . . . . . . . . . . 38
[30]   JURY WAIVER . . . . . . . . . 38
[31]   ENTIRE AGREEMENT, AMENDMENTS IN WRITING . . . 38
[32]   PARTIES BOUND . . . . . . . . . 38
[33]   RECORDATION OF MEMORANDUM OF LEASE . . . . 38
[34]   NOTICES . . . . . . . . . . 38
[35]   PARTIAL INVALIDITY . . . . . . . . 39
[36]   HEADINGS; GENERAL INTERPRETIVE PRINCIPLES . . . 40
[37]   MISCELLANEOUS . . . . . . . . . 40
[38]   FORCE MAJEURE . . . . . . . . . 40
[39]   DEFAULT RATE . . . . . . . . . 41
[40]   ATTORNEY'S FEES . . . . . . . . 41
[41]   QUIET ENJOYMENT . . . . . . . . 41

PHBF/ 739688 8

**TABLE OF CONTENTS**
**(continued)**

| Section | | Page |
|---|---|---|
| [42] | RENT CONTROL | 41 |
| [43] | LANDLORD'S CONSENT. | 41 |
| [44] | LIMITATION ON LANDLORD'S LIABILITY | 42 |
| [45] | HOLDING OVER | 43 |
| [46] | GOVERNING LAW | 43 |
| [47] | COUNTERPARTS; FACSIMILES | 43 |
| [48] | LEASE SUBMISSION | 43 |
| [49] | FUTURE CONDOMINIUM CONVERSION | 44 |
| [50] | RIGHT OF ENTRY | 44 |
| [51] | TENANT'S RIGHT TO "GO DARK", LANDLORD'S RECAPTURE RIGHT | 44 |

**LIST OF EXHIBITS AND SCHEDULES**

Exhibit A -   Land
Exhibit B -   Leased Space
Exhibit C -   Landlord's Work
Exhibit D -   Acoustical Specifications
Exhibit E -   Approved Tenant Signage
Exhibit F-   Prohibited Uses
Exhibit G-   Non-Disturbance Agreement
Exhibit H-   Initial Form of Gross Sales Statement
Exhibit I-   Conceptual Storefront Elevation
Exhibit J-   Utilities
Schedule 1 -   Rules and Regulations

PHBF/ 739688 8

## SCHEDULE OF TERMS

Whenever any term below is mentioned in this Lease, the definition and/or information next to the corresponding term shall be incorporated in its meaning:

A.    **LANDLORD:**    GREEN 521 FIFTH AVENUE, LLC, a New York limited liability company

B.    **LANDLORD'S ADDRESS:**    420 Lexington Avenue
New York, NY  10170
Attn  Director of Leasing

C.    **TENANT:**    URBAN OUTFITTERS, INC , a Pennsylvania corporation

D.    **TENANT'S ADDRESS:**    5000 South Broad Street
Philadelphia, PA  19112
Attn  President

E.    **LAND:** The tract of land located at 521 Fifth Avenue, New York, New York, as more fully described on *Exhibit A* attached hereto and made a part hereof

F.    *LEASED SPACE:* Those certain premises located on and comprising a rentable portion of the ground level and second level, which the parties agree shall be deemed to contain twenty-five thousand eight hundred sixty-six (25,866) square feet of space in the Building, as shown on the plan attached hereto as **Exhibit B** and made a part hereof; with nine thousand nine hundred fifty-five (9,955) square feet thereof on the ground level and fifteen thousand nine hundred eleven (15,911) square feet thereof on the second level

G    **BUILDING:** The thirty-nine (39) story mixed-use office and retail building erected on the Land

H    **PROPERTY:** The Land, together with the Building (and all other buildings and improvements on the Land) and all Common Areas and Facilities

I.    **COMMON AREAS AND FACILITIES:** All common areas and facilities located within, serving or pertaining to the Property, but only to the extent any of the same serve the Leased Space including sidewalks, the entrances and exits, now existing and from time to time hereafter furnished by Landlord in, on or upon the Property for the common or joint use and benefit of multiple occupants in the Property.

J    **INITIAL LEASE TERM:** Fifteen (15) Lease Years.

K    **COMMENCEMENT DATE:** The date as determined in accordance with the provisions of <u>Section [3]</u> hereof

- I -

L      **RENT COMMENCEMENT DATE:** The date which is seven (7) months after the
       Commencement Date; subject, however, to the application of any Rent credits provided
       by the provisions of Section [3](g) hereof

M      **EXPIRATION DATE:** 11:59 p m (New York, New York time) on the day
       immediately preceding the date which is fifteen (15) Lease Years after the Rent
       Commencement Date; subject, however, to Tenant's Options to Extend

N      **ANNUAL MINIMUM RENTAL RATE:**

| Lease Year | Annual Minimum Rental Rate | Monthly Installments |
|---|---|---|
| Initial Lease Term | | |
| 1-3 | $ 3,600,000 | $ 300,000 00 |
| 4-6 | 3,888,000 | 324,000 00 |
| 7-9 | 4,199,040 | 349,920 00 |
| 10-12 | 4,534,963 | 377,913 58 |
| 13-15 | 4,897,760 | 408,146 67 |
| First Extension Term | | |
| 16-20 | The "Market Rental Rate" as determined pursuant to the provisions of Section [8] hereof | One-twelfth (1/12) of the annual Market Rental Rate |
| Second Extension Term | | |
| 21-25 | The Market Rental Rate as determined pursuant to the provisions of Section [8] hereof | One-twelfth (1/12) of the annual Market Rental Rate |

O.     **ADDITIONAL RENT:** All costs and charges other than Minimum Rent and Percentage
       Rent payable by Tenant to Landlord pursuant to the provisions of this Lease

P      **PERCENTAGE RENT:** See Section [6] hereof

Q      **BASE TAX YEAR:** July 1, 2010 through and including June 30, 2011.

R      **DEFAULT RATE:** One and one-half percent (1 5%) per month, but in no event higher
       than the maximum rate permitted by law

S.     **PERMITTED USES:** Subject to Section [15] hereof, **Exhibit F** hereto and as may
       otherwise be provided in this Lease, any general retail use, including the display and sale
       of apparel, shoes and accessories, gifts, cards, furniture, home furnishings, housewares,
       pre-packaged food and food stuffs for off-premises consumption (in accordance with the
       Operating Standard, as defined below), plants, fresh and dried flowers, pots, containers

- II -

and stands for plants or flowers, and/or (for so long as Tenant is operating an "Urban Outfitters" store at the Leased Space) items related to the foregoing to the extent consistent with an "Urban Outfitters" (or any successor trade name for a retail operation meeting the Operating Standard (defined below)) store (the "UO Use"), together with ancillary office and storage use  Tenant's UO Use at the Leased Space shall in all respects be equal to or better than the standards of operation at Tenant's other Manhattan stores located at 999 Third Avenue and 2081 Broadway (the "Operating Standard"). Notwithstanding the foregoing (but in all events subject to Section [15], Exhibit F and as may otherwise be provided in this Lease), any change in use from the UO Use shall require Landlord's reasonable consent unless such change (i) involves the creation of an "Anthropologie" store (or any successor trade name thereof for a retail operation meeting the AI Standard (hereinafter defined)) (an "AI Use") in the Leased Space by Tenant or an Affiliate of Tenant or (ii) as assignment or subletting to a national or regional retailer of a quality and image at least equivalent to that of Tenant's Urban Outfitters national chain of stores.

