[36]   **HEADINGS; GENERAL INTERPRETIVE PRINCIPLES.**

(a)   Any headings preceding the text of the various Sections and subsections hereof are inserted solely for convenience and reference and shall not constitute a part of this Lease, nor shall they affect its meaning, construction or effect

(b)   For purposes of this Lease, except as otherwise expressly provided or unless the context otherwise requires, (i) the terms defined in this Lease have the meanings assigned to them and include the plural as well as the singular, and the use of any gender hereunder shall be deemed to include the other genders, (ii) references herein to "Sections," "subsections," "paragraphs" and other subdivisions without reference to a document are to designated Sections, subsections, paragraphs and other subdivisions of this Lease, (iii) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to paragraphs and other subdivisions; (iv) the words "herein," "hereof," "hereunder" and other words of similar import refer to this Lease as a whole and not to any particular provision, and (v) the word "including" means "including, but not limited to "

[37]   **MISCELLANEOUS.** The delivery or acceptance of keys to Landlord or its agents shall not constitute a termination of this Lease or a surrender of the Leased Space Acceptance by Landlord of less than the Rent herein provided shall at Landlord's option be deemed on account of earliest Rent remaining unpaid, but such application shall be without prejudice to any right Tenant may have to dispute the appropriateness of the item of Rent in question No endorsement on any check, or letter accompanying Rent, shall be deemed an accord and satisfaction, and such check may be cashed without prejudice to Landlord The statement in this Lease of the nature of the business to be conducted by Tenant shall not be deemed to constitute a representation or guaranty by Landlord that such use is lawful or permissible in the Leased Space under the certificate of occupancy for the Building

[38]   **FORCE MAJEURE.** If either Landlord or Tenant shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, martial law, restrictive Laws, riots, insurrection, acts of terrorism, war or other reasons of a like nature not the fault of, or under the reasonable control of, the party delayed in performing work or doing acts required under the terms, covenants, conditions or provisions of this Lease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay, provided, however, that the foregoing provisions of this Section [38] shall not apply to (i) any reimbursement or payment obligation of Landlord hereunder, (ii) Tenant's obligation to pay Rent (except in those instances under this Lease which specifically provided for a reduction or abatement thereof, as in Sections [19] and [20] relating to fire, casualty and taking), or (iii) any other performance obligation under this Lease which specifically provides that the provisions of this Section [38] shall not apply, provided further, that as to the aforesaid payment or reimbursement obligations, the provisions of this Section [38] shall apply if delivery thereof is delayed because of any of the foregoing occurrences or events and either Landlord or Tenant, as the case may be, is able to

- 40 -

establish that payment or reimbursement was presented to the delivery service (including either the postal or courier service) on or before the due date therefor

[39]   **DEFAULT RATE.** Any payment of any sums hereunder, or sums advanced or expended to or on behalf of one of the parties hereto by the other party, whether by Landlord to Tenant, or by Tenant to Landlord, which is not made or repaid when due shall accrue interest at the Default Rate from the due date through the date of collection or set-off, as the case may be.

[40]   **ATTORNEY'S FEES.** If either Landlord or Tenant shall institute any action or proceeding against the other relating to any of the terms, covenants, conditions or provisions of this Lease, or there occurs any Event of Default by Tenant or default by Landlord, the unsuccessful party in such action or proceeding shall reimburse the successful party for reasonable attorney's fees and other costs and expenses incurred therein by the successful party, including fees, costs and expenses incurred in any appellate proceeding

[41]   **QUIET ENJOYMENT.** Upon payment by Tenant of the Rent reserved and provided to be paid by Tenant hereunder and upon the keeping, observance and performance by Tenant of all of the terms, covenants, conditions and provisions of this Lease on Tenant's part to be kept, observed and performed, Tenant shall peaceably and quietly hold and enjoy the *Leased Space for the Term without hindrance or interruption by Landlord or by any person or persons lawfully claiming or holding by, through or under Landlord*

