# LEASE

### by and between

### GREEN 521 FIFTH AVENUE, LLC, LANDLORD

#### and

### URBAN OUTFITTERS, INC., TENANT

LEASED SPACE:   **Portion of Ground and Second Levels**
**521 Fifth Avenue**
**New York, New York 10175**

PHBF/ 739688 8

## TABLE OF CONTENTS

**Section**                                                                            **Page**

SCHEDULE OF TERMS ........................................................ 1
[1]     LEASED SPACE ...................................................... 1
[2]     COMMON AREAS AND FACILITIES .................................. 1
[3]     TERM; COMMENCEMENT DATE; EFFECTIVENESS, PRIOR POSSESSION. 1
[4]     PURPOSE ........................................................... 2
[5]     MINIMUM RENT ...................................................... 3
[6]     PERCENTAGE RENT ................................................... 3
[7]     TAX ESCALATIONS ................................................... 6
[8]     TENANT'S OPTIONS TO EXTEND ....................................... 8
[9]     UTILITIES AND SERVICES ............................................ 9
[10]    AFFIRMATIVE AGREEMENTS OF TENANT ................................ 10
[11]    NEGATIVE AGREEMENTS OF TENANT ................................... 14
[12]    AFFIRMATIVE AND NEGATIVE AGREEMENTS OF LANDLORD ............... 15
[13]    SIGNS AND DISPLAYS ............................................... 18
[14]    RUBBISH, ETC ..................................................... 18
[15]    ASSIGNMENT AND SUBLETTING ....................................... 19
[16]    INDEMNIFICATION, WAIVER OF SUBROGATION .......................... 24
[17]    ALTERATIONS AND IMPROVEMENTS .................................... 25
[18]    LIENS ............................................................ 29
[19]    DAMAGE ........................................................... 29
[20]    TAKING ........................................................... 30
[21]    TENANT'S DEFAULTS ................................................ 32
[22]    REMEDIES AND DAMAGES FOR TENANT'S DEFAULTS ..................... 33
[23]    LANDLORD'S DEFAULTS AND TENANT'S REMEDIES, LOSS OF
        LEASEHOLD ........................................................ 36
[24]    OWNERSHIP, ENCUMBRANCES AND COMPLIANCE WITH LAWS ............... 36
[25]    SUBORDINATION OF LEASE, ATTORNMENT .............................. 37
[26]    ESTOPPEL CERTIFICATES ............................................ 37
[27]    SHORING .......................................................... 37
[28]    NON-WAIVER OF DEFAULT; DARKENING OF WINDOWS ................... 37
[29]    AGENT ............................................................ 38
[30]    JURY WAIVER ...................................................... 38
[31]    ENTIRE AGREEMENT, AMENDMENTS IN WRITING ........................ 38
[32]    PARTIES BOUND .................................................... 38
[33]    RECORDATION OF MEMORANDUM OF LEASE ............................. 38
[34]    NOTICES .......................................................... 38
[35]    PARTIAL INVALIDITY ............................................... 39
[36]    HEADINGS; GENERAL INTERPRETIVE PRINCIPLES ...................... 40
[37]    MISCELLANEOUS .................................................... 40
[38]    FORCE MAJEURE .................................................... 40
[39]    DEFAULT RATE ..................................................... 41
[40]    ATTORNEY'S FEES .................................................. 41
[41]    QUIET ENJOYMENT .................................................. 41

- i -

PHBF/ 739688 8

# TABLE OF CONTENTS
## (continued)

| Section | | Page |
|---|---|---|
| [42] | RENT CONTROL | 41 |
| [43] | LANDLORD'S CONSENT. | 41 |
| [44] | LIMITATION ON LANDLORD'S LIABILITY.. | 42 |
| [45] | HOLDING OVER | 43 |
| [46] | GOVERNING LAW | 43 |
| [47] | COUNTERPARTS; FACSIMILES | 43 |
| [48] | LEASE SUBMISSION | 43 |
| [49] | FUTURE CONDOMINIUM CONVERSION | 44 |
| [50] | RIGHT OF ENTRY | 44 |
| [51] | TENANT'S RIGHT TO "GO DARK", LANDLORD'S RECAPTURE RIGHT | 44 |

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A -   Land
Exhibit B -   Leased Space
Exhibit C -   Landlord's Work
Exhibit D -   Acoustical Specifications
Exhibit E -   Approved Tenant Signage
Exhibit F-   Prohibited Uses
Exhibit G-   Non-Disturbance Agreement
Exhibit H-   Initial Form of Gross Sales Statement
Exhibit I-   Conceptual Storefront Elevation
Exhibit J-   Utilities
Schedule 1 -   Rules and Regulations

PHBF/ 739688 8

## SCHEDULE OF TERMS

Whenever any term below is mentioned in this Lease, the definition and/or information next to the corresponding term shall be incorporated in its meaning:

A.  **LANDLORD:**                 GREEN 521 FIFTH AVENUE, LLC, a New York limited liability company

B.  **LANDLORD'S ADDRESS:**           420 Lexington Avenue
                                      New York, NY 10170
                                      Attn Director of Leasing

C.  **TENANT:**                   URBAN OUTFITTERS, INC , a Pennsylvania corporation

D.  **TENANT'S ADDRESS:**         5000 South Broad Street
                                  Philadelphia, PA 19112
                                  Attn President

E.  **LAND:** The tract of land located at 521 Fifth Avenue, New York, New York, as more fully described on **Exhibit A** attached hereto and made a part hereof

F.  **LEASED SPACE:** Those certain premises located on and comprising a rentable portion of the ground level and second level, which the parties agree shall be deemed to contain twenty-five thousand eight hundred sixty-six (25,866) square feet of space in the Building, as shown on the plan attached hereto as **Exhibit B** and made a part hereof; with nine thousand nine hundred fifty-five (9,955) square feet thereof on the ground level and fifteen thousand nine hundred eleven (15,911) square feet thereof on the second level

G.  **BUILDING:** The thirty-nine (39) story mixed-use office and retail building erected on the Land

H.  **PROPERTY:** The Land, together with the Building (and all other buildings and improvements on the Land) and all Common Areas and Facilities

I.  **COMMON AREAS AND FACILITIES:** All common areas and facilities located within, serving or pertaining to the Property, but only to the extent any of the same serve the Leased Space including sidewalks, the entrances and exits, now existing and from time to time hereafter furnished by Landlord in, on or upon the Property for the common or joint use and benefit of multiple occupants in the Property.

J.  **INITIAL LEASE TERM:** Fifteen (15) Lease Years.

K.  **COMMENCEMENT DATE:** The date as determined in accordance with the provisions of Section [3] hereof

- 1 -

L    **RENT COMMENCEMENT DATE:** The date which is seven (7) months after the
Commencement Date; subject, however, to the application of any Rent credits provided
by the provisions of Section [3](g) hereof

M    **EXPIRATION DATE:** 11:59 p.m. (New York, New York time) on the day
immediately preceding the date which is fifteen (15) Lease Years after the Rent
Commencement Date; subject, however, to Tenant's Options to Extend

N    **ANNUAL MINIMUM RENTAL RATE:**

| Lease Year | Annual Minimum Rental Rate | Monthly Installments |
|---|---|---|
| Initial Lease Term | | |
| 1-3 | $ 3,600,000 | $ 300,000 00 |
| 4-6 | 3,888,000 | 324,000 00 |
| 7-9 | 4,199,040 | 349,920 00 |
| 10-12 | 4,534,963 | 377,913 58 |
| 13-15 | 4,897,760 | 408,146 67 |
| First Extension Term | | |
| 16-20 | The "Market Rental Rate" as determined pursuant to the provisions of Section [8] hereof | One-twelfth (1/12) of the annual Market Rental Rate |
| Second Extension Term | | |
| 21-25 | The Market Rental Rate as determined pursuant to the provisions of Section [8] hereof | One-twelfth (1/12) of the annual Market Rental Rate |

O.    **ADDITIONAL RENT:** All costs and charges other than Minimum Rent and Percentage
Rent payable by Tenant to Landlord pursuant to the provisions of this Lease

P    **PERCENTAGE RENT:** See Section [6] hereof

Q    **BASE TAX YEAR:** July 1, 2010 through and including June 30, 2011.

R    **DEFAULT RATE:** One and one-half percent (1 5%) per month, but in no event higher
than the maximum rate permitted by law

S.    **PERMITTED USES:** Subject to Section [15] hereof, **Exhibit F** hereto and as may
otherwise be provided in this Lease, any general retail use, including the display and sale
of apparel, shoes and accessories, gifts, cards, furniture, home furnishings, housewares,
pre-packaged food and food stuffs for off-premises consumption (in accordance with the
*Operating Standard, as defined below), plants, fresh and dried flowers, pots, containers*

- II -

and stands for plants or flowers, and/or (for so long as Tenant is operating an "Urban Outfitters" store at the Leased Space) items related to the foregoing to the extent consistent with an "Urban Outfitters" (or any successor trade name for a retail operation meeting the Operating Standard (defined below)) store (the "UO Use"), together with ancillary office and storage use   Tenant's UO Use at the Leased Space shall in all respects be equal to or better than the standards of operation at Tenant's other Manhattan stores located at 999 Third Avenue and 2081 Broadway (the "Operating Standard"). Notwithstanding the foregoing (but in all events subject to Section [15], Exhibit F and as may otherwise be provided in this Lease), any change in use from the UO Use shall require Landlord's reasonable consent unless such change (i) involves the creation of an "Anthropologie" store (or any successor trade name thereof for a retail operation meeting the AI Standard (hereinafter defined)) (an "AI Use") in the Leased Space by Tenant or an Affiliate of Tenant or (ii) as assignment or subletting to a national or regional retailer of a quality and image at least equivalent to that of  Tenant's Urban Outfitters national chain of stores.

T    **OPTIONS TO EXTEND:** Two (2) options of five (5) years each, exercisable in accordance with the provisions of Section [8] hereof

U    **TENANT'S SHARE:** Six and thirty-three hundredths percent (6 33%)

V    **LAWS:** All federal, state, county and local governmental or quasi-governmental laws, statutes, codes, ordinances, rules, decrees, orders, standards, requirements and regulations, including those of the Board of Fire Underwriters (or similar body) or any utility company or authority, public, quasi-public or private, both foreseen and unforeseen, either now in force or hereafter adopted or enacted

W    **LANDLORD'S WORK:** The construction, alterations and improvements set forth on **Exhibit C** attached hereto and made a part hereof (the completion of which is hereinafter acknowledged by Tenant)

X    **TENANT'S WORK:** The alterations and improvements to be performed by Tenant in accordance with the provisions of Section [17] hereof to prepare the Leased Space for Tenant's initial use and occupancy.

Y.    **AFFILIATE:** Any entity (i) into or with which an entity may be merged or consolidated, (ii) which is controlled by, controls, or is under common control of or with an entity, or (iii) which acquires or controls the majority of the assets of an entity. For purposes of this definition, the terms "controlled by," "controls" or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of any entity, whether through ownership, legally or beneficially, of voting securities, by contract or otherwise

[No Further Text on This Page]

- III -

## LEASE

This "LEASE" made this 30th day of June, 2010 by and between **GREEN 521 FIFTH AVENUE, LLC**, a New York limited liability company (the "Landlord"), and **URBAN OUTFITTERS, INC.**, a Pennsylvania corporation (the "Tenant")

## W I T N E S S E T H:

The parties hereto, intending to be legally bound, hereby covenant and agree as follows

[1]  **LEASED SPACE.** Landlord hereby demises and lets to Tenant, and Tenant hires and leases from Landlord, upon the terms, covenants, conditions and provisions set forth herein and in the Schedule of Terms attached hereto and made a part hereof, the Leased Space

[2]  **COMMON AREAS AND FACILITIES.** To the extent reasonably necessary to operate its business within the Leased Space, the Common Areas and Facilities shall be made reasonably available to Tenant, and its employees, agents and contractors  Furthermore, Landlord shall make available to Tenant at least one freight elevator serving the Leased Space (on a first-come, first-served basis), provided, however, that any use of the freight elevator outside the standard Building hours shall be subject to the then-standard charge for the use thereof

[3]  **TERM; COMMENCEMENT DATE; EFFECTIVENESS; PRIOR POSSESSION.**

(a)  The Initial Lease Term shall be for the period set forth in the Schedule of Terms, commencing on the Rent Commencement Date and ending on the Expiration Date, subject, however, to extension pursuant to Tenant's Options to Extend and to sooner termination pursuant to the provisions hereof

(b)  Landlord has heretofore, at Landlord's sole cost and expense, completed Landlord's Work, in a good and workmanlike manner in accordance with all Laws applicable to the Landlord's Work, and Tenant hereby acknowledges the same (including, without limitation, its receipt of an ACP 5 required in connection therewith) and agrees to accept delivery of the Leased Space in its "as is" condition, but nothing herein is intended to relieve or reduce Landlord's repair and maintenance obligations (including, without limitation, Landlord's obligation to remove existing hazardous substances) expressly provided for in this Lease  For purposes of this Lease, the "Commencement Date" shall mean the date on which Landlord delivers possession of the Leased Space to Tenant, provided, however, under no circumstances shall the Commencement Date be earlier than August 1, 2010 unless Tenant makes written request therefor at least five (5) business days prior to such earlier date  If available, Landlord shall deliver to Tenant full as-built drawings in a reproducible format for the Leased Space to a minimum of one-eighth (1/8) inch scale, all as improved by Landlord's Work  If the Commencement Date does not occur by December 31, 2010 (subject to

- 1 -

reasonable extension for force majeure), Tenant shall have the right, but not the obligation, to terminate this Lease by notice to Landlord at any time thereafter (but prior to Landlord's delivery of possession), in which event this Lease shall be null and void and neither Landlord nor Tenant shall have any further rights, liabilities or obligations hereunder.

(c)     From and after the date of this Lease, Landlord and Tenant shall be bound by all of the terms, covenants, conditions and provisions of this Lease (other than the payment of Rent) applicable respectively to each party hereunder, notwithstanding that the Initial Lease Term shall not commence until the Rent Commencement Date as provided hereby To that end, in addition to all other rights of Tenant hereunder, Tenant, its architects, contractors, agents and other designees shall have the right of access to and egress from the Leased Space and the Common Areas and Facilities from and after the Commencement Date to prepare the Leased Space for Tenant's use and occupancy Tenant's obligation to pay all Minimum Rent and regularly recurring Additional Rent (as distinguished from the cost of services and other items of Additional Rent that Tenant may request be supplied prior to the Rent Commencement Date (e g., freight elevator service), which Tenant shall pay within thirty (30) days of reasonably substantiated demand therefor) shall not begin until the Rent Commencement Date, subject, however, to any credits provided hereunder

(d)     Upon request of either party hereto, after the Rent Commencement Date has been established, Landlord and Tenant shall execute and deliver a memorandum confirming the Commencement Date, the Rent Commencement Date, and the Expiration Date

(e)     As used herein, the term "Rent" shall be defined as Minimum Rent, Percentage Rent, and all sums payable and collectible as Additional Rent

(f)     If the Rent Commencement Date and/or the Expiration Date is other than the first day or last day of a calendar month, as the case may be, then Rent shall be prorated for each such partial month (other than Percentage Rent, as the parties acknowledge that the calculation of Percentage Rent shall have already accounted for proration of Minimum Rent during such applicable Percentage Rent Lease Year, pursuant to the formula therefor in Section [6](a) below)

(g)     If, after the Commencement Date, a violation is issued by any governmental or quasi-governmental authority which is not the result of any act or omission of Tenant and which  prohibits Tenant from securing permits necessary for the performance of Tenant's Work or from opening and operating its business on the Leased Space, Landlord, promptly upon receipt of notice thereof (which shall be given to Landlord by Tenant within one (1) business day after Tenant first has knowledge thereof), shall cure such violation and the Rent Commencement Date shall be extended on a  day-for-day basis until such cure is effected to the extent Tenant was actually delayed thereby

[4]     **PURPOSE.** The Leased Space may be used and occupied for the Permitted Uses, subject to Section [15] and other applicable provisions of this Lease, including, without limitation, **Exhibit F** hereof

- 2 -

[5]    **MINIMUM RENT.**

(a)    Commencing on the Rent Commencement Date, Tenant shall pay Landlord the annual Minimum Rent in equal monthly installments on the first day of each calendar month during the Initial Lease Term and any Extension Term, in advance and without prior notice or demand, but subject to Section [5](c) below, provided, however, if the Rent Commencement Date would fall between October 31 and the following March 1, the Rent Commencement Date shall be postponed until the following March 1, and no Rent shall be due or payable for, or otherwise allocated or attributable to, any period prior to March 1, unless Tenant shall have opened and begun operating its business to the public in the Leased Space during that period

(b)    All Rent shall be payable to Landlord at its offices set forth in the Schedule of Terms, or to such other address as Landlord may so notify Tenant from time to time in the manner prescribed in Section [34] hereof

(c)    A "Lease Year" referred to in the Schedule of Terms shall mean each twelve (12) month period during the Initial Lease Term and any Extension Term commencing on the Rent Commencement Date or an anniversary of the Rent Commencement Date.

