_Executed_

LOCATION:  Orangefair Marketplace

ORIGINAL

# LEASE

between

## CIRCUIT CITY STORES WEST COAST, INC.,

as Tenant

and

## THE ORANGEFAIR COMPANY LLC

as Landlord

Dated: _____, 1995

## ORANGEFAIR MARKETPLACE

EXHIBIT A

## TABLE OF CONTENTS

Page

1.    Leased Property ..................................................... 1

2.    Construction of Building and Improvements ..................... 1

3.    Lease Term ......................................................... 2

4.    Rent ................................................................ 3

5.    Development of Shopping Center by Landlord ................. 4

6.    Easements .......................................................... 4

7.    Common Areas and Common Area Maintenance ............... 6

8.    Signs and Communications Equipment ....................... 11

9.    Taxes .............................................................. 12

10.   Maintenance, Repairs and Replacements .................... 14

11.   Payment of Utility Bills ...................................... 14

12.   Alterations ....................................................... 14

13.   Mechanics' Liens ................................................ 15

14.   Insurance ......................................................... 15

15.   Damage by Fire or Other Casualty .......................... 20

16.   Condemnation ..................................................... 26

17.   Assignment and Subletting .................................... 29

18.   Use ................................................................ 30

19.   Warranties and Representations .............................. 31

20.   Estoppel Certificates. ......................................... 40

21.   Subordination, Non-Disturbance and Attornment ........... 40

22.   Change of Landlord ............................................. 41

                                                                    Page

23.    Tenant's Financing . . . . . . . . . . . . . . . . . . . . . . .   42

24.    Tenant's Property and Waiver of Landlord's Lien . . . . . . . . . . . . .   42

25.    Memorandum of Lease; Commencement Date Agreement . . . . . . . . . .   42

26.    Expiration of Term and Holding Over . . . . . . . . . . . . . . . . .   43

27.    "For Rent" Signs . . . . . . . . . . . . . . . . . . . . . . . . .   43

28.    Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . .   43

29.    Events of Tenant's Default . . . . . . . . . . . . . . . . . . . .   44

30.    Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . .   44

31.    Events of Landlord's Default; Tenant's Remedies . . . . . . . . . . . . .   46

32.    Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

33.    Compliance with Applicable Laws . . . . . . . . . . . . . . . . . .   47

34.    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

35.    Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

36.    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . .   49

37.    Effectiveness of Lease; Tenant's Right to Terminate . . . . . . . . . . . .   51

38.    Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . .   52

39.    Gross Sales Reporting . . . . . . . . . . . . . . . . . . . . . . .   53

40.    Effectiveness of Lease . . . . . . . . . . . . . . . . . . . . . . .   53

<u>Page</u>

THIS PAGE MUST BE KEPT AS THE LAST PAGE OF THE DOCUMENT.

SoftSolution Network ID: LA-REL:R58854.8        Type: LES

## LEASE

This LEASE is made as of the ____ day of _____, 1995, by and between THE ORANGEFAIR COMPANY LLC, a California limited liability company ("Landlord"), and CIRCUIT CITY STORES WEST COAST, INC., a California corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

### W I T N E S E T H :

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Leased Property.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, all those certain "Premises" consisting of an area of the "Shopping Center" (defined below) containing approximately 38,100 square feet, together with the easements described in paragraph 6 below.  The Building and Other Improvements (both as defined in paragraph 2) will be constructed on the Premises, which is identified (approximately) and outlined in red on Exhibit "A" hereto (the "Site Plan"), and are all located in the Shopping Center, which consists of that certain real property with buildings and improvements constructed or to be constructed thereon, located at Harbor Boulevard and Orangethorpe Avenue, lying and being in the City of Fullerton (the "City"), County of Orange, State of California (the "State"), and more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto and made a part hereof for all purposes. All of the Shopping Center exclusive of the Premises is "Landlord's Premises".

2.     Construction of Building and Improvements.  Commencing immediately upon "Delivery of the Premises" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall construct on the Premises a one-story retail building, containing approximately 38,100 square feet of ground-floor gross leasable area, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions.  The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements".  The Improvements shall be

1

constructed by Tenant in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be held by Tenant until the termination or earlier expiration of the Lease, at which time title to the Improvements shall automatically vest in Landlord.

