power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation on the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of four and one-half (4.5) spaces (for full-sized automobiles) per 1000 square feet of ground-floor gross leasable area or that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6(d) above that access to the Premises is materially and adversely impeded.

(b)    <u>Tenant's Rights Upon Taking or Substantial Taking</u>.  In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    <u>Tenant's Rights Upon Less Than Substantial Taking</u>.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration.  If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and will have a material and adverse impact on Tenant's ability to conduct business, as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such

27

option to be exercised no later than sixty (60) days after the date of such Taking and by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)     Landlord's Obligations Upon Any Taking.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Improvements, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e)     Rights Upon Temporary Taking.  In the event of a Taking of the Improvements, the Premises and/or the Common Areas, or any portion thereof, for temporary use (specifically one not exceeding 60 days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking which relate only to the Premises or the Improvements (including the Common Areas within Tenant's Preferred Area), for periods prior to the expiration of the Lease shall be payable to Tenant.  All other such awards, damages, compensation and proceeds, including without limitation for periods after the expiration of the Lease, shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)     Taking of the Pylon and/or Monument Sign(s).  In the event of a Taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, Landlord shall be entitled to all compensation for such Taking; provided that Landlord, as soon as reasonably possible following such Taking, replaces and/or rebuilds any of such signage so taken at Landlord's sole cost and expense.  In the event that Landlord does not so replace or rebuild such pylon and/or monument signage for any reason

whatsoever, including without limitation, Landlord's inability to obtain the requisite governmental approvals therefor, Tenant shall be entitled to such compensation for such Taking attributable to Tenant's use rights in such pylon or monument sign, and Landlord shall be entitled to the remainder of such compensation for such Taking.

      (g)    <u>Tenant's Right Upon Condemnation</u>. In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall only be entitled to seek and receive from the condemning authority, as a separate award from any award to Landlord, an award which is attributable to:

      (i)    The unamortized cost of improvements or alterations made to the Premises and paid for by Tenant;

      (ii)    Tenant's trade fixtures, but not in excess of an amount equal to the original cost;

      (iii)    Tenant's moving expenses as allowed by the governmental authority having jurisdiction over the Shopping Center; and

      (iv)    Tenant's loss of good will to the extent proven by Tenant;

      Additionally, Tenant shall be entitled to any other award available to Tenant under applicable law. Tenant's sole remedy hereunder shall be against the condemning authority, and in no event shall Tenant have any claim whatsoever against Landlord for loss or diminution in value of the leasehold, for the value of any unexpired term of this Lease, or for any lease "bonus value" relating to such Taking, and Tenant expressly waives any such rights or claims. Each party waives the provisions of California Code of Civil Procedure § 1265.130, allowing either party to petition the Superior Court to terminate this Lease in the event of a partial taking of the Premises, and the rights of the parties in the event of a temporary Taking shall be governed by the terms of this Lease.

      17.    <u>Assignment and Subletting</u>. Tenant shall have the right to sublet, assign, transfer, reassign and grant concessions or licenses (a "Transfer") its interest in all or any part of the Premises and/or the Improvements and any of Tenant's rights and obligations under this Lease during the Term, with Landlord's prior consent, not to be unreasonably withheld, provided that (i) at the time of such Transfer Tenant is not in default in the performance and observance of any of the covenants and conditions of this Lease, beyond any applicable cure periods, (ii) the assignee or sublessee of the Tenant shall expressly assume in writing all of Tenant's obligations under this Lease, to the extent applicable, pursuant to an assumption agreement in form and content reasonably acceptable to Landlord, and (iii) the proposed use of the transferee does not violate the

exclusive use rights of any of those tenants set forth on Exhibit "F-2" attached hereto, as such use rights are set forth in such tenant's lease of space in the Shopping Center as of the Lease Date. Notwithstanding the foregoing, Landlord's consent to any Transfer proposed by Tenant shall be deemed given if the (i) the proposed transferee has a net worth equal to or in excess of Five Million Dollars ($5,000,000.00) (in 1995 dollars) as of the date of the proposed Transfer, (ii) the proposed transferee stocks and merchandises the Premises in a first-class manner, and (iii) the proposed use of the transferee does not violate the exclusive use rights of any of those tenants set forth on Exhibit "F-2" attached hereto, as such use rights are set forth in such tenant's lease of space in the Shopping Center as of the Lease Date and listed on Exhibit "F-1." In the event of any Transfer hereunder, Tenant shall remain liable for all of Tenant's obligations to Landlord arising under this Lease; provided, however, that in the event that this Lease is changed, modified or amended in any respect by Landlord and any transferee of Tenant following the date of any Transfer, Tenant shall only be liable for obligations arising from changes, modifications, or amendments to which Tenant has given its prior written consent, and Tenant shall not be liable for any additional obligations which arise from any changes, modifications or amendments made after the date of the Transfer to which Tenant has not given its prior written consent. Sales, assignments, mergers and acquisitions involving beneficial ownership interests in the Tenant shall not be deemed a Transfer hereunder and same may be effected without Landlord's knowledge or consent.

