5. The date of commencement of the fourth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

6. The date of commencement of the fifth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

Attest or Witness:

_____

_____

_____       By_____

Attest:                                CIRCUIT CITY STORES, INC.

_____       By_____
Assistant Secretary                            Vice President

2

<u>EXHIBIT "J"</u>

DISCLOSED ENVIRONMENTAL REPORTS

(TO BE ATTACHED WITHIN TEN (10) DAYS OF LEASE DATE)

# EXHIBIT "K"

## ESTOPPEL CERTIFICATE
### (See Attached)

EXHIBIT "K"

TENANT ESTOPPEL CERTIFICATE

_____
_____
_____

Gentlemen:

Reference is made to the lease dated _____ (the "Lease") between The Orangefair Company LLC, a California limited liability company, as landlord ("Landlord"), and _____, as tenant ("Tenant") of the space more particularly described in the Lease (the "Premises").

Tenant hereby and represents the following:

1.    True and complete copies of the Lease and all agreements, amendments, guarantees, side letters are annexed hereto as Exhibit "I" and made a part hereof, and there are no other such agreements or documents.

2.    The Lease is in full force and effect and has not been modified except in accordance with the documents attached hereto as Exhibit "I".

3.    Tenant's interest in the Lease has not been assigned, mortgaged, pledged or otherwise encumbered, nor has all or any portion of the Premises been sublet, except as set forth in attached Exhibit "II" (if no Exhibit "II" is attached, then there is no exception).

4.    Rent under the Lease is $_____ per annum and rent and additional rent required to be paid under the Lease has been paid through _____

5.    Tenant has accepted possession of and is now occupying the Premises.

6.    The term of the Lease commenced on _____.

7.    There exists no default on the part of Landlord under the Lease nor to the best of Tenant's knowledge has any event occurred which, with passage of time or the giving of notice or both, would constitute a default by Landlord thereunder, nor has Landlord suffered or permitted the occurrence of any such event, except as set forth in attached Exhibit "III" (if no Exhibit "III" is attached, then there is no exception).

j:24\bblak\oranage\CCTcnEst.crt
06/28/95

1

8.    As of the date hereof, Tenant has no offset, defense, claim or counterclaim, including, without limitation, claims to "free" rent, concessions, rebates or abatements in rent (based on late delivery of the Premises or otherwise) under the Lease, nor has Landlord waived any default of Tenant under the Lease, except as set forth in attached Exhibit "IV" (if no Exhibit "IV" is attached, then there is no exception).

9.    Except as set forth in the Lease and in the documents annexed hereto as Exhibit I, Tenant has no option to renew or extend the term of the Lease or to purchase the Premises or any portion of the Premises.

10.    All work to be performed by Landlord under the Lease has been completed in accordance with the terms of the Lease and the agreements attached hereto as Exhibit "I" and has been accepted by Tenant; Tenant acknowledges that all work performed by Landlord at the Premises has been performed in compliance with all of the requirements therefore as contained in the Lease, and any "punchlist" items have been completed to Tenant's satisfaction, except as set forth in attached Exhibit "V" (if no Exhibit "V" is attached, then there is no exception).

11.    Tenant has deposited the sum of $_____ (If no Security Deposit, insert "None") with Landlord as security for the performance of tenant's obligations under the Lease.

12.    To the best of Tenant's knowledge, no hazardous wastes or substances have been stored, used, generated or disposed of at the Premises in violation of applicable law during or prior to the term of the Lease.

13.    Tenant agrees that the foregoing representations and certifications may be relied upon by you or your assignee in purchasing the Premises and by any entity making a loan to such purchaser secured by an interest in the Premises.

Very truly yours,

_____

By:_____
        (Vice) President

DATED: _____, 19____

J:24\bllak\orange\CCTraBst.cti
06/28/95

2

# EXHIBIT "G"

## SUBORDINATION, NON-DISTURBANCE

## AND ATTORNMENT AGREEMENT

(See Attached)

# EXHIBIT "L"

## TENANT'S GEOTECHNICAL REPORT

(See Attached)

# REPORT OF GEOTECHNICAL INVESTIGATION
## PROPOSED FULLERTON STORE

## ORANGEFAIR MALL
## FULLERTON, CALIFORNIA

Prepared for:

## CIRCUIT CITY STORES, INC.

Walnut, California

Law/Crandall, Inc.

