**KUTAK ROCK LLP**
Loc Pfeiffer (VSB 39632)
Jeremy S. Williams (VSB 77469)
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700
*Counsel to Michelle A. Sifford*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| In re: | |
|---|---|
| CIRCUIT CITY STORES, INC., *et al*., | Case No. 08-35653-KRH |
| | Chapter 11 |
| Debtors. | Jointly Administered |

**RESPONSE AND OPPOSITION BY MICHELLE A. SIFFORD TO LIQUIDATING TRUST'S FIFTY-NINTH OMNIBUS OBJECTION TO CLAIMS**

Michelle A. Sifford ("Sifford"), by counsel, responds to the *Liquidating Trust's Fifty-Ninth Omnibus Objection to Claims: Fixing of Certain Unliquidated Claims, Reduction of Certain Partially Invalid Claims, or Disallowance of Certain Invalid Claims, as Applicable (Severance)* [Docket No. 12428] (the "Objection"), as follows:

1. Circuit City Stores, Inc. and certain of its affiliated entities (collectively, "Debtors") filed a petition for relief on or about November 10, 2008 and continued to operate as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. On September 14, 2010, the Court entered an order confirming the *Modified Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession and its Official Committee of Unsecured Creditors Holding General Unsecured Claims* [Docket No. 8555] (the "Plan of Liquidation"). Pursuant to

the Plan of Liquidation, the Circuit City Stores, Inc., Liquidating Trust was established and Alfred H. Siegel was appointed Trustee (the "Trustee").

2.      On January 28, 2009, Sifford timely filed a proof of claim with the Debtors' claims agent, Kurtzman Carson Consultants LLC, which claim was assigned Claim No. 7354 (the "Claim") and is attached as **Exhibit A**.

3.      As set forth in the Claim, upon termination, Sifford became entitled to certain severance benefits due and owing to her under that certain Employment Agreement for Michelle Sifford dated October 15, 2007, a copy of which is attached as an exhibit to the Claim (the "Contract").  Pursuant to Article 9.3 of the Contract, upon Sifford's termination as a result of the Debtors' bankruptcy filing, she was entitled to, among other things: (i) her base salary for a year at the rate in effect at the time of termination; (ii) her target annual bonus for the year in which the termination occurred; and (iii) a lump sum payment of one year's cost of perquisites.  As set forth in detail in the Claim, her base salary was $206,000.00, her target annual bonus was $82,400.00 and her car allowance was $6,396.00, for a total amount due of $294,796.00.

4.      In the Objection, the Trustee seeks to reduce the Claim to $231,441.00 on the basis that the Debtors' books and records show the reduced amount as the amount being due and owing to Sifford.  The Trustee gives no information as to how the amount was calculated, what base salary or target bonus the calculation was based on or whether it reviewed Sifford's specific compensation structure.  It is impossible to determine how the Trustee arrived as the proposed reduced claim amount.  Sifford, however, has put forth a detailed calculation of the amount she is entitled to under the Contract as well as provided all supporting documentation.

5. Sifford opposes the relief sought in the Objection. Given that the Trustee has failed to put forth an objection with sufficient detail to justify a reduction of the Claim, the Objection should be denied.

**WHEREFORE**, Sifford respectfully requests the Court to overrule the Objection, to allow the Claim, and to grant such other and further relief as is just and proper.

Dated: Richmond, Virginia
November 27, 2012

Respectfully submitted,

/s/ Jeremy S. Williams
**KUTAK ROCK LLP**
Loc Pfeiffer (VSB 39632)
Jeremy S. Williams (VSB 77469)
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700
*Counsel to Michelle A. Sifford*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on November 27, 2012, a true and exact copy of the foregoing was served via ECF notification to the following:

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard
Los Angeles, CA 90067-4100

Lynn L. Tavenner, Esq.
Paula S. Beran, Esq.
Tavenner & Beran, PLC
20 North Eighth Street, 2nd Floor
Richmond, VA 23219

/s/ Jeremy S. Williams
Counsel

**DECLARATION**

I declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that to the best of my knowledge the foregoing is true and correct.

Dated: November 27, 2012

**MICHELLE A. SIFFORD**

Michelle A. Sifford

**EXHIBIT A**

The Debtor has listed your claim as Contingent and Unliquidated on Schedule E as a General Unsecured Claim in
the amount of $0.00. If you believe that you have a claim against the Debtor, you are required to complete and
Case 08-35653-KRH Doc 11912-3 Filed 02/10/15 Entered 02/10/15 17:29:54 Desc
Main Document Page 6 of 24

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA | PROOF OF CLAIM |
|---|---|

**Debtor against which claim is asserted :** (Check only **one** box below:)

- ☒ Circuit City Stores, Inc. (Case No. 08-35653)
- ☐ Circuit City Stores West Coast, Inc. (Case No. 08-35654)
- ☐ InterTAN, Inc. (Case No. 08-35655)
- ☐ Ventoux International, Inc. (Case No. 08-35656)
- ☐ Circuit City Purchasing Company, LLC (Case No. 08-35657)
- ☐ CC Aviation, LLC (Case No. 08-35658)

- ☐ CC Distribution Company of Virginia, Inc. (Case No. 08-35659)
- ☐ Circuit City Stores PR, LLC (Case No. 08-35660)
- ☐ Circuit City Properties, LLC (Case No. 08-35661)
- ☐ Orbyx Electronics, LLC (Case No. 08-35662)
- ☐ Kinzer Technology, LLC (Case No. 08-35663)
- ☐ Courchevel, LLC (Case No. 08-35664)

