Steven E Jackson
60 Palatine #101
Irvine, CA 92612

November 27, 2012

Clerk of the Bankruptcy Court
United States Bankruptcy Court
701 East Broad Street – Room 4000
Richmond, VA 23219

Re: Circuit City Bankruptcy case # 08-35653-KRH

To whom it may concern:

The records of Circuit City relative to my termination payment are incorrect. My contract (copy enclosed) provided for a 52 week payout after a 30 day notice. (see paragraph 7.4, page 5 of 15.) That would be 52 weeks plus 4 weeks of notice equaling 56 weeks of pay. The records will show that I only received 54 weeks of pay from the point of my termination.

I told this to the HR department many times and while they agreed with me they said it was a mistake in the contract. This was NOT a mistake in the contract as this was a very carefully negotiated contract needing approval from the Circuit City Board of Directors, which was obtained. I am owed my last 2 weeks of pay and I sincerely hope the Court will honor my contract.
I do not have a fax machine but my email is: stevenejackson@gmail.com and my cell phone is 602-228-0175.

Regards,

Steven E Jackson

CC: Jeffrey N. Pomeranz, Esq.
    Lynn L. Tavenner, Esq.

RICHMOND DIVISION
FILED
NOV 28 2012
CLERK
US BANKRUPTCY COURT

Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, VA 23233

# Circuit City Stores, Inc.
# Employment Agreement for Steven E. Jackson

This **EMPLOYMENT AGREEMENT** ("Agreement") is made, entered into, and is effective as of the *1st* day of June 2005 (the "Effective Date"), by and between **Circuit City Stores, Inc.** (the "Company") and **Steven E. Jackson** (the "Executive").

WHEREAS, the Company desires to employ the Executive as Vice President, Real Estate of Circuit City Stores, Inc.;

WHEREAS, the Company recognizes the Executive's intimate knowledge and experience in the business of the Company, and desires to secure the employment of the Executive in the role of Vice President, Real Estate of the Company; and

WHEREAS, the Executive will develop and/or come in contact with the Company's proprietary and confidential information which is not readily available to the public, and which is of great importance to the Company and is treated by the Company as secret and confidential information.

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties set forth in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## Article 1.  Term of Employment

The Company hereby agrees to employ the Executive and the Executive hereby accepts employment as Vice President, Real Estate of the Company, in accordance with the terms and conditions set forth herein, for an initial period of one (1) year, commencing as of the Effective Date of this Agreement as indicated above (the "Initial Term"); subject, however, to earlier termination as expressly provided herein.

The Initial Term shall automatically be renewed for additional periods of one (1) year each at the end of the Initial Term, and then again after each successive year thereafter (collectively, the "Renewal Periods," which, together with the Initial Term, constitute the "Term" of this Agreement). However, either party may terminate this Agreement at the end of the Initial Term, or at the end of any Renewal Period, by giving the other party written notice of intent not to renew, delivered at least thirty (30) days prior to the end of the Initial Term or any Renewal Period. For purposes of this Agreement, an "Employment Year" shall mean any twelve (12) month period during the Term of this Agreement beginning on the Effective Date or on any anniversary thereof.

## Article 2.  Position and Responsibilities

During the Term of this Agreement, the Executive agrees to serve as Vice President, Real Estate of the Company. In his capacity as Vice President, Real Estate of the Company, the Executive shall report directly to the Executive Vice President and Chief Financial Officer, and shall have the duties and

 Initials

Steven E. Jackson
Employment Agreement
Page 2 of 15

responsibilities of Vice President, Real Estate of the Company and such other duties and responsibilities not inconsistent with the performance of his duties as Vice President, Real Estate of the Company.

## Article 3.  Standard of Care

During the term of this Agreement, the Executive agrees to devote substantially his full-time attention and energies to the Company's business.  The Executive covenants, warrants, and represents that he shall:

    (a)    Devote his full and best efforts and talents full time to the performance of his employment obligations and duties for the Company;

    (b)    Exercise the highest degree of loyalty and the highest standards of conduct in the performance of his duties;

    (c)    Comply with all rules, regulations, and policies established or issued by the Company; and

    (d)    Refrain from taking advantage, for himself or others, of any corporate opportunities of the Company.

## Article 4.  Other Employment.

The Executive shall not, during the term hereof, be interested directly or indirectly, in any manner, as partner, officer, director, investor, stockholder, advisor, employee, or in any other capacity, in any other business similar to Company's business for the Executive's personal advantage or benefit or that of others. Any other employment or position which might reasonably be deemed contrary to the best interests of the Company is prohibited.  During the term of employment hereunder, the Executive agrees to obtain the Company's written consent prior to entering into any other occupation, even if dissimilar to that of the Company.  Such consent may be granted or withheld, in the Company's absolute discretion.  Nothing herein contained shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other securities of any corporation whose stock or securities are regularly traded on any public exchange, nor shall anything herein contained be deemed to prevent the Executive from investing in real estate for his own benefit (so long as such investment (a) is not related to or in support of any entity engaged in a business similar to that of the Company or (b) does not detract from the Executive's performance of his duties and obligations hereunder).

## Article 5.  Compensation and Benefits

As remuneration for all services to be rendered by the Executive during his employment, and as consideration for complying with the covenants herein, the Company shall pay and provide to the Executive the following:

**5.1.**    **Base Salary.**  During the Term of this Agreement, the Company shall pay the Executive a Base Salary in an amount which shall be established and approved by the Compensation Committee of the Board of Directors; provided, however, that such Base Salary shall be established at a rate of $260,000 per year.  In addition, the Company shall not be obligated to maintain, increase, or refrain from reducing or amending such Base Salary.  This Base Salary shall be subject to all appropriate federal and

Initials

state withholding taxes and payable in accordance with the normal payroll practices of the Company. The Base Salary shall be reviewed at least annually following the Effective Date of this Agreement, while the Term of this Agreement is in force, to ascertain whether, in the judgment of the Compensation Committee, such Base Salary should be changed. If changed, the Base Salary as stated above shall, likewise, be changed for all purposes of this Agreement.

**5.2.    Annual Bonus.** In addition to his Base Salary, the Executive shall be entitled to participate in the Company's short-term incentive program, as such program may exist from time to time during the Term of this Agreement.

Under the Company's short-term incentive plan, the Executive has the opportunity to earn an annual bonus with respect to any fiscal year of the Company ("Annual Bonus"). The Annual Bonus, if earned, with respect to any fiscal year, will generally be in an amount that is not less than forty percent (40%) of the Executive's Base Salary for the fiscal year with respect to which the Annual Bonus is being paid (the "Minimum Bonus Rate"). Such Annual Bonus is commensurate with the position of Vice President, Real Estate of the Company.

The award and amount of any Annual Bonus shall be determined under the Company's short-term incentive plan, at the sole discretion of the Company's Compensation Committee. If the Minimum Bonus Rate is changed, it shall, likewise, be changed for all purposes of this Agreement.

**5.3. Long-Term Incentives.** During the Term of this Agreement, the Executive shall be eligible to participate in the Company's long-term incentive plan, to the extent that the Board of Directors of the Company or the Compensation Committee, in their discretion, determines is appropriate.

**5.4. Retirement Benefits.** During the Term of this Agreement, the Company shall provide to the Executive the opportunity for participation in all Company retirement, insurance, fringe benefit, and executive compensation plans and programs, subject to the eligibility and participation requirements of such plans.

**5.5. Employee Benefits.** During the Term of this Agreement, the Company shall provide the Executive all benefits, as commensurate with the position of Vice President, Real Estate of the Company, subject to the eligibility requirements and other provisions of such arrangements. Such benefits may include group term life insurance, comprehensive health and major medical insurance, dental and life insurance, and short-term and long-term disability.

**5.6. Perquisites.** During the Term of this Agreement, the Company shall provide to the Executive, at the Company's cost, all perquisites, which are commensurate with the position of Vice President, Real Estate of the Company.

**5.7. Right to Change Plans.** By reason of Articles 5.5 and 5.6 herein, the Company shall not be obligated to institute, maintain, or refrain from changing, amending, or discontinuing any benefit plan or perquisite.

## Article 6. Expenses

During the Term of this Agreement, the Company shall pay or reimburse the Executive for all ordinary and necessary expenses, in a reasonable amount, which the Executive incurs in performing his

 Initials

Steven E. Jackson
Employment Agreement
Page 4 of 15

duties under this Agreement including, but not limited to, travel, entertainment, professional dues and subscriptions, and all dues, fees, and expenses associated with membership in various professional, business, and civic associations and societies in which the Company finds that the Executive's participation is in the best interests of the Company. The payment of reimbursement of expenses shall be subject to such rules concerning documentation of expenses and the type or magnitude of such expenses as the Compensation Committee of the Board of Directors may establish from time to time.

## Article 7. Employment Termination

**7.1. Termination Due to Retirement or Death.** In the event the Executive's employment ends by reason of Retirement or the Executive's death during the term of this Agreement, the Executive's benefits shall be determined in accordance with the Company's retirement, survivor's benefits, insurance, and/or other applicable programs of the Company then in effect. In addition, all stock grants, except performance-based grants in the case of Retirement, will become immediately vested and may be exercised by the Executive, the Executive's personal representatives, distributees, legatees, or estate at any time before the expiration date of the grant.

The Effective Date of Termination due to Retirement or death shall be (a) ninety (90) days following the date the Executive provides the Company with written notice that the Executive is ending employment by reason of Retirement or (b) on the Executive's date of death, as the case may be. Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive or, if applicable, the Executive's estate; (a) any Base Salary or Annual Bonus that was accrued but not yet paid as of the Effective Date of Termination; and (b) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

**7.2. Termination Due to Disability.** The Company shall have the right to terminate the Executive's employment for disability. For the purposes of this Agreement, disability shall mean any physical or mental illness or injury that causes the Executive to be unable to substantially perform the Executive's normal duties; provided however that the Executive shall not be considered disabled until: (i) the Executive has been so disabled for 180 days during any period of twelve (12) consecutive months; (ii) the Executive's attending physician shall have furnished to the Company certification that the return of the Executive to his normal duties is impossible or improbable; or (iii) the Executive is determined to be totally disabled by the disability insurer then insuring the Executive, if any.

The Effective Date of Termination due to Disability shall be specified, in a written notice, by the Executive's immediate manager, and such written notice shall be delivered to the Executive, but shall be no less than thirty (30) calendar days after the delivery of such written notice to the Executive. Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive [or, if applicable, the Executive's estate]: (a) any salary that was accrued but not yet paid as of the Effective Date of Termination; (b) the unpaid Annual Bonus, if any, with respect to the fiscal year preceding the Effective Date of Termination (such Annual Bonus, if any, to be determined in the manner it would have been determined and payable at the time it would have been payable under Article 5.2 had there been no termination of the Employment Period); and (c) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

It is expressly understood that the Disability of the Executive for a period of one hundred eighty (180) calendar days or less in the aggregate during any period of twelve (12) consecutive months, in the absence of any reasonable expectation that his Disability will exist for more than such a period of time,

 Initials

Steven E. Jackson
Employment Agreement
Page 5 of 15

shall not constitute a failure by him to perform his duties hereunder and shall not be deemed a breach or default, and the Executive shall receive full compensation for any such period of Disability or for any other temporary illness or incapacity during the term of this Agreement.

If the employment of the Executive terminates because of Disability, all of the Executive's outstanding stock grants, excluding restricted stock grants issued under a performance based plan, will become immediately vested, effective as of the date of the Executive's Disability. Then, the Executive, the Executive's personal representatives, distributees, or legatees may exercise the Executive's grants at any time before the expiration date of the grant.

**7.3. Voluntary Termination by the Executive.** The Executive may terminate his employment and this Agreement at any time by giving the Company at least thirty (30) days written notice. The Company reserves the right to require the Executive not to work during the notice period but shall pay the Executive his full Base Salary, at the rate then in effect as provided in Article 5.1 herein, through the notice period plus all other benefits to which the Executive has a vested right on the last day of employment (for purposes of this paragraph, the Executive shall not be paid any Annual Bonus with respect to the fiscal year in which voluntary termination under this Article 7.3 occurs). The Company thereafter shall have no further obligations under this Agreement.

**7.4 Involuntary Termination by the Company Without Cause.** The Company may terminate the Executive's employment, at any time, for any reason other than death, Disability, Retirement, or for "Cause", by providing the Executive with at least thirty (30) days written notice; provided, however, that for purposes of this Article 7.4, no variation, alteration, modification, cancellation, change or amendment made to this Agreement pursuant to Article 12.3 or 12.4 shall be deemed an involuntary termination without Cause.

(a)     Upon the Effective Date of Termination specified by the Company for termination by the Company without cause, the Company shall pay to the Executive, an amount equal to the product of one (1) year of the Executive's Base Salary for the fiscal year in which the Executive's Effective Date of Termination occurs according to the Company's regularly scheduled payroll practices, or as otherwise determined by the Company. In addition, the Company shall pay to the Executive an amount equal to the product of the Executive's earned Annual Bonus established for the fiscal year in which the Executive's Effective Date of Termination occurs according to the Company's regularly scheduled bonus payment practices or as otherwise determined by the Company. In addition, the Company shall continue, at the same cost to the Executive as existed as of the Effective Date of Termination, all health and welfare benefit plan participation, as permitted by law, for one (1) full year following the Executive's termination of employment; provided, however, that the applicable COBRA "period of coverage" under any plan subject to Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code"), or Sections 601 through 609 of the Employee Retirement Income Security Act of 1974 (ERISA) shall begin as of the Effective Date of Termination.

(b)     The Company shall also provide the Executive with three (3) months of outplacement services.

(c)     Any unvested stock options or any outstanding restricted stock, excluding restricted stock grants issued under a performance based plan, that would become vested (that is,

Initials

Steven E. Jackson
Employment Agreement
Page 6 of 15

transferable and non-forfeitable) if the Executive remained an employee through the Initial Term or the then current Renewal Period of this Agreement will become vested as of the date of the Executive's termination of employment. The Executive must satisfy the tax withholding requirements.

The Company thereafter shall have no further obligations under this Agreement.

**7.5. Termination For Cause.** Nothing in this Agreement shall be construed to prevent the Company from terminating the Executive's employment under this Agreement, without notice or liability for doing so, for "Cause."

