WEIL, GOTSHAL & MANGES LLP
Gary T. Holtzer
767 Fifth Avenue
New York, New York 10153-0119
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

-and-

KUTAK ROCK LLP
Michael A. Condyles (Va. Bar No. 27807)
1111 East Main Street, Suite 800
Richmond, Virginia  23219
Telephone:  (804) 644-1700
Facsimile:  (804) 783-6192

*Attorneys for Chase Bank USA, National Association*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **CIRCUIT CITY STORES, INC.,** *et al.*, | : | **Case No. 08-35653 (KRH)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

## RESPONSE OF CHASE BANK, USA, NATIONAL ASSOCIATION
## TO THE OBJECTION OF THE CIRCUIT CITY STORES, INC.
## LIQUIDATING TRUST TO CLAIM NO. 14787

Now comes Chase Bank USA, National Association, as successor by merger with Bank One

Delaware, National Association ("Chase"), by counsel, and in response to the *Objection of the*

*Circuit City Stores, Inc. Liquidating Trust to Claim No. 14787 Filed by Chase Bank USA, National*

*Association,* respectfully states as follows:

## Background

1.    On January 16, 2004, Bank One, Delaware, N.A., now known and referred to herein as Chase[1] and Circuit City Stores, Inc. ("Circuit City") entered into a Consumer Credit Card Program Agreement ("Program Agreement").[2]  In connection with the Program Agreement, Chase purchased and then managed Circuit City's existing credit card program, which involved, among other things, the issuance of private label credit cards and co-branded credit cards ("Circuit City Credit Cards") to individual cardholders and the extension of credit by Chase to these cardholders. The effective date of the Program Agreement was in May 2004 and extended through May 2012. Performance by Circuit City, however, was cut short by more than three years as a result of Circuit City's rejection of the agreement.

2.    On November 10, 2008, Circuit City and its related entities (the "Debtors") filed a voluntary petition with the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On February 27, 2009, the Court entered a *Stipulation, Agreement and Order for the Rejection and Termination of Consumer Credit Card Agreement Program* [Dkt. No. 2338], which provided that the Program Agreement was rejected as of February 28, 2009.

3.    On January 7, 2010, Chase filed an amended proof of claim ("Claim No. 14787") asserting a general unsecured claim in the amount of $33,789,082.00.  Claim No. 14787 is comprised of the following categories and amounts of damages:

---

[1] In October 2004, the institution known as Chase Manhattan Bank, USA merged with Bank One, Delaware, and subsequently changed its name to Chase Bank USA, National Association.

[2] The Program Agreement was previously filed under seal with the Court pursuant to the Order of May 23, 2013 [Dkt. No. 11977].

- Personnel costs related to closing of Kennesaw and Richmond sites:  $8,601,082[3]

- IT/facility costs related to closing of Kennesaw and Richmond sites:  $1,187,044[4]

- Present value of costs of product trade:  $509,386

- Unamortized costs related to platform conversion:  $20,846,025

- Unamortized bounties  $2,114,886

- Surplus plastic and other supplies  $292,671

- Attorneys' Fees (Weil, Gotshal & Manges LLP):  $167,212

(Kutak Rock LLP):  $70,776

4.      On April 24, 2012, Alfred H. Siegel (the "Trustee"), as Trustee of the Circuit City Stores, Inc. Liquidating Trust, filed *Objection of the Circuit City Stores, Inc. Liquidating Trust to Claim No. 1487* [Dkt. No. 11868], seeking to disallow Claim No. 14787 in its entirety and for all purposes (the "Claim Objection").[5]

5.      As shown herein, there is no legal or equitable basis to deny Claim No. 14787, and the Claim Objection should be overruled.

## ARGUMENT AND AUTHORITIES

### I.      Claims Allowed in Bankruptcy Proceedings.

6.      The Bankruptcy Code broadly defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

---

[3] Upon further analysis, Chase has determined the amount associated with this category of damages equals $7,730,449.

[4] Upon further analysis, Chase has determined the amount associated with this category of damages equals $851,335, thereby making $8,581,784 the total sought for closure expenses for the Richmond and Kennesaw sites (as defined, *infra*, at ¶ 14) identified in categories 1 and 2.

[5] In March, 2013, Chase and the Trustee conducted a mediation in an effort to resolve the Claim Objection. Following the initial mediation, in response to various requests made by the Trustee, Chase provided numerous documents and other information in support of its claim. Despite the efforts of the parties to resolve the dispute, the mediation was unsuccessful.

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).

It also includes "a cause of action or right to payment that has not yet accrued or become

cognizable." 2 COLLIER ON BANKRUPTCY ¶ 101.05 at 101-38 (2011).

