## SEPARATION AGREEMENT

THIS SEPARATION AGREEMENT, dated as of May 21, 2002, by and between Circuit City Stores, Inc., a Virginia corporation ("Circuit City Stores"), and CarMax, Inc., a Virginia corporation ("CarMax");

WHEREAS, CarMax is a direct wholly owned Subsidiary of Circuit City Stores, and the CarMax Subsidiaries are direct or indirect wholly owned Subsidiaries of CarMax;

WHEREAS, Circuit City Stores has filed under the Securities Act with the Securities and Exchange Commission a registration statement on Form S-4 (File No. 333-85240) (as amended, the "Registration Statement");

WHEREAS, Circuit City Stores will distribute to all Circuit City Stockholders the proxy statement/prospectus (the "Proxy/Prospectus") included in the Registration Statement soliciting Circuit City Stockholders' approval, among other things, of a comprehensive plan (including an amendment to the Articles necessary to effect such plan (the "Amendment")) to separate CarMax from Circuit City Stores so that CarMax would become an independent, separately traded public company (the "Separation");

WHEREAS, the Separation will be effected by (i) the redemption of all CarMax Group Stock by Circuit City Stores in exchange for shares of common stock, par value $.50 per share, of CarMax, Inc. (the "CarMax Common Stock") in accordance with paragraph B(5)(b)(i) of Article V of the Articles (the "Redemption") and (ii) the distribution of CarMax Common Stock as a dividend by Circuit City Stores to all holders of its Circuit City Group Stock (the "Distribution");

WHEREAS, Circuit City Stores and CarMax wish to provide for certain payments to be made by CarMax to Circuit City Stores in connection with the Separation and for certain relationships to exist between Circuit City Stores and CarMax after the Separation;

WHEREAS, the Board has determined that the Separation will, among other things, allow Circuit City Stores and CarMax to better focus on their respective businesses by (i) alleviating capital restraints currently imposed on CarMax because of its affiliation with Circuit City Stores, (ii) allowing Circuit City Stores and CarMax to establish the most appropriate capital structures for their respective businesses, (iii) allowing Circuit City Stores and CarMax to create appropriate retirement arrangements for the employees of each business and (iv) allowing CarMax to conduct business with the most appropriate vendors;

WHEREAS, the Board has unanimously approved and declared the advisability of this Agreement and the transactions and future actions contemplated hereby, including, without limitation, the Separation, the Redemption, the Distribution and the Amendment;

WHEREAS, it is the intention of Circuit City Stores and CarMax that the Separation be a tax-free transaction under Section 355 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder;

WHEREAS, Morgan Stanley & Co. Incorporated has rendered to the Board an opinion respecting the fairness from a financial point of view of the Separation to the holders of Circuit City Group Stock and the holders of CarMax Group Stock;

WHEREAS, paragraph B(5)(b)(i) of Article V of the Articles permits the Board at any time at which all of the assets and liabilities attributed to the CarMax Group (and no other assets or liabilities of Circuit City Stores or any subsidiary thereof) are held directly or indirectly by a wholly owned subsidiary of Circuit City Stores, to redeem all of its outstanding CarMax Group Stock in exchange for the number of shares of common stock of such subsidiary equal to the number of such shares to be outstanding immediately following such exchange of shares multiplied by the "Outstanding CarMax Fraction" (as defined in the Articles);

WHEREAS, Circuit City Stores and the Board intend that all of the assets and liabilities of Circuit City Stores and its subsidiaries attributed to the CarMax Group (and no other assets or liabilities of Circuit City Stores or any subsidiary thereof) will be held by CarMax or one of the CarMax Subsidiaries at or prior to the time the Separation is consummated; and

WHEREAS, when the Amendment becomes effective, the CarMax Group Assets and the CarMax Group Liabilities will constitute, pursuant to the Articles, all of the assets and liabilities attributed to the CarMax Group (and no other assets or liabilities of Circuit City Stores or any subsidiary thereof);

NOW, THEREFORE, in consideration of the foregoing and the mutual promises set forth hereinafter, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

Section 1.1    Definitions.

"Affiliate" of any Person shall mean any Person directly or indirectly controlling, controlled by, or under common control with, such Person; *provided* that, for the purposes of this definition, "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or partnership interests, by contract or otherwise.

"Action" shall mean any action, claim (whether or not filed), suit, arbitration, inquiry, demand, proceeding or investigation.

"Agreement" shall mean this Separation Agreement.

"Allocation Policies" shall mean those certain allocation policies adopted by the Board since October 14, 1996 with respect to the Circuit City Group and the CarMax Group.

"Amendment" shall have the meaning given to such term in the recitals of this Agreement.

"Ancillary Contracts" shall mean the Tax Allocation Agreement, the Transition Services Agreement, the Employee Benefits Agreement and the Confidentiality Agreement.

"Articles" shall mean the Amended and Restated Articles of Incorporation of Circuit City Stores, as amended.

"Beneficial Assets" shall have the meaning given to such term in Section 2.8 of this Agreement.

"Board" shall mean the Board of Directors of Circuit City Stores.

"Business Day" shall mean a day other than a Saturday, a Sunday or a day on which banks in New York, New York or Richmond, Virginia are permitted or required to close.

"CarMax" shall have the meaning given to such term in the recitals of this Agreement.

"CarMax Action" shall have the meaning given to such term in Section 8.4(b) of this Agreement.

"CarMax Common Stock" shall have the meaning given to such term in the recitals to this Agreement.

"CarMax Group" shall mean, as of any date (i) all assets and liabilities of Circuit City Stores and its Subsidiaries attributed by the Board to the CarMax Group, (ii) all properties and assets transferred to the CarMax Group from the Circuit City Group pursuant to transactions in the ordinary course of business of the Circuit City Group and the CarMax Group or otherwise as the Board may have directed as permitted by the Articles and (iii) the interest of Circuit City Stores or any of its Subsidiaries in any business or asset acquired and any liabilities assumed by Circuit City Stores or any of its Subsidiaries outside of the ordinary course of business and attributed to the CarMax Group, as determined by the Board.

"CarMax Group Assets" shall mean all of the following assets of Circuit City Stores and its Subsidiaries: (i) all assets held by CarMax or one of the CarMax Subsidiaries on the date hereof which are assets of the CarMax Group under clauses (i), (ii), (iii), (iv) or (v) of paragraph B(7)(a) of Article V of the Articles; (ii) to the extent not included in other clauses of this definition, all assets attributed or transferred after the date hereof and on or before the Redemption Date, to the CarMax Group pursuant to action of the Board under paragraph B(7)(a) of Article V of the Articles; and (iii) to the extent not included in other clauses of this definition, any asset or assets arising after the Redemption Date that would have been attributed or transferred to the CarMax Group in accordance with paragraph B(7)(a) of Article V of the Articles had such asset or assets arisen prior to the Redemption Date; with such changes to the assets described in the clauses of this definition (including additions and subtractions) as are

contemplated by this Agreement or otherwise shall have occurred or shall occur in the ordinary course of the business of the CarMax Group after the date hereof.

"CarMax Group Liabilities" shall mean all of the following liabilities of Circuit City Stores and its Subsidiaries: (i) liabilities held by CarMax or one of the CarMax Subsidiaries on the date hereof which are liabilities of the CarMax Group under clauses (i), (ii) or (v) of paragraph B(7)(a) of Article V of the Articles; (ii) to the extent not included in other clauses of this definition, all liabilities attributed, after the date hereof and on or prior to the Redemption Date, to the CarMax Group pursuant to action of the Board under paragraph B(7)(a) of Article V of the Articles; and (iii) to the extent not included in the other clauses of this definition, any liability or liabilities arising after the Redemption Date that would have been attributed or transferred to the CarMax Group in accordance with paragraph B(7)(a) of Article V of the Articles had such liability or liabilities arisen prior to the Redemption Date; with such changes to the liabilities described in the clauses of this definition (including additions and subtractions) as are contemplated by this Agreement or otherwise shall have occurred or shall occur in the ordinary course of the business of the CarMax Group after the date hereof.

"CarMax Group Stock" shall mean Circuit City Stores, Inc.–CarMax Group Common Stock, par value $.50 per share.

"CarMax Subsidiaries" shall mean all of the Subsidiaries of CarMax, which Subsidiaries are listed on Schedule 1.1 hereto.

"Circuit City Action" shall have the meaning given to such term in Section 8.4(a) of this Agreement.

"Circuit City Group" shall mean, as of any date (i) the interest of Circuit City Stores or any of its Subsidiaries on such date in all of the assets, liabilities and businesses of Circuit City Stores or any of its Subsidiaries (and any successor companies), other than any assets, liabilities and businesses attributed in accordance with the Articles to the CarMax Group, (ii) all properties and assets transferred to the Circuit City Group from the CarMax Group pursuant to transactions in the ordinary course of business of both the Circuit City Group and the CarMax Group or otherwise as the Board may have directed as permitted by the Articles and (iii) the interest of Circuit City Stores or any of its Subsidiaries in any business or asset acquired and any liabilities assumed by Circuit City Stores or any of its Subsidiaries outside of the ordinary course of business and attributed to the Circuit City Group, as determined by the Board.

"Circuit City Group Stock" shall mean Circuit City Stores, Inc.–Circuit City Group Common Stock, par value $.50 per share.

"Circuit City Indemnified Persons" shall have the meaning given to such term in Section 4.1 of this Agreement.

"Circuit City Stockholders" shall mean, collectively, the holders of the Circuit City Group Stock and the holders of the CarMax Group Stock.

"Circuit City Stores" shall have the meaning given to such term in the recitals of this Agreement.

"Circuit City Stores Information" shall mean (i) all information contained in the Proxy/Prospectus under the captions "Circuit City Stores, Inc. Selected Historical Consolidated Financial Information," "Circuit City Group Selected Historical Financial Information," "Circuit City Stores, Inc. Selected Unaudited Pro Forma Consolidated Financial Information," "Risk Factors—Risk Factors Relating to the Circuit City Business," "Information about Circuit City Stores after the Separation" and (ii) all information not explicitly relating to CarMax or to the CarMax Group contained in the Proxy/Prospectus under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations of Circuit City Stores, Inc.," "Special Note Regarding Forward-Looking Statements" and "Annex E—Circuit City Stores, Inc. Historical Consolidated Financial Statements."

"Circuit City Subsidiaries" shall mean the Subsidiaries of Circuit City Stores other than CarMax and the CarMax Subsidiaries.

"Closing" shall have the meaning given to such term in Section 9.1 of this Agreement.

"Closing Intercompany Amount" shall have the meaning given to such term in Section 2.6(b) of this Agreement.

"Confidentiality Agreement" shall have the meaning given to such term in Section 7.2 of this Agreement.

"Corporate Contract" shall have the meaning given to such term in Section 8.1 of this Agreement.

"Deeds and Assignments" shall have the meaning given to such term in Section 2.3 hereof.

"Dispute" shall have the meaning given to such term in Section 10.1(a) hereof.

"Dispute Notice" shall have the meaning given to such term in Section 10.1(a) hereof.

"Distribution" shall have the meaning given to such term in the recitals of this Agreement.

"Effective Date" shall have the meaning given to such term in Section 2.1 of this Agreement.

"Employee Benefits Agreement" shall have the meaning given to such term in Section 6.1.

"Excluded Liabilities" shall have the meaning given to such term in Section 2.4 hereof.

"Fairness Opinion" shall have the meaning given to such term in the recitals of this Agreement.

"Final Intercompany Amount" shall have the meaning given to such term in Section 2.6(d) of this Agreement.

"Governmental Authority" shall mean any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any domestic or foreign state, county, city or other political subdivision.

"Indemnified Party" shall have the meaning given to such term in Section 4.4(b) of this Agreement.

"Indemnifying Party" shall have the meaning given to such term in Section 4.4(b) of this Agreement.

"Instruments of Assumption" shall have the meaning given to such term in Section 2.5 hereof.

"Insurance Administration" shall mean, with respect to each Joint Insurance Arrangement, (i) the accounting for premiums, retrospectively rated premiums, defense costs, indemnity payments, deductibles and retentions, as appropriate under the terms and conditions of each of the Joint Insurance Arrangements, (ii) the reporting to Insurers of any losses or claims that may cause the per occurrence, per claim or aggregate limits of any Joint Insurance Arrangement to be exceeded and (iii) the processing of claims made under the Joint Insurance Arrangements, including, without limitation, the reporting of claims to the Insurers' management and defense of claims and providing for appropriate releases upon settlement of claims.

"Insurance Arrangements" shall mean insurance policies and insurance contracts of any kind (other than insurance policies and insurance contracts which are employee benefit plans or as provided by the Employee Benefits Agreement), including, without limitation, primary and excess policies, commercial general liability policies, automobile policies, product liability policies, directors' and officers' liability policies, fiduciary liability policies, workers' compensation policies, and self-insurance programs and captive insurance company arrangements, together with the rights, benefits and privileges thereunder.

"Insurance Proceeds" shall mean those monies received by an insured from an Insurer or paid by an Insurer on behalf of an insured, in either case net of any applicable premium adjustment, retrospectively rated premium, deductible, retention or cost of reserve paid or held by or for the benefit of such insured.

"Insured Claims" shall mean those liabilities which, individually or in the aggregate, are covered within the terms and conditions of any of the Joint Insurance

Arrangements, whether or not subject to deductibles, co-insurance, uncollectability or retrospectively rated premium adjustments.

"Insurer" shall mean a third party insurance carrier.

"Intellectual Property" shall mean all patents, trademarks, trade names, service marks, copyrights together with any registrations and applications therefor, Internet domain names, net lists, schematics, inventories, technology, trade secrets, source codes, know-how, computer software programs or applications, including, without limitation, all object and source codes and tangible or intangible proprietary information or material.

"Intercompany Amount" shall have the meaning given to such term in Section 2.6(a) of this Agreement.

"Joint Insurance Arrangements" shall mean the Insurance Arrangements of Circuit City Stores or any of its Subsidiaries existing at the Redemption Date and/or prior thereto that are owned or maintained by or on behalf of Circuit City Stores or any of its Subsidiaries and that relate to both (a) the Circuit City Group and/or any of the assets or liabilities thereof and (b) the CarMax Group and/or any of the CarMax Group Assets or any of the CarMax Group Liabilities.

"liability" shall mean any liability, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, and whether or not the same that is or would properly be reflected on a balance sheet of Circuit City Stores or the Circuit City Group or the CarMax Group, or the notes thereto, including all costs and expenses relating thereto.

"Losses" shall have the meaning given to such term in Section 4.1 of this Agreement.

"Notice of Redemption" shall mean the Notice of Redemption to be sent to holders of CarMax Group Stock pursuant to paragraph B(5)(d)(vi) of Article V of the Articles.

"Person" shall mean and include an association, an individual, a partnership, a joint venture, a joint stock company, a corporation, a trust, an unincorporated organization, a limited liability company, a group, a government or other department or agency thereof and any other entity.

"Property Rights" shall have the meaning given to such term in Section 8.2(b) of this Agreement.

"Proxy/Prospectus" shall have the meaning given to such term in the recitals of this Agreement.

"Real Property" shall have the meaning given to such term in Section 2.2(a) of this Agreement.

"Real Property Rights" shall have the meaning given to such term in Section 8.2(a) of this Agreement.

"Redemption" shall have the meaning given to such term in the recitals of this Agreement.

"Redemption Date" shall mean the date on which the Redemption occurs.

"Registration Statement" shall have the meaning given to such term in the recitals of this Agreement.

"Released Parties" shall have the meaning given such term in Section 3.1 of this Agreement.

"Response" shall have the meaning given to such term in Section 10.1(a) hereof.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the Rules and Regulations promulgated thereunder.

"Senior Party Representative" shall have the meaning given to such term in Section 10.1(a) hereof.

"Separation" shall have the meaning given to such term in the recitals of this Agreement.

"Special Dividend" shall have the meaning given to such term in Section 8.6 of this Agreement.

"Spincos" shall mean CarMax and the CarMax Subsidiaries.

"Spinco Indemnified Persons" shall have the meaning given to such term in Section 4.2 of this Agreement.

"Subsidiary" shall mean, with respect to any Person, (x) any partnership of which such Person or any of its subsidiaries is a general partner or (y) any other entity in which such Person or any of its subsidiaries owns or has the power to vote more than 50% of the equity interests in such entity having general voting power to participate in the election of the governing body of such entity.

"Tax" shall mean all Federal, state, local and foreign tax or taxes, and other assessments of a similar nature (whether imposed directly or through a withholding), including any interest, additions to tax or penalties applicable thereto.

"Tax Allocation Agreement" shall have the meaning given to such term in Section 8.7.

"Transition Services Agreement" shall have the meaning given to such term in Section 8.8.

"Transaction Liabilities" shall have the meaning given to such term in Section 4.1(b) of this Agreement.

## ARTICLE II
## TRANSFER OF ASSETS AND LIABILITIES

Section 2.1    Effective Date. This Agreement shall become effective upon the date that the Proxy/Prospectus is first mailed to Circuit City Stockholders (the "Effective Date").

Section 2.2    CarMax Group Assets to Be Contributed to Spincos on or Prior to the Redemption Date. On or prior to the Redemption Date, Circuit City Stores will, or will cause the Circuit City Subsidiaries to, transfer, convey, assign and deliver to one of the Spincos designated by CarMax any remaining CarMax Group Assets held by Circuit City Stores or any Circuit City Subsidiary, including, without limitation:

(a)    all interests in real property set forth on Schedule 2.2(a) (the "Real Property");

(b)    all interests in Intellectual Property set forth on Schedule 2.2(b) hereto.

Notwithstanding the foregoing, the CarMax Group Assets shall not include any assets attributed to the Circuit City Group; and on or prior to the Redemption Date, CarMax will, or will cause the CarMax Subsidiaries to, transfer, convey, assign and deliver to Circuit City Stores or one of the Circuit City Subsidiaries designated by Circuit City Stores any assets held by any of the Spincos that are not CarMax Group Assets (other than rights under this Agreement and the Ancillary Contracts).

Section 2.3    Instruments of Conveyance. Any conveyance of CarMax Group Assets pursuant to this Agreement shall be effected by the execution and delivery by Circuit City Stores or the applicable Circuit City Subsidiary to CarMax or the applicable CarMax Subsidiary of (i) one or more appropriate deeds conveying all of Circuit City Stores' or the applicable Circuit City Subsidiary's right, title and interest in and to all applicable Real Property, (ii) one or more appropriate bills of sale or assignments evidencing the assignment of all personal property included in the applicable CarMax Group Assets, including Intellectual Property; and (iii) such other documents as shall be reasonably necessary or appropriate to vest in or confirm to CarMax or the applicable CarMax Subsidiary title to such conveyed CarMax Group Assets (collectively, the "Deeds and Assignments").

Section 2.4    CarMax Group Liabilities to Be Assumed by Spincos on or Prior to the Redemption Date. On or prior to the Redemption Date, CarMax or another Spinco designated by CarMax will assume, upon the terms and subject to the conditions set forth herein, or agree to perform or satisfy, any remaining CarMax Group Liabilities not previously assumed by, or an obligation of, a Spinco, including, without limitation:

(a)    any and all liabilities arising out of or that are expressly contemplated by this Agreement or any Ancillary Contract as liabilities to be assumed by a Spinco, and all

agreements, obligations and liabilities of such Spinco under this Agreement or any of the Ancillary Contracts; and

> (b)     any third-party fees and expenses arising out of or relating to this Agreement or the Ancillary Contracts (or the transactions contemplated thereby).

Notwithstanding the foregoing, the CarMax Group Liabilities shall not include (i) any liability attributed to the Circuit City Group, (ii) any third-party fees and expenses allocated to Circuit City Stores by this Agreement or the Ancillary Contracts, (iii) any liability resulting from claims by the holders of Circuit City Group Stock or the creditors of Circuit City Stores based on the transactions contemplated by this Agreement or the Ancillary Contracts (or the transactions contemplated thereby) or (iv) any indebtedness for borrowed money of Circuit City Stores or any of the Circuit City Subsidiaries to a third party except to the extent reflected in the calculation of the Intercompany Amount (collectively, the "Excluded Liabilities"); and on or prior to the Redemption Date, Circuit City Stores will, or will cause the Circuit City Subsidiaries to, assume, or agree to perform and satisfy, any liabilities held by any of the Spincos that are not CarMax Group Liabilities (other than obligations under this Agreement and the Ancillary Contracts).

   Section 2.5     Instruments of Assumption.  Any assumption by any of the Spincos of CarMax Group Liabilities pursuant to this Agreement shall be effected by the execution and the delivery to Circuit City Stores or the applicable Circuit City Subsidiary by such Spinco of one or more instruments of assumption and such other documents as shall be reasonably necessary or appropriate to evidence the assumption by such Spinco of such CarMax Group Liabilities (collectively, the "Instruments of Assumption").

   Section 2.6     Resolution of Intercompany Amount.

> (a)     For purposes of this Agreement, the term "Intercompany Amount" shall mean, as of the end of any fiscal month of Circuit City Stores, the difference between (i) the sum of (A) the aggregate amount of indebtedness of Circuit City Stores and the Circuit City Subsidiaries attributed to the CarMax Group that is reflected as a liability of the CarMax Group in the most recent publicly filed financial statements of Circuit City Stores and its Subsidiaries or (to the extent changed or arising thereafter) would be so reflected in a subsequent filing of such financial statements as determined in accordance with the Allocation Policies applied consistently with past practices but that is not otherwise assumed by one of the Spincos as part of the CarMax Group Liabilities (as of the end of the prior fiscal month) and (B) any items which increase the liabilities of the CarMax Group in the intergroup accounts identified on Schedule 2.6 hereto since the end of such prior fiscal month minus (ii) any items which decrease the liabilities of the CarMax Group in the intergroup accounts identified on Schedule 2.6 hereto since the end of such prior fiscal month.

> (b)     Not less than five Business Days prior to the then scheduled Redemption Date, Circuit City Stores shall deliver to CarMax its good faith determination of the Intercompany Amount as of the end of the immediately preceding fiscal month (such amount, the "Closing Intercompany Amount"), together with the calculation of the Closing Intercompany Amount and all necessary supporting documentation.

(c)     Immediately prior to the Redemption, CarMax shall pay to Circuit City Stores an aggregate amount in cash equal to the Closing Intercompany Amount.

(d)     As soon as practicable, but in no event later than 30 days following the Redemption Date, Circuit City Stores shall, on a basis consistent with past practice and the calculation of the Closing Intercompany Amount, prepare and deliver to CarMax an itemized calculation of the Intercompany Amount as of the Redemption Date (as finally determined pursuant to this paragraph, the "Final Intercompany Amount"). Following the determination of the Final Intercompany Amount, Circuit City Stores shall provide CarMax and its authorized representatives with full access to the books and records of Circuit City Stores necessary to review the calculation of the Final Intercompany Amount and cooperate fully with CarMax's authorized representatives in connection with such review. If CarMax objects to Circuit City Stores' calculation of the Final Intercompany Amount, it shall provide a detailed analysis of any such objection(s) on or prior to the 30th day following the delivery by Circuit City Stores of its determination of the Final Intercompany Amount (in which case any such disputes shall be resolved in the manner contemplated by Section 10.1 hereof). If CarMax does not object to Circuit City Stores' calculation of the Final Intercompany Amount within such 30-day period, then Circuit City Stores' calculation of the Final Intercompany Amount shall be final and binding on the parties for the purposes hereunder.

(e)     In the event that the Final Intercompany Amount is less than the Closing Intercompany Amount, then Circuit City Stores shall pay to CarMax an amount in cash equal to the amount of any such difference within five Business Days of the time that such determination becomes final pursuant to paragraph (d) above and Section 10.1. In the event that the Final Intercompany Amount is greater than the Closing Intercompany Amount, then CarMax shall pay to Circuit City Stores an amount in cash equal to the amount of any such difference within five Business Days of the time that such determination becomes final pursuant to paragraph (d) above and Section 10.1. Any payment made pursuant to this paragraph (e) shall be accompanied by interest at the prime rate as announced from time to time by Citibank N.A., accrued from the Redemption Date.

Section 2.7     Further Assurances.

(a)     In addition to the actions specifically provided for elsewhere in this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by this Agreement. Without limiting the foregoing, each party hereto shall cooperate with the other party, and execute and deliver, or use commercially reasonable efforts to cause to be executed and delivered, all instruments, including instruments of conveyance, assignment, transfer and assumption, and to make all filings with, and to obtain all consents, approvals or authorizations of, any governmental or regulatory authority or any other Person under any permit, license, agreement, indenture or other instrument, and take all such other actions as such party may reasonably be requested to take by the other party hereto from time to time, consistent with the terms of this Agreement and the Ancillary Contracts, in order to

effectuate the provisions and purposes of this Agreement and the transfers of assets and assumptions of liabilities and the other transactions contemplated hereby.

(b)    If any transfer of assets or assumption of liabilities contemplated by this Agreement is not consummated prior to or at the time of Redemption, then the party hereto retaining such asset or liability shall continue to take the actions required by this Section 2.7 to consummate and make effective such transfer as soon as commercially practicable after the Redemption Date and, in the case of assets, shall use its commercially reasonable efforts to preserve the value of such assets until the time of transfer. If and when any such asset or liability becomes transferable, such transfer shall be effected forthwith. The parties hereto agree that, no later than the Redemption Date, each party hereto shall be deemed to have acquired complete and sole beneficial ownership to all of the assets, together with all rights, powers and privileges incident thereto, and shall be deemed to have assumed in accordance with the terms of this Agreement and the Ancillary Contracts all of the liabilities, and all duties, obligations and responsibilities incident thereto, that such party is entitled or required to hold or assume pursuant to this Agreement.

(c)    If subsequent to the Redemption Date, Circuit City Stores shall either (i) receive written notice from CarMax or (ii) determine that certain specified assets of Circuit City Stores or a Circuit City Subsidiary that properly constitute CarMax Group Assets were not transferred to a Spinco on or prior to the Redemption Date, then, as soon as commercially practicable thereafter, Circuit City Stores shall transfer and deliver, or shall cause the applicable Circuit City Subsidiary to transfer and deliver, any and all of such assets to the applicable Spinco without the payment by such Spinco of any consideration therefor. If subsequent to the Redemption Date, CarMax shall either (i) receive written notice from Circuit City Stores or (ii) determine that certain specified assets of CarMax or a Spinco that do not properly constitute CarMax Group Assets were transferred to or held by a Spinco on or prior to the Redemption Date, then as soon as commercially practicable thereafter, CarMax shall transfer and deliver, or shall cause such Spinco to transfer and deliver, any and all of such assets to Circuit City Stores or the Circuit City Subsidiary designated by Circuit City Stores without the payment by Circuit City Stores or such Circuit City Subsidiary of any consideration therefor.

(d)    If subsequent to the Redemption Date, Circuit City Stores shall either (i) receive written notice from CarMax or (ii) determine that certain specified liabilities of Circuit City Stores or a Circuit City Subsidiary that properly constitute CarMax Group Liabilities were not assumed by a Spinco on or prior to the Redemption Date, then, as soon as commercially practicable thereafter, Circuit City Stores shall permit, or shall cause the applicable Circuit City Subsidiary to permit, a Spinco to assume (and such Spinco as soon as commercially practicable shall assume) such liabilities without payment by Circuit City or any Circuit City Subsidiary of any consideration for such assumption. If subsequent to the Redemption Date, CarMax shall either (i) receive written notice from Circuit City Stores or (ii) determine that certain specified liabilities of a Spinco that do not properly constitute CarMax Group Liabilities were assumed by a Spinco on or prior to the Redemption Date, then, as soon as commercially practicable thereafter, CarMax shall permit, or shall cause the applicable CarMax Subsidiary to permit, Circuit City Stores or a Circuit City Subsidiary to assume (and Circuit City Stores or such Circuit

City Subsidiary as soon as commercially practicable shall assume) such liabilities without the payment by any Spinco of any consideration for such assumption.

(e)    Any disagreement regarding whether or not any asset or liability was or should have been a CarMax Group Asset or CarMax Group Liability shall be resolved in accordance with the provisions of Section 10.1.

(f)    Circuit City Stores will cooperate with CarMax and its advisers in calculating the current and accumulated earnings and profits of the Spincos and in making estimates of such amount as of the Redemption Date. Not less than five Business Days prior to the Redemption Date, Circuit City Stores shall deliver to CarMax combined trial balances for the CarMax Group (including supporting schedules that combine the separate trial balances of each Spinco, together with any other adjustments, that are used in arriving at such CarMax Group combined trial balances) which shall reflect the results of the Carmax Group from the start of the current fiscal year through the end of the second to last full month immediately preceding the Redemption Date. Such combined trial balances shall be prepared consistently with the past practices of the CarMax Group and shall also be adjusted to take into account transactions that are expected to occur on or before the Redemption Date.

Section 2.8    Unassignable Assets. Notwithstanding anything in this Agreement to the contrary, neither this Agreement nor any of the Deeds and Assignments shall constitute an agreement to assign any CarMax Group Asset without the consent of another Person if an assignment or attempted assignment thereof without the consent of such Person would constitute a breach thereof or in any way impair the rights thereunder. If any such consent is not obtained or if an attempted assignment thereof would be ineffective or would impair any party's rights with respect to such CarMax Group Asset so that a Spinco would not receive all such rights, then Circuit City Stores and CarMax will cooperate in commercially reasonable arrangements to provide or cause to be provided to the Spincos the benefits of any such CarMax Group Asset (the "Beneficial Assets"), subject to the burdens thereof. In addition, Circuit City Stores shall take such other actions as may be reasonably requested by CarMax in order to place the Spincos, insofar as reasonably possible, in the same position as if such Beneficial Asset had been transferred as contemplated hereby, so that all the benefits and burdens relating thereto shall inure to the Spincos. If and when any such consents and approvals are obtained, the transfer of the applicable Beneficial Asset shall be promptly effected in accordance with the terms of this Agreement.

ARTICLE III
MUTUAL RELEASE; LIMITED REPRESENTATIONS AND WARRANTIES

Section 3.1    Mutual Release. From and after the Redemption Date, CarMax, on the one hand, and Circuit City Stores, on the other hand, releases and forever discharges the other and its Subsidiaries and each of their respective officers, directors, agents, Affiliates, record and beneficial security holders (including, without limitation, trustees and beneficiaries of trusts holding such securities), advisors and representatives and their respective successors and assigns (collectively "Released Parties"), of and from all debts, demands, actions, causes of action, suits,

accounts, covenants, contracts, agreements, damages, claims and liabilities whatsoever of every name and nature, both in law and in equity, which the releasing party has or ever had, which arise out of or relate to, in whole or in part, events, circumstances or actions, whether known or unknown, taken by such other party occurring or failing to occur or any conditions existing on or prior to the Redemption Date, but only to the extent any of the foregoing have been resolved in accordance with the Allocation Policies prior to the Redemption Date; *provided, however*, that the foregoing general release shall not apply to (a) any CarMax Group Liabilities, any liabilities attributed to the Circuit City Group or any liabilities or obligations under the Ancillary Contracts; (b) any party's rights to enforce this Agreement or any of the instruments delivered pursuant to this Agreement; and (c) any liability the release of which would result in the release of any Person other than a Released Party (provided that the parties agree not to bring suit or permit any of their Affiliates to bring suit against any Released Party with respect to any liability to the extent such Released Party would be released with respect to such liability by this Section 3.1 but for this clause (c)). The parties hereto acknowledge that the foregoing general release shall not apply to any liabilities or obligations assigned by the parties to third parties prior to the Redemption Date. In addition, each of the parties hereto separately acknowledges, and shall be deemed by operation of this Section 3.1 to have acknowledged, that the foregoing mutual release was separately bargained for and a key element of the transaction of which this mutual release is a part, and expressly waives (i) the benefits of the provisions of Section 1542 of the California Civil Code, which provides that "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor" and (ii) the benefits of any similar, comparable or equivalent law, statute, regulation or legal principle of any other jurisdiction.

Section 3.2    Waiver of Conflict. The parties acknowledge that each of the Spincos, on the one hand, and Circuit City Stores and the Circuit City Subsidiaries, on the other hand, are both currently represented by members of Circuit City Stores' legal department and Circuit City Stores' outside counsel. Each of CarMax (on behalf of the Spincos), on the one hand, and Circuit City Stores (on behalf of itself and the Circuit City Subsidiaries), on the other hand, waives any conflict with respect to such common representation that may arise before, at or after the Closing Date.

Section 3.3    Limited Representations and Warranties.

(a)    CarMax agrees and acknowledges that neither Circuit City Stores nor any of the Circuit City Subsidiaries nor any of their respective Affiliates is, in this Agreement or in any other agreement or document, making any representation or warranty to the Spincos as to any aspect of the CarMax Group, the CarMax Group Assets or the CarMax Group Liabilities or as to any consents or approvals required in connection with the consummation of the transactions contemplated by this Agreement, it being understood and agreed that each of the Spincos shall take the CarMax Group Assets, and shall assume, perform and discharge the CarMax Group Liabilities, on an "AS IS, WHERE IS" basis. The Spincos shall bear the economic and legal risk that any conveyance of CarMax Group Assets contemplated hereby shall be insufficient to convey anything more than all of Circuit City Stores' or the applicable Circuit City Subsidiary's right, title and interest to the applicable CarMax Group Assets.

# ARTICLE IV
## INDEMNIFICATION

Section 4.1    Indemnification by Spincos.    From and after the Redemption Date, CarMax shall indemnify and hold harmless, and shall cause the other Spincos to indemnify and hold harmless, Circuit City Stores and the Circuit City Subsidiaries and their respective officers, directors, agents, Affiliates, record and beneficial security holders (including, without limitation, trustees and beneficiaries of trusts holding such securities), advisors and representatives (the "Circuit City Indemnified Persons") and their respective successors and assigns against any and all claims, debts, obligations, damages, losses, liabilities (whether absolute, accrued, contingent, fixed or otherwise, or whether known or unknown, or due or to become due or otherwise), fines, fees, penalties, deficiencies, costs and expenses (including, without limitation, amounts paid in settlement and any reasonable legal, expert, accounting or other expenses for investigating or defending any actions or threatened actions) (collectively, "Losses") incurred by the Circuit City Indemnified Persons arising out of, relating to, due to, or in connection with, directly or indirectly:

(a)    any breach of any covenant, agreement or obligation of any Spinco contained in this Agreement or any of the Ancillary Contracts or in the Deeds and Assignments or the Instruments of Assumption;

(b)    any and all liabilities arising out of or relating to the Separation, the Redemption, the Distribution and/or the Proxy/Prospectus (other than the Circuit City Stores Information) (together, the "Transaction Liabilities") (in addition to any indemnification provided for in Section 4.1(a) above, and to the extent not arising out of or relating to a Circuit City Indemnified Person's failure to perform its obligations arising out of or relating thereto); or

(c)    any failure to perform or satisfy any of the CarMax Group Liabilities by any of the Spincos.

Section 4.2    Indemnification by Circuit City Stores and the Circuit City Subsidiaries. Subject to Section 4.3, from and after the Redemption Date, Circuit City Stores shall indemnify and hold harmless, and shall cause the Circuit City Subsidiaries to indemnify and hold harmless, each Spinco and their respective officers, directors, agents, Affiliates, record and beneficial security holders (including, without limitation, trustees and beneficiaries of trusts holding such securities), advisors and representatives (the "Spinco Indemnified Persons") and their respective successors and assigns against any and all Losses incurred by the Spinco Indemnified Persons arising out of, relating to, due to, or in connection with, directly or indirectly:

(a)    any breach of any covenant, agreement or obligation of Circuit City Stores or a Circuit City Subsidiary contained in this Agreement or any of the Ancillary Contracts or in the Deeds and Assignments or the Instruments of Assumption;

(b)    any and all liabilities arising out of or relating to the Circuit City Stores Information; or

(c)      any failure to perform or satisfy any liabilities attributed to the Circuit City Group (including any Excluded Liabilities).

Section 4.3      Other Liabilities. This Article IV shall not be applicable to:

(a)      any matters covered by the Tax Allocation Agreement, which matters shall be governed by such agreement;

(b)      any matters covered by the Employee Benefits Agreement, which matters shall be governed by such agreement; or

(c)      any Losses relating to, arising out of or due to any breach of the provisions of any other contract between or among Circuit City Stores or any of its Subsidiaries (other than the Spincos), on the one hand, and any of the Spincos, on the other hand, which shall be governed by the terms of such other contract.

Section 4.4      Indemnification Procedure.

(a)      In the event an Indemnified Party shall claim a right to payment pursuant to this Agreement, such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party. Such notice shall specify the basis for such claim. As promptly as possible after the Indemnified Party has given such notice, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such claim but in no event later than 30 days after receipt of such notice and, within five business days of the final determination of the merits and amount of such claim, the Indemnifying Party shall deliver to the Indemnified Party immediately available funds in an amount equal to such claim as determined hereunder.

(b)      Promptly after receipt by a Circuit City Indemnified Person or a Spinco Indemnified Person (in each case, an "Indemnified Party") of notice by a third party of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such Indemnified Party shall notify Circuit City Stores, if the Indemnified Party is a Spinco Indemnified Person, or CarMax, if the Indemnified Party is a Circuit City Indemnified Person (the "Indemnifying Party"), of such complaint or of the commencement of such action or proceeding; provided, however, that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party from liability for such claim arising under this Agreement or otherwise, unless the Indemnifying Party is materially prejudiced by such failure to so notify. The Indemnifying Party shall have the right, upon written notice to the Indemnified Party, to assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel. In the event, however, that the Indemnifying Party declines or fails to assume the defense of the action or proceeding or to employ counsel reasonably satisfactory to the Indemnified Party, in either case in a timely manner, then such Indemnified Party may employ counsel to represent or defend it in any such action or proceeding and the Indemnifying Party shall pay the reasonable fees and disbursements of such counsel as incurred; provided, however, that the Indemnifying Party shall not be required to pay the fees and

disbursements of more than one counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding with respect to which indemnification is being sought hereunder, the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such action, shall have the right to participate in such litigation and to retain its own counsel at such party's own expense. The Indemnifying Party or the Indemnified Party, as the case may be, shall at all times use reasonable efforts to keep the Indemnifying Party or the Indemnified Party, as the case may be, reasonably apprised of the status of the defense of any action, the defense of which it is maintaining and to cooperate in good faith with the Indemnifying Party or the Indemnified Party, as the case may be, with respect to the defense of any such action.

(c)    No Indemnified Party may settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party, unless such settlement, compromise or consent (i) includes an unconditional release of the Indemnifying Party from all liability arising out of such claim, (ii) does not contain an admission of guilt and (iii) does not require the Indemnifying Party to make or forego any payment or forego or take any action. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise or consent (i) includes an unconditional release of the Indemnified Party from all liability arising out of such claim, (ii) requires no payment by the Indemnified Party and (iii) does not contain any equitable order, judgment or term which in any manner affects, restrains or interferes with the business of the Indemnified Party or any of the Indemnified Party's respective Affiliates and does not contain an admission of guilt.

