Paul S. Bliley, Jr. – VSB No. 13973
**WILLIAMS, MULLEN**
200 South 10th Street, Suite 1600
Post Office Box 1320
Richmond, Virginia 23218-1320
Phone: 804.783.6448
FAX: 804.783.6507
pbliley@williamsmullen.com

*Counsel for CarMax, Inc. and
CarMax Auto Superstores, Inc.*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)

| | |
|---|---|
| In re: | |
| CIRCUIT CITY STORES, INC., *et al.*, | Case No. 08-35653 (KRH) |
| Debtors. | CHAPTER 11 |
| Alfred H. Siegel, solely as Liquidating Trustee for the Circuit CityStores, Inc., Liquidating Trust, | |
| Objector, | |
| v. | Contested Matter |
| CarMax, Inc. (Claim No. 14809), | |
| Claimant. | |

### RESPONSE OF CARMAX TO MOTION OF ALFRED H. SIEGEL, TRUSTEE, FOR SUMMARY ADJUDICATION DISALLOWING IN FULL CLAIM NO. 14809 FILED BY CARMAX, INC. AND CARMAX AUTO SUPERSTORES, INC.; AND MEMORANDUM OF POINTS AND AUTHORITES IN SUPPORT THEREOF

CarMax, Inc. and CarMax Auto Superstores, Inc., (collectively "CarMax") for its response to the Motion of Alfred H. Siegel, Trustee, for Summary Adjudication Disallowing in Full Claim No. 14809 Filed by CarMax, states the following:

Alfred H. Siegel, solely as liquidating trustee to the Circuit City Stores, Inc. Liquidating Trust (the "Trustee") filed a motion pursuant to Bankruptcy Rule 9014 (c) and 7056 and Rule 56 of the Federal Rules of Civil Procedure (the "Motion") seeking summary adjudication disallowing in full Claim No. 14809 (the "CarMax Claim") filed against the estate of Circuit City Stores, Inc. (the "Debtor") by CarMax Inc. and CarMax Auto Superstores, Inc. (collectively "CarMax"). The statement of the case and "Relevant Facts" set forth on pages 1 through 5 of the Motion are not in dispute.

CarMax was a wholly-owned direct subsidiary of Circuit City. On or about May 22, 2002, Circuit City and CarMax entered into that certain Separation Agreement (the "Separation Agreement"), in anticipation of, and to facilitate a spin-off of, CarMax as a separately-traded public company. In connection with the Separation Agreement, Circuit City assigned CarMax its leasehold interest in twenty-three real property leases (collectively, "Specific Leases") for locations leased by Circuit City from third-party landlords, at which CarMax conducted and continues to conduct business.

The Trustee correctly notes the applicable provisions of the Separation Agreement in paragraphs 4 and 5 of the Motion. For purposes of clarification, CarMax will also refer to these provisions as the "Indemnification Provision," and the "Contingent Lease Payment Provision" adopted by the Trustee. CarMax further confirms that the Special Dividend referred to in the Contingent Lease Payment Provision was in the amount of $28.4 million and was paid to Circuit City by CarMax as represented by the Trustee.

I.

## THE CARMAX CLAIM

A. <u>The Partial Recovery Claim</u>

1. CarMax believes the Contingent Lease Payment Provision of the CarMax Claim is supported by the law. This claim arises from Section 8.6 of the Separation Agreement which reads as follows:

> In recognition of Circuit City Stores' continuing contingent liability of 23 leases previously assigned by Circuit City Stores to a subsidiary of CarMax, on the Closing Date and immediately prior to the separation, CarMax shall make a one-time special dividend payment (the "Special Dividend") to Circuit City Stores in the amount of $28.4 million.

2. CarMax contends that the Special Dividend of $28.2 million made pursuant to that provision was in recognition of Circuit City's "continued contingent liability" on the Specific Leases and further contends that, because this continued contingent liability was discharged by Circuit City's bankruptcy, CarMax should be reimbursed and refunded for a portion of that payment. The extent of the damages may be difficult to prove; nevertheless, CarMax submitted a calculation as Exhibit "C" to the CarMax Claim which calculated the refund to be approximately $21.4 million using the "weighted average life" of the Specific Leases at a discount rate of 9.3%. The ultimate calculation of the damages for this claim is certainly subject to further analysis and proof.

