IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

_____
                                        )
IN RE:                                  )
                                        )
CIRCUIT CITY STORES, INC., *et al.*,    )      Chapter 11
                                        )      Case No. 08-35653-KRH
                      Debtors.          )      Jointly Administered
_____)

## <u>DECLARATION OF KEVIN J. FUNK, ESQUIRE</u>

Kevin J. Funk, pursuant to 28 U.S.C. § 1746, submits this declaration in support of Roy

Eisner's <u>Motion to Strike Expert Disclosures Pursuant to Rule 37</u> filed herewith:

1.       I am an attorney with the law firm of DurretteCrump, PLC.  I represent Roy

Eisner in connection with his claim in the above-captioned case.

2.       On March 23, 2015, The Circuit City Liquidating Trust, by counsel served the

report of David J. Axelrod, M.D. ("Axelrod Report") as an expert report.  A copy of the Axelrod

Report is attached hereto as <u>Exhibit A</u>.

3.       On March 23, 2015, The Circuit City Liquidating Trust, by counsel served the

report of Daniel M. Feinberg, M.D. ("Feinberg Report") as an expert report.  A copy of the

Feinberg Report is attached hereto as <u>Exhibit B</u>.

4.       On March 23, 2015, The Circuit City Liquidating Trust, by counsel served the

report of Lynn M. Levine, Ed. D. ("Levine Report") as an expert report.  A copy of the Levine

Report is attached hereto as <u>Exhibit C</u>.

5.       On March 23, 2015, The Circuit City Liquidating Trust, by counsel served the

report of Robert Toborowski, M.D. ("Toborowski Report") as an expert report.  A copy of the

Toborowski Report is attached hereto as <u>Exhibit D</u>.

6.      On April 1, 2015 I proposed to counsel for the Trust that Mr. Eisner be permitted

to file a rebuttal expert report, addressing the reports filed by the Trust.  As of the date of this

Declaration, I have not received a response.


I declare under penalty of perjury that the foregoing is true and accurate.


                                        /s/ Kevin J. Funk
Date: April 16, 2015                    _____

2



Jefferson.
University Physicians

Department of Medicine
Division of Internal Medicine

T 215.955.6180   F 215.955.6410

March 18, 2015

Nicholas J. Panarella, Esq.
Martin A. Krolewski, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

       RE:  Circuit City/Roy Eisner Litigation
       Independent Medical Examination

Dear Sirs:

You have asked me to examine Roy Eisner and to review his medical records and to
give my opinion on the status of his medical condition.  I am a practicing physician
in the field of internal medicine.  I am board certified through the American Board of
Internal Medicine, I teach and practice internal medicine at a major academic
medical center and am a Fellow in the American College of Physicians.[1]

I met Mr. Eisner in my office, at Jefferson Internal Medicine Associates on January
29, 2015.  Mr. Eisner was accompanied by his attorney, who was present throughout
the entire visit.

In preparation of this report, I have reviewed the following records that you have
forwarded to me:

1.  Roy and Joanne Eisner's Answers to Debtor's First Request for Admissions,
    First Set of Interrogatories and First Request of Production of Documents;
2.  Roy Eisner's Answers to Debtor's Second Set of Interrogatories
3.  Lower Buck Hospital Records;
4.  Workers Comp Questionnaire;
5.  Medical Imaging Associates;
6.  Frankford Hospital;
7.  Bensalem Medical Practice;
8.  Bensalem Chiropractic Center;
9.  Caine Chiropractic Center;

---

[1] Attached to this report as Exhibit A is my Curriculum Vitae, as Exhibit B my testimony list and as
Exhibit C my fee schedule for this engagement.

833 Chestnut Street, Suite 701, Philadelphia, PA 19107

THOMAS JEFFERSON UNIVERSITY

10. Norman Stempler, DO, orthopedics, including Dr. Stempler's Progress Report
dated December 2, 2104;
11. Delaware Valley Orthopedic Associates, LTD;
12. Transcript of Roy Eisner's deposition;
13. Roy Eisner's Lab Test Results dated February 10, 2015;
14. Police reports.

## History:

Mr. Eisner was born in 1956. He was noted to drink alcohol and to smoke cigarettes
beginning at age 18. Mr. Eisner has been treated with the anti-depressant
Wellbutrin since 2000. In 2001, Mr. Eisner was involved in a motor vehicle accident
and had some chronic pain in his lower back area from this incident.

In April of 2008, at the age of 51, Mr. Eisner was involved in a physical confrontation
with James O'Connell. Mr. Eisner was allegedly knocked to the ground and punched.
The police report notes that Mr. Eisner had a scratch on his left ear. Following the
incident, Mr. Eisner drove himself to the Emergency Room at Lower Bucks Hospital
and was treated for facial cuts and bruising and pain to his chest. He did not report
pain in his back and neck area to the ER at that time. He was noted to have a 3 cm
cut to his left ear. X-rays were negative for rib fractures. Mr. Eisner was diagnosed
with facial and scalp contusions and a chest wall injury. Mr. Eisner was treated with
ibuprofen and acetaminophen; he was also prescribed Darvocet and instructed to
follow-up in 5-7 days with his primary doctor.

Mr. Eisner then returned to work and continued to work until April 26, 2008. At
that time, Mr. Eisner, citing neck and back pain, stopped working. He has not
worked since. Mr. Eisner has reported a number of complaints since that time that
include: anger and apprehension, headaches, neck and back pain, anxiety,
depression and eye strain. Various diagnostic studies since the assault have
included MRIs of lumbar region and brain, which have been unremarkable and a CT
scan of the abdomen and pelvis indicating diverticulitis. He has been diagnosed
with myofasciitis with somatic dysfunction, a myofascial syndrome, knee pain,
insomnia, anemia, hypertension, anxiety, post-traumatic stress disorder and
depression. His treatment has included some physical therapy, chiropractor care,
deep tissue massage, a TENS unit and psychiatric therapy. Mr. Eisner has been
treated with medications including Wellbutrin, ibuprofen, Skelaxin, Percocet,
Klonapin and oxycodone/OxyContin. He has not participated in physical therapy in
the last 3-4 years and he sometimes uses a cane for ambulation assistance.

During my interview with Mr. Eisner on January 29, 2014, Mr. Eisner reported that
this is a "bad day" for him. He reports that by late afternoon his pain usually gets
worse. He states that he was having pain in his shoulders on both sides and the base
of his spine. He reports that he took 40 mg of OxyContin around 8 AM; he states that
he usually takes another one in the afternoon. He also reports taking 15mg of

oxycodone about 2 tablets per day; usually later in the day. The most amount of oxycodone he takes in a day is 110 mg. He states that he takes Xanax daily for anxiety, but did not feel anxious on the day of the examination and did not yet take any Xanax. He reports also taking Skelaxin daily and Wellbutrin for depression. He reports having a lot of headaches. He reports having pain down his right knee with pain when he lies down in bed. He reports getting uncomfortable when sitting in a chair after about 15 minutes. He states that he can't lift as much currently as he could before; says he can lift a 20 pound bag but has not tried anything heavier. He reports some pain in his back when he walks for awhile and when walking up stairs. He thinks he could not walk more than 20 stairs. When bending down he has to squat using his legs. He thinks he can crouch but kneeling is tough. Most of the exercise he does is helping with cleaning and vacuuming and helping to cut the grass. He reports problems with physical endurance.

Without OxyContin, Mr. Eisner says his pain would be a 10/10; with OxyContin the pain is down to 4-6/10. He says that he is unable to work and that his disability is about 60% from physical reasons and 40% from anxiety/PTSD.

He has tried a TENS unit; says this did not help. He reports that massage therapy has helped but is not currently doing massage therapy due to financial reasons. He has not tried aqua therapy or mindfulness treatment for pain.

A review of systems reveals that he has "floaters" in his eyes. He reports that he has photophobia when he has headaches. He also says that he has sinus allergies, and some sexual dysfunction. He complains of psoriasis. He thinks his memory is worse. He says he has anxiety and in particular anxious when he leaves Bucks County and that he is unable to drive over bridges due to anxiety.

**Physical Examination:**

Vital signs: 143/83 mmHg; heart rate 94, Temp 96.8, Height 5'9"; weight 156 lbs., his body mass index is 23.04.

Mr. Eisner appears comfortable sitting on the examination table. He does not appear in distress.

He looks his stated age; he is thin but does not appear underweight.

He is alert and oriented and appears to be in no acute distress.

His cranial nerves are grossly intact. His pupils are equal, round and reactive to light.

His sinuses are nontender.

His oropharynx is normal.

His neck is supple and non-tender without adenopathy or thyromegaly.

He has normal heart and lung sounds.

He has normal upper body strength with 5/5 strength in his biceps and triceps.

His abdominal is soft and nontender without organomegaly. He has a reducible ventral hernia.

His lower extremity strength is 5/5.

His gait appears to be normal.

He has not pain with lumbar flexion or lumbar extension.

His skin is notable for some areas of psoriatic lesions on both wrists, on the side of his head above the ear on the right side and on the small of his back.

He has some pain with straight leg rising on both legs. He has normal lumbar flexion and extension. I did not appreciate any back spasms or back pain.

He has a normal range of motion, normal deep tendon reflexes, normal gait and station, normal overall muscle strength.

I did not appreciate any functional deficits on my examination.

Lab test results from 2/10/2015:

Urinalysis: normal
Complete Blood Count: mildly low hemoglobin of 11.9 g/fL (normal 12.6-17.7) and hematocrit of 36.5% (normal 37.5-51.0)
Mildly low vitamin D level of 27.3 ng/dL (normal 30.0-100.0)
Comprehensive Metabolic Panel: normal
Lipid Panel: normal
Iron Studies: normal
Thyroid Stimulating Hormone: 2.000 ulU/ml - normal
Prostate Antigen Level: 1.7 ng/mL – normal

4

**Discussion:**

Both in my examination of Mr. Eisner, my history and my review of his records, I do not find an objective reason why Mr. Eisner is unable to find gainful employment in some capacity. Based on my review of the medical records after the alleged assault, I am unconvinced that the assault led to permanently disabling injuries.

Furthermore, I do not believe that Mr. Eisner has availed himself to maximizing treatment for what appears to be a chronic pain syndrome. I would recommend that he pursue aqua therapy, mindfulness meditation, additional massage therapy and other multimodal treatments for chronic pain. At this time, without exhausting these and other treatments, I disagree that he is permanently disabled and unable to find any gainful employment.

My opinions are based on a reasonable degree of medical certainty. I reserve the right to amend this report should additional material be made available.


Sincerely,

David J. Axelrod, MD, JD, FACP
Associate Professor of Medicine
Sidney Kimmel Medical College
Thomas Jefferson University

# Exhibit A

Updated 1/2/15

# David J. Axelrod, MD, JD, FACP

**Office Address:**    833 Chestnut Street
Suite 701
Philadelphia, PA 19107
Telephone: 215-955-2778
David.Axelrod@jefferson.edu

## Education:
1984-1988    BS *cum laude* Tufts University (Biology/Environmental Studies)
1989-1992    JD Boston University
1996-2000    MD University of Pittsburgh

## Postgraduate Training:
2000-2001    Intern in Medicine, University of Vermont College of Medicine, Burlington, VT
2001-2003    Resident in Medicine, Primary Care, University of Vermont College of Medicine, Burlington, VT
2006    The Program in Palliative Care Education and Practice, Harvard Medical School Center for Palliative Care, Boston, MA

## Faculty Appointments:
2003-2007    Instructor of Medicine, Department of Medicine, Jefferson Medical College
2007-2012    Assistant Professor of Medicine, Department of Medicine, Jefferson Medical College
2012-Present    Associate Professor of Medicine, Department of Medicine, Jefferson Medical College

## Hospital and Administrative Appointments:
2003-present    Associate, Jefferson Internal Medicine Associates
2003-2007    Director, Preventive Healthcare Program, Jefferson Internal Medicine Associates
2004-present    Clinical Director, Thomas Jefferson University Hospital Sickle Cell Program
2006-2010    Medical Co-Director, Thomas Jefferson University Hospital Palliative Care Program
2010-present    Course Director, Jefferson Medical College, Introduction to Clinical Medicine for 2nd year Medical School Class

## Specialty Certification
2003    American Board of Internal Medicine: Internal Medicine

2008    American Board of Internal Medicine: Hospice and Palliative Medicine

Meeting Maintenance of Certification Requirements

**Licensure:**
Pennsylvania

**Honors and Awards:**

| | |
|---|---|
| 1998-2000 | Morris H. and Gertrude Harris Foundation Merit Based Scholarship |
| 2007 | Recognition as an outstanding teacher and mentor by 3rd year medical students during the Internal Medicine Clerkship |
| 2008 | Elected to Fellowship in the American College of Physicians |

**Memberships in Professional and Scientific Societies:**

**National Societies:**
American College of Physicians (Associate 2000-2008, Fellow 2008-present)
Society of General Internal Medicine (2002-present)
American Academy of Hospice and Palliative Medicine (2007-present)

**Local Societies:**
Pennsylvania Medical Society
Philadelphia County Medical Society

**Professional and Scientific Committees:**
Practice Committee, Jefferson Internal Medicine Associates (2003-2008)

Society of General Internal Medicine, Mid-Atlantic Region, Abstract Committee (2005, 2007), Clinical Vignette Committee (2005, 2011, 2012, Chairman, 2010), Membership Chair (2012), Meeting Chair (2013)

Jefferson Medical College Committee on Student Affairs (2006-2008)

Thomas Jefferson University Hospital Anesthesia/Pain Subcommittee of Pharmacy and Therapeutics (2006-present)

Post-Graduate Recommendation Committee (2008-present)

Jefferson Medical College Curriculum Committee (2010-present)

Jefferson Medical College Admissions Committee (2011-present)

Jefferson University Physicians Credentialing Subcommittee (2012-present)

Thomas Jefferson University Hospital Safe Opioid Prescribing Task Force (2014-present)

**Major Teaching and Clinical Responsibilities at Thomas Jefferson University and Affiliated Hospitals:**

1.  Course Director, Introduction to Clinical Medicine, 2nd Year Medical School Class, responsibilities include curriculum development, lectures and administrative organization of medical school course (2010-present)

2.   Inpatient Teaching Attending at Thomas Jefferson University Hospital, 1-2 months/year (2003-present)

3.   Clinical Preceptor to Medical Students at Jefferson Internal Medicine Associates, 8 hours/week (2003-present)

4.   Lecturer to First Year Medical Student Class at Jefferson Medical College, 1 lecture per year on Sickle Cell Anemia (2004-present)

5.   Faculty Small Group Leader, Second Year Medical Student Course, 10 sessions per year (2005-present)

6.   Small Group Lecture to 3rd Year medical students on professionalism, four lectures per year (2011-present)

7.   Lecture to 3rd year medical students on "Primary Care Medicine," four lectures per year as part of Internal Medicine clinical rotation (2010-present)

8.   Clinical Preceptor to Internal Medicine Residents at Jefferson Internal Medicine Associates, 4 hours/week (2003-2010)

9.   Faculty Small Group Leader, Medical Practice for the 21st Century, Jefferson Medical College, First Year Medical Student Course, 16 sessions per year (2005-2010)

10.   Lecture to 3rd Year medical students on palliative care, four lectures per year as part of Internal Medicine clinical rotation (2006-present)

11.   Teaching medical students, residents and Geriatric fellows during clinical rotation on Palliative Care Service – 10 sessions per month (2006-2010)

12.   Course Director, Palliative Care 4th year medical student rotation – responsibilities include administering rotation, developing curriculum, lecturing to medical students and teaching attending (2007-2010)

**Lectures by Invitation:**

November 27, 2013   "Sickle Cell Disease – Can We Do Better?" Department of Medicine Grand Rounds, Albert Einstein Medical Center, Philadelphia, PA

September 14, 2012   "Principles of Pain Management in Sickle Cell Disease," Department of Medicine Grand Rounds, Chestnut Hill Hospital, Philadelphia, PA

May 20, 2011   "Pain and Symptom Management in Sickle Cell Disease," Palliative Care Grand Rounds, Christiana Medical Center, Newark, DE

February 24, 2011    "Ketamine for Severe Sickle Cell Painful Episodes in an Opioid Tolerant Patient," Annual National Sickle Cell Disease Scientific Meeting, Hollywood, FL

February 3, 2011    "Raft Debate: Who is the most important in the management of pancreatic cancer?" Jefferson Medical College Alumni Association Continuing Medical Education.  What Every Doctor Should Know: A General Medical Update, Aspen, CO

July 3, 2010    "Pain Management in the Hospitalized Patient: Optimizing Patient Care and Treating Challenging Cases," Department of Medicine Grand Rounds, Jersey Shore University Medical Center, Neptune City, NJ

May 11, 2010    "Comprehensive Sickle Cell Disease Management: Improving the Quality of Sickle Cell Care," Department of Medicine Grand Rounds, University of Rochester, Rochester, NY

April 18, 2010    "Heart Failure Review: Self-Assessment Module," Temple University Family Practice Review Course, Lancaster, PA

November 3, 2009    "Medical Legal Issues in Pain Management," Medical Grand Rounds, Nassau University Medical Center, East Meadow, NY

March 27, 2009    "Update in Pain Medicine," Medical/Surgical Grand Rounds, AtlantiCare Regional Medical Center, Atlantic City, NJ

March 12, 2009    "Sickle Cell Disease: Management of the Sickle Cell Crisis and Acute Complications," Medical Grand Rounds, Sinai Hospital, Baltimore, MD

February 18, 2009    "Selected Case Reports in Palliative Care," Medical Grand Rounds, Methodist Hospital, Philadelphia, PA

April 30, 2008    "Palliative Care: Pain and Symptom Management," Medical Grand Rounds, Mercy Fitzgerald Hospital, Darby, PA

October 3, 2007    "Pain Management of the Hospitalized Patient," Thomas Jefferson Department of Nursing Annual Conference, Philadelphia, PA

June 23, 2007    "Living with Sickle Cell Disease: Transitioning to Adult Care," Children's Hospital of Pittsburgh, State Conference on Sickle Cell Disease, Pittsburgh, PA

June 21, 2007    "Palliative Care in Action," 30th Annual Eastern Shore Medical Symposium, Rehoboth Beach, DE

May 25, 2007    "Primary Care for Adults with Sickle Cell Disease," Department of Medicine Grand Rounds, Capital Health System, Fuld Campus, Trenton, NJ

David J. Axelrod, MD                                                                      4

| | |
|---|---|
| April 26, 2007 | "Responsible Pain Management in Sickle Cell Disease," Department of Medicine Grand Rounds, York Hospital, York, PA |
| March 7, 2007 | "Pain Management in Sickle Cell Disease," Medical Grand Rounds, Mercy Fitzgerald Hospital, Darby, PA |
| November 2, 2005 | "Pain Management for the Hospitalized Patient," Wilmington Veterans Affairs Medical Center, Medical Grand Rounds, Medical Society of Delaware, Wilmington, DE |
| May 19, 2005 | "Managing Adult Sickle Cell Disease: Challenges and Opportunities," Institute for Cellular Therapeutics Visiting Professor, University of Louisville, Louisville, KY |
| October 22, 2004 | "Pain and Addiction: Challenges and Solutions," Atlantic City Medical Center Visiting Professor Series, Combined Clinical Grand Rounds: Atlantic City Medical Center, Atlantic City, NJ |

**Grand Rounds at Thomas Jefferson University:**

| | |
|---|---|
| November 25, 2009 | "Update in Sickle Cell Disease," Department of Psychiatry Grand Rounds, Thomas Jefferson University, Philadelphia, PA |
| May 22, 2009 | "Pain management in the Intensive Care Unit," Department of Pulmonology and Critical Care Grand Rounds, Thomas Jefferson University, Philadelphia, PA |
| May14, 2009 | "Pain and Symptom Management in Rheumatologic Diseases," Department of Rheumatology Grand Rounds, Thomas Jefferson University, Philadelphia, PA |
| January 9, 2009 | "Palliative Care and Liver Diseases," Hepatology Grand Rounds, Department of Gastroenterology, Thomas Jefferson University Hospital, Philadelphia, PA |
| March 28, 2008 | "Palliative Care and Radiation Oncology," Grand Rounds, Department of Radiation Oncology, Thomas Jefferson University Hospital, Philadelphia, PA |
| March 28, 2007 | "Palliative Care and Oncology," Kimmel Cancer Center Grand Rounds, Jefferson Medical College, Philadelphia, PA |
| January 25, 2007 | "End of Life Care," Department of Medicine Grand Rounds, Jefferson Medical College, Philadelphia, PA |
| October 25, 2006 | "Palliative Care," Thomas Jefferson University Department of Family and Community Medicine Grand Rounds, Jefferson Medical College, Philadelphia, PA |

**Intramural Lectures:**

| March 13, 2013 | "Case Studies in Sickle Cell Disease," Family Medicine Resident Lecture Series." Jefferson Medical College, Philadelphia, PA |
| March 21, 2013 | "Prevention in Primary Care," Panel Discussion with the Jefferson Prevention Interest Group, Jefferson Medical College, Philadelphia, PA |
| October 25, 2010 | "Pain Management in the Hospital," Internal Medicine Lecture Series to House Staff, Thomas Jefferson University Hospital, Philadelphia, PA |
| November 10, 2008 | "Legal Issues in Pain Medicine," Class of JMC 2010 Interclerkship Session, Jefferson Medical College, Philadelphia, PA |
| March 20, 2008 | "Pain Management of the Hospitalized Patient," Lecture to Family and Community Residency Program, Jefferson Medical College, Philadelphia, PA |
| March 12, 2008 | "Treatment of Pain: Sickle Cell Disease as a Model," Lecture to 2nd year Medical School Class, Jefferson Medical College, Philadelphia, PA |
| February 18, 2008 | "An Overview of Palliative Medicine," Internal Medicine Lecture Series to House Staff, Thomas Jefferson University Hospital, Philadelphia, PA |
| October 5, 2007 | "Palliative Care in the Intensive Care Unit," Lecture to Department of Pulmonary and Critical Care, Thomas Jefferson University, Philadelphia, PA |
| July 5, 2007 | "Pain Management in the Hospital," Internal Medicine Lecture Series to House Staff, Thomas Jefferson University Hospital, Philadelphia, PA |
| October 17, 2006 | "Palliative Care," Internal Medicine Lecture Series to House Staff, Thomas Jefferson University Hospital, Philadelphia, PA |
| October 5, 2006 | "Decision Making Near the End of Life," Panel Discussion with 1st Year Medical Students, Jefferson Medical College, Philadelphia, PA |
| June 16, 2006 | "The Case for Palliative Care," Lecture to Pulmonary and Critical Care Department, Thomas Jefferson University Hospital, Philadelphia, PA |
| June 15, 2005 | "Complications of Sickle Cell Disease," Internal Medicine Lecture Series to House Staff, Thomas Jefferson University Hospital, Philadelphia, PA |

David J. Axelrod, MD

November 21, 2005    "Pain Management for the Hospitalized Patient," Internal Medicine Lecture Series to House Staff, Thomas Jefferson University Hospital, Philadelphia, PA

February 22, 2005    "Pain and Addiction," Internal Medicine Lecture Series to House Staff, Thomas Jefferson University Hospital, Philadelphia, PA

August 18, 2004    "An Update on the Obesity Epidemic," Internal Medicine Lecture Series to House Staff, Thomas Jefferson University Hospital, Philadelphia, PA

April 14, 2004    "The Obesity Epidemic," Jefferson Internal Medicine Associates Educational Conference, Philadelphia, PA

February 12, 2003    "New Developments in the Management of Hypertension," Primary Care Conference Presentation, Department of Internal Medicine, University of Vermont School of Medicine, Burlington, VT

August 14, 2002    "Management of Fever," Intern Orientation Presentation, Department of Internal Medicine, University of Vermont School of Medicine, Burlington, VT

January 16, 2002    "Management of Asthma in Primary Care," Primary Care Conference Presentation, Department of Internal Medicine, University of Vermont School of Medicine, Burlington, VT

March 21, 2001    "New Developments in the Management of Gastro-Esophageal Reflux Disease," Primary Care Conference Presentation, Department of Internal Medicine, University of Vermont School of Medicine, Burlington, VT

**Abstracts:**

June 11, 2012    "Urine Drug Testing in a Sickle Cell Population Treated with Chronic Opioids." Axelrod DJ, Congdon-Martin E, Pulte E. Abstract #16, International Conference on Opioids: Basic Science, Clinical Applications and Compliance.  Boston, MA

February 29, 2012    "Urine Drug Testing in a Sickle Cell Population Treated with Chronic Opioids." Axelrod DJ, Congdon-Martin E, Pulte E. Abstract #66, 6th Annual National Sickle Cell Disease Research and Educational Symposium and Annual Scientific Meeting, Hollywood, FL

