Steven T. Gubner, Esq.
EZRA BRUTZKUS GUBNER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, California 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099

and

Eric D. Winston, Esq. (*pro hac* pending)
Justin C. Griffin, Esq. (*pro hac* pending)
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Special Litigation Counsel for Alfred H. Siegel,*
*Liquidating Trustee*

Andrew W. Caine (admitted *pro hac vice*)
PACHULSKI, STANG, ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Flr.
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083)
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Facsimile: (804) 783-0178

*Counsel for Trustee of the  Circuit City Stores, Inc.*
*Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| *In re*<br>CIRCUIT CITY STORES, INC., *et al.*,<br>                    Debtors.<sup>1</sup> | Case No. 08-35653 (KRH) |
| ALFRED H. SIEGEL, solely as Trustee of the Circuit City Stores, Inc. Liquidating Trust, and not in any individual or other capacity,<br><br>                    Plaintiff,<br>          v.<br><br>CALIFORNIA SELF-INSURERS' SECURITY FUND and CHRISTINE BAKER, solely in her capacity as Director of the California Department of Industrial Relations<br><br>                    Defendants | Chapter 11<br><br>(Jointly Administered)<br><br>Adv. No. 15-_____ |

<sup>1</sup>    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Circuit City Stores, Inc. (3875), Circuit City Stores West Coast, Inc. (0785), InterTAN, Inc. (0875), Ventoux International, Inc. (1838), Circuit City Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC Distribution Company of Virginia, Inc. (2821), Circuit City Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796), Sky Venture Corp. (0311), PRAHS, Inc. (n/a), XSStuff, LLC (9263), Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics, LLC (3360), and Circuit City Stores PR, LLC (5512).

## LIQUIDATING TRUSTEE'S COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES OWED TO THE TRUST

Alfred H. Siegel, the duly appointed trustee (the "Trustee") of the Circuit City Stores, Inc. Liquidating Trust ("Trust") files this complaint against the California Self-Insurers' Security Fund ("Fund") and Christine Baker, solely in her capacity as Director of the California Department of Industrial Relations (the "Department of Industrial Relations"), and alleges as follows:

## NATURE OF THE ACTION

1.      The Fund is supposed to be a vehicle by which injured workers may be compensated for their injuries even when their employers have filed for bankruptcy and may lack the resources to pay workers' compensation claims in full.  When the Fund takes on such obligations, it is entitled under California law to obtain security and to seek reimbursement from the employer to the extent that security is insufficient.

2.      The Fund is not supposed to be a vehicle to take advantage of insolvent companies and enrich itself by improperly seizing collateral and then conjuring up false estimates of future claims and inflating expenses to justify retention of seized collateral.

3.      With respect to Circuit City, however, the Fund clearly has engaged in this misconduct.  After Circuit City commenced these bankruptcy cases and announced its liquidation, the Fund drew down the entirety of a $14,119,256 letter of credit (the "Letter of Credit") posted by Circuit City prepetition, even though the Fund had no legitimate basis to conclude that its existing and future obligations to administer workers' compensation claims would ever come close to the amount of the proceeds of the Letter of Credit and had a legal obligation to return the excess.

4.    To make matters worse, the Fund filed nine proofs of claim in these cases, including administrative expense claims, totaling in excess of $58 million, repeatedly representing to this Court, the Debtors' estates, and their creditors that the Fund reasonably believed it was entitled to tens of millions of dollars for reimbursement over and above $14,119,256 in Letter of Credit proceeds it had taken to satisfy any obligations.

5.    Moreover, the Fund has resisted the Trust's formal and informal efforts to obtain information underlying the Fund's claims and administration of the subject workers compensation claims.  The Trust has been forced to spend substantial sums in legal and other professional fees to independently investigate, and object to, the Fund's asserted claims – claims that have affected the availability of funds for distributions to unsecured creditors.  At every stage, the Fund has exhibited "hide the ball" behavior in an effort to evade discovery that there is no factual basis for its claims.

