# Exhibit A

**SUBPOENA/SUBPOENA DUCES TECUM**
**TO PERSON UNDER FOREIGN SUBPOENA**
Commonwealth of Virginia   VA CODE §§ 8.01-412.8—8.01-412.15; Rule 4:9

File No. _CL16- 2739-2_

Richmond .. ............................................................................................ Circuit Court

400 N. 9th Street   Richmond   Va  23219
................................. ADDRESS OF COURT ...................................

THE STATE OF ILLINOIS ........................... v./In re: ... HITACHI, LTD., et al. .........

**TO THE PERSON AUTHORIZED BY LAW TO SERVE THIS PROCESS:**
You are commanded to summon

Circuit City Stores, Inc. Liquidating Trust  c/o Tavenner & Beran, PLC
................................................. NAME .................................................

20 North Eighth Street, Second Floor
................................................. STREET ADDRESS .................................................

Richmond, Virginia 23219
CITY ........................... STATE ........................... ZIP

**TO THE PERSON SUMMONED:**  You are commanded to

☒ attend and give testimony at a deposition

☒ produce the books, documents, records, electronically stored information, and tangible things designated and
described below

See attached Notice of Discovery and Evidence Depositions and Document Subpoena

at  1320 East Cary Street, Richmond, VA 23219    at   June 30, 2016 at 9:00 a.m.
............................. LOCATION .............................    ................ DATE AND TIME ................ ;

and to permit inspection and copying by the requesting party or someone acting in his or her behalf of the
designated items in your possession, custody or control

☐ permit inspection of the premises

at the following location

................................................. LOCATION .................................................

on .................................................
......... DATE AND TIME .........

This subpoena is issued upon the request of the party named below

Daniel Cummings
................................................. NAME OF REQUESTING PARTY .................................................

150 South Wacker Drive, Suite 3025
................................................. STREET ADDRESS .................................................

Chicago, IL  60606 (312) 372-2345
CITY ........................... STATE ........................... ZIP ........................... TELEPHONE NUMBER

FORM CC-1439 (MASTER, PAGE ONE OF THREE) 07/09

12-CH-35266

The requesting party has submitted to this Clerk's Office the foreign subpoena, copy attached, the terms of which are incorporated herein, and the written statement required by Virginia Code § 8.01-412.10.

The names, addresses and telephone numbers of all counsel of record in the proceeding to which the subpoena relates and of parties not represented by counsel are provided ☐ below ■ on attached list.

6-14-16
**DATE ISSUED**

EDWARD F. JEWETT, Clerk
**CLERK**

by /X/ J. Gilean Johnson
**DEPUTY CLERK**

| | | |
|---|---|---|
| **NAME OF ATTORNEY FOR REQUESTING PARTY** | **BAR NUMBER** | **LICENSING STATE** |
| **OFFICE ADDRESS** | **TELEPHONE NUMBER OF ATTORNEY** | |
| **OFFICE ADDRESS** | **FACSIMILE NUMBER OF ATTORNEY** | |
| **NAME** | **BAR NUMBER** | **LICENSING STATE** |
| **STREET ADDRESS** | **TELEPHONE NUMBER** | |
| **STREET ADDRESS** | **FACSIMILE NUMBER** | |
| **NAME** | **BAR NUMBER** | **LICENSING STATE** |
| **STREET ADDRESS** | **TELEPHONE NUMBER** | |
| **STREET ADDRESS** | **FACSIMILE NUMBER** | |
| **NAME** | **BAR NUMBER** | **LICENSING STATE** |
| **STREET ADDRESS** | **TELEPHONE NUMBER** | |
| **STREET ADDRESS** | **FACSIMILE NUMBER** | |

**RETURN OF SERVICE** (see page three of this form)

FORM CC-1439 (MASTER, PAGE TWO OF THREE) 07/09

12-CH-35266

[ ] This SUBPOENA/SUBPOENA DUCES TECUM TO PERSON UNDER FOREIGN SUBPOENA is being served by a private process server who must provide proof of service in accordance with Va. Code § 8.01-325.

TO the person authorized to serve this process: Upon execution, the return of this process shall be made to the Clerk of Court.

NAME: ..............................................................................................................................

ADDRESS: ..........................................................................................................................

| [ ] PERSONAL SERVICE | Tel. No. .......................................................... |
|---|---|

Being unable to make personal service, a copy was delivered in the following manner:

[ ]   Delivered to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of party named above after giving information of its purport.  List name, age of recipient, and relation of recipient to party named above:

..........................................................................................................................

..........................................................................................................................

[ ]   Posted on front door or such other door as appears to be the main entrance of usual place of abode, address listed above. (Other authorized recipient not found.)

| [ ]   not found | ...................................................................... , Sheriff |
|---|---|

.......................... by ...................................................................... , Deputy Sheriff
DATE

FORM CC-1439 (MASTER, PAGE THREE OF THREE) 07/09

Subpoena in a Civil Matter (For Testimony and/or Documents)     (This form replaces CCG N006 & CCG N014)   (Rev. 6/25/09) CCG 0106

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

THE STATE OF ILLINOIS, by its Attorney General, Lisa Madigan

                                                           Plaintiff/Petitioner       **FILED-1**

                         v.                                No. 12 CH 3262       2016 JUN 13 PM 2:42

HITACHI, LTD., et al.                                                          CIRCUIT COURT OF COOK
                                                           Defendant/Respondent    COUNTY OF ILLINOIS
                                                                                   LAW DIVISION
                         SUBPOENA IN A CIVIL MATTER
                         (For Testimony and/or Documents)

To: Circuit City Stores, Inc. Liquidating Trust c/o Tavenner & Beran, PLC

20 North Eighth Street, Second Floor

Richmond, Virginia 23219

[ ]  1. YOU ARE COMMANDED to appear to give your testimony before the Honorable _____

   In Room _____ , _____ , Illinois on _____ , _____ , _____

   at _____ m.

[✓]  2. YOU ARE COMMANDED to appear and give your deposition testimony before a Notary Public at: Courtyard Richmond Downtown

   In Room _____ 1320 East Cary Street, Richmond, VA 23219 , Illinois on June 30 , 2016

   at 9:00 a.m. m.

[✓]  3. YOU ARE COMMANDED to mail the following documents in your possession or control to William Bave, White & Case LLP

   at 1155 Avenue of the Americas New York, NY 10036, in electronic format to william.bave@whitecase.com , on or before June 30 , 2016

   at 9:00 a.m. m.

   ~~(THIS IS FOR RECORDS ONLY. THERE WILL BE NO ORAL INTERROGATORIES.):~~

   See attached Notice of Discovery and Evidence Depositions and Document Subpoena

[✓]  Description continued on attached page(s).

**YOUR FAILURE TO RESPOND TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT.**

**Notice to Deponent:**

[✓]  1. The deponent is a public or private corporation, partnership, association, or governmental agency. The matter(s) on which examination is
   requested are as follows: See attached Notice of Discovery and Evidence Depositions and Document Subpoena

[✓]  Description continued on attached page(s).
   (A nonparty organization has a duty to designate one or more officers, directors, or managing agents, or other persons to testify on its behalf,
   and may set forth, for each person designated, the matters on which that person will testify. Ill. Sup. Ct. Rule 206.)

[✓]  2. The deponent's testimony will be recorded by use of an audio-visual recording device, operated by Victor M. Renteria, Jr., CLVS of Visual Discovery, Inc.
                                                                                         (Name of Recording Device Operator)

   3. No discovery deposition of any party or witnesses shall exceed three hours regardless of the number of parties involved in the case, except
   by stipulation of the parties or by order upon showing that good cause warrants a lengthier examination. Ill. Sup. Ct. Rule 206(d).

Atty. No. 90707                              Pro Se 99500

Name: Daniel Cummings                                            Issued by: _____
                                                                                    Signature
Atty. for: Toshiba Corporation and Toshiba America Electronic Components, Inc.

Address: 150 South Wacker Drive, Suite 3025             [✓] Attorney

City/State/Zip: Chicago, IL 60606                      [ ] Clerk of Court

Telephone: (312) 372-2345                              Date: _____ , _____ , _____

[ ]  I served this subpoena by mailing a copy, as required by Ill. Sup. Ct. Rules 11, 12 and 204(a)(2), to _____

   by certified mail, return receipt requested (Receipt # _____ ) on _____ , _____ , _____

   I paid the witness $ _____ for witness and mileage fees.

[ ]  I served this subpoena by handing a copy to _____ on _____ , _____ , _____

   I paid the witness $ _____ for witness and mileage fees.

_____                    _____
   (Signature of Server)                          (Print Name)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILED-1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

2016 JUN 13 PM

CIRCUIT COURT OF COOK
COUNTY OF ILLINOIS
LAW DIVISION

STATE OF ILLINOIS, *ex rel.* Lisa Madigan,
Attorney General,

                Plaintiff,

    v.

HITACHI, LTD., *et al.*,

                Defendants.

No. 12-CH-35266

Hon. Rita M. Novak

## LIST OF PARTIES AND ATTORNEYS

**Plaintiff the State of Illinois, by its Attorney General, Lisa Madigan**

Blake Harrop
Chadwick Brooker
Antitrust Bureau
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
100 West Randolph Street
Chicago, Illinois 60601

**Defendants Hitachi, Ltd., Hitachi Electronic Devices (USA), Inc., and Hitachi Displays, Ltd.**

Kate Wheaton
Karl Stampfl
KIRKLAND & ELLIS
300 North LaSalle Street
Chicago, IL 60654

**Defendants Philips Electronics North America Corporation and Koninklijke Philips N.V.**

Jeffery Cross
David C. Gustman
Tonita M. Helton
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 300
Chicago, IL 60606

John M. Taladay
Erik T. Koons
Charles M. Malaise
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400

**Defendants Toshiba Corporation and Toshiba America Electronic Components, Inc.**

Dan Cummings
Alan Madans
ROTHSCHILD, BARRY & MYERS
150 South Wacker Drive
Suite 3025
Chicago, IL 60606

Christopher M. Curran
Lucius B. Lau
Dana E. Foster
WHITE & CASE
701 Thirteenth Street, N.W.
Washington, DC 20005

William H. Bave, III.
WHITE & CASE
1155 Avenue of the Americas
New York, NY 10036

**Defendants Samsung SDI America, Inc. and Samsung Display Device Co., Ltd.**

Daniel G. Rosenberg
Catherine B. Diggins
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
Three First National Plaza
70 West Madison Street, 48th Floor
Chicago, Illinois 60602

Michael Scarborough
Tyler M. Cunningham
SHEPPARD MULLIN RICHTER & HAMPTON LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111

**Defendants Panasonic Corporation, Panasonic Corporation of North America, and MT Picture Display Co., Ltd.**

Duane M. Kelley
James F. Herbison
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601

Jeffrey L. Kessler
Eva W. Cole
Molly M. Donovan
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166-4193

Steven A. Reiss
David L. Yohai
Adam C. Hemlock
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119

**Defendants LG Electronics, Inc. and LG Electronics USA, Inc.**

Nathan P. Eimer
David M. Simon
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604

Miriam Kim
MUNGER, TOLLES & OLSON LLP
560 Mission Street
27th Floor
San Francisco, California 94105-2907

Jessica Barclay-Strobel
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071

3

FILED-1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

CIRCUIT COURT OF COOK
COUNTY OF ILLINOIS
LAW DIVISION

STATE OF ILLINOIS, *ex rel.* Lisa Madigan,
Attorney General,

              Plaintiff,

    v.

HITACHI, LTD., *et al.*,

              Defendants.

No. 12-CH-35266

Hon. Rita M. Novak

## NOTICE OF RULE 206(a)(1) DISCOVERY AND EVIDENCE DEPOSITIONS AND DOCUMENT SUBPOENA

TO:    All Counsel of Record

    **PLEASE TAKE NOTICE** that, pursuant to Rule 206(a)(1) of the Illinois Supreme Court Rules, Defendants Toshiba Corporation and Toshiba America Electronic Components, Inc., through counsel and in conjunction with all defendants, will take the discovery deposition, followed by the evidence deposition, of the person or persons designated by Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust ("Circuit City") to testify about the information known or reasonably available to Circuit City on the matters set forth in the attached Exhibit A. Circuit City is directed to produce the documents set forth in Exhibit B attached hereto.

    The deposition will commence on June 30, 2016 at 9:00 a.m. at Courtyard Richmond Downtown, 1320 East Cary Street, Richmond, VA 23219. The deposition shall be recorded stenographically and a real-time transcription service such as LiveNote may also be available for the use of counsel. The deposition may also be recorded by sound or sound-and-visual means by

1

Victor M. Renteria, Jr., CLVS of Visual Discovery, Inc.  The deposition will continue pursuant to the Illinois Supreme Court Rules or order of the Court.

Circuit City is advised that Rule 206(a)(1) requires it to produce one or more witnesses at the stated location and time who are knowledgeable and prepared to testify about each of the matters identified in the List of Matters on Which Examination is Requested attached hereto as Exhibit A.  The designated witness or witnesses must be prepared to testify about matters known by or reasonably available to Circuit City, not just information personally known by the witness.

Dated:  June 13, 2016    By: _____

Daniel Cummings
Alan Madans
150 South Wacker Drive
Suite 3025
Chicago, IL 60606
Telephone:  (312) 372-2345
Fax: 312-372-2350
E-mail:  cummings@rbmchicago.com
        madans@rbmchicago.com

Christopher M. Curran
George L. Paul
Lucius B. Lau
Dana E. Foster
White & Case
701 Thirteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 626-3600
Email: ccurran@whitecase.com
gpaul@whitecase.com
alau@whitecase.com
defoster@whitecase.com

*Counsel for Toshiba Corporation and Toshiba America Electronic Components, Inc.*

## EXHIBIT A

## DEFINITIONS

For the purposes of this Notice of Deposition, the following definitions apply:

1.     "Any" shall be construed to mean "any and all."

2.     "CRT" or "CRTs" means any (a) color picture tubes ("CPTs"), which are cathode ray tubes used primarily in color televisions, and (b) color display tubes ("CDTs"), which are used primarily in computer monitors.

3.     "CRT Finished Product" or "CRT Finished Products" means televisions containing CPTs or computer monitors containing CDTs.

4.     "Defendant" or "Defendants" means any of the entities currently or formerly named as defendants in this litigation and, without limitation, all of their past and present parents, subsidiaries, affiliates, joint ventures, officers, directors, employees, agents, attorneys, or representatives (and the parents', subsidiaries', affiliates', or joint ventures' past and present officers, directors, employees, agents, attorneys, or representatives), and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing.

5.     "Document(s)" has the broadest possible meaning permissible under Illinois Supreme Court Rule 214, including, but not limited to, any written, printed, typed, recorded, filmed, punched, transcribed, taped or other graphic matter of any kind or nature, however produced or reproduced, whether in hard copy, electronic, or other form, and includes, without limitation, pamphlets, brochures, books, booklets, information sheets, papers, articles, journals, magazines, computer printouts, Internet search results, tapes, discs or other forms of audio, visual or audio/visual recordings, records, memoranda, reports, financial statements, affidavits, handwritten and other notes, transcripts, paper, indices, letters, envelopes, telegrams, cables, electronic mail messages,

3

telex messages, telecopied messages, telephone messages, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, summaries or records of meetings or conferences, minutes or transcriptions or notations of meetings or telephone conversations or other communications of any type, tabulations, studies, analyses, evaluations, projections, work papers, statements, summaries, opinions, journals, desk calendars, product labels, prescriptions, package inserts or other information accompanying medications, maintenance or service records, appointment books, diaries, billing records, checks, bank account statements, invoices, photographs, microfilms, tapes or other records, punch cards, magnetic tapes, discs, data cells, drums, printouts, other data compilations (in any form) from which information can be obtained, recordings made through data processing techniques and the written information necessary to understand and use such materials, and any other Documents discoverable under the Illinois Supreme Court Rule 214.

     6.    "Person" means and includes all natural persons or entities, governmental units, partnerships, firms, corporations, associations, joint ventures, any other form of business organization or arrangement, or any form of public, private or legal entity.

     7.    "Relating to," "referring to," "regarding," or "with respect to" mean, without limitation, the following concepts: discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

     8.    "Relevant Period" means March 1, 1995, to November 25, 2007.

     9.    "You," "Your," and "Circuit City" mean Circuit City Stores, Inc. and any other d/b/a's affiliated with Circuit City Stores, Inc., together with all present and former directors,

4

officers, employees, or agents of the entities listed in this Definition.

## LIST OF MATTERS UPON WHICH EXAMINATION IS REQUESTED

1.    Your overall corporate structure, including the identification of departments within Circuit City responsible for the purchase, sale, pricing, marketing, or distribution of CRT Finished Products and their functions and the identification of any individuals that had managerial responsibility for the purchase, sale, pricing, marketing, or distribution of CRT Finished Products.

2.    The identity and general description of the CRT Finished Products You purchased, sold, marketed, or distributed.

3.    The identity of the Defendants from whom you purchased CRT Finished Products, and the identity and amount of CRT Finished Products You purchased from them (by year, in units, and U.S. dollars), if any.

4.    The identity of any non-Defendant manufacturers, producers, or distributors from whom You purchased CRT Finished Products, and the identity and amount of CRT Finished Products (by year, in units, and U.S. dollars) that You purchased from them, if any.

5.    Circuit City's purchase or acquisition of CRT Finished Products.

6.    The factors Circuit City considered in determining (a) from which Defendant(s) or non-Defendant(s) to purchase CRT Finished Products, and (b) which CRT Finished Products to purchase from particular Defendants and non-Defendants, including but not limited to the vendor qualification process and new model reviews.

7.    The process by which You negotiated, entered into, approved, or ratified purchase agreements or contracts for CRT Finished Products, including: (a) Your policies and practices regarding the negotiation of terms and conditions of such sales contracts; (b) use of standardized

5

sales or purchase contracts; (c) use of "MFN" (Most Favored Nation) or "MFC" (Most Favored Company) clauses or similar price-protection clauses; (d) the use of dealer agreements; and (e) the identity and location of documents that relate to the matters specified in this topic.

8.    Circuit City's sales of CRT Finished Products, including:

(a)    the overall sales volume (by units and dollar value);

(b)    the sales volume in Illinois (by units and dollar value);

(c)    the price quoted and received for each sale (including any discounts, rebates, and other terms of sale);

(d)    the date and quantity of each sale; and

(e)    the person(s) to whom such CRT Finished Products were sold.

9.    Your policies and practices for setting the price at which You sold CRT Finished Products to Your customers.

10.    Your participation in any discounts, promotions, rebates, or advertising cooperative programs provided or sponsored by any Defendant or non-Defendant from whom You purchased CRT Finished Products.

11.    Your use of discounts, promotions, rebates or loyalty programs in connection with the sale of CRT Finished Products to Your customers, including how You recorded such discounts or rebates, and the identity and location of documents or data recording such discounts or rebates.

12.    How Circuit City's CRT Finished Products were marketed for sale, including whether factors other than price were evident in the marketing materials and how the marketing strategy was determined and implemented for the CRT Finished Products sold.

13.     Other products that You believed were viewed by Your customers as alternatives to CRT Finished Products, including: (a) products other than CRT Finished Products; (b) the reasons that You believe Your customers viewed such products to be alternatives to the CRT Finished Products You purchased from the Defendants; (c) the extent to which these products had any effect on Your pricing decisions; and (d) the identity and location of documents that relate to the matters specified in this topic.

14.     All contracts or any other agreements relating to CRT Finished Products between Circuit City and any entity, including the terms and conditions of any such contracts or agreements, including the scope of the agreement, choice of law, and forum selection.

15.     Explanation of whether, based on records maintained by Circuit City, it is possible to link, trace, or otherwise establish a relationship between the CRT Finished Products that Circuit City purchased to those that it sold and, if so, how.

16.     Your practices, policies, and procedures concerning Your market monitoring activity for CRT Finished Products, including the following: (a) Your competitive intelligence activities; (b) Your use of third-party data sources and market share/data analyses; and (c) Your knowledge, use, and tracking of Your competitors' pricing for CRT Finished Products.

17.     The extent to which Circuit City passed on its costs in purchasing or acquiring CRT Finished Products to its customers, including pricing practices and timing of price increases, but not including precise figures or total amounts of price margins.

18.     The aggregate amount that You received to settle Your claims in the CRT MDL, including any claims relating to alleged overcharges for CRTs contained in CRT Finished Products You sold or distributed to Persons in Illinois.

## EXHIBIT B

## DEFINITIONS

The applicable Definitions appear in Exhibit A.

## INSTRUCTIONS

1.      In responding to this subpoena, You are requested to produce all Documents in Your possession, custody, or control, wherever located.

2.      All Documents should be produced as maintained in the ordinary course of business.

3.      If any part of a Document is responsive to any Request herein, produce the entire Document, including any attachments or exhibits.

4.      In the event that more than one copy of a Document exists, produce each copy on which there appears any notation or marking of any sort not appearing on any other copy (including routing or filing instructions) or any copy containing different attachments from any other copy.

5.      If You withhold any Documents on a claim of privilege, You must provide a statement of the claim of privilege and all facts relied upon in support of that claim.

6.      All electronically stored information shall be produced. Documents originating in paper or other hard copy format should be produced in 300 DPI Group IV Monochrome Tagged Image File Format (.TIFF or .TIF) files. TIFF files shall be produced in single-page format along with image load files (.DII file and .OPT file and .LPF file). All Documents are to be provided with multi-page searchable text (.TXT) files. These text files and image load files should indicate page breaks to the extent possible, as well as Production Number Begin, Production Number End, Production Attachment Range Number Begin, Production Attachment Range Number End, and Production Document Page Count. As well, each .TIFF image should be branded with the applicable Bates number and confidentiality designation (pursuant to the Protective Order, a copy of which is attached).

8

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.    All Documents produced by You in *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. 07-5944 JST, MDL 1917 (N.D. Cal.).

Subpoena in a Civil Matter (For Testimony and/or Documents)    (This form replaces CCG N006 & CCG N014)    (Rev. 6/25/09) CCG 0106

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

THE STATE OF ILLINOIS, by its Attorney General, Lisa Madigan

         **Plaintiff/Petitioner**

v.

HITACHI, LTD., et al.

         **Defendant/Respondent**

No. __12-CH-35266__

**SUBPOENA IN A CIVIL MATTER**
(For Testimony and/or Documents)

To: Circuit City Stores, Inc. Liquidating Trust c/o Tavenner & Beran, PLC

20 North Eighth Street, Second Floor

Richmond, Virginia 23219

[ ] 1. **YOU ARE COMMANDED** to appear to give your testimony before the Honorable _____
in Room _____ , _____ , Illinois on _____ , _____
at _____ m.

[✓] 2. **YOU ARE COMMANDED** to appear and give your deposition testimony before a Notary Public at: Courtyard Richmond Downtown
in Room _____ , 1320 East Cary Street, Richmond, VA 23219 , ~~Illinois on~~ June 30 , 2016
at 9:00 a.m. m.

[✓] 3. **YOU ARE COMMANDED** to mail the following documents in your possession or control to William Bave, White & Case LLP
at 1155 Avenue of the Americas New York, NY 10036, in electronic format to william.bave@whitecase.com , on or before June 30 , 2016
at 9:00 a.m. m.
~~(THIS IS FOR RECORDS ONLY. THERE WILL BE NO ORAL INTERROGATORIES.)~~
See attached Notice of Discovery and Evidence Depositions and Document Subpoena

[✓] Description continued on attached page(s).
**YOUR FAILURE TO RESPOND TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT.**

Notice to Deponent:

[✓] 1. The deponent is a public or private corporation, partnership, association, or governmental agency. The matter(s) on which examination is
requested are as follows: See attached Notice of Discovery and Evidence Depositions and Document Subpoena

[✓] Description continued on attached page(s).
(A nonparty organization has a duty to designate one or more officers, directors, or managing agents, or other persons to testify on its behalf,
and may set forth, for each person designated, the matters on which that person will testify. Ill. Sup. Ct. Rule 206.)

[✓] 2. The deponent's testimony will be recorded by use of an audio-visual recording device, operated by Victor M. Renteria, Jr., CLVS of Visual Discovery, Inc .
                                            (Name of Recording Device Operator)

3. No discovery deposition of any party or witnesses shall exceed three hours regardless of the number of parties involved in the case, except
by stipulation of the parties or by order upon showing that good cause warrants a lengthier examination. Ill. Sup. Ct. Rule 206(d).

Atty . No. 90707         *Pro Se* 99500

Name: Daniel Cummings         Issued by: _____
                                          **Signature**

Atty. for: Toshiba Corporation and Toshiba America Electronic Components, Inc.

Address: 150 South Wacker Drive, Suite 3025        [✓] **Attorney**

City/State/Zip: Chicago, IL 60606        [ ] **Clerk of Court**

Telephone: (312) 372-2345        Date: _____

[ ] I served this subpoena by mailing a copy, as required by Ill. Sup. Ct. Rules 11, 12 and 204(a)(2), to _____ .
by certified mail, return receipt requested (Receipt # _____ ) on _____
I paid the witness $ _____ for witness and mileage fees.

[ ] I served this subpoena by handing a copy to _____ on _____
I paid the witness $ _____ for witness and mileage fees.

_____        _____
    **(Signature of Server)**                   **(Print Name)**

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# Exhibit B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| THE STATE OF ILLINOIS, by its Attorney General, Lisa Madigan, ) ) ) Plaintiff, ) ) v. ) ) AU OPTRONICS CORPORATION; ) AU OPTRONICS CORP. AMERICA, ) INC.; CHI MEI INNOLUX CORP.; ) CHI MEI OPTOELECTRONICS ) CORP. USA, INC.; CMO JAPAN ) COMPANY, LTD.; EPSON IMAGING ) DEVICES CORP.; EPSON ) ELECTRONICS AMERICA, INC.; ) HITACHI, LTD.; HITACHI DISPLAYS ) LTD.; HITACHI AMERICA, LTD.; ) HITACHI ELECTRONIC DEVICES ) USA, INC.; LG DISPLAY CO., LTD.; ) LG DISPLAY AMERICA, INC.; ) SAMSUNG ELECTRONICS CO., LTD.; ) SAMSUNG SEMICONDUCTOR, INC.; ) SAMSUNG ELECTRONICS AMERICA ) INC.; SHARP CORP.; SHARP ) ELECTRONICS CORP.; TOSHIBA ) CORP.; TOSHIBA AMERICA ) ELECTRONIC COMPONENTS, INC.; ) TOSHIBA MOBILE DISPLAY CO.; ) and TOSHIBA AMERICA ) INFORMATION SYSTEMS, INC., ) ) Defendants. ) | Case No. 10-CH-34472 Judge Moshe Jacobius |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' Renewed Motion to Permit the Use

of MDL Fact Witness Depositions as Evidence Depositions.[1] The Court has reviewed the

---

[1] The Court notes that the AU Optronics Defendants (AU Optronics Corp. and AU Optronics Corp. America) have withdrawn their participation from the instant motion pursuant to stipulation between the State and the AU Optronics Defendants; all other Defendants remain party to the instant motion.

1

foregoing motion and Defendants' memorandum in support thereof ("MTP"), as well as the State

of Illinois' Response  ("Resp."), the Defendants' Reply ("Reply"), and all the parties' respective

exhibits thereto. The Court has also considered the oral arguments of counsels and relevant legal

authorities.

## Background

The underlying allegations of this long-pending case have been discussed at length in

previous Orders and thus need not be recited again in great detail.[2] In late 2006, the public

learned of a price-fixing investigation being conducted by the United States Department of

Justice.  The investigation centered on allegations that manufacturers of thin-film transistor

liquid crystal display ("LCD") panels had held unlawful meetings for the purpose of fixing the

prices and output of LCD panels throughout the United States, including in Illinois.  The price

fixing allegedly occurred between November 30, 1998, and December 11, 2006, during which

time the State of Illinois and Illinois consumers purportedly paid artificially inflated prices for

LCD panels.

After the investigation became public, a torrent of litigation ensued, with hundreds of

civil actions filed in United States district courts throughout the country.  To promote the

efficient adjudication of those cases, the federal matters were consolidated in the United States

District Court for the Northern District of California under the caption *In re: TFT-LCD (Flat

Panel) Antitrust Litigation*, Case No. 3:07-MD-1827 SI, MDL No. 1827 (N.D. Cal.) (the

"multidistrict litigation"). The Honorable Judge Susan Illston has presided over the multidistrict

litigation since 2006, and ultimately certified two class actions therein.  The first class consisted

of entities that were direct purchasers of LCD panels (e.g., entities that utilize LCD panels as

components of other products).  The second class consisted of indirect purchasers of LCD

---

[2] *See,* e.g., this Court's previously-entered May 30, 2012, and November 26, 2013, Orders.

panels, specifically individuals and entities that purchased products containing LCD panels (e.g.,

cellular phones, computer monitors, televisions, and numerous other items). Additionally,

various plaintiffs opted out of the two classes and brought cases of their own in front of Judge

Illston.

Though many states elected to participate in the multidistrict litigation, the State of

Illinois opted to pursue its own action. On August 10, 2010, the Illinois Attorney General (the

"Attorney General" or the "State") filed the instant suit on behalf of Illinois indirect purchasers

of products containing LCD panels.[3] The Complaint alleges that Defendants violated section

3(1) of the Illinois Antitrust Act (the "IAA") by conspiring to fix prices on LCD panels. The

Complaint asserts claims for monetary relief (including treble damages) for damages suffered by

the State of Illinois, its state agencies, and, in the State's *parens patriae* capacity, Illinois

residents (both individuals and businesses) who purchased products containing LCD panels

during the period of alleged price-fixing. Additionally, the Complaint seeks injunctive relief to

undo the effects of Defendants' alleged unlawful conduct.

At issue in the instant motion is whether the Illinois Supreme Court Rules and the Illinois

Rules of Evidence permit Defendants to present certain depositions of fact witnesses, taken

primarily in connection with the multidistrict litigation, to be used as evidence depositions at trial

in the case before this Court. This issue has been pending before the Court for over a year,

having initially been raised in fall of 2014 in a motion by Defendants. MTP Ex. A. At a hearing

on November 17, 2014, the Court instructed Defendants to specify precisely which depositions

Defendants desired to use so that the State could raise any valid objections rather than addressing

the depositions generally. Resp. Ex. 1. The matter was continued, and another hearing was held

---

[3] Indirect purchasers include entities that sell products containing LCD panels and the consumers that ultimately buy the products.

3

on February 25, 2015. MTP Ex. F. Again, the Defendants were instructed to present specific

deposition testimony for the State to either agree or raise objections to. MTP Ex. F; MTP at 4;

Resp. at 3. The parties proceeded to engage in lengthy exchanges of documents, and discussions

thereon, in an attempt to resolve the dispute. According to Defendants, the end result of such

negotiations was that the State rejected all of their proposed deposition testimony. MTP at 5-6.

The State insists it did agree that "the Defendants could use some of the designated testimony at

trial" but still maintains that it such testimony would constitute hearsay. Resp. at 5. Defendants

continue to assert that they are "not aware of any designated testimony for which the State has

not asserted any objections." Reply at 12.

The parties being at an apparent impasse, Defendants filed the instant Renewed Motion,

which has been fully briefed by both sides, and which this Court must now attempt to resolve.  In

their Renewed Motion, the Defendants request this Court make the following findings:

(1) That Defendants are permitted to use all of the portions of depositions designated in

Defendants' Exhibit H at trial pursuant to Illinois Supreme Court Rule 202 and Rule 212;

(2) Tha "the fact that the State's counsel did not attend" the depositions presented in Exhibit

H "will not prevent Defendants from offering the designated testimony in evidence" at

trial pursuant to Illinois Rule of Evidence 804(b)(1); and

(3) That the parties must "work cooperatively to reach agreement" with regard to other

testimony from the multidistrict litigation being offered at trial. MTP at 3.

Defendants assert that these depositions taken in connection with the multidistrict

litigation involved witnesses from many states and other countries, and that they were taken at

great expense, pursuant to the Federal Rules of Civil Procedure and Federal Rules of Evidence

which do not distinguish between fact witness depositions and evidence depositions as do their

4

Illinois counterparts. MTP at 1-3. Indeed, proceedings in this case were stayed pending discovery proceedings in the multidistrict litigation. MPT at 2. When proceedings in this case resumed, Defendants provided the State with copies of all depositions conducted in the multidistrict litigation, many of which Defendants believe the State intends to rely upon in the instant suit under certain hearsay exceptions, such as statements against interest. MTP at 2. Defendants also believe the State will utilize such depositions as the basis for expert testimony, thereby avoiding entry of the depositions themselves into the record. MTP at 20.

Defendants argue it would be prejudicial to the interests of justice to allow the State to selectively use the parts of the depositions that might be beneficial to its position without allowing Defendants the opportunity to use parts of the depositions as may be beneficial to their position. MPT 1-3. Recreating the same depositions as evidence depositions under the Illinois Rules will require inordinate time and expense, Defendants say, because the witnesses, many of whom are third-parties, reside mostly outside Illinois and in some cases outside the United States. MPT at 1.

The State insists that under Illinois Supreme Court Rule 202 a party must specify in the notice or subpoena for a deposition whether it is for discovery or evidence, and that where neither is specified the depositions are automatically considered discovery depositions only. Resp. at 6. The State argues that depositions taken pursuant to the federal rules are not acceptable as evidence depositions in Illinois and that no exception should be made here where the State had no notice of depositions in the multidistrict litigation. Resp. at 7-9. The State acknowledges that it is still possible to use the depositions at trial, but only for the limited purposes allowed under Illinois Rule of Evidence 804 in conjunction with Illinois Supreme Court Rule 212. Resp. at 10. The state argues that, within the confines of the exceptions allowed, it makes no difference

5

whether there was a predecessor-in-interest of the State present at any of the depositions because

they can only be considered discovery depositions. Resp. at 10-11. Even if the Court were to

consider them evidence depositions for purposes of Illinois law, the State further argues that no

counsel representing consumers was present at some of the depositions at issue. Resp. at 10-11.

### Discussion

The Illinois Supreme Court Rules and the Illinois Rules of Evidence govern how

depositions must be conducted and for what purposes they may be used. Illinois Supreme Court

Rule 212 ("Rule 212") provides in pertinent part as follows:

(a) Purposes for Which **Discovery Depositions** May Be Used.
Discovery depositions taken under the provisions of this rule may be used only:
(1) for the purpose of impeaching the testimony of the deponent as a witness in the same manner and to the same extent as any inconsistent statement made by a witness;
(2) as an admission made by a party or by an officer or agent of a party in the same manner and to the same extent as any other admission made by that person;
(3) if otherwise admissible as an exception to the hearsay rule;
(4) for any purpose for which an affidavit may be used; or
(5) upon reasonable notice to all parties, *as evidence at trial or hearing against a party who appeared at the deposition or was given proper notice thereof,* if the court finds that the deponent is not a controlled expert witness, the deponent's evidence deposition has not been taken, *and the deponent is unable to attend or testify because of death or infirmity,* and if the court, based on its sound discretion, further finds such evidence at trial or hearing will do substantial justice between or among the parties.

(b) Use of **Evidence Depositions.**

****

All or any part of [non-physician and non-surgeon] evidence depositions may be used for any purpose for which a discovery deposition may be used, and may be used by any party for any purpose if the court finds that at the time of the trial:
(1) The deponent is dead or unable to attend or testify because of age, sickness, infirmity, or imprisonment;
(2) *The deponent is out of the county,* unless it appears that the absence was procured by the party offering the deposition, provided, that a party who is not a resident of this State may introduce his own deposition if he is absent from the county; or

6

(3) *The party offering the deposition has exercised reasonable diligence but* has been unable to procure the attendance of the deponent by subpoena; or finds, upon notice and motion in advance of trial, that *exceptional circumstances exist which make it desirable, in the interest of justice and with due regard for the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.*

(c) Partial Use. If only a part of a deposition is read or used at the trial by a party, any other party may at that time read or use or require him to read any other part of the deposition which ought in fairness to be considered in connection with the part read or used.

Ill. S. Ct. Rule 212 (emphasis added). In addition, Illinois Supreme Court Rule 202 ("Rule 202")

provides in pertinent part that "the notice, order, or stipulation to take a deposition shall specify

whether the deposition is to be a discovery deposition or an evidence deposition," and that "in

the absence of specification a deposition is a discovery deposition only." Ill. S. Ct. Rule 202.

The admissibility of evidence is a decision left to the sound discretion of the trial court.

*Leonardi v. Loyola University of Chicago*, 168 Ill.2d 83, 92 (1995). One type of evidence that is

allowed under only very limited circumstances is hearsay, which is defined as an out-of-court

statement offered for the truth of the matter asserted. *Id.* at 99. The Illinois Rules of Evidence

804 ("Rule of Evidence 804") enumerates a number of exceptional circumstances in which

hearsay, including both discovery and evidence depositions, are admissible in Illinois State Court

when the declarant is unavailable as a witness. Ill. R. Evid. 804. Under Rule of Evidence 804, an

evidence deposition may be used when declarant is unavailable if it is "taken in compliance with

law in the course of the same or another proceeding, if the party against whom the testimony is

now offered, or . . . a predecessor in interest, had an opportunity and similar motive to develop

the testimony by direct, cross, or redirect examination." *Id.* A discovery deposition, on the other

hand, is only admissible when declarant is unavailable if it was taken pursuant to subpart (a)(5)

of Rule 212. *Id.* Even if a declarant is deceased, a discovery deposition which does not meet *all*

requirements of subpart (a)(5), or fall into one of the other hearsay exceptions in Rule 212, is not admissible. *Longstreet v. Cottrell, Inc.*, 374 Ill. App. 3d 549, 554 (5th Dist. 2007) (deceased declarant's discovery deposition not admissible under Rule 212(a)(5) where declarant was also a party).

Defendants argue that federal law, which these depositions were taken in accordance with, makes no distinction between a discovery deposition and an evidence deposition, and that in fact Illinois is the only state to do so. MTP at 7. Depositions taken pursuant to federal rules, Defendants say, are all taken with the expectation that the testimony can be used at trial. MTP at 7. Furthermore, depositions taken pursuant to federal rules "meet all the pertinent criteria for evidence depositions under Illinois law." MTP at 7. Defendants cite several cases they believe support their position, including *McClure v. Owens Corning Fiberglas Corporation*, 298 Ill. App. 3d 591, 4th Dist. 1998), *In re Estate of Ragen*, 96 Ill. App. 3d 1035 (1st Dist. 1981), *Flack v. McClure*, 206 Ill. App. 3d 976 (1st Dist. 1990), and *Berry v. American Standard, Inc.*, 382 Ill. App. 3d 895 (5th Dist. 2008).

None of the cases cited by Defendants actually supports their position; instead, case law cited by Defendants fails to reach the question of whether a deposition taken pursuant to federal rules could be deemed an evidence deposition under Illinois rules. In *McClure*, the Fourth District speculated that a deposition taken pursuant to federal rules should have been admitted in an asbestos exposure case, but found no reversible error where the information in question had largely been admitted by "other means." *Id.* at 603. That court made no finding as to any equivalency between federal rules and Illinois rules pertaining to depositions, instead noting that neither party had raised the issue. *Id.* at 602. In *Ragen*, the First District determined that a deposition labeled as a "discovery deposition" could be used as evidence where a trial judge

8

informed the parties ahead of time that the deposition could be considered as evidence at trial, the attorney stated at the beginning of the deposition that it was intended to be evidentiary, counsel for both parties was present at the deposition, and the content did not prejudice either party. *In re Estate of Ragen*, 96 Ill. App. 3d at 1046. In *Flack*, a trial court did not err in admitting a deposition where "proper notice was given and . . . the dual [discovery and evidentiary] purpose of the deposition was stated on the record, giving opposing counsel the opportunity to object." *Flack*, 206 Ill. App. 3d at 981. Finally, *Berry* does not support Defendants' argument because the Fifth District determined in that case that the trial court had properly disallowed the deposition, noting that "strict compliance with supreme court rules is generally required," and Rule 212 gives a trial court discretion to allow evidentiary use of discovery deposition *only* for a non-party in the limited circumstances prescribed by subpart (a)(5). *Berry*, 382 Ill. App. 3d at 902 (citing Ill. S. Ct. Rule 212).

Since case law cited by Defendants is not on point, the Court turns to the plain language of Rule 202, Rule 212, and Rule of Evidence 804. Defendants argue that, under those rules, the key issue with respect to whether a deposition is considered a discovery or evidence deposition under Illinois law is how the deposition was noticed; because the depositions in question were noticed pursuant to the federal rules – which Defendants say would allow for use at trial – Defendants believe this notice was adequate for the depositions to be considered evidentiary depositions under Illinois law. MTP at 8-9.

Defendants' argument glosses over another key fact, however: the depositions in question were taken in connection with an entirely different proceeding to which the State of Illinois was not a party. Even if the Court assumes, *arguendo*, that a deposition taken pursuant to federal rules puts all the parties on sufficient notice that such deposition may be used as evidence at trial

9

– thereby satisfying the Illinois rules regarding an evidence deposition – Defendants would then need to show, with respect to each deposition they seek to introduce, that the following requirements are met:

(1) The witness is "unavailable" pursuant to Rule of Evidence 804(a);

(2) The State ("the party against whom the testimony is now offered"), *or* "a predecessor in interest" of the State, had *both* an opportunity *and* "similar motive" to examine the witness at the deposition in question.

With respect to the first prong, it is not proper for the Court to make a determination on availability until the time of the trial. *People v. Ward*, 207 Ill. App. 3d 365, 370 (3d Dist. 1991) ("The availability of a witness is an ongoing question for the trial court at the time the evidence is presented to it") (citing (*People v. Ford*, 139 Ill. App. 3d 894 (5th Dist. 1985)). Defendants have acknowledged this, and ask the Court to put aside determinations of availability accordingly, but to nevertheless answer whether, *if a witness is determined by the Court to be unavailable*, they are otherwise permitted to submit the depositions presented in Exhibit H at trial. MTP at 10.

On this question, Defendants first argue that the State had both adequate notice and opportunity to participate in depositions conducted in the multidistrict litigation based on the fact that counsel for the State filed appearances "very early on" in the multidistrict litigation, and as a result, received electronic case filings from that case, including the deposition protocol and Special Master's Order regarding individual action plaintiffs and case management. MTP at 11-12. The Special Master's Order indicated that deposition notices should be provided only to the liaison counsel for each group of plaintiffs. MTP at 12; MTP Ex. S. Because of this, say Defendants, the State was sufficiently aware that depositions were proceeding in the multidistrict

litigation and the State knew who to contact in the event they wanted to attend, thus satisfying the notice requirement. MTP at 12-13.

The State disputes Defendants' assertion that it had adequate notice of the depositions to satisfy Illinois rules. First of all, the State points out that notices of the depositions were not filed, so the fact that the State had entered an appearance in the multidistrict litigation did not result in their automatically receiving notice of depositions. Resp. at 9. The State acknowledges that it had access to the deposition protocol in the multidistrict litigation, but points out that this document lists no specific depositions, dates, or locations. Resp. at 9; MTP Ex. Q. The State further argues that the protective order in the multidistrict litigation prevented anyone who was not a party from accessing "confidential information" and that "virtually all of the deposition testimony and exhibits were designated confidential." Resp. at 9-10. Therefore, the State argues it could not have fully participated in the depositions even if it had notice. Resp. at 10.

The Defendants nevertheless maintain that the State had "de facto" notice, and further reply that notice to the State was not even necessary because "an evidence deposition need not be noticed as one intended to be used in a separate proceeding" and that "Rule 202 does not require that nonparties receive notice of an evidence deposition." Reply at 4. Rule of Evidence 804(b)(1) with its reference to a predecessor-in-interest would be rendered meaningless, Defendants argue, if the type of deposition contemplated therein were not allowed to be used in a separate proceeding by someone who was not party to the action in which the deposition was originally taken. Reply at 5.

Even assuming *arguendo* that Defendants are correct as to the legal aspect of this issue – that *if the State had notice* that a deposition was being taken for the purpose of introducing as evidence at trial in another suit, then such deposition should thereafter be considered an evidence

11

deposition as between Defendants and the State in the instant suit – there is *nothing* that indicates

the State had such notice with respect to the depositions at issue here. Defendants are inviting

this Court to craft a definition of what constitutes notice that is inclusive of merely (1) having

knowledge that some depositions are likely being conducted in a given case, and (2) having

knowledge of who may be contacted for additional information, should any be available. The

Court need not even entertain this invitation because Illinois Supreme Court Rule 206 ("Rule

206") provides clear instructions as to what constitutes notice of a deposition. Ill. S. Ct. Rule

206.

Rule 206 states in pertinent part that "a part desiring to take the deposition of any person

upon oral examination shall service notice in writing a reasonable time in advance on the other

parties. *The notice shall state the time and place for taking the deposition; the name and address*

*of each person to be examined, if known, or, if unknown, information sufficient to identify the*

*deponent; and whether the deposition is for purposes of discovery or for use in evidence.*" Ill. S.

Ct. Rule 206 (emphasis added). Nothing in the record or any of the parties' allegations indicates

that the State was provided with notice in advance of the time and place of any depositions, or

the name and address or other information sufficient to identify any witnesses. It is true that

federal rules, not Illinois rules, governed depositions taken in the multidistrict litigation;

nevertheless, Illinois rules govern the instant suit and what is required of the parties thereto.

Therefore, even if the Court were to accept Defendants' legal argument that notice of a

deposition being conducted in the multidistrict litigation pursuant to federal rules sufficiently

indicated that the deposition might be used as evidence in Illinois, the Court finds no indication

that such notice was ever provided to the State for any of the depositions at issue here.

12

Defendants next argue that, even if the State itself did not have an opportunity to cross-examine witnesses at the depositions, the depositions might still be used at trial under Rule of Evidence 804 because a "predecessor in interest" of the State had opportunity and "similar motive" to cross-examine the witnesses. MTP at 11. Defendants argue that the State's interests were adequately represented at the depositions by counsels for plaintiffs in the multidistrict litigation, including attorney generals from other states. MTP at 15-16.

The State argues that counsels for many of the plaintiffs in the multidistrict litigation were not predecessors in interest for the State because "the State has an interest in showing that the price-fixing overcharge was passed on from intermediaries to Illinois consumers." Resp. at 11-12. Furthermore, the State identifies at least one specific question – regarding the purported causal link between intermediary price increases and the alleged price-fixing of LCDs – the State would have asked, if given the opportunity, that none of the parties present at depositions with intermediary plaintiffs actually asked. Resp. at 12. Defendants reply that the State based its examples upon depositions that are not part of those contemplated by Defendants in Exhibit H, and that the State's proposed question has already been answered sufficiently in one of the depositions at issue. Neither party cites Illinois case law in support of their arguments as to what constitutes a "predecessor at interest" or a "similar motive" for purposes of Rule of Evidence 804.

This Court finds a relatively recent Illinois case called *Dukes v. Pneumo Abex Corporation* to be of guidance on this particular issue. 386 Ill. App. 3d 425 (4th Dist. 2008) (overruled on other grounds as stated in *Rodarmel v. Pneumo Abex, L.L.C.*, 2011 IL App (4th) 100463, ¶ 118). The Fourth District determined in *Dukes* that certain depositions taken in a federal conspiracy case regarding asbestos exposure could be used by a plaintiff in an Illinois

13

exposure liability case built upon the same underlying allegations. Dukes, 386 Ill. App. 3d at

442. A defendant manufacturer of products containing asbestos in *Dukes* called Honeywell

appealed a trial court's decision to allow deposition testimony from cases where Honeywell was

not a party. *Id.* at 427. The court explained the rule as follows:

> Former testimony is not admissible unless it is established the witness is
> unavailable, the action involved the same issue between the same parties or their
> privies, and the party against whom the testimony is offered had full opportunity
> to cross-examine the witness in the prior proceedings. However, the identity-of-
> the-parties requirement may not be strictly enforced as long as the party against
> whom the evidence is offered had full opportunity to test the veracity of the
> former testimony through cross-examination, such as where testimony at a
> defendant's criminal trial is sought to be introduced at a civil trial against the same
> defendant.
>
> Where the choice is between having testimony by way of deposition or prior trial
> testimony and having no testimony, this court has noted the identity-of-the-parties
> requirement should be relaxed further to allow the introduction of former
> testimony even if a party against whom the evidence is offered was not a party to
> the prior proceedings if 'the interests of the party against whom the deposition is
> sought to be admitted were protected by the presence of a party at the deposition
> with the opportunity and a similar motive to develop testimony.'

*Id.* at 441 (internal citations omitted).

The trial court in *Dukes* had reviewed each deposition at the time it was offered into

evidence to determine if the interests of the defendant (the party against whom the prior

testimony was offered) were protected. *Id.* In making its determination, the trial court had looked

at the purpose for which the testimony was offered, and at the interests of the parties present

when the deposition was taken. *Id.* at 441-42. The testimony at issue consisted of depositions of

former employees of asbestos manufacturers in the federal conspiracy litigation who were either

deceased or unavailable because they were not residents of Illinois. *Id.* at 441-43. The testimony

was offered "for the purposes of showing parallel conduct by alleged coconspirators," such as

whether they failed to inform employees of signs of asbestos-related disease detected by in-

14

house medical exams, but the testimony was not offered "for the purpose of proving conspiracy."
*Id.* at 441-42. Defendant Honeywell had not been a party to the federal conspiracy case, but
attorneys for a different asbestos manufacturer, who was a defendant in the federal case, were
present at the depositions. *Id.* at 442. The appellate court found no abuse of discretion in the trial
court's determination that attorneys for the asbestos manufacturer in the federal case would have
had a similar motive to disprove the testimony of former employees that information was
withheld from them. *Id.*

Applying the analysis of *Dukes* to the instant suit, in order to make any determination as
to the admissibility of a deposition taken in prior cases, including the multidistrict litigation, this
Court must first examine the purpose for which the testimony is being offered, and the interests
of the parties present when the deposition was taken. Although the Court has reviewed the wide
range of excerpts from deposition testimony presented by Defendants in Exhibit H, it remains
unclear at this time for what purpose Defendants propose to introduce each portion. Indeed, it is
unlikely Defendants could even predict with exactitude at this early stage – when no trial has
even been set – what their strategic needs may be with respect to every proposed witness. It
seems to this Court, however, that the gravamen of the deposition testimony at issue, to the
extent that it can even be summarized, concerns how prices for products were set and what
occurred at certain meetings where prices were allegedly fixed. MTP Ex. H; MTP Ex. W. These
facts go directly to the elements of the price-fixing conspiracy the State seeks to prove, unlike
the testimony in *Dukes* that was offered only to show parallel conduct by non-parties. Therefore
this Court finds that admission of such deposition testimony would be improper *even if* the other
criteria, such as unavailability of the witnesses, were met. With the many witnesses who testified
at the multidistrict litigation depositions, and who had knowledge of the underlying facts

15

regarding meetings and communications between the Defendants, there is less than a miniscule

chance that the Court would be left with "no testimony" whatsoever at trial. *See Duke*, 386 Ill.

App. 3d at 441 (the identity-of-parties requirement is properly relaxed "where the choice is

between having testimony by way of deposition or prior trial testimony and *having no testimony*"

(emphasis added)).

      Although the findings above are a sufficient basis to deny Defendants' motion, and

further analysis under *Dukes* need not be conducted, the Court will nevertheless fully address all

of the parties' arguments on this matter in the hope of subduing further redundancies in both

parties' motion practice on this issue. With respect to the second part of the *Dukes* analysis,

Defendants have somewhat helpfully provided a list of counsels present at the depositions

presented in Exhibit H. MTP Ex. W. Some of the parties represented include attorney generals

for other states, and some include counsel for a class of Indirect Purchaser Plaintiffs, while

others indicate only counsel for private intermediaries. MTP Ex. W. While these parties

represent a variety of interests, many of which might overlap in some respects with that of the

State, the Court finds that the interests of the parties who were present at all of the depositions at

issue are distinguishable from the interests of the State here in *at least* two ways. First, plaintiffs

who were intermediaries in the same alleged price-fixing at issue in the multidistrict litigation

had no interest in eliciting testimony about overcharges being passed on from intermediaries to

end-users. Second, none of the parties – not even attorney generals from other states – had an

interest in eliciting testimony about overcharges being passed on to consumers in Illinois

specifically. The Court thus fails to see how the interests of the State could have been adequately

represented at any of the depositions from prior litigation, even assuming *arguendo* that such

testimony meets the other requirements of Rule of Evidence 804.

16

Finally, Defendants have also argued that it would be inequitable to allow the State to

cherry-pick which depositions they will use under hearsay exceptions available to them – such as

statements against interest or statements of party opponents, or by allowing their experts to use

otherwise inadmissible depositions to form the basis of their opinion testimony – while denying

Defendants the opportunity to present those depositions that may be favorable to their case. This

circumstance, however, exists in every case tried before any Court; to wit, a party is always

permitted to put in testimony which is an admission by a party or a statement against interest. A

party who has no such testimony cannot use the opponents' right to counter such testimony with

rank hearsay. This case presents no different calculus and should be treated as any other case.

Defendants argue that requiring them to reconvene the depositions pursuant to Illinois

law would "cause inordinate expense and delay" where most of the witnesses in question are

third-party witnesses residing outside Illinois or even outside the United States. MTP at 18-19.

Some witnesses, Defendants say, may not be available at all. MTP at 19. This argument also

fails; there is no statute, rule, or case law supporting the premise that these impositions in and of

themselves overcome the fundamental rules regarding hearsay that bind this Court. *See* Illinois

Rules of Evidence, Article VIII, *et seq.*. None of the exceptions enumerated in Rules 803 or 804

of the Illinois Rules of Evidence provide that expense and/or delay alone are sufficient reasons to

allow hearsay into evidence. Defendants remain free to raise and advocate for introduction of

additional material pursuant to the Rule of Completeness,[4] codified in Rule 212(c), regarding any

portion of a deposition that might be introduced by the State at trial. Ill. Sup. Ct. Rule 212. To

---

[4] Discovery depositions and a "broad range of evidence" may be introduced pursuant to the Rule of Completeness, as explained by the Fourth District in a recent medical malpractice suit:

> Oral conversations, parts of written or recorded statements or in the nature of addenda thereto, and written or recorded statements neither part of the previously introduced written or recorded statement nor in the nature of addenda thereto may be introduced by an opposing party on his or her next examination of the same witness, whether cross or redirect, provided such evidence tends to explain, qualify, or otherwise shed light on the meaning of the evidence already received.

*Fakes v. Eloy*, 2014 IL App. (4th) 121100, ¶ 88.

17

the extent that any expert witness for the State relies on depositions as the basis of their conclusions, so may any expert witness for Defendants rely on otherwise inadmissible depositions to form their own conclusions, and each party will have the opportunity to cross the others' experts on the strength of their reasoning. *See* Ill. Rule of Evidence 703. Other exceptions pursuant to which Defendants believe the State may introduce some of the deposition testimony at issue, such as statements against interest, remain available for both parties to invoke, consistent with the Rules of Evidence, as in every case before this Court. The possibility that one party in a given case may have more evidence than another party which falls into such an exception does not work an injustice. Thus the Court finds that no fundamental unfairness to Defendants will result from this Court's adherence to the requirements of Rule of Evidence 804 with respect to the deposition at issue here.

For the reasons explained *supra*, this Court cannot grant the broad declaration of admissibility sought by Defendants. The full relief requested by Defendants is overly broad to the point that this Court would utterly abdicate its duty to enforce the Illinois Rules of Evidence and Illinois Supreme Court Rules by granting the motion, even putting aside that determinations as to availability of witnesses at trial are premature.

IT IS, THEREFORE, HEREBY ORDERED that:

1. The Defendants' Renewed Motion to Permit the Use of MDL Fact Witness Depositions
   as Evidence Depositions is DENIED.

ENTERED:

JUDGE MOSHE JACOBIUS-1556

FEB 24 2016

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

February 24, 2016

Judge Moshe Jacobius                                    No. 1556

19

# Exhibit C

1  Hojoon Hwang
   MUNGER, TOLLES & OLSON LLP
2  560 Mission Street, Twenty-Seventh Floor
   San Francisco, CA 94105
3  Tel: 415-512-4000
   Fax: 415-512-4077
4  Email: Hojoon.Hwang@mto.com

5
   *Counsel for Defendants LG Electronics, Inc.*
6  *and LG Electronics U.S.A., Inc.*

7  Additional Counsel Listed on Signature Pages

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11
    In re: CATHODE RAY TUBE (CRT)          Case No. 07-5944 (SC)
12  ANTITRUST LITIGATION
                                            MDL No. 1917
13
    ─────────────────────────────
14  This Document Relates to:              **NOTICE OF DEPOSITION OF
                                           PLAINTIFF ALFRED H. SIEGEL, AS
15  ALL ACTIONS                            TRUSTEE OF THE CIRCUIT CITY
                                           STORES, INC. LIQUIDATING TRUST
16                                         PURSUANT TO RULE 30(B)(6)**

17

18

19

20

21

22

23

24

25

26

27

28

No. 07-5944 (SC)                         1

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc., through counsel and in conjunction with all defendants, will take the deposition upon oral examination under oath of the person or persons designated by Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust ("Plaintiff"), on April 23, 2014 beginning at 9:00a.m. EST, and continuing from day to day thereafter until concluded. The deposition shall be held at the law offices of Tavenner & Beran, PLC, 20 North Eighth Street Second Floor, Richmond, VA 23219 before a notary public or other officer authorized to administer oaths. The testimony to be given will be recorded by stenographic and videographic means.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff is required to produce one or more witnesses at the stated location and time who are aware of and prepared to testify about Plaintiff's knowledge of the topics listed in the Schedule of Deposition Topics attached to this Notice as Exhibit A. If the designated representative or representatives do not have such knowledge, they are required to acquire it through whatever reasonable investigation may be necessary.

Dated: March 18, 2014

By: __/s/ Laura K. Lin_____

Laura K. Lin
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, CA 94105
Tel: 415-512-4000
Fax: 415-512-4077
Email: Hojoon.Hwang@mto.com

*Counsel for Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc.*

No. 07-5944 (SC)

2

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

# EXHIBIT A

## DEFINITIONS

1.    "Any" shall be construed to mean "any and all."

2.    "Circuit City" means Circuit City Stores, Inc.

3.    "CRT" or "CRTs" means any (a) color picture tubes ("CPTs"), which are cathode ray tubes used primarily in color televisions, and (b) color display tubes ("CDTs"), which are used primarily in computer monitors.

4.    "CRT Finished Product" or "CRT Finished Products" means televisions containing CPTs or computer monitors containing CDTs.

5.    "Defendant" or "Defendants" means any of the entities currently or formerly named as defendants in this litigation and, without limitation, all of their past and present parents, subsidiaries, affiliates, joint ventures, officers, directors, employees, agents, attorneys, or representatives (and the parents', subsidiaries', affiliates', or joint ventures' past and present officers, directors, employees, agents, attorneys, or representatives), and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing.

6.    "Document" or "documents" has the broadest possible meaning pursuant to the Federal Rules of Civil Procedure including all writings and other tangible things upon which any form of communication is recorded or reproduced, and preliminary drafts and non-identical copies of the above (whether such copies differ from the original by reason of notation made on such copies or otherwise). Without limiting the generality of the foregoing, the term "document" or "documents" includes correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports or summaries of investigations, trade letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes or minutes of meetings or of other communications of any type, including inter- and intra-office communications, questionnaires, surveys, charts, graphs, photographs, phonograph recordings, films, tapes, disks, data cells, print-outs of information stored or maintained by electronic data processing or word processing equipment, including e-mail, and all other data compilations from which information can be obtained (by translation, if necessary, by you through detection devices into usable form), including electromagnetically sensitive storage media such as floppy disks, hard disks and magnetic tapes, and any preliminary versions, drafts or revisions of any of the foregoing.

7.    "Or" and "and" should be construed so as to require the broadest possible response. If, for example, a request calls for information about "A or B" or "A and B," you should produce

1   all information about A and all the information about B, as well as all information about A and B

2   collectively.

3   8.   "Relating to," "referring to," "regarding," or "with respect to" mean, without

4   limitation, the following concepts: discussing, describing, reflecting, dealing with, pertaining to,

5   analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing,

6   recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or

in part.

7   9.   "Relevant Period" means March I, 1995, to November 25,2007 .

8   10.   "You," or "Your" mean the responding Plaintiff, Circuit City Stores, Inc. and any

other d/b/a's affiliated with Circuit City Stores, Inc., together with all present and former

9   directors, officers, employees, or agents of the entities listed in this Definition.

## SCHEDULE OF DEPOSITION TOPICS

Witnesses with knowledge of the following matters during the Relevant Period:

1.   Your overall corporate structure, including the identification of departments within

Circuit City responsible for the purchase, sale, pricing, marketing, or distribution of CRTs or

CRT Finished Products and their functions and the identification of any individuals that had

managerial responsibility for the purchase, sale, pricing, marketing, or distribution of CRTs or

CRT Finished Products.

2.   The location of Circuit City's purchasing operations for CRTs or CRT Finished

Products, including the location of price negotiations.

3.   The identity and general description of the CRTs or CRT Finished Products You

purchased, sold, marketed, or distributed.

4.   The identity of the Defendants from whom you purchased CRTs or CRT Finished

Products, and the identity and amount of CRTs or CRT Finished Products You purchased from them

(by year, in units, and U.S. dollars), if any.

5.   The identity of any non-Defendant manufacturers, producers, or distributors from

whom you purchased CRTs or CRT Finished Products, and the identity and amount of CRTs or CRT

Finished Products (by year, in units, and U.S. dollars) that You purchased from them, if any.

6.   Circuit City's purchase or acquisition of CRTs or CRT Finished Products, including:

(a)   purchase volume (by units and dollar value);

No. 07-5944 (SC)                4

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

(b)     the price quoted and paid for each purchase, including any discounts *(e.g.,* early-pay, volume, or deduction from invoice ("DFI") discounts), rebates *(e.g.,* guaranteed or unguaranteed volume, trailing credit, debit memoranda), and other terms of purchase;

(c)     the date and quantity of each purchase;

(d)     whether each purchase was for internal use or resale;

(e)     whether each purchase was for a new product or a refurbished product;

(f)     whether and when Circuit City took physical possession of the purchased CRTs or CRT Finished Products;

(g)     the reasons for purchasing CRTs or CRT Finished Products in one state or country as opposed to another;

(h)     the location of the person( s) who negotiated and consummated the purchase on Circuit City's behalf;

(i)     the locations from which and to which each purchase was shipped;

(j)     the locations from which and to which Circuit City was billed for each transaction;

(k)     the name of each entity from which you acquired the CRTs or CRT Finished Products.

7.     The factors Circuit City considered in determining (a) from which Defendant(s) or non-Defendant(s) to purchase CRTs or CRT Finished Products, and (b) which CRTs or CRT Finished Products to purchase from particular Defendants and non-Defendants, including but not limited to the vendor qualification process and new model reviews.

8.     The process by which You negotiated, entered into, approved, or ratified purchase agreements or contracts for CRTs or CRT Finished Products, including: (a) Your policies and practices regarding the negotiation of terms and conditions of such sales contracts; (b) use of standardized sales or purchase contracts; (c) use of "MFN" (Most Favored Nation) or "MFC" (Most Favored Company) clauses or similar price-protection clauses; (d) the use of dealer agreements; and (e) the identity and location of documents that relate to the matters specified in this topic.

9.     Your participation in any discounts, promotions, rebates, or advertising cooperative programs provided or sponsored by any Defendant or non-Defendant from whom You purchased CRTs or CRT Finished Products.

10.     Circuit City's sales of CRTs or CRT Finished Products, whether direct sales or sales by any person or entity purchasing or incorporating such CRTs or CRT Finished Products

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

into other CRT Finished Products on Circuit City's behalf, including Circuit City's incorporation of CRTs in any other product or resale of CRTs or CRT Finished Products, including:

      (a)   the sales volume (by units and dollar value);

      (b)   the price quoted and received for each sale (including any discounts, rebates, and other terms of sale);

      (c)   the date and quantity of each sale; and

      (d)   the person(s) to whom such CRTs or CRT Finished Products were sold.

11.   Your policies and practices for setting the price at which You sold CRT Finished Products to Your customers, including consideration or use of the following:

      (a)   formulas;

      (b)   factors such as cost, supply, demand, competitor pricing, market forecasts, and product specifications;

      (c)   price guidelines or price lists;

      (d)   negotiations or negotiated prices;

      (e)   commission costs;

      (f)   average costs;

      (g)   why pay prices;

      (h)   minimum advertised prices;

      (i)   meet-comping;

      (j)   alternative distribution channels;

      (k)   the percentage of price attributable to CRTs contained in CRT Finished Products sold;

      (l)   rebates;

      (m)   below-cost pricing;

      (n)   bundled product or services pricing;

      (o)   most-favored-nation pricing;

      (p)   sale pricing;

      (q)   market development funds or demo budgets;

      (r)   advertising funds;

      (s)   non-price consideration;

      (t)   loss-leader pricing;

      (u)   early-pay discounts;

      (v)   "min sell prices";

      (w)   "closest thing to wholesale" prices;

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

(x)    builder prices;

(y)    spiffs or spivs; and

(z)    if and how these policies, procedures, practices, methods, formulas, or factors vary by buyer.

12.    Your use of discounts, promotions, rebates or loyalty programs in connection with the sale of CRT Finished Products to Your customers, including how You recorded such discounts or rebates, and the identity and location of documents or data recording such discounts or rebates.

13.    Other products that You believed were viewed by Your customers as alternatives to CRT Finished Products, including: (a) products other than CRT Finished Products; (b) the reasons that You believe Your customers viewed such products to be alternatives to the CRT Finished Products You purchased from the Defendants; (c) the extent to which these products had any effect on Your pricing decisions; and (d) the identity and location of documents that relate to the matters specified in this topic.

14.    Your policies and practices relating to Your decision to give priority to the promotion, advertising, or sale of certain Defendants' CRT Finished Products over other Defendants' CRT Finished Products, to promote Defendants' CRT Finished Products over non-Defendants' CRT Finished Products, or to promote non-Defendants' CRT Finished Products over Defendants' CRT Finished Products.

15.    All contracts or any other agreements relating to CRTs or CRT Finished Products between Circuit City and any entity, including the terms and conditions of any such contracts or agreements, including the scope of the agreement, choice of law, and forum selection.

16.    Explanation of whether, based on records maintained by Circuit City, it is possible to link, trace, or otherwise establish a relationship between the CRTs or CRT Finished Products that Circuit City purchased to those that it sold and, if so, how.

17.    Whether the CRTs contained in each of the CRT Finished Products on which Circuit City bases its claims were first shipped-to or billed-to a location outside the United States or inside the United States, and an explanation of how Circuit City made or would make that determination.

18.    The identity of the manufacturer of the CRT contained in each of the CRT Finished Products on which Circuit City bases its claims, and an explanation of how Circuit City has made or would make that identification.

19.    Whether You engaged in market monitoring activity for CRT Finished Products and, if so, your practices, policies, and procedures concerning Your market monitoring activity for CRT Finished Products including the following: (a) Your competitive intelligence activities; (b) Your use of third-party data sources and market share/data analyses; and (c) Your knowledge, use, and tracking of Your competitors pricing for CRT Finished Products, including the shop-out database.

20.    Circuit City's suspicions or beliefs that any manufacturer of CRTs was engaged in any anticompetitive conduct relating to CRTs and the circumstances (including dates) surrounding, and reasons for and sources of, such suspicions or beliefs, and any formal or informal investigations conducted by Circuit City to confirm or deny such suspicions or beliefs.

21.    The identification, description, date, location, source, and persons involved in all statements that Circuit City read, heard, or otherwise became aware of upon which Circuit City bases its contention that Defendants fraudulently concealed the alleged conspiracy from Circuit City, including a description of Circuit City's reliance on any such statements.

22.    The method(s) used by You to track inventory levels, link returns and sales, and monitor product margins of CRT Finished Products that You sold, including any predecessor or successor systems.

23.    Your standards and practices with regard to tracking the purchases and sales of CRT Finished Products for determining the profitability of sales, and for financial reporting purposes, including the nature of the financial data available, the location of such data, and the names of individuals responsible for maintaining such data.

24.    The identity of each of Your electronic databases related to the purchases and sales listed in Topics 6 or 11 above, and the contents of each such database, including the fields or column headings used in such electronic databases.

25.    The extent to which Circuit City passed on its costs in purchasing or acquiring CRTs or CRT Finished Products to its customers.

26.    The assignment of any claims asserted in the Complaint, including the identification of the assignees, the identification of the assignors, the mechanism or form of said assignments, the consideration received for any such assignment, and any agreements or plans for the distribution of damages or settlement proceeds recovered in this action to the assignors.

27.    Your policies and practices related to the retention and deletion of all documents and data (including any of Your electronic databases, e-mail system, and any predecessor or successor systems) related to the purchases and sales listed in Topics 6 or 11.

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

28.   Circuit City's search for, production of, and all efforts to preserve any documents that are potentially relevant to this or any other litigation or investigation concerning CRTs or CRT Finished Products.

29.   Identification, location, last known address, telephone number, and e-mail address of any person having or believed to have any information regarding the foregoing topics or facts underlying these topics.

30.   Identification, location, last known address, telephone number, and e-mail address of any person having or believed to have any documents or other electronic or non-electronic files regarding the foregoing topics or facts underlying these topics, including any person having or believed to have information regarding each of the fields contained in such files and the means by which those fields were constructed.

31.   A complete explanation of Your transactional sales and purchase data for CRTs or CRT Finished Products, including any transactional-level sales data produced by You in this action and the information contained in such data.

No. 07-5944 (SC)                                    9

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

1  Hojoon Hwang
   MUNGER, TOLLES & OLSON LLP
2  560 Mission Street, Twenty-Seventh Floor
   San Francisco, CA 94105
3  Tel: 415-512-4000
   Fax: 415-512-4077
4  Email: Hojoon.Hwang@mto.com

5  *Counsel for Defendants LG Electronics, Inc.*
   *and LG Electronics U.S.A., Inc.*
6

7  Additional Counsel Listed on Signature Pages

8              **UNITED STATES DISTRICT COURT**

9           **NORTHERN DISTRICT OF CALIFORNIA**

10               **SAN FRANCISCO DIVISION**

11

12  **In Re CATHODE RAY TUBE (CRT)**      No.: 07-cv-5944 SC—MDL NO. 1917
    **ANTITRUST LITIGATION**
13                                          **CERTIFICATE OF SERVICE**

14  This Document Relates to:

15  ALL ACTIONS

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## CERTIFICATE OF SERVICE

3
4
5

I declare that I am employed with the law firm of Munger, Tolles & Olson LLP, 560 Mission Street, Twenty-Seventh Floor, San Francisco, California 94105. I am not a party to the within cause, and I am over the age of eighteen years. I further declare that on March 18, 2014, I served a copy of:

6
7

**NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)**

8
9

☒    **BY ELECTRONIC MAIL** by sending a true copy thereof to the addressees, as stated below.

| | |
|---|---|
| Steven Sklaver<br>State Bar No: 237612<br>SUSMAN GODFREY LLP<br>1901 Avenue of the Stars, Suite 950<br>Los Angeles, California 90067<br>Telephone: (31 0) 789-3100<br>Facsimile: (310) 789-3150<br>Email: ssklaver@SusmanGodfrey.com<br><br>Kenneth S. Marks<br>Jonathan Ross<br>SUSMAN GODFREY LLP<br>1000 Louisiana Street, Suite 5100<br>Houston, Texas 77002-5096<br>Telephone: (713) 651-9366<br>Facsimile: (713) 654-6666<br>kmarks@susmangodfrey.com<br>jross@susmangodfrey.com<br><br>*Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust.* | Philip J. Iovieno<br>E-mail: piovieno@bsfllp.com<br>William A. Isaacson<br>E-mail: wisaacson@bsfllp.com<br>BOIES, SCHILLER & FLEXNER LLP<br><br>*Liaison Counsel for Direct Action Plaintiffs* |
| Mario N. Alioto<br>E-mail: malioto@tatp.com<br>TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP<br><br>*Interim Lead Counsel for the Indirect Purchaser Plaintiffs* | Guido Saveri<br>E-mail: guido@saveri.com<br>SAVERI & SAVERI, INC.<br><br>*Interim Lead Counsel for the Direct Purchaser Plaintiffs* |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3      Executed on March 18, 2014 at San Francisco, California.  I declare under penalty

4 of perjury under the laws of the United States of America that the foregoing is true and correct.

5                                    /s/ Laura K. Lin
                                           Laura K. Lin

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit D

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4

              Case Number 07-5944 (SC)

5              MDL No. 1917

6

- - - - - - - - - - - - - - - - - x

7    In Re: CATHODE RAY TUBE (CRT)

8    ANTITRUST LITIGATION

9    This Document Relates to

10   ALL ACTIONS

11   - - - - - - - - - - - - - - - - - x

12

13     VIDEO DEPOSITION OF STEVEN DEASON

14          Richmond, Virginia

15       Wednesday, April 23, 2014

16          SSS 10:58 a.m.

17

18          * * * * *

19                        Corrections Made
                          06/03/2014

20

21                        RLALS

22

23

24

25



Page 2

```
 1
 2        * * * * * *
 3              Stephen
 4        Whereupon, this is the video deposition
 5  of STEVEN DEASON, who appeared as a witness
 6  called and examined by the Defendant on Wednesday,
 7  April 23, 2014, conducted at the law offices of
 8  Tavenner & Beran, PLC, 20 North 8th Street, Richmond,
 9  Virginia commencing at 10:58 a.m. and was reported
10  and transcribed by T. S. Hubbard, Jr..  The witness
11  was sworn in by the videographer Gordon Croll,
12  a Notary for the Commonwealth of Virginia.
13
14        * * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S :
 3  Jonathan Ross, Esquire
 4  John Pierre Lahad, Esquire
 5  Susman Godfrey, LLP
 6  1000 Louisiana Street
 7  Suite 5100
 8  Houston, TX 77002
 9  713.651.9366
10  jlahad@susmangodfrey.com
11      Appearing for Circuit City Liquidating Trust
12
13  Laura K. Lin, Esquire
14  Munger, Tolles and Olson LLP
15  560 Mission Street
16  Twenty-Seventh Floor
17  San Francisco, CA 94105-2907
18  415.512.4034
19  Laura.lin@mto.com
20      Appearing for LG Electronics Defendants.
21
22
23
24
25
```

Page 4

```
 1
 2  A P P E A R A N C E S :
 3
 4  William H. Bave, III
 5  White & Case, LLP
 6  1155 Avenue of the Americas
 7  New York, NY 10036
 8  212.819.2673
 9  wbave@whitecase.com
10      Appearing for the Toshiba entities
11
12
13  Sofia Arguello, Esquire
14  Winston & Strawn, LLP
15  200 Park Avenue
16  New York, NY 10166
17  212.294.5304
18  sarguello@winston.com
19      Appearing for the Panasonic Defendants
20
21
22
23
24
25
```

Page 5

```
 1
 2  A P P E A R A N C E S :
 3  (All others below appearing by phone.)
 4
 5  Melissa Whitehead, Esquire
 6  Alston & Bird LLP
 7  1201 West Peachtree Street
 8  Atlanta, GA 30309
 9  404.881.7000
10  404-253-8488 (fax)
11  melissa.whitehead@alston.com
12      Appearing for the Dell Plaintiffs
13
14  Shaun van Horn, Esquire
15  Jenner & Block LLP
16  353 North Clark Street
17  Chicago, Illinois 60654
18  312.222.9450
19  svanhorn@jenner.com
20      Appearing for the Mitsubishi Electric Defendants
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

```
1
2  A P P E A R A N C E S:
3  (All others below appearing by phone.)
4
5  Robert J. Gralewski, Esquire
6  Kirby McInerney LLP
7  825 Third Avenue, 16th Floor
8  New York, NY 10022
9  212.371.6600
10 bgralewski@kmllp.com
11    Appearing for the Indirect Purchaser Plaintiffs
12
13
14 Michael Gawley, Esquire
15 Kirkland and Ellis LLP
16 555 California Street, 27th Floor
17 San Francisco, CA 94104
18 415.439.1400
19 michael.gawley@kirkland.com
20    Appearing for the Hitachi entities
21
22
23
24
25
```

Page 7

```
1  A P P E A R A N C E S: (
2  (All others below appearing by phone.)
3  Charles M. Malaise, Esquire
4  Baker Botts, LLP
5  1299 Pennsylvania Avenue Northwest
6  Washington, DC 20004
7  202.639.1117
8  charles.malaise@bakerbotts.com
9     Appearing for the Phillips Defendants
10
11 John Brew, Esquire
12 Crowell & Moring
13 1001 Pennsylvania Avenue, Northwest
14 Washington, D.C. 20004
15 202.624.2720
16 jbrew@crowell.com
17    Appearing for Target
18
19 Jeffrey S. Roberts, Esquire
20 Faegre Baker & Daniels,
21 3200 Wells Fargo Center
22 1700 Lincoln Street
23 Denver, Colorado 80203
24 303.607.3792
25    Appearing for the Thomson Defendants
```

Page 8

```
1
2     TABLE OF CONTENTS
3  Witness:
4  STEVE DEASON                    Page
5  Examination
6  by Ms. Lin    ...............    10
7  by Mr. Bave   ...............    202
8  by Ms. Augello ...............   227
9  by Mr. Roberts ...............   238
10 by Mr. Gralewski ...............  249
11 by Mr. Lahad   ...............   252
12
13           * * * * *
14    INDEX OF DEFENDANTS EXHIBITS
   Exhibit   Description       Page
15
   Exhibit 2834  Memory Aide to witness   12
16 Exhibit 2835  Bates No. CC0572597      68
   Exhibit 2836  Bates No. CC 0567286     74
17 Exhibit 2837  Bates No. CC 0148714     105
   Exhibit 2838  Bates No. CC 0572187     122
18 Exhibit 2839  Bates No. CC 0569329     126
   Exhibit 2840  Bates No. CC 0543314     128
19 Exhibit 2841  Bates No. CC 0554111     137
   Exhibit 2842  Bates No. CC 0389749     154
20 Exhibit 2843  Bates No. CC 0021806     169
   Exhibit 2844  Bates No. CC 0606306     186
21 Exhibit 2845  Bates No. CC 0548555     198
   Exhibit 2846  Bates No. CC 0604919     208
22 Exhibit 2847  Bates No. CC 0397160     219
   Exhibit 2848  - Exhibit Jumped Over -
23 Exhibit 2849  Thomson Complaint        239
24
25           * * * * *
```

Page 9

```
1     PROCEEDINGS
2  (Before going on video and steno record.)
3      THE REPORTER:  Before going on the
4  video, and steno record, it was stipulated by
5  all counsel that counsel did not have to
6  repeat their appearances, that the same
7  appearances for the Brandy Fose deposition
8  would apply in this deposition of Steven
9  Deason.
10 (On the video and steno record.)
11      THE VIDEOGRAPHER:  Good morning still.   10:58:31
12 We are on the record.  The time is          10:58:33
13 approximately 10:58 a.m., and today's date is  10:58:36
14 April 23.  The year is 2014.                10:58:41
15     This is the video1 deposition of Steven  10:58:43
16 Deason.                                     10:58:46
17     My name is Gordon Croll.  The court      10:58:47
18 reporter here today is Steve Hubbard.        10:58:49
19     We are here from Veritext National       10:58:52
20 Deposition Litigation Services and this      10:58:55
21 deposition is being held at 20 North 8th     10:58:57
22 Street, Richmond, VA.                        10:59:01
23     The case is "In Re CRT" and would the    10:59:03
24 deponent please raise their right hand.      10:59:09
25 (Whereupon, STEVEN DEASON is sworn:)         10:59:12
```

3 (Pages 6 - 9)

Page 10

1    THE VIDEOGRAPHER: Counsel have already    10:59:16
2    identified themselves, and you may go    10:59:18
3    forward.    10:59:21
4    MR. LAHAD: Just for the record, this is    10:59:24
5    John Lahad from Susman Godfrey for the    10:59:24
6    witness and the Trust now defending the    10:59:24
7    witness.    10:59:27
8    EXAMINATION BY MS. LIN:    10:59:29
9    Q    Good morning, Mr. Deason.    10:59:29
10   A    Good morning.    10:59:30
11   Q    Thank you for being here today. Have    10:59:31
12   you ever been deposed before?    10:59:33
13   A    Yes.    10:59:35
14   Q    In what cases have you been deposed?    10:59:35
15   A    I was deposed for our LCD case for    10:59:38
16   Circuit City Trust.    10:59:42
17   Q    Did you serve as the 30(b)(6) witness in    10:59:43
18   that case?    10:59:45
19   A    Yes, I did.    10:59:45
20   Q    You understand that you will be serving    10:59:46
21   as the 30(b)(6) witness in today's deposition?    10:59:47
22   A    Yes.    10:59:50
23   Q    I think you heard me go over these this    10:59:50
24   morning, so I will be brief, but I have a couple    10:59:53
25   of ground rules that I want to cover with you.    10:59:54

Page 11

1    Let's try not to talk over one another    10:59:56
2    so that our court reporter can get a clear record.    10:59:57
3    Does that make sense?    11:00:00
4    A    Yes.    11:00:01
5    Q    I will ask you to make a verbal answer    11:00:01
6    instead of just nodding your head, does that make    11:00:04
7    sense?    11:00:06
8    A    Yes.    11:00:06
9    Q    If you want to break at any time please    11:00:07
10   just let me know, I would ask that you finish if I    11:00:08
11   have a question pending and then I am happy to    11:00:12
12   take a break.    11:00:13
13   Does that make sense?    11:00:14
14   A    Yes, it does.    11:00:15
15   Q    I am going to hand you a document    11:00:16
16   previously marked as Exhibit 2831. Have you seen    11:00:18
17   this exhibit before?    11:00:28
18   A    Yes.    11:00:28
19   Q    Do you understand this is the of today's    11:00:32
20   deposition?    11:00:34
21   A    Yes.    11:00:34
22   Q    I understand you will be discussing    11:00:38
23   topics 1 through 3, Topic 6 as to subparts G and    11:00:41
24   H, 7 through 9, 11, 13, 14, 19 through 21 and 25.    11:00:46
25   Is that correct?    11:00:53

Page 12

1    A    That is my understanding.    11:00:54
2    MR. LAHAD: I think you omitted part 12.    11:00:56
3    MS. LIN: And a part of 12.    11:01:00
4    MR. LAHAD: Yes, the first part of 12.    11:01:02
5    SKUs, discounts, promotions, rebates programs    11:01:03
6    in connection with the sale of CRT finished    11:01:06
7    products to your customers.    11:01:08
8    MS. LIN: Thank you.    11:01:10
9    BY MS. LIN:    11:01:11
10   Q    Mr. Deason, what did you do to prepare    11:01:12
11   for today's deposition?    11:01:15
12   A    I reviewed my testimony in the LCD case    11:01:16
13   and I met with counsel yesterday.    11:01:20
14   Q    Did you review any documents other than    11:01:22
15   the transcript of that LCD deposition?    11:01:24
16   A    This document here that I brought with    11:01:27
17   me about my own personal employment history with    11:01:29
18   Circuit City.    11:01:34
19   (Whereupon, Deposition Exhibit 2834 is marked for    11:01:34
20   Identification.)    11:01:34
21   MS. LIN: Why don't we go ahead and mark    11:01:37
22   the document you brought with you as Exhibit    11:01:39
23   2834 and use this version and then trade with    11:01:43
24   you, if that's okay.    11:01:47
25   THE WITNESS: That is fine.    11:01:48

Page 13

1    BY MS. LIN:    11:01:48
2    Q    Thank you. You prepared Exhibit 2834    11:01:48
3    just to help remember which positions you held at    11:01:51
4    Circuit City?    11:01:54
5    A    Yes.    11:01:54
6    Q    Did you bring any other documents with    11:01:55
7    you today to use at this deposition?    11:01:58
8    A    No.    11:02:00
9    Q    Did you talk to anyone other than your    11:02:01
10   attorneys to help prepare for today's deposition?    11:02:02
11   A    No.    11:02:05
12   Q    Have you ever been employed by the    11:02:10
13   Circuit City Liquidating Trust?    11:02:12
14   A    Yes.    11:02:16
15   Q    When were you employed by the Liquidated    11:02:18
16   Trust?    11:02:19
17   A    I have a consulting company, so I did it    11:02:20
18   as an independent contractor, but I did so as part    11:02:24
19   of the LCD case in answering interrogatories and    11:02:28
20   being the witness as I am again today.    11:02:34
21   Q    You are appearing today as the    11:02:39
22   subcontract employee of Circuit City Trust?    11:02:43
23   A    As an independent contractor, yes.    11:02:47
24   Q    Do you have any employer right now other    11:02:52
25   than your consulting company?    11:03:02

4 (Pages 10 - 13)

Page 14

```
 1   A   No.                              11:03:05
 2   Q   What is your consulting company called?   11:03:07
 3   A   Deason Consulting, Incorporated.   11:03:09
 4   Q   Does Deason Consulting, Incorporated   11:03:13
 5   provide services to any entities other than the   11:03:17
 6   Circuit City Liquidating Trust?      11:03:20
 7   A   Yes.                            11:03:21
 8   Q   Have you provided services to any of the   11:03:22
 9   parties in this litigation other than Circuit   11:03:25
10   City?                              11:03:28
11   A   I don't know if JVC is a party to this,   11:03:28
12   but I have done some work in the last five years   11:03:32
13   for JVC.                            11:03:35
14   Q   Is your previous employment with Circuit   11:03:43
15   City Stores reflected in Exhibit 2834?   11:03:46
16   A   Yes, it is.                      11:03:49
17   Q   In any of the positions reflected in   11:03:50
18   2834, did you have responsibility related to CRT   11:03:55
19   finished products?                  11:04:01
20   A   Yes.                            11:04:01
21   Q   When I refer to CRT finished products,   11:04:04
22   do you understand that to mean products that   11:04:07
23   containing CRTs?                    11:04:08
24   A   Yes.                            11:04:11
25   Q   Which of the positions reflected on   11:04:11
```

Page 15

```
 1   Exhibit 2834 did you have responsibility for CRT   11:04:14
 2   finished products?                  11:04:18
 3   A   In 1992 to 1995, I was southern division   11:04:20
 4   product manager for ACE in SOHO, and SOHO stands   11:04:25
 5   for small office home office and in that capacity   11:04:27
 6   I was involved with computer monitors.   11:04:35
 7       Also as corporate category manager,   11:04:48
 8   senior category management video, from 1996 to   11:04:54
 9   1998, I would have been involved with what we call   11:04:58
10   combination products which are products that have   11:05:05
11   both a CRT and a DVD or a VCR built into them, and   11:05:08
12   I was also during the period of 1998 to July 2002,   11:05:15
13   a national buyer for camcorders and VCRs, for   11:05:21
14   approximately two years of that period. I also   11:05:25
15   had responsibilities that included those same type   11:05:29
16   of combo products.                  11:05:31
17   Q   Going on your position from 1992 to   11:05:42
18   1995, what did your responsibilities, related to   11:05:45
19   computer monitors, include?          11:05:49
20   A   I would be responsible for a division of   11:05:52
21   the company, the southern division. It's a group   11:05:56
22   of stores in the Southeast based out of Atlanta,   11:05:58
23   Georgia, and four of those stores I would choose   11:06:02
24   which stores would get which product and I would   11:06:05
25   choose what products were in the ads for those   11:06:10
```

Page 16

```
 1   markets for the southern division markets.   11:06:16
 2       I would also set the commissions for   11:06:19
 3   those products and also functionally set the   11:06:26
 4   price. All of this was at the buyer's key   11:06:35
 5   direction. It was called store merchandising. We   11:06:39
 6   had merchants. I had no buying responsibilities.   11:06:44
 7   Q   Focusing on your role from 1996 to 1998   11:06:55
 8   when you were a corporate category manager, what   11:06:58
 9   did your responsibilities related to CRT finished   11:07:01
10   products include in that role?      11:07:04
11   A   Similar responsibilities. In this case,   11:07:06
12   I changed product categories, so I had video   11:07:11
13   product that included camcorders, VCRs, a   11:07:19
14   combination product, and did the same sort of   11:07:24
15   duties that I had done for the southern division,   11:07:28
16   I now did for the entire country and because we   11:07:30
17   were both physically located in Richmond,   11:07:34
18   Virginia, I had worked much more closely with the   11:07:38
19   buyer.                              11:07:41
20       Although I had no buying responsibility   11:07:41
21   during that period of time, I did sit in on quite   11:07:46
22   a few buyer vendor discussions including   11:07:50
23   negotiations.                       11:07:55
24   Q   Did your responsibilities change between   11:07:57
25   your corporate category manager role and your   11:08:00
```

Page 17

```
 1   following role as a national buyer?   11:08:02
 2   A   Correct. Once I became the national   11:08:04
 3   buyer, then I am the lead in actually negotiating   11:08:08
 4   the purchases and managing the product so that   11:08:12
 5   others would do the role that I used to do, but my   11:08:17
 6   role would include the actual purchase.   11:08:23
 7   Q   And your role related to the actual   11:08:27
 8   purchase that included purchasing the combination   11:08:30
 9   products we discussed previously?   11:08:34
10   A   Yes, not for the entire period of 1998   11:08:34
11   to 2002, but approximately the first couple of   11:08:38
12   years. We had an assistant buyer come on during   11:08:41
13   that period. I cannot speak to the exact date who   11:08:44
14   took it over.                       11:08:48
15   Q   At any other point in time, did you have   11:08:49
16   responsibility related to buying CRT finished   11:08:51
17   products?                           11:08:54
18   A   No.                             11:08:54
19       MR. GRALEWSKI: Objection, form.   11:08:56
20   BY MS. LIN:                         11:09:16
21   Q   When I refer to Circuit City, I will be   11:09:16
22   referring to Circuit City Stores, Inc., do you   11:09:18
23   understand?                         11:09:21
24   A   Yes.                            11:09:21
25   Q   From describing your roles at Circuit   11:09:22
```

5 (Pages 14 - 17)

Page 18

1  City, it sounds like Circuit City was divided into  11:09:26
2  regional divisions, is that right?  11:09:30
3     A  It was until 1995, so from the period of  11:09:31
4  time that we are talking about today it was not.  11:09:34
5     Q  Was Circuit City divided into any other  11:09:39
6  types of divisions until after 1995?  11:09:42
7     A  Operations continued to have divisions,  11:09:46
8  but merchandising did not.  11:09:50
9     Q  Were CRT finished products sales  11:09:58
10  purchased on a national level after 1995?  11:10:03
11     MR. LAHAD:  Objection, form.  11:10:07
12  BY MS. LIN:  11:10:07
13     Q  You can answer unless he instructs you  11:10:12
14  not to.  11:10:15
15     A  Yes, they were purchased on a national  11:10:16
16  level and they were also purchased on a national  11:10:18
17  level before 1995. I had no buying  11:10:20
18  responsibilities when I was in a divisional role.  11:10:24
19     Q  Were there positions equivalent to a  11:10:30
20  division product manager's role that you held in  11:10:38
21  1992 through 1995 after 1995?  11:10:40
22     A  No.  11:10:46
23     Q  Which positions took over the  11:10:50
24  responsibilities that you had in that southern  11:10:55
25  division product manager role?  11:10:58

Page 19

new

1     A  ~~Originally,~~ these roles were taken over  11:11:00
~~f~~ new
2  by the ~~nxt~~ two positions that I list which is  11:11:07
3  corporate market manager and corporate category  11:11:10
4  manager, and when I became a buyer those positions  11:11:13
5  in 1998, those positions no longer existed and the  11:11:18
6  buyer handled both the responsibilities that these  11:11:22
7  positions had handled before and the  11:11:26
8  responsibilities that the buyers had held before.  11:11:31
9     Q  Do I understand correctly that in 1998,  11:11:41
10  Circuit City consolidated the category manager and  11:11:45
11  buyer roles into one role?  11:11:48
12     A  Yes.  11:11:49
13     Q  Were there national buyers with  11:11:57
14  responsibility for CRT finished products other  11:12:01
15  than you?  11:12:03
16     A  Yes.  11:12:05
17     Q  How many positions were there related to  11:12:06
18  CRT finished products at the national buyer level?  11:12:10
19     A  I do not know.  11:12:16
20     Q  Do you know who acted as a national  11:12:25
21  buyer for CRT finished products at any point in  11:12:28
22  time other than yourself?  11:12:31
23     A  I know of ones, but it's a long period  11:12:33
24  of time. I believe we provided org charts which  11:12:36
25  are probably a lot more accurate than my memory,  11:12:43

Page 20

1  but I do know some specific people who fall along  11:12:47
2  the way.  11:12:51
3     I am not just sure that I could rattle  11:12:53
4  off everybody there were, but quite a few people  11:12:54
5  involved over that period of time.  11:12:56
6     Q  Quite a few people involved as national  11:12:58
7  buyers during that time?  11:12:59
8     A  Yes.  11:13:02
9     Q  Will you tell me the names of those  11:13:02
10  buyers just to the extent that you remember them?  11:13:03
11     A  Also I have to caution that I know that  11:13:08
12  they bought on the TV Team, whether they  11:13:11
13  specifically bought CRT, I may be in error.  11:13:15
14     Rick Souder who was a buyer for the TV  11:13:18
15  Team during this period, and also a division  11:13:22
16  merchandise manager, which is like supervisors  11:13:26  Shulklappe~~r~~
17  buyers, so he would have been ~~involved.~~  11:13:28
18     Andy ~~Schulklapper~~ -- I will not try that  11:13:38
19  one -- was also involved, Danny Cagwin, Doug  11:13:42
20  Moore, I believe, was involved at the very end of  11:13:46
21  this period. Tom Croll, Igor Anshakov. I will  11:13:52
22  stop at that point.  11:14:15
23     Q  Thank you. Did you collaborate with any  11:14:17
24  of the employees you just listed in determining  11:14:21
25  the CRT finished product purchases?  11:14:25

Page 21

1     MR. LAHAD:  Objection, form.  11:14:30
2     THE WITNESS: I don't know what you mean  11:14:31
3  by collaborate.  11:14:33
4  BY MS. LIN:  11:14:33
5     Q  Did you have any shared responsibilities  11:14:34
6  with any of the employees you just listed that  11:14:36
7  were related to CRT finished products?  11:14:37
8     A  We shared time together. We visited  11:14:45
9  suppliers together. We did not have shared  11:14:50
10  responsibilities if I understand the question  11:14:53
11  correctly.  11:14:55
12     Q  Do you know how many stores Circuit City  11:15:03
13  had during the relevant time period and we can go  11:15:05
14  by year if that is a more reasonable way to do it.  11:15:08
15     A  I am not going to say that accurate, but  11:15:10
16  you're talking about a period of time that we were  11:15:12
17  probably below 400 and at our peak somewhere  11:15:17
18  around 650 to 660.  11:15:22
19     Q  Do you know during the relevant period  11:15:29
20  what percentage of those stores were located in  11:15:31
21  California?  11:15:34
22     A  No.  11:15:35
23     Q  Would there be a way to find that out?  11:15:36
24     A  You could if you looked at the reports  11:15:40
25  and counted all the stores and then counted it  11:15:44

6 (Pages 18 - 21)

Page 22

1  out, but as far as doing it quickly, no.    11:15:47
2    Q   Do you know the percentage of Circuit    11:15:53
3  City Stores during the relevant period that were    11:15:55
4  located in Illinois?    11:15:57
5    A   No.    11:15:58
6    MR. LAHAD: A real quick one. One of    11:16:00
7  the things that we have not done yet on this    11:16:01
8  record as we did in the previous deposition    11:16:04
9  is to define relevant time period, so we are    11:16:04
10  still talking about March 1995 to November    11:16:06
11  2006?    11:16:09
12    MS. LIN: Thank you, yes. Does that    11:16:09
13  make sense?    11:16:11
14    THE WITNESS: Yes.    11:16:11
15    MS. LIN: Great.    11:16:12
16    MR. LAHAD: Sorry, did I say six?    11:16:14
17    MR. ROSS: You did.    11:16:15
18    MS. LIN: I am sorry, so we're about    11:16:15
19  March 1995 through November 2007 as the    11:16:15
20  relevant period.    11:16:20
21    MR. LAHAD: Okay.    11:16:21
22    MS. LIN: Does that make sense?    11:16:21
23    THE WITNESS: Yes.    11:16:23
24    MS. LIN: Great.    11:16:24
25  BY MS. LIN:    11:16:25

Page 23

1    Q   Did Circuit City have any stores named    11:16:25
2  something other than Circuit City during the    11:16:27
3  relevant time period?    11:16:29
4    A   We had stores, yes. We had stores in    11:16:34
5  Canada that would not be part of the records that    11:16:41
6  we have been talking about.    11:16:44
7    We previously had stores called Circuit    11:16:47
8  City Express, but I believe they were all closed    11:16:49
9  before this time period.    11:16:54
10    Q   Did your responsibilities in any of your    11:17:00
11  positions for Circuit City relate to products    11:17:03
12  eventually sold in Canada?    11:17:07
13    A   No.    11:17:08
14    Q   Do you know if any of the employees you    11:17:10
15  listed who had responsibility related to CRT    11:17:12
16  finished product purchases had responsibilities    11:17:15
17  related to CRT finished product sales in Canada?    11:17:18
18    A   They did not.    11:17:26
19    Q   Which divisions of Circuit City had    11:17:38
20  responsibilities related to the purchase of CRT    11:17:41
21  finished products during the relevant period?    11:17:44
22    A   The merchandising department would be    11:17:46
23  responsible. It is not a division, but is a    11:17:50
24  department that was responsible for purchase of    11:17:53
25  all Circuit City products for resale.    11:17:56

Page 24

1    Q   Was there a particular subdivision    11:18:06
2  within the merchandising department that had    11:18:08
3  responsibility for CRT finished product purchases?    11:18:11
4    A   I'm not sure what you would call them.    11:18:15
5  We had groups that were broken out managed by    11:18:24
6  different groups, so you would have a general    11:18:29
7  manager who would manage a group of products.    11:18:30
8    Most of the period we are talking about,    11:18:34
9  there would have been a video department where you    11:18:37
10  had a general manager who was over the video    11:18:40
11  product.    11:18:45
12    It was later called Display and at some    11:18:46
13  points it might have also had audio product in it.    11:18:50
14    We also had a division merchandise    11:18:55
15  manager, so you had a vice president of    11:19:01
16  merchandising, you had a general manager that    11:19:01
17  broke these groups in, and then you had a    11:19:06
18  divisional merchandise manager who would have    11:19:07
19  having separate groups.    11:19:09
20    For example, in this case, since we're    11:19:11
21  talking about CRT, the display was one DMM, and    11:19:12
22  all video product that was not displays was the    11:19:18
23  other DMM, and that was the DMM that I worked for    11:19:22
24  which had the combo product and other products    11:19:27
25  that are not CRT product.    11:19:30

Page 25

1    Q   Do you know which of those two groups    11:19:33
2  you were just talking about would have    11:19:36
3  responsibility related to CRT finished products    11:19:38
4  that were monitors?    11:19:40
5    A   I am sorry. I left that group out.    11:19:42
6  That would have been a separate group that we    11:19:45
7  called the SOHO group and that group was all small    11:19:47
8  office home office would include everything that    11:19:53
9  had to do with computers and usually some other    11:19:57
10  category, but predominantly computers.    11:20:02
11    Q   Was that SOHO group located in one    11:20:05
12  location?    11:20:09
13    A   Yes.    11:20:09
14    Q   Where was that location?    11:20:10
15    A   Richmond.    11:20:12
16    Q   Is that true throughout the relevant    11:20:13
17  period?    11:20:15
18    A   Yes.    11:20:15
19    Q   For the display group that had    11:20:16
20  responsibilities related to CRT finished products    11:20:20
21  other than monitors, was that group concentrated    11:20:23
22  in one location?    11:20:27
23    A   Yes.    11:20:28
24    Q   Where was that location?    11:20:29
25    A   Richmond.    11:20:30

7 (Pages 22 - 25)

Page 26

1  Q  Was that true throughout the relevant    11:20:31
2 period?                                       11:20:33
3  A  Yes.                                      11:20:33
4  Q  Was there a position at Circuit City      11:20:34
5 that had responsibility related to the deciding    11:20:43
6 which brands of CRT finished products to purchase?    11:20:46
7  A  The buyer chooses which products to buy.    11:20:50
8  Q  Were Circuit City's buyers concentrated    11:20:57
9 in any one location?                          11:21:00
10  A  They were all in the headquarters in     11:21:01
11 Richmond.                                     11:21:04
12  Q  Were there any buyers throughout the     11:21:07
13 relevant period located at another location other    11:21:09
14 than Richmond?                               11:21:12
15  A  No.                                      11:21:13
16  Q  Was there a position at Circuit City     11:21:16
17 that had the ultimate authority to approve a    11:21:24
18 buyer's decision of which vendors to purchase CRT    11:21:26
19 products from?                               11:21:30
20  A  I'm not sure I understand the question.    11:21:31
21  Q  Was there anyone supervising the buyers'    11:21:33
22 decisions of which vendors to purchase CRT    11:21:36
23 finished products from?                      11:21:38
24  A  The buyers had supervisors, but it was    11:21:40
25 not common practice for the supervisors to direct    11:21:43

Page 27

1 the purchases.                               11:21:49
2  Q  Was it the buyers who were responsible    11:22:00
3 for negotiating CRT finished product costs?    11:22:02
4  A  Yes.                                     11:22:05
5  Q  Was there a division at Circuit City     11:22:10
6 responsible for setting the prices at which CRT    11:22:12
7 finished products would be sold?              11:22:14
8  A  Yes.                                     11:22:18
9  Q  What was that division?                  11:22:19
10  A  Also the merchandising division and also    11:22:21
11 specifically the buyer.                       11:22:24
12  Q  Did the buyer have final authority on    11:22:28
13 the ultimate sales price of a CRT finished    11:22:31
14 product?                                     11:22:34
15     MR. LAHAD:  Objection, form.            11:22:35
16     THE WITNESS:  Again, I am not sure      11:22:38
17 exactly what you mean when you say by "final    11:22:39
18 authority." The buyers set the price.         11:22:42
19 BY MS. LIN:                                  11:22:45
20  Q  After a buyer sets a price at which a    11:22:45
21 CRT finished product would be sold, were there any    11:22:48
22 means by which that price would change?       11:22:50
23  A  Yes.                                     11:22:53
24  Q  How might a price set by a buyer for the    11:22:54
25 sale of a CRT finished product change?        11:22:57

Page 28

1  A  The buyer may choose to put the product    11:23:01
2 on sale. The store may choose to change the price    11:23:04
3 based on predetermined competitors and you could    11:23:14
4 also have the store change the price if the    11:23:19
5 product is damaged.                          11:23:23
6  Q  You mentioned that a store could change    11:23:36
7 a price based on predetermined competitors?    11:23:39
8  A  Yes.                                     11:23:42
9  Q  How did that process work?               11:23:42
10  A  Again, because it's a long period of    11:23:44
11 time, the specifics would change, but the general    11:23:48
12 process was that the operations group that run the    11:23:54
13 stores in conjunction with the buyers would make a    11:23:58
14 determination of who the key competitors were for    11:24:02
15 that store, that area, that region, or national,    11:24:07
16 and set out the rules that said, "We will react to    11:24:14
17 this or we will get reacting," because they were    11:24:21
18 not all solid.                               11:24:28
19     You would have a review that says, "Here    11:24:29
20 are the pieces that we don't look competitive on."    11:24:30
21 Now there is a discussion about whether we will    11:24:35
22 react or not.                                11:24:38
23  Q  Did the stores have the independent     11:24:41
24 ability to react to those prices?             11:24:44
25  A  Yes had very short windows, so again,    11:24:47

Page 29

1 they would within these parameters, it might be    11:24:51
2 generally you would be able to do it during a week    11:24:55
3 which is the general ad cycle.               11:24:59
4     Sometimes that became much shorter, and    11:25:03
5 sometimes it got eliminated, sometimes we      11:25:06
6 eliminate reacting during the Christmas period.    11:25:09
7  Q  You mentioned an operations group, what    11:25:15
8 are those?                                   11:25:18
9  A  The operations groups are literally the    11:25:19
10 people who run the stores, your store managers,    11:25:21
11 your district managers, the sales associates,    11:25:25
12 everybody that is in the store.              11:25:27
13  Q  Is each store a distinct operating      11:25:29
14 group?                                       11:25:32
15  A  Yes, as far as being able to identify    11:25:32
16 them, obviously, they are Circuit City Stores,    11:25:37
17 Inc., but each store has a number.           11:25:41
18  Q  Do you recall the sizes of CRT          11:25:59
19 televisions that Circuit City sold during the    11:26:03
20 relevant period?                             11:26:06
21  A  I could probably rattle off most of them    11:26:08
22 just from -- well, actually used to sell them. So    11:26:11
23 we had the 13 inch, the 19 inch, and 20 inch and    11:26:16
24 24 inch and I believe there was a period where we    11:26:20
25 had 30, and 35, and 40 inch.                 11:26:23

8 (Pages 26 - 29)

Page 30

1    All of those would have been displayed.   11:26:26
2  There may have been some other sizes like 21 in   11:26:28
3  there. Monitors worked a little different.   11:26:31
4    For a long time, especially CRT   11:26:37
5  monitors, were pretty much all 13 inch and then   11:26:40
6  there were some 19 inch, and these, of course, are   11:26:44
7  measured diagonally.   11:26:48
8    When I bought the combo product, I   11:26:52
9  believe our largest ones were 20, if I am not   11:26:56
10  mistaken, so we had 13 inch, 19 inch, and 20 inch.   11:27:03
11    Q  Did the sizes of CRT finished products   11:27:08
12  that Circuit City sold change over the course of   11:27:12
13  the relevant period?   11:27:14
14    A  Yes.   11:27:16
15    Q  Do you recall if there were any trends   11:27:18
16  in the way they were changing over the relevant   11:27:19
17  period?   11:27:21
18    A  They became larger. So there were   11:27:24
19  introductions of larger and larger sizes during   11:27:29
20  the period and that is about all I can say for   11:27:32
21  sure.   11:27:38
22    Q  Was there any position at Circuit City   11:27:41
23  responsible for deciding what size CRT finished   11:27:44
24  products to purchase at a given time?   11:27:47
25    A  The buyer would make the decision with   11:27:49

Page 31

1  some guidance from their supervisors on capacity   11:27:54
2  because you might have a buyer who buys nothing   11:28:03
3  but 13 inch and another buyer buys 19 inch, and   11:28:07
4  you only have that amount of display space, so   11:28:11
5  there has to be a consensus on how many inches   11:28:14
6  is going to have.   11:28:19
7    Q  Was there a way that buyers'   11:28:19
8  responsibilities were divided among CRT products,   11:28:22
9  for instance, by product size or product vendor?   11:28:25
10    A  Yes.   11:28:29
11    Q  How did that division work?   11:28:30
12    A  It would have been changed over the   11:28:33
13  years, but it would have been based on specific   11:28:35
14  features, so for example, when CRT was bigger as a   11:28:40
15  business you might have predominantly done by   11:28:48
16  size.   11:28:53
17    Once other display products were   11:28:55
18  introduced, then there was more division by the   11:28:59
19  type of display so you may have CRT, you may have   11:29:02
20  projection television, and so on.   11:29:06
21    Q  Do you recall approximately when Circuit   11:29:08
22  City changed that division to focus on product   11:29:11
23  types of televisions?   11:29:14
24    A  Each introduction requires you to do so.   11:29:18
25  There was always some division prior to this   11:29:23

Page 32

1  period.   11:29:26
2    There were console televisions, for   11:29:27
3  example, so you would have somebody that was in   11:29:31
4  charge of console televisions versus portable   11:29:33
5  televisions so there was always some division.   11:29:37
6    Those are represented as classes in most   11:29:41
7  cases in our documents, and in some cases, they   11:29:47
8  also go down to a tier level, but most buyer   11:29:51
9  responsibility was at a class level.   11:29:55
10    Q  There were tiers within the classes?   11:29:59
11    A  Yes.   11:30:01
12    Q  Do you recall when Circuit City   11:30:02
13  discontinued selling CRT televisions?   11:30:04
14    A  I thought we were selling them when we   11:30:07
15  shut down, but I don't know.   11:30:13
16    Q  Do you know if Circuit City at any point   11:30:15
17  discontinued selling CRT monitors?   11:30:18
18    A  I do not, no.   11:30:21
19    THE REPORTER:  That answer always   11:30:22
20  stumbles me.  "I do not know" is that k n o   11:30:22
21  w?  Or is it "I do not, no," period.   11:30:22
22    THE WITNESS:  K n o w.   11:30:22
23    THE REPORTER:  Thank you.   11:30:22
24  BY MS. LIN:   11:30:22
25    Q  Did Circuit City have different   11:30:40

Page 33

1  procurement procedures related to CRT monitors   11:30:43
2  versus CRT televisions?   11:30:45
3    A  The procedures would have been the same.   11:30:49
4    Q  How did Circuit City's buyers identify   11:30:55
5  the CRT finished products they wanted to purchase?   11:30:58
6    A  This could be a long answer.  Quite a   11:31:02
7  few different factors.  You start off demand.   11:31:09
8    You have got historical demand that you   11:31:14
9  are looking at that says, "We have sold so many of   11:31:18
10  these at a certain price, et cetera," and you   11:31:21
11  combine that with industry forecast on what you   11:31:23
12  believe is going to be the demand over the period   11:31:29
13  of time usually a year at a time.   11:31:32
14    After you have done your general demand   11:31:39
15  which is combined with what your available space   11:31:43
16  is, you're going to make your determinations on   11:31:47
17  the size of this.   11:31:53
18    Once you have got the size of the   11:31:57
19  assortment, then you listen to the presentations   11:31:59
20  from all the vendors that we either are doing   11:32:02
21  business with, or that want to do business with   11:32:06
22  us, and make the decisions based on, again, demand   11:32:09
23  first.   11:32:17
24    You might be meeting with Sony and you   11:32:17
25  know that Sony's is 25 percent of the industry.   11:32:21

9 (Pages 30 - 33)

Page 34

1 So it is probably reasonable to carry 25 percent   11:32:25
2 of your assortment in Sony.   11:32:29
3    Then you go to all of the other factors   11:32:33
4 which, of course, includes costs and it includes   11:32:36
5 the vendor's performance history, have they been   11:32:46
6 on time with delivery, have they kept you in   11:32:50
7 stock, have they supported the sell through   11:32:53
8 product? There are a lot of other smaller factors   11:32:59
9 that come into it, but that is basically the   11:33:04
10 process.   11:33:07
11    Q   You referenced determining the size of   11:33:11
12 an assortment.  Does that mean the number of   11:33:14
13 products?   11:33:16
14    A   Yes.   11:33:16
15    Q   Is there any industry forecasting that   11:33:27
16 Circuit City typically relied on in selecting its   11:33:27
17 CRT finished product purchases was done on an   11:33:29
18 annual basis?   11:33:32
19    A   Most of our plans were done on an annual   11:33:33
20 basis because of both the cycle of introduction of   11:33:38
21 product and because of budget planning, et cetera.   11:33:42
22    Those would be revamped generally about   11:33:48
23 half way through the year, you might make some   11:33:51
24 additional purchases and you may stop buying some   11:33:54
25 of the products that you bought before, but you   11:33:59

Page 35

1 generally did not change the whole assortment.   11:34:03
2    CRTs, television products specifically,   11:34:07
3 had a very strong fall introduction period, and so   11:34:11
4 it did not match, Circuit City's fiscal year was   11:34:17
5 from March to February if I remember correctly, so   11:34:24
6 it did not match the fiscal year quite the same as   11:34:27
7 some of the categories that I managed, and did, so   11:34:31
8 they were a little more active on the every six   11:34:33
9 months basis than other categories.   11:34:38
10    Q   Typically CRT finished product purchase   11:34:40
11 decisions would be made on a semi-annual basis?   11:34:43
12    A   Yes.   11:34:47
13    MR. LAHAD:  Objection, misstates the   11:34:49
14 testimony.  Give me a second to butt in.   11:34:50
15    THE WITNESS:  You have to kick me.   11:34:56
16 BY MS. LIN:   11:34:58
17    Q   You referenced earlier that in making   11:34:58
18 its CRT finished product purchasing decisions   11:35:01
19 Circuit City's buyers would listen to vendor   11:35:04
20 presentations, how would the specific vendors be   11:35:07
21 selected to give these presentations?   11:35:12
22    A   They would be selected based on the fact   11:35:15
23 that you had been doing business with them.   11:35:20
24    If you were doing business with them,   11:35:23
25 then you would be talking to them again, and also   11:35:27

Page 36

1 when other vendors requested the opportunity to   11:35:30
2 present us product, and in some rare cases because   11:35:34
3 we did business with most vendors, in rare cases   11:35:42
4 we might reach out to a vendor that we currently   11:35:46
5 are not doing business with and, say, "We have an   11:35:48
6 interest."   11:35:52
7    Q   In those rare cases when Circuit City   11:35:56
8 would reach out to a vendor and express an   11:35:58
9 interest, do you know why Circuit City would do so   11:36:00
10 in this CRT finished product context?   11:36:05
11    A   Either we saw that there was demand for   11:36:07
12 their product or there was what we would refer to   11:36:13
13 as a role in assortment, meaning, there was a role   11:36:17
14 that we needed playing that our current vendors   11:36:21
15 could not provide.   11:36:25
16    For example, it might be that none of   11:36:26
17 the suppliers that we have are doing business with   11:36:30
18 a specific price point, and so we know that a   11:36:35
19 vendor that we are not doing business with has a   11:36:40
20 product at that price and we would contact them,   11:36:43
21 and say, "Are you interested in selling that to   11:36:46
22 us?"   11:36:48
23    Q   You also reference in your answer   11:36:50
24 regarding procurement procedures that, for   11:36:52
25 instance, if Sony had 25 percent of the market   11:36:56

Page 37

1 that Circuit City might want 25 percent of its   11:36:59
2 assortment to come from Sony, do you remember that   11:37:01
3 testimony?   11:37:04
4    A   Yes.   11:37:05
5    Q   Would Circuit City generally try to   11:37:07
6 match the percentage market share of its vendors   11:37:08
7 in the market with the products Circuit City would   11:37:11
8 be selling from those vendors?   11:37:16
9    A   Generally is too open for me to answer   11:37:21
10 that as a yes or no.  We took it in as a factor   11:37:25
11 and we would want to know and we would want to be   11:37:30
12 deliberate in the fact that we were under buying   11:37:36
13 or over buying a particular vendor and know that   11:37:41
14 we had done so.   11:37:45
15    Q   You would want to make a particular   11:37:49
16 decision if you were going to purchase a vendor's   11:37:59
17 quantities either above or below their market   11:38:01
18 share in the entire market?   11:38:04
19    A   We would want to know that we were doing   11:38:06
20 so, and it would be deliberate that we had done   11:38:09
21 so.   11:38:11
22    I will give you one example.  We may   11:38:13
23 look at a product that's only carried at Wal-Mart   11:38:16
24 and it is 10 percent of the market share.   11:38:23
25    We are not necessarily going to go out   11:38:28

10 (Pages 34 - 37)

Page 38

1  and buy that 10 percent because of the role that    11:38:29
2  it's playing for that product.    11:38:33
3       There are demand brands and so if there    11:38:34
4  is a high demand brand, and the way we would    11:38:38
5  define demand brands, is a brand that the customer    11:38:41
6  walks in the door, and if they do not see it they    11:38:44
7  are likely not to buy from you, and so, those are    11:38:46
8  typically the brand names that are off the top of    11:38:50
9  your head as a consumer and those products we    11:38:54
10 would be more likely to buy closer to demand.    11:39:02
11      Q   Do you recall which vendors during the    11:39:12
12 relevant period sold demand brand CRT finished    11:39:15
13 products?    11:39:18
14      A   Again, their relevant demand would    11:39:20
15 change, but typically, all of the major brands,    11:39:24
16 Hitachi, Sony, JVC, and Toshiba they all had a    11:39:29
17 significant market share, and again, if it's a    11:39:39
18 major brand name that the consumer is going to    11:39:48
19 know, then buy.    11:39:53
20      Q   Do you know if LG Electronics was ever a    11:39:59
21 demand brand for CRT finished products during the    11:40:03
22 relevant period?    11:40:05
23      A   I do not know.    11:40:06
24      Q   Did Circuit City ever purchase its CRT    11:40:12
25 from its products direct from the CRT finished    11:40:16

Page 39

1  products manufacturers?    11:40:18
2       A   I don't know because I don't believe    11:40:24
3  that we would know who made the CRT.    11:40:27
4       Q   From the manufacturer creating the CRT    11:40:32
5  finished product, did Circuit City ever purchase    11:40:36
6  directly from those manufacturers?    11:40:39
7       A   Yes.    11:40:41
8       Q   Were there instances when Circuit City    11:40:42
9  purchased CRT finished products from distributors    11:40:45
10 who were not the manufacturers of the CRT finished    11:40:47
11 products?    11:40:50
12      A   Our experience with distributors was    11:40:54
13 pretty limited to extremely small purchases that    11:40:57
14 were used for our e-Commerce division.    11:41:02
15      Q   Were there other instances besides    11:41:10
16 e-Commerce where Circuit City would purchase CRT    11:41:13
17 finished products from distributors?    11:41:15
18      A   I don't know of any case. I never did.    11:41:18
19      Q   Do you know why distributors were used    11:41:20
20 in e-Commerce context?    11:41:22
21      A   Because of the size of purchase.    11:41:24
22      Q   Would that be because it was a    11:41:28
23 small-size purchase?    11:41:30
24      A   Yes. We are talking about -- so you    11:41:31
25 want to put maybe four more items on the web than    11:41:37

Page 40

1  what you carry in the store, but they do not sell.    11:41:40
2       You are only buying like one a month or    11:41:44
3  one every other month. so that doesn't fit the    11:41:47
4  rest of our way we do business where we are buying    11:41:53
5  directly from the vendor.    11:41:58
6       Q   Do you know whether the distributors    11:42:02
7  from which Circuit City purchased CRT finished    11:42:05
8  products were located exclusively within the    11:42:08
9  United States?    11:42:11
10      A   I believe that's the case.    11:42:14
11      Q   Do you know whether the manufacturers    11:42:17
12 from which Circuit City purchased its CRT finished    11:42:23
13 products were located exclusively within the    11:42:27
14 United States?    11:42:30
15      A   All of the buyers negotiations and    11:42:30
16 purchases were done with U.S. held companies that    11:42:36
17 I, yes, experienced in seeing, et cetera.    11:42:41
18      MR. GRALEWSKI: I apologize, the witness    11:42:51
19 cut out. Could I ask the court reporter to    11:42:53
20 read back that answer.    11:42:55
21 (Whereupon, record was read.)    11:43:09
22 BY MS. LIN:    11:43:09
23      Q   When you say U.S. held companies, do you    11:43:10
24 mean companies headquartered in the United States?    11:43:13
25      A   Yes.    11:43:16

Page 41

1       Q   Are you aware of any exceptions in which    11:43:18
2  CRT finished products purchases were negotiated    11:43:20
3  with manufacturers located outside of the United    11:43:25
4  States?    11:43:27
5       A   I don't know. I am not saying that the    11:43:32
6  product wasn't manufactured outside the United    11:43:36
7  States.    11:43:38
8       I am saying that we would deal with a    11:43:39
9  company and they may have an outside of the U.S.    11:43:42
10 presence, most of them did, but when we negotiated    11:43:47
11 price and we created a purchase order, those    11:43:51
12 purchase orders were to their U.S. held divisions    11:43:55
13 or otherwise you would be importing the product    11:44:03
14 and that is something that they did, not us, as    11:44:06
15 far as I know of.    11:44:11
16      Q   Are you aware of any instances when    11:44:17
17 Circuit City's purchase orders for CRT finished    11:44:19
18 products were sent outside of the United States?    11:44:21
19      A   I believe the U.S. group would share    11:44:26
20 their purchase orders with all of their companies,    11:44:29
21 so conversations about forecasted need were back    11:44:31
22 and forth between a supplier at every level and    11:44:42
23 Circuit City at several levels.    11:44:48
24      Q   I'm sorry. You've lost me. Do you mean    11:44:52
25 suppliers within Circuit City?    11:44:55

11 (Pages 38 - 41)

Page 42

1    A   No, vendors. I changed the word for   11:44:56
2   you. I am sorry. But because the U.S. group had   11:44:58
3   to make sure that we had adequate supply, they   11:45:04
4   would have to share any information about   11:45:08
5   purchases and sales with their entire company.   11:45:10
6    Q   I'm not sure I'm understanding, so the   11:45:19
7   vendors that Circuit City was speaking to in the   11:45:21
8   United States, Circuit City understood them, them   11:45:23
9   being the vendor, to share information throughout   11:45:25
10  the vendor's company?   11:45:29
11   A   Correct. I will use an example. We   11:45:31
12  forecast our needs and our inventory team   11:45:39
13  specifically says, "We are going to need this   11:45:44
14  amount of product over a period of time," and so   11:45:46
15  we would transfer that data to the vendor saying,   11:45:50
16  "This is what our forecasted needs are," and most   11:45:54
17  cases we also showed them what our sales were.   11:45:58
18       That data, since the U.S. company is a   11:46:02
19  sales company they have to share that data with   11:46:09
20  their manufacturing divisions.   11:46:13
21    Q   Did Circuit City's employees to your   11:46:25
22  knowledge ever take part in those discussions with   11:46:29
23  the manufacturers above the U.S. sales entities?   11:46:35
24       MR. LAHAD: Objection, vague.   11:46:42
25       THE WITNESS: Yes, I am not --   11:46:43

Page 43

1  BY MR. GRALEWSKI:   11:46:46
2    Q   Would Circuit City's buyers ever have   11:46:47
3   contact with any vendors apart from the sales   11:46:50
4   entities located in the United States?   11:46:53
5    A   Yes.   11:46:55
6    Q   In what capacity would that happen?   11:46:57
7    A   Seeing new product lineups and learning   11:47:01
8   about the feature, learning about the new product   11:47:11
9   primarily.   11:47:13
10    Q   Would purchase negotiations ever be   11:47:14
11  conducted between Circuit City and an entity other   11:47:16
12  than a U.S. based sales entity of a vendor?   11:47:20
13    A   ~~Absolutely that is~~   11:47:23
14    Q   Was there a process that Circuit City   11:47:23
15  used in negotiating prices for its purchases of   11:47:43
16  CRT finished products?   11:47:46
17    A   We did not negotiate prices. When I   11:47:49
18  refer to price, I refer to price as being what we   11:47:53
19  sell it at.   11:47:57
20    Q   I'm sorry. What term would you use to   11:47:58
21  discuss that? Would it be cost?   11:48:02
22    A   Cost.   11:48:03
23    Q   So the cost in this context would be   11:48:05
24  from the vendor to Circuit City to acquire the CRT   11:48:08
25  finished product?   11:48:11

Page 44

1    A   Correct.   11:48:12
2    Q   Was there a process that Circuit City   11:48:12
3   used to negotiate that cost for CRT finished   11:48:14
4   products?   11:48:18
5    A   There wasn't a formalized, "This is the   11:48:18
6   process," if that is what you are looking for.   11:48:35
7        But just the act of doing it creates a   11:48:38
8   process, and the standard, so the standard   11:48:41
9   function is you understand what the product that   11:48:46
10  the vendor wants to make the cost and then it is a   11:48:52
11  matter of does that work for you and if it doesn't   11:48:56
12  then you negotiate from there.   11:49:00
13    Q   Did Circuit City request quotes from the   11:49:01
14  vendors for product costs?   11:49:05
15       MR. LAHAD: Objection, vague.   11:49:08
16       THE WITNESS: Every time an assortment   11:49:10
17  was announced, there would generally be some   11:49:12
18  sort of communication, "If this is what the   11:49:19
19  product would cost for you?"   11:49:23
20  BY MS. KIM:   11:49:24
21    Q   Typically, CRT finished product costs   11:49:25
22  would initially be quoted by the vendor to Circuit   11:49:27
23  City?   11:49:30
24    A   Right, that would be the beginning of   11:49:30
25  negotiations.   11:49:32

Page 45

1    Q   Did Circuit City ever employ an auction   11:49:34
2   process in purchasing its CRT finished products?   11:49:37
3    A   Yes.   11:49:39
4    Q   How did that auction process work?   11:49:40
5    A   It's called a reverse auction and   11:49:42
6   basically you put everybody on line at the same   11:49:46
7   time.   11:49:51
8        You say that you are looking for a very   11:49:52
9   very specific product. Auctions were only used to   11:49:55
10  my knowledge for what we would refer to as   11:50:00
11  unbranded product, meaning, that it was not a   11:50:07
12  major demand brand, but it could be a secondary   11:50:10
13  type of brand.   11:50:15
14       But the specifics would be, "We've got   11:50:19
15  to have a 13 inch and it has got to have the   11:50:24
16  antenna with it and all of those sort of things,   11:50:28
17  you get a level playing field so that everybody is   11:50:30
18  quoting the same feature set, and then I was not   11:50:33
19  directly involved in one.   11:50:39
20       But the process is that everybody goes   11:50:43
21  out live with the computer feeds, and sees that   11:50:46
22  someone has bid lower, and they can choose to   11:50:53
23  react or not.   11:50:57
24       They do not know who it is.   11:50:58
25       It is blind from that viewpoint, but   11:51:01

*[handwritten left margin, near Page 43:]* overwrites were sometimes part of the negotiations

12 (Pages 42 - 45)

Page 46

1  they are basically bidding, and in these cases you    11:51:03
2  would say it is a set amount of product. "We want    11:51:06
3  to buy 10,000."    11:51:12
4      It was not part of our normal assortment    11:51:16
5  in most cases. There could have been some cases.    11:51:22
6    Q   In Circuit City's reverse auction    11:51:29
7  process the bidder offering the lowest price for    11:51:33
8  the product would typically win?    11:51:35
9    A   Yes.    11:51:38
10    Q   Do you know why the auction process was    11:51:39
11  not used for branded products?    11:51:39
12    A   Again, because you have a specific value    11:51:43
13  of that brand -- I said almost -- it was always    11:51:49
14  used for opening price point because that's where    11:51:56
15  cost actually has the biggest factor, meaning,    11:52:02
16  that it would have the least amount of features    11:52:05
17  and the customer's primary demand for purchasing    11:52:08
18  that product is driven by the fact that it is    11:52:12
19  retail price, whereas, all the other factors ...    11:52:16
20  (witness did not complete his answer.)    11:52:21
21    Q   For the unbranded products, Circuit City    11:52:24
22  considered price to be the biggest factor used by    11:52:26
23  the customer in purchasing those products?    11:52:29
24      MR. LAHAD: Objection, misstates the    11:52:32
25  testimony.    11:52:33

Page 47

1      THE WITNESS: For the opening price    11:52:33
2  point product, cost was much more of a factor    11:52:37
3  than in some other decisions.    11:52:43
4  BY MS. LIN:    11:52:46
5    Q   When you say "opening price point    11:52:47
6  product," what does that mean?    11:52:48
7    A   That means the lowest price retail    11:52:49
8  product within a group of like product, so for    11:52:56
9  example, a 13-inch CRT product may start as low as    11:53:01
10  $99, it might go to $400, the $99 is your opening    11:53:08
11  price point.    11:53:15
12    Q   Did the price of Circuit City's opening    11:53:17
13  price point products affect the price that Circuit    11:53:21
14  City would sell its other products in that same    11:53:24
15  category at?    11:53:27
16    A   I don't believe so.    11:53:30
17    Q   Was an unbranded product always the    11:53:37
18  opening price point product?    11:53:45
19    A   No.    11:53:48
20    Q   Are there specific CRT finished product    11:53:49
21  manufacturers that also sold opening point price    11:53:53
22  products?    11:53:58
23    A   That changed over a period of time. For    11:53:59
24  example, when I was doing the combination product    11:54:03
25  Magnavox was selling opening point product.    11:54:09

Page 48

1    Q   Did Circuit City use its reverse auction    11:54:16
2  process throughout the relevant period?    11:54:22
3    A   No.    11:54:24
4    Q   What years was the reverse auction    11:54:24
5  process used for CRT finished products?    11:54:26
6    A   The process was brought to us by a head    11:54:29
7  merchant that we had gotten from Target and he was    11:54:35
8  with us for -- what I am looking at is my history,    11:54:39
9  because I moved, my buying changed about right    11:54:52
10  after he came in.    11:55:05
11      So somewhere in 2002, to about 2004, he    11:55:06
12  was the champion of the reverse auction process    11:55:12
13  and that was when it was used the most to my    11:55:15
14  knowledge.    11:55:18
15    Q   Do you know what the employee's name is?    11:55:19
16    A   I knew that you were going to ask me,    11:55:22
17  but I cannot remember.    11:55:23
18    Q   If it comes back to you at any point    11:55:25
19  today, please speak up.    11:55:28
20    A   Yes.    11:55:29
21    Q   In the reverse auction process, did    11:55:31
22  Circuit City set all of the terms for the product    11:55:34
23  purchase except for the price point?    11:55:37
24    A   Yes.    11:55:38
25      MR. LAHAD: Objection, vague.    11:55:39

Page 49

1      THE WITNESS: To my knowledge we set as    11:55:41
2  many things as we possibly could so that    11:55:43
3  everything was backed down to the cost at    11:55:46
4  that point. Again, if I might add, we did    11:55:51
5  not do this a lot.    11:55:57
6  BY MS. LIN:    11:55:58
7    Q   Outside of the auction process, when    11:56:00
8  Circuit City was negotiating for CRT finished    11:56:03
9  product purchases, were negotiations primarily    11:56:07
10  focused on prices?    11:56:10
11    A   No, primarily, again, is a relevant    11:56:12
12  term, but there are so many factors that cost is    11:56:17
13  certainly one of them.    11:56:24
14      MR. LAHAD: Your question said prices    11:56:28
15  and he said costs. Are you asking about    11:56:28
16  prices or cost?    11:56:31
17      MS. LIN: I am sorry, I am asking about    11:56:32
18  costs.    11:56:33
19      MR. LAHAD: Then maybe you want to    11:56:34
20  reboot that just for the cleanliness of the    11:56:35
21  record.    11:56:37
22  BY MS. LIN:    11:56:37
23    Q   Apart from the auction process when    11:56:38
24  Circuit City was negotiating for CRT finished    11:56:41
25  product costs, were costs the primary factor at    11:56:44

13 (Pages 46 - 49)

Page 50

1  issue in those negotiations?    11:56:47
2        MR. GRALEWSKI: Objection, form.    11:56:49
3        THE WITNESS: No, demand was.    11:56:51
4  BY MS. LIN:    11:56:55
5    Q  Circuit City's ability to meet its    11:56:55
6  demand to purchase a quantity of CRT finished    11:57:03
7  products was its driving factor in purchase    11:57:05
8  negotiations?    11:57:09
9        MR. LAHAD: Objection, misstates the    11:57:10
10  testimony.    11:57:12
11        THE WITNESS: No, the customer demand.    11:57:12
12  The goal was to sell the product, so your    11:57:18
13  primary motivation and your primary factor is    11:57:23
14  always demand, how many customers are looking    11:57:25
15  for this product and want to buy this    11:57:28
16  product.    11:57:30
17  BY MS. LIN:    11:57:30
18    Q  When Circuit City was negotiating the    11:57:32
19  terms of its CRT product purchases which terms    11:57:35
20  were up for negotiation with the CRT finished    11:57:39
21  product vendors?    11:57:43
22    A  Which terms?    11:57:44
23    Q  Yes.    11:57:46
24        MR. GRALEWSKI: Objection, form.    11:57:47
25  BY MS. LIN:    11:57:49

Page 51

1    Q  For instance, you negotiated costs with    11:57:49
2  you being Circuit City negotiated cost with CRT    11:57:52
3  finished product vendors, correct?    11:57:55
4    A  Correct.    11:57:57
5        MR. GRALEWSKI: Objection.    11:57:58
6  BY MS. LIN:    11:57:59
7    Q  Were there other things in addition to    11:58:00
8  costs that were typically negotiated with CRT    11:58:01
9  finished product vendors?    11:58:04
10    A  Yes.    11:58:05
11        MR. GRALEWSKI: Same objection.    11:58:06
12  BY MS. LIN:    11:58:07
13    Q  What else was under negotiation in    11:58:07
14  addition to costs?    11:58:10
15        MR. GRALEWSKI: Objection.    11:58:11
16        THE WITNESS: You may have payment terms    11:58:13
17  and you might also negotiate market    11:58:16
18  development funds.    11:58:22
19  BY MS. LIN:    11:58:23
20    Q  When you say payment terms, what does    11:58:24
21  that mean?    11:58:26
22    A  That means whether they are paid in 30    11:58:27
23  days or they are due in 30 days or 60 days or 90    11:58:30
24  days, for example.    11:58:34
25    Q  Would a long payment term be more    11:58:38

Page 52

1  favorable to Circuit City?    11:58:41
2    A  Yes.    11:58:43
3    Q  In some instances could Circuit City be    11:58:44
4  willing to pay a higher cost for CRT finished    11:58:46
5  products in exchange for a longer payment term?    11:58:48
6    A  I did not personally experience that,    11:58:53
7  but theoretically.    11:58:59
8    Q  You also mentioned, I believe, market    11:59:04
9  development funds, is that right?    11:59:08
10    A  Yes.    11:59:09
11    Q  What were those?    11:59:10
12    A  Market development funds are funds that    11:59:11
13  are provided to develop a market for the product,    11:59:15
14  otherwise help you sell the product, and the    11:59:20
15  things that might help you sell the product    11:59:24
16  include training.    11:59:26
17        It might include the way the product is    11:59:28
18  displayed and most often it included how    11:59:31
19  frequently and how the product was advertised.    11:59:38
20    Q  For each of those instances training,    11:59:44
21  display, and advertising the vendor would provide    11:59:46
22  money to Circuit City to do those things?    11:59:49
23    A  They may.    11:59:52
24    Q  In negotiating the purchase of CRT    11:59:55
25  finished products, would Circuit City ever accept    11:59:58

Page 53

1  a higher cost in exchange for additional vendor    12:00:01
2  funds?    12:00:05
3        MR. LAHAD: Objection, vague.    12:00:09
4        THE WITNESS: I can only answer that    12:00:10
5  question when talking process. Process wise,    12:00:12
6  we were taught to buy the product and    12:00:16
7  negotiate the cost of the product, and once    12:00:19
8  we finished with that, then to have    12:00:22
9  discussions about market development funds as    12:00:25
10  a separate conversation.    12:00:29
11  BY MS. LIN:    12:00:30
12    Q  Did Circuit City have any type of    12:00:36
13  leverage to obtain market development funds?    12:00:39
14        MR. LAHAD: Objection, vague.    12:00:42
15        MR. GRALEWSKI: Can we have the same    12:00:45
16  agreement in this deposition that an    12:00:47
17  objection by one is an objection by all?    12:00:50
18        MS. LIN: An objection by all    12:00:54
19  plaintiffs, yes.    12:00:55
20        MR. GRALEWSKI: Thank you.    12:00:57
21        THE WITNESS: Could you restate the    12:00:59
22  question.    12:01:00
23  BY MS. LIN:    12:01:00
24    Q  Sure, so for instance, once Circuit City    12:01:01
25  had agreed on a cost term of a CRT finished    12:01:04

14 (Pages 50 - 53)

Page 54

1  product purchase, what could be used to persuade a    12:01:08
2  vendor to also provide additional market    12:01:11
3  development funds?    12:01:14
4      A   Primarily our visibility in the    12:01:15
5  marketplace because we were one of the largest    12:01:18
6  advertisers in the United States.    12:01:22
7      Also the fact that we had 600 something    12:01:24
8  stores where their product would be available to    12:01:29
9  be seen by the consumer.    12:01:31
10     The fact that we presented an    12:01:35
11 opportunity for the product to be seen and heard    12:01:38
12 and learned about was our leverage otherwise we    12:01:41
13 had the ability to sell the product.    12:01:47
14     Q   That gave you negotiating power with the    12:01:49
15 CRT finished product vendors?    12:01:51
16     MR. LAHAD:  Objection, misstates    12:01:54
17 testimony.    12:01:56
18 BY MS. LIN:    12:01:57
19     Q   Circuit City strength in the market    12:01:57
20 improved Circuit City's negotiating position with    12:01:59
21 CRT finished product manufacturers?    12:02:02
22     MR. LAHAD:  Same objection.    12:02:04
23     THE WITNESS:  I don't know whether it    12:02:06
24 did in the way that you are asking the    12:02:08
25 question.    12:02:10

Page 55

1      In some cases the reverse would happen    12:02:14
2  and the vendor doesn't want their product in    12:02:18
3  that many stores.  They would rather have it    12:02:21
4  in a few elite stores, so I can't say that    12:02:24
5  we got cost based on that or that we had a    12:02:32
6  leverage based on that.    12:02:36
7  BY MS. LIN:    12:02:37
8      Q   Would Circuit City purchase CRT finished    12:02:40
9  products for the company as a whole versus    12:02:43
10 purchasing for specific stores?    12:02:48
11     A   We bought for the company as a whole and    12:02:51
12 then decided how many stores we would put it in.    12:02:55
13     Q   Did the CRT finished product    12:02:58
14 manufacturer that Circuit City purchased from have    12:03:01
15 any role in deciding which Circuit City Stores its    12:03:04
16 product would end up in?    12:03:07
17     A   To the degree of supply, if they said,    12:03:09
18 "We are going to be able to supply more than 100    12:03:13
19 stores," then we wouldn't program more than 100    12:03:17
20 stores.    12:03:21
21     But as far as choosing the specific    12:03:22
22 stores, that would have been a highly unusual    12:03:25
23 conversation and not one that I was party to.    12:03:32
24     MR. LAHAD:  Is now a good time to break    12:03:36
25 for lunch?    12:03:36

Page 56

1      MS. LIN:  Yes, now would be a great time    12:03:37
2  to take a break.    12:03:37
3      THE VIDEOGRAPHER:  The time is    12:03:38
4  approximately 12:03 p.m.  We are off the    12:03:39
5  record.    12:03:42
6  AFTERNOON SESSION    12:03:42
7  (12:42 p.m.)    12:03:42
8      THE VIDEOGRAPHER:  The time is 12:42    12:42:44
9  p.m.  We are back on the record.    12:42:46
10     MS. LIN:  Thank you, Mr. Deason.    12:42:49
11 BY MS. LIN:    12:42:50
12     Q   Do you understand that you are still    12:42:50
13 under oath?    12:42:51
14     A   Yes.    12:42:51
15     Q   To your knowledge, did Circuit City ever    12:42:52
16 purchase CRT finished products from a Hitachi    12:42:56
17 related entity during the relevant period?    12:42:58
18     A   I don't know whether we bought CRT    12:43:00
19 product from Hitachi.  I know we were doing    12:43:03
20 business with Hitachi Television during the    12:43:06
21 period.    12:43:07
22     Q   Do you know if Circuit City bought any    12:43:09
23 CRT finished products from LG Electronics during    12:43:11
24 the relevant period?    12:43:16
25     A   Again, I cannot specifically say without    12:43:17

Page 57

1  looking at the reports, so I will just stop it    12:43:20
2  there.    12:43:23
3      Q   What about Panasonic?    12:43:24
4      A   Panasonic because I bought a Panasonic    12:43:27
5  television, I know we sold them, yes.    12:43:30
6      Q   Do you know which CRT finished products    12:43:32
7  from Panasonic Circuit City sold?    12:43:35
8      A   I do not know all the specifics.    12:43:38
9      Q   What about Phillips?  Phillips related    12:43:39
10 entities?    12:43:44
11     A   Again, I would not know the specifics.    12:43:45
12     Q   Would that be true for any number of    12:43:47
13 manufacturers I might list?    12:43:50
14     A   Yes.    12:43:51
15     Q   Do you know how many CRT finished    12:43:52
16 products in any particular size category that    12:43:55
17 Circuit City would sell at one time?    12:44:00
18     A   No.    12:44:01
19     Q   We discussed before lunch how there    12:44:02
20 would be high value products and low value    12:44:07
21 products within the same size category of CRT    12:44:12
22 finished products, do you remember that?    12:44:16
23     A   Yes.    12:44:17
24     Q   Was there any time during the relevant    12:44:17
25 period when Circuit City ceased to carry low-end    12:44:19

15 (Pages 54 - 57)

Page 58

1 CRT products?                          12:44:22
2        MR. LAHAD: Objection, vague.     12:44:26
3        THE WITNESS: I do not know.      12:44:27
4 BY MS. LIN:                            12:44:28
5    Q  Was the range of CRT finished products  12:44:28
6 at Circuit City sold reduced towards the end of  12:44:34
7 the relevant period?                   12:44:38
8    A  Again, I wouldn't have specific   12:44:40
9 knowledge, but the fact that their LCD product was  12:44:43
10 introduced, it is possible.            12:44:48
11   Q  We discussed combo products this   12:44:53
12 morning. Were there any combo CRT finished  12:44:57
13 products that were monitors sold by Circuit City?  12:45:00
14   A  My definition of a combo product was the  12:45:06
15 television product with either a DVD or a VCR in  12:45:09
16 it, so based on that definition the answer is no.  12:45:13
17   Q  Did Circuit City sell any computers that  12:45:16
18 contained a CRT finished product and the computer  12:45:19
19 itself within the same piece?          12:45:22
20       MR. LAHAD: Objection, vague.     12:45:26
21       THE WITNESS: I don't know.       12:45:27
22 BY MS. LIN:                           12:45:28
23   Q  When we were discussing CRT finished  12:45:29
24 products, that would be at a low or a high end of  12:45:39
25 a continuum within the same product category, were  12:45:43

Page 59

1 there certain factors that made products fall at  12:45:47
2 the higher end of that price category?  12:45:50
3    A  If they were more full featured, then  12:45:52
4 they would be in the higher end, and if they were  12:45:55
5 a basic less featured product, would be in the  12:45:57
6 lower end.                            12:46:00
7    Q  Were there certain brands that tended to  12:46:03
8 be at one end or another?              12:46:05
9    A  Yes.                           12:46:08
10   Q  Which brands fell at the high end of CRT  12:46:12
11 finished product price points?          12:46:17
12   A  Most of your -- again, consumer       12:46:20
13 recognized brands like Panasonic, Sony, Samsung  12:46:23
14 might have been at the higher end and the brands  12:46:31
15 that maybe were less recognized by consumers would  12:46:34
16 be at the lower end and that could change over a  12:46:38
17 period of time because at one point Samsung was  12:46:42
18 primarily at the opening price points, and over  12:46:46
19 the period that we're talking about they changed  12:46:50
20 from being opening to being more of a premium  12:46:53
21 product.                              12:46:56
22   Q  During the time that Circuit City was  12:47:00
23 purchasing CRT finished products, did Circuit City  12:47:02
24 ever know the entity that manufactured CRT within  12:47:05
25 the finished product?                  12:47:10

Page 60

1    A  I looked at that question on the       12:47:14
2 deposition and we visited factories, so it is  12:47:17
3 possible or probable that a buyer was in a factory  12:47:23
4 and saw a product that we bought actually either  12:47:29
5 making a picture tube or something like that.  12:47:34
6        I did not have specific knowledge of  12:47:37
7 doing it. I never did that.            12:47:39
8    Q  Would there be a way now for someone to  12:47:42
9 determine which entity manufactured a CRT within a  12:47:47
10 CRT finished product sold by Circuit City?  12:47:51
11   A  Not with Circuit City.            12:47:53
12       MR. GRALEWSKI: Objection, form.    12:47:55
13       THE WITNESS: Not from Circuit City's  12:47:58
14 viewpoint. I would assume the vendor could  12:48:01
15 provide that information but we could not.  12:48:05
16 BY MS. LIN:                           12:48:07
17   Q  Did Circuit City know whether the CRTs  12:48:09
18 contained in the CRT finished products it  12:48:13
19 purchased were manufactured in the United States?  12:48:15
20   A  They may have known. I am not sure we  12:48:20
21 cared.                                12:48:24
22   Q  Does Circuit City know at the present  12:48:26
23 where the CRTs contained in the CRT finished  12:48:28
24 products that sold were manufactured?  12:48:30
25   A  I don't understand the question.    12:48:34

Page 61

1    Q  You said Circuit City might have known  12:48:36
2 at some point in time where a CRT within a CRT  12:48:38
3 finished product had been manufactured. Is that  12:48:41
4 something that anyone with the company would still  12:48:43
5 know?                                 12:48:46
6        MR. LAHAD: Are you talking about the  12:48:46
7 Trust?                                12:48:48
8        MS. LIN: Yes.                   12:48:48
9        THE WITNESS: Again, it would have to be  12:48:49
10 a one on one type of experience where a buyer  12:48:55
11 who went over to see LG and Samsung which we  12:48:58
12 did a couple of times a year go over and see  12:49:05
13 the product, if they happened to see a  12:49:08
14 manufacturing facility, then they would do  12:49:12
15 it, but it wouldn't have been, again, there  12:49:14
16 was no need for us to know where the product,  12:49:19
17 where the CRT was manufactured.        12:49:23
18 BY MS. LIN:                           12:49:25
19   Q  Was the identity of the entity making  12:49:28
20 the CRT ever considered by Circuit City as part of  12:49:32
21 the finished product purchasing decisions?  12:49:36
22   A  I wouldn't think so.             12:49:39
23   Q  Do you know for the CRT finished       12:49:40
24 products that Circuit City purchased what  12:49:48
25 percentage of the purchase price was attributable  12:49:50

16 (Pages 58 - 61)

Page 62

1  to the cost of that CRT?                  12:49:54
2  A  No.                           12:49:55
3  Q  Would there be a way for Circuit City to  12:49:56
4  determine that information?              12:49:59
5  A  No.                           12:50:00
6     MR. GRALEWSKI: Objection, form.     12:50:02
7  BY MS. LIN:                         12:50:03
8  Q  You testified before lunch that      12:50:09
9  typically in a cost negotiation with a vendor  12:50:11
10 regarding a CRT finished product that typically a  12:50:16
11 vendor would be the first to throw out a cost  12:50:18
12 term, do you recall that testimony?       12:50:22
13 A  Yes.                          12:50:23
14 Q  Was Circuit City typically able to    12:50:24
15 negotiate more favorable cost terms than those  12:50:26
16 starting cost terms provided by a CRT finished  12:50:29
17 product vendor?                      12:50:31
18    MR. LAHAD: Vague.               12:50:34
19    MR. GRALEWSKI: Objection, form.     12:50:36
20    THE WITNESS: Reask the question,    12:50:38
21 please.                          12:50:42
22 BY MS. LIN:                         12:50:49
23 Q  Was Circuit City ever able to negotiate  12:50:49
24 more favorable cost terms than the starting cost  12:50:52
25 terms provided by a CRT finished product vendor?  12:50:55

Page 63

1  A  Yes.                          12:50:59
2  Q  How frequently could Circuit City    12:50:59
3  negotiate more favorable cost terms with a CRT  12:51:02
4  finished product vendor?                12:51:05
5  A  I could not tell you in any sort of    12:51:06
6  meaningful way.                     12:51:08
7  Q  Based on your experience as a buyer of  12:51:10
8  CRT finished products, were you able to    12:51:13
9  successfully negotiate lower products with CRT  12:51:17
10 finished product manufacturers?          12:51:19
11    MR. LAHAD: You said lower products?  12:51:22
12    MS. LIN: Lower costs.            12:51:25
13    MR. LAHAD: Why don't you reboot that,  12:51:26
14 for the record.                     12:51:27
15    MR. GRALEWSKI: Objection, form, outside  12:51:28
16 the scope.                        12:51:30
17 BY MS. LIN:                         12:51:33
18 Q  Based on your experience as a buyer of  12:51:33
19 CRT finished products, were you able to    12:51:37
20 successfully negotiate lower costs with the CRT  12:51:39
21 finished product vendors?               12:51:42
22    MR. GRALEWSKI: Same objection.      12:51:45
23    THE WITNESS: The answer is, yes, not in  12:51:47
24 all cases, but the way you asked the question  12:51:55
25 it sounds like you want me to say that it is  12:51:58

Page 64

1  for everything.  It is not, but there were  12:52:00
2  times when I was able to.              12:52:02
3  BY MS. LIN:                         12:52:06
4  Q  Are there specific circumstances that  12:52:06
5  you are aware of in which Circuit City was not  12:52:14
6  able to negotiate more favorable cost terms for  12:52:16
7  its CRT finished product purchases?       12:52:19
8  A  Again, I would have to refer to my own  12:52:26
9  experience and there were occasions where the  12:52:29
10 price quoted was the lowest price that I was able  12:52:32
11 to buy the product for.                12:52:36
12 Q  Did Circuit City have any recourse if a  12:52:39
13 vendor could not come down in price for a CRT  12:52:42
14 finished product that CRT wanted to purchase?  12:52:46
15    MR. LAHAD: Vague.               12:52:48
16    MR. GRALEWSKI: Objection, form.     12:52:50
17    THE WITNESS: Again, using the term   12:52:52
18 cost, if the cost was not to our liking we    12:52:56
19 might not buy the product, but in a lot of    12:53:06
20 cases we might buy the product anyhow.     12:53:10
21 BY MS. LIN:                         12:53:13
22 Q  Would Circuit City ever withdraw its   12:53:14
23 advertising support for a CRT finished product if  12:53:18
24 a CRT finished product manufacturer did not reduce  12:53:20
25 its cost?                         12:53:24

Page 65

1     MR. LAHAD: Objection, lacks foundation.  12:53:25
2     THE WITNESS: I don't know.  It doesn't  12:53:35
3  sound reasonable.                    12:53:42
4  BY MS. LIN:                         12:53:43
5  Q  Would Circuit City ever reduce the    12:53:44
6  volume of CRT finished products that it intended  12:53:57
7  to purchase if a CRT finished product vendor would  12:54:00
8  not meet Circuit City's requested price?  Strike  12:54:03
9  that.                            12:54:05
10    Would Circuit City ever reduce the    12:54:05
11 volume of CRT finished products that it intended  12:54:05
12 to purchase if a vendor would not meet Circuit  12:54:05
13 City's requested costs?                12:54:05
14 A  If we chose to stop buying the product,  12:54:06
15 then that is a reduction and we do make that    12:54:09
16 decision at times.                   12:54:13
17 Q  Did Circuit City have any overall     12:54:20
18 negotiating strategy with respect to trying to  12:54:23
19 reduce CRT finished product costs?        12:54:26
20    MR. LAHAD: Vague.               12:54:29
21    THE WITNESS: I don't know what you mean  12:54:30
22 as far as an overall strategy.           12:54:33
23 BY MS. LIN:                         12:54:34
24 Q  Were buyers trained in any specific    12:54:36
25 specific tactics they could use to try to    12:54:40

17 (Pages 62 - 65)

Page 66

1 negotiate lower cost of CRT finished products?    12:54:41
2    MR. LAHAD:  Trained by Circuit City?    12:54:47
3    MS. LIN:  (Counsel motions.)    12:54:50
4    MR. LAHAD:  For the record, she nodded    12:54:50
5 yes.    12:54:51
6    THE WITNESS:  We had basic negotiation    12:54:53
7 training just for all purposes, whether    12:54:58
8 managing people or buying, we had that type    12:55:05
9 of training at various times during my tenure    12:55:09
10 with the company and during this period of    12:55:12
11 time.    12:55:15
12    As far as a specific, "This is the way    12:55:16
13 you are to negotiate with a vendor," there    12:55:21
14 was no such training.    12:55:23
15 BY MS. LIN:    12:55:27
16    Q  If one CRT finished product vendor    12:55:27
17 decreased its prices, would Circuit City ever use    12:55:37
18 that price decrease to try to negotiate lower    12:55:40
19 prices for CRT finished products from its other    12:55:43
20 vendors?    12:55:46
21    MR. LAHAD:  You are using price again.    12:55:47
22 Did you mean cost?    12:55:48
23    MS. LIN:  I am sorry.  Let me reask    12:55:49
24 that.    12:55:52
25 BY MS. LIN:    12:55:52

Page 67

1    Q  If one CRT finished product vendor    12:55:52
2 decreased its cost to Circuit City for a CRT    12:55:54
3 finished product, would Circuit City ever use that    12:55:58
4 cost decrease to try to negotiate lower costs with    12:56:01
5 its other CRT finished product vendors?    12:56:03
6    MR. GRALEWSKI:  Objection, form.    12:56:07
7    THE WITNESS:  In general we would not    12:56:10
8 discuss -- we had non-disclosure forms    12:56:12
9 agreements and so we would not discuss    12:56:16
10 specifics on what other vendors were doing    12:56:20
11 that was not public.    12:56:23
12    So if another product has repositioned    12:56:27
13 its manufactured suggested retail price, not    12:56:32
14 its costs, but its suggested retail price,    12:56:36
15 we did, could, and would use that    12:56:38
16 information to have discussions about the    12:56:44
17 manufacturer's suggested retail price and    12:56:49
18 therefore the cost of other product.    12:56:50
19 BY MS. LIN:    12:56:55
20    Q  So Circuit City might use a public price    12:56:56
21 to a consumer of one CRT finished product to    12:57:00
22 negotiate a lower cost with another CRT finished    12:57:04
23 product vendor?    12:57:07
24    MR. LAHAD:  Objection.    12:57:09
25    MR. GRALEWSKI:  Objection, form.    12:57:10

Page 68

1    MR. LAHAD:  Misstates the testimony.    12:57:12
2    THE WITNESS:  Yes.    12:57:13
3 BY MS. LIN:    12:57:14
4    Q  Did Circuit City have any written    12:57:15
5 guidelines related to how costs would be    12:57:20
6 negotiated with CRT finished product vendors?    12:57:23
7    A  No.    12:57:25
8    Q  Did Circuit City have any unwritten    12:57:26
9 guidelines regarding how costs would be negotiated    12:57:29
10 with CRT finished product vendors?    12:57:31
11    MR. LAHAD:  Vague.    12:57:34
12    THE WITNESS:  That is what I would ask    12:57:35
13 is, I am not sure what you mean.    12:57:37
14 (Whereupon, Deposition Exhibit 2835 is marked for    12:57:40
15 Identification.)    12:57:40
16    MS. LIN:  I am going to hand the witness    12:58:03
17 a document marked as Exhibit 2835, and the    12:58:03
18 document is Bates stamped CC0572597.    12:58:06
19 BY MS. LIN:    12:58:17
20    Q  Are you familiar with any of the people    12:58:18
21 in Exhibit 2835?    12:58:40
22    A  Yes.    12:58:42
23    Q  Who are you familiar with?    12:58:43
24    A  I know Jay Nimechek, I know Danny    12:58:46
25 Caglin, and I know Paul Burgess.    12:58:48

Page 69

1    Q  Who is Jay Nimechek?    12:58:53
2    A  At this point he is the national account    12:58:56
3 manager for LG Zenith Electronics USA.    12:58:59
4    Q  Who is Danny Cagwin?    12:59:03
5    A  Danny Cagwin was a buyer for Circuit    12:59:04
6 City Stores.    12:59:08
7    Q  And who is Paul Burgess?    12:59:09
8    A  According to this, Paul at this time is    12:59:12
9 working for LG USA and that is all I can tell from    12:59:15
10 this.    12:59:19
11    Q  Looking at the last email in the chain,    12:59:22
12 so starting at the bottom of page 1 through the    12:59:44
13 top of page 2, reading this email through, does it    12:59:44
14 appear to you that LG Electronics has agreed to    12:59:45
15 reduce its costs of a CRT finished product in    12:59:49
16 response to a request from Circuit City?    12:59:52
17    MR. LAHAD:  Objection, calls for    12:59:54
18 speculation, the document speaks for itself.    12:59:55
19    MR. GRALEWSKI:  Objection, form.    12:59:59
20    THE WITNESS:  Can you ask again, I am    13:00:04
21 sorry.    13:00:04
22    MS. LIN:  Can the court reporter read    13:00:07
23 the question back?    13:00:07
24 (Whereupon, record was read.)    13:00:07
25    MR. LAHAD:  Same objections.    13:00:43

18 (Pages 66 - 69)

Page 70

1    THE WITNESS: Reading the email, it    13:00:45
2    appears that they have agreed to reduce the    13:00:50
3    costs, but there is also conversation about    13:00:57
4    what I am assuming is manufactured suggested    13:01:02
5    retail pricing, and so it appears that they    13:01:06
6    are having discussions about whether the    13:01:11
7    manufacturers suggested retail price is    13:01:13
8    competitive.    13:01:16
9    How one relates to the other, I am not    13:01:20
10   sure from this email.    13:01:23
11   BY MS. LIN:    13:01:25
12   Q   Would Circuit City request that its CRT    13:01:25
13   finished product manufacturers revise their    13:01:29
14   suggested retail pricing on CRT finished products    13:01:33
15   to remain competitive with Circuit City's other    13:01:38
16   finished product vendors?    13:01:41
17       MR. LAHAD: Objection, vague.    13:01:43
18       MR. GRALEWSKI: Objection, form.    13:01:44
19       THE WITNESS: We would have discussions    13:01:46
20   about whether their manufacturer suggested    13:01:48
21   retail price was going to be a fact and in    13:01:50
22   those conversations we might say, "We don't    13:01:55
23   think this is competitive."    13:01:57
24   BY MS. LIN:    13:01:58
25   Q   Circuit City might say to a finished    13:02:01

Page 71

1    product vendor that it's suggested pricing would    13:02:04
2    not be effective?    13:02:07
3    A   That we don't think that that is a    13:02:08
4    competitive price. We can then choose to price it    13:02:10
5    however we wish to price it.    13:02:14
6    Q   Would Circuit City in the context of    13:02:19
7    those negotiations request the CRT finished    13:02:22
8    product manufacturer reduce its cost to Circuit    13:02:27
9    City for selling that product?    13:02:30
10   A   If you're having a conversation about    13:02:36
11   whether a product is competitive or not, and    13:02:38
12   you're expecting the retail to be one price, but    13:02:45
13   it's going to be a different price, then yes, you    13:02:49
14   would expect that there would be an adjustment and    13:02:52
15   cost to support a different price point.    13:02:55
16   Q   In negotiating with its vendors to reach    13:03:00
17   a different price point, would Circuit City    13:03:02
18   negotiate to maintain the margins that it expected    13:03:06
19   receive at the original price point?    13:03:08
20   A   I would restate that our primary concern    13:03:12
21   is the cost of the product and our secondary    13:03:17
22   concern is what we can sell it at and the    13:03:22
23   manufacturer's suggested retail price definitely    13:03:25
24   impacts our ability of what we can sell it at, but    13:03:28
25   we still have the right to sell it at any price we    13:03:32

Page 72

1    want to.    13:03:35
2    Q   You are really talking about whether the    13:03:38
3    product is viable in the marketplace as a    13:03:40
4    standalone kind of a conversation.    13:03:46
5    Then once you decide whether it is    13:03:48
6    viable and it is going to sell, then you have    13:03:50
7    discussions about what costs you have to have to    13:03:53
8    be at that price.    13:03:56
9    Q   When you have discussions about the    13:03:58
10   costs, and you have to be at that price, were    13:04:00
11   those discussions internal to Circuit City or    13:04:03
12   between Circuit City and its vendors?    13:04:06
13   A   Between Circuit City and its vendors.    13:04:07
14   Q   Would Circuit City discuss its desired    13:04:10
15   margin on a particular CRT finished product with    13:04:14
16   its CRT finished product vendors?    13:04:17
17       MR. LAHAD: Vague.    13:04:20
18       THE WITNESS: They discuss what the    13:04:22
19   desired margin would be, and the difference,    13:04:24
20   the margin that would be delivered at a    13:04:28
21   manufacturer's suggested retail price,    13:04:29
22   however that is not the price that Circuit    13:04:32
23   City generally was able to get in the sale of    13:04:35
24   product, so that was like the highest margin    13:04:41
25   you would be getting on the product, but    13:04:44

Page 73

1    those discussions, yes, happened.    13:04:46
2       MS. LIN: Let's go take a break to    13:04:48
3    change the tape.    13:04:49
4       THE VIDEOGRAPHER: The time is    13:04:51
5    approximately 1:04 p.m. This is the end of    13:04:51
6    tape number one and we are off the record.    13:04:54
7    (Whereupon, a break in the proceedings    13:04:57
8    commenced at 1:04 p.m. and on resuming    13:04:57
9    at 1:06 p.m.)    13:04:57
10      THE VIDEOGRAPHER: The time is    13:06:10
11   approximately 1:06 p.m. This is the    13:06:12
12   beginning of tape number two. We are back on    13:06:15
13   the record.    13:06:17
14   BY MS. LIN:    13:06:17
15   Q   Looking at the top of the second page of    13:06:19
16   Exhibit 2835, do you know what is meant to    13:06:23
17   benchmark the pricing of a product?    13:06:27
18      MR. LAHAD: Lack foundation, calls for    13:06:30
19   speculation, the document speaks for itself.    13:06:31
20      THE WITNESS: Right, it wasn't a term    13:06:34
21   that I used in my day-to-day business and my    13:06:39
22   only read would be what I believe the word    13:06:43
23   benchmark means.    13:06:48
24   BY MS. LIN:    13:06:49
25   Q   Aside from Exhibit 2835, are you    13:06:49

19 (Pages 70 - 73)

**Page 74**

1  familiar with people at Circuit City using the          13:06:53
2  term benchmark in reference to pricing?               13:06:56
3      A   I have not heard the term, but it is an        13:07:02
4  adjective, I am sure that they did.                    13:07:05
5  (Whereupon, Deposition Exhibit 2836 is marked for      13:07:09
6  Identification.)                                       13:07:09
7      MS. LIN:  I am going to mark document             13:07:18
8  Dates Number CC 0567286 as Exhibit 2836.               13:07:20
9  BY MS. LIN:                                            13:07:29
10     Q   Are you familiar with any of the people       13:07:40
11 in Exhibit 2836?                                       13:07:42
12     A   Yes.                                           13:07:45
13     Q   Who are you familiar with?                     13:07:45
14     A   Andy Mintz and David Dowdy.                    13:07:47
15     Q   I think you mentioned David Dowdy              13:07:52
16 earlier.  What was his position at Circuit City?       13:07:53
17     A   He was a buyer.                                13:07:56
18     Q   Of CRT finished products?                      13:07:57
19     A   I know that he worked on the TV team, so       13:07:59
20 I do not know specifically whether he bought CRT       13:08:04
21 product.                                               13:08:07
22     Q   Who is Andy Mintz?                             13:08:08
23     A   Andy Mintz worked for Phillips                 13:08:09
24 Corporation.                                           13:08:13
25     Q   I am directing your attention to the          13:08:17

**Page 75**

1  middle of the first page in David Dowdy's email.       13:08:18
2  Do you see where it says, "If this model is            13:08:22
3  impacted and you would need to raise the $315 cost     13:08:25
4  to offset any increase in duty we won't buy it"?       13:08:29
5      A   Here you go.  Yes.                             13:08:35
6      Q   In negotiating the purchase of a CRT           13:08:46
7  finished product, was David Dowdy threatening not      13:08:54
8  to buy the product if Phillips could not meet          13:09:00
9  Circuit City's requested price?                        13:09:01
10     MR. LAHAD:  Lacks foundation, calls for           13:09:06
11  speculation.                                          13:09:07
12     THE WITNESS:  He says, "I can get this            13:09:09
13  model out of town for the same price.  I              13:09:10
14  won't pay anymore for it.  The same thing            13:09:16
15  goes for the 27-inch TV, so if you won't pay         13:09:16
16  anything more for it what would he do?"  I           13:09:19
17  would assume that he would not buy it.               13:09:22
18 BY MS. LIN:                                            13:09:26
19     Q   At the top of the page, do you see where      13:09:28
20 it says, "Andy Mintz says, 'I am sure you will be      13:09:30
21 covered on both models'"?                              13:09:32
22     A   Yes.                                           13:09:34
23     Q   Do you understand what it would mean to       13:09:36
24 be covered on a model of a CRT finished product?       13:09:37
25     MR. LAHAD:  Lack foundation, calls for            13:09:40

Taiwan

**Page 76**

1  speculation.                                           13:09:44
2      THE WITNESS:  I can only speculate.               13:09:45
3  BY MS. LIN:                                            13:09:47
4      Q   Outside of the context of this exhibit,       13:09:48
5  are you familiar with anyone talking about the         13:09:49
6  covering of a model's price in the CRT finished        13:09:52
7  product context?                                       13:09:56
8      A   I am familiar with the term of are we         13:10:05
9  going to be covered in the changes that we have        13:10:13
10 requested and that may be what this is in response     13:10:17
11 to.                                                    13:10:23
12     Q   To the extent that you are familiar with      13:10:24
13 the term of being covered in the changes that          13:10:26
14 Circuit City requested, what would that mean?          13:10:28
15     A   It could be anything that we requested        13:10:31
16 from a vendor, if they said, "We have you              13:10:34
17 covered," and that would imply that they are going     13:10:37
18 to do what you have asked them to do.                  13:10:40
19     Q   Would you be covered to the extent of         13:10:48
20 maintaining your margin that you originally            13:10:50
21 negotiated on the product, is that what being          13:10:53
22 covered means?                                         13:10:55
23     MR. LAHAD:  Objection, misstates the              13:10:57
24  testimony.                                            13:10:58
25     THE WITNESS:  It would be whatever it             13:11:00

**Page 77**

1  was that we had requested.                             13:11:02
2  BY MS. LIN:                                            13:11:03
3      Q   How often did Circuit City's CRT              13:11:21
4  finished product purchasing prices change?             13:11:24
5      MR. LAHAD:  You said purchasing prices?           13:11:28
6      MS. LIN:  Sorry, strike that.                     13:11:30
7  BY MS. LIN:                                            13:11:30
8      Q   How often did Circuit City's CRT              13:11:31
9  purchasing costs change?                               13:11:34
10     A   I don't know.                                 13:11:38
11     MR. GRALEWSKI:  Objection.                        13:11:39
12     THE WITNESS:  Yes, I don't know how to            13:11:40
13  answer that question.  There are lots of             13:11:41
14  different products, so are you talking about         13:11:44
15  a specific one product how often would its           13:11:48
16  price change?                                         13:11:51
17 BY MS. LIN:                                            13:11:53
18     Q   How often would a particular CRT              13:11:53
19 finished product cost Circuit City to change,          13:11:55
20 would that be on a bi-annual basis like we were        13:11:58
21 discussing before or might it have happened more       13:12:00
22 frequently?                                            13:12:02
23     A   It could happen once --                       13:12:02
24     MR. GRALEWSKI:  Objection.                        13:12:04
25     THE WITNESS:  It can happen as little             13:12:05

20 (Pages 74 - 77)

Page 78

1    as -- I have bought products that had the      13:12:11
2    same costs two years in a row.                 13:12:14
3       So it could happen that it didn't           13:12:17
4    change for a long period of time, but in       13:12:19
5    general those costs were sort of reviewed on   13:12:26
6    that semi-annual basis based on sales.         13:12:28
7    BY MS. LIN:                                     13:12:34
8       Q   Were Circuit City's prices for a CRT    13:12:34
9    finished product reviewed more frequently if other  13:12:38
10   vendors were changing their prices of CRT finished  13:12:42
11   products?                                      13:12:44
12       MR. LAHAD: You said prices again.          13:12:47
13       MS. LIN: Sorry.                            13:12:48
14       MR. LAHAD: I just want to make sure we     13:12:51
15   are on the same page is why I am doing it.     13:12:51
16       MS. LIN: No, I completely understand.      13:12:53
17   Strike that.                                   13:12:54
18   BY MS. LIN:                                     13:12:56
19       Q   Were Circuit City's costs for CRT      13:12:56
20   finished products ever negotiated more frequently  13:12:56
21   than bi-annually based on vendors of other CRT  13:13:00
22   finished products changing their costs to Circuit  13:13:03
23   City?                                          13:13:06
24       A   Yes.                                   13:13:06
25       Q   When one CRT finished product vendor   13:13:09

Page 79

1    changed its cost, would Circuit City then      13:13:13
2    typically renegotiate its cost on similar products  13:13:17
3    with other CRT finished product vendors?       13:13:20
4       A   It depended on what kind of impact it   13:13:24
5    had. If the cost change was significant, and that  13:13:27
6    meant that you were going to change your retail  13:13:31
7    price, then you could have that discussion that  13:13:34
8    says, again, with public information, I am priced  13:13:37
9    on my floor every day at $399 on your competitor,  13:13:42
10   and your product is $449, so you're not selling  13:13:44
11   any, you would have those kind of discussions.  13:13:52
12       But the reverse of that could also         13:13:55
13   happen where you have got a lower cost and you are  13:13:58
14   now making more money and that is all you want to  13:13:59
15   do is make more money.                         13:14:02
16       Q   Are you familiar with CRT finished     13:14:06
17   product costs to Circuit City ever going up?   13:14:07
18       A   Yes. Well, I can't say that it is a CRT  13:14:12
19   product that I have seen go up, but product prices  13:14:20
20   do go up occasionally.                         13:14:27
21       MR. LAHAD: Again, you used prices. Do      13:14:31
22   you mean prices or cost?                        13:14:33
23       THE WITNESS: Cost. Circuit City's cost     13:14:34
24   on a product, speaking specifically of CRT, I  13:14:37
25   do not know of a specific case, but products   13:14:44

Page 80

1    occasionally do have an increase in cost.      13:14:48
2    BY MR. LIN:                                     13:14:52
3       Q   During the relevant period, did Circuit  13:14:53
4    City's costs for CRT finished products go down  13:14:56
5    more frequently than they went up?             13:15:00
6       A   I would speculate that they would over a  13:15:05
7    period of time and that consumer electronics in  13:15:11
8    general have one price at introduction when they  13:15:16
9    are not selling very many, and then over a period  13:15:19
10   of time when they are selling a lot more, the  13:15:21
11   costs go down to manufacture and then the costs  13:15:23
12   are transferred to Circuit City Stores.        13:15:28
13       The life cycle of CRT, I don't know the    13:15:33
14   specifics, my guess would be that they leveled  13:15:39
15   out, but again that is a guess.                13:15:45
16       Q   When you talk about a life cycle of CRT,  13:15:48
17   what does that mean?                            13:15:50
18       A   From television. When television was   13:15:53
19   invented to the time that people basically stopped  13:15:56
20   selling CRT product.                           13:15:59
21       Q   Was there a consistent life cycle of a  13:16:01
22   particular CRT finished product?               13:16:03
23       A   Most individual SKUs or branded models  13:16:06
24   would be replaced on an annual basis. Sometimes  13:16:13
25   they would continue over, but for a specific   13:16:17

Page 81

1    model, the typical life cycle was a year.      13:16:23
2       Q   Are you familiar with the term price    13:16:35
3    protection?                                    13:16:37
4       A   Yes.                                    13:16:37
5       Q   What is price protection?               13:16:38
6       A   Price protection is when the vendor     13:16:41
7    agrees to reduce the cost of your product and all  13:16:47
8    the product that you already own and it is usually  13:16:52
9    from a specific date.                          13:16:58
10      Q   Did Circuit City negotiate price        13:17:04
11   protection as part of its CRT finished product  13:17:07
12   purchases?                                     13:17:11
13       MR. LAHAD: Objection, vague.               13:17:12
14       THE WITNESS: Circuit City requested        13:17:13
15   price protection when we built programs        13:17:20
16   because without it Circuit City is at risk of  13:17:26
17   owning a whole lot of inventory that is not    13:17:31
18   valuable, so the short answer is yes.          13:17:35
19   BY MS. LIN:                                     13:17:40
20      Q   When you say Circuit City built         13:17:41
21   programs, what does that mean?                 13:17:42
22       A   That is our assortment. Another word   13:17:44
23   for assortment.                               13:17:47
24      Q   Did Circuit City tend to have price     13:17:53
25   protection in place on all of its CRT finished  13:17:56

21 (Pages 78 - 81)

Page 82

1  product purchasing agreements?          13:17:59
2      A  No.                    13:18:00
3      Q  What would determine whether Circuit    13:18:01
4  City had a price protection agreement with a CRT    13:18:03
5  finished product vendor?          13:18:06
6      A  It was a negotiated process. Sometimes    13:18:09
7  it would be in a master agreement. Sometimes it    13:18:15
8  would be in a specific deal letter for an item.    13:18:17
9  but over this time period my experience is that we    13:18:23
10  got less and less price protection as a standard    13:18:28
11  rule of thumb and more sell through funding    13:18:32
12  instead.              13:18:37
13      Q  Were there specific CRT finished product    13:18:42
14  vendors that did not provide price protection?    13:18:45
15      A  I am sure there were, but I do not know    13:18:48
16  them.                13:18:51
17      Q  Are there specific CRT finished product    13:18:51
18  vendors to your knowledge that did provide price    13:18:54
19  protection consistently?          13:18:58
20      A  Again, my personal experience for CRT    13:19:01
21  product was limited to the combos and it was my    13:19:04
22  recollection that typically Magnavox provided    13:19:12
23  price protection.            13:19:17
24      MR. LAHAD:  You said Magnavox?    13:19:20
25      THE WITNESS:  Magnavox, yes.    13:19:21

Page 83

1  BY MS. LIN:            13:19:21
2      Q  You mentioned sell through credits.    13:19:22
3  What are sell through credits?        13:19:22
4      A  Sell through credits. That is an amount    13:19:24
5  of money provided to Circuit City based on the    13:19:27
6  sale of a specific product for a specific period    13:19:30
7  of time during a specific set of time.      13:19:33
8      Q  How would the amount of a sell through    13:19:37
9  credit be determined?          13:19:39
10      A  It would be determined by the vendor.    13:19:41
11      Q  Would the amount of the sell through    13:19:52
12  credit be tied to something?        13:19:54
13      A  The amount of it? I'm not sure I know    13:19:58
14  what you're asking.            13:20:06
15      Q  I'm not sure I am understanding you. In    13:20:06
16  setting a sell through credit, was that typically    13:20:11
17  a percentage of a sale price or tied to a former    13:20:14
18  advertised price, how would that term come to be    13:20:18
19  agreed upon?            13:20:21
20      A  It would be a discussion based on what    13:20:23
21  it would take to make a sales increase and since    13:20:26
22  we set our own pricing, the vendor could offer a    13:20:33
23  sell through bonus and say, "You are going to make    13:20:41
24  $10 more, $15 more, $20 more for all the ones that    13:20:45
25  you sell during this period of time.      13:20:50

Page 84

1      "If I gave you that, what do you think    13:20:55
2  it is going to do?"          13:20:59
3      And the buyer might say, "If you are    13:21:00
4  going to do that, then I might advertise it."    13:21:02
5      He might say, "I think I can get the    13:21:07
6  sales up and not talk about anything else."    13:21:13
7      But the whole idea is that during Point    13:21:17
8  A to Point B, you have got more money to do    13:21:21
9  something that might help the sales.      13:21:24
10      The things that the buyer can do is he    13:21:27
11  can reduce the price on the floor. He can    13:21:29
12  advertise the product. He can tell the sales    13:21:32
13  people, "This is a product that we are going to    13:21:34
14  have lots of and be sure to be aware of it or    13:21:37
15  train on it," but the two biggest levers are price    13:21:42
16  and advertising.            13:21:48
17      Q  Would sell through credits be    13:21:50
18  implemented when a CRT finished product would be    13:21:52
19  sold by Circuit City below the price at which    13:21:55
20  Circuit City originally intended to sell the    13:22:01
21  product?              13:22:03
22      MR. LAHAD:  Objection, lacks foundation.    13:22:04
23      THE WITNESS:  I am cautious about any    13:22:08
24  conversations about what we tend to sell. I    13:22:10
25  mean as a rule we typically sold product at    13:22:12

Page 85

1  manufacturer's suggested retail price.      13:22:17
2      If we had a sell through credit we may    13:22:22
3  choose to sell below that to be able to sell    13:22:26
4  faster during that period of time.        13:22:31
5  BY MS. LIN:            13:22:33
6      Q  Were sell through credits typically    13:22:36
7  implemented when a manufacturer's suggested retail    13:22:46
8  price had been lowered?          13:22:48
9      A  Generally, if a manufacturer's suggested    13:22:51
10  retail price has been lowered you're asking for    13:22:55
11  price protection, but instead of price protection,    13:22:59
12  you might get sell through credit for the    13:23:05
13  remaining inventory that you have for a period of    13:23:09
14  time or something of that nature.        13:23:13
15      Q  Did Circuit City typically negotiate    13:23:19
16  sell through credits at the time it negotiated to    13:23:21
17  purchase the CRT products?        13:23:24
18      A  No.                13:23:27
19      Q  Was price protection typically    13:23:31
20  negotiated at the time you purchased the CRT    13:23:32
21  products?              13:23:35
22      A  Yes.                13:23:35
23      Q  Was price protection ever negotiated    13:23:36
24  after the point in time at which you had already    13:23:39
25  purchased the CRT finished products?      13:23:41

22 (Pages 82 - 85)

Page 86

1    A   Yes.                    13:23:43
2    Q   Was one of those points in time for    13:23:49
3    price protection more common than the other, that    13:23:51
4    is, during the initial negotiations versus once    13:23:54
5    you already owned the product?    13:23:57
6    A   Again, it changed over the years. I    13:23:59
7    would say like the 1990s of this period there was    13:24:02
8    a lot of master agreements that included price    13:24:05
9    protection if something that vendor agreed would    13:24:09
10   occur every time that they changed, they    13:24:13
11   repositioned their product, their manufacturer's    13:24:20
12   suggested price or their costing that we would be    13:24:22
13   protected on that at that time.    13:24:26
14       The latter part of this period that    13:24:27
15   we're talking about, that was a lot less likely,    13:24:29
16   so because of that, you would end up asking for    13:24:32
17   that sort of price protection on a more one on one    13:24:37
18   type basis, and say similar to the sample here or    13:24:41
19   I think when a sample is given someone else is now    13:24:47
20   lower than you, and your product is not selling.    13:24:54
21       All the conversations go back to what is    13:24:59
22   selling, so if you want to know when did you talk    13:25:00
23   about sell through credits, it's when the product    13:25:04
24   stops selling.    13:25:07
25       If you bought a whole bunch of it and it    13:25:08

Page 87

1    is not selling, then you're going to talk about    13:25:10
2    sell through credits or anything else you can do    13:25:12
3    to get it to sell.    13:25:14
4        If it's selling you are not having those    13:25:16
5    conversations.    13:25:19
6    Q   When you're talking about price    13:25:23
7    protection protecting Circuit City, what does that    13:25:25
8    mean in terms of were you protecting Circuit    13:25:28
9    City's expected revenue or were you protecting    13:25:31
10   margin? What was that protection?    13:25:35
11   A   You are protecting Circuit City's    13:25:36
12   profitability because if we own product that costs    13:25:39
13   more than what we paid for it, then we can    13:25:43
14   actually be losing money, so I guess that is the    13:25:46
15   simplest answer. We are protecting our    13:25:52
16   profitability.    13:25:56
17   Q   When price protection was included in    13:25:58
18   your vendor agreements, do you know how Circuit    13:26:01
19   City was protecting its profitability?    13:26:04
20       MR. LAHAD: Objection, vague.    13:26:08
21       THE WITNESS: No. Price protection    13:26:09
22   would say that if the cost moves, then all of    13:26:13
23   the product that you own will be reduced to    13:26:19
24   the new cost and therefore we would not own    13:26:24
25   product that wasn't as competitive.    13:26:28

Page 88

1 BY MS. LIN:    13:26:31
2    Q   Did Circuit City negotiate the terms of    13:26:34
3    how CRT finished products would be delivered to    13:26:38
4    Circuit City as part of its purchase negotiations?    13:26:40
5    A   Yes.    13:26:48
6    Q   In negotiating delivery terms with CRT    13:26:52
7    finished product vendors, did Circuit City    13:26:56
8    sometimes negotiate that the vendors would pay to    13:26:59
9    deliver the CRT finished products to Circuit City?    13:27:01
10   A   Yes.    13:27:03
11   Q   Do you know if CRT finished products    13:27:04
12   were ever shipped to Circuit City from outside of    13:27:09
13   the United States?    13:27:11
14   A   They had to have been, so yes.    13:27:13
15   Q   Were CRT finished products ever shipped    13:27:18
16   to Circuit City from within the United States?    13:27:21
17   A   Yes.    13:27:23
18   Q   Do you know how you would distinguish    13:27:26
19   which products were shipped to Circuit City from    13:27:30
20   within the United States versus from abroad?    13:27:33
21   A   No.    13:27:35
22   Q   Did Circuit City's delivering    13:27:38
23   negotiations consider where a product would be    13:27:44
24   shipped from in negotiating the terms of delivery?    13:27:50
25   A   We would negotiate in some cases for our    13:27:54

Page 89

1    own tranches to do part of the delivery, so yes.    13:28:00
2    Q   Did Circuit City ever negotiate volume    13:28:12
3    discounts as part of its purchase negotiations?    13:28:15
4    A   Yes.    13:28:17
5    Q   How were volume discounts negotiated?    13:28:18
6    A   You would negotiate saying, "That if I    13:28:22
7    bought X amount of product either all at once or    13:28:26
8    over a period of time, then I want a better    13:28:31
9    price," and you might have several goals.    13:28:35
10       "If I sell this amount, I get it at this    13:28:40
11   cost. If I sell at that point, I get this cost."    13:28:43
12   Q   Did Circuit City ever negotiate the    13:28:51
13   receipt of market development funds as part of the    13:28:53
14   CRT finished product negotiating?    13:28:55
15   A   Yes.    13:28:57
16   Q   How were those funds negotiated for?    13:28:58
17   A   I don't know what you're asking.    13:29:10
18   Q   How did Circuit City select the amount    13:29:12
19   of market development funds it would seek from CRT    13:29:14
20   finished product vendors?    13:29:17
21   A   It would start with history. What had    13:29:19
22   you been getting from this particular vendor to    13:29:23
23   keep the marketplace going?    13:29:26
24       You would compare them to how much of    13:29:29
25   your business, is it, are you going to increase    13:29:34

23 (Pages 86 - 89)

Page 90

1 their business, or are you decreasing it?        13:29:38
2        If I was talking to LG, and said, "Last    13:29:41
3 year I bought 10,000 pieces from you. This year I  13:29:45
4 am going to buy 100,000 pieces. Last year you      13:29:48
5 gave me $2,000 worth MDF. Those 100,000 pieces is  13:29:51
6 a significant part my business, so therefore I      13:29:57
7 need this amount of MDF."        13:30:00
8    Q  Did Circuit City consistently receive       13:30:10
9 MDF funds from its CRT finished product vendors?   13:30:13
10   A  Yes.        13:30:17
11   Q  Did Circuit City negotiate the amount of    13:30:21
12 floor space that specific CRT finished product     13:30:24
13 vendors products would receive on Circuit City's   13:30:27
14 floors?        13:30:29
15       MR. LAHAD:  Vague.        13:30:31
16       THE WITNESS:  Yes, because we negotiated   13:30:38
17 how many SKUs or models we were going to         13:30:44
18 carry, therefore that becomes floor space,        13:30:48
19 but we did not do it the way you are saying        13:30:53
20 it.        13:30:56
21       We did not say, "We will give you 15       13:30:57
22 feet of space for X amount dollars."  It          13:31:00
23 would be much more about, "We carried four        13:31:04
24 SKUs from last year, and we only plan on          13:31:08
25 carrying three from you this year."  I will       13:31:11

Page 91

1 use models. That is probably the easiest          13:31:21
2 way.        13:31:24
3 BY MS. LIN:        13:31:24
4    Q  I'm not clear on your last answer.  In      13:31:26
5 negotiating the number of models Circuit City     13:31:27
6 would be purchasing, was that one collective      13:31:31
7 negotiation purchase those models together or what 13:31:34
8 did you mean?        13:31:36
9    A  Because usually the products all            13:31:37
10 transitioned at the same time. Instead of having  13:31:41
11 negotiated about a single product you were        13:31:45
12 generally talking about all the products that were 13:31:49
13 changing for that time period and the vendor would 13:31:52
14 show you 12 products knowing that you never bought 13:31:57
15 more than three.        13:32:03
16       The vendor is trying to, of course, get    13:32:06
17 you to buy more products, and as a buyer you want 13:32:08
18 to buy as few as you need and not one more. So    13:32:12
19 that was the negotiation.        13:32:18
20   Q  When Circuit City was negotiating its      13:32:24
21 costs on CRT finished products, was it typically   13:32:27
22 negotiating the costs for multiple products from   13:32:29
23 one vendor at the same time?        13:32:32
24   A  Yes.        13:32:34
25   Q  Would a cost deal on one of those          13:32:34

Page 92

1 products ever leave Circuit City to pay more for   13:32:37
2 another product from that same CRT finished        13:32:41
3 product vendor?        13:32:43
4    A  Yes.        13:32:44
5    Q  Other than the non-priced terms we have    13:32:48
6 just been discussing like MDF funds and price      13:32:51
7 protection, are there other terms that were        13:32:54
8 important to Circuit City in its negotiating for   13:32:56
9 CRT finished product purchases?        13:32:59
10   A  Other than costs and MDF, is that what     13:33:03
11 you're asking?        13:33:11
12   Q  And sell through credit and volume        13:33:13
13 discounts and selling?        13:33:16
14   A  Right, so the way the buyers looked at     13:33:18
15 it was that there was a cost that was going to go  13:33:22
16 into the system that you bought it and that was it 13:33:26
17 and is that going to basically work overall?       13:33:30
18       Then you also had all of these other      13:33:35
19 funds that were market development funds, whether  13:33:38
20 they be sell through.        13:33:43
21       Volume discounts, typically, went        13:33:47
22 directly into costs because, again, they are      13:33:50
23 calculated, and so on, but if it was a sell       13:33:53
24 through credit, if it was to fund a rebate, if it  13:33:56
25 was to fund a display, things like that, those all 13:34:01

Page 93

1 would be considered MDF for the buyer.            13:34:08
2       You will see documents.  You            13:34:14
3 probably already have.  CES-II is what we refer to 13:34:17
4 as those MDF funds.  CES, consumer electronic show 13:34:22
5 Roman numeral 2.        13:34:24
6       Like we had a CES-I markup that you saw    13:34:33
7 earlier and we had a CES-II which was where the    13:34:38
8 marketing funds went into for the all of these    13:34:43
9 type of activities.        13:34:49
10   Q  So to clarify.  What types of funds       13:34:52
11 would be included in that CES-II category?         13:34:54
12   A  Anything that was provided by the vendor   13:34:57
13 that did not go directly into the costs of the    13:35:00
14 goods.        13:35:04
15   Q  Would you list those funds out for me?    13:35:08
16   A  Sell through credits were typically not    13:35:11
17 included in the cost. Support for rebates.        13:35:19
18 Supports for ads. Support for displays. Support    13:35:25
19 for training. Those are the biggies.        13:35:30
20   Q  And those are all forms of support that    13:35:37
21 Circuit City received from CRT manufacturing       13:35:39
22 vendors?        13:35:42
23       MR. LAHAD:  Misstates the testimony.      13:35:44
24       THE WITNESS:  We received it from CRT     13:35:46
25 manufacturers, certainly.        13:35:50

24 (Pages 90 - 93)

Page 94

1  BY MS. LIN:                                13:35:54
2   Q  Are you familiar with the term spiff?  13:35:56
3   A  Yes.                                    13:35:58
4   Q  What is that?                           13:35:58
5   A  It's a specific commission for a        13:36:00
6  specific product.                           13:36:04
7   Q  Did Circuit City's sales employees      13:36:07
8  receive commissions other than spiffs?      13:36:12
9   A  Yes.                                    13:36:14
10  Q  Folks on the spiff first, how did spiff 13:36:18
11  payments work?                             13:36:20
12  A  Let me restate earlier. Our sales       13:36:22
13  floors changed from commission to non-commission  13:36:26
14  during this period of time.                13:36:29
15      I don't know the exact date, but again, 13:36:31
16  it is probably around 2000 there was no    13:36:37
17  commission.                                13:36:41
18  Q  So salespeople received commission at   13:36:42
19  Circuit City prior to approximately 2000 and then  13:36:45
20  no longer did after that?                   13:36:47
21  A  Right, and it may have been as late as  13:36:49
22  2002. I cannot quote that, but when they received  13:36:53
23  commissions they received a set percentage of the  13:36:59
24  retail price of the product as a commission and  13:37:05
25  they may or may not also receive a spiff.  13:37:09

Page 95

1   Q  After Circuit City abolished its        13:37:14
2  commissions around 2000, or 2002, did Circuit City  13:37:17
3  sales associates continue to receive spiffs?  13:37:22
4   A  No.                                     13:37:24
5   Q  Were spiff payments something that was  13:37:27
6  negotiated with CRT finished product vendors?  13:37:29
7   A  No.                                     13:37:32
8   Q  How were spiffs determined?             13:37:33
9   A  Spiffs are directive, meaning, that you 13:37:40
10  are using them to encourage the sale of that  13:37:44
11  specific product, so they could be determined  13:37:48
12  because you have an excess inventory.       13:37:52
13      They could be determined because it    13:37:55
14  supports your sales strategy or they could be  13:37:58
15  there because the product is highly profitable.  13:38:03
16  Q  Were spiffs ever funded by CRT finished 13:38:10
17  product vendors?                            13:38:13
18  A  During the time period we are talking   13:38:14
19  about, I don't know of any cases.          13:38:16
20      When I first became a buyer, I saw some 13:38:19
21  documents that said, "We will fund a spiff for you  13:38:23
22  during a certain period of time and what have  13:38:29
23  you," and I don't know if -- I doubt that it was  13:38:32
24  CRT product because combo product was not even  13:38:34
25  introduced at that time, so I wouldn't think so.  13:38:38

Page 96

1      MR. GRALEWSKI: When it is convenient,   13:38:47
2  can we take a very short break. I don't want  13:38:47
3  to interrupt your questioning.             13:38:51
4      MS. LIN: I think we have a little bit   13:38:53
5  longer to go.                              13:38:55
6  BY MS. LIN:                                 13:38:57
7   Q  Would Circuit City ever request non-cost 13:38:58
8  terms such as additional MDF funds in lieu of a  13:39:01
9  cost decrease on a CRT finished product purchase?  13:39:03
10  A  Because the buyers is first and foremost 13:39:08
11  rated on the profitability of the product based on  13:39:17
12  store costs, that would be an unusual activity for  13:39:21
13  long term type of things.                  13:39:32
14      But as we talked about for sell through 13:39:35
15  credit in effect that's what you're doing, is  13:39:39
16  you're getting some dollars to help you sell it  13:39:41
17  for a little bit of time.                  13:39:45
18      It is not really reducing the cost, but 13:39:47
19  it is sort of paying for you to take an action  13:39:51
20  like buying an ad.                         13:39:57
21  Q  Sell through credits could be used to   13:39:59
22  reduce Circuit City's sort of actual costs even if  13:40:01
23  they did not decrease its accounted for cost of a  13:40:06
24  CRT finished product?                      13:40:09
25      MR. LAHAD: Misstates the testimony.    13:40:11

Page 97

1      THE WITNESS: Yes, I don't know what you 13:40:12
2  mean by actual costs.                       13:40:14
3  BY MS. LIN:                                 13:40:15
4   Q  A sell through credit could decrease    13:40:18
5  Circuit City's overall costs of a CRT finished  13:40:21
6  product without decreasing costs as accounted for  13:40:24
7  in Circuit City's transactional data?      13:40:27
8      MR. LAHAD: Same objection.              13:40:30
9      THE WITNESS: Yes, the costs of the      13:40:31
10  product as we looked at it was the costs that  13:40:36
11  we paid for the product and MDF was evaluated  13:40:40
12  as a separate line.                        13:40:47
13      So we would look at, "Are we delivering 13:40:52
14  the margins and are we delivering the MDF  13:40:56
15  that our budgets have put out there?"      13:40:59
16      MS. LIN: Why don't we go ahead and take 13:41:03
17  a short break and go off the record.       13:41:04
18      THE VIDEOGRAPHER: The time is 1:41 p.m. 13:41:04
19  We are off the record. (Whereupon, a break 13:41:07
20  in the proceedings commenced at 1:41 p.m. and  13:41:10
21  on resuming at 1:48 p.m.)                  13:41:10
22      THE VIDEOGRAPHER: Time is approximately 13:48:36
23  1:48 p.m. We are back on the record.       13:48:39
24  BY MS. LIN:                                 13:48:42
25  Q  Thank you, Mr. Deason. Did Circuit City 13:48:43

25 (Pages 94 - 97)

Page 98

1  have a vendor qualification process that it used   13:48:45
2  for vendors of CRT finished products?   13:48:47
3      A   We created a vendor management group in   13:48:52
4  approximately 2004, if my memory is correct, that   13:48:55
5  created a score card of things that we cared   13:49:07
6  about, and in that process we issued saying, "We   13:49:12
7  want all of our vendors to do this."   13:49:17
8      Did they all do it?  No.   13:49:20
9      Q   Was that a qualification process in the   13:49:24
10  sense that Circuit City refused to purchase from   13:49:26
11  certain vendors that would meet specified terms?   13:49:29
12      MR. LAHAD:  Objection, vague.   13:49:36
13      THE WITNESS:  As you asked earlier about   13:49:38
14  would you buy a product that had 60-day terms   13:49:45
15  versus another one that had 30-day terms, it   13:49:53
16  would certainly be a factor, it may be a tie   13:49:55
17  breaker, but it wasn't cut and dry the way   13:50:02
18  you say, "If you do not do this, I am not   13:50:05
19  buying from you at all."   13:50:07
20      It would be considered with all the   13:50:09
21  other factors including the fact of, "Do you   13:50:10
22  have to have the product?"   13:50:13
23  BY MS. LIN:   13:50:14
24      Q   That's a good one to start with.   13:50:14
25      A   Right.  I mean, if you've got to have   13:50:16

Page 99

1  Panasonic, then you have got to have Panasonic.   13:50:17
2      Q   Prior to the program you were just   13:50:21
3  discussing that was implemented in 2004, there   13:50:22
4  any kind of vendor qualification process used by   13:50:25
5  Circuit City for CRT finished product purchases?   13:50:28
6      A   Overall, there was sort of a boilerplate   13:50:31
7  of vendor agreements, master agreements that would   13:50:36
8  say we expect not to be held liable in case of an   13:50:42
9  accident, indemnification that we are going to get   13:50:49
10  X amount of terms, that we're going to get this,   13:50:54
11  and this, and this, but there wasn't a "set in   13:50:55
12  stone" type of process as far as this is what we   13:51:03
13  expect from everybody.   13:51:07
14      Q   Did Circuit City have a master agreement   13:51:09
15  in place with every vendor from which it purchased   13:51:11
16  CRT finished products?   13:51:15
17      A   No.   13:51:17
18      Q   Are there any factors that distinguished   13:51:19
19  when Circuit City would purchase CRT finished   13:51:22
20  products without a master agreement in place?   13:51:27
21      A   If the vendor refused to sign one and   13:51:31
22  you still needed to carry the product and the   13:51:35
23  other would be a lazy buyer.   13:51:39
24      Q   Are you aware of any instances in which   13:51:42
25  a finished product vendor refused to sign Circuit   13:51:45

Page 100

1  City's master agreement?   13:51:48
2      A   A CRT vendor?   13:51:50
3      Q   Yes.   13:51:52
4      A   I do not.   13:51:52
5      Q   During the relevant period, did Circuit   13:51:57
6  City have any preferred suppliers of CRT finished   13:52:00
7  products?   13:52:03
8      A   No.   13:52:04
9      Q   Are you familiar with Circuit City   13:52:10
10  having sheltered brands of CRT products?   13:52:12
11      A   Yes.   13:52:15
12      Q   What were sheltered brands?   13:52:17
13      A   Brands that were not distributed as   13:52:19
14  widely.   13:52:22
15      Q   What determined whether a brand would be   13:52:24
16  a sheltered brand?   13:52:31
17      A   I just answered that.  It is the   13:52:34
18  definition of it.  If it is not carried, but in a   13:52:37
19  few locations, or in very limited locations, that   13:52:44
20  is the definition of it being sheltered.  There   13:52:48
21  are not very many other people that you have to   13:52:50
22  compete with.   13:52:53
23      Q   A sheltered brand would not be carried   13:52:55
24  at many locations outside of Circuit City?   13:52:57
25      A   Correct.   13:52:59

Page 101

1      Q   Do you recall any specific CRT finished   13:53:00
2  products that were sheltered?   13:53:06
3      A   Vendors sold their products.  They would   13:53:13
4  change whether they would distribute or how they   13:53:17
5  distributed their products.   13:53:21
6      At one point a brand might be sheltered   13:53:23
7  and then at another point it may not be sheltered   13:53:27
8  because the majority of it happened before this   13:53:33
9  case started, and I will use Mitsubishi as an   13:53:37
10  example.   13:53:40
11      Mitsubishi originally sold only to   13:53:41
12  consumer electronic stores and that had commission   13:53:43
13  sales forces and at some point they decided that   13:53:48
14  it didn't have to have commission sales forces   13:53:52
15  anymore.   13:53:55
16      Q   Did Circuit City maintain sheltered   13:53:57
17  brands of CRT finished products for off the   13:54:00
18  relevant period?   13:54:04
19      A   Circuit City could not determine.  They   13:54:06
20  cannot determine whether it is sheltered or not.   13:54:10
21  The vendor makes those decisions.   13:54:13
22      If it is a sheltered product, then it is   13:54:15
23  desirable to Circuit City, so to the degree that   13:54:19
24  products were sheltered, Circuit City would   13:54:22
25  actively pursue those brands.   13:54:28

26 (Pages 98 - 101)

Page 102

1    Q   Why did Circuit City find it desirable   13:54:30
2   to have sheltered products?   13:54:32
3    A   Because it is less competition. It's a   13:54:34
4   product that the customer can only buy from you,   13:54:37
5   and in some cases, only you and in some cases   13:54:41
6   maybe two or three places as opposed to 1,000.   13:54:44
7    Q   How many sheltered products would   13:54:51
8   Circuit City tend to have at a time in the CRT   13:54:54
9   finished products sort of specter?   13:54:56
10    MR. LAHAD:  Products or brand?   13:55:00
11    MS. LIN:  Products.   13:55:01
12    THE WITNESS:  I don't know.   13:55:02
13  BY MS. LIN:   13:55:03
14    Q   Do you know how many sheltered brands   13:55:03
15  Circuit City would tend to have at a time in the   13:55:05
16  CRT finished product context?   13:55:11
17    A   No.   13:55:13
18    Q   Were Circuit City's purchase   13:55:14
19  negotiations for CRT finished products ever   13:55:21
20  affected by the individual buyers relationships   13:55:25
21  with vendor representatives?   13:55:28
22    MR. LAHAD:  Objection, vague.   13:55:30
23    THE WITNESS:  I wouldn't say influenced   13:55:34
24  by their relationship to a single person, but   13:55:40
25  the relationship to the company.   13:55:46

Page 103

1    If XYZ company is a company that   13:55:50
2   usually does what they say they are going to   13:55:54
3   do, then you have a relationship that is   13:55:56
4   more beneficial than one that doesn't.   13:55:59
5  BY MS. LIN:   13:56:02
6    Q   Would Circuit City prefer to do business   13:56:02
7   with those CRT finished product vendors it   13:56:05
8   considered itself to have a consistent   13:56:10
9   relationship with?   13:56:11
10    A   We prefer to do business with those that   13:56:13
11  we trust.   13:56:16
12    Q   Do you recall specific CRT finished   13:56:18
13  product vendors that Circuit City trusted during   13:56:21
14  the relevant period?   13:56:23
15    MR. GRALEWSKI:  Objection, form.   13:56:26
16    THE WITNESS:  Yes, again, I could only   13:56:28
17  speak to those brands that I dealt with   13:56:30
18  directly, but I don't know how I could answer   13:56:32
19  the question for all the other buyers which I   13:56:40
20  think is what you are asking me.   13:56:43
21  BY MS. LIN:   13:56:46
22    Q   Testifying on behalf of Circuit City,   13:56:48
23  are there any CRT finished product vendors of   13:56:50
24  which you are aware of Circuit City not having a   13:56:52
25  strong relationship with?   13:56:57

Page 104

1    A   At one time we did not carry Samsung   13:56:58
2   product at all, for example, and we started and   13:57:02
3   stopped various relationships over the years for   13:57:09
4   various reasons.   13:57:15
5    Hitachi had been a good partner of   13:57:18
6   Circuit City for quite a long time.  I was   13:57:20
7   involved with developing the DVD camcorder with   13:57:24
8   Hitachi and so they made CRT -- well they sold CRT   13:57:28
9   product. I don't know if they made it.   13:57:35
10    They sold CRT product and so I know that   13:57:37
11  we had a particularly good relationship with   13:57:40
12  Hitachi at times and at other times we didn't.   13:57:43
13    Q   Having a good relationship with a   13:57:49
14  particular vendor might among other things being   13:57:52
15  equal influence Circuit City's decision to   13:57:54
16  purchase that vendor?   13:57:57
17    A   It sort of goes back to, "Why are you   13:57:59
18  having a good relationship?" and they go back to   13:58:03
19  all of those factors because they are giving you   13:58:06
20  product that is not widely sold, they are giving   13:58:08
21  you product that has extremely good profitability   13:58:11
22  opportunities.   13:58:18
23    Obviously, we set our own price. They   13:58:20
24  give you funding that allows you to train your   13:58:23
25  people and run the proper ads that you want to   13:58:26

Page 105

1  run.   13:58:29
2    In that aspect, yes, I mean, but all of   13:58:30
3   those factors make them the sort of the good   13:58:33
4   relationship, not the good relationship makes the   13:58:39
5   others.   13:58:42
6    Q   So the availability of MDF funds to   13:58:48
7   Circuit City might influence Circuit City's vendor   13:58:52
8   selection to purchase a CRT finished product?   13:58:54
9    MR. LAHAD:  Misstates testimony.   13:58:57
10    THE WITNESS:  The costs of the product   13:58:59
11  is negotiated first and then demand of the   13:59:01
12  product and all of those sort of things, and   13:59:05
13  yes, we expect to have MDF as part of that,   13:59:08
14  but there are so many other factors and to   13:59:13
15  put it way you put it, I would not.   13:59:17
16    MS. LIN:  Give me a second to dig into   13:59:27
17  my box of tricks down here.   13:59:30
18  (Whereupon, Deposition Exhibit 2837 is marked for   13:59:47
19  Identification.)   13:59:47
20    MS. LIN:  I am going to mark as Exhibit   13:59:47
21  2837 a document with Bates No. CC 0148714.  I   13:59:49
22  will represent to you that the handwriting on   14:00:02
23  this document was as produced by Circuit   14:00:02
24  City.   14:00:05
25  BY MS. LIN:   14:00:22

27 (Pages 102 - 105)

Page 106

1    Q   Are you familiar with the people on the   14:00:22
2    first page of Exhibit 2837?   14:00:24
3    A   Yes.   14:00:26
4    Q   Who are those people?   14:00:27
5    A   Andrew Scholclapper who is a buyer.   14:00:30
6    Rick Souder who was either a buyer or a division   14:00:34
7    merchandise manager, most likely the division   14:00:40
8    merchandise manager, and David Cecile, who was   14:00:43
9    either a buyer or a division merchandize manager   14:00:49
10   at the time. This is 2000. So I am not sure.   14:00:52
11   Q   I am concentrating on the first page of   14:00:59
12   Exhibit 2837, what do you understand Andrew   14:01:01
13   Scholclapper to be discussing with Mr. Souder and   14:01:05
14   Mr. Cecile?   14:01:07
15        MR. GRALEWSKI: Objection, form.   14:01:11
16        THE WITNESS: He is discussing the   14:01:13
17   impact of Panasonic, and what I believe PTV   14:01:15
18   stands for is projection television, but I   14:01:20
19   don't know.   14:01:26
20        He is discussing the program with   14:01:27
21   Panasonic and what the impact is to Circuit   14:01:32
22   City.   14:01:36
23   BY MS. LIN:   14:01:37
24   Q   What concerns does Mr. Scholclapper   14:01:37
25   raise?   14:01:40

Page 107

1        MR. LAHAD: The document speaks for   14:01:41
2    itself.   14:01:42
3        MR. GRALEWSKI: Objection, form, outside   14:01:42
4    the scope.   14:01:45
5        THE WITNESS: Give me a moment to read   14:01:49
6    this.   14:01:51
7    BY MS. LIN:   14:01:52
8    Q   Absolutely.   14:01:53
9    A   The short answer I would give you is   14:02:46
10   that he is discussing the impact of doing business   14:02:48
11   with Panasonic and what impact it will have on the   14:02:53
12   business that he has been discussing to do with   14:02:58
13   Hitachi and Thomson.   14:03:03
14   Q   Do you see in point number 2, where   14:03:12
15   Mr. Scholclapper says, "Backing out on them now   14:03:15
16   might lose his trust in the long term."   14:03:18
17        MR. GRALEWSKI: Same objection.   14:03:22
18        THE WITNESS: Hang on a second. Yes.   14:03:27
19   BY MS. LIN:   14:03:39
20   Q   What concerned you to understand   14:03:40
21   Mr. Scholclapper to be expressing there?   14:03:42
22        MR. GRALEWSKI: Same objection.   14:03:45
23        THE WITNESS: He is basically telling   14:03:46
24   the supervisors that he is building trust in   14:03:47
25   him and therefore in Circuit City and that if   14:03:53

Page 108

1    he does what he is discussing here that he   14:03:57
2    risked harming that trust.   14:03:59
3    BY MS. LIN:   14:04:01
4    Q   Engaging in a more favorable deal here   14:04:10
5    with Panasonic might damage Circuit City's   14:04:13
6    relationship with another vendor?   14:04:16
7        MR. GRALEWSKI: Same objection.   14:04:19
8        MR. LAHAD: Misstates the testimony.   14:04:21
9        THE WITNESS: Yes, I don't know that   14:04:22
10   this is a more favorable deal first of all.   14:04:23
11   I can't answer that question because I can't   14:04:25
12   tell you that this is a more favorable deal.   14:04:32
13   I think he is actually arguing that it is a   14:04:35
14   less favorable deal.   14:04:37
15   BY MS. LIN:   14:04:38
16   Q   Is a part of the reason that the   14:04:40
17   proposed deal from Panasonic in Exhibit 2837 less   14:04:42
18   attractive because it might damage relationships   14:04:47
19   with other of Circuit City's CRT finished product   14:04:48
20   vendors?   14:04:52
21        MR. LAHAD: Lacks foundation and calls   14:04:53
22   for speculation.   14:04:54
23        MR. GRALEWSKI: Same objections.   14:04:57
24        THE WITNESS: I think he is arguing   14:04:59
25   again that he doing this is going to cause   14:04:59

Page 109

1    him to have less credibility with the people   14:05:03
2    he has to negotiate with.   14:05:06
3    BY MS. LIN:   14:05:08
4    Q   It was important for buyers to maintain   14:05:08
5    their credibility with CRT finished product   14:05:11
6    vendors?   14:05:14
7    A   It is important for buyers to maintain   14:05:15
8    their credibility with all vendors.   14:05:19
9    Q   Could you read point number 4 on this.   14:05:24
10   A   Out loud?   14:05:29
11   Q   Just to yourself is fine. Do you   14:05:30
12   understand what Mr. Scholclapper is referring to   14:05:45
13   when he says "references playing by the rule   14:05:47
14   book"?   14:05:52
15        MR. GRALEWSKI: Same objections.   14:05:56
16        THE WITNESS: He says that what he means   14:06:04
17   is fair costs and distributions result in a   14:06:07
18   meeting are profit expectations so that's the   14:06:09
19   only way that it would imply that that is   14:06:12
20   what he means.   14:06:16
21        I don't know what Don is, by the way, so   14:06:19
22   I do not understand part of the context of   14:06:22
23   this letter.   14:06:24
24   BY MS. LIN:   14:06:31
25   Q   Did Circuit City expect that these   14:06:34

28 (Pages 106 - 109)

Page 110

1  vendors would provide fair costs and          14:06:36
2  distributions?                                14:06:40
3    A  Yes.                                     14:06:41
4    Q  Where does Circuit City's negotiations   14:07:00
5  with finished product vendors occur for CRT   14:07:02
6  finished products?                            14:07:07
7    MR. LAHAD:  Is there a time period?         14:07:09
8    MS. LIN:  During the relevant time          14:07:10
9  period.                                       14:07:11
10   THE WITNESS:  When we go to visit them       14:07:12
11  overseas, where you have got everybody        14:07:17
12  together and talking about the product as we  14:07:18
13  talked about earlier you start the            14:07:20
14  negotiations there because that's when you    14:07:23
15  first see the product, they first talk about  14:07:26
16  what they are thinking that they are going to 14:07:28
17  put their suggested retail price at, and some 14:07:31
18  of those are like trial balloons to see if    14:07:33
19  you think that is viable or not, it goes      14:07:38
20  straight out.                                 14:07:40
21     "We are thinking that this could make      14:07:42
22  $399 in the market place or retail price, do  14:07:43
23  you think that would be viable?" and you      14:07:46
24  would say, "No, I don't think so."            14:07:48
25     It starts at that big line where you       14:07:52

Page 111

1  have got everybody from the company there,    14:07:54
2  and you have got -- when we go to Japan, we    14:07:55
3  would stay for the week and we visit all the  14:08:03
4  vendors in Japan and we would go to Korea      14:08:07
5  and we would stay for the week.               14:08:09
6     We would go to China and do the same       14:08:10
7  thing, so that's where it starts, and then,   14:08:13
8  typically, what would happen is that you      14:08:18
9  would get back home and you would have,       14:08:23
10  "Okay, I know we talked about that it might   14:08:25
11  be $799, but we have decided that it is       14:08:29
12  going to be $699 and here's the costs that    14:08:30
13  is manufactured suggested retail price and    14:08:35
14  here is the cost to you."                     14:08:37
15     Then you would start having the           14:08:40
16  negotiations sometimes in person, but most   14:08:41
17  likely over the phone or through email.       14:08:46
18  You might maybe visit again.                  14:08:49
19     They might have a show where we change    14:08:52
20  some things, so what you saw might not        14:08:55
21  exactly be what the product is going to look  14:08:57
22  like and so you have to go either back to     14:08:59
23  Japan or wherever or go to a corporate        14:09:01
24  office in the U.S. and look at the product    14:09:05
25  again and continue to negotiate.              14:09:07

Page 112

1     From the time you saw the product to       14:09:10
2  the time you made the agreement, it is like   14:09:12
3  one long negotiation.                         14:09:15
4  BY MS. LIN:                                    14:09:16
5    Q  Were negotiations ever concluded on      14:09:16
6  those trips abroad in terms of selecting a cost to 14:09:19
7  Circuit City at which it would buy CRT finished 14:09:24
8  products?                                     14:09:27
9    A  It is possible because there are certain 14:09:28
10  products, "We really want you to sell this and 14:09:31
11  it's a brand new product and there's nothing like 14:09:35
12  it and it's the first 40-inch television," for 14:09:42
13  example.                                      14:09:48
14     I could see and I sit in on some of        14:09:49
15  these meetings because I was video, and I could 14:09:54
16  see a buyer saying, "We are going to buy that and 14:09:56
17  all he has seen is the list price and he might buy 14:10:00
18  it at a list price or he might be able to get a 14:10:04
19  little better, but he is really committed either 14:10:08
20  way.                                          14:10:11
21     So to answer your question. It could       14:10:11
22  happen and I am sure it did happen along the way 14:10:14
23  particularly for any new dynamic type of change 14:10:17
24  which for CRT would have been size.           14:10:26
25    Q  When Circuit City's representatives went 14:10:32

Page 113

1  abroad to examine CRT finished products, was it 14:10:36
2  meeting with domestic suppliers based here in the 14:10:41
3  United States that also went abroad or with -- let 14:10:41
4  me stop there.                                14:10:47
5    MR. LAHAD:  Vague.                          14:10:49
6    THE WITNESS:  The majority -- I am          14:10:50
7  sorry?                                        14:10:51
8    MR. LAHAD:  Vague.                          14:10:53
9    THE WITNESS:  The majority of the time      14:10:54
10  we would meet with representatives from the   14:10:56
11  company in whatever country we are visiting   14:11:03
12  and representatives of theirs that managed    14:11:05
13  the sales in the U.S. would be there with us. 14:11:10
14     It was very rare that they were not        14:11:14
15  also there, but there would be large amounts  14:11:16
16  of people because the vendor wants all of     14:11:20
17  their people to say, "This is the guy who is  14:11:25
18  either going to buy it or not buy it."        14:11:28
19     There would be a large cast of people.     14:11:32
20  You might have 50 people in the room.  You    14:11:35
21  might have seats all the way around where     14:11:38
22  you didn't even know where half of these      14:11:41
23  people did, but you typically had the         14:11:43
24  president of the company that would come in.  14:11:46
25     You would typically have the head of       14:11:49

29 (Pages 110 - 113)

Page 114

1    that division who would come in.                14:11:50
2        You would have like the U.S. president      14:11:54
3    of that company come in.  You would have        14:11:58
4    head of sales for that company come in and      14:12:00
5    then you might have the Circuit City rep,       14:12:03
6    the national account manager come in, but in    14:12:06
7    some rare cases, if there was something         14:12:12
8    specific you wanted to go see, you might        14:12:14
9    just be seeing some product and they may not    14:12:17
10   be paying the money for U.S. people to come     14:12:21
11   going with you.  That would be extremely        14:12:24
12   rare.                                           14:12:26
13 BY MS. LIN:                                       14:12:26
14   Q   Did the foreign CRT finished product       14:12:26
15 companies pay for Circuit City's representatives  14:12:35
16 to travel to them?                                14:12:38
17   A   Yes.                                        14:12:39
18   Q   Other than the meetings?                    14:12:43
19   A   They didn't pay all expenses.  We sort      14:12:45
20 of had some rules about that.  Typically they     14:12:48
21 would pick up air fare and hotel and we pick up   14:12:52
22 anything else like parking and incidentals and so 14:12:57
23 on and since we would arrange them in the way we   14:13:03
24 did, it would be shared with all of the people we  14:13:07
25 visited.                                          14:13:09

Page 115

1        We used to have what we called           14:13:10
2  "two-a-days," so that for the first half of a day  14:13:13
3  you were with one vendor and the second half with  14:13:15
4  another so that in the period of a week that's 10  14:13:18
5  or 8 or whatever and then you divide the cost of   14:13:21
6  the air and the hotel by the amount of vendors.    14:13:24
7    Q   Would the costs that the vendors spent    14:13:33
8  related to those trips be reflected in any way in   14:13:36
9  the Circuit City transactional data listing the    14:13:39
10 costs of CRT finished product purchases?           14:13:43
11   A   No.                                        14:13:45
12   Q   Other than the trips where Circuit        14:13:46
13 City's representatives went abroad to meet with    14:13:49
14 CRT finished product companies, did Circuit City's 14:13:52
15 representatives ever discuss CRT finished product  14:13:56
16 purchases negotiations with vendor representatives 14:14:00
17 located outside of the United States?              14:14:06
18   A   There were specific times when we would   14:14:10
19 have phone calls with a U.S. representative that   14:14:13
20 they would conference in people from outside of    14:14:22
21 the country, so yes.                               14:14:26
22   Q   Can you recall what those specific        14:14:33
23 instances might be?                                14:14:36
24   MR. LAHAD:  Specific vendors?                  14:14:39
25   MS. LIN:  He said there were specific         14:14:41

Page 116

1  times.                                           14:14:44
2 BY MS. LIN:                                        14:14:44
3    Q   I am trying to understand what that       14:14:44
4 means?                                             14:14:45
5    A   What I meant is you would have, it        14:14:45
6 wasn't a daily activity, but something might       14:14:49
7 happen where that would occur whether it be        14:14:53
8 because the negotiations are not going well, or    14:14:56
9 because sales are not going well.                  14:14:58
10     I mean those are sort of the biggies        14:15:01
11 that there would be conversations that we would    14:15:04
12 have people from outside of the country in on the  14:15:07
13 conversation to talk about what needed to be done  14:15:13
14 to get sales.                                      14:15:18
15     More often what you would get is a visit    14:15:21
16 from people that work outside of the country on a  14:15:27
17 daily basis that their offices are in Japan or     14:15:32
18 Korea, et cetera, that would come to the U.S. and  14:15:35
19 with the national account, the U.S. sales team     14:15:39
20 would come and visit Circuit City's headquarters   14:15:42
21 and talk to them about, "Why is this product not   14:15:47
22 selling?  Why are we not doing more business       14:15:49
23 together, et cetera.  Why aren't you buying five   14:15:55
24 pieces?"  The sales people say they can only sell  14:16:01
25 you three.  "Why aren't you buying these other     14:16:04

Page 117

1 two?"                                             14:16:07
2    Q   So foreign representatives from the CRT   14:16:10
3 finished product manufacturer would sometimes come 14:16:13
4 to Circuit City to try to sell additional amounts  14:16:17
5 of their CRT finished products?                    14:16:20
6    MR. LAHAD:  You switched from vendors to     14:16:22
7 manufacturers.  Are you using                      14:16:24
8 interchangeably?                                   14:16:26
9    MS. LIN:  I am sorry.                         14:16:27
10 BY MS. LIN:                                       14:16:29
11   Q   Would foreign CRT finished product       14:16:29
12 vendors sometimes come to Circuit City to try to   14:16:31
13 pitch selling more of their CRT finished products? 14:16:34
14   A   Yes.                                      14:16:37
15   Q   Did Circuit City have policies related   14:16:38
16 to how to set its sales prices?  So now we are     14:16:40
17 switching from purchases to sales?                 14:16:44
18   A   Yes, so our daily then sale -- do you     14:16:46
19 mean like an advertised sale or do you mean the    14:16:57
20 price that we sell it at?                          14:17:00
21   Q   The price that you would sell it at?      14:17:02
22   A   Our standard policy was to price a       14:17:05
23 product at the manufacturer's suggested retail     14:17:08
24 price to do our best to try to do that.            14:17:11
25   Q   Did Circuit City have any policies       14:17:21

30 (Pages 114 - 117)

Page 118

1  related to achieving certain margins based on its      14:17:24
2  sale prices?                                    14:17:28
3       A  We had margin budgets to be able to put    14:17:31
4  a business plan together. The pricing has to be    14:17:37
5  competitive, so I would answer that, no, in that    14:17:44
6  we did not price to hit the margin.             14:17:49
7       We priced to sell the product and then    14:17:52
8  try to do whatever else we could do to influence    14:17:57
9  the overall margins being better.              14:18:02
10      Q  How did Circuit City select its margin    14:18:05
11  budgets?                                       14:18:09
12      A  Based on history and opportunity. So if    14:18:10
13  it's been delivering this, you are trying to at    14:18:16
14  least maintain that, but there may be an       14:18:21
15  opportunity to improve it if there are innovations    14:18:23
16  or new items that you can get behind or if you can    14:18:31
17  increase the average, even though it doesn't    14:18:34
18  change the margin, if you increase the average    14:18:37
19  retail, then you are making more profit dollars    14:18:40
20  and that is really at the end of the day is what    14:18:43
21  we were most measured on is the profit dollars.    14:18:46
22      The old joke inside is, "Yes, you made    14:18:51
23  30 points margin, but you sold $100 and your    14:18:54
24  budget was $1,000, so you failed."             14:18:58
25      Q  Not good. Do you recall what Circuit    14:19:01

Page 119

1  City's margin budgets were for CRT finished    14:19:04
2  products during the relevant period?           14:19:08
3       A  No.                                   14:19:09
4       Q  What type of document would those margin    14:19:11
5  budgets be tracked in?                         14:19:15
6       MR. LAHAD: Objection, lacks foundation.    14:19:18
7       THE WITNESS: (No response.)            14:19:18   *Whine*
8  BY MS. LIN:                                     14:19:18
9       Q  Would those margin budgets be recorded    14:19:19
10  somewhere in Circuit City's records?           14:19:22
11      A  Yes.                                  14:19:24
12      Q  Where?                               14:19:25
13      A  Well, records. They would be         14:19:27
14  communicated within the merchandising team and so    14:19:29
15  we had a financial planning and analysis group, F,    14:19:33
16  P and A, that you will see some documents called    14:19:41
17  the 3M Report, and the 3M Report would say, "This    14:19:46
18  is your score card. Here's your budget broken    14:19:50
19  down for the year, broken down to the week level,"    14:19:57
20  but DMMs were part of the budget process and would    14:20:00
21  present to their general managers and to the vice    14:20:12
22  president of merchandising, their business plans    14:20:17
23  for overall profitability.                     14:20:21
24      They would influence where the margins    14:20:27
25  budgets want to be and so if you find budgets you    14:20:31

Page 120

1  are going to find it in those, the proposed    14:20:34
2  budgets, and finalized budgets and you are going    14:20:37
3  to find it in the 3M Report, and then a lot of the    14:20:40
4  other reports that we had prior to the 3M Report    14:20:50
5  were on demand reports, so we could query the AS    14:20:53
6  400 and it tell us what have we sold and what our    14:20:59
7  margins are overall, at the corporate level and we    14:21:04
8  could take all the way down the store level.    14:21:08
9       Q  Did different stores have different    14:21:14
10  margin budgets?                                14:21:16
11      A  No.                                   14:21:17
12      Q  You said DMM, what is that?           14:21:18
13      A  Division merchandise manager. That    14:21:20
14  title was sometimes the merchandise manager,    14:21:24
15  sometimes division merchandise manager, and for    14:21:26
16  the end of this period, I believe, was BTL, which    14:21:30
17  is business team *~~else~~* team    14:21:33
18      Q  Did Circuit City's buyers ever ask    14:21:36
19  Circuit City's CRT finished product vendors to    14:21:40
20  help Circuit City achieve its margin budgets    14:21:44
21  during negotiations to purchases CRT finished    14:21:46
22  product?                                       14:21:50
23      MR. LAHAD: Vague.                      14:21:51
24      THE WITNESS: I would answer that in    14:21:57
25  that we would say this product is not going    14:21:59

Page 121

1  to deliver the profit that my budget says    14:22:03
2  that I need to deliver.                         14:22:07
3       This is going to have an impact on my    14:22:09
4  ability to make my budget.                      14:22:13
5       Did we negotiate the budget, no.        14:22:15
6       We are negotiating the product and     14:22:19
7  needs to be a lower cost. The sort of          14:22:20
8  simple way I put it is the buyers would         14:22:24
9  ~~Vito,~~ but that is the only context I can    14:22:27
10  think of it.                                   14:22:31
11      We definitely talked about margins and    14:22:33
12  what our expected margins were and what are    14:22:36
13  actual margins were.                           14:22:39
14  BY MS. LIN:                                     14:22:42
15      Q  Do you know during the relevant period    14:22:42
16  whether Circuit City's expected margins how they    14:22:45
17  lined up with Circuit City's actual margins on CRT    14:22:49
18  finished product sales?                         14:22:52
19      A  I do not.                            14:22:53
20      Q  For CRT finished product sales, did    14:22:58
21  Circuit City ever have minimum profit margins?    14:23:01
22      MR. GRALEWSKI: Objection to the form.    14:23:05
23  BY MS. LIN:                                     14:23:06
24      Q  During the relevant period did Circuit    14:23:08
25  City have a policy regarding minimum profit    14:23:11

31 (Pages 118 - 121)

Page 122

1 margins on its CRT finished product sales?      14:23:14
2    A   I don't know. I would not think so.      14:23:18
3    Q   Do you know if Circuit City's buyers in      14:23:27
4 the course of their negotiations for CRT finished      14:23:30
5 products ever provided their margin targets to      14:23:34
6 Circuit City finished product vendors?      14:23:37
7    A   Yes. Let me amend that. We would      14:23:39
8 provide a targeted margin for that vendor, not our      14:23:58
9 targeted margin overall.      14:24:05
10 BY MS. LIN:      14:24:08
11    Q   So Circuit City would provide specific      14:24:09
12 CRT finished product vendors with a margin Circuit      14:24:11
13 City hoped to achieve selling that vendor's CRT      14:24:15
14 finished products?      14:24:18
15    A   Correct, and specifically those      14:24:19
16 products, so you might have five pieces from a      14:24:22
17 vendor, and say, if I am going to sell a $700      14:24:28
18 product, then I expect to make 30 points off of      14:24:32
19 it, but that one that is $99 my expectation is      14:24:36
20 that I will make 20 points off of it.      14:24:40
21 (Whereupon, Deposition Exhibit 2838 is marked for      14:24:49
22 Identification.)      14:24:49
23      MS. LIN: I am going to mark as Exhibit      14:24:49
24 2838, a document Bates Number beginning CC      14:24:51
25 0572187.      14:24:55

Page 123

1 BY MS. LIN:      14:25:03
2    Q   You can familiarize yourself with this      14:25:04
3 document for the moment. I am going to be asking      14:25:15
4 you about the first two pages.      14:25:17
5    A   You want me to read only the first two      14:27:25
6 pages?      14:27:28
7    Q   Let me ask you some questions and if you      14:27:28
8 feel you need to look at more of the document      14:27:30
9 please let me know. Are you familiar with Danny      14:27:33
10 Caglin?      14:27:34
11    A   Yes.      14:27:37
12    Q   And remind me, who is that?      14:27:38
13    A   Danny Caglin is a buyer for Circuit City      14:27:40
14 Stores.      14:27:42
15    Q   Are you familiar with Clyde Robertson?      14:27:42
16    A   Roberson, yes.      14:27:45
17    Q   Who is Mr. Roberson?      14:27:46
18    A   In this capacity he is the national      14:27:48
19 account manager for Samsung Electronics.      14:27:50
20    Q   Was Mr. Roberson ever employed by      14:27:56
21 Circuit City?      14:27:59
22    A   Yes.      14:27:59
23    Q   Did you know him in his capacity as a      14:28:00
24 Circuit City employee?      14:28:03
25    A   Yes.      14:28:03

Page 124

1    Q   What did he do for Circuit City?      14:28:04
2    A   For over a decade, I believe he was a      14:28:06
3 trainer for Circuit City, and his last positions      14:28:10
4 for Circuit City was that he worked in the store      14:28:15
5 merchandising department, but I do not know what      14:28:20
6 he was responsible for.      14:28:25
7    Q   When you say trainer who was he      14:28:27
8 training?      14:28:29
9    A   Sales counselors. Salespeople. Our      14:28:30
10 sales pool.      14:28:33
11    Q   On how to sell products at Circuit City?   14:28:33
12    A   (Non-verbalized response.)      14:28:38
13      THE REPORTER: Is that a yes?      14:28:38
14      THE WITNESS: I am sorry. Yes.      14:28:38
15      THE REPORTER: That's all right. I just   14:28:38
16 did not want the watered down version of it.      14:28:38
17 BY MS. LIN:      14:28:38
18    Q   I want to direct your attention to the      14:28:44
19 top of page 2 of Exhibit 2838. Do you see where      14:28:45
20 Mr. Roberson says, "I am squeezing every dime out   14:28:52
21 of SEA for margin advertising and partnership      14:28:55
22 ideas even though it may not appear so?"      14:28:58
23    A   Yes.      14:29:00
24    Q   Did Circuit City expect its vendors to      14:29:03
25 squeeze themselves for margin advertising and      14:29:06

Page 125

1 partnership ideas?      14:29:08
2      MR. LAHAD: Objection, vague.      14:29:10
3      MR. GRALEWSKI: Objection to the form.      14:29:12
4      THE WITNESS: I am not really sure that      14:29:14
5 I can answer that one without laughing. We      14:29:18
6 expected them to act like they were.      14:29:23
7 BY MS. LIN:      14:29:26
8    Q   Following that sentence still on the      14:29:29
9 same page where Mr. Roberson says, "There is no      14:29:33
10 one at CC up to the CEO that can explain why CC      14:29:37
11 has to have such significantly higher margins and   14:29:41
12 programs than everyone else in America."      14:29:44
13    A   Yes.      14:29:47
14    Q   Do you understand CC in that context to   14:29:48
15 mean Circuit City?      14:29:51
16    A   Yes.      14:29:51
17    Q   What do you think Mr. Roberson is      14:29:51
18 saying?      14:29:53
19      MR. LAHAD: Calls for speculation.      14:29:55
20      THE WITNESS: I think he is basically      14:29:58
21 saying that we are getting favorable      14:30:01
22 treatment.      14:30:05
23 BY MS. LIN:      14:30:07
24    Q   In your experience does Circuit City      14:30:08
25 have significantly higher margins and programs      14:30:10

32 (Pages 122 - 125)

Page 126

1  than everyone else in America?          14:30:14
2    A  I do not know. I would have no way of    14:30:15
3  knowing.                      14:30:17
4    Q  Are you familiar with any of Circuit    14:30:18
5  City's vendors ever expressing that they thought    14:30:20
6  Circuit City had higher margins than other    14:30:23
7  companies in America?              14:30:26
8      MR. LAHAD: This document?        14:30:28
9      MS. LIN: Yes.            14:30:29
10      THE WITNESS: I was party to        14:30:31
11  conversations where they would say, "Because    14:30:31
12  you have a trained sales force we give you    14:30:35
13  higher margins than someone else because you    14:30:39
14  provide the ability to sell better goods,"    14:30:43
15  and they want those goods sold, and therefore    14:30:46
16  they are doing it.              14:30:49
17      But again as far as any conversations    14:30:53
18  about our cost versus another person that we    14:30:57
19  were taught we did not discuss costs. Our    14:31:02
20  costs, the other guy's cost, we talk about    14:31:07
21  our own profitability.            14:31:11
22  (Whereupon, Deposition Exhibit 2839 is marked for    14:31:12
23  Identification.)                14:31:12
24      MS. LIN: Put that back to the side. I    14:31:22
25  am going to mark as Exhibit 2839 a document    14:31:37

Page 127

1  beginning with Bates No. CC 0569329.      14:31:41
2      THE WITNESS: I have read it.      14:32:40
3  BY MS. LIN:                14:32:41
4    Q  Focusing your attention on the final    14:32:42
5  sentence, do you know what Mr. Scholclapper means    14:32:44
6  when he writes that, "The program is a sort of    14:32:45
7  purgatory that denies both the glories of margin    14:32:48
8  heaven as well as the costs needed to descend into    14:32:51
9  promotional health"?  hell        14:32:52
10      MR. LAHAD: Calls for speculation.    14:32:55
11      MR. GRALEWSKI: Objection, form.    14:32:58
12      THE WITNESS: I would assume he means    14:33:00
13  that he does not view this as a good program.  14:33:02
14  BY MS. LIN:                14:33:06
15    Q  Do you know what Circuit City considered    14:33:06
16  to be margin heaven?            14:33:09
17      MR. LAHAD: Lacks foundation, calls for    14:33:13
18  speculation.                14:33:15
19      THE WITNESS: Not heaven, but good    14:33:20
20  margins would be margin that are above your    14:33:24
21  average margins and bad margins would be    14:33:27
22  those below your average margins.      14:33:30
23  BY MS. LIN:                14:33:33
24    Q  Do you know what Circuit City's average    14:33:33
25  margins were on CRT finished products at this    14:33:37

Page 128

1  time?                    14:33:41
2    A  No.                  14:33:41
3    Q  Was circuit striving to avoid      14:33:45
4  promotional hell?              14:33:47
5      MR. LAHAD: Objection, vague, lacks    14:33:51
6  foundation.                14:33:52
7      THE WITNESS: I think he is trying to    14:33:57
8  avoid promoting product that is not going to    14:33:59
9  be very profitable.              14:34:06
10  (Whereupon, Deposition Exhibit 2840 is marked for    14:34:08
11  Identification.)                14:34:08
12      MS. LIN: You can put that exhibit    14:34:08
13  aside. I am going to mark as Exhibit 2840, a    14:34:09
14  document beginning with Bates No. CC 0543314.    14:34:20
15  BY MS. LIN:                14:34:54
16    Q  If you could just familiarize yourself    14:34:54
17  briefly with the document and if you feel like you    14:34:55
18  need more time, please just let me know.    14:34:55
19    A  If you are going to ask about a specific    14:35:01
20  sentence, I will read those, but I know what this    14:35:03
21  document is, yes.              14:35:05
22    Q  So what is this document?        14:35:06
23    A  This is a document to the president of    14:35:07
24  the company, and to the head of merchandising and    14:35:10
25  a copy to another district merchant basically    14:35:16

Page 129

1  giving them the behind the scenes viewpoint of    14:35:22
2  strategic issues before Circuit City meets with    14:35:27
3  Thomson.                  14:35:32
4      So senior management, we call this the    14:35:34
5  white paper before we would go to visit a vendor.    14:35:37
6  These are pretty standard type of things. The    14:35:40
7  third and fourth page of this is written by me.    14:35:55
8    Q  Focused on the video and camcorder.    14:36:01
9    A  Yes, you see our camcorder portion, they    14:36:04
10  do not say that it is written by me, but it is    14:36:09
11  written by me.                14:36:11
12    Q  What generally was the purpose of this    14:36:12
13  type of white paper?            14:36:14
14    A  Because you were going in and having    14:36:15
15  very senior level conversations you wanted to make    14:36:19
16  sure that your senior management knew what the    14:36:24
17  opportunities and risks were for that meeting and    14:36:27
18  because of these meetings you might have a dinner    14:36:32
19  and somebody might bring up one of these issues,    14:36:32
20  or whatever, you wanted everybody who was going to    14:36:39
21  be at the meeting to understand what's going on so    14:36:42
22  that if they have the opportunity to reinforce, to    14:36:47
23  lessen the risk and increase the opportunities,    14:36:52
24  that they can help the buyer do so.      14:36:54
25      This is basically the buyer telling    14:36:57

33 (Pages 126 - 129)

Page 130

1  senior management what is going on and as we all    14:37:01
2  go in to meet with them, want you to know what is    14:37:04
3  going on.    14:37:07
4  Q  I want to direct your attention to the    14:37:08
5  second bullet on page 2 that begins, "Thomson    14:37:09
6  continues," what do you understand this point, the    14:37:13
7  second bullet on page 2 to be saying?    14:37:19
8      MR. GRALEWSKI: Objection, form.    14:37:24
9      THE WITNESS: Basically he is saying    14:37:31
10  that Thomson is creating a disruption in the    14:37:33
11  marketplace that will have a ripple effect    14:37:36
12  and cost us money.    14:37:40
13  BY MS. LIN:    14:37:41
14  Q  How is Thomson creating a disruption in    14:37:45
15  the marketplace?    14:37:48
16  A  Because they are pricing their product    14:37:48
17  well below all other brands with similar featured    14:37:51
18  product and by doing so they are reducing the    14:37:56
19  overall average retail for everything so you don't    14:38:02
20  have as much profit dollars because of that.    14:38:06
21  Q  Did Circuit City consider that reduction    14:38:12
22  by Thomson to be unfavorable?    14:38:15
23      MR. LAHAD: Objection, vague.    14:38:18
24      MR. GRALEWSKI: Objection, form, to this    14:38:20
25  question and the prior.    14:38:22

Page 131

1      THE WITNESS: He says that he doesn't    14:38:25
2  understand why you would do something that    14:38:28
3  reduces both their own profits and the    14:38:30
4  profits to retailers so he is saying that it    14:38:33
5  doesn't make sense.    14:38:37
6  BY MS. LIN:    14:38:38
7  Q  Would you agree that Thomson reducing    14:38:38
8  its prices in that fashion doesn't make sense?    14:38:41
9      MR. GRALEWSKI: Objection, form.    14:38:45
10      THE WITNESS: I would have to know more    14:38:47
11  about all of the other circumstances, but    14:38:49
12  typically, there is some consumer acceptance    14:38:52
13  that this product is worth that amount of    14:39:02
14  dollars and the people that are competing for    14:39:07
15  those sales are generally going to be around    14:39:10
16  that price.    14:39:12
17  To position all of your product below    14:39:15
18  the price, and also trying to sell because    14:39:17
19  they have the Thomson brand, they are trying    14:39:24
20  to sell the Thomson brand at a higher price.    14:39:26
21  That's the part that does not make    14:39:30
22  sense. If it was just trying to sell one    14:39:29
23  and he is going to grab all the market    14:39:33
24  share, kind of makes sense.    14:39:35
25  But in this context where he is trying    14:39:37

Page 132

1  to sell both, it doesn't make sense because    14:39:38
2  it looks like he is going to keep himself    14:39:40
3  from selling his own better product.    14:39:43
4  BY MS. LIN:    14:39:47
5  Q  Was it harmful to Circuit City if its    14:39:47
6  vendors positioned their products well below the    14:39:50
7  market price used by other vendors of similar    14:39:53
8  products?    14:39:57
9      MR. LAHAD: Objection, vague.    14:39:57
10      THE WITNESS: I could not give a yes or    14:40:04
11  no answer to that. It might be advantageous    14:40:06
12  to Circuit City for the vendor to position    14:40:10
13  their pricing below others if we are only    14:40:13
14  ones who carry it.    14:40:17
15  BY MS. LIN:    14:40:18
16  Q  What if Circuit City is not the only one    14:40:18
17  carrying that product?    14:40:21
18  A  It might be advantageous still because    14:40:21
19  it might produce very high margins and increase    14:40:25
20  sales, but it could also be a disadvantage in that    14:40:28
21  nobody sells anymore, but everybody sells it for    14:40:32
22  less.    14:40:36
23  Q  If everybody is selling a specific type    14:40:42
24  of CRT finished product for less that could reduce    14:40:46
25  Circuit City's profits?    14:40:49

Page 133

1      MR. LAHAD: Misstates the testimony.    14:40:52
2      THE WITNESS: Yes.    14:40:53
3  BY MS. LIN:    14:40:53
4  Q  Did Circuit City prefer for its CRT    14:40:57
5  finished products to sell at higher prices?    14:40:58
6  A  Circuit City has to be competitive.    14:41:04
7  That is its first priority. The second priority    14:41:08
8  is to sell as a high an average retail product as    14:41:11
9  it can with the highest average margin.    14:41:14
10  Anything that decreases the average    14:41:19
11  retail of a product is a risk, however, if it    14:41:22
12  increases sales enough to offset the decrease the    14:41:28
13  lost margin by or loss profit opportunity, then    14:41:34
14  that is advantageous.    14:41:38
15      MS. LIN: Let's go ahead and take a    14:41:40
16  short break to change the tape.    14:41:40
17      THE VIDEOGRAPHER: The time is    14:41:42
18  approximately 2:41. This is the end of tape    14:41:44
19  number 2 and we are off the record.    14:41:46
20  (After a short recess.)    14:41:47
21      THE VIDEOGRAPHER: This is the beginning    14:48:59
22  of tape 3. The time is approximately 2:48    14:49:07
23  p.m. and we are back on the record.    14:49:13
24  BY MS. LIN:    14:49:15
25  Q  Mr. Deason, can I have you read to    14:49:15

34 (Pages 130 - 133)

Page 134

1  yourself the first bullet on page 2, Exhibit 2840.    14:49:18
2  What do you understand that bullet to be    14:49:50
3  discussing?    14:49:51
4      MR. LAHAD: Calling for speculation and    14:49:53
5  lacks foundation.    14:49:54
6      THE WITNESS: He is discussing that the    14:49:56
7  entry level price products that Thomson is    14:50:02
8  offering are not at a competitive cost and    14:50:05
9  that others have that product and perhaps we    14:50:15
10  could leverage their more senior product    14:50:24
11  since we are going to be buying the other    14:50:28
12  product from them.    14:50:30
13      It might become more important to other    14:50:32
14  people. He says it is not his goal but it    14:50:34
15  might happen.    14:50:37
16  BY MS. LIN:    14:50:38
17      Q  Does Circuit City generally have the    14:50:38
18  ability to leverage other vendors' product    14:50:40
19  offerings in order to obtain better CRT finished    14:50:43
20  product prices?    14:50:47
21      MR. LAHAD: Objection, vague.    14:50:48
22      MR. GRALEWSKI: Objection, form.    14:50:49
23      THE WITNESS: I would bring that down to    14:50:52
24  he's got some entry level product that he    14:51:00
25  needs to buy and one guy's cost are higher    14:51:02

Page 135

1  than the other guy's cost as far as quoted to    14:51:07
2  him, so he is choosing between that.    14:51:09
3      The rest of this discussion talks about    14:51:13
4  if I am having to buy that product from    14:51:17
5  these guys, I might want to buy the better    14:51:19
6  product from these guys too.    14:51:23
7  BY MS. LIN:    14:51:24
8      Q  Did Circuit City typically learn about    14:51:27
9  CRT finished product manufacturers manufacturing    14:51:30
10  cost during its purchase negotiations?    14:51:34
11      A  No.    14:51:37
12      Q  Are you aware, other than the document    14:51:37
13  you have just read, Exhibit 2840, of Circuit City    14:51:42
14  learning about CRT finished product manufacturers    14:51:46
15  prices as part of the negotiation process?    14:51:49
16      MR. LAHAD: Objection, misstates    14:51:52
17  previous testimony.    14:51:54
18      THE WITNESS: Prices, again, I don't    14:51:55
19  know. Ask me again. I am sorry.    14:51:57
20  BY MS. LIN:    14:51:59
21      Q  Sure. The bullet we just read in    14:51:59
22  Exhibit 2840 is discussing the vendor's costs of    14:52:02
23  manufacturing?    14:52:05
24      A  (Non-verbalized response.)    14:52:06
25      THE REPORTER: Is that a yes?    14:52:06

Page 136

1      THE WITNESS: Yes.    14:52:06
2      THE REPORTER: Thank you.    14:52:06
3  BY MS. LIN:    14:52:06
4      Q  Are you aware of Circuit City learning    14:52:09
5  about CRT finished product manufacturers cost of    14:52:12
6  manufacturing in other contexts besides this    14:52:15
7  document we just looked at?    14:52:17
8      MR. LAHAD: Objection, vague, misstates    14:52:20
9  the testimony.    14:52:21
10      MR. GRALEWSKI: Objection to form, to    14:52:22
11  this question and the prior question.    14:52:25
12      THE WITNESS: We would not know the cost    14:52:28
13  of manufacturing of the vendor and to some    14:52:31
14  degree we might not care. What we care about    14:52:37
15  is whether the costs they give us is    14:52:42
16  competitive.    14:52:46
17      Now, am I familiar with vendors    14:52:47
18  complaining that their costs are high and    14:52:52
19  that makes their life tough, yes.    14:52:56
20  BY MS. LIN:    14:52:58
21      Q  Were there times during the relevant    14:53:02
22  period when Circuit City could not purchase as    14:53:04
23  many CRT finished products as it was seeking to?    14:53:08
24      A  I think that is highly likely. As new    14:53:12
25  products are introduced quite often the supply is    14:53:18

Page 137

1  not adequate, and so for example, as I used    14:53:24
2  earlier, when the 40 inch CRT was introduced. It    14:53:27
3  would be very likely that we were not getting all    14:53:32
4  of them that we wanted to get, but I don't again    14:53:35
5  know of a specific case of that.    14:53:39
6      Q  The 40-inch CRT you are using as an    14:53:42
7  example, but not necessarily a true example?    14:53:45
8      A  Correct. Anything that is new supply    14:53:48
9  tends to lag demand.    14:53:55
10      (Whereupon, Deposition Exhibit 2841 is marked for    14:53:59
11  Identification.)    14:53:59
12      MS. LIN: I am going to mark as Exhibit    14:54:18
13  2841 a document Bates numbered CC 0534111,    14:54:20
14  BY MS. LIN:    14:54:30
15      Q  Can you describe to me what this Exhibit    14:54:30
16  2841 appears to you to be?    14:55:04
17      A  It appears to be an update from Danny    14:55:06
18  Caglin, the buyer, to Andrew Scholelapper who is    14:55:10
19  probably his senior buyer or I am not sure of the    14:55:13
20  exact title at the time, telling him about what is    14:55:17
21  going on with their discussions with Hitachi.    14:55:25
22      Q  What concerns is Mr. Caglin raising    14:55:33
23  about Hitachi?    14:55:35
24      MR. LAHAD: The document speaks for    14:55:38
25  itself.    14:55:40

35 (Pages 134 - 137)

Page 138

| | | |
|---|---|---|
| 1 | MR. GAWLEY: Assumes facts, speculative, | 14:55:43 |
| 2 | lacks foundation. | 14:55:43 |
| 3 | THE WITNESS: He is basically saying | 14:55:52 |
| 4 | that the costs, that the margin on the | 14:55:55 |
| 5 | Hitachi product is going to go down and that | 14:55:58 |
| 6 | it is not go to be as competitive to other | 14:56:03 |
| 7 | product. | 14:56:06 |
| 8 | BY MS. LIN: | 14:56:06 |
| 9 | Q Can you read Mr. Scholclapper's | 14:56:09 |
| 10 | response? | 14:56:11 |
| 11 | A "Thanks for the update." Well, there | 14:56:11 |
| 12 | are a bunch of typos and so I will read it as what | 14:56:13 |
| 13 | I think he is saying, which is, "If you have not | 14:56:18 |
| 14 | done so already, please make sure Hitachi is aware | 14:56:23 |
| 15 | of your planned actions pulling in front ads, | 14:56:27 |
| 16 | potentially reducing store counts. They need to | 14:56:28 |
| 17 | understand the consequences of their decisions." | 14:56:33 |
| 18 | Q What do you understand Mr. Scholclapper | 14:56:35 |
| 19 | to be saying? | 14:56:37 |
| 20 | MR. LAHAD: Lacks foundation, calls for | 14:56:39 |
| 21 | speculation. | 14:56:41 |
| 22 | THE WITNESS: I would take it that he is | 14:56:45 |
| 23 | saying that if the product is not going to be | 14:56:46 |
| 24 | as competitive and if it is not going to | 14:56:49 |
| 25 | deliver as much margin, then we don't want to | 14:56:52 |

Page 139

| | | |
|---|---|---|
| 1 | sell as many. | 14:56:55 |
| 2 | BY MS. LIN: | 14:56:56 |
| 3 | Q So there were consequences for CRT | 14:56:56 |
| 4 | finished product vendors who did not accommodate | 14:56:59 |
| 5 | Circuit City's expected margins? | 14:57:03 |
| 6 | MR. LAHAD: Objection, misstates the | 14:57:06 |
| 7 | testimony. | 14:57:07 |
| 8 | THE WITNESS: He's saying that they are | 14:57:07 |
| 9 | not going to end up selling as much product | 14:57:08 |
| 10 | and so therefore we're going to have to do | 14:57:12 |
| 11 | these things in reaction to that and that | 14:57:14 |
| 12 | they need to know that. | 14:57:19 |
| 13 | BY MS. LIN: | 14:57:20 |
| 14 | Q Circuit City could pull planned ads from | 14:57:25 |
| 15 | CRT finished product vendors' product if those | 14:57:28 |
| 16 | vendors refused to reduce their suggested | 14:57:33 |
| 17 | advertised retail prices? | 14:57:36 |
| 18 | MR. LAHAD: Misstates testimony, lacks | 14:57:38 |
| 19 | foundation. | 14:57:40 |
| 20 | MS. LIN: It's a question. I am not | 14:57:41 |
| 21 | restating his testimony. | 14:57:43 |
| 22 | MR. LAHAD: To the extent that you are | 14:57:44 |
| 23 | relying on testimony, I think you're | 14:57:44 |
| 24 | mistaken. | 14:57:48 |
| 25 | THE WITNESS: I think the way you stated | 14:57:51 |

Page 140

| | | |
|---|---|---|
| 1 | it makes it say, "If you do not do this, we | 14:58:02 |
| 2 | will do that." | 14:58:05 |
| 3 | What they are discussing is the fact | 14:58:07 |
| 4 | that this product is not going to sell as | 14:58:08 |
| 5 | much and it is not going to be as | 14:58:10 |
| 6 | profitable. | 14:58:13 |
| 7 | If it is not going to sell as much and | 14:58:14 |
| 8 | it is not going to be profitable, then you | 14:58:15 |
| 9 | don't advertise it as often and you don't | 14:58:18 |
| 10 | carry it in as many stores and they need to | 14:58:20 |
| 11 | understand that because they should not be | 14:58:22 |
| 12 | surprised by that. | 14:58:24 |
| 13 | BY MS. LIN: | 14:58:27 |
| 14 | Q But generally speaking, not just in the | 14:58:27 |
| 15 | example of Exhibit 2814, Circuit City could enact | 14:58:30 |
| 16 | consequences to CRT finished product vendors that | 14:58:37 |
| 17 | did not move their suggested retail prices? | 14:58:39 |
| 18 | MR. LAHAD: Vague. | 14:58:46 |
| 19 | MR. GRALEWSKI: Objection, form. | 14:58:47 |
| 20 | THE WITNESS: The consequences are going | 14:58:51 |
| 21 | to happen because, in general, if people | 14:58:55 |
| 22 | don't react to the marketplace which is what | 14:59:01 |
| 23 | this is talking about, then their product is | 14:59:04 |
| 24 | going to not sell, so to say that there are | 14:59:08 |
| 25 | consequences from Circuit City, the | 14:59:16 |

Page 141

| | | |
|---|---|---|
| 1 | consequence is to Circuit City that the | 14:59:19 |
| 2 | product is not going to sell, if the retail | 14:59:21 |
| 3 | is going to go down, but the margin is | 14:59:24 |
| 4 | to down too, then there is impact to Circuit | 14:59:27 |
| 5 | City on their profit. | 14:59:32 |
| 6 | I think that that's as clear as I can | 14:59:35 |
| 7 | answer it. We are not saying, "If you don't | 14:59:37 |
| 8 | do this," I mean, they can choose do | 14:59:43 |
| 9 | whatever they want, but then it is not going | 14:59:48 |
| 10 | to sell, so we are going to stop buying it. | 14:59:50 |
| 11 | BY MS. LIN: | 14:59:54 |
| 12 | Q If a CRT finished product vendor | 14:59:55 |
| 13 | increased its costs, would Circuit City change the | 15:00:07 |
| 14 | retail price of the finished product in response? | 15:00:11 |
| 15 | A They may. If the manufacturer's | 15:00:15 |
| 16 | suggested retail price changed, then we are likely | 15:00:18 |
| 17 | to, and if it did not, we are unlikely to. | 15:00:25 |
| 18 | Q Do you recall any specific examples of | 15:00:32 |
| 19 | that happening? | 15:00:34 |
| 20 | A No. | 15:00:34 |
| 21 | Q To the extent its cost was increased, | 15:00:40 |
| 22 | would -- | 15:00:42 |
| 23 | A I'm sorry, I have got to correct myself. | 15:00:43 |
| 24 | The previous deposition, I was shown a letter | 15:00:46 |
| 25 | where somebody had increase in costs. | 15:00:50 |

36 (Pages 138 - 141)

Page 142

1  Q  The previous deposition you are          15:00:55
2  referring to the LCD case?                  15:00:56
3  A  LCD, but it was not for CRT product.     15:00:58
4  Q  You are not aware of any instances this  15:01:00
5  which CRT product prices were increased?    15:01:03
6  A  I am not aware.                          15:01:06
7     MR. GRALEWSKI: Can I have the court      15:01:17
8  reporter read back the last question and    15:01:18
9  answer?                                     15:01:20
10 (Whereupon the record was read.)            15:01:20
11    MR. LAHAD: Did you mean prices or        15:01:34
12 costs?                                      15:01:35
13    MS. LIN: I will keep prices. But why     15:01:38
14 not ask the question as to costs.           15:01:41
15 BY MS. LIN:                                 15:01:43
16 Q  Are you aware of any instances --        15:01:43
17    MR. LAHAD: Did you understand that       15:01:44
18 question to be prices or costs?             15:01:45
19    THE WITNESS: I understood it to be       15:01:47
20 costs. I am sorry.                          15:01:48
21 BY MS. LIN:                                 15:01:49
22 Q  No, that's okay.                         15:01:49
23 A  My answer was that it was based on our   15:01:51
24 cost going up.                              15:01:55
25 Q  You are not aware of any instances in    15:01:56

Page 143

1  which Circuit City's costs to purchase CRT  15:01:57
2  finished products went up?                  15:02:01
3  A  That is correct.                         15:02:02
4  Q  If there was a decrease in Circuit       15:02:12
5  City's costs to acquire a specific CRT finished  15:02:21
6  products, would Circuit City decrease the price  15:02:23
7  charged to the customer by that same amount?  15:02:30
8  A  Most likely not. We would reposition     15:02:33
9  price based on change of the manufacturer's  15:02:45
10 suggested retail price would be the primary reason  15:02:47
11 for us to reposition the price that we are selling  15:02:50
12 the product at.                             15:02:53
13    And furthermore, if you reduce the price  15:02:57
14 by $20, and you reduce the cost by $20, you  15:03:00
15 actually don't have the same margin. The math  15:03:04
16 doesn't work that way.                      15:03:08
17 Q  Would Circuit City typically move the    15:03:11
18 price to the consumer by the same amount at which  15:03:17
19 Circuit City's cost to acquired the CRT finished  15:03:21
20 product moved?                              15:03:25
21    MR. GRALEWSKI: Objection, form.          15:03:26
22    THE WITNESS: I believe I just answered   15:03:28
23 that.                                       15:03:30
24 BY MS. LIN:                                 15:03:31
25 Q  I thought you tagged it to margins, so I  15:03:32

Page 144

1  was trying to clarify, putting aside a margin  15:03:34
2  percentage, the dollar amount at which a CRT  15:03:36
3  finished product cost to Circuit City, would that  15:03:39
4  be the same dollar amount at which Circuit City  15:03:42
5  would change its retail price to consumers?  15:03:45
6  A  Cost and our selling price still exist   15:03:49
7  independently. You make the pricing decision  15:03:58
8  based on what is competitive.               15:04:01
9     If the vendor gives you a $20 reduction  15:04:04
10 in cost, but everybody is selling this at the same  15:04:07
11 price that they always sold it for, and you are  15:04:11
12 selling it at that and it is competitive, then you  15:04:14
13 may take the money.                         15:04:18
14    It is profitable.                        15:04:20
15    If the vendor has said, and this is the  15:04:21
16 more likely case where you have got a cost  15:04:24
17 reduction, "If you have a price protection, more  15:04:27
18 likely it used to be a $349 manufactured suggested  15:04:29
19 retail, it is now going to be $299 suggested  15:04:32
20 retail and here is your new cost."          15:04:36
21 Q  Did Circuit City use any type of         15:04:47
22 benchmark pricing in its prices charged to  15:04:49
23 consumers for instance tending to end products at  15:04:53
24 99 cents?                                   15:04:55
25 A  Yes.                                     15:04:56

Page 145

1  Q  And how did that benchmark pricing work?  15:04:57
2  A  The 99 cent was the standard ending for  15:05:00
3  everything that you sold in the sort of the normal  15:05:05
4  course of business.                         15:05:11
5     We had other endings that meant things,  15:05:12
6  and I am probably going to get these wrong, but I  15:05:15
7  will use them as the examples.              15:05:19
8     97 cent, might say, "That is an item     15:05:21
9  that was on sale," the 98 cent might mean that  15:05:23
10 "that is a floor sample," and the 95 cent, and I  15:05:28
11 am getting some of these, right, meant that it was  15:05:34
12 a damaged product.                          15:05:38
13 Q  If Circuit City decreased the price of a  15:05:56
14 particular CRT finished product, would that have  15:06:00
15 an affect on other CRT finished products in  15:06:03
16 Circuit City's lineup at the time?          15:06:06
17    MR. LAHAD: Objection, vague, as to       15:06:08
18 affect.                                     15:06:11
19    MR. GRALEWSKI: Objection, form.          15:06:11
20    THE WITNESS: What do you mean by         15:06:13
21 affect?                                     15:06:14
22 BY MS. LIN:                                 15:06:16
23 Q  If a particular CRT finished product     15:06:17
24 price decreases would that lead Circuit City to  15:06:23
25 change the prices of any other CRT finished  15:06:26

37 (Pages 142 - 145)

Page 146

1  products it was selling at that time?   15:06:29
2     A   It might.   15:06:32
3     Q   Why's that?   15:06:34
4     A   Because the other products might stop   15:06:35
5  selling.   15:06:38
6     Q   Would a price decrease in a particular   15:06:43
7  CRT finished product prompt Circuit City to reduce   15:06:45
8  prices of its other CRT finished products for   15:06:49
9  sale?   15:06:52
10     MR. LAHAD:  Asked and answered.   15:06:53
11     THE WITNESS:  Yes, I was actually   15:06:54
12  listening to see what was different. I don't   15:06:57
13  hear anything different in the question.   15:06:59
14  Maybe if you restate it, I can answer you.   15:07:05
15  BY MS. LIN:   15:07:12
16     Q   We were saying that if a price decreased   15:07:12
17  of one product, Circuit City might change its   15:07:14
18  prices of other products? I want to clarify,   15:07:16
19  would it change them to go down?   15:07:18
20     A   Yes, if the product was not selling   15:07:24
21  because the other product had gone down in price   15:07:26
22  then it would go down also.   15:07:31
23  BY MS. LIN:   15:07:33
24     Q   A decrease in price of one CRT product   15:07:34
25  was unlikely to cause Circuit City to increase the   15:07:35

Page 147

1  price of a different CRT product, is that right?   15:07:39
2     MR. LAHAD:  Misstates the testimony.   15:07:41
3     THE WITNESS:  Yes.   15:07:43
4     MR. LAHAD:  I am sorry, did you say was   15:07:53
5  then likely or was unlikely?   15:07:53
6  MS. LIN:  Unlikely.   15:07:55
7  BY MS. LIN:   15:07:56
8     Q   If a price change was to be implemented   15:08:03
9  on a particular CRT finished product, how did that   15:08:07
10  process work?   15:08:11
11     A   The buyers support team which had   15:08:12
12  various names, it could be a category support, or   15:08:21
13  a product manager, or a product specialist, the   15:08:25
14  buyer would create the basic form that said, "The   15:08:28
15  new price of this, we want to price our stores to   15:08:35
16  this starting at this date," and that is all that   15:08:39
17  would have to be done is that it would key in go   15:08:44
18  out to all the stores.   15:08:47
19     If there was a cost change at the same   15:08:49
20  time that is handled differently.   15:08:53
21     Q   You said was a cost change to acquire a   15:08:58
22  CRT finished product, would that information be   15:09:01
23  related to the retail stores?   15:09:03
24     A   That information is available to them,   15:09:07
25  but it would not be communicated to them unless it   15:09:10

Page 148

1  was significantly going to change sort of what   15:09:15
2  they have been trained to do or what they have   15:09:22
3  been selling.   15:09:24
4     Q   Were price changes, so that is price   15:09:26
5  charged to consumers, implemented across all   15:09:29
6  Circuit City retail stores at the same time?   15:09:34
7     A   Like 99.9 percent of the time they were.   15:09:36
8  There were exceptions where you would say in this   15:09:40
9  marketplace that price is not going to be   15:09:43
10  competitive and so you would put a different price   15:09:46
11  down.   15:09:49
12     Q   Were the same prices charged on Circuit   15:09:52
13  City's website as it charged on its retail stores   15:09:59
14  for CRT finished products?   15:10:02
15     A   The everyday pricing would have been the   15:10:05
16  same, however you could have different promotions.   15:10:09
17  It could be on sale in the stores and not be on   15:10:14
18  sale on the web or vice versa.   15:10:17
19     Q   Was it the buyers that determined the   15:10:20
20  web pricing as well?   15:10:23
21     A   The buyers determined the every day   15:10:24
22  pricing, yes.   15:10:27
23     Q   The size of its inventory of CRT   15:10:28
24  finished products impact Circuit City's prices it   15:10:30
25  charged to consumers to purchase these products?   15:10:34

Page 149

1     A   Yes.   15:10:38
2     Q   How so?   15:10:38
3     A   If we had an excess amount of inventory,   15:10:39
4  then we might reduce the price to the consumer to   15:10:41
5  increase sales.   15:10:45
6     If we had a shortage of inventory, we   15:10:47
7  may increase costs to the consumer because we are   15:10:49
8  going to sell all that we own.   15:10:52
9     Q   Would Circuit City sometimes buy more   15:10:55
10  inventory than usual if it felt that it was   15:10:58
11  getting a good price on a CRT finished product?   15:10:59
12     MR. LAHAD:  Vague, lacks foundation.   15:11:03
13     THE WITNESS:  I am trying to sort of   15:11:17
14  process the than usual. Yes, we would, and   15:11:17
15  there's a difference in culture in about   15:11:24
16  1995, 1996, 1997, that sort of stopped at the   15:11:28
17  beginning of this where the buyers could buy   15:11:33
18  a bulk of product and sit on it for a while,   15:11:38
19  if they got an incredible deal.   15:11:41
20     But as our supply chain got more   15:11:46
21  sophisticated we were not allowed to buy   15:11:51
22  that, and so for the majority of this period   15:11:53
23  of time, I would estimate that over 90   15:11:55
24  percent time that we are talking about here   15:12:00
25  the buyer could not buy in excess in that   15:12:03

38 (Pages 146 - 149)

Page 150

```
 1   way.                        15:12:09
 2  BY MS. LIN:                  15:12:10
 3   Q   Do you know why Circuit City changed its   15:12:11
 4  policy with respect to whether buyers can purchase  15:12:14
 5  excess CRT finished product inventory?   15:12:16
 6   A   Reduce risk.              15:12:19
 7   Q   Was that because Circuit City expected   15:12:23
 8  the prices of CRT finished products to decline?   15:12:24
 9   A   No, it is because any product that you   15:12:27
10  buy has the risk of suddenly being not profit or   15:12:31
11  not competitive and now you own it and so it   15:12:36
12  doesn't matter that it was CRTs. Just any mass   15:12:42
13  product.                     15:12:46
14   Q   Did individual Circuit City retail   15:12:52
15  stores have the authority to change the sales   15:12:54
16  prices of CRT finished products?   15:12:57
17   A   They could under very strict guidelines   15:13:00
18  and at some periods of time they were not allowed   15:13:04
19  to do so at all.             15:13:07
20   Q   Do you know what time periods individual   15:13:13
21  stores were not allowed to change CRT finished   15:13:16
22  product prices?              15:13:18
23   A   These type of decisions to give you an   15:13:20
24  example of a time when they were not allowed to   15:13:27
25  change them at all, I remember a Christmas, I   15:13:30
```

Page 151

```
 1  don't know which Christmas, where we said, "This   15:13:35
 2  date on, no price changes. No reactions."   15:13:38
 3   Q   So from some Christmas going forward   15:13:54
 4  individual stores were no longer allowed to change   15:13:56
 5  their CRT finished product prices, am I   15:13:59
 6  understanding you right?      15:14:01
 7      MR. LAHAD:  Misstates the testimony.   15:14:02
 8      THE WITNESS:  They are not allowed to   15:14:02
 9   change any prices.          15:14:04
10  BY MS. LIN:                  15:14:05
11   Q   Specific to that one day or going   15:14:05
12  forward?                     15:14:08
13   A   For a short period of time, like the   15:14:08
14  final three weeks of the year or the final three   15:14:10
15  weeks before Christmas.      15:14:13
16      The only prices by the way that they   15:14:15
17  were allowed to change were a specific groups of   15:14:17
18  product that we said, "These products were going   15:14:20
19  to compete on. You will compete with certain   15:14:24
20  other retailers and if they are at this price in   15:14:28
21  print, for example, then you will price yours   15:14:32
22  while that ad ran, and when the ad is over, you   15:14:36
23  put it back up."             15:14:39
24      They were not able to control, what I   15:14:40
25  have been referring to, as their every day   15:14:43
```

Page 152

```
 1  pricing. They were able to control their reaction   15:14:46
 2  to competitors' pricing.     15:14:50
 3   Q   Did someone at Circuit City determine   15:14:52
 4  which products would be in that category of   15:14:55
 5  products whose prices might change in reaction to   15:14:58
 6  competitor pricing?          15:15:00
 7   A   Yes.                    15:15:01
 8   Q   How did that work?       15:15:02
 9   A   The buyers and other senior management   15:15:03
10  in merchandising would identify the key categories   15:15:07
11  that required reaction and CRTs would have always   15:15:12
12  been in that category because they are hardware   15:15:16
13  categories with significant pricing. Whereas,   15:15:21
14  something like a camera bag where they carried 50   15:15:25
15  of them, and they cost $19, wouldn't be.   15:15:32
16   Q   Were all CRT finished products subject   15:15:35
17  to price changes based on competitor prices?   15:15:39
18      MR. LAHAD:  Vague.        15:15:44
19      THE WITNESS:  Right. It would vary   15:15:44
20  based on the time that we are talking about   15:15:46
21  here.                        15:15:50
22      As CRT was the largest part of   15:15:52
23  television probably at the beginning of the   15:15:55
24  cycle, I suspect all CRT was involved.   15:15:58
25      At the end, as CRT was not as visible   15:16:01
```

Page 153

```
 1  and wasn't advertised as much, wasn't as   15:16:08
 2  high priced, or et cetera, then I am sure   15:16:11
 3  that there were exceptions that said we are   15:16:15
 4  only going to do the ones above a certain   15:16:17
 5  price or certain size or something like that   15:16:20
 6  and it may have even been excluded.   15:16:21
 7      But television in general was our   15:16:24
 8  number one business and so in general we   15:16:28
 9  were very competitive on television.   15:16:31
10  BY MS. LIN:                  15:16:34
11   Q   Was Circuit City offering similar   15:16:35
12  ability to its retail stores to change their   15:16:37
13  prices in reaction to competitors in CRT monitor   15:16:40
14  sales?                       15:16:44
15   A   We were a little more careful with our   15:16:46
16  computer product because the overall profitability   15:16:49
17  of computers is typically lower than other   15:16:55
18  products and the visibility was a little bit   15:17:01
19  lower.                       15:17:04
20      Having said that, I am sure that there   15:17:05
21  were times when they were included, but it's not   15:17:07
22  the type of category that is dominant for Circuit   15:17:11
23  City.                        15:17:16
24      I would say in that case it is probably   15:17:19
25  the opposite, that most of the time they wouldn't   15:17:22
```

39 (Pages 150 - 153)

Page 154

1 have been included.                                15:17:26
2 (Whereupon, Deposition Exhibit 2842 is marked for   15:17:26
3 Identification.)                                   15:17:26
4     MS. LIN:  I am going to mark a document    15:17:34
5 beginning Bates No. CC 0389749 as Exhibit        15:17:36
6 2842.                                            15:17:42
7 BY MS. LIN:                                      15:18:17
8     Q  Are you familiar with the manager's      15:18:17
9 special price program referenced in Exhibit 2842?  15:18:19
10    A  This is a reminder that there is such a   15:18:24
11 program and looking at this is a reminder that   15:18:26
12 there is such a program existed.  I was not      15:18:29
13 actively involved in it.                         15:18:32
14 BY MS. LIN:                                      15:18:34
15    Q  Do you know how the manager special     15:18:34
16 price program worked?                            15:18:36
17    A  No.                                       15:18:37
18    Q  Looking page 2, there is a reference to  15:18:39
19 a low-price guaranty.  Do you know what Circuit  15:18:46
20 City's low price guaranty was?                   15:18:49
21    A  Yes.                                      15:18:50
22    Q  What was that?                            15:18:51
23    A  We would match competitors advertised    15:18:53
24 pricing, so that we would sell you the product at  15:18:58
25 the price that competitors advertised it at, and  15:19:00

Page 155

1 if you bought the product from us, and then the   15:19:04
2 product was advertised for less, we would refund  15:19:08
3 the difference between what you paid and what the  15:19:11
4 ad price was plus 10 percent, the difference.     15:19:15
5     Q  Do you know when that low-price guaranty  15:19:19
6 program was in place?                             15:19:21
7     A  Long before this period of time that we   15:19:24
8 are talking about.  It goes back to my beginning.  15:19:28
9 There was a low-price program when I started at   15:19:31
10 Circuit City in 1980.                            15:19:34
11    Q  Was that program when you started the    15:19:36
12 same as the low-price guaranty program in place in  15:19:38
13 1996?                                            15:19:44
14    A  I believe so, but there were changes to   15:19:46
15 that low-price program sometime during this      15:19:48
16 period.                                          15:19:54
17    Q  I direct your attention to the page      15:20:05
18 ending in Bates Number 56.  There is a little    15:20:07
19 easel in the left hand margin that says,         15:20:20
20 "Anticipate all customers shopping in a drop price  15:20:22
21 environment."  Do you know what that term "drop  15:20:26
22 price environment" means?                        15:20:27
23    A  That is actually a remainder of what the  15:20:29
24 manager's specials program was created for.      15:20:32
25    Going back to one of my positions where     15:20:35

Page 156

1 I was involved with highly competitive           15:20:38
2 marketplaces, many of these highly competitive   15:20:42
3 type environments, the competitor would price at  15:20:52
4 one price, but as soon as you said hello they    15:20:57
5 would offer you a lower price, and so by being   15:21:00
6 priced at one price and not being aware of that  15:21:04
7 and not having any sort of reaction to that we   15:21:07
8 were losing sales.                               15:21:10
9     We were particularly losing it for very     15:21:12
10 expensive television and this is Big Screen which  15:21:18
11 typically for Circuit City is talking about      15:21:21
12 projections sets.                                15:21:24
13    It is talking about the various types of     15:21:26
14 projection, the type of sets, and typically, would  15:21:31
15 not be CRT unless it was a 40 inch or something  15:21:32
16 that was included.                               15:21:36
17    This is primarily about any product that    15:21:37
18 was $2,000 to $3,000, and they would have a drop  15:21:41
19 price that was significant.                      15:21:44
20    So it's a $3,000 product and you say,        15:21:46
21 "hello," and it now $2,800 and we don't get the  15:21:49
22 sale.                                            15:21:54
23    That is what the manager's special          15:21:55
24 pricing was created to try to combat was how do we  15:21:58
25 deal with that because we were losing sales.     15:22:03

Page 157

1     Q  Would you turn to the next page.         15:22:12
2     A  It does say Big Tube, by the way, on     15:22:14
3 that same page.  There is some specific Big Tube  15:22:18
4 in here and Tube would have been CRT.            15:22:21
5     Q  Thank you.  So on the page ending Bates  15:22:24
6 No. 57, will you read to yourself the paragraph  15:22:24
7 beginning with, "Let me take a moment."          15:22:31
8     A  57?  Read it to myself?                   15:22:38
9     Q  Yes, just familiarize yourself with that  15:22:48
10 paragraph.  Do you see where this training       15:22:50
11 document says, "We shop other retailers as       15:23:19
12 customers on a regular basis and the prices you  15:23:21
13 see here are their consistent final drop prices  15:23:25
14 they give us."                                   15:23:28
15    A  Yes.                                      15:23:28
16    Q  What does that mean?                      15:23:29
17    A  We shop other retailer's customers on a  15:23:30
18 regular basis.  I don't mean to be smart, but    15:23:33
19 that's what it means is that we go out like if we  15:23:36
20 were a customer to try to buy the product to find  15:23:41
21 out what other guy is selling it for.            15:23:43
22    Q  So the final drop price would be         15:23:46
23 discussing the other retailer what lower than    15:23:49
24 sticker price a buyer could receive?             15:23:53
25    MR. LAHAD:  Misstates the testimony.         15:23:57

40 (Pages 154 - 157)

Page 158

1    THE WITNESS: Right.    15:23:59
2    MS. LIN: Let me ask it this way.    15:23:59
3 BY MS. LIN:    15:23:59
4    Q    When you are discussing final drop    15:24:00
5 prices from a competitor, what does that mean?    15:24:03
6    A    What it says is that we go to a    15:24:07
7 competitor and we go as a customer and see what    15:24:10
8 the real prices they are offering that customer    15:24:16
9 and then we are pricing to that price.    15:24:19
10    Q    The real price could be something other    15:24:22
11 than the advertised or sticker price?    15:24:24
12    A    The competitor's real price is something    15:24:29
13 other than what they have got tagged.    15:24:32
14    Q    Circuit City would act as a customer in    15:24:37
15 order to find out what that real lower price was    15:24:39
16 offered by a competitor?    15:24:42
17    A    Yes.    15:24:43
18    Q    Do you see anything wrong with that    15:24:52
19 practice of acting as a customer at your    15:24:54
20 competitor's store?    15:24:57
21    MR. LAHAD: Objection, scope. You are    15:24:59
22 asking him personally if there is anything    15:25:00
23 wrong with that, a 30(b)(6) witness? I don't    15:25:02
24 know.    15:25:04
25    MR. ROSS: Beyond the scope of the    15:25:07

Page 159

1 30(b)(6).    15:25:08
2    MR. GRALEWSKI: Objection, form.    15:25:10
3    THE WITNESS: I know of no other way to    15:25:12
4 stay competitive.    15:25:14
5 BY MS. LIN:    15:25:15
6    Q    Then to determine the prices that your    15:25:16
7 competitors are selling their products at?    15:25:19
8    A    Yes.    15:25:20
9    Q    Do you know if Circuit City ever used    15:25:22
10 CRT finished products as loss leaders during the    15:25:24
11 relevant time period?    15:25:28
12    A    By "loss leader" you would mean you sold    15:25:31
13 it for below cost?    15:25:34
14    Q    However that term might have been used    15:25:37
15 by Circuit City.    15:25:39
16    A    No, that would be the definition that I    15:25:40
17 would use is we did our very best and never sold    15:25:43
18 products below what we paid for it but yes there    15:25:49
19 were times we did do so.    15:25:53
20    Q    Do you know how Circuit City selected    15:25:54
21 the CRT finished products it would sell as loss    15:25:55
22 leaders?    15:26:00
23    A    They could choose ones that they thought    15:26:01
24 were effective in advertising or that they had an    15:26:06
25 excess inventory on whatever reason.    15:26:10

Page 160

1    Q    Did Circuit City tend to sell products    15:26:18
2 that were in high demand as loss leaders?    15:26:22
3    A    We created high demand by selling    15:26:27
4 products at a lower price, but if I understood you    15:26:34
5 correctly, to say these are high demand products    15:26:41
6 that we are trying to sell below costs, that would    15:26:44
7 not be why we sold them below costs.    15:26:46
8    MR. LAHAD: Is that question directed to    15:26:51
9 products generally or just CRT finished    15:26:52
10 products?    15:26:53
11 BY MS. LIN:    15:26:53
12    Q    To CRT finished products. Sorry.    15:26:54
13    A    Right.    15:26:56
14    MR. LAHAD: Is that how you understood    15:26:58
15 the question?    15:27:00
16    THE WITNESS: Yes.    15:27:01
17 BY MS. LIN:    15:27:03
18    Q    When Circuit City sold CRT finished    15:27:05
19 products below cost, did the person setting the    15:27:09
20 price know that they were setting it below cost?    15:27:12
21    A    The buyer would know, yes.    15:27:15
22    Q    Could an individual store set a CRT    15:27:20
23 finished product sale below cost without realizing    15:27:22
24 it was doing so?    15:27:25
25    MR. GRALEWSKI: Objection, form.    15:27:28

Page 161

1    THE WITNESS: They had the information    15:27:30
2 to know what the costs was.    15:27:34
3 BY MS. LIN:    15:27:36
4    Q    Could prices ever appear to be below    15:27:41
5 cost, but actually not truly be below cost, but    15:27:44
6 when factored in rebates or other vendor funding?    15:27:49
7    MR. LAHAD: Objection, lacks foundation,    15:27:54
8 vague.    15:27:55
9    THE WITNESS: I would answer that they    15:28:00
10 are still below costs. Do you have funds    15:28:02
11 that might make your overall profitability    15:28:05
12 better, yes, but they are still below costs,    15:28:11
13 BY MS. LIN:    15:28:15
14    Q    Given how Circuit City defines cost?    15:28:16
15    A    Right.    15:28:19
16    Q    Are you aware of laws in certain states    15:28:20
17 that prohibit below cost sales?    15:28:21
18    MR. LAHAD: Objection, scope.    15:28:25
19    MR. ROSS: Hold on a second. If you're    15:28:28
20 asking that as a 30(b)(6) witness, then no,    15:28:28
21 he is not going to answer. That is well    15:28:31
22 beyond the cope.    15:28:33
23 BY MS. LIN:    15:28:34
24    Q    Do you know if Circuit City would raise    15:28:35
25 prices at any time to make up for below cost sales    15:28:37

41 (Pages 158 - 161)

Page 162

1 that occurred during another time period?    15:28:41
2        MR. LAHAD:  Vague as to when you say "at  15:28:46
3 another time period."  Are you talking about    15:28:47
4 a time period other than the relevant time    15:28:49
5 period we are talking about?    15:28:52
6 BY MS. LIN:    15:28:52
7    Q    No.  So if a low-cost sale occurred --    15:28:52
8 No.  If a below-cost sale occurred at one time,    15:28:55
9 would Circuit City ever at a different point in    15:29:03
10 time than when that low sale occurred raise prices  15:29:06
11 to make up for the low cost incurred during the    15:29:09
12 low-cost sale?    15:29:12
13        MR. LAHAD:  Vague.    15:29:14
14        THE WITNESS:  Right, that scenario    15:29:15
15 doesn't sound viable because you still have    15:29:17
16 to have the product priced at a competitive    15:29:20
17 price.  So we are not going to price above    15:29:23
18 the competitive level.    15:29:26
19        We are not going to price above a    15:29:28
20 manufacturer's suggested retail price with    15:29:30
21 the hopes that that we sell a couple that    15:29:32
22 make the margin because you are not going to    15:29:34
23 sell them.    15:29:36
24 BY MS. LIN:    15:29:40
25    Q    Do you recall Circuit City using any    15:29:41

Page 163

1 thirty-party companies to provide information to    15:29:47
2 it about the CRT finished product market?    15:29:49
3        MR. LAHAD:  Vague.    15:29:56
4        THE WITNESS:  Yes.    15:29:59
5 BY MS. LIN:    15:30:00
6    Q    Which third-party companies?    15:30:02
7    A    We used NPD.  We used CEA.  We also used  15:30:04
8 other forecasters like Forrester for various    15:30:14
9 times.  I don't know whether CRT would have been   15:30:18
10 specific to that.    15:30:21
11        And that is the overall market is, the    15:30:25
12 type, are you talking about the selling market,    15:30:27
13 then that is what I have answered for.    15:30:32
14    Q    What types of information did these    15:30:35
15 companies provide to Circuit City about CRT    15:30:37
16 finished product market?    15:30:40
17    A    Typically, and CEA is what they call    15:30:43
18 "sell in data," NDP would sell-out data and    15:30:48
19 neither were all inclusive.    15:30:52
20        You could only use them as indicators.    15:30:55
21 They were not 100 percent accurate.    15:30:58
22        It would provide the size of the market,    15:31:02
23 so CRT, 13-inch TVs, are 2 million sales, units a  15:31:05
24 year, it would give you the forecast of what it is  15:31:18
25 going to be for usually a rolling three years kind  15:31:24

Page 164

1 of thing, but sometimes less.    15:31:29
2        It might give you an average selling    15:31:32
3 price.  It could depending on which company you    15:31:41
4 are working with, it might give you the share of   15:31:50
5 market for a model or a brand, so Sony has 50    15:31:53
6 percent of the market, or this specific product    15:32:00
7 has 6 percent of the market.    15:32:02
8    Q    Do you know how Circuit City made use of  15:32:05
9 the information it was obtaining from these    15:32:07
10 third-party companies about the CRT finished    15:32:09
11 product market?    15:32:12
12    A    We used it for budgeting processes.  We   15:32:13
13 used it for forecasting of our inventory    15:32:15
14 processes, and now we used it as sort of a report  15:32:19
15 card on how we are doing versus others.  We used   15:32:23
16 it as helping us to decide the size of our    15:32:26
17 programs or our assortments.    15:32:31
18    Q    Who were Circuit City's competitors    15:32:35
19 during the relevant time period?    15:32:38
20    A    I used to joke, "It is everybody."  But   15:32:41
21 the biggest competitors for consumer electronics   15:32:44
22 during this period of time would have been Best    15:32:48
23 Buy, Wal-Mart, Amazon, the sort of the three    15:32:50
24 biggies, and then you also had Target and we had   15:32:58
25 regional competitors that varied by marketplace    15:33:06

Page 165

1 and there are dozens of those.    15:33:09
2    Q    Were there any competitors that Circuit   15:33:15
3 City considered particularly significant in the    15:33:17
4 CRT finished product market?    15:33:20
5    A    Because Best Buy was the other large    15:33:22
6 consumer electronics store, they were clearly a    15:33:28
7 focus, but both Wal-Mart and Amazon market share   15:33:29
8 for consumer electronics grew over this period of  15:33:37
9 time that we are talking about, so like in 1995,   15:33:43
10 maybe Amazon was not a big deal, but by 2007, they 15:33:45
11 were a huge issue.    15:33:49
12    Q    Were there any positions at Circuit City  15:33:53
13 responsible for monitoring the CRT finished    15:33:57
14 product costs to consumers charged by Circuit    15:33:59
15 City's competitors?    15:34:03
16    A    You just asked me if we had anybody that  15:34:06
17 monitored the cost that other people had?    15:34:09
18    Q    I said cost to consumer, so the prices,   15:34:12
19 I am sorry, we are using those interchangeably?    15:34:15
20    A    Now we are on the other side.    15:34:17
21    Q    Yes, now we are on the other side.  Were  15:34:19
22 there any people at Circuit City that were    15:34:22
23 responsible for monitoring the prices Circuit    15:34:23
24 City's competitors charged to customers?    15:34:27
25    A    You could argue that everybody in    15:34:30

42 (Pages 162 - 165)

Page 166

1  merchandise was responsible and everybody in sales   15:34:32
2  was responsible because you need to have that   15:34:35
3  information to be competitive and just know what   15:34:37
4  is going on around you.   15:34:41
5      Specifically, the people who do ads   15:34:43
6  which is sometimes as an ad manager, and sometimes   15:34:52
7  it was the buyer, and sometimes it was as product   15:34:54
8  specialist, and so on, would keep track of what   15:34:57
9  prices our competitors advertised at and we would   15:34:59
10 react to those ad prices.   15:35:05
11     Their everyday pricing that was out   15:35:10
12 there in the field, Best Buy and Wal-Mart, and so   15:35:13
13 on, they tended to do the same thing we did which   15:35:17
14 is to price nationally.   15:35:22
15     As a buyer you could go out and shop   15:35:25
16 your own product and see what the other guy was   15:35:28
17 selling the product for individually.   15:35:31
18     But we also had people as we have talked   15:35:34
19 about that would go out and visit our competitors   15:35:37
20 and look at what their pricing is and communicate   15:35:41
21 that back to the merchandising team to decide if   15:35:46
22 we are going to react to it.   15:35:52
23   Q   Was that a specific role or job title   15:35:54
24 that someone went out to shop competitors' prices?   15:35:57
25   A   No.  We used everybody that was in the   15:36:01

Page 167

1  stores would shop, so no, there wasn't a single   15:36:04
2  title.   15:36:11
3    Q   Did Circuit City gather information   15:36:16
4  about its competitor's discounts?   15:36:22
5    A   As I said, if the competitor ran a sale,   15:36:27
6  we tracked that very closely because they are very   15:36:31
7  visible and it is easy to see and it has an   15:36:35
8  impact.   15:36:39
9      If they discounted their product on the   15:36:42
10 floor, then it is less visible and hopefully one   15:36:46
11 of our standard reports catches that information,   15:36:48
12 again, we probably would not react to it if it is   15:36:54
13 a short term type of a thing, but yes.   15:36:58
14   Q   You referenced a standard report, what   15:37:02
15 were those?   15:37:05
16   A   I am sorry.  I think I would have to   15:37:06
17 have it read back to me to make sure.   15:37:13
18     MR. ROSS:  You're missing a word.   15:37:16
19 BY MS. LIN:   15:37:16
20   Q   Maybe instead, standard shopping report?   15:37:19
21     MR. ROSS:  There you go.   15:37:21
22     THE WITNESS:  Right, so we had shopping.   15:37:21
23 They would go out, and say, "These are the   15:37:24
24 prices that we found," and communicate that   15:37:28
25 back.  "Here are the prices that are lower   15:37:31

Page 168

1  than us," we call that shopping report.   15:37:34
2  BY MS. LIN:   15:37:36
3    Q   How frequently were shopping reports   15:37:36
4  drafted?   15:37:38
5    A   Typically, if you were doing them at   15:37:40
6  all, they would be on a weekly basis, but there   15:37:43
7  were periods where you did not do them, as I said,   15:37:48
8  because we were not going to do anything with   15:37:50
9  them, so why waste people's time?   15:37:52
10     Again not only would Christmas time be   15:37:54
11 so hectic that people do not go from store to   15:38:00
12 store as often, but you also don't have any people   15:38:02
13 that are not busy, so you cannot send them out.   15:38:04
14   Q   Were shopping reports created throughout   15:38:10
15 the relevant period?   15:38:12
16   A   Yes.   15:38:14
17   Q   Did Circuit City ever use customer   15:38:21
18 surveys to monitor its competitors' prices?   15:38:23
19     MR. LAHAD:  During the relevant time   15:38:28
20 period for CRT finished products?   15:38:30
21     MS. LIN:  Yes.   15:38:32
22     THE WITNESS:  I don't know of any cases   15:38:33
23 where we used it to monitor retail prices,   15:38:34
24 no.   15:38:38
25     MS. LIN:  Do you want to take a short   15:38:44

Page 169

1  break or keep going?   15:38:44
2     MR. ROSS:  Let's take a break.   15:38:47
3     MS. LIN:  Let's take a short break.   15:38:48
4     THE VIDEOGRAPHER:  The time is   15:38:49
5  approximately 3:38 p.m. and we are off the   15:38:49
6  record.   15:38:51
7  (Whereupon, a break in the proceedings commenced   15:39:08
8  at 3:38 p.m. and on resuming at 3:50 p.m.)   15:39:08
9     THE VIDEOGRAPHER:  The time is   15:50:21
10 approximately 3:50 p.m. and we are back on   15:50:21
11 the record.   15:50:25
12 (Whereupon, Deposition Exhibit 2843 is marked for   15:50:28
13 Identification.)   15:50:28
14     MS. LIN:  I am going to mark another   15:50:28
15 document for you, I am marking Exhibit 2843,   15:50:29
16 a document Bates labeled CC 0021806.   15:50:34
17 BY MS. LIN:   15:50:40
18   Q   Are you familiar with the pricing   15:50:40
19 process described on the first page of Exhibit   15:51:24
20 2843?   15:51:26
21   A   I am familiar with many such documents.   15:51:29
22   Q   Do you know when this pricing process   15:51:34
23 was adopted by Circuit City?   15:51:38
24     MR. LAHAD:  Objection, assumes facts,   15:51:40
25     MS. LIN:  Strike that.   15:51:43

43 (Pages 166 - 169)

Page 170

1  BY MS. LIN:                          15:51:43
2      Q   Was a pricing process of this kind in   15:51:43
3  place at Circuit City?                 15:51:47
4      A   Yes, and to answer your question about   15:51:50
5  when, I do not know when this was produced.  The   15:51:54
6  reason why I said many such documents is because   15:52:03
7  this would change.                     15:52:05
8      Q   What was the pricing process here       15:52:08
9  generally referring to?                15:52:11
10     A   This is referring to how the everyday   15:52:13
11  pricing is set and who is going to provide   15:52:19
12  information and input on any other changes that   15:52:23
13  need to be done.                       15:52:26
14     Q   Were there specific employees whose job   15:52:30
15  title was market leader?               15:52:33
16     A   Yes, for this time period.          15:52:37
17     Q   Was that the job title, market leader?   15:52:42
18     A   I believe what they are referring to is   15:52:47
19  the -- No, I am sorry.  I think what we are   15:52:50
20  referring to is a person that has been designated   15:53:04
21  in a market to be a market leader, this would be a   15:53:09
22  store manager or a division merchandise manager   15:53:12
23  generally.                             15:53:16
24     Q   So market leader was not a full time   15:53:16
25  position.  It was an assignment?        15:53:19

Page 171

1      A   Yes.                            15:53:20
2      Q   What about pricing coordinator, was that   15:53:21
3  a particular position at Circuit City at any time?   15:53:25
4      A   Yes, there were pricing coordinators at   15:53:29
5  various times.                         15:53:34
6      Q   Was pricing coordinator a job title used   15:53:34
7  by Circuit City?                       15:53:38
8      A   Yes.                            15:53:39
9      Q   Can you recall anyone that held a       15:53:42
10  pricing coordinator position that related to CRT   15:53:44
11  finished products?                     15:53:47
12     A   This is a pricing coordinator in the    15:53:48
13  field, so this is a specific person who would have   15:53:51
14  worked in a store that would have been for   15:53:54
15  reporting to the market leader, as it says, that   15:53:58
16  would go out into those shops.  I can't name a   15:54:00
17  person who had that position.           15:54:05
18     Q   Would that be a full-time position doing   15:54:06
19  the duties described in the pricing coordinator   15:54:08
20  box per store?                         15:54:12
21     A   No, not per store.  Per market.      15:54:18
22     Q   Per market.  What constituted a market   15:54:21
23  by that definition?                    15:54:24
24     A   A market would be an area that will be   15:54:26
25  determined by the ad market, so it would have been   15:54:32

Page 172

1  where the newspaper has an influence,      15:54:37
2  predominantly large cities, small cities may not   15:54:41
3  have had a market leader and they certainly would   15:54:46
4  have had a pricing coordinator.         15:54:51
5      Q   Turn to the next page.  If you look at a   15:54:53
6  market leader role description, the second row   15:55:00
7  second column, do you know what the acronym TMI   15:55:05
8  means?                                 15:55:09
9      A   "Total" something "income," but       15:55:17
10  basically, it is profit dollars.  By the way, it   15:55:22
11  says, "market leaders are either a GM, a DM or   15:55:32
12  store manager."                        15:55:37
13     Q   I see, and GM and DM mean general manager   15:55:37
14  and district manager respectively?      15:55:42
15     A   Correct.                        15:55:45
16     Q   Are you familiar with the acronym PSB?   15:55:47
17     A   Yes.                            15:55:55
18     Q   What does PSB mean?              15:55:56
19     A   Program strategy book.           15:55:57
20     Q   What was the program strategy book?   15:56:02
21     A   The program strategy book was the     15:56:05
22  store's weekly.  They got one on a weekly basis.   15:56:08
23  It would say, "Here are all the products that you   15:56:17
24  carry.  Here are the prices that you are to price   15:56:22
25  them at on the floor," and it would also include   15:56:24

Page 173

1  data like store cost and it will include sales   15:56:28
2  data.                                  15:56:34
3      Q   Do you know the acronym CMB?        15:56:36
4      A   Where is that used here?  CBM was our   15:56:41
5  acronym for class brand model.          15:56:52
6      Q   So that is CBM.  So what is class brand   15:56:56
7  model?                                 15:56:58
8      A   Class would be like products all grouped   15:56:58
9  together.  So they are a television, 13-inch TVs   15:57:07
10  might be a class, and then the brand and then the   15:57:14
11  specific model number.                 15:57:18
12     Q   Each CRT finished products could be    15:57:19
13  defined with its CMB?                  15:57:22
14     A   Yes, CBM, yes.                   15:57:25
15     Q   CBM, thank you.  On that page ending in   15:57:26
16  Bates Number 07, the one that you were telling me.   15:57:32
17     A   Oh, there it is.                 15:57:38
18     Q   Under market leader and then market    15:57:40
19  Level CTC?                             15:57:44
20     A   Yes.                            15:57:46
21     Q   It says, "Competitively prices market to   15:57:49
22  focus competitors."  Is focus competitors a term   15:57:52
23  you are familiar with?                 15:57:55
24     A   Yes.                            15:57:56
25     Q   What does that mean?             15:57:57

44 (Pages 170 - 173)

Page 174

1    A    It means those that we have chosen to    15:57:58
2    react to as we discussed earlier, the key    15:58:01
3    competitors.    15:58:07
4    Q    Circuit City selected key focus    15:58:10
5    competitors to react to in terms of changing its    15:58:12
6    product prices?    15:58:16
7    A    Yes.    15:58:17
8    Q    Are you familiar with the phrase    15:58:22
9    strategy shops?    15:58:24
10    A    Yes.    15:58:24
11    Q    What does that mean?    15:58:25
12    A    It basically means that you are trying    15:58:28
13    to understand what the store does to make the    15:58:31
14    sale.    15:58:40
15        Do they have a strategy that they are    15:58:41
16    going to say, just like our strategies, that they    15:58:43
17    are, "Going to sell the stereo TVs, and by the    15:58:51
18    way, we have more stereo TVs than Circuit City    15:58:55
19    does."    15:58:58
20    Q    A strategy shop is an effort to learn    15:58:59
21    what strategies a competitor of Circuit City's is    15:59:01
22    using to sell products?    15:59:03
23    A    Yes.    15:59:05
24    Q    And Circuit City used strategy shops to    15:59:06
25    learn that information?    15:59:09

Page 175

1    A    Mostly, the buyer would do those sort of    15:59:10
2    things because they tend to be not as obvious.    15:59:15
3        But, yes, we would try to understand.    15:59:20
4    The strategy might just simply be Circuit City has    15:59:22
5    commission salespeople and that is what Best Buy    15:59:29
6    would tell every single person.    15:59:31
7        "Our people are non-commission.  They    15:59:35
8    are lying to you," so you need to know that so you    15:59:35
9    would be able to overcome an objection that your    15:59:39
10    customer might have.    15:59:42
11    Q    Do you know what tactical shops were?    15:59:44
12    A    The tacticals are the specific prices, I    15:59:47
13    believe.    15:59:53
14    Q    Circuit City shopped its competitors to    15:59:54
15    find out its price information through tactical    15:59:59
16    shops?    16:00:01
17    A    Where are you reading it and I will see    16:00:04
18    if I can --    16:00:06
19    Q    So under market leader shopping process?    16:00:06
20    A    Yes, basically saying, "Go out and find    16:00:16
21    out what the prices are."  That is your tactical    16:00:20
22    shop.    16:00:24
23        "Go out and find out what they are    16:00:24
24    saying to make people buy from them and instead    16:00:25
25    buy from you."    16:00:28

Page 176

1    Q    Going back to the box you were looking    16:00:31
2    at previously, so market leader, market level    16:00:33
3    CTCs, what does it means for Circuit City to    16:00:36
4    competitively price the market?    16:00:39
5    A    It means to react to the focus    16:00:42
6    competitor by changing your price to be    16:00:46
7    competitive with your focus competitors.    16:00:50
8    Q    Did Circuit City think it could best set    16:00:54
9    competitive prices by knowing the prices charged    16:00:57
10    by its competitors in the market?    16:00:59
11        MR. LAHAD:  Again talking about CRT    16:01:08
12    finished products during the relevant time    16:01:14
13    period?    16:01:17
14        MS. LIN:  Generally speaking.    16:01:17
15        THE WITNESS:  Ask again.  Sorry.    16:01:19
16    BY MS. LIN:    16:01:22
17    Q    Did Circuit City think it could best set    16:01:23
18    competitive prices by knowing the prices charged    16:01:26
19    by its competitors in the marketplace?    16:01:28
20    A    I think that's the definition of    16:01:31
21    competitive prices, so by definition, yes.    16:01:34
22    Q    Could I have you go to the next page?  I    16:01:39
23    want to direct your attention to the box "District    16:01:40
24    Manager" and "Store Execution."    16:01:47
25        Do you know what it means there by test,    16:01:54

Page 177

1    the store management's knowledge?    16:01:55
2    A    He is basically saying that the district    16:02:01
3    manager needs to say, "Does the store management    16:02:04
4    know what the competitors are up to?  Does he know    16:02:15
5    that the guy who is next door is lower than him on    16:02:18
6    ten items?"    16:02:25
7    Q    Circuit City expected its store managers    16:02:27
8    to know that type of information about its    16:02:30
9    competitors' sales prices?    16:02:32
10    A    He expected them to be able to create an    16:02:35
11    environment that kept us competitive.    16:02:38
12    Q    In creating that environment it included    16:02:42
13    knowing the prices charged by competitors.    16:02:46
14    A    The manager himself may not know those,    16:02:49
15    but because he has got people that he sent out to    16:02:52
16    do shopping reports, and because he looks at ads    16:02:56
17    and other activity that is public, he should have    16:03:00
18    some idea of what is going on in the business.    16:03:07
19    Q    Looking at the next row down that is    16:03:10
20    titled "Ad Advice," is it correct that it is a    16:03:13
21    weekly or a daily responsibility of the employees    16:03:18
22    listed on this chart to review competitor ads for    16:03:21
23    strategic and pricing information?    16:03:26
24    A    It would appear to be, yes, but almost    16:03:27
25    everybody in the company looked at competitor ads    16:03:31

45 (Pages 174 - 177)

Page 178

1 just again so he would know what was going on.  16:03:34
2   Q   Can I have you turn two pages forward to  16:03:54
3 the page ending in 21810 under pricing  16:03:57
4 coordinator's monthly responsibilities, do you see  16:04:06
5 where it says "communicate monthly shopping  16:04:09
6 calendar"?  16:04:11
7   A   Yes.  16:04:12
8   Q   What does that mean?  16:04:13
9   A   The pricing coordinator is saying who we  16:04:15
10 are going to shop and when we are to shop them.  16:04:21
11   Q   So the pricing coordinator would send  16:04:25
12 out assignments to shop other stores?  16:04:27
13   A   One price coordinator typically could  16:04:30
14 not do all the shopping, so he is going to say,  16:04:33
15 "This store needs to help me by shopping this, and  16:04:38
16 this store needs to help me by shopping that," and  16:04:42
17 so on, so he can get or she can get all of their  16:04:44
18 information together.  16:04:48
19   Q   Going to the daily column row for sale  16:04:55
20 counselors. So the bottom white box on the same  16:05:02
21 page, where it says, "Put up take down price tags  16:05:06
22 as directed by sales managers."  16:05:10
23       Was putting up or taking down price tags  16:05:12
24 as directed by sales managers a daily function of  16:05:14
25 sales counselors at Circuit City?  16:05:18

Page 179

1   A   No. It is listed under daily, but it  16:05:20
2 wasn't a daily activity. You had pricing that  16:05:26
3 happened on a week long basis because your PSB  16:05:30
4 came out and it talked about the promo report, so  16:05:37
5 you had a promo report that had to be tagged.  16:05:40
6       If you had a competitive price reaction,  16:05:43
7 it could happen off of that cycle, but we  16:05:45
8 specifically tried to tie those cycles so that  16:05:53
9 they didn't have to do it every single day.  16:05:55
10       You would typically say the ad, start on  16:05:59
11 Sunday, they end on Saturday, so Sunday is the day  16:06:02
12 where you put everything up. However, your  16:06:05
13 competitors run their ads on Sunday also, so you  16:06:09
14 have got to have a reaction to that and those may  16:06:13
15 be up Monday or they may be up Tuesday.  16:06:17
16       You had two or three days that had high  16:06:24
17 activity. You may also have another ad during the  16:06:24
18 week like a Thursday or Friday.  16:06:28
19   Q   And high activity in that context would  16:06:31
20 mean changing prices to react to a competitor's  16:06:34
21 prices?  16:06:37
22   A   Mostly it's because you're having an ad  16:06:38
23 and you have got all of these changes that you  16:06:41
24 have got to do to do your own add.  16:06:44
25       There would be far more changes based on  16:06:46

Page 180

1 our own promotional calendar than there would be  16:06:49
2 your competitor's calendar.  16:06:51
3   Q   Was Circuit City's promotional calendar  16:06:53
4 driven in part by competitor's prices?  16:06:56
5   A   It was driven by competitor's ad prices.  16:06:59
6   Q   Can I have you turn to the following  16:07:04
7 page. Do you know who Tim Kopp is, the name at  16:07:05
8 the top of this page?  16:07:12
9   A   I remember the name. I do not know him.  16:07:14
10   Q   Do you know what role Mr. Kopp had at  16:07:17
11 Circuit City?  16:07:20
12   A   No.  16:07:21
13   Q   Are you familiar with the corporate  16:07:22
14 operations department?  16:07:24
15   A   Yes.  16:07:25
16   Q   What is that?  16:07:25
17   A   That would be the store management group  16:07:26
18 and everybody in the store. For us "operations"  16:07:30
19 was everybody that ran the stores that worked in  16:07:36
20 the stores.  16:07:39
21   Q   So that corporate operations meant  16:07:40
22 anybody that worked in any Circuit City store?  16:07:42
23   A   Corporate operations would be the  16:07:44
24 supervisors for the people who worked in the  16:07:47
25 stores.  16:07:49

Page 181

1   Q   Was corporate operations located in  16:07:50
2 Richmond?  16:07:53
3   A   Yes.  16:07:54
4   Q   This document refers to A and B prices.  16:07:56
5 Are you familiar with those terms?  16:07:59
6       MR. LAHAD: For the record, this  16:08:02
7 document appears to be a draft. It has got  16:08:03
8 strike-throughs and underlines. It looks  16:08:07
9 like a red line and it has got the black  16:08:10
10 lines on the side.  16:08:11
11       To the extent that you want to ask him  16:08:12
12 about a document that is clearly a draft, I  16:08:14
13 will object in that it lacks foundation as  16:08:18
14 to what this document really is.  16:08:22
15 BY MS. LIN:  16:08:24
16   Q   Do you see at the top of the document,  16:08:24
17 it says, "supersedes"?  16:08:26
18   A   Yes.  16:08:29
19   Q   Do you see the date there is July 31,  16:08:31
20 1996?  16:08:34
21   A   Yes.  16:08:34
22   Q   Do you understand that that would mean  16:08:37
23 that the version, that parts of this document that  16:08:39
24 are not red lined are underlined were in the  16:08:42
25 original policy?  16:08:46

46 (Pages 178 - 181)

Page 182

1     MR. LAHAD: Calls for speculation, lacks    16:08:47
2  foundation.    16:08:49
3     THE WITNESS: That would be what it    16:08:50
4  appears, yes.    16:08:54
5  BY MS. LIN:    16:08:55
6     Q  You are familiar with store pricing    16:08:55
7  policies other than this document?    16:08:57
8     A  Yes.    16:09:02
9     Q  Did those store pricing policies include    16:09:03
10  information about shopping competitors' retail    16:09:06
11  prices just like we have been discussing?    16:09:07
12     A  Yes.    16:09:12
13     Q  Are you familiar with the terms A and B    16:09:13
14  pricing at Circuit City?    16:09:14
15     A  Yes.    16:09:16
16     Q  What does that mean?    16:09:16
17     A  The A price was the price that you were    16:09:18
18  tagged at the majority of the time.    16:09:23
19     The B price was most often your ad price    16:09:28
20  which quite often aligned with the manufacturer's    16:09:36
21  minimum advertised price.    16:09:40
22     But the price that would show up in the    16:09:44
23  stores -- the B price was created for the ease of    16:09:48
24  changing our own pricing so that you could say, "I    16:09:55
25  want to put all CRT TV on sale," then it would all    16:10:01

Page 183

1  go to B price. It was used as a process for our    16:10:06
2  promotional purposes.    16:10:12
3     Q  Did A price tend to be higher or B    16:10:15
4  price?    16:10:18
5     A  A price is the everyday higher price.    16:10:18
6     Q  Do you know what PSB price in this    16:10:28
7  document means?    16:10:31
8     A  It is the A price would have been --    16:10:32
9  well, at one point, the PSB would show you both an    16:10:36
10  A and B price, but the PSB is what we discussed    16:10:40
11  earlier.    16:10:45
12     So the PSB price could have been either    16:10:46
13  the A price or the B price. I believe he is    16:10:48
14  saying here the A PSB price.    16:10:52
15     Q  Sorry, remind me, what is the acronym    16:10:55
16  for PSB?    16:10:58
17     A  Program Strategy Book.    16:10:58
18     Q  That's right. Can I have you turn to    16:11:00
19  the page ending in Bates No. 21813, so two pages    16:11:03
20  forward and under the heading advertised prices,    16:11:13
21  can you read the sentence beginning, "Our    16:11:15
22  Strategy?"    16:11:20
23     A  "Our strategy is not to initiate    16:11:39
24  advertised prices lower than the prevailing market    16:11:41
25  advertised price."    16:11:44

Page 184

1     Q  Was that Circuit City's strategy to your    16:11:45
2  understanding?    16:11:49
3     MR. LAHAD: I will object again on the    16:11:50
4  basis that this is a draft document. He is    16:11:50
5  reading part of the red line version of this    16:11:53
6  document.    16:11:56
7     THE WITNESS: It may have been our    16:11:59
8  strategy at various times during this period    16:12:05
9  of time.    16:12:07
10  BY MS. LIN:    16:12:08
11     Q  Are you familiar with when Circuit    16:12:09
12  City's strategy was not to initiate advertised    16:12:12
13  prices lower than the prevailing market price?    16:12:13
14     A  Well, our overall strategy is to    16:12:16
15  maximize the profitability of our products, so we    16:12:21
16  always had an overall strategy or we had reason    16:12:24
17  not to be driving pricing down, but we also had to    16:12:32
18  have exceptions to that which is that our ad    16:12:39
19  prices had to be effective.    16:12:41
20     What this is saying at the field level    16:12:45
21  is that we are going to price where we are    16:12:51
22  competitive and we are not looking for you to    16:13:00
23  change an ad and drive our market down and so on.    16:13:04
24     By this time, I don't know that they    16:13:11
25  could have even changed an ad if they wanted to.    16:13:14

Page 185

1     Q  Do you know of any point in time when    16:13:17
2  Circuit City's strategy was to initiate advertised    16:13:19
3  prices lower than the prevailing market advertised    16:13:23
4  price?    16:13:26
5     A  If sales are bad, then we have to do    16:13:27
6  what we have to do to create sales.    16:13:32
7     Although you have an overall strategy    16:13:36
8  that says that you are trying to make the most    16:13:39
9  amount of profit possible by putting a product out    16:13:42
10  there at a competitive price and getting a sale,    16:13:47
11  if you're not getting sales, then you may choose    16:13:49
12  to do something else.    16:13:53
13     Q  And other specific times that you are    16:13:58
14  aware of that Circuit City elected to follow a    16:14:00
15  policy of initiating the lowest advertised price    16:14:04
16  with respect to CRT finished products?    16:14:07
17     A  During Black Friday because it is so    16:14:09
18  important to setting the tone for the Christmas    16:14:20
19  period, we specifically wanted to win.    16:14:22
20     We did not want to get beat.    16:14:27
21     You might be okay if you match, but    16:14:31
22  since you don't have a clue what the other guy is    16:14:34
23  going to advertise, you get very aggressive    16:14:37
24  because you know that it is a time that people get    16:14:41
25  very aggressive.    16:14:44

47 (Pages 182 - 185)

Page 186

```
 1    Q   Were there times other than Black Friday    16:14:46
 2  sales where Circuit City would advertise CRT       16:14:48
 3  finished products lower than other advertised      16:14:51
 4  prices for CRT finished products by competitors?   16:14:54
 5    A   You would do it for the same reasons we      16:14:57
 6  talked about pricing in general which is, if you   16:15:00
 7  had an excess inventory of a product, and you      16:15:02
 8  needed to get rid of it, then you're going to      16:15:05
 9  advertise it at what you think it needs to be done 16:15:08
10  to sell it.                                        16:15:10
11        If you weren't competitive on one            16:15:15
12  product because you did not carry it or whatever   16:15:17
13  you might get more competitive on another product, 16:15:19
14  but in all cases, it could drive additional sell   16:15:23
15  through.                                           16:15:28
16  (Whereupon, Deposition Exhibit 2844 is marked for  16:15:31
17  Identification.)                                   16:15:31
18        MS. LIN:  You can put that document          16:15:31
19  aside.  I will mark a document, Exhibit 2844.      16:15:31
20  Bates No. CC 0606306.                              16:15:48
21  BY MS. LIN:                                        16:15:53
22    Q   Mr. Deason, are you familiar with any of     16:15:54
23  the people on the email Exhibit 2844?              16:16:28
24    A   Yes.                                         16:16:31
25    Q   Who is Mr. Fiori?                            16:16:33
```

Page 187

```
 1    A   He is working in what at this time is        16:16:35
 2  what's called a pricing team, I believe.  He could 16:16:41
 3  have also been doing this based on November 25,    16:16:45
 4  2007, yes, probably pricing team, sorry.           16:16:49
 5    Q   What was the pricing team?                   16:16:53
 6    A   We had a pricing team that helped make       16:16:56
 7  sure that all the downloads were correct and that  16:17:01
 8  we were dealing with the end of life product and   16:17:05
 9  end pricing down into end of life product.         16:17:08
10        Buyers could deal with product that was      16:17:12
11  continually product still being sold, still being  16:17:16
12  in all stores, but invariably you would end up     16:17:20
13  with leftovers and those did not get high          16:17:23
14  visibility, so the pricing team would say, "You    16:17:27
15  have got 400 of these and you have funded them for 16:17:28
16  four months, what are you doing with it?"          16:17:32
17    Q   What does it mean to download a product?     16:17:34
18    A   Downloaded means that you are                16:17:36
19  downloading a price for the stores so that they    16:17:38
20  would then tag to that price so that when they     16:17:43
21  went to sell it it would automatically come up at  16:17:46
22  that price.                                        16:17:51
23    Q   Does downloading a price mean to             16:17:51
24  decrease a price?                                  16:17:54
25    A   Well, no, it could mean that you             16:17:54
```

*about* — (handwritten annotation, with line pointing to line 14–15)

Page 188

```
 1  increased the price, but it just means that you    16:17:58
 2  have put it in the system where it will come up.   16:18:01
 3        MR. LAHAD:  My page 2 on this is exhibit     16:18:05
 4  is blank.                                          16:18:08
 5        THE WITNESS:  Mine is too.                   16:18:09
 6        MS. LIN:  I think that is just how it        16:18:11
 7  was produced.                                      16:18:13
 8  BY MS. LIN:                                        16:18:16
 9    Q   Downloading a price effectively means to     16:18:16
10  put the electronic system used by stores to learn  16:18:22
11  their prices?                                      16:18:26
12    A   Right, it specifically refers to the way     16:18:27
13  our computer processed input overnight and then    16:18:29
14  downloaded that to the stores.                     16:18:35
15    Q   You were discussing a pricing team           16:18:36
16  previously.  How big was the pricing team, do you  16:18:38
17  know?                                              16:18:41
18    A   I think at its largest it might have         16:18:44
19  been as many as five, six people.  I don't know    16:18:46
20  precisely.                                         16:18:51
21    Q   Was that team located in one location?       16:18:53
22    A   Richmond, Virginia.                          16:18:56
23    Q   Do you know when the pricing team was        16:18:57
24  created?                                           16:19:00
25    A   I believe it was around 2004.  Similar       16:19:03
```

Page 189

```
 1  to when we started the BMA.                        16:19:09
 2    Q   At the end of the CC line on Exhibit         16:19:13
 3  2844, there are two emails ending in               16:19:16
 4  "Deloitte.com."  Are you familiar with either of   16:19:19
 5  those people?                                      16:19:24
 6    A   No.                                          16:19:29
 7    Q   Do you know why employees from Deloitte      16:19:30
 8  might be cc'd on an email about Circuit City's     16:19:33
 9  pricing?                                           16:19:36
10    A   Yes.                                         16:19:37
11    Q   Why's that?                                  16:19:37
12    A   They were a consultant.                      16:19:38
13    Q   What were they consulting Circuit City      16:19:40
14  on?                                                16:19:43
15    A   Practically everything.  I don't know       16:19:45
16  whether Deloitte specifically was that broad, but  16:19:47
17  this was a time period when Circuit City was       16:19:51
18  suffering and they had brought in quite a bit of   16:19:54
19  consultants to evaluate practically everything     16:19:58
20  that we did at the corporate level.                16:20:01
21    Q   The subject of this e-mail, is "Best Buy     16:20:04
22  Reactions Week of 11/25," do you see that?         16:20:06
23    A   Yes.                                         16:20:10
24    Q   What do you understand that to mean?         16:20:12
25    A   What I would understand it to mean is        16:20:15
```

48 (Pages 186 - 189)

**Page 190**

1 that, "This is what we are doing this week in     16:20:19
2 reaction to the Best Buy's ad of this week of     16:20:21
3 11/25, which by the way, is probably including     16:20:25
4 Thanksgiving and Black Friday."     16:20:29
5     Q   Do you know if Circuit City had weekly     16:20:30
6 reactions to Best Buy's ads?     16:20:33
7     A   We did at times.     16:20:35
8     Q   Do you know at what time Circuit City     16:20:39
9 had weekly reactions to Best Buy's ads?     16:20:41
10    A   As you can see here, he is talking about     16:20:44
11 that he is not going to download it for everybody,     16:20:47
12 he is only going to download it for 100 stores.     16:20:50
13    At other times we did not download     16:20:53
14 anything from corporate level. Everything was     16:20:55
15 done at the store level and then as we discussed     16:20:58
16 earlier there were times when we did not react.     16:21:03
17    Q   And the Best Buy reactions described in     16:21:06
18 Exhibit 2844 are all price reductions by Circuit     16:21:10
19 City, is that right?     16:21:13
20    A   That would be logical.     16:21:15
21    Q   Because Circuit City was typically     16:21:24
22 reducing its prices when it was responding to the     16:21:27
23 Best Buy?     16:21:30
24    A   Well, it's logical because you typically     16:21:31
25 don't have to go up to stay competitive. You     16:21:33

**Page 191**

1 typically have to go down to stay competitive.     16:21:36
2     Q   Did Circuit City ever ask its CRT     16:21:54
3 finished product vendors about the prices at which     16:21:57
4 they were selling to Circuit City competitors?     16:22:00
5     A   No.     16:22:02
6     Q   Was anyone at Circuit City responsible     16:22:03
7 for trying to gather that type of information     16:22:05
8 about the prices at which products were sold to     16:22:07
9 Circuit City's competitors?     16:22:08
10    A   No.     16:22:11
11    MR. LAHAD: Again, you meant cost.     16:22:13
12    MS. LIN: Yes.     16:22:16
13    THE WITNESS: She said prices sold to.     16:22:17
14 BY MS. LIN:     16:22:21
15    Q   Did Circuit City consider the prices at     16:22:23
16 which its competitors were selling products to     16:22:28
17 consumers to be confidential?     16:22:30
18    A   If the price that they were selling to     16:22:34
19 consumers was public information, so no.     16:22:37
20    Q   Did Circuit City consider the volume of     16:22:40
21 competitor's inventory that was being sold to     16:22:42
22 consumers to be confidential?     16:22:45
23    MR. LAHAD: Objection, lacks foundation.     16:22:47
24    THE WITNESS: Yes.     16:22:50
25 BY MS. LIN:     16:22:51

**Page 192**

1     Q   During the relevant time period, did     16:22:52
2 Circuit City consider the market for CRT finished     16:22:59
3 products that it was buying and selling to be     16:23:02
4 competitive?     16:23:05
5     MR. LAHAD: Objection, vague.     16:23:09
6     THE WITNESS: I don't even know what you     16:23:10
7 are asking, sorry.     16:23:11
8 BY MS. LIN:     16:23:12
9     Q   Did Circuit City consider the market for     16:23:13
10 CRT finished product sales to consumers to be a     16:23:15
11 competitive one?     16:23:19
12    MR. LAHAD: Same objection.     16:23:19
13    THE WITNESS: Yes.     16:23:20
14 BY MS. LIN:     16:23:22
15    Q   Why was that?     16:23:22
16    A   Because all consumer electronics is     16:23:24
17 competitive.     16:23:28
18    Q   If I use the term plasma, will you     16:23:37
19 understand that to mean a type of monitor or TV     16:23:38
20 technology?     16:23:40
21    A   Yes.     16:23:41
22    Q   Did Circuit City consider plasma     16:23:41
23 products to be competitors to CRT finished     16:23:44
24 products?     16:23:46
25    MR. LAHAD: Objection, vague.     16:23:48

**Page 193**

1     THE WITNESS: I don't see it as a     16:23:51
2 competitor. It's another offering. It is an     16:23:53
3 alternative, I guess, we sold.     16:23:58
4 BY MS. LIN:     16:24:03
5     Q   Did plasma products and CRT finished     16:24:04
6 products compete for the same floor space in     16:24:06
7 Circuit City Stores?     16:24:11
8     A   They could.     16:24:12
9     Q   Did they ever compete for the same     16:24:12
10 customers?     16:24:15
11    A   Only to the degree that there is some     16:24:18
12 sort of convergence of similar pricing, but my     16:24:21
13 experience as a customer, and sitting on many many     16:24:26
14 video meetings, is that the pricing of plasma     16:24:31
15 product was very far apart from the retail pricing     16:24:34
16 of plasma product very far apart from pricing of     16:24:40
17 CRT product.     16:24:45
18    Of course, you have the exception again     16:24:46
19 as we talked earlier if you have a very large CRT     16:24:49
20 product, the pricing may be close.     16:24:53
21    Q   Do you know if Circuit City ever used     16:24:56
22 the cost it was paying for plasma products as part     16:25:00
23 of its negotiations in negotiating to purchase CRT     16:25:04
24 finished products?     16:25:09
25    MR. LAHAD: Vague.     16:25:12

49 (Pages 190 - 193)

Page 194

1  THE WITNESS: First of all, they are not  16:25:14
2  going to share the costs, so they cannot do  16:25:15
3  it from -- but they might have done it from a  16:25:18
4  viewpoint of, "I am going to be selling  16:25:24
5  plasma product at lower than what you are  16:25:29
6  quoting us this CRT product for," and it  16:25:31
7  looks better.  16:25:36
8  So in that context, yes.  16:25:38
9  BY MS. LIN:  16:25:39
10  Q  That would be a way to try to seek a  16:25:39
11  reduced cost to Circuit City of the CRT finished  16:25:42
12  product?  16:25:45
13  MR. LAHAD: Misstates the testimony.  16:25:46
14  THE WITNESS: Right, and it also might  16:25:47
15  explain why you are not buying it.  16:25:49
16  BY MS. LIN:  16:25:51
17  Q  If I use the term LCD, will you  16:25:51
18  understand that to mean liquid crystal display?  16:25:54
19  A  Yes.  16:25:56
20  Q  Did Circuit City consider LDC products  16:25:57
21  to be competitors to CRT finished products?  16:25:59
22  MR. LAHAD: Vague.  16:26:03
23  THE WITNESS: I would give you the exact  16:26:04
24  same answer as I did for the plasma.  16:26:05
25  There were customers who only wanted a  16:26:10

Page 195

1  certain price point and where the price  16:26:14
2  points intersect they would be competitors  16:26:17
3  and where they did not intersect they would  16:26:20
4  become less an impact to each other.  16:26:22
5  BY MS. LIN:  16:26:24
6  Q  In negotiations with CRT finished  16:26:28
7  product vendors similar to what we were discussing  16:26:33
8  in the plasma context, did Circuit City ever use  16:26:36
9  the prices of LCD finished products as a  16:26:39
10  negotiating point to purchase the CRT finished  16:26:42
11  products?  16:26:45
12  MR. LAHAD: Vague.  16:26:46
13  THE WITNESS: I would answer the same  16:26:47
14  way. We would not be talking about the  16:26:48
15  prices that we did not intersect they would  16:26:53
16  in specific numbers.  16:26:57
17  We would be talking about we probably  16:26:59
18  just counseled it around retail, but we can  16:27:03
19  sell this product, we are going to be able  16:27:06
20  to sell an LCD product for this price, so  16:27:11
21  therefore, we are not interested in selling  16:27:14
22  a CRT at some price.  16:27:18
23  That negotiation might be that I don't  16:27:22
24  want to buy it and does that mean that the  16:27:24
25  CRT vendor does something, then yes.  16:27:27

Page 196

1  BY MS. LIN:  16:27:32
2  Q  Did Circuit City's sales prices to  16:27:32
3  consumers on plasma products impact the prices  16:27:35
4  that Circuit City charged to consumers for CRT  16:27:39
5  finished products?  16:27:42
6  MR. LAHAD: Vague.  16:27:47
7  THE WITNESS: What we sold one product  16:27:48
8  for influence, what we sold the other product  16:27:50
9  for, the plasma versus CRT to the degree that  16:27:52
10  the customer would buy the product.  16:28:04
11  BY MS. LIN:  16:28:06
12  Q  What do you mean by that?  16:28:09
13  A  If we had a CRT product and we planned  16:28:10
14  to sell it for $400, and we had another LCD  16:28:15
15  product that we planned to sell for $500, and the  16:28:19
16  CRT product wasn't selling, then we might say that  16:28:22
17  it needs to be further away from the other  16:28:27
18  product.  16:28:29
19  Q  And CRT finished products in that  16:28:33
20  context would need to be lower than plasma or LCD  16:28:36
21  products, is that right?  16:28:39
22  A  If they were comparably featured  16:28:40
23  typically LCD product was lighter and was trending  16:28:43
24  to become popular.  16:28:49
25  MS. LIN: Let's take a quick break to  16:28:53

Page 197

1  change the tape.  16:28:52
2  THE VIDEOGRAPHER: The time is  16:28:54
3  approximately 4:28 p.m. This is end of tape  16:28:55
4  number 3. We are off the record.  16:28:59
5  (Whereupon, a break in the proceedings commenced  16:29:14
6  at 4:28 p.m. and on resuming at 4:30 p.m.)  16:29:14
7  THE VIDEOGRAPHER: This is the beginning  16:31:13
8  of tape number 4. The time is approximately  16:31:14
9  4:30 p.m. We are back on the record.  16:31:17
10  BY MS. LIN:  16:31:18
11  Q  Do you know how Circuit City learned its  16:31:19
12  alleged claims in this lawsuit?  16:31:22
13  A  No.  16:31:23
14  Q  Did you know why Circuit City came to  16:31:26
15  believe that defendants engaged in the alleged  16:31:28
16  conspiracy without revealing any communications  16:31:30
17  with your counsel?  16:31:35
18  A  I have seen interrogatories on the LCD  16:31:37
19  case that would --  16:31:44
20  MR. ROSS: Let me stop you there. That  16:31:48
21  is different.  16:31:49
22  THE WITNESS: I have not seen anything  16:31:49
23  on this.  16:31:51
24  BY MS. LIN:  16:31:54
25  Q  During the relevant time period, did  16:31:54

50 (Pages 194 - 197)

Page 198

1  anyone at Circuit City suspect that prices of CRT    16:31:56
2  finished products were being kept high because of    16:31:59
3  any price fixing?    16:32:03
4      A.  No.    16:32:05
5  (Whereupon, Deposition Exhibit 2845 is marked for    16:32:05
6  Identification.)    16:32:05
7      MS. LIN:  I am going to mark an exhibit    16:32:13
8  as Exhibit 2845.  This is Bates No. CC    16:32:15
9  0548555.    16:32:21
10 BY MS. LIN:    16:32:38
11     Q.  Is Exhibit 2845 a white paper along the    16:32:39
12 type that we were reviewing previously?    16:32:45
13     A.  This one doesn't look like it is a    16:32:53
14 preparation for a meeting, but rather a recap of a    16:32:55
15 previous meeting.    16:32:58
16     Q.  Would that meeting be with Sony?    16:33:02
17     A.  Yes.    16:33:04
18     Q.  Are you familiar with the name of Jim    16:33:04
19 Palumbo?    16:33:06
20     A.  No.    16:33:07
21     Q.  I will represent to you that Jim Palumbo    16:33:09
22 was employed by a Sony entity.    16:33:11
23     A.  Okay.    16:33:18
24     Q.  Can I have you read to yourself the    16:33:19
25 fourth bullet on the first page.    16:33:22

Page 199

1      Does the information in that fourth    16:33:49
2  bullet, Thomson, Phillips and Zenith raised their    16:33:51
3  two prices in February 1996 suggest to you that    16:33:55
4  these manufacturers were coordinating their CRT    16:33:58
5  tube prices?    16:34:02
6      MR. LAHAD:  Lacks foundation, calls for    16:34:03
7  speculation.    16:34:04
8      THE WITNESS:  I don't know.    16:34:06
9  BY MS. LIN:    16:34:07
10     Q.  Is it possible that these three vendors    16:34:08
11 could have moved their two prices at the same time    16:34:09
12 as they were not coordinating their prices?    16:34:12
13     MR. LAHAD:  Calls for speculation, lacks    16:34:14
14 foundation.    16:34:17
15     THE WITNESS:  I don't know.    16:34:18
16 BY MS. LIN:    16:34:19
17     Q.  Do you know if Circuit City investigated    16:34:19
18 why the three manufacturers all raised their tube    16:34:22
19 price at the same time?    16:34:25
20     A.  I do not know.    16:34:26
21     MR. LAHAD:  Assumes facts, lacks    16:34:27
22 foundation.    16:34:31
23 BY MS. LIN:    16:34:31
24     Q.  Do you think Circuit City should have    16:34:31
25 investigated that information based on your    16:34:33

Page 200

1  reading of Exhibit 2845?    16:34:35
2      MR. LAHAD:  Is that 30(b)(6) question or    16:34:38
3  is that for him?    16:34:40
4      MS. LIN:  That is a 30(b)(6) question.    16:34:41
5      MR. LAHAD:  Lacks foundation.    16:34:44
6      MR. GRALEWSKI:  Objection, form.    16:34:47
7      THE WITNESS:  It wasn't uncommon for    16:34:57
8  vendors to tell us that their costs were    16:34:59
9  going up.  The rest of it, I just purely    16:35:01
10 speculate, and speaking for Circuit City, I    16:35:08
11 don't want to do that.    16:35:11
12 BY MS. LIN:    16:35:13
13     Q.  Reading the fourth bullet of Exhibit    16:35:13
14 2845, does it appear to you that CRT finished    16:35:16
15 product prices were decreasing at the same time    16:35:19
16 that tube prices were allegedly increasing?    16:35:22
17     MR. LAHAD:  Lacks foundation, calls for    16:35:26
18 speculation.    16:35:28
19     THE WITNESS:  It says that the industry    16:35:29
20 average retail is down, so with that, that    16:35:30
21 could be because you are selling more of a    16:35:34
22 lower-priced point product than a    16:35:39
23 higher-priced point product, they would not    16:35:42
24 have to necessarily be going down.    16:35:45
25 BY MS. LIN:    16:35:46

Page 201

1      Q.  Do you see where it says, "Palumbo    16:35:49
2  believes that a 5 to 10 percent tube price    16:35:51
3  increase with stick in early 1997"?    16:35:54
4      A.  Yes.    16:35:56
5      Q.  This memo is reporting that Palumbo    16:35:58
6  replayed this information as part of Circuit    16:35:59
7  City's meeting with Sony, correct?    16:36:03
8      MR. LAHAD:  Calls for speculation, lacks    16:36:05
9  foundation, and speaks for itself.    16:36:06
10     THE WITNESS:  I don't know, but it    16:36:11
11 implies such.    16:36:12
12 BY MS. LIN:    16:36:16
13     Q.  Does the comment about a 5 to 10 percent    16:36:17
14 tube price increase sticking suggest to you that    16:36:20
15 there might have been an agreement among tube    16:36:23
16 manufacturers to increase tube prices?    16:36:25
17     MR. LAHAD:  Lacks foundation, calls for    16:36:29
18 speculation, speaks for itself.    16:36:29
19     THE WITNESS:  I can only give you a    16:36:33
20 personal interpretation that it implies that    16:36:35
21 they all went up and that therefore it is    16:36:41
22 going to stay.    16:36:44
23 BY MS. LIN:    16:36:46
24     Q.  Do you know if Circuit City investigated    16:36:48
25 why Sony thought tube prices were expected to    16:36:51

51 (Pages 198 - 201)

Page 202

1  stick?                                          16:36:54
2    A  No.                                        16:36:55
3    MS. LIN:  Let's go briefly go off the    16:37:01
4  record.                                         16:37:01
5    THE VIDEOGRAPHER:  The time is 4:37 p.m.    16:37:03
6  and we are off the record.                      16:37:04
7  (Whereupon, a break in the proceedings commenced    16:38:10
8  at 4:37 p.m. and on resuming at 4:38 p.m.)       16:38:10
9    THE VIDEOGRAPHER:  The time is         16:38:10
10 approximately 4:38 p.m. and we are back on   16:38:11
11 the record.                                    16:38:13
12   MR. BAVE:  Good afternoon, Mr. Deason,    16:38:16
13 my name is William Bave and I represent the    16:38:17
14 Toshiba entities.  Thanks for you time this    16:38:18
15 afternoon.                                      16:38:22
16   THE WITNESS:  You are welcome.         16:38:22
17 EXAMINATION BY MR. BAVE:                       16:38:22
18   Q  You mentioned earlier in your testimony   16:38:23
19 that Circuit City purchased CRT finished products   16:38:24
20 from Toshiba, is that correct?                  16:38:28
21   A  I believe that we did do so.           16:38:32
22   Q  When you purchased a Toshiba brand CRT   16:38:34
23 product, did Circuit City know where that product   16:38:40
24 had been manufactured?                          16:38:42
25   A  They would not know where all product   16:38:43

Page 203

1  was manufactured.  They may have visited a factory   16:38:45
2  and seen where some product was manufactured.   16:38:49
3    Q  Did Circuit City know who had         16:38:52
4  manufactured the CRT within the Toshiba branded   16:38:53
5  finished product?                               16:38:57
6    A  Not in general, no.                    16:38:58
7    Q  Before we talked about who Circuit City   16:39:01
8  viewed as their competitors and the retail space   16:39:04
9  and you mentioned I think just generally regional   16:39:08
10 companies, correct?                             16:39:11
11   A  Correct.                             16:39:12
12   Q  Can you list some of the ones that come   16:39:13
13 to mind as regional competitors?               16:39:15
14   A  Future Shop, ~~Costco~~, American TV, HH   16:39:18
15 Craig, Electronics Express, Sound Advice, Ultimate   16:39:25
16 Electronics, and that is probably as good as I am   16:39:33
17 going to get.                                   16:39:39
18   Q  How about Brandsmart, was that regional?   16:39:40
19   A  Brandsmart, definitely.  Two different   16:39:40
20 Brandsmarts, by the way.                        16:39:44
21   Q  Did Circuit City also view warehouse   16:39:46
22 clubs such as Costco as competitors in that space?   16:39:49
23   A  Yes.                                  16:39:51
24   Q  Did Circuit City have a corporate policy   16:39:54
25 with respect to gathering the competitive   16:39:57

Page 204

1  information?                      16:39:59
2    A  We had policies that changed over    16:40:01
3  periods of time, but yes.                16:40:04
4    Q  How did the policies change over time?   16:40:06
5    A  Well, exactly who would do it, how they   16:40:08
6  would do it, how often they would do it, and then   16:40:10
7  what they would do in reaction to that.         16:40:14
8    Q  Did the types of competitive information   16:40:16
9  that you would collect change over time?        16:40:19
10   A  Not really, I mean primarily you are   16:40:21
11 wanting to know what did they tag it at, what did   16:40:25
12 they sell at and what did they advertise it at?   16:40:29
13   Q  Were those policies you mentioned in   16:40:32
14 writing?                                16:40:34
15   A  Some were as introduced earlier.     16:40:34
16   Q  Do those policies prohibit the Circuit   16:40:39
17 City's employees from speaking directly with   16:40:41
18 competitors' staffs?                     16:40:44
19   MR. LAHAD:  Vague.                  16:40:46
20   THE WITNESS:  We had training about the   16:40:49
21 appropriateness of sharing data with          16:40:56
22 competitors, yes.                        16:40:59
23 BY MS. LIN:                             16:41:00
24   Q  Was that training with an attorney?    16:41:01
25   A  We had training at the buyer level, that   16:41:04

Page 205

1  dealt with that type of information and then at   16:41:06
2  the store level you would have training, "Look,   16:41:13
3  they are the enemy.  We don't share data and we do   16:41:16
4  not expect them to share data and that is not the   16:41:21
5  way we do business."                    16:41:25
6    Q  Did Circuit City use the results of its   16:41:27
7  competitor monitoring in its price negotiations   16:41:33
8  with the CRT product vendors?                16:41:33
9    MR. LAHAD:  Vague.                  16:41:38
10   THE WITNESS:  No.                   16:41:38
11   THE REPORTER:  Did you say no?         16:41:49
12   THE WITNESS:  I just said yes to him.   16:41:49
13   THE REPORTER:  Because it sounded like a   16:41:50
14 no.                                     16:41:50
15   THE WITNESS:  Yes, we discuss with a    16:41:50
16 vendor that a competitor had a price that we   16:41:54
17 needed to compete with and that we might need   16:41:58
18 a lower cost in order to be able to be          16:42:03
19 competitive.                            16:42:05
20 BY MR. BAVE:                            16:42:05
21   Q  Did Circuit City have any knowledge   16:42:05
22 regarding its competitors' target margins in CRT   16:42:08
23 finished products?                       16:42:11
24   A  Not beyond anything that would have been   16:42:13
25 in a corporate report, and typically, those   16:42:15

52 (Pages 202 - 205)

Page 206

1 margins were rolled up to such a big high level   16:42:19
2 and included things like MDF and so on that you   16:42:23
3 could not tell the kind of detail that you are   16:42:28
4 asking.   16:42:34
5   Q   Where did you obtain the corporate   16:42:34
6 reports from?   16:42:36
7   A   From whatever. Someone releases their   16:42:37
8 annual corporate report, it is a public record.   16:42:40
9   Q   Was it anyone's particular   16:42:43
10 responsibility to review these corporate reports   16:42:44
11 and try to discern the margins?   16:42:48
12   A   Buyers would not review other   16:42:51
13 competitors' reports. Our senior management like   16:42:55
14 the president of the company, and so on, would,   16:43:04
15 obviously, monitor the competition in that way   16:43:07
16 since that is the same sort of thing that he is   16:43:11
17 communicating, but the buyers, no one said, "Let's   16:43:14
18 go look through these reports and try to figure   16:43:19
19 out what the other guy is paying."   16:43:22
20   Q   How did the competitor information that   16:43:23
21 was collected factor into Circuit City's retail   16:43:25
22 price decisions?   16:43:29
23   A   As I said earlier, it could not factor   16:43:31
24 at all or we could choose to react to the price.   16:43:36
25   Way in the majority of the time well   16:43:42

Page 207

1 over 90 percent you are talking about a temporary   16:43:46
2 reaction of a week or less and then we would go   16:43:50
3 back to our pricing.   16:43:55
4   With as many stores as we had managing   16:43:58
5 different prices it was difficult so you tried as   16:44:01
6 much as possible to keep pricing the same.   16:44:06
7   Q   Did the pricing decisions at Circuit   16:44:08
8 City vary by region on its CRT products?   16:44:11
9   A   As we discussed earlier you may have a   16:44:15
10 different set of competition in one market versus   16:44:19
11 the other and one market may be more competitive   16:44:22
12 because of that, so in that aspect, it did vary.   16:44:26
13   Q   And those variations between the regions   16:44:31
14 was usually dictated by the competition in those   16:44:33
15 regions?   16:44:37
16   A   Yes.   16:44:37
17   Q   We have seen certain times where the   16:44:38
18 collection of the competitive information has led   16:44:40
19 to Circuit City lowering its price to be more in   16:44:43
20 line with the competition, correct?   16:44:46
21   A   Correct.   16:44:48
22   MR. LAHAD: Objection, misstates   16:44:49
23 testimony.   16:44:50
24 BY MR. BAVE:   16:44:50
25   Q   Is it also true that if competitive   16:44:50

Page 208

1 intelligence revealed that a competitor was   16:44:52
2 pricing higher on a certain product, Circuit City   16:44:54
3 would raise its price to that level?   16:44:57
4   A   Typically, we might raise our price   16:45:01
5 back. If we had lowered it in reaction to them,   16:45:06
6 and they raised it, then we would go back to the   16:45:09
7 price typically where we were before.   16:45:13
8   So we have that manufacturer's suggested   16:45:18
9 retail price that we are trying to sell the   16:45:21
10 product for, and if the competition has gone back   16:45:23
11 to that price, or higher, then we are going to go   16:45:28
12 back typically to the manufacturer's suggested   16:45:31
13 retail price.   16:45:33
14   (Whereupon, Deposition Exhibit 2846 is marked for   16:45:50
15   Identification.)   16:45:50
16   MR. BAVE:  I am going to hand you what   16:45:50
17 has been marked Exhibit 2846 which is Bates   16:45:51
18 labeled CC 0604919. Let me know when you   16:45:54
19 have had a chance to review that.   16:46:13
20 BY MR. BAVE:   16:46:26
21   Q   This is an email from somebody named   16:46:26
22 Derrick Matilla from November 12, 2007, do you   16:46:28
23 know who Derrick Matilla?   16:46:33
24   A   Yes, but I think it is pronounced   16:46:36
25 Matilla.   16:46:38

Page 209

1   Q   Excuse me. What was his position?   16:46:40
2   A   He was a buyer.   16:46:42
3   Q   In what department?   16:46:42
4   A   In the video or display department.   16:46:44
5   Q   And he is addressing the email to Team.   16:46:47
6 Do you recognize the people in the "to / from" as   16:46:48
7 a part of some team at Circuit City?   16:46:53
8   A   It appears to be the rest of the display   16:46:56
9 team, that same group. This is the other buyers,   16:47:03
10 some of the assistant buyers, some of the product   16:47:10
11 managers, so the rest of the people within the   16:47:13
12 video, the display team.   16:47:17
13   Q   As a senior buyer was Derrick involved   16:47:20
14 in collecting the competitor intelligence that we   16:47:23
15 have discussed today?   16:47:25
16   A   Derrick would have been involved from   16:47:29
17 looking at a competitor's ad or when he is out and   16:47:31
18 about going into the stores, but the   16:47:40
19 over-competitive intelligence that came from the   16:47:46
20 stores would have been more regular than what   16:47:50
21 Derrick would have done. That was not his primary   16:47:55
22 job to go out and find out.   16:47:59
23   Q   But he did receive the reports of the   16:48:01
24 store employees that would go out and get a   16:48:04
25 compilation --   16:48:05

53 (Pages 206 - 209)

Page 210

1    A    Right, so he would be advised of issues    16:48:05
2    where we were not competitive.    16:48:09
3    Q    And his email reads, "that based on    16:48:12
4    competitive intelligence we received last Friday,    16:48:15
5    we have made the decision to change the price of    16:48:17
6    the OLV 247 TFHD that will be featured in    16:48:19
7    Wednesday TV commercial and on the web as a web    16:48:25
8    only deal."    16:48:28
9        Do you see that?    16:48:29
10    A    Yes.    16:48:29
11    Q    And he is recommending that based on    16:48:30
12    that competitive intelligence, they want to raise    16:48:32
13    the price from $999 to $1,999, do you see that?    16:48:35
14    A    Yes.    16:48:40
15    Q    He predicts, "... that this increase in    16:48:41
16    price will not compromise our traffic to our site    16:48:45
17    and will result in additional $500,000 to $700,000    16:48:48
18    in profitability." Do you see that?    16:48:53
19    A    Yes.    16:48:54
20    Q    So based on the competitive intelligence    16:48:55
21    he was able to discern that Circuit City was able    16:48:58
22    to raise its price without damaging its profits,    16:49:01
23    right?    16:49:04
24    A    Yes.    16:49:04
25        MR. BAVE: You can put that document    16:49:08

Page 211

1    aside for now.    16:49:10
2    BY MR. BAVE:    16:49:12
3    Q    Was the competitors' pricing information    16:49:12
4    that was collected an important factor in Circuit    16:49:13
5    City's price center?    16:49:17
6        MR. LAHAD: Vague.    16:49:20
7        THE WITNESS: Only important on a short    16:49:22
8    term market by market store by store type of    16:49:26
9    information.    16:49:29
10        Competitors' advertising pricing was    16:49:31
11    probably more important because of the    16:49:34
12    visibility of it. I hope that answers your    16:49:37
13    question.    16:49:44
14    BY MR. BAVE:    16:49:45
15    Q    We discussed a couple different types of    16:49:45
16    ways that competitive information was collected    16:49:47
17    within Circuit City, right?    16:49:51
18    A    Correct.    16:49:51
19    Q    How was this competitive intelligence    16:49:52
20    shared within the corporate structure of Circuit    16:49:55
21    City?    16:49:58
22        MR. LAHAD: Asked and answered.    16:49:58
23        THE WITNESS: Since the person who is    16:49:59
24    ultimately responsible for the product and    16:50:04
25    the price of the product is the buyer, that    16:50:07

Page 212

1    information will make its way up to the buyer    16:50:12
2    based on the frequency, based on the severity    16:50:17
3    of the difference in grabbing their attention    16:50:26
4    from that viewpoint, but we also had policies    16:50:32
5    as you saw earlier that said, "If you see    16:50:35
6    this, do that."    16:50:38
7    BY MR. BAVE:    16:50:39
8    Q    Was it collected within one database    16:50:40
9    within the company that people could go and see?    16:50:42
10    A    No.    16:50:44
11    Q    Yes? Sorry?    16:50:45
12    A    No. Not for this whole period of time.    16:50:47
13    There was a process for reacting. I hope I have    16:50:53
14    this correct. So we had a system where we    16:50:59
15    downloaded the prices we discussed earlier, Cesar,    16:51:04
16    or an ad system, there were several different    16:51:08
17    names for it.    16:51:11
18        So you could go in and see that data,    16:51:12
19    and say, "We reacted. So we [as clear] as far as    16:51:15
20    reporting goes. You are capturing your reaction,    16:51:24
21    not the actual report."    16:51:27
22        Let me also note that buyers can see    16:51:30
23    what prices their products are being sold at, and    16:51:33
24    if they see an anomaly, they can drill down and    16:51:39
25    find out where that occurred, and then they can go    16:51:43

Page 213

1    in, and ask, "Why is Brandsmart $100 less than    16:51:48
2    everybody? Why is Brandsmart Market $100 less    16:51:54
3    than everybody else is because Brandsmart has this    16:51:57
4    price for $100 below."    16:52:00
5    Q    Today we have discussed competitive    16:52:02
6    shopping as one of the ways Circuit City gathered    16:52:04
7    competitive intelligence, is that right?    16:52:07
8    A    Yes.    16:52:08
9    Q    Did Circuit City have specific    16:52:11
10    guidelines on what to do and what not to do when    16:52:13
11    an employee was shopping at a competitor's store?    16:52:15
12    A    I am not sure exactly what you are    16:52:20
13    asking.    16:52:22
14    Q    You mentioned certain training that the    16:52:24
15    store employees went through. Was a component of    16:52:26
16    that how to handle or how to actually go and do    16:52:30
17    this competitive shopping in the different    16:52:33
18    regions?    16:52:36
19    A    Yes, we did not want to be disruptive in    16:52:36
20    any way, shape or form, and we were not out to    16:52:42
21    sabotage anybody.    16:52:46
22        We were out to get the information with    16:52:47
23    the least amount of interaction that could can get    16:52:50
24    away with.    16:52:57
25        They were specifically told, "Do not    16:52:58

54 (Pages 210 - 213)

Page 214

1  discuss anything that Circuit City does with    16:53:03
2  anybody else or how they run their business." We    16:53:06
3  didn't do that.    16:53:11
4      Q    Were they given a check list of products    16:53:12
5  to go through on certain store visits?    16:53:14
6      A    As you saw in one of the ones where it    16:53:17
7  says, "sign a calendar", they would be given a    16:53:19
8  section of product or a description of product    16:53:25
9  like, "Go shop all the projection televisions. Go    16:53:29
10  shop all the CRT televisions. Go shop a category    16:53:31
11  or class or some subset thereof," and if there was    16:53:36
12  some reason they might say, "The last three weeks    16:53:42
13  in a row this brand has been below a price. Go    16:53:46
14  find out what's going on with that brand with this    16:53:50
15  competitor."    16:53:52
16      Q    During these competitive shops, did    16:53:54
17  Circuit City employees ever purchase a good from a    16:53:57
18  competing store?    16:53:59
19      A    Not as policy. I don't know of any case    16:54:03
20  where they would have.    16:54:10
21      Q    So it was purely an information    16:54:12
22  gathering exercise?    16:54:14
23      A    Yes.    16:54:14
24      Q    In addition to the retail pricing, what    16:54:15
25  other factors were the employees observing when    16:54:17

Page 215

1  they would do these competitive shops?    16:54:20
2      A    You are wanting to know what the    16:54:23
3  customer experience is and you are trying to    16:54:26
4  compare that with the Circuit City experience.    16:54:29
5      For example, you might get as close as    16:54:34
6  saying, "If I buy this, how fast can you deliver    16:54:37
7  it to me?" You would go, "Our delivery is backed    16:54:41
8  up for a week and he can deliver it today, so we    16:54:45
9  are at a disadvantage."    16:54:48
10      You're trying to understand everything    16:54:50
11  that has to do with the customer experience.    16:54:52
12      Do they have the product in stock? Do    16:54:55
13  they want to sell it? Are they doing everything    16:55:00
14  they can to tell you that it is a horrible product    16:55:04
15  or that it is the best thing since sliced bread?    16:55:09
16      What are they trying to sell to go with    16:55:15
17  it and what are they saying about competitors like    16:55:17
18  ourselves?    16:55:23
19      Q    Is one of the things they would check is    16:55:24
20  upcoming promotional activities that the store is    16:55:26
21  going to offer?    16:55:29
22      A    Yes, I can't say that one sells, one    16:55:34
23  person doing a shop might say is it going to go on    16:55:38
24  sale, but that was not our direction.    16:55:41
25      We were not trying to get our    16:55:44

Page 216

1  competitor's ad information before it got public.    16:55:49
2      Q    It would be helpful to know if a    16:55:52
3  competitor is going to be running a coming    16:55:53
4  promotion, correct?    16:55:55
5      A    It would be helpful, but in general    16:55:55
6  that's not the way we did business.    16:56:01
7      Q    In general, are there instances you are    16:56:04
8  aware of where that type of information was    16:56:06
9  obtained on store shops?    16:56:08
10      A    Not in reference to CRT. I was in a    16:56:12
11  store where a customer walked in with a    16:56:17
12  competitor's ad that had not been published yet,    16:56:20
13  and he wanted me to match the price and there's    16:56:24
14  not much I can do about it, he has brought it to    16:56:28
15  me.    16:56:31
16      Q    Some of the promotional activities    16:56:31
17  during certain seasons were released pretty far in    16:56:34
18  advance of the date, for instance, maybe Black    16:56:36
19  Friday, is that right?    16:56:39
20      A    If it's out there on the web, we are out    16:56:41
21  there looking at it. If it is public information,    16:56:42
22  we are doing our business to find out.    16:56:45
23      Q    Because that would allow you to know    16:56:47
24  what your competitors are going to be charging up    16:56:48
25  in upcoming periods?    16:56:50

Page 217

1      A    Correct.    16:56:52
2      Q    That will allow you to react to it    16:56:53
3  better?    16:56:53
4      A    Correct.    16:56:54
5      Q    Did Circuit City employees ever collect    16:56:56
6  information that was not readily ascertainable in    16:57:00
7  walking around the store?    16:57:02
8      MR. LAHAD: Asked and answered.    16:57:04
9      THE WITNESS: By posing as customers    16:57:06
10  they might get additional information, yes.    16:57:10
11  BY MR. BAVE:    16:57:12
12      Q    They would do that by having discussions    16:57:13
13  with the competitors' source sales staff?    16:57:15
14      A    I would not call it discussions. They    16:57:17
15  would go in and say, "I am looking for a    16:57:20
16  television," and role play the customers.    16:57:23
17      Q    And they were not going in representing    16:57:27
18  that they are from Circuit City. They would go in    16:57:29
19  and act --    16:57:30
20      A    No.    16:57:30
21      Q    -- as a person off the street?    16:57:31
22      A    No. Sorry interrupt you. No.    16:57:31
23      Q    They would remove their Circuit City    16:57:37
24  uniforms so they would look like a person walking    16:57:39
25  in off the street?    16:57:43

55 (Pages 214 - 217)

Page 218

1   A   Yes.                                          16:57:43
2   Q   Was the inventory level that a               16:57:46
3   competitor's store had readily ascertainable when   16:57:47
4   walking in to the retail store?                  16:57:51
5       MR. LAHAD:  Say that again.                  16:57:54
6       THE WITNESS:  It depends on the              16:57:55
7   retailer.  If they have stocked their product    16:57:57
8   on the floor, then it is.  If they have a        16:58:01
9   hidden warehouse, it is not.                     16:58:04
10  BY MR. BAVE:                                      16:58:06
11  Q   When they were walking around the            16:58:07
12  stores, how would they record the information that   16:58:08
13  they were recording on?                          16:58:10
14      MR. LAHAD:  Vague.                           16:58:13
15      THE WITNESS:  There were lots of             16:58:15
16  different tactics.  People would talk to         16:58:15
17  themselves, and end up having a recorder in      16:58:19
18  their pocket.                                    16:58:23
19      Some people would call their own             16:58:24
20  answering machine and talk to themselves,        16:58:27
21  but the amount of pricing that we were           16:58:29
22  shopping was generally limited enough that       16:58:33
23  all you were doing was looking for               16:58:36
24  exceptions.                                      16:58:38
25      For example, I would go in and shop for      16:58:41

Page 219

1   competition and I would walk out, and as         16:58:44
2   soon as I walked out, I would write down the     16:58:46
3   four exceptions that I found because you         16:58:50
4   would have very few in general.                  16:58:52
5   BY MR. BAVE:                                      16:58:55
6   Q   In instances where employees were using      16:58:55
7   recording devices, were those provided by Circuit   16:58:58
8   City?                                            16:59:01
9   A   I don't know.                                16:59:04
10  Q   Did Circuit City keep the recordings         16:59:06
11  that these employees made during their competitive   16:59:09
12  store visits?                                    16:59:13
13  A   No.  No, this would have been an             16:59:14
14  individual deciding that that was the way that   16:59:18
15  made it easier for themselves.                   16:59:19
16  (Whereupon, Deposition Exhibit 2847 is marked for   16:59:22
17  Identification.)                                 16:59:22
18      MR. BAVE:  Let me mark one more quickly.     16:59:22
19  I am handing you what has been marked as         16:59:46
20  Exhibit 2847 which is Bates No. CC 0397160.      16:59:46
21      THE WITNESS:  How much of this do you        17:00:54
22  need me to read?                                 17:00:55
23      MR. BAVE:  I will direct you to specific     17:00:56
24  portions.  Let me know when you are              17:00:57
25  familiarized overall.                            17:01:00

Page 220

1   BY MR. BAVE:                                      17:01:01
2   Q   You mentioned earlier memos on the          17:01:01
3   competitive shops, right?                        17:01:04
4   A   Yes.                                         17:01:04
5   Q   Does this follow the format of              17:01:05
6   competitive shop reports that you have seen?     17:01:08
7   A   No, because this is a buyer or an           17:01:10
8   assistant buyer or somebody in the corporate team   17:01:15
9   reporting back to a buyer.                       17:01:19
10      This is, yes, it's a type of shopping       17:01:24
11  report, but it is not the most common kind.      17:01:33
12      This is a market visit where because you    17:01:36
13  would only do a market visit like this because the   17:01:40
14  sales in that market were doing poorly.          17:01:44
15      Because the sales were doing poorly they    17:01:47
16  sent this group of people and it is almost always   17:01:50
17  that case, they sent this group of people in to   17:01:55
18  find out what the heck is going on.              17:01:55
19  Q   Under the Best Buy heading on the first     17:01:59
20  page there under subsection one pricing, they are   17:02:02
21  writing about asking an associate to check on the   17:02:05
22  inventory of an item, do you see that?           17:02:08
23  A   Yes.                                         17:02:13
24  Q   So that indicates that the employees        17:02:14
25  (sic) asked the employee to go back and check on   17:02:15

Page 221

1   the inventory?                                   17:02:18
2   A   Yes.                                         17:02:19
3       MR. LAHAD:  Calls for speculation, lacks    17:02:20
4   foundation.                                      17:02:23
5   BY MR. BAVE:                                      17:02:23
6   Q   Did you say "yes," sir?                      17:02:23
7   A   Yes.                                         17:02:24
8   Q   Have you ever heard of a market reaction    17:02:25
9   report in association with Best Buy?             17:02:31
10  A   I have not heard it specifically for        17:02:35
11  Best Buy.  It is sort of a common term.          17:02:38
12  Q   What does the term mean to you?             17:02:41
13  A   It means that it sounds like it means       17:02:43
14  that it is their version of what we call CTC or   17:02:48
15  our reaction.                                    17:02:52
16  Q   Would Circuit City in the normal course    17:02:52
17  of business have access to Best Buy's market     17:02:57
18  reaction report?                                 17:03:00
19  A   No.                                          17:03:00
20  Q   So that in this instance they were able    17:03:01
21  view it because they asked the sales clerk to go   17:03:03
22  in the back and check on inventory?             17:03:04
23      MR. LAHAD:  Misstates previous              17:03:08
24  testimony, lacks foundation, calls for           17:03:10
25  speculation.                                     17:03:12

56 (Pages 218 - 221)

Page 222

1    THE WITNESS: And I would just be    17:03:14
2  speculating. I believe that --    17:03:19
3    MR. ROSS: If you are speculating, don't    17:03:24
4  testify, but if you know about it, then you    17:03:25
5  can testify about it.    17:03:25
6    THE WITNESS: No.    17:03:26
7  BY MR. BAVE:    17:03:26
8    Q   This information about how Best Buy    17:03:27
9  conducted its shops that is contained in this    17:03:29
10 report, would be helpful information to    17:03:31
11 Circuit City, correct?    17:03:34
12    A   It could be, yes.    17:03:36
13    Q   If you would turn to the next page under    17:03:38
14 "Incredible Universe" have you ever heard of    17:03:44
15 Incredible Universe?    17:03:46
16    A   Yes.    17:03:48
17    Q   What is Incredible Universe?    17:03:48
18    A   Incredible Universe was a division of    17:03:49
19 Radio Shack Stores that were their super stores    17:03:53
20 basically. They were larger than Circuit City    17:03:57
21 Stores. They were approximately the size of    17:04:00
22 Brandsmart Stores.    17:04:02
23    Q   What is your understanding of the first    17:04:03
24 bullet there under "Pricing" what is going on?    17:04:05
25    A   My understanding would be that they    17:04:36

Page 223

1  represented that they had been to the Best Buy and    17:04:39
2  that they had seen this price on a 31 inch GE, and    17:04:42
3  would Incredible Universe match it, and they said    17:04:47
4  that they would, but since they were not able to    17:04:52
5  verify that Best Buy actually had them in    17:04:56
6  inventory, they did not match it.    17:04:58
7    Q   Was it normal during the course of the    17:05:00
8  competitive shop that you test another    17:05:03
9  competitor's price match policies?    17:05:06
10    A   You would want to understand, and this    17:05:08
11 is very intense type of shopping. When you say    17:05:10
12 "normal" this is extraordinary.    17:05:15
13    Because you have got to put together a    17:05:21
14 group of merchants and send them out to a market    17:05:24
15 to understand what's going on in the market and    17:05:29
16 understanding how the competition reacts and how    17:05:32
17 they drop price or anything that they do that we    17:05:41
18 don't know that they are doing it would be    17:05:44
19 important.    17:05:46
20    Q   Was it extraordinary to ask competitors    17:05:47
21 to go check inventory?    17:05:50
22    MR. LAHAD: Misstates the testimony.    17:05:53
23    THE WITNESS: It wouldn't be    17:05:55
24 extraordinary to ask them to check inventory    17:05:57
25 because if you are a customer and you wanted    17:05:59

Page 224

1  to buy the product you would also want to    17:06:03
2  know if they have it in stock, so as    17:06:05
3  testified earlier, knowing in stock levels it    17:06:08
4  is to a degree it is publicly available which    17:06:12
5  is, "Can I buy this?" is important, yes, I    17:06:18
6  mean, it is helpful.    17:06:21
7  BY MR. BAVE:    17:06:22
8    Q   How often did Circuit City run these    17:06:22
9  more intense competitive shops with its    17:06:25
10 merchandising team?    17:06:28
11    A   You could go and be somewhat random, but    17:06:31
12 you can go for a very long period of time. You    17:06:37
13 may not have any in a year or you may have based    17:06:39
14 on business, say, "We are going to send out two or    17:06:45
15 three teams to four or five markets this week."    17:06:48
16    There was no rhyme or reason. Some of    17:06:54
17 it had to do with workload and did you have the    17:06:56
18 time and the resources to deploy it this way.    17:07:00
19    Q   I just want to touch the low price    17:07:04
20 guaranty that we discussed a little bit earlier    17:07:07
21 today.    17:07:09
22    MR. LAHAD: Before you get there, can we    17:07:09
23 take a break or do you have a lot left?    17:07:11
24    MR. BAVE: Just a few more questions and    17:07:16
25 then I will be done if you want to wait. If    17:07:16

Page 225

1  you can wait, sir?    17:07:17
2    THE WITNESS: I can wait.    17:07:18
3  BY MR. BAVE:    17:07:21
4    Q   Before Circuit City would agree to match    17:07:21
5  a price, they have to verify their competitor's    17:07:26
6  price, correct, under the low price guaranty?    17:07:30
7    A   Yes, the low-price guaranty specifically    17:07:33
8  talked about an advertised price so the competitor    17:07:37
9  advertised the price we would do it.    17:07:42
10    That part was easy to verify and if we    17:07:46
11 were matching a price because we were selling the    17:07:50
12 product, then you look for other ways to try to    17:07:54
13 verify the price.    17:08:00
14    Q   It also would verify that the competitor    17:08:01
15 had the item in stock before you matched the    17:08:03
16 price, is that right?    17:08:06
17    A   Yes, and that is tough because you are a    17:08:06
18 person who is doing the confirmation if they are    17:08:15
19 talking about reaction type of time.    17:08:23
20    You have got a customer standing there,    17:08:25
21 so there's only so much you can do. Maybe the    17:08:28
22 customer gives you card that says that they have    17:08:31
23 got a quote on this product.    17:08:33
24    You can call the competitor, and say, "I    17:08:36
25 am interested in so and so and can I buy it?"    17:08:40

57 (Pages 222 - 225)

Page 226

1   Whether you got truthful information or   17:08:45
2   not it is tough.   17:08:50
3   Once you're able to go out online and   17:08:53
4   find out whether the customer had the product   17:08:55
5   because you could buy it through the Internet that   17:08:58
6   was very different.   17:09:02
7   Q   So one of the ways Circuit City would   17:09:04
8   verify a competitor's price was to pick up the   17:09:06
9   phone and call that competitor to get the price?   17:09:09
10   A   Again, acting as a customer saying,   17:09:12
11   "Look, I was in earlier, and I saw this on sale   17:09:17
12   for so and so, is it still on sale?" They might   17:09:22
13   say, "I don't know. We are busy. Come see for   17:09:26
14   yourself." They might say, "Give me a minute and   17:09:30
15   I will go find out," and so on.   17:09:33
16   Q   Was it necessary to act as a potential   17:09:35
17   customer because the competitor would not give the   17:09:38
18   information if it was circuit identified as the   17:09:40
19   caller?   17:09:43
20   MR. LAHAD:  Calls for speculation.   17:09:46
21   THE WITNESS:  Right. We would never   17:09:47
22   identify ourselves as Circuit City "and I   17:09:48
23   want to know your price." That was not our   17:09:51
24   policy practice. Just not the way you do   17:09:53
25   business.   17:09:55

Page 227

1   MR. BAVE:  Thank you. Those are all the   17:09:58
2   questions I have.   17:09:58
3   THE VIDEOGRAPHER:  The time is   17:10:01
4   approximately 5:10. We are off the record.   17:10:03
5   (On resuming after a short recess.)   17:14:45
6   THE VIDEOGRAPHER:  The time is   17:14:45
7   approximately 5:14 p.m. We are back on   17:14:46
8   record.   17:14:50
9   MS. ARGUELLO:  Hi, Mr. Deason.   17:14:51
10   THE WITNESS:  Hi.   17:14:51
11   MS. ARGUELLO:  My name is Sofia   17:14:54
12   Arguello. I work for the law firm Winston &   17:14:54
13   Strawn and we represent the Panasonic   17:14:56
14   defendants in this litigation.   17:14:59
15   EXAMINATION BY MS. ARGUELLO:   17:15:00
16   Q   I just have a few more questions for   17:15:00
17   you. We mentioned earlier that Circuit City had   17:15:02
18   promotional programs with many of its vendors.   17:15:07
19   Do you recall whether it had any   17:15:10
20   promotional programs with Panasonic North America?   17:15:11
21   A   When you saw promotional programs, are   17:15:16
22   you talking about MDF funds?   17:15:17
23   Q   I am talking about MDF funds or volume   17:15:19
24   rebates, or promotional allowances, any of the   17:15:23
25   programs that we discussed earlier today?   17:15:27

Page 228

1   A   Yes.   17:15:29
2   Q   Did the type of rebates differ by   17:15:30
3   vendor, so for example, did the volume rebates   17:15:37
4   that Panasonic North America offered differ from   17:15:42
5   those offered by other vendors?   17:15:46
6   A   In what way?   17:15:47
7   Q   For example, did Panasonic North America   17:15:49
8   offer a higher percentage of rebate or cash back   17:15:54
9   or cash discounts for certain things as opposed to   17:16:02
10   other vendors?   No   17:16:06
11   MR. LAHAD:  Compound and vague.   17:16:08
12   THE WITNESS:  I am aware of them   17:16:09
13   being materially different from other types   17:16:11
14   of programs that we dealt with because every   17:16:14
15   one of these were singular type of activities   17:16:19
16   for the most part.   17:16:23
17   When you are talking about a sell   17:16:24
18   through they could vary from the same   17:16:25
19   supplier based on whatever factors they are   17:16:33
20   using.   17:16:35
21   BY MS. ARGUELLO:   17:16:36
22   Q   Were these programs subject to   17:16:38
23   negotiation with Panasonic North America?   17:16:43
24   A   Yes.   17:16:46
25   Q   Was the negotiation on a model by model   17:16:47

Page 229

1   basis?   17:16:50
2   A   It could be model by model, but it could   17:16:52
3   be program, meaning, "I will buy five televisions   17:16:56
4   from you," so it is based on all of that.   17:16:59
5   It could be based at a senior level that   17:17:02
6   the buyer wouldn't be involved in which would be   17:17:06
7   cumulative of all the various departments buying   17:17:11
8   from a particular vendor.   17:17:13
9   Q   Do you recall whether any vendor was   17:17:15
10   more competitive in terms of, for example, volume   17:17:18
11   rebates?   17:17:23
12   MR. LAHAD:  Vague.   17:17:24
13   THE WITNESS:  I do not remember one   17:17:25
14   competitor being more, no.   17:17:27
15   BY MS. ARGUELLO:   17:17:31
16   Q   In your negotiations with Panasonic   17:17:34
17   North America, did Circuit City mention the   17:17:38
18   non-price terms of other vendors?   17:17:40
19   A   We would always refer to whether they   17:17:46
20   were competitive. We might say, "You are not   17:17:53
21   giving us as much ad money as I am getting from   17:17:59
22   others." It wouldn't be specific, but it might be   17:18:03
23   relative.   17:18:13
24   They would see the results of that   17:18:15
25   because they might -- these type of conversations   17:18:17

58 (Pages 226 - 229)

Page 230

1  would happen like, "Hey, you're advertising   17:18:22
2  Samsung all the time and you are not advertising   17:18:25
3  Panasonic. Why?" Well, it's, "They give us more   17:18:28
4  ad money."   17:18:30
5    Q   Would Circuit City ever ask Panasonic   17:18:32
6  North America to match the non-price terms of   17:18:36
7  other vendors?   17:18:39
8    A   In that same sort of way, they would   17:18:43
9  say, "We would like you to give us X amount of   17:18:46
10 percentage," and that would make you competitive.   17:18:53
11     The reason I am hesitating is because we   17:18:59
12 are not going to tell them what the otherwise guys   17:19:02
13 are doing.   17:19:03
14     Not in non-disclosure agreements. We   17:19:09
15 are not going to say, "The other guy has given me   17:19:10
16 $2 million. You got to give me $2 million as the   17:19:12
17 way we train our buyers." Just, again, that is   17:19:16
18 not the normal way we do business.   17:19:20
19    Q   Would it be fair to say that you would   17:19:24
20 communicate that other vendors are offering more   17:19:26
21 competitive rebates as opposed to giving out   17:19:30
22 specific percentage?   17:19:33
23    A   Yes.   17:19:33
24    Q   In your experience, how often would   17:19:34
25 Panasonic North America's non-price terms change   17:19:40

Page 231

1  over time?   17:19:44
2     MR. LAHAD:  To be clear.  When you say   17:19:46
3  "price," you mean price or costs as we have   17:19:47
4  been using it today?   17:19:51
5     MS. ARGUELLO:  I am saying procurement   17:19:52
6  costs, but I was saying pricing from   17:19:54
7  Panasonic North America, so we can go either   17:19:56
8  way.   17:19:59
9     Let me say procurement costs to keep   17:19:59
10 consistent with earlier.   17:20:01
11     MR. ROSS:  That is the way we have been   17:20:02
12 doing it for seven hours.   17:20:03
13     THE WITNESS:  Can you restate it?   17:20:04
14 BY MS. ARGUELLO:   17:20:05
15    Q   Yes.  How often did Panasonic North   17:20:05
16 America's non-cost terms change over time?   17:20:09
17    A   Typically, you had an overall program   17:20:17
18 that would last for a year, and again, they would   17:20:21
19 be reviewed at about a six month break based on   17:20:25
20 sell through, but it is constant from a viewpoint   17:20:31
21 again of if something is not selling, then it   17:20:35
22 would be common for Panasonic or any other vendor   17:20:41
23 to do some sort of reaction and that would end up   17:20:45
24 being ad money, sales money, that sort of thing.   17:20:50
25     I can't give you a number or I don't   17:20:55

Page 232

1  know how to answer the frequency.   17:21:01
2    Q   No, that was helpful.   17:21:03
3    A   But it is a standard part of the   17:21:04
4  business that during the life cycle of a product,   17:21:06
5  if it is not selling that there may be a reaction.   17:21:12
6    Q   Would Circuit City in these instances go   17:21:14
7  to a vendor like Panasonic North America, and tell   17:21:19
8  them, "Your product is not selling, so we should   17:21:22
9  renegotiate are non-cost terms?"   17:21:24
10    A   Yes.  The early part of this period -   17:21:29
11 the very early part of this period - my   17:21:33
12 understanding was that the vendors could not see   17:21:36
13 our sales data, but for the majority of this   17:21:42
14 period they could.   17:21:45
15     So we did not even have to tell them   17:21:46
16 what the sales were.  They knew the sales were not   17:21:48
17 good.   17:21:51
18    Q   Do you know what Circuit City's profit   17:21:55
19 margins were on finished products purchased from   17:21:58
20 Panasonic North America?   17:22:01
21    A   No.   17:22:02
22    Q   Did Circuit City control which models it   17:22:03
23 wanted to have the MDF funds applied to?   17:22:10
24     MR. LAHAD:  Vague.   17:22:15
25     THE WITNESS:  I don't know what you mean   17:22:18

Page 233

1  by applied to.   17:22:19
2  BY MS. ARGUELLO:   17:22:20
3    Q   When Circuit City negotiated for an MDF   17:22:20
4  fund with a vendor, did it specify on what   17:22:24
5  specific product it was going to spend that MDF   17:22:30
6  fund?   17:22:33
7    A   They could.  They wouldn't necessarily.   17:22:34
8    Q   In the cases where they would not   17:22:41
9  specify what product, would they just generally   17:22:44
10 just ask for an MDF fund?   17:22:45
11    A   Yes.   17:22:49
12    Q   Did Circuit City ever resist Panasonic   17:22:49
13 North America's price proposals and insist on a   17:22:56
14 lower price per specific models?   17:22:59
15    A   As I discussed earlier, we would   17:23:02
16 certainly insist that if they did not do it that   17:23:08
17 we would not buy the product anymore, but we   17:23:12
18 cannot physically make you do it.   17:23:14
19    Q   Did Circuit City have established price   17:23:22
20 points for purchasing models which it would tell   17:23:25
21 Panasonic North America it had to meet in order   17:23:28
22 for Panasonic North America to get the business?   17:23:30
23     MR. LAHAD:  Vague.   17:23:34
24     THE WITNESS:  Price points meaning what?   17:23:35
25 BY MS. ARGUELLO:   17:23:38

59 (Pages 230 - 233)

Page 234

1    Q   For example, did Circuit City ever say,    17:23:38
2   "You have to meet a price point of $100 or you    17:23:39
3   will not get this business?"    17:23:46
4       MR. LAHAD: Are you talking price point.    17:23:48
5   Cost?    17:23:49
6       THE WITNESS: (No response.)    17:23:49
7   BY MR. ROSS:    17:23:49
8    Q   Did Circuit City ever tell Panasonic    17:23:53
9   North America, "You have to meet a particular cost    17:23:56
10   point," for example, "$100, or you will not get    17:24:01
11   this business?"    17:24:04
12   A   Yes.    17:24:05
13    Q   As a general matter, when Circuit City's    17:24:15
14   procurement costs for a given Circuit City product    17:24:18
15   changed, did Circuit City change the price of the    17:24:23
16   CRT product accordingly to its customers?    17:24:24
17       MR. LAHAD: Asked and answered.    17:24:29
18       THE WITNESS: To re-answer it. We may    17:24:31
19   or may not.    17:24:34
20   BY MS. ARGUELLO:    17:24:37
21    Q   In what circumstances would you do that?    17:24:38
22       MR. LAHAD: This is asked and answered    17:24:43
23   as well.    17:24:44
24       THE WITNESS: Right. Based on    17:24:44
25   competitive environment.    17:24:47

Page 235

1   BY MS. ARGUELLO:    17:24:50
2    Q   In your experience, what is generally    17:24:51
3   the scale of a cost decrease?    17:25:03
4       MR. LAHAD: Vague.    17:25:08
5   BY MS. ARGUELLO:    17:25:09
6    Q   Of a cost decrease in a CRT finished    17:25:09
7   product?  Are they relatively small like by a    17:25:13
8   dollar or are they larger?    17:25:17
9       MR. GRALEWSKI: Objection, form.    17:25:21
10       THE WITNESS: I don't know that I could    17:25:24
11   generalize beyond generally we are not    17:25:29
12   dealing with a dollar because of all of the    17:25:34
13   work involved.    17:25:37
14       MR. LAHAD: Sorry, you said "aren't    17:25:39
15   dealing with a dollar?"    17:25:40
16       THE WITNESS: We are not dealing with    17:25:41
17   something that small because it is a lot of    17:25:42
18   work to do for a dollar, but it could happen    17:25:45
19   and it does happen.    17:25:51
20   BY MS. ARGUELLO:    17:25:53
21    Q   You said earlier that sometimes Circuit    17:25:53
22   City could increase the price of the finished    17:26:10
23   product to the customer by the increase in the    17:26:14
24   procurement costs, but it generally depended on    17:26:17
25   competitive circumstance, is that correct?    17:26:17

Page 236

1   A   Yes.    17:26:22
2    Q   Were there any other factors other than    17:26:26
3   competitive circumstances?    17:26:30
4   A   The manufacturers' suggested retail    17:26:31
5   price would be another factor. Again, whether we    17:26:34
6   had inventory excess or shortage, would be the    17:26:39
7   other factor.    17:26:44
8    Q   To the extent you could implement those    17:26:51
9   cost increases into your price increases, would    17:26:54
10   there generally be a lag between the change and    17:27:00
11   procurement costs and the change in retail price?    17:27:02
12       MR. LAHAD: Vague.    17:27:05
13       THE WITNESS: I am confused. Can you    17:27:07
14   ask me that again?  I am sorry.    17:27:20
15   BY MS. ARGUELLO:    17:27:21
16    Q   In the circumstances where an increase    17:27:22
17   in procurement costs was able to translate into an    17:27:26
18   increase in retail price, was there a lag between    17:27:29
19   those two increases or did it happen    17:27:33
20   simultaneously?    17:27:37
21       MR. LAHAD: Same objection.    17:27:38
22       THE WITNESS: It could be either way.    17:27:40
23   BY MS. ARGUELLO:    17:27:41
24    Q   In which cases would you be able to do    17:27:56
25   it simultaneously? Can you think of any examples?    17:27:59

Page 237

1   A   If we were told that manufacturers'    17:28:02
2   suggested retail price was going down by $50, and    17:28:06
3   that the cost was going down by $75, we would key    17:28:09
4   that in, and say, "Let's do this instantly," and    17:28:14
5   it happened to match our standard downloads for    17:28:19
6   the stores, so it wasn't two days before the next    17:28:24
7   download, or one day after, or something like    17:28:31
8   this.    17:28:34
9       It had to match the period that we    17:28:35
10   downloaded.  We did not always download every day.    17:28:38
11    Q   If price changes were to be implemented,    17:28:51
12   what steps were taken by Circuit City?    17:28:53
13   A   If price changes were to be made?    17:28:58
14   Q   Correct.    17:29:01
15   A   The steps are to download it in our    17:29:01
16   system so that it shows up and gets communicated    17:29:08
17   to the stores, and again, they have set tagging    17:29:11
18   days, or set times to tag, so you want to try to    17:29:15
19   stay with that cycle so that you do not have a    17:29:19
20   price that is not tagged properly, and other than    17:29:22
21   that, I do not know what other types of steps you    17:29:27
22   are talking about.    17:29:30
23    Q   Was it the same across all retail stores    17:29:32
24   if you did implement a price change?    17:29:36
25   A   We had the ability to download it for    17:29:38

60 (Pages 234 - 237)

Page 238

1  everybody if we wanted to or to download it for    17:29:41
2  one person if we wanted to.    17:29:44
3  Q  How were stores notified of the price    17:29:46
4  change?    17:29:49
5  A  They knew that on a standard day that    17:29:49
6  they would get a new PSB and that they need to go    17:29:52
7  price to that PSB.    17:29:56
8  Q  Would the same price change have been    17:30:00
9  made online?    17:30:02
10  A  It could be and it could not be.    17:30:03
11  MS. ARGUELLO: I have no further    17:30:10
12  questions.    17:30:11
13  MR. ROSS: Any other defendants on the    17:30:13
14  phone?    17:30:14
15  MR. ROBERTS: Yes, this is John Roberts,    17:30:16
16  the Thomson defendant.    17:30:16
17  EXAMINATION BY MR. ROBERTS    17:30:20
18  Q  I just have a couple quick questions.    17:30:20
19  Thank you, Mr. Deason. When did Circuit City    17:30:22
20  discover the existence of the alleged price    17:30:26
21  conspiracy in the CRT industry that is the subject    17:30:29
22  of its complaint in this case?    17:30:31
23  A  I do not know.    17:30:33
24  MR. ROBERTS: I would ask my colleague,    17:30:38
25  Ms. Lin, if she could hand the witness the    17:30:38

Page 239

1  exhibit that I asked her to bring, I would    17:30:42
2  really appreciate that, and to mark it as the    17:30:45
3  next exhibit.    17:30:47
4  (Whereupon, Deposition Exhibit 2849 is marked for    17:30:47
5  Identification.)    17:30:47
6  MS. LIN: I will hand the witness a    17:30:51
7  document marked Exhibit 2849.    17:30:51
8  THE WITNESS: Can I ask who this    17:30:58
9  gentleman represents?    17:30:59
10  MS. LIN: He represents Thomson.    17:31:02
11  THE WITNESS: Thomson, okay. Thank    17:31:03
12  you.    17:31:03
13  MR. GAWLEY: This is Michael Gawley    17:31:03
14  from Kirkland. What is the Bates stamp on    17:31:03
15  that exhibit?    17:31:08
16  MS. LIN: It is the Thomson complaint,    17:31:11
17  the Circuit City complaint against Thomson    17:31:12
18  and Mitsubishi. It doesn't have a Bates.    17:31:15
19  MR. GAWLEY: Thank you.    17:31:18
20  BY MR. ROBERTS:    17:31:19
21  Q  As has been represented to you, this is    17:31:26
22  the complaint that Circuit City filed against the    17:31:28
23  Thomson defendants in November 2013. If you could    17:31:30
24  please turn to paragraph 240 in that exhibit.    17:31:34
25  MR. ROSS: He is not going to answer any    17:31:58

Page 240

1  questions on 240. It is beyond the scope.    17:31:58
2  MR. LAHAD: Yes.    17:32:00
3  MR. ROSS: Next.    17:32:00
4  MR. LAHAD: And maybe on the same R-240,    17:32:02
5  is starts with Circuit City's claims were    17:32:03
6  told at American Pipe. Is that what your 240    17:32:04
7  is?    17:32:08
8  MR. ROBERTS: I am not asking about    17:32:08
9  American Pipe, sir.    17:32:09
10  BY MR. ROBERTS:    17:32:10
11  Q  If you will see, sir, in paragraph 240,    17:32:10
12  it states that claims were filed in this action in    17:32:15
13  November 2007. Do you see that first entry there?    17:32:20
14  THE WITNESS: Do you want me to answer?    17:32:25
15  MR. ROSS: No, it is beyond the scope.    17:32:29
16  Sorry. He is not a personal witness today.    17:32:30
17  He is a 30(b)(6). It is not within the    17:32:32
18  scope.    17:32:33
19  MR. ROBERTS: I am asking him questions    17:32:34
20  within the subject of Topic 20.    17:32:36
21  MR. ROSS: No. I had conversations with    17:32:44
22  Ms. Lin about this. You could talk about    17:32:46
23  width, when it was at Circuit City, but we    17:32:48
24  are not talking about anything after that.    17:32:51
25  If you want to ask him what he knew    17:32:54

Page 241

1  when he was at Circuit City about any kind    17:32:55
2  of suspicions or knowledge of a conspiracy,    17:32:58
3  as we say that in our complaint, you can go    17:33:03
4  ahead, otherwise it is beyond the scope.    17:33:06
5  MR. ROBERTS: I will represent to you,    17:33:10
6  sir, that the first complaints in this action    17:33:12
7  were filed in November 2007.    17:33:14
8  BY MR. ROBERTS:    17:33:18
9  Q  Immediately after those complaints were    17:33:18
10  filed, what action did Circuit City take to    17:33:21
11  discover if it had any claims against the Thomson    17:33:24
12  defendants?    17:33:28
13  MR. ROSS: Beyond the scope.    17:33:28
14  MR. ROBERTS: Sorry, was there an    17:33:29
15  objection? I could not hear it.    17:33:29
16  MR. ROSS: I am instructing him not to    17:33:33
17  answer. It is beyond the scope.    17:33:44
18  BY MR. ROBERTS:    17:33:46
19  Q  When did Circuit City first suspect that    17:33:56
20  the Thomson defendants were participants in the    17:33:59
21  alleged conspiracy?    17:34:02
22  MR. ROSS: Same instruction.    17:34:05
23  MR. ROBERTS: Sir, this is squarely    17:34:14
24  within Topic 20, as to when they first    17:34:15
25  suspected the existence of the alleged    17:34:18

61 (Pages 238 - 241)

Page 242

1  conspiracy. I don't understand why you are  17:34:21
2  objecting.  17:34:22
3      MR. ROSS: You were not part of the  17:34:22
4  negotiations of the topics and my discussions  17:34:24
5  with Ms. Lin, sorry.  17:34:25
6      We are not going beyond those  17:34:29
7  discussions. The discussions were that the  17:34:32
8  witness could testify as to any knowledge  17:34:33
9  that he or Circuit City had prior to the  17:34:37
10  liquidation while he was there and he has  17:34:41
11  answered that today and the answer was none.  17:34:46
12  Anything after that is beyond the scope.  17:34:49
13 BY MR. ROBERTS:  17:34:58
14  Q  Before November 2007, did Circuit City  17:34:59
15 conduct any investigations regarding the existence  17:35:02
16 of the alleged antitrust conspiracy?  17:35:07
17      MR. LAHAD: Asked and answered.  17:35:10
18      MR. ROSS: That, you can answer.  17:35:13
19      MR. LAHAD: You can answer that.  17:35:14
20      THE WITNESS: I don't know.  17:35:14
21 BY MR. ROBERTS:  17:35:16
22  Q  You don't know? Could you please turn  17:35:16
23 to paragraph 214 in the complaint that is in front  17:35:19
24 of you.  17:35:23
25      The first sentence in paragraph 214  17:35:39

Page 243

1  states, "Over the course of the relevant period,  17:35:41
2  the price of CRTs remains stable and in some  17:35:44
3  instances went up in an unexplained manner despite  17:35:46
4  the national trends in those technology products  17:35:49
5  to go down over time."  17:35:51
6      Did I read that correctly, sir?  17:35:54
7  A  I read it the same as you read it.  17:35:56
8  Q  But during the relevant period, did  17:36:00
9  Circuit City conduct investigations as to why  17:36:04
10 prices of CRTs seemed to be remaining stable  17:36:07
11 instead of going down as somewhat expected?  17:36:11
12      MR. ROSS: I instruct you not to answer.  17:36:14
13 Beyond the scope.  17:36:15
14 BY MR. ROBERTS:  17:36:34
15  Q  During the relevant period, did Circuit  17:36:35
16 City monitor the prices of CRTs as opposed to CRT  17:36:42
17 products?  17:36:47
18      MR. ROSS: I think that is beyond the  17:36:49
19 scope, but I will let him answer.  17:36:50
20      THE WITNESS: I would not know how or  17:36:52
21 why they would.  17:36:55
22 BY MR. ROBERTS:  17:36:56
23  Q  Is that answer no, sir?  17:36:57
24  A  No. The answer is no.  17:37:03
25  Q  Why didn't Circuit City conduct such an  17:37:11

Page 244

1  investigation of CRT product prices?  17:37:14
2      MR. LAHAD: Asked and answered.  17:37:19
3      THE WITNESS: (No response.)  17:37:20
4 BY MR. ROBERTS:  17:37:20
5  Q  You can answer, sir.  17:37:29
6  A  I haven't seen anything that would make  17:37:32
7 me believe that they had enough information to  17:37:35
8 warrant an investigation.  17:37:39
9  Q  If you will look quickly, again, at  17:37:47
10 Exhibit 2840. This was the exhibit that Ms. Lin  17:37:51
11 was showing you earlier today.  17:37:53
12      MR. LAHAD: Sorry, which exhibit?  17:37:58
13      MR. ROBERTS: 2840.  17:38:01
14 BY MR. ROBERTS:  17:38:02
15  Q  This is the exhibit that you may recall  17:38:28
16 you testified was a document that Circuit City  17:38:30
17 prepared in advance of discussions with  17:38:33
18 representatives of the Thomson defendants, is that  17:38:35
19 correct?  17:38:38
20  A  Yes, is in preparation for a meeting  17:38:40
21 with Thomson personnel.  17:38:44
22  Q  Looking again at the second page, the  17:38:47
23 second major bullet points, it states, "Thomson is  17:38:49
24 pricing products of similar quality and features  17:39:00
25 to other competitors and prices that are below  17:39:05

Page 245

1 those other competitors and reducing the profits  17:39:09
2 of retailers," is it your understanding that this  17:39:14
3 practice of Thomson was reducing the profits of  17:39:18
4 Circuit City?  17:39:22
5      MR. LAHAD: Objection, misquotes and  17:39:25
6 misstates the document.  17:39:27
7      MR. GRALEWSKI: Objection, form.  17:39:29
8      THE WITNESS: Now that the objections  17:39:32
9 have been done, I forgot what you asked. I  17:39:38
10 am sorry.  17:39:41
11      MR. ROBERTS: That's okay. Maybe my  17:39:42
12 question was unclear.  17:39:43
13 BY MR. ROBERTS:  17:39:46
14  Q  Was it your understanding that Thomson's  17:39:46
15 practice of pricing its products below those of  17:39:48
16 other similar competitors were pricing was  17:39:53
17 reducing the profitability of Circuit City?  17:39:54
18      MR. LAHAD: Lacks foundation, assumes  17:40:02
19 facts.  17:40:03
20      MR. GRALEWSKI: Objection, form.  17:40:05
21      THE WITNESS: As I have testified  17:40:07
22 earlier, anything that reduces the average  17:40:08
23 retail of products reduces the profitability  17:40:11
24 of Circuit City Stores.  17:40:14
25      Could reduce it unless they were in an  17:40:18

62 (Pages 242 - 245)

Page 246

1   increase in sales that would offset the loss   17:40:26
2   in profits from the average retail to   17:40:29
3   client.   17:40:33
4 BY MR. ROBERTS:   17:40:33
5   Q   Looking again at bullet point 2 here, is   17:40:37
6 it your understanding that this is representing   17:40:40
7 that Thomson was setting a comparatively low   17:40:43
8 suggestion manufacturer pricing for these   17:40:48
9 products?   17:40:50
10      MR. GRALEWSKI: Objection, form.   17:40:52
11      THE WITNESS: He says specifically that   17:40:56
12 he doesn't understand that the GE product   17:40:58
13 position well below other (similarly featured   17:41:02
14 product.) Does that answer your question?   17:41:05
15 BY MR. ROBERTS:   17:41:08
16   Q   I guess I am saying that that is the   17:41:08
17 manufacturer's suggested price?   17:41:11
18      MR. LAHAD: It assumes facts. Calls for   17:41:14
19 speculation.   17:41:17
20      THE WITNESS: (No response.)   17:41:17
21 BY MR. ROBERTS:   17:41:26
22   Q   You can answer, sir.   17:41:27
23   A   Again the question is -- well, what is   17:41:29
24 the question?   17:41:34
25   Q   I guess I am trying to understand   17:41:36

Page 247

1 exactly what your understanding is of what this   17:41:37
2 document is representing about how Thomson is   17:41:41
3 positioning the products, and I am asking you, it   17:41:43
4 says, "Thomson continues to build added value to   17:41:49
5 GE product and position it way below all of the   17:41:51
6 brands similarly featured products," is it saying   17:41:54
7 that Thomson is setting a suggested manufacturer's   17:41:56
8 retail price that is below what other   17:42:00
9 manufacturer's are setting?   17:42:04
10      MR. LAHAD: Again, lacks foundation.   17:42:08
11      MR. GRALEWSKI: Objection, form.   17:42:08
12      MR. LAHAD: Assumes facts. The document   17:42:09
13 speaks for itself.   17:42:10
14      THE WITNESS: Yes.   17:42:12
15 BY MR. ROBERTS:   17:42:14
16   Q   How does the fact that Thomson is   17:42:14
17 setting such a price will reduce the profitability   17:42:20
18 of Circuit City?   17:42:22
19      MR. GRALEWSKI: Objection, form.   17:42:28
20      MR. LAHAD: Yes, vague.   17:42:29
21      THE WITNESS: Again, anything that   17:42:31
22 decreases the average retail, that Circuit   17:42:34
23 City collects on a category of goods reduces   17:42:38
24 or is more than likely to reduce the profits   17:42:44
25 of that product unless there is a   17:42:48

Page 248

1   corresponding increase in unit sales to   17:42:51
2   offset it.   17:42:53
3 BY MR. ROBERTS:   17:42:54
4   Q   This bullet point discusses various   17:42:59
5 different sizes of GE televisions in comparison to   17:43:03
6 other brands of similar size.   17:43:06
7      Is it fair to say that Circuit City   17:43:09
8 earned different profit margins on different   17:43:12
9 brands of televisions of the same size?   17:43:16
10      MR. LAHAD: Vague.   17:43:21
11      THE WITNESS: I don't think the piece of   17:43:22
12 paper has anything to do with that, but as I   17:43:24
13 testified earlier, we would expect different   17:43:27
14 margins at different price points and so   17:43:30
15 different sizes have different price points.   17:43:34
16 BY MR. ROBERTS:   17:43:37
17   Q   I guess I am trying to get at the size   17:43:37
18 issue, sir. Was margin correlated in a general   17:43:39
19 way with the relative size of televisions that   17:43:44
20 were sold by Circuit City?   17:43:48
21      MR. LAHAD: Vague.   17:43:50
22      THE WITNESS: Price point was more of a   17:43:52
23 factor than size, but it could have been a   17:43:55
24 factor, yes.   17:44:03
25 BY MR. ROBERTS:   17:44:04

Page 249

1   Q   Did Circuit City earn different profit   17:44:05
2 margins on televisions that were relatively full   17:44:09
3 featured and higher quality than it did on lower   17:44:14
4 featured lower-quality televisions?   17:44:18
5      MR. LAHAD: Asked and answered.   17:44:21
6      THE WITNESS: The answer is yes.   17:44:21
7 BY MR. ROBERTS:   17:44:23
8   Q   Was that consistent throughout the   17:44:24
9 relevant period?   17:44:26
10   A   Yes.   17:44:27
11      MR. ROBERTS: Nothing further. Thank   17:44:30
12 you, sir.   17:44:31
13      MR. ROSS: Bob, I think you wanted to   17:44:33
14 ask a few.   17:44:34
15      MR. GRALEWSKI: Yes, thank you.   17:44:36
16 EXAMINATION BY MR. GRALEWSKI:   17:44:36
17   Q   Good afternoon, Mr. Deason. My name is   17:44:36
18 Bob Gralewski and I represent Consumers of CRT TVs   17:44:42
19 and Monitors many of whom likely bought from   17:44:48
20 Circuit City who are suing CRT manufacturers and I   17:44:53
21 have a couple of questions for you regarding MSRP.   17:44:58
22      For CRT finished products during the   17:45:05
23 relevant time period, was MSRP for a SKU ever set   17:45:11
24 lower than Circuit City's cost for that SKU?   17:45:16
25   A   I do not know of such an example and   17:45:26

63 (Pages 246 - 249)

Page 250

1 that would be a very odd occurrence.    17:45:29
2    Q   What is your understanding of how    17:45:35
3 generally speaking MSRP was set by vendors?    17:45:37
4    A   The manufacturer's suggested retail    17:45:43
5 price was generally set by the vendor as the price    17:45:45
6 that they believed was competitive in the    17:45:49
7 marketplace.    17:45:58
8    Q   Do you have an understanding that    17:45:59
9 anything else went into how particular MSRP was    17:46:00
10 arrived at?    17:46:07
11    A   I don't have knowledge of how the    17:46:08
12 vendors set it.    17:46:10
13    Q   Do you have an understanding that costs,    17:46:13
14 a vendor cost, was a component of MSRP?    17:46:16
15    A   Again, the discussions that a buyer    17:46:24
16 would have with a vendor about a manufacturer's    17:46:33
17 suggested retail price would be about whether it    17:46:36
18 was a competitive price or not. We would not be    17:46:39
19 having discussions about what it cost them to    17:46:44
20 build.    17:46:47
21    Q   What would you expect to happen based on    17:46:48
22 your experience to MSRP if vendor costs went down?    17:46:51
23    MS. LIN: Objection, calls for    17:47:03
24 speculation.    17:47:04
25    THE WITNESS: Since I don't know when    17:47:04

Page 251

1 vendors' costs went down, I am not sure that    17:47:06
2 I have a reasonable expectation.    17:47:10
3 BY MR. GRALEWSKI:    17:47:19
4    Q   I know that you have been testifying for    17:47:19
5 a long time today. Just a little bit ago you used    17:47:21
6 an example in an answer, I believe you talked    17:47:25
7 about MSRP decreasing by $75 and your Circuit    17:47:29
8 City's cost decreasing by $50 in that example, do    17:47:35
9 you remember that testimony?    17:47:39
10    A   Yes.    17:47:40
11    Q   Why did you use that example? Do you    17:47:40
12 have an understanding that a decrease in MSRP is    17:47:49
13 typically related to a decreased in your costs?    17:47:54
14    A   Yes.    17:48:02
15    Q   For CRT finished products during the    17:48:11
16 relevant time period, how often would MSRP change    17:48:14
17 for a particular CRT finished product SKU?    17:48:19
18    A   As I testified earlier the    17:48:26
19 manufacturer's suggested retail price was    17:48:32
20 generally set for a year.    17:48:35
21    It may change because it is not selling    17:48:38
22 or it may change because there is an introduction    17:48:44
23 of a new product.    17:48:47
24    The standard review was about every six    17:48:49
25 months, however any product that was not selling    17:48:56

Page 252

1 would be discussed and reviewed at any time.    17:48:59
2    MR. GRALEWSKI: Thank you, Mr. Deason.    17:49:04
3 I have no further questions at this time.    17:49:04
4    MR. ROSS: Is there anybody else on the    17:49:09
5 phone? We have a Little bit of clean up    17:49:11
6 though.    17:49:17
7    MR. LAHAD: Right and I will just ask    17:49:17
8 from here.    17:49:19
9 EXAMINATION BY MR. LAHAD:    17:49:19
10    Q   Mr. Deason, earlier you testified about    17:49:20
11 trips that you and other Circuit City buyers took    17:49:24
12 abroad to visit CRT finished product vendors    17:49:25
13 during the relevant time period, do you recall    17:49:27
14 that?    17:49:31
15    A   Yes.    17:49:31
16    Q   Do you recall any of the specific CRT    17:49:32
17 finished product vendors you visited during these    17:49:35
18 trips abroad?    17:49:38
19    A   Yes.    17:49:39
20    Q   Did you visit Panasonic?    17:49:39
21    MS. ARGUELLO: Object to form.    17:49:41
22    THE WITNESS: Yes.    17:49:42
23 BY MR. LAHAD:    17:49:44
24    Q   Did you and any other Circuit City    17:49:44
25 buyers visit Hitachi?    17:49:44

Page 253

1    A   Yes.    17:49:46
2    MR. GAWLEY: Object to form.    17:49:52
3 BY MR. LAHAD:    17:49:52
4    Q   Did you and any other Circuit City    17:49:57
5 buyers visit Toshiba?    17:49:57
6    MR. BAVE: Objection, vague and    17:50:04
7 ambiguous.    17:50:04
8    THE WITNESS: I was not party to any    17:50:05
9 Toshiba visits, so I cannot speak to that,    17:50:07
10 but I know that buyers went to all major    17:50:09
11 suppliers and would have it on their agenda    17:50:18
12 to visit Toshiba.    17:50:23
13 BY MR. LAHAD:    17:50:24
14    Q   Did you and any other buyers visit    17:50:26
15 Samsung?    17:50:27
16    A   Yes.    17:50:29
17    Q   What about LG?    17:50:30
18    MS. LIN: Object to form.    17:50:33
19    THE WITNESS: I was on a trip with    17:50:35
20 buyers who visited LG, but I did not.    17:50:37
21 BY MR. LAHAD:    17:50:40
22    Q   Did you or any other buyers visit    17:50:41
23 Phillips?    17:50:43
24    A   Yes.    17:50:50
25    Q   And you testified earlier that during    17:50:52

64 (Pages 250 - 253)

Page 254

1 these trips and visits the vendors would, if I   17:50:56
2 understood your testimony, present new or   17:50:58
3 forthcoming products, is that accurate?   17:51:01
4    A   Yes.   17:51:02
5    Q   You also testified that during these   17:51:04
6 presentations, vendors, I believe you used the   17:51:05
7 term, "trial balloon," do you recall that?   17:51:09
8    A   Yes.   17:51:10
9    Q   Can you give me a little bit more   17:51:11
10 explanation on what you meant by trial balloon?   17:51:12
11    A   They would say, "We have this product   17:51:16
12 and we are going to sell this at $999.  Do you   17:51:19
13 think that would be competitive?   17:51:23
14    Q   $999, meaning, the MSRP?   17:51:25
15    A   That is the manufacturer's suggested   17:51:27
16 retail price and would that be a competitive   17:51:29
17 manufactured suggested retail price and we might   17:51:35
18 give back information saying, "It is not   17:51:39
19 competitive today because I already own a product   17:51:44
20 that has more features on it than that, that I   17:51:46
21 sell for $799," or we might say, "We don't believe   17:51:48
22 that that is going to be competitive going   17:51:53
23 forward."   17:51:55
24    Q   When you say competitive, competitive   17:51:55
25 where?   17:51:57

Page 255

1    A   Competitive on our sales floor because   17:51:58
2 we looked at and are contemplating buying other   17:52:00
3 product that would make that product   17:52:07
4 non-competitive.   17:52:09
5    Q   The sales force in the U.S., is that   17:52:11
6 right?   17:52:13
7    A   Yes.   17:52:13
8    Q   You also testified if I understood your   17:52:16
9 testimony that this was the start of what you said   17:52:18
10 was, "One long negotiation," to you recall that?   17:52:20
11    A   Yes.   17:52:23
12    Q   I want to fill in a little more of this   17:52:24
13 long negotiation.  After you have this visit   17:52:26
14 abroad at these CRT finished product vendors   17:52:30
15 sites, and you come home, who or what would --   17:52:32
16    MR. LAHAD:  Strike that.   17:52:39
17 BY MR. LAHAD:   17:52:39
18    Q   What would be the next step?   17:52:39
19    A   Since you had seen things very early and   17:52:43
20 sometimes we see product six months before it is   17:52:47
21 going to be introduced, or even longer, the next   17:52:52
22 step would be, "What have they done?" based on the   17:52:59
23 feedback that you have given them, or that other   17:53:02
24 customers had given them, and so there would be an   17:53:06
25 update of, "You guys saw this once before, but   17:53:10

Page 256

1 this is what we're now going to do.  We are now   17:53:14
2 going to put the button on the left hand side.   17:53:18
3    "It now looks like this, and oh, by the   17:53:20
4 way, the manufacturer's suggested retail price is   17:53:23
5 going to be this."   17:53:26
6    That conversation could happen on a   17:53:29
7 return visit to a foreign country.  It could   17:53:31
8 happen by the foreign representatives coming to   17:53:33
9 Circuit City or coming to a sales office in the   17:53:40
10 U.S. and we meet them there.   17:53:44
11    But you have to get that level of, "This   17:53:47
12 is what we're going to offer and this is why the   17:53:50
13 change that we have made."   17:53:56
14    At that point we may have more   17:53:58
15 information that says, "Sorry, but that is still   17:54:01
16 not competitive," and so we may be giving an   17:54:04
17 indication at that point to senior people from   17:54:10
18 that vendor that it is still not right, and that   17:54:15
19 they have got more work to do overall but it's   17:54:20
20 starting.  That's the next step.   17:54:27
21    At some point they are going to say,   17:54:32
22 "This is our assortment and this is what we're   17:54:34
23 proposing that we sell it to you for."   17:54:38
24    It's possible that the buyer would get   17:54:42
25 ahead of that process, and say, "I would buy   17:54:46

Page 257

1 500,000 of these if you give me a cost of this."   17:54:53
2    You would have continuous negotiations   17:54:58
3 from there involving all of those people down to   17:55:01
4 the point of finally making an agreement.   17:55:04
5    Q   To be clear, on behalf of Circuit City,   17:55:07
6 it would be the buyer located in Richmond,   17:55:10
7 Virginia?   17:55:12
8    A   That is correct.   17:55:12
9    Q   Earlier there were some questions   17:55:16
10 regarding the use of cost information from one   17:55:17
11 vendor with other vendors, do you recall that?   17:55:21
12    A   Yes.   17:55:23
13    Q   Let me ask you this.  If a CRT finished   17:55:25
14 product vendor decreased its costs to Circuit City   17:55:29
15 for a class, or a product, would Circuit City use   17:55:32
16 that information that cost information with other   17:55:38
17 vendors at all?   17:55:41
18    A   No.   17:55:44
19    Q   Did Circuit City ever share specific   17:55:45
20 costs information from one vendor with another   17:55:48
21 vendor?   17:55:50
22    A   No.   17:55:51
23    Q   I want to point you to Exhibit 2845.   17:55:53
24 It's the memo to the Sony file.  I have a few   17:55:59
25 questions specifically about the fourth bullet   17:56:15

65 (Pages 254 - 257)

Page 258

1 point that we talked about before. Do you need a    17:56:18

2 second to re-read that bullet?    17:56:22

3    A  Yes.    17:56:24

4    Q  Please do.    17:56:25

5    A  I am familiar.    17:56:30

6    Q  Does this fourth bullet state that    17:56:32

7 Thomson, Phillips, and Zenith will raise their two    17:56:34

8 prices together after consulting with each other?    17:56:38

9    A  No.    17:56:40

10    Q  Is there any indication in this bullet    17:56:42

11 or in any of Exhibit 2845 that Mr. Palumbo    17:56:44

12 indicated that CRT makers were meeting to fix    17:56:49

13 prices?    17:56:52

14    A  No.    17:56:52

15    Q  Is there anything in this bullet point    17:56:53

16 or anywhere else in Exhibit 2845 that would lead    17:56:55

17 you to believe that CRT manufacturers were meeting    17:56:59

18 to conspire on fixing the prices of their    17:57:01

19 products?    17:57:04

20    A  No.    17:57:04

21    Q  In your mind is the information in    17:57:06

22 Exhibit 2845 specific enough for Circuit City to    17:57:09

23 initiate investigation into CRT price fixing?    17:57:14

24    MR. BAVE:  Objection to form.    17:57:18

25    THE WITNESS:  No.    17:57:21

Page 259

1    MR. LAHAD:  Nothing further for you.    17:57:22

2 Thank you.    17:57:23

3    THE VIDEOGRAPHER:  Are we done?  There

4 being no further matters, the time is

5 approximately 5:57 p.m.  This deposition is

6 concluded.

7

8 (Whereupon, the deposition concluded at

9 5:57 and the witness is to read and sign with

10 arrangements already on record with standing

11 orders for transcripts.)

12

13

14

15

16 _____

    STEVEN DEASON

17

18

19 Subscribed and sworn to before me

20 this    day of    , 2014.

21

22

23    NOTARY PUBLIC

24

25

Page 260

1

2  UNITED STATES OF AMERICA  )

                            ss:

3  DISTRICT OF COLUMBIA    )

4

5    I, T. S. HUBBARD, JR., a Notary Public

6 within and for the District of Columbia do hereby

7 certify that the witness whose deposition is

8 hereinbefore set forth was duly sworn and that the

9 within transcript is a true record of the testimony

10 given by such witness.

11

12    I further certify that I am not related

13 to any of the parties to this action by blood or

14 marriage and that I am in no way interested in the

15 outcome of this matter.

16

17    IN WITNESS WHEREOF, I have hereunto set

18 my hand this 5th day of May 2014.

19

20

21

22

23    T. S. HUBBARD, JR.

24    Commission Identification 237435

25    Commission Expires April 30, 2018

66 (Pages 258 - 260)

[& – 2845]

**&**

& 2:8 4:5,14 5:6,15
7:12,20 227:12

**0**

0021806 8:20
169:16
0148714 8:17
105:21
0389749 8:19 154:5
0397160 8:22
219:20
0534111 8:19
137:13
0543314 8:18
128:14
0548555 8:21 198:9
0567286 8:16 74:8
0569329 8:18 127:1
0572187 8:17
122:25
0604919 8:21
208:18
0606306 8:20
186:20
07 173:16
07-5944 1:4

**1**

1 11:23 69:12
1,000 102:6 118:24
1,999 210:13
10 8:6 37:24 38:1
83:24 115:4 155:4
201:2,13
10,000 46:3 90:3
100 55:18,19 118:23
163:21 190:12
213:1,2,4 234:2,10
100,000 90:4,5
1000 3:6
1001 7:13
10022 6:8
10036 4:7

10166 4:16
105 8:17
10:58 1:16 2:9 9:13
11 11:24
11/25 189:22 190:3
1155 4:6
12 8:15 12:2,3,4
91:14 208:22
1201 5:7
122 8:17
126 8:18
128 8:18
1299 7:5
12:03 56:4
12:42 56:7,8
13 11:24 29:23 30:5
30:10 31:3 45:15
47:9 163:23 173:9
137 8:19
14 11:24
15 83:24 90:21
154 8:19
169 8:20
16th 6:7
1700 7:22
186 8:20
19 11:24 29:23 30:6
30:10 31:3 152:15
1917 1:5
198 8:21
1980 155:10
1990s 86:7
1992 15:3,17 18:21
1995 15:3,18 18:3,6
18:10,17,21,21
22:10,19 149:16
165:9
1996 15:8 16:7
149:16 155:13
181:20 199:3
1997 149:16 201:3
1998 15:9,12 16:7
17:10 19:5,9
1:04 73:5,8

1:06 73:9,11
1:41 97:18,20
1:48 97:21,23

**2**

2 69:13 93:5 107:14
124:19 130:5,7
133:19 134:1
154:18 163:23
188:3 230:16,16
246:5
2,000 90:5 156:18
2,800 156:21
20 2:8 9:21 29:23
30:9,10 83:24
122:20 143:14,14
144:9 240:20
241:24
200 4:15
2000 94:16,19 95:2
106:10
20004 7:6,14
2002 15:12 17:11
48:11 94:22 95:2
2004 48:11 98:4
99:3 188:25
2006 22:11
2007 22:19 165:10
187:4 208:22
240:13 241:7
242:14
2013 239:23
2014 1:15 2:7 9:14
259:20 260:18
2018 260:25
202 8:7
202.624.2720 7:15
202.639.1117 7:7
208 8:21
21 11:24 30:2
212.294.5304 4:17
212.371.6600 6:9
212.819.2673 4:8
214 242:23,25

21810 178:3
21813 183:19
219 8:22
227 8:8
23 1:15 2:7 9:14
237435 260:24
238 8:9
239 8:23
24 29:24
240 239:24 240:1,4
240:6,11
247 210:6
249 8:10
25 11:24 33:25 34:1
36:25 37:1 187:3
252 8:11
27 75:15
27th 6:16
2814 140:15
2831 11:16
2834 8:15 12:19,23
13:2 14:15,18 15:1
2835 8:16 68:14,17
68:21 73:16,25
2836 8:16 74:5,8,11
2837 8:17 105:18,21
106:2,12 108:17
2838 8:17 122:21,24
124:19
2839 8:18 126:22,25
2840 8:18 128:10,13
134:1 135:13,22
244:10,13
2841 8:19 137:10,13
137:16
2842 8:19 154:2,6,9
2843 8:20 169:12,15
169:20
2844 8:20 186:16,19
186:23 189:3
190:18
2845 8:21 198:5,8
198:11 200:1,14
257:23 258:11,16
258:22

**[2846 - ad]**                                                                                      Page 2

2846  8:21 208:14,17
2847  8:22 219:16,20
2848  8:22
2849  8:23 239:4,7
299  144:19
2:41  133:18
2:48  133:22

**3**

3  11:23 133:22
  197:4
3,000  156:18,20
30  10:17,21 29:25
  51:22,23 98:15
  118:23 122:18
  158:23 159:1
  161:20 200:2,4
  240:17 260:25
303.607.3792  7:24
30309  5:8
31  181:19 223:2
312.222.9450  5:18
315  75:3
3200  7:21
349  144:18
35  29:25
353  5:16
399  79:9 110:22
3:38  169:5,8
3:50  169:8,10
3m  119:17,17 120:3
  120:4

**4**

4  109:9 197:8
40  29:25 112:12
  137:2,6 156:15
400  21:17 47:10
  120:6 196:14
404-253-8488  5:10
404.881.7000  5:9
415.439.1400  6:18
415.512.4034  3:18
449  79:10
4:28  197:3,6

4:30  197:6,9
4:37  202:5,8
4:38  202:8,10

**5**

5  201:2,13
50  113:20 152:14
  164:5 237:2 251:8
500  196:15
500,000  210:17
  257:1
5100  3:7
555  6:16
56  155:18
560  3:15
57  157:6,8
5:10  227:4
5:14  227:7
5:57  259:5,9
5th  260:18

**6**

6  10:17,21 11:23
  158:23 159:1
  161:20 164:7 200:2
  200:4 240:17
60  51:23 98:14
600  54:7
60654  5:17
650  21:18
660  21:18
68  8:16
699  111:12

**7**

7  11:24
700  122:17
700,000  210:17
713.651.9366  3:9
74  8:16
75  237:3 251:7
77002  3:8
799  111:11 254:21

**8**

8  115:5
800  187:15
80203  7:23
825  6:7
8th  2:8 9:21

**9**

9  11:24
90  51:23 149:23
  207:1
94104  6:17
94105-2907  3:17
95  145:10
97  145:8
98  145:9
99  47:10,10 122:19
  144:24 145:2
99.9  148:7
999  210:13 254:12
  254:14

**a**

a.m.  1:16 2:9 9:13
ability  28:24 50:5
  54:13 71:24 121:4
  126:14 134:18
  153:12 237:25
able  29:2,15 55:18
  62:14,23 63:8,19
  64:2,6,10 72:23
  85:3 112:18 118:3
  151:24 152:1 175:9
  177:10 195:19
  205:18 210:21,21
  221:20 223:4 226:3
  236:17,24
abolished  95:1
abroad  88:20 112:6
  113:1,3 115:13
  252:12,18 255:14
absolutely  107:8
accept  52:25
acceptance  131:12

access  221:17
accident  99:9
accommodate  139:4
account  69:2 114:6
  116:19 123:19
accounted  96:23
  97:6
accurate  19:25
  21:15 163:21 254:3
ace  15:4
achieve  120:20
  122:13
achieving  118:1
acquire  43:24 143:5
  147:21
acquired  143:19
acronym  172:7,16
  173:3,5 183:15
act  44:7 125:6
  158:14 217:19
  226:16
acted  19:20
acting  158:19
  226:10
action  96:19 240:12
  241:6,10 260:13
actions  1:10 138:15
active  35:8
actively  101:25
  154:13
activities  93:9
  215:20 216:16
  228:15
activity  96:12 116:6
  177:17 179:2,17,19
actual  17:6,7 96:22
  97:2 121:13,17
  212:21
ad  29:3 96:20
  151:22,22 155:4
  166:6,10 171:25
  177:20 179:10,17
  179:22 180:5
  182:19 184:18,23
  184:25 190:2

[ad - appropriateness]                                                                 Page 3

209:17 212:16
216:1,12 229:21
230:4 231:24
add  49:4 179:24
added  247:4
addition  51:7,14
214:24
additional  34:24
53:1 54:2 96:8
117:4 186:14
210:17 217:10
addressing  209:5
adequate  42:3 137:1
adjective  74:4
adjustment  71:14
adopted  169:23
ads  15:25 93:18
104:25 138:15
139:14 166:5
177:16,22,25
179:13 190:6,9
advance  216:18
244:17
advantageous
132:11,18 133:14
advertise  84:4,12
140:9 185:23 186:2
186:9 204:12
advertised  52:19
83:18 117:19
139:17 153:1
154:23,25 155:2
158:11 166:9
182:21 183:20,24
183:25 184:12
185:2,3,15 186:3
225:8,9
advertisers  54:6
advertising  52:21
64:23 84:16 124:21
124:25 159:24
211:10 230:1,2
advice  177:20
203:15

advised  210:1
affect  47:13 145:15
145:18,21
afternoon  56:6
202:12,15 249:17
agenda  253:11
aggressive  185:23
185:25
ago  251:5
agree  131:7 225:4
agreed  53:25 69:14
70:2 83:19 86:9
agreement  53:16
82:4,7 99:14,20
100:1 112:2 201:15
257:4
agreements  67:9
82:1 86:8 87:18
99:7,7 230:14
agrees  81:7
ahead  12:21 97:16
133:15 241:4
256:25
aide  8:15
air  114:21 115:6
aligned  182:20
alleged  197:12,15
238:20 241:21,25
242:16
allegedly  200:16
allow  216:23 217:2
allowances  227:24
allowed  149:21
150:18,21,24 151:4
151:8,17
allows  104:24
alston  5:6
alston.com  5:11
alternative  193:3
amazon  164:23
165:7,10
ambiguous  253:7
amend  122:7
america  125:12
126:1,7 227:20

228:4,7,23 229:17
230:6 231:7 232:7
232:20 233:21,22
234:9 260:2
america's  230:25
231:16 233:13
american  203:14
240:6,9
americas  4:6
amount  31:4 42:14
46:2,16 83:4,8,11
83:13 89:7,10,18
90:7,11,22 99:10
115:6 131:13 143:7
143:18 144:2,4
149:3 185:9 213:23
218:21 230:9
amounts  113:15
117:4
analysis  119:15
andrew  106:5,12
137:18
andy  20:18 74:14,22
74:23 75:20
announced  44:17
annual  34:18,19
35:11 77:20 78:6
80:24 206:8
annually  78:21
anomaly  212:24
anshakov  20:21
answer  11:5 18:13
32:19 33:6 36:23
37:9 40:20 46:20
53:4 58:16 63:23
77:13 81:18 87:15
91:4 103:18 107:9
108:11 112:21
118:5 120:24 125:5
132:11 141:7 142:9
142:23 146:14
161:9,21 170:4
194:24 195:13
232:1 234:18
239:25 240:14

241:17 242:11,18
242:19 243:12,19
243:23,24 244:5
246:14,22 249:6
251:6
answered  100:17
143:22 146:10
163:13 211:22
217:8 234:17,22
242:11,17 244:2
249:5
answering  13:19
218:20
answers  211:12
antenna  45:16
anticipate  155:20
antitrust  1:8 242:16
anybody  165:16
180:22 213:21
214:2 252:4
anymore  75:14
101:15 132:21
233:17
anyone's  206:9
apart  43:3 49:23
193:15,16
apologize  40:18
appear  69:14
124:22 161:4
177:24 200:14
appearances  9:6,7
appeared  2:5
appearing  3:11,20
4:10,19 5:3,12,20
6:3,11,20 7:2,9,17
7:25 13:21
appears  70:2,5
137:16,17 181:7
182:4 209:8
applied  232:23
233:1
apply  9:8
appreciate  239:2
appropriateness
204:21

[approve - have]                                                                    Page 4

approve 26:17
approximately 9:13
  15:14 17:11 31:21
  56:4 73:5,11 94:19
  97:22 98:4 133:18
  133:22 169:5,10
  197:3,8 202:10
  222:21 227:4,7
  259:5
april 1:15 2:7 9:14
  260:25
area 28:15 171:24
argue 165:25
arguello 4:13 227:9
  227:11,12,15
  228:21 229:15
  231:5,14 233:2,25
  234:20 235:1,5,20
  236:15,23 238:11
  252:21
arguing 108:13,24
arrange 114:23
arrangements
  259:10
arrived 250:10
ascertainable 217:6
  218:3
aside 73:25 128:13
  144:1 186:19 211:1
asked 63:24 76:18
  98:13 146:10
  165:16 211:22
  217:8 220:25
  221:21 234:17,22
  239:1 242:17 244:2
  245:9 249:5
asking 49:15,17
  54:24 83:14 85:10
  86:16 89:17 92:11
  103:20 123:3
  158:22 161:20
  192:7 206:4 213:13
  220:21 240:8,19
  247:3

aspect 105:2 207:12
assignment 170:25
assignments 178:12
assistant 17:12
  209:10 220:8
associate 220:21
associates 29:11
  95:3
association 221:9
assortment 33:19
  34:2,12 35:1 36:13
  37:2 44:16 46:4
  81:22,23 256:22
assortments 164:17
assume 60:14 75:17
  127:12
assumes 138:1
  169:24 199:21
  245:18 246:18
  247:12
assuming 70:4
atlanta 5:8 15:22
attention 74:25
  124:18 127:4 130:4
  155:17 176:23
  212:3
attorney 204:24
attorneys 13:10
attractive 108:18
attributable 61:25
auction 45:1,4,5
  46:6,10 48:1,4,12
  48:21 49:7,23
auctions 45:9
audio 24:13
auguello 8:8
authority 26:17
  27:12,18 150:15
automatically
  187:21
availability 105:6
available 33:15 54:8
  147:24 214:14
avenue 4:6,15 6:7
  7:5,13

average 118:17,18
  127:21,22,24
  130:19 133:8,9,10
  164:2 200:20
  245:22 246:2
  247:22
avoid 128:3,8
aware 41:1,16 64:5
  84:14 99:24 103:24
  135:12 136:4
  138:14 142:4,6,16
  142:25 156:6
  161:16 185:14
  216:8 228:12

b

b 8:2 10:17,21 84:8
  158:23 159:1
  161:20 181:4
  182:13,19,23 183:1
  183:3,10,13 200:2,4
  240:17
back 40:20 41:21
  48:18 56:9 69:23
  73:12 86:21 97:23
  104:17,18 111:9,22
  126:24 133:23
  142:8 151:23 155:8
  155:25 166:21
  167:17,25 169:10
  176:1 197:9 202:10
  207:3 208:5,6,10,12
  220:9,25 221:22
  227:7 228:8 254:18
backed 49:3 215:7
backing 107:15
bad 127:21 185:5
bag 152:14
baker 7:4,20
bakerbotts.com 7:8
balloon 254:7,10
balloons 110:18
based 15:22 28:3,7
  31:13 33:22 35:22
  43:12 55:5,6 58:16

63:7,18 78:6,21
  83:5,20 96:11 113:2
  118:1,12 142:23
  143:9 144:8 152:17
  152:20 179:25
  187:3 199:25 210:3
  210:11,20 212:2,2
  224:13 228:19
  229:4,5 231:19
  234:24 250:21
  255:22
basic 59:5 66:6
  147:14
basically 34:9 45:6
  46:1 80:19 92:17
  107:23 125:20
  128:25 129:25
  130:9 138:3 172:10
  174:12 175:20
  177:2 222:20
basis 34:18,20 35:9
  35:11 77:20 78:6
  80:24 86:18 116:17
  157:12,18 168:6
  172:22 179:3 184:4
  229:1
bates 8:16,16,17,17
  8:18,18,19,19,20,20
  8:21,21,22 68:18
  74:8 105:21 122:24
  127:1 128:14
  137:13 154:5
  155:18 157:5
  169:16 173:16
  183:19 186:20
  198:8 208:17
  219:20 239:14,18
have 4:4 8:7 202:12
  202:13,17 205:20
  207:24 208:16,20
  210:25 211:2,14
  212:7 217:11
  218:10 219:5,18,23
  220:1 221:5 222:7
  224:7,24 225:3

227:1 253:6 258:24
**beat** 185:20
**beginning** 44:24
  73:12 122:24 127:1
  128:14 133:21
  149:17 152:23
  154:5 155:8 157:7
  183:21 197:7
**begins** 130:5
**behalf** 103:22 257:5
**believe** 19:24 20:20
  23:8 29:24 30:9
  33:12 39:2 40:10
  41:19 47:16 52:8
  73:22 106:17
  120:16 124:2
  143:22 155:14
  170:18 175:13
  183:13 187:2
  188:25 197:15
  202:21 222:2 244:7
  251:6 254:6,21
  258:17
**believed** 250:6
**believes** 201:2
**benchmark** 73:17
  73:23 74:2 144:22
  145:1
**beneficial** 103:4
**beran** 2:8
**best** 117:24 159:17
  164:22 165:5
  166:12 175:5 176:8
  176:17 189:21
  190:2,6,9,17,23
  215:15 220:19
  221:9,11,17 222:8
  223:1,5
**better** 89:8 112:19
  118:9 126:14 132:3
  134:19 135:5
  161:12 194:7 217:3
**beyond** 158:25
  161:22 205:24
  235:11 240:1,15

241:4,13,17 242:6
  242:12 243:13,18
**bgralewski** 6:10
**bi** 77:20 78:21
**bid** 45:22
**bidder** 46:7
**bidding** 46:1
**big** 110:25 156:10
  157:2,3 165:10
  188:16 206:1
**bigger** 31:14
**biggest** 46:15,22
  84:15 164:21
**biggles** 93:19 116:10
  164:24
**bird** 5:6
**bit** 96:4,17 153:18
  189:18 224:20
  251:5 252:5 254:9
**black** 181:9 185:17
  186:1 190:4 216:18
**blank** 188:4
**blind** 45:25
**block** 5:15
**blood** 260:13
**bma** 189:1
**bob** 249:13,18
**boilerplate** 99:6
**bonus** 83:23
**book** 109:14 172:19
  172:20,21 183:17
**bottom** 69:12
  178:20
**botts** 7:4
**bought** 20:12,13
  30:8 34:25 55:11
  56:18,22 57:4 60:4
  74:20 78:1 86:25
  89:7 90:3 91:14
  92:16 155:1 249:19
**box** 105:17 171:20
  176:1,23 178:20
**brand** 38:4,5,8,12
  38:18,21 45:12,13
  46:13 100:15,16,23

101:6 102:10
  112:11 131:19,20
  164:5 173:5,6,10
  202:22 214:13,14
**branded** 46:11
  80:23 203:4
**brands** 26:6 38:3,5
  38:15 59:7,10,13,14
  100:10,12,13
  101:17,25 102:14
  103:17 130:17
  247:6 248:6,9
**brandsmart** 203:18
  203:19 213:1,2,3
  222:22
**brandsmarts** 203:20
**brandy** 9:7
**bread** 215:15
**break** 11:9,12 55:24
  56:2 73:2,7 96:2
  97:17,19 133:16
  169:1,2,3,7 196:25
  197:5 202:7 224:23
  231:19
**breaker** 98:17
**brew** 7:11
**brief** 10:24
**briefly** 128:17 202:3
**bring** 13:6 129:19
  134:23 239:1
**broad** 189:16
**broke** 24:17
**broken** 24:5 119:18
  119:19
**brought** 12:16,22
  48:6 189:18 216:14
**btl** 120:16
**budget** 34:21 118:24
  119:18,20 121:1,4,5
**budgeting** 164:12
**budgets** 97:15 118:3
  118:11 119:1,5,9,25
  119:25 120:2,2,10
  120:20

**build** 247:4 250:20
**building** 107:24
**built** 15:11 81:15,20
**bulk** 149:18
**bullet** 130:5,7 134:1
  134:2 135:21
  198:25 199:2
  200:13 222:24
  244:23 246:5 248:4
  257:25 258:2,6,10
  258:15
**bunch** 86:25 138:12
**burgess** 68:25 69:7
**business** 31:15
  33:21,21 35:23,24
  36:3,5,17,19 40:4
  56:20 73:21 89:25
  90:1,6 103:6,10
  107:10,12 116:22
  118:4 119:22
  120:17 145:4 153:8
  177:18 205:5 214:2
  216:6,22 221:17
  224:14 226:25
  230:18 232:4
  233:22 234:3,11
**busy** 168:13 226:13
**butt** 35:14
**button** 256:2
**buy** 26:7 38:1,7,10
  38:19 46:3 50:15
  53:6 64:11,19,20
  75:4,8,17 90:4
  91:17,18 98:14
  102:4 112:7,16,17
  113:18,18 134:25
  135:4,5 149:9,17,25
  150:10 157:20
  164:23 165:5
  166:12 175:5,24,25
  189:21 190:17,23
  195:24 196:10
  215:6 220:19 221:9
  221:11 222:8 223:1
  223:5 224:1,5

**[buy - change]**

225:25 226:5 229:3
233:17 256:25
**buy's** 190:2,6,9
221:17
**buyer** 15:13 16:19
16:22 17:1,3,12
19:4,6,11,18,21
20:14 26:7 27:11,12
27:20,24 28:1 30:25
31:2,3 32:8 60:3
61:10 63:7,18 69:5
74:17 84:3,10 91:17
93:1 95:20 99:23
106:5,6,9 112:16
123:13 129:24,25
137:18,19 147:14
149:25 157:24
160:21 166:7,15
175:1 204:25 209:2
209:13 211:25
212:1 220:7,8,9
229:6 250:15
256:24 257:6
**buyer's** 16:4 26:18
**buyers** 19:8,13 20:7
20:10,17 26:8,12,21
26:24 27:2,18 28:13
31:7 33:4 35:19
40:15 43:2 65:24
92:14 96:10 102:20
103:19 109:4,7
120:18 121:8 122:3
147:11 148:19,21
149:17 150:4 152:9
187:10 206:12,17
209:9,10 212:22
230:17 252:11,25
253:5,10,14,20,22
**buying** 16:6,20
17:16 18:17 34:24
37:12,13 40:2,4
48:9 65:14 66:8
96:20 98:19 116:23
116:25 134:11
141:10 192:3

194:15 195:15
229:7 255:2
**buys** 31:2,3

**c**

**c** 3:2 4:2 5:2 6:2 7:1
8:2 9:1
**ca** 3:17 6:17
**caglin** 68:25 123:10
123:13 137:18,22
**cagwin** 20:19 69:4,5
**calculated** 92:23
**calendar** 178:6
180:1,2,3 214:7
**california** 1:2 6:16
21:21
**call** 15:9 24:4 129:4
163:17 168:1
217:14 218:19
221:14 225:24
226:9
**called** 2:6 14:2 16:5
23:7 24:12 25:7
45:5 115:1 119:16
187:2
**caller** 226:19
**calling** 134:4
**calls** 69:17 73:18
75:10,25 108:21
115:19 125:19
127:10,17 138:20
182:1 199:6,13
200:17 201:8,17
221:3,24 226:20
246:18 250:23
**camcorder** 104:7
129:8,9
**camcorders** 15:13
16:13
**camera** 152:14
**canada** 23:5,12,17
**cap** 212:19
**capacity** 15:5 31:1
43:6 123:18,23

**capturing** 212:20
**card** 98:5 119:18
164:15 225:22
**care** 136:14,14
**cared** 60:21 98:5
**careful** 153:15
**carried** 37:23 90:23
100:18,23 152:14
**carry** 34:1 40:1
57:25 90:18 99:22
104:1 132:14
140:10 172:24
186:12
**carrying** 90:25
132:17
**case** 1:4 4:5 9:23
10:15,18 12:12
13:19 16:11 24:20
39:18 40:10 79:25
99:8 101:9 137:5
142:2 144:16
153:24 197:19
214:19 220:17
238:22
**cases** 10:14 32:7,7
36:2,3,7 42:17 46:1
46:5,5 55:1 63:24
64:20 88:25 95:19
102:5,5 114:7
168:22 186:14
233:8 236:24
**cash** 228:8,9
**cast** 113:19
**catches** 167:11
**categories** 16:12
35:7,9 152:10,13
**category** 15:7,8 16:8
16:25 19:3,10 25:10
47:15 57:16,21
58:25 59:2 93:11
147:12 152:4,12
153:22 214:10
247:23
**cathode** 1:7

**cause** 108:25 146:25
**caution** 20:11
**cautious** 84:23
**cbm** 173:4,6,14,15
**cc** 8:16,17,17,18,18
8:19,19,20,20,21,21
8:22 74:8 105:21
122:24 125:10,10
125:14 127:1
128:14 137:13
154:5 169:16
186:20 189:2 198:8
208:18 219:20
**cc'd** 189:8
**cc0572597** 8:16
68:18
**cea** 163:7,17
**ceased** 57:25
**cecile** 106:8,14
**cent** 145:2,8,9,10
**center** 7:21 211:5
**cents** 144:24
**ceo** 125:10
**certain** 33:10 59:1,7
95:22 98:11 112:9
118:1 151:19 153:4
153:5 161:16 195:1
207:17 208:2
213:14 214:5
216:17 228:9
**certainly** 49:13
93:25 98:16 172:3
233:16
**certify** 260:7,12
**ces** 93:3,4,6,7,11
**cesar** 212:15
**cetera** 33:10 34:21
40:17 116:18,23
153:2
**chain** 69:11 149:20
**champion** 48:12
**chance** 208:19
**change** 16:24 27:22
27:25 28:2,4,6,11
30:12 35:1 38:15

[change - circuit]

59:16 73:3 77:4,9
77:16,19 78:4 79:5
79:6 101:4 111:19
112:23 118:18
133:16 141:13
143:9 144:5 145:25
146:17,19 147:8,19
147:21 148:1
150:15,21,25 151:4
151:9,17 152:5
153:12 170:7
184:23 197:1 204:4
204:9 210:5 230:25
231:16 234:15
236:10,11 237:24
238:4,8 251:16,21
251:22 256:13
**changed** 16:12
31:12,22 42:1 47:23
48:9 59:19 79:1
86:6,10 94:13
141:16 150:3
184:25 204:2
234:15
**changes** 76:9,13
148:4 151:2 152:17
155:14 170:12
179:23,25 237:11
237:13
**changing** 30:16
78:10,22 91:13
174:5 176:6 179:20
182:24
**charge** 32:4
**charged** 143:7
144:22 148:5,12,13
148:25 165:14,24
176:9,18 177:13
196:4
**charging** 216:24
**charles** 7:3
**charles.malaise** 7:8
**chart** 177:22
**charts** 19:24

**check** 214:4 215:19
220:21,25 221:22
223:21,24
**chicago** 5:17
**china** 111:6
**choose** 15:23,25
28:1,2 45:22 71:4
85:3 141:8 159:23
185:11 206:24
**chooses** 26:7
**choosing** 55:21
135:2
**chose** 65:14
**chosen** 174:1
**christmas** 29:6
150:25 151:1,3,15
168:10 185:18
**circuit** 3:11 10:16
12:18 13:4,13,22
14:6,9,14 17:21,22
17:25 18:1,5 19:10
21:12 22:2 23:1,2,7
23:11,19,25 26:4,8
26:16 27:5 29:16,19
30:12,22 31:21
32:12,16,25 33:4
34:16 35:4,19 36:7
36:9 37:1,5,7 38:24
39:5,8,16 40:7,12
41:17,23,25 42:7,8
42:21 43:2,11,14,24
44:2,13,22 45:1
46:6,21 47:12,13
48:1,22 49:8,24
50:5,18 51:2 52:1,3
52:22,25 53:12,24
54:19,20 55:8,14,15
56:15,22 57:7,17,25
58:6,13,17 59:22,23
60:10,11,13,17,22
61:1,20,24 62:3,14
62:23 63:2 64:5,12
64:22 65:5,8,10,12
65:17 66:2,17 67:2
67:3,20 68:4,8 69:5

69:16 70:12,15,25
71:6,8,17 72:11,12
72:13,14,22 74:1,16
75:9 76:14 77:3,8
77:19 78:8,19,22
79:1,17,23 80:3,12
81:10,14,16,20,24
82:3 83:5 84:19,20
85:15 87:7,8,11,18
88:2,4,7,9,12,16,19
88:22 89:2,12,18
90:8,11,13 91:5,20
92:1,8 93:21 94:7
94:19 95:1,2 96:7
96:22 97:5,7,25
98:10 99:5,14,19,25
100:5,9,24 101:16
101:19,23,24 102:1
102:8,15,18 103:6
103:13,22,24 104:6
104:15 105:7,7,23
106:21 107:25
108:5,19 109:25
110:4 112:7,25
114:5,15 115:9,12
115:14 116:20
117:4,12,15,25
118:10,25 119:10
120:18,19,20
121:16,17,21,24
122:3,6,11,12
123:13,21,24 124:1
124:3,4,11,24
125:15,24 126:4,6
127:15,24 128:3
129:2 130:21 132:5
132:12,16,25 133:4
133:6 134:17 135:8
135:13 136:4,22
139:5,14 140:15,25
141:1,4,13 143:1,4
143:6,17,19 144:3,4
144:21 145:13,16
145:24 146:7,17,25
148:6,12,24 149:9

150:3,7,14 152:3
153:11,22 154:19
155:10 156:11
158:14 159:9,15,20
160:1,18 161:14,24
162:9,25 163:15
164:8,18 165:2,12
165:14,22,23 167:3
168:17 169:23
170:3 171:3,7 174:4
174:18,21,24 175:4
175:14 176:3,8,17
177:7 178:25 180:3
180:11,22 182:14
184:1,11 185:2,14
186:2 189:8,13,17
190:5,8,18,21 191:2
191:4,6,9,15,20
192:2,9,22 193:7,21
194:11,20 195:8
196:2,4 197:11,14
198:1 199:17,24
200:10 201:6,24
202:19,23 203:3,7
203:21,24 204:16
205:6,21 206:21
207:7,19 208:2
209:7 210:21 211:4
211:17,20 213:6,9
214:1,17 215:4
217:5,18,23 219:7
219:10 221:16
222:11,20 224:8
225:4 226:7,18,22
227:17 229:17
230:5 232:6,18,22
233:3,12,19 234:1,8
234:13,14,15
235:21 237:12
238:19 239:17,22
240:5,23 241:1,10
241:19 242:9,14
243:9,15,25 244:16
245:4,17,24 247:18
247:22 248:7,20

249:1,20,24 251:7
252:11,24 253:4
256:9 257:5,14,15
257:19 258:22
**circumstance**
235:25
**circumstances** 64:4
131:11 234:21
236:3,16
**cities** 172:2,2
**city** 3:11 10:16
12:18 13:4,13,22
14:6,10,15 17:21,22
18:1,1,5 19:10
21:12 22:3 23:1,2,8
23:11,19,25 26:4,16
27:5 29:16,19 30:12
30:22 31:22 32:12
32:16,25 34:16 36:7
36:9 37:1,5,7 38:24
39:5,8,16 40:7,12
41:23,25 42:7,8
43:11,14,24 44:2,13
44:23 45:1 46:21
47:14 48:1,22 49:8
49:24 50:18 51:2
52:1,3,22,25 53:12
53:24 54:19 55:8,14
55:15 56:15,22 57:7
57:17,25 58:6,13,17
59:22,23 60:10,11
60:17,22 61:1,20,24
62:3,14,23 63:2
64:5,12,22 65:5,10
65:17 66:2,17 67:2
67:3,20 68:4,8 69:6
69:16 70:12,25 71:6
71:9,17 72:11,12,13
72:14,23 74:1,16
76:14 77:19 78:23
79:1,17 80:12 81:10
81:14,16,20,24 82:4
83:5 84:19,20 85:15
87:7,19 88:2,4,7,9
88:12,16,19 89:2,12

89:18 90:8,11 91:5
91:20 92:1,8 93:21
94:19 95:1,2 96:7
97:25 98:10 99:5,14
99:19 100:6,9,24
101:16,19,23,24
102:1,8,15 103:6,13
103:22,24 104:6
105:7,24 106:22
107:25 109:25
112:7 114:5 115:9
117:4,12,15,25
118:10 120:20
121:21,25 122:6,11
122:13 123:13,21
123:24 124:1,3,4,11
124:24 125:15,24
126:6 127:15 129:2
130:21 132:5,12,16
133:4,6 134:17
135:8,13 136:4,22
139:14 140:15,25
141:1,5,13 143:6,17
144:3,4,21 145:13
145:24 146:7,17,25
148:6 149:9 150:3,7
150:14 152:3
153:11,23 155:10
156:11 158:14
159:9,15,20 160:1
160:18 161:14,24
162:9,25 163:15
164:8 165:3,12,22
167:3 168:17
169:23 170:3 171:3
171:7 174:4,18,24
175:4,14 176:3,8,17
177:7 178:25
180:11,22 182:14
185:14 186:2
189:13,17 190:5,8
190:19,21 191:2,4,6
191:15,20 192:2,9
192:22 193:7,21
194:11,20 195:8

196:4 197:11,14
198:1 199:17,24
200:10 201:24
202:19,23 203:3,7
203:21,24 205:6,21
207:8,19 208:2
209:7 210:21
211:17,21 213:6,9
214:1,17 215:4
217:5,18,23 219:8
219:10 221:16
222:11,20 224:8
225:4 226:7,22
227:17 229:17
230:5 232:6,22
233:3,12,19 234:1,8
234:14,15 235:22
237:12 238:19
239:17,22 240:23
241:1,10,19 242:9
242:14 243:9,16,25
244:16 245:4,17,24
247:18,23 248:7,20
249:1,20 252:11,24
253:4 256:9 257:5
257:14,15,19
258:22
**city's** 26:8 33:4 35:4
35:19 41:17 42:21
43:2 46:6 47:12
50:5 54:20 60:13
65:8,13 70:15 75:9
77:3,8 78:8,19
79:23 80:4 87:9,11
88:22 90:13 94:7
96:22 97:5,7 100:1
102:18 104:15
105:7 108:5,19
110:4 112:25
114:15 115:13,14
116:20 119:1,10
120:18,19 121:16
121:17 122:3 126:5
127:24 132:25
139:5 143:1,5,19

145:16 148:13,24
154:20 164:18
165:15,24 174:21
180:3 184:1,12
185:2 189:8 191:9
196:2 201:7 204:17
206:21 211:5
232:18 234:13
240:5 249:24 251:8
**claims** 197:12 240:5
240:12 241:11
**clarify** 93:10 144:1
146:18
**clark** 5:16
**class** 32:9 173:5,6,8
173:10 214:11
257:15
**classes** 32:6,10
**clean** 252:5
**cleanliness** 49:20
**clear** 11:2 91:4
141:6 231:2 257:5
**clearly** 165:6 181:12
**clerk** 221:21
**client** 246:3
**close** 193:20 215:5
**closed** 23:8
**closely** 16:18 167:6
**closer** 38:10
**clubs** 203:22
**clue** 185:22
**clyde** 123:15
**cmb** 173:3,13
**collaborate** 20:23
21:3
**colleague** 238:24
**collect** 204:9 217:5
**collected** 206:21
211:4,16 212:8
**collecting** 209:14
**collection** 207:18
**collective** 91:6
**collects** 247:23
**colorado** 7:23

[columbia - conducted]

columbia 260:3,6
column 172:7
   178:19
combat 156:24
combination 15:10
   16:14 17:8 47:24
combine 33:11
combined 33:15
combo 15:16 24:24
   30:8 58:11,12,14
   95:24
combos 82:21
come 17:12 34:9
   37:2 64:13 83:18
   113:24 114:1,3,4,6
   116:18,20 117:3,12
   187:21 188:2
   203:12 226:13
   255:15
comes 48:18
coming 216:3 256:8
   256:9
commenced 73:8
   97:20 169:7 197:5
   202:7
commencing 2:9
comment 201:13
commerce 39:14,16
   39:20
commercial 210:7
commission 94:5,13
   94:13,17,18,24
   101:12,14 175:5,7
   260:24,25
commissions 16:2
   94:8,23 95:2
committed 112:19
common 26:25 86:3
   220:11 221:11
   231:22
commonwealth 2:12
communicate
   166:20 167:24
   178:5 230:20

communicated
   119:14 147:25
   237:16
communicating
   206:17
communication
   44:18
communications
   197:16
companies 40:16,23
   40:24 41:20 114:15
   115:14 126:7 163:1
   163:6,15 164:10
   203:10
company 13:17,25
   14:2 15:21 41:9
   42:5,10,18,19 55:9
   55:11 61:4 66:10
   102:25 103:1,1
   111:1 113:11,24
   114:3,4 128:24
   164:3 177:25
   206:14 212:9
comparably 196:22
comparatively
   246:7
compare 89:24
   215:4
comparison 248:5
compete 100:22
   151:19,19 193:6,9
   205:17
competing 131:14
   214:18
competition 102:3
   206:15 207:14,20
   208:10 219:1
   223:16
competitive 28:20
   70:8,15,23 71:4,11
   87:25 118:5 133:6
   134:8 136:16 138:6
   138:24 144:8,12
   148:10 150:11
   153:9 156:1,2 159:4

162:16,18 166:3
176:7,9,18,21
177:11 179:6
184:22 185:10
186:11,13 190:25
191:1 192:4,11,17
203:25 204:8
205:19 207:11,18
207:25 209:19
210:2,4,12,20
211:16,19 213:5,7
213:17 214:16
215:1 219:11 220:3
220:6 223:8 224:9
229:10,20 230:10
230:21 234:25
235:25 236:3 250:6
250:18 254:13,16
254:19,22,24,24
255:1,4 256:16
competitively
   173:21 176:4
competitor 79:9
   152:6,17 156:3
   158:5,7,16 167:5
   174:21 176:6
   177:22,25 193:2
   205:7,16 206:20
   208:1 209:14
   214:15 216:3 225:8
   225:14,24 226:9,17
   229:14
competitor's 158:12
   158:20 167:4
   179:20 180:2,4,5
   191:21 209:17
   213:11 216:1,12
   218:3 223:9 225:5
   226:8
competitors 28:3,7
   28:14 152:2 153:13
   154:23,25 159:7
   164:18,21,25 165:2
   165:15,24 166:9,19
   166:24 168:18

173:22,22 174:3,5
175:14 176:7,10,19
177:4,9,13 179:13
182:10 186:4 191:4
191:9,16 192:23
194:21 195:2 203:8
203:13,22 204:18
204:22 205:22
206:13 207:10
211:3,10 215:17
216:24 217:13
223:20 244:25
245:1,16
compilation 209:25
complaining 136:18
complaint 8:23
   238:22 239:16,17
   239:22 241:3
   242:23
complaints 241:6,9
complete 46:20
completely 78:16
component 213:15
   250:14
compound 228:11
compromise 210:16
computer 15:6,19
   45:21 58:18 153:16
   188:13
computers 25:9,10
   58:17 153:17
concentrated 25:21
   26:8
concentrating
   106:11
concern 71:20,22
concerned 107:20
concerns 106:24
   137:22
concluded 112:5
   259:6,8
conduct 242:15
   243:9,25
conducted 2:7 43:11
   222:9

[conference - counsel]

conference 115:20
confidential 191:17
  191:22
confirmation
  225:18
confused 236:13
conjunction 28:13
connection 12:6
consensus 31:5
consequence 141:1
consequences
  138:17 139:3
  140:16,20,25
consider 88:23
  130:21 191:15,20
  192:2,9,22 194:20
considered 46:22
  61:20 93:1 98:20
  103:8 127:15 165:3
consistent 80:21
  103:8 157:13
  231:10 249:8
consistently 82:19
  90:8
console 32:2,4
consolidated 19:10
conspiracy 197:16
  238:21 241:2,21
  242:1,16
conspire 258:18
constant 231:20
constituted 171:22
consultant 189:12
consultants 189:19
consulting 13:17,25
  14:2,3,4 189:13
  258:8
consumer 38:9,18
  54:9 59:12 67:21
  80:7 93:4 101:12
  131:12 143:18
  149:4,7 164:21
  165:6,8,18 192:16
consumers 59:15
  144:5,23 148:5,25

165:14 191:17,19
  191:22 192:10
  196:3,4 249:18
contact 36:20 43:3
contained 58:18
  60:18,23 222:9
containing 14:23
contemplating
  255:2
context 36:10 39:20
  43:23 71:6 76:4,7
  102:16 109:22
  121:9 125:14
  131:25 179:19
  194:8 195:8 196:20
contexts 136:6
continually 187:11
continue 80:25 95:3
  111:25
continued 18:7
continues 130:6
  247:4
continuous 257:2
continuum 58:25
contractor 13:18,23
control 151:24
  152:1 232:22
convenient 96:1
convergence 193:12
conversation 53:10
  55:23 70:3 71:10
  72:4 116:13 256:6
conversations 41:21
  70:22 84:24 86:21
  87:5 116:11 126:11
  126:17 129:15
  229:25 240:21
coordinating 199:4
  199:12
coordinator 171:2,6
  171:10,12,19 172:4
  178:9,11,13
coordinator's 178:4
coordinators 171:4

cope 161:22
copy 128:25
corporate 15:7 16:8
  16:25 19:3,3 111:23
  120:7 180:13,21,23
  181:1 189:20
  190:14 203:24
  205:25 206:5,8,10
  211:20 220:8
corporation 74:24
correct 11:25 17:2
  42:11 44:1 51:3,4
  98:4 100:25 122:15
  137:8 141:23 143:3
  172:15 177:20
  187:7 201:7 202:20
  203:10,11 207:20
  207:21 211:18
  212:14 216:4 217:1
  217:4 222:11 225:6
  235:25 237:14
  244:19 257:8
correctly 19:9 21:11
  35:5 160:5 243:6
correlated 248:18
corresponding
  248:1
cost 43:21,22,23
  44:3,10,19 46:15
  47:2 49:3,12,16
  51:2 52:4 53:1,7,25
  55:5 62:1,9,11,15
  62:16,24,24 63:3
  64:6,18,18,25 66:1
  66:22 67:2,4,18,22
  71:8,15,21 75:3
  77:19 79:1,2,5,13
  79:22,23,23 80:1
  81:7 87:22,24 89:11
  89:11 91:25 92:15
  93:17 96:7,9,18,23
  111:14 112:6 115:5
  121:7 126:18,20
  130:12 134:8,25
  135:1,10 136:5,12

141:21 142:24
  143:14,19 144:3,6
  144:10,16,20
  147:19,21 152:15
  159:13 160:19,20
  160:23 161:5,5,14
  161:17,25 162:7,8
  162:11,12 165:17
  165:18 173:1
  191:11 193:22
  194:11 205:18
  231:16 232:9 234:5
  234:9 235:3,6 236:9
  237:3 249:24
  250:14,19 251:8
  257:1,10,16
costco 203:22
costing 86:12
costs 27:3 34:4
  44:14,21 49:15,18
  49:25,25 51:1,8,14
  63:12,20 65:13,19
  67:4,14 68:5,9
  69:15 70:3 72:7,10
  77:9 78:2,5,19,22
  79:17 80:4,11,11
  87:12 91:21,22
  92:10,22 93:13
  96:12,22 97:2,5,6,9
  97:10 105:10
  109:17 110:1
  111:12 115:7,10
  126:19,20 127:8
  135:22 136:15,18
  138:4 141:13,25
  142:12,14,18,20
  143:1,5 149:7 160:6
  160:7 161:2,10,12
  165:14 194:2 200:8
  231:3,6,9 234:14
  235:24 236:11,17
  250:13,22 251:1,13
  257:14,20
counsel 9:5,5 10:1
  12:13 66:3 197:17

counseled  195:18
counselors  124:9
  178:20,25
counted  21:25,25
country  16:16
  113:11 115:21
  116:12,16 256:7
counts  138:16
couple  10:24 17:11
  61:12 162:21
  211:15 238:18
  249:21
course  30:6,12 34:4
  91:16 122:4 145:4
  193:18 221:16
  223:7 243:1
court  1:1 9:17 11:2
  40:19 69:22 142:7
cover  10:25
covered  75:21,24
  76:9,13,17,19,22
covering  76:6
craig  203:15
create  147:14
  177:10 185:6
created  41:11 98:3,5
  155:24 156:24
  160:3 168:14
  182:23 188:24
creates  44:7
creating  39:4
  130:10,14 177:12
credibility  109:1,5,8
credit  83:9,12,16
  85:2,12 92:12,24
  96:15 97:4
credits  83:2,3,4
  84:17 85:6,16 86:23
  87:2 93:16 96:21
croll  2:11 9:17 20:21
crowell  7:12
crowell.com  7:16
crt  1:7 9:23 12:6
  14:18,21 15:1,11
  16:9 17:16 18:9

19:14,18,21 20:13
20:25 21:7 23:15,17
23:20 24:3,21,25
25:3,20 26:6,18,22
27:3,6,13,21,25
29:18 30:4,11,23
31:8,14,19 32:13,17
33:1,2,5 34:17
35:10,18 36:10
38:12,21,24,25 39:3
39:4,9,10,16 40:7
40:12 41:2,17 43:16
43:24 44:3,21 45:2
47:9,20 48:5 49:8
49:24 50:6,19,20
51:2,8 52:4,24
53:25 54:15,21 55:8
55:13 56:16,18,23
57:6,15,21 58:1,5
58:12,18,23 59:10
59:23,24 60:9,10,18
60:23 61:2,2,17,20
61:23 62:1,10,16,25
63:3,8,9,19,20 64:7
64:13,14,23,24 65:6
65:7,11,19 66:1,16
66:19 67:1,2,5,21
67:22 68:6,10 69:15
70:12,14 71:7 72:15
72:16 74:18,20 75:6
75:24 76:6 77:3,8
77:18 78:8,10,19,21
78:25 79:3,16,18,24
80:4,13,16,20,22
81:11,25 82:4,13,17
82:20 84:18 85:17
85:20,25 88:3,6,9
88:11,15 89:14,19
90:9,12 91:21 92:2
92:9 93:21,24 95:6
95:16,24 96:9,24
97:5 98:2 99:5,16
99:19 100:2,6,10
101:1,17 102:8,16
102:19 103:7,12,23

104:8,8,10 105:8
108:19 109:5 110:5
112:7,24 113:1
114:14 115:10,14
115:15 117:2,5,11
117:13 119:1
120:19,21 121:17
121:20 122:1,4,12
122:13 127:25
132:24 133:4
134:19 135:9,14
136:5,23 137:2,6
139:3,15 140:16
141:12 142:3,5
143:1,5,19 144:2
145:14,15,23,25
146:7,8,24 147:1,9
147:22 148:14,23
149:11 150:5,8,16
150:21 151:5
152:16,22,24,25
153:13 156:15
157:4 159:10,21
160:9,12,18,22
163:2,9,15,23
164:10 165:4,13
168:20 171:10
173:12 176:11
182:25 185:16
186:2,4 191:2 192:2
192:10,23 193:5,17
193:19,23 194:6,11
194:21 195:6,10,22
195:25 196:4,9,13
196:16,19 198:1
199:4 200:14
202:19,22 203:4
205:8,22 207:8
214:10 216:10
234:16 235:6
238:21 243:16
244:1 249:18,20,22
251:15,17 252:12
252:16 255:14
257:13 258:12,17

258:23
crts  14:23 35:2
  60:17,23 150:12
  152:11 243:2,10,16
crystal  194:18
ctc  173:19 221:14
ctcs  176:3
culture  149:15
cumulative  229:7
current  36:14
currently  36:4
customer  38:5 46:23
  50:11 102:4 143:7
  157:20 158:7,8,14
  158:19 168:17
  175:10 193:13
  196:10 215:3,11
  216:11 223:25
  225:20,22 226:4,10
  226:17 235:23
customer's  46:17
customers  12:7
  50:14 155:20
  157:12,17 165:24
  193:10 194:25
  217:9,16 234:16
  255:24
cut  40:19 98:17
cycle  29:3 34:20
  80:13,16,21 81:1
  152:24 179:7 232:4
  237:19
cycles  179:8

d

d  9:1
d.c.  7:14
daily  116:6,17
  117:18 177:21
  178:19,24 179:1,2
damage  108:5,18
damaged  28:5
  145:12
damaging  210:22

daniels 7:20
danny 20:19 68:24
  69:4,5 123:9,13
  137:17
data 42:15,18,19
  97:7 115:9 163:18
  163:18 173:1,2
  204:21 205:3,4
  212:18 232:13
database 212:8
date 9:13 17:13 81:9
  94:15 147:16 151:2
  181:19 216:18
david 74:14,15 75:1
  75:7 106:8
day 73:21,21 79:9
  98:14,15 115:2
  118:20 148:21
  151:11,25 179:9,11
  237:7,10 238:5
  259:20 260:18
days 51:23,23,23,24
  115:2 179:16 237:6
  237:18
dc 7:6
deal 41:8 82:8 91:25
  108:4,10,12,14,17
  149:19 156:25
  165:10 187:10
  210:8
dealing 187:8
  235:12,15,16
dealt 103:17 205:1
  228:14
deason 1:13 2:5 8:4
  9:9,16,25 10:9
  12:10 14:3,4 56:10
  97:25 133:25
  186:22 202:12
  227:9 238:19
  249:17 252:2,10
  259:16
decade 124:2
decide 72:5 164:16
  166:21

decided 55:12
  101:13 111:11
deciding 26:5 30:23
  55:15 219:14
decision 26:18 30:25
  37:16 65:16 104:15
  144:7 210:5
decisions 26:22
  33:22 35:11,18 47:3
  61:21 101:21
  138:17 150:23
  206:22 207:7
decline 150:8
decrease 66:18 67:4
  96:9,23 97:4 133:12
  143:4,6 146:6,24
  187:24 235:3,6
  251:12
decreased 66:17
  67:2 145:13 146:16
  251:13 257:14
decreases 133:10
  145:24 247:22
decreasing 90:1
  97:6 200:15 251:7,8
defendant 2:6
  238:16
defendant's 8:14
defendants 3:20
  4:19 5:20 7:9,25
  197:15 227:14
  238:13 239:23
  241:12,20 244:18
defending 10:6
define 22:9 38:5
defined 173:13
defines 161:14
definitely 71:23
  121:11 203:19
definition 58:14,16
  100:18,20 159:16
  171:23 176:20,21
degree 55:17 101:23
  136:14 193:11
  196:9 224:4

deliberate 37:12,20
deliver 88:9 121:1,2
  138:25 215:6,8
delivered 72:20 88:3
delivering 88:22
  97:13,14 118:13
delivery 34:6 88:6
  88:24 89:1 215:7
dell 5:12
deloitte 189:7,16
deloitte.com. 189:4
demand 33:7,8,12
  33:14,22 36:11 38:3
  38:4,5,10,12,14,21
  45:12 46:17 50:3,6
  50:11,14 105:11
  120:5 137:9 160:2,3
  160:5
denies 127:7
denver 7:23
department 23:22
  23:24 24:2,9 124:5
  180:14 209:3,4
departments 229:7
depended 79:4
  235:24
depending 164:3
depends 218:6
deploy 224:18
deponent 9:24
deposed 10:12,14,15
deposition 1:13 2:4
  9:7,8,15,20,21
  10:21 11:20 12:11
  12:15,19 13:7,10
  22:8 53:16 60:2
  68:14 74:5 105:18
  122:21 126:22
  128:10 137:10
  141:24 142:1 154:2
  169:12 186:16
  198:5 208:14
  219:16 239:4 259:5
  259:8 260:7

derrick 208:22,23
  209:13,16,21
descend 127:8
describe 137:15
described 169:19
  171:19 190:17
describing 17:25
description 8:14
  172:6 214:8
designated 170:20
desirable 101:23
  102:1
desired 72:14,19
despite 243:3
detail 206:3
determination
  28:14
determinations
  33:16
determine 60:9 62:4
  82:3 101:19,20
  152:3 159:6
determined 83:9,10
  95:8,11,13 100:15
  148:19,21 171:25
determining 20:24
  34:11
develop 52:13
developing 104:7
development 51:18
  52:9,12 53:9,13
  54:3 89:13,19 92:19
devices 219:7
diagonally 30:7
dictated 207:14
differ 228:2,4
difference 72:19
  149:15 155:3,4
  212:3
different 24:6 30:3
  32:25 33:7 71:13,15
  71:17 77:14 120:9,9
  146:12,13 147:1
  148:10,16 162:9
  197:21 203:19

207:5,10 211:15
212:16 213:17
218:16 226:6
228:13 248:5,8,8,13
248:14,15,15 249:1
**differently** 147:20
**difficult** 207:5
**dig** 105:16
**dime** 124:20
**dinner** 129:18
**direct** 26:25 38:25
124:18 130:4
155:17 176:23
219:23
**directed** 160:8
178:22,24
**directing** 74:25
**direction** 16:5
215:24
**directive** 95:9
**directly** 39:6 40:5
45:19 92:22 93:13
103:18 204:17
**disadvantage**
132:20 215:9
**discern** 206:11
210:21
**disclosure** 67:8
230:14
**discontinued** 32:13
32:17
**discounted** 167:9
**discounts** 12:5 89:3
89:5 92:13,21 167:4
228:9
**discover** 238:20
241:11
**discuss** 43:21 67:8,9
72:14,18 115:15
126:19 205:15
214:1
**discussed** 17:9
57:19 58:11 174:2
183:10 190:15
207:9 209:15

211:15 212:15
213:5 224:20
227:25 233:15
252:1
**discusses** 248:4
**discussing** 11:22
58:23 77:21 92:6
99:3 106:13,16,20
107:10,12 108:1
134:3,6 135:22
140:3 157:23 158:4
182:11 188:15
195:7
**discussion** 28:21
79:7 83:20 135:3
**discussions** 16:22
42:22 53:9 67:16
70:6,19 72:7,9,11
73:1 79:11 137:21
217:12,14 242:4,7,7
244:17 250:15,19
**display** 24:12,21
25:19 31:4,17,19
52:21 92:25 194:18
209:4,8,12
**displayed** 24:22
30:1 52:18
**displays** 93:18
**disruption** 130:10
130:14
**disruptive** 213:19
**distinct** 29:13
**distinguish** 88:18
**distinguished** 99:18
**distribute** 101:4
**distributed** 100:13
101:5
**distributions** 109:17
110:2
**distributors** 39:9,12
39:17,19 40:6
**district** 1:1,2 29:11
128:25 172:14
176:21 177:2 260:3
260:6

**divide** 115:5
**divided** 18:1,5 31:8
**division** 1:3 15:3,20
15:21 16:1,15 18:20
18:25 20:15 23:23
24:14 27:5,9,10
31:11,18,22,25 32:5
39:14 106:6,7,9
114:1 120:13,15
170:22 222:18
**divisional** 18:18
24:18
**divisions** 18:2,6,7
23:19 41:12 42:20
**dm** 172:11,13
**dmm** 24:21,23,23
120:12
**dmms** 119:20
**document** 1:9 11:15
12:16,22 68:17,18
69:18 73:19 74:7
105:21,23 107:1
119:4 122:24 123:3
123:8 126:8,25
128:14,17,21,22,23
135:12 136:7
137:13,24 154:4
157:11 169:15,16
181:4,7,12,14,16,23
182:7 183:7 184:4,6
186:18,19 210:25
239:7 244:16 245:6
247:2,12
**documents** 12:14
13:6 32:7 93:2
95:21 119:16
169:21 170:6
**doing** 22:1 33:20
35:23,24 36:5,17,19
37:19 44:7 47:24
56:19 60:7 67:10
78:15 96:15 107:10
108:25 116:22
126:16 130:18
160:24 164:15

168:5 171:18 187:3
187:16 190:1
215:13,23 216:22
218:23 220:14,15
223:18 225:18
230:13 231:12
**dollar** 144:2,4 235:8
235:12,15,18
**dollars** 90:22 96:16
118:19,21 130:20
131:14 172:10
**domestic** 113:2
**dominant** 153:22
**don** 109:21
**door** 38:6 177:5
**doubt** 95:23
**doug** 20:19
**dowdy** 74:14,15
75:7
**dowdy's** 75:1
**download** 187:17
190:11,12,13 237:7
237:10,15,25 238:1
**downloaded** 187:18
188:14 212:15
237:10
**downloading**
187:19,23 188:9
**downloads** 187:7
237:5
**dozens** 165:1
**draft** 181:7,12 184:4
**drafted** 168:4
**drill** 212:24
**drive** 184:23 186:14
**driven** 46:18 180:4
180:5
**driving** 50:7 184:17
**drop** 155:20,21
156:18 157:13,22
158:4 223:17
**dry** 98:17
**due** 51:23
**duly** 260:8

[duties - exhibit]                                                                                    Page 14

duties  16:15 171:19
duty  75:4
dvd  15:11 58:15
 104:7
dynamic  112:23

**e**

e  3:2,2 4:2,2 5:2,2
 6:2,2 7:1,1 8:2,2 9:1
 9:1 39:14,16,20
 189:21
earlier  35:17 74:16
 93:7 94:12 98:13
 110:13 137:2 174:2
 183:11 190:16
 193:19 202:18
 204:15 206:23
 207:9 212:5,15
 220:2 224:3,20
 226:11 227:17,25
 231:10 233:15
 235:21 244:11
 245:22 248:13
 251:18 252:10
 253:25 257:9
early  201:3 232:10
 232:11 255:19
earn  249:1
earned  248:8
ease  182:23
easel  155:19
easier  219:15
easiest  91:1
easy  167:7 225:10
effect  96:15 130:11
effective  71:2
 159:24 184:19
effectively  188:9
effort  174:20
either  33:20 36:11
 37:17 58:15 60:4
 89:7 106:6,9 111:22
 112:19 113:18
 172:11 183:12
 189:4 231:7 236:22

elected  185:14
electric  5:20
electronic  93:4
 101:12 188:10
electronics  3:20
 38:20 56:23 69:3,14
 80:7 123:19 164:21
 165:6,8 192:16
 203:15,16
eliminate  29:6
eliminated  29:5
elite  55:4 120:17
ellis  6:15
email  69:11,13 70:1
 70:10 75:1 111:17
 186:23 189:8
 208:21 209:5 210:3
emails  189:3
employ  45:1
employed  13:12,15
 123:20 198:22
employee  13:22
 123:24 213:11
 220:25
employee's  48:15
employees  20:24
 21:6 23:14 42:21
 94:7 170:14 177:21
 189:7 204:17
 209:24 213:15
 214:17,25 217:5
 219:6,11 220:24
employer  13:24
employment  12:17
 14:14
enact  140:15
encourage  95:10
endings  145:5
enemy  205:3
engaged  197:15
engaging  108:4
entire  16:16 17:10
 37:18 42:5
entities  4:10 6:20
 14:5 42:23 43:4

57:10 202:14
entity  43:11,12
 56:17 59:24 60:9
 61:19 198:22
entry  134:7,24
 240:13
environment  155:21
 155:22 177:11,12
 234:25
environments  156:3
equal  104:15
equivalent  18:19
error  20:13
especially  30:4
esquire  3:3,4,13
 4:13 5:5,14 6:5,14
 7:3,11,19
established  233:19
estimate  149:23
et  33:10 34:21 40:17
 116:18,23 153:2
evaluate  189:19
evaluated  97:11
eventually  23:12
everybody  20:4
 29:12 45:6,17,20
 99:13 110:11 111:1
 129:20 132:21,23
 144:10 164:20
 165:25 166:1,25
 177:25 180:18,19
 190:11 213:2,3
 238:1
everyday  148:15
 166:11 170:10
 183:5
exact  17:13 94:15
 137:20 194:23
exactly  27:17
 111:21 204:5
 213:12 247:1
examination  8:5
 10:8 202:17 227:15
 238:17 249:16
 252:9

examine  113:1
examined  2:6
example  24:20
 31:14 32:3 36:16
 37:22 42:11 47:9,24
 51:24 101:10 104:2
 112:13 137:1,7,7
 140:15 150:24
 151:21 215:5
 218:25 228:3,7
 229:10 234:1,10
 249:25 251:6,8,11
examples  141:18
 145:7 236:25
exception  193:18
exceptions  41:1
 148:8 153:3 184:18
 218:24 219:3
excess  95:12 149:3
 149:25 150:5
 159:25 186:7 236:6
exchange  52:5 53:1
excluded  153:6
exclusively  40:8,13
excuse  209:1
execution  176:24
exercise  214:22
exhibit  8:14,15,16
 8:16,17,18,18,19
 8:19,20,20,21,21,22
 8:22,22,23 11:16,17
 12:19,22 13:2 14:15
 15:1 68:14,17,21
 73:16,25 74:5,8,11
 76:4 105:18,20
 106:2,12 108:17
 122:21,23 124:19
 126:22,25 128:10
 128:12,13 134:1
 135:13,22 137:10
 137:12,15 140:15
 154:2,5,9 169:12,15
 169:19 186:16,19
 186:23 188:3 189:2
 190:18 198:5,7,8,11

[exhibit - finished]

200:1,13 208:14,17
219:16,20 239:1,3,4
239:7,15,24 244:10
244:10,12,15
257:23 258:11,16
258:22
**exhibits** 8:14
**exist** 144:6
**existed** 19:5 154:12
**existence** 238:20
241:25 242:15
**expect** 71:14 99:8,13
105:13 109:25
122:18 124:24
205:4 248:13
250:21
**expectation** 122:19
251:2
**expectations** 109:18
**expected** 71:18 87:9
121:12,16 125:6
139:5 150:7 177:7
177:10 201:25
243:11
**expecting** 71:12
**expenses** 114:19
**expensive** 156:10
**experience** 39:12
52:6 61:10 63:7,18
64:9 82:9,20 125:24
193:13 215:3,4,11
230:24 235:2
250:22
**experienced** 40:17
**expires** 260:25
**explain** 125:10
194:15
**explanation** 254:10
**express** 23:8 36:8
203:15
**expressing** 107:21
126:5
**extent** 20:10 76:12
76:19 139:22
141:21 181:11

236:8
**extraordinary**
223:12,20,24
**extremely** 39:13
104:21 114:11

**f**

**f** 8:2 119:15
**facility** 61:14
**fact** 35:22 37:12
46:18 54:7,10 58:9
70:21 98:21 140:3
247:16
**factor** 37:10 46:15
46:22 47:2 49:25
50:7,13 98:16
206:21,23 211:4
236:5,7 248:23,24
**factored** 161:6
**factories** 60:2
**factors** 33:7 34:3,8
46:19 49:12 59:1
98:21 99:18 104:19
105:3,14 214:25
228:19 236:2
**factory** 60:3 203:1
**facts** 138:1 169:24
199:21 245:19
246:18 247:12
**faegre** 7:20
**failed** 118:24
**fair** 109:17 110:1
230:19 248:7
**fall** 20:1 35:3 59:1
**familiar** 68:20,23
74:1,10,13 76:5,8
76:12 79:16 81:2
94:2 100:9 106:1
123:9,15 126:4
136:17 154:8
169:18,21 172:16
173:23 174:8
180:13 181:5 182:6
182:13 184:11
186:22 189:4

198:18 258:5
**familiarize** 123:2
128:16 157:9
**familiarized** 219:25
**far** 22:1 29:15 41:15
55:21 65:22 66:12
99:12 126:17 135:1
179:25 193:15,16
212:19 216:17
**fare** 114:21
**fargo** 7:21
**fashion** 131:8
**fast** 215:6
**faster** 85:4
**favorable** 52:1
62:15,24 63:3 64:6
108:4,10,12,14
125:21
**fax** 5:10
**feature** 43:8 45:18
**featured** 59:3,5
130:17 196:22
210:6 246:13 247:6
249:3,4
**features** 31:14 46:16
244:24 254:20
**february** 35:5 199:3
**feedback** 255:23
**feeds** 45:21
**feel** 123:8 128:17
**feet** 90:22
**fell** 59:10
**felt** 149:10
**field** 45:17 166:12
171:13 184:20
**figure** 206:18
**file** 257:24
**filed** 239:22 240:12
241:7,10
**fill** 255:12
**final** 27:12,17 127:4
151:14,14 157:13
157:22 158:4
**finalized** 120:2

**finally** 257:4
**financial** 119:15
**find** 21:23 102:1
119:25 120:1,3
157:20 158:15
175:15,20,23
209:22 212:25
214:14 216:22
220:18 226:4,15
**fine** 12:25 109:11
**finish** 11:10
**finished** 12:6 14:19
14:21 15:2 16:9
17:16 18:9 19:14,18
19:21 20:25 21:7
23:16,17,21 24:3
25:3,20 26:6,23
27:3,7,13,21,25
30:11,23 33:5 34:17
35:10,18 36:10
38:12,21,25 39:5,9
39:10,17 40:7,12
41:2,17 43:16,25
44:3,21 45:2 47:20
48:5 49:8,24 50:6
50:20 51:3,9 52:4
52:25 53:8,25 54:15
54:21 55:8,13 56:16
56:23 57:6,15,22
58:5,12,18,23 59:11
59:23,25 60:10,18
60:23 61:3,21,23
62:10,16,25 63:4,8
63:10,19,21 64:7,14
64:23,24 65:6,7,11
65:19 66:1,16,19
67:1,3,5,21,22 68:6
68:10 69:15 70:13
70:14,16,25 71:7
72:15,16 74:18 75:7
75:24 76:6 77:4,19
78:9,10,20,22,25
79:3,16 80:4,22
81:11,25 82:5,13,17
84:18 85:25 88:3,7

[finished - gathered]

88:9,11,15 89:14,20
90:9,12 91:21 92:2
92:9 95:6,16 96:9
96:24 97:5 98:2
99:5,16,19,25 100:6
101:1,17 102:9,16
102:19 103:7,12,23
105:8 108:19 109:5
110:5,6 112:7 113:1
114:14 115:10,14
115:15 117:3,5,11
117:13 119:1
120:19,21 121:18
121:20 122:1,4,6,12
122:14 127:25
132:24 133:5
134:19 135:9,14
136:5,23 139:4,15
140:16 141:12,14
143:2,5,19 144:3
145:14,15,23,25
146:7,8 147:9,22
148:14,24 149:11
150:5,8,16,21 151:5
152:16 159:10,21
160:9,12,18,23
163:2,16 164:10
165:4,13 168:20
171:11 173:12
176:12 185:16
186:3,4 191:3 192:2
192:10,23 193:5,24
194:11,21 195:6,9
195:10 196:5,19
198:2 200:14
202:19 203:5
205:23 232:19
235:6,22 249:22
251:15,17 252:12
252:17 255:14
257:13
**fiori**  186:25
**firm**  227:12
**first**  12:4 17:11
33:23 62:11 75:1

94:10 95:20 96:10
105:11 106:2,11
108:10 110:15,15
112:12 115:2 123:4
123:5 133:7 134:1
169:19 194:1
198:25 220:19
222:23 240:13
241:6,19,24 242:25
**fiscal**  35:4,6
**fit**  40:3
**five**  14:12 116:23
122:16 188:19
224:15 229:3
**fix**  258:12
**fixing**  198:3 258:18
258:23
**floor**  3:16 6:7,16
79:9 84:11 90:12,18
145:10 167:10
172:25 193:6 218:8
255:1
**floors**  90:14 94:13
**focus**  31:22 165:7
173:22,22 174:4
176:5,7
**focused**  49:10 129:8
**focusing**  16:7 127:4
**folks**  94:10
**follow**  185:14 220:5
**following**  17:1 125:8
180:6
**force**  126:12 255:5
**forces**  101:13,14
**forecast**  33:11 42:12
163:24
**forecasted**  41:21
42:16
**forecasters**  163:8
**forecasting**  34:15
164:13
**foreign**  114:14
117:2,11 256:7,8
**foremost**  96:10

**forgot**  245:9
**form**  17:19 18:11
21:1 27:15 50:2,24
60:12 62:6,19 63:15
64:16 67:6,25 69:19
70:18 103:15
106:15 107:3
121:22 125:3
127:11 130:8,24
131:9 134:22
136:10 140:19
143:21 145:19
147:14 159:2
160:25 200:6
213:20 235:9 245:7
245:20 246:10
247:11,19 252:21
253:2,18 258:24
**formalized**  44:5
**format**  220:5
**former**  83:17
**forms**  93:20
**forrester**  163:8
**forth**  41:22 260:8
**forthcoming**  254:3
**forward**  10:3 151:3
151:12 178:2
183:20 254:23
**fose**  9:7
**found**  167:24 219:3
**foundation**  65:1
73:18 75:10,25
84:22 108:21 119:6
127:17 128:6 134:5
138:2,20 139:19
149:12 161:7
181:13 182:2
191:23 199:6,14,22
200:5,17 201:9,17
221:4,24 245:18
247:10
**four**  15:23 39:25
90:23 187:16 219:3
224:15

**fourth**  129:7 198:25
199:1 200:13
257:25 258:6
**francisco**  1:3 3:17
6:17
**frequency**  212:2
232:1
**frequently**  52:19
63:2 77:22 78:9,20
80:5 168:3
**friday**  179:18
185:17 186:1 190:4
210:4 216:19
**front**  242:23
**full**  59:3 170:24
171:18 249:2
**function**  44:9
178:24
**functionally**  16:3
**fund**  92:24,25 95:21
233:4,6,10
**funded**  95:16
187:15
**funding**  82:11
104:24 161:6
**funds**  51:18 52:9,12
52:12 53:2,9,13
54:3 67:8 89:13,16
89:19 90:9 92:6,19
92:19 93:4,8,10,15
96:8 105:6 161:10
227:22,23 232:23
**further**  196:17
238:11 249:11
252:3 259:1,4
260:12
**furthermore**  143:13
**future**  203:14

g

**g**  9:1 11:23
**ga**  5:8
**gather**  167:3 191:7
**gathered**  213:6

[gathering - group]

gathering  203:25
  214:22
gawley  6:14 138:1
  239:13,13,19 253:2
ge  223:2 246:12
  247:5 248:5
general  24:6,10,16
  28:11 29:3 33:14
  67:7 78:5 80:8
  119:21 140:21
  153:7,8 172:13
  186:6 203:6 216:5,7
  219:4 234:13
  248:18
generalize  235:11
generally  29:2 34:22
  35:1 37:5,9 44:17
  72:23 85:9 91:12
  129:12 131:15
  134:17 140:14
  160:9 170:9,23
  176:14 203:9
  218:22 233:9 235:2
  235:11,24 236:10
  250:3,5 251:20
gentleman  239:9
georgia  15:23
getting  72:25 89:22
  96:16 125:21 137:3
  145:11 149:11
  185:10,11 229:21
give  35:14,21 37:22
  90:21 104:24
  105:16 107:5,9
  126:12 132:10
  136:15 150:23
  157:14 163:24
  164:2,4 194:23
  201:19 226:14,17
  230:3,9,16 231:25
  254:9,18 257:1
given  30:24 86:19
  161:14 214:4,7
  230:15 234:14
  255:23,24 260:10

gives  144:9 225:22
giving  104:19,20
  129:1 229:21
  230:21 256:16
glories  127:7
gm  172:11,13
go  10:2,23 12:21
  21:13 32:8 34:3
  37:25 47:10 61:12
  73:2 75:5 79:19,20
  80:4,11 86:21 92:15
  93:13 96:5 97:16,17
  104:18 110:10
  111:2,4,6,22,23
  114:8 129:5 130:2
  133:15 138:5,6
  141:3 146:19,22
  147:17 157:19
  158:6,7 166:15,19
  167:21,23 168:11
  171:16 175:20,23
  176:22 183:1
  190:25 191:1 202:3
  202:3 206:18 207:2
  208:6,11 209:22,24
  212:9,18,25 213:16
  214:5,9,9,10,13
  215:7,16,23 217:15
  217:18 218:25
  220:25 221:21
  223:21 224:11,12
  226:3,15 231:7
  232:6 238:6 241:3
  243:5
goal  50:12 134:14
goals  89:9
godfrey  3:5 10:5
goes  45:20 75:15
  104:17 110:19
  155:8 212:20
going  9:2,3 11:15
  15:17 21:15 31:6
  33:12,16 37:16,25
  38:18 42:13 48:16
  55:18 68:16 70:21

71:13 72:6 74:7
  76:9,17 79:6,17
  83:23 84:2,4,13
  87:1 89:23,25 90:4
  90:17 92:15,17 99:9
  99:10 103:2 105:20
  108:25 110:16
  111:12,21 112:16
  113:18 114:11
  116:8,9 120:1,2,25
  121:3 122:17,23
  123:3 126:25 128:8
  128:13,19 129:14
  129:20,21 130:1,3
  131:15,23 132:2
  134:11 137:12,21
  138:5,23,24 139:9
  139:10 140:4,5,7,8
  140:20,24 141:2,3,3
  141:9,10 142:24
  144:19 145:6 148:1
  148:9 149:8 151:3
  151:11,18 153:4
  154:4 155:25
  161:21 162:17,19
  162:22 163:25
  166:4,22 168:8
  169:1,14 170:11
  174:16,17 176:1
  177:18 178:1,10,14
  178:19 184:21
  185:23 186:8
  190:11,12 194:2,4
  195:19 198:7 200:9
  200:24 201:22
  203:17 208:11,16
  209:18 214:14
  215:21,23 216:3,24
  217:17 220:18
  222:24 223:15
  224:14 230:12,15
  233:5 237:2,3
  239:25 242:6
  243:11 254:12,22
  254:22 255:21

256:1,2,5,12,21
good  9:11 10:9,10
  55:24 98:24 104:5
  104:11,13,18,21
  105:3,4 118:25
  127:13,19 149:11
  202:12 203:16
  214:17 232:17
  249:17
goods  93:14 126:14
  126:15 247:23
gordon  2:11 9:17
gotten  48:7
grab  131:23
grabbing  212:3
gralewski  6:5 8:10
  17:19 40:18 43:1
  50:2,24 51:5,11,15
  53:15,20 60:12 62:6
  62:19 63:15,22
  64:16 67:6,25 69:19
  70:18 77:11,24 96:1
  103:15 106:15
  107:3,17,22 108:7
  108:23 109:15
  121:22 125:3
  127:11 130:8,24
  131:9 134:22
  136:10 140:19
  142:7 143:21
  145:19 159:2
  160:25 200:6 235:9
  245:7,20 246:10
  247:11,19 249:15
  249:16,18 251:3
  252:2
great  22:15,24 56:1
grew  165:8
ground  10:25
group  15:21 24:7
  25:5,6,7,7,11,19,21
  28:12 29:7,14 41:19
  42:2 47:8 98:3
  119:15 180:17
  209:9 220:16,17

[group - include]

223:14
grouped  173:8
groups  24:5,6,17,19
  25:1 29:9 151:17
guaranty  154:19,20
  155:5,12 224:20
  225:6,7
guess  80:14,15
  87:14 193:3 246:16
  246:25 248:17
guidance  31:1
guidelines  68:5,9
  150:17 213:10
guy  113:17 157:21
  166:16 177:5
  185:22 206:19
  230:15
guy's  126:20 134:25
  135:1
guys  135:5,6 230:12
  255:25

**h**

h  4:4 11:24
half  34:23 113:22
  115:2,3
hand  9:24 11:15
  68:16 155:19
  208:16 238:25
  239:6 256:2 260:18
handing  219:19
handle  213:16
handled  19:6,7
  147:20
handwriting  105:22
hang  107:18
happen  43:6 55:1
  77:23,25 78:3 79:13
  111:8 112:22,22
  116:7 134:15
  140:21 179:7 230:1
  235:18,19 236:19
  250:21 256:6,8
happened  61:13
  73:1 77:21 101:8

179:3 237:5
happening  141:19
happy  11:11
hardware  152:12
harmful  132:5
harming  108:2
head  11:6 38:9 48:6
  113:25 114:4
  128:24
heading  183:20
  220:19
headquartered
  40:24
headquarters  26:10
  116:20
health  127:9
hear  146:13 241:15
heard  10:23 54:11
  74:3 221:8,10
  222:14
heaven  127:8,16,19
heck  220:18
hectic  168:11
held  9:21 13:3 18:20
  19:8 40:16,23 41:12
  99:8 171:9
hell  128:4
hello  156:4,21
help  13:3,10 52:14
  52:15 84:9 96:16
  120:20 129:24
  178:15,16
helped  187:6
helpful  216:2,5
  222:10 224:6 232:2
helping  164:16
hereinbefore  260:8
hereunto  260:17
hesitating  230:11
hey  230:1
hh  203:14
hi  227:9,10
hidden  218:9
high  38:4 57:20
  58:24 59:10 132:19

133:8 136:18 153:2
  160:2,3,5 179:16,19
  187:13 198:2 206:1
higher  52:4 53:1
  59:2,4,14 125:11,25
  126:6,13 131:20
  133:5 134:25 183:3
  183:5 200:23 208:2
  208:11 228:8 249:3
highest  72:24 133:9
highly  55:22 95:15
  136:24 156:1,2
historical  33:8
history  12:17 34:5
  48:8 89:21 118:12
hit  118:6
hitachi  6:20 38:16
  56:16,19,20 104:5,8
  104:12 107:13
  137:21,23 138:5,14
  252:25
hold  161:19
home  15:5 25:8
  111:9 255:15
hope  211:12 212:13
hoped  122:13
hopefully  167:10
hopes  162:21
horn  5:14
horrible  215:14
hotel  114:21 115:6
hours  231:12
houston  3:8
hubbard  2:10 9:18
  260:5,24
huge  165:11

**i**

idea  84:7 177:18
ideas  124:22 125:1
identification  12:20
  68:15 74:6 105:19
  122:22 126:23
  128:11 137:11
  154:3 169:13

186:17 198:6
  208:15 219:17
  239:5 260:24
identified  10:2
  226:18
identify  29:15 33:4
  152:10 226:22
identity  61:19
igor  20:21
ii  93:3,7,11
iii  4:4
illinois  5:17 22:4
immediately  241:9
impact  79:4 106:17
  106:21 107:10,11
  121:3 141:4 148:24
  167:8 195:4 196:3
impacted  75:3
impacts  71:24
implement  236:8
  237:24
implemented  84:18
  85:7 99:3 147:8
  148:5 237:11
implies  201:11,20
imply  76:17 109:19
important  92:8
  109:4,7 134:13
  185:18 211:4,7,11
  223:19 224:5
importing  41:13
improve  118:15
improved  54:20
inch  29:23,23,23,24
  29:25 30:5,6,10,10
  30:10 31:3,3 45:15
  47:9 75:15 112:12
  137:2,6 156:15
  163:23 173:9 223:2
inches  31:5
incidentals  114:22
include  15:19 16:10
  17:6 25:8 52:16,17
  172:25 173:1 182:9

included  15:15
16:13 17:8 52:18
86:8 87:17 93:11,17
153:21 154:1
156:16 177:12
206:2
includes  34:4,4
including  16:22
98:21 190:3
inclusive  163:19
income  172:9
incorporated  14:3,4
increase  75:4 80:1
83:21 89:25 118:17
118:18 129:23
132:19 141:25
146:25 149:5,7
201:3,14,16 210:15
235:22,23 236:16
236:18 246:1 248:1
increased  141:13,21
142:5 188:1
increases  133:12
236:9,9,19
increasing  200:16
incredible  149:19
222:14,15,17,18
223:3
incurred  162:11
indemnification
99:9
independent  13:18
13:23 28:23
independently
144:7
index  8:14
indicated  258:12
indicates  220:24
indication  256:17
258:10
indicators  163:20
indirect  6:11
individual  80:23
102:20 150:14,20
151:4 160:22

219:14
individually  166:17
industry  33:11,25
34:15 200:19
238:21
influence  104:15
105:7 118:8 119:24
172:1 196:8
influenced  102:23
information  42:4,9
60:15 62:4 67:16
79:8 147:22,24
161:1 163:1,14
164:9 166:3 167:3
167:11 170:12
174:25 175:15
177:8,23 178:18
182:10 191:7,19
199:1,25 201:6
204:1,8 205:1
206:20 207:18
211:3,9,16 212:1
213:22 214:21
216:1,8,21 217:6,10
218:12 222:8,10
226:1,18 244:7
254:18 256:15
257:10,16,16,20
258:21
initial  86:4
initially  44:22
initiate  183:23
184:12 185:2
258:23
initiating  185:15
innovations  118:15
input  170:12 188:13
inside  118:22
insist  233:13,16
instance  31:9 36:25
51:1 53:24 144:23
216:18 221:20
instances  39:8,15
41:16 52:3,20 99:24
115:23 142:4,16,25

216:7 219:6 232:6
243:3
instantly  237:4
instruct  243:12
instructing  241:16
instruction  241:22
instructs  18:13
intelligence  208:1
209:14,19 210:4,12
210:20 211:19
213:7
intended  65:6,11
84:20
intense  223:11
224:9
interaction  213:23
interchangeably
117:8 165:19
interest  36:6,9
interested  36:21
195:21 225:25
260:14
internal  72:11
internet  226:5
interpretation
201:20
interrogatories
13:19 197:18
interrupt  96:3
217:22
intersect  195:2,3
introduced  31:18
58:10 95:25 136:25
137:2 204:15
255:21
introduction  31:24
34:20 35:3 80:8
251:22
introductions  30:19
invariably  187:12
invented  80:19
inventory  42:12
81:17 85:13 95:12
148:23 149:3,6,10
150:5 159:25

164:13 186:7
191:21 218:2
220:22 221:1,22
223:6,21,24 236:6
investigated  199:17
199:25 201:24
investigation  244:1
244:8 258:23
investigations
242:15 243:9
involved  15:6,9 20:5
20:6,17,19,20 45:19
104:7 152:24
154:13 156:1
209:13,16 229:6
235:13
involving  257:3
issue  50:1 165:11
248:18
issued  98:6
issues  129:2,19
210:1
item  82:8 145:8
220:22 225:15
items  39:25 118:16
177:6

## J

j  6:5
japan  111:2,4,23
116:17
jay  68:24 69:1
jbrew  7:16
jeffrey  7:19
jenner  5:15
jenner.com  5:19
jim  198:18,21
jlahad  3:10
job  166:23 170:14
170:17 171:6
209:22
john  3:4 7:11 10:5
238:15
joke  118:22 164:20

[jonathan - large]

jonathan 3:3
jr 2:10 260:5,24
july 15:12 181:19
jumped 8:22
jvc 14:11,13 38:16

**k**

k 3:13 32:20,22
kahn's 203:14
keep 89:23 132:2
142:13 166:8 169:1
207:6 219:10 231:9
kept 34:6 177:11
198:2
key 16:4 28:14
147:17 152:10
174:2,4 237:3
kick 35:15
kind 72:4 79:4,11
99:4 131:24 163:25
170:2 206:3 220:11
241:1
kirby 6:6
kirkland 6:15
239:14
kirkland.com 6:19
kmllp.com 6:10
knew 48:16 129:16
232:16 238:5
240:25
know 11:10 14:11
19:19,20,23 20:1,11
21:2,12,19 22:2
23:14 25:1 32:15,16
32:20 33:25 36:9,18
37:11,13,19 38:19
38:20,23 39:2,3,18
39:19 40:6,11 41:5
41:15 45:24 46:10
48:15 54:23 56:18
56:19,22 57:5,6,8
57:11,15 58:3,21
59:24 60:17,22 61:5
61:16,23 65:2,21
68:24,24,25 73:16

74:19,20 77:10,12
79:25 80:13 82:15
83:13 86:22 87:18
88:11,18 89:17
94:15 95:19,23 97:1
102:12,14 103:18
104:9,10 106:19
108:9 109:21
111:10 113:22
121:15 122:2,3
123:9,23 124:5
126:2 127:5,15,24
128:18,20 130:2
131:10 135:19
136:12 137:5
139:12 150:3,23
151:1 154:15,19
155:5,21 158:24
159:3,9,20 160:20
160:21 161:2,24
163:9 164:8 166:3
168:22 169:22
170:5 172:7 173:3
175:8,11 176:25
177:4,4,8,14 178:1
180:7,9,10 183:6
184:24 185:1,24
188:17,19,23 189:7
189:15 190:5,8
192:6 193:21
197:11,14 199:8,15
199:17,20 201:10
201:24 202:23,25
203:3 204:11
208:18,23 214:19
215:2 216:2,23
219:9,24 222:4
223:18 224:2
226:13,23 232:1,18
232:25 235:10
237:21 238:23
242:20,22 243:20
249:25 250:25
251:4 253:10

knowing 91:14
126:3 176:9,18
177:13 224:3
knowledge 42:22
45:10 48:14 49:1
56:15 58:9 60:6
82:18 177:1 205:21
241:2 242:8 250:11
known 60:20 61:1
kopp 180:7,10
korea 111:4 116:18

**l**

l 8:2
labeled 169:16
208:18
lack 73:18 75:25
lacks 65:1 75:10
84:22 108:11 119:6
127:17 128:5 134:5
138:2,20 139:18
149:12 161:7
181:13 182:1
191:23 199:6,13,21
200:5,17 201:8,17
221:3,24 245:18
247:10
lag 137:9 236:10,18
lahad 3:4 8:11 10:4
10:5 12:2,4 18:11
21:1 22:6,16,21
27:15 35:13 42:24
44:15 46:24 48:25
49:14,19 50:9 53:3
53:14 54:16,22
55:24 58:2,20 61:6
62:18 63:11,13
64:15 65:1,20 66:2
66:4,21 67:24 68:1
68:11 69:17,25
70:17 72:17 73:18
75:10,25 76:23 77:5
78:12,14 79:21
81:13 82:24 84:22
87:20 90:15 93:23

96:25 97:8 98:12
102:10,22 105:9
107:1 108:8,21
110:7 113:5,8
115:24 117:6 119:6
120:23 125:2,19
126:8 127:10,17
128:5 130:23 132:9
133:1 134:4,21
135:16 136:8
137:24 138:20
139:6,18,22 140:18
142:11,17 145:17
146:10 147:2,4
149:12 151:7
152:18 157:25
158:21 160:8,14
161:7,18 162:2,13
163:3 168:19
169:24 176:11
181:6 182:1 184:3
188:3 191:11,23
192:5,12,25 193:25
194:13,22 195:12
196:6 199:6,13,21
200:2,5,17 201:8,17
204:19 205:9
207:22 211:6,22
217:8 218:5,14
221:3,23 223:22
224:22 226:20
228:11 229:12
231:2 232:24
233:23 234:4,17,22
235:4,14 236:12,21
240:2,4 242:17,19
244:2,12 245:5,18
246:18 247:10,12
247:20 248:10,21
249:5 252:7,9,23
253:3,13,21 255:16
255:17 259:1
large 113:15,19
165:5 172:2 193:19

[larger - logical]                                                                Page 21

larger  30:18,19,19
  222:20 235:8
largest  30:9 54:5
  152:22 188:18
late  94:21
laughing  125:5
laura  3:13
laura.lin  3:19
law  2:7 227:12
laws  161:16
lawsuit  197:12
lazy  99:23
lcd  10:15 12:12,15
  13:19 58:9 142:2,3
  194:17 195:9,15,20
  196:14,20,23
  197:18
ldc  194:20
lend  17:3 145:24
  258:16
leader  159:12
  170:15,21,24
  171:15 172:3,6
  173:18 175:19
  176:2
leaders  159:10,22
  160:2 172:11
learn  135:8 174:20
  174:25 188:10
learned  54:12
  197:11
learning  43:7,8
  135:14 136:4
leave  92:1
led  207:18
left  25:5 155:19
  224:23 256:2
leftovers  187:13
lessen  129:23
letter  82:8 109:23
  141:24
level  18:10,16,17
  19:18 32:8,9 41:22
  45:17 119:19 120:7
  120:8 129:15 134:7

134:24 162:18
  173:19 176:2
  184:20 189:20
  190:14,15 204:25
  205:2 206:1 208:3
  218:2 229:5 256:11
leveled  80:14
levels  41:23 224:3
leverage  53:13
  54:12 55:6 134:10
  134:18
levers  84:15
lg  3:20 38:20 56:23
  61:11 69:3,9,14
  90:2 253:17,20
liable  99:8
lieu  96:8
life  80:13,16,21 81:1
  136:19 187:8,9
  232:4
lighter  196:23
liking  64:18
limited  39:13 82:21
  100:19 218:22
lin  3:13 8:6 10:8
  12:3,8,9,21 13:1
  17:20 18:12 21:4
  22:12,15,18,22,24
  22:25 27:19 32:24
  35:16 40:22 44:20
  47:4 49:6,17,22
  50:4,17,25 51:6,12
  51:19 53:11,18,23
  54:18 55:7 56:1,10
  56:11 58:4,22 60:16
  61:8,18 62:7,22
  63:12,17 64:3,21
  65:4,23 66:3,15,23
  66:25 67:19 68:3,16
  68:19 69:22 70:11
  70:24 73:2,14,24
  74:7,9 75:18 76:3
  77:2,6,7,17 78:7,13
  78:16,18 80:2 81:19
  83:1 85:5 88:1 91:3

94:1 96:4,6 97:3,16
  97:24 98:23 102:11
  102:13 103:5,21
  105:16,20,25
  106:23 107:7,19
  108:3,15 109:3,24
  110:8 112:4 114:13
  115:25 116:2 117:9
  117:10 119:8
  121:14,23 122:10
  122:23 123:1
  126:9,24 127:3,14
  127:23 128:12,15
  130:13 131:6 132:4
  132:15 133:3,15,24
  134:16 135:7,20
  136:3,20 137:12,14
  138:8 139:2,13,20
  140:13 141:11
  142:13,15,21
  143:24 145:22
  146:15,23 147:6,7
  150:2 151:10
  153:10 154:4,7,14
  158:2,3 159:5
  160:11,17 161:3,13
  161:23 162:6,24
  163:5 167:19 168:2
  168:21,25 169:3,14
  169:17,25 170:1
  176:14,16 181:15
  182:5 184:10
  186:18,21 188:6,8
  191:12,14,25 192:8
  192:14 193:4 194:9
  194:16 195:5 196:1
  196:11,25 197:10
  197:24 198:7,10
  199:9,16,23 200:4
  200:12,25 201:12
  201:23 202:3
  204:23 238:25
  239:6,10,16 240:22
  242:5 244:10

250:23 253:18
lincoln  7:22
line  45:6 97:12
  110:25 181:9 184:5
  189:2 207:20
lined  121:17 181:24
lines  181:10
lineup  145:16
lineups  43:7
liquid  194:18
liquidated  13:15
liquidating  3:11
  13:13 14:6
liquidation  242:10
list  19:2 57:13 93:15
  112:17,18 203:12
  214:4
listed  20:24 21:6
  23:15 177:22 179:1
listen  33:19 35:19
listening  146:12
listing  115:9
literally  29:9
litigation  1:8 9:20
  14:9 227:14
little  30:3 35:8 77:25
  96:4,17 112:19
  153:15,18 155:18
  224:20 251:5 252:5
  254:9 255:12
live  45:21
llp  3:5,14 4:5,14 5:6
  5:15 6:6,15 7:4
located  16:17 21:20
  22:4 25:11 26:13
  40:8,13 41:3 43:4
  115:17 181:1
  188:21 257:6
location  25:12,14,22
  25:24 26:9,13
  188:21
locations  100:19,19
  100:24
logical  190:20,24

[long - margins]                                                                                                Page 22

**long** 19:23 28:10
30:4 33:6 51:25
78:4 96:13 104:6
107:16 112:3 155:7
179:3 224:12 251:5
255:10,13
**longer** 19:5 52:5
94:20 96:5 151:4
255:21
**look** 28:20 37:23
97:13 111:21,24
123:8 166:20 172:5
198:13 205:2
206:18 217:24
225:12 226:11
244:9
**looked** 21:24 60:1
92:14 97:10 136:7
177:25 255:2
**looking** 33:9 44:6
45:8 48:8 50:14
57:1 69:11 73:15
154:11,18 176:1
177:19 184:22
209:17 216:21
217:15 218:23
244:22 246:5
**looks** 132:2 177:16
181:8 194:7 256:3
**lose** 107:16
**losing** 87:14 156:8,9
156:25
**loss** 133:13 159:10
159:12,21 160:2
246:1
**lost** 41:24 133:13
**lot** 19:25 34:8 49:5
64:19 80:10 81:17
86:8,15 120:3
224:23 235:17
**lots** 77:13 84:14
218:15
**loud** 109:10
**louisiana** 3:6

**low** 47:9 57:20,25
58:24 154:19,20
155:5,9,12,15 162:7
162:10,11,12
224:19 225:6,7
246:7
**lower** 45:22 59:6,16
63:9,11,12,20 66:1
66:18 67:4,22 79:13
86:20 121:7 153:17
153:19 156:5
157:23 158:15
160:4 167:25 177:5
183:24 184:13
185:3 186:3 194:5
196:20 200:22
205:18 233:14
249:3,4,24
**lowered** 85:8,10
208:5
**lowering** 207:19
**lowest** 46:7 47:7
64:10 185:15
**lunch** 55:25 57:19
62:8
**lying** 175:8

**m**

**m** 7:3
**machine** 218:20
**magnavox** 47:25
82:22,24,25
**mail** 189:21
**maintain** 71:18
101:16 109:4,7
118:14
**maintaining** 76:20
**major** 38:15,18
45:12 244:23
253:10
**majority** 101:8
113:6,9 149:22
182:18 206:25
232:13

**makers** 258:12
**making** 35:17 60:5
61:19 79:14 118:19
257:4
**malaise** 7:3
**manage** 24:7
**managed** 24:5 35:7
113:12
**management** 15:8
98:3 129:4,16 130:1
152:9 177:3 180:17
206:13
**management's**
177:1
**manager** 15:4,7
16:8,25 18:25 19:3
19:4,10 20:16 24:7
24:10,15,16,18 69:3
106:7,8,9 114:6
120:13,14,15
123:19 147:13
154:15 166:6
170:22,22 172:12
172:13,14 176:24
177:3,14
**manager's** 18:20
154:8 155:24
156:23
**managers** 29:10,11
119:21 177:7
178:22,24 209:11
**managing** 17:4 66:8
207:4
**manner** 243:3
**manufacture** 80:11
**manufactured** 41:6
59:24 60:9,19,24
61:3,17 67:13 70:4
111:13 144:18
202:24 203:1,2,4
254:17
**manufacturer** 39:4
55:14 64:24 70:20
71:8 117:3 246:8

**manufacturer's**
67:17 71:23 72:21
85:1,7,9 86:11
117:23 141:15
143:9 162:20
182:20 208:8,12
246:17 247:7,9
250:4,16 251:19
254:15 256:4
**manufacturers** 39:1
39:6,10 40:11 41:3
42:23 47:21 54:21
57:13 63:10 70:7,13
93:25 117:7 135:9
135:14 136:5 199:4
199:18 201:16
236:4 237:1 249:20
258:17
**manufacturing**
42:20 61:14 93:21
135:9,23 136:6,13
**march** 22:10,19
35:5
**margin** 72:15,19,20
72:24 76:20 87:10
118:3,6,10,18,23
119:1,4,9 120:10,20
122:5,8,9,12 124:21
124:25 127:7,16,20
133:9,13 138:4,25
141:3 143:15 144:1
155:19 162:22
248:18
**margins** 71:18
97:14 118:1,9
119:24 120:7
121:11,12,13,16,17
121:21 122:1
125:11,25 126:6,13
127:20,21,21,22,25
132:19 139:5
143:25 205:22
206:1,11 232:19
248:8,14 249:2

mark  12:21 74:7
105:20 122:23
126:25 128:13
137:12 154:4
169:14 186:19
198:7 219:18 239:2
marked  11:16 12:19
68:14,17 74:5
105:18 122:21
126:22 128:10
137:10 154:2
169:12 186:16
198:5 208:14,17
219:16,19 239:4,7
market  19:3 36:25
37:6,7,17,18,24
38:17 51:17 52:8,12
52:13 53:9,13 54:2
54:19 89:13,19
92:19 110:22
131:23 132:7 163:2
163:11,12,16,22
164:5,6,7,11 165:4
165:7 170:15,17,21
170:21,24 171:15
171:21,22,22,24,25
172:3,6,11 173:18
173:18,21 175:19
176:2,2,4,10 183:24
184:13,23 185:3
192:2,9 207:10,11
211:8,8 213:2
220:12,13,14 221:8
221:17 223:14,15
marketing  93:8
marketplace  54:5
72:3 89:23 130:11
130:15 140:22
148:9 164:25
176:19 250:7
marketplaces  156:2
markets  16:1,1
224:15
marking  169:15

markup  93:6
marriage  260:14
mart  37:23 164:23
165:7 166:12
mass  150:12
master  82:7 86:8
99:7,14,20 100:1
match  35:4,6 37:6
154:23 185:21
216:13 223:3,6,9
225:4 230:6 237:5,9
matched  225:15
matching  225:11
materially  228:13
math  143:15
matilla  208:22,23,25
matter  44:11 150:12
234:13 260:15
matters  259:4
maximize  184:15
mcinerney  6:6
mdf  90:5,7,9 92:6,10
93:1,4 96:8 97:11
97:14 105:6,13
206:2 227:22,23
232:23 233:3,5,10
mdl  1:5
mdp  163:18
mean  14:22 21:2
27:17 34:12 40:24
41:24 47:6 51:21
65:21 66:22 68:13
75:23 76:14 79:22
80:17 81:21 84:25
87:8 91:8 97:2
98:25 105:2 116:10
117:19,19 125:15
141:8 142:11 145:9
145:20 157:16,18
158:5 159:12
172:13,18 173:25
174:11 178:8
179:20 181:22
182:16 187:17,23
187:25 189:24,25

192:19 194:18
195:24 196:12
204:10 221:12
224:6 231:3 232:25
meaning  36:13
45:11 46:15 95:9
229:3 233:24
254:14
meaningful  63:6
means  27:22 47:7
51:22 73:23 76:22
109:16,20 116:4
127:5,12 155:22
157:19 172:8 174:1
174:12 176:3,5,25
183:7 187:18 188:1
188:9 221:13,13
meant  73:16 79:6
116:5 145:5,11
180:21 191:11
254:10
measured  30:7
118:21
meet  50:5 65:8,12
75:8 98:11 113:10
115:13 130:2
233:21 234:2,9
256:10
meeting  33:24
109:18 113:2
129:17,21 198:14
198:15,16 201:7
244:20 258:12,17
meetings  112:15
114:18 129:18
193:14
meets  129:2
melissa  5:5
melissa.whitehead
5:11
memo  201:5 257:24
memory  8:15 19:25
98:4
memos  220:2

mention  229:17
mentioned  28:6
29:7 52:8 74:15
83:2 202:18 203:9
204:13 213:14
220:2 227:17
merchandise  20:16
24:14,18 106:7,8
120:13,14,15 166:1
170:22
merchandising  16:5
18:8 23:22 24:2,16
27:10 119:14,22
124:5 128:24
152:10 166:21
224:10
merchandize  106:9
merchant  48:7
128:25
merchants  16:6
223:14
met  12:13
michael  6:14 239:13
michael.gawley
6:19
middle  75:1
million  163:23
230:16,16
mind  203:13 258:21
mine  188:5
minimum  121:21,25
182:21
mintz  74:14,22,23
75:20
minute  226:14
misquotes  245:5
missing  167:18
mission  3:15
misstates  35:13
46:24 50:9 54:16
68:1 76:23 93:23
96:25 105:9 108:8
133:1 135:16 136:8
139:6,18 147:2
151:7 157:25

[misstates - number]                                                    Page 24

194:13 207:22
221:23 223:22
245:6
mistaken  30:10
139:24
mitsubishi  5:20
101:9,11 239:18
model  75:2,13,24
81:1 164:5 173:5,7
173:11 228:25,25
229:2,2
model's  76:6
models  75:21 80:23
90:17 91:1,5,7
232:22 233:14,20
moment  107:5 123:3
157:7
monday  179:15
money  52:22 79:14
79:15 83:5 84:8
87:14 114:10
130:12 144:13
229:21 230:4
231:24,24
monitor  153:13
168:18,23 192:19
206:15 243:16
monitored  165:17
monitoring  165:13
165:23 205:7
monitors  15:6,19
25:4,21 30:3,5
32:17 33:1 58:13
249:19
month  40:2,3
231:19
monthly  178:4,5
months  35:9 187:16
251:25 255:20
moore  20:20
moring  7:12
morning  9:11 10:9
10:10,24 58:12
motions  66:3

motivation  50:13
move  140:17 143:17
moved  48:9 143:20
199:11
moves  87:22
mpd  163:7
msrp  249:21,23
250:3,9,14,22 251:7
251:12,16 254:14
mto.com  3:19
multiple  91:22
munger  3:14

**n**

n  3:2 4:2 5:2 6:2 7:1
8:2,2 9:1 32:20,22
name  9:17 38:18
48:15 171:16 180:7
180:9 198:18
202:13 227:11
249:17
named  23:1 208:21
names  20:9 38:8
147:12 212:17
national  9:19 15:13
17:1,2 18:10,15,16
19:13,18,20 20:6
28:15 69:2 114:6
116:19 123:18
243:4
nationally  166:14
nature  85:14
necessarily  37:25
137:7 200:24 233:7
necessary  226:16
need  41:21 42:13
61:16 75:3 90:7
91:18 121:2 123:8
128:18 138:16
139:12 140:10
166:2 170:13 175:8
196:20 205:17
219:22 238:6 258:1
needed  36:14 99:22
116:13 127:8 186:8

205:17
needs  42:12,16
121:7 134:25 177:3
178:15,16 186:9
196:17
negotiate  43:17 44:3
44:12 51:17 53:7
62:15,23 63:3,9,20
64:6 66:1,13,18
67:4,22 71:18 81:10
85:15 88:2,8,25
89:2,6,12 90:11
109:2 111:25 121:5
negotiated  41:2,10
51:1,2,8 68:6,9
76:21 78:20 82:6
85:16,20,23 89:5,16
90:16 91:11 95:6
105:11 233:3
negotiating  17:3
27:3 43:15 49:8,24
50:18 52:24 54:14
54:20 65:18 71:16
75:6 88:6,24 89:14
91:5,20,22 92:8
121:6 193:23
195:10
negotiation  50:20
51:13 62:9 66:6
91:7,19 112:3
135:15 195:23
228:23,25 255:10
255:13
negotiations  16:23
40:15 43:10 44:25
49:9 50:1,8 71:7
86:4 88:4,23 89:3
102:19 110:4,14
111:16 112:5
115:16 116:8
120:21 122:4
135:10 193:23
195:6 205:7 229:16
242:4 257:2

neither  163:19
net  19:2
never  39:18 60:7
91:14 159:17
226:21
new  4:7,16 6:8 43:7
43:8 87:24 112:11
112:23 118:16
136:24 137:8
144:20 147:15
238:6 251:23 254:2
newspaper  172:1
nimechek  68:24
69:1
nodded  66:4
nodding  11:6
non  67:8 92:5 94:13
96:7 124:12 135:24
175:7 229:18 230:6
230:14,25 231:16
232:9 255:4
normal  46:4 145:3
221:16 223:7,12
230:18
north  2:8 5:16 9:21
227:20 228:4,7,23
229:17 230:6,25
231:7,15 232:7,20
233:13,21,22 234:9
northern  1:2
northwest  7:5,13
notary  2:12 259:23
260:5
note  212:22
notified  238:3
november  22:10,19
187:3 208:22
239:23 240:13
241:7 242:14
number  1:4 29:17
34:12 57:12 73:6,12
74:8 91:5 107:14
109:9 122:24
133:19 153:8
155:18 173:11,16

197:4,8 231:25
**numbered** 137:13
**numbers** 195:16
**numeral** 93:5
**ny** 4:7,16 6:8

**o**

**o** 8:2,2 9:1 32:20,22
**oath** 56:13
**object** 181:13 184:3
    252:21 253:2,18
**objecting** 242:2
**objection** 17:19
    18:11 21:1 27:15
    35:13 42:24 44:15
    46:24 48:25 50:2,9
    50:24 51:5,11,15
    53:3,14,17,17,18
    54:16,22 58:2,20
    60:12 62:6,19 63:15
    63:22 64:16 65:1
    67:6,24,25 69:17,19
    70:17,18 76:23
    77:11,24 81:13
    84:22 87:20 97:8
    98:12 102:22
    103:15 106:15
    107:3,17,22 108:7
    119:6 121:22 125:2
    125:3 127:11 128:5
    130:8,23,24 131:9
    132:9 134:21,22
    135:16 136:8,10
    139:6 140:19
    143:21 145:17,19
    158:21 159:23
    160:25 161:7,18
    169:24 175:9
    191:23 192:5,12,25
    200:6 207:22 235:9
    236:21 241:15
    245:5,7,20 246:10
    247:11,19 250:23
    253:6 258:24

**objections** 69:25
    108:23 109:15
    245:8
**observing** 214:25
**obtain** 53:13 134:19
    206:5
**obtained** 216:9
**obtaining** 164:9
**obvious** 175:2
**obviously** 29:16
    104:23 206:15
**occasionally** 79:20
    80:1
**occasions** 64:9
**occur** 86:10 110:5
    116:7
**occurred** 162:1,7,8
    162:10 212:25
**occurrence** 250:1
**odd** 250:1
**offer** 83:22 156:5
    215:21 228:8
    256:12
**offered** 158:16
    228:4,5
**offering** 46:7 134:8
    153:11 158:8 193:2
    230:20
**offerings** 134:19
**office** 15:5,5 25:8,8
    111:24 256:9
**offices** 2:7 116:17
**offset** 75:4 133:12
    246:1 248:2
**oh** 173:17 256:3
**okay** 12:24 22:21
    111:10 142:22
    185:21 198:23
    239:11 245:11
**old** 118:22
**olson** 3:14
**olv** 210:6
**omitted** 12:2
**once** 17:2 31:17
    33:18 53:7,24 72:5

77:23 86:4 89:7
    226:3 255:25
**ones** 19:23 30:9
    83:24 132:14 153:4
    159:23 203:12
    214:6
**online** 226:3 238:9
**open** 37:9
**opening** 46:14 47:1
    47:5,10,12,18,21,25
    59:18,20
**operating** 29:13
**operations** 18:7
    28:12 29:7,9 180:14
    180:18,21,23 181:1
**opportunities**
    104:22 129:17,23
**opportunity** 36:1
    54:11 118:12,15
    129:22 133:13
**opposed** 102:6
    228:9 230:21
    243:16
**opposite** 153:25
**order** 41:11 134:19
    158:15 205:18
    233:21
**orders** 41:12,17,20
    259:11
**org** 19:24
**original** 71:19
    181:25
**originally** 19:1
    76:20 84:20 101:11
**outcome** 260:15
**outside** 41:3,6,9,18
    49:7 63:15 76:4
    88:12 100:24 107:3
    115:17,20 116:12
    116:16
**overall** 65:17,22
    92:17 97:5 99:6
    118:9 119:23 120:7
    122:9 130:19
    153:16 161:11

163:11 184:14,16
    185:7 219:25
    231:17 256:19
**overcome** 175:9
**overnight** 188:13
**overseas** 110:11
**owned** 86:5
**owning** 81:17

**p**

**p** 3:2,2 4:2,2 5:2,2
    6:2,2 7:1,1 9:1
    119:16
**p.m.** 56:4,7,9 73:5,8
    73:9,11 97:18,20,21
    97:23 133:23 169:5
    169:8,8,10 197:3,6
    197:6,9 202:5,8,8
    202:10 227:7 259:5
**page** 8:4,14 69:12
    69:13 73:15 75:1,19
    78:15 106:2,11
    124:19 125:9 129:7
    130:5,7 134:1
    154:18 155:17
    157:1,3,5 169:19
    172:5 173:15
    176:22 178:3,21
    180:7,8 183:19
    188:3 198:25
    220:20 222:13
    244:22
**pages** 123:4,6 178:2
    183:19
**paid** 51:22 87:13
    97:11 155:3 159:18
**palumbo** 198:19,21
    201:1,5 258:11
**panasonic** 4:19 57:3
    57:4,4,7 59:13 99:1
    99:1 106:17,21
    107:11 108:5,17
    227:13,20 228:4,7
    228:23 229:16
    230:3,5,25 231:7,15

231:22 232:7,20
233:12,21,22 234:8
252:20
**paper** 129:5,13
198:11 248:12
**paragraph** 157:6,10
239:24 240:11
242:23,25
**parameters** 29:1
**park** 4:15
**parking** 114:22
**part** 12:2,3,4 13:18
23:5 42:22 46:4
61:20 81:11 86:14
88:4 89:1,3,13 90:6
105:13 108:16
109:22 119:20
131:21 135:15
152:22 180:4 184:5
193:22 201:6 209:7
225:10 228:16
232:3,10,11 242:3
**participants** 241:20
**particular** 24:1
37:13,15 57:16
72:15 77:18 80:22
89:22 104:14
145:14,23 146:6
147:9 171:3 206:9
229:8 234:9 250:9
251:17
**particularly** 104:11
112:23 156:9 165:3
**parties** 14:9 260:13
**partner** 104:5
**partnership** 124:21
125:1
**parts** 181:23
**party** 14:11 55:23
126:10 163:1,6
164:10 253:8
**paul** 68:25 69:7,8
**pay** 52:4 75:14,15
88:8 92:1 114:15,19

**paying** 96:19 114:10
193:22 206:19
**payment** 51:16,20
51:25 52:5
**payments** 94:11
95:5
**peachtree** 5:7
**peak** 21:17
**pending** 11:11
**pennsylvania** 7:5,13
**people** 20:1,4,6
29:10 66:8 68:20
74:1,10 80:19 84:13
100:21 104:25
106:1,4 109:1
113:16,17,19,20,23
114:10,24 115:20
116:12,16,24
131:14 134:14
140:21 165:17,22
166:5,18 168:11,12
175:7,24 177:15
180:24 185:24
186:23 188:19
189:5 209:6,11
212:9 218:16,19
220:16,17 256:17
257:3
**people's** 168:9
**percent** 33:25 34:1
36:25 37:1,24 38:1
148:7 149:24 155:4
163:21 164:6,7
201:2,13 207:1
**percentage** 21:20
22:2 37:6 61:25
83:17 94:23 144:2
228:8 230:10,22
**performance** 34:5
**period** 15:12,14
16:21 17:10,13 18:3
19:23 20:5,15,21
21:13,16,19 22:3,9
22:20 23:3,9,21
24:8 25:17 26:2,13

28:10 29:6,20,24
30:13,17,20 32:1,21
33:12 35:3 38:12,22
42:14 47:23 48:2
56:17,21,24 57:25
58:7 59:17,19 66:10
78:4 80:3,7,9 82:9
83:6,25 85:4,13
86:7,14 89:8 91:13
94:14 95:18,22
100:5 101:18
103:14 110:7,9
115:4 119:2 120:16
121:15,24 136:22
149:22 151:13
155:7,16 159:11
162:1,3,4,5 164:19
164:22 165:8
168:15,20 170:16
176:13 184:8
185:19 189:17
192:1 197:25
212:12 224:12
232:10,11,14 237:9
243:1,8,15 249:9,23
251:16 252:13
**periods** 150:18,20
168:7 204:3 216:25
**person** 102:24
111:16 126:18
160:19 170:20
171:13,17 175:6
211:23 215:23
217:21,24 225:18
238:2
**personal** 12:17
82:20 201:20
240:16
**personally** 52:6
158:22
**personnel** 244:21
**persuade** 54:1
**phillips** 7:9 57:9,9
74:23 75:8 199:2
253:23 258:7

**phone** 5:3 6:3 7:2
111:17 115:19
226:9 238:14 252:5
**phrase** 174:8
**physically** 16:17
233:18
**pick** 114:21,21
226:8
**picture** 60:5
**piece** 58:19 248:11
**pieces** 28:20 90:3,4
90:5 116:24 122:16
**pierre** 3:4
**pipe** 240:6,9
**pitch** 117:13
**place** 81:25 99:15,20
110:22 155:6,12
170:3
**places** 102:6
**plaintiffs** 5:12 6:11
53:19
**plan** 90:24 118:4
**planned** 138:15
139:14 196:13,15
**planning** 34:21
119:15
**plans** 34:19 119:22
**plasma** 192:18,22
193:5,14,16,22
194:5,24 195:8
196:3,9,20
**play** 217:16
**playing** 36:14 38:2
45:17 109:13
**plc** 2:8
**please** 9:24 11:9
48:19 62:21 123:9
128:18 138:14
239:24 242:22
258:4
**plus** 155:4
**pocket** 218:18
**point** 17:15 19:21
20:22 32:16 36:18
46:14 47:2,5,11,13

47:18,21,25 48:18
48:23 49:4 59:17
61:2 69:2 71:15,17
71:19 84:7,8 85:24
89:11 101:6,7,13
107:14 109:9 130:6
162:9 183:9 185:1
195:1,10 200:22,23
234:2,4,10 246:5
248:4,22 256:14,17
256:21 257:4,23
258:1,15
**points** 24:13 59:11
59:18 86:2 118:23
122:18,20 195:2
233:20,24 244:23
248:14,15
**policies** 117:15,25
182:7,9 204:2,4,13
204:16 212:4 223:9
**policy** 117:22
121:25 150:4
181:25 185:15
203:24 214:19
226:24
**pool** 124:10
**poorly** 220:14,15
**popular** 196:24
**portable** 32:4
**portion** 129:9
**portions** 219:24
**posing** 217:9
**position** 15:17 26:4
26:16 30:22 54:20
74:16 131:17
132:12 170:25
171:3,10,17,18
209:1 246:13 247:5
**positioned** 132:6
**positioning** 247:3
**positions** 13:3 14:17
14:25 18:19,23 19:2
19:4,5,7,17 23:11
124:3 155:25
165:12

**possible** 58:10 60:3
112:9 185:9 199:10
207:6 256:24
**possibly** 49:2
**potential** 226:16
**potentially** 138:16
**power** 54:14
**practically** 189:15
189:19
**practice** 26:25
158:19 226:24
245:3,15
**precisely** 188:20
**predetermined** 28:3
28:7
**predicts** 210:15
**predominantly**
25:10 31:15 172:2
**prefer** 103:6,10
133:4
**preferred** 100:6
**premium** 59:20
**preparation** 198:14
244:20
**prepare** 12:10 13:10
**prepared** 13:2
244:17
**presence** 41:10
**present** 36:2 60:22
119:21 254:2
**presentations** 33:19
35:20,21 254:6
**presented** 54:10
**president** 24:15
113:24 114:2
119:22 128:23
206:14
**pretty** 30:5 39:13
129:6 216:17
**prevailing** 183:24
184:13 185:3
**previous** 14:14 22:8
135:17 141:24
142:1 198:15
221:23

**previously** 11:16
17:9 23:7 176:2
188:16 198:12
**price** 16:4 27:13,18
27:20,22,24 28:2,4
28:7 33:10 36:18,20
41:11 43:18,18 46:7
46:14,19,22 47:1,5
47:7,11,12,13,13,18
47:21,25 48:23 59:2
59:11,18 61:25
64:10,10,13 65:8
66:18,21 67:13,14
67:17,20 70:7,21
71:4,4,5,12,13,15,17
71:19,23,25 72:8,10
72:21,22 75:9,13
76:6 77:16 79:7
80:8 81:2,5,6,10,15
81:24 82:4,10,14,18
82:23 83:17,18
84:11,15,19 85:1,8
85:10,11,11,19,23
86:3,8,12,17 87:6
87:17,21 89:9 92:6
94:24 104:23
110:17,22 111:13
112:17,18 117:20
117:21,22,24 118:6
131:16,18,20 132:7
134:7 141:14,16
143:6,9,10,11,13,18
144:5,6,11,17
145:13,24 146:6,16
146:21,24 147:1,8
147:15,15 148:4,4,9
148:10 149:4,11
151:2,20,21 152:17
153:5 154:9,16,19
154:20,25 155:4,5,9
155:12,15,20,22
156:3,4,5,6,19
157:22,24 158:9,10
158:11,12,15 160:4
160:20 162:17,17

162:19,20 164:3
166:14 172:24
175:15 176:4,6
178:13,21,23 179:6
182:17,17,19,19,21
182:22,23 183:1,3,4
183:5,5,6,8,10,12,13
183:13,14,25
184:13,21 185:4,10
185:15 187:19,20
187:22,23,24 188:1
188:9 190:18
191:18 195:1,1,20
195:22 198:3
199:19 201:2,14
205:7,16 206:22,24
207:19 208:3,4,7,9
208:11,13 210:5,13
210:16,22 211:5,25
213:4 214:13
216:13 223:2,9,17
224:19 225:5,6,6,7
225:8,9,11,13,16
226:8,9,23 229:18
230:6,25 231:3,3
233:13,14,19,24
234:2,4,15 235:22
236:5,9,11,18 237:2
237:11,13,20,24
238:3,7,8,20 243:2
246:17 247:8,17
248:14,15,22 250:5
250:5,17,18 251:19
254:16,17 256:4
258:23
**priced** 79:8 92:5
118:7 153:2 156:6
162:16 200:22,23
**prices** 27:6 28:24
43:15,17 49:10,14
49:16 66:17,19 77:4
77:5 78:8,10,12
79:19,21,22 117:16
118:2 131:8 133:5
134:20 135:15,18

| | | | |
|---|---|---|---|
| 139:17 140:17 | 207:3,6,7 208:2 | **processed** 188:13 | 82:1,5,13,17,21 |
| 142:5,11,13,18 | 211:3,10 214:24 | **processes** 164:12,14 | 83:6 84:12,13,18,21 |
| 144:22 145:25 | 218:21 220:20 | **procurement** 33:1 | 84:25 86:11,20,23 |
| 146:8,18 148:12,24 | 222:24 231:6 | 36:24 231:5,9 | 87:12,23,25 88:7,23 |
| 150:8,16,22 151:5,9 | 244:24 245:15,16 | 234:14 235:24 | 89:7,14,20 90:9,12 |
| 151:16 152:5,17 | 246:8 | 236:11,17 | 91:11 92:2,3,9 94:6 |
| 153:13 157:12,13 | **primarily** 43:9 49:9 | **produce** 132:19 | 94:24 95:6,11,15,17 |
| 158:5,8 159:6 161:4 | 49:11 54:4 59:18 | **produced** 105:23 | 95:24,24 96:9,11,24 |
| 161:25 162:10 | 156:17 204:10 | 170:5 188:7 | 97:6,10,11 98:14,22 |
| 165:18,23 166:9,10 | **primary** 46:17 | **product** 15:4,24 | 99:5,22,25 101:22 |
| 166:24 167:24,25 | 49:25 50:13,13 | 16:12,13,14 17:4 | 102:4,16 103:7,13 |
| 168:18,23 172:24 | 71:20 143:10 | 18:20,25 20:25 | 103:23 104:2,9,10 |
| 173:21 174:6 | 209:21 | 23:16,17 24:3,11,13 | 104:20,21 105:8,10 |
| 175:12,21 176:9,9 | **print** 151:21 | 24:22,24,25 27:3,14 | 105:12 108:19 |
| 176:18,18,21 177:9 | **prior** 31:25 94:19 | 27:21,25 28:1,5 | 109:5 110:5,12,15 |
| 177:13 179:20,21 | 99:2 120:4 130:25 | 30:8 31:9,9,22 34:8 | 111:21,24 112:1,11 |
| 180:4,5 181:4 | 136:11 242:9 | 34:17,21 35:10,18 | 114:9,14 115:10,14 |
| 182:11 183:20,24 | **priority** 133:7,7 | 36:2,10,12,20 37:23 | 115:15 116:21 |
| 184:13,19 185:3 | **probable** 60:3 | 38:2 39:5 41:6,13 | 117:3,11,23 118:7 |
| 186:4 188:11 | **probably** 19:25 | 42:14 43:7,8,25 | 120:19,22,25 121:6 |
| 190:22 191:3,8,13 | 21:17 29:21 34:1 | 44:9,14,19,21 45:9 | 121:18,20 122:1,6 |
| 191:15 195:9,15 | 91:1 93:3 94:16 | 45:11 46:2,8,18 | 122:12,18 128:8 |
| 196:2,3 198:1 199:3 | 137:19 145:6 | 47:2,6,8,8,9,17,18 | 130:16,18 131:13 |
| 199:5,11,12 200:15 | 152:23 153:24 | 47:20,24,25 48:22 | 131:17 132:3,17,24 |
| 200:16 201:16,25 | 167:12 187:4 190:3 | 49:9,25 50:12,15,16 | 133:8,11 134:9,10 |
| 207:5 212:15,23 | 195:17 203:16 | 50:19,21 51:3,9 | 134:12,18,20,24 |
| 243:10,16 244:1,25 | 211:11 | 52:13,14,15,17,19 | 135:4,6,9,14 136:5 |
| 258:8,13,18 | **procedures** 33:1,3 | 53:6,7 54:1,8,11,13 | 138:5,7,23 139:4,9 |
| **pricing** 70:5,14 71:1 | 36:24 | 54:15,21 55:2,13,16 | 139:15,15 140:4,16 |
| 73:17 74:2 83:22 | **proceedings** 73:7 | 56:19 58:9,14,15,18 | 140:23 141:2,12,14 |
| 118:4 130:16 | 97:20 169:7 197:5 | 58:25 59:5,11,21,25 | 142:3,5 143:12,20 |
| 132:13 144:7,22 | 202:7 | 60:4,10 61:3,13,16 | 143:3 145:12,14,23 |
| 145:1 148:15,20,22 | **process** 28:9,12 | 61:21 62:10,17,25 | 146:7,17,20,21,24 |
| 152:1,2,6,13 154:24 | 34:10 43:14 44:2,6 | 63:4,10,21 64:7,11 | 147:1,9,13,13,22 |
| 156:24 158:9 | 44:8 45:2,4,20 46:7 | 64:14,19,20,23,24 | 149:11,18 150:5,9 |
| 166:11,20 169:18 | 46:10 48:2,5,6,12 | 65:7,14,19 66:16 | 150:13,22 151:5,18 |
| 169:22 170:2,8,11 | 48:21 49:7,23 53:5 | 67:1,3,5,12,18,21,23 | 153:16 154:24 |
| 171:2,4,6,10,12,19 | 53:5 82:6 98:1,6,9 | 68:6,10 69:15 70:13 | 155:1,2 156:17,20 |
| 172:4 177:23 178:3 | 99:4,12 119:20 | 70:16 71:1,8,9,11 | 157:20 160:23 |
| 178:9,11 179:2 | 135:15 147:10 | 71:21 72:3,15,16,24 | 162:16 163:2,16 |
| 182:6,9,14,24 | 149:14 169:19,22 | 72:25 73:17 74:21 | 164:6,11 165:4,14 |
| 184:17 186:6 187:2 | 170:2,8 175:19 | 75:7,8,24 76:7,21 | 166:7,16,17 167:9 |
| 187:4,5,6,9,14 | 183:1 212:13 | 77:4,15,19 78:9,25 | 174:6 185:9 186:7 |
| 188:15,16,23 189:9 | 256:25 | 79:3,10,17,19,19,24 | 186:12,13 187:8,9 |
| 193:12,14,15,16,20 | | 80:20,22 81:7,8,11 | 187:10,11,17 191:3 |

192:10 193:15,16
193:17,20 194:5,6
194:12 195:7,15,19
195:20 196:7,8,10
196:13,15,16,18,23
200:15,22,23
202:23,23,25 203:2
203:5 205:8 208:2
208:10 209:10
211:24,25 214:8,8
215:12,14 218:7
224:1 225:12,23
226:4 232:4,8 233:5
233:9,17 234:14,16
235:7,23 244:1
246:12,14 247:5,25
251:17,23,25
252:12,17 254:11
254:19 255:3,3,14
255:20 257:14,15
**products** 12:7 14:19
14:21,22 15:2,10,10
15:16,25 16:3,10
17:9,17 18:9 19:14
19:18,21 21:7 23:11
23:21,25 24:7,24
25:3,20 26:6,7,19
26:23 27:7 30:11,24
31:8,17 33:5 34:13
34:25 35:2 37:7
38:9,13,21,25 39:1
39:9,11,17 40:8,13
41:2,18 43:16 44:4
45:2 46:11,21,23
47:13,14,22 48:5
50:7 52:5,25 55:9
56:16,23 57:6,16,20
57:21,22 58:1,5,11
58:13,24 59:1,23
60:18,24 61:24 63:8
63:9,11,19 65:6,11
66:1,19 70:14 74:18
77:14 78:1,11,20,22
79:2,25 80:4 85:17
85:21,25 86:5 88:3

88:9,11,15,19 90:13
91:9,12,14,17,21,22
92:1 98:2 99:16,20
100:7,10 101:2,3,5
101:17,24 102:2,7,9
102:10,11,19 110:6
112:8,10 113:1
117:5,13 119:2
122:5,14,16 124:11
127:25 132:6,8
133:5 134:7 136:23
136:25 143:2,6
144:23 145:15
146:1,4,8,18 148:14
148:24,25 150:8,16
151:18 152:4,5,16
153:18 159:7,10,18
159:21 160:1,4,5,9
160:10,12,19
168:20 171:11
172:23 173:8,12
174:22 176:12
184:15 185:16
186:3,4 191:8,16
192:3,23,24 193:5,6
193:22,24 194:20
194:21 195:9,11
196:3,5,19,21 198:2
202:19 205:23
207:8 212:23 214:4
232:19 243:4,17
244:24 245:15,23
246:9 247:3,6
249:22 251:15
254:3 258:19
**profit** 109:18 118:19
118:21 121:1,21,25
130:20 133:13
141:5 150:10
172:10 185:9
232:18 248:8 249:1
**profitability** 87:12
87:16,19 96:11
104:21 119:23
126:21 153:16

161:11 184:15
210:18 245:17,23
247:17
**profitable** 95:15
128:9 140:6,8
144:14
**profits** 131:3,4
132:25 210:22
245:1,3 246:2
247:24
**program** 55:19 99:2
106:20 127:6,13
154:9,11,12,16
155:6,9,11,12,15,24
172:19,20,21
183:17 229:3
231:17
**programs** 12:5
81:15,21 125:12,25
164:17 227:18,20
227:21,25 228:14
228:22
**prohibit** 161:17
204:16
**projection** 31:20
106:18 156:14
214:9
**projections** 156:12
**promo** 179:4,5
**promoting** 128:8
**promotion** 216:4
**promotional** 127:9
128:4 180:1,3 183:2
215:20 216:16
227:18,20,21,24
**promotions** 12:5
148:16
**prompt** 146:7
**pronounced** 208:24
**proper** 104:25
**properly** 237:20
**proposals** 233:13
**proposed** 108:17
120:1

**proposing** 256:23
**protected** 86:13
**protecting** 87:7,8,9
87:11,15,19
**protection** 81:3,5,6
81:11,15,25 82:4,10
82:14,19,23 85:11
85:11,19,23 86:3,9
86:17 87:7,10,17,21
92:7 144:17
**provide** 14:5 36:15
52:21 54:2 60:15
82:14,18 110:1
122:8,11 126:14
163:1,15,22 170:11
**provided** 14:8 19:24
52:13 62:16,25
82:22 83:5 93:12
122:5 219:7
**psb** 172:16,18 179:3
183:6,9,10,12,14,16
238:6,7
**ptv** 106:17
**public** 67:11,20 79:8
177:17 191:19
206:8 216:1,21
259:23 260:5
**publicly** 224:4
**published** 216:12
**pull** 139:14
**pulling** 138:15
**purchase** 17:6,8
23:20,24 26:6,18,22
30:24 33:5 35:10
37:16 38:24 39:5,16
39:21,23 41:11,12
41:17,20 43:10
48:23 50:6,7 52:24
54:1 55:8 56:16
61:25 64:14 65:7,12
75:6 85:17 88:4
89:3 91:7 96:9
98:10 99:19 102:18
104:16 105:8
135:10 136:22

143:1 148:25 150:4
193:23 195:10
214:17
purchased 18:10,15
18:16 39:9 40:7,12
55:14 60:19 61:24
85:20,25 99:15
202:19,22 232:19
purchaser 6:11
purchases 17:4
20:25 23:16 24:3
27:1 34:17,24 39:13
40:16 41:2 42:5
43:15 49:9 50:19
64:7 81:12 92:9
99:5 115:10,16
117:17 120:21
purchasing 17:8
35:18 45:2 46:17,23
55:10 59:23 61:21
77:4,5,9 82:1 91:6
233:20
purely 200:9 214:21
purgatory 127:7
purpose 129:12
purposes 66:7 183:2
pursue 101:25
put 28:1 39:25 45:6
55:12 97:15 105:15
105:15 110:17
118:3 121:8 126:24
128:12 148:10
151:23 178:21
179:12 182:25
186:18 188:2,10
210:25 223:13
256:2
putting 144:1
178:23 185:9

q

qualification 98:1,9
99:4
quality 244:24
249:3,4

quantities 37:17
quantity 50:6
query 120:5
question 11:11
21:10 26:20 49:14
53:5,22 54:25 60:1
60:25 62:20 63:24
69:23 77:13 103:19
108:11 112:21
130:25 136:11,11
139:20 142:8,14,18
146:13 160:8,15
170:4 200:2,4
211:13 245:12
246:14,23,24
questioning 96:3
questions 123:7
224:24 227:2,16
238:12,18 240:1,19
249:21 252:3 257:9
257:25
quick 22:6 196:25
238:18
quickly 22:1 219:18
244:9
quite 16:21 20:4,6
33:6 35:6 104:6
136:25 182:20
189:18
quote 94:22 225:23
quoted 44:22 64:10
135:1
quotes 44:13
quoting 45:18 194:6

r

r 3:2 4:2 5:2 6:2 7:1
9:1 240:4
radio 222:19
raise 9:24 75:3
106:25 161:24
162:10 208:3,4
210:12,22 258:7
raised 199:2,18
208:6

raising 137:22
ran 151:22 167:5
180:19
random 224:11
range 58:5
rare 36:2,3,7 113:14
114:7,12
rated 96:11
rattle 20:3 29:21
ray 1:7
reach 36:4,8 71:16
react 28:16,22,24
45:23 140:22
166:10,22 167:12
174:2,5 176:5
179:20 190:16
206:24 217:2
reacted 212:19
reacting 28:17 29:6
212:13
reaction 139:11
152:1,5,11 153:13
156:7 179:6,14
190:2 204:7 207:2
208:5 212:20 221:8
221:15,18 225:19
231:23 232:5
reactions 151:2
189:22 190:6,9,17
reacts 223:16
read 40:20,21 69:22
69:24 73:22 107:5
109:9 123:5 127:2
128:20 133:25
135:13,21 138:9,12
142:8,10 157:6,8
167:17 183:21
198:24 219:22
243:6,7,7 258:2
259:9
reader 170:17
readily 217:6 218:3
reading 69:13 70:1
175:17 184:5 200:1
200:13

reads 210:3
real 22:6 158:8,10
158:12,15
realizing 160:23
really 72:2 96:18
112:10,19 118:20
125:4 181:14
204:10 239:2
reask 62:20 66:23
reason 108:16
143:10 159:25
170:6 184:16
214:12 224:16
230:11
reasonable 21:14
34:1 65:3 251:2
reasons 104:4 186:5
rebate 92:24 228:8
rebates 12:5 93:17
161:6 227:24 228:2
228:3 229:11
230:21
reboot 49:20 63:13
recall 29:18 30:15
31:21 32:12 38:11
62:12 101:1 103:12
115:22 118:25
141:18 162:25
171:9 227:19 229:9
244:15 252:13,16
254:7 255:10
257:11
recap 198:14
receipt 89:13
receive 71:19 90:8
90:13 94:8,25 95:3
157:24 209:23
received 93:21,24
94:18,22,23 210:4
recess 133:20 227:5
recognize 209:6
recognized 59:13,15
recollection 82:22
recommending
210:11

record 9:2,4,10,12
  10:4 11:2 22:8
  40:21 49:21 56:5,9
  63:14 66:4 69:24
  73:6,13 97:17,19,23
  133:19,23 142:10
  169:6,11 181:6
  197:4,9 202:4,6,11
  206:8 218:12 227:4
  227:12 259:10 260:9
recorded 119:9
recorder 218:17
recording 218:13
  219:7
recordings 219:10
records 23:5 119:10
  119:13
recourse 64:12
red 181:9,24 184:5
reduce 64:24 65:5
  65:10,19 69:15 70:2
  71:8 81:7 84:11
  96:22 132:24
  139:16 143:13,14
  146:7 149:4 150:6
  245:25 247:17,24
reduced 58:6 87:23
  194:11
reduces 131:3
  245:22,23 247:23
reducing 96:18
  130:18 131:7
  138:16 190:22
  245:1,3,17
reduction 65:15
  130:21 144:9,17
reductions 190:18
refer 14:21 17:21
  36:12 43:18,18
  45:10 64:8 93:3
  229:19
reference 36:23
  74:2 154:18 216:10
referenced 34:11
  35:17 154:9 167:14

references 109:13
referring 17:22
  109:12 142:2
  151:25 170:9,10,18
  170:20
refers 181:4 188:12
reflected 14:15,17
  14:25 115:8
refund 155:2
refused 98:10 99:21
  99:25 139:16
regarding 36:24
  62:10 68:9 121:25
  205:22 242:15
  249:21 257:10
region 28:15 207:8
regional 18:2
  164:25 203:9,13,18
regions 207:13,15
  213:18
regular 157:12,18
  209:20
reinforce 129:22
relate 23:11
related 14:18 15:18
  16:9 17:7,16 19:17
  21:7 23:15,17,20
  25:3,20 26:5 33:1
  56:17 57:9 68:5
  115:8 117:15 118:1
  147:23 171:10
  251:13 260:12
relates 1:9 70:9
relationship 102:24
  102:25 103:3,9,25
  104:11,13,18 105:4
  105:4 108:6
relationships
  102:20 104:3
  108:18
relative 229:23
  248:19
relatively 235:7
  249:2

released 216:17
releases 206:7
relevant 21:13,19
  22:3,9,20 23:3,21
  25:16 26:1,13 29:20
  30:13,16 38:12,14
  38:22 48:2 49:11
  56:17,24 57:24 58:7
  80:3 100:5 101:18
  103:14 110:8 119:2
  121:15,24 136:21
  159:11 162:4
  164:19 168:15,19
  176:12 192:1
  197:25 243:1,8,15
  249:9,23 251:16
  252:13
relied 34:16
relying 139:23
remain 70:15
remainder 155:23
remaining 85:13
  243:10
remains 243:2
remember 13:3
  20:10 35:5 37:2
  48:17 57:22 150:25
  180:9 229:13 251:9
remind 123:12
  183:15
reminder 154:10,11
remove 217:23
renegotiate 79:2
  232:9
rep 114:5
repeat 9:6
replaced 80:24
replayed 201:6
report 119:17,17
  120:3,4 164:14
  167:14,20 168:1
  179:4,5 205:25
  206:8 212:21
  220:11 221:9,18
  222:10

reported 2:9
reporter 9:3,18 11:2
  32:19,23 40:19
  69:22 124:13,15
  135:25 136:2 142:8
  205:11,13
reporting 171:15
  201:5 212:20 220:9
reports 21:24 57:1
  120:4,5 167:11
  168:3,14 177:16
  206:6,10,13,18
  209:23 220:6
reposition 143:8,11
repositioned 67:12
  86:11
represent 105:22
  198:21 202:13
  227:13 241:5
  249:18
representative
  115:19
representatives
  102:21 112:25
  113:10,12 114:15
  115:13,15,16 117:2
  244:18 256:8
represented 32:6
  223:1 239:21
representing 217:17
  246:6 247:2
represents 239:9,10
request 44:13 69:16
  70:12 71:7 96:7
requested 36:1 65:8
  65:13 75:9 76:10,14
  76:15 77:1 81:14
required 152:11
requires 31:24
resale 23:25
resist 233:12
resources 224:18
respect 65:18 150:4
  185:16 203:25

respectively 172:14
responding 190:22
response 69:16
76:10 119:7 124:12
135:24 138:10
141:14 234:6 244:3
246:20
responsibilities
15:15,18 16:6,9,11
16:24 18:18,24 19:6
19:8 21:5,10 23:10
23:16,20 25:20 31:8
178:4
responsibility 14:18
15:1 16:20 17:16
19:14 23:15 24:3
25:3 26:5 32:9
177:21 206:10
responsible 15:20
23:23,24 27:2,6
30:23 124:6 165:13
165:23 166:1,2
191:6 211:24
rest 40:4 135:3
200:9 209:8,11
restate 53:21 71:20
94:12 146:14
231:13
restating 139:21
result 109:17 210:17
results 205:6 229:24
resuming 73:8
97:21 169:8 197:6
202:8 227:5
retail 46:19 47:7
67:13,14,17 70:5,7
70:14,21 71:12,23
72:21 79:6 85:1,7
85:10 94:24 110:17
110:22 111:13
117:23 118:19
130:19 133:8,11
139:17 140:17
141:2,14,16 143:10
144:5,19,20 147:23

148:6,13 150:14
153:12 162:20
168:23 182:10
193:15 195:18
200:20 203:8
206:21 208:9,13
214:24 218:4 236:4
236:11,18 237:2,23
245:23 246:2 247:8
247:22 250:4,17
251:19 254:16,17
256:4
retailer 157:23
218:7
retailers 131:4
151:20 157:11
245:2
retailers's 157:17
return 256:7
revamped 34:22
revealed 208:1
revealing 197:16
revenue 87:9
reverse 45:5 46:6
48:1,4,12,21 55:1
79:12
review 12:14 28:19
177:22 206:10,12
208:19 251:24
reviewed 12:12 78:5
78:9 231:19 252:1
reviewing 198:12
revise 70:13
rhyme 224:16
richmond 1:14 2:8
9:22 16:17 25:15,25
26:11,14 181:2
188:22 257:6
rick 20:14 106:6
rid 186:8
right 9:24 13:24
18:2 44:24 48:9
52:9 71:25 73:20
92:14 94:21 98:25
124:15 145:11

147:1 151:6 152:19
158:1 160:13
161:15 162:14
167:22 183:18
188:12 190:19
194:14 196:21
210:1,23 211:17
213:7 216:19 220:3
225:16 226:21
234:24 252:7 255:6
256:18
ripple 130:11
risk 81:16 129:23
133:11 150:6,10
risked 108:2
risks 129:17
roberson 123:16,17
123:20 124:20
125:9,17
robert 6:5
roberts 7:19 8:9
238:15,15,17,24
239:20 240:8,10,19
241:5,8,14,18,23
242:13,21 243:14
243:22 244:4,13,14
245:11,13 246:4,15
246:21 247:15
248:3,16,25 249:7
249:11
robertson 123:15
role 16:7,10,25 17:1
17:5,6,7 18:18,20
18:25 19:11 36:13
36:13 38:1 55:15
166:23 172:6
180:10 217:16
roles 17:25 19:1,11
rolled 206:1
rolling 163:25
roman 93:5
room 113:20
ross 3:3 22:17
158:25 161:19
167:18,21 169:2

197:20 222:3
231:11 234:7
238:13 239:25
240:3,15,21 241:13
241:16,22 242:3,18
243:12,18 249:13
252:4
row 78:2 172:6
177:19 178:19
214:13
rule 82:11 84:25
109:13
rules 10:25 28:16
114:20
run 28:12 29:10
104:25 105:1
179:13 214:2 224:8
running 216:3

s

s 2:10 3:2 4:2 5:2
6:2 7:1,19 8:2 9:1
135:22 260:5,24
sabotage 213:21
sale 12:6 27:25 28:2
72:23 83:6,17 95:10
117:18,19 118:2
145:9 146:9 148:17
148:18 156:22
160:23 162:7,8,10
162:12 167:5
174:14 178:19
182:25 185:10
215:24 226:11,12
sales 18:9 23:17
27:13 29:11 42:5,17
42:19,23 43:3,12
78:6 83:21 84:6,9
84:12 94:7,12 95:3
95:14 101:13,14
113:13 114:4 116:9
116:14,19,24
117:16,17 121:18
121:20 122:1 124:9
124:10 126:12

131:15 132:20
133:12 149:5
150:15 153:14
156:8,25 161:17,25
163:23 166:1 173:1
177:9 178:22,24,25
185:5,6,11 186:2
192:10 196:2
217:13 220:14,15
221:21 231:24
232:13,16,16 246:1
248:1 255:1,5 256:9
**salespeople** 94:18
124:9 175:5
**sample** 86:18,19
145:10
**samsung** 59:13,17
61:11 104:1 123:19
230:2 253:15
**san** 1:3 3:17 6:17
**sarguello** 4:18
**saturday** 179:11
**saw** 36:11 60:4 93:6
95:20 111:20 112:1
212:5 214:6 226:11
227:21 255:25
**saying** 41:5,8 42:15
89:6 90:19 98:6
112:16 125:18,21
130:7,9 131:4 138:3
138:13,19,23 139:8
141:7 146:16
175:20,24 177:2
178:9 183:14
184:20 215:6,17
226:10 231:5,6
246:16 247:6
254:18
**says** 28:19 33:9
42:13 75:2,12,20,20
79:8 107:15 109:13
109:16 121:1
124:20 125:9 131:1
134:14 155:19
157:11 158:6

171:15 172:11
173:21 178:5,21
181:17 185:8
200:19 201:1 214:7
225:22 246:11
247:4 256:15
**sc** 1:4
**scale** 235:3
**scenario** 162:14
**scenes** 129:1
**scholclapper** 20:18
106:5,13,24 107:15
107:21 109:12
127:5 137:18
138:18
**scholclapper's**
138:9
**scope** 63:16 107:4
158:21,25 161:18
240:1,15,18 241:4
241:13,17 242:12
243:13,19
**score** 98:5 119:18
**screen** 156:10
**sea** 124:21
**seasons** 216:17
**seats** 113:21
**second** 35:14 73:15
105:16 107:18
115:3 130:5,7 133:7
161:19 172:6,7
244:22,23 258:2
**secondary** 45:12
71:21
**section** 214:8
**see** 38:6 61:11,12,13
75:2,19 93:2 107:14
110:15,18 112:14
112:16 114:8
119:16 124:19
129:9 146:12
157:10,13 158:7,18
166:16 167:7
172:13 175:17
178:4 181:16,19

189:22 190:10
193:1 201:1 210:9
210:13,18 212:5,9
212:18,22,24
220:22 226:13
229:24 232:12
240:11,13 255:20
**seeing** 40:17 43:7
114:9
**seek** 89:19 194:10
**seeking** 136:23
**seen** 11:16 54:9,11
79:19 112:17
197:18,22 203:2
207:17 220:6 223:2
244:6 255:19
**sees** 45:21
**select** 89:18 118:10
**selected** 35:21,22
159:20 174:4
**selecting** 34:16
112:6
**selection** 105:8
**sell** 34:7 40:1 43:19
47:14 50:12 52:14
52:15 54:13 57:17
58:17 71:22,24,25
72:6 82:11 83:2,3,4
83:8,11,16,23,25
84:17,20,24 85:2,3
85:3,6,12,16 86:23
87:2,3 89:10,11
92:12,20,23 93:16
96:14,16,21 97:4
112:10 116:24
117:4,20,21 118:7
122:17 124:11
126:14 131:18,20
131:22 132:1 133:5
133:8 139:1 140:4,7
140:24 141:2,10
149:8 154:24
159:21 160:1,6
162:21,23 163:18
163:18 174:17,22

186:10,14 187:21
195:19,20 196:14
196:15 204:12
208:9 215:13,16
228:17 231:20
254:12,21 256:23
**selling** 32:13,14,17
36:21 37:8 47:25
71:9 79:10 80:9,10
80:20 86:20,22,24
87:1,4 92:13 116:22
117:13 122:13
132:3,23 139:9
143:11 144:6,10,12
146:1,5,20 148:3
157:21 159:7 160:3
163:12 164:2
166:17 191:4,16,18
192:3 194:4 195:21
196:16 200:21
225:11 231:21
232:5,8 251:21,25
**sells** 132:21,21
215:22
**semi** 35:11 78:6
**send** 168:13 178:11
223:14 224:14
**senior** 15:8 129:4,15
129:16 130:1
134:10 137:19
152:9 206:13
209:13 229:5
256:17
**sense** 11:3,7,13
22:13,22 98:10
131:5,8,22,24 132:1
**sent** 41:18 177:15
220:16,17
**sentence** 125:8
127:5 128:20
183:21 242:25
**separate** 24:19 25:6
53:10 97:12
**serve** 10:17

services  9:20 14:5,8
serving  10:20
session  56:6
set  16:2,3 27:18,24
  28:16 45:18 46:2
  48:22 49:1 83:7,22
  94:23 99:11 104:23
  117:16 160:22
  170:11 176:8,17
  207:10 237:17,18
  249:23 250:3,5
  251:20 260:8,17
sets  27:20 156:12,14
setting  27:6 83:16
  160:19,20 185:18
  246:7 247:7,9,17
seven  231:12
seventh  3:16
severity  212:2
shack  222:19
shape  213:20
share  37:6,18,24
  38:17 41:19 42:4,9
  42:19 131:24 164:4
  165:7 194:2 205:3,4
  257:19
shared  21:5,8,9
  114:24 211:20
sharing  204:21
shaun  5:14
sheltered  100:10,12
  100:16,20,23 101:2
  101:6,7,16,20,22,24
  102:2,7,14
shipped  88:12,15,19
  88:24
shop  157:11,17
  166:15,24 167:1
  174:20 175:22
  178:10,10,12
  203:14 214:9,10,10
  215:23 218:25
  220:6 223:8
shopped  175:14

shopping  155:20
  167:20,22 168:1,3
  168:14 175:19
  177:16 178:5,14,15
  178:16 182:10
  213:6,11,17 218:22
  220:10 223:11
shops  171:16 174:9
  174:24 175:11,16
  214:16 215:1 216:9
  220:3 222:9 224:9
short  28:25 81:18
  96:2 97:17 107:9
  133:16,20 151:13
  167:13 168:25
  169:3 211:7 227:5
shortage  149:6
  236:6
shorter  29:4
show  91:14 93:4
  111:19 182:22
  183:9
showed  42:17
showing  244:11
shown  141:24
shows  237:16
shut  32:15
sic  220:25
side  126:24 165:20
  165:21 181:10
  256:2
sign  99:21,25 214:7
  259:9
significant  38:17
  79:5 90:6 152:13
  156:19 165:3
significantly  125:11
  125:25 148:1
similar  16:11 79:2
  86:18 130:17 132:7
  153:11 188:25
  193:12 195:7
  244:24 245:16
  248:6

similarly  246:13
  247:6
simple  121:8
simplest  87:15
simply  175:4
simultaneously
  236:20,25
single  91:11 102:24
  167:1 175:6 179:9
singular  228:15
sir  221:6 225:1
  240:9,11 241:6,23
  243:6,23 244:5
  246:22 248:18
  249:12
sit  16:21 112:14
  149:18
site  210:16
sites  255:15
sitting  193:13
six  22:16 35:8
  188:19 231:19
  251:24 255:20
size  30:23 31:9,16
  33:17,18 34:11
  39:21,23 57:16,21
  112:24 148:23
  153:5 163:22
  164:16 222:21
  248:6,9,17,19,23
sizes  29:18 30:2,11
  30:19 248:5,15
sku  249:23,24
  251:17
skus  12:5 80:23
  90:17,24
sliced  215:15
small  15:5 25:7
  39:13,23 172:2
  235:7,17
smaller  34:8
smart  157:18
sofia  4:13 227:11
soho  15:4,4 25:7,11

sold  23:12 27:7,21
  29:19 30:12 33:9
  38:12 47:21 57:5,7
  58:6,13 60:10,24
  84:19,25 101:3,11
  104:8,10,20 118:23
  120:6 126:15
  144:11 145:3
  159:12,17 160:7,18
  187:11 191:8,13,21
  193:3 196:7,8
  212:23 248:20
solid  28:18
somebody  32:3
  129:19 141:25
  208:21 220:8
somewhat  224:11
  243:11
sony  33:24 34:2
  36:25 37:2 38:16
  59:13 164:5 198:16
  198:22 201:7,25
  257:24
sony's  33:25
soon  156:4 219:2
sophisticated
  149:21
sorry  22:16,18 25:5
  41:24 42:2 43:20
  49:17 66:23 69:21
  77:6 78:13 113:7
  117:9 124:14
  135:19 141:23
  142:20 147:4
  160:12 165:19
  167:16 170:19
  176:15 183:15
  187:4 192:7 212:11
  217:22 235:14
  236:14 240:16
  241:14 242:5
  244:12 245:10
  256:15
sort  16:14 44:18
  45:16 63:5 78:5

[sort - store]                                                                    Page 35

86:17 96:19,22 99:6
102:9 104:17 105:3
105:12 114:19
116:10 121:7 127:6
145:3 148:1 149:13
149:16 156:7
164:14,23 175:1
193:12 206:16
221:11 230:8
231:23,24
**souder** 20:14 106:6
106:13
**sound** 65:3 162:15
203:15
**sounded** 205:13
**sounds** 18:1 63:25
221:18
**source** 217:13
**southeast** 15:22
**southern** 15:3,21
16:1,15 18:24
**space** 31:4 33:15
90:12,18,22 193:6
203:8,22
**speak** 17:13 48:19
103:17 253:9
**speaking** 42:7 79:24
140:14 176:14
200:10 204:17
250:3
**speaks** 69:18 73:19
107:1 137:24 201:9
201:18 247:13
**special** 154:9,15
156:23
**specialist** 147:13
166:8
**specials** 155:24
**specific** 20:1 31:13
35:20 36:18 45:9
46:12 47:20 55:10
55:21 58:8 60:6
64:4 65:24,25 66:12
77:15 79:25 80:25
81:9 82:8,13,17

83:6,6,7 90:12 94:5
94:6 95:11 101:1
103:12 114:8
115:18,22,24,25
122:11 128:19
132:23 137:5
141:18 143:5
151:11,17 157:3
163:10 164:6
166:23 170:14
171:13 173:11
175:12 185:13
195:16 213:9
219:23 229:22
230:22 233:5,14
252:16 257:19
258:22
**specifically** 20:13
27:11 35:2 42:13
56:25 74:20 79:24
122:15 166:5 179:8
185:19 188:12
189:16 213:25
221:10 225:7
246:11 257:25
**specifics** 28:11
45:14 57:8,11 67:10
80:14
**specified** 98:11
**specify** 233:4,9
**specter** 102:9
**speculate** 76:2 80:6
200:10
**speculating** 222:2,3
**speculation** 69:18
73:19 75:11 76:1
108:22 125:19
127:10,18 134:4
138:21 182:1 199:7
199:13 200:18
201:8,18 221:3,25
226:20 246:19
250:24
**speculative** 138:1

**spend** 233:5
**spent** 115:7
**spiff** 94:2,10,10,25
95:5,21
**spiffs** 94:8 95:3,8,9
95:16
**squarely** 241:23
**squeeze** 124:25
**squeezing** 124:20
**ss** 260:2
**sss** 1:16
**stable** 243:2,10
**staff** 217:13
**staffs** 204:18
**stamp** 239:14
**stamped** 68:18
**standalone** 72:4
**standard** 44:8,8
82:10 117:22 129:6
145:2 167:11,14,20
232:3 237:5 238:5
251:24
**standing** 225:20
259:10
**stands** 15:4 106:18
**start** 33:7 47:9
89:21 98:24 110:13
111:15 179:10
255:9
**started** 101:9 104:2
155:9,11 189:1
**starting** 62:16,24
69:12 147:16
256:20
**starts** 110:25 111:7
240:5
**state** 258:6
**stated** 139:25
**states** 1:1 40:9,14,24
41:4,7,18 42:8 43:4
54:6 60:19 88:13,16
88:20 113:3 115:17
161:16 240:12
243:1 244:23 260:2

**stay** 111:3,5 159:4
190:25 191:1
201:22 237:19
**steno** 9:2,4,10
**step** 255:18,22
256:20
**steps** 237:12,15,21
**stereo** 174:17,18
**steve** 8:4 9:18
**steven** 1:13 2:5 9:8
9:15,25 259:16
**stick** 201:3 202:1
**sticker** 157:24
158:11
**sticking** 201:14
**stipulated** 9:4
**stock** 34:7 215:12
224:2,3 225:15
**stocked** 218:7
**stone** 99:12
**stop** 20:22 34:24
57:1 65:14 113:4
141:10 146:4
197:20
**stopped** 80:19 104:3
149:16
**stops** 86:24
**store** 16:5 28:2,4,6
28:15 29:10,12,13
29:17 40:1 96:12
120:8 124:4 138:16
158:20 160:22
165:6 168:11,12
170:22 171:14,20
171:21 172:12
173:1 174:13
176:24 177:1,3,7
178:15,16 180:17
180:18,22 182:6,9
190:15 205:2
209:24 211:8,8
213:11,15 214:5,18
215:20 216:9,11
217:7 218:3,4
219:12

store's  172:22
stores  14:15 15:22
    15:23,24 17:22
    21:12,20,25 22:3
    23:1,4,4,7 28:13,23
    29:10,16 54:8 55:3
    55:4,10,12,15,19,20
    55:22 69:6 80:12
    101:12 120:9
    123:14 140:10
    147:15,18,23 148:6
    148:13,17 150:15
    150:21 151:4
    153:12 167:1
    178:12 180:19,20
    180:25 182:23
    187:12,19 188:10
    188:14 190:12
    193:7 207:4 209:18
    209:20 218:12
    222:19,19,21,22
    237:6,17,23 238:3
    245:24
straight  110:20
strategic  129:2
    177:23
strategies  174:16,21
strategy  65:18,22
    95:14 172:19,20,21
    174:9,15,20,24
    175:4 183:17,22,23
    184:1,8,12,14,16
    185:2,7
strawn  4:14 227:13
street  2:8 3:6,15 5:7
    5:16 6:16 7:22 9:22
    217:21,25
strength  54:19
strict  150:17
strike  65:8 77:6
    78:17 169:25 181:8
    255:16
striving  128:3
strong  35:3 103:25

structure  211:20
stumbles  32:20
subcontract  13:22
subdivision  24:1
subject  152:16
    189:21 228:22
    238:21 240:20
subparts  11:23
subscribed  259:19
subsection  220:20
subset  214:11
successfully  63:9,20
suddenly  150:10
suffering  189:18
suggest  199:3
    201:14
suggested  67:13,14
    67:17 70:4,7,14,20
    71:1,23 72:21 85:1
    85:7,9 86:12 110:17
    111:13 117:23
    139:16 140:17
    141:16 143:10
    144:18,19 162:20
    208:8,12 236:4
    237:2 246:17 247:7
    250:4,17 251:19
    254:15,17 256:4
suggestion  246:8
suing  249:20
suite  3:7
sunday  179:11,11
    179:13
super  222:19
supersedes  181:17
supervising  26:21
supervisors  20:16
    26:24,25 31:1
    107:24 180:24
supplier  41:22
    228:19
suppliers  21:9 36:17
    41:25 100:6 113:2
    253:11

supply  42:3 55:17
    55:18 136:25 137:8
    149:20
support  64:23 71:15
    93:17,18,18,20
    147:11,12
supported  34:7
supports  93:18
    95:14
sure  20:3 24:4 26:20
    27:16 30:21 42:3,6
    53:24 60:20 68:13
    70:10 74:4 75:20
    78:14 82:15 83:13
    83:15 84:14 106:10
    112:22 125:4
    129:16 135:21
    137:19 138:14
    153:2,20 167:17
    187:7 213:12 251:1
surprised  140:12
surveys  168:18
susman  3:5 10:5
susmangodfrey.com
    3:10
suspect  152:24
    198:1 241:19
suspected  241:25
suspicions  241:2
svanhorn  5:19
switched  117:6
switching  117:17
sworn  2:11 9:25
    259:19 260:8
system  92:16 188:2
    188:10 212:14,16
    237:16

                t

t  2:10 8:2,2,2 260:5
    260:24
tactical  175:11,15
    175:21
tacticals  175:12

tactics  65:25 218:16
tag  187:20 204:11
    237:18
tagged  143:25
    158:13 179:5
    182:18 237:20
tagging  237:17
tags  178:21,23
take  11:12 42:22
    56:2 73:2 83:21
    96:2,19 97:16 120:8
    133:15 138:22
    144:13 157:7
    168:25 169:2,3
    178:21 196:25
    224:23 241:10
taken  19:1 237:12
talk  11:1 13:9 80:16
    84:6 86:22 87:1
    110:15 116:13,21
    126:20 218:16,20
    240:22
talked  96:14 110:13
    111:10 121:11
    166:18 179:4 186:6
    193:19 203:7 225:8
    251:6 258:1
talking  18:4 21:16
    22:10 23:6 24:8,21
    25:2 35:25 39:24
    53:5 59:19 61:6
    72:2 76:5 77:14
    86:15 87:6 90:2
    91:12 95:18 110:12
    140:23 149:24
    152:20 155:8
    156:11,13 162:3,5
    163:12 165:9
    176:11 190:10
    195:14,17 207:1
    225:19 227:22,23
    228:17 234:4
    237:22 240:24
talks  135:3

**tape** 73:3,6,12
133:16,18,22 197:1
197:3,8
**target** 7:17 48:7
164:24 205:22
**targeted** 122:8,9
**targets** 122:5
**taught** 53:6 126:19
**tavenner** 2:8
**team** 20:12,15 42:12
74:19 116:19
119:14 120:17
147:11 166:21
187:2,4,5,6,14
188:15,16,21,23
209:5,7,9,12 220:8
224:10
**teams** 224:15
**technology** 192:20
243:4
**television** 31:20
35:2 56:20 57:5
58:15 80:18,18
106:18 112:12
152:23 153:7,9
156:10 173:9
217:16
**televisions** 29:19
31:23 32:2,4,5,13
33:2 214:9,10 229:3
248:5,9,19 249:2,4
**tell** 20:9 29:22 63:5
69:9 84:12 108:12
120:6 175:6 200:8
206:3 215:14
230:12 232:7,15
233:20 234:8
**telling** 107:23
129:25 137:20
173:16
**temporary** 207:1
**ten** 177:6
**tend** 81:24 84:24
102:8,15 160:1
175:2 183:3

**tended** 59:7 166:13
**tending** 144:23
**tends** 137:9
**tenure** 66:9
**term** 43:20 49:12
51:25 52:5 53:25
62:12 64:17 73:20
74:2,3 76:8,13 81:2
83:18 94:2 96:13
107:16 155:21
159:14 167:13
173:22 192:18
194:17 211:8
221:11,12 254:7
**terms** 48:22 50:19
50:19,22 51:16,20
62:15,16,24,25 63:3
64:6 87:8 88:2,6,24
92:5,7 96:8 98:11
98:14,15 99:10
112:6 174:5 181:5
182:13 229:10,18
230:6,25 231:16
232:9
**test** 176:25 223:8
**testified** 62:8 224:3
244:16 245:21
248:13 251:18
252:10 253:25
254:5 255:8
**testify** 222:4,5 242:8
**testifying** 103:22
251:4
**testimony** 12:12
35:14 37:3 46:25
50:10 54:17 62:12
68:1 76:24 93:23
96:25 105:9 108:8
133:1 135:17 136:9
139:7,18,21,23
147:2 151:7 157:25
194:13 202:18
207:23 221:24
223:22 251:9 254:2
255:9 260:9

**tfhd** 210:6
**thank** 10:11 12:8
13:2 20:23 22:12
32:23 53:20 56:10
97:25 136:2 157:5
173:15 227:1
238:19 239:11,19
249:11,15 252:2
259:2
**thanks** 138:11
202:14
**thanksgiving** 190:4
**theirs** 113:12
**theoretically** 52:7
**thereof** 214:11
**thing** 75:14 111:7
164:1 166:13
167:13 206:16
215:15 231:24
**things** 22:7 45:16
49:2 51:7 52:15,22
84:10 92:25 96:13
98:5 104:14 105:12
111:20 129:6
139:11 145:5 175:2
206:2 215:19 228:9
255:19
**think** 10:23 12:2
61:22 70:23 71:3
74:15 84:1,5 86:19
95:25 96:4 103:20
108:13,24 110:19
110:23,24 121:10
122:2 125:17,20
128:7 136:24
138:13 139:23,25
141:6 167:16
170:19 176:8,17,20
186:9 188:6,18
199:24 203:9
208:24 236:25
243:18 248:11
249:13 254:13
**thinking** 110:16,21

**third** 6:7 129:7
163:6 164:10
**thirty** 163:1
**thomson** 7:25 8:23
107:13 129:3 130:5
130:10,14,22 131:7
131:19,20 134:7
199:2 238:16
239:10,11,16,17,23
241:11,20 244:18
244:21,23 245:3
246:7 247:2,4,7,16
258:7
**thomson's** 245:14
**thought** 32:14 126:5
143:25 159:23
201:25
**threatening** 75:7
**three** 90:25 91:15
102:6 116:25
151:14,14 163:25
164:23 179:16
199:10,18 214:12
224:15
**throughs** 181:8
**throw** 62:11
**thumb** 82:11
**thursday** 179:18
**tie** 98:16 179:8
**tied** 83:12,17
**tier** 32:8
**tiers** 32:10
**tim** 180:7
**time** 9:12 11:9 16:21
17:15 18:4 19:22,24
20:5,7 21:8,13,16
22:9 23:3,9 28:11
30:4,24 33:13,13
34:6 42:14 44:16
45:7 47:23 55:24
56:1,3,8 57:17,24
59:17,22 61:2 66:11
69:8 73:4,10 78:4
80:7,10,19 82:9
83:7,7,25 85:4,14

85:16,20,24 86:2,10
86:13 89:8 91:10,13
91:23 94:14 95:18
95:22,25 96:17
97:18,22 102:8,15
104:1,6 106:10
110:7,8 112:1,2
113:9 128:1,18
133:17,22 137:20
145:16 146:1
147:20 148:6,7
149:23,24 150:18
150:20,24 151:13
152:20 153:25
155:7 159:11
161:25 162:1,3,4,4
162:8,10 164:19,22
165:9 168:9,10,19
169:4,9 170:16,24
171:3,18 176:12
182:18 184:9,24
185:1,24 187:1
189:17 190:8 192:1
197:2,8,25 199:11
199:19 200:15
202:5,9,14 204:3,4
204:9 206:25
212:12 224:12,18
225:19 227:3,6
230:2 231:1,16
243:5 249:23 251:5
251:16 252:1,3,13
259:4
**times** 61:12 64:2
65:16 66:9 104:12
104:12 115:18
116:1 136:21
153:21 159:19
163:9 171:5 184:8
185:13 186:1 190:7
190:13,16 207:17
237:18
**title** 120:14 137:20
166:23 167:2
170:15,17 171:6

**titled** 177:20
**tmi** 172:7
**today** 9:18 10:11
13:7,20,21 18:4
48:19 209:15 213:5
215:8 224:21
227:25 231:4
240:16 242:11
244:11 251:5
254:19
**today's** 9:13 10:21
11:19 12:11 13:10
**told** 213:25 237:1
240:6
**tolles** 3:14
**tom** 20:21
**tone** 185:18
**top** 38:8 69:13 73:15
75:19 124:19 180:8
181:16
**topic** 11:23 240:20
241:24
**topics** 11:23 242:4
**toshiba** 4:10 38:16
202:14,20,22 203:4
253:5,9,12
**total** 172:9
**touch** 224:19
**tough** 136:19 225:17
226:2
**town** 75:13
**track** 166:8
**tracked** 119:5 167:6
**trade** 12:23
**traffic** 210:16
**train** 84:15 104:24
230:17
**trained** 65:24 66:2
126:12 148:2
**trainer** 124:3,7
**training** 52:16,20
66:7,9,14 93:19
124:8 157:10
204:20,24,25 205:2
213:14

**tranches** 89:1
**transactional** 97:7
115:9
**transcribed** 2:10
**transcript** 12:15
260:9
**transcripts** 259:11
**transfer** 42:15
**transferred** 80:12
**transitioned** 91:10
**translate** 236:17
**travel** 114:16
**treatment** 125:22
**trending** 196:23
**trends** 30:15 243:4
**trial** 110:18 254:7
254:10
**tricks** 105:17
**tried** 179:8 207:5
**trip** 253:19
**trips** 112:6 115:8,12
252:11,18 254:1
**true** 25:16 26:1
57:12 137:7 207:25
260:9
**truly** 161:5
**trust** 3:11 10:6,16
13:13,16,22 14:6
61:7 103:11 107:16
107:24 108:2
**trusted** 103:13
**truthful** 226:1
**try** 11:1 20:18 37:5
65:25 66:18 67:4
117:4,12,24 118:8
156:24 157:20
175:3 194:10
206:11,18 225:12
237:18
**trying** 65:18 91:16
116:3 118:13 128:7
131:18,19,22,25
144:1 149:13 160:6
174:12 185:8 191:7
208:9 215:3,10,16

215:25 246:25
248:17
**tube** 1:7 60:5 157:2
157:3,4 199:5,18
200:16 201:2,14,15
201:16,25
**tuesday** 179:15
**turn** 157:1 172:5
178:2 180:6 183:18
222:13 239:24
242:22
**tv** 20:12,14 74:19
75:15 182:25
192:19 203:14
210:7
**tvs** 163:23 173:9
174:17,18 249:18
**twenty** 3:16
**two** 15:14 19:2 25:1
73:12 78:2 84:15
102:6 115:2 117:1
123:4,5 178:2
179:16 183:19
189:3 199:3,11
203:19 224:14
236:19 237:6 258:7
**tx** 3:8
**type** 15:15 31:19
45:13 53:12 61:10
66:8 86:18 93:9
96:13 99:12 112:23
119:4 129:6,13
132:23 144:21
150:23 153:22
156:3,14 163:12
167:13 177:8 191:7
192:19 198:12
205:1 211:8 216:8
220:10 223:11
225:19 228:2,15
229:25
**types** 18:6 31:23
93:10 156:13
163:14 204:8
211:15 228:13

[types - vendors]

237:21
typical 81:1
typically 34:16
35:10 38:8,15 44:21
46:8 51:8 62:9,10
62:14 79:2 82:22
83:16 84:25 85:6,15
85:19 91:21 92:21
93:16 111:8 113:23
113:25 114:20
131:12 135:8
143:17 153:17
156:11,14 163:17
168:5 178:13
179:10 190:21,24
191:1 196:23
205:25 208:4,7,12
231:17 251:13
typos 138:12

**u**

u.s. 40:16,23 41:9,12
41:19 42:2,18,23
43:12 111:24
113:13 114:2,10
115:19 116:18,19
255:5 256:10
ultimate 26:17
27:13 203:15
ultimately 211:24
unbranded 45:11
46:21 47:17
unclear 245:12
uncommon 200:7
underlined 181:24
underlines 181:8
understand 10:20
11:19,22 14:22
17:23 19:9 21:10
26:20 44:9 56:12
60:25 75:23 78:16
106:12 107:20
109:12,22 116:3
125:14 129:21
130:6 131:2 134:2

138:17,18 140:11
142:17 174:13
175:3 181:22
189:24,25 192:19
194:18 215:10
223:10,15 242:1
246:12,25
understanding 12:1
42:6 83:15 151:6
184:2 222:23,25
223:16 232:12
245:2,14 246:6
247:1 250:2,8,13
251:12
understood 42:8
142:19 160:4,14
254:2 255:8
unexplained 243:3
unfavorable 130:22
uniforms 217:24
unit 248:1
united 1:1 40:9,14
40:24 41:3,6,18
42:8 43:4 54:6
60:19 88:13,16,20
113:3 115:17 260:2
units 163:23
universe 222:14,15
222:17,18 223:3
unusual 55:22 96:12
unwritten 68:8
upcoming 215:20
216:25
update 137:17
138:11 255:25
usa 69:3,9
use 12:23 13:7 42:11
43:20 48:1 65:25
66:17 67:3,15,20
91:1 101:9 144:21
145:7 159:17
163:20 164:8
168:17 192:18
194:17 195:8 205:6
251:11 257:10,15

usual 149:10,14
usually 25:9 33:13
81:8 91:9 103:2
163:25 207:14

**v**

va 9:22
vague 42:24 44:15
48:25 53:3,14 58:2
58:20 62:18 64:15
65:20 68:11 70:17
72:17 81:13 87:20
90:15 98:12 102:22
113:5,8 120:23
125:2 128:5 130:23
132:9 134:21 136:8
140:18 145:17
149:12 152:18
161:8 162:2,13
163:3 192:5,25
193:25 194:22
195:12 196:6
204:19 205:9 211:6
218:14 228:11
229:12 232:24
233:23 235:4
236:12 247:20
248:10,21 253:6
valuable 81:18
value 46:12 57:20
57:20 247:4
van 5:14
variations 207:13
varied 164:25
various 66:9 104:3,4
147:12 156:13
163:8 171:5 184:8
229:7 248:4
vary 152:19 207:8
207:12 228:18
vcr 15:11 58:15
vcrs 15:13 16:13
vendor 16:22 31:9
35:19 36:4,8,19
37:13 40:5 42:9,15

43:12,24 44:10,22
52:21 53:1 54:2
55:2 60:14 62:9,11
62:17,25 63:4 64:13
65:7,12 66:13,16
67:1,23 71:1 76:16
78:25 81:6 82:5
83:10,22 86:9 87:18
89:22 91:13,16,23
92:3 93:12 98:1,3
99:4,7,15,21,25
100:2 101:21
102:21 104:14,16
105:7 108:6 113:16
115:3,16 122:8,17
129:5 132:12
135:22 136:13
141:12 144:9,15
161:6 195:25
205:16 228:3 229:8
229:9 231:22 232:7
233:4 250:5,14,16
250:22 256:18
257:11,14,20,21
vendor's 34:5 37:16
42:10 122:13
vendors 26:18,22
33:20 35:20 36:1,3
36:14 37:6,8 38:11
42:1,7 43:3 44:14
50:21 51:3,9 54:15
63:21 66:20 67:5,10
68:6,10 70:16 71:16
72:12,13,16 78:10
78:21 79:3 82:14,18
88:7,8 89:20 90:9
90:13 93:22 95:6,17
98:2,7,11 101:3
103:7,13,23 108:20
109:6,8 110:1,5
111:4 115:6,7,24
117:6,12 120:19
122:6,12 124:24
126:5 132:6,7
134:18 136:17

[vendors – why's]    Page 40

139:4,15,16 140:16
191:3 195:7 199:10
200:8 205:8 227:18
228:5,10 229:18
230:7,20 232:12
250:3,12 251:1
252:12,17 254:1,6
255:14 257:11,17
**verbal** 11:5
**verbalized** 124:12
135:24
**verify** 223:5 225:5
225:10,13,14 226:8
**veritext** 9:19
**versa** 148:18
**version** 12:23
124:16 181:23
184:5 221:14
**versus** 32:4 33:2
55:9 86:4 88:20
98:15 126:18
164:15 196:9
207:10
**viable** 72:3,6 110:19
110:23 162:15
**vice** 24:15 119:21
148:18
**video** 1:13 2:4 9:2,4
9:10 15:8 16:12
24:9,10,22 112:15
129:8 193:14 209:4
209:12
**video1** 9:15
**videographer** 2:11
9:11 10:1 56:3,8
73:4,10 97:18,22
133:17,21 169:4,9
197:2,7 202:5,9
227:3,6 259:3
**view** 127:13 203:21
221:21
**viewed** 203:8
**viewpoint** 45:25
60:14 129:1 194:4
212:4 231:20

**virginia** 1:14 2:9,12
16:18 188:22 257:7
**visibility** 54:4
153:18 187:14
211:12
**visible** 152:25 167:7
167:10
**visit** 110:10 111:3
111:18 116:15,20
129:5 166:19
220:12,13 252:12
252:20,25 253:5,12
253:14,22 255:13
256:7
**visited** 21:8 60:2
114:25 203:1
252:17 253:20
**visiting** 113:11
**visits** 214:5 219:12
253:9 254:1
**volume** 65:6,11 89:2
89:5 92:12,21
191:20 227:23
228:3 229:10

**w**

**w** 32:21,22
**wait** 224:25 225:1,2
**wal** 37:23 164:23
165:7 166:12
**walk** 219:1
**walked** 216:11
219:2
**walking** 217:7,24
218:4,11
**walks** 38:6
**want** 10:25 11:9
33:21 37:1,11,11,15
37:19 39:25 46:2
49:19 50:15 55:2
63:25 72:1 78:14
79:14 86:22 89:8
91:17 96:2 98:7
104:25 112:10
119:25 123:5

124:16,18 126:15
130:2,4 135:5
138:25 141:9
146:18 147:15
168:25 176:23
181:11 182:25
185:20 195:24
200:11 210:12
213:19 215:13
223:10 224:1,19,25
226:23 237:18
240:14,25 255:12
257:23
**wanted** 33:5 64:14
114:8 129:15,20
137:4 184:25
185:19 194:25
216:13 223:25
232:23 238:1,2
249:13
**wanting** 204:11
215:2
**wants** 44:10 113:16
**warehouse** 203:21
218:9
**warrant** 244:8
**washington** 7:6,14
**waste** 168:9
**watered** 124:16
**way** 20:2 21:14,23
30:16 31:7 34:23
38:4 40:4 52:17
54:24 60:8 62:3
63:6,24 66:12 90:19
91:2 92:14 98:17
105:15 109:19,21
112:20,22 113:21
114:23 115:8 120:8
121:8 126:2 139:25
143:16 150:1
151:16 157:2 158:2
159:3 172:10
174:18 188:12
190:3 194:10
195:14 203:20

205:5 206:15,25
212:1 213:20 216:6
219:14 224:18
226:24 228:6 230:8
230:17,18 231:8,11
236:22 247:5
248:19 256:4
260:14
**ways** 211:16 213:6
225:12 226:7
**wbave** 4:9
**we've** 45:14
**web** 39:25 148:18
148:20 210:7,7
216:20
**website** 148:13
**wednesday** 1:15 2:6
210:7
**week** 29:2 111:3,5
115:4 119:19 179:3
179:18 189:22
190:1,2 207:2 215:8
224:15
**weekly** 168:6 172:22
172:22 177:21
190:5,9
**weeks** 151:14,15
214:12
**welcome** 202:16
**wells** 7:21
**went** 61:11 80:5
92:21 93:8 112:25
113:3 115:13 143:2
166:24 187:21
201:21 213:15
243:3 250:9,22
251:1 253:10
**west** 5:7
**whereof** 260:17
**white** 4:5 129:5,13
178:20 198:11
**whitecase.com** 4:9
**whitehead** 5:5
**why's** 146:3 189:11

| | | |
|---|---|---|
| **widely** 100:14 104:20 | 146:11 147:3 149:13 151:8 | 180:19,22,24 |
| **width** 240:23 | 152:19 158:1,23 | **working** 69:9 164:4 187:1 |
| **william** 4:4 202:13 | 159:3 160:16 161:1 | **workload** 224:17 |
| **willing** 52:4 | 161:9,20 162:14 | **worth** 90:5 131:13 |
| **win** 46:8 185:19 | 163:4 167:22 | **write** 219:2 |
| **windows** 28:25 | 168:22 176:15 | **writes** 127:6 |
| **wine** 121:9 | 182:3 184:7 188:5 | **writing** 204:14 220:21 |
| **winston** 4:14 227:12 | 191:13,24 192:6,13 | **written** 68:4 129:7 129:10,11 |
| **winston.com** 4:18 | 193:1 194:1,14,23 | **wrong** 145:6 158:18 158:23 |
| **wise** 53:5 | 195:13 196:7 | |
| **wish** 71:5 | 197:22 199:8,15 | **x** |
| **withdraw** 64:22 | 200:7,19 201:10,19 | **x** 1:6,11 89:7 90:22 |
| **witness** 2:5,10 8:3 | 202:16 204:20 | 99:10 230:9 |
| 8:15 10:6,7,17,21 | 205:10,12,15 211:7 | **xyz** 103:1 |
| 12:25 13:20 21:2 | 211:23 217:9 218:6 | **y** |
| 22:14,23 27:16 | 218:15 219:21 | **year** 9:14 21:14 |
| 32:22 35:15 40:18 | 222:1,6 223:23 | 33:13 34:23 35:4,6 |
| 42:25 44:16 46:20 | 225:2 226:21 | 61:12 81:1 90:3,3,4 |
| 47:1 49:1 50:3,11 | 227:10 228:12 | 90:24,25 119:19 |
| 51:16 53:4,21 54:23 | 229:13 231:13 | 151:14 163:24 |
| 58:3,21 60:13 61:9 | 232:25 233:24 | 224:13 231:18 |
| 62:20 63:23 64:17 | 234:6,18,24 235:10 | 251:20 |
| 65:2,21 66:6 67:7 | 235:16 236:13,22 | **years** 14:12 15:14 |
| 68:2,12,16 69:20 | 238:25 239:6,8,11 | 17:12 31:13 48:4 |
| 70:1,19 72:18 73:20 | 240:14,16 242:8,20 | 78:2 86:6 104:3 |
| 75:12 76:2,25 77:12 | 243:20 244:3 245:8 | 163:25 |
| 77:25 79:23 81:14 | 245:21 246:11,20 | **yesterday** 12:13 |
| 82:25 84:23 87:21 | 247:14,21 248:11 | **york** 4:7,16 6:8 |
| 90:16 93:24 97:1,9 | 248:22 249:6 | **z** |
| 98:13 102:12,23 | 250:25 252:22 | **zenith** 69:3 199:2 |
| 103:16 105:10 | 253:8,19 258:25 | 258:7 |
| 106:16 107:5,18,23 | 259:9 260:7,10,17 | |
| 108:9,24 109:16 | **word** 42:1 73:22 | |
| 110:10 113:6,9 | 81:22 167:18 | |
| 119:7 120:24 | **work** 14:12 28:9 | |
| 124:14 125:4,20 | 31:11 44:11 45:4 | |
| 126:10 127:2,12,19 | 92:17 94:11 116:16 | |
| 128:7 130:9 131:1 | 143:16 145:1 | |
| 131:10 132:10 | 147:10 152:8 | |
| 133:2 134:6,23 | 227:12 235:13,18 | |
| 135:18 136:1,12 | 256:19 | |
| 138:3,22 139:8,25 | **worked** 16:18 24:23 | |
| 140:20 142:19 | 30:3 74:19,23 124:4 | |
| 143:22 145:20 | 154:16 171:14 | |

Page 259

```
 1              MR. LAHAD:  Nothing further for you.        17:57:22
 2         Thank you.                                       17:57:23
 3              THE VIDEOGRAPHER:  Are we done?  There
 4         being no further matters, the time is
 5         approximately 5:57 p.m.  This deposition is
 6         concluded.
 7
 8         (Whereupon, the deposition concluded at
 9         5:57 and the witness is to read and sign with
10         arrangements already on record with standing
11         orders for transcripts.)
12
13
14
15
16    _____
          STEVEN DEASON   (correct spelling is Stephen)
17
18
19    Subscribed and sworn to before me
20    this 21 day of MAY        , 2014.
21
22    _____            EILEEN GILMAN
                                                  Notary Public
                                                  Commonwealth of Virginia
                                                  273341
23        NOTARY PUBLIC                       My Commission Expires Sep 30, 2014
24
25
```

ERRATA SHEET
VERITEXT REPORTING COMPANY
1250 BROADWAY
NEW YORK, NEW YORK 10001
212-267-6868

NAME OF CASE: IN RE: CRT Antitrust Litigation
DATE OF DEPOSTION: April 23, 2014
NAME OF DEPONENT: Steven Deason

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| 2 | 5 | replace "Steven" with "Stephen" | legal name, spelling |
| 15 | 23 | replace "four" with "for" | spelling, meaning |
| 19 | 2 | replace "net" with "new" | misheard |
| 20 | 18 | replace "Shoclapper" with "Shulklapper" | spelling |
| 24 | 22 | replace "displayed" with "display" | misheard |
| 29 | 22 | replace "tell" with "sell" | typo? |
| 31 | 5 | replace "it" with "each" | clarity |
| 43 | 13 | replace "no" with "other parties | Answer was not complete, |
| 43 | 13 cont. | were sometimes part of the | Corrected in testimony on |
| 43 | 13 cont. | negotiations" | pages 110-117 & 254-257 |
| 55 | 18 | replace "are going" with "are not going" | misheard |
| 67 | 8 | replace "funds" with "forms" | misheard |
| 70 | 21 | replace "fact" with "factor" | misheard |
| 71 | 14 | replace "and" with "on" | misheard |
| 75 | 13 | replace "town" with "Taiwan" | misheard |

Continued on next page

_Stephen M Deason_
STEVEN DEASON
(correct spelling is Stephen)

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 21 DAY OF M.y , 2014

_Eileen Gilman_
(NOTARY PUBLIC)

9. 30. 2014
MY COMMISSION EXPIRES:

EILEEN GILMAN
Notary Public
Commonwealth of Virginia
273341
My Commission Expires Sep 30, 2014

ERRATA SHEET
VERITEXT REPORTING COMPANY
1250 BROADWAY
NEW YORK, NEW YORK 10001
312-267-6868

NAME OF CASE: IN RE: CRT Antitrust Litigation
DATE OF DEPOSTION: April 23, 2014
NAME OF DEPONENT: Steven Deason

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| | | Part Two - Continued from prior page | |
| 89 | 1 | replace "tranches" with "trucks" | misheard |
| 89 | 25 | replace "business. is it, are" with "business is it. Are" | clarity |
| 109 | 17 | replace "a" with "our" | clarity |
| 109 | 18 | replace "are" with "our" | misheard |
| 120 | 17 | replace "elite" with "lead" | misheard |
| 121 | 9 | replace "wine" with "whine" | spelling |
| 127 | 9 | replace "health" with "hell" | misheard |
| 133 | 7 | replace "his" with "it's" | clarity |
| 149 | 14 | replace "then" with "than" | misheard |
| 150 | 10 | replace "profit" with "profitable" | clarity |
| 151 | 17 | replace "were" with "we're" | typo? |
| 163 | 7 | replace "MPD" with "NPD" | misheard |
| 163 | 18 | replace "MDP would sell out" to "NPD was sell through" | clarity |
| 187 | 16 | replace "what" with "about" | clarity / misheard? |

Continued on next page

(correct spelling is Stephen)

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 21 DAY OF MAY , 201 4

(NOTARY PUBLIC)

9. 30 2014
MY COMMISSION EXPIRES:

EILEEN GILMAN
Notary Public
Commonwealth of Virginia
273341
My Commission Expires Sep 30, 2014

ERRATA SHEET
VERITEXT REPORTING COMPANY
1250 BROADWAY
NEW YORK, NEW YORK 10001
212-267-6868

NAME OF CASE: IN RE: CRT Antitrust Litigation
DATE OF DEPOSTION: April 23, 2014
NAME OF DEPONENT: Steven Deason

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| Part Three - Continued from prior pages | | | |
| 203 | 14 | replace "Kahn's" with "Conns" | spelling |
| 212 | 19 | replace "we cap" with "we're clear" | clarity |
| 228 | 12 | replace "So I am" with "No, I am not" | misheard / clarity |
| 250 | 12 | replace "said" with "set" | misheard |

*(correct spelling is Stephen)*

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 2/ DAY OF _MAY_ , 20_14_

_____
(NOTARY PUBLIC)

MY COMMISSION EXPIRES: 5. 30. 2014

EILEEN GILMAN
Notary Public
Commonwealth of Virginia
273341
My Commission Expires Sep 30, 2014