# EXHIBIT 2

## Foster, Dana

| | |
|---|---|
| **From:** | Andrew Caine <acaine@pszjlaw.com> |
| **Sent:** | Thursday, July 07, 2016 7:33 PM |
| **To:** | Foster, Dana |
| **Subject:** | CC/State of Illinois v. Hitachi, Ltd. - Responses and Objections to Foreign Subpoena/Subpoena Duces Tecum |
| **Attachments:** | IL v. Hitachi Responses.pdf |

Dana –

Attached is a courtesy copy of the Trust's Responses and Objections that were served today.

Best,

Andy

**Andrew Caine**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 310.772.2357
Tel: 310.277.6910 | Fax: 310.201.0760
acaine@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this e-mail and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

|  |  |
|---|---|
| THE STATE OF ILLINOIS, by its Attorney General, Lisa Madigan, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| HITACHI, LTD., et al, | ) ) |
| Defendants. | ) ) ) |

File No. CL16-2739-2

## RESPONSES AND OBJECTIONS OF ALFRED H. SIEGEL, SOLELY IN HIS CAPACITY AS TRUSTEE FOR THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST, TO FOREIGN SUBPOENA / SUBPOENA DUCES TECUM

Non-party Alfred H. Siegel, solely in his capacity as trustee (the "Trustee") for the Circuit City Stores, Inc. Liquidating Trust (the "Trust"), hereby responds and objects to the *Subpoena / Subpoena Duces Tecum to Person Under Foreign Subpoena* (the "Subpoena") issued under the authority of the Richmond Circuit Court, 13th Judicial Circuit of Virginia (the "Virginia Court") on or about June 14, 2016, at the behest of Toshiba Corporation and Toshiba America Electronic Components, Inc. (together, "Toshiba"). The Subpoena was purportedly issued in connection with *State of Illinois v. Hitachi, Ltd., et al.*, which is currently pending as Case No. 12-CH-35266 in the Circuit Court of Cook County, Illinois (the "Illinois Action"). A

copy of the Subpoena, in the form in which it was purportedly served on counsel for the Trust

(rather than the Trust itself), is attached hereto as **Exhibit A.**[1]

## PRELIMINARY STATEMENT

Before its liquidation at the height of the financial crisis in 2008–09, Circuit City Stores,

Inc. (together with its affiliated companies, "Circuit City") was a retailer of electronic products.

On November 10, 2008, Circuit City sought relief under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern

District of Virginia (the "Bankruptcy Court"). On September 10, 2010, the Bankruptcy Court

entered its *Findings of Fact, Conclusions of Law and Order Confirming Modified Second*

*Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors* (the

"Confirmation Order"), which, *inter alia*, established the Trust and appointed the Trustee.

The Trust is a creation of the Bankruptcy Court. *See generally Barton v. Barbour*, 104

U.S. 126 (1881). It carries on no trade or commerce; rather, the Trust exists solely for the

limited purposes set out in the Confirmation Order. The Trust maintains custody of certain of

Circuit City's books and records, and employs a limited staff for the purpose of liquidating assets

and resolving claims against the debtors, in order to maximize the distribution on claims against

the bankruptcy estates. Consistent with the Confirmation Order and subject to the ongoing

supervision of the Bankruptcy Court, the Trust is a party to legacy litigation involving claims

that previously belonged to Circuit City. One such proceeding is the federal multidistrict

litigation styled *In re Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. 07-5944 JST,

MDL 1917 (N.D. Cal.) (the "CRT Action"). The Trust was previously a plaintiff in the CRT

---

[1]   Toshiba's failure to properly serve the Trust itself, rather than counsel for the Trust, is one of
the multiple defects in the Subpoena. By filing these responses and objections, the Trustee
does not waive – and specifically preserves – all procedural and substantive objections.

Action, but is no longer a party to the CRT Action (having settled all of its claims with all

defendants – including Toshiba).  Toshiba was and apparently remains a defendant in the CRT

Action as to claims of plaintiffs other than the Trust.

During the time period that the Trust was involved in the CRT Action, the Trust complied

with discovery obligations imposed by the Federal Rules of Civil Procedure.  Among other

things, the Trust produced voluminous documents to the defendants in the CRT Action,

including Toshiba.  The Trust also gave corporate deposition testimony, pursuant to Federal Rule

of Civil Procedure 30(b)(6), at the behest of defendants in the CRT Action, including Toshiba.

Providing affirmative discovery – especially deposition testimony – in connection with the CRT

Action was a costly and cumbersome task, given the Trust's few employees.  Ultimately the

Trust hired outside consultants, at significant expense, to facilitate the Trust's compliance with

its discovery obligations in the CRT Action.

The Subpoena essentially seeks a "do over" of discovery the Trust provided in the CRT

Action, on account of an Illinois rule that prohibits the use of deposition testimony at trial unless

the deposition was specially designated as a trial deposition.  Thus, even though Toshiba actively

participated in discovery in the CRT Action, and apparently had the ability to make the

appropriate Illinois designation(s) at the time, Toshiba now allegedly finds itself unable to use

that discovery in connection with the Illinois Action.[2]  As a result, Toshiba sought the issuance

---

[2]    *See Memorandum Opinion and Order* (attached hereto as **Exhibit B**) (order in a different but
substantially similar action pending in the Circuit Court of Cook County, Illinois, denying
Toshiba's request to use federal deposition testimony given Toshiba's failure to properly
notice the federal deposition testimony as an "evidence deposition" under Illinois Supreme
Court Rule 202).

of the Subpoena to compel the Trust to provide the very same testimony that the Trust – at significant cost – already provided years ago.[3]

The Trust is not a party to the Illinois Action and has neither the appropriate resources nor the appropriate personnel to respond to the burdensome requests embodied in the Subpoena. The Trustee has endeavored to cooperate with Toshiba with regard to the Subpoena, and (as set out in more detail below) is willing to produce to Toshiba all documents that the Trust produced in the CRT Action.  What the Trust is unable to do, however, is undertake the unduly burdensome task of, and incur the significant expense associated with, hiring and educating a witness to testify regarding the 18 overly broad "Matters Upon Which Examination Is Requested" listed in the Subpoena.  None of the Trust's few remaining employees have the knowledge necessary to give sworn testimony on the myriad deposition topics included in the Subpoena.  As such, compliance with the deposition component of the Subpoena would require the Trustee to hire and educate a consultant for the sole purpose of providing non-party deposition testimony.  That is not an appropriate use of a non-party Subpoena, and it is especially objectionable here given that Toshiba's alleged need for a "do over" is a problem of Toshiba's own making.

---

[3]    Significantly, in the CRT Action, the Trustee was served with a deposition notice (a copy of which is attached hereto as **Exhibit C**) (the "CRT Notice"), which covered all but one of the deposition topics in the Subpoena (indeed, 16 of the 18 the "Matters Upon Which Examination is Requested" are copied verbatim, or nearly verbatim, from the CRT Notice).  The Trustee hired a consultant and worked extensively with counsel to prepare the consultant as a corporate representative who ultimately gave deposition testimony (the "CRT Deposition").  As reflected in the transcript of the CRT Deposition (attached hereto as **Exhibit D**), counsel for Toshiba attended the CRT Deposition and examined the deponent at length.

**GENERAL OBJECTIONS**

1.      The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that it was served without leave of the Bankruptcy Court and purports to command and direct the Trustee's use of Trust resources for purposes inconsistent with the Confirmation Order in usurpation of the power and authority of the Bankruptcy Court.

2.      The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that it was not properly served on the Trustee or the Trust. The Subpoena is addressed to "Circuit City Stores, Inc. Liquidating Trust c/o Tavenner & Beran, PLC" and was delivered to the Trustee's counsel, who was not and is not authorized to accept service of the Subpoena.

3.      The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that it is inconsistent with the *Settlement and Release* dated December 2, 2014 (the "CRT Settlement Agreement") between the Trustee and Toshiba, which definitively compromised and resolved the parties' relationship to each other vis-à-vis the CRT Action. The CRT Settlement Agreement contains a standard integration clause (under which the Settlement Agreement is the complete and definitive agreement between Toshiba and the Trust with regard to matters pertaining to the CRT Action), and the Settlement Agreement contains no requirement that the parties cooperate further with each other by providing testimony and evidence in related litigation (even though such further cooperation provisions are often found in settlement agreements).[4]

---

[4]      The Trustee has not attached the Settlement Agreement because it is designated as Confidential. The Settlement Agreement was submitted to the Bankruptcy Court under seal, and the Bankruptcy Court approved all provisions of the Settlement Agreement.

4.     The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that the Subpoena does not comply with the State of Illinois's requirements for issuance of a subpoena.  The Illinois form subpoena attached as the last page of the Subpoena (*i.e.*, the last page of Exhibit A hereto) is designed for use in securing testimony within the State of Illinois itself, as it is a fill-in-the-blanks form that commands the recipient "to appear and give your deposition testimony before a Notary Public at: [blank], in Room [blank], [blank], Illinois." Toshiba's counsel struck out the word "Illinois" and filled in the rest of the blanks with a Virginia address.  There is no indication that Toshiba sought or secured the issuance of letters rogatory.

5.     The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that the Subpoena does not comply with Virginia's requirements for issuance of a subpoena pursuant to the Uniform Interstate Deposition & Discovery Act.

6.     The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that compliance therewith would subject the Trustee, a non-party, to undue burden or expense.  *See* Va. Sup. Ct. R. 4:1(c) & 4:9A(c).

7.     The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that the requested non-party discovery is disproportionate to the legitimate needs of the requesting parties given the facts and circumstances here.  *See* Va. Sup. Ct. R. 4:1(b)(1).

8.     The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that it is entirely duplicative of discovery previously provided by the Trustee in the CRT Action.  It is unfair and inequitable to require the Trustee to produce

the same exact evidence again, at significant expense, on account of Toshiba's unilateral failure to comply with Illinois procedural requirements.

9.      The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that the same topics set out in the Subpoena were first set out in the CRT Notice, and during the meet-and-confer process in the CRT Action were subsequently narrowed and cabined. It is unfair and inequitable to require the Trustee to respond to the overly broad and burdensome topics set out in the Subpoena when those same overly broad and burdensome topics were previously narrowed by agreement of the parties in the CRT Action.

10.     The Trustee objects to the Subpoena, including each and every component thereof and request therein, on the ground that the "Relevant Period" is defined by the Subpoena to span more than twelve years, a time period that is overbroad, oppressive, and unduly burdensome.

11.     The Trustee objects to the Subpoena, including each and every component thereof and request therein, to the extent it seeks to impose upon the Trustee obligations greater than, or otherwise different from, those imposed by Code of Virginia, the Rules of the Supreme Court of Virginia, and/or any other applicable law, rule, or court order.

12.     The Trustee objects to the Subpoena, including each and every component thereof and request therein, to the extent it seeks the disclosure of documents or information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or doctrine. The Trustee has not authorized the waiver of any such privilege or doctrine, and therefore any inadvertent disclosure of privileged information by counsel is unauthorized and shall not operate as a waiver.

13.     The Trustee objects to the Subpoena, including each and every component thereof and request therein, to the extent it seeks any document or information that (a) is already in the possession, custody, or control of Toshiba or another defendant in the Illinois Action; (b) is not within the Trustee's possession, custody, or control; and/or (c) can more readily, conveniently, and in a less burdensome fashion be obtained from others.

## SPECIFIC OBJECTIONS AND RESPONSES

## REQUEST FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:**

All Documents produced by You in *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. 07-5944 JST, MDL 1917 (N.D. Cal.).

**RESPONSE/OBJECTION TO REQUEST FOR PRODUCTION NO. 1:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. Subject to and without waiving its General Objections, the Trustee is willing to produce the documents previously produced in the CRT Action.

## LIST OF MATTERS UPON WHICH EXAMINATION IS REQUESTED

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 1:**

Your overall corporate structure, including the identification of departments within Circuit City responsible for the purchase, sale, pricing, marketing, or distribution of CRT Finished Products and their functions and the identification of any individuals that had managerial responsibility for the purchase, sale, pricing, marketing, or distribution of CRT Finished Products.

**RESPONSE/OBJECTION TO MATTER NO. 1:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. In addition, the Trustee objects to this request on the

8

ground that it requires detailed testimony about the "corporate structure" of an entity (Circuit City) that is no longer in existence and has not engaged in business operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 2:**

The identity and general description of the CRT Finished Products You purchased, sold, marketed, or distributed.

**RESPONSE/OBJECTION TO MATTER NO. 2:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. In addition, the Trustee objects to this request on the ground that it requires detailed testimony about products once sold by an entity (Circuit City) that is no longer in existence and has not engaged in business operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 3:**

The identity of the Defendants from whom you purchased CRT Finished Products, and the identity and amount of CRT Finished Products You purchased from them (by year, in units, and U.S. dollars), if any.

**RESPONSE/OBJECTION TO MATTER NO. 3:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. In addition, the Trustee objects to this request on the ground that it requires detailed testimony about vendors from which purchases were made by an entity (Circuit City) that is no longer in existence and has not engaged in business operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 4:**

The identity of any non-Defendant manufacturers, producers, or distributors from whom You purchased CRT Finished Products, and the identity and amount of CRT Finished Products (by year, in units, and U.S. dollars) that You purchased from them, if any.

**RESPONSE/OBJECTION TO MATTER NO. 4:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein.  In addition, the Trustee objects to this request on the ground that it requires detailed testimony about manufacturers or distributors from which purchases were made by an entity (Circuit City) that is no longer in existence and has not engaged in business operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 5:**

Circuit City's purchase or acquisition of CRT Finished Products.

**RESPONSE/OBJECTION TO MATTER NO. 5:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein.  In addition, the Trustee objects to this request on the ground that it is hopelessly vague and indefinite.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 6:**

The factors Circuit City considered in determining (a) from which Defendant(s) or non-Defendant(s) to purchase CRT Finished Products, and (b) which CRT Finished Products to purchase from particular Defendants and non-Defendants, including but not limited to the vendor qualification process and new model reviews.

**RESPONSE/OBJECTION TO MATTER NO. 6:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. In addition, the Trustee objects to this request on the ground that it requires detailed testimony about the acquisition strategy of an entity (Circuit City) that is no longer in existence and has not engaged in business operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 7:**

The process by which You negotiated, entered into, approved, or ratified purchase agreements or contracts for CRT Finished Products, including: (a) Your policies and practices regarding the negotiation of terms and conditions of such sales contracts; (b) use of standardized sales or purchase contracts; (c) use of "MFN" (Most Favored Nation) or "MFC" (Most Favored Company) clauses or similar price-protection clauses; (d) the use of dealer agreements; and (e) the identity and location of documents that relate to the matters specified in this topic.

**RESPONSE/OBJECTION TO MATTER NO. 7:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. In addition, the Trustee objects to this request on the ground that it requires detailed testimony about the acquisition strategy and related corporate policies of an entity (Circuit City) that is no longer in existence and has not engaged in business operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 8:**

Circuit City's sales of CRT Finished Products, including:

(a) the overall sales volume (by units and dollar value);

(b) the sales volume in Illinois (by units and dollar value);

11

(c) the price quoted and received for each sale (including any discounts,

rebates, and other terms of sale);

(d) the date and quantity of each sale; and

(e) the person(s) to whom such CRT Finished Products were sold.

**RESPONSE/OBJECTION TO MATTER NO. 8:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set

out above as if fully set forth herein. In addition, the Trustee objects to this request on the

ground that it is hopelessly vague and indefinite, apparently requiring the Trustee to itemize

every CRT product sale (*e.g.*, television sets and computer monitors) made to every customer

who ever bought anything from a retailer (Circuit City) that is no longer in existence and has not

engaged in business operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 9:**

Your policies and practices for setting the price at which You sold CRT Finished

Products to Your customers.

**RESPONSE/OBJECTION TO MATTER NO. 9:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set

out above as if fully set forth herein. In addition, the Trustee objects to this request on the

ground that it requires detailed testimony about the pricing strategy and related corporate policies

of an entity (Circuit City) that is no longer in existence and has not engaged in business

operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 10:**

Your participation in any discounts, promotions, rebates, or advertising cooperative

programs provided or sponsored by any Defendant or non-Defendant from whom You purchased

CRT Finished Products.

**RESPONSE/OBJECTION TO MATTER NO. 10:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set

out above as if fully set forth herein.  In addition, the Trustee objects to this request on the

ground that it requires detailed testimony about the pricing strategy and related corporate policies

of an entity (Circuit City) that is no longer in existence and has not engaged in business

operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 11:**

Your use of discounts, promotions, rebates or loyalty programs in connection with the

sale of CRT Finished Products to Your customers, including how You recorded such discounts

or rebates, and the identity and location of documents or data recording such discounts or

rebates.

**RESPONSE/OBJECTION TO MATTER NO. 11:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set

out above as if fully set forth herein.  In addition, the Trustee objects to this request on the

ground that it requires detailed testimony about the pricing strategy and related corporate policies

of an entity (Circuit City) that is no longer in existence and has not engaged in business

operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 12:**

How Circuit City's CRT Finished Products were marketed for sale, including whether factors other than price were evident in the marketing materials and how the marketing strategy was determined and implemented for the CRT Finished Products sold.

**RESPONSE/OBJECTION TO MATTER NO. 12:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. In addition, the Trustee objects to this request on the ground that it requires detailed testimony about the marketing strategy and related corporate policies of an entity (Circuit City) that is no longer in existence and has not engaged in business operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 13:**

Other products that You believed were viewed by Your customers as alternatives to CRT Finished Products, including: (a) products other than CRT Finished Products; (b) the reasons that You believe Your customers viewed such products to be alternatives to the CRT Finished Products You purchased from the Defendants; (c) the extent to which these products had any effect on Your pricing decisions; and (d) the identity and location of documents that relate to the matters specified in this topic.

**RESPONSE/OBJECTION TO MATTER NO. 13:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. In addition, the Trustee objects to this request on the ground that it is hopelessly vague and indefinite, apparently requiring the Trustee to divine the expectations and motivations of retail customers with regard to product purchases from a retailer

(Circuit City) that is no longer in existence and has not engaged in business operations for the better part of a decade.

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 14:**

All contracts or any other agreements relating to CRT Finished Products between Circuit City and any entity, including the terms and conditions of any such contracts or agreements, including the scope of the agreement, choice of law, and forum selection.

**RESPONSE/OBJECTION TO MATTER NO. 14:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. In addition, the Trustee objects to this request on the ground that it requires detailed testimony about acquisition strategy and related corporate policies of an entity (Circuit City) that is no longer in existence and has not engaged in business operations for the better part of a decade, and further on the ground that it is hopelessly vague and indefinite in its use of the terms "any entity" and "any such contracts or agreements."

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 15:**

Explanation of whether, based on records maintained by Circuit City, it is possible to link, trace, or otherwise establish a relationship between the CRT Finished Products that Circuit City purchased to those that it sold and, if so, how.

**RESPONSE/OBJECTION TO MATTER NO. 15:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set out above as if fully set forth herein. In addition, the Trustee objects to this request on the ground that it requires detailed testimony about corporate records and policies of an entity (Circuit City) that is no longer in existence and has not engaged in business operations for the

15

better part of a decade, and further on the ground that it is hopelessly vague and indefinite in its

use of the phrase "link, trace, or otherwise establish a relationship."

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 16:**

Your practices, policies, and procedures concerning Your market monitoring activity for

CRT Finished Products, including the following: (a) Your competitive intelligence activities; (b)

Your use of third-party data sources and market share/data analyses; and (c) Your knowledge,

use, and tracking of Your competitors' pricing for CRT Finished Products.

**RESPONSE/OBJECTION TO MATTER NO. 16:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set

out above as if fully set forth herein.  In addition, the Trustee objects to this request on the

ground that it requires detailed testimony about corporate policies and procedures of an entity

(Circuit City) that is no longer in existence and has not engaged in business operations for the

better part of a decade, and further on the ground that it is hopelessly vague and indefinite in its

use of the terms "market monitoring activity," "competitive intelligence activities," and "third-

party data sources and market share/data analyses."

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 17:**

The extent to which Circuit City passed on its costs in purchasing or acquiring CRT

Finished Products to its customers, including pricing practices and timing of price increases, but

not including precise figures or total amounts of price margins.

**RESPONSE/OBJECTION TO MATTER NO. 17:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set

out above as if fully set forth herein.  In addition, the Trustee objects to this request on the

ground that it requires detailed testimony about acquisition, pricing, and marketing strategies and

related corporate policies of an entity (Circuit City) that is no longer in existence and has not

engaged in business operations for the better part of a decade, and further on the ground that it is

hopelessly vague and indefinite in its use of the phrase "passed on."

**MATTER UPON WHICH EXAMINATION IS REQUESTED NO. 18:**

The aggregate amount that You received to settle Your claims in the CRT MDL,

including any claims relating to alleged overcharges for CRTs contained in CRT Finished

Products You sold or distributed to Persons in Illinois.

**RESPONSE/OBJECTION TO MATTER NO. 18:**

The Trustee repeats and re-alleges the Preliminary Statement and General Objections set

out above as if fully set forth herein.  In addition, the Trustee objects to this request on the

ground that it requires testimony about confidential settlements – including settlements (such as

the Trustee's settlement with Toshiba in the CRT Action) that were submitted under seal to the

Bankruptcy Court and are the subject of sealing orders by the Bankruptcy Court.

## RESERVATION OF RIGHTS

The Trustee reserves all rights to seek reimbursement of the fees and costs associated

with the Subpoena, including fees and costs incurred in the preparation of these responses and

objections, and to seek sanctions against Toshiba in any appropriate court.

Dated: July 7, 2016

TAVENNER & BERAN, PLC

Lynn L. Tavenner (VA Bar No. 30083)
Paula S. Beran (VA Bar No. 34679)
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
(804) 783-8300

- and -

Andrew W. Caine, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 227-6910

*Counsel to Alfred H. Siegel, as Trustee for the
Circuit City Stores, Inc. Liquidating Trust*



18

Exhibit A

**SUBPOENA/SUBPOENA DUCES TECUM**
**TO PERSON UNDER FOREIGN SUBPOENA**
Commonwealth of Virginia   VA CODE §§ 8.01-412.8—8.01-412.15; Rule 4:9

File No. _CLIG- 2739-2_

_Richmond_ ............................................................... Circuit Court

_400 N. 9th Street   Richmond   Va 23219_
<span style="font-size:smaller">ADDRESS OF COURT</span>

THE STATE OF ILLINOIS ........................ v./In re: HITACHI, LTD., et al.

**TO THE PERSON AUTHORIZED BY LAW TO SERVE THIS PROCESS:**
You are commanded to summon

Circuit City Stores, Inc. Liquidating Trust c/o Tavenner & Beran, PLC
<span style="font-size:smaller">NAME</span>

20 North Eighth Street, Second Floor
<span style="font-size:smaller">STREET ADDRESS</span>

Richmond, Virginia 23219
<span style="font-size:smaller">CITY                    STATE                    ZIP</span>

**TO THE PERSON SUMMONED:** You are commanded to

☑ attend and give testimony at a deposition

☑ produce the books, documents, records, electronically stored information, and tangible things designated and described below

    See attached Notice of Discovery and Evidence Depositions and Document Subpoena

at   1320 East Cary Street, Richmond, VA 23219      at   June 30, 2016 at 9:00 a.m.
<span style="font-size:smaller">    LOCATION                                                                          DATE AND TIME</span>

and to permit inspection and copying by the requesting party or someone acting in his or her behalf of the designated items in your possession, custody or control

☐ permit inspection of the premises

at the following location

_____
<span style="font-size:smaller">LOCATION</span>

on _____
<span style="font-size:smaller">DATE AND TIME</span>

This subpoena is issued upon the request of the party named below

Daniel Cummings
<span style="font-size:smaller">NAME OF REQUESTING PARTY</span>

150 South Wacker Drive, Suite 3025
<span style="font-size:smaller">STREET ADDRESS</span>

Chicago, IL  60606 (312) 372-2346
<span style="font-size:smaller">CITY                    STATE                    ZIP                    TELEPHONE NUMBER</span>

<span style="font-size:smaller">FORM CC-1439 (MASTER, PAGE ONE OF THREE) 03/09</span>

12-CH-35266

The requesting party has submitted to this Clerk's Office the foreign subpoena, copy attached, the terms of which are incorporated herein, and the written statement required by Virginia Code § 8.01-412.10.

The names, addresses and telephone numbers of all counsel of record in the proceeding to which the subpoena relates and of parties not represented by counsel are provided ☐ below ☑ on attached list.

| 6-14-16 | , EDWARD F. JEWETT, Clerk |
|---|---|
| DATE ISSUED | CLERK |
| | by _____ Garbara Johnson |
| | DEPUTY CLERK |

| NAME OF ATTORNEY FOR REQUESTING PARTY | BAR NUMBER | LICENSING STATE |
|---|---|---|
| OFFICE ADDRESS | TELEPHONE NUMBER OF ATTORNEY | |
| OFFICE ADDRESS | FACSIMILE NUMBER OF ATTORNEY | |

| NAME | BAR NUMBER | LICENSING STATE |
|---|---|---|
| STREET ADDRESS | TELEPHONE NUMBER | |
| STREET ADDRESS | FACSIMILE NUMBER | |

| NAME | BAR NUMBER | LICENSING STATE |
|---|---|---|
| STREET ADDRESS | TELEPHONE NUMBER | |
| STREET ADDRESS | FACSIMILE NUMBER | |

| NAME | BAR NUMBER | LICENSING STATE |
|---|---|---|
| STREET ADDRESS | TELEPHONE NUMBER | |
| STREET ADDRESS | FACSIMILE NUMBER | |

## RETURN OF SERVICE (see page three of this form)

FORM CC-1439 (MASTER, PAGE TWO OF THREE) 01/09

12-CH-35266

[ ] This SUBPOENA/SUBPOENA DUCES TECUM TO PERSON UNDER FOREIGN SUBPOENA is being served by a private process server who must provide proof of service in accordance with Va. Code § 8.01-325.

**TO** the person authorized to serve this process: Upon execution, the return of this process shall be made to the Clerk of Court.

| | |
|---|---|
| NAME: ............................................................................................................... | |
| ADDRESS: ........................................................................................................... | |
| ............................................................................................................................... | |
| [ ] PERSONAL SERVICE | Tel. No. ...................................... |

Being unable to make personal service, a copy was delivered in the following manner:

[ ]   Delivered to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of party named above after giving information of its purport.  List name, age of recipient, and relation of recipient to party named above:

........................................................................................................................................

........................................................................................................................................

[ ]   Posted on front door or such other door as appears to be the main entrance of usual place of abode, address listed above. (Other authorized recipient not found.)

| [ ]   not found | ...................................................................... , Sheriff |
|---|---|
| ....................................... by ...................................................................... , Deputy Sheriff | |
| DATE | |

Subpoena in a Civil Matter (For Testimony and/or Documents)    (This form replaces CCG N006 & CCG N014)    (Rev. 6/25/09) CCG 0106

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

THE STATE OF ILLINOIS, by its Attorney General, Lisa Madigan

                                                                    FILED-1
                                                 Plaintiff/Petitioner    2016 JUN 13    PM 2:42
                                    v.                                No.
HITACHI, LTD., et al.                                                CIRCUIT COURT OF COOK
                                                 Defendant/Respondent    COUNTY OF ILLINOIS
                                    SUBPOENA IN A CIVIL MATTER    LAW DIVISION
                                        (For Testimony and/or Documents)

To: Circuit City Stores, Inc. Liquidating Trust c/o Tavenner & Beran, PLC

20 North Eighth Street, Second Floor

Richmond, Virginia 23219

[  ]    1. YOU ARE COMMANDED to appear to give your testimony before the Honorable _____
        in Room _____ , _____ , Illinois on _____ , _____
        at _____ m.

[✓]    2. YOU ARE COMMANDED to appear and give your deposition testimony before a Notary Public at: Courtyard Richmond Downtown
        in Room _____ 1320 East Cary Street, Richmond, VA 23219 , Illinois on June 30 , 2016
        at 9:00 a.m. m.

[✓]    3. YOU ARE COMMANDED to mail the following documents in your possession or control to William Bave, White & Case LLP
        at 1155 Avenue of the Americas New York, NY 10036, in electronic format to william.bave@whitecase.com , on or before June 30 , 2016
        at 9:00 a.m. m.
        [THIS IS FOR RECORDS ONLY. THERE WILL BE NO ORAL INTERROGATORIES.];
        See attached Notice of Discovery and Evidence Depositions and Document Subpoena

[✓]    Description continued on attached page(s).
YOUR FAILURE TO RESPOND TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT.

Notice to Deponent:

[✓]    1. The deponent is a public or private corporation, partnership, association, or governmental agency. The matter(s) on which examination is
        requested are as follows: See attached Notice of Discovery and Evidence Depositions and Document Subpoena

[✓]    Description continued on attached page(s).
        (A nonparty organization has a duty to designate one or more officers, directors, or managing agents, or other persons to testify on its behalf,
        and may set forth, for each person designated, the matters on which that person will testify. Ill. Sup. Ct. Rule 206.)

[✓]    2. The deponent's testimony will be recorded by use of an audio-visual recording device, operated by Victor M. Renteria, Jr., CLVS of Visual Discovery, Inc
                                                                                    (Name of Recording Device Operator)
        3. No discovery deposition of any party or witness shall exceed three hours regardless of the number of parties involved in the case, except
        by stipulation of the parties or by order upon showing that good cause warrants a lengthier examination. Ill. Sup. Ct. Rule 206(d).

Atty. No. 90707                                    Pro Se 99500
Name: Daniel Cummings                                                Issued by: _____
Atty. for: Toshiba Corporation and Toshiba America Electronic Components, Inc.                    Signature
Address: 150 South Wacker Drive, Suite 3025                        [✓] Attorney
City/State/Zip: Chicago, IL 60606                                 [  ] Clerk of Court
Telephone: (312) 372-2345                                         Date: _____

[  ]    I served this subpoena by mailing a copy, as required by Ill. Sup. Ct. Rules 11, 12 and 204(a)(2), to _____
        by certified mail, return receipt requested (Receipt # _____ ) on _____
        I paid the witness $ _____ for witness and mileage fees.

[  ]    I served this subpoena by handing a copy to _____ on _____
        I paid the witness $ _____ for witness and mileage fees.

_____ (Signature of Server)                            _____ (Print Name)
DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

STATE OF ILLINOIS, *ex rel.* Lisa Madigan,
Attorney General,

        Plaintiff,

    v.

HITACHI, LTD., *et al.*,

        Defendants.

No. 12-CH-35266

Hon. Rita M. Novak

## LIST OF PARTIES AND ATTORNEYS

Plaintiff the State of Illinois, by its Attorney General, Lisa Madigan

Blake Harrop
Chadwick Brooker
Antitrust Bureau
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
100 West Randolph Street
Chicago, Illinois 60601

**Defendants Hitachi, Ltd., Hitachi Electronic Devices (USA), Inc., and Hitachi Displays, Ltd.**

Kate Wheaton
Karl Stampfl
KIRKLAND & ELLIS
300 North LaSalle Street
Chicago, IL 60654

**Defendants Philips Electronics North America Corporation and Koninklijke Philips N.V.**

Jeffery Cross
David C. Gustman
Tonita M. Helton
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 300
Chicago, IL 60606

John M. Taladay
Erik T. Koons
Charles M. Malaise
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400

**Defendants Toshiba Corporation and Toshiba America Electronic Components, Inc.**

Dan Cummings
Alan Madans
ROTHSCHILD, BARRY & MYERS
150 South Wacker Drive
Suite 3025
Chicago, IL 60606

Christopher M. Curran
Lucius B. Lau
Dana E. Foster
WHITE & CASE
701 Thirteenth Street, N.W.
Washington, DC 20005

William H. Bave, III.
WHITE & CASE
1155 Avenue of the Americas
New York, NY 10036

**Defendants Samsung SDI America, Inc. and Samsung Display Device Co., Ltd.**

Daniel G. Rosenberg
Catherine B. Diggins
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
Three First National Plaza
70 West Madison Street, 48th Floor
Chicago, Illinois 60602

Michael Scarborough
Tyler M. Cunningham
SHEPPARD MULLIN RICHTER & HAMPTON LLP
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111

**Defendants Panasonic Corporation, Panasonic Corporation of North America, and MT Picture Display Co., Ltd.**

Duane M. Kelley
James F. Herbison
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601

Jeffrey L. Kessler
Eva W. Cole
Molly M. Donovan
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166-4193

Steven A. Reiss
David L. Yohai
Adam C. Hemlock
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119

**Defendants LG Electronics, Inc. and LG Electronics USA, Inc.**

Nathan P. Eimer
David M. Simon
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604

Miriam Kim
MUNGER, TOLLES & OLSON LLP
560 Mission Street
27th Floor
San Francisco, California 94105-2907

Jessica Barclay-Strobel
MUNGER, TOLLES & OLSON LLP
355 South Grand Ave.
35th Floor
Los Angeles, California 90071

FILED-1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION 2:43

CIRCUIT COURT OF COOK
COUNTY OF ILLINOIS
LAW DIVISION

STATE OF ILLINOIS, *ex rel.* Lisa Madigan,
Attorney General,

                Plaintiff,

    v.

HITACHI, LTD., *et al.*,

                Defendants.

No. 12-CH-35266

Hon. Rita M. Novak

## NOTICE OF RULE 206(a)(1) DISCOVERY AND EVIDENCE DEPOSITIONS AND DOCUMENT SUBPOENA

TO:    All Counsel of Record

    **PLEASE TAKE NOTICE** that, pursuant to Rule 206(a)(1) of the Illinois Supreme Court Rules, Defendants Toshiba Corporation and Toshiba America Electronic Components, Inc., through counsel and in conjunction with all defendants, will take the discovery deposition, followed by the evidence deposition, of the person or persons designated by Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust ("Circuit City") to testify about the information known or reasonably available to Circuit City on the matters set forth in the attached Exhibit A. Circuit City is directed to produce the documents set forth in Exhibit B attached hereto.

    The deposition will commence on June 30, 2016 at 9:00 a.m. at Courtyard Richmond Downtown, 1320 East Cary Street, Richmond, VA 23219. The deposition shall be recorded stenographically and a real-time transcription service such as LiveNote may also be available for the use of counsel. The deposition may also be recorded by sound or sound-and-visual means by

1

Victor M. Renteria, Jr., CLVS of Visual Discovery, Inc. The deposition will continue pursuant
to the Illinois Supreme Court Rules or order of the Court.

Circuit City is advised that Rule 206(a)(1) requires it to produce one or more witnesses at
the stated location and time who are knowledgeable and prepared to testify about each of the
matters identified in the List of Matters on Which Examination is Requested attached hereto as
Exhibit A. The designated witness or witnesses must be prepared to testify about matters known
by or reasonably available to Circuit City, not just information personally known by the witness.

Dated: June 13, 2016                    By: _____

Daniel Cummings
Alan Madans
150 South Wacker Drive
Suite 3025
Chicago, IL 60606
Telephone: (312) 372-2345
Fax: 312-372-2350
E-mail: cummings@rbmchicago.com
          madans@rbmchicago.com

Christopher M. Curran
George L. Paul
Lucius B. Lau
Dana E. Foster
White & Case
701 Thirteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 626-3600
Email: ccurran@whitecase.com
gpaul@whitecase.com
alau@whitecase.com
defoster@whitecase.com

*Counsel for Toshiba Corporation and Toshiba
America Electronic Components, Inc.*

2

## EXHIBIT A

### DEFINITIONS

For the purposes of this Notice of Deposition, the following definitions apply:

1.     "Any" shall be construed to mean "any and all."

2.     "CRT" or "CRTs" means any (a) color picture tubes ("CPTs"), which are cathode ray tubes used primarily in color televisions, and (b) color display tubes ("CDTs"), which are used primarily in computer monitors.

3.     "CRT Finished Product" or "CRT Finished Products" means televisions containing CPTs or computer monitors containing CDTs.

4.     "Defendant" or "Defendants" means any of the entitles currently or formerly named as defendants in this litigation and, without limitation, all of their past and present parents, subsidiaries, affiliates, joint ventures, officers, directors, employees, agents, attorneys, or representatives (and the parents', subsidiaries', affiliates', or joint ventures' past and present officers, directors, employees, agents, attorneys, or representatives), and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing.

5.     "Document(s)" has the broadest possible meaning permissible under Illinois Supreme Court Rule 214, including, but not limited to, any written, printed, typed, recorded, filmed, punched, transcribed, taped or other graphic matter of any kind or nature, however produced or reproduced, whether in hard copy, electronic, or other form, and includes, without limitation, pamphlets, brochures, books, booklets, information sheets, papers, articles, journals, magazines, computer printouts, Internet search results, tapes, discs or other forms of audio, visual or audio/visual recordings, records, memoranda, reports, financial statements, affidavits, handwritten and other notes, transcripts, paper, indices, letters, envelopes, telegrams, cables, electronic mail messages,

3

telex messages, telecopied messages, telephone messages, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, summaries or records of meetings or conferences, minutes or transcriptions or notations of meetings or telephone conversations or other communications of any type, tabulations, studies, analyses, evaluations, projections, work papers, statements, summaries, opinions, journals, desk calendars, product labels, prescriptions, package inserts or other information accompanying medications, maintenance or service records, appointment books, diaries, billing records, checks, bank account statements, invoices, photographs, microfilms, tapes or other records, punch cards, magnetic tapes, discs, data cells, drums, printouts, other data compilations (in any form) from which information can be obtained, recordings made through data processing techniques and the written information necessary to understand and use such materials, and any other Documents discoverable under the Illinois Supreme Court Rule 214.

6.    "Person" means and includes all natural persons or entities, governmental units, partnerships, firms, corporations, associations, joint ventures, any other form of business organization or arrangement, or any form of public, private or legal entity.

7.    "Relating to," "referring to," "regarding," or "with respect to" mean, without limitation, the following concepts: discussing, describing, reflecting, dealing with, pertaining to, analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing, recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or in part.

8.    "Relevant Period" means March 1, 1995, to November 25, 2007.

9.    "You," "Your," and "Circuit City" mean Circuit City Stores, Inc. and any other d/b/a's affiliated with Circuit City Stores, Inc., together with all present and former directors,

4

officers, employees, or agents of the entities listed in this Definition.

## LIST OF MATTERS UPON WHICH EXAMINATION IS REQUESTED

1.    Your overall corporate structure, including the identification of departments within Circuit City responsible for the purchase, sale, pricing, marketing, or distribution of CRT Finished Products and their functions and the identification of any individuals that had managerial responsibility for the purchase, sale, pricing, marketing, or distribution of CRT Finished Products.

2.    The identity and general description of the CRT Finished Products You purchased, sold, marketed, or distributed.

3.    The identity of the Defendants from whom you purchased CRT Finished Products, and the identity and amount of CRT Finished Products You purchased from them (by year, in units, and U.S. dollars), if any.

4.    The identity of any non-Defendant manufacturers, producers, or distributors from whom You purchased CRT Finished Products, and the identity and amount of CRT Finished Products (by year, in units, and U.S. dollars) that You purchased from them, if any.

5.    Circuit City's purchase or acquisition of CRT Finished Products.

6.    The factors Circuit City considered in determining (a) from which Defendant(s) or non-Defendant(s) to purchase CRT Finished Products, and (b) which CRT Finished Products to purchase from particular Defendants and non-Defendants, including but not limited to the vendor qualification process and new model reviews.

7.    The process by which You negotiated, entered into, approved, or ratified purchase agreements or contracts for CRT Finished Products, including: (a) Your policies and practices regarding the negotiation of terms and conditions of such sales contracts; (b) use of standardized

sales or purchase contracts; (c) use of "MFN" (Most Favored Nation) or "MFC" (Most Favored Company) clauses or similar price-protection clauses; (d) the use of dealer agreements; and (e) the identity and location of documents that relate to the matters specified in this topic.

8.  Circuit City's sales of CRT Finished Products, including:

    (a)  the overall sales volume (by units and dollar value);

    (b)  the sales volume in Illinois (by units and dollar value);

    (c)  the price quoted and received for each sale (including any discounts, rebates, and other terms of sale);

    (d)  the date and quantity of each sale; and

    (e)  the person(s) to whom such CRT Finished Products were sold.

9.  Your policies and practices for setting the price at which You sold CRT Finished Products to Your customers.

10.  Your participation in any discounts, promotions, rebates, or advertising cooperative programs provided or sponsored by any Defendant or non-Defendant from whom You purchased CRT Finished Products.

11.  Your use of discounts, promotions, rebates or loyalty programs in connection with the sale of CRT Finished Products to Your customers, including how You recorded such discounts or rebates, and the identity and location of documents or data recording such discounts or rebates.

12.  How Circuit City's CRT Finished Products were marketed for sale, including whether factors other than price were evident in the marketing materials and how the marketing strategy was determined and implemented for the CRT Finished Products sold.

13.    Other products that You believed were viewed by Your customers as alternatives to CRT Finished Products, including: (a) products other than CRT Finished Products; (b) the reasons that You believe Your customers viewed such products to be alternatives to the CRT Finished Products You purchased from the Defendants; (c) the extent to which these products had any effect on Your pricing decisions; and (d) the identity and location of documents that relate to the matters specified in this topic.

14.    All contracts or any other agreements relating to CRT Finished Products between Circuit City and any entity, including the terms and conditions of any such contracts or agreements, including the scope of the agreement, choice of law, and forum selection.

15.    Explanation of whether, based on records maintained by Circuit City, it is possible to link, trace, or otherwise establish a relationship between the CRT Finished Products that Circuit City purchased to those that it sold and, if so, how.

16.    Your practices, policies, and procedures concerning Your market monitoring activity for CRT Finished Products, including the following: (a) Your competitive intelligence activities; (b) Your use of third-party data sources and market share/data analyses; and (c) Your knowledge, use, and tracking of Your competitors' pricing for CRT Finished Products.

17.    The extent to which Circuit City passed on its costs in purchasing or acquiring CRT Finished Products to its customers, including pricing practices and timing of price increases, but not including precise figures or total amounts of price margins.

18.    The aggregate amount that You received to settle Your claims in the CRT MDL, including any claims relating to alleged overcharges for CRTs contained in CRT Finished Products You sold or distributed to Persons in Illinois.

## EXHIBIT B

## DEFINITIONS

The applicable Definitions appear in Exhibit A.

## INSTRUCTIONS

1.      In responding to this subpoena, You are requested to produce all Documents in Your possession, custody, or control, wherever located.

2.      All Documents should be produced as maintained in the ordinary course of business.

3.      If any part of a Document is responsive to any Request herein, produce the entire Document, including any attachments or exhibits.

4.      In the event that more than one copy of a Document exists, produce each copy on which there appears any notation or marking of any sort not appearing on any other copy (including routing or filing instructions) or any copy containing different attachments from any other copy.

5.      If You withhold any Documents on a claim of privilege, You must provide a statement of the claim of privilege and all facts relied upon in support of that claim.

6.      All electronically stored information shall be produced. Documents originating in paper or other hard copy format should be produced in 300 DPI Group IV Monochrome Tagged Image File Format (.TIFF or .TIF) files. TIFF files shall be produced in single-page format along with image load files (.DII file and .OPT file and .LPF file). All Documents are to be provided with multi-page searchable text (.TXT) files.  These text files and image load files should indicate page breaks to the extent possible, as well as Production Number Begin, Production Number End, Production Attachment Range Number Begin, Production Attachment Range Number End, and Production Document Page Count.  As well, each .TIFF image should be branded with the applicable Bates number and confidentiality designation (pursuant to the Protective Order, a copy of which is attached).

8

## REQUEST FOR PRODUCTION OF DOCUMENTS

1.     All Documents produced by You in *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. 07-5944 JST, MDL 1917 (N.D. Cal.).

Subpoena in a Civil Matter (For Testimony and/or Documents)          (This form replaces CCG N006 & CCG N014)   (Rev. 6/25/09) CCG 0106

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

THE STATE OF ILLINOIS, by its Attorney General, Lisa Madigan

                                                              Plaintiff/Petitioner
                              v.                                                              }     No. 12-CH-35266

HITACHI, LTD., et al.

                                                              Defendant/Respondent

### SUBPOENA IN A CIVIL MATTER
#### (For Testimony and/or Documents)

To: Circuit City Stores, Inc. Liquidating Trust c/o Tavenner & Beran, PLC

20 North Eighth Street, Second Floor

Richmond, Virginia 23219

[ ] 1. YOU ARE COMMANDED to appear to give your testimony before the Honorable _____

In Room _____  _____  , Illinois on _____  , _____

at _____  m.

[✓] 2. YOU ARE COMMANDED to appear and give your deposition testimony before a Notary Public at: Courtyard Richmond Downtown

In Room _____  , 1320 East Cary Street, Richmond, VA 23219  , Illinois on June 30  , 2016

at 9:00 a.m.  m.

[✓] 3. YOU ARE COMMANDED to mail the following documents in your possession or control to  William Bavs, White & Case LLP

at 1155 Avenue of the Americas New York, NY 10036, in electronic format to william.bavs@whitecase.com , on or before June 30  , 2016

at 9:00 a.m.  m.

(THIS IS FOR RECORDS ONLY. THERE WILL BE NO ORAL INTERROGATORIES.)

See attached Notice of Discovery and Evidence Depositions and Document Subpoena

[✓] Description continued on attached page(s).

**YOUR FAILURE TO RESPOND TO THIS SUBPOENA WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT.**

Notice to Deponents

[✓] 1. The deponent is a public or private corporation, partnership, association, or governmental agency. The matter(s) on which examination is
requested are as follows: See attached Notice of Discovery and Evidence Depositions and Document Subpoena

[✓] Description continued on attached page(s).
(A nonparty organization has a duty to designate one or more officers, directors, or managing agents, or other persons to testify on its behalf,
and may set forth, for each person designated, the matters on which that person will testify. Ill. Sup. Ct. Rule 206.)

[✓] 2. The deponent's testimony will be recorded by use of an audio-visual recording device, operated by  Victor M. Renteria, Jr., CLVS of Visual Discovery, Inc.
                                                                                                    (Name of Recording Device Operator)

3. No discovery deposition of any party or witnesses shall exceed three hours regardless of the number of parties involved in the case, except
by stipulation of the parties or by order upon showing that good cause warrants a lengthier examination. Ill. Sup. Ct. Rule 206(d).

Atty . No. 90707  Pro Se 99500                          Issued by: _____

Name: Daniel Cummings                                                          Signature

Atty. for: Toshiba Corporation and Toshiba America Electronic Components, Inc.      [✓] Attorney

Address: 150 South Wacker Drive, Suite 3025                                    [ ] Clerk of Court

City/State/Zip: Chicago, IL 60606

Telephone: (312) 372-2345                                Date: _____

[ ] I served this subpoena by mailing a copy, as required by Ill. Sup. Ct. Rules 11, 12 and 204(a)(1), to _____

by certified mail, return receipt requested (Receipt # _____ ) on _____

I paid the witness $ _____  for witness and mileage fees.

[ ] I served this subpoena by handing a copy to _____  on _____

I paid the witness $ _____  for witness and mileage fees.

_____                                    _____
(Signature of Server)                                          (Print Name)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# Exhibit B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| THE STATE OF ILLINOIS, by its Attorney General, Lisa Madigan, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 10-CH-34472 |
| AU OPTRONICS CORPORATION; AU OPTRONICS CORP. AMERICA, INC.; CHI MEI INNOLUX CORP.; CHI MEI OPTOELECTRONICS CORP. USA, INC.; CMO JAPAN COMPANY, LTD.; EPSON IMAGING DEVICES CORP.; EPSON ELECTRONICS AMERICA, INC.; HITACHI, LTD.; HITACHI DISPLAYS LTD.; HITACHI AMERICA, LTD.; HITACHI ELECTRONIC DEVICES USA, INC.; LG DISPLAY CO., LTD.; LG DISPLAY AMERICA, INC.; SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG SEMICONDUCTOR, INC.; SAMSUNG ELECTRONICS AMERICA INC.; SHARP CORP.; SHARP ELECTRONICS CORP.; TOSHIBA CORP.; TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.; TOSHIBA MOBILE DISPLAY CO.; and TOSHIBA AMERICA INFORMATION SYSTEMS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Moshe Jacobius |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' Renewed Motion to Permit the Use

of MDL Fact Witness Depositions as Evidence Depositions.[1] The Court has reviewed the

---

[1] The Court notes that the AU Optronics Defendants (AU Optronics Corp. and AU Optronics Corp. America) have withdrawn their participation from the instant motion pursuant to stipulation between the State and the AU Optronics Defendants; all other Defendants remain party to the instant motion.

foregoing motion and Defendants' memorandum in support thereof ("MTP"), as well as the State

of Illinois' Response ("Resp."), the Defendants' Reply ("Reply"), and all the parties' respective

exhibits thereto. The Court has also considered the oral arguments of counsels and relevant legal

authorities.

### Background

The underlying allegations of this long-pending case have been discussed at length in

previous Orders and thus need not be recited again in great detail.[2] In late 2006, the public

learned of a price-fixing investigation being conducted by the United States Department of

Justice. The investigation centered on allegations that manufacturers of thin-film transistor

liquid crystal display ("LCD") panels had held unlawful meetings for the purpose of fixing the

prices and output of LCD panels throughout the United States, including in Illinois. The price

fixing allegedly occurred between November 30, 1998, and December 11, 2006, during which

time the State of Illinois and Illinois consumers purportedly paid artificially inflated prices for

LCD panels.

After the investigation became public, a torrent of litigation ensued, with hundreds of

civil actions filed in United States district courts throughout the country. To promote the

efficient adjudication of those cases, the federal matters were consolidated in the United States

District Court for the Northern District of California under the caption *In re: TFT-LCD (Flat

Panel) Antitrust Litigation*, Case No. 3:07-MD-1827 SI, MDL No. 1827 (N.D. Cal.) (the

"multidistrict litigation"). The Honorable Judge Susan Illston has presided over the multidistrict

litigation since 2006, and ultimately certified two class actions therein. The first class consisted

of entities that were direct purchasers of LCD panels (e.g., entities that utilize LCD panels as

components of other products). The second class consisted of indirect purchasers of LCD

---

[2] *See, e.g.,* this Court's previously-entered May 30, 2012, and November 26, 2013, Orders.

2

panels, specifically individuals and entities that purchased products containing LCD panels (e.g.,

cellular phones, computer monitors, televisions, and numerous other items).  Additionally,

various plaintiffs opted out of the two classes and brought cases of their own in front of Judge

Illston.

Though many states elected to participate in the multidistrict litigation, the State of

Illinois opted to pursue its own action.  On August 10, 2010, the Illinois Attorney General (the

"Attorney General" or the "State") filed the instant suit on behalf of Illinois indirect purchasers

of products containing LCD panels.[3]  The Complaint alleges that Defendants violated section

3(1) of the Illinois Antitrust Act (the "IAA") by conspiring to fix prices on LCD panels.  The

Complaint asserts claims for monetary relief (including treble damages) for damages suffered by

the State of Illinois, its state agencies, and, in the State's *parens patriae* capacity, Illinois

residents (both individuals and businesses) who purchased products containing LCD panels

during the period of alleged price-fixing.  Additionally, the Complaint seeks injunctive relief to

undo the effects of Defendants' alleged unlawful conduct.

At issue in the instant motion is whether the Illinois Supreme Court Rules and the Illinois

Rules of Evidence permit Defendants to present certain depositions of fact witnesses, taken

primarily in connection with the multidistrict litigation, to be used as evidence depositions at trial

in the case before this Court. This issue has been pending before the Court for over a year,

having initially been raised in fall of 2014 in a motion by Defendants.  MTP Ex. A. At a hearing

on November 17, 2014, the Court instructed Defendants to specify precisely which depositions

Defendants desired to use so that the State could raise any valid objections rather than addressing

the depositions generally. Resp. Ex. 1. The matter was continued, and another hearing was held

---

[3] Indirect purchasers include entities that sell products containing LCD panels and the consumers that ultimately buy the products.

on February 25, 2015. MTP Ex. F. Again, the Defendants were instructed to present specific

deposition testimony for the State to either agree or raise objections to. MTP Ex. F; MTP at 4;

Resp. at 3. The parties proceeded to engage in lengthy exchanges of documents, and discussions

thereon, in an attempt to resolve the dispute. According to Defendants, the end result of such

negotiations was that the State rejected all of their proposed deposition testimony. MTP at 5-6.

The State insists it did agree that "the Defendants could use some of the designated testimony at

trial" but still maintains that it such testimony would constitute hearsay. Resp. at 5. Defendants

continue to assert that they are "not aware of any designated testimony for which the State has

not asserted any objections." Reply at 12.

　　　The parties being at an apparent impasse, Defendants filed the instant Renewed Motion,

which has been fully briefed by both sides, and which this Court must now attempt to resolve.  In

their Renewed Motion, the Defendants request this Court make the following findings:

　　(1) That Defendants are permitted to use all of the portions of depositions designated in

　　　　Defendants' Exhibit H at trial pursuant to Illinois Supreme Court Rule 202 and Rule 212;

　　(2) Tha  "the fact that the State's counsel did not attend" the depositions presented in Exhibit

　　　　H "will not prevent Defendants from offering the designated testimony in evidence" at

　　　　trial pursuant to Illinois Rule of Evidence 804(b)(1); and

　　(3) That the parties must "work cooperatively to reach agreement" with regard to other

　　　　testimony from the multidistrict litigation being offered at trial. MTP at 3.

　　　Defendants assert that these depositions taken in connection with the multidistrict

litigation involved witnesses from many states and other countries, and that they were taken at

great expense, pursuant to the Federal Rules of Civil Procedure and Federal Rules of Evidence

which do not distinguish between fact witness depositions and evidence depositions as do their

4

Illinois counterparts. MTP at 1-3. Indeed, proceedings in this case were stayed pending discovery

proceedings in the multidistrict litigation. MPT at 2. When proceedings in this case resumed,

Defendants provided the State with copies of all depositions conducted in the multidistrict

litigation, many of which Defendants believe the State intends to rely upon in the instant suit

under certain hearsay exceptions, such as statements against interest. MTP at 2. Defendants also

believe the State will utilize such depositions as the basis for expert testimony, thereby avoiding

entry of the depositions themselves into the record. MTP at 20.

Defendants argue it would be prejudicial to the interests of justice to allow the State to

selectively use the parts of the depositions that might be beneficial to its position without

allowing Defendants the opportunity to use parts of the depositions as may be beneficial to their

position. MPT 1-3. Recreating the same depositions as evidence depositions under the Illinois

Rules will require inordinate time and expense, Defendants say, because the witnesses, many of

whom are third-parties, reside mostly outside Illinois and in some cases outside the United

States. MPT at 1.

The State insists that under Illinois Supreme Court Rule 202 a party must specify in the

notice or subpoena for a deposition whether it is for discovery or evidence, and that where

neither is specified the depositions are automatically considered discovery depositions only.

Resp. at 6. The State argues that depositions taken pursuant to the federal rules are not acceptable

as evidence depositions in Illinois and that no exception should be made here where the State had

no notice of depositions in the multidistrict litigation. Resp. at 7-9. The State acknowledges that

it is still possible to use the depositions at trial, but only for the limited purposes allowed under

Illinois Rule of Evidence 804 in conjunction with Illinois Supreme Court Rule 212. Resp. at 10.

The state argues that, within the confines of the exceptions allowed, it makes no difference

whether there was a predecessor-in-interest of the State present at any of the depositions because

they can only be considered discovery depositions. Resp. at 10-11. Even if the Court were to

consider them evidence depositions for purposes of Illinois law, the State further argues that no

counsel representing consumers was present at some of the depositions at issue. Resp. at 10-11.

### Discussion

The Illinois Supreme Court Rules and the Illinois Rules of Evidence govern how

depositions must be conducted and for what purposes they may be used. Illinois Supreme Court

Rule 212 ("Rule 212") provides in pertinent part as follows:

> (a) Purposes for Which **Discovery Depositions** May Be Used.
> Discovery depositions taken under the provisions of this rule may be used
> only:
>> (1) for the purpose of impeaching the testimony of the deponent as a
>> witness in the same manner and to the same extent as any inconsistent
>> statement made by a witness;
>> (2) as an admission made by a party or by an officer or agent of a party in
>> the same manner and to the same extent as any other admission made by
>> that person;
>> (3) if otherwise admissible as an exception to the hearsay rule;
>> (4) for any purpose for which an affidavit may be used; or
>> (5) upon reasonable notice to all parties, *as evidence at trial or hearing
>> against a party who appeared at the deposition or was given proper
>> notice thereof,* if the court finds that the deponent is not a controlled
>> expert witness, the deponent's evidence deposition has not been taken, *and
>> the deponent is unable to attend or testify because of death or infirmity,*
>> and if the court, based on its sound discretion, further finds such evidence
>> at trial or hearing will do substantial justice between or among the parties.
> (b) Use of **Evidence Depositions.**
>            ****
> All or any part of [non-physician and non-surgeon] evidence depositions may be
> used for any purpose for which a discovery deposition may be used, and may be
> used by any party for any purpose if the court finds that at the time of the trial:
>> (1) The deponent is dead or unable to attend or testify because of age,
>> sickness, infirmity, or imprisonment;
>> (2) *The deponent is out of the county,* unless it appears that the absence
>> was procured by the party offering the deposition, provided, that a party
>> who is not a resident of this State may introduce his own deposition if he
>> is absent from the county; or

6

> (3) *The party offering the deposition has exercised reasonable diligence but* has been unable to procure the attendance of the deponent by subpoena; or finds, upon notice and motion in advance of trial, that *exceptional circumstances exist which make it desirable, in the interest of justice and with due regard for the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.*
>
> (c)  Partial Use.  If only a part of a deposition is read or used at the trial by a party, any other party may at that time read or use or require him to read any other part of the deposition which ought in fairness to be considered in connection with the part read or used.

Ill. S. Ct. Rule 212 (emphasis added). In addition, Illinois Supreme Court Rule 202 ("Rule 202")

provides in pertinent part that "the notice, order, or stipulation to take a deposition shall specify

whether the deposition is to be a discovery deposition or an evidence deposition," and that "in

the absence of specification a deposition is a discovery deposition only." Ill. S. Ct. Rule 202.

The admissibility of evidence is a decision left to the sound discretion of the trial court.

*Leonardi v. Loyola University of Chicago*, 168 Ill.2d 83, 92 (1995). One type of evidence that is

allowed under only very limited circumstances is hearsay, which is defined as an out-of-court

statement offered for the truth of the matter asserted. *Id.* at 99. The Illinois Rules of Evidence

804 ("Rule of Evidence 804") enumerates a number of exceptional circumstances in which

hearsay, including both discovery and evidence depositions, are admissible in Illinois State Court

when the declarant is unavailable as a witness. Ill. R. Evid. 804. Under Rule of Evidence 804, an

evidence deposition may be used when declarant is unavailable if it is "taken in compliance with

law in the course of the same or another proceeding, if the party against whom the testimony is

now offered, or . . . a predecessor in interest, had an opportunity and similar motive to develop

the testimony by direct, cross, or redirect examination." *Id.* A discovery deposition, on the other

hand, is only admissible when declarant is unavailable if it was taken pursuant to subpart (a)(5)

of Rule 212. *Id.* Even if a declarant is deceased, a discovery deposition which does not meet *all*

7

requirements of subpart (a)(5), or fall into one of the other hearsay exceptions in Rule 212, is not

admissible. *Longstreet v. Cottrell, Inc.*, 374 Ill. App. 3d 549, 554 (5th Dist. 2007) (deceased

declarant's discovery deposition not admissible under Rule 212(a)(5) where declarant was also a

party).

Defendants argue that federal law, which these depositions were taken in accordance

with, makes no distinction between a discovery deposition and an evidence deposition, and that

in fact Illinois is the only state to do so. MTP at 7. Depositions taken pursuant to federal rules,

Defendants say, are all taken with the expectation that the testimony can be used at trial. MTP at

7. Furthermore, depositions taken pursuant to federal rules "meet all the pertinent criteria for

evidence depositions under Illinois law." MTP at 7. Defendants cite several cases they believe

support their position, including *McClure v. Owens Corning Fiberglas Corporation*, 298 Ill.

App. 3d 591, 4th Dist. 1998), *In re Estate of Ragen*, 96 Ill. App. 3d 1035 (1st Dist. 1981), *Flack

v. McClure*, 206 Ill. App. 3d 976 (1st Dist. 1990), and *Berry v. American Standard, Inc.*, 382 Ill.

App. 3d 895 (5th Dist. 2008).

None of the cases cited by Defendants actually supports their position; instead, case law

cited by Defendants fails to reach the question of whether a deposition taken pursuant to federal

rules could be deemed an evidence deposition under Illinois rules. In *McClure*, the Fourth

District speculated that a deposition taken pursuant to federal rules should have been admitted in

an asbestos exposure case, but found no reversible error where the information in question had

largely been admitted by "other means." *Id.* at 603. That court made no finding as to any

equivalency between federal rules and Illinois rules pertaining to depositions, instead noting that

neither party had raised the issue. *Id.* at 602. In *Ragen*, the First District determined that a

deposition labeled as a "discovery deposition" could be used as evidence where a trial judge

informed the parties ahead of time that the deposition could be considered as evidence at trial, the attorney stated at the beginning of the deposition that it was intended to be evidentiary, counsel for both parties was present at the deposition, and the content did not prejudice either party. *In re Estate of Ragen*, 96 Ill. App. 3d at 1046. In *Flack*, a trial court did not err in admitting a deposition where "proper notice was given and . . . the dual [discovery and evidentiary] purpose of the deposition was stated on the record, giving opposing counsel the opportunity to object." *Flack*, 206 Ill. App. 3d at 981. Finally, *Berry* does not support Defendants' argument because the Fifth District determined in that case that the trial court had properly disallowed the deposition, noting that "strict compliance with supreme court rules is generally required," and Rule 212 gives a trial court discretion to allow evidentiary use of discovery deposition *only* for a non-party in the limited circumstances prescribed by subpart (a)(5). *Berry*, 382 Ill. App. 3d at 902 (citing Ill. S. Ct. Rule 212).

Since case law cited by Defendants is not on point, the Court turns to the plain language of Rule 202, Rule 212, and Rule of Evidence 804. Defendants argue that, under those rules, the key issue with respect to whether a deposition is considered a discovery or evidence deposition under Illinois law is how the deposition was noticed; because the depositions in question were noticed pursuant to the federal rules – which Defendants say would allow for use at trial – Defendants believe this notice was adequate for the depositions to be considered evidentiary depositions under Illinois law. MTP at 8-9.

Defendants' argument glosses over another key fact, however: the depositions in question were taken in connection with an entirely different proceeding to which the State of Illinois was not a party. Even if the Court assumes, *arguendo*, that a deposition taken pursuant to federal rules puts all the parties on sufficient notice that such deposition may be used as evidence at trial

9

– thereby satisfying the Illinois rules regarding an evidence deposition – Defendants would then need to show, with respect to each deposition they seek to introduce, that the following requirements are met:

> (1) The witness is "unavailable" pursuant to Rule of Evidence 804(a);
>
> (2) The State ("the party against whom the testimony is now offered"), *or* "a predecessor in interest" of the State, had *both* an opportunity *and* "similar motive" to examine the witness at the deposition in question.

With respect to the first prong, it is not proper for the Court to make a determination on availability until the time of the trial. *People v. Ward*, 207 Ill. App. 3d 365, 370 (3d Dist. 1991) ("The availability of a witness is an ongoing question for the trial court at the time the evidence is presented to it") (citing (*People v. Ford*, 139 Ill. App. 3d 894 (5th Dist. 1985)). Defendants have acknowledged this, and ask the Court to put aside determinations of availability accordingly, but to nevertheless answer whether, *if a witness is determined by the Court to be unavailable,* they are otherwise permitted to submit the depositions presented in Exhibit H at trial. MTP at 10.

On this question, Defendants first argue that the State had both adequate notice and opportunity to participate in depositions conducted in the multidistrict litigation based on the fact that counsel for the State filed appearances "very early on" in the multidistrict litigation, and as a result, received electronic case filings from that case, including the deposition protocol and Special Master's Order regarding individual action plaintiffs and case management. MTP at 11-12. The Special Master's Order indicated that deposition notices should be provided only to the liaison counsel for each group of plaintiffs. MTP at 12; MTP Ex. S. Because of this, say Defendants, the State was sufficiently aware that depositions were proceeding in the multidistrict

litigation and the State knew who to contact in the event they wanted to attend, thus satisfying the notice requirement. MTP at 12-13.

The State disputes Defendants' assertion that it had adequate notice of the depositions to satisfy Illinois rules. First of all, the State points out that notices of the depositions were not filed, so the fact that the State had entered an appearance in the multidistrict litigation did not result in their automatically receiving notice of depositions. Resp. at 9. The State acknowledges that it had access to the deposition protocol in the multidistrict litigation, but points out that this document lists no specific depositions, dates, or locations. Resp. at 9; MTP Ex. Q. The State further argues that the protective order in the multidistrict litigation prevented anyone who was not a party from accessing "confidential information" and that "virtually all of the deposition testimony and exhibits were designated confidential." Resp. at 9-10. Therefore, the State argues it could not have fully participated in the depositions even if it had notice. Resp. at 10.

The Defendants nevertheless maintain that the State had "de facto" notice, and further reply that notice to the State was not even necessary because "an evidence deposition need not be noticed as one intended to be used in a separate proceeding" and that "Rule 202 does not require that nonparties receive notice of an evidence deposition." Reply at 4. Rule of Evidence 804(b)(1) with its reference to a predecessor-in-interest would be rendered meaningless, Defendants argue, if the type of deposition contemplated therein were not allowed to be used in a separate proceeding by someone who was not party to the action in which the deposition was originally taken. Reply at 5.

Even assuming *arguendo* that Defendants are correct as to the legal aspect of this issue –
that *if the State had notice* that a deposition was being taken for the purpose of introducing as evidence at trial in another suit, then such deposition should thereafter be considered an evidence

11

deposition as between Defendants and the State in the instant suit – there is *nothing* that indicates

the State had such notice with respect to the depositions at issue here. Defendants are inviting

this Court to craft a definition of what constitutes notice that is inclusive of merely (1) having

knowledge that some depositions are likely being conducted in a given case, and (2) having

knowledge of who may be contacted for additional information, should any be available. The

Court need not even entertain this invitation because Illinois Supreme Court Rule 206 ("Rule

206") provides clear instructions as to what constitutes notice of a deposition. Ill. S. Ct. Rule

206.

Rule 206 states in pertinent part that "a part desiring to take the deposition of any person

upon oral examination shall service notice in writing a reasonable time in advance on the other

parties. *The notice shall state the time and place for taking the deposition; the name and address*

*of each person to be examined, if known, or, if unknown, information sufficient to identify the*

*deponent; and whether the deposition is for purposes of discovery or for use in evidence*." Ill. S.

Ct. Rule 206 (emphasis added). Nothing in the record or any of the parties' allegations indicates

that the State was provided with notice in advance of the time and place of any depositions, or

the name and address or other information sufficient to identify any witnesses. It is true that

federal rules, not Illinois rules, governed depositions taken in the multidistrict litigation;

nevertheless, Illinois rules govern the instant suit and what is required of the parties thereto.

Therefore, even if the Court were to accept Defendants' legal argument that notice of a

deposition being conducted in the multidistrict litigation pursuant to federal rules sufficiently

indicated that the deposition might be used as evidence in Illinois, the Court finds no indication

that such notice was ever provided to the State for any of the depositions at issue here.

12

Defendants next argue that, even if the State itself did not have an opportunity to cross-
examine witnesses at the depositions, the depositions might still be used at trial under Rule of
Evidence 804 because a "predecessor in interest" of the State had opportunity and "similar
motive" to cross-examine the witnesses. MTP at 11. Defendants argue that the State's interests
were adequately represented at the depositions by counsels for plaintiffs in the multidistrict
litigation, including attorney generals from other states. MTP at 15-16.

The State argues that counsels for many of the plaintiffs in the multidistrict litigation
were not predecessors in interest for the State because "the State has an interest in showing that
the price-fixing overcharge was passed on from intermediaries to Illinois consumers." Resp. at
11-12. Furthermore, the State identifies at least one specific question – regarding the purported
causal link between intermediary price increases and the alleged price-fixing of LCDs – the State
would have asked, if given the opportunity, that none of the parties present at depositions with
intermediary plaintiffs actually asked. Resp. at 12. Defendants reply that the State based its
examples upon depositions that are not part of those contemplated by Defendants in Exhibit H,
and that the State's proposed question has already been answered sufficiently in one of the
depositions at issue. Neither party cites Illinois case law in support of their arguments as to what
constitutes a "predecessor at interest" or a "similar motive" for purposes of Rule of Evidence
804.

This Court finds a relatively recent Illinois case called *Dukes v. Pneumo Abex
Corporation* to be of guidance on this particular issue. 386 Ill. App. 3d 425 (4th Dist. 2008)
(overruled on other grounds as stated in *Rodarmel v. Pneumo Abex, L.L.C.*, 2011 IL App (4th)
100463, ¶ 118). The Fourth District determined in *Dukes* that certain depositions taken in a
federal conspiracy case regarding asbestos exposure could be used by a plaintiff in an Illinois

13

exposure liability case built upon the same underlying allegations. Dukes, 386 Ill. App. 3d at

442. A defendant manufacturer of products containing asbestos in *Dukes* called Honeywell

appealed a trial court's decision to allow deposition testimony from cases where Honeywell was

not a party. *Id.* at 427. The court explained the rule as follows:

> Former testimony is not admissible unless it is established the witness is
> unavailable, the action involved the same issue between the same parties or their
> privies, and the party against whom the testimony is offered had full opportunity
> to cross-examine the witness in the prior proceedings. However, the identity-of-
> the-parties requirement may not be strictly enforced as long as the party against
> whom the evidence is offered had full opportunity to test the veracity of the
> former testimony through cross-examination, such as where testimony at a
> defendant's criminal trial is sought to be introduced at a civil trial against the same
> defendant.
>
> Where the choice is between having testimony by way of deposition or prior trial
> testimony and having no testimony, this court has noted the identity-of-the-parties
> requirement should be relaxed further to allow the introduction of former
> testimony even if a party against whom the evidence is offered was not a party to
> the prior proceedings if 'the interests of the party against whom the deposition is
> sought to be admitted were protected by the presence of a party at the deposition
> with the opportunity and a similar motive to develop testimony.'

*Id.* at 441 (internal citations omitted).

The trial court in *Dukes* had reviewed each deposition at the time it was offered into

evidence to determine if the interests of the defendant (the party against whom the prior

testimony was offered) were protected. *Id.* In making its determination, the trial court had looked

at the purpose for which the testimony was offered, and at the interests of the parties present

when the deposition was taken. *Id.* at 441-42. The testimony at issue consisted of depositions of

former employees of asbestos manufacturers in the federal conspiracy litigation who were either

deceased or unavailable because they were not residents of Illinois. *Id.* at 441-43. The testimony

was offered "for the purposes of showing parallel conduct by alleged coconspirators," such as

whether they failed to inform employees of signs of asbestos-related disease detected by in-

house medical exams, but the testimony was not offered "for the purpose of proving conspiracy."
*Id.* at 441-42. Defendant Honeywell had not been a party to the federal conspiracy case, but
attorneys for a different asbestos manufacturer, who was a defendant in the federal case, were
present at the depositions. *Id.* at 442. The appellate court found no abuse of discretion in the trial
court's determination that attorneys for the asbestos manufacturer in the federal case would have
had a similar motive to disprove the testimony of former employees that information was
withheld from them. *Id.*

Applying the analysis of *Dukes* to the instant suit, in order to make any determination as
to the admissibility of a deposition taken in prior cases, including the multidistrict litigation, this
Court must first examine the purpose for which the testimony is being offered, and the interests
of the parties present when the deposition was taken. Although the Court has reviewed the wide
range of excerpts from deposition testimony presented by Defendants in Exhibit H, it remains
unclear at this time for what purpose Defendants propose to introduce each portion. Indeed, it is
unlikely Defendants could even predict with exactitude at this early stage – when no trial has
even been set – what their strategic needs may be with respect to every proposed witness. It
seems to this Court, however, that the gravamen of the deposition testimony at issue, to the
extent that it can even be summarized, concerns how prices for products were set and what
occurred at certain meetings where prices were allegedly fixed. MTP Ex. H; MTP Ex. W. These
facts go directly to the elements of the price-fixing conspiracy the State seeks to prove, unlike
the testimony in *Dukes* that was offered only to show parallel conduct by non-parties. Therefore
this Court finds that admission of such deposition testimony would be improper *even if* the other
criteria, such as unavailability of the witnesses, were met. With the many witnesses who testified
at the multidistrict litigation depositions, and who had knowledge of the underlying facts

15

regarding meetings and communications between the Defendants, there is less than a miniscule chance that the Court would be left with "no testimony" whatsoever at trial. *See Duke*, 386 Ill. App. 3d at 441 (the identity-of-parties requirement is properly relaxed "where the choice is between having testimony by way of deposition or prior trial testimony and *having no testimony*" (emphasis added)).

Although the findings above are a sufficient basis to deny Defendants' motion, and further analysis under *Dukes* need not be conducted, the Court will nevertheless fully address all of the parties' arguments on this matter in the hope of subduing further redundancies in both parties' motion practice on this issue. With respect to the second part of the *Dukes* analysis, Defendants have somewhat helpfully provided a list of counsels present at the depositions presented in Exhibit H. MTP Ex. W. Some of the parties represented include attorney generals for other states, and some include counsel for a class of Indirect Purchaser Plaintiffs, while others indicate only counsel for private intermediaries. MTP Ex. W. While these parties represent a variety of interests, many of which might overlap in some respects with that of the State, the Court finds that the interests of the parties who were present at all of the depositions at issue are distinguishable from the interests of the State here in *at least* two ways. First, plaintiffs who were intermediaries in the same alleged price-fixing at issue in the multidistrict litigation had no interest in eliciting testimony about overcharges being passed on from intermediaries to end-users. Second, none of the parties – not even attorney generals from other states – had an interest in eliciting testimony about overcharges being passed on to consumers in Illinois specifically. The Court thus fails to see how the interests of the State could have been adequately represented at any of the depositions from prior litigation, even assuming *arguendo* that such testimony meets the other requirements of Rule of Evidence 804.

16

Finally, Defendants have also argued that it would be inequitable to allow the State to cherry-pick which depositions they will use under hearsay exceptions available to them – such as statements against interest or statements of party opponents, or by allowing their experts to use otherwise inadmissible depositions to form the basis of their opinion testimony – while denying Defendants the opportunity to present those depositions that may be favorable to their case. This circumstance, however, exists in every case tried before any Court; to wit, a party is always permitted to put in testimony which is an admission by a party or a statement against interest. A party who has no such testimony cannot use the opponents' right to counter such testimony with rank hearsay. This case presents no different calculus and should be treated as any other case.

Defendants argue that requiring them to reconvene the depositions pursuant to Illinois law would "cause inordinate expense and delay" where most of the witnesses in question are third-party witnesses residing outside Illinois or even outside the United States. MTP at 18-19. Some witnesses, Defendants say, may not be available at all. MTP at 19. This argument also fails; there is no statute, rule, or case law supporting the premise that these impositions in and of themselves overcome the fundamental rules regarding hearsay that bind this Court. *See* Illinois Rules of Evidence, Article VIII, *et seq.*. None of the exceptions enumerated in Rules 803 or 804 of the Illinois Rules of Evidence provide that expense and/or delay alone are sufficient reasons to allow hearsay into evidence. Defendants remain free to raise and advocate for introduction of additional material pursuant to the Rule of Completeness,[4] codified in Rule 212(c), regarding any portion of a deposition that might be introduced by the State at trial. Ill. Sup. Ct. Rule 212. To

---

[4] Discovery depositions and a "broad range of evidence" may be introduced pursuant to the Rule of Completeness, as explained by the Fourth District in a recent medical malpractice suit:

> Oral conversations, parts of written or recorded statements or in the nature of addenda thereto, and written or recorded statements neither part of the previously introduced written or recorded statement nor in the nature of addenda thereto may be introduced by an opposing party on his or her next examination of the same witness, whether cross or redirect, provided such evidence tends to explain, qualify, or otherwise shed light on the meaning of the evidence already received.

*Fakes v. Eloy*, 2014 IL App. (4th) 121100, ¶ 88.

17

the extent that any expert witness for the State relies on depositions as the basis of their conclusions, so may any expert witness for Defendants rely on otherwise inadmissible depositions to form their own conclusions, and each party will have the opportunity to cross the others' experts on the strength of their reasoning. *See* Ill. Rule of Evidence 703. Other exceptions pursuant to which Defendants believe the State may introduce some of the deposition testimony at issue, such as statements against interest, remain available for both parties to invoke, consistent with the Rules of Evidence, as in every case before this Court. The possibility that one party in a given case may have more evidence than another party which falls into such an exception does not work an injustice. Thus the Court finds that no fundamental unfairness to Defendants will result from this Court's adherence to the requirements of Rule of Evidence 804 with respect to the deposition at issue here.

For the reasons explained *supra*, this Court cannot grant the broad declaration of admissibility sought by Defendants. The full relief requested by Defendants is overly broad to the point that this Court would utterly abdicate its duty to enforce the Illinois Rules of Evidence and Illinois Supreme Court Rules by granting the motion, even putting aside that determinations as to availability of witnesses at trial are premature.

IT IS, THEREFORE, HEREBY ORDERED that:

1. The Defendants' Renewed Motion to Permit the Use of MDL Fact Witness Depositions

   as Evidence Depositions is DENIED.

ENTERED:

JUDGE MOSHE JACOBUS.1556

FEB 24 2016

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK_____

February 24, 2016          Judge Moshe Jacobius          No. 1556

19

# Exhibit C

1  Hojoon Hwang
   MUNGER, TOLLES & OLSON LLP
2  560 Mission Street, Twenty-Seventh Floor
   San Francisco, CA 94105
3  Tel: 415-512-4000
   Fax: 415-512-4077
4  Email: Hojoon.Hwang@mto.com

5  *Counsel for Defendants LG Electronics, Inc.*
6  *and LG Electronics U.S.A., Inc.*

7  Additional Counsel Listed on Signature Pages

8                    **UNITED STATES DISTRICT COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10                     **SAN FRANCISCO DIVISION**

11

12  In re: CATHODE RAY TUBE (CRT)          Case No. 07-5944 (SC)
    ANTITRUST LITIGATION
13  ─────────────────────────────          MDL No. 1917

14  This Document Relates to:               **NOTICE OF DEPOSITION OF
                                            PLAINTIFF ALFRED H. SIEGEL, AS
15  ALL ACTIONS                             TRUSTEE OF THE CIRCUIT CITY
                                            STORES, INC. LIQUIDATING TRUST
16                                          PURSUANT TO RULE 30(B)(6)**

17

18

19

20

21

22

23

24

25

26

27

28

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc., through counsel and in conjunction with all defendants, will take the deposition upon oral examination under oath of the person or persons designated by Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust ("Plaintiff"), on April 23, 2014 beginning at 9:00a.m. EST, and continuing from day to day thereafter until concluded. The deposition shall be held at the law offices of Tavenner & Beran, PLC, 20 North Eighth Street Second Floor, Richmond, VA 23219 before a notary public or other officer authorized to administer oaths. The testimony to be given will be recorded by stenographic and videographic means.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff is required to produce one or more witnesses at the stated location and time who are aware of and prepared to testify about Plaintiff's knowledge of the topics listed in the Schedule of Deposition Topics attached to this Notice as Exhibit A. If the designated representative or representatives do not have such knowledge, they are required to acquire it through whatever reasonable investigation may be necessary.

Dated: March 18, 2014

By:   _/s/ Laura K. Lin_

Laura K. Lin
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, CA 94105
Tel: 415-512-4000
Fax: 415-512-4077
Email: Hojoon.Hwang@mto.com

*Counsel for Defendants LG Electronics, Inc.*
*and LG Electronics U.S.A., Inc.*

No. 07-5944 (SC)                                    2

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

## EXHIBIT A

## DEFINITIONS

1.    "Any" shall be construed to mean "any and all."

2.    "Circuit City" means Circuit City Stores, Inc.

3.    "CRT" or "CRTs" means any (a) color picture tubes ("CPTs"), which are cathode ray tubes used primarily in color televisions, and (b) color display tubes ("CDTs"), which are used primarily in computer monitors.

4.    "CRT Finished Product" or "CRT Finished Products" means televisions containing CPTs or computer monitors containing CDTs.

5.    "Defendant" or "Defendants" means any of the entities currently or formerly named as defendants in this litigation and, without limitation, all of their past and present parents, subsidiaries, affiliates, joint ventures, officers, directors, employees, agents, attorneys, or representatives (and the parents', subsidiaries', affiliates', or joint ventures' past and present officers, directors, employees, agents, attorneys, or representatives), and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing.

6.    "Document" or "documents" has the broadest possible meaning pursuant to the Federal Rules of Civil Procedure including all writings and other tangible things upon which any form of communication is recorded or reproduced, and preliminary drafts and non-identical copies of the above (whether such copies differ from the original by reason of notation made on such copies or otherwise). Without limiting the generality of the foregoing, the term "document" or "documents" includes correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports or summaries of investigations, trade letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes or minutes of meetings or of other communications of any type, including inter- and intra-office communications, questionnaires, surveys, charts, graphs, photographs, phonograph recordings, films, tapes, disks, data cells, print-outs of information stored or maintained by electronic data processing or word processing equipment, including e-mail, and all other data compilations from which information can be obtained (by translation, if necessary, by you through detection devices into usable form), including electromagnetically sensitive storage media such as floppy disks, hard disks and magnetic tapes, and any preliminary versions, drafts or revisions of any of the foregoing.

7.    "Or" and "and" should be construed so as to require the broadest possible response. If, for example, a request calls for information about "A or B" or "A and B," you should produce

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

1    all information about A and all the information about B, as well as all information about A and B

2    collectively.

     8.      "Relating to," "referring to," "regarding," or "with respect to" mean, without

3    limitation, the following concepts: discussing, describing, reflecting, dealing with, pertaining to,

4    analyzing, evaluating, estimating, constituting, studying, surveying, projecting, assessing,

5    recording, summarizing, criticizing, reporting, commenting, or otherwise involving, in whole or

6    in part.

7        9.      "Relevant Period" means March I, 1995, to November 25,2007 .

8        10.     "You," or "Your" mean the responding Plaintiff, Circuit City Stores, Inc. and any

9    other d/b/a's affiliated with Circuit City Stores, Inc., together with all present and former

     directors, officers, employees, or agents of the entities listed in this Definition.

10

11                           **SCHEDULE OF DEPOSITION TOPICS**

         Witnesses with knowledge of the following matters during the Relevant Period:

12

         1.      Your overall corporate structure, including the identification of departments within

13   Circuit City responsible for the purchase, sale, pricing, marketing, or distribution of CRTs or

14   CRT Finished Products and their functions and the identification of any individuals that had

15   managerial responsibility for the purchase, sale, pricing, marketing, or distribution of CRTs or

16   CRT Finished Products.

17       2.      The location of Circuit City's purchasing operations for CRTs or CRT Finished

     Products, including the location of price negotiations.

18

         3.      The identity and general description of the CRTs or CRT Finished Products You

19   purchased, sold, marketed, or distributed.

20       4.      The identity of the Defendants from whom you purchased CRTs or CRT Finished

21   Products, and the identity and amount of CRTs or CRT Finished Products You purchased from them

22   (by year, in units, and U.S. dollars), if any.

         5.      The identity of any non-Defendant manufacturers, producers, or distributors from

23   whom you purchased CRTs or CRT Finished Products, and the identity and amount of CRTs or CRT

24   Finished Products (by year, in units, and U.S. dollars) that You purchased from them, if any.

25       6.      Circuit City's purchase or acquisition of CRTs or CRT Finished Products, including:

26           (a)      purchase volume (by units and dollar value);

27

28

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

(b)     the price quoted and paid for each purchase, including any discounts *(e.g.,* early-pay, volume, or deduction from invoice ("DFI") discounts), rebates *(e.g.,* guaranteed or unguaranteed volume, trailing credit, debit memoranda), and other terms of purchase;

(c)     the date and quantity of each purchase;

(d)     whether each purchase was for internal use or resale;

(e)     whether each purchase was for a new product or a refurbished product;

(f)     whether and when Circuit City took physical possession of the purchased CRTs or CRT Finished Products;

(g)     the reasons for purchasing CRTs or CRT Finished Products in one state or country as opposed to another;

(h)     the location of the person( s) who negotiated and consummated the purchase on Circuit City's behalf;

(i)     the locations from which and to which each purchase was shipped;

(j)     the locations from which and to which Circuit City was billed for each transaction;

(k)     the name of each entity from which you acquired the CRTs or CRT Finished Products.

7.     The factors Circuit City considered in determining (a) from which Defendant(s) or non-Defendant(s) to purchase CRTs or CRT Finished Products, and (b) which CRTs or CRT Finished Products to purchase from particular Defendants and non-Defendants, including but not limited to the vendor qualification process and new model reviews.

8.     The process by which You negotiated, entered into, approved, or ratified purchase agreements or contracts for CRTs or CRT Finished Products, including: (a) Your policies and practices regarding the negotiation of terms and conditions of such sales contracts; (b) use of standardized sales or purchase contracts; (c) use of "MFN" (Most Favored Nation) or "MFC" (Most Favored Company) clauses or similar price-protection clauses; (d) the use of dealer agreements; and (e) the identity and location of documents that relate to the matters specified in this topic.

9.     Your participation in any discounts, promotions, rebates, or advertising cooperative programs provided or sponsored by any Defendant or non-Defendant from whom You purchased CRTs or CRT Finished Products.

10.     Circuit City's sales of CRTs or CRT Finished Products, whether direct sales or sales by any person or entity purchasing or incorporating such CRTs or CRT Finished Products

into other CRT Finished Products on Circuit City's behalf, including Circuit City's incorporation of CRTs in any other product or resale of CRTs or CRT Finished Products, including:

      (a)    the sales volume (by units and dollar value);

      (b)    the price quoted and received for each sale (including any discounts, rebates, and other terms of sale);

      (c)    the date and quantity of each sale; and

      (d)    the person(s) to whom such CRTs or CRT Finished Products were sold.

      11.    Your policies and practices for setting the price at which You sold CRT Finished Products to Your customers, including consideration or use of the following:

      (a)    formulas;

      (b)    factors such as cost, supply, demand, competitor pricing, market forecasts, and product specifications;

      (c)    price guidelines or price lists;

      (d)    negotiations or negotiated prices;

      (e)    commission costs;

      (f)    average costs;

      (g)    why pay prices;

      (h)    minimum advertised prices;

      (i)    meet-comping;

      (j)    alternative distribution channels;

      (k)    the percentage of price attributable to CRTs contained in CRT Finished Products sold;

      (l)    rebates;

      (m)    below-cost pricing;

      (n)    bundled product or services pricing;

      (o)    most-favored-nation pricing;

      (p)    sale pricing;

      (q)    market development funds or demo budgets;

      (r)    advertising funds;

      (s)    non-price consideration;

      (t)    loss-leader pricing;

      (u)    early-pay discounts;

      (v)    "min sell prices";

      (w)    "closest thing to wholesale" prices;

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

(x)     builder prices;

(y)     spiffs or spivs; and

(z)     if and how these policies, procedures, practices, methods, formulas, or factors vary by buyer.

12.     Your use of discounts, promotions, rebates or loyalty programs in connection with the sale of CRT Finished Products to Your customers, including how You recorded such discounts or rebates, and the identity and location of documents or data recording such discounts or rebates.

13.     Other products that You believed were viewed by Your customers as alternatives to CRT Finished Products, including: (a) products other than CRT Finished Products; (b) the reasons that You believe Your customers viewed such products to be alternatives to the CRT Finished Products You purchased from the Defendants; (c) the extent to which these products had any effect on Your pricing decisions; and (d) the identity and location of documents that relate to the matters specified in this topic.

14.     Your policies and practices relating to Your decision to give priority to the promotion, advertising, or sale of certain Defendants' CRT Finished Products over other Defendants' CRT Finished Products, to promote Defendants' CRT Finished Products over non-Defendants' CRT Finished Products, or to promote non-Defendants' CRT Finished Products over Defendants' CRT Finished Products.

15.     All contracts or any other agreements relating to CRTs or CRT Finished Products between Circuit City and any entity, including the terms and conditions of any such contracts or agreements, including the scope of the agreement, choice of law, and forum selection.

16.     Explanation of whether, based on records maintained by Circuit City, it is possible to link, trace, or otherwise establish a relationship between the CRTs or CRT Finished Products that Circuit City purchased to those that it sold and, if so, how.

17.     Whether the CRTs contained in each of the CRT Finished Products on which Circuit City bases its claims were first shipped-to or billed-to a location outside the United States or inside the United States, and an explanation of how Circuit City made or would make that determination.

18.     The identity of the manufacturer of the CRT contained in each of the CRT Finished Products on which Circuit City bases its claims, and an explanation of how Circuit City has made or would make that identification.

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

19.     Whether You engaged in market monitoring activity for CRT Finished Products and, if so, your practices, policies, and procedures concerning Your market monitoring activity for CRT Finished Products including the following: (a) Your competitive intelligence activities; (b) Your use of third-party data sources and market share/data analyses; and (c) Your knowledge, use, and tracking of Your competitors pricing for CRT Finished Products, including the shop-out database.

20.     Circuit City's suspicions or beliefs that any manufacturer of CRTs was engaged in any anticompetitive conduct relating to CRTs and the circumstances (including dates) surrounding, and reasons for and sources of, such suspicions or beliefs, and any formal or informal investigations conducted by Circuit City to confirm or deny such suspicions or beliefs.

21.     The identification, description, date, location, source, and persons involved in all statements that Circuit City read, heard, or otherwise became aware of upon which Circuit City bases its contention that Defendants fraudulently concealed the alleged conspiracy from Circuit City, including a description of Circuit City's reliance on any such statements.

22.     The method(s) used by You to track inventory levels, link returns and sales, and monitor product margins of CRT Finished Products that You sold, including any predecessor or successor systems.

23.     Your standards and practices with regard to tracking the purchases and sales of CRT Finished Products for determining the profitability of sales, and for financial reporting purposes, including the nature of the financial data available, the location of such data, and the names of individuals responsible for maintaining such data.

24.     The identity of each of Your electronic databases related to the purchases and sales listed in Topics 6 or 11 above, and the contents of each such database, including the fields or column headings used in such electronic databases.

25.     The extent to which Circuit City passed on its costs in purchasing or acquiring CRTs or CRT Finished Products to its customers.

26.     The assignment of any claims asserted in the Complaint, including the identification of the assignees, the identification of the assignors, the mechanism or form of said assignments, the consideration received for any such assignment, and any agreements or plans for the distribution of damages or settlement proceeds recovered in this action to the assignors.

27.     Your policies and practices related to the retention and deletion of all documents and data (including any of Your electronic databases, e-mail system, and any predecessor or successor systems) related to the purchases and sales listed in Topics 6 or 11.

NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL,
AS TRUSTEE OF THE CIRCUIT CITY STORES, INC.
LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)

28.     Circuit City's search for, production of, and all efforts to preserve any documents that are potentially relevant to this or any other litigation or investigation concerning CRTs or CRT Finished Products.

29.     Identification, location, last known address, telephone number, and e-mail address of any person having or believed to have any information regarding the foregoing topics or facts underlying these topics.

30.     Identification, location, last known address, telephone number, and e-mail address of any person having or believed to have any documents or other electronic or non-electronic files regarding the foregoing topics or facts underlying these topics, including any person having or believed to have information regarding each of the fields contained in such files and the means by which those fields were constructed.

31.     A complete explanation of Your transactional sales and purchase data for CRTs or CRT Finished Products, including any transactional-level sales data produced by You in this action and the information contained in such data.

Exhibit 2   Page 69 of 185

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Hojoon Hwang
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, CA 94105
Tel: 415-512-4000
Fax: 415-512-4077
Email: Hojoon.Hwang@mto.com

*Counsel for Defendants LG Electronics, Inc.
and LG Electronics U.S.A., Inc.*

Additional Counsel Listed on Signature Pages

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In Re CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | No.: 07-cv-5944 SC—MDL NO. 1917 |
| | **CERTIFICATE OF SERVICE** |
| This Document Relates to: | |
| ALL ACTIONS | |

## CERTIFICATE OF SERVICE

I declare that I am employed with the law firm of Munger, Tolles & Olson LLP, 560 Mission Street, Twenty-Seventh Floor, San Francisco, California 94105. I am not a party to the within cause, and I am over the age of eighteen years. I further declare that on March 18, 2014, I served a copy of:

**NOTICE OF DEPOSITION OF PLAINTIFF ALFRED H. SIEGEL, AS TRUSTEE OF THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST PURSUANT TO RULE 30(B)(6)**

☒   **BY ELECTRONIC MAIL** by sending a true copy thereof to the addressees, as stated below.

| | |
|---|---|
| Steven Sklaver<br>State Bar No: 237612<br>SUSMAN GODFREY LLP<br>1901 Avenue of the Stars, Suite 950<br>Los Angeles, California 90067<br>Telephone: (31 0) 789-3100<br>Facsimile: (310) 789-3150<br>Email: ssklaver@SusmanGodfrey.com<br><br>Kenneth S. Marks<br>Jonathan Ross<br>SUSMAN GODFREY LLP<br>1000 Louisiana Street, Suite 5100<br>Houston, Texas 77002-5096<br>Telephone: (713) 651-9366<br>Facsimile: (713) 654-6666<br>kmarks@susmangodfrey.com<br>jross@susmangodfrey.com<br><br>*Attorneys for Plaintiff Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc. Liquidating Trust.* | Philip J. Iovieno<br>E-mail: piovieno@bsfllp.com<br>William A. Isaacson<br>E-mail: wisaacson@bsfllp.com<br>BOIES, SCHILLER & FLEXNER LLP<br><br>*Liaison Counsel for Direct Action Plaintiffs* |
| Mario N. Alioto<br>E-mail: malioto@tatp.com<br>TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP<br><br>*Interim Lead Counsel for the Indirect Purchaser Plaintiffs* | Guido Saveri<br>E-mail: guido@saveri.com<br>SAVERI & SAVERI, INC.<br><br>*Interim Lead Counsel for the Direct Purchaser Plaintiffs* |

1

2

3        Executed on March 18, 2014 at San Francisco, California.  I declare under penalty
4  of perjury under the laws of the United States of America that the foregoing is true and correct.

5                                        /s/ Laura K. Lin
                                           Laura K. Lin
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit D

Page 1

1      IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO DIVISION

4

            Case Number 07-5944 (SC)

5           MDL No. 1917

6

7    In Re: CATHODE RAY TUBE (CRT)

8    ANTITRUST LITIGATION

9    This Document Relates to

10   ALL ACTIONS

11   - - - - - - - - - - - - - - - - - x

12

13      VIDEO DEPOSITION OF STEVEN DEASON

14          Richmond, Virginia

15        Wednesday, April 23, 2014

16            SSS 10:58 a.m.

17

18            * * * * *            Corrections Made

19                                 06/03/2014

20

21                                 MLW

22

23

24

25

Page 2

```
1
2          • • • • • •
3        Stephen
4      Whereupon, this is the video deposition
5   of STEVEN DEASON, who appeared as a witness
6   called and examined by the Defendant on Wednesday,
7   April 23, 2014, conducted at the law offices of
8   Tavenner & Beran, PLC, 20 North 8th Street, Richmond,
9   Virginia commencing at 10:58 a.m. and was reported
10  and transcribed by T. S. Hubbard, Jr.. The witness
11  was sworn by the videographer Gordon Croll,
12  a Notary for the Commonwealth of Virginia.
13
14         • • • • • •
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S :
3   Jonathan Ross, Esquire
4   John Pierre Lahad, Esquire
5   Susman Godfrey, LLP
6   1000 Louisiana Street
7   Suite 5100
8   Houston, TX 77002
9   713.651.9366
10  jlahad@susmangodfrey.com
11      Appearing for Circuit City Liquidating Trust
12
13  Laura K. Lin, Esquire
14  Munger, Tolles and Olson LLP
15  560 Mission Street
16  Twenty-Seventh Floor
17  San Francisco, CA 94105-2907
18  415.512.4034
19  Laura.lin@mto.com
20      Appearing for LG Electronics Defendants.
21
22
23
24
25
```

Page 4

```
1
2   A P P E A R A N C E S :
3
4   William H. Bave, III
5   White & Case, LLP
6   1155 Avenue of the Americas
7   New York, NY 10036
8   212.819.2673
9   wbave@whitecase.com
10      Appearing for the Toshiba entities
11
12
13  Sofia Arguello, Esquire
14  Winston & Strawn, LLP
15  200 Park Avenue
16  New York, NY 10166
17  212.294.5304
18  sarguello@winston.com
19      Appearing for the Panasonic Defendants
20
21
22
23
24
25
```

Page 5

```
1
2   A P P E A R A N C E S :
3   (All others below appearing by phone.)
4
5   Melissa Whitehead, Esquire
6   Alston & Bird LLP
7   1201 West Peachtree Street
8   Atlanta, GA 30309
9   404.881.7000
10  404-253-8488 (fax)
11  melissa.whitehead@alston.com
12      Appearing for the Dell Plaintiffs
13
14  Shaun van Horn, Esquire
15  Jenner & Block LLP
16  353 North Clark Street
17  Chicago, Illinois 60654
18  312.222.9450
19  svanhorn@jenner.com
20      Appearing for the Mitsubishi Electric Defendants
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

```
1
2  A P P E A R A N C E S :
3  (All others below appearing by phone.)
4
5  Robert J. Gralewski, Esquire
6  Kirby McInerney LLP
7  825 Third Avenue, 16th Floor
8  New York, NY 10022
9  212.371.6600
10 bgralewski@kmllp.com
11   Appearing for the Indirect Purchaser Plaintiffs
12
13
14 Michael Gawley, Esquire
15 Kirkland and Ellis LLP
16 555 California Street, 27th Floor
17 San Francisco, CA 94104
18 415.439.1400
19 michael.gawley@kirkland.com
20   Appearing for the Hitachi entities
21
22
23
24
25
```

Page 7

```
1  A P P E A R A N C E S :  (
2  (All others below appearing by phone.)
3  Charles M. Malaise, Esquire
4  Baker Botts, LLP
5  1299 Pennsylvania Avenue Northwest
6  Washington, DC 20004
7  202.639.1117
8  charles.malaise@bakerbotts.com
9    Appearing for the Phillips Defendants
10
11 John Brew, Esquire
12 Crowell & Moring
13 1001 Pennsylvania Avenue, Northwest
14 Washington, D.C. 20004
15 202.624.2720
16 jbrew@crowell.com
17   Appearing for Target
18
19 Jeffrey S. Roberts, Esquire
20 Faegre Baker & Daniels,
21 3200 Wells Fargo Center
22 1700 Lincoln Street
23 Denver, Colorado 80203
24 303.607.3792
25   Appearing for the Thomson Defendants
```

Page 8

```
1
2  T A B L E  O F  C O N T E N T S
3  Witness:
4  STEVE DEASON                        Page
5  Examination
6  by Ms. Lin    ...............    10
7  by Mr. Bave   ...............   202
8  by Ms. Auguello ............    227
9  by Mr. Roberts ..............   238
10 by Mr. Gralewski .............  249
11 by Mr. Luhad  ...............   252
12
13              * * * * *
14 INDEX OF DEFENDANT'S EXHIBITS
     Exhibit    Description           Page
15
    Exhibit 2834  Memory Aide to witness   12
16  Exhibit 2835  Bates No. CC0572597       68
    Exhibit 2836  Bates No. CC 0567286      74
17  Exhibit 2837  Bates No. CC 0148714     105
    Exhibit 2838  Bates No. CC 0572187     122
18  Exhibit 2839  Bates No. CC 0569329     126
    Exhibit 2840  Bates No. CC 0543314     128
19  Exhibit 2841  Bates No. CC 0534111     137
    Exhibit 2842  Bates No. CC 0389749     154
20  Exhibit 2843  Bates No. CC 0021806     169
    Exhibit 2844  Bates No. CC 0606306     186
21  Exhibit 2845  Bates No. CC 0548555     198
    Exhibit 2846  Bates No. CC 0604919     208
22  Exhibit 2847  Bates No. CC 0397160     219
    Exhibit 2848 - Exhibit Jumped Over -
23  Exhibit 2849  Thomson Complaint        239
24
25              * * * * *
```

Page 9

```
1            P R O C E E D I N G S
2  (Before going on video and steno record.)
3       THE REPORTER:  Before going on the
4   video, and steno record, it was stipulated by
5   all counsel that counsel did not have to
6   repeat their appearances, that the same
7   appearances for the Brandy Fose deposition
8   would apply in this deposition of Steven
9   Deason.
10 (On the video and steno record.)
11      THE VIDEOGRAPHER:  Good morning still.   10:58:31
12  We are on the record.  The time is        10:58:33
13  approximately 10:58 a.m., and today's date is  10:58:36
14  April 23.  The year is 2014.              10:58:41
15     This is the video1 deposition of Steven  10:58:43
16  Deason,                                   10:58:46
17     My name is Gordon Croll.  The court     10:58:47
18  reporter here today is Steve Hubbard.        10:58:49
19     We are here from Veritext National       10:58:52
20  Deposition Litigation Services and this      10:58:55
21  deposition is being held at 20 North 8th    10:58:57
22  Street, Richmond, VA.                      10:59:01
23     The case is "In Re CRT" and would the   10:59:03
24  deponent please raise their right hand.     10:59:09
25 (Whereupon, STEVEN DEASON is sworn.)        10:59:12
```

3 (Pages 6 - 9)

Page 10

```
1       THE VIDEOGRAPHER: Counsel have already    10:59:16
2   identified themselves, and you may go         10:59:18
3   forward.                                      10:59:21
4       MR. LAHAD: Just for the record, this is   10:59:24
5   John Lahad from Susman Godfrey for the        10:59:24
6   witness and the Trust now defending the       10:59:24
7   witness.                                      10:59:27
8 EXAMINATION BY MS. LIN:                         10:59:29
9   Q   Good morning, Mr. Deason.                 10:59:29
10  A   Good morning.                             10:59:30
11  Q   Thank you for being here today. Have      10:59:31
12 you ever been deposed before?                  10:59:33
13  A   Yes.                                       10:59:35
14  Q   In what cases have you been deposed?      10:59:35
15  A   I was deposed for our LCD case for        10:59:38
16 Circuit City Trust.                            10:59:42
17  Q   Did you serve as the 30(b)(6) witness in  10:59:43
18 that case?                                      10:59:45
19  A   Yes, I did.                               10:59:45
20  Q   You understand that you will be serving   10:59:46
21 as the 30(b)(6) witness in today's deposition? 10:59:47
22  A   Yes.                                       10:59:50
23  Q   I think you heard me go over these this   10:59:50
24 morning, so I will be brief, but I have a couple 10:59:53
25 of ground rules that I want to cover with you. 10:59:54
```

Page 11

```
1       Let's try not to talk over one another    10:59:56
2  so that our court reporter can get a clear record. 10:59:57
3       Does that make sense?                     11:00:00
4   A   Yes.                                       11:00:01
5   Q   I will ask you to make a verbal answer    11:00:01
6  instead of just nodding your head, does that make 11:00:04
7  sense?                                         11:00:06
8   A   Yes.                                       11:00:06
9   Q   If you want to break at any time please   11:00:07
10 just let me know, I would ask that you finish if I 11:00:08
11 have a question pending and then I am happy to  11:00:12
12 take a break.                                   11:00:13
13      Does that make sense?                     11:00:14
14  A   Yes, it does.                             11:00:15
15  Q   I am going to hand you a document         11:00:16
16 previously marked as Exhibit 2831. Have you seen 11:00:18
17 this exhibit before?                            11:00:28
18  A   Yes.                                       11:00:28
19  Q   Do you understand this is of today's      11:00:32
20 deposition?                                     11:00:34
21  A   Yes.                                       11:00:34
22  Q   I understand you will be discussing       11:00:38
23 topics 1 through 3, Topic 6 as to subparts G and 11:00:41
24 H, 7 through 9, 11, 13, 14, 19 through 21 and 25. 11:00:46
25 Is that correct?                                11:00:53
```

Page 12

```
1   A   That is my understanding.                 11:00:54
2       MR. LAHAD: I think you omitted part 12.   11:00:56
3       MS. LIN: And a part of 12.                11:01:00
4       MR. LAHAD: Yes, the first part of 12.     11:01:02
5   SKUs, discounts, promotions, rebates programs 11:01:03
6   in connection with the sale of CRT finished   11:01:06
7   products to your customers.                   11:01:08
8       MS. LIN: Thank you.                       11:01:10
9 BY MS. LIN:                                     11:01:11
10  Q   Mr. Deason, what did you do to prepare    11:01:12
11 for today's deposition?                         11:01:15
12  A   I reviewed my testimony in the LCD case   11:01:16
13 and I met with counsel yesterday.               11:01:20
14  Q   Did you review any documents other than  11:01:22
15 the transcript of that LCD deposition?          11:01:24
16  A   This document here that I brought with    11:01:27
17 me about my own personal employment history with 11:01:29
18 Circuit City.                                   11:01:34
19 (Whereupon, Deposition Exhibit 2834 is marked for 11:01:34
20 Identification.)                                11:01:34
21      MS. LIN: Why don't we go ahead and mark   11:01:37
22  the document you brought with you as Exhibit  11:01:39
23  2834 and use this version and then trade with 11:01:43
24  you, if that's okay.                          11:01:47
25      THE WITNESS: That is fine.                11:01:48
```

Page 13

```
1 BY MS. LIN:                                     11:01:48
2   Q   Thank you. You prepared Exhibit 2834      11:01:48
3 just to help remember which positions you held at 11:01:51
4 Circuit City?                                    11:01:54
5   A   Yes.                                       11:01:54
6   Q   Did you bring any other documents with    11:01:55
7 you today to use at this deposition?            11:01:58
8   A   No.                                       11:02:00
9   Q   Did you talk to anyone other than your   11:02:01
10 attorneys to help prepare for today's deposition? 11:02:02
11  A   No.                                       11:02:05
12  Q   Have you ever been employed by the        11:02:10
13 Circuit City Liquidating Trust?                 11:02:12
14  A   Yes.                                       11:02:16
15  Q   When were you employed by the Liquidated  11:02:18
16 Trust?                                          11:02:19
17  A   I have a consulting company, so I did it  11:02:20
18 as an independent contractor, but I did so as part 11:02:24
19 of the LCD case in answering interrogatories and 11:02:28
20 being the witness as I am again today,          11:02:34
21  Q   You are appearing today as the           11:02:39
22 subcontract employee of Circuit City Trust?    11:02:43
23  A   As an independent contractor, yes.        11:02:47
24  Q   Do you have any employer right now other  11:02:52
25 than your consulting company?                   11:03:02
```

4 (Pages 10 - 13)





**Page 14**

1    A    No.    11:03:05
2    Q    What is your consulting company called?    11:03:07
3    A    Deason Consulting, Incorporated.    11:03:09
4    Q    Does Deason Consulting, Incorporated    11:03:13
5    provide services to any entities other than the    11:03:19
6    Circuit City Liquidating Trust?    11:03:20
7    A    Yes.    11:03:21
8    Q    Have you provided services to any of the    11:03:22
9    parties in this litigation other than Circuit    11:03:25
10    City?    11:03:28
11    A    I don't know if JVC is a party to this,    11:03:28
12    but I have done some work in the last five years    11:03:32
13    for JVC.    11:03:35
14    Q    Is your previous employment with Circuit    11:03:43
15    City Stores reflected in Exhibit 2834?    11:03:46
16    A    Yes, it is.    11:03:49
17    Q    In any of the positions reflected in    11:03:50
18    2834, did you have responsibility related to CRT    11:03:55
19    finished products?    11:04:01
20    A    Yes.    11:04:01
21    Q    When I refer to CRT finished products,    11:04:04
22    do you understand that to mean products that    11:04:07
23    containing CRTs?    11:04:08
24    A    Yes.    11:04:11
25    Q    Which of the positions reflected on    11:04:11

**Page 15**

1    Exhibit 2834 did you have responsibility for CRT    11:04:14
2    finished products?    11:04:18
3    A    In 1992 to 1995, I was southern division    11:04:20
4    product manager for ACE in SOHO, and SOHO stands    11:04:25
5    for small office home office and in that capacity    11:04:27
6    I was involved with computer monitors.    11:04:35
7    Also as corporate category manager,    11:04:48
8    senior category management video, from 1996 to    11:04:54
9    1998, I would have been involved with what we call    11:04:58
10    combination products which are products that have    11:05:05
11    both a CRT and a DVD or a VCR built into them, and    11:05:08
12    I was also during the period of 1998 to July 2002,    11:05:15
13    a national buyer for camcorders and VCRs, for    11:05:21
14    approximately two years of that period. I also    11:05:25
15    had responsibilities that included those same type    11:05:29
16    of combo products.    11:05:31
17    Q    Going on your position from 1992 to    11:05:42
18    1995, what did your responsibilities, related to    11:05:45
19    computer monitors, include?    11:05:49
20    A    I would be responsible for a division of    11:05:52
21    the company, the southern division. It's a group    11:05:56
22    of stores in the Southeast based out of Atlanta,    11:05:58
23    Georgia, and four of those stores I would choose    11:06:02
24    which stores would get which product and I would    11:06:05
25    choose what products were in the ads for those    11:06:10

**Page 16**

1    markets for the southern division markets.    11:06:16
2    I would also set the commissions for    11:06:19
3    those products and also functionally set the    11:06:26
4    price. All of this was at the buyer's key    11:06:35
5    direction. It was called store merchandising. We    11:06:39
6    had merchants. I had no buying responsibilities.    11:06:44
7    Q    Focusing on your role from 1996 to 1998    11:06:55
8    when you were a corporate category manager, what    11:06:58
9    did your responsibilities related to CRT finished    11:07:01
10    products include in that role?    11:07:04
11    A    Similar responsibilities. In this case,    11:07:06
12    I changed product categories, so I had video    11:07:11
13    product that included camcorders, VCRs, a    11:07:19
14    combination product, and did the same sort of    11:07:24
15    duties that I had done for the southern division,    11:07:28
16    I now did for the entire country and because we    11:07:30
17    were both physically located in Richmond,    11:07:34
18    Virginia, I had worked much more closely with the    11:07:38
19    buyer.    11:07:41
20    Although I had no buying responsibility    11:07:41
21    during that period of time, I did sit in on quite    11:07:46
22    a few buyer vendor discussions including    11:07:50
23    negotiations.    11:07:55
24    Q    Did your responsibilities change between    11:07:57
25    your corporate category manager role and your    11:08:00

**Page 17**

1    following role as a national buyer?    11:08:02
2    A    Correct. Once I became the national    11:08:04
3    buyer, then I am the lead in actually negotiating    11:08:08
4    the purchases and managing the product so that    11:08:12
5    others would do the role that I used to do, but my    11:08:17
6    role would include the actual purchase.    11:08:23
7    Q    And your role related to the actual    11:08:27
8    purchase that included purchasing the combination    11:08:30
9    products we discussed previously?    11:08:34
10    A    Yes, not for the entire period of 1998    11:08:34
11    to 2002, but approximately the first couple of    11:08:38
12    years. We had an assistant buyer come on during    11:08:41
13    that period. I cannot speak to the exact date who    11:08:44
14    took it over.    11:08:48
15    Q    At any other point in time, did you have    11:08:49
16    responsibility related to buying CRT finished    11:08:51
17    products?    11:08:54
18    A    No.    11:08:54
19    MR. GRALEWSKI: Objection, form.    11:08:56
20    BY MS. LIN:    11:09:16
21    Q    When I refer to Circuit City, I will be    11:09:16
22    referring to Circuit City Stores, Inc., do you    11:09:18
23    understand?    11:09:21
24    A    Yes.    11:09:21
25    Q    From describing your roles at Circuit    11:09:22

5 (Pages 14 - 17)



Page 18

1 City, it sounds like Circuit City was divided into   11:09:26
2 regional divisions, is that right?   11:09:30
3    A   It was until 1995, so from the period of   11:09:31
4 time that we are talking about today it was not.   11:09:34
5    Q   Was Circuit City divided into any other   11:09:39
6 types of divisions until after 1995?   11:09:42
7    A   Operations continued to have divisions,   11:09:46
8 but merchandising did not.   11:09:50
9    Q   Were CRT finished products sales   11:09:58
10 purchased on a national level after 1995?   11:10:03
11       MR. LAHAD: Objection, form.   11:10:07
12 BY MS. LIN:   11:10:07
13    Q   You can answer unless he instructs you   11:10:12
14 not to.   11:10:15
15    A   Yes, they were purchased on a national   11:10:16
16 level and they were also purchased on a national   11:10:18
17 level before 1995. I had no buying   11:10:20
18 responsibilities when I was in a divisional role,   11:10:24
19    Q   Were there positions equivalent to a   11:10:30
20 division product manager's role that you held in   11:10:38
21 1992 through 1995 after 1995?   11:10:40
22    A   No.   11:10:46
23    Q   Which positions took over the   11:10:50
24 responsibilities that you had in that southern   11:10:55
25 division product manager role?   11:10:58

Page 19

1    A   Originally, these roles were taken over   11:11:00   *New*
2 by the next two positions that I list which is   11:11:07
3 corporate market manager and corporate category   11:11:10
4 manager, and when I became a buyer those positions   11:11:13
5 in 1998, those positions no longer existed and the   11:11:18
6 buyer handled both the responsibilities that these   11:11:22
7 positions had handled before and the   11:11:28
8 responsibilities that the buyers had held before.   11:11:31
9    Q   Do I understand correctly that in 1998,   11:11:41
10 Circuit City consolidated the category manager and   11:11:45
11 buyer roles into one role?   11:11:48
12    A   Yes.   11:11:49
13    Q   Were there national buyers with   11:11:57
14 responsibility for CRT finished products other   11:12:01
15 than you?   11:12:03
16    A   Yes.   11:12:05
17    Q   How many positions were there related to   11:12:06
18 CRT finished products at the national buyer level?   11:12:10
19    A   I do not know.   11:12:16
20    Q   Do you know who acted as a national   11:12:25
21 buyer for CRT finished products at any point in   11:12:28
22 time other than yourself?   11:12:31
23    A   I know of ones, but it's a long period   11:12:33
24 of time. I believe we provided org charts which   11:12:36
25 are probably a lot more accurate than my memory,   11:12:43

Page 20

1 but I do know some specific people who fall along   11:12:47
2 the way.   11:12:51
3    I am not just sure that I could rattle   11:12:53
4 off everybody there were, but quite a few people   11:12:54
5 involved over that period of time.   11:12:56
6    Q   Quite a few people involved as national   11:12:58
7 buyers during that time?   11:12:59
8    A   Yes.   11:13:02
9    Q   Will you tell me the names of those   11:13:02
10 buyers just to the extent that you remember them?   11:13:03
11    A   Also I have to caution that I know that   11:13:08
12 they bought on the TV Team, whether they   11:13:11
13 specifically bought CRT, I may be in error.   11:13:15
14    Rick Souder who was a buyer for the TV   11:13:18
15 Team during this period, and also a division   11:13:22
16 merchandise manager, which is like supervisors   11:13:26   — *Shultzlappe*
17 buyers, so he would have been involved.   11:13:28
18    Andy Schu(lzlapper -- I will not try that   11:13:38
19 one -- was also involved, Danny Cagwin, Doug   11:13:42
20 Moore, I believe, was involved at the very end of   11:13:46
21 this period. Tom Croll, Igor Anshakov. I will   11:13:52
22 stop at that point.   11:14:15
23    Q   Thank you. Did you collaborate with any   11:14:17
24 of the employees you just listed in determining   11:14:21
25 the CRT finished product purchases?   11:14:25

Page 21

1       MR. LAHAD: Objection, form.   11:14:30
2       THE WITNESS: I don't know what you mean   11:14:31
3 by collaborate.   11:14:33
4 BY MS. LIN:   11:14:33
5    Q   Did you have any shared responsibilities   11:14:34
6 with any of the employees you just listed that   11:14:36
7 were related to CRT finished products?   11:14:37
8    A   We shared time together. We visited   11:14:45
9 suppliers together. We did not have shared   11:14:50
10 responsibilities if I understand the question   11:14:53
11 correctly.   11:14:55
12    Q   Do you know how many stores Circuit City   11:15:03
13 had during the relevant time period and we can go   11:15:05
14 by year if that is a more reasonable way to do it.   11:15:08
15    A   I am not going to get that accurate, but   11:15:10
16 you're talking about a period of time that we were   11:15:12
17 probably below 400 and at our peak somewhere   11:15:17
18 around 650 to 660.   11:15:22
19    Q   Do you know during the relevant period   11:15:29
20 what percentage of those stores were located in   11:15:31
21 California?   11:15:34
22    A   No.   11:15:35
23    Q   Would there be a way to find that out?   11:15:36
24    A   You could if you looked at the reports   11:15:40
25 and counted all the stores and then counted it   11:15:44

6 (Pages 18 - 21)



Page 22

1 out, but as far as doing it quickly, no.   11:15:47
2   Q   Do you know the percentage of Circuit   11:15:53
3 City Stores during the relevant period that were   11:15:55
4 located in Illinois?
5   A   No.   11:15:57
6       MR. LAHAD: A real quick one. One of   11:16:00
7   the things that we have not done yet on this   11:16:01
8   record as we did in the previous deposition   11:16:04
9   is to define relevant time period, so we are   11:16:04
10  still talking about March 1995 to November   11:16:06
11  2006?   11:16:09
12      MS. LIN: Thank you, yes. Does that   11:16:09
13  make sense?
14      THE WITNESS: Yes.   11:16:11
15      MS. LIN: Great.   11:16:12
16      MR. LAHAD: Sorry, did I say six?   11:16:14
17      MR. ROSS: You did.   11:16:15
18      MS. LIN: I am sorry, so we're about   11:16:15
19  March 1995 through November 2007 as the   11:16:15
20  relevant period.   11:16:20
21      MR. LAHAD: Okay.   11:16:21
22      MS. LIN: Does that make sense?   11:16:21
23      THE WITNESS: Yes.   11:16:23
24      MS. LIN: Great.   11:16:24
25 BY MS. LIN:   11:16:25

Page 23

1   Q   Did Circuit City have any stores owned   11:16:25
2 something other than Circuit City during the   11:16:27
3 relevant time period?   11:16:29
4   A   We had stores, yes. We had stores in   11:16:34
5 Canada that would not be part of the records that   11:16:41
6 we have been talking about.   11:16:44
7       We previously had stores called Circuit   11:16:47
8 City Express, but I believe they were all closed   11:16:49
9 before this time period.   11:16:54
10  Q   Did your responsibilities in any of your   11:17:00
11 positions for Circuit City relate to products   11:17:03
12 eventually sold in Canada?   11:17 07
13  A   No.   11:17:08
14  Q   Do you know if any of the employees you   11:17:10
15 listed who had responsibility related to CRT   11:17:12
16 finished product purchases had responsibilities   11:17:15
17 related to CRT finished product sales in Canada?   11:17:18
18  A   They did not.   11:17:26
19  Q   Which divisions of Circuit City had   11:17:38
20 responsibilities related to the purchase of CRT   11:17:41
21 finished products during the relevant period?   11:17:44
22  A   The merchandising department would be   11:17:46
23 responsible. It is not a division, but is a   11:17:50
24 department that was responsible for purchase of   11:17:53
25 all Circuit City products for resale.   11:17:56

Page 24

1   Q   Was there a particular subdivision   11:18:06
2 within the merchandising department that had   11:18:08
3 responsibility for CRT finished product purchases?   11:18:11
4   A   I'm not sure what you would call them.   11:18:15
5 We had groups that were broken out managed by   11:18:24
6 different groups, so you would have a general   11:18:29
7 manager who would manage a group of products.   11:18:30
8       Most of the period we are talking about,   11:18:34
9 there would have been a video department where you   11:18:37
10 had a general manager who was over the video   11:18:40
11 product.   11:18:45
12      It was later called Display and at some   11:18:46
13 points it might have also had audio product in it.   11:18:50
14      We also had a division merchandise   11:18:55
15 manager, so you had a vice president of   11:19:01
16 merchandising, you had a general manager that   11:19:01
17 broke these groups in, and then you had a   11:19:06
18 divisional merchandise manager who would have   11:19 07
19 having separate groups.   11 19:09
20      For example, in this case, since we're   11:19:11
21 talking about CRT, the display one was DMM, and   11:19:12
22 all video product that was not displayed was the   11:19:18
23 other DMM, and that was the DMM that I worked for   11:19:22
24 which had the combo product and other products   11:19:27
25 that are not CRT product.   11:19:30

Page 25

1   Q   Do you know which of those two groups   11:19:33
2 you were just talking about had   11:19:36
3 responsibility related to CRT finished products   11:19:38
4 that were monitors?   11:19:40
5   A   I am sorry. I left that group out.   11:19:42
6 That would have been a separate group that we   11:19:45
7 called the SOHO group and that group was all small   11:19:47
8 office home office would include everything that   11:19:53
9 had to do with computers and usually some other   11:19:57
10 category, but predominantly computers.   11:20:02
11  Q   Was that SOHO group located in one   11:20:05
12 location?   11:20:09
13  A   Yes.   11:20:09
14  Q   Where was that location?   11:20:10
15  A   Richmond.   11:20:12
16  Q   Is that true throughout the relevant   11:20:13
17 period?   11:20:15
18  A   Yes.   11:20:15
19  Q   For the display group that had   11:20:16
20 responsibilities related to CRT finished products   11:20:20
21 other than monitors, was that group concentrated   11:20:23
22 in one location?   11:20:27
23  A   Yes.   11:20:28
24  Q   Where was that location?   11:20:29
25  A   Richmond.   11:20:30

7 (Pages 22 - 25)



Page 26

```
 1   Q   Was that true throughout the relevant      11:20:31
 2   period?                                         11:20:33
 3   A   Yes.                                        11:20:33
 4   Q   Was there a position at Circuit City       11:20:34
 5   that had responsibility related to the deciding of  11:20:43
 6   which brands of CRT finished products to purchase?  11:20:46
 7   A   The buyer chooses which products to buy.   11:20:50
 8   Q   Were Circuit City's buyers concentrated    11:20:57
 9   in any one location?                            11:21:00
10   A   They were all in the headquarters in       11:21:01
11   Richmond.                                       11:21:04
12   Q   Were there any buyers throughout the       11:21:07
13   relevant period located at another location other  11:21:09
14   than Richmond?                                  11:21:12
15   A   No.                                         11:21:13
16   Q   Was there a position at Circuit City       11:21:16
17   that had the ultimate authority to approve a   11:21:24
18   buyer's decision of which vendors to purchase CRT  11:21:26
19   products from?                                  11:21:30
20   A   I'm not sure I understand the question.    11:21:31
21   Q   Was there anyone supervising the buyers'   11:21:33
22   decisions of which vendors to purchase CRT      11:21:36
23   finished products from?                         11:21:38
24   A   The buyers had supervisors, but it was     11:21:40
25   not common practice for the supervisors to direct  11:21:43
```

Page 27

```
 1   the purchases.                                  11:21:49
 2   Q   Was it the buyers who were responsible     11:22:00
 3   for negotiating CRT finished product costs?     11:22:02
 4   A   Yes.                                        11:22:05
 5   Q   Was there a division at Circuit City       11:22:10
 6   responsible for setting the prices at which CRT  11:22:12
 7   finished products would be sold?                11:22:14
 8   A   Yes.                                        11:22:18
 9   Q   What was that division?                     11:22:19
10   A   Also the merchandising division and also   11:22:21
11   specifically the buyer.                         11:22:24
12   Q   Did the buyer have final authority on      11:22:28
13   the ultimate sales price of a CRT finished      11:22:31
14   product?                                        11:22:34
15       MR. LAHAD:  Objection, form.               11:22:35
16       THE WITNESS:  Again, I am not sure         11:22:38
17   exactly what you mean when you say by "final    11:22:39
18   authority." The buyers set the price.           11:22:42
19   BY MS. LIN:                                     11:22:45
20   Q   After a buyer sets a price at which a      11:22:45
21   CRT finished product would be sold, were there any  11:22:48
22   means by which that price would change?         11:22:50
23   A   Yes.                                        11:22:53
24   Q   How might a price set by a buyer for the   11:22:54
25   sale of a CRT finished product change?          11:22:57
```

Page 28

```
 1   A   The buyer may choose to put the product    11:23:01
 2   on sale. The store may choose to change the price  11:23:04
 3   based on predetermined competitors and you could  11:23:14
 4   also have the store change the price if the     11:23:19
 5   product is damaged.                             11:23:23
 6   Q   You mentioned that a store could change    11:23:36
 7   a price based on predetermined competitors?     11:23:39
 8   A   Yes.                                        11:23:42
 9   Q   How did that process work?                  11:23:42
10   A   Again, because it's a long period of       11:23:44
11   time, the specifics would change, but the general  11:23:48
12   process was that the operations group that ran the  11:23:54
13   stores in conjunction with the buyers would make a  11:23:58
14   determination of who the key competitors were for  11:24:02
15   that store, that area, that region, or national,  11:24:07
16   and set out the rules that said, "We will react to  11:24:14
17   this or we will get reacting," because they were  11:24:21
18   not all solid.                                  11:24:28
19       You would have a review that says, "Here   11:24:29
20   are the pieces that we don't look competitive on."  11:24:30
21   Now there is a discussion about whether we will  11:24:35
22   react or not.                                   11:24:38
23   Q   Did the stores have the independent        11:24:41
24   ability to react to those prices?               11:24:44
25   A   Yes had very short windows, so again,      11:24:47
```

Page 29

```
 1   they would within these parameters, it might be  11:24:51
 2   generally you would be able to do it during a week  11:24:55
 3   which is the general ad cycle.                  11:24:59
 4       Sometimes that became much shorter, and    11:25:03
 5   sometimes it got eliminated, sometimes we       11:25:06
 6   eliminate reacting during the Christmas period.  11:25:09
 7   Q   You mentioned an operations group, what    11:25:15
 8   are those?                                      11:25:18
 9   A   The operations groups are literally the    11:25:19
10   people who run the stores, your store managers,  11:25:21
11   your district managers, the sales associates,   11:25:25
12   everybody that is in the store.                 11:25:27
13   Q   Is each store a distinct operating         11:25:29
14   group?                                          11:25:32
15   A   Yes, as far as us being able to identify   11:25:32
16   them, obviously, they are Circuit City Stores,  11:25:37
17   Inc., but each store has a number.              11:25:41
18   Q   Do you recall the sizes of CRT             11:25:59
19   televisions that Circuit City sold during the   11:26:03
20   relevant period?                                11:26:06
21   A   I could probably rattle off most of them   11:26:08
22   just from — well, actually used to sell them. So  11:26:11
23   we had the 13 inch, the 19 inch, and 20 inch and  11:26:16
24   24 inch and I believe there was a period where we  11:26:20
25   had 30, and 35, and 40 inch.                    11:26:23
```

8 (Pages 26 - 29)

Page 30

1      All of those would have been displayed.   11:26:26
2   There may have been some other sizes like 21 in   11:26:28
3   there. Monitors worked a little different.   11:26:31
4      For a long time, especially CRT   11:26:37
5   monitors, were pretty much all 13 inch and then   11:26:40
6   there were some 19 inch, and these, of course, are   11:26:44
7   measured diagonally.   11:26:48
8      When I bought the combo product, I   11:26:52
9   believe our largest ones were 20, if I am not   11:26:56
10   mistaken, so we had 13 inch, 19 inch, and 20 inch.   11:27:03
11   Q   Did the sizes of CRT finished products   11:27:08
12   that Circuit City sold change over the course of   11:27:12
13   the relevant period?   11:27:14
14   A   Yes.   11:27:16
15   Q   Do you recall if there were any trends   11:27:18
16   in the way they were changing over the relevant   11:27:19
17   period?   11:27:21
18   A   They became larger. So there were   11:27:24
19   introductions of larger and larger sizes during   11:27:29
20   the period and that is about all I can say for   11:27:32
21   sure.   11:27:38
22   Q   Was there any position at Circuit City   11:27:41
23   responsible for deciding what size CRT finished   11:27:44
24   products to purchase at a given time?   11:27:47
25   A   The buyer would make the decision with   11:27:49

Page 31

1   some guidance from their supervisors on capacity   11:27:54
2   because you might have a buyer who buys nothing   11:28:03
3   but 13 inch and another buyer buys 19 inch, and   11:28:07
4   you only have that amount of display space, so   11:28:11
5   there has to be a consensus on how many inches it   11:28:14
6   is going to have.   11:28:19
7   Q   Was there a way that buyers'   11:28:19
8   responsibilities were divided among CRT products,   11:28:22
9   for instance, by product size or product vendor?   11:28:25
10   A   Yes.   11:28:29
11   Q   How did that division work?   11:28:30
12   A   It would have been changed over the   11:28:33
13   years, but it would have been based on specific   11:28:35
14   features, so for example, when CRT was bigger as a   11:28:40
15   business you might have predominantly done by   11:28:48
16   size.   11:28:53
17      Once other display products were   11:28:55
18   introduced, then there was more division by the   11:28:59
19   type of display so you may have CRT, you may have   11:29:02
20   projection television, and so on.   11:29:06
21   Q   Do you recall approximately when Circuit   11:29:08
22   City changed that division to focus on product   11:29:11
23   types of televisions?   11:29:14
24   A   Each introduction requires you to do so.   11:29:18
25   There was always some division prior to this   11:29:23

Page 32

1   period.   11:29:26
2      There were console televisions, for   11:29:27
3   example, so you would have somebody that was in   11:29:31
4   charge of console televisions versus portable   11:29:33
5   televisions so there was always some division.   11:29:37
6      Those are represented as classes in most   11:29:41
7   cases in our documents, and in some cases, they   11:29:47
8   also go down to a tier level, but most buyer   11:29:51
9   responsibility was at a class level.   11:29:55
10   Q   There were tiers within the classes?   11:29:59
11   A   Yes.   11:30:01
12   Q   Do you recall when Circuit City   11:30:02
13   discontinued selling CRT televisions?   11:30:04
14   A   I thought we were selling them when we   11:30:07
15   shut down, but I don't know.   11:30:13
16   Q   Do you know if Circuit City at any point   11:30:15
17   discontinued selling CRT monitors?   11:30:18
18   A   I do not, no.   11:30:21
19      THE REPORTER: That answer always   11:30:22
20   stumbles me. "I do not know" is that k n o   11:30:22
21   w? Or is it "I do not, no," period.   11:30:22
22      THE WITNESS: K n o w.   11:30:22
23      THE REPORTER: Thank you.   11:30:22
24   BY MS. LIN:   11:30:32
25   Q   Did Circuit City have different   11:30:40

Page 33

1   procurement procedures related to CRT monitors   11:30:43
2   versus CRT televisions?   11:30:45
3   A   The procedures would have been the same.   11:30:49
4   Q   How did Circuit City's buyers identify   11:30:55
5   the CRT finished products they wanted to purchase?   11:30:58
6   A   This could be a long answer. Quite a   11:31:02
7   few different factors. You start off demand.   11:31:09
8      You have got historical demand that you   11:31:14
9   are looking at that says, "We have sold so many of   11:31:18
10   these at a certain price, et cetera," and you   11:31:21
11   combine that with industry forecast on what you   11:31:23
12   believe is going to be the demand over the period   11:31:29
13   of time usually a year at a time.   11:31:32
14      After you have done your general demand   11:31:39
15   which is combined with what your available space   11:31:43
16   is, you're going to make your determinations on   11:31:47
17   the size of this.   11:31:53
18      Once you have got the size of the   11:31:57
19   assortment, then you listen to the presentations   11:31:59
20   from all the vendors that we either are doing   11:32:02
21   business with, or that want to do business with   11:32:06
22   us, and make the decisions based on, again, demand   11:32:09
23   first.   11:32:17
24      You might be meeting with Sony and you   11:32:17
25   know that Sony's is 25 percent of the industry.   11:32:21

9 (Pages 30 - 33)

Page 34

1 So it is probably reasonable to carry 25 percent   11:32:25
2 of your assortment in Sony.   11:32:29
3         Then you go to all of the other factors   11:32:33
4 which, of course, includes costs and it includes   11:32:16
5 the vendor's performance history, have they been   11:32:46
6 on time with delivery, have they kept you in   11:32:50
7 stock, have they supported the sell through   11:32:53
8 product? There are a lot of other smaller factors   11:33:00
9 that come into it, but that is basically the   11:33:04
10 process.   11:33:07
11    Q   You referenced determining the size of   11:33:11
12 an assortment. Does that mean the number of   11:33:14
13 products?   11:33:16
14    A   Yes.   11:33:16
15    Q   Is there any industry forecasting that   11:33:27
16 Circuit City typically relied on in selecting its   11:33:27
17 CRT finished product purchases was done on an   11:33:29
18 annual basis?   11:33:32
19    A   Most of our plans were done on an annual   11:33:33
20 basis because of both the cycle of introduction of   11:33:38
21 product and because of budget planning, et cetera.   11:33:42
22         Those would be revamped generally about   11:33:48
23 half way through the year, you might make some   11:33:51
24 additional purchases and you may stop buying some   11:33:54
25 of the products that you bought before, but you   11:33:59

Page 35

1 generally did not change the whole assortment.   11:34:03
2         CRTs, television products specifically,   11:34:07
3 had a very strong fall introduction period, and so   11:34:11
4 it did not match, Circuit City's fiscal year was   11:34:17
5 from March to February if I remember correctly, so   11:34:24
6 it did not match the fiscal year quite the same as   11:34:27
7 some of the categories that I managed, and did, so   11:34:31
8 they were a little more active on the every six   11:34:33
9 months basis than other categories.   11:34:38
10    Q   Typically CRT finished product purchase   11:34:40
11 decisions would be made on a semi-annual basis?   11:34:43
12    A   Yes.   11:34:47
13         MR. LAHAD:  Objection, misstates the   11:34:49
14 testimony. Give me a second to butt in.   11:34:50
15         THE WITNESS:  You have to kick me.   11:34:56
16 BY MS. LIN:   11:34:58
17    Q   You referenced earlier that in making   11:34:58
18 its CRT finished product purchasing decisions   11:35:01
19 Circuit City's buyers would listen to vendor   11:35:04
20 presentations, how would the specific vendors be   11:35:07
21 selected to give these presentations?   11:35:12
22    A   They would be selected based on the fact   11:35:15
23 that you had been doing business with them.   11:35:20
24         If you were doing business with them,   11:35:23
25 then you would be talking to them again, and also   11:35:27

Page 36

1 when other vendors requested the opportunity to   11:35:30
2 present us product, and in some rare cases because   11:35:34
3 we did business with most vendors, in rare cases   11:35:42
4 we might reach out to a vendor that we currently   11:35:46
5 are not doing business with and, say, "We have an   11:35:48
6 interest."   11:35:52
7    Q   In those rare cases when Circuit City   11:35:56
8 would reach out to a vendor and express an   11:35:58
9 interest, do you know why Circuit City would do so   11:36:00
10 in this CRT finished product context?   11:36:05
11    A   Either we saw that there was demand for   11:36:07
12 their product or there was what we would refer to   11:36:13
13 as a role in assortment, meaning, there was a role   11:36:17
14 that we needed playing that our current vendors   11:36:21
15 could not provide.   11:36:25
16         For example, it might be that none of   11:36:26
17 the suppliers that we have are doing business with   11:36:30
18 a specific price point, and so we know that a   11:36:35
19 vendor that we are not doing business with has a   11:36:40
20 product at that price and we would contact them,   11:36:43
21 and say, "Are you interested in selling that to   11:36:46
22 us?"   11:36:48
23    Q   You also reference in your answer   11:36:50
24 regarding procurement procedures that, for   11:36:52
25 instance, if Sony had 25 percent of the market   11:36:56

Page 37

1 that Circuit City might want 25 percent of its   11:36:59
2 assortment to come from Sony, do you remember that   11:37:01
3 testimony?   11:37:04
4    A   Yes.   11:37:05
5    Q   Would Circuit City generally try to   11:37:05
6 match the percentage market share of its vendors   11:37:08
7 in the market with the products Circuit City would   11:37:11
8 be selling from those vendors?   11:37:16
9    A   Generally it is too open for me to answer   11:37:21
10 that as a yes or no. We took it in as a factor   11:37:25
11 and we would want to know and we would want to be   11:37:30
12 deliberate in the fact that we were under buying   11:37:36
13 or over buying a particular vendor and know that   11:37:41
14 we had done so.   11:37:45
15    Q   You would want to make a particular   11:37:49
16 decision if you were going to purchase a vendor's   11:37:59
17 quantities either above or below their market   11:38:01
18 share in the entire market?   11:38:04
19    A   We would want to know that we were doing   11:38:06
20 so, and it would be deliberate that we had done   11:38:09
21 so.   11:38:11
22         I will give you one example. We may   11:38:13
23 look at a product that's only carried at Wal-Mart   11:38:16
24 and it is 10 percent of the market share,   11:38:23
25         We are not necessarily going to go out   11:38:28

10 (Pages 34 - 37)

Page 38

```
 1   and buy that 10 percent because of the role that    11:38:29
 2   it's playing for that product.                      11:38:33
 3         There are demand brands and so if there       11:38:34
 4   is a high demand brand, and the way we would        11:38:38
 5   define demand brands, is a brand that the customer  11:38:41
 6   walks in the door, and if they do not see it they   11:38:44
 7   are likely not to buy from you, and so, those are   11:38:46
 8   typically the brand names that are off the top of   11:38:50
 9   your head as a consumer and those products we       11:38:54
10   would be more likely to buy closer to demand.       11:39:02
11      Q   Do you recall which vendors during the       11:39:12
12   relevant period sold demand brand CRT finished      11:39:15
13   products?                                           11:39:18
14      A   Again, their relevant demand would           11:39:20
15   change, but typically, all of the major brands,     11:39:24
16   Hitachi, Sony, JVC, and Toshiba they all had a      11:39:29
17   significant market share, and again, if it's a      11:39:39
18   major brand name that the consumer is going to      11:39:48
19   know, then buy.                                     11:39:53
20      Q   Do you know if LG Electronics was ever a     11:39:59
21   demand brand for CRT finished products during the   11:40:03
22   relevant period?                                    11:40:05
23      A   I do not know.                               11:40:06
24      Q   Did Circuit City ever purchase its CRT       11:40:12
25   from its products direct from the CRT finished      11:40:16
```

Page 39

```
 1   products manufacturers?                             11:40:18
 2      A   I don't know because I don't believe         11:40:24
 3   that we would know who made the CRT.                11:40:27
 4      Q   From the manufacturer creating the CRT       11:40:32
 5   finished product, did Circuit City ever purchase    11:40:36
 6   directly from those manufacturers?                  11:40:39
 7      A   Yes.                                         11:40:41
 8      Q   Were there instances when Circuit City       11:40:42
 9   purchased CRT finished products from distributors   11:40:45
10   who were not the manufacturers of the CRT           11:40:47
11   products?                                           11:40:50
12      A   Our experience with distributors was         11:40:54
13   pretty limited to extremely small purchases that    11:40:57
14   were used for our e-Commerce division.              11:41:02
15      Q   Were there other instances besides           11:41:10
16   e-Commerce where Circuit City would purchase CRT    11:41:13
17   finished products from distributors?                11:41:15
18      A   I don't know of any case.  I never did.      11:41:18
19      Q   Do you know why distributors were used       11:41:20
20   in e-Commerce context?                              11:41:22
21      A   Because of the size of purchase.             11:41:24
22      Q   Would that be because it was a               11:41:28
23   small-size purchase?                                11:41:30
24      A   Yes.  We are talking about -- so you         11:41:31
25   want to put maybe four more items on the web than   11:41:37
```

Page 40

```
 1   what you carry in the store, but they do not sell.  11:41:40
 2         You are only buying like one a month or       11:41:44
 3   one every other month, so that doesn't fit the      11:41:47
 4   rest of our way we do business where we are buying  11:41:53
 5   directly from the vendor.                           11:41:58
 6      Q   Do you know whether the distributors         11:42:02
 7   from which Circuit City purchased CRT finished      11:42:05
 8   products were located exclusively within the        11:42:08
 9   United States?                                      11:42:11
10      A   I believe that's the case.                   11:42:14
11      Q   Do you know whether the manufacturers        11:42:17
12   from which Circuit City purchased its CRT finished  11:42:23
13   products were located exclusively within the        11:42:27
14   United States?                                      11:42:30
15      A   All of the buyers negotiations and           11:42:30
16   purchases were done with U.S. held companies that   11:42:36
17   I, yes, experienced in seeing, et cetera.           11:42:41
18         MR. GRALEWSKI:  I apologize, the witness      11:42:51
19   cut out.  Could I ask the court reporter to         11:42:53
20   read back that answer.                              11:42:55
21   (Whereupon, record was read.)                       11:43:00
22   BY MS. LIN:                                         11:43:09
23      Q   When you say U.S. held companies, do you     11:43:10
24   mean companies headquartered in the United States?  11:43:13
25      A   Yes.                                         11:43:16
```

Page 41

```
 1      Q   Are you aware of any exceptions in which     11:43:18
 2   CRT finished products purchases were negotiated     11:43:20
 3   with manufacturers located outside of the United    11:43:25
 4   States?                                             11:43:27
 5      A   I don't know.  I am not saying that the      11:43:32
 6   product wasn't manufactured outside of the United   11:43:36
 7   States.                                             11:43:38
 8         I am saying that we would deal with a         11:43:39
 9   company and they may have an outside of the U.S.    11:43:42
10   presence, most of them did, but when we negotiated  11:43:47
11   price and we created a purchase order, those        11:43:51
12   purchase orders were to their U.S. held divisions   11:43:55
13   or otherwise you would be importing the product     11:44:03
14   and that is something that they did, not us, as     11:44:06
15   far as I know of.                                   11:44:11
16      Q   Are you aware of any instances when          11:44:17
17   Circuit City's purchase orders for CRT finished     11:44:19
18   products were sent outside of the United States?    11:44:21
19      A   I believe the U.S. group would share         11:44:26
20   their purchase orders with all of their companies,  11:44:29
21   so conversations about forecasted need were back    11:44:31
22   and forth between a supplier at every level and     11:44:42
23   Circuit City at several levels,                     11:44:48
24      Q   I'm sorry.  You've lost me.  Do you mean     11:44:52
25   suppliers within Circuit City?                      11:44:55
```

11 (Pages 38 - 41)

Page 42

1    A   No, vendors. I changed the word for   11:44:56
2 you. I am sorry. But because the U.S. group had   11:44:58
3 to make sure that we had adequate supply, they   11:45:04
4 would have to share any information about   11:45:08
5 purchases and sales with their entire company.   11:45:10
6    Q   I'm not sure I'm understanding, so the   11:45:19
7 vendors that Circuit City was speaking to in the   11:45:21
8 United States, Circuit City understood them, them   11:45:23
9 being the vendor, to share information throughout   11:45:25
10 the vendor's company?   11:45:29
11    A   Correct. I will use an example. We   11:45:31
12 forecast our needs and our inventory team   11:45:39
13 specifically says, "We are going to need this   11:45:44
14 amount of product over a period of time," and so   11:45:46
15 we would transfer that data to the vendor saying,   11:45:50
16 "This is what our forecasted needs are," and most   11:45:54
17 cases we also showed them what our sales were.   11:45:58
18    That data, since the U.S. company is a   11:46:02
19 sales company they have to share that data with   11:46:09
20 their manufacturing divisions.   11:46:13
21    Q   Did Circuit City's employees to your   11:46:25
22 knowledge ever take part in those discussions with   11:46:29
23 the manufacturers above the U.S. sales entities?   11:46:35
24    MR. LAHAD:  Objection, vague.   11:46:42
25    THE WITNESS:  Yes, I am not --   11:46:43

Page 43

1 BY MR. GRALEWSKI:   11:46:46
2    Q   Would Circuit City's buyers ever have   11:46:47
3 contact with any vendors apart from the sales   11:46:50
4 entities located in the United States?   11:46:53
5    A   Yes.   11:46:55
6    Q   In what capacity would that happen?   11:46:57
7    A   Seeing new product lineups and learning   11:47:01
8 about the feature, learning about the new product   11:47:11
9 primarily.   11:47:13
10    Q   Would purchase negotiations ever be   11:47:14
11 conducted between Circuit City and an entity other   11:47:16
12 than a U.S. based sales entity of a vendor?   11:47:20
13    A   ~~Purchase price~~   11:47:23
14    Q   Was there a process that Circuit City   11:47:23
15 used in negotiating prices for its purchases of   11:47:43
16 CRT finished products?   11:47:46
17    A   We did not negotiate prices. When I   11:47:49
18 refer to price, I refer to price as being what we   11:47:53
19 sell it at.   11:47:57
20    Q   I'm sorry. What term would you use to   11:47:58
21 discuss that? Would it be cost?   11:48:02
22    A   Cost.   11:48:03
23    Q   So the cost in this context would be   11:48:05
24 from the vendor to Circuit City to acquire the CRT   11:48:08
25 finished product?   11:48:11

*new prices were sometimes part of the negotiations*

Page 44

1    A   Correct.   11:48:12
2    Q   Was there a process that Circuit City   11:48:12
3 used to negotiate that cost for CRT finished   11:48:14
4 products?   11:48:18
5    A   There wasn't a formalized, "This is the   11:48:18
6 process," if that is what you are looking for,   11:48:35
7    But just the act of doing it creates a   11:48:38
8 process, and the standard, so the standard   11:48:41
9 function is you understand what the product that   11:48:46
10 the vendor wants to make the cost and then it is a   11:48:52
11 matter of does that work for you and if it doesn't   11:48:56
12 then you negotiate from there.   11:49:00
13    Q   Did Circuit City request quotes from the   11:49:01
14 vendors for product costs?   11:49:05
15    MR. LAHAD:  Objection, vague.   11:49:08
16    THE WITNESS:  Every time an assortment   11:49:10
17 was announced, there would generally be some   11:49:12
18 sort of communication, "If this is what the   11:49:19
19 product would cost for you?"   11:49:23
20 BY MS. LIN:   11:49:24
21    Q   Typically, CRT finished product costs   11:49:25
22 would initially be quoted by the vendor to Circuit   11:49:27
23 City?   11:49:30
24    A   Right, that would be the beginning of   11:49:30
25 negotiations.   11:49:32

Page 45

1    Q   Did Circuit City ever employ an auction   11:49:34
2 process in purchasing its CRT finished products?   11:49:37
3    A   Yes.   11:49:39
4    Q   How did that auction process work?   11:49:40
5    A   It's called a reverse auction and   11:49:42
6 basically you put everybody on line at the same   11:49:46
7 time.   11:49:51
8    You say that you are looking for a very   11:49:52
9 very specific product. Auctions were only used to   11:49:55
10 my knowledge for what we would refer to as   11:50:00
11 unbranded product, meaning, that it was not a   11:50:07
12 major demand brand, but it could be a secondary   11:50:10
13 type of brand.   11:50:15
14    But the specifics would be, "We've got   11:50:19
15 to have a 13 inch and it has got to have the   11:50:24
16 antenna with it and all of those sort of things,   11:50:28
17 you get a level playing field so that everybody is   11:50:30
18 quoting the same feature set, and then I was not   11:50:30
19 directly involved in one.   11:50:39
20    But the process is that everybody goes   11:50:43
21 out live with the computer feeds, and sees that   11:50:46
22 someone has bid lower, and they can choose to   11:50:53
23 react or not.   11:50:57
24    They do not know who it is.   11:50:58
25    It is blind from that viewpoint, but   11:51:01

12 (Pages 42 - 45)



Page 46

1 they are basically bidding, and in these cases you    11:51:03
2 would say it is a set amount of product. "We want    11:51:06
3 to buy 10,000."    11:51:12
4       It was not part of our normal assortment    11:51:16
5 in most cases. There could have been some cases,    11:51:22
6    Q    In Circuit City's reverse auction    11:51:29
7 process the bidder offering the lowest price for    11:51:33
8 the product would typically win?    11:51:35
9    A    Yes.    11:51:38
10    Q    Do you know why the auction process was    11:51:39
11 not used for branded products?    11:51:39
12    A    Again, because you have a specific value    11:51:43
13 of that brand -- I said almost -- it was always    11:51:49
14 used for opening price point because that's where    11:51:56
15 cost actually has the biggest factor, meaning,    11:52:02
16 that it would have the least amount of features    11:52:05
17 and the customer's primary demand for purchasing    11:52:08
18 that product is driven by the fact that it is    11:52:12
19 retail price, whereas, all the other factors ...    11:52:16
20    (witness did not complete his answer.)    11:52:21
21    Q    For the unbranded products, Circuit City    11:52:24
22 considered price to be the biggest factor used by    11:52:26
23 the customer in purchasing those products?    11:52:29
24       MR. LAHAD: Objection, misstates the    11:52:32
25 testimony.    11:52:33

Page 47

1       THE WITNESS: For the opening price    11:52:33
2 point product, cost was much more of a factor    11:52:37
3 than in some other decisions.    11:52:43
4 BY MS. LIN:    11:52:46
5    Q    When you say "opening price    11:52:47
6 product," what does that mean?    11:52:48
7    A    That means the lowest price retail    11:52:49
8 product within a group of like product, so for    11:52:56
9 example, a 13-inch CRT product may start as low as    11:53:01
10 $99, it might go to $400, the $99 is your opening    11:53:08
11 price point.    11:53:15
12    Q    Did the price of Circuit City's opening    11:53:17
13 price point products affect the price that Circuit    11:53:21
14 City would sell its other products in that same    11:53:24
15 category at?    11:53:27
16    A    I don't believe so.    11:53:30
17    Q    Was an unbranded product always the    11:53:37
18 opening point price product?    11:53:45
19    A    No.    11:53:48
20    Q    Are there specific CRT finished product    11:53:49
21 manufacturers that also sold opening point price    11:53:53
22 products?    11:53:58
23    A    That changed over a period of time. For    11:53:59
24 example, when I was doing the combination product    11:54:03
25 Magnavox was selling opening price point product.    11:54:09

Page 48

1    Q    Did Circuit City use its reverse auction    11:54:16
2 process throughout the relevant period?    11:54:22
3    A    No.    11:54:24
4    Q    What years was the reverse auction    11:54:24
5 process used for CRT finished products?    11:54:26
6    A    The process was brought to us by a head    11:54:29
7 merchant that we had gotten from Target and he was    11:54:35
8 with us for -- what I am looking at is my history,    11:54:39
9 because I moved, my buying changed about right    11:54:52
10 after he came in.    11:55:05
11       So somewhere in 2002, to about 2004, he    11:55:06
12 was the champion of the reverse auction process    11:55:12
13 and that was when it was used the most to my    11:55:15
14 knowledge.    11:55:18
15    Q    Do you know what the employee's name is?    11:55:19
16    A    I knew that you were going to ask me,    11:55:22
17 but I cannot remember.    11:55:23
18    Q    If it comes back to you at any point    11:55:25
19 today, please speak up,    11:55:28
20    A    Yes.    11:55:29
21    Q    In the reverse auction process, did    11:55:31
22 Circuit City set all of the terms for the product    11:55:34
23 purchase except for the price point?    11:55:37
24    A    Yes.    11:55:38
25       MR. LAHAD: Objection, vague.    11:55:39

Page 49

1       THE WITNESS: To my knowledge we set as    11:55:41
2 many things as we possibly could so that    11:55:43
3 everything was backed down to the cost at    11:55:46
4 that point. Again, if I might add, we did    11:55:51
5 not do this a lot.    11:55:57
6 BY MS. LIN:    11:55:58
7    Q    Outside of the auction process, when    11:56:00
8 Circuit City was negotiating for CRT finished    11:56:03
9 product purchases, were negotiations primarily    11:56:07
10 focused on price?    11:56:10
11    A    No, primarily, again, is a relevant    11:56:12
12 term, but there are so many factors that cost is    11:56:17
13 certainly one of them.    11:56:24
14       MR. LAHAD: Your question said prices    11:56:28
15 and he said costs. Are you asking about    11:56:28
16 prices or cost?    11:56:31
17       MS. LIN: I am sorry, I am asking about    11:56:32
18 costs.    11:56:33
19       MR. LAHAD: Then maybe you want to    11:56:34
20 reboot that just for the cleanliness of the    11:56:35
21 record.    11:56:37
22 BY MS. LIN:    11:56:37
23    Q    Apart from the auction process when    11:56:38
24 Circuit City was negotiating for CRT finished    11:56:41
25 product costs, were costs the primary factor at    11:56:44

13 (Pages 46 - 49)



Page 50

1  issue in those negotiations?                11:56:47
2       MR. GRALEWSKI: Objection, form.         11:56:49
3       THE WITNESS: No, demand was.            11:56:51
4  BY MS. LIN:                                  11:56:55
5       Q   Circuit City's ability to meet its  11:56:55
6  demand to purchase a quantity of CRT finished 11:57:03
7  products was its driving factor in purchase   11:57:05
8  negotiations?                                11:57:09
9       MR. LAHAD: Objection, misstates the     11:57:10
10 testimony.                                   11:57:12
11      THE WITNESS: No, the customer demand.   11:57:12
12 The goal was to sell the product, so your    11:57:18
13 primary motivation and your primary factor is 11:57:23
14 always demand, how many customers are looking 11:57:25
15 for this product and want to buy this         11:57:28
16 product.                                     11:57:30
17 BY MS. LIN:                                  11:57:30
18      Q   When Circuit City was negotiating the 11:57:32
19 terms of its CRT product purchases which terms 11:57:35
20 were up for negotiation with the CRT finished 11:57:39
21 product vendors?                             11:57:43
22      A   Which terms?                        11:57:44
23      Q   Yes.                                11:57:46
24      MR. GRALEWSKI: Objection, form.         11:57:47
25 BY MS. LIN:                                  11:57:49

Page 51

1       Q   For instance, you negotiated costs with 11:57:49
2  you being Circuit City negotiated cost with CRT 11:57:52
3  finished product vendors, correct?           11:57:55
4       A   Correct.                            11:57:57
5       MR. GRALEWSKI: Objection.               11:57:58
6  BY MS. LIN:                                  11:57:59
7       Q   Were there other things in addition to 11:58:00
8  costs that were typically negotiated with CRT 11:58:01
9  finished product vendors?                    11:58:04
10      A   Yes.                                11:58:05
11      MR. GRALEWSKI: Same objection.          11:58:06
12 BY MS. LIN:                                  11:58:07
13      Q   What else was under negotiation in   11:58:07
14 addition to costs?                           11:58:10
15      MR. GRALEWSKI: Objection.               11:58:11
16      THE WITNESS: You may have payment terms 11:58:13
17 and you might also negotiate market          11:58:16
18 development funds.                           11:58:22
19 BY MS. LIN:                                  11:58:23
20      Q   When you say payment terms, what does 11:58:24
21 that mean?                                   11:58:26
22      A   That means whether they are paid in 30 11:58:27
23 days or they are due in 30 days or 60 days or 90 11:58:30
24 days, for example.                           11:58:34
25      Q   Would a long payment term be more   11:58:38

Page 52

1  favorable to Circuit City?                   11:58:41
2       A   Yes.                                11:58:43
3       Q   In some instances could Circuit City be 11:58:44
4  willing to pay a higher cost for CRT finished 11:58:46
5  products in exchange for a longer payment term? 11:58:48
6       A   I did not personally experience that, 11:58:53
7  but theoretically.                           11:58:59
8       Q   You also mentioned, I believe, market 11:59:04
9  development funds, is that right?            11:59:08
10      A   Yes.                                11:59:09
11      Q   What were those?                    11:59:10
12      A   Market development funds are funds that 11:59:11
13 are provided to develop a market for the product, 11:59:15
14 otherwise help you sell the product, and the 11:59:20
15 things that might help you sell the product   11:59:24
16 include training.                            11:59:26
17      It might include the way the product is  11:59:28
18 displayed and most often it included how      11:59:31
19 frequently and how the product was advertised. 11:59:38
20      Q   For each of those instances training, 11:59:44
21 display, and advertising the vendor would provide 11:59:46
22 money to Circuit City to do those things?    11:59:49
23      A   They may.                           11:59:52
24      Q   In negotiating the purchase of CRT   11:59:55
25 finished products, would Circuit City ever accept 11:59:58

Page 53

1  a higher cost in exchange for additional vendor 12:00:01
2  funds?                                       12:00:05
3       MR. LAHAD: Objection, vague.            12:00:09
4       THE WITNESS: I can only answer that     12:00:10
5  question when talking process. Process wise,  12:00:12
6  we were taught to buy the product and         12:00:16
7  negotiate the cost of the product, and once   12:00:19
8  we finished with that, then to have           12:00:22
9  discussions about market development funds as 12:00:25
10 a separate conversation.                     12:00:29
11 BY MS. LIN:                                  12:00:30
12      Q   Did Circuit City have any type of   12:00:36
13 leverage to obtain market development funds?  12:00:39
14      MR. LAHAD: Objection, vague.            12:00:42
15      MR. GRALEWSKI: Can we have the same     12:00:45
16 agreement in this deposition that an          12:00:47
17 objection by one is an objection by all?     12:00:50
18      MS. LIN: An objection by all            12:00:54
19 plaintiffs, yes.                             12:00:55
20      MR. GRALEWSKI: Thank you.               12:00:57
21      THE WITNESS: Could you restate the      12:00:59
22 question.                                    12:01:00
23 BY MS. LIN:                                  12:01:00
24      Q   Sure, so for instance, once Circuit City 12:01:01
25 had agreed on a cost term of a CRT finished   12:01:04

14 (Pages 50 - 53)



Page 54

1 product purchase, what could be used to persuade a   12:01:08
2 vendor to also provide additional market   12:01:11
3 development funds?   12:01:14
4     A   Primarily our visibility in the   12:01:15
5 marketplace because we were one of the largest   12:01:18
6 advertisers in the United States.   12:01:22
7        Also the fact that we had 600 something   12:01:24
8 stores where their product would be available to   12:01:29
9 be seen by the consumer.   12:01:31
10        The fact that we presented an   12:01:35
11 opportunity for the product to be seen and heard   12:01:38
12 and learned about was our leverage otherwise we   12:01:41
13 had the ability to sell the product.   12:01:47
14     Q   That gave you negotiating power with the   12:01:49
15 CRT finished product vendors?   12:01:51
16        MR. LAHAD:  Objection, misstates   12:01:54
17 testimony.   12:01:56
18 BY MS. LIN:   12:01:57
19     Q   Circuit City strength in the market   12:01:57
20 improved Circuit City's negotiating position with   12:01:59
21 CRT finished product manufacturers?   12:02:02
22        MR. LAHAD:  Same objection.   12:02:04
23        THE WITNESS:  I don't know whether it   12:02:06
24 did in the way that you are asking the   12:02:08
25 question.   12:02:10

Page 55

1        In some cases the reverse would happen   12:02:14
2 and the vendor doesn't want their product in   12:02:18
3 that many stores.  They would rather have it   12:02:21
4 in a few elite stores, so I can't say that   12:02:24
5 we got cost based on that or that we had a   12:02:32
6 leverage based on that.   12:02:36
7 BY MS. LIN:   12:02:37
8     Q   Would Circuit City purchase CRT finished   12:02:40
9 products for the company as a whole versus   12:02:43
10 purchasing for specific stores?   12:02:48
11     A   We bought for the company as a whole and   12:02:51
12 then decided how many stores we would put it in.   12:02:55
13     Q   Did the CRT finished product   12:02:58
14 manufacturer that Circuit City purchased from have   12:03:01
15 any role in deciding which Circuit City Stores its   12:03:04
16 product would end up in?   12:03:07
17     A   To the degree of supply, if they said,   12:03:09
18 "We are going to be able to supply more than 100   12:03:13
19 stores," then we wouldn't program more than 100   12:03:17
20 stores.   12:03:21
21        But as far as choosing the specific   12:03:22
22 stores, that would have been a highly unusual   12:03:25
23 conversation and not one that I was party to.   12:03:32
24        MR. LAHAD:  Is now a good time to break   12:03:36
25 for lunch?   12:03:36

Page 56

1        MS. LIN:  Yes, now would be a great time   12:03:37
2 to take a break.   12:03:37
3        THE VIDEOGRAPHER:  The time is   12:03:38
4 approximately 12:03 p.m.  We are off the   12:03:39
5 record.   12:03:42
6 AFTERNOON SESSION   12:03:42
7 (12:42 p.m.)   12:03:42
8        THE VIDEOGRAPHER:  The time is 12:42   12:42:44
9 p.m.  We are back on the record.   12:42:46
10        MS. LIN:  Thank you, Mr. Deason.   12:42:49
11 BY MS. LIN:   12:42:50
12     Q   Do you understand that you are still   12:42:50
13 under oath?   12:42:51
14     A   Yes.   12:42:51
15     Q   To your knowledge, did Circuit City ever   12:42:52
16 purchase CRT finished products from a Hitachi   12:42:55
17 related entity during the relevant period?   12:42:58
18     A   I don't know whether we bought CRT   12:43:00
19 product from Hitachi.  I know we were doing   12:43:03
20 business with Hitachi Television during the   12:43:06
21 period.   12:43:07
22     Q   Do you know if Circuit City bought any   12:43:09
23 CRT finished products from LG Electronics during   12:43:11
24 the relevant period?   12:43:16
25     A   Again, I cannot specifically say without   12:43:17

Page 57

1 looking at the reports, so I will just stop it   12:43:20
2 there.   12:43:23
3     Q   What about Panasonic?   12:43:24
4     A   Panasonic because I bought a Panasonic   12:43:27
5 television, I know we sold them, yes.   12:43:30
6     Q   Do you know which CRT finished products   12:43:32
7 from Panasonic Circuit City sold?   12:43:35
8     A   I do not know all the specifics.   12:43:38
9     Q   What about Phillips?  Phillips related   12:43:39
10 entities?   12:43:44
11     A   Again, I would not know the specifics.   12:43:45
12     Q   Would that be true for any number of   12:43:47
13 manufacturers I might list?   12:43:50
14     A   Yes.   12:43:51
15     Q   Do you know how many CRT finished   12:43:52
16 products in any particular size category that   12:43:55
17 Circuit City would sell at one time?   12:44:00
18     A   No.   12:44:01
19     Q   We discussed before lunch how there   12:44:02
20 would be high value products and low value   12:44:07
21 products within the same size category of CRT   12:44:12
22 finished products, do you remember that?   12:44:16
23     A   Yes.   12:44:17
24     Q   Was there any time during the relevant   12:44:17
25 period when Circuit City ceased to carry low-end   12:44:19

Page 58

1 CRT products?                                    12:44:22
2        MR. LAHAD: Objection, vague.              12:44:26
3        THE WITNESS: I do not know.               12:44:27
4 BY MS. LIN:                                      12:44:28
5    Q   Was the range of CRT finished products    12:44:28
6 at Circuit City sold reduced towards the end of  12:44:34
7 the relevant period?                             12:44:38
8    A   Again, I wouldn't have specific           12:44:40
9 knowledge, but the fact that their LCD product was 12:44:43
10 introduced, it is possible.                      12:44:48
11   Q   We discussed combo products this          12:44:53
12 morning. Were there any combo CRT finished       12:44:57
13 products that were monitors sold by Circuit City? 12:45:00
14   A   My definition of a combo product was the  12:45:06
15 television product with either a DVD or a VCR in  12:45:09
16 it, so based on that definition the answer is no. 12:45:13
17   Q   Did Circuit City sell any computers that  12:45:16
18 contained a CRT finished product and the computer 12:45:19
19 itself within the same piece?                    12:45:22
20       MR. LAHAD: Objection, vague.              12:45:26
21       THE WITNESS: I don't know.                12:45:27
22 BY MS. LIN:                                      12:45:28
23   Q   When we were discussing CRT finished      12:45:29
24 products, that would be at a low or a high end of 12:45:39
25 a continuum within the same product category, were 12:45:43

Page 59

1 there certain factors that made products fall at  12:45:47
2 the higher end of that price category?            12:45:50
3    A   If they were more full featured, then     12:45:52
4 they would be in the higher end, and if they were 12:45 55
5 a basic less featured product, would be in the    12:45:57
6 lower end.                                        12:46:00
7    Q   Were there certain brands that tended to  12:46:03
8 be at one end or another?                         12:46:05
9    A   Yes.                                       12:46:08
10   Q   Which brands fell at the high end of CRT   12:46:12
11 finished product price points?                    12:46:17
12   A   Most of your -- again, consumer           12:46:20
13 recognized brands like Panasonic, Sony, Samsung   12:46:23
14 might have been at the higher end and the brands  12:46:31
15 that maybe were less recognized by consumers would 12:46:34
16 be at the lower end and that could change over a  12:46:38
17 period of time because at one point Samsung was   12:46:42
18 primarily at the opening price points, and over   12:46:46
19 the period that we're talking about they changed  12:46:50
20 from being opening to being more of a premium     12:46 53
21 product.                                          12:46:56
22   Q   During the time that Circuit City was     12:47:00
23 purchasing CRT finished products, did Circuit City 12:47:02
24 ever know the entity that manufactured CRT within 12:47 05
25 the finished product?                             12:47:10

Page 60

1    A   I looked at that question on the          12:47:14
2 deposition and we visited factories, so it is     12:47:17
3 possible or probable that a buyer was in a factory 12:47:23
4 and saw a product that we bought actually either  12:47:29
5 making a picture tube or something like that.     12:47:34
6        I did not have specific knowledge of       12:47:37
7 doing it. I never did that.                       12:47:39
8    Q   Would there be a way now for someone to   12:47:42
9 determine which entity manufactured a CRT within a 12:47:47
10 CRT finished product sold by Circuit City?        12:47:51
11   A   Not with Circuit City.                     12:47:53
12       MR. GRALEWSKI: Objection, form.           12:47:55
13       THE WITNESS: Not from Circuit City's       12:47:58
14 viewpoint. I would assume the vendor could        12:48:01
15 provide that information but we could not.         12:48:05
16 BY MS. LIN:                                       12:48:07
17   Q   Did Circuit City know whether the CRTs    12:48:09
18 contained in the CRT finished products it          12:48:13
19 purchased were manufactured in the United States? 12:48:15
20   A   They may have known. I am not sure we     12:48:20
21 cared.                                            12:48:24
22   Q   Does Circuit City know at the present     12:48:26
23 where the CRTs contained in the CRT finished      12:48:28
24 products that sold were manufactured?             12:48:30
25   A   I don't understand the question.          12:48:34

Page 61

1    Q   You said Circuit City might have known    12:48:36
2 at some point in time where a CRT within a CRT    12:48:38
3 finished product had been manufactured. Is that   12:48:41
4 something that anyone with the company would still 12:48:43
5 know?                                             12:48:46
6        MR. LAHAD: Are you talking about the      12:48:46
7 Trust?                                            12:48:48
8        MS. LIN: Yes.                             12:48:48
9        THE WITNESS: Again, it would have to be    12:48:49
10 a one on one type of experience where a buyer     12:48:55
11 who went over to see LG and Samsung which we      12:48:58
12 did a couple of times a year go over and see      12:49:05
13 the product, if they happened to see a            12:49:08
14 manufacturing facility, then they would do        12:49:12
15 it, but it wouldn't have been, again, there       12:49:14
16 was no need for us to know where the product,     12:49:19
17 where the CRT was manufactured.                   12:49:23
18 BY MS. LIN:                                       12:49:25
19   Q   Was the identity of the entity making     12:49:28
20 the CRT ever considered by Circuit City as part of 12:49:32
21 the finished product purchasing decisions?        12:49:36
22   A   I wouldn't think so.                       12:49:39
23   Q   Do you know for the CRT finished          12:49:40
24 products that Circuit City purchased what          12:49:48
25 percentage of the purchase price was attributable 12:49:50

16 (Pages 58 - 61)

Page 62

1  to the cost of that CRT?                          12:49:54
2    A  No.                                12:49:55
3    Q  Would there be a way for Circuit City to     12:49:56
4  determine that information?                      12:49:59
5    A  No.                                12:50:00
6      MR. GRALEWSKI: Objection, form.        12:50:02
7  BY MS. LIN:                              12:50:03
8    Q  You testified before lunch that          12:50:09
9  typically in a cost negotiation with a vendor    12:50:11
10  regarding a CRT finished product that typically a  12:50:16
11  vendor would be the first to throw out a cost     12:50:18
12  term, do you recall that testimony?              12:50:22
13    A  Yes.                               12:50:23
14    Q  Was Circuit City typically able to      12:50:24
15  negotiate more favorable cost terms than those    12:50:26
16  starting cost terms provided by a CRT finished    12:50:29
17  product vendor?                          12:50:31
18      MR. LAHAD:  Vague.                12:50:34
19      MR. GRALEWSKI: Objection, form.       12:50:36
20      THE WITNESS:  Reask the question,     12:50:38
21  please.                               12:50:42
22  BY MS. LIN:                              12:50:49
23    Q  Was Circuit City ever able to negotiate  12:50:49
24  more favorable cost terms than the starting cost   12:50:52
25  terms provided by a CRT finished product vendor?   12:50:55

Page 63

1    A  Yes.                               12:50:59
2    Q  How frequently could Circuit City        12:50:59
3  negotiate more favorable cost terms with a CRT    12:51:02
4  finished product vendor?                       12:51:05
5    A  I could not tell you in any sort of       12:51:06
6  meaningful way.                           12:51:08
7    Q  Based on your experience as a buyer of   12:51:10
8  CRT finished products, were you able to         12:51:13
9  successfully negotiate lower products with CRT    12:51:17
10  finished product manufacturers?                12:51:19
11      MR. LAHAD:  You said lower products?     12:51:22
12      MS. LIN:  Lower costs.             12:51:25
13      MR. LAHAD:  Why don't you reboot that,  12:51:26
14  for the record.                          12:51:27
15      MR. GRALEWSKI: Objection, form, outside  12:51:28
16  the scope.                             12:51:30
17  BY MS. LIN:                              12:51:33
18    Q  Based on your experience as a buyer of   12:51:33
19  CRT finished products, were you able to         12:51:37
20  successfully negotiate lower costs with the CRT   12:51:39
21  finished product vendors?                     12:51:42
22      MR. GRALEWSKI: Same objection.         12:51:45
23      THE WITNESS: The answer is, yes, not in  12:51:47
24  all cases, but the way you asked the question     12:51:55
25  it sounds like you want me to say that it is      12:51:58

Page 64

1  for everything.  It is not, but there were      12:52:00
2  times when I was able to.                   12:52:02
3  BY MS. LIN:                              12:52:06
4    Q  Are there specific circumstances that     12:52:06
5  you are aware of in which Circuit City was not    12:52:14
6  able to negotiate more favorable cost terms for    12:52:16
7  its CRT finished product purchases?             12:52:19
8    A  Again, I would have to refer to my own    12:52:26
9  experience and there were occasions where the     12:52:29
10  price quoted was the lowest price that I was able  12:52:32
11  to buy the product for.                       12:52:36
12    Q  Did Circuit City have any recourse if a   12:52:39
13  vendor could not come down in price for a CRT     12:52:42
14  finished product that CRT wanted to purchase?      12:52:46
15      MR. LAHAD:  Vague.                12:52:48
16      MR. GRALEWSKI: Objection, form.       12:52:50
17      THE WITNESS: Again, using the term    12:52:52
18  cost, if the cost was not to our liking we        12:52:56
19  might not buy the product, but in a lot of       12:53:06
20  cases we might buy the product anyhow.          12:53:10
21  BY MS. LIN:                              12:53:13
22    Q  Would Circuit City ever withdraw its    12:53:14
23  advertising support for a CRT finished product if  12:53:18
24  a CRT finished product manufacturer did not reduce  12:53:20
25  its cost?                              12:53:24

Page 65

1      MR. LAHAD: Objection, lacks foundation.  12:53:25
2      THE WITNESS: I don't know.  It doesn't   12:53:35
3  sound reasonable.                         12:53:42
4  BY MS. LIN.                              12:53:43
5    Q  Would Circuit City ever reduce the      12:53:44
6  volume of CRT finished products that it intended    12:53:57
7  to purchase if a CRT finished product vendor would  12:54:00
8  not meet Circuit City's requested price?  Strike   12:54:03
9  that.                                 12:54:05
10      Would Circuit City ever reduce the     12:54:05
11  volume of CRT finished products that it intended    12:54:05
12  to purchase if a vendor would not meet Circuit     12:54:05
13  City's requested costs?                      12:54:05
14    A  If we chose to stop buying the product,   12:54:06
15  then that is a reduction and we do make that      12:54:09
16  decision at times                         12:54:13
17    Q  Did Circuit City have any overall       12:54:20
18  negotiating strategy with respect to trying to    12:54:23
19  reduce CRT finished product costs?             12:54:26
20      MR. LAHAD:  Vague.                12:54:29
21      THE WITNESS: I don't know what you mean  12:54:30
22  as far as an overall strategy.               12:54:33
23  BY MS. LIN:                              12:54:34
24    Q  Were buyers trained in any specific     12:54:36
25  specific tactics they could use to try to        12:54:40

17 (Pages 62 - 65)



Page 66

1  negotiate lower cost of CRT finished products?   12:54:41
2      MR. LAHAD:  Trained by Circuit City?   12:54:47
3  MS. LIN:  (Counsel motions.)   12:54:50
4      MR. LAHAD:  For the record, she nodded   12:54:50
5  yes.   12:54:51
6      THE WITNESS:  We had basic negotiation   12:54:53
7  training just for all purposes, whether   12:54:58
8  managing people or buying, we had that type   12:55:05
9  of training at various times during my tenure   12:55:09
10 with the company and during this period of   12:55:12
11 time.   12:55:15
12     As far as a specific, "This is the way   12:55:16
13 you are to negotiate with a vendor," there   12:55:21
14 was no such training.   12:55:23
15 BY MS. LIN:   12:55:27
16  Q  If one CRT finished product vendor   12:55:27
17 decreased its prices, would Circuit City ever use   12:55:37
18 that price decrease to try to negotiate lower   12:55:40
19 prices for CRT finished products from its other   12:55:43
20 vendors?   12:55:46
21     MR. LAHAD:  You are using price again.   12:55:47
22 Did you mean cost?   12:55:48
23     MS. LIN:  I am sorry.  Let me reask   12:55:49
24 that.   12:55:52
25 BY MS. LIN:   12:55:52

Page 67

1  Q  If one CRT finished product vendor   12:55:52
2  decreased its cost to Circuit City for a CRT   12:55:54
3  finished product, would Circuit City ever use that   12:55:58
4  cost decrease to try to negotiate lower costs with   12:56:01
5  its other CRT finished product vendors?   12:56:03
6      MR. GRALEWSKI:  Objection, form.   12:56:07
7      THE WITNESS:  In general we would not   12:56:10
8  discuss -- we had non-disclosure terms   12:56:12
9  agreements and so we would not discuss   12:56:16
10 specifics on what other vendors were doing   12:56:20
11 that was not public.   12:56:23
12     So if another product has repositioned   12:56:27
13 its manufactured suggested retail price, not   12:56:32
14 its costs, but its suggested retail price,   12:56:36
15 we did, could, and would use that   12:56:38
16 information to have discussions about the   12:56:44
17 manufacturer's suggested retail price and   12:56:49
18 therefore the cost of other product.   12:56:50
19 BY MS. LIN:   12:56:55
20  Q  So Circuit City might use a public price   12:56:56
21 to a consumer of one CRT finished product to   12:57:00
22 negotiate a lower cost with another CRT finished   12:57:04
23 product vendor?   12:57:07
24     MR. LAHAD:  Objection.   12:57:09
25     MR. GRALEWSKI:  Objection, form.   12:57:10

Page 68

1      MR. LAHAD:  Misstates the testimony.   12:57:12
2      THE WITNESS:  Yes.   12:57:13
3  BY MS. LIN:   12:57:14
4   Q  Did Circuit City have any written   12:57:15
5  guidelines related to how costs would be   12:57:20
6  negotiated with CRT finished product vendors?   12:57:23
7   A  No.   12:57:25
8   Q  Did Circuit City have any unwritten   12:57:26
9  guidelines regarding how costs would be negotiated   12:57:29
10 with CRT finished product vendors?   12:57:31
11     MR. LAHAD:  Vague.   12:57:34
12     THE WITNESS:  That is what I would ask   12:57:35
13 is, I am not sure what you mean.   12:57:37
14 (Whereupon, Deposition Exhibit 2835 is marked for   12:57:40
15 identification.)   12:57:40
16     MS. LIN:  I am going to hand the witness   12:58:03
17 a document marked as Exhibit 2835, and the   12:58:03
18 document is Bates stamped CC0572597.   12:58:06
19 BY MS. LIN:   12:58:17
20  Q  Are you familiar with any of the people   12:58:18
21 in Exhibit 2835?   12:58:40
22  A  Yes.   12:58:42
23  Q  Who are you familiar with?   12:58:43
24  A  I know Jay Nimechek, I know Danny   12:58:46
25 Caglin, and I know Paul Burgess.   12:58:48

Page 69

1  Q  Who is Jay Nimechek?   12:58:53
2  A  At this point he is the national account   12:58:56
3  manager for LG Zenith Electronics USA.   12:58:59
4  Q  Who is Danny Cagwin?   12:59:02
5  A  Danny Cagwin was a buyer for Circuit   12:59:04
6  City Stores.   12:59:08
7  Q  And who is Paul Burgess?   12:59:09
8  A  According to this, Paul at this time is   12:59:12
9  working for LG USA and that is all I can tell from   12:59:15
10 this.   12:59:19
11  Q  Looking at the last email in the chain,   12:59:22
12 so starting at the bottom of page 1 through the   12:59:44
13 top of page 2, reading this email through, does it   12:59:44
14 appear to you that LG Electronics has agreed to   12:59:45
15 reduce its costs of a CRT finished product in   12:59:49
16 response to a request from Circuit City?   12:59:52
17     MR. LAHAD:  Objection, calls for   12:59:54
18 speculation, the document speaks for itself.   12:59:55
19     MR. GRALEWSKI:  Objection, form.   12:59:59
20     THE WITNESS:  Can you ask again, I am   13:00:02
21 sorry.   13:00:04
22     MS. LIN:  Can the court reporter read   13:00:07
23 the question back?   13:00:07
24 (Whereupon, record was read.)   13:00:07
25     MR. LAHAD:  Same objections.   13:00:43

18 (Pages 66 - 69)



Page 70

1 THE WITNESS: Reading the email, it 13:00:45
2 appears that they have agreed to reduce the 13:00:50
3 costs, but there is also conversation about 13:00:57
4 what I am assuming is manufactured product 13:01:02
5 retail pricing, and so it appears that they 13:01:06
6 are having discussions about whether the 13:01:11
7 manufacturers suggested retail price is 13:01:13
8 competitive. 13:01:16
9 How one relates to the other, I am not 13:01:20
10 sure from this email. 13:01:23
11 BY MS. LIN: 13:01:25
12 Q Would Circuit City request that its CRT 13:01:25
13 finished product manufacturers revise their 13:01:29
14 suggested retail pricing on CRT finished products 13:01:33
15 to remain competitive with Circuit City's other 13:01:38
16 finished product vendors? 13:01:41
17 MR. LAHAD: Objection, vague. 13:01:43
18 MR. GRALEWSKI: Objection, form. 13:01:44
19 THE WITNESS: We would have discussions 13:01:46
20 about whether their manufacturer suggested 13:01:48
21 retail price was going to be a fact and in 13:01:50
22 those conversations we might say, "We don't 13:01:55
23 think this is competitive." 13:01:57
24 BY MS. LIN: 13:01:58
25 Q Circuit City might say to a finished 13:02:01

Page 71

1 product vendor that it's suggested pricing would 13:02:04
2 not be effective? 13:02:07
3 A That we don't think that that is a 13:02:08
4 competitive price. We can then choose to price it 13:02:10
5 however we wish to price it. 13:02:14
6 Q Would Circuit City in the context of 13:02:19
7 those negotiations request the CRT finished 13:02:22
8 product manufacturer reduce its cost to Circuit 13:02:27
9 City for selling that product? 13:02:30
10 A If you're having a conversation about 13:02:35
11 whether a product is competitive or not, and 13:02:38
12 you're expecting the retail to be one price, but 13:02:45
13 it's going to be a different price, then yes, you 13:02:49
14 would expect that there would be an adjustment 13:02:52
15 cost to support a different price point. 13:02:55
16 Q In negotiating with its vendors to reach 13:03:00
17 a different price point, would Circuit City 13:03:02
18 negotiate to maintain the margins that it expected 13:03:06
19 receive at the original price point? 13:03:08
20 A I would restate that our primary concern 13:03:12
21 is the cost of the product and our secondary 13:03:17
22 concern is what we can sell it at and the 13:03:22
23 manufacturer's suggested retail price definitely 13:03:25
24 impacts our ability of what we can sell it at, but 13:03:28
25 we still have the right to sell it at any price we 13:03:32

Page 72

1 want to. 13:03:35
2 You are really talking about whether the 13:03:38
3 product is viable in the marketplace as a 13:03:40
4 standalone kind of a conversation. 13:03:48
5 Then once you decide whether it is 13:03:48
6 viable and it is going to sell, then you have 13:03:50
7 discussions about what costs you have to have to 13:03:53
8 be at that price. 13:03:56
9 Q When you have discussions about the 13:03:58
10 costs, and you have to be at that price, were 13:04:00
11 those discussions internal to Circuit City or 13:04:03
12 between Circuit City and its vendors? 13:04:06
13 A Between Circuit City and its vendors. 13:04:07
14 Q Would Circuit City discuss its desired 13:04:10
15 margin on a particular CRT finished product with 13:04:14
16 its CRT finished product vendors? 13:04:17
17 MR. LAHAD: Vague. 13:04:20
18 THE WITNESS: They discuss what the 13:04:22
19 desired margin would be, and the difference, 13:04:24
20 the margin that would be delivered at a 13:04:28
21 manufacturer's suggested retail price, 13:04:29
22 however that is not the price that Circuit 13:04:32
23 City generally was able to get in the sale of 13:04:35
24 product, so that was like the highest margin 13:04:41
25 you would be getting on the product, but 13:04:44

Page 73

1 those discussions, yes, happened. 13:04:46
2 MS. LIN: Let's go take a break to 13:04:48
3 change the tape. 13:04:49
4 THE VIDEOGRAPHER: The time is 13:04:51
5 approximately 1:04 p.m. This is the end of 13:04:51
6 tape number one and we are off the record. 13:04:54
7 (Whereupon, a break in the proceedings 13:04:57
8 commenced at 1:04 p.m. and on resuming 13:04:57
9 at 1:06 p.m.) 13:04:57
10 THE VIDEOGRAPHER: The time is 13:06:10
11 approximately 1:06 p.m. This is the 13:06:12
12 beginning of tape number two. We are back on 13:06:15
13 the record. 13:06:17
14 BY MS. LIN: 13:06:17
15 Q Looking at the top of the second page of 13:06:19
16 Exhibit 2835, do you know what is meant to 13:06:23
17 benchmark the pricing of a product? 13:06:27
18 MR. LAHAD: Lack foundation, calls for 13:06:30
19 speculation, the document speaks for itself. 13:06:31
20 THE WITNESS: Right, it wasn't a term 13:06:34
21 that I used in my day-to-day business and my 13:06:39
22 only read would be what I believe the word 13:06:43
23 benchmark means. 13:06:48
24 BY MS. LIN: 13:06:49
25 Q Aside from Exhibit 2835, are you 13:06:49

19 (Pages 70 - 73)

Page 74

1 familiar with people at Circuit City using the      13:06:53
2 term benchmark in reference to pricing?      13:06:56
3    A   I have not heard the term, but it is an      13:07:02
4 adjective, I am sure that they did.      13:07:05
5   (Whereupon, Deposition Exhibit 2836 is marked for   13:07:09
6 Identification.)      13:07:09
7      MS. LIN: I am going to mark document      13:07:18
8 Bates Number CC 0567286 as Exhibit 2836.      13:07:20
9 BY MS. LIN:      13:07:29
10    Q   Are you familiar with any of the people      13:07:40
11 in Exhibit 28367      13:07:42
12    A   Yes.      13:07:45
13    Q   Who are you familiar with?      13:07:45
14    A   Andy Mintz and David Dowdy.      13:07:47
15    Q   I think you mentioned David Dowdy      13:07:52
16 earlier. What was his position at Circuit City?   13:07:53
17    A   He was a buyer.      13:07:56
18    Q   Of CRT finished products?      13:07:57
19    A   I know that he worked on the TV team, so   13:07:59
20 I do not know specifically whether he bought CRT   13:08:04
21 product.      13:08:07
22    Q   Who is Andy Mintz?      13:08:08
23    A   Andy Mintz worked for Phillips      13:08:09
24 Corporation.      13:08:13
25    Q   I am directing your attention to the      13:08:17

Page 75

1 middle of the first page in David Dowdy's email.   13:08:18
2 Do you see where it says, "If this model is      13:08:22
3 impacted and you would need to raise the $315 cost   13:08:25
4 to offset any increase in duty we won't buy it"?   13:08:29
5    A   Here you go. Yes.      13:08:35
6    Q   In negotiating the purchase of a CRT      13:08:46
7 finished product, was David Dowdy threatening not   13:08:54
8 to buy the product if Phillips could not meet      13:09:00
9 Circuit City's requested price?      13:09:01
10      MR. LAHAD: Lacks foundation, calls for   13:09:06
11 speculation.      13:09:07
12      THE WITNESS: He says, "I can get this      13:09:09
13 model out of town for the same price. I      13:09:10
14 won't pay anymore for it. The same thing      13:09:13
15 goes for the 27-inch TV, so if you won't pay   13:09:16
16 anything more for it what would he do?" I      13:09:19
17 would assume that he would not buy it.      13:09:22
18 BY MS. LIN:      13:09:26
19    Q   At the top of the page, do you see where   13:09:28
20 it says, "Andy Mintz says, 'I am sure you will be   13:09:30
21 covered on both models'"?      13:09:32
22    A   Yes.      13:09:34
23    Q   Do you understand what it would mean to   13:09:36
24 be covered on a model of a CRT finished product?   13:09:37
25      MR. LAHAD: Lack foundation, calls for   13:09:40

Page 76

1 speculation.      13:09:44
2      THE WITNESS: I can only speculate.      13:09:45
3 BY MS. LIN:      13:09:47
4    Q   Outside of the context of this exhibit,   13:09:48
5 are you familiar with anyone talking about the      13:09:49
6 covering of a model's price in the CRT finished   13:09:52
7 product context?      13:09:56
8    A   I am familiar with the term of are we   13:10:05
9 going to be covered in the changes that we have   13:10:13
10 requested and that may be what this is in response   13:10:17
11 to.      13:10:23
12    Q   To the extent that you are familiar with   13:10:24
13 the term of being covered in the changes that      13:10:26
14 Circuit City requested, what would that mean?      13:10:28
15    A   It could be anything that we requested   13:10:31
16 from a vendor, if they said, "We have you      13:10:34
17 covered," and that would imply that they are going   13:10:37
18 to do what you have asked them to do.      13:10:40
19    Q   Would you be covered to the extent of   13:10:48
20 maintaining your margin that you originally      13:10:50
21 negotiated on the product, is that what being      13:10:53
22 covered means?      13:10:55
23      MR. LAHAD: Objection, misstates the   13:10:57
24 testimony.      13:10:58
25      THE WITNESS: It would be whatever it      13:11:00

Page 77

1 was that we had requested.      13:11:02
2 BY MS. LIN:      13:11:03
3    Q   How often did Circuit City's CRT      13:11:21
4 finished product purchasing prices change?      13:11:24
5      MR. LAHAD: You said purchasing prices?   13:11:28
6      MS. LIN: Sorry, strike that.      13:11:30
7 BY MS. LIN:      13:11:30
8    Q   How often did Circuit City's CRT      13:11:31
9 purchasing costs change?      13:11:34
10    A   I don't know.      13:11:38
11      MR. GRALEWSKI: Objection.      13:11:39
12      THE WITNESS: Yes, I don't know how to   13:11:40
13 answer that question. There are lots of      13:11:41
14 different products, so are you talking about   13:11:44
15 a specific one product how often would its   13:11:48
16 price change?      13:11:51
17 BY MS. LIN:      13:11:53
18    Q   How often would a particular CRT      13:11:53
19 finished product cost Circuit City to change,      13:11:53
20 would that be on a bi-annual basis like we were   13:11:58
21 discussing before or might it have happened more   13:12:00
22 frequently?      13:12:02
23    A   It could happen once --      13:12:02
24      MR. GRALEWSKI: Objection.      13:12:04
25      THE WITNESS: It can happen as little   13:12:05

20 (Pages 74 - 77)

Taiwan



Page 78

1  as -- I have bought products that had the      13:12:11
2  same costs two years in a row.      13:12:14
3  So it could happen that it didn't      13:12:17
4  change for a long period of time, but in      13:12:20
5  general those costs were sort of reviewed on      13:12:26
6  that semi-annual basis based on sales.      13:12:28
7  BY MS. LIN:      13:12:34
8  Q  Were Circuit City's prices for a CRT      13:12:34
9  finished product reviewed more frequently if other      13:12:38
10  vendors were changing their prices of CRT finished      13:12:42
11  products?      13:12:44
12  MR. LAHAD: You said prices again.      13:12:47
13  MS. LIN: Sorry.      13:12:48
14  MR. LAHAD: I just want to make sure we      13:12:51
15  are on the same page is why I am doing it.      13:12:51
16  MS. LIN: No, I completely understand.      13:12:53
17  Strike that.      13:12:54
18  BY MS. LIN:      13:12:56
19  Q  Were Circuit City's costs for CRT      13:12:56
20  finished products ever negotiated more frequently      13:12:56
21  than bi-annually based on vendors of other CRT      13:13:00
22  finished products changing their costs to Circuit      13:13:03
23  City?      13:13:06
24  A  Yes.      13:13:06
25  Q  When one CRT finished product vendor      13:13:09

Page 79

1  changed its cost, would Circuit City then      13:13:13
2  typically renegotiate its cost on similar products      13:13:17
3  with other CRT finished product vendors?      13:13:20
4  A  It depended on what kind of impact it      13:13:24
5  had. If the cost change was significant, and that      13:13:27
6  meant that you were going to change your retail      13:13:31
7  price, then you have that discussion that I      13:13:34
8  says, again, with public information, I am priced      13:13:37
9  on my floor every day at $399 on your competitor,      13:13:42
10  and your product is $449, so you're not selling      13:13:44
11  any, you would have those kind of discussions.      13:13:52
12  But the reverse of that could also      13:13:55
13  happen where you have got a lower cost and you are      13:13:58
14  now making more money and that is all you want to      13:13:59
15  do is make more money.      13:14:02
16  Q  Are you familiar with CRT finished      13:14:06
17  product costs to Circuit City ever going up?      13:14:07
18  A  Yes. Well, I can't say that it is a CRT      13:14:12
19  product that I have seen go up, but product prices      13:14:20
20  do go up occasionally.      13:14:27
21  MR. LAHAD: Again, you used prices. Do      13:14:31
22  you mean prices or cost?      13:14:33
23  THE WITNESS: Cost. Circuit City's cost      13:14:34
24  on a product, speaking specifically of CRT, I      13:14:37
25  do not know of a specific case, but products      13:14:44

Page 80

1  occasionally do have an increase in cost.      13:14:48
2  BY MS. LIN.      13:14:52
3  Q  During the relevant period, did Circuit      13:14:53
4  City's costs for CRT finished products go down      13:14:56
5  more frequently than they went up?      13:15:00
6  A  I would speculate that they would over a      13:15:05
7  period of time and that consumer electronics in      13:15:11
8  general have one price at introduction when they      13:15:16
9  are not selling very many, and then over a period      13:15:19
10  of time when they are selling a lot more, the      13:15:21
11  costs go down to manufacture and then the costs      13:15:23
12  are transferred to Circuit City Stores.      13:15:28
13  The life cycle of CRT, I don't know the      13:15:33
14  specifics, my guess would be that they leveled      13:15:39
15  out, but again that is a guess.      13:15:45
16  Q  When you talk about a life cycle of CRT,      13:15:48
17  what does that mean?      13:15:50
18  A  From television. When television was      13:15:53
19  invented to the time that people basically stopped      13:15:56
20  selling CRT product.      13:15:59
21  Q  Was there a consistent life cycle of a      13:16:01
22  particular CRT finished product?      13:16:03
23  A  Most individual SKUs or branded models      13:16:06
24  would be replaced on an annual basis. Sometimes      13:16:13
25  they would continue over, but for a specific      13:16:17

Page 81

1  model, the typical life cycle was a year.      13:16:23
2  Q  Are you familiar with the term price      13:16:35
3  protection?      13:16:37
4  A  Yes.      13:16:37
5  Q  What is price protection?      13:16:38
6  A  Price protection is when the vendor      13:16:41
7  agrees to reduce the cost of your product and all      13:16:47
8  the product that you already own and it is usually      13:16:52
9  from a specific date.      13:16:58
10  Q  Did Circuit City negotiate price      13:17:04
11  protection as part of its CRT finished product      13:17:07
12  purchases?      13:17:11
13  MR. LAHAD: Objection, vague.      13:17:12
14  THE WITNESS: Circuit City requested      13:17:13
15  price protection when we built programs      13:17:20
16  because without it Circuit City is at risk of      13:17:26
17  owning a whole lot of inventory that is not      13:17:31
18  valuable, so the short answer is yes.      13:17:35
19  BY MS. LIN:      13:17:40
20  Q  When you say Circuit City built      13:17:41
21  programs, what does that mean?      13:17:42
22  A  That is our assortment. Another word      13:17:44
23  for assortment.      13:17:47
24  Q  Did Circuit City tend to have price      13:17:53
25  protection in place on all of its CRT finished      13:17:56

21 (Pages 78 - 81)

Page 82

1  product purchasing agreements?                13:17:59
2     A   No.                                    13:18:00
3     Q   What would determine whether Circuit   13:18:01
4  City had a price protection agreement with a CRT  13:18:03
5  finished product vendor?                       13:18:06
6     A   It was a negotiated process. Sometimes  13:18:09
7  it would be in a master agreement. Sometimes it  13:18:15
8  would be in a specific deal letter for an item.  13:18:17
9  but over this time period my experience is that we  13:18:23
10 got less and less price protection as a standard  13:18:28
11 rule of thumb and more sell through funding     13:18:32
12 instead.                                        13:18:37
13    Q   Were there specific CRT finished product  13:18:42
14 vendors that did not provide price protection?   13:18:45
15    A   I am sure there were, but I do not know   13:18:48
16 them.                                            13:18:51
17    Q   Are there specific CRT finished product   13:18:51
18 vendors to your knowledge that did provide price  13:18:54
19 protection consistently?                         13:18:58
20    A   Again, my personal experience for CRT    13:19:01
21 product was limited to the combos and it was my  13:19:04
22 recollection that typically Magnavox provided    13:19:12
23 price protection.                                13:19:17
24    MR. LAHAD:  You said Magnavox?               13:19:20
25    THE WITNESS:  Magnavox, yes.                 13:19:21

Page 83

1  BY MS. LIN:                                     13:19:21
2     Q   You mentioned sell through credits.      13:19:22
3  What are sell through credits?                   13:19:22
4     A   Sell through credits. That is an amount   13:19:24
5  of money provided to Circuit City based on the   13:19:27
6  sale of a specific product for a specific period  13:19:30
7  of time during a specific set of time.           13:19:33
8     Q   How would the amount of a sell through    13:19:37
9  credit be determined?                            13:19:39
10    A   It would be determined by the vendor.     13:19:41
11    Q   Would the amount of the sell through      13:19:52
12 credit be tied to something?                     13:19:54
13    A   The amount of it? I'm not sure I know     13:19:58
14 what you're asking.                              13:20:06
15    Q   I'm not sure I am understanding you. In   13:20:06
16 setting a sell through credit, was that typically  13:20:11
17 a percentage of a sale price or tied to a former  13:20:14
18 advertised price, how would that term come to be  13:20:18
19 agreed upon?                                     13:20:21
20    A   It would be a discussion based on what    13:20:23
21 it would take to make a sales increase and since  13:20:26
22 we set our own pricing, the vendor could offer a  13:20:33
23 sell through bonus and say, "You are going to make  13:20:41
24 $10 more, $15 more, $20 more for all the ones that  13:20:45
25 you sell during this period of time.             13:20:50

Page 84

1     "If I gave you that, what do you think     13:20:55
2  it is going to do?"                             13:20:59
3     And the buyer might say, "If you are        13:21:00
4  going to do that, then I might advertise it."    13:21:02
5     He might say, "I think I can get the        13:21:07
6  sales up and not talk about anything else."      13:21:13
7     But the whole idea is that during Point      13:21:17
8  A to Point B, you have got more money to do      13:21:21
9  something that might help the sales.             13:21:24
10    The things that the buyer can do is he       13:21:27
11 can reduce the price on the floor. He can        13:21:29
12 advertise the product. He can tell the sales     13:21:32
13 people, "This is a product that we are going to   13:21:34
14 have lots of and be sure to be aware of it or     13:21:37
15 train on it," but the two biggest levers are price  13:21:42
16 and advertising.                                 13:21:48
17    Q   Would sell through credits be           13:21:50
18 implemented when a CRT finished product would be  13:21:52
19 sold by Circuit City below the price at which     13:21:55
20 Circuit City originally intended to sell the      13:22:01
21 product?                                          13:22:03
22    MR. LAHAD:  Objection, lacks foundation.      13:22:04
23    THE WITNESS:  I am cautious about any         13:22:08
24 conversations about what we tend to sell. I      13:22:10
25 mean as a rule we typically sold product at      13:22:12

Page 85

1  manufacturer's suggested retail price.          13:22:17
2     If we had a sell through credit we may       13:22:22
3  choose to sell below that to be able to sell     13:22:26
4  faster during that period of time.               13:22:31
5  BY MS. LIN:                                      13:22:33
6     Q   Were sell through credits typically      13:22:36
7  implemented when a manufacturer's suggested retail  13:22:46
8  price had been lowered?                           13:22:48
9     A   Generally, if a manufacturer's suggested  13:22:51
10 retail price has been lowered you're asking for   13:22:55
11 price protection, but instead of price protection,  13:22:59
12 you might get sell through credit for the         13:23:05
13 remaining inventory that you have for a period of  13:23:09
14 time or something of that nature.                13:23:13
15    Q   Did Circuit City typically negotiate      13:23:19
16 sell through credits at the time it negotiated to  13:23:21
17 purchase the CRT products?                        13:23:24
18    A   No.                                       13:23:27
19    Q   Was price protection typically           13:23:31
20 negotiated at the time you purchased the CRT      13:23:32
21 products?                                         13:23:35
22    A   Yes.                                      13:23:35
23    Q   Was price protection ever negotiated      13:23:36
24 after the point in time at which you had already   13:23:39
25 purchased the CRT finished products?             13:23:41

22 (Pages 82 - 85)



**Page 86**

```
 1    A   Yes.                               13:23:43
 2    Q   Was one of those points in time for    13:23:49
 3  price protection more common than the other, that   13:23:51
 4  is, during the initial negotiations versus once    13:23:54
 5  you already owned the products?            13:23:57
 6    A   Again, it changed over the years.  I   13:23:59
 7  would say like the 1990s of this period there was   13:24:02
 8  a lot of master agreements that included price     13:24:05
 9  protection if something that vendor agreed would   13:24:09
10  occur every time that they changed, they   13:24:13
11  repositioned their product, their manufacturer's   13:24:20
12  suggested price or their costing that we would be   13:24:22
13  protected on that at that time.            13:24:26
14        The latter part of this period that   13:24:27
15  we're talking about, that was a lot less likely,   13:24:29
16  so because of that, you would end up asking for    13:24:32
17  that sort of price protection on a more one on one   13:24:37
18  type basis, and say similar to the sample here or   13:24:41
19  I think when a sample is given someone else is now   13:24:47
20  lower than you, and your product is not selling.   13:24:54
21        All the conversations go back to what is   13:24:59
22  selling, so if you want to know when did you talk   13:25:00
23  about sell through credits, it's when the product   13:25:04
24  stops selling.                          13:25:07
25        If you bought a whole bunch of it and it   13:25:08
```

**Page 87**

```
 1  is not selling, then you're going to talk about   13:25:10
 2  sell through credits or anything else you can do   13:25:12
 3  to get it to sell.                      13:25:14
 4        If it's selling you are not having those   13:25:16
 5  conversations.                         13:25:19
 6    Q   When you're talking about price     13:25:23
 7  protection protecting Circuit City, what does that   13:25:25
 8  mean in terms of were you protecting Circuit    13:25:28
 9  City's expected revenue or were you protecting   13:25:31
10  margin?  What was that protection?         13:25:35
11    A   You are protecting Circuit City's   13:25:36
12  profitability because if we own product that costs   13:25:39
13  more than what we paid for it, then we can    13:25:43
14  actually be losing money, so I guess that is the   13:25:46
15  simplest answer.  We are protecting our    13:25:52
16  profitability.                         13:25:56
17    Q   When price protection was included in   13:25:58
18  your vendor agreements, do you know how Circuit   13:26:01
19  City was protecting its profitability?     13:26:04
20        MR. LAHAD:  Objection, vague.        13:26:08
21        THE WITNESS:  No.  Price protection   13:26:09
22  would say that if the cost moves, then all of   13:26:13
23  the product that you own will be reduced to    13:26:19
24  the new cost and therefore we would not own    13:26:24
25  product that wasn't as competitive.        13:26:28
```

**Page 88**

```
 1  BY MS. LIN:                             13:26:31
 2    Q   Did Circuit City negotiate the terms of   13:26:34
 3  how CRT finished products would be delivered to   13:26:38
 4  Circuit City as part of its purchase negotiations?   13:26:40
 5    A   Yes.                             13:26:48
 6    Q   In negotiating delivery terms with CRT   13:26:52
 7  finished product vendors, did Circuit City    13:26:56
 8  sometimes negotiate that the vendors would pay to   13:26:59
 9  deliver the CRT finished products to Circuit City?   13:27:01
10    A   Yes.                             13:27:03
11    Q   Do you know if CRT finished products   13:27:04
12  were ever shipped to Circuit City from outside of   13:27:09
13  the United States?                     13:27:11
14    A   They had to have been, so yes.        13:27:13
15    Q   Were CRT finished products ever shipped   13:27:18
16  to Circuit City from within the United States?   13:27:21
17    A   Yes.                             13:27:23
18    Q   Do you know how you would distinguish   13:27:26
19  which products were shipped to Circuit City from   13:27:30
20  within the United States versus from abroad?    13:27:33
21    A   No.                              13:27:35
22    Q   Did Circuit City's delivering     13:27:38
23  negotiations consider where a product would be   13:27:44
24  shipped from in negotiating the terms of delivery?   13:27:50
25    A   We would negotiate in some cases for our   13:27:54
```

**Page 89**

```
 1  own trucks to do part of the delivery, so yes.   13:28:00
 2    Q   Did Circuit City ever negotiate volume   13:28:12
 3  discounts as part of its purchase negotiations?   13:28:15
 4    A   Yes.                             13:28:17
 5    Q   How were volume discounts negotiated?   13:28:18
 6    A   You would negotiate saying, "That if I   13:28:22
 7  bought X amount of product either all at once or   13:28:26
 8  over a period of time, then I want a better    13:28:31
 9  price," and you might have several goals.    13:28:35
10        "If I sell this amount, I get it at this   13:28:40
11  cost.  If I sell at this point, I get this cost."   13:28:43
12    Q   Did Circuit City ever negotiate the   13:28:51
13  receipt of market development funds as part of the   13:28:53
14  CRT finished product negotiating?          13:28:55
15    A   Yes.                             13:28:57
16    Q   How were those funds negotiated for?   13:28:58
17    A   I don't know what you're asking.     13:29:10
18    Q   How did Circuit City select the amount   13:29:12
19  of market development funds it would seek from CRT   13:29:14
20  finished product vendors?                13:29:17
21    A   It would start with history.  What had   13:29:19
22  you been getting from this particular vendor to   13:29:23
23  keep the marketplace going?               13:29:26
24        You would compare them to how much of   13:29:29
25  your business is I  Are you going to increase   13:29:34
```

Page 90

1  their business, or are you decreasing it?  13:29:38
2      If I was talking to LG, and said, "Last  13:29:41
3  year I bought 10,000 pieces from you. This year I  13:29:45
4  am going to buy 100,000 pieces. Last year you  13:29:48
5  gave me $2,000 worth MDF. Those 100,000 pieces is  13:29:51
6  a significant part my business, so therefore I  13:29:57
7  need this amount of MDF."  13:30:00
8    Q    Did Circuit City consistently receive  13:30:10
9  MDF funds from its CRT finished product vendors?  13:30:13
10   A    Yes.  13:30:17
11   Q    Did Circuit City negotiate the amount of  13:30:21
12  floor space that specific CRT finished product  13:30:24
13  vendors products would receive on Circuit City's  13:30:27
14  floors?  13:30:29
15     MR. LAHAD: Vague.  13:30:31
16     THE WITNESS: Yes, because we negotiated  13:30:38
17  how many SKUs or models we were going to  13:30:44
18  carry, therefore that becomes floor space,  13:30:48
19  but we did not do it the way you are saying  13:30:53
20  it.  13:30:56
21     We did not say, "We will give you 15  13:30:57
22  feet of space for X amount dollars." It  13:31:00
23  would be much more about, "We carried four  13:31:04
24  SKUs from you last year, and we only plan on  13:31:08
25  carrying three from you this year." I will  13:31:11

Page 91

1  use models. That is probably the easiest  13:31:21
2  way.  13:31:24
3  BY MS. LIN:  13:31:24
4    Q    I'm not clear on your last answer. In  13:31:26
5  negotiating the number of models Circuit City  13:31:27
6  would be purchasing, was that one collective  13:31:31
7  negotiation purchase those models together or what  13:31:34
8  did you mean?  13:31:36
9    A    Because usually the products all  13:31:37
10  transitioned at the same time. Instead of having  13:31:41
11  negotiated about a single product you were  13:31:45
12  generally talking about all the products that were  13:31:49
13  changing for that time period and the vendor would  13:31:52
14  show you 12 products knowing that you never bought  13:31:57
15  more than three.  13:32:03
16     The vendor is trying to, of course, get  13:32:06
17  you to buy more products, and as a buyer you want  13:32:08
18  to buy as few as you need and not one more. So  13:32:12
19  that was the negotiation.  13:32:18
20    Q    When Circuit City was negotiating its  13:32:24
21  costs on CRT finished products, was it typically  13:32:27
22  negotiating the costs for multiple products from  13:32:29
23  one vendor at the same time?  13:32:32
24    A    Yes.  13:32:34
25    Q    Would a cost deal on one of those  13:32:34

Page 92

1  products ever leave Circuit City to pay more for  13:32:37
2  another product from that same CRT finished  13:32:41
3  product vendor?  13:32:43
4    A    Yes.  13:32:44
5    Q    Other than the non-priced terms we have  13:32:48
6  just been discussing like MDF funds and price  13:32:51
7  protection, are there other terms that were  13:32:54
8  important to Circuit City in its negotiating for  13:32:56
9  CRT finished product purchases?  13:32:59
10   A    Other than costs and MDF, is that what  13:33:03
11  you're asking?  13:33:11
12   Q    And sell through credit and volume  13:33:13
13  discounts and selling?  13:33:16
14   A    Right, so the way the buyers looked at  13:33:18
15  it was that there was a cost that was going to go  13:33:22
16  into the system that was going to and that was it  13:33:26
17  and is that going to basically work overall?  13:33:30
18     Then you also had all of these other  13:33:35
19  funds that were market development funds, whether  13:33:38
20  they be sell through.  13:33:43
21     Volume discounts, typically, went  13:33:47
22  directly into costs because, again, they are  13:33:50
23  calculated, and so on, but if it was a sell  13:33:53
24  through credit, if it was to fund a rebate, if it  13:33:56
25  was to fund a display, things like that, those all  13:34:01

Page 93

1  would be considered MDF for the buyer.  13:34:08
2     You will see documents. You  13:34:14
3  probably already have. CES-II is what we refer to  13:34:17
4  as those MDF funds. CES, consumer electronic show  13:34:22
5  Roman numeral 2.  13:34:24
6     Like we had a CES-I markup that you saw  13:34:33
7  earlier and we had a CES-II which was where the  13:34:38
8  marketing funds went into for the all of these  13:34:43
9  type of activities.  13:34:49
10   Q    So to clarify. What types of funds  13:34:52
11  would be included in that CES-II category?  13:34:54
12   A    Anything that was provided by the vendor  13:34:57
13  that did not go directly into the costs of the  13:35:00
14  goods.  13:35:04
15   Q    Would you list those funds out for me?  13:35:08
16   A    Sell through credits were typically not  13:35:11
17  included in the cost. Support for rebates.  13:35:19
18  Support for ads. Support for displays. Support  13:35:25
19  for training. Those are the biggies.  13:35:30
20   Q    And those are all forms of support that  13:35:37
21  Circuit City received from CRT manufacturing  13:35:39
22  vendors?  13:35:42
23     MR. LAHAD: Misstates the testimony.  13:35:44
24     THE WITNESS: We received it from CRT  13:35:46
25  manufacturers, certainly.  13:35:50

24 (Pages 90 - 93)

Page 94

```
 1 BY MS. LIN:                               13:35:54
 2    Q   Are you familiar with the term spiff?   13:35:56
 3    A   Yes.                                 13:35:58
 4    Q   What is that?                        13:35:58
 5    A   It's a specific commission for a     13:36:00
 6 specific product.                           13:36:04
 7    Q   Did Circuit City's sales employees   13:36:07
 8 receive commissions other than spiffs?      13:36:12
 9    A   Yes.                                 13:36:14
10    Q   Folks on the spiff first, how did spiff  13:36:18
11 payments work?                              13:36:20
12    A   Let me restate earlier.  Our sales   13:36:22
13 floors changed from commission to non-commission  13:36:26
14 during this period of time.                 13:36:29
15        I don't know the exact date, but again,  13:36:31
16 it is probably around 2000 there was no     13:36:37
17 commission.                                 13:36:41
18    Q   So salespeople received commission at  13:36:42
19 Circuit City prior to approximately 2000 and then  13:36:45
20 no longer did after that?                   13:36:47
21    A   Right, and it may have been as late as  13:36:49
22 2002. I cannot quote that, but when they received  13:36:53
23 commissions they received a set percentage of the  13:36:57
24 retail price of the product as a commission and  13:37:05
25 they may or may not also receive a spiff.   13:37:09
```

Page 95

```
 1    Q   After Circuit City abolished its     13:37:14
 2 commissions around 2000, or 2002, did Circuit City  13:37:17
 3 sales associates continue to receive spiffs?  13:37:22
 4    A   No.                                  13:37:24
 5    Q   Were spiff payments something that was  13:37:27
 6 negotiated with CRT finished product vendors?  13:37:29
 7    A   No.                                  13:37:32
 8    Q   How were spiffs determined?          13:37:33
 9    A   Spiffs are directive, meaning, that you  13:37:40
10 are using them to encourage the sale of that  13:37:40
11 specific product, so they could be determined  13:37:48
12 because you have an excess inventory.        13:37:52
13        They could be determined because it  13:37:55
14 supports your sales strategy or they could be  13:37:58
15 there because the product is highly profitable.  13:38:03
16    Q   Were spiffs ever funded by CRT finished  13:38:10
17 product vendors?                            13:38:13
18    A   During the time period we are talking  13:38:14
19 about, I don't know of any cases.           13:38:16
20        When I first became a buyer, I saw some  13:38:19
21 documents that said, "We will fund a spiff for you  13:38:23
22 during a certain period of time and what have  13:38:29
23 you," and I don't know if -- I doubt that it was  13:38:32
24 CRT product because combo product was not even  13:38:34
25 introduced at that time, so I wouldn't think so.  13:38:38
```

Page 96

```
 1        MR. GRALEWSKI:  When it is convenient,  13:38:47
 2 can we take a very short break.  I don't want  13:38:47
 3 to interrupt your questioning.              13:38:51
 4        MS. LIN:  I think we have a little bit  13:38:53
 5 longer to go.                               13:38:55
 6 BY MS. LIN:                                 13:38:57
 7    Q   Would Circuit City ever request non-cost  13:38:58
 8 terms such as additional MDF funds in lieu of a  13:39:01
 9 cost decrease on a CRT finished product purchase?  13:39:03
10    A   Because the buyers is first and foremost  13:39:08
11 rated on the profitability of the product based on  13:39:17
12 store costs, that would be an unusual activity for  13:39:21
13 long term type of things.                   13:39:32
14        But as we talked about for sell through  13:39:35
15 credit in effect that's what you're doing, is  13:39:39
16 you're getting some dollars to help you sell it  13:39:41
17 for a little bit of time.                   13:39:45
18        It is not really reducing the cost, but  13:39:47
19 it is sort of paying for you to take an action  13:39:51
20 like buying an ad.                          13:39:57
21    Q   Sell through credits could be used to  13:39:59
22 reduce Circuit City's sort of actual costs even if  13:40:01
23 they did not decrease its accounted for cost of a  13:40:06
24 CRT finished product?                       13:40:09
25        MR. LAHAD:  Misstates the testimony.  13:40:11
```

Page 97

```
 1        THE WITNESS:  Yes, I don't know what you  13:40:12
 2 mean by actual costs.                       13:40:14
 3 BY MS. LIN:                                 13:40:15
 4    Q   A sell through credit could decrease  13:40:18
 5 Circuit City's overall costs of a CRT finished  13:40:21
 6 product without decreasing costs as accounted for  13:40:24
 7 in Circuit City's transactional data?       13:40:27
 8        MR. LAHAD:  Same objection.          13:40:30
 9        THE WITNESS:  Yes, the costs of the   13:40:31
10 product as we looked at it was the costs that  13:40:36
11 we paid for the product and MDF was evaluated  13:40:40
12 as a separate line.                         13:40:47
13        So we would look at, "Are we delivering  13:40:52
14 the margins and are we delivering the MDF    13:40:56
15 that our budgets have put out there?"        13:40:59
16        MS. LIN:  Why don't we go ahead and take  13:41:03
17 a short break and go off the record.        13:41:04
18        THE VIDEOGRAPHER:  The time is 1:41 p.m.  13:41:04
19 We are off the record.  (Whereupon, a break  13:41:07
20 in the proceedings commenced at 1:41 p.m. and  13:41:10
21 on resuming at 1:48 p.m.)                   13:41:10
22        THE VIDEOGRAPHER:  Time is approximately  13:48:36
23 1:48 p.m.  We are back on the record.       13:48:39
24 BY MS. LIN:                                 13:48:42
25    Q   Thank you, Mr. Denson.  Did Circuit City  13:48:43
```

25 (Pages 94 - 97)

Page 98

1  have a vendor qualification process that it used   13:48:45
2  for vendors of CRT finished products?   13:48:47
3     A   We created a vendor management group in   13:48:52
4  approximately 2004, if my memory is correct, that   13:48:55
5  created a score card of things that we cared   13:49:07
6  about, and in that process we issued saying, "We   13:49:12
7  want all of our vendors to do this."   13:49:17
8        Did they all do it? No.   13:49:20
9     Q   Was that a qualification process in the   13:49:24
10  sense that Circuit City refused to purchase from   13:49:26
11  certain vendors that would meet specified terms?   13:49:29
12     MR. LAHAD: Objection, vague.   13:49:36
13     THE WITNESS: As you asked earlier about   13:49:38
14  would you buy a product that had 60-day terms   13:49:45
15  versus another one that had 30-day terms, it   13:49:53
16  would certainly be a factor, it may be a tie   13:49:55
17  breaker, but it wasn't cut and dry the way   13:50:02
18  you say, "If you do not do this, I am not   13:50:05
19  buying from you at all."   13:50:07
20        It would be considered with all the   13:50:09
21  other factors including the fact of, "Do you   13:50:10
22  have to have the product?"   13:50:13
23  BY MS. LIN:   13:50:14
24     Q   That's a good one to start with.   13:50:14
25     A   Right.  I mean, if you've got to have   13:50:16

Page 99

1  Panasonic, then you have got to have Panasonic.   13:50:17
2     Q   Prior to the program you were just   13:50:21
3  discussing that was implemented in 2004, was there   13:50:22
4  any kind of vendor qualification process used by   13:50:25
5  Circuit City for CRT finished product purchases?   13:50:28
6     A   Overall, there was sort of a boilerplate   13:50:31
7  of vendor agreements, master agreements that would   13:50:36
8  say we expect not to be held liable in case of an   13:50:42
9  accident, indemnification that we are going to get   13:50:49
10  X amount of terms, that we're going to get this,   13:50:54
11  and this, and this, but there wasn't a "set in   13:50:55
12  stone" type of process as far as this is what we   13:51:03
13  expect from everybody.   13:51:07
14     Q   Did Circuit City have a master agreement   13:51:09
15  in place with every vendor from which it purchased   13:51:11
16  CRT finished products?   13:51:15
17     A   No.   13:51:17
18     Q   Are there any factors that distinguished   13:51:19
19  when Circuit City would purchase CRT finished   13:51:22
20  products without a master agreement in place?   13:51:27
21     A   If the vendor refused to sign one and   13:51:31
22  you still needed to carry the product and the   13:51:35
23  other would be a lazy buyer.   13:51:39
24     Q   Are you aware of any instances in which   13:51:42
25  a finished product vendor refused to sign Circuit   13:51:45

Page 100

1  City's master agreement?   13:51:48
2     A   A CRT vendor?   13:51:50
3     Q   Yes.   13:51:52
4     A   I do not.   13:51:52
5     Q   During the relevant period, did Circuit   13:51:57
6  City have any preferred suppliers of CRT finished   13:52:00
7  products?   13:52:03
8     A   No.   13:52:04
9     Q   Are you familiar with Circuit City   13:52:10
10  having sheltered brands of CRT products?   13:52:12
11     A   Yes.   13:52:15
12     Q   What were sheltered brands?   13:52:17
13     A   Brands that were not distributed as   13:52:19
14  widely.   13:52:22
15     Q   What determined whether a brand would be   13:52:24
16  a sheltered brand?   13:52:31
17     A   I just answered that.  It is the   13:52:34
18  definition of it.  If it is not carried, but in a   13:52:37
19  few locations, or in very limited locations, that   13:52:44
20  is the definition of it being sheltered.  There   13:52:48
21  are not very many other people that you have to   13:52:50
22  compete with.   13:52:53
23     Q   A sheltered brand would not be carried   13:52:55
24  at many locations outside of Circuit City?   13:52:57
25     A   Correct.   13:52:59

Page 101

1     Q   Do you recall any specific CRT   13:53:00
2  products that were sheltered?   13:53:06
3     A   Vendors sold their products.  They would   13:53:13
4  change whether they would distribute or how they   13:53:17
5  distributed their products.   13:53:21
6        At one point a brand might be sheltered   13:53:23
7  and then at another point it may not be sheltered   13:53:27
8  because the majority of it happened before this   13:53:33
9  case started, and I will use Mitsubishi as an   13:53:37
10  example.   13:53:40
11        Mitsubishi originally sold only to   13:53:41
12  consumer electronic stores and that had commission   13:53:43
13  sales forces and at some point they decided that   13:53:48
14  it didn't have to have commission sales forces   13:53:52
15  anymore.   13:53:55
16     Q   Did Circuit City maintain sheltered   13:53:57
17  brands of CRT finished products for off the   13:54:00
18  relevant period?   13:54:04
19     A   Circuit City could not determine.  They   13:54:06
20  cannot determine whether it is sheltered or not.   13:54:10
21  The vendor makes those decisions.   13:54:13
22        If it is a sheltered product, then it is   13:54:15
23  desirable to Circuit City, so to the degree that   13:54:19
24  products were sheltered, Circuit City would   13:54:22
25  actively pursue those brands.   13:54:28

26 (Pages 98 - 101)



Page 102

```
 1   Q   Why did Circuit City find it desirable   13:54:30
 2  to have sheltered products?                    13:54:32
 3   A   Because it is less competition. It's a    13:54:34
 4  product that the customer can only buy from you,  13:54:37
 5  and in some cases, only you and in some cases   13:54:41
 6  maybe two or three places as opposed to 1,000,   13:54:44
 7   Q   How many sheltered products would         13:54:51
 8  Circuit City tend to have at a time in the CRT   13:54:54
 9  finished products sort of specter?             13:54:56
10      MR. LAHAD:  Products or brand?             13:55:00
11      MS. LIN.  Products,                        13:55:01
12      THE WITNESS:  I don't know.                13:55:02
13  BY MS. LIN:                                    13:55:03
14   Q   Do you know how many sheltered brands     13:55:03
15  Circuit City would tend to have at a time in the  13:55:05
16  CRT finished product context?                  13:55:11
17   A   No.                                       13:55:13
18   Q   Were Circuit City's purchase             13:55:14
19  negotiations for CRT finished products ever     13:55:21
20  affected by the individual buyers relationships  13:55:25
21  with vendor representatives?                   13:55:28
22      MR. LAHAD:  Objection, vague.              13:55:30
23      THE WITNESS:  I wouldn't say influenced    13:55:34
24  by their relationship to a single person, but   13:55:40
25  the relationship to the company                13:55:46
```

Page 103

```
 1  If XYZ company is a company that               13:55:50
 2  usually does what they say they are going to    13:55:54
 3  do, then you have a relationship that is        13:55:56
 4  more beneficial than one that doesn't.          13:55:59
 5  BY MS. LIN:                                    13:56:02
 6   Q   Would Circuit City prefer to do business  13:56:02
 7  with those CRT finished product vendors it      13:56:05
 8  considered itself to have a consistent          13:56:10
 9  relationship with?                             13:56:11
10   A   We prefer to do business with those that  13:56:13
11  we trust.                                      13:56:16
12   Q   Do you recall specific CRT finished       13:56:18
13  product vendors that Circuit City trusted during  13:56:21
14  the relevant period?                           13:56:23
15      MR. GRALEWSKI:  Objection, form.           13:56:26
16      THE WITNESS:  Yes, again, I could only     13:56:28
17  speak to those brands that I dealt with         13:56:30
18  directly, but I don't know how I could answer   13:56:32
19  the question for all the other buyers which I   13:56:40
20  think is what you are asking me.               13:56:43
21  BY MS. LIN:                                    13:56:46
22   Q   Testifying on behalf of Circuit City,     13:56:48
23  are there any CRT finished product vendors of   13:56:50
24  which you are aware of Circuit City not having a  13:56:52
25  strong relationship with?                      13:56:57
```

Page 104

```
 1   A   At one time we did not carry Samsung      13:56:58
 2  product at all, for example, and we started and  13:57:02
 3  stopped various relationships over the years for  13:57:09
 4  various reasons.                               13:57:15
 5      Hitachi had been a good partner of         13:57:18
 6  Circuit City for quite a long time. I was       13:57:20
 7  involved with developing the DVD camcorder with  13:57:24
 8  Hitachi and so they made CRT -- well they sold CRT  13:57:28
 9  product. I don't know if they made it.         13:57:35
10      They sold CRT product and so I know that   13:57:37
11  we had a particularly good relationship with    13:57:40
12  Hitachi at times and at other times we didn't.  13:57:43
13   Q   Having a good relationship with a         13:57:49
14  particular vendor might among other things being  13:57:52
15  equal influence Circuit City's decision to      13:57:54
16  purchase from that vendor?                     13:57:57
17   A   It sort of goes back to, "Why are you     13:57:59
18  having a good relationship?" and they go back to  13:58:03
19  all of those factors because they are giving you  13:58:06
20  product that is not widely sold, they are giving  13:58:08
21  you product that has extremely good profitability  13:58:11
22  opportunities.                                 13:58:18
23      Obviously, we set our own price. They      13:58:20
24  give you funding that allows you to train your   13:58:23
25  people and run the proper ads that you want to   13:58:26
```

Page 105

```
 1  run.                                           13:58:29
 2      In that aspect, yes, I mean, but all of    13:58:30
 3  those factors make them the sort of the good    13:58:33
 4  relationship, not the good relationship makes the  13:58:39
 5  others.                                        13:58:42
 6   Q   So the availability of MDF funds to       13:58:48
 7  Circuit City might influence Circuit City's vendor  13:58:52
 8  selection to purchase a CRT finished product?   13:58:54
 9      MR. LAHAD:  Misstates testimony.           13:58:57
10      THE WITNESS:  The costs of the product     13:58:59
11  is negotiated first and then demand of the      13:59:01
12  product and all of those sort of things, and    13:59:05
13  yes, we expect to have MDF as part of that,     13:59:08
14  but there are so many other factors and to      13:59:13
15  put it way you put it, I would not.            13:59:17
16      MS. LIN:  Give me a second to dig into     13:59:27
17  my box of tricks down here.                    13:59:30
18  (Whereupon, Deposition Exhibit 2837 is marked for  13:59:47
19  identification.)                               13:59:47
20      MS. LIN:  I am going to mark as Exhibit    13:59:47
21  2837 a document with Bates No. CC 0148714.  I  13:59:49
22  will represent to you that the handwriting on   14:00:02
23  this document was as produced by Circuit        14:00:02
24  City.                                          14:00:05
25  BY MS. LIN:                                    14:00:22
```

27 (Pages 102 - 105)

Page 106

1  Q  Are you familiar with the people on the    14:00:22
2  first page of Exhibit 2837?    14:00:24
3  A  Yes.    14:00:26
4  Q  Who are those people?    14:00:27
5  A  Andrew Scholelapper who is a buyer.    14:00:30
6  Rick Souder who was either a buyer or a division    14:00:34
7  merchandise manager, most likely the division    14:00:40
8  merchandise manager, and David Cecile, who was    14:00:43
9  either a buyer or a division merchandize manager    14:00:49
10  at the time. This is 2000. So I am not sure.    14:00:52
11  Q  I am concentrating on the first page of    14:00:59
12  Exhibit 2837, what do you understand Andrew    14:01:01
13  Scholelapper to be discussing with Mr. Souder and    14:01:05
14  Mr. Cecile?    14:01:07
15  MR. GRALEWSKI: Objection, form.    14:01:11
16  THE WITNESS: He is discussing the    14:01:13
17  impact of Panasonic, and what I believe PTV    14:01:15
18  stands for is projection television, but I    14 01:20
19  don't know.    14:01:26
20  He is discussing the program with    14:01:27
21  Panasonic and what the impact is to Circuit    14:01:32
22  City.    14:01:36
23  BY MS. LIN:    14:01:37
24  Q  What concerns does Mr. Scholelapper    14:01:37
25  raise?    14:01:40

Page 107

1  MR. LAHAD: The document speaks for    14:01:41
2  itself.    14:01:42
3  MR. GRALEWSKI: Objection, form, outside    14:01:42
4  the scope.    14:01:45
5  THE WITNESS: Give me a moment to read    14:01:49
6  this.    14:01:51
7  BY MS. LIN:    14:01:52
8  Q  Absolutely.    14:01:53
9  A  The short answer I would give you is    14:02:46
10  that he is discussing the impact of doing business    14:02:48
11  with Panasonic and what impact it will have on the    14:02:53
12  business that he has been discussing to do with    14:02:58
13  Hitachi and Thomson.    14:03:03
14  Q  Do you see in point number 2, where    14:03:12
15  Mr. Scholelapper says, "Backing out on them now    14:03:15
16  might lose his trust in the long term."    14:03:18
17  MR. GRALEWSKI: Same objection.    14:03:22
18  THE WITNESS: Hang on a second. Yes,    14:03:27
19  BY MS. LIN:    14:03:39
20  Q  What concerned you to understand    14:03:40
21  Mr. Scholelapper to be expressing there?    14:03:42
22  MR. GRALEWSKI: Same objection.    14:03:45
23  THE WITNESS: He is basically telling    14:03:46
24  the supervisors that he is building trust in    14:03:47
25  him and therefore in Circuit City and that if    14:03:53

Page 108

1  he does what he is discussing here that he    14:03:57
2  risked harming that trust.    14:03:59
3  BY MS. LIN:    14:04:01
4  Q  Engaging in a more favorable deal here    14:04:10
5  with Panasonic might damage Circuit City's    14:04:13
6  relationship with another vendor?    14:04:16
7  MR. GRALEWSKI: Same objection.    14:04:19
8  MR. LAHAD: Misstates the testimony.    14:04:21
9  THE WITNESS: I know not that    14:04:22
10  this is a more favorable deal first of all.    14:04:23
11  I can't answer that question because I can't    14:04:25
12  tell you that this is a more favorable deal.    14:04:32
13  I think he is actually arguing that it is a    14:04:35
14  less favorable deal.    14:04:37
15  BY MS. LIN:    14:04:38
16  Q  Is a part of the reason that the    14:04:40
17  proposed deal from Panasonic in Exhibit 2837 less    14:04:42
18  attractive because it might damage relationships    14:04:47
19  with other of Circuit City's CRT finished product    14:04:48
20  vendors?    14:04:52
21  MR. LAHAD: Lacks foundation and calls    14:04:53
22  for speculation.    14:04:54
23  MR. GRALEWSKI: Same objections.    14:04:57
24  THE WITNESS: I think he is arguing    14:04:59
25  again that by doing this is going to cause    14:04:59

Page 109

1  him to have less credibility with the people    14:05:03
2  he has to negotiate with.    14:05:06
3  BY MS. LIN:    14:05:08
4  Q  It was important for buyers to maintain    14:05:08
5  their credibility with CRT finished product    14:05:11
6  vendors?    14:05:14
7  A  It is important for buyers to maintain    14:05:15
8  their credibility with all vendors.    14:05:19
9  Q  Could you read point number 4 on this.    14:05:24
10  A  Out loud?    14:05:29
11  Q  Just to yourself is fine. Do you    14:05:30
12  understand what Mr. Scholelapper is referring to    14:05:45
13  when he says "references playing by the rule    14:05:47
14  book"?    14:05:52
15  MR. GRALEWSKI: Same objections.    14:05:56
16  THE WITNESS: He says that what he means    14:06:04
17  is fair costs and distributions result in a    14:06:07
18  meeting are profit expectations so that's the    14:06:09
19  only way that it would imply that that is    14:06:12
20  what he means.    14:06:16
21  I don't know who Don is, by the way, so    14:06:19
22  I do not understand part of the context of    14:06:22
23  this letter.    14:06:24
24  BY MS. LIN:    14:06:31
25  Q  Did Circuit City expect that these    14:06:34

28 (Pages 106 - 109)



Page 110

1  vendors would provide fair costs and          14:06:36
2  distributions?                                 14:06:40
3    A  Yes.                                       14:06:41
4    Q  Where does Circuit City's negotiations    14:07:00
5  with finished product vendors occur for CRT    14:07:02
6  finished products?                             14:07:07
7    MR. LAHAD:  Is there a time period?          14:07:09
8    MS. LIN:  During the relevant time           14:07:10
9  period.                                        14:07:11
10   THE WITNESS:  When we go to visit them       14:07:12
11 overseas, where you have got everybody         14:07:17
12 together and talking about the product as we   14:07:19
13 talked about earlier you start the             14:07:20
14 negotiations there because that's when you     14:07:23
15 first see the product, they first talk about   14:07:26
16 what they are thinking that they are going to  14:07:28
17 put their suggested retail price at, and some  14:07:31
18 of those are like trial balloons to see if     14:07:35
19 you think that is viable or not, it goes       14:07:38
20 straight out.                                  14:07:40
21    "We are thinking that this could make       14:07:42
22 $399 in the market place or retail price, do   14:07:43
23 you think that would be viable?" and you       14:07:46
24 would say, "No, I don't think so."             14:07:48
25    It starts at that big line where you        14:07:52

Page 111

1  have got everybody from the company there,     14:07:54
2  and you have got -- when we go to Japan, we    14:07:55
3  would stay for the week and we visit all the   14:08:03
4  vendors in Japan and we would go to Korea      14:08:07
5  and we would stay for the week.                14:08:07
6    We would go to China and do the same         14:08:10
7  thing, so that's where it starts, and then,    14:08:13
8  typically, what would happen is that you       14:08:18
9  would get back home and you would have,        14:08:23
10   "Okay, I know we talked about that it might   14:08:25
11 be $799, but we have decided that it is        14:08:29
12 going to be $699 and here's the costs that     14:08:30
13 is manufactured suggested retail price and     14:08:35
14 here is the cost to you."                      14:08:37
15    Then you would start having the             14:08:40
16 negotiations sometimes in person, but most     14:08:41
17 likely over the phone or through email.        14:08:46
18 You might maybe visit again.                   14:08:49
19    They might have a show where we change      14:08:53
20 some things, so what you saw might not         14:08:55
21 exactly be what the product is going to look   14:08:57
22 like and so you have to go either back to      14:08:59
23 Japan or wherever or go to a corporate         14:09:01
24 office in the U.S. and look at the product     14:09:05
25 again and continue to negotiate.              14:09:07

Page 112

1    From the time you saw the product to         14:09:10
2  the time you made the agreement, it is like    14:09:12
3  one long negotiation.                          14:09:15
4  BY MS. LIN:                                     14:09:16
5    Q  Were negotiations ever concluded on       14:09:16
6  those trips abroad in terms of selecting a cost to  14:09:19
7  Circuit City at which it would buy CRT finished 14:09:24
8  products?                                      14:09:27
9    A  It is possible because there are certain  14:09:28
10 products, "We really want you to sell this and 14:09:31
11 It's a brand new product and there's nothing like 14:09:35
12 it and it's the first 40-inch television," for 14:09:42
13 example.                                       14:09:48
14    I could see and I sit in on some of         14:09:49
15 these meetings because I was video, and I could 14:09:54
16 see a buyer saying, "We are going to buy that and 14:09:56
17 all he has seen is the list price and he might buy 14:10:00
18 it at a list price or he might be able to get a 14:10:04
19 little better, but he is really committed either 14:10:08
20 way.                                           14:10:11
21    So to answer your question, it could        14:10:11
22 happen and I am sure it did happen along the way 14:10:14
23 particularly for any new dynamic type of change 14:10:17
24 which for CRT would have been size.            14:10:26
25   Q  When Circuit City's representatives went  14:10:32

Page 113

1  abroad to examine CRT finished products, was it 14:10:36
2  meeting with domestic suppliers based here in the 14:10:41
3  United States that also went abroad or with -- let 14:10:41
4  me stop there.                                 14:10:47
5    MR. LAHAD:  Vague.                           14:10:49
6    THE WITNESS:  The majority -- I am           14:10:50
7  sorry?                                         14:10:51
8    MR. LAHAD:  Vague.                           14:10:53
9    THE WITNESS:  The majority of the time       14:10:54
10 we would meet with representatives from the    14:10:56
11 company in whatever country we are visiting    14:11:03
12 and representatives of theirs that managed     14:11:05
13 the sales in the U.S. would be there with us,  14:11:10
14 it was very rare that they were not            14:11:14
15 also there, but there would be large amounts   14:11:16
16 of people because the vendor wants all of      14:11:20
17 their people to say, "This is the guy who is   14:11:25
18 either going to buy it or not buy it."         14:11:28
19    There would be a large cast of people.      14:11:32
20 You might have 50 people in the room.  You     14:11:35
21 might have seats all the way around where      14:11:38
22 you didn't even know where half of these       14:11:41
23 people did, but you typically had the          14:11:43
24 president of the company that would come in.   14:11:46
25    You would typically have the head of        14:11:49

29 (Pages 110 - 113)

Page 114

1 that division who would come in.                14:11:50
2      You would have like the U.S. president   14:11:54
3 of that company come in. You would have      14:11:58
4 head of sales for that company come in and    14:12:00
5 then you might have the Circuit City rep,      14:12:03
6 the national account manager come in, but in   14:12:06
7 some rare cases, if there was something        14:12:12
8 specific you wanted to go see, you might       14:12:14
9 just be seeing some product and they may not  14:12:17
10 be paying the money for U.S. people to be     14:12:21
11 going with you. That would be extremely       14:12:24
12 rare.                                          14:12:26
13 BY MS. LIN:                                    14:12:26
14   Q   Did the foreign CRT finished product    14:12:26
15 companies pay for Circuit City's representatives 14:12:35
16 to travel to them?                              14:12:38
17   A   Yes.                                      14:12:39
18   Q   Other than the meetings?                 14:12:43
19   A   They didn't pay all expenses. We sort   14:12:45
20 of had some rules about that. Typically they   14:12:48
21 would pick up air fare and hotel and we pick up 14:12:52
22 anything else like parking and incidentals and so 14:12:57
23 on and since we would arrange them in the way we 14:13:03
24 did, it would be shared with all of the people we 14:13:07
25 visited.                                        14:13:09

Page 115

1      We used to have what we called           14:13:10
2 "two-a-days," so that for the first half of a day 14:13:13
3 you were with one vendor and the second half with 14:13:15
4 another so that in the period of a week that's 10 14:13:18
5 or 8 or whatever and then you divide the cost of 14:13:21
6 the hotel by the amount of vendors.            14:13:28
7   Q   Would the costs that the vendors spent   14:13:33
8 related to those trips be reflected in any way in 14:13:36
9 the Circuit City transactional data listing the 14:13:39
10 costs of CRT finished product purchases?      14:13:43
11   A   No.                                      14:13:45
12   Q   Other than the trips where Circuit      14:13:46
13 City's representatives went abroad to meet with 14:13:49
14 CRT finished product companies, did Circuit City's 14:13:52
15 representatives ever discuss CRT finished product 14:13:56
16 purchases negotiations with vendor representatives 14:14:00
17 located outside of the United States?          14:14:06
18   A   There were specific times when we would 14:14:10
19 have phone calls with a U.S. representative that 14:14:13
20 they would conference in people from outside of 14:14:22
21 the country, so yes.                           14:14:26
22   Q   Can you recall what those specific     14:14:33
23 instances might be?                            14:14:36
24      MR. LAHAD: Specific vendors?             14:14:39
25      MS. LIN: He said there were specific    14:14:41

Page 116

1 times.                        14:14:44
2 BY MS. LIN:                    14:14:44
3   Q   I am trying to understand what that     14:14:44
4 means?                                          14:14:45
5   A   What I meant is you would have, it      14:14:45
6 wasn't a daily activity, but something might   14:14:49
7 happen where that would occur whether it be    14:14:53
8 because the negotiations are not going well, or 14:14:56
9 because sales are not going well.              14:14:58
10      I mean those are sort of the biggies    14:15:01
11 that there would be conversations that we would 14:15:04
12 have people from outside of the country in on the 14:15:07
13 conversation to talk about what needed to be done 14:15:13
14 to get sales.                                   14:15:18
15      More often what you would get is a visit 14:15:21
16 from people that work outside of the country on a 14:15:27
17 daily basis that their offices are in Japan or 14:15:32
18 Korea, et cetera, that would come to the U.S. and 14:15:35
19 with the national account, the U.S. sales team 14:15:39
20 would come and visit Circuit City's headquarters 14:15:42
21 and talk to them about, "Why is this product not 14:15:47
22 selling? Why are we not doing more business    14:15:49
23 together, et cetera. Why aren't you buying five 14:15:55
24 pieces?" The sales people say they can only sell 14:16:01
25 you three. "Why aren't you buying these other  14:16:04

Page 117

1 two?"                            14:16:07
2   Q   So foreign representatives from the CRT 14:16:10
3 finished product manufacturer would sometimes come 14:16:13
4 to Circuit City to try to sell additional amounts 14:16:17
5 of their CKT finished products?                 14:16:20
6      MR. LAHAD: You switched from vendors to  14:16:22
7 manufacturers. Are you using                    14:16:24
8 interchangeably?                                14:16:26
9      MS. LIN: I am sorry.                       14:16:27
10 BY MS. LIN:                                     14:16:29
11   Q   Would foreign CRT finished product     14:16:29
12 vendors sometimes come to Circuit City to try to 14:16:31
13 pitch selling more of their CRT finished products? 14:16:34
14   A   Yes.                                      14:16:37
15   Q   Did Circuit City have policies related  14:16:38
16 to how to set its sales prices? So now we are  14:16:40
17 switching from purchases to sales?              14:16:44
18   A   Yes, so our daily then sale – do you    14:16:46
19 mean like an advertised sale or do you mean the 14:16:57
20 price that we sell it at?                        14:17:00
21   Q   The price that you would sell it at?    14:17:02
22   A   Our standard policy was to price a      14:17:05
23 product at the manufacturer's suggested retail 14:17:08
24 price to do our best to try to do that.         14:17:11
25   Q   Did Circuit City have any policies     14:17:21

30 (Pages 114 - 117)



Page 118

1 related to achieving certain margins based on its 14:17:24
2 sale prices? 14:17:28
3 A  We had margin budgets to be able to put 14:17:31
4 a business plan together. The pricing has to be 14:17:37
5 competitive, so I would answer that, no, in that 14:17:44
6 we did not price to hit the margin. 14:17:49
7     We priced to sell the product and then 14:17:52
8 try to do whatever else we could do to influence 14:17:57
9 the overall margins being better. 14:18:02
10 Q  How did Circuit City select its margin 14:18:05
11 budgets? 14:18:09
12 A  Based on history and opportunity. So if 14:18:10
13 it's been delivering this, you are trying to at 14:18:16
14 least maintain that, but there may be an 14:18:21
15 opportunity to improve it if there are innovations 14:18:23
16 or new items that you can get behind or if you can 14:18:31
17 increase the average, even though it doesn't 14:18:34
18 change the margin, if you increase the average 14:18:37
19 retail, then you are making more profit dollars 14:18:40
20 and that is really at the end of the day is what 14:18:43
21 we were most measured on is the profit dollars. 14:18:46
22     The old joke inside is, "Yes, you made 14:18:51
23 30 points margin, but you sold $100 and your 14:18:54
24 budget was $1,000, so you failed." 14:18:58
25 Q  Not good. Do you recall what Circuit 14:19:01

Page 119

1 City's margin budgets were for CRT finished 14:19:04
2 products during the relevant period? 14:19:08
3 A  No. 14:19:09
4 Q  What type of document would those margin 14:19:11
5 budgets be tracked in? 14:19:15
6     MR. LAHAD: Objection, lacks foundation. 14:19:18
7     THE WITNESS: (No response.) 14:19:18  *Whine*
8 BY MS. LIN: 14:19:18
9 Q  Would those margin budgets be recorded 14:19:19
10 somewhere in Circuit City's records? 14:19:22
11 A  Yes. 14:19:24
12 Q  Where? 14:19:25
13 A  Well, records. They would be 14:19:27
14 communicated within the merchandising team and so 14:19:29
15 we had a financial planning and analysis group, F, 14:19:33
16 P and A, that you will see some documents called 14:19:41
17 the 3M Report, and the 3M Report would say, "This 14:19:46
18 is your score card. Here's your budget broken 14:19:50
19 down for the year, broken down to the week level," 14:19:57
20 but DMMs were part of the budget process and would 14:20:00
21 present to their general managers and the vice 14:20:12
22 president of merchandising, their business plans 14:20:17
23 for overall profitability. 14:20:21
24     They would influence where the margins 14:20:27
25 budgets want to be and so if you find budgets you 14:20:31

Page 120

1 are going to find it in those, the proposed 14:20:34
2 budgets, and finalized budgets and you are going 14:20:37
3 to find it in the 3M Report, and then a lot of the 14:20:40
4 other reports that we had prior to the 3M Report 14:20:50
5 were on demand reports, so we could query the AS 14:20:53
6 400 and it tell us what have we sold and what our 14:20:59
7 margins are overall, at the corporate level and we 14:21:04
8 could take all the way down the store level. 14:21:08
9 Q  Did different stores have different 14:21:14
10 margin budgets? 14:21:16
11 A  No. 14:21:17
12 Q  You said DMM, what is that? 14:21:18
13 A  Division merchandise manager. That 14:21:20
14 title was sometimes the merchandise manager, 14:21:24
15 sometimes division merchandise manager, and for 14:21:26
16 the end of this period, I believe, was BTL, which 14:21:30
17 is business team ~~lead~~ lead 14:21:33
18 Q  Did Circuit City's buyers ever ask 14:21:36
19 Circuit City's CRT finished product vendors to 14:21:40
20 help Circuit City achieve its margin budgets 14:21:44
21 during negotiations to purchases CRT finished 14:21:46
22 product? 14:21:50
23     MR. LAHAD: Vague. 14:21:51
24     THE WITNESS: I would answer that in 14:21:57
25 that we would say this product is not going 14:21:59

Page 121

1 to deliver the profit that my budget says 14:22:03
2 that I need to deliver. 14:22:07
3     This is going to have an impact on my 14:22:09
4 ability to make my budget. 14:22:13
5     Did we negotiate the budget, no. 14:22:15
6     We are negotiating the product and 14:22:19
7 needs to be a lower cost. The sort of 14:22:20
8 simple way I put it is the buyers would 14:22:27
9 ~~draw~~, but that is the only context I can 14:22:27
10 think of it. 14:22:31
11     We definitely talked about margins and 14:22:33
12 what our expected margins were and what are 14:22:36
13 actual margins were. 14:22:39
14 BY MS. LIN: 14:22:42
15 Q  Do you know during the relevant period 14:22:42
16 whether Circuit City's expected margins how they 14:22:45
17 lined up with Circuit City's actual margins on CRT 14:22:49
18 finished product sales? 14:22:52
19 A  I do not. 14:22:53
20 Q  For CRT finished product sales, did 14:22:58
21 Circuit City ever have minimum profit margins? 14:23:01
22     MR. GRALEWSKI: Objection to the form. 14:23:05
23 BY MS. LIN: 14:23:06
24 Q  During the relevant period did Circuit 14:23:08
25 City have a policy regarding minimum profit 14:23:11

31 (Pages 118 - 121)

**Page 122**

1 margins on its CRT finished product sales?   14:23:14

2    A  I don't know. I would not think so.   14:23:18

3    Q  Do you know if Circuit City's buyers in   14:23:27

4 the course of their negotiations for CRT finished   14:23:30

5 products ever provided their margin targets to   14:23:34

6 Circuit City finished product vendors?   14:23:37

7    A  Yes. Let me amend that. We would   14:23:39

8 provide a targeted margin for that vendor, not our   14:23:58

9 targeted margin overall.   14:24:05

10 BY MS. LIN:   14:24:08

11    Q  So Circuit City would provide specific   14:24:09

12 CRT finished product vendors with a margin Circuit   14:24:11

13 City hoped to achieve selling that vendor's CRT   14:24:15

14 finished products?   14:24:18

15    A  Correct, and specifically those   14:24:19

16 products, so you might have five pieces from a   14:24:25

17 vendor, and say, if I am going to sell a $700   14:24:28

18 product, then I expect to make 30 points off of   14:24:32

19 it, but that one that is $99 my expectation is   14:24:36

20 that I will make 20 points off of it.   14:24:40

21    (Whereupon, Deposition Exhibit 2838 is marked for   14:24:49

22 Identification.)   14:24:49

23    MS. LIN: I am going to mark as Exhibit   14:24:49

24 2838, a document Bates Number beginning CC   14:24:51

25 0572187.   14:24:55

**Page 123**

1 BY MS. LIN:   14:25:03

2    Q  You can familiarize yourself with this   14:25:04

3 document for the moment. I am going to be asking   14:25:15

4 you about the first two pages.   14:25:17

5    A  You want me to read only the first two   14:27:25

6 pages?   14:27:28

7    Q  Let me ask you some questions and if you   14:27:28

8 feel you need to look at more of the document   14:27:30

9 please let me know. Are you familiar with Danny   14:27:33

10 Caglin?   14:27:34

11    A  Yes.   14:27:37

12    Q  And remind me, who is that?   14:27:38

13    A  Danny Coglin is a buyer for Circuit City   14:27:40

14 Stores.   14:27:42

15    Q  Are you familiar with Clyde Robertson?   14:27:42

16    A  Robertson, yes.   14:27:45

17    Q  Who is Mr. Roberson?   14:27:46

18    A  In this capacity he is the national   14:27:48

19 account manager for Samsung Electronics.   14:27:50

20    Q  Was Mr. Roberson ever employed by   14:27:56

21 Circuit City?   14:27:59

22    A  Yes.   14:27:59

23    Q  Did you know him in his capacity as a   14:28:00

24 Circuit City employee?   14:28:03

25    A  Yes.   14:28:03

**Page 124**

1    Q  What did he do for Circuit City?   14:28:04

2    A  For over a decade, I believe he was a   14:28:06

3 trainer for Circuit City, and his last positions   14:28:10

4 for Circuit City was that he worked in the store   14:28:15

5 merchandising department, but I do not know what   14:28:20

6 he was responsible for.   14:28:25

7    Q  When you say trainer who was he   14:28:27

8 training?   14:28:29

9    A  Sales counselors. Salespeople. Our   14:28:30

10 sales pool.   14:28:33

11    Q  On how to sell products at Circuit City?   14:28:33

12    A  (Non-verbalized response.)   14:28:38

13    THE REPORTER: Is that a yes?   14:28:38

14    THE WITNESS: I am sorry. Yes.   14:28:38

15    THE REPORTER: That's all right. I just   14:28:38

16 did not want the watered down version of it.   14:28:38

17 BY MS. LIN:   14:28:38

18    Q  I want to direct your attention to the   14:28:44

19 top of page 2 of Exhibit 2838. Do you see where   14:28:45

20 Mr. Roberson says, "I am squeezing every dime out   14:28:52

21 of SEA for margin advertising and partnership   14:28:55

22 ideas even though it may not appear so?"   14:28:58

23    A  Yes.   14:29:00

24    Q  Did Circuit City expect its vendors to   14:29:03

25 squeeze themselves for margin advertising and   14:29:06

**Page 125**

1 partnership ideas?   14:29:08

2    MR. LAHAD: Objection, vague.   14:29:10

3    MR. GRALEWSKI: Objection to the form.   14:29:12

4    THE WITNESS: I am not really sure that   14:29:14

5 I can answer that one without laughing. We   14:29:18

6 expected them to act like they were.   14:29:23

7 BY MS. LIN:   14:29:26

8    Q  Following that sentence still on the   14:29:29

9 same page where Mr. Roberson says, "There is no   14:29:33

10 one at CC up to the CEO that can explain why CC   14:29:37

11 has to have such significantly higher margins and   14:29:41

12 programs that everyone else in America."   14:29:44

13    A  Yes.   14:29:47

14    Q  Do you understand CC in that context to   14:29:48

15 mean Circuit City?   14:29:51

16    A  Yes.   14:29:51

17    Q  What do you think Mr. Roberson is   14:29:51

18 saying?   14:29:53

19    MR. LAHAD: Calls for speculation.   14:29:55

20    THE WITNESS: I think he is basically   14:29:58

21 saying that we are getting favorable   14:30:01

22 treatment.   14:30:05

23 BY MS. LIN:   14:30:07

24    Q  In your experience does Circuit City   14:30:08

25 have significantly higher margins and programs   14:30:10



Page 126

1  than everyone else in America?                14:30:14
2     A   I do not know. I would have no way of    14:30:15
3  knowing.                                      14:30:17
4     Q   Are you familiar with any of Circuit    14:30:18
5  City's vendors ever expressing that they thought   14:30:20
6  Circuit City had higher margins than other    14:30:23
7  companies in America?                         14:30:26
8     MR. LAHAD: This document?                   14:30:28
9     MS. LIN: Yes.                              14:30:29
10    THE WITNESS: I was party to                14:30:31
11 conversations where they would say, "Because   14:30:31
12 you have a trained sales force we give you     14:30:35
13 higher margins than someone else because you   14:30:39
14 provide the ability to sell better goods,"     14:30:43
15 and they want those goods sold, and therefore  14:30:46
16 they are doing it.                             14:30:49
17    But again as far as any conversations      14:30:53
18 about our cost versus another person that we   14 30.57
19 were taught we did not discuss costs. Our      14:31:02
20 costs, the other guy's cost, we talk about     14:31:07
21 our own profitability.                         14:31:11
22 (Whereupon, Deposition Exhibit 2839 is marked for   14:31:12
23 Identification.)                               14:31:12
24    MS. LIN: Put that back to the side. I      14:31:22
25 am going to mark as Exhibit 2839 a document    14:31:37

Page 127

1  beginning with Bates No. CC 0569329.           14:31:41
2     THE WITNESS: I have read it.               14:32:40
3  BY MS. LIN:                                    14:32:41
4     Q   Focusing your attention on the final   14:32:42
5  sentence, do you know what Mr. Scheidapper means   14:32:44
6  when he writes that, "The program is a sort of   14:32:45
7  purgatory that denies both the glories of margin   14:32:48
8  heaven as well as the costs needed to descend into   14:32:51
9  promotional health"?  hell                     14:32:52
10    MR. LAHAD: Calls for speculation.          14:32:55
11    MR. GRALEWSKI: Objection, form.            14:32:58
12    THE WITNESS: I would assume he means       14:33:00
13 that he does not view this as a good program.  14 33:02
14 BY MS. LIN:                                    14:33:06
15    Q   Do you know what Circuit City considered   14:33:06
16 to be margin heaven?                           14:33:09
17    MR. LAHAD: Lacks foundation, calls for     14:33:13
18 speculation.                                   14:33:15
19    THE WITNESS: Not heaven, but good          14:33:20
20 margins that are above your                    14:33:24
21 average margins and bad margins would be       14:33:28
22 those below your average margins.              14:33:30
23 BY MS. LIN:                                    14:33:33
24    Q   Do you know what Circuit City's average   14:33:33
25 margins were on CRT finished products at this  14:33:37

Page 128

1  time?                                          14:33:41
2     A   No.                                     14:33:41
3     Q   Was circuit striving to avoid          14:33:45
4  promotional hell?                              14:33:47
5     MR. LAHAD: Objection, vague, lacks         14:33:51
6  foundation.                                    14:33:52
7     THE WITNESS: I think he is trying to       14:33:57
8  avoid promoting product that is not going to   14:33:59
9  be very profitable.                            14:34:06
10 (Whereupon, Deposition Exhibit 2840 is marked for   14:34:08
11 Identification.)                               14:34:08
12    MS. LIN: You can put that exhibit          14:34:08
13 aside. I am going to mark as Exhibit 2840, a   14:34:09
14 document beginning with Bates No. CC 0543314.  14:34:20
15 BY MS. LIN:                                    14:34:54
16    Q   If you could just familiarize yourself   14:34:54
17 briefly with the document and if you feel like you   14:34:55
18 need more time, please just let me know.       14:34:55
19    A   If you are going to ask about a specific   14:35:01
20 sentence, I will read those, but I know what this   14:35:03
21 document is, yes.                              14:35:05
22    Q   So what is this document?              14:35:06
23    A   This is a document to the president of   14:35:07
24 the company, and to the head of merchandising and   14,35:10
25 a copy to another district merchant basically  14:35:16

Page 129

1  giving them the behind the scenes viewpoint of   14:35:22
2  strategic issues before Circuit City meets with   14:35:27
3  Thomson.                                       14:35:32
4     So senior management, we call this the     14:35:34
5  white paper before we would go to visit a vendor.   14:35:37
6  These are pretty standard type of things. The   14:35:40
7  third and fourth page of this is written by me.   14:35:55
8     Q   Focused on the video and camcorder.    14:36:01
9     A   Yes, you see our camcorder portion, they   14:36:04
10 do not say that it is written by me, but it is   14:36:09
11 written by me.                                 14:36:11
12    Q   What generally was the purpose of this   14:36:12
13 type of white paper?                           14:36:14
14    A   Because you were going in and having    14:36:15
15 very senior level conversations you wanted to make   14:36:19
16 sure that your senior management know what the   14:36:24
17 opportunities and risks were for that meeting and   14:36:27
18 because of these meetings you might have a dinner   14:36:32
19 and somebody might bring up one of these issues,   14:36:36
20 or whatever, you wanted everybody who was going to   14:36:39
21 be at the meeting to understand what's going on so   14:36:42
22 that if they have the opportunity to reinforce, to   14:36:47
23 lessen the risk and increase the opportunities,   14:36:52
24 that they can help the buyer do so.            14:36:54
25    This is basically the buyer telling        14:36:57

33 (Pages 126 - 129)

Page 130

1  senior management what is going on and as we all    14:37:01
2  go in to meet with them, want you to know what is    14:37:04
3  going on.    14:37:07
4    Q   I want to direct your attention to the    14:37:08
5  second bullet on page 2 that begins, "Thomson    14:37:09
6  continues," what do you understand this point, the    14:37:13
7  second bullet on page 2 to be saying?    14:37:19
8      MR. GRALEWSKI: Objection, form.    14:37:24
9      THE WITNESS: Basically he is saying    14:37:31
10  that Thomson is creating a disruption in the    14:37:33
11  marketplace that will have a ripple effect    14:37:36
12  and cost us money.    14:37:40
13  BY MS. LIN:    14:37:41
14    Q   How is Thomson creating a disruption in    14:37:45
15  the marketplace?    14:37:48
16    A   Because they are pricing their product    14:37:48
17  well below all other brands with similar featured    14:37:51
18  product and by doing so they are reducing the    14:37:56
19  overall average retail for everything so you don't    14:38:02
20  have as much profit dollars because of that.    14:38:06
21    Q   Did Circuit City consider that reduction    14:38:12
22  by Thomson to be unfavorable?    14:38:15
23      MR. LAHAD: Objection, vague.    14:38:18
24      MR. GRALEWSKI: Objection, form, to this    14:38:20
25  question and the prior.    14:38:22

Page 131

1      THE WITNESS: He says that he doesn't    14:38:25
2  understand why you would do something that    14:38:28
3  reduces both their own profits and the    14:38:30
4  profits to retailers so he is saying that it    14:38:33
5  doesn't make sense.    14:38:37
6  BY MS. LIN:    14:38:38
7    Q   Would you agree that Thomson reducing    14:38:38
8  its prices in that fashion doesn't make sense?    14:38:41
9      MR. GRALEWSKI: Objection, form.    14:38:45
10      THE WITNESS: I would have to know more    14:38:47
11  about all of the other circumstances, but    14:38:49
12  typically, there is some consumer acceptance    14:38:52
13  that this product is worth that amount of    14:39:02
14  dollars and the people that are competing for    14:39:07
15  those sales are generally going to be around    14:39:10
16  that price.    14:39:12
17      To position all of your product below    14:39:15
18  the price, and also trying to sell because    14:39:17
19  they have the Thomson brand, they are trying    14:39:19
20  to sell the Thomson brand at a higher price,    14:39:26
21      That's the part that does not make    14:39:30
22  sense. If it was just trying to sell one    14:39:29
23  and he is going to grab all the market    14:39:33
24  share, kind of makes sense.    14:39:35
25      But in this context where he is trying    14:39:37

Page 132

1  to sell both, it doesn't make sense because    14:39:38
2  it looks like he is going to keep himself    14:39:40
3  from selling his own better product.    14:39:43
4  BY MS. LIN:    14:39:47
5    Q   Was it harmful to Circuit City if its    14:39:47
6  vendors positioned their products well below the    14:39:50
7  market price used by other vendors of similar    14:39:53
8  products?    14:39:57
9      MR. LAHAD: Objection, vague.    14:39:57
10      THE WITNESS: I could not give a yes or    14:40:04
11  no answer to that. It might be advantageous    14:40:06
12  to Circuit City for the vendor to position    14:40:10
13  their pricing below others if we are only    14:40:13
14  ones who carry it.    14:40:17
15  BY MS. LIN:    14:40:18
16    Q   What if Circuit City is not the only one    14:40:18
17  carrying that product?    14:40:21
18    A   It might be advantageous still because    14:40:21
19  it might produce very high margins and increase    14:40:25
20  sales, but it could also be a disadvantage in that    14:40:28
21  nobody sells anymore, but everybody sells it for    14:40:32
22  less.    14:40:36
23    Q   If everybody is selling a specific type    14:40:42
24  of CRT finished product for less that could reduce    14:40:46
25  Circuit City's profits?    14:40:49

Page 133

1      MR. LAHAD: Misstates the testimony.    14:40:52
2      THE WITNESS: Yes.    14:40:53
3  BY MS. LIN:    14:40:53
4    Q   Did Circuit City prefer for its CRT    14:40:57
5  finished products to sell at higher prices?    14:40:58
6    A   Circuit City has to be competitive.    14:41:04
7  That is his first priority. The second priority    14:41:08
8  is to sell as a high an average retail product as    14:41:11
9  it can with the highest average margin.    14:41:14
10      Anything that decreases the average    14:41:19
11  retail of a product is a risk, however, if it    14:41:22
12  increases sales enough to offset the decrease the    14:41:28
13  lost margin by or loss profit opportunity, then    14:41:34
14  that is advantageous.    14:41:38
15      MS. LIN: Let's go ahead and take a    14:41:40
16  short break to change the tape.    14:41:40
17      THE VIDEOGRAPHER: The time is    14:41:42
18  approximately 2:41. This is the end of tape    14:41:44
19  number 2 and we are off the record.    14:41:46
20  (After a short recess.)    14:41:47
21      THE VIDEOGRAPHER: This is the beginning    14:48:59
22  of tape 3. The time is approximately 2:48    14:49:07
23  p.m. and we are back on the record.    14:49:13
24  BY MS. LIN:    14:49:15
25    Q   Mr. Deason, can I have you read to    14:49:15

34 (Pages 130 - 133)





**Page 134**

1  yourself the first bullet on page 2, Exhibit 2840.    14:49:18
2  What do you understand that bullet to be    14:49:50
3  discussing?    14:49:51
4  MR. LAHAD: Calling for speculation and    14:49:53
5  lacks foundation.    14:49:54
6  THE WITNESS: He is discussing that the    14:49:56
7  entry level price products that Thomson is    14:50:02
8  offering are not at a competitive cost and    14:50:05
9  that others have that product and perhaps we    14:50:15
10  could leverage their more senior product    14:50:24
11  since we are going to be buying the other    14:50:28
12  product from them.    14:50:30
13  It might become more important to other    14:50:32
14  people. He says it is not his goal but it    14:50:34
15  might happen.    14:50:37
16  BY MS. LIN:    14:50:38
17  Q  Does Circuit City generally have the    14:50:38
18  ability to leverage other vendors' product    14:50:40
19  offerings in order to obtain better CRT finished    14:50:43
20  product prices?    14:50:47
21  MR. LAHAD: Objection, vague.    14:50:48
22  MR. GRALEWSKI: Objection, form.    14:50:49
23  THE WITNESS: I would bring that down to    14:50:52
24  he's got some entry level product that he    14:51:00
25  needs to buy and one guy's cost are higher    14:51:02

**Page 135**

1  than the other guy's cost as far as quoted to    14:51:07
2  him, so he is choosing between that.    14:51:09
3  The rest of this discussion talks about    14:51:13
4  if I am having to buy that product from    14:51:17
5  these guys, I might want to buy the better    14:51:19
6  product from these guys too.    14:51:23
7  BY MS. LIN:    14:51:24
8  Q  Did Circuit City typically learn about    14:51:27
9  CRT finished product manufacturers manufacturing    14:51:30
10  cost during its purchase negotiations?    14:51:34
11  A  No.    14:51:37
12  Q  Are you aware, other than the document    14:51:37
13  you have just read, Exhibit 2840, of Circuit City    14:51:42
14  learning about CRT finished product manufacturers    14:51:46
15  prices as part of the negotiation process?    14:51:49
16  MR. LAHAD: Objection, misstates    14:51:52
17  previous testimony.    14:51:54
18  THE WITNESS: Prices, again, I don't    14:51:55
19  know. Ask me again, I am sorry.    14:51:57
20  BY MS. LIN:    14:51:59
21  Q  Sure. The bullet we just read in    14:51:59
22  Exhibit 2840 is discussing the vendor's cost of    14:52:02
23  manufacturing?    14:52:05
24  A  (Non-verbalized response.)    14:52:06
25  THE REPORTER: Is that a yes?    14:52:06

**Page 136**

1  THE WITNESS: Yes.    14:52:06
2  THE REPORTER: Thank you.    14:52:06
3  BY MS. LIN:    14:52:06
4  Q  Are you aware of Circuit City learning    14:52:09
5  about CRT finished product manufacturers cost of    14:52:12
6  manufacturing in other contexts besides this    14:52:15
7  document we just looked at?    14:52:17
8  MR. LAHAD: Objection, vague, misstates    14:52:20
9  the testimony.    14:52:22
10  MR. GRALEWSKI: Objection to form, to    14:52:22
11  this question and the prior question.    14:52:25
12  THE WITNESS: We would not know the cost    14:52:28
13  of manufacturing of the vendor and to some    14:52:31
14  degree we might not care. What we care about    14:52:37
15  is whether the costs they give us is    14:52:42
16  competitive.    14:52:46
17  Now, am I familiar with vendors    14:52:47
18  complaining that their costs are high and    14:52:52
19  that that makes their life tough, yes.    14:52:56
20  BY MS. LIN:    14:52:58
21  Q  Were there times during the relevant    14:53:02
22  period when Circuit City could not purchase as    14:53:04
23  many CRT finished products as it was seeking to?    14:53:08
24  A  I think that is highly likely. As new    14:53:12
25  products are introduced quite often the supply is    14:53:18

**Page 137**

1  not adequate, and so for example, as I used    14:53:24
2  earlier, when the 40 inch CRT was introduced, it    14:53:27
3  would be very likely that we were not getting all    14:53:32
4  of them that we wanted to get, but I don't again    14:53:35
5  know of a specific case of that.    14:53:39
6  Q  The 40-inch CRT you are using as an    14:53:42
7  example, but not necessarily a true example?    14:53:45
8  A  Correct. Anything that is new supply    14:53:48
9  tends to lag demand.    14:53:55
10  (Whereupon, Deposition Exhibit 2841 is marked for    14:53:59
11  Identification.)    14:53:59
12  MS. LIN: I am going to mark as Exhibit    14:54:18
13  2841 a document Bates numbered CC 0534111.    14:54:20
14  BY MS. LIN:    14:54:30
15  Q  Can you describe to me what this Exhibit    14:54:30
16  2841 appears to you to be?    14:55:04
17  A  It appears to be an update from Danny    14:55:06
18  Caglin, the buyer, to Andrew Scholclapper who is    14:55:10
19  probably his senior buyer or I am not sure of the    14:55:13
20  exact title at the time, telling him about what is    14:55:17
21  going on with their discussions with Hitachi.    14:55:25
22  Q  What concerns is Mr. Caglin raising    14:55:33
23  about Hitachi?    14:55:35
24  MR. LAHAD: The document speaks for    14:55:38
25  itself.    14:55:40

35 (Pages 134 - 137)

Page 138

1    MR. GAWLEY: Assumes facts, speculative,   14:55:43
2    lacks foundation.   14:55:43
3    THE WITNESS: He is basically saying   14:55:52
4    that the costs, that the margin on the   14:55:55
5    Hitachi product is going to go down and that   14:55:58
6    it is not go to be as competitive to other   14:56:03
7    product.   14:56:06
8    BY MS. LIN:   14:56:06
9    Q   Can you read Mr. Scholclapper's   14:56:09
10   response?   14:56:11
11   A   "Thanks for the update." Well, there   14:56:11
12   are a bunch of typos and so I will read it as what   14:56:13
13   I think he is saying, which is, "If you have not   14:56:18
14   done so already, please make sure Hitachi is aware   14:56:23
15   of your planned actions pulling in from ads,   14:56:27
16   potentially reducing store counts. They need to   14:56:29
17   understand the consequences of their decisions."   14:56:33
18   Q   What do you understand Mr. Scholclapper   14:56:35
19   to be saying?   14:56:37
20   MR. LAHAD: Lacks foundation, calls for   14:56:39
21   speculation.   14:56:41
22   THE WITNESS: I would take it that he is   14:56:45
23   saying that if the product is not going to be   14:56:46
24   as competitive and if it is not going to   14:56:49
25   deliver as much margin, then we don't want to   14:56:52

Page 139

1    sell as many.   14:56:55
2    BY MS. LIN:   14:56:56
3    Q   So there were consequences for CRT   14:56:56
4    finished product vendors who did not accommodate   14:56:59
5    Circuit City's expected margins?   14:57:03
6    MR. LAHAD: Objection, misstates the   14:57:06
7    testimony.   14:57:07
8    THE WITNESS: He's saying that they are   14:57:07
9    not going to end up selling as much product   14:57:08
10   and so therefore we're going to have to do   14:57:12
11   these things in reaction to that and that   14:57:14
12   they need to know that.   14:57:19
13   BY MS. LIN:   14:57:20
14   Q   Circuit City could pull planned ads from   14:57:25
15   CRT finished product vendors' product if those   14:57:28
16   vendors refused to reduce their suggested   14:57:33
17   advertised retail prices?   14:57:36
18   MR. LAHAD: Misstates testimony, lacks   14:57:38
19   foundation.   14:57:40
20   MS. LIN: It's a question. I am not   14:57:41
21   restating his testimony.   14:57:43
22   MR. LAHAD: To the extent that you are   14:57:44
23   relying on testimony, I think you're   14:57:44
24   mistaken.   14:57:48
25   THE WITNESS: I think the way you stated   14:57:51

Page 140

1    it makes it say, "If you do not do this, we   14:58:02
2    will do that."   14:58:05
3    What they are discussing is the fact   14:58:07
4    that this product is not going to sell as   14:58:08
5    much and it is not going to be as   14:58:10
6    profitable.   14:58:13
7    If it is not going to sell as much and   14:58:14
8    it is not going to be profitable, then you   14:58:15
9    don't advertise it as often and you don't   14:58:18
10   carry it in as many stores and they need to   14:58:20
11   understand that because they should not be   14:58:22
12   surprised by that.   14:58:24
13   BY MS. LIN:   14:58:27
14   Q   But generally speaking, not just in the   14:58:27
15   example of Exhibit 2814, Circuit City could enact   14:58:30
16   consequences to CRT finished product vendors that   14:58:37
17   did not move their suggested retail prices?   14:58:39
18   MR. LAHAD: Vague.   14:58:46
19   MR. GRALEWSKI: Objection, form.   14:58:47
20   THE WITNESS: The consequences are going   14:58:51
21   to happen because, in general, if people   14:58:55
22   don't react to the marketplace which is what   14:59:01
23   this is talking about, then their product is   14:59:04
24   going to not sell, so to say that there are   14:59:08
25   consequences from Circuit City, the   14:59:16

Page 141

1    consequence is to Circuit City that the   14:59:19
2    product is not going to sell, if the retail   14:59:21
3    is going to go down, but the margin is going   14:59:26
4    to down too, then there is impact to Circuit   14:59:27
5    City on their profit.   14:59:32
6    I think that that's as clear as I can   14:59:35
7    answer it. We are not saying, 'If you don't   14:59:37
8    do this,' I mean, they can choose do   14:59:43
9    whatever they want, but then it is not going   14:59:48
10   to sell, so we are going to stop buying it.   14:59:50
11   BY MS. LIN:   14:59:54
12   Q   If a CRT finished product vendor   14:59:55
13   increased its costs, would Circuit City change the   15:00:07
14   retail price of the finished product in response?   15:00:11
15   A   They may. If the manufacturer's   15:00:15
16   suggested retail price changed, then we are likely   15:00:18
17   to, and if it did not, we are unlikely to.   15:00:25
18   Q   Do you recall any specific examples of   15:00:32
19   that happening?   15:00:34
20   A   No.   15:00:34
21   Q   To the extent its cost was increased,   15:00:40
22   would --   15:00:42
23   A   I'm sorry, I have got to correct myself.   15:00:43
24   The previous deposition, I was shown a letter   15:00:46
25   where somebody had increase in costs.   15:00:50

36 (Pages 138 - 141)



Page 142

```
 1    Q   The previous deposition you are        15:00:55
 2 referring to the LCD case?                     15:00:56
 3    A   LCD, but it was not for CRT product.    15:00:58
 4    Q   You are not aware of any instances this 15:01:00
 5 which CRT product prices were increased?       15:01:03
 6    A   I am not aware.                         15:01:06
 7        MR. GRALEWSKI:  Can I have the court     15:01:17
 8 reporter read back the last question and       15:01:18
 9 answer?                                        15:01:20
10 (Whereupon the record was read.)               15:01:20
11        MR. LAHAD:  Did you mean prices or      15:01:21
12 costs?                                         15:01:35
13        MS. LIN:  I will keep prices.  But why  15:01:38
14 not ask the question as to costs.              15:01:41
15 BY MS. LIN:                                    15:01:43
16    Q   Are you aware of any instances --       15:01:43
17        MR. LAHAD:  Did you understand that     15:01:44
18 question to be prices or costs?                15:01:45
19        THE WITNESS:  I understood it to be     15:01:47
20 costs.  I am sorry.                            15:01:48
21 BY MS. LIN:                                    15:01:49
22    Q   No, that's okay.                        15:01:49
23    A   My answer was that it was based on our  15:01:51
24 cost going up.                                 15:01:55
25    Q   You are not aware of any instances in   15:01:56
```

Page 143

```
 1 which Circuit City's costs to purchase CRT     15:01:57
 2 finished products went up?                     15:02:01
 3    A   That is correct.                        15:02:02
 4    Q   If there was a decrease in Circuit      15:02:12
 5 City's costs to acquire a specific CRT finished 15:02:21
 6 products, would Circuit City decrease the price 15:02:23
 7 charged to the customer by that same amount?   15:02:30
 8    A   Most likely not.  We would reposition   15:02:33
 9 price based on change of the manufacturer's    15:02:45
10 suggested retail price would be the primary reason 15:02:47
11 for us to reposition the price that we are selling 15:02:50
12 the product at.                                15:02:53
13        And furthermore, if you reduce the price 15:02:57
14 by $20, and you reduce the cost by $20, you    15:03:00
15 actually don't have the same margin.  The math 15:03:04
16 doesn't work that way.                         15:03:08
17    Q   Would Circuit City typically move the   15:03:11
18 price to the consumer by the same amount at which 15:03:17
19 Circuit City's cost to acquired the CRT finished 15:03:21
20 product moved?                                 15:03:25
21        MR. GRALEWSKI:  Objection, form.        15:03:26
22        THE WITNESS:  I believe I just answered 15:03:28
23 that.                                          15:03:30
24 BY MS. LIN:                                    15:03:31
25    Q   I thought you tagged it to margins, so I 15:03:32
```

Page 144

```
 1 was trying to clarify, putting aside a margin  15:03:34
 2 percentage, the dollar amount at which a CRT   15:03:36
 3 finished product cost to Circuit City, would that 15:03:39
 4 be the same dollar amount at which Circuit City 15:03:42
 5 would change its retail price to consumers?    15:03:45
 6    A   Cost and our selling price still exist  15:03:49
 7 independently.  You make the pricing decision  15:03:58
 8 based on what is competitive.                  15:04:01
 9        If the vendor gives you a $20 reduction 15:04:04
10 in cost, but everybody is selling this at the same 15:04:07
11 price that they always sold it for, and you are 15:04:11
12 selling it at that and it is competitive, then you 15:04:14
13 may take the money.                            15:04:18
14        It is profitable.                       15:04:20
15        If the vendor has said, and this is the 15:04:21
16 more likely case where you have got a cost     15:04:24
17 reduction, "If you have a price protection, more 15:04:27
18 likely it used to be a $349 manufactured suggested 15:04:29
19 retail, it is now going to be $299 suggested   15:04:32
20 retail and here is your new cost."             15:04:36
21    Q   Did Circuit City use any type of        15:04:47
22 benchmark pricing in its prices charged to     15:04:49
23 consumers for instance tending to end products at 15:04:53
24 99 cents?                                      15:04:55
25    A   Yes.                                    15:04:56
```

Page 145

```
 1    Q   And how did that benchmark pricing work? 15:04:57
 2    A   The 99 cent was the standard ending for 15:05:00
 3 everything that you sold in the sort of the normal 15:05:05
 4 course of business.                            15:05:11
 5        We had other endings that meant things, 15:05:12
 6 and I am probably going to get these wrong, but I 15:05:15
 7 will use them as the examples.                 15:05:19
 8        97 cent, might say, "That is an item    15:05:21
 9 that was on sale," the 98 cent might mean that 15:05:23
10 "that is a floor sample," and the 95 cent, and I 15:05:28
11 am getting some of these, right, meant that it was 15:05:34
12 a damaged product.                             15:05:38
13    Q   If Circuit City decreased the price of a 15:05:56
14 particular CRT finished product, would that have 15:06:00
15 an effect on other CRT finished products in    15:06:03
16 Circuit City's lineup at the time?             15:06:06
17        MR. LAHAD:  Objection, vague, as to     15:06:08
18 affect.                                        15:06:11
19        MR. GRALEWSKI:  Objection, form,        15:06:11
20        THE WITNESS  What do you mean by        15:06:13
21 affect?                                        15:06:14
22 BY MS. LIN:                                    15:06:16
23    Q   If a particular CRT finished product    15:06:17
24 price decreases would that lead Circuit City to 15:06:23
25 change the prices of any other CRT finished    15:06:26
```

37 (Pages 142 - 145)

Page 146

```
 1  products it was selling at that time?          15:06:29
 2     A   It might.                               15:06:32
 3     Q   Why's that?                             15:06:34
 4     A   Because the other products might stop   15:06:35
 5  selling.                                       15:06:38
 6     Q   Would a price decrease in a particular  15:06:43
 7  CRT finished product prompt Circuit City to reduce  15:06:45
 8  prices of its other CRT finished products for  15:06:49
 9  sale?                                          15:06:52
10     MR. LAHAD:  Asked and answered.             15:06:53
11     THE WITNESS:  Yes, I was actually           15:06:54
12  listening to see what was different.  I don't  15:06:57
13  hear anything different in the question.        15:06:59
14  Maybe if you restate it, I can answer you.     15:07:05
15  BY MS. LIN:                                    15:07:12
16     Q   We were saying that if a price decreased  15:07:12
17  of one product, Circuit City might change its  15:07:14
18  prices of other products?  I want to clarify,  15:07:16
19  would it change them to go down?               15:07:18
20     A   Yes, if the product was not selling     15:07:24
21  because the other product had gone down in price  15:07:26
22  then it would go down also.                    15:07:31
23  BY MS. LIN:                                    15:07:33
24     Q   A decrease in price of one CRT product  15:07:34
25  was unlikely to cause Circuit City to increase the  15:07:35
```

Page 147

```
 1  price of a different CRT product, is that right?  15:07:39
 2     MR. LAHAD:  Misstates the testimony.        15:07:41
 3     THE WITNESS:  Yes.                          15:07:43
 4     MR. LAHAD:  I am sorry, did you say was     15:07:53
 5  then likely or was unlikely?                   15:07:53
 6     MS. LIN:  Unlikely.                         15:07:55
 7  BY MS. LIN:                                    15:07:56
 8     Q   If a price change was to be implemented  15:08:03
 9  on a particular CRT finished product, how did that  15:08:07
10  process work?                                  15:08:11
11     A   The buyers support team which had       15:08:12
12  various names, it could be a category support, or  15:08:21
13  a product manager, or a product specialist, the  15:08:25
14  buyer would create the basic form that said, "The  15:08:28
15  new price of this, we want to price our stores to  15:08:35
16  this starting at this date," and that is all that  15:08:39
17  would have to be done is that it would key in go  15:08:44
18  out to all the stores.                         15:08:47
19     If there was a cost change at the same       15:08:49
20  time that is handled differently.              15:08:53
21     Q   You said was a cost change to acquire a  15:08:58
22  CRT finished product, would that information be  15:09:01
23  related to the retail stores?                  15:09:03
24     A   That information is available to them,  15:09:07
25  but it would not be communicated to them unless it  15:09:10
```

Page 148

```
 1  was significantly going to change sort of what  15:09:15
 2  they have been trained to do or what they have  15:09:22
 3  been selling.                                  15:09:24
 4     Q   Were price changes, so that is price    15:09:26
 5  charged to consumers, implemented across all   15:09:29
 6  Circuit City retail stores at the same time?   15:09:34
 7     A   Like 99.9 percent of the time they were.  15:09:36
 8  There were exceptions where you would say in this  15:09:40
 9  marketplace that price is not going to be      15:09:43
10  competitive and so you would put a different price  15:09:46
11  down.                                          15:09:49
12     Q   Were the same prices charged on Circuit  15:09:52
13  City's website as it charged on its retail stores  15:09:59
14  for CRT finished products?                     15:10:02
15     A   The everyday pricing would have been the  15:10:05
16  same, however you could have different promotions.  15:10:09
17  It could be on sale in the stores and not be on  15:10:14
18  sale on the web or vice versa.                 15:10:17
19     Q   Was it the buyers that determined the  15:10:20
20  web pricing as well?                           15:10:23
21     A   The buyers determined the every day     15:10:24
22  pricing, yes.                                  15:10:27
23     Q   The size of its inventory of CRT        15:10:28
24  finished products impact Circuit City's prices it  15:10:30
25  charged to consumers to purchase these products?  15:10:34
```

Page 149

```
 1     A   Yes.                                    15:10:38
 2     Q   How so?                                 15:10:38
 3     A   If we had an excess amount of inventory,  15:10:39
 4  then we might reduce the price to the consumer to  15:10:41
 5  increase sales.                                15:10:45
 6     If we had a shortage of inventory, we        15:10:47
 7  may increase costs to the consumer because we are  15:10:49
 8  going to sell all that we own.                 15:10:52
 9     Q   Would Circuit City sometimes buy more   15:10:55
10  inventory than usual if it felt that it was   15:10:58
11  getting a good price on a CRT finished product?  15:10:59
12     MR. LAHAD:  Vague, lacks foundation.        15:11:03
13     THE WITNESS:  I am trying to sort of         15:11:17
14  process the than usual.  Yes, we would, and    15:11:17
15  there's a difference in culture in about       15:11:24
16  1995, 1996, 1997, that sort of stopped at the  15:11:28
17  beginning of this where the buyers could buy   15:11:33
18  a bulk of product and sit on it for a while,   15:11:38
19  if they got an incredible deal.                15:11:41
20     But as our supply chain got more            15:11:46
21  sophisticated we were not allowed to do        15:11:51
22  that, and so for the majority of this period   15:11:53
23  of time, I would estimate that over 90         15:11:55
24  percent time that we are talking about here    15:12:00
25  the buyer could not buy in excess in that      15:12:03
```

38 (Pages 146 - 149)



Page 150

```
1    way,                        15:12:09
2  BY MS. LIN:                    15:12:10
3     Q   Do you know why Circuit City changed its   15:12:11
4  policy with respect to whether buyers can purchase   15:12:14
5  excess CRT finished product inventory?   15:12:16
6     A   Reduce risk.           15:12:19
7     Q   Was that because Circuit City expected   15:12:23
8  the prices of CRT finished products to decline?   15:12:24
9     A   No, it is because any product that you   15:12:27
10 buy has the risk of suddenly being not profit of   15:12:31
11 not competitive and now you own it and so it   15:12:36
12 doesn't matter that it was CRTs.  Just any mass   15:12:42
13 product.                       15:12:46
14    Q   Did individual Circuit City retail   15:12:52
15 stores have the authority to change the sales   15:12:54
16 prices of CRT finished products?   15:12:57
17    A   They could under very strict guidelines   15:13:00
18 and at some periods of time they were not allowed   15:13:04
19 to do so at all.               15:13:07
20    Q   Do you know what time periods individual   15:13:13
21 stores were not allowed to change CRT finished   15:13:16
22 product prices?                15:13:18
23    A   These type of decisions to give you an   15:13:20
24 example of a time when they were not allowed to   15:13:27
25 change them at all, I remember a Christmas, I   15:13:30
```

Page 151

```
1  don't know which Christmas, where we said, "This   15:13:35
2  date on, no price changes.  No reactions."   15:13:38
3     Q   So from some Christmas going forward   15:13:54
4  individual stores were no longer allowed to change   15:13:56
5  their CRT finished product prices, am I   15:13:59
6  understanding you right?       15:14:01
7     MR. LAHAD:  Misstates the testimony.   15:14:02
8     THE WITNESS:  They are not allowed to   15:14:02
9  change any prices.             15:14:04
10 BY MS. LIN:                    15:14:05
11    Q   Specific to that one day or going   15:14:05
12 forward?                       15:14:08
13    A   For a short period of time, like the   15:14:08
14 final three weeks of the year or the final three   15:14:10
15 weeks before Christmas.        15:14:13
16    The only prices by the way that they   15:14:15
17 were allowed to change were a specific groups of   15:14:17
18 product that we said, "These products were going   15:14:20
19 to compete on.  You will compete with certain   15:14:24
20 other retailers and if they are at this price in   15:14:28
21 print, for example, then you will price yours   15:14:32
22 while that ad ran, and when the ad is over, you   15:14:36
23 put it back up."               15:14:39
24    They were not able to control, what I   15:14:40
25 have been referring to, as their every day   15:14:43
```

Page 152

```
1  pricing.  They were able to control their reaction   15:14:46
2  to competitors' pricing.       15:14:50
3     Q   Did someone at Circuit City determine   15:14:52
4  which products would be in that category of   15:14:55
5  products whose prices might change in reaction to   15:14:58
6  competitor pricing?            15:15:00
7     A   Yes.                    15:15:01
8     Q   How did that work?      15:15:02
9     A   The buyers and other senior management   15:15:03
10 in merchandising would identify the key categories   15:15:07
11 that required reaction and CRTs would have always   15:15:12
12 been in that category because they are hardware   15:15:16
13 categories with significant pricing.  Whereas,   15:15:21
14 something like a camera bag where they carried 50   15:15:25
15 of them, and they cost $19, wouldn't be.   15:15:32
16    Q   Were all CRT finished products subject   15:15:35
17 to price changes based on competitor prices?   15:15:39
18    MR. LAHAD:  Vague.          15:15:44
19    THE WITNESS:  Right.  It would vary   15:15:44
20 based on the time that we are talking about   15:15:46
21 here.                          15:15:50
22    As CRT was the largest part of   15:15:52
23 television probably at the beginning of the   15:15:55
24 cycle, I suspect all CRT was involved.   15:15:58
25    At the end, as CRT was not as visible   15:16:01
```

Page 153

```
1  and wasn't advertised as much, wasn't as   15:16:08
2  high priced, or et cetera, then I am sure   15:16:11
3  that there were exceptions that said we are   15:16:15
4  only going to do the ones above a certain   15:16:17
5  price or certain size or something like that   15:16:20
6  and it may have even been excluded.   15:16:21
7     But television in general was our   15:16:24
8  number one business and so in general we   15:16:28
9  were very competitive on television.   15:16:31
10 BY MS. LIN:                    15:16:34
11    Q   Was Circuit City offering similar   15:16:35
12 ability to its retail stores to change their   15:16:37
13 prices in reaction to competitors in CRT monitor   15:16:40
14 sales?                         15:16:44
15    A   We were a little more careful with our   15:16:46
16 computer product because the overall profitability   15:16:49
17 of computers is typically lower than other   15:16:55
18 products and the visibility was a little bit   15:17:01
19 lower.                         15:17:04
20    Having said that, I am sure that there   15:17:05
21 were times when they were included, but it's not   15:17:07
22 the type of category that is dominant for Circuit   15:17:11
23 City.                          15:17:16
24    I would say in that case it is probably   15:17:19
25 the opposite, that most of the time they wouldn't   15:17:22
```

39 (Pages 150 - 153)



Page 154

1  have been included.                              15:17:26
2  (Whereupon, Deposition Exhibit 2842 is marked for  15:17:26
3  Identification.)                                  15:17:26
4      MS. LIN:  I am going to mark a document     15:17:34
5  beginning Bates No. CC 0389749 as Exhibit        15:17:36
6  2842.                                            15:17:42
7  BY MS. LIN:                                      15:18:17
8    Q   Are you familiar with the manager's       15:18:17
9  special price program referenced in Exhibit 2842?  15:18:19
10   A   This is a reminder that there is such a   15:18:24
11 program and looking at this is a reminder that   15:18:26
12 there is such a program existed.  I was not      15:18:29
13 actively involved in it.                         15:18:32
14 BY MS. LIN:                                      15:18:34
15   Q   Do you know how the manager special      15:18:34
16 price program worked?                            15:18:36
17   A   No.                                        15:18:37
18   Q   Looking page 2, there is in a reference to  15:18:39 \
19 a low-price guaranty.  Do you know what Circuit   15:18:46
20 City's low price guaranty was?                   15:18:49
21   A   Yes.                                       15:18:50
22   Q   What was that?                             15:18:51
23   A   We would match competitors advertised     15:18:53
24 pricing, so that we would sell you the product at  15:18:58
25 the price that competitors advertised it at, and  15:19:00

Page 155

1  if you bought the product from us, and then the   15:19:04
2  product was advertised for less, we would refund  15:19:08
3  the difference between what you paid and what the  15:19:11
4  ad price was plus 10 percent, the difference.     15:19:15
5    Q   Do you know when that low-price guaranty  15:19:19
6  program was in place?                            15:19:21
7    A   Long before this period of time that we   15:19:24
8  are talking about.  It goes back to my beginning.  15:19:28
9  There was a low-price program when I started at  15:19:31
10 Circuit City in 1980.                            15:19:34
11   Q   Was that program when you started the    15:19:36
12 same as the low-price guaranty program in place in  15:19:38
13 1996?                                            15:19:44
14   A   I believe so, but there were changes to   15:19:46
15 that low-price program sometime during this      15:19:48
16 period.                                          15:19:54
17   Q   I direct your attention to the page      15:20:05
18 ending in Bates Number 56.  There is a little    15:20:07
19 easel in the left hand margin that says,         15:20:20
20 "Anticipate all customers shopping in a drop price  15:20:22
21 environment."  Do you know what that term "drop   15:20:26
22 price environment" means?                        15:20:27
23   A   That is actually a remainder of what the  15:20:29
24 manager's specials program was created for.      15:20:32
25     Going back to one of my positions where     15:20:35

Page 156

1  I was involved with highly competitive           15:20:38
2  marketplaces, many of these highly competitive   15:20:42
3  type environments, the competitor would price at  15:20:52
4  one price, but as soon as you said hello they    15:20:57
5  would offer you a lower price, and so by being   15:21:00
6  priced at one price and not being aware of that  15:21:04
7  and not having any sort of reaction to that we   15:21:07
8  were losing sales.                               15:21:10
9      We were particularly losing it for very     15:21:12
10 expensive television and this is Big Screen which  15:21:18
11 typically for Circuit City is talking about      15:21:21
12 projection sets.                                 15:21:24
13     It is talking about the various types of    15:21:26
14 projection, the type of sets, and typically, would  15:21:31
15 not be CRT unless it was a 40 inch or something   15:21:32
16 that was included.                               15:21:36
17     This is primarily about any product that    15:21:37
18 was $2,000 to $3,000, and they would have a drop  15:21:41
19 price that was significant.                      15:21:44
20     So it's a $3,000 product and you say,       15:21:46
21 "hello," and it now $2,800 and we don't get the  15:21:49
22 sale.                                            15:21:54
23     That is what the manager's special         15:21:55
24 pricing was created to try to combat was how do we  15:21:58
25 deal with that because we were losing sales.     15:22:03

Page 157

1    Q   Would you turn to the next page.         15:22:12
2    A   It does say Big Tube, by the way, on      15:22:14
3  that same page.  There is some specific Big Tube  15:22:18
4  in here and Tube would have been CRT.            15:22:21
5    Q   Thank you.  So on the page ending Bates  15:22:24
6  No. 57, will you read to yourself the paragraph  15:22:24
7  beginning with, "Let me take a moment."          15:22:31
8    A   57?  Read it to myself?                   15:22:38
9    Q   Yes, just familiarize yourself with that  15:22:48 .
10 paragraph.  Do you see where this training       15:22:50
11 document says, "We shop other retailers on a     15:23:19
12 customers on a regular basis and the prices you  15:23:21
13 see here are their consistent final drop prices  15:23:25
14 they give us."                                   15:23:28
15   A   Yes.                                       15:23:28
16   Q   What does that mean?                       15:23:29
17   A   We shop other retailer's customers on a  15:23:30
18 regular basis.  I don't mean to be smart, but    15:23:33
19 that's what it means is that we go out like if we  15:23:36
20 were a customer to try to buy the product to find  15:23:41
21 out what other guy is selling it for.            15:23:43
22   Q   So the final drop price would be         15:23:46
23 discussing with the other retailer what lower than  15:23:49
24 sticker price a buyer could receive?             15:23:53
25     MR. LAHAD:  Misstates the testimony.       15:23:57

40 (Pages 154 - 157)



Page 158

1       THE WITNESS: Right.          15:23:59
2       MS. LIN: Let me ask it this way.      15:23:59
3 BY MS. LIN:                  15:23:59
4    Q   When you are discussing final drop     15:24:00
5 prices from a competitor, what does that mean?   15:24:03
6    A   What it says is that we go to a        15:24:07
7 competitor and we go as a customer and see what   15:24:10
8 the real prices they are offering that customer    15:24:16
9 and then we are pricing to that price.         15:24:19
10   Q   The real price could be something other   15:24:22
11 than the advertised or sticker price?        15:24:24
12   A   The competitor's real price is something   15:24:29
13 other than what they have got tagged.        15:24:32
14   Q   Circuit City would act as a customer in   15:24:37
15 order to find out what that real lower price was   15:24:39
16 offered by a competitor?              15:24:42
17   A   Yes.                 15:24:43
18   Q   Do you see anything wrong with that    15:24:52
19 practice of acting as a customer at your       15:24:54
20 competitor's store?               15:24:57
21       MR. LAHAD: Objection, scope. You are   15:24:59
22 asking him personally if there is anything      15:25:00
23 wrong with that, a 30(b)(6) witness? I don't    15:25:02
24 know.                   15:25:04
25       MR. ROSS: Beyond the scope of the     15:25:07

Page 159

1 30(b)(6).                   15:25:08
2       MR. GRALEWSKI: Objection, form.       15:25:10
3       THE WITNESS: I know of no other way to   15:25:12
4 stay competitive.                15:25:14
5 BY MS. LIN:                  15:25:15
6    Q   Then to determine the prices that your   15:25:16
7 competitors are selling their products at?       15:25:19
8    A   Yes.                 15:25:20
9    Q   Do you know if Circuit City ever used    15:25:22
10 CRT finished products as loss leaders during the   15:25:24
11 relevant time period?               15:25:28
12   A   By "loss leader" you would mean you sold   15:25:31
13 it for below cost?                15:25:34
14   Q   However that term might have been used   15:25:37
15 by Circuit City.                15:25:39
16   A   No, that would be the definition that I   15:25:40
17 would use is we did our very best and never sold   15:25:43
18 products below what we paid for it but yes there   15:25:49
19 were times we did do so.              15:25:53
20   Q   Do you know how Circuit City selected    15:25:54
21 the CRT finished products it would sell as loss   15:25:55
22 leaders?                   15:26:00
23   A   They could choose ones that they thought   15:26:01
24 were effective in advertising or that they had an   15:26:06
25 excess inventory on for whatever reason.      15:26:10

Page 160

1    Q   Did Circuit City tend to sell products   15:26:18
2 that were in high demand as loss leaders?      15:26:22
3    A   We created high demand by selling       15:26:27
4 products at a lower price, but if I understood you   15:26:34
5 correctly, to say these are high demand products   15:26:41
6 that we are trying to sell below costs, that would   15:26:44
7 not be why we sold them below costs.         15:26:46
8       MR. LAHAD: Is that question directed to   15:26:51
9 products generally or just CRT finished       15:26:52
10 products?                 15:26:53
11 BY MS. LIN:                 15:26:53
12   Q   To CRT finished products. Sorry.      15:26:54
13   A   Right.                15:26:56
14       MR. LAHAD: Is that how you understood   15:26:58
15 the question?                15:27:00
16       THE WITNESS: Yes.          15:27:01
17 BY MS. LIN:                 15:27:03
18   Q   When Circuit City sold CRT finished     15:27:05
19 products below cost, did the person setting the   15:27:09
20 price know that they were setting it below store?  15:27:12
21   A   The buyer would know, yes.        15:27:15
22   Q   Could an individual store set a CRT    15:27:20
23 finished product sale below cost without realizing   15:27:22
24 it was doing so?                15:27:25
25       MR. GRALEWSKI: Objection, form.       15:27:28

Page 161

1       THE WITNESS: They had the information   15:27:30
2 to know what the costs was.            15:27:34
3 BY MS. LIN:                  15:27:36
4    Q   Could prices ever appear to be below    15:27:41
5 cost, but actually not truly be below cost, but   15:27:44
6 when factored in rebates or other vendor funding?  15:27:49
7       MR. LAHAD: Objection, lacks foundation,   15:27:54
8 vague.                   15:27:55
9       THE WITNESS: I would answer that they   15:28:00
10 are still below costs. Do you have funds       15:28:02
11 that might make your overall profitability      15:28:05
12 better, yes, but they are still below costs,    15:28:11
13 BY MS. LIN:                 15:28:15
14   Q   Given how Circuit City defines cost?    15:28:16
15   A   Right.                15:28:19
16   Q   Are you aware of laws in certain states   15:28:20
17 that prohibit below cost sales?           15:28:21
18       MR. LAHAD: Objection, scope.        15:28:25
19       MR. ROSS: Hold on a second. If you're   15:28:28
20 asking that as a 30(b)(6) witness, then no,    15:28:28
21 he is not going to answer. That is well      15:28:31
22 beyond the scope.                15:28:33
23 BY MS. LIN:                 15:28:34
24   Q   Do you know if Circuit City would raise   15:28:35
25 prices at any time to make up for below cost sales   15:28:37

41 (Pages 158 - 161)

Page 162

1 that occurred during another time period?    15:28:41
2     MR. LAHAD: Vague as to when you say "at    15:28:46
3 another time period." Are you talking about    15:28:47
4 a time period other than the relevant time    15:28:49
5 period we are talking about?    15:28:52
6 BY MS. LIN:    15:28:52
7    Q    No. So if a low-cost sale occurred --    15:28:52
8 No. If a below-cost sale occurred at one time,    15:28:55
9 would Circuit City ever at a different point in    15:29:03
10 time than when that low sale occurred raise prices    15:29:06
11 to make up for the low cost incurred during the    15:29:09
12 low-cost sale?    15:29:12
13     MR. LAHAD: Vague.    15:29:14
14     THE WITNESS: Right, that scenario    15:29:15
15 doesn't sound viable because you still have    15:29:17
16 to have the product priced at a competitive    15:29:21
17 price. So we are not going to price above    15:29:23
18 the competitive level.    15:29:26
19     We are not going to price above a    15:29:28
20 manufacturer's suggested retail price with    15:29:30
21 the hopes that that we sell a couple that    15:29:32
22 make the margin because you are not going to    15:29:34
23 sell them.    15:29:36
24 BY MS. LIN:    15:29:40
25    Q    Do you recall Circuit City using any    15:29:41

Page 163

1 thirty-party companies to provide information to    15:29:47
2 it about the CRT finished product market?    15:29:49
3     MR. LAHAD: Vague.    15:29:56
4     THE WITNESS: Yes.    15:29:59
5 BY MS. LIN:    15:30:00
6    Q    Which third-party companies?    15:30:02
7    A    We used NPD. We used CEA. We also used    15:30:04
8 other forecasters like Forrester for various    15:30:14
9 times. I don't know whether CRT would have been    15:30:18
10 specific to that.    15:30:21
11     And that is the overall market is, the    15:30:25
12 type, are you talking about the selling market,    15:30:27
13 then that is what I have answered for.    15:30:32
14    Q    What types of information did these    15:30:35
15 companies provide to Circuit City about CRT    15:30:37
16 finished product market?    15:30:40
17    A    Typically, and CEA is what they call    15:30:43
18 "sell in data," NDP would sell-out data and    15:30:48
19 neither were all inclusive.    15:30:52
20     You could only use them as indicators.    15:30:55
21 They were not 100 percent accurate.    15:30:58
22     It would provide the size of the market,    15:31:02
23 so CRT, 13-inch TVs, are 2 million sales, units a    15:31:05
24 year, it would give you the forecast of what it is    15:31:18
25 going to be for usually a rolling three years kind    15:31:24

Page 164

1 of thing, but sometimes less.    15:31:29
2     It might give you an average selling    15:31:32
3 price. It could depending on which company you    15:31:41
4 are working with, it might give you the share of    15:31:50
5 market for a model or a brand, so Sony has 50    15:31:53
6 percent of the market, or this specific product    15:32:00
7 has 6 percent of the market.    15:32:02
8    Q    Do you know how Circuit City made use of    15:32:05
9 the information it was obtaining from these    15:32:07
10 third-party companies about the CRT finished    15:32:09
11 product market?    15:32:12
12    A    We used it for budgeting processes. We    15:32:13
13 used it for forecasting of our inventory    15:32:15
14 processes, and now we used it as sort of a report    15:32:19
15 card on how we are doing versus others. We used    15:32:23
16 it as helping us to decide the size of our    15:32:26
17 programs or our assortments.    15:32:31
18    Q    Who were Circuit City's competitors    15:32:35
19 during the relevant time period?    15:32:38
20    A    I used to joke, "It is everybody." But    15:32:41
21 the biggest competitors for consumer electronics    15:32:44
22 during this period of time would have been Best    15:32:48
23 Buy, Wal-Mart, Amazon, the sort of the three    15:32:50
24 biggies, and then you also had Target and we had    15:32:58
25 regional competitors that varied by marketplace    15:33:06

Page 165

1 and there are dozens of those.    15:33:09
2    Q    Were there any competitors that Circuit    15:33:15
3 City considered particularly significant in the    15:33:17
4 CRT finished product market?    15:33:20
5    A    Because Best Buy was the other large    15:33:22
6 consumer electronics store, they were clearly a    15:33:28
7 focus, but both Wal-Mart and Amazon market share    15:33:29
8 for consumer electronics grew over this period of    15:33:37
9 time that we are talking about, so like in 1995,    15:33:40
10 maybe Amazon was not a big deal, but by 2007, they    15:33:45
11 were a huge issue.    15:33:49
12    Q    Were there any positions at Circuit City    15:33:53
13 responsible for monitoring the CRT finished    15:33:57
14 product costs to consumers charged by Circuit    15:33:59
15 City's competitors?    15:34:03
16    A    You just asked me if we had anybody that    15:34:06
17 monitored the cost that other people had?    15:34:09
18    Q    I said cost to consumer, so the prices,    15:34:12
19 I am sorry, we are using those interchangeably?    15:34:15
20    A    Now we are on the other side.    15:34:17
21    Q    Yes, now we are on the other side. Were    15:34:19
22 there any people at Circuit City that were    15:34:22
23 responsible for monitoring the prices Circuit    15:34:23
24 City's competitors charged to customers?    15:34:27
25    A    You could argue that everybody in    15:34:30

42 (Pages 162 - 165)



Page 166

1 merchandise was responsible and everybody in sales   15:34:32
2 was responsible because you need to have that   15:34:35
3 information to be competitive and just know what   15:34:37
4 is going on around you.   15:34:41
5     Specifically, the people who do ads   15:34:43
6 which is sometimes as an ad manager, and sometimes   15:34:52
7 it was the buyer, and sometimes it was as product   15:34:52
8 specialist, and so on, would keep track of what   15:34:57
9 prices our competitors advertised at and we would   15:34:59
10 react to those ad prices.   15:35:05
11     Their everyday pricing that was out   15:35:10
12 there in the field, Best Buy and Wal-Mart, and so   15:35:13
13 on, they tended to do the same thing we did which   15:35:17
14 is to price nationally.   15:35:22
15     As a buyer you could go out and shop   15:35:25
16 your own product and see what the other guy was   15:35:28
17 selling the product for individually.   15:35:31
18     But we also had people as we talked   15:35:34
19 about that would go out and visit our competitors   15:35:37
20 and look at what their pricing is and communicate   15:35:41
21 that back to the merchandising team to decide if   15:35:46
22 we are going to react to it.   15:35:52
23   Q   Was that a specific role or job title   15:35:54
24 that someone went out to shop competitors' prices?   15:35:57
25   A   No.  We used everybody that was in the   15:36:01

Page 167

1 stores would shop, so no, there wasn't a single   15:36:04
2 title.   15:36:11
3   Q   Did Circuit City gather information   15:36:16
4 about its competitor's discounts?   15:36:22
5   A   As I said, if the competitor ran a sale,   15:36:27
6 we tracked that very closely because they are very   15:36:31
7 visible and it is easy to see and it has an   15:36:35
8 impact.   15:36:39
9     If they discounted their product on the   15:36:42
10 floor, then it is less visible and hopefully one   15:36:46
11 of our standard reports catches that information,   15:36:48
12 again, we probably would not react to it if it is   15:36:54
13 a short term type of a thing, but yes.   15:36:58
14   Q   You referenced a standard report, what   15:37:02
15 were those?   15:37:05
16   A   I am sorry.  I think I would have to   15:37:06
17 have it read back to me to make sure.   15:37:13
18   MR. ROSS:  You're missing a word.   15:37:16
19 BY MS. LIN:   15:37:16
20   Q   Maybe instead, standard shopping report?   15:37:19
21   MR. ROSS:  There you go.   15:37:21
22   THE WITNESS:  Right, so we had shopping.   15:37:21
23 They would go out, and say, "These are the   15:37:24
24 prices that we found," and communicate that   15:37:27
25 back.  "Here are the prices that are lower   15:37:31

Page 168

1 than us," we call that shopping report.   15:37:34
2 BY MS. LIN:   15:37:36
3   Q   How frequently were shopping reports   15:37:36
4 drafted?   15:37:39
5   A   Typically, if you were doing them in   15:37:40
6 all, they would be on a weekly basis, but there   15:37:43
7 were periods where you did not do them, as I said,   15:37:48
8 because we were not going to do anything with   15:37:50
9 them, so why waste people's time?   15:37:52
10     Again not only would Christmas time be   15:37:54
11 so hectic that people do not go from store to   15:38:00
12 store as often, but you also don't have any people   15:38:02
13 that are not busy, so you cannot send them out.   15:38:04
14   Q   Were shopping reports created throughout   15:38:10
15 the relevant period?   15:38:12
16   A   Yes.   15:38:14
17   Q   Did Circuit City ever use customer   15:38:21
18 surveys to monitor its competitors' prices?   15:38:23
19   MR. LAHAD:  During the relevant time   15:38:28
20 period for CRT finished products?   15:38:30
21   MS. LIN:  Yes.   15:38:32
22   THE WITNESS:  I don't know of any cases   15:38:33
23 where we used it to monitor retail prices,   15:38:34
24 no.   15:38:38
25   MS. LIN:  Do you want to take a short   15:38:44

Page 169

1 break or keep going?   15:38:44
2   MR. ROSS:  Let's take a break.   15:38:47
3   MS. LIN:  Let's take a short break.   15:38:48
4   THE VIDEOGRAPHER:  The time is   15:38:49
5 approximately 3:38 p.m. and we are off the   15:38:49
6 record.   15:38:51
7 (Whereupon, a break in the proceedings commenced   15:39:08
8 at 3:38 p.m. and on resuming at 3:50 p.m.)   15:39:08
9   THE VIDEOGRAPHER:  The time is   15:50:21
10 approximately 3:50 p.m. and we are back on   15:50:21
11 the record.   15:50:25
12 (Whereupon, Deposition Exhibit 2843 is marked for   15:50:28
13 Identification.)   15:50:28
14   MS. LIN:  I am going to mark another   15:50:28
15 document for you, I am marking Exhibit 2843,   15:50:29
16 a document Bates labeled CC 0021806.   15:50:34
17 BY MS. LIN:   15:50:40
18   Q   Are you familiar with the pricing   15:50:40
19 process described on the first page of Exhibit   15:51:24
20 2843?   15:51:26
21   A   I am familiar with many such processes.   15:51:29
22   Q   Do you know when this pricing process   15:51:34
23 was adopted by Circuit City?   15:51:38
24   MR. LAHAD:  Objection, assumes facts,   15:51:40
25   MS. LIN:  Strike that.   15:51:43

43 (Pages 166 - 169)

Page 170

1  BY MS. LIN:                          15:51:43
2    Q   Was a pricing process of this kind in   15:51:43
3  place at Circuit City?                 15:51:47
4    A   Yes, and to answer your question about   15:51:50
5  when, I do not know when this was produced. The   15:51:54
6  reason why I said many such documents is because   15:52:03
7  this would change.                     15:52:05
8    Q   What was the pricing process here   15:52:08
9  generally referring to?                15:52:11
10   A   This is referring to how the everyday   15:52:13
11  pricing is set and who is going to provide   15:52:19
12  information and input on any other changes that   15:52:23
13  need to be done.                       15:52:26
14   Q   Were there specific employees whose job   15:52:30
15  title was market leader?                15:52:33
16   A   Yes, for this time period.          15:52:37
17   Q   Was that the job title, market reader?   15:52:42
18   A   I believe what they are referring to is   15:52:47
19  the – No, I am sorry. I think what we are   15:52:50
20  referring to is a person that has been designated   15:53:04
21  in a market to be a market leader, this would be a   15:53:09
22  store manager or a division merchandise manager   15:53:12
23  generally.                             15:53:16
24   Q   So market leader was not a full time   15:53:16
25  position. It was an assignment?         15:53:19

Page 171

1    A   Yes.                          15:53:20
2    Q   What about pricing coordinator, was that   15:53:21
3  a particular position at Circuit City at any time?   15:53:25
4    A   Yes, there were pricing coordinators at   15:53:29
5  various times.                         15:53:34
6    Q   Was pricing coordinator a job title used   15:53:34
7  by Circuit City?                       15:53:38
8    A   Yes.                          15:53:39
9    Q   Can you recall anyone that held a   15:53:42
10  pricing coordinator position that related to CRT   15:53:44
11  finished products?                     15:53:47
12   A   This is a pricing coordinator in the   15:53:48
13  field, so this is a specific person who would have   15:53:51
14  worked in a store that would have been for   15:53:55
15  reporting to the market leader, as it says, that   15:53:58
16  would go out into those shops. I can't name a   15:54:00
17  person who had that position.           15:54:05
18   Q   Would that be a full-time position doing   15:54:06
19  the duties described in the pricing coordinator   15:54:08
20  box per store?                         15:54:12
21   A   No, not per store. Per market.       15:54:18
22   Q   Per market. What constituted a market   15:54:21
23  by that definition?                    15:54:24
24   A   A market would be an area that will be   15:54:26
25  determined by the ad market, so it would have been   15:54:32

Page 172

1  where the newspaper has an influence,     15:54:37
2  predominantly large cities, small cities may not   15:54:41
3  have had a market leader and they certainly would   15:54:46
4  have had a pricing coordinator.          15:54:51
5    Q   Turn to the next page. If you look at a   15:54:53
6  market leader role description, the second row   15:55:00
7  second column, do you know what the acronym TMI   15:55:05
8  means?                                 15:55:09
9    A   "Total" something "Income," but   15:55:17
10  basically, it is profit dollars. By the way, it   15:55:22
11  says, "market leaders are either a GM, a DM or   15:55:32
12  store manager."                        15:55:37
13   Q   I see, and GM and DM mean general manager   15:55:37
14  and district manager respectively?       15:55:42
15   A   Correct.                      15:55:45
16   Q   Are you familiar with the acronym PSB?   15:55:47
17   A   Yes.                          15:55:55
18   Q   What does PSB mean?               15:55:56
19   A   Program strategy book.            15:55:57
20   Q   What was the program strategy book?   15:56:02
21   A   The program strategy book was the   15:56:05
22  store's weekly. They got one on a weekly basis.   15:56:08
23  It would say, "Here are all the products that you   15:56:17
24  carry. Here are the prices that you are to price   15:56:22
25  them at on the floor," and it would also include   15:56:27

Page 173

1  data like store cost and it will include sales   15:56:28
2  data.                                  15:56:34
3    Q   Do you know the acronym CMB?         15:56:36
4    A   Where is that used here? CBM was our   15:56:41
5  acronym for class brand model.          15:56:52
6    Q   So that is CBM. So what is class brand   15:56:55
7  model?                                 15:56:58
8    A   Class would be like products all grouped   15:56:58
9  together. So they are a television, 13-inch TVs   15:57:07
10  might be a class, and then the brand and then the   15:57:11
11  specific model number.                 15:57:18
12   Q   Each CRT finished products could be   15:57:19
13  defined with its CMB?                  15:57:22
14   A   Yes, CBM, yes.                   15:57:25
15   Q   CBM, thank you. On that page ending in   15:57:26
16  Bates Number 07, the one that you were telling me.   15:57:32
17   A   Oh, there it is.                 15:57:38
18   Q   Under market leader and then market   15:57:40
19  Level CTC?                             15:57:44
20   A   Yes.                          15:57:46
21   Q   It says, "Competitively prices market to   15:57:49
22  focus competitors." Is focus competitors a term   15:57:52
23  you are familiar with?                 15:57:55
24   A   Yes.                          15:57:56
25   Q   What does that mean?              15:57:57

44 (Pages 170 - 173)

**Page 174**

1 A   It means those that we have chosen to   15:57:58
2 react to as we discussed earlier, the key   15:58:01
3 competitors.   15:58:07
4 Q   Circuit City selected key focus   15:58:10
5 competitors to react to in terms of changing its   15:58:12
6 product prices?   15:58:16
7 A   Yes.   15:58:17
8 Q   Are you familiar with the phrase   15:58:22
9 strategy shops?   15:58:24
10 A   Yes.   15:58:24
11 Q   What does that mean?   15:58:25
12 A   It basically means that you are trying   15:58:28
13 to understand what the store does to make the   15:58:31
14 sale.   15:58:40
15   Do they have a strategy that they are   15:58:41
16 going to say, just like our strategies, that they   15:58:43
17 are, "Going to sell the stereo TVs, and by the   15:58:50
18 way, we have more stereo TVs than Circuit City   15:58:55
19 does."   15:58:58
20 Q   A strategy shop is an effort to learn   15:58:59
21 what strategies a competitor of Circuit City's is   15:59:01
22 using to sell products?   15:59:03
23 A   Yes.   15:59:05
24 Q   And Circuit City used strategy shops to   15:59:06
25 learn that information?   15:59:09

**Page 175**

1 A   Mostly, the buyer would do those sort of   15:59:10
2 things because they tend to be not as obvious.   15:59:15
3   But, yes, we would try to understand.   15:59:20
4 The strategy might just simply be Circuit City has   15:59:22
5 commission salespeople and that is what Best Buy   15:59:29
6 would tell every single person.   15:59:31
7   "Our people are non-commission. They   15:59:35
8 are lying to you," so you need to know that so you   15:59:35
9 would be able to overcome an objection that your   15:59:39
10 customer might have.   15:59:42
11 Q   Do you know what tactical shops were?   15:59:44
12 A   The tacticals are the specific prices, I   15:59:47
13 believe.   15:59:53
14 Q   Circuit City shopped its competitors to   15:59:54
15 find out its price information through tactical   15:59:59
16 shops?   16:00:01
17 A   Where are you reading it and I will see   16:00:04
18 if I can --   16:00:06
19 Q   So under market leader shopping process?   16:00:06
20 A   Yes, basically saying, "Go out and find   16:00:16
21 out what the prices are." That is your tactical   16:00:20
22 shop.   16:00:24
23   "Go out and find out what they are   16:00:24
24 saying to make people buy from them and instead   16:00:25
25 buy from you."   16:00:28

**Page 176**

1 Q   Going back to the box you were looking   16:00:31
2 at previously, as market leader, market level   16:00:33
3 CTCs, what does it means for Circuit City to   16:00:36
4 competitively price the market?   16:00:39
5 A   It means to react to the focus   16:00:42
6 competitor by changing your price to be   16:00:46
7 competitive with your focus competitors.   16:00:50
8 Q   Did Circuit City think it could best set   16:00:54
9 competitive prices by knowing the prices charged   16:00:57
10 by its competitors in the market?   16:00:59
11   MR. LAHAD:  Again talking about CRT   16:01:08
12 finished products during the relevant time   16:01:14
13 period?   16:01:17
14   MS. LIN:  Generally speaking.   16:01:17
15   THE WITNESS:  Ask again. Sorry.   16:01:19
16 BY MS. LIN:   16:01:22
17 Q   Did Circuit City think it could best set   16:01:23
18 competitive prices by knowing the prices charged   16:01:26
19 by its competitors in the marketplace?   16:01:28
20 A   I think that's the definition of   16:01:31
21 competitive prices, so by definition, yes.   16:01:34
22 Q   Could I have you go to the next page? I   16:01:39
23 want to direct your attention to the box "District   16:01:40
24 Manager" and "Store Execution."   16:01:47
25   Do you know what it means there by test,   16:01:54

**Page 177**

1 the store management's knowledge?   16:01:55
2 A   He is basically saying that the district   16:02:01
3 manager needs to say, "Does the store management   16:02:04
4 know what the competitors are up to? Does he know   16:02:15
5 that the guy who is next door is lower than him on   16:02:18
6 ten items?"   16:02:25
7 Q   Circuit City expected its store managers   16:02:27
8 to know that type of information about its   16:02:30
9 competitors' sales prices?   16:02:32
10 A   He expected them to be able to create an   16:02:35
11 environment that kept us competitive.   16:02:38
12 Q   In creating that environment it included   16:02:42
13 knowing the prices charged by competitors.   16:02:46
14 A   The manager himself may not know those,   16:02:49
15 but because he has got people that has sent out to   16:02:52
16 do shopping reports, and because he looks at ads   16:02:56
17 and other activity that is public, he should have   16:03:00
18 some idea of what is going on in the business.   16:03:07
19 Q   Looking at the next row down that is   16:03:10
20 titled "Ad Advice," is it correct that it is a   16:03:13
21 weekly or a daily responsibility of the employees   16:03:18
22 listed on this chart to review competitor ads for   16:03:21
23 strategic and pricing information?   16:03:26
24 A   It would appear to be, yes, but almost   16:03:27
25 everybody in the company looked at competitor ads   16:03:31

Page 178

1 just again so he would know what was going on.    16:03:34
2    Q   Can I have you turn two pages forward to    16:03:54
3 the page ending in 21810 under pricing    16:03:57
4 coordinator's monthly responsibilities, do you see    16:04:06
5 where it says "communicate monthly shopping    16:04:09
6 calendar"?    16:04:11
7    A   Yes,    16:04:12
8    Q   What does that mean?    16:04:13
9    A   The pricing coordinator is saying who we    16:04:15
10 are going to shop and when we are to shop them.    16:04:21
11    Q   So the pricing coordinator would send    16:04:25
12 out assignments to shop other stores?    16:04:27
13    A   One price coordinator typically could    16:04:30
14 not do all the shopping, so he is going to say,    16:04:33
15 "This store needs to help me by shopping this, and    16:04:38
16 this store needs to help me by shopping that," and    16:04:42
17 so on, so he can get or she can get all of their    16:04:44
18 information together.    16:04:48
19    Q   Going to the daily column row for sale    16:04:55
20 counselors. So the bottom white box on the same    16:05:02
21 page, where it says, "Put up take down price tags    16:05:06
22 as directed by sales managers."    16:05:10
23    Was putting up or taking down price tags    16:05:12
24 as directed by sales managers a daily function of    16:05:14
25 sales counselors at Circuit City?    16:05:18

Page 179

1    A   No. It is listed under daily, but it    16:05:20
2 wasn't a daily activity. You had pricing that    16:05:26
3 happened on a week long basis because your PSB    16:05:30
4 came out and it talked about the promo report, so    16:05:37
5 you had a promo report that had to be tagged.    16:05:40
6    If you had a competitive price reaction,    16:05:43
7 it could happen off of that cycle, but we    16:05:45
8 specifically tried to tie those cycles so that    16:05:53
9 they didn't have to do it every single day.    16:05:55
10    You would typically say the ad, start on    16:05:59
11 Sunday, they end on Saturday, so Sunday is the day    16:06:02
12 where you put everything up. However, your    16:06:05
13 competitors run their ads on Sunday also, so you    16:06:09
14 have got to have a reaction to that and those may    16:06:13
15 be up Monday or they may be up Tuesday.    16:06:17
16    You had two or three days that had high    16:06:20
17 activity. You may also have another ad during the    16:06:24
18 week like a Thursday or Friday.    16:06:28
19    Q   And high activity in that context would    16:06:31
20 mean changing prices to react to a competitor's    16:06:34
21 prices?    16:06:37
22    A   Mostly it's because you're having an ad    16:06:38
23 and you have got all of these changes that you    16:06:41
24 have got to do to do your own add.    16:06:44
25    There would be far more changes based on    16:06:46

Page 180

1 our own promotional calendar than there would be    16:06:49
2 your competitor's calendar.    16:06:51
3    Q   Was Circuit City's promotional calendar    16:06:53
4 driven in part by competitor's prices?    16:06:56
5    A   It was driven by competitor's ad prices.    16:06:59
6    Q   Can I have you turn to the following    16:07:04
7 page. Do you know who Tim Kopp is, the name at    16:07:05
8 the top of this page?    16:07:12
9    A   I remember the name. I do not know him.    16:07:14
10    Q   Do you know what role Mr. Kopp had at    16:07:17
11 Circuit City?    16:07:20
12    A   No.    16:07:21
13    Q   Are you familiar with the corporate    16:07:22
14 operations department?    16:07:24
15    A   Yes.    16:07:25
16    Q   What is that?    16:07:25
17    A   That would be the store management group    16:07:26
18 and everybody in the store. For us "operations"    16:07:30
19 was everybody that ran the stores that worked in    16:07:36
20 the stores.    16:07:39
21    Q   So that corporate operations meant    16:07:40
22 anybody that worked in any Circuit City store?    16:07:42
23    A   Corporate operations would be the    16:07:44
24 supervisors for the people who worked in    16:07:47
25 stores.    16:07:49

Page 181

1    Q   Was corporate operations located in    16:07:50
2 Richmond?    16:07:53
3    A   Yes.    16:07:54
4    Q   This document refers to A and B prices.    16:07:56
5 Are you familiar with those terms?    16:07:59
6    MR. LAHAD:   For the record, this    16:08:02
7 document appears to be a draft. It has got    16:08:03
8 strike-throughs and underlines. It looks    16:08:07
9 like a red line and it has got the black    16:08:10
10 lines on the side.    16:08:11
11    To the extent that you want to ask him    16:08:12
12 about a document that is clearly a draft, I    16:08:14
13 will object in that it lacks foundation as    16:08:18
14 to what this document really is.    16:08:21
15 BY MS. LIN:    16:08:24
16    Q   Do you see at the top of the document,    16:08:24
17 it says, "supersedes"?    16:08:26
18    A   Yes.    16:08:29
19    Q   Do you see the date there is July 31,    16:08:31
20 1996?    16:08:34
21    A   Yes.    16:08:34
22    Q   Do you understand that that would mean    16:08:37
23 that the version, that parts of this document that    16:08:39
24 are not red lined are underlined were in the    16:08:42
25 original policy?    16:08:46

46 (Pages 178 - 181)





Page 182

1    MR. LAHAD: Calls for speculation, lacks    16:08:47
2 foundation.    16:08:49
3    THE WITNESS: That would be what it    16:08:50
4 appears, yes.    16:08:54
5 BY MS. LIN:    16:08:55
6    Q   You are familiar with store pricing    16:08:55
7 policies other than this document?    16:08:57
8    A   Yes.    16:09:02
9    Q   Did those store pricing policies include    16:09:03
10 information about shopping competitors' retail    16:09:06
11 prices just like we have been discussing?    16:09:07
12    A   Yes.    16:09:12
13    Q   Are you familiar with the terms A and B    16:09:13
14 pricing at Circuit City?    16:09:14
15    A   Yes.    16:09:16
16    Q   What does that mean?    16:09:16
17    A   The A price was the price that you were    16:09:18
18 tagged at the majority of the time.    16:09:23
19    The B price was most often your ad price    16:09:28
20 which quite often aligned with the manufacturer's    16:09:36
21 minimum advertised price.    16:09:40
22    But the price that would show up in the    16:09:44
23 stores -- the B price was created for the ease of    16:09:48
24 changing our own pricing so that you could say, "I    16:09:55
25 want to put all CRT TV on sale," then it would all    16:10:01

Page 183

1 go to B price. It was used as a process for our    16:10:06
2 promotional purposes.    16:10:11
3    Q   Did A price tend to be higher or B    16:10:15
4 price?    16:10:18
5    A   A price is the everyday higher price.    16:10:18
6    Q   Do you know what PSB price in this    16:10:28
7 document means?    16:10:31
8    A   It is the A price would have been --    16:10:32
9 well, at one point, the PSB would show you both an    16:10:36
10 A and B price, but the PSB is what we discussed    16:10:40
11 earlier.    16:10:45
12    So the PSB price could have been either    16:10:46
13 the A price or the B price. I believe he is    16:10:48
14 saying here the A PSB price.    16:10:52
15    Q   Sorry, remind me, what is the acronym    16:10:55
16 for PSB?    16:10:58
17    A   Program Strategy Book.    16:10:58
18    Q   That's right. Can I have you turn to    16:11:00
19 the page ending in Bates No. 21813, so two pages    16:11:03
20 forward and under the heading advertised prices,    16:11:13
21 can you read the sentence beginning, "Our    16:11:15
22 Strategy?"    16:11:20
23    A   "Our strategy is not to initiate    16:11:39
24 advertised prices lower than the prevailing market    16:11:41
25 advertised price."    16:11:44

Page 184

1    Q   Was that Circuit City's strategy to your    16:11:45
2 understanding?    16:11:49
3    MR. LAHAD: I will object again on the    16:11:50
4 basis that this is a draft document. He is    16:11:50
5 reading part of the red line version of this    16:11:53
6 document.    16:11:56
7    THE WITNESS: It may have been our    16:11:59
8 strategy at various times during this period    16:12:05
9 of time.    16:12:07
10 BY MS. LIN:    16:12:08
11    Q   Are you familiar with when Circuit    16:12:09
12 City's strategy was not to initiate advertised    16:12:12
13 prices lower than the prevailing market price?    16:12:13
14    A   Well, our overall strategy is to    16:12:16
15 maximize the profitability of our products, so we    16:12:21
16 always had an overall strategy or we had reason    16:12:24
17 not to be driving pricing down, but we also had to    16:12:32
18 have exceptions to that which is that our ad    16:12:39
19 prices had to be effective.    16:12:41
20    What this is saying at the field level    16:12:45
21 is that we are going to price where we are    16:12:51
22 competitive and we are not looking for you to    16:13:00
23 change an ad and drive your market down and so on.    16:13:04
24    By this time, I don't know that they    16:13:11
25 could have even changed an ad if they wanted to.    16:13:14

Page 185

1    Q   Do you know of any point in time when    16:13:17
2 Circuit City's strategy was to initiate advertised    16:13:19
3 prices lower than the prevailing market advertised    16:13:23
4 price?    16:13:26
5    A   If sales are bad, then we have to do    16:13:27
6 what we have to do to create sales.    16:13:32
7    Although you have an overall strategy    16:13:36
8 that says that you are trying to make the most    16:13:39
9 amount of profit possible by putting a product out    16:13:42
10 there at a competitive price and getting a sale,    16:13:47
11 if you're not getting sales, then you may choose    16:13:49
12 to do something else.    16:13:53
13    Q   And other specific times that you are    16:13:58
14 aware of that Circuit City elected to follow a    16:14:00
15 policy of initiating the lowest advertised price    16:14:04
16 with respect to CRT finished products?    16:14:07
17    A   During Black Friday because it is so    16:14:09
18 important to setting the tone for the Christmas    16:14:20
19 period, we specifically wanted to win.    16:14:22
20    We did not want to get beat.    16:14:27
21    You might be okay if you match, but    16:14:31
22 since you don't have a clue what the other guy is    16:14:34
23 going to advertise, you get very aggressive    16:14:37
24 because you know that it is a time that people get    16:14:41
25 very aggressive.    16:14:44

47 (Pages 182 - 185)

Page 186

1 Q Were there times other than Black Friday 16:14:46
2 sales where Circuit City would advertise CRT 16:14:48
3 finished products lower than other advertised 16:14:51
4 prices for CRT finished products by competitors? 16:14:54
5 A You would do it for the same reasons we 16:14:57
6 talked about pricing in general which is, if you 16:15:00
7 had an excess inventory of a product, and you 16:15:02
8 needed to get rid of it, then you're going to 16:15:05
9 advertise it at what you think it needs to be done 16:15:08
10 to sell it. 16:15:10
11 If you weren't competitive on one 16:15:15
12 product because you did not carry it or whatever 16:15:17
13 you might get more competitive on another product, 16:15:19
14 but in all cases, it could drive additional sell 16:15:23
15 through. 16:15:28
16 (Whereupon, Deposition Exhibit 2844 is marked for 16:15:31
17 Identification.) 16:15:31
18 MS. LIN: You can put that document 16:15:31
19 aside. I will mark a document, Exhibit 2844. 16:15:31
20 Bates No. CC 0606306. 16:15:48
21 BY MS. LIN: 16:15:53
22 Q Mr. Denson, are you familiar with any of 16:15:54
23 the people on the email Exhibit 2844? 16:16:28
24 A Yes. 16:16:31
25 Q Who is Mr. Fiori? 16:16:33

Page 187

1 A He is working in what at this time is 16:16:35
2 what's called a pricing team, I believe. He could 16:16:41
3 have also been doing this based on November 25, 16:16:45
4 2007, yes, probably pricing team, sorry. 16:16:49
5 Q What was the pricing team? 16:16:53
6 A We had a pricing team that helped make 16:16:56
7 sure that all the downloads were correct and that 16:17:01
8 we were dealing with the end of life product and 16:17:05
9 end pricing down into end of life product. 16:17:08
10 Buyers could deal with product that was 16:17:12
11 continually product still being sold, still being 16:17:16
12 in all stores, but invariably you would end up 16:17:20
13 with leftovers and those did not get high 16:17:23
14 visibility, so the pricing team would say, "You 16:17:27

about ──

15 have got 400 of these and you have funded them for 16:17:28
16 four months, what are you doing with it?" 16:17:32
17 Q What does it mean to download a product? 16:17:34
18 A Downloaded means that you are 16:17:36
19 downloading a price for the stores so that they 16:17:38
20 would then tag to that price so that when they 16:17:43
21 went to sell it it would automatically come up: 16:17:46
22 that price. 16:17:51
23 Q Does downloading a price mean to 16:17:51
24 decrease a price? 16:17:54
25 A Well, no, it could mean that you 16:17:54

Page 188

1 increased the price, but it just means that you 16:17:58
2 have put it in the system where it will come up. 16:18:01
3 MR. LAHAD: My page 2 on this is exhibit 16:18:05
4 is blank. 16:18:08
5 THE WITNESS: Mine is too. 16:18:09
6 MS. LIN: I think that is just how it 16:18:11
7 was produced. 16:18:13
8 BY MS. LIN: 16:18:16
9 Q Downloading a price effectively means to 16:18:16
10 put the electronic system used by stores to learn 16:18:22
11 their prices? 16:18:26
12 A Right, it specifically refers to the way 16:18:27
13 our computer processed input overnight and then 16:18:29
14 downloaded that to the stores. 16:18:35
15 Q You were discussing a pricing team 16:18:36
16 previously. How big was the pricing team, do you 16:18:38
17 know? 16:18:41
18 A I think at its largest it might have 16:18:44
19 been as many as five, six people. I don't know 16:18:46
20 precisely. 16:18:51
21 Q Was that team located in one location? 16:18:53
22 A Richmond, Virginia. 16:18:56
23 Q Do you know when the pricing team was 16:18:57
24 created? 16:19:00
25 A I believe it was around 2004. Similar 16:19:03

Page 189

1 to when we started the BMA. 16:19:09
2 Q At the end of the CC line on Exhibit 16:19:13
3 2844, there are two emails ending in 16:19:16
4 "Deloitte.com." Are you familiar with either of 16:19:19
5 those people? 16:19:24
6 A No. 16:19:28
7 Q Do you know why employees from Deloitte 16:19:30
8 might be cc'd on an email about Circuit City's 16:19:33
9 pricing? 16:19:36
10 A Yes. 16:19:37
11 Q Why's that? 16:19:37
12 A They were a consultant. 16:19:38
13 Q What were they consulting Circuit City 16:19:40
14 on? 16:19:43
15 A Practically everything. I don't know 16:19:45
16 whether Deloitte specifically was that broad, but 16:19:47
17 this was a time period when Circuit City was 16:19:51
18 suffering and they had brought in quite a bit of 16:19:54
19 consultants to evaluate practically everything 16:19:58
20 that we did at the corporate level. 16:20:01
21 Q The subject of this e-mail is, "Best Buy 16:20:04
22 Reactions Week of 11/25," do you see that? 16:20:06
23 A Yes. 16:20:10
24 Q What do you understand that to mean? 16:20:12
25 A What I would understand it to mean is 16:20:15

48 (Pages 186 - 189)



Page 190

1 that, "This is what we are doing this week in   16:20:19
2 reaction to the Best Buy's ad of this week of   16:20:21
3 11/25, which by the way, is probably including   16:20:25
4 Thanksgiving and Black Friday."   16:20:29
5    Q   Do you know if Circuit City had weekly   16:20:30
6 reactions to Best Buy's ads?   16:20:33
7    A   We did at times.   16:20:35
8    Q   Do you know at what time Circuit City   16:20:39
9 had weekly reactions to Best Buy's ads?   16:20:41
10    A   As you can see here, he is talking about   16:20:44
11 that he is not going to download it for everybody,   16:20:47
12 he is only going to download it for 100 stores.   16:20:50
13    At other times we did not download   16:20:53
14 anything from corporate level. Everything was   16:20:55
15 done at the store level and then as we discussed   16:20:58
16 earlier there were times when we did not react.   16:21:03
17    Q   And the Best Buy reactions described in   16:21:06
18 Exhibit 2844 are all price reductions by Circuit   16:21:10
19 City, is that right?   16:21:13
20    A   That would be logical.   16:21:15
21    Q   Because Circuit City was typically   16:21:24
22 reducing its prices when it was responding to the   16:21:27
23 Best Buy?   16:21:30
24    A   Well, it's logical because you typically   16:21:31
25 don't have to go up to stay competitive. You   16:21:33

Page 191

1 typically have to go down to stay competitive.   16:21:36
2    Q   Did Circuit City ever ask its CRT   16:21:54
3 finished product vendors about the prices at which   16:21:57
4 they were selling to Circuit City competitors?   16:22:00
5    A   No.   16:22:02
6    Q   Was anyone at Circuit City responsible   16:22:03
7 for trying to gather that type of information   16:22:05
8 about the prices at which products were sold to   16:22:07
9 Circuit City's competitors?   16:22:08
10    A   No.   16:22:11
11    MR. LAHAD: Again, you meant cost.   16:22:13
12    MS. LIN: Yes.   16:22:16
13    THE WITNESS: She said prices sold to.   16:22:17
14 BY MS. LIN:   16:22:21
15    Q   Did Circuit City consider the prices at   16:22:23
16 which its competitors were selling products to   16:22:28
17 consumers to be confidential?   16:22:30
18    A   If the price that they were selling to   16:22:34
19 consumers was public information, so no.   16:22:37
20    Q   Did Circuit City consider the volume of   16:22:40
21 competitor's inventory that was being sold to   16:22:42
22 consumers to be confidential?   16:22:45
23    MR. LAHAD: Objection, lacks foundation.   16:22:47
24    THE WITNESS: Yes.   16:22:50
25 BY MS. LIN:   16:22:51

Page 192

1    Q   During the relevant time period, did   16:22:52
2 Circuit City consider the market for CRT finished   16:22:59
3 products that it was buying and selling to be   16:23:02
4 competitive?   16:23:05
5    MR. LAHAD: Objection, vague.   16:23:09
6    THE WITNESS: I don't even know what you   16:23:10
7    are asking, sorry.   16:23:11
8 BY MS. LIN:   16:23:12
9    Q   Did Circuit City consider the market for   16:23:13
10 CRT finished product sales to consumers to be a   16:23:15
11 competitive one?   16:23:19
12    MR. LAHAD: Same objection.   16:23:19
13    THE WITNESS: Yes.   16:23:20
14 BY MS. LIN:   16:23:22
15    Q   Why was that?   16:23:22
16    A   Because all consumer electronics is   16:23:24
17 competitive.   16:23:28
18    Q   If I use the term plasma, will you   16:23:37
19 understand that to mean a type of monitor or TV   16:23:38
20 technology?   16:23:40
21    A   Yes.   16:23:41
22    Q   Did Circuit City consider plasma   16:23:41
23 products to be competitors to CRT finished   16:23:44
24 products?   16:23:46
25    MR. LAHAD: Objection, vague.   16:23:48

Page 193

1    THE WITNESS: I don't see it as a   16:23:51
2    competitor. It's another offering. It is an   16:23:53
3    alternative, I guess, we sold.   16:23:58
4 BY MS. LIN:   16:24:03
5    Q   Did plasma products and CRT finished   16:24:04
6 products compete for the same floor space in   16:24:06
7 Circuit City Stores?   16:24:11
8    A   They could.   16:24:12
9    Q   Did they ever compete for the same   16:24:12
10 customers?   16:24:15
11    A   Only to the degree that there is some   16:24:18
12 sort of convergence of similar pricing, but my   16:24:21
13 experience as a customer, and sitting on many many   16:24:26
14 video meetings, is that the pricing of plasma   16:24:31
15 product was very far apart from the retail pricing   16:24:34
16 of plasma product very far apart from pricing of   16:24:40
17 CRT product.   16:24:45
18    Of course, you have the exception again   16:24:46
19 as we talked earlier if you have a very large CRT   16:24:49
20 product, the pricing may be close.   16:24:53
21    Q   Do you know if Circuit City ever used   16:24:56
22 the cost it was paying for plasma products as part   16:25:00
23 of its negotiations in negotiating to purchase CRT   16:25:04
24 finished products?   16:25:09
25    MR. LAHAD: Vague.   16:25:12

49 (Pages 190 - 193)

Page 194

1    THE WITNESS: First of all, they are not    16:25:14
2    going to share the costs, so they cannot do    16:25:15
3    it from -- but they might have done it from a    16:25:18
4    viewpoint of, "I am going to be selling    16:25:24
5    plasma product at lower than what you are    16:25:29
6    quoting us this CRT product for," and it    16:25:31
7    looks better.    16:25:36
8    So in that context, yes.    16:25:38
9 BY MS. LIN:    16:25:39
10    Q    That would be a way to try to seek a    16:25:39
11 reduced cost to Circuit City of the CRT finished    16:25:42
12 product?    16:25:45
13    MR. LAHAD: Misstates the testimony.    16:25:46
14    THE WITNESS: Right, and it also might    16:25:47
15 explain why you are not buying it.    16:25:49
16 BY MS. LIN:    16:25:51
17    Q    If I use the term LCD, will you    16:25:51
18 understand that to mean liquid crystal display?    16:25:54
19    A    Yes.    16:25:56
20    Q    Did Circuit City consider LDC products    16:25:57
21 to be competitors to CRT finished products?    16:25:59
22    MR. LAHAD: Vague.    16:26:03
23    THE WITNESS: I would give you the exact    16:26:04
24    same answer as I did for the plasma.    16:26:05
25    There were customers who only wanted a    16:26:10

Page 195

1    certain price point and where the price    16:26:14
2    points intersect they would be competitors    16:26:17
3    and where they did not intersect they would    16:26:20
4    become less an impact to each other.    16:26:22
5 BY MS. LIN:    16:26:24
6    Q    In negotiations with CRT finished    16:26:33
7 product vendors similar to what we were discussing    16:26:33
8 in the plasma context, did Circuit City ever use    16:26:36
9 the prices of LCD finished products as a    16:26:39
10 negotiating point to purchase the CRT finished    16:26:42
11 products?    16:26:45
12    MR. LAHAD: Vague.    16:26:46
13    THE WITNESS: I would answer the same    16:26:47
14 way.  We would not be talking about the    16:26:48
15    prices that we were buying LCD product from    16:26:53
16    in specific numbers.    16:26:57
17    We would be talking about we probably    16:26:59
18    just counseled it around retail, but we can    16:27:03
19    sell this product, so that we would be able    16:27:06
20    to sell an LCD product for this price, so    16:27:11
21    therefore, we are not interested in selling    16:27:14
22    a CRT at some price.    16:27:18
23    That negotiation might be that I don't    16:27:22
24    want to buy it and does that mean that the    16:27:24
25    CRT vendor does something, then yes.    16:27:27

Page 196

1 BY MS. LIN:    16:27:32
2    Q    Did Circuit City's sales prices to    16:27:32
3 consumers on plasma products impact the prices    16:27:35
4 that Circuit City charged to consumers for CRT    16:27:39
5 finished products?    16:27:42
6    MR. LAHAD: Vague.    16:27:47
7    THE WITNESS: What we sold one product    16:27:48
8    for influence, what we sold the other product    16:27:50
9    for, the plasma versus CRT to the degree that    16:27:52
10    the customer would buy the product.    16:28:04
11 BY MS. LIN:    16:28:06
12    Q    What do you mean by that?    16:28:09
13    A    If we had a CRT product and we planned    16:28:10
14 to sell it for $400, and we had another LCD    16:28:15
15 product that we planned to sell for $500, and the    16:28:19
16 CRT product wasn't selling, then we might say that    16:28:22
17 it needs to be further away from the other    16:28:27
18 product.    16:28:29
19    Q    And CRT finished products in that    16:28:33
20 context would need to be lower than plasma or LCD    16:28:36
21 products, is that right?    16:28:39
22    A    If they were comparably featured    16:28:40
23 typically LCD product was lighter and was trending    16:28:43
24 to become popular.    16:28:49
25    MS. LIN: Let's take a quick break to    16:28:53

Page 197

1    change the tape.    16:28:52
2    THE VIDEOGRAPHER: The time is    16:28:54
3    approximately 4:28 p.m. This is end of tape    16:28:55
4    number 3.  We are off the record.    16:28:59
5 (Whereupon, a break in the proceedings commenced    16:29:14
6 at 4:28 p.m. and on resuming at 4:30 p.m.)    16:29:14
7    THE VIDEOGRAPHER: This is the beginning    16:31:13
8    of tape number 4.  The time is approximately    16:31:14
9    4:30 p.m.  We are back on the record.    16:31:17
10 BY MS. LIN:    16:31:18
11    Q    Do you know how Circuit City learned its    16:31:19
12 alleged claims in this lawsuit?    16:31:22
13    A    No.    16:31:23
14    Q    Did you know why Circuit City came to    16:31:26
15 believe that defendants engaged in the alleged    16:31:28
16 conspiracy without revealing any communications    16:31:30
17 with your counsel?    16:31:35
18    A    I have seen interrogatories on the LCD    16:31:37
19 case that would --    16:31:44
20    MR. ROSS: Let me stop you there.  That    16:31:48
21    is different.    16:31:49
22    THE WITNESS: I have not seen anything    16:31:49
23    on this.    16:31:51
24 BY MS. LIN:    16:31:54
25    Q    During the relevant time period, did    16:31:54

50 (Pages 194 - 197)



Page 198

```
 1  anyone at Circuit City suspect that prices of CRT    16:31:56
 2  finished products were being kept high because of    16:31:59
 3  any price fixing?                                     16:32:03
 4      A   No.                                           16:32:05
 5      (Whereupon, Deposition Exhibit 2845 is marked for  16:32:05
 6  Identification.)                                      16:32:05
 7      MS. LIN:  I am going to mark an exhibit           16:32:13
 8  as Exhibit 2845.  This is Bates No. CC               16:32:15
 9  0548555.                                             16:32:21
10  BY MS. LIN:                                           16:32:38
11      Q   Is Exhibit 2845 a white paper along the       16:32:39
12  type that we were reviewing previously?               16:32:45
13      A   This one doesn't look like it is a            16:32:53
14  preparation for a meeting, but rather a recap of a    16:32:55
15  previous meeting.                                     16:32:58
16      Q   Would that meeting be with Sony?              16:33:02
17      A   Yes.                                          16:33:04
18      Q   Are you familiar with the name of Jim         16:33:04
19  Palumbo?                                              16:33:06
20      A   No.                                           16:33:07
21      Q   I will represent to you that Jim Palumbo      16:33:09
22  was employed by a Sony entity.                        16:33:11
23      A   Okay.                                         16:33:18
24      Q   Can I have you read to yourself the           16:33:19
25  fourth bullet on the first page.                      16:33:22
```

Page 199

```
 1      Does the information in that fourth               16:33:49
 2  bullet, Thomson, Phillips and Zenith raised their     16:33:51
 3  two prices in February 1996 suggest to you that       16:33:55
 4  these manufacturers were coordinating their CRT       16:33:58
 5  tube prices?                                          16:34:02
 6      MR. LAHAD:  Lacks foundation, calls for           16:34:03
 7  speculation.                                          16:34:04
 8      THE WITNESS:  I don't know.                       16:34:07
 9  BY MS. LIN:                                           16:34:07
10      Q   Is it possible that these three vendors       16:34:08
11  could have moved their two prices at the same time    16:34:09
12  as they were not coordinating their prices?           16:34:12
13      MR. LAHAD:  Calls for speculation, lacks          16:34:14
14  foundation.                                           16:34:17
15      THE WITNESS:  I don't know.                       16:34:18
16  BY MS. LIN:                                           16:34:19
17      Q   Do you know if Circuit City investigated      16:34:19
18  why the three manufacturers all raised their tube     16:34:22
19  price at the same time?                               16:34:25
20      A   I do not know.                                16:34:26
21      MR. LAHAD:  Assumes facts, lacks                  16:34:27
22  foundation.                                           16:34:31
23  BY MS. LIN:                                           16:34:31
24      Q   Do you think Circuit City should have         16:34:31
25  investigated that information based on your           16:34:33
```

Page 200

```
 1  reading of Exhibit 2845?                              16:34:35
 2      MR. LAHAD:  Is that 30(b)(6) question or          16:34:38
 3  is that for him?                                      16:34:40
 4      MS. LIN:  That is a 30(b)(6) question.            16:34:41
 5      MR. LAHAD:  Lacks foundation.                     16:34:44
 6      MR. GRALEWSKI:  Objection, form.                  16:34:47
 7      THE WITNESS:  It wasn't uncommon for              16:34:57
 8  vendors to tell us that their costs were              16:34:59
 9  going up.  The rest of it, I just purely             16:35:01
10  speculate, and speaking for Circuit City, I           16:35:08
11  don't want to do that.                                16:35:11
12  BY MS. LIN:                                           16:35:13
13      Q   Reading the fourth bullet of Exhibit          16:35:13
14  2845, does it appear to you that CRT finished         16:35:16
15  product prices were decreasing at the same time       16:35:19
16  that tube prices were allegedly increasing?           16:35:22
17      MR. LAHAD:  Lacks foundation, calls for           16:35:26
18  speculation.                                          16:35:28
19      THE WITNESS:  It says that the industry           16:35:29
20  average retail is down, so with that, that            16:35:30
21  could be because you are selling more of a            16:35:34
22  lower-priced point product than a                     16:35:39
23  higher-priced point product, they would not           16:35:42
24  have to necessarily be going down.                    16:35:45
25  BY MS. LIN:                                           16:35:46
```

Page 201

```
 1      Q   Do you see where it says, "Palumbo            16:35:49
 2  believes that a 5 to 10 percent tube price            16:35:51
 3  increase with stick in early 1997"?                   16:35:54
 4      A   Yes.                                          16:35:56
 5      Q   This memo is reporting that Palumbo           16:35:58
 6  relayed this information as part of Circuit           16:35:59
 7  City's meeting with Sony, correct?                    16:36:03
 8      MR. LAHAD:  Calls for speculation, lacks          16:36:05
 9  foundation, and speaks for itself.                    16:36:06
10      THE WITNESS:  I don't know, but it                16:36:11
11  implies such.                                         16:36:12
12  BY MS. LIN:                                           16:36:16
13      Q   Does the comment about a 5 to 10 percent      16:36:17
14  tube price increase sticking suggest to you that      16:36:20
15  there might have been an agreement among tube         16:36:23
16  manufacturers to increase tube prices?                16:36:25
17      MR. LAHAD:  Lacks foundation, calls for           16:36:29
18  speculation, speaks for itself.                       16:36:29
19      THE WITNESS:  I can only give you a               16:36:33
20  personal interpretation that it implies that          16:36:35
21  they all went up and that therefore it is             16:36:41
22  going to stay.                                        16:36:44
23  BY MS. LIN:                                           16:36:46
24      Q   Do you know if Circuit City investigated      16:36:48
25  why Sony thought tube prices were expected to         16:36:51
```

51 (Pages 198 - 201)

Page 202

1  stick?                              16:36:54
2    A   No.                           16:36:55
3      MS. LIN:  Let's go briefly go off the   16:37:01
4  record.                            16:37:01
5      THE VIDEOGRAPHER:  The time is 4:37 p.m.   16:37:03
6  and we are off the record.          16:37:04
7  (Whereupon, a break in the proceedings commenced   16:38:10
8  at 4:37 p.m. and on resuming at 4:38 p.m.)   16:38:10
9      THE VIDEOGRAPHER:  The time is   16:38:10
10  approximately 4:38 p.m. and we are back on   16:38:11
11  the record.                        16:38:13
12      MR. BAVE:  Good afternoon, Mr. Deason,   16:38:16
13  my name is William Bave and I represent the   16:38:17
14  Toshiba entities.  Thanks for you time this   16:38:18
15  afternoon.                          16:38:22
16      THE WITNESS:  You are welcome.   16:38:22
17  EXAMINATION BY MR. BAVE:           16:38:22
18    Q   You mentioned earlier in your testimony   16:38:23
19  that Circuit City purchased CRT finished products   16:38:24
20  from Toshiba, is that correct?      16:38:28
21    A   I believe that we did do so.   16:38:32
22    Q   When you purchased a Toshiba brand CRT   16:38:34
23  product, did Circuit City know where that product   16:38:38
24  had been manufactured?              16:38:42
25    A   They would not know where all product   16:38:43

Page 203

1  was manufactured.  They may have visited a factory   16:38:45
2  and seen where some product was manufactured.   16:38:49
3    Q   Did Circuit City know who had   16:38:52
4  manufactured the CRT within the Toshiba branded   16:38:53
5  finished product?                   16:38:57
6    A   Not in general, no.            16:38:58
7    Q   Before we talked about who Circuit City   16:39:01
8  viewed as their competitors and the retail space   16:39:04
9  and you mentioned I think just generally regional   16:39:08
10  companies, correct?                16:39:11
11    A   Correct.                      16:39:12
12    Q   Can you list some of the ones that come   16:39:13
13  to mind as regional competitors?    16:39:15
14    A   Future Shop, Kmart, American TV, HH   16:39:18
15  Craig, Electronics Express, Sound Advice, Ultimate   16:39:25
16  Electronics, and that is probably as good as I am   16:39:33
17  going to get.                      16:39:39
18    Q   How about Brandsmart, was that regional?   16:39:40
19    A   Brandsmart, definitely.  Two different   16:39:40
20  Brandsmarts, by the way.            16:39:44
21    Q   Did Circuit City also view warehouse   16:39:46
22  clubs such as Costco as competitors in that space?   16:39:49
23    A   Yes.                          16:39:51
24    Q   Did Circuit City have a corporate policy   16:39:54
25  with respect to gathering the competitive   16:39:57

Page 204

1  information?                        16:39:59
2    A   We had policies that changed over   16:40:01
3  periods of time, but yes.           16:40:04
4    Q   How did the policies change over time?   16:40:06
5    A   Well, exactly who would do it, how they   16:40:08
6  would do it, how often they would do it, and then   16:40:10
7  what they would do in reaction to that.   16:40:14
8    Q   Did the types of competitive information   16:40:16
9  that you would collect change over time?   16:40:19
10    A   Not really, I mean primarily you are   16:40:21
11  wanting to know what did they tag it at, what did   16:40:25
12  they sell at and what did they advertise it at?   16:40:29
13    Q   Were those policies you mentioned in   16:40:32
14  writing?                            16:40:34
15    A   Some were as introduced earlier.   16:40:34
16    Q   Do those policies prohibit the Circuit   16:40:39
17  City's employees from speaking directly with   16:40:41
18  competitors' staffs?                16:40:44
19      MR. LAHAD:  Vague.              16:40:46
20      THE WITNESS:  We had training about the   16:40:49
21  appropriateness of sharing data with   16:40:56
22  competitors, yes.                   16:40:59
23  BY MS. LIN:                        16:41:00
24    Q   Was that training with an attorney?   16:41:01
25    A   We had training at the buyer level, that   16:41:04

Page 205

1  dealt with that type of information and then at   16:41:06
2  the store level you would have training, "Look,   16:41:13
3  they are the enemy.  We don't share data and we do   16:41:16
4  not expect them to share data and that is not the   16:41:21
5  way we do business."                16:41:25
6    Q   Did Circuit City use the results of its   16:41:27
7  competitor monitoring in its price negotiations   16:41:29
8  with the CRT product vendors?        16:41:33
9      MR. LAHAD:  Vague.              16:41:38
10      THE WITNESS:  No.              16:41:38
11      THE REPORTER:  Did you say no?    16:41:49
12      THE WITNESS:  I just said yes to him.   16:41:49
13      THE REPORTER:  Because it sounded like a   16:41:50
14  no.                                16:41:50
15      THE WITNESS:  Yes, we discuss with a   16:41:50
16  vendor that a competitor had a price that we   16:41:54
17  needed to compete with and that we might need   16:41:58
18  a lower cost in order to be able to be   16:42:02
19  competitive.                        16:42:05
20  BY MR. BAVE:                       16:42:05
21    Q   Did Circuit City have any knowledge   16:42:05
22  regarding its competitors' target margins in CRT   16:42:08
23  finished products?                  16:42:11
24    A   Not beyond anything that would have been   16:42:13
25  in a corporate report, and typically, those   16:42:15

52 (Pages 202 - 205)



**Page 206**

1 margins were rolled up to such a big high level    16:42:19
2 and included things like MDF and so on that you    16:42:23
3 could not tell the kind of detail that you are    16:42:28
4 asking.    16:42:34
5    Q   Where did you obtain the corporate    16:42:34
6 reports from?    16:42:36
7    A   From whatever. Someone releases their    16:42:37
8 annual corporate report, it is a public record.    16:42:40
9    Q   Was it anyone's particular    16:42:43
10 responsibility to review these corporate reports    16:42:44
11 and try to discern the margins?    16:42:48
12    A   Buyers would not review other    16:42:51
13 competitors' reports. Our senior management like    16:42:55
14 the president of the company, and so on, would,    16:43:04
15 obviously, monitor the competition in that way    16:43:07
16 since that is the same sort of thing that he is    16:43:11
17 communicating, but the buyers, no one said, "Let's    16:43:14
18 go look through these reports and try to figure    16:43:19
19 out what the other guy is paying."    16:43:22
20    Q   How did the competitor information that    16:43:23
21 was collected factor into Circuit City's retail    16:43:25
22 price decisions?    16:43:29
23    A   As I said earlier, it could not factor    16:43:31
24 at all or we could choose to react to the price.    16:43:36
25       Way in the majority of the time well    16:43:42

**Page 207**

1 over 90 percent you are talking about a temporary    16:43:46
2 reaction of a week or less and then we would go    16:43:50
3 back to our pricing.    16:43:55
4       With as many stores as we had managing    16:43:58
5 different prices it was difficult so you tried as    16:44:01
6 much as possible to keep pricing the same.    16:44:06
7    Q   Did the pricing decisions at Circuit    16:44:08
8 City vary by region on its CRT products?    16:44:11
9    A   As we discussed earlier you may have a    16:44:15
10 different set of competitors in one market versus    16:44:19
11 the other and one market may be more competitive    16:44:22
12 because of that, so in that aspect, it did vary.    16:44:26
13    Q   And those variations between the regions    16:44:31
14 was usually dictated by the competition in those    16:44:33
15 regions?    16:44:37
16    A   Yes.    16:44:37
17    Q   We have seen certain times where the    16:44:38
18 collection of the competitive information has led    16:44:40
19 to Circuit City lowering its price to be more in    16:44:43
20 line with the competition, correct?    16:44:46
21    A   Correct.    16:44:48
22       MR. LAHAD: Objection, misstates    16:44:49
23 testimony.    16:44:50
24 BY MR. BAVE:    16:44:50
25    Q   Is it also true that if competitive    16:44:50

**Page 208**

1 intelligence revealed that a competitor was    16:44:52
2 pricing higher on a certain product, Circuit City    16:44:54
3 would raise its price to that level?    16:44:57
4    A   Typically, we might raise our price    16:45:01
5 back. If we had lowered it in reaction to them,    16:45:06
6 and they raised it, then we would go back to the    16:45:09
7 price typically where we were before.    16:45:13
8       So we have that manufacturer's suggested    16:45:18
9 retail price that we are trying to sell the    16:45:21
10 product for, and if the competition has gone back    16:45:23
11 to that price, or higher, then we are going to go    16:45:28
12 back typically to the manufacturer's suggested    16:45:31
13 retail price.    16:45:33
14 (Whereupon, Deposition Exhibit 2846 is marked for    16:45:50
15 Identification.)    16:45:50
16       MR. BAVE: I am going to hand you what    16:45:50
17 has been marked Exhibit 2846 which is Bates    16:45:51
18 labeled CC 0604919. Let me know when you    16:45:54
19 have had a chance to review that.    16:46:13
20 BY MR. BAVE:    16:46:26
21    Q   This is an email from somebody named    16:46:26
22 Derrick Matilla from November 12, 2007, do you    16:46:28
23 know who Derrick Matilla?    16:46:33
24    A   Yes, but I think it is pronounced    16:46:36
25 Matilla.    16:46:38

**Page 209**

1    Q   Excuse me. What was his position?    16:46:40
2    A   He was a buyer.    16:46:42
3    Q   In what department?    16:46:42
4    A   In the video or display department.    16:46:44
5    Q   And he is addressing the email to Team.    16:46:47
6 Do you recognize the people in the "to / from" as    16:46:48
7 a part of some team at Circuit City?    16:46:53
8    A   It appears to be the rest of the display    16:46:56
9 team, that same group. This is the other buyers,    16:47:03
10 some of the assistant buyers, some of the product    16:47:10
11 managers, so the rest of the people within the    16:47:13
12 video, the display team.    16:47:17
13    Q   As a senior buyer was Derrick involved    16:47:20
14 in collecting the competitor intelligence that we    16:47:23
15 have discussed today?    16:47:25
16    A   Derrick would have been involved from    16:47:29
17 looking at a competitor's ad or when he is out and    16:47:31
18 about going into the stores, but the    16:47:40
19 over-competitive intelligence that came from the    16:47:46
20 stores would have been more regular than what    16:47:50
21 Derrick would have done. That was not his primary    16:47:55
22 job to go out and find out.    16:47:59
23    Q   But he did receive the reports of the    16:48:01
24 store employees that would go out and get a    16:48:04
25 compilation —    16:48:05

53 (Pages 206 - 209)

**Page 210**

1  A  Right, so he would be advised of issues  16:48:05
2  where we were not competitive.  16:48:09
3  Q  And his email reads, "that based on  16:48:12
4  competitive intelligence we received last Friday,  16:48:15
5  we have made the decision to change the price of  16:48:17
6  the OLV 247 TFHD that will be featured in  16:48:25
7  Wednesday TV commercial and on the web as a web  16:48:25
8  only deal,"  16:48:28
9      Do you see that?  16:48:29
10  A  Yes.  16:48:29
11  Q  And he is recommending that based on  16:48:30
12  that competitive intelligence, they want to raise  16:48:32
13  the price from $999 to $1,999, do you see that?  16:48:35
14  A  Yes.  16:48:40
15  Q  He predicts, "... that this increase in  16:48:41
16  price will not compromise our traffic to our site  16:48:45
17  and will result in additional $500,000 to $700,000  16:48:48
18  in profitability." Do you see that?  16:48:53
19  A  Yes.  16:48:54
20  Q  So based on the competitive intelligence  16:48:55
21  he was able to discern that Circuit City was able  16:48:58
22  to raise its price without damaging its profits,  16:49:01
23  right?  16:49:04
24  A  Yes.  16:49:04
25      MR. BAVE: You can put that document  16:49:08

**Page 211**

1  aside for now.  16:49:10
2  BY MR. BAVE:  16:49:12
3  Q  Was the competitors' pricing information  16:49:12
4  that was collected an important factor in Circuit  16:49:13
5  City's price center?  16:49:17
6      MR. LAHAD: Vague.  16:49:20
7      THE WITNESS: Only important on a short  16:49:22
8  term market by market store by store type of  16:49:26
9  information.  16:49:29
10      Competitors' advertising pricing was  16:49:31
11  probably more important because of the  16:49:34
12  visibility of it. I hope that answers your  16:49:37
13  question.  16:49:44
14  BY MR. BAVE:  16:49:45
15  Q  We discussed a couple different types of  16:49:45
16  ways that competitive information was collected  16:49:47
17  within Circuit City, right?  16:49:51
18  A  Correct.  16:49:51
19  Q  How was this competitive intelligence  16:49:52
20  shared within the corporate structure of Circuit  16:49:55
21  City?  16:49:58
22      MR. LAHAD: Asked and answered.  16:49:58
23      THE WITNESS: Since the person who is  16:49:59
24  ultimately responsible for the product and  16:50:04
25  the price of the product is the buyer, that  16:50:07

**Page 212**

1  information will make its way up to the buyer  16:50:12
2  based on the frequency, based on the severity  16:50:17
3  of the difference in grabbing their attention  16:50:26
4  from that viewpoint, but we also had policies  16:50:30
5  as you saw earlier that said, "If you see  16:50:35
6  this, do that."  16:50:38
7  BY MR. BAVE:  16:50:39
8  Q  Was it collected within one database  16:50:40
9  within the company that people could go and see?  16:50:42
10  A  No.  16:50:44
11  Q  Yes? Sorry?  16:50:45
12  A  No. Not for this whole period of time.  16:50:47
13  There was a process for reacting. I hope I have  16:50:53
14  this correct. So we had a system where we  16:50:59
15  downloaded the prices we discussed earlier, Cesar,  16:51:04
16  for an ad system, there were several different  16:51:08
17  names for it.  16:51:11
18      So you could go in and see that data,  16:51:12
19  and say, "We reacted. So we are as far as  16:51:15
20  reporting goes. You are capturing your reaction,  16:51:24
21  not the actual report."  16:51:27
22      Let me also note that buyers can see  16:51:30
23  what prices their products are being sold at, and  16:51:33
24  if they see an anomaly, they can drill down and  16:51:39
25  find out where that occurred, and then they can go  16:51:43

**Page 213**

1  in, and ask, "Why is Brandsmart $100 less than  16:51:48
2  everybody? Why is Brandsmart Market $100 less  16:51:54
3  than everybody else is because Brandsmart has this  16:51:57
4  price for $100 below."  16:52:00
5  Q  Today we have discussed competitive  16:52:02
6  shopping as one of the ways Circuit City gathered  16:52:04
7  competitive intelligence, is that right?  16:52:07
8  A  Yes.  16:52:08
9  Q  Did Circuit City have specific  16:52:11
10  guidelines on what to do and what not to do when  16:52:13
11  an employee was shopping at a competitor's store?  16:52:15
12  A  I am not sure exactly what you are  16:52:20
13  asking.  16:52:22
14  Q  You mentioned certain training that the  16:52:24
15  store employees went through. Was a component of  16:52:26
16  that how to handle or how to actually go and do  16:52:30
17  this competitive shopping in the different  16:52:33
18  regions?  16:52:36
19  A  Yes, we did not want to be disruptive in  16:52:36
20  any way, shape or form, and we were not out to  16:52:42
21  sabotage anybody.  16:52:46
22      We were out to get the information with  16:52:47
23  the least amount of interaction that could can get  16:52:50
24  away with.  16:52:57
25      They were specifically told, "Do not  16:52:58

54 (Pages 210 - 213)



Page 214

1  discuss anything that Circuit City does with    16:53:03
2  anybody else or how they run their business." We    16:53:06
3  didn't do that.    16:53:11
4    Q    Were they given a check list of products    16:53:12
5  to go through on certain store visits?    16:53:14
6    A    As you saw in one of the ones where it    16:53:17
7  says, "sign a calendar", they would be given a    16:53:19
8  section of product or a description of product    16:53:25
9  like, "Go shop all the projection televisions. Go    16:53:29
10  shop all the CRT televisions. Go shop a category    16:53:31
11  or class or some subset thereof," and if there was    16:53:36
12  some reason they might say, "The last three weeks    16:53:42
13  in a row this brand has been below a price. Go    16:53:46
14  find out what's going on with that brand with this    16:53:50
15  information."    16:53:52
16    Q    During these competitive shops, did    16:53:54
17  Circuit City employees ever purchase a good from a    16:53:57
18  competing store?    16:53:59
19    A    Not as policy. I don't know of any case    16:54:03
20  where they would have.    16:54:10
21    Q    So it was purely an information    16:54:12
22  gathering exercise?    16:54:14
23    A    Yes.    16:54:14
24    Q    In addition to the retail pricing, what    16:54:15
25  other factors were the employees observing when    16:54:17

Page 215

1  they would do these competitive shops?    16:54:20
2    A    You are wanting to know what the    16:54:23
3  customer experience is and you are trying to    16:54:26
4  compare that with the Circuit City experience.    16:54:29
5    For example, you might get as close as    16:54:34
6  saying, "If I buy this, how fast can you deliver    16:54:37
7  it to me?" You would go, "Our delivery is backed    16:54:41
8  up for a week and he can deliver it today, so we    16:54:45
9  are at a disadvantage."    16:54:48
10    You're trying to understand everything    16:54:50
11  that has to do with the customer experience.    16:54:52
12    Do they have the product in stock? Do    16:54:55
13  they want to sell it? Are they doing everything    16:55:00
14  they can to tell you that it is a horrible product    16:55:04
15  or that it is the best thing since sliced bread?    16:55:09
16    What are they trying to sell to go with    16:55:15
17  it and what are they saying about competitors like    16:55:17
18  ourselves?    16:55:23
19    Q    Is one of the things they would check is    16:55:24
20  upcoming promotional activities that the store is    16:55:26
21  going to offer?    16:55:29
22    A    Yes, I can't say that one sells, one    16:55:34
23  person doing a shop might say is it going to go on    16:55:38
24  sale, but that was not our direction.    16:55:41
25    We were not trying to get our    16:55:44

Page 216

1  competitor's ad information before it got public.    16:55:49
2    Q    It would be helpful to know if a    16:55:52
3  competitor is going to be running a coming    16:55:53
4  promotion, correct?    16:55:55
5    A    It would be helpful, but in general    16:55:55
6  that's not the way we did business.    16:56:01
7    Q    In general, are there instances you are    16:56:04
8  aware of where that type of information was    16:56:06
9  obtained on store shops?    16:56:08
10    A    Not in reference to CRT. I was in a    16:56:12
11  store where a customer walked in with a    16:56:17
12  competitor's ad that had not been published yet,    16:56:20
13  and he wanted me to match the price and there's    16:56:24
14  not much I can do about it, he has brought it to    16:56:28
15  me.    16:56:31
16    Q    Some of the promotional activities    16:56:31
17  during certain seasons were released pretty far in    16:56:34
18  advance of the date, for instance, maybe Black    16:56:36
19  Friday, is that right?    16:56:39
20    A    If it's out there on the web, we are out    16:56:41
21  there looking at it. If it is public information,    16:56:42
22  we are doing our business to find out.    16:56:45
23    Q    Because that would allow you to know    16:56:47
24  what your competitors are going to be charging up    16:56:48
25  in upcoming periods?    16:56:50

Page 217

1    A    Correct.    16:56:52
2    Q    That will allow you to react to it    16:56:53
3  better?    16:56:53
4    A    Correct.    16:56:54
5    Q    Did Circuit City employees ever collect    16:56:56
6  information that was not readily ascertainable in    16:57:00
7  walking around the store?    16:57:02
8    MR. LAHAD:    Asked and answered.    16:57:04
9    THE WITNESS:    By posing as customers    16:57:06
10  they might get additional information, yes.    16:57:10
11  BY MR. BAVE:    16:57:12
12    Q    They would do that by having discussions    16:57:13
13  with the competitors' source sales staff?    16:57:15
14    A    I would not call it discussions. They    16:57:17
15  would go in and say, "I am looking for a    16:57:20
16  television," and role play the customers.    16:57:23
17    Q    And they were not going in representing    16:57:27
18  that they are from Circuit City. They would go in    16:57:29
19  and act --    16:57:30
20    A    No.    16:57:30
21    Q    -- as a person off the street?    16:57:31
22    A    No. Sorry interrupt you. No.    16:57:31
23    Q    They would remove their Circuit City    16:57:37
24  uniforms so they would look like a person walking    16:57:39
25  in off the street?    16:57:43

55 (Pages 214 - 217)

Page 218

1　A　Yes.　16:57:43
2　Q　Was the inventory level that a　16:57:46
3　competitor's store had readily ascertainable when　16:57:47
4　walking in to the retail store?　16:57:51
5　　　MR. LAHAD: Say that again.　16:57:54
6　　　THE WITNESS: It depends on the　16:57:55
7　retailer. If they have stocked their product　16:57:57
8　on the floor, then it is. If they have a　16:58:01
9　hidden warehouse, it is not.　16:58:04
10　BY MR. BAVE:　16:58:06
11　Q　When they were walking around the　16:58:07
12　stores, how would they record the information that　16:58:08
13　they were recording on?　16:58:10
14　　　MR. LAHAD: Vague.　16:58:13
15　　　THE WITNESS: There were lots of　16:58:15
16　different tactics. People would talk to　16:58:15
17　themselves, and end up having a recorder in　16:58:19
18　their pocket.　16:58:23
19　　　Some people would call their own　16:58:24
20　answering machine and talk to themselves,　16:58:27
21　but the amount of pricing that we were　16:58:29
22　shopping was generally limited enough that　16:58:33
23　all you were doing was looking for　16:58:36
24　exceptions.　16:58:38
25　　　For example, I would go in and shop for　16:58:41

Page 219

1　competition and I would walk out, and as　16:58:44
2　soon as I walked out, I would write down the　16:58:46
3　four exceptions that I found because you　16:58:50
4　would have very few in general.　16:58:52
5　BY MR. BAVE:　16:58:55
6　Q　In instances where employees were using　16:58:55
7　recording devices, were those provided by Circuit　16:58:56
8　City?　16:59:01
9　A　I don't know.　16:59:04
10　Q　Did Circuit City keep the recordings　16:59:06
11　that these employees made during their competitive　16:59:09
12　store visits?　16:59:13
13　A　No. No, this would have been an　16:59:14
14　individual deciding that that was the way that　16:59:18
15　made it easier for themselves.　16:59:19
16　(Whereupon, Deposition Exhibit 2847 is marked for　16:59:22
17　Identification.)　16:59:22
18　　　MR. BAVE: Let me mark one more quickly.　16:59:22
19　I am handing you what has been marked as　16:59:46
20　Exhibit 2847 which is Bates No. CC 0397160.　16:59:46
21　　　THE WITNESS: How much of this do you　17:00:54
22　need me to read?　17:00:55
23　　　MR. BAVE: I will direct you to specific　17:00:56
24　portions. Let me know when you are　17:00:57
25　familiarized overall.　17:01:00

Page 220

1　BY MR. BAVE:　17:01:01
2　Q　You mentioned earlier memos on the　17:01:01
3　competitive shops, right?　17:01:04
4　A　Yes.　17:01:04
5　Q　Does this follow the format of　17:01:05
6　competitive shop reports that you have seen?　17:01:08
7　A　No, because this is a buyer or an　17:01:10
8　assistant buyer or somebody in the corporate team　17:01:15
9　reporting back to a buyer.　17:01:19
10　　　This is, yes, it's a type of shopping　17:01:24
11　report, but it is not the most common kind.　17:01:33
12　　　This is a market visit where because you　17:01:36
13　would only do a market visit like this because the　17:01:40
14　sales in that market were doing poorly.　17:01:44
15　　　Because the sales were doing poorly they　17:01:47
16　sent this group of people and it is almost always　17:01:50
17　that case, they sent this group of people in to　17:01:55
18　find out what the heck is going on.　17:01:55
19　Q　Under the Best Buy heading on the first　17:01:59
20　page there under subsection one pricing, they are　17:02:02
21　writing about asking an associate to check on the　17:02:05
22　inventory of an item, do you see that?　17:02:08
23　A　Yes.　17:02:13
24　Q　So that indicates that the employees　17:02:14
25　(sic) asked the employee to go back and check on　17:02:15

Page 221

1　the inventory?　17:02:18
2　A　Yes.　17:02:19
3　　　MR. LAHAD: Calls for speculation, lacks　17:02:20
4　foundation.　17:02:23
5　BY MR. BAVE:　17:02:23
6　Q　Did you say "yes," sir?　17:02:23
7　A　Yes.　17:02:24
8　Q　Have you ever heard of a market reaction　17:02:25
9　report in association with Best Buy?　17:02:31
10　A　I have not heard it specifically for　17:02:35
11　Best Buy. It is sort of a common term.　17:02:38
12　Q　What does the term mean to you?　17:02:41
13　A　It means that it sounds like it means　17:02:43
14　that it is their version of what we call CTC or　17:02:48
15　our reaction.　17:02:52
16　Q　Would Circuit City in the normal course　17:02:55
17　of business have access to Best Buy's market　17:02:57
18　reaction report?　17:03:00
19　A　No.　17:03:00
20　Q　So that in this instance they were able　17:03:01
21　view it because they asked the sales clerk to go　17:03:03
22　in the back and check on inventory?　17:03:04
23　　　MR. LAHAD: Misstates previous　17:03:08
24　testimony, lacks foundation, calls for　17:03:10
25　speculation.　17:03:12




Page 222

```
 1        THE WITNESS: And I would just be        17:03:14
 2    speculating. I believe that --              17:03:19
 3        MR. ROSS: If you are speculating, don't  17:03:24
 4    testify, but if you know about it, then you  17:03:25
 5    can testify about it.                        17:03:25
 6        THE WITNESS: No.                         17:03:26
 7    BY MR. BAVE:                                 17:03:26
 8    Q    This information about how Best Buy     17:03:27
 9    conducted its shops that is contained in this 17:03:29
10    report, that would be helpful information to  17:03:31
11    Circuit City, correct?                       17:03:34
12    A    It could be, yes.                        17:03:36
13    Q    If you would turn to the next page under 17:03:38
14    "Incredible Universe" have you ever heard of  17:03:44
15    Incredible Universe?                          17:03:46
16    A    Yes.                                     17:03:48
17    Q    What is Incredible Universe?            17:03:48
18    A    Incredible Universe was a division of    17:03:49
19    Radio Shack Stores that were their super stores 17:03:53
20    basically. They were larger than Circuit City 17:03:57
21    Stores. They were approximately the size of   17:04:00
22    Brandsmart Stores.                            17:04:02
23    Q    What is your understanding of the first  17:04:03
24    bullet there under "Pricing" what is going on? 17:04:05
25    A    My understanding would be that they      17:04:36
```

Page 223

```
 1    represented that they had been to the Best Buy and 17:04:39
 2    that they had seen this price on a 31 inch GE, and  17:04:42
 3    would Incredible Universe match it, and they said   17:04:47
 4    that they would, but since they were not able to    17:04:52
 5    verify that Best Buy actually had them in           17:04:56
 6    inventory, they did not match it.                   17:04:58
 7    Q    Was it normal during the course of the         17:05:00
 8    competitive shop that you test another              17:05:03
 9    competitor's price match policies?                  17:05:06
10    A    You would want to understand, and this         17:05:08
11    is very intense type of shopping. When you say      17:05:10
12    "normal" this is extraordinary.                     17:05:15
13        Because you have got to put together a          17:05:21
14    group of merchants and send them out to a market    17:05:24
15    to understand what's going on in the market and     17:05:29
16    understanding how the competition reacts and how    17:05:32
17    they drop price or anything that they do that we    17:05:41
18    don't know that they are doing it would be          17:05:44
19    important.                                          17:05:46
20    Q    Was it extraordinary to ask competitors        17:05:47
21    to go check inventory?                              17:05:50
22        MR. LAHAD: Misstates the testimony.            17:05:53
23        THE WITNESS: It wouldn't be                    17:05:55
24    extraordinary to ask them to check inventory        17:05:57
25    because if you are a customer and you wanted        17:05:59
```

Page 224

```
 1    to buy the product you would also want to           17:06:03
 2    know if they have it in stock, so as                17:06:05
 3    testified earlier, knowing in stock levels it       17:06:08
 4    is to a degree it is publicly available which       17:06:12
 5    is, "Can I buy this?" is important, yes, I          17:06:18
 6    mean, it is helpful.                                17:06:21
 7    BY MR. BAVE:                                        17:06:22
 8    Q    How often did Circuit City run these           17:06:22
 9    more intense competitive shops with its             17:06:25
10    merchandising team?                                 17:06:28
11    A    You could go and be somewhat random, but       17:06:31
12    you can go for a very long period of time. You      17:06:37
13    may not have any in a year or you may have based    17:06:39
14    on business, say, "We are going to send out two or  17:06:45
15    three teams to four or five markets this week."     17:06:48
16        There was no rhyme or reason. Some of          17:06:54
17    it had to do with workload and did you have the     17:06:56
18    time and the resources to deploy it this way.       17:07:00
19    Q    I just want to touch the low price             17:07:04
20    guaranty that we discussed a little bit earlier     17:07:07
21    today.                                              17:07:09
22        MR. LAHAD: Before you got there, can we        17:07:09
23    take a break or do you have a lot left?             17:07:11
24        MR. BAVE: Just a few more questions and        17:07:16
25    then I will be done if you want to wait. If         17:07:16
```

Page 225

```
 1    you can wait, sir?                                  17:07:17
 2        THE WITNESS: I can wait.                       17:07:18
 3    BY MR. BAVE:                                        17:07:21
 4    Q    Before Circuit City would agree to match      17:07:21
 5    a price, they have to verify their competitor's     17:07:25
 6    price, correct, under the low price guaranty?       17:07:30
 7    A    Yes, the low-price guaranty specifically       17:07:33
 8    talked about an advertised price so the competitor  17:07:37
 9    advertised the price we would do it.                17:07:42
10        That part was easy to verify and if we         17:07:46
11    were matching a price because we were selling the   17:07:50
12    product, then you look for other ways to try to     17:07:54
13    verify the price.                                   17:08:00
14    Q    It also would verify that the competitor       17:08:01
15    had the item in stock before you matched the        17:08:03
16    price, is that right?                               17:08:06
17    A    Yes, and that is tough because you are a        17:08:06
18    person who is doing the confirmation if they are    17:08:15
19    talking about reaction type of time.                17:08:23
20        You have got a customer standing there,         17:08:25
21    so there's only so much you can do. Maybe the       17:08:26
22    customer gives you card that says that they have    17:08:31
23    got a quote on this product.                        17:08:33
24        You can call the competitor, and say, "I       17:08:36
25    am interested in su and so and can I buy it?"        17:08:40
```

57 (Pages 222 - 225)

Page 226

1  Whether you got truthful information or    17:08:45
2  not it is tough.    17:08:50
3    Once you're able to go out online and    17:08:53
4  find out whether the customer had the product    17:08:55
5  because you could buy it through the Internet that    17:08:58
6  was very different.    17:09:02
7    Q    So one of the ways Circuit City would    17:09:04
8  verify a competitor's price was to pick up the    17:09:06
9  phone and call that competitor to get the price?    17:09:09
10    A    Again, acting as a customer saying,    17:09:12
11  "Look, I was in earlier, and I saw this on sale    17:09:17
12  for so and so, is it still on sale?" They might    17:09:22
13  say, "I don't know. We are busy. Come see for    17:09:26
14  yourself." They might say, "Give me a minute and    17:09:30
15  I will go find out," and so on.    17:09:33
16    Q    Was it necessary to act as a potential    17:09:35
17  customer because the competitor would not give the    17:09:38
18  information if it was circuit identified as the    17:09:40
19  caller?    17:09:43
20    MR. LAHAD:    Calls for speculation.    17:09:46
21    THE WITNESS:    Right. We would never    17:09:47
22  identify ourselves as Circuit City "and I    17:09:48
23  want to know your price." That was not our    17:09:51
24  policy practice. Just not the way you do    17:09:53
25  business.    17:09:57

Page 227

1    MR. BAVE:    Thank you    Those are all the    17:09:58
2  questions I have.    17:09:58
3    THE VIDEOGRAPHER:    The time is    17:10:01
4  approximately 5:10. We are off the record.    17:10:03
5  (On resuming after a short recess.)    17:14:45
6    THE VIDEOGRAPHER:    The time is    17:14:45
7  approximately 5:14 p.m. We are back on    17:14:46
8  record.    17:14:50
9    MS. ARGUELLO:    Hi, Mr. Deason.    17:14:51
10    THE WITNESS:    Hi.    17:14:51
11    MS. ARGUELLO:    My name is Sofia    17:14:54
12  Arguello. I work for the law firm Winston &    17:14:54
13  Strawn and we represent the Panasonic    17:14:56
14  defendants in this litigation.    17:14:59
15  EXAMINATION BY MS. ARGUELLO:    17:15:00
16    Q    I just have a few more questions for    17:15:00
17  you. We mentioned earlier that Circuit City had    17:15:02
18  promotional programs with many of its vendors.    17:15:07
19    Do you recall whether it had any    17:15:10
20  promotional programs with Panasonic North America?    17:15:11
21    A    When you saw promotional programs, are    17:15:16
22  you talking about MDF funds?    17:15:17
23    Q    I am talking about MDF funds or volume    17:15:19
24  rebates, or promotional allowances, any of the    17:15:23
25  programs that we discussed earlier today?    17:15:27

Page 228

1    A    Yes.    17:15:29
2    Q    Did the type of rebates differ by    17:15:30
3  vendor, so for example, did the volume rebates    17:15:37
4  that Panasonic North America offered differ from    17:15:42
5  those offered by other vendors?    17:15:46
6    A    In what way?    17:15:47
7    Q    For example, did Panasonic North America    17:15:49
8  offer a higher percentage of rebate or cash back    17:15:54
9  or cash discounts for certain things as opposed to    17:16:02
10  other vendors?     17:16:06
11    MR. LAHAD:    Compound and vague.    17:16:08
12    THE WITNESS:    I am aware of them    17:16:09
13  being materially different from other types    17:16:11
14  of programs that we dealt with because every    17:16:14
15  one of these were singular type of activities    17:16:19
16  for the most part.    17:16:23
17    When you are talking about a sell    17:16:24
18  through they could vary from the same    17:16:25
19  supplier based on whatever factors they are    17:16:33
20  using.    17:16:35
21  BY MS. ARGUELLO:    17:16:36
22    Q    Were these programs subject to    17:16:38
23  negotiation with Panasonic North America?    17:16:43
24    A    Yes.    17:16:46
25    Q    Was the negotiation on a model by model    17:16:47

Page 229

1  basis?    17:16:50
2    A    It could be model by model, but it could    17:16:52
3  be program, meaning, "I will buy five televisions    17:16:56
4  from you," so it is based on all of that.    17:16:59
5    It could be based of a senior level that    17:17:02
6  the buyer wouldn't be involved in which would be    17:17:06
7  cumulative of all the various departments buying    17:17:11
8  from a particular vendor.    17:17:13
9    Q    Do you recall whether any vendor was    17:17:15
10  more competitive in terms of, for example, volume    17:17:18
11  rebates?    17:17:23
12    MR. LAHAD:    Vague.    17:17:24
13    THE WITNESS:    I do not remember one    17:17:25
14  competitor being more, no.    17:17:27
15  BY MS. ARGUELLO:    17:17:31
16    Q    In your negotiations with Panasonic    17:17:34
17  North America, did Circuit City mention the    17:17:37
18  non-price terms of other vendors?    17:17:40
19    A    We would always refer to whether they    17:17:46
20  were competitive. We might say, "You are not    17:17:53
21  giving us as much ad money as I am getting from    17:17:59
22  others." It wouldn't be specific, but it might be    17:18:03
23  relative.    17:18:13
24    They would see the results of that    17:18:15
25  because they might -- these type of conversations    17:18:17

58 (Pages 226 - 229)

Page 230

1  would happen like, "Hey, you're advertising    17:18:22
2  Samsung all the time and you are not advertising    17:18:25
3  Panasonic. Why?" Well, it's, "They give us more    17:18:28
4  ad money."    17:18:30
5      Q   Would Circuit City ever ask Panasonic    17:18:32
6  North America to match the non-price terms of    17:18:36
7  other vendors?    17:18:39
8      A   In that same sort of way, they would    17:18:43
9  say, "We would like you to give us X amount of    17:18:46
10  percentage," and that would make you competitive.    17:18:53
11      The reason I am hesitating is because we    17:18:59
12  are not going to tell them what the otherwise guys    17:19:02
13  are doing.    17:19:03
14      Not in non-disclosure agreements. We    17:19:09
15  are not going to say, "The other guy has given me    17:19:10
16  $2 million. You got to give me $2 million as the    17:19:12
17  way we train our buyers." Just, again, that is    17:19:16
18  not the normal way we do business    17:19:20
19      Q   Would it be fair to say that you would    17:19:24
20  communicate that other vendors are offering more    17:19:26
21  competitive rebates as opposed to giving out    17:19:30
22  specific percentage?    17:19:33
23      A   Yes.    17:19:33
24      Q   In your experience, how often would    17:19:34
25  Panasonic North America's non-price terms change    17:19:40

Page 231

1  over time?    17:19:44
2      MR. LAHAD:  To be clear.  When you say    17:19:46
3  "price," you mean price or costs as we have    17:19:47
4  been using it today?    17:19:51
5      MS. ARGUELLO:  I am saying procurement    17:19:52
6  costs, but I was saying pricing from    17:19:54
7  Panasonic North America, so we can go either    17:19:56
8  way.    17:19:59
9      Let me say procurement costs to keep    17:19:59
10  consistent with earlier.    17:20:01
11      MR. ROSS:  That is the way we have been    17:20:02
12  doing it for seven hours.    17:20:03
13      THE WITNESS:  Can you restate it?    17:20:04
14  BY MS. ARGUELLO:    17:20:05
15      Q   Yes.  How often did Panasonic North    17:20:05
16  America's non-cost change over time?    17:20:09
17      A   Typically, you had an overall program    17:20:17
18  that would last for a year, and again, they would    17:20:21
19  be reviewed at about a six month break based on    17:20:25
20  sell through, but it is constant from a viewpoint    17:20:31
21  again of if something is not selling, then it    17:20:35
22  would be common for Panasonic or any other vendor    17:20:41
23  to do some sort of reaction and that would end up    17:20:45
24  being ad money, sales money, that sort of thing.    17:20:50
25  I can't give you a number or I don't    17:20:55

Page 232

1  know how to answer the frequency.    17:21:01
2      Q   No, that was helpful.    17:21:03
3      A   But it is a standard part of the    17:21:04
4  business that during the life cycle of a product,    17:21:06
5  if it is not selling that there may be a reaction.    17:21:12
6      Q   Would Circuit City in these instances go    17:21:14
7  to a vendor like Panasonic North America, and tell    17:21:19
8  them, "Your product is not selling, so we should    17:21:22
9  renegotiate are non-cost terms?"    17:21:24
10      A   Yes.  The early part of this period -    17:21:29
11  the very early part of this period - my    17:21:33
12  understanding was that the vendors could not see    17:21:36
13  our sales data, but for the majority of this    17:21:42
14  period they could.    17:21:45
15      So we did not even have to tell them    17:21:46
16  what the sales were.  They knew the sales were not    17:21:48
17  good.    17:21:51
18      Q   Do you know what Circuit City's profit    17:21:55
19  margins were on finished products purchased from    17:21:58
20  Panasonic North America?    17:22:01
21      A   No.    17:22:02
22      Q   Did Circuit City control which models it    17:22:03
23  wanted to have the MDF funds applied to?    17:22:10
24      MR. LAHAD:  Vague.    17:22:15
25      THE WITNESS:  I don't know what you mean    17:22:18

Page 233

1  by applied to.    17:22:19
2  BY MS. ARGUELLO:    17:22:20
3      Q   When Circuit City negotiated for an MDF    17:22:20
4  fund with a vendor, did it specify on what    17:22:24
5  specific product it was going to spend that MDF    17:22:30
6  fund?    17:22:33
7      A   They could.  They wouldn't necessarily.    17:22:34
8      Q   In the cases where they would not    17:22:41
9  specify what product, would they just generally    17:22:44
10  just ask for an MDF fund?    17:22:45
11      A   Yes.    17:22:49
12      Q   Did Circuit City ever resist Panasonic    17:22:49
13  North America's price proposals and insist on a    17:22:56
14  lower price per specific models?    17:22:59
15      A   As I discussed earlier, we would    17:23:02
16  certainly insist that if they did not do it that    17:23:08
17  we would not buy the product anymore, but we    17:23:12
18  cannot physically make you do it.    17:23:14
19      Q   Did Circuit City have established price    17:23:22
20  points for purchasing models which it would tell    17:23:25
21  Panasonic North America it had to meet in order    17:23:28
22  for Panasonic North America to get the business?    17:23:30
23      MR. LAHAD:  Vague.    17:23:34
24      THE WITNESS:  Price points meaning what?    17:23:35
25  BY MS. ARGUELLO:    17:23:38

59 (Pages 230 - 233)

Page 234

1  Q  For example, did Circuit City ever say,  17:23:38
2  "You have to meet a price point of $100 or you  17:23:39
3  will not get this business?"  17:23:46
4      MR. LAHAD: Are you talking price point.  17:23:48
5  Cost?  17:23:49
6      THE WITNESS: (No response.)  17:23:49
7  BY MR. ROSS:  17:23:49
8  Q  Did Circuit City ever tell Panasonic  17:23:53
9  North America, "You have to meet a particular cost  17:23:56
10  point," for example, "$100, or you will not get  17:24:01
11  this business?"  17:24:04
12  A  Yes.  17:24:05
13  Q  As a general matter, when Circuit City's  17:24:15
14  procurement costs for a given Circuit City product  17:24:18
15  changed, did Circuit City change the price of the  17:24:23
16  CRT product accordingly to its customers?  17:24:24
17      MR. LAHAD: Asked and answered.  17:24:29
18      THE WITNESS: To re-answer it. We may  17:24:31
19  or may not.  17:24:34
20  BY MS. ARGUELLO:  17:24:37
21  Q  In what circumstances would you do that?  17:24:38
22      MR. LAHAD: This is asked and answered  17:24:43
23  as well.  17:24:44
24      THE WITNESS: Right. Based on  17:24:44
25  competitive environment.  17:24:47

Page 235

1  BY MS. ARGUELLO:  17:24:50
2  Q  In your experience, what is generally  17:24:51
3  the scale of a cost decrease?  17:25:03
4      MR. LAHAD: Vague.  17:25:08
5  BY MS. ARGUELLO:  17:25:09
6  Q  Of a cost decrease in a CRT finished  17:25:09
7  product? Are they relatively small like by a  17:25:13
8  dollar or are they larger?  17:25:17
9      MR. GRALEWSKI: Objection, form.  17:25:21
10      THE WITNESS: I don't know that I could  17:25:24
11  generalize beyond generally we are not  17:25:29
12  dealing with a dollar because of all of the  17:25:34
13  work involved.  17:25:37
14      MR. LAHAD: Sorry, you said "aren't  17:25:39
15  dealing with a dollar?"  17:25:40
16      THE WITNESS: We are not dealing with  17:25:41
17  something that small because it is a lot of  17:25:42
18  work to do for a dollar, but it could happen  17:25:45
19  and it does happen.  17:25:51
20  BY MS. ARGUELLO:  17:25:53
21  Q  You said earlier that sometimes Circuit  17:25:53
22  City could increase the price of the finished  17:26:10
23  product to the customer by the increase in the  17:26:14
24  procurement costs, but it generally depended on  17:26:17
25  competitive circumstance, is that correct?  17:26:21

Page 236

1  A  Yes.  17:26:22
2  Q  Were there any other factors other than  17:26:26
3  competitive circumstances?  17:26:30
4  A  The manufacturers' suggested retail  17:26:31
5  price would be another factor. Again, whether we  17:26:34
6  had inventory excess or shortage, would be the  17:26:39
7  other factor.  17:26:44
8  Q  To the extent you could implement those  17:26:51
9  cost increases into your price increases, would  17:26:54
10  there generally be a lag between the change and  17:27:00
11  procurement costs and the change in retail price?  17:27:02
12      MR. LAHAD: Vague.  17:27:05
13      THE WITNESS: I am confused. Can you  17:27:07
14  ask me that again? I am sorry.  17:27:20
15  BY MS. ARGUELLO:  17:27:21
16  Q  In the circumstances where an increase  17:27:22
17  in procurement costs was able to translate into an  17:27:26
18  increase in retail price, was there a lag between  17:27:29
19  those two increases or did it happen  17:27:33
20  simultaneously?  17:27:37
21      MR. LAHAD: Same objection.  17:27:38
22      THE WITNESS: It could be either way,  17:27:40
23  BY MS. ARGUELLO:  17:27:41
24  Q  In which cases would you be able to do  17:27:56
25  it simultaneously? Can you think of any examples?  17:27:59

Page 237

1  A  If we were told that manufacturers'  17:28:02
2  suggested retail price was going down by $50, and  17:28:06
3  that the cost was going down by $75, we would key  17:28:09
4  that in, and say, "Let's do this instantly," and  17:28:14
5  it happened to match our standard downloads for  17:28:19
6  the stores, so it wasn't two days before the next  17:28:24
7  download, or one day after, or something like  17:28:31
8  this.  17:28:34
9      It had to match the period that we  17:28:35
10  downloaded. We did not always download every day.  17:28:38
11  Q  If price changes were to be implemented,  17:28:51
12  what steps were taken by Circuit City?  17:28:53
13  A  If price changes were to be made?  17:28:58
14  Q  Correct.  17:29:01
15  A  The steps are to download it in our  17:29:01
16  system so that it shows up and gets communicated  17:29:08
17  to the stores, and again, they have set tagging  17:29:11
18  days, or set times to tag, so you want to try to  17:29:15
19  stay with that cycle so that you do not have a  17:29:19
20  price that is not tagged properly, and other than  17:29:22
21  that, I do not know what other types of steps you  17:29:27
22  are talking about.  17:29:30
23  Q  Was it the same across all retail stores  17:29:32
24  if you did implement a price change?  17:29:36
25  A  We had the ability to download it for  17:29:38


VERITEXT REPORTING COMPANY

212-267-6868          www.veritext.com          516-608-2400

Page 238

1 everybody if we wanted to or to download it for 17:29:41
2 one person if we wanted to. 17:29:44
3 Q How were stores notified of the price 17:29:46
4 change? 17:29:49
5 A They knew that on a standard day that 17:29:49
6 they would get a new PSB and that they need to go 17:29:52
7 price to that PSB. 17:29:56
8 Q Would the same price change have been 17:30:00
9 made online? 17:30:02
10 A It could be and it could not be. 17:30:03
11 MS. ARGUELLO: I have no further 17:30:10
12 questions. 17:30:11
13 MR. ROSS: Any other defendants on the 17:30:13
14 phone? 17:30:14
15 MR. ROBERTS: Yes, this is John Roberts, 17:30:16
16 the Thomson defendant. 17:30:16
17 EXAMINATION BY MR. ROBERTS 17:30:20
18 Q I just have a couple quick questions. 17:30:20
19 Thank you, Mr. Deason. When did Circuit City 17:30:22
20 discover the existence of the alleged price 17:30:26
21 conspiracy in the CRT industry that is the subject 17:30:29
22 of its complaint in this case? 17:30:31
23 A I do not know. 17:30:33
24 MR. ROBERTS: I would ask my colleague, 17:30:38
25 Ms. Lin, if she could hand the witness the 17:30:38

Page 239

1 exhibit that I asked her to bring. I would 17:30:42
2 really appreciate that, and to mark it as the 17:30:45
3 next exhibit 17:30:47
4 (Whereupon, Deposition Exhibit 2849 is marked for 17:30:47
5 Identification.) 17:30:47
6 MS. LIN: I will hand the witness a 17:30:51
7 document marked Exhibit 2849. 17:30:51
8 THE WITNESS: Can I ask who this 17:30:58
9 gentleman represents? 17:30:59
10 MS. LIN: He represents Thomson. 17:31:02
11 THE WITNESS: Thomson, okay. Thank 17:31:03
12 you. 17:31:03
13 MR. GAWLEY: This is Michael Gawley 17:31:03
14 from Kirkland. What is the Bates stamp on 17:31:03
15 that exhibit? 17:31:08
16 MS. LIN: It is the Thomson complaint, 17:31:11
17 the Circuit City complaint against Thomson 17:31:12
18 and Mitsubishi. It doesn't have a Bates. 17:31:15
19 MR. GAWLEY: Thank you. 17:31:18
20 BY MR. ROBERTS: 17:31:19
21 Q As has been represented to you, this is 17:31:26
22 the complaint that Circuit City filed against the 17:31:28
23 Thomson defendants in November 2013. If you could 17:31:30
24 please turn to paragraph 240 in that exhibit. 17:31:34
25 MR. ROSS: He is not going to answer any 17:31:58

Page 240

1 questions on 240. It is beyond the scope. 17:31:58
2 MR. LAHAD: Yes. 17:32:00
3 MR. ROSS: Next. 17:32:00
4 MR. LAHAD: And maybe on the same R-240, 17:32:02
5 is starts with Circuit City's claims were 17:32:03
6 told at American Pipe. Is that what your 240 17:32:04
7 is? 17:32:08
8 MR. ROBERTS: I am not asking about 17:32:08
9 American Pipe, sir. 17:32:09
10 BY MR. ROBERTS: 17:32:10
11 Q If you will see, sir, in paragraph 240, 17:32:10
12 it states that claims were filed in this action in 17:32:15
13 November 2007. Do you see that first entry there? 17:32:20
14 THE WITNESS: Do you want me to answer? 17:32:25
15 MR. ROSS: No, it is beyond the scope. 17:32:29
16 Sorry. He is not a personal witness today. 17:32:30
17 He is a 30(b)(6). It is not within the 17:32:32
18 scope. 17:32:33
19 MR. ROBERTS: I am asking him questions 17:32:34
20 within the subject of Topic 20. 17:32:36
21 MR. ROSS: No. I had conversations with 17:32:44
22 Ms. Lin about this. You could talk about 17:32:46
23 width, when it was at Circuit City, but we 17:32:48
24 are not talking about anything after that. 17:32:51
25 If you want to ask him what he knew 17:32:54

Page 241

1 when he was at Circuit City about any kind 17:32:55
2 of suspicions or knowledge of a conspiracy, 17:32:58
3 as we say that in our complaint, you can go 17:33:03
4 ahead, otherwise it is beyond the scope. 17:33:06
5 MR. ROBERTS: I will represent to you, 17:33:10
6 sir, that the first complaints in this action 17:33:12
7 were filed in November 2007. 17:33:14
8 BY MR. ROBERTS: 17:33:18
9 Q Immediately after those complaints were 17:33:18
10 filed, what action did Circuit City take to 17:33:21
11 discover if it had any claims against the Thomson 17:33:24
12 defendants? 17:33:28
13 MR. ROSS: Beyond the scope. 17:33:28
14 MR. ROBERTS: Sorry, was there an 17:33:29
15 objection? I could not hear it. 17:33:29
16 MR. ROSS: I am instructing him not to 17:33:33
17 answer. It is beyond the scope. 17:33:44
18 BY MR. ROBERTS: 17:33:46
19 Q When did Circuit City first suspect that 17:33:56
20 the Thomson defendants were participants in the 17:33:59
21 alleged conspiracy? 17:34:02
22 MR. ROSS: Same instruction. 17:34:05
23 MR. ROBERTS: Sir, this is squarely 17:34:14
24 within Topic 20, as to when they first 17:34:15
25 suspected the existence of the alleged 17:34:18

61 (Pages 238 - 241)

Page 242

1  conspiracy. I don't understand why you are  17:34:21
2  objecting.  17:34:22
3     MR. ROSS: You were not part of the  17:34:22
4  negotiations of the topics and my discussions  17:34:24
5  with Ms. Lin, sorry.  17:34:25
6     We are not going beyond those  17:34:29
7  discussions. The discussions were that the  17:34:32
8  witness could testify as to any knowledge  17:34:33
9  that he or Circuit City had prior to the  17:34:37
10 liquidation while he was there and he has  17:34:41
11 answered that today and the answer was none.  17:34:46
12 Anything after that is beyond the scope.  17:34:49
13 BY MR. ROBERTS:  17:34:58
14    Q   Before November 2007, did Circuit City  17:34:59
15 conduct any investigations regarding the existence  17:35:02
16 of the alleged antitrust conspiracy?  17:35:07
17    MR. LAHAD: Asked and answered.  17:35:10
18    MR. ROSS: That, you can answer.  17:35:13
19    MR. LAHAD: You can answer that.  17:35:14
20    THE WITNESS: I don't know.  17:35:14
21 BY MR. ROBERTS:  17:35:16
22    Q   You don't know? Could you please turn  17:35:16
23 to paragraph 214 in the complaint that is in front  17:35:19
24 of you.  17:35:23
25    The first sentence in paragraph 214  17:35:39

Page 243

1  states, "Over the course of the relevant period,  17:35:41
2  the price of CRTs remains stable and in some  17:35:44
3  instances went up in an unexplained manner despite  17:35:46
4  the national trends in those technology products  17:35:49
5  to go down over time."  17:35:51
6     Did I read that correctly, sir?  17:35:54
7     A   I read it the same as you read it.  17:35:56
8     Q   But during the relevant period, did  17:36:00
9  Circuit City conduct investigations as to why  17:36:04
10 prices of CRTs seemed to be remaining stable  17:36:07
11 instead of going down as somewhat expected?  17:36:11
12    MR. ROSS: I instruct you not to answer.  17:36:14
13 Beyond the scope.  17:36:15
14 BY MR. ROBERTS:  17:36:34
15    Q   During the relevant period, did Circuit  17:36:35
16 City monitor the prices of CRTs as opposed to CRT  17:36:42
17 products?  17:36:47
18    MR. ROSS: I think that is beyond the  17:36:49
19 scope, but I will let him answer.  17:36:50
20    THE WITNESS: I would not know how or  17:36:52
21 why they would.  17:36:55
22 BY MR. ROBERTS:  17:36:56
23    Q   Is that answer no, sir?  17:36:57
24    A   No. The answer is no.  17:37:03
25    Q   Why didn't Circuit City conduct such an  17:37:11

Page 244

1  investigation of CRT product prices?  17:37:14
2     MR. LAHAD: Asked and answered.  17:37:19
3     THE WITNESS: (No response.)  17:37:20
4  BY MR. ROBERTS:  17:37:20
5     Q   You can answer, sir.  17:37:29
6     A   I haven't seen anything that would make  17:37:32
7  me believe that they had enough information to  17:37:35
8  warrant an investigation.  17:37:39
9     Q   If you will look quickly, again, at  17:37:47
10 Exhibit 2840. This was the exhibit that Ms. Lin  17:37:51
11 was showing you earlier today.  17:37:53
12    MR. LAHAD: Sorry, which exhibit?  17:37:58
13    MR. ROBERTS: 2840.  17:38:01
14 BY MR. ROBERTS:  17:38:02
15    Q   This is the exhibit that you may recall  17:38:28
16 you testified was a document that Circuit City  17:38:30
17 prepared in advance of discussions with  17:38:33
18 representatives of the Thomson defendants, is that  17:38:35
19 correct?  17:38:38
20    A   Yes, in preparation for a meeting  17:38:40
21 with Thomson personnel.  17:38:44
22    Q   Looking again at the second page, the  17:38:47
23 second major bullet points, it states, "Thomson is  17:38:49
24 pricing products of similar quality and features  17:39:00
25 to other competitors and prices that are below  17:39:05

Page 245

1  those other competitors and reducing the profits  17:39:09
2  of retailers," is it your understanding that this  17:39:14
3  practice of Thomson was reducing the profits of  17:39:18
4  Circuit City?  17:39:22
5     MR. LAHAD: Objection, misquotes and  17:39:25
6  misstates the document.  17:39:27
7     MR. GRALEWSKI: Objection, form.  17:39:29
8     THE WITNESS: Now that the objections  17:39:32
9  have been done, I forgot what you asked. I  17:39:38
10 am sorry.  17:39:41
11    MR. ROBERTS: That's okay. Maybe my  17:39:42
12 question was unclear.  17:39:43
13 BY MR. ROBERTS:  17:39:46
14    Q   Was it your understanding that Thomson's  17:39:46
15 practice of pricing its products below those of  17:39:48
16 other similar competitors were pricing was  17:39:53
17 reducing the profitability of Circuit City?  17:39:54
18    MR. LAHAD: Lacks foundation, assumes  17:40:02
19 facts.  17:40:03
20    MR. GRALEWSKI: Objection, form.  17:40:05
21    THE WITNESS: As I have testified  17:40:07
22 earlier, anything that reduces the average  17:40:08
23 retail of products reduces the profitability  17:40:11
24 of Circuit City Stores.  17:40:14
25    Could reduce it unless they were in an  17:40:18

62 (Pages 242 - 245)



Page 246

1  increase in sales that would offset the loss  17:40:26
2  in profits from the average retail to  17:40:29
3  client.  17:40:33
4  BY MR. ROBERTS:  17:40:33
5      Q  Looking again at bullet point 2 here, is  17:40:37
6  it your understanding that this is representing  17:40:40
7  that Thomson was setting a comparatively low  17:40:43
8  suggestion manufacturer pricing for these  17:40:48
9  products?  17:40:50
10     MR. GRALEWSKI: Objection, form.  17:40:52
11     THE WITNESS: He says specifically that  17:40:56
12  he doesn't understand that the GE product  17:40:58
13  position well below other (similarly featured  17:41:02
14  product.) Does that answer your question?  17:41:05
15 BY MR. ROBERTS:  17:41:08
16     Q  I guess I am saying that that is the  17:41:08
17 manufacturer's suggested price?  17:41:11
18     MR. LAHAD: It assumes facts. Calls for  17:41:14
19  speculation.  17:41:17
20     THE WITNESS: (No response )  17:41:21
21 BY MR. ROBERTS:  17:41:26
22     Q  You can answer, sir.  17:41:27
23     A  Again the question is — well, what is  17:41:29
24  the question?  17:41:34
25     Q  I guess I am trying to understand  17:41:36

Page 247

1  exactly what your understanding is of what this  17:41:37
2  document is representing about how Thomson is  17:41:41
3  positioning the products, and I am asking you, it  17:41:43
4  says, "Thomson continues to build added value to  17:41:49
5  GE product and position it way below all of the  17:41:51
6  brands similarly featured products," is it saying  17:41:54
7  that Thomson is setting a suggested manufacturer's  17:41:56
8  retail price and is below what other  17:42:00
9  manufacturer's are setting?  17:42:04
10     MR. GRALEWSKI: Again, lacks foundation.  17:42:06
11     MR. GRALEWSKI: Objection, form.  17:42:08
12     MR. LAHAD: Assumes facts. The document  17:42:09
13  speaks for itself.  17:42:10
14     THE WITNESS: Yes.  17:42:12
15 BY MR. ROBERTS:  17:42:12
16     Q  How does the fact that Thomson is  17:42:14
17 setting such a price will reduce the profitability  17:42:20
18 of Circuit City?  17:42:22
19     MR. GRALEWSKI: Objection, form.  17:42:28
20     MR. LAHAD: Yes, vague.  17:42:29
21     THE WITNESS: Again, anything that  17:42:31
22  decreases the average retail, that Circuit  17:42:34
23  City collects on a category of goods reduces  17:42:38
24  or is more than likely to reduce the profits  17:42:44
25  of that product unless there is a  17:42:48

Page 248

1  corresponding increase in unit sales to  17:42:51
2  offset it.  17:42:53
3  BY MR. ROBERTS:  17:42:54
4      Q  This bullet point discusses various  17:42:59
5  different sizes of GE televisions in comparison to  17:43:03
6  other brands of similar size.  17:43:06
7      Is it fair to say that Circuit City  17:43:09
8  earned different profit margins on different  17:43:12
9  brands of televisions of the same size?  17:43:16
10     MR. LAHAD: Vague.  17:43:21
11     THE WITNESS: I don't think the piece of  17:43:22
12  paper has anything to do with that, but as I  17:43:24
13  testified earlier, we would expect different  17:43:27
14  margins at different price points and so  17:43:30
15  different sizes have different price points.  17:43:34
16 BY MR. ROBERTS:  17:43:37
17     Q  I guess I am trying to get at the size  17:43:37
18 issue, you know. Was margin correlated in a general  17:43:39
19 way with the relative size of televisions that  17:43:44
20 were sold by Circuit City?  17:43:48
21     MR. LAHAD: Vague.  17:43:50
22     THE WITNESS: Price point was more of a  17:43:52
23  factor than size, but it could have been a  17:43:55
24  factor, yes.  17:44:03
25 BY MR. ROBERTS  17:44:04

Page 249

1      Q  Did Circuit City earn different profit  17:44:05
2  margins on televisions that were relatively full  17:44:09
3  featured and higher quality than it did on lower  17:44:14
4  featured lower-quality televisions?  17:44:18
5      MR. LAHAD: Asked and answered.  17:44:21
6      THE WITNESS: The answer is yes.  17:44:21
7  BY MR. ROBERTS:  17:44:23
8      Q  Was that consistent throughout the  17:44:24
9  relevant period?  17:44:26
10     A  Yes.  17:44:27
11     MR. ROBERTS: Nothing further. Thank  17:44:30
12  you, sir.  17:44:31
13     MR. ROSS: Bob, I think you wanted to  17:44:33
14  ask a few.  17:44:34
15     MR. GRALEWSKI: Yes, thank you.  17:44:36
16 EXAMINATION BY MR. GRALEWSKI:  17:44:36
17     Q  Good afternoon, Mr. Deason. My name is  17:44:36
18 Bob Gralewski and I represent Consumers of CRT TVs  17:44:44
19 and Monitors many of whom likely bought from  17:44:48
20 Circuit City who are suing CRT manufacturers and I  17:44:53
21 have a couple of questions for you regarding MSRP.  17:44:58
22     For CRT finished products during the  17:45:05
23 relevant time period, was MSRP for a SKU ever set  17:45:11
24 lower than Circuit City's cost for that SKU?  17:45:16
25     A  I do not know of such an example and  17:45:26

63 (Pages 246 - 249)

Page 250

1 that would be a very odd occurrence.                17:45:29
2    Q   What is your understanding of how      17:45:35
3 generally speaking MSRP was set by vendors?     17:45:37
4    A   The manufacturer's suggested retail      17:45:43
5 price was generally set by the vendor as the price   17:45:45
6 that they believed was competitive in the        17:45:49
7 marketplace.                                      17:45:58
8    Q   Do you have an understanding that       17:45:59
9 anything else went into how particular MSRP was   17:46:00
10 arrived at?                                      17:46:07
11   A   I don't have knowledge of how the       17:46:08
12 vendors sold it.                                 17:46:10
13   Q   Do you have an understanding that costs,  17:46:13
14 a vendor cost, was a component of MSRP?          17:46:16
15   A   Again, the discussions that a buyer      17:46:24
16 would have with a vendor about a manufacturer's   17:46:33
17 suggested retail price would be about whether it   17:46:36
18 was a competitive price or not. We would not be   17:46:39
19 having discussions about what it cost them to     17:46:44
20 build.                                           17:46:47
21   Q   What would you expect to happen based on  17:46:48
22 your experience to MSRP if vendor costs went down?  17:46:51
23   MS. LIN: Objection, calls for            17:47:03
24 speculation.                                     17:47:04
25   THE WITNESS: Since I don't know when      17:47:04

Page 251

1 vendors' costs went down, I am not sure that   17:47:06
2 I have a reasonable expectation.                 17:47:10
3 BY MR. GRALEWSKI:                               17:47:19
4    Q   I know that you have been testifying for  17:47:19
5 a long time today. Just a little bit ago you used  17:47:21
6 an example in an answer, I believe you talked    17:47:25
7 about MSRP decreasing by $75 and your Circuit    17:47:29
8 City's cost decreasing by $50 in that example, do  17:47:35
9 you remember that testimony?                     17:47:39
10   A   Yes.                                      17:47:40
11   Q   Why did you use that example? Do you     17:47:40
12 have an understanding that a decrease in MSRP is   17:47:49
13 typically related to a decreased in your costs?   17:47:54
14   A   Yes.                                      17:48:02
15   Q   For CRT finished products during the     17:48:11
16 relevant time period, how often would MSRP change  17:48:14
17 for a particular CRT finished product SKU?       17:48:19
18   A   As I testified earlier the              17:48:26
19 manufacturer's suggested retail price was         17:48:32
20 generally set for a year.                        17:48:35
21      It may change because it is not selling  17:48:38
22 or it may change because there is an introduction  17:48:44
23 of a new product.                               17:48:47
24      The standard review was about every six  17:48:49
25 months, however any product that was not selling  17:48:56

Page 252

1 would be discussed and reviewed at any time.     17:48:59
2    MR. GRALEWSKI: Thank you, Mr. Deason.     17:49:04
3 I have no further questions at this time.        17:49:04
4    MR. ROSS: Is there anybody else on the    17:49:09
5 phone? We have a little bit of clean up         17:49:11
6 though.                                          17:49:17
7    MR. LAHAD: Right and I will just ask       17:49:17
8 from here.                                       17:49:19
9 EXAMINATION BY MR. LAHAD:                       17:49:19
10   Q   Mr. Deason, earlier you testified about  17:49:20
11 trips that you and other Circuit City buyers took  17:49:24
12 abroad to visit CRT finished product vendors     17:49:25
13 during the relevant time period, do you recall   17:49:27
14 that?                                            17:49:31
15   A   Yes.                                      17:49:31
16   Q   Do you recall any of the specific CRT   17:49:32
17 finished product vendors you visited during these  17:49:35
18 trips abroad?                                    17:49:38
19   A   Yes.                                      17:49:39
20   Q   Did you visit Panasonic?               17:49:39
21   MS. ARGUELLO: Object to form.           17:49:41
22   THE WITNESS: Yes.                        17:49:42
23 BY MR. LAHAD:                                   17:49:44
24   Q   Did you and any other Circuit City     17:49:44
25 buyers visit Hitachi?                            17:49:44

Page 253

1    A   Yes.                                      17:49:46
2    MR. GAWLEY: Object to form.             17:49:52
3 BY MR. LAHAD:                                   17:49:52
4    Q   Did you and any other Circuit City     17:49:57
5 buyers visit Toshiba?                            17:49:57
6    MR. BAVE: Objection, vague and          17:50:04
7 ambiguous.                                       17:50:04
8    THE WITNESS: I was not party to any     17:50:05
9 Toshiba visits, so I cannot speak to that,      17:50:07
10 but I know that buyers went to all major        17:50:09
11 suppliers and would have it on their agenda     17:50:18
12 to visit Toshiba.                               17:50:23
13 BY MR. LAHAD:                                   17:50:24
14   Q   Did you and any other buyers visit      17:50:26
15 Samsung?                                         17:50:27
16   A   Yes.                                      17:50:29
17   Q   What about LG?                         17:50:30
18   MS. LIN: Object to form.                17:50:30
19   THE WITNESS: I was on a trip with       17:50:35
20 buyers who visited LG, but I did not.           17:50:37
21 BY MR. LAHAD:                                   17:50:40
22   Q   Did you or any other buyers visit      17:50:41
23 Phillips?                                        17:50:43
24   A   Yes.                                      17:50:50
25   Q   And you testified earlier that during   17:50:52

64 (Pages 250 - 253)



Page 254

```
 1  these trips and visits the vendors would, if I   17:50:56
 2  understood your testimony, present new or        17:50:58
 3  forthcoming products, is that accurate?          17:51:01
 4     A   Yes.                                       17:51:02
 5     Q   You also testified that during these       17:51:04
 6  presentations, vendors, I believe you used the   17:51:05
 7  term, "trial balloon," do you recall that?       17:51:09
 8     A   Yes.                                       17:51:10
 9     Q   Can you give me a little bit more          17:51:11
10  explanation on what you meant by trial balloon?  17:51:12
11     A   They would say, "We have this product      17:51:16
12  and we are going to sell this at $999.  Do you   17:51:19
13  think that would be competitive?"                17:51:23
14     Q   $999, meaning, the MSRP?                   17:51:25
15     A   That is the manufacturer's suggested      17:51:27
16  retail price and would that be a competitive     17:51:31
17  manufactured suggested retail price and we might 17:51:35
18  give back information saying, "It is not          17:51:39
19  competitive today because I already own a product 17:51:44
20  that has more features on it than that, that I   17:51:46
21  sell for $799," or we might say, "We don't believe 17:51:48
22  that that is going to be competitive going        17:51:53
23  forward."                                         17:51:55
24     Q   When you say competitive, competitive     17:51:55
25  where?                                            17:51:57
```

Page 255

```
 1     A   Competitive on our sales floor because    17:51:58
 2  we looked at and are contemplating buying other  17:52:00
 3  product that would make that product             17:52:07
 4  non-competitive.                                  17:52:09
 5     Q   The sales force in the U.S., is that       17:52:11
 6  right?                                            17:52:13
 7     A   Yes.                                       17:52:13
 8     Q   You also testified if I understood your   17:52:16
 9  testimony that this was the start of what you said 17:52:18
10  was, "One long negotiation," to you recall that? 17:52:20
11     A   Yes.                                       17:52:23
12     Q   I want to fill in a little more of this   17:52:24
13  long negotiation.  After you have this visit     17:52:26
14  abroad at these CRT finished product vendors     17:52:30
15  sites, and you come home, who or what would --   17:52:32
16         MR. LAHAD:  Strike that.                  17:52:39
17  BY MR. LAHAD:                                     17:52:39
18     Q   What would be the next step?              17:52:39
19     A   Since you had seen things very early and  17:52:43
20  sometimes we see product six months before it is 17:52:47
21  going to be introduced, or even longer, the next 17:52:52
22  step would be, "What have they done?" based on the 17:52:59
23  feedback that you have given them, or that other  17:53:02
24  customers had given them, and so there would be an 17:53:06
25  update of, "You guys saw this once before, but   17:53:10
```

Page 256

```
 1  this is what we're now going to do.  We are now  17:53:14
 2  going to put the button on the left hand side.   17:53:18
 3         "It now looks like this, and oh, by the   17:53:20
 4  way, the manufacturer's suggested retail price is 17:53:23
 5  going to be this."                               17:53:26
 6         That conversation could happen on a       17:53:29
 7  return visit to a foreign country.  It could     17:53:31
 8  happen by the foreign representatives coming to  17:53:33
 9  Circuit City or coming to a sales office in the  17:53:40
10  U.S. and we meet them there.                     17:53:44
11         But you have to get that level of, "This  17:53:47
12  is what we're going to offer and this is why the 17:53:50
13  change that we have made."                       17:53:56
14         At that point we may have more            17:53:58
15  information that says, "Sorry, but that is still 17:54:01
16  not competitive," and so we may be giving an     17:54:04
17  indication at that point to senior people from   17:54:10
18  that vendor that it is still not right, and that 17:54:15
19  they have got more work to do overall but it's   17:54:20
20  starting.  That's the next step.                 17:54:27
21         At some point they are going to say,      17:54:32
22  "This is our assortment and this is what we're   17:54:34
23  proposing that we sell it to you for."           17:54:38
24         It's possible that the buyer would get    17:54:42
25  ahead of that process, and say, "I would buy     17:54:46
```

Page 257

```
 1  500,000 of these if you give me a cost of this." 17:54:53
 2         You would have continuous negotiations    17:54:58
 3  from there involving all of those people down to 17:55:01
 4  the point of finally making an agreement.        17:55:04
 5     Q   To be clear, on behalf of Circuit City,   17:55:07
 6  it would be the buyer located in Richmond,       17:55:10
 7  Virginia?                                         17:55:12
 8     A   That is correct.                          17:55:12
 9     Q   Earlier there were some questions         17:55:16
10  regarding the use of cost information from one   17:55:17
11  vendor with other vendors, do you recall that?   17:55:21
12     A   Yes.                                       17:55:23
13     Q   Let me ask you this.  If a CRT finished   17:55:25
14  product vendor decreased its costs to Circuit City 17:55:29
15  for a class, or a product, would Circuit City use 17:55:32
16  that information that cost information with other 17:55:38
17  vendors at all?                                   17:55:41
18     A   No.                                        17:55:44
19     Q   Did Circuit City ever share specific      17:55:45
20  costs information from one vendor with another    17:55:48
21  vendor?                                           17:55:50
22     A   No.                                        17:55:51
23     Q   I want to point you to Exhibit 2845.      17:55:53
24  It's the memo to the Sony file.  I have a few    17:55:59
25  questions specifically about the fourth bullet   17:56:15
```

65 (Pages 254 - 257)



**Page 258**

1  point that we talked about before. Do you need a   17:56:18
2  second to re-read that bullet?   17:56:22
3   A   Yes.   17:56:24
4   Q   Please do.   17:56:25
5   A   I am familiar.   17:56:30
6   Q   Does this fourth bullet state that   17:56:32
7  Thomson, Phillips, and Zenith will raise their two   17:56:34
8  prices together after consulting with each other?   17:56:38
9   A   No.   17:56:40
10   Q   Is there any indication in this bullet   17:56:42
11  or in any of Exhibit 2845 that Mr. Palombo   17:56:44
12  indicated that CRT makers were meeting to fix   17:56:49
13  prices?   17:56:52
14   A   No.   17:56:52
15   Q   Is there anything in this bullet point   17:56:53
16  or anywhere else in Exhibit 2845 that would lead   17:56:55
17  you to believe that CRT manufacturers were meeting   17:56:59
18  to conspire on fixing the prices of their   17:57:01
19  products?   17:57:04
20   A   No.   17:57:04
21   Q   In your mind is the information in   17:57:06
22  Exhibit 2845 specific enough for Circuit City to   17:57:09
23  initiate investigation into CRT price fixing?   17:57:14
24   MR. BAVE:  Objection to form.   17:57:18
25   THE WITNESS:  No.   17:57:21

**Page 259**

1   MR. LAHAD:  Nothing further for you.   17:57:22
2  Thank you.   17:57:23
3   THE VIDEOGRAPHER:  Are we done?  There
4  being no further matters, the time is
5  approximately 5:57 p.m.  This deposition is
6  concluded.
7
8   (Whereupon, the deposition concluded at
9  5:57 and the witness is to read and sign with
10  arrangements already on record with standing
11  orders for transcripts.)
12
13
14
15
16
   _____
   STEVEN DEASON
17
18
19  Subscribed and sworn to before me
20  this      day of      , 2014.
21
22
   _____
23  NOTARY PUBLIC
24
25

**Page 260**

1
2  UNITED STATES OF AMERICA  )
                             ss:
3  DISTRICT OF COLUMBIA    )
4
5   I, T. S. HUBBARD, JR., a Notary Public
6  within and for the District of Columbia do hereby
7  certify that the witness whose deposition is
8  hereinbefore set forth was duly sworn and that the
9  within transcript is a true record of the testimony
10  given by such witness.
11
12   I further certify that I am not related
13  to any of the parties to this action by blood or
14  marriage and that I am in no way interested in the
15  outcome of this matter.
16
17   IN WITNESS WHEREOF, I have hereunto set
18  my hand this 5th day of May 2014.
19
20
21
22
23
24   T. S. HUBBARD, JR.
   Commission Identification 237435
25   Commission Expires April 30, 2018

66 (Pages 258 - 260)



[& - 2845]

| & | | | |
|---|---|---|---|

**&**

& 2:8 4:5,14 5:6,15
  7:12,20 227:12

**0**

0021806 8:20
  169:16
0148714 8:17
  105:21
0389749 8:19 154:5
0397160 8:22
  219:20
0534111 8:19
  137:13
0543314 8:18
  128:14
0548555 8:21 198:9
0567286 8:16 74:8
0569329 8:18 127:1
0572187 8:17
  122:25
0604919 8:21
  208:18
0606306 8:20
  186:20
07 173:16
07-5944 1:4

**1**

1 11:23 69:12
1,000 102:6 118:24
1,999 210:13
10 8:6 37:24 38:1
  83:24 115:4 155:4
  201:2,13
10,000 46:3 90:3
100 55:18,19 118:23
  163:21 190:12
  213:1,2,4 234:2,10
100,000 90:4,5
1000 3:6
1001 7:13
10022 6:8
10036 4:7

10166 4:16
105 8:17
10:58 1:16 2:9 9:13
11 11:24
11/25 189:22 190:3
1155 4:6
12 8:15 12:2,3,4
  91:14 208:22
1201 5:7
122 8:17
126 8:18
128 8:18
1299 7:5
12:03 56:4
12:42 56:7,8
13 11:24 29:23 30:5
  30:10 31:3 45:15
  47:9 163:23 173:9
137 8:19
14 11:24
15 83:24 90:21
154 8:19
169 8:20
16th 6:7
1700 7:22
186 8:20
19 11:24 29:23 30:6
  30:10 31:3 152:15
1917 1:5
198 8:21
1980 155:10
1990s 86:7
1992 15:3,17 18:21
1995 15:3,18 18:3,6
  18:10,17,21,21
  22:10,19 149:16
  165:9
1996 15:8 16:7
  149:16 155:13
  181:20 199:3
1997 149:16 201:3
1998 15:9,12 16:7
  17:10 19:5,9
1:04 73:5,8

1:06 73:9,11
1:41 97:18,20
1:48 97:21,23

**2**

2 69:13 93:5 107:14
  124:19 130:5,7
  133:19 134:1
  154:18 163:23
  188:3 230:16,16
  246:5
2,000 90:5 156:18
2,800 156:21
20 2:8 9:21 29:23
  30:9,10 83:24
  122:20 143:14,14
  144:9 240:20
  241:24
200 4:15
2000 94:16,19 95:2
  106:10
20004 7:6,14
2002 15:12 17:11
  48:11 94:22 95:2
2004 48:11 98:4
  99:3 188:25
2006 22:11
2007 22:19 165:10
  187:4 208:22
  240:13 241:7
  242:14
2013 239:23
2014 1:15 2:7 9:14
  259:20 260:18
2018 260:25
202 8:7
202.624.2720 7:15
202.639.1117 7:7
208 8:21
21 11:24 30:2
212.294.5304 4:17
212.371.6600 6:9
212.819.2673 4:8
214 242:23,25

21810 178:3
21813 183:19
219 8:22
227 8:8
23 1:15 2:7 9:14
237435 260:24
238 8:9
239 8:23
24 29:24
240 239:24 240:1,4
  240:6,11
247 210:6
249 8:10
25 11:24 33:25 34:1
  36:25 37:1 187:3
252 8:11
27 75:15
27th 6:16
2814 140:15
2831 11:16
2834 8:15 12:19,23
  13:2 14:15,18 15:1
2835 8:16 68:14,17
  68:21 73:16,25
2836 8:16 74:5,8,11
2837 8:17 105:18,21
  106:2,12 108:17
2838 8:17 122:21,24
  124:19
2839 8:18 126:22,25
2840 8:18 128:10,13
  134:1 135:13,22
  244:10,13
2841 8:19 137:10,13
  137:16
2842 8:19 154:2,6,9
2843 8:20 169:12,15
  169:20
2844 8:20 186:16,19
  186:23 189:3
  190:18
2845 8:21 198:5,8
  198:11 200:1,14
  257:23 258:11,16
  258:22

2846  8:21 208:14,17
2847  8:22 219:16,20
2848  8:22
2849  8:23 239:4,7
299  144:19
2:41  133:18
2:48  133:22

**3**

3  11:23 133:22
  197:4
3,000  156:18,20
30  10:17,21 29:25
  51:22,23 98:15
  118:23 122:18
  158:23 159:1
  161:20 200:2,4
  240:17 260:25
303.607.3792  7:24
30309  5:8
31  181:19 223:2
312.222.9450  5:18
315  75:3
3200  7:21
349  144:18
35  29:25
353  5:16
399  79:9 110:22
3:38  169:5,8
3:50  169:8,10
3m  119:17,17 120:3
  120:4

**4**

4  109:9 197:8
40  29:25 112:12
  137:2,6 156:15
400  21:17 47:10
  120:6 196:14
404-253-8488  5:10
404.881.7000  5:9
415.439.1400  6:18
415.512.4034  3:18
449  79:10
4:28  197:3,6

4:30  197:6,9
4:37  202:5,8
4:38  202:8,10

**5**

5  201:2,13
50  113:20 152:14
  164:5 237:2 251:8
500  196:15
500,000  210:17
  257:1
5100  3:7
555  6:16
56  155:18
560  3:15
57  157:6,8
5:10  227:4
5:14  227:7
5:57  259:5,9
5th  260:18

**6**

6  10:17,21 11:23
  158:23 159:1
  161:20 164:7 200:2
  200:4 240:17
60  51:23 98:14
600  54:7
60654  5:17
650  21:18
660  21:18
68  8:16
699  111:12

**7**

7  11:24
700  122:17
700,000  210:17
713.651.9366  3:9
74  8:16
75  237:3 251:7
77002  3:8
799  111:11 254:21

**8**

8  115:5
800  187:15
80203  7:23
825  6:7
8th  2:8 9:21

**9**

9  11:24
90  51:23 149:23
  207:1
94104  6:17
94105-2907  3:17
95  145:10
97  145:8
98  145:9
99  47:10,10 122:19
  144:24 145:2
99.9  148:7
999  210:13 254:12
  254:14

**a**

a.m.  1:16 2:9 9:13
ability  28:24 50:5
  54:13 71:24 121:4
  126:14 134:18
  153:12 237:25
able  29:2,15 55:18
  62:14,23 63:8,19
  64:2,6,10 72:23
  85:3 112:18 118:3
  151:24 152:1 175:9
  177:10 195:19
  205:18 210:21,21
  221:20 223:4 226:3
  236:17,24
abolished  95:1
abroad  88:20 112:6
  113:1,3 115:13
  252:12,18 255:14
absolutely  107:8
accept  52:25
acceptance  131:12

access  221:17
accident  99:9
accommodate  139:4
account  69:2 114:6
  116:19 123:19
accounted  96:23
  97:6
accurate  19:25
  21:15 163:21 254:3
ace  15:4
achieve  120:20
  122:13
achieving  118:1
acquire  43:24 143:5
  147:21
acquired  143:19
acronym  172:7,16
  173:3,5 183:15
act  44:7 125:6
  158:14 217:19
  226:16
acted  19:20
acting  158:19
  226:10
action  96:19 240:12
  241:6,10 260:13
actions  1:10 138:15
active  35:8
actively  101:25
  154:13
activities  93:9
  215:20 216:16
  228:15
activity  96:12 116:6
  177:17 179:2,17,19
actual  17:6,7 96:22
  97:2 121:13,17
  212:21
ad  29:3 96:20
  151:22,22 155:4
  166:6,10 171:25
  177:20 179:10,17
  179:22 180:5
  182:19 184:18,23
  184:25 190:2

[ad - appropriateness]                                                                      Page 3

209:17 212:16
216:1,12 229:21
230:4 231:24
**add** 49:4 179:24
**added** 247:4
**addition** 51:7,14
214:24
**additional** 34:24
53:1 54:2 96:8
117:4 186:14
210:17 217:10
**addressing** 209:5
**adequate** 42:3 137:1
**adjective** 74:4
**adjustment** 71:14
**adopted** 169:23
**ads** 15:25 93:18
104:25 138:15
139:14 166:5
177:16,22,25
179:13 190:6,9
**advance** 216:18
244:17
**advantageous**
132:11,18 133:14
**advertise** 84:4,12
140:9 185:23 186:2
186:9 204:12
**advertised** 52:19
83:18 117:19
139:17 153:1
154:23,25 155:2
158:11 166:9
182:21 183:20,24
183:25 184:12
185:2,3,15 186:3
225:8,9
**advertisers** 54:6
**advertising** 52:21
64:23 84:16 124:21
124:25 159:24
211:10 230:1,2
**advice** 177:20
203:15

**advised** 210:1
**affect** 47:13 145:15
145:18,21
**afternoon** 56:6
202:12,15 249:17
**agenda** 253:11
**aggressive** 185:23
185:25
**ago** 251:5
**agree** 131:7 225:4
**agreed** 53:25 69:14
70:2 83:19 86:9
**agreement** 53:16
82:4,7 99:14,20
100:1 112:2 201:15
257:4
**agreements** 67:9
82:1 86:8 87:18
99:7,7 230:14
**agrees** 81:7
**ahead** 12:21 97:16
133:15 241:4
256:25
**aide** 8:15
**air** 114:21 115:6
**aligned** 182:20
**alleged** 197:12,15
238:20 241:21,25
242:16
**allegedly** 200:16
**allow** 216:23 217:2
**allowances** 227:24
**allowed** 149:21
150:18,21,24 151:4
151:8,17
**allows** 104:24
**alston** 5:6
**alston.com** 5:11
**alternative** 193:3
**amazon** 164:23
165:7,10
**ambiguous** 253:7
**amend** 122:7
**america** 125:12
126:1,7 227:20

228:4,7,23 229:17
230:6 231:7 232:7
232:20 233:21,22
234:9 260:2
**america's** 230:25
231:16 233:13
**american** 203:14
240:6,9
**americas** 4:6
**amount** 31:4 42:14
46:2,16 83:4,8,11
83:13 89:7,10,18
90:7,11,22 99:10
115:6 131:13 143:7
143:18 144:2,4
149:3 185:9 213:23
218:21 230:9
**amounts** 113:15
117:4
**analysis** 119:15
**andrew** 106:5,12
137:18
**andy** 20:18 74:14,22
74:23 75:20
**announced** 44:17
**annual** 34:18,19
35:11 77:20 78:6
80:24 206:8
**annually** 78:21
**anomaly** 212:24
**anshakov** 20:21
**answer** 11:5 18:13
32:19 33:6 36:23
37:9 40:20 46:20
53:4 58:16 63:23
77:13 81:18 87:15
91:4 103:18 107:9
108:11 112:21
118:5 120:24 125:5
132:11 141:7 142:9
142:23 146:14
161:9,21 170:4
194:24 195:13
232:1 234:18
239:25 240:14

241:17 242:11,18
242:19 243:12,19
243:23,24 244:5
246:14,22 249:6
251:6
**answered** 100:17
143:22 146:10
163:13 211:22
217:8 234:17,22
242:11,17 244:2
249:5
**answering** 13:19
218:20
**answers** 211:12
**antenna** 45:16
**anticipate** 155:20
**antitrust** 1:8 242:16
**anybody** 165:16
180:22 213:21
214:2 252:4
**anymore** 75:14
101:15 132:21
233:17
**anyone's** 206:9
**apart** 43:3 49:23
193:15,16
**apologize** 40:18
**appear** 69:14
124:22 161:4
177:24 200:14
**appearances** 9:6,7
**appeared** 2:5
**appearing** 3:11,20
4:10,19 5:3,12,20
6:3,11,20 7:2,9,17
7:25 13:21
**appears** 70:2,5
137:16,17 181:7
182:4 209:8
**applied** 232:23
233:1
**apply** 9:8
**appreciate** 239:2
**appropriateness**
204:21

**approve** 26:17
**approximately** 9:13
  15:14 17:11 31:21
  56:4 73:5,11 94:19
  97:22 98:4 133:18
  133:22 169:5,10
  197:3,8 202:10
  222:21 227:4,7
  259:5
**april** 1:15 2:7 9:14
  260:25
**area** 28:15 171:24
**argue** 165:25
**arguello** 4:13 227:9
  227:11,12,15
  228:21 229:15
  231:5,14 233:2,25
  234:20 235:1,5,20
  236:15,23 238:11
  252:21
**arguing** 108:13,24
**arrange** 114:23
**arrangements**
  259:10
**arrived** 250:10
**ascertainable** 217:6
  218:3
**aside** 73:25 128:13
  144:1 186:19 211:1
**asked** 63:24 76:18
  98:13 146:10
  165:16 211:22
  217:8 220:25
  221:21 234:17,22
  239:1 242:17 246:22
  245:9 249:5
**asking** 49:15,17
  54:24 83:14 85:10
  86:16 89:17 92:11
  103:20 123:3
  158:22 161:20
  192:7 206:4 213:13
  220:21 240:8,19
  247:3

**aspect** 105:2 207:12
**assignment** 170:25
**assignments** 178:12
**assistant** 17:12
  209:10 220:8
**associate** 220:21
**associates** 29:11
  95:3
**association** 221:9
**assortment** 33:19
  34:2,12 35:1 36:13
  37:2 44:16 46:4
  81:22,23 256:22
**assortments** 164:17
**assume** 60:14 75:17
  127:12
**assumes** 138:1
  169:24 199:21
  245:18 246:18
  247:12
**assuming** 70:4
**atlanta** 5:8 15:22
**attention** 74:25
  124:18 127:4 130:4
  155:17 176:23
  212:3
**attorney** 204:24
**attorneys** 13:10
**attractive** 108:18
**attributable** 61:25
**auction** 45:1,4,5
  46:6,10 48:1,4,12
  48:21 49:7,23
**auctions** 45:9
**audio** 24:13
**auguello** 8:8
**authority** 26:17
  27:12,18 150:15
**automatically**
  187:21
**availability** 105:6
**available** 33:15 54:8
  147:24 224:4
**avenue** 4:6,15 6:7
  7:5,13

**average** 118:17,18
  127:21,22,24
  130:19 133:8,9,10
  164:2 200:20
  245:22 246:2
  247:22
**avoid** 128:3,8
**aware** 41:1,16 64:5
  84:14 99:24 103:24
  135:12 136:4
  138:14 142:4,6,16
  142:25 156:6
  161:16 185:14
  216:8 228:12

**b**

**b** 8:2 10:17,21 84:8
  158:23 159:1
  161:20 181:4
  182:13,19,23 183:1
  183:3,10,13 200:2,4
  240:17
**back** 40:20 41:21
  48:18 56:9 69:23
  73:12 86:21 97:23
  104:17,18 111:9,22
  126:24 133:23
  142:8 151:23 155:8
  155:25 166:21
  167:17,25 169:10
  176:1 197:9 202:10
  207:3 208:5,6,10,12
  220:9,25 221:22
  227:7 228:8 254:18
**backed** 49:3 215:7
**backing** 107:15
**bad** 127:21 185:5
**bag** 152:14
**baker** 7:4,20
**bakerbotts.com** 7:8
**balloon** 254:7,10
**balloons** 110:18
**based** 15:22 28:3,7
  31:13 33:22 35:22
  43:12 55:5,6 58:16

**63**:7,18 78:6,21
  83:5,20 96:11 113:2
  118:1,12 142:23
  143:9 144:8 152:17
  152:20 179:25
  187:3 199:25 210:3
  210:11,20 212:2,2
  224:13 228:19
  229:4,5 231:19
  234:24 250:21
  255:22
**basic** 59:5 66:6
  147:14
**basically** 34:9 45:6
  46:1 80:19 92:17
  107:23 125:20
  128:25 129:25
  130:9 138:3 172:10
  174:12 175:20
  177:2 222:20
**basis** 34:18,20 35:9
  35:11 77:20 78:6
  80:24 86:18 116:17
  157:12,18 168:6
  172:22 179:3 184:4
  229:1
**bates** 8:16,16,17,17
  8:18,18,19,19,20,20
  8:21,21,22 68:18
  74:8 105:21 122:24
  127:1 128:14
  137:13 154:5
  155:18 157:5
  169:16 173:16
  183:19 186:20
  198:8 208:17
  219:20 239:14,18
**bave** 4:4 8:7 202:12
  202:13,17 205:20
  207:24 208:16,20
  210:25 211:2,14
  212:7 217:11
  218:10 219:5,18,23
  220:1 221:5 222:7
  224:7,24 225:3

227:1 253:6 258:24
**beat** 185:20
**beginning** 44:24
  73:12 122:24 127:1
  128:14 133:21
  149:17 152:23
  154:5 155:8 157:7
  183:21 197:7
**begins** 130:5
**behalf** 103:22 257:5
**believe** 19:24 20:20
  23:8 29:24 30:9
  33:12 39:2 40:10
  41:19 47:16 52:8
  73:22 106:17
  120:16 124:2
  143:22 155:14
  170:18 175:13
  183:13 187:2
  188:25 197:15
  202:21 222:2 244:7
  251:6 254:6,21
  258:17
**believed** 250:6
**believes** 201:2
**benchmark** 73:17
  73:23 74:2 144:22
  145:1
**beneficial** 103:4
**beran** 2:8
**best** 117:24 159:17
  164:22 165:5
  166:12 175:5 176:8
  176:17 189:21
  190:2,6,9,17,23
  215:15 220:19
  221:9,11,17 222:8
  223:1,5
**better** 89:8 112:19
  118:9 126:14 132:3
  134:19 135:5
  161:12 194:7 217:3
**beyond** 158:25
  161:22 205:24
  235:11 240:1,15

241:4,13,17 242:6
  242:12 243:13,18
**bgralewski** 6:10
**bi** 77:20 78:21
**bid** 45:22
**bidder** 46:7
**bidding** 46:1
**big** 110:25 156:10
  157:2,3 165:10
  188:16 206:1
**bigger** 31:14
**biggest** 46:15,22
  84:15 164:21
**biggies** 93:19 116:10
  164:24
**bird** 5:6
**bit** 96:4,17 153:18
  189:18 224:20
  251:5 252:5 254:9
**black** 181:9 185:17
  186:1 190:4 216:18
**blank** 188:4
**blind** 45:25
**block** 5:15
**blood** 260:13
**bma** 189:1
**bob** 249:13,18
**bollerplate** 99:6
**bonus** 83:23
**book** 109:14 172:19
  172:20,21 183:17
**bottom** 69:12
  178:20
**botts** 7:4
**bought** 20:12,13
  30:8 34:25 55:11
  56:18,22 57:4 60:4
  74:20 78:1 86:25
  89:7 90:3 91:14
  92:16 155:1 249:19
**box** 105:17 171:20
  176:1,23 178:20
**brand** 38:4,5,8,12
  38:18,21 45:12,13
  46:13 100:15,16,23

101:6 102:10
  112:11 131:19,20
  164:5 173:5,6,10
  202:22 214:13,14
**branded** 46:11
  80:23 203:4
**brands** 26:6 38:3,5
  38:15 59:7,10,13,14
  100:10,12,13
  101:17,25 102:14
  103:17 130:17
  247:6 248:6,9
**brandsmart** 203:18
  203:19 213:1,2,3
  222:22
**brandsmarts** 203:20
**brandy** 9:7
**bread** 215:15
**break** 11:9,12 55:24
  56:2 73:2,7 96:2
  97:17,19 133:16
  169:1,2,3,7 196:25
  197:5 202:7 224:23
  231:19
**breaker** 98:17
**brew** 7:11
**brief** 10:24
**briefly** 128:17 202:3
**bring** 13:6 129:19
  134:23 239:1
**broad** 189:16
**broke** 24:17
**broken** 24:5 119:18
  119:19
**brought** 12:16,22
  48:6 189:18 216:14
**btl** 120:16
**budget** 34:21 118:24
  119:18,20 121:1,4,5
**budgeting** 164:12
**budgets** 97:15 118:3
  118:11 119:1,5,9,25
  119:25 120:2,2,10
  120:20

**build** 247:4 250:20
**building** 107:24
**built** 15:11 81:15,20
**bulk** 149:18
**bullet** 130:5,7 134:1
  134:2 135:21
  198:25 199:2
  200:13 222:24
  244:23 246:5 248:4
  257:25 258:2,6,10
  258:15
**bunch** 86:25 138:12
**burgess** 68:25 69:7
**business** 31:15
  33:21,21 35:23,24
  36:3,5,17,19 40:4
  56:20 73:21 89:25
  90:1,6 103:6,10
  107:10,12 116:22
  118:4 119:22
  120:17 145:4 153:8
  177:18 205:5 214:2
  216:6,22 221:17
  224:14 226:25
  230:18 232:4
  233:22 234:3,11
**busy** 168:13 226:13
**butt** 35:14
**button** 256:2
**buy** 26:7 38:1,7,10
  38:19 46:3 50:15
  53:6 64:11,19,20
  75:4,8,17 90:4
  91:17,18 98:14
  102:4 112:7,16,17
  113:18,18 134:25
  135:4,5 149:9,17,25
  150:10 157:20
  164:23 165:5
  166:12 175:5,24,25
  189:21 190:17,23
  195:24 196:10
  215:6 220:19 221:9
  221:11 222:8 223:1
  223:5 224:1,5

225:25 226:5 229:3
233:17 256:25
**buy's** 190:2,6,9
221:17
**buyer** 15:13 16:19
16:22 17:1,3,12
19:4,6,11,18,21
20:14 26:7 27:11,12
27:20,24 28:1 30:25
31:2,3 32:8 60:3
61:10 63:7,18 69:5
74:17 84:3,10 91:17
93:1 95:20 99:23
106:5,6,9 112:16
123:13 129:24,25
137:18,19 147:14
149:25 157:24
160:21 166:7,15
175:1 204:25 209:2
209:13 211:25
212:1 220:7,8,9
229:6 250:15
256:24 257:6
**buyer's** 16:4 26:18
**buyers** 19:8,13 20:7
20:10,17 26:8,12,21
26:24 27:2,18 28:13
31:7 33:4 35:19
40:15 43:2 65:24
92:14 96:10 102:20
103:19 109:4,7
120:18 121:8 122:3
147:11 148:19,21
149:17 150:4 152:9
187:10 206:12,17
209:9,10 212:22
230:17 252:11,25
253:5,10,14,20,22
**buying** 16:6,20
17:16 18:17 34:24
37:12,13 40:2,4
48:9 65:14 66:8
96:20 98:19 116:23
116:25 134:11
141:10 192:3

194:15 195:15
229:7 255:2
**buys** 31:2,3

**c**

**c** 3:2 4:2 5:2 6:2 7:1
8:2 9:1
**ca** 3:17 6:17
**caglin** 68:25 123:10
123:13 137:18,22
**cagwin** 20:19 69:4,5
**calculated** 92:23
**calendar** 178:6
180:1,2,3 214:7
**california** 1:2 6:16
21:21
**call** 15:9 24:4 129:4
163:17 168:1
217:14 218:19
221:14 225:24
226:9
**called** 2:6 14:2 16:5
23:7 24:12 25:7
45:5 115:1 119:16
187:2
**caller** 226:19
**calling** 134:4
**calls** 69:17 73:18
75:10,25 108:11
115:19 125:19
127:10,17 138:20
182:1 199:6,13
200:17 201:8,17
221:3,24 226:20
246:18 250:23
**camcorder** 104:7
129:8,9
**camcorders** 15:13
16:13
**camera** 152:14
**canada** 23:5,12,17
**cap** 212:19
**capacity** 15:5 31:1
43:6 123:18,23

**capturing** 212:20
**card** 98:5 119:18
164:15 225:22
**care** 136:14,14
**cared** 60:21 98:5
**careful** 153:15
**carried** 37:23 90:23
100:18,23 152:14
**carry** 34:1 40:1
57:25 90:18 99:22
104:1 132:14
140:10 172:24
186:12
**carrying** 90:25
132:17
**case** 1:4 4:5 9:23
10:15,18 12:12
13:19 16:11 24:20
39:18 40:10 79:25
99:8 101:9 137:5
142:2 144:16
153:24 197:19
214:19 220:17
238:22
**cases** 10:14 32:7,7
36:2,3,7 42:17 46:1
46:5,5 55:1 63:24
64:20 88:25 95:19
102:5,5 114:7
168:22 186:14
233:8 236:24
**cash** 228:8,9
**cast** 113:19
**catches** 167:11
**categories** 16:12
35:7,9 152:10,13
**category** 15:7,8 16:8
16:25 19:3,10 25:10
47:15 57:16,21
58:25 59:2 93:11
147:12 152:4,12
153:22 214:10
247:23
**cathode** 1:7

**cause** 108:25 146:25
**caution** 20:11
**cautious** 84:23
**cbm** 173:4,6,14,15
**cc** 8:16,17,18,18
8:19,19,20,20,21,21
8:22 74:8 105:21
122:24 125:10,10
125:14 127:1
128:14 137:13
154:5 169:16
186:20 189:2 198:8
208:18 219:20
**cc'd** 189:8
**cc0572597** 8:16
68:18
**cea** 163:7,17
**ceased** 57:25
**cecile** 106:8,14
**cent** 145:2,8,9,10
**center** 7:21 211:5
**cents** 144:24
**ceo** 125:10
**certain** 33:10 59:1,7
95:22 98:11 112:9
118:1 151:19 153:4
153:5 161:16 195:1
207:17 208:2
213:14 214:5
216:17 228:9
**certainly** 49:13
93:25 98:16 172:3
233:16
**certify** 260:7,12
**ces** 93:3,4,6,7,11
**cesar** 212:15
**cetern** 33:10 34:21
40:17 116:18,23
153:2
**chain** 69:11 149:20
**champion** 48:12
**chance** 208:19
**change** 16:24 27:22
27:25 28:2,4,6,11
30:12 35:1 38:15

[change - circuit]

| | | | |
|---|---|---|---|
| 59:16 73:3 77:4,9 | **check** 214:4 215:19 | 69:16 70:12,15,25 | 150:3,7,14 152:3 |
| 77:16,19 78:4 79:5 | 220:21,25 221:22 | 71:6,8,17 72:11,12 | 153:11,22 154:19 |
| 79:6 101:4 111:19 | 223:21,24 | 72:13,14,22 74:1,16 | 155:10 156:11 |
| 112:23 118:18 | **chicago** 5:17 | 75:9 76:14 77:3,8 | 158:14 159:9,15,20 |
| 133:16 141:13 | **china** 111:6 | 77:19 78:8,19,22 | 160:1,18 161:14,24 |
| 143:9 144:5 145:25 | **choose** 15:23,25 | 79:1,17,23 80:3,12 | 162:9,25 163:15 |
| 146:17,19 147:8,19 | 28:1,2 45:22 71:4 | 81:10,14,16,20,24 | 164:8,18 165:2,12 |
| 147:21 148:1 | 85:3 141:8 159:23 | 82:3 83:5 84:19,20 | 165:14,22,23 167:3 |
| 150:15,21,25 151:4 | 185:11 206:24 | 85:15 87:7,8,11,18 | 168:17 169:23 |
| 151:9,17 152:5 | **chooses** 26:7 | 88:2,4,7,9,12,16,19 | 170:3 171:3,7 174:4 |
| 153:12 170:7 | **choosing** 55:21 | 88:22 89:2,12,18 | 174:18,21,24 175:4 |
| 184:23 197:1 204:4 | 135:2 | 90:8,11,13 91:5,20 | 175:14 176:3,8,17 |
| 204:9 210:5 230:25 | **chose** 65:14 | 92:1,8 93:21 94:7 | 177:7 178:25 180:3 |
| 231:16 234:15 | **chosen** 174:1 | 94:19 95:1,2 96:7 | 180:11,22 182:14 |
| 236:10,11 237:24 | **christmas** 29:6 | 96:22 97:5,7,25 | 184:1,11 185:2,14 |
| 238:4,8 251:16,21 | 150:25 151:1,3,15 | 98:10 99:5,14,19,25 | 186:2 189:8,13,17 |
| 251:22 256:13 | 168:10 185:18 | 100:5,9,24 101:16 | 190:5,8,18,21 191:2 |
| **changed** 16:12 | **circuit** 3:11 10:16 | 101:19,23,24 102:1 | 191:4,6,9,15,20 |
| 31:12,22 42:1 47:23 | 12:18 13:4,13,22 | 102:8,15,18 103:6 | 192:2,9,22 193:7,21 |
| 48:9 59:19 79:1 | 14:6,9,14 17:21,22 | 103:13,22,24 104:6 | 194:11,20 195:8 |
| 86:6,10 94:13 | 17:25 18:1,5 19:10 | 104:15 105:7,7,23 | 196:2,4 197:11,14 |
| 141:16 150:3 | 21:12 22:2 23:1,2,7 | 106:21 107:25 | 198:1 199:17,24 |
| 184:25 204:2 | 23:11,19,25 26:4,8 | 108:5,19 109:25 | 200:10 201:6,24 |
| 234:15 | 26:16 27:5 29:16,19 | 110:4 112:7,25 | 202:19,23 203:3,7 |
| **changes** 76:9,13 | 30:12,22 31:21 | 114:5,15 115:9,12 | 203:21,24 204:16 |
| 148:4 151:2 152:17 | 32:12,16,25 33:4 | 115:14 116:20 | 205:6,21 206:21 |
| 155:14 170:12 | 34:16 35:4,19 36:7 | 117:4,12,15,25 | 207:7,19 208:2 |
| 179:23,25 237:11 | 36:9 37:1,5,7 38:24 | 118:10,25 119:10 | 209:7 210:21 211:4 |
| 237:13 | 39:5,8,16 40:7,12 | 120:18,19,20 | 211:17,20 213:6,9 |
| **changing** 30:16 | 41:17,23,25 42:7,8 | 121:16,17,21,24 | 214:1,17 215:4 |
| 78:10,22 91:13 | 42:21 43:2,11,14,24 | 122:3,6,11,12 | 217:5,18,23 219:7 |
| 174:5 176:6 179:20 | 44:2,13,22 45:1 | 123:13,21,24 124:1 | 219:10 221:16 |
| 182:24 | 46:6,21 47:12,13 | 124:3,4,11,24 | 222:11,20 224:8 |
| **charge** 32:4 | 48:1,22 49:8,24 | 125:15,24 126:4,6 | 225:4 226:7,18,22 |
| **charged** 143:7 | 50:5,18 51:2 52:1,3 | 127:15,24 128:3 | 227:17 229:17 |
| 144:22 148:5,12,13 | 52:22,25 53:12,24 | 129:2 130:21 132:5 | 230:5 232:6,18,22 |
| 148:25 165:14,24 | 54:19,20 55:8,14,15 | 132:12,16,25 133:4 | 233:3,12,19 234:1,8 |
| 176:9,18 177:13 | 56:15,22 57:7,17,25 | 133:6 134:17 135:8 | 234:13,14,15 |
| 196:4 | 58:6,13,17 59:22,23 | 135:13 136:4,22 | 235:21 237:12 |
| **charging** 216:24 | 60:10,11,13,17,22 | 139:5,14 140:15,25 | 238:19 239:17,22 |
| **charles** 7:3 | 61:1,20,24 62:3,14 | 141:1,4,13 143:1,4 | 240:5,23 241:1,10 |
| **charles.malaise** 7:8 | 62:23 63:2 64:5,12 | 143:6,17,19 144:3,4 | 241:19 242:9,14 |
| **chart** 177:22 | 64:22 65:5,8,10,12 | 144:21 145:13,16 | 243:9,15,25 244:16 |
| **charts** 19:24 | 65:17 66:2,17 67:2 | 145:24 146:7,17,25 | 245:4,17,24 247:18 |
| | 67:3,20 68:4,8 69:5 | 148:6,12,24 149:9 | 247:22 248:7,20 |

249:1,20,24 251:7
252:11,24 253:4
256:9 257:5,14,15
257:19 258:22
**circumstance**
235:25
**circumstances** 64:4
131:11 234:21
236:3,16
**cities** 172:2,2
**city** 3:11 10:16
12:18 13:4,13,22
14:6,10,15 17:21,22
18:1,1,5 19:10
21:12 22:3 23:1,2,8
23:11,19,25 26:4,16
27:5 29:16,19 30:12
30:22 31:22 32:12
32:16,25 34:16 36:7
36:9 37:1,5,7 38:24
39:5,8,16 40:7,12
41:23,25 42:7,8
43:11,14,24 44:2,13
44:23 45:1 46:21
47:14 48:1,22 49:8
49:24 50:18 51:2
52:1,3,22,25 53:12
53:24 54:19 55:8,14
55:15 56:15,22 57:7
57:17,25 58:6,13,17
59:22,23 60:10,11
60:17,22 61:1,20,24
62:3,14,23 63:2
64:5,12,22 65:5,10
65:17 66:2,17 67:2
67:3,20 68:4,8 69:6
69:16 70:12,25 71:6
71:9,17 72:11,12,13
72:14,23 74:1,16
76:14 77:19 78:23
79:1,17 80:12 81:10
81:14,16,20,24 82:4
83:5 84:19,20 85:15
87:7,19 88:2,4,7,9
88:12,16,19 89:2,12

89:18 90:8,11 91:5
91:20 92:1,8 93:21
94:19 95:1,2 96:7
97:25 98:10 99:5,14
99:19 100:6,9,24
101:16,19,23,24
102:1,8,15 103:6,13
103:22,24 104:6
105:7,24 106:22
107:25 109:25
112:7 114:5 115:9
117:4,12,15,25
118:10 120:20
121:21,25 122:6,11
122:13 123:13,21
123:24 124:1,3,4,11
124:24 125:15,24
126:6 127:15 129:2
130:21 132:5,12,16
133:4,6 134:17
135:8,13 136:4,22
139:14 140:15,25
141:1,5,13 143:6,17
144:3,4,21 145:13
145:24 146:7,17,25
148:6 149:9 150:3,7
150:14 152:3
153:11,23 155:10
156:11 158:14
159:9,15,20 160:1
160:18 161:14,24
162:9,25 163:15
164:8 165:3,12,22
167:3 168:17
169:23 170:3 171:3
171:7 174:4,18,24
175:4,14 176:3,8,17
177:7 178:25
180:11,22 182:14
185:14 186:2
189:13,17 190:5,8
190:19,21 191:2,4,6
191:15,20 192:2,9
192:22 193:7,21
194:11,20 195:8

196:4 197:11,14
198:1 199:17,24
200:10 201:24
202:19,23 203:3,7
203:21,24 205:6,21
207:8,19 208:2
209:7 210:21
211:17,21 213:6,9
214:1,17 215:4
217:5,18,23 219:8
219:10 221:16
222:11,20 224:8
225:4 226:7,22
227:17 229:17
230:5 232:6,22
233:3,12,19 234:1,8
234:14,15 235:22
237:12 238:19
239:17,22 240:23
241:1,10,19 242:9
242:14 243:9,16,25
244:16 245:4,17,24
247:18,23 248:7,20
249:1,20 252:11,24
253:4 256:9 257:5
257:14,15,19
258:22
**city's** 26:8 33:4 35:4
35:19 41:17 42:21
43:2 46:6 47:12
50:5 54:20 60:13
65:8,13 70:15 75:9
77:3,8 78:8,19
79:23 80:4 87:9,11
88:22 90:13 94:7
96:22 97:5,7 100:1
102:18 104:15
105:7 108:5,19
110:4 112:25
114:15 115:13,14
116:20 119:1,10
120:18,19 121:16
121:17 122:3 126:5
127:24 132:25
139:5 143:1,5,19

145:16 148:13,24
154:20 164:18
165:15,24 174:21
180:3 184:1,12
185:2 189:8 191:9
196:2 201:7 204:17
206:21 211:5
232:18 234:13
240:5 249:24 251:8
**claims** 197:12 240:5
240:12 241:11
**clarify** 93:10 144:1
146:18
**clark** 5:16
**class** 32:9 173:5,6,8
173:10 214:11
257:15
**classes** 32:6,10
**clean** 252:5
**cleanliness** 49:20
**clear** 11:2 91:4
141:6 231:2 257:5
**clearly** 165:6 181:12
**clerk** 221:21
**client** 246:3
**close** 193:20 215:5
**closed** 23:8
**closely** 16:18 167:6
**closer** 38:10
**clubs** 203:22
**clue** 185:22
**cmb** 173:3,13
**collaborate** 20:23
21:3
**colleague** 238:24
**collect** 204:9 217:5
**collected** 206:21
211:4,16 212:8
**collecting** 209:14
**collection** 207:18
**collective** 91:6
**collects** 247:23
**colorado** 7:23

columbia 260:3,6
column 172:7
  178:19
combat 156:24
combination 15:10
  16:14 17:8 47:24
combine 33:11
combined 33:15
combo 15:16 24:24
  30:8 58:11,12,14
  95:24
combos 82:21
come 17:12 34:9
  37:2 64:13 83:18
  113:24 114:1,3,4,6
  116:18,20 117:3,12
  187:21 188:2
  203:12 226:13
  255:15
comes 48:18
coming 216:3 256:8
  256:9
commenced 73:8
  97:20 169:7 197:5
  202:7
commencing 2:9
comment 201:13
commerce 39:14,16
  39:20
commercial 210:7
commission 94:5,13
  94:13,17,18,24
  101:12,14 175:5,7
  260:24,25
commissions 16:2
  94:8,23 95:2
committed 112:19
common 26:25 86:3
  220:11 221:11
  231:22
commonwealth 2:12
communicate
  166:20 167:24
  178:5 230:20

communicated
  119:14 147:25
  237:16
communicating
  206:17
communication
  44:18
communications
  197:16
companies 40:16,23
  40:24 41:20 114:15
  115:14 126:7 163:1
  163:6,15 164:10
  203:10
company 13:17,25
  14:2 15:21 41:9
  42:5,10,18,19 55:9
  55:11 61:4 66:10
  102:25 103:1,1
  111:1 113:11,24
  114:3,4 128:24
  164:3 177:25
  206:14 212:9
comparably 196:22
comparatively
  246:7
compare 89:24
  215:4
comparison 248:5
compete 100:22
  151:19,19 193:6,9
  205:17
competing 131:14
  214:18
competition 102:3
  206:15 207:14,20
  208:10 219:1
  223:16
competitive 28:20
  70:8,15,23 71:4,11
  87:25 118:5 133:6
  134:8 136:16 138:6
  138:24 144:8,12
  148:10 150:11
  153:9 156:1,2 159:4

162:16,18 166:3
  176:7,9,18,21
  177:11 179:6
  184:22 185:10
  186:11,13 190:25
  191:1 192:4,11,17
  203:25 204:8
  205:19 207:11,18
  207:25 209:19
  210:2,4,12,20
  211:16,19 213:5,7
  213:17 214:16
  215:1 219:11 220:3
  220:6 223:8 224:9
  229:10,20 230:10
  230:21 234:25
  235:25 236:3 250:6
  250:18 254:13,16
  254:19,22,24,24
  255:1,4 256:16
competitively
  173:21 176:4
competitor 79:9
  152:6,17 156:3
  158:5,7,16 167:5
  174:21 176:6
  177:22,25 193:2
  205:7,16 206:20
  208:1 209:14
  214:15 216:3 225:8
  225:14,24 226:9,17
  229:14
competitor's 158:12
  158:20 167:4
  179:20 180:2,4,5
  191:21 209:17
  213:11 216:1,12
  218:3 223:9 225:5
  226:8
competitors 28:3,7
  28:14 152:2 153:13
  154:23,25 159:7
  164:18,21,25 165:2
  165:15,24 166:9,19
  166:24 168:18

173:22,22 174:3,5
  175:14 176:7,10,19
  177:4,9,13 179:13
  182:10 186:4 191:4
  191:9,16 192:23
  194:21 195:2 203:8
  203:13,22 204:18
  204:22 205:22
  206:13 207:10
  211:3,10 215:17
  216:24 217:13
  223:20 244:25
  245:1,16
compilation 209:25
complaining 136:18
complaint 8:23
  238:22 239:16,17
  239:22 241:3
  242:23
complaints 241:6,9
complete 46:20
completely 78:16
component 213:15
  250:14
compound 228:11
compromise 210:16
computer 15:6,19
  45:21 58:18 153:16
  188:13
computers 25:9,10
  58:17 153:17
concentrated 25:21
  26:8
concentrating
  106:11
concern 71:20,22
concerned 107:20
concerns 106:24
  137:22
concluded 112:5
  259:6,8
conduct 242:15
  243:9,25
conducted 2:7 43:11
  222:9

conference  115:20
confidential  191:17
  191:22
confirmation
  225:18
confused  236:13
conjunction  28:13
connection  12:6
consensus  31:5
consequence  141:1
consequences
  138:17  139:3
  140:16,20,25
consider  88:23
  130:21  191:15,20
  192:2,9,22  194:20
considered  46:22
  61:20  93:1  98:20
  103:8  127:15  165:3
consistent  80:21
  103:8  157:13
  231:10  249:8
consistently  82:19
  90:8
console  32:2,4
consolidated  19:10
conspiracy  197:16
  238:21  241:2,21
  242:1,16
conspire  258:18
constant  231:20
constituted  171:22
consultant  189:12
consultants  189:19
consulting  13:17,25
  14:2,3,4  189:13
  258:8
consumer  38:9,18
  54:9  59:12  67:21
  80:7  93:4  101:12
  131:12  143:18
  149:4,7  164:21
  165:6,8,18  192:16
consumers  59:15
  144:5,23  148:5,25

165:14  191:17,19
  191:22  192:10
  196:3,4  249:18
contact  36:20  43:3
contained  58:18
  60:18,23  222:9
containing  14:23
contemplating
  255:2
context  36:10  39:20
  43:23  71:6  76:4,7
  102:16  109:22
  121:9  125:14
  131:25  179:19
  194:8  195:8  196:20
contexts  136:6
continually  187:11
continue  80:25  95:3
  111:25
continued  18:7
continues  130:6
  247:4
continuous  257:2
continuum  58:25
contractor  13:18,23
control  151:24
  152:1  232:22
convenient  96:1
convergence  193:12
conversation  53:10
  55:23  70:3  71:10
  72:4  116:13  256:6
conversations  41:21
  70:22  84:24  86:21
  87:5  116:11  126:11
  126:17  129:15
  229:25  240:21
coordinating  199:4
  199:12
coordinator  171:2,6
  171:10,12,19  172:4
  178:9,11,13
coordinator's  178:4
coordinators  171:4

cope  161:22
copy  128:25
corporate  15:7  16:8
  16:25  19:3,3  111:23
  120:7  180:13,21,23
  181:1  189:20
  190:14  203:24
  205:25  206:5,8,10
  211:20  220:8
corporation  74:24
correct  11:25  17:2
  42:11  44:1  51:3,4
  98:4  100:25  122:15
  137:8  141:23  143:3
  172:15  177:20
  187:7  201:7  202:20
  203:10,11  207:20
  207:21  211:18
  212:14  216:4  217:1
  217:4  222:11  225:6
  235:25  237:14
  244:19  257:8
correctly  19:9  21:11
  35:5  160:5  243:6
correlated  248:18
corresponding
  248:1
cost  43:21,22,23
  44:3,10,19  46:15
  47:2  49:3,12,16
  51:2  52:4  53:1,7,25
  55:5  62:1,9,11,15
  62:16,24,24  63:3
  64:6,18,18,25  66:1
  66:22  67:2,4,18,22
  71:8,15,21  75:3
  77:19  79:1,2,5,13
  79:22,23,23  80:1
  81:7  87:22,24  89:11
  89:11  91:25  92:15
  93:17  96:7,9,18,23
  111:14  112:6  115:5
  121:7  126:18,20
  130:12  134:8,25
  135:1,10  136:5,12

141:21  142:24
  143:14,19  144:3,6
  144:10,16,20
  147:19,21  152:15
  159:13  160:19,20
  160:23  161:5,5,14
  161:17,25  162:7,8
  162:11,12  165:17
  165:18  173:1
  191:11  193:22
  194:11  205:18
  231:16  232:9  234:5
  234:9  235:3,6  236:9
  237:3  249:24
  250:14,19  251:8
  257:1,10,16
costco  203:22
costing  86:12
costs  27:3  34:4
  44:14,21  49:15,18
  49:25,25  51:1,8,14
  63:12,20  65:13,19
  67:4,14  68:5,9
  69:15  70:3  72:7,10
  77:9  78:2,5,19,22
  79:17  80:4,11,11
  87:12  91:21,22
  92:10,22  93:13
  96:12,22  97:2,5,6,9
  97:10  105:10
  109:17  110:1
  111:12  115:7,10
  126:19,20  127:8
  135:22  136:15,18
  138:4  141:13,25
  142:12,14,18,20
  143:1,5  149:7  160:6
  160:7  161:2,10,12
  165:14  194:2  200:8
  231:3,6,9  234:14
  235:24  236:11,17
  250:13,22  251:1,13
  257:14,20
counsel  9:5,5  10:1
  12:13  66:3  197:17

counseled 195:18
counselors 124:9
  178:20,25
counted 21:25,25
country 16:16
  113:11 115:21
  116:12,16 256:7
counts 138:16
couple 10:24 17:11
  61:12 162:21
  211:15 238:18
  249:21
course 30:6,12 34:4
  91:16 122:4 145:4
  193:18 221:16
  223:7 243:1
court 1:1 9:17 11:2
  40:19 69:22 142:7
cover 10:25
covered 75:21,24
  76:9,13,17,19,22
covering 76:6
craig 203:15
create 147:14
  177:10 185:6
created 41:11 98:3,5
  155:24 156:24
  160:3 168:14
  182:23 188:24
creates 44:7
creating 39:4
  130:10,14 177:12
credibility 109:1,5,8
credit 83:9,12,16
  85:2,12 92:12,24
  96:15 97:4
credits 83:2,3,4
  84:17 85:6,16 86:23
  87:2 93:16 96:21
croll 2:11 9:17 20:21
crowell 7:12
crowell.com 7:16
crt 1:7 9:23 12:6
  14:18,21 15:1,11
  16:9 17:16 18:9

19:14,18,21 20:13
20:25 21:7 23:15,17
23:20 24:3,21,25
25:3,20 26:6,18,22
27:3,6,13,21,25
29:18 30:4,11,23
31:8,14,19 32:13,17
33:1,2,5 34:17
35:10,18 36:10
38:12,21,24,25 39:3
39:4,9,10,16 40:7
40:12 41:2,17 43:16
43:24 44:3,21 45:2
47:9,20 48:5 49:8
49:24 50:6,19,20
51:2,8 52:4,24
53:25 54:15,21 55:8
55:13 56:16,18,23
57:6,15,21 58:1,5
58:12,18,23 59:10
59:23,24 60:9,10,18
60:23 61:2,2,17,20
61:23 62:1,10,16,25
63:3,8,9,19,20 64:7
64:13,14,23,24 65:6
65:7,11,19 66:1,16
66:19 67:1,2,5,21
67:22 68:6,10 69:15
70:12,14 71:7 72:15
72:16 74:18,20 75:6
75:24 76:6 77:3,8
77:18 78:8,10,19,21
78:25 79:3,16,18,24
80:4,13,16,20,22
81:11,25 82:4,13,17
82:20 84:18 85:17
85:20,25 88:3,6,9
88:11,15 89:14,19
90:9,12 91:21 92:2
92:9 93:21,24 95:6
95:16,24 96:9,24
97:5 98:2 99:5,16
99:19 100:2,6,10
101:1,17 102:8,16
102:19 103:7,12,23

104:8,8,10 105:8
108:19 109:5 110:5
112:7,24 113:1
114:14 115:10,14
115:15 117:2,5,11
117:13 119:1
120:19,21 121:17
121:20 122:1,4,12
122:13 127:25
132:24 133:4
134:19 135:9,14
136:5,23 137:2,6
139:3,15 140:16
141:12 142:3,5
143:1,5,19 144:2
145:14,15,23,25
146:7,8,24 147:1,9
147:22 148:14,23
149:11 150:5,8,16
150:21 151:5
152:16,22,24,25
153:13 156:15
157:4 159:10,21
160:9,12,18,22
163:2,9,15,23
164:10 165:4,13
168:20 171:10
173:12 176:11
182:25 185:16
186:2,4 191:2 192:2
192:10,23 193:5,17
193:19,23 194:6,11
194:21 195:6,10,22
195:25 196:4,9,13
196:16,19 198:1
199:4 200:14
202:19,22 203:4
205:8,22 207:8
214:10 216:10
234:16 235:6
238:21 243:16
244:1 249:18,20,22
251:15,17 252:12
252:16 255:14
257:13 258:12,17

258:23
crts 14:23 35:2
  60:17,23 150:12
  152:11 243:2,10,16
crystal 194:18
ctc 173:19 221:14
ctcs 176:3
culture 149:15
cumulative 229:7
current 36:14
currently 36:4
customer 38:5 46:23
  50:11 102:4 143:7
  157:20 158:7,8,14
  158:19 168:17
  175:10 193:13
  196:10 215:3,11
  216:11 223:25
  225:20,22 226:4,10
  226:17 235:23
customer's 46:17
customers 12:7
  50:14 155:20
  157:12,17 165:24
  193:10 194:25
  217:9,16 234:16
  255:24
cut 40:19 98:17
cycle 29:3 34:20
  80:13,16,21 81:1
  152:24 179:7 232:4
  237:19
cycles 179:8

           d

d 9:1
d.c. 7:14
daily 116:6,17
  117:18 177:21
  178:19,24 179:1,2
damage 108:5,18
damaged 28:5
  145:12
damaging 210:22

daniels 7:20
danny 20:19 68:24
69:4,5 123:9,13
137:17
data 42:15,18,19
97:7 115:9 163:18
163:18 173:1,2
204:21 205:3,4
212:18 232:13
database 212:8
date 9:13 17:13 81:9
94:15 147:16 151:2
181:19 216:18
david 74:14,15 75:1
75:7 106:8
day 73:21,21 79:9
98:14,15 115:2
118:20 148:21
151:11,25 179:9,11
237:7,10 238:5
259:20 260:18
days 51:23,23,23,24
115:2 179:16 237:6
237:18
dc 7:6
deal 41:8 82:8 91:25
108:4,10,12,14,17
149:19 156:25
165:10 187:10
210:8
dealing 187:8
235:12,15,16
dealt 103:17 205:1
228:14
deason 1:13 2:5 8:4
9:9,16,25 10:9
12:10 14:3,4 56:10
97:25 133:25
186:22 202:12
227:9 238:19
249:17 252:2,10
259:16
decade 124:2
decide 72:5 164:16
166:21

decided 55:12
101:13 111:11
deciding 26:5 30:23
55:15 219:14
decision 26:18 30:25
37:16 65:16 104:15
144:7 210:5
decisions 26:22
33:22 35:11,18 47:3
61:21 101:21
138:17 150:23
206:22 207:7
decline 150:8
decrease 66:18 67:4
96:9,23 97:4 133:12
143:4,6 146:6,24
187:24 235:3,6
251:12
decreased 66:17
67:2 145:13 146:16
251:13 257:14
decreases 133:10
145:24 247:22
decreasing 90:1
97:6 200:15 251:7,8
defendant 2:6
238:16
defendant's 8:14
defendants 3:20
4:19 5:20 7:9,25
197:15 227:14
238:13 239:23
241:12,20 244:18
defending 10:6
define 22:9 38:5
defined 173:13
defines 161:14
definitely 71:23
121:11 203:19
definition 58:14,16
100:18,20 159:16
171:23 176:20,21
degree 55:17 101:23
136:14 193:11
196:9 224:4

deliberate 37:12,20
deliver 88:9 121:1,2
138:25 215:6,8
delivered 72:20 88:3
delivering 88:22
97:13,14 118:13
delivery 34:6 88:6
88:24 89:1 215:7
dell 5:12
deloitte 189:7,16
deloitte.com. 189:4
demand 33:7,8,12
33:14,22 36:11 38:3
38:4,5,10,12,14,21
45:12 46:17 50:3,6
50:11,14 105:11
120:5 137:9 160:2,3
160:5
denies 127:7
denver 7:23
department 23:22
23:24 24:2,9 124:5
180:14 209:3,4
departments 229:7
depended 79:4
235:24
depending 164:3
depends 218:6
deploy 224:18
deponent 9:24
deposed 10:12,14,15
deposition 1:13 2:4
9:7,8,15,20,21
10:21 11:20 12:11
12:15,19 13:7,10
22:8 53:16 60:2
68:14 74:5 105:18
122:21 126:22
128:10 137:10
141:24 142:1 154:2
169:12 186:16
198:5 208:14
219:16 239:4 259:5
259:8 260:7

derrick 208:22,23
209:13,16,21
descend 127:8
describe 137:15
described 169:19
171:19 190:17
describing 17:25
description 8:14
172:6 214:8
designated 170:20
desirable 101:23
102:1
desired 72:14,19
despite 243:3
detail 206:3
determination
28:14
determinations
33:16
determine 60:9 62:4
82:3 101:19,20
152:3 159:6
determined 83:9,10
95:8,11,13 100:15
148:19,21 171:25
determining 20:24
34:11
develop 52:13
developing 104:7
development 51:18
52:9,12 53:9,13
54:3 89:13,19 92:19
devices 219:7
diagonally 30:7
dictated 207:14
differ 228:2,4
difference 72:19
149:15 155:3,4
212:3
different 24:6 30:3
32:25 33:7 71:13,15
71:17 77:14 120:9,9
146:12,13 147:1
148:10,16 162:9
197:21 203:19

207:5,10 211:15
212:16 213:17
218:16 226:6
228:13 248:5,8,8,13
248:14,15,15 249:1
**differently** 147:20
**difficult** 207:5
**dig** 105:16
**dime** 124:20
**dinner** 129:18
**direct** 26:25 38:25
124:18 130:4
155:17 176:23
219:23
**directed** 160:8
178:22,24
**directing** 74:25
**direction** 16:5
215:24
**directive** 95:9
**directly** 39:6 40:5
45:19 92:22 93:13
103:18 204:17
**disadvantage**
132:20 215:9
**discern** 206:11
210:21
**disclosure** 67:8
230:14
**discontinued** 32:13
32:17
**discounted** 167:9
**discounts** 12:5 89:3
89:5 92:13,21 167:4
228:9
**discover** 238:20
241:11
**discuss** 43:21 67:8,9
72:14,18 115:15
126:19 205:15
214:1
**discussed** 17:9
57:19 58:11 174:2
183:10 190:15
207:9 209:15

211:15 212:15
213:5 224:20
227:25 233:15
252:1
**discusses** 248:4
**discussing** 11:22
58:23 77:21 92:6
99:3 106:13,16,20
107:10,12 108:1
134:3,6 135:22
140:3 157:23 158:4
182:11 188:15
195:7
**discussion** 28:21
79:7 83:20 135:3
**discussions** 16:22
42:22 53:9 67:16
70:6,19 72:7,9,11
73:1 79:11 137:21
217:12,14 242:4,7,7
244:17 250:15,19
**display** 24:12,21
25:19 31:4,17,19
52:21 92:25 194:18
209:4,8,12
**displayed** 24:22
30:1 52:18
**displays** 93:18
**disruption** 130:10
130:14
**disruptive** 213:19
**distinct** 29:13
**distinguish** 88:18
**distinguished** 99:18
**distribute** 101:4
**distributed** 100:13
101:5
**distributions** 109:17
110:2
**distributors** 39:9,12
39:17,19 40:6
**district** 1:1,2 29:11
128:25 172:14
176:23 177:2 260:3
260:6

**divide** 115:5
**divided** 18:1,5 31:8
**division** 1:3 15:3,20
15:21 16:1,15 18:20
18:25 20:15 23:23
24:14 27:5,9,10
31:11,18,22,25 32:5
39:14 106:6,7,9
114:1 120:13,15
170:22 222:18
**divisional** 18:18
24:18
**divisions** 18:2,6,7
23:19 41:12 42:20
**dm** 172:11,13
**dmm** 24:21,23,23
120:12
**dmms** 119:20
**document** 1:9 11:15
12:16,22 68:17,18
69:18 73:19 74:7
105:21,23 107:1
119:4 122:24 123:3
123:8 126:8,25
128:14,17,21,22,23
135:12 136:7
137:13,24 154:4
157:11 169:15,16
181:4,7,12,14,16,23
182:7 183:7 184:4,6
186:18,19 210:25
239:7 244:16 245:6
247:2,12
**documents** 12:14
13:6 32:7 93:2
95:21 119:16
169:21 170:6
**doing** 22:1 33:20
35:23,24 36:5,17,19
37:19 44:7 47:24
56:19 60:7 67:10
78:15 96:15 107:10
108:25 116:22
126:16 130:18
160:24 164:15

168:5 171:18 187:3
187:16 190:1
215:13,23 216:22
218:23 220:14,15
223:18 225:18
230:13 231:12
**dollar** 144:2,4 235:8
235:12,15,18
**dollars** 90:22 96:16
118:19,21 130:20
131:14 172:10
**domestic** 113:2
**dominant** 153:22
**don** 109:21
**door** 38:6 177:5
**doubt** 95:23
**doug** 20:19
**dowdy** 74:14,15
75:7
**dowdy's** 75:1
**download** 187:17
190:11,12,13 237:7
237:10,15,25 238:1
**downloaded** 187:18
188:14 212:15
237:10
**downloading**
187:19,23 188:9
**downloads** 187:7
237:5
**dozens** 165:1
**draft** 181:7,12 184:4
**drafted** 168:4
**drill** 212:24
**drive** 184:23 186:14
**driven** 46:18 180:4
180:5
**driving** 50:7 184:17
**drop** 155:20,21
156:18 157:13,22
158:4 223:17
**dry** 98:17
**due** 51:23
**duly** 260:8

duties 16:15 171:19
duty 75:4
dvd 15:11 58:15
  104:7
dynamic 112:23
        e
e 3:2,2 4:2,2 5:2,2
  6:2,2 7:1,1 8:2,2 9:1
  9:1 39:14,16,20
  189:21
earlier 35:17 74:16
  93:7 94:12 98:13
  110:13 137:2 174:2
  183:11 190:16
  193:19 202:18
  204:15 206:23
  207:9 212:5,15
  220:2 224:3,20
  226:11 227:17,25
  231:10 233:15
  235:21 244:11
  245:22 248:13
  251:18 252:10
  253:25 257:9
early 201:3 232:10
  232:11 255:19
earn 249:1
earned 248:8
ease 182:23
ensel 155:19
easier 219:15
easiest 91:1
easy 167:7 225:10
effect 96:15 130:11
effective 71:2
  159:24 184:19
effectively 188:9
effort 174:20
either 33:20 36:11
  37:17 58:15 60:4
  89:7 106:6,9 111:22
  112:19 113:18
  172:11 183:12
  189:4 231:7 236:22

elected 185:14
electric 5:20
electronic 93:4
  101:12 188:10
electronics 3:20
  38:20 56:23 69:3,14
  80:7 123:19 164:21
  165:6,8 192:16
  203:15,16
eliminate 29:6
eliminated 29:5
elite 55:4 120:17
ellis 6:15
email 69:11,13 70:1
  70:10 75:1 111:17
  186:23 189:8
  208:21 209:5 210:3
emails 189:3
employ 45:1
employed 13:12,15
  123:20 198:22
employee 13:22
  123:24 213:11
  220:25
employee's 48:15
employees 20:24
  21:6 23:14 42:21
  94:7 170:14 177:21
  189:7 204:17
  209:24 213:15
  214:17,25 217:5
  219:6,11 220:24
employer 13:24
employment 12:17
  14:14
enact 140:15
encourage 95:10
endings 145:5
enemy 205:3
engaged 197:15
engaging 108:4
entire 16:16 17:10
  37:18 42:5
entities 4:10 6:20
  14:5 42:23 43:4

57:10 202:14
entity 43:11,12
  56:17 59:24 60:9
  61:19 198:22
entry 134:7,24
  240:13
environment 155:21
  155:22 177:11,12
  234:25
environments 156:3
equal 104:15
equivalent 18:19
error 20:13
especially 30:4
esquire 3:3,4,13
  4:13 5:5,14 6:5,14
  7:3,11,19
established 233:19
estimate 149:23
et 33:10 34:21 40:17
  116:18,23 153:2
evaluate 189:19
evaluated 97:11
eventually 23:12
everybody 20:4
  29:12 45:6,17,20
  99:13 110:11 111:1
  129:20 132:21,23
  144:10 164:20
  165:25 166:1,25
  177:25 180:18,19
  190:11 213:2,3
  238:1
everyday 148:15
  166:11 170:10
  183:5
exact 17:13 94:15
  137:20 194:23
exactly 27:17
  111:21 204:5
  213:12 247:1
examination 8:5
  10:8 202:17 227:15
  238:17 249:16
  252:9

examine 113:1
examined 2:6
example 24:20
  31:14 32:3 36:16
  37:22 42:11 47:9,24
  51:24 101:10 104:2
  112:13 137:1,7,7
  140:15 150:24
  151:21 215:5
  218:25 228:3,7
  229:10 234:1,10
  249:25 251:6,8,11
examples 141:18
  145:7 236:25
exception 193:18
exceptions 41:1
  148:8 153:3 184:18
  218:24 219:3
excess 95:12 149:3
  149:25 150:5
  159:25 186:7 236:6
exchange 52:5 53:1
excluded 153:6
exclusively 40:8,13
excuse 209:1
execution 176:24
exercise 214:22
exhibit 8:14,15,16
  8:16,17,18,18,19
  8:19,20,20,21,21,22
  8:22,22,23 11:16,17
  12:19,22 13:2 14:15
  15:1 68:14,17,21
  73:16,25 74:5,8,11
  76:4 105:18,20
  106:2,12 108:17
  122:21,23 124:19
  126:22,25 128:10
  128:12,13 134:1
  135:13,22 137:10
  137:12,15 140:15
  154:2,5,9 169:12,15
  169:19 186:16,19
  186:23 188:3 189:2
  190:18 198:5,7,8,11

200:1,13 208:14,17
219:16,20 239:1,3,4
239:7,15,24 244:10
244:10,12,15
257:23 258:11,16
258:22
exhibits 8:14
exist 144:6
existed 19:5 154:12
existence 238:20
241:25 242:15
expect 71:14 99:8,13
105:13 109:25
122:18 124:24
205:4 248:13
250:21
expectation 122:19
251:2
expectations 109:18
expected 71:18 87:9
121:12,16 125:6
139:5 150:7 177:7
177:10 201:25
243:11
expecting 71:12
expenses 114:19
expensive 156:10
experience 39:12
52:6 61:10 63:7,18
64:9 82:9,20 125:24
193:13 215:3,4,11
230:24 235:2
250:22
experienced 40:17
expires 260:25
explain 125:10
194:15
explanation 254:10
express 23:8 36:8
203:15
expressing 107:21
126:5
extent 20:10 76:12
76:19 139:22
141:21 181:11

236:8
extraordinary
223:12,20,24
extremely 39:13
104:21 114:11

f

f 8:2 119:15
facility 61:14
fact 35:22 37:12
46:18 54:7,10 58:9
70:21 98:21 140:3
247:16
factor 37:10 46:15
46:22 47:2 49:25
50:7,13 98:16
206:21,23 211:4
236:5,7 248:23,24
factored 161:6
factories 60:2
factors 33:7 34:3,8
46:19 49:12 59:1
98:21 99:18 104:19
105:3,14 214:25
228:19 236:2
factory 60:3 203:1
facts 138:1 169:24
199:21 245:19
246:18 247:12
faegre 7:20
failed 118:24
fair 109:17 110:1
230:19 248:7
fall 20:1 35:3 59:1
familiar 68:20,23
74:1,10,13 76:5,8
76:12 79:16 81:2
94:2 100:9 106:1
123:9,15 126:4
136:17 154:8
169:18,21 172:16
173:23 174:8
180:13 181:5 182:6
182:13 184:11
186:22 189:4

198:18 258:5
familiarize 123:2
128:16 157:9
familiarized 219:25
far 22:1 29:15 41:15
55:21 65:22 66:12
99:12 126:17 135:1
179:25 193:15,16
212:19 216:17
fare 114:21
fargo 7:21
fashion 131:8
fast 215:6
faster 85:4
favorable 52:1
62:15,24 63:3 64:6
108:4,10,12,14
125:21
fax 5:10
feature 43:8 45:18
featured 59:3,5
130:17 196:22
210:6 246:13 247:6
249:3,4
features 31:14 46:16
244:24 254:20
february 35:5 199:3
feedback 255:23
feeds 45:21
feel 123:8 128:17
feet 90:22
fell 59:10
felt 149:10
field 45:17 166:12
171:13 184:20
figure 206:18
file 257:24
filed 239:22 240:12
241:7,10
fill 255:12
final 27:12,17 127:4
151:14,14 157:13
157:22 158:4
finalized 120:2

finally 257:4
financial 119:15
find 21:23 102:1
119:25 120:1,3
157:20 158:15
175:15,20,23
209:22 212:25
214:14 216:22
220:18 226:4,15
fine 12:25 109:11
finish 11:10
finished 12:6 14:19
14:21 15:2 16:9
17:16 18:9 19:14,18
19:21 20:25 21:7
23:16,17,21 24:3
25:3,20 26:6,23
27:3,7,13,21,25
30:11,23 33:5 34:17
35:10,18 36:10
38:12,21,25 39:5,9
39:10,17 40:7,12
41:2,17 43:16,25
44:3,21 45:2 47:20
48:5 49:8,24 50:6
50:20 51:3,9 52:4
52:25 53:8,25 54:15
54:21 55:8,13 56:16
56:23 57:6,15,22
58:5,12,18,23 59:11
59:23,25 60:10,18
60:23 61:3,21,23
62:10,16,25 63:4,8
63:10,19,21 64:7,14
64:23,24 65:6,7,11
65:19 66:1,16,19
67:1,3,5,21,22 68:6
68:10 69:15 70:13
70:14,16,25 71:7
72:15,16 74:18 75:7
75:24 76:6 77:4,19
78:9,10,20,22,25
79:3,16 80:4,22
81:11,25 82:5,13,17
84:18 85:25 88:3,7

**[finished - gathered]**

88:9,11,15 89:14,20
90:9,12 91:21 92:2
92:9 95:6,16 96:9
96:24 97:5 98:2
99:5,16,19,25 100:6
101:1,17 102:9,16
102:19 103:7,12,23
105:8 108:19 109:5
110:5,6 112:7 113:1
114:14 115:10,14
115:15 117:3,5,11
117:13 119:1
120:19,21 121:18
121:20 122:1,4,6,12
122:14 127:25
132:24 133:5
134:19 135:9,14
136:5,23 139:4,15
140:16 141:12,14
143:2,5,19 144:3
145:14,15,23,25
146:7,8 147:9,22
148:14,24 149:11
150:5,8,16,21 151:5
152:16 159:10,21
160:9,12,18,23
163:2,16 164:10
165:4,13 168:20
171:11 173:12
176:12 185:16
186:3,4 191:3 192:2
192:10,23 193:5,24
194:11,21 195:6,9
195:10 196:5,19
198:2 200:14
202:19 203:5
205:23 232:19
235:6,22 249:22
251:15,17 252:12
252:17 255:14
257:13
**fiori** 186:25
**firm** 227:12
**first** 12:4 17:11
33:23 62:11 75:1

94:10 95:20 96:10
105:11 106:2,11
108:10 110:15,15
112:12 115:2 123:4
123:5 133:7 134:1
169:19 194:1
198:25 220:19
222:23 240:13
241:6,19,24 242:25
**fiscal** 35:4,6
**fit** 40:3
**five** 14:12 116:23
122:16 188:19
224:15 229:3
**fix** 258:12
**fixing** 198:3 258:18
258:23
**floor** 3:16 6:7,16
79:9 84:11 90:12,18
145:10 167:10
172:25 193:6 218:8
255:1
**floors** 90:14 94:13
**focus** 31:22 165:7
173:22,22 174:4
176:5,7
**focused** 49:10 129:8
**focusing** 16:7 127:4
**folks** 94:10
**follow** 185:14 220:5
**following** 17:1 125:8
180:6
**force** 126:12 255:5
**forces** 101:13,14
**forecast** 33:11 42:12
163:24
**forecasted** 41:21
42:16
**forecasters** 163:8
**forecasting** 34:15
164:13
**foreign** 114:14
117:2,11 256:7,8
**foremost** 96:10

**forgot** 245:9
**form** 17:19 18:11
21:1 27:15 50:2,24
60:12 62:6,19 63:15
64:16 67:6,25 69:19
70:18 103:15
106:15 107:3
121:22 125:3
127:11 130:8,24
131:9 134:22
136:10 140:19
143:21 145:19
147:14 159:2
160:25 200:6
213:20 235:9 245:7
245:20 246:10
247:11,19 252:21
253:2,18 258:24
**formalized** 44:5
**format** 220:5
**former** 83:17
**forms** 93:20
**forrester** 163:8
**forth** 41:22 260:8
**forthcoming** 254:3
**forward** 10:3 151:3
151:12 178:2
183:20 254:23
**fose** 9:7
**found** 167:24 219:3
**foundation** 65:1
73:18 75:10,25
84:22 108:21 119:6
127:17 128:6 134:5
138:2,20 139:19
149:12 161:7
181:13 182:2
191:23 199:6,14,22
200:5,17 201:9,17
221:4,24 245:18
247:10
**four** 15:23 39:25
90:23 187:16 219:3
224:15

**fourth** 129:7 198:25
199:1 200:13
257:25 258:6
**francisco** 1:3 3:17
6:17
**frequency** 212:2
232:1
**frequently** 52:19
63:2 77:22 78:9,20
80:5 168:3
**friday** 179:18
185:17 186:1 190:4
210:4 216:19
**front** 242:23
**full** 59:3 170:24
171:18 249:2
**function** 44:9
178:24
**functionally** 16:3
**fund** 92:24,25 95:21
233:4,6,10
**funded** 95:16
187:15
**funding** 82:11
104:24 161:6
**funds** 51:18 52:9,12
52:12 53:2,9,13
54:3 67:8 89:13,16
89:19 90:9 92:6,19
92:19 93:4,8,10,15
96:8 105:6 161:10
227:22,23 232:23
**further** 196:17
238:11 249:11
252:3 259:1,4
260:12
**furthermore** 143:13
**future** 203:14

                    **g**
**g** 9:1 11:23
**ga** 5:8
**gather** 167:3 191:7
**gathered** 213:6

gathering 203:25
214:22
gawley 6:14 138:1
239:13,13,19 253:2
ge 223:2 246:12
247:5 248:5
general 24:6,10,16
28:11 29:3 33:14
67:7 78:5 80:8
119:21 140:21
153:7,8 172:13
186:6 203:6 216:5,7
219:4 234:13
248:18
generalize 235:11
generally 29:2 34:22
35:1 37:5,9 44:17
72:23 85:9 91:12
129:12 131:15
134:17 140:14
160:9 170:9,23
176:14 203:9
218:22 233:9 235:2
235:11,24 236:10
250:3,5 251:20
gentleman 239:9
georgia 15:23
getting 72:25 89:22
96:16 125:21 137:3
145:11 149:11
185:10,11 229:21
give 35:14,21 37:22
90:21 104:24
105:16 107:5,9
126:12 132:10
136:15 150:23
157:14 163:24
164:2,4 194:23
201:19 226:14,17
230:3,9,16 231:25
254:9,18 257:1
given 30:24 86:19
161:14 214:4,7
230:15 234:14
255:23,24 260:10

gives 144:9 225:22
giving 104:19,20
129:1 229:21
230:21 256:16
glories 127:7
gm 172:11,13
go 10:2,23 12:21
21:13 32:8 34:3
37:25 47:10 61:12
73:2 75:5 79:19,20
80:4,11 86:21 92:15
93:13 96:5 97:16,17
104:18 110:10
111:2,4,6,22,23
114:8 129:5 130:2
133:15 138:5,6
141:3 146:19,22
147:17 157:19
158:6,7 166:15,19
167:21,23 168:11
171:16 175:20,23
176:22 183:1
190:25 191:1 202:3
202:3 206:18 207:2
208:6,11 209:22,24
212:9,18,25 213:16
214:5,9,9,10,13
215:7,16,23 217:15
217:18 218:25
220:25 221:21
223:21 224:11,12
226:3,15 231:7
232:6 238:6 241:3
243:5
goal 50:12 134:14
goals 89:9
godfrey 3:5 10:5
goes 45:20 75:15
104:17 110:19
155:8 212:20
going 9:2,3 11:15
15:17 21:15 31:6
33:12,16 37:16,25
38:18 42:13 48:16
55:18 68:16 70:21

71:13 72:6 74:7
76:9,17 79:6,17
83:23 84:2,4,13
87:1 89:23,25 90:4
90:17 92:15,17 99:9
99:10 103:2 105:20
108:25 110:16
111:12,21 112:16
113:18 114:11
116:8,9 120:1,2,25
121:3 122:17,23
123:3 126:25 128:8
128:13,19 129:14
129:20,21 130:1,3
131:15,23 132:2
134:11 137:12,21
138:5,23,24 139:9
139:10 140:4,5,7,8
140:20,24 141:2,3,3
141:9,10 142:24
144:19 145:6 148:1
148:9 149:8 151:3
151:11,18 153:4
154:4 155:25
161:21 162:17,19
162:22 163:25
166:4,22 168:8
169:1,14 170:11
174:16,17 176:1
177:18 178:1,10,14
178:19 184:21
185:23 186:8
190:11,12 194:2,4
195:19 198:7 200:9
200:24 201:22
203:17 208:11,16
209:18 214:14
215:21,23 216:3,24
217:17 220:18
222:24 223:15
224:14 230:12,15
233:5 237:2,3
239:25 242:6
243:11 254:12,22
254:22 255:21

256:1,2,5,12,21
good 9:11 10:9,10
55:24 98:24 104:5
104:11,13,18,21
105:3,4 118:25
127:13,19 149:11
202:12 203:16
214:17 232:17
249:17
goods 93:14 126:14
126:15 247:23
gordon 2:11 9:17
gotten 48:7
grab 131:23
grabbing 212:3
gralewski 6:5 8:10
17:19 40:18 43:1
50:2,24 51:5,11,15
53:15,20 60:12 62:6
62:19 63:15,22
64:16 67:6,25 69:19
70:18 77:11,24 96:1
103:15 106:15
107:3,17,22 108:7
108:23 109:15
121:22 125:3
127:11 130:8,24
131:9 134:22
136:10 140:19
142:7 143:21
145:19 159:2
160:25 200:6 235:9
245:7,20 246:10
247:11,19 249:15
249:16,18 251:3
252:2
great 22:15,24 56:1
grew 165:8
ground 10:25
group 15:21 24:7
25:5,6,7,7,11,19,21
28:12 29:7,14 41:19
42:2 47:8 98:3
119:15 180:17
209:9 220:16,17

[group - include]                                                                                                                                    Page 18

223:14
grouped  173:8
groups  24:5,6,17,19
25:1 29:9 151:17
gunranty  154:19,20
155:5,12 224:20
225:6,7
guess  80:14,15
87:14 193:3 246:16
246:25 248:17
guidance  31:1
guidelines  68:5,9
150:17 213:10
guy  113:17 157:21
166:16 177:5
185:22 206:19
230:15
guy's  126:20 134:25
135:1
guys  135:5,6 230:12
255:25

**h**

h  4:4 11:24
half  34:23 113:22
115:2,3
hand  9:24 11:15
68:16 155:19
208:16 238:25
239:6 256:2 260:18
handing  219:19
handle  213:16
handled  19:6,7
147:20
handwriting  105:22
hang  107:18
happen  43:6 55:1
77:23,25 78:3 79:13
111:8 112:22,22
116:7 134:15
140:21 179:7 230:1
235:18,19 236:19
250:21 256:6,8
happened  61:13
73:1 77:21 101:8

179:3 237:5
happening  141:19
happy  11:11
hardware  152:12
harmful  132:5
harming  108:2
head  11:6 38:9 48:6
113:25 114:4
128:24
heading  183:20
220:19
headquartered
40:24
headquarters  26:10
116:20
health  127:9
hear  146:13 241:15
heard  10:23 54:11
74:3 221:8,10
222:14
heaven  127:8,16,19
heck  220:18
hectic  168:11
held  9:21 13:3 18:20
19:8 40:16,23 41:12
99:8 171:9
hell  128:4
hello  156:4,21
help  13:3,10 52:14
52:15 84:9 96:16
120:20 129:24
178:15,16
helped  187:6
helpful  216:2,5
222:10 224:6 232:2
helping  164:16
hereinbefore  260:8
hereunto  260:17
hesitating  230:11
hey  230:1
hh  203:14
hl  227:9,10
hidden  218:9
high  38:4 57:20
58:24 59:10 132:19

133:8 136:18 153:2
160:2,3,5 179:16,19
187:13 198:2 206:1
higher  52:4 53:1
59:2,4,14 125:11,25
126:6,13 131:20
133:5 134:25 183:3
183:5 200:23 208:2
208:11 228:8 249:3
highest  72:24 133:9
highly  55:22 95:15
136:24 156:1,2
historical  33:8
history  12:17 34:5
48:8 89:21 118:12
hit  118:6
hitachi  6:20 38:16
56:16,19,20 104:5,8
104:12 107:13
137:21,23 138:5,14
252:25
hold  161:19
home  15:5 25:8
111:9 255:15
hope  211:12 212:13
hoped  122:13
hopefully  167:10
hopes  162:21
horn  5:14
horrible  215:14
hotel  114:21 115:6
hours  231:12
houston  3:8
hubbard  2:10 9:18
260:5,24
huge  165:11

**i**

idea  84:7 177:18
ideas  124:22 125:1
identification  12:20
68:15 74:6 105:19
122:22 126:23
128:11 137:11
154:3 169:13

186:17 198:6
208:15 219:17
239:5 260:24
identified  10:2
226:18
identify  29:15 33:4
152:10 226:22
identity  61:19
igor  20:21
ii  93:3,7,11
iii  4:4
illinois  5:17 22:4
immediately  241:9
impact  79:4 106:17
106:21 107:10,11
121:3 141:4 148:24
167:8 195:4 196:3
impacted  75:3
impacts  71:24
implement  236:8
237:24
implemented  84:18
85:7 99:3 147:8
148:5 237:11
implies  201:11,20
imply  76:17 109:19
important  92:8
109:4,7 134:13
185:18 211:4,7,11
223:19 224:5
importing  41:13
improve  118:15
improved  54:20
inch  29:23,23,23,24
29:25 30:5,6,10,10
30:10 31:3,3 45:15
47:9 75:15 112:12
137:2,6 156:15
163:23 173:9 223:2
inches  31:5
incidentals  114:22
include  15:19 16:10
17:6 25:8 52:16,17
172:25 173:1 182:9

[Included - joke]                                                                                                Page 19

included  15:15
  16:13 17:8 52:18
  86:8 87:17 93:11,17
  153:21 154:1
  156:16 177:12
  206:2
includes  34:4,4
including  16:22
  98:21 190:3
inclusive  163:19
income  172:9
incorporated  14:3,4
increase  75:4 80:1
  83:21 89:25 118:17
  118:18 129:23
  132:19 141:25
  146:25 149:5,7
  201:3,14,16 210:15
  235:22,23 236:16
  236:18 246:1 248:1
increased  141:13,21
  142:5 188:1
increases  133:12
  236:9,9,19
increasing  200:16
incredible  149:19
  222:14,15,17,18
  223:3
incurred  162:11
indemnification
  99:9
independent  13:18
  13:23 28:23
independently
  144:7
index  8:14
indicated  258:12
indicates  220:24
indication  256:17
  258:10
indicators  163:20
indirect  6:11
individual  80:23
  102:20 150:14,20
  151:4 160:22

219:14
individually  166:17
industry  33:11,25
  34:15 200:19
  238:21
influence  104:15
  105:7 118:8 119:24
  172:1 196:8
influenced  102:23
information  42:4,9
  60:15 62:4 67:16
  79:8 147:22,24
  161:1 163:1,14
  164:9 166:3 167:3
  167:11 170:12
  174:25 175:15
  177:8,23 178:18
  182:10 191:7,19
  199:1,25 201:6
  204:1,8 205:1
  206:20 207:18
  211:3,9,16 212:1
  213:22 214:21
  216:1,8,21 217:6,10
  218:12 222:8,10
  226:1,18 244:7
  254:18 256:15
  257:10,16,16,20
  258:21
initial  86:4
initially  44:22
initiate  183:23
  184:12 185:2
  258:23
initiating  185:15
innovations  118:15
input  170:12 188:13
inside  118:22
insist  233:13,16
instance  31:9 36:25
  51:1 53:24 144:23
  216:18 221:20
instances  39:8,15
  41:16 52:3,20 99:24
  115:23 142:4,16,25

216:7 219:6 232:6
  243:3
instantly  237:4
instruct  243:12
instructing  241:16
instruction  241:22
instructs  18:13
intelligence  208:1
  209:14,19 210:4,12
  210:20 211:19
  213:7
intended  65:6,11
  84:20
intense  223:11
  224:9
interaction  213:23
interchangeably
  117:8 165:19
interest  36:6,9
interested  36:21
  195:21 225:25
  260:14
internal  72:11
Internet  226:5
interpretation
  201:20
interrogatories
  13:19 197:18
interrupt  96:3
  217:22
intersect  195:2,3
introduced  31:18
  58:10 95:25 136:25
  137:2 204:15
  255:21
introduction  31:24
  34:20 35:3 80:8
  251:22
introductions  30:19
invariably  187:12
invented  80:19
inventory  42:12
  81:17 85:13 95:12
  148:23 149:3,6,10
  150:5 159:25

164:13 186:7
  191:21 218:2
  220:22 221:1,22
  223:6,21,24 236:6
investigated  199:17
  199:25 201:24
investigation  244:1
  244:8 258:23
investigations
  242:15 243:9
involved  15:6,9 20:5
  20:6,17,19,20 45:19
  104:7 152:24
  154:13 156:1
  209:13,16 229:6
  235:13
involving  257:3
issue  50:1 165:11
  248:18
issued  98:6
issues  129:2,19
  210:1
item  82:8 145:8
  220:22 225:15
items  39:25 118:16
  177:6

                    J

j  6:5
japan  111:2,4,23
  116:17
jay  68:24 69:1
jbrew  7:16
jeffrey  7:19
jenner  5:15
jenner.com  5:19
jim  198:18,21
jlahad  3:10
job  166:23 170:14
  170:17 171:6
  209:22
john  3:4 7:11 10:5
  238:15
joke  118:22 164:20

[jonathan - large]                                                                Page 20

**jonathan** 3:3
**jr** 2:10 260:5,24
**july** 15:12 181:19
**jumped** 8:22
**jvc** 14:11,13 38:16

**k**

**k** 3:13 32:20,22
**kahn's** 203:14
**keep** 89:23 132:2
   142:13 166:8 169:1
   207:6 219:10 231:9
**kept** 34:6 177:11
   198:2
**key** 16:4 28:14
   147:17 152:10
   174:2,4 237:3
**kick** 35:15
**kind** 72:4 79:4,11
   99:4 131:24 163:25
   170:2 206:3 220:11
   241:1
**kirby** 6:6
**kirkland** 6:15
   239:14
**kirkland.com** 6:19
**kmllp.com** 6:10
**knew** 48:16 129:16
   232:16 238:5
   240:25
**know** 11:10 14:11
   19:19,20,23 20:1,11
   21:2,12,19 22:2
   23:14 25:1 32:15,16
   32:20 33:25 36:9,18
   37:11,13,19 38:19
   38:20,23 39:2,3,18
   39:19 40:6,11 41:5
   41:15 45:24 46:10
   48:15 54:23 56:18
   56:19,22 57:5,6,8
   57:11,15 58:3,21
   59:24 60:17,22 61:5
   61:16,23 65:2,21
   68:24,24,25 73:16

74:19,20 77:10,12
79:25 80:13 82:15
83:13 86:22 87:18
88:11,18 89:17
94:15 95:19,23 97:1
102:12,14 103:18
104:9,10 106:19
108:9 109:21
111:10 113:22
121:15 122:2,3
123:9,23 124:5
126:2 127:5,15,24
128:18,20 130:2
131:10 135:19
136:12 137:5
139:12 150:3,20
151:1 154:15,19
155:5,21 158:24
159:3,9,20 160:20
160:21 161:2,24
163:9 164:8 166:3
168:22 169:22
170:5 172:7 173:3
175:8,11 176:25
177:4,4,8,14 178:1
180:7,9,10 183:6
184:24 185:1,24
188:17,19,23 189:7
189:15 190:5,8
192:6 193:21
197:11,14 199:8,15
199:17,20 201:10
201:24 202:23,25
203:3 204:11
208:18,23 214:19
215:2 216:2,23
219:9,24 222:4
223:18 224:2
226:13,23 232:1,18
232:25 235:10
237:21 238:23
242:20,22 243:20
249:25 250:25
251:4 253:10

**knowing** 91:14
   126:3 176:9,18
   177:13 224:3
**knowledge** 42:22
   45:10 48:14 49:1
   56:15 58:9 60:6
   82:18 177:1 205:21
   241:2 242:8 250:11
**known** 60:20 61:1
**kopp** 180:7,10
**korea** 111:4 116:18

**l**

**l** 8:2
**labeled** 169:16
   208:18
**lack** 73:18 75:25
**lacks** 65:1 75:10
   84:22 108:21 119:6
   127:17 128:5 134:5
   138:2,20 139:18
   149:12 161:7
   181:13 182:1
   191:23 199:6,13,21
   200:5,17 201:8,17
   221:3,24 245:18
   247:10
**lag** 137:9 236:10,18
**lahad** 3:4 8:11 10:4
   10:5 12:2,4 18:11
   21:1 22:6,16,21
   27:15 35:13 42:24
   44:15 46:24 48:25
   49:14,19 50:9 53:3
   53:14 54:16,22
   55:24 58:2,20 61:6
   62:18 63:11,13
   64:15 65:1,20 66:2
   66:4,21 67:24 68:1
   68:11 69:17,25
   70:17 72:17 73:18
   75:10,25 76:23 77:5
   78:12,14 79:21
   81:13 82:24 84:22
   87:20 90:15 93:23

96:25 97:8 98:12
102:10,22 105:9
107:1 108:8,21
110:7 113:5,8
115:24 117:6 119:6
120:23 125:2,19
126:8 127:10,17
128:5 130:23 132:9
133:1 134:4,21
135:16 136:8
137:24 138:20
139:6,18,22 140:18
142:11,17 145:17
146:10 147:2,4
149:12 151:7
152:18 157:25
158:21 160:8,14
161:7,18 162:2,13
163:3 168:19
169:24 176:11
181:6 182:1 184:3
188:3 191:11,23
192:5,12,25 193:25
194:13,22 195:12
196:6 199:6,13,21
200:2,5,17 201:8,17
204:19 205:9
207:22 211:6,22
217:8 218:5,14
221:3,23 223:22
224:22 226:20
228:11 229:12
231:2 232:24
233:23 234:4,17,22
235:4,14 236:12,21
240:2,4 242:17,19
244:2,12 245:5,18
246:18 247:10,12
247:20 248:10,21
249:5 252:7,9,23
253:3,13,21 255:16
255:17 259:1
**large** 113:15,19
   165:5 172:2 193:19

larger  30:18,19,19
  222:20 235:8
largest  30:9 54:5
  152:22 188:18
late  94:21
laughing  125:5
laura  3:13
laura.lin  3:19
law  2:7 227:12
laws  161:16
lawsuit  197:12
lazy  99:23
lcd  10:15 12:12,15
  13:19 58:9 142:2,3
  194:17 195:9,15,20
  196:14,20,23
  197:18
ldc  194:20
lead  17:3 145:24
  258:16
leader  159:12
  170:15,21,24
  171:15 172:3,6
  173:18 175:19
  176:2
leaders  159:10,22
  160:2 172:11
learn  135:8 174:20
  174:25 188:10
learned  54:12
  197:11
learning  43:7,8
  135:14 136:4
leave  92:1
led  207:18
left  25:5 155:19
  224:23 256:2
leftovers  187:13
lessen  129:23
letter  82:8 109:23
  141:24
level  18:10,16,17
  19:18 32:8,9 41:22
  45:17 119:19 120:7
  120:8 129:15 134:7

134:24 162:18
  173:19 176:2
  184:20 189:20
  190:14,15 204:25
  205:2 206:1 208:3
  218:2 229:5 256:11
leveled  80:14
levels  41:23 224:3
leverage  53:13
  54:12 55:6 134:10
  134:18
levers  84:15
lg  3:20 38:20 56:23
  61:11 69:3,9,14
  90:2 253:17,20
liable  99:8
lieu  96:8
life  80:13,16,21 81:1
  136:19 187:8,9
  232:4
lighter  196:23
liking  64:18
limited  39:13 82:21
  100:19 218:22
lin  3:13 8:6 10:8
  12:3,8,9,21 13:1
  17:20 18:12 21:4
  22:12,15,18,22,24
  22:25 27:19 32:24
  35:16 40:22 44:20
  47:4 49:6,17,22
  50:4,17,25 51:6,12
  51:19 53:11,18,23
  54:18 55:7 56:1,10
  56:11 58:4,22 60:16
  61:8,18 62:7,22
  63:12,17 64:3,21
  65:4,23 66:3,15,23
  66:25 67:19 68:3,16
  68:19 69:22 70:11
  70:24 73:2,14,24
  74:7,9 75:18 76:3
  77:2,6,7,17 78:7,13
  78:16,18 80:2 81:19
  83:1 85:5 88:1 91:3

94:1 96:4,6 97:3,16
  97:24 98:23 102:11
  102:13 103:5,21
  105:16,20,25
  106:23 107:7,19
  108:3,15 109:3,24
  110:8 112:4 114:13
  115:25 116:12 117:9
  117:10 119:8
  121:14,23 122:10
  122:23 123:1
  124:17 125:7,23
  126:9,24 127:3,14
  127:23 128:12,15
  130:13 131:6 132:4
  132:15 133:3,15,24
  134:16 135:7,20
  136:3,20 137:12,14
  138:8 139:2,13,20
  140:13 141:11
  142:13,15,21
  143:24 145:22
  146:15,23 147:6,7
  150:2 151:10
  153:10 154:4,7,14
  158:2,3 159:5
  160:11,17 161:3,13
  161:23 162:6,24
  163:5 167:19 168:2
  168:21,25 169:3,14
  169:17,25 170:1
  176:14,16 181:15
  182:5 184:10
  186:18,21 188:6,8
  191:12,14,25 192:8
  192:14 193:4 194:9
  194:16 195:5 196:1
  196:11,25 197:10
  197:24 198:7,10
  199:9,16,23 200:4
  200:12,25 201:12
  201:23 202:3
  204:23 238:25
  239:6,10,16 240:22
  242:5 244:10

250:23 253:18
lincoln  7:22
line  45:6 97:12
  110:25 181:9 184:5
  189:2 207:20
lined  121:17 181:24
lines  181:10
lineup  145:16
lineups  43:7
liquid  194:18
liquidated  13:15
liquidating  3:11
  13:13 14:6
liquidation  242:10
list  19:2 57:13 93:15
  112:17,18 203:12
  214:4
listed  20:24 21:6
  23:15 177:22 179:1
listen  33:19 35:19
listening  146:12
listing  115:9
literally  29:9
litigation  1:8 9:20
  14:9 227:14
little  30:3 35:8 77:25
  96:4,17 112:19
  153:15,18 155:18
  224:20 251:5 252:5
  254:9 255:12
live  45:21
llp  3:5,14 4:5,14 5:6
  5:15 6:6,15 7:4
located  16:17 21:20
  22:4 25:11 26:13
  40:8,13 41:3 43:4
  115:17 181:1
  188:21 257:6
location  25:12,14,22
  25:24 26:9,13
  188:21
locations  100:19,19
  100:24
logical  190:20,24

long   19:23 28:10
30:4 33:6 51:25
78:4 96:13 104:6
107:16 112:3 155:7
179:3 224:12 251:5
255:10,13
longer   19:5 52:5
94:20 96:5 151:4
255:21
look   28:20 37:23
97:13 111:21,24
123:8 166:20 172:5
198:13 205:2
206:18 217:24
225:12 226:11
244:9
looked   21:24 60:1
92:14 97:10 136:7
177:25 255:2
looking   33:9 44:6
45:8 48:8 50:14
57:1 69:11 73:15
154:11,18 176:1
177:19 184:22
209:17 216:21
217:15 218:23
244:22 246:5
looks   132:2 177:16
181:8 194:7 256:3
lose   107:16
losing   87:14 156:8,9
156:25
loss   133:13 159:10
159:12,21 160:2
246:1
lost   41:24 133:13
lot   19:25 34:8 49:5
64:19 80:10 81:17
86:8,15 120:3
224:23 235:17
lots   77:13 84:14
218:15
loud   109:10
louisiana   3:6

low   47:9 57:20,25
58:24 154:19,20
155:5,9,12,15 162:7
162:10,11,12
224:19 225:6,7
246:7
lower   45:22 59:6,16
63:9,11,12,20 66:1
66:18 67:4,22 79:13
86:20 121:7 153:17
153:19 156:5
157:23 158:15
160:4 167:25 177:5
183:24 184:13
185:3 186:3 194:5
196:20 200:22
205:18 233:14
249:3,4,24
lowered   85:8,10
208:5
lowering   207:19
lowest   46:7 47:7
64:10 185:15
lunch   55:25 57:19
62:8
lying   175:8

m

m   7:3
machine   218:20
magnavox   47:25
82:22,24,25
mail   189:21
maintain   71:18
101:16 109:4,7
118:14
maintaining   76:20
major   38:15,18
45:12 244:23
253:10
majority   101:8
113:6,9 149:22
182:18 206:25
232:13

makers   258:12
making   35:17 60:5
61:19 79:14 118:19
257:4
malaise   7:3
manage   24:7
managed   24:5 35:7
113:12
management   15:8
98:3 129:4,16 130:1
152:9 177:3 180:17
206:13
management's
177:1
manager   15:4,7
16:8,25 18:25 19:3
19:4,10 20:16 24:7
24:10,15,16,18 69:3
106:7,8,9 114:6
120:13,14,15
123:19 147:13
154:15 166:6
170:22,22 172:12
172:13,14 176:24
177:3,14
manager's   18:20
154:8 155:24
156:23
managers   29:10,11
119:21 177:7
178:22,24 209:11
managing   17:4 66:8
207:4
manner   243:3
manufacture   80:11
manufactured   41:6
59:24 60:9,19,24
61:3,17 67:13 70:4
111:13 144:18
202:24 203:1,2,4
254:17
manufacturer   39:4
55:14 64:24 70:20
71:8 117:3 246:8

manufacturer's
67:17 71:23 72:21
85:1,7,9 86:11
117:23 141:15
143:19 162:20
182:20 208:8,12
246:17 247:7,9
250:4,16 251:19
254:15 256:4
manufacturers   39:1
39:6,10 40:11 41:3
42:23 47:21 54:21
57:13 63:10 70:7,13
93:25 117:7 135:9
135:14 136:5 199:4
199:18 201:16
236:4 237:1 249:20
258:17
manufacturing
42:20 61:14 93:21
135:9,23 136:6,13
march   22:10,19
35:5
margin   72:15,19,20
72:24 76:20 87:10
118:3,6,10,18,23
119:1,4,9 120:10,20
122:5,8,9,12 124:21
124:25 127:7,16,20
133:9,13 138:4,25
141:3 143:15 144:1
155:19 162:22
248:18
margins   71:18
97:14 118:1,9
119:24 120:7
121:11,12,13,16,17
121:21 122:1
125:11,25 126:6,13
127:20,21,21,22,25
132:19 139:5
143:25 205:22
206:1,11 232:19
248:8,14 249:2

mark 12:21 74:7
  105:20 122:23
  126:25 128:13
  137:12 154:4
  169:14 186:19
  198:7 219:18 239:2
marked 11:16 12:19
  68:14,17 74:5
  105:18 122:21
  126:22 128:10
  137:10 154:2
  169:12 186:16
  198:5 208:14,17
  219:16,19 239:4,7
market 19:3 36:25
  37:6,7,17,18,24
  38:17 51:17 52:8,12
  52:13 53:9,13 54:2
  54:19 89:13,19
  92:19 110:22
  131:23 132:7 163:2
  163:11,12,16,22
  164:5,6,7,11 165:4
  165:7 170:15,17,21
  170:21,24 171:15
  171:21,22,22,24,25
  172:3,6,11 173:18
  173:18,21 175:19
  176:2,2,4,10 183:24
  184:13,23 185:3
  192:2,9 207:10,11
  211:8,8 213:2
  220:12,13,14 221:8
  221:17 223:14,15
marketing 93:8
marketplace 54:5
  72:3 89:23 130:11
  130:15 140:22
  148:9 164:25
  176:19 250:7
marketplaces 156:2
markets 16:1,1
  224:15
marking 169:15

markup 93:6
marriage 260:14
mart 37:23 164:23
  165:7 166:12
mass 150:12
master 82:7 86:8
  99:7,14,20 100:1
match 35:4,6 37:6
  154:23 185:21
  216:13 223:3,6,9
  225:4 230:6 237:5,9
matched 225:15
matching 225:11
materially 228:13
math 143:15
matilla 208:22,23,25
matter 44:11 150:12
  234:13 260:15
matters 259:4
maximize 184:15
mcinerney 6:6
mdf 90:5,7,9 92:6,10
  93:1,4 96:8 97:11
  97:14 105:6,13
  206:2 227:22,23
  232:23 233:3,5,10
mdl 1:5
mdp 163:18
mean 14:22 21:2
  27:17 34:12 40:24
  41:24 47:6 51:21
  65:21 66:22 68:13
  75:23 76:14 79:22
  80:17 81:21 84:25
  87:8 91:8 97:2
  98:25 105:2 116:10
  117:19,19 125:15
  141:8 142:11 145:9
  145:20 157:16,18
  158:5 159:12
  172:13,18 173:25
  174:11 178:8
  179:20 181:22
  182:16 187:17,23
  187:25 189:24,25

192:19 194:18
  195:24 196:12
  204:10 221:12
  224:6 231:3 232:25
meaning 36:13
  45:11 46:15 95:9
  229:3 233:24
  254:14
meaningful 63:6
means 27:22 47:7
  51:22 73:23 76:22
  109:16,20 116:4
  127:5,12 155:22
  157:19 172:8 174:1
  174:12 176:3,5,25
  183:7 187:18 188:1
  188:9 221:13,13
meant 73:16 79:6
  116:5 145:5,11
  180:21 191:11
  254:10
measured 30:7
  118:21
meet 50:5 65:8,12
  75:8 98:11 113:10
  115:13 130:2
  233:21 234:2,9
  256:10
meeting 33:24
  109:18 113:2
  129:17,21 198:14
  198:15,16 201:7
  244:20 258:12,17
meetings 112:15
  114:18 129:18
  193:14
meets 129:2
melissa 5:5
melissa.whitehead
  5:11
memo 201:5 257:24
memory 8:15 19:25
  98:4
memos 220:2

mention 229:17
mentioned 28:6
  29:7 52:8 74:15
  83:2 202:18 203:9
  204:13 213:14
  220:2 227:17
merchandise 20:16
  24:14,18 106:7,8
  120:13,14,15 166:1
  170:22
merchandising 16:5
  18:8 23:22 24:2,16
  27:10 119:14,22
  124:5 128:24
  152:10 166:21
  224:10
merchandize 106:9
merchant 48:7
  128:25
merchants 16:6
  223:14
met 12:13
michael 6:14 239:13
michael.gawley
  6:19
middle 75:1
million 163:23
  230:16,16
mind 203:13 258:21
mine 188:5
minimum 121:21,25
  182:21
mintz 74:14,22,23
  75:20
minute 226:14
misquotes 245:5
missing 167:18
mission 3:15
misstates 35:13
  46:24 50:9 54:16
  68:1 76:23 93:23
  96:25 105:9 108:8
  133:1 135:16 136:8
  139:6,18 147:2
  151:7 157:25

194:13 207:22
221:23 223:22
245:6
mistaken 30:10
139:24
mitsubishi 5:20
101:9,11 239:18
model 75:2,13,24
81:1 164:5 173:5,7
173:11 228:25,25
229:2,2
model's 76:6
models 75:21 80:23
90:17 91:1,5,7
232:22 233:14,20
moment 107:5 123:3
157:7
monday 179:15
money 52:22 79:14
79:15 83:5 84:8
87:14 114:10
130:12 144:13
229:21 230:4
231:24,24
monitor 153:13
168:18,23 192:19
206:15 243:16
monitored 165:17
monitoring 165:13
165:23 205:7
monitors 15:6,19
25:4,21 30:3,5
32:17 33:1 58:13
249:19
month 40:2,3
231:19
monthly 178:4,5
months 35:9 187:16
251:25 255:20
moore 20:20
moring 7:12
morning 9:11 10:9
10:10,24 58:12
motions 66:3

motivation 50:13
move 140:17 143:17
moved 48:9 143:20
199:11
moves 87:22
mpd 163:7
msrp 249:21,23
250:3,9,14,22 251:7
251:12,16 254:14
mto.com 3:19
multiple 91:22
munger 3:14

**n**

n 3:2 4:2 5:2 6:2 7:1
8:2,2 9:1 32:20,22
name 9:17 38:18
48:15 171:16 180:7
180:9 198:18
202:13 227:11
249:17
named 23:1 208:21
names 20:9 38:8
147:12 212:17
national 9:19 15:13
17:1,2 18:10,15,16
19:13,18,20 20:6
28:15 69:2 114:6
116:19 123:18
243:4
nationally 166:14
nature 85:14
necessarily 37:25
137:7 200:24 233:7
necessary 226:16
need 41:21 42:13
61:16 75:3 90:7
91:18 121:2 123:8
128:18 138:16
139:12 140:10
166:2 170:13 175:8
196:20 205:17
219:22 238:6 258:1
needed 36:14 99:22
116:13 127:8 186:8

205:17
needs 42:12,16
121:7 134:25 177:3
178:15,16 186:9
196:17
negotiate 43:17 44:3
44:12 51:17 53:7
62:15,23 63:3,9,20
64:6 66:1,13,18
67:4,22 71:18 81:10
85:15 88:2,8,25
89:2,6,12 90:11
109:2 111:25 121:5
negotiated 41:2,10
51:1,2,8 68:6,9
76:21 78:20 82:6
85:16,20,23 89:5,16
90:16 91:11 95:6
105:11 233:3
negotiating 17:3
27:3 43:15 49:8,24
50:18 52:24 54:14
54:20 65:18 71:16
75:6 88:6,24 89:14
91:5,20,22 92:8
121:6 193:23
195:10
negotiation 50:20
51:13 62:9 66:6
91:7,19 112:3
135:15 195:23
228:23,25 255:10
255:13
negotiations 16:23
40:15 43:10 44:25
49:9 50:1,8 71:7
86:4 88:4,23 89:3
102:19 110:4,14
111:16 112:5
115:16 116:8
120:21 122:4
135:10 193:23
195:6 205:7 229:16
242:4 257:2

neither 163:19
net 19:2
never 39:18 60:7
91:14 159:17
226:21
new 4:7,16 6:8 43:7
43:8 87:24 112:11
112:23 118:16
136:24 137:8
144:20 147:15
238:6 251:23 254:2
newspaper 172:1
nimechek 68:24
69:1
nodded 66:4
nodding 11:6
non 67:8 92:5 94:13
96:7 124:12 135:24
175:7 229:18 230:6
230:14,25 231:16
232:9 255:4
normal 46:4 145:3
221:16 223:7,12
230:18
north 2:8 5:16 9:21
227:20 228:4,7,23
229:17 230:6,25
231:7,15 232:7,20
233:13,21,22 234:9
northern 1:2
northwest 7:5,13
notary 2:12 259:23
260:5
note 212:22
notified 238:3
november 22:10,19
187:3 208:22
239:23 240:13
241:7 242:14
number 1:4 29:17
34:12 57:12 73:6,12
74:8 91:5 107:14
109:9 122:24
133:19 153:8
155:18 173:11,16

[number - panasonic]                                                          Page 25

197:4,8 231:25
numbered 137:13
numbers 195:16
numeral 93:5
ny 4:7,16 6:8

**o**

o 8:2,2 9:1 32:20,22
oath 56:13
object 181:13 184:3
  252:21 253:2,18
objecting 242:2
objection 17:19
  18:11 21:1 27:15
  35:13 42:24 44:15
  46:24 48:25 50:2,9
  50:24 51:5,11,15
  53:3,14,17,17,18
  54:16,22 58:2,20
  60:12 62:6,19 63:15
  63:22 64:16 65:1
  67:6,24,25 69:17,19
  70:17,18 76:23
  77:11,24 81:13
  84:22 87:20 97:8
  98:12 102:22
  103:15 106:15
  107:3,17,22 108:7
  119:6 121:22 125:2
  125:3 127:11 128:5
  130:8,23,24 131:9
  132:9 134:21,22
  135:16 136:8,10
  139:6 140:19
  143:21 145:17,19
  158:21 159:2
  160:25 161:7,18
  169:24 175:9
  191:23 192:5,12,25
  200:6 207:22 235:9
  236:21 241:15
  245:5,7,20 246:10
  247:11,19 250:23
  253:6 258:24

objections 69:25
  108:23 109:15
  245:8
observing 214:25
obtain 53:13 134:19
  206:5
obtained 216:9
obtaining 164:9
obvious 175:2
obviously 29:16
  104:23 206:15
occasionally 79:20
  80:1
occasions 64:9
occur 86:10 110:5
  116:7
occurred 162:1,7,8
  162:10 212:25
occurrence 250:1
odd 250:1
offer 83:22 156:5
  215:21 228:8
  256:12
offered 158:16
  228:4,5
offering 46:7 134:8
  153:11 158:8 193:2
  230:20
offerings 134:19
office 15:5,5 25:8,8
  111:24 256:9
offices 2:7 116:17
offset 75:4 133:12
  246:1 248:2
oh 173:17 256:3
okay 12:24 22:21
  111:10 142:22
  185:21 198:23
  239:11 245:11
old 118:22
olson 3:14
olv 210:6
omitted 12:2
once 17:2 31:17
  33:18 53:7,24 72:5

77:23 86:4 89:7
  226:3 255:25
ones 19:23 30:9
  83:24 132:14 153:4
  159:23 203:12
  214:6
online 226:3 238:9
open 37:9
opening 46:14 47:1
  47:5,10,12,18,21,25
  59:18,20
operating 29:13
operations 18:7
  28:12 29:7,9 180:14
  180:18,21,23 181:1
opportunities
  104:22 129:17,23
opportunity 36:1
  54:11 118:12,15
  129:22 133:13
opposed 102:6
  228:9 230:21
  243:16
opposite 153:25
order 41:11 134:19
  158:15 205:18
  233:21
orders 41:12,17,20
  259:11
org 19:24
original 71:19
  181:25
originally 19:1
  76:20 84:20 101:11
outcome 260:15
outside 41:3,6,9,18
  49:7 63:15 76:4
  88:12 100:24 107:3
  115:17,20 116:12
  116:16
overall 65:17,22
  92:17 97:5 99:6
  118:9 119:23 120:7
  122:9 130:19
  153:16 161:11

163:11 184:14,16
  185:7 219:25
  231:17 256:19
overcome 175:9
overnight 188:13
overseas 110:11
owned 86:5
owning 81:17

**p**

p 3:2,2 4:2,2 5:2,2
  6:2,2 7:1,1 9:1
  119:16
p.m. 56:4,7,9 73:5,8
  73:9,11 97:18,20,21
  97:23 133:23 169:5
  169:8,8,10 197:3,6
  197:6,9 202:5,8,8
  202:10 227:7 259:5
page 8:4,14 69:12
  69:13 73:15 75:1,19
  78:15 106:2,11
  124:19 125:9 129:7
  130:5,7 134:1
  154:18 155:17
  157:1,3,5 169:15
  172:5 173:15
  176:22 178:3,21
  180:7,8 183:19
  188:3 198:25
  220:20 222:13
  244:22
pages 123:4,6 178:2
  183:19
paid 51:22 87:13
  97:11 155:3 159:18
palumbo 198:19,21
  201:1,5 258:11
panasonic 4:19 57:3
  57:4,4,7 59:1,3 99:1
  99:1 106:17,21
  107:11 108:5,17
  227:13,20 228:4,7
  228:23 229:16
  230:3,5,25 231:7,15

231:22 232:7,20
233:12,21,22 234:8
252:20
paper 129:5,13
198:11 248:12
paragraph 157:6,10
239:24 240:11
242:23,25
parameters 29:1
park 4:15
parking 114:22
part 12:2,3,4 13:18
23:5 42:22 46:4
61:20 81:11 86:14
88:4 89:1,3,13 90:6
105:13 108:16
109:22 119:20
131:21 135:15
152:22 180:4 184:5
193:22 201:6 209:7
225:10 228:16
232:3,10,11 242:3
participants 241:20
particular 24:1
37:13,15 57:16
72:15 77:18 80:22
89:22 104:14
145:14,23 146:6
147:9 171:3 206:9
229:8 234:9 250:9
251:17
particularly 104:11
112:23 156:9 165:3
parties 14:9 260:13
partner 104:5
partnership 124:21
125:1
parts 181:23
party 14:11 55:23
126:10 163:1,6
164:10 253:8
paul 68:25 69:7,8
pay 52:4 75:14,15
88:8 92:1 114:15,19

paying 96:19 114:10
193:22 206:19
payment 51:16,20
51:25 52:5
payments 94:11
95:5
peachtree 5:7
peak 21:17
pending 11:11
pennsylvania 7:5,13
people 20:1,4,6
29:10 66:8 68:20
74:1,10 80:19 84:13
100:21 104:25
106:1,4 109:1
113:16,17,19,20,23
114:10,24 115:20
116:12,16,24
131:14 134:14
140:21 165:17,22
166:5,18 168:11,12
175:7,24 177:15
180:24 185:24
186:23 188:19
189:5 209:6,11
212:9 218:16,19
220:16,17 256:17
257:3
people's 168:9
percent 33:25 34:1
36:25 37:1,24 38:1
148:7 149:24 155:4
163:21 164:6,7
201:2,13 207:1
percentage 21:20
22:2 37:6 61:25
83:17 94:23 144:2
228:8 230:10,22
performance 34:5
period 15:12,14
16:21 17:10,13 18:3
19:23 20:5,15,21
21:13,16,19 22:3,9
22:20 23:3,9,21
24:8 25:17 26:2,13

28:10 29:6,20,24
30:13,17,20 32:1,21
33:12 35:3 38:12,22
42:14 47:23 48:2
56:17,21,24 57:25
58:7 59:17,19 66:10
78:4 80:3,7,9 82:9
83:6,25 85:4,13
86:7,14 89:8 91:13
94:14 95:18,22
100:5 101:18
103:14 110:7,9
115:4 119:2 120:16
121:15,24 136:22
149:22 151:13
155:7,16 159:11
162:1,3,4,5 164:19
164:22 165:8
168:15,20 170:16
176:13 184:8
185:19 189:17
192:1 197:25
212:12 224:12
232:10,11,14 237:9
243:1,8,15 249:9,23
251:16 252:13
periods 150:18,20
168:7 204:3 216:25
person 102:24
111:16 126:18
160:19 170:20
171:13,17 175:6
211:23 215:23
217:21,24 225:18
238:2
personal 12:17
82:20 201:20
240:16
personally 52:6
158:22
personnel 244:21
persuade 54:1
phillips 7:9 57:9,9
74:23 75:8 199:2
253:23 258:7

phone 5:3 6:3 7:2
111:17 115:19
226:9 238:14 252:5
phrase 174:8
physically 16:17
233:18
pick 114:21,21
226:8
picture 60:5
piece 58:19 248:11
pieces 28:20 90:3,4
90:5 116:24 122:16
pierre 3:4
pipe 240:6,9
pitch 117:13
place 81:25 99:15,20
110:22 155:6,12
170:3
places 102:6
plaintiffs 5:12 6:11
53:19
plan 90:24 118:4
planned 138:15
139:14 196:13,15
planning 34:21
119:15
plans 34:19 119:22
plasma 192:18,22
193:5,14,16,22
194:5,24 195:8
196:3,9,20
play 217:16
playing 36:14 38:2
45:17 109:13
plc 2:8
please 9:24 11:9
48:19 62:21 123:9
128:18 138:14
239:24 242:22
258:4
plus 155:4
pocket 218:18
point 17:15 19:21
20:22 32:16 36:18
46:14 47:2,5,11,13

47:18,21,25 48:18
48:23 49:4 59:17
61:2 69:2 71:15,17
71:19 84:7,8 85:24
89:11 101:6,7,13
107:14 109:9 130:6
162:9 183:9 185:1
195:1,10 200:22,23
234:2,4,10 246:5
248:4,22 256:14,17
256:21 257:4,23
258:1,15
**points** 24:13 59:11
59:18 86:2 118:23
122:18,20 195:2
233:20,24 244:23
248:14,15
**policies** 117:15,25
182:7,9 204:2,4,13
204:16 212:4 223:9
**policy** 117:22
121:25 150:4
181:25 185:15
203:24 214:19
226:24
**pool** 124:10
**poorly** 220:14,15
**popular** 196:24
**portable** 32:4
**portion** 129:9
**portions** 219:24
**posing** 217:9
**position** 15:17 26:4
26:16 30:22 54:20
74:16 131:17
132:12 170:25
171:3,10,17,18
209:1 246:13 247:5
**positioned** 132:6
**positioning** 247:3
**positions** 13:3 14:17
14:25 18:19,23 19:2
19:4,5,7,17 23:11
124:3 155:25
165:12

**possible** 58:10 60:3
112:9 185:9 199:10
207:6 256:24
**possibly** 49:2
**potential** 226:16
**potentially** 138:16
**power** 54:14
**practically** 189:15
189:19
**practice** 26:25
158:19 226:24
245:3,15
**precisely** 188:20
**predetermined** 28:3
28:7
**predicts** 210:15
**predominantly**
25:10 31:15 172:2
**prefer** 103:6,10
133:4
**preferred** 100:6
**premium** 59:20
**preparation** 198:14
244:20
**prepare** 12:10 13:10
**prepared** 13:2
244:17
**presence** 41:10
**present** 36:2 60:22
119:21 254:2
**presentations** 33:19
35:20,21 254:6
**presented** 54:10
**president** 24:15
113:24 114:2
119:22 128:23
206:14
**pretty** 30:5 39:13
129:6 216:17
**prevailing** 183:24
184:13 185:3
**previous** 14:14 22:8
135:17 141:24
142:1 198:15
221:23

**previously** 11:16
17:9 23:7 176:2
188:16 198:12
**price** 16:4 27:13,18
27:20,22,24 28:2,4
28:7 33:10 36:18,20
41:11 43:18,18 46:7
46:14,19,22 47:1,5
47:7,11,12,13,13,18
47:21,25 48:23 59:2
59:11,18 61:25
64:10,10,13 65:8
66:18,21 67:13,14
67:17,20 70:7,21
71:4,4,5,12,13,15,17
71:19,23,25 72:8,10
72:21,22 75:9,13
76:6 77:16 79:7
80:8 81:2,5,6,10,15
81:24 82:4,10,14,18
82:23 83:17,18
84:11,15,19 85:1,8
85:10,11,11,19,23
86:3,8,12,17 87:6
87:17,21 89:9 92:6
94:24 104:23
110:17,22 111:13
112:17,18 117:20
117:21,22,24 118:6
131:16,18,20 132:7
134:7 141:14,16
143:6,9,10,11,13,18
144:5,6,11,17
145:13,24 146:6,16
146:21,24 147:1,8
147:15,15 148:4,4,9
148:10 149:4,11
151:2,20,21 152:17
153:5 154:9,16,19
154:20,25 155:4,5,9
155:12,15,20,22
156:3,4,5,6,19
157:22,24 158:9,10
158:11,12,15 160:4
160:20 162:17,17

162:19,20 164:3
166:14 172:24
175:15 176:4,6
178:13,21,23 179:6
182:17,17,19,19,21
182:22,23 183:1,3,4
183:5,5,6,8,10,12,13
183:13,14,25
184:13,21 185:4,10
185:15 187:19,20
187:22,23,24 188:1
188:9 190:18
191:18 195:1,1,20
195:22 198:3
199:19 201:2,14
205:7,16 206:22,24
207:19 208:3,4,7,9
208:11,13 210:5,13
210:16,22 211:5,25
213:4 214:13
216:13 223:2,9,17
224:19 225:5,6,6,7
225:8,9,11,13,16
226:8,9,23 229:18
230:6,25 231:3,3
233:13,14,19,24
234:2,4,15 235:22
236:5,9,11,18 237:2
237:11,13,20,24
238:3,7,8,20 243:2
246:17 247:8,17
248:14,15,22 250:5
250:5,17,18 251:19
254:16,17 256:4
258:23
**priced** 79:8 92:5
118:7 153:2 156:6
162:16 200:22,23
**prices** 27:6 28:24
43:15,17 49:10,14
49:16 66:17,19 77:4
77:5 78:8,10,12
79:19,21,22 117:16
118:2 131:8 133:5
134:20 135:15,18

[prices - product]                                                                    Page 28

139:17 140:17
142:5,11,13,18
144:22 145:25
146:8,18 148:12,24
150:8,16,22 151:5,9
151:16 152:5,17
153:13 157:12,13
158:5,8 159:6 161:4
161:25 162:10
165:18,23 166:9,10
166:24 167:24,25
168:18,23 172:24
173:21 174:6
175:12,21 176:9,9
176:18,18,21 177:9
177:13 179:20,21
180:4,5 181:4
182:11 183:20,24
184:13,19 185:3
186:4 188:11
190:22 191:3,8,13
191:15 195:9,15
196:2,3 198:1 199:3
199:5,11,12 200:15
200:16 201:16,25
207:5 212:15,23
243:10,16 244:1,25
258:8,13,18
pricing  70:5,14 71:1
73:17 74:2 83:22
118:4 130:16
132:13 144:7,22
145:1 148:15,20,22
152:1,2,6,13 154:24
156:24 158:9
166:11,20 169:18
169:22 170:2,8,11
171:2,4,6,10,12,19
172:4 177:23 178:3
178:9,11 179:2
182:6,9,14,24
184:17 186:6 187:2
187:4,5,6,9,14
188:15,16,23 189:9
193:12,14,15,16,20

207:3,6,7 208:2
211:3,10 214:24
218:21 220:20
222:24 231:6
244:24 245:15,16
246:8
primarily  43:9 49:9
49:11 54:4 59:18
156:17 204:10
primary  46:17
49:25 50:13,13
71:20 143:10
209:21
print  151:21
prior  31:25 94:19
99:2 120:4 130:25
136:11 242:9
priority  133:7,7
probable  60:3
probably  19:25
21:17 29:21 34:1
91:1 93:3 94:16
137:19 145:6
152:23 153:24
167:12 187:4 190:3
195:17 203:16
211:11
procedures  33:1,3
36:24
proceedings  73:7
97:20 169:7 197:5
202:7
process  28:9,12
34:10 43:14 44:2,6
44:8 45:2,4,20 46:7
46:10 48:2,5,6,12
48:21 49:7,23 53:5
53:5 82:6 98:1,6,9
99:4,12 119:20
135:15 147:10
149:14 169:19,22
170:2,8 175:19
183:1 212:13
256:25

processed  188:13
processes  164:12,14
procurement  33:1
36:24 231:5,9
234:14 235:24
236:11,17
produce  132:19
produced  105:23
170:5 188:7
product  15:4,24
16:12,13,14 17:4
18:20,25 20:25
23:16,17 24:3,11,13
24:22,24,25 27:3,14
27:21,25 28:1,5
30:8 31:9,9,22 34:8
34:17,21 35:10,18
36:2,10,12,20 37:23
38:2 39:5 41:6,13
42:14 43:7,8,25
44:9,14,19,21 45:9
45:11 46:2,8,18
47:2,6,8,8,9,17,18
47:20,24,25 48:22
49:9,25 50:12,15,16
50:19,21 51:3,9
52:13,14,15,17,19
53:6,7 54:1,8,11,13
54:15,21 55:2,13,16
56:19 58:9,14,15,18
58:25 59:5,11,21,25
60:4,10 61:3,13,16
61:21 62:10,17,25
63:4,10,21 64:7,11
64:14,19,20,23,24
65:7,14,19 66:16
67:1,3,5,12,18,21,23
68:6,10 69:15 70:13
70:16 71:1,8,9,11
71:21 72:3,15,16,24
72:25 73:17 74:21
75:7,8,24 76:7,21
77:4,15,19 78:9,25
79:3,10,17,19,19,24
80:20,22 81:7,8,11

82:1,5,13,17,21
83:6 84:12,13,18,21
84:25 86:11,20,23
87:12,23,25 88:7,23
89:7,14,20 90:9,12
91:11 92:2,3,9 94:6
94:24 95:6,11,15,17
95:24,24 96:9,11,24
97:6,10,11 98:14,22
99:5,22,25 101:22
102:4,16 103:7,13
103:23 104:2,9,10
104:20,21 105:8,10
105:12 108:19
109:5 110:5,12,15
111:21,24 112:1,11
114:9,14 115:10,14
115:15 116:21
117:3,11,23 118:7
120:19,22,25 121:6
121:18,20 122:1,6
122:12,18 128:8
130:16,18 131:13
131:17 132:3,17,24
133:8,11 134:9,10
134:12,18,20,24
135:4,6,9,14 136:5
138:5,7,23 139:4,9
139:15,15 140:4,16
140:23 141:2,12,14
142:3,5 143:12,20
143:3 145:12,14,23
146:7,17,20,21,24
147:1,9,13,13,22
149:11,18 150:5,9
150:13,22 151:5,18
153:16 154:24
155:1,2 156:17,20
157:20 160:23
162:16 163:2,16
164:6,11 165:4,14
166:7,16,17 167:9
174:6 185:9 186:7
186:12,13 187:8,9
187:10,11,17 191:3

192:10 193:15,16
193:17,20 194:5,6
194:12 195:7,15,19
195:20 196:7,8,10
196:13,15,16,18,23
200:15,22,23
202:23,23,25 203:2
203:5 205:8 208:2
208:10 209:10
211:24,25 214:8,8
215:12,14 218:7
224:1 225:12,23
226:4 232:4,8 233:5
233:9,17 234:14,16
235:7,23 244:1
246:12,14 247:5,25
251:17,23,25
252:12,17 254:11
254:19 255:3,3,14
255:20 257:14,15
**products** 12:7 14:19
14:21,22 15:2,10,10
15:16,25 16:3,10
17:9,17 18:9 19:14
19:18,21 21:7 23:11
23:21,25 24:7,24
25:3,20 26:6,7,19
26:23 27:7 30:11,24
31:8,17 33:5 34:13
34:25 35:2 37:7
38:9,13,21,25 39:1
39:9,11,17 40:8,13
41:2,18 43:16 44:4
45:2 46:11,21,23
47:13,14,22 48:5
50:7 52:5,25 55:9
56:16,23 57:6,16,20
57:21,22 58:1,5,11
58:13,24 59:1,23
60:18,24 61:24 63:8
63:9,11,19 65:6,11
66:1,19 70:14 74:18
77:14 78:1,11,20,22
79:2,25 80:4 85:17
85:21,25 86:5 88:3

88:9,11,15,19 90:13
91:9,12,14,17,21,22
92:1 98:2 99:16,20
100:7,10 101:2,3,5
101:17,24 102:2,7,9
102:10,11,19 110:6
112:8,10 113:1
117:5,13 119:2
122:5,14,16 124:11
127:25 132:6,8
133:5 134:7 136:23
136:25 143:2,6
144:23 145:15
146:1,4,8,18 148:14
148:24,25 150:8,16
151:18 152:4,5,16
153:18 159:7,10,18
159:21 160:1,4,5,9
160:10,12,19
168:20 171:11
172:23 173:8,12
174:22 176:12
184:15 185:16
186:3,4 191:8,16
192:3,23,24 193:5,6
193:22,24 194:20
194:21 195:9,11
196:3,5,19,21 198:2
202:19 205:23
207:8 212:23 214:4
232:19 243:4,17
244:24 245:15,23
246:9 247:3,6
249:22 251:15
254:3 258:19
**profit** 109:18 118:19
118:21 121:1,21,25
130:20 133:13
141:5 150:10
172:10 185:9
232:18 248:8 249:1
**profitability** 87:12
87:16,19 96:11
104:21 119:23
126:21 153:16

161:11 184:15
210:18 245:17,23
247:17
**profitable** 95:15
128:9 140:6,8
144:14
**profits** 131:3,4
132:25 210:22
245:1,3 246:2
247:24
**program** 55:19 99:2
106:20 127:6,13
154:9,11,12,16
155:6,9,11,12,15,24
172:19,20,21
183:17 229:3
231:17
**programs** 12:5
81:15,21 125:12,25
164:17 227:18,20
227:21,25 228:14
228:22
**prohibit** 161:17
204:16
**projection** 31:20
106:18 156:14
214:9
**projections** 156:12
**promo** 179:4,5
**promoting** 128:8
**promotion** 216:4
**promotional** 127:9
128:4 180:1,3 183:2
215:20 216:16
227:18,20,21,24
**promotions** 12:5
148:16
**prompt** 146:7
**pronounced** 208:24
**proper** 104:25
**properly** 237:20
**proposals** 233:13
**proposed** 108:17
120:1

**proposing** 256:23
**protected** 86:13
**protecting** 87:7,8,9
87:11,15,19
**protection** 81:3,5,6
81:11,15,25 82:4,10
82:14,19,23 85:11
85:11,19,23 86:3,9
86:17 87:7,10,17,21
92:7 144:17
**provide** 14:5 36:15
52:21 54:2 60:15
82:14,18 110:1
122:8,11 126:14
163:1,15,22 170:11
**provided** 14:8 19:24
52:13 62:16,25
82:22 83:5 93:12
122:5 219:7
**psb** 172:16,18 179:3
183:6,9,10,12,14,16
238:6,7
**ptv** 106:17
**public** 67:11,20 79:8
177:17 191:19
206:8 216:1,21
259:23 260:5
**publicly** 224:4
**published** 216:12
**pull** 139:14
**pulling** 138:15
**purchase** 17:6,8
23:20,24 26:6,18,22
30:24 33:5 35:10
37:16 38:24 39:5,16
39:21,23 41:11,12
41:17,20 43:10
48:23 50:6,7 52:24
54:1 55:8 56:16
61:25 64:14 65:7,12
75:6 85:17 88:4
89:3 91:7 96:9
98:10 99:19 102:18
104:16 105:8
135:10 136:22

143:1 148:25 150:4
193:23 195:10
214:17
**purchased** 18:10,15
18:16 39:9 40:7,12
55:14 60:19 61:24
85:20,25 99:15
202:19,22 232:19
**purchaser** 6:11
**purchases** 17:4
20:25 23:16 24:3
27:1 34:17,24 39:13
40:16 41:2 42:5
43:15 49:9 50:19
64:7 81:12 92:9
99:5 115:10,16
117:17 120:21
**purchasing** 17:8
35:18 45:2 46:17,23
55:10 59:23 61:21
77:4,5,9 82:1 91:6
233:20
**purely** 200:9 214:21
**purgatory** 127:7
**purpose** 129:12
**purposes** 66:7 183:2
**pursue** 101:25
**put** 28:1 39:25 45:6
55:12 97:15 105:15
105:15 110:17
118:3 121:8 126:24
128:12 148:10
151:23 178:21
179:12 182:25
186:18 188:2,10
210:25 223:13
256:2
**putting** 144:1
178:23 185:9

**q**

**qualification** 98:1,9
99:4
**quality** 244:24
249:3,4

**quantities** 37:17
**quantity** 50:6
**query** 120:5
**question** 11:11
21:10 26:20 49:14
53:5,22 54:25 60:1
60:25 62:20 63:24
69:23 77:13 103:19
108:11 112:21
130:25 136:11,11
139:20 142:8,14,18
146:13 160:8,15
170:4 200:2,4
211:13 245:12
246:14,23,24
**questioning** 96:3
**questions** 123:7
224:24 227:2,16
238:12,18 240:1,19
249:21 252:3 257:9
257:25
**quick** 22:6 196:25
238:18
**quickly** 22:1 219:18
244:9
**quite** 16:21 20:4,6
33:6 35:6 104:6
136:25 182:20
189:18
**quote** 94:22 225:23
**quoted** 44:22 64:10
135:1
**quotes** 44:13
**quoting** 45:18 194:6

**r**

**r** 3:2 4:2 5:2 6:2 7:1
9:1 240:4
**radio** 222:19
**raise** 9:24 75:3
106:25 161:24
162:10 208:3,4
210:12,22 258:7
**raised** 199:2,18
208:6

**raising** 137:22
**ran** 151:22 167:5
180:19
**random** 224:11
**range** 58:5
**rare** 36:2,3,7 113:14
114:7,12
**rated** 96:11
**rattle** 20:3 29:21
**ray** 1:7
**reach** 36:4,8 71:16
**react** 28:16,22,24
45:23 140:22
166:10,22 167:12
174:2,5 176:5
179:20 190:16
206:24 217:2
**reacted** 212:19
**reacting** 28:17 29:6
212:13
**reaction** 139:11
152:1,5,11 153:13
156:7 179:6,14
190:2 204:7 207:2
208:5 212:20 221:8
221:15,18 225:19
231:23 232:5
**reactions** 151:2
189:22 190:6,9,17
**reacts** 223:16
**read** 40:20,21 69:22
69:24 73:22 107:5
109:9 123:5 127:2
128:20 133:25
135:13,21 138:9,12
142:8,10 157:6,8
167:17 183:21
198:24 219:22
243:6,7,7 258:2
259:9
**reader** 170:17
**readily** 217:6 218:3
**reading** 69:13 70:1
175:17 184:5 200:1
200:13

**reads** 210:3
**real** 22:6 158:8,10
158:12,15
**realizing** 160:23
**really** 72:2 96:18
112:10,19 118:20
125:4 181:14
204:10 239:2
**reask** 62:20 66:23
**reason** 108:16
143:10 159:25
170:6 184:16
214:12 224:16
230:11
**reasonable** 21:14
34:1 65:3 251:2
**reasons** 104:4 186:5
**rebate** 92:24 228:8
**rebates** 12:5 93:17
161:6 227:24 228:2
228:3 229:11
230:21
**reboot** 49:20 63:13
**recall** 29:18 30:15
31:21 32:12 38:11
62:12 101:1 103:12
115:22 118:25
141:18 162:25
171:9 227:19 229:9
244:15 252:13,16
254:7 255:10
257:11
**recap** 198:14
**receipt** 89:13
**receive** 71:19 90:8
90:13 94:8,25 95:3
157:24 209:23
**received** 93:21,24
94:18,22,23 210:4
**recess** 133:20 227:5
**recognize** 209:6
**recognized** 59:13,15
**recollection** 82:22
**recommending**
210:11

**record** 9:2,4,10,12
  10:4 11:2 22:8
  40:21 49:21 56:5,9
  63:14 66:4 69:24
  73:6,13 97:17,19,23
  133:19,23 142:10
  169:6,11 181:6
  197:4,9 202:4,6,11
  206:8 218:12 227:4
  227:8 259:10 260:9
**recorded** 119:9
**recorder** 218:17
**recording** 218:13
  219:7
**recordings** 219:10
**records** 23:5 119:10
  119:13
**recourse** 64:12
**red** 181:9,24 184:5
**reduce** 64:24 65:5
  65:10,19 69:15 70:2
  71:8 81:7 84:11
  96:22 132:24
  139:16 143:13,14
  146:7 149:4 150:6
  245:25 247:17,24
**reduced** 58:6 87:23
  194:11
**reduces** 131:3
  245:22,23 247:23
**reducing** 96:18
  130:18 131:7
  138:16 190:22
  245:1,3,17
**reduction** 65:15
  130:21 144:9,17
**reductions** 190:18
**refer** 14:21 17:21
  36:12 43:18,18
  45:10 64:8 93:3
  229:19
**reference** 36:23
  74:2 154:18 216:10
**referenced** 34:11
  35:17 154:9 167:14

**references** 109:13
**referring** 17:22
  109:12 142:2
  151:25 170:9,10,18
  170:20
**refers** 181:4 188:12
**reflected** 14:15,17
  14:25 115:8
**refund** 155:2
**refused** 98:10 99:21
  99:25 139:16
**regarding** 36:24
  62:10 68:9 121:25
  205:22 242:15
  249:21 257:10
**region** 28:15 207:8
**regional** 18:2
  164:25 203:9,13,18
**regions** 207:13,15
  213:18
**regular** 157:12,18
  209:20
**reinforce** 129:22
**relate** 23:11
**related** 14:18 15:18
  16:9 17:7,16 19:17
  21:7 23:15,17,20
  25:3,20 26:5 33:1
  56:17 57:9 68:5
  115:8 117:15 118:1
  147:23 171:10
  251:13 260:12
**relates** 1:9 70:9
**relationship** 102:24
  102:25 103:3,9,25
  104:11,13,18 105:4
  105:4 108:6
**relationships**
  102:20 104:3
  108:18
**relative** 229:23
  248:19
**relatively** 235:7
  249:2

**released** 216:17
**releases** 206:7
**relevant** 21:13,19
  22:3,9,20 23:3,21
  25:16 26:1,13 29:20
  30:13,16 38:12,14
  38:22 48:2 49:11
  56:17,24 57:24 58:7
  80:3 100:5 101:18
  103:14 110:8 119:2
  121:15,24 136:21
  159:11 162:4
  164:19 168:15,19
  176:12 192:1
  197:25 243:1,8,15
  249:9,23 251:16
  252:13
**relied** 34:16
**relying** 139:23
**remain** 70:15
**remainder** 155:23
**remaining** 85:13
  243:10
**remains** 243:2
**remember** 13:3
  20:10 35:5 37:2
  48:17 57:22 150:25
  180:9 229:13 251:9
**remind** 123:12
  183:15
**reminder** 154:10,11
**remove** 217:23
**renegotiate** 79:2
  232:9
**rep** 114:5
**repeat** 9:6
**replaced** 80:24
**replayed** 201:6
**report** 119:17,17
  120:3,4 164:14
  167:14,20 168:1
  179:4,5 205:25
  206:8 212:21
  220:11 221:9,18
  222:10

**reported** 2:9
**reporter** 9:3,18 11:2
  32:19,23 40:19
  69:22 124:13,15
  135:25 136:2 142:8
  205:11,13
**reporting** 171:15
  201:5 212:20 220:9
**reports** 21:24 57:1
  120:4,5 167:11
  168:3,14 177:16
  206:6,10,13,18
  209:23 220:6
**reposition** 143:8,11
**repositioned** 67:12
  86:11
**represent** 105:22
  198:21 202:13
  227:13 241:5
  249:18
**representative**
  115:19
**representatives**
  102:21 112:25
  113:10,12 114:15
  115:13,15,16 117:2
  244:18 256:8
**represented** 32:6
  223:1 239:21
**representing** 217:17
  246:6 247:2
**represents** 239:9,10
**request** 44:13 69:16
  70:12 71:7 96:7
**requested** 36:1 65:8
  65:13 75:9 76:10,14
  76:15 77:1 81:14
**required** 152:11
**requires** 31:24
**resale** 23:25
**resist** 233:12
**resources** 224:18
**respect** 65:18 150:4
  185:16 203:25

respectively 172:14
responding 190:22
response 69:16
  76:10 119:7 124:12
  135:24 138:10
  141:14 234:6 244:3
  246:20
responsibilities
  15:15,18 16:6,9,11
  16:24 18:18,24 19:6
  19:8 21:5,10 23:10
  23:16,20 25:20 31:8
  178:4
responsibility 14:18
  15:1 16:20 17:16
  19:14 23:15 24:3
  25:3 26:5 32:9
  177:21 206:10
responsible 15:20
  23:23,24 27:2,6
  30:23 124:6 165:13
  165:23 166:1,2
  191:6 211:24
rest 40:4 135:3
  200:9 209:8,11
restate 53:21 71:20
  94:12 146:14
  231:13
restating 139:21
result 109:17 210:17
results 205:6 229:24
resuming 73:8
  97:21 169:8 197:6
  202:8 227:5
retail 46:19 47:7
  67:13,14,17 70:5,7
  70:14,21 71:12,23
  72:21 79:6 85:1,7
  85:10 94:24 110:17
  110:22 111:13
  117:23 118:19
  130:19 133:8,11
  139:17 140:17
  141:2,14,16 143:10
  144:5,19,20 147:23

148:6,13 150:14
153:12 162:20
168:23 182:10
193:15 195:18
200:20 203:8
206:21 208:9,13
214:24 218:4 236:4
236:11,18 237:2,23
245:23 246:2 247:8
247:22 250:4,17
251:19 254:16,17
256:4
retailer 157:23
  218:7
retailers 131:4
  151:20 157:11
  245:2
retailers's 157:17
return 256:7
revamped 34:22
revealed 208:1
revealing 197:16
revenue 87:9
reverse 45:5 46:6
  48:1,4,12,21 55:1
  79:12
review 12:14 28:19
  177:22 206:10,12
  208:19 251:24
reviewed 12:12 78:5
  78:9 231:19 252:1
reviewing 198:12
revise 70:13
rhyme 224:16
richmond 1:14 2:8
  9:22 16:17 25:15,25
  26:11,14 181:2
  188:22 257:6
rick 20:14 106:6
rid 186:8
right 9:24 13:24
  18:2 44:24 48:9
  52:9 71:25 73:20
  92:14 94:21 98:25
  124:15 145:11

147:1 151:6 152:19
158:1 160:13
161:15 162:14
167:22 183:18
188:12 190:19
194:14 196:21
210:1,23 211:17
213:7 216:19 220:3
225:16 226:21
234:24 252:7 255:6
256:18
ripple 130:11
risk 81:16 129:23
  133:11 150:6,10
risked 108:2
risks 125:16 17,24
roberson 123:16,17
  123:20 124:20
  125:9,17
robert 6:5
roberts 7:19 8:9
  238:15,15,17,24
  239:20 240:8,10,19
  241:5,8,14,18,23
  242:13,21 243:14
  243:22 244:4,13,14
  245:11,13 246:4,15
  246:21 247:15
  248:3,16,25 249:7
  249:11
robertson 123:15
role 16:7,10,25 17:1
  17:5,6,7 18:18,20
  18:25 19:11 36:13
  36:13 38:1 55:15
  166:23 172:6
  180:10 217:16
roles 17:25 19:1,11
rolled 206:1
rolling 163:25
roman 93:5
room 113:20
ross 3:3 22:17
  158:25 161:19
  167:18,21 169:2

197:20 222:3
231:11 234:7
238:13 239:25
240:3,15,21 241:13
241:16,22 242:3,18
243:12,18 249:13
252:4
row 78:2 172:6
  177:19 178:19
  214:13
rule 82:11 84:25
  109:13
rules 10:25 28:16
  114:20
run 28:12 29:10
  104:25 105:1
  179:13 214:2 224:8
running 216:3

**s**

s 2:10 3:2 4:2 5:2
  6:2 7:1,19 8:2 9:1
  135:22 260:5,24
sabotage 213:21
sale 12:6 27:25 28:2
  72:23 83:6,17 95:10
  117:18,19 118:2
  145:9 146:9 148:17
  148:18 156:22
  160:23 162:7,8,10
  162:12 167:5
  174:14 178:19
  182:25 185:10
  215:24 226:11,12
sales 18:9 23:17
  27:13 29:11 42:5,17
  42:19,23 43:3,12
  78:6 83:21 84:6,9
  84:12 94:7,12 95:3
  95:14 101:13,14
  113:13 114:4 116:9
  116:14,19,24
  117:16,17 121:18
  121:20 122:1 124:9
  124:10 126:12

131:15 132:20
133:12 149:5
150:15 153:14
156:8,25 161:17,25
163:23 166:1 173:1
177:9 178:22,24,25
185:5,6,11 186:2
192:10 196:2
217:13 220:14,15
221:21 231:24
232:13,16,16 246:1
248:1 255:1,5 256:9
**salespeople** 94:18
124:9 175:5
**sample** 86:18,19
145:10
**samsung** 59:13,17
61:11 104:1 123:19
230:2 253:15
**san** 1:3 3:17 6:17
**sarguello** 4:18
**saturday** 179:11
**saw** 36:11 60:4 93:6
95:20 111:20 112:1
212:5 214:6 226:11
227:21 255:25
**saying** 41:5,8 42:15
89:6 90:19 98:6
112:16 125:18,21
130:7,9 131:4 138:3
138:13,19,23 139:8
141:7 146:16
175:20,24 177:2
178:9 183:14
184:20 215:6,17
226:10 231:5,6
246:16 247:6
254:18
**says** 28:19 33:9
42:13 75:2,12,20,20
79:8 107:15 109:13
109:16 121:1
124:20 125:9 131:1
134:14 155:19
157:11 158:6

171:15 172:11
173:21 178:5,21
181:17 185:8
200:19 201:1 214:7
225:22 246:11
247:4 256:15
**sc** 1:4
**scale** 235:3
**scenario** 162:14
**scenes** 129:1
**scholclapper** 20:18
106:5,13,24 107:15
107:21 109:12
127:5 137:18
138:18
**scholclapper's**
138:9
**scope** 63:16 107:4
158:21,25 161:18
240:1,15,18 241:4
241:13,17 242:12
243:13,19
**score** 98:5 119:18
**screen** 156:10
**sea** 124:21
**seasons** 216:17
**seats** 113:21
**second** 35:14 73:15
105:16 107:18
115:3 130:5,7 133:7
161:19 172:6,7
244:22,23 258:2
**secondary** 45:12
71:21
**section** 214:8
**see** 38:6 61:11,12,13
75:2,19 93:2 107:13
110:15,18 112:14
112:16 114:8
119:16 124:19
129:9 146:12
157:10,13 158:7,18
166:16 167:7
172:13 175:17
178:4 181:16,19

189:22 190:10
193:1 201:1 210:9
210:13,18 212:5,9
212:18,22,24
220:22 226:13
229:24 232:12
240:11,13 255:20
**seeing** 40:17 43:7
114:9
**seek** 89:19 194:10
**seeking** 136:23
**seen** 11:16 54:9,11
79:19 112:17
197:18,22 203:2
207:17 220:6 223:2
244:6 255:19
**sees** 45:21
**select** 89:18 118:10
**selected** 35:21,22
159:20 174:4
**selecting** 34:16
112:6
**selection** 105:8
**sell** 34:7 40:1 43:19
47:14 50:12 52:14
52:15 54:13 57:17
58:17 71:22,24,25
72:6 82:11 83:2,3,4
83:8,11,16,23,25
84:17,20,24 85:2,3
85:3,6,12,16 86:23
87:2,3 89:10,11
92:12,20,23 93:16
96:14,16,21 97:4
112:10 116:24
117:4,20,21 118:7
122:17 124:11
126:14 131:18,20
131:22 132:1 133:5
133:8 139:1 140:4,7
140:24 141:2,10
149:8 154:24
159:21 160:1,6
162:21,23 163:18
163:18 174:17,22

186:10,14 187:21
195:19,20 196:14
196:15 204:12
208:9 215:13,16
228:17 231:20
254:12,21 256:23
**selling** 32:13,14,17
36:21 37:8 47:25
71:9 79:10 80:9,10
80:20 86:20,22,24
87:1,4 92:13 116:22
117:13 122:13
132:3,23 139:9
143:11 144:6,10,12
146:1,5,20 148:3
157:21 159:7 160:3
163:12 164:2
166:17 191:4,16,18
192:3 194:4 195:21
196:16 200:21
225:11 231:21
232:5,8 251:21,25
**sells** 132:21,21
215:22
**semi** 35:11 78:6
**send** 168:13 178:11
223:14 224:14
**senior** 15:8 129:4,15
129:16 130:1
134:10 137:19
152:9 206:13
209:13 229:5
256:17
**sense** 11:3,7,13
22:13,22 98:10
131:5,8,22,24 132:1
**sent** 41:18 177:15
220:16,17
**sentence** 125:8
127:5 128:20
183:21 242:25
**separate** 24:19 25:6
53:10 97:12
**serve** 10:17

services  9:20 14:5,8
serving  10:20
session  56:6
set  16:2,3 27:18,24
  28:16 45:18 46:2
  48:22 49:1 83:7,22
  94:23 99:11 104:23
  117:16 160:22
  170:11 176:8,17
  207:10 237:17,18
  249:23 250:3,5
  251:20 260:8,17
sets  27:20 156:12,14
setting  27:6 83:16
  160:19,20 185:18
  246:7 247:7,9,17
seven  231:12
seventh  3:16
severity  212:2
shack  222:19
shape  213:20
share  37:6,18,24
  38:17 41:19 42:4,9
  42:19 131:24 164:4
  165:7 194:2 205:3,4
  257:19
shared  21:5,8,9
  114:24 211:20
sharing  204:21
shaun  5:14
sheltered  100:10,12
  100:16,20,23 101:2
  101:6,7,16,20,22,24
  102:2,7,14
shipped  88:12,15,19
  88:24
shop  157:11,17
  166:15,24 167:1
  174:20 175:22
  178:10,10,12
  203:14 214:9,10,10
  215:23 218:25
  220:6 223:8
shopped  175:14

shopping  155:20
  167:20,22 168:1,3
  168:14 175:19
  177:16 178:5,14,15
  178:16 182:10
  213:6,11,17 218:22
  220:10 223:11
shops  171:16 174:9
  174:24 175:11,16
  214:16 215:1 216:9
  220:3 222:9 224:9
short  28:25 81:18
  96:2 97:17 107:9
  133:16,20 151:13
  167:13 168:25
  169:3 211:7 227:5
shortage  149:6
  236:6
shorter  29:4
show  91:14 93:4
  111:19 182:22
  183:9
showed  42:17
showing  244:11
shown  141:24
shows  237:16
shut  32:15
sic  220:25
side  126:24 165:20
  165:21 181:10
  256:2
sign  99:21,25 214:7
  259:9
significant  38:17
  79:5 90:6 152:13
  156:19 165:3
significantly  125:11
  125:25 148:1
similar  16:11 79:2
  86:18 130:17 132:7
  153:11 188:25
  193:12 195:7
  244:24 245:16
  248:6

similarly  246:13
  247:6
simple  121:8
simplest  87:15
simply  175:4
simultaneously
  236:20,25
single  91:11 102:24
  167:1 175:6 179:9
singular  228:15
slr  221:6 225:1
  240:9,11 241:6,23
  243:6,23 244:5
  246:22 248:18
  249:12
sit  16:21 112:14
  149:18
site  210:16
sites  255:15
sitting  193:13
six  22:16 35:8
  188:19 231:19
  251:24 255:20
size  30:23 31:9,16
  33:17,18 34:11
  39:21,23 57:16,21
  112:24 148:23
  153:5 163:22
  164:16 222:21
  248:6,9,17,19,23
sizes  29:18 30:2,11
  30:19 248:5,15
sku  249:23,24
  251:17
skus  12:5 80:23
  90:17,24
sliced  215:15
small  15:5 25:7
  39:13,23 172:2
  235:7,17
smaller  34:8
smart  157:18
sofia  4:13 227:11
soho  15:4,4 25:7,11

sold  23:12 27:7,21
  29:19 30:12 33:9
  38:12 47:21 57:5,7
  58:6,13 60:10,24
  84:19,25 101:3,11
  104:8,10,20 118:23
  120:6 126:15
  144:11 145:3
  159:12,17 160:7,18
  187:11 191:8,13,21
  193:3 196:7,8
  212:23 248:20
solid  28:18
somebody  32:3
  129:19 141:25
  208:21 220:8
somewhat  224:11
  243:11
sony  33:24 34:2
  36:25 37:2 38:16
  59:13 164:5 198:16
  198:22 201:7,25
  257:24
sony's  33:25
soon  156:4 219:2
sophisticated
  149:21
sorry  22:16,18 25:5
  41:24 42:2 43:20
  49:17 66:23 69:21
  77:6 78:13 113:7
  117:9 124:14
  135:19 141:23
  142:20 147:4
  160:12 165:19
  167:16 170:19
  176:15 183:15
  187:4 192:7 212:11
  217:22 235:14
  236:14 240:16
  241:14 242:5
  244:12 245:10
  256:15
sort  16:14 44:18
  45:16 63:5 78:5

86:17 96:19,22 99:6
102:9 104:17 105:3
105:12 114:19
116:10 121:7 127:6
145:3 148:1 149:13
149:16 156:7
164:14,23 175:1
193:12 206:16
221:11 230:8
231:23,24
**souder** 20:14 106:6
106:13
**sound** 65:3 162:15
203:15
**sounded** 205:13
**sounds** 18:1 63:25
221:13
**source** 217:13
**southeast** 15:22
**southern** 15:3,21
16:1,15 18:24
**space** 31:4 33:15
90:12,18,22 193:6
203:8,22
**speak** 17:13 48:19
103:17 253:9
**speaking** 42:7 79:24
140:14 176:14
200:10 204:17
250:3
**speaks** 69:18 73:19
107:1 137:24 201:9
201:18 247:13
**special** 154:9,15
156:23
**specialist** 147:13
166:8
**specials** 155:24
**specific** 20:1 31:13
35:20 36:18 45:9
46:12 47:20 55:10
55:21 58:8 60:6
64:4 65:24,25 66:12
77:15 79:25 80:25
81:9 82:8,13,17

83:6,6,7 90:12 94:5
94:6 95:11 101:1
103:12 114:8
115:18,22,24,25
122:11 128:19
132:23 137:5
141:18 143:5
151:11,17 157:3
163:10 164:6
166:23 170:14
171:13 173:11
175:12 185:13
195:16 213:9
219:23 229:22
230:22 233:5,14
252:16 257:19
258:22
**specifically** 20:13
27:11 35:2 42:13
56:25 74:20 79:24
122:15 166:5 179:8
185:19 188:12
189:16 213:25
221:10 225:7
246:11 257:25
**specifics** 28:11
45:14 57:8,11 67:10
80:14
**specified** 98:11
**specify** 233:4,9
**specter** 102:9
**speculate** 76:2 80:6
200:10
**speculating** 222:2,3
**speculation** 69:18
73:19 75:11 76:1
108:22 125:19
127:10,18 134:4
138:21 182:1 199:7
199:13 200:18
201:8,18 221:3,25
226:20 246:19
250:24
**speculative** 138:1

**spend** 233:5
**spent** 115:7
**spiff** 94:2,10,10,25
95:5,21
**spiffs** 94:8 95:3,8,9
95:16
**squarely** 241:23
**squeeze** 124:25
**squeezing** 124:20
**ss** 260:2
**sss** 1:16
**stable** 243:2,10
**staff** 217:13
**staffs** 204:18
**stamp** 239:14
**stamped** 68:18
**standalone** 72:4
**standard** 44:8,8
82:10 117:22 129:6
145:2 167:11,14,20
232:3 237:5 238:5
251:24
**standing** 225:20
259:10
**stands** 15:4 106:18
**start** 33:7 47:9
89:21 98:24 110:13
111:15 179:10
255:9
**started** 101:9 104:2
155:9,11 189:1
**starting** 62:16,24
69:12 147:16
256:20
**starts** 110:25 111:7
240:5
**state** 258:6
**stated** 139:25
**states** 1:1 40:9,14,24
41:4,7,18 42:8 43:4
54:6 60:19 88:13,16
88:20 113:3 115:17
161:16 240:12
243:1 244:23 260:2

**stay** 111:3,5 159:4
190:25 191:1
201:22 237:19
**steno** 9:2,4,10
**step** 255:18,22
256:20
**steps** 237:12,15,21
**stereo** 174:17,18
**steve** 8:4 9:18
**steven** 1:13 2:5 9:8
9:15,25 259:16
**stick** 201:3 202:1
**sticker** 157:24
158:11
**sticking** 201:14
**stipulated** 9:4
**stock** 34:7 215:12
224:2,3 225:15
**stocked** 218:7
**stone** 99:12
**stop** 20:22 34:24
57:1 65:14 113:4
141:10 146:4
197:20
**stopped** 80:19 104:3
149:16
**stops** 86:24
**store** 16:5 28:2,4,6
28:15 29:10,12,13
29:17 40:1 96:12
120:8 124:4 138:16
158:20 160:22
165:6 168:11,12
170:22 171:14,20
171:21 172:12
173:1 174:13
176:24 177:1,3,7
178:15,16 180:17
180:18,22 182:6,9
190:15 205:2
209:24 211:8,8
213:11,15 214:5,18
215:20 216:9,11
217:7 218:3,4
219:12

store's 172:22
stores 14:15 15:22
  15:23,24 17:22
  21:12,20,25 22:3
  23:1,4,4,7 28:13,23
  29:10,16 54:8 55:3
  55:4,10,12,15,19,20
  55:22 69:6 80:12
  101:12 120:9
  123:14 140:10
  147:15,18,23 148:6
  148:13,17 150:15
  150:21 151:4
  153:12 167:1
  178:12 180:19,20
  180:25 182:23
  187:12,19 188:10
  188:14 190:12
  193:7 207:4 209:18
  209:20 218:12
  222:19,19,21,22
  237:6,17,23 238:3
  245:24
straight 110:20
strategic 129:2
  177:23
strategies 174:16,21
strategy 65:18,22
  95:14 172:19,20,21
  174:9,15,20,24
  175:4 183:17,22,23
  184:1,8,12,14,16
  185:2,7
strawn 4:14 227:13
street 2:8 3:6,15 5:7
  5:16 6:16 7:22 9:22
  217:21,25
strength 54:19
strict 150:17
strike 65:8 77:6
  78:17 169:25 181:8
  255:16
striving 128:3
strong 35:3 103:25

structure 211:20
stumbles 32:20
subcontract 13:22
subdivision 24:1
subject 152:16
  189:21 228:22
  238:21 240:20
subparts 11:23
subscribed 259:19
subsection 220:20
subset 214:11
successfully 63:9,20
suddenly 150:10
suffering 189:18
suggest 199:3
  201:14
suggested 67:13,14
  67:17 70:4,7,14,20
  71:1,23 72:21 85:1
  85:7,9 86:12 110:17
  111:13 117:23
  139:16 140:17
  141:16 143:10
  144:18,19 162:20
  208:8,12 236:4
  237:2 246:17 247:7
  250:4,17 251:19
  254:15,17 256:4
suggestion 246:8
suing 249:20
suite 3:7
sunday 179:11,11
  179:13
super 222:19
supersedes 181:17
supervising 26:21
supervisors 20:16
  26:24,25 31:1
  107:24 180:24
supplier 41:22
  228:19
suppliers 21:9 36:17
  41:25 100:6 113:2
  253:11

supply 42:3 55:17
  55:18 136:25 137:8
  149:20
support 64:23 71:15
  93:17,18,18,20
  147:11,12
supported 34:7
supports 93:18
  95:14
sure 20:3 24:4 26:20
  27:16 30:21 42:3,6
  53:24 60:20 68:13
  70:10 74:4 75:20
  78:14 82:15 83:13
  83:15 84:14 106:10
  112:22 125:4
  129:16 135:21
  137:19 138:14
  153:2,20 167:17
  187:7 213:12 251:1
surprised 140:12
surveys 168:18
susman 3:5 10:5
susmangodfrey.com
  3:10
suspect 152:24
  198:1 241:19
suspected 241:25
suspicions 241:2
svanhorn 5:19
switched 117:6
switching 117:17
sworn 2:11 9:25
  259:19 260:8
system 92:16 188:2
  188:10 212:14,16
  237:16

**t**

t 2:10 8:2,2,2 260:5
  260:24
tactical 175:11,15
  175:21
tacticals 175:12

tactics 65:25 218:16
tag 187:20 204:11
  237:18
tagged 143:25
  158:13 179:5
  182:18 237:20
tagging 237:17
tags 178:21,23
take 11:12 42:22
  56:2 73:2 83:21
  96:2,19 97:16 120:8
  133:15 138:22
  144:13 157:7
  168:25 169:2,3
  178:21 196:25
  224:23 241:10
taken 19:1 237:12
talk 11:1 13:9 80:16
  84:6 86:22 87:1
  110:15 116:13,21
  126:20 218:16,20
  240:22
talked 96:14 110:13
  111:10 121:11
  166:18 179:4 186:6
  193:19 203:7 225:8
  251:6 258:1
talking 18:4 21:16
  22:10 23:6 24:8,21
  25:2 35:25 39:24
  53:5 59:19 61:6
  72:2 76:5 77:14
  86:15 87:6 90:2
  91:12 95:18 110:12
  140:23 149:24
  152:20 155:8
  156:11,13 162:3,5
  163:12 165:9
  176:11 190:10
  195:14,17 207:1
  225:19 227:22,23
  228:17 234:4
  237:22 240:24
talks 135:3

[tape - time]                                                                                      Page 37

tape 73:3,6,12
  133:16,18,22 197:1
  197:3,8
target 7:17 48:7
  164:24 205:22
targeted 122:8,9
targets 122:5
taught 53:6 126:19
tavenner 2:8
team 20:12,15 42:12
  74:19 116:19
  119:14 120:17
  147:11 166:21
  187:2,4,5,6,14
  188:15,16,21,23
  209:5,7,9,12 220:8
  224:10
teams 224:15
technology 192:20
  243:4
television 31:20
  35:2 56:20 57:5
  58:15 80:18,18
  106:18 112:12
  152:23 153:7,9
  156:10 173:9
  217:16
televisions 29:19
  31:23 32:2,4,5,13
  33:2 214:9,10 229:3
  248:5,9,19 249:2,4
tell 20:9 29:22 63:5
  69:9 84:12 108:12
  120:6 175:6 200:8
  206:3 215:14
  230:12 232:7,15
  233:20 234:8
telling 107:23
  129:25 137:20
  173:16
temporary 207:1
ten 177:6
tend 81:24 84:24
  102:8,15 160:1
  175:2 183:3

tended 59:7 166:13
tending 144:23
tends 137:9
tenure 66:9
term 43:20 49:12
  51:25 52:5 53:25
  62:12 64:17 73:20
  74:2,3 76:8,13 81:2
  83:18 94:2 96:13
  107:16 155:21
  159:14 167:13
  173:22 192:18
  194:17 211:8
  221:11,12 254:7
terms 48:22 50:19
  50:19,22 51:16,20
  62:15,16,24,25 63:3
  64:6 87:8 88:2,6,24
  92:5,7 96:8 98:11
  98:14,15 99:10
  112:6 174:5 181:5
  182:13 229:10,18
  230:6,25 231:16
  232:9
test 176:25 223:8
testified 62:8 224:3
  244:16 245:21
  248:13 251:18
  252:10 253:25
  254:5 255:8
testify 222:4,5 242:8
testifying 103:22
  251:4
testimony 12:12
  35:14 37:3 46:25
  50:10 54:17 62:12
  68:1 76:24 93:23
  96:25 105:9 108:8
  133:1 135:17 136:9
  139:7,18,21,23
  147:2 151:7 157:25
  194:13 202:18
  207:23 221:24
  223:22 251:9 254:2
  255:9 260:9

tfhd 210:6
thank 10:11 12:8
  13:2 20:23 22:12
  32:23 53:20 56:10
  97:25 136:2 157:5
  173:15 227:1
  238:19 239:11,19
  249:1,15 252:2
  259:2
thanks 138:11
  202:14
thanksgiving 190:4
theirs 113:12
theoretically 52:7
thereof 214:11
thing 75:14 111:7
  164:1 166:13
  167:13 206:16
  215:15 231:24
things 22:7 45:16
  49:2 51:7 52:15,22
  84:10 92:25 96:13
  98:5 104:14 105:12
  111:20 129:6
  139:11 145:5 175:2
  206:2 215:19 228:9
  255:19
think 10:23 12:2
  61:22 70:23 71:3
  74:15 84:1,5 86:19
  95:25 96:4 103:20
  108:13,24 110:19
  110:23,24 121:10
  122:2 125:17,20
  128:7 136:24
  138:13 139:23,25
  141:6 167:16
  170:19 176:8,17,20
  186:9 188:6,18
  199:24 203:9
  208:24 236:25
  243:18 248:11
  249:13 254:13
thinking 110:16,21

third 6:7 129:7
  163:6 164:10
thirty 163:1
thomson 7:25 8:23
  107:13 129:3 130:5
  130:10,14,22 131:7
  131:19,20 134:7
  199:2 238:16
  239:10,11,16,17,23
  241:11,20 244:18
  244:21,23 245:3
  246:7 247:2,4,7,16
  258:7
thomson's 245:14
thought 32:14 126:5
  143:25 159:23
  201:25
threatening 75:7
three 90:25 91:15
  102:6 116:25
  151:14,14 163:25
  164:23 179:16
  199:10,18 214:12
  224:15
throughs 181:8
throw 62:11
thumb 82:11
thursday 179:18
tie 98:16 179:8
tied 83:12,17
tier 32:8
tiers 32:10
tim 180:7
time 9:12 11:9 16:21
  17:15 18:4 19:22,24
  20:5,7 21:8,13,16
  22:9 23:3,9 28:11
  30:4,24 33:13,13
  34:6 42:14 44:16
  45:7 47:23 55:24
  56:1,3,8 57:17,24
  59:17,22 61:2 66:11
  69:8 73:4,10 78:4
  80:7,10,19 82:9
  83:7,7,25 85:4,14

85:16,20,24 86:2,10
86:13 89:8 91:10,13
91:23 94:14 95:18
95:22,25 96:17
97:18,22 102:8,15
104:1,6 106:10
110:7,8 112:1,2
113:9 128:1,18
133:17,22 137:20
145:16 146:1
147:20 148:6,7
149:23,24 150:18
150:20,24 151:13
152:20 153:25
155:7 159:11
161:25 162:1,3,4,4
162:8,10 164:19,22
165:9 168:9,10,19
169:4,9 170:16,24
171:3,18 176:12
182:18 184:9,24
185:1,24 187:1
189:17 190:8 192:1
197:2,8,25 199:11
199:19 200:15
202:5,9,14 204:3,4
204:9 206:25
212:12 224:12,18
225:19 227:3,6
230:2 231:1,16
243:5 249:23 251:5
251:16 252:1,3,13
259:4
**times** 61:12 64:2
65:16 66:9 104:12
104:12 115:18
116:1 136:21
153:21 159:19
163:9 171:5 184:8
185:13 186:1 190:7
237:18
**title** 120:14 137:20
166:23 167:2
170:15,17 171:6

**titled** 177:20
**tml** 172:7
**today** 9:18 10:11
13:7,20,21 18:4
48:19 209:15 213:5
215:8 224:21
227:25 231:4
240:16 242:11
244:11 251:5
254:19
**today's** 9:13 10:21
11:19 12:11 13:10
**told** 213:25 237:1
240:6
**tolles** 3:14
**tom** 20:21
**tone** 185:18
**top** 38:8 69:13 73:15
75:19 124:19 180:8
181:16
**topic** 11:23 240:20
241:24
**topics** 11:23 242:4
**toshiba** 4:10 38:16
202:14,20,22 203:4
253:5,9,12
**total** 172:9
**touch** 224:19
**tough** 136:19 225:17
226:2
**town** 75:13
**track** 166:8
**tracked** 119:5 167:6
**trade** 12:23
**traffic** 210:16
**train** 84:15 104:24
230:17
**trained** 65:24 66:2
126:12 148:2
**trainer** 124:3,7
**training** 52:16,20
66:7,9,14 93:19
124:8 157:10
204:20,24,25 205:2
213:14

**tranches** 89:1
**transactional** 97:7
115:9
**transcribed** 2:10
**transcript** 12:15
260:9
**transcripts** 259:11
**transfer** 42:15
**transferred** 80:12
**transitioned** 91:10
**translate** 236:17
**travel** 114:16
**treatment** 125:22
**trending** 196:23
**trends** 30:15 243:4
**trial** 110:18 254:7
254:10
**tricks** 105:17
**tried** 179:8 207:5
**trip** 253:19
**trips** 112:6 115:8,12
252:11,18 254:1
**true** 25:16 26:1
57:12 137:7 207:25
260:9
**truly** 161:5
**trust** 3:11 10:6,16
13:13,16,22 14:6
61:7 103:11 107:16
107:24 108:2
**trusted** 103:13
**truthful** 226:1
**try** 11:1 20:18 37:5
65:25 66:18 67:4
117:4,12,24 118:8
156:24 157:20
175:3 194:10
206:11,18 225:12
237:18
**trying** 65:18 91:16
116:3 118:13 128:7
131:18,19,22,25
144:1 149:13 160:6
174:12 185:8 191:7
208:9 215:3,10,16

215:25 246:25
248:17
**tube** 1:7 60:5 157:2
157:3,4 199:5,18
200:16 201:2,14,15
201:16,25
**tuesday** 179:15
**turn** 157:1 172:5
178:2 180:6 183:18
222:13 239:24
242:22
**tv** 20:12,14 74:19
75:15 182:25
192:19 203:14
210:7
**tvs** 163:23 173:9
174:17,18 249:18
**twenty** 3:16
**two** 15:14 19:2 25:1
73:12 78:2 84:15
102:6 115:2 117:1
123:4,5 178:2
179:16 183:19
189:3 199:3,11
203:19 224:14
236:19 237:6 258:7
**tx** 3:8
**type** 15:15 31:19
45:13 53:12 61:10
66:8 86:18 93:9
96:13 99:12 112:23
119:4 129:6,13
132:23 144:21
150:23 153:22
156:3,14 163:12
167:13 177:8 191:7
192:19 198:12
205:1 211:8 216:8
220:10 223:11
225:19 228:2,15
229:25
**types** 18:6 31:23
93:10 156:13
163:14 204:8
211:15 228:13

237:21
typical  81:1
typically  34:16
35:10 38:8,15 44:21
46:8 51:8 62:9,10
62:14 79:2 82:22
83:16 84:25 85:6,15
85:19 91:21 92:21
93:16 111:8 113:23
113:25 114:20
131:12 135:8
143:17 153:17
156:11,14 163:17
168:5 178:13
179:10 190:21,24
191:1 196:23
205:25 208:4,7,12
231:17 251:13
typos  138:12

**u**

u.s.  40:16,23 41:9,12
41:19 42:2,18,23
43:12 111:24
113:13 114:2,10
115:19 116:18,19
255:5 256:10
ultimate  26:17
27:13 203:15
ultimately  211:24
unbranded  45:11
46:21 47:17
unclear  245:12
uncommon  200:7
underlined  181:24
underlines  181:8
understand  10:20
11:19,22 14:22
17:23 19:9 21:10
26:20 44:9 56:12
60:25 75:23 78:16
106:12 107:20
109:12,22 116:3
125:14 129:21
130:6 131:2 134:2

138:17,18 140:11
142:17 174:13
175:3 181:22
189:24,25 192:19
194:18 215:10
223:10,15 242:1
246:12,25
understanding  12:1
42:6 83:15 151:6
184:2 222:23,25
223:16 232:12
245:2,14 246:6
247:1 250:2,8,13
251:12
understood  42:8
142:19 160:4,14
254:2 255:8
unexplained  243:3
unfavorable  130:22
uniforms  217:24
unit  248:1
united  1:1 40:9,14
40:24 41:3,6,18
42:8 43:4 54:6
60:19 88:13,16,20
113:3 115:17 260:2
units  163:23
universe  222:14,15
222:17,18 223:3
unusual  55:22 96:12
unwritten  68:8
upcoming  215:20
216:25
update  137:17
138:11 255:25
usa  69:3,9
use  12:23 13:7 42:11
43:20 48:1 65:25
66:17 67:3,15,20
91:1 101:9 144:21
145:7 159:17
163:20 164:8
168:17 192:18
194:17 195:8 205:6
251:11 257:10,15

usual  149:10,14
usually  25:9 33:13
81:8 91:9 103:2
163:25 207:14

**v**

va  9:22
vague  42:24 44:15
48:25 53:3,14 58:2
58:20 62:18 64:15
65:20 68:11 70:17
72:17 81:13 87:20
90:15 98:12 102:22
113:5,8 120:23
125:2 128:5 130:23
132:9 134:21 136:8
140:18 145:17
149:12 152:18
161:8 162:2,13
163:3 192:5,25
193:25 194:22
195:12 196:6
204:19 205:9 211:6
218:14 228:11
229:12 232:24
233:23 235:4
236:12 247:20
248:10,21 253:6
valuable  81:18
value  46:12 57:20
57:20 247:4
van  5:14
variations  207:13
varied  164:25
various  66:9 104:3,4
147:12 156:13
163:8 171:5 184:8
229:7 248:4
vary  152:19 207:8
207:12 228:18
vcr  15:11 58:15
vcrs  15:13 16:13
vendor  16:22 31:9
35:19 36:4,8,19
37:13 40:5 42:9,15

43:12,24 44:10,22
52:21 53:1 54:2
55:2 60:14 62:9,11
62:17,25 63:4 64:13
65:7,12 66:13,16
67:1,23 71:1 76:16
78:25 81:6 82:5
83:10,22 86:9 87:18
89:22 91:13,16,23
92:3 93:12 98:1,3
99:4,7,15,21,25
100:2 101:21
102:21 104:14,16
105:7 108:6 113:16
115:3,16 122:8,17
129:5 132:12
135:22 136:13
141:12 144:9,15
161:6 195:25
205:16 228:3 229:8
229:9 231:22 232:7
233:4 250:5,14,16
250:22 256:18
257:11,14,20,21
vendor's  34:5 37:16
42:10 122:13
vendors  26:18,22
33:20 35:20 36:1,3
36:14 37:6,8 38:11
42:1,7 43:3 44:14
50:21 51:3,9 54:15
63:21 66:20 67:5,10
68:6,10 70:16 71:16
72:12,13,16 78:10
78:21 79:3 82:14,18
88:7,8 89:20 90:9
90:13 93:22 95:6,17
98:2,7,11 101:3
103:7,13,23 108:20
109:6,8 110:1,5
111:4 115:6,7,24
117:6,12 120:19
122:6,12 124:24
126:5 132:6,7
134:18 136:17

139:4,15,16 140:16
191:3 195:7 199:10
200:8 205:8 227:18
228:5,10 229:18
230:7,20 232:12
250:3,12 251:1
252:12,17 254:1,6
255:14 257:11,17
**verbal** 11:5
**verbalized** 124:12
135:24
**verify** 223:5 225:5
225:10,13,14 226:8
**veritext** 9:19
**versa** 148:18
**version** 12:23
124:16 181:23
184:5 221:14
**versus** 32:4 33:2
55:9 86:4 88:20
98:15 126:18
164:15 196:9
207:10
**viable** 72:3,6 110:19
110:23 162:15
**vice** 24:15 119:21
148:18
**video** 1:13 2:4 9:2,4
9:10 15:8 16:12
24:9,10,22 112:15
129:8 193:14 209:4
209:12
**video1** 9:15
**videographer** 2:11
9:11 10:1 56:3,8
73:4,10 97:18,22
133:17,21 169:4,9
197:2,7 202:5,9
227:3,6 259:3
**view** 127:13 203:21
221:21
**viewed** 203:8
**viewpoint** 45:25
60:14 129:1 194:4
212:4 231:20

**virginia** 1:14 2:9,12
16:18 188:22 257:7
**visibility** 54:4
153:18 187:14
211:12
**visible** 152:25 167:7
167:10
**visit** 110:10 111:3
111:18 116:15,20
129:5 166:19
220:12,13 252:12
252:20,25 253:5,12
253:14,22 255:13
256:7
**visited** 21:8 60:2
114:25 203:1
252:17 253:20
**visiting** 113:11
**visits** 214:5 219:12
253:9 254:1
**volume** 65:6,11 89:2
89:5 92:12,21
191:20 227:23
228:3 229:10

**w**

**w** 32:21,22
**wait** 224:25 225:1,2
**wal** 37:23 164:23
165:7 166:12
**walk** 219:1
**walked** 216:11
219:2
**walking** 217:7,24
218:4,11
**walks** 38:6
**want** 10:25 11:9
33:21 37:1,11,11,15
37:19 39:25 46:2
49:19 50:15 55:2
63:25 72:1 78:14
79:14 86:22 89:8
91:17 96:2 98:7
104:25 112:10
119:25 123:5

124:16,18 126:15
130:2,4 135:5
138:25 141:9
146:18 147:15
168:25 176:23
181:11 182:25
185:20 195:24
200:11 210:12
213:19 215:13
223:10 224:1,19,25
226:23 237:18
240:14,25 255:12
257:23
**wanted** 33:5 64:14
114:8 129:15,20
137:4 184:25
185:19 194:25
216:13 223:25
232:23 238:1,2
249:13
**wanting** 204:11
215:2
**wants** 44:10 113:16
**warehouse** 203:21
218:9
**warrant** 244:8
**washington** 7:6,14
**waste** 168:9
**watered** 124:16
**way** 20:2 21:14,23
30:16 31:7 34:23
38:4 40:4 52:17
54:24 60:8 62:3
63:6,24 66:12 90:19
91:2 92:14 98:17
105:15 109:19,21
112:20,22 113:21
114:23 115:8 120:8
121:8 126:2 139:25
143:16 150:1
151:16 157:2 158:2
159:3 172:10
174:18 188:12
190:3 194:10
195:14 203:20

205:5 206:15,25
212:1 213:20 216:6
219:14 224:18
226:24 228:6 230:8
230:17,18 231:8,11
236:22 247:5
248:19 256:4
260:14
**ways** 211:16 213:6
225:12 226:7
**wbave** 4:9
**we've** 45:14
**web** 39:25 148:18
148:20 210:7,7
216:20
**website** 148:13
**wednesday** 1:15 2:6
210:7
**week** 29:2 111:3,5
115:4 119:19 179:3
179:18 189:22
190:1,2 207:2 215:8
224:15
**weekly** 168:6 172:22
172:22 177:21
190:5,9
**weeks** 151:14,15
214:12
**welcome** 202:16
**wells** 7:21
**went** 61:11 80:5
92:21 93:8 112:25
113:3 115:13 143:2
166:24 187:21
201:21 213:15
243:3 250:9,22
251:1 253:10
**west** 5:7
**whereof** 260:17
**white** 4:5 129:5,13
178:20 198:11
**whitecase.com** 4:9
**whitehead** 5:5
**why's** 146:3 189:11

widely  100:14
  104:20
width  240:23
william  4:4 202:13
willing  52:4
win  46:8 185:19
windows  28:25
wine  121:9
winston  4:14 227:12
winston.com  4:18
wise  53:5
wish  71:5
withdraw  64:22
witness  2:5,10 8:3
  8:15 10:6,7,17,21
  12:25 13:20 21:2
  22:14,23 27:16
  32:22 35:15 40:18
  42:25 44:16 46:20
  47:1 49:1 50:3,11
  51:16 53:4,21 54:23
  58:3,21 60:13 61:9
  62:20 63:23 64:17
  65:2,21 66:6 67:7
  68:2,12,16 69:20
  70:1,19 72:18 73:20
  75:12 76:2,25 77:12
  77:25 79:23 81:14
  82:25 84:23 87:21
  90:16 93:24 97:1,9
  98:13 102:12,23
  103:16 105:10
  106:16 107:5,18,23
  108:9,24 109:16
  110:10 113:6,9
  119:7 120:24
  124:14 125:4,20
  126:10 127:2,12,19
  128:7 130:9 131:1
  131:10 132:10
  133:2 134:6,23
  135:18 136:1,12
  138:3,22 139:8,25
  140:20 142:19
  143:22 145:20

146:11 147:3
149:13 151:8
152:19 158:1,23
159:3 160:16 161:1
161:9,20 162:14
163:4 167:22
168:22 176:15
182:3 184:7 188:5
191:13,24 192:6,13
193:1 194:1,14,23
195:13 196:7
197:22 199:8,15
200:7,19 201:10,19
202:16 204:20
205:10,12,15 211:7
211:23 217:9 218:6
218:15 219:21
222:1,6 223:23
225:2 226:21
227:10 228:12
229:13 231:13
232:25 233:24
234:6,18,24 235:10
235:16 236:13,22
238:25 239:6,8,11
240:14,16 242:8,20
243:20 244:3 245:8
245:21 246:11,20
247:14,21 248:11
248:22 249:6
250:25 252:22
253:8,19 258:25
259:9 260:7,10,17
word  42:1 73:22
  81:22 167:18
work  14:12 28:9
  31:11 44:11 45:4
  92:17 94:11 116:16
  143:16 145:1
  147:10 152:8
  227:12 235:13,18
  256:19
worked  16:18 24:23
  30:3 74:19,23 124:4
  154:16 171:14

180:19,22,24
working  69:9 164:4
  187:1
workload  224:17
worth  90:5 131:13
write  219:2
writes  127:6
writing  204:14
  220:21
written  68:4 129:7
  129:10,11
wrong  145:6 158:18
  158:23

**x**

x  1:6,11 89:7 90:22
  99:10 230:9
xyz  103:1

**y**

year  9:14 21:14
  33:13 34:23 35:4,6
  61:12 81:1 90:3,3,4
  90:24,25 119:19
  151:14 163:24
  224:13 231:18
  251:20
years  14:12 15:14
  17:12 31:13 48:4
  78:2 86:6 104:3
  163:25
yesterday  12:13
york  4:7,16 6:8

**z**

zenith  69:3 199:2
  258:7

Page 259

```
 1          MR. LAHAD:  Nothing further for you,        17:57:22

 2     Thank you.                                       17:57:23

 3          THE VIDEOGRAPHER:  Are we done?  There

 4     being no further matters, the time is

 5     approximately 5:57 p.m.  This deposition is

 6     concluded.

 7

 8     (Whereupon, the deposition concluded at

 9     5:57 and the witness is to read and sign with

10     arrangements already on record with standing

11     orders for transcripts.)

12

13

14

15

16     _____

       STEVEN DEASON    (correct spelling is Stephen)

17

18

19     Subscribed and sworn to before me

20     this 21 day of MAY        , 2014.

21

22     _____

23     NOTARY PUBLIC
```

EILEEN GILMAN
Notary Public
Commonwealth of Virginia
273341
My Commission Expires Sep 30, 2014

```
24

25
```

ERRATA SHEET
VERITEXT REPORTING COMPANY
1250 BROADWAY
NEW YORK, NEW YORK 10001
212-267-6868

NAME OF CASE: IN RE: CRT Antitrust Litigation
DATE OF DEPOSTION: April 23, 2014
NAME OF DEPONENT: Steven Deason

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| 2 | 5 | replace "Steven" with "Stephen" | legal name, spelling |
| 15 | 23 | replace "four" with "for" | spelling, meaning |
| 19 | 2 | replace "net" with "new" | misheard |
| 20 | 18 | replace "Shoclapper" with "Shulklapper" | spelling |
| 24 | 22 | replace "displayed" with "display" | misheard |
| 29 | 22 | replace "tell" with "sell" | typo? |
| 31 | 5 | replace "it" with "each" | clarity |
| 43 | 13 | replace "no" with "other parties | Answer was not complete, |
| 43 | 13 cont. | were sometimes part of the | Corrected in testimony on |
| 43 | 13 cont. | negotiations" | pages 110-117 & 254-257 |
| 55 | 18 | replace "are going" with "are not going" | misheard |
| 67 | 8 | replace "funds" with "forms" | misheard |
| 70 | 21 | replace "fect" with "factor" | misheard |
| 71 | 14 | replace "and" with "on" | misheard |
| 75 | 13 | replace "town" with "Taiwan" | misheard |

Continued on next page

_Stephen M Deason_
STEVEN DEASON
(correct spelling is Stephen)

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 21 DAY OF MAY , 2014

_Eileen Gilman_
(NOTARY PUBLIC)

9. 30. 2014
MY COMMISSION EXPIRES:

EILEEN GILMAN
Notary Public
Commonwealth of Virginia
273341
My Commission Expires Sep 30, 2014

**ERRATA SHEET**
**VERITEXT REPORTING COMPANY**
**1250 BROADWAY**
**NEW YORK, NEW YORK 10001**
**212-267-6868**

NAME OF CASE: IN RE: CRT Antitrust Litigation
DATE OF DEPOSTION: April 23, 2014
NAME OF DEPONENT: Stephen Deangel

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| **Part Two** — Continued from prior page | | | |
| 89 | 1 | replace "tranches" with "trucks" | misheard |
| 89 | 25 | replace "business. is it, are" with "business is it. Are" | clarity |
| 109 | 17 | replace "a" with "our" | clarity |
| 109 | 18 | replace "are" with "our" | misheard |
| 120 | 17 | replace "elite" with "lead" | misheard |
| 121 | 9 | replace "wine" with "whine" | spelling |
| 127 | 9 | replace "health" with "hell" | misheard |
| 133 | 7 | replace "his" with "it's" | clarity |
| 149 | 14 | replace "then" with "than" | misheard |
| 150 | 10 | replace "profit" with "profitable" | clarity |
| 151 | 17 | replace "were" with "we're" | typo? |
| 163 | 7 | replace "MPD" with "NPD" | misheard |
| 163 | 18 | replace "MDP would sell out" to "NPD was sell through" | clarity |
| 187 | 16 | replace "what" with "about" | clarity / misheard? |

Continued on next page

(correct spelling is Stephen)

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 21 DAY OF MAY , 2014.

_____
(NOTARY PUBLIC)

9. 30 2014
MY COMMISSION EXPIRES:

EILEEN GILMAN
Notary Public
Commonwealth of Virginia
273341
My Commission Expires Sep 30, 2014

ERRATA SHEET
VERITEXT REPORTING COMPANY
1250 BROADWAY
NEW YORK, NEW YORK 10001
212-267-6868

NAME OF CASE: IN RE: CRT Antitrust Litigation
DATE OF DEPOSITION: April 23, 2014
NAME OF DEPONENT: Steven Deason

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| | | **Part Three - Continued from prior pages** | |
| 203 | 14 | replace "Kahn's" with "Conns" | spelling |
| 212 | 19 | replace "we cap" with "we're clear" | clarity |
| 228 | 12 | replace "So I am" with "No, I am not" | misheard / clarity |
| 250 | 12 | replace "said" with "set" | misheard |

(correct spelling is Stephen)

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 21 DAY OF MAY , 20 14

_(NOTARY PUBLIC)_          9. 30. 2014
                          MY COMMISSION EXPIRES:

EILEEN GILMAN
Notary Public
Commonwealth of Virginia
273341
My Commission Expires Sep 30, 2014

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

| | | |
|---|---|---|
| THE STATE OF ILLINOIS, by its Attorney General, Lisa Madigan, | ) ) ) ) | File No. CL16-2739-2 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| HITACHI, LTD., et al, | ) ) | |
| Defendants. | ) ) ) | |

### Certificate of Service

Pursuant to the Rules of the Circuit Court of Virginia, I herby certify under penalty of perjury

that on July 7, 2016, I caused a true and exact copy of the following documents to be served via

first class mail and/or certified mail upon the parties as set forth on the service list attached

hereto as **Exhibit A**:

1. Responses and Objections of Alfred H. Siegel, Solely in his Capacity as Trustee for the Circuit City Stores, Inc. Liquidating Trust, to Foreign Subpoena / Subpoena *Duces Tecum.*

Respectfully submitted,

Dated: July 7, 2016

/s/ *Paula S. B*

Lynn L. Tavenner, Esquire (VSB No. 30083)
Paula S. Beran, Esquire (VSB No. 34679)
David N. Tabakin, Esquire (VSB No. 82709)
Tavenner & Beran
20 North 8th Street
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopier: (804) 783-0178

Exhibit A

Daniel Cummings
Rothschild, Barry & Myers LLP
55 West Monroe Street, Suite 3900
Chicago, IL 60603-5017