# Exhibit A

# PROMISSORY NOTE

$3,674,679.00

Lafayette, Louisiana
February 27, 1995

FOR VALUE RECEIVED, the undersigned, **CIRCUIT INVESTORS-MATTESON LIMITED PARTNERSHIP**, a Texas limited partnership having a principal place of business at c/o Cardinal Capital Partners, Inc., 8411 Preston Road, 8th Floor, Dallas, Texas 75225 ("Maker"), promises to pay to the order of **THE PAUL REVERE LIFE INSURANCE COMPANY**, a Massachusetts corporation with a principal place of business at 18 Chestnut Street, Worcester, Massachusetts 01608-1528 ("Holder"), the principal sum of THREE MILLION SIX HUNDRED SEVENTY-FOUR THOUSAND SIX HUNDRED SEVENTY-NINE and no/100 ($3,674,679.00) DOLLARS or so much thereof that is currently outstanding (the "Principal Amount"), together with (i) interest at the rate and in the manner hereinafter provided; (ii) all amounts which may become due under the Mortgage, Assignment of Leases and Security Agreement (First) dated the date hereof securing this Note (the "Mortgage"), which Mortgage encumbers that certain real property located at 5264 Johnson Street, Lafayette, Louisiana (the "Property") or under any other documents securing or further evidencing the indebtedness evidenced by this Note (collectively, the "Loan Documents"); and (iii) any costs and expenses, including reasonable attorneys' and appraisers' fees, incurred in the collection of this Note, or in the foreclosure of the Mortgage, or in protecting or sustaining the lien of the Mortgage or in any litigation or controversy arising from or connected with this Note or the Mortgage. All amounts owing under this Note and interest thereon shall be payable in legal tender of the United States of America.

## 1. INTEREST RATE

1.1    Interest Rate. The Principal Amount hereof, from time to time outstanding, shall bear interest at a rate equal to eight and nine-tenths (8.9%) percent per annum (the "Interest Rate"). Interest on the Principal Amount shall be calculated on the basis of a three hundred sixty (360) day year based on twelve (12) thirty (30) day months.

1.2    Maximum Interest Rate. Notwithstanding any provisions of this Note, it is the understanding and agreement of Maker and Holder that the interest required to be paid by Maker to Holder under this Note shall not exceed the maximum rate of interest permissible to be charged by Holder under applicable laws. Any amount paid in excess of such rate shall be considered to have been a payment in reduction of principal. All sums paid or agreed to be paid to the Holder hereof for the use, forbearance or detention of the indebtedness of the Maker evidenced hereby, outstanding from time to time shall, to the extent permitted by applicable law, and only to the extent necessary to preclude exceeding the limit of validity prescribed by law, shall be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of this Note until payment in full of the loan evidenced hereby so that the actual rate of interest on account of such indebtedness is uniform throughout the balance of the term hereof. The

Lafayette, Louisiana

terms and provisions of this paragraph shall control every other provision of all agreements between Holder and Maker.

## 2. PAYMENTS OF PRINCIPAL AND INTEREST

2.1   Principal and Interest Payments Until Maturity. A payment consisting of principal and interest in the amount of $31,770.67 (calculated based upon a 22-year self-liquidating amortization schedule) shall be due and payable in arrears, commencing on the first (1st) day of April, 1995 and a like sum of $31,770.67 on the first (1st) day of each and every calendar month thereafter up to and including the first (1st) day of February, 2017.

Holder reserves the right to require that all payments of principal and interest hereunder be made to Holder by wire transfer of immediately available funds.

2.2   Maturity. The unpaid principal balance hereof, all accrued and unpaid interest and all other obligations due hereunder shall be due and payable on the first (1st) day of March, 2017 (the "Maturity Date").

2.3   Application of Payments. Payments made under this Note shall be applied in the following order: first to interest due on payments made by Holder in respect of Maker's obligations under the Mortgage; second, to the payments made by Holder in respect of Maker's obligations as may then be due and payable under the Mortgage; third, to any late charges to which Maker shall become subject under this Note; fourth, to interest due on this Note; and fifth, to the Principal Amount.

2.4   Business Day. Whenever any payment hereunder shall be stated to be due on a day other than a "business day" (a day on which banks are open for business in New York, New York), such payment shall be made on the next succeeding business day, unless such extension would cause such payment to be payable in the next following calendar month, in which case such payment shall be made on the business day most immediately preceding such day.

2.5   Prepayment. Maker shall have the privilege of prepaying the principal balance of this Note as follows:

(a)   Provided no Event of Default (as hereinafter defined) exists under this Note or under the other Loan Documents, the Principal Amount may be prepaid in whole, but not in part, at the election of Maker on any scheduled payment date provided that simultaneously with such prepayment Maker also pays the entire principal amount of all other promissory notes then held by Holder and guaranteed by Maker pursuant to the terms of that certain Agreement of Guaranty of even date from Maker to Holder (the "Guaranty"). The Principal Amount may be prepaid only if accompanied by a fee (the "Prepayment Fee") in an amount equal to the greater of (i) one (1%) percent of the then Principal Amount or (ii) the Yield Maintenance (hereinafter defined).

Lafayette, Louisiana                                              - 2 -

(b)    Maker may prepay the Principal Amount in whole, but not in part, on any scheduled payment date on or subsequent to November 1, 2016 and prior to the Maturity Date without payment of a Prepayment Fee.

(c)    Maker shall also pay to Holder, as a condition to any permitted prepayment, all interest due up to and including the date of prepayment and any and all amounts due and owing pursuant to this Note, the Mortgage and the other Loan Documents. Permitted prepayments may be made only on monthly installment due dates upon thirty (30) days prior written notice to Holder. Prepayments made by virtue of the application by Holder of condemnation awards or insurance proceeds shall not be accompanied by a Prepayment Fee.

(d)    The Yield Maintenance shall be computed as follows:

(i)    The United States Treasury Note or Bond having a maturity date closest to the Maturity Date will be identified by Holder as of thirty (30) days prior to the date of prepayment upon receipt of Maker's notice of prepayment (utilizing a quotations publication designated by Holder). If, for any reason, a quotation is unavailable for such date, quotations for the next preceding date for which such quotations are available shall be used. In the event Holder identifies more than one Note or Bond having the same maturity date, the Note or Bond having a coupon interest rate closest to the Interest Rate shall be employed. The term "Reinvestment Yield" shall mean the yield to maturity of the security identified in the previous sentence, if purchased on the date the Note or Bond is identified by Holder.

(ii)    The monthly interest that would be earned by reinvesting the principal portion of the amount being prepaid at the interest rate equal to the Reinvestment Yield shall then be calculated. The result is the "Reinvestment Payment".

(iii)    The Reinvestment Payment shall be subtracted from the monthly interest which would be earned if the prepayment were not made and the loan continued to its stated Maturity Date. The result, if positive, is the "Monthly Payment Differential". The Monthly Payment Differential shall in no event be less than zero.

(iv)    The Monthly Payment Differentials from the prepayment date to the stated Maturity Date shall be discounted to present value at the Reinvestment Yield on a monthly basis. The result is the "Yield Maintenance".

Lafayette, Louisiana                                          - 3 -

## 3. **PRINCIPAL SECURITY**

3.1     Security.  This Note is secured by the Mortgage, and the security set forth in the other Loan Documents.

## 4. **DEFAULT; REMEDIES**

4.1     Acceleration.  Upon the occurrence of an Event of Default (as defined below), Holder may, at its option, declare the entire unpaid Principal Amount, together with accrued interest and all other amounts which are evidenced by this Note and the other Loan Documents to be immediately due and payable, without the necessity for prior demand or notice. Notwithstanding anything to the contrary contained herein, in the event Holder exercises its option to accelerate the indebtedness evidenced by this Note upon an Event of Default, there shall be due and payable, in addition to the Principal Amount, all accrued interest thereon, and all other amounts due under the Loan Documents, a default prepayment fee equal to the sum of (i) two (2%) percent of the then Principal Amount plus (ii) the Yield Maintenance.  Such default prepayment fee shall be added to the Principal Amount if not paid upon acceleration of this Note.  Failure to exercise this option shall not constitute a waiver of the right to exercise the same at a later date during the continuation of such Event of Default or in the event of any subsequent Event of Default.

4.2     Event of Default.  For purposes of this Note, the term "Event of Default" shall have the same meaning ascribed to such term in, and shall include any event which would constitute an Event of Default under, the Mortgage (regardless of whether or not at such time the Mortgage constitutes a valid encumbrance upon the Property) and the Loan Documents.

4.3     Late Charges.  If any installment of principal or interest or any installment of taxes or insurance under the Loan Documents shall not be received within five (5) business days of the date when due, the Holder may, at its option, charge a "late charge" equal to the lesser of four cents for each dollar so overdue or the maximum permitted by law.  In connection therewith, Maker and Holder, by its acceptance of this Note, agree as follows: (1) such late payment will cause Holder to incur administrative costs, collection costs, loss of interest, and other direct and indirect costs in uncertain amounts, (2) it would be impractical or extremely difficult to fix the exact amount of such costs in such event, (3) the late charge is a reasonable estimate of such costs and is fair compensation to Holder for its anticipated losses and additional risks resulting from such late payment, and (4) without limiting its rights to recover such installment and to exercise all other rights under this Note, the Mortgage and the other Loan Documents, Holder agrees to accept such late charge in lieu of its right to recover its actual damages resulting from such late payment.

4.4     Default Interest Rate.  In the event the Holder exercises its option to accelerate the maturity of this Note by reason of an Event of Default, or upon maturity of this Note, any amount which is not paid shall thereafter bear interest at the alternative rate (the "Default Rate"),

Lafayette, Louisiana                                    - 4 -

equal to the lesser of (i) four (4%) percent per annum above the Interest Rate or (ii) the maximum rate permitted by law, until the required payment is made.

## 5. MISCELLANEOUS PROVISIONS

    5.1    <u>Attorneys' Fees</u>. Should suit be brought to enforce, interpret or collect any part of this Note, the prevailing party shall be entitled to recover, as an element of the costs of suit and not as damages, reasonable attorneys' fees and other costs of enforcement and collection.

    5.2    <u>Jurisdiction</u>. This Note shall be construed and enforced in accordance with the internal laws of the State of Louisiana, without giving effect to the conflicts of law provisions thereof. Specifically, this business or commercial note is subject to La.R.S. 9:3509 et seq.

    5.3    <u>Obligation Unconditional</u>. No provision of this Note or of any other agreement shall alter, impair or render conditional the payment obligations of Maker, which are absolute and unconditional, to pay the principal and interest on this Note at the place and at the respective times herein prescribed. Time is of the essence under this Note and the Loan Documents.

    5.4    <u>Maker's Waivers</u>. Maker (and all guarantors, endorsers and other parties now or hereafter becoming liable for the payment of this Note) hereby waives diligence, presentment, protest, demand of payment, notice of protest, dishonor and nonpayment, and waives the legal effect of Holder's failure to give all notices not expressly provided for herein. Maker expressly agrees that, without in any way affecting the liability of Maker hereunder, the Holder may, without notice to Maker, extend the Maturity Date or the time for payment of any amount due hereunder, accept additional security, release any party liable hereunder, and release any security now or hereafter securing this Note. Maker further waives, to the full extent permitted by law, the right to plead any and all statutes of limitation as a defense to any demand on this Note, or on any agreement now or hereafter securing this Note.

    5.5    <u>Loss or Destruction</u>. Upon receipt of evidence reasonably satisfactory to Maker of the loss or mutilation of this Note, Maker will execute and deliver, in substitution hereof, a replacement note.

    5.6    <u>Severance</u>. Every provision of this Note is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable. Holder and Maker further agree to replace any such void or unenforceable provision of this Note with valid and enforceable provisions which will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

    5.7    <u>Waivers and Delays by Holder to be Strictly Limited</u>. Any waiver, express or implied, of any breach or default hereunder shall not be considered a waiver of any subsequent or different breach or default. No delay or omission on the part of Holder in exercising any

Lafayette, Louisiana          - 5 -

right under this Note or under any of the Loan Documents shall operate as a waiver of such right or of any other right of the Holder hereunder. Failure to accelerate the indebtedness evidenced hereby by reason of default in the payment of a monthly installment of principal or interest or the acceptance of a past due installment of same shall not be construed as a novation of this Note or as a waiver of the right of the Holder to thereafter insist upon strict compliance with the terms of this Note without previous notice of such intention being given to Maker.

5.8   Modification. No provision of this Note may be waived, modified or discharged other than by an express writing signed by the party against whom enforcement of such waiver, modification or discharge is sought.

5.9   Exculpatory Provision. By accepting the Mortgage and this Note, the Holder agrees that the promise of the Maker contained in this Note to pay the Principal Amount with interest is included herein for the sole purpose of establishing the existence of said indebtedness. The Holder's source of satisfaction of said indebtedness and of any sum of money which is or may be payable under this Note or the Mortgage or other Loan Documents shall be limited to the Property, the rents, issues and profits therefrom whether collected or uncollected, the improvements and the rights in condemnation awards or eminent domain awards, and insurance policies and proceeds and any and all other collateral securing the amounts due and owing under the Loan Documents except to the extent set forth below in this Section 5.9. Except to the extent set forth below in this Section 5.9, Holder agrees that it will not seek or be entitled to enforce out of any other assets of the Maker or any party constituting the Maker any judgment for any sum of money which is or may be payable under this Note or the Mortgage or other Loan Documents or for the performance of any of the obligations of the Maker under the Mortgage or other Loan Documents or any deficiency remaining after foreclosure of the Mortgage. The provisions of this Section, however, shall not:

(a)   constitute a waiver, release or impairment of any obligation evidenced or secured by the Loan Documents, as such documents may be subsequently modified or amended;

(b)   limit or impair the right of Holder to name Maker as a party defendant in any action or suit for judicial foreclosure and sale under the Mortgage or otherwise arising in connection with the Loan Documents;

(c)   prohibit Holder from pursuing all of its rights and remedies against any guarantor or surety, whether or not such guarantor or surety is a partner of Maker, or affect the validity or enforceability of any guaranty made in connection with the Loan Documents;

(d)   impair the right of Holder to obtain the appointment of a receiver or keeper;

(e)   impair the enforcement of the Assignment of Leases and Rents or any Loan Documents executed in connection herewith;

Lafayette, Louisiana                              - 6 -

(f)    impair the right of Holder to obtain all economic incidents associated with the use, occupancy or operation of the Property or any other collateral evidenced by the Loan Documents, inclusive of income, profits and the rents received by Maker after the occurrence of an Event of Default;

(g)    impair the right of Holder to obtain insurance proceeds and condemnation awards due to Holder under the Mortgage or any other proceeds derived from the Property, or any other collateral evidenced by the Loan Documents, due to Holder under the Mortgage;

(h)    impair the right of Holder after an Event of Default to apply any cash, escrow funds or other collateral which are subject to the security interest of Holder, as well as any funds deposited for payment of taxes, assessments and insurance premiums and the like, to the reduction of the indebtedness hereunder;

(i)    impair the right of Holder to seek any remedy available under the Loan Documents to enforce and realize upon the interest in the Property, the rents, or any other collateral given to Holder as security for repayment of this Note;

(j)    prevent Holder from obtaining injunctive or other equitable relief to secure performance of the obligations of Maker (as distinguished from enforcement against Maker personally to obtain damages or other monetary relief) or to prevent a breach of any of Maker's obligations under the Loan Documents; or

(k)    in any way preclude Holder from enforcing any of its rights or remedies at law or in equity against Maker except as provided in this paragraph.

Further, nothing in this paragraph shall limit the liability of Maker or the personal liability of any general partner of Maker to Holder, or impair the right of Holder to bring suit and seek recovery against any of the foregoing for any of the following:

(i)    fraud or material misrepresentation by Maker or any other person or entity in connection with the Loan Documents;

(ii)    Maker's misappropriation or misapplication of rents, tenant security deposits, rents collected in advance, insurance proceeds, condemnation awards or other proceeds derived from the Property or any other collateral given to secure this Note;

(iii)    Maker's misuse or diversion of any cash or other collateral subject to the security interest of Holder after an Event of Default [e.g., failure to apply cash obtained from the Property to Property-related obligations];

Lafayette, Louisiana                                    - 7 -

    (iv)    the obligations undertaken by Maker under that certain hazardous waste indemnity letter from Maker to Holder;

    (v)    Maker's failure to maintain the Property or any other collateral evidenced by the Loan Documents or any part thereof in a manner consistent with the Property's current condition, use and market;

    (vi)    Maker's failure to repair or restore the Property or any other collateral evidenced by the Loan Documents in a satisfactory manner after a casualty loss when Holder agreed to make insurance proceeds available for such repair or restoration;

    (vii)    any casualty to the Property or any other collateral evidenced by the Loan Documents for which insurance coverage was not maintained as required under the terms of the Mortgage;

    (viii)    Maker's failure to comply with the terms and provisions of the Loan Documents prohibiting the sale or further encumbrance of the Property or any other collateral evidenced by the Loan Documents;

    (ix)    Maker's failure to comply with all federal, state and local laws; and

    (x)    Maker's failure to pay real (immovable) and personal (movable) property, sale, use or other taxes and insurance premiums when due.

Maker, and its general partners do hereby agree to indemnify, defend and hold Holder harmless with respect to any loss, claim, damage or liability arising in connection with any of the foregoing.

5.10    <u>Binding Effect</u>. This Note shall bind the successors and assigns of Maker and all endorsers hereto and shall inure to the benefit of Holder and its successors and assigns.

5.11    <u>Parties, Definitions</u>. Whenever in this Note words of any gender appear, they should be deemed to apply equally to any gender. Whenever used in this Note, the plural shall include the singular and the singular shall include the plural as the context may require. In the event Maker consists of more than one person or entity, the obligations of each Maker hereunder shall be joint and several. Any capitalized words used in this Note and not herein defined shall have the meanings ascribed to such terms in the Loan Documents.

5.12    <u>Venue</u>. Borrower hereby consents to the exercise of personal jurisdiction over it by any federal or state court in the state where the Property is located and consents to the

Lafayette, Louisiana                         - 8 -

laying of venue in any jurisdiction or locality in the state where the Property is located. Service shall be effected by any means permitted by the court in which any action is filed, or at Holder's option, by mailing process, postage prepaid, by certified mail, return receipt requested, to Maker at Maker's address set forth on the first page of this Note. Service shall be deemed effective upon receipt. Maker may designate a change of address for purposes of this paragraph by written notice to Holder made in accordance with the notice provisions of the Mortgage at least ten (10) days before such change of address is to become effective.

5.13    Maker's Waiver. To the extent permitted by applicable law, Maker hereby waives and releases all errors, defects and imperfections in any proceedings instituted by Holder under the terms of this Note, or of the Mortgage or other Loan Documents, as well as all benefit that might accrue to Maker by virtue of any present or future laws exempting the Property, or any other property, real or personal, pledged or mortgaged as security for the payment of this Note, or any part of the proceeds arising from any sale of any such property, from attachment, levy, or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment; and Maker agrees that any real estate that may be levied upon pursuant to a judgment obtained by virtue hereof, or any writ of execution issued thereon, may be sold upon any such writ in whole or in part in any order desired by Holder.

## 6. **WAIVER OF JURY TRIAL**

6.1    Waiver. Maker hereby expressly waives any and all rights it may have to trial by jury of any claim, demand, action, or cause of action (1) arising under this Note, the Mortgage securing same or any other Loan Document executed or delivered in connection herewith, or (2) in any way connected with or related or incidental to the dealings of the parties hereto or any of them with respect to this Note, the Mortgage securing same or any other Loan Document executed or delivered in connection herewith, or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether sounding in contract or tort or otherwise; and Maker hereby agrees and consents that any such claim, demand, action, or cause of action shall be decided by court trial without a jury, and holder may file an original counterpart or a copy of this section with any court as written evidence of the consent of each of them to the waiver of its right to trial by jury.

Lafayette, Louisiana                              - 9 -

**MAKER:**

CIRCUIT   INVESTORS-MATTESON   LIMITED
PARTNERSHIP, a Texas limited partnership

By:   CIRCUIT   GENERAL   PARTNER   #4,   INC.,   a
Texas corporation, General Partner

By:

Its: _Presiden r_
(Duly Authorized)

STATE OF _Texas_
COUNTY OF _Dallas_

     BE IT KNOWN, that on this _27_ day of February, 1995, before me, the undersigned
Notary Public, duly commissioned, qualified and sworn within and for the State and County
aforesaid, personally came and appeared _Gil J. Besing_, to me known to be the identical person
who executed the above and foregoing instrument, who declared and acknowledged to me,
Notary, in the presence of the undersigned competent witnesses, that he is the _President_ of
Circuit General Partner #4, Inc., a Texas corporation as general partner of Circuit Investors-
Matteson Limited Partnership, a Texas limited partnership, that as such duly authorized officer,
by and with the authority of the Board of Directors of said Corporation, he signed and executed
the foregoing instrument, as his free and voluntary act and deed of said Corporation, for and on
behalf of said Corporation, for the uses, purposes and benefits therein expressed.

WITNESSES:

[signatory]

TERIE L. RASMUSSEN
NOTARY PUBLIC
State of Texas
Comm. Exp. 03-12-98

(Seal if any)

Notary Public: _Terie L. Rasmussen_

My Commission Expires: _3-12-98_

I:\AFZ\27098\6-038.not\022595\lc

Lafayette, Louisiana                     - 10 -

## ENDORSEMENT TO NOTE


FOR VALUE RECEIVED, the undersigned, the original or successor payee under that certain promissory note to which this Endorsement is affixed (the "Note"), absolutely assigns, transfers, endorses, negotiates, and sets over to and makes payable to the order of German American Capital Corporation, a Maryland corporation (the "Purchaser"), without recourse, representation or warranty of any kind, except as set forth in that certain Asset Purchase Agreement dated as of August 8, 1997 (the "Purchase Agreement"), by and between the Purchaser and The Paul Revere Life Insurance Company, a Massachusetts corporation and The Paul Revere Variable Annuity Insurance Company, a Massachusetts corporation , as sellers, the Note, all interest, principal, and other sums due or to become due under the Note, and all other rights of any nature accrued or to accrue under the Note.

Dated:  As of August _22_ , 1997.

THE PAUL REVERE LIFE INSURANCE
COMPANY, a Massachusetts corporation

By: _____

Its: _Anthony Leo / Signatory_____

# Note Allonge

Loan Number:            172790

Loan Name:              VOIT PARTNERS, LTD.

Pay to the order of:

LaSalle National Bank, as trustee for the registered holders of
GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through
Certificates, Series 1997-C1, without recourse

## German American Capital Corporation

By: _____

Name: Kenneth G.lison          Robert D Burns

Title: Authorized Signatory    Vice President

# Exhibit B



**Doc Type Group**

Legal Documents

**Document Type**

Mortgage/Deed of Trust

**Loan Number**

9820003746

**Library**

A

**Doc Date**

02/27/95

**Class**

Servicing

**HEADER**



N

User : TLYNCH



FILE NO.

95-010878

O.C. "DAN" GUILLIOT
CLERK OF
COURT RECORDER

CLERK OF COURT
LAFAYETTE, LA
FILED AND RECORDED

95 APR -4  PM 3: 07

# MORTGAGE, ASSIGNMENT OF LEASES
# AND
# SECURITY AGREEMENT
# (FIRST)

### FROM

*CIRCUIT INVESTORS - MATTESON LIMITED PARTNERSHIP,*
a Texas limited partnership

### TO

*THE PAUL REVERE LIFE INSURANCE COMPANY,*
a Massachusetts corporation

Effective February 27, 1995

Pepe & Hazard
Goodwin Square
Hartford, CT  06103-4302

Lafayette, Louisiana

## TABLE OF CONTENTS

RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

GRANTING CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARTICLE TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    COVENANTS AND AGREEMENTS OF MORTGAGOR . . . . . . . . . . . . . 9
    2.1.  Warranty of Title . . . . . . . . . . . . . . . . . . . . . . . . 9
    2.2.  Power and Authority of Mortgagor . . . . . . . . . . . . . . . 10
    2.3.  Performance of Note, Mortgage and Other Documents . . . . . . . 10
    2.4.  Maintenance, Repair and Alterations . . . . . . . . . . . . . . 10
    2.5.  Required Insurance . . . . . . . . . . . . . . . . . . . . . . . 11
    2.6.  Delivery of Policies; Payment of Premiums . . . . . . . . . . . 12
    2.7.  Insurance Proceeds . . . . . . . . . . . . . . . . . . . . . . 14
    2.8.  Indemnification; Subrogation; Waiver of Offset . . . . . . . . . 16
    2.9.  Taxes and Impositions . . . . . . . . . . . . . . . . . . . . . 17
    2.10.  Eminent Domain . . . . . . . . . . . . . . . . . . . . . . . . 19
    2.11.  Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    2.12.  Mortgagor's Lease Obligations . . . . . . . . . . . . . . . . 20
    2.13.  Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    2.14.  Tradenames; Fictitious Name Registration . . . . . . . . . . . 21
    2.15.  Books and Records; Financial Statements . . . . . . . . . . . . 21
    2.16.  Mortgagor's Existence; Restrictions on Transfer and
        Encumbrance . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    2.17.  Compliance with Laws; Notice . . . . . . . . . . . . . . . . . 26
    2.19.  Survival of Covenants, Representations and Warranties . . . . . 27

ARTICLE THREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    ASSIGNMENT OF RENTS, ISSUES, PROFITS AND LEASES . . . . . . . . . . 27
    3.1.  Assignment of Rents . . . . . . . . . . . . . . . . . . . . . 27
    3.2.  Collection of Rents . . . . . . . . . . . . . . . . . . . . . 28
    3.3.  Assignment of Leases . . . . . . . . . . . . . . . . . . . . . 28
    3.4.  Covenants as to Leases . . . . . . . . . . . . . . . . . . . . 28

ARTICLE FOUR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    SECURITY AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    4.1.  Creation of Security Interest . . . . . . . . . . . . . . . . . 29
    4.2.  Warranties, Representations and Covenants of Mortgagor . . . . 29

ARTICLE FIVE ................................................. 30
    REMEDIES UPON DEFAULT ............................... 30
        5.1.   Events of Default ..................................... 30
        5.2.   Acceleration Upon Default ........................... 33
        5.3.   Foreclosure and Other Actions by Mortgagee .............. 34
        5.4.   Recovery of Expenses by Mortgagee .................... 35
        5.5.   Mortgagee's Right of Possession in Case of Default ......... 36
        5.6.   Application of Income Received by Mortgagee ............. 37
        5.7.   Appointment of Keeper .............................. 38
        5.12.  Remedies Not Exclusive ............................ 40
        5.13.  Counsel Fees ..................................... 41
        5.14.  Exculpation ...................................... 41

ARTICLE SIX .................................................. 42
    ENVIRONMENTAL    REPRESENTATIONS,    COVENANTS    AND
    WARRANTIES ........................................... 42
        6.1.   General ......................................... 42
        6.2.   Representations and Warranties ........................ 42
        6.3.   Mortgagor's Covenants ............................. 43
        6.4.   Mortgagee's Rights ................................ 44
        6.5.   Definitions ....................................... 45

ARTICLE SEVEN ............................................... 48
    MISCELLANEOUS ....................................... 48
        7.1.   Governing Law ................................... 48
        7.2.   Mortgagor Waiver of Rights ......................... 48
        7.3.   Limitation of Interest ............................... 48
        7.4.   Giving of Notice .................................. 49
        7.5.   Statements by Mortgagor ............................ 50
        7.6.   Additional Security ................................ 51
        7.7.   Successors and Assigns ............................. 51
        7.8.   Inspection ....................................... 51
        7.9.   Mortgagee's Powers ............................... 51
        7.10.  Actions by Mortgagee to Preserve Property; Mortgagee's Own
              Protection ....................................... 51
        7.11.  Expenses ....................................... 52
        7.12.  Suits to Protect the Property ......................... 53
        7.13.  Proofs of Claim .................................. 53
        7.14.  No Waiver of One Default To Affect Another ............. 53
        7.15.  Remedies Cumulative ............................. 53
        7.16.  Notices ......................................... 54
        7.17.  Captions ........................................ 54
        7.18.  Exhibits ........................................ 54
        7.19.  Invalidity of Certain Provisions ...................... 55

7.20.  Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
7.21.  No Merger  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
7.22.  Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
7.23.  Future Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
7.24.  Waiver of Certificates  . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## MORTGAGE, ASSIGNMENT OF LEASES AND SECURITY AGREEMENT (FIRST)

MULTIPLE INDEBTEDNESS
MORTGAGE, ASSIGNMENT OF LEASES            UNITED STATES OF AMERICA
AND SECURITY AGREEMENT

STATE OF _Texas_

BY:                                       COUNTY OF _Dallas_

MORTGAGOR:       CIRCUIT INVESTORS - MATTESON LIMITED PARTNERSHIP

IN FAVOR OF:     THE PAUL REVERE LIFE INSURANCE COMPANY


BE IT KNOWN, that on this 31st day of March but effective February 27, 1995;

BEFORE ME, _Teve L. Rasmussy_ Notary Public in and for the State of _Texas_ , County of _Dallas_ , and in the presence of the undersigned competent witnesses;

PERSONALLY CAME AND APPEARED:

CIRCUIT INVESTORS - MATTESON LIMITED PARTNERSHIP , a Texas limited partnership (TIN: 04-1768571), whose principal place of business is at c/o Cardinal Capital Partners, Inc., 8411 Preston Road, 8th Floor, Dallas, Texas, 75225, appearing herein by and through Circuit General Partner #4, Inc., a Texas corporation, its general partner and duly authorized representative pursuant to a resolution of its Board of Directors, a certified extract of which is attached hereto (herein, together with its successors and assigns and any and all persons and entities subsequently purchasing the Property pursuant to the terms of this Mortgage, the "Mortgagor");

WHO DECLARED THAT:

### RECITALS

This Mortgage (hereinafter defined) is made pursuant to a certain Loan Application executed by Cardinal Capital Partners, Inc. on January 26, 1995 and accepted by The Paul Revere Life Insurance Company, a Massachusetts corporation (T.I.N. 04-1768571), whose principal place of business is at c/o The Paul Revere Investment Management Corporation, 18 Chestnut Street, Worcester, Massachusetts 01608 (herein, together with its successors and assigns, and any future holder or holders of any of the Notes or the Indebtedness, or any interest therein, the "Mortgagee") on January 31, 1995 (the "Commitment"), pursuant to which Mortgagee agreed to advance to Mortgagor the principal sum of THREE MILLION SIX

Lafayette, Louisiana

HUNDRED SEVENTY-FOUR THOUSAND SIX HUNDRED SEVENTY-NINE
($3,674,679.00) DOLLARS (the "Loan") to fund acquisition costs and for other purposes
associated with the Property (as hereinafter defined) and will encumber, as a first mortgage loan,
Mortgagee's interest in and to a certain piece or parcel of real immovable property commonly
known as 5264 Johnson Street, Lafayette, Louisiana. The Loan is evidenced by a promissory
note of even date herewith. The Mortgage hereby granted will create a valid first mortgage on
Mortgagee's interest in the Property. The security interest granted hereby will, upon the
recording of this Mortgage and the filing of an appropriate financing statement in the office of
the Lafayette Parish Clerk of Court, create a valid and perfected security interest in any and all
personal property and fixtures used in conjunction with, located upon or adjunct to the Property.

## GRANTING CLAUSE

NOW, THEREFORE, in consideration of the Indebtedness (hereinafter defined) and other
good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,
and in order to secure the prompt and punctual payment and satisfaction of the Indebtedness (as
hereinafter defined), in principal, interest, costs, expenses, attorneys' fees and other fees and
charges, including any and all additional advances that Mortgagee may make on behalf of
Mortgagor as provided in this Mortgage, together with interest thereon, up to a maximum
amount outstanding at any one time from time to time of $50,000,000.00 (the "Maximum
Amount"), Mortgagor does by these presents specifically mortgage, affect, hypothecate,
collaterally assign, pledge and grant a continuing security interest upon, unto and in favor of
Mortgagee all of the Property (as hereinafter defined) that is susceptible of mortgage under the
Louisiana Civil Code, and does further affect, hypothecate, and grant a continuing security
interest in favor of Mortgagee, as secured party, in all property and rights described below as
part of the Property that is susceptible of a security interest under Chapter 9 of the Louisiana
Commercial Laws, La. R.S. 10:9-101 et seq. ("Chapter 9 of the Uniform Commercial Code"),
and does further affect, hypothecate, assign, and pledge unto and in favor of Mortgagee, as
assignee, all the present and future Leases and Rents (as hereinafter defined), as well as all
leases, rents, and other property and rights described below as part of the Property that are
susceptible of assignment under La. R.S. 9:4401, including without limitation, any and all of
Mortgagor's present and future right, title and interest in and to that certain real property and
all of the rights, title, benefits and entitlements including any options to purchase the real
property described in Exhibit A attached hereto and made a part hereof (the "Land").

TOGETHER WITH, all existing and future rents, issues, profits, royalties, income,
reversions and remainders, and other benefits derived from the Property (as hereinafter defined)
(collectively, the "Rents"), subject to the revocable license hereinafter given to Mortgagor to
collect and apply such Rents; and

TOGETHER WITH, all right, title and interest of Mortgagor in and to all leases,
subleases, permits, licenses, franchises or certificates covering the Property or any portion
thereof now existing or hereafter entered into, and all right, title and interest of Mortgagor

thereunder, including, without limitation, all cash or security deposits, advance rentals, and deposits or payments of similar nature (the "Leases"); and

TOGETHER WITH, all interests, estate or other claims, both in law and in equity, which Mortgagor now has or hereafter may acquire in the Property; and

TOGETHER WITH, all right, title and interest of Mortgagor, now owned or hereafter acquired, in and to any and all tenements, hereditaments and appurtenances belonging to the Property or any part thereof hereby mortgaged or intended so to be, or in any way appertaining thereto, and all streets, alleys, strips, gores, passages, ways, sewer rights, water courses, water rights and powers and all leasehold estates, easements, servitudes, rights of way, privileges, advantages and covenants now existing or hereafter created for the benefit of Mortgagor or any subsequent owner or tenant of the Property over ground adjoining the Property and all rights to enforce the maintenance thereof, including, without limitation, all other rights, liberties and privileges of whatsoever kind or character, and all the estate, right, title, interest, property, possession, claim and demand whatsoever, at law or in equity, of Mortgagor in and to the Property or any part thereof; and

TOGETHER WITH, all right, title and interest of Mortgagor in and to any and all buildings, constructions, component parts, attachments and appurtenances and improvements now or hereafter erected on the Property, and the fixtures, attachments, appliances, equipment, machinery, and other articles attached to and/or forming integral or component parts, attachments, appurtenances to said buildings and improvements in accordance with the Louisiana Civil Code (the "Improvements"); and

TOGETHER WITH, all right, title and interest of Mortgagor in and to all goods, inventory, equipment, machinery, furniture, fixtures and other articles of personal movable property of every kind and nature whatsoever, now or hereafter located in, upon or about the Property described herein, and used or usable in connection with the present or future operation of said Property, whether or not the same are or shall be attached to said Property in any manner, and specifically in all construction equipment, building materials, supplies and other property stored at or delivered to the Land or at other locations for incorporation into the Improvements and as used in connection with the development and construction of the Improvements, including but not limited to Mortgagor's books and records with respect to the Property, all goods, machinery, tools, equipment (including fire sprinklers and alarm systems, office air conditioning, heating, refrigerating, electronic monitoring, parking ticket dispensing and validation, cash registers, time clocks, entertainment, recreational, window or structural cleaning rigs, equipment used in connection with maintenance, exclusion of vermin or insects, removal of dust, refuse or garbage and all other equipment of every kind), indoor or outdoor furniture (including tables, chairs, planters, desks, partitions, sofas, shelves, lockers and cabinets), decorative accessories, works of art, wall beds, wall safes, furnishings, appliances, (including ice boxes, refrigerators, fans, heaters, stoves, water heaters and incinerators), inventory, rugs, carpets and other floor coverings, draperies and drapery rods and brackets,

awnings, window shades, venetian blinds, curtains, lamps, chandeliers and other lighting fixtures and office maintenance and other supplies (the "FF&E"); and

TOGETHER WITH, all right, title and interest of Mortgagor in and to all unearned premiums, accrued, accruing or to be accrued under insurance policies now or hereafter obtained by Mortgagor and all proceeds of the conversion, voluntary or involuntary, of any of the Property described herein into cash or liquidated claims, including, without limitation, proceeds of hazard or title insurance and any and all awards and payments hereafter to be made or paid by any governmental authority with respect to the Property for any reason whatsoever, including but not limited to, the exercise of eminent domain or the alteration of the grade of any street or otherwise and all proceeds of any sale or other disposition of the Property described herein, all contract rights, licenses, permits, designs, surveys, plans and specifications, operating or maintenance agreements and other agreement and documents now or hereafter existing with respect to the Property and all right, title and interest of Mortgagor arising under any contracts and subcontracts, including, without limitation, all rights arising under any performance and payment bonds, now or hereafter executed with respect to the Property, all right, title and interest of Mortgagor in and to all reserve or escrow agreements now or hereafter created and the funds established thereby pursuant to the Mortgage, the Note (as hereinafter defined) or the other Loan Documents (as hereinafter defined), and all modifications and amendments thereto and replacements thereof (collectively, the "Contracts"); and

TOGETHER WITH, all right, title and interest of Mortgagor in and to all deposits (including tenants' security deposits), funds (including funds received for the use of parking spaces), instruments, accounts receivable, documents and general intangibles arising out of or used in connection with the operation of the Property and all notes and chattel paper arising from or by virtue of any transaction related to the Property (collectively, the "Accounts"); and

TOGETHER WITH, all right, title and interest of Mortgagor in and to all reserve or escrow agreements now or hereafter created and the funds established thereby pursuant to the Mortgage, the Note, the Tax, Insurance and Capital Reserve Escrow Agreement or the other Loan Documents (hereinafter defined); and

TOGETHER WITH, all right, title and interest of Mortgagor in and to all proceeds, products, replacements, additions, substitutions, renewals and accessions of and to any item of the Property described herein.

All of the above mentioned portion of Mortgagor's interest in the Land, the Rents, Leases, Improvements, FF&E, Accounts, Contracts and the balance of the entire estate, property and interest hereby conveyed to Mortgagee is sometimes hereafter collectively referred to as the "Property".

This Mortgage has been executed by Mortgagor pursuant to Article 3298 of the Louisiana Civil Code for the purpose of securing Mortgagor's Indebtedness that may now be existing and/or that may arise in the future as provided herein, with the preferences and priorities provided under applicable Louisiana law, including without limitation:

(a)    Payment of the Indebtedness evidenced by that certain Promissory Note (the "Note") of even date, with a Maturity Date (as defined therein) of March 1, 2017, a copy of which is attached as Exhibit B, and any and all modifications, extensions and renewals thereof, including Indebtedness arising as a result of advances made in the future, and all interest provided for in the Note.

(b)    Payment and performance of all obligations of Mortgagor under the Loan Documents (as hereinafter defined).

(c)    Payment of all sums advanced by Mortgagee to protect the Property or its interests therein, to the extent such advances are permitted hereunder or are authorized under the law of the State (hereinafter defined) with interest thereon at the rate of four percent (4%) per annum higher than the Interest Rate (as defined in the Note), or the maximum rate of interest permitted by law in the State, whichever shall be less (the "Default Rate").

(d)    Payment of all other sums, with interest thereon, which either contemporaneously with the execution of the Note or thereafter may be loaned to Mortgagor, or its successors or assigns, by Mortgagee, up to the Maximum Amount when evidenced by a promissory note or notes reciting that they are secured by this Mortgage.

(e)    Payment and performance of all obligations and agreements of Mortgagor contained herein or incorporated herein by reference.

Notwithstanding any other provision of this Mortgage, the maximum amount of Indebtedness secured hereby shall be limited to the Maximum Amount. However, nothing under this Mortgage shall be construed as limiting the duration of this Mortgage or the purpose or purposes for which Mortgagor's Indebtedness may be requested or extended.

This Mortgage, the Note, and any other instruments given to evidence or further secure the payment and performance of any obligation secured hereby are sometimes hereinafter collectively referred to as the "Loan Documents."

This Mortgage will remain in effect until:  all of the Indebtedness is fully paid and satisfied and there is no agreement or commitment to advance any additional Indebtedness cancelling this Mortgage.  Mortgagor may request Mortgagee to sign a written cancellation instrument by writing Mortgagee at the address provided for notices herein or at such other address as Mortgagee may advise.  Mortgagee may delay providing Mortgagor with such a mortgage cancellation instrument for a period of sixty (60) days following receipt of Mortgagor's

Lafayette, Louisiana                                          5

written request, or such longer time as may be necessary for Mortgagee to verify that all conditions precedent for mortgage cancellation have been satisfied.

TO PROTECT THE SECURITY OF THIS MORTGAGE, MORTGAGOR HEREBY COVENANTS AND AGREES AS FOLLOWS:

### ARTICLE ONE
### DEFINITIONS

1. <u>Definitions</u>.

    1.1.   The following terms have the meanings ascribed to them below:

        1.1.1.   "Accounts" shall have the meaning ascribed to it in the Granting Clauses herein.

        1.1.2.   "Affiliate" shall mean any Person which, directly or indirectly, controls or is controlled by or is under common control with a Person and, for the purpose of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") means the possession, directly or indirectly (including, but not limited to, control through remote tier partnerships or other entities), of the power to direct or cause the direction of management and policies of such controlled Person, whether through the ownership of voting securities or by contract or otherwise.

        1.1.3.   "Circuit City Lease" shall mean that certain lease dated February 22, 1995 entered into between Mortgagor and the Tenant with respect to the Property.

        1.1.4.   "Commitment" shall have the meaning ascribed to it in the Recitals section herein.

        1.1.5.   "Condemnation" shall have the meaning ascribed to it in Section 2.10 herein.

        1.1.6.   "Contaminant" shall have the meaning ascribed to it in Section 6.5.1 herein.

        1.1.7.   "Default Rate" shall mean the default rate identified in the Granting Clauses herein.

1.1.8.    "Enforcement Action" shall have the meaning ascribed to it in Section 6.5.2 herein.

1.1.9.    "Environmental Laws" shall have the meaning ascribed to it in Section 6.5.3 herein.

1.1.10.    "Event of Default" shall have the meaning ascribed to it in Section 5.1 herein.

1.1.11.    "Guaranty" shall mean that certain Agreement of Guaranty of even date executed by Mortgagor, as Guarantor, in favor of Mortgagee and secured by a second mortgage of the Property.

1.1.12.    "Impositions" shall have the meaning ascribed to it in Section 2.9.1 herein.

1.1.13.    "Improvements" shall have the meaning ascribed to it in the Granting Clauses herein.

1.1.14.    "Indebtedness" shall have the meaning ascribed to it in Section 2.3 herein.

1.1.15.    "Leases" shall have the meaning ascribed to it in the Granting Clauses herein.

1.1.16.    "Maturity" shall have the meaning ascribed to it in Note.

1.1.17.    "Mortgage" shall mean this Mortgage and any and all schedules, exhibits or riders annexed hereto and any and all amendments, modifications and supplements hereof.

1.1.18.    "Mortgagee" shall mean the person who is the owner and holder of the Note whether or not specifically named herein as "Mortgagee", or any subsequent owner and holder of the Note and this Mortgage.

1.1.19.    "Mortgagor" shall mean the person named in this Mortgage and who executes the same and any subsequent owner of the Property and its respective heirs, executors, administrators, successors and assigns in each case during such person's ownership of the Property.  If Mortgagor consists of more than one person, all agreements, conditions, covenants, provisions, stipulations, warrants of attorney, authorizations, waivers, releases, options, undertakings, rights and benefits made or given by Mortgagor shall

be joint and several, and shall bind and affect all persons who are defined as "Mortgagor" as fully as though all of them were specifically named herein wherever the word "Mortgagor" is used.

1.1.20.    "Note" shall mean the Note or any other evidence of Indebtedness secured by this Mortgage.

1.1.21.    "Organizational Documents" shall mean the Certificate of Incorporation, Bylaws and other documents creating or evidencing the existence of a corporation or the Certificate of Limited Partnership of a partnership or the Articles of Organization of a Limited Liability Company or such other documents evidencing the formation, organization and the governance of any entity.

1.1.22.    "Permitted Exceptions" shall have the meaning ascribed to it in Section 2.1.1 herein.

1.1.23.    "Person" shall include an individual, corporation, partnership, trust, unincorporated association, government, governmental authority, or other entity.

1.1.24.    "Personal Property" shall have the meaning ascribed to it in Section 4.1 herein.

1.1.25.    "Phase I Environmental Assessment" shall have the meaning ascribed to it in Section 6.5.5 herein.

1.1.26.    "Phase II Environmental Assessment" shall have the meaning ascribed to it in Section 6.5.6 herein.

1.1.27.    "Principal Amount" shall have the meaning ascribed to it in the Note.

1.1.28.    "Proceeds" shall have the meaning ascribed to it in Section 2.10.1 herein.

1.1.29.    "Property" shall include any portion of the Property or interest therein.

1.1.30.    "Release" shall have the meaning ascribed to it in Section 6.5.4 herein.

1.1.31.   "Rents" shall have the meaning ascribed to it in the Granting Clause herein.

1.1.32.   "Shopping Center Agreements" shall mean and include reciprocal easement agreements, easements, reciprocal and/or restrictive covenants and the like in effect from time to time for the purpose of governing the rights and obligations of land owners and occupants of any shopping center of which the Property is a part.

1.1.33.   "State" shall mean the state in which the Property is located.

1.1.34.   "Tenant" shall mean Circuit City Stores, Inc., a Virginia corporation.

1.2.   The use of any gender shall include all genders;

1.3.   The singular number shall include the plural and the plural the singular as the context may require.

1.4.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms. The words "include," "including," and "such as" shall each be construed as if followed by the phrases "without being limited to." The words "herein," "hereof," "hereunder" and words of similar import shall be construed to refer to this Mortgage as a whole and not to any particular Article or Section hereof unless expressly so stated.

## ARTICLE TWO
## COVENANTS AND AGREEMENTS OF MORTGAGOR

2.   Covenants and Agreements of Mortgagor.

2.1.   Warranty of Title.

2.1.1. Mortgagor warrants that it has good, marketable and insurable (at customary rates) fee simple absolute full ownership title to the Property and has good right to bargain, sell and mortgage the same in the manner and in the form as provided herein and that the same is free from all encumbrances, except any encumbrances, easements and other restrictions identified in Exhibit C attached hereto ("Permitted Exceptions"). This Mortgage is and will remain a valid and enforceable first mortgage on the Property subject only to the Permitted Exceptions. Mortgagor shall preserve such title and will forever warrant and defend the validity and priority of this Mortgage against the claims of all persons and parties whatsoever.

2.1.2. Mortgagor warrants that this Mortgage is a valid first lien on the Property, subject to the Permitted Exceptions.

2.2.  Power and Authority of Mortgagor. Mortgagor has full power and authority to subject the Property to this Mortgage, and to execute and deliver the Note, this Mortgage and all other documents and instruments required of it by Mortgagee. No consent of any other person or entity and no consent, approval, or authorization is required by Mortgagor in connection with the foregoing.

2.3.  Performance of Note, Mortgage and Other Documents. Mortgagor shall cause to be performed, observed and complied with all provisions of the Note, this Mortgage, the Commitment and each and every other Loan Document, and will promptly pay to Mortgagee the Principal Amount with interest thereon and all other sums required to be paid by Mortgagor under the Note and pursuant to the provisions of this Mortgage, the Commitment and the other Loan Documents when payment shall become due (the entire Principal Amount of the Note, all accrued interest thereon and all obligations and indebtedness herein described or described in the other Loan Documents being referred to herein as the "Indebtedness"). All Loan Documents not of record shall be located at Mortgagee's notice address as set forth herein, to which access may be had after prior written notice to Mortgagee and during reasonable business hours.

2.4.  Maintenance, Repair and Alterations. Mortgagor shall keep or cause to keep the Property, including the Land and the Improvements constituting any part thereof, in good order and condition and in a rentable and tenantable state of repair. Mortgagor (i) shall not permit, commit or suffer any waste, impairment or deterioration of the Property or any part thereof (ordinary wear and tear excepted); (ii) shall make or cause to be made, as and when necessary, all repairs, renewals and replacements, structural and non-structural, exterior and interior, ordinary and extraordinary, foreseen and unforeseen; (iii) shall not remove, demolish or substantially alter any of the Improvements, except for such alterations (a) as may be required by laws, ordinances or regulations, or (b) which are undertaken by the Tenant under the Circuit City Lease in accordance with the terms thereof or (c) which, upon the prior approval by Mortgagee of plans therefor, will maintain the quality and character of the Property and if made will not diminish the revenues derived from the Property; (iv) shall complete promptly and in good and workmanlike manner any building or other construction or other improvement which may be constructed on the Property and promptly restore in like manner any Improvements which may be damaged or destroyed thereon, and promptly pay when due all claims for labor performed and materials furnished therefor; (v) shall comply with all laws, ordinances, regulations, covenants, conditions, restrictions and any agreements now or hereafter affecting the Property or any part thereof including, but not limited to, the Shopping Center Agreements or requiring any alterations or improvements; (vi) shall not commit or permit any waste or deterioration of the Property; (vii) shall keep and maintain abutting grounds, sidewalks, roads, parking and landscape areas in good and neat order and repair; (viii) shall comply with the provisions of any lease of all or any part of the Property; (ix) shall not commit, suffer or permit any act to be done in or upon the Property in violation of any law, ordinance or regulation or which will increase the risk of fire or other hazards to the Property; (x) shall not during any

period when the Circuit City Lease is not in effect permit the improved portions of the Property or any part thereof to become unguarded, and (xi) shall not cancel, transfer, amend, or assign any Shopping Center Agreement without Mortgagee's prior written consent, nor consent to the cancellation, transfer, amendment, or assignment of any Shopping Center Agreement by any party to any such Shopping Center Agreement without Mortgagee's prior written consent.

    2.5.   <u>Required Insurance</u>.  Mortgagor shall provide, maintain and keep in force the following insurance coverage with respect to the Property:

    2.5.1.  Insurance against loss or damage to the Improvements by fire and any of the risks covered by insurance of the type now known as "All-Risk" property and fire insurance (with an extended coverage endorsement, including hurricane, tornado and wind damage coverage) in an amount not less than the full replacement cost of the Improvements including the cost of debris removal (exclusive of the cost of excavations, foundations, and footings below the lowest basement floor), and with a deductible from the loss payable for any casualty in an amount satisfactory to Mortgagee, in its sole discretion.  The policies of insurance carried in accordance with this subparagraph 2.5.1 shall contain a "Replacement Cost Endorsement;"

    2.5.2.  Flood insurance, if such insurance is required under the United States Flood Disaster Protection Act of 1973;

    2.5.3.  Business interruption insurance and/or loss of "rental value" insurance in an amount equal to one year's scheduled rent;

    2.5.4.  Comprehensive general liability insurance (including coverage for employee dishonesty, elevators and escalators, if any, on the Property and, if any construction of new improvements occurs after execution of this Mortgage, completed operations coverage for two years after construction of the improvements has been completed) on an "occurrence basis" against claims for "personal injury" including, without limitation, bodily injury, death or property damage occurring on, in or about the Property and the adjoining streets, sidewalks and passageways, such insurance to afford immediate minimum protection to a limit of not less than that required by Mortgagee with respect to personal injury or death to any one or more persons or damage to property;

    2.5.5.  Workers' compensation insurance (including employer's liability insurance, if requested by Mortgagee) for all employees of Mortgagor engaged on or with respect to the Property in such amount as is reasonably satisfactory to Mortgagee, or if such limits are established by law, in such amounts;

    2.5.6.  During the course of any construction or repair of Improvements on the Property, builder's risk insurance, completed value form, against "all risks of physical loss", including collapse and transit coverage, during construction of such Improvements, with deductibles acceptable to Mortgagee in its sole discretion, in non-reporting form, covering the total value of work performed and equipment, supplies and materials furnished.  Said policy of

insurance shall contain the "permission to occupy upon completion of work or occupancy" endorsement;

2.5.7. Boiler and machinery insurance covering pressure vessels, air tanks, boilers, machinery, pressure piping, heating, air conditioning and elevator equipment and escalator equipment, provided the Improvements contain equipment of such nature, and insurance against loss of occupancy or use arising from any such breakdown, in such amounts as may from time be required by Mortgagee;

2.5.8. Insurance against loss or damage to the Personal Property by fire and other risks covered by insurance of the type now known as "fire and extended coverage;"

2.5.9. Such other insurance, and in such amounts, as may from time to time be reasonably required by Mortgagee against the same or other hazards.

All policies of insurance required by the terms of this Mortgage shall contain an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy notwithstanding any act or negligence of Mortgagor which might otherwise result in forfeiture of said insurance.

2.5.10. Notwithstanding the foregoing, so long as the Tenant is not in default under the Circuit City Lease beyond any applicable grace or notice periods, Mortgagor shall be deemed to be in compliance with the terms of this Section 2.5.

2.6.    Delivery of Policies; Payment of Premiums.  All policies of insurance required by the terms of this Mortgage shall be issued by companies and in amounts as to each company satisfactory to Mortgagee.

2.6.1. All policies of insurance required by the terms of this Mortgage shall have attached thereto a lender's loss payable endorsement for the benefit of Mortgagee, not subject to contribution, in form satisfactory to Mortgagee.  Mortgagor shall furnish Mortgagee with a signed duplicate original policy with respect to all required insurance coverage.  If Mortgagee shall in its discretion consent to Mortgagor providing any of the required insurance through blanket policies carried by Mortgagor and covering more than one location, Mortgagor shall furnish Mortgagee with a certificate of insurance for each such policy setting forth the coverage in respect of the Property, the limits of liability, the name of the carrier, the policy number and the expiration date.  At least thirty (30) days prior to the expiration of each such policy, Mortgagor shall furnish Mortgagee with evidence satisfactory to Mortgagee of the reissuance of a policy continuing insurance in force as required by this Mortgage.  All policies required to be maintained pursuant to this Mortgage shall be in form satisfactory to Mortgagee; shall be maintained in full force and effect, with premiums prepaid, as collateral security for payment of the Indebtedness secured hereby; and shall contain a provision that such policies will not be

cancelled or materially amended, which term shall include any reduction in the scope or limits of coverage, without at least thirty (30) days prior written notice to Mortgagee.

2.6.2. If Mortgagor shall at any time fail to provide, maintain, keep in force or deliver and furnish to Mortgagee the policies of insurance required by this Section, Mortgagee may procure such insurance or single-interest insurance for such risks covering Mortgagee's interest, and Mortgagor will pay or reimburse the cost of all premiums thereon promptly upon demand by Mortgagee, and until such payment is made by Mortgagor the amount of all such premiums together with interest thereon at the Default Rate, shall be secured by this Mortgage.

2.6.3. At the request of Mortgagee, Mortgagor shall deposit with Mortgagee, in monthly installments on the day installments of interest are due under the Note, an amount equal to one-twelfth of the estimated aggregate annual insurance premiums on all policies of insurance required by this Mortgage (or such greater amount as Mortgagee reasonably estimates will be needed to make the next succeeding scheduled installment ratably deposited over the monthly installments due prior to the payment date of such installment). Mortgagor further agrees, upon Mortgagee's request, to cause all bills, statements or other documents relating to the foregoing insurance premiums to be sent or mailed directly to Mortgagee. Upon receipt of such bills, statements or other documents, and providing Mortgagor has deposited sufficient funds with Mortgagee pursuant to this Section 2.6.3, and provided that an Event of Default has not then occurred, Mortgagee shall pay such amounts as may be due thereunder out of the funds so deposited with Mortgagee. If at any time and for any reason the funds deposited with Mortgagee are or will be insufficient to pay such amounts as may then or subsequently be due, Mortgagee shall notify Mortgagor and Mortgagor shall immediately deposit an amount equal to such deficiency with Mortgagee. Notwithstanding the foregoing, nothing contained herein shall cause Mortgagee to be deemed a trustee of said funds or to be obligated to pay any amounts in excess of the amount of funds deposited with Mortgagee pursuant to this Section 2.6.3. Mortgagee may commingle said deposits with its own funds and Mortgagor shall be entitled to no interest on said funds. Mortgagee may impound or reserve for future payment of premiums such portion of such payments as Mortgagee may in its absolute discretion deem proper, applying the balance to the Indebtedness. Should Mortgagor fail to deposit with Mortgagee (exclusive of any portion of said payments which may have been applied by Mortgagee to the payment of the Indebtedness secured by the Loan Documents) sums sufficient to fully pay such premiums at least thirty (30) days before they may be due, Mortgagee may, at Mortgagee's election, but without any obligation so to do, advance any amounts required to make up the deficiency, which advances, if any, shall be secured hereby and shall be repayable to Mortgagee immediately upon Mortgagee's demand, and until such payment is made by Mortgagor the amount of all such premiums together with interest thereon at the Default Rate shall be secured by this Mortgage (or at its option Mortgagee may, without making any advance whatsoever, apply any sums held by it upon any obligation of the Mortgagor secured hereby). Should any default occur or exist in the payment or performance of Mortgagor's and/or any guarantor's obligations under the terms of the Loan Documents, Mortgagee may, at any time at Mortgagee's option, apply any sums or amounts in its hands received pursuant hereto, or as Rents of the Property or otherwise, to the payment or discharge of any Indebtedness of Mortgagor or

Lafayette, Louisiana                                          13

obligation of Mortgagor secured hereby in such manner and order as Mortgagee may elect. The receipt, use or application of any such sums paid by Mortgagor to Mortgagee hereunder shall not be construed to affect the maturity of any Indebtedness secured by this Mortgage or any of the rights or powers of Mortgagee under the terms of the Loan Documents or any of the obligations of Mortgagor and/or any guarantor under this Mortgage.

2.6.4. Notwithstanding the foregoing, so long as the Tenant is not in default under the Circuit City Lease beyond any applicable grace or notice periods, Mortgagor shall be deemed to be in compliance with the terms of this Section 2.6.

2.7.    Insurance Proceeds. After the happening of any casualty to the Property or any part thereof, Mortgagor shall within five (5) business days give written notice thereof to Mortgagee, and the following provisions shall apply:

2.7.1. In the event of any damage or destruction of all or any portion of the Improvements, all proceeds of insurance shall be payable to Mortgagee, and Mortgagee is hereby authorized and empowered by Mortgagor to make proof of loss on and to settle, adjust or compromise any claims for loss, damage or destruction under any policy or policies of insurance; provided, however, that Mortgagor may participate in the settlement, adjustment or compromise of any such claim but such right of participation shall not affect or diminish the rights of Mortgagee in its sole discretion to make all determinations and decisions in respect of the settlement, adjustment or compromise of any such claim. Each insurance company concerned is authorized and directed hereby to make payment under such insurance policies, including return of unearned premiums, directly to Mortgagee instead of to Mortgagor and Mortgagee jointly, and Mortgagor appoints Mortgagee, irrevocably, as Mortgagor's attorney-in-fact to endorse any draft therefor. All such proceeds of insurance received by Mortgagee shall be held by Mortgagee and applied at Mortgagee's sole discretion as a mandatory prepayment to reduction of the Principal Amount of the Note, without prepayment fee, whether or not such amount is otherwise then due and without regard to whether the Property and Improvements can be repaired or restored, or to restoration of the Property.

2.7.2. Notwithstanding the foregoing, Mortgagee agrees to make insurance proceeds available to Mortgagor for restoration or repair of the Property provided:

2.7.2.1.    There has been no Event of Default under the Loan Documents in the twelve months immediately prior to the occurrence of such casualty; and

2.7.2.2.    The cost to repair the Property is not more than 2% of the original Principal Amount of the Note; or

2.7.2.3.    The cost to repair the Property is greater than 2% but is not more than 30% of the original Principal Amount of the Note; and

2.7.2.3.1.    Mortgagor demonstrates to Mortgagee's satisfaction
that Mortgagor has the ability, during
reconstruction, to fulfill the obligations contained in
the Loan Documents from the proceeds of rent,
insurance or otherwise;

2.7.2.3.2.    The casualty in question occurs prior to the last two
years immediately preceding the Maturity Date (as
defined in the Note) and Mortgagor demonstrates to
Mortgagee's satisfaction that complete restoration is
feasible within twelve months after such casualty;

2.7.2.3.3.    The funds are released under escrow/construction
funding arrangements satisfactory to Mortgagee
which may at Mortgagee's sole discretion include
the use of a consulting engineer to review release
requests, the costs for which shall be paid by
Mortgagor; and

2.7.2.3.4.    The economics of the Property and the security for
the Loan are not materially impaired in Mortgagee's
sole opinion and the loan-to-value ratio of the Loan
would be no greater than 70% of the Property value
as restored based on a current appraisal obtained at
Mortgagor's expense and acceptable to Mortgagee
in its sole discretion.

2.7.2.4. Notwithstanding the foregoing, so long as the Tenant is not in
default under the Circuit City Lease beyond any applicable grace or notice periods, Mortgagee
shall waive the foregoing requirements and disburse the insurance proceeds in accordance with
the terms of the Circuit City Lease.

2.7.3. The balance of any insurance proceeds held by Mortgagee remaining after
the completion of any repair, restoration or reconstruction shall, in Mortgagee's discretion, be
paid to Mortgagor or applied by Mortgagee to the Indebtedness secured hereby and in such order
as Mortgagee may determine.

2.7.4. Nothing herein contained shall be deemed to excuse Mortgagor from
repairing or maintaining the Property as provided in Section 2.4 hereof or from restoring all
damage or destruction to the Property, regardless of whether or not there are insurance proceeds
available or whether any such proceeds are sufficient in amount, nor shall anything provided
hereinabove affect or derogate from Mortgagee's right to take such actions as it may in its sole
discretion choose to take to protect the security hereof pursuant to Section 7.10 hereinafter, and
the application or release by Mortgagee of any insurance proceeds shall not cure or waive any

default or notice of default under this Mortgage or invalidate any act done pursuant to such notice.

### 2.8. Indemnification; Subrogation; Waiver of Offset.

2.8.1. If Mortgagee is made a party defendant to any litigation concerning this Mortgage or the Property or any part thereof (including any action concerning or arising out of the occupancy thereof by Mortgagor or persons claiming through Mortgagor), then Mortgagor shall indemnify, defend and hold Mortgagee harmless from all liability arising by reason of such litigation, including reasonable attorneys' fees and expenses incurred by Mortgagee in any such litigation, whether or not any such litigation is prosecuted to judgment.    If Mortgagee commences an action against Mortgagor to enforce any of the terms hereof or because of the breach by Mortgagor of any of the terms hereof, or for the recovery of any sum secured hereby, Mortgagor shall pay to Mortgagee reasonable attorneys' fees and expenses, and the right to such attorneys' fees and expenses shall be deemed to have accrued on the commencement of such action, and shall be enforceable whether or not such action is prosecuted to judgment.    If Mortgagor shall violate any term of this Mortgage, Mortgagee may employ an attorney or attorneys to protect its rights hereunder, and in the event of such employment following any breach by Mortgagor, Mortgagor shall pay to Mortgagee the reasonable attorneys' fees and expenses incurred by Mortgagee, whether or not an action is actually commenced against Mortgagor by reason of such breach.    This indemnification provision is not in derogation of any other indemnification provided for hereunder or in any other Loan Document and all such indemnification obligations of Mortgagor shall be independent obligations of Mortgagor and any other indemnitors thereunder.

2.8.2. Mortgagor waives any and all right to claim or recover against Mortgagee, its officers, employees, agents and representatives, for loss of or damage to Mortgagor, the Property, property of Mortgagor or the property of others under the control of Mortgagor from any cause insured against or required to be insured against by the provisions of this Mortgage.

2.8.3. All sums payable by Mortgagor hereunder shall be payable without notice, demand, counterclaim, setoff, deduction or defense and without abatement, suspension, deferment, diminution or reduction, and the obligations and liabilities of Mortgagor hereunder shall in no way be released, discharged or otherwise affected by reason of: (i) any damage to or destruction of, or any condemnation or similar taking of the Property or any part thereof; (ii) any restriction or prevention of or interference with any use of the Property or any part thereof; (iii) any title defect or encumbrance or any eviction from the Property or the Improvements or any part thereof by title paramount or otherwise; (iv) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to Mortgagee, or any action taken with respect to this Mortgage by any trustee or receiver of Mortgagee, or by any court, in any such proceeding; (v) any claim which Mortgagor has or might have against Mortgagee; (vi) any default or failure on the part of Mortgagee to perform or comply with any of the terms hereof or of any other agreement with Mortgagor; or (vii) any other occurrence whatsoever, whether similar or dissimilar to the foregoing; and whether or not

Mortgagor shall have notice or knowledge of any of the foregoing. Except as expressly provided herein, Mortgagor waives all rights now or hereafter conferred by statute or otherwise to any abatement, suspension, deferment, diminution or reduction of any sum secured hereby and payable by Mortgagor.

2.9.    <u>Taxes and Impositions.</u>

2.9.1. Mortgagor shall deposit with Mortgagee, in monthly installments on the day installments of principal and interest are due under the Note, an amount equal to one-twelfth of the estimated aggregate of all real (immovable) property taxes and assessments, general and special, and all other taxes and assessments of any kind or nature whatsoever, including, without limitation, nongovernmental levies or assessments such as maintenance charges, owner association dues or charges or fees, levies or charges resulting from covenants, conditions and restrictions affecting the Property, charges for any easement or agreement maintained for the benefit of the Property, which are assessed or imposed upon any of the Property, or against Mortgagor or arising in respect of the occupancy, use or possession hereof, or become due and payable in respect thereof, or upon any Personal Property, equipment or other facilities used in the operation or management thereof (all of which taxes, assessments and other governmental charges of a like or different nature are hereinafter referred to as "Impositions"), or such greater amount as Mortgagee reasonably estimates will be needed to make the next succeeding scheduled payment of Impositions if ratably deposited over the monthly installment due prior to the payment date of such next succeeding payment of the Impositions. If the Land described in Exhibit A is not treated as a separate parcel for purposes of any Impositions, Mortgagee retains the right to require that Mortgagor deposit monthly installments equal to one-twelfth of all Impositions imposed on the parcel or parcels of which the Land forms a part. Mortgagor further agrees, upon Mortgagee's request, to cause all bills, statements or other documents related to the Impositions to be sent or mailed directly to Mortgagee. Upon receipt of such bills, statements or other documents and providing Mortgagor has deposited sufficient funds with Mortgagee pursuant to this Section 2.9.1, and provided that an Event of Default has not occurred hereunder, Mortgagee shall pay such amounts as may be due with respect to such Impositions out of funds so deposited with Mortgagee. If at any time and for any reason the funds deposited with Mortgagee are or will be insufficient to pay such amounts as may then or subsequently be due, Mortgagee shall notify Mortgagor and Mortgagor shall immediately deposit an amount equal to such deficiency with Mortgagee. Notwithstanding the foregoing, nothing contained herein shall cause Mortgagee to be deemed a trustee of said funds or to be obligated to pay any amounts in excess of the amount of funds deposited with Mortgagee pursuant to this Section 2.9.1. Mortgagee may commingle said deposits with its own funds and Mortgagor shall be entitled to no interest on said funds. Mortgagee may impound or reserve for future payment of Impositions such portion of such payments as Mortgagee may in its absolute discretion deem proper, applying the balance to the Indebtedness and in such order as Mortgagee may determine. Should Mortgagor fail to deposit with Mortgagee (exclusive of any portion of said payments which may have been applied by Mortgagee to the payment of the Indebtedness) sums sufficient to fully pay such Impositions at least thirty (30) days before they may be due, Mortgagee may, (i) at Mortgagee's election, but without any obligation so to do, advance any amounts required

to make up the deficiency, which advances, if any, shall be secured hereby and shall be repayable to Mortgagee immediately upon Mortgagee's demand and until such payment is made by Mortgagor the amount of such payment, together with interest thereon at the Default Rate, shall be secured by this Mortgage, or (ii) at its option, and without making any advance whatsoever, apply any sums held by it upon any obligation of the Mortgagor secured hereby. Should an Event of Default or any default occur or exist in the payment or performance of Mortgagor's and/or any guarantor's obligations under the terms of the Loan Documents, Mortgagee may, at any time at Mortgagee's option, apply any sums or amounts in its hands received pursuant hereto, or as Rents of the Property or otherwise, to the payment or discharge of the Indebtedness in such manner and order as Mortgagee may elect. The receipt, use or application of any such sums paid by Mortgagor to Mortgagee hereunder shall not be construed to affect the maturity of the Indebtedness or any of the rights or powers of Mortgagee under the terms of the Loan Documents or any of the obligations of Mortgagor and/or any guarantor under this Mortgage. Notwithstanding the foregoing, so long as the Tenant is not in default under the Circuit City Lease beyond any applicable grace or notice periods, Mortgagee shall waive the foregoing requirements of this Section 2.9.1.

2.9.2. If under the provisions of any law or ordinance now or hereafter in effect there shall be assessed or imposed (i) a tax or assessment on the Property in lieu of or in addition to the Impositions payable by Mortgagor pursuant to 2.9.1 hereof, or (ii) a license fee, tax or assessment on Mortgagee measured by or based in whole or in part upon the amount of the outstanding obligations secured hereby, then all such taxes, assessments or fees shall be deemed to be included within the term "Impositions" as defined in 2.9.1 hereof, and Mortgagor shall pay and discharge the same as herein provided with respect to the payment of Impositions and if such Impositions are not paid by Mortgagor or if payment thereof by Mortgagor is prohibited by law, then at the option of Mortgagee, all obligations secured hereby together with all accrued interest thereon, shall immediately become due and payable. Anything to the contrary herein notwithstanding, Mortgagor shall have no obligation to pay any franchise, estate, inheritance, income, excess profits or similar tax levied on Mortgagee or on the obligations secured hereby.

2.9.3. Mortgagor covenants to furnish Mortgagee within forty-five (45) days after the date upon which any Imposition is due and payable by Mortgagor, official receipts of the appropriate taxing or other authority, or other proof satisfactory to Mortgagee, evidencing the payment thereof.

2.9.4. Mortgagor shall have the right, before any delinquency occurs, to contest or object to the amount or validity of any Imposition by appropriate legal proceedings, but this shall not be deemed or construed in any way as relieving, modifying or extending the covenants of Mortgagor to pay any Imposition at the time and in the manner provided in this Section 2.9, unless Mortgagor shall have given prior written notice to Mortgagee of intent to so contest or object to an Imposition, and unless, at Mortgagee's sole option, (i) Mortgagor shall demonstrate to Mortgagee's satisfaction that the legal proceeding shall operate conclusively to prevent the sale of the Property, or any part thereof, to satisfy such Imposition prior to final determination

of such proceedings; or (ii) Mortgagor shall furnish (1) a good and sufficient bond or surety as requested by and satisfactory to Mortgagee; or (2) Mortgagor shall have provided Mortgagee with a good and sufficient undertaking as may be required or permitted by law to accomplish a stay of such proceedings. The foregoing requirements shall be deemed satisfied with respect to any contest undertaken by the Tenant in compliance with the terms of the Circuit City Lease.

2.9.5.  Mortgagor covenants and agrees that to the fullest extent permitted by law, Mortgagor will not suffer, permit or initiate the joint assessment of taxes upon the Property and the Personal Property, or any other procedure whereby the lien of any taxes assessed against the Property and the lien of any taxes assessed against the Personal Property would be assessed, levied or charged to the Property as a single lien.

2.9.6.  For all periods during which the title to the Property or any part thereof shall be held by a corporation or other entity subject to corporate taxes or taxes similar to corporate taxes, Mortgagor shall file or cause to be filed returns for such taxes with the proper authorities, bureaus or departments and shall cause to be paid, when due and before interest or penalties are due thereon, all taxes payable by such corporation or other entity to the United States, to such state of incorporation or formation and to the state in which the Property is situated and any political subdivision thereof, and shall produce to Mortgagee receipts showing payment of any and all such taxes, charges or assessments prior to the last dates upon which such taxes, charges or assessments are payable without interest or penalty charges; provided, however, that Mortgagor shall have the right before any delinquency occurs to contest or object to the amount or validity of any such taxes, charges or assessments in good faith and by appropriate legal proceedings, but this shall not be deemed or construed in any way as relieving, modifying or extending Mortgagor's obligation to pay any such taxes, charges or assessments at the time such contest, objection and legal proceedings have been terminated or discontinued adversely to Mortgagor.  Within ten (10) days of receipt thereof, Mortgagor shall produce to Mortgagee all settlements, notices of deficiency or overassessment and any other notices pertaining to Mortgagor's tax liability, which may be issued by the United States, such state of incorporation, the state in which the Property is situated and any political subdivision thereof. If at any time the United States or any department or bureau thereof shall require Internal Revenue stamps on the Note secured hereby, Mortgagor on demand shall pay for them with any interest or penalties payable thereon.

2.10.  Eminent Domain.  If the Property, or any part thereof or interest therein, is taken or damaged by reason of any public improvement, eminent domain or other similar proceeding or through a conveyance in lieu of the foregoing, or in any other manner ("Condemnation"), or if Mortgagor receives any notice or other information regarding such proceeding, Mortgagor shall give prompt written notice thereof to Mortgagee, and the following provisions shall apply:

2.10.1.    Mortgagee shall be entitled to all compensation for the Property taken or for damage to the Property not taken, awards and other payments or relief therefor whether as a result of such proceedings or in lieu thereof made to Mortgagor and/or others, and shall be entitled at its option to commence, appear in and prosecute in its own name any action

or proceedings; provided, however, that Mortgagor may participate in any such action or proceedings, but such right of participation shall not affect or diminish the rights of Mortgagee to make all determinations and decisions in respect of such action or proceedings. Mortgagee also shall be entitled to make any compromise or settlement in connection with such condemnation or damage. All such compensation, awards, damages, rights of action and proceeds awarded to Mortgagor and/or others (the "Proceeds") are hereby assigned by Mortgagor to Mortgagee and the same shall be received and collected by Mortgagee, and Mortgagor agrees to execute such further assignments of the Proceeds and other instruments as Mortgagee may require. Such assignment shall not relieve Mortgagor of its obligations to continue to pay and perform the obligations and Indebtedness secured hereby or such portion thereof as remains unpaid after any application by Mortgagee pursuant to this Section 2.10.1 of the Proceeds to the obligations or Indebtedness so secured.

2.10.2.        If any portion of the Property is taken or damaged by condemnation, Mortgagee shall have the option, in its sole and absolute discretion, to apply all Proceeds, after deducting therefrom all costs and expenses (regardless of the particular nature thereof and whether incurred with or without suit), including attorneys' fees, incurred by it in connection with such Proceeds, against any Indebtedness secured hereby at par, without prepayment charge, and in such order as Mortgagee may determine, or to apply all such Proceeds, after such deductions, to the restoration of the Property upon such conditions as Mortgagee may determine. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice. In the event proceeds will be applied by Mortgagee to the repair, restoration or reconstruction of any improvements, such monies will be re-advanced to Mortgagor, in Mortgagee's discretion, in accordance with Mortgagee's standard construction loan disbursement procedures as described above with respect to re-advance of insurance proceeds.

2.10.3.        Notwithstanding the foregoing, so long as the Tenant is not in default under the Circuit City Lease beyond any applicable grace or notice periods, Mortgagee shall waive the foregoing requirements and disburse the Proceeds in accordance with the terms of the Circuit City Lease.

2.11.  Utilities.  Mortgagor shall pay when due all utility charges incurred by Mortgagor for the benefit of the Property or which may become a charge or lien against the Property for gas, electricity, water or sewer services furnished to the Property and all other assessments or charges of a similar nature, whether public or private, affecting the Property or any portion thereof, whether or not such taxes, assessments or charges are liens thereon.

2.12.  Mortgagor's Lease Obligations.  Mortgagor shall pay when due all rents and other payments and perform all covenants and agreements contained in any lease, sublease or ground lease which may constitute a portion of or an interest in the Property, and shall not surrender, assign or sublease any such lease, sublease or ground lease, nor take any other action which would affect or permit the termination of any such lease, sublease or ground lease. Upon Mortgagee's request, Mortgagor covenants to furnish to Mortgagee within thirty (30) days after

such request, receipts or such other evidence satisfactory to Mortgagee evidencing the payment of such rents or other payments as are due and payable by Mortgagor.

2.13.  Liens.  Prior to the commencement of any construction, renovation, improvement or other work on the Property, Mortgagor shall file or cause to be filed waivers of mechanics' liens in a form and manner satisfactory to Mortgagee.  Mortgagor shall pay and promptly discharge, at Mortgagor's cost and expense, all liens, encumbrances and charges upon the Property, or any part thereof or interest therein; provided, that Mortgagor shall have the right to contest in good faith the validity of any such lien, encumbrance or charge, as long as (i) such contest operates to stay any proceedings for enforcement of or execution on the lien or encumbrance, (ii) Mortgagor shall first deposit with Mortgagee a bond or other security reasonably satisfactory to Mortgagee in such amounts as Mortgagee reasonably shall require, and (iii) Mortgagor shall thereafter diligently proceed to cause such lien, encumbrance or charge to be removed and discharged.  If Mortgagor shall fail to discharge any such lien, encumbrance or charge, or provide such security, then, in addition to any other right or remedy of Mortgagee, Mortgagee may, but shall not be obligated to, discharge the same, either by paying the amount claimed to be due, or by procuring the discharge of such lien by depositing in court a bond or the amount claimed or otherwise giving security for such claim, or in such manner as is or may be prescribed by law; and all funds advanced by Mortgagee to pay such obligations, liabilities, costs and expenses shall be reimbursed by Mortgagor upon demand by Mortgagee together with interest thereon until reimbursement at the Default Rate, and all such advances with interest thereon as aforesaid shall be secured by this Mortgage and the other Loan Documents.  The foregoing requirements shall be deemed satisfied with respect to any contest undertaken by the Tenant in compliance with the requirements of the Circuit City Lease.

2.14.  Tradenames; Fictitious Name Registration.  At the request of Mortgagee, Mortgagor shall execute a certificate in form satisfactory to Mortgagee listing the tradenames under which Mortgagor intends to operate the Property, and representing and warranting that Mortgagor does business under no other tradename with respect to the Property.  Mortgagor promptly shall notify Mortgagee in writing of any change in said tradenames, and will, upon request of Mortgagee, execute additional UCC financing statements and other instruments revised to reflect the change in tradename.  Mortgagor shall make all filings and take all other steps required in order to comply with applicable fictitious name statutes, and shall provide evidence of such compliance to Mortgagee.

2.15.  Books and Records; Financial Statements.

2.15.1.        Mortgagor shall keep and maintain at all times complete, true and accurate books of account and records reflecting the results of operation of the Property. Mortgagee and its designated agents shall have the right to inspect Mortgagor's books and records with respect to the Property at all reasonable times.

2.15.2.        Mortgagor will cause to be delivered to Mortgagee as soon as practicable, but in any event within ninety (90) days after the close of each fiscal year of

Mortgagor, a statement of condition or balance sheet of Mortgagor as of the end of each fiscal year, all certified as to accuracy by an independent certified public accountant acceptable to Mortgagee, and an annual operating statement showing in reasonable detail and in form satisfactory to Mortgagee all income and expenses, surplus and rent rolls, together with gross sales of each tenant or occupant of the Property whose rent is based in whole or in part upon such gross sales, of Mortgagor with respect to the operation of the Property, prepared at Mortgagor's expense and certified as to accuracy by an independent certified public accountant acceptable to Mortgagee. Mortgagor agrees to make its books and accounts relating to the Property available for inspection by Mortgagee or its representatives upon request at any time. Notwithstanding the foregoing, Mortgagee shall waive the requirements of this Section 2.15.2 so long as the Circuit City Lease remains in effect.

2.15.3.    Mortgagee shall be furnished with the following documents with respect to the Tenant within the periods set forth below, and in no event later than five (5) business days after the same shall become available to the public (i) annual report on Form 10-K and any and all exhibits thereto, within ninety (90) days after the end of Tenant's fiscal year; (ii) quarterly reports on Form 10-Q, within forty-five (45) days after the end of the quarter in question; (iii) reports on Form 8-K to the extent such reports reveal information related to extraordinary events which may have a related material and adverse affect on the financial condition of the Tenant; and (iv) preliminary and final proxy materials required by Section 14 of the Securities and Exchange Act of 1934, as amended. In addition, Landlord shall be furnished with any and all other documents, instruments, certificates and financial statements which Tenant delivers to its stockholders from time to time which include information related to a material change in the financial condition of the Tenant. Mortgagor hereby advises that Tenant's fiscal year ends on February 28.

2.16.    Mortgagor's Existence; Restrictions on Transfer and Encumbrance.

2.16.1.    Mortgagor and any subsequent owner of any of the Property shall do all things necessary to preserve and keep in full force and effect its and their existence, franchises, rights and privileges as a corporation or partnership, as the case may be, under the laws of the state of its formation and its right to own property and transact business in the state in which the Property is situated. Neither Mortgagor nor any subsequent owner of all or any portion of the Property shall amend, modify, transfer, assign or cancel the Organizational Documents of Mortgagor, or such subsequent owner, without the prior written consent of Mortgagee, which consent Mortgagee may grant or deny in its sole discretion. Neither the composition nor form of business association of Mortgagor may be modified, amended or altered, nor may the ownership of Mortgagor or the Property, in whole or in part, be sold, transferred, assigned or otherwise disposed of without the prior written consent of Mortgagee, which consent may be withheld in Mortgagee's sole discretion.

2.16.2.    Without the prior written consent of Mortgagee, which consent can be withheld in Mortgagee's sole discretion, Mortgagor shall not (i) permit to exist any lien on the Property or encumber all or any portion of the Property (other than Permitted Exceptions)

Lafayette, Louisiana                            22

or any interest in Mortgagor with subordinate financing or hypothecate all or any portion of its interest in the Property (the foregoing shall not preclude installment purchase agreements or leasing agreements of Personal Property, entered into in the ordinary course of business, provided that any security interest granted in connection therewith relates only to the Personal Property so purchased or leased), (ii) sell, lease (other than equipment leases in the ordinary course of business and Leases in accordance with the terms hereof) or transfer its interest in all or any portion of the Property; (iii) execute a land contract or purchase agreement (unless a condition of closing of such land contract or purchase agreement shall be the repayment in full of the Loan in full compliance herewith and with the Note); (iv) record a condominium declaration with respect to all or any portion of the Property; or (v) change, directly or indirectly, the ownership or control of Mortgagor including a direct or indirect transfer of first or more remote tier limited partnership interests or stock or membership interests in corporate entities or voting or non-voting securities or management rights with respect to Mortgagor or otherwise affect Mortgagor's composition, form of business association or ownership except as hereinafter specifically provided in Section 2.16.4. hereof.

      2.16.3.      In connection with any consent requested and granted pursuant to this Section 2.16, Mortgagee may require payment of a fee and/or modification of the terms of the Loan as a condition to giving any such consent. Any such transfer (other than as hereinafter specifically provided in Section 2.16.4) made without Mortgagee's prior express written consent (which may be withheld arbitrarily notwithstanding the provisions hereof setting forth provisions upon which Mortgagee may condition its consent) shall be void and shall constitute an Event of Default hereunder and shall entitle Mortgagee to exercise any and all remedies available to it under the Loan Documents, including, without limitation, acceleration of the Note. Mortgagor agrees that if the ownership of the Property or any part thereof becomes vested in a person other than Mortgagor, Mortgagee may, without notice to Mortgagor, deal in any way with such successor or successors in interest with reference to this Mortgage, the Note or any other Loan Document without in any way vitiating or discharging Mortgagor's liability hereunder, under the Note or under any other Loan Document. No such transaction and no forbearance to any person with respect to this Mortgage and no extension granted to any person of the time for payment of the Note or the Indebtedness, given by Mortgagee shall operate to release, discharge, modify, change or affect the original liability of Mortgagor either in whole or in part.

      2.16.4.      Notwithstanding the provisions of 2.16.1, 2.16.2 or 2.16.3 hereof to the contrary, Mortgagor shall have the right to a one-time sale, transfer, or assignment, in whole or in part, of its interest in the Property to any party of equal qualification and creditworthiness provided:

      2.16.4.1.      No Event of Default exists under the Loan Documents at the time of transfer;

      2.16.4.2.      There exists no material deferred maintenance on the Property at the time of transfer;

Lafayette, Louisiana            23

2.16.4.3.    The proposed transferee is an Institutional Investor (as hereinafter defined) or a Qualified Real Estate Investor (as hereinafter defined) approved by Mortgagee;

2.16.4.3.1.    As used herein, the term "Institutional Investor" means any creditworthy bank, savings and loan association, trust company, insurance company, pension fund, investment advisor, credit union, real estate investment trust, or charitable foundation actively engaged in acquiring or financing commercial real estate properties, subject to Mortgagee's approval;

2.16.4.3.2.    As used herein, the term "Qualified Real Estate Investor" means any reputable corporation, partnership, joint venture, joint stock company, trust or individual with a minimum net worth equivalent to the Principal Amount or greater, a minimum current cash position equal to at least ten percent (10%) of net worth, based in the United States and free from any bankruptcy, reorganization or insolvency proceedings or any criminal charges or proceedings and shall not have been, at the time of transfer or in the past, a litigant (plaintiff or defendant) in any suit brought against or by Mortgagee or any affiliate of Mortgagee. The proposed transferee, its principals, and affiliates shall not have offered a deed in lieu of foreclosure (dation en paiement) on a previous transaction nor have been in control of a property foreclosed upon by Mortgagee or an affiliate of Mortgagee.

Mortgagee shall act reasonably in determining whether the proposed transferee is an "Institutional Investor" or a "Qualified Real Estate Investor";

2.16.4.4.    The Debt Service Coverage Ratio (as hereinafter defined) on the Loan at the time of transfer exceeds 1.0X;

2.16.4.4.1.    As used herein, the term "Debt Service Coverage Ratio" means the ratio between (i) net after tax operating income from the Property and each of the properties which secure promissory notes that are then subject to the Guaranty, and (ii) the total payments due under the Note and the promissory notes that are subject to the Guaranty during such period, all as determined in accordance with Generally Accepted Accounting Principles;

2.16.4.5.    The proposed transferee has specific related commercial real estate experience in the Metropolitan Statistical Area where the Property is located;

2.16.4.6.    Affiliates of the proposed transferee own or manage a minimum of 100,000 square feet of retail space;

2.16.4.7.    The proposed transferee agrees that upon the request of Mortgagee such transferee will form a single asset entity to take title to the Property.

2.16.4.8.    At least forty-five (45) days prior to such transfer, Mortgagor provides Mortgagee with all of the material provisions of such transfer including, without limitation the proposed date of transfer, the purchase price and the name, net worth, background, and address of the proposed transferee;

2.16.4.9.    Mortgagor provides Mortgagee with such evidence as Mortgagee may require demonstrating that the proposed transferee has assumed and shall fulfill each and every obligation of Mortgagor under the Loan Documents as such obligations pertain to the Property and such transfer shall not affect or impair Mortgagee's security and rights under the Loan Documents;

2.16.4.10.    Mortgagee receives such documentation as Mortgagee shall reasonably require providing for the cross default and cross collateralization of each mortgage assumed by such transferee or its Affiliates which encumber any of the five properties which originally secured the loan made pursuant to the Commitment.

2.16.4.11.    The notice received under 2.1.4.8 above shall be accompanied by the payment to Mortgagee of a nonrefundable fee in the amount of one percent (1%) of the outstanding aggregate Principal Amount of the Loan in cash, cashier's check, or certified check in order to induce Mortgagee to allow the proposed transferee to assume the obligations of Mortgagor under the Loan Documents; such fee shall be returned to Mortgagor if Mortgagee disapproves of such transfer;

2.16.4.12.    If Tenant is no longer a tenant of the Property, the loan-to-value ratio of the outstanding Principal Amount under the Note and the Property at the time of transfer, based on the sales price and confirmed by a current appraisal obtained at Mortgagor's expense and acceptable to Mortgagee, must not exceed eighty percent (80%); and

2.16.4.13.    Mortgagor shall pay for all of Mortgagee's costs and expenses (including reasonable attorneys' fees) associated with the transfer.

2.16.5.    Notwithstanding any other provision of Section 2.16.1, 2.16.2, 2.16.3 or 2.16.4 to the contrary, so long as there is no default existing under the Circuit City Lease, and the Tenant's credit rating remains "investment grade" (i.e., rated either Moody's "Ba2", Standard and Poor's "BBB-", Duff & Phelps "BBB-" or NAIC "2") Mortgagor shall have the right to sell, transfer, or assign its interest in the Property, to any party provided that:

2.16.5.1.    No event of default exists under the Loan Documents at the time of transfer;

2.16.5.2.    There exists no material deferred maintenance on the Property at the time of transfer;

2.16.5.3.    At least forty-five (45) days prior to such a transfer, Mortgagor provides Mortgagee with all of the material provisions of such transfer including without limitation the proposed date of transfer, the purchase price and the name, net worth, background, and address of the proposed transferee;

2.16.5.4.    Mortgagor provides Mortgagee with such evidence as Mortgagee may require demonstrating that the proposed transferee has assumed and shall fulfill each and every obligation of Mortgagor under the Loan Documents as such obligations pertain to the Property and that such transfer shall not affect or impair Mortgagee's security and rights under the Loan Documents;

2.16.5.5.    Such notice received under 2.16.5.3 above shall be accompanied by the payment to Mortgagee of a nonrefundable fee in the amount of fifty (50) basis points (.005) on the outstanding Principal Amount of the Loan in cash, cashier's check, or certified check in order to induce Mortgagee to allow the proposed transferee to assume the obligations of Mortgagor under the Loan Documents; such fee to be returned to Mortgagor if Mortgagee disapproves of such transfer;

2.16.5.6.    Mortgagee receives such documentation as Mortgagee shall reasonably require providing for the cross default and cross collateralization of each mortgage assumed by such transferee or its Affiliates which encumber any of the five properties which originally secured the loan made pursuant to the Commitment.

2.16.5.7.    Mortgagor shall pay for all of Mortgagee's costs and expenses (including reasonable attorneys' fees) associated with such transfer(s).

2.16.6.    Release.  Upon transfer of the Property pursuant to Section 2.16.4 or 2.16.5 hereof, the transferor shall be released from all obligations thereafter accruing hereunder.

2.17.    Compliance with Laws; Notice.  Mortgagor covenants and warrants that to the best knowledge of Mortgagor, the Property presently complies with and will continue to comply with all applicable restrictive covenants, applicable zoning and subdivision ordinances and building codes, all applicable health and Environmental Laws and all other applicable laws, rules and regulations (including but not limited to the obligation to maintain on the Property paved parking spaces in sufficient number and size to comply with the minimum parking requirements of all applicable zoning and other municipal regulations).  If Mortgagor receives notice from any federal, state or other governmental body that it or the Property is not in compliance with any

such covenant, ordinance, code, law or regulation, Mortgagor shall provide Mortgagee with a copy of such notice promptly.

2.18.  <u>Single Asset Entity</u>.  Mortgagor hereby warrants and represents to Mortgagee that Mortgagor is a single asset entity and owns no property other than the Property and that during the term of the Loan, Mortgagor shall acquire no Property other than the Property without the Mortgagee's consent.

2.19.  <u>Survival of Covenants, Representations and Warranties</u>.  Mortgagor shall fully and faithfully satisfy and perform the obligations of Mortgagor contained in the Loan Documents and each agreement of Mortgagor incorporated by reference therein or herein and any modification or amendment therefor.  All representations, warranties and covenants of Mortgagor contained therein or herein or incorporated by reference therein or herein shall survive the closing and funding of the loan evidenced by the Note and shall remain continuing obligations, warranties and representations of Mortgagor during any time when any portion of the Indebtedness secured by this Mortgage shall remain outstanding.

**ARTICLE THREE**
**ASSIGNMENT OF RENTS, ISSUES, PROFITS AND LEASES**

3.    <u>Assignment of Rents, Issues, Profits and Leases</u>.

3.1.  <u>Assignment of Rents</u>.  Mortgagor hereby collateraly assigns, transfers and pledges to Mortgagee, and grants Mortgagee a continuing security interest in and to all the Rents (whether now or hereafter existing), including without limitation, any and all rents, income, profits, bonuses, revenues, royalties, cash or security deposits, advance rentals and other payments, and further including Mortgagor's rights to enforce all present and future leases or subleases and to receive and enforce any rights that Mortgagor might have to collect rental and all other payments, and hereby gives to and confers upon Mortgagee the right, power and authority to collect such Rents in order to secure the payment and performance of the Indebtedness, up to the Maximum Amount, to the fullest extent permitted by La. R.S. 9:4401. Mortgagor irrevocably appoints Mortgagee Mortgagor's true and lawful attorney-in-fact, at the option of Mortgagee at any time and from time to time, to demand, receive and enforce payment, to give receipts, releases and satisfactions, and to sue, in the name of Mortgagor or Mortgagee, for all such Rents and apply them to the Indebtedness secured hereby.  The assignment of the Rents of the Property in this Article Three is intended to be an absolute assignment from Mortgagor to Mortgagee upon the occurrence of an Event of Default (as hereinafter defined).  Mortgagee may require Mortgagor to execute a separate instrument also assigning the Rents and Leases with respect to the Property.  If so, such separate document will be deemed to supplement this Article Three and not to supersede this Article and both this Article and such separate instrument may be enforced by Mortgagee against Mortgagor in accordance with their respective terms.

3.2.    Collection of Rents.  Mortgagee shall apply all Rents collected hereunder to any
Indebtedness secured hereby and in such order as Mortgagee may determine.  The collection of
such Rents, or the entering upon and taking possession of the Property, or the application thereof,
as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any
act done in response to such default or pursuant to such notice of default.

3.3.    Assignment of Leases.  Mortgagor hereby assigns, transfers and pledges to
Mortgagee, and grants Mortgagee continuing security interest in and to all present and future
Leases upon all or any part of the Property as additional security for the payment and
performance of the Indebtedness, up to the Maximum Amount, to the fullest extent permitted
by La. R.S. 9:4401, and further agrees to execute and deliver, at the request of Mortgagee, all
such further assurances and assignments of Leases with respect to the Property as Mortgagee
shall from time to time require.  Mortgagor, as lessor under every Lease now or hereafter
transferred or assigned to Mortgagee, its successors and assigns, shall perform and fulfill any
term, covenant, condition or provision in such Lease, on Mortgagor's part to be performed or
fulfilled, at the times and in the manner in said Lease provided, and under such assignment of
Lease.

3.4.    Covenants as to Leases.  Mortgagor may execute as Landlord leases or subleases
of the Property or any part thereof, subject to the following provisions:

3.4.1.  All proposed leases related to the Property and all amendments,
modifications, terminations or acceptances of surrender with respect to any existing leases
relating to the Property shall be subject to and contingent upon prior written approval thereof
by Mortgagee, and any lease or lease amendment, modification, termination or surrender entered
into by Mortgagor without such prior written approval shall be null and void and shall constitute
an Event of Default (hereinafter defined) hereunder.  Before entering into any proposed lease
(a "Proposed Lease"), Mortgagor shall deliver to Mortgagee for approval a term sheet ("Term
Sheet") for the Proposed Lease, the terms of which shall not deviate materially from the lease
form previously approved by Mortgagee.  Each Term Sheet shall describe the basic economic
terms of the Proposed Lease in reasonable detail (including, without limitation, the name of the
tenant, the space and area leased, the monthly rent, the lease term and any options or rental
concessions).  Mortgagee shall have a period of ten (10) business days following receipt of a
Term Sheet from Mortgagor to approve the terms of the Proposed Lease contained in the Term
Sheet.  Upon Mortgagee's approval of the Term Sheet in accordance herewith, Mortgagor may
enter into the Proposed Lease so long as such Proposed Lease does not deviate materially from
the Term Sheet.  Mortgagor shall deliver to Mortgagee, within thirty (30) days of tenant's
execution thereof, an executed duplicate original of each lease, and shall periodically, promptly
upon demand by Mortgagee, supply to Mortgagee a statement of all leases in effect at the time
of the statement, including details of the tenants, the rentals payable and all outstanding defaults
under such leases.

Lafayette, Louisiana                                28

3.4.2. Mortgagor shall perform all of the obligations on its part to be performed and enforce all of the obligations on the part of the tenants to be performed under all Leases of any part of the Property.

3.4.3. All Leases of any part of the Property shall be subordinate to this Mortgage; provided, however, that Mortgagee shall have the right at any time to require that any such Lease be made superior to the lien of this Mortgage at Mortgagor's expense; and provided further that Mortgagee shall have the right at any time and from time to time to require that any tenant under any such Lease execute a subordination, non-disturbance and attornment agreement in form and substance satisfactory to Mortgagee, and Mortgagee agrees upon Mortgagor's request or the request of any tenant to execute such subordination, non-disturbance and attornment agreement.

## ARTICLE FOUR
## SECURITY AGREEMENT

4.    Security Agreement.

4.1.    Creation of Security Interest.  Mortgagor hereby grants to Mortgagee a continuing security interest in Mortgagor's interest in all of the FF&E, the Accounts, Contracts and all other elements of personal (movable) property within the definition of the "Property" ("Personal Property") and the proceeds thereof, for the purpose of securing all obligations of Mortgagor contained in any of the Loan Documents.

4.2.    Warranties, Representations and Covenants of Mortgagor.  Mortgagor hereby warrants, represents and covenants as follows:

4.2.1. Except for the security interest granted hereby, Mortgagor is, and as to the portions of the Personal Property to be acquired after the date hereof will be, the sole owner of the Personal Property free from any lien, security interest, encumbrance or claim thereon of any kind whatsoever.  Mortgagor will notify Mortgagee of, and will defend the Personal Property against, all claims and demands of all persons at any time claiming the Personal Property or any interest therein.

4.2.2. Mortgagor will not assign, pledge, encumber, lease, sell, convey or in any manner transfer the Personal Property or portions thereof without the prior written consent of Mortgagee except as otherwise permitted under the Loan Documents.  All of the Personal Property attached to, incorporated into or to be incorporated into the Property will be kept free and clear of all chattel mortgages, liens, conditional vendor's liens, encumbrances and security interests, except as expressly waived in writing by Mortgagee.

4.2.3. The Personal Property is not and will not be used or acquired for personal, family or household purposes.

Lafayette, Louisiana                                    29

4.2.4. The Personal Property will be kept on or at the Property, and Mortgagor will not remove any portion or item of Personal Property affixed or attached to the Property without the prior written consent of Mortgagee, except such portions or items of Personal Property which are consumed or worn out in ordinary usage, and are promptly replaced by Mortgagor with new items of equal or greater quality.

4.2.5. At the request of Mortgagee, Mortgagor will join Mortgagee in executing one or more financing statements and renewals, continuation statements and amendments thereof pursuant to the State Uniform Commercial Code in form satisfactory to Mortgagee, and will pay the cost of filing the same in all public offices wherever filing is deemed by Mortgagee to be necessary or desirable. Without limiting the foregoing, Mortgagor hereby irrevocably appoints Mortgagee attorney-in-fact for Mortgagor to execute, deliver and file such instruments for and on behalf of Mortgagor, and Mortgagor will pay the costs of any such filing.

4.2.6. This Mortgage constitutes a Security Agreement as defined in Chapter 9 of the Uniform Commercial Code.

4.2.7. Notwithstanding any release of any or all of the Property which is deemed "real property", or "immovable property" any proceedings to foreclose this Mortgage or its satisfaction of record, the terms hereof shall survive as a security agreement with respect to the security interest created hereby and referred to above until the repayment or satisfaction in full of the obligations of Mortgagor as are now or hereafter evidenced by the Note.

4.2.8. Mortgagor hereby appoints Mortgagee or substitutes appointed by Mortgagee or its successors and assigns as Mortgagor's true and lawful attorney, for Mortgagor and in Mortgagor's name to perform and do all every act and thing whatsoever requisite and necessary to be done under all contracts, licenses, leases and similar documents and agreements in which Mortgagee has a security interest, upon an Event of Default hereunder. This appointment shall be coupled with an interest and shall be non-cancelable except upon satisfaction of the Indebtedness secured hereby. Mortgagor hereby ratifies and confirms all that Mortgagee shall lawfully do or cause to be done pursuant hereto.

## ARTICLE FIVE
## REMEDIES UPON DEFAULT

5.    Remedies Upon Default.

5.1.    Events of Default.  The occurrence of any one or more of the following events shall constitute a default (an "Event of Default") by Mortgagor hereunder:

5.1.1. Provided Mortgagee has given Mortgagor five (5) business days notice of a monetary default, failure by Mortgagor to pay within five (5) business days of the date when due (i) any periodic installment of interest or principal due under the Note, or (ii) the

outstanding principal balance of the Note, together with interest accrued thereon and any other expenses then due, at Maturity of the Note, whether by acceleration or otherwise, or upon prepayment of the Note; or

      5.1.2. A breach of or default by Mortgagor under any other term, covenant, agreement, condition or provision, contained in this Mortgage or any other of the Loan Documents not otherwise expressly the subject of this Section 5.1 which breach or default remains uncured for more than thirty (30) days following Mortgagee's written notice to Mortgagor thereof provided, however, (i) if such default relates to the failure to pay any Impositions as provided herein or any insurance premiums with respect to any insurance required to be kept in force hereunder, the time within which to cure such default shall be fifteen (15) days following written notice, not thirty (30) days, and (ii) if such default, by its nature, cannot be cured within such thirty (30) day period then Mortgagee shall not be in default hereunder if, during such thirty (30) day period Mortgagee commences to cure such default and thereafter diligently pursues such cure to completion; or

      5.1.3. Mortgagor shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Mortgagor or of all or any part of the Property, or of any or all of the royalties, revenues or rents thereof, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due; or

      5.1.4. A court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Mortgagor seeking any reorganization, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the first day of entry thereof; or any trustee, receiver or liquidator of Mortgagor or of all or any part of the Property, or of any or all of the Rents thereof, shall be appointed without the consent or acquiescence of Mortgagor and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

      5.1.5. A writ of execution or attachment or any similar process shall be issued or levied against all or any part of or interest in the Property, or any judgment involving monetary damages shall be entered against Mortgagor which shall become a lien on the Property or any portion thereof or interest therein, and such execution, attachment or similar process or judgment is not released, bonded, satisfied, vacated or stayed within thirty (30) days after its entry or levy; or

Lafayette, Louisiana

5.1.6. There shall have occurred a transfer of title, conveyance, transfer of control or disposition by Mortgagor of all or any part of Mortgagor's right, title and interest in and to the Property, or any part thereof, whether voluntarily or by operation of law, any secondary financing in violation hereof, except as herein otherwise permitted; or

5.1.7. Any representation or warranty made by Mortgagor in any Loan Document or in any other instrument which pertains to this Mortgage or any obligation secured hereby proves to be incorrect when made in any material respect; or

5.1.8. A default by Mortgagor in any payment of principal or interest on any other obligation for borrowed money other than obligations secured under the Loan Documents, if an effect of such default is to cause, or permit such obligation to become due prior to its stated maturity; or

5.1.9. The occurrence of a default (i) under any encumbrance or other mortgage affecting all or any portion of the Property or any other event permitting acceleration of the maturity of any indebtedness secured thereby, (ii) by Mortgagor under the terms of any Lease affecting all or any portion of the Property, (ii) under any other indebtedness of Mortgagor to Mortgagee, or (iv) under any other indebtedness or obligation of Mortgagor permitting acceleration of any such indebtedness or obligation which is secured by a lien or mortgage on any real property of Mortgagor; or

5.1.10.        A final judgment or judgments for the payment of money in excess of $10,000 shall be rendered against Mortgagor and the same shall remain undischarged or unbonded for a period of thirty (30) consecutive days; or

5.1.11.        Any Improvement or other material part of the Property is demolished, removed, substantially altered (in violation of this Mortgage) or is substantially damaged or destroyed by an uninsured casualty and Mortgagor, unless the obligation to carry insurance has been excused, fails to provide satisfactory evidence to Mortgagee within thirty (30) days of such casualty that the necessary funds for satisfactory restoration of the Improvements will be available at the time of restoration; or

5.1.12.        The entry by any court of last resort of a decision that any material undertaking by Mortgagor herein provided to pay the Indebtedness, Impositions or other obligations assumed by Mortgagor hereunder is legally inoperative or cannot be enforced; or

5.1.13.        Liquidation or dissolution of Mortgagor; or

5.1.14.        The occurrence of an Event of Default under the mortgage which secures the Guaranty; or

5.1.15.        The occurrence of an event of default under the Guaranty; or

5.1.16.    The occurrence of an event which, pursuant to the terms of any of the other Loan Documents is deemed to constitute an Event of Default hereunder.

5.2.    <u>Acceleration Upon Default</u>.  Upon the occurrence of an Event of Default, Mortgagee may declare all Indebtedness secured hereby to be due and payable and the same shall thereupon become due and payable without any presentment, demand, protest or notice of any kind.  When the entire Indebtedness shall become due and payable, either because of maturity or because of the occurrence of an Event of Default, or otherwise, then forthwith, Mortgagee may, to the fullest extent allowed by law:

5.2.1. Commence an action to foreclose this Mortgage, appoint a receiver or keeper, or specifically enforce any of the covenants hereof;

5.2.2. Exercise any or all of the remedies available to a secured party under Chapter 9 of the Uniform Commercial Code, including, but not limited to:

5.2.2.1.    Either personally or by means of a court appointed receiver or keeper, taking possession of all or any of the Personal Property and excluding therefrom Mortgagor and all others claiming under Mortgagor, and thereafter holding, storing, using, operating, managing, maintaining and controlling, making repairs, replacements, alterations, additions and improvements to and exercising all rights and powers of Mortgagor in respect of the Personal Property or any part thereof.  In the event Mortgagee demands or attempts to take possession of the Personal Property in the exercise of any rights under any of the Loan Documents, Mortgagor promises and agrees promptly to turn over and deliver complete possession thereof to Mortgagee;

5.2.2.2.    Without notice to or demand upon Mortgagor, making such payments and doing such acts as Mortgagee may deem necessary to protect its security interest in the Personal Property, including without limitation, paying, purchasing, contesting or compromising any encumbrance, charge or lien which is prior to or superior to the security interest granted hereunder, and in exercising any such powers or authority to pay all expenses incurred in connection therewith;

5.2.2.3.    Require Mortgagor to assemble the Personal Property or any portion thereof, at a place designated by Mortgagee and reasonably convenient to both parties, and promptly to deliver such Personal Property to Mortgagee, or an agent or representative designated by it. Mortgagee, and its agents and representatives shall have the right to enter upon any or all of Mortgagor's Property and other property to exercise Mortgagee's rights hereunder;

5.2.2.4.    Sell, lease or otherwise dispose of the Personal Property at public sale, with or without having the Personal Property at the place of sale, and upon such terms and in such manner as Mortgagee may determine. Mortgagee may be a purchaser at any such sale.  Unless the Personal Property is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Mortgagee shall give Mortgagor at least

Lafayette, Louisiana                                            33

ten (10) days prior written notice of the time and place of any public sale of the Personal Property or other intended disposition thereof. Such notice may be mailed to Mortgagor at the address set forth at the beginning of this Mortgage.

      5.2.3. <u>Confession of Judgment</u>.    For purposes of foreclosure under Louisiana executory process procedures, effective upon an Event of Default Mortgagor confesses judgment and acknowledges to be indebted unto and in favor of Mortgagee, up to the full amount of the Indebtedness, in principal, interest, costs, expenses, and attorneys' fees. To the extent permitted under applicable Louisiana law, Mortgagor waives: (a) the benefit of appraisal as provided in Articles 2332, 2336, 2723 and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (b) the demand and three (3) days' delay as provided under Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (c) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (d) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (e) all other benefits provided under Articles 2331, 2722 and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above. To the fullest extent allowed by law, for the purpose of enabling Mortgagee to obtain possession of the Property upon the occurrence of any Event of Default hereunder, Mortgagor hereby authorizes and empowers any attorney of any court of record in the State or elsewhere, as attorney for Mortgagor and all persons claiming under or through Mortgagor, to sign an agreement for entering in any competent court an amicable action in ejectment for possession of the Property and to appear for and confess judgment against Mortgagor, and against all persons claiming under or through Mortgagor, in favor of Mortgagee, for recovery by Mortgagee of possession thereof, for which this Mortgage, or a copy thereof verified by affidavit, shall be sufficient warrant; and thereupon a writ of possession may immediately issue for possession of the Property, without any prior writ or proceeding whatsoever and without any stay of execution. If for any reason after such action has been commenced it shall be discontinued, or possession of the Property shall remain in or be restored to Mortgagor, or if Mortgagee shall at first obtain possession of only a portion of the Property Mortgagee shall have the right for the same default or any subsequent default to bring one or more further amicable actions as above provided to recover possession of the Property (or the remainder thereof). Mortgagee may bring an amicable action in ejectment and confess judgment therein before or after the institution of proceedings to foreclose this Mortgage or to enforce the Note or any other Loan Document or after entry of judgment therein or on any of the Note, or after a sheriff's sale of the Property in which Mortgagee is the successful bidder, it being the understanding of the parties that the authorization to pursue such proceedings for obtaining possession and confession of judgment therein is an essential part of the remedies for enforcement of this Mortgage, the Note and the other Loan Documents, and shall survive any execution sale to Mortgagee;

    5.3.    <u>Foreclosure and Other Actions by Mortgagee</u>.    When the Indebtedness hereby secured, or any part thereof, shall become due, whether upon Maturity, by acceleration, or otherwise, Mortgagee may institute one or more actions of mortgage foreclosure against the Property (or any portion thereof), or take such other action at law or in equity for the enforcement of this Mortgage and the Note and realization on the Property or any other security

herein or elsewhere provided for as the law may allow, and may proceed therein to final judgment and execution for the entire unpaid balance of the Indebtedness, with interest at the Contract Interest Rate stipulated in the Note to the date of default, and thereafter at the Default Rate together with all other sums due by Mortgagor in accordance with the provisions of the Note, this Mortgage, and the other Loan Documents, such amount may include all sums which may have been loaned by Mortgagee to Mortgagor after the date of this Mortgage and pursuant to the terms of this Mortgage, and all sums which may have been paid, incurred or advanced by or on behalf of Mortgagee for taxes, water or sewer rents, charges or claims, payments or prior liens, insurance or repairs to the Property, appraiser's fees, outlays for documentary and expert evidence, stenographers' charges, publication costs, and costs (which may be estimated as to items to be expended after entry of judgment) of procuring all such abstracts of title, title searches and examinations, title insurance policies, and similar data and assurances with respect to title as Mortgagee may deem reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such judgment the true condition of the title to or the value of the Property, all costs of suit, all expenses and fees as may be incurred in the protection of the Property and the maintenance of this Mortgage, including but not limited to reasonable fees of any attorney empowered by Mortgagee in any litigation or proceeding affecting this Mortgage or any other Loan Document including probate and bankruptcy proceedings or in the preparation for the commencement or defense of any proceeding or threatened suit or proceeding and all costs incurred by Mortgagee in the exercise of its right of possession as set forth herein and any other costs incurred by Mortgagee in proceeding hereunder. In the event that Mortgagee elects to commence appropriate Louisiana foreclosure proceedings under this Mortgage, Mortgagee may cause the mortgaged Property, or any part or parts thereof, to be immediately seized and sold, whether in term of court or in vacation, under ordinary or executory process, in accordance with applicable Louisiana law, to the highest bidder for cash, with or without appraisement, and without the necessity of making additional demand upon or notifying Mortgagor or placing Mortgagor in default, all of which are expressly waived. Any real estate or interest therein sold pursuant to any writ of execution issued on a judgment obtained by virtue of the Note or this Mortgage, or pursuant to any other judicial proceedings under this Mortgage, may be sold in one parcel, as an entirety, or in such parcels, and such interests, and in such manner or order as Mortgagee in its sole discretion may elect. In the event that Mortgagee elects to exercise its remedies hereunder with respect to a portion, but not all, of the Property securing the Loan, no such election or exercise shall impair or otherwise affect Mortgagee's lien upon or rights with respect to the remainder of such property. Mortgagee shall not be required to accept any part or parts of the Property, as distinguished from the whole, as payment of or for the Indebtedness notwithstanding the value of said part or parts and Mortgagee shall not be compelled to accept or allow such apportionment of the Indebtedness to any part of the Property. Mortgagee agrees that any court having jurisdiction to foreclose this Mortgage may sell the Property in part or as an entity.

5.4.    <u>Recovery of Expenses by Mortgagee</u>. All expenditures and expenses incurred by Mortgagee and added to the Indebtedness hereunder, shall be immediately due and payable by Mortgagor, with interest thereon at the Default Rate specified in Note and shall be secured by this Mortgage. Mortgagee shall have the right, from time to time, to bring an appropriate action

to recover any sums required to be paid by Mortgagor under the terms of this Mortgage, as they become due, without regard to whether or not the principal Indebtedness or any other sums evidenced by the Note and secured by this Mortgage shall be due, and without prejudice to the right of Mortgagee thereafter to bring an action of mortgage foreclosure, or any other action, for any default by Mortgagor existing at the time the earlier action was commenced.

5.5.   Mortgagee's Right of Possession in Case of Default.  In any case in which under the provisions of this Mortgage Mortgagee has a right to institute foreclosure proceedings, whether before or after the Indebtedness secured hereby is declared to be immediately due, and whether before or after the institution of legal proceedings to foreclose this Mortgage and before or after sale thereunder, Mortgagee in its own discretion, without obligation so to do and without notice to or demand upon Mortgagor, except as specifically provided herein, and without releasing Mortgagor from any obligation, may make any payment or do any act in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof, including demanding the surrender of possession of the Property in which case Mortgagor shall so surrender to Mortgagee and Mortgagee shall be entitled to take actual possession of the Property or any part thereof personally or by its agent or attorneys.  In connection therewith Mortgagee shall have and is hereby given the right (to the fullest extent allowed by law) but not the obligation (without limiting the foregoing general powers) (i) with or without force, or without proceeding by process of law, enter upon and take and maintain possession of all or any part of the Property together with all documents, books, records, papers and accounts of Mortgagor relating thereto and may exclude Mortgagor and Mortgagor's agents or servants wholly therefrom (and if Mortgagee permits Mortgagor to remain in possession of any part of the Property, Mortgagor will pay monthly in advance to Mortgagee, on Mortgagee's entry into possession or to any receiver or keeper appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in the actual possession of Mortgagor, and upon default of any such payment Mortgagor will vacate and surrender possession of such part of the Property to Mortgagee or to such receiver or keeper and, in default thereof Mortgagor may be evicted by summary proceeding or otherwise) and may, as attorney-in-fact or agent of Mortgagor or in its own name as Mortgagee and under the powers herein granted, hold, operate, manage and control the Property and conduct the business, if any, thereof either personally or by its agents and with full power to use such measures legal or equitable as, in its discretion or in the discretion of its successors or assigns, may be deemed proper or necessary to enforce the payment or security of the Rents, value, marketability or rentability of the Property; (ii) to cancel or terminate any Lease for any cause or on any grounds which would entitle Mortgagor to cancel such Lease; (iii) to extend or modify any then existing Leases and to make new Leases, which extensions, modifications and new leases may provide for terms to expire beyond the maturity date of the Indebtedness secured hereby and beyond the date of the issuance of a deed or deeds to a purchaser or purchasers at a foreclosure sale, it being understood and agreed that any such leases, and the options or other such provisions to be contained therein, shall be binding upon Mortgagor and all persons whose interests in the Property are subject to the lien hereof and upon the purchaser or purchasers at any foreclosure sale, notwithstanding any discharge or satisfaction of the mortgage Indebtedness, satisfaction of any foreclosure decree or deficiency judgment, or issuance of any bill of sale or deed to any

purchaser; (iv) to make all necessary or proper repairs, decorations, renewals, replacements, alterations, additions, betterments and improvements to the Property as may seem judicious to Mortgagee; (v) to insure and reinsure the Property and all risks incidental to Mortgagee's possession, operation and management thereof; (vi) to receive all of such Rents hereby granting full power and authority to exercise each and every of the rights, privileges and powers herein granted at any and all times hereafter, without notice to Mortgagor; (vii) to appear and participate in any action or proceeding affecting or which may affect the security hereof or the rights or powers of Mortgagee; (viii) to pay, purchase, contest or compromise any encumbrance, claim, charge, lien or debt which, in the judgment of Mortgagee, may affect or appears to affect the security of this Mortgage or be prior or superior hereto; (ix) in exercising such powers, to pay necessary expenses, including employment of counsel or other necessary or desirable consultants; (x) to elect to disaffirm any lease or sublease, which is then subordinate to the lien hereof. Notwithstanding the foregoing rights and powers of Mortgagee, Mortgagee shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability under any lease of the Property or any part thereof. Mortgagor shall and does hereby agree to indemnify and hold Mortgagee harmless of and from any and all liability, loss or damage which it may or might incur under such leases or under or by reason of the assignment thereof and of and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in such leases, except for the acts of Mortgagee as a tenant under such leases. Should Mortgagee incur any such liability, loss or damage, under such leases or under or by reason of the assignment thereof, or in the defense of any claims or demands with respect thereto, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured hereby, and Mortgagor shall reimburse Mortgagee therefor immediately upon demand.

5.6.    <u>Application of Income Received by Mortgagee</u>. Mortgagee, in the exercise of the rights and powers hereinabove conferred upon it by this Article Five or otherwise herein, shall have full power to use and apply the Rents of the Property to the payment of or on account of the following, in such order as Mortgagee may determine:

5.6.1. to costs of collection and sale of the Property or portions thereof;

5.6.2. to the payment of the operating expenses of the Property, including cost of management and leasing thereof (which shall include reasonable compensation to Mortgagee and its agent or agents including any receiver or keeper, if management be delegated to an agent or agents, and shall also include lease commissions and other compensation and expenses of seeking and procuring tenants and entering into leases), established claims for damages, if any, and premiums on insurance hereinabove authorized;

5.6.3. to the payments of Impositions now due or which may hereafter become due on the Property, and of all rents due or which may hereafter become due under any underlying lease;

5.6.4. to the payment of all repairs, decorating, renewals, replacements, alternations, additions, betterment, and improvements of the Property, including the cost from time to time of installing or replacing the Personal Property therein, and of placing the Property in such condition as will, in the judgment of Mortgagee, make it readily rentable; and/or

5.6.5. to the payment of any Indebtedness secured hereby or any deficiency which may result from any foreclosure sale upon the Property, or any part thereof.

.5.7.    Appointment of Keeper. Should any or all of the property be seized as an incident to an action for the recognition or enforcement of this Mortgage, by executory process, sequestration, attachment, writ of fieri facias or otherwise, Mortgagor hereby agrees that the court issuing any such order shall, if requested by Mortgagee, appoint Mortgagee, or any agent designated by Mortgagee, or any person or entity named by Mortgagee at the time such seizure is requested, or any time thereafter, as Keeper of the mortgaged Property as provided under La. R.S. 9:5136, et seq. Such a Keeper shall be entitled to reasonable compensation. Mortgagor agrees to pay the reasonable fees of such Keeper, which are hereby fixed at the lesser of market rate or $50.00 per hour, which compensation to the Keeper shall also be secured by this Mortgage as provided herein. Such a Keeper shall have all powers allowed by La. R.S. 9:5136, et seq., including without limitation, the power to: (i) to collect the Rents of the Property during the pendency of any foreclosure suit as well as during any other times when Mortgagor, except for the intervention of such receiver, would be entitled to collect such Rents; (ii) to extend or modify any then existing Leases and to make new Leases, which extensions, modifications and new Leases may provide for terms to expire, or for options to lessees to extend or renew terms to expire, beyond the maturity date of the Indebtedness secured hereby and beyond the date of the issuance of a deed or deeds to a purchaser or purchasers at a foreclosure sale, it being understood and agreed that any such Leases, and the options or other such provisions to be contained therein, shall be binding upon Mortgagor and all persons whose interests in the Property are subject to the lien hereof and upon the purchaser or purchasers at any foreclosure sale, notwithstanding any discharge or satisfaction of the mortgage Indebtedness, satisfaction of any foreclosure decree or deficiency judgment, or issuance of any bill of sale or deed to any purchaser; (iii) to exercise all other powers which may be necessary or are usual in such cases for the protection, possession, control, management and operation of the Property during the whole of such period; and (iv) as may otherwise be granted by the court or under applicable law. Any receiver or keeper shall, upon receipt of authority from the court and upon application to the court from Mortgagee, apply the net income in his hands in payment in whole or in part to: (1) the Indebtedness secured hereby, or by any judgment or decree foreclosing this Mortgage, or any Imposition or other lien which may be or become superior to the lien hereof or of such judgment or decree, provided such application is made prior to foreclosure sale; (2) and all rents due or which may become due under the superior lease if this is a leasehold mortgage; and (3) the deficiency judgment, in case of a foreclosure sale and deficiency judgment. Mortgagee shall be liable to account only for Rents actually received by Mortgagee received pursuant to this Section and not for Rents held by the receiver. Notwithstanding the appointment of any receiver, keeper, or other custodian, Mortgagee shall be entitled to the

continued possession and control of any cash, deposits or instruments at the time held by or payable or deliverable under the terms of this Mortgage to Mortgagee.

5.8.   Declaration of Fact.   Should it become necessary for Mortgagee to foreclose under this Mortgage, all declarations of fact, which are made under an authentic act before a Notary Public in the presence of two witnesses, by a person declaring such facts to lie within his or her knowledge, shall constitute authentic evidence for purposes of executory process and also for purposes of La. R.S. 9:3509.1, La. R.S. 9:3504(D)(6) and La. R.S. 10:9-508, where applicable.

5.9.   Separate Sale of Mortgagor's Rights Following Default.   Should one or more Events of Default occur or exist under this Mortgage, Mortgagee shall have the additional right, at its sole option, to separately sell the Property, or any part or parts thereof, at private or public sale, at such price or prices as Mortgagee may deem best, either for cash or for any other compensation, or on credit, or for future delivery, without the assumption of any credit risk. The sale of the Property may be without appraisement, the benefit of which is also expressly waived by Mortgagor.   Mortgagee may exercise any other remedies with regard to the Property as may be authorized under the Louisiana Commercial Laws (La. R.S. 10:1-101, et seq.).

5.10.   Automatic Transfer of Rights.   In the event of foreclosure under this Mortgage, or other transfer of title or assignment of the Property, or any part or parts thereof, in lieu of payment of the Note, whether in whole or in part, all policies of insurance and other rights applicable to the foreclosed upon or transferred Property shall automatically inure to the benefit of and shall pass to the purchaser(s) or transferee(s) thereof, subject to the rights of the purchaser(s) or transferee(s) to reject such insurance coverage and/or rights at its or their sole option and election.

5.11.   Mortgagee's Right To Directly Collect And Receive Proceeds And Payments After Default.   Mortgagee shall have the right, at its sole option and election, upon the occurrence of an Event of Default, to directly collect and receive all proceeds and/or payments arising under or in any way accruing from the Property, as such amounts become due and payable.   In order to permit the foregoing, Mortgagor unconditionally agrees to deliver to Mortgagee, immediately following demand following an Event of Default, any and all of Mortgagor's records, ledger sheets, and other documentation, in the form requested by Mortgagee, with regard to the Property and any and all proceeds and/or payments applicable thereto.

Mortgagee shall have the further right, upon the occurrence of an Event of Default, where appropriate and within Mortgagee's sole discretion, to file suit, either in Mortgagee's own name or in the name of Mortgagor, to collect any and all proceeds and payments that may then and/or in the future be due and owing under and/or as a result of the Property.   Where it is necessary for Mortgagee to attempt to collect any such proceeds and/or payments from the obligors therefor, Mortgagee may compromise, settle, extend, or renew for any period (whether or not longer than the original period) any obligation or indebtedness thereunder or evidenced thereby, or surrender, release, or exchange all or any part of said obligation or indebtedness, without affecting the liability of Mortgagor under this Mortgage or under the Note.   To that end,

Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact, coupled with an interest and with full power of substitution, to take any and all such actions and any and all other actions permitted hereby, either in the name of Mortgagor or Mortgagee.

In order to permit the foregoing, Mortgagee shall have the additional irrevocable right, coupled with an interest, following an Event of Default, to: (A) remove any and all of Mortgagor's documents, instruments, files and records relating or pertaining to the Property from any premises where the same shall then be located; (B) endorse Mortgagor's name on any and all notes, acceptances, checks, drafts, money orders, or other evidences of payment of such proceeds and/or payments that may come into Mortgagee's possession, and to deposit or otherwise collect the same; (C) prepare and mail invoices and/or statements to such obligors and/or debtors; and (D) send verifications of amounts owed to such obligors and/or debtors. In the event that Mortgagor should, for any reason whatsoever, receive any proceeds derived from the sale, lease, insurance loss, damage and/or condemnation, of all or any part of the Property and/or Mortgagor's assigned and pledged rights, or should Mortgagor receive any other payments from the Property as provided hereunder (with such proceeds and/or payments being hereinafter individually, collectively and interchangeably referred to as Mortgagor's "Funds"), following notice to the obligors or debtors thereunder to make their respective payments directly to Mortgagee, Mortgagor shall hold such Funds in trust for and on behalf of Mortgagee, and Mortgagor hereby unconditionally agrees to remit or to otherwise turn over such Funds to Mortgagee immediately following demand.

5.12. <u>Remedies Not Exclusive</u>. Mortgagor hereby agrees that:

5.12.1.    Mortgagee shall be entitled to enforce payment and performance of any Indebtedness or obligation secured hereby and to exercise all rights, remedies and powers under this Mortgage or any other Loan Documents and the warrants contained therein or any other agreement or any laws now or hereafter in force, notwithstanding that some or all of such Indebtedness and obligations secured hereby may now or hereafter be otherwise secured, whether by mortgage, deed of trust, pledge, lien, assignment or otherwise. Neither the acceptance of this Mortgage nor its enforcement whether by court action or other powers herein contained shall prejudice or in any manner affect Mortgagee's right to realize upon or enforce this Mortgage and any other security now or hereafter held by Mortgagee in such order and manner as it may in its absolute discretion determine.

5.12.2.    No remedy herein conferred upon or reserved to Mortgagee is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute, and nothing under this Mortgage shall be construed as to limit or restrict the options and remedies available to Mortgagee following any Event of Default, or to in any way limit or restrict the rights and ability of Mortgagee to proceed directly against Mortgagor and/or any guarantor or endorser of the Note, or to proceed against other collateral directly or indirectly securing any of the Note. Every power or remedy given by any of the Loan Documents to Mortgagee or to which it may be otherwise entitled may be

Lafayette, Louisiana                              40

exercised separately, successively, concurrently or independently, from time to time and as often as it may be deemed expedient by Mortgagee, and Mortgagee may pursue inconsistent remedies.

        5.12.3.      The failure by Mortgagee or any holder of the Note to exercise any right, power or remedy herein or at law or in equity shall in no event be construed as a waiver or release thereof or of any Event of Default. Any failure by Mortgagee to insist upon strict performance by Mortgagor of any of the terms and provisions of this Mortgage or of the other Loan Documents shall not be deemed to be a waiver of any of the terms or provisions of the Mortgage or other Loan Documents, and Mortgagee shall have the right thereafter to insist upon strict performance by Mortgagor of any and all of them.

        5.12.4.      Neither Mortgagor nor any other person now or hereafter obligated for payment of all or any part of the sums now or hereafter secured by this Mortgage shall be relieved of such obligation by reason of the failure of Mortgagee to comply with any request of Mortgagor or of any other person so obligated to take action to foreclose on this Mortgage or otherwise enforce any provisions of the Mortgage or the other Loan Documents, or by reason of the release, regardless of consideration, of all or any part of the security held for the Indebtedness secured by this Mortgage, or by reason of any agreement or stipulation between any subsequent owner of the Property or any interest therein and Mortgagee extending the time of payment or modifying the terms of the Mortgage or other Loan Documents without first having obtained the consent of Mortgagor or such other person; and in the latter event Mortgagor and all such other persons shall continue to be liable to make payments according to the terms of any such extension or modification agreement, unless expressly released and discharged in writing by Mortgagee.

        5.12.5.      Mortgagee may release, regardless of consideration, any part of the security held for the Indebtedness secured by this Mortgage without, as to the remainder of the security, in any way impairing or affecting the lien of this Mortgage or its priority over any subordinate lien.

      5.13.  Counsel Fees.  If Mortgagee becomes a party to any suit or proceeding affecting the Property or title thereto, the lien created by this Mortgage or Mortgagee's interest therein, or if Mortgagee or any successor or assignee of Mortgagee has engaged counsel to prepare or review any of the Loan Documents, in preparation for an assignment by Mortgagee of the Loan Documents or any of them, the costs, expenses and reasonable counsel fees of Mortgagee and such assignee shall be paid by Mortgagor to Mortgagee or such assignee, as appropriate, on demand, with interest at the then effective Contract Interest Rate set forth in the Note, and until paid they shall be deemed to be part of the Indebtedness evidenced by the Note and secured by this Mortgage.

      5.14.  Exculpation.  This Mortgage is subject to the exculpation provisions and exceptions therefrom contained in the Note, which provisions are incorporated herein by this reference.

## ARTICLE SIX
### ENVIRONMENTAL REPRESENTATIONS, COVENANTS AND WARRANTIES

6.    <u>Environmental Representations, Covenants and Warranties.</u>

    6.1.    <u>General</u>. The following additional provisions with regard to the environmental status of the Property are a part of this Mortgage.

    6.2.    <u>Representations and Warranties</u>. Mortgagor represents and warrants to Mortgagee that:

        6.2.1. To the best knowledge of Mortgagor after reasonable inquiry the Property is free of any Contaminants and neither Mortgagor nor, to the best knowledge of Mortgagor, any other person (including but not limited to prior owners, occupiers and tenants) has ever caused or permitted any Contaminant to be manufactured, placed, generated, stored, held, transferred, processed, produced, transported or disposed on, at, through or under the Property and neither the Property nor any property adjacent thereto has ever been used (whether by Mortgagor or, to the best knowledge of Mortgagor, by any other person) as a location for the manufacture, placement, storage, location or disposal of any Contaminants.

        6.2.2. Neither Mortgagor nor, to the best knowledge of Mortgagor, any other person (including but not limited to prior owners, occupiers and tenants), has ever caused or permitted any Contaminant to be manufactured, placed, stored, held, transferred, processed, produced, transported, located or disposed of on, under or at any other real property owned, occupied (under leases or licenses or otherwise) or operated by Mortgagor.

        6.2.3. No lien has or is currently attached to any revenues or any real or personal property owned by Mortgagor (including but not limited to the Property) under any Environmental Law or as a result of any governmental entity expending monies as a result of any alleged Release or the existence of any Contaminant on or about the Property or a breach of an Environmental Law. Furthermore, Mortgagor has no notice, written or oral, that any claim for such lien has or is about to be made.

        6.2.4. Mortgagor has caused no condition to exist (by its action or inaction, intentional or unintentional) and to the best of Mortgagor's knowledge, after diligent inquiry, no condition does exist, as to any parcel of property contiguous with the Property or located within five hundred (500) yards of the perimeter of the Property which would require disclosure under this Section if such property were the Property.

        6.2.5. Neither Mortgagor nor, to the best knowledge of Mortgagor, any other person (including but not limited to prior owners, occupants and tenants) has received any notice, written or oral, or advice of any contemplated, proposed or pending Enforcement Action with respect to the Property.

6.2.6. Mortgagor has conducted or caused to be conducted by a consultant acceptable to Mortgagee a site assessment of the Property to confirm the absence of Contaminants on the Property or violations of Environmental Laws with respect to the Property. Mortgagor's consultant has found no evidence of the presence of such Contaminants or the violation of such Environmental Laws. A copy of said consultant's report has been delivered to Mortgagee and Mortgagee has been authorized by Mortgagor and its consultant to rely upon said report in agreeing to make the Loan secured by this Mortgage.

6.3. <u>Mortgagor's Covenants</u>. Mortgagor will establish and maintain, at Mortgagor's sole expense, a system to assure and monitor continued compliance with Environmental Laws and the exclusion of Contaminants from the Property, by any and all owners or operators of the Property, which system shall include annual reviews of such compliance by employees or agents of Mortgagor who are familiar with the requirements of the Environmental Laws and, at the request of Mortgagee no more than once each year, a detailed review of such compliance of the environmental condition of the Property ("Environmental Compliance Report") in scope satisfactory to Mortgagee by an environmental consulting firm approved in advance by Mortgagee; provided, however, that if any Environmental Compliance Report indicates a violation of any Environmental Law, such system shall include at the request of Mortgagee a detailed review ("Environmental Remediation Report") of the status of such violation by such environmental consultant. Mortgagor shall furnish each Environmental Compliance Report or Environmental Remediation Report to the Mortgagee within sixty (60) days after Mortgagee so requests, together with such additional information as Mortgagee may reasonably request. So long as the Circuit City Lease remains in effect and the Tenant is not in default beyond any applicable notice and grace periods thereunder, the foregoing requirement shall be waived.

6.3.1. Mortgagor will keep the Property and any other real property owned, occupied or operated by Mortgagor free of any Contaminants and in compliance with applicable Environmental Laws.

6.3.2. Mortgagor will not use the Property or any other real property owned, operated or occupied by Mortgagor for the manufacture, placement, generation, handling, storage, location or disposal of any Contaminants nor permit the Property or any other property owned, occupied or operated by it to be used in such a manner except in accordance with applicable law.

6.3.3. Mortgagor shall not cause or permit to exist as a result of any intentional or unintentional action or omission on its part or for which it is responsible under applicable Environmental Laws a Release of any Contaminant unless and to the extent such Release is made pursuant to and in compliance with the conditions of a permit issued by all appropriate federal and/or state governmental authorities.

6.3.4. Mortgagor shall at its own expense procure, maintain in effect, and comply with all conditions of any and all permits, licenses, and other governmental and regulatory

approvals required under any Environmental Law required for Mortgagor's use and occupancy of the Property.

6.3.5. In the event of any Release of a Contaminant onto the Property or onto any other property owned, occupied or leased by Mortgagor or for which Mortgagor is otherwise responsible under applicable Environmental Laws, it shall promptly remediate such Release in accordance with the provisions of all applicable Loan Documents (if any) and all Environmental Laws of appropriate governmental entities and authorities having jurisdiction.

6.3.6. Mortgagor shall provide notice in writing to Mortgagee of any of the following within three (3) business days:

6.3.6.1.    A Release of any Contaminant onto the Property or onto any other real property owned, occupied or operated by Mortgagor for which Release it is or may be responsible or with respect to which such responsibility is asserted by a governmental agency or, in any private cause of action, by a party to such suit under applicable law; or

6.3.6.2.    Any notice of any pending or threatened Enforcement Action with respect to Mortgagor or the Property including copies of complaints, orders, citations or notices from any person or entity including, without limitation, the U.S. Environmental Protection Agency and applicable state agencies.

6.3.7. In the event Mortgagor leases or enters into any operating agreement pursuant to which any third party may operate any business or control any portion of the Property, Mortgagor shall cause to be included in any such lease or operating agreement, representations, warranties and covenants substantially similar to the representations, warranties and covenants contained in this Article. The foregoing requirement shall not apply to the Circuit City Lease.

6.4.    Mortgagee's Rights.    Not in limitation but in addition to any other rights Mortgagee may have under this Mortgage and/or any other Loan Documents, Mortgagee shall have the following additional rights and remedies with respect to the environmental status of the Property:

6.4.1. Mortgagee shall have the right but not the obligation, and without limitation of Mortgagee's other rights under this Mortgage, to enter onto the Property to conduct or to take such actions as it deems necessary or advisable to cleanup, remediate, encapsulate, remove, resolve or minimize the impact of, or otherwise deal with, any Contaminants or Enforcement Actions or breaches of Environmental Laws pertaining to the Property or any part thereof which could result in an order, suit or other action against Mortgagor and/or which, in the sole opinion of Mortgagee, could jeopardize its security under this Mortgage. All reasonable costs and expenses incurred by Mortgagee in the exercise of any such rights shall be secured by this Mortgage and shall be payable by Mortgagor upon demand or charged to Mortgagor's loan balance at the discretion of Mortgagee. The foregoing provision shall not apply for so long as

Lafayette, Louisiana                              44

the Circuit City Lease remains in effect and the Tenant is not in default beyond any applicable grace or notice period thereunder.

6.4.2.  Mortgagee shall have the right, in its sole discretion, to require Mortgagor to periodically (but not more frequently than annually unless an Enforcement Action is then outstanding in which case this limitation will not apply) perform at Mortgagor's expense a Phase I Environmental Assessment and, if deemed necessary by Mortgagee, a Phase II Environmental Assessment, each of which must be satisfactory to Mortgagee, of the Property. Said assessment must be by an environmental consultant satisfactory to Mortgagee. Should Mortgagor fail to perform said Environmental Assessment within thirty (30) days of Mortgagee's written request, Mortgagee shall have the right but not the obligation to retain an environmental consultant to perform said Environmental Assessment. All costs and expenses incurred by Mortgagee in the exercise of such rights shall be secured by this Mortgage and shall be payable by Mortgagor upon demand or charged to Mortgagor's loan balance at the discretion of Mortgagee. The foregoing provision shall not apply for so long as the Circuit City Lease remains in effect and the Tenant is not in default beyond any applicable grace or notice period thereunder.

6.4.3.  Mortgagee's rights under this Article shall be exercised by it in its sole discretion and for the benefit of Mortgagee only. Mortgagee shall have no obligation to enter onto the Property or to take any other action which it is authorized by this Article to take for the protection of its security. Any action which it may elect to take hereunder shall be for its own benefit and all third party beneficiary rights are hereby expressly negated. Mortgagee shall have no responsibility for the conduct of Mortgagor's environmental practices on the Property or in any other location. Any action or inaction by Mortgagee hereunder shall not be deemed to constitute the taking of control over Mortgagor's waste disposal, waste management, or other environmental practices with respect to the Property or any other property.

6.5.  Definitions. As used in this Article, the following terms shall have the meanings ascribed to them below.

6.5.1.  "Contaminant" means any pollutants, hazardous or toxic substances or wastes or contaminated materials including but not limited to oil and oil products, asbestos, asbestos containing materials (whether as a waste or incorporated into any structures), urea formaldehyde foam insulation (whether as a waste or incorporated into any structures), transformers or other equipment which contain dielectric fluid containing polychlorinated biphenyls, flammables, explosives, radioactive materials, laboratory wastes, biohazardous wastes, chemicals, elements, compounds or any other materials and substances (including materials, substances or things which are composed of or which have as constituents any of the foregoing substances), which are or may be subject to regulation under, or the Release of which or exposure to which is prohibited, limited or regulated under any Environmental Law.

6.5.2.  "Enforcement Action" means any action, proceeding or investigation (administrative or judicial, civil or criminal) instituted or threatened by U.S. Environmental Protection Agency, or any other federal, state or local governmental agency related to any

alleged or actual violation of any Environmental Law with respect to the Property and/or any business conducted thereon, and/or the Mortgagor, including, but not limited to, actions seeking Remediation, the Imposition or enforcement of liability pursuant to any Environmental Law and compliance with any Environmental Law. Enforcement Action shall also include any similar actual or threatened action by any private party pursuant to any Environmental Law.

6.5.3. "Environmental Law(s)" means any and all present and future: federal, state, and local laws, statutes, ordinances, rules, and regulations, relating to protection of human health and the environment from Contaminants including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, as amended, (CERCLA), 42 USC §9601 et seq.; the Resource Conservation and Recovery Act, as amended, (RCRA), 42 USC §6901 et seq.; the Clean Air Act, as amended, 42 USC §7401 et seq.; the Federal Water Pollution Control Act, as amended (including but not limited to as amended by the Clean Water Act), 33 USC §1251 et seq.; the Toxics Substances Control Act, as amended (TSCA), 15 USC §2601 et seq.; the Emergency Planning and Community Right-to-Know Act (also known as SARA Title III), as amended, (EPCRA), 42 USC §11001 et seq.; the Safe Drinking Water Act, as amended, 42 USC §300(f) et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, as amended (FIFRA), 7 USC §136 et seq.; the Occupational Safety and Health Act, as amended, (OSHA), 29 USC §651 et seq.; the Endangered Species Act, as amended, 16 USC §1531 et seq.; the National Environmental Policy Act, as amended, (NEPA), 42 USC §4321 et seq.; the Rivers and Harbors Act of 1899, as amended, 33 USC §401 et seq.; state and local laws, rules and regulations similar to or addressing similar matters as the foregoing federal laws; laws, rules and regulations governing underground or above-ground storage tanks; laws, rules and regulations imposing liens for response costs or costs of other Remediation, whether or not those liens have a higher priority than existing liens; laws, rules and regulations conditioning transfer of property upon a form of negative declaration or other approval of a governmental authority of the environmental condition of a property; laws, rules and regulations requiring the disclosure of conditions relating to Contaminants in connection with transfer of title to or interest in property law; laws, rules and regulations requiring notifying of any government entity with regard to a Release of any Contaminant; conditions or requirements imposed in connection with any permits; government orders and demands and judicial orders pursuant to any of the foregoing; laws, rules and regulations relating to the Release, use, treatment, storage, disposal, transportation, transfer, generation, processing, production, refining, control, management, or handling of Contaminants; any and all other laws, rules, regulations, guidance, guidelines and common law of any governmental entity relating to the protection of human health or the environment from Contaminants. Any terms mentioned in the preceding subsection which are defined in any Environmental Law shall have the meanings ascribed to such terms in said laws unless otherwise defined herein; any of such laws are amended so as to broaden the meaning of any term defined therein, such broader meaning shall apply subsequent to the effective date of such amendment.

6.5.4. "Release" means any spilling, leaking, migrating, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment of any Contaminant.

6.5.5. "Phase I Environmental Assessment" means a review by an environmental, engineering or consulting firm reasonably acceptable to Mortgagee of all data and other, information available regarding the status of the compliance of the Property with applicable Environmental Laws including (i) a review of the history of the Property, (ii) physical examination of the Property (not including physical testing within the scope of a Phase II Environmental Assessment), (iii) examination of the condition and use of adjoining real property (including identifying the location of private and public wells and other potential sources of Contaminants), (iv) a statement of the ground water classification of the Property, (v) review of all industrial or transport or storage processes conducted on the Property which involve the handling, processing, use, transport, generation, disposal or treatment of a Contaminant, (vi) contact with and review of the records of the applicable region of the United States Environmental Protection Agency and appropriate State agencies and authorities, (vii) review of local or municipal records, and (viii) conversations with appropriate State and local officials. the Phase I Environmental Assessment shall be prepared in accordance with or otherwise meet the minimum standards of "ASTM E1527-93 Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process".

6.5.6. "Phase II Environmental Assessment" means a Phase I Environmental Assessment supplemented with subsurface investigation of the Property and surrounding areas and, if applicable, with appropriate biological, physical and chemical testing of water, soil, materials and air samples for suspected Contaminants. Both Phase I and Phase II Environmental Assessments shall include a professional opinion as to the current environmental status of the Property, the compliance of the Property with applicable Environmental Laws, recommendations for any cleanup deemed appropriate, a statement of the scope of the consultant's services and its qualifications (including its professional opinion that the assessment techniques and procedures undertaken by such consultant were appropriate in order to assess the environmental status of the Property in light of the information developed in the course of the assessment) and insurance coverages and assurances (by way of a separate side letter) that the assessment may be relied upon by Mortgagee.

6.5.7. "Property" for purposes of this Article means the Property as described in this Mortgage together with any other property which will be included in the description of the Property for purposes of any applicable Environmental Law.


### ARTICLE SEVEN
### MISCELLANEOUS

7.    Miscellaneous.

7.1.    Governing Law. This Mortgage shall be subject to and governed by the laws of the State, without giving effect to the conflicts of law provisions thereof. In the event that any provision or clause of any of the Loan Documents conflicts with applicable laws, such conflicts shall not affect other provisions of such Loan Documents which can be given effect without the

conflicting provision, and to this end the provisions of the Loan Documents are declared to be severable. This instrument cannot be waived, amended, changed, released, discharged or satisfied orally, but only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, release, discharge or satisfaction is sought.

7.2.    Mortgagor Waiver of Rights.    To the extent allowed under applicable law, Mortgagor waives the benefit of all laws now existing or that hereafter may be enacted providing for (i) any appraisal before sale of any portion of the Property, and (ii) the benefit of all laws that may be hereafter enacted in any way extending the time for the enforcement of the collection of the Note or the debts evidenced thereby or creating or extending a period of redemption from any sale made in collecting such debts. To the fullest extent Mortgagor may do so, Mortgagor agrees that Mortgagor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisal, valuation, stay, marshalling of assets, extension or redemption, and Mortgagor, for itself and its successors and assigns, and for any and all persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisal, stay of execution, notice of election to mature or declare due the whole of the secured Indebtedness and marshalling in the event of foreclosure of the liens hereby created. Mortgagor hereby waives and releases all errors, defects and imperfections in any proceeding instituted by Mortgagee under the Note or this Mortgage or the other Loan Documents, or any of them, and unless specifically required herein, all notices of Mortgagor's default or of Mortgagee's election to exercise, or Mortgagee's actual exercise of any option under the Note or this Mortgage or the other Loan Documents. If any law referred to in this Section and now in force of which Mortgagor, or its successors and assigns or other person may take advantage despite this Section, shall hereafter be repealed or cease to be in force, such law shall not thereafter be deemed to preclude the application of this Section. Mortgagor expressly waives and relinquishes any and all rights and remedies which Mortgagor may have or be able to assert by reason of the laws of the State pertaining to the rights and remedies of sureties. Further, to the extent allowed under applicable law, Mortgagor waives demand, presentment for payment, protest, notice of protest, notice of dishonor, diligence in collection, notice of nonpayment with respect to the Indebtedness and any and all notices of a like nature.

7.3.    Limitation of Interest.    It is the intent of Mortgagor and Mortgagee in the execution of this Mortgage and the Note and all other instruments securing the Note to contract in strict compliance with the usury laws of the state governing the loan evidenced by the Note. In furtherance thereof, Mortgagee, and Mortgagor stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged by the laws of the state governing the loan evidenced by the Note. In the event it is determined that any holder of the Note has collected monies which are deemed to constitute interest and are deemed to increase the effective interest rate on the Note to a rate in excess of that permitted to be charged by the laws of the state governing the loan evidenced by the Note, all such sums shall be applied to reduce the outstanding principal amount of the Note to zero. Any excess thereafter shall be refunded to

*Lafayette, Louisiana*                               48

Mortgagor. All sums paid or agreed to be paid to the holder hereof for the use, forbearance or detention of the Indebtedness of Mortgagor evidenced hereby, outstanding from time to time, shall, to the extent permitted by applicable law, and only to the extent necessary to preclude exceeding the limit of validity prescribed by law, be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of the Note until payment in full of the Loan so that the actual rate of interest on account of such Indebtedness is uniform throughout the balance of the term hereof. The terms and provisions of this paragraph shall control every other provision of all agreements between Mortgagee and Mortgagor.

7.4.    Giving of Notice.

7.4.1. Notices. All notices, demands, consents, approvals, requests or other communications provided for or required to be given or furnished by either party hereunder shall be in writing and shall be (i) hand-delivered, effective upon receipt, or (ii) sent by United States Express Mail or by private overnight courier, effective upon receipt, or (iii) served by certified mail, postage prepaid, return receipt requested, deemed effective on the day of actual delivery as shown by the addressee's return receipt or the expiration of three (3) business days after the date of mailing, whichever is the earlier in time; addressed to the party intended to receive the same at the address set forth below:

> Mortgagor:
>
> Circuit Investors - Matteson Limited Partnership
> c/o Cardinal Capital Partners, Inc.
> 8411 Preston Road, 8th Floor
> Dallas, Texas 75225
> Attention:
> Telecopier No. (214) 696-9845
> Confirmation No. (214) 696-3600
>
> with a copy to:
>
> Goldfarb & Fleece
> 345 Park Avenue
> New York, New York 10154
> Attention: Steven Shore
> Telecopier No. (212) 751-3738
> Confirmation No. (212) 421-2828

<u>Mortgagee:</u>

The Paul Revere Life Insurance Company
c/o The Paul Revere Investment Management Corporation
18 Chestnut Street
Worcester, MA 01608
Attention: Karen Jessey, Esq.
Telecopier No. (508) 793-5854
Confirmation No. (508) 751-7617

with a copy to:

Pepe & Hazard
Goodwin Square
Hartford, Connecticut  06103
Attention: Chairperson, Real Estate/Finance Department
Telecopier No. (203) 522-2796
Confirmation No. (203) 522-5175

7.4.2. Unless otherwise specified to the contrary in this Mortgage, notice shall be deemed to have been given on the date the notice is deposited in the United States mail.

7.5.    <u>Statements by Mortgagor</u>.   Mortgagor, within ten (10) days after being given written notice of a request by Mortgagee, shall furnish (a) a written statement, duly acknowledged, setting forth the unpaid principal of and interest on the Note, and whether or not any offsets or defenses exist against such principal and interest or other sums, and (b) a lease ratification and estoppel agreement as to any Lease affecting the Property, in form and substance satisfactory to Mortgagee, which shall be executed by Mortgagor and by each lessee (if any), stating, if such be the case, that the Lease is in full force and effect, that it has not been amended or modified, and that there is no default thereunder, that the lessee has accepted and is in possession and occupancy of the leased premises, paying the full rental called for therein on a current basis, that no rental payments have been made more than one month in advance, that there are no offsets, claims or defenses to the payment of the rent or enforcement of the terms of the Lease, that all work required to be performed by the lessor under the Lease has been completed, and stating the date of commencement and termination of the original lease term and the terms of any renewals or extensions of the lease term.  If the Circuit City Lease is then in effect, an estoppel certificate from the Tenant in substantially the form delivered in connection with the origination of the Loan shall be deemed satisfactory to Mortgagee.

7.6.    <u>Additional Security</u>.   If at any time Mortgagee holds additional security for any of the obligations secured hereby, Mortgagee may enforce the sale thereof or otherwise realize upon such additional security, at its option, either before or concurrently with or after enforcing its remedies hereunder or under any of the Loan Documents.

*Lafayette, Louisiana*                                    50

7.7.    Successors and Assigns.  This Mortgage shall apply to, inure to the benefit of and bind all parties hereto, their successors and assigns, subject to the limitations of Sections 2.1 and 2.16 hereof.

7.8.    Inspection.  Upon prior notice (except in the case of an emergency, in which case no such notice shall be necessary), Mortgagee, its agents, representatives and workmen, are authorized to enter at any reasonable time upon or in any part of the Property for the purpose of inspecting the same and for the purpose of performing any of the acts it is authorized to perform under the terms of any of the Loan Documents.

7.9.    Mortgagee's Powers.  Without affecting the liability of any other person liable for the payment or performance of any obligation secured hereby, and without affecting the lien or charge of this Mortgage upon any portion of the Property not then or theretofore released as security for the full amount and extent of all unpaid and unperformed obligations, Mortgagee may, from time to time and without notice (i) release any person so liable, (ii) extend the maturity or alter any of the terms of any such obligation or grant other indulgences, (iii) release or reconvey, or cause to be released or reconveyed at any time at Mortgagee's option, any parcel, portion or interest in all or any part of the Property, (iv) take or release any other or additional security for any obligation herein mentioned, (v) make compositions or other arrangements with debtors in relation thereto, or (vi) advance additional funds to protect the security hereof and pay or discharge the obligations of Mortgagor hereunder or under the Loan Documents, and all amounts so advanced shall be reimbursed by Mortgagor upon demand by Mortgagee together with interest thereon at the Default Rate, and all such advances, with interest thereon as aforesaid shall be secured by this Mortgage and the other Loan Documents.

7.10.    Actions by Mortgagee to Preserve Property; Mortgagee's Own Protection.  Should Mortgagor fail to make any payment or to do any act as and in the manner provided in any of the Loan Documents, Mortgagee in its sole discretion, without obligation so to do and without notice to or demand upon Mortgagor and without releasing Mortgagor from any obligation, may upon the expiration of applicable notice and cure periods hereunder (except in the case of emergency, in which case no such delay shall be necessary) make or do the same in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof.  In connection therewith, without limiting its general powers, Mortgagee shall have and is hereby given the right (to the extent allowed under applicable law), but not the obligation, (i) to generally perform or observe the obligations of Mortgagor hereunder; (ii) to enter upon and take possession of the Property; (iii) to make additions, alterations, repairs and improvements to the Property which it may consider necessary or proper to keep the Property in good condition and repair; (iv) to appear and participate in any action or proceeding affecting or which may affect the security hereof or the rights or powers of Mortgagee; (v) to pay, purchase, contest or compromise any encumbrance, claim, charge, lien or debt which in the judgment of Mortgagee may affect or appears to affect the security of this Mortgage or be prior or superior hereto; and (vi) in exercising such powers, to pay all necessary expenses, including the fees and expenses of counsel and/or other necessary or desirable consultants including but not limited to surveyors, appraisers and environmental consultants.  The amount so incurred or paid by Mortgagee,

together with interest thereon at the Default Rate, from the date incurred until paid by Mortgagor shall be added to the Indebtedness and secured by this Mortgage to the extent permitted by law. Immediately upon demand therefor by Mortgagee, Mortgagor shall pay or reimburse all costs and expenses incurred by Mortgagee in connection with the exercise by Mortgagee of the foregoing rights. Mortgagee is hereby empowered to enter and to authorize others to enter upon the Property or any part thereof for the purpose of performing or observing any such defaulted covenant, condition or term, without thereby becoming liable to Mortgagor or any person in possession holding under Mortgagor. No person not a party to this Mortgage shall have or enjoy any rights hereunder and all third-party beneficiary rights are hereby expressly negated.

**7.11.** Expenses.

**7.11.1.** Mortgagor will pay when due and payable or reimburse Mortgagee on demand for all costs and expenses of every character which have been incurred or which may hereafter be reasonably incurred by Mortgagee including but not limited to appraisal fees, recording fees, taxes, brokerage fees and commissions, abstract fees, title policy fees, escrow fees, attorneys' fees, court costs and fees of inspecting architect(s) and engineer(s) in connection with: (i) the preparation and execution of Loan Documents; (ii) the funding of the Loan; (iii) in the event an Event of Default occurs, preparation for enforcement of this Mortgage or any of the other Loan Documents, whether or not suit or other action is actually commenced or undertaken; (iv) enforcement of this Mortgage or any of the other Loan Documents; (v) court or administrative proceedings of any kind to which Mortgagee may be a party, either as plaintiff or defendant, by reason of the Note, this Mortgage or any other Loan Document; (vi) preparation for and actions taken in connection with Mortgagee's taking possession of the Property; (vii) negotiations with Mortgagor, or any of its agents in connection with the existence or cure of any Event of Default; (viii) any proposed refinancing by Mortgagor of the Indebtedness secured hereby; (ix) the transfer of the Property in lieu of foreclosure (dation en paiement); and (x) the approval by Mortgagee of actions taken or proposed to be taken by Mortgagor, or other person or entity which approval is required by the terms of this Mortgage or any other Loan Document.

**7.11.2.** If Mortgagee is made a party to any action arising out of or related to this Mortgage or this Loan for any reason whatsoever (including, but not limited to, personal injury) other than arising out of Mortgagee's sole and direct intentional misconduct, Mortgagor shall and does hereby agree to indemnify, hold harmless and defend Mortgagee and any of its officers or employees from and against and reimburse Mortgagee for all claims, demands, liabilities, losses, damages, judgments, penalties, costs and expenses which may be imposed upon, asserted against or incurred or paid by Mortgagee by reason of, on account of, or in connection with, any of the foregoing.

**7.12.** Suits to Protect the Property. Mortgagee shall have the power and authority to institute and maintain any suits and proceedings as Mortgagee may deem advisable (i) to prevent any impairment of the Property by any acts which may be unlawful or any violation of this

Mortgage, (ii) to foreclose this Mortgage, (iii) to preserve and protect its interest in the Property, and (iv) to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order might impair the security hereunder or be prejudicial to Mortgagee's interest.

7.13.  <u>Proofs of Claim</u>.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial case of proceedings affecting Mortgagor or any guarantor, its creditors or its property, Mortgagee to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have its claims allowed in such case or proceedings for the entire Indebtedness at the date of the institution of such case or proceedings, and for any additional amounts which may become due and payable by Mortgagor after such date.

7.14.  <u>No Waiver of One Default To Affect Another</u>.  No waiver of any Event of Default hereunder shall extend to or affect any subsequent or any other Event of Default then existing, or impair any rights, powers or remedies resulting therefrom.  If Mortgagee (i) grants forbearance or an extension of time for the payment of any of the Indebtedness; (ii) takes other or additional security for the payment thereof; (iii) waives or does not exercise any right granted in the Note, this Mortgage or any other Loan Document; (iv) releases any part of the Property from the lien of this Mortgage or any other instrument securing the Note; (v) consents to the filing of any map, plat or replat of the Land; (vi) consents to the granting of any easement or servitude on the Land; or (vii) makes or consents to any agreement changing the terms of this Mortgage or subordinating this Mortgage, no such act or omission shall release, discharge, modify, change or affect the original liability under this Mortgage or otherwise of Mortgagor or any maker, co-signer, endorser, surety or guarantor.  No such act or omission shall preclude Mortgagee from exercising any right, power or privilege herein granted or intended to be granted in case of any Event of Default then existing or of any subsequent Event of Default nor, except as otherwise expressly provided in an instrument or instruments executed by Mortgagee, shall this Mortgage be altered thereby.

7.15.  <u>Remedies Cumulative</u>.  No right, power or remedy conferred upon or reserved to Mortgagee by the Note, this Mortgage or any other Loan Document is exclusive of any other right, power or remedy, but each and every such right, power and remedy shall be cumulative and concurrent and shall be in addition to any other right, power and remedy given hereunder or under the Note or any other Loan Document, or now or hereafter existing at law, in equity or by statute.

7.16.  <u>Notices</u>.  Mortgagor shall notify Mortgagee promptly upon Mortgagor's becoming aware of the occurrence of any of the following:

7.16.1.  A default or threatened or potential default or event which with the passage of time or the giving of notice, or both, would become a default by Mortgagor under

the terms of this Mortgage or any other Loan Documents with respect to which default Mortgagor has knowledge;

      7.16.2.      Receipt of notice of Condemnation of the Property or any part thereof;

      7.16.3.      Receipt of notice or correspondence, written or otherwise, from any governmental authority relating to the structure, use or occupancy of the Property including any such notice or correspondence from the applicable environmental agencies;

      7.16.4.      Receipt of any notice from any tenant of all or any portion of the Property asserting that Mortgagor is in breach of an obligation to such tenant;

      7.16.5.      Substantial change in the use of the Property;

      7.16.6.      Commencement of any litigation affecting the Property;

      7.16.7.      Receipt of any notice of default under any agreement and contract relating to the construction of any contemplated improvements at the Property or the operation of Mortgagor's business at the Property;

      7.16.8.      Any contract or agreement with respect to any sale, Proposed Lease, partition or other transfer of all or any part of the Property; or

      7.16.9.      any fact or representation contained in any certificate, notice, opinion (written or oral), or other document furnished to Mortgagee which ceases to be true and correct, which notification shall set forth the untrue or incorrect statement or misrepresentation, and the action being taken by Mortgagor in connection therewith.

    7.17.  Captions.  The captions or headings at the beginning of each Section hereof are for the convenience of the parties, are not a part of this Mortgage and do not affect the meaning of the provisions of this Mortgage.

    7.18.  Exhibits.  All exhibits attached to this Mortgage are incorporated into the Mortgage and made a part of the Mortgage by this reference.

    7.19.  Invalidity of Certain Provisions.  If the lien of this Mortgage is invalid or unenforceable as to any part of the debt, or if the lien is invalid or unenforceable as to any part of the Property, the unsecured or partially secured portion of the debt shall be paid completely prior to the payment of the remaining and secured or partially secured portion of the debt, and all payments made on the debt, whether voluntary or under foreclosure or other enforcement action or procedure, shall be considered to have been first paid on and applied to the full payment of that portion of the debt which is not secured or not fully secured by the lien of this Mortgage.  In the event that any of the covenants, agreements, terms or provisions contained

in the Note, or in this Mortgage or in any other Loan Document shall be deemed invalid, illegal or unenforceable in any respect, the validity of the remaining covenants, agreements, terms or provisions contained herein or in the Note or in any other Loan Document shall be in no way affected, prejudiced or disturbed thereby.

7.20. <u>Subrogation</u>. To the extent that proceeds of the loans evidenced by the Note are used to pay any outstanding lien, charge or prior encumbrance against the Property, and such proceeds are advanced by Mortgagee, Mortgagee shall be subrogated to any and all rights and liens held by any owner or holder of such outstanding liens, charges and prior encumbrances, irrespective of whether such liens, charges or encumbrances are released.

7.21. <u>No Merger</u>. If both the lessor's and lessee's estates under any lease or any portion thereof which constitutes a part of the Property shall at any time become vested in one owner, this Mortgage and the lien created hereby shall not be destroyed or terminated by application of the doctrine of merger (confusion title), and, in such event, Mortgagee shall continue to have and enjoy all of the rights and privileges of Mortgagee as purchaser at any such foreclosure sale shall so elect. No act by or on behalf of Mortgagee or any such purchaser shall constitute a termination of any lease or sublease unless Mortgagee or such purchaser shall give written notice thereof to such tenant or subtenant.

7.22. <u>Amendments</u>. This Mortgage may be amended only by written agreement, executed by all of the parties hereto, and no other purported agreement, written or oral, shall be effective to vary the terms hereof.

7.23. <u>Future Advances</u>. In the event further advances are made to Mortgagor by Mortgagee, such advances, with interest thereon, shall be secured by this Mortgage when evidenced by promissory notes stating that such notes are secured hereby. At no time shall the principal amount of indebtedness secured by this Mortgage exceed the original amount of the Note nor shall the maturity of such further advances secured hereby extend beyond the time of repayment of the Note.

7.24. <u>Waiver of Certificates</u>. The parties to this Mortgage hereby waive the production of mortgage, conveyance, tax, paving, assignment of accounts receivable and other certificates and relieve and release the Notary Public before whom this Mortgage was passed from all responsibilities and liabilities in connection therewith.

THUS DONE AND PASSED, on the day, month and year first written above, by the undersigned Mortgagor in the presence of the undersigned Notary Public and the undersigned competent witnesses, who hereunto sign their names with Mortgagor after reading of the whole.

CIRCUIT INVESTORS- MATTESON LIMITED
PARTNERSHIP, a Texas limited partnership

By:    CIRCUIT GENERAL PARTNER #4, INC.,
a Texas corporation, General Partner

WITNESSES:

By: _____

Its: _____
(Duly Authorized)

_____
NOTARY PUBLIC
MY COMMISSION EXPIRES: 3/12/98

f:afz\27098\6-072_MTG\033095\tmo

TERIE L RASMUSSEN
NOTARY PUBLIC
State of Texas
Comm. Exp. 03-12-98

Lafayette, Louisiana                    56

## CERTIFICATE OF INCUMBENCY
## OF CIRCUIT GENERAL PARTNER #4, INC.

I, Joe C. Longbotham, am the duly appointed and qualified Secretary and custodian of the records of Circuit General Partner #4, Inc., a Texas corporation (the "Corporation"), which Corporation is duly organized and existing under the laws of the State of Texas and hereby certifies that the following persons have been appointed or elected and are now acting as officers or employees of the Corporation in the capacity set forth after their respective names:

| Name | Title | Signature |
|------|-------|-----------|
| Gil J. Besing | President, Assistant Secretary and Assistant Treasurer | |
| Joe C. Longbotham | Vice-President, Secretary and Treasurer | |

IN WITNESSETH WHEREOF, I have hereunto set my hand this 22nd day of February, 1995.

JOE C. LONGBOTHAM, Secretary

THE STATE OF TEXAS        §
                          §
COUNTY OF DALLAS          §

This instrument was acknowledged before me on the 22nd day of February, 1995, by JOE C. LONGBOTHAM, the Secretary of Circuit General Partner #4, Inc., a Texas corporation, on behalf of said corporation.

Notary Public in and for the
State of Texas

PAMELA McFERRIN
Printed or Typed Name of Notary

My Commission Expires:

1-25-97

PAMELA McFERRIN
Notary Public, State of Texas
My Commission Expires
JAN. 25, 1997

CLF\WP51\5002\47\INCUMBAN.CG4

CORPORATE RESOLUTIONS OF

CIRCUIT GENERAL PARTNER #4, INC.

The undersigned, being all of the directors of Circuit General Partner #4, Inc., a Texas corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting:

RESOLVED, that the Corporation, as the sole general partner of Circuit Investors-Carmax Limited Partnership, a Texas limited partnership (formerly known as Circuit Investors #4-Midwest Limited Partnership) (herein, "Carmax L.P.") and Circuit Investors-Matteson Limited Partnership, a Texas limited partnership (formerly known as Circuit Investors #4-Lawrenceville Limited Partnership) (herein, "Matteson L.P.") (collectively, the "Partnerships"), each composed of the Corporation as the sole general partner and Gil J. Besing and Joe C. Longbotham as the limited partners, hereby approves the Partnerships' acquisition of title to the Properties (herein so called) described on Exhibits "A-1" and "A-2" attached hereto and incorporated herein by reference for all purposes;

FURTHER RESOLVED, that the Corporation is hereby authorized to cause the Partnerships to enter into sale/leaseback agreements with Circuit City Stores, Inc. and/or its affiliates (the "Seller") for the purpose of acquiring the Properties and leasing same back to Seller, upon such terms as any officer of the Corporation may deem appropriate (including the terms set forth on Exhibits "A-1" and "A-2" attached hereto), or, if any such sale/leaseback agreements already exist, cause the Partnerships to accept an assignment of the same, as the general partner of the Partnerships;

FURTHER RESOLVED, that the Corporation, as general partner of the Partnerships enter into such financing arrangements with regard to the purchase of the Properties as any officer of the Corporation may deem advisable, including but not limited to loans from Seller described on Exhibits "A-1" and "A-2" attached hereto and incorporated herein by reference for all purposes and that the Corporation, as general partner of the Partnerships, is hereby authorized to enter into any and all such agreements, documents and instruments as any officer of the Corporation shall deem necessary or advisable in connection with such financing;

FURTHER RESOLVED, that the Corporation may qualify to do business in Lousiana, Illinios and such other states as any officer of the Corporation may determine and that the Corporation, as general partner of the Partnerships, may cause the Partnerships to qualify to do business in Louisiana (as to Matteson L.P.) and Illinios (as to Carmax L.P.) and such other states as any officer of the Corporation may determine and that the Corporation, as general partner of the Partnerships, may change the name of Partnerships or otherwise reconstitute or amend the Partnerships, on such terms as any officer of the Corporation may determine;

FURTHER RESOLVED, that the Corporation, as general partner of the Partnerships, may negotiate sales of the Properties on such terms as any officer of the

C:\wp51\5002\47\corpres2.CG4

Corporation may deem advisable, execute any and all documents necessary in connection therewith, accept funds, accounts receivable and the like as may be generated by any such sales and carry out such other matters as may be necessary to accomplish any sale of the Properties;

FURTHER RESOLVED, that the President, any Vice President, any Assistant Vice President, any Treasurer or any Secretary of the Corporation, or their duly appointed attorney-in-fact, be, and each of them is hereby, authorized and directed to do any and all things deemed necessary or advisable, and to execute any and all documents, in the best interest of the Corporation, at their sole discretion, in connection with (a) the formation, amendment and qualification to do business in various states, of the Corporation or the Partnerships, (b) the purchase of the Properties from the Seller and the lease of same back to Seller pursuant to sale/leaseback agreements executed or to be executed by the Partnerships or assigned to the Partnerships, (c) the financing of the acquisition of the Properties and (d) any sale of the Properties, all of which documents are hereby ratified by the undersigned for the Corporation, on its own behalf and as general partner of the Partnerships, for all intents and purposes;

FURTHER RESOLVED, that the aforesaid officers of the Corporation, or their duly appointed attorneys-in-fact, are hereby authorized to, on behalf of the Corporation as general partner of the Partnerships, execute, or accept an assignment of, the sale/leaseback agreements referred to above, execute any and all documents regarding amendmending and qualifying the Corporation and any of the Partnerships, acquiring the Properties, leasing same, financing same and selling same with or without the joinder of the Secretary or any Assistant Secretary or any other officer of the Corporation, and that any corporate seal need not be affixed to any such instrument.

FURTHER RESOLVED, that all actions heretofore taken by the incorporators or the directors or the officers of the Corporation, and all things done by their authority, with respect to the organization and qualification of the Corporation and the Partnerships (including any reconstitution or amendment of the Partnerships) and in connection with the acquisition, leasing, financing and any sale of the Properties as aforesaid, be, and the same are hereby, ratified, approved and adopted as the acts of the Corporation as general partner of thereof.

IN WITNESS WHEREOF, as of this ²² day of February, 1995.


_____
GIL J. BESING

_____
JOE C. LONGBOTHAM

- 2 -

C:\wp51\5002\47\corpres2.CG4

## EXHIBIT "A-1"
### Countryside, Illinois
### Acquisition by Circuit Investors-Carmax Limited Partnership

Property:              9950 Joliet Road, Countryside, Illinois 60525

Purchase Price:        $6,200,000.00

Lease Term:            Approximately 22 years

Lease Rent:            $53,578.33 per month

Loan Amount:           $5,716,743.50

C:\wp51\5002\47\corpres2.CG4

EXHIBIT "A-2"
Lafayette, Louisana
Acquisition by Circuit Investors-Matteson Limited Partnership

| | |
|---|---|
| Property: | 5264 Johnson Street, Lafayette, Louisana |
| Purchase Price: | $3,680,000.00 |
| Lease Term: | Approximately 22 years |
| Lease Rent: | $31,801.33 per month |
| Loan Amount: | $3,370,775 |

- 4 -

C:\wp51\5002\47\corpres2.CG4

## CORPORATE RESOLUTIONS OF CIRCUIT GENERAL PARTNER #4, INC.
### Circuit Investors-Matteson Limited Partnership

The undersigned, being all of the directors of Circuit General Partner #4, Inc., a Texas corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting:

RESOLVED, that the Corporation, as the sole general partner of Circuit Investors-Matteson Limited Partnership, a Texas limited partnership (formerly known as Circuit Investors #4-Lawrenceville Limited Partnership) (herein, the "Partnership") may enter into such refinancing arrangements with regard to the refinancing of the Property (herein so called) described on Exhibit "A" as any officer of the Corporation may deem advisable, including but not limited to the loan with The Paul Revere Life Insurance Company ("Lender") described on Exhibit "A" attached hereto and incorporated herein by reference for all purposes and that the Corporation, as general partner of the Partnership is hereby authorized to enter into any and all such agreements, documents and instruments as any officer of the Corporation shall deem necessary or advisable in connection with such refinancing;

FURTHER RESOLVED, that the Corporation, as general partner of the Partnership, may cause the Partnership to guaranty loans made by Lender to Circuit Investors-Carmax Limited Partnership, a Texas limited partnership (formerly known as Circuit Investors #4-Midwest Limited Partnership) (herein, "Carmax L.P."), Circuit Investors #4-Oklahoma City Limited Partnership, a Texas limited partnership (herein, "Oklahoma L.P.") and Circuit Investors #5-Montgomeryville Limited Partnership (herein, "Montgomeryville L.P.") (Oklahoma L.P., Carmax L.P. and Montgomeryville L.P. are herein referred to collectively as the "Other Partnerships"), as described in Exhibit "A" attached hereto, cause the Partnership to pledge the Property as security for such guaranty and to agree that any default by such Other Partnerships will be a default under the Partnership's loan;

FURTHER RESOLVED, that the Corporation may qualify to do business in Louisana and such other states as any officer of the Corporation may determine and that the Corporation, as general partner of the Partnership, may cause the Partnership to qualify to do business in Louisana and such other states as any officer of the Corporation may determine and that the Corporation, as general partner of the Partnership, may change the name of Partnership or otherwise reconstitute or amend the Partnership, on such terms as any officer of the Corporation may determine;

FURTHER RESOLVED, that the Corporation, as general partner of the Partnership, may negotiate a sale of the Property on such terms as any officer of the Corporation may deem advisable, execute any and all documents necessary in connection therewith, accept funds, accounts receivable and the like as may be generated by any such sale and carry out such other matters as may be necessary to accomplish any sale of the Property;

FURTHER RESOLVED, that the President, any Vice President, any Assistant Vice President, any Treasurer or any Secretary of the Corporation, or their duly appointed attorney-in-fact, be, and each of them is hereby, authorized and directed to do any and all things deemed necessary or advisable, and to execute any and all documents, in the best

C:\wp51\5002\47\corpres.MAT

interest of the Corporation, at their sole discretion, in connection with (a) the formation, reconstitution, amendment and qualification of the Corporation or the Partnership, (b) the refinancing of the Property including the guaranty and cross default provisions referred to above and (c) any sale of the Property, all of which documents are hereby ratified by the undersigned for the Corporation, on its own behalf and as general partner of the Partnership, for all intents and purposes;

FURTHER RESOLVED, that the aforesaid officers of the Corporation, or their duly appointed attorneys-in-fact, are hereby authorized to, on behalf of the Corporation as general partner of the Partnership, execute the documents regarding reconstituting, amending and qualifying the Partnership, acquiring, leasing, financing and refinancing the Property (including any guaranty or cross default) and selling the Property with or without the joinder of the Secretary or any Assistant Secretary or any other officer of the Corporation, and that any corporate seal need not be affixed to any such instrument.

FURTHER RESOLVED, that all actions heretofore taken by the incorporators or the directors or the officers of the Corporation, and all things done by their authority, with respect to the organization and qualification of the Corporation and the Partnership (including any reconstitution or amendment of the Partnership) and in connection with the acquisition, leasing, financing, refinancing and any sale of the Property as aforesaid, be, and the same are hereby, ratified, approved and adopted as the acts of the Corporation as general partner of thereof.

IN WITNESS WHEREOF, as of this 27th day of February, 1995.


GIL J. BESING                                JOE C. LONGBOTHAM


C:\wp51\5002\47\corpres.HAT

EXHIBIT "A"
Lafayette, Louisana

Refinancing Amount:        $3,674,679

Loan Term:                 22 years

Guaranteed Debt:           $6,191,036 loan to Circuit Investors-Carmax Limited Partnership, a Texas
                           limited partnership

                           $4,870,000 loan to Circuit Investors #4-Oklahoma City Limited
                           Partnership, a Texas limited partnership

                           $3,854,419 loan to Circuit Investors #5-Montgomeryville Limited
                           Partnership, a Pennsylvania limited partnership

                           $2,356,587 loan to Circuit Investors #5-Montgomeryville Limited
                           Partnership, a Pennsylvania limited partnership

- 3 -                              C:\wp51\5002\47\corpres.HAT

## CONSENT OF LIMITED PARTNERS
### (Matteson)

The undersigned, constituting the sole limited partners of Circuit Investors-Matteson Limited Partnership, a Texas limited partnership (the "Partnership") hereby consent to the actions to be taken by Circuit General Partner #4, Inc., a Texas corporation, as the general partner of the Partnership, as set forth in the *corporate resolutions attached hereto:*

EXECUTED THIS 2 2 DAY OF FEBRUARY, 1995.

_____
GIL J. BESING

_____
JOE C. LONGBOTHAM

## CONSENT OF LIMITED PARTNERS
### (Matteson)

The undersigned, constituting the sole limited partners of Circuit Investors-Matteson Limited Partnership, a Texas limited partnership (the "Partnership") hereby consent to the actions to be taken by Circuit General Partner #4, Inc., a Texas corporation, as the general partner of the Partnership, as set forth in the corporate resolutions attached hereto, including the general partner agreeing to the confession of a judgement in any loan documents executed by it on behalf of the Partnership.

EXECUTED THIS 27th DAY OF FEBRUARY, 1995.

_____
GIL J. BESING

_____
JOE C. LONGBOTHAM

## EXHIBIT A

### MAIN PARCEL

A certain tract of land containing 3.504 acres, known as Lot 2B, Acadiana Square Shopping Center, located in Section 68, Township 10 South, Range 4 East, City of Lafayette, Lafayette Parish, Louisiana, being more fully described as follows:

Commencing at the projected intersection of the more easterly right-of-way of Fountainhead Drive and the more northerly right-of-way of Johnston Street (U.S. Highway 167), proceed along said right-of-way of Johnston Street a bearing of North 41 degrees 36 minutes 31 seconds East, a distance of 704.00 feet to a point; thence continue along said right-of-way of Johnston Street a bearing of North 41 degrees 35 minutes 16 seconds East, a distance of 646.20 feet to a point; thence proceed along a bearing of North 48 degrees 25 minutes 04 seconds West, a distance of 247.67 feet to a point; thence proceed along a bearing of North 13 degrees 41 minutes 34 seconds West, a distance 23.34 feet to a point, said point hereinafter to be known as the Point of Beginning; thence proceed along a bearing of South 74 degrees 26 minutes 08 seconds West, a distance of 248.86 feet to a point; thence proceed along a bearing of North 15 degrees 33 minutes 52 seconds West a distance of 225.06 feet to a point; thence proceed along a bearing of South 74 degrees 26 minutes 08 seconds East a distance of 8.15 feet to a point; thence proceed along a bearing of North 15 degrees 33 minutes 52 seconds West, a distance of 379.64 feet to a point on the southerly right-of-way of Target Loop; thence proceed along the southerly right-of-way of Target Loop a bearing of North 75 degrees 32 minutes 27 seconds East a distance of 260.35 feet to a point; thence proceed along a bearing of South 13 degrees 41 minutes 34 seconds East a distance of 600.00 feet to the Point of Beginning; all as shown on the current Replat of Acadiana Square Shopping Center, dated February 13, 1994, last revised December 12, 1994, by C. H. Fenstermaker & Associates, Inc., a copy of which is recorded under Act No. 94-045525 in the Lafayette Parish Court House, Lafayette, Louisiana.

### SERVITUDE PARCEL

That certain non-exclusive servitude interest acquired pursuant to Reciprocal Easement and Operation Agreement executed by CAP-Lafayette Investors Limited Partnership, Toys "R" Us, Inc. and Lowe's Home Center, Inc., dated April 25, 1990, recorded as File No. 90-12433; as amended by First Amendment to Reciprocal Easement and Operation Agreement, dated January 20, 1993, recorded as File No. 93-003289; as further amended by Second Amendment to Reciprocal Easement and Operation Agreement, dated January 31, 1994, recorded as File No. 94-010707.

## PROMISSORY NOTE

$3,674,679.00                                                        Lafayette, Louisiana
                                                                    February 27, 1995

       FOR VALUE RECEIVED, the undersigned, **CIRCUIT INVESTORS-MATTESON
LIMITED PARTNERSHIP**, a Texas limited partnership having a principal place of business
at c/o Cardinal Capital Partners, Inc., 8411 Preston Road, 8th Floor, Dallas, Texas 75225
("Maker"), promises to pay to the order of **THE PAUL REVERE LIFE INSURANCE
COMPANY**, a Massachusetts corporation with a principal place of business at 18 Chestnut
Street, Worcester, Massachusetts 01608-1528 ("Holder"), the principal sum of THREE
MILLION SIX HUNDRED SEVENTY-FOUR THOUSAND SIX HUNDRED SEVENTY-NINE
and no/100 ($3,674,679.00) DOLLARS or so much thereof that is currently outstanding (the
"Principal Amount"), together with (i) interest at the rate and in the manner hereinafter
provided; (ii) all amounts which may become due under the Mortgage, Assignment of Leases
and Security Agreement (First) dated the date hereof securing this Note (the "Mortgage"), which
Mortgage encumbers that certain real property located at 5264 Johnson Street, Lafayette,
Louisiana (the "Property") or under any other documents securing or further evidencing the
indebtedness evidenced by this Note (collectively, the "Loan Documents"); and (iii) any costs
and expenses, including reasonable attorneys' and appraisers' fees, incurred in the collection of
this Note, or in the foreclosure of the Mortgage, or in protecting or sustaining the lien of the
Mortgage or in any litigation or controversy arising from or connected with this Note or the
Mortgage.  All amounts owing under this Note and interest thereon shall be payable in legal
tender of the United States of America.

### 1.  INTEREST RATE

       1.1    Interest Rate.  The Principal Amount hereof, from time to time outstanding, shall
bear interest at a rate equal to eight and nine-tenths (8.9%) percent per annum (the "Interest
Rate").  Interest on the Principal Amount shall be calculated on the basis of a three hundred
sixty (360) day year based on twelve (12) thirty (30) day months.

       1.2    Maximum Interest Rate.  Notwithstanding any provisions of this Note, it is the
understanding and agreement of Maker and Holder that the interest required to be paid by Maker
to Holder under this Note shall not exceed the maximum rate of interest permissible to be
charged by Holder under applicable laws.  Any amount paid in excess of such rate shall be
considered to have been a payment in reduction of principal.  All sums paid or agreed to be paid
to the Holder hereof for the use, forbearance or detention of the indebtedness of the Maker
evidenced hereby, outstanding from time to time shall, to the extent permitted by applicable law,
and only to the extent necessary to preclude exceeding the limit of validity prescribed by law,
shall be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds
of this Note until payment in full of the loan evidenced hereby so that the actual rate of interest
on account of such indebtedness is uniform throughout the balance of the term hereof.  The

Lafayette, Louisiana

terms and provisions of this paragraph shall control every other provision of all agreements between Holder and Maker.

## 2. PAYMENTS OF PRINCIPAL AND INTEREST

2.1   Principal and Interest Payments Until Maturity.  A payment consisting of principal and interest in the amount of $31,770.67 (calculated based upon a 22-year self-liquidating amortization schedule) shall be due and payable in arrears, commencing on the first (1st) day of April, 1995 and a like sum of $31,770.67 on the first (1st) day of each and every calendar month thereafter up to and including the first (1st) day of February, 2017.

Holder reserves the right to require that all payments of principal and interest hereunder be made to Holder by wire transfer of immediately available funds.

2.2   Maturity.  The unpaid principal balance hereof, all accrued and unpaid interest and all other obligations due hereunder shall be due and payable on the first (1st) day of March, 2017 (the "Maturity Date").

2.3   Application of Payments.  Payments made under this Note shall be applied in the following order:   first to interest due on payments made by Holder in respect of Maker's obligations under the Mortgage; second, to the payments made by Holder in respect of Maker's obligations as may then be due and payable under the Mortgage; third, to any late charges to which Maker shall become subject under this Note; fourth, to interest due on this Note; and fifth, to the Principal Amount.

2.4   Business Day.  Whenever any payment hereunder shall be stated to be due on a day other than a "business day" (a day on which banks are open for business in New York, New York), such payment shall be made on the next succeeding business day, unless such extension would cause such payment to be payable in the next following calendar month, in which case such payment shall be made on the business day most immediately preceding such day.

2.5   Prepayment.  Maker shall have the privilege of prepaying the principal balance of this Note as follows:

(a)     Provided no Event of Default (as hereinafter defined) exists under this Note or under the other Loan Documents, the Principal Amount may be prepaid in whole, but not in part, at the election of Maker on any scheduled payment date provided that simultaneously with such prepayment Maker also pays the entire principal amount of all other promissory notes then held by Holder and guaranteed by Maker pursuant to the terms of that certain Agreement of Guaranty of even date from Maker to Holder (the "Guaranty").  The Principal Amount may be prepaid only if accompanied by a fee (the "Prepayment Fee") in an amount equal to the greater of (i) one (1%) percent of the then Principal Amount or (ii) the Yield Maintenance (hereinafter defined).

Lafayette, Louisiana                              - 2 -

## 3. PRINCIPAL SECURITY

3.1     Security.  This Note is secured by the Mortgage, and the security set forth in the other Loan Documents.

## 4. DEFAULT; REMEDIES

4.1     Acceleration.  Upon the occurrence of an Event of Default (as defined below), Holder may, at its option, declare the entire unpaid Principal Amount, together with accrued interest and all other amounts which are evidenced by this Note and the other Loan Documents to be immediately due and payable, without the necessity for prior demand or notice. Notwithstanding anything to the contrary contained herein, in the event Holder exercises its option to accelerate the indebtedness evidenced by this Note upon an Event of Default, there shall be due and payable, in addition to the Principal Amount, all accrued interest thereon, and all other amounts due under the Loan Documents, a default prepayment fee equal to the sum of (i) two (2%) percent of the then Principal Amount plus (ii) the Yield Maintenance. Such default prepayment fee shall be added to the Principal Amount if not paid upon acceleration of this Note. Failure to exercise this option shall not constitute a waiver of the right to exercise the same at a later date during the continuation of such Event of Default or in the event of any subsequent Event of Default.

4.2     Event of Default.  For purposes of this Note, the term "Event of Default" shall have the same meaning ascribed to such term in, and shall include any event which would constitute an Event of Default under, the Mortgage (regardless of whether or not at such time the Mortgage constitutes a valid encumbrance upon the Property) and the Loan Documents.

4.3     Late Charges.  If any installment of principal or interest or any installment of taxes or insurance under the Loan Documents shall not be received within five (5) business days of the date when due, the Holder may, at its option, charge a "late charge" equal to the lesser of four cents for each dollar so overdue or the maximum permitted by law. In connection therewith, Maker and Holder, by its acceptance of this Note, agree as follows: (1) such late payment will cause Holder to incur administrative costs, collection costs, loss of interest, and other direct and indirect costs in uncertain amounts, (2) it would be impractical or extremely difficult to fix the exact amount of such costs in such event, (3) the late charge is a reasonable estimate of such costs and is fair compensation to Holder for its anticipated losses and additional risks resulting from such late payment, and (4) without limiting its rights to recover such installment and to exercise all other rights under this Note, the Mortgage and the other Loan Documents, Holder agrees to accept such late charge in lieu of its right to recover its actual damages resulting from such late payment.

4.4     Default Interest Rate.  In the event the Holder exercises its option to accelerate the maturity of this Note by reason of an Event of Default, or upon maturity of this Note, any amount which is not paid shall thereafter bear interest at the alternative rate (the "Default Rate"),

equal to the lesser of (i) four (4%) percent per annum above the Interest Rate or (ii) the maximum rate permitted by law, until the required payment is made.

## 5. MISCELLANEOUS PROVISIONS

5.1    Attorneys' Fees. Should suit be brought to enforce, interpret or collect any part of this Note, the prevailing party shall be entitled to recover, as an element of the costs of suit and not as damages, reasonable attorneys' fees and other costs of enforcement and collection.

5.2    Jurisdiction. This Note shall be construed and enforced in accordance with the internal laws of the State of Louisiana, without giving effect to the conflicts of law provisions thereof. Specifically, this business or commercial note is subject to La.R.S. 9:3509 et seq.

5.3    Obligation Unconditional. No provision of this Note or of any other agreement shall alter, impair or render conditional the payment obligations of Maker, which are absolute and unconditional, to pay the principal and interest on this Note at the place and at the respective times herein prescribed. Time is of the essence under this Note and the Loan Documents.

5.4    Maker's Waivers. Maker (and all guarantors, endorsers and other parties now or hereafter becoming liable for the payment of this Note) hereby waives diligence, presentment, protest, demand of payment, notice of protest, dishonor and nonpayment, and waives the legal effect of Holder's failure to give all notices not expressly provided for herein. Maker expressly agrees that, without in any way affecting the liability of Maker hereunder, the Holder may, without notice to Maker, extend the Maturity Date or the time for payment of any amount due hereunder, accept additional security, release any party liable hereunder, and release any security now or hereafter securing this Note. Maker further waives, to the full extent permitted by law, the right to plead any and all statutes of limitation as a defense to any demand on this Note, or on any agreement now or hereafter securing this Note.

5.5    Loss or Destruction. Upon receipt of evidence reasonably satisfactory to Maker of the loss or mutilation of this Note, Maker will execute and deliver, in substitution hereof, a replacement note.

5.6    Severance. Every provision of this Note is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable. Holder and Maker further agree to replace any such void or unenforceable provision of this Note with valid and enforceable provisions which will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

5.7    Waivers and Delays by Holder to be Strictly Limited. Any waiver, express or implied, of any breach or default hereunder shall not be considered a waiver of any subsequent or different breach or default. No delay or omission on the part of Holder in exercising any

Lafayette, Louisiana                                    - 5 -

right under this Note or under any of the Loan Documents shall operate as a waiver of such right or of any other right of the Holder hereunder. Failure to accelerate the indebtedness evidenced hereby by reason of default in the payment of a monthly installment of principal or interest or the acceptance of a past due installment of same shall not be construed as a novation of this Note or as a waiver of the right of the Holder to thereafter insist upon strict compliance with the terms of this Note without previous notice of such intention being given to Maker.

5.8    Modification.  No provision of this Note may be waived, modified or discharged other than by an express writing signed by the party against whom enforcement of such waiver, modification or discharge is sought.

5.9    Exculpatory Provision.  By accepting the Mortgage and this Note, the Holder agrees that the promise of the Maker contained in this Note to pay the Principal Amount with interest is included herein for the sole purpose of establishing the existence of said indebtedness. The Holder's source of satisfaction of said indebtedness and of any sum of money which is or may be payable under this Note or the Mortgage or other Loan Documents shall be limited to the Property, the rents, issues and profits therefrom whether collected or uncollected, the improvements and the rights in condemnation awards or eminent domain awards, and insurance policies and proceeds and any and all other collateral securing the amounts due and owing under the Loan Documents except to the extent set forth below in this Section 5.9.  Except to the extent set forth below in this Section 5.9, Holder agrees that it will not seek or be entitled to enforce out of any other assets of the Maker or any party constituting the Maker any judgment for any sum of money which is or may be payable under this Note or the Mortgage or other Loan Documents or for the performance of any of the obligations of the Maker under the Mortgage or other Loan Documents or any deficiency remaining after foreclosure of the Mortgage.  The provisions of this Section, however, shall not:

      (a)    constitute a waiver, release or impairment of any obligation evidenced or secured by the Loan Documents, as such documents may be subsequently modified or amended;

      (b)    limit or impair the right of Holder to name Maker as a party defendant in any action or suit for judicial foreclosure and sale under the Mortgage or otherwise arising in connection with the Loan Documents;

      (c)    prohibit Holder from pursuing all of its rights and remedies against any guarantor or surety, whether or not such guarantor or surety is a partner of Maker, or affect the validity or enforceability of any guaranty made in connection with the Loan Documents;

      (d)    impair the right of Holder to obtain the appointment of a receiver or keeper;

      (e)    impair the enforcement of the Assignment of Leases and Rents or any Loan Documents executed in connection herewith;

Lafayette, Louisiana                     - 6 -

(f)     impair the right of Holder to obtain all economic incidents associated with the use, occupancy or operation of the Property or any other collateral evidenced by the Loan Documents, inclusive of income, profits and the rents received by Maker after the occurrence of an Event of Default;

(g)     impair the right of Holder to obtain insurance proceeds and condemnation awards due to Holder under the Mortgage or any other proceeds derived from the Property, or any other collateral evidenced by the Loan Documents, due to Holder under the Mortgage;

(h)     impair the right of Holder after an Event of Default to apply any cash, escrow funds or other collateral which are subject to the security interest of Holder, as well as any funds deposited for payment of taxes, assessments and insurance premiums and the like, to the reduction of the indebtedness hereunder;

(i)     impair the right of Holder to seek any remedy available under the Loan Documents to enforce and realize upon the interest in the Property, the rents, or any other collateral given to Holder as security for repayment of this Note;

(j)     prevent Holder from obtaining injunctive or other equitable relief to secure performance of the obligations of Maker (as distinguished from enforcement against Maker personally to obtain damages or other monetary relief) or to prevent a breach of any of Maker's obligations under the Loan Documents; or

(k)     in any way preclude Holder from enforcing any of its rights or remedies at law or in equity against Maker except as provided in this paragraph.

Further, nothing in this paragraph shall limit the liability of Maker or the personal liability of any general partner of Maker to Holder, or impair the right of Holder to bring suit and seek recovery against any of the foregoing for any of the following:

(i)     fraud or material misrepresentation by Maker or any other person or entity in connection with the Loan Documents;

(ii)     Maker's misappropriation or misapplication of rents, tenant security deposits, rents collected in advance, insurance proceeds, condemnation awards or other proceeds derived from the Property or any other collateral given to secure this Note;

(iii)     Maker's misuse or diversion of any cash or other collateral subject to the security interest of Holder after an Event of Default [e.g., failure to apply cash obtained from the Property to Property-related obligations];

Lafayette, Louisiana                    - 7 -

laying of venue in any jurisdiction or locality in the state where the Property is located. Service shall be effected by any means permitted by the court in which any action is filed, or at Holder's option, by mailing process, postage prepaid, by certified mail, return receipt requested, to Maker at Maker's address set forth on the first page of this Note. Service shall be deemed effective upon receipt. Maker may designate a change of address for purposes of this paragraph by written notice to Holder made in accordance with the notice provisions of the Mortgage at least ten (10) days before such change of address is to become effective.

5.13   Maker's Waiver.  To the extent permitted by applicable law, Maker hereby waives and releases all errors, defects and imperfections in any proceedings instituted by Holder under the terms of this Note, or of the Mortgage or other Loan Documents, as well as all benefit that might accrue to Maker by virtue of any present or future laws exempting the Property, or any other property, real or personal, pledged or mortgaged as security for the payment of this Note, or any part of the proceeds arising from any sale of any such property, from attachment, levy, or sale under execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment; and Maker agrees that any real estate that may be levied upon pursuant to a judgment obtained by virtue hereof, or any writ of execution issued thereon, may be sold upon any such writ in whole or in part in any order desired by Holder.

## 6.  WAIVER OF JURY TRIAL

6.1   Waiver.  Maker hereby expressly waives any and all rights it may have to trial by jury of any claim, demand, action, or cause of action (1) arising under this Note, the Mortgage securing same or any other Loan Document executed or delivered in connection herewith, or (2) in any way connected with or related or incidental to the dealings of the parties hereto or any of them with respect to this Note, the Mortgage securing same or any other Loan Document executed or delivered in connection herewith, or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether sounding in contract or tort or otherwise; and Maker hereby agrees and consents that any such claim, demand, action, or cause of action shall be decided by court trial without a jury, and holder may file an original counterpart or a copy of this section with any court as written evidence of the consent of each of them to the waiver of its right to trial by jury.

(iv)    the obligations undertaken by Maker under that certain hazardous waste indemnity letter from Maker to Holder;

(v)    Maker's failure to maintain the Property or any other collateral evidenced by the Loan Documents or any part thereof in a manner consistent with the Property's current condition, use and market;

(vi)    Maker's failure to repair or restore the Property or any other collateral evidenced by the Loan Documents in a satisfactory manner after a casualty loss when Holder agreed to make insurance proceeds available for such repair or restoration;

(vii)    any casualty to the Property or any other collateral evidenced by the Loan Documents for which insurance coverage was not maintained as required under the terms of the Mortgage;

(viii)    Maker's failure to comply with the terms and provisions of the Loan Documents prohibiting the sale or further encumbrance of the Property or any other collateral evidenced by the Loan Documents;

(ix)    Maker's failure to comply with all federal, state and local laws; and

(x)    Maker's failure to pay real (immovable) and personal (movable) property, sale, use or other taxes and insurance premiums when due.

Maker, and its general partners do hereby agree to indemnify, defend and hold Holder harmless with respect to any loss, claim, damage or liability arising in connection with any of the foregoing.

5.10    <u>Binding Effect</u>. This Note shall bind the successors and assigns of Maker and all endorsers hereto and shall inure to the benefit of Holder and its successors and assigns.

5.11    <u>Parties, Definitions</u>. Whenever in this Note words of any gender appear, they should be deemed to apply equally to any gender. Whenever used in this Note, the plural shall include the singular and the singular shall include the plural as the context may require. In the event Maker consists of more than one person or entity, the obligations of each Maker hereunder shall be joint and several. Any capitalized words used in this Note and not herein defined shall have the meanings ascribed to such terms in the Loan Documents.

5.12    <u>Venue</u>. Borrower hereby consents to the exercise of personal jurisdiction over it by any federal or state court in the state where the Property is located and consents to the

Lafayette, Louisiana          - 8 -

**MAKER:**

CIRCUIT  INVESTORS-MATTESON  LIMITED
PARTNERSHIP, a Texas limited partnership

By:    CIRCUIT  GENERAL  PARTNER  #4,  INC., a
Texas corporation, General Partner

By:_____

Its:_____
(Duly Authorized)

STATE OF _____
COUNTY OF _____

      BE IT KNOWN, that on this _____ day of February, 1995, before me, the undersigned
Notary Public, duly commissioned, qualified and sworn within and for the State and County
aforesaid, personally came and appeared _____, to me known to be the identical person
who executed the above and foregoing instrument, who declared and acknowledged to me,
Notary, in the presence of the undersigned competent witnesses, that he is the _____ of
Circuit General Partner #4, Inc., a Texas corporation as general partner of Circuit Investors-
Matteson Limited Partnership, a Texas limited partnership, that as such duly authorized officer,
by and with the authority of the Board of Directors of said Corporation, he signed and executed
the foregoing instrument, as his free and voluntary act and deed of said Corporation, for and on
behalf of said Corporation, for the uses, purposes and benefits therein expressed.

WITNESSES:

_____

_____          _____
                                 [signatory]

_____


                                 Notary Public:_____

(Seal, if any)

                                 My Commission Expires:_____

I\AFZ\27098\6-038.nox\022595\lc

Lafayette, Louisiana                  - 10 -



EXHIBIT C

PERMITTED EXCEPTIONS

EXCEPTIONS FROM COVERAGE

## PART L

This policy does not insure against loss or damage (and the company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Ad valorem real taxes and special assessments for the year 1995, and subsequent years not yet due and payable.

2. The Company does not insure the square footage or acreage of the property.

3. Right of way Easement granted by James J. Whittington in favor of Southwest Louisiana Electric Membership Corporation by act dated March 31, 1958, recorded as File No. 650237 in COB 120, folio 905 on September 17, 1975; as amended by Act dated April 14, 1980, recorded as File No. 80-8333, as shown on survey of C.H. Fenstermaker & Associates, Inc., dated February 17, 1995, revised February 22, 1995.

4. Servitude granted by the Whittington Family Partnership in favor of South Central Bell Telephone Company by act dated March 12, 1980, recorded as File No. 80-8017, as shown on survey of C.H. Fenstermaker & Associates, Inc., dated February 17, 1995, revised February 22, 1995.

5. Reciprocal Easement and Operation Agreement executed by CAP-Lafayette Investors Limited Partnership, Toys "R" Us, Inc. and Lowe's Home Center, Inc., dated April 25, 1990, recorded as File No. 90-12433; as amended by First Amendment to Reciprocal Easement and Operation Agreement, dated January 20, 1993, recorded as File No. 93-003289; as further amended by Second Amendment to Reciprocal Easement and Operation Agreement, dated January 31, 1994, recorded as File No. 94-010707, as referenced on survey by C.H. Fenstermaker & Associates, Inc., dated February 17, 1995, revised February 22, 1995.

6. Memorandum of Property Development Agreement between and by Circuit City Stores, Inc. and Concordia Properties, Inc., dated March 19, 1994, recorded as File No. 94-010708, as referenced on survey by C.H. Fenstermaker & Associates, Inc., dated February 17, 1995, revised February 22, 1995.

7. 6-foot South Central Bell Servitude, 10-foot Utility Easement, 20-foot Maintenance Easement and 25-foot Utility Easement, all as shown on survey by C.H. Fenstermaker & Associates, Inc., dated February 17, 1995, revised February 22, 1995.

8. Drainage ditch along Target Loop side, as shown on survey by C.H. Fenstermaker & Associates, Inc., dated February 17, 1995, revised February 22, 1995.




9. Encroachments of concrete and concrete curbing as shown on survey of C.H. Fenstermaker & Associates, Inc., dated February 17, 1995, revised February 22, 1995.

10. Utilities as evidenced by drain man holes, sewer service clean out, light poles, double catch basins, water valve and electrical transformer, all as shown on survey of C.H. Fenstermaker & Associates, Inc., dated February 17, 1995, revised February 22, 1995.

11. Lease Agreement between Circuit Investors-Matteson Limited Partnership (Landlord) and Circuit City Stores, Inc. (Tenant) dated February __, 1995, as evidenced by Memorandum of Lease by Circuit Investors-Circuit Investors-Matteson Limited Partnership, a Texas limited partnership and Circuit City Stores, Inc., dated February __, 1995, recorded as File No. _____ on February __, 1995 in the conveyance records of Lafayette Parish.

NOTE: Paragraph 7 of the "Exclusions from Coverage" section of this loan policy is hereby deleted from coverage.

NOTE: We will require written confirmation from Ben Grant that he has approved the deletion of creditor's rights.

NOTE (COLLATERAL MORTGAGES): We are informed that the Collateral Mortgage and Collateral Mortgage Note have been pledged, and a security interest granted therein, to as additional security to secure payment of $ upon which information we name the insured(s) in this Policy. The insurance to be provided by this Policy shall continue in full force and effect as to all amounts actually outstanding upon the indebtedness of the current owner of the property to the proposed insured up to the amount of the face amount of this Policy only so long as the proposed insured holds the collateral mortgage note in pledge under the written pledge agreement as security for the obligations contemplated by the written pledge agreement. The definition of the "insured" as appears in Section 1(a) of the Conditions and Stipulations of this policy is modified to exclude any future transferee or assignee of the insured collateral mortgage or of the collateral mortgage note, which note is secured by the insured collateral mortgage, unless expressly acknowledged by endorsement issued after compliance with such requirements with respect to the form and substance of the transfer and assignment, recordation of the assignment, and other matters, including the payment of an additional premium, as Chicago Title Insurance Company may impose.

Pending disbursement of the full proceeds of the loan secured by the mortgage, liability under this loan policy is limited to the extent of the amount actually disbursed but increases as each disbursement is made in good faith and without knowledge of any defects in, or objections to, the title, up to the face amount of the policy. The Company takes cognizance that the amount disbursed as of the date of this policy is $ and, accordingly, the amount of coverage of this policy is presently $.

NOTE: The Company will affirmatively insure the insured against actual monetary loss (excluding lost profits or income) occasioned by the entry of a final decree by a court of competent jurisdiction permitting the surface entry onto the land to be insured herein to exercise the rights under the mineral lease described in Item __, above.




## PART II.

In addition to the matters set forth in Part I of this Schedule B, the title to the interest in the land described or referred to in Schedule A is subject to the following matters, but the Company insures that such matters are subordinate to the lien of the insured mortgage upon said estate or interest.

1. Mortgage, Assignment of Leases and Security Agreement (First) from Circuit Investors-Matteson Limited Partnership to The Paul Revere Life Insurance Company, dated February __, 1995, recorded as File No. _____ on February __, 1995 in the conveyance office of Lafayette Parish.

2. Assignment of Leases (First) by Circuit Investors-Matteson Limited Partnership to The Paul Revere Life Insurance Company dated February __, 1995, recorded as File No. _____ on February __, 1995 in the conveyance records of Lafayette Parish.

3. Mortgage, Assignment of Leases and Security Agreement (Second) from Circuit Investors-Matteson Limited Partnership to The Paul Revere Life Insurance Company, dated February __, 1995, recorded as File No. _____ on February __, 1995 in the mortgage and conveyance offices of Lafayette Parish.

4. Assignment of Leases (Second) by Circuit Investors-Matteson Limited Partnership to The Paul Revere Life Insurance Company dated February __, 1995, recorded as File No. _____ on February __, 1995 in the conveyance records of Lafayette Parish.

NY00203.W75

*109007*
Legal

CLERK OF COURT
LAFAYETTE, LA
FILED AND RECORDED

FILE NO.    **ASSIGNMENT OF LEASES AND RENTS** TAB    N/D

95-010879    95 APR -4 PM 3:28

O.C. "DAN" GUILLIOT
CLERK OF
COURT RECORDED

This **ASSIGNMENT OF LEASES AND RENTS** ("Assignment") is made as of the date hereinafter set forth by **CIRCUIT INVESTORS -MATTESON LIMITED PARTNERSHIP**, a Texas limited partnership having a principal place of business at c/o Cardinal Capital Partners, Inc., 8411 Preston Road, 8th Floor, Dallas, Texas 75225 ("Assignor") to **THE PAUL REVERE LIFE INSURANCE COMPANY**, a Massachusetts corporation (T.I.N. 04-1768571) having a principal place of business at 18 Chestnut Street, Worcester, Massachusetts 01608 ("Assignee").

1.    Purpose

    This Assignment is made in connection with a loan in the original principal amount of up to THREE MILLION SIX HUNDRED SEVENTY-FOUR THOUSAND SIX HUNDRED SEVENTY-NINE and 00/100 ($3,674,679.00) Dollars (the "Loan") made to Assignor by Assignee for the purpose of securing the following obligations and indebtedness, up to a maximum principal amount outstanding at any one or more times, from time to time, not to exceed U.S. $50,000,000.00 (the "Maximum Amount").

    a.    Payment of the indebtedness evidenced by that certain promissory note of even date in the aggregate maximum principal amount as indicated above (the "Note") and secured by a mortgage, assignment of leases and security agreement of even date (the "Mortgage") which encumbers Assignor's interest in a certain parcel of land located at 5264 Johnson Street, Lafayette, Louisiana (hereinafter called the "Property") and more particularly described in Exhibit A attached hereto.

    b.    Payment of all other sums with interest thereon becoming due and payable to Assignee under the provisions of this Assignment, the Note, the Mortgage and any other documents or instruments evidencing or securing the Loan (all such documents, including but not limited to the Note, the Mortgage and this Assignment, being collectively referred to herein as the "Loan Documents").

    c.    The performance and discharge of each and every obligation, covenant and agreement of Assignor herein and in the Loan Documents and in any and all leases affecting the Property.

2.    Grant

    FOR VALUE RECEIVED, and in order to secure the payment and performance of said obligations and indebtedness, up to the Maximum Amount, to the fullest extent permitted by La. R.S. 9:4401, Assignor hereby assigns, transfers, pledges and hereby grants to Assignee a continuing security interest in and to all of its rights, interest and privileges which Assignor has or may have as lessor in any and all leases now in existence, or hereafter executed affecting any

Lafayette, Louisiana

portion of the Property, including any modifications, extensions or renewals thereof; together with all rents, income, issues and profits, revenues, royalties, bonuses, accounts receivable, advance rentals and tenant security deposits arising from said leases and any extensions and renewals thereof, further including Assignor's rights to enforce such leases and to receive and collect payments and proceeds thereunder; and together with all rents, income, issues and profits due or to become due from the Property, and from any and all leases for the use and occupancy of the Property or any part thereof which may be made in the future during the term of this Assignment, whether or not recorded; and together with and including Assignor's entire interest in any other lease, rental or occupancy agreement now existing or which may be made hereafter affecting the Property (all of which present and future leases, subleases, rental and occupancy agreements and renewals thereof whether or not identified in Exhibit B are made subject to this Assignment and are herein referred to as "Leases").  Assignor hereby also assigns to Assignee any award made hereafter to it in any court procedure involving any of the lessees in any bankruptcy, insolvency, or reorganization proceedings in any state or federal court; and any and all payments made by lessees in lieu of rent.  This Assignment includes an assignment of any and all guarantees of the lessees' obligations under leases covered hereby.  Notwithstanding any provisions herein to the contrary, this Assignment is intended to be an absolute assignment from Assignor to Assignee upon the occurrence of an Event of Default (as such term is defined in the Mortgage).  All rents, income, profits and payments (i) arising from the Leases, (ii) arising from the use, enjoyment and occupancy of the Property, or (iii) otherwise secured by this Assignment are hereinafter collectively referred to as the "Rents."  A description of each Lease now in effect is attached as Exhibit B.

3.    Authorization to Lease

Assignor is hereby authorized to lease space at the Property to tenants subject to the terms and conditions contained herein and in any other Loan Document.

4.    Assignor's Agreements

Assignor hereby represents, covenants and agrees:

a.    Each Lease set forth on Exhibit B has been duly executed and is valid and enforceable and each Lease hereafter entered into by Landlord shall be duly executed and be valid and enforceable.

b.    There is no default under any of the Leases set forth on Exhibit B, nor has there been any action, or failure to act which, with the passage of time, or the giving of notice, or both, would constitute a default under any of the Leases set forth on Exhibit B, nor are there any offsets invoked or defenses asserted, or which could in the future be invoked or asserted with respect to the payment of any portion of the Rents.

c.    None of the Rents have been or will be anticipated or prepaid by more than thirty (30) days in advance of their due date.

Lafayette, Louisiana                                    -2-

d.    Assignor shall deliver to Assignee within fifteen (15) days following written request by Assignee a rent roll certified correct by Assignor stating the names of each tenant, the term and rent of each Lease, whether or not the rent under each Lease is current, and whether any other default under the Lease has occurred or is occurring. Rental concessions such as free rent, above standard tenant improvements, moving allowances, lease buyouts, or any other monetary inducements must be noted on the rent roll. Assignee has previously received a certified rent roll, which rent roll Assignor hereby warrants and represents is true and correct as of the date of this Assignment.

e.    Certified copies of all Leases affecting the Property, along with information concerning the credit of each tenant, must be submitted to Assignee for prior written approval, which approval shall not be unreasonably withheld or delayed. Assignee's failure to approve or disapprove of a lease submitted within fifteen (15) business days shall be deemed approval provided Assignor has made reasonable efforts to contact Assignee before and during such 15-day period. The Leases shall be approved upon the satisfaction of the following requirements:

(i)    The Leases must be in form and substance satisfactory to Assignee.

(ii)    The tenants thereunder must be satisfactory to Assignee.

(iii)    The tenants thereunder and their guarantors are solvent and not subject to any bankruptcy, insolvency, receivership or reorganization proceedings.

f.    Except as already provided on Exhibit B, Assignor shall deliver to Assignee within ten (10) business days following written request by Assignee conformed copies of all Leases or other instruments affecting the Property.

g.    Assignor shall not surrender, cancel, modify or terminate any Lease, exercise any option which might lead to such termination or change, consent to the release of any party liable thereunder or consent to or permit any violation, default, assignment or subletting of any Lease by a tenant other than as permitted by such Lease without the prior written consent of Assignee, which approval shall not be unreasonably withheld, conditioned or delayed. Assignor shall not request, consent to, agree to or accept a subordination of any Lease to any mortgage or other encumbrance, or any other Lease, now or hereafter affecting the Property, without Assignee's prior written consent.

h.    No other assignment of any interest in the Leases or Rents has been made by Assignor, and Assignor shall not pledge, mortgage or further assign any Lease or the Rents as security for any obligation other than to Assignee in connection with the transaction of which this is a part.

i.    Assignor shall observe and perform within applicable grace periods all of the obligations imposed upon Assignor in said Leases, shall not do or permit to be done anything

Lafayette, Louisiana

to impair the validity thereof and shall enforce all of the terms, covenants and conditions contained in the Leases upon the part of the lessees thereunder to be observed or performed.

j.    This Assignment is irrevocable.

k.    Assignor has full power and authority to execute and deliver this Assignment and the execution and delivery of this Assignment has been duly authorized, and does not conflict with or constitute a default under any law, judicial order or other agreement affecting the Assignor or the Property.

l.    Assignor will promptly notify Assignee of any default by Assignor or any tenant under any Lease and shall send copies to Assignee of all notices of default which Assignor shall send or receive thereunder. Assignor shall appear in and defend, at no cost to Assignee, any action or proceeding arising under or in any manner connected with any Lease.

m.    All subsequent Leases affecting the Property shall be and are hereby made subject to all of the terms of this Assignment without the need for a further or supplemental assignment.

n.    Assignor shall assign and transfer to Assignee any and all further Leases upon all or any part of the Property and agrees to execute and deliver, at the written request of Assignee, all such further assurances and assignments as Assignee shall from time to time reasonably require.

o.    The terms of the Leases have not been changed from the terms in the copies of such Leases submitted to Assignee for approval.

5.    Assignee's Remedies Upon Default

Upon or at any time after an Event of Default (as such term is defined in the Mortgage) by Assignor, or a default by Assignor as lessor under any Lease beyond any applicable cure and grace period, Assignee, without in any way waiving such default, may at its option, enter and take possession of the Property to the fullest extent allowed by law, in which event Assignee shall have the right to have, hold, manage, lease and operate the same on such terms and for such period of time as Assignee may deem proper, with full power to make from time to time all alterations, renovations, repairs or replacements thereto as may seem proper to Assignee, and to do all things required of or permitted to the landlord under said Leases (including the right to demand, sue for and otherwise collect all Rents), and to apply such Rents (to the extent required of or permitted to the landlord under the Leases) to the payment of: (a) the cost of such alterations, renovations, repairs and replacements and expenses incident to taking and retaining possession of the Property and the management and operation thereof, and keeping the same properly insured and (b) all taxes, charges, claims, assessments, water rents and any other liens which may be prior to this Assignment or the Loan Documents, and premiums for said insurance, with interest on all such items, and (c) the indebtedness secured hereby, together with all costs and reasonable attorneys' fees, in such order of priority as to any of such items, as

Assignee in its sole discretion may determine, statute, law, custom or use to the contrary notwithstanding. Assignee shall have the additional right, at any time and for any reason, whether or not an Event of Default exists, to directly collect and receive the benefit of all obligations and all proceeds and/or payments assigned to Assignee under this Assignment, as such amounts and/or obligations become due and payable. In order to permit the foregoing, from and after an Event of Default Assignor unconditionally agrees to deliver to Assignee, immediately following demand, any and all records and other documentation, in the form requested by Assignee, with regard to the Leases. Assignee shall have the further right, where appropriate and within Assignee's sole discretion, to file suit, either in its own name or in the name of Assignor, to enforce any obligations and/or to collect any and all such proceeds and payments that may now and in the future be due and owing under the Leases. Assignor hereby grants to Assignee its irrevocable power of attorney, coupled with an interest, to take any and all of the aforementioned actions and any or all other actions designated by Assignee for the proper management and preservation of the Property.

Assignee's remedies upon any Event of Default shall be cumulative in nature and nothing under this Assignment shall be construed as to limit or restrict the options and remedies otherwise available to Assignee following an Event of Default, or to in any way limit or restrict the rights and ability of Assignee to proceed directly against Assignor and/or against any co-makers, guarantors, sureties and/or endorsers of the Notes, and/or to proceed against any other collateral directly or indirectly securing said indebtedness.

6.    No Assumption of Assignor's Obligations

Assignee shall not be liable for any loss sustained by Assignor resulting from Assignee's failure to let the Property after any default hereunder, or from any act or omission of Assignee in managing the Property after default. Assignee shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability under the Leases, or under or by reason of this Assignment, and Assignor shall and does hereby agree to indemnify Assignee for and to hold Assignee harmless from any and all liability, loss or damage which it may or might incur under the Leases or under or by reason of this Assignment and from any and all claims and demands whatsoever which may be asserted against it by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases. Should Assignee incur any such liability, loss or damage under the Leases or under or by reason of this Assignment, or in the defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees shall be secured hereby, and Assignor shall reimburse Assignee therefor within thirty (30) days following written demand, and upon the failure of Assignor to do so, Assignor shall be in default under this Assignment and the Loan Documents. This Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Assignee, nor for the carrying out of any of the terms and conditions of the Leases; nor shall it operate to make Assignee responsible or liable for any waste committed on the Property by the tenants or any other parties, or for any dangerous or defective condition of the Property, including without limitation the presence of any Hazardous Materials (as defined in the

Lafayette, Louisiana                                -5-

Mortgage), or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or other person.

7.    Condition of Assignment

Upon the payment in full of all indebtedness secured hereby and the performance of all of the obligations, covenants and agreements contained herein, this Assignment shall become null and void and of no effect, and until such payment and performance, this Assignment shall itself constitute conclusive evidence of the validity, effectiveness and continuation of this Assignment. Assignor hereby directs and requires all tenants to pay such rents to Assignee and Assignor shall have no right or claim against tenants for any such rents so paid by tenants to Assignee.

8.    Subordination, Non-Disturbance and Attornment

Assignee reserves the right to require that all Leases be subordinate to the Loan. Assignee may require that certain Leases be made superior to the Loan and that certain provisions of such superior leases be made subject to the Loan. Assignee may further require the execution of subordination, attornment and non-disturbance agreements on a pre-approved form from tenants specified by Assignee.

9.    Cross Default

A default by Assignor beyond the expiration of applicable grace and notice periods in the performance of any obligation, covenant or agreement herein or under any Leases or the breach of any representation or warranty contained herein shall constitute an Event of Default under and as defined in the Loan Documents.

10.    Certain Definitions

Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "Assignor" shall mean "each Assignor and any subsequent owner or owners of the Property or any part thereof or interest therein," the word "Assignee" shall mean "Assignee and any subsequent holder of the Note secured by the Mortgage," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Mortgage," the word "person" shall include an individual, corporation, partnership, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the word "Loan" shall mean the principal balance of the Note with interest thereon as provided in the Note and the Mortgage, this Assignment and the Loan Documents. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

11.    Notices.  All notices, demands, consents, approvals, requests or other communications provided for or required to be given or furnished by either party hereunder shall be in writing and shall be (i) hand-delivered, effective upon receipt, or (ii) sent by United States Express Mail or by private overnight courier, effective upon receipt, or (iii) served by certified mail, postage prepaid, return receipt requested, deemed effective on the day of actual delivery as shown by the addressee's return receipt or the expiration of three (3) business days after the date of mailing, whichever is the earlier in time; addressed to the party intended to receive the same at the address set forth below:

| | |
|---|---|
| Assignee: | The Paul Revere Life Insurance Company |
| | c/o The Paul Revere Investment Management Corporation |
| | 18 Chestnut Street |
| | Worcester, Massachusetts 01608-1528 |
| | Attention:  Real Estate Investments |
| | |
| with a copy to: | Pepe & Hazard |
| | Goodwin Square |
| | Hartford, Connecticut 06103-4302 |
| | Attention:  Timothy J. Boyce, Esq. |
| | |
| Assignor: | Circuit Investors-Matteson Limited Partnership |
| | c/o Cardinal Capital Partners, Inc. |
| | 8411 Preston Road, 8th Floor |
| | Dallas, Texas 75225 |
| | Attention:  Gil Besing |
| | |
| with a copy to: | Goldfarb & Fleece |
| | 345 Park Avenue |
| | New York, New York 10154 |
| | Attention: Steven Shore |

12.    Miscellaneous

        a.    Assignee may take or release any other security, may release any party primarily or secondarily liable for any indebtedness secured hereby, may grant extensions, renewals or indulgences with respect to such indebtedness, and may apply any other security therefor held by it to the satisfaction of such indebtedness without prejudice to any of its rights hereunder.

        b.    In the event of foreclosure of the Mortgage by sale or otherwise, Assignee is hereby authorized to sell Assignor's interest in the Leases with the Property or to assign the same without consideration to the purchaser at said sale or to any other claimant to the title to the Property by virtue of a foreclosure of the Mortgage; and there shall be no liability to account to Assignor for any rents or profits accruing after the vesting of title in another following such foreclosure.

Lafayette, Louisiana

-7-

c.      This Assignment shall be governed and construed under the internal laws of the State of Louisiana, without giving effect to the conflicts of law provisions thereof.

d.      Nothing herein contained and no act done or omitted by Assignee pursuant to the powers and rights granted it herein shall be deemed to be a waiver by Assignee of its rights and remedies under this Assignment or any of the Loan Documents, and this Assignment is expressly made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms thereof. The right of Assignee to collect the indebtedness secured hereby and to enforce any other security therefor owned by Assignee may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by Assignee hereunder. The continued receipt by Assignee of any Rents pursuant to this instrument following the institution of foreclosure proceedings under the Mortgage shall not cure such default nor affect such proceedings or any sale pursuant thereto.

e.      The full payment of the Note secured by the Mortgage and full performance of the Mortgage and the duly recorded release and discharge of the Mortgage shall constitute simultaneous release and discharge of this Assignment. In case of any conflict between the terms of this Assignment and the terms of the Mortgage, the terms of the Mortgage shall prevail.

f.      If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

g.      Nothing herein contained, nor any collection of Rents under the Leases, whether by Assignee or by a receiver, shall be construed as constituting Assignee a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Assignee. In the exercise of the powers herein granted Assignee, no liability shall be asserted or enforced against Assignee, all such liability being expressly waived and released by Assignor.

h.      All the covenants and agreements hereinabove set forth on the part of either party shall apply to and bind their respective heirs, successors and permitted assigns as well as any subsequent owner of the Property.

i.      All exhibits attached hereto are by this reference incorporated fully into this Assignment.

j.      Assignor authorizes Assignee to give notice in writing of this instrument at any time to any tenant under any of the Leases.

k.      Each Lease shall remain in full force and effect despite any merger of the interest of Assignor and any lessee thereunder. Assignor shall not transfer or convey title to the leased premises to any lessee without the prior written consent of Assignee, and where such consent is given or where under applicable law the requirement for such consent is not enforceable, Assignor shall require the lessee, in writing, to assume and agree to pay Assignor's Note in accordance with the terms, covenants and conditions of the Note and the Mortgage. In no event

shall any such transfer or conveyance operate to release or relieve Assignor from any liability to Assignee unless Assignee specifically agrees otherwise in writing.

      l.     If any Lease provides for the abatement of rent during repair of the leased premises by reason of fire or other casualty, Assignor shall furnish rental insurance to Assignee, the policies to be in such amounts and forms and written by such companies as shall be satisfactory to Assignee, in addition to any rental insurance required under the Mortgage.

      .m.    This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Assignor or Assignee, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

      n.    This Assignment is subject to the exculpation provisions and exceptions therefrom contained in the Note, which provisions are incorporated herein by this reference.

     IN WITNESS WHEREOF, this Assignment has been executed by Assignor on this 27th day of February, 1995.

ASSIGNOR:

CIRCUIT INVESTORS-MATTESON LIMITED PARTNERSHIP, a Texas limited partnership

By:    CIRCUIT GENERAL PARTNER #4, INC., a Texas corporation, General Partner

By: _____

Title: PRESIDENT _____

STATE OF _Texas_
COUNTY OF _Dallas_

BE IT KNOWN, that on this _27_ day of February, 1995, before me, the undersigned Notary Public, duly commissioned, qualified and sworn within and for the State and County aforesaid, personally came and appeared _Gald. Besing_ to me known to be the identical person who executed the above and foregoing instrument, who declared and acknowledged to me, Notary, in the presence of the undersigned competent witnesses, that he is the _President of_ Circuit General Partner #4, Inc., a Texas corporation as general partner of Circuit Investors-Matteson Limited Partnership, a Texas limited partnership, that as such duly authorized officer, by and with the authority of the Board of Directors of said Corporation, he signed and executed the foregoing instrument, as his free and voluntary act and deed of said Corporation, for and on behalf of said Corporation, for the uses, purposes and benefits therein expressed.

WITNESSES:

_Ashley Stattan_

_Stacy Swirling_



_Terie L. Rasmussen_

NOTARY PUBLIC
MY COMMISSION EXPIRES: _3-12-98_

```
TERIE L. RASMUSSEN
NOTARY PUBLIC
State of Texas
Comm. Exp. 03-12-98
```

Rafx\27098\6-059.ASG\022695\lb

Lafayette, Louisiana                    ~10~

EXHIBIT A

## MAIN PARCEL

A certain tract of land containing 3.504 acres, known as Lot 2B,
Acadiana Square Shopping Center, located in Section 68, Township
10 South, Range 4 East, City of Lafayette, Lafayette Parish,
Louisiana, being more fully described as follows:

Commencing at the projected intersection of the more easterly
right-of-way of Fountainhead Drive and the more northerly right-
of-way of Johnston Street (U.S. Highway 167), proceed along said
right-of-way of Johnston Street a bearing of North 41 degrees 36
minutes 31 seconds East, a distance of 704.00 feet to a point;
thence continue along said right-of-way of Johnston Street a
bearing of North 41 degrees 35 minutes 16 seconds East, a
distance of 646.20 feet to a point; thence proceed along a
bearing of North 48 degrees 25 minutes 04 seconds West, a
distance of 247.67 feet to a point; thence proceed along a
bearing of North 13 degrees 41 minutes 34 seconds West, a
distance 23.34 feet to a point, said point hereinafter to be
known as the Point of Beginning; thence proceed along a bearing
of South 74 degrees 26 minutes 08 seconds West, a distance of
248.86 feet to a point; thence proceed along a bearing of North
15 degrees 33 minutes 52 seconds West a distance of 225.06 feet
to a point; thence proceed along a bearing of South 74 degrees 26
minutes 08 seconds East a distance of 8.15 feet to a point;
thence proceed along a bearing of North 15 degrees 33 minutes 52
seconds West, a distance of 379.64 feet to a point on the
southerly right-of-way of Target Loop; thence proceed along the
southerly right-of-way of Target Loop a bearing of North 75
degrees 32 minutes 27 seconds East a distance of 260.35 feet to a
point; thence proceed along a bearing of South 13 degrees 41
minutes 34 seconds East a distance of 600.00 feet to the Point of
Beginning; all as shown on the current Replat of Acadiana Square
Shopping Center, dated February 13, 1994, last revised December
12, 1994, by C. H. Fenstermaker & Associates, Inc., a copy of
which is recorded under Act No. 94-045525 in the Lafayette Parish
Court House, Lafayette, Louisiana.

## SERVITUDE PARCEL

That certain non-exclusive servitude interest acquired pursuant
to Reciprocal Easement and Operation Agreement executed by CAP-
Lafayette Investors Limited Partnership, Toys "R" Us, Inc. and
Lowe's Home Center, Inc., dated April 25, 1990, recorded as File
No. 90-12433; as amended by First Amendment to Reciprocal
Easement and Operation Agreement, dated January 20, 1993,
recorded as File No. 93-003289; as further amended by Second
Amendment to Reciprocal Easement and Operation Agreement, dated
January 31, 1994, recorded as File No. 94-010707.

## EXHIBIT B

Lease between Assignor, as landlord, and Circuit City Stores, Inc., as tenant, dated February 22, 1995.

RatX27098\6-059.ASG\022695\lb

Lafayette, Louisiana

# Exhibit D



**Doc Type Group**

Legal Documents

**Document Type**

Mortgage/Deed of Trust - Assignment

**Loan Number**

9 8 2 0 0 3 7 4 6

**Library**

A

**Doc Date**

1 1 / 0 9 / 9 8

**Class**

Servicing

**HEADER**



N

User : TLYNCH

Mar-28-99 05:39pm From

99 - 002077

D.C. "DAN GUILLIOT
CLERK OF
COURT RECORDER

FILED AND RECORDED

99 JAN 19 AM 9: 37

RCG#:133.1- MTG YP
LaSalle #: 172790 /172790 PREVERE
Issuer/Pool:  1055/2 GMAC97C1

## GERMAN AMERICAN CAPITAL CORPORATION, A MARYLAND CORPORATION
### (Assignor)
### and
## GMAC Commercial Mortgage, as Master Servicer for LaSalle National Bank, as Trustee for GMACCM Mortgage Pass-Through Certificates, Series 1997-C1
### (Assignee)

## ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND SECURITY AGREEMENT (FIRST)

DATED:                    11/9/98
PROPERTY LOCATION:
COUNTY & STATE:       Lafayette, LA
NEW YORK SECTION:
  BLOCK:
  LOT:                    **COPY**
PIN # (If Required):

### PREPARED BY AND RECORD AND RETURN TO:
S. Richardson, RCG, Inc.
505 San Marin Drive, #110A
Novato, California 94945
415-898-7200
Attn: GMAC97C1 LASALLE 1055/2 PREVERE

## ASSIGNMENT OF MORTGAGE, ASSIGNMENT OF LEASES AND SECURITY AGREEMENT (FIRST)

For Value Received, **GERMAN AMERICAN CAPITAL CORPORATION, A MARYLAND CORPORATION**, the undersigned holder of a(n) MORTGAGE, ASSIGNMENT OF LEASES AND SECURITY AGREEMENT (FIRST) (herein "Assignor") whose address is 31 West 52nd Street New York New York 10019, does hereby grant, sell, assign, transfer and convey, without recourse unto **GMAC Commercial Mortgage, as Master Servicer for LaSalle National Bank, as Trustee for GMACCM Mortgage Pass-Through Certificates, Series 1997-C1 (herein Assignee")** whose address is 135 S. LaSalle Street, 16th Floor, Attn. Mtg Custody Chicago Illinois 60674, the mortgage loan documents identified below, hereto (the "Asset"), together with the promissory note(s), related thereto together with all amendments, supplements and modifications thereto ("collectively, the "Loan Documents and Collateral"), recorded in the real estate records of Lafayette County/jurisdiction, in the Commonwealth or State of LA, described as follows:

MORTGAGE, ASSIGNMENT OF LEASES AND SECURITY AGREEMENT (FIRST)

| | |
|---|---|
| Borrower Name(s): | CIRCUIT INVESTORS -MATTESON LIMITED PARTNERSHIP, A TEXAS LIMITED PARTNERSHIP |
| Original Lender: | THE PAUL REVERE LIFE INSURANCE COMPANY, A MASSACHUSETTS CORPORATION |
| Trustee (if DOT): | |
| Date of Document: | 3/31/95 |
| Date of Recording: | 4/04/95 |
| Book/Volume: | _____    Page No.: _____ |
| Instr/Ref: | 95-010878 |
| Other #: | |
| Township/Borough: | |

Subject to the right and equity of redemption, if any there be of said mortgagor and their heirs and assigns in the same.

In the event the property securing this loan is in the state of New York, this Assignment is not subject to the requirements of Section 275 or Section 255 of the Real Property Law because it is an assignment within the secondary mortgage market. The Assignee is not acting as a nominee of the mortgagor and the Mortgage continues to secure a bona fide obligation.

RCG#: 133.1-MTG YP
LaSalle #: 172790/ 172790 PREVERE
Issuer/Pool: 1055/2 LASALLE GMAC97C1

Mar-29-99 09:39pm From-

Page 2-RCG#:133.1-MTG YP
LaSalle #: 172790/ 172790 PREVERE
Issuer/Pool: 1055/2LASALLE GMAC97C1

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, forever, subject only to the terms and conditions of the above-described MORTGAGE, ASSIGNMENT OF LEASES AND SECURITY AGREEMENT (FIRST).

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed and delivered, effective the _9th_ day of _Nov_, 199_8_

ASSIGNOR:
GERMAN AMERICAN CAPITAL CORPORATION,
A MARYLAND CORPORATION

By: _____
Name: Keven Gilder
Title: Authorized Signatory

Steven Stuart
Vice President

STATE OF _New York_ }
                            }ss:
COUNTY OF _New York_ }

On the _9th_ day of _November_, 1998, before me, personally came _Kenneth Gilderstown Steat_, personally known to me, to be the person whose name is subscribed to the within instrument, who being by me duly sworn, did depose and say that he/she resides at 31 West 52nd Street New York New York 10019, and that he/she is the _authorized signatory_ of GERMAN AMERICAN CAPITAL CORPORATION, A MARYLAND CORPORATION and who acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the person or the entity on behalf of which the person acted, executed the instrument.

JOYCE C. LANDRY
Notary Public, State of New York
No. 01LA5084146
Qualified in Queens County
Certificate Filed in New York County
Commission Expires Aug. 25/ 222

Witness my hand and official seal.

Notary Public: _____

[notary seal]

My Commission Expires: _____

# Exhibit E

# SECOND CONSENT, ASSUMPTION AND MORTGAGE MODIFICATION AGREEMENT (FIRST)

### Mortgage, Assignment of Leases and Security Agreement (First)

CLERK OF COURT
LAFAYETTE, LA
FILED AND RECORDE

99 APR -1 PM 4: 18

CANOL. ARDOIN
CLERK OF
COURT RECORDER.

99-013257

109007
172790

BE IT KNOWN, that on this 29ᵗʰ day of March, 1999;

BEFORE ME, a Notary Public, duly commissioned and qualified in and for the Parish of East Baton Rouge, State of Louisiana, and in the presence of the undersigned competent witnesses,

## PERSONALLY CAME AND APPEARED:

BANK ONE, LOUISIANA, N.A. (T.I.N. 95-4538767) a national banking association, not in its individual capacity but solely as trustee under that certain Trust Agreement of Voit Partners Louisiana Sub-Trust (the **"Louisiana Sub-Trust"**) first dated January 13, 1997, having a mailing address of 451 Florida Street, Baton Rouge, Louisiana 70801, appearing herein by and through James A. Pock III its Vice president and duly authorized representative pursuant to a resolution of its Board of Directors, a certified copy of which is annexed hereto (**"Bank One"**);

BE IT KNOWN, that on this 25ᵗʰ day of March, 1999;

BEFORE ME, a Notary Public, duly commissioned and qualified, in and for the County of Orange, State of California, and in the presence of the undersigned competent witnesses,

## PERSONALLY CAME AND APPEARED:

VOIT PARTNERS, LTD. I, TRUST #1 (T.I.N. 95-4538767) a Delaware Business Trust, having a mailing address of 21600 Oxnard Street, Suite 300, Woodland Hills, California 91367, appearing herein by and through Voit Partners, Ltd. I, a California Limited Partnership, not in its individual capacity but solely as administrative trustee appearing herein by and through Voit Warner Properties III, LLC, a California Limited Liability Company appearing herein by and through James T. Muth, a duly authorized representative pursuant to that certain Certificate of Manager of Voit Warner Properties III, LLC effective October 15, 1998 and that certain Special Power of Attorney by Robert D. Voit, as manager, to James T. Muth and James B. Allen (each of which may act individually), dated January 13, 1997, but effective as of December 30, 1996, a certified copy of which is annexed hereto (**"Voit"**) (Bank One and Voit are herein collectively referred to as the **"Borrower"**);

1055/2/2-0035-000

## SECOND CONSENT, ASSUMPTION AND
## MORTGAGE MODIFICATION AGREEMENT (FIRST)

### Mortgage, Assignment of Leases and
### Security Agreement (First)

BE IT KNOWN, that on this 29th day of March, 1999;

BEFORE ME, a Notary Public, duly commissioned and qualified in and for the Parish of East Baton Rouge, State of Louisiana, and in the presence of the undersigned competent witnesses,

#### PERSONALLY CAME AND APPEARED:

BANK ONE, LOUISIANA, N.A. (T.I.N. 95-4538767) a national banking association, not in its individual capacity but solely as trustee under that certain Trust Agreement of Voit Partners Louisiana Sub-Trust (the **"Louisiana Sub-Trust"**) first dated January 13, 1997, having a mailing address of 451 Florida Street, Baton Rouge, Louisiana 70801, appearing herein by and through James A. Focke III, its Vice President and duly authorized representative pursuant to a resolution of its Board of Directors, a certified copy of which is annexed hereto (**"Bank One"**);

BE IT KNOWN, that on this 25th day of March, 1999;

BEFORE ME, a Notary Public, duly commissioned and qualified, in and for the County of Los Angeles, State of California, and in the presence of the undersigned competent witnesses,

#### PERSONALLY CAME AND APPEARED:

VOIT PARTNERS, LTD. I, TRUST #1 (T.I.N. 95-4538767) a Delaware Business Trust, having a mailing address of 3001 Douglas Boulevard, Suite 360, Roseville, California 95661, appearing herein by and through Voit Partners, Ltd. I, a California Limited Partnership, not in its individual capacity but solely as administrative trustee appearing herein by and through Voit Warner Properties III, LLC, a California Limited Liability Company appearing herein by and through James T. Muth, a duly authorized representative pursuant to that certain Certificate of Manager of Voit Warner Properties III, LLC effective October 15, 1998 and that certain Special Power of Attorney by Robert D. Voit, as manager, to James T. Muth and James B. Allen (each of which may act individually), dated January 13, 1997, but effective as of December 30, 1996, a certified copy of which is annexed hereto (**"Voit"**) (Bank One and Voit are herein collectively referred to as the **"Borrower"**);

1(a)

BE IT KNOWN, that on this 29th day of March, 1999;

BEFORE ME, a Notary Public, duly commissioned and qualified, in and for the County of ___Cook___, State of ___Illinois___, and in the presence of the undersigned competent witnesses,

## PERSONALLY CAME AND APPEARED:

**GMAC COMMERCIAL MORTGAGE CORP.**, as Master Servicer for LaSalle National Bank, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1, appearing herein by and through Diane Norberg, its Vice-President and duly authorized representative pursuant to a resolution of its Board of Directors, a certified copy of which is annexed hereto (the "**Lender**");

BE IT KNOWN, that on 24th day of March, 1999;

BEFORE ME, a Notary Public, duly commissioned and qualified, in and for the County of ___Steele___, State of ___Minnesota___, and in the presence of the undersigned competent witnesses,

## PERSONALLY CAME AND APPEARED:

**CC LAFAYETTE, LLC**, a Minnesota limited liability company having a mailing address of 1355 Lemond Road, Owatonna, Minnesota 55060, appearing herein by and through Larry J. Reitz, its Chief Manager and duly authorized representative (the "**Purchaser**");

## W I T N E S S E T H:

WHEREAS, this Agreement is made effective as of the 31st day of March, 1999;

WHEREAS, Circuit Investors-Matteson Limited Partnership, a Texas limited partnership ("**Circuit Investors**"), executed a Promissory Note in favor of The Paul Revere Life Insurance Company, a Massachusetts corporation ("**Paul Revere**") dated February 27, 1995 in the original principal amount of THREE MILLION SIX HUNDRED SEVENTY-FOUR THOUSAND SIX HUNDRED SEVENTY-NINE AND no/100 Dollars ($3,674,679.00) (the "**Note**") to evidence a loan made by Paul Revere to Circuit Investors in said amount on said date (the "**Original Loan**"); and

WHEREAS, the Note is evidenced and secured by various instruments, including (i) that certain Mortgage, Assignment of Leases and Security Agreement (First) dated March 31, 1995, but effective February 27, 1995, from Circuit Investors to Paul Revere, and recorded on April 4, 1995 as File No. 95-010878 of the mortgage and conveyance records of the Clerk of Court, Lafayette,

2

Louisiana (the "**Recorder's Office**"), as corrected by that certain Act of Correction of Clerical Error by Notary Public, dated May 5, 1995, recorded as File No. 95-14523 on May 9, 1995 in the mortgage and conveyance records in the Recorder's Office, all as modified by that certain Consent, Assumption and Mortgage Modification Agreement (First) dated January 15, 1997, by and among Circuit Investors, Paul Revere and Borrower (the "**First Modification**"), and recorded as File No. 97-1985 in the mortgage and conveyance records in the Recorder's Office (as modified, the "**Mortgage**"); (ii) that certain Assignment of Leases and Rents dated February 27, 1995 from Circuit Investors to Paul Revere and recorded on April 4, 1995 as File No. 95-010879 in the mortgage and conveyance records in the Recorder's Office, as corrected by that certain Act of Correction of Clerical Error by Notary Public, dated May 5, 1995, recorded as File No. 95-14523 on May 9, 1995 in the mortgage and conveyance records in the Recorder's Office (the "**Assignment of Leases**"); (iii) that certain UCC-1 Financing Statement filed in the mortgage and conveyance records in the Recorder's Office on April 4, 1995 as File No. 28-362165 (the "**UCC**"); (iv) that certain Environmental Indemnity Agreement dated February 27, 1995 from Circuit Investors to Paul Revere (the "**Indemnity Letter**"); and (v) that certain Tax, Insurance and Capital Reserve Escrow Agreement, dated February 27, 1995 (the "**Tax, Insurance and Capital Reserve Escrow Agreement**"), (the Note, Mortgage, Assignment of Leases, UCC, Indemnity Letter, Tax, Insurance and Capital Reserve Escrow Agreement and all other documents and instruments relating to the Property (as hereinafter defined) and evidencing or securing such Loan, as modified herein, being hereinafter referred to collectively as the "**Loan Documents**"); and

WHEREAS, the Loan Documents encumber that certain real property (immovable) described in Exhibit A attached hereto and improvements thereon commonly known as 5264 Johnson Street, Lafayette, Louisiana, and more particularly described in the Mortgage (the "**Property**"); and

WHEREAS, pursuant to Section 2.16 of the Mortgage, any transfer of the Property without the consent of Lender would constitute an Event of Default; and

WHEREAS, Circuit Investors subsequently sold and transferred the Property to Bank One, as trustee of the Louisiana Sub-Trust, with the consent of Paul Revere, pursuant to which Borrower assumed the Loan in accordance with the First Modification; and

WHEREAS, Paul Revere subsequently assigned the Mortgage and other Loan Documents to German American Capital Corporation pursuant to a certain Assignment dated August 22, 1997; and

WHEREAS, German American Capital Corporation subsequently assigned the Mortgage and other Loan Documents to Lender; and

WHEREAS, Lender is willing to allow the sale of the Property from Bank One, as trustee of the Louisiana Sub-Trust, to Purchaser provided that (i) Purchaser assumes all of the obligations of Borrower under the Loan Documents, and (ii) Borrower and Purchaser execute and deliver to Lender this Agreement and such other miscellaneous assurances and/or documentation as Lender may reasonably require in connection with the proposed transaction, including but not limited to a modification of the Mortgage as hereinafter described.

3

NOW THEREFORE, for good and valuable consideration, and in consideration of the mutual promises of the parties contained herein, the sufficiency and receipt of which are hereby acknowledged, it is hereby agreed as follows:

1.     The principal balance of the Loan as of March 31, 1999, is THREE MILLION FOUR-HUNDRED TWENTY-ONE THOUSAND SEVEN HUNDRED NINETY AND 62/100 DOLLARS ($3,421,790.62) and the amount of all accrued but unpaid interest as of March 31, 1999 is TWENTY-FIVE THOUSAND THREE-HUNDRED SEVENTY-EIGHT AND 28/100 DOLLARS ($25,378.28).

2.     Borrower hereby warrants and covenants to Lender that, as of the date hereof, (i) Borrower has received no written notice of, and to the best of its knowledge (without additional inquiry), no Event of Default (as defined in the Mortgage) exists under the Loan Documents, (ii) to the best of its knowledge (without additional inquiry) no deferred maintenance exists with respect to the Property, (iii) Borrower has received no written notice of, and to the best of its knowledge (without additional inquiry), there is no default existing under that certain lease of the Property dated February 22, 1995, between Circuit Investors as Landlord and Circuit City Stores, Inc. ("**Circuit City Stores**"), as Tenant, and (iv) Circuit City Stores' credit remains "investment grade" (as that term is defined in the Mortgage).

3.     Purchaser hereby (a) assumes and agrees to perform all of the covenants, agreements and obligations contained in the Loan Documents on the part of Borrower thereunder and (b) agrees to make all payments required to be made under the Loan Documents in accordance with the provisions thereof, subject to the nonrecourse provisions contained therein, provided, however, that notwithstanding anything to the contrary contained herein or in any of the Loan Documents, Purchaser does not (with the exception of interest accrued on the Note on March 31, 1999, which Purchaser expressly agrees to pay upon the next regularly scheduled payment date under the Note) assume any liability of Borrower however arising that accrued before the execution date of this Agreement, including without limitation, any personal liability of Borrower arising out of or in any way relating to the Loan Documents or the Property, all of which are retained by Borrower.

4.     Purchaser hereby restates with respect to itself all of the representations and warranties made by Borrower under the Loan Documents; provided that all representations regarding title to the Property shall be limited solely to Purchaser.

5.     Purchaser hereby stipulates and agrees that its title to the Property is and shall be subject to the liens, security interests and terms and conditions of the Mortgage and the other Loan Documents.

6.     Purchaser represents that the lien of the Mortgage on the Property is, to the best of its knowledge, a valid and existing first lien and that the Property shall remain in all respects subject to the lien of the Mortgage and nothing therein contained, and nothing done pursuant hereto shall affect the lien or assignment effected by the Mortgage or the priority thereof over other liens, charges, encumbrances or assignments, or release or diminish the liability of any party who is now, or may hereafter be, liable to Lender under the Loan Documents; nor shall anything herein contained affect any other security or instrument, if any, held by Lender as security for or evidence of the Loan, including any of the Loan Documents. Purchaser further represents that, as of the date hereof, Eric

4

J. Rietz owns 50% of the total membership units of Purchaser, and, as of the date hereof, Joel L. Rietz owns 50% of the total membership units of Purchaser.

7.    Lender represents and warrants to Purchaser that:

a.    It has not assigned, transferred or conveyed (in any way) its interest in the Loan Documents to any other person or entity;

b.    As to payments of principal and/or interest under the Note, there is no Event of Default by Borrower under the Loan Documents; and

c.    To the best of its knowledge, without inquiry, there is no other Event of Default by Borrower under the Loan Documents.

8.    The Mortgage is hereby modified as follows:

a.    Section 1.1.11 of the Mortgage is hereby deleted in its entirety.

Any reference in the Mortgage to the Guaranty shall henceforth be null and void.

b.    Section 2.16.4.4.1 of the Deed of Trust is hereby amended to delete all references to "promissory notes that are then subject to the Guaranty."

c.    Section 5.1.14 of the Deed of Trust is hereby deleted in its entirety.

d.    Section 5.1.15 of the Deed of Trust is hereby deleted in its entirety.

e.    The Mortgage is hereby amended by adding the following new Section 5.1.18 to Article Five:

Any breach by CC Lafayette, LLC of the Second Consent, Assumption and Mortgage Modification Agreement (First) executed by GMAC Commercial Mortgage Corp., as Master Servicer for LaSalle National Bank, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1; Bank One, Louisiana, N.A., as trustee of the Louisiana Sub-Trust; Voit Partners, Ltd. I, Trust #1 and CC Lafayette, LLC, or any misrepresentations made by CC Lafayette, LLC therein.

f.    Section 7.4.1 is amended to delete Lender's address for notices and the following is substituted in its place and stead:

5

Lender:

LaSalle National Bank, as Trustee for the registered holders of
GMAC Commercial Mortgage Securities, Inc.,
Mortgage Pass-Through Certificates, Series 1997-C1
c/o Starwood Asset Services
100 Great Meadow Road
Suite 603
Wethersfield, Connecticut 06109

    with a copy to:

Hebb & Gitlin
One State Street
Hartford, Connecticut 06103
Attention: John B. D'Agostino, Esq.

    9.    Purchaser agrees that except as specifically modified hereby, the rights, privileges, duties and obligations of the parties hereto under the Loan Documents shall remain unchanged and in full force and effect and shall continue in full force and effect and shall be binding upon Purchaser.

    10.    Purchaser hereby requests and agrees that its address for notices under the Loan Documents shall be as follows:

    To Purchaser:

        CC Lafayette, LLC
        1355 Lemond Road
        Owatonna, MN 55060
        Attention: Larry J. Rietz

        with a copy to:

        Vedder, Price, Kaufman & Kammholz
        222 North LaSalle Street
        Chicago, Illinois 60601
        Attention: Eric J. Rietz, Esq.

    11.    Subject to the foregoing, Lender hereby consents to the transfer of the Property from Bank One as trustee of the Louisiana Sub-Trust to Purchaser provided, however, that such consent shall not be construed as consent to any further or additional transfer or conveyance of the Property except as specifically provided in the Mortgage.

    12.    Purchaser and Lender agree that the term "Commitment" shall be used for informational purposes only, and only in the Recital portion of any Loan Document, and all other

6

references to "Commitment" wherever appearing in any Loan Document shall be deemed null, void and of no effect, as the context may require.

13.    Purchaser and Lender agree that in the event of any conflict between the Loan Documents and this Agreement, the provisions of this Agreement shall control.

14.    Effective upon transfer of the Property from Bank One as trustee of the Louisiana Sub-Trust to Purchaser, Lender hereby releases Borrower and Guarantor from all obligations accruing under the Loan Documents from and after the date of such transfer.

15.    This Agreement shall be binding upon the parties hereto and their respective heirs, executors, administrators, personal representatives, survivors, successors and assigns.

16.    This Agreement shall be governed by and construed in accordance with the internal laws of the state in which the Property is located.

17.    This Agreement may be executed in two or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

18.    Nothing herein shall constitute a novation, release, termination or reissuance of the Mortgage, or a novation of the indebtedness evidenced by the Loan Documents. As modified hereby, the Mortgage shall remain in full force and effect.

The parties hereto hereby instruct the Clerk of Court for the Parish of Lafayette, Louisiana, to make note of this Agreement in the margin of the Clerk's records of (i) the Mortgage, Assignment of Leases and Security Agreement (First) by Circuit Investors, as mortgagor, to Paul Revere as mortgagee, dated March 31, 1995, but effective February 27, 1995, recorded as File No. 95-010878 on April 4, 1995 in the mortgage and conveyance records of Lafayette Parish, Louisiana, as corrected by that certain Act of Correction, dated May 5, 1995, recorded as File No. 95-14523 on May 9, 1995 in the mortgage and conveyance records of Lafayette Parish, Louisiana, as amended by a Consent, Assumption and Mortgage Modification (First) dated January 15, 1997, and recorded as File No. 97-1985 in the Clerk's records, and (ii) the Assignment of Leases and Rents by Circuit Investors to Paul Revere, dated as of February 27, 1995, recorded as File No. 95-010879 on April 4, 1995 in the conveyance records of Lafayette Parish, Louisiana, and to record this Agreement to serve as occasion may require.

7

THUS DONE AND SIGNED in the Parish of *East Baton Rouge* State of *Louisiana*, in the presence of the two undersigned competent witnesses, who have signed as such, together with the said appearers, and me, Notary, on the day and in the month and year first hereinabove written.

Signed and delivered
in the presence of:

Print name: *Maria Landry*

Print name: *Kathy S. Robertson*

BANK ONE, LOUISIANA, N.A., as Trustee of Voit Partners Louisiana Sub-Trust

By: _____
    Name: *James A Fochs, IV*
    Title: *Vice President*

THUS DONE AND SIGNED in the County of *Los Angeles*, State of *California*, in the presence of the two undersigned competent witnesses, who have signed as such, together with the said appearers, and me, Notary, on the day and in the month and year first hereinabove written.

VOIT PARTNERS, LTD. I, a California limited partnership, as Administrative Trustee of Voit Partners, Ltd. I, Trust #1

Print name: _____

Print name: _____

By: _____
    Name:
    Title:

8

THUS DONE AND SIGNED in the County of _Cook_____, State of _Illinois_____, in the presence of the two undersigned competent witnesses, who have signed as such, together with the said appearers, and me, Notary, on the day and in the month and year first hereinabove written.

LA SALLE NATIONAL BANK, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1

By:    GMAC Commercial Mortgage Corp., as Master Servicer for LaSalle National Bank, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1

Print name: _ROBERTA MOORE_

Print name: _Lena Bailey-Holland_

By: _____
    Name: Diane M Nesbery
    Title: Vice President

THUS DONE AND SIGNED in the County of _____, State of _____, in the presence of the two undersigned competent witnesses, who have signed as such, together with the said appearers, and me, Notary, on the day and in the month and year first hereinabove written.

CC LAFAYETTE, LLC, a Minnesota limited liability company

By: _____
    Name:
    Title:

Print name: _____

Print name: _____

9

THUS DONE AND SIGNED in the County of _____, State of _____, in the presence of the two undersigned competent witnesses, who have signed as such, together with the said appearers, and me, Notary, on the day and in the month and year first hereinabove written.

> **LA SALLE NATIONAL BANK**, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1
>
> By:    GMAC Commercial Mortgage Corp., as Master Servicer for LaSalle National Bank, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1

Print name: _____

By:_____
                    Name:
                    Title:

Print name: _____


THUS DONE AND SIGNED in the County of _Steele_, State of _Minnesota_, in the presence of the two undersigned competent witnesses, who have signed as such, together with the said appearers, and me, Notary, on the day and in the month and year first hereinabove written.

> **CC LAFAYETTE, LLC**, a Minnesota limited liability company

Print name: PAUL J. OSDOBA

Print name: Paula J. Engebretson

By: _____
                    Name: Larry J. Rietz
                    Title: Chief Manager

9

STATE OF _Louisiana_ )

                            )         ss:

PARISH OF _East Baton Rouge_ )

On this the _29_ day of March, 1999, before the undersigned, personally appeared _James A. Pouche IV_, who acknowledged himself/herself to be the _Vice President_ of BANK ONE, LOUISIANA, N.A., Trustee of Voit Partners Louisiana Sub-Trust, and that he/she, as such _Vice President_, being authorized so to do, executed the foregoing instrument as his/her free act and deed and the free act and deed of said Trustee for the purposes therein contained.

In witness whereof, I hereunto set my hand.

_____

Commissioner of the Superior Court
Notary Public
My Commission expires:_____

STATE OF _____ )

                            )         ss:

COUNTY OF _____ )

On this the ____ day of March, 1999, before the undersigned, personally appeared _____, who acknowledged himself/herself to be the _____ of VOIT PARTNERS, LTD. I, a California limited partnership, as Administrative Trustee of Voit Partners, Ltd. I, Trsut #1, and that he/she, as such _____, being authorized so to do, executed the foregoing instrument as his/her free act and deed and the free act and deed of said limited partnership and said Trustee for the purposes therein contained.

In witness whereof, I hereunto set my hand.

_____

Commissioner of the Superior Court
Notary Public
My Commission expires:

10

STATE OF _Illinois_____ )
                         )     ss:
COUNTY OF _Cook_____ )

On this the _29_ day of March, 1999, before the undersigned, personally appeared _Diane Norberg_, who acknowledged himself/herself to be the _Vice President_ of GMAC COMMERCIAL MORTGAGE CORP., as Master Servicer for LaSalle National Bank, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1, and that he/she, as such _Vice President_, being authorized so to do, executed the foregoing instrument as his/her free act and deed and the free act and deed of said Trustee for the purposes therein contained.

In witness whereof, I hereunto set my hand.

_Roberta Moore_

Commissioner of the Superior Court
Notary Public
My Commission expires:

"OFFICIAL SEAL"
Roberta Moore
Notary Public, State of Illinois
My Commission Expires 2/04/00

STATE OF _____ )
                         )     ss:
COUNTY OF _____ )

On this the ____ day of March, 1999, before the undersigned, personally appeared _____, who acknowledged himself/herself to be the _____ of CC LAFAYETTE, LLC, a Minnesota limited liability company, and that he/she, as such _____, being authorized so to do, executed the foregoing instrument as his/her free act and deed and the free act and deed of said limited liability company for the purposes therein contained.

In witness whereof, I hereunto set my hand.

Commissioner of the Superior Court
Notary Public
My Commission expires:

11

STATE OF _____ )
                          )    ss:
COUNTY OF _____ )

On this the ____ day of March, 1999, before the undersigned, personally appeared _____, who acknowledged himself/herself to be the _____ of GMAC COMMERCIAL MORTGAGE CORP., as Master Servicer for LaSalle National Bank, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1, and that he/she, as such _____, being authorized so to do, executed the foregoing instrument as his/her free act and deed and the free act and deed of said Trustee for the purposes therein contained.

In witness whereof, I hereunto set my hand.


_____
Commissioner of the Superior Court
Notary Public
My Commission expires:


STATE OF _Minnesota_ )
                          )    ss:
COUNTY OF _Steele_ )

On this the 24ᵗʰ day of March, 1999, before the undersigned, personally appeared Larry J. Rietz, who acknowledged himself/herself to be the Chief Manager of CC LAFAYETTE, LLC, a Minnesota limited liability company, and that he/she, as such Chief Manager being authorized so to do, executed the foregoing instrument as his/her free act and deed and the free act and deed of said limited liability company for the purposes therein contained.

In witness whereof, I hereunto set my hand.


JANETTE HOFFMAN
NOTARY PUBLIC - MINNESOTA
STEELE COUNTY
My Comm Expires Jan. 31, 2000

_Janette Hoffman_
_____
Commissioner of the Superior Court
Notary Public
My Commission expires: 1-31-2000

11

STATE OF CALIFORNIA          )
                             ) SS:
COUNTY OF LOS ANGELES        )

On March 25, 1999, before me, Valerie Hibert, a Notary Public in and for said state, personally
appeared **ROBERT D. VOIT**, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized capacity, and that by his
signature on the instrument the person, or the entity upon behalf of which the person acted,
executed the instrument.

WITNESS my hand and official seal.

_Valerie Hibert_

(SEAL)

VALERIE HIBERT
Commission # 1173534
Notary Public - California
Los Angeles County
My Comm. Expires Feb 13, 2002

EXHIBIT A

## MAIN PARCEL

A certain tract of land containing 3.504 acres, known as Lot 2B, Acadiana Square Shopping Center, located in Section 68, Township 10 South, Range 4 East, City of Lafayette, Lafayette Parish, Louisiana, being more fully described as follows:

Commencing at the projected intersection of the more easterly right-of-way of Fountainhead Drive and the more northerly right-of-way of Johnston Street (U.S. Highway 167), proceed along said right-of-way of Johnston Street a bearing of North 41 degrees 36 minutes 31 seconds East, a distance of 704.00 feet to a point; thence continue along said right-of-way of Johnston Street a bearing of North 41 degrees 35 minutes 16 seconds East, a distance of 646.20 feet to a point; thence proceed along a bearing of North 48 degrees 25 minutes 04 seconds West, a distance of 247.67 feet to a point; thence proceed along a bearing of North 13 degrees 41 minutes 34 seconds West, a distance of 23.34 feet to a point, said point hereinafter to be known as the Point of Beginning; thence proceed along a bearing of South 74 degrees 26 minutes 08 seconds West, a distance of 248.86 feet to a point; thence proceed along a bearing of North 15 degrees 33 minutes 52 seconds West a distance of 225.06 feet to a point; thence proceed along a bearing of South 74 degrees 26 minutes 08 seconds East a distance of 8.15 feet to a point; thence proceed along a bearing of North 15 degrees 33 minutes 52 seconds West, a distance of 379.64 feet to a point on the southerly right-of-way of Target Loop; thence proceed along the southerly right-of-way of Target Loop a bearing of North 75 degrees 32 minutes 27 seconds East a distance of 260.35 feet to a point; thence proceed along a bearing of South 13 degrees 41 minutes 34 seconds East a distance of 600.00 feet to the Point of Beginning; all as shown on the current Replat of Acadiana Square Shopping Center, dated February 13, 1994, last revised December 12, 1994, by C. H. Fenstermaker & Associates, Inc., a copy of which is recorded under Act No. 94-045525 in the Lafayette Parish Court House, Lafayette, Louisiana.

## SERVITUDE PARCEL

That certain non-exclusive servitude interest acquired pursuant to Reciprocal Easement and Operation Agreement executed by CAP-Lafayette Investors Limited Partnership, Toys "R" Us, Inc. and Lowe's Home Center, Inc., dated April 25, 1990, recorded as File No. 90-12433; as amended by First Amendment to Reciprocal Easement and Operation Agreement, dated January 20, 1993, recorded as File No. 93-003289; as further amended by Second Amendment to Reciprocal Easement and Operation Agreement, dated January 31, 1994, recorded as File No. 94-010707.

## RELEASE

**LaSALLE NATIONAL BANK, AS TRUSTEE FOR THE REGISTERED HOLDERS OF GMAC COMMERCIAL MORTGAGE SECURITIES, INC., MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 1997 C-1** ("**LaSalle**"), by and through a certain assignment recorded or to be recorded in the land records of the Department of Records of Jackson County, Missouri (the "**Recorder's Office**") from **GERMAN AMERICAN CAPITAL CORPORATION**, a Maryland corporation, by and through an assignment recorded or to be recorded in the Recorder's Office from **THE PAUL REVERE LIFE INSURANCE COMPANY**, a Massachusetts corporation, and recorded October 9, 1998 as Document No. 98-I-79896 in Book I3289 at Page 1570, is the mortgagee under and holder of the following loan documents:

(i)     Deed of Trust, Assignment of Leases and Security Agreement (Second) from Circuit Investors #5 - Montgomeryville Limited Partnership, a Pennsylvania limited partnership ("**Circuit Investors**") to Larry D. Irick, as Trustee for the benefit of The Paul Revere Life Insurance Company ("**Paul Revere**") dated February 27, 1995 and recorded in the Recorder's Office on March 6, 1995, in Book I2664, Page 1906, as amended by a certain Consent, Assumption and Mortgage Modification Agreement (Second) by and among Circuit Investors, Paul Revere, Mercantile Bank of Kansas City, as Trustee of Voit Partners Missouri Sub-Trust ("**Mercantile Bank**") and Voit Partners, Ltd. I, as Administrative Trustee for Voit Partners, Ltd. I, Trust #3 ("**Voit**") dated January 17, 1997 and duly recorded in the Recorder's Office as Document No. I-3132 (the "**Mortgage**"); and

(ii)     that certain Agreement of Guaranty by Mercantile Bank and Voit for the benefit of Paul Revere, dated January 17, 1997 (the "**Guaranty**"),

and does hereby release and discharge the lien and operation of the Mortgage and Guaranty.

**IN WITNESS WHEREOF**, this instrument has been executed this 20ᵗʰ day of March, 1999.

**Witnessed:**

**LA SALLE NATIONAL BANK**, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1

By:     GMAC Commercial Mortgage Corp., as Master Servicer for LaSalle National Bank, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1

Print name: ROBERTA MOORE

Print name: JOYCE MACK-CARR

By: _____
Name: Diane M Norberg
Title: Vice President

**STATE OF** _Illinois_ )
                          )      **SS:**
**COUNTY OF** _Cook_ )

      The foregoing instrument was acknowledged before this _30_ day of March, 1999, by _Diane Notary_ who acknowledged himself/herself to be the _Vice President_ of GMAC COMMERCIAL MORTGAGE CORP., as Master Servicer for LaSalle National Bank, as Trustee for the registered holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 1997-C1, on behalf of said Trustee. He/She is personally known to me or has produced _____ as identification.

                                  _Roberta Moore_
                                Print Name:
                                Notary Public
                                My Commission expires:

                                   "OFFICIAL SEAL"
                                   Roberta Moore
                                   Notary Public, State of Illinois
                                   My Commission Expires 2/04/00

2



# UNITED STATES OF AMERICA
## State of Louisiana

DUPLICATE

### Fox McKeithen
### SECRETARY OF STATE

*As Secretary of State, of the State of Louisiana, I do hereby Certify that*

the Application Form for Certificate of Authority of

CC LAFAYETTE, LLC, A MINNESOTA LIMITED LIABILITY COMPANY

Domiciled at OWATONNA, MINNESOTA,

Was filed and recorded in this Office on October 28, 1998,

Thus authorizing the limited liability company to exercise
the same rights and privileges accorded similar domestic
limited liability companies, subject to the provisions of R.
S. Title 12, Chapter 22, Part VIII.

*In testimony whereof, I have hereunto set
my hand and caused the Seal of my Office
to be affixed at the City of Baton Rouge on,*

October 28, 1998

*Secretary of State*

SMA 347011740

FOR OFFICE USE ONLY

**STATE OF MINNESOTA**
**ARTICLES OF ORGANIZATION FOR**
**A LIMITED LIABILITY COMPANY**
**MINNESOTA STATUTES CHAPTER 322B**

Filing date: _____

Charter # _____ -LLC

Page # _____

**PLEASE TYPE OR PRINT IN BLACK INK.**

**Before Completing this Form Please Read the Instructions on the Back.**          **FILING FEE $135.00**

1. Name of Company: _____ CC Lafayette, LLC _____ _____

2. Registered Office Address:

_____ 1355 Lemond Road _____                 Owatonna          MN  55060
Complete Street Address or Rural Route and Rural Route Box Number          City                State      ZIP Code
*(P.O. Box is Unacceptable)*

3. Name of Registered Agent (optional): _____

4. Business Mailing Address: (if different from registered office address)

_____          City          State      ZIP Code
Address

5. Desired Duration of LLC: (in years) _100_

6. List your SIC Code. _99_ Select one of the 2-digit SIC codes listed on the reverse side of this form that most accurately describes the nature of the business you are forming.

7. The members of this company (**check one**)   do _X_  do not _____ have the power to avoid dissolution by giving dissolution avoidance consent in the case of occurrence of events listed in section 322B.80, subdivision 1, clause (5).

8. The members of this company (**check one**)   do _X_  do not _____ have the power to enter into a business continuation agreement.

9. Does this LLC own, lease or have any interest in agricultural land or land capable of being farmed?
   (Check One)          Yes _____          No _X_

10. Name and Telephone Number of Contact Person for this LLC:

Name   _Larry J. Rietz_                         Phone (507 ) 451-3205

11. Name and Address of Organizer(s):

| Name (print) | Complete Address | Original Signature (required) |
|---|---|---|
| Larry J. Rietz | 1355 Lemond Road<br>Owatonna, MN 55060 | *[signature]* |
| | | |
| | | |

05920791  Rev. 6/96

STATE OF MINNESOTA
DEPARTMENT OF STATE
FILED

OCT 2 0 1998

*[signature]*

Secretary of State

### State of Minnesota

# SECRETARY OF STATE

## CERTIFICATE OF GOOD STANDING

I, Joan Anderson Growe, Secretary of State of Minnesota, do certify that: the limited liability company listed below is a limited liability company formed or registered to do business under the laws of Minnesota; the limited liability company was formed by filing an application for a certificate of authority with the Office of the Secretary of State on the date listed below; the limited liability company is governed by Chapter 322B of Minnesota Statutes; and this limited liability company is authorized to do business as a limited liability company at the time this certificate is issued.

**Name:** CC Lafayette, LLC

**Date Formed or Registered:** 10/20/1998

**State of Organization:** Minnesota

This certificate has been issued on October 20, 1998



*Joan Anderson Growe*
Secretary of State.

# CERTIFICATION

STATE OF MINNESOTA     )
                       )  ss.
COUNTY OF STEELE       )


The undersigned, Priscilla J. Rietz, Secretary of CC Lafayette, LLC, certifies that

true and correct copies of the following are attached hereto:

1.    Member Control Agreement, dated October 21, 1998

2.    Operating Agreement

3.    Call & Waiver of Notice of First Meeting of Members of CC
      Independence, LLC, dated October 20, 1998

4.    Minutes of The First Meeting of The Members of CC Lafayette, LLC,
      dated October 21, 1998

5.    Call and Waiver of Notice of First Meeting of Board of Governors of CC
      Lafayette, LLC, dated October 20, 1998

6.    Minutes of The First Meeting of The Board of Governors of CC Lafayette,
      LLC, dated October 21, 1998


                              _Priscilla J. Rietz_
                              Priscilla J. Rietz
                              Secretary, CC Lafayette, LLC


Subscribed and sworn to before me
this  7th  day of November, 1998.


_Todd F. Rietz_
Notary Public



TODD F. RIETZ
NOTARY PUBLIC - MINNESOTA
STEELE COUNTY
My Commission Expires Jan. 31, 2000

# MEMBER CONTROL AGREEMENT

## OF

## CC LAFAYETTE, LLC

THIS MEMBER CONTROL AGREEMENT ("Agreement") is made as of the 21st day of October, 1998, by and among CC Lafayette, LLC, a Minnesota limited liability company ("Company"), and Larry J. Rietz.

### RECITALS

A.    The undersigned constitute all of the current Members of the Company; and

B.    Section 322B.37 of the Minnesota Limited Liability Company Act authorizes a "member control agreement" as defined therein; and

C.    Each of the undersigned wishes to enter into this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained in this Agreement, the Members agree as follows:

### ARTICLE I.
### DEFINITIONS

Section 1.    Definitions.    The terms defined in this Article 1 (except as may be otherwise expressly provided in this Agreement or unless the context clearly requires otherwise) shall, for purposes of this Agreement, the Articles of Organization and the Operating Agreement of the Company have the following respective meanings:

1.1 - "Act" means the Minnesota Limited Liability Company Act contained in Minnesota Statutes, Chapter 322B.

1.2 - "Agreement" means this Member Control Agreement, and all amendments and modifications hereto, including any schedules, amendments or supplements to the Agreement.

1.3 - "Articles of Organization" means the Articles of Organization of the Company, as the same may be amended from time to time.

1.4 - "Board" or "Board of Governors" means the board of governors of the Company.

1.5 - "Capital Account" means the account of a Member which is established and maintained in accordance with the provisions of Section 4.1 hereof.

1.6 - "Capital Contribution" means the total amount of cash and/or the fair market value of property contributed or agreed to be contributed by a Member as a capital contribution upon becoming a Member of the Company.

1.7 - "Code" means the Internal Revenue Code of 1986, as amended, and any successor thereto. Any reference to specific sections of the Code shall be to the section as it now exists and to any successor provision.

1.8 - "Contribution" means the total amount of money and/or the value accorded by the Board of Governors to property or services contributed by a Member to the Company with respect to his, her or its Membership Units.

1.9 - "Distribution" means the total amount of cash and/or the fair market value of property distributed by the Company to Members from time to time with respect to their Membership Units.

1.10 - "Financial Rights" means those rights associated with a Membership Unit to share in Net Income and Net Losses and Distributions with respect to Membership Units, and the right to assign such rights, in accordance with the terms of this Agreement, the Articles of Organization and the Operating Agreement.

1.11 - "Governance Rights" means all rights associated with a Membership Unit in the Company other than Financial Rights, including, without limitation, rights to vote, receive notices and attend meetings of members.

1.12 - "Governor" means a person serving on the Board of Governors.

1.13 - "Manager" means a person elected, appointed, or otherwise designated as a manager by the Board of Governors, and any other person considered elected as a manager pursuant to the Act.

1.14 - "Member" means a person reflected in the Required Records of the Company as the owner of one or more Membership Units of the Company who has signed this Agreement, such person's heirs, executors, administrators, personal representative and successors and any assigns of Membership Units, Governance Rights or Financial Rights as permitted by the Act, the Articles of Organization, the Operating

-2-

Agreement, and this Agreement and as reflected in the Required
Records of the Company. When the Governance Rights and
Financial Rights attributable to a Membership Unit have been
separated and such separation is reflected in the Required
Records of the Company, references to Member shall mean the
holder of the Governance Rights or Financial Rights related to
such Membership Unit as appropriate in the context.

1.15 - "Membership Unit" means one of the units created
by the Company's Articles of Organization into which the
Members' ownership interests in the Company are divided, each
such Membership Unit consisting of Governance Rights and
Financial Rights, the right to assign such Membership Unit or
the Financial Rights attributable to such Membership Unit, and
to separate the Governance Rights and Financial Rights
attributable to a Membership Unit and separately assign such
rights, all in accordance with the Act, the Articles of
Organization and Operating Agreement of the Company, and this
Agreement. When the Governance Rights and Financial Rights
attributable to a Membership Unit have been separated and such
separation is reflected in the Required Records of the
Company, references to Membership Unit shall mean the
Governance Rights or Financial Rights related to such
Membership Unit as appropriate in the context.

1.16 - "Net Income" and "Net Losses" mean the profits
and losses of the Company, as the case may be, as determined
for federal income tax purposes as of the close of each of the
fiscal years of the Company.

1.17 - "Operating Agreement" means the Operating
Agreement of the Company, as adopted by the Board of Governors
and as amended from time to time.

1.18 - "Required Records" mean those records required to
be maintained by the Company pursuant to the Operating
Agreement and Section 322B.373 of the Act.

1.19 - "Mortgaged Premises" means the property located
at 5624 Johnston Street, Lafayette, Louisiana.

1.20 - "Lender" means The Paul Revere Life Insurance
Company, its successors and assigns.

1.21 - "Mortgage Loan" means that certain loan from
Lender to Circuit Investors Matteson Limited Partnership,
which loan is being assumed by the Company for the Company's
acquisition of the Mortgaged Premises.

1.22 - "Lease" means the Lease dated February 22, 1995;
including the First, Second and Third Amendment thereto,
covering the Mortgaged Premises in which Circuit City Stores,
Inc. is Tenant and Circuit Investors Matteson Limited
Partnership is Landlord.

## ARTICLE II.
### FIRST GOVERNORS

The first Governors of the Company shall be the following, who are hereby elected to hold office until their successors are elected and qualified pursuant to the Operating Agreement of the Company:

Larry J. Rietz

## ARTICLE III.
### CONTRIBUTIONS AND MEMBERSHIP UNITS

Section 3.1    Membership Units and Board Authority as to Additional Membership Units.    The names of the Members, their respective Contributions and the value accorded thereto, and their Membership Units are reflected on Schedule A, which is attached hereto and incorporated herein by reference.    No additional Contributions shall be accepted or Membership Units granted by the Board without the consent of the owners of more than fifty (50%) percent of the Membership Units outstanding. The Required Records shall be modified to reflect any changes in the outstanding Membership Units.

Section 3.2    Terms of Membership Units.    Except as provided in the Operating Agreement or this Agreement, Membership Units reflected in Schedule A shall be equal in all respects.

Section 3.3    No Right to Return of Contribution.    No Member shall have the right to withdraw or to demand the return of all or any part of his or her Contribution, except as otherwise expressly provided herein.    The Company shall not be liable to the Members for repayment of their Contribution.

Section 3.4    Loans from Members to Company.    The Company's ability to incur indebtedness other than the Mortgage Loan is limited in incurring liabilities in the ordinary course of its business that are related to the ownership and operation of the Mortgaged Premises.    No exception exists for loans from owners or other affiliates.

Section 3.5    No Interest on Contributions.    No interest shall be paid to any Member on Contributions.

Section 3.6    Nonassessability.    No Member shall be required to make any Contributions in excess of the amount stated in Section 3.1 and Schedule A.


## ARTICLE IV.
### ALLOCATIONS OF NET INCOME
### AND NET LOSSES AND DISTRIBUTIONS

Section 4.1    Capital Accounts.    A separate Capital Account shall be maintained by the Company for each Member. The Capital Account for each Member shall be increased by such Member's Capital Contributions and shall be decreased by Distributions made to such Member.    Each Member's Capital Account shall also be increased or decreased, as the case may be, to account for allocations of Net Income and Net Losses to such Member.    As of the date on which additional Contributions are made by any Member or Distributions are made in

liquidation of any Membership Units, the Capital Account balances of the Members may be restated to reflect the market values of the Company's properties as of such date and the manner in which Net Income and Net Losses would have been allocated had the Company disposed of its properties on such date, all in accordance with Treasury Regulations §§ 1.704-1(b)(2)(iv)(f) and (r), as in effect on the date hereof. Subsequent adjustments to Capital Accounts shall be made so as to comply with the requirements of Treasury Regulations §§ 1.704-1(b)(2)(iv) and 1.704-1(b)(4)(i), as in effect on the date hereof.  For example, appreciation and depreciation of assets reflected in the Capital Accounts of the Members by reason of the adjustments described above shall be taken into account in making later Capital Account adjustments for Net Income and Net Losses.

Section 4.2   Allocations of Net Income and Net Losses. Except as otherwise expressly provided in this Agreement, Net Income and Net Losses shall be allocated to the Members pro rata based on their Membership Units in the Company on each day of the Company's taxable year.  Allocations for federal income tax purposes shall be made in accordance with the requirements of Treasury Regulations § 1.704-1(b)(4)(i), as in effect on the date hereof, to take into account prior Capital Account adjustments.

Section 4.3   Section 704(c) Allocation.  To the extent required by Section 704(c) of the Code, items of income, gain, loss, or deduction with respect to contributed properties shall be allocated among the Members in such manner as takes into account any variations between the bases of such properties to the Company upon contribution and the fair market values of such properties at the time of contribution. Any allocations made solely to comply with this Section 4.3 and Section 704(c) of the Code shall not be reflected in Capital Account adjustments.

Section 4.4   Distributions Prior to Liquidation.  The Board of Governors shall determine from time to time whether to make any Distributions to the Members.  Such Distributions shall be made among the Members in proportion to their Membership Units.

Section 4.5   Distribution Upon Dissolution and Winding Up.  At the time of the dissolution and winding up of the Company, following the allocation of all Net Income and Net Losses and the payment of all Company obligations, the remaining assets shall be distributed to the Members in accordance with any positive balances in their respective Capital Accounts.

Section 4.6   No Distribution by Reason of Withdrawal. Withdrawal from the Company or transfer of Membership Units

-6-

shall not entitle any Member to receive any Distribution from
the Company except as Distributions to all Members are
subsequently made pursuant to Sections 4.4 or 4.5.

Section 4.7  <u>Distribution in Kind</u>.  No Member shall have
any right to demand or receive a Distribution from the Company
in any form other than cash, nor shall any Member be compelled
to accept any distribution of property in kind except under
circumstances where all Members receive undivided interests in
property or substantially equivalent interests in property on
the basis of their Membership Units.  In the event of a
Distribution of property in kind, such property shall be
assumed to have been sold at its fair market value at the time
of the Distribution, and the resulting gain or loss shall be
allocated among the Members according to their Membership
Units, and their Capital Accounts shall be adjusted
accordingly.

Section 4.8  <u>Effect of Assignment on Allocation of Net
Income and Net Losses and Distributions</u>.  Net Income and Net
Losses allocable to any Membership Units transferred or
assigned during a year shall be allocated between the assignor
and assignee based upon the length of time during any fiscal
year of the Company, as measured by the effective date of the
assignment, that the Membership Units were owned by each of
them, or, in the discretion of the Board of Governors, based
upon a cut-off of the Company books as of the effective date
of the assignment.  All Distributions after the effective date
of the assignment shall be made to the assignee.  The
agreement between assignor and assignee should take into
account the extent that such Distributions may be attributable
to the results of operations during the time that the
Membership Units were owned by the assignor.

ARTICLE V.<br>TAX MATTERS

Section 5.1  <u>Tax Characterization and Returns</u>.  The
Members acknowledge that the Company will be treated as a
"partnership" for tax purposes.  Within ninety (90) days after
the end of each fiscal year, the chief manager or chief
financial manager of the Company will cause to be delivered to
each person who was a Member at any time during such fiscal
year a Form K-1 and such other information, if any, with
respect to the Company as may be necessary for the preparation
of such Member's federal or state income tax (or information)
returns, including a statement showing each Member's share of
income, gain, or loss and credits for such fiscal year for
federal or state income tax purposes.

Section 5.2  <u>Accounting Decisions</u>.  All decisions as to
accounting matter shall be made by the Board of Governors in
its sole discretion.  The Company, at the sole discretion of

the Board, may make or revoke such elections as may be allowed pursuant to the Code, including the election referred to in Section 754 of the Code, or any successor thereto, to adjust the basis of Company property.

Section 5.3  "Tax Matters Partner".  The Board shall designate a Manager to act on behalf of the Company as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code.

ARTICLE VI.
BUY-SELL PROVISIONS

If the parties wish to provide for the purchase and sale of their Membership Units by the Company or the remaining Members upon the death or other termination of any Member, insert such provisions here.  Please keep in mind that buy-sell provisions for this type of entity may raise tax issues not present in regular corporations.

ARTICLE VII.
AGREEMENT TO AVOID DISSOLUTIONS

Section 7.1  Dissolution Avoidance Consent.  Each Member agrees that, at the request of the Company and no later than thirty (30) days after the occurrence of an event that terminates the continued membership of a Member (including the events enumerated in Section 322B.80, subdivision 1, clause (5), of the Act), each remaining Member with Governance Rights shall consent to the continuation of the Company as a legal entity without dissolution and to the continuation of its business.

Section 7.2  Status of Terminated Member if Dissolution is Avoided.  If dissolution is avoided under Section 7.1, then the Member whose interest has terminated shall lose all Governance Rights and shall be considered merely an assignee of the Financial Rights owned before the termination of Membership.

Section 7.3  No Obligation to Purchase Membership Units of Terminated Members.  If dissolution is avoided under Section 7.1, neither the Company nor the remaining Members shall be obligated to purchase the Membership Units of the Member whose interest was terminated.

Section 7.4  Covenant Not to Resign or Withdraw.  In furtherance of the foregoing and in order to limit the situations under which a dissolution of the Company would occur, all Members covenant and agree not to resign or withdraw from the Company without the unanimous written

-8-

consent of all Members with Governance Rights.  If any Member resigns or withdraws from the Company in contravention of this Section 7.4, such Member shall be liable to the Company and the remaining Members for any damages caused by such resignation or withdrawal.

ARTICLE VIII.
BUSINESS CONTINUATION AGREEMENT

Section 8.1  <u>Agreement to Continue Business</u>.  If one or more Members fails to give the consent specified in Article VII and the Company dissolves as a result, each Member agrees that the Company and the Members shall have the right to transfer the Company's assets and business to a successor limited liability company and to continue its business in such successor as provided in Section 8.2.

Section 8.2  <u>Procedures to Transfer and Continue Business</u>.  Following dissolution in the circumstances described in Section 8.1, the Board shall organize a new limited liability company (the "Successor") under the Act and shall prepare a plan of merger pursuant to which the Company would be merged into the Successor, which would be the surviving company, and the Membership Units of which would be the surviving company, and the Membership Units of the Members in the Company would be converted into membership interests or units in the Successor with substantially identical rights as those under the Company.  If approved by the Members of the Company with Governance Rights, such merger shall be promptly effected in accordance with law.  The articles of organization, operating agreement and member control agreement of the Successor shall, to the greatest extent practicable, be identical to the Articles of Organization, Operating Agreement and Member Control Agreement of the Company.  Each Member agrees to waive any dissenter's rights with respect to such merger.  If, notwithstanding the agreement in the previous sentence, the Act allows a Member to assert dissenters' rights, and a Member asserts dissenters' rights, such rights shall be limited as and subject to the offset provided in Section 302A.873, subdivision 3, of the Act.

ARTICLE IX.
AMENDMENTS

Section 9.1  <u>Amendment of Agreement</u>.  No change, modification or amendment of this Agreement shall be valid or binding unless such change, modification or amendment is contained in a writing signed by Members owning more than fifty (50%) percent of the Membership Units; provided, however, in no event may this Agreement be amended to provide for less than unanimous consent to avoid dissolution under Section 7.1, and provided, however, in no event may any such

modification or amendment more adversely affect any rights of
any Member(s) holding only Financial Rights than Member(s)
holding some Governance Rights without the consent of the
Member(s) holding only Financial Rights.


ARTICLE X.
MISCELLANEOUS

Section 10.1   Governing Law.  Notwithstanding the fact
that the Company may conduct business in states other than
Minnesota, and notwithstanding the fact that some or all of
the Members may be residents of states other than Minnesota,
this Agreement and the rights of the parties hereunder will be
governed by, interpreted, and enforced in accordance with the
laws of the State of Minnesota.

Section 10.2   Articles of Organization and Operating
Agreement.  The Articles of Organization and the Operating
Agreement of the Company are incorporated by reference and
hereby made a part of this Agreement.  In the event of any
conflict between the Articles of Organization or the Operating
Agreement and this Agreement, the provisions of this Agreement
shall govern to the extent not contrary to law.

Section 10.3   Binding Effect.  This Agreement will be
binding upon and inure to the benefit of the Members, and
their respective heirs, executors, administrators, personal
representatives, successors and assigns.

Section 10.4   Severability.  If any provision of this
Agreement is held to be illegal, invalid, or unenforceable
under the present or future laws effective during the term of
this Agreement, such provision will be fully severable, and
this Agreement will be construed and enforced as if such
illegal, invalid, or unenforceable provision had never
comprised a part of this Agreement, and the remaining
provisions of this Agreement will remain in full force and
effect and will not be affected by the illegal, invalid, or
unenforceable provision or by its severance from this
Agreement.  Furthermore, in lieu of such illegal, invalid, or
unenforceable provision, there will be added automatically as
a part of this Agreement a provision as similar in terms to
such illegal, invalid, or unenforceable provision as may be
possible and be legal, valid, and enforceable.

Section 10.5   Counterparts.  This Agreement may be
executed in several counterparts, each of which will be deemed
an original, but all of which will constitute one and the same
instrument.  However, in making proof hereof it will be
necessary to produce only one copy hereof signed by the party
to be charged.

Section 10.6   Additional Documents and Acts.  Each

-10-

Member agrees to execute and deliver such additional documents
and instruments and to perform such additional acts as may be
necessary or appropriate to effectuate, carry out and perform
all of the terms, provisions, and conditions of this Agreement
and the transactions contemplated hereby.

Section 10.7  <u>No Third Party Beneficiary</u>.  This
Agreement is made solely and specifically among and for the
benefit of the parties hereto, and their respective successors
and assigns, and no other person will have any rights,
interest, or claim hereunder or be entitled to any benefits
under or on account of this Agreement, whether as a third
party beneficiary or otherwise.

Section 10.8  <u>Notices</u>.  Any notice to be given or to be
served upon the Company or any party hereto in connection with
this Agreement must be in writing and will be deemed to have
been given when received by the Company.  Notices to Members
will be deemed given when (i) delivered personally to a
Member, (ii) delivered via telegraph or facsimile to a
location or number designated by a Member, or (iii) deposited
in the United States mail, postage prepaid and addressed to a
Member at the address specified in the Company's records.  Any
Member or the Company may, at any time by giving five (5)
days' prior written notice to the other Members and the
Company, designate any other address in substitution of the
foregoing address to which such notice will be given.

Section 10.9  <u>Other Business Ventures</u>.  Any Member may
engage in or possess an interest in other business ventures of
every nature and description, independently or with others,
whether such ventures are competitive with the Company or
otherwise; and neither the Company nor the Members shall have
any right by virtue of this Agreement in or to such
independent ventures or to the income or profits derived
therefrom and no Member shall have the obligation to bring any
business opportunity to the Company or to any other Member;
provided, however, that the foregoing shall be limited as
provided in Sections 322B.663, 322B.666 and 322B.69 with
respect to any Member who is also a Governor or a Manager.

Section 10.10  <u>Headings and Titles</u>.  Article and section
headings and titles are for descriptive purposes and
convenience of reference only and shall not control or alter
the meaning of this Agreement as set forth in the text.

ARTICLE XI

Section 11.1  The Company is a "Single Purpose" entity
that owns no other property and is engaged in no business
activities other than owning the Mortgaged Premises and
performing the obligations imposed upon the Company, as
Landlord, under the terms of the Lease.

Section 11.2    Until such time as the Mortgage Loan is paid in full, the Company will acquire no other real property and will engage in no business activities other than owning the Mortgaged Premises.

Section 11.2    The Company is not in any way indebted to any person or entity for any amounts other than the debt evidenced by the Promissory Note for the Mortgage Loan.

Section 11.4    Until such time as the Mortgage Loan is paid in full, the Company will incur no indebtedness, without Lender's prior written consent, other than any indebtedness that may be required to allow the Company to perform its obligations as Landlord under the terms of the Circuit City Stores, Inc. lease.

Section 11.5    Until such time as the Mortgage Loan is paid in full, the Company will not engage in a merger, consolidation, sale, lease, transfer or asset transfer with an entity that does not qualify as a "Single Purpose" entity.

Section 11.6    None of the assets of any Member of the Company will be co-mingled with the assets of the Company.

IN WITNESS WHEREOF, the undersigned have executed this Agreement on the date first above written, or with respect to Members acquiring Membership Interest after the date of this Agreement, on the date opposite the Member's signature.

Larry J. Rietz

# EXHIBIT A

| MEMBERS | CONTRIBUTION | MEMBERSHIP UNITS |
|---|---|---|
| Larry J. Rietz | $1,000.00 | 1,000 |

OPERATING AGREEMENT

OF

CC LAFAYETTE, LLC

ARTICLE I.
OFFICES

Section 1.  Principal Executive Office.  The principal
executive office of CC Lafayette, LLC (the "Company") shall be
in the City of Owatonna, County of Steele, Minnesota.

Section 2.  Registered Office.  The location and address
of the registered office of the Company is 1355 Lemond Road,
Owatonna, Minnesota  55060.  The registered office need not be
identical with the principal executive office of the Company
and may be changed from time to time by the Board of
Governors.

Section 3.  Other Offices.  The Company may have other
offices at such other places within and without the State of
Minnesota as the Board of Governors may determine from time to
time.

ARTICLE II.
MEMBERS

Section 1.  Number of Members.  The Company shall have
one (1) or more Members at the time of its formation.  The
Company shall be dissolved as provided in Article VI whenever
the Company ceases to have at least one (1) Member.

Section 2.  Place of Meeting.  All meetings of the
Members of the Company shall be held at its principal
executive office unless some other place for any such meeting
within or without the State of Minnesota is designated by the
Board of Governors in the notice of meeting.  Any regular or
special meeting of the Members of the Company called by or
held pursuant to a written demand of Members shall be held in
the county where the principal executive office of the Company
is located.

Section 3.  Regular Meetings.  Regular meetings of the
Members of the Company may be held at the discretion of the
Board of Governors on an annual or less frequent periodic
basis on such dates and at such times and places as may be
designated by the Board of Governors in the notices of

meeting.  At regular meetings, the Members shall elect a Board
of Governors and transact such other business as may be
appropriate for action by Members.  If a regular meeting of
Members has not been held for a period of fifteen (15) months,
one or more Members holding not less than three (3%) percent
of the Membership Units entitled to vote of the Company
outstanding may call a regular meeting of Members by
delivering to the chief manager or chief financial manager a
written demand for a regular meeting.  Within thirty (30) days
after the receipt of such a written demand by the chief
manager or chief financial manager, the Board of Governors
shall cause a regular meeting of Members to be called and held
on notice no later than ninety (90) days after the receipt of
such written demand, all at the expense of the Company.

Section 4.  <u>Special Meetings</u>.  Special meetings of the
Members, for any purpose or purposes appropriate for action by
Members, may be called by the chief manager, by the acting
chief manager in the absence of the chief manager, by the
chief financial manager, or by the Board of Governors or any
two or more Governors.  Such meeting shall be held on such
date and at such time and place as shall be fixed by the
person or persons calling the meeting and designated in the
notice of meeting.  A special meeting may also be called by
one or more Members holding ten (10%) percent or more of the
Membership Units entitled to vote outstanding.  The Members
calling such meeting shall deliver to the chief manager or
chief financial manager a written demand for a special
meeting, which demand shall contain the purposes of the
meeting.  Within thirty (30) days after the receipt of such a
written demand for special meeting of Members by the chief
manager or chief financial manager, the Board of Governors
shall cause a special meeting of Members to be called and held
on notice no later than ninety (90) days after the receipt of
such written demand, all at the expense of the Company.
Business transacted at any special meeting of Members shall be
limited to the purpose or purposes stated in the notice of
meeting.  Any business transacted at any special meeting of
Members that is not included among the stated purposes of such
meeting shall be voidable by or on behalf of the Company
unless all of the Members entitled to vote have waived notice
of the meeting.

Section 5.  <u>Notice of Meetings</u>.  Except where a meeting
of Members is an adjourned meeting and the date, time, and
place of such meeting were announced at the time of
adjournment, notice of all meetings of Members stating the
date, time, and place thereof, and any other information
required by law or desired by the Board of Governors or by
such other person or persons calling the meeting, and in the
case of special meetings, the purpose thereof, shall be given
to each Member of record entitled to vote at such meeting not

less than three (3) days and not more than sixty (60) days
prior to the date of such meeting.  If a plan of merger or
exchange or the sale or other disposition of all or
substantially all of the assets of the Company is to be
considered at a meeting of Members, notice of such meeting
shall be given to every Member, whether or not entitled to
vote.   The notice of meeting at which there is to be
considered a proposal to adopt a plan of merger or exchange or
the sale or other disposition of all or substantially all of
the assets of the Company shall be given not less than
fourteen (14) days prior to the date of such meeting, shall
state the purpose of such meeting, and, where a plan of merger
or exchange is to be considered, shall include a copy or a
short description of the plan.

Notices of meeting shall be given to each Member
entitled thereto by oral communication, by mailing a copy
thereof to such Member at an address designated by such Member
or to the last known address of such Member, by handing a copy
thereof to such Member, or by any other delivery that conforms
to law.  Notice by mail shall be deemed given when deposited
in the United States mail with sufficient postage affixed.
Notice shall be deemed received when it is given.

Any Member may waive notice of any meeting of Members.
Waiver of notice shall be effective whether given before, at,
or after the meeting and whether given orally, in writing, or
by attendance.  Attendance by a Member at a meeting is a
waiver of notice of that meeting, except where the Member
objects at the beginning of the meeting to the transaction of
business because the meeting is not lawfully called or
convened and does not participate thereafter in the meeting,
or objects before a vote on an item of business because the
item may not lawfully be considered at that meeting and does
not participate in the consideration of that item at the
meeting.

Section 6.  Record Date.  For the purpose of determining
Members entitled to notice of and to vote at any meeting of
Members or any adjournment thereof, or Members entitled to
receive payment of any dividend, or in order to make a
determination of Members for any other proper purpose, the
Board of Governors may, but need not, fix a date as the record
date for any such determination of Members, which record date,
however, shall in no event be more than sixty (60) days prior
to any such intended action or meeting.

Section 7.  Quorum.  The owners of a majority of the
Membership Units of the Company entitled to vote at a meeting
shall constitute a quorum at a meeting of Members for the

purpose of taking any action other than adjourning such
meeting. If the owners of a majority of the Membership Units
entitled to vote are not represented at a meeting, the Members
present in person or by proxy shall constitute a quorum for
the sole purpose of adjourning such meeting, and the owners of
a majority of the Membership Units entitled to vote so
represented may adjourn the meeting to such date, time, and
place as they shall announce at the time of adjournment. Any
business that might have been transacted at the adjourned
meeting had a quorum been present, may be transacted at the
meeting held pursuant to such an adjournment and at which a
quorum shall be represented. If a quorum is present when a
duly called or held meeting is convened, the Members present
may continue to transact business until adjournment, even
though the withdrawal of a number of Members originally
represented leaves less than the number otherwise required for
a quorum.

Section 8. Voting and Proxies. At each meeting of the
Members, every Member shall be entitled to one (1) vote for
each Membership Unit which carries voting rights, except as
may be otherwise provided in the Articles of Organization or
as may be required to provide for cumulative voting (if not
denied by the Articles of Organization), but no appointment of
a proxy shall be valid for any purpose more than eleven (11)
months after the date of its execution, unless a longer period
is expressly provided in the appointment. Every appointment
of a proxy shall be in writing (which shall include
telegraphing, cabling or telephotographic transmission,
provided that any appointment by telegraph, cable or other
method where the signature of the member is not available
shall be accompanied by the Member's social security number,
home telephone number and address to confirm the identity of
the Member), and shall be filed with a manager of the Company
before or at the meeting at which the appointment is to be
effective. An appointment of a proxy for Membership Units
entitled to vote held jointly by two or more Members shall be
valid if signed by any one of them, unless a manager of the
Company receives from any one of such Members written notice
either denying the authority of another of such Members to
appoint a proxy or appointing a different proxy. All
questions regarding the qualification of voters, the validity
of appointments of proxies, and the acceptance or rejection of
votes shall be decided by the presiding manager or governor of
the meeting. The Members shall take action by the affirmative
vote of the owners of a majority of the Membership Units
present, in person or represented by proxy, and entitled to
vote, except where a different vote is required by law, the
Articles of Organization, this Operating Agreement or any
applicable member control agreement.

Section 9. Action in Writing. Any action required or

-4-

permitted to be taken at a meeting of Members may be taken
without a meeting by written action signed by the Members who
own the number of Membership Units entitled to vote that would
be required to take the same action at a meeting of Members at
which all Members entitled to vote were present.    If any
written action is taken by less than all Members entitled to
vote, all Members entitled to vote shall be notified
immediately of its text and effective date.    The failure to
provide such notice, however, shall not invalidate such
written action.

ARTICLE III.
GOVERNORS

Section 1.    General Powers.    Except as otherwise
provided by the Members pursuant to a member control
agreement, the business and affairs of the Company shall be
managed by or under the direction of its Board of Governors.
The Governors may exercise all such powers and do all such
things as may be exercised or done by the Company, subject to
the provisions of applicable law, the Articles of
Organization, this Operating Agreement and any member control
agreement.

Section 2.    Number, Tenure and Qualification.    The
number of Governors which shall constitute the whole Board of
Governors shall be fixed from time to time by resolution of
the Members, subject to increase by resolution of the Board of
Governors.    In the event that the Members fail to fix the
number of Governors, the number of Governors shall be one (1),
subject to increase by resolution of the Board of Governors.
No decrease in the number of Governors pursuant to this
section shall effect the removal of any Governor then in
office except upon compliance with the provisions of Section 7
of this Article.    Except as provided in Sections 6 and 7 of
this Article, each Governor shall be elected at a regular
meeting of Members and shall hold office until the next
regular meeting of Members and thereafter until a successor is
duly elected and qualified, unless a prior vacancy shall occur
by reason of death, resignation, or removal from office.
Governors shall be natural persons, but need not be Members.

Section 3.    Meetings.    Meetings of the Board of
Governors may be held at such times and places as shall from
time to time be determined by the Board of Governors.
Meetings of the Board of Governors may be called by the chief
manager, by the acting chief manager in the absence of the
chief manager, or by any Governor, in which case the person or
persons calling such meeting may fix the date, time, and place
thereof, either within or without the State of Minnesota, and
shall cause notice of meeting to be given.

Section 4.  <u>Notice of Meetings</u>.  If the date, time, and place of a meeting of the Board of Governors has been announced at a previous meeting, no notice is required.  In all other cases three (3) days notice of meetings of the Board of Governors, stating the date and time thereof and any other information required by law or desired by the person or persons calling such meeting, shall be given to each Governor. If notice of meeting is required, and such notice does not state the place of the meeting, such meeting shall be held at the principal executive Office of the Company.  Notice of meetings of the Board of Governors shall be given to Governors in the manner provided in this Operating Agreement for giving notice to Members of meetings of Members.

Any Governor may waive notice of any meeting.  A waiver of notice by a Governor is effective whether given before, at, or after the meeting, and whether given orally, in writing, or by attendance.  The attendance of a Governor at any meeting shall constitute a waiver of notice of such meeting, unless such Governor objects at the beginning of the meeting to the transaction of business on grounds that the meeting is not lawfully called or convened and does not participate thereafter in the meeting.

Section 5.  <u>Quorum and Voting</u>.  A majority of the Governors currently holding office shall constitute a quorum for the transaction of business at any meeting of the Board of Governors.  In the absence of a quorum, a majority of the Governors present may adjourn the meeting from time to time until a quorum is present.  If a quorum is present when a duly called or held meeting is convened, the Governors present may continue to transact business until adjournment, even though the withdrawal of a number of Governors originally present leaves less than the number otherwise required for a quorum.

The Board of Governors shall take action by the affirmative vote of a majority of the Governors present at any duly held meeting, except as to any question upon which any different vote is required by law, the Articles of Organization, or any member control agreement.  A governor may give advance written consent or objection to a proposal to be acted upon at a meeting of the Board of Governors.  If the proposal acted on at the meeting is substantially the same or has substantially the same effect as the proposal to which the Governor has consented or objected, such consent or objection shall be counted as a vote for or against the proposal and shall be recorded in the minutes of the meeting.  Such consent or objection shall not be considered in determining the existence of a quorum.

Section 6.  <u>Vacancies and Newly Created Governorships</u>.
Any vacancy occurring in the Board of Governors may be filled
by the affirmative vote of a majority of the Governors
remaining in office, even though said remaining Governors be
less than a quorum.  Any newly created governorship resulting
from an increase in the authorized number of Governors by
action of the Board of Governors may be filled by a majority
vote of the Governors serving at the time of such increase.
Any vacancy or newly created governorship may be filled by
resolution of the Members.

Section 7.  <u>Removal of Governors</u>.  The entire Board of
Governors or any Governor or Governors may be removed from
office, with or without cause, at any special meeting of the
Members duly called for that purpose as provided in this
Operating Agreement, by a vote of the Members owning a
majority of the Membership Units entitled to vote at an
election of Governors.  At such meeting, without further
notice, the Members may fill any vacancy or vacancies created
by such removal as provided in Section 6 of this Article.  Any
such vacancy not so filled may be filled by the Governors as
provided in Section 6 of this Article.  Any Governor named by
the Board of Governors to fill a vacancy may be removed at any
time, with or without cause, by an affirmative vote of a
majority of all remaining Governors (including remaining
Governors that were elected by the Members and remaining
Governors elected by the Governors without Member action
pursuant to Section 6 of this Article), even though said
remaining Governors be less than a quorum, if the Members have
not elected Governors in the interval between the appointment
to fill the vacancy and the time of removal.

Section 8.  <u>Committees</u>.  The Board of Governors, by a
resolution approved by the affirmative vote of a majority of
the Governors then holding office, may establish one or more
committees of one or more natural persons having the authority
of the Board of Governors in the management of the business of
the Company to the extent provided in such resolution.  Such
committees, however, shall at all times be subject to the
direction and control of the Board of Governors.  Committee
members need not be Governors and shall be appointed by the
affirmative vote of a majority of the Governors present.  A
majority of the members of any committee shall constitute a
quorum for the transaction of business at a meeting of any
such committee.  In other matters of procedure, the provisions
of this Operating Agreement shall apply to committees and the
members thereof to the same extent they apply to the Board of
Governors and Governors, including, without limitation, the
provisions with respect to meetings and notice thereof, absent
members, written actions, and valid acts.  Each committee

-7-

shall keep regular minutes of its proceedings and report the same to the Board of Governors.

Section 9. <u>Action in Writing</u>. Any action required or permitted to be taken at a meeting of the Board of Governors or of a lawfully constituted committee thereof may be taken by written action signed by all of the Governors then in office or by all of the members of such committee, as the case may be. If the action does not require Member approval, such action shall be effective if signed by the number of Governors or members of such committee that would be required to take the same action at a meeting at which all Governors or committee members were present. If any written action is taken by less than all Governors, all Governors shall be notified immediately of its text and effective date. The failure to provide such notice, however, shall not invalidate such written action.

Section 10. <u>Meeting by Means of Electronic Communication</u>. Members of the Board of Governors of the Company, or any committee designated by the Board, may participate in a meeting of the Board or committee by means of conference telephone or similar means of communication by which all persons participating in the meeting can simultaneously hear each other. Participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

ARTICLE IV.<br/>MANAGERS

Section 1. <u>Number and Qualifications</u>. The Managers of the Company shall consist of one or more natural persons elected by the Board of Governors exercising the functions of the offices, however designated, of Chief Manager and Chief Financial Manager. The Board of Governors may also appoint such other Managers and assistant Managers as it may deem necessary or advisable. Except as provided in this Operating Agreement or any applicable member control agreement, the Board of Governors shall fix the powers, duties, and compensation of all Managers. Managers may be, but need not be, Governors of the Company. Any number of Manager positions may be held by the same person.

Section 2. <u>Term of Office</u>. A Manager shall hold office until a successor has been duly elected, unless prior thereto such Manager has resigned or been removed from office as hereinafter provided.

Section 3. <u>Removal and Vacancies</u>. Any Manager or agent elected or appointed by the Board of Governors shall hold

office at the pleasure of the Board of Governors and may be
removed, with or without cause, at any time by vote of a
majority of the Board of Governors present, subject to the
terms of any member control agreement.   Any vacancy in an
office of the Company shall be filled by action of the Board
of Governors.

Section 4.   Chief Manager.   Unless provided otherwise by
a resolution adopted by the Board of Governors, the Chief
Manager shall have general active management of the business
of the Company, and in the absence of the Chairperson of the
Board or if the office of Chairperson of the Board is vacant,
shall preside at meetings of the members and Board of
Governors, shall see that all orders and resolutions of the
Board of Governors are carried into effect, shall have
authority to sign and deliver in the name of the Company any
deeds, mortgages, bonds, contracts, or other instruments
pertaining to the business of the Company, except in cases in
which the authority to sign and deliver is required by law to
be exercised by another person or is expressly delegated by
the Articles of Organization, this Operating Agreement, or the
Board of Governors to some other Manager or agent of the
Company, may maintain records of and certify proceedings of
the Board of Governors and Members, and shall perform such
other duties as may from time to time be prescribed by the
Board of Governors.

Section 5.   Chief Financial Manager.   Unless provided
otherwise by a resolution adopted by the Board of Governors,
the Chief Financial Manager and/or the Chief Manager shall
have authority to sign and deliver in the name of the Company
any instruments pertaining to registration of the Company.
Unless provided otherwise by a resolution adopted by the Board
of Governors, the Chief Financial Manager shall have authority
to keep accurate financial records for the Company, shall
deposit all monies, drafts, and checks in the name of and to
the credit of the Company in such banks and depositories as
the Board of Governors shall designate from time to time,
shall endorse for deposit all notes, checks, and drafts
received by the Company as ordered by the Board of Governors,
making proper vouchers therefore, shall disburse Company funds
and issue checks and drafts in the name of the Company as
ordered by the Board of Governors, shall render to the Chief
Manager and the Board of Governors, whenever requested, an
account of all such Manager's transactions as Chief Financial
Manager and of the financial condition of the Company, and
shall perform such other duties as may be prescribed by the
Board of Governors or the Chief Manager from time to time.

Section 6.   Chairperson of the Board.   The Board of
Governors may elect a Chairperson of the Board who, if
elected, shall preside at all meetings of the Members and of

-9-

the Board of Governors and shall perform such other duties as may be prescribed by the Board of Governors from time to time.

Section 7.  **President**.  Unless otherwise determined by the Board of Governors, the President shall be the Chief Manager of the Company.  If a Manager other than the President is designated Chief Manager, the President shall have such powers and perform such duties as the Board of Governors or the Chief Manager may prescribe from time to time.

Section 8.  **Vice Presidents**.  The Vice President, if any, or Vice Presidents in the case there may be more than one, shall have such powers and perform such duties as the Chief Manager or the Board of Governors may prescribe from time to time.  In the absence of the President or in the event of the President's death, inability, or refusal to act, the Vice President, or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board of Governors, or, in the absence of any designation, in the order of their election, shall perform the duties of the President, and, when so acting, shall have all the powers of and be subject to all of the restrictions upon the President.

Section 9.  **Secretary**.  The Secretary shall attend all meetings of the Board of Governors and of the Members and shall maintain records of, and whenever necessary, certify all proceedings of the Board of Governors and of the Members.  The Secretary shall keep the Required Records of the Company, when so directed by the Board of Governors or other person or persons authorized to call such meetings, shall give or cause to be given notice of meetings of the Members and of meetings of the Board of Governors, and shall also perform such other duties and have such other powers as the Chief Manager or the Board of Governors may prescribe from time to time.

Section 10.  **Treasurer**.  Unless otherwise determined by the Board of Governors, the Treasurer shall be the Chief Financial Manager of the Company.  If a Manager other than the Treasurer is designated Chief Financial Manager, the Treasurer shall have such powers and perform such duties as the Chief Manager or the Board of Governors may prescribe from time to time.

Section 11.  **Delegation**.  Unless prohibited by a resolution approved by the affirmative vote of a majority of the Governors present, a Manager elected or appointed by the Board of Governors may delegate in writing some or all of the duties and powers of such person's management position to other persons.

ARTICLE V.
MEMBERSHIP UNITS

Section 1.  Membership Units.  Membership interests in
the Company shall be represented by Membership Units.
Membership Units shall be deemed to be personal property but
shall not be evidenced by any writing, except as provided in
this section.  At the request of any Member, the Company shall
state in writing the particular Membership Units, or any
rights with respect thereto, owned by that Member at the time
of the statement.  The statement must describe the Member's
voting rights, share in profits and losses, share in
distributions, and any assignment of the Member's rights then
in effect, but such statement shall not be (i) a certificated
security as defined in Minnesota Statutes §336.8-102(1)(a);
(ii) an uncertificated security as defined in Minnesota
Statutes §336.8-102(1)(b); nor (iii) a negotiable instrument,
and nor may such statement be used to transfer any Membership
Unit, in whole or in part.  For the purpose of any law
relating to security interests, a Membership Unit and any
financial rights appurtenant thereto are each a general
intangible as defined in Minnesota Statutes §336.9-106.

A Membership Unit includes both financial rights and
governance rights.  Financial rights are the right to share in
profits and losses, the right to receive distributions from
the Company, and the right to assign financial rights.
Governance rights are all rights other than financial rights,
including without limitation any rights to vote, receive
notices and attend meetings of members.

Section 2.  Transfer of Financial Rights, Governance
Rights and Membership Units.  Unless otherwise provided in the
Articles of Organization, this Operating Agreement, any
resolution adopted by the Members, or any written agreement or
written action among the Members and the Company, any Member
may transfer his, her or its financial rights, in whole or in
part, without the consent of any other Member.  Unless
otherwise provided in the Articles of Organization, this
Operating Agreement, any resolution adopted by the Members, or
any written agreement or written action among the Members and
the Company, any Member may transfer his, her or its
governance rights, in whole or in part, to any other Member
without the consent of any other Member.  Any other transfer
of governance rights, in whole or in part, to any person not a
Member is effective only upon the unanimous written consent of
all Members with voting rights other than the Member seeking
to make the transfer.  The foregoing notwithstanding, any
transfer of financial rights apart from the appurtenant
governance rights terminates the governance rights of the
transferor with respect to the Membership Units to which the
transferred financial rights are attributable.  For the

-11-

purposes of this Operating Agreement, the word "transfer" includes any disposition, sale or gift, whether voluntary or involuntary, but it does not include the voluntary grant of a security interest or other lien or encumbrance unless such voluntary security interest or other lien or encumbrance is foreclosed, executed, levied, or realized upon in any manner provided by law.

In any case, no transfer or assignment of any rights with respect to Membership Units shall be effective until a duly executed and acknowledged written instrument of assignment, in form and substance satisfactory to the Company, is received and accepted by the Company. No proposed transfer or

assignment of any rights with respect to Membership Units which (i) fails to comply with all applicable state and federal securities laws; (ii) will have adverse impact on the ability of the Company to be taxed as a partnership for federal income tax purposes; (iii) will result in a Member being exposed to liability for the debts and obligations of the Company; or (iv) will result in the termination of the Company for tax purposes pursuant to Section 708 of the Internal Revenue Code of 1986, as amended, or for state law purposes pursuant to Chapter 322B of the Minnesota Statutes, will be effective for any purpose. The Company may request an opinion of counsel satisfactory to the Company (with the costs and expenses thereof payable by the transferee or assignee), stating that the foregoing conditions have been satisfied. All sales, transfers or assignments of Membership Units, or any financial or governance rights appurtenant thereto, occurring during any calendar month shall be deemed effective on the first day of the calendar month following the calendar month in which the transfer or assignment occurs. Until such time as a written assignment that conforms to all requirements of this Section 2 has been received by and recorded on the books of the Company, any distribution by the Company to any Member or his, her or its executors, administrators, or representatives shall acquit the Company of liability to the extent of such payments to any other person who may have an interest in such payment by reason of a transfer or assignment by the Member, such Member's death, or otherwise.

ARTICLE VI.
REQUIRED RECORDS

The books and records of the Company shall be maintained at the designated or principal office of the Company as listed in the Articles of Organization and shall be available for examination there by any Member or his, her or its duly

authorized representatives by appointment during ordinary
business hours upon five (5) days notice.  The Company shall
keep the following records:

    (a)   a current list of the full legal name and last
known business address of each Member;

    (b)   a copy of the Articles of Organization, this
Operating Agreement and any applicable member
control agreement and all amendments to any of the
foregoing, and executed copies of any powers of
attorney pursuant to which any of the foregoing
have been executed;

    (c)   copies of the Company's federal, state, and local
income tax returns and reports, if any, for the
three (3) most recent years;

    (d)   copies of any financial statements of the Company
for the three most recent years; and

    (e)   to the extent not contained in a member control
agreement, a writing setting out contributions made
and agreed to be made by each Member, and, if other
than cash, the agreed value of such contributions.

In addition, the Company shall maintain any other books
and records required to be maintained by Chapter 322B of the
Minnesota Statutes and such additional books and records as
the Board of Governors or Chief Manager deems advisable.

ARTICLE VII.
DISSOLUTION

Section 1.  Events Causing Dissolution.  The Company
shall be dissolved upon the happening of the first to occur of
the following:

    (a)   The expiration of the term set forth in the
Articles of Organization of the Company;

    (b)   Any order of a court of competent jurisdiction
requiring dissolution;

    (c)   The action of the Members as provided in Section
302A.806 of the Minnesota Statutes to dissolve the
Company;

    (d)   The unanimous written consent of all Members

-13-

holding Membership Units entitled to vote to dissolve the Company;

(e)   Any event that terminates the continued membership of a Member in the Company, including:

    (i)    death of any Member;

    (ii)   retirement of any Member;

    (iii) resignation of any Member;

    (iv)   redemption of a Member's complete Membership Unit(s);

    (v)    assignment of a Member's financial or governance rights which leaves the Member with no governance rights;

    (vi)   purchase of a Member's Membership Unit(s) that leaves the Member with no governance rights;

    (vii) to the extent that Members may be expelled pursuant to the Articles of Organization or any member control agreement, expulsion of any Member; and

    (viii) bankruptcy and/or dissolution of any Member; or

(f)   A merger or exchange in which the Company is not the surviving or acquiring company.

Section 2.   <u>Effect of Dissolution</u>.   Upon the occurrence of any event causing dissolution of the Company, the business of the Company shall be wound up and terminated as provided in Chapter 322B of the Minnesota Statutes, except that the dissolution of the Company due to the occurrence of any event which terminates the continued membership of a member in the Company can be avoided as provided in Section 322B.80 of the Minnesota Statutes, and except that the business of the Company may be continued after dissolution only as provided in Section 322B.03, subd. 9, and Section 322B.37 of the Minnesota Statutes.

ARTICLE VIII.
CONTRACTS, LOANS, CHECKS AND DEPOSITS

Section 1.  Contracts.  The Board of Governors may authorize such Managers or agents as they shall designate to enter into contracts or execute and deliver instruments in the name of and on behalf of the Company, and such authority may be general or confined to specific instances.

Section 2.  Loans.  The Company shall not lend money to, guarantee the obligation of, become a surety for, or otherwise financially assist any person unless the transaction, or class of transactions to which the transaction belongs, has been approved by the affirmative vote of a majority of Governors present, and (a) is in the usual and regular course of business of the Company, (b) is with, or for the benefit of, a related company, an organization in which the Company has a financial interest, an organization with which the Company has a business relationship, or an organization to which the Company has the power to make donations, (c) is with, or for the benefit of, a manager or other employee of the Company or a subsidiary, including a Manager or employee who is a Governor of the Company or a subsidiary, and may reasonably be expected, in the judgment of the Board of Governors, to benefit the Company, or (d) has been approved by the affirmative vote of the owners of two-thirds (2/3) of the outstanding Membership Units, including both voting and non-voting Membership Units, if any.

Section 3.  Checks, Drafts, etc.  All checks, drafts or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Company shall be signed by the Chief Manager or such Managers or agents of the Company as shall be designated and in such manner as shall be determined from time to time by resolution of the Board of Governors.

Section 4.  Deposits.  All funds of the Company not otherwise employed shall be deposited from time to time to the credit of the Company in such banks or other financial institutions as the Board of Governors may select.

ARTICLE IX.
MISCELLANEOUS

Section 1.  Distributions.  The Board of Governors from time to time may declare, and the Company may make, distributions on its outstanding Membership Units in the manner and upon the terms and conditions provided by law.

Section 2.  Reserves.  There may be set aside out of any

-15-

funds of the Company available for distributions such sum or sums as the Board of Governors from time to time, in its absolute discretion, deems proper as a reserve or reserves to meet contingencies, for equalizing distributions, for repairing or maintaining any property of the Company, for the purchase of additional property, or for such other purpose as the Governors shall deem to be consistent with the interests of the Company. The Board of Governors may modify or abolish any such reserve.

Section 3. <u>Fiscal Year</u>. The fiscal year of the Company shall be such twelve-month period as is set by a resolution of the Board of Governors, provided, however, that the first fiscal year of the Company may be a shorter period if permitted by law and set by a resolution of the Board of Governors.

Section 4. <u>Amendments</u>. Except as limited by the Articles of Organization or any member control agreement, this Operating Agreement may be altered or amended by the Board of Governors at any meeting of Governors to the full extent permitted by law, subject, however, to the power of the Members of the Company to alter or repeal this Operating Agreement.

Section 5. <u>Member Control Agreements</u>. In the event of any conflict of inconsistency between this Operating Agreement, or any amendment thereto, and the terms of any member control agreement, whenever adopted, the terms of such member control agreement shall control.

Section 6. <u>Seal</u>. The Company shall have no seal.

*   *   *   *   *   *   *   *   *   *

The undersigned, Secretary of CC Lafayette, LLC, a Minnesota limited liability company, does hereby certify that the foregoing Operating Agreement is the Operating Agreement adopted for the Company by its Board of Governors.

_____
Priscilla J. Rietz, Secretary

-16-

# CALL AND WAIVER OF NOTICE OF

# FIRST MEETING OF MEMBERS

# OF

# CC LAFAYETTE, LLC

We, the undersigned, being all of the members of CC Lafayette, LLC, do hereby call the first meeting of the members of said limited liability company to be held in the City of Owatonna, County of Steele, State of Minnesota, at 9:00 o'clock a.m., on the 21st of October, 1998, for the election of governors and the transaction of such other business as may come before said meeting, and we hereby waive all requirements as to notice of such meeting.

Dated:    October 20, 1998

Larry J. Rietz

# MINUTES OF THE FIRST MEETING
## OF THE MEMBERS
## OF
## CC LAFAYETTE, LLC

The first meeting of the Members of CC Lafayette, LLC, was held on the 21st day of October, 1998, at 9:00 o'clock a.m., at the registered office, 1355 Lemond Road, City of Owatonna, County of Steele, State of Minnesota, pursuant to a Call and Waiver of Notice of said meeting signed by the members.

The following members were present:
    Larry J. Rietz

representing all of the members of said limited liability company.

Larry J. Rietz called the meeting to order.

On motion duly made and carried, Larry J. Rietz was elected chairman of the meeting, and Priscilla J. Rietz was elected secretary of the meeting.

On motion duly made and seconded, the following resolution was unanimously adopted:

RESOLVED, that Larry J. Rietz is hereby recognized and confirmed as the sole member of the Board of Governors of said limited liability company and shall hold office for one year or until his successor is duly elected and qualified.

On motion duly made and seconded, the meeting was adjourned.

_Priscilla J. Rietz_
Priscilla J. Rietz, Secretary

# CALL AND WAIVER OF NOTICE OF

# FIRST MEETING OF BOARD OF GOVERNORS

## OF

## CC LAFAYETTE, LLC

The undersigned governor of CC Lafayette, LLC, who is the sole member of the Board of Governors thereof, does hereby call the first meeting of the Board of Governors of said limited liability company to be held in the City of Owatonna, County of Steele, State of Minnesota, at 10:00 o'clock a.m., on the 21st day of October, 1998, for the election of officers and the transaction of such other business as may come before said meeting and hereby waives all requirements as to notice of such meeting.

Dated:   October 20,1998

Larry J. Rietz

# MINUTES OF THE FIRST MEETING

## OF THE BOARD OF GOVERNORS

### OF

## CC LAFAYETTE, LLC

The first meeting of the Board of Governors of CC Lafayette, LLC was held at the registered office, 1355 Lemond Road, in the City of Owatonna, County of Steele, State of Minnesota, at 10:00 a.m., on the 21st day of October, 1998, pursuant to the foregoing Call and Waiver of Notice.

The following Board of Governors was present:

Larry J. Rietz

Larry J. Rietz was chosen chairman of the meeting and Priscilla J. Rietz  was chosen secretary of the meeting.

The chairman called for nominations of officers of said limited liability company.  Thereupon, the following were nominated for the offices set forth after their respective names to serve until their successors are duly elected and qualified.

        Larry J. Rietz - Chief Manager
        Larry J. Rietz – President/Treasurer
        Priscilla J. Rietz – Chief Financial Manager/ Tax
                    Matters Partner
        Priscilla J. Rietz – Vice President/Secretary

No further nominations being made, the nominations were closed and a vote taken.  All of the governors present having voted, the vote was counted and the chairman announced that

the aforesaid persons had been duly elected to the offices set forth after their respective names to serve until their successors are duly elected and qualified.

The permanent officers of said limited liability company then took charge of the meeting.

On motion duly made and seconded, the meeting was adjourned.

_Priscilla J. Rietz_
Priscilla J. Rietz, Secretary



LEXIS Document Service

XDS-98-35653-KRH     Doc: 14041-1     Filed 03/31/dance:ERROR 02/31/Springfield, Illinois 62703-2861

For Courier:     801 Adlai Stevenson Drive, Springfield, Illinois 62703-4261
Filed 03/31/dance:ERROR 02/31/Springfield, Illinois 62703-2861
Exhibits A through F     Telephone:800-531-0738     FAX NO: 800-457-6299

CC LAFAYETTE, LLC                                        Original UCC
1355 LEMOND ROAD
OWATONNA, MN 55060


Secretary of State, Minnesota


Courier Service: UPS To                    Confirmation: None

REQUESTING PARTY (COMPLETE NAME, ADDRESS, CITY, STATE, AND ZIP)

MARLENE FEDEO                              CREF# STARWOOD/VOLT
BINGHAM DANA, LLP                          CUST# 70279        01/03/2000
100 PEARL STREET                           Letter & Filing
HARTFORD, CT  06103                        Phone:(860) 240-2700

                                           Fax:  (860) 240-2800

Orig # 2192003   1/10/00          Tick to
                                  7/10/04
                                           Services:         13.00
ORDER/ 5191856-2   ACKNOWLEDGMENT  01/24/2000  EXTRA PAGE(S)  4   Disbursement:     23.00
INVOICE:           SENT:                       PAGES BACK     0   Taxes:            0.00
                                                                  Confirmation:     0.00
                                                                  Courier Serv:     12.00

PSM                                        TOTAL             50.00

A member of the Reed Elsevier plc group

                              **CONFIRMATION**

## STATE OF MINNESOTA
## UCC-1 FINANCING STATEMENT

For Filing Officer

2192003

00 JAN 10  AM10:3

SEC. OF STATE
MINNESOTA

This statement is presented for filing pursuant to *Minnesota Uniform Commercial Code Minnesota Statutes Chapter 336.9-402*

| 1. Individual Debtor - Last Name | | | First Name | | Middle I. |
|---|---|---|---|---|---|
| Social Security # | | Mailing Address | | | |
| City | | | State | | Zip Code |
| 2. Individual Debtor - Last Name | | | First Name | Middle I. | |
| Social Security # | | Mailing Address | | | |
| City | | | State | | Zip Code |

**3. Business Debtor - Name**
  CC Lafayette, LLC

| Fed. ID # 41-1921935 | Mailing Address 1355 Lemond Road | | |
|---|---|---|---|
| City OWATONNA | | State MN | Zip Code 55060 |

| 4. Secured Party Name LaSalle National Bank, as Trustee (See Attached) | | 5. Assignee of Secured Party |
|---|---|---|
| Mailing Address c/o Starwood Asset Services 100 Great (See Attached) | | Mailing Address |

| City WETHERSFIELD | State CT | Zip Code 06109 | City | State | Zip Code |
|---|---|---|---|---|---|

6. This financing statement covers the following types or items of property. (If crops are covered describe the real estate and list the name of record owner.)

See Exhibit A attached hereto and made a part hereof.

*B 510 1856-2*

_____ Debtor is a transmitting utility
as defined by Minnesota Statutes Chapter 336.9-105

MN-SOS

| RETURN ACKNOWLEDGEMENT COPY TO: (name and addrress) | TERMINATION STATEMENT: This statement of Termination of Financing is presented to a Filing Officer purusant to the Uniform Commercial Code. The Secured Party certifies that the Secured Party no longer claims a security interest under the financing statement bearing the file number shown above. |
|---|---|
| | By:_____ (Signature of Secured Party or Assignee of Record. Must be signed) |
| Please do not type outside the bracketed area. | Date:_____ |

(06920819 Rev. 5/93) Standard Form Approved by Secretary of State

(3) FILING OFFICER COPY ACKNOWLEDGEMENT

# STATE OF MINNESOTA
## UCC-1 FINANCING STATEMENT

This statement is presented for filing pursuant to *Minnesota Uniform Commercial Code Minnesota Statutes Chapter 336.9-402*

| | For Filing Officer |
|---|---|
| | 2192003 |
| | 00 JAN 10  AM 10:30 |
| | SEC. OF STATE MINNESOTA |

| 1. Individual Debtor - Last Name | | First Name | Middle I. |
|---|---|---|---|
| Social Security # | Mailing Address | | |
| City | | State | Zip Code |

| 2. Individual Debtor - Last Name | | First Name | Middle I. |
|---|---|---|---|
| Social Security # | Mailing Address | | |
| City | | State | Zip Code |

**3. Business Debtor - Name**
CC Lafayette, LLC

| Fed. ID # 41-1921935 | Mailing Address 1355 Lemond Road | |
|---|---|---|
| City OWATONNA | State MN | Zip Code 55060 |

| 4. Secured Party Name LaSalle National Bank, as Trustee (See Attached) | 5. Assignee of Secured Party |
|---|---|
| Mailing Address c/o Starwood Asset Services 100 Great (See Attached) | Mailing Address |

| City WETHERSFIELD | State CT | Zip Code 06109 | City | State | Zip Code |
|---|---|---|---|---|---|

6. This financing statement covers the following types or items of property. (If crops are covered describe the real estate and list the name of record owner.)

See Exhibit A attached hereto and made a part hereof.

_____ Debtor is a transmitting utility
as defined by Minnesota Statutes Chapter 336.9-105

MN-SOS

| RETURN ACKNOWLEDGEMENT COPY TO: (name and address) | CC Lafayette, LLC |
|---|---|
| | *Debtor's Signature* (Required in Most Cases see instructions) |
| | Debtor's Signature |
| | LaSalle National Bank, as Trustee |
| | Secured Party's Signature |

Please do not type outside the bracketed area.

(06920819 Rev. 5/93) Standard Form Approved by Secretary of State

(4)  SECURED PARTY COPY

# STATE OF MINNESOTA
## UCC-1 FINANCING STATEMENT

For
Filing
Officer

2192003

00 JAN 10  AM 10:30

SEC. OF STATE
MINNESOTA

This statement is presented for filing pursuant to *Minnesota Uniform Commercial Code Minnesota Statutes Chapter 336.9-402*

| 1. Individual Debtor - Last Name | | First Name | Middle I. |
|---|---|---|---|
| Social Security # | Mailing Address | | |
| City | | State | Zip Code |
| 2. Individual Debtor - Last Name | | First Name | Middle I. |
| Social Security # | Mailing Address | | |
| City | | State | Zip Code |

3. Business Debtor - Name
CC Lafayette, LLC

| Fed. ID # | Mailing Address 1355 Lemond Road | | |
|---|---|---|---|
| City OWATONNA | | State MN | Zip Code 55060 |

| 4. Secured Party Name LaSalle National Bank, as Trustee (See Attached) | 5. Assignee of Secured Party |
|---|---|
| Mailing Address c/o Starwood Asset Services 100 Great (See Attached) | Mailing Address |

| City WETHERSFIELD | State CT | Zip Code 06109 | City | State | Zip Code |
|---|---|---|---|---|---|

6. This financing statement covers the following types or items of property. (If crops are covered describe the real estate and list the name of record owner.)

See Exhibit A attached hereto and made a part hereof.

_____ Debtor is a transmitting utility
as defined by Minnesota Statutes Chapter 336.9-105

MN-SOS

| RETURN ACKNOWLEDGEMENT COPY TO: (name and address) | CC Lafayette, LLC |
|---|---|
| | Debtor's Signature (Required in Most Cases see instructions) |
| | Debtor's Signature |
| | LaSalle National Bank, as Trustee |
| | Secured Party's Signature |

Please do not type outside the bracketed area.

(06920819 Rev. 5/93) Standard Form Approved by Secretary of State

(5) DEBTOR COPY

# Office of the Secretary of State

## State of Minnesota

100 Constitution Ave., 180 State Office Bldg.
St. Paul, MN 55155-1299

**Mary Kiffmeyer**
*Secretary of State*

Public Information: (651)296-2803
Election Division: (651)215-1440

### UNIFORM COMMERCIAL CODE DIVISION

### NOTICE

Pursuant to Minnesota Statutes Section 336.9-403, (1993) a
limit of four additional pages per financing statement will
be accepted by the Office of the Secretary of State.

This office has accepted the first four pages for filing as
part of the financing statement. All remaining pages are
returned to you for filing with your records.

Minnesota Statutes Section 336.9-402 (1) states that a
financing statement is sufficient if it contains a statement
indicating the types or describing the items of collateral.
Four additional pages is a reasonable number of attachments
to meet this requirement.

The purpose of filing in the Uniform Commercial Code records
is to provide public notice, not complete information.
Complete information regarding the security interest is
available from the secured party in the security agreement.

### SCHEDULE 1 TO EXHIBIT A

### MAIN PARCEL

A certain tract of land containing 3.504 acres, known as Lot 2B,
Acadiana Square Shopping Center, located in Section 68, Township
10 South, Range 4 East, City of Lafayette, Lafayette Parish,
Louisiana, being more fully described as follows:

Commencing at the projected intersection of the more easterly
right-of-way of Fountainhead Drive and the more northerly right-
of-way of Johnston Street (U.S. Highway 167), proceed along said
right-of-way of Johnston Street a bearing of North 41 degrees 36
minutes 31 seconds East, a distance of 704.00 feet to a point;
thence continue along said right-of-way of Johnston Street a
bearing of North 41 degrees 35 minutes 16 seconds East, a
distance of 646.20 feet to a point; thence proceed along a
bearing of North 48 degrees 25 minutes 04 seconds West, a
distance of 247.67 feet to a point; thence proceed along a
bearing of North 13 degrees 41 minutes 34 seconds West, a
distance 23.34 feet to a point, said point hereinafter to be
known as the Point of Beginning; thence proceed along a bearing
of South 74 degrees 26 minutes 08 seconds West, a distance of
248.86 feet to a point; thence proceed along a bearing of North
15 degrees 33 minutes 52 seconds West a distance of 225.06 feet
to a point; thence proceed along a bearing of South 74 degrees 26
minutes 08 seconds East a distance of 8.15 feet to a point;
thence proceed along a bearing of North 15 degrees 33 minutes 52
seconds West, a distance of 379.64 feet to a point on the
southerly right-of-way of Target Loop; thence proceed along the
southerly right-of-way of Target Loop a bearing of North 75
degrees 32 minutes 27 seconds East a distance of 260.35 feet to a
point; thence proceed along a bearing of South 13 degrees 41
minutes 34 seconds East a distance of 600.00 feet to the Point of
Beginning; all as shown on the current Replat of Acadiana Square
Shopping Center, dated February 13, 1994, last revised December
12, 1994, by C. H. Fenstermaker & Associates, Inc., a copy of
which is recorded under Act No. 94-045525 in the Lafayette Parish
Court House, Lafayette, Louisiana.

### SERVITUDE PARCEL

That certain non-exclusive servitude interest acquired pursuant
to Reciprocal Easement and Operation Agreement executed by CAP-
Lafayette Investors Limited Partnership, Toys "R" Us, Inc. and
Lowe's Home Center, Inc., dated April 25, 1990, recorded as File
No. 90-12433; as amended by First Amendment to Reciprocal
Easement and Operation Agreement, dated January 20, 1993,
recorded as File No. 93-003289; as further amended by Second
Amendment to Reciprocal Easement and Operation Agreement, dated
January 31, 1994, recorded as File No. 94-010707.

 **LEXIS Document Services**

For Courier:   801 Adlai Stevenson Drive, Springfield, Illinois 62703-4261
For Remittance: PO Box 2861, Springfield, Illinois 62708-2861
Telephone: 800-445-4738     FAX NO: 800-457-6299

CC LAFAYETTE, LLC                                        Original UCC
1355 LEMOND ROAD
OWATONNA, MN  55060

Clerk of Court, Lafayette Parish, Louisiana

Courier Service: UPS To                          Confirmation: None

REQUESTING PARTY (COMPLETE NAME, ADDRESS, CITY, STATE, AND ZIP)

MARLENE FEBEO                                   CREF# STARWOOD/VUIT
BINGHAM DANA, LLP                               CUST# 70279      01/03/2000
1 STATE STREET                                  Letter & Filing
22ND FLOOR                                      Phone:(860) 240-2700
HARTFORD, CT  06103
                                                Fax:  (860) 240-2800
Orig#: 28-393617 01/21/2000

                                                        Services:       13.00
                                                        Disbursement:   30.00
ORDER/                                          EXTRA PAGE(S) 4         Taxes:          0.00
INVOICE: 5101356-1    ACKNOWLEDGMENT  02/07/2000  PAGES BACK  0         Confirmation:   0.00
                      SENT:                                             Courier Serv:  12.00

        nec                                             TOTAL          55.00

A member of the Reed Elsevier plc group                    **CONFIRMATION**

FRC (2/98)

**1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b)**

| 1a. ENTITY'S NAME | | | |
|---|---|---|---|
| OR CC Lafayette, LLC | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE |
|---|---|---|---|
| 1355 Lemond Road | OWATONNA | MN | 55060 |

1d. S.S. OR TAX I.D. #

**2. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b)**

| 2a. ENTITY'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE |
|---|---|---|---|

2d. S.S. OR TAX I.D. #

**3. SECURED PARTY INFORMATION**

| 3a. SECURED PARTY | 3b. SS# OR EMPLOYER I.D. NO. |
|---|---|
| LaSalle National Bank, as Trustee for the registered (See Attached) | |

3c. MAILING ADDRESS
c/o Starwood Asset Services, 100 Great Meadow Road, Suite 603, WETHERSFIELD, CT 06109

| 4a. ASSIGNEE OF SECURED PARTY (IF ANY) | 4b. SS# OR EMPLOYER I.D. NO. |
|---|---|

4c. MAILING ADDRESS

**5. PROPERTY INFORMATION**

5a. This FINANCING STATEMENT covers the following types or items of property:

See Exhibit A attached hereto and made a part hereof.

5b. [X] Products of collateral are also covered.

6a. Check if applicable and attach legal description of real property:    LA-Lafayette Parish

[X] Fixture filing under R.S. 10:9-313

[ ] Minerals or the like (including oil and gas) or accounts subject to R.S. §§ 10:9-103(5) will be financed at the wellhead or minehead of the well or mine.

[ ] The debtor(s) do not have an interest of record in the real property. (Enter name and social security/employer i.d. number of an owner of record in 6b and 6c).

| 6b. OWNER OR REAL PROPERTY (If other than named debtor) (Enter name and social security/employer i.d. # of an owner of record) | 6c. SS# /EMPLOYER I.D. NO. |
|---|---|

7a. This statement is filed without the debtor's signature to perfect a security interest in collateral (check [ ] if so):

7b. [ ] Debtor is a Transmitting Utility. Filing is Effective Until Terminated Pursuant R.S. 10:9-403(8).

[ ] already subject to a security interest in another jurisdiction when brought into this state or debtor's location changed to this state.

[ ] which is proceeds of the original collateral described above in which a security interest was perfected.

[ ] as to which the filing has lapsed.

[ ] acquired after a change of debtor's name, identity or corporate structure AND social security/employer I.D. number.

**8. SIGNATURE(S) OF DEBTOR(S)**

CC Lafayette, LLC

*Gary J. Tietz, Chief Mgr.*

11. THIS SPACE FOR USE OF FILING OFFICER (DATE, TIME, ENTRY # AND FILING OFFICER)

**9. SIGNATURE(S) OF SECURED PARTY(IES)(if applicable)**

LaSalle National Bank, as Trustee

**10.** Return copy to:

NAME

ADDRESS

CITY, STATE

ZIP CODE

12. Number of additional sheets presented __5__

LOUISIANA APPROVED FORM UCC-1 SECRETARY OF STATE W. FOX MCKEITHEN

(2) FILING OFFICER COPY-

**1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b)**

| 1a. ENTITY'S NAME | | | |
|---|---|---|---|
OR| CC Lafayette, LLC | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE |
|---|---|---|---|
| 1355 Lemond Road | OWATONNA | MN | 55060 |

| 1d. S.S. OR TAX I.D. # |
|---|
| |

**2. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b)**

| 2a. ENTITY'S NAME | | | |
|---|---|---|---|
OR| | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE |
|---|---|---|---|
| | | | |

| 2d. S.S. OR TAX I.D. # |
|---|
| |

**3. SECURED PARTY INFORMATION**

| 3a. SECURED PARTY | 3b. SS# OR EMPLOYER I.D. NO. |
|---|---|
| LaSalle National Bank, as Trustee for the registered (See Attached) | |

| 3c. MAILING ADDRESS |
|---|
| c/o Starwood Asset Services, 100 Great Meadow Road, Suite 603, WETHERSFIELD, CT 06109 |

| 4a. ASSIGNEE OF SECURED PARTY (IF ANY) | 4b. SS# OR EMPLOYER I.D. NO. |
|---|---|
| | |

| 4c. MAILING ADDRESS |
|---|
| |

**5. PROPERTY INFORMATION**

5a. This FINANCING STATEMENT covers the following types or items of property:

See Exhibit A attached hereto and made a part hereof.

5b. [x] Products of collateral are also covered.

6a. Check if applicable and attach legal description of real property:    LA-Lafayette Parish

[x] Fixture filing under R.S. 10:9-313

[ ] Minerals or the like (including oil and gas) or accounts subject to R.S.§§ 10:9-103(5) will be financed at the wellhead or minehead of the well or mine.

[ ] The debtor(s) do not have an interest of record in the real property. (Enter name and social security/employer i.d. number of an owner of record in 6b and 6c).

| 6b. OWNER OR REAL PROPERTY (if other than named debtor) (Enter name and social security/employer i.d. # of an owner of record) | 6c. SS# /EMPLOYER I.D. NO. |
|---|---|
| | |

7a. This statement is filed without the debtor's signature to perfect a security interest in collateral (check [ ] if so):

[ ] already subject to a security interest in another jurisdiction when brought into this state or debtor's location changed to this state.

[ ] which is proceeds of the original collateral described above in which a security interest was perfected.

[ ] as to which the filing has lapsed.

[ ] acquired after a change of debtor's name, identity or corporate structure AND social security/employer I.D. number.

7b. [ ] Debtor is a Transmitting Utility. Filing is Effective Until Terminated Pursuant R.S. 10:9-403(8).

**8. SIGNATURE(S) OF DEBTOR(S)**

CC Lafayette, LLC

*Larry J. O'Rietz, Chief Mgr.*

**9. SIGNATURE(S) OF SECURED PARTY(IES)(if applicable)**

LaSalle National Bank, as Trustee

**11. THIS SPACE FOR USE OF FILING OFFICER (DATE, TIME, ENTRY # AND FILING OFFICER)**

**10.** Return copy to:

NAME
ADDRESS
CITY, STATE
ZIP CODE

**12.** Number of additional sheets presented  5

LOUISIANA APPROVED FORM UCC-1 SECRETARY OF STATE W. FOX MCKEITHEN

(3) SECURED PARTY COPY

This FINANCING STATEMENT is presented for filing pursuant to Chapter 9 of the Louisiana Commercial Laws.
Main Document Page 182 of 187

**1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b)**

| 1a. ENTITY'S NAME | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| CC Lafayette, LLC | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE |
|---|---|---|---|
| 1355 Lemond Road | OWATONNA | MN | 55060 |

1d. S.S. OR TAX I.D. #

**2. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b)**

| 2a. ENTITY'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE |
|---|---|---|---|

2d. S.S. OR TAX I.D. #

**3. SECURED PARTY INFORMATION**

| 3a. SECURED PARTY | 3b. SS# OR EMPLOYER I.D. NO. |
|---|---|
| LaSalle National Bank, as Trustee for the registered (See Attached) | |

3c. MAILING ADDRESS
c/o Starwood Asset Services, 100 Great Meadow Road, Suite 603, WETHERSFIELD, CT 06109

| 4a. ASSIGNEE OF SECURED PARTY (IF ANY) | 4b. SS# OR EMPLOYER I.D. NO. |
|---|---|

4c. MAILING ADDRESS

**5. PROPERTY INFORMATION**

5a. This FINANCING STATEMENT covers the following types or items of property:

See Exhibit A attached hereto and made a part hereof.

5b. [X] Products of collateral are also covered.

6a. Check if applicable and attach legal description of real property:   **LA-Lafayette Parish**

[x] Fixture filing under R.S. 10:9-313

[ ] Minerals or the like (including oil and gas) or accounts subject to R.S.§§ 10:9-103(5) will be financed at the wellhead or minehead of the well or mine.

[ ] The debtor(s) do not have an interest of record in the real property. (Enter name and social security/employer i.d. number of an owner of record in 6b and 6c.)

| 6b. OWNER OR REAL PROPERTY (if other than named debtor) (Enter name and social security/employer i.d. # of an owner of record) | 6c. SS# /EMPLOYER I.D. NO. |
|---|---|

7a. This statement is filed without the debtor's signature to perfect a security interest in collateral (check [ ] if so):

[ ] already subject to a security interest in another jurisdiction when brought into this state or debtor's location changed to this state.

[ ] which is proceeds of the original collateral described above in which a security interest was perfected.

[ ] as to which the filing has lapsed.

[ ] acquired after a change of debtor's name, identity or corporate structure AND social security/employer I.D. number.

7b. [ ] Debtor is a Transmitting Utility. Filing is Effective Until Terminated Pursuant R.S. 10:9-403(8).

**8. SIGNATURE(S) OF DEBTOR(S)**

CC Lafayette, LLC

*[signature]* , Chief Mgr.

**11. THIS SPACE FOR USE OF FILING OFFICER (DATE, TIME, ENTRY # AND FILING OFFICER)**

**9. SIGNATURE(S) OF SECURED PARTY(IES)(if applicable)**

LaSalle National Bank, as Trustee

**10.** *Return copy to:*

NAME

ADDRESS

CITY, STATE

ZIP CODE

12. Number of additional sheets presented ___5___

LOUISIANA APPROVED FORM UCC-1 SECRETARY OF STATE W. FOX MCKEITHEN

(4) DEBTOR COPY

Return To:

LEXIS Document Services
73 Tremont Street, 5th Floor
Boston, MA  02108-3901
Phone: (617) 248-6792

5101856 - 1

(UP TO N) - ("BOS")
Debtor: CC LAFAYETTE, LLC
Juris:   Clerk of Court, Lafayette Paris, LA

# Exhibit F

15th JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE
STATE OF LOUISIANA

BANK OF AMERICA, N.A.,
successor by merger to LaSalle National
Bank Association (f/k/a LaSalle National
Bank), as Trustee for the Registered
Holders of GMAC Commercial Mortgage
Securities, Inc., Commercial Mortgage
Pass-Through Certificates, Series 1997-C1

SUIT NUMBER *2009481/*

DIVISION "_____"

Versus

CC LAFAYETTE, LLC, A MINNESOTA
LIMITED LIABILITY COMPANY

## ORDER

CONSIDERING the foregoing Petition for Executory Process filed Bank of America, N.A., successor by merger to LaSalle National Bank Association (f/k/a LaSalle National Bank), as Trustee for the Registered Holders of GMAC Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 1997-C1 (the "Trustee"), and the exhibits attached thereto;

IT IS ORDERED that a writ of seizure and sale be issued commanding the Sheriff of this Parish to immediately seize and after due legal advertisements, delays, requisites and formalities, and service of all notices and pleadings required, to sell the Property described on the attached Exhibit "A," (the "Seized Property"), at public auction, according to law, for one hundred percent (100%) cash to be paid at the moment of adjudication, without appraisal, to the highest bidder;

IT IS FURTHER ORDERED that Tarantino Properties, Inc., through its authorized representative, be appointed Keeper of the Property pending Sheriff's Sale without the necessity of posting bond, and that said Keeper is hereby authorized to take all actions which might be required with respect to the Seized Property to manage and conserve its value pursuant to all powers under law and Loan Documents;

IT IS FURTHER ORDERED that CC Lafayette, LLC, A Minnesota Limited Liability Company ("CC Lafayette") is instructed to provide an accounting of and turn over to the Keeper all of the Seized Property, and that CC Lafayette cooperate generally with the Keeper and Sheriff

in the orderly transition of the Seized Property, and permit Keeper to carry out all of its rights

and responsibilities under this Order;

      **IT IS FURTHER ORDERED** that to the extent that Tarantino Properties, Inc., as

Keeper, is required during the pendency of this action to make advances or incur expenses for

the protection and preservation of the Property or incurs such other expenses as may be

otherwise provided by the loan documents, such amounts shall be taxed by the Court as costs

pursuant to La. R.S. 9:5138(C);

      **IT IS FURTHER ORDERED** that out of the proceeds of this sale, the Trustee be paid

by preference and priority over all other persons and creditors the full amount herein claimed as

follows:

| Description | Amount |
|---|---|
| Unpaid Principal Balance | $ 2,207,146.90 |
| Note Rate Interest (at 8.90% from February 1, 2009 through July 1, 2009) | $ 81,848.36 |
| Default Rate Interest (at 4.0% from March 1, 2009 through July 1, 2009) | $ 29,428.63 |
| Default Premium (2.0% of Principal Balance) | $ 44,142.94 |
| Late Charges | $ 8,895.81 |
| Property Protection Advances | $ 16,427.11 |
| Suspense Balance | ($ 27,438.13) |
| **Estimated Total** | $ 2,360,451.62 |

plus additional default interest to accrue on the unpaid principal balance at the rate of 12.9%

until paid, plus reasonable attorney's fees not to exceed twenty-five (25%) percent of the

principal balance due and all costs of collection; and

      **IT IS FINALLY ORDERED** this Order be rendered specifically reserving the rights of

the Trustee, it successors and/or assigns, against CC Lafayette and all other persons for any and

all other causes of action not alleged herein, and any and all other assets or security of any kind

or type, together with all rights against all other collateral, property, endorsers, guarantors,

sureties, or others.

      **ORDER SIGNED** in Lafayette, Louisiana on this 14th day of

_____, 2009.

                              S/Ed Rubin
                              *Judge, 15th Judicial District Court*
                              *Parish of Lafayette*
                              *State of Louisiana*

Respectfully Submitted:

Jon Ann Giblin, LA Bar Roll #23093
Stephen P. Strohschein, LA Bar Roll # 12541
E. Stewart Spielman, LA Bar Roll # 28766
McGlinchey Stafford, PLLC
One American Place, Fourteenth Floor
Baton Rouge, Louisiana 70825
Telephone:  (225) 383-9000
Facsimile:  (225) 343-3076

ATTORNEYS FOR BANK OF AMERICA, N.A., AS TRUSTEE