```
 1                   IN THE UNITED STATES BANKRUPTCY COURT
                      EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2
     In Re:                            )  Case No. 08-35653-KRH
 3                                     )  Richmond, Virginia
     CIRCUIT CITY STORES, INC., et     )
 4   al.,                              )
                                       )  July 25, 2018
 5            Debtors.                 )  2:25 p.m.
                                       )
 6   -------------------------------   )
     ALFRED H. SIEGEL, TRUSTEE OF THE )  Adv. Proc. 18-03040-KRH
 7   CIRCUIT CITY STORES, INC.         )
     LIQUIDATING TRUST,                )
 8                                     )
              Plaintiff,               )
 9   v.                                )
                                       )
10   CALIFORNIA SELF-INSUREDS'         )
     SECURITY FUND AND ANDRE SCHOORL, )
11                                     )
              Defendants.              )
12   -------------------------------   )

13
                         TRANSCRIPT OF HEARING ON
14    ADVERSARY CASE 18-03040: MOTION FOR SUMMARY JUDGMENT (MOTION OF
       PLAINTIFF TRUSTEE ALFRED H. SIEGEL FOR SUMMARY JUDGMENT, AND
15      MEMORANDUM IN SUPPORT THEREOF) FILED BY LYNN L. TAVENNER OF
      TAVENNER & BERAN, PLC ON BEHALF OF ALFRED H. SIEGEL, TRUSTEE OF
16          THE CIRCUIT CITY STORES, INC. LIQUIDATING TRUST
                            (DOCKET NO. 18);
17    MOTION TO APPROVE (MOTION OF THE LIQUIDATING TRUSTEE FOR ENTRY
      OF AN ORDER FURTHER EXTENDING TERM OF LIQUIDATING TRUST) FILED
18     BY LYNN L. TAVENNER OF TAVENNER & BERAN, PLC ON BEHALF OF
      CIRCUIT CITY STORES, INC. LIQUIDATING TRUST (DOCKET NO. 14173)
19            BEFORE THE HONORABLE KEVIN R. HUENNEKENS
                   UNITED STATES BANKRUPTCY JUDGE
20

21

22

23

24

25
```

```
 1  APPEARANCES:
    For the Liquidating Trustee -    ANDREW W. CAINE, ESQ.
 2  Plaintiff:                       PACHULSKI STANG ZIEHL & JONES
                                     10100 Santa Monica Boulevard
 3                                   13th Floor
                                     Los Angeles, CA 90067
 4
                                     LYNN L. TAVENNER, ESQ.
 5                                   TAVENNER & BERAN, PLC
                                     20 North Eighth Street
 6                                   Second Floor
                                     Richmond, VA 23219
 7
                                     STEVEN T. GUBNER, ESQ.
 8                                     (TELEPHONICALLY)
                                     BRUTZKUS GUBNER ROZANSKY SEROR
 9                                     WEBER LLP
                                     21650 Oxnard Street
10                                   Suite 500
                                     Woodland Hills, CA 91367
11
    For California Self-Insureds'    WILLIAM E. EVANS, ESQ.
12  Security Fund - Defendant:       NIXON PEABODY LLP
                                     799 9th Street, NW
13                                   4 Suite 500
                                     Washington, DC 20001
14
                                     LOUIS J. CISZ, III, ESQ.
15                                   NIXON PEABODY LLP
                                     One Embarcadero Center
16                                   Suite 1800
                                     San Francisco, CA 94111
17
    Also Present:                    Katie W. Bradshaw, CPA
18                                   General Manager of Circuit
                                     City, Inc. Liquidating Trust
19

20

21  Transcription Services:          eScribers, LLC
                                     7227 North 16th Street
22                                   Suite #207
                                     Phoenix, AZ 85020
23                                   (973) 406-2250

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

1        THE CLERK:  Circuit City Stores, items 1 and 2 on

2   proposed agenda.

3        MR. GUBNER:  Good morning, Your Honor.  Steven Gubner

4   for Circuit City Liquidating Trust.

5        THE COURT:  I'm sorry, I'm going to need to have you

6   speak up a little bit.  I could just barely hear you there.

7   Could you please state your appearance again?

8        MR. GUBNER:  Yes, Your Honor.  I'm sorry.  Steven

9   Gubner, G-U-B-N-E-R, on behalf of the Circuit City Liquidating

10  Trust.

11       THE COURT:  Thank you very much, Mr. Gubner.

12       Mr. Caine, I think this is your motion.  Right?

13       MR. CAINE:  Good afternoon.

14       MR. GUBNER:  That's correct.  Is Mr. Caine in the

15  courtroom?

16       THE COURT:  Yes, he is.

17       MR. CAINE:  Good afternoon, Your Honor.

18       MR. GUBNER:  I believe Mr. Caine is going to take the

19  lead for Circuit City Liquidating Trust, Your Honor.

20       THE COURT:  Okay, very good.

21       MR. CAINE:  Andrew Caine, Pachulski Stang Ziehl &

22  Jones --

23       THE COURT:  I noticed the relief in Mr. Gubner's

24  voice, so I just --

25       MR. CAINE:  He's smiling in his photo.

1          THE COURT:  All right, very good.  My law clerk's gone

2    out to retrieve the volumes that you've all filed with me.

3    There they come.  Normally we have a break between the

4    docket --

5          MR. CAINE:  Well, would you like a few minutes?

6          THE COURT:  Oh, no; I've read all of the stuff.

7          MR. CAINE:  Okay.

8          THE COURT:  And I've got it all organized.  It just

9    needed to come from chambers, out here.  I've got it all now.

10   All right.

11         MR. CAINE:  Thank you, Your Honor.  -- appearing for

12   the Circuit City Liquidating Trust.  With me at counsel table

13   is my co-counsel, Lynn Tavenner, and also Katie Bradshaw, the

14   general manager of the trust.

15         THE COURT:  All right.

16         MR. CAINE:  There are two matters on the agenda, Your

17   Honor; one is the contested motion for summary judgment in the

18   trust's adversary proceeding against the California State

19   Compensation Insurance Fund, and then the other is the trust's

20   motion to extend the term of the trust, which has not been

21   contested.  And so we ask if Your Honor would like to take the

22   uncontested matter first or proceed in the order of the agenda?

23         THE COURT:  Let's proceed in the order of the agenda.

24         MR. CAINE:  Okay.  I have to get my glasses out.

25         THE COURT:  According to the last hearing, that's an

1    impairment, I think.

2            MR. CAINE:  It is.  We were all smiling when we heard

3    about that.

4            THE COURT:  Yes.

5            MR. CAINE:  Your Honor, this adversary proceeding was

6    filed by the trust in order to get some resolution of what is

7    apparently an open question arising out of the settlement

8    agreement between the State Compensation Insurance Fund and the

9    trust, which was entered into to resolve an adversary

10   proceeding commenced in 2015, by which the trust sought to

11   recover excess collateral on the letter of credit that the fund

12   had drawn down upon once the bankruptcy was filed, because

13   Circuit City was self-insured for workers'-compensation claims

14   in the state of California.

15           The trust encountered several of these situations,

16   state funds or agencies in which the debtors were self-

17   insured -- Ohio, Washington, and California -- and also with

18   excess carriers, all who were holding funds drawn down from

19   letters of credit.  And in each instance the trust was acting

20   to recover those funds for the benefit of creditors, because in

21   every instance the trust believed that there was an excess.

22   Also in every instance, each of those either excess carriers or

23   state agencies had filed proofs of claim claiming that more

24   than the amount of the collateral they held was going to be due

25   from the bankruptcy estates.

1              The trust worked through each of these, with the

2     intention that the last would be Old Republic, because Old

3     Republic was an excess carrier for a number of different

4     situations.  And part of the prerequisite, if you will, for a

5     resolution with Old Republic was to get resolutions with each

6     of the states in which Circuit City was self-insured for

7     workers'-compensation claims.

8              The last of these to be resolved was California.  And

9     when that resolution was accomplished, it was certainly the

10    trust's understanding that there would be nothing left that

11    would detract from the trust's ability to recover from Old

12    Republic excess collateral that would have anything to do with

13    workers'-compensation claims coming out of the state of

14    California.

15             And the release that was negotiated and agreed and

16    signed by the parties, and the settlement agreement of that

17    litigation with the fund, the trust believes, accomplishes

18    exactly that, and that is, the resolution of any possible

19    claim, known or unknown, that has anything to do with workers'-

20    compensation claims filed against Circuit City in the state of

21    California.

22             That is the background for which this litigation came

23    about, because as we were negotiating with Old Republic to try

24    and agree to a number on the return of collateral, Old Republic

25    let us know that they had received a demand for reimbursement

1    from the California fund.  And our reaction was surprise.  That

2    is the genesis of this adversary proceeding and it is the

3    genesis of this motion by which we seek summary judgment on our

4    claims for breach of contract and declaratory relief, that the

5    release is plain and simple, it releases everything, and that

6    the fund has breached the agreement by demanding payment from

7    Old Republic, some of which it received.

8           So there aren't really any facts in dispute with

9    respect to the signing of the settlement agreement and the

10   demands by the fund and the one payment by Old Republic and the

11   second demand by the fund that was not paid by Old Republic.

12   The dispute, Your Honor, that we find in this motion is whether

13   or not the agreement says what the trust says it does, which is

14   that this is a complete release of anybody who might be

15   responsible for workers'-compensation claims in California that

16   were made by employees of the debtors, or whether, as the fund

17   seems to suggest, that the settlement agreement be rewritten to

18   carve out its right to pursue the excess carrier.  Everyone

19   agrees that's not in the agreement.  And it is our view of

20   their opposition, that is exactly what they are asking the

21   Court to do.

22          In sum, Connor -- Your Honor -- excuse me -- it is our

23   belief that the extrinsic evidence that has been presented by

24   the fund does not satisfy the test that I will walk through,

25   set forth by State of California, to in any way convince this

1   Court to vary the language that is set forth in the release

2   itself.  And we will ask for summary judgment as prayed.

3         I know that Your Honor's very familiar with the

4   materials and so please stop me if you would like to do so in

5   order to ask any questions along the way, and --

6         THE COURT:  I've never been shy about asking

7   questions.

8         MR. CAINE:  Yes, and I appreciate that, Your Honor.

9   And I also know that Your Honor's well aware of the factual

10  situation by which Old Republic holds excess collateral and the

11  like.

12        So, turning, Your Honor, to the interpretation of the

13  contract.  California statutes and the California Civil Code as

14  set forth in our motion are pretty clear on what happens when

15  you're trying to interpret a contract and there is an apparent

16  dispute.  Civil Code Section 1636 said the basic goal is to

17  give effect to the parties' mutual intent at the time of the

18  contract.  This is in our motion, at page 15, Your Honor.

19        THE COURT:  Right.

20        MR. CAINE:  And Section 1639 says, when you have a

21  written contract, the parties' intent is to be determined from

22  the writing alone, if possible.  The first place to look is at

23  the writing itself.  And Section 1644 says that any applicable

24  words and phrases are to be understood in their ordinary and

25  popular sense.  And we're going to return to that concept when

1    we talk about the Neverkovec case that is relied upon so

2    heavily by the fund.

3          But the point is you look at the contract and you take

4    the language in its ordinary and popular sense.  And of course,

5    it's our position that the release is crystal clear and, in any

6    ordinary, popular, reasonable sense, it's clear that all the

7    claims are released.

8          Well, the fund's opposition takes the position that

9    California law requires the Court to admit parol or extrinsic

10   evidence to construe the contract.  And, Your Honor, it's our

11   position, that really overstates what the rule is.  And I'm

12   going to spend a couple of minutes talking about a case which

13   is not in the materials but I have copies of; I can hand one to

14   Your Honor, one to counsel.

15         THE COURT:  That'll be fine.

16         MR. CAINE:  Your Honor, the case is Winet v. Price;

17   it's a 1992 California Court of Appeal decision.  And the Winet

18   case identifies a two-step process that the court follows when

19   one party to an agreement suggests that the agreement on its

20   face doesn't tell the whole story.  The first step is to

21   provisionally accept the parol evidence concerning the parties'

22   intentions, to determine whether there's any ambiguity in the

23   contract itself.  So the evidence is reviewed, but not

24   admitted, so the court can determine whether there really is

25   any ambiguity, whether the court can, as Section 1639 of the

1   Civil Code suggests, determine the parties' intention from the
2   writing alone.

3          If the court determines that there is an ambiguity,
4   then the Winet case says you go to the second step, which is
5   that you admit the parol evidence to aid in interpreting the
6   contract, but if, and only if, the court determines that the
7   language of the contract is reasonably susceptible to the
8   interpretation urged by the parties seeking to change it.

9          So not only must there be an ambiguity, but the
10  interpretation that the challenging party is offering must be
11  reasonably susceptible based on the language.  Here, Your
12  Honor, it's the trust's position that that is not the case,
13  that first, there is no ambiguity.  It is clear that the
14  release was all known and unknown claims relating to workers'-
15  compensation claims filed against Circuit City in California,
16  and that the fund's position that there should be a carve-out
17  for claims against excess carriers for reimbursement is not
18  reasonably susceptible based on the evidence or language.

19         The facts of Winet are important, Your Honor.  There
20  was a dispute between an attorney and a client regarding fees.
21  It was settled with a settlement agreement.  It included a
22  broad general release and language under California Civil Code
23  Section 1542, which is included in agreements all over the
24  country, that more or less says, hey, you're about to release
25  known and unknown claims and you're acknowledging that you're

1  doing that, and basically in bold capital letters says,

2  understand what you're about to sign.

3      The client many years later sued the attorney for

4  malpractice, based on a dispute regarding a partnership

5  agreement that the attorney had drafted.  And the court said,

6  well, that's all included in the general release from the fee

7  case that you signed before.  The general-release language in

8  that fee settlement agreement showed that the parties intended

9  to encompass all known and unknown claims.

10      Even though the client in that case, the new

11  plaintiff, gave a sworn statement that it was not his

12  subjective intent to release malpractice in some partnership

13  agreement, the court didn't give credence to that, because,

14  first, the client was aware of every transaction that he had

15  done with the attorney, that the release language is clear and

16  included Section 1542, and the client was represented by

17  counsel in the underlying fee lawsuit and in the signing of the

18  settlement agreement.

19      And the court, at page 1168, in fact cites to a case

20  called Bodle v. Bodle and says, quote, "Where a formal contract

21  has been prepared by persons learned in the law, the words

22  should be given their ordinary legal import," end quote.  The

23  court also noted at the end of the opinion that it is important

24  to enforce general releases, where appropriate, to give

25  finality to disputes.

1    So the California law, Your Honor, is this two-step

2    process.  And in the Winet case, the court had no problem

3    enforcing the general release, because it was known and

4    understood.  No subjective-intent evidence was going to change

5    that or create any ambiguity.

6    So in applying the two-step process, Your Honor, for

7    ambiguity or whether the language is reasonably susceptible,

8    again, subjective intent is not the standard.

9    And now I turn to the Neverkovec case, with my

10   apologies to Mr. or Ms. Neverkovec if I mispronounced their

11   name, which is relied upon at length in the opposition filed by

12   the fund.  And that case provides, Your Honor, that subjective

13   intent is not the standard of that of a reasonable person.

14   With your indulgence, Your Honor, I'm going to read one short

15   portion of the Neverkovec opinion:  "We note that while the

16   contracting parties may testify regarding their actual intent,

17   the sufficiency of such evidence must be determined according

18   to the usual objective standard of contract interpretation.

19   The trier of fact must decide how a reasonable person in the

20   releasing party's shoes would have believed the other party

21   understood the scope of the release.  Thus, the testimony by

22   the releasing party regarding who he thought he was releasing,

23   while it may serve to explain the situation, does not determine

24   the legal effect of the release.  How a reasonable person would

25   view the other party's understanding of the release is

1    generally a matter of inference based on the extrinsic

2    evidence.  Unless that extrinsic evidence is in conflict, the

3    question is one of law.  On a motion for summary judgment, the

4    court may determine which inferences are 'reasonably deducible