T      **OPTIONS TO EXTEND:** Two (2) options of five (5) years each, exercisable in accordance with the provisions of Section [8] hereof

U      **TENANT'S SHARE:** Six and thirty-three hundredths percent (6 33%)

V      **LAWS:** All federal, state, county and local governmental or quasi-governmental laws, statutes, codes, ordinances, rules, decrees, orders, standards, requirements and regulations, including those of the Board of Fire Underwriters (or similar body) or any utility company or authority, public, quasi-public or private, both foreseen and unforeseen, either now in force or hereafter adopted or enacted

W      **LANDLORD'S WORK:** The construction, alterations and improvements set forth on **Exhibit C** attached hereto and made a part hereof (the completion of which is hereinafter acknowledged by Tenant)

X      **TENANT'S WORK:** The alterations and improvements to be performed by Tenant in accordance with the provisions of Section [17] hereof to prepare the Leased Space for Tenant's initial use and occupancy.

Y.     **AFFILIATE:** Any entity (i) into or with which an entity may be merged or consolidated, (ii) which is controlled by, controls, or is under common control of or with an entity, or (iii) which acquires or controls the majority of the assets of an entity. For purposes of this definition, the terms "controlled by," "controls" or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of any entity, whether through ownership, legally or beneficially, of voting securities, by contract or otherwise

[No Further Text on This Page]

- III -

## LEASE

This "LEASE" made this 30th day of June, 2010 by and between **GREEN 521 FIFTH AVENUE, LLC**, a New York limited liability company (the "Landlord"), and **URBAN OUTFITTERS, INC.**, a Pennsylvania corporation (the "Tenant")

## W I T N E S S E T H:

The parties hereto, intending to be legally bound, hereby covenant and agree as follows

[1]    **LEASED SPACE.** Landlord hereby demises and lets to Tenant, and Tenant hires and leases from Landlord, upon the terms, covenants, conditions and provisions set forth herein and in the Schedule of Terms attached hereto and made a part hereof, the Leased Space

[2]    **COMMON AREAS AND FACILITIES.** To the extent reasonably necessary to operate its business within the Leased Space, the Common Areas and Facilities shall be made reasonably available to Tenant, and its employees, agents and contractors  Furthermore, Landlord shall make available to Tenant at least one freight elevator serving the Leased Space (on a first-come, first-served basis), provided, however, that any use of the freight elevator outside the standard Building hours shall be subject to the then-standard charge for the use thereof

[3]    **TERM; COMMENCEMENT DATE; EFFECTIVENESS; PRIOR POSSESSION.**

(a)    The Initial Lease Term shall be for the period set forth in the Schedule of Terms, commencing on the Rent Commencement Date and ending on the Expiration Date, subject, however, to extension pursuant to Tenant's Options to Extend and to sooner termination pursuant to the provisions hereof

(b)    Landlord has heretofore, at Landlord's sole cost and expense, completed Landlord's Work, in a good and workmanlike manner in accordance with all Laws applicable to the Landlord's Work, and Tenant hereby acknowledges the same (including, without limitation, its receipt of an ACP 5 required in connection therewith) and agrees to accept delivery of the Leased Space in its "as is" condition, but nothing herein is intended to relieve or reduce Landlord's repair and maintenance obligations (including, without limitation, Landlord's obligation to remove existing hazardous substances) expressly provided for in this Lease  For purposes of this Lease, the "Commencement Date" shall mean the date on which Landlord delivers possession of the Leased Space to Tenant, provided, however, under no circumstances shall the Commencement Date be earlier than August 1, 2010 unless Tenant makes written request therefor at least five (5) business days prior to such earlier date  If available, Landlord shall deliver to Tenant full as-built drawings in a reproducible format for the Leased Space to a minimum of one-eighth (1/8) inch scale, all as improved by Landlord's Work  If the Commencement Date does not occur by December 31, 2010 (subject to

- 1 -

reasonable extension for force majeure), Tenant shall have the right, but not the obligation, to terminate this Lease by notice to Landlord at any time thereafter (but prior to Landlord's delivery of possession), in which event this Lease shall be null and void and neither Landlord nor Tenant shall have any further rights, liabilities or obligations hereunder.

(c)     From and after the date of this Lease, Landlord and Tenant shall be bound by all of the terms, covenants, conditions and provisions of this Lease (other than the payment of Rent) applicable respectively to each party hereunder, notwithstanding that the Initial Lease Term shall not commence until the Rent Commencement Date as provided hereby To that end, in addition to all other rights of Tenant hereunder, Tenant, its architects, contractors, agents and other designees shall have the right of access to and egress from the Leased Space and the Common Areas and Facilities from and after the Commencement Date to prepare the Leased Space for Tenant's use and occupancy Tenant's obligation to pay all Minimum Rent and regularly recurring Additional Rent (as distinguished from the cost of services and other items of Additional Rent that Tenant may request be supplied prior to the Rent Commencement Date (e g., freight elevator service), which Tenant shall pay within thirty (30) days of reasonably substantiated demand therefor) shall not begin until the Rent Commencement Date, subject, however, to any credits provided hereunder

(d)     Upon request of either party hereto, after the Rent Commencement Date has been established, Landlord and Tenant shall execute and deliver a memorandum confirming the Commencement Date, the Rent Commencement Date, and the Expiration Date

(e)     As used herein, the term "Rent" shall be defined as Minimum Rent, Percentage Rent, and all sums payable and collectible as Additional Rent

(f)     If the Rent Commencement Date and/or the Expiration Date is other than the first day or last day of a calendar month, as the case may be, then Rent shall be prorated for each such partial month (other than Percentage Rent, as the parties acknowledge that the calculation of Percentage Rent shall have already accounted for proration of Minimum Rent during such applicable Percentage Rent Lease Year, pursuant to the formula therefor in Section [6](a) below)

(g)     If, after the Commencement Date, a violation is issued by any governmental or quasi-governmental authority which is not the result of any act or omission of Tenant and which prohibits Tenant from securing permits necessary for the performance of Tenant's Work or from opening and operating its business on the Leased Space, Landlord, promptly upon receipt of notice thereof (which shall be given to Landlord by Tenant within one (1) business day after Tenant first has knowledge thereof), shall cure such violation and the Rent Commencement Date shall be extended on a day-for-day basis until such cure is effected to the extent Tenant was actually delayed thereby

[4]     PURPOSE. The Leased Space may be used and occupied for the Permitted Uses, subject to Section [15] and other applicable provisions of this Lease, including, without limitation, Exhibit F hereof

PHBF/ 739688 8

[5]    **MINIMUM RENT.**

(a)    Commencing on the Rent Commencement Date, Tenant shall pay
Landlord the annual Minimum Rent in equal monthly installments on the first day of each
calendar month during the Initial Lease Term and any Extension Term, in advance and without
prior notice or demand, but subject to Section [5](c) below, provided, however, if the Rent
Commencement Date would fall between October 31 and the following March 1, the Rent
Commencement Date shall be postponed until the following March 1, and no Rent shall be due
or payable for, or otherwise allocated or attributable to, any period prior to March 1, unless
Tenant shall have opened and begun operating its business to the public in the Leased Space
during that period

(b)    All Rent shall be payable to Landlord at its offices set forth in the
Schedule of Terms, or to such other address as Landlord may so notify Tenant from time to
time in the manner prescribed in Section [34] hereof

(c)    A "Lease Year" referred to in the Schedule of Terms shall mean
each twelve (12) month period during the Initial Lease Term and any Extension Term
commencing on the Rent Commencement Date or an anniversary of the Rent Commencement
Date.