[42]   **RENT CONTROL.** If, at the commencement of or at any time or times during the Lease Term, the Rents reserved in this Lease shall not be fully collectible by reason of any Law, Tenant shall enter into such reasonable agreements and take such other reasonable steps (without additional material expense to Tenant) as Landlord may request and as may be legally permissible to permit Landlord to collect the maximum rents that may, from time to time during the continuance of such legal rent restriction, be legally permissible (and not in excess of the amounts reserved therefor under this Lease)  Upon the termination of such legal rent restriction prior to the expiration of the Term, (a) the Rents shall become and thereafter be payable hereunder in accordance with the amounts reserved in this Lease for the periods following such termination, and (b) Tenant shall pay to Landlord, if legally permissible, an amount equal to (i) the items of Rent that would have been paid pursuant to this Lease but for such legal rent restriction, less (ii) the rents paid by Tenant to Landlord during the period or periods such legal rent restriction was in effect.

[43]   **LANDLORD'S CONSENT.** If Landlord shall refuse to give consent or approval when Landlord's consent or approval is required under this Lease, Tenant in no event shall be entitled to and shall not make any claim, and Tenant hereby waives any claim against Landlord which it may have based upon any assertion that Landlord has unreasonably withheld or unreasonably delayed any such consent hereunder, and Tenant agrees that its sole remedy shall be an action or proceeding to enforce any such provision or for specific performance, injunction or declaratory judgment. In the event of such a determination, the requested consent shall be deemed to have been granted, however, Landlord shall have no liability to Tenant for its refusal or failure to give such consent  The sole remedy for Landlord's unreasonably

- 41 -

*Building or from the appurtenant street or sewer or as the result of surface or subsurface conditions*

(c)    If the Building containing the Leased Space shall be sold, transferred or leased, or the lease thereof transferred or sold, Landlord shall be relieved of all future obligations and liabilities hereunder and the purchaser, transferee or tenant of the Building shall be deemed to have assumed and agreed to perform all such obligations and liabilities of Landlord hereunder  In the event of such sale, transfer or lease, Landlord shall also be relieved of all existing obligations and liabilities hereunder, provided that the purchaser, transferee or tenant of the Building assumes in writing such obligations and liabilities, and Tenant shall be informed of the new address for payment of Rent hereunder

[45]    **HOLDING OVER.** Should Tenant remain in possession of the Leased Space after the Expiration Date or sooner termination of the Term without the execution of a new lease, such holding over, in the absence of a written agreement to the contrary, shall be deemed, if Landlord so elects in writing, to have created and be construed to be a tenancy from month-to-month terminable on thirty (30) days' notice by either party to the other, all subject to all the other terms and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy  In the event of any such holding over by Tenant, Tenant shall pay as holdover rental for each month (or any portion of a month) that Tenant shall so hold over in the Leased Space, (a) for the first thirty (30) days of the holdover, an amount equal to one and one-half (1.5) times the sum of (i) the monthly installment of Minimum Rent payable during the last month of the Term and (ii) one-twelfth (1/12th) of Tenant's Share of Real Estate Taxes in accordance with Section [7](b) payable for the last Lease Year of the Term, and (b) thereafter, two (2) times the sum of (i) the monthly installment of Minimum Rent payable during the last month of the Term and (ii) one-twelfth (1/12th) of Tenant's Share of Real Estate Taxes in accordance with Section [7](b) payable for the last Lease Year of the Term

[46]    **GOVERNING LAW.** This Lease shall be construed, interpreted and governed by the laws of the State in which the Leased Space is situated

[47]    **COUNTERPARTS; FACSIMILES.**

(a)    This Lease may be executed in any number of counterparts, each of which shall be an original, and such counterparts together shall constitute one and the same instrument

(b)    The parties hereto agree that a facsimile (or similar electronic) transmission of an executed counterpart of this Lease shall have the same binding effect on the signatory as an executed and delivered original thereof  The parties hereto further agree, for confirmatory purposes only, to exchange copies of executed counterpart originals promptly after the aforesaid facsimile (or similar electronic) transmissions so that each party may have at least one (1) fully executed original hereof