[6]    **PERCENTAGE RENT.**

(a)    In addition to the Minimum Rent and all other charges and sums payable as Additional Rent hereunder, Tenant shall pay to Landlord, in the manner and in accordance with the provisions herein set forth for each Percentage Rent Lease Year (as hereinafter defined) during the Initial Lease Term and any Extension Term, a percentage rent ("Percentage Rent") equal to six percent (6%) of "Gross Sales from the Leased Space" (as hereinafter defined) for such Percentage Rent Lease Year in excess of the quotient of the Minimum Rent payable with respect to such Percentage Rent Lease Year divided by [ 06] (the "Percentage Rent Base"). Further and notwithstanding anything to the contrary elsewhere contained in this Lease, in the event that Tenant opens for the conduct of its business with the public prior to the Rent Commencement Date, then, notwithstanding Section [6](b) below, such period from such opening date until the Rent Commencement Date shall be deemed to be a part of the first Percentage Rent Lease Year

(b)    The term "Percentage Rent Lease Year" as used herein shall mean the twelve (12) month period beginning on February 1 and ending on January 31, and each successive twelve (12) month period thereafter during the Initial Lease Term and any Extension Term, provided, however, that if the Rent Commencement Date is other than a February 1, then the first Percentage Rent Lease Year shall be the period from the Rent Commencement Date to the next succeeding January 31, and, provided further, if the first Percentage Rent Lease Year contains less than one hundred eighty (180) days, the Gross Sales from the Leased Space generated for such Percentage Rent Lease Year and the prorated Minimum Rent due and payable for such Percentage Rent Lease Year shall each be added to the respective figures applicable to the second Percentage Rent Lease Year for purposes of

- 3 -

determining Percentage Rent for the combined first and second Percentage Rent Lease Years
In such instance, anything in Section [6](c) or elsewhere in this Lease to the contrary
notwithstanding, the combined Percentage Rent due for such first and second Percentage Rent
Lease Years shall be due within ninety (90) days after the expiration of the second Percentage
Rent Lease Year. If the Expiration Date is other than January 31, the last Percentage Rent
Lease Year shall be the period from the immediately preceding February 1 to the Expiration
Date, and the Percentage Rent Base for such partial Percentage Rent Lease Year shall be
adjusted accordingly

(c)    Within ninety (90) days after the expiration of each Percentage
Rent Lease Year (except as provided in Section [6](b) hereof with respect to a first Percentage
Rent Lease Year of less than one hundred eighty (180) days), Tenant shall submit to Landlord a
statement, certified as being true and correct on behalf of Tenant by its Chief Financial Officer,
showing the amount of Gross Sales from the Leased Space for such Percentage Rent Lease
Year, and Tenant will pay to Landlord any Percentage Rent due hereunder within ninety (90)
days after the expiration of the Percentage Rent Lease Year    The form of such statement
currently in use by Tenant is annexed hereto as **Exhibit H**, which is hereby approved by
Landlord, and which Tenant may change from time to time provided any replacement form
contains, substantively, the same information as is provided for in **Exhibit H**

(d)    If Landlord is unwilling to accept the statement furnished to
Landlord by Tenant, Landlord is hereby given the right to audit the gross receipts and sales
books of Tenant pertaining to the Leased Space either by itself or by an independent certified
public accountant of its own choice (a "**C.P.A**") If the findings of such audit retained by
Landlord indicate a discrepancy in Gross Sales from the Leased Space which is less than or
equal to three percent (3%) of those furnished by Tenant and which would entitle Landlord to
receive a greater amount of Percentage Rent, then Landlord agrees to pay the compensation of
any C P.A retained by Landlord, and Tenant shall pay Landlord the amount of Percentage Rent
so found to be due and owing within thirty (30) days after receipt of demand therefor, with
interest at the Default Rate from the date first due    Should the audit indicate a discrepancy
which indicates that Tenant's payment of Percentage Rent exceeded the amount which
otherwise was due, then Landlord agrees to pay the compensation of any C P.A , and to
reimburse Tenant, within thirty (30) days after demand therefor, in an amount equal to any
overpayment. If, however, the audit discloses a discrepancy in excess of three percent (3%)
between the audit figures and those furnished by Tenant which would entitle Landlord to
receive a greater amount of Percentage Rent, then Tenant shall pay the actual reasonable cost of
conducting such audit, and Tenant agrees that its Percentage Rent payments shall be made in
accordance with the findings of such audit, such payment to be made within thirty (30) days
after receipt of demand therefor, with interest at the Default Rate from the date first due

(e)    Tenant shall keep at the Leased Space or at the headquarters of
Tenant sufficient books of account, vouchers and other records, in conformity with good
accounting practices, showing Gross Sales from the Leased Space of Tenant, and Tenant shall
permit Landlord and any C P A retained by Landlord at all reasonable times and upon
reasonable advance notice, to examine (and copy) the same for the purpose of verification of
the statements hereinabove provided for, if Landlord should elect to do so, which examination

- 4 -

of any particular statement shall be made within four (4) years after the date such statement is delivered to Landlord.

(f)     The expression "Gross Sales from the Leased Space" used in this Lease shall mean the sum of (i) the total (exclusive of all sales taxes or other taxes in the nature thereof) of all selling prices or charges (exclusive of interest or other carrying charges collected by Tenant upon time or credit card sales not to exceed two percent (2%) of Gross Sales from the Leased Space) for merchandise sold or services rendered at, in, or from the Leased Space, whether for cash or on credit, by or for Tenant, reduced by any discounts or adjustments allowed to purchasers on such sales and by the price of returned merchandise so sold during a Percentage Rent Lease Year, and (ii) the gross sales of any permitted concessionaire, licensee or subtenant of Tenant occupying any portion or portions of the Leased Space (determined in accordance with the provisions of the preceding clause (i)), provided, however, in the case of coin-in-slot machines (including public telephones and vending machines) which Tenant may either maintain or license to be maintained on the Leased Space, such expression shall not mean the amounts collected in such machines, but only the license fees or other comparable fees which accrue to Tenant therefrom.  The Gross Sales from the Leased Space shall not include (A) the exchange of merchandise between stores of Tenant where such exchanges are made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale which has theretofore been made at, in, on or from the Leased Space *and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would* have been made at, in, on or from the Leased Space; or (B) returns to shippers or manufacturers, or (C) mail order (whether telephonic, electronic or otherwise) sales shipped from the Leased Space or from any of Tenant's distribution centers or facilities for merchandise orders placed through e-mail, facsimile transmission, internet or other similar telephonic or electronic devices, or any other retail, wholesale or office facilities, except to the extent those sales are run through the register at the Leased Space and for which the Leased Space is credited with the sale in accordance with Tenant's standard accounting practices, consistently applied; or (D) sales of fixtures and equipment after use thereof in the conduct of Tenant's business in the Leased Space, or (E) all rent actually collected by Tenant from any concessionaire, licensee or subtenant of Tenant occupying any portion or portions of the Leased Space, or (F) donations of merchandise from the Leased Space to charitable organizations, provided such donations do not exceed one percent (1%) of Gross Sales from the Leased Space; or (G) sales at a discount to employees of Tenant, provided such sales do not exceed one percent (1%) of Gross Sales from the Leased Space; or (H) the price of any gift card sold or exchanged, except and to the extent a gift card, after (and regardless of the location of) issuance, is used to purchase merchandise at, in or from the Leased Space

(g)     Notwithstanding the fact that a portion of the rental reserved hereunder may be a percentage of Gross Sales from the Leased Space, and notwithstanding anything else to the contrary, Landlord shall not be deemed for any purpose to be or to have become a partner of Tenant or a joint venturer or a member of a joint enterprise with Tenant The provisions of this Lease relating to Percentage Rent payable hereunder are included solely for the purpose of providing a method whereby Percentage Rent is to be measured and ascertained

- 5 -

[7]    **TAX ESCALATIONS.**

(a)    Tenant shall pay to Landlord, as Additional Rent, tax escalation in accordance with this Section  For the purpose of this Section, the following definitions shall apply.

(i)    The phrase "Real Estate Taxes Payable During the Base Tax Year" shall mean the Real Estate Taxes payable by Landlord with respect to the Property during the Base Tax Year

(ii)    The term "Comparative Year" shall mean the twelve (12) month period beginning on July 1, 2011 and ending on June 30, 2012, and each subsequent period of twelve (12) months thereafter

(iii)    The term "Real Estate Taxes" shall mean the total of all taxes and special or other assessments levied, assessed or imposed at any time by any governmental authority upon or against the Property, including, without limitation, any tax or assessment levied, assessed or imposed at any time by any governmental authority in connection with the receipt of income or rents from said Property to the extent that same shall be in lieu of all or a portion of any of the aforesaid taxes or assessments, or additions or increases thereof, upon or against the Property, and shall include any business improvement district ("BID") assessments, dues, fees or charges  If, due to a future change in the method of taxation or in the taxing authority, or for any other reason, a franchise, income, transit, profit or other tax or governmental imposition, however designated, shall be levied against Landlord in substitution in whole or in part for the Real Estate Taxes, or in lieu of additions to or increases of said Real Estate Taxes, then such franchise, income, transit, profit or other tax or governmental imposition shall be deemed to be included within the definition of "Real Estate Taxes" for the purposes hereof

(iv)    Where more than one assessment is imposed by the City of New York for any tax year, whether denominated an "actual assessment" or a "transitional assessment" or otherwise, then the phrases herein "assessed value" and "assessments" shall mean whichever of the actual, transitional or other assessment is designated by the City of New York as the taxable assessment for that tax year

(b)    In the event that the Real Estate Taxes payable for any Comparative Year shall exceed the amount of the Real Estate Taxes Payable During the Base Tax Year, Tenant shall pay to Landlord, as Additional Rent for such Comparative Year, an amount equal to Tenant's Share of the excess  Before or after the start of each Comparative Year, Landlord shall furnish to Tenant a statement of the Real Estate Taxes payable during the Comparative Year, together with a calculation of Tenant's Share of such excess  If the Real Estate Taxes payable for such Comparative Year exceed the Real Estate Taxes Payable During the Base Tax Year, Additional Rent for such Comparative Year, in an amount equal to Tenant's Share of the excess, shall be due from Tenant to Landlord, and such Additional Rent shall be payable by Tenant to Landlord within thirty (30) days after receipt of the aforesaid statement

- 6 -

(c)     Should the Real Estate Taxes payable during the Base Tax Year be reduced by final determination of legal proceedings, settlement or otherwise, then, the "Real Estate Taxes Payable During the Base Tax Year" shall be correspondingly revised, the Additional Rent theretofore paid or payable hereunder for all Comparative Years shall be recomputed on the basis of such reduction, and Tenant shall pay to Landlord as Additional Rent, within ten (10) days after being billed therefor, any deficiency between the amount of such Additional Rent as theretofore computed and the amount thereof due as the result of such recomputations

(d)     If, after Tenant shall have made a payment of Additional Rent under Section [7](b), Landlord shall receive a refund of any portion of the Real Estate Taxes payable for any Comparative Year on which such payment of Additional Rent shall have been based, as a result of a reduction of such Real Estate Taxes by final determination of legal proceedings, settlement or otherwise, Landlord shall within ten (10) days after receiving the refund pay to Tenant Tenant's Share of the refund less Tenant's Share of reasonable expenses (including attorneys' and appraisers' fees) incurred by Landlord in connection with any such application or proceeding  In addition to the foregoing, Tenant shall pay to Landlord, as Additional Rent, within ten (10) days after Landlord shall have delivered to Tenant a statement therefor, Tenant's Share of all reasonable expenses incurred by Landlord in reviewing or contesting the validity or amount of any Real Estate Taxes, or for the purpose of obtaining reductions in the assessed valuation of the Property prior to the billing of Real Estate Taxes, including without limitation, the fees and disbursements of attorneys, third party consultants, experts and others.

(e)     The statements of the Real Estate Taxes to be furnished by Landlord as provided above shall be certified by Landlord and shall constitute a final determination as between Landlord and Tenant of the Real Estate Taxes for the periods represented thereby, unless Tenant within six (6) months after they are furnished shall give a written notice to Landlord that it disputes their accuracy or their appropriateness, which notice shall specify the particular respects in which the statement is inaccurate or inappropriate  If Tenant shall so dispute said statement then, pending the resolution of such dispute, Tenant shall pay the Additional Rent to Landlord in accordance with the statement furnished by Landlord

(f)     In no event shall the Annual Minimum Rent under this Lease be reduced by virtue of this Section [7]

(g)     Upon the date of any expiration or termination of this Lease (except termination because of an Event of Default), whether the same be the Expiration Date hereinabove set forth or any prior or subsequent date, a proportionate share of said Additional Rent for the Comparative Year during which such expiration or termination occurs shall become due and payable by Tenant to Landlord within thirty (30) days after Tenant's receipt of an invoice therefor, if it was not theretofore already billed and paid (in which case, Landlord shall, within thirty (30) days, refund any excess sums previously paid by Tenant with respect thereto)  The said proportionate share shall be based upon the length of time that this Lease shall have been in existence during such Comparative Year  Landlord shall promptly cause statements of said Additional Rent for that Comparative Year to be prepared and furnished to

- 7 -

Tenant   Landlord and Tenant shall thereupon make appropriate adjustments of amounts then owing

(h)      Landlord's and Tenant's obligations to make the adjustments referred to in Section [7](g) above shall survive any expiration or termination of this Lease Any delay or failure of Landlord in billing any tax escalation hereinabove provided shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay such tax escalation hereunder

## [8]    TENANT'S OPTIONS TO EXTEND.

(a)      Tenant shall have the options to extend the Initial Lease Term for two (2) additional periods (each an "Extension Term," and collectively, the "Extension Terms") of five (5) years each, commencing on the first day following the Expiration Date of the Initial Lease Term or of the Extension Term then in effect, as the case may be   Tenant's exercise of any Extension Term shall be by notice to Landlord at least fourteen (14) months prior to the last day of either the Initial Lease Term or the Extension Term then in effect, as the case may be   The Initial Lease Term, as extended by the Extension Terms as exercised by Tenant pursuant to this section, shall collectively be referred to as the "Term."

(b)      The Extension Terms shall be upon the same terms, covenants, conditions and provisions as are in effect as of the Expiration Date of the Initial Lease Term, except that the annual Minimum Rental Rate in effect during each Extension Term shall be the Market Rental Rate (as defined below) for the Leased Space   The "Market Rental Rate" shall mean the rental rate then in effect for similar retail space in comparable buildings located in Midtown Manhattan/Fifth Avenue corridor in the vicinity of the Building, as such Market Rental Rate shall be determined by Landlord or by "appraisal" (as hereinafter provided).  In all cases, the Market Rental Rate shall be determined after taking into account all then relevant factors

(i)      Within thirty (30) days after applicable receipt of Tenant's notice of its exercise of the applicable Extension Term, Landlord shall advise Tenant of Landlord's determination of the Market Rental Rate   If Landlord and Tenant are unable to agree upon the Market Rental Rate within fourteen (14) days of Tenant's receipt of Landlord's determination, Tenant shall have the right by notice to Landlord within ten (10) days thereafter (time being of the essence) to either (1) revoke its exercise of the extension option, or (2) submit the determination of the Market Rental Rate to appraisal in the manner hereinafter set forth   In the event that Tenant fails to give any such notice within such ten (10) day period, Tenant shall be conclusively deemed to have elected to submit such determination to such appraisal.

(ii)     If the appraisal process is instituted by Tenant, Landlord and Tenant agree to cooperate in such effort so that the determination of the Market Rental Rate can be completed no later than three (3) months prior to the commencement date of such Extension Term.