    3.    <u>Lease Term</u>. Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Premises to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined below). The main term (the "Main Term") of the Lease shall commence on the "Commencement Date," which is defined as the earlier of (i) Tenant's opening for business in the Improvements, or (ii) Two Hundred Ten (210) days following the later of either (x) "Delivery of the Premises," or (y) the earlier of the date upon which Tenant has obtained the necessary permits for the construction of the Improvements or sixty (60) days following the "Lease Date" (as such term is defined in Paragraph 40 below), and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

    In addition to the Main Term, Tenant shall have the option (a "Renewal Option") to renew and extend the Lease for two (2) consecutive five (5) year periods and one (1) four (4) year period (collectively, the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days and not more than three hundred sixty (360) days prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such Renewal Option, if Tenant shall fail to give any such notice within the one hundred eighty (180) day time limit and shall not have given Landlord prior written notice of its intent not to exercise its Renewal Option, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired), until ten (10) business days after Landlord shall have given Tenant a written notice of Landlord's election to terminate the Renewal Option, during which period Tenant may exercise its Renewal Option at any time prior to the expiration of such ten (10) business day period. Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the Term (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice

without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

    4.    <u>Rent</u>.

    (a)    <u>Base Rent</u>. During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to the provisions of paragraph 1 of the Construction Provisions) on the Commencement Date and thereafter on the first day of each succeeding calendar month throughout the Term.

Tenant shall pay Base Rent in equal monthly installments, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in paragraph 4(b) below, Base Rent shall be paid pursuant to the following schedule:

    (i)    <u>First Five Years</u>. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Nine Dollars ($9.00) times the actual gross area (in square feet) of the Premises, payable in equal monthly installments. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

    (ii)    <u>Increases in Base Rent</u>. Annual Base Rent shall increase on the first day of the sixth Lease Year and every succeeding fifth Lease Year, over the initial Base Rent charged hereunder by the lesser of $1.00 per square foot of gross area or one and one-half (1-½) times the percentage increase in the "CPI-U" (as defined below) during the five (5) year period ending on October 31 of the sixth (or, as applicable, any succeeding fifth) Lease Year. As used herein, the CPI-U shall be the Consumer Price

3

Index -- All Urban Consumers (Los Angeles - Anaheim - Riverside; 1982-84=100), as published by the United States Department of Labor, Bureau of Labor Statistics. If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another, similar governmental agency, which index is most nearly equivalent to the CPI-U.

     5.    Development of Shopping Center by Landlord. The location of buildings and other tenant space within the Shopping Center will only be within the "Permissible Building Areas" as shown on the Site Plan, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) four and one-half (4.5) spaces (for full-sized automobiles) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements. All such parking shall be at ground level. Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of any construction performed by or on behalf of Landlord within the Shopping Center. Landlord shall not permit construction traffic over the Premises, and Landlord shall refrain from interfering with the conduct of Tenant's business. Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

     6.    Easements. In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of the Shopping Center, as set forth below, during the Term and shall expire or terminate simultaneously with this Lease, except as provided below for earlier termination thereof.

     (a)    Construction Easements. For the period of Tenant's construction of the Improvements, and any renovation or reconstruction thereof, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Premises, over the Common Areas (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises. In addition, Landlord grants to Tenant an exclusive easement for a construction staging area (the "Staging Area") of approximately 5,000 square feet, in a

4

portion of the Common Areas as designated on the Site Plan for Tenant's use in constructing the Improvements.

(b)    Footing and Foundation Easements.  Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in Landlord's Premises and the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and demising walls; (ii) to allow their respective buildings to abut and connect (but not to bear structurally upon each other unless and except as otherwise provided herein); (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets; and (iv) for encroachments which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (iii) above.  No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by the party to whose building the attachment is to be made, which approval shall not be unreasonably withheld.

(c)    Utility Easements.  During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use of the Common Areas by other occupants of the Shopping Center, for the benefit of the Premises.  For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord.

(d)    Common Area Easement.  During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor.  It is specifically agreed that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-

5

Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements, and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", Tenant shall have the right under this Lease to designate such parking spaces for exclusive use by Tenant or Tenant's customers, invitees and patrons; provided, however, that Tenant shall not have the right to enforce such exclusive use of such parking spaces by towing, "ticketing," or otherwise. Upon receipt by Landlord of written complaint by any other tenant of the Shopping Center alleging that such exclusive parking designation by Tenant violates the lease pursuant to which such other tenant occupies a portion of the Shopping Center, Landlord shall in good faith and using commercially reasonable efforts attempt to negotiate with such tenant to permit Tenant to maintain such exclusive parking designation. For purposes of this Paragraph 6(d), "commercially reasonable efforts" shall not include the expenditure of any funds by Landlord. In the event that Landlord is unsuccessful in its efforts to convince such complaining tenant to permit Tenant to continue to designate Tenant's Customer Pick-Up parking area for the exclusive use Tenant or Tenant's customers, invitees, and patrons, Landlord shall provide Tenant with written notice of the same, and within a reasonable time following Tenant's receipt of such notice, Tenant shall remove any signs or other items designating such parking spaces exclusively as Tenant's. In addition, Tenant shall have the right to use such Common Areas as are immediately adjacent to Tenant's Improvements and within the Tenant's Preferred Area as shown on the Site Plan for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations.