Notwithstanding anything to the contrary contained in this Lease, an assignment of the Lease or subletting of the Premises and/or the Improvements to a corporation with which Tenant may merge or consolidate, or in connection with the sale of all or portion of Tenant's assets, or to any parent or subsidiary of Tenant, or a subsidiary of Tenant's parent, shall not be a "Transfer" hereunder and may be effectuated without the consent of Landlord. Furthermore, the sale of stock by Tenant or by any shareholder of it shall not constitute a Transfer under the terms of this Lease.

Any assignment or subletting of this Lease by Tenant shall be executed by Tenant and the assignee or sublessee. Each assignee or sublessee, for the benefit of Landlord, shall agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

18.    Use.

(a)    Tenant shall initially maintain, use and operate on the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video

recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)    Thereafter, Tenant shall have the right to use the Premises for any other lawful retail use; provided, however, under no circumstances shall the Premises be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenant executed prior to this Lease and listed on Exhibit "F-1", or (iv) in violation of any other applicable provision of the "Permitted Title Encumbrances" contained in Exhibit "F-2".

(c)    Nothing contained in this Lease shall be construed to require Tenant to operate on the Premises continuously either for the use first stated or for any other use.

19.    Warranties and Representations.

(a)    Landlord represents, warrants and covenants to Tenant that:

(i)    Quiet and Peaceful Enjoyment.  Landlord has the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)    Title.  Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F-2" attached hereto and entitled "Permitted Title Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease.  Nothing contained in this Lease, including the Permitted Title Encumbrances and other matters disclosed on Exhibit "F-1" or Exhibit "F-2", shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business on the Premises.  Landlord specifically covenants and

warrants that no third party, other than applicable governmental agencies or authorities, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage. This representation and warranty is a material inducement to the Tenant's execution of this Lease. Furthermore, Landlord specifically covenants that, notwithstanding any of the items set forth on Exhibit "F-2", Landlord shall cause those certain water and sewer easements which, as of the Lease Date, are located on or partially on the Premises, to be removed in accordance with Exhibit "C" and to cause appropriate reconveyance documents to be recorded in the Official Records of the County of Orange prior to the date upon which Tenant opens for business in the Premises.

(iii)    Certificate of Authority.    Landlord covenants that it is presently a duly constituted limited liability company under the laws of the State of California, and that Milton Bilak, who is acting as its signatory in this Lease, is duly authorized and empowered to act for and on behalf of such limited liability company.

(iv)    No Litigation.    There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    Hazardous or Toxic Materials.    Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and, except as set forth in those certain environmental reports delivered to Tenant prior to the Lease Date, which reports Tenant has reviewed and has agreed to enter into this Lease in spite of such reports, Landlord has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any such Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by,

all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease. In the event any contamination by Hazardous Substances occurs or has occurred on, under or about the Shopping Center, including the Premises, and to the extent that such contamination materially and adversely interferes with Tenant's use and enjoyment of the Premises or operation of Tenant's business thereon, Tenant's obligation to pay rent and other charges payable hereunder shall abate (on a basis proportionate to the scope and degree of such interference) for the duration of such interference; furthermore, if such contamination does materially and adversely interfere with the operation of Tenant's business on the Premises and has continued for a period in excess of one hundred eighty (180) days (or under the circumstances is almost certain to continue for such period), Tenant shall have the right to terminate this Lease at any time prior to the cessation of such interference by delivery of thirty (30) days' prior written notice to Landlord.