Los Angeles, California

November 21, 1994

Project 2661.40788.0001

## TABLE OF CONTENTS

Page

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

1.0 SCOPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.0 PROJECT DESCRIPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3.0 SITE CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4.0 EXPLORATIONS AND TESTS . . . . . . . . . . . . . . . . . . . . . . . . . 2
    4.1 FIELD INVESTIGATION . . . . . . . . . . . . . . . . . . . . . . . . . 2
    4.2. LABORATORY TESTING . . . . . . . . . . . . . . . . . . . . . . . . 3

5.0 SOIL CONDITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6.0 LIMITED GEOLOGIC HAZARDS EVALUATION . . . . . . . . . . . . . . . . . . . . 3

7.0 RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    7.1 FOUNDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    7.2 EXCAVATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    7.3 SHORING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    7.4 RETAINING WALLS . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    7.5 FLOOR SLAB SUPPORT . . . . . . . . . . . . . . . . . . . . . . . . 7
    7.6 PAVING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    7.7 GRADING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8.0 BASIS FOR RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . 10

PLOT PLAN

APPENDIX: EXPLORATIONS AND LABORATORY TESTS

*Circuit City Stores, Inc.—Geotechnical Investigation*    *November 21, 1994*
*Law/Crandall Project 2661.40788.0001*

## SUMMARY

We have performed a geotechnical investigation for the proposed store for Circuit City Stores, Inc. in Fullerton, California. The proposed building will be a high one-story building at the northwest corner of the existing shopping center. The finished floor elevation of the proposed building will be established at about the existing grade; basement construction is not planned. The existing building at the site, formerly Long's Drug Store, will be demolished.

The soil conditions were explored by drilling three borings at the site to depths of 35 feet. We previously explored the site with several borings during the initial mall construction. Fill soils, up to 4½ feet in thickness, were encountered in our current exploration borings. The fill consists of sandy silt and sand and does not appear to be uniformly well compacted. Deeper and/or poorer quality fill could occur between borings. The natural soils consist of clayey silt underlain by sandy silt. The natural soils are moderately firm. Water was not encountered in the borings.

No active or potentially active faults are known to exist within the site, and the site is not located within an Alquist-Priolo Earthquake Fault Zone. Accordingly, the potential for surface rupture at the site due to faulting is considered low.

The existing fill soils are not suitable for support of the proposed building. If existing fill soils and any disturbed natural soils are removed and properly compacted, the proposed building may be supported on shallow spread footings established in the properly compacted fill or undisturbed natural soils. Due to the depth of the existing fill soils, shoring may be required to prevent undermining the existing adjacent buildings. The settlement of the proposed additions, supported on spread footings in the manner recommended in our report, should be within acceptable limits. The on-site soils, less any debris, are suitable for use as compacted fill. The floor slabs may be supported on grade, if the recommendations for grading are followed.

## 1.0  SCOPE

This report presents the results of our geotechnical investigation for the proposed building.  The locations of the proposed building, existing shopping center, and our previous and current exploration borings are shown on the attached Plot Plan, Figure 1.

This investigation was authorized to determine the static physical characteristics of the soils at the site of the proposed building, and to provide recommendations for foundation design, floor slab support, and grading.  More specifically, the scope of this investigation included the following objectives:

- Evaluation of the existing soil and ground water conditions at the site;

- Review of area and site geologic conditions;

- Recommendations for design of a feasible foundation system along with the necessary design parameters, including the estimated total and differential settlement due to the anticipated loadings;

- Recommendations for loading dock retaining walls;

- Recommendations for subgrade preparation and floor slab support;

- Recommendations for asphalt concrete pavement design; and

- Recommendations for grading, including site preparation, the placing of compacted fill, and quality control measures relating to earthwork.

The scope of this investigation did not include seismic studies for the site.  Accordingly, our conclusions and recommendations are for static loading conditions only.  We tested the samples obtained from our borings with an organic vapor analyzer (OVA); however, the assessment of general site environmental conditions for the presence of contaminants in the soils and ground water of the site was beyond the scope of this investigation.

Our recommendations are based on the results of our field explorations, laboratory tests, and appropriate engineering analyses.  The results of the field explorations and laboratory tests, which form the basis of our recommendations, are presented in the attached Appendix.

Our professional services have been performed using that degree of care and skill ordinarily exercised, under similar circumstances, by reputable geotechnical consultants practicing in this or similar localities. No other warranty, expressed or implied, is made as to the professional advice included in this report. This report has been prepared for Circuit City Stores, Inc. and their design consultants to be used solely in the design of the proposed building addition. The report has not been prepared for use by other parties, and may not contain sufficient information for purposes of other parties or other uses.

## 2.0  PROJECT DESCRIPTION

The proposed building will a high one-story building at the northwest corner of the existing shopping center. The finished floor elevation of the proposed building will be established at about the existing grade; basement construction is not planned. The existing building at the site, formerly Long's Drug Store, will be demolished. Typical column loads will be about 65 to 80 kips, and column bays will be about 30 to 40 feet wide.

## 3.0  SITE CONDITIONS

The site is located at Orangefair Mall, in Fullerton, California. The area of the proposed building is occupied by an existing building, formerly Long's Drug Store, which will be demolished. The site is paved with concrete and asphalt and is relatively flat. Numerous underground utility lines cross the perimeter of the site.

## 4.0  EXPLORATIONS AND TESTS

### 4.1  FIELD INVESTIGATION

The site was explored by drilling three borings at the location shown on the Plot Plan. The borings were drilled to depths of about 35 feet below the existing grade. Two of the borings were offset away from the building due to the presence of utilities near the building location. We initially proposed to drill five shallower borings; however, due to the presence of utilities, locations of our previous borings, and soils encountered, we drilled three deeper borings. Further details of the explorations and logs of the borings are presented in the Appendix.