- ☐ Abbott Advertising, Inc. (Case No. 08-35665)
- ☐ Mayland MN, LLC (Case No. 08-35666)
- ☐ Patapsco Designs, Inc. (Case No. 08-35667)
- ☐ Sky Venture Corporation (Case No. 08-35668)
- ☐ XSStuff, LLC (Case No. 08-35669)
- ☐ PRAHS, INC. (Case No. 08-35670)

NOTE: *This form should not be used to make a claim for administrative expenses arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503(a).*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>SIFFORD, MICHELLE A | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:    NameID: 5054609    PackID: 426204<br><br>SIFFORD, MICHELLE A<br>2917 NORTHLAKE DIRVE<br>RICHMOND VA 23233<br><br>Telephone number:<br>804-364-3926 | Court Claim Number:_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**      $ 294,796<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐  Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:** Employment Agreement<br>(See instruction #2 on reverse side.) See Attached - Section 9.3<br><br>**3. Last four digits of any number by which creditor identifies debtor:** 5653<br><br>　3a. Debtor may have scheduled account as:_____<br>　　(See instruction #3a on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:**  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>Describe:<br><br>**Value of Property:** $_____  **Annual Interest Rate** ___%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br>**if any:** $_____  **Basis for perfection:**_____<br><br>**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____ | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtors business, whichever is earlier — 11 U.S.C. § 507(a)(4).<br><br>☐ Contributions to an employee benefit plan — 11 U.S.C. § 507(a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use — 11 U.S.C. § 507(a)(7).<br><br>☐ Taxes or penalties owed to governmental units — 11 U.S.C. § 507(a)(8).<br><br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment* |

| | | |
|---|---|---|
| **Date:**<br>01/26/2009 | **Signature:** the person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*Michelle A. Sifford*<br><br>*Michelle A. Sifford* | **FOR COURT USE ONLY** |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

MasterCode: 10065660



0835653081218074302240500

Sifford, Michelle A.
2917 Northlake Drive
Richmond, VA 23233

Master Code:10065660          Name ID:5054609          PackID:426204

**This Proof of Claim shall include any and all claims arising out of or relating to any employment agreement or other contractual arrangement, compensation plan or program, benefit plan or program including, without limitation: the 1984 Circuit City Stores, Inc. Employee Stock Purchase Plan; the Circuit City Stores, Inc. Supplemental 401(k) Plan; the Circuit City Stores, Inc. Benefit Restoration Plan; the Retirement Plan of Circuit City Stores, Inc.; the Circuit City Stores, Inc. 2008 Annual Performance-Based Incentive Plan; the Circuit City Stores, Inc. Executive Deferred Compensation Plan; the Circuit City Stores, Inc. 2003 Annual Performance-Based Incentive Plan; and the Circuit City Stores, Inc. 401(k) Plan, each as may have been amended or restated to date. Such claims shall include, without limitation, any rights of indemnification, reimbursement or contribution.**

Michelle Sifford - Circuit City - 01-26-2009



your total rewards

Through your job, you make a significant contribution to our success. Compensation is about the rewards we provide you in return for that contribution. The following includes the rewards you've received in your paycheck and more.

| **Circuit City's Compensation Investment** | **$608,317** |
|---|---|

## Cash Compensation

as of December 31, 2008

| | |
|---|---|
| **Annual Base Salary**<br>Your projected annual base pay | $206,000 |
| **Performance Bonuses**<br>Paid during the last 12 months.<br>Current annual bonus target: 40% of base pay | $36,000 |
| **Other Cash Compensation**<br>Paid during the last 12 months | $11,921 |
| **Total Cash Compensation** | **$253,921** |

$206,000 base Salary
X 40% bonus target
$82,400 bonus $

## Perquisites

as of November 30, 2008

| | |
|---|---|
| **Car (or Car Allowance)**<br>Annual Value | $6,396 |
| **Total Perquisites** | **$6,396** |

$206,000 BASE
82,400 Bonus.
6,396 Car All.
$294,796 → total Claim

## Long-Term Incentives

**Stock Options** — $37,800

You have received the following during the last 12-month period ending November 30, 2008:

- Total stock options: **15,000**
- Total value: **$37,800**

View and model your equity portfolio

**Restricted Stock Plan** — $200

You have received the following during the last 12-month period ending November 30, 2008:

- Total restricted shares: **10,000**
- Current value: **$200**

Current value based on stock price of $0.02 as of 4:51 ET on Nov 12

View and model your equity portfolio

**Stock Purchase Plan** — $0

You are currently eligible to participate in the plan but are not contributing. Please note that both employee contributions and the company match to this plan were suspended effective October 1, 2008.

**Cash Based Plans** — $310,000

You have received long-term cash award(s) with future vesting dates during the 12-month period ending November 30, 2008. Details of the award(s) are contained in your award letter(s).

| **Total Long-Term Incentives** | **$348,000** |
|---|---|

## Other Equity-Based Incentives

This section reflects equity-based awards received during the 12-month period ending November 30, 2008. Any awards received prior to this date can be viewed and modeled in your equity portfolio by clicking here.

**Disclaimer**

Hewitt Associates does not give any warranty or other assurance as to the operation, quality, or functionality of the site. Access to the site may be interrupted,

Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, VA 23233

# Circuit City Stores, Inc.
# Employment Agreement for Michelle A. Sifford

This **EMPLOYMENT AGREEMENT** ("Agreement") is made, entered into, and is effective as of the 15 day of October, 2007 (the "Effective Date"), by and between **Circuit City Stores, Inc.** (the "Company") and **Michelle A. Sifford** (the "Executive").