For purposes of this Agreement, "Cause" means:

(a)     The Executive's material breach of this Agreement, which breach is not cured within ten (10) days of receipt by the Executive of written notice from the Company specifying the breach;

(b)     The Executive's gross negligence in the performance of his material duties hereunder, intentional nonperformance or intentional misperformance of such duties, misconduct or refusal to abide by or comply with the directives of the Board, his superior officers, or the Company's policies and procedures, which actions continue for a period of ten (10) days after receipt by the Executive of written notice of the need to cure or cease;

(c)     Conviction of a felony or any crime involving moral turpitude;

(d)     The Executive engaging in illegal conduct, dishonesty or fraud with respect to the business or affairs of the Company that in the reasonable judgment of the Company materially and adversely affects the operations or reputation of the Company;

(e)     Failure of the Executive to disclose to the Executive's manager a conflict of interest, of which the Executive knew or, with reasonable diligence, would have known, in connection with any transaction entered into on behalf of the Company; or

(f)     Failure of the Executive to agree to a modification of this Agreement, pursuant to paragraph 12.3 below, when the purpose of the modification is to comply with applicable federal, state and/or local laws or regulations, or when such modification is designed to further define the restrictions of Article 8 or otherwise enhance the enforcement of Article 8 without increasing the scope of the Article 8 restrictions.

In the event this Agreement is terminated for Cause, the Company shall pay the Executive his Base Salary through the Effective Date of Termination for cause and the Executive shall immediately thereafter forfeit all rights and benefits (other than vested benefits) he would otherwise have been entitled to receive under this Agreement. The Company thereafter shall have no further obligations under this Agreement.

Initials

Steven E. Jackson
Employment Agreement
Page 7 of 15

## Article 8. Noncompetition and Confidentiality

### 8.1. Noncompetition.

(a)     During the Executive's employment and for a period of one (1) year following the last day of the Executive's employment, the Executive shall not directly or indirectly compete with the Company by engaging, in a competitive capacity, in any business that is engaged in the same or similar business of the Company in one or more Metropolitan Statistical Areas ("MSAs"), specifically including Best Buy, Radio Shack, Wal-Mart and CompUSA, in which the Company is doing business on the last day of the Executive's employment. A business will not be considered to be in competition with the Company for purposes of this paragraph 8.1(a) or paragraph 8.1(b) below if:

> (i)     The business or the operating unit of the business in which the Executive is employed or with which the Executive is associated (collectively the "Business Unit") is not engaged in the retail sales of consumer electronics;

> (ii)     If sales of the Business Unit's products or services in the retail sales and service of consumer electronics constitute less than ten percent (10%) of such Business Unit's sales; or

> (iii)     If the sales of the Business Unit in the retail sales and service of consumer electronics do constitute more than ten percent (10%) of the sales of the Business Unit, but the Business Unit solely operates outside of North America.

Notwithstanding the foregoing, nothing herein shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other securities of any corporation whose stock or securities are regularly traded on any public exchange, nor shall anything herein contained be deemed to prevent Employee from investing in real estate for his own benefit (as long as such investment is not related to or in support of any entity engaged in the same or similar business as the Company in competition with the Company in one or more MSA's in which the Company is doing business during the Executive's employment).

(b)     During the Executive's employment and for a period of one (1) year following the last day of the Executive's employment, the Executive shall not directly or indirectly compete with the Company by engaging, in a competitive capacity, in any business engaged in the same or similar business of the Company in one or more MSAs where, on the last day of the Executive's employment, the Company is engaged in real estate site selection or has taken further steps toward the commencement of operations in the future, of which the Executive is aware.

(c)     The Executive agrees that competition, as set forth in Article 8.1(a) above, shall include, but not be limited to, engaging in competitive activity, as an individual, as a partner, as a joint venturer with any other person or entity, or as an employee, agent, or representative of any other person or entity.

(d)     It is the specific intent of the parties that the Executive shall be restricted from competing directly or indirectly with any segment of the Company's business in which the Executive

Initials

engaged prior to the last day of his employment and from any segment of the Company's business about which the Executive acquired proprietary or confidential information during the course of his employment.

(e)    If any provision of this Article 8.1 relating to the time period, geographic area or scope of restricted activities shall be declared by a court of competent jurisdiction to exceed the maximum time period, geographic area or scope of activities, as applicable, that such court deems reasonable and enforceable, said time period, geographic area or scope of activities shall be deemed to be, and thereafter shall become, the maximum time period, scope of activities or largest geographic area that such court deems reasonable and enforceable and this Agreement shall automatically be considered to have been amended and revised to reflect such determination.

(f)    The Executive and the Company have examined in detail this Covenant Not to Compete and agree that the restraint imposed upon the Executive is reasonable in light of the legitimate interests of the Company, and it is not unduly harsh upon the Executive's ability to earn a livelihood.

**8.2. Non-Solicitation of Employees.** The Executive agrees that during the Executive's employment with the Company and for a period of one (1) year following the last day of the Executive's employment, the Executive shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, any employee of the Company to leave the Company for any reason whatsoever or hire any individual employed by the Company. For purposes of this Article 8.2, employee shall mean any individual employed by the Company on the last day of the Executive's employment or within the three-month period prior to the last day of the Executive's employment.

**8.3. Confidentiality.** The Company has advised the Executive and the Executive acknowledges that it is the policy of the Company to maintain as secret and confidential all Protected Information (as defined below), and that Protected Information has been and will be developed at substantial cost and effort to the Company. The Executive agrees to hold in strict confidence and safeguard any information of or about the Company gained by the Executive in any manner or from any source during the Executive's employment. The Executive shall not, without the prior written consent of the Company, at any time, directly or indirectly, divulge, furnish, use, disclose or make accessible to any person, firm, corporation, association, or other entity (otherwise than as may be required in the regular course of the Executive's employment), either during the Executive's employment with the Company or subsequent to the last day of the Executive's employment, any Protected Information, or cause any such information of the Company to enter the public domain.

The Executive understands and agrees that any information, data and/or trade secrets about Company or its suppliers and/or distributors is the property of the Company and is essential to the protection of the Company's goodwill and to the maintenance of the Company's competitive position and accordingly should be kept secret. For purposes of this Agreement, "Protected Information" means trade secrets, confidential and proprietary business information of or about the Company, and any other information of the Company, including, customer lists (including potential customers), sources of supply, processes, plans, materials, pricing information, internal memoranda, marketing plans, promotional plans, internal policies, research, purchasing, accounting and financial information, computer programs, hardware, software, and products and services which may be developed from time to time by the Company and its agents or employees, including the Executive; provided, however, that information that

 Initials

acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii), and (iii) of subsection (c) of this Article 9.2;

(b)     Individuals who, as of the Effective Date, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of such Board; provided that any individual who becomes a director of the Company subsequent to the Effective Date, whose election, or nomination for election by the Company's stockholders, was approved by the vote of at least a majority of the directors then comprising the Incumbent Board shall be deemed a member of the Incumbent Board; and provided further, that any individual who was initially elected as a director of the Company as a result of an actual or threatened election contest, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act, or any other actual or threatened solicitation of proxies or consents by or on behalf of any Person other than the Board shall not be deemed a member of the Incumbent Board;

(c)     The consummation of a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company (a "Corporate Transaction"); excluding, however, a Corporate Transaction pursuant to which: (i) all or substantially all of the individuals or entities who are the beneficial owners, respectively, of the Outstanding Common Stock and the Outstanding Voting Securities immediately prior to such Corporate Transaction will beneficially own, directly or indirectly, more than sixty percent (60%) of, respectively, the outstanding shares of common stock, and the combined voting power of the outstanding securities of such corporation entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Corporate Transaction (including, without limitation, a corporation, which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or indirectly) in substantially the same proportions relative to each other as their ownership, immediately prior to such Corporate Transaction, of the Outstanding Common Stock and the Outstanding Voting Securities, as the case may be; (ii) no Person (other than: the Company; any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; the corporation resulting from such Corporate Transaction; and any Person which beneficially owned, immediately prior to such Corporate Transaction, directly or indirectly, twenty-five percent (25%) or more of the Outstanding Common Stock or the Outstanding Voting Securities, as the case may be) will beneficially own, directly or indirectly, twenty-five percent (25%) or more of, respectively, the outstanding shares of common stock of the corporation resulting from such Corporate Transaction or the combined voting power of the outstanding securities of such corporation entitled to vote generally in the election of directors; and (iii) individuals who were members of the Incumbent Board will constitute at least a majority of the members of the board of directors of the corporation resulting from such Corporate Transaction; or

(d)     The consummation of a plan of complete liquidation, dissolution, or sale of substantially all the assets of the Company.

For purposes of this Article 9, "Affiliate" shall mean with reference to a specified Person, any Person that directly or indirectly through one (1) or more intermediaries controls or is controlled by or is under common control with the specified Person. For purposes of this definition, "control" (including,

Initials

with correlative meaning, the terms "controlled by" and "under common control with"), as used in respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such Person, whether through ownership of voting securities or by contract or otherwise.

**9.3. Change-in-Control Severance Benefits.** If at any time during the Term of this Agreement there is a Change in Control of the Company and the Executive's employment is terminated for any reason other than death, Disability, Retirement, Voluntary Termination, or Involuntary Termination for Cause within the one (1) year period following the Change in Control, the Company shall provide to the Executive the following:

(a)    Base Salary and all other benefits due him as if he had remained an employee pursuant to Article 5 through the remainder of the month in which the termination occurs, less applicable withholding taxes and other authorized payroll deductions;

(b)    A lump-sum severance allowance in an amount that is equal to the product of one (1) times both the Executive's Base Salary at the rate in effect immediately prior to the termination and the Executive's target Annual Bonus established for the fiscal year in which the Executive's termination of employment occurs;

(c)    Continuation at the same cost to the Executive as existed as of the Effective Date of Termination of Agreement of all health, welfare, and benefit plan participation for one (1) full year following employment termination;

(d)    Provision of outplacement services for a period of three (3) months for the Executive;

(e)    A lump-sum payment equal to the one (1) year cost of perquisites outlined in Article 5.6 above; and

(f)    Any unvested stock options or any outstanding restricted stock, excluding restricted stock grants issued under a performance based plan, that would become vested (that is, transferable and non-forfeitable) if the Executive remained an employee through the Initial Term or the then current Renewal Period of this Agreement will become vested as of the date of the Executive's termination of employment. The Executive must satisfy the tax withholding requirements.

**9.4. Excise Tax Equalization Payment.** In the event that the Executive becomes entitled to severance benefits under this Agreement or any other agreement with or plan of the Company (in the aggregate, the "Total Payments"), if any of the Total Payments will [be subject to the tax (the "Excise Tax") imposed by Section 4999 of the Code) or any similar excise tax that may hereafter be imposed), the Company shall pay to the Executive in cash an additional amount (the "Gross-Up Payment"), such that the net amount retained by the Executive after deduction of any Excise Tax upon the Total Payments and any federal, state, and local income tax and Excise Tax upon the Gross-Up Payment provided for by this Article 9.4 (including FICA and FUTA), shall be equal to the Total Payments. The Company shall make such payment to the Executive as soon as practicable following the Effective Date of Termination, but in no event beyond thirty (30) days from such date.

Initials

Steven E. Jackson
Employment Agreement
Page 12 of 15

For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made, and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence on the Effective Date of Termination, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

The Company's Compensation Committee shall determine, based upon the advice of the Company's independent certified public accountants, whether any payments or benefits hereunder are subject to the Excise Tax.

**9.5.  Subsequent Recalculation.**  In the event the Internal Revenue Service adjusts the computation of the Company under Article 9.4 herein so that the Executive did not receive the greatest net benefit, the Company shall reimburse the Executive for the full amount necessary to make the Executive whole, plus a market rate of interest, as determined by the Compensation Committee.

## Article 10.  Assignment

**10.1.  Assignment by Company,**  This Agreement may and shall be assigned or transferred to, and shall be binding upon and shall inure to the benefit of, any successor of the Company, and any such successor shall be deemed substituted for all purposes of the "Company" under the terms of this Agreement.  As used in this Agreement, the term "successor" shall mean any person, firm, corporation, or business entity which, at any time, whether by merger, purchase, or otherwise, acquires all or substantially all of the assets or the business of the Company.  In addition, the obligations of the Executive under Articles 8 and 12 of this Agreement shall continue after the termination of the Executive's employment and shall be binding on the Executive's heirs, executors, legal representatives and assigns.

Failure of the Company to obtain the agreement of any successor to be bound by the terms of this Agreement prior to the effectiveness of any such succession shall be a breach of this Agreement, and shall immediately entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled in the event of an Involuntary Termination of Employment without Cause as provided by Article 7.4.  Except as provided herein, the Company may not otherwise assign this Agreement.

**10.2.  Assignment by Executive.**  The services to be provided by the Executive to the Company hereunder are personal to the Executive, and the Executive's duties may not be assigned by the Executive; provided, however, that this Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, and administrators, successors, heirs, distributees, devisees, and legatees.  If the Executive dies while any amounts payable to the Executive hereunder remain outstanding, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee or, in the absence of such designee, to the Executive's estate.

## Article 11.  Dispute Resolution and Notice

**11.1.  Issue Resolution.**  Except for actions initiated by the Company to enjoin a breach by, and/or recover damages from the Executive related to violation of any of the restrictive covenants in Article 8 of

 Initials

Steven E. Jackson
Employment Agreement
Page 13 of 15

this Agreement, which Company may bring in an appropriate court of law or equity, any disagreement between the Executive and the Company concerning anything covered by this Agreement or concerning other terms or conditions of the Executive's employment or the termination of the Executive's employment will be settled by final and binding arbitration pursuant to the Company's Associate Issue Resolution Program. The Dispute Resolution Agreement and the Dispute Resolution Rules and Procedures are incorporated herein by reference as if set forth in full in this Agreement. The decision of the arbitrator will be final and binding on both the Executive and the Company and may be enforced in a court of appropriate jurisdiction.

**11.2. Notice.** Any notices, requests, demands, or other communications provided for by this Agreement shall be sufficient if in writing, and if sent by registered or certified mail to the Executive at the last address he has filed in writing with the Company or, in the case of the Company, at its principal offices.

## Article 12. Miscellaneous

**12.1. Entire Agreement.** This Agreement supersedes any prior agreements or understandings, oral or written, between the parties hereto, with respect to the subject matter hereof, and constitutes the entire agreement of the parties with respect thereto. Without limiting the generality of the foregoing sentence, this Agreement completely supersedes any and all prior employment agreements entered into by and between the Company, and the Executive, and all amendments thereto, in their entirety.

**12.2. Return of Materials.** Upon the termination of the Executive's employment with the Company, however such termination is effected, the Executive shall promptly deliver to Company all property, records, materials, documents, and copies of documents concerning the Executive's business and/or its customers (hereinafter collectively "Company Materials") which the Executive has in his possession or under his control at the time of termination of his employment. The Executive further agrees not to take or extract any portion of Company Materials in written, computer, electronic or any other reproducible form without the prior written consent of the Executive's immediate manager.