## II. The Trustee Bears The Initial Burden.

7.      A properly filed proof of claim is *prima facie* evidence of the validity and amount of

the claim. Fed. R. Bankr. P. 3001(f).  A claim is deemed allowed unless a party in interest objects.

11 U.S.C. § 502(a).  An objection creates a contested matter under Fed. R. Bankr. P. 9014.  The

objecting party bears the burden of proof to overcome the *prima facie* validity of the claim.   4

COLLIER ON BANKRUPTCY ¶ 502.02[3][f] at 502-17.  Only "[o]nce the presumption of *prima*

*facie* validity is overcome— *e.g.,* the objecting party establishes that the proof of claim lacks a

sound legal basis—the burden shifts to the claimant to support its proof of claim unless the claimant

would not bear that burden outside of bankruptcy." *In re MF Global Holdings Ltd*., 2012 WL

5499847 at *3 (Bankr. S.D.N.Y. 2012); *see also In re C-4 Media Cable South, L.P.,* 150 B.R. 374,

377 (Bankr. E.D. Va. 1992) ("a proof of claim constitutes prima facie evidence of the validity of a

claim.  An objector must overcome the prima facie validity of a claim to shift the burden of

production to the party who filed the claim.").

8.      The Trustee states that "[i]f an objection is made to the proof of claim, the creditor

has the ultimate burden of persuasion as to the validity and amount of the claim."  Claim Objection

at p.8.  The Trustee's representation, however, omits the critically important first step: as objector,

the Trustee must overcome the *prima facie* validity of Claim No. 14787 before he can shift any

burden to Chase.  As set forth below, the Trustee cannot overcome the *prima facie* validity of Claim

No. 14787, and Claim No. 14787, therefore, should be allowed.

III.    **The Court Should Allow Claim No. 14787 and Overrule or Deny the Objection.**

9.      Claim No. 14787 is valid and should be allowed in its entirety.  As detailed below, Chase is seeking reimbursement for those direct and general damages that it incurred as a result of Circuit City's breach.  These damages were the direct, natural and probable result of Circuit City's breach and were reasonably foreseeable by Circuit City at the time the parties entered into the Program Agreement, including the subsequent third amendment to the Program Agreement ("Amendment No. 3"), which amendment provides for the platform conversion to be implemented by both Chase and Circuit City.  Accordingly, as a matter of law, the Trustee's objection should be rejected and Claim No. 14787 should be allowed.

10.     The Trustee erroneously asserts that Claim No. 14787 "is comprised entirely of claims for lost profits and consequential and indirect damages that are not causally related to the rejection of the Program Agreement, were not within the contemplation of the parties when they entered into the Program Agreement, and are speculative and/or overstated in amount."

11.     In support of his argument, the Trustee attempts to rely on Section 11.26 of the Program Agreement.[6]  Section 11.26, however, does not support the Trustee's position.  First, Section 11.26 has no applicability where, as here, the parties are seeking direct damages.  Second, even if any of the damages could be found to constitute consequential or indirect damages, Section 11.26 allows for the recovery of consequential damages in the event of an "intentional breach," which occurred as a result of Circuit City's rejection of the Program Agreement.  Finally, even in the absence of an intentional breach, the exclusionary language of Section 11.26 does not apply to

---

[6] Section 11.26 of the Program Agreement provides as follows: "[n]otwithstanding anything to the contrary in this Agreement, in the absence of gross negligence, bad faith, willful misconduct, or **intentional breach** or repudiation of a party's obligations, [Chase] and [Circuit City] shall not be liable to the other under or in connection with this Agreement or the Program for any indirect, consequential or other damages relating to prospective profits, income, anticipated sales or investments, or goodwill, or for any punitive or exemplary damages. . . ."  Program Agreement § 11.26 (emphasis added).

the damages sought in this instance, since Section 11.26 only precludes consequential damages related to "prospective profits, income, anticipated sales or investments, or goodwill, or for any punitive or exemplary damages," none of which are being sought by Chase.  Accordingly, as discussed in more detail below, in the event any of the damages for which Chase seeks recovery are found not to constitute direct damages, they are still recoverable  under the terms of the Program Agreement.

### IV.    The Damages Incurred By Chase Are Direct Damages.

12.    The Agreement provides that it is governed by New York law.  New York law distinguishes between "direct" or "general" damages and "special" or "consequential" damages. *See, e.g., Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989) (citation omitted) ("General damages are those which are the natural and probable consequence of the breach while special damages are extraordinary in that they do not so directly flow from the breach.").