(d)    The amount of any Loss for which indemnification is provided under this Article IV shall be (i) increased to take account of any net Tax cost incurred by the Indemnified Party arising from the receipt or accrual of an indemnity payment hereunder (grossed up for such increase) and (ii) reduced to take into account any net Tax benefit realized by the Indemnified Party arising from incurring or paying such Loss. In computing the amount of any such Tax cost or Tax benefit, the Indemnified Party shall be deemed to recognize all other items of income, gain, loss, deduction or credit before recognizing any item arising from the receipt or accrual of any indemnity payment hereunder or incurring or paying any indemnified Loss. Any indemnity payment hereunder shall initially be made without regard to this Section 4.4(d) and shall be increased or reduced to reflect any such net Tax cost or net Tax benefit only after the Indemnified Party has actually realized such cost or benefit. For purposes of this Agreement, an Indemnified Party shall be deemed to have "actually realized" a net Tax cost or a net Tax benefit to the extent that, and at such time as, the amount of Taxes payable by such Indemnified Party is increased above or reduced below, as the case may be, the amount of Taxes that such Indemnified Party would be required to pay but for the receipt or accrual of such indemnity payment of the incurrence or payment of such Loss, as the case may be. The amount of any increase or reduction hereunder shall be adjusted to reflect any final determination with respect to the Indemnified Party's liability for Taxes, and payments between the Indemnifying Party and the Indemnified Party shall be made to reflect such adjustments if necessary. Any indemnity

payment made pursuant to this Article IV shall relate back to the Redemption and shall for tax purposes be treated by the parties as occurring immediately before the Redemption.

(e)   The amount which an Indemnifying Party is required to pay to any Indemnified Party under this Article IV shall be reduced, including retroactively, by any insurance proceeds or other amounts actually recovered by such Indemnified Party in reduction of the related Loss, it being understood and agreed that each such party shall use commercially reasonable efforts to collect any such proceeds or other amounts to which it or any of its Affiliates may be entitled, without regard to whether it is the Indemnifying Party hereunder. No Indemnified Party shall be required, however, to collect any such proceeds or other amounts prior to being entitled to indemnification from an Indemnifying Party hereunder. If any Indemnified Party received an indemnity payment in respect of a Loss and subsequently receives insurance proceeds or other amounts in respect of such Loss, then the Indemnified Party shall pay to the Indemnifying Party an amount equal to the difference between (a) the sum of the amount of the indemnity payment and the amount of such proceeds or other amounts actually received and (b) the amount of such Loss, adjusted (at such time as appropriate adjustment can be determined) in each case to reflect any premium adjustment attributable to such claim.

ARTICLE V
INSURANCE MATTERS

Section 5.1   Joint Insurance Arrangements. Other than as set forth on Schedule 5.1, as of the Redemption Date, all of the Joint Insurance Arrangements shall be discontinued and each of Circuit City Stores and the Circuit City Subsidiaries, on the one hand, and the Spincos, on the other hand, shall be responsible for arranging separate Insurance Arrangements with respect to injuries, losses, liabilities, damages and expenses arising after the Redemption Date with respect to their respective businesses. At the Redemption Date, all prepaid and unused premiums with respect to each discontinued Joint Insurance Arrangement shall be allocated to Circuit City Stores and the Circuit City Subsidiaries, on the one hand, and the Spincos, on the other hand, in the same ratio in which such premiums were allocated by Circuit City Stores to the Circuit City Group and to the CarMax Group prior to the Redemption Date. Following the Redemption Date, any refunds received by the parties with respect to a discontinued Joint Insurance Arrangement shall be allocated to Circuit City Stores and the Circuit City Subsidiaries, on the one hand, and the Spincos, on the other hand, in the same ratio in which premiums payable with respect to such discontinued Joint Insurance Arrangement were allocated by Circuit City Stores to the Circuit City Group and to the CarMax Group prior to the Redemption Date. To the extent any party receives any such refund, the party receiving such refund shall promptly transfer to the other party the portion of such refund to which such other party is entitled. Following the Redemption Date, each of Circuit City Stores and the Circuit City Subsidiaries, on the one hand, and the Spincos, on the other hand, shall pay the premiums on any continuing Joint Insurance Arrangements as set forth on Schedule 5.1.

Section 5.2    Administration; Other Matters.

(a)    From and after the Redemption Date, Circuit City Stores shall be responsible for Insurance Administration under the Joint Insurance Arrangements with respect to all liabilities other than the CarMax Group Liabilities and the Spincos shall be responsible for Insurance Administration under the Joint Insurance Arrangements with respect to the CarMax Group Liabilities. The disbursements, out-of-pocket expenses and costs of employees or agents of any party relating to Insurance Administration contemplated by this Section 5.2(a) shall be borne by the party incurring such expenses or costs. Insurance Proceeds with respect to claims, costs and expenses under the Joint Insurance Arrangements shall be paid by the Insurer to the party making the Insured Claim thereunder. In the event Circuit City Stores or a Circuit City Subsidiary, on the one hand, or a Spinco, on the other hand, makes an Insured Claim under a Joint Insurance Arrangement, such party shall deliver notice to the other party of such Insured Claim and shall keep the other party periodically updated as to the status of such Insured Claim.

(b)    From and after the Redemption Date, Circuit City Stores and the Circuit City Subsidiaries, on the one hand, and each of the Spincos, on the other hand, shall have the right to claim coverage for Insured Claims under each Joint Insurance Arrangement with respect to any claim covered by such Joint Insurance Arrangement as and to the extent that such insurance is available up to the full extent of the applicable limits of liability, if any, of such Joint Insurance Arrangement (and may receive any Insurance Proceeds with respect thereto); *provided, however*, that, prior to making any Insured Claim under a Joint Insurance Arrangement, Circuit City Stores, a Circuit City Subsidiary or a Spinco, as the case may be, shall be required to have retained a portion of the liability underlying such Insured Claim equal to the amount of the self-insured retention or deductible, if any, of such party with respect to such liability. In the event that the total Insurance Proceeds payable to Circuit City Stores and the Circuit City Subsidiaries and the Spincos under a Joint Insurance Arrangement shall have exhausted the limits of liability, if any, under such Joint Insurance Arrangement, payment of any future claims which are not reimbursed under such Joint Insurance Arrangement as a result of such exhaustion of the limits of liability under such policy shall be the sole responsibility of the party to which such liability is allocated under the terms of this Agreement. The parties agree to use commercially reasonable efforts to maximize available coverage under those Joint Insurance Arrangements applicable to it, and to take all commercially reasonable steps to recover from all other responsible parties in respect of an Insured Claim made thereunder.

Section 5.3    Cooperation; Disagreements. The parties shall use their commercially reasonable efforts to cooperate with respect to the various insurance matters contemplated by this Agreement. Circuit City Stores shall use its commercially reasonable efforts to assist CarMax in (i) obtaining separate Insurance Arrangements and (ii) enforcing its rights and receiving benefits and privileges under Joint Insurance Arrangements relating to Insured Claims arising prior to the Redemption Date. Any disagreements between the parties under this Article V shall be submitted and resolved in accordance with the provisions of Section 10.1 hereof.

# ARTICLE VI
## EMPLOYEE MATTERS

Section 6.1    <u>Employee Benefits Agreement</u>.    Prior to or on the Redemption Date, Circuit City Stores and CarMax shall execute the Employee Benefits Agreement (the "Employee Benefits Agreement") substantially in the form of Exhibit C.

Section 6.2    <u>Non-Solicitation of Employees</u>.    Without the prior written consent of Circuit City Stores, CarMax shall not, and shall cause each of the CarMax Subsidiaries not to, for a period of two years from and after the Redemption Date, either directly or indirectly, solicit for employment any senior or key employee of Circuit City Stores or any Circuit City Subsidiary. Without the prior written consent of CarMax, Circuit City Stores shall not, and shall cause each of the Circuit City Subsidiaries not to, for a period of two years from and after the Redemption Date, either directly or indirectly, solicit for employment any senior or key employee of CarMax or any CarMax Subsidiary. Notwithstanding the foregoing, solicitations of senior or key employees of Circuit City Stores or any Circuit City Subsidiary or CarMax or any CarMax Subsidiary will be permitted if such senior or key employees unilaterally (i) approach Circuit City Stores or CarMax, as the case may be, on an unsolicited basis or (ii) respond to a widely-published recruitment advertisement.

# ARTICLE VII
## BOOKS/RECORDS; OTHER INFORMATION

Section 7.1    <u>Provision of Corporate Records</u>.    Prior to or as promptly as practicable after the Redemption Date, Circuit City Stores and the Circuit City Subsidiaries shall deliver to the applicable Spinco all corporate books and records of the CarMax Group in its possession and copies of the relevant portions of all corporate books and records of Circuit City Stores relating directly and primarily to the business of the CarMax Group, the CarMax Group Assets and the CarMax Group Liabilities, including, without limitation, original corporate minute books, stock ledgers and certificates and the corporate seal of each corporation the capital stock of which is included in the CarMax Group Assets and documentation relating to the CarMax Group Liabilities, including, in each case, all active agreements, active litigation files and government filings. From and after the Redemption Date, all such books, records and copies shall be the property of the respective Spincos. Prior to or as promptly as practicable after the Redemption Date, each Spinco shall deliver to Circuit City Stores or the applicable Circuit City Subsidiary all corporate books and records of the Circuit City Group in its possession and copies of the relevant portions of all corporate books and records of the CarMax Group relating directly and primarily to the Circuit City Group, including, in each case, all active agreements, active litigation files and government filings. From and after the Redemption Date, all such books, records and copies shall be the property of Circuit City Stores or the applicable Circuit City Subsidiary.

Section 7.2    <u>Access to Information; Confidentiality Agreement</u>.    From and after the Redemption Date, each of Circuit City Stores and the Circuit City Subsidiaries, on the one hand, and the Spincos, on the other hand, shall afford to the other and to the other's representatives reasonable access and duplicating rights, during normal business hours and upon reasonable

advance notice, to all information within the possession or control of such party relating to the other party's business, assets or liabilities or relating to or arising in connection with the relationship between the Circuit City Group and the CarMax Group, insofar as such access is reasonably required for a reasonable purpose, subject to the terms of the confidentiality agreement, dated the date hereof, between Circuit City Stores and CarMax (the "Confidentiality Agreement") substantially in the form attached hereto as Exhibit D, which the parties shall execute prior to or on the Redemption Date.

Section 7.3   Retention of Records.   Except as otherwise agreed in writing, or as otherwise provided in the Ancillary Contracts, Circuit City Stores and the Circuit City Subsidiaries, on the one hand, and the Spincos, on the other hand, shall comply with the current records retention policy of Circuit City Stores with respect to all information in such party's possession or under its control relating directly and primarily to the business, assets or liabilities of the other party.

Section 7.4   Cooperation with Respect to Government Reports and Filings.   Circuit City Stores, on the one hand, and CarMax, on the other hand, agree to provide the other or their respective Affiliates, with such cooperation and information as may be reasonably requested by the other in connection with the preparation or filing of any government report or other government filing contemplated by this Agreement or the Ancillary Contracts or in conducting any other government proceeding relating to the business, assets or liabilities of either party or relating to or in connection with the relationship between the Circuit City Group and the CarMax Group on or prior to the Redemption Date.   Such cooperation and information shall include, without limitation, promptly forwarding copies of appropriate notices and forms or other communications received from or sent to any Governmental Authority which relate to the Circuit City Group, in the case of the Spincos, or the CarMax Group, in the case of Circuit City Stores and the Circuit City Subsidiaries. Each party shall make its employees and facilities available during normal business hours and on reasonable prior notice to provide explanation of any documents or information provided hereunder.

Section 7.5   Certain Limitations with Respect to Information.

(a)   Any confidential or proprietary information owned by Circuit City Stores or the Circuit City Subsidiaries, on the one hand, or any of the Spincos, on the other hand, that is provided to the other pursuant to this Agreement or any Ancillary Contract shall be deemed to remain the property of the providing party.   Unless specifically set forth herein, nothing contained in this Agreement shall be construed as granting or conferring rights of license or otherwise in any such information.

(b)   A party providing information hereunder or under any Ancillary Contract shall be entitled to receive from the requesting party the reasonable costs, if any, of creating, gathering and copying such information, to the extent that such costs are incurred for the benefit of the requesting party.   Except as may be otherwise specifically provided elsewhere in this Agreement or in any of the Ancillary Contracts, such costs shall be computed solely in accordance with the providing party's standard methodology and procedures.

(c)     No party shall have any liability to any other party in the event that any information exchanged or provided pursuant to this Article VII which is an estimate or forecast, or which is based on an estimate or forecast, is found to be inaccurate, in the absence of willful misconduct by the party providing such information. No party shall have any liability to any other party if any information is destroyed after reasonable best efforts are made by such party to comply with the provisions of Section 7.3 hereof.

(d)     The rights and obligations granted under this Article VII are subject to the specific limitations, qualifications or additional provisions on the sharing, exchange or confidential treatment of information set forth in each of the Ancillary Contracts.

Section 7.6     Protective Arrangements.  In the event that any party determines on the advice of its counsel that it is required to disclose any information pursuant to applicable law or receives any demand under lawful process or from any Governmental Authority to disclose or provide information concerning any other party that is subject to the confidentiality provisions hereof, such party shall notify the other party prior to disclosing or providing such information and shall cooperate at the expense of the requesting party in seeking any reasonable protective arrangements requested by such other party.  Subject to the foregoing, the Person that received such request may thereafter disclose or provide information to the extent required by such law (as so advised by counsel) or by lawful process or such Governmental Authority.

ARTICLE VIII
OTHER AGREEMENTS

Section 8.1     Corporate Contracts.  Each of the parties hereto agrees to use its commercially reasonable efforts to permit the other party hereto to obtain the benefits of contracts with nationally-based vendors and suppliers utilized by both the Circuit City Group and the CarMax Group prior to the Redemption Date until the expiration of the primary term of such contracts (each such contract, individually, a "Corporate Contract" and, collectively, the "Corporate Contracts").  Each party hereby agrees to cooperate with respect to obtaining favorable prices under such Corporate Contracts by combining or consolidating orders made under such Corporate Contracts during the remainder of the primary term of such Corporate Contracts.  Circuit City Stores shall administer these Corporate Contracts and the Spincos shall be responsible for the portions attributable to the CarMax Group or, following the Separation, CarMax of any order or delivery of goods and services received under each Corporate Contract (including costs of administration).  Any arrangement under any of the Corporate Contracts relating to employee matters shall be governed by the terms of the Employee Benefits Agreement.

Section 8.2     Access to Property.

(a)     On or prior to the Redemption Date, each of Circuit City Stores and CarMax shall review all instances in which the Circuit City Group has heretofore enjoyed or made use of, whether or not subject to any agreement, contract or formal arrangement, any rights of entry or access or use, rights of ingress and egress, water rights, utility easements or similar

rights or benefits relating to the Real Property (the "Real Property Rights") in connection with the conduct of business by the Circuit City Group in and around the Real Property, and before the date that is six months after the Redemption Date the Spincos agree to execute and deliver such leases, easements, licenses or other instruments as shall be commercially reasonably necessary to vest in Circuit City Stores or the applicable Circuit City Subsidiary, without royalty, fee or other payment by Circuit City Stores or any Circuit City Subsidiary, continued enjoyment of the Real Property Rights.

(b)    On or prior to the Redemption Date, each of Circuit City Stores and CarMax shall review all instances in which the CarMax Group has heretofore enjoyed or made use of, whether or not subject to any agreement, contract or formal arrangement, any rights of entry or access or use, rights of ingress and egress, water rights, utility easements or similar rights or benefits relating to the real property of Circuit City Stores (other than the Real Property) (the "Property Rights") in connection with the conduct of business by the Carmax Group in and around such real property, and before the date that is six months after the Redemption Date Circuit City Stores and the Circuit City Subsidiaries agree to execute and deliver such leases, easements, licenses or other instruments as shall be commercially reasonably necessary to vest in CarMax or the applicable Spinco, without royalty, fee or other payment by CarMax or any Spinco, continued enjoyment of the Property Rights.

Section 8.3    Corporate Name.

(a)    The Spincos shall have the right, for a period of 90 days after the Redemption Date, to use any name or trade name, service mark, trade mark or logo which includes the name "Circuit City" or any derivative thereof or similar name. As soon as commercially practicable after the Redemption Date, but in any event within 90 days thereafter, except as mutually agreed in writing by the parties hereto, each Spinco will, at its own expense, remove (or, if necessary, on an interim basis, cover up) any and all exterior signs and other identifiers located on any of property or premises included in the CarMax Group Assets which refer or pertain to Circuit City Stores or any Circuit City Subsidiary or which include any name, logo or other trademark of Circuit City Stores or any Circuit City Subsidiary (other than any CarMax Group Intellectual Property).

(b)    As soon as is commercially practicable after the Redemption Date, but in any event within 90 days thereafter, except as mutually agreed in writing by the parties hereto, each Spinco will remove from all letterhead, envelopes, invoices and other communications media of any kind, all references to Circuit City Stores or any Circuit City Subsidiary and any name, logo or other trademark of Circuit City Stores or any Circuit City Subsidiary (other than any CarMax Group Intellectual Property).

Section 8.4    Litigation.

(a)    Subject to subsection (c) of this Section 8.4 and except as provided in Section 4.4(c) or otherwise provided in the Tax Allocation Agreement, after the Redemption Date, Circuit City Stores shall have exclusive authority and control over the investigation,

prosecution, defense and appeal of all pending Actions not relating primarily to CarMax, the CarMax Group Assets and/or the CarMax Group Liabilities, including, but not limited to, Actions relating to the Transaction Liabilities and the pending Actions listed on Schedule 8.4(a) hereto (each, a "Circuit City Action"), and may settle or compromise, or consent to the entry of any judgment with respect to, any such Circuit City Action without the consent of CarMax.

(b)    Subject to subsection (c) of this Section 8.4 and except as provided in Section 4.4(c) or otherwise provided in the Tax Allocation Agreement, following the Redemption Date, CarMax shall have exclusive authority and control over the investigation prosecution, defense and appeal of all pending Actions relating primarily to CarMax, the CarMax Group Assets and/or the CarMax Group Liabilities, including, but not limited to, the pending Actions listed on Schedule 8.4(b) hereto (each, a "CarMax Action"), and may settle or compromise, or consent to the entry of any judgment with respect to, any such CarMax Action without the consent of Circuit City Stores.

(c)    Except as provided in Section 4.4(c) with respect to an Indemnified Party, but notwithstanding any other provision of this Agreement, if Circuit City Stores or any of its respective directors, officers or employees is named as a party to a CarMax Action or if CarMax or any of its respective directors, officers or employees is named as a party to a Circuit City Action, neither CarMax nor Circuit City Stores, as the case may be, may settle or compromise, or consent to the entry of any judgment with respect to, any such Action without the prior written consent of such other named party (which consent may not be unreasonably withheld), unless such settlement (i) includes a complete release of such other named party and such party's directors, officers or employees (to the extent such directors, officers or employees are named in such Action) and (ii) does not require such other named party or such party's directors, officers or employees (to the extent such directors, officer or employees are named in such Action) to admit any liability or make or forego any payment or forego or take any action, Each of CarMax and Circuit City Stores shall cooperate fully with the other and its counsel in the investigation, defense and settlement of any Circuit City Action or CarMax Action.

Section 8.5    Restriction on Competitive Activities.    During the three-year period following the Redemption Date (the "Restriction Period"), Circuit City Stores shall not, directly or indirectly, engage in, invest in, provide financing for or become associated with any venture or entity, whether as principal, partner, joint venturer, member, consultant, advisor, agent or shareholder, that is engaged in the CarMax Business. During the Restriction Period, CarMax shall not, directly or indirectly, engage in, invest in, provide financing for or become associated with any venture or entity, whether as principal, partner, joint venturer, member, consultant, advisor, agent or shareholder, that is engaged in the Circuit City Business. "CarMax Business" shall mean the used-car superstore business utilizing the non-negotiated low price concept as well as the sale of new vehicles under franchise agreements with new vehicle manufacturers in any state (or the District of Columbia) in which CarMax is doing business as a retailer as of the Redemption Date. "Circuit City Business" shall mean the retail sale of consumer electronics, personal computers, entertainment software, including video equipment, audio equipment, mobile electronics, video and security systems, home office products, wireless phones, digital and 35 mm cameras, and a range of accessories in any state (or the District of Columbia) in which Circuit City Stores is doing business as a retailer as of the Redemption Date; provided that

the Circuit City Business shall not include any such sale which is incidental to the sale of motor vehicles. The foregoing shall not prohibit Circuit City Stores or CarMax from owning or holding an ownership interest of no more than five percent (5%) of any class of securities of any publicly held corporation or from participating to any degree in an investment fund managed by a third party and not controlled, directly or indirectly, by Circuit City Stores or CarMax, respectively.

Section 8.6    Contingent Lease Payment.    In recognition of Circuit City Stores' continuing contingent liability on 23 leases previously assigned by Circuit City Stores to a subsidiary of CarMax, on the Closing date and immediately prior to the Separation, CarMax shall make a one-time special dividend payment (the "Special Dividend") to Circuit City Stores in the amount of $28.4 million. CarMax shall pay the Special Dividend in immediately available funds by wire transfer to the account of Circuit City Stores identified by Circuit City Stores to CarMax at least two business days prior to the Closing date.

Section 8.7    Tax Allocation Agreement.    Prior to or on the Redemption Date, Circuit City Stores and CarMax shall execute the Amended and Restated Tax Allocation Agreement (the "Tax Allocation Agreement") substantially in the form of Exhibit A.

Section 8.8    Transition Services Agreement.    Prior to or on the Redemption Date, Circuit City Stores and CarMax shall execute the Transition Services Agreement (the "Transition Services Agreement") substantially in the form of Exhibit B.

ARTICLE IX
CLOSING

Section 9.1    The closing of the Separation (the "Closing") will take place at the offices of McGuireWoods LLP, 901 East Cary Street Richmond, Virginia 23219 at 9:00 a.m. on August 1, 2002, unless the parties hereto agree in writing to another time, date and place.

ARTICLE X
DISPUTE RESOLUTION

Section 10.1    Dispute Resolution; Mediation.

(a)    Either party may commence the dispute resolution process of this Section 10.1 by giving the other party written notice (a "Dispute Notice") of any controversy, claim or dispute of whatever nature arising out of or relating to this Agreement or the breach, termination, enforceability or validity thereof (a "Dispute") which has not been resolved in the normal course of business.  The parties shall attempt in good faith to resolve any Dispute by negotiation between executives of each party hereto ("Senior Party Representatives") who have authority to settle the Dispute and who are at a higher level of management than the persons who have direct responsibility for the administration of this Agreement.  Within 15 days after delivery of the Dispute Notice, the receiving party shall submit to the other a written response (the "Response"). The Dispute Notice and the Response shall include (i) a statement setting forth the position of the party giving such notice and a summary of arguments supporting such position and (ii) the name

and title of such party's Senior Party Representative and any other persons who will accompany the Senior Party Representative at the meeting at which the parties will attempt to settle the Dispute.   Within 30 days after the delivery of the Dispute Notice, the Senior Party Representatives of both parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the Dispute.   The parties shall cooperate in good faith with respect to any reasonable requests for exchanges of information regarding the Dispute or a Response thereto.

(b)     If the Dispute has not been resolved within 60 days after delivery of the Dispute Notice, or if the parties fail to meet within 30 days after delivery of the Dispute Notice as hereinabove provided, the parties shall make a good faith attempt to settle the Dispute by mediation pursuant to the provisions of this Section 10.1 before resorting to arbitration contemplated by Section 10.2 or any other dispute resolution procedure that may be agreed by the parties.

(c)     All negotiations, conferences and discussions pursuant to this Section 10.1 shall be confidential and shall be treated as compromise and settlement negotiations.   Nothing said or disclosed, nor any document produced, in the course of such negotiations, conferences and discussions that is not otherwise independently discoverable shall be offered or received as evidence or used for impeachment or for any other purpose in any current or future arbitration.

(d)     Unless the parties agree otherwise, the mediation shall be conducted in accordance with the CPR Institute for Dispute Resolution ("CPR") Model Procedure for Mediation of Business Disputes in effect on the date of this Agreement by a mediator mutually selected by the parties.

(e)     Within 30 days after the mediator has been selected as provided above, both parties and their respective attorneys shall meet with the mediator for one mediation session of at least four hours, it being agreed that each party representative attending such mediation session shall be a Senior Party Representative with authority to settle the Dispute.   If the Dispute cannot be settled at such mediation session or at any mutually agreed continuation thereof, either party may give the other and the mediator a written notice declaring the mediation process at an end.

Section 10.2     Arbitration.   If the Dispute has not been resolved by the dispute resolution process described in either Section 10.1(a) or Section 10.1(e) above, the parties agree that any such Dispute shall be settled by binding arbitration before the American Arbitration Association ("AAA") in Richmond, Virginia pursuant to the Commercial Rules of the AAA. Any arbitrator(s) selected to resolve the Dispute shall be bound exclusively by the laws of the Commonwealth of Virginia without regard to its choice of law rules.   Any decisions of award of the arbitrator(s) will be final and binding upon the parties and may be entered as a judgment by the parties hereto.   Any rights to appeal or review such award by any court or tribunal are hereby waived to the extent permitted by law.

Section 10.3   Costs.   The costs of any mediation or arbitration pursuant to this Article X shall be shared equally between the parties.

## ARTICLE XI
## MISCELLANEOUS

Section 11.1    Termination; Survival.    This Agreement may be terminated, and the obligations of the parties to consummate the transactions contemplated hereunder, including, without limitation, the Separation and the Redemption, may be abandoned, by the Board, in its sole discretion, at any time prior to the date of first mailing of the Notice of Redemption to holders of CarMax Group Stock.  Thereafter, this Agreement may be terminated solely upon the issuance by a Governmental Authority of an order, injunction or decree that shall prohibit or prevent the consummation of the Separation and the transactions contemplated hereunder. Notwithstanding the foregoing, the provisions of Article X of this Agreement shall survive any termination of this Agreement.

Section 11.2    Jurisdiction and Forum.    Except as otherwise provided herein, the parties hereto hereby agree that the appropriate forum and venue for any disputes between any of the parties hereto arising out of this Agreement shall be any state or federal court sitting in Richmond, Virginia and each of the parties hereto hereby submits to the personal jurisdiction of any such court.  The foregoing shall not limit the rights of any party to obtain execution of judgment in any other jurisdiction.

Section 11.3    Applicable Law.    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without regard to its conflicts of law rules.

Section 11.4    Notices.    Each notice, communication and delivery under this Agreement shall be made in writing and shall be deemed to have been duly given if delivered by courier or sent by registered or certified mail, postage prepaid, or by facsimile transmission to the parties at the following addresses or at such other addresses as shall be specified by the parties by like notice; *provided* that a notice of change of address shall be effective only upon receipt thereof:

If to Circuit City Stores or the Circuit City Subsidiaries to:

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, Virginia 23223-1464
Attn:   Michael T. Chalifoux
Fax:    (804) 418-8286

With a copy to:

McGuireWoods LLP
901 East Cary Street
Richmond, Virginia 23219
Attn:   Clifford A. Cutchins, IV, Esq.
Fax:    (804) 225-5344

and

Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
Attn:   Raymond W. Wagner, Esq.
Fax:    (212) 445-2502

If to the Spincos to:

CarMax, Inc.
4900 Cox Road
Glen Allen, Virginia 23060-3314
Attn:   Keith D. Browning
Fax:    (804) 967-2978

With a copy to:

McGuireWoods LLP
901 East Cary Street
Richmond, Virginia 23219
Attn:   Clifford A. Cutchins, IV, Esq.
Fax:    (804) 225-5344

and

Simpson Thacher & Bartlett
425 Lexington Avenue
New York, NY 10017
Attn:   Raymond W. Wagner, Esq.
Fax:    (212) 445-2502

and

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
Attn:  Robert B. Pincus, Esq.
Fax:  888-329-4133

Section 11.5   Waiver and Amendment.  Any term or provision of this Agreement may be waived in writing at any time by the party that is entitled to the benefits thereof.  No amendment of this Agreement shall be effective unless in a writing signed by the parties hereto.

Section 11.6   Entire Agreement.   This Agreement and the documents contemplated hereby constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and thereof.

Section 11.7  Counterparts.    This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

Section 11.8  Construction.    The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.  When a reference is made in this Agreement to Sections, such reference shall be to a Section of this Agreement unless otherwise indicated.

Section 11.9  Successors in Interest.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, and any reference to a party hereto shall also be a reference to a successor or permitted assigns.

Section 11.10  Number; Gender.  Whenever the context so requires, the singular number shall include the plural and the plural shall include the singular, and the gender of any pronoun shall include the other genders.

Section 11.11  Third-Party Beneficiaries.    Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any person, firm or corporation other than the parties hereto, and their respective successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such person, firm or corporation being deemed a third party beneficiary of this Agreement.

Section 11.12  Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

IN WITNESS WHEREOF, Circuit City Stores and CarMax have executed this Agreement as of the date first above written.

CIRCUIT CITY STORES, INC.

By: _P Dunn_

Name:   Phillip J. Dunn
Title:   Senior Vice President, Treasurer
         and Controller

CARMAX, INC.

By: _____

Name:   W. Austin Ligon
Title:   President

SCHEDULE 1.1

CARMAX SUBSIDIARIES

1. CarMax Auto Superstores, Inc.

2. CarMax Auto Superstores West Coast, Inc.

3. Kenosha Automotive, LLC

4. CarMax Auto Mall, LLC

5. CarMax of Laurel, LLC

6. CPD, Inc.

7. CFCII, Inc.

8. CarMax Auto Receivables, LLC

9. CarMax Funding, LLC

# SCHEDULES

SCHEDULE 2.2(a)

REAL PROPERTY

| Loc. No. | Name | Address | Deal Type |
|---|---|---|---|
| 07136 | Duarte CarMax (S/L) | 1131 Central Avenue<br>Duarte, CA 91010 | Sale/Leaseback |
| 07810 | Lax CPJ & Dodge CarMax | 1030 West Manchester Boulevard<br>Inglewood, CA 90301 | Lease |
| 07812 | Lax Mitsubishi CarMax | 8611 Lacienega Boulevard<br>Inglewood, CA 90301 | Purchase |
| 07120 | Los Angeles Ontario CarMax – Land | Milliken & I-10 @ Ontario Mills<br>Ontario, CA 91761 | Purchase |
| 07147 | Roseville CarMax | 1450 Eureka Road<br>Roseville, CA 95661 | Purchase |
| 07113 | Boynton Beach CarMax (S/L) | 2000 Highridge Road<br>Boynton Beach, FL 33426 | Sale/Leaseback |
| 07172 | Clearwater CarMax (S/L) | 2550 Roosevelt Boulevard<br>Clearwater, FL 33760 | Sale/Leaseback |
| 07172 | Clearwater CarMax (S/L)<br>*Billboard Sublease* | 2550 Roosevelt Boulevard<br>Clearwater, FL 34620 | Sublease |
| 07108 | Ft. Lauderdale CarMax (S/L) | 7420 State Road 84<br>Davie, FL 33317 | Sale/Leaseback |
| 07108-A | Ft. Lauderdale CarMax Additional Property | Right-of-Way on SW 75th Street<br>Davie, FL 33317 | Purchase |
| 07110 | International Mall CarMax (S/L) | 1300 N.W. 98th Court<br>Miami, FL 33172 | Sale/Leaseback |
| 07107 | Orlando CarMax (S/L) | 6375 South Semoran Boulevard<br>Orlando, FL 32822 | Sale/Leaseback |
| 07205 | Orlando CPJ CarMax | 7530 South Orange Blossom Trail<br>Orlando, FL 32809 | Lease |
| 07105 | Tampa CarMax (S/L) | 14920 North Nebraska Avenue<br>Tampa, FL 33613 | Sale/Leaseback |
| 07103 | Town Center CarMax (S/L) | 1215 Ernest Barrett Parkway<br>Kennesaw, GA 30144 | Sale/Leaseback |
| 07103-A | Town Center CarMax Additional Property | Ernest Barrett Parkway<br>Kennesaw, GA 30144 | Purchase |

| 09210**** | Chastain Meadows Office (S/L) | 225 Chastain Meadows Court<br>Kennesaw, GA 30144 | Sale/Leaseback |
|---|---|---|---|
| 07104 | Norcross CarMax (S/L) | 1975 Beaver Ruin Road<br>Norcross, GA 30071 | Sale/Leaseback |
| 07117 | Southlake CarMax (S/L) | 3100 Mt. Zion Parkway<br>Stockbridge, GA 30281 | Sale/Leaseback |
| 07146 | Hillside CarMax (S/L) | 101 North Wolf Road<br>Hillside, IL 60162 | Sale/Leaseback |
| 07122 | Naperville CarMax (S/L) | 3320 Odyssey Court<br>Naperville, IL 60566 | Sale/Leaseback |
| 07128 | Schaumburg CarMax (S/L) | 250 East Golf Road<br>Schaumburg, IL 60173 | Sale/Leaseback |
| 07123 | Tinley Park CarMax (S/L) | 18800 South Oak Park Avenue<br>Tinley Park, IL 60477 | Sale/Leaseback |
| 07144 | Indianapolis CarMax – Land | Lafayette Road &<br>Interstate 65<br>Indianapolis, IN 46254 | Purchase |
| 07180 | Merrillville CarMax | 1370 East 79th Place<br>Merrillville, IN 46410 | Purchase |
| 07173 | Kansas CarMax | 9009 West 67th Street<br>Merriam, KS 66202 | Purchase |
| 07118 | Laurel CarMax (S/L) | 8800 Freestate Drive<br>Laurel, MD 20723 | Sale/Leaseback |
| 07806 | Laurel Toyota CarMax (S/L) | 8801 Freestate Drive<br>Laurel, MD 20723 | Sale/Leaseback |
| 07206 | Rockville CarMax | 15931 Frederick Road<br>Rockville, MD 20855 | Lease |
| 07121 | White Marsh CarMax (S/L) | 10201 Philadelphia Road<br>White Marsh, MD 21162 | Sale/Leaseback |
| 07121-A | White Marsh CarMax Additional Property | 10109 Philadelphia Road<br>White Marsh, MD 21162 | Purchase |
| 07157*** | Las Vegas CarMax | SEC Warm Springs & US 95<br>Henderson, NV 89015 | Purchase |
| 07106 | Charlotte CarMax (S/L) | 7700 Krefeld Drive<br>Charlotte, NC 28227 | Sale/Leaseback |
| 07185 | Greensboro CarMax | 3412 West Wendover Avenue<br>Greensboro, NC 27407 | Purchase |
| 07197* | South Boulevard CarMax | 10510 Cadillac Street<br>Pineville, NC 28134 | Purchase |
| 07102 | Raleigh CarMax (S/L) | 8520 Glenwood Avenue | Sale/Leaseback |

| | | Raleigh, NC 27612 | |
|---|---|---|---|
| 07102-A | Raleigh CarMax – Auction Lot | 8837 Glenwood Avenue Raleigh, NC 27612 | Lease |
| 07165 | Cleveland CarMax – Land | Miles Road & Interstate 271 Warrensville Heights, OH 44128 | Purchase |
| 07177 | Greenville CarMax (S/L) | 2800 Laurens Road Greenville, SC 29607 | Sale/Leaseback |
| 07241** | Knoxville CarMax | 11225 Parkside Drive Knoxville, TN | Purchase |
| 07150 | Nashville CarMax (S/L) | 2501 Powell Avenue Nashville, TN 37204 | Sale/Leaseback |
| 07112 | Ft. Worth/Arlington CarMax (S/L) | 8400 Anderson Boulevard Ft. Worth, TX 76120 | Sale/Leaseback |
| 07109 | Garland CarMax (S/L) | 12715 LBJ Freeway Garland, TX 75041 | Sale/Leaseback |
| 07111 | Southwest Freeway CarMax (S/L) | 6909 Southwest Freeway Houston, TX 77074 | Sale/Leaseback |
| 07114 | Houston North CarMax (S/L) | 16110 North Freeway Houston, TX 77090 | Sale/Leaseback |
| 07116 | Gulf Freeway CarMax (S/L) | 13100 Gulf Freeway Houston, TX 77034 | Sale/Leaseback |
| 07203 | Cypress Fairbanks CarMax (S/L) | 19500 N.W. Freeway Houston, TX 77065 | Sale/Leaseback |
| 07115 | Texas Stadium CarMax (S/L) | 3100 Spur 482 Irving, TX 75062 | Sale/Leaseback |
| 07207 | Plano CarMax (S/L) | 4448 West Plano Parkway Plano, TX 75093 | Sale/Leaseback |
| 07152 | San Antonio CarMax (S/L) | 3611 Fountainhead Drive San Antonio, TX 78229 | Sale/Leaseback |
| 07152-A | San Antonio CarMax Pylon Sign | Medical Drive San Antonio, TX 78229 | Lease |
| 07028 | 4900 CarMax Office Building | 4900 Cox Road Glen Allen, VA 23060 | Lease |
| 07028-A | 4900 Building Parking | 4900 Cox Road Glen Allen, VA 23060 | Lease |
| 07062 | CarMax Office @ Innsbrook Place | 5020 Sadler Road, Suite 200 Glen Allen, VA 23060 | Lease |
| 07062-A | CarMax Office @ Innsbrook Place (1st Floor Sublease) | 5020 Sadler Road, Suite 101 Glen Allen, VA 23060 | Lease |
| 07101 | Richmond CarMax (S/L) | 11090 West Broad Street | Sale/Leaseback |

| | | Glen Allen, VA 23060 | |
|---|---|---|---|
| 07101 | Richmond CarMax (S/L) *Parking License Agreement* | 9954 Mayland Drive Richmond, VA 23233 | License |
| 07132 | Dulles CarMax (S/L) | 45210 Towlern Place Sterling, VA 20166 | Sale/Leaseback |
| 07807 | Kenosha Auto Mall CarMax | 8200 120th Avenue Kenosha, WI 53142 | Lease |

\* Due to open 9/20/2002
\*\* Due to open 11/1/2002
\*\*\* Due to open 1/24/2003
\*\*\*\* CarMax occupies only portion of building

NOTE:   Our records show the following locations are owned by (if Purchase) or leased by (if Lease or Sale/Leaseback) Circuit City Stores, Inc.:

07028
07028-A
07101
07102
07102-A
07103
07103-A
07104
07105
07106
07112
09210

## SCHEDULE 2.2(b)

## INTELLECTUAL PROPERTY

None.