3. The Trustee asserts in paragraphs 14 and 15 of the Motion that CarMax's claim to recover a portion of the Special Dividend is not a contractual payment in exchange for continued contingent liability, but rather a one-time dividend which need not be supported by consideration and further that the Special Dividend was not made "in exchange" for Circuit City's continued contingent liability but in "recognition of" the continued contingent liability.

3

4. In reviewing the Separation Agreement in its entirety, whether the Special Dividend was made "in recognition of" or "in exchange for", the continuing contingent liability seems to be a "splitting of hairs". The Motion admits in paragraph 15 that, the Special Dividend was made "'in recognition of' Circuit City's continuing contingent liability, i.e., <u>to compensate Circuit City for potential liability on those leases even though those obligations thereunder had been expressly assumed by CarMax Superstores</u>." (emphasis added). Paragraph 15 of the Motion also asserts that "the CarMax Entities obtained no benefit (contractual or otherwise) from Circuit City's 'continuing contingent liability,' which, as noted, runs to the benefit of the Landlords not the CarMax Entities." CarMax disagrees with this characterization of the Contingent Lease Payment Provision of the Separation Agreement.

II.

**Argument**

a. **The Contingent Lease Payment Provision of the Separation Agreement was Directly Beneficial to CarMax.**

5. Attached hereto as Exhibit A is a copy of an Annual Report filed by Circuit City prior to its bankruptcy. This 2005 Annual Report, on page 26, makes reference to assignment of the specific leases and indicates that Circuit City, rather than CarMax, entered into these leases so that CarMax could take advantage of the favorable economic terms available to Circuit City as a large retailer. The report acknowledges that Circuit City assigned these leases to CarMax but remained contingently liable on the leases. It states in further recognition of this ongoing contingent liability, CarMax paid a $28.4 million Special Dividend at the time of the separation. On page 45 of this report, it was noted that the potential contingent liability to Circuit City under that arrangement was $422.9 million as of the date of the report. Similar language is contained in later Circuit City Annual Reports. Accordingly, these reports confirm

4

that CarMax did indeed receive substantial benefits from the assignment of these leases. CarMax obtained the leases with favorable terms and none of the landlords objected to the assignments based on the Circuit City continuing contingent liability on the leases.

    b.    **As a Result of the Lease Assignments, Circuit City became a Surety for CarMax by Operation of law**

    6.    It is a well-established rule that a contracted party cannot, by an assignment of a contract, relieve itself of its obligations thereunder. Even where the assignee expressly assumes the obligations delegated by the assignor, the assignor remains liable. Restatement (Second) of Contracts at Section 318(3) (1981). This concept was further discussed in In re Trask's Charolais, etc., 84 B.R. 646 (Bankr. S.D. 1988) at page 649, where the court stated:

> The assignor becomes a surety for the performance of the contract by the assignee. "…. Where one party to a contact, as part of the agreement, assumes an indebtedness owing by the other to a third person, the one assuming the indebtedness becomes the principal and the former debtor the surety…."

citing, Varga v. Woods, 381 N.W.2d 247, 250 (S.D. 1986), *quoting* 72 C.J.S. "Principal and Surety" Section 40 at 532 (1951); *see also*, Kruger v. Campbell, 264 Mich. at ___, 250 N.W. at 286.

    7.    The concept that a suretyship relationship can be created by operation of law is further recognized in 74 Am. Jur. 2d, "Suretyship" Section 6, which states, in part:

> "The relation of suretyship, although it generally is created by express contract of the parties and with the consent of the creditor, may nevertheless arise by operation of law…. Whenever one promises another, for sufficient consideration to pay the debt to a third person, as between such promisor and promisee, the former becomes the principal obligor and the latter, the surety. In that situation, a suretyship by operation of law is created. "