February 29, 2012    "Suspected Opioid Addiction in a Patient with Sickle Cell Disease." Congdon-Martin E, Axelrod DJ. Abstract #123, 6th Annual National Sickle Cell Disease Research and Educational Symposium and Annual Scientific Meeting, Hollywood, FL

| | |
|---|---|
| February 24, 2011 | "Ketamine for Severe Sickle Cell Painful Episodes in an Opioid Tolerant Patient." Axelrod DJ, Colfer K, Stewart J, Ballas SK, Kark J, Viscusi ER. Abstract #103, 5th Annual National Sickle Cell Disease Research and Educational Symposium and Annual Scientific Meeting, Hollywood, FL |
| February 23, 2011 | "Cocaine Use in Patients with Sickle Cell Disease and Chronic Opioid Treatment." Axelrod DJ, Wintersteen M. Abstract # 71,5[th] Annual National Sickle Cell Disease Research and Educational Symposium and Annual Scientific Meeting, Hollywood, FL |
| February 20, 2009 | "Causes of Blindness in Adult Patients with Sickle Cell Disease." Ballas SK, Riddick-Burden G, Axelrod DJ, Riggio J, Goldstein MJ. Abstract #157, 3rd Annual Sickle Cell Disease Research and Educational Symposium and Annual Sickle Cell Disease Scientific Meeting, Fort Lauderdale, FL |
| February 20, 2009 | "Opioids Used to Treat Pregnant Women with Sickle Cell Disease May Cause Neonatal Abstinence Syndrome," Ballas SK, Baxter JK, Axelrod DJ, Riggio J, Abstract #164, 3rd Annual Sickle Cell Disease Research and Educational Symposium and Annual Sickle Cell Disease Scientific Meeting, Fort Lauderdale, FL |
| February 20, 2009 | "Obstetrical Outcomes of Pregnancies Complicated by Sickle Crises," Berzolla CE, Seligman N, Dysart K, Baxter JK, Axelrod DJ, Riggio J, Ballas SK. Abstract #163, 3rd Annual Sickle Cell Disease Research and Educational Symposium and Annual Sickle Cell Disease Scientific Meeting, Fort Lauderdale, FL |
| January 30, 2009 | "Serum Levels of Opioids in Patients with Sickle Cell Disease Treated in the Day Unit," "Ballas SK, Axelrod DJ, Riggio JM, Riddick-Burden G. Annual Meeting of the American Academy of Pain Medicine, Honolulu, HI |
| May 17, 2008 | "Physician Induced Hypochondriasis in a Patient with Sickle Cell Trait," Minen M, Axelrod DJ.  American College of Physicians, Annual National Meeting. Washington, DC |
| March 7, 2008 | "Palliative Care in a Case of Extensive Post-operative Gastric Bypass Surgery Complications," Stache S, Axelrod DJ, Kyrillos JV. Abstract #49, Society of General Internal Medicine, Mid-Atlantic Regional Meeting, Philadelphia, PA |
| February 23, 2008 | "Palliative Care and Post-operative Gastric Bypass Surgery Complications," Stache S, Axelrod DJ, Kyrillos JV. Abstract #10, Annual Meeting of the American College of Physicians, Delaware Chapter, Newark, DE |
| February 2, 2008 | "Developing Consensus Among Multiple Consultants: A Valuable Role for Palliative Care Teams," Snyderman D, Reville B, Axelrod |

David J. Axelrod, MD                                                                                 8

DJ, et al. American Academy of Hospice and Palliative Care
Annual Meeting, Tampa, FL

September 21, 2007   "Early Conversion to Oral Opioids: An Inpatient Pain Treatment
Protocol for Uncomplicated Sickle Cell Painful Crisis," Axelrod DJ,
Riggio JM, et al. Abstract #136, Page 319. 35th Anniversary
Convention of the National Sickle Cell Disease Program and the
Sickle Cell Disease Association of America, Inc., Washington
Hilton & Towers, Washington, DC

September 21, 2007   "Safety of Radiographic Contrast Media Administration in Patients
with Sickle Cell Disease," Campbell KL, Hud L, Adams S, Axelrod
DJ, Ballas SK. Abstract #172, Page 322. 35th Anniversary
Convention of the National Sickle Cell Disease Program and the
Sickle Cell Disease Association of America, Inc., Washington
Hilton & Towers, Washington, DC

September 21, 2007   "Opioid Serum Levels in Patients Treated in the Sickle Cell Day
Unit," Riddick-Burden G, Axelrod DJ, Riggio JM, Ballas SK.
Abstract #137, Page 336. 35th Anniversary Convention of the
National Sickle Cell Disease Program and the Sickle Cell Disease
Association of America, Inc., Washington Hilton & Towers,
Washington, DC

April 11, 2006   "Opioid Hyperalgesia in a Patient with Sickle Cell Anemia,"
Axelrod DJ, Riggio JM. 29th Annual Meeting of the National Sickle
Cell Disease Program, Memphis, TN

March 10, 2006   "Stay Still for the Flash –Flash Pulmonary Edema in Adult Stills
Disease" Chen J, Axelrod DJ. Society of General Internal
Medicine Regional Conference, Hershey, PA

November 13, 2005   "Racial Disparities in Hepatitis C Testing," Trooskin SB, Axelrod
DJ, Winn R, McNeal S, Herrine SK, Navarro VJ. 56th Annual
Meeting of the American Association for the Study of Liver
Diseases, San Francisco, CA

October 25, 2005   "A Paradoxical Presentation of Chronic Pancreatitis," Bennis A,
Sakamaki M, Axelrod DJ. American College of Physicians,
Pennsylvania Chapter, Southeastern Region Associates Meeting,
Lankenau Hospital, Wynnewood, PA

April 13, 2005   "A Variant of Lemierre's Syndrome Complicating Totally
Implantable Intravenous Catheters in the Management of Sickle
Cell Disease," Ballas SK, Wheeler C, Gay RN, Riggio JM, Axelrod
DJ, Menajovsky LB. 28th Annual Meeting of the National Sickle
Cell Disease Program, Cincinnati, OH

April 12, 2005   "Idiosyncratic Side Effects of Brand and Generic Hydroxyurea,"
Ballas SK, Dampier C, Axelrod DJ, Riggio JM, 28th Annual

|                    | Meeting of the National Sickle Cell Disease Program, Cincinnati, OH |
|--------------------|---------------------------------------------------------------------|
| May 16, 2003       | "The Prevalence and Desirability of Physician Advice to Overweight Patients," Internal Medicine Grand Rounds, Senior Resident Poster Presentation, Fletcher Allen Health Care, University of Vermont School of Medicine, Burlington, VT |
| October 18, 2002   | "Hypogonadism and Compression Fractures," Clinical Vignette Poster Presentation, American College of Physicians, Vermont Regional Annual Conference, Stowe, VT |
| October 19, 2001   | "Methotrexate Induced Hemolytic Anemia," Clinical Vignette Poster Presentation, American College of Physicians, Vermont Regional Annual Conference, Stowe, VT |

**Invited Conference Participation:**

| December 1, 2006   | "Discussion of Pain Intervention and Alleviation from the Perspectives of the Professional Caregiver," Panel Discussion, Atlantic City Medical Center Annual Academic Retreat. Atlantic City, NJ. |
|--------------------|---------------------------------------------------------------------|
| September 16, 2006 | "The ABC's of Sickle Cell Disease," Sickle Cell Disease Association of American-Delaware Valley, Seminar Day Workshop Leader, Community College of Philadelphia, Philadelphia, PA |
| March 11, 2005     | Moderator, Oral Research Abstracts and Clinical Vignettes, Society of General Internal Medicine, Mid-Atlantic Regional Conference, Cornell University School of Medicine, New York, NY |
| September 18, 2004 | "Living with Sickle Cell Disease," Sickle Cell Disease Association of America-Delaware Valley, Panel Discussion on Sickle Cell Disease: Philadelphia, PA |

**Publications:**

**Peer Reviewed Articles:**

1. Axelrod D, Tranh V, Vuong N, Pulte E, Mosier J. Identifying Sickle Cell Patients at High Risk for Opioid Abuse. Publication Pending in Journal of Opioid Management.

2. Hojat M, Axelrod D, Spandorfer J, Mangione S. Enhancing and Sustaining Empathy in Medical Students. Med Teach. 2013; 35:996-1001.

3. Campbell KL, Hud LM, Adams S, Andrel J, Ballas SK, Feldman AM, Axelrod DJ. Safety of Iodinated Intravenous Contrast Medium Administration in Sickle Cell Disease. Am J Med. 2012;125(1):100.e11-6.

David J. Axelrod, MD

10

4. Trooskin SB, Vega M, Herrine SK, McNeal AS, Winn RJ, Axelrod DJ, Navarro VJ. Prevalence of HCV Risk Factors in Hispanic-American Sub Populations. J Immigrant Minority Health, 2010:12(6):915-20.

5. Reville B, Axelrod DJ, Maury R. Palliative Care for the Cancer Patient. In Wender R, Snyderman D, eds. Cancer: What the Primary Care Practitioner Needs to Know, Part II, Primary Care: Clinics in Office Practice; 2009; 36(3).

6. Becker M, Axelrod DJ, Oyesanmi O, Markov D, Kunkel ES. Hematologic Problems in Psychosomatic Medicine. Psychiatric Clinics of North America, 2007 December 30(4): 739-759.

7. Trooskin SB, Velez M, Rossi S, Herrine SK, Winn R, Axelrod DJ, McNeal AS, Navarro VJ. Racial and Ethnic Disparities in Knowledge about Hepatitis C. Open General and Internal Medicine Journal, 2007, 1,1-5.

8. Axelrod DJ, Reville BA. Using Methadone to Treat Opioid Induced Hyperalgesia and Refractory Pain. J Opioid Management 2007 March/April 3(2):113-114.

9. Trooskin SB, Navarro VJ, Winn R, Axelrod DJ, McNeal SA, Velez M, Herrine SK, Rossi S. Hepatitis C Risk Assessment, Testing and Referral for Treatment in Urban Primary Care: The Role of Race and Ethnicity. World J Gastroenterol 2007 February 21;13(7):1074-1078.

## Book Chapters:

1. Axelrod DJ. Alcohol and Vitamin Deficiencies.  In *Medical Nutrition and Disease: A Case-Based Approach*, 5th Edition. Edited by Hark L, Dean D, Morrison G. John Wiley & Sons. Hoboken NJ, 2014, 308-313.

2. Becker M, Axelrod, DJ, Oyesanmi O, Markov DD, Martin E, Kunkel EJS: Hematology, in The American Psychiatric Publishing *Textbook of Psychosomatic Medicine: Psychiatric Care of the Medically Ill*, 2nd Edition.  Edited by Levinson JL. Washington, DC, American Psychiatric Publishing, 2010: 551-570.

3. Axelrod DJ, Lehman A. Sickle Cell Anemia. In: Ebell EH, Ferenchick G, Smith M, Barry H, Slawson D, Shaughnessy A, Forsch R, Li S, Wilkes M, Usatine R, eds. *Essential Evidence*. John Wiley & Sons. Hoboken, NJ, 2009.

4. Axelrod DJ. Patient Confidentiality. In: Spandorfer J, Pohl CA, Rattner,SL, Nasca JT, Eds. *Professionalism in Medicine: A Case Based Guide for Medical Students* First Edition, Cambridge University Press, 2009.

5. Axelrod DJ. Pain Management of the Hospitalized Patient. In: Williams MV, Hayward R, Eds. *Comprehensive Hospital Medicine: An Evidence Based Approach*. First Edition. Philadelphia, PA: Saunders Publishing. 2007 (94):725-733.

6. Axelrod DJ, Berg D. Abdominal Examination: Practice and Teaching. In: Berg D, Warzala K, Eds. *Atlas of Adult Physical Diagnosis*. Philadelphia, PA: Lippincott Williams and Wilkins; 2006:131-160.

**Alternative Media:**

1. ACP Observer, April, 2007: Interview on CT scanning for cancer screening.

2. Philadelphia Inquirer Interview 8/30/04: "Doctors' Responsibilities, Patients Rights Debated."

3. Fox 29 Ten O'Clock News Philadelphia, Television Interview 12/20/04: "Remedies for Cold and Flu."

4. WCAU-TV Television Interview, Philadelphia, 1/31/04: "Persistent Respiratory Problems."

**Previous Professional Experience:**

| | |
|---|---|
| 1995-96 | Research Assistant, the Krogman Growth Center of the University of Pennsylvania, Philadelphia, PA |
| 1994-95 | Administrative Assistant, Public Health and Education Association-Midwest, Evanston, IL |
| 1992-93 | Judicial Law Clerk to the Hon. Louis G. Hill, Philadelphia Court of Common Pleas, Philadelphia, PA |

**Other Academic Activities:**
Faculty Advisor, Jefferson Medical College Internal Medicine Interest Group
Mentor, Jefferson Medical College within a College

# Exhibit B

David J. Axelrod Testimony History:

3/3/15:  Trial Testimony on behalf of Defendant, Philadelphia Court of Common Pleas

7/2014: Trial Testimony on behalf of Plaintiff, Toledo, Ohio

5/2014: Deposition Testimony on behalf of Defendant, Cherry Hill, NJ

4/2014: Deposition Testimony on behalf of Defendant, Cherry Hill, NJ

3/2013: Trial Testimony on behalf of Plaintiff, Miami, FL

1/31/2013: Deposition Testimony on behalf of Defendant, Cherry Hill, NJ

2012: Trial Testimony on behalf of Defendant, Philadelphia Court of Common Pleas

11/2012: Deposition Testimony on behalf of Plaintiff, Philadelphia, PA

8/2012: Deposition Testimony on behalf of Defendant, Cherry Hill, NJ

# Exhibit C

**Fee Schedule for David J. Axelrod, MD, JD, FACP**

$400 per hour for review

$500 per hour for trial or deposition testimony

 **Penn Medicine**

Pennsylvania Hospital

Daniel M. Feinberg, MD, FAAN
*Chief Medical Officer*
*Professor of Clinical Neurology*

March 22, 2015

Nicholas J. Panarella, Esquire
Martin A. Krolewski, Esquire
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

RE: **Circuit City/Roy Eisner Litigation**

Dear Mr. Panarella and Mr. Krolewski:

I performed a neurological evaluation of Roy Eisner on January 21, 2015. Louis Dobi, Esquire, accompanied him for the evaluation.

**HISTORY ACCORDING TO ROY EISNER**

Mr. Eisner is a 58 year old, left-handed man, who stated that he was attacked in a parking lot at work on 4/8/08 at 5:50 am. The other man ran towards him and tackled him. Mr. Eisner stated that he struck his head on a curb and blacked out for a few minutes. He said that he was punched and kicked, had the "wind knocked out of him," and scraped his ear. He stated that most of the kicking and punching were on his back and neck. He also claimed that he injured his right knee.

Mr. Eisner said that he "woke up" and went into the warehouse. He stated that he was disoriented the entire day. He drove himself to an ER and was evaluated. He needed stiches in his ear. He told me that he was instructed to follow up with his PCP, which he did. Mr. Eisner said that the ER was concerned about blood behind the right eye and visual difficulties. He said that he saw an ophthalmologist, and was told that scar tissue might continue to cause problems. He does not recall any specific ophthalmologic follow-up.

Since that time, Mr. Eisner stated that he has had severe bifrontal headaches, occasionally with nausea and photophobia. He said that he has continued to have two headaches per week since that time. He takes aspirin and has some relief. His wife tells him that his memory has been poor since that time. He notes some concentration issues, needing to read things several times in order to comprehend. He says that he is always losing things and forgets names. He stated that he has difficulty spelling things. He stated  that he had dizzy spells in the past when he was taking blood pressure medications but they are now gone. All symptoms have remained the same, except for memory, which he believes is worse. Mr. Eisner reports that neck pain is frequent and range of motion is diminished. No radiating pain into either arm or hand is present. He also reported pain in the lower thoracic region and lumbar spine. He described pain that extends from the right lower back into the right thigh to the knee. Injections in the spine did not help.

Fatigue has been terrible and has increased over time, with the patient raising the possible of chronic fatigue syndrome. He does not believe that his concentration and memory would allow him to function

as a manager at work. He does not believe that his neck and back symptoms would allow him to type at a computer or spend a lot of time walking.

## PAST MEDICAL HISTORY

Rear ended in motor vehicle incident in 2000 that resulted in whiplash, treated by a chiropractor, no previous work related neck or back injuries. He had "sinus" headaches in the past but very different from the current headaches. He has depression and is followed by a psychiatrist. He is not currently treating with any specialists and is followed by his primary care physician.

## MEDICATIONS

Oxycontin 40 mg BID for back and neck pain, ASA, oxycodone 15 mg BID for breakthrough pain, Xanax for anxiety since 2010, Wellbutrin since before this incident, now on 300 mg daily, Claritin for allergies, Skelaxin BID for muscle spasm

## PERSONAL HISTORY

Married with 2 children (34, 36). Former smoker, no ETOH. Has not been able to go back to work as a trucking manager for Spirit. He is on Social Security Disability.

## NEUROLOGICAL EXAMINATION

General: psoriasis on lower back, hand and scalp. Negative Patrick's sign. Straight leg testing produced back pain only.

Musculoskeletal: reported decreased range of motion in the neck with flexion and extension, tenderness throughout the cervical, thoracic and lumbar spine, but no paravertebral muscle spasm.

Cranial nerves: normal pupillary function, extraocular movements, facial motor and sensory function, elevation of the palate and tongue movements.

Motor: 5/5 power in all four limbs, though with poor effort throughout. Normal muscle bulk and tone throughout.

Reflexes: 2/4 throughout in the arms and legs, no Babinski or Hoffman's signs present.

Sensation: normal and symmetrical to pinwheel, vibration and cool.

Coordination: finger-to-nose and heel-knee-shin testing normal, overt astasia/abasia with Romberg testing.

Gait: Normal without ataxia

RECORD REVIEW

I reviewed the following documents:

1. Norman P. Stempler, DO;
2. Plaintiff's answers to interrogatories;
3. Lower Bucks Hospital;
4. Bensalem Medical Practice;
5. Medical Imaging Associates;
6. Bensalem Chiropractic Center;
7. Report of Dr. Herbert Stein;
8. Mark Reznic, DO;
9. Elliot Frank, DO;
10. Caine Chiropractic Center;
11. Occupational Therapy and Rehabilitation Services;
12. Aria Health;
13. Eusebio Nunez, MD;
14. Tri-county Eye Physicians and Surgeons;
15. Mid Atlantic Retina;
16. Deposition transcripts of Plaintiff;
17. Report of Gladys Fenichel, MD.
18. Frankford Hospital

Mr. Eisner was evaluated at the Lower Bucks Hospital Emergency Room on 4/8/08 and was noted to have NO loss of consciousness. He was noted to have no tenderness in the neck or back. He received stitches to his ear and was discharged with diagnoses of contusion of the face and chest.

Radiology exams of cervical and dorsal spines on 4/21/08 from Frankford Hospital showed no fracture or dislocation. The report stated that there were only mild degenerative changes.

A cervical MRI on 5/21/08 was reported as normal. A lumbar MRI on that same date was reported to show mild degenerative disc disease at L4-5 and L5-S1 with small superimposed disc protrusions at those levels and left L4-5 and right L5-S1 foraminal narrowing.

Dr. Nunez, a physiatrist, evaluated Mr. Eisner on 7/2/08. He noted the history and Mr. Eisner's reported tenderness and diminished range of motion in the neck, thoracic and lumbar spine. Dr. Nunez diagnosed strain and sprain in those regions. Dr. Nunez also noted that Mr. Eisner reported no loss of consciousness.

Dr. Fenichel, a psychiatrist, evaluated Mr. Eisner on 9/2/08 at the request of AIG. She opined that he had anxiety and depression, not post traumatic stress disorder. She did not make a diagnosis of post concussion syndrome. Memory and intelligence testing were "normal."

Dr. Stempler evaluated Mr. Eisner on 9/4/08 for neck, upper, mid and low back pain. Dr. Stempler noted that Mr. Eisner denied loss of consciousness as a result of attack on 4/8/08. Dr. Stempler also noted the history of "spinal complaints" after an MVA in 2000, but wrote that Mr. Eisner had chiropractic treatment and was pain free 6 months later. On 9/4/08, Mr. Eisner had no radicular complaints but noted difficulties with sitting, standing, bending, lifting, twisting, and turning. On

3

examination, Dr. Stempler noted reports of trapezial pain and tenderness and pain with neck movements in all directions. Upper extremity motor, sensory and reflexes were normal. There were also complaints of lumbar pain and spasm, pain with range of motion testing and a positive sciatic tension test. As in the upper extremities, there were no neurological deficits in the lower extremities. The impression was "chronic, refractory cervical, thoracic and lumbosacral strain and sprain with myofascitis" and "somatic dysfunction." Dr. Stempler recommended Percocet, anti-inflammatory medications and muscle relaxants. He also recommended physical therapy and chiropractic treatment. He opined that the patient's complaints were causally related to the 4/8/08 incident and that Mr. Eisner was disabled from his previous employment.

Dr. Herbert Stein performed an orthopedic evaluation on 9/8/08 at the request of AIG. He reported no palpable muscle spasm in the cervical and dorsolumbar spine areas. It was his opinion that the degenerative disc disease noted on the MRI on 5/21/08 was not causally related to the incident on 4/8/08, only 6 weeks earlier. He diagnosed contusions and sprain of the cervical and dorsolumbar spine. Dr. Mark Reznic evaluated Mr. Eisner on 2/12/09 and documented the history. Review of systems was notable for headaches but no difficulties with memory or concentration. Dr. Reznic diagnosed cervical and lumbar disc disease and recommended facet joint injections in the cervical spine.
An MRI of the brain on 5/12/10 at Frankford Hospital showed no evidenced of acute intracranial abnormality.

On 12/2/14, Dr. Stempler re-evaluated Mr. Eisner continuing "painful activity." On examination, he documented tenderness in the paracervical, trapezial, paralumbar and sacroiliac areas, increased with attempted range of motion. He noted that Mr. Eisner was neurologically intact. The impression was the same as above. Dr. Stempler wrote that this was a "serious and permanent injury to his spine" as a direct result of the incident on 4/8/08.

**IMPRESSION**

In my neurological examination on 1/21/15, Mr. Eisner did not have any objective evidence of cervical or lumbar radiculopathy, brachial plexopathy or any neurological disorder. Although he complained of neck, mid back and lower back tenderness, he had no objective evidence of muscle spasm in those regions. He exhibited poor effort during strength testing although it was clear that his strength was normal. He has what is called astasia/abasia during testing, which is voluntary tilting back and forth, without falling during balance testing, a clear sign that Mr. Eisner was elaborating his symptoms during the examination.

I respectfully disagree with Dr. Stempler's opinions. In my opinion, Mr. Eisner may have had cervical, thoracic and lumbar strain/sprain but these conditions would resolve within 4-6 weeks of the onset of symptoms. They would not result in a "serious and permanent injury to his spine," as opined by Dr. Stempler. Dr. Stempler's examinations listed subjective, but not objective findings. I found no objective evidence of any spinal disorder. In contrast, I found clear evidence of elaboration of symptoms in my examination.

4

I do not believe that Mr. Eisner has any neurological causes of disability. I would not place any restrictions upon him with respect to returning to his previous position.
I state all of the above with a reasonable degree of medical certainty.

Sincerely yours,

Daniel M. Feinberg, MD, FAAN

**Curriculum Vitae**
**Date:  November, 2014**

**Daniel Marc Feinberg, M.D., FAAN**

**Office Address:**

Pennsylvania Hospital
800 Spruce Street
Philadelphia, PA  19107
Phone:  215-829-7556
E-mail:  Daniel.Feinberg@uphs.upenn.edu

**Education:**

| | |
|---|---|
| 1983-87 | B.A., University of Pennsylvania |
| 1987-92 | M.D., Pennsylvania State University College of Medicine |

**Postgraduate Training and Fellowship Appointments:**

1992-93

Intern in Internal Medicine
Graduate Hospital
Philadelphia, Pennsylvania

1993-95

Resident in Neurology
Albert Einstein College of Medicine &
Montefiore Medical Center
Bronx, New York

1995-96

Chief Resident in Neurology
Albert Einstein College of Medicine

1996-97

Fellow in Clinical Neurophysiology and Neuromuscular
Disorders
Brigham and Women's Hospital
Harvard Medical School

2002-03

Graduate Certificate in the Business of Medicine
School of Medicine
School of Professional Studies in Business and Education
Johns Hopkins University

2007

American Medical Informatics Association
Oregon Health Services University
10X10 Course Certificate Program

Daniel M. Feinberg, M.D., FAAN
Page 1

| | |
|---|---|
| 2008 | Wharton Academic Medicine Leadership Program<br>The Wharton School<br>University of Pennsylvania |
| 2009-2012 | Senior Fellow (non-faculty affiliate)<br>Jefferson School of Population Health<br>Thomas Jefferson University<br>Philadelphia, PA |

**Faculty Appointments:**

| | |
|---|---|
| 1996-1997 | Clinical Fellow in Neurology<br>Harvard Medical School |
| 1997-2006 | Clinical Assistant Professor of Neurology<br>University of Pennsylvania School of Medicine |
| 2006-2009 | Clinical Associate Professor of Neurology<br>University of Pennsylvania School of Medicine |
| 2009-2014 | Associate Professor of Clinical Neurology<br>Perelman School of Medicine<br>University of Pennsylvania |
| 2014-present | Professor of Clinical Neurology<br>Perelman School of Medicine<br>University of Pennsylvania |

**Employment:**

| | |
|---|---|
| October, 2010-present | Chief Medical Officer<br>Pennsylvania Hospital of the University of Pennsylvania<br>Health System |
| October, 2010-present | Designated Institutional Official<br>Pennsylvania Hospital of the University of Pennsylvania<br>Health System |
| January, 2010-October, 2010 | Corporate Vice President, Clinical Excellence<br>Catholic Health East<br>Newtown Square, PA |

Daniel M. Feinberg, M.D., FAAN
Page 2

**Hospital Appointments:**

| | |
|---|---|
| 1997-present | Attending Neurologist<br>Pennsylvania Hospital |
| 1997-present | Attending Neurologist<br>Hospital of the University of Pennsylvania |
| 1999-2003 | Attending Neurologist<br>ALS Association Clinical Center at the Penn Neurological Institute at Pennsylvania Hospital |
| 2000-2003 | Medical Director, Performance Improvement<br>Pennsylvania Hospital of the University of Pennsylvania Health System |
| 2001-2009 | Patient Safety Officer<br>Pennsylvania Hospital of the University of Pennsylvania Health System |
| 2005-2009 | Medical Director of Clinical Informatics<br>Pennsylvania Hospital of the University of Pennsylvania Health System |
| 2007-2009 | Chief Patient Safety Officer, University of Pennsylvania Health System |
| October, 2010-present | Chief Medical Officer<br>Pennsylvania Hospital of the University of Pennsylvania Health System |
| October, 2010-present | Designated Institutional Officer<br>Pennsylvania Hospital of the University of Pennsylvania |
| November, 2014-present | Physician Champion, Penn Chart (Epic implementation for University of Pennsylvania Health System) |
| 2007-present | Consulting Neurologist, Philadelphia Flyers Hockey Club |

**Specialty Certification:**

| | |
|---|---|
| 1997-2007 | Diplomate of the American Board of Psychiatry and Neurology (Certified in Neurology) |

Daniel M. Feinberg, M.D., FAAN
Page 3

| | |
|---|---|
| 2007-2017 | Re-certified as a Diplomate of the American Board of Psychiatry and Neurology |
| 2001 | Diplomate of the American Board of Electrodiagnostic Medicine |