6.    To this day the Fund has refused to disclose any facts or provide any financial information supporting why it is appropriate for the Fund to continue to hold on to all of the $14,119,256 in Letter of Credit proceeds, because it cannot.

7.    The Fund's conduct is inexcusable.  To remedy the harms the estates and their creditors have suffered, the Trust brings this action to declare as property of estate the Trust's right to recover Letter of Credit proceeds in excess of the Fund's legitimate underlying claim payments and reasonable costs of administration.  This action asserts claims for unjust enrichment and abuse of discretion for failure to refund excess Letter of Credit proceeds, and claims under California's Unfair Competition Law for restitution

and injunctive relief to ensure that the Fund does not engage in similar misconduct against vulnerable insolvent or bankrupt companies.  The Trust seeks sanctions for the Fund filing of grossly exaggerated proofs of claim in these bankruptcy cases and then refusing to withdraw them until long after the Trust incurred substantial fees and expenses investigating the clearly baseless claims.

### THE PARTIES

8.      The Trustee is the duly appointed trustee of the Circuit City Stores, Inc. Liquidating Trust ("Trust"), successor in interest to the Debtors pursuant to the confirmed Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession and its Official Committee of Creditors Holding General Unsecured Claims (the "Plan").  The Trustee has the sole authority to pursue claims transferred to the Trust by the Debtors through the Plan. The claims for relief stated herein are claims transferred to the Trust by the Debtors through the Plan.

9.      The Trustee is informed and believes, and based thereon alleges, that the Fund is an entity created pursuant to California statute.  The Fund was directed by the Department of Industrial Relations to assume administration of workers' compensation claims against the Debtor.  Even though it was created by California law, the Fund is not a governmental unit within the meaning of 11 U.S.C. § 101(27) or "arm of the state" or instrumentality of California.  To the extent that the Fund is deemed to be either a governmental unit, an "arm of the state," or an instrumentality of California, then any sovereign immunity has been waived.

10.     The Trustee is informed and believes, and based thereon alleges, that

Defendant Christine Baker (the "Director"), is an individual and is the Director of the

California Department of Industrial Relations.  The Trustee asserts two claims against the

Director solely as nominal defendant.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157

and 1334.

12.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§§ 157(b)(2)(B), (C), (E), and (O), and pursuant to the proofs of claim filed the Fund in

this case.

13.     Venue properly lies in this judicial district pursuant to 28 U.S.C. §§ 1408

and 1409, as the Debtors' underlying bankruptcy cases are pending before this Court.

14.     The statutory and legal predicates for the relief requested in this

Complaint are sections 105 and 541 of Title 11 of the United States Code ("Bankruptcy

Code"), 28 U.S.C. § 2201, Rule 3007 of the Federal Rule of Bankruptcy Procedure

("Bankruptcy Rules"), and applicable California law.

## GENERAL ALLEGATIONS

15.     On November 10, 2008 ("Petition Date"), Circuit City Stores, Inc.

("Circuit City") and Circuit City Stores West Coast, Inc. ("CC-West" and, with Circuit

City, the "Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code.

16.     Prior to the commencement of their chapter 11 cases, the Debtors were

"self-insured" employers for purposes of their workers' compensation obligations.

17.     Because they were self-insuring their workers' compensation exposure, the Debtors acquired workers' compensation excess liability insurance policies.  Under these policies, self- insured retention (SIR) levels ranged from $300,000 to $2,000,000 per claim, meaning that excess insurance generally would become available once the SIR level had been reached.

18.     Prior to the Petition Date, over the prior ten years, the Debtors averaged 528 workers' compensation claims per accident year in California.  Such claims were often reported within one year of the accident date.

19.     Because the Debtors were in the retail business, the vast majority of workers' compensation claims involved minor injuries.  The average and median amounts paid on workers' claims was just under $8,000 per claim.  Of the 5,813 claims reported within ten years prior to the Petition Date, 5,654 (or 97%) were closed as of October 31, 2008.  Thus, most of the Debtors' workers' compensation claims were completely compensated for no more than $8,000 each.