5    from the evidence,' and may grant summary judgment if there is

6    no conflict with other reasonable inferences or evidence."

7             It is our position, Your Honor, that the extrinsic

8    evidence that has been presented by the fund changes nothing in

9    terms of a determination from the language of the release, as

10   to what the parties intended.

11            And it's important to look at the facts of Neverkovec

12   also, Your Honor, in order to see how the court came to the

13   conclusion that it did.  It was a car accident, so it was a

14   personal-injury lawsuit.  And the lawsuit that was resolved was

15   between all the parties that were in the same car.  It was the

16   victim suing the driver of the car -- and there were three

17   people in the car -- and the owner of that car.  And the

18   lawsuit was resolved and the insurer signed the settlement

19   agreement.

20            There was then later a lawsuit by the same victim,

21   against the driver of the other car.  And the question was

22   whether or not the driver of the other car could get the

23   benefit of the release from the initial lawsuit, which said in

24   one part of the agreement, everyone who might be liable for

25   this accident is released.

1          The court found an ambiguity, Your Honor, because

2   there was another provision of the agreement that anticipated

3   that there would be -- I lost my spot for a second -- that

4   there would be payment by other persons involved.  And so there

5   was some conflict between the release provision and the fact

6   that other responsible parties might not have to make payment

7   in the future.

8          In sum, the court held that the general release first

9   shifted the burden of proof to the victim, the party trying to

10  avoid the release, which here would be the fund.  But there it

11  held that the evidence raised a triable issue regarding the

12  parties' intention to release the new defendant, because of the

13  conflicting provisions in the settlement agreement.

14         But the court also held, relying on the Supreme Court

15  decision in General Motors, that broad releases are okay, they

16  don't violate public policy, and -- this is at page either 866

17  or 350 of the decision, depending upon which reporter you're

18  looking at -- whether the third party is an intended

19  beneficiary of the contract involves construction of the

20  parties' intent to be gleaned from reading the contract as a

21  whole, in light of the circumstances under which it was entered

22  into.

23         And with those standards in mind, Your Honor, now we

24  turn to the extrinsic evidence and arguments that the fund has

25  made to try to avoid the conclusion that the trust asserts,

1   which is that the release is clear and that any actions that

2   the fund might have been able to take, any rights that it may

3   have had in order to seek reimbursement or to seek money from

4   the collateral held from the debtors, was all signed away in

5   the settlement agreement.

6          First, they've submitted declarations that say, we

7   didn't intend that, which, Your Honor, we submit is essentially

8   the same as the client in the Winet case who said, I didn't

9   intend to release that.  But the question there was, well, did

10  they really know about these rights when they signed this

11  release that said, we're waiving everything?  And again, the

12  answer is yes, they knew about it.

13         The second argument they make, Your Honor, is, well,

14  how could Old Republic be released as a third-party beneficiary

15  when they weren't involved in the lawsuit, they weren't

16  involved in negotiations, they didn't sign the settlement

17  agreement?  But, Your Honor, the release expressly includes all

18  claims against the debtors or the trust, and it includes

19  specifically and expressly beneficiaries and broadly

20  encompasses anything that had to do with workers'-compensation

21  claims filed against the debtors.

22         At length in the opposition, the fund discusses the

23  rights that the fund has under the California Labor Code to

24  pursue excess carriers.  The fund clearly knew this at the time

25  that the lawsuit was going on and the settlement agreement was

1   entered into.  They clearly knew, or should have known, that

2   these rights could and would be compromised by a broad general

3   release.  Never in the opposition does the fund challenge the

4   notion that those rights can be compromised or released.  In

5   fact, that is what happened.

6          There was no need to include Old Republic as a party.

7   The trust was banking on the notion that it would get finality

8   for these California workers'-compensation claims by entering

9   into the settlement, so that it could then, as I decided -- as

10  I described earlier, go to Old Republic and say, hey, this

11  basket of claims is off the table now, we don't have to worry

12  about California anymore while we negotiate the return of our

13  collateral.

14         And the final, sort of, basket of extrinsic evidence

15  presented by the fund, Your Honor, is under the category that

16  the excess amount that was described in the expert reports

17  prepared by the parties' actuaries for trial demonstrates a

18  lack of intent to include everything.  But we respectfully

19  disagree, Your Honor, because those expert reports regarding

20  the excess collateral were only one piece of that litigation,

21  and they were only one piece of the settlement.  In fact, the

22  opposition itself discusses many of those pieces.  And when all

23  of them are added up, you will see, Your Honor, that the 5.35

24  million dollars that the parties agreed to in the settlement is

25  actually a very reasonable amount, considering the range that

1    was in play.

2         First, as noted in the opposition, according to the

3    trust's expert, PwC, net of reimbursement, the excess was two

4    million dollars.  Second, a discount rate should be applied,

5    with the upside of about 500,000 dollars.  So we're up to 2.5.

6    The trust was also asserting in that lawsuit that, because the

7    fund had held this money for so many years, from 2009 to 2016

8    at the time that the settlement agreement was entered into,

9    that the trust was going to be entitled to interest or

10   investment income, which, as the opposition notes, ranged from

11   one million -- one and a half million to five million dollars.

12        In addition, in that lawsuit, while it was

13   controversial, the trust was challenging the conduct of the

14   fund in pursuing proofs of claim for sixty million dollars,

15   when, at least by the trust's belief, the fund knew that there

16   would never be any additional amounts needed and, in fact, that

17   there would be an excess based on the collateral.  So that

18   there were the attorney's fees incurred by the trust through

19   the objection period, and there were attorney's fees that the

20   fund paid its lawyers, which were drawn down from the

21   collateral that the trust could have gotten back, for that

22   whole objection process itself and whatever damages that the

23   trust might be entitled to for the fund if it could prove that

24   there was any kind of bad faith through the claim process.

25        And you add all those amounts together, Your Honor,

Colloquy                                                            18

1  you get to a range between four and a half and almost nine

2  million dollars.  And the trust settled for 5.35 million

3  dollars.

4          So the expert reports, Your Honor, are really a red

5  herring, because they were only one piece of the puzzle.  And

6  there's nothing in the suggestion of the amounts discussed in

7  those expert reports that would lead to a thought that there's

8  any ambiguity in the plain language of the agreement or that

9  the carving out of this ability of the fund to pursue the

10  excess carrier is reasonably susceptible to that kind of

11  rewrite.

12         Your Honor, there're two, sort of, policy arguments

13  that the fund raises that I'll address briefly; the first is

14  that California law requires that a release is only effective

15  if it clearly identifies the claims being released.  And the

16  fund cites to Powers v. Superior Court.  And, Your Honor, the

17  Powers case is really not helpful to the fund for that

18  proposition, because the fund clearly had notice of everything

19  that it was releasing.  And the language of the release itself

20  was quite clear.

21         In Powers, a woman was attempting to rent one of these

22  gliders -- piloted gliders, and she signed two releases:  one

23  just a general release of liability, and one a renter's

24  release.  And the court found that there was an ambiguity

25  because the two release had slightly different release

1   language.  And that was important because the woman was not

2   represented by counsel when she signed either of these form

3   releases that were created by the glider rental company.

4           But the court had no problem finding that releases are

5   okay under the proper circumstances, and no problem finding

6   that the fact that there were two releases did not establish a

7   lack of notice.  So it wasn't a lack-of-notice issue there,

8   which is what the fund is attempting to submit this case for,

9   but it was the fact that there was an ambiguity because there

10  were two releases with different language.  So, Powers does not

11  help, Your Honor.  And it is our position that, as I've stated,

12  the fund clearly knew all of the factors that were involved,

13  all of its rights, going into the settlement agreement.

14          The last argument they raise, Your Honor, is that,

15  under California law, no interpretation can be made if it would

16  lead to an absurd or unconscionable result.  They've only

17  submitted the general language to that effect, Your Honor.  We

18  don't disagree with that general proposition, but there are no

19  cases cited with any sort of facts that would lead us to

20  believe that in this case there is an absurd or unconscionable

21  result.  And because it's the trust's position that the fund

22  knew all of its rights and knew exactly what it was waiving

23  when it was signing this general release, that that bank of

24  cases is simply not applicable.

25          So in sum, Your Honor, it is the trust's position that

1    we have a clear release that covers the exact recovery that the

2    fund is trying to make from the excess carrier, that the right

3    to seek that reimbursement was well known to the fund at the

4    time, and that there is not any evidence submitted by the fund

5    that can create any ambiguity in the language of the settlement

6    agreement, nor can the language of the settlement agreement be

7    reasonably susceptible to this rewriting through a carve-out

8    that the fund is suggesting.  Your Honor, we ask that the

9    motion be granted.

10          THE COURT:  All right, thank you, Mr. Caine.

11          MR. EVANS:  Good afternoon, Your Honor.

12          THE COURT:  Good afternoon.

13          MR. EVANS:  William Evans with Nixon Peabody, on

14   behalf of the fund.  And I'm here at counsel table with Lou

15   Cisz, also of Nixon Peabody; he's going to be arguing the

16   motion.

17          THE COURT:  All right, very good.

18          Welcome to the court.

19          MR. CISZ:  Good afternoon, Your Honor.  Lou Cisz of

20   Nixon Peabody.  Thank you for allowing me to appear pro hac

21   vice.

22          Your Honor, I want to step back for just a minute and

23   talk a little bit about the prior adversary proceeding; that's

24   the defined term we use in our papers.  And I understand that

25   the Court's read all of our papers; I understand that they're

Colloquy                                                              21

1    somewhat voluminous.  So we appreciate the Court taking the

2    time to read all these papers.

3           Your Honor, the prior adversary proceeding that was

4    commenced by the trust was focused on whether there was surplus

5    relative to the letter of credit that had been pledged to cover

6    the debtors' liabilities exclusive from excess insurance.

7    There were really --

8           THE COURT:  Where did it say that?

9           MR. CISZ:  Well, it didn't say that specifically.

10          THE COURT:  Okay.

11          MR. CISZ:  Let me just say that, generally speaking,

12   and you can -- and you'll see this from the record, that the

13   debtor was -- in order to self-insure under California law, the

14   debtor had to post security with the Office of Self-Insurance

15   Plans and it also had to get excess insurance.  Both of those

16   things happened.

17          THE COURT:  And I'm well familiar with that, because

18   we had litigated that.  And, matter of fact, I think I wrote on

19   that at some point.

20          MR. CISZ:  I think you did with respect to excess --

21   whether excess -- strike that -- whether surplus of the letter

22   of credit was property of the estate.  You wrote on that, and

23   that's -- and we accept that.  But generally speaking, the

24   fund -- when the fund takes over an estate because the debtor

25   is no longer -- defaults on its self-insurance obligations and

1    the debtor is not able to pay for injured workers on their

2    claims, the fund looks to at least two sources for recovery:

3    one would be the debtor and the debtor's collateral to the

4    extent it posted it, and another bucket of reimbursement would

5    be excess insurance.  And excess insurance was not the subject

6    of the prior adversary proceeding.  ORIC wasn't a named

7    defendant, and there weren't issues relative to excess

8    insurance that we were pursuing in the prior adversary

9    proceeding.

10          And the -- what counsel refers to, a red herring,

11   referencing the expert-witness reports, is anything but a red

12   herring; it's significant evidence that shows the factfinder

13   what the parties were thinking when the parties were trying to

14   calculate the surplus.  And that's what that prior adversary

15   proceeding was all about.  And there was agreement among the

16   parties -- and if you look at the two expert-witness reports,

17   there was agreement about how to calculate that surplus.  Both

18   camps, both sides, agreed that, in calculating the surplus, you

19   net out excess recoveries.  That's being recovered from another

20   source.

21          So when you're trying to figure out what's the

22   ultimate amount of money that should be returned to the estate,

23   yes, there were other pieces that were being calculated, but

24   one really important piece was is the fund holding enough money

25   to pay all those claims net -- not including excess, because

1    excess is going to be recovered from another source, not the

2    debtor; recovered from another source.

3            And interestingly, this is an unusual situation where

4    the debtor has actually pledged collateral to secure its excess

5    obligations.  Not typically the case.  But here that is the

6    case.  So we understand that sometime later the debtor has

7    realized that it wants to resolve that issue with its excess

8    carrier.  But when the fund and then the trust were determining

9    what that surplus amount was going to be, there was agreement

10   among their experts that, when you calculate the net case

11   reserves, which is part of that surplus calculation, you take

12   out of consideration excess-insurance reimbursements.

13           So both parties had that expectation that the amount

14   that they were going to try and figure out assumed that the

15   fund was going to continue to collect excess insurance and that

16   when the fund figured out "what's my ultimate exposure to pay

17   the debtors' workers", the fund is no longer going to be able

18   to look to the bucket that was responsibility of the debtor.

19   That's true; those -- that's what the release was focused on is

20   that the fund couldn't assert any other claims against the

21   debtor for that part of -- for that letter of credit that the

22   debtor had posted.

23           So the fund returned 5.35 million dollars, which means

24   it couldn't -- and it couldn't assert any more claims against

25   the debtor.  And the debtor -- and -- sorry -- and the trust

1    and the fund were waiving all claims relative to the letter of

2    credit, that there were no -- there was no waiver of release as

3    it relates to ORIC.  In fact, just the opposite was true:  that

4    the parties agreed that the fund was -- continued to look to

5    ORIC for the excess reimbursements.  And indeed that's -- that

6    was happening throughout the case, until the fund was recently

7    sued.  The fund was pursuing those recoveries -- those

8    reimbursements, as it needed to, and there was no dispute in

9    that regard.

10        And it's interesting, Your Honor, when we're talking

11    about the Neverkovec case, that in that case the court says,

12    you know, if there's -- if anybody needs to enforce this third-

13    party-beneficiary status -- excuse -- third-party-beneficiary

14    status, it should be the third party; it should be ORIC.  Where

15    is ORIC?  ORIC is not asserting that they were a beneficiary

16    under this settlement agreement.  And indeed, ORIC isn't a

17    beneficiary.  ORIC is an insurer.  The insured might be a

18    beneficiary, but not --

19        THE COURT:  Well, yeah --

20        MR. CISZ:  -- the insurer.

21        THE COURT:  -- they hold exactly the same kind of

22    funds that I said was property of the estate, which, to the

23    extent that they're surplus, they would be property of the

24    estate.  So it's exactly the same thing; it's the debtor's

25    money.

1          MR. CISZ:  To the extent that there is surplus.  And

2     we don't disagree with that, Your Honor.  The question is what

3     is the amount of that surplus that ORIC is holding.  And that's

4     going to be a separate calculation that ORIC and the trust need

5     to make, and there's going to have to be some analysis as it

6     relates to what are ORIC's obligations on its -- on the

7     workers' claims that exceed 300,000 dollars, the self-insured

8     retention; what does ORIC believe it's going to have to pay out

9     on those claims over the years.  That was a -- that was, and

10    is, a risk that the insurer, ORIC, took and continues to take.

11    That's not the fund's risk.

12         So if you think about what the parties were doing when

13    they were settling this matter, the underlying prior adversary