[6]    **PERCENTAGE RENT.**

(a)    In addition to the Minimum Rent and all other charges and sums
payable as Additional Rent hereunder, Tenant shall pay to Landlord, in the manner and in
accordance with the provisions herein set forth for each Percentage Rent Lease Year (as
hereinafter defined) during the Initial Lease Term and any Extension Term, a percentage rent
("Percentage Rent") equal to six percent (6%) of "Gross Sales from the Leased Space" (as
hereinafter defined) for such Percentage Rent Lease Year in excess of the quotient of the
Minimum Rent payable with respect to such Percentage Rent Lease Year divided by [ 06] (the
"Percentage Rent Base"). Further and notwithstanding anything to the contrary elsewhere
contained in this Lease, in the event that Tenant opens for the conduct of its business with the
public prior to the Rent Commencement Date, then, notwithstanding Section [6](b) below, such
period from such opening date until the Rent Commencement Date shall be deemed to be a part
of the first Percentage Rent Lease Year

(b)    The term "Percentage Rent Lease Year" as used herein shall
mean the twelve (12) month period beginning on February 1 and ending on January 31, and
each successive twelve (12) month period thereafter during the Initial Lease Term and any
Extension Term, provided, however, that if the Rent Commencement Date is other than a
February 1, then the first Percentage Rent Lease Year shall be the period from the Rent
Commencement Date to the next succeeding January 31, and, provided further, if the first
Percentage Rent Lease Year contains less than one hundred eighty (180) days, the Gross Sales
from the Leased Space generated for such Percentage Rent Lease Year and the prorated
Minimum Rent due and payable for such Percentage Rent Lease Year shall each be added to the
respective figures applicable to the second Percentage Rent Lease Year for purposes of

determining Percentage Rent for the combined first and second Percentage Rent Lease Years
In such instance, anything in Section [6](c) or elsewhere in this Lease to the contrary
notwithstanding, the combined Percentage Rent due for such first and second Percentage Rent
Lease Years shall be due within ninety (90) days after the expiration of the second Percentage
Rent Lease Year. If the Expiration Date is other than January 31, the last Percentage Rent
Lease Year shall be the period from the immediately preceding February 1 to the Expiration
Date, and the Percentage Rent Base for such partial Percentage Rent Lease Year shall be
adjusted accordingly

(c)    Within ninety (90) days after the expiration of each Percentage
Rent Lease Year (except as provided in Section [6](b) hereof with respect to a first Percentage
Rent Lease Year of less than one hundred eighty (180) days), Tenant shall submit to Landlord a
statement, certified as being true and correct on behalf of Tenant by its Chief Financial Officer,
showing the amount of Gross Sales from the Leased Space for such Percentage Rent Lease
Year, and Tenant will pay to Landlord any Percentage Rent due hereunder within ninety (90)
days after the expiration of the Percentage Rent Lease Year  The form of such statement
currently in use by Tenant is annexed hereto as **Exhibit H**, which is hereby approved by
Landlord, and which Tenant may change from time to time provided any replacement form
contains, substantively, the same information as is provided for in **Exhibit H**

(d)    *If Landlord is unwilling to accept the statement furnished to
Landlord by Tenant, Landlord is hereby given the right to audit the gross receipts and sales
books of Tenant pertaining to the Leased Space either by itself or by an independent certified
public accountant of its own choice (a "C.P.A ")  If the findings of such audit retained by
Landlord indicate a discrepancy in Gross Sales from the Leased Space which is less than or
equal to three percent (3%) of those furnished by Tenant and which would entitle Landlord to
receive a greater amount of Percentage Rent, then Landlord agrees to pay the compensation of
any C P.A  retained by Landlord, and Tenant shall pay Landlord the amount of Percentage Rent
so found to be due and owing within thirty (30) days after receipt of demand therefor, with
interest at the Default Rate from the date first due   Should the audit indicate a discrepancy
which indicates that Tenant's payment of Percentage Rent exceeded the amount which
otherwise was due, then Landlord agrees to pay the compensation of any C P.A , and to
reimburse Tenant, within thirty (30) days after demand therefor, in an amount equal to any
overpayment. If, however, the audit discloses a discrepancy in excess of three percent (3%)
between the audit figures and those furnished by Tenant which would entitle Landlord to
receive a greater amount of Percentage Rent, then Tenant shall pay the actual reasonable cost of
conducting such audit, and Tenant agrees that its Percentage Rent payments shall be made in
accordance with the findings of such audit, such payment to be made within thirty (30) days
after receipt of demand therefor, with interest at the Default Rate from the date first due*

(e)    Tenant shall keep at the Leased Space or at the headquarters of
Tenant sufficient *books of account, vouchers and other records, in conformity with good
accounting practices, showing Gross Sales from the Leased Space of Tenant, and Tenant shall
permit Landlord and any C P A  retained by Landlord at all reasonable times and upon
reasonable advance notice, to examine (and copy) the same for the purpose of verification of
the statements hereinabove provided for, if Landlord should elect to do so, which examination*

- 4 -

of any particular statement shall be made within four (4) years after the date such statement is delivered to Landlord.

(f)     The expression "Gross Sales from the Leased Space" used in this Lease shall mean the sum of (i) the total (exclusive of all sales taxes or other taxes in the nature thereof) of all selling prices or charges (exclusive of interest or other carrying charges collected by Tenant upon time or credit card sales not to exceed two percent (2%) of Gross Sales from the Leased Space) for merchandise sold or services rendered at, in, on or from the Leased Space, whether for cash or on credit, by or for Tenant, reduced by any discounts or adjustments allowed to purchasers on such sales and by the price of returned merchandise so sold during a Percentage Rent Lease Year, and (ii) the gross sales of any permitted concessionaire, licensee or subtenant of Tenant occupying any portion or portions of the Leased Space (determined in accordance with the provisions of the preceding clause (i)), provided, however, in the case of coin-in-slot machines (including public telephones and vending machines) which Tenant may either maintain or license to be maintained on the Leased Space, such expression shall not mean the amounts collected in such machines, but only the license fees or other comparable fees which accrue to Tenant therefrom.  The Gross Sales from the Leased Space shall not include (A) the exchange of merchandise between stores of Tenant where such exchanges are made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale which has theretofore been made at, in, on or from the Leased Space and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would have been made at, in, on or from the Leased Space; or (B) returns to shippers or manufacturers, or (C) mail order (whether telephonic, electronic or otherwise) sales shipped from the Leased Space or from any of Tenant's distribution centers or facilities for merchandise orders placed through e-mail, facsimile transmission, internet or other similar telephonic or electronic devices, or any other retail, wholesale or office facilities, except to the extent those sales are run through the register at the Leased Space and for which the Leased Space is credited with the sale in accordance with Tenant's standard accounting practices, consistently applied; or (D) sales of fixtures and equipment after use thereof in the conduct of Tenant's business in the Leased Space, or (E) all rent actually collected by Tenant from any concessionaire, licensee or subtenant of Tenant occupying any portion or portions of the Leased Space, or (F) donations of merchandise from the Leased Space to charitable organizations, provided such donations do not exceed one percent (1%) of Gross Sales from the Leased Space; or (G) sales at a discount to employees of Tenant, provided such sales do not exceed one percent (1%) of Gross Sales from the Leased Space; or (H) the price of any gift card sold or exchanged, except and to the extent a gift card, after (and regardless of the location of) issuance, is used to purchase merchandise at, in or from the Leased Space

(g)     Notwithstanding the fact that a portion of the rental reserved hereunder may be a percentage of Gross Sales from the Leased Space, and notwithstanding anything else to the contrary, Landlord shall not be deemed for any purpose to be or to have become a partner of Tenant or a joint venturer or a member of a joint enterprise with Tenant The provisions of this Lease relating to Percentage Rent payable hereunder are included solely for the purpose of providing a method whereby Percentage Rent is to be measured and ascertained

- 5 -

[7]    TAX ESCALATIONS.

(a)    Tenant shall pay to Landlord, as Additional Rent, tax escalation in accordance with this Section  For the purpose of this Section, the following definitions shall apply.