[48]    **LEASE SUBMISSION.** Landlord and Tenant agree that this Lease is submitted to Tenant on the understanding that it shall not be considered an offer and shall not bind Landlord in any way unless and until (i) Tenant has duly executed and delivered duplicate

originals thereof.to Landlord and (ii) Landlord has executed and delivered one of said originals
to Tenant

[49]    **FUTURE CONDOMINIUM CONVERSION.** Tenant acknowledges
that the Building and the Land may be subjected to the condominium form of ownership prior to
the end of the Term of this Lease  Tenant agrees that if, at any time during the Term, the
Building and the Land shall be subjected to the condominium form of ownership, then, this
Lease and all rights of Tenant hereunder are and shall be subject and subordinate in all respects
to any condominium declaration and any other documents (collectively, the "Declaration"),
provided that such Declaration does not materially increase Tenant's obligations, or materially
decrease Tenant's rights, under this Lease, which shall be recorded in order to convert the
Building and the Land to a condominium form of ownership in accordance with the provisions of
Article 9-B of the Real Property Law of the State of New York or any successor thereto  If any
such Declaration is to be recorded, Tenant, upon request of Landlord, shall enter into an
amendment of this Lease in such respects as shall be necessary to conform to such
condominiumization, including, without limitation, appropriate adjustments to Real Estate Taxes
Payable During the Base Tax Year and Tenant's Share

[50]    **RIGHT OF ENTRY.** Tenant shall permit Landlord to erect, construct
and maintain pipes, conduits and shafts in and through the Leased Space within walls or columns
or above hung ceilings (or, if none, tight to the ceiling as provided in **Exhibit C**) or below floors,
provided no protrusions or access panels are readily visible in the sales areas of the Leased
Space), except that Tenant's right to reasonably approve the location thereof shall only apply to
the installation of pipes, conduits and shafts which affect or require the relocation of Tenant's
installations, or as provided in Exhibit C with respect to "tight to the ceiling" installations
Landlord or its agents shall have the right to enter or pass through the Leased Space at all times
to examine the same, and to make such repairs, alterations or additions as it may deem necessary
or desirable to the Leased Space or the Building, and to take all material into and upon the
Leased Space that may be required therefor  Such entry and work shall not constitute an eviction
of Tenant in whole or in part, shall not be grounds for any abatement of Rent, and shall impose
no liability on Landlord by reason of inconvenience or injury to Tenant's business  Landlord
shall have the right at any time, without the same constituting an actual or constructive eviction,
and without incurring any liability to Tenant, to change the arrangement and/or location of
entrances or passageways, windows, corridors, elevators, stairs, toilets, or other public parts of
the Building, and to change the designation or number of rooms and suites and the name or number by
which the Building is known  All entry by Landlord shall be performed in such manner as is
commercially reasonably to minimize interference with the normal conduct of Tenant's business
in the Leased Space, it being understood that, during periods of such entry, Tenant shall have the
right to have a representative of Tenant present, except in the event of an emergency when no
such representative is available, Landlord or its agents may access the Leased Space by
reasonable force or otherwise

[51]    **TENANT'S RIGHT TO "GO DARK"; LANDLORD'S
RECAPTURE RIGHT.** Tenant shall open for business as an Urban Outfitters retail store
meeting the Operating Standard in the Leased Space for at least one (1) day  Other than the
foregoing one (1) day opening covenant, Tenant shall not be obligated to operate a business of