(iii)    The appraisal process shall be conducted in the following manner   Within the first fourteen (14) days, Landlord and Tenant shall each provide the other

- 8 -

with the name and respective qualifications of an appraiser who meets the "Appraiser Qualifications" (as defined below), and those two appraisers, within seven (7) additional days after their appointments, shall select a third appraiser who meets the Appraiser Qualifications The parties shall share equally all of the costs of the appraisers

(iv)    Within fourteen (14) days following the selection of the appraisers, Landlord and Tenant shall each notify the other and the three appraisers, in writing, of their respective determinations of the Market Rental Rate; understanding, however, that Landlord's determination may not be higher than the last Market Rental Rate proposed to Tenant under clause (i) above and, concomitantly, Tenant's determination may not be lower than the last Market Rental Rate proposed to Landlord under clause (i) above  Within fourteen (14) days thereafter, the three (3) appraisers shall decide in writing whether Landlord's or Tenant's determination of the Market Rental Rate is more correct and shall state in detail the reasons therefor  If the three (3) appraisers do not unanimously agree, the decision of the majority shall be deemed to be the decision of the appraisers  The determination of the Market Rental Rate, which the appraisers decide to be the more correct, shall be the Market Rental Rate for purposes of this Lease  The appraisers shall be empowered to choose only between Landlord's and Tenant's determination, as submitted to the appraisers, and shall reach no other compromise or decision. As used herein, "Appraiser Qualifications" shall mean a real estate broker currently holding a valid and active real estate brokerage license pursuant to the laws of New York and with experience in commercial retail leases in Midtown Manhattan, including at least ten (10) years' experience in appraising and/or leasing retail properties in Midtown Manhattan

[9]    **UTILITIES AND SERVICES.**

(a)    Tenant hereby acknowledges and agrees that Landlord has provided the lines, equipment and/or facilities to enable Tenant to obtain the utilities specifically set forth in **Exhibit J** hereto, all as part of Landlord's Work, as accepted by Tenant hereunder  Landlord shall provide Tenant with any applicable meter numbers, and unobstructed access to any such meters at all reasonable times to the extent any of such meters are located outside of the Leased Space  Tenant shall pay prior to delinquency all costs and charges for such utilities or services used or consumed by Tenant on the Leased Space, whether supplied by Landlord or by a private, public or quasi-public utility company or authority, provided, however, if such utilities or services are not separately metered to the Leased Space, Tenant's obligation to pay the same shall be conditioned on Tenant's receipt of reasonably substantiated invoices therefor from Landlord  In no event shall Tenant be obligated to pay Landlord for any submetered utilities or services at rates or charges in excess of the rates or charges that Landlord actually pays for such utilities or services, nor shall Tenant be responsible for any late fees, charges, penalties or interest due to Landlord's failure to timely make such payments  In the event that the supply of any such service to the Leased Space is interrupted or discontinued, or the quantity or character of such service is changed or is no longer available or suitable for Tenant's requirements for any other reason, Tenant shall not be released from any liability under this Lease and neither Landlord nor Landlord's agent shall incur any liability for any damage or loss sustained by Tenant by reason of such disruption, diminution or discontinuance of service.

- 9 -

(b)     Tenant shall pay the amount of Landlord's cost for all excessive *water used by Tenant for any purpose other than ordinary lavatory uses, and any sewer rent or* tax based thereon. Landlord may install a water meter to measure Tenant's water consumption for all purposes and Tenant agrees that, if Landlord has installed same due to Tenant's excess usage, Tenant shall pay for the installation and maintenance thereof, and, in all instances, Tenant shall pay for water consumed as shown on said meter at Landlord's cost therefor. Landlord reserves the right to discontinue water service to the Leased Space if either the quantity or character of such service is changed or is no longer available or suitable for Tenant's requirements or for any other reason without releasing Tenant from any liability under this Lease and without Landlord or Landlord's agent incurring any liability for any damage or loss sustained by Tenant by such discontinuance of service; nonetheless, unless otherwise required by Law, such discontinuance shall not take effect until Tenant has had ample time to secure substitute service, acting with due diligence.

(c)     If there shall be a "sprinkler system" in the Leased Space for any period during this Lease and such sprinkler system is damaged by any act or omission of Tenant or its agents, employees, licensees or visitors, Tenant shall restore the system to good working condition at its own expense  If the New York Board of Fire Underwriters, the New York Fire Insurance Exchange, the Insurance Services Office, or any governmental authority requires the installation of, or any alteration to a sprinkler system by reason of Tenant's particular manner of *occupancy or use of the Leased Space, including any alteration necessary to obtain the full* allowance for a sprinkler system in the fire insurance rate of Landlord, or for any other reason, Tenant shall make such installation or alteration promptly and at its own expense

**[10]    AFFIRMATIVE AGREEMENTS OF TENANT.** Tenant agrees, throughout the Term:

(a)     To keep the interior of the Leased Space clean, well-maintained and in good order and condition in conformity with the Operating Standard (or the AI Standard, if applicable) and, except as otherwise expressly provided in this Lease, in compliance with applicable Laws. Without limiting the foregoing, Tenant shall require every person engaged to clean any windows of the Leased Space from the outside to use the equipment and safety devices which are required pursuant to New York Labor Law § 202, and any other Laws applicable thereto. Moreover, all persons engaged in performing cleaning services shall be reasonably approved by Landlord, which approval Landlord may only withhold on the basis of a prior negative experience,

(b)     To comply with all notices issued, with respect to the Leased Space, by any governmental authorities having jurisdiction thereof (provided, however, Tenant shall not be obligated to comply with any such notice to the extent compliance requires repair, maintenance, replacement, alteration or modification of any structural component of the Building, unless such compliance is required as a result of any act or omission of Tenant, its agents, contractors, servants or employees, in which case, Landlord will be responsible for such compliance, and Tenant shall reimburse Landlord its actual costs incurred with respect to such compliance), as well as with the reasonable recommendations with respect to Tenant's use and occupancy of the Leased Space made by the Board of Fire Underwriters and by insurance

- 10 -

carriers insuring the Property, unless such compliance is necessitated by the failure, negligently or intentionally, of Landlord, its agents, contractors, servants or employees, to keep, observe and perform Landlord's obligations under this Lease,

(c) To use every reasonable precaution against fire in the Leased Space and/or the Building,

(d) To give Landlord prompt notice of any fire occurring in the Leased Space,

(e) To maintain (i) commercial general liability insurance coverage written on an occurrence form through a company(ies) reasonably satisfactory to Landlord naming Landlord and its reasonable designees as additional insureds and covering any and all claims for bodily injury (including death) and property damage occurring in or about the Leased Space with a combined single limit of not less than Ten Million Dollars ($10,000,000) per occurrence with a contractual liability endorsement covering Tenant's indemnity obligations under this Lease, and (ii) Special Form (formerly "all risk") coverage insurance covering Tenant's leasehold improvements on a replacement cost basis, with a deductible not in excess of $25,000, provided that, if Tenant shall breach the foregoing obligation, Tenant's sole liability shall be that Tenant shall be deemed to be carrying insurance policies having a deductible of $25,000 and Tenant shall indemnify and save Landlord harmless from and against any and all claims of whatever nature resulting from Tenant's failure to maintain such insurance deductible (it being understood that Landlord will not carry any insurance coverage in respect of, and shall have no obligation to restore or replace, Tenant's leasehold improvements, inventory, furniture, fixtures, equipment and other personal property). All such insurance shall be obtained from a company authorized to do business in New York and shall provide that it cannot be canceled without thirty (30) days' (or ten (10) days' with respect to non-payment of premiums) prior written notice to Landlord,

(f) To deliver to Landlord certificate(s) of insurance(s) maintained by Tenant pursuant to subsection (e) above (which, at Tenant's option, may be maintained under blanket and/or umbrella coverages) at the Commencement Date, and, thereafter, at least ten (10) days prior to the expiration date of any policy(ies) then in force, failing which, in addition to any and all other rights and remedies, Landlord shall have the right, upon five (5) days' prior notice to Tenant, to secure such insurance coverage and charge Tenant for the cost thereof, with interest thereon at the Default Rate, which shall be payable within ten (10) days of demand therefor;

(g) To be responsible for all maintenance and repair of the interior, non-structural portions of the Leased Space, including those portions of the plumbing, HVAC Systems, electrical, sprinkler and other utility systems located entirely within the Leased Space and/or which serve it exclusively, unless such work is necessitated by the failure, negligently or intentionally, of Landlord, its agents, contractors, servants or employees, to keep, observe and perform Landlord's obligations under this Lease  To the extent that Tenant reasonably requires access to areas outside of the Leased Space to perform its obligations under this Subparagraph (g) or the performance thereof involves structural work, Tenant shall give Landlord notice

- 11 -

thereof and, thereupon, Landlord shall, at its option, either perform such work and bill (as Additional Rent payable within thirty (30) days after such bill) Tenant for its actual and reasonable out-of-pocket expenses incurred in connection therewith, or provide Tenant with access and authority to perform the same. In furtherance, and not in limitation, thereof, Tenant covenants and agrees that it will repair and replace whenever necessary, at its own cost and expense, all exterior doors leading to the Leased Space, and fittings appurtenant thereto, including front door assemblies, jambs, transoms, checks and hardware,

(h)     Tenant acknowledges and agrees that air-conditioning service to the Leased Space shall be supplied through equipment operated, maintained and repaired by Tenant and that Landlord has no obligation to operate, maintain or to repair the said equipment or to supply air-conditioning service to the Leased Space, it being further acknowledged that, on the Commencement Date, the Leased Space shall be serviced by the existing air-cooled package units (forty (40) tons serving the ground level of the Leased Space and forty-five (45) tons serving the second level of the Leased Space), which Tenant accepts in satisfaction of the applicable portion of Landlord's Work  All air conditioning systems, equipment and facilities now or hereafter located in or servicing the Leased Space (the "HVAC Systems") including, without limitation, all ducts, dampers, registers, grilles and appurtenances utilized in connection therewith, shall be maintained, repaired and operated by Tenant in compliance with all present and future Laws relating thereto at Tenant's sole cost and expense  Tenant shall pay for all electricity consumed in the operation of the HVAC Systems  Tenant shall pay for all parts and supplies necessary for the proper operation of the HVAC Systems (and any restoration or replacement by Tenant of all or any part thereof shall be in quality and class at least equal to the original work or installations), provided, however, that Tenant shall not alter, modify, remove or replace the HVAC Systems, or any part thereof, without Landlord's prior written consent, such consent shall be granted or denied in accordance with Section [17].  Without limiting Tenant's foregoing obligation to maintain, repair and replace the HVAC Systems serving the Leased Space, Tenant shall enter into, and maintain throughout the Term of this Lease, a standard maintenance contract (which shall provide that the same may only be canceled or terminated on thirty (30) days' notice thereof to Landlord), annually written at normal and customary rates, for the servicing of the HVAC Systems serving the Leased Space, such contract to at least provide (but with no obligation that it extend beyond) (i) inspection, cleaning and testing at least quarterly, (ii) any servicing, maintenance, repair or replacement of filters, belts or other items covered by such a standard contract, and (iii) an annual service report at the end of each calendar year.  Upon the expiration or termination of the Term of this Lease, Tenant shall surrender to Landlord the HVAC System in working order and condition, subject to normal wear and tear (and, for the sake of clarity, the parties agree that "normal wear and tear" may result in the HVAC Systems being in working order although at or near the end of their useful life, and in such instance, Tenant shall have no responsibility to replace the HVAC Systems if Tenant has complied with its maintenance obligations during the Term).  In the event that Tenant fails to obtain the contract required herein or perform any of the maintenance or repairs or replacements required hereunder, Landlord shall have the right, but not the obligation, to procure such contract and/or perform any such work and charge the Tenant as Additional Rent hereunder the cost of same shall be paid for by Tenant within thirty (30) days of its receipt of a reasonably substantiated demand therefor;

- 12 -

(i)     To surrender possession of the Leased Space to Landlord at the Expiration Date in good order and condition and broom-clean, reasonable wear and tear and damage by fire or other casualty or "taking" *(as that term is hereinafter defined) excepted*, with all furniture, moveable trade fixtures and personal property removed, as well as signs removed in accordance with Section [13], and Specialty Alterations removed in accordance with Section [17] upon the Expiration Date of the Term, and repair any damage resulting therefrom;

(j)     To keep the sidewalks immediately in front of the Leased Space *reasonably free of snow, ice and debris;*

(k)     To cause all deliveries to be made to and from the Leased Space via the route and during the hours reasonably designated by Landlord from time to time, and in accordance with the Rules and Regulations. Without limiting the generality of the foregoing or any other provisions of this Lease, Tenant shall not permit any deliveries to be placed on the sidewalks adjacent to the Leased Space in a manner which will materially impede the flow of pedestrian traffic and/or deliveries into or out of the Building;

(l)     To, and to cause its contractors, employees, agents, visitors, guests and licensees to, faithfully observe and comply with the "Rules and Regulations" set forth in **Schedule 1** annexed hereto and hereby made a part hereof, and such additional reasonable Rules and Regulations as Landlord hereafter at any time or from time to time may make and may communicate in writing to Tenant, which, in the judgment of Landlord, shall be necessary or desirable for the reputation, safety, care or appearance of the Building, or the preservation of good order therein, or the operation or maintenance of the Building, or the equipment thereof, or the comfort of tenants or others in the Building; provided, however, that (i) no new Rules or Regulations shall materially increase Tenant's obligations or materially decrease Tenant's rights under this Lease, and (ii) in the case of any conflict between the provisions of this Lease and any such Rules and Regulations, the provisions of this Lease shall control;

(m)     Tenant at its expense shall comply with all requirements of the New York Board of Fire Underwriters, or any other similar body affecting the Leased Space, and shall not use the Leased Space in a manner which shall increase the rate of fire insurance of Landlord or of any other tenant, over that in effect prior to this Lease; it being hereby acknowledged that the UO Use will not result in any such increase If Tenant's use of the Leased Space increases the fire insurance rate, Tenant shall, within thirty (30) days of a reasonably substantiated demand therefor, reimburse Landlord for all such increased costs;

(n)     Tenant, at its expense, shall install and at all times maintain and repair, at its sole cost and expense, in good and working order any ventilating equipment and systems, and fire prevention and suppression systems as may be required by Law based upon Tenant's use of the Leased Space, as well as any related duct work, piping, connections and vertical risers, if any, and shall at all times keep ducts in the Leased Space free of grease so that the same shall at no time constitute a fire hazard;

(o)    Tenant covenants and agrees to maintain in good order, condition and repair the exterior of the Leased Space at least in conformity with the Operating Standard (or the AI Standard, if applicable), including, without limitation, the storefront and plate glass therein, windows, doors, fittings, and any signs awnings, in a manner reasonably satisfactory to the Landlord  In this regard and not in limitation thereof, the storefront windows shall be cleaned weekly (weather permitting), while the storefront metal and stonework shall at all times be maintained in a clean and good condition, and

(p)    Tenant, at its own cost and expense, shall keep the Leased Space free from vermin, rodents or anything of like objectionable nature, and shall employ only such pest, insect or exterminating contractors as are approved by Landlord, which approval Landlord agrees shall not be unreasonably withheld, conditioned or delayed  In the event of Tenant's failure to keep the Leased Space free from vermin, the Landlord after five (5) days' notice shall have the right, at the Tenant's expense, to take all necessary or proper measures to exterminate any and all vermin from the Leased Space

[11]    **NEGATIVE AGREEMENTS OF TENANT.**  Tenant agrees, throughout the Term, that Tenant shall not, without the prior consent of Landlord

(a)    Use or operate any machinery or equipment that is harmful to the Leased Space or the Building;

(b)    Place any weights in the Leased Space beyond the safe carrying capacity of the Building,

(c)    Do or allow to be done anything which may suspend or increase the cost of (unless mere occupancy by Tenant causes such an increase) the fire insurance maintained by Landlord covering the Building,

(d)    Use or occupy the Leased Space in violation of the certificate of occupancy issued for the Building,

(e)    Create or permit persons or entities under its control to create a nuisance, including, without limitation, not exceeding the permissible decibel levels provided for in **Exhibit D**,

(f)    Use or occupy the Leased Space in violation of the Operating Standard (subject to any change in use permitted under this Lease)

(g)    Use or consume electric current in the Leased Space in excess of the capacity of existing feeders or wiring installations

(h)    Use or permit to be used any space outside of the Leased Space for display, sale or any similar undertaking. Nor shall Tenant use or permit to be used any advertising medium and/or loudspeaker and/or sound amplifier and/or radio or television broadcast which is intended to be heard from outside of the Leased Space

- 14 -

## [12]    AFFIRMATIVE AND NEGATIVE AGREEMENTS OF LANDLORD.

(a)    The Leased Space shall be, as of the Commencement Date, structurally sound with the roof and all below grade levels watertight (insofar as the same affects the Leased Space), and that possession of the Leased Space shall be delivered to Tenant *in such condition on the Commencement Date*  Landlord further covenants, represents, warrants and agrees that all water, sewer and electrical lines shall be provided in accordance with Exhibit J and in good condition and working order (with the water and sewer lines free of any obstructions) as of the Commencement Date and as a condition thereof  Landlord, at its sole cost and expense, shall be responsible for

(i)    the maintenance and repair (including replacements, as necessary) of.