(e)    Non-Dedication. None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.    Common Areas and Common Area Maintenance.

(a)    Definition of Common Areas. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, elevators, escalators, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and

available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees.   Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylon, monument, and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)   CAM Charges.  For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs, fees and expenses of insuring (including the amount of any "commercially reasonable deductible" paid by Landlord, as more particularly set forth in paragraph 14(f) below), repairing, operating and maintaining the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount not to exceed seven percent (7%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures and real estate taxes).  Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1) real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to the Shopping Center necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition, or made to any interior mall space or space occupied by an occupant or tenant of the Shopping Center or to any buildings or utility systems not part of the Common Areas;

(4) repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the

7

Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7) premiums for liability insurance for the Common Areas and Additional Areas of the Shopping Center for coverage in excess of the greater of limits established in paragraph 14(e) below or that which is commercially reasonable for shopping centers of similar size and type in the Orange County area;

(8) repairs, replacements or other improvements of a capital nature (whether or not capitalized), unless the costs of same are amortized over the entire useful life of such repairs or replacements and provided that repairs or replacements are not the direct result of initial defects in materials or workmanship; provided, however, in no event shall Tenant's Pro Rata Share of said charges exceed Ten Thousand Dollars ($10,000) in any one CAM Year, such amount to be adjusted in accordance with the CPI-U at the same times as set forth in Paragraph 4(a)(ii) above for Base Rent;

(9) improvements, repairs or replacements (other than patching and similar minor periodic maintenance), including without limitation restriping, re-covering, or re-asphalting, of the parking lot or other paved areas during the first five (5) "CAM Years" (as defined below);

(10) reserves for anticipated future expenses;

(11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12) Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(13) amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions); or

(14) other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent

8

with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

In addition, provided Tenant is provided advertising space on the pylon and/or monument signs referenced in paragraph 8, Tenant shall pay as additional rent the out-of-pocket costs incurred by Landlord in operating, repairing and maintaining such signs so long as Tenant's obligation hereunder shall be limited to the payment of "Tenant's Portion" of such costs, and Landlord or any other tenant or occupant advertised thereon shall pay the balance of such costs. For purposes hereof, "Tenant's Portion" shall be equal to the product of (i) such costs, and (ii) a fraction, the numerator of which shall be the number of square feet of surface area of Tenant's face panel, and the denominator of which shall be the total number of square feet of surface area available for all identification sign panels maintained thereon (including the Shopping Center name panel).

(c)    Tenant Payments. Commencing thirty (30) days following the date Tenant opens for business at the Premises, and continuing throughout the Term on a monthly basis, Tenant shall pay to Landlord its share of CAM Charges as billed by the Landlord pursuant hereto. Within thirty (30) days following the end of each calendar month, Landlord shall provide Tenant with a bill for actual CAM Charges for such preceding calendar month, broken down into separate categories corresponding to the major types of expenses (e.g., insurance, taxes, maintenance, repair, etc.). Tenant shall pay to Landlord such amount within thirty (30) days of receipt of such bill. The annual amount of CAM Charges shall be for periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"). In no event shall such CAM Charges (exclusive of Real Estate Taxes, the cost of utility usage at the Shopping Center, and Landlord's cost of insuring the Shopping Center pursuant to this Lease) exceed by more than five percent (5%) those in effect during the preceding CAM Year. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within sixty (60) days after the end of each CAM Year, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with

9

respect to amounts owed by either party for such preceding CAM Year shall thereupon be made.   Subject to adjustments as herein contemplated, Tenant's share of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction (such fraction being referred to herein as "Tenant's Pro Rata Share"), the numerator of which is the number of square feet of the ground-floor gross leasable area (excluding loading docks and outside sales areas) in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (excluding the area of any outside sales area and loading docks exclusive to a single occupant) in the Shopping Center.   In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls.   Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than the gross leasable area of the Shopping Center as shown on the Site Plan.   The remainder of CAM Charges shall be borne by Landlord and/or other tenants.   In the event that Landlord leases any non-ground floor space in the Shopping Center to any tenant and such tenant is obligated under its lease for such space to make direct payments of CAM Charges to Landlord, the amount of CAM Charges payable by such tenant shall be deducted from the amount of CAM Charges upon which Tenant's Pro Rata Share is calculated pursuant to this Paragraph 7(c).   Landlord and Tenant anticipate that, as of the Commencement Date, the Shopping Center will contain approximately Three Hundred Fifty-Nine Thousand, Five Hundred Seven (359,507) square feet of ground floor gross leasable space, and the Premises will contain 38,100 square feet; Tenant's Pro Rate Share shall thus initially be ten and sixty/100 percent 10.60%.   In the event that any additional ground floor leasable square footage is added to the Shopping Center, Tenant's Pro Rata Share shall be accordingly decreased. Notwithstanding the foregoing, in no event shall Tenant's Pro Rata Share be increased above said ten and sixty/100 percent (10.60%).