(vi)   Tenant's Exclusive Use. So long as the Premises are used for the initial uses set forth in paragraph 18, and subject to the rights of the tenants under those leases set forth on Exhibit "F-2" attached hereto, and the successors and assigns of such tenants, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases in existence as of the Lease Date and described on Exhibit "F-1". This paragraph 19(a)(vi) shall not prohibit any occupant of the Shopping Center from engaging in the sale, installation or servicing of the Products provided the square footage of the area used for the same shall not in the aggregate exceed the lesser of (a) 250 square feet or (b) ten percent (10%) of the gross leasable area occupied by the party so engaged.

33

(vii)    Zoning and Subdivision.    The Premises and the Shopping
Center are presently properly subdivided, in conformity with all applicable laws
and zoned so as to permit (A) the development and operation of the Premises and
the Shopping Center in accordance with the provisions of this Lease; and (B) the
initial use of the Premises described in paragraph 18 of this Lease.

(viii)    Prohibited Activities.    Except as permitted under those
leases set forth on Exhibit "F-2," Landlord shall not operate or lease (or permit
to be operated or leased) any building or tenant space in the Shopping Center for
use as:

(A) a bar, pub, nightclub, music hall or disco in which less than
fifty percent (50%) of its space or revenue is devoted to and derived from
food service;

(B) a bowling alley;

(C) a billiard or bingo parlor;

(D) a flea market;

(E) a massage parlor (provided, however, that a gymnasium, sport or
health club or spa permitted under this Lease shall not be prohibited from
providing non-sexually oriented massages as an incidental part of their
primary business);

(F) a funeral home;

(G) a facility for the sale of paraphernalia for use with illicit drugs;

(H) a facility for the sale or display of pornographic material (as
determined by community standards for the area in which the Shopping Center
is located);

(I) an off-track betting parlor;

(J) a carnival, amusement park or circus;

(K) a gas station, car wash or auto repair or body shop (the parties
specifically acknowledging that Tenant's car stereo installation facility is not
included in this prohibition (K));

(L) a facility for the sale of new or used motor vehicles, trailers
or mobile homes;

(M) a facility for any use which is illegal or dangerous, constitutes
a nuisance or is inconsistent with an integrated, community-oriented retail
and commercial shopping center;

(N) a skating rink;

(O) an arcade, pinball or computer gameroom (provided that retail
facilities in the Shopping Center may operate no more than four (4) such
electronic games incidentally to their primary operations);

(P) service-oriented offices (such as, by way of example, medical
or employment offices, travel agencies, real estate agencies or dry
cleaning establishments) or other nonretail uses except for offices and
storage facilities incidental to a primary retail operation;

(Q) a banquet hall, auditorium or other place of public assembly;

(R) a training or educational facility (including, without limitation,
a beauty school, barber college, reading room, school or other facility
catering primarily to students or trainees rather than customers);

(S) a theater of any kind; or

(T) a gymnasium, sport or health club or spa.

Notwithstanding the foregoing, the second and third floors of the building currently occupied by Home Base may be used for a public storage facility (with offices to be permitted therein only insofar as the same are incidental to the primary use as a public storage facility) so long as such use does not cause a violation of the minimum parking ratio as required under this Lease.

In addition to the foregoing, other than a restaurant located in the pad area designated on the Site Plan and which is, as of the Lease Date, occupied by "Tony Roma's," Landlord shall not operate, lease or permit to be operated or leased any restaurant within any building on Landlord's Premises which abuts "Tenant's Preferred Area" (as shown on the Site Plan), or which is located in the "Main Portion" of the Shopping Center (as designated on the Site Plan) and within three hundred (300) feet of any customer entrance to the Building.  Notwithstanding the foregoing, Landlord shall not permit any restaurant which is permitted under the foregoing sentence to abut Tenant's Preferred Area or to be located in the Main Portion of the Shopping Center and within three hundred (300) feet of any customer entrance to the Building to be expanded enlarged, or to otherwise increase in square footage or seating capacity.  In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center. Furthermore, notwithstanding anything to the contrary contained in this Paragraph 19(a)(viii), provided that sufficient parking as required by applicable law and by the minimum parking ratio set forth this Lease exists for such subject use in the Rear Portion of the Shopping Center, excluding from the calculation thereof the parking area in the Main Portion of the Shopping Center, and provided further that Landlord permanently closes-off and prevents the opening of any pedestrian walkways, breezeways, or routes of pedestrian access between the Main Portion and the Rear Portion of the Shopping Center, leaving only those "Access Driveways" designated on the Site Plan as the only means for patrons of the Shopping Center to move between the Main Portion and the

Rear Portion thereof, the following uses shall be permitted in the Rear Portion of the Shopping Center (as designated on the Site Plan): (AA) those prohibited uses set forth in subparagraphs 19(a)(viii)(A), (B), (K) (except for an auto repair or body shop), (N), (P), and (S); (BB) during the months of January through September only, and for a duration of no more than two (2) weeks in a single visit, a temporary carnival, amusement park, or circus; (CC) a gymnasium, sport or health club or spa, provided that only one such facility shall be permitted in the Shopping Center at any single time; and (DD) office or service-oriented offices, but only in the second and third floors of that building occupied by Home Base as of the Lease Date.