*Circuit City Stores, Inc.—Geotechnical Investigation*
*Law/Crandall Project 2661.40788.0001*

*November 21, 1994*

## 4.2. LABORATORY TESTING

Laboratory tests were performed on selected samples obtained from the borings to aid in the classification of the soils and to determine the pertinent engineering properties of the foundation soils. The following tests were performed:

- Moisture content and dry density determinations
- Direct shear
- Compaction

Details of the laboratory testing program and test results are presented in the Appendix.

## 5.0 SOIL CONDITIONS

Fill soils, up to 4½ feet in thickness, were encountered in our current borings. The fill soils consist of sandy silt and sand and do not appear to be uniformly well compacted. Some brick debris was encountered in one of the borings.

The natural soils beneath the site consist primarily of silty sand, sandy silt and sand. The natural soils are generally firm. Water was not encountered within the 35-foot depth explored.

The samples obtained from our borings were tested with an organic vapor analyzer for the presence of volatile organic compounds. The test results indicate a relatively low level of volatile organic compounds in the soils. The results of the tests are shown on Figures A-1.1 and A-1.3, Log of Borings.

## 6.0 LIMITED GEOLOGIC HAZARDS EVALUATION

Our evaluation is based on our review of the Orange County Safety Element (1987), Component II of the Orange County General Plan, and other available published and unpublished literature. No active or potentially active faults are known to exist within the site, and the site is not located within a currently established Alquist-Priolo Earthquake Fault Zone. Accordingly, the potential for surface rupture at the site due to faulting is considered low. Although the site could be subject

to severe ground shaking in the event of a major earthquake, this hazard is common to Southern California, and the effects of shaking can be mitigated if the structure is designed and constructed in accordance with current engineering practice and building codes and the recommendations presented in this report. According to the Orange County Safety Element, the site is within a standard project flood zone and is within an area subject to inundation (due to failure of the Prado Dam). The potential for other geologic hazards, including liquefaction, slope instability, subsidence, tsunamis, and seiches adversely affecting the site is considered low.

## 7.0 RECOMMENDATIONS

### 7.1 FOUNDATIONS

**General**

The existing fill soils are not suitable for support of the proposed building. The natural soils are generally firm. The removal of any existing concrete slabs and utilities will disturb the upper soils. If the existing fill and any disturbed natural soils are excavated and recompacted, the proposed building may be supported on spread footings established in the property recompacted fill or undisturbed natural soils.

Recommendations for grading are presented in a following section. The excavation of the fill and disturbed natural soils and the compaction of all required fill should be observed and tested by personnel of our firm.

**Bearing Value**

Spread footings established in properly compacted fill or undisturbed natural soils may be designed to impose a net dead plus live load pressure of 2,500 pounds per square foot. A one-third increase in the bearing value may be used for wind or seismic loads. Exterior footings should extend at least 2 feet below the lowest adjacent final grade. Interior footings may be established at a depth of 2 feet below the lowest adjacent floor level. Adjacent to the existing building, footings should extend to at least the same level as the existing footings.

If desired, loading dock walls may be supported on shallower footings using a lesser bearing value. Footings for such light loads established in the compacted fill or natural soils and extending at least 1 foot below the adjacent grade may be designed to impose a net dead plus live load pressure of 1,000 pounds per square foot.

Since the recommended bearing value is a net value, the weight of the concrete within the footings may be taken as equal to 50 pounds per cubic foot, and the weight of soil backfill may be neglected in computing the downward foundation loads for footing design. While the actual bearing value of the compacted fill will depend on the material used and the compaction methods employed, the quoted value will be applicable if acceptable soils are used and are compacted as recommended. The bearing value of the fill should be confirmed after completion of the grading.

## Settlement

The settlement of the proposed building, supported on spread footings in the manner recommended, is estimated to be less than ½ inch. Differential settlement should be less than ¼ inch.

## Lateral Loads

Lateral loads may be resisted by soil friction on the footings and by the passive resistance of the soils. A coefficient of friction of 0.4 may be used between the footings and the supporting soils. The passive resistance of properly compacted fill and undisturbed natural soils against footings may be assumed to be 250 pounds per cubic foot. A one-third increase in the passive value may be used for wind or seismic loads. The frictional resistance and the passive resistance of the soils may be combined without reduction in determining the total lateral resistance.

## Footing Observation

The footing excavations should be observed by personnel of our firm to verify that the footings are founded in satisfactory soils. The footings should be deepened where necessary to reach satisfactory soils. Adjacent to the existing structure, excavations should not extend below a 1½:1 (horizontal to vertical) plane drawn downward from the tops of the existing footings so as not to remove their support. Due to the depth of the existing fill soils, shoring may be required to

prevent undermining the existing building.   All required backfill should be mechanically compacted; flooding should not be permitted.

Inspection of footing excavations may also be required by the appropriate reviewing governmental agencies.   The contractor should be familiar with the inspection requirements of the reviewing agencies.