WHEREAS, the Company desires to employ the Executive as Vice President, Inventory of Circuit City Stores, Inc.;

WHEREAS, the Company recognizes the Executive's intimate knowledge and experience in the business of the Company, and desires to secure the employment of the Executive in the role of Vice President, Inventory of the Company;

WHEREAS, the Executive will develop and/or come in contact with the Company's proprietary and confidential information which is not readily available to the public, and which is of great importance to the Company and is treated by the Company as secret and confidential information; and

WHEREAS, upon execution of this Agreement, any prior employment agreement by and between the Executive and the Company, whether oral or written, will have no force and effect with respect to the terms and conditions of the Executive's employment and will be fully replaced and superseded by the terms of this Agreement.

NOW, THEREFORE, in consideration of the Executive's continued employment and of the mutual covenants and agreements of the parties set forth in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

**Article 1. Term of Employment**

The Company hereby agrees to employ the Executive and the Executive hereby accepts employment as Vice President, Inventory of the Company, in accordance with the terms and conditions set forth herein, for an initial period of one (1) year, commencing as of the Effective Date of this Agreement as indicated above (the "Initial Term"); subject, however, to earlier termination as expressly provided herein.

The Initial Term shall automatically be renewed for additional periods of six (6) months each at the end of the Initial Term, and then again after each successive six (6) months thereafter (collectively, the "Renewal Periods," which, together with the Initial Term, constitute the "Term" of this Agreement). However, either party may terminate this Agreement at the end of the Initial Term, or at the end of any Renewal Period, by giving the other party written notice of intent not to renew, delivered at least thirty (30) days prior to the end of the Initial Term or any Renewal Period.

Initials

**Article 2. Position and Responsibilities**

During the Term of this Agreement, the Executive agrees to serve as Vice President, Inventory of the Company. In her capacity as Vice President, Inventory, the Executive shall report directly to Senior Vice President, Supply Chain, and shall have the duties and responsibilities of Vice President, Inventory of the Company and such other duties and responsibilities not inconsistent with the performance of her duties as Vice President, Inventory of the Company.

**Article 3. Standard of Care**

During the term of this Agreement, the Executive agrees to devote substantially her full-time attention and energies to the Company's business. The Executive covenants, warrants, and represents that she shall:

(a) Devote her full and best efforts and talents full time to the performance of her employment obligations and duties for the Company;

(b) Exercise the highest degree of loyalty and the highest standards of conduct in the performance of her duties;

(c) Comply with all rules, regulations, and policies established or issued by the Company; and

(d) Refrain from taking advantage, for herself or others, of any corporate opportunities of the Company.

**Article 4. Other Employment**

The Executive shall not, during the term hereof, be interested directly or indirectly, in any manner, as partner, officer, director, investor, stockholder, advisor, employee, or in any other capacity, in any other business similar to Company's business for the Executive's personal advantage or benefit or that of others. Any other employment or position which might reasonably be deemed contrary to the best interests of the Company is prohibited. During the term of employment hereunder, the Executive agrees to obtain the Company's written consent prior to entering into any other occupation, even if dissimilar to that of the Company. Such consent may be granted or withheld, in the Company's absolute discretion. Nothing herein contained shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other securities of any corporation whose stock or securities are regularly traded on any public exchange, nor shall anything herein contained be deemed to prevent the Executive from investing in real estate for her own benefit (so long as such investment (a) is not related to or in support of any entity engaged in a business similar to that of the Company or (b) does not detract from the Executive's performance of her duties and obligations hereunder).

Initials

**Article 5. Compensation and Benefits**

As remuneration for all services to be rendered by the Executive during her employment, and as consideration for complying with the covenants herein, the Company shall pay and provide to the Executive the following:

**5.1. Base Salary.** During the Term of this Agreement, the Company shall pay the Executive a Base Salary in an amount which shall be established and approved by the Compensation and Personnel Committee of the Board of Directors; provided, however, that such Base Salary shall be established at a rate of not less than $180,000.00 gross per year. In addition, the Company shall not be obligated to maintain, increase, or refrain from reducing or amending such Base Salary so long as such changes are similarly applicable to comparably situated employees. This Base Salary shall be subject to all appropriate federal and state withholding taxes and payable in accordance with the normal payroll practices of the Company. The Base Salary shall be reviewed at least annually following the Effective Date of this Agreement, while the Term of this Agreement is in force, to ascertain whether, in the judgment of the Compensation and Personnel Committee, such Base Salary should be changed. If changed, the Base Salary as stated above shall, likewise, be changed for all purposes of this Agreement.

**5.2 Annual Bonus.** In addition to her Base Salary, the Executive shall be entitled to participate in the Company's short-term incentive program, as such program may exist from time to time during the Term of this Agreement.

Under the Company's short-term incentive plan, the Executive has the opportunity to earn an annual bonus with respect to any fiscal year of the Company ("Annual Bonus"). The Annual Bonus, if earned, with respect to any fiscal year, will generally be in an amount that is not less than forty percent (40%) of the Executive's Base Salary for the fiscal year with respect to which the Annual Bonus is being paid (the "Minimum Bonus Rate").

The award and amount of any Annual Bonus shall be determined under the Company's short-term incentive plan, at the sole discretion of the Company's Compensation and Personnel Committee. If the Minimum Bonus Rate is changed, it shall, likewise, be changed for all purposes of this Agreement.

**5.3. Long-Term Incentives.** During the Term of this Agreement, the Executive shall be eligible to participate in the Company's long-term incentive plan, to the extent that the Board of Directors of the Company or the Compensation and Personnel Committee, in their discretion, determines is appropriate.

**5.4. Retirement Benefits.** During the Term of this Agreement, the Company shall provide to the Executive the opportunity for participation in all Company retirement, insurance, fringe benefits, and executive compensation plans and programs, subject to the eligibility and participation requirements of such plans.