**12.3. Modification.** This Agreement shall not be varied, altered, modified, canceled, changed, or in any way amended except by mutual agreement of the parties in a written instrument executed by the parties hereto or their legal representatives.

**12.4. Severability.** It is the intention of the parties that the provisions of the restrictive covenants herein shall be enforceable to the fullest extent permissible under the applicable law. If any clause or provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, then the remainder of this Agreement shall not be affected thereby, and in lieu of each clause or provision of this Agreement which is illegal, invalid or unenforceable, there shall be added, as a part of this Agreement, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and as may be legal, valid, and enforceable.

**12.5. Counterparts.** This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

Initials

Steven E. Jackson
Employment Agreement
Page 14 of 15

**12.6. Tax Withholding.** The Company may withhold from any benefits payable under this Agreement all federal, state, city, or other taxes as may be required pursuant to any law or governmental regulation or ruling.

**12.7. Restrictive Covenants of the Essence.** The restrictive covenants of the Executive set forth herein are of the essence of this Agreement; they shall be construed as independent of any other provision in this Agreement; and the existence of any claim or cause of action of the Executive against the Company, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by the Company of the restrictive covenants contained herein. The Company shall at all times maintain the right to seek enforcement of these provisions whether or not the Company has previously refrained from seeking enforcement of any such provision as to the Executive or any other individual who has signed an agreement with similar provisions.

**12.8 Beneficiaries.** The Executive may designate one (1) or more persons or entities as the primary and/or contingent beneficiaries of any amounts to be received under this Agreement. Such designation must be in the form of a signed writing acceptable to the Executive's immediate manager. The Executive may make or change such designation at any time.

**12.9. Payment Obligation Absolute.** The Company's obligation to make the payments and the arrangement provided for herein shall be absolute and unconditional, and shall not be affected by any circumstances, including, without limitation, any offset, counterclaim, recoupment, defense, or other right which the Company may have against the Executive or anyone else. All amounts payable by the Company hereunder shall be paid without notice or demand. Each and every payment made hereunder by the Company shall be final, and the Company shall not seek to recover all or any part of such payment from the Executive or from whomsoever may be entitled thereto, for any reasons whatsoever.

The Executive shall not be obligated to seek other employment in mitigation of the amounts payable or arrangements made under any provision of this Agreement, and the obtaining of any such other employment shall in no event effect any reduction of the Company's obligations to make the payments and arrangements required to be made under this Agreement; provided, however, that continued health, welfare, and benefit plan participation pursuant to Article 7.4 or Article 9.3 herein shall be discontinued in the event the Executive becomes eligible to receive substantially similar benefits from a successor employer.

**12.10. Contractual Rights to Benefits.** This Agreement establishes and vests in the Executive a contractual right to the benefits to which he is entitled hereunder. However, nothing herein contained shall require or be deemed to require, or prohibit or be deemed to prohibit, the Company to segregate, earmark, or otherwise set aside any funds or other assets, in trust or otherwise, to provide for any payments to be made or required hereunder.

## Article 13. Governing Law

To the extent not preempted by federal law, the provisions of this Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Virginia, without reference to Virginia's choice of law statutes or decisions.

 Initials

Steven E. Jackson
Employment Agreement
Page 15 of 15

IN WITNESS WHEREOF, the Executive and the Company have executed this Agreement as of the Effective Date.

**CIRCUIT CITY STORES, INC.**

By: _____
~~Eric~~ A. Jonas, Jr.
Senior Vice President, Human Resources

**EXECUTIVE:**

_____
Steven E. Jackson      SSN: 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

**ATTEST:**

_____

Initials

Circuit City Stores, Inc.
c/o KCC
2335 Alaska Ave
El Segundo, CA 90245

PRF #52311                          PackID: 31
Case No. 08-35653

JACKSON, STEVEN              000031
60 PALATINE NO 101
IRVINE, CA 92612-5640

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy:  (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy:  (804) 783-0178

*Counsel for the Circuit City Stores, Inc.*
*Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CIRCUIT CITY STORES, INC., et al.,. | : | Case No. 08-35653-KRH |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

### NOTICE OF LIQUIDATING TRUST'S FIFTY-NINTH OMNIBUS
### OBJECTION TO CLAIMS: FIXING OF CERTAIN UNLIQUIDATED CLAIMS,
### REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS, OR DISALLOWANCE
### OF CERTAIN INVALID CLAIMS, AS APPLICABLE (SEVERANCE)

**PLEASE TAKE NOTICE** that the Circuit City Stores, Inc. Liquidating Trust (the "Liquidating Trust" and/or "Trust"), through Alfred H. Siegel, the duly appointed trustee of the Trust (the "Trustee"), pursuant to the Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession and its Official Committee of Creditors Holding General Unsecured Claims in the above-captioned cases of the above referenced estates of Circuit City Stores, Inc. et al. (collectively, the "Debtors") filed the Liquidating Trust's Fifty-Ninth Omnibus Objection to Claims: Fixing of Certain Unliquidated Claims, Reduction of Certain Partially Invalid Claims, or Disallowance of Certain Invalid Claims, As Applicable (Severance) (the "Objection") with the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"). A copy of the Objection is attached to this notice (this "Notice") as Exhibit 1. By the Objection, the Liquidating Trust is seeking to fix certain unliquidated claims, reduce certain partially invalid claims and disallow certain invalid claims, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** on April 1, 2009, the Bankruptcy Court entered the Order Establishing Omnibus Objection Procedures and Approving the Form and Manner of the Notice of Omnibus Objections (Docket No. 2881) (the "Order"), by which the Bankruptcy Court approved procedures for filing omnibus objections to proofs of claim and

requests for allowance and payment of administrative expenses and/or cure claims (collectively, the "Claims") in connection with the above-captioned chapter 11 cases (the "Omnibus Objection Procedures").

Specifically, the Objection seeks to reduce, disallow, or reclassify certain claims, including your claim(s), listed below, all as set forth in the Objection.

| TO: | Name and Address | Claim Number | Claim Amount | Reference Objection |
|-----|------------------|--------------|--------------|---------------------|
|     | JACKSON, STEVEN<br>60 PALATINE NO 101<br>IRVINE, CA 92612-5640 | 3352 | $0.00 | Books & Records: Expunge |

SPECIFIC INFORMATION PROVIDED ON INDIVIDUALIZED NOTICE

**YOU ARE RECEIVING THIS NOTICE BECAUSE THE PROOF(S) OF CLAIM LISTED HEREIN THAT YOU FILED AGAINST ONE OR MORE OF THE DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES ARE SUBJECT TO THE OBJECTION. <u>YOUR RIGHTS MAY BE AFFECTED BY THE OBJECTION.</u> THEREFORE, YOU SHOULD READ THIS NOTICE (INCLUDING THE OBJECTION AND OTHER ATTACHMENTS) CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

**MOREOVER, PURSUANT TO RULE 3007-1 OF THE LOCAL RULES OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA AND THE OMNIBUS OBJECTION PROCEDURES, UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE COURT AND SERVED ON THE OBJECTING PARTY BY <u>4:00 P.M. (EASTERN TIME) ON NOVEMBER 29, 2012</u>, THE COURT MAY DEEM ANY OPPOSITION WAIVED, TREAT THE OBJECTION AS CONCEDED AND ENTER AN ORDER GRANTING THE RELIEF REQUESTED WITHOUT A HEARING.**

<u>**Critical Information for Claimants**</u>
<u>**Choosing to File a Response to the Objection**</u>

<u>Who Needs to File a Response</u>:  If you oppose the relief requested in the Objection and if you are unable to resolve the Objection with the Liquidating Trust before the deadline to respond, then you must file and serve a written response (the "Response") to the Objection in accordance with this Notice.

If you do not oppose the relief requested in the Objection, then you do not need to file a written Response to the Objection and you do not need to appear at the hearing.

Response Deadline:  The Response Deadline is **4:00 p.m. (Eastern Time) on November 29, 2012 (the "Response Deadline")**.

**THE BANKRUPTCY COURT WILL ONLY CONSIDER YOUR RESPONSE IF YOUR RESPONSE IS FILED, SERVED <u>AND</u> RECEIVED BY THE RESPONSE DEADLINE.**

Your Response will be deemed timely filed only if the Response is **actually received** on or before the Response Deadline by the Bankruptcy Court at the following address:

> Clerk of the Bankruptcy Court
> United States Bankruptcy Court
> 701 East Broad Street – Room 4000
> Richmond, Virginia 23219

Your Response will be deemed timely served only if a copy of the Response is actually received on or before the Response Deadline by the Liquidating Trust's attorneys:

| | |
|---|---|
| Jeffrey N. Pomerantz, Esq. | Lynn L. Tavenner, Esq. (VA Bar No. 30083) |
| Andrew W. Caine, Esq. | Paula S. Beran, Esq. (VA Bar No. 34679) |
| (admitted *pro hac vice*) | TAVENNER & BERAN, PLC |
| PACHULSKI STANG ZIEHL & JONES LLP | 20 North Eighth Street, 2nd Floor |
| 10100 Santa Monica Boulevard | Richmond, Virginia 23219 |
| Los Angeles, California 90067-4100 | Telephone: (804) 783-8300 |
| Telephone: (310) 277-6910 | Telecopy:  (804) 783-0178 |
| Telecopy:  (310) 201-0760 | |

The status hearing on the Objection will be held at **2:00 p.m. (Eastern Time) on December 6, 2012 at:**

> United States Bankruptcy Court
> 701 East Broad Street – Courtroom 5000
> Richmond, Virginia 23219

If you file a timely Response, in accordance with the Objection Procedures, you do <u>not</u> need to appear at the status hearing on the Objection.

**<u>Procedures for Filing a Timely Response and
Information Regarding the Hearing on the Objection</u>**

**Contents.** To facilitate a speedy and non-judicial resolution of a Claim subject to the Objection, any claimant filing a Response shall use its best efforts to include the following (at a minimum) in its filed Response, to the extent such materials are not attached to its proof of claim:

3

requests for allowance and payment of administrative expenses and/or cure claims (collectively, the "Claims") in connection with the above-captioned chapter 11 cases (the "Omnibus Objection Procedures").

Specifically, the Objection seeks to reduce, disallow, or reclassify certain claims, including your claim(s), listed below, all as set forth in the Objection.

TO:

| | Claim Number | Claim Amount | Reference Objection |
|---|---|---|---|

SPECIFIC INFORMATION PROVIDED ON INDIVIDUALIZED NOTICE

**YOU ARE RECEIVING THIS NOTICE BECAUSE THE PROOF(S) OF CLAIM LISTED HEREIN THAT YOU FILED AGAINST ONE OR MORE OF THE DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES ARE SUBJECT TO THE OBJECTION. <u>YOUR RIGHTS MAY BE AFFECTED BY THE OBJECTION.</u> THEREFORE, YOU SHOULD READ THIS NOTICE (INCLUDING THE OBJECTION AND OTHER ATTACHMENTS) CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

**MOREOVER, PURSUANT TO RULE 3007-1 OF THE LOCAL RULES OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA AND THE OMNIBUS OBJECTION PROCEDURES, UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE COURT AND SERVED ON THE OBJECTING PARTY BY <u>4:00 P.M. (EASTERN TIME) ON NOVEMBER 29, 2012</u>, THE COURT MAY DEEM ANY OPPOSITION WAIVED, TREAT THE OBJECTION AS CONCEDED AND ENTER AN ORDER GRANTING THE RELIEF REQUESTED WITHOUT A HEARING.**

**Critical Information for Claimants**
**Choosing to File a Response to the Objection**

<u>Who Needs to File a Response</u>: If you oppose the relief requested in the Objection and if you are unable to resolve the Objection with the Liquidating Trust before the deadline to respond, then you must file and serve a written response (the "Response") to the Objection in accordance with this Notice.

If you do not oppose the relief requested in the Objection, then you do not need to file a written Response to the Objection and you do not need to appear at the hearing.

<u>Response Deadline</u>: The Response Deadline is **4:00 p.m. (Eastern Time) on November 29, 2012 (the "Response Deadline")**.

**THE BANKRUPTCY COURT WILL ONLY CONSIDER YOUR RESPONSE IF YOUR RESPONSE IS FILED, SERVED <u>AND</u> RECEIVED BY THE RESPONSE DEADLINE.**

Your Response will be deemed timely filed only if the Response is **actually received** on or before the Response Deadline by the Bankruptcy Court at the following address:

> Clerk of the Bankruptcy Court
> United States Bankruptcy Court
> 701 East Broad Street – Room 4000
> Richmond, Virginia 23219

Your Response will be deemed timely served only if a copy of the Response is actually received on or before the Response Deadline by the Liquidating Trust's attorneys:

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy: (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083)
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy:  (804) 783-0178

The status hearing on the Objection will be held at **2:00 p.m. (Eastern Time) on December 6, 2012 at:**

> United States Bankruptcy Court
> 701 East Broad Street – Courtroom 5000
> Richmond, Virginia 23219

If you file a timely Response, in accordance with the Objection Procedures, you do not need to appear at the status hearing on the Objection.

### Procedures for Filing a Timely Response and
### Information Regarding the Hearing on the Objection

**Contents**.  To facilitate a speedy and non-judicial resolution of a Claim subject to the Objection, any claimant filing a Response shall use its best efforts to include the following (at a minimum) in its filed Response, to the extent such materials are not attached to its proof of claim:

> a.   a caption setting forth the name of the Bankruptcy Court, the name of the Debtors, the case number and the title of the Objection to which the Response is directed;
>
> b.   the claimant's name and an explanation for the amount of the Claim;
>
> c.   a concise statement, executed by (or identifying by name, address and telephone number) a person with personal knowledge of the relevant facts that support the Response, setting forth the reasons why the Bankruptcy

*this Agreement.*" Employment Contract, **Exh. H**, at ¶ 7.3 (emphasis added). Certain of the Claimants resigned prior to the "Change in Control."

16.     The Employment Contracts were rejected by Orders entered on December 23, 2008 [Docket No. 1260] and on March 4, 2010 [Docket No. 6686].

## OBJECTION

17.     By this Objection, the Liquidating Trust seeks entry of an order, in substantially the form attached hereto as **Exhibit A**, pursuant to Bankruptcy Code sections 105(a), 502 and 503, Bankruptcy Rule 3007 and Local Bankruptcy Rule 3007-1, (i) fixing each of the Claims identified on **Exhibit C** attached hereto in the amount specified therein, (ii) reducing each of the Claims identified on **Exhibit D** attached hereto in the amount specified therein, and (iii) disallowing each of the Claims identified on **Exhibits E through G** attached hereto.

18.     For ease of reference, attached hereto as **Exhibit B** is an alphabetical listing of all Claimants whose Claims are included in this Objection, with a cross-reference by claim number.