13.    General damages "are those which the law presumes will flow from a particular wrong and which everyone would expect to result in the ordinary course of events" while special or consequential damages "are those which are peculiar to a particular plaintiff and would not be expected to occur regularly as a result of a breach." *Commercial Damages,* by Charles L. Knapp, vol. I, "General and Special Damages" § 1.04, pp. 1-11.  This distinction is well-recognized. Specifically, "[general] damages are said to be the proximate result of a breach, and are sometimes called 'loss of bargain' damages because they reflect a failure on the part of the defendant to live up to the bargain it made, or a failure of the promised performance itself."  24 Samuel Williston & Richard A. Lord, *A Treatise on the Law Of Contracts* § 64:12.

14.    In Claim No. 14787, Chase seeks to recover five categories of damages: (1) costs related to the site closures in Richmond, Virginia ("<u>Richmond</u>") and Kennesaw, Georgia

("Kennesaw"); (2) product trade costs; (3) unamortized costs related to platform conversion and bounties; (4) destruction costs; and (5) attorney's fees and costs.

15.      As detailed below, these damages were the direct, natural and probable result of Circuit City's breach and were reasonably foreseeable by Circuit City at the time the parties entered into the Program Agreement.

### a.      Costs Related to Site Closures in Kennesaw and Richmond

16.      Damages incurred by Chase resulting from Circuit City's breach of the Program Agreement include approximately $8.6MM[7] in costs related to closing the Kennesaw and Richmond sites.  The costs Chase seeks to recover were reasonably foreseeable at the time of entry into the Program Agreement.  The establishment and maintenance of both the Richmond and Kennesaw facilities flow from specific contractual obligations to Circuit City, as documented below.

17.      The site closure costs that Chase seeks to recover in Claim No. 14787 include the following: (1) severance and outplacement; (2) staff recruitment and relocation costs to continue to collect the Circuit City accounts and other card products/partners after the closure of Kennesaw; (3) fixed asset write-offs; (4) site decommissioning costs; and (5) net lease expenses for Richmond through the June 30, 2012 lease expiration date, less sub-lease income.

18.      In support of its argument that costs related to the Kennesaw and Richmond site closings are nonrecoverable, the Trustee argues that "Chase made an independent decision to open call centers in Richmond, Virginia and Kennesaw, Georgia" and the call centers were opened for Chase's "own convenience, and not for the Debtors' benefit, or out of any obligation under the Agreement."  Claim Objection at pp. 12-13.  The Trustee is simply wrong.

---

[7] As noted in footnotes 3 and 4 above, the combined costs of the site closures have been revised from approximately $9.8MM to $8.6MM.

19.    The Trustee's assertions fail in the face of the plain language of the Program Agreement and the undisputed facts.  The unequivocal terms of the Program Agreement specifically required that ten (10) Chase marketing employees would be located near the Richmond headquarters of Circuit City.  *See* Program Agreement Ex. 2.1(d) **("[Chase] shall dedicate at least 10 individuals to the Program near [Circuit City's] offices to support marketing, direct mail, database management, and other Program activities.**") (emphasis added).

20.    Likewise, the Kennesaw site was not opened by Chase, but rather was established and operated by Circuit City in 1991, thirteen (13) years prior to the parties entering into the Program Agreement.  *See* Circuit City Annual 10-K (February 21, 2001).  The Kennesaw site was the site of Circuit City's wholly owned credit card bank subsidiary, First North American National Bank.  *See* Office of the Comptroller of the Currency, Public Disclosure, Community Reinvestment Act Performance Evaluation (February 2, 2001).  The Kennesaw facility was leased to Circuit City. In 2004, in connection with a Purchase and Sale Agreement dated as of January 16, 2004 (the "Purchase and Sale Agreement"), Circuit City sold its credit card operations (including both its private label credit cards and its co-branded Visa credit cards) to Bank One, now Chase.  A specific term of the Purchase and Sale Agreement required that Chase assume the Circuit City lease of the Kennesaw site.  *See* Purchase and Sale Agreement § 9.02(a)(iv) and § 9.03(a)(iv).  The Program Agreement was also entered into between the parties as part of the same sales transaction.

21.    It was foreseeable, therefore, and in fact necessary, to establish the Richmond site and to continue to use the Kennesaw facility.  It was likewise foreseeable that if Circuit City terminated the Program Agreement early, both the Richmond and Kennesaw facilities would lose their usefulness to Chase since they were specifically established by and/or for Circuit City.  Thus, the costs associated with the closure of the Richmond and Kennesaw sites were the direct result of

Circuit City's breach of the Program Agreement, and the direct damages sought by Chase in connection with the breach are required in order for Chase to realize the benefit of its bargain. *See Latham Land v. TGI Fridays*, 948 N.Y.S.2d 147, 151 (N.Y. App. Div. 2012) (holding plaintiff can recover for expectation damages flowing from defendants' breach, i.e. the loss of the benefit of its bargain and "these are direct damages 'which are the natural and probable consequence of the breach.'").