## SCHEDULE 2.6

## INTERGROUP ACCOUNTS

| Account | Description |
| --- | --- |
| 180109 | Investment in CMAX |
| 340012 | Contributed Capital – ACME |
| 260004 | Due to FNANB-IC General |
| 260010 | Due to CC – I/C General |
| 260070 | Due to CCS (CarMax) |
| 270006 | Accrued State Income Taxes |
| 270005 | Accrued Federal Income Taxes |

SCHEDULE 5.1

JOINT INSURANCE ARRANGEMENTS

None.

SCHEDULE 8.4(a)

CIRCUIT CITY ACTIONS

All Actions other than those listed on Schedule 8.4(b), except for any Actions that relate solely to CarMax, the CarMax Group Assets or the CarMax Group Liabilities.

SCHEDULE 8.4(b)

CARMAX ACTIONS

The following agency proceedings and arbitration matters are pending by or against CarMax:

| Date Filed | Name |
|---|---|
| 01/18/02 | Barry Ward, III |
| 05/16/01 | Khaled Mohammed |
| 09/21/01 | OFCCP |
| 12/07/01 | Marvin Gussoff |
| -1-3-2 | Courtney Whitley |
| 01/03/02 | Karen Dillingham |
| 01/03/02 | Tusar Townsend |
| 01/03/02 | Kendrix Johnson |
| 01/18/02 | Alice Pollard |
| 01/15/02 | James Irland |
| 02/15/02 | Damian McDonald |
| 03/25/99 | OFCCP |
| 04/17/02 | David Nwachukwu |
| 04/09/02 | Norman Thompson |
| 12/04/01 | Amy Marquez |
| 12/28/01 | Ricky Campbell |
| 12/29/01 | Robert Gonzalez |
| 01/21/02 | Robert Kaufman |
| 04/03/02 | Renika Askew |
| 04/08/02 | Peggy McNutt |

The following insurance claims are pending by or against CarMax:

| Organization Code | Major Line | Claim Number |
|---|---|---|
| CMSS07108001050 | WORKERS COMP | ATM9709 |
| CMSS07111001050 | WORKERS COMP | AUF9094 |
| CMSS07114001050 | AUTO | Aug-51 |
| CMSS07115001050 | AUTO | C5P4872 |
| CMSS07115001050 | WORKERS COMP | ASK9109 |
| CMSS07128001050 | WORKERS COMP | AQU2874 |
| CMSS07203001050 | LIABILITY | Aug-10 |
| CMSS07206001050 | AUTO | C5N4591 |
| CMSS07206001050 | AUTO | C5N4592 |

| Organization Code | Major Line | Claim Number |
|---|---|---|
| CMSS07806001050 | AUTO | C5P5026 |
| CMSS07806001050 | AUTO | C5P5024 |
| CMSS07806001050 | AUTO | C5P5022 |
| CMSV07102070050 | WORKERS COMP | ARV9891 |
| CMSV07102070050 | WORKERS COMP | ARV9886 |
| CMSV07102070050 | WORKERS COMP | ARV9883 |
| CMSV07103070050 | WORKERS COMP | AQW1861 |
| CMSV07103070050 | WORKERS COMP | AQW1549 |
| CMSV07104070050 | WORKERS COMP | AQW1627 |
| CMSV07105070050 | WORKERS COMP | ATM9628 |
| CMSV07106070050 | WORKERS COMP | AQG0068 |
| CMSV07107070050 | WORKERS COMP | ATM9690 |
| CMSV07108070050 | WORKERS COMP | AQQ0290 |
| CMSV07115070050 | WORKERS COMP | ASK9412 |
| CMSV07116070050 | WORKERS COMP | AUF9151 |
| CMSV07118070050 | AUTO | C5N5083 |
| CMSV07123070050 | WORKERS COMP | AQU2421 |
| CMSV07132070050 | WORKERS COMP | AVA6830 |
| CMSV07132070050 | WORKERS COMP | AVA6610 |
| CMSV07806070050 | AUTO | C5N5096 |
| CMSV07806070050 | WORKERS COMP | AXR4660 |

| Major Line Of Insurance | Claim Number | Accident Date |
|---|---|---|
| A/L | ASK3438 | 03082002 |
| A/L | AUG0297 | 02072002 |
| A/L | AUG0338 | 02082002 |
| A/L | AUG0338 | 02082002 |
| A/L | AUG0576 | 05212001 |
| A/L | AUG1457 | 02272002 |
| A/L | AUG2249 | 07222000 |
| A/L | AUG2440 | 03282002 |
| A/L | AUG2440 | 03282002 |
| A/L | AUG3131 | 07162001 |
| A/L | AUG3140 | 03112002 |
| A/L | AUG3287 | 04182002 |
| A/L | AUG3287 | 04182002 |
| A/L | AUG3702 | 07142001 |
| A/L | AUG3740 | 04272002 |
| A/L | AUG3744 | 04222002 |
| A/L | AUG3776 | 04182002 |
| A/L | AUG3776 | 04182002 |
| A/L | AUG4574 | 12112001 |

| Major Line Of Insurance | Claim Number | Accident Date |
|---|---|---|
| | | |
| A/L | AUG4622 | 01282001 |
| A/L | AXM0242 | 12162000 |
| A/L | AXM0242 | 12162000 |
| A/L | AXM0469 | 06192001 |
| A/L | AXM0469 | 06192001 |
| A/L | AXM3697 | 08282001 |
| A/L | AXM3697 | 08282001 |
| A/L | AXM4847 | 06302001 |
| A/L | AXM5902 | 10202001 |
| A/L | AXM7310 | 10212001 |
| A/L | AXM7967 | 12062001 |
| A/L | AXM8670 | 11162001 |
| A/L | AXM8752 | 12272000 |
| A/L | AXM9159 | 01132002 |
| A/L | AXM9515 | 01142002 |
| A/L | AXM9714 | 08291999 |
| A/L | AXM9957 | 01252001 |
| A/L | AYR4222 | 07202000 |
| A/L | AYR4222 | 07202000 |
| A/L | AYR4722 | 07292002 |
| A/L | AYR8919 | 09252000 |
| A/L | BWI9997 | 12121997 |
| A/L | BWI9997 | 12121997 |
| A/L | B4R0930 | 12081999 |
| A/L | B4R7354 | 03262000 |
| A/L | B4R7354 | 03262000 |
| A/L | B9R4446 | 03171999 |
| A/L | B9R4446 | 03171999 |
| A/L | C5N0689 | 04052002 |
| A/L | C5N0689 | 04052002 |
| A/L | C5N1967 | 04252002 |
| A/L | C5N1967 | 04252002 |
| A/L | C5N4211 | 05172002 |
| A/L | C5P0623 | 04022002 |
| A/L | C5P0623 | 04022002 |
| A/L | C5P3821 | 05172002 |
| A/L | C5P3822 | 05202002 |
| A/L | C5P3823 | 05202002 |
| A/L | C5Q1978 | 11282001 |
| A/L | C5Q9428 | 03042002 |
| A/L | C5R1615 | 10302001 |
| A/L | C5R1615 | 10302001 |
| A/L | C5R9344 | 03102002 |
| A/L | C5R9346 | 03122002 |
| A/L | C5S5520 | 08022001 |

| Major Line Of Insurance | Claim Number | Accident Date |
|---|---|---|
| A/L | C5S5520 | 08022001 |
| A/L | C6B1549 | 09292000 |
| A/L | C6B1549 | 09292000 |
| A/L | DUF0691 | 11092000 |
| A/L | DUF2913 | 01261998 |
| A/L | DUF3610 | 01042001 |
| A/L | DUF3610 | 01042001 |
| A/L | DUF6406 | 03152001 |
| A/L | DUF7523 | 04122001 |
| A/L | DUF7523 | 04122001 |
| A/L | DUF7863 | 03012001 |
| A/L | DUF8306 | 04142000 |
| A/L | DUF8306 | 04142000 |
| A/L | DUF8338 | 04032001 |
| A/L | DUF8737 | 05012001 |
| A/L | DUF9490 | 05182001 |
| A/L | DUF9490 | 05182001 |
| A/L | DUF9564 | 05232001 |
| A/L | D9G8955 | 05021996 |
| A/L | D9G8955 | 05021996 |
| APD | AUG0338 | 02082002 |
| APD | AUG2440 | 03282002 |
| APD | AXM0469 | 06192001 |
| APD | AXM3697 | 08282001 |
| APD | AXM5206 | 09212001 |
| APD | AXM5902 | 10202001 |
| APD | AXM8752 | 12272000 |
| APD | AYR4222 | 07202000 |
| APD | DUF7523 | 04122001 |
| APD | DUF8338 | 04032001 |
| APD | DUF8737 | 05012001 |
| APD | DUF8995 | 05162001 |
| APD | DUF9564 | 05232001 |
| G/L | AUG0679 | 02182002 |
| G/L | AUG1605 | 03112002 |
| G/L | AUG3049 | 03292002 |
| G/L | AUG4233 | 05072002 |
| G/L | AUG4664 | 05152002 |
| G/L | AUG5087 | 05232002 |
| G/L | AXM6744 | 11122001 |
| G/L | C5U1037 | 06162001 |
| G/L | DUF9111 | 05212001 |
| W/C | AQU1108 | 05142002 |
| W/C | ARV1610 | 03082002 |
| W/C | ARV2214 | 03132002 |

| Major Line Of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | ARV3101 | 03272002 |
| W/C | ARV3425 | 04012002 |
| W/C | ARV3517 | 04022002 |
| W/C | ARV5107 | 04092002 |
| W/C | ARV5863 | 04242002 |
| W/C | ARV6026 | 04252002 |
| W/C | ARV6040 | 04222002 |
| W/C | ARV6119 | 04292002 |
| W/C | ARV8531 | 05272002 |
| W/C | ASJ2639 | 05172002 |
| W/C | ASK0713 | 02212002 |
| W/C | ASK0881 | 02212002 |
| W/C | ASK2080 | 03052002 |
| W/C | ASK2748 | 03192002 |
| W/C | ASK5267 | 04192002 |
| W/C | ASK6683 | 05062002 |
| W/C | ASK7691 | 05132002 |
| W/C | ASK8040 | 05202002 |
| W/C | ASK8184 | 05222002 |
| W/C | ASK8204 | 05202002 |
| W/C | ASK8678 | 05242002 |
| W/C | ASU0948 | 05032002 |
| W/C | ASU2300 | 05282002 |
| W/C | ATD2477 | 02012002 |
| W/C | ATD4983 | 02182002 |
| W/C | ATD5016 | 03052002 |
| W/C | ATD5019 | 03042002 |
| W/C | ATD5878 | 03122002 |
| W/C | ATD7113 | 03272002 |
| W/C | ATD8444 | 04122002 |
| W/C | ATD8449 | 04162002 |
| W/C | ATD9173 | 04182002 |
| W/C | ATD9403 | 02082002 |
| W/C | ATD9406 | 05232001 |
| W/C | ATD9636 | 05012000 |
| W/C | ATD9813 | 04052002 |
| W/C | ATD9999 | 05022002 |
| W/C | ATH4455 | 03062002 |
| W/C | ATH5119 | 03132002 |
| W/C | ATH5378 | 03152002 |
| W/C | ATH5475 | 03092002 |
| W/C | ATH5860 | 03222002 |
| W/C | ATH6227 | 03272002 |
| W/C | ATH6576 | 03122002 |
| W/C | ATH6633 | 04012002 |

| Major Line Of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | ATH6675 | 04022002 |
| W/C | ATH6696 | 04022002 |
| W/C | ATH6954 | 04052002 |
| W/C | ATH7286 | 04102002 |
| W/C | ATH7427 | 04102002 |
| W/C | ATH7582 | 04152002 |
| W/C | ATH7904 | 04172002 |
| W/C | ATH8342 | 04182002 |
| W/C | ATH8782 | 04292002 |
| W/C | ATH8861 | 04232002 |
| W/C | ATH9074 | 05022002 |
| W/C | ATH9728 | 05052002 |
| W/C | ATH9918 | 05112002 |
| W/C | ATJ5714 | 03262002 |
| W/C | ATJ8871 | 05032002 |
| W/C | ATM0247 | 01212002 |
| W/C | ATM0308 | 11202001 |
| W/C | ATM2994 | 01032001 |
| W/C | ATM3001 | 02282002 |
| W/C | ATM3129 | 03022002 |
| W/C | ATM3220 | 03012002 |
| W/C | ATM3468 | 03052002 |
| W/C | ATM4200 | 03152002 |
| W/C | ATM6902 | 04252002 |
| W/C | ATM7366 | 05012002 |
| W/C | ATM7450 | 04302002 |
| W/C | ATM8252 | 05032002 |
| W/C | ATM8483 | 05162002 |
| W/C | ATM8508 | 05162002 |
| W/C | ATM8526 | 05102002 |
| W/C | ATM8587 | 05142002 |
| W/C | ATM8672 | 05202002 |
| W/C | ATM8760 | 05212002 |
| W/C | ATM8997 | 05232002 |
| W/C | ATM9289 | 05292002 |
| W/C | ATW4327 | 03132002 |
| W/C | ATW6245 | 04112002 |
| W/C | ATW7029 | 04222002 |
| W/C | ATW8115 | 05052002 |
| W/C | ATW8132 | 05092002 |
| W/C | ATW8452 | 05142002 |
| W/C | AUF3966 | 02222002 |
| W/C | AUF4411 | 03022002 |
| W/C | AUF5056 | 03142002 |
| W/C | AUF6953 | 04192002 |

| Major Line Of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | AUF7048 | 04082002 |
| W/C | AUF7136 | 04242002 |
| W/C | AUF7918 | 05092002 |
| W/C | AUF8255 | 05162002 |
| W/C | AUG4943 | 03252002 |
| W/C | AUM4480 | 10252001 |
| W/C | AUM9523 | 12222001 |
| W/C | AUW7027 | 02112002 |
| W/C | AVA0359 | 12202001 |
| W/C | AVA3521 | 03152002 |
| W/C | AVA4066 | 03302002 |
| W/C | AVA4208 | 03272002 |
| W/C | AVA5262 | 04292002 |
| W/C | AVA6315 | 05242002 |
| W/C | AVA6337 | 05242002 |
| W/C | AVB3875 | 10092001 |
| W/C | AVF5733 | 09042001 |
| W/C | AVF8060 | 10052001 |
| W/C | AVF9919 | 10272001 |
| W/C | AVP8546 | 03122002 |
| W/C | AVP9254 | 04022002 |
| W/C | AVP9257 | 04022002 |
| W/C | AVZ3775 | 09052001 |
| W/C | AWB4601 | 03062002 |
| W/C | AWB4869 | 03202002 |
| W/C | AWB5613 | 04122002 |
| W/C | AWB5614 | 04132002 |
| W/C | AWB5796 | 04192002 |
| W/C | AWB6475 | 05102002 |
| W/C | AWD4017 | 10162001 |
| W/C | AWD4124 | 10172001 |
| W/C | AWD4944 | 10272001 |
| W/C | AWL8301 | 06122001 |
| W/C | AWU0353 | 06082001 |
| W/C | AWU2207 | 04162001 |
| W/C | AWU2384 | 07172001 |
| W/C | AWU4776 | 08242001 |
| W/C | AWW6854 | 08132001 |
| W/C | AXG3933 | 03292001 |
| W/C | AXG5630 | 04162001 |
| W/C | AXH7035 | 05022001 |
| W/C | AXM4574 | 09172001 |
| W/C | AXR2630 | 03072002 |
| W/C | AXR2745 | 03132002 |
| W/C | AXR3088 | 03272002 |

| Major Line Of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | AXR3571 | 04182002 |
| W/C | AXR3602 | 01312002 |
| W/C | AXR3665 | 04232002 |
| W/C | AXR3759 | 04262002 |
| W/C | AXR3897 | 04252002 |
| W/C | AXR4183 | 05152002 |
| W/C | AXR4249 | 05172002 |
| W/C | AXR4345 | 05222002 |
| W/C | AXY5607 | 05032001 |
| W/C | AYD7066 | 02042000 |
| W/C | AYF5151 | 03242000 |
| W/C | AYJ2052 | 03292000 |
| W/C | AYJ3350 | 04152000 |
| W/C | AYJ4243 | 04282000 |
| W/C | AYV8542 | 09022001 |
| W/C | AYV9277 | 10042001 |
| W/C | BAI3365 | 07122000 |
| W/C | BAI8200 | 05222001 |
| W/C | BEN5381 | 09181998 |
| W/C | BFJ7774 | 10201999 |
| W/C | BFU7321 | 12101998 |
| W/C | BHT2867 | 11221999 |
| W/C | BHT7534 | 07222000 |
| W/C | BHT7796 | 08022000 |
| W/C | BPA2918 | 04021998 |
| W/C | BTR9898 | 02041999 |
| W/C | BUP6006 | 11142000 |
| W/C | BUT4935 | 09292000 |
| W/C | BXL1102 | 07142000 |
| W/C | BXL4116 | 01012001 |
| W/C | BXL5833 | 01122001 |
| W/C | BXL7315 | 01292001 |
| W/C | BXL8435 | 01252001 |
| W/C | BXP4405 | 03212000 |
| W/C | BXR6694 | 04282001 |
| W/C | BXR7295 | 06072001 |
| W/C | B0N7129 | 12012000 |
| W/C | B0N7210 | 11282000 |
| W/C | B0V7640 | 10282000 |
| W/C | B0V8825 | 11182000 |
| W/C | B0W4580 | 03242000 |
| W/C | B0W6384 | 07062000 |
| W/C | B2G5691 | 07062001 |
| W/C | B2G6934 | 08252001 |
| W/C | B5E1067 | 04132000 |

| Major Line Of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | B5R5608 | 09071999 |
| W/C | B6F2246 | 10191999 |
| W/C | B7P7408 | 09122000 |
| W/C | B8T7193 | 07261999 |
| W/C | B8T7737 | 07301999 |
| W/C | C5P0430 | 03292002 |
| W/C | C5P1907 | 04192002 |
| W/C | C5R8679 | 01182002 |
| W/C | C5R9486 | 03142002 |
| W/C | C6A4944 | 03052001 |
| W/C | DUG6437 | 12272000 |
| W/C | DUX5399 | 01192001 |
| W/C | DUX6831 | 02192001 |
| W/C | D1I9167 | 06071999 |
| W/C | D3N1896 | 09071996 |

There are two CarMax property insurance claims pending:

1.    Location 7109, date of loss 2/25/00; and

2.    Location 7116, date of loss of 6/09/01.

The following is the litigation/potential litigation by or against CarMax:

| Matter ID | Title | Lit. Status |
|---|---|---|
| 1996-10-14-001 | CASI v. Salazar, Luis d/b/a S&D Motorsports | Litigation |
| 1997-11-13-001 | CASI v. State of Texas (Blue Laws) | Litigation |
| 1998-03-23-004 | Goodson, Chelmer | Non-Litigation |
| 1998-03-26-010 | CASI v. Nicholson, David | Litigation |
| 1998-11-24-016 | Dimambro, Jason Thomas | Non-Litigation |
| 1998-11-24-019 | Drye, Jesse | Non-Litigation |
| 1998-11-25-002 | CASI v. Holleran, Brian | Litigation |
| 1998-12-04-025 | Ward, Melody & Jeffrey | Non-Litigation |
| 1998-12-04-031 | CASI v. Wilson, Bernie | Litigation |
| 1998-12-22-010 | Rose, Philip Timothy | Non-Litigation |
| 1998-12-22-019 | Slavik, Valentin | Non-Litigation |
| 1999-02-11-004 | CASI v. Jumbelick, Timothy | Litigation |

| Matter ID | Title | Lit. Status |
|---|---|---|
| 1999-02-24-008 | Powell, James Andre | Non-Litigation |
| 1999-03-04-001 | Kenrry-Alacorn, Leonardo DeJesus | Non-Litigation |
| 1999-03-05-001 | CASI v. Knox, Tori | Litigation |
| 1999-03-25-004 | Porch, Cathy | Non-Litigation |
| 1999-03-25-005 | Quaiel, Karen | Non-Litigation |
| 1999-03-25-006 | Roseborough, Carnelle | Non-Litigation |
| 1999-03-25-007 | Weir, Greg Eugene | Non-Litigation |
| 1999-03-25-008 | CASI v. Nougd, U.S. Auto & Imports | Litigation |
| 1999-04-05-010 | Torres, Ramond | Non-Litigation |
| 1999-04-12-004 | Sutton, Stephanie | Non-Litigation |
| 1999-04-13-007 | Lapid, Dolores | Non-Litigation |
| 1999-04-19-004 | CASI v. South Florida Auto Brokers | Litigation |
| 1999-04-30-001 | Wilson, Christine | Non-Litigation |
| 1999-05-07-001 | Senegal, Frankie M. | Non-Litigation |
| 1999-05-10-001 | Sunguard Detailing & Access v. CASI | Litigation |
| 1999-05-24-003 | Dingle, Andre | Non-Litigation |
| 1999-05-25-003 | Miller, Theodore J. | Non-Litigation |
| 1999-07-16-009 | Sack, Stephen | Non-Litigation |
| 1999-07-29-002 | White, Torey | Non-Litigation |
| 2000-02-14-001 | Howell, Robin | Non-Litigation |
| 1999-08-16-002 | Grupo Nacional Provincial v. CASI and Wilson, Derrick and Michael | Litigation |
| 1999-08-17-001 | Ramsey, Donna Marcia | Non-Litigation |
| 1999-08-17-007 | Wallace, Cynthia | Non-Litigation |
| 1999-09-10-002 | Murray, Leo | Non-Litigation |
| 1999-10-21-003 | Skreczko, David | Non-Litigation |
| 1999-10-25-006 | Ward, Felicia | Non-Litigation |
| 1999-11-02-003 | Thomas, Sean | Non-Litigation |
| 1999-11-05-003 | CASI v. Patrico, Michael A. | Litigation |
| 1999-11-08-002 | Spectran | Non-Litigation |
| 1999-11-19-003 | Smith, Rebecca | Non-Litigation |
| 1999-11-19-004 | Schelegel, Sonia | Non-Litigation |
| 1999-12-16-002 | Chavers, Rhenia | Non-Litigation |
| 1999-12-28-001 | Chrisanthou, George | Non-Litigation |
| 2000-01-19-003 | Lafazia, Timothy | Non-Litigation |
| 2000-01-27-001 | Ambrose, Jeffrey | Non-Litigation |
| 2000-02-16-001 | Purvis, Gwendolyn v. CASI | Litigation |
| 2000-02-28-004 | Illinois Department of Transportation v. CASI, et al. | Litigation |
| 2000-02-29-004 | Brown, Monica and Ball, Patrick | Non-Litigation |
| 2000-03-03-007 | CASI v. Walker, Herschel | Litigation |
| 2000-03-13-001 | Sperrazza, Christine J. & Dirvesta, Brett C. | Non-Litigation |
| 2000-03-13-003 | Steeve, Steve | Non-Litigation |

| Matter ID | Title | Lit. Status |
|---|---|---|
| 2002-03-05-001 | Amodeo, Charlene | Non-Litigation |
| 2000-03-29-004 | Eckelhoff, Kristina | Non-Litigation |
| 2000-03-31-001 | Ladewig, William | Non-Litigation |
| 2000-04-03-004 | Maison, Keith A. | Non-Litigation |
| 2000-04-06-001 | Prentice, Ed | Non-Litigation |
| 2000-04-11-004 | CASI v. Reinsager, Jay | Litigation |
| 2000-04-13-001 | Texas Department w/ transportation/"Cash Price" Ad | Non-Litigation |
| 2000-04-17-001 | CASI v. Gheen, Jason | Litigation |
| 2000-04-19-003 | Lawson, Andre D. | Non-Litigation |
| 2000-04-19-006 | CASI v. Vogel, William | Litigation |
| 2000-05-03-006 | CASI v. Gamez, Abelino | Litigation |
| 2000-05-09-001 | Walker, Patricia | Non-Litigation |
| 2000-05-11-001 | Vidal, Joanne | Non-Litigation |
| 2001-04-23-001 | CASI v. Vlietstra, Kari | Litigation |
| 2000-05-11-005 | Peterson, Felicia | Non-Litigation |
| 2000-06-08-001 | Betances, Margie | Non-Litigation |
| 2000-06-13-001 | CASI v. M & M Industries; Taylor, Johnnie & Rosemary | Litigation |
| 2000-06-16-002 | Cox, Patricia D. | Non-Litigation |
| 2002-05-06-001 | Brooks, Stephanie | Non-Litigation |
| 2000-06-29-001 | CASI v. Hannigan, Michele B | Litigation |
| 2000-07-03-001 | Robinson, Allen E. | Non-Litigation |
| 2000-07-06-001 | Buckner, Mattie | Non-Litigation |
| 2000-07-24-002 | CASI v. Gray, Dwayne | Litigation |
| 2000-07-24-008 | Deavers, Jimmy | Non-Litigation |
| 2000-08-01-006 | CASI v. Desbrow, Patricia | Litigation |
| 2000-08-09-006 | Rickelman, Kurt | Non-Litigation |
| 2000-08-17-003 | CASI v. Vaughn, Latonia | Litigation |
| 2000-08-21-002 | Williams, Terence L. | Non-Litigation |
| 2000-08-23-001 | CASI v. Houston, Jr., Thomas | Litigation |
| 2000-09-06-003 | Webb, Mitchell v. CASI | Litigation |
| 2000-09-06-004 | Tatum, Brian | Non-Litigation |
| 2000-09-08-001 | CASI v. Diaz, Angel | Litigation |
| 2000-08-30-002 | CASI v. Arnold, Charles H. | Litigation |
| 2000-09-21-001 | Smith, Alan | Non-Litigation |
| 2000-10-03-001 | CASI v. Jones, Ernest | Litigation |
| 2000-10-03-002 | Cole, Peter D. | Non-Litigation |
| 2000-10-05-004 | CASI v. Carol, Ralph A. | Litigation |
| 2000-10-17-002 | Marshall, Joey | Non-Litigation |
| 2000-10-17-003 | Wojcik, Michelle | Non-Litigation |
| 2000-10-27-002 | Mares, Luz | Non-Litigation |

| Matter ID | Title | Lit. Status |
|---|---|---|
| 2000-11-28-006 | Bice, Curtis | Non-Litigation |
| 2000-12-01-004 | Sims, Rovert F. | Non-Litigation |
| 2000-12-04-003 | Mohamed, Amyn | Non-Litigation |
| 2000-12-12-006 | Orlander, Nikio/Auto Finance | Non-Litigation |
| 2000-12-12-009 | CASI v. Baggott, Latarsha M. | Litigation |
| 2000-12-12-010 | CASI v. Novitski, Alexander I. | Litigation |
| 2000-12-14-002 | Alexander, Amy M. | Non-Litigation |
| 2000-12-14-003 | Roberts, Shavonne Kristi | Non-Litigation |
| 2000-12-20-005 | Zuley, Sean | Non-Litigation |
| 2001-01-04-001 | CASI v. Buford, Aaron | Litigation |
| 2001-01-10-002 | Mate, Ramiro | Non-Litigation |
| 2001-01-10-004 | CASI v. Eastham, Sean | Litigation |
| 2001-01-10-005 | Mullins, Matthew | Non-Litigation |
| 2001-01-15-005 | CASI v. McDaniel, Yolanda S. and Michael R. | Litigation |
| 2001-01-26-003 | CASI v. Dalton, David R., Jr. | Litigation |
| 2001-02-05-002 | Perez, Marlene & Angel | Non-Litigation |
| 2001-02-08-002 | Suissa, Meyer M. and Mindy | Non-Litigation |
| 2001-02-08-003 | Fischer, Sean N. | Non-Litigation |
| 2001-02-13-001 | Anderson, Lorrie | Non-Litigation |
| 2001-02-13-005 | Schell, Melanie C. | Non-Litigation |
| 2001-02-13-007 | CASI v. Stonebreaker, Richard | Litigation |
| 2001-02-20-002 | Meekins, Gregory | Non-Litigation |
| 2001-02-21-001 | Burgos, Ricardo | Non-Litigation |
| 2001-02-21-002 | Speights, Eric Van | Non-Litigation |
| 2001-02-26-003 | Harrison, Troy & April | Non-Litigation |
| 2001-02-26-007 | CASI v. Hodge, Michelle | Litigation |
| 2001-02-28-001 | Ragone, Jeffrey T. | Non-Litigation |
| 2001-03-07-001 | Holmes, Anita M. | Non-Litigation |
| 2001-03-14-001 | CASI v. Lewis, Tommie Jean | Non-Litigation |
| 2001-03-20-002 | Childs, Damian | Non-Litigation |
| 2001-04-02-004 | Schilberg, Jason | Non-Litigation |
| 2001-03-23-002 | CASI v. Washington, Chiffonda | Litigation |
| 2001-03-29-003 | Winberg, Bill | Non-Litigation |
| 2001-04-05-010 | CASI v. Andrews, Lance | Non-Litigation |
| 2001-04-16-004 | North, Howard and Mekeshua | Non-Litigation |
| 2001-04-18-006 | Foulds, Demmos and Rhouda | Non-Litigation |
| 2001-05-03-002 | CASI v. Filipkiy, Natalya | Litigation |
| 2001-05-07-002 | Jackson, Alfred J. | Non-Litigation |
| 2001-05-08-004 | Taylor, Steven | Non-Litigation |
| 2001-05-08-005 | CASI v. Herrington, Steven dba Cars, Cars | Litigation |
| 2001-05-10-004 | Bodnar, Ronald | Non-Litigation |
| 2001-05-14-003 | Warren, Troy and Teresa | Non-Litigation |

| Matter ID | Title | Lit. Status |
|-----------|-------|-------------|
| 2001-05-17-001 | Cable, Jeffrey M. | Non-Litigation |
| 2001-05-18-003 | Martin, Shelly | Non-Litigation |
| 2001-05-21-004 | CASI v. Arceneaux, Tiffany and Christopher | Non-Litigation |
| 2001-05-21-005 | CASI v. Kennedy, Shawn | Litigation |
| 2001-05-21-010 | CASI v. Knight, Tanisha D. | Litigation |
| 2001-05-21-011 | CASI v. Divita, Robert M. | Litigation |
| 2001-05-23-001 | Hart, William L. v. CASI | Litigation |
| 2001-05-23-004 | Rodriguez, Maria | Non-Litigation |
| 2001-05-24-001 | CASI v. Kerusenko, Sergey | Litigation |
| 2001-05-25-002 | CASI v. Lee, Melanie A. | Litigation |
| 2001-05-25-003 | Slater, Edna M. R. | Non-Litigation |
| 2001-05-30-001 | Bailey, Jason | Non-Litigation |
| 2001-06-01-002 | Thomas, Rodney | Non-Litigation |
| 2001-06-01-003 | Allen, Michael, Sr. v. CASI | Litigation |
| 2001-06-01-005 | Stryker, Rochelle | Non-Litigation |
| 2001-06-05-003 | Bronson, Karen | Non-Litigation |
| 2001-06-06-001 | CASI v. London, Monzell | Litigation |
| 2001-06-06-002 | Russell, Diana | Non-Litigation |
| 2001-06-08-006 | CASI v. Smith, Mark E. | Non-Litigation |
| 2001-06-12-001 | Cole, Jeff v. CASI | Litigation |
| 2001-06-12-004 | Ambrosii, Karinna | Non-Litigation |
| 2001-06-12-006 | Gebhart, Jette | Non-Litigation |
| 2001-06-14-004 | Brooks, Richard and Nimfa | Non-Litigation |
| 2001-06-22-002 | Zapf, Richard | Non-Litigation |
| 2001-06-28-003 | Hall, Kenneth | Non-Litigation |
| 2001-06-29-001 | Bertram, Christine | Non-Litigation |
| 2001-06-29-003 | GMC v. Ferrer, Anthony, CASI | Litigation |
| 2001-07-05-003 | Perez, Eduardo and Gonzales, April v. CASI | Litigation |
| 2001-07-06-002 | White, Warren | Non-Litigation |
| 2001-07-11-004 | Palacios, Carlos | Non-Litigation |
| 2001-07-11-006 | Jacobson, Melody | Non-Litigation |
| 2001-07-11-007 | CASI v. Silvas, Rey Jr. | Litigation |
| 2001-07-16-002 | CASI v. Dorestes, Alain | Litigation |
| 2001-07-20-002 | Taylor, Albert | Non-Litigation |
| 2001-07-26-002 | CASI v. Texas Senate Bill 5 | Litigation |
| 2001-08-06-001 | Pierce, Alton | Non-Litigation |
| 2001-08-13-001 | Baker, John | Non-Litigation |
| 2001-07-17-002 | Wallace, Gibson | Non-Litigation |
| 2001-07-17-005 | Diaz, Julio | Non-Litigation |
| 2001-07-17-006 | Jaycox, Timothy | Non-Litigation |
| 2001-07-17-007 | Gonzalez, Daniel | Non-Litigation |
| 2001-08-15-007 | CASI v. Leggans, Gregory | Litigation |

| Matter ID | Title | Lit. Status |
|---|---|---|
| 2001-08-17-001 | CASI v. Grant, Lisah | Litigation |
| 2001-08-17-003 | CASI v. Hicks, Ken and Kendra | Litigation |
| 2001-08-24-003 | Groves, Christopher | Non-Litigation |
| 2001-09-07-003 | Young, Jay and Panadda Thestae | Non-Litigation |
| 2001-09-10-004 | Shoemaker, David E. v. CASI | Litigation |
| 2001-09-10-005 | CASI v. Gordon, Marvin | Litigation |
| 2001-09-11-003 | Powell, Robert | Non-Litigation |
| 2001-09-12-002 | Stermer, Beverly | Non-Litigation |
| 2001-09-14-001 | Taviere, Beverly | Non-Litigation |
| 2001-09-14-008 | Bryan, George | Non-Litigation |
| 2001-09-19-003 | CASI v. Grandson, Carolyn | Litigation |
| 2001-09-19-004 | CASI v. Khan, Mohammed and Khan Abdul | Litigation |
| 2001-09-24-002 | Will, Hunter and Angela | Non-Litigation |
| 2001-09-25-002 | Prapapan, Janjira | Non-Litigation |
| 2001-09-25-004 | Lawrence, Clive | Non-Litigation |
| 2001-09-25-006 | CASI v. Cummingham, Ronald | Litigation |
| 2001-09-27-002 | Miller, Jesse | Non-Litigation |
| 2001-09-27-004 | Dragoo, John and Suzanne | Non-Litigation |
| 2001-09-28-003 | CASI v. Benn, Michael | Litigation |
| 2001-10-01-001 | CASI v. Dickinson, Linda | Litigation |
| 2001-10-03-002 | Celozzi Ford | Non-Litigation |
| 2001-08-31-002 | Conrad, John | Non-Litigation |
| 2001-09-04-006 | Camacho, Domingo | Non-Litigation |
| 2001-10-04-001 | Reynolds, Christopher | Non-Litigation |
| 2001-10-04-002 | Fisher, Stephen v. CASI | Litigation |
| 2001-10-05-001 | Hicks, Stephen v. CASI | Litigation |
| 2001-10-05-003 | Holliday, Dee | Non-Litigation |
| 2001-10-08-006 | Farley, Craig | Non-Litigation |
| 2001-10-09-001 | Ekunwe, Charles and Janice | Non-Litigation |
| 2001-10-10-002 | Frazier, Scott | Non-Litigation |
| 2001-10-16-003 | Phillips, Tina v. CASI | Litigation |
| 2001-10-22-002 | Herout, Pamela and Carl | Non-Litigation |
| 2001-10-30-001 | O'Leary, Timothy K. | Non-Litigation |
| 2001-11-01-003 | Tayman, James | Non-Litigation |
| 2001-11-02-001 | Mayo, Wendell | Non-Litigation |
| 2001-11-05-005 | Walker, Ileana | Non-Litigation |
| 2001-11-06-001 | Pereira, Angelo | Non-Litigation |
| 2001-11-06-003 | CASI v. Green, Timothy | Non-Litigation |
| 2001-11-06-005 | Coats, Dawnielle v. CASI | Litigation |
| 2001-11-06-007 | Connally, Kim | Non-Litigation |
| 2001-11-06-009 | Trygar, Louis v. CASI | Litigation |
| 2001-11-07-001 | Valentin, John | Non-Litigation |

| Matter ID | Title | Lit. Status |
|---|---|---|
| 2001-11-07-002 | Corandel, Dale | Non-Litigation |
| 2001-11-09-003 | Ray, Michelle | Non-Litigation |
| 2001-11-09-005 | Bresth, Stephanie | Non-Litigation |
| 2001-11-13-001 | Shelton, Tamara C. | Non-Litigation |
| 2001-11-13-011 | Tapley, Michael S. | Non-Litigation |
| 2001-11-21-001 | Jones, Nicole | Non-Litigation |
| 2001-11-27-001 | Little, John | Non-Litigation |
| 2001-11-27-002 | Hicks, Clifford | Non-Litigation |
| 2001-11-28-001 | CASI v. Kernan, Frank | Litigation |
| 2001-11-29-002 | Johnson, Christopher | Non-Litigation |
| 2001-11-29-007 | Stubbs, Larry and Manique v. CASI | Litigation |
| 2001-12-03-001 | Leutik, Theresa | Non-Litigation |
| 2001-12-06-001 | Vermaaten, Holly | Non-Litigation |
| 2001-12-06-005 | Terrell, Tara | Non-Litigation |
| 2001-12-07-005 | Plane, Anthony | Non-Litigation |
| 2001-12-10-003 | Rodriguez, Pilar | Non-Litigation |
| 2001-12-11-004 | CASI v. Campbell, Kevin | Litigation |
| 2001-12-13-001 | Watkins, Charles (www.carmaxscrewedme.com) | Non-Litigation |
| 2001-12-14-001 | Daniel, Charmaine | Non-Litigation |
| 2001-12-17-002 | CASI v. Smith, John | Litigation |
| 2001-12-18-002 | Crew, Kimberly | Non-Litigation |
| 2001-12-24-004 | Gutierrez, Maribel and Fernando | Non-Litigation |
| 2001-12-26-001 | Cabreja, Rafael J. | Non-Litigation |
| 2001-12-27-001 | All Star Ford-Mercury, Inc. (Bridges, David and Katherine) v. CASI | Litigation |
| 2002-01-07-017 | Sweeney, Jonathan v. CASI | Litigation |
| 2002-01-09-005 | Thomas, Stuart and Sabrina | Non-Litigation |
| 2002-01-10-003 | Perkerson, Mary | Non-Litigation |
| 2002-01-10-004 | Fly, Lawrence | Non-Litigation |
| 2002-01-10-005 | Toledo, Robert | Non-Litigation |
| 2002-01-10-006 | CASI v. Thomas, Andrew | Non-Litigation |
| 2002-01-15-001 | Martins, Jeffinfer | Non-Litigation |
| 2002-01-16-001 | Bailey, Gene v. CASI | Litigation |
| 2002-01-21-003 | CASI v. Finney, Ursula | Litigation |
| 2002-01-22-008 | Pittman, Julia | Non-Litigation |
| 2002-01-23-001 | Chang, Keysha | Non-Litigation |
| 2002-01-28-001 | Edwards, Nanette | Non-Litigation |
| 2002-01-07-020 | Perrett, Christopher | Non-Litigation |
| 2002-01-07-021 | Green, Andrew | Non-Litigation |
| 2002-01-07-022 | Kuwomu, Peter | Non-Litigation |
| 2002-01-09-001 | Walker, Erica | Non-Litigation |
| 2002-01-28-002 | Shadix, Mike | Non-Litigation |