    8.    As a result of the assignment of Specific Leases by Circuit City, the assumption of the Specific Lease obligations by CarMax and its retention of the liability under

the Specific Leases, Circuit City, by operation of law became a surety for CarMax. In this suretyship arrangement, Circuit City was willing to assign the leases and remain liable thereon with a future contingent liability in excess of $400 million. Circuit City was willing to retain that liability in return for a one-time payment of $28.4 million from CarMax. The span of this suretyship coverage was for the life span of the Specific Leases which, with the extension of the lease terms, could be for as long as thirty to forty years. Due to the bankruptcy, the contingent liability was terminated roughly six years after the Separation Agreement was entered into and the $28.4 million payment was made by CarMax. If this suretyship arrangement is analyzed as an insurance policy, the insurance company (or in this case, Circuit City as surety) would be required to return the unearned portion of the insurance premium.

9. An analogous situation was presented to the Virginia Supreme Court in <u>Autumn Ridge L.P. v. Acordia of Virginia, Inc.</u>, 270 Va. 83 (2005). This case considered an action brought by twelve limited partnerships alleging negligence and breach of contract by an insurance broker in failing to include them as named insureds on a builder's risk insurance policy. The plaintiffs, who should have been named insureds on the purchased policies, were not named on the policies. Fortunately for these claimants, they suffered no loss which would have been covered by the insurance. Nevertheless, the Virginia Supreme Court determined that, even though no loss occurred that would have been covered by a request to the insurance policy, the measure of damages for failure to procure insurance is the amount paid by the intended insured as a premium. Using this insurance analogy, the partial recovery claim is, in effect, a claim for the return of an "insurance premium" or a "payment for a surety" which was unearned by Circuit City due to the filing of its bankruptcy.

10. The common law basis for an action for recovery of premiums or return of

premiums by an insured against an insurer is one for "money had and received" to recover back premiums paid where there was no effective contract or where <u>the contract had been repudiated by the insurer</u>. (emphasis added) 20 <u>Appleman Insurance Law and Practice</u>, Section 11276 at 111 (Rev. 1980). This right of action was noted by the Sixth Circuit in <u>K.L. Patterson, etc., et al. v. Employers Reinsurance Corp.</u>, 900 F.2d 986, 989 (6th Cir. 1990). The Sixth Circuit further explained that <u>Black's Law Dictionary</u> defined an action for "money had and received" as follows:

> **Money had and received.** In common law pleading, the technical designation of a form of declaration in <u>assumsit</u>, wherein the plaintiff declares that the defendant had and received certain money, etc.
>
> Gist of the action for "money had and received" is that defendant has <u>received money</u>, which, in equity and good conscience, should have been paid to the plaintiff and under such circumstances that he ought to pay it over.

<u>Black's Law Dictionary</u>, 907 (5th Edition 1979).

11. The first legal basis for the CarMax partial recovery claim is the common law action for money had and received. As a result of the lease assignments and the assumption of that potential $400 million obligation by CarMax a suretyship relationship was created between the parties. CarMax paid a "premium" of $28.4 million for the Circuit City continuing contingent liability on the leases over their effective span of 30 to 40 years. The continuing contingent obligation of Circuit City was terminated roughly 6 years after its inception due to the Circuit City bankruptcy proceeding. The partial recovery claim represents CarMax's right to a refund on the unearned portion of the dividend it paid in recognition of the continued contingent liability.

    c.    <u>The CarMax Claim against Circuit City is Further Justified on the Basis of the Doctrine of Unjust Enrichment.</u>

12. In addition to the suretyship principles and the common law action of

7

money paid and received, CarMax has a further legal basis for its Proof of Claim for its partial recovery claim based upon the equitable doctrine of unjust enrichment. 66 Am. Jur. 2d "Restitution and Implied Contracts" Section 3 defines "unjust enrichment" as follows:

> Unjust enrichment describes a recovery for the value of the benefit retained when there is no contractual relationship but when, on grounds of fairness and justice, the law compels payment of a legal and moral duty to pay. … Unjust enrichment also applies whenever a justice requires compensation to be given for property or services rendered under a contract and no remedy is available by action on the contract.

13. The Virginia Supreme Court in Schmidt v. Household Finance Corporation II, etc., 276 Va. 106, 661 S.E.2d 834 (2008), explained that, in order to state a cause of action for unjust enrichment, the plaintiff is required to allege that (1) he conferred a benefit on the defendant; (2) that the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) that the defendant accepted or retained the benefit without paying for its value.