**Licensure:**          Pennsylvania

**Awards and Honors:**

| | |
|---|---|
| 1989 | National Institutes of Health Summer Research Fellowship |
| 1992 | First Place Prize-Basic Science Research Project Annual Medical Student Research Symposium |
| 1996 | Annual Meeting Resident Scholarship, American Academy of Neurology |
| 1997 | Junior Member Recognition Award, American Association of Electrodiagnostic Medicine |
| 2002 | VHA Physician Leadership Scholarship |
| 2005-2006, 2007-2008, 2009-2010 | Best Doctors in America |
| 2007 | Fellow, American Academy of Neurology |
| 2007 | Fellow, College of Physicians of Philadelphia |
| 2012 | Penn Medicine Patient Advocacy Award |
| 2013 | University of Pennsylvania Health System Palliative Care Champions Award:  Administrative Leader |
| 2014 | Alfred Stengel Health System Champion Award |

**Memberships in Professional and Scientific Societies:**

| | |
|---|---|
| 1994-present | American Academy of Neurology - Active Member |
| 1998-2002 | American Academy of Neurology Practice Improvement Subcommittee-Member |
| 1996-present | American Association of Electrodiagnostic Medicine-Fellow |
| 1998-2004 | American Board of Psychiatry and Neurology, Examiner for the Oral Board Certification Examination |
| 2000-present | Philadelphia Neurological Society |
| 2001-2003 | AIDS Clinical Trial Group (ACTG)-Neurology Subcommittee-Ad Hoc Member |
| 2003-2007 | Member, AIDS Clinical Trial Group (ACTG)-Neurology Subcommittee |
| 2003-2007 | Member, AIDS Clinical Trial Group (ACTG)-Neurology Subcommittee, Neuropathy Focus Group |
| 2001-2003 | Member, Cochrane Collaborative, Neuromuscular Disease Group |
| 2005-2006 | Vice-Chair, Patient Safety Subcommittee, American |

|  | Academy of Neurology |
| --- | --- |
| 2006-2007 | Course Director, Patient Safety Colloquium American Academy of Neurology, Annual Meeting |
| 2007-2009 | Chair, Patient Safety Subcommittee, American Academy of Neurology |
| 2007-2009 | Member, Practice Committee, American Academy of Neurology |
| 2010-present | Member, Committee on Quality and Care Management, Hospital Association of Pennsylvania |
| 2009-present | Member, American College of Physician Executives |

**Editorial Positions:**

| 1999, 2000 | Ad Hoc Reviewer, Muscle & Nerve |
| --- | --- |
| 2004, 2005 | Ad Hoc Reviewer, Neuroscience Letters |
| 2006-2008 | Reviewer, Institute for Safe Medical Practices (ISMP) Newsletter |
| 2013 | Reviewer, Delaware Valley Patient Safety and Quality Award, Health Care Improvement Foundation |

**Committees at Pennsylvania Hospital/University of Pennsylvania Health System:**

| 1997-2000 | Member, Credentials Committee |
| --- | --- |
| 1998-2009, 2010-present | Member, Performance Improvement Committee |
| 1998 | Member, Committee for the Development of the Physical Medicine/Rehabilitation Service Line |
| 1998-1999 | Clinical Champion-Headache Disease Management Program of the UPHS |
| 1999-2001 | Member, Research Review Committee (Institutional Review Board) |
| 1999 | Member, Urgent Admissions Committee |
| 1999-2001 | Member, Restraint Task Force |
| 1999-2001 | Member, Pain Management Task Force |
| 2000-2003 | Chairman, Performance Improvement Committee |
| 2000-2009, 2010-present | Member, UPHS Committee for Clinical Effectiveness and Quality Improvement |
| 1999-2009 | Member, Incidents and Occurrences Committee |
| 2010-present | Chairman, Incidents and Occurrences Committee |
| 1999-2009 | Chairman, Patient Safety Steering Committee |
| 2001-2004 | Member, Environment of Care Committee |
| 1999-2009 | Member, Administrative Policy Review Committee |
| 1999-2009 | Co-Chairman, Environment of Care/Safety Committee |
| 1999-2009 | Member, Sunrise Implementation Steering Committee |
| 1999-2009 | Chairman, Workflow/Clinical Transformation |

Daniel M. Feinberg, M.D., FAAN

Page 5

| | |
|---|---|
| | Subcommittee of the Sunrise Implementation Steering Committee |
| 2006-2009 | Quality Improvement Operations Committee |
| 2005-2009 | Chairman, UPHS Patient Safety Officers and Directors Committee |
| 2007-2009, 2010-present | Member, UPHS Clinical IT Governance Committee |
| 2007-2009 | Member, UPHS Inpatient EMR Oversight Committee |
| 2007-2009 | Chair, UPHS Inpatient EMR Operations Subcommittee |
| 2007-2009 | Chair, Medical Informatics Committee Pennsylvania Hospital |
| 2009, 2013- | Member, Magnet Advisory Board Pennsylvania Hospital |
| 2010-2011 | Member, Chair of Emergency Medicine Search Committee |
| 2010-present | Member, UPHS Transitions Executive Steering Committee |
| 2010-2013 | Member, Epic Optime Steering Committee |
| 2010-present | Member, UPHS Malpractice Oversight Committee |
| 2011-present | Member, Internal Advisory Board, Penn Medicine Center for Evidence-Based Practice |
| 2011-present | Member, Residency and Fellowship Position Allocation Committee |
| 2010-present | Chair, Graduate Medical Education Committee, Pennsylvania Hospital |
| 2010-present | Member, UPHS Graduate Medical Education Committee |
| 2011-present | Member, UPHS Quality Analytics Steering Committee |
| 2012-2014 | Member, CPUP Clinical Operations, Patient Experience Subcommittee |
| 2014-present | Co-chair, Penn Chart Clinical Oversight Committee |
| 2014-present | Chair, Penn Chart Senior Physicians Advisory Commmittee |
| 2014-present | Member, Academic Clinician Advisory Committee |

## Self-Report of Teaching

1. Attending Neurologist on Consult/Inpatient Service-Pennsylvania Hospital        1997-2009, 2010-present
2. Electromyography instruction for rotating Neurology Residents        1997-2000
3. Physical diagnosis  Course 101        1999-2005
First year medical students-Neurological examination
4. Brain and Behavior Course        1999-2005, 2013
First year medical students-Clinical vignettes
5. Attending Neurologist, Neurology Residents' Clinic, Hospital of the University of Pennsylvania   2002-2009
6. Lecturer, Department of Medicine Intern Lecture Series, Pennsylvania Hospital,  Neurological Emergencies, Lumbar Puncture, Patient Safety, 2002-2009, 2010-present

Daniel M. Feinberg, M.D., FAAN
Page 6

7. Lecturer, Departments of Obstetrics and Gynecology, Pathology and Radiology, Pennsylvania Hospital, Patient Safety, 2002-2009

**Lectures by Invitation:**

| | |
|---|---|
| March, 1997 | "Intensive Review of Electromyography" EMG Case Presentations Harvard Medical School Boston, MA |
| December, 1997 | "Muscle Attack," Medical Grand Rounds, Pennsylvania Hospital |
| May, June 1999 | Stroke/TIA and Headache Disease Management Program Roll-outs, University of Pennsylvania Health System |
| May, 1999 | Sharing Practices: "Approach and Processes in Stroke Management," VHA East Coast Stroke Forum, East Windsor, NJ |
| November, 1999 | "Approach to Peripheral Neuropathy," Medical Grand Rounds, Pennsylvania Hospital |
| December, 1999 | "Approach to Peripheral Neuropathy," Medical Grand Rounds, Nazareth Hospital, Philadelphia, Pennsylvania |
| May, 2000 | "Neurological Disease Management in Action," Annual Meeting of the American Academy of Neurology, San Diego, CA |
| May, 2000 | "HIV-associated Peripheral Neuropathy," Project Teach, Philadelphia Fight, Philadelphia, PA |
| May, 2000 | "Approach to Peripheral Neuropathy," Medical Grand Rounds, Graduate Hospital, Philadelphia, PA |
| April, 2001 | "Introduction to ALS," Managing ALS Conference, Fort Washington, PA |
| November, 2001 | "Safety First at the Nation's First," Annual Meeting of the Professional Staff, Pennsylvania Hospital |

Daniel M. Feinberg, M.D., FAAN
Page 7

| | |
|---|---|
| April, 2002 | "Culture Change in Patient Safety,"<br>Patient Safety Symposium, Annual Meeting of the<br>American Academy of Neurology, Denver, CO |
| May, 2002 | "Neurosurgical Imposters,"<br>Grand Rounds<br>Department of Neurosurgery<br>University of Pennsylvania |
| September, 2003 | "Safety First at the Nation's First,"<br>Annual Meeting of the Professional Staff,<br>Pennsylvania Hospital |
| December, 2003 | "Above All, Do no Harm"<br>Grand Rounds, Department of Medicine<br>Pennsylvania Hospital |
| December, 2003 | "Above All, Do no Harm"<br>Grand Rounds, Department of OB-Gyn<br>Pennsylvania Hospital |
| October, 2004 | "Patient Safety for Psychiatrists"<br>Grand Rounds, Department of Psychiatry<br>Pennsylvania Hospital |
| November, 2004 | "Neurosurgical Imposters"<br>Grand Rounds, Department of Neurosurgery<br>University of Pennsylvania |
| January, 2005 | "Fumbles and Foibles"<br>Grand Rounds, Department of Medicine<br>Pennsylvania Hospital |
| March, 2005 | "The History of Myasthenia Gravis"<br>Grand Rounds, Department of Neurology<br>Hospital of the University of Pennsylvania |
| April, 2005 | "Vulnerable Venues: Radiology and Lab"<br>Patient Safety Symposium<br>Annual Meeting of the American Academy of Neurology<br>Miami, Florida |
| May, 2005 | "Fumbles and Foibles"<br>Grand Rounds, Department of Obstetrics and Gynecology<br>Pennsylvania Hospital |

Daniel M. Feinberg, M.D., FAAN

July, 2005     "Neurological Emergencies"
          Department of Medicine-Core Conference Series
          Pennsylvania Hospital

March, 2006     "Health Literacy 101"
          Grand Rounds, Department of Medicine
          Pennsylvania Hospital

April, 2006     "Communication in Patient Safety: It's a No Brainer"
          Patient Safety Symposium
          Annual Meeting of the American Academy of Neurology
          San Diego, California

July, 2006     "Neurological Emergencies"
          Department of Medicine-Core Conference Series
          Pennsylvania Hospital

December, 2006    "Approach to Myopathies"
          Department of Rehabilitation Medicine
          Hospital of the University of Pennsylvania

February, 2007    "Localization Anyone?"
          Grand Rounds, Department of Neurosurgery
          University of Pennsylvania

March, 2007     "Patient Safety 2007"
          Grand Rounds, Department of Medicine
          Pennsylvania Hospital

April, 2007     "Patient Safety Colloquium"
          Annual Meeting of the American Academy of Neurology
          Boston, Massachusetts

October, 2007    "Patient Safety 101 for Neurologists"
          Meeting of the Pennsylvania Neurological Society
          Philadelphia, Pennsylvania

April, 2008     "Measurement:  A Key Element in Patient Safety"
          Patient Safety Colloquium
          Annual Meeting of the American Academy of Neurology
          Chicago, Illinois

June, 2008     "Patient Safety 101 for Neurologists"
          Grand Rounds, Department of Neurology

University of Pennsylvania

| | |
|---|---|
| January, 2009 | "Patient Safety for Neurosurgeons"<br>Grand Rounds, Department of Neurosurgery<br>University of Pennsylvania |
| June, 2009 | "Health Literacy"<br>Grand Rounds, Department of Neurology<br>University of Pennsylvania |
| November, 2009 | "Neuromuscular Complications of HIV"<br>Pennsylvania/Mid-Atlantic AIDS Education and Training<br>Center, Health Federation of Philadelphia |
| March, 2010 | "Patient Safety 101"<br>Professional Staff Meeting<br>Mercy Health System<br>Philadelphia, PA |
| October, 2010 | "Patient Safety in the Era of Health Reform"<br>Symposium on Health Reform<br>Drexel University School of Law<br>Philadelphia, PA |
| November, 2011 | "Patient Safety 101 for Neurologists"<br>Grand Rounds, Department of Neurology<br>Penn State University College of Medicine<br>Hershey, PA |
| May, 2011 | "Navigating Never Events"<br>Healthcare Summit<br>National Constitution Center<br>Philadelphia, PA |
| July, 2011 | "Neurological Emergencies"<br>Department of Medicine-Core Conference Series<br>Pennsylvania Hospital |
| January, 2012 | "Blueprint for Quality and Safety"<br>Grand Rounds, Department of Medicine<br>Pennsylvania Hospital |
| July, 2012 | "Neurological Emergencies"<br>Department of Medicine-Core Conference Series |

Daniel M. Feinberg, M.D., FAAN
Page 10

Pennsylvania Hospital

| | |
|---|---|
| April, 2013 | "What is Quality?"<br>Keynote Address: Performance Improvement in Action<br>Penn Medicine Academy<br>University of Pennsylvania Health System |
| July, 2013 | "Neurological Emergencies"<br>Department of Medicine-Core Conference Series<br>Pennsylvania Hospital |
| July, 2014 | "Neurological Emergencies"<br>Department of Medicine-Core Conference Series<br>Pennsylvania Hospital |

## Clinical Research:

| | |
|---|---|
| 1999-2000 | Principal Investigator<br>"A Multicenter, Double-Blind, Randomized, Placebo-Controlled Evaluation of Lamictal in Adult Subjects with HIV-Associated Peripheral Neuropathy." |
| 1999-2003 | Co-investigator<br>The ALS Patient Care Database |
| 2000-2001 | Co-investigator<br>Botulinum Toxin Type A as a Treatment for Siallorhea in ALS and Parkinson's Disease |
| 2001-2003 | Principal Investigator<br>Pathophysiologic Study of Development of Distal Symmetrical Polyneuropathy in Individuals with Advanced HIV-1 Infection and Prior Antiretroviral Exposure.  A Study of the Adult AIDS Clinical Trial Group, sponsored by The National Institute of Allergy and Infectious Diseases and the Neurological AIDS Research Consortium |
| 2004-2005 | Principal Investigator<br>A randomized, double-blind, placebo-controlled, multicenter, dose ranging study to evaluate the efficacy and safety of prosaptide over 6 weeks of treatment for the relief of neuropathic pain associated with HIV-1.  A collaborative study sponsored by the Neurological AIDS Research Consortium, Savient Pharmaceuticals, and the Adult AIDS Clinical Trials Group |
| 2006-2007 | Principal Investigator<br>A randomized, double-blind, placebo-controlled, parallel-group, multi-center trial |

Daniel M. Feinberg, M.D., FAAN
Page 11

of pregabelin versus placebo in the treatment of neuropathic pain associated with HIV neuropathy (Pregabelin A0081066).

## Bibliography:

### Research Publications, Peer Reviewed:

Kelley RI, **Feinberg DM**, Segal S. Galactose-1-phosphate uridyl transferase in density-fractionated erythrocytes: Studies of normal and mutant enzymes. **Hum Genet** 1989; 82:99-103.

**Feinberg DM**, Weidenheim K, Spiro AJ. Distinct light microscopic changes in HIV-associated adult-onset nemaline myopathy. **Neurology** 1998; 50:529-531.

McCluskey LF, **Feinberg DM**, Bird SJ. Case of the Month: Suprascapular neuropathy related to a glenohumeral joint cyst. **Muscle Nerve** 1999; 22(6):772-777.

**Feinberg DM**, Preston DC, Shefner JM, Logigian EL. Amplitude-dependent slowing of conduction in amyotrophic lateral sclerosis and polyneuropathy. **Muscle Nerve** 1999; 22:937-940.

McCluskey LF, Bird SJ, **Feinberg DM**. "Pseudo-conduction block" in vasculitic mononeuropathy multiplex is related to focal axonal conduction failure. **Muscle Nerve** 1999; 22(10):1361-1366.

Varrato J, Siderowf A, Damiano P, Gregory S, **Feinberg D**, McCluskey, L. Postural change of forced vital capacity predicts some respiratory symptoms in ALS. **Neurology** 2001; 57:357-359.

Varrato J, Damiano P, Siderowf A, Gregory S, **Feinberg D**, McCluskey LF. Postural change of forced vital capacity predicts some respiratory symptoms in ALS. **ALS and other Motor Neuron Disorders** 2001: 2(suppl 2): 7-8.

Glick TH, Rizzo M, Stern BJ, **Feinberg DM**. Neurologists for Patient Safety: Where we stand, time to deliver. **Neurology** 2006; 67:2119-2123.

### Published Abstracts :

Munger BL, Jones TE, Morohunfola K, **Feinberg D**, Mauger A, Saxod R. Expansion of sensory dermatomes following experimental neural lesions and in subjects with Spina Bifida: Trophic interactions of afferent nerves and their cutaneous targets. **Society for Neuroscience Abstracts** 1990; 16:141.4.

Munger BL, Jones TE, Morohunfola K, **Feinberg D**, Mauger A, Saxod R. The

impact of neural lesions on the pattern of cutaneous appendages in chicken embryos and opossum pups. **Anat Rec** 1991; 229(4):61A.

**Feinberg DM**, Munger BL. The production of cryptotia in opossum pups following lesions of the trigeminal ganglion. **Society for Neuroscience Abstracts** 1991; 17:449.9.

**Feinberg DM**, Herskovitz S, Weidenheim K, Liebman J. HIV-associated adult-onset nemaline myopathy. **Neurology** 1996; 46:A465.

Jacobs BS, **Feinberg DM**, Katz PM. Bilateral horizontal and vertical gaze palsies in an alert patient with vertebral artery dissection. **Neurology** 1996; 46:A460.

**Feinberg DM**, Preston DC, Shefner JM, Logigian EL. Amplitude-dependent slowing of motor nerve conduction in amyotrophic lateral sclerosis and axonal neuropathy. **Muscle Nerve** 1997; 20(8):1064-65.

Wang AK, Rutkove SB, Levy M, **Feinberg DM**, Preston DC, Raynor EM. Involvement of the superficial peroneal nerve in common peroneal neuropathy. **Muscle Nerve** 1997; 20(8):1070.

**Feinberg DM**, Preston DC, Simuni T, McCluskey L. Normocalcemic tetany. **Neurology** 1998; 50(4)(supplement 4):A305.

**Feinberg DM**, Herskovitz S, Liebman J, McCluskey LF. Heroin-associated plexopathy. **Muscle Nerve** 1998; 21(11):1568.

McCluskey LF, Emery C, Jameson D, **Feinberg DM**. Relapsing and remitting chronic inflammatory demyelinating polyneuropathy with oculomotor and abducens palsies and magnetic resonance imaging enhancement of the abducens and trigeminal nerves. **Muscle Nerve** 1998; 21(11):1574-75.

McCluskey LF, Bird SJ, **Feinberg DM**. "Pseudo-conduction block" in vasculitic mononeuropathy multiplex is related to focal axonal conduction failure. **Muscle Nerve** 1998; 21(11):1590.

McCluskey, LF, Gregory S, **Feinberg D**, Varrato, J. Postural Change of Forced Vital Capacity Correlates with Respiratory Symptoms in ALS. **Neurology** 2001; 56(supplement 3):A198.

## Editorials, Reviews, Chapters:

**Feinberg DM.** Re-designing graduate medical education-location and content. **NEJM** 1996; 335(19):1459.

**Feinberg DM.** Financial influences on career choices in neurology. **Ann Neurol** 1997; 41(2):283-84.

**Feinberg DM.** Peripheral neuropathy. **Neurology** 1997; 48(4):1140.

**Feinberg DM**, Logigian EL. Acquired axonal neuropathies. In: Gilchrist JM, ed. Prognosis in Neurology. Boston: Butterworth-Heinemann: 1998.

**Feinberg DM**, Spiro AJ, Weidenheim K. Distinct light microscopic changes in HIV-associated nemaline myopathy. **Neurology** 1999; 53(1):241-242.

**Feinberg DM**, Preston DC. Mononeuropathies. In: Evans RW, ed. Diagnostic Testing in Neurology. WB Saunders: 1999.

**Feinberg DM**. Reflex sympathetic dystrophy. **NEJM** 2000; 343(24): 1811.

**Feinberg DM**. Will neurology residents with large student loan debts become academicians? **Neurology** 2002; 59(5): 789.

Weber, M, **Feinberg D**. Treatment of cramps in ALS and motor neuron disease. [Protocol] **Cochrane Neuromuscular Disease Group** *Cochrane Database of Systematic Reviews. 3, 2003.*

Huang JH, **Feinberg DM**, Zager EL. Comments: Outcomes of cubital tunnel surgery among patients with absent sensory nerve conduction. **Neurosurgery** 2004; 54(4): 895-96.

**Lay Press:**

"Patient Safety Authority Data Emerges." **Physician's News Digest**, June 2005.

"Prescription for Preventing Common Medication Errors," **Neurology Now**, March/April, 2006.

"Why an Apology Goes a Long Way When Medical Errors Occur," **Neurology Today**, November 21, 2006.

"Increased Adverse Side Effects Reported to FDA-Pain Drugs and Immunomodulary Drugs Among Most Frequently Fatal." **Neurology Today**. November 6, 2007.

"When Colleagues Err, What to Tell Patients? A Report Offers Guidance on Disclosure." **Neurology Today**, December, 5, 2013.

*Daniel M. Feinberg, M.D.*
*P.O. Box 670*
*Moorestown, NJ  08057*

**Fee Schedule**

This is the fee schedule for neurological expert services:

1. Neurological Examination                                    $1,000 (prepayment required)
2. Record review and report                                   $350/hour (retainer based upon file)
3. Deposition (up to three hours, $500/hr after)   $2,500
4. Live trial testimony, including travel time          $3,500 for up
                                                                              to ½ day
                                                                              $5,000 for more than ½  day

Neurological examination

The neurological examination will take place in my office at Pennsylvania Hospital at
**330 South Ninth Street, Philadelphia, PA  19107, on the third floor**.  If an
examination is postponed or cancelled within 3 business days of the scheduled
time/date, the full fee is retained.  If the examination is postponed or cancelled between
4 business days and 10 business days of the scheduled time/date, 50% is retained.

Medical records and documents should be sent to:

**Daniel M. Feinberg, MD**
**P.O. Box 670**
**Moorestown, NJ  08057-0670**

Record review and live/videotaped testimony fees must be pre-paid and will be billed
under the tax ID number, 26-4466537.

If the patient does not appear for the examination without cancelling three (3) business
days prior to the examination, the examination fee will be retained.  If the patient
appears for the examination more than 30 minutes late, the examination will not be
performed and the fee will be forfeited.

If a deposition or trial appearance is postponed or cancelled for any reason within two
weeks of the scheduled date, the full fee is retained.  If testimony is postponed or
cancelled more than two weeks in advance of the scheduled date, the fee will be
refunded or credited.

If your office needs to speak with me further, please contact me at 215-829-7556.

Sincerely yours,

Daniel M. Feinberg, M.D., FAAN
*Diplomate of the American Board of Psychiatry and Neurology*
*Certified in Adult Neurology*

**EXHIBIT C**

## LYNN M. LEVINE, Ed.D.
Licensed Professional Counselor
102 Browning Lane - Bldg. A, Suite 3
Cherry Hill, NJ 08003

Telephone: (856) 354-0330
Fax        (856) 354-0360
www.careerandlifeoptions.com

Correspondence to:
P.O. Box 361
Cherry Hill, NJ 08003

March 23, 2015

Martin A. Krolewski, Esq.
Nicholas J. Panarella, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NJ 10178

RE:    Roy Eisner

**REASON FOR REFERRAL:**    Mr. Roy Eisner was referred for evaluation in order to assess overall vocational capacities.

**AGE: 58**
**D.O.B.: 11/25/56**
**DATE OF EVALUATION: 1/28/2015**
**AGE AT INJURY: 51**
**DATE AND NATURE OF INJURY: Mr. Eisner stated that on April 8, 2008, at approximately 5:45 a.m., he was assaulted by former Circuit City employee James O'Connell in the Circuit City parking lot.**

## EVALUATION METHODOLOGY:

- Review of Roy Eisner's earnings and work history through tax forms, information derived from documentation furnished by the evaluee (Responses to Interrogatories, etc.) deposition testimony, and direct interview on January 28, 2015.

- Review of medical history, treatment and current status.

- Vocational testing

- Independent verification of previous and potential job titles, through work history, and associated vocational characteristics, through the *Dictionary of Occupational Titles* (U.S. Department of Labor, *Standard Occupational Codes* (U.S. Department of Labor), and *Occupational Outlook Handbook, 2014-2015* (U.S. Department of Labor).

- Discussion of Vocational Options and Current Vocational Status.

## DOCUMENTS REVIEWED FOR THIS EVALUATION

- Vocational-Economic Loss Report by Robert P. Wolf, Ed.D., MBA (deceased)

- Plaintiff Roy Eisner's Answers to Debtor's First Request for Admissions, First Set of Interrogatories

- JoAnne Eisner's Answers to Debtor's First Request for Admissions

- Occupational Therapy and Rehabilitation Services, John Kirby OTR/L, Evaluation Date: 6/23/2008

- H. Gray Broughton, M.Ed., CRC, CCM, CRP – Vocational Report, December 18, 2014

- Tax Returns 2004 through 2013; W-2's for 2004 through 2008

- Spirit Delivery Personnel File, including Plaintiff Work History, Resume, and Employee Evaluation

- Victim Impact Statement

- Workers Compensation Questionnaire

- Depositions of Roy Eisner: Vol. I.- 1/13/2015 and Vol. 2- 1/14/2015

- Medical Records and Reports including Bensalem Medical Practice, Bensalem Chiropractic, Frankford Hospital, Medical Imaging Associates, Norman B. Stempler, D.O., Delaware Valley Orthopaedic Assoc. (Dr. Herbert Stein), Clinical Pain Management Assoc., Gastroenterologists Limited, Caine Chiropractic, Aria Health, Eusebio R. Nunez, M.D., Tri County Eye Physicians & Surgeons, MidAtlantic Retina, Dr. Brad Shamis, Gladys S. Fenichel, M.D., Bensalem Medical Practice Physical Therapy, Robert M. Toborowsky, M.D., and David J. Axelrod, M.D.