20.     Based on the Debtors' election to self-insure for workers' compensation claims, the Debtors were required to post and maintain security deposits with the State of California Office of Self-Insurance Plans to ensure that sufficient funds were available to satisfy employee claims on an ongoing basis throughout any given year.  Prepetition the Debtors always complied with this requirement, but were always able to fully satisfy obligations on worker claims without drawing down on this security.

21.     Just months prior to the Petition Date, on or about July 1, 2008, the Debtors obtained and posted with the Office of Self-Insurance Plans the Letter of Credit,

which was issued by Bank of America, N.A. ("BofA"). This Letter of Credit remained in place after the filing of Debtors' bankruptcy petitions.

22.     Under the Labor Code, when a self-insured employer becomes unable to satisfy its workers' compensation obligations, at the direction of the Director the Fund is authorized to obtain possession of posted security in amounts necessary to satisfy employee claims and take over the administration and payment of the employer's workers' compensation liabilities. The posted security may be used by the Fund to pay the employer's claims and to pay the Fund's related reasonable administrative expenses, but all excess funds must be refunded to the employer, and the Director is obligated to exercise discretion to ensure that the Fund does refund the excess.

## A.    **The Bankruptcy Cases**

23.     A few months after the Petition Date, the Debtors entered into, and this Court approved, sales of assets, authorized the Debtors to discontinue all remaining operations, and authorized "going out of business" sales at the Debtors' remaining stores ("Final Store Closing Sales").

24.     The Final Store Closing Sales ran from January 17, 2009 to March 8, 2009, which is the approximate date when the last remaining Circuit City store closed and virtually all of Debtors' day-to-day employees were terminated.

25.     As set forth in the Final Store Closing Agreement, liquidators conducting the Final Store Closing Sales assumed any workers' compensation claims that arose during the Final Store Closing Sales. Thus, workers' compensation claims that the

Debtors might be responsible for were effectively cut off as of January 17, 2009 (the "Transition Date").

26.    On information and belief, on or about the Transition Date there were open (i.e, not fully resolved) 144 reported workers' compensation claims against the Debtors.

27.    Prior to March 24, 2009, Debtors were informed that the Letter of Credit would not be renewed by BofA.  Because the Debtors had already announced their liquidation, representatives of the Debtors informed the California Self-Insurers Security Fund that Debtors would not be able to post any security.

28.    On information and belief, on or about April 3, 2009, the Director instructed the Fund to assume administration and payment of all Debtors' workers' compensation claims made by employees of the Debtors who sustained injuries. Immediately thereafter, the Director authorized the Fund to draw down on the entirety of Debtors' Letter of Credit to satisfy alleged pending claims, "estimating" future liability of approximately $12,389,557.00 with specific excess insurance covering $1,797,219.00 of that sum (meaning that the Fund's admitted maximum possible exposure was significantly less than the amount of the Letter of Credit proceeds).

29.    The Fund did not explain the basis for this estimate at the time, has refused to do so to date, and has never explained why it was necessary to draw down the entirety of the Letter of Credit when its own (unexplained) estimate of future liability was substantially less than the amount of the Letter of Credit.

30.     On information and belief, the Fund made no effort to determine whether

drawing down the entire amount of the Letter of Credit was justified or had any factual

basis.  On information and belief, it must have become obvious within a short time after

the Transition Date to the Fund that, given the number and nature of the open workers'

compensation claims and the existence of excess insurance, the Fund would need little, if

any, of the Letter of Credit proceeds to discharge its obligations.