14    proceeding, the parties were not trying to assess risk as it

15    relates to excess insurance.  There's no evidence of that.  The

16    parties weren't doing that.

17         THE COURT:  Well, but what you were doing was looking

18    at what were the total amount of claims that you thought were

19    going to be made as far as workers'-comp claims were concerned.

20    And as we all know, by that time the workers'-comp claims were

21    old and cold and we pretty well had a good handle on what they

22    were, what they weren't.  And so we had -- we were looking at

23    that.  And then we were looking to see what was the excess over

24    and above that, and that's what the parties agreed to resolve.

25         Now, my question is, though, where does this other

Colloquy                                                          26

1    liability then come from, because you can't have liability

2    against ORIC or claim liability against ORIC if you don't

3    have -- if Circuit City's not liable for that liability.

4          MR. CISZ:  The -- Circuit City still has -- well, the

5    claims still exist; the workers'-compensation claims still

6    exist.  There are still payments being made to injured workers

7    on --

8          THE COURT:  I understand that, but vis-a-vis the fund

9    and vis-a-vis Circuit City, you can only get reimbursed to the

10   extent that Circuit City has liability.

11         MR. CISZ:  That's right.

12         THE COURT:  Okay, and you resolved that liability in

13   connection with your release.

14         MR. CISZ:  No.  No, Your Honor, we resolved liability

15   as it relates to the letter of credit, and we agreed that we

16   would not assert any more claims against the debtor or the

17   debtor's estate.  But that doesn't -- but we didn't waive the

18   fund's right to seek reimbursement from ORIC.

19         THE COURT:  Well, but you did have a mutual release

20   with regard to the trust --

21         MR. CISZ:  Correct.

22         THE COURT:  -- which is Circuit City.

23         MR. CISZ:  That's right.

24         THE COURT:  Okay, so you have agreed to release any

25   and all obligations of any nature whatsoever against Circuit

Colloquy                                                    27

1   City.

2           MR. CISZ:  Against Circuit City.

3           THE COURT:  So how are you --

4           MR. CISZ:  Against the estate.

5           THE COURT:  -- how are you raising now claims against

6   Circuit City?  That's what I don't understand.

7           MR. CISZ:  Because, again, there are two buckets of

8   recovery for the fund.  The injured workers still are asserting

9   claims, and the injured workers are still asserting -- some of

10  these workers have large claims, so it pierces through the

11  self-insured retention such that ORIC is paying down on those

12  claims -- paying those claims -- strike that.  The fund is

13  paying those claims and is seeking reimbursement from ORIC.

14  That's still happening.  The fund is not seeking any claims

15  against Circuit City.

16          THE COURT:  Okay, as I understand -- and then taking

17  back -- and getting -- I guess -- and I'm trying to just

18  understand factually where we are, and I'll get into my legal

19  questions in just a second.

20          MR. CISZ:  Sure.

21          THE COURT:  But in the beginning, we had about, what,

22  fourteen million dollar -- and I'm trying -- help me if I'm

23  getting these numbers wrong -- about fourteen million dollars

24  in LCs that had been posted, with the fund --

25          MR. CISZ:  That's correct.

1          THE COURT:  -- to cover Circuit City's obligation to

2   self-insure.  Okay.

3          MR. CISZ:  For each claim that does not pierce through

4   self-insured retention, yes.

5          THE COURT:  Okay.  So -- okay, tell me what that

6   means.

7          MR. CISZ:  Well, that's significant because, as I say,

8   there --

9          THE COURT:  That's why I want you to tell me what it

10  means.

11         MR. CISZ:  There -- because the -- if Circuit City

12  were self-insuring and hadn't defaulted, it would be paying

13  claims only up to the self-insured retention; then it would

14  look to its excess insurer to pay for anything that pierced

15  through self-insured retention.  So that's a separate bucket.

16         THE COURT:  But the self-insured retention was

17  fourteen million dollars?

18         MR. CISZ:  No.  I'm sorry, Your Honor.  On a per-claim

19  basis, the self-insured retention was 300,000 dollars per

20  claim.

21         THE COURT:  Okay.

22         MR. CISZ:  I'm sorry; I didn't explain that clearly.

23         THE COURT:  Okay.

24         MR. CISZ:  So it's on a per-claim basis.  And so what

25  excess insurance is for, in effect, is to insure the debtor

1    against claims that exceed 300,000 dollars, really large claims

2    that just kind of blow up.  That's why they need to get excess

3    insurance under California law.  And to the extent there's a

4    pierce through that self-insured-retention layer of 300,000

5    dollars, Circuit City is no longer going to pay out of its own

6    dollars; it's going to -- the payment will be made through

7    ORIC, its excess insurer.

8         And that's still happening.  There are some claims

9    that have pierced through self-insured retention.  The fund

10   isn't going to -- the Circuit City estate's saying, hey, even

11   though we released you, we're going to -- we're going to seek

12   more money from you.  No.  But we didn't get a -- but ORIC

13   wasn't released.  ORIC wasn't acting as if it was released.  It

14   was still paying -- was still giving the fund reimbursement for

15   claims that the fund paid that had already pierced through

16   self-insured retention.  That's still going on.

17        And that was considered by the trust and the fund when

18   we were settling the prior adversary proceeding.  That's the --

19   when I talk about that the experts, both PwC and Milliman, the

20   two experts -- when they were calculating the net case

21   reserves, that is to say, the anticipated -- the future

22   liability on these claims -- the expected future liability,

23   both experts deducted what they believed was going to be the

24   amount that was going to be paid by excess insurance.  They

25   deducted those amounts out; between 2.4 and 2.9 million dollars

1    at the time.

2            Both experts agreed, yeah, that's not part of what we

3    are using to calculate surplus.  Why?  Because we know that the

4    fund is going to continue to be paying on excess, not surplus

5    but excess -- so there's a difference; excess insurance,

6    right? -- and that the fund is going to continue to see

7    reimbursement from the excess carrier, ORIC.  Both experts

8    agreed that that's -- that was going to be the process.  That's

9    important because, again, if you go back and you look at the

10   way in which both parties calculated what that surplus was

11   going to be, not excess but the surplus that was going to be

12   returned to the estate, the experts said, yeah, that's right,

13   that's about the amount that's going to be returned, but we're

14   assuming that the fund can continue to seek reimbursement for

15   claims that exceed the 300,000-dollar self-insured retention.

16           THE COURT:  Well, let me ask this question:  when you

17   filed your proofs of claim in this case, did you include the

18   excess in your claims?

19           MR. CISZ:  No, we didn't.

20           THE COURT:  So when you filed any of the proofs of

21   claim, that didn't calculate that?

22           MR. CISZ:  No.  What -- they didn't, because, again,

23   we understood that there was going to be -- I'll go back to --

24   what we relied upon, Your Honor, were the -- in those

25   calculations, we relied upon the actuaries and the third-party

1    administrators.  And actuaries, when they calculate those net

2    case reserves, they always net out excess.

3          So when we're filing a claim before the Court, we're

4    saying this is the amount that we can recover from the estate

5    and that those -- the twenty-nine million dollars did include

6    the fourteen million dollars of letter of credit.  So in other

7    words, if you net out that fourteen million dollars of letter

8    of credit, what the fund was initially seeking from the estate

9    was about fifteen million dollars.  And then you'll see in our

10   papers that Mr. Hapes (ph.), I think in 2011, wrote a letter to

11   the debtor's counsel and said, hey, we think the exposure right

12   now for the debtor is about five million dollars.

13         So, informally we were trying to work with the debtor

14   and get information from the debtor relative to -- there was a

15   Lockton report, which apparently had actuary analysis prepared

16   by the debtor's actuary, that we only got through discovery

17   from Lockton.  And even Lockton indicated to the debtor and

18   reported there that Lockton -- at the time that the Lockton

19   report was drafted, there was not going to be a surplus -- even

20   at that time, surplus at stake.  And Lockton -- and every

21   actuary was netting out excess insurance.

22         So to answer your direct question, Your Honor, no, the

23   fund was not seeking, as part of its claim, recoveries of

24   excess.  That's a separate bucket.  And that's critically

25   important.  And that's the kind of extrinsic evidence that this

Colloquy                                                                    32

1  Court must hear to understand what the parties were trying to

2  accomplish through this settlement process.

3          THE COURT:  Okay, well, let's turn to that, because

4  Mr. Caine made a big deal about that.  So let's -- here's the

5  problem, okay -- and I really have read all these California

6  cases, because we don't have this rule in Virginia.  In

7  Virginia we have the parol-evidence rule and we look at this.

8  But even as I understand California law on this, you can use

9  extrinsic evidence to maybe interpret an ambiguity, but you

10  can't contradict the language of a contract itself; in other

11  words, you can't -- it can explain it but not contradict it.

12          Now -- and I want to look at the release that the

13  parties entered into, because Mr. Caine said it was very broad.

14  And I've been reading this thing now for a number of days, over

15  and over again, as I've been going through this, and the

16  release appears to me to be very, very broad.  And so I want

17  you to help me with that part.  And I know you know this as

18  well as I do, but it includes the trust and then it includes,

19  of course, all of the usual suspects, members, shareholders, et

20  cetera, et cetera.  But it also includes, and Mr. Caine pointed

21  this out, beneficiaries.  Okay?

22          And then there are other places where we go and we say

23  who are beneficiaries.  Well, the beneficiaries would be the

24  claimants.

25          MR. CISZ:  Um-hum.

1          THE COURT:  And who's a claimant?  Well, guess what?

2    ORIC is a claimant and is therefore a beneficiary per how we

3    define things in this case.

4          And so we've got that.  And then we go on and we talk,

5    though, about, well, what liabilities are being released.  And

6    it's any obligations of any nature, okay, whether known or

7    unknown, okay, which not only come out of the proofs of claim

8    but arise out of the parties' relationship in any way, shape,

9    or form.  How is that not included, all of the workers'-

10   compensation claims?

11         MR. CISZ:  Well, if it included all the workers'-

12   compensation claims, wouldn't that mean that the workers'-

13   compensation claims are being waived in a release as well, Your

14   Honor?  They're not.  Those claims continue to be paid on by

15   the fund.

16         THE COURT:  No, no, no, no.  I'm talking about vis-a-

17   vis Circuit City's role in any of this, because this is between

18   the fund and Circuit City.  Now, obviously the claims are being

19   paid by the fund.  The fund is doing all of this stuff.  All

20   right?  But what was being released was Circuit City, the --

21   and I say "Circuit City"; I'm talking about the trust.

22         MR. CISZ:  Yes.

23         THE COURT:  That, in my mind, is the same as Circuit

24   City.  -- and again, all important, the beneficiaries, and

25   which would be the ORICs of the world, as claimants and such,

1    in connection with this estate, and the way that we look at

2    that, and arising out of any -- the relationship between the

3    parties, being the trust and the fund, in any way, shape, or

4    form.

5           And we didn't say "except excess".  We didn't say any

6    of that.  And so -- now, we did have one "except", but that had

7    to do with more -- other types of claims that are completely

8    unrelated, such as regulatory authority over wages and hours or

9    things like that, if I recall correctly.

10          But in any event, so we knew how to do that when we

11   wanted to.  We don't have excess insurance carved out here.

12          MR. CISZ:  That's true, we don't.  And that's really

13   the debtor's burden, the movant's burden, to explain why it

14   wasn't in there.  If we're talking about something that should

15   be clear on its face and the debtor is now trying to ask for a

16   ruling that's going to impact the fund by millions of dollars,

17   not just 20,000 dollars, then the debtor should -- then it's

18   the debtor's burden to say, yeah, on that big issue we were

19   clear, we were clear that ORIC should be released, because

20   there's general boilerplate language about beneficiaries.

21          And by the way, Your Honor, I actually disagree that

22   ORIC would be viewed as a beneficiary in the context of the

23   adversary -- the prior adversary proceeding, which was focused

24   on the surplus.  The prior adversary proceeding had no

25   reference to ORIC; it didn't reference excess insurance.  It

1    was the debtor's attempt to recover surplus from the letter-of-

2    credit proceeds.  That was the main thrust of that case.  Yes,

3    there were some tangential claims, but they did not relate to

4    excess insurance.

5            And so what I submit to you, Your Honor, is that --

6    and by the way, other evidence that you would hear about this

7    case is that this settlement came together over a Labor Day

8    weekend.  We were about ready to go to a mediation to try and

9    resolve this and, while the parties were in different parts of

10   the country, taking and defending depositions, this all came

11   together.  Lee Goodwin (ph.), my partner out of the Washington,

12   D.C. office, took the first cut at the settlement agreement.

13   He submitted a declaration to this Court under penalty of

14   perjury and said there was no mention of this, there was no

15   reference to this, and, by the way, Nixon Peabody was not

16   authorized to release ORIC by any stretch of the imagination.

17           This was coming together very quickly and they -- and

18   we were using things like -- the release language is

19   boilerplate.  Is it broad as it relates to the claims that --

20   the proofs of claim that the fund could assert relative to its

21   exposure to the estate or its rights against the estate?  Yes,

22   it was that broad.  But the intent was always to look to ORIC

23   as a third -- as an insurer for recovery on the excess.  And

24   again, I believe that the best evidence of that are -- is the

25   expert report that our expert prepared, as well as the expert

1  report that the trust had prepared.

2           THE COURT:  Why isn't the best evidence of that, which

3  you call boilerplate -- which seems to me rather routine kind

4  of language, and maybe it becomes boilerplate once it's been

5  routine for so long.  But all of us know what these kinds of

6  releases mean.  We've interpreted them before.  We -- back in

7  the day, I wrote these things.  And it is meant to be extremely

8  broad, I mean, and covered the relationship in any way, shape,

9  or form.  That goes pretty far as far as covering all of this

10 stuff.

11          And you say, well, it was up to the trust to then make

12 sure that it was clear, but how can you be any more clear than

13 "any way, shape, or form"?

14          MR. CISZ:  I think you could be much clearer, Your

15 Honor.  Again, if the trust was thinking about, hey, we want --

16 we've got expo -- we've got surplus issues with ORIC and we

17 want to -- we want to work on those but we're going to wrap up

18 the California Self-Insureds' Security Fund first, it would

19 have been helpful if they had talked to us about that.  Why?

20 Because then we could have gone back to our experts and said,

21 okay, we need to calculate our exposure based on the fact that

22 we, the fund, are now going to assume additional risk, we're

23 going to assume risk relative to excess insurance, which is

24 something that the fund never does.

25          So if the trustee's intent and the trust's intent is

1  to wrap everything up, including excess, which is contrary to

2  what the expert-opinion reports say, is that was the intent,

3  then it would have been helpful to have a conversation about

4  that so that we all could have calculated what the surplus

5  would have been if you're including excess insurance.  And,

6  Your Honor, I can submit to you that the amount that the estate

7  would have recovered would have been a couple million dollars

8  less by the -- it's simple math.  And we could have done that

9  calculation.

10         We would -- I could tell you that the fund -- it would

11 have been -- gone kicking and screaming down that road because

12 it's now acting as an insurer of excess insurance, which it

13 never does.  It always looks to excess to cover the amount that

14 pierces through that self-insured retention level of 300,000

15 dollars per claim.  That's a risk that a third party's solvent

16 excess insurer takes on.  That's their job.  That's their

17 business, not the fund's business.

18         So I submit to you, Your Honor, that if that was

19 really the trust's intent, we should have had that

20 conversation.  We never had a conversation like that

21 whatsoever.

22         THE COURT:  Okay, and you keep coming back to that,

23 but what I want to focus on is this:  like, how do I reconcile

24 what you say you want me to find now by way of the proffered

25 parol and the language that I'm reading right here?  Because, I

1  mean, it would be any obligation of any nature in all equity,

2  of any way, shape, or form.  It would be something less than

3  that.  And you're asking me now to take this language and read

4  it more restrictively.