(i)    The phrase "Real Estate Taxes Payable During the Base Tax Year" shall mean the Real Estate Taxes payable by Landlord with respect to the Property during the Base Tax Year

(ii)    The term "Comparative Year" shall mean the twelve (12) month period beginning on July 1, 2011 and ending on June 30, 2012, and each subsequent period of twelve (12) months thereafter

(iii)    The term "Real Estate Taxes" shall mean the total of all taxes and special or other assessments levied, assessed or imposed at any time by any governmental authority upon or against the Property, including, without limitation, any tax or assessment levied, assessed or imposed at any time by any governmental authority in connection with the receipt of income or rents from said Property to the extent that same shall be in lieu of all or a portion of any of the aforesaid taxes or assessments, or additions or increases thereof, upon or against the Property, and shall include any business improvement district ("BID") assessments, dues, fees or charges  If, due to a future change in the method of taxation or in the taxing authority, or for any other reason, a franchise, income, transit, profit or other tax or governmental imposition, however designated, shall be levied against Landlord in substitution in whole or in part for the Real Estate Taxes, or in lieu of additions to or increases of said Real Estate Taxes, then such franchise, income, transit, profit or other tax or governmental imposition shall be deemed to be included within the definition of "Real Estate Taxes" for the purposes hereof

(iv)    Where more than one assessment is imposed by the City of New York for any tax year, whether denominated an "actual assessment" or a "transitional assessment" or otherwise, then the phrases herein "assessed value" and "assessments" shall mean whichever of the actual, transitional or other assessment is designated by the City of New York as the taxable assessment for that tax year

(b)    In the event that the Real Estate Taxes payable for any Comparative Year shall exceed the amount of the Real Estate Taxes Payable During the Base Tax Year, Tenant shall pay to Landlord, as Additional Rent for such Comparative Year, an amount equal to Tenant's Share of the excess  Before or after the start of each Comparative Year, Landlord shall furnish to Tenant a statement of the Real Estate Taxes payable during the Comparative Year, together with a calculation of Tenant's Share of such excess  If the Real Estate Taxes payable for such Comparative Year exceed the Real Estate Taxes Payable During the Base Tax Year, Additional Rent for such Comparative Year, in an amount equal to Tenant's Share of the excess, shall be due from Tenant to Landlord, and such Additional Rent shall be payable by Tenant to Landlord within thirty (30) days after receipt of the aforesaid statement

(c)    Should the Real Estate Taxes payable during the Base Tax Year be reduced by final determination of legal proceedings, settlement or otherwise, then, the "Real Estate Taxes Payable During the Base Tax Year" shall be correspondingly revised, the Additional Rent theretofore paid or payable hereunder for all Comparative Years shall be recomputed on the basis of such reduction, and Tenant shall pay to Landlord as Additional Rent, within ten (10) days after being billed therefor, any deficiency between the amount of such Additional Rent as theretofore computed and the amount thereof due as the result of such recomputations

(d)    If, after Tenant shall have made a payment of Additional Rent under Section [7](b), Landlord shall receive a refund of any portion of the Real Estate Taxes payable for any Comparative Year on which such payment of Additional Rent shall have been based, as a result of a reduction of such Real Estate Taxes by final determination of legal proceedings, settlement or otherwise, Landlord shall within ten (10) days after receiving the refund pay to Tenant Tenant's Share of the refund less Tenant's Share of reasonable expenses (including attorneys' and appraisers' fees) incurred by Landlord in connection with any such application or proceeding  In addition to the foregoing, Tenant shall pay to Landlord, as Additional Rent, within ten (10) days after Landlord shall have delivered to Tenant a statement therefor, Tenant's Share of all reasonable expenses incurred by Landlord in reviewing or contesting the validity or amount of any Real Estate Taxes, or for the purpose of obtaining reductions in the assessed valuation of the Property prior to the billing of Real Estate Taxes, including without limitation, the fees and disbursements of attorneys, third party consultants, experts and others.

(e)    The statements of the Real Estate Taxes to be furnished by Landlord as provided above shall be certified by Landlord and shall constitute a final determination as between Landlord and Tenant of the Real Estate Taxes for the periods represented thereby, unless Tenant within six (6) months after they are furnished shall give a written notice to Landlord that it disputes their accuracy or their appropriateness, which notice shall specify the particular respects in which the statement is inaccurate or inappropriate  If Tenant shall so dispute said statement then, pending the resolution of such dispute, Tenant shall pay the Additional Rent to Landlord in accordance with the statement furnished by Landlord

(f)    In no event shall the Annual Minimum Rent under this Lease be reduced by virtue of this Section [7]

(g)    Upon the date of any expiration or termination of this Lease (except termination because of an Event of Default), whether the same be the Expiration Date hereinabove set forth or any prior or subsequent date, a proportionate share of said Additional Rent for the Comparative Year during which such expiration or termination occurs shall become due and payable by Tenant to Landlord within thirty (30) days after Tenant's receipt of an invoice therefor, if it was not theretofore already billed and paid (in which case, Landlord shall, within thirty (30) days, refund any excess sums previously paid by Tenant with respect thereto)  The said proportionate share shall be based upon the length of time that this Lease shall have been in existence during such Comparative Year  Landlord shall promptly cause statements of said Additional Rent for that Comparative Year to be prepared and furnished to

- 7 -

Tenant  Landlord and Tenant shall thereupon make appropriate adjustments of amounts then owing

(h)     Landlord's and Tenant's obligations to make the adjustments referred to in Section [7](g) above shall survive any expiration or termination of this Lease Any delay or failure of Landlord in billing any tax escalation hereinabove provided shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay such tax escalation hereunder

## [8]    TENANT'S OPTIONS TO EXTEND.

(a)     Tenant shall have the options to extend the Initial Lease Term for two (2) additional periods (each an "Extension Term," and collectively, the "Extension Terms") of five (5) years each, commencing on the first day following the Expiration Date of the Initial Lease Term or of the Extension Term then in effect, as the case may be  Tenant's exercise of any Extension Term shall be by notice to Landlord at least fourteen (14) months prior to the last day of either the Initial Lease Term or the Extension Term then in effect, as the case may be The Initial Lease Term, as extended by the Extension Terms as exercised by Tenant pursuant to this section, shall collectively be referred to as the "Term."

(b)     The Extension Terms shall be upon the same terms, covenants, conditions and provisions as are in effect as of the Expiration Date of the Initial Lease Term, except that the annual Minimum Rental Rate in effect during each Extension Term shall be the Market Rental Rate (as defined below) for the Leased Space  The "Market Rental Rate" shall mean the rental rate then in effect for similar retail space in comparable buildings located in Midtown Manhattan/Fifth Avenue corridor in the vicinity of the Building, as such Market Rental Rate shall be determined by Landlord or by "appraisal" (as hereinafter provided).  In all cases, the Market Rental Rate shall be determined after taking into account all then relevant factors

(i)     Within thirty (30) days after applicable receipt of Tenant's notice of its exercise of the applicable Extension Term, Landlord shall advise Tenant of Landlord's determination of the Market Rental Rate  If Landlord and Tenant are unable to agree upon the Market Rental Rate within fourteen (14) days of Tenant's receipt of Landlord's determination, Tenant shall have the right by notice to Landlord within ten (10) days thereafter (time being of the essence) to either (1) revoke its exercise of the extension option, or (2) submit the determination of the Market Rental Rate to appraisal in the manner hereinafter set forth  In the event that Tenant fails to give any such notice within such ten (10) day period, Tenant shall be conclusively deemed to have elected to submit such determination to such appraisal.

(ii)     If the appraisal process is instituted by Tenant, Landlord and Tenant agree to cooperate in such effort so that the determination of the Market Rental Rate can be completed no later than three (3) months prior to the commencement date of such Extension Term.