- 44 -

any kind from the Leased Space and, at any time during the Term of this Lease, as the same may be extended, Tenant shall have the right, but not the obligation, to cease its business operations within the Leased Space, provided it keeps the storefront and the storefront windows "dressed" in such a manner so that the Leased Space appears to be an operating facility meeting the Operating Standard (which may be referred to herein as "Go Dark" or any verb-tense variation thereof), provided, however, that nothing herein shall be deemed to affect Tenant's obligation to pay full Rent during the period Tenant has Gone Dark   If Tenant fails to keep the storefront and storefront windows so "dressed" and the same continues for five (5) business days following notice thereof, Landlord, at Tenant's expense, may do so in any manner it deems fitting (except that in doing so, the same will not identify any competitor of Tenant, i e , an apparel or home furnishings retailer selling similar merchandise at similar price points as is sold in Urban Outfitters or Anthropologie stores), the cost of which shall be paid by Tenant to Landlord, as Additional Rent, within thirty (30) days of Tenant's receipt of a reasonably substantiated demand therefor   If Tenant Goes Dark from the Leased Space for a period of one hundred eighty (180) or more days ("Dark Period"), except for a Permitted Closure (defined below), Landlord shall have the right, but not the obligation, as its sole and exclusive remedy, to terminate this Lease and recapture the Leased Space at any time after, and during the continuance of, such Dark Period by delivering written notice to Tenant indicating its election to so terminate this Lease ("Termination Notice").  This Lease shall terminate sixty (60) days after Tenant's receipt of the Termination Notice; provided, however, that Tenant may nullify such termination by Landlord if, within thirty (30) days after Tenant's receipt of the Termination Notice, Tenant re-opens for business in the Leased Space.  Notwithstanding the foregoing, from the date of the Termination Notice through the effective date of termination as set forth in such notice Termination Notice, Tenant shall continue to pay full Rent   Notwithstanding anything contained herein to the contrary, Tenant shall not be required to open for business in the Leased Space (i) on nationally recognized holidays (e g , Christmas Day, Thanksgiving Day, New Year's Day, etc ), (ii) for periods of closure for conducting inventory and stock taking, (iii) for periods of closure for permitted remodeling, (iv) for periods of closure due to *force majeure* events, or (v) for other closures expressly permitted in this Lease (any of the foregoing being a "Permitted Closure")

[Signatures Follow]

PHBF/ 739688 8

IN WITNESS WHEREOF the parties hereto, intending to be legally bound, have caused this Lease to be duly executed, under seal, the day and year first above-written.

LANDLORD:

**GREEN 521 FIFTH AVENUE, LLC**, a New York limited liability company

By _____

Name: Stewart M. Dubin

Title: Executive Vice President,
Director of Leasing and Real Property

JISA MANNING
Notary Public, State of New York
No. 4836074
Qualified in Westchester County
Commission Expires December 31, 20__

TENANT:

**URBAN OUTFITTERS, INC.**, a Pennsylvania corporation

By _____

Name  Glen T. Senk

Title  Chief Executive Officer

EXHIBIT "A"

Land

ALL that certain plot, piece of parcel of land, situate, lying and being in the Borough of
Manhattan, County of New York, City and State of New York, known as and by Lot Nos 2, 3, 4,
5, 6, 7 and 8 on "Map of Property in the 19th Ward, belonging to the heirs of Isaac Burr,
deceased, surveyed by Isaac T Ludlam, C.S. with other property", together bounded and
described as follows:

BEGINNING at the northeasterly corner of Fifth Avenue and 43rd Street,

RUNNING THENCE Northerly along the easterly side of Fifth Avenue, 104 feet,

THENCE Easterly parallel with 43rd Street, 150 feet;

THENCE Southerly and parallel with Fifth Avenue, 3 feet 7 inches to the center line of the
block,

THENCE Easterly parallel with 43rd Street, 34 feet 4 inches,

THENCE Southerly parallel with Fifth Avenue, 100 feet 5 inches to the northerly side of 43rd
Street and

THENCE Westerly along 43rd Street, 184 Feet 4 inches to the point or place of BEGINNING

A-1

EXHIBIT "B"

<u>Leased Space</u>

(Attached)

PHBF/ 739688 8









521 5TH AVENUE
GROUND FLOOR

B-3

EXHIBIT "C"