(A)    the Common Areas and Facilities insofar as the *failure to do so would materially adversely affect Tenant's operations in the Leased Space,*

(B)    except as otherwise provided herein, all structural portions of the Building (whether or not within, above, below, or outside of the Leased Space), including the roof with built-up insulation, downspouts, drains, gutters, exterior walls, ceilings, floor slabs, foundation and structural supports and windows (other than the storefront of the Leased Space, which Tenant shall maintain, repair and replace), except that Landlord may elect to delay or forego such repairs an maintenance to the extent that same does not materially affect the Leased Space, or Tenant's ability to operate its business thereon,

(C)    [Intentionally Omitted],

(D)    the water, sewer and electrical lines, equipment and facilities (the "Building Systems") from each public or private utility source to the point where such utility first exclusively serves the Leased Space,

(E)    the removal of water which has infiltrated the Leased Space (other than through the doors or plate glass), but Landlord shall not be responsible *for the abatement of any dangerous conditions or substances (e g , mold) which may result or has* resulted from such infiltrations, and

(F)    the portions of various utility lines, systems, equipment and facilities within the Leased Space which service other tenants or occupants of any portion of the Property either exclusively or in common with Tenant, and

(ii)    the removal from the Leased Space of all hazardous substances (i e , asbestos), in a manner which complies with applicable Laws unless Tenant or a *person or entity under Tenant's reasonable control is the cause thereof, in which event, Tenant* shall be responsible for the removal thereof

- 15 -

Notwithstanding anything to the contrary contained in this Section [12], Tenant shall be responsible for the cost and expense of Landlord's performance of any of the foregoing obligations set forth in subsections (i) and (ii) to the extent needed by reason of the act or omission, negligent or intentional, of Tenant, its agents, contractors, servants, employees and persons/entities under Tenant's reasonable control

In carrying out its responsibilities as required under this Section [12], Landlord shall promptly undertake all such maintenance, repair and replacement work as soon as Landlord knows of the need therefor and thereafter shall diligently prosecute the same to completion. All such work shall be commenced and completed in accordance with applicable Laws and undertaken in a manner which endeavors not to unreasonably disrupt or interfere with the business activities of Tenant and, to the extent reasonably necessary to avoid an unreasonable disruption or interference with the business activities of Tenant (but without any requirement to incur overtime charges), all repairs shall be done during the hours that Tenant is not open for business unless and to the extent otherwise reasonably required by emergency circumstances

(b)     Except as specifically set forth in Sections [10](a) and (b) hereof, and not in limitation thereof, Landlord, at Landlord's sole cost and expense, shall comply with all Laws relating to the Building, the Common Areas and Facilities and/or the Property outside of the Leased Space, including those pertaining to seismic reinforcement, replacement and retrofitting, life and fire safety and the protection of health and the environment, and any structural portions or components of the Building within the Leased Space (unless and to the extent such compliance relates to structural portions or components installed by Tenant, or is required by reason of Tenant's Work or a Tenant Alteration), provided, however, if non-compliance does not impact Tenant, the Leased Space, or Tenant's ability to operate its business therein, Landlord may elect to delay or forego such compliance.

(c)     Landlord shall maintain (i) Special Form Coverage insurance covering the Building (including the Leased Space, but exclusive of Tenant's leasehold improvements, which Tenant must insure) to at least eighty percent (80%) of its full insurable replacement cost (or such higher percentage as required to avoid any applicable co-insurance provision in Landlord's policy), and (ii) commercial general liability insurance coverage written on an occurrence form with a combined single limit of not less than an aggregate of Ten Million Dollars ($10,000,000) per occurrence (under primary and excess coverage policies) covering all claims for bodily injury (including death), property damage and advertising injury occurring in or about the Common Areas and Facilities  Upon request therefor, Landlord shall deliver to Tenant, at Landlord's option, said policies or certificates thereof

(d)     Landlord and its authorized representatives may upon reasonable advance notice to Tenant (except in the case of an emergency, in which event no such notice shall be required)  (i) inspect the Leased Space; (ii) exhibit the Leased Space to current and prospective purchasers, lenders, insurers, governmental authorities and, within the eighteen (18) months prior to the Expiration Date of the Term to brokers and prospective tenants, and (iii) enter the Leased Space for the purpose of exercising any rights or remedies expressly granted or reserved to Landlord under this Lease or applicable Laws, or to make any repairs, maintenance, replacements, improvements or alterations or other work in or about the Leased Space

- 16 -

consistent with Landlord's responsibilities hereunder or as otherwise provided in Section [50]
In connection with exercising such rights, Landlord shall conduct itself in a manner intending to
minimize any disruption or interference with the operation of Tenant's business thereon or
therefrom, which shall include, to the extent possible, the exercise of such rights during the
hours that Tenant is not open for business (but without obligation to incur overtime charges in
connection therewith) unless and to the extent otherwise reasonably required by emergency
circumstances

      (e)    [Intentionally Omitted]

      (f)    Landlord shall not utilize the area adjacent to the storefront of the
Leased Space, either temporarily or permanently, in a manner which in Tenant's reasonable
judgment is, or could be, injurious to Tenant's image or reputation, or to the operation of
Tenant's business, or to the use, occupancy and enjoyment of the Leased Space, including the
installation or utilization of any signage or billboards or building "wraps" on or above the
storefront of the Leased Space without the prior approval of Tenant; provided, however, any
tenant of such space above the Leased Space shall have the right to install signs identifying its
business within such premises. Landlord and Tenant hereby agree that this Section [12](f) is
not intended to apply to scaffolding, sidewalk bridges or similar temporary structures or
blockages, which shall be governed by Section [12](i) below

      (g)    Landlord shall apply uniformly all Rules and Regulations to all
tenants and occupants of other premises on the Property from time to time, but shall not be
liable to Tenant for the violation of such rules and regulations by any other tenant

      (h)    Landlord agrees that, for so long as Tenant is operating an Urban
Outfitters store or an Anthropologie store (or such other trade name as is then utilized for a
retail operation meeting the UO Use or the AI Use, as applicable) at the Leased Space, Tenant
may have sound and music within the Leased Space typical of an Urban Outfitters store (or
such other trade name as is then utilized for a retail operation meeting the UO Use or the AI
Use, as applicable) provided that Tenant complies with the terms and conditions of **Exhibit D**
hereto

      (i)    Landlord shall not erect or maintain sidewalk bridges or
scaffolding on or about the exterior of the Leased Space or the Building, unless same are
required to be maintained pursuant to applicable Laws or reasonably required in connection
with and for the operation of the Building or any repairs, improvements or other work
performed at the Building  If scaffolding is so required on or about the exterior of the Leased
Space or the Building, Landlord agrees to (i) erect appropriate scaffolding in a good and
workmanlike manner, (ii) install thereon or affix thereto an identification sign hung upon the
street-facing side of such scaffolding in only the area thereof in front of Tenant's Fifth Avenue
storefront (as supplied by Tenant, but reasonably approved in advance by Landlord), (iii)
fabricate and install, at Landlord's cost, a "blade" sign over the sidewalk, on the underside of
the scaffold (designed by Landlord with reasonable input from Tenant as to Tenant's aesthetics
therefor based on other blade signs used in connection with the UO Use or AI Use, as
applicable) in reasonable proximity of Tenant's store entrance, (iv) give Tenant reasonable

- 17 -

advance notice of the erection of any sidewalk bridge or scaffold (except in an emergency) and (v) use commercially reasonable efforts to minimize the time during which such sidewalk bridge or scaffold remains in place

### [13]    SIGNS AND DISPLAYS

(a)    Subject to Tenant's compliance with all applicable provisions of the Lease and this Section, including, without limitation, Landlord's approval of the manner of installation (which Landlord shall not unreasonably withhold, condition or delay), Landlord hereby approves, as to concept, Tenant's signage depicted on **Exhibit E** ("Tenant's Initial Signs") to this Lease. Provided that the Leased Space is being used for the UO Use or an AI Use (provided that such AI Use is, in all respects, equal to or better than Anthropologie's other Manhattan stores located at 75 9th Avenue, 85 Fifth Avenue and 50 Rockefeller Center (collectively, the "AI Standard")) and subject to compliance with applicable provisions of the Lease (including, without limitation, Section [17]), Landlord shall not unreasonably withhold, condition or delay its consent to a request by Tenant to (i) modify Tenant's Initial Signs, or (ii) install signs and lighting in the interior of the Leased Space, so long as in each such circumstance such signs are in compliance with the Operating Standard (or the AI Standard, if applicable). Tenant acknowledges and agrees that it shall be deemed reasonable for Landlord to disapprove any signs which are flashing or moving   In the event that the Leased Space is not being used for the UO Use or the AI Use, any sign or any item of any kind or nature on the outside of the store windows, door or exterior of the Leased Space or which is visible from outside of the Leased Space shall be subject to Landlord's prior written approval in each instance   Tenant shall be responsible for the erection, repair and maintenance of such lighting and signs in accordance with the terms of the Lease and all such applicable Laws   Tenant agrees, at Tenant's sole cost and expense, at the Expiration Date of the Term, to remove lighting and signs, and to repair any damage to the Leased Space and/or the Building caused by the erection, maintenance or removal thereof

(b)    Provided that the Leased Space is being used for the UO Use (or the AI Use, if applicable), Landlord acknowledges that Tenant may install and maintain at all times, subject to the other provisions of this Section and this Lease, displays of merchandise within the interior of the Leased Space and/or the display windows (collectively referred to in this Section [13](b) as "displays"), which are consistent with the Operating Standard (or, with respect to the AI Use, consistent with the AI Standard) ("Approved Displays")   If the Leased Space is not being used for the UO Use or the AI Use, displays shall be subject to Landlord's approval in its discretion   In no event shall any display contain any content which (i) would have prurient appeal or otherwise be pornographic, sexually explicit or obscene, (ii) actually results in physical protest, picketing or other civil disturbance or (iii) Landlord reasonably believes is likely to result in physical protest, picketing or other civil disturbance and gives Tenant notice thereof.

### [14]    RUBBISH, ETC.

(a)    Tenant shall, at its own cost and expense, store and dispose of all of its garbage and waste matter in a manner which prevents the emanation of any odor and

- 18 -

effluent, and in compliance with all applicable Laws, and the Building Rules and Regulations
Without limiting the generality of the foregoing, all refuse shall be kept in airtight containers,
and removed from the Leased Space via the route reasonably designated by Landlord in heavy
duty plastic bags to a location adjacent to the Building reasonably designated by Landlord, at
least once a day during hours reasonably designated by Landlord  In removing such garbage
and waste matter from the Leased Space, Tenant shall use closed containers of such a nature
that in the process of such removal no refuse or waste matter shall spill or flow from such
containers  Tenant shall pay the cost of such removal directly to the carting company supplying
such service to Tenant.

(b)    Landlord hereby covenants and agrees to uniformly enforce such
Rules and Regulations as against the other retail tenants within the Building, but shall not be
liable for a violation thereof by any such other tenant

[15]   **ASSIGNMENT AND SUBLETTING.**

(a)    Tenant covenants and agrees for Tenant and its successors,
assigns and legal representatives, that neither this Lease nor the term and estate hereby granted,
nor any part hereof or thereof, will be assigned, mortgaged, pledged, encumbered or otherwise
transferred (whether voluntarily, involuntarily, by operation of law, or otherwise), and that
neither the Leased Space, nor any part thereof, will be encumbered in any manner by reason of
any act or omission on the part of Tenant, or will be used or occupied, or permitted to be used
or occupied, or utilized as a concession, by anyone other than Tenant, or for any purpose other
than as hereinbefore set forth, or will be sublet, without the prior written consent of Landlord in
every case, which consent shall be granted or denied in accordance with this Section [15]
Except with respect to a Permitted Transfer (as hereinafter defined), a transfer of a fifty percent
(50%) or greater interest (whether stock, partnership interest or otherwise) of Tenant, other than
through any nationally recognized stock exchange or "over the counter" market, shall be
deemed to be an assignment of this Lease, whether such transfer occurs in one transaction or in
any series of related transactions.

(b)    If at any time during the Term, Tenant determines to seek to
assign this Lease or to sublet all or any portion of the Leased Space, except with respect to a
Permitted Transfer, Tenant shall notify Landlord in writing of such determination and shall
submit to Landlord (1) the proposed assignment and assumption agreement or an executed
counterpart of the term sheet relating to the proposed sublease, as the case may be (and the
effective date of which assignment and assumption agreement and/or the commencement date
of any sublease (as indicated on the term sheet) shall be no less than thirty (30) days and no
more than ninety (90) days after the date of Tenant's notice to Landlord), (2) a statement setting
forth in reasonable detail the identity of the proposed assignee or subtenant, the nature of its
business and its proposed use of the Leased Space, (3) current financial information with
respect to the proposed assignee or subtenant, including, without limitation, its most recent
audited financial report or statement for its three (3) prior fiscal years (if same exists, and if not,
the equivalent information in a form reasonably satisfactory to Landlord), and (4) such other
documentation and information regarding the proposed assignee or subtenant as Landlord shall
reasonably request (collectively, the "Sublease or Assignment Statement")  Such Sublease or

- 19 -

Assignment Statement shall be deemed an offer from Tenant to Landlord whereby Landlord may, at its option and without any obligation to exercise such option, (i) terminate this Lease or (i) require Tenant to assign this Lease to Landlord's designee and thereupon be released from all executory obligations under this Lease (singly and collectively referred to herein as the "termination option", "option to terminate" or similar reference); the termination option, however, shall not apply to any Permitted Transfer   Said termination option may be exercised by Landlord by notice to Tenant at any time within thirty (30) days after such Sublease or Assignment Statement has been given by Tenant to Landlord; *and during such thirty (30) day period Tenant shall not assign this Lease or sublet the Leased Space to any person,* <u>provided, however,</u> Tenant shall have the right, during such thirty (30) day period, to withdraw its Sublease or Assignment Statement, *and its offer to Landlord to terminate this Lease, and Landlord's election to terminate this Lease shall thereby be nullified, and this Lease shall thereafter continue without giving any effect to the requested assignment or sublease, and Tenant shall be precluded from presenting a subsequent Sublease or Assignment Statement for a period of six (6) months thereafter;* notwithstanding the foregoing, if, at the time Landlord receives Tenant's notice exercising such right of withdrawal, Landlord has entered into another lease or other contractual arrangement for the occupancy of the Leased Space or any portion *thereof, Landlord shall give Tenant notice thereof and Tenant's exercise of its right of withdrawal shall thereby be rendered a nullity and of no force and effect*   If Landlord exercises its option to terminate this Lease in the case where Tenant desires either to assign this Lease or sublet the Leased Space, then this Lease shall end and expire on the date that such assignment or sublet was to be effective or commence, as the case may be, as if such date were the Expiration Date, and the Minimum Rent, Percentage Rent and Additional Rent shall be paid and apportioned to such date.  If Landlord does not exercise its option to so terminate this Lease, Landlord shall have the right, exercisable within forty-five (45) days after Landlord's receipt of the Sublease or Assignment Statement, to grant or withhold its consent to any such assignment or subletting, which consent, as to any assignment or subletting proposed by the originally named tenant hereunder or a Permitted Transferee, shall not be unreasonably withheld, conditioned or delayed provided·

(i)    the proposed assignee or subtenant is a reputable party of a financial standing which, in Landlord's reasonable judgment, will allow, in the case of an assignment, such proposed assignee to meet its obligations under this Lease as they become due, the nature and character of the proposed subtenant or assignee, its business activities and intended use of the Leased Space are in keeping with the use permitted and required hereunder (or otherwise reasonably acceptable to Landlord in its sole discretion) and the then standards of the Building, and the proposed assignment or subletting does not violate any negative covenants as to use contained in any other lease made with any other tenant(s) of the Building,

(ii)    there shall be no monetary default by Tenant under any of the terms, covenants and conditions of this Lease at the time that Landlord's consent to any such assignment or subletting is requested and on the effective date of the assignment or the proposed sublease, and

(iii)    any such proposed subletting shall be for not less than the entirety of the Leased Space

- 20 -

(iv)    the Leased Space shall not, without Landlord's prior consent, have been listed or otherwise publicly advertised for assignment or subletting at a rental rate lower than the higher of (A) the Annual Minimum Rent and all Additional Rent then payable, or (B) the then prevailing rental rate for other retail space in the Building

(v)    the proposed assignee or subtenant shall not then be a tenant, subtenant, assignee or occupant of any space in the Building (except if, at such time, there is not any other comparable space within the Building then available), nor shall the proposed assignee or subtenant be a person or entity who or which has dealt with Landlord or Landlord's agent (directly or through a broker) with respect to retail space in the Building during the six (6) months immediately preceding the submission of the Sublease or Assignment Statement

(vi)    the proposed assignee or subtenant shall not be an entity which is entitled to diplomatic or sovereign immunity or which is not subject to service of process in the State of New York or to jurisdiction of the courts of the State of New York and the United States located in New York County

(c)    With respect to each and every sublease or subletting authorized by Landlord under the provisions of this Lease, it is further agreed·

(i)    no subletting shall be for a term ending later than one (1) day prior to the Expiration Date of this Lease, and

(ii)    no sublease shall be valid, and no subtenant shall take possession of the Leased Space or any part thereof, until an executed counterpart of such sublease (substantially conforming, in all material respects, to the submitted form of sublease or term sheet, as applicable) has been delivered to Landlord

(d)    Each subletting pursuant to this Section [15] shall be subject to all of the covenants, agreements, terms, provisions and conditions contained in this Lease  In the event of termination, re-entry or dispossess by Landlord under this Lease, Landlord may, at its option, evict the subtenant or take over all of the right, title and interest of Tenant, as sublessor, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not (A) be liable for any previous act or omission of Tenant under such sublease, (B) be subject to any offset, not expressly provided in such sublease, which theretofore accrued to such subtenant against Tenant, or (C) be bound by any previous modification of such sublease which was not approved by Landlord or by any previous prepayment of more than one (1) month's subrent or any additional subrent payable under the sublease  Tenant covenants and agrees that, notwithstanding such assignment or any such subletting to any subtenant and/or acceptance of rent or additional rent by Landlord from any assignee or any subtenant, Tenant shall and will remain fully liable for the payment of the Minimum Rent, Percentage Rent and Additional Rent due and to become due hereunder and for the performance of all the covenants, agreements, terms, provisions and conditions contained in this Lease on the part of Tenant to be performed  Tenant further covenants and agrees that notwithstanding any such assignment or subletting, no other and further assignment, underletting or subletting of the Leased Space or any part thereof

- 21 -

shall or will be made without Landlord's approval, strictly in accordance with the provisions of this Section [15], including, without limitation Landlord's approval of what otherwise would constitute a Permitted Transfer, which approval shall not be unreasonably withheld, conditioned or delayed (except for Permitted Transfers described in Clause (iii) of Section [15](h), which may thereafter be effected without Landlord's consent, so long as any such transfer is not a subterfuge to avoid Landlord's consent which would have otherwise been required hereunder) Tenant shall furnish to Landlord a fully-executed copy of each sublease within ten (10) days following the date of execution thereof, but in all events, prior to such subtenant taking possession of the Leased Space under its sublease.