(d)   Examination of Landlord's Records.   Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year.   Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord.   If such examination shall disclose any over-charge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in

excess of 5% of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

        8.   <u>Signs and Communications Equipment</u>.

        (a)   <u>Signs</u>. Landlord shall provide Tenant, at the locations and of the sizes shown on <u>Schedule "E-1"</u> to <u>Exhibit "E"</u>, pylon and/or monument sign structures (with electrical wired box installed) having sufficient space thereon for inclusion of double-sided "face panels" and "readerboards" identifying Tenant's store, which face panels and readerboards shall be constructed and installed at Tenant's sole cost and expense. Tenant shall have the right to use such portions of such pylon and/or monument signs as indicated on <u>Schedule "E-1"</u> attached hereto for identification sign panels on such pylon and/or monument signs for Tenant's face panels or other panels. Furthermore, if Landlord obtains the approval(s) for the construction of additional pylon and/or monument signs other than those depicted on <u>Schedule "E-1,"</u>, including without limitation a pylon and/or monument sign on Orangethorpe Avenue, Tenant shall have the right to be considered on an equal basis to any other tenants or occupants of the Shopping Center with respect to the use and position rights on any such additional pylon and/or monument signs constructed at the Shopping Center. Attached as a portion of <u>Exhibit "E"</u> are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, and at Tenant's sole cost and expense, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed, and subject to all applicable governmental approvals and at no cost or expense to Landlord.

        (b)   <u>Communications Equipment</u>. Tenant may, from time to time, subject to applicable law, and at Tenant's sole cost and expense, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Tenant shall be solely responsible to pay for all costs and expenses relating to repairs and/or replacements

necessitated by such acts of Tenant. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

    9.    Taxes.

    (a)    Taxes Contemplated Hereunder. The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies which are assessed, levied or charged upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof by any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Governmental charges for services such as fire protection, street, sidewalk and road maintenance, refuse removal, parking, and other public services shall be deemed included within the definition of "Real Estate Taxes" for purposes of this Lease. Notwithstanding anything to the contrary contained in this Lease, in no event shall Tenant be obligated to pay any local, county, municipal, state or federal income, gift, franchise, corporate, estate, inheritance, succession, capital levy, excess profit, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease. If, at any time during the Term of this Lease, any governmental authority having the power to tax, including without limitation any Federal, State, County, City government or any political subdivision thereof (collectively, "Taxing Authority") shall alter the methods and/or standards of taxation and assessment against Landlord's legal or equitable interest in the Shopping Center or the underlying realty, in whole or in part, so as to impose a tax plan in lieu of or in addition to the tax plan in existence as of the Lease Date, such taxes or assessments based upon such new tax plan, including without limitation, (i) a tax, assessment, excise, surcharge, fee, levy, bond, or similar imposition (collectively, "Impositions"), (ii) any Impositions in substitution or in lieu of, partially or totally , any which are assessed upon the Shopping Center prior to any such tax plan alteration, or (iii) any Imposition upon this Lease transaction or upon any document to which Tenant is a party which creates or transfers any interest in the Premises or any portion thereof, shall be considered "Real Estate Taxes" for purposes of this Lease.

    (b)    Payment of Real Estate Taxes. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall

12

be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

(c)    Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises and/or the Improvements assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within fifteen (15) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(d)    Payment Following Appeal. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings, in which event Tenant shall pay its Pro Rata Share, including any penalty or fine imposed

13

as a result of Tenant's failure to make such payment), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises and/or the Improvements, as well as a reimbursement of all costs, fees and expenses it incurs in such protest or reassessment; provided, however, such refunds and reimbursements shall only be paid to Tenant out of refund proceeds as and when actually received by Landlord.

10.    Maintenance, Repairs and Replacements. Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents or employees), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for the maintenance and repair (structural and non-structural), as is necessary from time to time, of the Improvements. Notwithstanding the foregoing, Landlord agrees to maintain the Common Areas in the manner set forth in this Lease, including without limitation the Common Areas immediately surrounding the Building, including sidewalks and landscaping. Except as caused by the negligence or willful misconduct of Landlord, its agents, contractors, or employees, Landlord shall have no obligation whatsoever as to any maintenance, repair or replacement of any portion of the Building. Additionally, Landlord shall maintain the buildings adjacent to the Premises in accordance with the provisions of the leases pursuant to which such buildings are occupied by other tenants or occupants.

11.    Payment of Utility Bills. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone, television, cable and other public or private utilities used by Tenant with regard to the Improvements. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas.