(ix)   Site Covenants.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)   Building Height and Location.  No building adjacent to the Premises shall exceed twenty-eight (28) feet in height above finished grade, nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent thereto. Except as shown on the Site Plan, no outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and no building located on an outparcel elsewhere in the Shopping Center shall exceed one story, eighteen (18) feet in height, nor shall it exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas.  No development shall occur within the Shopping Center except as shown on the Site Plan, and except as otherwise expressly permitted under this Lease.

(B)   Construction and Alterations. Following the Construction Term, no construction shall be permitted in the Shopping Center during the months of October, November and December, except for interior alterations not affecting the operations of any other occupant

of the Shopping Center and except for emergency repairs. In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and fencing or screening of such construction reasonably acceptable to Tenant. With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges. Landlord shall make no changes in Tenant's "Preferred Area" as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways or parking spaces or reduction of the parking ratio specified in paragraph 5) or alter truck access to the Premises without Tenant's express written consent, which Tenant may, in its sole discretion, withhold. Except with respect to Tenant's Preferred Area, Landlord shall have the right, subject to the limitations contained herein, to make changes from time to time in the shape and location of the improvements, buildings, driveways, accommodation areas, and other improvements, and to eliminate or add any improvement or buildings in the Shopping Center, including without limitation a new building in the location set forth on Exhibit "A-2"; provided, however, that all buildings existing or hereafter constructed at the Shopping Center shall not exceed the boundaries of the "permissible building areas" as outlined on Exhibit "A-2" attached hereto. In connection with the construction of such new building, Landlord may eliminate the present common area "breezeway" (identified on Exhibit "A-2") and construct new ground floor leasable space to the Shopping Center, subject to the limitations contained herein. Notwithstanding the foregoing, Landlord shall make no changes in the Common Areas outside Tenant's Preferred Area that will materially and adversely impact (in Tenant's reasonable opinion) parking, ingress and egress to the Premises, the visibility thereof, drive-lanes, or sight lines without the prior written consent of Tenant, which consent shall not be unreasonably withheld.

(C)    Prohibited Uses in Common Areas. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas:

(1) advertisements or signs except for the pylon and monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise, except for "sidewalk sales" as allowed Tenant pursuant to paragraph 6(d) hereof; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor authorize or permit, any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein, and shall use all customary legal and equitable means to prevent the same. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center (other than those tenants occupying the "pad" areas located within Tenant's Preferred Area) shall be in designated "employee parking" areas, the location of which shall not be within Tenant's Preferred Area and shall be agreed upon by Landlord and Tenant.

(D)    Easements.    Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in Tenant's Preferred Area without Tenant's prior written consent.

(x)    Interference with Tenant's Reception/Transmission. Landlord shall not install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi)    Notices Affecting the Premises.    Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii)    Constructive Trust. Subject to the rights of Landlord's first mortgagee as of the Lease Date, which rights shall in no way limit Tenant's

38

rights and remedies against Landlord under this Lease, Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due; provided, however, if at the time of Landlord's receipt of such funds, such third party charges have been paid, then Landlord shall retain such funds as reimbursement of such prior payments.

(b)     Tenant represents, warrants and covenants to Landlord that:

(i)     Tenant's Authority. Tenant is a duly constituted corporation organized under the laws of the State of California; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)     Tenant's Warranty as to Hazardous or Toxic Materials. Neither Tenant, nor Tenant's directors, officers, agents, employees or contractors will introduce, discharge, deposit, spill, or store any "Hazardous Materials" (defined below) in the Premises or the Shopping Center in violation of applicable law. If at any time it is determined that Tenant, or Tenant's directors, officers, agents, employees, or contractors have placed, brought onto, or released, at, on, above or below the Premises, the Common Areas, or any other part of the Shopping Center any Hazardous Materials, then Tenant shall be solely responsible for, and shall indemnify, defend and hold Landlord free and harmless from, and shall pay for, all costs, fees, expenses, fines, penalties, damages, liabilities and other obligations incurred, imposed or levied in connection with, arising out, or related to, any clean-up, remediation, removal, repair or restoration work required by any federal, state or local governmental agency or political subdivision because of the presence of such Hazardous Materials in the soil, groundwater or soil vapor on, above or under the Shopping Center, or any property adjacent to the Shopping Center.