## 7.2 EXCAVATION

Excavations up to 4½ feet will be required for the proposed building.   Deeper excavations may be required.   Where the necessary space is available, temporary unsurcharged slopes may be made at 1:1 in lieu of shoring.   The excavation should be observed by personnel of our firm so that any necessary modifications can be made.   Traffic or any surcharged loading should be no closer than 10 feet from the tops of the sloped excavations.   Adjacent to existing structures, unshored excavations should not extend below a 1½:1 (horizontal to vertical) plane extending downward from the bottoms of the adjacent building foundations, and care should be exercised not to undermine the existing floor slabs.

All applicable federal, state, and local safety requirements should be met.

## 7.3 SHORING

**General**

If sufficient space is not available to permit the required excavation, shoring will be required. Shoring could consist of steel soldier beams installed in drilled holes and backfilled with lean concrete.   For excavations up to 15 feet in depth, properly designed cantilevered shoring may be used.   Continuous lagging will be required between the soldier piles.

**Lateral Pressures**

For design of cantilevered shoring, where the surface of the retained earth is level, it may be assumed that the soils will exert a lateral pressure equal to that developed by a fluid with a density

6

*Circuit City Stores, Inc.—Geotechnical Investigation*
*Law/Crandall Project 2661.40788.0001*

*November 21, 1994*

of 30 pounds per cubic foot. The shoring should also be designed to resist surcharge loads from the existing footings.

For resisting lateral loads, the passive resistance of the soils against soldier piles spaced at least two diameters on centers may be assumed to be equal to 500 pounds per square foot per foot of depth to a maximum of 5,000 pounds per square foot. The passive resistance against continuous sheet piles may be assumed to be equal to 250 pounds per square foot per foot of depth.

We would be pleased to provide additional information for design of shoring when the structural features are known.

## 7.4  RETAINING WALLS

For design of cantilevered retaining walls or dock walls with level backfill, it may be assumed that the soils will exert a lateral pressure equal to that developed by a fluid with a density of 30 pounds per cubic foot plus any surcharge due to storage loads on the adjacent dock slab. The additional lateral pressure due to storage loads may be assumed to be equal to one-third of the vertical pressure resulting from the storage load.

Backfill adjacent to the walls and wall footings should be mechanically compacted to at least 90% of the maximum density obtainable by the ASTM Designation D1557-91 method of compaction. All required backfill behind the walls should consist of relatively non-expansive, predominantly granular soils. We recommend that weep holes on approximately 8-foot centers be installed at the base of walls below grade to relieve hydrostatic pressure that may develop behind the walls.

## 7.5  FLOOR SLAB SUPPORT

If the subgrade is prepared as recommended, the concrete slabs may be supported on grade. The fill soils should be reworked, and all required fill should be properly compacted as recommended in the following section on grading.

Construction activities and exposure to the environment can cause deterioration of the prepared subgrade. Therefore, we recommend that our field representative observe the condition of the final

subgrade soils immediately prior to slab-on-grade construction, and, if necessary, perform further density and moisture content tests to determine the suitability of the final prepared subgrade.

If the vinyl or other moisture-sensitive floor covering is planned, we recommend that the floor slab in those areas be underlain by a capillary break consisting of an impermeable membrane over a 4-inch-thick layer of gravel. A 2-inch-thick layer of sand should be placed between the gravel and the membrane to decrease the possibility of damage to the membrane. We suggest the following gradation for the gravel:

| Sieve Size | Percent Passing |
|------------|-----------------|
| 3/4" | 90 - 100 |
| No. 4 | 0 - 10 |
| No. 100 | 0 - 3 |

A low-slump concrete should be used to minimize possible curling of the slab. A 2-inch-thick layer of coarse sand can be placed over the impermeable membrane to reduce slab curling. If this sand bedding is used, care should be taken during the placement of the concrete to prevent displacement of the sand. The concrete slab should be allowed to cure properly before placing vinyl or other moisture-sensitive floor covering.

## 7.6 PAVING

An R-value of 30 was assumed for design of asphalt paving based on our observations and experience with similar soil conditions. The R-value should be confirmed during grading. Assuming that the paving subgrade will consist of the on-site or comparable soils compacted to at least 90% as recommended, the minimum recommended paving thicknesses are presented in the following table.

| Traffic Use | TI | Asphalt Concrete (inches) | Base Course (inches) |
|-------------|-----|---------------------------|----------------------|
| Light Duty | 6.5 | 4.0 | 9 |
| Heavy Duty | 7.0 | 4.0 | 10 |

The traffic indexes presented are based on traffic uses provided by Circuit City Stores, Inc. The asphalt paving sections were determined using the Caltrans design method. We can determine the recommended paving and base course thicknesses for other Traffic Indices if required. Careful inspection is recommended to verify that the recommended thicknesses or greater are achieved, and that proper construction procedures are followed.