**5.5. Employee Benefits.** During the Term of this Agreement, the Company shall provide the Executive all benefits, subject to the eligibility requirements and other provisions of such arrangements. Such benefits may include group term life insurance, comprehensive health and major medical insurance, dental and life insurance, and short-term and long-term disability.

**5.6. Perquisites.** During the Term of this Agreement, the Company shall provide to the Executive, at the Company's cost, all perquisites, to the extent that the Board of Directors of the Company or the Compensation and Personnel Committee, in their discretion, determines is appropriate.

**5.7. Right to Change Plans.** By reasons of Articles 5.5 and 5.6 herein, the Company shall not be obligated to institute, maintain, or refrain from changing, amending, or discontinuing any benefit plan or perquisite.

**Article 6. Expenses**

During the Term of this Agreement, the Company shall pay or reimburse the Executive for all ordinary and necessary expenses, in a reasonable amount, which the Executive incurs in performing her duties under this Agreement including, but not limited to, travel, entertainment, professional dues and subscriptions, and all dues, fees, and expenses associated with membership in various professional, business, and civic associations and societies in which the Company finds that the Executive's participation is in the best interests of the Company. The payment of reimbursement of expenses shall be subject to such rules concerning documentation of expenses and the type or magnitude of such expenses as the Compensation and Personnel Committee of the Board of Directors may establish from time to time.

**Article 7. Employment Termination**

**7.1. Termination Due to Retirement or Death.** In the event the Executive's employment ends by reason of Retirement or the Executive's death during the term of this Agreement, the Executive's benefits shall be determined in accordance with the Company's retirement, survivor's benefits, insurance, and/or other applicable programs of the Company then in effect. In addition, in the case of the Executive's death, all stock grants will become immediately vested and may be exercised by the Executive's personal representatives, distributees, legatees, or estate at any time before the expiration date of the grant.

The Effective Date of Termination due to Retirement or death shall be (a) ninety (90) days following the date the Executive provides the Company with written notice that the Executive is ending employment by reason of Retirement or (b) on the Executive's date of death, as the case may be. Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive or, if applicable, the Executive's estate: (a) any Base Salary or Annual Bonus that was accrued but not yet paid as of the Effective Date of Termination; and (b) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

**7.2. Termination Due to Disability.** The Company shall have the right to terminate the Executive's employment for disability. For the purposes of this Agreement, disability shall mean any physical or mental illness or injury that causes the Executive to be unable to substantially perform the Executive's normal duties; provided however that the Executive shall not be considered disabled until: (i) the Executive has been so disabled for 180 days during any period of twelve (12) consecutive months; (ii) the Executive's attending physician shall have furnished to the Company certification that the return of the Executive to her normal duties is impossible or improbable; or (iii) the Executive is determined to be totally disabled by the disability insurer then insuring the Executive, if any.

The Effective Date of Termination due to Disability shall be specified, in a written notice, by the Executive's immediate manager, and such written notice shall be delivered to the Executive, but shall be no less than thirty (30) calendar days after the delivery of such written notice to the Executive. Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive (or, if applicable, the Executive's estate): (a) any salary that was accrued but not yet paid as of the Effective Date of Termination; (b) the unpaid Annual Bonus, if any, with respect to the fiscal year preceding the Effective Date of Termination (such Annual Bonus, if any, to be determined in the manner it would have been determined and payable at the time it would have been payable under Article 5.2 had there been no termination of the Employment Period); and (c) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

It is expressly understood that the Disability of the Executive for a period of one hundred eighty (180) calendar days or less in the aggregate during any period of twelve (12) consecutive months, in the absence of any reasonable expectation that her Disability will exist for more than such a period of time, shall not constitute a failure by her to perform her duties hereunder and shall not be deemed a breach or default, and the Executive shall receive full compensation for any such period of Disability or for any other temporary illness or incapacity during the term of this Agreement.

If the employment of the Executive terminates because of Disability, all of the Executive's outstanding stock grants, excluding restricted stock grants issued under a performance based plan, will become immediately vested, effective as of the date of the Executive's Disability. Then, the Executive, the Executive's personal representatives, distributees, or legatees may exercise the Executive's grants at any time before the expiration date of the grant.

**7.3. Voluntary Termination by the Executive.** The Executive may terminate her employment and this Agreement at any time by giving the Company at least thirty (30) days written notice. The Company reserves the right to require the Executive not to work during the notice period but shall pay the Executive her full Base Salary, at the rate then in effect as provided in Article 5.1 herein, through the notice period plus all other benefits to which the Executive has a vested right on the last day of employment (for purposes of this paragraph, the Executive shall not be paid any Annual Bonus with respect to the fiscal year in which voluntary termination under this Article 7.3 occurs). The Company thereafter shall have no further obligations under this Agreement.

**7.4. Involuntary Termination by the Company Without Cause.** The Company may terminate the Executive's employment, at any time, for any reason other than death, Disability, Retirement, or for "Cause", by providing the Executive with at least thirty (30) days written notice; provided, however, that for purposes of this Article 7.4 (a), no variation, alteration, modification, cancellation, change or amendment made to this Agreement pursuant to Article 12.3 or 12.4 shall be deemed an involuntary termination without Cause.

(a) Upon the Effective Date of Termination specified by the Company for termination by the Company without cause, the Company shall pay to the Executive, an amount equal to six (6) months of the Executive's Base Salary and a pro rata share of the Executive's target Annual Bonus established for the fiscal year in which the Executive's Effective Date of Termination occurs according the Company's regularly scheduled payroll practices. If, however, the Company determines that such payments are subject to Treasury Regulation Service 1.409A-3(g)(2), payment shall begin on the first day of the month following the

 Initials

six (6) month anniversary of the Executive's Effective Date of Termination, and such payment shall be made in full by or within thirty (30) days thereafter.