### A.     Fixing of Certain Unliquidated Claims.

19.     The basis for fixing each of the Claims in the amount listed on **Exhibit C** attached hereto (the "Unliquidated Claims") is that each Unliquidated Claim was filed in an unliquidated amount, but asserts a liability under the Claimant's Employment Contract, in whole or in part, for which the Liquidating Trust believes there is liability on the part of the Debtors. Specifically, after a review of each of the Unliquidated Claims and the bases upon which each is asserted, and a review of the Debtors' books and records, the Liquidating Trust has determined that the Claimant is entitled to a claim based on his or her Employment Contract. The Liquidating Trust has determined the amount of the Debtors' liability on each Unliquidated Claim under the Claimant's Employment Contract and in accordance with section 502(b)(7) of the Bankruptcy Code, and seeks to allow the Unliquidated Claim in that amount, as set forth on

**Exhibit C.** Accordingly, the Liquidating Trust requests that the Unliquidated Claims identified on **Exhibit C** be fixed in the amounts stated in **Exhibit C**.

### B.    Reduction of Certain Partially Invalid Claims.

20.    The basis for reduction of the Claims listed on **Exhibit D** attached hereto (the "Partially Invalid Claims") is that each of the Partially Invalid Claims asserts, in part, an amount for which the Debtors are not liable.

21.    Specifically, after a review of each of the Partially Invalid Claims and the bases upon which each is asserted, and a review of the Debtors' books and records and in accordance with section 502(b)(7) of the Bankruptcy Code, the Liquidating Trust has determined that for each Claimant listed on **Exhibit D**, the Partially Invalid Claim is overstated and the Partially Invalid Claim must be reduced accordingly, as detailed on **Exhibit D**. Accordingly, the Partially Invalid Claims identified on **Exhibit D** should be reduced in the manner stated in **Exhibit D** to correspond to the Liquidating Trust's books and records and conform to section 502(b)(7) of the Bankruptcy Code.

### C.    Disallowance of Certain Invalid Claims.

22.    The basis for disallowance of the Claims listed on **Exhibit E** attached hereto (the "Books and Records Invalid Claims") is that each of the Books and Records Invalid Claims asserts amounts for which the Debtors' books and records show no liability to the Claimant on account of the Claimant's Employment Contract. After a review of each Books and Records Invalid Claim and the bases upon which it is asserted, and a review of the Debtors' books and records, the Liquidating Trust has determined that the Debtors have no liability on any of the Books and Records Invalid Claims because, *inter alia*, (i) the Debtors' books and records do not show any liability remaining on account of the Employment Contract or (ii) the Claimant voluntarily resigned prior to the "Change in Control" and is not entitled to benefits as a result of voluntary resignation (Employment Contract, **Exh. H**, at ¶ 7.3) or "Change in Control" (Employment Contract, **Exh. H**, at ¶ 9.3). Accordingly, the Liquidating Trust requests that the

Books and Records Invalid Claims identified on **Exhibit E** be disallowed in their entirety for the reasons stated therein.

23. The basis for disallowance of the Claims listed on **Exhibit F** attached hereto (the "Amended Claims") is that each of the Amended Claims was amended by another claim; the claim number of the amended claim is listed on **Exhibit F** hereto. Accordingly, the Liquidating Trust requests that the Amended Claims identified on **Exhibit F** be disallowed.

24. The basis for disallowance of the Claims listed on **Exhibit G** attached hereto (the "Duplicate Claims") is that each of the Duplicate Claims asserts liabilities already asserted in their entirety by the Claimant in another claim; the claim number of the allowed, surviving claim is listed on **Exhibit G** hereto. Accordingly, the Liquidating Trust requests that the Duplicate Claims identified on **Exhibit G** be disallowed.

## RESERVATION OF RIGHTS

25. At this time, the Liquidating Trust has not completed its review of the validity of all claims/expenses filed against the Debtors' estates, and reserves the right to further object to any and all claims, whether or not the subject of this Objection, for allowance and/or distribution purposes, and on any other grounds, including the right to modify, supplement and/or amend this Objection as it pertains to any Claim or Claimant herein.

## NOTICE AND PROCEDURE

26. Notice of this Objection has been provided to the Claimants identified on **Exhibit B**, and to parties-in-interest in accordance with the Court's *Supplemental Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management and Administrative Procedures* (entered on December 30, 2009 at Docket No. 6208) (the "Case Management Order"). The Liquidating Trust submits that the following methods of service upon the Claimants should be deemed by the Court to constitute due and sufficient service of this Objection: (a) service in accordance with Federal Rule of Bankruptcy Procedure 7004 and the

applicable provisions of Federal Rule of Civil Procedure 4; (b) to the extent counsel for the

Claimants is not known to the Liquidating Trust, by first class mail, postage prepaid, on the

signatory of the Claimant's proof of claim form or other representative identified in the proof of

claim form or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel

that has appeared on the Claimant's behalf in the Debtors' bankruptcy cases.  The Liquidating

Trust is serving the Claimant with this Objection and the exhibit on which the Claimant's Claim

is listed.

       27.     To the extent any Claimant timely files and properly serves a response to

this Objection by 4:00 P.M. (Eastern) on November 29, 2012, as required by the Case

Management Order and under applicable law, and the parties are unable to otherwise resolve the

Objection, the Liquidating Trust requests that the Court conduct a status conference with respect

to any such responding claimant at 2:00 P.M. (Eastern) on December 6, 2012, and thereafter

schedule the matter for a future hearing as to the merits of such claim.  However, to the extent

any Claimant fails to timely file and properly serve a response to this Objection as required by

the Case Management Order and applicable law, the Liquidating Trust requests that the Court

enter an order, substantially in the form attached hereto as **Exhibit A**, (i) fixing each of the

claims identified on **Exhibit C** attached hereto in the amount specified therein, (ii) reducing each

of the claims identified on **Exhibit D** attached hereto in the amount specified therein, and (iii)

disallowing each of the claims identified on **Exhibits E through G** attached hereto.

## COMPLIANCE WITH BANKRUPTCY RULE 3007 AND THE OMNIBUS OBJECTION PROCEDURES ORDER

       28.     This Objection complies with Bankruptcy Rule 3007(e).  Additionally, the

Liquidating Trust submits that this Objection is filed in accordance with the Omnibus Objection

Procedures Order.

### WAIVER OF MEMORANDUM OF LAW

29.    Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Motion, the Liquidating Trust requests that the requirement that all motions be accompanied by a written memorandum of law be waived.

### NO PRIOR RELIEF

30.    No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Liquidating Trust respectfully requests that the Court enter an Order sustaining this Objection and granting such other and further relief as the Court deems appropriate.

Dated: Richmond, Virginia
September 24, 2012

TAVENNER & BERAN, PLC

*/s/ Lynn L. Tavenner*
Lynn L. Tavenner (VA Bar No. 30083)
Paula S. Beran (VA Bar No. 34679)
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
(804) 783-8300

- and -

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
(310) 277-6910

- and --

PACHULSKI STANG ZIEHL & JONES LLP
Robert J. Feinstein, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
(212) 561-7700

*Counsel to the Circuit City Stores, Inc.
Liquidating Trust*

## EXHIBIT A

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy:  (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083)
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy:  (804) 783-0178

- and --

Robert J. Feinstein, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: (212) 561-7700
Telecopy: (212) 561-7777

*Counsel to the Liquidating Trustee*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| - - - - - - - - - - - - - - | x | |
| In re: | : | Chapter 11 |
| | : | |
| CIRCUIT CITY STORES, INC., et al., | : | Case No. 08-35653 (KRH) |
| | : | |
| Debtors. | : | |
| - - - - - - - - - - - - - - | : | Jointly Administered |
| | x | |

**ORDER SUSTAINING LIQUIDATING TRUST'S FIFTY-NINTH OMNIBUS
OBJECTION TO CLAIMS: FIXING OF CERTAIN UNLIQUIDATED CLAIMS,
REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS,
OR DISALLOWANCE OF CERTAIN INVALID CLAIMS,
AS APPLICABLE (SEVERANCE)**

THIS MATTER having come before the Court[2] on the *Liquidating Trust's Fifty-Ninth Omnibus Objection to Claims: Fixing of Certain Unliquidated Claims, Reduction of Certain Partially Invalid Claims, or Disallowance of Certain Invalid Claims, as Applicable (Severance)* (the "Objection"), which requested, among other things, that the claims specifically identified on **Exhibit B** attached to the Objection be fixed, reduced or disallowed, as applicable, for those reasons set forth in the Objection; and it appearing that due and proper notice and service of the Objection as set forth therein was good and sufficient and that no other further notice or service of the Objection need be given; and it further appearing that no response was timely filed or properly served by the Claimants being affected by this Order; and it appearing that the relief requested on the Objection is in the best interest of the Liquidating Trust, the Debtors' estates and creditors and other parties-in-interest; and after due deliberation thereon, good and sufficient cause exists for the granting of the relief as set forth herein,

IT IS HEREBY ORDERED ADJUDGED AND DECREED THAT:

1.    The Objection is SUSTAINED.

2.    The Claims identified on **Exhibit A** as attached hereto and incorporated herein are forever fixed in the amount specified on **Exhibit A** for all purposes in these bankruptcy cases.

3.    The Claims identified on **Exhibit B** as attached hereto and incorporated herein are forever reduced for all purposes in these bankruptcy cases in the manner stated in **Exhibit B**.

4.    The Claims identified on **Exhibit C** as attached hereto and incorporated herein are forever disallowed in their entirety for all purposes in these bankruptcy cases.

5.    The Court will conduct a status conference on _____, 2012

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Objection.

at 2:00 p.m. for all Claims identified on **Exhibit D** attached hereto.

6.       The Liquidating Trust's rights to object to any claim including (without limitation) the Claims subject to the Objection, on any grounds that applicable law permits, are not waived and are expressly reserved.

7.       The Liquidating Trust shall serve a copy of this Order on the claimants included on the exhibits to this Order on or before five (5) business days from the entry of this Order.

8.       This Court shall retain jurisdiction to hear and determine all matters arising from or relating to this Order.

Dated: Richmond, Virginia
_____, 2012

_____
HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

TAVENNER & BERAN, PLC

_____
Lynn L. Tavenner (VA Bar No. 30083)
Paula S. Beran (VA Bar No. 34679)
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
(804) 783-8300
                  - and -

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
(310) 277-6910
                  - and –

PACHULSKI STANG ZIEHL & JONES LLP
Robert J. Feinstein, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
(212) 561-7700

*Counsel to the Circuit City Stores, Inc.*
*Liquidating Trust*

## CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

                              */s/ Lynn L. Tavenner*
                              Lynn L. Tavenner

In re Circuit City Stores, Inc, et al.
Case No. 08-35653 (KRH)

**EXHIBIT B**

**ALPHABETICAL LISTING OF CLAIMANTS**

| Claim Holder | Claim Number | Exhibit |
|---|---|---|
| APPLEBY, ROBERT J<br><br>14320 WINTER RIDGE LANE<br><br><br>MIDLOTHIAN, VA 23113-6709 | 7252<br><br>2000725201 | Exhibit C<br>UNLIQUIDATED CLAIMS AMOUNT TO BE FIXED |
| BADE, BRIAN M<br><br>11200 PRESCOTT PL<br><br><br>GLEN ALLEN, VA 23059 | 6038<br><br>2000603801 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| BRADLEY, BRIAN<br><br>3036 LEANNE CT<br><br><br>CLEARWATER, FL 33759 | 8131<br><br>2000813101 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| CHARLES, DAVID LEE<br><br>3957 E El Sendero Rd<br><br><br>Cave Creek, AZ 85331 | 538<br><br>2000053801 | Exhibit F<br>Expunge: Amended by another claim |
| DAVIS, TONY V<br><br>26310 Wooded Hollow Ln<br><br><br>Katy, TX 77494-5011 | 9122<br><br>2000912201 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| DAWN VONBECHMANN<br><br>1225 Vancouver Ave<br><br><br>Burlingame, CA 94010 | 8652<br><br>2000865202 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| DAWN VONBECHMANN<br><br>1225 Vancouver Ave<br><br><br>Burlingame, CA 94010 | 14999<br><br>2001499902 | Exhibit G<br>DUPLICATE CLAIMS TO BE EXPUNGED |
| DAWN VONBECHMANN<br><br>1225 Vancouver Ave<br><br><br>Burlingame, CA 94010 | 14999<br><br>2001499901 | Exhibit G<br>DUPLICATE CLAIMS TO BE EXPUNGED |

In re Circuit City Stores, Inc, et al.
Case No. 08-35653 (KRH)

**EXHIBIT B**

**ALPHABETICAL LISTING OF CLAIMANTS**

| Claim Holder | Claim Number | Exhibit |
|---|---|---|
| EDWARDS, GENEVA<br><br>7526 MEDIA PARK RD<br><br>HENRICO, VA 23231 | 4468<br><br>2000446801 | Exhibit E<br><br>INVALID CLAIMS TO BE EXPUNGED |
| ERRION, VICKI FELTON<br><br>1360 WOODLAWN DR<br><br>ORANGE PARK, FL 32065 | 6879<br><br>2000687901 | Exhibit C<br><br>UNLIQUIDATED CLAIMS AMOUNT TO BE FIXED |
| ERRION, VICKI FELTON<br><br>1360 WOODLAWN DR<br><br>ORANGE PARK, FL 32065 | 6877<br><br>2000687701 | Exhibit C<br><br>UNLIQUIDATED CLAIMS AMOUNT TO BE FIXED |
| FAY, LAWRENCE W<br><br>9785 SPRINGSTONE RD<br><br>MC CORDSVILLE, IN 46055 | 10842<br><br>2001084201 | Exhibit D<br><br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| GEITH, JON C<br><br>13663 PINEFIELD CT<br><br>MOORPARK, CA 93021 | 4809<br><br>2000480901 | Exhibit C<br><br>UNLIQUIDATED CLAIMS AMOUNT TO BE FIXED |
| GROSSE, ANDREW | 369<br><br>2000036902 | Exhibit D<br><br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| HARLOW, JOHN<br><br>1024 DODGE ST NO 509<br><br>OMAHA, NE 68102 | 10269<br><br>2001026901 | Exhibit C<br><br>UNLIQUIDATED CLAIMS AMOUNT TO BE FIXED |
| HENDRICKS, EDWARD M<br><br>1286 89TH ST<br><br>NEW RICHMND, WI 54017 | 10173<br><br>2001017301 | Exhibit E<br><br>INVALID CLAIMS TO BE EXPUNGED |

In re Circuit City Stores, Inc. et al.
Case No. 08-35653 (KRH)