22.     In the alternative, because Chase acquired the obligations for the Richmond and Kennesaw facilities prior to the termination of the Program Agreement, the costs to close and decommission the Richmond and Kennesaw sites are reliance damages, representing Chase's wasted efforts resulting from Circuit City's breach of the Program Agreement. It is well-recognized under New York law that "as an alternative to expectation-based damages (which would include lost profits and benefit of bargain), a plaintiff may recover 'damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.'" *St. Lawrence v. Ogdensburg Bridge & Port Auth.*, 13 N.Y.3d 204, 208 (N.Y. 2009) (quoting *Restatement (Second) of Contracts* § 349). As noted by the court in *Am. Elec. Power Co., Inc. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 460, n. 44 (S.D.N.Y. 1976), "expenditures which are not incurred as a consequence of the breach, but were instead incurred before the breach occurred and in reliance on the contractual warranties, are recoverable as direct damages."

**b.     Product Trade Costs**

23.     The second general category of damages that Chase seeks to recover is comprised of $509,386 in <u>present value costs</u> incurred in product trade. Both the Circuit City private label credit

cards and co-branded Visa credit cards had Circuit City's logo prominently displayed on the card. Upon termination of the Program Agreement, the customer base had to be notified of what steps to take with respect to their existing Circuit City-branded credit cards and new cards without Circuit City branding had to be mailed.  In addition, statement messages for monthly statements had to be prepared and printed.

24.    The specific costs that Chase incurred included the costs associated with the following: (1) mailing notification; (2) email deployment notification; (3) email creative notification; (4) statement inserts notification; (5) statement messaging notification; and (6) card mailing conversion.

25.    Although Chase may have had to incur such costs if the contract continued to its scheduled termination, the need to expend these funds 3.8 years earlier than anticipated under the terms of the Program Agreement was a result of Circuit City's breach and therefore, for all the reasons discussed above, a direct and foreseeable element of damage resulting from the early termination of the Program Agreement.  *See, e.g., St. Lawrence*, 13 N.Y.3d at 208; *Hodes v. Hoffman Intern. Corp.,* 280 F. Supp. 252, 257 (S.D.N.Y. 1968); *Latham Land,* 948 N.Y.S.2d at 151.[8]

---

[8] A more complete description of the product trade costs and the discount rate analysis used for calculating  the applicable damages is as follows:

| | |
|---|---|
| Notification Mailing | $520,487 |
| Notification Email Deployment | $55,930 |
| Notification Email Creative | $5,800 |
| Notification Statement Inserts | $25,740 |
| Notification Statement Messaging | $15,980 |
| Conversion Plastic Mailing | $863,646 |
| **Total** | **$1,487,583** |
| No. of periods charge accelerated | 3.08 years |
| Projected future costs | $1,629,531 (3% annual inflation) |
| Discount Rate | 18% |
| Present value | $978,197 |
| **Product Trade Cost Damages** | **$509,386** |

### c.    Unamortized Platform Conversion Costs and Bounties

26.    The third category of damages that Chase has incurred and for which it seeks reimbursement includes $20,846,025 in unamortized costs related to platform conversion and $2,114,886 in unamortized bounties.  The Circuit City cardholder base was converted from Circuit City's platform operating system to the Chase platform operating system in August 2008.  Chase and Circuit City specifically agreed to the platform conversion, and Chase paid Circuit City $7 million for the conversion in accordance with Amendment No. 3 to the Program Agreement, dated as of October 24, 2007.

27.    The platform conversion cost Chase over $24 million in total.[9]  The costs associated with the initial conversion included the following: (1) internal development hours; (2) external resources development hours; (3) operations and training; (4) infrastructure/hardware; (5) hardware installation; (6) deconversion costs; (7) external vendor costs; (8) employee severance/retention costs; and (9) Circuit City support payment.