| Matter ID | Title | Lit. Status |
|---|---|---|
| 2002-01-28-003 | Plater, Marlon | Non-Litigation |
| 2002-01-29-001 | Texas Dealer's License (Delgado, Gabriel) v. CASI | Litigation |
| 2002-01-29-002 | Harris, Larry | Non-Litigation |
| 2002-01-29-004 | McClure, Shannon v. CASI | Litigation |
| 2002-01-29-005 | Jones, Tahir | Non-Litigation |
| 2002-02-05-001 | Pollard, Dwight | Non-Litigation |
| 2002-02-05-004 | Williams, Arthur and Ann | Non-Litigation |
| 2002-02-07-001 | Hames, Michael F. | Non-Litigation |
| 2002-02-07-002 | Ashley, Ronn | Non-Litigation |
| 2002-02-07-003 | Culter, Ray | Non-Litigation |
| 2002-02-07-004 | Rios, Michael | Non-Litigation |
| 2002-02-13-001 | Bruce, Darlene and John v. CASI | Litigation |
| 2002-02-13-002 | Smith, Marcus | Non-Litigation |
| 2002-02-13-003 | Roland, Timothy | Non-Litigation |
| 2002-02-13-004 | Kenosha Ford-Threatened Termination | Non-Litigation |
| 2002-02-14-001 | Fondren, Mike | Non-Litigation |
| 2002-02-14-003 | Kelly, Walter | Non-Litigation |
| 2002-02-14-006 | Outland, Lisa | Non-Litigation |
| 2002-02-14-007 | Purdie, Rebecca | Non-Litigation |
| 2002-02-14-009 | Demory, Howard | Non-Litigation |
| 2002-02-18-004 | Martin, Paul and Victoria v. CASI | Litigation |
| 2002-02-18-007 | DeVine, Lindsey | Non-Litigation |
| 2002-02-22-002 | Lawson, Damon | Non-Litigation |
| 2002-02-25-001 | Quintana, Eddie and Hollie | Non-Litigation |
| 2002-02-26-002 | Garay, Rafael | Non-Litigation |
| 2002-02-26-003 | Reed, Brandon and Loeta | Non-Litigation |
| 2002-02-26-004 | McCurry, Stephen | Non-Litigation |
| 2002-02-26-005 | Smith, Shaun | Non-Litigation |
| 2002-02-28-001 | Lang, Theresa | Non-Litigation |
| 2002-02-28-003 | Wooden, Marcia | Non-Litigation |
| 2002-02-28-004 | Hunt, Donald v. CASI | Litigation |
| 2002-02-28-005 | Ramirez, Sharon v. CASI | Litigation |
| 2002-03-01-001 | Mercado, Penny v. CASI | Litigation |
| 2002-03-05-002 | Fitzgerald, Ingrid | Non-Litigation |
| 2002-03-05-003 | Kidd, Brooke | Non-Litigation |
| 2002-03-06-001 | Moyer, Yolanda | Non-Litigation |
| 2002-03-06-003 | CASI v. J.B.M. Investments | Litigation |
| 2002-03-07-001 | Dey, Trishna | Non-Litigation |
| 2002-03-08-001 | Silvestri, Kenneth and Mary Sue | Non-Litigation |
| 2002-03-12-002 | Parnell, Chuck | Non-Litigation |
| 2002-03-12-003 | Atlanta Check Cashers, Inc. v. CASI | Litigation |
| 2002-03-12-004 | Caffrey, Michelle | Non-Litigation |

| Matter ID | Title | Lit. Status |
|---|---|---|
| 2002-03-13-001 | Misc. Expenses FY2003 | Non-Litigation |
| 2002-03-13-002 | Dues & Subscriptions FY2003 | Non-Litigation |
| 2002-03-14-001 | Suarez, Cristina and Avello, Henry | Non-Litigation |
| 2002-03-14-004 | CASI v. Lee, Justin | Litigation |
| 2002-03-14-005 | Flores, Donna v. CASI | Litigation |
| 2002-03-15-003 | Stevens, Laura | Non-Litigation |
| 2002-03-18-001 | Roberts, Melody L. | Non-Litigation |
| 2002-03-18-002 | Watkins, Angela | Non-Litigation |
| 2002-03-19-002 | Blackwell Bobby and Anna | Non-Litigation |
| 2002-03-21-001 | Poole, Shawn | Non-Litigation |
| 2002-03-21-002 | Kruse, Kevin | Non-Litigation |
| 2002-03-22-001 | Burdi, Joseph | Non-Litigation |
| 2002-03-22-003 | Hongsurapan, Supanya | Non-Litigation |
| 2002-03-22-004 | Shetler, Daniel and Deanna | Non-Litigation |
| 2002-03-25-001 | Hemsley, Anthony | Non-Litigation |
| 2002-03-25-004 | Abston, Jenette | Non-Litigation |
| 2002-03-25-008 | Alves, Paul v. CASI | Litigation |
| 2002-03-26-001 | Houff, Bradley | Non-Litigation |
| 2002-03-26-003 | Segovia, Jose A. | Non-Litigation |
| 2002-03-27-002 | Bowles, Velda v. CASI | Litigation |
| 2002-04-01-004 | Forrest, Joyce and Ronald | Non-Litigation |
| 2002-04-02-003 | Kura, Donald | Non-Litigation |
| 2002-04-04-002 | Walker, Harvey | Non-Litigation |
| 2002-04-04-003 | Tebo, Joseph | Non-Litigation |
| 2002-04-04-004 | Mobile One Detailing | Non-Litigation |
| 2002-04-04-007 | Griffin, Pumea N. | Non-Litigation |
| 2002-04-04-008 | Christopher, Brenda J. | Non-Litigation |
| 2002-04-05-001 | Munoz, Roxana and Rodrigo v. CASI | Litigation |
| 2002-04-05-002 | Huisel, Timothy J., Jr. and Timothy J., Sr. v. CASI | Litigation |
| 2002-04-05-003 | St. Ives, Thomas | Non-Litigation |
| 2002-04-08-001 | CSC FY2003 | Non-Litigation |
| 2002-04-08-002 | West Law Group FY2003 | Non-Litigation |
| 2002-04-12-001 | Ruiz, Lilia | Non-Litigation |
| 2002-04-12-002 | Dixon, Mark T. | Non-Litigation |
| 2002-04-12-003 | Tison, Randy | Non-Litigation |
| 2002-04-12-005 | Bryant, Cade | Non-Litigation |
| 2002-04-15-001 | Valerio, Guido | Non-Litigation |
| 2002-04-15-002 | Albet, Andrew J. v. CASI | Litigation |
| 2002-04-15-003 | Adilson Andrade v. KP Properties, et al., CASI | Litigation |
| 2002-04-15-005 | Santiago, Pablo | Non-Litigation |
| 2002-04-15-006 | Clifton, Sheryl | Non-Litigation |
| 2002-04-16-001 | Duluth Motor Cars, Inc. | Non-Litigation |

| Matter ID | Title | Lit. Status |
|-----------|-------|-------------|
| 2002-04-16-003 | Vantage Motors, Inc. | Non-Litigation |
| 2002-04-16-004 | Stevens, Derek and Hill, Sabrina | Non-Litigation |
| 2002-04-16-005 | Salas, David | Non-Litigation |
| 2002-04-16-006 | Taylor, Lynn | Non-Litigation |
| 2002-04-16-007 | Fisk, Linda | Non-Litigation |
| 2002-04-16-009 | Carson, Carmen | Non-Litigation |
| 2002-04-16-011 | SUV Central, Inc. | Non-Litigation |
| 2002-04-17-001 | Gilland, Terry G. | Non-Litigation |
| 2002-04-17-002 | Anise, Maikel | Non-Litigation |
| 2002-04-17-003 | Prendergast, John | Non-Litigation |
| 2002-04-18-002 | Green, Sabian | Non-Litigation |
| 2002-04-18-003 | Lencioni, Susan | Non-Litigation |
| 2002-04-19-001 | Bilberry, Lee | Non-Litigation |
| 2002-04-19-002 | Stanwich, Brett | Non-Litigation |
| 2002-04-22-001 | McCarthy, Michael | Non-Litigation |
| 2002-04-22-003 | Wright, Virginia Goodson | Non-Litigation |
| 2002-04-22-004 | Campos, Roy | Non-Litigation |
| 2002-04-23-001 | Barefoot, Susan | Non-Litigation |
| 2002-04-25-001 | Hutchison, Jonathan | Non-Litigation |
| 2002-04-25-002 | Colver, Scott | Non-Litigation |
| 2002-04-25-003 | Stinson, Cynthia | Non-Litigation |
| 2002-04-25-004 | Vancelette, Jackie | Non-Litigation |
| 2002-04-25-005 | Moorer, Terrence | Non-Litigation |
| 2002-04-26-001 | Washington, Gregory | Non-Litigation |
| 2002-04-26-002 | Noorbakhsh, Tabasom/Mohajerin, Hooman | Non-Litigation |
| 2002-04-26-003 | Henshaw, Charles and Monica | Non-Litigation |
| 2002-04-26-004 | Schulman, Daniel | Non-Litigation |
| 2002-04-29-001 | Orta, Rosalie | Non-Litigation |
| 2002-04-30-001 | Baker, Herman | Non-Litigation |
| 2002-04-30-002 | Dallas, Michael | Non-Litigation |
| 2002-04-30-003 | Lopez, Rafael | Non-Litigation |
| 2002-04-30-005 | Francis, Sharita | Non-Litigation |
| 2002-04-30-006 | Fetrow, Chihoko | Non-Litigation |
| 2002-05-01-001 | Kabba, Mohamed S. v. CASI West Coast | Non-Litigation |
| 2002-05-03-001 | Slepawic, David | Non-Litigation |
| 2002-05-03-002 | United Road Services | Non-Litigation |
| 2002-05-03-004 | Tucker, Aileen F. v. CASI | Litigation |
| 2002-05-03-005 | GM Quinn & Associates, Ltd. | Non-Litigation |
| 2002-05-03-006 | Espinoza, Victoria | Non-Litigation |
| 2002-05-03-007 | Gardner, Carissa | Non-Litigation |
| 2002-05-03-008 | Shin-fen, Tiffany Jen | Non-Litigation |
| 2002-05-03-009 | CASI v. Adams, William | Litigation |

| Matter ID | Title | Lit. Status |
|---|---|---|
| 2002-05-06-003 | Retig, Douglas and Lori | Non-Litigation |
| 2002-05-08-001 | Gee, Angela | Non-Litigation |
| 2002-05-08-002 | Ferguson, David | Non-Litigation |
| 2002-05-08-003 | Phoenix Sales and Leasing | Non-Litigation |
| 2002-05-09-001 | Spann-Leak, Karissa | Non-Litigation |
| 2002-05-09-002 | Shears, Matthew | Non-Litigation |
| 2002-05-10-001 | Nagy, Louis | Non-Litigation |
| 2002-05-13-003 | Uceda, Frank and Ruby | Non-Litigation |
| 2002-05-14-001 | Ledebur, John | Non-Litigation |
| 2002-05-14-002 | Integrated Vehicle Leasing Inc. | Non-Litigation |
| 2002-05-14-003 | Plano Independent School District v. CASI | Litigation |
| 2002-05-14-004 | Christian, Derric | Non-Litigation |
| 2002-05-14-005 | Sanchez, Olga | Non-Litigation |
| 2002-05-14-006 | Popular Cash Express | Non-Litigation |
| 2002-05-14-007 | Ashorn, Brian and Heather | Non-Litigation |
| 2002-05-14-008 | Marshall, Stacy | Non-Litigation |
| 2002-05-14-009 | Baker, Everlene | Non-Litigation |
| 2002-05-14-010 | Washington, Kelly | Non-Litigation |
| 2002-05-14-011 | Brodsky/Mintz, Amy | Non-Litigation |
| 2002-05-15-001 | Jones, Tina | Non-Litigation |
| 2002-05-15-002 | Rokakis, James | Non-Litigation |
| 2002-05-15-003 | Laws, Amanda and Halley, Lorraine | Non-Litigation |
| 2002-05-15-004 | Tabor, Phil (Sunray Investment) | Non-Litigation |
| 2002-05-15-005 | Williams, Dwayne | Non-Litigation |
| 2002-05-15-006 | B&F Cleaning Services, Inc. | Non-Litigation |
| 2002-05-16-001 | Kilman, Donald G. | Non-Litigation |
| 2002-05-16-002 | Welsh, John | Non-Litigation |
| 2002-05-16-003 | Goldsmith, John M. | Non-Litigation |
| 2002-05-20-002 | Eley, Antoinette V. | Non-Litigation |
| 2002-05-20-003 | Ayyadurai, Manivannan | Non-Litigation |
| 2002-05-20-004 | Gonzalez, Ignacio | Non-Litigation |
| 2002-05-20-005 | Fitzgerald, Misty | Non-Litigation |
| 2002-05-20-006 | Powell, Whitney | Non-Litigation |
| 2002-05-20-007 | Staiano, Michael | Non-Litigation |
| 2002-05-21-002 | Broughton, Paul G., et al. V. Discount Motors, et al. (CASI | Litigation |
| 2002-05-21-003 | Wright, Deidra Nicole and Clayborn, Mary | Non-Litigation |
| 2002-05-22-001 | Flores, Frank | Non-Litigation |
| 2002-05-22-002 | Renteria, Honorio v. Ford Motor Company | Non-Litigation |
| 2002-05-22-003 | Saucedo, Noemi and Luis v. Ford Motor Company | Non-Litigation |
| 2002-05-22-004 | Orchard, Paul and Ann v. Ford Motor Company | Non-Litigation |
| 2002-05-23-001 | Te, Mum | Non-Litigation |

| Matter ID | Title | Lit. Status |
|---|---|---|
| 2002-05-23-002 | Penny Tracy and Deborah | Non-Litigation |
| 2002-05-24-001 | Bakarr, Willa M. | Non-Litigation |
| 2002-05-28-001 | Flores, Benjamin | Non-Litigation |
| 2002-05-28-002 | Oppermann, Lynn | Non-Litigation |
| 2002-05-28-003 | Smith, Robert | Non-Litigation |
| 2002-05-28-004 | Hill, Calvin | Non-Litigation |
| 2002-05-28-005 | Martin, William | Non-Litigation |
| 2002-05-28-006 | Hernandez, Trina | Non-Litigation |
| 2002-05-28-007 | Pena, Carmen | Non-Litigation |
| 2002-05-28-008 | Pritchard, Jim and Ana | Non-Litigation |
| 2002-05-28-009 | Pegoda, David | Non-Litigation |
| 2002-05-28-010 | Stone, Tracy | Non-Litigation |
| 2002-05-28-011 | Beckham, Wendy | Non-Litigation |
| 2002-05-29-001 | Taylor, Judy | Non-Litigation |
| 2002-05-29-002 | Dillaman, Steve | Non-Litigation |
| 2002-05-30-001 | Frome, William | Non-Litigation |
| 2002-06-03-001 | Dennison, Joanne M. | Non-Litigation |
| 2002-06-03-002 | Bethea, Quintin | Non-Litigation |
| 2002-06-03-003 | Feldman, Joy | Non-Litigation |
| 2002-06-03-004 | Bell, Patricia | Non-Litigation |
| 2002-06-03-005 | Perdomo, Charles | Non-Litigation |
| 2002-06-03-006 | Wood, Toby A. | Non-Litigation |
| 2002-06-03-007 | Chae, Min Seuk | Non-Litigation |
| 2002-06-03-008 | Thompson, Essex | Non-Litigation |
| 2002-06-03-009 | Middleton, William J. and Fountain, Lillian M. | Non-Litigation |

//CORP 117530.3

# UPDATED SCHEDULES

## SCHEDULE 2.2(a)

## REAL PROPERTY

| LOC. # | NAME | ADDRESS | CITY | STATE | ZIPCODE | DEAL TYPE |
|--------|------|---------|------|-------|---------|-----------|
| 07136 | DUARTE CARMAX (S/L) | 1131 CENTRAL AVENUE | DUARTE | CA | 91010 | SALE/LEASEBACK |
| 07810 | LAX CPJ & DODGE CARMAX | 1030 WEST MANCHESTER BOULEVARD | INGLEWOOD | CA | 90301 | LEASE |
| 07812 | LAX MITSUBISHI CARMAX | 8611 LACIENEGA BOULEVARD | INGLEWOOD | CA | 90301 | PURCHASE |
|  | LOS ANGELES ONTARIO CARMAX - LAND | MILLIKEN & I-10@ ONTARIO MILLS | ONTARIO | CA | 91761 | PURCHASE |
| 07120 | ROSEVILLE CARMAX | 1450 EUREKA ROAD | ROSEVILLE | CA | 95661 | PURCHASE |
| 07147 |  |  |  |  |  |  |
| 07113 | BOYNTON BEACH CARMAX (S/L) | 2000 HIGHRIDGE ROAD | BOYNTON BEACH | FL | 33426 | SALE/LEASEBACK |
| 07172 | CLEARWATER CARMAX (S/L) | 2550 ROOSEVELT BOULEVARD | CLEARWATER | FL | 33760 | SALE/LEASEBACK |
| 07172 | CLEARWATER CARMAX (S/L) BILLBOARD SUBLEASE | 2550 ROOSEVELT BOULEVARD | CLEARWATER | FL | 34620 | SUBLEASE |
| 07108 | FT. LAUDERDALE CARMAX (S/L) | 7420 STATE ROAD 84 | DAVIE | FL | 33317 | SALE/LEASEBACK |
| 07108-A | FT. LAUDERDALE CARMAX ADDITIONAL PROPERTY | RIGHT-OF-WAY ON SW 75TH STREET | DAVIE | FL | 33317 | PURCHASE |
| 07110 | INTERNATIONAL MALL CARMAX (S/L) | 1300 N.W. 98TH COURT | MIAMI | FL | 33172 | SALE/LEASEBACK |
| 07107 | ORLANDO CARMAX (S/L) | 6375 SOUTH SEMORAN BOULEVARD | ORLANDO | FL | 32822 | SALE/LEASEBACK |
| 07205 | ORLANDO CPJ CARMAX | 7530 SOUTH ORANGE BLOSSOM TRAIL | ORLANDO | FL | 32809 | LEASE |
| 07105 | TAMPA CARMAX (S/L) | 14920 NORTH NEBRASKA AVENUE | TAMPA | FL | 33613 | SALE/LEASEBACK |
| 07103 | TOWN CENTER CARMAX (S/L) | 1215 ERNEST BARRETT PARKWAY | KENNESAW | GA | 30144 | SALE/LEASEBACK |
| 07103-A | TOWN CENTER CARMAX ADDITIONAL PROPERTY | ERNEST BARRETT PARKWAY | KENNESAW | GA | 30144 | PURCHASE |
| 09210 **** | CHASTAIN MEADOWS OFFICE (S/L) | 225 CHASTAIN MEADOWS COURT | KENNESAW | GA | 30144 | SALE/LEASEBACK |
| 07104 | NORCROSS CARMAX (S/L) | 1975 BEAVER RUIN ROAD | NORCROSS | GA | 30071 | SALE/LEASEBACK |
| 07117 | SOUTHLAKE CARMAX (S/L) | 3100 MT. ZION PARKWAY | STOCKBRIDGE | GA | 30281 | SALE/LEASEBACK |
| 07146 | HILLSIDE CARMAX (S/L) | 101 NORTH WOLF ROAD | HILLSIDE | IL | 60162 | SALE/LEASEBACK |
| 07122 | NAPERVILLE CARMAX (S/L) | 3320 ODYSSEY COURT | NAPERVILLE | IL | 60566 | SALE/LEASEBACK |
| 07128 | SCHAUMBURG CARMAX (S/L) | 250 EAST GOLF ROAD | SCHAUMBURG | IL | 60173 | SALE/LEASEBACK |
| 07123 | TINLEY PARK CARMAX (S/L) | 18800 SOUTH OAK PARK AVENUE | TINLEY PARK | IL | 60477 | SALE/LEASEBACK |
| 07144 | INDIANAPOLIS CARMAX - LAND | LAFAYETTE RD & INTERSTATE 65 | INDIANAPOLIS | IN | 46254 | PURCHASE |
| 07180 | MERRILLVILLE CARMAX | 1370 EAST 79TH PLACE | MERRILLVILLE | IN | 46410 | PURCHASE |
| 07173 | KANSAS CARMAX | 9009 WEST 67TH STREET | MERRIAM | KS | 66202 | PURCHASE |
| 07118 | LAUREL CARMAX (S/L) | 8800 FREESTATE DRIVE | LAUREL | MD | 20723 | SALE/LEASEBACK |
| 07806 | LAUREL TOYOTA CARMAX (S/L) | 8801 FREESTATE DRIVE | LAUREL | MD | 20723 | SALE/LEASEBACK |
| 07206 | ROCKVILLE CARMAX | 15931 FREDERICK ROAD | ROCKVILLE | MD | 20855 | LEASE |
| 07121 | WHITE MARSH CARMAX (S/L) | 10201 PHILADELPHIA  ROAD | WHITE MARSH | MD | 21162 | SALE/LEASEBACK |
| 07121-A | WHITE MARSH CARMAX ADDITIONAL PROPERTY | 10109 PHILADELPHIA ROAD | WHITE MARSH | MD | 21162 | PURCHASE |
| 07157 *** | LAS VEGAS CARMAX | SEC WARM SPRINGS & US 95 | HENDERSON | NV | 89015 | PURCHASE |
| 07106 | CHARLOTTE CARMAX (S/L) | 7700 KREFELD DRIVE | CHARLOTTE | NC | 28227 | SALE/LEASEBACK |
| 07185 | GREENSBORO CARMAX | 3412 WEST WENDOVER AVENUE | GREENSBORO | NC | 27407 | PURCHASE |
| 07197 * | SOUTH BOULEVARD CARMAX | 10510 CADILLAC STREET | PINEVILLE | NC | 28134 | PURCHASE |
| 07102 | RALEIGH CARMAX (S/L) | 8520 GLENWOOD AVENUE | RALEIGH | NC | 27612 | SALE/LEASEBACK |
| 07102-A | RALEIGH CARMAX - AUCTION LOT | 8837 GLENWOOD AVENUE | RALEIGH | NC | 27612 | LEASE |
| 07165 | CLEVELAND CARMAX - LAND | MILES ROAD & INTERSTATE 271 | WARRENSVILLE HEIGHTS | OH | 44128 | PURCHASE |
| 07177 | GREENVILLE CARMAX (S/L) | 2800 LAURENS ROAD | GREENVILLE | SC | 29607 | SALE/LEASEBACK |
| 07241 ** | KNOXVILLE CARMAX | 11225 PARKSIDE DRIVE | KNOXVILLE | TN |  | PURCHASE |
| 07150 | NASHVILLE CARMAX (S/L) | 2501 POWELL AVENUE | NASHVILLE | TN | 37204 | SALE/LEASEBACK |
| 07112 | FT. WORTH/ARLINGTON CARMAX (S/L) | 8400 ANDERSON BOULEVARD | FT. WORTH | TX | 76120 | SALE/LEASEBACK |
| 07109 | GARLAND CARMAX (S/L) | 12715 LBJ FREEWAY | GARLAND | TX | 75041 | SALE/LEASEBACK |
| 07111 | SOUTHWEST FREEWAY CARMAX (S/L) | 6909 SOUTHWEST FREEWAY | HOUSTON | TX | 77074 | SALE/LEASEBACK |
| 07114 | HOUSTON NORTH CARMAX (S/L) | 16110 NORTH FREEWAY | HOUSTON | TX | 77090 | SALE/LEASEBACK |
| 07116 | GULF FREEWAY CARMAX (S/L) | 13100 GULF FREEWAY | HOUSTON | TX | 77034 | SALE/LEASEBACK |

| LOC. # | NAME | ADDRESS | CITY | STATE | ZIPCODE | DEAL TYPE |
|---|---|---|---|---|---|---|
| 07203 | CYPRESS FAIRBANKS CARMAX (S/L) | 19500 N.W. FREEWAY | HOUSTON | TX | 77065 | SALE/LEASEBACK |
| 07115 | TEXAS STADIUM CARMAX (S/L) | 3100 SPUR 482 | IRVING | TX | 75062 | SALE/LEASEBACK |
| 07207 | PLANO CARMAX (S/L) | 4448 WEST PLANO PARKWAY | PLANO | TX | 75093 | SALE/LEASEBACK |
| 07152 | SAN ANTONIO CARMAX (S/L) | 3611 FOUNTAINHEAD DRIVE | SAN ANTONIO | TX | 78229 | SALE/LEASEBACK |
| 07152-A | SAN ANTONIO CARMAX PYLON SIGN | MEDICAL DRIVE | SAN ANTONIO | TX | 78229 | LEASE |
| 07028 | 4900 CARMAX OFFICE BUILDING | 4900 COX ROAD | GLEN ALLEN | VA | 23060 | LEASE |
| 07028-A. | 4900 BUILDING PARKING | 4900 COX ROAD | GLEN ALLEN | VA | 23060 | LEASE |
| 07062 | CARMAX OFFICE @ INNSBROOK PLACE | 5020 SADLER ROAD, SUITE 200 | GLEN ALLEN | VA | 23060 | LEASE |
| 07062-A | CARMAX OFFICE @ INNSBROOK PLACE (1ST FLOOR SUBLEASE) | 5020 SADLER ROAD, SUITE 101 | GLEN ALLEN | VA | 23060 | LEASE |
| 07101 | RICHMOND CARMAX (S/L) | 11090 WEST BROAD STREET | GLEN ALLEN | VA | 23060 | SALE/LEASEBACK |
| 07101 | RICHMOND CARMAX (S/L) *PARKING LICENSE AGREEMENT* | 9954 MAYLAND DRIVE | RICHMOND | VA | 23233 | LICENSE |
| 07132 | DULLES CARMAX (S/L) | 45210 TOWLERN PLACE | STERLING | VA | 20166 | SALE/LEASEBACK |
| 07807 | KENOSHA AUTO MALL CARMAX | 8200 120TH AVENUE | KENOSHA | WI | 53142 | LEASE |

\* *Due to open 9/20/2002*

\*\* *Due to open 11/1/2002*

\*\*\* *Due to open 1/24/2003*

\*\*\*\* *CarMax occupies only portion of building - do not know how much (contact Doug Moyers)*

NOTE: *Our records show the following locations are owned by (if purchase) or leased by (if Lease or Sale/Leaseback) Circuit City Stores, Inc.:*

07028
07028-A
07101
07102
07102-A
07103
07103-A
07104
07105
07106
07112
09210

SCHEDULE 2.6

INTERGROUP ACCOUNTS

None.

SCHEDULE 8.4(b)

CARMAX ACTIONS

The following agency proceedings and arbitration matters are pending by or against CarMax:

| Date Filed | Name |
|---|---|
| 01/18/02 | Barry Ward, III |
| 05/16/01 | Khaled Mohammed |
| 01/03/02 | Courtney Whitley |
| 01/03/02 | Karen Dillingham |
| 01/03/02 | Tusar Townsend |
| 01/03/02 | Kendrix Johnson |
| 01/18/02 | Alice Pollard |
| 04/17/02 | David Nwachukwu |
| 12/04/01 | Amy Marquez |
| 04/03/02 | Renika Askew |
| 04/08/02 | Peggy McNutt |
| 06/25/02 | Pablo Lundez-Ruiz |
| 06/25/02 | Mark Falso |
| 07/11/02 | Jeffrey Orr |
| 07/12/02 | Luis Crucet |
| 07/15/02 | A. Bailey |
| 08/22/02 | Tiffany Bissett |

The following insurance claims were filed by or against CarMax prior to or on August 31, 2002:

| Major Line of Insurance | Claim Number | Accident Date |
|---|---|---|
| A/L | ASK3438 | 03082002 |
| A/L | AUG0297 | 02072002 |
| A/L | AUG0704 | 02162002 |
| A/L | AUG1579 | 03092002 |
| A/L | AUG2249 | 07222000 |
| A/L | AUG2258 | 03262002 |
| A/L | AUG2440 | 03282002 |
| A/L | AUG3131 | 07162001 |
| A/L | AUG3140 | 03112002 |
| A/L | AUG3214 | 02162002 |
| A/L | AUG3287 | 04182002 |

| Major Line of Insurance | Claim Number | Accident Date |
|---|---|---|
| A/L | AUG3740 | 04272002 |
| A/L | AUG3776 | 04182002 |
| A/L | AUG4542 | 04282002 |
| A/L | AUG4949 | 05202002 |
| A/L | AUG5602 | 05182002 |
| A/L | AUG6097 | 06162002 |
| A/L | AUG6224 | 06102002 |
| A/L | AUG6886 | 04222002 |
| A/L | AUG6938 | 07012002 |
| A/L | AUG7298 | 07112002 |
| A/L | AUG7645 | 07032002 |
| A/L | AUG7817 | 06292002 |
| A/L | AUG8167 | 07152002 |
| A/L | AUG8401 | 08032002 |
| A/L | AUG8559 | 07262002 |
| A/L | AUG9228 | 08102002 |
| A/L | AUG9378 | 08242002 |
| A/L | AUG9484 | 08272002 |
| A/L | AUG9551 | 08272002 |
| A/L | AUG9626 | 08282002 |
| A/L | AXM0242 | 12162000 |
| A/L | AXM0469 | 06192001 |
| A/L | AXM4847 | 06302001 |
| A/L | AXM5484 | 05152001 |
| A/L | AXM5902 | 10202001 |
| A/L | AXM7310 | 10212001 |
| A/L | AXM7967 | 12062001 |
| A/L | AXM8670 | 11162001 |
| A/L | AXM8752 | 12272000 |
| A/L | AXM9159 | 01132002 |
| A/L | AXM9515 | 01142002 |
| A/L | AXM9714 | 08291999 |
| A/L | AYR4222 | 07202000 |
| A/L | AYR4722 | 07292000 |
| A/L | AYR8919 | 09252000 |
| A/L | B4R0930 | 12081999 |
| A/L | B4R7354 | 02102000 |
| A/L | B9R4446 | 03171999 |
| A/L | C5N4211 | 05172002 |
| A/L | C5N5096 | 06132002 |
| A/L | C5N6553 | 07032002 |
| A/L | C5N6722 | 07092002 |
| A/L | C5N8629 | 08102002 |

| Major Line of Insurance | Claim Number | Accident Date |
|---|---|---|
| A/L | C5P5025 | 06082002 |
| A/L | C5P5633 | 06142002 |
| A/L | C5P5855 | 06202002 |
| A/L | C5P8361 | 08022002 |
| A/L | C5P9615 | 08222002 |
| A/L | C5R1615 | 10302001 |
| A/L | C6B1549 | 09292000 |
| A/L | DUF0691 | 11092000 |
| A/L | DUF2913 | 01261998 |
| A/L | DUF7523 | 04122001 |
| A/L | DUF8306 | 04142000 |
| A/L | DUF8338 | 04032001 |
| A/L | DUF8737 | 05012001 |
| A/L | DUF9490 | 05182001 |
| A/L | DUF9564 | 05232001 |
| A/L | D9G8955 | 05021996 |
| APD | AUG2440 | 03282002 |
| APD | AUG4949 | 05202002 |
| APD | AXM0469 | 06192001 |
| APD | AXM5902 | 10202001 |
| APD | AXM8752 | 12272000 |
| APD | AYR4222 | 07202000 |
| APD | DUF7523 | 04122001 |
| APD | DUF8338 | 04032001 |
| APD | DUF8737 | 05012001 |
| APD | DUF8995 | 05162001 |
| APD | DUF9564 | 05232001 |
| G/L | AUG3049 | 03292002 |
| G/L | AUG6993 | 07052002 |
| G/L | AUG7756 | 07222002 |
| G/L | C5N5772 | 06232002 |
| G/L | C5U1037 | 06162001 |
| G/L | DUF9111 | 05212001 |
| W/C | AQG0068 | 05132002 |
| W/C | AQG1738 | 06282002 |
| W/C | AQG2037 | 07012002 |
| W/C | AQG2103 | 07022002 |
| W/C | AQG2575 | 07052002 |
| W/C | AQG2584 | 06302002 |
| W/C | AQG3231 | 07132002 |
| W/C | AQG3394 | 07162002 |
| W/C | AQG4993 | 07302002 |
| W/C | AQG7033 | 08032002 |

| Major Line of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | AQG7037 | 08132002 |
| W/C | AQG7039 | 05012002 |
| W/C | AQG7483 | 08232002 |
| W/C | AQG7590 | 08252002 |
| W/C | AQI0855 | 06202002 |
| W/C | AQI0857 | 06202002 |
| W/C | AQI1188 | 06252002 |
| W/C | AQI4464 | 05242002 |
| W/C | AQI4467 | 07292002 |
| W/C | AQI4517 | 07012002 |
| W/C | AQI5166 | 08092002 |
| W/C | AQI5433 | 08052002 |
| W/C | AQI5774 | 08162002 |
| W/C | AQI6180 | 07222002 |
| W/C | AQI6763 | 08282002 |
| W/C | AQQ0290 | 06112002 |
| W/C | AQQ0687 | 06142002 |
| W/C | AQQ0867 | 06162002 |
| W/C | AQQ1625 | 03032002 |
| W/C | AQQ1633 | 06262002 |
| W/C | AQQ1780 | 06082002 |
| W/C | AQQ2029 | 07022002 |
| W/C | AQQ2793 | 07152002 |
| W/C | AQQ3614 | 07232002 |
| W/C | AQQ3677 | 07262002 |
| W/C | AQQ3832 | 07292002 |
| W/C | AQQ3923 | 07252002 |
| W/C | AQQ4511 | 08052002 |
| W/C | AQQ4522 | 07202002 |
| W/C | AQQ4666 | 06122002 |
| W/C | AQQ5489 | 08172002 |
| W/C | AQQ6205 | 08282002 |
| W/C | AQQ6218 | 08222002 |
| W/C | AQQ6231 | 08142002 |
| W/C | AQU2421 | 06032002 |
| W/C | AQU2874 | 09292001 |
| W/C | AQU3584 | 06142002 |
| W/C | AQU3609 | 06052002 |
| W/C | AQU4903 | 07012002 |
| W/C | AQU5292 | 07052002 |
| W/C | AQU5517 | 07082002 |
| W/C | AQU5518 | 07092002 |
| W/C | AQU6067 | 07052002 |

| Major Line of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | AQU6789 | 07222002 |
| W/C | AQU6966 | 07202002 |
| W/C | AQU7028 | 07252002 |
| W/C | AQU7379 | 07302002 |
| W/C | AQU7668 | 08012002 |
| W/C | AQU7917 | 08052002 |
| W/C | AQU8235 | 08092002 |
| W/C | AQU8684 | 08132002 |
| W/C | AQU9862 | 08282002 |
| W/C | AQU9995 | 08292002 |
| W/C | AQV4784 | 07172002 |
| W/C | AQV5075 | 07192002 |
| W/C | AQW1549 | 06032002 |
| W/C | AQW1861 | 06062002 |
| W/C | AQW2737 | 06142002 |
| W/C | AQW3279 | 06222002 |
| W/C | AQW5044 | 12202001 |
| W/C | AQW6705 | 07292002 |
| W/C | AQW6723 | 08072002 |
| W/C | AQW7557 | 08152002 |
| W/C | AQW8163 | 08212002 |
| W/C | AQW8328 | 08262002 |
| W/C | AQW8331 | 08232002 |
| W/C | ARA0840 | 06212002 |
| W/C | ARA3490 | 08032002 |
| W/C | ARF0357 | 06292002 |
| W/C | ARF1276 | 07172002 |
| W/C | ARF1686 | 06272002 |
| W/C | ARF1696 | 07252002 |
| W/C | ARF1828 | 07262002 |
| W/C | ARF3430 | 08132002 |
| W/C | ARV1610 | 03082002 |
| W/C | ARV6119 | 04292002 |
| W/C | ARV9883 | 05292002 |
| W/C | ARV9886 | 05312002 |
| W/C | ARV9891 | 05312002 |
| W/C | ASJ5413 | 07062002 |
| W/C | ASJ6221 | 07212002 |
| W/C | ASJ6236 | 07122002 |
| W/C | ASJ6261 | 07252002 |
| W/C | ASJ6263 | 07172002 |
| W/C | ASJ6264 | 06142002 |
| W/C | ASK2080 | 03052002 |

| Major Line of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | ASK8040 | 05202002 |
| W/C | ASK8204 | 05202002 |
| W/C | ASK8678 | 05242002 |
| W/C | ASK8769 | 05292002 |
| W/C | ASK9109 | 06012002 |
| W/C | ASU0948 | 05032002 |
| W/C | ASU3119 | 06142002 |
| W/C | ASU3722 | 06282002 |
| W/C | ASU4583 | 07192002 |
| W/C | ATD4983 | 02182002 |
| W/C | ATD5878 | 03122002 |
| W/C | ATD7113 | 03272002 |
| W/C | ATD8444 | 04122002 |
| W/C | ATD9636 | 05012000 |
| W/C | ATH8861 | 04232002 |
| W/C | ATM0247 | 01212002 |
| W/C | ATM0308 | 11202001 |
| W/C | ATM6902 | 04252002 |
| W/C | ATM8508 | 05162002 |
| W/C | ATM8672 | 05202002 |
| W/C | ATM8760 | 05212002 |
| W/C | ATM8997 | 05232002 |
| W/C | ATM9510 | 05272002 |
| W/C | ATM9628 | 06032002 |
| W/C | ATM9690 | 06042002 |
| W/C | ATM9709 | 06032002 |
| W/C | ATW6245 | 04112002 |
| W/C | AUF2677 | 01152002 |
| W/C | AUF3966 | 02222002 |
| W/C | AUF5056 | 03142002 |
| W/C | AUF7136 | 04242002 |
| W/C | AUF9094 | 06042002 |
| W/C | AUF9929 | 06202002 |
| W/C | AUG6543 | 06172002 |
| W/C | AUG6710 | 01222002 |
| W/C | AUG8619 | 08072002 |
| W/C | AUG9230 | 08142002 |
| W/C | AUW7027 | 02112002 |
| W/C | AVA0359 | 12202001 |
| W/C | AVA6610 | 06042002 |
| W/C | AVA6830 | 06102002 |
| W/C | AVA7128 | 06172002 |
| W/C | AVA7644 | 07012002 |

| Major Line of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | AVA7679 | 07022002 |
| W/C | AVA7825 | 07052002 |
| W/C | AVA9775 | 08272002 |
| W/C | AVB3875 | 10092001 |
| W/C | AVF5733 | 09042001 |
| W/C | AVF8060 | 10052001 |
| W/C | AVF9919 | 10272001 |
| W/C | AVP9254 | 04022002 |
| W/C | AVP9257 | 04022002 |
| W/C | AVZ3775 | 09052001 |
| W/C | AWB7668 | 06192002 |
| W/C | AWB8343 | 07122002 |
| W/C | AWB8714 | 07182002 |
| W/C | AWB8869 | 07242002 |
| W/C | AWD4017 | 10162001 |
| W/C | AWD4124 | 10172001 |
| W/C | AWD4944 | 10272001 |
| W/C | AWL8301 | 06122001 |
| W/C | AWU2207 | 04162001 |
| W/C | AWU2384 | 07172001 |
| W/C | AWU4776 | 08242001 |
| W/C | AWW6854 | 08132001 |
| W/C | AXG3933 | 03292001 |
| W/C | AXG5630 | 04162001 |
| W/C | AXH7035 | 05022001 |
| W/C | AXR2630 | 03072002 |
| W/C | AXR3088 | 03272002 |
| W/C | AXR4249 | 05172002 |
| W/C | AXR4890 | 06142002 |
| W/C | AXR4962 | 06172002 |
| W/C | AXR5086 | 06192002 |
| W/C | AXR5198 | 06262002 |
| W/C | AXR5319 | 07022002 |
| W/C | AXR5500 | 03302002 |
| W/C | AXR5522 | 07042002 |
| W/C | AXR5977 | 06112002 |
| W/C | AXR6143 | 08052002 |
| W/C | AXR6511 | 08072002 |
| W/C | AXR6650 | 08222002 |
| W/C | AXR6671 | 08232002 |
| W/C | AXY5607 | 05032001 |
| W/C | AXZ8184 | 10052001 |
| W/C | AYD7066 | 02042000 |

| Major Line of Insurance | Claim Number | Accident Date |
|---|---|---|
| W/C | AYJ2052 | 03292000 |
| W/C | AYJ3350 | 04152000 |
| W/C | AYJ4243 | 04282000 |
| W/C | BAI3365 | 07122000 |
| W/C | BEN5381 | 09181998 |
| W/C | BFJ7774 | 10201999 |
| W/C | BFU7321 | 12101998 |
| W/C | BHT2867 | 11221999 |
| W/C | BHT7534 | 07222000 |
| W/C | BHT7796 | 08022000 |
| W/C | BTR9898 | 02041999 |
| W/C | BUP6006 | 11142000 |
| W/C | BUT4935 | 09292000 |
| W/C | BXL1102 | 07142000 |
| W/C | BXL4116 | 01012001 |
| W/C | BXL5833 | 01122001 |
| W/C | BXL7315 | 01292001 |
| W/C | BXL8435 | 01252001 |
| W/C | BXR6694 | 04282001 |
| W/C | BXR7295 | 06072001 |
| W/C | B0N7129 | 12012000 |
| W/C | B0N7210 | 11282000 |
| W/C | B0W4580 | 03242000 |
| W/C | B0W6384 | 07062000 |
| W/C | B0W8078 | 07242000 |
| W/C | B2G5691 | 07062001 |
| W/C | B2G6934 | 08252001 |
| W/C | B5E1067 | 04132000 |
| W/C | B5R5608 | 09071999 |
| W/C | B6F2246 | 10191999 |
| W/C | B8T7193 | 07261999 |
| W/C | B8T7737 | 07301999 |
| W/C | C5N5979 | 06142002 |
| W/C | C5P7250 | 07132002 |
| W/C | C5R8679 | 01182002 |
| W/C | C6A4944 | 03052001 |
| W/C | C6X5088 | 01152000 |
| W/C | DUG6437 | 12272000 |
| W/C | DUX6831 | 02192001 |
| W/C | D1I9167 | 06071999 |
| W/C | D3N1896 | 09071996 |