14. With respect to the CarMax partial recovery claim, simply stated, CarMax paid $28.4 million in recognition of the Circuit City continued contingent liability under the assigned Specific Leases. By Circuit City's own admission, the potential contingent liability on the leases was in excess of $400 million. Circuit City accepted the dividend, again by its own admission, to compensate it for potential liability on those leases even though the obligations had been expressly assumed by CarMax. Nevertheless, the Circuit City obligation under the leases was terminated upon the filing of the bankruptcy of Circuit City and the ultimate discharge of the contingent lease obligations through the bankruptcy. If there had been no bankruptcy filing, but, after six years, Circuit City had decided to unilaterally cease its contingent liability on the Specific Leases and had gone through the process of removing itself from those leases, Circuit City would have reasonably expected CarMax to seek a refund of some portion of the $28.4

million.

15. Pursuant to the Virginia rule as indicated in <u>Schmidt, supra</u>, the conditions have been met to satisfy the cause of action for unjust enrichment. CarMax conveyed a benefit on Circuit City by the payment of the $28.4 million Special Dividend. Circuit City was aware of the benefit and acknowledged that the receipt of the funds was accepted in return for its continued contingent liability on the twenty-three assigned leases which, again, was potentially in excess of $400 million. Circuit City obtained the full benefit of the $28.4 million, although it terminated its liability under the assigned leases by the filing of the bankruptcy, roughly six years subsequent to the execution of the Separation Agreement. Simply stated, CarMax did not get what it bargained for and is entitled to a claim against Circuit City for the portion of the Special Dividend which was not truly "earned" by Circuit City based on the equitable doctrine of unjust enrichment.

16. The doctrine of unjust enrichment is used in law to characterize the result or effect of a failure to make restitution of, or for, property or benefits received, under circumstances as to give rise to a legal or equitable obligation to account therefore. 66 <u>Am. Jur. 2d,</u> "Restitution and Implied Contracts", Section 2. Unjust enrichment is a general principle, underlying various legal doctrines and remedies, that one person should not be permitted to unjustly enrich himself or herself at the expense of another, but should be required to make restitution of, or for, property or benefits received, retained or appropriated where it is just and equitable that such restitution be made and where such action involves no violation or frustration of law or opposition to public policy either directly or indirectly. <u>Ibid.</u>

17. This Court is a court of equity. Circuit City received $28.4 million from CarMax pursuant to the provisions of the Separation Agreement in recognition of the Circuit

City continuing contingent liability on the assigned Specific Leases. This continued liability permitted a smooth transition from Circuit City to CarMax with respect to the leased premises. CarMax bargained for this continued liability throughout the term of the leases, however, that Circuit City obligation was terminated due to the bankruptcy filing. As a result, under the doctrine of unjust enrichment, CarMax should be entitled to a refund of the unearned portion of the $28.4 million payment made.

### B. The Indemnification Claim

18. With respect to the indemnification claim, regardless of the legal merits of this claim, it appears, as a practical matter, that no claim has been made or asserted by any landlord with respect to any of the Specific Leases. Accordingly, even if there was contractual support for the indemnity claim, there is no basis for recovery because no claim for damages has been made. Accordingly CarMax will concede that it the indemnification claim of the CarMax Claim has no value.

### CONCLUSION

For the reasons set forth above, CarMax believes that its partial recovery claim has merit and is supported by the doctrines of suretyship, the common law claim for money had and received and the concepts of unjust enrichment. CarMax acknowledges that the computation of its claim is subject to further evidence and can be determined at a future time, but believes that a legal basis exists for the partial recovery claim and, as such, the Trustee's Motion for Summary Judgment should be denied.

                          CARMAX, INC. and
                          CARMAX AUTO SUPERSTORES, INC.