## RESULTS OF INTERVIEW

Background information was obtained from Mr. Roy Eisner during the course of the three-hour evaluation meeting held on January 28, 2015.

In Attendance: Mr. Eisner and Ms. Lauren Siciliano, an Independent Paralegal who was hired by Mr. Eisner's counsel to attend the meeting and to take notes. Mr. Eisner and Ms. Siciliano arrived and departed separately.

Observations and Behavior:

Roy Eisner arrived at the meeting by taxi. He appeared of normal weight and was neatly groomed, although he left his outer jacket on for the meeting, as he said he is usually cold. Mr. Eisner reported that his height is 5'9" and that his weight pre-injury was approximately 185

pounds. He indicated that he had lost weight in recent years, but stated that he has regained weight to approximately 150 pounds, at this time.

This evaluator noted that Mr. Eisner spoke fluently and articulately, without apparent word-finding difficulty or lapses in conversational ability.

## PERSONAL DATA

Family Background, per report of evaluee:

Roy Eisner was born in Philadelphia. His mother graduated from high school, was a homemaker, and currently lives with Mr. Eisner's sister. Mr. Eisner's father, deceased in 1993, completed high school and was a field serviceman for a fire engine manufacturer.

Siblings:
One brother, deceased.

A sister, Holly, age 67, is a high school graduate who Mr. Eisner "thinks is not working." Mr. Eisner stated that he has not been in touch with his mother and sister since the death of his father.

Marital Status:

Mr. Eisner has been married for 29 years to Joanne Eisner, age 56, D.O.B. 4/11/58. Mr. Eisner was previously married, from 1977 to 1982, and has a daughter, age 37, from that marriage. He legally adopted Frank, age 33, Joanne Eisner's son from her first marriage. Mr. Eisner stated that he does not have financial obligations for family members other than his wife.

## DESCRIPTION OF INJURY

Medical records from the Lower Bucks Hospital Emergency Department indicated "Alleged Assault" of 4/08/08, with a Primary Diagnosis of "920- Contusion of face/scalp/neck except eye" and Secondary Diagnoses of "9221-Contusion of chest wall, 87200- Uncomplicated open wound of external ear unspecified, and E9600- Unarmed fight/brawl." Mr. Eisner reports neck and back pain, headaches, anxiety, and depression.

## PRIOR MEDICAL HISTORY

In May 2000, Mr. Eisner was involved in a rear-end MVA in which he sustained minor lumbar strain and sprain, which he indicated was fully resolved after six months.

## ACTIVITIES OF DAILY LIVING

The Eisners reside in a town house located at 5078 S. Hunters Court, Bensalem, Pennsylvania. Mr. Eisner said that he does not have trouble with the steps that lead to the basement, living room or basement areas.

In terms of pre-injury activities, Roy Eisner reported that, as his wife has had multiple medical issues, he was responsible for all of the vacuum cleaning and food shopping, as well as mowing the small lawn and other maintenance duties. He visited with his family on the weekends and was engaged in writing a book on the history of Philadelphia radio, which he "hopes to finish."

Mr. Eisner now reports that he "does as much as possible to help [his] wife with the cleaning. [He] does all the food shopping, cuts the grass, and cleans up after four cats with her help." Mr. Eisner said that he still visits with the family, including his son Frank and grand-daughter Audra, but they live "a distance away." He reported that his "wife has neck and back issues [among other medical problems] and [he] is in A-1 health compared to her." Paid household services have not been employed to date. Both Mr. and Mrs. Eisner receive Social Security Disability payments.

## EDUCATION AND TRAINING

Roy Eisner reported that he graduated from Council Rock High School in 1975. He indicated that he maintained a B average and preferred English and Journalism. Mr. Eisner experienced some difficulty with mathematics, but did not fail any classes in this subject. He was involved in the school's radio and television stations from his sophomore year onward.

Despite his interest in broadcasting, Mr. Eisner stated that he did not continue with his formal education following high school graduation as he "realized that there were radical changes in the broadcast industry." He did apply for and receive his FCC Broadcasting License, at some point, and, in 2002, studied for and obtained a Pennsylvania real estate salesperson's license. However, he "realized that it would not be cost effective to work in that field and the license was allowed to expire."

Mr. Eisner maintains a regular driver's license, with vision corrected by contact lenses.

## EMPLOYMENT HISTORY

## EMPLOYER WHEN INJURED:

At the time of his injury, Roy Eisner was employed as a Location Manager (Supervisor of Delivery Drivers) by Spirit Delivery and Distribution Inc.. He began employment in April 2004 and worked until April 2008.

According to Mr. Eisner's account, his specific responsibilities included:

- Supervising the loading of trucks in the morning by the drivers
- Conducting twice weekly meetings with the drivers to resolve any current issues
- Setting up routes for the following day

- During the work day, handling frequent issues pertaining to the deliveries, such as placement problems or delivery delays
- Receiving ongoing notices of new orders and adjusting routes accordingly

Mr. Eisner estimated that he spent 90% of his time on the computer and on the telephone with customers, and 10% in direct contact with the drivers. He did not lift objects or do any physical work. This employment would therefore be considered sedentary in nature (see exertional definitions below). Mr. Eisner described himself as "self-motivated and a good fit for the job...[as demonstrated by] rapid wage growth with Spirit Delivery." His ending salary was $55,000, as indicated by tax forms and the Spirit personnel file. Mr. Eisner also received medical and dental coverage, for which he paid 25% of the premium. He was not involved in any other part-time work at the time of the incident.

<u>Documents in Personnel File obtained from Spirit Delivery and reviewed by this evaluator:</u>

- References to pay increases from starting salary, effective 4/9/04 of $35,000 per year, to increases to $55,000 ($26.4423 per hour), effective 10/12/06.

- Application for employment dated 3/31/04.

- Background Investigation indicating no criminal convictions in State of Pennsylvania.

- Documentation of Individual Progress Discussion with Management Employees- status appears to be satisfactory.

- Copy of resume and driver's license of Roy Eisner

- Letter from PA Dept. of Labor and Industry to Spirit Delivery, stating, on the first page, that "the claimant states that he/she last worked for you on 3/03/2008 and is unemployed because he was discharged." The content of this letter conflicts with Mr. Eisner's reported employment through April 2008.

<u>Tax Returns</u>

According to the W-2's provided by Spirit Delivery and Distribution, Roy Eisner was paid $52,0801.26 by this company for the last full year of employment, 2007, and $18 204.13 for the partial year, 2008.

**PREVIOUS EMPLOYERS AND WAGES**

Mr. Eisner's work chronology was constructed via his verbal account and through deposition testimony. He indicated that, upon graduation from high school, he held a variety of retail positions, with the longest in the furniture department at Woolco in Langhorne, Pennsylvania. Mr. Eisner said that he began this job as a salesman, but was "promoted to manager within 2 months."

From 1978 to 1980, Roy Eisner worked as a Loan Processor and Credit Investigator for Public Finance Company. His work also included skip tracing and debt collection.

From 1980 to 1986, Mr. Eisner served as the sole Dispatcher for Marck Express, in locations that moved from Morrisville, PA, to King of Prussia, and then to Lansdale. He was responsible for coordinating the over the road hauling services of this company for the eastern United States region. Mr. Eisner stated that "I liked the job and it got me into the trucking industry. I took on most of the management of the office and got new business for the company."

In October 1986, Marck began to move to an "agent format," but Mr. Eisner "didn't feel ready [to work in this capacity]." He moved to McHugh Brothers in Pendell, PA where he became the Trucking Manager, with responsibility to dispatch drivers on local jobs, to develop new business, and to visit existing customers to solicit hauling jobs, such as deliveries of pipes and nursery products. As a result of the experience gained in this position, Mr. Eisner started his own business in 1988, under the name of RJ Trucking (RJ Express, Inc.) He recalled that he "took the nursery and pipe hauling accounts" with him and also obtained some business with former accounts from Marck Express. Mr. Eisner reported that he used preexisting contacts and also created a new network of independent truck drivers. He was involved in diverse facets of the business, including:

- Business development, which expanded to obtaining new accounts in the areas to which deliveries were made, such as South Carolina, so as to create a "reverse flow" of trucking materials on the return trip.

- Dispatch

- Solicitation of new accounts

- Obtaining permits for oversize loads in multiple states

- Monthly inspection of independent trucks

- Collection of unpaid debts from clients, either over the telephone or in person

In this trucking business, Mr. Eisner "dealt mainly with manufactured items." The business was housed in his basement, with a separate phone line, and he would leave paperwork and payments for his drivers in a mailbox store that was located down the street. As the years progressed, he found that "a lot of manufacturers had moved out of the country, such as steel fabricators. [He] felt that he would have to radically change the customer base and that RJ was not big enough to compete in a new market. [He] also wanted to get out of running [his] own business." Therefore, he began "wrapping up" in 2002 and 2003.

Mr. Eisner stated that, in 2003, he "tried to do real estate, but did not make any sales." He found the position at Spirit Delivery through an advertisement for a trucking manager in the Bucks County Times, and started work for this company in April 2004.

## POST-INJURY OCCUPATIONAL STATUS

According to his verbal report, Mr. Eisner had seen a decline in the Circuit City business, prior to the date of the assault, as customers were able to carry away the lighter flat screen TVs that were becoming the norm. He had been "offered a position in early 2008 as a home delivery manager for Williams Sonoma at a salary of $55,000," but "had declined the job and had planned to ride it out with Spirit."

Mr. Eisner stated that he had planned to go back to work for Spirit, following his injury. He reported to this evaluator that "I was concerned about what Spirit would do after Circuit City went under. I was always looking in the paper and online, but my wife said that I wouldn't be able to do the work. Today [the day of the evaluation meeting] is a good day, but I will be exhausted tonight." Upon questioning, Mr. Eisner said that he could not recall having made any formal job applications post-injury, although he "may have looked at some postings through Monster.com and probably applied in the same industry." He indicated that he did not obtain any interviews, and engaged in some job search activity as "something to keep [him] from going crazy."

## COMPUTER SKILLS

Mr. Eisner reported that he used a dedicated database software program during his employment with Spirit Delivery. He said that he is currently proficient in Microsoft Office software, including Excel (spreadsheets) and Word (word processing). He stated that he "can learn quickly, can keyboard, and uses email, Twitter, and Facebook."

## ANALYSIS OF WORK EXPERIENCE

Consistent with *The Dictionary of Occupational Titles, The Guide to Occupational Exploration, The O\*Net (Occupational Information Network)*, all publications of the U.S. Dept. of Labor, and Roy Eisner's description of employment, his *pre-injury* work history is classified as follows:

Job Titles:

The closest matches, per U.S. Dept. of Labor job descriptions, for Mr. Eisner's position with Spirit Delivery would be:

I. D.O.T. CODE: **292.137-014 - SUPERVISOR, ROUTE SALES-DELIVERY DRIVERS (retail trade; wholesale tr.) alternate titles:** Dispatcher, route sales-delivery drivers; route supervisor

*\*\*Evaluator note: This job title also includes the activities of supervisors/managers who are in charge of delivery activities by Delivery Drivers who sell products on their routes. Mr. Eisner was responsible for deliveries of products for Circuit City. The drivers did not engage in sales activities and references to sales have been deleted from this job description.*

Supervises and coordinates activities of DRIVERS . . . . (retail trade; wholesale tr.) engaged in...distributing products or services: Plans routes and schedules drivers, vehicles, and deliveries and pickups based on driver, company, and customer information. Records drivers' attendance and time for payroll records. Informs DRIVERS, . . . (retail trade; wholesale tr.) of location of accounts and of collection procedures. . . Oversees loading and dispatching of trucks. . . May collect daily cash receipts

from drivers and record amounts in records. May solicit new accounts. May investigate customer complaints and pay claims for damaged articles. . .   Performs other duties as described under SUPERVISOR (any industry) Master Title. May be designated according to product sold as Supervisor, Newspaper Deliveries (wholesale tr.).

ONET CROSSWALK: 81011 First-Line Supervisors and Manager/Supervisors- Transportation and Material Moving Machine and Vehicle Operators

II.  CODE: **184.167-118**          **OPERATIONS MANAGER (motor trans.)**

Directs and coordinates activities of workers engaged in crating, moving, and storing household goods and furniture: Inspects warehouse facilities and equipment and recommends changes in allocation of space, and crating procedures to WAREHOUSE SUPERVISOR (motor trans.). Purchases moving equipment such as dollies, pads, trucks, and trailers. Plans pickup and delivery schedules for TRUCK DRIVERS, HEAVY (any industry). Answers such inquiries as type of service offered, rates, schedules, and areas serviced. Examines items to be moved, to ascertain approximate weights and type of crating required. Investigates customers' complaints involving such matters as damaged items, overcharges, and delay in shipment, and makes necessary adjustment. Interviews, selects, trains, and assigns new personnel. May call on customers to solicit new business. May prepare cost estimates for clients.

ONET CROSSWALK: 15023D Storage and Distribution Managers

## JOB TITLES IN PRIOR EMPLOYMENT:

## 1986- 2003

CODE: **909.137-010**          **DRIVER SUPERVISOR (motor trans.)**
**(In employed and in self-employed capacities)**

Supervises and coordinates activities of TRACTOR-TRAILER-TRUCK DRIVER (any industry) 904.383-010 and TRUCK DRIVERS, HEAVY (any industry) 905.663-014 engaged in operating motor vehicles to haul materials for motor freight company or in off-highway haulage activities at industrial site. Performs duties as described under SUPERVISOR (any industry) Master Title.

ONET CROSSWALK: 81011 First-Line Supervisors and Manager/Supervisors- Transportation and Material Moving Machine and Vehicle Operators

## 1980 - 1986

CODE: **249.167-014**          **DISPATCHER, MOTOR VEHICLE (clerical)**

Assigns motor vehicles and drivers for conveyance of freight or passengers: Compiles list of available vehicles. Assigns vehicles according to factors, such as length and purpose of trip, freight or passenger requirements, and preference of user. Issues keys, record sheets, and credentials to drivers. Records time of departure, destination, cargo, and expected time of return. Investigates overdue vehicles. Directs activities of drivers, using two-way radio. May confer with customers to expedite or locate missing, misrouted, delayed, or damaged merchandise. May maintain record of mileage, fuel used, repairs made, and other expenses. May establish service or delivery routes. May issue equipment to drivers, such as hand trucks, dollies, and blankets. May assign helpers to drivers.
ONET CROSSWALK: 58005 Dispatchers- Except Police, Fire, and Ambulance

**1978-80, and in own business, 1988 – 2003:**

CODE: 241.367-010                    **COLLECTOR (clerical) alternate titles: bill collector**

Locates customers to collect installments or overdue accounts, damage claims, or nonpayable checks: Visits or phones customer and attempts to persuade customer to pay amount due or arranges for payment at later date... Keeps record of collections and status of accounts.

ONET CROSSWALK: 53508 Bill and Account Collectors

Skill Levels

Mr. Eisner's employment history comprised a variety of semi-skilled to skilled employment levels, in administrative and clerical capacities. Job titles are defined by the U.S. Dept. of Labor according to the highest level of specific vocational preparation. SVP is the amount of time required by a typical worker to learn the techniques, acquire the information and develop the facility for average performance in a specific job-worker situation. Mr. Eisner's work as a Supervisor of Drivers is categorized at Level 7, requiring between two and four years of specific training or preparation, depending upon the job site and the alternate job title, Operations Manager (motor transp. industry) is categorized at Level 6, requiring between one and two years of specific training or preparations. Dispatchers have a lower level of SVP, Level 5, which requires under one year of training, while Bill Collectors are identified as Level 4, or between three and six months of training.

General Educational Development

The general educational development required for each job title is assessed using the United States Department of Labor GED Scale that ranges from a low of 1 to a high of 6. Based on education and prior work history, Roy Eisner has demonstrated, at minimum, reasoning ability up to a level of 4, mathematics ability to a level of 3, and language ability to a level of 4.

Strength Required:

Definitions for physical demands are as follows:

Sedentary work- Lifting 10 pounds maximum and occasionally lifting and/or carrying such articles as books, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing for brief periods of time may be necessary.

Light work - Lifting 20 pounds maximum with frequent lifting and/or carrying of objects weighing up to 10 pounds. Although the weight lifted may be a negligible amount, a job is in this category when it requires walking or standing to a significant degree, or when it involves sitting most of the time with a degree of pushing and pulling or arm and/or leg controls.

Medium work- Lifting 50 pounds maximum with frequent lifting and/or carrying of objects weighing up to 25 pounds.

Heavy work- Lifting 100 pounds maximum with frequent lifting and/or carrying of objects weighing up to 50 pounds.

Very heavy work- Lifting objects in excess of 100 pounds with frequent lifting and/or carrying of objects weighing up to 50 pounds or more.

*Mr. Eisner's work experience is classified within the Sedentary to Light levels of exertion.*

## POST-INJURY PHYSICAL STATUS AS REPORTED BY ROY EISNER

Mr. Eisner stated he can remain seated at a desk for up to 15 minutes at a time, stand for up to 30 minutes, and walk for up to 10 minutes, before he becomes uncomfortable. However, he remained seated for 1 hour 30 minutes for the interview portion of our evaluation, followed by a 5-minute break for an e-cigarette. He then remained in a seated position at a desk for an additional hour and one half of testing, before the end of our session.

According to his verbal account, Roy Eisner experiences headaches, "a couple of times a week, to the point of nausea, as well as daily back pain, that extends from the neck region down to the lower back "except when medications overlap." He reported sexual and sleep dysfunction and said that when he is lying down, his right knee hurts and the pain radiates to the base of his spine, which interrupts his sleep. However, he can sleep "soundly when exhausted."

Mr. Eisner related that he can identify five to seven "bad days" per week, although there may be as many as four "good days." An increase in pain is not necessarily connected to weather conditions, although "going to these appointments" exacerbates the level of pain. His medications include Oxycontin (40 mg. twice daily), Oxycodone ( 15 mg. twice daily for "break through pain"), generic Xanax (1.5 mg. twice daily), Wellbutrin (used pre-injury, but increased to 300 mg. per day), and an acid reflux product.

## PSYCHOLOGICAL STATUS AS REPORTED BY ROY EISNER

Roy Eisner reported that he meets with a psychologist, Dr. Brad Shamis, for a psychotherapy session every three weeks in order to treat for PTSD and the "aftermath" of his injury. Mr. Eisner stated that he does not think that he is depressed, but that he is "frustrated and worried." He said that he dislikes not having control over his life and "resents the present adversarial situation." He also indicated that there were "problems in the marriage post-injury, but the situation is beginning to improve." Although he visits regularly with his six-year old granddaughter, he "can't go as much as [he] would want, given the exhaustion." Mr. Eisner said that he drives one hour to pick up his granddaughter from day care in Sellersville every other Friday, brings her back to his home in Bensalem for a visit, and then returns her to his son Frank in Warminster at 7 p.m.

## MEDICAL DOCUMENTATION AND REPORTS

**Lower Bucks Hospital**- admit date:  4/08/2008, discharge date:  4/08/2008

Primary Diagnosis:  Contusion of face/scalp/neck except eye

Secondary Diagnoses: Contusion of chest wall, Uncomplicated open wound of external ear, unspecified, Unarmed fight/brawl.
Severity of Pain:  Mild
Social Hx: Smoker, Alcohol
General Appearance:  Appears well, alert.
Neck:  Non-tender, painless ROM.
Respiratory:  Rib tenderness
Abdomen:  Non-tender
Neuro:  Oriented x3, Neuro grossly intact, Sensation and motor normal
Psych:  Mood/affect normal
Back:  no CVA tenderness, no vertebral tenderness
Extremities:  Atraumatic, Pelvis stable, Hips non-tender, Normal ROM
No loss of consciousness

Tri-County Eye Physicians & Surgeons

4/9/08

"Feels like he is looking thru screen door moving around."

**Frankford Hospital**, 4/21/2008:

Diagnostic Radiology:

Cervical spine  - Indication:  Pain.  Impression:  Mild degenerative changes

Thoracic spine – Indication:  Pain.  Impression:  No compression fracture or dislocation.

**Workers Comp Questionnaire**, 4/21/08

Mr. Eisner reported pain in the neck and back that had prevented him from returning to work.  He described pre-injury employment as an "Operations Manager" that included Light lifting, sitting and walking.

**Medical Imaging Associates**

5/21/2008

MRI Lumbar spine:  Mild degenerative disc disease at L4- L5 and L5-Si, with small superimposed disc protrusions as described.  There is mild narrowing of the left L4-L5 and right L5-S1 neural foramina.

MRI Cervical Spine:  Normal examination of the cervical spine.

## Bensalem Chiropractic Center

Medical records and reports regarding Mr. Eisner for injuries sustained in a work-related incident.

8/8/08: Evaluation note.  Prior treatment at this office from 11/13/00 until 7/06/01, until discharge with complete absence of symptoms.  Subjective Complains include neck, middle and low back pain, persistent headache, sleep loss, clicking of the joints on motion of his lower neck. Diagnoses of post-traumatic cervical sprain/strain, thoracic sprain/strain, lumbar sprain/strain, cervicogenic headache syndrome, vertebrogenic pain syndrome, segmental dysfunction (multiple levels), myofascial pain syndrome.  Recommended treatment plan for 2 weekly visits for approximately 6 weeks.

11/01/08 Note:  14 treatment visits from 8/18/08 through 10/29/08.  Concurrent treatment at his medical doctor's office.  "Based on his symptoms and clinical presentation today, he is approximately 50% improved compared to 8/18/08.  The initial treatment goal of 60% improvement was not achieved, but 50% is an appropriate outcome and continued chiropractic care is warranted based on the results... Recommended treatment schedule is twice weekly for 4 weeks, then once weekly for 4 weeks, by which time MMI is expected...The prognosis is fair to good, and the updated treatment goals are expected to be met within the specified time frame."

## Bensalem Medical Practice

Progress Notes reviewed from 4/14/08 through 8/27/14.  Chief complaint of 4/14/08 was rib and back pain.  Dr. Kenneth A. Morris provided a certification letter that Mr. Eisner was disabled from work that was transmitted on 4/29/08.  Mr. Eisner received physical therapy through this practice from the end of April through May of that year.  Follow-up visits during 2009 included notations for psychotropic and pain medication management, outside and home-directed physical therapy, and visits to psychologist Dr. Brad Shamis for treatment of major depression.  Ongoing references to cervical and lumbar sprain and strain, PTSD, chronic muscle spasm, and weight loss, with weight loss entries dating from 6/30/09.  Physical therapy services in-house at this practice were resumed in May and June 2009.  Diagnoses of insomnia, psoriasis, depression, and chronic pain were found in notes during 2010.  A diagnosis of COPD was added on 10/04/2010, with a note that Mr. Eisner used "vapor cigarettes;" this diagnosis continues thereafter.  Indication of pain related to bursitis of the left knee was found in notes of 1/3/11.  Notes of 4/27/11 include references to weight loss, increased stress, increased/chronic pain, anxiety and COPD, continuing into 2012.  Stabilization of weight, with some increase, was indicated in notes of July 2012 and thereafter.  In 2013, notes indicated a return to weight loss, ongoing GI concerns (GERD), chronic pain, psoriasis, COPD, depression/anxiety, and anemia.  Weight gain was noted on 2/10/14.  A reference to memory loss was found in notes of 5/7/14, with the question as to whether that was due to "inattention vs. meds."  Weight was stable at that time.  As of last notes received by this evaluator, dated 8/27/14, Mr. Eisner's weight remained stable, with ongoing diagnosis of chronic pain, depression, GERD, and psoriasis.

**Occupational Therapy and Rehabilitation Services, PC., Evaluation by John Kirby OTR/L, 6/23/2008.**

Patient complains of "achiness, tightness and pulling" in neck, and low, mid, and upper back. Patient's description of physical demand as "Office Manager" was in Light level of exertion. Reported Status: "Unable to return to job:

"Patient is limited in areas of lifting, bending and squatting tasks. Patient can benefit from occupational therapy for training in proper body mechanics for activities of daily living and functional tasks to decrease stress at the neck, upper back, mid back and low back regions."

**Eusebio R. Nunez, M.D., Physiatric Consultation, 7/6/2008.**

Evaluation performed by request of Dr. Kenneth Morris. "Impression: Sprain and strain of the myoligamentous supporting structure of the cervical, thoracic and lumbosacral spines, unresolved with associated myositis and stiffness of the related paraspinal muscles. Traumatic myositis of the upper trapezii with active tender points bilaterally. History of multiple contusions. History of closed head injury with posttraumatic headaches. Right eye trauma with decreased vision, under care....The patient will benefit from an ongoing patient physical therapy and rehabilitation program utilizing the different physical therapeutic modalities of deep heat over the affected areas...As the symptoms subside, the patient should embark on a progressive and gentle rehabilitation and exercise program under your supervision..."

**Mid Atlantic Retina, Carl D. Regillo, M.D., 7/15/2008**

"Mr. Eisner suffered blunt trauma to the right eye and left side of his head dating back now nearly three months. He has persistent floaters and decreased vision in the right eye. The floaters could be explained based on the PVD and associated small vitreous opacities. I did not detect a retinal cause for his decreased vision. A fluorescein angiogram and an OCT test were performed and both tests were normal."

**Caine Chiropractic Center**

Treatment notes from 8/18/08 for visits through 9/25/08. As of 9/25/08, "Patient reports good outcome to treatment...Decreased symptoms....Partial restoration of functional ROM ."

**Delaware Valley Orthopaedic Associates LTD, Herbert Stein, M.D., 9/08/08**

In this Independent Medical Examination of Mr. Eisner performed for AIG Domestic Claims, Inc., Dr. Stein listed diagnoses of "multiple contusions and sprain, cervical and dorsolumbar spine and as well as disc degenerative disease, lumbosccaral spine (preexistent to injury of 4/8/08) with small/mild disc bulging at L4-5 and L5-Si with a small left paracentral disc protrusion at L5-S1 as reported by MRI."

Dr. Stein states: "It is my opinion that the degenerative disc disease is not related to the injury of 4/8/08 since the MRI was done only about six weeks post injury. In addition, although he has a small left paracentral disc protrusion, I did not find any abnormalities that would indicate a radiculopathy on objective basis. He has some significant symptom magnification.