**B.**     **The Claims**

31.     In addition to drawing down the entire Letter of Credit, the Fund filed the

below-described Proofs of Claims, including five after it took over administration of

workers' compensation claims:

| Claim # | Filing Date | Debtor Entity | Stated Claim Amt. | Stated Basis for Claim | Basis for Priority | Secured Amt. |
|---------|-------------|---------------|-------------------|------------------------|--------------------|--------------|
| 11721 | 3/6/2009 | Circuit City Stores, Inc. | Unk. | Reimbursement; Taxes or Penalties owed to Government agency | 11 U.S.C. § 507(a)(8) | N/A |
| 11811 | 3/6/2009 | Circuit City Stores West Coast, Inc. | Unk. | Reimbursement; Taxes or Penalties owed to Government agency | 11 U.S.C. § 507(a)(8) | N/A |
| 14971 | 3/31/2010 | Circuit City Stores, Inc. | Unk. | Reimbursement; Postpetition workers' compensation obligations | 11 U.S.C. § 503(b) | N/A |
| 14973 | 3/31/2010 | Circuit City Stores West Coast, Inc. | Unk. | Reimbursement; Postpetition workers' compensation obligations | 11 U.S.C. § 503(b) | N/A |
| 15004 | 4/7/2010 | Circuit City Stores West Coast, Inc. | Unk. | Reimbursement; Postpetition workers' compensation obligations | 11 U.S.C. § 503(b) | N/A |
| 15028 | 5/13/2010 | Circuit City Stores, Inc. | $29,289,125 | Pre- and postpetition workers' compensation obligations | N/A | $6,278,351 |
| 15029 | 5/13/2010 | Circuit City Stores West Coast, Inc. | $29,189,125 | Pre- and postpetition workers' compensation obligations | N/A | $6,278,351 |
| 15030 | 5/13/2010 | Circuit City Stores West Coast, Inc. | Unk. | Reimbursement; Postpetition workers' compensation obligations | 11 U.S.C. § 503(b) | N/A |

| Claim # | Filing Date | Debtor Entity | Stated Claim Amt. | Stated Basis for Claim | Basis for Priority | Secured Amt. |
|---------|-------------|---------------|-------------------|------------------------|--------------------|--------------| 
| 15031 | 5/13/2010 | Circuit City Stores, Inc. | Unk. | Reimbursement; Postpetition workers' compensation obligations | 11 U.S.C. § 503(b) | N/A |

32.     By these claims, the Fund represented to this Court, under penalty of perjury, that it was entitled to not only all of the Letter of Credit proceeds, but additional payment for the Claims of roughly $60 million, plus additional unliquidated "reimbursement" claims.  The Fund made this representation numerous times of the course of 14 months.

33.     Thus, despite the fact that in the five years prior to the Petition Date the Debtors had incurred only $11 million in California workers' compensation claims in the prior ten years, had been reducing their employees for years, and had substantial excess insurance, somehow as of the Petition Date the Fund contended that the Debtors had workers compensation liabilities of at least $74 million - $14,119,256 to be satisfied by the Letter of Credit Proceeds plus an additional $60 million in prepetition and postpetition claims.

34.     The Fund knew it was grossly overinflating its claims, or acted with reckless disregard, in order to enrich itself on the Letter of Credit proceeds.  The Fund consciously hid from the Debtors' estates, including the Trust and its professionals, information that would have permitted the estates to determine whether the Fund's claims were legitimate and whether the Fund should refund some or all of the Letter of Credit Proceeds.

35.     The Fund's Claims filed in this Court were generally based on two categories of contingent and unliquidated claims:  (1) claims seeking the Debtors' reimbursement of workers' compensation claims made by employees of the Debtors for prepetition injuries that were filed by the employees postpetition and were paid by the Fund (Claim Nos. 11721, 11811, 14971,

14973, 15004, 15030, and 15031, the "Reimbursement Claims"); and (2) claims in approximate

amount of $60 million based on the Fund's assertion that it is entitled to reimbursement for

prepetition and postpetition workers' compensation claims made by employees and paid by the

Fund on behalf of the Debtors, in addition to an estimation of claims the Fund will be required to

pay postpetition (Claim Nos. 15028 and 15029, the "Contingent Claims").

36.    None of the Fund's claims was accompanied by any supporting documentation

concerning the underlying workers' compensation claims – there were no loss run reports or any

facts demonstrating how the Fund calculated its claims.  This obfuscation was apparently

intentional.