5        MR. CISZ:  I -- what I'm asking you to do, Your Honor,

6  is to find that the settlement agreement that the trust and the

7  fund entered into related to the surplus proceeds of the letter

8  of credit.  That's what the focus of the litigation was and

9  that's what the focus of the settlement agreement was intended

10  to be.

11        THE COURT:  Okay, well, then let's go to the case that

12  Mr. Caine just handed me, because -- and you, because -- and

13  that was the one that was dealing with the attorney.  And of

14  course they were resolving a fee dispute, which is just like

15  what you're saying; okay, we were resolving this.  But it also

16  had very broad language.  And so when later -- years later on,

17  there was a malpractice claim that was brought -- which is

18  certainly not covered in the settlement agreement.  When they

19  say "any and all", the Court had no problem in saying, well,

20  "any and all" means any and all.  And you certainly had to

21  include that, even -- whether it was known or unknown.

22        And we've got exactly the same -- and it says,

23  "whether known or un" -- I mean, our release language is

24  broader than this language.

25        MR. CISZ:  Well, again, Your Honor, I think that what

1    these California cases also say is that this Court needs to

2    consider extrinsic evidence.  And extrinsic evidence includes

3    the expert-witness reports that really do tell the story of

4    what the parties were expecting to resolve.  And you can also

5    look to the parties' conduct as it relates to ORIC.  If ORIC

6    was intended to be released through this settlement agreement,

7    was there any communication to ORIC after the settlement

8    agreement was executed?  No.  Not to my knowledge.

9          Now, we're entitled to discovery on that, but, dollars

10    to donuts, I'll bet the answer is no.  And why would that be?

11    If the -- if ORIC was going to be released, why did it take

12    over a year for there to be a discovery by the estate and ORIC

13    that the fund was continuing to expect excess-insurance

14    reimbursements?  That kind of conduct is also extrinsic

15    evidence that we're entitled to put before this Court to

16    establish what the true intention of the parties were (sic) at

17    the time they entered into this agreement.  And again --

18          THE COURT:  I would suggest the reason is because

19    we've got exactly the same issue going on here with ORIC:  that

20    they want LC proceeds back and that -- and they said, well, why

21    wouldn't you?  And you said, well, because we're still getting

22    claims submitted from the fund.  And then Circuit City's

23    looking at this and says, well, but they released us and said

24    they couldn't go through anybody else, because it says, "by,

25    through any of them".  And you're going now to collect exactly

1   the same obligation by going after ORIC.  That makes perfectly

2   good sense to me why it would be raised now.

3           MR. CISZ:  Well, but again, if ORIC -- the point, Your

4   Honor, is that if ORIC was intent -- intended to be a released

5   party, I would think that it would be reasonable to communicate

6   that to ORIC at the time that the settlement agreement had been

7   entered into, or soon after when it got approved by the Court.

8   I don't know if there were any discussions about that with ORIC

9   at the time relative to the trust, but I think we're entitled

10  to discovery on that issue.  And we indicated in our papers

11  that if the Court is inclined to grant the motion, that I do

12  believe we're entitled to conduct discovery to understand what

13  was going on relative to the communications with ORIC and the

14  estate.  And I believe we're entitled to put forth whatever

15  extrinsic evidence we can find to establish what the true

16  intent of the parties were (sic).

17          THE COURT:  Okay, and you say this excess is different

18  from surplus, but you would --

19          MR. CISZ:  It is.

20          THE COURT:  -- you would agree that the excess would

21  arise in some way, shape, or form from the relationship of the

22  parties?

23          MR. CISZ:  No, not as it relates to what this release

24  was intending to accomplish, Your Honor.  I would say that what

25  we're trying -- what we're intending to accomplish relative to

Colloquy                                                       41

1   that settlement agreement was to resolve the surplus letter-of-

2   credit proceeds and related claims.  And the parties understood

3   and expected that the fund would continue to seek reimbursement

4   from ORIC as the excess carrier.  And that's the -- again, I

5   believe that the best evidence of that is the debtor's expert-

6   witness report -- or the trust's expert-witness report.

7           THE COURT:  And not the language of the ruling?

8           MR. CISZ:  Correct.

9           THE COURT:  Got it.

10          MR. CISZ:  Correct.

11          THE COURT:  All right.  Thank you very much.

12          MR. CISZ:  Thank you, Your Honor.

13          THE COURT:  Mr. Caine, you get the last word here.

14          MR. CAINE:  Thank you, Your Honor.  I believe that Mr.

15  Gubner might want to address a factual --

16          MR. GUBNER:  Yes.  Thank you.

17          MR. CAINE:  -- issue --

18          MR. GUBNER:  Thank you for that, Mr. Caine.

19          MR. CAINE:  -- if that's okay with you.

20          MR. GUBNER:  Your Honor, can you hear me okay?

21          THE COURT:  I can, Mr. Grubner (sic).  Can you hear

22  me?

23          MR. GUBNER:  Thank you.  It's Gubner.  I got

24  dropped -- my last name is pronounced [Gub-ner] --

25          THE COURT:  Gubner.  Okay, Mr. Gubner.

Colloquy                                                                      42

1           MR. GUBNER:  -- not [Grub-ner].

2           You know, I've been listening very patiently to this

3   argument and the circular nature of it proposed by Nixon.  You

4   never got an answer to your question, Your Honor, which is the

5   following:  can you make a claim against ORIC if you can't make

6   a claim against Circuit City?  ORIC stood as a second -- and

7   the answer -- Your Honor recognized, and you asked counsel

8   several times, and the answer is no.

9           Yes, we did not sue ORIC.  We were negotiating with

10  ORIC for the return of its collateral, and we found out about

11  six months ago that, lo and behold, ORIC was making payments to

12  SCIF.  And we said, are you kidding me, what are you doing,

13  we -- there's no claim that exists between Circuit City and

14  SCIF, so therefore there is no secondary insurance necessary to

15  pay those claims.  Oh, no, no, no, we have a longstanding

16  relationship with SCIF, if you want us to stop paying them,

17  you're going to have to get a court order.  That's why we're

18  here.

19          The truth is -- and you asked this question of counsel

20  three times.  And this is really simple.  And let's take just a

21  step back, think about the insurance process.  Let's say CCLT

22  never filed bankruptcy and was just going its merry way.  SCIF

23  would submit invoices, literally invoices, to Circuit City, and

24  Circuit City would pay them in the normal course of business

25  when somebody got hurt or had an injury.

1        The scheme for self-insurance is found in the

2   California Code and it specifically says that you have to base

3   it on an actuarial report post -- side collateral if you're

4   unable to pay the bills which are presented by SCIF, and that

5   you must provide a portion of reinsurance or supplemental

6   insurance in the event that you can't afford to pay that bill.

7        And so we've got three ways to collect:  one is to

8   bill you, one is to draw on collateral, or the third is an

9   insurance policy that you'll buy -- the estate will buy, and

10  we'll get it -- we'll get it that way.  But if you -- again,

11  the answer's this:  that if you were hurt, Your Honor, and you

12  never worked for Circuit City and filed a workers'-comp claim

13  in California, truth is that ORIC wouldn't pay it, even if SCIF

14  demanded it from them.

15       The truth is that secondary insurance only covers

16  claims related and between the debtor and SCIF.  In the event

17  that the debtor can't pay it -- in this case, the debtor's not

18  obligated to pay it, because the claims were dismissed with

19  prejudice, so there is no underlying claim to insure.  I heard

20  that go around and around on the issues, Your Honor, and I

21  wanted to make sure the Court was clear that it never got an

22  answer from counsel.  Counsel -- the only response that I

23  heard:  well, Your Honor, you know, this was done on a weekend

24  and we were rushed, if you look at the intent of the parties by

25  focusing on abstract expert reports, we're going to get there.

1        I don't like discussing settlement discussions; again,

2    they're supposed to be privileged.  But the truth is, and this

3    is a very good point, we felt that -- and we're still willing

4    to stand by this -- quite frankly, that if there's no claim

5    against Circuit City, there cannot be a claim against any of

6    its insurers.  And we went ahead and streamlined the settlement

7    agreement on that basis; we finished it up.

8        And with all due respect to counsel for Nixon Peabody,

9    if SCIF really believed that was the case -- and I assure you

10    they did not -- well, I cannot tell you what they were

11    thinking.  We gave up millions and millions of dollars of

12    backed-in (ph.) claims.  I can tell you, Your Honor, I really

13    wanted to try this case.

14        But I want to make sure the Court is aware that this

15    is really just a backhanded attempt to claw back a couple

16    million dollars that they just gave up.  1542, as Your Honor

17    pointed out, is designed to be as broad as possible.  Broad as

18    possible.  And why?  The cases that Mr. Caine referenced

19    earlier are streamlined with respect to the step-by-step

20    process you have to go if you're going to get around them.

21    It's almost unheard of.

22        And so I just wanted to really make the point, Your

23    Honor -- and I'm sorry for being longwinded, I know we've been

24    here a while -- and that is that I really think that Your Honor

25    asked a question three times and never got a realistic answer.

Colloquy                                        45

1   The simple truth is SCIF does not have a claim it can maintain

2   against CCLT, and therefore ORIC should not be paying them.

3   And that's what we're here to get:  an order to that effect.

4           THE COURT:  All right, thank you very much, Mr.

5   Gubner.  And I apologize earlier for mispronouncing your name.

6           MR. GUBNER:  Thank you, Your Honor.

7           THE COURT:  All right.  Okay, anything further, or are

8   we done?

9           MR. CAINE:  Just one comment, Your Honor, if I may.

10  One of the last statements that counsel made was that the

11  burden is on the trust to say why there wasn't a carve-out of

12  this right that the fund is pursuing.  And in fact, the

13  Neverkovec case says quite the opposite:  because of the

14  existence of an apparently clear general release, the burden is

15  then shifted to the party who is seeking to overcome that

16  language.  And that is the burden that the fund is faced with.

17  And it is the trust's position that, based on the extrinsic

18  evidence that the fund has submitted, no reasonable person

19  would conclude that the settlement-agreement release is

20  susceptible to being restricted to less than what it says and

21  that the release should be enforced based on the language.

22          THE COURT:  All right, thank you.

23          The Court has before it the motion for summary

24  judgment that has been filed by the trustee for the trust in

25  the Circuit City case.  The Court has read the -- all the

1    papers in this case, including the responses and all of the

2    supporting documents that were filed.  And the parties have

3    done an excellent job providing all of this wealth of

4    information.

5            The Court has considered the proffer of the proposed

6    evidence of the suggested ambiguity in the contract and has

7    considered that in looking at the language in the release, and

8    the Court believes that it has to give the language in the

9    release, as was suggested earlier in the argument, an ordinary

10   interpretation of what the words mean.  And they're not that

11   complicated.  The release provides that the parties release

12   each other.  It's a mutual release:  all of the usual

13   suspects -- members, shareholders, employees, attorneys,

14   successors-in-interest, et cetera, including beneficiaries.

15   And what is it releasing them of?  Any obligations of any

16   nature, whether known or unknown.

17           And there is the waiver of the California Civil Code

18   Section 1542 set forth in the release, as Mr. Gubner pointed

19   out.  And we also then are releasing any known or unknown

20   claims, whether liquidated or contingent, from the beginning of

21   time.  And what are they?  Arising out of the parties'

22   relationship in any way, shape, or form whatsoever.

23           I can't read that restrictively.  That is terribly

24   broad.  And it's not boilerplate.  It is the essence of this

25   agreement.  And how it was negotiated or what, the parties

1     clearly intended that they were done.

2              And as pointed out here, once you release the claims

3     against Circuit City and the trust, there can't be any claim

4     against the trust's insured (sic).  That just defies any kind

5     of meaningful understanding.

6              So the Court finds the language in the agreement to be

7     unambiguous.  I think it's very clear what it means.  The Court

8     does not -- can't take the proffer of extrinsic evidence to

9     contradict exactly what's in the release.  And the parties did

10    agree to release any and all claims, whether known or unknown,

11    arising out of the relationship between the parties, and that

12    includes whether it be surplus or excess or whatever you want

13    to call it; anything whatsoever to do with this.

14             The parties knew how to carve out a specific provision

15    where they wanted to do that, and they did do that.  This was

16    obviously drafted by, as we say, learned counsel.  And the

17    Court just can't find that there's ambiguity here.

18             So the Court is going to grant the motion for summary

19    judgment.  I'll issue a memorandum opinion in that regard so

20    that if the trust (sic) would like to appeal the Court's

21    decision in that regard, you'll have the benefit of the Court's

22    analysis and the like.  And I'm sure you know the time frames

23    and such, within which you would need to note an appeal if you

24    want to take that.  But I didn't want to keep the parties in

25    suspense while I was going about that, because I am going on

 1  vacation for two weeks, so I'm not even going to look at this
 2  again, and start writing for two weeks after that.  So it will
 3  be a little while before you get my opinion.  But I did want to
 4  share with you my thoughts on where -- how I was going to
 5  decide this.
 6          Now, with that said, any questions regarding what I
 7  said as far as the Court's disposition of this matter, how --
 8  what you might expect to see?
 9          MR. CISZ:  No, Your Honor.
10          MR. CAINE:  No, Your Honor.
11          THE COURT:  Okay.  Thank you again for your very
12  capable presentations here today.  And I do appreciate all of
13  the thorough briefing on this matter.
14          We'll be adjourned.
15          MR. GUBNER:  Thank you, Your Honor.
16          THE COURT:  We're not; we have one more matter, which
17  I --
18          Yeah, Mr. Gubner, you're released to the extent that
19  you would like to be, and as well as y'all, but -- unless you
20  want to hear the final matter we've got.  As I said, I'd take
21  that next.
22          MR. CAINE:  Thank you, Your Honor.  Andrew Caine again
23  for the trust.
24          The second item on the agenda is the trustee's motion
25  for an order to further extend the term of the liquidating

1   trust.  As the motion recites, there are a number of

2   affirmative matters that the trust is pursuing, that the

3   trustee believes will generate significant revenue for the

4   benefit of creditors, and those matters require more time than

5   the current term allows, which is October 31st, in order to be

6   concluded.  And so the trustee has asked for extension of the

7   trust through December 31 of 2019.  And to our knowledge, Your

8   Honor, there's been no objection to the motion.

9           THE COURT:  All right.  Does any party wish to be

10  heard in connection with the trustee's motion to extend the

11  term of the trust through December of 2019?

12          All right, having no objection here -- I was not aware

13  of any having been filed, either -- I think that, under the

14  circumstances, although this case never seems to want to end,

15  there have constantly been a number of issues that need to be

16  resolved, and I'm aware of some that are still outstanding, and

17  the Court will certainly grant the trustee's motion in that

18  regard and extend the term of the trust through the requested

19  period, and ask you to submit an order to that effect.

20          MR. CAINE:  We will.  Thank you, Your Honor.

21          THE COURT:  Thank you.  All right, now is there any

22  other business here in this case?

23          UNIDENTIFIED SPEAKER:  No, Your Honor.

24          THE COURT:  Okay.  Thank you very much.

25          THE CLERK:  All rise.

1          THE COURT:  Thank you.

2          THE CLERK:  Court is now adjourned.

3     (Whereupon these proceedings were concluded at 3:41 PM)

1                          I N D E X

2

3

4    RULINGS:                                    PAGE   LINE

5    Plaintiff trustee's motion for summary       47     18
     judgment, granted.
6
     Trustee's motion for an order to             49     17
7    further extend the term of the
     liquidating trust to December 31,
8    2018, granted.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2

 3         I, Clara Rubin, the court-approved transcriber, do

 4   hereby certify the foregoing is a true and correct transcript

 5   from the official electronic sound recording of the proceedings

 6   in the above-entitled matter.

 7

 8

 9

10

11                                    September 10, 2018

12   _____    _____

13   CLARA RUBIN                         DATE

14

15

16

17

18

19

20

21

22

23

24

25
```