(iii)     The appraisal process shall be conducted in the following manner  Within the first fourteen (14) days, Landlord and Tenant shall each provide the other

- 8 -

with the name and respective qualifications of an appraiser who meets the "Appraiser Qualifications" (as defined below), and those two appraisers, within seven (7) additional days after their appointments, shall select a third appraiser who meets the Appraiser Qualifications The parties shall share equally all of the costs of the appraisers

(iv)    Within fourteen (14) days following the selection of the appraisers, Landlord and Tenant shall each notify the other and the three appraisers, in writing, of their respective determinations of the Market Rental Rate; understanding, however, that Landlord's determination may not be higher than the last Market Rental Rate proposed to Tenant under clause (i) above and, concomitantly, Tenant's determination may not be lower than the last Market Rental Rate proposed to Landlord under clause (i) above  Within fourteen (14) days thereafter, the three (3) appraisers shall decide in writing whether Landlord's or Tenant's determination of the Market Rental Rate is more correct and shall state in detail the reasons therefor  If the three (3) appraisers do not unanimously agree, the decision of the majority shall be deemed to be the decision of the appraisers  The determination of the Market Rental Rate, which the appraisers decide to be the more correct, shall be the Market Rental Rate for purposes of this Lease  The appraisers shall be empowered to choose only between Landlord's and Tenant's determination, as submitted to the appraisers, and shall reach no other compromise or decision. As used herein, "Appraiser Qualifications" shall mean a real estate broker currently holding a valid and active real estate brokerage license pursuant to the laws of New York and with experience in commercial retail leases in Midtown Manhattan, including at least ten (10) years' experience in appraising and/or leasing retail properties in Midtown Manhattan

## [9]    UTILITIES AND SERVICES.

(a)    Tenant hereby acknowledges and agrees that Landlord has provided the lines, equipment and/or facilities to enable Tenant to obtain the utilities specifically set forth in Exhibit J hereto, all as part of Landlord's Work, as accepted by Tenant hereunder  Landlord shall provide Tenant with any applicable meter numbers, and unobstructed access to any such meters at all reasonable times to the extent any of such meters are located outside of the Leased Space  Tenant shall pay prior to delinquency all costs and charges for such utilities or services used or consumed by Tenant on the Leased Space, whether supplied by Landlord or by a private, public or quasi-public utility company or authority, provided, however, if such utilities or services are not separately metered to the Leased Space, Tenant's obligation to pay the same shall be conditioned on Tenant's receipt of reasonably substantiated invoices therefor from Landlord  In no event shall Tenant be obligated to pay Landlord for any submetered utilities or services at rates or charges in excess of the rates or charges that Landlord actually pays for such utilities or services, nor shall Tenant be responsible for any late fees, charges, penalties or interest due to Landlord's failure to timely make such payments  In the event that the supply of any such service to the Leased Space is interrupted or discontinued, or the quantity or character of such service is changed or is no longer available or suitable for Tenant's requirements for any other reason, Tenant shall not be released from any liability under this Lease and neither Landlord nor Landlord's agent shall incur any liability for any damage or loss sustained by Tenant by reason of such disruption, diminution or discontinuance of service.

PHBF/ 739688 8

(b)     Tenant shall pay the amount of Landlord's cost for all excessive water used by Tenant for any purpose other than ordinary lavatory uses, and any sewer rent or tax based thereon. Landlord may install a water meter to measure Tenant's water consumption for all purposes and Tenant agrees that, if Landlord has installed same due to Tenant's excess usage, Tenant shall pay for the installation and maintenance thereof, and, in all instances, Tenant shall pay for water consumed as shown on said meter at Landlord's cost therefor. Landlord reserves the right to discontinue water service to the Leased Space if either the quantity or character of such service is changed or is no longer available or suitable for Tenant's requirements or for any other reason without releasing Tenant from any liability under this Lease and without Landlord or Landlord's agent incurring any liability for any damage or loss sustained by Tenant by such discontinuance of service; nonetheless, unless otherwise required by Law, such discontinuance shall not take effect until Tenant has had ample time to secure substitute service, acting with due diligence.

(c)     If there shall be a "sprinkler system" in the Leased Space for any period during this Lease and such sprinkler system is damaged by any act or omission of Tenant or its agents, employees, licensees or visitors, Tenant shall restore the system to good working condition at its own expense If the New York Board of Fire Underwriters, the New York Fire Insurance Exchange, the Insurance Services Office, or any governmental authority requires the installation of, or any alteration to a sprinkler system by reason of Tenant's particular manner of occupancy or use of the Leased Space, including any alteration necessary to obtain the full allowance for a sprinkler system in the fire insurance rate of Landlord, or for any other reason, Tenant shall make such installation or alteration promptly and at its own expense

**[10]     AFFIRMATIVE AGREEMENTS OF TENANT.** Tenant agrees, throughout the Term:

(a)     To keep the interior of the Leased Space clean, well-maintained and in good order and condition in conformity with the Operating Standard (or the AI Standard, if applicable) and, except as otherwise expressly provided in this Lease, in compliance with applicable Laws. Without limiting the foregoing, Tenant shall require every person engaged to clean any windows of the Leased Space from the outside to use the equipment and safety devices which are required pursuant to New York Labor Law § 202, and any other Laws applicable thereto. Moreover, all persons engaged in performing cleaning services shall be reasonably approved by Landlord, which approval Landlord may only withhold on the basis of a prior negative experience,

(b)     To comply with all notices issued, with respect to the Leased Space, by any governmental authorities having jurisdiction thereof (provided, however, Tenant shall not be obligated to comply with any such notice to the extent compliance requires repair, maintenance, replacement, alteration or modification of any structural component of the Building, unless such compliance is required as a result of any act or omission of Tenant, its agents, contractors, servants or employees, in which case, Landlord will be responsible for such compliance, and Tenant shall reimburse Landlord its actual costs incurred with respect to such compliance), as well as with the reasonable recommendations with respect to Tenant's use and occupancy of the Leased Space made by the Board of Fire Underwriters and by insurance

- 10 -

thereof and, thereupon, Landlord shall, at its option, either perform such work and bill (as Additional Rent payable within thirty (30) days after such bill) Tenant for its actual and reasonable out-of-pocket expenses incurred in connection therewith, or provide Tenant with access and authority to perform the same. In furtherance, and not in limitation, thereof, Tenant covenants and agrees that it will repair and replace whenever necessary, at its own cost and expense, all exterior doors leading to the Leased Space, and fittings appurtenant thereto, including front door assemblies, jambs, transoms, checks and hardware,