Landlord's Work

I    Delivery of Leased Space

    1    The delivery of the Leased Space free and clear of any and all hazardous substances pertaining to the environment, including but not limited to asbestos and asbestos-containing materials (encapsulated or not), toxic and non-toxic molds, radon, and transformers containing or contaminated by PCBs, whether or not presently regulated under any Laws   Landlord shall provide an ACP-5 report as required by the governing jurisdiction

    2    The delivery of the Leased Space in compliance with all applicable Laws, including but not limited to those concerning handicapped accessibility   Tenant acknowledges that Landlord is only responsible for ADA compliance up to and outside of the lease line of the Leased Space in its existing condition

    3    Delivery of possession of the Leased Space to Tenant, broom swept, and free of all machinery, equipment, and fixtures   Landlord shall provide fully demised Leased Space with studs extending to the underside of the roof deck or the floor above   Any proposed or future Landlord-installed interior utility lines, conduit, flexible conduit, BX conduit, pipes, ducts, shafts and chases within the Leased Space shall be located tight to the deck above, layout and location to be approved by Tenant acting in a reasonable manner.

II   Vanilla Shell Construction Requirements

    1    Floor

        a    Landlord shall provide a substantially smooth, level at a single elevation on the upper floor, and clean concrete slab for the entire Leased Space   Tenant acknowledges the three existing level changes on the ground floor, as well as ramp condition at the existing Leased Space entrance

        b.   Landlord shall be responsible for assuring that the floor, on all levels, is designed to meet the governing building code load requirements of Tenant for (i) retail use, and (ii) full height stock room/storage use

    2    Elevator

        a    Landlord shall provide the existing passenger elevator assembly, in good working order and free of any material defect, with all necessary and current certification and inspection certificates

C-1

PHBF/ 739688 8

3    Cut-outs

    a    Tenant shall be responsible for the infill of the existing stair cutout and removal of the existing staircase. Tenant shall also be responsible for the installation of Tenant's grand staircase, to Tenant's design and specifications, and which shall not constitute an egress staircase.

4    Walls

    a.    Interior Demising Walls - the delivery of the Leased Space fully demised with all demising walls   All walls throughout Leased Space sheathed on Tenant-side, and repaired to good condition with like materials, extending to the underside of the roof deck on the floor above, unless otherwise directed by Tenant in writing

    b.    All demising walls (interior and exterior) shall substantially be true and plumb.

5.    Watertightness

    a.    All levels, if more than one, including those at grade and below grade, are to be watertight. All penetrations through the upper floor ceiling deck to be watertight with no insulation (foam or otherwise) visible within the Tenant's Leased Space

6    Utilities

    a.    Provide to the Leased Space and install, or cause to be installed, separate sub-meters or for utilities and services to be used or consumed on the Leased Space by Tenant, including, but not limited to, electric and water

7    Electrical

    a    Landlord shall provide existing conduit for Tenant's electrical service (1600A 3PH 120/208V), with existing feeder wires pulled from a meter room identified on the site plan to the existing panels within the Leased Space, with meter socket identified by a meter socket number and capacity per Tenant's electrical service, and unrestricted access provided to Tenant upon request

8.    Telephone / Data

    a    Landlord shall provide the existing conduit from Telephone Company switching equipment location to the Leased Space for Tenant's use

C-2

9      Heating, Ventilation and Air-Conditioning (HVAC)

    a      Landlord shall provide existing HVAC units to provide Tenant with a
tonnage of 85 tons, with 35 tons serving the ground floor and 50 tons
serving the upper floor

    b      Landlord shall provide within the Building, existing access for connection
points for any necessary or code-required chases, shafts or exhausts

    c      Landlord shall provide low-pressure steam to the Leased Space, in
sufficient capacity to operate the existing perimeter radiators

10     Plumbing

    a      Sewer - Landlord shall provide the existing sanitary sewer line within the
Leased Space   Tenant shall be responsible for the tie-in to the sewer lines
Landlord represents that the sewer line is in good working order and free
of obstructions

    b      Water - Landlord shall provide the existing domestic water service within
the Leased Space with sufficient capacity for Tenant's use

    c      Vent Connection Points - Landlord shall provide within the Leased Space
connection points for sanitary vents, fresh air intakes, and rest room
exhaust fans