(e)     If Landlord shall give its consent to any assignment of this Lease or to any sublease (which shall not apply to a Permitted Transfer), Tenant shall in consideration thereof, pay to Landlord promptly upon receipt of such sums by Tenant, as Additional Rent

(i)     In the case of an assignment of this Lease, an amount equal to fifty percent (50%) of the positive difference, if any, between (A) all sums and other consideration paid to Tenant by the assignee for or by reason of such assignment (including sums paid for installations, Alterations and leasehold improvements in the Leased Space, but excluding any sale or rental of Tenant's moveable equipment, furniture, furnishings or other moveable personal property), minus (B) the sum of (1) in the case of sums paid for installations, Alterations and leasehold improvements, which Tenant may amortize or depreciate under applicable law, the then net unamortized or undepreciated cost determined on the basis of Tenant's federal income tax returns, (2) the reasonable brokerage commissions and reasonable attorneys' fees paid by Tenant in effectuating such assignment, and (3) the costs and expenses, if any, incurred by Tenant in improving or modifying the Leased Space for the assignee

(ii) ·   In the case of a sublease, fifty percent (50%) of the positive difference, if any, between (A) any rents (excluding any rental concessions), additional charges or other consideration payable under the sublease to Tenant by the subtenant which is in excess of the Minimum Rent and Additional Rent accruing during the term of the sublease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof (including, but not limited to, sums paid for installations, Alterations and leasehold improvements in the sublet premises, but excluding any sale or rental of Tenant's moveable equipment, furniture or other moveable personal property) minus (B) the sum of (1) in the case of sums paid for installations, Alterations and leasehold improvements to the subleased area which Tenant may amortize or depreciate under applicable Law, the then net unamortized or undepreciated cost (allocated for the duration of the term of the sublease only) determined on the basis of Tenant's federal income tax returns, and (2) the reasonable brokerage commissions and reasonable attorneys' fees incurred by Tenant in effectuating such sublease, and (3) the costs and expenses, if any, incurred by Tenant in improving or modifying the Leased Space for the subtenant (which offsets set forth in Clause (B) shall be amortized over the term of the sublease) The sums payable under this Section shall be paid to Landlord as and when paid by the subtenant or assignee, as the case may be, to Tenant

(f)     If this Lease is assigned, or if the Leased Space is sublet or occupied by anybody other than Tenant, Landlord may, after an Event of Default by Tenant,

- 22 -

collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver by Landlord of any of Tenant's covenants contained in this Section [15] or the acceptance of the assignee, subtenant or occupant as Tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained

(g)   Any assignment or transfer requiring Landlord's approval shall be made only if, and shall not be effective until, the assignee shall execute, acknowledge and deliver to Landlord an agreement in form and substance reasonably satisfactory to Landlord, whereby the assignee shall assume all of the obligations of this Lease on the part of Tenant to be performed or observed and whereby the assignee shall agree that the provisions contained in this Section shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers

(h)   Notwithstanding the foregoing, Landlord's consent, for operation of the Leased Space for the UO Use (or an AI Use), shall not be required hereunder with respect to (i) the merger, consolidation or similar transaction of Tenant into or with another entity, or the assignment of this Lease in connection with such a merger, consolidation or similar transaction, provided the surviving entity has a tangible net worth equal to or greater than the tangible net worth of Tenant (combined, if applicable, with the net worth of any assignor (direct or remote) of Tenant) immediately prior to transaction in question (ii) the assignment of Tenant's entire interest under this Lease, or the sublease of all of the Leased Space for substantially all of the Term, in connection with the sale of all or substantially all of the assets of Tenant, including, without limitation, substantially all of the assets of the Urban Outfitters' chain (or Anthropologie chain, if the use is then an AI Use) (or such other respective trade name as is then utilized for a retail operation meeting the UO Use or the AI Use, as applicable) of stores in the United States, (iii) the assignment of Tenant's entire interest under this Lease, or the sublease of all of the Leased Space for substantially all of the Term, to an Affiliate of Tenant for so long as such assignee or subtenant remains an Affiliate of Tenant or an Affiliate of, or is merged or consolidated with, Tenant's successor entity under Clauses (i), (ii) and (iv), or (iv) an assignment of Tenant's interest in the Leased Space to any entity which acquires all or substantially all of the retail locations comprising the Urban Outfitters' chain (or Anthropologie chain if the use is then an AI Use) (or such other respective trade name as is then utilized for a retail operation meeting the UO Use or the AI Use, as applicable) of stores in the United States (the transfers referenced in Clauses (i)-(iv) shall be referred to as the "Permitted Transfers"), provided that in each case· (A) such transaction must be for a valid business purpose and not principally for the purpose of transferring Tenant's interest in this Lease or to circumvent Tenant's obligations under this Lease, (B) Tenant shall have notified Landlord in writing of such transaction at least thirty (30) days in advance of the effective date thereof, (C) the assignor entity shall not be released from liability hereunder, and (D) reasonable evidence of all of the foregoing requirements applicable to such Permitted Transfer shall have been provided to Landlord at least thirty (30) days prior to such transaction  Furthermore, the "conversion" from one form of business entity to another pursuant to applicable provisions of state law which provide for the continuity of such converted entity (such as conversion from corporation to a limited liability company), without change in control of Tenant, shall not constitute an assignment or transfer

- 23 -

(i)      Tenant shall, within ten (10) days after execution thereof (but in all events prior to the delivery of possession thereunder), deliver to Landlord either (x) a duplicate original instrument of assignment in form and substance reasonably satisfactory to Landlord, duly executed by Tenant, together with an instrument in form and substance reasonably satisfactory to Landlord, duly executed by the assignee, in which such assignee shall assume observance and performance of, and agree to be personally bound by, all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed, or (y) a duplicate original sublease in form and substance reasonably satisfactory to Landlord, duly executed by Tenant and the subtenant

## [16]    INDEMNIFICATION; WAIVER OF SUBROGATION.

(a)      Tenant agrees to indemnify, defend and hold harmless Landlord and its agents and their respective direct and indirect partners, shareholders, officers, directors, employees, agents and contractors (collectively, the "Landlord Parties") against and from all claims, losses, liabilities, costs, damages or expenses (including reasonable attorney's, consultant's and expert fees and expenses actually incurred) directly or indirectly arising out of or attributable to Tenant's act or omission, negligent or intentional, or from the failure of Tenant to keep, observe, and perform any of the terms, covenants, conditions and provisions of this Lease to be kept, observed or performed by Tenant, unless the same is caused by the act or omission, negligent or intentional, of Landlord or any Landlord Party, or is covered by insurance required to be maintained by Tenant hereunder or which arises out of or is attributable to the failure of Landlord to keep, observe or perform any of the terms, covenants, conditions or provisions of this Lease to be kept, observed or performed by Landlord   Landlord shall indemnify, defend and save Tenant harmless from and against any liability or expense suits arising out of accidents, damage, injury or loss to any and all persons and property relating to events occurring in the Common Areas and Facilities resulting from the negligence or willful misconduct of Landlord or its agents, employees or contractors   The scope and the extent of the obligations of Tenant under this Section [16] shall be to the fullest extent permitted by Law, and also shall not be limited to the minimum dollar amounts of commercial general liability insurance to be maintained by Tenant under this Lease   Anything to the contrary contained in this Lease notwithstanding, in no event shall the foregoing indemnities be deemed to extend to consequential damages   The indemnification, defense and hold harmless provisions of this Section [16] shall survive the Expiration Date of the Term

(b)      As to any loss or damage which occurs upon the property of a party hereto, such party hereby releases the other and waives its carrier's(s') rights of subrogation, to the extent of such damaged party's insurance coverage therefor (such coverage to be deemed to be at least the coverage required hereunder), from any and all liability for such loss or damage even if such loss or damage shall be brought about by the fault or negligence of such other party, or the agents, servants or employees of such other party, provided, however, that this release shall be effective only with respect to loss or damage occurring during such time as the applicable policy(ies) of insurance shall contain a clause to the effect that this release shall not affect said policy(ies) or the right of the insured to recover thereunder   If any policy does not contain such a clause, the insured party shall, at the request of the other party to this Lease, have

- 24 -

such a clause added to said policy if obtainable, or, if not obtainable, add the other party as an additional insured thereunder

### [17]    ALTERATIONS AND IMPROVEMENTS.

(a)    At any time during the Term of this Lease, Tenant, at Tenant's sole cost and expense, may, but only in compliance with all applicable Laws and the Rules and Regulations pertaining thereto, make any non-structural alterations and improvements (other than Specialty Alterations) within the Leased Space as Tenant desires and without Landlord's consent, for Tenant's use, occupancy and enjoyment and the operation of its business thereon and therefrom, provided that such alterations and improvements (1) are in conformity with the Operating Standard (or the AI Standard, if applicable), (2) cost no more than One Hundred Thousand and 00/100 ($100,000 00) Dollars in any given twelve (12) month period, (3) are non-structural, (4) do not require a building permit from the New York City Department of Buildings, or a change in the certificate of occupancy for the Building, (5) do not affect Building Systems, (6) except to the extent otherwise expressly permitted under this Lease (including without limitation Section [13] hereof, but nevertheless subject to obtaining Landlord's approval thereunder), do not directly or indirectly affect any portion of the Building outside of the Leased Space, and (7) Tenant provides Landlord with not less than five (5) days' prior written notice thereof  No other alterations or improvements shall be made without the prior written consent of Landlord  All alterations and improvements shall be performed in accordance with the following conditions·

(i)    Prior to the commencement of any alterations and/or improvements (herein sometimes referred to as an "Alteration") requiring Landlord's consent hereunder, Tenant shall first submit to Landlord for its approval detailed dimensioned coordinated plans and specifications, including (to the extent applicable) layout, architectural, mechanical, electrical, plumbing and structural drawings for each proposed alteration or improvement ("Tenant's Plans")  Landlord shall be given, in writing, a good description of all other alterations or improvements  Landlord shall promptly review, in good faith, Tenant's Plans submitted for Landlord's approval under this Section [17] and shall notify Tenant within twenty (20) days of the receipt thereof that Landlord either  (A) approves Tenant's Plans, (B) disapproves Tenant's Plans (stating the reasons therefor with reasonable specificity), (C) requires clarification or additional information or (D) has engaged the services of an outside consultant to review Tenant's Plans (an "Outside Consultant Notice").  If Landlord fails to respond to Tenant's Plans within such twenty (20) day period, Tenant may give a notice to Landlord referencing this Subsection [17](a)(i) and stating that "Landlord shall be deemed to have granted approval to Tenant's Plans if Landlord fails respond to Tenant's Plans within five (5) business days from Landlord's receipt of this notice "  If Landlord fails to respond to Tenant's Plans within such five (5) business day period, Landlord shall be deemed to have granted approval to Tenant's Plans  If Landlord delivers an Outside Consultant Notice within the time period set forth above, the effect thereof shall be to extend by ten (10) business days the number of days that Landlord shall have to respond to Tenant's Plans  Landlord's review of resubmissions of Tenant's Plans following any disapproval or request for clarification shall be upon all of the same terms and conditions of this Subsection [17](a)(i), except that:  (1) all references hereinabove to twenty (20) days shall be deemed references to ten (10) days and (2) all

- 25 -

references hereinabove to ten (10) business days shall be deemed references to five (5) business days  As of the date of this Lease, Landlord has reviewed Tenant's preliminary plans with respect to the initial Tenant's Work (including, without limitation, Tenant's conceptual storefront elevation annexed hereto as Exhibit I), and has approved same in concept, subject to its review and approval of Tenant's complete, "signed and sealed" construction drawings in respect of such concept or concepts, and Tenant agrees that its construction of its initial work shall be substantially (i e., except for de minimis variance required to accommodate field conditions) in accordance with such construction drawings as finally approved (i e , Tenant's Plans).

(ii)    All alterations or improvements in and to the Leased Space shall be performed in a good and workmanlike manner and in accordance with the Building's Rules and Regulations governing tenant alterations, using a general contractor, a life-safety subcontractor, a sprinkler subcontractor and an electrician approved by Landlord, it being understood that Landlord may only withhold such approval based upon an actual negative experience Landlord (or any of its Affiliates owning and/or operating buildings in New York City) had with any such proposed contractor  Except as otherwise provided below, Landlord's approval shall not be required for any of Tenant's other subcontractors, it being understood, however, that all subcontractors shall be subject to Landlord's Rules and Regulations relating to alterations  All work affecting the Building's "Class E" system shall be performed by Landlord's designated contractor and all plan filings with the New York City Department of Buildings shall be performed by Landlord's designated expeditor and Landlord's designated consulting engineer,  provided the charges of such expeditor and consulting engineer shall not exceed the commercially reasonable and competitive rates that are charged by the expediter and engineer normally retained by Tenant for its construction projects in Manhattan, which Tenant shall establish to Landlord's reasonable satisfaction  Prior to the commencement of any such alterations or improvements, Tenant shall, at its sole cost and expense, obtain and exhibit to Landlord any governmental permit required in connection therewith  In order to compensate Landlord for the costs incurred by Landlord in connection with the review and approval of Tenant's Plans for Tenant's Work and for any future alterations or improvements, Tenant shall pay to Landlord Landlord's reasonable, out-of-pocket third-party costs incurred in connection with the review and approval of such plans, except that such costs shall not exceed Twenty-Five Thousand dollars ($25,000) with respect to the review of Tenant's Plans for Tenant's Work

(iii)    All alterations and improvements shall be done in compliance with all other applicable provisions of this Lease and with all applicable Laws, including, without limitation, the Americans with Disabilities Act of 1990 and New York City Local Law Nos  57 (Equal Access to Bathroom Facilities) and 87 (Obstruction of Exits) and similar present or future laws, and regulations issued pursuant thereto, and also New York City Local Law No. 76 (Asbestos Control Program) and similar present or future laws, and regulations issued pursuant thereto

(iv)    All Tenant's Work and subsequent alterations and improvements shall be performed by duly licensed and insured professionals, and Tenant agrees to use all commercially reasonable efforts to ensure labor harmony in the performance of Tenant's Work and subsequent alterations and improvements, and of Tenant's operation of the Leased Space  Tenant acknowledges that there is union work being performed within the

- 26 -

Building  The performance of any Alteration shall not be done in a manner which would violate Landlord's union contracts affecting the Property, or create any work stoppage, picketing, labor disruption, disharmony or dispute or any interference with the business of Landlord or any tenant or occupant of the Building. Tenant shall promptly stop the performance of any Alteration if Landlord notifies Tenant that continuing such Alteration would violate Landlord's union contracts affecting the Property, or create any work stoppage, picketing, labor disruption, disharmony or dispute or any interference with the business of Landlord or any tenant or occupant of the Building, and Tenant shall not resume the performance of such Alteration until such time as such Alteration may be performed in a manner which shall not violate such union contracts or create such work stoppage, picketing, labor disruption, disharmony or dispute or interference  Notwithstanding the foregoing sentence, in the event that Landlord becomes or is made aware of the possible assertion of a claim that would result in labor disharmony by virtue of the manner in which Tenant is performing an Alteration, it shall, thereupon, give prompt notice thereof to Tenant and shall extend commercially reasonable efforts to convene, within five (5) business days, a meeting among Landlord, Tenant and the representatives of the concerned union(s), at which Landlord and Tenant shall both extend commercially reasonable efforts to resolve and settle the disharmony in question (but on the understanding that any payments made or to be made in resolution and settlement of such disharmony shall be the sole responsibility of Tenant)

(v)  Tenant shall keep the Building and the Leased Space free and clear of all liens for any work or material claimed to have been furnished to Tenant or to the Leased Space as provided in Section [18]

(vi)  Prior to the commencement of any work by or for Tenant, Tenant shall furnish to Landlord certificates evidencing the existence of the following insurance

(A)  Workmen's compensation insurance covering all persons employed for such work and with respect to whom death or bodily injury claims could be asserted against Landlord, Tenant or the Leased Space; and

(B)  Broad form general liability insurance written on an occurrence basis naming Tenant as an insured and naming Landlord and its reasonable designees (including, without limitation, Landlord's mortagee(s) and managing agent) as additional insureds, with limits of not less than $3,000,000 combined single limit for personal injury in any one occurrence, and with limits of not less than $500,000 for property damage (the foregoing limits may be revised from time to time by Landlord to such higher limits as Landlord from time to time reasonably requires)  Tenant, at its sole cost and expense, shall cause all such insurance to be maintained at all time when the work to be performed for or by Tenant is in progress  All such insurance shall be obtained from a company authorized to do business in New York and shall provide that it cannot be canceled without thirty (30) days' prior written notice to Landlord All polices, or certificates therefor, issued by the insurer and bearing notations evidencing the payment of premiums, shall be delivered to Landlord  Blanket coverage shall be acceptable, provided that coverage meeting the requirements of this paragraph is assigned to Tenant's location at the Leased Space

- 27 -

PHBF/ 739688 8

(vii)    All work to be performed by Tenant shall be done in a manner which will not unreasonably interfere with or disturb other tenants and occupants of the Building.