12.    Alterations. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior of the Building or Other Improvements. Landlord's withholding of consent as to any exterior alteration or modification shall be deemed

reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's sole cost and expense in a good and workmanlike manner and in compliance with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within twenty (20) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

    13.    Mechanics' Liens. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto. Notwithstanding the foregoing, Landlord shall not be obligated hereunder to cause the removal of any such lien affecting any portion of the Shopping Center (exclusive of the Premises and the Common Areas) if such lien is the result of work performed by or on behalf of another tenant or occupant of the Shopping Center, and not by or on behalf of Landlord.

    14.    Insurance.

        (a)    Property Damage. During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for no less than

15

eighty percent (80%) of the replacement value of all such construction. During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of All-Risk of Physical Loss or Damage insurance covering loss or damage to the Improvements ("Tenant's All-Risk Policy") in the amount of eighty percent (80%) of the replacement value of the Improvements, exclusive of excavation, footings and foundations, with a commercially reasonable deductible, for which Tenant shall be fully responsible. Although it is Tenant's policy, as of the Lease Date, to carry earthquake insurance covering Tenant's stores, Tenant shall be obligated to carry earthquake insurance covering earthquake damage to the Improvements ("Earthquake Insurance") in the amount of eighty percent (80%) of the replacement value of the Improvements only if such Earthquake Insurance is available to Tenant at commercially reasonable rates. The determination of whether such Earthquake Insurance is available at commercially reasonable rates shall be based upon (but shall not be limited to) such factors as increases in the cost of such insurance as compared to the cost thereof as of the Lease Date and general practices of retailers similar to Tenant in terms of the size and number of stores in the Southern California region. In the event that such Earthquake Insurance is deemed pursuant to this Paragraph 14 not to be available to Tenant at commercially reasonable rates, any damage or destruction to the Improvements shall be deemed an "uninsured casualty" for purposes of this Lease and shall be governed by Paragraph 15(b) below. Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

      (b)    Liability Insurance. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Improvements and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than Three Million Dollars ($3,000,000.00) combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)     <u>Workers' Compensation Insurance</u>. To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)     <u>Self-Insurance</u>. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than One Hundred Million Dollars ($100,000,000.00), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision).

(e)     <u>Common Area, Additional Areas and Third Party Tenant Insurance and Insurance During Landlord's Construction</u>. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (i) commercial general liability insurance, and (ii) All-Risk of Physical Loss or Damage insurance covering, without limitation, boiler, machinery, flood, earthquake, foundations, and footings ("Landlord's All-Risk Policy") in the amount of the full replacement value, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, and (iii) vacated or otherwise uninsured (except as set forth in the following sentence) tenant space, whether by reason of lease expiration or otherwise. For purposes of this paragraph 14(e) only, the Additional Areas shall not include portions of the Shopping Center which are leased to or occupied by third parties if the leases pursuant to which such third parties are occupying or have the right to occupy such portions of the Shopping Center require the tenants or occupants thereunder to keep in full force and effect commercial general liability and All-Risk insurance coverages required under this paragraph 14(e); provided, however, that Landlord shall be obligated under this Lease to provide such insurance coverage immediately upon Landlord's discovering that such tenant or occupant is not carrying the same, (regardless of whether or not Landlord has

17

the right under the lease pursuant to which such tenant or occupant is occupying or has the right to occupy such portion of the Shopping Center to provide such insurance coverage in the event of such tenant's failure to maintain the same or to recoup the cost thereof from such tenant or occupant). Said policies shall name Tenant and any lender which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such lender have insurable interests. The limit of the commercial general liability policy shall be not less than Three Million Dollars ($3,000,000.00) combined single limit for bodily injury and property damage, with a commercially reasonable deductible. The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of the greater of (i) that coverage requested by Tenant or (ii) that coverage which is customary among owners of like shopping centers in the City. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1) Workers' Compensation - statutory limits
   Employer's Liability - $500,000;

2) Automotive Liability for all vehicles with limits of $2,000,000; and

3) Commercial General Liability to include premises operations and products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

18

(f)    Policy Provisions.    All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than B+VIII. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Improvements and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance; provided, however, that the amount of any such deductibles shall be included as part of CAM Charges, but only if such deductible (i) pertains to a claim regarding the Common Areas of the Shopping Center, and (ii) is not otherwise reimbursable from another tenant or occupant of the Shopping Center. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Improvements and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)    Waiver of Right of Recovery and Subrogation.    To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Improvements or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises, the Common Areas, or the Additional Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)    Evidence of Insurance.    Subject to Tenant's right to self-insure hereunder, upon (i) commencement of the Main Term (as to casualty insurance), (ii) upon Delivery of the Premises (as to property insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that no expiration,

19

cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and Landlord's first Mortgagee, if applicable).