For purposes of this Lease, "Hazardous Materials" shall include, but not be limited to, substances defined as "hazardous substances," "hazardous materials" or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"); the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901; et seq. ("RCRA"); and those substances defined as "hazardous wastes" in Section 25117 of the California Health & Safety Code or as "hazardous substances" in Section 25316 of the California Health & Safety Code; and in the regulations adopted and publications promulgated pursuant to

39

such laws. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    Estoppel Certificates. Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. The form and content of attached Exhibit "K" is acceptable to Landlord and Tenant for use as an estoppel certificate. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    Subordination, Non-Disturbance and Attornment. Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to and any and all Ground

Leases (as defined below) and any and all Mortgages (as defined below) encumbering the Premises and placed thereon by Landlord, a subordination, non-disturbance and attornment agreement in the form of Exhibit "G" hereto attached, executed by Landlord under any such Ground Lease ("Ground Lessor") or the holder of such Mortgage ("Mortgagee"), as applicable. In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement in the form of Exhibit "G" executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages and with regard to all renewals, modifications, replacements and extensions of such Ground Leases or Mortgages. Upon Tenant's receipt of the non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage.

In the event of a foreclosure of any Mortgagee, Tenant shall attorn to a Mortgagee or any purchaser at a foreclosure sale (any such foreclosure, or deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee or purchaser executes a writing in favor of Tenant which contains the language in Exhibit "G". In the event of termination of the Ground Lease, Tenant shall attorn to any Ground Lessor from whom Tenant has received a non-disturbance agreement in accordance with this paragraph 21.

Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises, as set forth in paragraph 37(b) below. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Premises.

22.    Change of Landlord.    Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall notify Tenant in writing of the name and address of such Successor and Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes.

41

23.   Tenant's Financing.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment.   Furthermore, Tenant may mortgage, sell, convey, assign, lease or otherwise encumber Tenant's interest in the Lease, provided that any such mortgage, sale, conveyance, assignment, lease, or other encumbrance shall be limited to such Tenant's interest in the Lease and shall not extend to Landlord's fee interest in any part of the Shopping Center or Landlord's reversionary rights to the Premises and the Improvements following the expiration or earlier termination of this Lease.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to execute all documents necessary to permit Tenant to exercise the rights provided in this paragraph 23 and to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises and/or Improvements, pursuant to the terms of this Lease, if necessary to effect such cure); provided, however, such lenders' cure period shall not begin to run until Tenant's cure period has expired.  In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24.   Tenant's Property and Waiver of Landlord's Lien.  All of the Personalty shall be and remain the personal property of Tenant.  Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.   Memorandum of Lease; Commencement Date Agreement.  Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by State law.  In addition, Landlord, at the request of Tenant, shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established.  Recording costs for either or both documents shall be borne

by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26.    Expiration of Term and Holding Over. All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".) Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month-to-month, subject to all of the provisions hereof and at the monthly Base Rent Tenant had been paying during the Lease year immediately preceding such holdover period.

27.    "For Rent" Signs. Tenant hereby permits Landlord during the last ninety (180) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, on the parking lot of the Shopping Center.

28.    Force Majeure. Except as otherwise specifically contemplated in this Lease or in paragraph 4 of the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of the Construction Provisions. Notwithstanding the foregoing, the inability of either Landlord or Tenant to pay such sums which are, under normal

43

commercial circumstances, necessary to cause the performance of some act required thereof hereunder shall not be deemed an event of "force majeure."