The base course should conform to requirements of Section 26 of State of California Department of Transportation Standard Specifications (Caltrans), latest edition, or meet the specifications for untreated base as defined in Section 200-2 of the latest edition of the Standard Specifications for Public Works Construction (Green Book). The base course should be compacted to at least 95%.

## 7.7 GRADING

To provide support for spread footings and the building floor slabs, the existing fill soils and any disturbed soils should be excavated and recompacted. Where space is available, the excavation of the fill should extend at least 5 feet beyond the building footings in plan. All required additional fill should be properly compacted.

After clearing the site and excavating as recommended, the exposed soils should be carefully inspected to verify the removal of all unsuitable deposits. Next, the exposed soils should be scarified to a depth of 6 inches, brought to optimum moisture content, and compacted to at least 90% of the maximum dry density obtainable by the ASTM Designation D1557-91 method of compaction.

After compacting the exposed soils, all required fill should be placed in loose lifts not more than 8 inches in thickness and compacted to at least 90%. The moisture content of the on-site soils should vary no more than 2% below or above optimum moisture content during compaction.

The on-site soils, less any debris or organic matter within the existing fill, may be used in compacted fills. Any required imported fill should consist of relatively non-expansive soils with an expansion index of less than 35. The material should contain sufficient fines (binder material) so as to be relatively impermeable when compacted and result in a stable subgrade.

*Circuit City Stores, Inc.—Geotechnical Investigation*                                    *November 21, 1994*
*Law/Crandall Project 2661.40788.0001*

The excavation and reworking of the upper soils and the compaction of all required fill should be observed and tested by our firm. All required import fill material should be approved for use prior to placing and compacting.

The governmental agencies having jurisdiction over the project should be notified prior to commencement of grading so that the necessary grading permits may be obtained and arrangements may be made for the required inspection(s).

## 8.0  BASIS FOR RECOMMENDATIONS

The recommendations provided in this report are based upon our understanding of the described project information and on our interpretation of the data collected during the subsurface exploration. We have made our recommendations based upon experience with similar subsurface conditions under similar loading conditions. The recommendations apply to the specific project discussed in this report; therefore, any change in the loads or the location of the proposed building additions or the site grades should be provided to us so that we may review our conclusions and recommendations and make any necessary modifications.

The recommendations provided in this report are also based upon the assumption that the necessary geotechnical observations and testing during construction will be performed by representatives of our firm. The field observation services are considered a continuation of the geotechnical investigation and essential to verify that the actual soil conditions are as anticipated. This also provides for the procedure whereby the client can be advised of unanticipated or changed conditions that would require modifications of our original recommendations. In addition, the presence of our representative at the site provides the client with an independent professional opinion regarding the geotechnically related construction procedures. If another firm is retained for the geotechnical observation services, our professional responsibility and liability would be limited to the extent that we would not be the geotechnical engineer of record.



PROJECT No. 266...

# HARBOUR BOULEVARD

ORANGEFAIR AVENUE

PROPOSED BUILDING

EXISTING BUILDING

EXISTING BUILDING

EXISTING BUILDING

EXISTING BUILDING

EXISTING BUILDING

EXISTING BUILDING

228'-8"

135'-9

195'-6"

## PLOT PLAN

SCALE 1" = 100'

LAW/CRANDALL, INC.

FIGURE 1

**REFERENCE:**
PLAN (DATED 10/18/94) BY DESIGN
DEPARTMENT CIRCUIT CITY STORES, INC.

**KEY:**
3 ● CURRENT INVESTIGATION (2661.40768.0001)
5 ◐ PREVIOUS INVESTIGATION (A-77026)
5 ◑ PREVIOUS INVESTIGATION (A-65269)
2 ○ PREVIOUS INVESTIGATION (65138)
2 ○ BORING LOCATION AND NUMBER

N →

*Circuit City Stores, Inc.—Geotechnical Investigation*
*Law/Crandall Project 2661.40788.0001*

*November 21, 1994*

# APPENDIX

## EXPLORATIONS AND LABORATORY TESTS

*Circuit City Stores, Inc.—Geotechnical Investigation*
*Law/Crandall Project 2661.40788.0001*

*November 21, 1994*

## EXPLORATIONS AND LABORATORY TESTS

### EXPLORATIONS

The soil conditions beneath the site were explored by drilling three borings at the locations shown on the Plot Plan. The borings were drilled to depths of 35 feet below the existing grade using 16-inch-diameter bucket-type drilling equipment. Caving or raveling of the boring walls did not occur during drilling; casing or drilling mud was not used to extend the borings to the depths drilled.

The soils encountered were logged by our field technician, and relatively undisturbed and bulk samples were obtained for laboratory inspection and testing. The logs of the borings are presented on Figures A-1.1 through A-1.3, Log of Borings. The depths at which undisturbed samples were obtained are indicated to the left of the boring logs. The number of blows required to drive the Crandall sampler 12 inches is indicated on the logs. The soils are classified in accordance with the Unified Soil Classification System described on Figure A-2.

### LABORATORY TESTS

The field moisture content and dry density of the soils encountered were determined by performing tests on the undisturbed samples. The results of the tests are shown to the left of the boring logs.