(b) In addition, the Company shall continue, at the same cost to the Executive as existed as of the Effective Date of Termination, all health and welfare benefit plan participation, as permitted by law, for six (6) months following the Executive's termination of employment; provided, however, that the applicable COBRA "period of coverage" under any plan subject to Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code"), or Sections 601 through 609 of the Employee Retirement Income Security Act of 1974 (ERISA) shall begin as of the Effective Date of Termination.

(c) The Company shall also provide the Executive with three (3) months of outplacement services.

(d) Any unvested stock options or any outstanding restricted stock, excluding performance-based restricted stock grants, as of the Effective Date of Termination, that would become vested (that is, exercisable in the case of stock options or transferable and non-forfeitable in the case of restricted stock) if the Executive remained an employee through the Initial Term or the then current Renewal Period of this Agreement will become vested as of the date of the Effective Date of Termination. The Executive must satisfy the tax withholding requirements.

The Company thereafter shall have no further obligations under this Agreement.

**7.5. Termination For Cause.** Nothing in this Agreement shall be construed to prevent the Company from terminating the Executive's employment under this Agreement, without notice or liability for doing so, for "Cause."

For purposes of this Agreement, "Cause" means:

(a) The Executive's material breach of this Agreement, which breach is not cured within ten (10) days of receipt by the Executive of written notice from the Company specifying the breach;

(b) The Executive's gross negligence in the performance of her material duties hereunder, intentional nonperformance or intentional misperformance of such duties, misconduct or refusal to abide by or comply with the directives of the Board, her superior officers, or the Company's policies and procedures, which actions continue for a period of ten (10) days after receipt by the Executive of written notice of the need to cure or cease;

(c) Conviction of a felony or any crime involving moral turpitude;

(d) The Executive engaging in illegal conduct, dishonesty or fraud with respect to the business or affairs of the Company that in the reasonable judgment of the Company materially and adversely affects the operations or reputation of the Company;

(e) Failure of the Executive to disclose to the Executive's manager a conflict of interest, of which the Executive knew or, with reasonable diligence, would have known, in connection with any transaction entered into on behalf of the Company;

(f) Failure of the Executive to agree to a modification of this Agreement, pursuant to paragraph 12.3 below, when the purpose of the modification is to comply with applicable federal, state and/or local laws or regulations, or when such modification is designed to further define the restrictions of Article 8 or otherwise enhance the enforcement of Article 8 without increasing the scope of the Article 8 restrictions; or

(g) The Executive engages in any act or omission which the Company believes could injure or bring discredit upon the reputation and/or goodwill of the Company and/or its respective officers, directors or shareholders.

In the event this Agreement is terminated for Cause, the Company shall pay the Executive her Base Salary through the Effective Date of Termination for cause and the Executive shall immediately thereafter forfeit all rights and benefits (other than vested benefits) she would otherwise have been entitled to receive under this Agreement. The Company thereafter shall have no further obligations under this Agreement.

**Article 8. Noncompetition and Confidentiality**

**8.1. Noncompetition.**

(a) During the Executive's employment and for a period of one (1) year following the last day of the Executive's employment, the Executive shall not directly or indirectly compete with the Company by engaging, in a competitive capacity, in any business that is engaged in the same or similar business of the Company, specifically including, but not limited to, Best Buy Co., Inc.; Dell, Inc; eBay; Wal-Mart Stores; Amazon.com, and any of the related or affiliated entities for each of the above companies. A business will not be considered to be in competition with the Company for purposes of this paragraph 8.1(a) or paragraph 8.1(b) below if:

(i) The business or the operating unit of the business in which the Executive is employed or with which the Executive is associated (collectively the "Business Unit") is not engaged in the retail sales of consumer electronics;

(ii) If sales of the Business Unit's products or services in the retail sales and service of consumer electronics constitute less than ten percent (10%) of such Business Unit's sales; or

(iii) If the sales of the Business Unit in the retail sales and service of consumer electronics do constitute more than ten percent (10%) of the sales of the Business Unit, but the Business Unit solely operates outside of North America.

Notwithstanding the foregoing, nothing herein shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other securities of any corporation

Initials

whose stock or securities are regularly traded on any public exchange, nor shall anything herein contained be deemed to prevent Employee from investing in real estate for her own benefit (as long as such investment is not related to or in support of any entity engaged in the same or similar business as the Company in competition with the Company in one or more Metropolitan Statistical Areas ("MSAs") in which the Company is doing business during the Executive's employment).

(b) During the Executive's employment and for a period of one (1) year following the last day of the Executive's employment, the Executive shall not directly or indirectly compete with the Company by engaging, in a competitive capacity, in any business engaged in the same or similar business of the Company in one or more MSAs where, on the last day of the Executive's employment, the Company is engaged in real estate site selection or has taken further steps toward the commencement of operations in the future, of which the Executive is aware.

(c) The Executive agrees that competition, as set forth in Article 8.1(a) above, shall include, but not be limited to, engaging in competitive activity, as an individual, as a partner, as a joint venturer with any other person or entity, or as an employee, agent, or representative of any other person or entity.

(d) It is the specific intent of the parties that the Executive shall be restricted from competing directly or indirectly with any segment of the Company's business in which the Executive engaged prior to the last day of her employment and from any segment of the Company's business about which the Executive acquired proprietary or confidential information during the course of her employment.

(e) If any provision of this Article 8.1 relating to the time period, geographic area or scope of restricted activities shall be declared by a court of competent jurisdiction to exceed the maximum time period, geographic area or scope of activities, as applicable, that such court deems reasonable and enforceable, said time period, geographic area or scope of activities shall be deemed to be, and thereafter shall become, the maximum time period, scope of activities or largest geographic area that such court deems reasonable and enforceable and this Agreement shall automatically be considered to have been amended and revised to reflect such determination.