EXHIBIT B

ALPHABETICAL LISTING OF CLAIMANTS

| Claim Holder | Claim Number | Exhibit |
|---|---|---|
| HENDRICKS, EDWARD M<br><br>1286 89TH ST<br><br><br>NEW RICHMND, WI 54017 | 10174<br><br>2001017401 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| HENDRICKS, EDWARD M<br><br>1286 89TH ST<br><br><br>NEW RICHMND, WI 54017 | 10175<br><br>2001017501 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| HOUSTON, JASON E<br><br>11621 PEAVEY ST<br><br><br>GLEN ALLEN, VA 23059-3435 | 7585<br><br>2000758501 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| JACKSON, STEVEN<br><br>60 PALATINE NO 101<br><br><br>IRVINE, CA 92612-5640 | 3352<br><br>2000335201 | Exhibit E<br>INVALID CLAIMS TO BE EXPUNGED |
| JOLY, RUSSELL N<br><br>5318 WOODSTONE COURT<br><br><br>LOUISA, VA 23093 | 6465<br><br>2000646501 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| JONAS JR, ERIC A<br><br>2 ANNETT AVE<br><br><br>EDGEWATER, NJ 07020 | 6526<br><br>2000652601 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| JOSEPH V REILLY<br><br>1712 E Lake Woodlands Pkwy<br><br><br>Oldsmar, FL 34677 | 8994<br><br>2000899401 | Exhibit E<br>INVALID CLAIMS TO BE EXPUNGED |
| KEN J YOUNG<br><br>2836 Bayhill Woods Cove<br><br><br>Collierville, TN 38017 | 5162<br><br>2000516201 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |

severance

In re Circuit City Stores, Inc, et al.
Case No. 08-35653 (KRH)

**EXHIBIT B**
**ALPHABETICAL LISTING OF CLAIMANTS**

| Claim Holder | Claim Number | Exhibit |
|---|---|---|
| LUBARY JAMES<br><br>3161 Druid Ln<br><br><br>Los Alamitos, CA 90720 | 9598<br><br>2000959801 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| MAYNARD JEFFREY<br><br>2325 Wooded Oak Pl<br><br><br>Midlothian, VA 23113-3105 | 8069<br><br>2000806901 | Exhibit C<br>UNLIQUIDATED CLAIMS AMOUNT TO BE FIXED |
| MOORE, LEIGH ANN<br><br>13808 Long Cove Ct<br><br><br>Midlothian, VA 23112 | 2615<br><br>2000261501 | Exhibit F<br>Expunge: Amended by another claim |
| MOORE, LEIGH ANN<br><br>13808 Long Cove Ct<br><br><br>Midlothian, VA 23112 | 2615<br><br>2000261502 | Exhibit F<br>Expunge: Amended by another claim |
| MOSIER, MICHELLE O<br><br>4503 W FRANKLIN ST<br><br><br>RICHMOND, VA 23221 | 15169<br><br>2001516902 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| OLDANI, MARK<br><br>303 HAMLETS END WAY<br><br><br>FRANKLIN, TN 37067-6471 | 10044<br><br>2001004401 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| PHILIP J DUNN<br><br>11465 Barrington Bridge Ct<br><br><br>Richmond, VA 23233 | 6303<br><br>2000630302 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| PHILLIP SCHOONOVER<br><br>PO Box 1555<br><br><br>Richmond, VA 23218-1555 | 6718<br><br>2000671801 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |

severance

In re Circuit City Stores, Inc, et al.
Case No. 08-35653 (KRH)

EXHIBIT B
ALPHABETICAL LISTING OF CLAIMANTS

| Claim Holder | Claim Number | Exhibit |
|---|---|---|
| RALEIGH, JOHN P<br><br>3621 MEADOW POND COUR<br><br><br>GLEN ALLEN, VA 23060 | 11391<br>2001139101 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| REYES, FERNANDO<br><br>15027 PEPPERDINE DR<br><br><br>FONTANA, CA 92336 | 5941<br>2000594101 | Exhibit C<br>UNLIQUIDATED CLAIMS AMOUNT TO BE FIXED |
| SCHOONOVER, PHILIP J<br><br>PO Box 28<br><br><br>Fryeburg, ME 04037-0028 | 1329<br>2000132901 | Exhibit F<br>Expunge: Amended by another claim |
| SCHOONOVER, PHILIP J<br><br>PO Box 28<br><br><br>Fryeburg, ME 04037-0028 | 2304<br>2000230401 | Exhibit G<br>DUPLICATE CLAIMS TO BE EXPUNGED |
| SIDDONS, DEREK J<br><br>1689 LENOX DR<br><br><br>WACONIA, MN 55387 | 6697<br>2000869702 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| SIFFORD, MICHELLE A<br><br>6324 HAMLET TRL<br><br><br>ROANOKE, VA 24018 | 7354<br>2000735401 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| SISE, BRAD A<br><br>1020 108TH AVE NE APT NO<br><br><br>BELLEVUE, WA 98004 | 5740<br>2000574001 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| SMITH, JAMES B<br><br>15444 E Peakview Ct<br><br><br>Fountain Hls, AZ 85268 | 6288<br>2000628801 | Exhibit F<br>Expunge: Amended by another claim |

severance

In re Circuit City Stores, Inc, et al.
Case No. 08-35653 (KRH)

**EXHIBIT B**
**ALPHABETICAL LISTING OF CLAIMANTS**

| Claim Holder | Claim Number | Exhibit |
|---|---|---|
| SMITH, JAMES B<br><br>15444 E Peakview Ct<br><br><br>Fountain Hls, AZ 85268 | 6292<br><br>2000629201 | Exhibit F<br>Expunge: Amended by another claim |
| SMITH, JAMES B<br><br>15444 E Peakview Ct<br><br><br>Fountain Hls, AZ 85268 | 6290<br><br>2000629001 | Exhibit F<br>Expunge: Amended by another claim |
| STINDE, MARK S<br><br>8704 PONDEROSA DR<br><br><br>MCKINNEY, TX 75070 | 7038<br><br>2000703801 | Exhibit D<br>REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS |
| STRAUSS, DAVID ROBERT<br><br>5204 DAVENPORT PL<br><br><br>ROSWELL, GA 30075 | 4763<br><br>2000476301 | Exhibit C<br>UNLIQUIDATED CLAIMS AMOUNT TO BE FIXED |

44

severance

Case 08-35653-KRH    Doc 12428    Filed 09/24/12    Entered 09/24/12 20:23:04    Desc
Main Document    Page 26 of 52

In re Circuit City Stores, Inc., et al.
Case No. 08-35653 (KRH)

**EXHIBIT C**
**CLAIMS TO BE FIXED**

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Proposed Modified Claim Amount | Proposed Modified Claim Class | Debtor(s) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/15/2009 | 4763 2000476301 | STRAUSS, DAVID ROBERT 5204 DAVENPORT PL ROSWELL, GA 30075 | | $0.00 | U | CIRCUIT CITY STORES, INC. | $287,897.00 | General Unsecured | CIRCUIT CITY STORES, INC. | Claim was filed for an unliquidated amount and must be fixed at a specified amount. The proposed amount has been calculated by the Trust in accordance with the applicable documents |
| 1/22/2009 | 4809 2000480901 | GEITH, JON C 13663 PINEFIELD CT MOORPARK, CA 93021 | | $0.00 | U | CIRCUIT CITY STORES, INC. | $262,776.00 | General Unsecured | CIRCUIT CITY STORES, INC. | Claim was filed for an unliquidated amount and must be fixed at a specified amount. The proposed amount has been calculated by the Trust in accordance with the applicable documents |
| 1/27/2009 | 5941 2000594101 | REYES, FERNANDO 15027 PEPPERDINE DR FONTANA, CA 92336 | | $0.00 | U | CIRCUIT CITY STORES WEST COAST INC. | $162,657.00 | General Unsecured | CIRCUIT CITY STORES WEST COAST INC | Claim was filed for an unliquidated amount and must be fixed at a specified amount. The proposed amount has been calculated by the Trust in accordance with the applicable documents |
| 1/28/2009 | 6877 2000687701 | ERRION, VICKI FELTON 1360 WOODLAWN DR ORANGE PARK, FL 32285 | | $0.00 | U | CIRCUIT CITY STORES, INC. | $6,396.00 | General Unsecured | CIRCUIT CITY STORES, INC. | Claim was filed for an unliquidated amount and must be fixed at a specified amount. The proposed amount has been calculated by the Trust in accordance with the applicable documents |

severance

Case 08-35653-KRH   Doc 12428   Filed 09/24/12   Entered 09/24/12 20:23:04   Desc
Main Document     Page 27 of 52

In re Circuit City Stores, Inc., et al.
Case No. 08-35653 (KRH)
EXHIBIT C
CLAIMS TO BE FIXED

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Proposed Modified Claim Amount | Proposed Modified Claim Class | Debtor(s) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/28/2009 | 6879 2000687901 | ERRION, VICKI FELTON 1360 WOODLAWN DR ORANGE PARK, FL 32065 | | $0.00 | U | CIRCUIT CITY STORES, INC. | $9,600.00 | General Unsecured | CIRCUIT CITY STORES, INC | Claim was filed for an unliquidated amount and must be fixed at a specified amount. The proposed amount has been calculated by the Trust in accordance with the applicable documents. |
| 1/28/2009 | 7252 2000725201 | APPLEBY, ROBERT J 14320 WINTER RIDGE LANE MIDLOTHIAN, VA 23113-6709 | | $0.00 | U | CIRCUIT CITY STORES, INC. | $219,420.00 | General Unsecured | CIRCUIT CITY STORES, INC. | Claim was filed for an unliquidated amount and must be fixed at a specified amount. The proposed amount has been calculated by the Trust in accordance with the applicable documents. |
| 1/29/2009 | 8069 2000806901 | MAYNARD JEFFREY 2325 Wooded Oak Pl Midlothian, VA 23113-3105 | | $0.00 | U | CIRCUIT CITY STORES, INC. | $264,797.00 | General Unsecured | CIRCUIT CITY STORES, INC. | Claim was filed for an unliquidated amount and must be fixed at a specified amount. The proposed amount has been calculated by the Trust in accordance with the applicable documents. |
| 1/28/2009 | 10269 2001026901 | HARLOW, JOHN 1024 DODGE ST NO 509 OMAHA, NE 68102 | | $0.00 | U | CIRCUIT CITY STORES, INC. | $1,099,896.00 | General Unsecured | CIRCUIT CITY STORES, INC. | Claim was filed for an unliquidated amount and must be fixed at a specified amount. The proposed amount has been calculated by the Trust in accordance with the applicable documents. |

severance

Case 08-35653-KRH    Doc 12428    Filed 09/24/12    Entered 09/24/12 20:23:04    Desc
Main Document        Page 28 of 52

In re Circuit City Stores, Inc., et al.
Case No. 08-35653 (KRH)

**EXHIBIT D**

**REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS**

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Proposed Modified Claim Amount | Proposed Modified Claim Class | Debtor(s) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/24/2008 | 369 2000036902 | GROSSE, ANDREW | | $110,352.23 | U | CIRCUIT CITY STORES, INC. | $0.00 | General Unsecured | CIRCUIT CITY STORES, INC. | Claimant's severance is being allowed on claim 8223 |
| 1/23/2009 | 5162 2000516201 | KEN J YOUNG 2836 Bayhill Woods Cove Collierville, TN 38017 | | $422,096.00 | U | CIRCUIT CITY STORES, INC. | $312,811.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records |
| 1/27/2009 | 5740 2000574001 | SISE, BRAD A 1020 108TH AVE NE APT NO BELLEVUE, WA 98004 | | $205,463.70 | U | CIRCUIT CITY STORES, INC. | $182,176.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records |
| 1/27/2009 | 6038 2000603601 | BADE, BRIAN M 11200 PRESCOTT PL GLEN ALLEN, VA 23059 | | $323,200.00 | U | CIRCUIT CITY STORES, INC. | $250,961.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records |

severance

In re Circuit City Stores, Inc. et al.
Case No. 08-35653 (KRH)

**EXHIBIT D**

**REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS**

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Proposed Modified Claim Amount | Proposed Modified Claim Class | Debtor(s) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/27/2009 | 6303 2000630202 | PHILIP J DUNN  11465 Barrington Bridge Ct  Richmond, VA 23233 | | $1,226,667.00 | U | CIRCUIT CITY STORES, INC | $959,896.00 | General Unsecured | CIRCUIT CITY STORES, INC | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/26/2009 | 6465 2000654501 | JOLY, RUSSELL N  5318 WOODSTONE COURT  LOUISA, VA 23093 | | $355,500.00 | U | CIRCUIT CITY STORES, INC | $263,290.00 | General Unsecured | CIRCUIT CITY STORES, INC | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/23/2009 | 5526 2000652601 | JONAS JR. ERICA A  2 ANNETT AVE  EDGEWATER NJ 07020 | | $1,304,080.00 | U | CIRCUIT CITY STORES, INC | $884,329.00 | General Unsecured | CIRCUIT CITY STORES, INC | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/28/2009 | 6697 2000669702 | SIDDONS, DEREK J  1689 LENOX DR  WACONIA, MN 55387 | | $146,571.50 | U | CIRCUIT CITY STORES, INC | $130,687.00 | General Unsecured | CIRCUIT CITY STORES, INC | The claim is being reduced to the amount of severance due according to the debtors' books and records. |

severance

Case 08-35653-KRH   Doc 12428   Filed 09/24/12   Entered 09/24/12 20:23:04   Desc
Main Document      Page 30 of 52

In re Circuit City Stores, Inc., et al.
Case No. 08-35653 (KRH)
EXHIBIT D
REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Proposed Modified Claim Amount | Proposed Modified Claim Class | Debtor(s) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/28/2009 | 6718 2006/71801 | PHILLIP SCHOONOVER PO Box 1555 Richmond, VA 23218-1555 | c o Sports Fan PC | $1,845,000.00 | U | CIRCUIT CITY STORES, INC. | $1,819,896.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/28/2009 | 7038 2007/03801 | STINDE, MARK S 8704 PONDEROSA DR MCKINNEY, TX 75070 | | $88,000.00 | U | CIRCUIT CITY STORES, INC. | $25,924.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/28/2009 | 7354 2000/35401 | SIFFORD, MICHELLE A 6324 HAMLET TRL ROANOKE, VA 24018 | | $294,796.00 | U | CIRCUIT CITY STORES, INC. | $231,441.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/28/2009 | 7885 2000/58501 | HOUSTON, JASON E 11821 PEAVEY ST GLEN ALLEN, VA 23059-3435 | | $172,946.00 | U | CIRCUIT CITY STORES, INC. | $140,619.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |

severance

Case 08-35653-KRH   Doc 12428   Filed 09/24/12   Entered 09/24/12 20:23:04   Desc
Main Document   Page 31 of 52