28.    The conversion was finalized in August 2008.  The period over which this cost would have been amortized, therefore, was from September 2008 through the May 2012 end date of

---

[9] **Conversion Costs**

| | |
|---|---|
| Internal Development Hours | $6,732,000 |
| External Resources Development Hours | $5,612,000 |
| Operations & Training | $44,000 |
| Infrastructure/Hardware | $2,408,000 |
| Hardware Installation | $5,000 |
| Deconversion Costs | $91,000 |
| External Vendor Costs | $750,000 |
| Employee Severance/Retention Costs | $1,412,000 |
| Circuit City Support Payment | $7,000,000 |
| **Total conversion costs spent** | **$24,053,106** |

45 months benefit time (Sept. '08 through May '12) *(from conversion implementation through original Program Agreement end date)*

**Amortization recognized through Feb. 2009 (when the Program Agreement was rejected)**
**$3,207,081**

**Unamortized costs**                                    **$20,846,025**

the Program Agreement.  Approximately $3.2 million of this cost was amortized at the time of Circuit City's breach and is not included in Chase's damage claim.

29.    Although the Trustee implies that some of the damages incurred relate to work performed for the benefit of other Chase customers,  that is not the case.  Chase tracked and assigned unique project codes to any work performed for Circuit City regarding the platform conversion.  In contrast, work that benefitted a separate business line or other Chase customers was reported under separate project codes.[10]  All of the costs and expenses were tracked separately and only those costs related to Circuit City have been included in the damages claimed for platform conversion.

30.    In addition, Chase paid bounties to Circuit City for new accounts opened by Circuit City personnel.  In turn, Circuit City paid its employees a bounty for each new private-label and co-branded Circuit City credit card account.  The payment of bounties was an agreed-upon contractual provision of the Program Agreement and was paid by Chase as an incentive to Circuit City employees to encourage customers to open new credit card accounts.  *See* Program Agreement Ex. 2.6(a); *see also* Circuit City's May 2004 8-K.  The average life of an account was 36 months.  Thus, for accounts opened within 36 months of the rejection of the Program Agreement, Chase could not fully recover its investment for these bounties.

---

[10] Examples of IT codes used to track the costs of conversion separately between Circuit City and other customers involved in the conversion are the following:

Circuit City codes:

- 10056318 Circuit City Insource Output - Project Technology Development
- 37750603 Circuit City Conversion - March Release - Project Technology Development
- 37754608 Circuit City Conversion - June Release- Project Technology Development

Non-Circuit City codes [**Dan and Bran, are there any confidentiality concerns about including this information?**]:

- 9989349 Chase Healthcare Financing - 2008 Target State - Project Technology Development
- 11737383 Healthcare Savings - Project Technology Development
- 8502959 GI-Healthcare Elective - Project Technology Development

31.     As the non-breaching party, Chase is entitled to recover "an award of damages [that] will put [Chase] in the same position [it] would have occupied had the contract been performed." *Tractebel Energy Mkt., Inc. v. AEP Power Mkt., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007).   The unamortized costs related to platform conversion and unamortized bounties are direct and foreseeable losses resulting from the early termination of the Program Agreement and, accordingly, constitute direct and recoverable damages.  *See Latham Land,* 948 N.Y.S.2d at 151 (allowing lessee to recover as direct damages the loss of the value of the leasehold interest as the "value of the promised performance"); *Schultz v. Onan Corp.,* 737 F.2d 339, 348 (3d Cir. 1984) (distinguishing between lost profits and recoverable "unrecouped expenditures" that "includes any unamortized capital expenditures that would have produced future profits (or reduced future costs)").

32.     In addition, Chase incurred the unamortized costs related to platform conversion and unamortized bounties in reliance on Circuit City fulfilling its obligations under the Program Agreement.  In *Applied Data Processing, Inc. v. Burroughs Corp*., 394 F. Supp. 504, 508 (D. Conn. 1975), the court held that a lessee could recover as reliance damages those expenses involved in converting from a competitor's computer language to the lessor's computer language since those expenses were incurred before the breach and the lessor "knew the costs would be incurred and that they would be valueless if [the lessor] did not fulfill its obligation."  New York law recognizes that a plaintiff may recover damages incurred for its reliance on a contract in making expenditures in preparation for performance or in the performance of the contract's terms.  *See supra St. Lawrence*, 13 N.Y.3d at 208 and *Am. Elec. Power Co.,* 418 F. Supp. at 460 at ¶ 22.  The platform conversion and the payment of the bounties were specifically provided for in the Program Agreement, the costs of which are, therefore, recoverable as reliance damages.

33.     The cases relied upon by the Trustee in the Claim Objection are inapposite.  The sole issue before the courts in *EPN Ingenieria S.A. de C.V. v. GE*, 1996 U.S. Dist. LEXIS 136687 (S.D.N.Y. 1996) and *Int'l Gateway Exch., LLC v. Western Union Fin. Servs.*, 333 F. Supp. 2d 131, 150 (S.D.N.Y. 2004), was the recoverability of lost future profits.  Here, Chase is not seeking lost profits; Chase seeks only to recover its investment.  Likewise, the damages at issue in *Carco Group, Inc. v. Maconachy*, 2010 U.S. App. LEXIS 13574, 4-5 (2d Cir. 2010) resulted from plaintiff's "inability to secure new business" and were "consequential" damages.  Equally irrelevant is *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004), which involved allegations of a supervening event.  There is no allegation of a supervening event here.  To the contrary, all of the damages for which Chase seeks recovery were the direct and proximate result of Circuit City's breach.