The following insurance claims were filed by or against CarMax between September 1, 2002 and September 27, 2002:

| Organizational Code | Major Line | Claim Number |
|---|---|---|
| CMSS07108001050 | AUTO | AQM0440 |
| CMSS07111001050 | W/C | ARF4275 |
| CMSS07113001050 | W/C | AQQ7728 |
| CMSS07114001050 | W/C | ARF4708 |
| CMSS07118001050 | AUTO | C5L1407 |
| CMSS07118001050 | AUTO | C5L1406 |
| CMSS07118001050 | W/C | AXR7404 |
| CMSS07121001050 | W/C | AXR7260 |
| CMSS07132001050 | W/C | ARC0858 |
| CMSS07132001050 | W/C | ARC0734 |
| CMSS07132001050 | W/C | ARC0473 |
| CMSS07146001050 | W/C | APN2404 |
| CMSS07152001050 | W/C | ARF4630 |
| CMSS07806001050 | AUTO | C5M0704 |
| CMSS07806001050 | AUTO | C5M0705 |
| CMSS07807001050 | AUTO | C5L1402 |
| CMSS07807001050 | AUTO | C5L1403 |
| CMSV07105070050 | AUTO | C5M0851 |
| CMSV07105070050 | W/C | AQQ7676 |
| CMSV07107070050 | W/C | AQQ7903 |
| CMSV07107070050 | W/C | AQQ7749 |
| CMSV07108070050 | W/C | AQQ8089 |
| CMSV07111070050 | W/C | ARF4519 |
| CMSV07112070050 | W/C | AQI8410 |
| CMSV07112070050 | W/C | AQI8378 |
| CMSV07114070050 | W/C | ARF4741 |
| CMSV07115070050 | W/C | AQI9142 |
| CMSV07115070050 | W/C | AQI9141 |
| CMSV07116070050 | W/C | ARF4774 |
| CMSV07117070050 | W/C | APF0689 |
| CMSV07118070050 | AUTO | C5M1059 |
| CMSV07118070050 | AUTO | C5M1060 |
| CMSV07122070050 | W/C | APN1776 |
| CMSV07122070050 | W/C | APN1247 |
| CMSV07132070050 | W/C | ARC0823 |
| CMSV07146070050 | AUTO | AQM0788 |
| CMSV07146070050 | AUTO | AQM0786 |
| CMSV07810070050 | AUTO | C5M1368 |

The following is litigation/potential litigation by or against CarMax:

| MatterID | Title | LitStatus |
|---|---|---|
| 20020802002 | Abraham, Lana | Non-Litigation |
| 20020724003 | Abraham, Shannon | Non-Litigation |
| 20020923002 | Adaser, Anthony | Non-Litigation |
| 20020415003 | Adilson Andrade v. KP Properties, et al., CASI | Litigation |
| 20001214002 | Alexander, Amy M. | Non-Litigation |
| 20020829001 | Alexander, Tamika | Non-Litigation |
| 20011227001 | All Star Ford-Mercury, Inc. (Bridges, David and Katherine) v. CASI | Litigation |
| 20020926001 | Alloway, Erika | Non-Litigation |
| 20020325008 | Alves, Paul v. CASI | Litigation |
| 20000127001 | Ambrose, Jeffrey | Non-Litigation |
| 20010612004 | Ambrosii, Karinna | Non-Litigation |
| 20020305001 | Amodeo, Charlene | Non-Litigation |
| 20020924014 | Amtech Lighting Servives | Non-Litigation |
| 20010213001 | Anderson, Lorrie | Non-Litigation |
| 20020917002 | Anderson, Thomas and Tiffany | Non-Litigation |
| 20020917004 | Arellano, Benito and Brenda | Non-Litigation |
| 20020207002 | Ashley, Ronn | Non-Litigation |
| 20020819004 | Audain, Melika | Non-Litigation |
| 20020729006 | Auto Finance Center of Harrisonburg | Non-Litigation |
| 20020711001 | Auyon, Ada | Non-Litigation |
| 20020520003 | Ayyadurai, Manivannan | Non-Litigation |
| 20020515006 | B&F Cleaning Services, Inc. | Litigation |
| 20020116001 | Bailey, Gene v. CASI | Litigation |
| 20010530001 | Bailey, Jason | Non-Litigation |
| 20020729001 | Baker, Joshua and Mack, Nyeisha | Non-Litigation |
| 20020423001 | Barefoot, Susan | Non-Litigation |
| 20020916001 | Bass, Daten | Non-Litigation |
| 20020916002 | Belanger, Kevin | Non-Litigation |
| 20020625011 | Bell, Therese | Non-Litigation |
| 20020906004 | Benjamin, Susan | Non-Litigation |
| 20010629001 | Bertram, Christine | Non-Litigation |
| 20000608001 | Betances, Margie | Non-Litigation |
| 20001128006 | Bice, Curtis | Non-Litigation |
| 20020916007 | Bixler, Jason | Non-Litigation |
| 20010510004 | Bodnar, Ronald | Non-Litigation |
| 20020327002 | Bowles, Velda v. CASI | Litigation |
| 20020926003 | Boyd, Nathalie | Non-Litigation |
| 20011109005 | Bresth, Stephanie | Non-Litigation |
| 20020806001 | Briches, Donald | Non-Litigation |
| 20020514011 | Brodsky/Mintz, Amy | Non-Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
| | | |
| | | Non-Litigation |
| 20010605003 | Bronson, Karen | |
| 20020521002 | Broughton, Paul G., et al. V. Discount Motors, et al. (CASI | Litigation |
| 20000229004 | Brown, Monica and Ball, Patrick | Non-Litigation |
| 20020802001 | Brown, Robert and Tucker, Michelle | Non-Litigation |
| 20020213001 | Bruce, Darlene and John v. CASI | Litigation |
| 20000706001 | Buckner, Mattie | Non-Litigation |
| 20020806002 | Burns, John L. and Cathy M. | Non-Litigation |
| 20020924005 | Burns, Louis | Non-Litigation |
| 20010517001 | Cable, Jeffrey M. | Non-Litigation |
| 20020913008 | Carlson, Lynn and Sven | Non-Litigation |
| 20020416009 | Carson, Carmen | Non-Litigation |
| 20010405010 | CASI v. Andrews, Lance | Non-Litigation |
| 20010521004 | CASI v. Arceneaux, Tiffany and Christopher | Non-Litigation |
| 20000830002 | CASI v. Arnold, Charles H. | Litigation |
| 20001212009 | CASI v. Baggott, Latarsha M. | Litigation |
| 20010928003 | CASI v. Benn, Michael | Litigation |
| 20010104001 | CASI v. Buford, Aaron | Litigation |
| 20011211004 | CASI v. Campbell, Kevin | Litigation |
| 20001005004 | CASI v. Carol, Ralph A. | Litigation |
| 20010925006 | CASI v. Cummingham, Ronald | Litigation |
| 20010126003 | CASI v. Dalton, David R., Jr. | Litigation |
| 20000801006 | CASI v. Desbrow, Patricia | Litigation |
| 20011001001 | CASI v. Dickinson, Linda | Litigation |
| 20010521011 | CASI v. Divita, Robert M. | Litigation |
| 20010716002 | CASI v. Dorestes, Alain | Litigation |
| 20010110004 | CASI v. Eastham, Sean | Litigation |
| 20010503002 | CASI v. Filipkiy, Natalya | Litigation |
| 20020121003 | CASI v. Finney, Ursula | Litigation |
| 20000503006 | CASI v. Gamez, Abelino | Litigation |
| 20000417001 | CASI v. Gheen, Jason | Litigation |
| 20010919003 | CASI v. Grandson, Carolyn | Litigation |
| 20010817001 | CASI v. Grant, Lisah | Litigation |
| 20000724002 | CASI v. Gray, Dwayne | Litigation |
| 20011106003 | CASI v. Green, Timothy | Non-Litigation |
| 20000629001 | CASI v. Hannigan, Michele B | Litigation |
| 20010508005 | CASI v. Herrington, Steven dba Cars, Cars | Litigation |
| 20010817003 | CASI v. Hicks, Ken and Kendra | Litigation |
| 20010226007 | CASI v. Hodge, Michelle | Litigation |
| 19981125002 | CASI v. Holleran, Brian | Litigation |
| 20000823003 | CASI v. Houston, Jr., Thomas | Litigation |
| 20020306003 | CASI v. J.B.M. Investments | Litigation |
| 20001003001 | CASI v. Jones, Ernest | Litigation |
| 19990211004 | CASI v. Jumbelick, Timothy | Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
| | | |
| 20010521005 | CASI v. Kennedy, Shawn | Litigation |
| 20011128001 | CASI v. Kernan, Frank | Litigation |
| 20010524001 | CASI v. Kerusenko, Sergey | Litigation |
| 20010919004 | CASI v. Khan, Mohammed and Khan Abdul | Litigation |
| 20010521010 | CASI v. Knight, Tanisha D. | Litigation |
| 19990305001 | CASI v. Knox, Tori | Litigation |
| 20010815007 | CASI v. Leggans, Gregory | Litigation |
| 20010314001 | CASI v. Lewis, Tommie Jean | Non-Litigation |
| 20010606001 | CASI v. London, Monzell | Litigation |
| 20000613001 | CASI v. M & M Industries; Taylor, Johnnie & Rosemary | Litigation |
| 20010115005 | CASI v. McDaniel, Yolanda S. and Michael R. | Litigation |
| 19980326010 | CASI v. Nicholson, David | Litigation |
| 19990325008 | CASI v. Nougd, U.S. Auto & Imports | Litigation |
| 20001212010 | CASI v. Novitski, Alexander I. | Litigation |
| 19991105003 | CASI v. Patrico, Michael A. | Litigation |
| 20000411004 | CASI v. Reinsager, Jay | Litigation |
| 19961014001 | CASI v. Salazar, Luis d/b/a S&D Motorsports | Litigation |
| 20010711007 | CASI v. Silvas, Rey Jr. | Litigation |
| 20010525003 | CASI v. Slater, Edna M. R. | Litigation |
| 20011217002 | CASI v. Smith, John | Litigation |
| 20010608006 | CASI v. Smith, Mark E. | Non-Litigation |
| 19990419004 | CASI v. South Florida Auto Brokers | Litigation |
| 19971113001 | CASI v. State of Texas (Blue Laws) | Litigation |
| 20010213007 | CASI v. Stonebreaker, Richard | Litigation |
| 20020110006 | CASI v. Thomas, Andrew | Litigation |
| 20000817003 | CASI v. Vaughn, Latonia | Litigation |
| 20000419006 | CASI v. Vogel, William | Litigation |
| 20000303007 | CASI v. Walker, Herschel | Litigation |
| 20010323002 | CASI v. Washington, Chiffonda | Litigation |
| 19981204031 | CASI v. Wilson, Bernie | Litigation |
| 20011003002 | Celozzi Ford | Non-Litigation |
| 20020603007 | Chae, Min Seuk | Non-Litigation |
| 20020802003 | Chapman, Harold | Non-Litigation |
| 20020903007 | Charpentier, David | Non-Litigation |
| 20020709005 | Chatard, Joseph (Nolan Scott Chatard, LLC v. CASI) | Litigation |
| 19991216002 | Chavers, Rhenia | Non-Litigation |
| 20010320002 | Childs, Damian | Non-Litigation |
| 19991228001 | Chrisanthou, George | Non-Litigation |
| 20020613004 | Citizens Equity First Credit Union v. CASI | Litigation |
| 20020926004 | Clayton, Chasidy | Non-Litigation |
| 20020415006 | Clifton, Sheryl | Non-Litigation |
| 20011106005 | Coats, Dawnielle v. CASI | Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
| 20010612001 | Cole, Jeff v. CASI | Litigation |
| 20001003002 | Cole, Peter D. | Non-Litigation |
| 20020821003 | Collier, Craig | Non-Litigation |
| 20020620002 | Colmenares, Johanna | Non-Litigation |
| 20020425002 | Colver, Scott | Non-Litigation |
| 20020816002 | Conklin, Julie | Non-Litigation |
| 20010831002 | Conrad, John | Non-Litigation |
| 20020702005 | Cook, Denise | Non-Litigation |
| 20020807002 | Coolidge, Danny | Non-Litigation |
| 20020812002 | Cooper, Paula | Non-Litigation |
| 20011107002 | Corandel, Dale | Non-Litigation |
| 20020924013 | Couvillon, Ivan | Non-Litigation |
| 20000616002 | Cox, Patricia D. | Non-Litigation |
| 20020808002 | Crafton, Eric v. CASI | Litigation |
| 20020912001 | Crespo, Misael | Non-Litigation |
| 20011218002 | Crew, Kimberly | Non-Litigation |
| 20020819003 | Crown Motors (Christiansen, Kipp) | Non-Litigation |
| 20020802005 | Czosnowski, Carolyn | Non-Litigation |
| 20020430002 | Dallas, Michael | Non-Litigation |
| 20020718009 | Daniel, Bethany M. and Elmore, Jason | Non-Litigation |
| 20011214001 | Daniel, Charmaine | Non-Litigation |
| 20020916003 | Delvaux, Karen | Non-Litigation |
| 20020916004 | Dewhart, Kimberley | Non-Litigation |
| 20020903006 | Dewhart, Kimberly | Non-Litigation |
| 20020802004 | Digiacomo, Donna | Non-Litigation |
| 19981124016 | Dimambro, Jason Thomas | Non-Litigation |
| 19990524003 | Dingle, Andre | Non-Litigation |
| 20020412002 | Dixon, Mark T. | Non-Litigation |
| 20020718008 | Douglas, Harland D. | Non-Litigation |
| 20010927004 | Dragoo, John and Suzanne | Non-Litigation |
| 19981124019 | Drye, Jesse | Non-Litigation |
| 20020829007 | Dryfhout, Carl | Non-Litigation |
| 20020619005 | Echols, Anthony D. | Non-Litigation |
| 20020809004 | Eisenberg, James | Non-Litigation |
| 20020722003 | Eng, Jason | Non-Litigation |
| 20011008006 | Farley, Craig | Non-Litigation |
| 20020724004 | FC Mortgages, Ltd. | Non-Litigation |
| 20010208003 | Fischer, Sean N. | Non-Litigation |
| 20020911003 | Fisher, Natalie | Non-Litigation |
| 20011004002 | Fisher, Stephen v. CASI | Litigation |
| 20020305002 | Fitzgerald, Ingrid | Non-Litigation |
| 20020528001 | Flores, Benjamin | Non-Litigation |
| 20020805001 | Floro, Lisa v. CASI | Litigation |
| 20020913003 | Fooks, Minnie | Non-Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
| 20020924006 | Fowler, Guy | Non-Litigation |
| 20020430005 | Francis, Sharita | Non-Litigation |
| 20011010002 | Frazier, Scott | Non-Litigation |
| 20020924009 | Furmanski, Neil and Julie | Non-Litigation |
| 20020813003 | Galal, Ashraf | Non-Litigation |
| 20020813006 | Galal, Hala | Non-Litigation |
| 20020503007 | Gardner, Carissa | Non-Litigation |
| 20020926016 | Garrett, Susan | Non-Litigation |
| 20020916008 | Gayle, Rhonda | Non-Litigation |
| 20020917006 | Gaynor, Edna | Non-Litigation |
| 20010612006 | Gebhart, Jette | Non-Litigation |
| 20020508001 | Gee, Angela | Non-Litigation |
| 20020417001 | Gilland, Terry G. | Non-Litigation |
| 20020913005 | Gill-Gzosnowski, Carolyn | Non-Litigation |
| 20020916009 | Glaser, Bruce | Non-Litigation |
| 20020503005 | GM Quinn & Associates, Ltd. | Non-Litigation |
| 20010629003 | GMC v. Ferrer, Anthony, CASI | Litigation |
| 20020913007 | Gonzalez, Ricardo and Arevalo, Olgamaria | Non-Litigation |
| 19980323004 | Goodson, Chelmer | Non-Litigation |
| 20020715007 | Gradney, Michael | Non-Litigation |
| 20020903003 | Graffam, Marianne and Kayla | Non-Litigation |
| 20020625002 | Grainger, Ben F. | Non-Litigation |
| 20020911001 | Graves, Olga | Non-Litigation |
| 20020903004 | Gray, Novena | Non-Litigation |
| 20020910001 | Greco, Brandon | Non-Litigation |
| 20020107021 | Green, Andrew | Non-Litigation |
| 20020404007 | Griffin, Pumea N. | Non-Litigation |
| 20010824003 | Groves, Christopher | Non-Litigation |
| 19990816002 | Grupo Nacional Provincial v. CASI and Wilson, Derrick and Michael | Litigation |
| 20020715016 | Guilford, William L. III | Non-Litigation |
| 20011224004 | Gutierrez, Maribel and Fernando | Non-Litigation |
| 20010628003 | Hall, Kenneth | Non-Litigation |
| 20020207001 | Hames, Michael F. | Non-Litigation |
| 20020911005 | Harden, William | Non-Litigation |
| 20020129002 | Harris, Larry | Non-Litigation |
| 20010226003 | Harrison, Troy & April | Non-Litigation |
| 20010523001 | Hart, William L. v. CASI | Litigation |
| 20020620001 | Hatchet, Willie E. and Jaquez, Laura A. Cassidy | Non-Litigation |
| 20020813004 | Hawkins, Arnold | Litigation |
| 20020617017 | Haynes, Charles | Non-Litigation |
| 20020325001 | Hemsley, Anthony | Non-Litigation |
| 20020829010 | Hermelin, William | Non-Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
| 20011022002 | Herout, Pamela and Carl | Non-Litigation |
| 20011127002 | Hicks, Clifford | Non-Litigation |
| 20011005001 | Hicks, Stephen v. CASI | Litigation |
| 20020528004 | Hill, Calvin | Non-Litigation |
| 20020912008 | Hinton, Carolyn | Non-Litigation |
| 20020813002 | Holler, Jon T. | Non-Litigation |
| 20011005003 | Holliday, Dee | Non-Litigation |
| 20020912010 | Holloway, Cheryl | Non-Litigation |
| 20010307001 | Holmes, Anita M. | Non-Litigation |
| 20020612002 | Hood, Holly | Non-Litigation |
| 20020326001 | Houff, Bradley | Non-Litigation |
| 20020903010 | Hubbard, Oscar | Non-Litigation |
| 20020405002 | Huisel, Timothy J., Jr. and Timothy J., Sr. v. CASI | Litigation |
| 20020917001 | Hurdle, Josephine | Non-Litigation |
| 20020425001 | Hutchison, Jonathan | Non-Litigation |
| 20000228004 | Illinois Department of Transportation v. CASI, et al. | Litigation |
| 20020514002 | Integrated Vehicle Leasing Inc. | Non-Litigation |
| 20020926011 | Irving-Reeves, Eulette | Non-Litigation |
| 20010507002 | Jackson, Alfred J. | Non-Litigation |
| 20010711006 | Jacobson, Melody | Non-Litigation |
| 20020829004 | Jahnke, Herbert C., Jr. | Non-Litigation |
| 20020924002 | James, Mary K. | Non-Litigation |
| 20011129002 | Johnson, Christopher | Non-Litigation |
| 20020617009 | Johnson, Dorothy | Non-Litigation |
| 20020812005 | Johnson, Kaneshia | Non-Litigation |
| 20020624001 | Justice, Timothy | Non-Litigation |
| 20020501001 | Kabba, Mohamed S. v. CASI West Coast | Non-Litigation |
| 20020711002 | Karrasch, Michael A. | Non-Litigation |
| 20020214003 | Kelly, Walter | Non-Litigation |
| 20020829008 | Kendrick, Rebecca | Non-Litigation |
| 20020213004 | Kenosha Ford-Threatened Termination | Non-Litigation |
| 19990304001 | Kenrry-Alacorn, Leonardo DeJesus | Non-Litigation |
| 20020305003 | Kidd, Brooke | Non-Litigation |
| 20020923003 | Kotter, Monia | Non-Litigation |
| 20020625007 | Kowan, Aaron | Non-Litigation |
| 20020821002 | Krebs, Damon | Non-Litigation |
| 20020926017 | Kron, Alan | Non-Litigation |
| 20020321002 | Kruse, Kevin | Non-Litigation |
| 20020402003 | Kura, Donald | Non-Litigation |
| 20020107022 | Kuwomu, Peter | Non-Litigation |
| 20020912004 | Labant, Robert | Non-Litigation |
| 20000331001 | Ladewig, William | Non-Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
| 20000119003 | Lafazia, Timothy | Non-Litigation |
| 20020228001 | Lang, Theresa | Non-Litigation |
| 20020624003 | Lanier, Ivan | Non-Litigation |
| 19990413007 | Lapid, Dolores | Non-Litigation |
| 20020912002 | Larkin, Michael | Non-Litigation |
| 20020715014 | Laurel Identity Fraud | Non-Litigation |
| 20010925004 | Lawrence, Clive | Non-Litigation |
| 20000419003 | Lawson, Andre D. | Non-Litigation |
| 20020911002 | Lee, Carrie | Non-Litigation |
| 20020906001 | Lee, Minho | Non-Litigation |
| 20020816003 | Lerner, Joseph | Non-Litigation |
| 20011127001 | Little, John | Non-Litigation |
| 20020612005 | Logan, Marvin | Non-Litigation |
| 20020924015 | Lomax, Hazel | Non-Litigation |
| 20020430003 | Lopez, Rafael | Non-Litigation |
| 20000403004 | Maison, Keith A. | Non-Litigation |
| 20001027002 | Mares, Luz | Non-Litigation |
| 20020718004 | Marino, Ellen | Non-Litigation |
| 20001017002 | Marshall, Joey | Non-Litigation |
| 20020923006 | Marshall, Kathleen | Non-Litigation |
| 20020715004 | Martin, Amy | Non-Litigation |
| 20020218004 | Martin, Paul and Victoria v. CASI | Litigation |
| 20010518003 | Martin, Shelly | Non-Litigation |
| 20020528005 | Martin, William | Non-Litigation |
| 20020115001 | Martins, Jennifer | Non-Litigation |
| 20010110002 | Mata, Ramiro | Non-Litigation |
| 20011102001 | Mayo, Wendell | Non-Litigation |
| 20020422001 | McCarthy, Michael | Non-Litigation |
| 20020912007 | McCool, Ladora S. | Non-Litigation |
| 20020802007 | McDonald, Leroy | Non-Litigation |
| 20020905001 | McVay, William | Non-Litigation |
| 20010220002 | Meekins, Gregory | Non-Litigation |
| 20020301001 | Mercado, Penny v. CASI | Litigation |
| 20020603009 | Middleton, William J. and Fountain, Lillian M. | Non-Litigation |
| 20010927002 | Miller, Jesse | Non-Litigation |
| 20020819002 | Mitsubishi Motor Credit | Non-Litigation |
| 20020404004 | Mobile One Detailing | Non-Litigation |
| 20001204003 | Mohamed, Amyn | Non-Litigation |
| 20020729002 | Mohepath, Sarah | Non-Litigation |
| 20020912006 | Molina, Frank and Winkler, Katherine | Non-Litigation |
| 20020913006 | Montijo, Brandon | Non-Litigation |
| 20020724002 | Morgan, Grayson and Cynthia | Non-Litigation |
| 20010110005 | Mullins, Matthew | Non-Litigation |
| 20020405001 | Munoz, Roxana and Rodrigo v. CASI | Litigation |

| MatterID | Title | LitStatus |
|----------|-------|-----------|
| | | Non-Litigation |
| 19990910002 | Murray, Leo | Non-Litigation |
| 20020510001 | Nagy, Louis | Non-Litigation |
| 20020910002 | Novak, David | Non-Litigation |
| 20020715003 | O'Conner, Daniel | Non-Litigation |
| 20020916006 | O'Leary, Timothy (Complaint) | Non-Litigation |
| 20011030001 | O'Leary, Timothy K. | Non-Litigation |
| 20020923001 | Omer, Sultana | Non-Litigation |
| 20001212006 | Orlander, Nikio/Auto Finance | Non-Litigation |
| 20020429001 | Orta, Rosalie | Non-Litigation |
| 20020214006 | Outland, Lisa | Litigation |
| 20011015003 | Parks, Sheryl v. Firestone | Non-Litigation |
| 20020312002 | Parnell, Chuck | Non-Litigation |
| 20020709001 | Pastor, Melissa | Non-Litigation |
| 20011106001 | Pereira, Angelo | Litigation |
| 20010705003 | Perez, Eduardo and Gonzales, April v. CASI | Non-Litigation |
| 20020926008 | Perez, Jose | Non-Litigation |
| 20010205002 | Perez, Marlene & Angel | Non-Litigation |
| 20020916005 | Perpall, Patricia | Non-Litigation |
| 20020107020 | Perrett, Christopher | Non-Litigation |
| 20000511005 | Peterson, Felicia | Non-Litigation |
| 20020924001 | Phillips, Sherrell | Non-Litigation |
| 20020508003 | Phoenix Sales and Leasing | Non-Litigation |
| 20010806001 | Pierce, Alton | Non-Litigation |
| 20011207005 | Plane, Anthony | Litigation |
| 20020514003 | Plano Independent School District v. CASI | Non-Litigation |
| 20020321001 | Poole, Shawn | Non-Litigation |
| 20020628002 | Pope, Daryl | Non-Litigation |
| 19990325004 | Porch, Cathy | Non-Litigation |
| 20020926010 | Posse, Omar | Non-Litigation |
| 20010911003 | Powell, Robert | Non-Litigation |
| 20010925002 | Prapapan, Janjira | Non-Litigation |
| 20000406001 | Prentice, Ed | Non-Litigation |
| 20020724001 | Price, Phillip J. | Non-Litigation |
| 20020528008 | Pritchard, Jim and Ana | Non-Litigation |
| 19990325005 | Quaiel, Karen | Non-Litigation |
| 20020829003 | Quintanilla, Rolando | Non-Litigation |
| 20010228001 | Ragone, Jeffrey T. | Non-Litigation |
| 20020715001 | Ramos, Priscilla | Non-Litigation |
| 19990817001 | Ramsey, Donna Marcia | Non-Litigation |
| 20011109003 | Ray, Michelle | Non-Litigation |
| 20020226003 | Reed, Brandon and Loeta | Non-Litigation |
| 20020612001 | Regions Bank | Non-Litigation |
| 20011004001 | Reynolds, Christopher | Non-Litigation |
| 20020709003 | Reynolds, Vondale | Non-Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
| | | |
| 20020913004 | Richine, Kirill | Non-Litigation |
| 20000809006 | Rickelman, Kurt | Non-Litigation |
| 20020207004 | Rios, Michael | Non-Litigation |
| 20020903001 | Rivera, Connie v. CASI | Litigation |
| 20000703001 | Robinson, Allen E. | Non-Litigation |
| 20020617012 | Robinson, Michael | Non-Litigation |
| 20020718001 | Rodriguez, Luciano E. | Non-Litigation |
| 20010523004 | Rodriguez, Maria | Non-Litigation |
| 20011210003 | Rodriguez, Pilar | Non-Litigation |
| 20020917005 | Rogers, Craig and Linda | Non-Litigation |
| 20020815002 | Rogers, Robert | Non-Litigation |
| 20020213003 | Roland, Timothy | Non-Litigation |
| 19981222010 | Rose, Philip Timothy | Non-Litigation |
| 19990325006 | Roseborough, Carnelle | Non-Litigation |
| 20020624002 | Ruiz, Maria | Non-Litigation |
| 20020715011 | Saia Motor Freight Line | Non-Litigation |
| 20020416005 | Salas, David | Non-Litigation |
| 20020911006 | Sanchez, Janneth | Non-Litigation |
| 20020514005 | Sanchez, Olga | Non-Litigation |
| 20020415005 | Santiago, Pablo | Non-Litigation |
| 20020923004 | Scercy, Rick | Non-Litigation |
| 19991119004 | Schelegel, Sonia | Non-Litigation |
| 20010213005 | Schell, Melanie C. | Non-Litigation |
| 20010402004 | Schilberg, Jason | Non-Litigation |
| 20020426004 | Schulman, Daniel | Non-Litigation |
| 19990507001 | Senegal, Frankie M. | Non-Litigation |
| 20020128002 | Shadix, Mike | Non-Litigation |
| 20020913002 | Shadley, Richard | Non-Litigation |
| 20020509002 | Shears, Matthew | Non-Litigation |
| 20011113001 | Shelton, Tamara C. | Non-Litigation |
| 20010910004 | Shoemaker, David E. v. CASI | Litigation |
| 20020926009 | Sibbett, Rick | Non-Litigation |
| 20020829005 | Silhavy, Ken v. CASI | Litigation |
| 20020923004 | Simmons, Samuel | Non-Litigation |
| 20001201004 | Sims, Rovert F. | Non-Litigation |
| 19991021003 | Skreczko, David | Non-Litigation |
| 19981222019 | Slavik, Valentin | Non-Litigation |
| 20020906003 | Smith, Charles | Non-Litigation |
| 20020226005 | Smith, Shaun | Non-Litigation |
| 20020913001 | Sogbesan, Charles | Non-Litigation |
| 20020626005 | Soto, Jenia | Non-Litigation |
| 20020711003 | Spann, Michael J. | Non-Litigation |
| 19991108002 | Spectran | Non-Litigation |
| 20010221002 | Speights, Eric Van | Non-Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
| | | |
| 20000313001 | Sperrazza, Christine J. & Dirvesta, Brett C. | Non-Litigation |
| 20020405003 | St. Ives, Thomas | Non-Litigation |
| 20020520007 | Staiano, Michael | Non-Litigation |
| 20000313003 | Steeve, Steve | Non-Litigation |
| 20020917003 | Stefan, Anita | Non-Litigation |
| 20010912002 | Stermer, Beverly | Non-Litigation |
| 20020425003 | Stinson, Cynthia | Non-Litigation |
| 20020916010 | Stolarik, Melanie | Non-Litigation |
| 20020604006 | Storey, Rena E. | Non-Litigation |
| 20020912009 | Stover, Chad & Kim | Non-Litigation |
| 20010601005 | Stryker, Rochelle | Non-Litigation |
| 20011129007 | Stubbs, Larry and Manique v. CASI | Litigation |
| 20020314001 | Suarez, Cristina and Avello, Henry | Non-Litigation |
| 20010208002 | Suissa, Meyer M. and Mindy | Non-Litigation |
| 19990510001 | Sunguard Detailing & Access v. CASI | Litigation |
| 19990412004 | Sutton, Stephanie | Non-Litigation |
| 20020416011 | SUV Central, Inc. | Non-Litigation |
| 20020107017 | Sweeney, Jonathan v. CASI | Litigation |
| 20020926013 | Sweeney, Steven | Non-Litigation |
| 20011113011 | Tapley, Michael S. | Non-Litigation |
| 20000906004 | Tatum, Brian | Non-Litigation |
| 20010720002 | Taylor, Albert | Non-Litigation |
| 20020920002 | Taylor, Pamela | Non-Litigation |
| 20020718007 | Taylor, Randel | Non-Litigation |
| 20010508004 | Taylor, Steven | Non-Litigation |
| 20011206005 | Terrell, Tara | Non-Litigation |
| 20000413001 | Texas Department w/ transportation/"Cash Price" Ad | Non-Litigation |
| 20010601002 | Thomas, Rodney v. CASI | Litigation |
| 19991102003 | Thomas, Sean | Non-Litigation |
| 20020109005 | Thomas, Stuart and Sabrina | Non-Litigation |
| 20020603008 | Thompson, Essex | Non-Litigation |
| 20020918001 | Thornsbury, Steven | Non-Litigation |
| 20020903011 | Topalovic, Slavomir | Non-Litigation |
| 20020802006 | Tran, Thuy | Non-Litigation |
| 20020912005 | Troutman, Kimberly | Non-Litigation |
| 20011106009 | Trygar, Louis v. CASI | Litigation |
| 20020503004 | Tucker, Aileen F. v. CASI | Litigation |
| 20020905003 | Turner, Joyce | Non-Litigation |
| 20020926002 | Tyler, Scott F. | Non-Litigation |
| 20020807001 | Tyndall, Ronald | Non-Litigation |
| 20020513003 | Uceda, Frank and Ruby | Non-Litigation |
| 20020813005 | Umana, Herbert and Nisson, Ted | Non-Litigation |
| 20020503002 | United Road Services | Non-Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
| | | |
| 20020918002 | Univision and HBC Merger | Non-Litigation |
| 20020415001 | Valerio, Guido v. CASI | Litigation |
| 20020416003 | Vantage Motors, Inc. | Non-Litigation |
| 20011206001 | Vermaaten, Holly | Non-Litigation |
| 20010423001 | Vlietstra, Kari v. CASI | Litigation |
| 20020906006 | Wagner, Kevin v. CASI | Litigation |
| 20020109001 | Walker, Erica | Non-Litigation |
| 20011105005 | Walker, Ileana | Non-Litigation |
| 20020906002 | Walker, Laura | Non-Litigation |
| 19990817007 | Wallace, Cynthia | Non-Litigation |
| 20020712005 | Walton, Emily | Non-Litigation |
| 19991025006 | Ward, Felicia | Non-Litigation |
| 19981204025 | Ward, Melody & Jeffrey | Non-Litigation |
| 20010514003 | Warren, Troy and Teresa | Non-Litigation |
| 20020426001 | Washington, Gregory | Non-Litigation |
| 20020514010 | Washington, Kelly | Non-Litigation |
| 20020910003 | Webb, Bobby | Non-Litigation |
| 20000906003 | Webb, Mitchell v. CASI | Litigation |
| 20020903009 | Weiner, Stacey | Non-Litigation |
| 19990325007 | Weir, Greg Eugene | Non-Litigation |
| 20020821001 | Wessinger, Scott | Non-Litigation |
| 19990729002 | White, Torey | Non-Litigation |
| 20010706002 | White, Warren | Non-Litigation |
| 20020923005 | Whiting, Juanita | Non-Litigation |
| 20020903005 | Whittinghill, Clifford | Non-Litigation |
| 20010924002 | Will, Hunter and Angela | Non-Litigation |
| 20020905002 | Willems, Mary | Non-Litigation |
| 20020205004 | Williams, Arthur and Ann | Non-Litigation |
| 20020920003 | Williams, Benjamin | Non-Litigation |
| 20020604002 | Williams, Hallie | Non-Litigation |
| 20020920001 | Williams, Harriet | Non-Litigation |
| 20020807005 | Williams, James | Non-Litigation |
| 20020718012 | Williams, Michael G. | Non-Litigation |
| 20020924004 | Williams, Paula | Non-Litigation |
| 20020619003 | Williamson, Christoper and Barnes, Catherine | Non-Litigation |
| 20020812004 | Willis, Lillie | Non-Litigation |
| 20020903008 | Wilson, Bradley | Non-Litigation |
| 19990430001 | Wilson, Christine | Non-Litigation |
| 20010329003 | Winberg, Bill | Non-Litigation |
| 20020620004 | Wittman, Amy and Karrasch, Michael | Non-Litigation |
| 20001017003 | Wojcik, Michelle | Non-Litigation |
| 20020422003 | Wright, Virginia Goodson | Non-Litigation |
| 20010907003 | Young, Jay and Panadda Thestae | Non-Litigation |
| 20010622002 | Zapf, Richard | Non-Litigation |

| MatterID | Title | LitStatus |
|---|---|---|
|  |  | Non-Litigation |
| 20001220005 | Zuley, Sean |  |

**EXHIBIT A**

# FORM OF AMENDED AND RESTATED
## TAX ALLOCATION AGREEMENT

This AMENDED AND RESTATED TAX ALLOCATION AGREEMENT is dated as of [      ], 2002, by and among Circuit City Stores, Inc. ("Circuit City"), a Virginia corporation, and those corporations listed on Exhibit A hereto (together with Circuit City, the "Parties").