                    By:  /s/ Paul S. Bliley, Jr.
                                Counsel

Paul S. Bliley, Jr., Esq. – VSB No. 13973
**WILLIAMS MULLEN**
Two James Center, 16th Floor
1021 East Cary Street
Post Office Box 1320
Richmond, Virginia 23218-1320
Phone: 804.783.6489
FAX: 804.783.6507
pbliley@williamsmullen.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on the 14th day of May, 2014, a true and correct copy of the foregoing Response of Carmax to the Motion of Alfred H. Siegel, Trustee, for Summary Adjudication Disallowing In Full Claim No. 14809 Filed By Carmax, Inc. and Carmax Auto Superstores, Inc. and Memorandum of Points and Authorities in Support thereof was served via CM/ECF or first class mail, postage prepaid, as follows:

Lynn L. Tavenner

20 North Eight St., 2nd Floor

Richmond, Va. 23219

- and –

Jeremy V. Richards

Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd. 13th Floor

Los Angeles, CA. 90067

/s/ Paul S. Bliley, Jr.
Paul S. Bliley, Jr.

25566845_2

# Circuit City Stores, Inc.

Annual Report 2005

EXHIBIT A

Since the initiation of our store revitalization program at the beginning of fiscal 2001 through the end of fiscal 2005, the domestic segment has relocated 66 stores, of which 46 have been open for more than six months. In their first full six months following grand opening, these stores had

- an average sales change that was approximately 28 percentage points better than the sales pace of the remainder of the store base during the same time periods and
- an internal rate of return of approximately 15 percent.

The 31 relocated stores open more than 12 months produced the following results for their 12-month periods after grand opening:

- an average sales change that was approximately 25 percentage points better than the sales pace of the remainder of the store base during the same time periods;
- a return on invested capital, including lease termination and sublease costs on vacated stores, of approximately 7 percent; and
- a return on invested capital, excluding lease termination and sublease costs on vacated stores, of approximately 18 percent.

The reported return on invested capital performance for relocated stores open more than 12 months includes the impact of terminating the leases on, rather than subleasing, three of the four stores added to the calculation base in the fourth quarter of fiscal 2005. In most cases when terminating a lease, the aggregate payout to the landlord would be less than the aggregate payout to the landlord, net of sublease income, over the life of a sublease. Due to the timing of the payment, however, the return on invested capital in the measured period is lower under a lease termination, in which a one-time payment is made, than under a sublease, in which the payments are spread over the life of the lease.

Since initiation of the revitalization program in fiscal 2001, the domestic segment has opened 80 incremental stores. For the measured periods, incremental stores have produced the following results:

- a return on invested capital of approximately 13 percent measured at the end of the first twelve months after grand opening for the 48 stores that have been open for more than 12 months and
- a return on invested capital of approximately 22 percent measured at the end of the second twelve months after grand opening for the 41 stores that have been open for more than 24 months.

We anticipate that, as stores are added to the relocation base and incremental store base, the average results from relocated and incremental stores will vary.

We remain committed to our store revitalization strategy. As we build stores, we are committed to selecting superior real estate, and so, the mix of new versus relocated stores opened in any one year will depend upon the availability of sites that we expect would meet or exceed management's performance hurdles.

## Contractual Obligations

CONTRACTUAL OBLIGATIONS AT FEBRUARY 28, 2005

| (Amounts in millions) | Total | 1 Year | 2 to 3 Years | 4 to 5 Years | After 5 Years |
|---|---|---|---|---|---|
| Contractual obligations: | | | | | |
| Capital leases | $ 12.4 | $ 0.9 | $ 2.2 | $ 2.8 | $ 6.5 |
| Operating leases | 5,077.6 | 406.6 | 802.6 | 771.7 | 3,096.7 |
| Other contractual obligations (a) | 183.2 | 53.7 | 49.6 | 41.1 | 38.7 |
| Total | $5,273.2 | $461.2 | $854.4 | $815.6 | $3,141.9 |

(a) Other contractual obligations include commitments related to information technology programs, advertising and outsourcing.

CarMax currently operates 23 of its sales locations pursuant to leases under which we are the primary obligor. We rather than CarMax, entered into these leases so that CarMax could take advantage of the favorable economic terms available to us as a large retailer. We have assigned each of these leases to CarMax, but we remain contingently liable under the leases. In recognition of our ongoing contingent liability, CarMax paid a $28.4 million special dividend to us at the time of the separation in fiscal 2003. At February 28, 2005, the future minimum fixed lease obligations on these 23 leases totaled $142.9 million and are included in operating leases in the above table.