*It is my opinion, based on objective findings, he should be able to return to his usual work as a manager for Spirit Delivery."* (Emphasis by this evaluator)

### Gladys S. Fenichel, M.D., 10/8/2008

Dr. Fenichel performed an Independent Psychiatric Examination on 9/02/08, upon the request of AIG Domestic Claims, Inc. This evaluation took place approximately five months post-injury.

In her Summary and Impression section, Dr. Fenichel referenced Mr. Eisner's weekly appointments with Dr. Shamis and that he had "denied a history of psychiatric or psychological treatment before the work injury, although Dr. Morris had prescribed Wellbutrin for 'mild depression.'" Mr. Eisner "reported the experience of disabling pain. The IME report from Dr. Stein noted that Mr. Eisner had degenerative disc disease, not related to the work injury as the MRI completed six weeks after the injury showed degenerative changes. *There were no findings of radiculopathy, but there was significant symptom magnification. Dr. Stein wrote that based on objective findings, Mr. Eisner should be able to return to his usual work as a manager for Spirit Delivery."* (Emphasis by this evaluator)

Dr. Fenichel noted that Mr. Eisner's physical and emotional symptoms, post-injury, appeared "to be increasing rather than decreasing...the event that Mr. Eisner described is compatible with an incident that could give rise to the diagnosis of posttraumatic stress disorder; however it must be noted that Mr. Eisner returned to work at his usual work site for two weeks after the injury. By his report, he left the job because of his physical pain in addition to his report of discomfort at the work site."

Dr. Fenichel indicated that Mr. Eisner was taking Wellbutrin at the time of injury, and that this mediation is not specifically approved for treatment of PTSD. Dr. Shamis' records did not include a treatment plan, and at the time of this evaluation, Mr. Eisner did not report treatment with cognitive behavioral techniques for the anxiety symptoms nor was there a specific desensitization plan to address the "limited zone of comfort."

Recommendations included institution of cognitive behavioral therapy techniques and desensitization. It was Dr. Fenichel's opinion that "*with more aggressive mental health treatment, he should be able to return to work at his normal job site within the next three to four months. At the time of the evaluation, Mr. Eisner described man work skills. It is my opinion that Mr. Eisner would be able to work at a different job site as he continues to receive treatment for the anxiety symptoms he reported."* (Emphasis by this evaluator)

**Clinical Pain Management Associates, Mark Reznik, D.O.**, New Patient Evaluation, 2/12/09

In this evaluation, performed upon referral by Dr. Kenneth A. Morris, Dr. Reznik provides an Impression of cervical and lumbar facet arthralgia, lumbar degenerative disc disease, lumbar disc displacement, and myofascial pain.  He recommends, in addition to existing conservative treatments, a trial of cervical and/or lumbar facet steroid injections.

**Medical Imaging Associates**, MRI Brain, 5/2/10

Impression:  No evidence of acute intracranial abnormality, incidental lesion [which] "probably corresponds to a sebaceous cyst."

**Gastroenterologists Limited, Elliott B. Frank, D.O.**

3/2/2011

"Physical examination revealed the patient to be in no apparent distress.  He was somewhat anxious....normal CBC and chemistry profile...patient should have a screening colonoscopic exam."

3/30/2011

Following colonoscopy, recommendations for changes in diet.

7/13/2011

Recommendations for further screening in follow-up for chronic constipation.

8/1/2011

Evidence of small sliding hiatal hernia.  Medication prescribed.

**Norman B. Stempler, D.O., Board Certified Orthopedic Surgeon**

9/4/2008

Initial evaluation upon referral of Roger Caine, D.C.  Mr. Eisner presented with "neck pain, as well as upper, mid and low back pain."  Recommendations included changing Mr. Eisner's medication from Percocet to a non-narcotic analgesic, instituting use of an anti-inflammatory medication and a muscle relaxant, and continuation of physical therapy and chiropractic treatments and adjustments.  Dr. Stempler opined that, at that time, Mr. Eisner "is disabled from his previous employment" and suggested reevaluation should there be no response to treatment in "the next six to eight weeks."

<u>12/02/14</u>

(Evaluator note: Mr. Eisner returned for his reevaluation appointment six years after the initial evaluation with Dr. Stempler, although Dr. Stempler had recommended a more immediate follow-up meeting.)

Dr. Stempler stated that Mr. Eisner remained symptomatic and "disabled from any physical labor." He does not reference any limitation in a return to prior employment in this Progress Note.

## Caine Chiropractic Center

Treatment notes from Mr. Eisner's return to chiropractic treatment on 4/2/13, at which time Mr. Eisner described his overall health as "very good, other than back problems," which he indicated were constant and "getting worse." He "has the expectation that chiropractic care will help with relief of symptoms." Visits continued through 7/08/13, at which time "an appropriate outcome to treatment [and] partial by appropriate relief of symptoms " were reported by Dr. Caine.

## ARIA Health, X-Ray Knee, 4/24/2013

Impression: Moderate degenerative change of the right knee.

## Brad Shamis, PhD, Pennsylvania Licensed Psychologist

Dr. Shamis indicated that Roy Eisner began psychological treatment with him on April 29, 2008. In a letter to Marshall E. Kresman, Esq. of 5/1/2008, Dr. Shamis stated that Mr. Eisner would require ongoing treatment for Posttraumatic Stress Disorder and it "*is estimated that his return to work will not be until June 16, 2008.*" (Emphasis by this evaluator)

The treatment notes provided for the following sessions are handwritten, and in many instances, difficult to decipher. In his initial treatment plan, to extend through 8/31/08, Dr. Shamis indicated problems including PTSD, Anxiety and Panic, and Depression, with the intended therapeutic intervention of CBT (cognitive behavioral therapy). The expected outcomes were not listed. Progress notes thereafter reference Mr. Eisner's report of his current clinical condition, status, and Dr. Shamis' plan to "provide behavioral therapies." A note of 2/4/11 indicates that Dr. Shamis provided exposure treatment to reduce anxiety, and this treatment "reduced pre-tx distress level of 9 to post-tx level of (indecipherable)....He is assigned homework to go outside and walk about his block daily, increasing distance 5 minutes per day to desensitize from agoraphobia." As of 5/13/11, "patient continues to have poor appetite, daily pain levels in 7-10 range and has anxiety, depression and PTSD symptoms in 7-10 range...provided with cognitive tx."

Ongoing brief visit notes indicate that Mr. Eisner's reported symptoms continued. Each note provides a several line summary of Mr. Eisner's status, but does not identify any specific cognitive behavioral or desensitization techniques that were employed during that session, at least as is evident in the handwritten content. There is no mention of the strategies employed by this therapist, and patient response to same. Mr. Eisner references constant pain in his visits and Dr.

Shamis, as of 9/28/12, states that "his PTSD still profound." A note of 11/30/12 indicates "We worked on cognitive techniques to reduce the psychological effects of the pain," but specifics of this treatment are not provided, i.e. specific exercises or peer-reviewed modalities. No changes in physical or mental status are reported through the end of case notes provided through 11/17/14.

*Evaluator note: Despite the lack of improvement in Mr. Eisner's mental health status during the 8+ years of treatment with Dr. Shamis, this evaluator could not discern any references to referral to psychiatric treatment or to a recognized university or therapeutic center that would specialize in the most up-to-date cognitive behavioral approaches to pain management, and PTSD.*

### Robert M. Toborowsky, M.D., March 17, 2015

In this psychiatric examination of Roy Eisner, requested by counsel for Kelley Drye & Warren, LLP, Dr. Toborowsky performed a document review, and met with Mr. Eisner for 3.5 hours, during which time he obtained a psychiatric and personal history. In his presentation, Mr. Eisner indicated that "Dr. Shamis and Dr. Morris, have told him that he never will work again because he has no endurance." Dr. Toborowsky states that "He said that Dr. Shamis feels that he cannot heal until the pending litigation is resolved, a seemingly contradictory comment."

Dr. Toborosky questioned Mr. Eisner regarding his current and/or persistent medical physical and emotional problems, past medical history, past psychiatric history, and treatment with Dr. Shamis. Mr. Eisner "emphasized that, were it not for his low energy level and his persistent pain, he could reenter the workforce, a disclosure made with conviction ad one at substantial variance with contrary opinions offered by Dr. Shamis...He indicated that even at a certain pain level he could gradually reach the point that would permit him to return to the workforce within six to twelve months."

Following a Mental Status Examination, Dr. Toborosky furnished the following opinions and conclusions:

- Relevant psychiatric diagnoses include a chronic, non-disabling Adjustment Disorder with Anxiety and a Dysthymic Disorder, a chronic, non-disabling, and, in his case, mild to moderate depression.

- [Mr. Eisner] does not suffer from a Post Traumatic Stress Disorder or any other DSM-V psychiatric disorder.

- From a psychiatric standpoint, Mr. Eisner is not disabled and capable of returning to the workforce without any limitations or restrictions.

- His psychological symptoms and complaints are neither intense, severe or pervasive, and not associated with any significant functional impairment, nor do they prevent him from participating in and deriving pleasure and satisfaction from numerous activities.

- "Regrettably, he apparently has adopted a lifestyle of disability, one reinforced by prominent secondary gain and iatrogenic factors." Evaluator note: An "iatrogenic factor"

is one which is brought on by something a physician may say or do. (*Encarta Webster's World English Dictionary*)

### David J. Axelrod, MD, JD, FACP, Associate Professor of Medicine, Thomas Jefferson University, March 18, 2015

Dr. Axelrod, a board-certified physician and instructor of internal medicine, performed a physical evaluation of Mr. Eisner by request of counsel for Kelley Drye. He reviewed medical records obtained a personal, medical, and employment history, and performed a physical examination. Dr. Axelrod has opined:

"I do not find an objective reason why Mr. Eisner is unable to find gainful employment in some capacity. Based on my review of the medical records after the alleged assault, I am unconvinced that the assault led to permanently disabling injuries.

Furthermore, I do not believe that Mr. Eisner has availed himself to maximizing treatment for what appears to be a chronic pain syndrome. I would recommend that he pursue aqua therapy, mindfulness meditation, additional massage therapy and other multimodal treatments for chronic pain. At this time, without exhausting these and other treatments, I disagree that he is permanently disabled and unable to find any gainful employment."

## PRESENT PHYSICAL/PSYCHOLOGICAL TREATMENT

In addition to Mr. Eisner's visits with Dr. Shamis every three weeks, he sees at nurse practitioner at Bensalem Medical Practice every three months for monitoring. After a period of weight loss, he has recently seen improvement after adding "smoothies" to his diet. He also reported that he gained weight after experiencing "sleep eating while taking Ambien."

Mr. Eisner stated that his physicians have not imposed any physical restrictions on his activity, and have advised him "to do whatever [he] can." He engages in stretching and meditation to music for about one hour each day.

### Review and Discussion of Report of Broughton Associates, Inc., H. Gray Broughton, M.Ed., CRC, CCM, CRP, December 18, 2014

Mr. Broughton issued an Employability, Placeability, Earning Capacity Evaluation Report upon request of Marshall E. Kresman, Esq. on December 18, 2 014. He stated that he conducted a Vocational Diagnostic Interview of Mr. Eisner on December 3, 2014, performed a document review, analyzed Mr. Eisner's past work and transferable skills, if any, researched salary ranges and employment information particular to Mr. Eisner's ability to perform various types of jobs.

According to his report, Mr. Broughton conducted his interview of Mr. Eisner "telephonically," on 12/18/2014. He does not reference the amount of time that he spent with Mr. Eisner. (In his deposition of 1/14/2015, one month later, Mr. Eisner initially could not recall Mr. Broughton's name. Upon further questioning, Mr. Eisner stated that he had "one conversation" with Mr. Broughton, but didn't "really recall the conversation all that well."

Mr. Broughton indicates that Mr. Eisner is capable of lifting 15 pounds occasionally, sitting for 15 minutes, and has difficulty climbing, balancing, stooping, driving, reaching, seeing (due to floaters in eye), standing, walking, bending, kneeling, and sleeping. There is no reference to any current assessment of physical status, performed by a medical professional, to support these representations, which were apparently offered by Mr. Eisner during that conversation. Mr. Broughton did not conduct a Skype-type interview, so it would not have been possible for him to determine if Mr. Eisner could sit longer than the 15 minutes that he alleged. It is also stated that Mr. Eisner had "difficulty choosing words," i.e. limitations in talking. During the meeting with this evaluator, Mr. Eisner sat continuously for two periods of 1.5 hours each, with only a 5-minute break for an e-cigarette. Additionally, Mr. Eisner's conversation was fluid, his vocabulary was extensive, and his responses to questions were detailed and, at times, lengthy.

In his review of Mr. Eisner's work history, Mr. Broughton indicates that prior employment was administrative, supervisory, skilled and sedentary/light in nature. The maximum exertional level for the Sedentary classification is lifting 10 lbs. maximum, while the Light classification involves lifting to 20 lbs. maximum. Thus, Mr. Eisner's prior work history did not involve exertion beyond the lowest two classifications, and it appears that he indicated that he could lift 15 lbs. maximum during his interview, although a medical report was not included with this information.

Mr. Broughton does not provide any discussion of any methodology that he used to determine that Mr. Eisner is "unemployable and not placeable in any competitive work activities and he is totally disabled from gainful employment." He does not reference any attempt to determine the existence of residual jobs, among the almost 13,000 job titles in the U.S. economy, that would be compatible with Mr. Eisner's present physical and cognitive status, if indeed a diminished capacity were present. Instead, he concludes that Mr. Eisner's loss of earning capacity will be permanent, until age 67, at which point he would have been eligible for full Social Security benefits.

In terms of remaining years of employability, Mr. Broughton does not provide data from an appropriate Worklife Expectancy Table for individuals of Mr. Eisner's gender and educational background. Use of such a table would demonstrate a work life expectancy that would be less than the 15.7 years offered by Mr. Broughton, given the statistical probability that individuals will not work an uninterrupted "straight line" to retirement, given such life events as illness or periods of unemployment.

A worklife expectancy is a statistical average of how long persons will work over a lifetime. The Current Population Survey is the primary source of labor force characteristics for people in the U.S. and is a joint project between the Bureau of Labor Statistics (BLS) and the Census Bureau. *The Gamboa Gibson Worklife Tables, Revised 2010,*, authored by Anthony M. Gamboa, Jr., Ph.D. MBA and David S. Gibson, MBA, CPA and derived from these U.S. Census Bureau statistics, provide data for average worklife expectancies that are categorized by age, gender, level of education, and work disability status. Mr. Broughton has used the figure of 15.7 remaining years of expected work life for Mr. Eisner from the date of his injury on April 8, 2008, had he not been injured. According to government survey data, a more reliable figure would be an estimate of 13.4 years for a male high school graduate at age 51. This two-year difference would have an economic impact in excess of $100,000 in the calculation of Mr. Eisner's lost wages and benefits.

In addition, Mr. Broughton has opined that Mr. Eisner should be considered "severely disabled" due to the 2008 event. However, according to medical documentation, Mr. Eisner had suffered from disc degeneration prior to the alleged assault. The question remains as to the degree of current disability that should be attributed directly to the incident in question. For "not severely disabled" individuals of Mr. Eisner's age and educational level at the time of injury, the CPS data indicate a residual work life expectancy of 8.2 years. In either case, as a "not disabled" or "not severely disabled" individual, the probable work life expectancy for Mr. Eisner would be less than the 15.7 years postulated by Mr. Broughton, as this figure is based on the hope/expectation that there would have been no interruption in employment prior to age 67. Given the pre-existing disc deterioration, and the downturn in the economy concurrent with Mr. Eisner's departure from the work force, it is entirely likely that his work life would have been shortened due to other medical or economic factors.

## VOCATIONAL TESTING

Vocational tests, administered to Mr. Eisner during the meeting of 1/28/2015, included the CAPS (Career Ability Placement Survey) and the CEI (Career Exploration Inventory). Mr. Broughton, the plaintiff evaluator, had conducted his interview of Mr. Eisner by telephone, and did not provide any test results in his report that could be reviewed by this evaluator.

### Career Ability Placement Survey (CAPS)

The CAPS was developed to meet the need for a measure of abilities related to occupations and careers. Levels of ability may be interpreted separately or used in conjunction with interest inventories to determine school courses, training programs, and occupational choice. The scores on the CAPS are expressed as percentile ranges and as stanines. Mr. Eisner appeared to understand all directions and remained seated for the approximately 1.5 hours required for testing:

*Score range- Superior (stanine 9): 92-99%, Above Average (stanines 6, 7, 8): 68-91%, Average (stanines 4, 5): 33-67%, Below Average (stanines 2, 3): 11% to 32%, Significantly Below Average (stanine 1): under 11%.*

Mr. Roy Eisner was examined in the following areas, with descriptions of each test according to the administration manual, and score range:

Mechanical Reasoning: measures how well a person can understand mechanical principles and devices and the laws of physics. This ability is important especially in courses in industrial arts and occupations in Technology as well as skilled level jobs in Science.

Level: High Average

Spatial Relations: measures how well a person can visualize or think in three dimensions and can mentally picture to the position of objects from a diagram or drawings. This ability is important in courses in arts and industrial arts and jobs in Science, Technology and Arts.

Level: Significantly Below Average

<u>Verbal Reasoning</u>: measures how well a person can reason with words and the facility for understanding and using concepts expressed in words. This ability is important in general academic success and in jobs requiring written or oral communication, especially those professional level occupations in Communication, Science, and Service involving high levels of responsibility and decision making. This subtest focuses on logical reasoning, rather than fluency of expression.

Level: Significantly Below Average

<u>Numerical Ability</u>: measures how well a person can reason with and use numbers and work with quantitative materials and ideas. This ability is important in school courses and jobs in field of Science and Technology involving mathematics, chemistry, physics or engineering and in Business and Clerical fields.

Level: Below Average

<u>Language Usage</u>: measures how well a person can recognize and use correct grammar, punctuation and capitalization. This ability is especially important in jobs requiring written or oral communication and in Clerical jobs as well as Professional level occupations in Science, and in all levels of Business and Service.

Level: Above Average

<u>Word Knowledge</u>: measures how well a person can understand the meaning and precise use of words. This is important in Communication and all Professional level occupations involving high levels of responsibility and decision making.

Level: Superior

<u>Perceptual Speed and Accuracy</u>: measures how well a person can perceive small detail rapidly and accurately within a mass of letters, numbers and symbols. This ability is important in office work and other jobs requiring fine visual discrimination.

Level: Significantly Below Average—Evaluator note: Mr. Eisner only made one error in this subtest, but his score was reduced by a lack of speed.

<u>Manual Speed and Dexterity</u>: measures how well a person can make rapid and accurate movements with their hands. This ability is important in skilled Arts and skilled Technology occupations and other jobs requiring use of the hands.

Level: Below Average --- Evaluator note: As in the test of Perceptual Speed and Accuracy, Mr. Eisner's responses were all correct, but the score was affected by lack of speed.

Composite scores on the eight subtests of the CAPS are entered into a grid that indicates the competency of the examinee in the aptitude areas required in fourteen occupational areas including professional science, skilled science, professional technology, skilled technology, consumer economics, outdoor activities, professional business administration, business

management, clerical responsibilities, professional arts, skilled arts, professional service and skilled service. Mr. Eisner's profile indicates that he has greatest competency in verbal and written expression. According to his career profile, his strongest career matches, in terms of his aptitudes, would be in the skilled business, clerical, and professional service areas. This profile remains consistent with Roy Eisner's work history, which included a mix of management, clerical, dispatch, and customer contact responsibilities.

## OCCUPATIONAL INTERESTS

### Career Exploration Inventory

The Career Exploration Inventory helps clients client plan work and educational activities based on their responses to 120 items related to 15 major clusters of interest. These factors have been found to be very important in the selection of and success in a career. The cluster areas include:

- Arts, Entertainment, and Media
- Physical and Life Sciences
- Math, Engineering, and Technology
- Plants and Animals
- Law, Law Enforcement, and Public Safety
- Mechanics, Installers, Repairers, and Construction
- Transportation (Driving)
- Industrial Production
- Business Detail
- Sales and Marketing
- Recreation, Travel, and Personal Services
- Education and Social Services
- General Management and Support
- Financial Detail
- Medical and Health Services

Examinees indicate their interest in performing activities in each vocational area and indicate whether this interest is of a past, current, or potential nature. Scores are tallied and plotted on a grid that displays levels of interest.

Roy Eisner displayed low interest in the Physical and Life Sciences, Plants and Animals, Law and Law Enforcement, occupations which require Driving, Industrial Production, Financial Detail and Medical/Health Services. He had borderline Average scores in Sales and Marketing, and Recreation, Travel and Personal Service. Mr. Eisner's highest scores clustered in the areas of Arts, Entertainment and Media (related to earlier high school interests, as well as ongoing avocational or "hobby-related" communication activities), Math, Engineering and Technology, Mechanics, Installers, Repairers, Business Detail, Education and Social Service, and General Management and Support. Greatest preference was indicated for the area of General Management and Support. Again, as in the CAPS aptitude testing, Mr. Eisner's vocational interests are consistent with his work history. Of significance is Mr. Eisner's responses to questions relating to his expected future interests in General Management and Support, which

included such items as Plan and direct an educational program, Take a course in administration and leadership, Have leadership ability, Serve as an officer of a group, Help others do research, Direct others, Supervise others, and Be a leader. A sampling of related occupations based on strongest interests in General Management and Support profile includes Business Manager, Office Manager, Operations Director, Traffic Manager, and Personnel Recruiter. In his own business, and as an employee of Spirit Delivery, Mr. Eisner worked in business, office, operations, traffic, and personnel capacities.

## POST-INJURY VOCATIONAL PROFILE AND ECONOMIC IMPLICATIONS

It is the opinion of this evaluator that Mr. Roy Eisner is capable of a return to employment in any of the job titles that he held prior to April 2008. Any diminishment of Mr. Eisner's earning capacity would reflect his voluntary absence from competitive employment for the past seven years, as well as possible changes in salary structures connected with the economic downturn of 2008, which may have affected workers who did not hold continuous employment during that time and thereafter.

Specific points that support the conclusion that Mr. Eisner should not be classified as vocationally disabled include:

- Mr. Eisner demonstrates strong verbal ability, as evidenced in the evaluation interview and through aptitude testing. Verbal ability is important in the performance of such job duties as dispatching, supervision of employees, telephone communications, and entering information into a computer.

- Mr. Eisner reports that he remains physically capable of engaging in a variety of household duties, such as vacuum cleaning, food shopping, mowing his own lawn and that of others, which are required to maintain his home and to assist his disabled wife. He stated that he "is in A-1 health compared to her."

- He drives one hour to pick up his granddaughter, returns with her to the marital residence, and then transports her to meet his son. Mr. Eisner's prior work activities took place well within this driving distance.

- Roy Eisner has effectively been living a "disability lifestyle," in part supported by the Social Security Disability payments that are received by both Mr. and Mrs. Eisner. He stated that, early on in the post-injury months, he had been told by his wife that it was unrealistic to expect that he would be able to return to work. In addition, he had seen a decline in the Circuit City delivery business prior to the date of the assault, so he was not greatly optimistic regarding long-term employment options at that time, and had been "prepared to ride it out."

- Expectations of fatigue may be self-fulfilling. Although Mr. Eisner demonstrated the ability to participate continuously in the three-hour evaluation meeting, which involved sustained sitting, talking, and testing, he stated that he "would be exhausted [that] night."

- Pre-injury employment, in all capacities, was of a sedentary/light nature consistent with Mr. Eisner's present physical status. His prior employment was largely verbal/communications-based, with, per his account, "90% of the time on the computer, and 10% of the time spent speaking with the drivers." No lifting or physical work was involved.

- Mr. Eisner's prior employment did not require a CDL (commercial driver's license). He maintains a conventional driver's license, with vision corrected by contact lenses.

- He has a demonstrated history of competence in management/supervision, business development, sales, and debt collection, skills which could be applied to multiple job titles.

- By his report, Mr. Eisner did not make formal job applications post-injury.

- He has proficiency in Microsoft Office and, per his account, "can learn quickly, can keyboard, and use email, Twitter, and Facebook." In prior work activities, Mr. Eisner demonstrated reasoning, math, and language ability at a minimum of the average level.

- During our evaluation meeting, Roy Eisner remained seated for two periods of 1.5 hours each, with breaks for e-cigarettes. Related to his use of this nicotine delivery system, he was observed to "partake" prior to, mid-way, and following the session. His medical records indicate a diagnosis of COPD, in notes from October 2010 through 2012, although this diagnosis is disputed by Mr. Eisner. In a recent publication, *Prevention Matters* (Fox Chase Cancer Center, Spring/Summer 2015), authors Margie Clapper, Ph.D. and Arlene Wartenberg, Ph.D. state, "E-cig use also narrows the peripheral airways, a concern for people with chronic lung disease." Per information furnished by the National Institutes of Health, " a COPD patient will progressively become less physically active."

- Dr. Shamis has treated Mr. Eisner for approximately seven years, yet there has been no apparent lessening of symptoms. In fact, Mr. Eisner's reported mental health status has worsened. There is no indication in progress notes that Dr. Shamis has referred Mr. Eisner for more intensive psychiatric treatment after such a lengthy time period, nor is there, at least as appears in the handwritten content, any detailed outline of specific cognitive-behavioral modalities that may have been attempted.

- Mr. Eisner has a documented history of "mild degenerative disc disease," which was revealed in the MRI of May 21, 2008. This disc issue had not prevented ongoing employment prior to April 2008. In addition, Mr. Eisner had been treated with Wellbutrin, also prior to April 2008. This medication would have been prescribed for a diagnosis of depression, yet this diagnosis and use of medication did not impact upon his ability to hold employment.

- As early as 7/6/2008, Dr. Nunez, a physiatrist, had indicated that "*as symptoms subside* (emphasis by this evaluator) the patient should embark on a progressive and gentle rehabilitation and exercise program."

- As early as September 2008, Dr. Herbert Stein stated, "He has some significant symptom magnification....he should be able to return to his usual work as a manager for Spirit Delivery."

- As early as October 2008, Dr. Gladys Fenichel, a psychiatrist, also noted a lack of specific treatment techniques in Dr. Shamis' notes, and stated her opinion that Mr. Eisner, could, with more aggressive treatment, return to his pre-injury job site within 3-4 months from that date, or could work at an alternative job site during treatment.