## C.    <u>Claims Litigation Efforts</u>

37.    On February 25, 2011, the Trust objected to the Fund's Reimbursement Claims

and Contingent Claims in its Sixth and Seventh Omnibus Objection to Claims [Dkt. Nos. 10044

and 10045].  The Trust's objections asserted that such claims were contingent and actual

damages have not been proven, pursuant to 11 U.S.C. § 502(e).

38.    The Trustee repeatedly requested information from the Fund which could or

would substantiate the Fund's over-inflated Claims, to no avail.  Other than providing vague and

incomplete "Loss Run" reports, the Fund failed and refused to provide any evidence or

documents regarding how the Letter of Credit proceeds were used to satisfy outstanding

workers' compensation claims or how (and in what amounts) the Fund has reimbursed itself

from those proceeds for administrative expenses incurred in the resolution of the claims.

39.     Although the Fund has produced to the Trust certain "Loss Run" reports regarding its alleged activity on the Debtors' workers' compensation claims, the reports have proven to be internally inconsistent and unsubstantiated by any supporting documents.

40.     Specifically, in the "Loss Run" reports the Fund chose to provide, the Fund has asserted that it has administered and successfully closed seventy-six (76) claims since it took control of the Debtors' workers' compensation program.  However, the Fund has failed to produce any information regarding the cost incurred and spent by the Fund on each of these claims, despite multiple requests by the Trustee and his professionals for the information.

41.     The Fund also asserted that as of April 30, 2014, it was still administering 68 claims.  Despite the Trust's request for the information, the Fund has failed to provide any details to substantiate the pending claims.  Many of these claims are years old (some occurred in the 1990s) and received substantial payments from the Debtors prepetition, yet the Fund appears to be improperly crediting (and thus double-counting) all payments made on the claims as if they were made by the Fund.

42.     Further, on information and belief the "Loss Run" reports appear to include grossly excessive estimates as to the amounts needed to pay and administer then pending claims and fails to credit insurance payments made on the claims.  Based on these reports, it appears that the Fund intended to reserve an average of more than $120,000 per remaining claim, which amount is almost fifteen times what the Debtors had historically paid to close most of their claims.  This reserve estimated by the Fund appears even more excessive when one considers the amount already paid on each of these remaining claims—approximately $180,000 per claim according to the "Loss Run" report calculations.

43.     In other words, the Fund implies that it needed a total of over $300,000 per remaining claim to cover amounts owed to injured workers as well as "unallocated loss adjustment expense" reimbursements paid to the Fund, far in excess of what was the historical practice of the Debtors for the decade prior to the Petition Date.

44.     The Fund continued to include in these reserves sums that should not be added into such estimates, such as sums that represent obligations that were incurred but never reported to the Debtors or to the Fund (referred to in the "Loss Run" reports as Incurred-But-Not-Reported expenses or "IBNR").

45.     For example:

- The Fund contends that as of April 2014 one claim incurred costs of $2,304,770.73 when prior to the Transition Date the Debtor had incurred only $60,423.  The Trust was able to see from an actuarial report that the claim was resolved in 2014 by a compromise & release for only $382,660.

- In an April 2014 Loss Run report, the Fund stated that it had incurred $1,498,275.18 in overall losses for an accident that occurred in January 2001 and $1,088,409.20 in overall losses for an accident that occurred in July 1996. However, the Fund's actuarial report stated that, as of July 2012, the claim appeared "to have exceeded the retention level and Traveler's Insurance is currently processing reimbursements on what appears to be a semiannual basis." No credit was given for insurance payments;

- Several claims for accidents that occurred years ago inexplicably had significant increases in "overall losses" after the Fund began administering the claims.  In

one instance, the Fund reported $344,908.37 in overall losses for an accident that occurred in October 2006. However, before the Fund began administering the claim, the claim had incurred $232,609.19 in overall losses. Thus, there has been a 48% increase in incurred loss during the Fund's period of administration for a claim that was roughly 2.5 years old at the time of transition.

- The Fund reported one claim with $216,848.78 in overall losses for an accident that occurred in September 2007. However, before the Fund commenced administration, the same claim had already incurred $106,947.00 in overall losses. Thus, there has been a 103% increase in incurred loss during the Fund's period of administration for a claim that was roughly 1.5 years old at the time of the transition.