**9:9;10:5**

**[**

[Grub-ner] (1)
42:1
[Gub-ner] (1)
41:24

**A**

ability (2)
6:11;18:9
able (3)
15:2;22:1;23:17
above (1)
25:24
abstract (1)
43:25
absurd (2)
19:16,20
accept (2)
9:21;21:23
accident (2)
13:13,25
accomplish (3)
32:2;40:24,25
accomplished (1)
6:9
accomplishes (1)
6:17
According (3)
4:25;12:17;17:2
acknowledging (1)
10:25
acting (3)
5:19;29:13;37:12
actions (1)
15:1
actual (1)
12:16
actually (3)
16:25;23:4;34:21
actuarial (1)
43:3
actuaries (3)
16:17;30:25;31:1
actuary (3)
31:15,16,21
add (1)
17:25
added (1)
16:23
addition (1)
17:12
additional (2)
17:16;36:22
address (2)
18:13;41:15
adjourned (1)
48:14;50:2
administrators (1)
31:1
admit (2)

admitted (1)
9:24
adversary (14)
4:18;5:5,9;7:2;
20:23;21:3;22:6,8,
14;25:13;29:18;
34:23,23,24
affirmative (1)
49:2
afford (1)
43:6
afternoon (5)
3:13,17;20:11,12,
19
again (19)
3:7;12:8;15:11;
27:7;30:9;22;32:15;
33:24;35:24;36:15;
38:25;39:17;40:3;
41:4;43:10;44:1;
48:2,11,22
against (26)
4:18;6:20;10:15,
17;13:21;15:18,21;
23:20,24;26:2,2,16,
25;27:2,4,5,15;29:1;
35:21;42:5,6;44:5,5;
45:2;47:3,4
agencies (2)
5:16,23
agenda (5)
3:2;4:16,22,23;
48:24
ago (1)
42:11
agree (3)
6:24;40:20;47:10
agreed (9)
6:15;16:24;22:18;
24:4;25:24;26:15,
24;30:2,8
agreement (42)
5:8;6:16;7:6,9,13,
17,19;9:19,19,10:21;
11:5,8,13,13;13:19,
24;14:2,13;15:5,17,
25;17:8;18:8;19:13;
20:6,6;22:15,17;
23:9;24:16;35:12;
38:6,9,18;39:6,8,17;
40:6;41:1;44:7;
46:25;47:6
agreements (1)
10:23
agrees (1)
7:19
ahead (1)
44:6
aid (1)
10:5
allowing (1)
20:20

allows (1)
49:5
almost (2)
18:1;44:21
alone (2)
8:22;10:2
along (1)
8:5
although (1)
49:14
always (3)
31:2;35:22;37:13
ambiguity (15)
9:22,25;10:3,9,13;
12:5,7;14:1;18:8,24;
19:9;20:5;32:9;46:6;
47:17
among (2)
22:15;23:10
amount (13)
5:24;16:16,25;
22:22;23:9,13;25:3,
18;29:24;30:13;
31:4;37:6,13
amounts (4)
17:16,25;18:6;
29:25
analysis (3)
25:5;31:15;47:22
Andrew (2)
3:21;48:22
answer's (1)
43:11
anticipated (2)
14:2;29:21
anymore (1)
16:12
apologies (1)
12:10
apologize (1)
45:5
apparent (1)
8:15
apparently (3)
5:7;31:15;45:14
Appeal (3)
9:17;47:20,23
appear (1)
20:20
appearance (1)
3:7
appearing (1)
4:11
appears (1)
32:16
applicable (2)
8:23;19:24
applied (1)
17:4
applying (1)
12:6
appreciate (3)
8:8;21:1;48:12

appropriate (1)
11:24
approved (1)
40:7
arguing (1)
20:15
argument (4)
15:13;19:14;42:3;
46:9
arguments (2)
14:24;18:12
arise (2)
33:8;40:21
arising (4)
5:7;34:2;46:21;
47:11
around (3)
43:20,20;44:20
assert (4)
23:20,24;26:16;
35:20
asserting (4)
17:6;24:15;27:8,9
asserts (1)
14:25
assess (1)
25:14
assume (2)
36:22,23
assumed (1)
23:14
assuming (1)
30:14
assure (1)
44:9
attempt (2)
35:1;44:15
attempting (2)
18:21;19:8
attorney (5)
10:20;11:3,5,15;
38:13
attorneys (1)
46:13
attorney's (2)
17:18,19
authority (1)
34:8
authorized (1)
35:16
avoid (2)
14:10,25
aware (5)
8:9;11:14;44:14;
49:12,16
away (1)
15:4

**B**

back (11)
17:21;20:22;
27:17;30:9,23;36:6,

20;37:22;39:20;
42:21;44:15
backed-in (1)
44:12
background (1)
6:22
backhanded (1)
44:15
bad (1)
17:24
bank (1)
19:23
banking (1)
16:7
bankruptcy (3)
5:12,25;42:22
barely (1)
3:6
base (1)
43:2
based (8)
10:11,18;11:4;
13:1;17:17;36:21;
45:17,21
basic (1)
8:16
basically (1)
11:1
basis (3)
28:19,24;44:7
basket (2)
16:11,14
becomes (1)
36:4
beginning (2)
27:21;46:20
behalf (2)
3:9;20:14
behold (1)
42:11
belief (2)
7:23;17:15
believes (3)
6:17;46:8;49:3
beneficiaries (7)
15:19;32:21,23,
23;33:24;34:20;
46:14
beneficiary (7)
14:19;15:14;
24:15,17,18;33:2;
34:22
benefit (4)
5:20;13:23;47:21;
49:4
best (3)
35:24;36:2;41:5
bet (1)
39:10
big (2)
32:4;34:18
bill (2)
43:6,8

**bills (1)**
43:4
**bit (2)**
3:6;20:23
**blow (1)**
29:2
**Bodle (2)**
11:20,20
**boilerplate (5)**
34:20;35:19;36:3,
4;46:24
**bold (1)**
11:1
**Both (9)**
21:15;22:17,18;
23:13;29:19,23;30:2,
7,10
**Bradshaw (1)**
4:13
**breach (1)**
7:4
**breached (1)**
7:6
**break (1)**
4:3
**briefing (1)**
48:13
**briefly (1)**
18:13
**broad (12)**
10:22;14:15;16:2;
32:13,16;35:19,22;
36:8;38:16;44:17,
17;46:24
**broader (1)**
38:24
**broadly (1)**
15:19
**brought (1)**
38:17
**bucket (4)**
22:4;23:18;28:15;
31:24
**buckets (1)**
27:7
**burden (7)**
14:9;34:13,13,18;
45:11,14,16
**business (4)**
37:17,17;42:24;
49:22
**buy (2)**
43:9,9

**C**

**Caine (34)**
3:12,13,14,17,18,
21,21,25;4:5,7,11,16,
24;5:2,5;8:8,20;
9:16;20:10;32:4,13,
20;38:12;41:13,14,
17,18,19;44:18;45:9;

48:10,22,22;49:20
**calculate (7)**
22:14,17;23:10;
30:3,21;31:1;36:21
**calculated (3)**
22:23;30:10;37:4
**calculating (2)**
22:18;29:20
**calculation (3)**
23:11;25:4;37:9
**calculations (1)**
30:25
**California (30)**
4:18;5:14,17;6:8,
14,21;7:1,15,25;
8:13,13;9:9,17;
10:15,22;12:1;
15:23;16:8,12;
18:14;19:15;21:13;
29:3;32:5,8;36:18;
39:1;43:2,13;46:17
**call (2)**
36:3;47:13
**called (1)**
11:20
**came (2)**
6:22;13:12;35:7,
10
**camps (1)**
22:18
**can (23)**
9:13,24,25;16:4;
19:15;20:5,6;21:12;
26:9;30:14;31:4;
32:8,11;36:12;37:6;
39:4;40:15;41:20,21,
21;42:5;44:12;45:1
**capable (1)**
48:12
**capital (1)**
11:1
**car (7)**
13:13,15,16,17,17,
21,22
**carrier (7)**
6:3;7:18;18:10;
20:2;23:8;30:7;41:4
**carriers (4)**
5:18,22;10:17;
15:24
**carve (2)**
7:18;47:14
**carved (1)**
34:11
**carve-out (3)**
10:16;20:7;45:11
**carving (1)**
18:9
**case (37)**
9:1,12,16,18;10:4,
12;11:7,10,19;12:2,
9,12;15:8;18:17;
19:8,20;23:5,6,10;

24:6,11,11;29:20;
30:17;31:2;33:3;
35:2,7;38:11;43:17;
44:9,13;45:13,25;
46:1;49:14,22
**cases (5)**
19:19,24;32:6;
39:1;44:18
**category (1)**
16:15
**CCLT (2)**
42:21;45:2
**certainly (4)**
6:9;38:18,20;
49:17
**cetera (1)**
32:20,20;46:14
**challenge (1)**
16:3
**challenging (2)**
10:10;17:13
**chambers (1)**
4:9
**change (2)**
10:8;12:4
**changes (1)**
13:8
**Circuit (36)**
3:1,4,9,19;4:12;
5:13;6:6,20;10:15;
26:3,4,9,10,22,25;
27:2,6,15;28:1,11;
29:5,10;33:17,18,20,
21,23;39:22;42:6,13,
23,24;43:12;44:5;
45:25;47:3
**circular (1)**
42:3
**circumstances (3)**
14:21;19:5;49:14
**Cisz (40)**
20:15,19,19;21:9,
11,20;24:20;25:1;
26:4,11,14,21,23;
27:2,4,7,20,25;28:3,
7,11,18,22,24;30:19,
22;32:25;33:11,22;
34:12;36:14;38:5,
25;40:3,19,23;41:8,
10,12;48:9
**cited (1)**
19:19
**cites (2)**
11:19;18:16
**City (32)**
3:1,4,9,19;4:12;
5:13;6:6,20;10:15;
26:4,9,10,22;27:1,2,
6,15;28:11;29:5,10;
33:18,20,21,24;42:6,
13,23,24;43:12;44:5;
45:25;47:3
**City's (4)**

26:3;28:1;33:17;
39:22
**Civil (5)**
8:13,16;10:1,22;
46:17
**claim (24)**
5:23;6:19;17:14,
24;26:2;28:3,20;
30:17,21;31:3,23;
33:7;35:20;37:15;
38:17;42:5,6,13;
43:12,19;44:4,5;
45:1;47:3
**claimant (2)**
33:1,2
**claimants (2)**
32:24;33:25
**claiming (1)**
5:23
**claims (62)**
5:13;6:7,13,20;
7:4,15;9:7;10:14,15,
17,25;11:9;15:18,21;
16:8,11;18:15;22:2,
25;23:20,24;24:1;
25:7,9,18,19,20;
26:5,5,16;27:5,9,10,
12,12,13,14;28:13;
29:1,1,8,15,22;
30:15,18;33:10,12,
13,14,18;34:7;35:3,
19;39:22;41:2;
42:15;43:16,18;
44:12;46:20;47:2,10
**claw (1)**
44:15
**clear (16)**
8:14;9:5,6;10:13;
11:15;15:1;18:20;
20:1;34:15,19,19;
36:12,12;43:21;
45:14;47:7
**clearer (1)**
36:14
**clearly (7)**
15:24;16:1;18:15,
18;19:12;28:22;47:1
**CLERK (3)**
3:1;49:25;50:2
**clerk's (1)**
4:1
**client (6)**
10:20;11:3,10,14,
16;15:8
**co-counsel (1)**
4:13
**Code (7)**
8:13,16;10:1,22;
15:23;43:2;46:17
**cold (1)**
25:21
**collateral (15)**
5:11,24;6:12,24;

26:3;28:1;33:17;
39:22
**Civil (5)**
8:13,16;10:1,22;
46:17
**claim (24)**
5:23;6:19;17:14,
24;26:2;28:3,20;
30:17,21;31:3,23;
33:7;35:20;37:15;
38:17;42:5,6,13;
43:12,19;44:4,5;
45:1;47:3
**claimant (2)**
33:1,2
**claimants (2)**
32:24;33:25
**claiming (1)**
5:23
**claims (62)**
5:13;6:7,13,20;
7:4,15;9:7;10:14,15,
17,25;11:9;15:18,21;
16:8,11;18:15;22:2,
25;23:20,24;24:1;
25:7,9,18,19,20;
26:5,5,16;27:5,9,10,
12,12,13,14;28:13;
29:1,1,8,15,22;
30:15,18;33:10,12,
13,14,18;34:7;35:3,
19;39:22;41:2;
42:15;43:16,18;
44:12;46:20;47:2,10
**claw (1)**
44:15
**clear (16)**
8:14;9:5,6;10:13;
11:15;15:1;18:20;
20:1;34:15,19,19;
36:12,12;43:21;
45:14;47:7
**clearer (1)**
36:14
**clearly (7)**
15:24;16:1;18:15,
18;19:12;28:22;47:1
**CLERK (3)**
3:1;49:25;50:2
**clerk's (1)**
4:1
**client (6)**
10:20;11:3,10,14,
16;15:8
**co-counsel (1)**
4:13
**Code (7)**
8:13,16;10:1,22;
15:23;43:2;46:17
**cold (1)**
25:21
**collateral (15)**
5:11,24;6:12,24;

8:10;15:4;16:13,20;
17:17,21;22:3;23:4;
42:10;43:3,8
**collect (3)**
23:15;39:25;43:7
**coming (3)**
6:13;35:17;37:22
**commenced (2)**
5:10;21:4
**comment (1)**
45:9
**communicate (1)**
40:5
**communication (1)**
39:7
**communications (1)**
40:13
**company (1)**
19:3
**Compensation (7)**
4:19;5:8;6:20;
10:15;33:10,12,13
**complete (1)**
7:14
**completely (1)**
34:7
**complicated (1)**
46:11
**compromised (2)**
16:2,4
**concept (1)**
8:25
**concerned (1)**
25:19
**concerning (1)**
9:21
**conclude (1)**
45:19
**concluded (2)**
49:6;50:3
**conclusion (2)**
13:13;14:25
**conduct (4)**
17:13;39:5,14;
40:12
**conflict (3)**
13:2,6;14:5
**conflicting (1)**
14:13
**connection (3)**
26:13;34:1;49:10
**Connor (1)**
7:22
**consider (1)**
39:2
**consideration (1)**
23:12
**considered (3)**
29:17;46:5,7
**considering (1)**
16:25
**constantly (1)**
49:15

**construction (1)**
14:19
**construe (1)**
9:10
**contested (2)**
4:17,21
**context (1)**
34:22
**contingent (1)**
46:20
**continue (6)**
23:15;30:4,6,14;
33:14;41:3
**continued (1)**
24:4
**continues (1)**
25:10
**continuing (1)**
39:13
**contract (16)**
7:4;8:13,15,18,21;
9:3,10,23;10:6,7;
11:20;12:18;14:19,
20;32:10;46:6
**contracting (1)**
12:16
**contradict (3)**
32:10,11;47:9
**contrary (1)**
37:1
**controversial (1)**
17:13
**conversation (3)**
37:3,20,20
**convince (1)**
7:25
**copies (1)**
9:13
**correctly (1)**
34:9
**counsel (14)**
4:12;9:14;11:17;
19:2;20:14;22:10;
31:11;42:7,19;43:22,
22;44:8;45:10;47:16
**country (2)**
10:24;35:10
**couple (3)**
9:12;37:7;44:15
**course (4)**
9:4;32:19;38:14;
42:24
**COURT (113)**
3:5,11,16,20,23;
4:1,6,8,15,23,25;5:4;
7:21;8:1,6,19;9:9,15,
17,18,24,25;10:3,6;
11:5,13,19,23;12:2;
13:4,12;14:1,8,14,
14;18:16,24;19:4;
20:10,12,17,18;21:1,
8,10,17;24:11,19,21;
25:17;26:8,12,19,22,

24;27:3,5,16,21;
28:1,5,9,16,21,23;
30:16,20;31:3;32:1,
3;33:1,16,23;35:13;
36:2;37:22;38:11,
19;39:1,15,18;40:7,
11,17,20;41:7,9,11,
13,21,25;42:17;
43:21;44:14;45:4,7,
22,23,25;46:5,8;
47:6,7,17,18;48:11,
16;49:9,17,21,24;
50:1,2
**courtroom (1)**
3:15
**Court's (4)**
20:25;47:20,21;
48:7
**cover (3)**
21:5;28:1;37:13
**covered (2)**
36:8;38:18
**covering (1)**
36:9
**covers (2)**
20:1;43:15
**create (2)**
12:5;20:5
**created (1)**
19:3
**credence (1)**
11:13
**credit (12)**
5:11,19;21:5,22;
23:21;24:2;26:15;
31:6,8;35:2;38:8;
41:2
**creditors (2)**
5:20;49:4
**critically (1)**
31:24
**crystal (1)**
9:5
**current (1)**
49:5
**cut (1)**
35:12

**D**

**damages (1)**
17:22
**Day (2)**
35:7;36:7
**days (1)**
32:14
**DC (1)**
35:12
**deal (1)**
32:4
**dealing (1)**
38:13
**debtor (23)**

21:13,14,24;22:1,
3;23:2,4,6,18,21,22,
25,25;26:16;28:25;
31:12,13,14,17;
34:15,17;43:16,17
**debtors (5)**
5:16;7:16;15:4,18,
21
**debtors' (2)**
21:6;23:17
**debtor's (10)**
22:3;24:24;26:17;
31:11,16;34:13,18;
35:1;41:5;43:17
**December (2)**
49:7,11
**decide (2)**
12:19;48:5
**decided (1)**
16:9
**decision (4)**
9:17;14:15,17;
47:21
**declaration (1)**
35:13
**declarations (1)**
15:6
**declaratory (1)**
7:4
**deducible (1)**
13:4
**deducted (2)**
29:23,25
**defaulted (1)**
28:12
**defaults (1)**
21:25
**defendant (2)**
14:12;22:7
**defending (1)**
35:10
**defies (1)**
47:4
**define (1)**
33:3
**defined (1)**
20:24
**demand (2)**
6:25;7:11
**demanded (1)**
43:14
**demanding (1)**
7:6
**demands (1)**
7:10
**demonstrates (1)**
16:17
**depending (1)**
14:17
**depositions (1)**
35:10
**described (2)**
16:10,16