(h)     Tenant acknowledges and agrees that air-conditioning service to the Leased Space shall be supplied through equipment operated, maintained and repaired by Tenant and that Landlord has no obligation to operate, maintain or to repair the said equipment or to supply air-conditioning service to the Leased Space, it being further acknowledged that, on the Commencement Date, the Leased Space shall be serviced by the existing air-cooled package units (forty (40) tons serving the ground level of the Leased Space and forty-five (45) tons serving the second level of the Leased Space), which Tenant accepts in satisfaction of the applicable portion of Landlord's Work   All air conditioning systems, equipment and facilities now or hereafter located in or servicing the Leased Space (the "HVAC Systems") including, without limitation, all ducts, dampers, registers, grilles and appurtenances utilized in connection therewith, shall be maintained, repaired and operated by Tenant in compliance with all present and future Laws relating thereto at Tenant's sole cost and expense   Tenant shall pay for all electricity consumed in the operation of the HVAC Systems   Tenant shall pay for all parts and supplies necessary for the proper operation of the HVAC Systems (and any restoration or replacement by Tenant of all or any part thereof shall be in quality and class at least equal to the original work or installations), provided, however, that Tenant shall not alter, modify, remove or replace the HVAC Systems, or any part thereof, without Landlord's prior written consent, such consent shall be granted or denied in accordance with Section [17].  Without limiting Tenant's foregoing obligation to maintain, repair and replace the HVAC Systems serving the Leased Space, Tenant shall enter into, and maintain throughout the Term of this Lease, a standard maintenance contract (which shall provide that the same may only be canceled or terminated on thirty (30) days' notice thereof to Landlord), annually written at normal and customary rates, for the servicing of the HVAC Systems serving the Leased Space, such contract to at least provide (but with no obligation that it extend beyond) (i) inspection, cleaning and testing at least quarterly, (ii) any servicing, maintenance, repair or replacement of filters, belts or other items covered by such a standard contract, and (iii) an annual service report at the end of each calendar year.  Upon the expiration or termination of the Term of this Lease, Tenant shall surrender to Landlord the HVAC System in working order and condition, subject to normal wear and tear (and, for the sake of clarity, the parties agree that "normal wear and tear" may result in the HVAC Systems being in working order although at or near the end of their useful life, and in such instance, Tenant shall have no responsibility to replace the HVAC Systems if Tenant has complied with its maintenance obligations during the Term).  In the event that Tenant fails to obtain the contract required herein or perform any of the maintenance or repairs or replacements required hereunder, Landlord shall have the right, but not the obligation, to procure such contract and/or perform any such work and charge the Tenant as Additional Rent hereunder the cost of same shall be paid for by Tenant within thirty (30) days of its receipt of a reasonably substantiated demand therefor;

- 12 -

(i)     To surrender possession of the Leased Space to Landlord at the Expiration Date in good order and condition and broom-clean, reasonable wear and tear and damage by fire or other casualty or "taking" (as that term is hereinafter defined) excepted, with all furniture, moveable trade fixtures and personal property removed, as well as signs removed in accordance with Section [13], and Specialty Alterations removed in accordance with Section [17] upon the Expiration Date of the Term, and repair any damage resulting therefrom;

(j)     To keep the sidewalks immediately in front of the Leased Space reasonably free of snow, ice and debris;

(k)     To cause all deliveries to be made to and from the Leased Space via the route and during the hours reasonably designated by Landlord from time to time, and in accordance with the Rules and Regulations. Without limiting the generality of the foregoing or any other provisions of this Lease, Tenant shall not permit any deliveries to be placed on the sidewalks adjacent to the Leased Space in a manner which will materially impede the flow of pedestrian traffic and/or deliveries into or out of the Building;

(l)     To, and to cause its contractors, employees, agents, visitors, guests and licensees to, faithfully observe and comply with the "Rules and Regulations" set forth in **Schedule 1** annexed hereto and hereby made a part hereof, and such additional reasonable Rules and Regulations as Landlord hereafter at any time or from time to time may make and may communicate in writing to Tenant, which, in the judgment of Landlord, shall be necessary or desirable for the reputation, safety, care or appearance of the Building, or the preservation of good order therein, or the operation or maintenance of the Building, or the equipment thereof, or the comfort of tenants or others in the Building; provided, however, that (i) no new Rules or Regulations shall materially increase Tenant's obligations or materially decrease Tenant's rights under this Lease, and (ii) in the case of any conflict between the provisions of this Lease and any such Rules and Regulations, the provisions of this Lease shall control;

(m)     Tenant at its expense shall comply with all requirements of the New York Board of Fire Underwriters, or any other similar body affecting the Leased Space, and shall not use the Leased Space in a manner which shall increase the rate of fire insurance of Landlord or of any other tenant, over that in effect prior to this Lease; it being hereby acknowledged that the UO Use will not result in any such increase. If Tenant's use of the Leased Space increases the fire insurance rate, Tenant shall, within thirty (30) days of a reasonably substantiated demand therefor, reimburse Landlord for all such increased costs;

(n)     Tenant, at its expense, shall install and at all times maintain and repair, at its sole cost and expense, in good and working order any ventilating equipment and systems, and fire prevention and suppression systems as may be required by Law based upon Tenant's use of the Leased Space, as well as any related duct work, piping, connections and vertical risers, if any, and shall at all times keep ducts in the Leased Space free of grease so that the same shall at no time constitute a fire hazard;

- 13 -

(o)    Tenant covenants and agrees to maintain in good order, condition and repair the exterior of the Leased Space at least in conformity with the Operating Standard (or the AI Standard, if applicable), including, without limitation, the storefront and plate glass therein, windows, doors, fittings, and any signs awnings, in a manner reasonably satisfactory to the Landlord  In this regard and not in limitation thereof, the storefront windows shall be cleaned weekly (weather permitting), while the storefront metal and stonework shall at all times be maintained in a clean and good condition, and

(p)    Tenant, at its own cost and expense, shall keep the Leased Space free from vermin, rodents or anything of like objectionable nature, and shall employ only such pest, insect or exterminating contractors as are approved by Landlord, which approval Landlord agrees shall not be unreasonably withheld, conditioned or delayed  In the event of Tenant's failure to keep the Leased Space free from vermin, the Landlord after five (5) days' notice shall have the right, at the Tenant's expense, to take all necessary or proper measures to exterminate any and all vermin from the Leased Space

[11]    **NEGATIVE AGREEMENTS OF TENANT.**  Tenant agrees, throughout the Term, that Tenant shall not, without the prior consent of Landlord

(a)    Use or operate any machinery or equipment that is harmful to the Leased Space or the Building;

(b)    Place any weights in the Leased Space beyond the safe carrying capacity of the Building,

(c)    Do or allow to be done anything which may suspend or increase the cost of (unless mere occupancy by Tenant causes such an increase) the fire insurance maintained by Landlord covering the Building,

(d)    Use or occupy the Leased Space in violation of the certificate of occupancy issued for the Building,

(e)    Create or permit persons or entities under its control to create a nuisance, including, without limitation, not exceeding the permissible decibel levels provided for in **Exhibit D**,

(f)    Use or occupy the Leased Space in violation of the Operating Standard (subject to any change in use permitted under this Lease)

(g)    Use or consume electric current in the Leased Space in excess of the capacity of existing feeders or wiring installations

(h)    Use or permit to be used any space outside of the Leased Space for display, sale or any similar undertaking.  Nor shall Tenant use or permit to be used any advertising medium and/or loudspeaker and/or sound amplifier and/or radio or television broadcast which is intended to be heard from outside of the Leased Space

- 14 -

## [12]   AFFIRMATIVE AND NEGATIVE AGREEMENTS OF LANDLORD.

(a)     The Leased Space shall be, as of the Commencement Date, structurally sound with the roof and all below grade levels watertight (insofar as the same affects the Leased Space), and that possession of the Leased Space shall be delivered to Tenant in such condition on the Commencement Date  Landlord further covenants, represents, warrants and agrees that all water, sewer and electrical lines shall be provided in accordance with Exhibit J and in good condition and working order (with the water and sewer lines free of any obstructions) as of the Commencement Date and as a condition thereof  Landlord, at its sole cost and expense, shall be responsible for

(i)     the maintenance and repair (including replacements, as necessary) of.