11     Storefront.

    a      Subject to the next paragraph, storefront façade constructed for attachment
of Tenant's storefront, including but not limited to all bulkheads, soffits,
neutral pier and intermediate Landlord column finishes   Provide
dimensions of the rough openings and façade (solid portions of the
building exterior) to Landlord design finishes, including but not limited to,
sign bands, neutral piers, parapets, etc

    b      Landlord shall provide the existing storefront and facade on the upper
floor, in good condition, free of any leaks, and free of any material defect

    c.     Second means of egress – Landlord shall supply a second means of egress
and full door assembly for each floor of the Leased Space shell condition,
in compliance with all laws and egress and accessibility requirements

12     Structure

    a      Landlord shall ensure that the existing structure, both in the Leased Space
and adjacent dependent structure, is structurally sound, and meets or

exceeds all applicable and governing structural code requirements, including as same relate to seismic reinforcement

b.  Any modifications to the existing structure, including seismic bracing, required to maintain compliance with local or governmental codes, shall be performed by Landlord at its sole cost and expense prior to Tenant taking possession of the Leased Space, unless an alternative schedule is mutually agreed-upon by Landlord and Tenant in writing

c   Tenant's only responsibility for structural improvements or reinforcement to the Leased Space shall be that which arises from Tenant's modification of the existing structural elements of the Leased Space

13   Fire Requirements and Life-Safety Systems.

a.  Scope - Any fire separation work (e g  mixed-use buildings), fire rated construction or fireproofing of any kind for the retail building shell condition shall be at Landlord's expense

b   *Fire Suppression System* - Landlord to provide the existing fire sprinkler system to the Leased Space, in accordance with New York Department of Building and Fire code requirements, inclusive of a sprinkler riser and main trunk  Tenant shall be responsible for the modification of the existing distribution grid, and upright heads to provide the required sprinkler coverage for the Leased Space

c   Modifications to Landlord's Fire Sprinkler System - If Landlord requires Tenant to use a designated sprinkler contractor, then Landlord will guarantee that said contractor's rates and fees are comparable to equivalent contractors in the area  Tenant may provide alternative bid pricing to Landlord for review against Landlord's subcontractor rates, with approval not to be unreasonably withheld

d   Landlord shall provide Tenant with the existing Class E notifier fire alarm system, which shall not be tied to the building

C-4

Exhibit "D"

Acoustical Specifications


[Attached]

D-1



# ROBERT A. HANSEN ASSOCIATES, INC
## ACOUSTICAL / AUDIO / VIDEO CONSULTANTS

Revised: June 28, 2010
Project No.: 5278

SUBJECT    Acoustical Work Letter for Tenant Lease

PROJECT.    1st and 2nd Floor Retail Tenant – Urban Outfitters
521 Fifth Avenue
New York, NY

ATTN·    Nancy Merriman – SL Green

FROM    Robert Lee

I    Acoustical Design Criteria

The Tenant agrees to achieve the following acoustical design criteria established
for airborne noise levels attributable to the operation of the music sound system

A    Airborne Intrusive Noise

1.    The Tenant agrees to limit noise transmission in Tenant's space to
limits as listed in Table A.  The Tenant agrees that operation of
music sound system shall not exceed the following decibel levels
within their space   Note that the decibel levels indicated below are
C-weighted and represent the average sound levels produced by
the speakers as measured 1 meter away from them·

Table A
Permissible Sound Pressure Levels – Own Space

| Octave Bands Center Frequency (Hz) | Maximum Peak SPL in dB |
|---|---|
| 31 5 | 74 |
| 63 | 77 |
| 125 | 80 |
| 250 | 77 |
| 500 | 74 |
| 1000 | 71 |
| 2000 | 68 |
| 4000 | 65 |
| 8000 | 62 |