(viii)    The review and/or approval by Landlord, its agents, consultants and/or contractors, of any alteration or improvement or of plans and specifications therefor and the coordination of such alteration or improvement work with the Building, as described in part above, are solely for the benefit of Landlord, and neither Landlord nor any of its agents, consultants or contractors shall have any duty toward Tenant, nor shall Landlord or any of its agents, consultants and/or contractors be deemed to have made any representation or warranty to Tenant, or have any liability, with respect to the safety, adequacy, correctness, efficiency or compliance with laws of any plans and specifications, alterations or improvements, or any other matter relating thereto

(ix)    Promptly following the substantial completion of any alterations or improvement, Tenant shall submit to Landlord   (A) one (1) sepia and one (1) copy on CD or other computer file (using a current version of Autocad or such other similar software as is then commonly in use) of final, "as-built" plans for the Leased Space (provided that Tenant has obtained same for its own use, failing which, Tenant shall supply its final working drawings marked to show "as built" conditions) showing all such alterations or improvements and demonstrating that such alterations or improvements were performed substantially in accordance with plans and specifications first approved by Landlord and (B) lien waivers and releases from all general contractors and, additionally,  subcontractors or materialman receiving or to receive at least Fifty Thousand dollars ($50,000) in connection with an alteration or improvement, Tenant's certification of completion, and all governmental approvals and confirmations of completion for such alterations

(b)    To the extent Tenant and its designees require access to areas of the Property outside of the Leased Space to commence and complete any such alterations or improvements permitted pursuant to this Section [17], Landlord shall reasonably endeavor to provide or coordinate such access  All alterations, additions or improvements to the Leased Space, including air-conditioning equipment and duct work [except signage, movable furnishings,  trade fixtures and trade equipment installed at the expense of Tenant, which shall in all events be removed prior to the expiration or sooner termination of this Lease] shall, unless Landlord elects otherwise in writing, become the property of Landlord, and shall be surrendered with the Leased Space, at the expiration or sooner termination of the term of this Lease Notwithstanding anything contained in this Lease to the contrary, Tenant shall not be obligated to remove any alterations or improvements hereinafter performed in or to the Leased Space except for Specialty Alterations  For purposes hereof, "Specialty Alterations" shall mean alterations or improvements which are structural in nature or penetrate or otherwise affects any floor slab, and other alterations or improvements  which are not typical of a retail tenant located in an office building in midtown Manhattan (i.e , cannot reasonably be reused by a succeeding retail tenant and/or would be unusually costly to remove), including but not limited to· water fountain or water features, mezzanine, safes, decorative stair case, interior and storefront signage; provided, however, in no event shall any of the initial Tenant's Work which is consistent with Landlord's conceptual approval under Section [17](a)(i) above (including,

- 28 -

without limitation, Tenant's storefront elevation and Tenant's preliminary plans, but exclusive of Tenant's signage and moveable furnishings, fixtures and trade equipment which shall be removed in accordance with Section [10](h)(i)) be required to be removed, whether or not any of same would be classified as a "Specialty Alteration" Tenant shall, at Tenant's cost and expense, remove any Specialty Alteration designated by Landlord, repair any damage to the Leased Space or the Building due to such removal, cap all electrical, plumbing and waste disposal lines in accordance with sound construction practice and restore the Leased Space to the condition existing prior to the making of such Specialty Alteration Any such designation for removal of Specialty Alterations with respect to the Expiration Date of the Term shall be made at least one hundred twenty (120) days prior thereto All such work shall be performed in accordance with plans and specifications first approved by Landlord and all applicable terms, covenants, and conditions of this Section [17] and of this Lease If Landlord's insurance premiums increase as a result of any Specialty Alterations, Tenant shall pay each such increase each year as Additional Rent upon receipt of a bill therefor from Landlord

[18]    **LIENS.** Tenant shall keep the Property and Leased Space free from any liens arising from any labor performed by or on behalf of, or materials furnished to, Tenant If any such lien attaches, and the same is not discharged of record or bonded off within twenty (20) days after Landlord notifies Tenant thereof, then Landlord shall have the option to discharge the same in such manner as it may elect and Tenant shall reimburse Landlord promptly therefor as Additional Rent.

[19]    **DAMAGE.**

(a)    In the event of damage to or destruction of the Leased Space, or to any portions of either the Building or the Common Areas and Facilities (whether or not the Leased Space is directly affected), caused by fire or other casualty, Landlord shall make repairs and restorations (i) to the core and shell of the Leased Space, and otherwise restore the Leased Space to the condition thereof on the Commencement Date, and (ii) to the Building and/or the Common Areas and Facilities to the extent necessary to supply access or services to the Leased Space (collectively, "Landlord's Restoration Work"), all as hereinafter set forth, unless this Lease is terminated by either Landlord or Tenant as hereinafter provided. If the damage or destruction is to the Leased Space or to any portion(s) of the Common Areas and Facilities and the same cannot be restored within eighteen (18) months after the casualty to the condition as existed immediately prior to such damage or destruction, then Landlord shall so advise Tenant promptly, and either party hereto, for a period of thirty (30) days after Tenant's receipt of such notice, shall have the right to terminate this Lease by notice to the other, as of the date specified in such termination notice, which termination date shall be no earlier than thirty (30) days nor later than sixty (60) days after the date of such termination notice Additionally, if the Leased Space is rendered wholly untenantable by fire or other casualty and if Landlord shall decide not to restore the Leased Space, or if the Building shall be so damaged that Landlord shall decide to demolish it or not to rebuild it (whether or not the Leased Space has been damaged), Landlord may, within ninety (90) days after such fire or other casualty, give written notice to Tenant of its election that the Term of this Lease shall automatically expire, upon a date set forth in such notice which is not less than ten (10) nor more than thirty (30) days after such notice is given In the event of such fire or other casualty, if this Lease is not terminated pursuant to the

- 29 -

provisions of this <u>Section [19]</u>, then Landlord shall proceed diligently to perform Landlord's Restoration Work  In effecting such restoration as to damage covered by a peril required to be insured by Landlord under <u>Section [12](c)</u>, Landlord shall not be required to expend more than the net insurance proceeds received by it (or, absent such insurance for any reason, the net proceeds which would have been received by it) plus the amount of the deductible maintained (or, absent such insurance, would reasonably would have been maintained) under Landlord's insurance policy in question

        (b)      In the event of such damage or destruction and if this Lease has not been terminated as elsewhere provided herein, if Landlord has not "<u>substantially completed</u>" (being defined as completion of such work to the point when Landlord is ready to re-deliver exclusive possession of the Leased Space to Tenant with only punch-list items (i.e , items which do not and will not adversely affect Tenant's ability to perform Tenant's Work) remaining to be completed) the repairs and reconstruction of the Leased Space within eighteen (18) months (subject to extension for force majeure) after the date on which such damage or destruction occurred, Tenant, at its option, may terminate this Lease effective within thirty (30) days thereafter by giving notice thereof to Landlord at any time prior to the substantial completion of such work, <u>provided</u>, <u>however</u>, if Landlord substantially completes such restoration within such thirty (30) day period, Tenant's termination shall be nullified, and this Lease shall thereafter continue in full force and effect

        (c)      [Intentionally Omitted]

        (d)      If Landlord elects to terminate this Lease as provided herein, then it is agreed and understood that no such notice of termination by Landlord shall be effective unless Landlord shall have similarly and simultaneously cancelled the leases of all other tenants in the Building so affected by the damage or destruction

        (e)      If any such damage or destruction to the Leased Space or to any portions of the Common Areas and Facilities or to the Building is of a nature or extent that Tenant's continued use and occupancy of the Leased Space is impaired, the Rent payable by Tenant hereunder shall be equitably abated until the date on which Landlord substantially completes Landlord's Restoration Work.

        (f)      Tenant hereby expressly waives the provisions of Section 227 of the New York Real Property Law or any like law which may hereafter be enacted and agrees that the foregoing provisions of this <u>Section [19]</u> shall govern and control in lieu thereof, this <u>Section [19]</u> being an express agreement governing any case of damage or destruction of the Leased Space by fire or other casualty

     [20]   **TAKING.**

        (a)      If any portion(s) of the Leased Space is taken or condemned for a public or quasi-public use by any lawful power or authority, or if Tenant is denied access to or egress from the Leased Space by any action or decree of any lawful power or authority, or if Tenant is denied or deprived of either the use, occupancy and/or enjoyment of the Leased Space and/or the ability to operate its business thereon or therefrom by action or decree of any lawful

- 30 -

power or authority, or by any written agreement between Landlord or any such power or authority (individually, and collectively, a "taking"), and the taking is not deemed "temporary" (as that term is hereinafter defined), this Lease shall, as to the part which is subject to the taking, terminate as of the date Tenant is denied or deprived of such possession, use, occupancy, enjoyment and/or operation of or on the Leased Space, and the Rent due hereunder shall be reduced proportionately by the square footage of the Leased Space which is so affected

(b)    A taking, whether partial or total, shall be deemed "temporary" hereunder if, as of the date on which such taking commenced, Tenant has the expectation that, within one hundred fifty (150) days after the taking, Tenant's access and egress to and from the Leased Space, and/or Tenant's possession, use, occupancy, enjoyment and operation of or on the Leased Space, as the case may be, shall be restored to the satisfaction of Tenant. In the event of a temporary taking, Rent shall be reduced as aforesaid, and Tenant's other obligations under this Lease shall be suspended, for the duration thereof. If, after one hundred fifty (150) days, notwithstanding Tenant's expectation, Tenant's rights have not been restored to Tenant's satisfaction as aforesaid, then Tenant shall notify Landlord to such effect, the taking shall no longer be deemed temporary, and the other provisions of this Section [20] applicable to a taking shall then apply. In the event of any total or partial taking, whether temporary or not, Tenant waives all claims against Landlord and agrees that its claim against the exercising power or authority shall be limited to those claims provided by applicable Laws for lessees similarly situated which shall not diminish the award to Landlord (which award shall include, without limitation, the value of the leasehold estate hereof), such as business interruption and loss of business, removal expenses and loss of leasehold improvements, trade fixtures and personalty

(c)    If this Lease shall continue after a partial taking, Landlord shall make such repairs and restorations to the remainder of the Property (including the Leased Space) as may be reasonably required for the continued operation of Tenant's business on and from the Leased Space (or the remainder thereof), but Landlord shall not be required to expend any sums in excess of the total net award and insurance proceeds received by it, provided, however, that if such collective proceeds are insufficient, in Landlord's opinion, to complete the repairs and restorations and Landlord is unwilling to expend any additional sums, then Landlord shall notify Tenant to that effect, and Tenant shall have the option of (i) terminating this Lease by giving notice to Landlord, the effective date of which shall be no less than fifteen (15) days and no more than sixty (60) days after the date of Tenant's notice, within thirty (30) days after Tenant's receipt from Landlord of Landlord's notice of its unwillingness to expend such additional sums and the Rent shall be apportioned as of the effective date of such termination notice, or (ii) paying to Landlord (without any right to offset or otherwise recoup the same) the additional amount needed to complete the repairs and restorations as may be required for the continued operation of its business on and from the Leased Space.

(d)    Landlord agrees to promptly notify Tenant of any taking

PHBF/ 739688 8

[21]   **TENANT'S DEFAULTS.** Each of the following events shall be an "Event of Default" hereunder

(a)     Tenant fails to pay when due any installment of Rent and such default shall continue for ten (10) days after notice of such default is given to Tenant, except that if Landlord shall have given two (2) such notices of default in the payment of any category of Rent in any twelve (12) month period, Tenant shall not be entitled to any further notice of its delinquency in any payment of such category of Rent until such time as twelve (12) consecutive months shall have elapsed without Tenant having failed to make any such payment when due (the "No-Notice Period"), and the occurrence of any default in any payment of such category of Rent for ten (10) days after such payment of such item of Rent is due within the No-Notice Period shall constitute an Event of Default, or

(b)     Tenant fails to observe or perform any other term, covenant or condition of this Lease and such failure continues for more than thirty (30) days after notice by Landlord to Tenant of such default, or if such default is of a nature that it cannot be completely remedied within thirty (30) days, failure by Tenant to commence to remedy such failure within said thirty (30) days, and thereafter diligently prosecute to completion all steps necessary to remedy such default, provided in all events the same is completed within one hundred eighty (180) days, or

(c)     Tenant files a voluntary petition in bankruptcy or insolvency, or is adjudicated a bankrupt or insolvent, or files any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any present or future federal bankruptcy act or any other present or future applicable federal, state or other statute or law, or makes an assignment for the benefit of creditors of all or substantially all of its assets, or seeks or consents to or acquiesces in the appointment of any trustee, receiver, liquidator or other similar official for Tenant or for all or any part of Tenant's property, or

(d)     a court of competent jurisdiction shall enter an order, judgment or decree adjudicating Tenant bankrupt, or appointing a trustee, receiver or liquidator of Tenant, or of the whole or any substantial part of its property, without the consent of Tenant, or approving a petition filed against Tenant seeking reorganization or arrangement of Tenant under the bankruptcy laws of the United States, as now in effect or hereafter amended, or any state thereof, and such order, judgment or decree shall not be vacated or set aside or stayed within ninety (90) days from the date of entry thereof

Upon the occurrence of any one or more of such Events of Default, Landlord may, at its sole option, give to Tenant three (3) days' notice of cancellation of this Lease (or of Tenant's possession of the Leased Space), in which event this Lease and the Term (or Tenant's possession of the Leased Space) shall terminate (whether or not the Term shall have commenced) with the same force and effect as if the date set forth in the notice was the Expiration Date stated herein, and Tenant shall then quit and surrender the Leased Space to Landlord, but Tenant shall remain liable for damages as provided in this Section [21]

- 32 -

## [22]   REMEDIES AND DAMAGES FOR TENANT'S DEFAULTS.

(a)   <u>Landlord's Remedies</u>.