(i)    Indemnities.  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage (exclusive of consequential damages) or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts or omissions of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage (exclusive of consequential damages) or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises, resulting from the use thereof by Landlord, its agents or employees.

15.    Damage by Fire or Other Casualty.

(a)    Insured Casualty.

(1) Improvements.  In the event of a fire or other insured casualty causing destruction or damage to the Improvements, which casualty is covered by Tenant's All-Risk Policy of insurance required to be carried by Tenant under this Lease, or the Earthquake Insurance which Tenant may be required to carry under Paragraph 14(a) above, this Lease shall not terminate except as expressly set forth herein. Notwithstanding anything to the contrary, in the event Tenant reasonably estimates that restoration of the Improvements will take more than three hundred sixty-five (365) days from the date of such casualty (such estimate being based upon such factors as, without limitation, advice of independent contractors as to duration of construction, the time required to obtain necessary permits and/or approvals from governmental agencies having jurisdiction over the same, Landlord's willingness and ability to accommodate Tenant's reasonable requests pertaining to the provision of staging, access, utilities, and other construction related needs of Tenant, Landlord's willingness and ability to perform restoration and/or repair work to the Common Area, and to perform or cause other tenants or occupants of the Shopping Center to perform repair and/or restoration work to the Additional and/or "Remaining Areas" (as defined in Paragraph 15(a)(3) below) in

20

such a manner and at such times as to minimize any interference, intentional or unintentional, with Tenant's work of restoration or reconstruction of the Improvements or Tenant's conduct of business therein (collectively, the "Potential Delay Factors"), Tenant shall have the right, upon thirty (30) days written notice to Landlord, to terminate this Lease, provided that such notice is delivered to Landlord within ninety (90) days following the date of such casualty. If this Lease is so terminated by Tenant, Tenant shall pay to Landlord all proceeds of Tenant's All-Risk Policy (and/or Earthquake Insurance, if applicable) received by Tenant as a result of such casualty, up to but not exceeding the then-full replacement cost of the Improvements, and if Tenant's All-Risk Policy (and/or Earthquake Insurance, if applicable) is for less than the full replacement cost of the Improvements, Tenant shall also pay to Landlord the difference between the amount of proceeds received by Tenant under Tenant's All-Risk Policy (and/or Earthquake Insurance, if applicable) and the amount of proceeds which Tenant would have received had such All-Risk Policy (and/or Earthquake Insurance, if applicable) covered the full replacement cost of the Improvements; provided, however, that if Tenant is required to carry Earthquake Insurance under Paragraph 14(a) above, Tenant shall not be obligated to pay Landlord the difference, if any, between the amount of insurance proceeds received by Tenant under Tenant's Earthquake Insurance and the amount of proceeds which Tenant would have received if such Earthquake Insurance had covered the then-full replacement cost of the Improvements if Landlord has the right to recover such difference from any insurance which Landlord may be carrying or be required to carry under this Lease. If this Lease is not so terminated, within ninety (90) days after such casualty, subject to force majeure, applicable building codes, and the procurement of building permits, Tenant shall commence (and proceed diligently to completion) reconstruction of the Improvements. In the event that, subject to force majeure, the Improvements are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by Tenant within two hundred forty (240) days after receipt of any required governmental permits, for which permits Tenant shall make prompt application following such destruction or damage, and receipt by Tenant of insurance proceeds (if not self-insured), then Landlord, at its option, by giving written notice to Tenant within thirty (30) days after the expiration of said period, if Tenant has not demonstrated within such thirty (30) day period that it is proceeding diligently with the reconstruction of the Improvements, may undertake completion of such reconstruction, in which event Tenant shall make available to Landlord all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