29.     Events of Tenant's Default. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)     Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)     Bankruptcy. Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30.     Landlord's Remedies. After the occurrence of an Event of Default by Tenant, Landlord shall have the right, provided Landlord has given Tenant's lenders (as referenced in paragraph 23 hereof and provided Landlord has received from Tenant written notification of the name and address of such lender) the required notice and opportunity to cure, to exercise the following remedies:

(a)     Continue Lease. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due, including any sums due for any Option Period for which a Renewal Option has been exercised. In the alternative, Landlord shall have the right to peaceably re-enter the Premises on the terms set forth in subparagraph (b) below, without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord

44

may deem advisable, in which event the rents received on such reletting shall be applied first, to the payment of any indebtedness (other than rent) due hereunder from Tenant to Landlord; second, to the payment of any cost of such reletting (including brokerage commissions but expressly excluding any costs or expenses for alterations, renovation, remodeling or redecorating the Improvements; third, to the payment of the cost of any repairs to the Improvements necessary to make the same leasable; fourth, to the payment of rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder and paid to Tenant if all of Tenant's monetary obligations to Landlord have been fully satisfied, including the payment of future rents. If a sufficient amount to pay such expenses and sums shall not be realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

 (b) <u>Terminate Lease</u>. Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

 (i) The "worth at the time of the award" (defined below) of any obligation of Tenant which has accrued prior to the date of termination;

 (ii) The "worth at the time of the award" of the amount by which the unpaid Base Rent which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation; and

 (iii) The "worth at the time of award" by which the unpaid Base Rent, for the balance of the Term after the time of award, exceeds the amount of such rental loss that Tenant proves could reasonably have been avoided.

 As used in this paragraph 30(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of six percent (6%) for past

due obligations, and a discount rate to net present value equal to the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one percent 1% on anticipated future obligations, on the amount of the obligations payable on the date of such calculation.    In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings.    Landlord shall never be entitled to dispossess the Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)    Reimbursement of Landlord's Costs in Exercising Remedies. Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d)    Remedies Are Cumulative.    The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease).    Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

31.    Events of Landlord's Default; Tenant's Remedies.    Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer per-

46

iod as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations, and only if such default relates to Landlord's obligations with respect to either the Premises or that portion of the Common Areas affecting Tenant's use of the Premises, offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder, (ii) sue for damages, including interest, transaction costs, and attorneys' fees as specified in subsection (i) immediately above,  or (iii) if Landlord's default materially and adversely impacts Tenant's ability to conduct its business at the Premises, terminate this Lease and sue for damages, including interest, transaction costs, and attorneys' fees as specified in subsection (i) above.  All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by non-judicial means available under State law, or any other applicable proceedings.  The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise.

32.    Waiver.  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease.  Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.    Compliance with Applicable Laws.  During the Term, Landlord and Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Shopping Center, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements.  In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances

shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest from Tenant with the next installment or installments of Base Rent.  In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work only if such work relates to the portion of the Common Areas affecting Tenant's use of the Premises and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.    Notices.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:          CIRCUIT CITY STORES, INC.
                       Deep Run I
                       9950 Mayland Drive
                       Richmond, Virginia 23233
                       Attention:  Corporate Secretary

with a copy to:        CIRCUIT CITY STORES, INC.
                       Real Estate Department
                       Deep Run I
                       9950 Mayland Drive
                       Richmond, Virginia 23233
                       Attention:  Vice President of Real Estate

If to Landlord:        The Orangefair Company LLC
                       433 North Camden Drive, Suite 725
                       Beverly Hills, California  90210
                       Attention:  Mr. Milton Bilak

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35.    Brokers.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Gortikov

Enterprises, Inc. and West Venture who collectively represent Landlord and Soboroff Partners and The Equity Group who collectively represent the Tenant. Soboroff Partners will be paid a commission by Landlord of $2.00 per square foot pursuant to their separate written agreement. Thereafter, Soboroff Partners will satisfy The Equity Group from the commission paid Soboroff Partners by Landlord. Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

 36. <u>Miscellaneous</u>.

  (a) <u>Headings and Gender</u>.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

  (b) <u>Construction</u>.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

  (c) <u>Waiver of Jury Trial</u>.  In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

  (d) <u>Relationship of Landlord-Tenant</u>.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

  (e) <u>Entire Agreement; Merger</u>.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

  (f) <u>Attorneys' Fees</u>.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial

49

declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the non-prevailing party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)    <u>Partial Invalidity</u>. If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)    <u>Consents</u>.    Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)    <u>Holidays</u>.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)    <u>Applicable Law</u>.  This Lease shall be construed in accordance with the laws of the State of California, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)    <u>Successors and Assigns</u>.    All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)    <u>Counterparts</u>.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)    <u>Trademarks and Trade Names</u>.    All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)    <u>Easements and Access Rights</u>.  Landlord reserves the right to grant public utility easements and public rights of way and access affecting any portion of the Shopping Center, exclusive of the Premises.  Any such easements and rights shall be subject to the rights of Tenant in the Premises and shall not be implemented in any manner that would materially and adversely interfere with Tenant's use of the Premises or of the Common Areas contained within Tenant's Preferred Area.  Tenant agrees, if

requested by Landlord and required by law, to join in the conveyance of such easement or grant of such rights without further consideration to Tenant, provided such conveyance or grant shall be without any cost, liability, or expense to Tenant. *Subject to Tenant's prior written approval, to be withheld in Tenant's sole and absolute discretion,* Landlord shall be entitled to maintain, repair and replace such utility lines, pipes, and the line in, under, over and upon the Premises as may be reasonably necessary or advisable for the servicing of the Premises, or of other portions of the Shopping Center.

(o)    Interpretation. No provision of this Lease shall be interpreted for or against a party because that party or that party's attorney drafted such provision. If Tenant consists of more than one person or entity, then the obligations of all persons and/or entities constituting Tenant shall be joint and several.

(p)    Trash Removal. Landlord shall provide a service for collection of refuse, trash and garbage for the Common Area of the Shopping Center, and Tenant shall pay the same percentage of the cost of the same as Tenant pays for its Pro Rata Share (as may exist from time to time) of CAM Costs; provided, that Landlord acknowledges that Tenant intends to provide, at Tenant's sole cost and expense, for the removal of refuse, trash and garbage generated by Tenant, and Tenant's obligation hereunder shall be limited to collection of refuse, trash and garbage removal from the Common Area of the Shopping Center. Accordingly, Tenant shall not be obligated to pay any portion of the such costs as they pertain to the removal of any refuse, trash, or garbage generated by any other tenant or occupant of the Shopping Center. If, however, Tenant imposes an other than normal burden on such removal services as they pertain to the Common Area (as compared to other tenants or occupants of the Shopping Center) due to large quantities of refuse for disposal or refuse having unusual or strong odors or requiring extra refuse containers or locks for the refuse containers, then Tenant shall pay all extra costs associated with such needs or requirements, provided that Landlord imposes the same obligation on all other tenants or occupants of the Shopping Center.

37.    Effectiveness of Lease; Tenant's Right to Terminate. Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Intentionally Omitted.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant within thirty (30) days following the Lease Date. Tenant hereby approves such an agreement in the form attached hereto as Exhibit "G".

(c)   Landlord's demolition and removal of all debris resulting therefrom by the "Demolition Deadline" as such term is defined in subparagrpah 3(a) of Exhibit "C" attached hereto.

(d)   Intentionally Omitted.

(e)   Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of Delivery of the Premises (as defined in the Construction Provisions).

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

38.   Confidentiality. The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction. Accordingly, to the extent that the parties hereto deem it necessary to discuss the material terms of this Lease, or to provide a copy of this Lease to any third parties, such as developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto, the parties shall inform such third party of this covenant of confidentiality, and shall use their best reasonable efforts to ensure that any copy of this Lease which is provided to any such third party is accompanied by a letter from Landlord, Tenant, or their respective counsels informing the receiving party of this covenant of confidentiality. The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to, any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction. It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental

law or ordinance. Any breach of this confidentiality agreement shall constitute an Event of Default under the terms and provisions of this Lease.

39.   Gross Sales Reporting. Although Tenant shall not be required to pay any rent based on its Gross Sales, Tenant shall submit to Landlord within twenty (20) days following the end of each quarter during the calendar year a written quarterly statement of the Gross Sales generated from the Premises, and within forty-five (45) days after the close of each calendar year a written annual statement of Gross Sales; provided, however, Tenant's failure to do so shall not be a default hereunder.

40.   Effectiveness of Lease.   This Lease shall be effective upon such date ("Lease Date") which is the later the date of execution by Landlord or Tenant as set forth below.


WITNESS the following:

LANDLORD

THE ORANGEFAIR COMPANY LLC,
a California limited liability company

DATE: June 28, 1995        By _____

Name: Milton Bilak

Title: Member

TENANT

DATE: July 11, 1995        CIRCUIT CITY STORES WEST COAST, INC.,
a California corporation

By: _____

Name: _____

Title: _____ V.P.

## EXHIBIT "A"

SITE PLAN
(See Attached)



## EXHIBIT "A-1"

### LEGAL DESCRIPTION
(See Attached)