Remolded direct shear tests were performed on selected undisturbed samples to evaluate the strength of the soils. The tests were performed after soaking to near-saturated moisture content and at various surcharge pressures. The yield-point values obtained from the direct shear tests are presented on Figure A-3, Direct Shear Test Data.

The optimum moisture content and maximum dry density of the upper soils were determined by performing a compaction test on a selected sample. The test was performed in general accordance with the ASTM Designation D1557-91 method of compaction. The results of the test are presented on Figure A-4, Compaction Test Data.





# BORING 1

DATE DRILLED:     November 8, 1994
EQUIPMENT USED:  16" - Diameter Bucket
ELEVATION:       100.3**

| ELEVATION (ft.) | DEPTH (ft.) | O.V.A.*** (p.p.m.) | MOISTURE (% of dry wt.) | DRY DENSITY (lbs./cu. ft.) | BLOW COUNT* (blows/ft.) | SAMPLE TYPE | |
|---|---|---|---|---|---|---|---|
| 100 | | | | | | ML | 4" Asphalt paving<br>SANDY SILT - brown |
| | | 25 | 12.7 | 103 | <1 | | |
| | | 35 | 13.8 | 96 | <1 | SM | SILTY SAND - fine, brown |
| 95 | 5 | 25 | 9.3 | 96 | 1 | | |
| | | 20 | 21.4 | 77 | 1 | ML | SANDY SILT - brown |
| 90 | 10 | | | | | | NOTE: Water not encountered.  No caving. |
| | | | | | | | * Number of blows required to drive the Crandall sampler 12 inches for a depths of:<br>0 to 25 feet using 1600 pound hammer falling 12 inches.<br>Below 25 feet using 800 pound hammer falling 12 inches. |
| 85 | 15 | 35 | 17.8 | 95 | 1 | | ** Elevations refer to assumed datum; see Figure 1 for location and elevation of bench mark. |
| | | | | | | | ***Gastechtor Model No. 1238 used. |
| 80 | 20 | 50 | - | - | 3 | SP | SAND - fine, brown |
| | | | | | | ML | SANDY SILT - brown |
| 75 | 25 | 30 | - | - | 5 | SP | SAND - fine, brown |
| 70 | 30 | 10 | - | - | 6 | ML | SANDY SILT - brown<br>some organics |
| | | | | | | SP | SAND - fine, light brown |
| | 35 | 20 | - | - | 9 | | END OF BORING AT 35' |

Note: The log of subsurface conditions shown hereon applies only at the specific boring location and at the date indicated.
It is not warranted to be representative of subsurface conditions at other locations and times.

JOB  2661.40788.0001   DATE  11/23/1994   F.T.  GMC   DR.  BDS   O.E.  BDS   CHKD

## LOG OF BORING

LAW/CRANDALL, INC. 



# BORING 2

DATE DRILLED:   November 8, 1994
EQUIPMENT USED:   16" - Diameter Bucket
ELEVATION:   99.7**

| ELEVATION (ft.) | DEPTH (ft.) | O.V.A.*** (p.p.m.) | MOISTURE (% of dry wt.) | DRY DENSITY (lbs./cu. ft.) | BLOW COUNT* (blows/ft.) | SAMPLE TYPE | |
|---|---|---|---|---|---|---|---|
| | | 50 | 10.2 | 105 | 1 | ML | 4" Asphalt paving - 5" base course<br>FILL - SANDY SILT - pieces of brick and concrete, brown<br>SURFACE OF NATURAL SOIL |
| | | | | | | SM | SILTY SAND - fine, brown |
| 95 | 5 | 80 | 6.7 | 100 | <1 | | |
| | | 100 | 11.3 | 95 | 1 | | |
| 90 | 10 | 60 | 21.0 | 100 | <1 | ML | SANDY SILT - some clay, brown |
| 85 | 15 | 70 | 11.8 | 90 | 1 | SM | SILTY SAND - fine, some Gravel, brown |
| 80 | 20 | 50 | - | - | 4 | SP | SAND - fine, some Gravel, brown |
| | | | | | | ML | SANDY SILT - brown |
| 75 | 25 | 20 | - | - | 2 | SP | SAND - fine, brown |
| | | | | | | ML | SANDY SILT - brown |
| 70 | 30 | 15 | - | - | 5 | | |
| 65 | 35 | 30 | - | - | 5 | | END OF BORING AT 35'<br><br>NOTE: Water not encountered. No caving. |

Note: The log of subsurface conditions shown hereon applies only at the specific boring location and at the date indicated. It is not warranted to be representative of subsurface conditions at other locations and times.

JOB  2661.40788.0001   DATE  11/23/1994   F.T.  GMC   DR.  BDS   O.E.  BDS   CHKD

# LOG OF BORING

LAW/CRANDALL, INC.