(f) The Executive and the Company have examined in detail this Covenant Not to Compete and agree that the restraint imposed upon the Executive is reasonable in light of the legitimate interests of the Company, and it is not unduly harsh upon the Executive's ability to earn a livelihood.

**8.2. Non-Solicitation of Employees.** The Executive agrees that during the Executive's employment with the Company and for a period of one (1) year following the last day of the Executive's employment, the Executive shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, any employee of the Company to leave the Company for any reason whatsoever or hire any individual employed by the Company. For purposes of this Article 8.2, employee shall mean any individual employed by the Company on the last day of the Executive's employment or within the three-month period prior to the last day of the Executive's employment.

**8.3. Confidentiality.** The Company has advised the Executive and the Executive acknowledges that it is the policy of the Company to maintain as secret and confidential all Protected Information (as defined below), and that Protected Information has been and will be developed at substantial cost and effort to the Company. The Executive agrees to hold in strict confidence and safeguard any information of or about the Company gained by the Executive in any manner or from any source during the Executive's employment. The Executive shall not, without the prior written consent of the Company, at any time, directly or indirectly, divulge, furnish, use, disclose or make accessible to any person, firm, corporation, association, or other entity (otherwise than as may be required in the regular course of the Executive's employment), either during the Executive's employment with the Company or subsequent to the last day of the Executive's employment, any Protected Information, or cause any such information of the Company to enter the public domain.

The Executive understands and agrees that any information, data and/or trade secrets about Company or its suppliers and/or distributors is the property of the Company and is essential to the protection of the Company's goodwill and to the maintenance of the Company's competitive position and accordingly should be kept secret. For purposes of this Agreement, "Protected Information" means trade secrets, confidential and proprietary business information of or about the Company, and any other information of the Company, including, customer lists (including potential customers), sources of supply, processes, plans, materials, pricing information, internal memoranda, marketing plans, promotional plans, internal policies, research, purchasing, accounting and financial information, computer programs, hardware, software, and products and services which may be developed from time to time by the Company and its agents or employees, including the Executive; provided, however, that information that is in the public domain (other than as a result of a breach of this Agreement), approved for release by the Company or lawfully obtained from third parties who are not bound by a confidentiality agreement with the Company, is not Protected Information.

Nothing contained in this Article is intended to reduce in any way protection available to the Company pursuant to the Uniform Trade Secrets Act as adopted in the Commonwealth of Virginia or any other state or other applicable laws which prohibit the misuse or disclosure of confidential or proprietary information.

**8.4. Acknowledgement of Covenants.** The parties hereto acknowledge that the Executive's services are of a special, extraordinary, and intellectual character which gives her unique value, and that the business of the Company and its subsidiaries is highly competitive, and that violation of any of the covenants provided in this Article 8 would cause immediate, immeasurable, and irreparable harm, loss, and damage to the Company not adequately compensable by a monetary award. The Executive acknowledges that the time, scope of activities and geographical area restrained by the provisions of this Article 8 are reasonable and do not impose a greater restraint than is necessary to protect the goodwill of the Company's business. The Executive further acknowledges that she and the Company have negotiated and bargained for the terms of this Agreement and that the Executive has received adequate consideration for entering into this Agreement. In the event of any such breach or threatened breach by the Executive of any one or more of such covenants, the Company shall be entitled to such equitable and injunctive relief as may be available to restrain the Executive from violating the provisions hereof. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available at law or in equity for such breach or threatened breach, including the recovery of damages and the immediate termination of the employment of the Executive hereunder for cause.

 Initials

**Article 9. Change in Control**

**9.1. Change in Control.** This Article 9 shall not become effective, and the Company shall have no obligation hereunder, if the employment of the Executive with the Company shall terminate prior to a Change in Control (as defined in Article 9.2 below) of the Company.

**9.2. Definition of Change in Control.** Change in Control of the Company means, and shall be deemed to have occurred, upon the first to occur of any of the following events:

(a) The acquisition by any individual, entity, or group (a "Person"), including a "person" within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), but excluding an Affiliate (as defined below) of the Company, of beneficial ownership within the meaning of Rule 13d-3 promulgated under the Exchange Act, of thirty-five percent (35%) or more of either: (i) the then outstanding shares of common stock of Circuit City (the "Outstanding Common Stock"); or (ii) the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors (the "Outstanding Voting Securities"); excluding, however, the following: (A) any acquisition directly from the Company (excluding an acquisition resulting from the exercise of an option, conversion right, or exchange privilege unless the security being so exercised, converted or exchanged was acquired directly from the Company); (B) any acquisition by the Company; (C) any acquisition by an employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii), and (iii) of subsection (c) of this Article 9.2;

(b) Individuals who, as of the Effective Date, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of such Board; provided that any individual who becomes a director of the Company subsequent to the Effective Date, whose election, or nomination for election by the Company's stockholders, was approved by the vote of at least a majority of the directors then comprising the Incumbent Board shall be deemed a member of the Incumbent Board; and provided further, that any individual who was initially elected as a director of the Company as a result of an actual or threatened election contest, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act, or any other actual or threatened solicitation of proxies or consents by or on behalf of any Person other than the Board shall not be deemed a member of the Incumbent Board;

(c) The consummation of a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company (a "Corporate Transaction"); excluding, however, a Corporate Transaction pursuant to which: (i) all or substantially all of the individuals or entities who are the beneficial owners, respectively, of the Outstanding Common Stock and the Outstanding Voting Securities immediately prior to such Corporate Transaction will beneficially own, directly or indirectly, more than sixty percent (60%) of, respectively, the outstanding shares of common stock, and the combined voting power of the outstanding securities of such corporation entitled to