In re Circuit City Stores, Inc., et al.
Case No. 08-35653 (KRH)
EXHIBIT D
REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Proposed Modified Claim Amount | Proposed Modified Claim Class | Debtor(s) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/29/2009 | 8131 2000813101 | BRADLEY, BRIAN<br>3036 LEANNE CT<br>CLEARWATER, FL 33759 | | $2,670,000.00 | U | CIRCUIT CITY STORES, INC. | $706,298.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/29/2009 | 8652 2000965202 | DAWN VONBECHMANN<br>1225 Vancouver Ave<br>Burlingame, CA 94010 | Dawn vonBechmann | $409,004.00 | U | CIRCUIT CITY STORES, INC. | $292,439.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/29/2009 | 9122 2000912201 | DAVIS, TONY V<br>26310 Wooded Hollow Ln<br>Katy, TX 77494-5011 | | $303,196.00 | U | CIRCUIT CITY STORES, INC. | $237,605.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/30/2009 | 9598 2000959901 | LUBARY JAMES<br>3161 Druid Ln.<br>Los Alamitos, CA 90720 | | $401,333.00 | U | CIRCUIT CITY STORES, INC. | $265,751.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |

severance

Case 08-35653-KRH   Doc 12428   Filed 09/24/12   Entered 09/24/12 20:23:04   Desc
Main Document       Page 32 of 52

In re Circuit City Stores, Inc., et al.
Case No. 08-35653 (KRH)
EXHIBIT D
REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Proposed Modified Claim Amount | Proposed Modified Claim Class | Debtor(s) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/2009 | 10044 2001004401 | OLDANI, MARK<br>303 HAMLETS END WAY<br>FRANKLIN, TN 37067-6471 | | $424,156.00 | U | CIRCUIT CITY STORES, INC. | $318,197.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/30/2009 | 10174 2001017401 | HENDRICKS, EDWARD M<br>1286 89TH ST<br>NEW RICHMND, WI 54017 | | $20,000.00 | U | CIRCUIT CITY STORES, INC. | $13,401.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 1/30/2009 | 10175 2001017501 | HENDRICKS, EDWARD M<br>1286 89TH ST<br>NEW RICHMND, WI 54017 | | $530,000.00 | U | CIRCUIT CITY STORES, INC. | $273,519.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |
| 2/12/2009 | 10842 2001094201 | FAY, LAWRENCE W<br>9785 SPRINGSTONE RD<br>MC CORDSVILLE, IN 46055 | | $641,722.00 | U | CIRCUIT CITY STORES, INC. | $234,120.00 | General Unsecured | CIRCUIT CITY STORES, INC. | The claim is being reduced to the amount of severance due according to the debtors' books and records. |

severance

In re Circuit City Stores, Inc. et al.
Case No. 08-35653 (KRH)
**EXHIBIT D**
REDUCTION OF CERTAIN PARTIALLY INVALID CLAIMS

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Proposed Modified Claim Amount | Proposed Modified Claim Class | Debtor(s) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/2/2009 | 11391 2001139101 | RALEIGH, JOHN P 3821 MEADOW POND COUR GLEN ALLEN, VA 23060 | | $138,527.92 | U | CIRCUIT CITY STORES, INC | $133,324.00 | General Unsecured | CIRCUIT CITY STORES, INC | The claim is being reduced to the amount of severance due according to the debtors' books and records |
| 12/7/2010 | 15169 2001516902 | MOSIER, MICHELLE O 4503 W FRANKLIN ST RICHMOND, VA 23221 | | $1,115.00 | U | Circuit City Stores, Inc. | $0.00 | General Unsecured | Circuit City Stores, Inc. | Claimant's severance is being allowed on claim 7419 |

22

severance

Case 08-35653-KRH    Doc 12428    Filed 09/24/12    Entered 09/24/12 20:23:04    Desc
Main Document        Page 34 of 52

In re Circuit City Stores, Inc., et al.
Case No. 08-35653 (KRH)

**EXHIBIT E**
**INVALID CLAIMS TO BE EXPUNGED**

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Proposed Modified Claim Amount | Comments |
|---|---|---|---|---|---|---|---|---|
| 1/12/2009 | 3352 2000335201 | JACKSON, STEVEN<br><br>60 PALATINE NO 101<br><br>IRVINE, CA 92612-6540 | | $10,000.00 | U | CIRCUIT CITY STORES, INC | $0.00 | The claimant terminated 3/26/2008, and the debtors' books and records reflect no remaining liability under the separation agreement |
| 1/21/2009 | 4468 2000446801 | EDWARDS, GENEVA<br><br>7526 MEDIA PARK RD<br><br>HENRICO, VA 23231 | | $0.00 | U | CIRCUIT CITY STORES, INC | $0.00 | The claimant terminated 4/4/2004, and the debtors' books and records reflect no remaining liability under the separation agreement |
| 1/30/2009 | 8994 2000899401 | JOSEPH V REILLY<br><br>1712 E Lake Woodlands Pkwy<br><br>Oldsmar, FL 34677 | | $307,239.00 | U | CIRCUIT CITY STORES, INC | | The claimant is claiming change-in-control benefits under his employment agreement. The claimant's employment terminated on 2/16/2009, due to a voluntary resignation, prior to the change in control that occurred on 3/8/2009 |
| 1/30/2009 | 10173 2001017301 | HENDRICKS, EDWARD M<br><br>1286 89TH ST<br><br>NEW RICHMND, WI 54017 | | $198,000.00 | U | CIRCUIT CITY STORES, INC | $0.00 | The claimant is claiming the gross-up amount necessary to cover the excise tax imposed under IRS code section 280(g). The payment of this claim does not trigger this excise tax; thus, the Trust is not liable for the payment of the tax |

severance

In re Circuit City Stores, Inc. et al.
Case No. 08-35653 (KRH)

EXHIBIT F
AMENDED CLAIMS TO BE EXPUNGED

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Surviving Claim Number | Comments |
|---|---|---|---|---|---|---|---|---|
| 11/25/2008 | 538<br>2000053901 | CHARLES, DAVID LEE<br>3957 E El Sendero Rd<br>Cave Creek, AZ 85331 | | $260,000.00 | U | CIRCUIT CITY STORES, INC. | 5386 | The claim was amended by another claim. |
| 12/19/2008 | 1329<br>2000132901 | SCHOONOVER, PHILIP J<br>PO Box 28<br>Fryeburg, ME 04037-0028 | | $0.00 | U | CIRCUIT CITY STORES, INC | 6718 | The claim was amended by another claim |
| 1/9/2009 | 2615<br>2000261502 | MOORE, LEIGH ANN<br>13808 Long Cove Ct<br>Midlothian, VA 23112 | | $51,431.53 | U | CIRCUIT CITY STORES, INC. | 15092 | The claim was amended by another claim. |
| 1/9/2009 | 2615<br>2000261501 | MOORE, LEIGH ANN<br>13808 Long Cove Ct<br>Midlothian, VA 23112 | | $7,563.46 | P | CIRCUIT CITY STORES, INC. | 15092 | The claim was amended by another claim |
| 1/27/2009 | 6288<br>2000628801 | SMITH, JAMES B<br>15444 E Peakview Ct<br>Fountain Hls, AZ 85268 | | $6,000.00 | U | CIRCUIT CITY STORES WEST COAST, INC. | 7358 | The claim was amended by another claim. |

Case 08-35653-KRH    Doc 12428    Filed 09/24/12    Entered 09/24/12 20:23:04    Desc
Main Document    Page 36 of 52

In re Circuit City Stores, Inc., et al.
Case No. 08-35653 (KRH)

**EXHIBIT F**
**AMENDED CLAIMS TO BE EXPUNGED**

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Surviving Claim Number | Comments |
|---|---|---|---|---|---|---|---|---|
| 1/27/2009 | 6290 2000629001 | SMITH, JAMES B 15444 E Peakview Ct Fountain His, AZ 85268 | | $165,000.00 | U | CIRCUIT CITY STORES WEST COAST INC | 7360 | The claim was amended by another claim. |
| 1/27/2009 | 6292 2000629201 | SMITH, JAMES B 15444 E Peakview Ct Fountain His, AZ 85268 | | $6,000.00 | U | CIRCUIT CITY STORES WEST COAST INC | 7359 | The claim was amended by another claim. |

severance

In re Circuit City Stores, Inc, et al.
Case No. 08-35653 (KRH)

**EXHIBIT G**
**DUPLICATE CLAIMS TO BE EXPUNGED**

| Date Filed | Claim Number | Name Address | Notice Name | Docketed Claim Amount | Docketed Claim Class | Debtor(s) | Surviving Claim Number | Comments |
|---|---|---|---|---|---|---|---|---|
| 12/19/2008 | 2304<br><br>2000230401 | SCHOONOVER, PHILIP J<br><br>PO Box 28<br><br>Fryeburg, ME 04037-0028 | | $0.00 | U | CIRCUIT CITY STORES, INC | 1329 | The claim is a duplicate of an already-filed claim |
| 4/2/2010 | 14999<br><br>2001499902 | DAWN VONBECHMANN<br><br>1225 Vancouver Ave<br><br>Burlingame, CA 94010 | | $418,896.00 | U | CIRCUIT CITY STORES, INC | 8652 | The claim is a duplicate of an already-filed claim |
| 4/2/2010 | 14999<br><br>2001499901 | DAWN VONBECHMANN<br><br>1225 Vancouver Ave<br><br>Burlingame, CA 94010 | | $0.00 | P | CIRCUIT CITY STORES, INC. | 8652 | The claim is a duplicate of an already-filed claim |

severance

Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, VA 23233-1464
T 804.527.4000

EXHIBIT H

## Circuit City Stores, Inc.
## Employment Agreement for ██████████████

This **EMPLOYMENT AGREEMENT** is made, entered into, and is effective as of the 24th day of June 2005 (the "Effective Date"), by and between **Circuit City Stores, Inc.** (the "Company") and ████████████ (the "Executive").

WHEREAS, the Company desires to employ the Executive as ████████████ of Circuit City Stores, Inc.;

WHEREAS, the Company recognizes the Executive's intimate knowledge and experience in the business of the Company, and desires to secure the employment of the Executive in the role of ██████ ████████████; and

WHEREAS, the Executive will develop and/or come in contact with the Company's proprietary and confidential information which is not readily available to the public, and which is of great importance to the Company and is treated by the Company as secret and confidential information.

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties set forth in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

### Article 1. Term of Employment

The Company hereby agrees to employ the Executive and the Executive hereby accepts employment as ████████████ of the Company, in accordance with the terms and conditions set forth herein, for an initial period of one (1) year, commencing as of the Effective Date of this Agreement as indicated above (the "Initial Term"); subject, however, to earlier termination as expressly provided herein.

The Initial Term shall automatically be renewed for additional periods of one (1) year each at the end of the Initial Term, and then again after each successive year thereafter (collectively, the "Renewal Periods," which, together with the Initial Term, constitute the "Term" of this Agreement). However, either party may terminate this Agreement at the end of the Initial Term, or at the end of any Renewal Period, by giving the other party written notice of intent not to renew, delivered at least thirty (30) days prior to the end of the Initial Term or any Renewal Period. For purposes of this Agreement, an "Employment Year" shall mean any twelve (12) month period during the Term of this Agreement beginning on the Effective Date or on any anniversary thereof.

### Article 2. Position and Responsibilities

During the Term of this Agreement, the Executive agrees to serve as ████████████ ████████████ of the Company. In her capacity as ████████████ of the Company, the Executive shall report directly to the Senior Vice President and Chief Accounting Officer, and shall have

██████ initials

Employment Agreement
Page 2 of 15

the duties and responsibilities of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ of the Company and such other
duties and responsibilities not inconsistent with the performance of her duties as ▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

## Article 3. Standard of Care

During the term of this Agreement, the Executive agrees to devote substantially her full-time
attention and energies to the Company's business. The Executive covenants, warrants, and represents
that she shall:

(a)   Devote her full and best efforts and talents full time to the performance of her
employment obligations and duties for the Company;

(b)   Exercise the highest degree of loyalty and the highest standards of conduct in the
performance of her duties;

(c)   Comply with all rules, regulations, and policies established or issued by the Company;
and

(d)   Refrain from taking advantage, for herself or others, of any corporate opportunities of the
Company.

## Article 4. Other Employment.

The Executive shall not, during the term hereof, be interested directly or indirectly, in any manner,
as partner, officer, director, investor, stockholder, advisor, employee, or in any other capacity, in any other
business similar to Company's business for the Executive's personal advantage or benefit or that of others.
Any other employment or position which might reasonably be deemed contrary to the best interests of the
Company is prohibited. During the term of employment hereunder, the Executive agrees to obtain the
Company's written consent prior to entering into any other occupation, even if dissimilar to that of the
Company. Such consent may be granted or withheld, in the Company's absolute discretion. Nothing herein
contained shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other
securities of any corporation whose stock or securities are regularly traded on any public exchange, nor shall
anything herein contained be deemed to prevent the Executive from investing in real estate for her own
benefit (so long as such investment (a) is not related to or in support of any entity engaged in a business
similar to that of the Company or (b) does not detract from the Executive's performance of her duties and
obligations hereunder).

## Article 5. Compensation and Benefits

As remuneration for all services to be rendered by the Executive during the Employment Period,
and as consideration for complying with the covenants herein, the Company shall pay and provide to the
Executive the following:

5.1.   **Base Salary.** During the Term of this Agreement, the Company shall pay the Executive
a Base Salary in an amount which shall be established and approved by the Compensation Committee of
the Board of Directors; provided, however, that such Base Salary shall be established at a rate of
▇▇▇▇▇▇ per year. In addition, the Company shall not be obligated to maintain, increase, or refrain from


Initials

Case 08-35653-KRH    Doc 12428    Filed 09/24/12    Entered 09/24/12 20:23:04    Desc
Main Document    Page 40 of 52

Employment Agreement
Page 3 of 15

reducing or amending such Base Salary. This Base Salary shall be subject to all appropriate federal and state withholding taxes and payable in accordance with the normal payroll practices of the Company. The Base Salary shall be reviewed at least annually following the Effective Date of this Agreement, while the Term of this Agreement is in force, to ascertain whether, in the judgment of the Compensation Committee, such Base Salary should be changed. If changed, the Base Salary as stated above shall, likewise, be changed for all purposes of this Agreement.

**5.2.    Annual Bonus.** In addition to her Base Salary, the Executive shall be entitled to participate in the Company's short-term incentive program, as such program may exist from time to time during the Term of this Agreement.