34.     Circuit City was undeniably aware that Chase incurred platform conversion costs and bounties as a result of its specific contractual obligations under the Program Agreement, as these costs were incurred well before the breach occurred.  Chase incurred these costs, including the $7 million payment to Circuit City due under Amendment No. 3, in reliance on Circuit City fulfilling its contractual obligations to Chase, and with the knowledge of both parties that continued performance by Circuit City would allow Chase to amortize these costs and thereby recoup some benefit.  Chase is, accordingly, entitled to recover its expectation damages, *i.e.*, the "loss of the benefit of its bargain," *Latham Land,* 948 N.Y.S.2d. at 151.  Platform conversion costs and bounties are recoverable as direct damages flowing from Circuit City's breach.

### d.    Destruction of Surplus Plastic Credit Cards and Other Supplies

35.     Chase is entitled to recover $292,671 for costs it incurred destroying surplus plastic credit cards and other supplies as a result of Circuit City's breach.  In connection with operations

under the Program Agreement, Chase was required to print and prepare certain literature and plastic credit cards bearing Circuit City's name. The Program Agreement mandated the specifications of various printed materials and also provided certain "Critical Performance Standards," such as mailing a new credit card within 4 business days from approval of an application. *See* Program Agreement, §§ 3.6(e), Ex. 2.1(b) & Ex. 3.12. To comply with its contractual obligations under the Program Agreement, Chase had to maintain a stock of material to distribute to customers bearing Circuit City's name or other identifying marks. Upon rejection of the Program Agreement, Chase incurred costs it could not recover for the following materials and supplies that were worthless and had to be destroyed: (1) brochures; (2) welcome letters; (3) privacy policies; (4) envelopes; (5) card member agreements; (6) arbitration labels; (7) plastic credit cards; and (8) instant credit brochures.[11]

36.    Destruction of surplus materials due to the early termination of the Program Agreement caused direct damages to Chase. *See, e.g., Rock Creek Ginger Ale Co., Inc. v. Thermice Corp.,* 352 F. Supp. 522 (D.D.C. 1971) (damages incurred as the result of sale of defective product to bottler included the costs of production and destruction of product). Destruction of surplus materials is analogous to storage costs or other costs "normally incurred when a buyer (or a seller) repudiates the contract or wrongfully rejects the goods causing the other to incur such expenses as transporting, storing or reselling the goods." *Petroleo Basileiro, S.A., Pietro v. Ameropan Oil*

---

[11] **Costs to Destroy Surplus Plastic/ Physical Credit Cards and Other Supplies**

| Category | Units Destroyed | Value |
|---|---|---|
| Brochures | 769,900 | $30,180.08 |
| Welcome Letters | 898,100 | $21,958.55 |
| Privacy Policy | 956,650 | $13,632.26 |
| Envelopes | 734,000 | $10,268.66 |
| Card Member Agreements | 710,289 | $27,346.13 |
| Activation Labels | 1,925,000 | $7,392.00 |
| Plastic/ Physical Credit Cards | 1,211,222 | $96,897.76 |
| Instant Credit Brochure | 629,900 | $84,995.93 |
| **Total** | **7,835,061** | **$292,671.36** |

*Corp.,* 372 F. Supp. 503, 508 (E.D.N.Y. 1974) (applying UCC and distinguishing direct or "incidental" damages from consequential damages.").

37.    Alternatively, the cost of creating the surplus plastic credit cards and supplies, incurred prior to the breach, is a reliance damage.  *See St. Lawrence,* 13 N.Y.3d at 208; *Hodes,* 280 F. Supp. at 257 (awarding damages for cost of material that plaintiff purchased to enable it to perform contract, less any value realized upon resale of material); *Am. Elec. Power Co.,* 418 F. Supp. at 460 ("expenditures which are not incurred as a consequence of the breach, but were instead incurred before the breach occurred and in reliance on the contractual warranties, are recoverable as direct damages.").

**e.    Attorneys' Fees**

38.    Chase's attorneys' fees should be awarded in accordance with the terms of the Program Agreement as direct damages resulting from Circuit City's breach.  The Program Agreement provides that Circuit City will indemnify Chase for "any and all losses, damages, liabilities, costs, and expenses (including reasonable attorney's fees and expenses) . . . ." (Program Agreement §10.1) resulting from any breach by Circuit City.