WHEREAS, as of the date hereof, Circuit City is the common parent of an affiliated group of domestic corporations within the meaning of Section 1504(a) of the Code, and the members of the affiliated group have heretofore joined in filing consolidated federal income Tax returns (the "Affiliated Group");

WHEREAS, Circuit City and members of its Affiliated Group previously executed that certain Tax Allocation Agreement dated as of May 1, 1994 (the "Original Tax Allocation Agreement");

WHEREAS, Circuit City intends to separate the business of the CarMax Group from the rest of Circuit City Stores (the "Separation") such that following the Separation CarMax, Inc., a Virginia corporation and currently a wholly-owned subsidiary of Circuit City, will become an independent separately traded public company;

WHEREAS, the Separation will be consummated by Circuit City Stores by means of (i) the redemption (the "Redemption") of all of the issued and outstanding shares of CarMax Group Stock in exchange for shares of common stock, par value $.50 per share, of CarMax (the "CarMax Common Stock") and (ii) the distribution ("the "Distribution") of CarMax Common Stock to the holders of Circuit City Group Stock as a pro rata dividend;

WHEREAS, as a result of the Separation, the Parties desire to amend and restate the Original Tax Allocation Agreement to provide for certain Tax matters, including the assignment of responsibility for the preparation and filing of Tax Returns, the payment of Taxes (including Taxes with respect to the Separation), and the prosecution and defense of any Tax controversies;

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained in this Agreement, the Parties hereby agree as follows:

### ARTICLE I. DEFINITIONS

SECTION 1.1. <u>General</u>.  Capitalized terms used in this Agreement and not defined herein shall have the meanings that such terms have in the Separation Agreement.  As used in this Agreement, the following terms shall have the following meanings:

"Agreement" shall mean this Tax Allocation Agreement.

"Benefit Amount" shall mean the amount derived by adding (i) a Loss Company's net operating loss multiplied by the highest marginal corporate income tax rate applicable for the taxable period to (ii) total credits generated by the Loss Company.

"Business Day" or "Business Days" shall mean a day which is not a Saturday, Sunday or a day on which the Federal Reserve banks are authorized or required by law to close.

"CarMax" shall have the meaning set forth in the recitals hereof.

"CarMax Group" shall mean CarMax, and each Subsidiary of CarMax, immediately after the Separation.

"Circuit City" shall have the meaning set forth in the recitals hereof.

"Circuit City Group" shall mean Circuit City, and each Subsidiary of Circuit City, immediately after the Separation.

"Circuit City Return" shall mean the federal income tax return of Circuit City prepared on a stand-alone basis for all taxable periods.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the Treasury regulations promulgated thereunder, including any successor legislation.

"Consolidated Return" shall mean any federal income tax return where Circuit City and at least one Subsidiary jointly file.

"Control" shall have the meaning set forth in Section 355(a) of the Code.

"Final Determination" shall mean the final resolution of liability for any Tax for any taxable period, including any related interest or penalties, by or as a result of: (1) a final and unappealable decision, judgment, decree or other order by any court of competent jurisdiction; (2) a closing agreement or accepted offer in compromise under Section 7121 or 7122 of the Code, or comparable agreement under the laws of other jurisdictions which resolves the entire Tax liability for any taxable period; or (3) any allowance of a refund or credit in respect of an overpayment of Tax, but only after the expiration of all periods during which such refund may be recovered by the jurisdiction imposing the Tax.

"Indemnified Liability" shall mean any liability imposed upon or incurred by any Member of the Circuit City Group for which it is indemnified and held harmless under Section 4.3(a).

"IRS" shall mean the Internal Revenue Service.

"Loss Company" shall mean any Member whose Separate Return shows a net operating loss.

"Member" shall mean each corporation that is a member of the Affiliated Group.

"Member Return" shall mean the federal income tax return of a Member prepared on a stand-alone basis for all taxable periods.

"Party" shall mean any of Circuit City or the corporations listed on Exhibit A hereto.

"Person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership or government, or any agency or political subdivision thereof.

"Proceeding" shall mean any audit, examination or other proceeding brought by a Taxing Authority with respect to Taxes.

"Prohibited Acts" shall have the meaning specified in Section 4.2.

"Ruling" shall mean the private letter ruling issued by the IRS to Circuit City dated April 10, 2002.

"Restricted Period" shall mean the two-year period commencing with the Separation.

"Separate Return" shall mean (i) for a Member other than Circuit City, the Member Return, after consideration of intercompany adjustments and eliminating entries, that is involved in the Consolidated Return and (ii) for Circuit City, the Circuit City Return, after consideration of intercompany adjustments and eliminating entries, that is involved in the Consolidated Return.

"Separation" shall have the meaning set forth in the recitals hereof.

"Separation Agreement" shall mean the agreement between Circuit City and CarMax dated as of [DATE].

"Separation Date" shall mean the Business Day on which the Separation is effected.

"Subsidiary" shall mean an entity more than 50% of the equity interest in which is owned directly or indirectly by Members.

"Tax" or "Taxes" shall mean any taxes, charges, fees, levies, imposts, duties, or other assessments of a similar nature, including without limitation, income, alternative or add-on minimum, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, occupation, windfall profits, withholding, Social Security, unemployment, disability, ad valorem, estimated, highway use, commercial rent, capital stock, paid up capital, recording, registration, property, real property gains, value added, business license, custom duties, or other tax or governmental fee of any kind

whatsoever, imposed or required to be withheld by any Taxing Authority including any interest, additions to tax, or penalties applicable thereto.

"Taxing Authority" shall mean any governmental authority (whether United States or non-United States, and including, without limitation, any state, municipality, political subdivision or governmental agency) responsible for the imposition of any Tax.

"Tax Due" shall mean all federal income taxes, alternative minimum taxes, environmental taxes, penalties, interest, and any other amount properly included as being due for the return in question net of all available credits and deductions. Tax Due may not be less than zero.

"Tax Returns" shall mean all reports or returns (including information returns) required to be filed or that may be filed for any period with any Taxing Authority in connection with any Tax or Taxes (whether domestic or foreign).

SECTION 1.2. References; Interpretation. References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa. The words "include", "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation". Unless the context otherwise requires, references in this Agreement to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, such Agreement. Unless the context otherwise requires, the words "hereof", "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement.

## ARTICLE II.  ALLOCATION OF TAX LIABILITIES

SECTION 2.1. Allocation of Tax Liabilities.

(a) The Affiliated Group shall apportion its consolidated federal income tax liability among the Members on a separate company basis. Each Member shall be allocated liability for the Tax Due shown on its Separate Return.

For each taxable period, Circuit City will compute each Member's Tax Due on a Separate Return basis. Circuit City will then allocate the tax liability to each Member based on the following method:

(i)     Step 1: The Tax Due shown on the Consolidated Return is allocated to each Member in the ratio that each Member's Separate Return Tax Due bears to the sum of the Members' Tax Due on their Separate Returns.

(ii)    Step 2: An additional amount is allocated to each Member equal to 100% of the excess of (1) the Member's Separate Return Tax Due, over (2) the Consolidated Return Tax Due allocated to the Member in Step 1.

(iii)    Step 3: The total of the amounts allocated under Step 2 is credited to all Loss Companies in the ratio that each Loss Company's Benefit Amount bears to the total Benefit Amounts of all Loss Companies.

(b)  If Tax Due on a Separate Return changes as the result of the filing of amended tax returns, carrybacks, carryovers, tax audits or for any other reasons, Circuit City shall recalculate the allocation of tax liability and pay to the applicable Member or the applicable Member shall pay to Circuit City, as the case may be, such amount within 90 days of the date such change is finally determined.

SECTION 2.2.  Estimated Tax Payments.  Circuit City will calculate each Member's share of the Affiliated Group's estimated tax payments consistent with the provisions of Section 2.1 and each Member will pay that amount to Circuit City within a reasonable time before the due date of the estimated tax payment.  Any amounts paid under this Section 2.2 shall be credited against the amounts payable to Circuit City pursuant to Section 2.1 hereof.  Circuit City will solely be responsible for making the required tax payments and will be responsible for any penalty or interest due with respect to any amount not paid timely.

SECTION 2.3.  Procedures.

(a)  The Affiliated Group shall file a Consolidated Return for each taxable year with respect to which this Agreement is in effect and for which the Affiliated Group is required or permitted to file a Consolidated Return, unless the Parties elect not to file a Consolidated Return by mutual consent.  Circuit City shall execute and file any consents, elections, and other documents required or appropriate for the proper filing of such Returns.

(b)  Unless otherwise agreed by the Parties in writing, Circuit City will deliver to each Member for its review and consent (which will not be unreasonably withheld) a draft of its Member Return as prepared on a separate basis, together with an explanation of applicable intercompany adjustments and eliminating entries, upon the request of each Member, not later than 30 days prior to the due date, including extensions, for the applicable Consolidated Return. If the Parties cannot agree with respect to such Member Return, the Parties will negotiate in good faith to resolve any such disagreement, and if it cannot be resolved will be subject to the provisions of Section 2.5, provided that notwithstanding this Section 2.3 Circuit City shall be entitled to file any Tax Return before its due date (including extensions).  Each Member will allow Circuit City access to all work papers and other materials needed in the preparation of the Member Return and warrants that it will respond to any information requested concerning these items on a timely basis.  In connection with the foregoing and other matters covered by this Agreement, Circuit City agrees to furnish accounting, administrative, technical and any other similar tax and accounting assistance requested by any Member for an agreed-on fee that shall be not less than the cost of such services to Circuit City.

(c)  Circuit City will prepare the Circuit City Return and the Affiliated Group's Consolidated Return.  Circuit City will be responsible for and bear all additional costs and efforts associated with the preparation of the Consolidated Return.

(d)  Circuit City will provide each Member with a complete copy of the Consolidated Return, upon the request of each Member, within a reasonable time after filing such return, and will grant each Member access to the work papers used to prepare the Member Return.

SECTION 2.4.  Audit.

(a)  Circuit City will defend on audit the Consolidated Returns.  Each Party agrees (1) to notify the other of any contact that may be construed as indicating that a Tax Authority may or will question, or is questioning the treatment of any items covered by this Agreement, and (2) keep the other party appropriately informed of all matters relating to audits, submissions to tax authorities, protests, conferences, litigation, and similar items.

(b)  Within 90 days after any amended return is filed, any audit is settled, or any other event that causes a change in a Consolidated Return is finally resolved, the Tax Due for the applicable return will be recomputed and payment made on the basis set forth in Section 2.1 hereof.

SECTION 2.5.  Dispute Resolution.  If there is a conflict between any Member and Circuit City relating to any matters covered by this Agreement, such dispute shall be resolved by a mutually agreed upon nationally recognized firm of certified public accountants.

SECTION 2.6.  Application.  This Article will apply to all taxable years for which the Affiliated Group files a Consolidated Return, and shall terminate except as otherwise specifically provided herein with respect to any party when such party ceases to be a Member of the Affiliated Group.  Notwithstanding termination of this Agreement or the filing of Consolidated Returns, this Agreement shall continue in effect with respect to any payment or refunds due or other matters relating to all taxable periods (or portions thereof) for which this Agreement was in effect.

SECTION 2.7.  Miscellaneous.  State and local taxes which are based upon net income shall be treated in a manner consistent with the methods applicable to federal income taxes if and when the Members file jointly on a consolidated, combined or unitary basis with respect to such taxes.

ARTICLE III.  RETURNS AND TAXES ATTRIBUTABLE TO MEMBERS OF THE
CARMAX GROUP

SECTION 3.1.  Short Period

For the taxable period that includes the Separation Date, Circuit City shall include the Members of the CarMax Group in the Consolidated Return of the Affiliated Group for the portion of the taxable year ending on the Separation Date (the "Short Period") on the basis of the closing of the books method.  Any tax liability of the Members of the CarMax Group for the Short Period shall be determined under Article II hereof.  To the extent permitted by law or administrative practice with respect to other Tax Returns, the taxable period of the Members of the CarMax Group shall be treated as ending on the Separation Date, and if the taxable period

does not end on the Separation Date, the Parties shall apportion all tax items between the portions of the taxable period before and after the Separations Date on the closing of the books method.

SECTION 3.2. Post-Separation CarMax Group Taxes. Unless otherwise provided in this Agreement, CarMax shall pay all Taxes and shall be entitled to receive and retain all refunds of Taxes with respect to taxable periods beginning on or after the Separation Date that are attributable to any Member of the CarMax Group.

SECTION 3.3. Post-Separation CarMax Group Tax Returns.

(a) The filing of all Tax Returns relating to Members of the CarMax Group for periods beginning on or after the Separation Date shall be the responsibility of CarMax.

(b) In the case of any partnership in which a Member of the CarMax Group is the designated Tax matters partner, CarMax shall cause such Member to continue to prepare and file such partnership's Tax Returns.

SECTION 3.4. Manner of Preparation.

(a) Unless otherwise agreed by the Parties in writing, with regard to Tax Returns to be prepared and filed by Circuit City or any other Member of the Circuit City Group with respect to which CarMax has liability under this Agreement, Circuit City shall submit such Tax Return to CarMax at least 30 days prior to the date on which such Tax Return is due (including extensions). CarMax shall submit its comments to Circuit City within 10 days of receipt of such Tax Return.

(b) All Tax Returns filed on or after the Separation Date shall be prepared in a manner that is consistent with the rulings obtained from the IRS or any other Taxing Authority in connection with the Separation (in the absence of a Final Determination to the contrary) and shall be filed on a timely basis (including pursuant to extensions) by the Party responsible for such filing under this Agreement. In the absence of a Final Determination to the contrary and unless deviation from past practice would have no material adverse effect on either Circuit City or CarMax, all Tax Returns filed after the date of this Agreement shall be prepared on a basis consistent with the elections, accounting methods, conventions, assumptions and principles of taxation used for the most recent taxable periods for which Tax Returns of the Affiliated Group have been filed.

SECTION 3.5. Carrybacks. In the event any net operating loss, capital loss or credit of the CarMax Group for any taxable period ending after the Separation Date is eligible to be carried back to a taxable period beginning prior to the Separation Date (any such amount, an "Eligible Amount"), CarMax shall, where applicable, elect to carry such Eligible Amount forward to subsequent taxable periods. If such Eligible Amount must be carried back to a taxable period of the Affiliated Group beginning prior to the Separation Date, any refund payable to CarMax shall be determined under the principles of Section 2.1 hereof.

SECTION 3.6. Retention of Records; Access.

(a) Circuit City and CarMax shall, and shall cause each of their Subsidiaries to, retain adequate records, documents, accounting data and other information (including computer data) necessary for the preparation and filing of all Tax Returns required to be filed by any Member of the Circuit City Group or the CarMax Group and for any Proceeding relating to such Tax Returns or to any Taxes payable by any Member of the Circuit City Group or the CarMax Group.

(b) Circuit City and CarMax shall, and shall cause each of their Subsidiaries to, provide reasonable access to (i) all records, documents, accounting data and other information (including computer data) necessary for the preparation and filing of all Tax Returns required to be filed by any Member of the Circuit City Group or the CarMax Group and for any Proceeding relating to such Tax Returns or to any Taxes payable by any Member of the Circuit City Group or the CarMax Group and (ii) its personnel and premises, for the purpose of the review or audit of such reports or returns to the extent relevant to an obligation or liability of a Party under this Agreement and in accordance with the procedures provided in Section 7.4 of the Separation Agreement.

(c) The obligations set forth above in Sections 3.6(a) and 3.6(b) shall continue until the longer of (i) the time of a Final Determination or (ii) expiration of all applicable statutes of limitations, to which the records and information relate. For purposes of the preceding sentence, each Party shall assume that no applicable statute of limitations has expired unless such Party has received notification or otherwise has actual knowledge that such statute of limitations has expired.

SECTION 3.7. Confidentiality; Ownership of Information; Privileged Information. The provisions of Article 7.2 and Exhibit D of the Separation Agreement relating to confidentiality of information, ownership of information, privileged information and related matters shall apply with equal force to any records and information prepared and/or shared by and among the Parties in carrying out the intent of this Agreement.

## ARTICLE IV. SEPARATION TAX MATTERS

Notwithstanding anything herein to the contrary, the provisions of this Article IV shall govern all matters among the Parties related to an Indemnified Liability.

SECTION 4.1. Compliance with the Ruling. CarMax hereby confirms and agrees to comply with any and all covenants, agreements and representations in the Ruling applicable to CarMax or any member of the CarMax Group, including but not limited to agreeing that CarMax will not cease the active conduct of its trade or business within the meaning of Section 355(b) of the Code during the Restricted Period.

SECTION 4.2. Opinion Requirement for Major Transactions Undertaken by CarMax During the Restricted Period. CarMax agrees that during the Restricted Period it will not (i) merge or consolidate with or into any other corporation, (ii) liquidate or partially liquidate (within the meaning of such terms as defined in Section 346 and Section 302, respectively, of the Code), (iii) sell or transfer all or substantially all its assets (within the meaning of Rev. Proc. 77-37, 1977-2 C.B. 568) in a single transaction or series of related transactions, (iv) redeem or

otherwise repurchase any of CarMax's capital stock other than pursuant to open market stock repurchase programs meeting the requirements of section 4.05(1)(b) of Rev. Proc. 96-30, 1996-1 C.B. 696, or (v) enter into any negotiations, agreements or arrangements with respect to transactions or events (including, without limitation, stock issuances, pursuant to the exercise of options or otherwise, option grants, capital contributions or acquisitions, or a series of such transactions or events, but excluding the Separation) that may cause the Separation to be treated as part of a plan pursuant to which one or more persons acquire directly or indirectly stock of CarMax representing a "50-percent or greater interest" therein within the meaning of Section 355(d)(4) of the Code (collectively the "Prohibited Acts"), unless CarMax first obtains an opinion of a nationally recognized law firm reasonably satisfactory to Circuit City, or a supplemental ruling from the Internal Revenue Service, that such transaction, and any transaction related thereto, will not affect the qualification of the Separation under Section 355 of the Code or cause the stock of CarMax distributed in the Separation to fail to be treated as qualified property pursuant to Section 355(e) of the Code.

SECTION 4.3. Indemnification. If CarMax takes any action or enters into any agreement to take any action at any time on or following the Separation Date, including, without limitation, any Prohibited Act, or if there is a breach of Section 4.1 hereof, and the Separation shall fail to qualify under Section 355 of the Code or the stock of CarMax distributed in the Separation shall fail to be treated as qualified property pursuant to Section 355(e) of the Code as a result of such action, actions or breach, then CarMax shall indemnify and hold harmless Circuit City and each Member of the Circuit City Group against any and all Taxes imposed upon or incurred by any Member of the Circuit City Group and against any liability imposed on Circuit City or any Member of the Circuit City Group for Taxes of any stockholder of Circuit City as a result. Circuit City and each other Member of the Circuit City Group shall be indemnified and held harmless under this Section 4.3 without regard to the fact that CarMax may have obtained an opinion or supplemental ruling pertaining to the action pursuant to Section 4.2 hereof.

SECTION 4.4. Procedural Matters.

(a) Notice. If either CarMax or Circuit City receives any written notice of deficiency, claim or adjustment or any other written communication from a Taxing Authority that may result in an Indemnified Liability, the Party receiving such notice or communication shall promptly give written notice thereof to the other Party, provided that any delay by Circuit City in so notifying CarMax shall not relieve CarMax of any liability to Circuit City hereunder except to the extent CarMax is materially and adversely prejudiced by such delay. Circuit City undertakes and agrees that from and after such time as Circuit City obtains knowledge that any representative of a Taxing Authority has begun to investigate or inquire into the Separation (whether or not such investigation or inquiry is a formal or informal investigation or inquiry), Circuit City shall (i) notify CarMax thereof, provided that any delay by Circuit City in so notifying CarMax shall not relieve CarMax of any liability to Circuit City hereunder except to the extent CarMax is materially and adversely prejudiced by such delay, (ii) consult with CarMax from time to time as to the conduct of such investigation or inquiry, (iii) provide CarMax with copies of all correspondence between Circuit City or its representatives and such Taxing Authority or any representative thereof pertaining to such investigation or inquiry and (iv) arrange for a representative of CarMax to be present at (but not participate in, except as

otherwise provided in Section 4.4(c) below) all meetings with such Taxing Authority or any representative thereof pertaining to such investigation or inquiry.

(b) <u>Written Acknowledgment</u>. Promptly upon receipt of notice as provided in Section 4.4(a), CarMax shall confirm in writing to Circuit City that the liability asserted in the notice of deficiency, claim or adjustment or other written communication would, if imposed upon or incurred by any Member of the Circuit City Group, be an Indemnified Liability, unless CarMax believes in good faith that such liability would not be an Indemnified Liability in which case CarMax shall set forth in writing to Circuit City the grounds for such belief.

(c) <u>Tax Proceedings Controlled by CarMax</u>. Any Proceeding that may result in an Indemnified Liability, which is acknowledged as such by CarMax pursuant to Section 4.4(b) hereof, shall be conducted in accordance with this Section 4.4(c) hereof.

(i) Promptly upon CarMax's written acknowledgment that the asserted liability is an Indemnified Liability pursuant to Section 4.4(b) hereof, CarMax shall assume and direct the defense or settlement of the Proceeding, subject to the participation and consultation of Circuit City. If the Indemnified Liability is grouped with other unrelated asserted liabilities or issues in the Proceeding, Circuit City and CarMax shall use their respective commercially reasonable efforts to cause the Indemnified Liability to be the subject of a separate Proceeding. If such severance is not possible, CarMax shall assume and direct and be responsible only for the matters relating to the Indemnified Liability.

(ii) Upon request, during the course of the Proceeding, CarMax shall from time to time furnish Circuit City with evidence reasonably satisfactory to Circuit City of its ability to pay the full amount of the Indemnified Liability. If at any time during such Proceeding, Circuit City reasonably determines, after due investigation, that CarMax may not be able to pay the full amount of the Indemnified Liability, if required, then CarMax shall be required to furnish a guarantee or performance bond satisfactory to Circuit City in an amount equal to the amount of the Indemnified Liability asserted by the Taxing Authority. If CarMax fails to furnish such guarantee or bond, Circuit City may assume control of the Proceedings in accordance with Section 4.4(d) hereof, <u>provided</u>, <u>however</u>, that Circuit City will not settle any Proceeding of which it assumes control pursuant to this Section 4.4(c)(ii) without the consent of CarMax, which consent will not be unreasonably withheld.

(iii) CarMax shall pay all expenses related to the Indemnified Liability, including but not limited to fees for attorneys, accountants, expert witnesses or other consultants retained by it and, to the extent that any such expenses have been or are paid by Circuit City or any Member of the Circuit City Group, CarMax shall promptly reimburse Circuit City or such Member therefor.

(iv) Circuit City shall not pay (unless otherwise required by a proper notice of assessment and after prompt notification to CarMax of Circuit City's receipt of notice and demand for payment), settle, compromise or concede any portion of the Indemnified Liability without the written consent of CarMax. Circuit City shall, at CarMax's sole cost (including but not limited to any reasonable out-of-pocket costs incurred by Circuit

City), take such action as CarMax may reasonably request (including but not limited to the execution of powers of attorney for one or more persons designated by CarMax and the filing of a petition, complaint, amended Tax Return or claim for refund) in contesting the Indemnified Liability.  CarMax shall, on a timely basis, keep Circuit City informed of all developments in the Proceeding and provide Circuit City with copies of all pleadings, briefs, orders, and other written papers pertaining thereto.

(v)  Subject to satisfaction of the conditions herein set forth, CarMax may direct Circuit City to settle the Indemnified Liability on such terms and for such amount as CarMax may direct.  Circuit City may condition such settlement on receipt, prior to the settlement, from CarMax of the indemnity payment with respect to the Indemnified Liability less any amounts to be paid directly by CarMax to the Taxing Authority. CarMax may direct Circuit City, at CarMax's expense, to pay an asserted deficiency for the Indemnified Liability out of funds provided by CarMax, and to file a claim for refund.

(d)  Tax Proceedings Controlled by Circuit City. Should CarMax not provide Circuit City with the confirmation contemplated by Section 4.4(b) hereof within thirty (30) days following receipt of notice provided in Section 4.4(a) hereof or, following such confirmation, should CarMax fail within thirty (30) days following request therefor to furnish to Circuit City evidence of its ability to pay the full amount of the Indemnified Liability, or should Circuit City reasonably believe after due investigation that CarMax may not be able to pay the full amount of the Indemnified Liability, if required, and CarMax fails to furnish a guarantee or performance bond satisfactory to Circuit City in an amount equal to the amount of the Indemnified Liability then being asserted by the Taxing Authority, then Circuit City may assume control of the Proceeding upon the following terms: (1) Circuit City will diligently defend against the claim of the Taxing Authority, including the pursuit of the appeal of any adverse determinations to the appropriate tribunal (unless advised in writing by independent outside counsel at CarMax's sole cost in its reasonable judgment that Circuit City would not prevail upon any such appeal) and shall employ such resources, including independent counsel, in conducting such defense as are reasonably commensurate to the nature and magnitude of the claim; (2) Circuit City will consult with CarMax as to the conduct of all Proceedings, will provide CarMax with copies of all protests, pleadings, briefs, filings, correspondence and similar materials relative to the Proceedings and will arrange for a representative of CarMax to be present at (but not to participate in) all meetings with the relevant Taxing Authority and all hearings before any court; and (3) Circuit City will not settle, compromise or concede any claim that would result in an Indemnified Liability unless Circuit City has made the determination, and has been so advised in writing by independent outside counsel at CarMax's sole expense, that such settlement is reasonable in the circumstance.  Subject to the above, any such Proceeding shall be controlled and directed exclusively by Circuit City and may be contested, defended, paid, settled, compromised or conceded by Circuit City and any related expenses incurred by any Member of the Circuit City Group, including but not limited to, fees for attorneys, accountants, expert witnesses or other consultants shall be reimbursed by CarMax, if CarMax admits or is found to have incorrectly failed to acknowledge the asserted liability as an Indemnified Liability as provided in Section 4.4(b) hereof; provided, however, that Circuit City will not be required to pursue the claim in the federal district court, Court of Claims or any state court if as a prerequisite to such court's jurisdiction, it is required to pay the asserted liability unless the funds necessary to invoke such jurisdiction are provided by CarMax at no cost to Circuit City.

(e) <u>Time and Manner of Payment</u>. Unless otherwise agreed in writing, CarMax shall pay to Circuit City the amount with respect to an Indemnified Liability (less any amount paid directly by CarMax to the Taxing Authority or made available to Circuit City under Section 4.4(d) hereof) at least two (2) Business Days prior to the date payment of the Indemnified Liability is to be made to the Taxing Authority. Such payment shall be paid by CarMax to Circuit City by wire transfer of immediately available funds to an account designated by Circuit City by written notice to CarMax prior to the due date of such payment. If CarMax delays making payment beyond the due date hereunder, CarMax shall pay interest to Circuit City on the amount unpaid at the rate of the monthly average of the "prime rate" as published in the Wall Street Journal for each day and the actual number of days for which any amount due hereunder is unpaid; provided, however, that this provision for interest shall not be construed to give CarMax the right to defer payment beyond the due date hereunder.

(f) <u>Refund of Amounts Paid by CarMax</u>. Should Circuit City or any other Member of the Circuit City Group receive a refund in respect of amounts paid by CarMax to any Taxing Authority on Circuit City's behalf or paid by CarMax to Circuit City for payment to a Taxing Authority, or should any such amounts that would otherwise be refundable to Circuit City be applied or credited by the Taxing Authority to obligations of Circuit City or any other Member of the Circuit City Group unrelated to an Indemnified Liability, then Circuit City shall, promptly following receipt (or notification of credit), remit such refund (including any statutory interest that is included in such refund or credited amount) to CarMax.

(g) <u>Cooperation</u>. Subject to the provisions of Section 3.7 hereof, Circuit City and CarMax shall reasonably cooperate with one another in a timely manner in any Proceeding involving any matter that may result in an Indemnified Liability. Circuit City and CarMax agree that such cooperation shall include, without limitation, making available to the other party, during normal business hours, all books, records and information, officers and employees (without substantial interruption of employment) necessary or useful in connection with any such judicial or administrative Proceeding. The party requesting or otherwise entitled to any books, records, information, officers or employees pursuant to this Section 4.4(g) shall bear all reasonable out-of-pocket costs and expenses (except reimbursement of salaries, employee benefits and general overhead) incurred in connection with providing such books, records, information, officers or employees.

## ARTICLE V. MISCELLANEOUS

SECTION 5.1. <u>Complete Agreement; Construction</u>. This Agreement shall constitute the entire agreement between the Parties with respect to the subject matter hereof and shall supersede all previous negotiations, commitments and writings with respect to such subject matter.

SECTION 5.2. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by both Parties.

SECTION 5.3.  Survival of Agreements.  Except as otherwise contemplated by this Agreement, all covenants and agreements of the Parties contained in this Agreement shall survive the Separation Date in accordance with their terms.

SECTION 5.4.  Expenses.  Except as otherwise set forth in this Agreement, all costs and expenses incurred on or prior to the Separation Date (whether or not paid on or prior to the Separation Date) in connection with the preparation, execution, delivery and implementation of this Agreement shall be charged to and paid by Circuit City.  Except as otherwise set forth in this Agreement, the CarMax Group shall bear its own costs and expenses incurred after the Separation Date.

SECTION 5.5.  Notices.  All notices and other communications hereunder shall be in writing and hand delivered or mailed by registered or certified mail (return receipt requested) or sent by any means of electronic message transmission with delivery confirmed (by voice or otherwise) to the Parties at the following addresses (or at such other addresses for a Party as shall be specified by like notice) and will be deemed given on the date on which such notice is received:

To any Member of the Circuit City Group:

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464
Attn:  [General Counsel]

To any Member of the CarMax Group:

CarMax, Inc.
4900 Cox Road
Glen Allen, VA 23060-3314
Attn:  [General Counsel]

SECTION 5.6.  Waivers.  The failure of any Party to require strict performance by the other Party of any provision in this Agreement will not waive or diminish that Party's right to demand strict performance thereafter of that or any other provision hereof.

SECTION 5.7.  Amendments.  This Agreement may not be modified or amended except by an agreement in writing signed by the Parties hereto; provided that this Agreement may be amended or terminated by the Members of the Circuit City Group for any taxable period beginning after the Separation without the consent of any Member of the CarMax Group.

SECTION 5.8.  Assignment.  This Agreement shall not be assignable, in whole or in part, directly or indirectly, by any Party hereto without the prior written consent of the other Party hereto, and any attempt to assign any rights or obligations arising under this Agreement without such consent shall be void.

SECTION 5.9.  Successors and Assigns.  The provisions to this Agreement shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.

SECTION 5.10.  Additional Members.  Any new Members of the Affiliated Group shall automatically become a Party to this Agreement upon becoming Members.

SECTION 5.11.  Third Party Beneficiaries.  This Agreement is solely for the benefit of the Parties hereto and should not be deemed to confer upon third parties any remedy, claim, liability, reimbursement, claim of action or other right in excess of those existing without reference to this Agreement.

SECTION 5.12.  Title and Headings.  Titles and headings to sections herein are inserted for the convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

SECTION 5.13.  Exhibits.  The Exhibits to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.

SECTION 5.14.  GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF VIRGINIA, WITHOUT REGARD TO ITS CONFLICTS OF LAW RULES.

SECTION 5.15.  Consent to Jurisdiction.  The Parties hereto hereby agree that the appropriate forum and venue for any disputes between any of the Parties hereto arising out of this Agreement shall be any state or federal court sitting in Richmond, Virginia and each of the Parties hereto hereby submits to the personal jurisdiction of any such court.  The foregoing shall not limit the rights of any party to obtain execution of judgment in any other jurisdiction.

SECTION 5.16.  Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The Parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

CIRCUIT CITY STORES, INC., for itself and on behalf of the Members of the Circuit City Group

By: _____
    Name:
    Title:

CARMAX, INC., for itself and on behalf of the Members of the CarMax Group

By: _____
    Name:
    Title:

**EXHIBIT B**

## FORM OF TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT is dated as of _____, 2002 by and between Circuit City Stores, Inc., a Virginia corporation ("Circuit City Stores") and CarMax, Inc., a Virginia corporation ("CarMax").

### RECITALS

WHEREAS, Circuit City Stores and CarMax have entered into the Separation Agreement dated as of May 21, 2002 (the "Separation Agreement"), providing for the conveyance by Circuit City Stores and certain Subsidiaries of Circuit City Stores to CarMax of all of the assets and liabilities attributed to the CarMax Group to be held by CarMax or one or more of the CarMax Subsidiaries.

WHEREAS, CarMax has been operated by its parent Circuit City Stores, and has been dependent upon Circuit City Stores for various support and services since CarMax's inception;

WHEREAS, in connection with the implementation of the Separation Agreement, CarMax will need certain administrative and infrastructure support in connection with the ongoing administrative and operation of CarMax;

WHEREAS, as a condition to the respective obligations of the parties to the Separation Agreement to consummate the transactions contemplated therein, the Separation Agreement requires the execution and delivery of this Agreement pursuant to which Circuit City Stores agrees to provide CarMax certain transition services upon the terms set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises set forth hereinafter, the parties hereby agree as follows:

### ARTICLE I

**Section 1.1    Definitions**.  Terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Separation Agreement.  In addition, the following terms, as used herein, have the following meanings:

"Fully Loaded Cost" shall mean, with respect to any service supplied, the sum of (i) the allocable portion of all direct and indirect costs included in the functional department's cost center relating to services supplied, determined in accordance with Circuit City Stores' cost accounting practices on the date hereof, plus (ii) an amount equal to ten percent (10%) of the amount in clause (i).

"Service" or "Transition Services" shall mean each distinct service or all services listed in Column A of Schedule 1 and Schedule 2 attached hereto.

# ARTICLE II

**Section 2.1    Duration of Services on Schedule 1**. This Agreement shall be effective as of the time and day on which Circuit City Stores redeems its CarMax Group Stock in exchange for shares of CarMax Common Stock pursuant to the Separation Agreement ("Redemption Date") and shall continue, with respect to each Service listed on Schedule 1, through the date or for the period shown in Column B for such Service.  At the option of CarMax, exercised by no less than thirty (30) days written notice to Circuit City Stores, the Service(s) specified in such written notice shall continue for a renewal period of three (3) months.  The provision of Service(s) specified in each written notice may be extended for consecutive three (3) month periods (or portions thereof); provided; however, that in no event will any Transition Service be provided for more than twelve (12) months from the Redemption Date for the Services listed on Schedule 1.  CarMax may, upon ninety (90) days written notice to Circuit City, terminate the utilization of any Service listed on Schedule 1 during the initial term or any renewal period.

**Section 2.2    Duration of Services on Schedule 2**. This Agreement shall be effective as of the Redemption Date and shall continue, with respect to each Service listed on Schedule 2, through the date or for the period shown in Column B of Schedule 2 for such Service.  Computer Center and Telecommunications shall be considered "Extended Services."  At the option of CarMax, exercised by no less than thirty (30) days written notice to Circuit City Stores, the Service(s) specified in such written notice shall continue for a renewal period of six (6) months. The provision of Service(s) specified in each written notice may be extended for consecutive six (6) month periods (or portions thereof); provided; however, that in no event will any Transition Service be provided for more than twenty-four (24) months, or forty-eight (48) months for Extended Services, from the Redemption Date for the Services listed on Schedule 2.  CarMax may, upon ninety (90) days written notice to Circuit City Stores, terminate the provision of any Service listed on Schedule 2 during the initial term or any renewal period.

**Section 2.3    Employees**. Employees of Circuit City or its Affiliates who are made available to provide the Services shall at all times remain the employees of Circuit City or its Affiliates and shall not at any time be deemed the agents, representatives, employees or leased employees of CarMax.  Circuit City is solely responsible for designating the individual employees to be made available to CarMax to provide the Services, and for the wages, salary, benefits, expenses or other costs (including workers' compensation claims or any other employment related liability) (collectively, "employee costs") associated with such individuals. All other employees or personnel provided by CarMax or any third party in connection with this Transition Services Agreement shall remain the employees or personnel of CarMax or such third party and shall not be deemed the agents, representatives, employees or leased employees of Circuit City or its Affiliates. Neither Circuit City nor its Affiliates shall be responsible for the employee costs associated with work to be performed by such employees or personnel of CarMax or any third party.  Neither party shall be responsible for the acts of or for supervising the other party's employees or personnel.

**Section 2.4    Efforts for Alternative Sources of Services**. Notwithstanding the foregoing but except with respect to the Extended Services, CarMax shall use all reasonable best

efforts to establish, as quickly as reasonably possible, their own systems and employees to perform the Services supplied to them by Circuit City Stores and, upon at least ninety (90) days prior written notice to Circuit City Stores, to terminate its use of each such respective Service.

## ARTICLE III

**Section 3.1   Performance**. Circuit City Stores agrees to provide timely to CarMax the Transition Services listed on Schedule 1 and 2 to the extent requested by CarMax, at levels consistent with and in no event to exceed the extent to which such Transition Services had been made available to CarMax before the date hereof.

**Section 3.2   Cost of Services**. The cost of each Service shall be the Fully Loaded Cost.

**Section 3.3   Invoice and Payment**. Circuit City shall provide an invoice to CarMax with respect to each calendar month in which Transition Services are provided. The invoice shall set forth in detail the Transition Services performed during that month and cost associated with each Transition Service. Invoices shall be payable by CarMax within thirty (30) days of the invoice date (the "Payment Date").

**Section 3.4   Late Payment**. Any payment due and unpaid under this Transition Services Agreement by the Payment Date shall bear interest from the Payment Date at a rate per annum of one percent (1%) over the prime rate of interest published by SunTrust Bank, or its successor, on the first day of each month, for large commercial lenders. In addition, Circuit City may, after giving thirty (30) days written notice to CarMax, suspend Services under this Transition Services Agreement until Circuit City has been paid in full all amounts due for Transition Services rendered and expenses incurred. Notwithstanding the foregoing or anything else to the contrary, there shall be no suspension of Transition Services during which there is a good faith dispute concerning any invoice.