## Off-Balance Sheet Arrangements

We do not have any off-balance sheet arrangements at February 28, 2005.

## 12. LEASE COMMITMENTS

The company conducts a substantial portion of its business in leased premises. The company's lease obligations are based upon contractual minimum rates.

Rent expense for all operating leases on active properties and equipment is summarized as follows:

| (Amounts in millions) | Years Ended February 28 or 29 | | |
|---|---|---|---|
| | 2005 | 2004 | 2003 |
| Minimum rentals | $335.9 | $308.0 | $314.2 |
| Rentals based on sales volume | 0.5 | 0.1 | 0.2 |
| Total rent expense | $336.4 | $308.1 | $314.4 |

Most of the company's leases are fixed-dollar rental commitments, with many containing rent escalations based on the lesser of a fixed amount or a multiple of the change in the Consumer Price Index. Several store leases include rental commitments based on a percentage of sales volumes in excess of defined amounts. Most leases provide that the company pay taxes, maintenance, insurance and operating expenses applicable to the premises.

The initial term of most real property leases will expire within the next 20 years; however, most of the leases have options providing for additional lease terms of five to 25 years at terms similar to the initial terms.

Future minimum fixed lease obligations, including closed locations and excluding taxes, insurance and other costs payable directly by the company, as of February 28, 2005, were as follows:

| (Amounts in millions) Fiscal Year | Capital Leases | Operating Lease Commitments | Operating Sublease Income |
|---|---|---|---|
| 2006 | $ 2.1 | $ 406.6 | $ 51.9 |
| 2007 | 2.2 | 404.0 | 48.5 |
| 2008 | 2.2 | 398.6 | 45.1 |
| 2009 | 2.2 | 390.2 | 41.6 |
| 2010 | 2.2 | 381.5 | 40.1 |
| After 2010 | 8.4 | 3,096.7 | 335.9 |
| Total minimum lease payments | 19.4 | $5,077.6 | $563.1 |
| Less amounts representing interest | 7.0 | | |
| Present value of net minimum capital lease payments | $12.4 | | |

CarMax currently operates 23 of its sales locations pursuant to leases under which the company is the primary obligor. In conjunction with the separation, the company assigned each of these operating leases to CarMax. CarMax paid a special dividend of $28.4 million to Circuit City Stores, Inc. in recognition of the company's continuing contingent liability on the leases related to these CarMax locations. At February 28, 2005, the future minimum fixed lease obligations on these 23 leases totaled $422.9 million. Amounts presented within the above table reflect the company's lease commitments on these leases and the corresponding sublease income associated with these CarMax locations.

The company constructs stores on both owned and leased land. The company may receive reimbursement from the landlord for the cost of the structure. These transactions are evaluated for sale-leaseback accounting and in cases where substantial funding is received, the transaction qualifies for sale-leaseback accounting. Any gain or loss from the transaction is deferred and included in other assets or deferred rent credits on the consolidated balance sheets and amortized on a straight-line basis over the base term of the lease. Proceeds from sale-leaseback transactions totaled $88.5 million in fiscal 2005, $38.3 million in fiscal 2004 and $52.3 million in 2003.

In cases where the landlord reimbursement results in a substantial under-funding of costs incurred for the construction of the building, the company is deemed to have continuing involvement and thus the transaction does not qualify for sale-leaseback accounting. Instead, the landlord reimbursement is considered a financing and included in deferred rent credits on the consolidated balance sheets. The financing liability is amortized using the interest method over the base term of the lease. No lease entered into in fiscal 2005, fiscal 2004 and fiscal 2003 qualified for treatment as financing. The financing liability associated with leases entered into prior to fiscal 2003, was $11.6 million at February 28, 2005, $13.9 million at February 29, 2004 and $14.1 million at February 28, 2003.

In some instances, the company leases land with an existing structure at the inception of the lease. The company may receive an incentive from the landlord for improvements to the structure. Under these circumstances, the company classifies the incentive as deferred rent credits and amortizes the incentive on a straight-line basis over the base term of the lease.