- Mr. Eisner had been referred by his chiropractor to Dr. Norman Stempler, an orthopedic surgeon, who, in September 2008, suggested a re-evaluation "should there be no response to treatment within the next 6-8 weeks." Mr. Eisner did not return for that re-evaluation for six years.

- In his recent report Dr. Toborowsky diagnoses "a chronic, non-disabling Adjustment Disorder and a Dysthymic Disorder." He indicates that Roy Eisner does not suffer from PTSD and that Mr. Eisner is capable of returning to the workforce "without any limitations or restrictions." He further states that Mr. Eisner has "regrettably adopted a lifestyle of disability reinforced by secondary gain."

- Dr. Axelrod, in the most recently-available physical evaluation, dated 3/18/2015, finds no evidence that Mr. Eisner is disabled from employment from a physical standpoint.

- The content of the report by Mr. Broughton, plaintiff's vocational evaluator, which was based on a document review and a telephone interview, does not provide any substantive basis to support a contention that Mr. Eisner is disabled from his former employment, or from any alternative employment that could be allowed by residual functional capacities.

- Roy Eisner's aptitudes and interests, as measured through vocational testing administered by this evaluator, remain consistent with his pre-injury employment. The below-average scores found in some of the sub-tests reflect a lack of speed, rather than a lack of accuracy, as Mr. Eisner had demonstrated similar abilities in prior employment. This outcome is commonly found in testing of individuals who have not taken timed tests in recent years.

It is, accordingly, my professional opinion that Mr. Roy Eisner retains the ability to perform the full range of his pre-injury occupations, including, but not limited to, the specific job titles of Operations Manager (motor transportation), Driver Supervisor (motor transportation), Dispatcher, Motor Vehicle, and Collector (bill collector, collection agent). Should any additional medical documentation be produced that will change this conclusion, I reserve the right to amend this report. The opinions contained herein are based on a reasonable degree of vocational certainty.

Sincerely yours,

*Lynn M. Levine, Ed.D., LPC*
Lynn M. Levine, Ed.D., LPC

**LYNN M. LEVINE, Ed.D., NCC, NCCC**
*Licensed Professional Counselor*
102 Browning Lane – Bldg. A
P.O. Box 361
Cherry Hill, NJ 08003

(856) 354-0330                                                                    Fax: (856) 354-0360

## TRIALS AND DEPOSITIONS – 2010 THROUGH 2014

**2010**

1/13/10 Flanigan v. Ferriter- Docket No. FM-12-544-09E- Superior Court of NJ – Middlesex County- for Gabrielle Strich/Amy Stutzke, Strich Law Firm (v. John Hartman). Judge Barry Weinberg

5/4/10 Parissi-Polidori v. Polidori- Superior Court of NJ – Burlington County- for Patrick McShane, Forkin McShane Manos & Rotz (v. Robert Adinolfi). Judge Terrence Cook

7/29/10  Katz v. Katz – Superior Court of NJ – Mercer County – for Jeffrey Epstein, Szaferman Lakind (v. Barbara Ulrichsen). Judge Fleming

10/25/10 Korth v. Korth – Superior Court of NJ – Camden County – for Lee Hymerling (Archer and Greiner) Judge Rand

12/16/10  Mendel v. Mendel – Superior Court of NJ – Camden County – joint expert for Ronald Manos (rep. Mr. Mendel) and Patrick Judge – Archer & Greiner (rep. Denise Mendel) – Judge Nan Famular

**2011**

2/1/11  Lisa Leventhal vs. Temple University, Temple University Health System, Court of Common Pleas, Philadelphia County, PA – for Thomas Wehner (Reger Rizzo) – Judge Leon Tucker – (December Term, 2008, No. 01582)

2/16/11  Teslic v. Teslic Deposition – Mercer County- Discovery Dep. Conducted by Hanan Isaacs for K. Teslic. Retained by B. Ulrichsen on behalf of Srdjan Teslic.  Judge Fleming.

4/14/11  Salem v. Salem – Camden County – Discovery Dep.  Conducted by Nancy Gold for K. Salem.  Retained by Tom  Hurley on behalf of Dr. Raja Salem.  Judge Famular

5/2/11 Clark v. Clark – Camden County – Trial – Retained by Jamie Galemba/Adinolfi & Spevak on behalf of Bonnie Clark.  Opposing: Greg DeMichele.  Judge Leone

5/23/11  Falcone V. Falcone – Cape May County- Trial- Ret. By Michael Sorenson on behalf of Robert Falcone.  Opposing:  Patrick McShane (Forkin, McShane, Manos & Rotz).  Judge John Rauh

10/5/11  Levy v. Bell Levy – Middlesex County – Trial- Ret. By Gabrielle Strich and Megan Oltman of Strich Law on behalf of Kurt Levy.  Opposing: Abby Webb (Wilentz).  Judge Deborah Venezia

10/24/12  F. Daniel Swanson Jr. – (PI) – Cumberland County- Taped Trial Testimony (Deposition)- Docket No:  CUM-L-1238-08.  For Defense: Renee Scrocca (Testa Heck Scrocca, Vineland)  Opposing Counsel:  Chance and McCann- (Deana Walsh appeared for the firm.)

7/11/13  Patricia Zdichocki vs. Plaza Construction Co, Inc. Et.Al.  Hudson County Docket No, HUD-K-2675-09.  For Defense:  Edward L. Thornton (Methfessel & Werbel, Esqs., Edison), Opposing Plaintif Counsel:  Glenn M. Gerlanc (Parisi & Gerlanc)

11/18/13  Amy Jarozynski (formerly Amy Nolte) vs. Adam Brod, Camden County Docket NO:  FD-04-002485-09-C.  Education case. Mr. Brod's counsel- Steven B. Sacharow, (Flaster Greenberg).  Opposing Counsel:  Marybeth Baron.

7/8/2014  - Golestani v. Golestani; Somerset County- for Cheryl Golestani- Barry Szaferman; Opposing Counsel:  Michael Stanton.  Judge Fitzpatrick

**LYNN M. LEVINE, Ed.D.**
102 Browning Lane- Bldg. A – Suite 3
P.O. Box 361
Cherry Hill NJ  08003-0361
(856) 354-0330     Fax: (856) 354-0360
www.careerandlifeoptions.com

## PROFESSIONAL BACKGROUND

**DIRECTOR AND COUNSELOR**
*Career and Life Options*, Cherry Hill, NJ (1980 to present)
Founder of a career, educational and personal counseling and consulting practice.

- Conduct comprehensive evaluations, crisis and supportive counseling for individuals referred by legal, medical, or psychological service providers and for those who are self-referred. Clientele includes both non-disabled and disabled populations.

- Provide vocational evaluation, testing, reports and testimony in matrimonial, personal injury, death and employment cases as forensic counseling specialist.  Admitted as expert witness in the areas of vocational evaluation, employability and earning capacity in New Jersey and Pennsylvania courts.

- Prepare and present needs assessments, programs and in-service workshops in the areas of career development, student assistance, employee assistance, and substance abuse awareness for professional, educational, and community organizations.

- Provide comprehensive educational planning services for college, graduate programs and technical school for high school students and adults.

- As consultant to school districts, developed and maintained programs for crisis management and substance abuse awareness.  Trained professional staff in assessment and intervention techniques.  Coordinated referral and follow-up activities with social, medical and community agencies.

**COUNSELOR**
Haddonfield, NJ Public Schools and Woodbury, NJ Public Schools (1973-1974)

- Counseled both mainstreamed and special needs (emotionally-disturbed, perceptually-impaired, and neurologically-impaired) students in academic, personal development, and vocational preparation areas.

**TEACHER**
Haddon Heights Public Schools  (September 1970 – June 1972)
Pitman, NJ Public Schools  (September 1969 – June 1970)

- As NJ-certified teacher, instructed high school and middle school students and developed curriculum for French, Social Studies, and Humanities programs.

Lynn M. Levine, p. 2

# EDUCATION

**DOCTOR OF EDUCATION (Ed.D.)**
Rutgers University, New Brunswick, NJ
Department of Educational Administration, Supervision, and Adult Education.
Specialization: Organizational Analysis - 1986
Courses including organizational psychology and sociology, management and statistics.

**MASTER OF ARTS (M.A.)**
Rowan University, Glassboro, NJ - 1973
Guidance and Counseling

**BACHELOR OF ARTS (B.A.)**
Douglass College of Rutgers University, New Brunswick, NJ - 1969

## CONTINUING EDUCATION

- Ongoing seminars and programs at Rowan University, Rutgers University and through other nationally and regionally-recognized providers in the areas of career development, vocational rehabilitation, litigation economics, crisis intervention and counseling with special populations. Special emphasis on vocational/economic approaches to earning capacity, determination of labor market access and worklife expectancy issues.
- Post-graduate Substance Awareness Coordinator Certification Program, Rowan University

## LICENSES AND CERTIFICATIONS

Licensed Professional Counselor - New Jersey
American Rehabilitation Economics Association - Registered Forensic Vocational Expert
National Board Certified Counselor (NCC)
National Board Certified Career Counselor (NCCC)
Master Career Counselor (MCC) – National Career Development Association
NJ Educational Certificates: Director of Student Personnel Services, Substance Awareness
Coordinator, Principal/Supervisor, Guidance Counselor, Teacher of French and History

## HONORS

Phi Beta Kappa
Kappa Delta Pi - Honorary Society in Education

Lynn M. Levine, p. 3

## PROFESSIONAL ASSOCIATIONS AND AFFILIATIONS

New Jersey Career Development/Employment Counseling Association –
        President (2006-2008), President-Elect (2011), Co-President (2012-2014),
        Past President (2014-2016)
New Jersey Counseling Association- Executive Board
American Rehabilitation Economics Association
National Association of Forensic Economics
American Counseling Association
National Career Development Association
The Cooper Foundation – Fundraiser Steering Committee Member

## REPRESENTATIVE SEMINARS, PRESENTATIONS, AND PUBLICATIONS

Commencement Address: "Oh, the Places You'll Go," Anthem Institute, Cherry Hill, NJ, May 30, 2013

New Jersey Counseling Association Conference, Resume and Career Counseling Clinic (Volunteer Facilitator), Lincroft, NJ, April 20, 2013

New Jersey Career Development Association, Fall Educational Seminar, Workshop Facilitator and Presenter, East Brunswick, NJ, November 9, 2012

"Employability Experts in Collaborative Law", Mid-Jersey Collaborative Law Alliance, Princeton, NJ, May 9, 2012

"Marketing Yourself in a Difficult Economy", Camden County Professional Service Group of the NJ Employment Service, Camden, NJ, August 10, 2009

"Issues in Workforce Re-entry", United Methodist Church of Marlton, April 21, 2009

New Jersey Counseling Association, NJCDA/ECA Division Meeting Coordinator, Spring Conference, Somerset, NJ, April 28, 2008

New Jersey Career Development Association, Fall Educational Seminar, Workshop Facilitator and Presenter, East Brunswick, NJ, October 12, 2007

New Jersey Network Public Television (NJN), Guest Appearance on "NJ Works", "A Visit to a Career Counselor", Programs Airing during July 2006

Guest Lecture, "A Career in Vocational Counseling", Temple University, Graduate Program in Counseling, July 26, 2006

Lynn M. Levine, p. 4

"Bridging the Gap:  How Counselors Can Foster the Post-High School Educational and Career Development of Individuals with Learning Disabilities", New Jersey Counseling Association Conference, May 2, 2005

"Career Planning for Individuals with Attention Deficit Disorders", *NCDA Newsletter*, Fall 2004

"Career and Educational Options:  Strategies for Adolescents and Adults with ADHD", CHADD of Camden County, October 2004

 "Motivating the Resistant or Involuntary Client", *The Forensic Counselor*, Winter 1996

"The Proper Use of Forensic Experts", Philadelphia Bar Education Center, Philadelphia, 1996

"Search for Tomorrow:  Vocational Evaluation in Divorce Cases", Philadelphia Bar Education Center, Philadelphia, 1995

"Marketing Yourself", National MS Society Job Raising Program, Voorhees, NJ, 1993

"Post-Retirement Planning for Educators", Sterling District Wellness Day, Somerdale, NJ, 1993

"Drug Abuse Workshop", Adjunct Professor, Jersey City State College, Department of Psychology, Fall 1992

"Stress Management Workshop", Department of the Public Advocate, Division of Mental Health Advocacy, Trenton, NJ, 1992

"Career Perspectives in Couples' Therapy", Marriage Council of Philadelphia, PA, Fall 1992

"The Career, the Family, and a Changing Economy", Marriage Council of Philadelphia, PA., Spring 1992

"Job Market for College Graduates", Interview- Courier Post Newspaper, Spring 1992

"Therapeutic Intervention in Substance Abuse", Adjunct Professor, Jersey City State College, Department of Psychology, Spring 1992

"Ask the Experts - How to Succeed in Business" - Four-part series, *Courier-Post*, 1990

"Spousal Rehabilitation Assessment in Matrimonial Cases", Camden County Bar Association, Family Law Committee.  Gloucester County Bar Association, Family Law Committee, 1990

**LYNN M. LEVINE, Ed.D., LPC**
**102 Browning Lane - Bldg. A, Suite 3**
**Cherry Hill, NJ 08003**

**Telephone: (856) 354-0330**                                    <u>**Correspondence to:**</u>
**Fax:         (856) 354-0360**                                    **P.O. Box 361**
**www.careerandlifeoptions.com**                                    **Cherry Hill, NJ 08003**

**RETAINER AGREEMENT**

Martin A. Krolewski, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NJ 10178

Re:      Vocational Evaluation of Roy Eisner

Vocational evaluation including clinical interview, vocational testing, if and as needed, document and medical evaluation review, research, determination of post-injury employability, review and comment on opposing expert evaluation, with comprehensive assessment report, including rebuttal, issued to the referring attorney.

**Fee for Service**:  The case fee of <u>$5850</u>, to be paid upon signing this agreement, will include case initiation and up to 11 hours composed of office visits, research, report preparation, telephone consultation, and Labor Market Access analysis.  Charges for Document/File Review will be invoiced prior to the scheduled assessment at a rate of $400 per hour, due and payable prior to the date of that meeting.  Additional documents, including report from opposing expert, will be reviewed upon receipt, with time billed at the above rate, due prior to issuance of report.  In the event of case cancellation after an evaluation is initiated and a signed retainer agreement is received, a minimum of $1450 will be charged against the case fee for administrative costs and case review. If case cancellation is received less than one week prior to a confirmed evaluation meeting, a minimum of $2450 will be charged against the case fee, to cover administrative costs and time reserved for this meeting. Rescheduling of evaluation appointments requires 72 hours notice to avoid charges. This cost is the responsibility of the signer of this agreement

**Additional Services:**
Consultation with attorneys and clients - off premises:    $400.00 per hour, portal to portal
Consultation - in office:   $400.00 per hour
Depositions, video depositions, court testimony:   $475 per hour, portal to portal, or such rate in effect at time of deposition/trial.  Testimony and preparation time beyond pre-trial estimate to be billed.  Retainer refundable up to 10 business days prior to scheduled testimony with a deduction for any preparation time; non-refundable with less than that notice.

**SERVICES WILL BE SCHEDULED UPON RECEIPT OF A SIGNED COPY OF THIS LETTER AND THE RETAINER FEE. PLEASE MAKE CHECK FOR $5850 PAYABLE TO LYNN M. LEVINE, Ed.D. AND COMPLETE REQUESTED CASE INFORMATION.  MAIL TO P.O. BOX 361, CHERRY HILL, NJ 08003.**
**FILE REVIEW CHARGES WILL BE INVOICED.  PHYSICAL CAPACITIES EVALUATION FORM AND PSYCHOLOGICAL CAPACITIES EVALUATION FORM  ARE ATTACHED AND SHOULD BE COMPLETED BY APPROPRIATE SERVICE PROVIDERS. INSTRUCT INDIVIDUAL TO BE EVALUATED TO ALLOW APPROXMATELY 3 HOURS FOR THE MEETING AND TO BRING READING GLASSES, IF NEEDED.  ONCE RETAINER AGREEMENT AND ALL REQUESTED INFORMATION HAS BEEN FORWARDED TO THIS OFFICE, EVALUEE OR REPRESENTATIVE SHOULD CALL FOR THE APPOINTMENT.  THANK YOU FOR THIS REFERRAL.**

_____      ____      *Lynn M. Levine, Ed.D.*      12/22/2014
Martin A. Krolewski, Esq.      Date      Lynn M. Levine, Ed.D.      Date
                                               (E.I.N. 20-3191337)

Robert M. Toborowsky, MD
1700 Sansom Street - Suite 1101
Philadelphia, PA 19103
(215) 399-3535
biga310@aol.com

March 17, 2015

Nicholas J. Panarella, Esq.
Martin A. Krolewski, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

**Re: Eisner v. Circuit City**
**Date of Incident: April 8, 2008**
**Date of Examination: January 16, 2015**

Dear Sirs:

This report is based on my psychiatric examination of Mr. Roy Eisner, with whom I met at your request on January 16, 2015. The examination, which began at 9:47AM and ended at 1:13PM, took place in my Philadelphia office. Mark C. Wesoski, Esq. attended the examination as an observer.

Also provided for review in connection with my psychiatric examination are the following documents, copies of which were provided by your office:

1) Victim Impact Statement
2) Roy and Joanne Eisner's Answers to Debtor's First Request for Admissions, First Set of Interrogatories and First Request of Production of Documents
3) Roy Eisner's Answers to Debtor's Second Set of Interrogatories
4) Unsecured Claim in Bankruptcy Court
5) Records from Lower Bucks Hospital
6) October 8, 2008 report authored by Gladys S. Fenichel, MD, psychiatrist
7) Records authored by Brad Shamis, PhD, treating psychologist, including Dr. Shamis' Certification dated August 12, 2013
8) January 13 and 14, 2015 deposition transcripts of Roy Eisner

I should note that at the beginning of the examination I reviewed the usual preliminaries with Mr. Eisner, including clarifying my role and informing him of the limits of confidentiality inherent in performing an independent psychiatric examination. He indicated that he understood the nature and purpose of the examination and freely consented to be examined.

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

I should note further that I focused my examination and record review most specifically on whether and, if so, to what extent Mr. Eisner may be suffering from any psychiatric sequelae traceable to an event which allegedly occurred on April 8, 2008, an event which has given rise to the pending litigation.

My qualifications for rendering an expert report in this case are delineated in the curriculum vitae which I previously provided and which describes my training and experience in psychiatry.

**Introduction:**

- The records reflect that Mr. Eisner has brought a claim against Circuit City Stores, Inc. ("CCS") and its affiliated debtors for personal injuries allegedly sustained almost seven years ago on April 8, 2008 as a result of being assaulted by James O'Connell, a former CCS employee.
- As a result of the alleged assault, Mr. Eisner claims that he was not only physically injured during the assault, but that he also has developed a Post Traumatic Stress Disorder ("PTSD"). Mr. Eisner also subsequently stopped working.
- Brad Shamis, PhD, with whom Mr. Eisner has been meeting since April 2008, has opined that Mr. Eisner is permanently disabled from any employment.
- Gladys S. Fenichel, MD, a psychiatrist who performed an independent psychiatric evaluation of Mr. Eisner on September 2, 2008, arrived at a contrary opinion, namely, that with appropriate mental health treatment Mr. Eisner "should be able to return to work at his normal job site within the next three to four months."
- Dr. Fenichel further opined that as of the time she evaluated him "Mr. Eisner would be able to return to work at a different job site as he continues to receive treatment for the anxiety symptoms he reported."
- Mr. Eisner's wife, Joanne, has brought a separate claim against CCS arising out of her husband's alleged injuries.

**Comment on the Above Listed Records:**

Among the records reviewed, the following are of particular relevance to the present evaluation:

**The Records of Brad Shamis, PhD**

These records state, reflect or indicate that:

- Mr. Eisner began psychological treatment with Dr. Shamis on April 29, 2008, three weeks after the subject April 8, 2008 incident.
- In a May 1, 2008 letter addressed to Marshall E. Kresman, Esq. Dr. Shamis advised that Mr. Eisner will need ongoing treatment for PTSD.

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

- Dr. Shamis causally related Mr. Eisner's PTSD to the subject April 8, 2008 incident.
- Dr. Shamis further opined that Mr. Eisner's level of functioning was such that he was unable to work and that his estimated return to work date would not be until June 16, 2008.
- Dr. Shamis also identified a Panic Disorder and Major Depression as targets for therapeutic intervention.
- Dr. Shamis continued to treat Mr. Eisner during the ensuing years, most recently, according to the records I was provided, on November 17, 2014.
- Mr. Eisner has not made the hoped for and anticipated recovery and he has not returned to work since April 18, 2008.
- On August 12, 2013 Dr. Shamis opined that as a result of Mr. Eisner's PTSD and other psychiatric problems, he was permanently and totally disabled from any gainful employment.
- Dr. Shamis never has referred Mr. Eisner to a colleague for a second opinion or to a psychiatrist, nor ever administered any psychological tests.
- The above notwithstanding, Dr. Shamis apparently has conveyed to Mr. Eisner that he possibly could "heal" once the pending litigation was resolved, underscoring that secondary gain and iatrogenic factors are operating prominently in this case.
(N.B. As noted later in this report, Mr. Eisner himself indicated that were it not for persistent pain and his "low energy level" he could reenter the workforce "right away," and that even at a certain pain level he would be able to return to the workforce within six to twelve months.)

**The October 8, 2008 Report Authored by Gladys S. Fenichel, MD**

In this report Dr. Fenichel, states, indicates or opines that:

- She evaluated Mr. Eisner on September 2, 2008 and obtained an extensive history from him.
- She also reviewed various documents, including records from Kenneth Morris, D.O., a family practitioner.
- Dr. Morris opined that Mr. Eisner developed "PTSD" following the subject April 8, 2008 incident and that as of April 18, 2008 he was "completely disabled."
- Mr. Eisner stated that he was unhappy with his life, but he did not display anxiety or depression during her mental status evaluation.
- Mr. Eisner had prior treatment for depression with Wellbutrin.
- Mr. Eisner's emotional symptoms, like his physical symptoms, appeared to be increasing rather than decreasing.
- Mr. Eisner described certain emotional symptoms that he related to the subject incident in a "dramatic" fashion.

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

- During a September 10, 2008 medical IME performed by Dr. Herbert Stein, Dr. Stein observed "significant symptom magnification" and opined that Mr. Eisner should be able to return to his former position at Spirit Delivery.
- Mr. Eisner's diagnoses include Anxiety Disorder NOS with features of PTSD and Agoraphobia and a pre-existing Dysthymic Disorder, a mild, chronic, non-disabling depression.
- Mr. Eisner was capable of returning to work at a different job site as of the time she examined him.
- Mr. Eisner should be able to return to work in his normal job site within three to four months.

**The January 13, 2015 Deposition Testimony of Mr. Eisner**

During this deposition Mr. Eisner testified that:

- Despite contrary documentation, he disputes that he was discharged from his position at Spirit Delivery and Distribution.
- April 9, 2004 "might have been the date" he began working for Spirit Delivery and Distribution.
- It does not refresh his recollection that another document indicates that the last day he worked was March 3, 2008.
- After the subject incident ("the assault") he went back to work for a certain period of time, but then he stopped working and since then he never has worked again anywhere.
- He has been "fully disabled" since then.
- He believes that Jim O'Connell, the "attacker," was under the impression that he, Mr. Eisner, "had something to do with him being fired."
- The assault was the "single worst thing" that ever has happened to him.
- At one point after the assault, during which he was punched and kicked, he "blacked out."
- He does not know for certain how long he "blacked out."
- On a document he completed one day after the incident he wrote, "Bloody ear, three stitches required, bruised ribs and chest, scrapes and cuts on face, treated and released from Lower Bucks Hospital."
- He did not report a neck injury, a back injury or loss of consciousness, but he was "in shock that entire week."
- After the incident he first drove himself home, and later he drove himself to the Lower Bucks Hospital ER.
- When he got home he did not want to wake his wife before driving to the hospital out of concern that he might upset her.
- The Bristol Township Police Incident Report dated April 8, 2008 indicates that he told Officer Mancuso that he fell and had a small scratch on his left ear.
- He did not tell the ER staff that he lost consciousness.

4

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

- After leaving the ER he went home for lunch and he then returned to his office.
- He worked the rest of that day (the afternoon of April 8), the next day (April 9) and the rest of that week.
- He thinks that he worked on a part time basis the following week before he stopped working at Spirit somewhere around the 16th or the 18th of April.
- He has not worked since.
- In 2001 he was rear ended in an auto accident.
- He had a "mild whiplash" and he had back pain for two months after the accident and he received chiropractic care from Dr. Caine.
- He reportedly recovered fully and did not file a lawsuit.
- He has had various other treatments/therapies during the intervening years.
- Other than back problems, he would rate his overall health currently as "very good."
- He has been treating his back pain for "a couple of years," primarily with Oxycodone and Oxycontin, both opioid analgesics.
- He also takes Xanax, Skelaxin and Wellbutrin.
- He stopped taking Ambien about three weeks prior to the deposition because he was "sleep-eating."
- Other than back and neck injuries, he does not have any other physical ailments traceable to the 2008 assault.
- He does have what was described to him as post-traumatic stress syndrome.
- He is very cautious in parking lots and when he is out of his "comfort zone" (basically Bucks County) his anxiety "goes way up."
- He also "can't go over bridges," but does not know why.
- Certain "things" trigger recollections of the assault.
- His anxiety began in 2008 and has remained essentially the same since then.
- He has been seeing Dr. Shamis since 2008, currently for forty-five minutes on an every three week basis.
- Dr. Shamis has been challenging him to go beyond his comfort zone.
- He has not had any hospitalizations due to his psychiatric complaints.
- He never was treated for a psychiatric condition prior to April 8, 2008 with the exception that has been taking Wellbutrin since around 2000.
- His physician, Dr. Morris, prescribed the Wellbutrin because he had signs of depression.
- He, Mr. Eisner, does not think that he was depressed nor does he think that the medication "actually does anything."
- Then, contradicting himself, he said that it helped both prior to and after the assault.
- No doctor has treated him for COPD or ever told him that he has COPD, although at a mediation someone apparently "tried to say" that he does have COPD.
- He has been diagnosed with "slight anemia."
- Since 2009 he has been using electronic cigarettes.
- He never has had any head trauma and an MRI of his brain was normal.
- Other than seeing Dr. Shamis, he meditates, exercises and engages in stretching.