- Another claim reported in October 2003 had incurred $365,887.72 prior to administration. The Fund's Loss Run report contended that this claim incurred $471,117.98 in total loss as of April 2014, which reflects a 28.8% increase over the pre-administration amount.

- And yet another claim was reported in December 2007 but had incurred only $1,523.05 prior to the transition to the Fund's administration and had reserved zero dollars for further administration of the claim. The Fund's Loss Run report from April 2014 asserts that this claim has incurred $354,591.67 in cumulative loss, 230 times more than what the Debtor had reported, despite the claim having been open for more than 15 months prior to the Transition Date, and the Fund purportedly  reserving $207,006.49 as of April 2014.

46.     In addition, the Fund failed to provide the Trustee with a claim-by-claim analysis for claims purportedly being administered by the Fund.  With less than 150 claims at issue, and the Fund holding Letter of Credit proceeds in excess of $14 million, the Fund should have had no impediments to providing detailed information on a claim by claim basis.

47.     Despite the Trustee's Sixth and Seventh Omnibus Objections and requests for information from the Fund that supported the Fund's Reimbursement or Contingent Claims, the Fund did not provide any documentation to the Trustee to substantiate the Claims.

48.     In addition, despite multiple requests by the Trustee, the Fund has failed to provide an accounting or other explanation of how the proceeds from the Letter of Credit were used, how such funds were allocated between paying claims and the Fund's administrative fees, or how the Fund otherwise exhausted the Letter of Credit.

49.     Only very recently, on the eve of the Trust filing a motion to compel on its document requests relating to the claim objections, did the Fund offer to withdraw all of its filed proofs of claim, with prejudice.  Thus, after repeatedly filing unjustified proofs of claim, and after years of delay, the Fund, in order to avoid complying with discovery obligations that would reveal the Fund's misconduct, simply sought to walk away, as if no harm had been done to the estates and their creditors.  The Trust, however, has borne significant expense to evaluate the Fund's claims and obtain supporting documentation – expense that was greatly increased by the Fund's foot-dragging and obfuscation.

50.     On information and belief, the Fund commonly uses delay tactics to prevent insolvent companies and their experts from preparing accurate reports to

determine the Fund's use of letters of credit and similar collateral, and whether the

Fund's use of such proceeds was proper under the Labor Code.

51.     In this case, the Trustee has executed numerous confidentiality agreements

as requested by the Fund in order to obtain necessary information to (1) determine the

Fund's use of the Debtors' Letter of Credit proceeds and (2) identify the amount of

proceeds that should have been returned by the Fund to the Debtors.  Despite the

Trustee's agreement to each and every one of the Fund's confidentiality and related

requests, the Fund has consistently and willfully failed and refused to provide sufficient

information in this regard.

52.     The Trustee believes this is a pattern and practice of the Fund, in that it

routinely holds proceeds until such time as they are exhausted by the continued accrual of

administrative costs.

53.     With respect to the Fund's overtaking of the Debtors' worker's

compensation program, the Trustee is informed and believes, and based thereon alleges,

that the Fund has improperly made payments on claims where the claimant-employee is

now deceased.  Additionally, the Trustee is similarly informed and believes that the Fund

has delayed in closing claims otherwise ready for closure—in some circumstances, for

over five (5) years—in order to consume the entirety of the Letter of Credit proceeds.

54.     The Trustee and his professionals have expended significant resources

defending against the Claims for the benefit of unsecured creditors.  By filing the

knowingly grossly overstated Claims and requiring the Trustee to defend such Claims for

the benefit of these estates, the Fund has damaged the body of unsecured creditors by

decreasing the pool of resources available for satisfaction of their claims through the
Trust and by hiding from the Trust information necessary to permit the Trust to obtain a
refund of unused Letter of Credit Proceeds.

55.    Furthermore, by filing of the (overstated) Claims, the Fund necessarily
misrepresented that no excess Letter of Credit proceeds were owed to the Debtors.