**designed (1)**
44:17
**determination (1)**
13:9
**determine (5)**
9:22,24;10:1;
12:23;13:4
**determined (2)**
8:21;12:17
**determines (2)**
10:3,6
**determining (1)**
23:8
**detract (1)**
6:11
**difference (1)**
30:5
**different (5)**
6:3;18:25;19:10;
35:9;40:17
**direct (1)**
31:22
**disagree (4)**
16:19;19:18;25:2;
34:21
**discount (1)**
17:4
**discovery (5)**
31:16;39:9,12;
40:10,12
**discussed (1)**
18:6
**discusses (2)**
15:22;16:22
**discussing (1)**
44:1
**discussions (2)**
40:8;44:1
**dismissed (1)**
43:18
**disposition (1)**
48:7
**dispute (7)**
7:8,12;8:16;10:20;
11:4;24:8;38:14
**disputes (1)**
11:25
**docket (1)**
4:4
**documents (1)**
46:2
**dollar (1)**
27:22
**dollars (28)**
16:24;17:4,5,11,
14;18:2,3;23:23;
25:7;27:23;28:17,
19;29:1,5,6,25;31:5,
6,7,9,12;34:16,17;
37:7,15;39:9;44:11,
16
**done (6)**
11:15;37:8;43:23;

45:8;46:3;47:1
**donuts (1)**
39:10
**down (5)**
5:12,18;17:20;
27:11;37:11
**drafted (3)**
11:5;31:19;47:16
**draw (1)**
43:8
**drawn (3)**
5:12,18;17:20
**driver (3)**
13:16,21,22
**dropped (1)**
41:24
**due (2)**
5:24;44:8

**E**

**earlier (4)**
16:10;44:19;45:5;
46:9
**effect (6)**
8:17;12:24;19:17;
28:25;45:3;49:19
**effective (1)**
18:14
**either (4)**
5:22;14:16;19:2;
49:13
**else (1)**
39:24
**employees (2)**
7:16;46:13
**encompass (1)**
11:9
**encompasses (1)**
15:20
**encountered (1)**
5:15
**end (3)**
11:22,23;49:14
**enforce (2)**
11:24;24:12
**enforced (1)**
45:21
**enforcing (1)**
12:3
**enough (1)**
22:24
**entered (8)**
5:9;14:21;16:1;
17:8;32:13;38:7;
39:17;40:7
**entering (1)**
16:8
**entitled (7)**
17:9,23;39:9,15;
40:9,12,14
**equity (1)**
38:1

**essence (1)**
46:24
**essentially (1)**
15:7
**establish (3)**
19:6;39:16;40:15
**estate (17)**
21:22,24;22:22;
24:22,24;26:17;
27:4;30:12;31:4,8;
34:1;35:21,21;37:6;
39:12;40:14;43:9
**estates (1)**
5:25
**estate's (1)**
29:10
**et (3)**
32:19,20;46:14
**EVANS (3)**
20:11,13,13
**Even (8)**
11:10;29:10;
31:17,19;32:8;
38:21;43:13;48:1
**event (3)**
34:10;43:6,16
**Everyone (2)**
7:18;13:24
**evidence (31)**
7:23;9:10,21,23;
10:5,18;12:4,17;
13:2,2,6,8;14:11,24;
16:14;20:4;22:12;
25:15;31:25;32:9;
35:6,24;36:2;39:2,2,
15;40:15;41:5;
45:18;46:6;47:8
**evidence' (1)**
13:5
**exact (1)**
20:1
**exactly (9)**
6:18;7:20;19:22;
24:21,24;38:22;
39:19,25;47:9
**exceed (3)**
25:7;29:1;30:15
**excellent (1)**
46:3
**except (2)**
34:5,6
**excess (61)**
5:11,18,21,22;6:3,
12;7:18;8:10;10:17;
15:24;16:16,20;17:3,
17;18:10;20:2;21:6,
15,20,21;22:5,5,7,19,
25;23:1,4,7,15;24:5;
25:15,23;28:14,25;
29:2,7,24;30:4,5,5,7,
11,18;31:2,21,24;
34:5,11,25;35:4,23;
36:23;37:1,5,12,13,

16;40:17,20;41:4;
47:12
**excess-insurance (2)**
23:12;39:13
**exclusive (1)**
21:6
**excuse (2)**
7:22;24:13
**executed (1)**
39:8
**exist (2)**
26:5,6
**existence (1)**
45:14
**exists (1)**
42:13
**expect (2)**
39:13;48:8
**expectation (1)**
23:13
**expected (2)**
29:22;41:3
**expecting (1)**
39:4
**expert (9)**
16:16,19;17:3;
18:4,7;35:25,25,25;
43:25
**expert- (1)**
41:5
**expert-opinion (1)**
37:2
**experts (8)**
23:10;29:19,20,
23;30:2,7,12;36:20
**expert-witness (4)**
22:11,16;39:3;
41:6
**explain (4)**
12:23;28:22;
32:11;34:13
**expo (1)**
36:16
**exposure (4)**
23:16;31:11;
35:21;36:21
**expressly (1)**
15:17,19
**extend (4)**
4:20;48:25;49:10,
18
**extension (1)**
49:6
**extent (6)**
22:4;24:23;25:1;
26:10;29:3;48:18
**extremely (1)**
36:7
**extrinsic (15)**
7:23;9:9;13:1,2,7;
14:24;16:14;31:25;
32:9;39:2,2,14;
40:15;45:17;47:8

9:15
**finished (1)**
44:7
**first (11)**
4:22;8:22;9:20;
10:13;11:14;14:8;
15:6;17:2;18:13;
35:12;36:18
**five (2)**
17:11;31:12
**focus (3)**
37:23;38:8,9
**focused (3)**
21:4;23:19;34:23
**focusing (1)**
43:25
**following (1)**
42:5
**follows (1)**
9:18
**form (8)**
19:2;33:9;34:4;
36:9;13;38:2;40:21;
46:22
**formal (1)**
11:20
**forth (5)**
7:25;8:1,14;40:14;
46:18
**found (4)**
14:1;18:24;42:10;
43:1
**four (1)**
18:1
**fourteen (5)**
27:22,23;28:17;
31:6,7
**frames (1)**
47:22
**frankly (1)**
44:4
**Fund (85)**
4:19;5:8,11;6:17;
7:1,6,10,11,16,24;
9:2;12:12;13:8;
14:10,24;15:2,22,23,
24;16:3,15;17:7,14,
15,20,23;18:9,13,16,
17,18;19:8,12,21;
20:2,3,4,8,14;21:24,
24;22:2,24;23:8,15,
16,17,20,23;24:1,4,6,
7;26:8;27:8,12,14,
24;29:9,14,15,17;
30:4,6,14;31:8,23;
33:15,18,19,19;34:3,
16;35:20;36:18,22,
24;37:10;38:7;
39:13,22;41:3;45:12,
16,18
**funds (4)**
5:16,18,20;24:22
**fund's (5)**

## F

**face (2)**
9:20;34:15
**faced (1)**
45:16
**fact (12)**
11:19;12:19;14:5;
16:5,21;17:16;19:6,
9;21:18;24:3;36:21;
45:12
**factfinder (1)**
22:12
**factors (1)**
19:12
**facts (4)**
7:8;10:19;13:11;
19:19
**factual (2)**
8:9;41:15
**factually (1)**
27:18
**faith (1)**
17:24
**familiar (2)**
8:3;21:17
**far (4)**
25:19;36:9,9;48:7
**fee (4)**
11:6,8,17;38:14
**fees (3)**
10:20;17:18,19
**felt (1)**
44:3
**few (1)**
4:5
**fifteen (1)**
31:9
**figure (2)**
22:21;23:14
**figured (1)**
23:16
**filed (15)**
4:2;5:6,12,23;
6:20;10:15;12:11;
15:21;30:17,20;
42:22;43:12;45:24;
46:2;49:13
**filing (1)**
31:3
**final (2)**
16:14;48:20
**finality (2)**
11:25;16:7
**find (5)**
7:12;37:24;38:6;
40:15;47:17
**finding (2)**
19:4,5
**finds (1)**
47:6
**fine (1)**

9:8;10:16;25:11;
26:18;37:17
**further (2)**
45:7;48:25
**future (3)**
14:7;29:21,22

## G

**gave (3)**
11:11;44:11,16
**general (14)**
4:14;10:22;11:6,
24;12:3;14:8,15;
16:2;18:23;19:17,18,
23;34:20;45:14
**generally (3)**
13:1;21:11,23
**general-release (1)**
11:7
**generate (1)**
49:3
**genesis (2)**
7:2,3
**given (1)**
11:22
**giving (1)**
29:14
**glasses (1)**
4:24
**gleaned (1)**
14:20
**glider (1)**
19:3
**gliders (2)**
18:22,22
**goal (1)**
8:16
**goes (1)**
36:9
**Good (12)**
3:3,13,17,20;4:1;
20:11,12,17,19;
25:21;40:2;44:3
**Goodwin (1)**
35:11
**grant (4)**
13:5;40:11;47:18;
49:17
**granted (1)**
20:9
**Grubner (1)**
41:21
**Gubner (21)**
3:3,3,8,9,11,14,18;
41:15,16,18,20,23,
23,25,25;42:1;45:5,
6;46:18;48:15,18
**G-U-B-N-E-R (1)**
3:9
**Gubner's (1)**
3:23
**guess (2)**

Case 08-35653-KRH    Doc 14180    Filed 09/10/18    Entered 09/10/18 13:21:54    Desc
Main Document    Page 57 of 62

CIRCUIT CITY STORES, INC., et al.
Case No. 08-35653-KRH

July 25, 2018

27:17;33:1

**H**

**hac (1)**
20:20
**half (2)**
17:11;18:1
**hand (1)**
9:13
**handed (1)**
38:12
**handle (1)**
25:21
**Hapes (1)**
31:10
**happened (2)**
16:5;21:16
**happening (3)**
24:6;27:14;29:8
**happens (1)**
8:14
**hear (6)**
3:6;32:1;35:6;
41:20,21;48:20
**heard (4)**
5:2;43:19,23;
49:10
**hearing (1)**
4:25
**heavily (1)**
9:2
**held (6)**
5:24;14:8,11,14;
15:4;17:7
**help (3)**
19:11;27:22;32:17
**helpful (3)**
18:17;36:19;37:3
**here's (1)**
32:4
**herring (3)**
18:5;22:10,12
**hey (5)**
10:24;16:10;
29:10;31:11;36:15
**hold (1)**
24:21
**holding (3)**
5:18;22:24;25:3
**holds (1)**
8:10
**Honor (82)**
3:3,8,17,19;4:11,
17,21;5:5;7:12,22;
8:8,12,18;9:10,14,
16;10:12,19;12:1,6,
12,14;13:7,12;14:1,
23;15:7,13,17;16:15,
19,23;17:25;18:4,12,
16;19:11,14,17,25;
20:8,11,19,22;21:3;
24:10;25:2;26:14;

28:18;30:24;31:22;
33:14;34:21;35:5;
36:15;37:6,18;38:5,
25;40:4,24;41:12,14,
20;42:4,7;43:11,20,
23;44:12,16,23,24;
45:6,9;48:9,10,15,
22;49:8,20,23
**Honor's (2)**
8:3,9
**hours (1)**
34:8
**hurt (2)**
42:25;43:11

**I**

**identifies (1)**
9:18;18:15
**imagination (1)**
35:16
**impact (1)**
34:16
**impairment (1)**
5:1
**import (1)**
11:22
**important (8)**
10:19;11:23;
13:11;19:1;22:24;
30:9;31:25;33:24
**inclined (1)**
40:11
**include (5)**
16:6,18;30:17;
31:5;38:21
**included (6)**
10:21,23;11:6,16;
33:9,11
**includes (7)**
15:17,18;32:18,18,
20;39:2;47:12
**including (5)**
22:25;37:1,5;46:1,
14
**income (1)**
17:10
**incurred (1)**
17:18
**indeed (2)**
24:5,16
**indicated (2)**
31:17;40:10
**indulgence (1)**
12:14
**inference (1)**
13:1
**inferences (2)**
13:4,6
**informally (1)**
31:13
**information (2)**
31:14;46:4

**initial (1)**
13:23
**initially (1)**
31:8
**injured (4)**
22:1;26:6;27:8,9
**injury (1)**
42:25
**instance (3)**
5:19,21,22
**Insurance (25)**
4:19;5:8;21:6,15;
22:5,5,8;23:15;
25:15;28:25;29:3,
24;30:5;31:21;
34:11,25;35:4;
36:23;37:5,12;42:14,
21;43:6,9,15
**insure (1)**
28:25;43:19
**insured (3)**
5:17;24:17;47:4
**insurer (9)**
13:18;24:17,20;
25:10;28:14;29:7;
35:23;37:12,16
**insurers (1)**
44:6
**intend (2)**
15:7,9
**intended (7)**
11:8;13:10;14:18;
38:9;39:6;40:4;47:1
**intending (2)**
40:24,25
**intent (16)**
8:17,21;11:12;
12:8,13,16;14:20;
16:18;35:22;36:25,
25;37:2,19;40:4,16;
43:24
**intention (4)**
6:2;10:1;14:12;
39:16
**intentions (1)**
9:22
**interest (1)**
17:9
**interesting (1)**
24:10
**interestingly (1)**
23:3
**interpret (2)**
8:15;32:9
**interpretation (6)**
8:12;10:8,10;
12:18;19:15;46:10
**interpreted (1)**
36:6
**interpreting (1)**
10:5
**into (11)**
5:9;14:22;16:1,9;

17:8;19:13;27:18;
32:13;38:7;39:17;
40:7
**investment (1)**
17:10
**invoices (2)**
42:23,23
**involved (4)**
14:4;15:15,16;
19:12
**involves (1)**
14:19
**issue (8)**
14:11;19:7;23:7;
34:18;39:19;40:10;
41:17;47:19
**issues (4)**
22:7;36:16;43:20;
49:15
**item (1)**
48:24
**items (1)**
3:1

**J**

**job (2)**
37:16;46:3
**Jones (1)**
3:22
**judgment (7)**
4:17;7:3;8:2;13:3,
5;45:24;47:19

**K**

**Katie (1)**
4:13
**keep (2)**
37:22;47:24
**kicking (1)**
37:11
**kidding (1)**
42:12
**kind (8)**
17:24;18:10;
24:21;29:2;31:25;
36:3;39:14;47:4
**kinds (1)**
36:5
**knew (5)**
15:12,24;16:1;
17:15;19:12,22,22;
34:10;47:14
**knowledge (2)**
39:8;49:7
**known (13)**
6:19;10:14,25;
11:9;12:13;16:1;20:3;
33:6;38:21,23;46:16,
19;47:10

**L**

**Labor (2)**
15:23;35:7
**lack (2)**
16:18;19:7
**lack-of-notice (1)**
19:7
**language (32)**
8:1;9:4;10:7,11,
18,22;11:7,15;12:7;
13:9;18:8,19;19:1,
10,17;20:5,6;32:10;
34:20;35:18;36:4;
37:25;38:3,16,23,24;
41:7;45:16,21;46:7,
8;47:6
**large (2)**
27:10;29:1
**last (7)**
4:25;6:2,8;19:14;
41:13,24;45:10
**later (5)**
11:3;13:20;23:6;
38:16,16
**law (10)**
4:1;9:9;11:21;
12:1;13:3;18:14;
19:15;21:13;29:3;
32:8
**lawsuit (10)**
11:17;13:14,14,18,
20,23;15:15,25;17:6,
12
**lawyers (1)**
17:20
**layer (1)**
29:4
**LC (1)**
39:20
**LCs (1)**
27:24
**lead (4)**
3:19;18:7;19:16,
19
**learned (2)**
11:21;47:16
**least (2)**
17:15;22:2
**Lee (1)**
35:11
**left (1)**
6:10
**legal (3)**
11:22;12:24;27:18
**length (2)**
12:11;15:22
**less (4)**
10:24;37:8;38:2;
45:20
**letter (10)**
5:11;21:5,21;