(A)     the Common Areas and Facilities insofar as the failure to do so would materially adversely affect Tenant's operations in the Leased Space,

(B)     except as otherwise provided herein, all structural portions of the Building (whether or not within, above, below, or outside of the Leased Space), including the roof with built-up insulation, downspouts, drains, gutters, exterior walls, ceilings, floor slabs, foundation and structural supports and windows (other than the storefront of the Leased Space, which Tenant shall maintain, repair and replace), except that Landlord may elect to delay or forego such repairs an maintenance to the extent that same does not materially affect the Leased Space, or Tenant's ability to operate its business thereon,

(C)     [Intentionally Omitted],

(D)     the water, sewer and electrical lines, equipment and facilities (the "Building Systems") from each public or private utility source to the point where such utility first exclusively serves the Leased Space,

(E)     the removal of water which has infiltrated the Leased Space (other than through the doors or plate glass), but Landlord shall not be responsible for the abatement of any dangerous conditions or substances (e g , mold) which may result or has resulted from such infiltrations, and

(F)     the portions of various utility lines, systems, equipment and facilities within the Leased Space which service other tenants or occupants of any portion of the Property either exclusively or in common with Tenant, and

(ii)     the removal from the Leased Space of all hazardous substances (i e , asbestos), in a manner which complies with applicable Laws unless Tenant or a person or entity under Tenant's reasonable control is the cause thereof, in which event, Tenant shall be responsible for the removal thereof

PHBF/ 739688 8

Notwithstanding anything to the contrary contained in this Section [12], Tenant shall be responsible for the cost and expense of Landlord's performance of any of the foregoing obligations set forth in subsections (i) and (ii) to the extent needed by reason of the act or omission, negligent or intentional, of Tenant, its agents, contractors, servants, employees and persons/entities under Tenant's reasonable control

In carrying out its responsibilities as required under this Section [12], Landlord shall promptly undertake all such maintenance, repair and replacement work as soon as Landlord knows of the need therefor and thereafter shall diligently prosecute the same to completion. All such work shall be commenced and completed in accordance with applicable Laws and undertaken in a manner which endeavors not to unreasonably disrupt or interfere with the business activities of Tenant and, to the extent reasonably necessary to avoid an unreasonable disruption or interference with the business activities of Tenant (but without any requirement to incur overtime charges), all repairs shall be done during the hours that Tenant is not open for business unless and to the extent otherwise reasonably required by emergency circumstances

(b)    Except as specifically set forth in Sections [10](a) and (b) hereof, and not in limitation thereof, Landlord, at Landlord's sole cost and expense, shall comply with all Laws relating to the Building, the Common Areas and Facilities and/or the Property outside of the Leased Space, including those pertaining to seismic reinforcement, replacement and retrofitting, life and fire safety and the protection of health and the environment, and any structural portions or components of the Building within the Leased Space (unless and to the extent such compliance relates to structural portions or components installed by Tenant, or is required by reason of Tenant's Work or a Tenant Alteration), provided, however, if non-compliance does not impact Tenant, the Leased Space, or Tenant's ability to operate its business therein, Landlord may elect to delay or forego such compliance.

(c)    Landlord shall maintain (i) Special Form Coverage insurance covering the Building (including the Leased Space, but exclusive of Tenant's leasehold improvements, which Tenant must insure) to at least eighty percent (80%) of its full insurable replacement cost (or such higher percentage as required to avoid any applicable co-insurance provision in Landlord's policy), and (ii) commercial general liability insurance coverage written on an occurrence form with a combined single limit of not less than an aggregate of Ten Million Dollars ($10,000,000) per occurrence (under primary and excess coverage policies) covering all claims for bodily injury (including death), property damage and advertising injury occurring in or about the Common Areas and Facilities    Upon request therefor, Landlord shall deliver to Tenant, at Landlord's option, said policies or certificates thereof

(d)    Landlord and its authorized representatives may upon reasonable advance notice to Tenant (except in the case of an emergency, in which event no such notice shall be required)    (i) inspect the Leased Space; (ii) exhibit the Leased Space to current and prospective purchasers, lenders, insurers, governmental authorities and, within the eighteen (18) months prior to the Expiration Date of the Term to brokers and prospective tenants, and (iii) enter the Leased Space for the purpose of exercising any rights or remedies expressly granted or reserved to Landlord under this Lease or applicable Laws, or to make any repairs, maintenance, replacements, improvements or alterations or other work in or about the Leased Space

- 16 -

consistent with Landlord's responsibilities hereunder or as otherwise provided in Section [50] In connection with exercising such rights, Landlord shall conduct itself in a manner intending to minimize any disruption or interference with the operation of Tenant's business thereon or therefrom, which shall include, to the extent possible, the exercise of such rights during the hours that Tenant is not open for business (but without obligation to incur overtime charges in connection therewith) unless and to the extent otherwise reasonably required by emergency circumstances

        (e)    [Intentionally Omitted]

        (f)    Landlord shall not utilize the area adjacent to the storefront of the Leased Space, either temporarily or permanently, in a manner which in Tenant's reasonable judgment is, or could be, injurious to Tenant's image or reputation, or to the operation of Tenant's business, or to the use, occupancy and enjoyment of the Leased Space, including the installation or utilization of any signage or billboards or building "wraps" on or above the storefront of the Leased Space without the prior approval of Tenant; provided, however, any tenant of such space above the Leased Space shall have the right to install signs identifying its business within such premises. Landlord and Tenant hereby agree that this Section [12](f) is not intended to apply to scaffolding, sidewalk bridges or similar temporary structures or blockages, which shall be governed by Section [12](i) below

        (g)    Landlord shall apply uniformly all Rules and Regulations to all tenants and occupants of other premises on the Property from time to time, but shall not be liable to Tenant for the violation of such rules and regulations by any other tenant

        (h)    Landlord agrees that, for so long as Tenant is operating an Urban Outfitters store or an Anthropologie store (or such other trade name as is then utilized for a retail operation meeting the UO Use or the AI Use, as applicable) at the Leased Space, Tenant may have sound and music within the Leased Space typical of an Urban Outfitters store (or such other trade name as is then utilized for a retail operation meeting the UO Use or the AI Use, as applicable) provided that Tenant complies with the terms and conditions of **Exhibit D** hereto

        (i)    Landlord shall not erect or maintain sidewalk bridges or scaffolding on or about the exterior of the Leased Space or the Building, unless same are required to be maintained pursuant to applicable Laws or reasonably required in connection with and for the operation of the Building or any repairs, improvements or other work performed at the Building If scaffolding is so required on or about the exterior of the Leased Space or the Building, Landlord agrees to (i) erect appropriate scaffolding in a good and workmanlike manner, (ii) install thereon or affix thereto an identification sign hung upon the street-facing side of such scaffolding in only the area thereof in front of Tenant's Fifth Avenue storefront (as supplied by Tenant, but reasonably approved in advance by Landlord), (iii) fabricate and install, at Landlord's cost, a "blade" sign over the sidewalk, on the underside of the scaffold (designed by Landlord with reasonable input from Tenant as to Tenant's aesthetics therefor based on other blade signs used in connection with the UO Use or AI Use, as applicable) in reasonable proximity of Tenant's store entrance, (iv) give Tenant reasonable

- 17 -

advance notice of the erection of any sidewalk bridge or scaffold (except in an emergency) and (v) use commercially reasonable efforts to minimize the time during which such sidewalk bridge or scaffold remains in place

### [13]   SIGNS AND DISPLAYS

(a)   Subject to Tenant's compliance with all applicable provisions of the Lease and this Section, including, without limitation, Landlord's approval of the manner of installation (which Landlord shall not unreasonably withhold, condition or delay), Landlord hereby approves, as to concept, Tenant's signage depicted on **Exhibit E** ("Tenant's Initial Signs") to this Lease. Provided that the Leased Space is being used for the UO Use or an AI Use (provided that such AI Use is, in all respects, equal to or better than Anthropologie's other Manhattan stores located at 75 9th Avenue, 85 Fifth Avenue and 50 Rockefeller Center (collectively, the "AI Standard")) and subject to compliance with applicable provisions of the Lease (including, without limitation, Section [17]), Landlord shall not unreasonably withhold, condition or delay its consent to a request by Tenant to (i) modify Tenant's Initial Signs, or (ii) install signs and lighting in the interior of the Leased Space, so long as in each such circumstance such signs are in compliance with the Operating Standard (or the AI Standard, if applicable). Tenant acknowledges and agrees that it shall be deemed reasonable for Landlord to disapprove any signs which are flashing or moving  In the event that the Leased Space is not being used for the UO Use or the AI Use, any sign or any item of any kind or nature on the outside of the store windows, door or exterior of the Leased Space or which is visible from outside of the Leased Space shall be subject to Landlord's prior written approval in each instance  Tenant shall be responsible for the erection, repair and maintenance of such lighting and signs in accordance with the terms of the Lease and all such applicable Laws  Tenant agrees, at Tenant's sole cost and expense, at the Expiration Date of the Term, to remove lighting and signs, and to repair any damage to the Leased Space and/or the Building caused by the erection, maintenance or removal thereof