2    The Tenant also agrees to limit noise transmission into other tenant spaces to limits as listed in Table B.  The Tenant agrees that *operation of music sound system shall not exceed the following decibel levels within other tenant spaces, exclusive of competing noises and sounds:*

Table B<br>Permissible Sound Pressure Levels – Other's Space

| Octave Bands Center Frequency (Hz) | Maximum Peak SPL in dB |
|:---:|:---:|
| 31 5 | 54 |
| 63 | 54 |
| 125 | 44 |
| 250 | 37 |
| 500 | 31 |
| 1000 | 27 |
| 2000 | 24 |
| 4000 | 22 |
| 8000 | 21 |

B.    <u>Acoustical Control Measures - Music Sound System</u>

The Tenant agrees to implement the following noise control measures

1.    Loudspeakers are not permitted to be mounted on the ceiling nor suspended from the ceiling structure   Loudspeakers shall be either floor mounted or wall mounted.  If wall mounted, vibration isolation resilient mounting hardware shall be installed to isolate structureborne sound energy transmission by a minimum of 95 percent isolation efficiency.  In addition separate bass, or subwoofer, loudspeakers are not permitted to be wall mounted These are permitted to be floor mounted.  Wall mounted speakers shall be frequency band limited to 125 Hz and above

2.    The frequency response of the music sound system shall be calibrated and tuned to eliminate undesirable acoustical peaks and balanced for a uniform frequency response, particularly in the bass frequency region of 250 Hz and lower.  A One-third Octave Band Graphic Equalizer shall be installed and professionally equalized using a calibrated pink noise source and spectrum analyzer/sound level meter.  The equalizer shall also have adjustable high pass filtering capability to permit further attenuation of low frequency energy below 100 Hz.



ROBERT A  HANSEN ASSOCIATES, INC
ACOUSTICAL / AUDIO / VIDEO CONSULTANTS
124 EAST 40th STREET  NEW YORK  NY 10016

3. To ensure continual acoustical isolation, the Tenant must install an automatic audio device to monitor and control the transmission of music sound levels. This shall be accomplished by installing a Compressor/Limiter device at the input of the Audio Power Amplifier and adjusting the sound system source input volume controls to regulate the overall loudness levels  To prevent tampering by unauthorized persons, the controls for the Compressor/Limiter and the Audio Power Amplifier shall be covered with locked security panels

3 of 3

ROBERT A. HANSEN ASSOCIATES, INC
ACOUSTICAL / AUDIO / VIDEO CONSULTANTS
124 EAST 40th STREET NEW YORK NY 10016

Exhibit "E"

[Approved Tenant Signage]


(Attached)





EXHIBIT "F"

<u>Prohibited Uses</u>

"<u>Prohibited Uses</u>" shall mean any one or more of the following uses.

(a)     food or beverage sales (except as expressly permitted as part of the Permitted Use);

(b)     a bowling alley;

(c)     a billiard or bingo parlor,

(d)     a flea market,

(e)     a massage parlor,

(f)     a funeral home,

(g)     a facility for the sale of paraphernalia for use with illicit drugs,

(h)     a facility for the sale or display of pornographic material,

(i)     an off-track betting parlor,

(j)     a carnival, amusement park or circus,

(k)     a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (k)),

(l)     *a facility for the sale of new or used motor vehicles, trailers or mobile homes,*

(m)     a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with a Class-A office building have a retail component in the Midtown Manhattan submarket, the parties hereby agreeing that the UO Use is not inconsistent with such a Class-A office building;

(n)     a skating rink,

(o)     an arcade, pinball or computer game room (<u>provided</u>, <u>however</u>, the inclusion of one or more video game machines as a novelty as a part of the operation of the UO Use shall not be prohibited),

(p)     service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments);

(q)     a banquet hall, auditorium or other place of public assembly,

(r)     a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers),

(s)     a theater of any kind,

(t)     a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods,

(u)     a gymnasium, sport or health club or spa,

(v)     hotel or residential facility, or

(w)     a drug store or variety store with a prescription drug department or facility

F-1

PHBF/ 739688 8