(i)   <u>Possession/Reletting</u>. If any Event of Default occurs and this Lease and the Term, or Tenant's right to possession of the Leased Space, terminates as provided in <u>Section [21]</u>:

(A)   <u>Surrender of Possession</u>  Tenant shall quit and surrender the Leased Space to Landlord, and Landlord and its agents may immediately, or at any time after such termination, re-enter the Leased Space or any part thereof, without additional notice, by summary proceedings, or by any other applicable action or proceeding or otherwise in accordance with applicable legal proceedings (without being liable to indictment, prosecution or damages therefor), and may repossess the Leased Space and dispossess Tenant and any other persons or entities from the Leased Space and remove any and all of their property and effects from the Leased Space

(B)   <u>Landlord's Optional Reletting</u>  Landlord, at Landlord's option, may, without any obligation to do so or to attempt to do so, relet all or any part of the Leased Space from time to time, either in the name of Landlord or otherwise, to such tenant or tenants, for any term ending before, on or after the Expiration Date, at such rental and upon such other conditions (which may include concessions and free rent periods) as Landlord, in its sole discretion, may determine  Landlord shall have no obligation to accept any tenant offered by Tenant and shall not be liable for failure to relet (or, in the event of any such reletting, for failure to collect any rent due upon any such reletting, and no such failure shall relieve Tenant of, or otherwise affect, any liability under this Lease  Landlord, at Landlord's option, may make such alterations, decorations and other physical changes in and to the Leased Space as Landlord, in its sole discretion, considers advisable or necessary in connection with such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

(ii)   <u>Tenant's Waiver</u>. Tenant, on its own behalf and on behalf of all persons or entities claiming through or under Tenant, including all creditors, hereby waives all rights which Tenant and all such persons or entities might otherwise have under any applicable law (i) to redeem, or to re-enter or repossess the Leased Space, or (ii) to restore the operation of this Lease, after (A) Tenant shall have been dispossessed by judgment or by warrant of any court or judge, (B) any re-entry by Landlord, or (C) any expiration or early termination of the Term of this Lease, whether such dispossess, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease  The words "<u>re-enter</u>," "<u>re-entry</u>" and "<u>re-entered</u>" as used in this Lease shall not be deemed to be restricted to their technical legal meanings

(iii)   <u>Tenant's Breach</u>  Upon the occurrence and during the continuance of an Event of Default by Tenant or upon a threatened breach by Tenant, or any persons or entities claiming through or under Tenant, Landlord shall have the right to seek to enjoin such Event of Default or threatened breach and, with respect to an Event of Default, to

- 33 -

invoke any other remedy allowed by law or in equity as if reentry, summary proceedings and other special remedies were not provided in this Lease. The rights to invoke the remedies set forth above are cumulative and shall not preclude Landlord from invoking any other remedy allowed at law or in equity

(b)    Landlord's Damages

(i)    Amount of Damages. If this Lease and the Term, or Tenant's right to possession of the Leased Space, terminates as provided in Section [21], then

(A)    Tenant shall pay to Landlord all items of Rent payable under this Lease by Tenant to Landlord prior to the date of termination or re-entry;

(B)    Landlord may retain all monies, if any, paid by Tenant to Landlord, whether as prepaid Rent, a security deposit or otherwise, which monies, to the extent not otherwise applied to amounts due and owing to Landlord, shall be credited by Landlord against any damages payable by Tenant to Landlord, and the balance (if any) returned to Tenant,

(C)    Tenant shall pay to Landlord, in monthly installments, on the days specified in this Lease for payment of installments of Annual Minimum Rent, any difference between (i) Annual Minimum Rent and Additional Rent for the period that otherwise would have constituted the unexpired portion of the Term (assuming the Additional Rent during such period to be the same as had been payable for the year immediately preceding such termination or re-entry, increased in each succeeding year by four percent (4%) on a compounded basis), and (ii) the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of this Lease for any part of such period (after first deducting from such rents all reasonable costs and expenses incurred by Landlord in connection with the termination of this Lease, Landlord's re-entry upon the Leased Space and such reletting, including repossession costs, brokerage commissions, attorney's fees and disbursements, and alteration costs) (the "Deficiency"); it being understood that Landlord shall be entitled to recover the Deficiency from Tenant each month as the same shall arise, and no suit to collect the amount of the Deficiency for any month, shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding, and

(D)    whether or not Landlord shall have collected any monthly Deficiency, Tenant shall pay to Landlord, on demand, in lieu of any further Deficiency and as liquidated and agreed final damages, a sum equal to the amount by which the annual Minimum Rent and Additional Rent for the period that otherwise would have constituted the unexpired portion of the Term (assuming the Additional Rent during such period to be the same as had been payable for the year immediately preceding such termination or re-entry, increased in each succeeding year by four percent (4%) on a compounded basis) exceeds the then fair and reasonable rental value of the Leased Space, for the same period (with both amounts being discounted to present value at a rate of interest equal to the then annual rate of interest publicly announced from time to time by Citibank, N A., or its successor, in New York, New York as its "base rate" (or such other term as may be used by Citibank, N.A , or its successor, from time to

- 34 -

time, for the rate presently referred to as its "base rate") (the "Base Rate"), but not less than five percent (5%), less the aggregate amount of Deficiencies theretofore collected by Landlord pursuant to the provisions of Section [22](b)(i)(C) for the same period. If before presentation of proof of such liquidated damages to any court, commission or tribunal, the Leased Space, or any part thereof, shall have been relet by Landlord for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, the amount of rent reserved upon such reletting shall be deemed, prima facie, to be the fair and reasonable rental value for the part or the whole of the Leased Space so relet during the term of the reletting

(ii)    Reletting. If the Leased Space, or any part thereof, shall be relet together with other space in the Building, the rents collected or reserved under any such reletting and the expenses of any such reletting shall be equitably apportioned for the purposes of this Section [22](b)  Tenant shall not be entitled to any rents collected or payable under any reletting, whether or not such rents exceeds the Minimum Rent reserved in this Lease  Nothing contained in Section [22] shall be deemed to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages by applicable law, or of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this Section [22](b)

(c)    Interest. If any payment of Rent is not paid when due, interest shall accrue on such payment, from the date such payment became due until paid at the Default Rate  In connection therewith, Tenant acknowledges that late payment by Tenant of Rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impracticable to fix  Such costs include, without limitation, processing and accounting charges, and late charges that may be imposed on Landlord by the terms of any note secured by a mortgage covering the Property  Therefore, in addition to interest, if any amount of Minimum Rent or regularly-scheduled Additional Rent is not paid when due more than once in any twelve (12) month period, a late charge equal to 2% of each such amount shall be assessed and payable on demand therefor  Such interest and late charges are separate and cumulative and are in addition to and shall not diminish or represent a substitute for any of Landlord's rights or remedies under any other provision of this Lease

(d)    Other Rights of Landlord. If Tenant is in arrears in the payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to any items Landlord sees fit, regardless of any request by Tenant, subject, however, to any good faith dispute by Tenant as to whether such sums are owed.

(e)    Landlord May Cure Defaults. If an Event of Default shall occur and be continuing, Landlord may perform the same for the account of Tenant, and if Landlord, in connection therewith, makes any expenditures or incurs any obligations for the payment of money, including but not limited to reasonable attorney's fees, such sums so paid or obligations incurred shall be deemed to be Additional Rent hereunder, and shall be paid by Tenant to Landlord within five (5) days of rendition of any bill or statement therefor, and if the Term shall have terminated or expired at the time of the making of such expenditures or incurred of such obligations, such sums shall be recoverable by Landlord as damages

- 35 -

**[23]    LANDLORD'S DEFAULTS AND TENANT'S REMEDIES; LOSS OF LEASEHOLD.**

(a)    It shall constitute a default hereunder if, from and after the date of this Lease, Landlord fails to keep, observe or perform any of its obligations to be kept, observed or performed under this Lease within thirty (30) days after Landlord's receipt of notice of nonperformance from Tenant; provided, however, that if such breach cannot be cured within thirty (30) days, then within such additional time, if any, as is reasonably necessary to complete such cure, so long as Landlord has commenced such cure within the initial thirty (30) day period and diligently pursues such cure to completion.

(b)    If, by virtue of Landlord's bankruptcy, or otherwise, it becomes necessary to value such leasehold estate, then a variety of factors must be taken into account to make a determination whether Tenant's interest in the leasehold estate is adequately protected The parties hereto further acknowledge and agree that such determination of adequate protection must recognize the various unique aspects of the leasehold estate which cannot be duplicated, including, (i) the amount of rent and sums payable as additional rent therefor by Tenant if less than fair market value, (ii) the cost of leasehold improvements made by Tenant, (iii) the cost of furniture, fixtures and equipment installed by or on behalf of Tenant, (iv) the layout of the Leased Space for Tenant's business, and (v) the creation and development of good will and market presence for Tenant's business at the Leased Space

**[24]    OWNERSHIP, ENCUMBRANCES AND COMPLIANCE WITH LAWS.**

(a)    Landlord covenants, represents and warrants to and agrees with Tenant as follows

(i)    Landlord is the owner in fee simple of the Leased Space and the Property.

(ii)    Landlord is a limited liability company duly organized and validly existing under the laws of New York, Landlord has full power and authority under the laws of New York to execute and deliver this Lease and to perform its obligations hereunder, the signatory hereto on behalf of Landlord has full power and authority to bind Landlord and all requisite actions necessary to authorize Landlord to execute and deliver this Lease and to perform its obligations hereunder have been taken

(iii)    To the best of its knowledge, Landlord has received no written notice from any governmental or quasi-governmental authority stating that the Leased Space is in violation of any Laws.

(iv)    The Property is a separately assessed real estate tax parcel for all purposes.

(b)    Tenant covenants, represents and warrants to Landlord that Tenant is a corporation duly organized and validly existing under the laws of Pennsylvania;

- 36 -

Tenant has full power and authority under the laws of Pennsylvania to execute and deliver this Lease and to perform its obligations hereunder; the signatory hereto on behalf of Tenant has full power and authority to bind Tenant and all requisite actions necessary to authorize Tenant to execute and deliver this Lease and to perform its obligations hereunder have been taken

[25]    **SUBORDINATION OF LEASE; ATTORNMENT.** This Lease shall not become subject or subordinate to any lease, right, claim, mortgage or deed of trust hereafter placed against or affecting the Leased Space or any portion or portions thereof unless and until the holder of any right or claim or the mortgagee under any mortgage or the lessor under any lease, as the case may be (hereafter the "holder") shall have executed, acknowledged and delivered to Tenant a recordable, written instrument in form and content which is reasonably the substantive equivalent of **Exhibit G** (the "Non-Disturbance Agreement") pursuant to which any such holder on behalf of itself and its respective heirs, personal representatives, successors and assigns (including any purchaser under foreclosure proceedings or grantee under a deed in lieu of foreclosure (the "Purchaser")) shall recognize Tenant's interest in this Lease and permit Tenant to remain in quiet possession of the Leased Space (together with Tenant's non-exclusive right in and to the Common Areas and Facilities) for the balance of the Term so long as Tenant shall timely pay the Minimum Rent as reserved hereunder and otherwise timely keep, observe and perform all of its obligations under this Lease It is hereby acknowledged and agreed that **Exhibit G** annexed hereto is a Non-Disturbance Agreement satisfactory to Landlord, Tenant and the current holder of the first mortgage affecting the Property, which such parties shall execute and deliver contemporaneously with (i e , within sixty (60) days of) the execution of this Lease

[26]    **ESTOPPEL CERTIFICATES.** Landlord and Tenant agree within twenty (20) days after receipt of request therefor to execute and deliver to the other a statement, addressed to such party, in writing, certifying. (a) that this Lease is in full force and effect and unmodified or, if modified, stating the date of modification and the terms thereof, (b) the Commencement Date, the Rent Commencement Date, and the Expiration Date, (c) that the Rent is paid currently without any offset or defense thereto, or stating any offsets or defenses claimed by Tenant or Landlord, as the case may be, and known at the time of such statement, (d) the amount of Rent, if any, paid in advance, and (e) that, to the actual knowledge of the certifying party, there are no uncured Events of Default by Tenant or defaults by Landlord, as the case may be, or stating those claimed by either Tenant or Landlord provided that, in fact, such Events of Default or defaults are ascertainable

[27]    **SHORING.** Tenant shall permit any person authorized to make an excavation on land adjacent to the Building containing the Leased Space to do any work within the Leased Space necessary to preserve the wall of the Building from injury or damage, and Tenant shall have no claim against Landlord for damages or abatement of rent by reason thereof

[28]    **NON-WAIVER OF DEFAULT; DARKENING OF WINDOWS.** No delay or omission by Landlord in exercising any right upon any Event of Default by Tenant or enforcing any Rule or Regulation, or any other provision of this Lease, or by Tenant in exercising any right upon any default by Landlord or enforcing any other provision of this Lease, will impair any such right or be construed as a waiver thereof or be deemed to be a waiver as to future events No waiver of any provision of this Lease shall be effective unless such waiver be

- 37 -

in writing signed by the party to be charged  This Lease shall not be affected by nor shall Landlord in any way be liable for the closing, darkening or bricking up of windows in the Leased Space as the result of construction on any property of which the Leased Space are not a part or by Landlord's own acts, or for any similar reason, provided, however, that Landlord shall not permanently darken or obstruct the windows unless required to do so by applicable Law

[29]   **AGENT.** Landlord and Tenant represent, warrant and agree that the only broker or agent with which they have dealt in connection with this Lease is The McDevitt Company and National Retail Group, a division of Newmark & Company Real Estate Inc , d/b/a Newmark Knight Frank, for whose commissions Landlord agrees to be solely responsible  Each of Landlord and Tenant agrees to indemnify, defend and hold the other harmless of, from and against any claims against or costs and expenses (including reasonable attorney's fees and expenses) incurred by the other resulting from a misrepresentation, breach of warranty, nonfulfillment of warranty or breach of agreement with respect to the foregoing by the indemnifying party  The provisions of this Section [29] shall survive the Expiration Date of the Term

[30]   **JURY WAIVER.** Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim involving any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Leased Space or involving the right to any statutory relief or remedy

[31]   **ENTIRE AGREEMENT; AMENDMENTS IN WRITING.** The parties hereto have read this Lease carefully and understand it fully.  The parties expressly understand and agree that this Lease sets forth all of the terms, covenants, conditions, promises and agreements relative to the Leased Space, and there are no terms, covenants, conditions, promises or agreements, either oral or written, express or implied, other than those set forth herein  Neither this Lease, nor any Exhibits or Schedules attached hereto, may be modified or amended except pursuant to a written agreement executed and delivered by both parties hereto

[32]   **PARTIES BOUND.** All rights and liabilities given to, or imposed upon, the parties to this Lease shall also extend to and bind their several and respective heirs, personal representatives, successors and assigns.

[33]   **RECORDATION OF MEMORANDUM OF LEASE.** At the request of either party hereto, such parties shall execute and deliver a recordable memorandum or short form of this Lease.  The requesting party shall (i) be responsible for all costs and expenses for recording same, and (ii) remove or discharge of record such memorandum or short form of lease prior to the expiration or sooner termination of the Term, at such party's sole cost and expense  The obligations of this Section shall survive the expiration or sooner termination of this Lease

[34]   **NOTICES.** All notices, statements, demands, requests, consents, communications and certificates to Landlord must be in writing and given by certified or registered mail, return receipt requested, postage prepaid, or by nationally-recognized overnight courier service, addressed to Landlord at the address set forth below (and regardless of whether or not the provisions of this Lease specifically indicate that a notice shall be in writing)  Except

- 38 -

as expressly provided in this Lease to the contrary, all notices, statements, demands, requests, consents, communications and certificates by Landlord to Tenant must be in writing and given by certified or registered mail, return receipt requested, postage prepaid, or by nationally-recognized overnight courier service, addressed to Tenant at the address set forth below (and regardless of whether or not the provisions of this Lease specifically indicate that a notice shall be in writing) Any such notices, statements, demands, requests, consents, communications, or certificates may also be given to such other parties or addresses as Landlord or Tenant may designate in writing to the other from time to time in the manner prescribed above. All notices shall be deemed given upon receipt, or upon the first date of rejection or refusal of delivery. Notwithstanding the foregoing, bills may be sent by First Class United States mail, or such other method as the parties may agree upon

To Landlord    420 Lexington Avenue
             New York, NY  10170
             Attn.  Director of Leasing
                 and
             420 Lexington Avenue
             New York, NY  10170
             Attn   General Counsel-Real Property

with copy to    Davis & Gilbert LLP
             1740 Broadway
             New York, NY  10019
             Attn·  Jeffrey A. Moross, Esquire

To Tenant:    5000 South Broad Street
             Philadelphia, PA  19112
             Attn:  President
                 and
             5000 South Broad Street
             Philadelphia, PA  19112
             Attn   General Counsel

with copy to    Drinker Biddle & Reath LLP
             One Logan Square, Suite 2000
             Philadelphia, PA  19103-6996
             Attn   Harry S Cherken, Jr., Esquire

       [35]   **PARTIAL INVALIDITY.**  If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease and the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term, covenant and condition of this Lease shall be valid and enforceable to the fullest extent permitted by law.