21

(2) <u>Common Areas</u>.   In the event of a fire or other insured casualty, causing destruction or damage to the Common Areas, which casualty is covered by Landlord's All-Risk Policy required under this Lease, and Tenant does not elect to terminate this Lease pursuant to paragraph 15(a)(1) above, within ninety (90) days after such casualty, subject to force majeure, applicable building codes, and the procurement of building permits Landlord shall commence (and proceed diligently to completion) reconstruction of the Common Areas to that condition existing immediately prior to such casualty, in Landlord's reasonable discretion; provided, however, that in the course of reconstruction Landlord shall not materially change or alter the design of any portions of the Common Areas from that existing immediately prior to such event of casualty without Tenant's prior written approval, not to be unreasonably withheld or delayed. If, at any time prior to the date upon which the Common Areas are substantially repaired or restored, Tenant is open for business to the public at the Premises, Base Rent and other charges payable by Tenant to Landlord under this Lease shall be equitably abated in proportion to the degree to which the subject damage or destruction of the Common Areas interferes with the conduct of Tenant's business in the Premises, and if Tenant is unable to open for business to the public from the Premises as a result of the Common Areas not being substantially repaired or restored, Base Rent and other charges payable by Tenant to Landlord under this Lease shall be entirely abated. Such abatement shall continue until such time as the Common Areas are substantially repaired and reconstructed. If, at any time prior to the date upon which the Common Areas are substantially repaired or reconstructed, Tenant is not open for business to the public at the Premises for any reason other than as a direct result of the Common Areas not being substantially repaired or restored, Base Rent or other charges payable by Tenant to Landlord under the Lease shall not be abated. In the event that, subject to force majeure, the Common Areas are not substantially repaired and reconstructed by Landlord within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make prompt application following such destruction or damage, then Tenant, at its option, by giving written notice to Landlord within thirty (30) days after the expiration of said period, if Landlord has not demonstrated within such thirty (30) day period that it is proceeding diligently with the reconstruction of the Common Areas, may undertake completion of such reconstruction, in which event Landlord shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(3) <u>Remainder of Shopping Center</u>. In the event of a fire or other insured casualty causing destruction or damage to any portion of the Shopping Center other than the Improvements or the Common Areas (hereinafter, the "Remaining Areas"), and Tenant does not elect to terminate this Lease pursuant to paragraph 15(a)(1) above, within ninety (90) days after such casualty, subject to force majeure, applicable building codes, the procurement of building permits, Landlord shall commence (and proceed diligently to completion), or cause to be commenced and completed in a diligent manner, reconstruction of those portions of the Remaining Areas designated on <u>Exhibit "A-3"</u> attached hereto to that condition existing immediately prior to such casualty, in Landlord's reasonable discretion; provided, however, that in the course of such reconstruction Landlord shall not materially change or alter the design of any portions of the Remaining Areas from that existing immediately prior to such event of casualty without Tenant's prior written approval, not to be unreasonably withheld or delayed. In the event that Landlord elects not to reconstruct all of the Remaining Areas of the Shopping Center, but reconstructs all of the Common Areas, Tenant's Pro Rata Share of CAM Charges following such reconstruction shall be based upon the CAM Charges applicable only to such portion of the Common Areas which is reasonably necessary to support the Improvements and the portions of the Remaining Areas which have been reconstructed or are otherwise still operating following such reconstruction. In the event that, subject to force majeure, the Remaining Areas are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced by Landlord (or such other party with such repair and restoration obligations) within two hundred forty (240) days after receipt of any required governmental permits, for which permits Landlord shall make, or shall cause the party with repair obligations to make, prompt application following such destruction or damage, then Tenant, at its option, by giving written notice to Landlord and the party with repair obligations, if applicable, within thirty (30) days after the expiration of said period, if Landlord or such other party with repair obligations has not demonstrated within such thirty (30) day period that it is proceeding diligently with the reconstruction of the Remaining Areas, may undertake completion of such reconstruction, in which event Landlord, or the party with such repair obligations, if applicable, shall make available to Tenant all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction. Notwithstanding Landlord's obligation to reconstruct or cause to be reconstructed those portions of the Remaining Areas set forth on <u>Exhibit "A-3"</u> attached hereto, following such reconstruction Landlord shall not be obligated to maintain the same tenants or occupants in such portions of the Remaining

23

Areas, and subject to the provisions of this Lease pertaining to permitted uses in the Shopping Center and to Tenant's exclusive rights set forth in paragraph 19(a)(vi) of this Lease, Landlord shall be entitled to maintain in effect, terminate, or modify the leases pertaining to such portions of the Remaining Areas in effect prior to the subject event of casualty and to lease such areas to new third party occupants.

     (b)    Uninsured Casualty.

     (1) Improvements.  In the event of the occurrence of a casualty which is (i) not covered by the provisions of Tenant's All-Risk Policy, regardless of whether Tenant elects to carry such Policy or instead elects to exercise its right under this Lease to self-insure all or part of the risks covered by such All-Risk Policy, or (ii) is not covered by the provisions of Tenant's Earthquake Insurance if Tenant is required to carry the same under Paragraph 14(a) above, and such casualty causes destruction or damage to the Improvements which has a repair and reconstruction cost of twenty-five percent (25%) or more of the then-total reconstruction cost of said Improvements (exclusive of excavation, footings and foundations) (which percentage shall be reduced to ten percent (10%) during the last four (4) years of the Main Term or during an Option Period), or if Tenant reasonably estimates (based upon the Potential Delay Factors) that the restoration of the Improvements will take more than three hundred sixty-five (365) days from the date of such casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty.  In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under Paragraph 12 above.