# BORING 3

DATE DRILLED: November 8, 1994
EQUIPMENT USED: 16" - Diameter Bucket
ELEVATION: 101.5**

| ELEVATION (ft.) | DEPTH (ft.) | O.V.A.*** (p.p.m.) | MOISTURE (% of dry wt.) | DRY DENSITY (lbs./cu. ft.) | BLOW COUNT* (blows/ft.) | SAMPLE TYPE | |
|---|---|---|---|---|---|---|---|
| 100 | | 75 | 29.8 | 92 | 1 | SP-SM | 5" Concrete Slab<br>FILL - SILTY SAND and SAND - fine to medium, pieces of brick, brown |
| | 5 | 75 | 13.6 | 111 | 3 | SM | SURFACE OF NATURAL SOIL<br>SILTY SAND - fine, brown |
| 95 | | 25 | 17.2 | 99 | 2 | | |
| | | 20 | 18.0 | 104 | 1 | ML | SANDY SILT - brown |
| 90 | 10 | | | | | | |
| | 15 | 40 | 17.6 | 99 | 1 | SM | 8" - 10" Sand layer<br>SILTY SAND - fine, light brown |
| 85 | | | | | | | |
| | 20 | 50 | - | - | 3 | | |
| 80 | | | | | | ML | 12" Sand layer<br>SANDY SILT - brown |
| | 25 | 35 | - | - | <1 | | some Clay |
| 75 | | | | | | SM | SILTY SAND - fine, brown |
| | 30 | 60 | - | - | 6 | ML | SANDY SILT - brown |
| 70 | | | | | | | |
| | 35 | 25 | - | - | 6 | | END OF BORING AT 35'<br>NOTE: Water not encountered. No caving. |

JOB  2661.40788.0001    DATE  11/23/1994    F.T.  GMC    DR.  BDS    O.E.  BDS    CHKD

Note: The log of subsurface conditions shown hereon applies only at the specific boring location and at the date indicated.
It is not warranted to be representative of subsurface conditions at other locations and times.

# LOG OF BORING

LAW/CRANDALL, INC.    

| MAJOR DIVISIONS | | | GROUP SYMBOLS | TYPICAL NAMES |
|---|---|---|---|---|
| COARSE GRAINED SOILS (More than 50% of material is LARGER than the No.200 sieve size) | GRAVELS (More than 50% of coarse fraction is LARGER than the No.4 sieve size) | CLEAN GRAVELS (Little or no fines) | GW | Well graded gravels, gravel-sand mixtures, little or no fines |
| | | | GP | Poorly graded gravels or gravel-sand mixtures, little or no fines |
| | | GRAVELS WITH FINES (Appreciable amount of fines) | GM | Silty gravels, gravel-sand-silt mixtures |
| | | | GC | Clayey gravels, gravel-sand-clay mixtures |
| | SANDS (More than 50% of coarse fraction is SMALLER than the No.4 sieve size) | CLEAN SANDS (Little or no fines) | SW | Well graded sands, gravelly sands, little or no fines |
| | | | SP | Poorly graded sands or gravelly sands, little or no fines |
| | | SANDS WITH FINES (Appreciable amount of fines) | SM | Silty sands, sand-silt mixtures |
| | | | SC | Clayey sands, sand-clay mixtures |
| FINE GRAINED SOILS (More than 50% of material is SMALLER than the No.200 sieve size) | SILTS AND CLAYS (Liquid limit LESS than 50) | | ML | Inorganic silts and very fine sands, rock flour, silty or clayey fine sands or clayey silts with slight plasticity |
| | | | CL | Inorganic clays of low to medium plasticity, gravelly clays, sandy clays, silty clays, lean clays |
| | | | OL | Organic silts and organic silty clays of low plasticity |
| | SILTS AND CLAYS (Liquid limit GREATER than 50) | | MH | Inorganic silts, micaceous or diatomaceous fine sandy or silty soils, elastic silts |
| | | | CH | Inorganic clays of high plasticity, fat clays |
| | | | OH | Organic clays of medium to high plasticity, organic silts |
| HIGHLY ORGANIC SOILS | | | PT | Peat and other highly organic soils |

BOUNDARY CLASSIFICATIONS:    Soils possessing characteristics of two groups are designated by combinations of group symbols.

P A R T I C L E    S I Z E    L I M I T S



| SILT OR CLAY | SAND | | | GRAVEL | | COBBLES | BOULDERS |
|---|---|---|---|---|---|---|---|
| | Fine | Medum | Coarse | Fine | Coarse | | |

No.200   No.40      No.10     No.4      3/4 in.      3 in.      (12 in.)

U. S.  S T A N D A R D  S I E V E  S I Z E

# UNIFIED SOIL CLASSIFICATION SYSTEM

REFERENCE:
The Unified Soil Classification System, Corps of Engineers, U.S. Army
Technical Memorandum No. 3-357, Vol. 1, March, 1953. (Revised April, 1960).

L A W / C R A N D A L L , I N C. 

FIGURE  A-2



**SHEAR STRENGTH in Pounds per Square Foot**

BORING NUMBER &
SAMPLE DEPTH (FT.)