MAS Initials

vote generally in the election of directors, as the case may be, of the corporation resulting from such Corporate Transaction (including, without limitation, a corporation, which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or indirectly) in substantially the same proportions relative to each other as their ownership, immediately prior to such Corporate Transaction, of the Outstanding Common Stock and the Outstanding Voting Securities, as the case may be; (ii) no Person (other than: the Company; any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; the corporation resulting from such Corporate Transaction; and any Person which beneficially owned, immediately prior to such Corporate Transaction, directly or indirectly, twenty-five percent (25%) or more of the Outstanding Common Stock or the Outstanding Voting Securities, as the case may be) will beneficially own, directly or indirectly, twenty-five percent (25%) or more of, respectively, the outstanding shares of common stock of the corporation resulting from such Corporate Transaction or the combined voting power of the outstanding securities of such corporation entitled to vote generally in the election of directors; and (iii) individuals who were members of the Incumbent Board will constitute at least a majority of the members of the board of directors of the corporation resulting from such Corporate Transaction; or

(d) The consummation of a plan of complete liquidation, dissolution, or sale of substantially all the assets of the Company.

For purposes of this Article 9, "Affiliate" shall mean with reference to a specified Person, any Person that directly or indirectly through one (1) or more intermediaries controls or is controlled by or is under common control with the specified Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used in respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such Person, whether through ownership of voting securities or by contract or otherwise.

**9.3. Change-in-Control Severance Benefits.** If at any time during the Term of this Agreement there is a Change in Control of the Company and the Executive's employment is terminated for any reason other than death, Disability, Retirement, Voluntary Termination, or Involuntary Termination for Cause within the one (1) year period following the Change in Control, the Company shall provide to the Executive the following:

(a) Base Salary and all other benefits due her as if she had remained an employee pursuant to Article 5 through the remainder of the month in which the termination occurs, less applicable withholding taxes and other authorized payroll deductions;

(b) A lump-sum severance allowance in an amount that is equal to the product of one (1) times both the Executive's Base Salary at the rate in effect immediately prior to the termination and the Executive's target Annual Bonus established for the fiscal year in which the Executive's termination of employment occurs;

Initials

(c) Continuation at the same cost to the Executive as existed as of the Effective Date of Termination of Agreement of all health, welfare, and benefit plan participation for one (1) full year following employment termination;

(d) Provision of outplacement services for the Executive for three (3) months;

(e) A lump-sum payment equal to the one (1) year cost of perquisites outlined in Article 5.6 above; and

(f) Any unvested stock options or any outstanding restricted stock, excluding performance based restricted stock grants, as of the Effective Date of Termination, that would become vested (that is, exercisable in the case of stock options or transferable and non-forfeitable in the case of restricted stock) if the Executive remained an employee through the Initial Term or the then current Renewal Period of this Agreement will become vested as of the date of the Effective Date of Termination. The Executive must satisfy the tax withholding requirements.

**9.4. Excise Tax Equalization Payment.** In the event that the Executive becomes entitled to severance benefits under this Agreement or any other agreement with or plan of the Company (in the aggregate, the "Total Payments"), if any of the Total Payments will be subject to the tax (the "Excise Tax") imposed by Section 4999 of the Code or any similar excise tax that may hereafter be imposed), the Company shall pay to the Executive in cash an additional amount (the "Gross-Up Payment"), such that the net amount retained by the Executive after deduction of any Excise Tax upon the Total Payments and any federal, state, and local income tax and Excise Tax upon the Gross-Up Payment provided for by this Article 9.4 (including FICA and FUTA), shall be equal to the Total Payments. The Company shall make such payment to the Executive as soon as practicable following the Effective Date of Termination, but in no event beyond thirty (30) days from such date.

For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made, and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence on the Effective Date of Termination, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

The Company's Compensation and Personnel Committee shall determine, based upon the advice of the Company's independent certified public accountants, whether any payments or benefits hereunder are subject to the Excise Tax.

**9.5. Subsequent Recalculation.** In the event the Internal Revenue Service adjusts the computation of the Company under Article 9.4 herein so that the Executive did not receive the greatest net benefit, the Company shall reimburse the Executive for the full amount necessary to make the Executive whole, plus a market rate of interest, as determined by the Compensation and Personnel Committee.

**Article 10. Assignment**

**10.1. Assignment by Company.** This Agreement may and shall be assigned or transferred to, and shall be binding upon and shall inure to the benefit of, any successor of the Company, and any such successor shall be deemed substituted for all purposes of the "Company" under the terms of this Agreement. As used in this Agreement, the term "successor" shall mean any person, firm, corporation, or business entity which, at any time, whether by merger, purchase, or otherwise, acquires all or substantially all of the assets or the business of the Company. In addition, the obligations of the Executive under Articles 8 and 12 of this Agreement shall continue after the termination of the Executive's employment and shall be binding on the Executive's heirs, executors, legal representatives and assigns.

Failure of the Company to obtain the agreement of any successor to be bound by the terms of this Agreement prior to the effectiveness of any such succession shall be a breach of this Agreement, and shall immediately entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled in the event of an Involuntary Termination of Employment Without Cause as provided by Article 7.4. Except as provided herein, the Company may not otherwise assign this Agreement.

**10.2. Assignment by Executive.** The services to be provided by the Executive to the Company hereunder are personal to the Executive, and the Executive's duties may not be assigned by the Executive; provided, however, that this Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, and administrators, successors, heirs, distributees, devisees, and legatees. If the Executive dies while any amounts payable to the Executive hereunder remain outstanding, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee or, in the absence of such designee, to the Executive's estate.