Under the Company's short-term incentive plan, the Executive has the opportunity to earn an annual bonus with respect to any fiscal year of the Company ("Annual Bonus"). For any Initial Term and any Renewal Period, the Annual Bonus, if earned, with respect to any fiscal year, will generally be in an amount that is not less than thirty-five percent (35%) of the Executive's Base Salary for the fiscal year with respect to which the Annual Bonus is being paid (the "Minimum Bonus Rate")

The award and amount of any Annual Bonus shall be determined under the Company's short-term incentive plan, at the sole discretion of the Company's Compensation Committee. If the Minimum Bonus Rate is changed, it shall, likewise, be changed for all purposes of this Agreement.

**5.3. Long-Term Incentives.** During the Term of this Agreement, the Executive shall be eligible to participate in the Company's long-term incentive plan, to the extent that the Board of Directors of the Company or the Compensation Committee, in their discretion, determines is appropriate.

**5.4. Retirement Benefits.** During the Term of this Agreement, the Company shall provide to the Executive the opportunity for participation in all Company retirement, insurance, fringe benefit, and executive compensation plans and programs, subject to the eligibility and participation requirements of such plans.

**5.5. Employee Benefits.** During the Term of this Agreement, the Company shall provide the Executive all benefits, as commensurate with the position of ██████████████ of the Company. Such benefits may include group term life insurance, comprehensive health and major medical insurance, dental and life insurance, and short-term and long-term disability.

**5.6. Perquisites.** During the Term of this Agreement, the Company shall provide to the Executive, at the Company's cost, all perquisites to the extent that the Board of Directors or the Compensation Committee, in their discretion, determines is appropriate.

**5.7. Right to Change Plans.** By reason of Articles 5.5 and 5.6 herein, the Company shall not be obligated to institute, maintain, or refrain from changing, amending, or discontinuing any benefit plan or perquisite.

**Article 6. Expenses**

During the Term of this Agreement, the Company shall pay or reimburse the Executive for all ordinary and necessary expenses, in a reasonable amount, which the Executive incurs in performing her duties under this Agreement including, but not limited to, travel, entertainment, professional dues and

Initials

Case 08-35653-KRH  Doc 12428  Filed 09/24/12  Entered 09/24/12 20:23:04  Desc
Main Document    Page 41 of 52

Employment Agreement
Page 4 of 15

subscriptions, and all dues, fees, and expenses associated with membership in various professional, business, and civic associations and societies in which the Company finds that the Executive's participation is in the best interests of the Company. The payment of reimbursement of expenses shall be subject to such rules concerning documentation of expenses and the type or magnitude of such expenses as the Compensation Committee of the Board of Directors may establish from time to time.

### Article 7.  Employment Termination

**7.1.  Termination Due to Retirement or Death.** In the event the Executive's employment ends by reason of Retirement or the Executive's death during the term of this Agreement, the Executive's benefits shall be determined in accordance with the Company's retirement, survivor's benefits, insurance, and/or other applicable programs of the Company then in effect. In addition, all stock grants, except performance-based grants in the case of Retirement, will become immediately vested and may be exercised by the Executive, the Executive's personal representatives, distributees, legatees, or estate at any time before the expiration date of the grant.

The Effective Date of Termination due to Retirement or death shall be (a) ninety (90) days following the date the Executive provides the Company with written notice that the Executive is ending employment by reason of Retirement or (b) on the Executive's date of death, as the case may be. Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive or, if applicable, the Executive's estate; (a) any Base Salary or Annual Bonus that was accrued but not yet paid as of the Effective Date of Termination; and (b) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

**7.2.  Termination Due to Disability.** The Company shall have the right to terminate the Executive's employment for disability. For the purposes of this Agreement, disability shall mean any physical or mental illness or injury that causes the Executive to be unable to substantially perform the Executive's normal duties; provided however that the Executive shall not be considered disabled until: (i) the Executive has been so disabled for 180 days during any period of twelve (12) consecutive months; (ii) the Executive's attending physician shall have furnished to the Company certification that the return of the Executive to her normal duties is impossible or improbable; or (iii) the Executive is determined to be totally disabled by the disability insurer then insuring the Executive, if any.

The Effective Date of Termination due to Disability shall be specified, in a written notice, by the Executive's immediate manager, and such written notice shall be delivered to the Executive, but shall be no less than thirty (30) calendar days after the delivery of such written notice to the Executive. Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive [or, if applicable, the Executive's estate]: (a) any salary that was accrued but not yet paid as of the Effective Date of Termination; (b) the unpaid Annual Bonus, if any, with respect to the fiscal year preceding the Effective Date of Termination (such Annual Bonus, if any, to be determined in the manner it would have been determined and payable at the time it would have been payable under Article 5.2 had there been no termination of the Employment Period); and (c) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

It is expressly understood that the Disability of the Executive for a period of one hundred eighty (180) calendar days or less in the aggregate during any period of twelve (12) consecutive months, in the absence of any reasonable expectation that her Disability will exist for more than such a period of time, shall not constitute a failure by her to perform her duties hereunder and shall not be deemed a breach or


Initials

Employment Agreement
Page 5 of 15

default, and the Executive shall receive full compensation for any such period of Disability or for any other temporary illness or incapacity during the term of this Agreement.

If the employment of the Executive terminates because of Disability, all of the Executive's outstanding stock grants, excluding restricted stock grants issued under a performance based plan, will become immediately vested, effective as of the date of the Executive's Disability. Then, the Executive, the Executive's personal representatives, distributees, or legatees may exercise the Executive's grants at any time before the expiration date of the grant.

**7.3. Voluntary Termination by the Executive.** The Executive may terminate her employment and this Agreement at any time by giving the Company at least thirty (30) days written notice. The Company reserves the right to require the Executive not to work during the notice period but shall pay the Executive her full Base Salary, at the rate then in effect as provided in Article 5.1 herein, through the notice period plus all other benefits to which the Executive has a vested right on the last day of employment (for purposes of this paragraph, the Executive shall not be paid any Annual Bonus with respect to the fiscal year in which voluntary termination under this Article 7.3 occurs). The Company thereafter shall have no further obligations under this Agreement.

**7.4 Involuntary Termination by the Company Without Cause.** The Company may terminate the Executive's employment, at any time, for any reason other than death, Disability, Retirement, or for "Cause", by providing the Executive with at least thirty (30) days written notice; modification, cancellation, change or amendment made to this Agreement pursuant to Article 12.3 or 12.4 shall not be deemed an involuntary termination without Cause.

(a)     Upon the Effective Date of Termination specified by the Company for termination by the Company without cause, the Company shall pay to the Executive, an amount equal to six (6) months of the Executive's Base Salary for the fiscal year in which the Executive's Effective Date of Termination occurs according to the Company's regularly scheduled payroll practices, or as otherwise determined by the Company. In addition, the Company shall pay to the Executive an amount equal to one (1) year of the Executive's earned Annual Bonus established for the fiscal year in which the Executive's Effective Date of Termination occurs according to the Company's regularly scheduled bonus payment practices or as otherwise determined by the Company. In addition, the Company shall continue, at the same cost to the Executive as existed as of the Effective Date of Termination, all health and welfare benefit plan participation, as permitted by law, for one (1) year following the Executive's termination of employment; provided, however, that the applicable COBRA "period of coverage" under any plan subject to Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code"), or Sections 601 through 609 of the Employee Retirement Income Security Act of 1974 (ERISA) shall begin as of the Effective Date of Termination.

(b)     The Company shall also provide the Executive with three (3) months of outplacement services.

(c)     Any unvested stock options or any outstanding restricted stock, excluding restricted stock grants issued under a performance based plan, that would become vested (that is, transferable and non-forfeitable) if the Executive remained an employee through the Initial Term or the then current Renewal Period of this Agreement will become vested as

Initials

Employment Agreement
Page 6 of 15

of the date of the Executive's termination of employment. The Executive must satisfy the tax withholding requirements.

The Company thereafter shall have no further obligations under this Agreement.

**7.5. Termination For Cause.** Nothing in this Agreement shall be construed to prevent the Company from terminating the Executive's employment under this Agreement, without notice or liability for doing so, for "Cause."

For purposes of this Agreement, "Cause" means:

(a)     The Executive's material breach of this Agreement, which breach is not cured within ten (10) days of receipt by the Executive of written notice from the Company specifying the breach;

(b)     The Executive's gross negligence in the performance of her material duties hereunder, intentional nonperformance or intentional misperformance of such duties, misconduct or refusal to abide by or comply with the directives of the Board, her superior officers, or the Company's policies and procedures, which actions continue for a period of ten (10) days after receipt by the Executive of written notice of the need to cure or cease;

(c)     Conviction of a felony or other crime involving moral turpitude;

(d)     The Executive engaging in illegal conduct, dishonesty or fraud with respect to the business or affairs of the Company that in the reasonable judgment of the Company materially and adversely affects the operations or reputation of the Company;

(e)     Failure of the Executive to disclose to the Executive's manager a conflict of interest, of which the Executive knew or, with reasonable diligence, would have known, in connection with any transaction entered into on behalf of the Company; or

(f)     Failure of the Executive to agree to a modification of this Agreement, pursuant to paragraph 12.3 below, when the purpose of the modification is to comply with applicable federal, state and/or local laws or regulations, or when such modification is designed to further define the restrictions of Article 8 or otherwise enhance the enforcement of Article 8 without increasing the scope of the Article 8 restrictions.

In the event this Agreement is terminated for Cause, the Company shall pay the Executive her Base Salary through the Effective Date of Termination for cause and the Executive shall immediately thereafter forfeit all rights and benefits (other than vested benefits) she would otherwise have been entitled to receive under this Agreement. The Company thereafter shall have no further obligations under this Agreement.

Initials

Employment Agreement
Page 7 of 15

## Article 8. Noncompetition and Confidentiality

### 8.1. Noncompetition.

(a)     During the Executive's employment and for a period of one (1) year following the last day of the Executive's employment, the Executive shall not directly or indirectly compete with the Company by engaging, in a competitive capacity, in any business that is engaged in the same or similar business of the Company in one or more Metropolitan Statistical Areas ("MSAs"), specifically including Best Buy, Radio Shack, Wal-Mart and CompUSA, in which the Company is doing business on the last day of the Executive's employment. A business will not be considered to be in competition with the Company for purposes of this paragraph 8.1(a) or paragraph 8.1(b) below if:

  (i)     The business or the operating unit of the business in which the Executive is employed or with which the Executive is associated (collectively the "Business Unit") is not engaged in the retail sales of consumer electronics;

  (ii)    If sales of the Business Unit's products or services in the retail sales and service of consumer electronics constitute less than ten percent (10%) of such Business Unit's sales; or

  (iii)   If the sales of the Business Unit in the retail sales and service of consumer electronics do constitute more than ten percent (10%) of the sales of the Business Unit, but the Business Unit solely operates outside of North America.

Notwithstanding the foregoing, nothing herein shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other securities of any corporation whose stock or securities are regularly traded on any public exchange, nor shall anything herein contained be deemed to prevent Employee from investing in real estate for her own benefit (as long as such investment is not related to or in support of any entity engaged in the same or similar business as the Company in competition with the Company in one or more MSA's in which the Company is doing business during the Executive's employment).

(b)     During the Executive's employment and for a period of one (1) year following the last day of the Executive's employment, the Executive shall not directly or indirectly compete with the Company by engaging, in a competitive capacity, in any business engaged in the same or similar business of the Company in one or more MSAs where, on the last day of the Executive's employment, the Company is engaged in real estate site selection or has taken further steps toward the commencement of operations in the future, of which the Executive is aware.

(c)     The Executive agrees that competition, as set forth in Article 8.1(a) above, shall include, but not be limited to, engaging in competitive activity, as an individual, as a partner, as a joint venturer with any other person or entity, or as an employee, agent, or representative of any other person or entity.

(d)     It is the specific intent of the parties that the Executive shall be restricted from competing directly or indirectly with any segment of the Company's business in which the Executive


Initials

Employment Agreement
Page 8 of 15

engaged prior to the last day of her employment and from any segment of the Company's business about which the Executive acquired proprietary or confidential information during the course of her employment.

(e)     If any provision of this Article 8.1 relating to the time period, geographic area or scope of restricted activities shall be declared by a court of competent jurisdiction to exceed the maximum time period, geographic area or scope of activities, as applicable, that such court deems reasonable and enforceable, said time period, geographic area or scope of activities shall be deemed to be, and thereafter shall become, the maximum time period, scope of activities or largest geographic area that such court deems reasonable and enforceable and this Agreement shall automatically be considered to have been amended and revised to reflect such determination.

(f)     The Executive and the Company have examined in detail this Covenant Not to Compete and agree that the restraint imposed upon the Executive is reasonable in light of the legitimate interests of the Company, and it is not unduly harsh upon the Executive's ability to earn a livelihood.

**8.2.  Non-Solicitation of Employees.**  The Executive agrees that during the Executive's employment with the Company and for a period of one one (1) year following the last day of the Executive's employment, the Executive shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, any employee of the Company to leave the Company for any reason whatsoever or hire any individual employed by the Company. For purposes of this Article 8.2, employee shall mean any individual employed by the Company on the last day of the Executive's employment or within the three-month period prior to the last day of the Executive's employment.

**8.3.  Confidentiality.**  The Company has advised the Executive and the Executive acknowledges that it is the policy of the Company to maintain as secret and confidential all Protected Information (as defined below), and that Protected Information has been and will be developed at substantial cost and effort to the Company. The Executive agrees to hold in strict confidence and safeguard any information of or about the Company gained by the Executive in any manner or from any source during the Executive's employment. The Executive shall not, without the prior written consent of the Company, at any time, directly or indirectly, divulge, use, furnish, use, disclose or make accessible to any person, firm, corporation, association, or other entity (otherwise than as may be required in the regular course of the Executive's employment), either during the Executive's employment with the Company or subsequent to the last day of the Executive's employment, any Protected Information, or cause any such information of the Company to enter the public domain.

The Executive understands and agrees that any information, data and/or trade secrets about Company or its suppliers and/or distributors is the property of the Company and is essential to the protection of the Company's goodwill and to the maintenance of the Company's competitive position and accordingly should be kept secret. For purposes of this Agreement, "Protected Information" means trade secrets, confidential and proprietary business information of or about the Company, and any other information of the Company, including, customer lists (including potential customers), sources of supply, processes, plans, materials, pricing information, internal memoranda, marketing plans, promotional plans, internal policies, research, purchasing, accounting and financial information, computer programs, hardware, software, and products and services which may be developed from time to time by the Company and its agents or employees, including the Executive; provided, however, that information that


Initials

Employment Agreement
Page 9 of 15

is in the public domain (other than as a result of a breach of this Agreement), approved for release by the Company or lawfully obtained from third parties who are not bound by a confidentiality agreement with the Company, is not Protected Information.