39.    The Trustee does not even attempt to argue that Chase is not entitled to recover attorneys' fees.  Rather, the Trustee makes conclusory allegations regarding the reasonableness of the fees.  In short, the attorneys' fees for which Chase seeks recovery directly resulted from Circuit City's breach of the Program Agreement, and the fees charged for the services performed in the case are reasonable.

**V.    Chase's Damages Are Recoverable Even If They Are Not Direct.**

40.    As detailed above, the damages incurred by Chase are direct damages arising from Circuit City's breach of the Program Agreement.  In short, the "promised performance" under the

Program Agreement obligated Circuit City to continue honoring the credit program until the agreed termination date. Chase's damages are the foreseeable, direct and natural result of Circuit City's breach. Accordingly, compensation for Circuit City's failure to provide its "promised performance" under the Program Agreement constitutes direct damages.

41.    In the event, however, that any of the foregoing damages for which Chase seeks recovery may be found not to constitute direct damages, they are still recoverable by Chase. While direct damages are the natural and probable result of a breach, special or consequential damages "are extraordinary in that they do not so directly flow from the breach." *Am. List Corp.,* 549 N.E.2d at 1164. As Corbin explains, "[t]he term 'consequential damages' has often been used with respect to harm suffered as a 'consequence' of the breach of duty, but not as a direct and immediate and foreseeable consequence." 2 Arthur L. Corbin, *Corbin on Contracts* § 1011; *see also Commercial Damages,* by Charles L. Knapp, vol. I, "General and Special Damages" § l.04, p.1-11 (Special or consequential damages "are those which are peculiar to a particular plaintiff and would not be expected to occur regularly as a result of a breach.").

> **a.    The Program Agreement Allows Consequential Damages in the Event of an "Intentional Breach," Which Occurred as a Result of Circuit City's Rejection.**

42.    The Program Agreement specifically allows for the recovery of consequential damages if there is an "intentional breach" of the Program Agreement. Program Agreement § 11.26. In this instance, Circuit City's rejection of the Program Agreement constituted an intentional breach. *See In re Calpine Corporation*, 337 B.R. 27, 34 (Bankr. S.D.N.Y. 2006) ("[R]ejection [under section 365(a)] amounts to an intentional breach of the contract, transforming the contractual obligations into a claim for damages treated as all other unsecured claims for damages against the estate."). *In re Salvino*, 373 B.R. 578, 591 (Bankr. N.D. Ill. 2007) supports this well-accepted

principle, with the Court finding that "the rejection of an executory contract is a breach (as specified by 365(g)), always intentional, that will almost certainly harm the other party. . . ."

43.    The Trustee's argument that the Program Agreement wholly excludes consequential damages ignores the express language in Section 11.26 regarding intentional breaches.  The Trustee cannot ignore the plain language of the Program Agreement.  The law prevents parties, like Circuit City, from evading contractual liability by ignoring or varying the plain language of their agreements.  Exculpatory clauses, such as Section 11.26 of the Program Agreement, are narrowly construed against the party seeking their enforcement.  *See Vanderlinde Elec. Corp. v. City of Rochester,* 388 N.Y.S.2d 388, 391 (N.Y. App. Div. 1976) ("'No damage' clauses are not always absolute and they must be strictly construed against the party seeking to avoid liability."); *see also Toyomenka, Inc. v. S. S. Tosaharu Maru,* 523 F.2d 518, 520-21 (2d Cir. 1975) (a limitation of common law liability, "must be clearly expressed" and "strictly construed against the parties whom it is claimed to benefit.").

**b.    Even in the Absence of an Intentional Breach, the Exclusionary Language of Section 11.26 Does Not Apply.**

44.    Regardless of whether there was an intentional breach, the Program Agreement does not exclude any consequential damages being sought by Chase.  Section 11.26 of the Program Agreement limits the types of consequential damages that cannot be recovered in certain instances to damages for "prospective profits, income, anticipated sales or investments, or goodwill, or for any punitive or exemplary damages."  Chase is not seeking any such damages.  The Trustee completely mischaracterizes all of Chase's damages as consequential "lost profits."  Chase has not sought the recovery of any lost profits or any damages excluded by Section 11.26 of the Program Agreement.

18

**VI.    The Trustee's Putative Defense of Mitigation Is Unavailing.**

45.    The Trustee argues in the Claim Objection that Chase's damages from the Kennesaw and Richmond site closures and surplus plastic credit cards and other supplies are overstated because Chase had a duty to mitigate.  To the extent that Chase, as the non-breaching party, is under a duty to mitigate damages, there can be no practical mitigation argument here as to the site closures given the specific and limited purpose of the Richmond and Kennesaw sites.