**Section 3.5   Performance by Third Parties**. CarMax understands that during the term of this Agreement, Circuit City Stores may decide to have all or a portion of any particular Service performed in whole or in part, by a third-party provider. In such event, Circuit City Stores may assign all or a portion of its obligations hereunder relating to such Service to such third-party provider; provided however, that no such assignment (i) shall diminish in any material respect the nature, scope or timeliness of the Transition Services to be provided by Circuit City Stores or (ii) increase the amounts payable by CarMax for Transition Services under 3(b). CarMax agrees to provide such third-party provider CarMax's specified service level requirements for the remainder of the term of this Agreement, such service level to reflect the service level then provided by Circuit City Stores for the remainder of the term of this Agreement.

**Section 3.6   Force Majeure**.

(a)      Circuit City Stores may suspend or reduce, in whole or in part, the performance or supply of any or all of the Transition Services or any of its obligations hereunder

to the extent it is materially impeded in its ability to provide such Service as a result of an act of God, labor dispute, war, riot, fire or other casualty, acts of any governmental body, or other cause or conditions beyond such party's reasonable control (each a "Force Majeure Event"). Circuit City Stores shall use its reasonable best efforts to restore the suspended or reduced Transition Service. Any Transition Services not provided by reason of this section shall be promptly resumed upon the elimination of the Force Majeure Event.

(b)    During any period in which any Transition Services are reduced or suspended pursuant to Section 3.6(a), CarMax shall not be obligated to remit payment for the reduced, suspended or terminated portion of such Transition Services.

**Section 3.7    Limitation of Liability of Circuit City Stores.**

(a)    Neither Circuit City Stores, nor its Affiliates, Subsidiaries, employees or agents shall be liable to CarMax for, and CarMax shall release and discharge and shall indemnify and hold harmless Circuit City Stores, its Affiliates, Subsidiaries, employees and agents from any and all claims, liabilities, actions, suits, judgments, losses, injuries, damages (including, without limitation, incidental or consequential damages), costs and expenses arising out of or connected with any act or omission of Circuit City Stores, its Affiliates, Subsidiaries, employees or agents, with respect to the Transition Services listed on Schedule 1 or Schedule 2, or any failure to provide the Transition Services listed on Schedule 1 or Schedule 2 to CarMax other than (i) a refusal by Circuit City Stores in material breach of this Agreement or (ii) gross negligence or willful misconduct of Circuit City Stores, its employees or agents.

(b)    CarMax shall not use the Transition Services listed on Schedule 1 or Schedule 2 for any purpose other than the operation of their internal business. CarMax will indemnify Circuit City Stores against any loss, damage or expense incurred by Circuit City Stores as a result of CarMax's misuse or employment of any such Transition Service.

**Section 3.8    Absence of Warranties.** The parties expressly agree that no warranty shall be implied under this Agreement, whether warranties of utility or of fitness for any particular purpose or of merchantability or of any other type and, further, that no warranties of any sort are made herein.

## ARTICLE IV

**Section 4.1    Notices.** All notices and other communications required or permitted hereunder shall be in writing (including telex, facsimile transmission or similar writing) and shall be given:

(a)    If to Circuit City Stores to:

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, Virginia 23223-1464

Attn:   Michael T. Chalifoux
Fax:    (804) 418-8286

(b)      If to CarMax to:

CarMax, Inc.
4900 Cox Road
Glen Allen, Virginia 23060-3314
Attn:   Keith D. Browning
Fax:    (804) 967-2978

or to such other person or to such other address or facsimile number as the party to whom such notice is to be given may have furnished the other parties in writing by like notice. If mailed, any such communication shall be deemed to have been given on the third business day following the day on which the communication is posed by registered or certified mail (return receipt requested). If given by any other means it shall be deemed to have been given when delivered to the address specified in this Section.

**Section 4.2    Interpretation**. The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**Section 4.3    Books and Records**. In addition to the maintenance of the data relating to each Service that shall be transferred to CarMax as described in Attachment A, Circuit City shall maintain books, records, documents and other evidence, consistent with normal accounting procedures and practices, sufficient to accurately and properly reflect the performance of the Services hereunder and the amounts due Circuit City hereunder. CarMax or its representatives shall have access at all reasonable times to such records for the purposes of auditing and verifying the accuracy of the invoices submitted by Circuit City. Circuit City shall maintain such books and records five years from the completion of all Services.

**Section 4.4    Confidentiality**. Each party acknowledges that it may be necessary to disclose Confidential Information (as defined below) to the other in order to facilitate the provision of Services under this Transition Services Agreement. Except as agreed by the parties pursuant to this Transition Services Agreement, each party agrees not to use, copy, disclose to third parties (other than consultants engaged in the provision of Services) or to publish any Confidential Information of the other which is (i) confidential under applicable law, or (ii) proprietary and confidential information including, without limitation, the following: (a) any trade secret, know-how, invention, software program, application, documentation, schematic, procedure, contract, information, knowledge, data, process, technique, design, drawing, program, formula or test data, work in progress, engineering, manufacturing, marketing, financial, sales, supplier, customer, employee, investor, or business information, whether in oral, written, graphic or electronic form; or (b) any document, diagram, photograph, drawing, computer program or other communication that is either conspicuously marked "confidential", known or reasonably should have been known by the other party to be confidential, or is of a proprietary nature, and is learned or disclosed in the course of discussions, studies or other work undertaken between the parties. Notwithstanding the foregoing, the Parties shall have the right to disclose any information necessary to comply with any request or order of a Governmental Authority or court. Nothing in this Section shall be deemed to

limit or restrict in any way the right of a Governmental Authority to exercise its authority to audit or review the books or records of a party or any Affiliate of a party, but the party must advise the other party of the pending disclosure as described below.

If a party intends to disclose Confidential Information to any Governmental Authority or court, the Disclosing party shall, to the extent doing so does not violate any such request or order, advise the Non-Disclosing party prior to disclosure and cooperate in any effort by the Non-Disclosing party to minimize the amount of Confidential Information disclosed, secure confidential treatment of such Confidential Information, or seek permission from such Governmental Authority or court to revise the Confidential Information in a manner consistent with the interests of the Parties and in a manner which meets the requirements of the Governmental Authority or court.

Except to the extent information is confidential under applicable law, any information transmitted to either party will not be deemed Confidential Information if that information is:

(a)     In the receiving party's possession without restriction on disclosure prior to disclosure hereunder;

(b)     At the time of disclosure, generally available to the public without restriction on disclosure except to the extent then applicable corporate policies on confidentiality and handling of proprietary information would have prevent disclosure;

(c)     After disclosure, generally available to the public without restriction on disclosure, by publication or otherwise, through no fault of receiving party; or

(d)     After the time of disclosure, received from a third party who imposes no obligation of confidentiality and who, insofar as the receiving party can reasonably determine, did not acquire any such Confidential Information directly or indirectly from the other party subject to requirements of confidentiality.

The provisions of this Section shall survive the termination of the Transition Services and shall bind the parties and their successors and assigns for a period of five (5) years after initial disclosure of such Confidential Information.   Notwithstanding the foregoing, to the extent information may not be disclosed under applicable law, such information shall remain subject to this confidentiality provision until no longer protected under applicable law.

**Section 4.5     Governing Law and Venue.** This Transition Services Agreement shall be governed by and construed in accordance with the domestic laws of the Commonwealth of Virginia, without regard to its conflicts of law rules.

**Section 4.6     Severability.** Any term or provision of this Transition Services Agreement that is held invalid or unenforceable in any situation shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation; provided, however, that the remaining terms and provisions of this Transition Services Agreement may be enforced only to the extent that such enforcement in the absence of any invalid terms and provisions would not result in (a) deprivation of a party of a material aspect of its original bargain upon execution of this

Transition Services Agreement, (b) unjust enrichment of a party, or (c) any other manifestly unfair or inequitable result.

     **Section 4.7    Miscellaneous**. This Agreement (i) together with the Separation Agreement, constitutes the entire agreement relating to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof and in the event of a conflict between this Agreement and the Separation Agreement, the terms of this Agreement shall control; (ii) is an independent agreement, the rights and obligations of the parties to which shall not be affected by any provision of, or remedy arising under or with respect to, the Separation Agreement or any other agreement between the parties, except to the extent expressly provided in any such agreement; and (iii) is not intended to and shall not confer upon any other person or business entity, other than the parties hereto or any permitted assignees, any rights or remedies with respect to the subject matter hereof.

     **Section 4.8    Counterparts**. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

*    *    *    *    *

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF the parties have caused this Agreement to be executed by their duly authorized officers.

CIRCUIT CITY STORES, INC.


By:_____

Name: _____

Title: _____


CARMAX, INC.


By:_____

Name: _____

Title: _____

# SCHEDULE 1

## Transition Services

| Column A<br>Transition Services | Column B<br>Initial Term of Service |
|---|---|
| Human Resources | 6 Months |
| Purchasing of Television Advertising | 6 Months |
| Cafeteria Services | 6 Months |
| STS | 6 Months |

## SCHEDULE 2

Transition Services

| Column A<br>Transition Service | Column B<br>Initial Term of Service |
|---|---|
| Computer Center | 24 Months |
| Telecommunications | 24 Months |
| Administrative Services | 12 Months |
| Tax Services | 12 Months |
| Payroll | 12 Months |
| Benefits Administration | 12 Months |

**EXHIBIT C**

FORM OF EMPLOYEE BENEFITS AGREEMENT

BY AND BETWEEN CIRCUIT CITY STORES, INC. AND

CARMAX, INC.

Effective as of May 21, 2002

## EMPLOYEE BENEFITS AGREEMENT

This EMPLOYEE BENEFITS AGREEMENT, dated as of _____, 2002 (the "Effective Date") is by and between Circuit City Stores, Inc., a Virginia corporation ("Circuit City"), and CarMax, Inc., a Virginia corporation and a wholly owned subsidiary of Circuit City ("CarMax").

WHEREAS, the Board of Directors of Circuit City has determined that it is in the best interests of Circuit City and its shareholders to separate CarMax from Circuit City's remaining businesses such that CarMax will become an independent, separately traded public business (the "Separation");

WHEREAS, in furtherance of the foregoing, Circuit City and CarMax have entered into a Separation Agreement, dated as of May 21, 2002 (the "Separation Agreement"), and other specific agreements that will govern certain matters relating to the Separation and the relationship of Circuit City, CarMax, and their respective Affiliates following the Separation Date; and

WHEREAS, Circuit City and CarMax have agreed to enter into this Agreement to provide for the allocation of assets, liabilities, and responsibilities with respect to certain employee compensation and benefit plans and programs between them.

NOW, THEREFORE, the parties, intending to be legally bound, agree as follows:

# ARTICLE I

## DEFINITIONS

For purposes of this Agreement the following terms shall have the following meanings:

1.1    "Administration Period" means the period from the consummation of the Separation until the date on which CarMax determines it can properly administer the applicable employee benefit plan or payroll practice without assistance from Circuit City, which period may differ as between benefit plans and practices. CarMax shall notify Circuit City at least thirty days in advance of any termination of the Administration Period, with respect to any benefit plan or payroll practice, and provided however that the Administration Period shall in no event extend for a period in excess of one year from the consummation of the Separation with respect to any benefit plan or payroll practice.

1.2    "Affiliate" means a member of an entity's controlled group of corporations within the meaning of Section 414 of the Code.

1.3    "Agreement" means this Employee Benefits Agreement, including all the Schedules hereto.

1.4    "Auditing Party" is defined in Section 6.5(a).

1.5    "Award," when immediately preceded by "Circuit City," means an award under the Circuit City Stock Incentive Plan; when immediately preceded by "CarMax," means an award under the CarMax Stock Incentive Plan.

1.6    "CarMax" is defined in the recitals to this Agreement.

1.7    "CarMax Common Stock" means common shares, par value of $0.50 per share, of CarMax to be issued to holders of CarMax Group Common Stock and holders of Circuit City Group Common Stock in the Separation and that also trades before and through the CarMax Dividend Date on a "when issued" basis.

1.8    "CarMax Dividend" shall mean the distribution by Circuit City of CarMax Common Stock as a dividend to holders of Circuit City Group Common Stock in the Separation.

1.9    "CarMax Dividend Date" means the date on which the CarMax Common Stock held by Circuit City is distributed as a dividend to holders of Circuit City Group Common Stock and the date on which Circuit City Stores Common Stock ceases to trade on a "when issued" basis.

1.10    "CarMax Employee" means any individual who, as of the consummation of the Separation, is either actively employed by or then on a leave of absence from CarMax or a CarMax Entity.

1.11   "CarMax Entity" means CarMax and any Person that is, at the relevant time, an Affiliate of CarMax or is otherwise controlled, directly or indirectly, by CarMax.

1.12   "CarMax Executive" means a CarMax Employee or Circuit City Transferee who is eligible to participate in or receive a benefit under any CarMax Executive Benefit Plan.

1.13   "CarMax Executive Benefit Plans" means the executive benefit and nonqualified plans, programs, and arrangements (exclusive of Individual Agreements) established and sponsored by CarMax, for the benefit of employees and former employees of CarMax or a CarMax Entity after the Close of the Separation Date.

1.14   "CarMax Exchange Date" means the date on which CarMax Group Common Stock is redeemed in exchange for CarMax Common Stock.

1.15   "CarMax 401(k) Plan" means the CarMax, Inc. 401(k) Savings Plan.

1.16   "CarMax Group Common Stock" means common shares, par value of $0.50 per share, of Circuit City designated as "Circuit City Stores, Inc. -- CarMax Group Common Stock" in the Circuit City Amended and Restated Articles of Incorporation, to be redeemed by Circuit City in the Separation.

1.17   "CarMax Group Option" means an option (either nonqualified or incentive) to purchase shares of CarMax Group Common Stock pursuant to a Circuit City Stock Incentive Plan.

1.18   "CarMax Stock Incentive Plan" means the Stock Incentive Plan or program to be established by CarMax, effective immediately prior to the CarMax Dividend Date, in connection with the treatment of options as described in Article V.

1.19   "CarMax Post-Dividend Stock Value" means the average of the sum of the closing sale prices of CarMax Common Stock reported on the NYSE Composite Transaction Tape as of 4:00 P.M., Eastern Standard Time or Eastern Daylight Time (whichever shall then be in effect) for each of the five trading days consisting of the CarMax Dividend Date and the four trading days immediately preceding the CarMax Dividend Date.

1.20   "CarMax Pre-Dividend Stock Value" means the average of the sum of the closing sale prices of CarMax Group Common Stock reported on the NYSE Composite Transaction Tape as of 4:00 P.M., Eastern Standard Time or Eastern Daylight Time (whichever shall then be in effect) for each of the five trading days consisting of the CarMax Dividend Date and the four trading days immediately preceding the CarMax Dividend Date.

1.21   "CarMax Option" means an option (either nonqualified or incentive) to purchase shares of CarMax Common Stock pursuant to the CarMax Stock Incentive Plan.

1.22   "CarMax Retirement Plan" means the Retirement Plan of CarMax, Inc., established on March 1, 2002.

1.23    "Circuit City" is defined in the recitals to this Agreement.

1.24    "Circuit City Common Stock" means the common shares, par value $.50 per share, of Circuit City designated as "Common Stock" in the Circuit City Amended and Restated Articles of Incorporation immediately after the Separation, such shares having previously been designated as Circuit City Group Common Stock and having been redesignated as "Common Stock" pursuant to an amendment to the Amended and Restated Articles of Incorporation to be filed by Circuit City in connection with the Separation.

1.25    "Circuit City Employee" means any individual who, as of the consummation of the Separation, is either actively employed by or then on a leave of absence from Circuit City or a Circuit City Entity, but does not include any Circuit City Transferee or any CarMax Employee.

1.26    "Circuit City Entity" means any entity that is, at the time relevant to the applicable provision of this Agreement, an Affiliate of Circuit City, except that, for periods beginning after the Separation Date, the term "Circuit City Entity" shall not include CarMax or a CarMax Entity.

1.27    "Circuit City Executive" means an employee or former employee of Circuit City who, immediately before the Close of the Separation Date, is eligible to participate in or receive a benefit under any Circuit City Executive Benefit Plan.

1.28    "Circuit City Executive Benefit Plans" means the executive benefit and nonqualified plans, programs, and arrangements (exclusive of Individual Agreements) established and sponsored by Circuit City, to the extent maintained, agreed upon, or assumed by Circuit City or a Circuit City Entity (other than CarMax or a CarMax Entity) for the benefit of employees and former employees of Circuit City or a Circuit City Entity (other than CarMax or a CarMax Entity) before the Close of the Separation Date.

1.29    "Circuit City 401(k) Plan" means the Circuit City Stores, Inc. 401(k) Plan.

1.30    "Circuit City Group Common Stock" means common shares, par value of $0.50 per share, of Circuit City designated as "Circuit City Stores, Inc. – Circuit City Group Common Stock" in the Circuit City Amended and Restated Articles of Incorporation that trade before the CarMax Dividend Date "with due bills" to reflect the right to receive the CarMax Dividend.

1.31    "Circuit City Group Option" means an option (either nonqualified or incentive) to purchase shares of Circuit City Group Common Stock pursuant to a Circuit City Stock Incentive Plan.

1.32    "Circuit City Stock Incentive Plan" means either or both of the Circuit City Stores, Inc. 1988 Stock Incentive Plan and the Circuit City Stores, Inc.1994 Stock Incentive Plan.

1.33   "Circuit City Post-Dividend Stock Value" means the average of the sum of the closing
sale prices of Circuit City Stores Common Stock reported on the NYSE Composite
Transaction Tape as of 4:00 P.M., Eastern Standard Time or Eastern Daylight Time
(whichever shall then be in effect) for each of the five trading days consisting of the
CarMax Dividend Date and the four trading days immediately preceding the CarMax
Dividend Date.

1.34   "Circuit City Pre-Dividend Stock Value" means the average of the sum of the closing
sale prices of Circuit City Group Common Stock reported on the NYSE Composite
Transaction Tape as of 4:00 P.M., Eastern Standard Time or Eastern Daylight Time
(whichever shall then be in effect) for each of the five trading days consisting of the
CarMax Dividend Date and the four trading days immediately preceding the CarMax
Dividend Date.

1.35   "Circuit City Retirement Plan" means the Retirement Plan of Circuit City Stores, Inc.

1.36   "Circuit City Stores Common Stock" means common shares, par value of $0.50 per
share, of Circuit City designated as "Circuit City Stores, Inc. -- Common Stock" in the
Circuit City Amended and Restated Articles of Incorporation of Circuit City Stores, Inc.
that trade before and through the CarMax Dividend Date on a "when issued" basis to
denote no rights to receive the CarMax Dividend and continue to trade after the CarMax
Dividend Date.

1.37   "Circuit City Stores Option" means an option (either nonqualified or incentive) to
purchase shares of Circuit City Stores Common Stock pursuant to a Circuit City Stock
Incentive Plan.

1.38   "Circuit City Transferees" means individuals who are employees of Circuit City or a
Circuit City Entity (other than CarMax or a CarMax Entity) at any time after February
28, 2002 and who become employees of CarMax or a CarMax Entity after the Separation
Date and prior to March 1, 2003; provided however, that such individuals shall not be
deemed to be Circuit City Transferees hereunder until such transfer of employment has
occurred.

1.39   "Close of the Separation Date" means 11:59:59 P.M., Eastern Standard Time or Eastern
Daylight Time (whichever shall then be in effect), on the Separation Date.

1.40   "COBRA" means the continuation coverage requirements for "group health plans" under
Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended,
and as codified in Code Section 4980B and ERISA Sections 601 through 608.

1.41   "Code" means the Internal Revenue Code of 1986, as amended, or any successor federal
income tax law. Reference to a specific Code provision also includes any proposed,
temporary, or final regulation in force under that provision.

1.42    "Disposition Year" means the Circuit City fiscal year during which the Separation Date occurs or the first CarMax fiscal year that ends after the Separation Date, as applicable.

1.43    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended. Reference to a specific provision of ERISA also includes any proposed, temporary, or final regulation in force under that provision.

1.44    "Health and Welfare Plans," when immediately preceded by "Circuit City," means the health and welfare plans established and sponsored by Circuit City, to the extent maintained, agreed upon, or assumed by Circuit City for the benefit of employees and retirees of Circuit City and Circuit City Entities (other than CarMax or a CarMax Entity after the consummation of the Separation), and such other health and welfare plans or programs as may apply to such employees and retirees and, when immediately preceded by "CarMax," means the health and welfare plans sponsored and maintained by CarMax or a CarMax Entity before or after the Separation.

1.45    "HIPAA" means the health insurance portability and accountability requirements for "group health plans" under the Health Insurance Portability and Accountability Act of 1996, as amended.

1.46    "Individual Agreement" means an individual contract or agreement (whether written or unwritten) entered into between Circuit City, a Circuit City Entity, CarMax, or a CarMax Entity and a Circuit City Executive or a CarMax Executive that establishes the terms and conditions of the employment of such individual, including any rights to special executive compensation or benefits.

1.47    "Liabilities" means any liability, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, and whether or not the same that is or would properly be reflected on a balance sheet of Circuit City, any Circuit City Entity, CarMax, or any CarMax Entity, or the notes thereto, including all costs and expenses relating thereto.

1.48    "NYSE" means the New York Stock Exchange.

1.49    "Participating Company" means (a) Circuit City, (b) any Person (other than an individual) that Circuit City has approved for participation in, and which is participating in, a Plan sponsored by Circuit City or a Circuit City Entity, and (c) any Person (other than an individual) which, by the terms of such a Plan, participates in such Plan or any employees or retirees of which, by the terms of such Plan, participate in or are covered by such Plan.

1.50    "Person" means and includes an association, an individual, a partnership, a joint venture, a joint stock company, a corporation, a trust, an unincorporated organization, a limited liability company, a group, a government or other department or agency thereof and any other entity.

1.51   "Plan," when immediately preceded by "Circuit City," means any plan, policy, program, payroll practice, on-going arrangement, contract, trust, insurance policy or other agreement or funding vehicle, to the extent amended from time to time, for which the eligible classes of participants include employees or former employees of Circuit City or a Circuit City Entity, and when immediately preceded by "CarMax," means any plan, policy, program, payroll practice, on-going arrangement, contract, trust, insurance policy or other agreement or funding vehicle as amended from time to time, for which the eligible classes of participants are limited to employees or former employees of CarMax or a CarMax Entity, but no other Circuit City Entity.

1.52   "Separation Date" means the last date as of which CarMax is a member of Circuit City's controlled group of corporations within the meaning of Code Section 414.

## ARTICLE II

## GENERAL PRINCIPLES

2.1    Assumption and Retention of Liabilities.

(a)    CarMax shall not assume any Liabilities not expressly provided to be assumed in this Agreement.

(b)    As of the consummation of the Separation, CarMax shall assume and agree to pay, perform, fulfill, and discharge, except as expressly provided in this Agreement, (i) all Liabilities under CarMax Plans, (ii) all employment or service-related Liabilities with respect to (A) all CarMax Employees (and their dependents and beneficiaries), (B) former employees of CarMax or a CarMax Entity (and their dependents and beneficiaries) whose last employment with a Circuit City Entity was primarily connected to CarMax or a CarMax Entity and (C) any individual who is, or was, an independent contractor, temporary employee, temporary service worker, consultant, freelancer, agency employee, leased employee, on-call worker, incidental worker, or nonpayroll worker or in any other employment relationship primarily connected to CarMax or a CarMax Entity, in each case for periods during which such individuals were employees of, or primarily performed services for CarMax or a CarMax Entity, as applicable, (iii) all employment-related Liabilities with respect to all Circuit City Transferees for periods of service with CarMax or a CarMax Entity after the Separation Date and (iv) any Circuit City Liabilities expressly transferred to CarMax or a CarMax Entity under this Agreement.

(c)    Circuit City shall retain all Liabilities not expressly transferred to and assumed by CarMax pursuant to this Agreement, including Liabilities other than those described in Section 2.1(b)(ii) relating to CarMax Employees, Circuit City Transferees, and their dependents and beneficiaries, arising out of or resulting from employment as employees of Circuit City or a Circuit City Entity for periods on or before the Separation Date (including without limitation all Liabilities under Circuit City Plans) or that are expressly retained by Circuit City in this Agreement or any other written agreement between CarMax and Circuit City.

(d)    Notwithstanding anything to the contrary in this Section 2.1, Liabilities relating to the CarMax Retirement Plan shall be treated as described in Section 3.2.

2.2    CarMax Participation in the Circuit City Plans.  Effective as of the consummation of the Separation, CarMax and each CarMax Entity shall cease to be a Participating Company in any Circuit City Plan, and Circuit City and CarMax and each CarMax Entity shall take all necessary action before the Separation Date to effectuate such cessation as a Participating Company.

2.3    Sponsorship of the CarMax Plans. Effective no later than immediately after the Separation Date, CarMax shall assume, or shall cause a CarMax Entity to assume, sponsorship of (a) the CarMax Retirement Plan and (b) each other CarMax Plan (each of which is listed on Schedule 2.3 of the Agreement).

2.4    Terms of Participation by CarMax Employees in CarMax Plans. Circuit City and CarMax shall adopt, or cause to be adopted, all reasonable and necessary Plan amendments and procedures to prevent CarMax Employees and former employees from receiving duplicative benefits from the Circuit City Plans and the CarMax Plans. With respect to CarMax Employees and Circuit City Transferees, each CarMax Plan shall provide that all service, all compensation, and all other benefit-affecting determinations that, as of the consummation of the Separation, were recognized under the corresponding Circuit City Plan shall, as of immediately after the consummation of the Separation (or the transfer employment for purposes of Circuit City Transferees) receive full recognition, credit, and validity and be taken into account under such CarMax Plan, except to the extent that duplication of benefits would result.

2.5    Service Crediting. With respect to CarMax Employees and Circuit City Transferees, each CarMax Plan shall provide that for purposes of determining eligibility to participate, vesting, and entitlement to benefits (but not for accrual of pension benefits under any defined benefit pension plan), service prior to the Separation Date with Circuit City or a Circuit City Entity shall be treated as service with CarMax or the applicable CarMax entity; provided, however, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits. Such service also shall apply for purposes of satisfying any waiting periods, evidence of insurability requirements, or the application of any preexisting condition limitations under any CarMax Plan. Each CarMax Plan shall waive pre-existing condition limitations with respect to CarMax Employees and Circuit City Transferees. CarMax Employees and Circuit City Transferees shall be given credit under the applicable CarMax Plan for amounts paid during the Disposition Year prior to the Separation Date for purposes of applying deductibles, copayments and out-of-pocket maximums as though such amounts had been paid in accordance with the terms and conditions of the CarMax Plan. With respect to individuals who, following the Separation Date but prior to March 1, 2003, either (i) cease employment with Circuit City or a Circuit City Entity and immediately become employees of CarMax or a CarMax Entity or (ii) are CarMax Employees and cease employment with CarMax or a CarMax Entity and immediately become employees of Circuit City or a Circuit City Entity, Circuit City and CarMax and their respective Affiliates shall (i) credit service recognized by the other under the terms of their respective benefit plans and programs where appropriate (but not for purposes of benefit accruals under any pension plan except as provided in Section 3.2), (ii) transfer accounts between the Circuit City 401(k) Plan and the CarMax 401(k) Plan and (iii) provide coverage and benefits relating to health and welfare plans in a manner consistent with the provisions of Article IV. The service crediting described above shall be subject to any applicable "service bridging" or "break in service" rules under the Circuit City Retirement Plan and 401(k) Plan and the CarMax Retirement Plan and 401(k) Plan.

2.6    Approval of Plans. Prior to the Separation Date, Circuit City shall cause CarMax to adopt (i) the CarMax Stock Incentive Plan, which shall have terms and conditions that are substantially similar to the Circuit City Stock Incentive Plan; (ii) the CarMax Employee Stock Purchase Plan; (iii) the CarMax Annual Performance-Based Bonus Plan, which shall have terms and conditions that are substantially similar to the Circuit City Annual Performance-Based Bonus Plan; and (iv) the CarMax Supplemental Executive Retirement Plan, which shall have terms and conditions substantially similar to the Circuit City Supplemental Executive Retirement Plan, which plans shall be approved prior to the Separation Date by Circuit City shareholders.

2.7    CarMax Transferees. In the event that a CarMax Employee or a Circuit City Transferee becomes an employee of Circuit City or a Circuit City Entity on or after the Separation Date but before February 28, 2003, the individual and his or her associated employment Liabilities, including but not limited to those liabilities under the CarMax health and welfare plans, and assets and accrued benefits with respect to the CarMax 401(k) Plan and Retirement Plan shall be transferred to Circuit City or the applicable Circuit City benefit plans under the same general principles as those provided in this Agreement for transferring the employment Liabilities, assets and accrued benefits of Circuit City Transferees to CarMax or the CarMax employee benefit plans.

## ARTICLE III

## DEFINED CONTRIBUTION AND DEFINED BENEFIT PLANS

3.1    <u>CarMax 401(k) Plan</u>.

(a)    *CarMax, Inc. 401(k) Savings Plan and Trust*.  Circuit City and CarMax shall adopt or cause to be adopted any amendments to any trust agreements or plan documents reasonably necessary to transfer settlor responsibility and sponsorship of the CarMax 401(k) Plan and related trust from Circuit City and the trustees appointed by Circuit City to CarMax and trustees appointed by CarMax.  Such amendments will be effective as of the consummation of the Separation.

(b)    *Assumption of Liabilities and Transfer of Assets*.  Circuit City and CarMax shall cause, in the manner described herein, the accounts under the Circuit City 401(k) Plan of each former and current CarMax Employee and Circuit City Transferee to be transferred to the CarMax 401(k) Plan as soon as practicable after the Separation Date or such earlier date as Circuit City and CarMax shall mutually determine; provided, however, that such transfer (and the related assumption of liabilities) shall not occur if Circuit City, CarMax or any other Circuit City or CarMax Plan fiduciary reasonably believes that the transfer could result in the failure of the Circuit City 401(k) Plan or the CarMax 401(k) Plan to qualify under Code Section 401(a).  Circuit City agrees to provide to CarMax, in connection with the transfer to the CarMax 401(k) Plan, a list of the CarMax Employees, former employees and Circuit City Transferees who were participants in or are otherwise entitled to benefits under the Circuit City 401(k) Plan, including descriptions of their respective account balances and the protected benefits (within the meaning of Code Section 411(d)(6)) attached to their accounts.  As soon as practicable after the Separation Date: (i) Circuit City shall cause the accounts (including any outstanding loan balances) of each CarMax Employee and Circuit City Transferee in the Circuit City 401(k) Plan (without regard to any applicable vesting schedule) to be transferred to the CarMax 401(k) Plan and its related trust in kind based on the investment election of the individuals; (ii) CarMax (or any successor CarMax Entity) and the CarMax 401(k) Plan shall assume and be solely responsible for all liabilities under the CarMax 401(k) Plan relating to the accounts that are so transferred as of the time of such transfer; and (iii) CarMax shall cause such transferred accounts to be accepted by the CarMax 401(k) Plan and its related trust and shall cause the CarMax 401(k) Plan to satisfy all protected benefit requirements under the Code and applicable law with respect to the transferred accounts.  In determining whether a CarMax Employee is vested in his or her account under the CarMax 401(k) Plan, the CarMax 401(k) Plan shall credit each CarMax Employee, former employee or Circuit City Transferee with all the individual's service credited under the Circuit City 401(k) Plan.  Prior to the date upon which the transfer described above occurs, Circuit City shall

contribute to the Circuit City 401(k) Plan all matching contributions, if any, due to the CarMax Employees, former employees and Circuit City Transferees pursuant to the terms and conditions of such Plan prior to the transfer date.

(c)     Circuit City and CarMax agree to use commercially reasonable efforts to coordinate the nondiscrimination testing for the Circuit City 401(k) Plan and the CarMax 401(k) Plan for the plan year ending February 27, 2003, to the extent deemed advisable.

3.2     CarMax Retirement Plan. Effective no later than the consummation of the Separation, Circuit City shall transfer sponsorship of the CarMax Retirement Plan to CarMax. Each Circuit City Transferee who is transferred to CarMax or a CarMax Entity after the Separation but on or prior to March 1, 2003 and who has an accrued benefit under the Circuit City Retirement Plan that has not been transferred to the CarMax Retirement Plan ("Subsequent Transferee") shall have his accrued benefit and associated benefit liabilities transferred to the CarMax Retirement Plan as soon as practicable after February 28, 2003. CarMax shall ensure that the CarMax Retirement Plan accepts and Circuit City shall ensure that the Circuit City Retirement Plan makes any transfer of benefits and liabilities required under this Section 3.2. Circuit City shall cause the trustee of the Circuit City Retirement Plan to transfer cash from the trust under the Circuit City Retirement Plan to the trust under the CarMax Retirement Plan, in an amount determined by a certified actuary chosen by Circuit City and CarMax (the "Actuary") to be equal to the present value of all accrued benefits as of February 28, 2002 (the Valuation Date) with respect to Subsequent Transferees on a termination basis in accordance with Section 414(1) of the Code and the regulations promulgated thereunder. If the market value of assets as of the Valuation Date is not sufficient to fund such present value, assets will be allocated to various priority categories under section 4044 of ERISA. The calculation of the present value of such benefits shall be performed by the Actuary. From the Valuation Date to the date of transfer, the assets to be transferred shall be credited with interest at the rate per annum mutually agreed to by Circuit City and CarMax and an amount equal to such interest shall be transferred to the trust under the CarMax Retirement Plan on the date the transfer of assets occurs. Effective as of the date the transfer of employment, Subsequent Transferees shall cease to accrue benefits under the Circuit City Retirement Plan and shall commence to accrue benefits under the CarMax Retirement Plan. Effective as of the date the transfer of assets occurs, CarMax shall assume all liabilities and obligations with respect to benefits accrued by the Subsequent Transferees under the Circuit City Retirement Plan and shall indemnify and hold harmless Circuit City, its officers, directors, employees and agents and affiliates from and against any and all liabilities with respect to such benefits.

ARTICLE IV

HEALTH AND WELFARE PLANS

4.1    Assumption of Health and Welfare Plan Liabilities.

(a)    All Liabilities relating to, arising out of, or resulting from health and welfare coverage or claims incurred by or on behalf of CarMax Employees on or before the Separation Date for periods of employment with CarMax before the Separation Date, or their covered dependents under the Circuit City Health and Welfare Plans shall become Liabilities of CarMax as of the consummation of the Separation, and, except as provided in Section 4.1(b), all Liabilities relating to health and welfare coverage or claims incurred by or on behalf of CarMax Employees, Circuit City Transferees, or their covered dependents after the Separation Date shall be Liabilities of CarMax under the corresponding CarMax Health and Welfare Plans. Except as provided in Section 4.1(b), a claim or Liability (i) for medical and dental benefits shall be deemed to be incurred upon the rendering of health services giving rise to the obligation to pay such benefits; (ii) for life insurance and accidental death and dismemberment insurance benefits shall be deemed to be incurred upon the occurrence of the event giving rise to the entitlement to such benefits; and (iii) for disability benefits shall be deemed to be incurred on the date an individual is deemed to be disabled, as defined under the applicable plan.

(b)    As of the Separation Date for periods of time following the Separation Date or date of transfer as the case may be, CarMax also shall be responsible for all Liabilities that relate to, arise out of, or result from any denture work, bridge work, crown installation, or root canal therapy for a CarMax Employee, Circuit City Transferee, or his or her covered dependent for which preparatory dental services have been rendered under a Circuit City Health and Welfare Plan on or before the Separation Date or date of transfer as the case may be for such dental treatment that occurs after the Separation Date. Coverage for any such hospitalization or dental services shall be provided after the Separation Date without interruption under the appropriate CarMax Health and Welfare Plan subject to applicable plan rules and limitations.

4.2    Health and Welfare Plan Transitional Coverage Rules.

(a)    CarMax Employees, Circuit City Transferees and their covered dependents who participate in Circuit City Health and Welfare Plans immediately before the Separation Date (i) will be treated in the same manner under the Circuit City Health and Welfare Plans as any other similarly situated employee of Circuit City or a Circuit City Entity with the same years of service and age who may otherwise terminate his or her employment with Circuit City and all Circuit City Entities on the Separation Date; and (ii) will automatically be enrolled on the day following the

Separation Date in CarMax Health and Welfare Plans corresponding to the Circuit City Health and Welfare Plans in which the CarMax Employee, Circuit City Transferee, and his or her covered dependents, if any, participated immediately before the Separation Date. CarMax will maintain the CarMax Health and Welfare Plans as a continuation of the Circuit City Health and Welfare Plans, so that CarMax will give CarMax Employees and Circuit City Transferees credit under the CarMax Health and Welfare Plans for payments made under the Circuit City Health and Welfare Plans for purposes of deductibles and maximum out-of-pocket limits for the Disposition Year.

(b)     With respect to any CarMax Employee, Circuit City Transferee and his or her dependents (if any) who were covered under a Circuit City Health and Welfare Plan immediately before the Close of the Separation Date, CarMax shall take the appropriate actions reasonably necessary to ensure that the proof of insurability requirements (if any) and the preexisting condition exclusions (if any) applicable to new enrollees under the corresponding CarMax Health and Welfare Plans (if any) are waived with respect to such CarMax Employee, Circuit City Transferee and his or her dependents, provided that to the extent necessary, such individual or his or her dependents enroll for coverage in the corresponding CarMax Health and Welfare Plan within no more than 31 days after the last day of the month in which the Separation Date or date of transfer as the case may be occurs.

(c)     The transfer of employment from Circuit City or a Circuit City Entity to CarMax or a CarMax Entity as of the consummation of the Separation shall not be required to be treated as a "status change" with respect to any CarMax Employee or Circuit City Transferee under the Circuit City Health and Welfare Plans or the CarMax Health and Welfare Plans.

4.3     Post-Disposition Transitional Rules. Effective as of or prior to the Separation Date, CarMax shall establish a dependent care assistance plan (the "CarMax DCA Plan") that is substantially similar to the Circuit City Dependent Care Assistance Plan (the "Circuit City DCA Plan"), to cover CarMax Employees and Circuit City Transferees. The CarMax Employees and Circuit City Transferees who elected to participate in the Circuit City DCA Plan for the Disposition Year automatically will be eligible to participate in the CarMax DCA Plan for that part of the Disposition Year remaining after the Separation Date. CarMax shall maintain the CarMax DCA Plan as a continuation of the Circuit City DCA Plan for the Disposition Year, so that the aggregate benefit that any CarMax Employee or Circuit City Transferee receives under the Circuit City DCA Plan and the CarMax DCA Plan is not less than the benefits such CarMax Employee or Circuit City Transferee would have received had he or she remained a Circuit City Employee through the Disposition Year.