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

- He does not feel that he is able to work in any capacity, even on a part time basis.
- He is exhausted and physically drained.

## The January 14, 2015 Deposition of Mr. Eisner

During his second deposition, Mr. Eisner testified that:

- He also has problems with his right eye and right knee that he traces to the subject assault.
- He never has met with a vocational expert, but he has had one telephone conversation with Mr. Broughton, a vocational expert, that lasted less than an hour.
- Mr. Broughton's report accurately references physical problems and limitations and lifestyle changes.
- He has been to a casino once since 2008 and once or twice since 2008 he has gone out to dinner with friends.
- Since 2008 he and his wife typically have gone to restaurants once a week.
- He spends every other Friday with his granddaughter, Audra.
- He picks her up from daycare in Sellersville, takes her back to his home, spends the afternoon with her and then drives her to a point between his home and Sellersville where his son picks her up.
- Other time is spent watching television, writing a book and spending some time on his computer.
- He participates "a little bit" on Facebook and Twitter.
- He has made 36,900 tweets since March 2009 (which averages out to 20 tweets a day).
- He follows over 1,900 Twitter accounts.
- He most recently posted something on Twitter "Probably two days ago."
- He also has posted You Tube videos from late 2009 through 2014, videos that deal with political commentaries or jokes.
- He feels that he has been "robbed" of having a normal relationship with his grandchildren.
- His wife was diagnosed with depression after she got Lyme disease around 1994 or 1995.
- They both get their antidepressants from Dr. Morris, their regular doctor.
- The Lyme disease and her depression "really slowed her down" and prevented her from doing as much as she was able to do before.
- The arthritis that resulted from the Lyme disease only slightly affected the couple's intimate relationships, but not the frequency.
- His wife has other medical problems, including, but not limited to, diabetes, renal disease and multiple orthopedic problems.
- She became disabled between 2006-2007.
- Contradicting himself, he described the couple's sex life as non-existent at this point.

6

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

**Psychiatric History and Additional Background Information:**

During the examination I conducted Mr. Eisner provided me with the following information:

He is fifty-nine years old, having been born on November 25, 1956. He is five feet nine inches tall and weighs one hundred forty-five pounds, thirty pounds less than he weighed on April 8, 2008. Even so, despite forgetting to eat "a lot of days," he is comfortable at his present weight.

He told me that he came to the examination by taxi, a forty-seven minute ride from the Bensalem townhouse where he has been living with his fifty-six year old wife Joanne since 1990. He said that because Joanne twice has fallen down steps at home, once in the very recent past, they probably will move "when this is over." I then learned that, although he apparently has no driving restrictions since the alleged attack, he no longer drives in the city. He said that this is mainly because during the "attack" his right eye was injured and it has resulted in a lot of "floaters."

He also told me that he no longer feels safe walking around Philadelphia. He has become more vigilant in Philadelphia and concerned that he could be attacked and unable to defend himself. His "comfort zone" is Bucks County. He mentioned too that the litigation is wearing him down and that Dr. Shamis has told him that he "can't move on until this is over," i.e. the pending litigation. He said that talking about "these things" (as happens in the context of the litigation) triggers memories of the incident, "the single most horrible thing that's ever happened in my life." He said that Dr. Shamis has, in fact, encouraged him to challenge his "comfort zone," but he is fearful of doing so as it increases his "internal stress." He further volunteered that I was seeing him at his best both mentally and physically, that on some days it takes him a couple of hours to "get going."

I next learned that he and his wife will be married thirty years this July. It is a second marriage for both partners. Her first marriage produced a son, Frank, now married and in his early thirties and himself the father of a little girl. Mr. Eisner said that he raised and adopted Frank. He also said that his own first marriage produced a daughter, Patricia, who is currently thirty-six and who was "mostly" raised by her biological mother. She is now in Tennessee raising her own large family.

He mentioned also that he is very close to Frank's six year old daughter. He spends many hours with her every other Friday, including the time it takes him to drive her to daycare and later to her home. He added that "all the driving takes a toll" such that on the following day he sleeps for eleven or twelve hours, one or two hours more than he usually gets.

He also confided that his wife has "a lot of issues" as well. He explained that since 2005 she has been receiving a Social Security Disability benefit for orthopedic problems. She also has

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

kidney function problems, suffers from juvenile diabetes and has been diagnosed with
"retinopathy." He added that she is being followed by an endocrinologist. He also said that she
was diagnosed with Lyme disease in 1990 and that since then she has gone "downhill." He
further mentioned that she has been taking Wellbutrin, an antidepressant, for at least ten years.

He remarked that he regards himself as being on a similar "downhill" path. He said that
were it not for his religion he would have "offed" himself. He also volunteered that no amount
of money could compensate him for the medical problems he has been enduring.

Even so, he said that if it were possible he would like to return to work; however, two
doctors, Dr. Shamis and Dr. Morris, have told him that he never will work again because he has
no endurance. He said that Dr. Shamis feels that he cannot heal until the pending litigation is
resolved, a seeming contradictory comment. Nevertheless, he feels that somehow he once again
could be the person he used to be, and he is holding out hope that with more time he will "heal"
and "it would go away." In the meantime, according to Dr. Morris, his pain is "taking a toll."

When asked for a more specific account of his current and/or persistent medical/physical
problems, he reported that the "only issues" are "incredible" neck and back pain and headaches.
He then commented that he is not as "mentally sharp," but that otherwise "There's nothing
wrong with me." (N.B. Later, as an afterthought, he mentioned that he has the "beginning" of "a
little arthritis" in his right knee, which "swells" and "not in alignment," according to Joanne, his
Physician's Assistant, a problem that "didn't start until the assault.")

When I next asked for a more specific account of his current and/or persistent
psychological/emotional problems, he initially referenced the aforementioned "combat zone
issues" and "hypervigilance." He also said that a number of seemingly unrelated "triggers"
serve as upsetting reminders of the incident." He also told me that he has nightmares during
which he is being attacked and which wake him up, and he mentioned that once a week he
dreams of being in a parking lot, but unable to find his car. He also recalled that a couple of
weeks ago when approached by a man who asked him for a handout he felt his heart pounding
and he began to sweat. When asked if he has any other psychological/emotional problems, he
replied "I don't think so."

When I inquired about past medical history, he said that he sustained a "slight whiplash"
injury in 2000 or 2001 after being rear ended. He said that he recovered fully.

When I inquired about past psychiatric history, he said that Dr. Morris prescribed
antidepressant medication in 2001 and 2002. He also recalled that he took Wellbutrin both
before and after the subject assault, originally because he felt "a little down." He commented,
however, that even after the Wellbutrin was increased he did not feel that he needed it or
benefitted from it.

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

He said that there has been no psychiatrist involved in his treatment, although Dr. Shamis reportedly told Dr. Morris to prescribe an anti-anxiety medication and he did, first Klonopin and subsequently Xanax (both of which are sedating and can compromise energy level). He said that he and Dr. Shamis meet for forty-five minutes every three weeks, which is more frequent than what is documented in Dr. Shamis' records. He said that "early on" they focused on his son's divorce and talked about how he, Mr. Eisner, is feeling and "what's going on." He said that he likes Dr. Shamis, but acknowledged that he never referred him to a colleague for a second opinion or to a psychiatrist. He then said that he thinks that "a lot of the problem" is his "loss of control" and that "this situation," including the pending litigation, has "all spun out of control."

He said that his Worker's Compensation case settled in calendar year 2010 and that since at least 2010 he also has been collecting a Social Security Disability benefit. His wife also collects a Social Security Disability benefit. He said that they are paying their bills in a timely manner, but they are on a "tight budget." He acknowledged that financial problems are a stressor as is what he perceives as the deterioration in his "condition."

When I inquired about his current medication regimen, he reported that he takes the following, all of which are prescribed by healthcare professionals at the Bensalem Medical Practice:

1) Oxycontin, a sedating narcotic pain medication – 40mg twice a day.
2) Oxycodone, another sedating narcotic pain medication – 15 mg twice a day (on average) for "breakthrough pain."
3) Omeprazole – twice daily for "digestion."
4) Skelaxin – a muscle relaxant he takes twice a day to relieve "spasms."

He said that nevertheless he still "walks around" with a certain amount of pain and he has not seen a pain management specialist since 2010 or 2011.

He said that his alcohol intake is very modest and that he does not use any street drugs, but that for the past several years he has used electronic cigarettes a couple of times a day. His caffeine intake is also modest. He buys Claritin over the counter for seasonal allergies and cat dander, the latter because the family has four pet cats. He also told me that he never has served in the military, never been involved with the police or other authorities in an adverse fashion and never involved in any prior litigation other than when he got divorced.

When asked how he is utilizing his time, he first replied that since 2001 he has been writing a book ("A History of Philadelphia Radio") and he is more than halfway done. He said that he has made little progress during the past couple of years, although currently he still devotes one and a half hours a week to this project. He next mentioned the time he spends with his granddaughter, and after that he told me that he is a "TV addict." His favorite programs include Breaking Bad, the Wire, Sons of Anarchy and Modern Family. He also watches professional baseball and football, and he enjoys reading Stephen King, Dean Coons, and books

9

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

about the Titanic.   He said that he gets his exercise by cleaning the house, but he does so less often than formerly.  He said that energy and pain are limiting factors, otherwise he can still do just about everything he used to do before the subject accident.

More specifically, he said that he vacuums twice a week, he dusts, he polishes, he does the laundry and the dishes.  He feeds the cats and cleans out the litter boxes.  He also does handyman type things, e.g. he has done some painting and he has changed light switches.  He also reads the newspapers, listens to music, does some grass cutting, and goes grocery shopping.  He also spends time on his computer, which he uses to pay bills, tweet and download I-tunes.  He also listens to Helen Leicht, a WXPN disc jockey and he said that he owns over four thousand CDs.  He said that he does not belong to any church or clubs and he socializes only a couple of times a year.

He emphasized that, were it not for his low energy level and his persistent pain, he could reenter the workforce, a disclosure made with conviction and one at substantial variance with contrary opinions offered by Dr. Shamis.  In fact, he said that absent pain he could do so "right away."  He indicated that even at a certain pain level he could gradually reach the point that would permit him to return to the workforce within six to twelve months.

He further informed me that at the time of the subject April 8, 2008 incident he was employed as a manager for Spirit Delivery.  His position was mostly a desk job and he was "damn good at that job."  He said that when first hired in 2004 his annual salary was $35,000 and that when he stopped working four years later he was earning $55,000.  He said that he is a very enthusiastic person, that he got good performance evaluations and that the company "loved" him.

A further inquiry into his background revealed that he was born in Philadelphia, but since the age of two grew up in Bucks County.  He is the youngest of three siblings.  Without further explanation, he said that his one brother died and that for ten years before he died he "shut everyone out of his life."  He said that he has an "okay" relationship with his older sister.

He said that he does not have much contact with his ninety-three year old "stubborn" mother who currently lives with his sister and brother-in-law.  His father died of heart disease twenty-two years ago.  He said that his family lacked closeness, although he said that he felt loved and safe and happy.  He said that he never was abused or traumatized.  He said that he needed to attend special classes, but otherwise denied any specific developmental, school, family or social problems.  He said that he married at the age of twenty, but that he got divorced after four and a half or five years as he and his wife were "not right for each other."

He said that over the years he has worked as a furniture salesman, for a finance company, for a company that processed loans, and for another company that required "going on collections."  Subsequently, beginning in the mid 1980s, he founded his own trucking company, a company he owned for seventeen years.

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

**Mental Status Examination:**

Mr. Eisner was alert, oriented, attentive and cooperative. His appearance was notable for a moustache, a beard and very short hair. He was dressed informally in a purple hoodie and jeans, and he wore a gold or gold colored chain around his neck. He also carried a cane. He told me that he has Psoriasis which was visible on his right hand and which he said he scratches when stressed. There were no speech or word finding abnormalities in evidence, nor did I observe him to scratch.

He described his mood on the day of the examination as "pretty relaxed," although anxious because he was not in his "comfort zone." He said that he was not depressed, but noted that on some days he is. He also said, seemingly contradicting himself, that he is nervous and tense all the time, and that it is "exhausting."

His conversation was relevant and goal directed and there was no evidence of a thought disorder. He was neither tangential or circumstantial. He did not report any obsessions or compulsions, but he said that since the subject incident he no longer can drive over a bridge or drive at night in unfamiliar places. (He acknowledged that he is uncertain whether this aversion is related in any way to the subject incident.) He did not report any other fears or phobias. He said that he questions "why I did not lay a hand on the other guy."

When asked specifically, he said that he has become more safety conscious and hypervigilant and he said that he is concerned that he may be followed. Although with not much conviction, he also said that he has felt that Circuit City might hire a "hit man." When again asked specifically, he said that he startles more easily, and he said that since the subject incident he has become a gun owner. Even so, he told me that he has not "in fear" a lot of the time, and he does not engage in any reckless or destructive behavior.

He said that his wife complains about his memory, but I could discern no gross impairment in memory or concentration, nor were there any other signs of cognitive impairment in evidence. He also said that he has a very good recollection of the subject assault. Furthermore, he told me that although he hit his head and "blacked out" he did not incur a brain injury. He said that he has consulted an ophthalmologist because he developed "floaters;" however, he never has been treated by a neurologist.

He denied any perceptual abnormalities and I could discern no evidence of delusional thinking, paranoia or other psychotic signs. He said that he has daily intrusive recollections of the incident and that he has dreams and nightmares related to it, but he does not have any true "flashbacks" nor does he feel detached from others, have any difficulty enjoying himself or have any difficulty expressing warm and loving feelings.

11

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

He said that he thought he was going to die during the alleged incident. He also said that he becomes upset when reminded of the alleged incident, but he knows that it was not his fault and that he is not a bad person. He said that he feels embarrassed "that the other guy has no scratches." He also feels guilty and ashamed that he has not gotten any better. He said that he is "not so much angry as frustrated."

He falls asleep a lot, but always wakes up after a few hours. He said that until a couple of weeks ago he took Ambien or Ambien Extended Relief for approximately four years. He said that he never has seen a sleep doctor.

He said that he is not optimistic that he will become a productive member of society within the next five years. However, he said that while he "can't get any worse," it is important for him to get better, and then, contradicting himself, he volunteered that "when this is all over" (a reference to the pending litigation), he will be the same person he used to be.

At the conclusion of the examination he complimented me for being empathic and thorough, thanked me and shook my hand.

## Opinions and Conclusions:

The relevant psychiatric diagnoses include a chronic, non-disabling Adjustment Disorder with Anxiety and a Dysthymic Disorder, a chronic, non-disabling, pre-existing and, in his case, mild to moderate depression.

He does not suffer from a Post Traumatic Stress Disorder or any other DSM-V psychiatric disorder and, from a psychiatric standpoint, he is not disabled and capable of returning to the workforce without any limitations or restrictions. His psychological symptoms and complaints are neither intense, severe or pervasive and not associated with any significant functional impairment, nor do they prevent him from participating in and deriving pleasure and satisfaction from numerous activities. Regrettably, he apparently has adopted a lifestyle of disability, one reinforced by prominent secondary gain and iatrogenic factors.

I should emphasize that questions concerning the nature, origin, extent and significance of his physical complaints, as distinct from psychiatric issues, are better delegated to the appropriate specialists for analysis.

12

*Nicholas J. Panarella, Esq.*
*Martin A. Krolewski, Esq.*
*Re: Eisner v. Circuit City*
*March 17, 2015*

I should emphasize further that all the opinions rendered in this report have been reached with a reasonable degree of medical certainty. If additional relevant documents become available, I would respectfully request an opportunity to review them and, if appropriate, I will prepare an addendum.

Sincerely,

Robert M. Toborowsky, MD

RMT/at

## Robert M. Toborowsky, MD
## Robert M. Toborowsky, MD, PC

Dr. Toborowsky is a clinical and forensic psychiatrist who practices in Center City Philadelphia where he provides psychotherapy and prescribes psychotropic medication to older adolescents and adults. He is licensed to practice medicine in both Pennsylvania and New Jersey.

In addition to seeing patients, Dr. Toborowsky performs forensic evaluations, consultations and expert testimony for law firms, insurance companies and other businesses, corporations and agencies in a wide variety of civil matters involving Traumatic Brain Injury, Post Traumatic Stress Disorder, Suicide, Psychopharmacology, Sexual Abuse, Harassment, Discrimination, Testamentary Capacity, Worker's Compensation, Malpractice, Disability, Personal Injury, Violence Risk Assessment, and Fitness for Duty, among others. He has testified in local, state and federal courts on numerous occasions on behalf of both defendants and plaintiffs.

As a Clinical Associate Professor of Psychiatry at the University of Pennsylvania Dr. Toborowsky has been actively involved in teaching and supervising medical students, residents and psychology graduate students for many years. In addition, he currently serves as a member of the Ethics Committee of the American Academy of Psychiatry and the Law, and as a member of the Ethics Committee of the Psychiatric Physicians of Pennsylvania.

Dr. Toborowsky earned his medical degree from the Pearlman School of Medicine at the University of Pennsylvania. He then completed a year of training in Internal Medicine at the Mount Sinai Medical Center in New York City, after which he returned to the University of Pennsylvania where he completed a residency and Chief Residency in Psychiatry. Then, while on active duty in the United States Air Force, he served as Chief of Psychiatry at a Strategic Air Command Base.

After discharge from the Air Force he was recruited back to the University of Pennsylvania where he has since served as Medical Director of the Hall Mercer Community Mental Health/Mental Retardation Center and in other leadership roles at Pennsylvania Hospital and the Penn Health System. He is Board Certified by the American Board of Psychiatry and Neurology, in Psychiatry, and for many years he has participated as a senior examiner for the Board.

For eighteen consecutive years he has been named one of the Best Doctors in America, and he has been similarly honored as one of America's Top Psychiatrists by the Consumers' Research Council of America and by Philadelphia Magazine.

**Curriculum Vitae**
**Robert M. Toborowsky, MD**

**February 1, 2015**

| | |
|---|---|
| **Office Address:** | **1700 Sansom Street**<br>**Suite 1101**<br>**Philadelphia, PA 19103**<br>**(215) 399-3535 (office)**<br>**(215) 399-3536 (fax)**<br>**E-mail:  biga310@aol.com** |

**Education:**

| | |
|---|---|
| 1956-60 | B.A. Rutgers University<br>Summa cum laude |
| 1960-64 | M.D., University of Pennsylvania |

**Other Educational Experience:**

U.S. State Department - Rutgers University
Special Exchange Student, University of Buenos Aires,
Argentina - Summer 1959

**Post Graduate Training and Fellowship Appointments:**

| | |
|---|---|
| 1964-65 | Intern, Department of Internal Medicine<br>Mount Sinai Hospital, New York, New York |
| 1965-67 | Resident, Department of Psychiatry<br>University of Pennsylvania |
| 1967-68 | Chief Resident in Psychiatry<br>Department of Psychiatry<br>University of Pennsylvania |
| 1973-75 | Special Fellow in Group Psychotherapy<br>Department of Psychiatry<br>University of Pennsylvania |
| 1984-85 | Special Fellow in Forensic Psychiatry<br>Department of Psychiatry<br>University of Pennsylvania |

**Military Service:**

| | |
|---|---|
| 1968-70 | Captain - U.S.A.F.<br>Chief of Psychiatry, Westover USAF Regional Hospital<br>Acting Consultant, USAF Surgeon General |

Robert M. Toborowsky, MD
Page 2 of 6

**Faculty Appointments:**

| | |
|---|---|
| 1970-80 | Lecturer in Psychiatry<br>Department of Occupational Therapy<br>University of Pennsylvania |
| 1970-72 | Instructor in Psychiatry<br>Department of Psychiatry<br>University of Pennsylvania |
| 1972-73 | Associate in Psychiatry<br>Department of Psychiatry<br>University of Pennsylvania |
| 1973-76 | Assistant Professor of Psychiatry<br>Department of Psychiatry<br>University of Pennsylvania |
| 1976-79 | Assistant Clinical Professor of Psychiatry<br>Department of Psychiatry<br>University of Pennsylvania |
| 1979-85 | Clinical Assistant Professor of Psychiatry<br>Department of Psychiatry<br>University of Pennsylvania |
| **1985-Present** | **Clinical Associate Professor of Psychiatry<br>Department of Psychiatry<br>University of Pennsylvania** |

**Hospital and Administrative Appointments and Professional Activities:**

| | |
|---|---|
| 1969-70 | Senior Psychiatrist<br>Commonwealth of Massachusetts |
| 1969-70 | Director, Drug Abuse Clinic<br>Springfield Hospital Medical Center<br>Springfield, MA |
| 1970-75 | Associate Director<br>Psychiatric Outpatient Department<br>Hospital of the University of Pennsylvania |

Robert M. Toborowsky, MD
Page 3 of 6

**Hospital and Administrative Appointments and Professional Activities (Cont'd):**

| | |
|---|---|
| 1975-76 | Senior Attending Psychiatrist, Director of Psychiatric Clinical Services for the University of Pennsylvania, and Assistant Chief of Psychiatry, Philadelphia General Hospital |
| 1975-78 | Lecturer and Consultant in Psychiatry U.S. Naval Regional Medical Center Philadelphia |
| 1976-77 | Consultant in Psychiatry Philadelphia General Hospital |
| 1976-78 | Consultant in Psychiatry Pennsylvania Bureau of Vocational Rehabilitation |
| 1978-80 | Consultant Psychopharmacology Research and Treatment Unit University of Pennsylvania |
| 1978-83 | Member, Written Examination Committee American Board of Psychiatry and Neurology |
| 1979-82 | Member, Education Committee Philadelphia Psychiatric Society |
| 1979-86 | Faculty Member Continuing Education Project The Institute of Pennsylvania Hospital |
| 1979-94 | Consultant, Benjamin Franklin Clinic Philadelphia |
| 1980-85 | Specialist Site Visitor Residency Review Committee for Psychiatry and Neurology, American Medical Association |
| 1981-82 | Chairman Subcommittee on Community Psychiatric Facilities (Mental Health Services Committee) Pennsylvania Psychiatric Society |
| 1981-82 | Acting Director, Department of Psychiatry Pennsylvania Hospital |
| 1981-86 | Consultant, Veterans Administration Medical Center Philadelphia |

Robert M. Toborowsky, MD
Page 4 of 6

**Hospital and Administrative Appointments and Professional Activities (Cont'd):**

| | |
|---|---|
| 1981-87 | Consultant, Right Associates<br>Philadelphia |
| 1982-89 | Associate Director, Department of Psychiatry<br>Pennsylvania Hospital |
| 1987-90 | Member, Executive Committee<br>Philadelphia Psychiatric Society |
| 1989-90 | Vice Chairman, Department of Psychiatry<br>Pennsylvania Hospital |
| 1990-92 | Acting Chairman, Department of Psychiatry<br>Pennsylvania Hospital |
| 1976-96 | Clinical Director and Chief of Professional Services<br>The Hall Mercer CMH/MRC of Pennsylvania Hospital |
| 1978-97 | Senior Attending Psychiatrist<br>The Institute of Pennsylvania Hospital |
| 1995-98 | Vice President<br>Professional Staff of Pennsylvania Hospital |
| 1995-98 | Member, Executive Committee<br>Pennsylvania Hospital Professional Staff |
| 1992-99 | Member, Standing Appeals Panel for Psychiatry<br>Accreditation Council for Graduate Medical Education |
| 1996-99 | Medical Director, Department of Psychiatry<br>Pennsylvania Hospital |
| 1990-00 | Article Reviewer, Psychiatric Services |
| 1996-01 | Member, Medical Panel<br>Philadelphia Board of Pensions and Retirement |
| 1996-01 | Director, Psychiatric Consultation and Liaison Service<br>Pennsylvania Hospital |
| 1992-01 | Vice Chairman, Department of Psychiatry<br>Pennsylvania Hospital |

Robert M. Toborowsky, MD
Page 5 of 6

**Hospital and Administrative Appointments and Professional Activities (Cont'd):**

| | |
|---|---|
| 1995-03 | Consultant<br>Judge Joseph A. Stokes<br>Workers' Compensation Judge<br>Commonwealth of Pennsylvania<br>Department of Labor and Industry |
| 1996-05 | Senior Proctor - Part I Examination<br>American Board of Psychiatry and Neurology |
| 1998-05 | Consultant<br>Board of Professional and Occupational Affairs<br>Commonwealth of Pennsylvania |
| 1988-08 | Coordinator, House Staff Support System<br>Pennsylvania Hospital |
| 1999-08 | Chairman, Physicians' Health Committee<br>Pennsylvania Hospital (Ad Hoc) |
| 2001-2008 | Forensic Consultant<br>Department of Psychiatry<br>Pennsylvania Hospital |
| **1975-** | **Senior Examiner - Part II Examination**<br>**American Board of Psychiatry and Neurology** |
| **1997-** | **Psychiatrist to Pennsylvania Hospital** |

**Specialty Certification:**

| | |
|---|---|
| 1971- | Diplomate, American Board of Psychiatry and<br>Neurology (in psychiatry) |

**Licensure:**

| | |
|---|---|
| 1965- | Pennsylvania - MD-008309-E |
| 1973- | New Jersey - MA 29439 |

Robert M. Toborowsky, MD
Page 6 of 6

## Awards, Honors and Membership in Honorary Societies:

| | |
|---|---|
| 1956-60 | General Alumni Scholar, Rutgers University |
| 1956-60 | California Oil Company Scholar, Rutgers University |
| 1960-64 | Robert Wood Johnson Scholar |
| | University of Pennsylvania School of Medicine |
| 1960-64 | Leopold Schepp Scholar |
| | University of Pennsylvania School of Medicine |
| 1960- | Freylinghuysen Prize for Academic Excellence |
| | Rutgers University |
| 1960 | Phi Beta Kappa |
| 1963 | Alpha Omega Alpha |

## Membership in Professional and Scientific Societies:

### National Societies:

American Psychiatric Association
American Academy of Psychiatry and the Law: **Member, Ethics Committee**

### Local Societies:

Philadelphia Psychiatric Society
Psychiatric Physicians of Pennsylvania: **Member, Ethics Committee**
College of Physicians of Philadelphia: **Member, Section on Medicine, Ethics and the Law**

## Academic and Institutional Committees:

2008 - Present    **Member, Ethics Committee**
Pennsylvania Hospital

## Major Academic and Clinical Teaching Responsibilities at the School of Medicine, University of Pennsylvania:

1) PS 200 - **Ethics Lectures**, throughout the year: University of Pennsylvania Medical Students.
2) MD301 - **(Preceptor) The Doctor-Patient Relationship Course**: University of Pennsylvania Medical Students.