## FIRST CLAIM FOR RELIEF (against all Defendants)

### Declaratory Relief

### [11 U.S.C. § 541; 28 U.S.C. § 2201]

56.    The Trustee realleges and incorporates by this reference each and every
allegation set forth in above paragraphs 1 through 55, *supra*, as though fully set forth
herein.

57.    An actual controversy exists between the Trustee, on the one hand, and
Defendants and each of them on the other hand, as to the Debtors' right, title, and interest
in and to the Proceeds.

58.    The Trustee asserts that, under applicable nonbankruptcy law, the right to
seek a refund of Letter of Credit proceeds is property of the Debtors' estates and that
excess Proceeds must be turned over to the Trustee for the benefit of unsecured creditors.

59.    The Trustee is informed and believes, and based thereon alleges, that
Defendant asserts that no such Proceeds exist.

60.    As a result of the actual controversy described herein, the Trustee requests
that this Court issue an order declaring the rights and interests of the Trustee and the
Defendants in and to the Proceeds pursuant to 28 U.S.C. § 2201.

## SECOND CLAIM FOR RELIEF (against the Fund)

### Contempt for Intentionally Filing Excessive Proofs of Claim

### [11 U.S.C. § 105(a)]

61.     The Trustee realleges and incorporates by this reference each and every allegation set forth in above paragraphs 1 through 60, *supra*, as though fully set forth herein.

62.     The Fund repeatedly filed with this Court proofs of claim and requests for administrative claims asserting claims that the Fund knew were grossly inflated, if not entirely false.

63.     The Fund did so to avoid having to return any Letter of Credit Proceeds.

64.     Only after the Trust incurred substantial costs investigating the Fund's claims and, in response to the Fund's deliberate refusal to provide sufficient information supporting its Claims, did the Fund finally state that it would withdraw all claims with prejudice.

65.     The Trust was required to reserve for the Fund's claims, thus delaying distributions to creditors of the reserved amounts.

66.     11 U.S.C. § 105(a) authorizes this Court to enter any order, process, or judgment, necessary to or appropriate to carry out the provisions of Title 11 of the United States Code.

67.     The Fund should be held in contempt and required to compensate the Trust for the fees and costs incurred to investigate and object to the Fund's filed claims. This relief would further the purposes of 11 U.S.C. §§ 501 and 502, which authorize the

filing of claims that creditors reasonably believe to have a good faith basis.  Entities like

the Fund that have no reasonable basis for belief in the filed claims should be deterred

from filing such claims.

## THIRD CLAIM FOR RELIEF (against the Fund)

### Unjust Enrichment

### [11 U.S.C. § 105(a) and applicable California law]

68.    The Trustee realleges and incorporates by this reference each and every

allegation set forth in above paragraphs 1 through 67, *supra*, as though fully set forth

herein.

69.    The Fund gained an unjust economic benefit and advantage over the

Debtors and these estates in the form of the Letter of Credit Proceeds that are in excess of

the amounts actually necessary to pay future claims and the Fund's reasonable and

related legal fees.

70.    All excess Proceeds should have been turned over to the Debtors' estates.

71.    The Fund had knowledge of the benefit conferred upon it to the detriment

of the Debtors and these estates at the time it drew down on the Letter of Credit.

72.    The Fund wrongfully retained the benefit of the Proceeds, and equity

requires that the excess amount of the Proceeds be paid to the Trustee for the benefit of

the Trust and unsecured creditors.

73.    As a result thereof and to prevent further injustice, the excess Proceeds

should be disgorged from Fund in an exact amount to be determined according to proof at

trial.

## FOURTH CLAIM FOR RELIEF (against the Fund)

### Unfair Business Practices

### [11 U.S.C. § 105(a) and California Business and Professions Code Section 17200 *et seq*.]

74.     The Trustee realleges and incorporates by this reference each and every

allegation set forth in paragraphs 1 through 73, *supra*, as though fully set forth herein.

75.     California's Business and Professions Code Section 17200 prohibits

unlawful, unfair, and fraudulent business practices.