23:21;24:1;26:15;
31:6,7,10;38:7
**letter-of- (2)**
35:1;41:1
**letters (2)**
5:19;11:1
**level (1)**
37:14
**liabilities (2)**
21:6;33:5
**liability (10)**
18:23;26:1,1,2,3,
10,12,14;29:22,22
**liable (2)**
13:24;26:3
**light (1)**
14:21
**liquidated (1)**
46:20
**Liquidating (5)**
3:4,9,19;4:12;
48:25
**listening (1)**
42:2
**literally (1)**
42:23
**litigated (1)**
21:18
**litigation (4)**
6:17,22;16:20;
38:8
**little (3)**
3:6;20:23;48:3
**lo (1)**
42:11
**Lockton (6)**
31:15,17,17,18,18,
20
**long (1)**
36:5
**longer (3)**
21:25;23:17;29:5
**longstanding (1)**
42:15
**longwinded (1)**
44:23
**look (15)**
8:22;9:3;13:11;
22:16;23:18;24:4;
28:14;30:9;32:7,12;
34:1;35:22;39:5;
43:24;48:1
**looking (6)**
14:18;25:17,22,
23:39:23;46:7
**looks (2)**
22:2;37:13
**lost (1)**
14:3
**Lou (1)**
20:14,19
**Lynn (1)**
4:13

## M

**main (1)**
35:2
**maintain (1)**
45:1
**makes (1)**
40:1
**making (1)**
42:11
**malpractice (3)**
11:4,12;38:17
**manager (1)**
4:14
**many (3)**
11:3;16:22;17:7
**materials (2)**
8:4;9:13
**math (1)**
37:8
**matter (8)**
4:22;13:1;21:18;
25:13;48:7,13,16,20
**matters (3)**
4:16;49:2,4
**may (6)**
12:16,23;13:4,5;
15:2;45:9
**maybe (2)**
32:9;36:4
**mean (6)**
33:12;36:6,8;38:1,
23;46:10
**meaningful (1)**
47:5
**means (5)**
23:23;28:6,10;
38:20;47:7
**meant (1)**
36:7
**mediation (1)**
35:8
**members (2)**
32:19;46:13
**memorandum (1)**
47:19
**mention (1)**
35:14
**merry (1)**
42:22
**might (8)**
7:14;13:24;14:6;
15:2;17:23;24:17;
41:15;48:8
**Milliman (1)**
29:19
**million (20)**
16:24;17:4,11,11,
11,14;18:2,2;23:23;
27:22,23;28:17;
29:25;31:5,6,7,9,12;
37:7;44:16

**millions (3)**
34:16;44:11,11
**mind (2)**
14:23;33:23
**minute (1)**
20:22
**minutes (2)**
4:5;9:12
**mispronounced (1)**
12:10
**mispronouncing (1)**
45:5
**money (6)**
15:3;17:7;22:22,
24;24:25;29:12
**months (1)**
42:11
**more (10)**
5:23;10:24;23:24;
26:16;29:12;34:7;
36:12;38:4;48:16;
49:4
**morning (1)**
3:3
**motion (18)**
3:12;4:17,20;7:3,
12;8:14,18;13:3;
20:9,16;40:11;
45:23;47:18;48:24;
49:1,8,10,17
**Motors (1)**
14:15
**movant's (1)**
34:13
**much (5)**
3:11;36:14;41:11;
45:4;49:24
**must (6)**
10:9,10;12:17,19;
32:1;43:5
**mutual (3)**
8:17;26:19;46:12

## N

**name (3)**
12:11;41:24;45:5
**named (1)**
22:6
**nature (5)**
26:25;33:6;38:1;
42:3;46:16
**necessary (1)**
42:14
**need (7)**
3:5;16:6;25:4;
29:2;36:21;47:23;
49:15
**needed (3)**
4:9;17:16;24:8
**needs (2)**
24:12;39:1
**negotiate (1)**

16:12
**negotiated (2)**
6:15;46:25
**negotiating (2)**
6:23;42:9
**negotiations (1)**
15:16
**net (8)**
17:3;22:19,25;
23:10;29:20;31:1,2,7
**netting (1)**
31:21
**Neverkovec (7)**
9:1;12:9,10,15;
13:11;24:11;45:13
**new (2)**
11:10;14:12
**next (1)**
48:21
**nine (1)**
18:1
**Nixon (6)**
20:13,15,20;
35:15;42:3;44:8
**nor (1)**
20:6
**normal (1)**
42:24
**Normally (1)**
4:3
**note (2)**
12:15;47:23
**noted (2)**
11:23;17:2
**notes (1)**
17:10
**notice (2)**
18:18;19:7
**noticed (1)**
3:23
**notion (2)**
16:4,7
**number (5)**
6:3,24;32:14;49:1,
15
**numbers (1)**
27:23

## O

**objection (4)**
17:19,22;49:8,12
**objective (1)**
12:18
**obligated (1)**
43:18
**obligation (3)**
28:1;38:1;40:1
**obligations (6)**
21:25;23:5;25:6;
26:25;33:6;46:15
**obviously (2)**
33:18;47:16

**October (1)**
49:5
**off (1)**
16:11
**offering (1)**
10:10
**Office (2)**
21:14;35:12
**Ohio (1)**
5:17
**Old (14)**
6:2,2,5,11,23,24;
7:7,10,11;8:10;
15:14;16:6,10;25:21
**once (3)**
5:12;36:4;47:2
**one (25)**
4:17;7:10;9:13,14,
19;12:14;13:3,24;
16:20,21;17:11,11;
18:5,21,22,23;22:3,
24;34:6;38:13;43:7,
8;45:9,10;48:16
**only (13)**
10:6;9:16;20:21;
18:5,14;19:16;26:9;
28:13;31:16;33:7;
43:15,22
**open (1)**
5:7
**opinion (4)**
11:23;12:15;
47:19;48:3
**opposite (2)**
24:3;45:13
**opposition (5)**
7:20;9:8;12:11;
15:22;16:3,22;17:2,
10
**order (12)**
4:22,23;5:6;8:5;
13:12;15:3;21:13;
42:17;45:3;48:25;
49:5,19
**ordinary (5)**
8:24;9:4,6;11:22;
46:9
**organized (1)**
4:8
**ORIC (48)**
22:6;24:3,5,14,15,
15,16,17;25:3,4,8,
10;26:2,2,18;27:11,
13;29:7,12,13;30:7;
33:2;34:19,22,25;
35:16,22;36:16;39:5,
5,7,11,12,19;40:1,3,
4,6,8,13;41:4;42:5,6,
9,10,11;43:13;45:2
**ORICs (1)**
33:25
**ORIC's (1)**
25:6

Min-U-Script®    eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(6) letter-of- - ORIC's

**out (31)**
4:2,9,24;5:7,6:13;
7:18;18:9;22:19,21;
23:12,14,16;25:8;
29:5,25;31:2,7,21;
32:21;33:7,8;34:2,
11;35:11;42:10;
44:17;46:19,21;47:2,
11,14

**outstanding (1)**
49:16

**over (9)**
10:23;21:24;25:9,
23;32:14,15;34:8;
35:7;39:12

**overcome (1)**
45:15

**overstates (1)**
9:11

**own (1)**
29:5

**owner (1)**
13:17

**P**

**Pachulski (1)**
3:21

**page (3)**
8:18;11:19;14:16

**paid (6)**
7:11;17:20;29:15,
24;33:14,19

**papers (6)**
20:24,25;21:2;
31:10;40:10;46:1

**parol (4)**
9:9,21;10:5;37:25

**parol-evidence (1)**
32:7

**part (7)**
6:4;13:24;23:11,
21;30:2;31:23;32:17

**parties (35)**
6:16;10:8;11:8;
12:16;13:10,15;
14:6;16:24;22:13,13,
16;23:13;24:4;
25:12,14,16,24;
30:10;32:1,13;34:3;
35:9;39:4,16;40:16,
22;41:2;43:24;46:2,
11,25;47:9,11,14,24

**parties' (10)**
8:17,21;9:21;10:1;
14:12,20;16:17;
33:8;39:5;46:21

**partner (1)**
35:11

**partnership (2)**
11:4,12

**parts (1)**
35:9

**party (11)**
9:19;10:10;12:20,
22;14:9,18;16:6;
24:14;40:5;45:15;
49:9

**party-beneficiary (1)**
24:13

**party's (5)**
12:20,25;37:15

**patiently (1)**
42:2

**pay (13)**
22:1,25;23:16;
25:8;28:14;29:5;
42:15,24;43:4,6,13,
17,18

**paying (8)**
27:11,12,13;
28:12;29:14;30:4;
42:16;45:2

**payment (5)**
7:6,10;14:4,6;29:6

**payments (2)**
26:6;42:11

**Peabody (5)**
20:13,15,20;
35:15;44:8

**penalty (1)**
35:13

**people (1)**
13:17

**per (3)**
28:19;33:2;37:15

**per-claim (2)**
28:18,24

**perfectly (1)**
40:1

**period (2)**
17:19;49:19

**perjury (1)**
35:14

**person (4)**
12:13,19,24;45:18

**personal-injury (1)**
13:14

**persons (2)**
11:21;14:4

**ph (1)**
31:10;35:11;44:12

**photo (1)**
3:25

**phrases (1)**
8:24

**piece (4)**
16:20,21;18:5;
22:24

**pieces (2)**
16:22;22:23

**pierce (2)**
28:3;29:4

**pierced (3)**
28:14;29:9,15

**pierces (2)**

27:10;37:14

**piloted (1)**
18:22

**place (1)**
8:22

**places (1)**
32:22

**plain (2)**
7:5;18:8

**plaintiff (1)**
11:11

**Plans (1)**
21:15

**play (1)**
17:1

**please (2)**
3:7;8:4

**pledged (2)**
21:5;23:4

**PM (1)**
50:3

**point (5)**
9:3;21:19;40:3;
44:3,22

**pointed (4)**
32:20;44:17;
46:18;47:2

**policy (3)**
14:16;18:12;43:9

**popular (3)**
8:25;9:4,6

**portion (2)**
12:15;43:5

**position (10)**
9:5,8,11;10:12,16;
13:7;19:11,21,25;
45:17

**possible (4)**
6:18;8:22;44:17,
18

**post (2)**
21:14;43:3

**posted (3)**
22:4;23:22;27:24

**Powers (4)**
18:16,17,21;19:10

**prayed (1)**
8:2

**prejudice (1)**
43:19

**prepared (5)**
11:21;16:17;
31:15;35:25;36:1

**prerequisite (1)**
6:4

**presentations (1)**
48:12

**presented (4)**
7:23;13:8;16:15;
43:4

**pretty (3)**
8:14;25:21;36:9

**Price (1)**

9:16

**prior (9)**
20:23;21:3;22:6,8,
14;25:13;29:18;
34:23,24

**privileged (1)**
44:2

**pro (1)**
20:20

**problem (5)**
12:2;19:4,5;32:5;
38:19

**proceed (2)**
4:22,23

**proceeding (13)**
4:18;5:5,10;7:2;
20:23;21:3;22:6,9,
15;25:14;29:18;
34:23,24

**proceedings (1)**
50:3

**proceeds (4)**
35:2;38:7;39:20;
41:2

**process (9)**
9:18;12:2,6;17:22,
24;30:8;32:2;42:21;
44:20

**proffer (2)**
46:5;47:8

**proffered (1)**
37:24

**pronounced (1)**
41:24

**proof (1)**
14:9

**proofs (6)**
5:23;17:14;30:17,
20;33:7;35:20

**proper (1)**
19:5

**property (3)**
21:22;24:22,23

**proposed (3)**
3:2;42:3;46:5

**proposition (2)**
18:18;19:18

**prove (1)**
17:23

**provide (1)**
43:5

**provides (2)**
12:12;46:11

**providing (1)**
46:3

**provision (3)**
14:2,5;47:14

**provisionally (1)**
9:21

**provisions (1)**
14:13

**public (1)**
14:16

**pursue (3)**
7:18;15:24;18:9

**pursuing (2)**
17:14;22:8;24:7;
45:12;49:2

**put (2)**
39:15;40:14

**puzzle (1)**
18:5

**PwC (2)**
17:3;29:19

**Q**

**quickly (1)**
35:17

**quite (3)**
18:20;44:4;45:13

**quote (2)**
11:20,22

**R**

**raise (1)**
19:14

**raised (2)**
14:11;40:2

**raises (1)**
18:13

**raising (1)**
27:5

**range (2)**
16:25;18:1

**ranged (1)**
17:10

**rate (1)**
17:4

**rather (1)**
36:3

**reaction (1)**
7:1

**read (8)**
4:6;12:14;20:25;
21:2;32:5;38:3;
45:25;46:23

**reading (1)**
14:20;32:14;37:25

**ready (1)**
35:8

**realistic (1)**
44:25

**realized (1)**
23:7

**really (19)**
7:8;9:11,24;15:10;
18:4,17;21:7;22:24;
29:1;32:5;34:12;
37:19;39:3;42:20;
44:9,12,15,22,24

**reason (1)**
39:18

**reasonable (8)**
9:6;12:13,19,24;

13:6;16:25;40:5;
45:18
**reasonably (7)**
10:7,11,18;12:7;
13:4;18:10;20:7
**recall (1)**
34:9
**received (2)**
6:25;7:7
**recently (1)**
24:6
**recites (1)**
49:1
**recognized (1)**
42:7
**reconcile (1)**
37:23
**record (1)**
21:12
**recover (5)**
5:11,20;6:11;31:4;
35:1
**recovered (4)**
22:19;23:1,2;37:7
**recoveries (3)**
22:19;24:7;31:23
**recovery (4)**
20:1;22:2;27:8;
35:23
**red (3)**
18:4;22:10,11
**reference (3)**
34:25,25;35:15
**referenced (1)**
44:18
**referencing (1)**
22:11
**refers (1)**
22:10
**regard (5)**
24:9;26:20;47:19,
21;49:18
**regarding (7)**
10:20;11:4;12:16,
22;14:11;16:19;48:6
**regulatory (1)**
34:8
**reimbursed (1)**
26:9
**reimbursement (12)**
6:25;10:17;15:3;
17:3;20:3;22:4;
26:18;27:13;29:14;
30:7,14;41:3
**reimbursements (4)**
23:12;24:5,8;
39:14
**reinsurance (1)**
43:5
**relate (1)**
35:3
**related (3)**
38:7;41:2;43:16

**relates (7)**
24:3;25:6,15;
26:15;35:19;39:5;
40:23
**relating (1)**
10:14
**relationship (7)**
33:8;34:2;36:8;
40:21;42:16;46:22;
47:11
**relative (9)**
21:5;22:7;24:1;
31:14;35:20;36:23;
40:9,13,25
**release (58)**
6:15;7:5,14;8:1;
9:5;10:14,22,24;
11:6,12,15;12:3,21,
24,25;13:9,23;14:5,
8,10,12;15:1,9,11,
17;16:3;18:14,19,23,
24,25,25;19:23;20:1;
23:19;24:2;26:13,19,
24;32:12,16;33:13;
35:16,18;38:23;
40:23;45:14,19,21;
46:7,9,11,11,12,18;
47:2,9,10
**released (16)**
9:7;13:25;15:14;
16:4;18:15;29:11,13,
13;33:5,20;34:19;
39:6,11,23;40:4;
48:18
**releases (9)**
7:5;11:24;14:15;
18:22;19:3,4,6,10;
36:6
**releasing (6)**
12:20,22,22;
18:19;46:15,19
**relied (4)**
9:1;12:11;30:24,
25
**relief (2)**
3:23;7:4
**relying (1)**
14:14
**rent (1)**
18:21
**rental (1)**
19:3
**renter's (1)**
18:23
**report (7)**
31:15,19;35:25;
36:1;41:6,6;43:3
**reported (1)**
31:18
**reporter (1)**
14:17
**reports (9)**
16:16,19;18:4,7;