(b)   Provided that the Leased Space is being used for the UO Use (or the AI Use, if applicable), Landlord acknowledges that Tenant may install and maintain at all times, subject to the other provisions of this Section and this Lease, displays of merchandise within the interior of the Leased Space and/or the display windows (collectively referred to in this Section [13](b) as "displays"), which are consistent with the Operating Standard (or, with respect to the AI Use, consistent with the AI Standard) ("Approved Displays")  If the Leased Space is not being used for the UO Use or the AI Use, displays shall be subject to Landlord's approval in its discretion  In no event shall any display contain any content which (i) would have prurient appeal or otherwise be pornographic, sexually explicit or obscene, (ii) actually results in physical protest, picketing or other civil disturbance or (iii) Landlord reasonably believes is likely to result in physical protest, picketing or other civil disturbance and gives Tenant notice thereof.

### [14]   RUBBISH, ETC.

(a)   Tenant shall, at its own cost and expense, store and dispose of all of its garbage and waste matter in a manner which prevents the emanation of any odor and

- 18 -

effluent, and in compliance with all applicable Laws, and the Building Rules and Regulations Without limiting the generality of the foregoing, all refuse shall be kept in airtight containers, and removed from the Leased Space via the route reasonably designated by Landlord in heavy duty plastic bags to a location adjacent to the Building reasonably designated by Landlord, at least once a day during hours reasonably designated by Landlord In removing such garbage and waste matter from the Leased Space, Tenant shall use closed containers of such a nature that in the process of such removal no refuse or waste matter shall spill or flow from such containers Tenant shall pay the cost of such removal directly to the carting company supplying such service to Tenant.

       (b)     Landlord hereby covenants and agrees to uniformly enforce such Rules and Regulations as against the other retail tenants within the Building, but shall not be liable for a violation thereof by any such other tenant

### [15]   ASSIGNMENT AND SUBLETTING.

       (a)     Tenant covenants and agrees for Tenant and its successors, assigns and legal representatives, that neither this Lease nor the term and estate hereby granted, nor any part hereof or thereof, will be assigned, mortgaged, pledged, encumbered or otherwise transferred (whether voluntarily, involuntarily, by operation of law, or otherwise), and that neither the Leased Space, nor any part thereof, will be encumbered in any manner by reason of any act or omission on the part of Tenant, or will be used or occupied, or permitted to be used or occupied, or utilized as a concession, by anyone other than Tenant, or for any purpose other than as hereinbefore set forth, or will be sublet, without the prior written consent of Landlord in every case, which consent shall be granted or denied in accordance with this Section [15] Except with respect to a Permitted Transfer (as hereinafter defined), a transfer of a fifty percent (50%) or greater interest (whether stock, partnership interest or otherwise) of Tenant, other than through any nationally recognized stock exchange or "over the counter" market, shall be deemed to be an assignment of this Lease, whether such transfer occurs in one transaction or in any series of related transactions.

       (b)     If at any time during the Term, Tenant determines to seek to assign this Lease or to sublet all or any portion of the Leased Space, except with respect to a Permitted Transfer, Tenant shall notify Landlord in writing of such determination and shall submit to Landlord (1) the proposed assignment and assumption agreement or an executed counterpart of the term sheet relating to the proposed sublease, as the case may be (and the effective date of which assignment and assumption agreement and/or the commencement date of any sublease (as indicated on the term sheet) shall be no less than thirty (30) days and no more than ninety (90) days after the date of Tenant's notice to Landlord), (2) a statement setting forth in reasonable detail the identity of the proposed assignee or subtenant, the nature of its business and its proposed use of the Leased Space, (3) current financial information with respect to the proposed assignee or subtenant, including, without limitation, its most recent audited financial report or statement for its three (3) prior fiscal years (if same exists, and if not, the equivalent information in a form reasonably satisfactory to Landlord), and (4) such other documentation and information regarding the proposed assignee or subtenant as Landlord shall reasonably request (collectively, the "Sublease or Assignment Statement")  Such Sublease or

- 19 -

Assignment Statement shall be deemed an offer from Tenant to Landlord whereby Landlord may, at its option and without any obligation to exercise such option, (i) terminate this Lease or (i) require Tenant to assign this Lease to Landlord's designee and thereupon be released from all executory obligations under this Lease (singly and collectively referred to herein as the "termination option", "option to terminate" or similar reference); the termination option, however, shall not apply to any Permitted Transfer  Said termination option may be exercised by Landlord by notice to Tenant at any time within thirty (30) days after such Sublease or Assignment Statement has been given by Tenant to Landlord; and during such thirty (30) day period Tenant shall not assign this Lease or sublet the Leased Space to any person, provided, however, Tenant shall have the right, during such thirty (30) day period, to withdraw its Sublease or Assignment Statement, and its offer to Landlord to terminate this Lease, and Landlord's election to terminate this Lease shall thereby be nullified, and this Lease shall thereafter continue without giving any effect to the requested assignment or sublease, and Tenant shall be precluded from presenting a subsequent Sublease or Assignment Statement for a period of six (6) months thereafter; notwithstanding the foregoing, if, at the time Landlord receives Tenant's notice exercising such right of withdrawal, Landlord has entered into another lease or other contractual arrangement for the occupancy of the Leased Space or any portion thereof, Landlord shall give Tenant notice thereof and Tenant's exercise of its right of withdrawal shall thereby be rendered a nullity and of no force and effect  If Landlord exercises its option to terminate this Lease in the case where Tenant desires either to assign this Lease or sublet the Leased Space, then this Lease shall end and expire on the date that such assignment or sublet was to be effective or commence, as the case may be, as if such date were the Expiration Date, and the Minimum Rent, Percentage Rent and Additional Rent shall be paid and apportioned to such date.  If Landlord does not exercise its option to so terminate this Lease, Landlord shall have the right, exercisable within forty-five (45) days after Landlord's receipt of the Sublease or Assignment Statement, to grant or withhold its consent to any such assignment or subletting, which consent, as to any assignment or subletting proposed by the originally named tenant hereunder or a Permitted Transferee, shall not be unreasonably withheld, conditioned or delayed provided·

(i)     the proposed assignee or subtenant is a reputable party of a financial standing which, in Landlord's reasonable judgment, will allow, in the case of an assignment, such proposed assignee to meet its obligations under this Lease as they become due, the nature and character of the proposed subtenant or assignee, its business activities and intended use of the Leased Space are in keeping with the use permitted and required hereunder (or otherwise reasonably acceptable to Landlord in its sole discretion) and the then standards of the Building, and the proposed assignment or subletting does not violate any negative covenants as to use contained in any other lease made with any other tenant(s) of the Building,

(ii)    there shall be no monetary default by Tenant under any of the terms, covenants and conditions of this Lease at the time that Landlord's consent to any such assignment or subletting is requested and on the effective date of the assignment or the proposed sublease, and

(iii)   any such proposed subletting shall be for not less than the entirety of the Leased Space

- 20 -