PHBF/ 739688 8

[36]    **HEADINGS; GENERAL INTERPRETIVE PRINCIPLES.**

(a)    Any headings preceding the text of the various Sections and subsections hereof are inserted solely for convenience and reference and shall not constitute a part of this Lease, nor shall they affect its meaning, construction or effect

(b)    For purposes of this Lease, except as otherwise expressly provided or unless the context otherwise requires, (i) the terms defined in this Lease have the meanings assigned to them and include the plural as well as the singular, and the use of any gender hereunder shall be deemed to include the other genders, (ii) references herein to "Sections," "subsections," "paragraphs" and other subdivisions without reference to a document are to designated Sections, subsections, paragraphs and other subdivisions of this Lease, (iii) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to paragraphs and other subdivisions; (iv) the words "herein," "hereof," "hereunder" and other words of similar import refer to this Lease as a whole and not to any particular provision, and (v) the word "including" means "including, but not limited to "

[37]    **MISCELLANEOUS.** The delivery or acceptance of keys to Landlord or its agents shall not constitute a termination of this Lease or a surrender of the Leased Space Acceptance by Landlord of less than the Rent herein provided shall at Landlord's option be deemed on account of earliest Rent remaining unpaid, but such application shall be without prejudice to any right Tenant may have to dispute the appropriateness of the item of Rent in question No endorsement on any check, or letter accompanying Rent, shall be deemed an accord and satisfaction, and such check may be cashed without prejudice to Landlord The statement in this Lease of the nature of the business to be conducted by Tenant shall not be deemed to constitute a representation or guaranty by Landlord that such use is lawful or permissible in the Leased Space under the certificate of occupancy for the Building

[38]    **FORCE MAJEURE.** If either Landlord or Tenant shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, martial law, restrictive Laws, riots, insurrection, acts of terrorism, war or other reasons of a like nature not the fault of, or under the reasonable control of, the party delayed in performing work or doing acts required under the terms, covenants, conditions or provisions of this Lease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay, provided, however, that the foregoing provisions of this Section [38] shall not apply to (i) any reimbursement or payment obligation of Landlord hereunder, (ii) Tenant's obligation to pay Rent (except in those instances under this Lease which specifically provided for a reduction or abatement thereof, as in Sections [19] and [20] relating to fire, casualty and taking), or (iii) any other performance obligation under this Lease which specifically provides that the provisions of this Section [38] shall not apply, provided further, that as to the aforesaid payment or reimbursement obligations, the provisions of this Section [38] shall apply if delivery thereof is delayed because of any of the foregoing occurrences or events and either Landlord or Tenant, as the case may be, is able to

- 40 -

establish that payment or reimbursement was presented to the delivery service (including either the postal or courier service) on or before the due date therefor

[39]    **DEFAULT RATE.** Any payment of any sums hereunder, or sums advanced or expended to or on behalf of one of the parties hereto by the other party, whether by Landlord to Tenant, or by Tenant to Landlord, which is not made or repaid when due shall accrue interest at the Default Rate from the due date through the date of collection or set-off, as the case may be.

[40]    **ATTORNEY'S FEES.** If either Landlord or Tenant shall institute any action or proceeding against the other relating to any of the terms, covenants, conditions or provisions of this Lease, or there occurs any Event of Default by Tenant or default by Landlord, the unsuccessful party in such action or proceeding shall reimburse the successful party for reasonable attorney's fees and other costs and expenses incurred therein by the successful party, including fees, costs and expenses incurred in any appellate proceeding

[41]    **QUIET ENJOYMENT.** Upon payment by Tenant of the Rent reserved and provided to be paid by Tenant hereunder and upon the keeping, observance and performance by Tenant of all of the terms, covenants, conditions and provisions of this Lease on Tenant's part to be kept, observed and performed, Tenant shall peaceably and quietly hold and enjoy the Leased Space for the Term without hindrance or interruption by Landlord or by any person or persons lawfully claiming or holding by, through or under Landlord

[42]    **RENT CONTROL.** If, at the commencement of or at any time or times during the Lease Term, the Rents reserved in this Lease shall not be fully collectible by reason of any Law, Tenant shall enter into such reasonable agreements and take such other reasonable steps (without additional material expense to Tenant) as Landlord may request and as may be legally permissible to permit Landlord to collect the maximum rents that may, from time to time during the continuance of such legal rent restriction, be legally permissible (and not in excess of the amounts reserved therefor under this Lease) Upon the termination of such legal rent restriction prior to the expiration of the Term, (a) the Rents shall become and thereafter be payable hereunder in accordance with the amounts reserved in this Lease for the periods following such termination, and (b) Tenant shall pay to Landlord, if legally permissible, an amount equal to (i) the items of Rent that would have been paid pursuant to this Lease but for such legal rent restriction, less (ii) the rents paid by Tenant to Landlord during the period or periods such legal rent restriction was in effect.

[43]    **LANDLORD'S CONSENT.** If Landlord shall refuse to give consent or approval when Landlord's consent or approval is required under this Lease, Tenant in no event shall be entitled to and shall not make any claim, and Tenant hereby waives any claim against Landlord which it may have based upon any assertion that Landlord has unreasonably withheld or unreasonably delayed any such consent hereunder, and Tenant agrees that its sole remedy shall be an action or proceeding to enforce any such provision or for specific performance, injunction or declaratory judgment. In the event of such a determination, the requested consent shall be deemed to have been granted, however, Landlord shall have no liability to Tenant for its refusal or failure to give such consent   The sole remedy for Landlord's unreasonably

- 41 -

withholding or delaying of consent shall be as provided in this Section [43]. Notwithstanding anything in this Lease to the contrary, any dispute relating to the withholding or delay of consent by Landlord (in those instances where Landlord is required, by law or by the express terms of this Lease, not to unreasonably withhold such consent) may be determined, at Tenant's option, under the Expedited Procedures provisions of the Commercial Arbitration Rules of the American Arbitration Association (presently Rules E-1 through E-10); provided, however, that with respect to any such arbitration, (i) the list of arbitrators referred to in Rule E-4 shall be returned within five (5) business days from the date of mailing, (ii) the parties shall notify the American Arbitration Association, by telephone, within four (4) days of any objections to the arbitrator appointed and will have no right to object if the arbitrator so appointed was on the list submitted by the American Arbitration Association and was not objected to in accordance with the second sentence of Rule E-4(c), (iii) the Notice of Hearing referred to in Rule E-7 shall be four (4) days in advance of the hearing, (iv) the hearing shall be held within seven (7) days after the appointment of the arbitrator, and (v) the arbitrator shall have no right to award damages. Judgment upon any decision rendered in any arbitration held pursuant to this Section [43] shall be final and binding upon Landlord and Tenant, whether or not a judgment shall be entered in any Court  Each party shall pay its own counsel fees and expenses, if any, in connection with any arbitration under this Section [43], including the expenses and fees of any arbitrator selected by it in accordance with the provisions of this Section [43], and the parties shall share all other *expenses and fees of any such arbitration  The arbitrators shall be bound by the provisions of* this Lease, and shall not add to, subtract from or otherwise modify such provisions  To the extent of any inconsistency between the terms and provisions of this Section [43] and the Commercial Arbitration Rules of the American Arbitration Association, the terms and provisions of the Commercial Arbitration Rules of the American Arbitration Association shall govern and prevail

## [44]    LIMITATION ON LANDLORD'S LIABILITY.

(a)    Tenant shall look solely to Landlord's estate and interest in the Property, including any undistributed rents, profits and proceeds therefrom, for the satisfaction of any right of Tenant for the collection of a judgment or other judicial process requiring the payment of money by Landlord; subject, however, to the prior rights of any superior mortgagee or superior lessor, and no other property or assets of Landlord, Landlord's agents, officers, directors, members, principals (disclosed or undisclosed) or affiliates shall be subject to levy, lien, execution, attachment, or other enforcement procedure for the satisfaction of Tenant's rights and remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder or under law, or Tenant's use and occupancy of the Leased Space or any other liability of Landlord to Tenant

(b)    Tenant covenants and agrees that Landlord shall not be liable to Tenant, its agents, servants or employees for any action of the elements, or, unless directly due to the gross negligence or willful misconduct of Landlord, for any injury or damage to the property of Tenant or others whose property is within or upon the Leased Space, because of water or other liquids, rain or snow which may leak or flow from or to any part of the Building, including but not limited to water or liquids which may leak or flow from any pipes, gutters, leaders, appliances, plumbing, fixtures, roof or any other place or source to, from or within the

- 42 -

*Building or from the appurtenant street or sewer or as the result of surface or subsurface conditions*

(c)    If the Building containing the Leased Space shall be sold, transferred or leased, or the lease thereof transferred or sold, Landlord shall be relieved of all future obligations and liabilities hereunder and the purchaser, transferee or tenant of the Building shall be deemed to have assumed and agreed to perform all such obligations and liabilities of Landlord hereunder  In the event of such sale, transfer or lease, Landlord shall also be relieved of all existing obligations and liabilities hereunder, provided that the purchaser, transferee or tenant of the Building assumes in writing such obligations and liabilities, and Tenant shall be informed of the new address for payment of Rent hereunder

[45]    **HOLDING OVER.**  Should Tenant remain in possession of the Leased Space after the Expiration Date or sooner termination of the Term without the execution of a new lease, such holding over, in the absence of a written agreement to the contrary, shall be deemed, if Landlord so elects in writing, to have created and be construed to be a tenancy from month-to-month terminable on thirty (30) days' notice by either party to the other, all subject to all the other terms and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy  In the event of any such holding over by Tenant, Tenant shall pay as holdover rental for each month (or any portion of a month) that Tenant shall so hold over in the Leased Space, (a) *for the first thirty (30) days of the holdover, an amount equal to one and one-half (1.5) times the* sum of (i) the monthly installment of Minimum Rent payable during the last month of the Term and (ii) one-twelfth (1/12th) of Tenant's Share of Real Estate Taxes in accordance with Section [7](b) payable for the last Lease Year of the Term, and (b) thereafter, two (2) times the sum of (i) the monthly installment of Minimum Rent payable during the last month of the Term and (ii) one-twelfth (1/12th) of Tenant's Share of Real Estate Taxes in accordance with Section [7](b) payable for the last Lease Year of the Term

[46]    **GOVERNING LAW.**  This Lease shall be construed, interpreted and governed by the laws of the State in which the Leased Space is situated

[47]    **COUNTERPARTS; FACSIMILES.**

(a)    This Lease may be executed in any number of counterparts, each of which shall be an original, and such counterparts together shall constitute one and the same instrument

(b)    The parties hereto agree that a facsimile (or similar electronic) transmission of an executed counterpart of this Lease shall have the same binding effect on the signatory as an executed and delivered original thereof  The parties hereto further agree, for confirmatory purposes only, to exchange copies of executed counterpart originals promptly after the aforesaid facsimile (or similar electronic) transmissions so that each party may have at least one (1) fully executed original hereof

[48]    **LEASE SUBMISSION.**  Landlord and Tenant agree that this Lease is submitted to Tenant on the understanding that it shall not be considered an offer and shall not bind Landlord in any way unless and until (i) Tenant has duly executed and delivered duplicate

- 43 -

originals thereof.to Landlord and (ii) Landlord has executed and delivered one of said originals to Tenant

[49]    **FUTURE CONDOMINIUM CONVERSION.** Tenant acknowledges that the Building and the Land may be subjected to the condominium form of ownership prior to the end of the Term of this Lease  Tenant agrees that if, at any time during the Term, the Building and the Land shall be subjected to the condominium form of ownership, then, this Lease and all rights of Tenant hereunder are and shall be subject and subordinate in all respects to any condominium declaration and any other documents (collectively, the "Declaration"), provided that such Declaration does not materially increase Tenant's obligations, or materially decrease Tenant's rights, under this Lease, which shall be recorded in order to convert the Building and the Land to a condominium form of ownership in accordance with the provisions of Article 9-B of the Real Property Law of the State of New York or any successor thereto  If any such Declaration is to be recorded, Tenant, upon request of Landlord, shall enter into an amendment of this Lease in such respects as shall be necessary to conform to such condominiumization, including, without limitation, appropriate adjustments to Real Estate Taxes Payable During the Base Tax Year and Tenant's Share

[50]    **RIGHT OF ENTRY.** Tenant shall permit Landlord to erect, construct and maintain pipes, conduits and shafts in and through the Leased Space within walls or columns or above hung ceilings (or, if none, tight to the ceiling as provided in **Exhibit C**) or below floors, provided no protrusions or access panels are readily visible in the sales areas of the Leased Space), except that Tenant's right to reasonably approve the location thereof shall only apply to the installation of pipes, conduits and shafts which affect or require the relocation of Tenant's installations, or as provided in Exhibit C with respect to "tight to the ceiling" installations  Landlord or its agents shall have the right to enter or pass through the Leased Space at all times to examine the same, and to make such repairs, alterations or additions as it may deem necessary or desirable to the Leased Space or the Building, and to take all material into and upon the Leased Space that may be required therefor  Such entry and work shall not constitute an eviction of Tenant in whole or in part, shall not be grounds for any abatement of Rent, and shall impose no liability on Landlord by reason of inconvenience or injury to Tenant's business  Landlord shall have the right at any time, without the same constituting an actual or constructive eviction, and without incurring any liability to Tenant, to change the arrangement and/or location of entrances or passageways, windows, corridors, elevators, stairs, toilets, or other public parts of the Building, and to change the designation of rooms and suites and the name or number by which the Building is known  All entry by Landlord shall be performed in such manner as is commercially reasonably to minimize interference with the normal conduct of Tenant's business in the Leased Space, it being understood that, during periods of such entry, Tenant shall have the right to have a representative of Tenant present, except in the event of an emergency when no such representative is available, Landlord or its agents may access the Leased Space by reasonable force or otherwise

[51]    **TENANT'S RIGHT TO "GO DARK"; LANDLORD'S RECAPTURE RIGHT.** Tenant shall open for business as an Urban Outfitters retail store meeting the Operating Standard in the Leased Space for at least one (1) day  Other than the foregoing one (1) day opening covenant, Tenant shall not be obligated to operate a business of

- 44 -

any kind from the Leased Space and, at any time during the Term of this Lease, as the same may be extended, Tenant shall have the right, but not the obligation, to cease its business operations within the Leased Space, provided it keeps the storefront and the storefront windows "dressed" in such a manner so that the Leased Space appears to be an operating facility meeting the Operating Standard (which may be referred to herein as "Go Dark" or any verb-tense variation thereof), provided, however, that nothing herein shall be deemed to affect Tenant's obligation to pay full Rent during the period Tenant has Gone Dark If Tenant fails to keep the storefront and storefront windows so "dressed" and the same continues for five (5) business days following notice thereof, Landlord, at Tenant's expense, may do so in any manner it deems fitting (except that in doing so, the same will not identify any competitor of Tenant, i e , an apparel or home furnishings retailer selling similar merchandise at similar price points as is sold in Urban Outfitters or Anthropologie stores), the cost of which shall be paid by Tenant to Landlord, as Additional Rent, within thirty (30) days of Tenant's receipt of a reasonably substantiated demand therefor If Tenant Goes Dark from the Leased Space for a period of one hundred eighty (180) or more days ("Dark Period"), except for a Permitted Closure (defined below), Landlord shall have the right, but not the obligation, as its sole and exclusive remedy, to terminate this Lease and recapture the Leased Space at any time after, and during the continuance of, such Dark Period by delivering written notice to Tenant indicating its election to so terminate this Lease ("Termination Notice"). This Lease shall terminate sixty (60) days after Tenant's receipt of the Termination Notice; provided, however, that Tenant may nullify such termination by Landlord if, within thirty (30) days after Tenant's receipt of the Termination Notice, Tenant re-opens for business in the Leased Space. Notwithstanding the foregoing, from the date of the Termination Notice through the effective date of termination as set forth in such notice Termination Notice, Tenant shall continue to pay full Rent Notwithstanding anything contained herein to the contrary, Tenant shall not be required to open for business in the Leased Space (i) on nationally recognized holidays (e g , Christmas Day, Thanksgiving Day, New Year's Day, etc ), (ii) for periods of closure for conducting inventory and stock taking, (iii) for periods of closure for permitted remodeling, (iv) for periods of closure due to force majeure events, or (v) for other closures expressly permitted in this Lease (any of the foregoing being a "Permitted Closure")

[Signatures Follow]

IN WITNESS WHEREOF the parties hereto, intending to be legally bound, have caused this Lease to be duly executed, under seal, the day and year first above-written.

**LANDLORD:**

**GREEN 521 FIFTH AVENUE, LLC**, a New York limited liability company

By _____

Name: _____

Title _____

**TENANT:**

**URBAN OUTFITTERS, INC.**, a Pennsylvania corporation

By _____

Name  *Glen T. Senk*

Title  *Chief Executive Officer*