     (2) Common Areas.  In the event of an uninsured casualty causing damage to the Common Areas, and Tenant does not elect to terminate this Lease as provided in paragraph 15(b)(1) above, Landlord shall reconstruct all Common Areas in the manner specified by paragraphs 15(a)(2) above, regardless of the amount of damage to same.  If, at any time prior to the date upon which the Common Areas are substantially repaired or restored, Tenant is open for business to the public at the Premises, Base Rent and other charges payable by Tenant to Landlord under this Lease shall be equitably abated in proportion to the degree which the subject damage or destruction of the Common Areas interferes with the conduct of Tenant's business in the

Premises, and if Tenant is unable to open for business to the public from the Premises as a result of the Common Areas not being substantially repaired or restored, Base Rent and other charges payable by Tenant to Landlord under this Lease shall be entirely abated.    Such abatement shall continue until such time as the Common Areas are substantially repaired and reconstructed.  If, at any time prior to the date upon which the Common Areas are substantially repaired or reconstructed, Tenant is not open for business to the public at the Premises for any reason other than as a direct result of the Common Areas not being substantially repaired or restored, Base Rent or other charges payable by Tenant to Landlord under the Lease shall not be abated.

(3)  Remaining Areas.  In the event of an uninsured casualty causing damage to the Remaining Areas, and Tenant does not elect to terminate this Lease as provided in paragraph 15(b)(1) above, Landlord shall reconstruct or cause to be reconstructed those portions of the Remaining Areas shown on Exhibit "A-3" hereto in the manner specified by paragraphs 15(a)(3) above, regardless of the amount of damage to same.

(c)    Damage During Last Two (2) Years of Main Term or Option Period.  Notwithstanding the foregoing, if any damage or destruction occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall have the option, exercisable by written notice ("Cancellation Notice") from Tenant to Landlord within ninety (90) days from the date of such damage or destruction, to elect not to restore the Improvements and to terminate this Lease.  If Tenant timely gives Landlord the Cancellation Notice, then (i) the Lease shall terminate on the date specified in the Cancellation Notice, which date shall be at least thirty (30) days following the date the Cancellation Notice is delivered to Landlord, and (ii) Tenant shall be under no obligation to restore the Improvements, but Tenant shall be obligated to deliver to Landlord all insurance proceeds actually received by Tenant pursuant to Tenant's All-Risk Policy (and/or Tenant's Earthquake Insurance, if Tenant is required to carry the same pursuant to Paragraph 14(a) above) in connection with such damage or destruction and attributable to the Improvements, or if Tenant has elected to self-insure as to those risks which would be covered under Tenant's All-Risk Policy, Tenant shall pay to Landlord an amount equal to the "cash value" (as such term is defined in Tenant's standard "All-Risk Policy" or a comparable standard all-risk policy of insurance ) of the Improvements in their condition immediately prior to the casualty causing such damage or destruction, regardless of the replacement cost of the Improvements.  In the event that Tenant elects not to restore the Improvements following an insured casualty

25

pursuant to this Paragraph 15(c), regardless of whether Tenant self-insures or carries Tenant's All-Risk Policy, or carries Tenant's Earthquake Insurance, Tenant shall be entitled to deduct from the amount paid to Landlord under this Paragraph 15(c) the unamortized value of any "Special Improvements" (as defined below) installed by Tenant at the Premises, such amortization schedule to be based on the reasonable useful life of such Special Improvements as applicable to the use of Tenant. For purposes hereof, "Special Improvements" are defined to include only those improvements to the Premises which are installed after the initial construction of the Improvements and are in the form of replacement of mechanical systems (e.g., HVAC), the roof of the Building, electrical panels and plumbing systems, or the installation of improvements mandated by governmental authorities for buildings in general and are not necessitated as a result of Tenant's particular use of the Premises, such as, without limitation, the installation of sprinkler systems or seismic reinforcement.

(d) <u>General Provisions</u>. Landlord and Tenant waive the provisions of California Civil Code Sections 1932 and 1933 or any other related or successor provision of law which permits the termination or modification of a lease when the thing leased is damaged or destroyed and each agrees that in any such events, the rights and obligations of Landlord and Tenant shall be governed solely by the terms of this Lease. All insurance proceeds received by Tenant or Landlord to satisfy their respective obligations under this Paragraph 15, less the costs, if any, actually incurred for the recovery of such proceeds, shall be applied to satisfy their respective obligations for the repair and/or restoration of such damage or destruction, including without limitation, expenditures for temporary repairs or for the protection of property pending the completion of such repairs and/or restoration. Landlord shall assure (through parallel lease provisions or otherwise) that all the "Remaining Areas" (as defined below) of the Shopping Center shown on <u>Exhibit "A-3"</u> and leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Improvements and Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, and Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed in accordance with this Paragraph 15.

16.    <u>Condemnation</u>.

(a)    <u>Definition of Taking and Substantial Taking</u>. For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the