2@0-2

KEY:

△   Samples tested after soaking to a moisture content near saturation
└── Remolded samples compacted to 90%

# DIRECT SHEAR TEST DATA

LAW/CRANDALL, INC.



JOB : 2661.40788.0001   DATE : 11/16/94   OE : MMH   CHKD :

BORING NUMBER
AND SAMPLE DEPTH:                                    2 at 0' to 2'

SOIL TYPE :                                          FILL -
                                                    SANDY SILT

MAXIMUM DRY DENSITY  :
   ( lbs./cu. ft. )                                      126

OPTIMUM MOISTURE CONTENT  :
   ( % of dry wt. )                                       11

TEST METHOD :  ASTM  Designation  D1557 - 91

**COMPACTION    TEST    DATA**

CHKD  MWH  O.E.  MWH  DR.  11/18/94  DATE

JOB  2661.40788.0001

LAW/CRANDALL, INC.

FIGURE  A - 4

... ... ... Company LLC ("Lessor"), as lessor/landlord, and
Circuit City Stores West Coast, Inc. ("CCSWC"), as lessee/tenant (the "Lease").

1.   In consideration of Lessor's lease of the premises described
in the Lease ("Premises") to CCSWC on the terms and conditions set forth in the
Lease, Circuit City Stores, Inc. ("CCS"), the sole shareholder of CCSWC, hereby
guarantees the full and timely payment and performance by CCSWC of all its
obligations under the Lease.

2.   So long as the lessee under the Lease is either CCSWC or any successor
or assign of CCSWC which is wholly owned or controlled by CCS (collectively
"Lessee"), the following shall apply:

(i)   Lessor shall not be required to give CCS any notice of any
failure, breach or default by the Lessee to perform its obligations under the
Lease;

(ii)   Lessor shall not be required to obtain the consent or approval of
CCS for, or notify CCS of, any amendment, modification, supplement or change
to any of the provisions of the Lease;

(iii)   Lessor shall not be required to report to CCS any information that
Lessor receives or discovers about Lessee's financial condition or any
circumstances bearing on Lessee's ability to pay or otherwise perform Lessee's
obligations under the Lease.

3.   The validity of this Guaranty and the obligation of CCS under this
Guaranty shall in no way be terminated, affected or impaired by reason of (i) the
release or discharge of Lessee (or any other tenant under the Lease) in any
creditor's receivership, bankruptcy or other proceeding; (ii) the impairment,
limitation or modification of the liability of Lessee (or any other tenant under the
Lease) or the estate of Lessee (or any other tenant under the Lease) in bankruptcy,
or of any remedy for the enforcement of Lessee's (or any other tenant under the
Lease) liability under the Lease resulting from the operation of any present or
future provision of any Federal Bankruptcy Act or other statute or from the decision
in any court; (iii) the rejection or disaffirmance of the Lease in any such
proceedings; or (iv) the assignment or transfer of or subletting under the Lease by
Lessee (or any other tenant under the Lease).

4.   So long as Lessee is the tenant under the Lease, CCS's obligations under
this Guaranty shall be independent of those of Lessee. Lessor may maintain, assert
or prosecute separate and distinct claims, rights or actions against CCS under the
terms of this Guaranty regardless of whether Lessee or anyone else is joined with
CCS or whether the same or similar claims, rights or actions are maintained,
asserted, or prosecuted against Lessee or whether Lessor proceeds against any
security or pursues any other remedies.  If Lessee is not the tenant under the
Lease, Lessor shall first exhaust its remedies under the Lease against the tenant
under the Lease prior to enforcing its rights against CCS under this Guaranty.

5.   If Lessee is not the tenant under the Lease, then Lessor shall,
concurrent with the notice given to tenant, give CCSWC and CCS prompt written notice
at the address set forth below of any failure by such tenant to perform its
obligations under the Lease.  Failure to provide such notice to CCS within 30 days
after such failure becomes known to Lessor shall relieve CCS of any obligation under
this Guaranty.

6.   The following shall also be conditions of CCS's obligations under this
Guaranty:  (i) all conditions to the obligation of Lessee (or any other tenant under
the Lease) giving rise to such obligation by CCS have been satisfied, (ii) all
notices required to be given to Lessee (or any other tenant under the Lease) in
respect of the failure or breach by Lessee (or any other tenant under the Lease) at
issue have been given, and (iii) any grace period in respect of such obligation by
Lessee (or any other tenant under the Lease) have expired.

7.   If any action is instituted by Lessor to enforce this Guaranty or
otherwise obtain performance by CCS under this Guaranty, the Court in such action
shall require the non-prevailing party in such action to pay to the prevailing party
in such action attorneys' fees and related costs and expenses incurred by the
prevailing party.

8.   This Guaranty shall be governed by California law.  All rights and
benefits of Lessor under this Guaranty shall also inure to the benefit of Lessor's
representatives, successors and assigns and be binding upon CCS's representatives,
successors and assigns.

By: _____

Address for Notices:

9950 Mayland Drive
Richmond, Virginia 23233
Attention: Vice President-Real
                Estate