**Article 11. Dispute Resolution and Notice**

**11.1. Issue Resolution.** Except for actions initiated by the Company to enjoin a breach by, and/or recover damages from the Executive related to violation of any of the restrictive covenants in Article 8 of this Agreement, which Company may bring in an appropriate court of law or equity, any disagreement between the Executive and the Company concerning anything covered by this Agreement or concerning other terms or conditions of the Executive's employment or the termination of the Executive's employment will be settled by final and binding arbitration pursuant to the Company's Associate Issue Resolution Program. The Dispute Resolution Agreement and the Dispute Resolution Rules and Procedures are incorporated herein by reference as if set forth in full in this Agreement. The decision of the arbitrator will be final and binding on both the Executive and the Company and may be enforced in a court of appropriate jurisdiction.

**11.2. Notice.** Any notices, requests, demands, or other communications provided for by this Agreement shall be sufficient if in writing, and if sent by registered or certified mail to the Executive at the last address she has filed in writing with the Company or, in the case of the Company, at its principal offices.

 Initials

**Article 12. Miscellaneous**

**12.1. Entire Agreement.** This Agreement supersedes any prior agreements or understandings, oral or written, between the parties hereto, with respect to the subject matter hereof, and constitutes the entire agreement of the parties with respect thereto. Without limiting the generality of the foregoing sentence, this Agreement completely supersedes any and all prior employment agreements entered into by and between the Company, and the Executive, and all amendments thereto, in their entirety.

**12.2. Return of Materials.** Upon the termination of the Executive's employment with the Company, however such termination is effected, the Executive shall promptly deliver to Company all property, records, materials, documents, and copies of documents concerning the Executive's business and/or its customers (hereinafter collectively "Company Materials") which the Executive has in her possession or under her control at the time of termination of her employment. The Executive further agrees not to take or extract any portion of Company Materials in written, computer, electronic or any other reproducible form without the prior written consent of the Executive's immediate manager.

**12.3. Modification.** This Agreement shall not be varied, altered, modified, canceled, changed, or in any way amended except by mutual agreement of the parties in a written instrument executed by the parties hereto or their legal representatives. It is the intention of the parties that this Agreement may be modified to ensure that this Agreement is in compliance with all federal laws and regulations, including but not limited to, Internal Revenue Code Section 409A and regulations thereunder.

**12.4. Severability.** It is the intention of the parties that the provisions of the restrictive covenants herein shall be enforceable to the fullest extent permissible under the applicable law. If any clause or provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, then the remainder of this Agreement shall not be affected thereby, and in lieu of each clause or provision of this Agreement which is illegal, invalid or unenforceable, there shall be added, as a part of this Agreement, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and as may be legal, valid, and enforceable.

**12.5. Counterparts.** This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

**12.6. Tax Withholding.** The Company may withhold from any benefits payable under this Agreement all federal, state, city, or other taxes as may be required pursuant to any law or governmental regulation or ruling.

**12.7. Restrictive Covenants of the Essence.** The restrictive covenants of the Executive set forth herein are of the essence of this Agreement; they shall be construed as independent of any other provision in this Agreement; and the existence of any claim or cause of action of the Executive against the Company, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by the Company of the restrictive covenants contained herein. The Company shall at all times maintain the right to seek enforcement of these provisions whether or not the Company has previously refrained from seeking enforcement of any such provision as to the Executive or any other individual who has signed an agreement with similar provisions.

Initials

**12.8. Beneficiaries.** The Executive may designate one (1) or more persons or entities as the primary and/or contingent beneficiaries of any amounts to be received under this Agreement. Such designation must be in the form of a signed writing acceptable to the Executive's immediate manager. The Executive may make or change such designation at any time.

**12.9. Payment Obligation Absolute.** The Company's obligation to make the payments and the arrangement provided for herein shall be absolute and unconditional, and shall not be affected by any circumstances, including, without limitation, any offset, counterclaim, recoupment, defense, or other right which the Company may have against the Executive or anyone else. All amounts payable by the Company hereunder shall be paid without notice or demand. Each and every payment made hereunder by the Company shall be final, and the Company shall not seek to recover all or any part of such payment from the Executive or from whomsoever may be entitled thereto, for any reasons whatsoever.

The Executive shall not be obligated to seek other employment in mitigation of the amounts payable or arrangements made under any provision of this Agreement, and the obtaining of any such other employment shall in no event effect any reduction of the Company's obligations to make the payments and arrangements required to be made under this Agreement; provided, however, that continued health, welfare, and benefit plan participation pursuant to Article 7.4 or Article 9.3 herein shall be discontinued in the event the Executive becomes eligible to receive substantially similar benefits from a successor employer.

**12.10. Contractual Rights to Benefits.** This Agreement establishes and vests in the Executive a contractual right to the benefits to which she is entitled hereunder. However, nothing herein contained shall require or be deemed to require, or prohibit or be deemed to prohibit, the Company to segregate, earmark, or otherwise set aside any funds or other assets, in trust or otherwise, to provide for any payments to be made or required hereunder.

Initials

**Article 13. Governing Law**

To the extent not preempted by federal law, the provisions of this Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Virginia, without reference to Virginia's choice of law statutes or decisions.

IN WITNESS WHEREOF, the Executive and the Company have executed this Agreement as of the Effective Date.

**CIRCUIT CITY STORES, INC.**

By: Laurie Lambert-Gaffney
Laurie Lambert-Gaffney
Vice President, HR Operations

**EXECUTIVE:**

Michelle A. Sifford
Michelle A. Sifford
SSN: 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

Initials