Nothing contained in this Article is intended to reduce in any way protection available to the Company pursuant to the Uniform Trade Secrets Act as adopted in Virginia or any other state or other applicable laws which prohibit the misuse or disclosure of confidential or proprietary information.

**8.4. Acknowledgement of Covenants.** The parties hereto acknowledge that the Executive's services are of a special, extraordinary, and intellectual character which gives her unique value, and that the business of the Company and its subsidiaries is highly competitive, and that violation of any of the covenants provided in this Article 8 would cause immediate, immeasurable, and irreparable harm, loss, and damage to the Company not adequately compensable by a monetary award. The Executive acknowledges that the time, scope of activities and geographical area restrained by the provisions of this Article 8 are reasonable and do not impose a greater restraint than is necessary to protect the goodwill of the Company's business. The Executive further acknowledges that she and the Company have negotiated and bargained for the terms of this Agreement and that the Executive has received adequate consideration for entering into this Agreement. In the event of any such breach or threatened breach by the Executive of any one or more of such covenants, the Company shall be entitled to such equitable and injunctive relief as may be available to restrain the Executive from violating the provisions hereof. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available at law or in equity for such breach or threatened breach, including the recovery of damages and the immediate termination of the employment of the Executive hereunder for cause.

## Article 9. Change in Control

**9.1. Change in Control.** This Article 9 shall not become effective, and the Company shall have no obligation hereunder, if the employment of the Executive with the Company shall terminate prior to a Change in Control (as defined in Article 9.2 below) of the Company.

**9.2. Definition of Change in Control.** Change in Control of the Company means, and shall be deemed to have occurred, upon the first to occur of any of the following events:

(a)     The acquisition by any individual, entity, or group (a "Person"), including a "person" within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), but excluding an Affiliate (as defined below) of the Company, of beneficial ownership within the meaning of Rule 13d-3 promulgated under the Exchange Act, of thirty-five percent (35%) or more of either:  (i) the then outstanding shares of common stock of the Circuit City Group (the "Outstanding Common Stock"); or (ii) the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors (the "Outstanding Voting Securities"); excluding, however, the following:  (A) any acquisition directly from the Company (excluding an acquisition resulting from the exercise of an option, conversion right, or exchange privilege unless the security being so exercised, converted or exchanged was acquired directly from the Company);  (B) any acquisition by the Company;  (C) any acquisition by an employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (D) any

Initials

Employment Agreement
Page 10 of 15

acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii), and (iii) of subsection (c) of this Article 9.2;

(b)    Individuals who, as of the Effective Date, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of such Board; provided that any individual who becomes a director of the Company subsequent to the Effective Date, whose election, or nomination for election by the Company's stockholders, was approved by the vote of at least a majority of the directors then comprising the Incumbent Board shall be deemed a member of the Incumbent Board; and provided further, that any individual who was initially elected as a director of the Company as a result of an actual or threatened election contest, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act, or any other actual or threatened solicitation of proxies or consents by or on behalf of any Person other than the Board shall not be deemed a member of the Incumbent Board;

(c)    The consummation of a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company (a "Corporate Transaction"); excluding, however, a Corporate Transaction pursuant to which: (i) all or substantially all of the individuals or entities who are the beneficial owners, respectively, of the Outstanding Common Stock and the Outstanding Voting Securities immediately prior to such Corporate Transaction will beneficially own, directly or indirectly, more than sixty percent (60%) of, respectively, the outstanding shares of common stock, and the combined voting power of the outstanding securities of such corporation entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Corporate Transaction (including, without limitation, a corporation, which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or indirectly) in substantially the same proportions relative to each other as their ownership, immediately prior to such Corporate Transaction, of the Outstanding Common Stock and the Outstanding Voting Securities, as the case may be; (ii) no Person (other than: the Company; any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; the corporation resulting from such Corporate Transaction; and any Person which beneficially owned, immediately prior to such Corporate Transaction, directly or indirectly, twenty-five percent (25%) or more of the Outstanding Common Stock or the Outstanding Voting Securities, as the case may be) will beneficially own, directly or indirectly, twenty-five percent (25%) or more of, respectively, the outstanding shares of common stock of the corporation resulting from such Corporate Transaction or the combined voting power of the outstanding securities of such corporation entitled to vote generally in the election of directors; and (iii) individuals who were members of the Incumbent Board will constitute at least a majority of the members of the board of directors of the corporation resulting from such Corporate Transaction; or

(d)    The consummation of a plan of complete liquidation, dissolution, or sale of substantially all the assets of the Company.

For purposes of this Article 9, "Affiliate" shall mean with reference to a specified Person, any Person that directly or indirectly through one (1) or more intermediaries controls or is controlled by or is under common control with the specified Person. For purposes of this definition, "control" (including,

Initials

Employment Agreement
Page 11 of 15

with correlative meaning, the terms "controlled by" and "under common control with"), as used in respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such Person, whether through ownership of voting securities or by contract or otherwise.

**9.3. Change-in-Control Severance Benefits.** If at any time during the Term of this Agreement there is a Change in Control of the Company and the Executive's employment is terminated for any reason other than death, Disability, Retirement, Voluntary Termination or Involuntary Termination for Cause within the one (1) year period following the Change in Control, the Company shall provide to the Executive the following:

(a)     Base Salary and all other benefits due her as if she had remained an employee pursuant to Article 5 through the remainder of the month in which the termination occurs, less applicable withholding taxes and other authorized payroll deductions;

(b)     A lump-sum severance allowance in an amount that is equal to the product of one (1) times both the Executive's Base Salary at the rate in effect immediately prior to the termination and the Executive's target Annual Bonus established for the fiscal year in which the Executive's termination of employment occurs;

(c)     Continuation at the same cost to the Executive as existed as of the Effective Date of Termination of Agreement of all health, welfare, and benefit plan participation for one (1) full year following employment termination;

(d)     Provision of outplacement services for a period of six (6) months for the Executive;

(e)     A lump-sum payment equal to the one (1) year cost of perquisites outlined in Article 5.6 above; and

(f)     Any unvested stock options or any outstanding restricted stock, excluding restricted stock grants issued under a performance based plan, that would become vested (that is, transferable and non-forfeitable) if the Executive remained an employee through the Initial Term or the then current Renewal Period of this Agreement will become vested as of the date of the Executive's termination of employment. The Executive must satisfy the tax withholding requirements.

**9.4. Excise Tax Equalization Payment.** In the event that the Executive becomes entitled to severance benefits under this Agreement or any other agreement with or plan of the Company (in the aggregate, the "Total Payments"), if any of the Total Payments will [be subject to the tax (the "Excise Tax") imposed by Section 4999 of the Code] or any similar excise tax that may hereafter be imposed), the Company shall pay to the Executive in cash an additional amount (the "Gross-Up Payment"), such that the net amount retained by the Executive after deduction of any Excise Tax upon the Total Payments and any federal, state, and local income tax and Excise Tax upon the Gross-Up Payment provided for by this Article 9.4 (including FICA and FUTA), shall be equal to the Total Payments. The Company shall make such payment to the Executive as soon as practicable following the Effective Date of Termination, but in no event beyond thirty (30) days from such date.

 Initials

Employment Agreement
Page 12 of 15

For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made, and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence on the Effective Date of Termination, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

The Company's Compensation Committee shall determine, based upon the advice of the Company's independent certified public accountants, whether any payments or benefits hereunder are subject to the Excise Tax.

**9.5. Subsequent Recalculation.** In the event the Internal Revenue Service adjusts the computation of the Company under Article 9.4 herein so that the Executive did not receive the greatest net benefit, the Company shall reimburse the Executive for the full amount necessary to make the Executive whole, plus a market rate of interest, as determined by the Compensation Committee.

## Article 10. Assignment

**10.1. Assignment by Company,** This Agreement may and shall be assigned or transferred to, and shall be binding upon and shall inure to the benefit of, any successor of the Company, and any such successor shall be deemed substituted for all purposes of the "Company" under the terms of this Agreement. As used in this Agreement, the term "successor" shall mean any person, firm, corporation, or business entity which, at any time, whether by merger, purchase, or otherwise, acquires all or substantially all of the assets or the business of the Company. In addition, the obligations of the Executive under Articles 8 and 12 of this Agreement shall continue after the termination of the Executive's employment and shall be binding on the Executive's heirs, executors, legal representatives and assigns.

Failure of the Company to obtain the agreement of any successor to be bound by the terms of this Agreement prior to the effectiveness of any such succession shall be a breach of this Agreement, and shall immediately entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled in the event of a Termination of Employment for Good Reason as provided by Article 7.6. Except as provided herein, the Company may not otherwise assign this Agreement.

**10.2. Assignment by Executive.** The services to be provided by the Executive to the Company hereunder are personal to the Executive, and the Executive's duties may not be assigned by the Executive; provided, however, that this Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, and administrators, successors, heirs, distributees, devisees, and legatees. If the Executive dies while any amounts payable to the Executive hereunder remain outstanding, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee or, in the absence of such designee, to the Executive's estate.

## Article 11. Dispute Resolution and Notice

**11.1. Issue Resolution.** Except for actions initiated by the Company to enjoin a breach by, and/or recover damages from the Executive related to violation of any of the restrictive covenants in Article 8 of

Initials

· Case 08-35653-KRH    Doc 12428    Filed 09/24/12    Entered 09/24/12 20:23:04    Desc
Main Document        Page 50 of 52

Employment Agreement
Page 13 of 15

this Agreement, which Company may bring in an appropriate court of law or equity, any disagreement between the Executive and the Company concerning anything covered by this Agreement or concerning other terms or conditions of the Executive's employment or the termination of the Executive's employment will be settled by final and binding arbitration pursuant to the Company's Associate Issue Resolution Program. The Dispute Resolution Agreement and the Dispute Resolution Rules and Procedures are incorporated herein by reference as if set forth in full in this Agreement. The decision of the arbitrator will be final and binding on both the Executive and the Company and may be enforced in a court of appropriate jurisdiction.

**11.2. Notice.** Any notices, requests, demands, or other communications provided for by this Agreement shall be sufficient if in writing, and if sent by registered or certified mail to the Executive at the last address she has filed in writing with the Company or, in the case of the Company, at its principal offices.

### Article 12. Miscellaneous

**12.1. Entire Agreement.** This Agreement supersedes any prior agreements or understandings, oral or written, between the parties hereto, with respect to the subject matter hereof, and constitutes the entire agreement of the parties with respect thereto. Without limiting the generality of the foregoing sentence, this Agreement completely supersedes any and all prior employment agreements entered into by and between the Company, and the Executive, and all amendments thereto, in their entirety.

**12.2. Return of Materials.** Upon the termination of the Executive's employment with the Company, however such termination is effected, the Executive shall promptly deliver to Company all property, records, materials, documents, and copies of documents concerning the Executive's business and/or its customers (hereinafter collectively "Company Materials") which the Executive has in her possession or under her control at the time of termination of her employment. The Executive further agrees not to take or extract any portion of Company Materials in written, computer, electronic or any other reproducible form without the prior written consent of the Executive's immediate manager.

**12.3. Modification.** This Agreement shall not be varied, altered, modified, canceled, changed, or in any way amended except by mutual agreement of the parties in a written instrument executed by the parties hereto or their legal representatives.

**12.4. Severability.** It is the intention of the parties that the provisions of the restrictive covenants herein shall be enforceable to the fullest extent permissible under the applicable law. If any clause or provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, then the remainder of this Agreement shall not be affected thereby, and in lieu of each clause or provision of this Agreement which is illegal, invalid or unenforceable, there shall be added, as a part of this Agreement, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and as may be legal, valid, and enforceable.

**12.5. Counterparts.** This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

 Initials

Employment Agreement
Page 14 of 15

**12.6. Tax Withholding.** The Company may withhold from any benefits payable under this Agreement all federal, state, city, or other taxes as may be required pursuant to any law or governmental regulation or ruling.

**12.7. Restrictive Covenants of the Essence.** The restrictive covenants of the Executive set forth herein are of the essence of this Agreement; they shall be construed as independent of any other provision in this Agreement; and the existence of any claim or cause of action of the Executive against the Company, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by the Company of the restrictive covenants contained herein. The Company shall at all times maintain the right to seek enforcement of these provisions whether or not the Company has previously refrained from seeking enforcement of any such provision as to the Executive or any other individual who has signed an agreement with similar provisions.

**12.8 Beneficiaries.** The Executive may designate one (1) or more persons or entities as the primary and/or contingent beneficiaries of any amounts to be received under this Agreement. Such designation must be in the form of a signed writing acceptable to the Executive's immediate manager. The Executive may make or change such designation at any time.

**12.9. Payment Obligation Absolute.** The Company's obligation to make the payments and the arrangement provided for herein shall be absolute and unconditional, and shall not be affected by any circumstances, including, without limitation, any offset, counterclaim, recoupment, defense, or other right which the Company may have against the Executive or anyone else. All amounts payable by the Company hereunder shall be paid without notice or demand. Each and every payment made hereunder by the Company shall be final, and the Company shall not seek to recover all or any part of such payment from the Executive or from whomsoever may be entitled thereto, for any reasons whatsoever.

The Executive shall not be obligated to seek other employment in mitigation of the amounts payable or arrangements made under any provision of this Agreement, and the obtaining of any such other employment shall in no event effect any reduction of the Company's obligations to make the payments and arrangements required to be made under this Agreement; provided, however, that continued health, welfare, and benefit plan participation pursuant to Article 7.4 or Article 9.3 herein shall be discontinued in the event the Executive becomes eligible to receive substantially similar benefits from a successor employer.

**12.10. Contractual Rights to Benefits.** This Agreement establishes and vests in the Executive a contractual right to the benefits to which she is entitled hereunder. However, nothing herein contained shall require or be deemed to require, or prohibit or be deemed to prohibit, the Company to segregate, earmark, or otherwise set aside any funds or other assets, in trust or otherwise, to provide for any payments to be made or required hereunder.

**Article 13. Governing Law**

To the extent not preempted by federal law, the provisions of this Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Virginia, without reference to Virginia's choice of law statutes or decisions.

 Initials

Employment Agreement
Page 15 of 15

IN WITNESS WHEREOF, the Executive and the Company have executed this Agreement as of the Effective Date.

**CIRCUIT CITY STORES, INC.**

By: _____
~~Eric~~ A. Jonas, Jr.
Senior Vice President, Human Resources

**EXECUTIVE:**

**ATTEST:**

_____

Initials