46.    All of the work and the personnel at the Richmond site were dedicated and limited exclusively to Circuit City credit card operations.  The vast majority of all work and personnel at the Kennesaw site was likewise dedicated exclusively to Circuit City credit card operations.  This is evidenced by the fact that 99.90% of all credit card accounts serviced at the Kennesaw location were Circuit City-branded accounts.  This percentage is reflected by the number of accounts that were converted from the legacy Circuit City system platform to the Chase platform in the months just prior to the Circuit City bankruptcy filing.

47.    Given the limited number of personnel on site in Richmond, and the continuation of the facilities in Kennesaw as they were originally developed and taken over by Chase from Circuit City, Circuit City's mitigation argument fails.

48.    Likewise, because the surplus plastics credit cards and other supplies at issue were private label and co-branded products bearing Circuit City's identification, any mitigation argument relevant to destruction of the supplies is irrelevant.  The creation of the surplus plastic material and other supplies in anticipation of the ongoing business relationship was a foreseeable, necessary, and ascertainable result of the Program Agreement, and the cost of the destruction of the materials should be awarded for Chase's wasted efforts.

49.    All of the costs related to the closure of the Richmond and Kennesaw sites are foreseeable damages directly flowing from Circuit City's breach and, therefore, recoverable by Chase.

**VII.    The Trustee's Putative Defense of Speculation Is Unavailing.**

50.    The Trustee argues that many of the categories of damages that Chase seeks to recover, including, specifically, the product trade costs, cannot be recovered as the amount of damage is "purely speculative, and cannot be stated with any reasonable certainty."    Claim Objection at p. 14; see also *id.* at pp. 6, 7, & 9.   The Trustee does not rely upon any case law, nor can he because under New York law, when applied to direct damages, the requirement that damages be reasonably certain applies to the fact of damage and not the amount of damages.   *See, e.g., Tractebel Energy Mkt., Inc.,* 487 F.3d at 110.    Applying New York law, the Second Circuit emphasizes that a breaching party should not be allowed to escape liability merely because of uncertainty in the amount of damage it caused.   *Id.* ("[T]he burden of uncertainty as to the amount of damages is upon the wrongdoer. . . . The plaintiff need only show a 'stable foundation for a reasonable estimate' of the damage incurred as a result of the breach.") (citations omitted).

51.    Here, all of the damages that Chase seeks to recover are specific and quantified. Each category of damages Chase seeks to recover is the result of actual losses that Chase incurred as a result of Circuit City's breach (*i.e.*, rejection) of the Program Agreement more than three years early.   Chase has not sought damages that may be considered speculative.   Instead, Chase seeks specific elements of damage it incurred as a result of the credit card program ending early.

**VI.    Conclusion.**

52.    All of the costs incurred by Chase are the natural and direct result of Circuit City's breach and recoverable by Chase as direct damages.   Even if any of the damages sought by Chase are found not to constitute direct damages and are consequential or indirect damages, they are

recoverable.  If any of Chase's damages are deemed consequential, they are still recoverable under the express language in Section 11.26 of the Program Agreement, both because of Circuit City's intentional breach, and because Section 11.26 does not apply to the type of damages being sought.

WHEREFORE, Chase requests that the Court overrule and deny Trustee's Objection to Claim No. 14787, allow Claim No. 14787, grant Chase its costs and attorneys' fees incurred in connection with this matter, and grant Chase such other and further relief as may be deemed appropriate.

Dated:  Richmond, Virginia
       August 20, 2013

Respectfully submitted,


By: /s/ Michael A. Condyles
    Michael A. Condyles, Esq. (Va. Bar No. 27807)
    KUTAK ROCK, LLP
    1111 East Main Street, Suite 800
    Richmond, Virginia  23219
    (804) 644-1700
    -and-
    WEIL, GOTSHAL & MANGES LLP
    Gary T. Holtzer, Esq.
    767 Fifth Avenue
    New York, New York 10153
    (212) 310-8000

    *Attorneys for Chase Bank USA, National Association*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 20, 2013, a true and exact copy of the foregoing was served via electronic means on the following:

Andrew W. Caine, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard
Los Angeles, CA 90067-4100

Lynn L. Tavenner, Esq.
Paula S. Beran, Esq.
Tavenner & Beran, PLC
20 North Eighth Street, 2nd Floor
Richmond, VA 23219

/s/  Michael A. Condyles
                    Counsel