(a)     If the aggregate amount contributed by CarMax Employees and Circuit City Transferees for the Disposition Year to the Circuit City DCA Plan exceeds the aggregate claims paid by Circuit City for the Disposition Year with respect to the accounts of individuals under such plan, Circuit City will pay CarMax an amount in cash equal to such excess, to the extent that the aggregate amount contributed

by the CarMax Employees or Circuit City Transferees for the Disposition Year to the CarMax DCA Plan is less than the aggregate claims paid by CarMax for the Disposition Year with respect to the such individuals under those plans.

(b)     If the aggregate amount contributed by CarMax Employees and Circuit City Transferees for the Disposition Year to the Circuit City DCA Plan is less than the aggregate claims paid by Circuit City for Disposition Year with respect to the accounts of such individuals under such plan, CarMax will pay Circuit City an amount in cash equal to such deficit, to the extent that the aggregate amount contributed by the CarMax Employees and Circuit City Transferees for the Disposition Year to the CarMax DCA Plan exceeds the aggregate claims paid by CarMax for the Disposition Year with respect to such individuals under those plans.

(c)     The foregoing payments will be made as soon as practicable after all claims have been paid with respect to the Disposition Year.

4.4     Workers' Compensation Liabilities. Except as provided below, all workers' compensation Liabilities relating to, arising out of, or resulting from any claim by CarMax Employees or Circuit City Transferees that result from an accident or from an occupational disease which is incurred or becomes manifest, as the case may be, on or before the Separation Date and while such individual was employed by Circuit City or a Circuit City Entity shall be retained by Circuit City. CarMax and each CarMax Entity shall be solely responsible for all workers' compensation Liabilities relating to, arising out of, or resulting from any claim incurred for a compensable injury sustained (i) by CarMax Employees at any time; and (ii) by Circuit City Transferees after the date their employment is transferred. For purposes of this Agreement, an injury shall be deemed to be sustained upon the occurrence of the event giving rise to eligibility for workers' compensation benefits or in the case of an occupational disease, at such time as the occupational disease is diagnosed by a qualified medical professional, as the case may be. Circuit City, each Circuit City Entity, CarMax and each CarMax Entity shall cooperate with respect to any notification to appropriate governmental agencies of the disposition and the issuance of new, or the transfer of existing, workers' compensation insurance policies and claims handling contracts.

4.5     Payroll Taxes and Reporting. Circuit City and CarMax shall, to the extent practicable, (i) treat CarMax (or a CarMax Entity designated by CarMax) as a "successor employer" and Circuit City (or the appropriate Circuit City Entity) as a "predecessor," within the meaning of Sections 3121(a)(1) and 3306(b)(1) of the Code, with respect to CarMax Employees and Circuit City Transferees for purposes of taxes imposed under the United States Federal Unemployment Tax Act or the United States Federal Insurance Contributions Act, and (ii) cooperate with each other to avoid, to the extent possible, the filing of more than one IRS Form W-2 with respect to each CarMax Employee and Circuit City Transferee for the Disposition Year. Circuit City, each Circuit City Entity, CarMax and each CarMax Entity shall each bear its responsibility for payroll tax obligations and for the proper reporting to the appropriate governmental authorities of

compensation earned by their respective employees after the Separation Date, including compensation related to the exercise of Options.

4.6    COBRA and HIPAA Liability and Compliance.  As of the Separation Date, CarMax shall be responsible for all COBRA Liabilities relating to, arising out of, or resulting from any claim by any CarMax Employee or former CarMax Employee or his or her qualified dependents that result from a qualifying event occuring on or before the Separation Date and while such individual was employed by CarMax. As of the Separation Date, for periods of time following the Separation Date or date of transfer as the case may be, CarMax also shall be responsible for all COBRA Liabilities that relate to, arise out of, or result from qualifying events for any CarMax Employee, former CarMax Employee, Circuit City Transferee, or their qualified dependents.  Circuit City shall be responsible for administering compliance with the health care continuation requirements of COBRA, the certificate of creditable coverage requirements of HIPAA, and the corresponding provisions of the Circuit City Health and Welfare Plans with respect to CarMax Employees and their covered dependents who incur a COBRA qualifying event or loss of coverage under the Circuit City Health and Welfare Plans at any time on or before the consummation of the Separation and Circuit City Transferees who incur a COBRA qualifying event or loss of coverage after the date their employment is transferred. Subject to Section 6.2, effective immediately after the Separation Date, CarMax shall be responsible for administering compliance with the health care continuation requirements of COBRA, the certificate of creditable coverage requirements of HIPAA, and the corresponding provisions of the CarMax Health and Welfare Plans with respect to CarMax Employees, Circuit City Transferees and their covered dependents who incur a COBRA qualifying event or loss of coverage under the CarMax Health and Welfare Plans at any time after the consummation of the Separation.

ARTICLE V

EXECUTIVE BENEFITS AND OTHER BENEFITS

5.1    Individual Agreements – Assumption of Liabilities and Consents.

(a)    Circuit City has been providing compensation and benefits, subject to reimbursement from CarMax, to certain Circuit City Transferees, during the period those Circuit City Transferees have been providing services on a substantially full-time basis to a CarMax Entity. Circuit City shall continue to provide such compensation and benefits through the Separation Date, and be entitled to reimbursement from a CarMax Entity, in accordance with established practices.

(b)    Certain plans and programs of Circuit City, as well as certain Individual Agreements, provide for the payment of certain compensation and benefits in the event of the termination of employment of the individual covered by the terms of such plans or Individual Agreements. Prior to the Separation Date, Circuit City shall take all necessary and appropriate actions so that a termination of a CarMax Employee's or Circuit City Transferee's employment with Circuit City described in Section 2.7 shall not constitute a termination of employment for purposes of any Individual Agreement, the Circuit City Supplemental Executive Retirement Plan, or other similar plans and programs. A termination of employment from Circuit City of a CarMax Employee or a Circuit City Transferee in connection with or in anticipation of the consummation of the transactions contemplated by the Separation shall not be deemed to be a termination of employment for purposes of administering benefits under such Individual Agreements or any other plan or program, the payment or vesting of which is conditioned upon termination of employment.

5.2    Circuit City Annual Performance-Based Bonus Plan. CarMax shall be responsible for determining all awards payable under the CarMax Annual Performance-Based Bonus Plan to CarMax Employees and Circuit City Transferees for the Disposition Year. CarMax shall also determine for Circuit City Transferees (a) the extent to which established performance criteria (as interpreted by CarMax, in its sole discretion, after taking into account the effects of the Separation) have been met, and (b) the payment level for each Circuit City Transferee. CarMax shall assume all Liabilities with respect to any such awards payable to CarMax Employees and Circuit City Transferees for the Disposition Year.

5.3    Awards under the Circuit City Stock Incentive Plan or Otherwise. Circuit City and CarMax shall use their commercially reasonable efforts to take all actions necessary or appropriate so that each outstanding Circuit City Award granted under any Circuit City Stock Incentive Plan held by any individual who is either a current or former employee of Circuit City or a Circuit City Entity (as determined by Circuit City) and any CarMax

Employee or Circuit City Transferee shall be adjusted as set forth in this Article V and as illustrated in Schedule 5.3(a) hereto.

(a)    *Circuit City Group Options Held by Circuit City Employees.*

    (i)    This Section 5.3(a) shall apply to any individual who is not a CarMax Employee as of the Close of the Separation Date and who is holding a Circuit City Group Option at that time. As determined by the Committee (as that term is defined in the Circuit City Stock Incentive Plan) pursuant to its authority under any of the Circuit City Stock Incentive Plans, each Circuit City Group Option outstanding under any Circuit City Stock Incentive Plan as of the CarMax Dividend Date shall be adjusted so that each individual who is the holder of a Circuit City Group Option will have such option converted, immediately after the CarMax Dividend, into a Circuit City Stores Option under the applicable Circuit City Stock Incentive Plan.

    (ii)    The adjustment set forth in Section 5.3(a)(i) shall be made as follows:

The exercise price per share of Circuit City Stores Common Stock subject to a Circuit City Stores Option will be equal to the product obtained by multiplying (a) times (b) where "(a)" equals the exercise price per share of the Circuit City Group Option with respect to which an adjustment is being made immediately before the CarMax Dividend, and "(b)" equals the quotient obtained by dividing the Circuit City Post-Dividend Stock Value by the Circuit City Pre-Dividend Stock Value.

The number of shares of Circuit City Stores Common Stock subject to a Circuit City Stores Option will equal the product obtained by multiplying (a) times (b) where "(a)" equals the number of shares of Circuit City Group Common Stock covered by the Circuit City Group Option, and "(b)" equals the quotient obtained by dividing the Circuit City Pre-Dividend Stock Value by the Circuit City Post-Dividend Stock Value.

    (iii)    After the Separation Date, Circuit City Stores Options, regardless of by whom held, shall be settled by Circuit City pursuant to the terms of the applicable Circuit City Stock Incentive Plan.

(b)    *Circuit City Group Options Held by CarMax Employees.*

    (i)    This Section 5.3(b) shall apply to any individual who is a CarMax Employee holding a Circuit City Group Option as of the Close of the Separation Date. Each Circuit City Group Option outstanding under any Circuit City Stock Incentive Plan as of the CarMax Dividend Date shall be adjusted so that each individual who is the holder of a Circuit City Group

Option will have such option converted, immediately after the CarMax Dividend, into a CarMax Option under the CarMax Stock Incentive Plan.

(ii)   The adjustment set forth in Section 5.3(b)(i) shall be made as follows:

The exercise price per share of CarMax Common Stock subject to a CarMax Option will be equal to the product obtained by multiplying (a) times (b) where "(a)" equals the exercise price per share of the Circuit City Group Option with respect to which an adjustment is being made immediately before the CarMax Dividend, and "(b)" equals the quotient obtained by dividing the CarMax Post-Dividend Stock Value by the Circuit City Pre-Dividend Stock Value.

The number of shares of CarMax Common Stock subject to a CarMax Option will equal the product obtained by multiplying (a) times (b) where "(a)" equals the number of shares of Circuit City Group Common Stock covered by the Circuit City Group Option, and "(b)" equals the quotient obtained by dividing the Circuit City Pre-Dividend Stock Value by the CarMax Post-Dividend Stock Value.

(c)   *CarMax Group Options Held by CarMax Employees.*

(i)   This Section 5.3(c) shall apply to any individual who is a CarMax Employee holding a CarMax Group Option as of the Close of the Separation Date. This Section 5.3(c) shall also apply to any individual holding a CarMax Group Option as of the Close of the Separation Date who is not a CarMax Employee or a Circuit City Employee at that time. The CarMax Group Option shall be modified to be a CarMax Option by substituting CarMax Common Stock for CarMax Group Common Stock under the option. The per share exercise price, number of shares and all other terms of a CarMax Option after the Separation Date will be the same as the applicable CarMax Group Option before the Separation Date.

(ii)   After the Separation Date, CarMax Options, regardless of by whom held, shall be settled by CarMax pursuant to the terms of the CarMax Stock Incentive Plan.

(d)   *CarMax Group Options Held by Circuit City Employees.*

(i)   This Section 5.3(c) shall apply to any individual who is a Circuit City Employee as of the Close of the Separation Date and who is holding a CarMax Group Option at that time. As determined by the Committee (as that term is defined in the Circuit City Stock Incentive Plan) pursuant to its authority under any of the Circuit City Stock Incentive Plans, each CarMax Group Option outstanding under any Circuit City Stock Incentive Plan as of the CarMax Dividend Date shall be adjusted so that each

individual who is the holder of a CarMax Group Option will have such option converted, immediately after the CarMax Dividend, into a Circuit City Stores Option under the Circuit City Stock Incentive Plan.

(ii)   The adjustment set forth in Section 5.3(d)(i) shall be made as follows:

The exercise price per share of Circuit City Common Stock subject to a Circuit City Stores Option will be equal to the product obtained by multiplying (a) times (b) where "(a)" equals the exercise price per share of the CarMax Group Option with respect to which an adjustment is being made immediately before the CarMax Dividend, and "(b)" equals the quotient obtained by dividing the Circuit City Post-Dividend Stock Value by the CarMax Pre-Dividend Stock Value.

The number of shares of Circuit City Common Stock subject to a Circuit City Stores Option will equal the product obtained by multiplying (a) times (b) where "(a)" equals the number of shares of CarMax Group Common Stock covered by the CarMax Group Option, and "(b)" equals the quotient obtained by dividing the CarMax Pre-Dividend Stock Value by the Circuit City Post-Dividend Stock Value.

(e)   *Option Terms.* Each Circuit City Stores Option issued as part of the adjustment to Circuit City Group Options or CarMax Group Options pursuant to Section 5.3(a) or (d) shall be subject to the same terms and conditions regarding term, vesting, and other provisions regarding exercise as set forth in the original Circuit City Group Option or CarMax Group Option. Each CarMax Option issued as part of the adjustment to CarMax Group Options or Circuit City Group Options pursuant to Section 5.3(b) or (c) shall be subject to the same terms and conditions regarding term, vesting, and other provisions regarding exercise as set forth in the CarMax Group Option or Circuit City Group Option. Notwithstanding the foregoing, Circuit City will take such action as is necessary to ensure that with respect to the Circuit City Stores Option grants that are held by Circuit City Employees who become CarMax Employees after the Separation Date but on or before February 28, 2003, such individuals will not incur a termination of employment for purposes of the Circuit City Stores Options. CarMax will take such action as is necessary to ensure that with respect to the CarMax Option grants that are held by CarMax Employees who become Circuit City Employees after the Separation Date but on or before February 28, 2003, such individuals will not incur a termination of employment for purposes of the CarMax Options.

The Circuit City Stores Options and CarMax Options shall not be exercisable until the adjustments provided in Sections 5.3(a)-(d) have been made.

(f)   *Circuit City and CarMax Restricted Stock.* The restricted shares of Circuit City Group Common Stock that are outstanding under any Circuit City Stock Incentive Plan or otherwise as of the CarMax Dividend Date shall not be adjusted except for

adjustments applicable to all shares of Circuit City Group Common Stock and shall remain subject to all prior restrictions following the CarMax Dividend Date. Circuit City will hold the shares of CarMax Common Stock issued in the CarMax Dividend subject to the same restrictions as applicable to the restricted shares of Circuit City Group Common Stock on which the CarMax Dividend was paid. The restricted shares of CarMax Group Common Stock that are outstanding under any Circuit City Stock Incentive Plan or otherwise as of the CarMax Dividend Date (i) shall be assumed by the CarMax Stock Incentive Plan, (ii) shall not be adjusted except for adjustments applicable to all shares of CarMax Group Common Stock, and (iii) shall remain subject to all prior restrictions following the CarMax Dividend Date.

(g)     *Circuit City Stock Appreciation Rights and CarMax Stock Appreciation Rights.*

    (i)     As determined by the Committee (as that term is defined in the Circuit City Stock Incentive Plan or the CarMax Stock Incentive Plan) pursuant to its authority under any of the Circuit City Stock Incentive Plans or the CarMax Stock Incentive Plan, each Circuit City Stock Appreciation Right ("Circuit City SAR") outstanding under any Circuit City Stock Incentive Plan and held by an employee of a Circuit City Entity or a CarMax Entity as of the CarMax Dividend Date shall be adjusted in the same manner as the related Circuit City Group Option is adjusted under Section 5.3(a) or (b).

    (ii)     As determined by the Committee (as that term is defined in the Circuit City Stock Incentive Plan or the CarMax Stock Incentive Plan) pursuant to its authority under any of the Circuit City Stock Incentive Plans or the CarMax Stock Incentive Plan, each CarMax Stock Appreciation Right ("CarMax SAR") outstanding under any Circuit City Stock Incentive Plan and held by an employee of a Circuit City Entity or a CarMax Entity as of the CarMax Dividend Date shall be adjusted in the same manner as the related CarMax Group Option is adjusted under Section 5.3(c) or (d).

    (iii)     After the Separation Date, Circuit City SARs, regardless of by whom held, shall be settled by Circuit City pursuant to the terms of the Circuit City Stock Incentive Plan. After the Separation Date, CarMax SARs, regardless of by whom held, shall be settled by CarMax pursuant to the terms of the CarMax Stock Incentive Plan.

(h)     *Taxes.* Except as may be provided pursuant to a separate agreement between Circuit City and CarMax, Circuit City shall claim the benefit of federal, state, and local tax deductions related to the exercise of all Circuit City Stores Options, and Circuit City SARs that are exercised by Circuit City Employees after the Separation Date and CarMax shall not claim any such tax deductions. Circuit City shall be responsible for the proper payroll tax treatment and the proper reporting to the appropriate governmental authorities of compensation relating to

all option and SAR exercises by Circuit City Employees. Except as may be provided pursuant to a separate agreement between Circuit City and CarMax, CarMax shall claim the benefit of federal, state, and local tax deductions related to the exercise of all Circuit City Group Options, Circuit City SARs, CarMax Options and CarMax SARs that are exercised by both CarMax Employees after the Separation Date and Circuit City Transferees after their transfer date and Circuit City shall not claim any such tax deductions. CarMax shall be responsible for the proper payroll tax treatment and the proper reporting to the appropriate governmental authorities of compensation relating to all option and SAR exercises by CarMax Employees and Circuit City Transferees. Circuit City and CarMax agree to act (or to take such action) with respect to such federal, state, or local tax deductions, and with respect to fulfilling the payroll tax and reporting obligations on compensation as are reasonably necessary or appropriate to achieve, maintain and/or preserve such tax results. Any amounts required to be reimbursed by one party to another under this subsection shall be paid within 30 days of invoice.

(h)     *Partial Interests in Shares.* To the extent that any adjustment in stock options or stock appreciation rights results in any fractional interest in shares, such fractional interest shall be rounded to the nearest whole share. No fractional interests in shares or stock appreciation rights shall be payable in cash or otherwise.

(i)     *Incentive Stock Options.* Circuit City and CarMax agree to use their commercially reasonable efforts to preserve the value and tax treatment accorded incentive stock options awarded under the Circuit City Stock Incentive Plan.

5.4     Employee Stock Purchase Plans. As of the consummation of the Separation, CarMax will assume and accept all assets and liabilities of the 1997 Circuit City Stores, Inc. Employee Stock Purchase Plan for CarMax Group Employees. All transferred amounts will be applied on the next exercise date coincident with or next following the Separation Date toward the purchase of CarMax Common Stock.

5.5     Registration Requirements. As soon as practicable following the time as of which the Form 10 or Form 8-A for CarMax, Inc., as the case may be, is declared effective by the Securities and Exchange Commission, CarMax agrees that it shall cause to be registered pursuant to the Securities Act of 1933, as amended, the shares of CarMax Common Stock authorized for issuance under the CarMax Stock Incentive Plan and the CarMax Employee Stock Purchase Plan. Circuit City shall use commercially reasonable efforts to assist CarMax in completing such registration.

5.7     Confidentiality and Proprietary Information. No provision of the Separation Agreement or this Agreement shall be deemed to release any individual for any violation of any agreement or policy pertaining to confidential or proprietary information of Circuit City or any of its Affiliates or of CarMax or any of its Affiliates, respectively, or otherwise relieve any individual of his or her obligations under any such agreements or policies.

5.8    Circuit City Nonqualified Pension Plans and Arrangements. CarMax will assume all Liabilities relating to CarMax Employees, former employees of CarMax and Circuit City Transferees under the CarMax Supplemental Executive Retirement Plan and any individual nonqualified pension arrangements identified in Schedule 5.8 hereto as of the consummation of the Separation and for all service after the Separation Date, and shall make benefit payments to CarMax Employees and Circuit City Transferees at such times and in such manner as is provided for under the terms of the respective nonqualified pension plans and arrangements.

5.9    Circuit City Director Plans. Circuit City and CarMax shall use their commercially reasonable efforts to take all actions necessary or appropriate so that each outstanding Circuit City Award granted under Circuit City Stores, Inc. Amended And Restated 1989 Non-Employee Directors Stock Option Plan and Circuit City Stores, Inc. 2000 Non-Employee Directors Stock Incentive Plan held by any individual who is either a current or former member of the Board of Directors of Circuit City shall be adjusted as set forth in this Section 5.9.

(a)    *Continuing Circuit City Directors.* This Section 5.9(a) shall apply to options and SARs held by individuals who continue to be members of the Board of Directors of Circuit City after the Separation Date. Each Circuit City Group Option and SAR shall be adjusted in the manner provided in Section 5.3(a). Each CarMax Group Option and SAR shall be adjusted in the manner provided in Section 5.3(c).

(b)    *CarMax Directors.* This Section 5.9(b) shall apply to options held by individuals who cease to be members of the Board of Directors of Circuit City after the Separation Date and become members of the Board of Directors of CarMax. Each Circuit City Group Option and SAR shall be adjusted in the manner provided in Section 5.3(a). Each CarMax Group Option and SAR shall be adjusted in the manner provided in Section 5.3(c).

ARTICLE VI
GENERAL AND ADMINISTRATIVE

6.1     Payment of Liabilities. CarMax shall pay directly, or reimburse Circuit City promptly for, all compensation payable to Circuit City Transferees for services rendered to CarMax while in the employ of Circuit City or a Circuit City Entity on or before the consummation of the Separation to the extent not previously reimbursed. To the extent the amount of such Liabilities is not yet determinable because the status of individuals as Circuit City Transferees is not yet determined, except as otherwise specified herein or in another ancillary agreement with respect to particular Liabilities, CarMax shall make such payments or reimbursements based upon Circuit City's reasonable estimates of the amounts thereof, and when such status is determined, CarMax shall make additional reimbursements or payments, or Circuit City shall reimburse CarMax, to the extent necessary to reflect the actual amount of such Liabilities.

6.2     Administration of the CarMax Plans. During the Administration Period, with respect to a plan or a payroll practice, Circuit City shall assist CarMax in (i) all aspects of the delivery of employee benefits to CarMax Employees and Circuit City Transferees, (ii) the administration of and tax and reporting obligations related to CarMax's payroll processes, and (iii) the administration of the CarMax Plans, including the CarMax 401(k) Plan, CarMax Retirement Plan, CarMax Supplemental Executive Retirement Plan, CarMax Health and Welfare Plans, CarMax Employee Stock Purchase Plan, and any other plans or programs that are implemented by CarMax on and after the Separation Date and which are substantially similar to the benefit plans provided by Circuit City to its employees. CarMax shall pay Circuit City for such services in accordance with the terms of a transition services agreement between Circuit City and CarMax. During the Administration Period with respect to a plan, CarMax may not change any CarMax Plan without the consent of Circuit City if the change would materially and adversely affect the administration of the CarMax Plan.

6.3     Sharing of Participant Information. Circuit City and CarMax shall share, Circuit City shall cause each applicable Circuit City Entity to share, and CarMax shall cause each applicable CarMax Entity to share, with each other and their respective agents and vendors (without obtaining releases) all participant information necessary for the efficient and accurate administration of each of the Circuit City Plans and the CarMax Plans. Circuit City and CarMax and their respective authorized agents shall, subject to applicable laws on confidentiality, be given reasonable and timely access to, and may make copies of, all information relating to the subjects of this Agreement in the custody of the other party, to the extent necessary for such administration. Until the consummation of the Separation, all participant information shall be provided in the manner and medium applicable to Participating Companies in the Circuit City Plans generally, and thereafter until the time at which the parties subsequently determine, all participant information shall be provided in a manner and medium that are compatible

with the data processing systems of Circuit City as in effect as of the consummation of the Separation, unless otherwise agreed to by Circuit City and CarMax.

6.4    Non-Termination of Employment; No Third Party Beneficiaries. Except as expressly provided in this Agreement, no provision of this Agreement or the Separation Agreement shall be construed to create any right, or accelerate entitlement, to any compensation or benefit whatsoever on the part of any future, present, or former employee of Circuit City, a Circuit City Entity, CarMax, or a CarMax Entity under any Circuit City Plan or CarMax Plan or otherwise. Without limiting the generality of the foregoing: (i) except as expressly provided in this Agreement, neither the occurrence of the consummation of the Separation nor the termination of the Participating Company status of CarMax or a CarMax Entity shall cause any employee to be deemed to have incurred a termination of employment which entitles such individual to the commencement of benefits under any of the CarMax Plans or any of the Individual Agreements; (ii) except as expressly provided in this Agreement, nothing in this Agreement shall preclude CarMax or any CarMax Entity, at any time after the consummation of the Separation, from amending, merging, modifying, terminating, eliminating, reducing, or otherwise altering in any respect any CarMax Plan, any benefit under any Plan or any trust, insurance policy or funding vehicle related to any CarMax Plan; and (iii) except as expressly provided in this Agreement, nothing in this Agreement shall preclude Circuit City or any Circuit City Entity, at any time after the Close of the Separation Date, from amending, merging, modifying, terminating, eliminating, reducing, or otherwise altering in any respect any Circuit City Plan, any benefit under any Plan or any trust, insurance policy or funding vehicle related to any Circuit City Plan.

6.5    Audit Rights with Respect to Information Provided.

(a)    Each of Circuit City and CarMax, and their duly authorized representatives, shall have the right to conduct audits with respect to all information provided to it by the other party. The party conducting the audit (the "Auditing Party") shall have the sole discretion to determine the procedures and guidelines for conducting audits and the selection of audit representatives under this Section 6.5(a). The Auditing Party shall have the right to make copies of any records at its expense, subject to the confidentiality provisions set forth in the Separation Agreement, which are incorporated by reference herein. The party being audited shall provide the Auditing Party's representatives with reasonable access during normal business hours to its operations, computer systems and paper and electronic files, and provide workspace to its representatives. After any audit is completed, the party being audited shall have the right to review a draft of the audit findings and to comment on those findings in writing within five business days after receiving such draft.

(b)    The Auditing Party's audit rights under this Section 6.5 shall include the right to audit, or participate in an audit facilitated by the party being audited, of any Affiliates of the party being audited and of any benefit providers and third parties with whom the party being audited has a relationship, or agents of such party, to

the extent any such persons are affected by or addressed in this Agreement (collectively, the "Non-parties"), subject to the consent of such party. The party being audited shall, upon written request from the Auditing Party, provide an individual (at the Auditing Party's expense) to supervise any audit of a Non-party. The Auditing Party shall be responsible for supplying, at the Auditing Party's expense, additional personnel sufficient to complete the audit in a reasonably timely manner. The responsibility of the party being audited shall be limited to providing, at the Auditing Party's expense, a single individual at each audited site for purposes of facilitating the audit.

6.6    Fiduciary Matters. Circuit City and CarMax each acknowledge that actions required to be taken pursuant to this Agreement may be subject to fiduciary duties or standards of conduct under ERISA or other applicable law, and no party shall be deemed to be in violation of this Agreement if it fails to comply with any provisions hereof based upon its good faith determination that to do so would violate such a fiduciary duty or standard. Each party shall be responsible for taking such actions as are deemed necessary and appropriate to comply with its own fiduciary responsibilities and shall fully release and indemnify the other party for any Liabilities caused by the failure to satisfy any such responsibility.

6.7    Consent of Third Parties. If any provision of this Agreement is dependent on the consent of any third party (such as a vendor or a union) and such consent is withheld, Circuit City and CarMax shall use commercially reasonable efforts to implement the applicable provisions of this Agreement to the full extent practicable. If any provision of this Agreement cannot be implemented due to the failure of such third party to consent, Circuit City and CarMax shall negotiate in good faith to implement the provision in a mutually satisfactory manner. The phrase "commercially reasonable efforts" as used herein shall not be construed to require the incurrence of any non-routine or unreasonable expense or liability or the waiver of any right.

ARTICLE VII
MISCELLANEOUS

7.1   Effect if Disposition Does Not Occur.  If the consummation of the Separation does not occur, then all actions and events that are, under this Agreement, to be taken or occur effective immediately prior to or as of the consummation of the Separation, or immediately after the Separation Date, or otherwise in connection with the Separation, shall not be taken or occur except to the extent specifically agreed by CarMax and Circuit City.

7.2   Relationship of Parties.  Nothing in this Agreement shall be deemed or construed by the parties or any third party as creating the relationship of principal and agent, partnership or joint venture between the parties, it being understood and agreed that no provision contained herein, and no act of the parties, shall be deemed to create any relationship between the parties other than the relationship set forth herein.

7.3   Affiliates.  Each of Circuit City and CarMax shall cause to be performed, and hereby guarantees the performance of, all actions, agreements and obligations set forth in this Agreement to be performed by a Circuit City Entity or a CarMax Entity, respectively.

7.4   Governing Law.  To the extent not preempted by applicable federal law, this Agreement shall be governed by, construed and interpreted in accordance with the laws of the Commonwealth of Virginia as to all matters, including matters of validity, construction, effect, performance and remedies.

7.5   References.  All references to Sections, Articles or Schedules contained herein mean Sections, Articles or Schedules of or to this Agreement, as the case may be, unless otherwise stated or unless the context otherwise requires.

7.6   Counterparts.  This Agreement may be executed in separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement.

7.7   Assignment.  No party to this Agreement will convey, assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the other party.

7.8   Cooperation.  Circuit City and CarMax will cooperate in taking all such action as may be necessary or appropriate to implement the provisions of this Agreement, including making all appropriate filings as may be required under ERISA or the Code, the regulations thereunder and any other applicable laws, exchanging and sharing all appropriate records, amending plan, trust, record keeping and other related documents and implementing all appropriate communications with participants.

7.9   Notices.  All notices, requests, claims, demands and other communications required or permitted to be given hereunder will be in writing and will be delivered by hand,

telecopied, e-mailed or sent, postage prepaid, by registered, certified or express mail or reputable overnight courier service and will be deemed given when so delivered by hand or telecopied, when e-mail confirmation is received if delivered by e-mail, or three business days after being so mailed (one business day in the case of express mail or overnight courier service). All such notices, requests, claims, demands and other communications will be addressed as set forth in the Separation Agreement, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

7.10    <u>Waivers; Remedies; Dispute Resolution</u>. No failure or delay on the part of Circuit City or CarMax in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any waiver on the part of Circuit City or CarMax of any right, power or privilege hereunder operate as a waiver of any other right, power or privilege hereunder, nor will any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. It is understood and agreed that any dispute, controversy or question arising under this Agreement shall be subject to the dispute resolution provisions of Article X of the Separation Agreement.

\*          \*          \*          \*          \*

IN WITNESS WHEREOF, the parties have caused this Employee Benefits Agreement to be duly executed as of the day and year first above written.


CIRCUIT CITY STORES, INC.


By: _____
Name:
Title:


CARMAX, INC.


By: _____
Name:
Title:

**EXHIBIT D**

## FORM OF CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is made as of the _____ day of
_____, _____ by and among Circuit City Stores, Inc., ("Circuit City") a Virginia
corporation and CarMax, Inc., a Virginia corporation ("CarMax"), either Circuit City or CarMax
as a "Party" or collectively, as the "Parties".

### INTRODUCTION

A.      Circuit City and CarMax have executed a Separation Agreement dated as of
_____ (the "Separation Agreement"), pursuant to which CarMax and the CarMax
Subsidiaries separated from Circuit City and the Circuit City Subsidiaries (the "Spin-off"). For
purposes of this Agreement, Circuit City and the Circuit City Subsidiaries collectively, or
CarMax and the CarMax Subsidiaries collectively, shall each be referred to as a "Party".

B.      Prior to the Spin-off, CarMax existed as part of Circuit City, resulting in the
sharing and consolidation of Confidential Information (as defined below).

C.      As a result of the historical co-mingling of Circuit City and CarMax information
prior to the Spin-off, there are paper records, localized electronic records (stored on individual
PC's or discs) or information stored in other media containing Confidential Information of the
other Party.

D.      Further, pursuant to the Separation Agreement, Circuit City will provide certain
transition services to CarMax following the Spin-off pursuant to Transition Services Agreement
between Circuit City and CarMax. As a result, certain Circuit City employees will have access to
CarMax's Confidential Information.

E.      The Parties agree that full segregation of all co-mingled Confidential Information
that pre-dates the Spin-off is not practical and that the disclosure of Confidential Information
during the provision of services pursuant to the Transition Services Agreement or other Ancillary
Agreements may be unavoidable.

NOW, THEREFORE, in consideration of the joint nature of the disclosure and the
business relationship between the parties, it is hereby agreed as follows:

1.      <u>Definition</u>. For purposes of this Agreement, the term "Confidential Information"
shall mean proprietary and confidential business information obtained by either Party at any time
including, without limitation, the following:

(a)    Any trade secret, know-how, invention, software program, application, documentation, schematic, procedure, contract, information, knowledge, data, process, technique, design, drawing, program, formula or test data, work in progress, engineering, manufacturing, marketing, financial, sales, supplier, customer, employee, investor, or business information, whether in oral, written, graphic or electronic form;

(b)    Any non-public business information, including, without limitation, personnel data; correspondence with governmental agencies; historical customer information and data; historical cost information such as budgets and operating expenses and capital costs; and projected capital additions and operating cost information;

(c)    Any document, diagram, photograph, drawing, computer program or other communication that is either conspicuously marked "confidential", or is known or reasonably should have been known by the Party in possession to be confidential; and

(d)    Any advice, information, exhibits, documentation or any other information that a Party reasonably expects would be protected by attorney-client privilege or work product doctrine or other applicable privileges.

2.    Prohibition of Use.  Circuit City acknowledges that it is authorized to access and use the Confidential Information of CarMax for the sole purpose of performing the services it is contractually bound to provide to such parties, specifically with respect to carrying out its obligations under the Transition Services Agreement and other agreements related to the Separation Agreement.  Otherwise, each of the Parties agrees that, with respect to the Confidential Information of the other Party, it will not (i) take any affirmative action to access such Confidential Information; (ii) directly or indirectly utilize any such Confidential Information in its business; (ii) manufacture and/or sell any product or provide any service that is based in whole or in part on such Confidential Information; (iii) copy or modify such Confidential Information, or any copy or portion thereof; or (iv) disclose such Confidential Information to any third party.

3.    Prior Disclosures.  Prior to the Separation Agreement, Circuit City and CarMax may have exchanged information within their consolidated corporate structure without restriction.  Such information supplied to one Party by the other prior to the execution of this Agreement shall nonetheless be considered Confidential Information (except as specifically excluded pursuant to Section 5 below) for the purposes of this Agreement and shall be subject to the terms and conditions hereof.

4.    Specific Restriction Regarding Waiver of Attorney-Client Privilege or Work Product Doctrine.  Prior to any action by the either Party that could reasonably be expected to lead to or that would constitute waiver of attorney-client privilege or work product doctrine, the Party disclosing the information must give prior notice to the other Party as soon as possible.

CORP 110514.2 (Exhibit D)

2

5.     Nonprotected Information.  The Parties agree that their mutual covenants with respect to each other's Confidential Information shall not apply to any information, data or other materials imparted to the extent that any of the following conditions apply:

(a)     The information is, or any time hereafter becomes, available to the public or contained in a filing to a government agency without breach of this Agreement by the receiving Party;

(b)     The information is obtained by the recipient from any other person, firm or company having no obligation to or relationship with the disclosing Party;

(c)     The information is developed by or for recipient independently of information received from one or more of the Parties hereto; or

(d)     The information is more than ten (10) years old.

6.     Court-Ordered Disclosure.  No Party hereto shall be liable for disclosure of Confidential Information of the other Party if made in response to a valid order of a court or authorized agency of government; provided, however that five (5) days' notice first be given to the other Party so a protective order, if appropriate, and may be sought by such Party with the cooperation of the other Party.

7.     Disclosure of Confidentiality Agreement Terms.  Notwithstanding any other provisions hereof, the terms of this Agreement shall not be deemed to be the Confidential Information of any Party hereto, and each Party shall have the right to disclose the terms hereof to third parties in its own discretion.

8.     No Conveyance or License.  Nothing in this Agreement shall be construed to convey to the recipient of Confidential Information any right, title, interest or copyright in any Confidential Information, or any license to use, sell, exploit, copy or further develop any such Confidential Information.  This Agreement does not in any way bind the Parties to enter into a business relationship of any type with each other.

9.     Injunctive Relief.  The Parties agree that a breach by either Party of this Agreement with respect to the Confidential Information of the other Party to this Agreement will cause irreparable damages to the other Party (the "Non-Breaching Party") for which recovery of money damages would be inadequate, and that the Non-Breaching Party shall, therefore, be entitled to obtain timely injunctive relief to protect its rights under this Agreement in addition to any and all remedies available at law without the need to post a bond or other undertaking.

10.    Governing Law and Choice of Forum. This Agreement has been made under and shall be governed by, interpreted and enforced in accordance with the laws of the Commonwealth of Virginia without regard to the conflict of laws rules thereof. All disputes hereunder shall be resolved in the applicable state or Federal courts of Virginia. The parties consent to the jurisdiction of such courts, agree to accept service of process by mail, and waive any jurisdictional or venue defenses otherwise available.

11.    Agreement Binding on Successors. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, and their heirs, administrators, successors and assigns.

12.    Waiver. The failure of either Party at any time or times to demand strict performance by the other Party of the terms, covenants, or conditions set forth in this Agreement shall not be construed as a continuing waiver or relinquishment thereof, and either Party may at any time demand strict and complete performance of such terms, covenants, and conditions.

13.    Assignability. This Agreement is personal to both Parties and may not be assigned by any act of either Party or by operation of law unless in connection with a transfer of substantially all the assets of such Party as a transfer to its affiliate.

14.    Severability. If any provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other provision, and such invalid provision shall be deemed to be severed from the Agreement.

15.    Significance of Headings. Paragraph headings contained herein are solely for the purpose of aiding in speedy location of subject matter and are not in any sense to be used in the construction of this Agreement. Accordingly, in case of any questions with respect to the construction of this Agreement, it is to be construed as though paragraph headings had been omitted.

16.    Integration. This Agreement constitutes the final, exclusive, and complete expression of the agreement of the Parties hereto, and it embodies all of the terms and conditions of the Agreement between the Parties with respect to the subject matter hereof. This Agreement is expressly intended to replace and supersede all prior and contemporaneous agreements, proposals, negotiations, representations, and warranties, if any, between the Parties whether oral or written with respect to the subject matter hereof. There are no agreements, representations, or warranties that have not been included in this Agreement with respect to the subject matter hereof. It represents the result of arms length negotiation between the Parties and shall be interpreted and construed without regard to any presumption or other rule requiring construction against either Party.

CORP 110514.2 (Exhibit D)                                    4

17.    Amendments.  This Agreement shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement.

18.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

*    *    *    *    *

[REMAINDER OF PAGE INTENTIONALLY BLANK]

CORP 110514.2 (Exhibit D)

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the latest date set forth below.

Circuit City Stores, Inc.          CarMax, Inc.

By: _____          By: _____
Title: _____          Title: _____
Date: _____          Date: _____