## Other Major Professional Activities:

1970-Present    **Private Practice, Adult and Forensic Psychiatry**

| | List of Cases*<br>Robert M. Toborowsky, MD<br>2007-2008 | 1 of 8 |
|---|---|---|
| Patricia Drake vs. Robert J. James, et al<br>Pamela A. Carlos, Esq.<br>Bennett, Bricklin & Saltzburg, LLP<br>(Defense) | Deposition<br>Court of Common Pleas<br>Philadelphia County<br>November Term 2003<br>No. 2726 | January 12, 2007 |
| Korzeniowski v. Lind, et al<br>James Toll, Esq.<br>Sills Cummins Epstein & Gross,PC<br>(Plaintiff) | Deposition<br>Superior Court of New Jersey<br>Law Division: Essex County<br>Docket No. ESX-L-6273-04 | February 19, 2007 |
| Melissa Brangan v. Nationwide Insurance<br>John Lewis, Esq.<br>Swartz Campbell<br>(Defense) | Arbitration Hearing<br>Underinsured Motorist Arbitration<br>Court of Common Pleas<br>Bucks County<br>Docket #060507332-06 | April 4, 2007 |
| Debbie Roque v. PNC Bank<br>Francis J. Sherry, Esq.<br>Foley & Sherry, LLC<br>(Defense) | Deposition<br>Commonwealth of Pennsylvania<br>Department of Labor and Industry<br>Bureau of Workers' Compensation<br>Bureau Claim No. 2358681<br>SSN 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 | April 11, 2007 |
| Patricia J. Hough et al v. Javia et al<br>Michael Brophy, Esq.<br>Harvey Pennington Ltd.<br>(Defense) | Deposition<br>Court of Common Pleas<br>Northampton County<br>No. 1998-C9401 | May 14, 2007 |
| Craig McLaurin v. SEPTA<br>Doreen P. Grant, Esq.<br>Schaff and Young, P.C.<br>(Defense) | Deposition<br>Commonwealth of Pennsylvania<br>Dept. of Labor and Industry<br>Bureau of Workers' Compensation<br>Bureau Claim No. 3D51488<br>SSN: 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 | June 13, 2007 |
| Dennis J. Buchanan et al v. S.G.F. Cardiology, Inc., et al<br>John C. Farrell, Esq.<br>Marshall, Dennehey, Warner, Coleman & Giggin<br>(Defense) | Trial Testimony<br>Court of Common Pleas<br>Delaware County, Pennsylvania<br>No. 05-05489 | December 10, 2007 |
| Rodriguez v. Home Depot, USA, Inc. et al<br>Patrick Brady, Esq.<br>Gibbons<br>(Defense) | Deposition<br>Superior Court of New Jersey<br>Morris County<br>Docket No.: MOR-L-3457-05 | April 1, 2008 |
| Deborah Fulton vs. Johnson & Johnson, et al<br>Larry L. Turner, Esq.<br>Morgan, Lewis & Bockius,LLP<br>(Defense) | Trial Testimony<br>United States District Court for the Division of New Jersey<br>Civil Action No. 05-1891 (SRC) | May 12, 2008 |
| Geist v. General Motors Corporation<br>Michael A. Kaplan, Esq.<br>Jarve Kaplan Granato LLC<br>(Plaintiff) | Trial Testimony<br>Camden County Superior Court - Hall of Justice<br>CAM-L-5997-04 | August 8, 2008 |
| | | |

*Cases listed are limited to those that required Dr. Toborowsky's deposition or trial testimony

| | List of Cases*<br>Robert M. Toborowsky, MD<br>2008 – 2009 | 2 of 8 |
|---|---|---|
| DeLuca v. Commerce Bank<br>Mark C. Orlow, Esq.<br>Begelman & Orlow, P.C.<br>(Plaintiff) | Deposition<br>Burlington County<br>Superior Court Docket L-3588-06 | August 15, 2008 |
| Christine Flamer v. Worldwide Flight<br>Services<br>Elizabeth S. Cavallaro, Esq.<br>Post & Schell, P.C.<br>(Defense) | Deposition<br>Commonwealth of Pennsylvania<br>Department of Labor and Industry<br>Bureau Claim No. 3003494<br>Social Security No.: 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 | September 16, 2008 |
| Heather Nardello v. Applebee<br>American Group et al<br>Marc M. Orlow, Esq.<br>Begelman & Orlow, P.C.<br>(Plaintiff) | Deposition<br>Superior Court of New Jersey<br>Law Division - Camden County<br>No: CAM-L-9-06 | October 27, 2008 |
| Alicia Buchanan v. West Goshen<br>Township, et al<br>Matthew J. Connell, Esq.<br>Holstein Associates<br>(Defense) | Deposition<br>U.S.D.C. for the Eastern District of<br>Pennsylvania<br>No. 08-00462 | January 8, 2009 |
| Douglas J. McClure v. Catholic<br>Diocese of Wilmington, Inc., et al<br>Neilli Mullen Walsh, Esq.<br>Young, Conaway, Stargate LLP<br>(Defense) | Deposition<br>Superior Court of the State of<br>Delaware, New Castle<br>C.A. No.: 06C-12-235 (CLS) | March 23, 2009 |
| Marc N. Berman v. Ballet Makers,<br>Inc.<br>Vincent N. Avallone, Esq.<br>K & L Gates<br>(Defense) | Deposition<br>United States District Court for the<br>District of New Jersey<br>C.A. No.: 2:08-cv 01032-FSH-MAS | April 23, 2009 |
| Commonwealth of PA v. Michael A.<br>Fuentes, MD<br>Joseph A. Amendola, Esq.<br>(Defense) | Trial Testimony<br>Court of Common Please of Centre<br>County<br>C.A. No.: 2007-1389 | June 3, 2009 |
| Kweh v. Darby Township et al<br>Robert P. DiDomenicis, Esq.<br>Holstein & Associates<br>(Defense) | Trial Testimony<br>U.S.D.C. for the Eastern District of<br>Pennsylvania<br>08-3347 | June 24, 2009 |
| Vai v. Catholic Diocese of<br>Wilmington, Inc., et al<br>Neilli Mullen Walsh, Esq.<br>Young Conaway Stargate & Taylor,<br>LLP<br>(Defense) | Deposition<br>Superior Court of Delaware in and<br>for New Castle County<br>Civil Action: 08C-06-044 (JTV) | July 16, 2009 |
| John Doe v. Catholic Diocese of<br>Wilmington, Inc., et al<br>Neilli Mullen Walsh, Esq.<br>Young Conaway Stargate & Taylor,<br>LLP<br>(Defense) | Deposition<br>Superior Court of Delaware in and<br>for New Castle Delaware<br>Civil Action: 08C-10-028 (JTV) | July 16,2009 |
| Wilson v. Kelsch<br>Leo M. Gibbons, Esq.<br>MacElree Harvey, Ltd.<br>(Plaintiff) | Deposition<br>Chester County Court of Common<br>Pleas<br>CCP No.: 07-06312 | July 22, 2009 |

*Cases listed are limited to those that required Dr. Toborowsky's deposition or trial testimony

| | List of Cases*<br>Robert M. Toborowsky, MD<br>2009 – 2010 | 3 of 8 |
|---|---|---|
| John Doe  et al v. Catholic Diocese of Wilmington, Inc., et al<br>Neilli Mullen Walsh, Esq.<br>Young, Conaway, Stargate, LLP<br>(Defense) | Deposition<br>Superior Court of the State of Delaware, New Castle<br>C.A. No.: 07C-09-025 (JTV) | September 10, 2009 |
| James E. Sheehan v. Oblates of St. Francis deSales, et al<br>Colleen D. Shields, Esq.<br>Elzufron Austin Reardon Tarlov & Mondell, P.A.<br>(Defense) | Deposition<br>Superior Court of the State of Delaware, New Castle<br>C.A. No.: 07C-11-234 (CLS) | September 16, 2009 |
| Wyche v. Kharod<br>Eileen Lampe, Esq.<br>Eckert Seamans Cherin & Mellott, LLC<br>(Defense) | Trial Testimony<br>CCP Philadelphia<br>April 2007, No. 1667 | October 21, 2009 |
| James E. Sheehan v. Oblates of St. Francis de Sales, et al<br>Colleen D. Shields, Esq.<br>Elzufon Austin Reardon Tarlov & Mondell, P.A.<br>(Defense) | Trial Testimony<br>Superior Court of the State of Delaware, New Castle<br>C.A. No.: 07C-11-234 (CLS) | November 19, 2009 |
| Salvatore DiLisio, et al v. Peter A. Sinaiko, MD, et al<br>Steven Costello, Esq.<br>Post & Schell, P.C.<br>(Defense) | Trial Testimony<br>Court of Common Pleas<br>Bucks County<br>No. 02001692 | December 3, 2009 |
| In the matter of the Petition for Reinstatement of the Veterinary License of Cynthia L. Maro, DVM, Petitioner<br>Anne Gingrich, Esq.<br>Post & Schell<br>(Plaintiff) | Commonwealth of PA Dept. of State<br>The State Board of Veterinary Medicine<br>Docket No.: 1709-57-09<br>File No.: 09-57-09039 | Testimony at Hearing<br>December 23, 2009 |
| Lolita Jones-N'Diaye vs. SEPTA<br>Doreen P. Grant, Esq.<br>Schaff & Young, P.C.<br>Defense | Deposition<br>Commonwealth of Pennsylvania Department of Labor & Industry Bureau of Workers' Compensation<br>S.S.No.: 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<br>No. 3431369 | January 12, 2010 |
| Kelly Theresa Matthews vs. Friends Hospital<br>Jeffrey Bates, Esq.<br>Marshall, Dennehey, Warner, Coleman & Goggin<br>(Defense) | Testimony at Arbitration Hearing<br>CCP Philadelphia<br>July Term - 2005<br>No.: 001047 | January 22, 2010 |
| Zimmerman v. Toyota Material Handling, Inc., et al<br>James Waldenberger, Esq.<br>Kline & Specter P.C.<br>(Plaintiff) | Trial Testimony<br>Court of Common Pleas<br>Philadelphia County<br>Civil Trial Division<br>May Term, 2007<br>No. 004119 | February 4, 2010 |

*Cases listed are limited to those that required Dr. Toborowsky's deposition or trial testimony

|  | List of Cases*<br>Robert M. Toborowsky, MD<br>2010 | 4 of 8 |
|---|---|---|
| Michael Richards v. Johnson & Johnson, Inc., et al<br>Jane Rigby, Esq.<br>McElroy, Deutsch, Mulvaney & Carpenter, LLP<br>(Defense) | Trial Testimony<br>United States District Court of New Jersey<br>Civil Action No.: 05-CV-3663 | February 9, 2010 |
| Dawn Cassidy, et al vs. Crozer-Chester Medical Center, et al<br>Kathleen Foley Burke, Esq.<br>Post & Schell<br>(Defense) | Trial Testimony<br>Court of Common Pleas<br>Delaware County<br>No. 07-8172 | February 18, 2010 |
| John Dougherty v. St. Ann's Roman Catholic Church<br>Colleen D. Shields, Esq.<br>Elfuzon Austin Reardon Tarlov & Mondell, P.A.<br>(Defense) | Deposition<br>Superior Court of the State of Delaware<br>Civil Action No.: 09-06-141 CLS | March 22, 2010 |
| Oglesby v. US Airways Group, Inc.<br>Trisha M. Cruz, Esq.<br>Littler Mendelson, PC<br>(Defense) | Deposition<br>Commonwealth of PA<br>Dept. of Labor & Industry<br>Bureau of Workers' Compensation<br>Bureau Claim No. 3099312 | May 19, 2010 |
| Lucy Rorrer et al v. Cleveland Steel Container Corp., et al<br>Martha Sperling, Esq.<br>Silver and Sperling, LLP<br>(Plaintiff) | Trial Testimony<br>United States District Court for the Eastern District of Pennsylvania<br>Civil Action No.: 08-671 | June 17, 2010 |
| EEOC v. 99 West, Inc.<br>Woody Anglade, Esq.<br>(Plaintiff) | Deposition<br>United States District Court for the Eastern District of Pennsylvania<br>Civil Action No. 09-4422 | July 7, 2010 |
| Rhonda Denson Johnson v. Atlantic County, et al<br>Paul R. Melletz, P.A.<br>(Plaintiff) | Trial Testimony<br>United States District Court for the District of New Jersey<br>Civil Action No.: 07-CV-04212 | August 25, 2010 |
| Estate of Jose Fontanez v. Temple University Hospital<br>George L. Young, Esq.<br>Young and McGilvery, P.C.<br>(Defense) | Deposition<br>Philadelphia Court of Common Pleas<br>July 2008 Term<br>Civil Action No.: 04304 | October 19, 2010 |
| Shields et al v. Holy Redeemer Hospital & Medical Center, et al<br>Amalia Romanowicz, Esq.<br>Post & Schell<br>(Defense) | Trial Testimony<br>Montgomery County Court of Common Pleas<br>Civil Action No.: 06-17171 | November 1, 2010 |
| Cianfrani and Russell v. City of Clifton Heights, et al<br>Robert P. DiDomenicis, Esq.<br>Holstein & Associates<br>(Defense) | Trial Testimony<br>United States District Court for the Eastern District of Pennsylvania<br>Civil Action No.: 09-0046 | November 10, 2010 |

*Cases listed are limited to those that required Dr. Toborowsky's deposition or trial testimony

| | List of Cases*<br>Robert M. Toborowsky, MD<br>2010-2011 | 5 of 8 |
|---|---|---|
| Vai v. Catholic Diocese of Wilmington, Inc.<br>Colleen Shields, Esq.<br>Elzufon Austin Reardon Tarlov & Mondell, P.A.<br>(Defense) | Trial Testimony<br>Superior Court of Delaware in and for New Castle County<br>Civil Action No: 08C-06-044 JTV | November 18, 2010 |
| Joseph Curry v Catholic Diocese of Wilmington, Inc., et al<br>Colleen Shields, Esq.<br>Elzufon Austin Reardon Tarlov & Mondell, P.A.<br>(Defense) | Deposition Testimony<br>Superior Court of Delaware in and for New Castle County<br>Civil Action No.: 08C-08-043 CLS | December 2, 2010 |
| Regina Smith v. US Airways<br>Trish M. Cruz, Esq.<br>Littler Mendelson, P.C.<br>(Defense) | Deposition Testimony<br>Commonwealth of Pennsylvania Dept. of Labor and Industry Bureau of Workers' Compensation<br>B.C.#: 3547254 | December 10, 2010 |
| Anthony Kramedas and Christopher J. Mauro v. Oblates of St. Francis deSales<br>Colleen Shields, Esq.<br>Elzufon Austin Reardon Tarlov & Mondell, P.A.<br>(Defense) | Deposition Testimony<br>Superior Court of Delaware in and for New Castle County<br>Civil Action No.: 08C-08-028 JRS | February 4, 2011 |
| Stone/Desir v Temple Hospital, et al<br>Suzanne Pritchard, Esq.<br>McCann & Geschke<br>(Defense) | Trial Testimony<br>Philadelphia Court of Common Pleas<br>February Term 2009<br>No.: 0245 | February 10, 2011 |
| Joseph Coppock v. US Airways<br>Christopher M. Fox, Esq.<br>Littler Mendelson, P.C.<br>(Defense) | Deposition Testimony<br>Commonwealth of Pennsylvania Dept. of Labor and Industry Workers' Compensation<br>#3720727 | April 21, 2011 |
| Lockbaum v. Ridgeway et al<br>Michael A. Trunk, Esq.<br>Klein & Specter, P.C.<br>(Plaintiff) | Deposition Testimony<br>Superior Court of New Jersey Law Division<br>Atlantic County<br>Docket No.: ATL-L-2852-09 | May 10, 2011 |
| Perry and Perry vs. Universal Health Services, Inc., et al<br>Larry Bennett, Esq.<br>Weber, Gallagher, Simpson, Stapleton, Fires and Newby, LLP<br>(Defense) | Deposition Testimony<br>Superior Court of New Jersey Law Division<br>Burlington County<br>Docket No.: BUR-6-2823-09 | August 25, 2011 |
| Matthews v. KPM, LLP<br>Peter O. Hughes, Esq.<br>Ogletree, Deakens, Nash, Smoak & Stewart, P.C.<br>(Defense) | Trial Testimony<br>Philadelphia Court of Common Pleas<br>May Term, 2010<br>No. 01537 | September 21, 2011 |
| | | |

*Cases listed are limited to those that required Dr. Toborowsky's deposition or trial testimony

| | List of Cases*<br>Robert M. Toborowsky, MD<br>2011-2013 | 6 of 8 |
|---|---|---|
| Koren v. Verizon<br>Communications<br>Post & Schell, P.C.<br>Peter M. Harrison, Esq.<br>(Defense) | Deposition Testimony<br>Commonwealth of Pennsylvania<br>Department of Labor and<br>Industry<br>Bureau of Workers'<br>Compensation | November 2, 2011 |
| Estate of Coleen Miller v. RWJ<br>Univ. Hospital, et al<br>James D. Martin, Esq.<br>(Plaintiff) | Deposition Testimony<br>Superior Court of New Jersey<br>Law Division-Middlesex County<br>Docket No.:  MID-L-1368-08 | November 3, 2011 |
| Holland v Cronin, et al<br>Gregory S. Nesbitt, Esq.<br>Kilcoyne c. Nesbitt<br>(Defense) | Trial Testimony<br>Court of Common Pleas<br>Delaware County<br>Civil Division<br>No. 09-13585 | April 2, 2012 |
| Micciulla v. Woodland Financial<br>Services, Inc.<br>David C. Franceski, Esq.<br>Stradley Ronin Stevens & Young,<br>LLP<br>(Plaintiff) | Testimony Before Finra Dispute<br>Resolution Arbitration<br>Panel No.: 10-05689 | May 3, 2012 |
| Anthony D. Costa et al v. Amy A.<br>Costa, et al<br>J. Llewellyn Mathews, Esq.<br>(Plaintiff) | Trial Testimony<br>Superior Court of New Jersey<br>Chancery Division<br>Burlington County<br>Probate Part<br>Docket No.:  209-0692 | June 5, 2012 |
| Michael M. Choy vs Comcast<br>Cable Communications, Inc.<br>Frank A. Chernak, Esq.<br>Ballard Spahr LLP<br>(Defense) | Trial Testimony<br>U.S. District Court for the<br>District of New Jersey<br>CA No.: 08-CV-4092-RBK-<br>AMD | September 12, 2012 |
| Morrison vs. Verizon<br>Pennsylvania<br>Peter M. Harrison, Esq.<br>Post & Schell<br>(Defense) | Deposition Testimony<br>Commonwealth of Pennsylvania<br>Department of Labor & Industry<br>Bureau of Workers' compensation<br>BCN2983175 | October 19, 2012 |
| John Garner v. USA Airways<br>John J. O'Donnell, Esq.<br>Littler Mendelson, P.C.<br>(Defense) | Deposition Testimony<br>Commonwealth of Pennsylvania<br>Department of Labor & Industry<br>BCN: 288897 | March 6, 2013 |
| Rolland V. Senn<br>Paul A. Lauricella, Esq.<br>McLaughlin & Lauricella, P.C.<br>(Plaintiff) | Trial Testimony<br>Philadelphia County<br>Court of Common Pleas<br>Civil Trial Division<br>No. 3110 | March 18, 2013 |
| Wisniewski v School Dist. Phila.<br>Eric M. Burry, Esq.<br>Musi, Malone & Daubenberger,<br>LLP (Defense) | Deposition Testimony<br>Commonwealth of Pennsylvania<br>Department of Labor & Industry<br>Bureau  Workers Compensation<br>SSN: 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 | June 14, 2013 |

*Cases listed are limited to those that required Dr. Toborowsky's deposition or trial testimony

| | List of Cases*<br>Robert M. Toborowsky, MD<br>2013-2014 | 7 of 8 |
|---|---|---|
| In the Matter of the Estate of William J. Mallas, Deceased<br>Ronald J. Busch, Esq.<br>Busch & Busch, LLP<br>(Plaintiff) | Deposition<br>Superior Court of New Jersey<br>Middlesex County<br>Chancery Division: Probate Part<br>Civil Action<br>Docket No.: 229203 | July 18, 2013 |
| In the Matter of the Estate of William J. Mallas, Deceased<br>Ronald J. Busch, Esq.<br>Busch & Busch, LLP<br>(Plaintiff) | Trial Testimony<br>Superior Court of New Jersey<br>Middlesex County<br>Chancery Division: Probate Part<br>No. 229203 | August 14, 2013 |
| Robert Snyder v. City of Philadelphia Dept. of Public Health<br>Toi Shields, Esq.<br>City of Philadelphia Law Dept.<br>(Defense) | Trial Testimony<br>Court of Common Pleas<br>Philadelphia County<br>December Term, 2012<br>No. 03502 | February 25, 2014 |
| Jasmine Vicente v Logisticare<br>Peter M. Harrison, Esq.<br>Weber Gallagher<br>(Defense) | Deposition<br>Commonwealth of Pennsylvania<br>Department of Labor and Industry<br>Bureau of Workers' Compensation<br>Bureau Claim No. 4131378 | February 27, 2014 |
| Bobbie Lynn Pierce v. Cherry Hill Township<br>Anthony Marchetti, Esq.<br>Marchetti Law, P.C.<br>(Plaintiff) | Deposition<br>Superior Court of New Jersey<br>Camden County<br>Law Division<br>Docket No. CAM-L-5868-08 | April 16, 2014 |
| In the Matter of the Application for a License as a Physician Assistant of Stefanie Schnier, Applicant<br>Richard Q. Hark, Esq.<br>(Defense) | Testimony before Hearing Examiner Marc. A. Moyer, Esq.<br>@ 1 Penn Center, Harrisburg, PA<br>Docket No.: 0187-49-14 | July 31, 2014 |
| Mary Boardman vs. Brown's Super Stores<br>Dimetrius Mavroudis, Esq.<br>City of Phila. Law Department<br>(Defense) | Trial Testimony<br>US District Court for the Eastern District of Pennsylvania<br>No. 2:13-CV-01499-PD | October 28, 2014 |
| In the Matter of the Application for a License as a Nurse of Nicole O'Callaghan<br>Richard Q. Hark, Esq.<br>(Defense) | Testimony before Hearing Examiner Ruth Dunnewold, Esq.<br>@ 1Penn Center, Harrisburg, PA<br>Docket No.: 0505-51-14 | October 29, 2014 |
| Romanowski v. Ameripath New York LLC et al<br>Michael T. Hensley, Esq.<br>Bressler Amery & Ross PC<br>(Defense) | Deposition<br>Superior Court of New Jersey<br>Law Division: Essex County<br>Docket No.: ESX-L-6932-11 | November 4, 2014 |
| | | |

*Cases listed are limited to those that required Dr. Toborowsky's deposition or trial testimony

| | List of Cases*<br>Robert M. Toborowsky, MD<br>2014-2015 | 8 of 8 |
|---|---|---|
| Koren v. Verizon Corp.<br>Peter Harrison, Esq.<br>Weber Gallagher<br>(Defense) | Deposition<br>Commonwealth of Pennsylvania<br>Dept. Labor & Industry<br>Bureau of Workers'<br>Compensation<br>Bureau Claim #2045643 | November 11, 2014 |
| Touey & Touey v. Geisinger<br>Wyoming Valley Medical Center<br>Charles Eppolito, Esq.<br>White and Williams<br>(Defense) | Trial Testimony<br>Luzerne County CCP No. 1856<br>of 2000 | February 18, 2015 |
| Schmidt v. Overlook Medical<br>Center, AHS Hospital Corp., et al<br>Steven F. Ritardi, Esq.<br>Carmagnola & Ritardi, LLC<br>(Defense) | Deposition<br>Superior Court of New Jersey<br>Law Division – Union County<br>Docket No. UNN-L-3939-11 | March 18, 2015 |

*Cases listed are limited to those that required Dr. Toborowsky's deposition or trial testimony

**Mailing Address**
**Robert M. Toborowsky, MD, PC**
**1700 Sansom Street - Suite 1101**
**Philadelphia, PA 19103**
**(215) 399-3535 (office)**
**(215) 399-3536 (fax)**
**Email: biga310@aol.com**

### Tax I.D. # 23-2105478

### Fee Schedule  - January 1, 2015 - Robert M. Toborowsky, MD, PC

1)   Record Review, Consultation, Forensic Examination*,
     Report Writing and Preparation for Trial or
     Deposition Testimony:                                $625.00 per hour

2)   Deposition Testimony:                                $3,500.00**

3)   Courtroom Appearance:                                $5,000.00***

4)   Travel Time and Expenses:                            By arrangement

5)   **Retainer Policy:**                                 **Except by arrangement a**
                                                          **retainer of $3,500 is**
                                                          **required prior to undertaking**
                                                          **a record review or performing**
                                                          **a psychiatric evaluation.**

\*       **A cancellation fee of $625 will apply to all psychiatric examinations not cancelled at**
         **least five business days before the appointed time, whether rescheduled or not.**

\*\*     **Payable three weeks in advance.  After four hours there will be an additional charge of**
         **$625 per hour.  A cancellation fee of $1,250 will be applied unless canceled at least ten**
         **business days before the appointed time, whether rescheduled or not.  If not canceled**
         **at least five business days before the appointed time, there will be no refund.**

\*\*\*   **Payable three weeks in advance.  A cancellation fee of $2,500 will be applied unless**
         **canceled at least ten business days before the appointed time, whether rescheduled**
         **or not.  If not canceled at least five business days before the appointed time, there will**
         **be no refund.**