76.     The Fund has engaged in unlawful and unfair business practices as herein

alleged, including but not limited to by filing, and maintaining, false claims; wrongfully

taking and refusing to return funds to the Fund neither has nor had any right; and by

asserting false estimates of future claims and inflating expenses in an attempt to justify

improperly retaining funds that should have been returned.  Defendant's conduct is

inappropriate, oppressive, and unscrupulous and offends established public policy.

77.     The Debtors have suffered and will suffer injury in fact and has and will

lose money as a result of the Fund's violation of Section 17200.

## FIFTH CLAIM FOR RELIEF (against all Defendants)

### Abuse of Discretion and Direction to Compel Fund to Return Excess Proceeds

### [11 U.S.C. § 105(a); Cal. Lab. Code § 3701.3[2] and other applicable California law]

78.     The Trustee realleges and incorporates by this reference each and every

allegation set forth in paragraphs 1 through 60, *supra*, as though fully set forth herein.

---

[2] Then in effect at the time the Debtors commenced these chapter 11 cases.

79.     Under California Labor Code section 3701.3 then in effect as of the

Petition Date, the Director was required to exercise discretion in determining the amount

of Proceeds to be returned to the Debtors as excess security deposits originating from the

Letter of Credit.

80.     The amount of funds originating from the Letter of Credit needed to pay

open workers' compensation claims and the Fund's legal fees does not, and never was

going to, exceed the total amount of the Letter of Credit.

81.     Under California law, because the amount of funds the Fund needed to

discharge its obligations was substantially less than the amount of the Letter of Credit

proceeds, the Trustee is entitled to a refund of all excess proceeds.

82.     It is an abuse of discretion under California Labor Code section 3701.3 to

permit the Fund to retain excess Letter of Credit proceeds.

83.     As a result of such abuse of discretion, the Trustee has been damaged in

an amount in an exact amount to be determined according to proof at trial

84.     To remedy the abuse of discretion, the Director should direct the Fund to

refund to the Trustee all excess Letter of Credit proceeds.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests and prays for judgment as follows:

1.      A declaration that the right to claim a refund of Letter of Credit proceeds constitutes property of the Debtors' estates;

2.      For damages to compensate the Trust for the expenses that it incurred in response to the Fund's baseless Claims and unwarranted conduct in resisting the Trust's investigation of the Claims and use of the Letter of Credit Proceeds;

3.      For restitution of all excess Letter of Credit proceeds;

4.      To the extent required under California law, judgment directing the Director to cause the Fund to refund all excess Letter of Credit proceeds;

5.      For damages to deter future conduct to that reflected with respect to the Debtors' estates

6.      On All Claims for Relief, for:

   a)      Prejudgment interest at the legally allowed applicable rate,

   b)      Costs and expenses of suit incurred herein, and

   c)      Such other and further relief as the Court deems just and proper under the circumstances.

DATED: December 23, 2015

By:   */s/ Lynn L. Tavenner*   
Lynn L. Tavenner, Esq. (VSB No. 30083)  
TAVENNER & BERAN, PLC  
20 North Eighth Street, Second Floor  
Richmond, VA 23219  
Telephone: (804) 783-8300

-and-

Andrew W. Caine, Esq.  
(admitted *pro hac vice*)  
PACHULSKI STANG ZIEHL & JONES LLP  
10100 Santa Monica Boulevard  
Los Angeles, California 90067-4100  
Telephone: (310) 277-6910

*Counsel to Plaintiff, as Trustee of the Circuit City Stores, Inc. Liquidating Trust*

-and-

Eric D. Winston, Esq.  
Justin C. Griffin, Esq.  
QUINN EMANUEL URQUHART & SULLIVAN LLP  
865 South Figueroa Street, 10th Floor  
Los Angeles, California 90017  
Telephone: (213) 443-3000

-and-

Steven T. Gubner, Esq.  
EZRA BRUTZKUS GUBNER LLP  
21650 Oxnard Street, Suite 500  
Woodland Hills, California 91367  
Telephone: (818) 827-9000

*Special Litigation Counsel to Plaintiff*