22:11,16;37:2;39:3;
43:25
**represented (2)**
11:16;19:2
**Republic (13)**
6:2,3,5,12,23,24;
7:7,10,11;8:10;
15:14;16:6,10
**requested (1)**
49:18
**require (1)**
49:4
**requires (2)**
9:9;18:14
**reserves (3)**
23:11;29:21;31:2
**resolution (4)**
5:6;6:5,9,18
**resolutions (1)**
6:5
**resolve (6)**
5:9;23:7;25:24;
35:9;39:4;41:1
**resolved (6)**
6:8;13:14,18;
26:12,14;49:16
**resolving (2)**
38:14,15
**respect (4)**
7:9;21:20;44:8,19
**respectfully (1)**
16:18
**response (1)**
43:22
**responses (1)**
46:1
**responsibility (1)**
23:18
**responsible (2)**
7:15;14:6
**restricted (1)**
45:20
**restrictively (2)**
38:4;46:23
**result (2)**
19:16,21
**retention (11)**
25:8;27:11;28:4,
13,15,16,19;29:9,16;
30:15;37:14
**retrieve (1)**
4:2
**return (4)**
6:24;8:25;16:12;
42:10
**returned (4)**
22:22;23:23;
30:12,13
**revenue (1)**
49:3
**reviewed (1)**
9:23
**rewrite (1)**

18:11
**rewriting (1)**
20:7
**rewritten (1)**
7:17
**Right (25)**
3:12;4:1,10,15;
7:18;8:19;20:2,10,
17;26:11,18,23;30:6,
12;31:11;33:20;
37:25;41:11;45:4,7,
12,22;49:9,12,21
**rights (8)**
15:2,10,23;16:2,4;
19:13,22;35:21
**rise (1)**
49:25
**risk (6)**
25:10,11,14;36:22,
23;37:15
**road (1)**
37:11
**role (1)**
33:17
**routine (2)**
36:3,5
**rule (3)**
9:11;32:6,7
**ruling (2)**
34:16;41:7
**rushed (1)**
43:24

## S

**same (9)**
13:15,20;15:8;
24:21,24;33:23;
38:22;39:19;40:1
**satisfy (1)**
7:24
**saying (4)**
29:10;31:4;38:15,
19
**scheme (1)**
43:1
**SCIF (9)**
42:12,14,16,22;
43:4,13,16;44:9;45:1
**scope (1)**
12:21
**screaming (1)**
37:11
**second (8)**
7:11;10:4;14:3;
15:13;17:4;27:19;
42:6;48:24
**secondary (2)**
42:14;43:15
**Section (7)**
8:16,20,23;9:25;
10:23;11:16;46:18
**secure (1)**

23:4
**security (2)**
21:14;36:18
**seek (8)**
7:3;15:3,3;20:3;
26:18;29:11;30:14;
41:3
**seeking (6)**
10:8;27:13,14;
31:8,23;45:15
**seems (3)**
7:17;36:3;49:14
**self- (1)**
5:16
**Self-Insurance (3)**
21:14,25;43:1
**self-insure (2)**
21:13;28:2
**self-insured (13)**
5:13;6:6;25:7;
27:11;28:4,13,15,16,
19;29:9,16;30:15;
37:14
**self-insured-retention (1)**
29:4
**Self-Insureds' (1)**
36:18
**self-insuring (1)**
28:12
**sense (4)**
8:25;9:4,6;40:2
**separate (3)**
25:4;28:15;31:24
**serve (1)**
12:23
**set (4)**
7:25;8:1,14;46:18
**settled (2)**
10:21;18:2
**settlement (32)**
5:7;6:16;7:9,17;
10:21;11:8,18;
13:18;14:13;15:5,16,
25;16:9,21,24;17:8;
19:13;20:5,6;24:16;
32:2;35:7,12;38:6,9,
18;39:6,7;40:6;41:1;
44:1,6
**settlement-agreement (1)**
45:19
**settling (2)**
25:13;29:18
**several (2)**
5:15;42:8
**shape (7)**
33:8;34:3;36:8,13;
38:2;40:21;46:22
**share (1)**
48:4
**shareholders (2)**
32:19;46:13
**shifted (2)**
14:9;45:15

**shoes (1)**
12:20
**short (1)**
12:14
**showed (1)**
11:8
**shows (1)**
22:12
**shy (1)**
8:6
**sic (5)**
39:16;40:16;
41:21;47:4,20
**side (1)**
43:3
**sides (1)**
22:18
**sign (2)**
11:2;15:16
**signed (7)**
6:16;11:7;13:18;
15:4,10;18:22;19:2
**significant (1)**
22:12;28:7;49:3
**signing (3)**
7:9;11:17;19:23
**simple (4)**
7:5;37:8;42:20;
45:1
**simply (1)**
19:24
**situation (3)**
8:10;12:23;23:3
**situations (2)**
5:15;6:4
**six (1)**
42:11
**sixty (1)**
17:14
**slightly (1)**
18:25
**smiling (2)**
3:25;5:2
**solvent (1)**
37:15
**somebody (1)**
42:25
**sometime (1)**
23:6
**somewhat (1)**
21:1
**soon (1)**
40:7
**sorry (6)**
3:5,8;23:25;28:18,
22;44:23
**sort (3)**
16:14;18:12;19:19
**sought (1)**
5:10
**source (3)**
22:20;23:1,2
**sources (1)**

22:2
**speak (1)**
3:6
**SPEAKER (1)**
49:23
**speaking (2)**
21:11,23
**specific (1)**
47:14
**specifically (3)**
15:19;21:9;43:2
**spend (1)**
9:12
**spot (1)**
14:3
**stake (1)**
31:20
**stand (1)**
44:4
**standard (3)**
12:8,13,18
**standards (1)**
14:23
**Stang (1)**
3:21
**start (1)**
48:2
**state (9)**
3:7;4:18;5:8,14,
16,23;6:13,20;7:25
**stated (1)**
19:11
**statement (1)**
11:11
**statements (1)**
45:10
**states (1)**
6:6
**status (2)**
24:13,14
**statutes (1)**
8:13
**step (4)**
9:20;10:4;20:22;
42:21
**step-by-step (1)**
44:19
**Steven (2)**
3:3,8
**still (14)**
26:4,5,5,6;27:8,9,
14;29:8,14,14,16;
39:21;44:3;49:16
**stood (1)**
42:6
**stop (2)**
8:4;42:16
**Stores (1)**
3:1
**story (2)**
9:20;39:3
**streamlined (2)**
44:6,19

**stretch (1)**
35:16
**strike (2)**
21:21;27:12
**stuff (3)**
4:6;33:19;36:10
**subject (1)**
22:5
**subjective (3)**
11:12;12:8,12
**subjective-intent (1)**
12:4
**submit (7)**
15:7;19:8;35:5;
37:6,18;42:23;49:19
**submitted (6)**
15:6;19:17;20:4;
35:13;39:22;45:18
**successors-in-interest (1)**
46:14
**sue (1)**
42:9
**sued (2)**
11:3;24:7
**sufficiency (1)**
12:17
**suggest (2)**
7:17;39:18
**suggested (2)**
46:6,9
**suggesting (1)**
20:8
**suggestion (1)**
18:6
**suggests (2)**
9:19;10:1
**suing (1)**
13:16
**sum (3)**
7:22;14:8;19:25
**summary (7)**
4:17;7:3;8:2;13:3,
5;45:23;47:18
**Superior (1)**
18:16
**supplemental (1)**
43:5
**supporting (1)**
46:2
**supposed (1)**
44:2
**Supreme (1)**
14:14
**Sure (5)**
27:20;36:12;
43:21;44:14;47:22
**surplus (24)**
21:4,21;22:14,17,
18;23:9,11;24:23;
25:1,3;30:3,4,10,11;
31:19,20;34:24;
35:1;36:16;37:4;
38:7;40:18;41:1;

47:12
**surprise (1)**
7:1
**susceptible (7)**
10:7,11,18;12:7;
18:10;20:7;45:20
**suspects (2)**
32:19;46:13
**suspense (1)**
47:25
**sworn (1)**
11:11

---

**T**

**table (3)**
4:12;16:11;20:14
**talk (4)**
9:1;20:23;29:19;
33:4
**talked (1)**
36:19
**talking (5)**
9:12;24:10;33:16,
21;34:14
**tangential (1)**
35:3
**Tavenner (1)**
4:13
**term (6)**
4:20;20:24;48:25;
49:5,11,18
**terms (1)**
13:9
**terribly (1)**
46:23
**test (1)**
7:24
**testify (1)**
12:16
**testimony (1)**
12:21
**That'll (1)**
9:15
**therefore (3)**
33:2;42:14;45:2
**there're (1)**
18:12
**thinking (3)**
22:13;36:15;44:11
**third (5)**
14:18;24:14;
35:23;37:15;43:8
**third- (1)**
24:12
**third-party (2)**
15:14;30:25
**third-party-beneficiary (1)**
24:13
**thorough (1)**
48:13
**though (4)**
11:10;25:25;

29:11;33:5
**thought (3)**
12:22;18:7;25:18
**thoughts (1)**
48:4
**three (4)**
13:16;42:20;43:7;
44:25
**throughout (1)**
24:6
**thrust (1)**
35:2
**Thus (1)**
12:21
**times (3)**
42:8,20;44:25
**today (1)**
48:12
**together (4)**
17:25;35:7,11,17
**took (2)**
25:10;35:12
**total (1)**
25:18
**transaction (1)**
11:14
**triable (1)**
14:11
**trial (1)**
16:17
**trier (1)**
12:19
**true (5)**
23:19;24:3;34:12;
39:16;40:15
**Trust (49)**
3:4,10,19;4:12,14,
20;5:6,9,10,15,19,
21;6:1,17;7:13;
14:25;15:18;16:7;
17:6,9,13,18,21,23;
18:2;21:4;23:8,25;
25:4;26:20;29:17;
32:18;33:21;34:3;
36:1,11,15;38:6;
40:9;45:11,24;47:3,
20;48:23;49:1,2,7,
11,18
**trustee (3)**
45:24;49:3,6
**trustee's (4)**
36:25;48:24;
49:10,17
**trust's (14)**
4:18,19;6:10,11;
10:12;17:3,15;19:21,
25;36:25;37:19;
41:6;45:17;47:4
**truth (5)**
42:19;43:13,15;
44:2;45:1
**try (5)**
6:23;14:25;23:14;

Case 08-35653-KRH    Doc 14180    Filed 09/10/18    Entered 09/10/18 13:21:54    Desc
Main Document    Page 62 of 62

CIRCUIT CITY STORES, INC., et al.
Case No. 08-35653-KRH                                                    July 25, 2018

35:8;44:13

**trying (12)**
8:15;14:9;20:2;
22:13,21;25:14;
27:17,22;31:13;
32:1;34:15;40:25

**turn (3)**
12:9;14:24;32:3

**turning (1)**
8:12

**twenty-nine (1)**
31:5

**two (13)**
4:16;17:3;18:12,
22,25;19:6,10;22:2,
16;27:7;29:20;48:1,
2

**two-step (3)**
9:18;12:1,6

**types (1)**
34:7

**typically (1)**
23:5

## U

**ultimate (2)**
22:22;23:16

**Um-hum (1)**
32:25

**un (1)**
38:23

**unable (1)**
43:4

**unambiguous (1)**
47:7

**unconscionable (2)**
19:16,20

**uncontested (1)**
4:22

**under (11)**
10:22;14:21;
15:23;16:15;19:5,
15;21:13;24:16;
29:3;35:13;49:13

**underlying (3)**
11:17;25:13;43:19

**understood (5)**
8:24;12:4,21;
30:23;41:2

**unheard (1)**
44:21

**UNIDENTIFIED (1)**
49:23

**unknown (9)**
6:19;10:14,25;
11:9;33:7;38:21;
46:16,19;47:10

**Unless (2)**
13:2;48:19

**unrelated (1)**
34:8

**unusual (1)**

23:3

**up (11)**
3:6;16:23;17:5;
28:13;29:2;36:11,
17;37:1;44:7,11,16

**upon (6)**
5:12;9:1;12:11;
14:17;30:24,25

**upside (1)**
17:5

**urged (1)**
10:8

**use (2)**
20:24;32:8

**using (2)**
30:3;35:18

**usual (3)**
12:18;32:19;46:12

## V

**vacation (1)**
48:1

**vary (1)**
8:1

**vice (1)**
20:21

**victim (3)**
13:16,20;14:9

**view (2)**
7:19;12:25

**viewed (1)**
34:22

**violate (1)**
14:16

**Virginia (2)**
32:6,7

**vis (1)**
33:17

**vis-a- (1)**
33:16

**vis-a-vis (2)**
26:8,9

**voice (1)**
3:24

**volumes (1)**
4:2

**voluminous (1)**
21:1

## W

**wages (1)**
34:8

**waive (1)**
26:17

**waived (1)**
33:13

**waiver (2)**
24:2;46:17

**waiving (3)**
15:11;19:22;24:1

**walk (1)**

7:24

**wants (1)**
23:7

**Washington (2)**
5:17;35:11

**way (17)**
7:25;8:5;30:10;
33:8;34:1,3,21;35:6,
15;36:8,13;37:24;
38:2;40:21;42:22;
43:10;46:22

**ways (1)**
43:7

**wealth (1)**
46:3

**weekend (2)**
35:8;43:23

**weeks (2)**
48:1,2

**Welcome (1)**
20:18

**weren't (5)**
15:15,15;22:7;
25:16,22

**what's (3)**
22:21;23:16;47:9

**whatsoever (4)**
26:25;37:21;
46:22;47:13

**Whereupon (1)**
50:3

**whole (3)**
9:20;14:21;17:22

**who's (1)**
33:1

**William (1)**
20:13

**willing (1)**
44:3

**Winet (6)**
9:16,17;10:4,19;
12:2;15:8

**wish (1)**
49:9

**within (1)**
47:23

**witness (1)**
41:6

**woman (2)**
18:21;19:1

**word (1)**
41:13

**words (5)**
8:24;11:21;31:7;
32:11;46:10

**work (2)**
31:13;36:17

**worked (2)**
6:1;43:12

**workers (6)**
22:1;23:17;26:6;
27:8,9,10

**workers' (1)**

25:7

**workers'- (5)**
6:19;10:14;33:9,
11,12

**workers'-comp (3)**
25:19,20;43:12

**workers'-compensation (7)**
5:13;6:7,13;7:15;
15:20;16:8;26:5

**world (1)**
33:25

**worry (1)**
16:11

**wrap (2)**
36:17;37:1

**writing (4)**
8:22,23;10:2;48:2

**written (1)**
8:21

**wrong (1)**
27:23

**wrote (4)**
21:18,22;31:10;
36:7

## Y

**y'all (1)**
48:19

**year (1)**
39:12

**years (4)**
11:3;17:7;25:9;
38:16

## Z

**Ziehl (1)**
3:21

## 1

**1 (1)**
3:1

**1168 (1)**
11:19

**15 (1)**
8:18

**1542 (4)**
10:23;11:16;
44:16;46:18

**1636 (1)**
8:16

**1639 (2)**
8:20;9:25

**1644 (1)**
8:23

**1992 (1)**
9:17

## 2

**2 (1)**

3:1

**2.4 (1)**
29:25

**2.5 (1)**
17:5

**2.9 (1)**
29:25

**20,000 (1)**
34:17

**2009 (1)**
17:7

**2011 (1)**
31:10

**2015 (1)**
5:10

**2016 (1)**
17:7

**2019 (2)**
49:7,11

## 3

**3:41 (1)**
50:3

**300,000 (5)**
25:7;28:19;29:1,4;
37:14

**300,000-dollar (1)**
30:15

**31 (1)**
49:7

**31st (1)**
49:5

**350 (1)**
14:17

## 5

**5.35 (3)**
16:23;18:2;23:23

**500,000 (1)**
17:5

## 8

**866 (1)**
14:16