Robert B. Van Arsdale (Va. Bar No. 17483)
Department of Justice
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219
(804) 771-2310
Fax: (804) 771-2330

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Richmond Division)

| | |
|---|---|
| **In re:** | Case No. 08-35653 (KRH) |
| **CIRCUIT CITY STORES, INC., et al.,** | Chapter 11 |
| **Debtors**. | (Jointly Administered) |

## OBJECTION OF THE UNITED STATES TRUSTEE TO THE MOTION OF THE LIQUIDATING TRUSTEE TO DETERMINE EXTENT OF LIABILITY FOR POST-CONFIRMATION QUARTERLY FEES PAYABLE TO THE UNITED STATES TRUSTEE PURSUANT TO 28 U.S.C. § 1930(A)(6) AND MEMORANDUM IN SUPPORT

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
WENDY COX
SUMI SAKATA
Trial Attorney

Department of Justice
Executive Office for United States
  Trustees
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
Fax: (202) 307-2397

JOHN P. FITZGERALD, III
United States Trustee, Region 4
ROBERT VAN ARSDALE
Trial Attorney

Department of Justice
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, Virginia 23219
(804) 771-2310
Fax: (804) 771-2330

# TABLE OF CONTENTS

SUMMARY ............................................................................................................. 1

FACTS .................................................................................................................... 2

    A.  Circuit City Stores, Inc. Files a Chapter 11 Case. ...................................... 2

    B.  The Liquidating Trustee challenges the quarterly fees due under 28 U.S.C.
        § 1930.......................................................................................................... 3

    C.  Quarterly fees billed to date. ..................................................................... 4

OBJECTION ........................................................................................................... 5

    I.   Overview of Chapter 11 Quarterly Fees and the 2017 Amendment.................. 7

        A.  Congress established chapter 11 quarterly fees so that the cost of the United
            States Trustee Program is not borne by taxpayers. ...................................... 7

        B.  Congress temporarily increased fees in 2017 to avoid a deficit in the United
            States Trustee System Fund and to fund additional judgeships................. 11

    II.  The 2017 Amendment Does Not Violate the Bankruptcy Clause. ................... 17

        A.  Congress's 2017 quarterly fee amendment does not violate the Bankruptcy
            Clause because the law is uniform.............................................................. 18

        B.  An *ultra vires* failure to enforce section 1930 does not violate the Bankruptcy
            Clause........................................................................................................ 22

        C.  Alternatively, the quarterly fees do not violate the Bankruptcy Clause because
            section 1930(a)(6) is not a law "on the subject of Bankruptcies."............. 24

        D.  Like *Prines*, *Victoria Farms* supports the government's position............. 25

            1.  *Victoria Farms* enforced the quarterly fee requirement. ................... 26

            2.  The Liquidating Trustee does not dispute that later amendments to the
               statute cured any lack of uniformity. ................................................... 27

            3.  *Victoria Farms* did not rule on a revenue provision like the 2017
               amendment, which is not a law "on the subject of Bankruptcies.".................. 29

III. The 2017 Amendment Raises No Retroactivity Concerns. ............................................. 31

    A.  The presumption against retroactivity does not apply because the amendment's temporal reach is clear. ........................................................................................... 32

    B.  The 2017 amendment does not have a retroactive effect............................................ 37

    C.  Even if the amendment had applied retroactively, it would be constitutional............ 38

        1.  There are no retroactivity concerns when, as here, Congress had a rational basis for its law. ................................................................................................... 39

        2.  Supreme Court jurisprudence rejects the Liquidating Trustee's argument that any payment that exceeds the benefits received is unconstitutional.............. 43

CONCLUSION................................................................................................................. 47

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.H. Robins Co. Inc.*,
    219 B.R. 145 (Bankr. E.D. Va. 1998) ....................................................................46

*Alamo Rent-a-Car, Inc. v. Sarasota-Manatee Airport Authority*,
    906 F.2d 516 (11th Cir. 1990) ............................................................................45

*Ashton v. Cameron Cnty. Water Imp. Dist. No. 1*,
    298 U.S. 513 (1936)..........................................................................................24

*Augusta Towing Co. v. United States*,
    5 Cl. Ct. 160 (Ct. Cl. 1984)..............................................................................17

*In re Blair*,
    644 F.2d 69 (2d Cir. 1980)................................................................................36

*Blanchette v. Conn. Gen. Ins. Corps.*,
    419 U.S. 102 (1974)..........................................................................................18

*In re Buffets, LLC*,
    No. 16-50557-RBK, 2019 WL 518318 (Bankr. W.D. Tex. Feb. 8, 2019) ..................... *passim*

*In re Burk Development Co., Inc.*,
    205 B.R. 778 (Bankr. M.D. La. 1997) ..............................................................41

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
    508 U.S. 602 (1993)..........................................................................................38

*Eastern Enters. v. Apfel*,
    524 U.S. 498 (1998) .........................................................................................39

*EPA v. New Orleans Pub. Serv., Inc.*,
    826 F.2d 361 (5th Cir. 1987) ............................................................................37

*General Motors Corp. v. Romein*,
    503 U.S. 181 (1992)..........................................................................................39

*Hobbs v. Buffets Holdings, LLC*,
  Case No. 5:19-cv-0173-DAE (W.D. Tex.) ............................................................. 1

*Holywell Corp. v. Smith*,
  503 U.S. 47 (1992) ............................................................................................ 42

*In re Kindred Healthcare, Inc.*,
  No. 99-3199 (MFW), 2003 WL 22327933 (Bankr. D. Del. Oct. 9, 2003) ............ 45

*Landgraf v. USI Film Products*,
  511 U.S. 244 (1994) ............................................................................ 32, 33, 37, 39

*Law v. Siegel*,
  571 U.S. 415 (2014) ......................................................................................... 43

*McAndrews v. Fleet Bank of Massachusetts*,
  989 F.2d 13 (1st Cir. 1993) ............................................................................... 38

*In re Miles*,
  330 B.R. 861 (Bankr. M.D. Ga. 2005) ............................................................... 21

*Peony Park v. O'Malley*,
  121 F. Supp. 690 (D. Neb. 1954), *aff'd*, 223 F.2d 668 (8th Cir. 1955) ................. 23

*In re Postconfirmation Fees*,
  224 B.R. 793 (E.D. Wash. 1998) ....................................................................... 42

*In re Prines*,
  867 F.2d 478 (8th Cir. 1989) .................................................................... *passim*

*In re Reese*,
  91 F.3d 37 (7th Cir. 1996) ........................................................................... 18, 25

*In re Richardson Serv. Corp.*,
  210 B.R. 332 (Bankr. W.D. Mo. 1997) .......................................................... 37, 39

*Rosenberg v. United States*,
  72 Fed. Cl. 387 (Ct. Fed. Cl. 2006) .................................................................. 22

*Ry. Labor Execs. Ass'n v. Gibbons*,
  455 U.S. 457 (1982) .................................................................................. *passim*

*Schultz v. United States*,
    529 F.3d 343 (6th Cir. 2008) ..........................................................................19, 22

*Shady Grove Orthopedic Assocs. PA v. Allstate Ins. Co.*,
    559 U.S. 393, 407 (2010) ......................................................................................31

*St. Angelo v. Victoria Farms*,
    38 F.3d 1525 (9th Cir. 1994), *as amended by* 46 F.3 969 (1995).................... *passim*

*Turner Broadcasting Sys., Inc. v. FCC*,
    520 U.S. 180 (1997)...............................................................................................40

*U.S. Trustee v. Gryphon at Stone Mansion, Inc.*,
    166 F.3d 552 (3d Cir. 1999)..................................................................25, 37, 39, 42

*U.S. Trustee v. CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.)*, 150 F.3d 1233 (10th Cir. 1998) ........................................37, 39, 42, 43

*United States v. Carlton*,
    512 U.S. 26 (1994)................................................................................................39

*United States v. Ptasynski*,
    462 U.S. 74 (1983)................................................................................................22

*United States v. Sperry*,
    493 U.S. 52 (1989).......................................................................................... *passim*

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)..................................................................................................39

## Statutes

2 U.S.C. §§ 651-658g ..........................................................................................34

28 U.S.C. § 589a .................................................................................................8, 9

28 U.S.C. § 1930..........................................................................................  *passim*

Additional Supplemental Appropriations for Disaster Relief Requirements Act,
    Pub. L. No. 115-72, div. B, § 1004, 131 Stat. 1224, 1232 (2017) ............................10

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No.
  109-8, tit. III, § 325, 119 Stat. 23, 98-99 (2005), as amended by Pub. L. No.
  109-13, § 6058, 119 Stat. 297 (2005) ...................................................................9

Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of
  1986, Pub. L. 99-554, 100 Stat. 3088 (1986)................................................7, 10, 35

Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004(c) ................................... *passim*

Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978).................................7

Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. B, tit. II,
  §§ 212, 213, 121 Stat. 1844, 1914 (2007)...............................................................10

Deficit Reduction Act of 2005, Pub. L. No. 109-171, tit. X, § 10101, 120 Stat. 4,
  184 (2006) ..................................................................................................10

Departments of Commerce, Justice and State, the Judiciary, and Related Agencies
  Appropriations Act, 1990, Pub. L. No. 101-162, tit. II, § 406, 103 Stat. 988,
  1016 (1989) ..................................................................................................9

Departments of Commerce, Justice and State, the Judiciary, and Related Agencies
  Appropriations Act, 1992, Pub. L. No. 102-140, tit. I, § 111, 105 Stat. 782,
  795 (1991) ...................................................................................................9

Departments of Commerce, Justice, and State, the Judiciary and Related Agencies
  Appropriations Act, 1994, Pub. L. No. 103-121, tit. I, § 111, 107 Stat. 1153,
  1164-65 (1993)...............................................................................................9

Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, §§ 102 -105, 114
  Stat. 2410 (2000)...................................................................................9, 10, 28

Judicial Improvements Act of 1990, Pub. L. No. 101-650, 101st Cong., 2d Sess.
  § 317(a) (1990) ........................................................................................26, 27

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, tit. I,
  § 109, 110 Stat. 3009, 3009-18-3009-19 (1996)........................................................9, 36, 41

Temporary Bankruptcy Judgeships Extension Act of 2012, Pub. L. No. 112-121,
  § 3, 126 Stat. 346, 348-349 (2012) .....................................................................10

Unfunded Mandates Reform Act, 2 U.S.C. § 1501, *et seq.*...............................................34

## Other Authorities

Dep't of Justice U.S. Tr. Program FY 2018 Performance Budget Cong.
    Submission at 9, available at https://www.justice.gov/file/968761/download ........................12

Dep't of Justice U.S. Tr. Program FY 2019 Performance Budget Cong.
    Submission at 9, available at
    https://www.justice.gov/jmd/page/file/1034391/download .....................................................12

E.D. Va. R. 1006-1(C)(1) .........................................................................................................30

H.R. 1752 ...............................................................................................................................28

H.R. 2266 .......................................................................................................................... *passim*

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .......................................7, 8

H.R. Rep. No. 99-764 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227 ..........................................8

H.R. Rep. No. 115-130 (2017), *reprinted in* 2017 U.S.C.C.A.N. 154 ................................. *passim*

Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of
    2017 (May 18, 2017), available at https://www.cbo.gov/system/files/2018-
    07/52739-hr2266.pdf ........................................................................................................14

Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and Federal
    Courts Improvement Act of 1999: Hearing before the Subcomm. on Courts
    and Intellectual Property of the H. Comm. on the Judiciary on H.R. 2112 and
    H.R. 1752, 106 Cong. 26-27 (1999) ..................................................................................28

N.D. Tex. R. 1007-1 ................................................................................................................30

Remarks of Director Cliff White before the Del. Bankruptcy American Inn of
    Court (Dec. 11, 2018), available at:
    https://www.justice.gov/ust/speech/remarks-director-cliff-white-delaware-
    bankruptcy-american-inn-court ........................................................................................15

Report of the Judicial Conference Committee on the Administration of the
    Bankruptcy System, at 19 (Sept. 2018) ............................................................................20

Report of the Proceedings of the Judicial Conference of the United States,
(Sept./Oct. 2001) (available at
http://www.uscourts.gov/sites/default/files/2001-09_0.pdf) ...............................................6, 11

U.S. Const. art. I § 8, cl. 1...................................................................................................19, 23

U.S. Const. art. 1, § 8, cl. 4 ................................................................................................ *passim*

John P. Fitzgerald, III, Acting United States Trustee for Region Four (the "United States Trustee"), files this Objection to the *Motion of the Liquidating Trustee to Determine Extent of Liability for Post-Confirmation Quarterly Fees Payable to the United States Trustee Pursuant to 28 U.S.C. § 1930(A)(6)* (the "Motion"). In support of this objection, the United States Trustee respectfully states as follows:

## SUMMARY

1.        In 2017, Congress amended 28 U.S.C. § 1930(a)(6) by adding a new subsection (B) and an additional uncodified provision. That 2017 amendment temporarily increased the amount of quarterly fees to be collected in larger chapter 11 cases, those with quarterly disbursements of $1 million or more each quarter. 28 U.S.C. § 1930(a)(6)(B). Congress passed the 2017 amendment so the Treasury would collect sufficient fees to fully offset the congressional appropriations that fund the cost of the United States Trustee Program, and 18 additional bankruptcy judgeships. It did that so ordinary taxpayers would not bear the costs of the bankruptcy system. This temporary fee increase was effective for disbursements made on or after January 1, 2018. Because of a recent decision from the United States Bankruptcy Court for the Western District of Texas,[1] the Liquidating Trustee now asks this Court to "rule" that (1) the 2017 amendment is unconstitutional as applied to this case, (2) the amount of quarterly fees due should be calculated based on the pre-amendment version of the statute, and (3) "the Trust's rights to seek recovery of any excess amounts previously remitted . . . are preserved." Motion at 14.

---

[1] *In re Buffets, LLC,* No. 16-50557-RBK, 2019 WL 518318 (Bankr. W.D. Tex. Feb. 8, 2019), appeal pending *sub nom. Hobbs v. Buffets Holdings, LLC*, Case No. 5:19-cv-0173-DAE (W.D. Tex.).

2.     The Motion should be denied because Congress's 2017 amendment is constitutional.

## FACTS

### A.     Circuit City Stores, Inc. Files a Chapter 11 Case.

3.     Circuit City Stores, Inc. and certain of its subsidiaries and affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on November 10, 2008.

4.     On September 14, 2010, the Court confirmed a plan of reorganization (the "Plan").

5.     The Court also approved, as provided in the Plan, the formation of the Circuit City Stores, Inc. Liquidating Trust (the "Trust") to be overseen by a Liquidating Trustee.  Mr. Alfred H. Siegel is the Liquidating Trustee.

6.     Under the Plan and the order confirming the Plan, the Liquidating Trustee is required to remit quarterly fees to the Office of the United States Trustee:

> All fees then due and payable pursuant to 28 U.S.C. § 1930, as determined by the Court at the Confirmation Hearing, shall be paid on or before the Effective Date by the Debtors.  All such fees that become due and payable thereafter by a Debtor shall be paid by the Liquidating Trustee.  The Liquidating Trustee shall pay quarterly fees to the U.S. Trustee until the Chapter 11 Cases are closed or converted and/or the entry of final decrees.  The Debtors, through the Liquidating Trust, shall file post-confirmation quarterly reports or any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing in conformance with the U.S. Trustee Guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which shall be paid by the Debtors and/or the Liquidating Trustee.

Doc. No. 8555 at 101.

2

**B.      The Liquidating Trustee challenges the quarterly fees due under 28 U.S.C. § 1930.**

7.      On March 28, 2019, Mr. Siegel, as the Liquidating Trustee, filed the Motion and a notice of constitutional question (Doc. No. 14198).

8.      The Liquidating Trustee challenges the constitutionality of section 1930(a)(6)(B) of title 28 and an uncodified provision that applies section 1930(a)(6)(B) to all disbursements made on or after January 1, 2018.  28 U.S.C. § 1930(a)(6)(B); Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004(c) (uncodified).[2]   The 2017 amendment applies to post-January 1, 2018, disbursements made in this case.

9.      The Liquidating Trustee asks this Court to (1) determine the amount of quarterly fees due; (2) hold that the 2017 amendment is unconstitutional as applied to this case because it violates the uniformity provision of the Bankruptcy Clause of the Constitution, U.S. Const. Art. I, § 8, cl. 4, and (3) hold that the 2017 amendment does not apply to this case because such application would be unconstitutionally retroactive.  Motion ¶ 15.

10.      Through the Motion, the Liquidating Trustee also purports to "reserve[] [the Trust's] rights . . . to seek recovery of all excess amounts previously remitted" based on application of the 2017 amendment, *id*., and asks this Court to hold that "the Trust's rights to seek recovery of any excess amounts previously remitted . . . are preserved," *id*. at 14.

---

[2] Section 1004 of the amendment provides in relevant part:

> (c)  APPLICATION OF AMENDMENTS.—The amendments made by this section shall apply to quarterly fees payable under section 1930(a)(6) of title 28, United States Code, as amended by this section, for disbursements made in any calendar quarter that begins on or after the date of enactment of this Act.

3

**C.      Quarterly fees billed to date.**

11.      According to the Trust's post-confirmation reports, there were total disbursements

of:  $23,284,297 during the quarter ending March 31, 2018 (Doc. 14166); $14,909,055 during the

quarter ending June 30, 2018 (Doc. 14181); $12,530,446 during the quarter ending September 30,

2018 (Doc. 14190); and $3,077,721 during the quarter ending December 31, 2018 (Doc. 14195).

12.      The quarterly fees incurred under section 1930(a)(6) since January 1, 2018 have

fallen below the $250,000 quarterly maximum Congress authorized in the 2017 amendment.

Instead, they were set at 1% of quarterly disbursements.  28 U.S.C. § 1930(a)(6)(B).  Based on the

disbursements noted above, the fees ranged from $30,777 in the fourth quarter of 2018 to $232,843

in the first quarter of 2018.

13.      By comparison, based on the monthly operating reports (cited above, *supra* ¶ 11),

professional fees in 2018 have totaled over $9.5 million, or 17.79% of total disbursements during

that time.

14.      From the commencement of the case through December 31, 2017, based on the

Debtors' monthly operating reports, the quarterly disbursements ranged between a little over $4

million to about $1.8 billion.  A spreadsheet showing disbursements and quarterly fees for this

period is attached as Appendix A.

15.      The quarterly fees incurred during that pre-amendment period ranged between

$10,400 and $30,000.  *See* 28 U.S.C. § 1930(a)(6); Appendix A.  On average, the quarterly fees

were about $22,500 and they totaled $833,400 from the commencement of the case through

December 31, 2017.  *See* Appendix A.  As a percentage of quarterly disbursements, the quarterly

fees ranged between 0.002% and 0.252%.  *Id*.  On average, the quarterly fees for this pre-

amendment period were about 0.096% of quarterly disbursements, and were 0.019% of the total

disbursements during that time. *Id.*

## OBJECTION

16.     The Liquidating Trustee argues Congress's 2017 amendment is unconstitutional for

two reasons.  First, he argues that the 2017 amendment violates the Bankruptcy Clause of the

Constitution, which confers the power on Congress to pass "uniform Laws on the subject of

Bankruptcies." U.S. Const. art. 1, § 8, cl. 4.  In his view, the temporary fees imposed in this district

were unconstitutionally non-uniform because they apply to all disbursements made on or after

January 1, 2018, but the increased fees in six judicial districts located in North Carolina and

Alabama (the "bankruptcy administrator districts") were not collected in bankruptcy cases filed

before October 1, 2018.  Motion ¶ 18 (citing Report of the Judicial Conference, at 11-12 (Sept.

2018)).  Second, the Liquidating Trustee argues that the 2017 amendment should not be read to

apply to cases pending before the 2017 amendment's effective date (January 1, 2018) because

application to pending cases would be unconstitutionally retroactive.  As this case was filed before

January 1, 2018, he concludes the 2017 amendment is unconstitutionally retroactive as applied to

the Trust.

17.     This Court should deny the Liquidating Trustee's request because it fails to satisfy

the heavy burden to overcome the amendment's presumption of constitutionality.

18.     First, Congress's 2017 amendment does not violate the United States Constitution's

Bankruptcy Clause.  Section 1930, as amended, is uniform because 28 U.S.C. § 1930(a)(7)

provides that bankruptcy administrator districts (located in Alabama and North Carolina), may

charge only the same fees as those charged in the other districts under 28 U.S.C. § 1930(a)(6).

5

That is dispositive because the Bankruptcy Clause requires only uniform laws, and not uniform application.  The disparity here flows not from non-uniform laws but human error.  Under a controlling directive of the Judicial Conference of the United States issued in 2001 (the "2001 Directive") fees in bankruptcy administrator districts must go up automatically when Congress increases fees under section 1930(a)(6).[3]  In other words, the 2001 Directive means fees in North Carolina and Alabama increased by operation of the Directive on January 1, 2018, just like it did in the other 48 states.  The Judicial Conference's 2001 Directive was in full force and effect on January 1, 2018.  There is no explanation why the Executive Committee—acting under authority delegated by the Judicial Conference—decided almost eight months later in September 2018 to permit bankruptcy administrator districts to disregard the 2001 Directive and sections 1930(a)(6) and (a)(7) by charging fees only in cases filed on or after October 1, 2018—9 months after the fee increase became effective in those jurisdictions.  The bankruptcy administrators' failure on and after January 1, 2018, to  follow both the Judicial Conference's 2001 Directive and section 1930(a)(7) was human error, not the absence of a uniform law.

19.    Alternatively, the 2017 amendment is not a substantive bankruptcy law of the type subject to the Bankruptcy Clause.  The Supreme Court has explained that the Bankruptcy Clause only encompasses laws that regulate the adjustment of a debtor's obligations to creditors.  The 2017 amendment does not do this; rather, it is a revenue measure to allocate the costs of certain government functions so that they fall on users of the bankruptcy system rather than taxpayers.

---

[3] *See* Report of the Proceedings of the Judicial Conference of the United States, at 45-46 (Sept./Oct. 2001) (available at http://www.uscourts.gov/sites/default/files/2001-09_0.pdf) (attached as Exhibit A).

20.     Second, Congress's October 2017 amendment is not impermissibly retroactive. Instead, the 2017 amendment is prospective because it applies to disbursements beginning January 1, 2018 rather than going back to disbursements made since the petition date.  And even if the amendment were retroactive, it does not violate the Due Process Clause.  Instead, it is a rational measure designed and calibrated to ensure that bankruptcy system users, and not taxpayers, shoulder the "costs" of the system.

## I.     Overview of Chapter 11 Quarterly Fees and the 2017 Amendment.

### A.     Congress established chapter 11 quarterly fees so that the cost of the United States Trustee Program is not borne by taxpayers.

21.     In passing the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978), Congress overhauled a bankruptcy system that had been in place since 1898 because bankruptcy courts were burdened with statutory duties to supervise and administer bankruptcy cases.  H.R. Rep. No. 95-595, at 3 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 5965.  The solution was to remove those duties from the judges and transfer them to a "new system of United States trustees" in the Justice Department.[4] *Id.* at 4, 100.  *See also In re Prines*, 867 F.2d 478, 480 (8th Cir. 1989) ("Congress established the United States Trustee Pilot Program in 1978 to separate—on a trial basis—the administrative and judicial functions previously performed solely by the bankruptcy courts.").  United States Trustees "were given responsibility for many administrative functions, such as appointing private trustees and monitoring their performance,

---

[4]   The United States Trustee Program was established as a pilot program in 1978 and was nationalized in 1986.  *See* Bankruptcy Reform Act of 1978, Pub. L. 95-598, 92 Stat. 2549, (1978); Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. 99-554, 100 Stat. 3088 (1986).

and monitoring cases for signs of fraud or abuse." *Id*. Thus, as envisioned by Congress, the United States Trustee Program was integral to the new bankruptcy system. H.R. Rep. No. 95-595, at 88-109.

22.　　Congress used a variety of "bankruptcy fees" to offset the monies it appropriates to fund the Program. Under this congressional regime, all quarterly fees paid under section 1930(a)(6) of title 28 are deposited into the United States Trustee System Fund established in the U.S. Treasury (the "Fund"), and are used to offset congressional appropriations made to directly fund the Program. *See* 28 U.S.C. § 589a(a) & (b); H.R. Rep. No. 115-130, at 7 (2017), *reprinted in* 2017 U.S.C.C.A.N. 154, 159-160.

23.　　Congress created the Fund at Treasury to ensure the Program's cost would be borne "by the users of the bankruptcy system—at no cost to the taxpayer." *See* H.R. Rep. No. 99-764 at 25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5227, 5238; *see also id*. at 22.

24.　　Before settling on quarterly fees as part of the way to fund the Program, Congress "considered many different possible mechanisms . . . including fees based on a debtor's assets, fees based on a debtor's liabilities, and a flat fee for all debtors." H.R. Rep. No. 99-764 at 26.

25.　　Congress charges graduated quarterly fees based on the size of a chapter 11 case's disbursements because it determined that "[s]maller chapter 11 debtors should pay smaller additional fees than larger debtors; [and] the funding mechanism [in section 1930(a)(6)] ensures that this will be the case." *Id*.

26.　　This regime allows Congress to easily increase or reduce the fees paid under section 1930, so that the amount collected for deposit in the Fund will never be unacceptably small or unreasonably large. The Attorney General is required to report to Congress every year on the

amounts deposited in the Fund and expenditures made from it.  *See* 28 U.S.C. § 589a(d).  If the

amounts collected exceed the appropriations by Congress for a particular year, the excess remains

in the Fund to offset appropriations in subsequent years.  *See* 28 U.S.C. § 589a(c).  Conversely, if

the costs of operating the Program in a particular year exceed the amounts available in the Fund,

monies collected from taxpayers might be required to fund part of the appropriation to the United

States Trustee Program.  *See* 28 U.S.C. § 589a(e).

27.    On no fewer than ten occasions, Congress has amended section 1930(a) or section

589a of title 28, which establishes how the Fund is funded and how those funds may be expended:

- Departments of Commerce, Justice and State, the Judiciary, and Related Agencies
  Appropriations Act, 1990, Pub. L. No. 101-162, tit. II, § 406, 103 Stat. 988, 1016
  (1989) (increasing filing fee);

- Departments of Commerce, Justice and State, the Judiciary, and Related Agencies
  Appropriations Act, 1992, Pub. L. No. 102-140, tit. I, § 111, 105 Stat. 782, 795
  (1991) (increasing filing fee and quarterly fees, and directing deposit of a
  percentage of fees into Fund);

- Departments of Commerce, Justice, and State, the Judiciary and Related Agencies
  Appropriations Act, 1994, Pub. L. No. 103-121, tit. I, § 111, 107 Stat. 1153,
  1164-65 (1993) (increasing filing fees, changing percentage of fees allocated to
  Fund, and requiring Judicial Conference to report on bankruptcy fee system and
  possible impact of using graduated fee system based on assets, liabilities, or both,
  of debtor);

- Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, tit. I,
  § 109, 110 Stat. 3009, 3009-18-3009-19 (1996) (increasing quarterly fees and
  clarifying that quarterly fees requirement applies regardless of confirmation status
  of debtor's reorganization plan);

- Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, §§ 102 -105, 114
  Stat. 2410 (2000) (increasing filing fee and conversion fee, and providing for fees
  under subsection (a)(7));

- Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No.
  109-8, tit. III, § 325, 119 Stat. 23, 98-99 (2005), as amended by Pub. L. No. 109-

13, § 6058, 119 Stat. 297 (2005) (increasing filing fees and changing percentage of fees allocated to Fund);

- Deficit Reduction Act of 2005, Pub. L. No. 109-171, tit. X, § 10101, 120 Stat. 4, 184 (2006) (increasing filing fees);

- Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. B, tit. II, §§ 212, 213, 121 Stat. 1844, 1914 (2007) (adjusting quarterly fees and directing deposit of fines into Fund);

- Temporary Bankruptcy Judgeships Extension Act of 2012, Pub. L. No. 112-121, § 3, 126 Stat. 346, 348-349 (2012) (increasing filing fee and decreasing allocation of fees into Fund);

- Additional Supplemental Appropriations for Disaster Relief Requirements Act, Pub. L. No. 115-72, div. B, § 1004, 131 Stat. 1224, 1232 (2017) (increasing quarterly fees for largest chapter 11 debtors).

28.    All jurisdictions participate in the United States Trustee Program except the North Carolina and Alabama bankruptcy administrator districts. *See* Pub. L. No. 99-554 (1986); Pub. L. No. 106-518, § 501 (2000). In those districts, Judicial Branch employees known as bankruptcy administrators oversee chapter 11 cases.

29.    Although bankruptcy administrators initially could not charge quarterly fees, Congress fixed that in 2001 by enacting section 1930(a)(7) of title 28. *See* Federal Courts Improvements Act of 2000, Pub. L. No. 106-518, § 105, 114 Stat. 2410 (2000).

30.    Section 1930(a)(7) provides that in the bankruptcy administrator districts "the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees *equal* to those imposed by paragraph (6) of this subsection." 28 U.S.C. § 1930(a)(7) (emphasis added). It does not permit them to charge amounts that differ from those set by section 1930(a)(6). *Id*. It permits only fees that are equal to section 1930(a)(6).

10

31.     Promptly upon section 1930(a)(7)'s enactment, the Judicial Conference issued its 2001 Directive approving the imposition of quarterly fees in bankruptcy administrator districts "in the amounts specified in 28 U.S.C. § 1930, *as those amounts may be amended from time to time.*" Report of the Proceedings of the Judicial Conference of the United States (Sept./Oct. 2001) at 45-46 (emphasis added) (available at http://www.uscourts.gov/sites/default/files/2001-09_0.pdf) (attached as Exhibit A).   The 2001 Directive automatically approved future changes to the quarterly fees charged in bankruptcy administrator districts so they immediately mirror amendments to section 1930(a)(6).  *Id.* (noting fees in bankruptcy administrator districts would go up when the statute was amended "from time to time").

32.     By its 2001 Directive imposing the same bankruptcy fees in North Carolina and Alabama as set by section 1930(a)(6), as amended from time to time, the Judicial Conference guaranteed that those districts would always be in compliance with section 1930(a)(7).  Whenever Congress amended section 1930(a)(6) to increase quarterly fees, the Judicial Conference's 2001 Directive ensured that the bankruptcy administrators in North Carolina and Alabama were in compliance with section 1930(a)(7) by increasing fees to "equal" those required by section 1930(a)(6).

**B.     Congress temporarily increased fees in 2017 to avoid a deficit in the United States Trustee System Fund and to fund additional judgeships.**

33.     In October 2017, Congress amended 28 U.S.C. § 1930(a)(6) to increase the quarterly fees where both the disbursements equal or exceed $1 million during a quarter and the Fund balance at Treasury is below $200 million in the most recent fiscal year.  *See* H.R. Rep. No. 115-130, at 7-8.  The new subparagraph B provides:

11

(B) During each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund as of September 30 of the most recent full fiscal year is less than $200,000,000, the quarterly fee payable for a quarter in which disbursements equal or exceed $1,000,000 shall be the lesser of 1 percent of such disbursements or $250,000.

28 U.S.C. § 1930(a)(6)(B).

34.    The 2017 amendment provides that it "shall apply to quarterly fees payable under section 1930(a)(6) . . . for disbursements made in any calendar quarter that begins on or after the date of enactment" of the amendment.  Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004(c) (uncodified).  That quarter began on January 1, 2018.  *Id*.

35.    Congress passed this most recent amendment following a seven-year decline in bankruptcy filings.  *See* Dep't of Justice U.S. Tr. Program FY 2018 Performance Budget Cong. Submission at 9, available at https://www.justice.gov/file/968761/download (last visited April 10, 2019) ("UST FY 2018 Submission") (showing consistent decrease in quarterly fee and filing fee collections over past several years).  The resulting decrease in fees collected under section 1930(a) exhausted the Fund's unrestricted balance at Treasury during fiscal year 2017.  *See* Dep't of Justice U.S. Tr. Program FY 2019 Performance Budget Cong. Submission at 9, available at https://www.justice.gov/jmd/page/file/1034391/download (last visited April 10, 2019).  Without the amendment, the Fund was predicted to have a zero balance in fiscal year 2018.  *See* UST FY 2018 Submission at 9.  The remaining fund balance and fee collections were projected to fall $92 million short of offsetting the funds Congress appropriated for the Program in fiscal year 2017. *See id*.

36.    Because the Program's appropriations are offset from the Fund, *id*. at 8, any shortfall in offsetting the appropriations results in taxpayers bearing the burden of those

operational costs.  Without the Fund surplus from prior years, the Fund would not have been able

to fully offset appropriations to the United States Trustee Program.  *See id*. at 9 ("In FY 2016,

offsetting collections covered approximately 66 percent of the Program's appropriation, with the

remainder being drawn from the Fund.").

37.    Given Congress's longstanding intention that collections should be sufficient to

offset Program appropriations, on October 26, 2017, Congress temporarily increased the cap on

the amount of quarterly fees collected in the largest chapter 11 cases.  Pub. L. No. 115-72, § 1004;

*see* H.R. Rep. No. 115-130, at 7-8.  Congress specified that the temporary fee increase would

become effective for disbursements made in the first quarter beginning after the statute's

enactment—that is, for the quarter starting on January 1, 2018—which was more than two months

after the enactment.  *See* Pub. L. No. 115-72, div. B, § 1004(c), 131 Stat. at 1232.

38.    A May 17, 2017 House Report states that the bill that led to the 2017 amendment

sought to convert 14 temporary bankruptcy judgeships to permanent judgeships and add four new

bankruptcy judgeships.[5]  H.R. Rep. No. 115-130, at 7-8.  The Report explains that the increase in

the quarterly fees for large chapter 11 cases is intended to cover the costs of the judgeships, in

addition to providing separately needed funds for the operations of the United States Trustee

Program.[6]

---

[5] H.R. 2266 was later amended to extend the temporary judgeships rather than converting them to
permanent judgeships.

[6] *See* H.R. Rep. No. 115-130, at 8 ("The funds generated by the fee increase will cover both the
costs of this bill and separately needed funds for the operation of the U.S. Trustee Program."); *id*.
at 7 (noting "inclusion of an increase in the quarterly U.S. Trustee fees for large chapter 11 cases
to serve as a funding offset for the cost of the judgeships").  The Report noted that Congress had

39.    The House Report states that the Judiciary Committee expected "based on informal estimates by CBO" that the increased quarterly fees would increase revenues "by an amount sufficient to fully offset the increases in direct spending caused by the bill." *Id*. at 9.  The day after the House Report was issued, the Congressional Budget Office issued a Cost Estimate, which reflects that its calculations assume that the increased fees would apply to cases pending on the amendment's effective date.  For example, the Cost Estimate states that the amendment would increase fees paid "by entities that are *currently* in Chapter 11 bankruptcy and that have disbursements of more than $1 million per quarter."  *See* Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017, at 1 (May 18, 2017), available at https://www.cbo.gov/system/files/2018-07/52739-hr2266.pdf (last accessed May 6, 2019) (attached as Exhibit B); *see also id*. ("The act also would adjust the formula used to set certain quarterly fees paid by businesses involved in *ongoing* Chapter 11 bankruptcy cases . . . ."); *id*. at 5 ("H.R. 2266 would . . . increase[e] the amount of fees paid to the DOJ by entities *that are already in bankruptcy* and that have disbursements . . . of more than $1 million per quarter.") (emphasis added); *id*. at 6 ("Some portion of those [increased quarterly fee] collections would be from entities *already in bankruptcy* . . .") (emphasis added).

40.    Congress exercised its legislative judgment in designing the temporary fee increase. The 2017 amendment affected only those chapter 11 cases in which disbursements during a quarter equal or exceed $1 million.  28 U.S.C. § 1930(a)(6)(B).  Quarterly fees in those cases were set to the lesser of 1 percent of their disbursements or $250,000.  *Id*.

---

previously introduced a similar bill that did not include funding for the judgeships, which was not enacted.  *Id*. at 7.

41.     Based on historical fee and disbursement patterns, the government estimates that only about 10% of chapter 11 debtors have disbursements of $1 million or more and only about 1% of chapter 11 debtors would be assessed the maximum fee.  *See* Remarks of Director Cliff White before the Del. Bankruptcy American Inn of Court (Dec. 11, 2018), available at: https://www.justice.gov/ust/speech/remarks-director-cliff-white-delaware-bankruptcy-american-inn-court (last visited April 10, 2019).  The amendment provides for the fees to revert to their previous levels when the Fund equals or surpasses $200 million at the end of a fiscal year.  28 U.S.C. § 1930(a)(6)(B); *see* H.R. Rep. No. 115-130, at 8.  Regardless, the increase terminates at the end of fiscal year 2022. *Id*.

42.     Notably, the 2017 amendment made the percentage charged in the largest chapter 11 cases more consistent with the percentages charged in the smaller cases.  The following chart shows the relative percentages before the amendment:[7]

---

[7] The chart calculates the fees due as a percentage of the disbursements as set forth in the statute, but rounds to the nearest hundredth.

| Section 1930(a)(6)(2017) | Disbursements | Fee | Percentage Range |
|---|---|---|---|
| Tier 1 | $            - | $           325.00 | 32500% |
|  | $       14,999.00 | $           325.00 | 2.17% |
| Tier 2 | $       15,000.00 | $           650.00 | 4.33% |
|  | $       74,999.00 | $           650.00 | 0.87% |
| Tier 3 | $       75,000.00 | $           975.00 | 1.30% |
|  | $      149,999.00 | $           975.00 | 0.65% |
| Tier 4 | $      150,000.00 | $         1,625.00 | 1.08% |
|  | $      224,999.00 | $         1,625.00 | 0.72% |
| Tier 5 | $      250,000.00 | $         1,950.00 | 0.78% |
|  | $      299,999.00 | $         1,950.00 | 0.65% |
| Tier 6 | $      300,000.00 | $         4,875.00 | 1.63% |
|  | $      999,999.00 | $         4,875.00 | 0.49% |
| Tier 7 | $    1,000,000.00 | $         6,500.00 | 0.65% |
|  | $    1,999,999.00 | $         6,500.00 | 0.33% |
| Tier 8 | $    2,000,000.00 | $         9,750.00 | 0.49% |
|  | $    2,999,999.00 | $         9,750.00 | 0.33% |
| Tier 9 | $    3,000,000.00 | $        10,400.00 | 0.35% |
|  | $    4,999,999.00 | $        10,400.00 | 0.21% |
| Tier 10 | $    5,000,000.00 | $        13,000.00 | 0.26% |
|  | $   14,999,999.00 | $        13,000.00 | 0.09% |
| Tier 11 | $   15,000,000.00 | $        20,000.00 | 0.13% |
|  | $   29,000,000.00 | $        20,000.00 | 0.07% |
| Tier 12 | $   30,000,000.00 | $        30,000.00 | 0.10% |

43.     After the 2017 amendment, the percentages for fees in cases with $1 million or

more in quarterly disbursements are as follows:

| Tier 7 | $    1,000,000.00 | $       10,000.00 | 1.00% |
|---|---|---|---|
| 28 USC 1930(a)(6)(A) | $   25,000,000.00 | $      250,000.00 | 1.00% |
|  | $   30,000,000.00 | $      250,000.00 | 0.83% |

44.     In cases with disbursements of less than $1 million, the fees range between 0.49%

to more than 4% of quarterly disbursements.  By contrast, before the 2017 amendment, in cases

with $1 million or more in disbursements, the fees ranged between 0.1% to 0.65%.  In addition,

before the amendment, in cases with $1 million or more in disbursements, the fees were never

*more* than 0.65%, while the fees were never *less* than 0.65% in cases with less than $300,000 in

disbursements.   Here, the  pre-amendment fees  averaged  only  about  0.096%  of  quarterly

16

disbursements and were only about 0.019% of the total disbursements through December 31, 2017.

*See supra* ¶ 15.  Under the 2017 amendment, those high-disbursement cases still never pay more

than 1%.

## II.    The 2017 Amendment Does Not Violate the Bankruptcy Clause.

45.    Congress did not violate the Bankruptcy Clause when it amended section

1930(a)(6) of title 28.  The Constitution provides that Congress "shall have the power . . . [t]o

establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  U.S.

Const. art. 1, § 8, cl. 4.[8]  Three things must be true for the Bankruptcy Clause to be violated: the

subject of the challenge is a "Law," the law is not "uniform," and the law is "on the subject of

Bankruptcies."  *Id.*

46.    None is true here.  First, the statute at issue is uniform because it requires that any

fees charged in the bankruptcy administrator districts under section 1930(a)(7) must be "equal" to

those imposed under section 1930(a)(6).  Second, the alleged lack of uniformity—the failure to

collect the section 1930(a)(6) fees in bankruptcy administrator districts—is not the result of a law

but human error in allowing fees under section 1930(a)(7) to differ rather than "equal" those under

section 1930(a)(6)'s 2017 amendment.  Third, the 2017 amendment is not "on the subject of

---

[8] The Motion also cites Article I, Section 8, clause 3 of the Constitution, which requires "all Duties, Imposts and Excises shall be uniform throughout the United States."  Motion ¶ 16 (quoting U.S. Const. art. I § 8, cl. 1).  The Liquidating Trustee does not explain why he believes the quarterly fees established by section 1930 constitute a duty, impost or excise within the scope of this clause. *Id.*  They do not.  Rather, they are user fees that do not come within the scope of this constitutional provision.  *See Augusta Towing Co. v. United States*, 5 Cl. Ct. 160, 167 (Ct. Cl. 1984) ("A user charge is one type of revenue measure designed to compensate the Government for supplying a benefit to the user and, as such, is not subject to the constitutional limitations on the Government's power to tax, including the Tax Uniformity clause.").

Bankruptcies" under Supreme Court precedent because it does not alter any debtor or creditor rights or remedies under the Bankruptcy Code.

**A.      Congress's 2017 quarterly fee amendment does not violate the Bankruptcy Clause because the law is uniform.**

47.      The Bankruptcy Clause authorizes Congress to pass "uniform" laws.  U.S. Const. art. 1, § 8, cl. 4.   But there is "flexibility inherent" in the Bankruptcy Clause that tolerates significant differences in application of bankruptcy laws.  *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 158 (1974) (rejecting uniformity challenge to statute that applied only in a single statutorily defined region because "it overlooks the flexibility inherent in the constitutional provision").

48.      The principal purpose of the Bankruptcy Clause was to enable Congress to pass a nationwide bankruptcy law enforceable among the states—because, "[g]iven the sovereign status of the States, questions were raised as to whether one State had to recognize the relief given to a debtor by another State"—and to prohibit Congress from enacting private bankruptcy laws.  *See Ry. Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457, 472 (1982); *see also In re Reese*, 91 F.3d 37, 39 (7th Cir. 1996) ("The limited legislative history of the uniformity clause, plus the decisions by the Supreme Court interpreting it . . . establish that the clause forbids only two things.  The first is arbitrary regional differences in the provisions of the Bankruptcy Code.  The second is private bankruptcy bills—that is, bankruptcy laws limited to a single debtor—or the equivalent.").

49.    Given the history and purpose of the Bankruptcy Clause, and given the difference

in its language as compared to the tax uniformity clause, U.S. Const. art. I, § 8, cl. 1,[9] the Sixth

Circuit has explained that "the term 'uniform' was intended to grant an additional power at the

expense of the fifty states, rather than to limit the scope of Congress's delegated powers." *See*

*Schultz v. United States*, 529 F.3d 343, 356 (6th Cir. 2008).

50.    Only once in the nation's history has the Supreme Court held that a statute violated

the Bankruptcy Clause.  It did so because the challenged act, by its terms, applied to only one

regional bankrupt railroad, therefore, the statute was "nothing more than a private bill," which the

Framers sought to prevent by adopting the Bankruptcy Clause.  *Gibbons*, 455 U.S. at 470-71; *see*

*id.* at 472.

51.    Here, section 1930, including the 2017 amendment, applies uniformly.  The statute

sets a graduated amount of fees for all cases under chapter 11, and the amendment governs fees in

all chapter 11 cases with quarterly disbursements equal to or exceeding $1 million.

52.    The Liquidating Trustee argues that the 2017 amendment is not uniform because

the Judicial Conference did not immediately adopt the fee increase in bankruptcy administrator

districts as of January 1, 2018, but instead only authorized the increase to begin in October 2018.

Motion ¶¶ 18-19.  However, nothing in the 2017 amendment purports to exclude chapter 11 cases

in Alabama and North Carolina from the fee increases.  Neither of those states is even mentioned

in the amendment in connection with quarterly fees.

---

[9] This clause provides: "The Congress shall have power to lay and collect taxes, duties, imposts
and excises, to pay the debts and provide for the common defense and general welfare of the United
States; but all duties, imposts and excises *shall be uniform* throughout the United States."  *Id.*
(emphasis added).

19

53.     Nor is there any lack of uniformity simply because the fees in North Carolina and Alabama are governed by a different subparagraph of section 1930(a).   Section 1930(a)(7) provides that in the bankruptcy administrator districts "the Judicial Conference of the United States may require the debtor in a case under chapter 11 of title 11 to pay fees *equal* to those imposed by paragraph (6) of this subsection."   28 U.S.C. § 1930(a)(7) (emphasis added).

54.     In other words, subsection (a)(7) mandates that any fees charged in these districts must be the same as—"equal to"—those prescribed in subsection (a)(6).   The law is uniform in its prescription of the amount of fees due in chapter 11 cases.

55.     The statute itself thus refutes the Liquidating Trustee's assertion that "the Bankruptcy Administrator ('BA') program utilized in North Carolina and Alabama was not subject to the 1930 fee increase amendment approved by Congress in 2017."   Motion ¶ 16.   Likewise incorrect is the statement of the *Buffets* court that the 2017 amendment "increased quarterly fees only in the UST program."   *In re Buffets, LLC,* No. 16-50557-RBK, 2019 WL 518318, at *4 (Bankr. W.D. Tex. Feb. 8, 2019) (cited in Motion ¶ 19).

56.     Because section 1930(a)(7) authorizes the Judicial Conference only to charge fees "equal to those imposed by [section 1930(a)(6)]," the 2017 amendment applies to the bankruptcy administrator districts and there is no lack of uniformity.

57.     The Judicial Conference's decision to enact its 2001 Directive underscores this. The 2001 Directive requires that fees in bankruptcy administrator districts be charged in the amount specified in section 1930(a)(6), as it is amended from time to time.   The 2001 Directive was still in full force and effect on January 1, 2018, when the 2017 amendment became effective. *See* Report of the Judicial Conference Committee on the Administration of the Bankruptcy System,

20

at 19 (Sept. 2018) ("2018 Judicial Conference Committee Report") (attached as Exhibit C)[10] (referring to 2001 approval).

58.    As of January 1, 2018, then, the 2001 Directive commanded bankruptcy administrators to charge the same fees as charged in the rest of the country: those set forth in section 1930(a)(6), as amended in 2017.

59.    As Eighth Circuit precedent makes plain, even if there were a statutory difference in quarterly fees—which there is not—(and even if section 1930(a)(6) were a law "on the subject of Bankruptcies," which it is not, *see infra* Part II.C.) such a difference would not violate the Bankruptcy Clause.  When Congress first implemented the United States Trustee Program in 1978, it did so initially as a pilot program.  *See In re Prines*, 867 F.2d 478, 480 (8th Cir. 1989).  In 1986, Congress expanded the Program nationwide.  *Id*.  The law that expanded the Program had different effective dates for districts that participated in the pilot program than for those that did not participate in it.  *Id*. at 482-83.

60.    The Eighth Circuit held that the different fees charged in those various districts did not violate the uniformity requirement of the Bankruptcy Clause.  *Id*. at 484-85.

61.    The Eighth Circuit noted that "[a]rguably, debtors are being treated equally by the statutory scheme, since pending cases are subject to the quarterly fee assessment only if the trustee has authority over them."  *Id*. at 485.  *See also In re Miles*, 330 B.R. 861, 863 (Bankr. M.D. Ga. 2005) (holding debtors failed to show cases are administered any differently between bankruptcy administrator and United States Trustee districts and "law could be construed as uniform if the

---

[10] This Report was included in the appendix of the appellee in a pending appeal, *Cranberry Growers Coop. v. Layng*, Case No. 18-3289 (7th Cir.).

programs operate the same"). The same is true here because the only alleged lack of uniformity is

between districts over which United States Trustees have authority and those over which they do

not.

62.    The Eighth Circuit went on to hold that, even if this application was not uniform,

that non-uniformity was not a constitutional violation because "the Supreme Court has held . . .

[that] the appropriate standard for measuring the propriety of classifications in bankruptcy

legislation to be 'that of rational justification.'" *In re Prines*, 867 F.2d at 485 (quoting *United

States v. Kras*, 409 U.S. 434, 446 (1973)).[11]  The Eighth Circuit thus found that, even "[a]ssuming

unequal treatment, . . . this statutory scheme is rationally related to the legitimate governmental

interest of establishing a nationwide self-supporting trustee system." *Id*.  Here, too, the 2017

amendment easily passes rational basis review. *See infra* Part III.C.1.

**B.    An *ultra vires* failure to enforce section 1930 does not violate the Bankruptcy
Clause.**

63.    In addition, the Bankruptcy Clause does not apply to the difference in fees about

which the Liquidating Trustee complains because that difference does not result from a law. The

Bankruptcy Clause, by its terms, applies only to "Laws," i.e., acts of Congress. U.S. Const. art. 1,

§ 8, cl. 4.

---

[11] *Cf. United States v. Ptasynski*, 462 U.S. 74, 86 (1983) (upholding geographically defined class
against tax uniformity challenge, because "[w]here, as here, Congress has exercised its considered
judgment with respect to an enormously complex problem," courts should be "reluctant to disturb
its determination"); *but see Schultz*, 529 F.3d at 355 (finding that a lower level of scrutiny should
apply to the uniformity requirement of the Bankruptcy Clause than applied in *Ptasynski* to the tax
uniformity clause).

64.     Accordingly, an *ultra vires* failure to enforce a law does not render that law
unconstitutionally non-uniform. *Cf. Rosenberg v. United States*, 72 Fed. Cl. 387, 395-96 (Ct. Fed.
Cl. 2006) (holding that complaint alleging that IRS engaged in "*ultra vires* and nonuniform
collection" of a tax did not allege a violation of the tax uniformity clause, U.S. Const., art. I, § 8,
cl. 1, because "[t]he Uniformity Clause . . . is a limitation on legislative, not executive, action");
*Peony Park v. O'Malley*, 121 F. Supp. 690 (D. Neb. 1954) (rejecting tax uniformity challenge
where statute was uniform but enforcement was not), *aff'd*, 223 F.2d 668 (8th Cir. 1955).

65.     Section 1930(a)(7) authorizes the Judicial Conference only to charge fees "*equal
to* those imposed by paragraph (6) . . . ." 28 U.S.C. § 1930(a)(7) (emphasis added).  The statute
gives the Judicial Conference only two options: (1) charge quarterly fees equal to quarterly fees
specified by section 1930(a)(6); or (2) do not charge any quarterly fees at all.  It does not authorize
charging fees inconsistent with section 1930(a)(6).

66.     In 2001, the Judicial Conference elected in its Directive to charge quarterly fees in
bankruptcy administrator districts, and the 2001 Directive required them to match those Congress
imposed under section 1930(a)(6).  For the next 16 years, quarterly fees imposed in bankruptcy
administrator districts and United States Trustee districts were consistent, including when fees
went up from time to time.

67.     The Judicial Conference's 2001 Directive imposing fees in the amount specified in
section 1930(a)(6), as amended from time to time, was still in effect on January 1, 2018, when the
2017 amendment became effective and was still mandatory in September of 2018.  *See* 2018
Judicial Conference Committee Report, at 19 (referring to 2001 approval).  Nothing in either the

23

statute or the Judicial Conference's 2001 Directive permitted charging fees less than those set by

section 1930(a)(6) between January 1, 2018 and September 30, 2018.

68.     The Liquidating Trustee's grievance therefore, is not that a federal statute is non-

uniform.  The Bankruptcy Clause requires only uniform laws, not uniform implementation.  U.S.

Const. art. 1, § 8, cl. 4.  The 2017 amendment is uniform on its face.  The failure of the bankruptcy

administrators to comply with the Judicial Conference 2001 Directive and with sections 1930(a)(6)

and (a)(7) is not a problem of constitutional dimension and cannot justify striking down a

congressional enactment.[12]

### C.     Alternatively, the quarterly fees do not violate the Bankruptcy Clause because section 1930(a)(6) is not a law "on the subject of Bankruptcies."

69.     To be subject to the Bankruptcy Clause, a law also must be one "on the subject of

Bankruptcies."  U.S. Const. art. 1, § 8, cl. 4.  The Supreme Court has defined "bankruptcy" as the

"'subject of the relations between [a] . . . debtor and his creditors, extending to his and their relief.'"

*Gibbons,* 455 U.S. at 466 (quoting *Hanover Nat'l Bank v. Moyses,* 186 U.S. 181, 186 (1902)); *see*

*also Ashton v. Cameron Cnty. Water Imp. Dist. No. 1,* 298 U.S. 513, 536-37 (1936) (stating that

the Court's consistent reading of the Bankruptcy Clause is that it says, in substance: "Congress

shall have power to establish uniform laws on the subject of any person's general inability to pay

his debts throughout the United States") (Cardozo, J., dissenting) (internal quotation marks

omitted).

---

[12] The Liquidating Trustee has not challenged the bankruptcy administrators' implementation of the amendment and lacks standing to do so in this case.

70.    In other words, "Congress' power under the Bankruptcy Clause 'contemplate[s] an adjustment of a failing debtor's obligations.'" *Gibbons*, 455 U.S. at 466 (quoting *Hanover Nat'l Bank*, 186 U.S. at 186).

71.    The quarterly fee statute does not violate the Bankruptcy Clause because it is not a law "on the subject of Bankruptcies," and thus the Bankruptcy Clause does not apply to it.  The quarterly fee is merely a funding mechanism for the efficient administration of bankruptcy matters and to pay for bankruptcy judgeships—it does not alter substantive bankruptcy law.  The amendment does not govern the relations between creditor and debtor.  *See Gibbons,* 455 U.S. at 466; *In re Reese*, 91 F.3d at 39-40; *cf. U.S. Trustee v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 557 (3d Cir. 1999) ("Congress's mandate requiring payment of post-confirmation quarterly fees is not an effort to alter the terms of pre-existing debts; rather, it creates a new expense that did not exist before the plan was confirmed.") (internal quotations omitted).  Indeed, the Bankruptcy Code itself remains unchanged by the 2017 amendment.  *See In re Reese*, 91 F.3d at 39 (holding Bankruptcy Clause forbids "arbitrary regional differences in the provisions of the Bankruptcy Code").  A change to the fees charged is a matter of judicial administration and appropriations, not the substantive law of bankruptcy.

**D.    Like *Prines*, *Victoria Farms* supports the government's position.**

72.    The *Buffets* decision ignores the Eighth Circuit's directly relevant *Prines* decision, which upheld section 1930(a)(6) against a uniformity challenge, choosing instead to rely upon a Ninth Circuit case, *St. Angelo v. Victoria Farms*, 38 F.3d 1525 (9th Cir. 1994), *as amended by* 46 F.3 969 (1995).  *In re Buffets, LLC,* 2019 WL 518318, at *3-4 (quoted in Motion ¶ 19).  *See supra* ¶¶ 59-62 (discussing *Prines*, 867 F.2d at 484-85).

25

73.    *Buffets*'s reliance on *Victoria Farms* is misplaced.  In focusing solely on *Victoria Farms*, the *Buffets* court failed to recognize that the *Victoria Farms* decision addressed the validity of a different provision, section 317(a) of the Judicial Improvements Act of 1990, which extended the time for Alabama and North Carolina to implement the United States Trustee Program.

74.    Reliance on *Victoria Farms* to invalidate the 2017 amendment is inappropriate for three other reasons, as well.  First, the result in *Victoria Farms* supports the government's position. The Ninth Circuit in *Victoria Farms* did *not* invalidate section 1930(a)(6) and did not permit the debtor to evade its quarterly fees despite what the court perceived to be a lack of uniformity in the implementation of the United States Trustee Program.  Second, unlike the situation at the time of the *Victoria Farms* decision, there is no longer any statutory difference in the amount of quarterly fees permitted to be charged.  Finally, *Victoria Farms* does not support invalidating the 2017 amendment because its uniformity decision was incorrect.

**1.    *Victoria Farms* enforced the quarterly fee requirement.**

75.    In *Victoria Farms*, the Ninth Circuit addressed a challenge to section 1930(a)(6) at a time when there was no provision for quarterly fees in the bankruptcy administrator districts. When Congress decided to expand the United States Trustee Program in 1986, North Carolina and Alabama initially were not required to implement the Program until 1992.  *Victoria Farms*, 38 F.3d at 1529.  Through section 317(a) of the Judicial Improvements Act of 1990, Pub. L. No. 101-650, 101st Cong., 2d Sess. § 317(a) (1990), Congress extended the deadline for North Carolina and Alabama to implement the United States Trustee Program until 2002.  *Id.*  In a divided opinion, the *Victoria Farms* majority held that the bifurcated system under which United States Trustees administered bankruptcy cases and charged quarterly fees in 48 states, but bankruptcy

26

administrators administered bankruptcy cases and did not charge quarterly fees in the other two

states, violated the Bankruptcy Clause.  *Id*. at 1532.[13]

76.    Notably, however, the Ninth Circuit "adher[ed] to the principle of judicial restraint"

and did not strike down the quarterly fees provision.    *Id*.    And it did not hold that section

1930(a)(6), a revenue provision, violated the Bankruptcy Clause.

77.    Rather, the court specifically "decline[d] to invalidate all of section 1930 or any

other part of the statutory scheme governing the U.S. Trustee system."  *Id.* at 1533.  Instead, the

Ninth Circuit struck down section 317(a), which extended the time for North Carolina and

Alabama to opt-in to the United States Trustee system.  The Ninth Circuit stated that by doing so

"we leave in place a uniform law governing bankruptcy throughout the nation."  *Id*.

78.    Having cured the perceived uniformity problem, the court proceeded to reverse the

bankruptcy and district courts' decisions and ordered the debtor to pay all of the quarterly fees

owed under a plain language reading of the statute.  *Id.* at 1534.  That the system was not, in the

eyes of the Ninth Circuit, uniform during the quarters at issue had no bearing on the debtor's duty

to pay the quarterly fees.

### 2.    The Liquidating Trustee does not dispute that later amendments to the statute cured any lack of uniformity.

79.    As noted above, at the time of the *Victoria Farms* decision, section 1930 did not

include any provision for quarterly fees in chapter 11 cases pending in bankruptcy administrator

---

[13] The Liquidating Trustee challenges only the differential in fees; he does not allege that excepting the bankruptcy administrator districts from the United States Trustee Program violates the Constitution.    Nor could he.    As discussed above, *see supra* Part II.C, laws governing the administration of the court system are not laws "on the subject of Bankruptcies" because they do not alter the rights or remedies available to debtors or creditors.

27

districts.  In response to *Victoria Farms*, the Judicial Conference recommended, and Congress

adopted, a provision for the imposition of quarterly fees in bankruptcy administrator districts as a

way to address the perceived uniformity problem.

80.    In 1999, Congress heard testimony by the Judicial Conference recommending that

Congress authorize the collection of quarterly fees in bankruptcy administrator districts.  *See*

Multidistrict, Multiparty, Multiforum Trial Jurisdiction Act of 1999 and Federal Courts

Improvement Act of 1999: Hearing before the Subcomm. on Courts and Intellectual Property of

the H. Comm. on the Judiciary on H.R. 2112 and H.R. 1752,[14] 106 Cong. 26-27 (1999) ("1999 H.

Subcomm. Hearing").  That testimony explained that "[a]t its March 1996 proceeding, the Judicial

Conference determined that implementing the establishment of chapter 11 quarterly fees in the

bankruptcy administrator districts would eliminate any *Victoria Farms* problem."  *Id*. at 26.

81.    In 2001, Congress granted the Judicial Conference's request and amended section

1930 to add section 1930(a)(7).  Federal Courts Improvements Act of 2000, Pub. L. No. 106-518,

§ 105, 114 Stat. 2410 (2000).[15]  As discussed above, this amendment allows only fees "equal to"

those set forth in section 1930(a)(6)—it does not permit imposition of a different amount of fees.

28 U.S.C. § 1930(a)(7).

82.    The Liquidating Trustee does not dispute that the addition of section 1930(a)(7)

was designed to, and did, cure any possible lack of uniformity.  *See* Motion ¶ 19.  Rather, he

complains of the failure to implement the 2017 amendment in the bankruptcy administrator

---

[14] H.R. 1752 is the House of Representative's companion bill to the enacted Senate bill.

[15] In that same legislation, Congress removed the deadline for Alabama and North Carolina to
adopt the United States Trustee system.  *See* Pub. L. No. 106-518, § 501, 114 Stat. 2410, 2421
(2000).

districts, but that failure is not a result of the statute, and thus provides no basis for finding that the statute is constitutionally infirm.  *See supra* Part II.B.

### 3. *Victoria Farms* did not rule on a revenue provision like the 2017 amendment, which is not a law "on the subject of Bankruptcies."

83.    *Victoria Farms*' conclusion that the extension of time for districts in Alabama and North Carolina to implement the United States Trustee Program was a law "on the subject of Bankruptcies," 38 F.3d at 1530-31, does not support holding that the 2017 amendment is such a law.

84.    The 2017 amendment is a revenue provision—it recoups funds for the U.S. Treasury to offset congressional appropriations to the Justice Department for the United States Trustee Program—rather than "a Law on the subject of Bankruptcies."  Without question, many federal laws affect the financial status of debtors, but neither Congress nor the Supreme Court has ever characterized such revenue provisions as laws "on the subject of Bankruptcies."  To do so would expand the Bankruptcy Clause far beyond its historic role and the courts' understanding of it.

85.    *Victoria Farms* did not analyze whether revenue provisions, such as section 1930(a)(6), are laws on the subject of bankruptcies within the scope of the Bankruptcy Clause, much less hold that they are.  *See* 38 F.3d at 1530-31 (discussing whether the United States Trustee Program, and the extension of time for Alabama and North Carolina to implement it, is such a law).

86.    The *Victoria Farms*' majority erroneously focused on the effect of the statute to determine whether it is subject to the Bankruptcy Clause.  *See Victoria Farms*, 38 F.3d at 1530-31

29

(reasoning that the statute establishing the United States Trustee system is a law on the subject of bankruptcies because it has a "direct effect" upon debtors and creditors and because higher fees have "a concrete effect" on the relief available to creditors).  Under Supreme Court precedent, the relevant question instead is whether a statute is a law that "contemplate[s] an adjustment of a failing debtor's obligations.'"  *Gibbons*, 455 U.S. at 466 (quoting *Hanover Nat'l Bank*, 186 U.S. at 186).

87.    The fact that a law has an effect on a bankruptcy right or remedy cannot mean that, without more, the law is one "on the subject of Bankruptcies" within the scope of the Bankruptcy Clause.  Any statute imposing or increasing a financial obligation, such as a property tax, a license fee, or a domestic support obligation, likewise could "reduce[] the amount of funds that the debtor can ultimately pay to his creditors."  *Victoria Farms*, 38 F.3d at 1531.  The Supreme Court has never even intimated that such a law would be one "on the subject of Bankruptcies."

88.    Likewise, no one contends that local rules of bankruptcy procedure violate the uniformity provision, although there are geographical differences in such rules and they have a direct effect on debtors' and creditors' rights.  Local rules impact parties, for example, by providing for dismissal of cases for violations of certain rules.  *See, e.g.*, Bankr. N.D. Tex. R. 1007-1 (providing that failure to file mailing list is "cause for summary dismissal"); Bankr. E.D. Va. R. 1006-1(C)(1) (providing for dismissal if filing fee is not paid within three-day cure period and no hearing is requested).[16]

---

[16] True, local rules are not statutes.  But neither is a decision of the Judicial Conference establishing different fees for bankruptcy administrator districts.  And unlike the case of local rules, the Judicial Conference acted outside its authority in charging different fees than those established by section 1930(a)(6).

89.     The Supreme Court's decision in *Shady Grove Orthopedic Assocs. PA v. Allstate Ins. Co.*, helps explain why such local rules, as well as fee provisions, are not laws on the subject of bankruptcies.  559 U.S. 393, 407 (2010) (plurality opinion).  In that case, the Court explained the difference between rules that are merely procedural and those that alter substantive rights and are thus prohibited by the Rules Enabling Act.  *Id.*  The Court noted that "[t]he test is not whether the rule affects a litigant's substantive rights; most procedural rules do."  *Id.*  Rather, the Court explained, a rule modifies a substantive right only "if it alters 'the rules of decision by which [the] court will adjudicate [those] rights;'" but it is an authorized procedural rule if it "governs only 'the manner and the means' by which the litigants' rights are 'enforced.'"  *Id.* (alterations in original, quoting *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 445 (1946)).

90.     Statutes establishing case fees are akin to such rules of procedure; while they may have a practical effect on the parties, they do not alter the rules of decision by which courts will adjudicate debtors' or creditors' rights.  *See id.*; *see also id.* at 435 (categorizing filing fees as procedural) (Stevens, J., concurring in part and concurring in the judgment).

91.     Because section 1930(a)(6) is a revenue statute and does not modify any rights or remedies of creditors or debtors under the Bankruptcy Code, *see supra* Part II.C., it is not a law "on the subject of Bankruptcies."  U.S. Const. art. I, § 8, cl. 4.

## III.    The 2017 Amendment Raises No Retroactivity Concerns.

92.     The Liquidating Trustee argues that the 2017 amendment should not be read as applying to cases pending on its effective date because doing so would have a retroactive effect that violates the Due Process Clause of the Constitution.  Motion ¶¶ 20-31.  The Liquidating

31

Trustee is wrong; the amendment does not operate retroactively, and if it did, it does not do so in a constitutionally impermissible way.

**A.    The presumption against retroactivity does not apply because the amendment's temporal reach is clear.**

93.    The presumption against retroactivity is not implicated here because the presumption is only a tool of statutory construction; it does not determine the constitutionality of a statute.  Because the temporal scope of the 2017 amendment is explicit, resort to such a tool is inappropriate.  *See Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994) (presumption applies only in the "[a]bsen[ce of] plain language in a statute or clear legislative intent").

94.    The Liquating Trustee argues that the 2017 amendment "does not specify its application to" pending cases.  Motion ¶ 23; *see also Buffets*, 2019 WL 518318, at *5.  This proposition is not correct.

95.    Section 1930(a)(6)(B) expressly states that it applies "[d]uring each of fiscal years 2018 through 2022."  28 U.S.C. § 1930(a)(6)(B).  In addition, the 2017 amendment expressly provides that the amendment "shall apply to quarterly fees payable under section 1930(a)(6) . . . for disbursements made in any calendar quarter that begins on or after the date of enactment" of the amendment.  Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004(c) (uncodified).

96.    That quarter began on January 1, 2018, so under the amendment's plain language, "disbursements" made on or after January 1, 2018 are subject to the 2017 amendment's temporary fee structure.  Congress stated with precision both when the amendment became effective—roughly ten weeks after enactment—and to what it applied—disbursements made by debtors on or

after January 1, 2018.  That means the Trust must pay fees under the 2017 amendment for all the disbursements it makes on or after January 1, 2018.  The statute is perfectly clear about that.

97.    Congress did more here than simply provide a generic "statement that a statute will become effective on a certain date."  *Landgraf*, 511 U.S. at 257 (quoted in Motion ¶ 21).  Rather, Congress specifically identified the relevant conduct—disbursements in a chapter 11 case—and expressly provided that the statute applied to such conduct occurring in quarters beginning on or after January 1, 2018.

98.    The Liquidating Trustee effectively asks the Court to re-write the amendment so it applies to quarterly fees payable in "any calendar quarter that begins on or after the date of enactment other than in pending cases."  But those are not the words that Congress wrote.  Because the statute provides an express directive as to when it applies to disbursements in chapter 11 cases, the presumption against retroactivity does not apply.  *See Landgraf*, 511 U.S. at 280.

99.    Any such re-write would be both contrary to congressional intent and undermine Congress's funding goals.  The Judiciary Committee recommended passage of the amendment to replenish the United States Trustee System Fund and to fund bankruptcy judgeships.  *See* H.R. Rep. No. 115-130, at 8.  The Committee expected the amendment to accomplish this goal in part based on an estimate from the Congressional Budget Office, *id*. at 9, which assumed the amendment would increase the fees paid "by entities *that are already in bankruptcy*"—not just those that file for bankruptcy after the amendment's effective date.  Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017, at 5 (May 18, 2017) (emphasis added), (attached as Exhibit B); *see also id.* at 1 (stating amendment would increase fees paid "by entities that are *currently* in Chapter 11 bankruptcy and that have disbursements of more than $1 million

per quarter") (emphasis added); *see also id.* ("The act also would adjust the formula used to set certain quarterly fees paid by businesses involved in *ongoing* Chapter 11 bankruptcy cases . . . .") (emphasis added).

100.    The fact that the fee increase would apply to pending cases was critical to the Congressional Budget Office's analysis for another reason as well.  By statute, the Congressional Budget Office is required to determine whether the aggregate costs of "mandates" would be greater than certain statutory thresholds established in Unfunded Mandates Reform Act, 2 U.S.C. § 1501, *et seq*.  *See also* 2 U.S.C. §§ 651-658g (governing Congressional Budget Office duties).  According to the Congressional Budget Office's analysis, however, it was only because the fee increase applied to pending cases that it constituted a "mandate" that required this determination.  *See, e.g., id*. at 6 ("Some portion of those [increased quarterly fee] collections would be from entities *already in bankruptcy* . . . and those are the entities that would face a mandate under the act.") (emphasis added).

101.    The version of the bill reviewed by the Congressional Budget Office included the substantially same language as the final version—passed five months later—mandating application of the increased fees to disbursements made in any quarter after its effective date.  H.R. 2266, 115th Cong. (May 17, 2017).[17]  Had Congress thought the Congressional Budget Office's

---

[17] *Compare* H.R. 2266, 115th Cong. (May 17, 2017) ("The amendments made by this section shall apply to quarterly fees payable under section 1930(a)(6) of title 28 of the United States Code, as amended by this section, for disbursements made in any calendar quarter that begins on or after the effective date of the amendments made by this section.") *with* Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72, § 1004(c) (uncodified) ("The amendments made by this section shall apply to quarterly fees payable under section 1930(a)(6) of title 28, United States Code, as amended by this section, for disbursements made in any calendar quarter that begins on or after the date of enactment of this Act.").

repeatedly stated assumption that the increased fees applied to cases pending on the amendment's effective date was incorrect, it easily could have changed this language, and certainly would have reconsidered whether the increased fees were sufficient to meet its purpose.

102.    In addition, Congress was not operating on a blank slate when in amended the statute in 2017.  Historically, amendments imposing or increasing quarterly fees had been applied to pending cases.  Indeed, when Congress first enacted the quarterly fee statute in the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. 99-554, 100 Stat. 3088 (1986), the Eighth Circuit squarely rejected the argument, like the one the Liquidating Trustee makes here, that the fees did not apply to cases pending in pilot districts on its effective date.  *See In re Prines*, 867 F.2d 478 (8th Cir. 1989).[18]  The Act stated that it "shall not be construed to require the payment of a fee under [section 1936(a)(6)] . . . for any conduct or period occurring before such paragraph becomes effective in the district in which such case is pending."  *Id.* (quoting Pub. L. No. 99-554, § 303(e)(3), 1986 U.S. Code Cong. & Admin. News (100 Stat.) 3120–21). The Eighth Circuit construed this language in conjunction with the general effective date to mean that the quarterly fees should be applied to cases pending in pilot program districts as of the general effective date.  *Prines*, 867 F.2d at 483-84.  In light of this history, Congress would not have seen

---

[18] The 1986 Act provided that in non-pilot districts the quarterly fees would not become effective until a specified period of time after the statute's general effective date.  *See Prines*, 867 F.2d at 484; Pub. L. No. 99-554, § 302(d), 1986 U.S. Code Cong. & Admin. News (100 Stat.) 3120–21. By contrast, for pilot districts, the Act contained no such provision for a delayed effective date.  *In re Prines*, 867 F.2d at 483.

any need to be yet more explicit in the 2017 amendment than its express command that the fees

are due based on disbursements in any calendar quarter that begins on or after its enactment date.[19]

103.     Notably, in *United States v. Sperry*, in which the Supreme Court rejected a

constitutional challenge to a fee imposed on awards made by the Iran-United States Tribunal, all

parties and the Court assumed that the fee applied to cases pending on the statute's effective date

as long as the award was entered after the effective date.  493 U.S. 52, 65-65 (1989).  In *Sperry*,

the statute had an expressly retroactive effective date of June 7, 1982.  *Id*. at 58.  The Court's

opinion reflects that the statute applied to all awards made after that date—even if the case was

pending before that date—and that even under a purely prospective application of the statute the

fees would still apply to cases pending on the statute's effective date.  *Id*. at 64-65 ("If Congress

had made the application of § 502 prospective only, the costs of the Tribunal would have fallen

disproportionately on the claimants whose awards, for whatever reason, were delayed . . . .").

Likewise, here, imposition of the fees based on disbursements made after the effective date, even

if the case already was pending at the time the amendment became effective, is a purely prospective

application of the statute.

---

[19] This also is consistent with the 1996 amendment to section 1930(a)(6), which applied to all cases, including those in which a plan had been confirmed.  Because some courts did as the Liquidating Trustee asks and effectively rewrote the 1996 amendment, Congress was obligated to clarify in a subsequent amendment that it meant what it said and the 1996 amendment applied to all pending cases.  *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-19 (1996) (clarifying that quarterly fees payable under 28 U.S.C. § 1930(a)(6) "shall accrue and be payable from and after January 27, 1996, in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans").  *Cf. In re Blair*, 644 F.2d 69 (2d Cir. 1980) (applicable law for determining dischargeability is law in force at time of determination of dischargeability, not at time petition was filed).

36

**B.      The 2017 amendment does not have a retroactive effect.**

104.    The 2017 amendment does not operate retroactively because it is triggered only by conduct that occurs after the amendment.  The conduct that triggers liability for quarterly fees is the pendency of a chapter 11 case and the disbursements of amounts equal to or exceeding $1 million during any calendar quarter after January 1, 2018.  Because the amendment applies only to disbursements made in pending cases more than 9 weeks after its enactment, the amendment only operates prospectively.[20]  *U.S. Trustee v. CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.)*, 150 F.3d 1233, 1237 (10th Cir. 1998) (holding that 1996 amendment to section 1930(a)(6) imposing quarterly fees post-confirmation is not retroactive); *In re Richardson Serv. Corp.*, 210 B.R. 332, 335 (Bankr. W.D. Mo. 1997) ("The amendment only triggers prospective assessment of fees from the amendment's effective date until entry of the final decree.").

105.    *Landgraf* undermines the Liquidating Trustee's contention that the amendment is retroactive as applied here because the Plan was confirmed before the amendment became effective.  *See* Motion ¶¶ 25-29.  A statute does not operate retroactively "merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law."  511 U.S. at 269 (citation omitted).  Nor is a law retroactive simply because its application requires some reference to antecedent facts. *EPA v. New Orleans Pub. Serv., Inc.*,

---

[20] The legislation was passed on October 26, 2017.  The first calendar quarter that began after passage of the amendment began on January 1, 2018.  Thus, the amendment applies to disbursements made on or after January 1, 2018.

826 F.2d 361, 365 (5th Cir. 1987) (holding that law altering classification of transformers for purposes of future matters is not retroactive).

106.    As the First Circuit put it in *McAndrews v. Fleet Bank of Massachusetts*, 989 F.2d 13, 16 (1st Cir. 1993):

> [A] statute may modify the legal effect of a present status or alter a preexisting relationship without running up against the retroactivity hurdle.  The key lies in how the law interacts with the facts.  So long as the neotonic law determines status solely for the purposes of future matters, its application is deemed prospective.

107.    The 2017 amendment does not backdate collection of increased fees from the date a case was filed or the date a plan was confirmed.  The amendment only triggers prospective assessment of the increased fees from the amendment's effective date until entry of the final decree.  Therefore, it does not operate retroactively.

**C.    Even if the amendment had applied retroactively, it would be constitutional.**

108.    Even if the amendment could be characterized as retroactive, it would be constitutional—contrary to the Liquidating Trustee's claim that retroactive application would violate the Due Process Clause.  Motion ¶ 26.

109.    The Supreme Court has upheld the constitutionality of retroactive statutes.  *See, e.g., Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 637 (1993) (upholding statute that imposed retroactive withdrawal liability against taking and due process challenges); *Sperry Corp.*, 493 U.S. 52 (upholding retroactive statute against due process and takings challenges).

110.    And courts have consistently upheld the constitutionality of section 1930(a)(6) and Congress's authority to issue it.  For example, the Tenth Circuit resoundingly rejected a claim that

38

a prior amendment to section 1930(a)(6) was impermissibly retroactive by interfering with a confirmed plan in *In re CF & I Fabricators of Utah Inc.*, 150 F.3d at 1237-38.  *See also U.S. Trustee v. Gryphon at Stone Mansion, Inc.*, 166 F.3d 552, 557 n.7 (3d Cir. 1999) (discussing cases rejecting constitutional challenges to section 1930(a)(6)); *In re Richardson Serv. Corp.*, 210 B.R. at 334-35 (holding prior amendment to section 1930(a)(6) was supported by rational basis because it was enacted to collect additional revenues to support the self-funded administration of bankruptcy cases).

111.    Here, too, the 2017 amendment does not violate the Due Process Clause.

        **1.    There are no retroactivity concerns when, as here, Congress had a rational basis for its law.**

112.    The 2017 amendment easily satisfies the requirements of the Due Process Clause. The constitutional restraint upon enacting retroactive civil legislation is a "modest" one. *Landgraf*, 511 U.S. at 272.  "Statutes may be invalidated on due process grounds only under the most egregious of circumstances." *Eastern Enters. v. Apfel*, 524 U.S. 498, 550 (1998) (Kennedy, J. concurring in part and dissenting in part).  Laws adjusting the burdens and benefits of economic life are presumed to be constitutional and the burden is on the party complaining of a due process violation to establish that Congress has acted in an arbitrary way. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).  As long as there is a legitimate legislative purpose furthered by rational means, economic legislation meets the test of due process. *General Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992); *United States v. Carlton*, 512 U.S. 26 (1994) (upholding amendment to estate tax deduction that operated retroactively).

39

113.    In addition, "courts must accord substantial deference to the predictive judgments

of Congress." *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (internal quotation

marks omitted).  This deference stems from the different institutional competencies and roles of

the courts and Congress.  Congress as an institution is best equipped to amass and evaluate data

bearing on legislative questions.  *Id*.

114.    Congress exercised this legislative expertise in determining that the amount of

quarterly fees it voted to impose was needed to fund the cost of providing the bankruptcy system

to debtors.  That decision was not arbitrary or irrational.

115.    As explained *supra* in Part I.B., the 2017 amendment was enacted to collect

sufficient funds to fully offset Program appropriations and the costs of 18 bankruptcy judgeships

so that ordinary taxpayers would not have to bear those costs of the bankruptcy system.  H.R. Rep.

No. 115-130, at 8.  Congress acted rationally in applying the temporary fee increase in all pending

cases, rather than only in cases filed after its effective date, because application to all pending cases

spreads the costs among all of the largest chapter 11 debtors using the bankruptcy system, instead

of making comparatively fewer debtors shoulder the burden.  Moreover, applying the temporary

fee increase to a larger number of cases allowed Congress's funding goal to be met, and met more

quickly.  *See* Cong. Budget Office Cost Estimate, H.R. 2266, Bankruptcy Judgeship Act of 2017,

at 5 (May 18, 2017) (relying on application of the fee increase to pending cases for cost and revenue

estimates) (attached as Exhibit B).  This is perfectly acceptable Congressional action.  *See Sperry*,

493 U.S. at 64 ("It is surely proper for Congress to legislate retrospectively to ensure that costs of

a program are borne by the entire class of persons that Congress rationally believes should bear

them.").

40

116.    In addition, the 2017 amendment provides two safety valves that protect debtors. If the Fund balance at the end of a prior fiscal year equals or exceeds $200 million, the temporary fees revert to their former levels. This—and the mandatory sunset in fiscal year 2022—is how Congress chose to protect debtors. There is no legitimate ground upon which to give them greater protection than Congress did.

117.    The *Buffet* court's reliance on *In re Burk Development Co., Inc.,* 205 B.R. 778 (Bankr. M.D. La. 1997), to support its due process holding is misplaced. *In re Buffets, LLC,* 2019 WL 518318, at *6 (cited in Motion ¶ 27). In *Burk Development*, the bankruptcy court addressed the 1996 amendment to section 1930(a)(6) that required the payment of quarterly fees after confirmation in open chapter 11 cases. *Id.* at 780. The *Burk Development* court found that retroactive application of the 1996 amendment would *not* violate the Due Process Clause. 205 B.R. at 786-89; *see also id.* at 800 ("[H]ad Congress wanted to give the Amendment retrospective effect, such effect would not have been constitutionally infirm—the imposition of postconfirmation quarterly fees is a rational means of generating income.").[21]

118.    The Liquidating Trustee argues that the new fees were imposed without sufficient notice to Debtors. Motion ¶¶ 26, 28. But debtors have no constitutional right to insist that quarterly fees remain static. Since Congress first instituted quarterly fees in 1986, Congress has re-visited

_____

[21] As a matter of statutory interpretation, the *Burk Development* court held that the 1996 amendment did not apply to cases in which plans already had been confirmed as of its effective date. *Id.* at 800. This reading, however, was incorrect and expressly rejected by Congress in its clarifying amendment stating that the 1996 amendment indeed did apply to pending cases with confirmed plans. *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-19 (1996) (clarifying that quarterly fees payable under section 1930(a)(6) "shall accrue and be payable from and after January 27, 1996, in all cases (including, without limitation, any cases pending as of that date), regardless of confirmation status of their plans").

41

section 1930(a) or section 589a of title 28 (which governs the United States Trustee System Fund established in the U.S. Treasury) to adjust the amount or the allocation of bankruptcy fees ten times. *See supra* ¶ 27. *Cf. Gryphon at Stone Mansion, Inc.*, 166 F.3d at 557 n.7 (noting quarterly fees do not violate the Takings Clause "because, due to the vagaries of the bankruptcy process, there can be no reasonable expectation that the amount of the final distribution will remain fixed throughout the process"); *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d at 1239 (agreeing, in rejecting Takings Clause challenge, that "any expectation new fees would not be assessed is patently unreasonable in an ongoing bankruptcy case").

119.    The fact that the Plan did not include any provision for increased fees makes no difference.  As appellate courts have recognized, a reorganization plan can no more immunize a reorganized debtor from post-confirmation fee increases than it can from increased taxes or any of the other infinite number of potential increases to its post-confirmation costs of doing business. *See Gryphon at Stone Mansion, Inc*., 166 F.3d at 557 (holding new fees are "no different from taxes arising post confirmation or any similar post confirmation expenses not specified in plan" and a plan cannot extinguish claims arising post-confirmation) (quoting *In re A.H. Robins Co. Inc.*, 219 B.R. 145, 148 (Bankr. E.D. Va. 1998)); *In re CF & I Fabricators*, 150 F.3d at 1238 (same); *In re Postconfirmation Fees*, 224 B.R. 793, 796 (E.D. Wash. 1998) ("This fee is no different than any expense which arises post-confirmation and is not provided for in a plan. . . . Nothing in a bankruptcy proceeding immunizes a debtor from paying license fees or taxes or governmental charges which are created post-confirmation.").  *See also Holywell Corp. v. Smith*, 503 U.S. 47, 58 (1992) ("Even if § 1141(a) [regarding the effects of a confirmed plan] binds creditors of the corporate and individual debtors with respect to claims that arose before confirmation, we do not

42

see how it can bind the United States or any other creditor with respect to postconfirmation claims."). Quarterly fees are creatures of statute; they cannot be contracted away. *In re CF & I Fabricators*, 150 F.3d at 1239-40.

120.    When Congress amended section 1930(a)(6) in 2017, it did so thoughtfully and rationally. Nothing more is required. Congress ensured that the temporary increase in fees would not be charged if the Fund balance reached a certain level. It set caps on fees. It provided for the temporary increase to expire. And like its prior nine amendments, Congress ensured that the cost of the system will not be borne by taxpayers. This is a far cry from the sort of arbitrary or irrational action that could violate the Due Process Clause.

> **2.    Supreme Court jurisprudence rejects the Liquidating Trustee's argument that any payment that exceeds the benefits received is unconstitutional.**

121.    The Liquidating Trustee argues that, in determining the constitutionality of the amendment, the Court should consider that "the huge new fees bear no reasonable relationship or proportionality to the amount of work performed." Motion ¶ 30. However, in *United States v. Sperry*, the Supreme Court specifically rejected a similar challenge, under both the Due Process and Takings Clauses, to a fee that applied retroactively to an arbitration award on the ground that it allegedly was disproportionate to the services received. 493 U.S. at 60-61.[22]

122.    The statutory fee in *Sperry* was 1.5% of the first $5 million, and 1% of any amount over $5 million, awarded to United States-based claimants on certain arbitral awards and

---

[22] The Supreme Court also has soundly rejected the notion that the "equities," Motion ¶ 30, can override statutory mandates. *See Law v. Siegel*, 571 U.S. 415, 421 (2014) ("[A] bankruptcy court may not contravene specific statutory provisions.").

settlements before the Iran-United States Tribunal.[23]  *Id.* at 58.  Sperry, who had been granted an

award by the Tribunal, contended that the deducted charge could not be upheld as a user fee—and

thus must constitute a taking or violate due process—because "there [was] no showing that the

amount of the deduction approximates the cost of the Tribunal to the United States or bears any

relationship to Sperry's use of the Tribunal or the value of the Tribunal's services to Sperry."  493

U.S. at 60.

123.    The Supreme Court disagreed.  It noted that "'[a] governmental body has an

obvious interest in making those who specifically benefit from its services pay the cost.'"  *Id.* at

63 (quoting *Massachusetts v. United States*, 435 U.S. 444, 462 (1978)).  The Supreme Court held

that Sperry had benefited from the Tribunal's existence, even though its settlement was reached

through private negotiations.  *Id.* at 63.  It upheld the government's ability to require Sperry "to

pay a [1.5%] charge for the availability of the Tribunal even if it never actually used the Tribunal;

Sperry received the 'benefit from [the Tribunal] in the sense that the services are available for [its]

use.'"  *Id.* (quoting *Massachusetts*, 435 U.S. at 468) (edits in original).

124.    The Court further noted that "[t]his Court has never held that the amount of a user

fee must be precisely calibrated to the use that a party makes of Government services.  Nor does

the Government need to record invoices and billable hours to justify the cost of its services."  *Id.*

The Court elaborated, holding that "when the Federal Government applies user charges to a large

number of parties, it probably will charge a user more or less than it would under a perfect user-

fee system."  *Id.* at 61 (citing *Massachusetts*, 435 U.S. at 463 n.19).  The Supreme Court declined

---

[23] By contrast, the temporary quarterly fee at issue here is for the lesser of 1% or $250,000.  28
U.S. § 1930(a)(6)(B).

to identify what percentage of a Tribunal award might be too great for the government to assess, as it upheld the government's authority to charge 1.5% as constitutional "by any standard of excessiveness." *Id*. at 62. The Supreme Court concluded that the 1.5% fee "was obviously the judgment of Congress and we abide by it." *Id.*

125.    *Sperry* holds that the Constitution does not require a case-by-case correlation between a user fee and either the costs or benefits of the government's services. *Id*. at 60-61. Rather, whether the fee represents a "fair approximation" of the costs of government benefits is determined on an aggregate basis without any reference to what use was made in any particular case. *Id*. at 60; *cf. Alamo Rent-a-Car, Inc. v. Sarasota-Manatee Airport Authority*, 906 F.2d 516, 520 (11th Cir. 1990) (upholding airport usage fee against Commerce Clause challenge, despite the "imprecise" nature of approximating airport use by measuring car rental company's gross receipts from customers at airport, when approximation was "not irrational," and rejecting argument that fee should correspond exactly to the percentage of company's airport use).

126.    Significantly, *Sperry*'s "fair approximation" looks at the cost of the government's provision of services. 493 U.S. at 60, 63. It does not look at the use the payer makes of the system, *id*., as the Liquidating Trustee argues it should, Motion ¶ 30.

127.    As these cases show, it is the role of Congress to consider efficiency, equity, revenue adequacy, and administrative burden when it designs federal regulatory fees. Congress has done that with quarterly fees.

128.    Following the Supreme Court's guidance in *Sperry*, the court in *In re Kindred Healthcare, Inc.* expressly upheld the constitutionality of section 1930(a)(6) against a takings challenge asserting that quarterly fees exceeded benefits provided. No. 99-3199 (MFW), 2003

45

WL 22327933, at *3-5 (Bankr. D. Del. Oct. 9, 2003).  As held in *Kindred Healthcare*, fees assessed under section 1930(a)(6) are "fees associated with the Debtors' use of the bankruptcy judicial system." *Id*. at *4.

129.    Having successfully reorganized under chapter 11, the Liquidating Trustee does not, and could not, dispute that the Debtors have received—and continue to receive—the benefits of the bankruptcy system. *See, e.g., In re A.H. Robins Co. Inc.*, 219 B.R. 145, 148 n.8 (Bankr. E.D. Va. 1998) (noting that while the United States Trustee had done little in the case post-confirmation, the debtor "benefitted from the Court's continued involvement in this still-open case").

130.    Despite the Liquidating Trustee's complaint about the "exponential" increase in quarterly fees, Motion ¶ 12, the fees are not particularly large as a percentage of total disbursements.  They are capped at 1%.  By contrast, payments to plan professionals during this time period were approximately 17.79% of total disbursements.  *See supra* ¶ 13.

131.    Indeed, as a percentage of disbursements, the pre-amendment fees in cases with $1 million or more in quarterly disbursements were disproportionately low as compared to the smaller cases.  See 28 U.S.C. § 1930(a)(6).  *See supra* ¶¶ 42-44.  The 2017 amendment merely brought the percentage charged in those largest cases in line with the percentages charged in the smaller cases. Even under the 2017 amendment, the fees in these largest of chapter 11 cases are still never more than 1%.

132.    As shown by the chart below, comparing *Sperry* and the fees challenged here demonstrates that the quarterly fee regime is more favorable to the payee than the fees upheld in *Sperry*.

46

| Factor | *U.S. v. Sperry* | Quarterly fee statute as amended in 2017 |
|---|---|---|
| Statutory Percentage | **1.5%** (on first $5 million, then 1%) | **Up to 1%** |
| Dollar cap on payments? | **No** | **Yes** ($250,000) |
| Voluntary use of the service? | **No** (use was involuntary because party did not want to use tribunal) | **Yes** (debtor chose to use the bankruptcy system) |
| Sunset? | **No** | **Yes** |
| Retroactive statute? | **Yes** (expressly retroactive) | **No** (didn't apply until the quarter after enactment) |
| Upheld statute? | **Yes**. S. Ct. upheld | |

133.    There is no basis for the bankruptcy court to overrule Congress's determination that the amount of the quarterly fees it voted to impose is a fair approximation of the cost of providing the bankruptcy system to debtors, and a fair distribution of those costs among those who use the bankruptcy system. *See Sperry*, 493 U.S. at 60, 63.

134.    No justification exists for taking the extreme step of striking down the amendment to quarterly fees.

## CONCLUSION

For these reasons, the United States Trustee respectfully asks this Court to deny the Motion.

Date: May 9, 2019                                     Respectfully submitted,

John P.  Fitzgerald, III
Acting United States Trustee, Region Four

By: /s/ *Robert B. Van Arsdale*
Robert B. Van Arsdale (Va. Bar No. 17483)

47

RAMONA D. ELLIOTT                    JOHN P. FITZGERALD, III
Deputy Director/General Counsel      United States Trustee, Region 4
P. MATTHEW SUTKO                     ROBERT B. VAN ARSDALE
Associate General Counsel            (Va. Bar No. 17483)
BETH A. LEVENE                       Department of Justice
WENDY COX                            Office of the United States Trustee
SUMI SAKATA                          701 East Broad Street, Suite 4304
Trial Attorneys                      Richmond, Virginia 23219
Department of Justice                (804) 771-2310
Executive Office for United States Trustees   Fax: (804) 771-2330
441 G Street, N.W., Suite 6150
Washington, DC  20530
(202) 307-1399
Fax: (202) 307-2397

## APPENDIX A

| Quarter | Disbursements | Fee | % of Fee to Disb |
|---------|---------------|-----|------------------|
| 4-2008 | 1,811,073,999 | 30,000 | 0.002% |
| 1-2009 | 1,356,776,000 | 30,000 | 0.002% |
| 2-2009 | 206,515,000 | 30,000 | 0.015% |
| 2-2009 | 33,190,000 | 30,000 | 0.090% |
| 4-2009 | 12602000 | 13,000 | 0.103% |
| 1-2010 | 17,278,000 | 20,000 | 0.116% |
| 2-2010 | 7,467,415 | 13,000 | 0.174% |
| 3-2010 | 6,782,656 | 13,000 | 0.192% |
| 4-2010 | 60,886,775 | 30,000 | 0.049% |
| 1-2011 | 4,297,083 | 10,400 | 0.242% |
| 2-2011 | 24,014,008 | 20,000 | 0.083% |
| 3-2011 | 13,580,501 | 13,000 | 0.096% |
| 4-2011 | 37,082,144 | 30,000 | 0.081% |
| 1-2012 | 9,995,244 | 13,000 | 0.130% |
| 2-2012 | 5,920,491 | 13,000 | 0.220% |
| 3-2012 | 57,740,516 | 30,000 | 0.052% |
| 4-2012 | 11,148,936 | 13,000 | 0.117% |
| 1-2013 | 21,344,817 | 20,000 | 0.094% |
| 2-2013 | 57,374,409 | 30,000 | 0.052% |
| 3-2013 | 9,104,550 | 13,000 | 0.143% |
| 4-2013 | 39,425,099 | 30,000 | 0.076% |
| 1-2014 | 9,479,730 | 13,000 | 0.137% |
| 2-2014 | 15,853,765 | 20,000 | 0.126% |
| 3-2014 | 39,960,031 | 30,000 | 0.075% |
| 4-2014 | 13,015,450 | 13,000 | 0.100% |
| 1-2015 | 56,033,793 | 30,000 | 0.054% |
| 2-2015 | 72,845,691 | 30,000 | 0.041% |
| 3-2015 | 50,531,274 | 30,000 | 0.059% |
| 4-2014 | 19,142,942 | 20,000 | 0.104% |
| 1-2016 | 60,964,510 | 30,000 | 0.049% |
| 2-2016 | 76,198,875 | 30,000 | 0.039% |
| 3-2016 | 41,232,820 | 30,000 | 0.073% |
| 4-2016 | 46,270,193 | 30,000 | 0.065% |
| 1-2017 | 82,392,180 | 30,000 | 0.036% |
| 2-2017 | 22,387,521 | 20,000 | 0.089% |
| 3-2017 | 18,972,015 | 20,000 | 0.105% |
| 4-2017 | 5,153,940 | 13,000 | 0.252% |
| **Total** | **4,434,034,373** | **833,400** | **0.019%** |
|  |  |  |  |
| *Average* |  | *$ 22,524.32* | *0.096%* |

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2019, a true copy of the foregoing was delivered via electronic mail pursuant to the Administrative Procedures of the CM/ECF System for the United States Bankruptcy Court for the Eastern District of Virginia to all necessary parties, specifically including the following:

Robert K. Coulter on behalf of United States of America
robert.coulter@usdoj.gov; USAVAE.ALX.ECF.BANK@usdoj.gov

Robert P. McIntosh on behalf of United States of America
Robert.Mclntosh@usdoj.gov;      USAVAE.RIC.ECF.CIVIL@usdoj.gov;
Heidi.E.Bokor@usdoj.gov; HBokor@usa.do j.gov

In addition, a copy was mailed to the following by first class postage pre-paid United States mail:

United States of America
c/o Lee J. Lofthus
Assistant A.G. for Administration
950 Pennsylvania Ave., NW, Rm. I I I I Washington,
DC 20530

United States of America c/o
William P. Barr
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530-000 I

United States of America
c/o G. Zachary Terwilliger, Esquire
2100 Jamieson Avenue
Alexandria, VA 22314

/s/ *Robert B. Van Arsdale*
Robert B. Van Arsdale

# REPORT OF THE PROCEEDINGS
# OF THE JUDICIAL CONFERENCE
# OF THE UNITED STATES

*SEPTEMBER/OCTOBER 2001*
*WASHINGTON, D.C.*

# REPORT OF THE PROCEEDINGS
## OF THE JUDICIAL CONFERENCE
## OF THE UNITED STATES

*SEPTEMBER/OCTOBER 2001*
*WASHINGTON, D.C.*

*JUDICIAL CONFERENCE OF THE UNITED STATES*
*CHIEF JUSTICE WILLIAM H. REHNQUIST,*
*PRESIDING*
*LEONIDAS RALPH MECHAM, SECRETARY*

# REPORT OF THE PROCEEDINGS
# OF THE JUDICIAL CONFERENCE
# OF THE UNITED STATES

## September/October 2001

### Contents

Call of the Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Executive Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   Resolutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   United States Sentencing Commission . . . . . . . . . . . . . . . . . . . . . . . . 39
   Information Technology Security/Use of the Internet . . . . . . . . . . . . 39
   Miscellaneous Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Committee on the Administrative Office . . . . . . . . . . . . . . . . . . . . . . . . 41
   Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Committee on Automation and Technology . . . . . . . . . . . . . . . . . . . . . 42
   Lawbooks and Libraries Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
   Use of the Internet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
   Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
Committee on the Administration of the Bankruptcy System . . . . . . . . . . . . . 45
   Trustee Retention of Professionals . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
   Chapter 11 Quarterly Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
   Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Committee on the Budget . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   Fiscal Year 2003 Budget Request . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   Certifying Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
   Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Committee on Codes of Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
   Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Committee on Court Administration and Case Management . . . . . . . . . . . . . 48
   Privacy and Public Access to Electronic Case Files . . . . . . . . . . . . . 48
   Model Local Rules for Electronic Case Filing . . . . . . . . . . . . . . . . . . 50
   Miscellaneous Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
   Juror Attendance Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
   E-Government Act of 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
   Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Committee on Criminal Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    DNA and Competency of Counsel Legislation  . . . . . . . . . . . . . . . . . . . . . 54
    Committee Activities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Committee on Defender Services  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    Malpractice Claims Against Panel Attorneys  . . . . . . . . . . . . . . . . . . . . . 54
    DNA and Competency of Counsel Legislation  . . . . . . . . . . . . . . . . . . . . . 55
    Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Committee on Federal-State Jurisdiction  . . . . . . . . . . . . . . . . . . . . . . . . . 56
    Diversity Jurisdiction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    Patients' Rights Legislation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    DNA and Competency of Counsel Legislation  . . . . . . . . . . . . . . . . . . . . . 58
    Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
Committee on Financial Disclosure  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    Financial Disclosure Report Preparation  . . . . . . . . . . . . . . . . . . . . . . . . 59
    Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
Committee on Intercircuit Assignments  . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    Committee Activities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
Committee on International Judicial Relations  . . . . . . . . . . . . . . . . . . . . . . 60
    Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
Committee on the Judicial Branch  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    Government Management Reform Act of 1994  . . . . . . . . . . . . . . . . . . . . 60
    Travel Regulations for United States Justices and Judges . . . . . . . . . . . . 61
    Committee Activities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
Committee on Judicial Resources  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    Court Interpreter Positions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    Bankruptcy Administrator Staff  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
    Physical Fitness Centers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
    Bankruptcy Appellate Panel Law Clerks . . . . . . . . . . . . . . . . . . . . . . . . 62
    District Clerks' Offices Staffing Formula . . . . . . . . . . . . . . . . . . . . . . . . 63
    Alternative Dispute Resolution Staffing Factor  . . . . . . . . . . . . . . . . . . . 64
    Qualifications Standards for Chief Probation and
       Chief Pretrial Services Officers  . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
    Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
Committee on the Administration of the Magistrate Judges System . . . . . . . . . 65
    Selection and Appointment Regulations . . . . . . . . . . . . . . . . . . . . . . . . . 65
    Changes in Magistrate Judge Positions . . . . . . . . . . . . . . . . . . . . . . . . . 65
    Accelerated Funding  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    Committee Activities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
Committee to Review Circuit Council Conduct and Disability Orders  . . . . . . . 68
    Committee Activities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Committee on Rules of Practice and Procedure . . . . . . . . . . . . . . . . . . . . . . . 68
    Federal Rules of Appellate Procedure . . . . . . . . . . . . . . . . . . . . . . . . 68
    Federal Rules of Bankruptcy Procedure . . . . . . . . . . . . . . . . . . . . . . . 69
    Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
    Federal Rules of Criminal Procedure . . . . . . . . . . . . . . . . . . . . . . . . . 70
    Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
Committee on Security and Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
    *U.S. Courts Design Guide* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
    Delegation of Construction Authority . . . . . . . . . . . . . . . . . . . . . . . . . 71
    Congressional Review of Courthouse Construction . . . . . . . . . . . . . . . 71
    Courtroom Information Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
    Committee Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
Committees on Criminal Law, Defender Services, and
  Federal-State Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
    Consolidated Report on DNA and Competency of Counsel Legislation . 72
Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

# REPORT OF THE PROCEEDINGS
## OF THE JUDICIAL CONFERENCE
## OF THE UNITED STATES

**September/October 2001**

       The Judicial Conference of the United States convened in Washington, D.C., on September 11, 2001, pursuant to the call of the Chief Justice of the United States issued under 28 U.S.C. § 331.  The Chief Justice presided, and the following members of the Conference were present:

First Circuit:

> Chief Judge Michael Boudin
> Chief Judge D. Brock Hornby,
> > District of Maine

Second Circuit:

> Chief Judge John M. Walker, Jr.
> Judge Charles P. Sifton,
> > Eastern District of New York

Third Circuit

> Chief Judge Edward R. Becker
> Chief Judge Sue L. Robinson,
> > District of Delaware

Fourth Circuit

> Chief Judge J. Harvie Wilkinson III
> Chief Judge Charles H. Haden II,
> > Southern District of West Virginia

Fifth Circuit

> Chief Judge Carolyn Dineen King
> Judge Hayden W. Head, Jr.,
> > Southern District of Texas

*Judicial Conference of the United States*

Sixth Circuit

Chief Judge Boyce F. Martin, Jr.
Judge Thomas A. Wiseman, Jr.,
Middle District of Tennessee

Seventh Circuit

Chief Judge Joel M. Flaum
Chief Judge Marvin E. Aspen,
Northern District of Illinois

Eighth Circuit

Chief Judge Roger L. Wollman
Chief Judge James M. Rosenbaum,
District of Minnesota

Ninth Circuit

Chief Judge Mary M. Schroeder
Judge Lloyd D. George,[1]
District of Nevada

Tenth Circuit

Chief Judge Deanell R. Tacha
Chief Judge Frank Howell Seay,
Eastern District of Oklahoma

Eleventh Circuit

Chief Judge R. Lanier Anderson, III
Chief Judge Charles R. Butler, Jr.,
Southern District of Alabama

---

[1]Designated by the Chief Justice to attend in lieu of Judge Judith N. Keep of the Southern District of California.

36

*September/October 2001*

District of Columbia Circuit:

> Chief Judge Douglas H. Ginsburg
> Chief Judge Thomas F. Hogan,
>     District of Columbia

Federal Circuit:

> Chief Judge Haldane Robert Mayer

Court of International Trade:

> Chief Judge Gregory W. Carman

Shortly after the Judicial Conference session began on September 11, 2001, members were informed of terrorist attacks in New York and Washington, D.C. The Conference adjourned promptly upon notification of the evacuation of the Supreme Court Building. No Conference business was conducted on that day, although the members were addressed by Senators Patrick Leahy, Orrin Hatch, and Jeff Sessions, and Representatives James Sensenbrenner and Howard Coble. The committee recommendations comprising the Conference's consent and discussion calendars were subsequently considered by Conference members in two mail ballots[2] — one concluded on September 19, 2001, and the second concluded on October 1, 2001. The actions taken as a result of these mail ballots are described below.[3]

## EXECUTIVE COMMITTEE

### RESOLUTIONS

The Judicial Conference approved a recommendation of the Executive Committee to adopt the following resolution in recognition of the substantial contributions made by Judicial Conference committee chairs who will complete their terms of service in 2001:

---

[2]Two discussion items were deferred until the March 2002 Conference session.

[3]Unless otherwise noted, all actions were approved by the mail ballot concluded on September 19, 2001.

37

*Judicial Conference of the United States*

The Judicial Conference of the United States recognizes with appreciation, respect and admiration the following judicial officers:

**HONORABLE CAROL BAGLEY AMON**
Committee on Codes of Conduct

**HONORABLE WALTER K. STAPLETON**
Committee on Federal-State Jurisdiction

**HONORABLE WILLIAM J. ZLOCH**
Committee on Financial Disclosure

**HONORABLE DAVID R. HANSEN**[4]
Committee on the Judicial Branch

**HONORABLE WILL L. GARWOOD**
Advisory Committee on Rules of Appellate Procedure

**HONORABLE W. EUGENE DAVIS**
Advisory Committee on Rules of Criminal Procedure

Appointed as committee chairs by Chief Justice William H. Rehnquist, these outstanding jurists have played a vital role in the administration of the federal court system.  These judges served with distinction as leaders of their Judicial Conference committees while, at the same time, continuing to perform their duties as judges in their own courts.  They have set a standard of skilled leadership and earned our deep respect and sincere gratitude for their innumerable contributions.  We acknowledge with appreciation their commitment and dedicated service to the Judicial Conference and to the entire federal judiciary.

---

[4]The resolution recognizing the contributions of Judge Hansen was approved by the Executive Committee, on behalf of the Conference, by mail ballot concluded on March 29, 2001, to coincide with the completion of his term as chair.

*September/October 2001*

## UNITED STATES SENTENCING COMMISSION

On recommendation of the Executive Committee, the Judicial Conference agreed to urge the President, with the advice and consent of the Senate, to reappoint to the United States Sentencing Commission Judges Sterling Johnson, Jr., of the Eastern District of New York, and Joe Kendall of the Northern District of Texas.

## INFORMATION TECHNOLOGY SECURITY/ USE OF THE INTERNET

In March 2001, the Executive Committee was advised that, consistent with Judicial Conference policy (*see* JCUS-SEP 88, p. 57), the Administrative Office was confidentially informing chief judges of potentially inappropriate use of the Internet by court personnel, so that the chief judge could take action, if appropriate. The Committee supported these actions, and asked the Committee on Automation and Technology to develop a comprehensive plan for improving information technology security in the judiciary. In late May, upon hearing of objections by certain judges to the judiciary's Internet access policy as managed by the AO, the Executive Committee urged the Committee on Automation and Technology, on an expedited basis, to develop policies and procedures to protect the confidentiality of electronic judicial communications and work product, including appropriate controls on monitoring.

The Executive Committee subsequently learned that the Ninth Circuit Judicial Council had directed the disconnection of intrusion detection software installed at the Ninth Circuit Internet gateway (which also serves the Eighth and Tenth Circuits). This software made possible, among other things, the identification of high-volume music and movie files. Concerned that the security of judiciary data in these circuits was jeopardized, the Committee determined to ask that the Ninth Circuit Council reactivate the intrusion detection software immediately, and agreed that if this was done, the identification of high-volume files (to which the Ninth Circuit Council had objected) would cease in all three judiciary gateways, pending the previously requested development of policies and procedures by the Automation and Technology Committee. The Ninth Circuit Council agreed.

In June, and again in August 2001, the Executive Committee was informed by the Chair of the Automation and Technology Committee of the latter committee's efforts to develop procedures on appropriate Internet use and the management of such use and on recommendations to be presented to the

*Judicial Conference of the United States*

Conference for actions to be taken pending further development (*see* "Use of the Internet ," p. 43).  In August 2001, the Executive Committee, with the concurrence of the Automation and Technology Committee, agreed to release to the public prior to the Conference session the latter committee's addendum to its report, which deals with this matter.

## MISCELLANEOUS ACTIONS

The Executive Committee—

• Approved proposed interim financial plans for fiscal year 2002 for the Salaries and Expenses, Defender Services, Fees of Jurors and Commissioners, and Court Security accounts, as recommended by the Director of the Administrative Office, and authorized the Director of the Administrative Office to make technical and other adjustments as deemed necessary.  The Executive Committee will be consulted as necessary concerning significant changes in the financial plans or allotments that might be required once a full-year appropriation is enacted.

• Concurred in the determination of the Court Administration and Case Management Committee to defer seeking enactment in a federal courts improvement bill of a provision authorizing the judiciary to charge fees for courtroom technologies such as videoconferencing of appellate arguments, in order to maintain the noncontroversial nature of the bill.

• Declined to take action on a Judicial Branch Committee request to authorize the Director of the Administrative Office to "weigh-in" in support of permitting federal employees to utilize frequent flier mileage for personal use.

• Discussed the issue of judges' attendance at private seminars, and determined to ask the Codes of Conduct Committee to consider amending Advisory Opinion No. 67 in light of *In re Aguinda*, 241 F.3d 194 (2d Cir. 2001).

• Approved a recommendation of the Budget Committee to amend the cost control monitoring system policy on funding court positions to provide nine months of funding for each increase in work units and three months of funding for each decrease in work units, subject to the availability of funds as determined by the Executive Committee during approval of annual financial plans, and upon consideration of the advice

and recommendation of the Director of the Administrative Office.

•    Approved a recommendation of the Security and Facilities Committee
     that a third "judicial space emergency" be declared in Brooklyn, New
     York.

•    Agreed to release to the public prior to Conference action a Court
     Administration and Case Management Committee report relating to
     privacy and public access to electronic case files.

•    On recommendation of the Criminal Law Committee, agreed to (a)
     strongly support the establishment of projects designed to evaluate
     reentry programs to assist certain criminal offenders' reintegration into
     local communities from prison; (b) not oppose legislation designed to
     implement such projects so long as the judiciary is fully funded to
     implement the required provisions of any proposed legislation; and (c)
     authorize the Administrative Office Director to work with Congress to
     suggest modifications to any proposed legislation reflecting concerns of
     the Conference including, among other things, that the project
     parameters be structured to maximize efficiency and effectiveness.

•    Agreed to ask the Administrative Office to implement certain changes
     to the Federal Law Clerk Information System suggested by law school
     placement personnel and also agreed to encourage all judges to
     participate in the system.

## COMMITTEE ON THE ADMINISTRATIVE OFFICE

### COMMITTEE ACTIVITIES

The Committee on the Administrative Office reported that, at the
request of the Executive Committee, it conducted a review of the purposes for
which statutorily required reports are produced by the Administrative Office
and determined that it was not necessary to seek to modify or eliminate any of
the 17 statutorily required reports. The Administrative Office Committee
devoted considerable attention to the AO's role and actions in managing the
security and performance of the judiciary's data communications network,
including its procedures for notifying chief judges about possible inappropriate
Internet use, which were consistent with established protocols. The Committee
was briefed on current issues respecting the managing of judiciary Internet
usage; it met in executive session and reviewed and approved the actions of the
Administrative Office in that regard.   The Committee was also briefed on the

*Judicial Conference of the United States*

progress of several major initiatives and studies, including the status of the AO's management oversight and stewardship initiative.

# COMMITTEE ON AUTOMATION AND TECHNOLOGY

## LAWBOOKS AND LIBRARIES STUDY

At the request of the Executive Committee, the Committee on Automation and Technology, with the assistance of the Committee on Security and Facilities, undertook a comprehensive study of lawbook and library usage within the judiciary with an eye toward cutting costs. Based on this study, the Committee recommended that the Conference adopt the following strategic recommendations:

1.   The lawbooks and library program should be actively managed through circuit-wide library committees and governance structures, increased use and better application of existing management tools and techniques, and periodic review of and consultation with users as to their needs and use of legal research materials. Potential opportunities for more efficient use of lawbook resources should be explored by each circuit.

2.   While successful efforts to restrain the costs of the lawbooks and library program have been achieved over the past several years, modest changes to chambers core collection guidelines and refinements to space and other guidelines would assist in a cost-effective use of judiciary lawbook funds.

3.   There continues to be a clear and compelling need for legal research materials in hard copy format, and it is clear that the transition to on-line legal research is an evolutionary process. The judiciary should continue to promote the use of on-line research and training for judges, librarians and others. Local variations due to differences in research needs, types of cases, culture, and physical plant need to be recognized, and the reduction of lawbook collections should occur on a voluntary basis.

The Committee also recommended adoption of 32 implementing recommendations, which are contained in the executive summary to the Committee's Lawbooks and Libraries Study Report. The Judicial Conference approved the Committee's recommendations, which are intended to make the lawbook and library program more cost-effective and efficient without sacrificing availability of research materials.

42

*September/October 2001*

_____

## USE OF THE INTERNET

In September 1997, the Judicial Conference approved a judiciary-wide policy aimed at protecting the security of the judiciary's electronic systems and information, requiring that, for computers connected to the judiciary's data communications network, access to the Internet would be provided only through national gateway connections approved by the Administrative Office pursuant to procedures adopted by the Automation and Technology Committee. It also urged all courts to adopt their own policies establishing local responsibility for managing employee access to the Internet and providing guidance on appropriate Internet use. JCUS-SEP 97, pp. 52-53. In December 2000, concerned with the explosive growth in Internet usage within the judiciary, the Committee asked the Administrative Office to conduct an analysis of such use. The analysis revealed that a significant factor contributing to the growth of Internet traffic in the courts appeared to be related to personal, rather than business usage.

Informed of the Automation and Technology Committee's efforts, of the AO's analysis, and of subsequent steps taken to advise chief judges of potentially inappropriate Internet use, the Executive Committee, in March 2001, asked the Committee on Automation and Technology to develop a comprehensive plan for improving information technology security in the judiciary (*see* JCUS-MAR 2001, p. 6). The Executive Committee later expanded its request, urging the Automation Committee, on an expedited basis, to develop policies and procedures to protect the confidentiality of electronic judiciary communications and work product, including appropriate controls on monitoring (*supra*, "Information Technology Security/Use of the Internet," pp. 39-40).

The Committee on Automation and Technology developed a number of recommendations regarding operations of the national communications infrastructure, appropriate use of judiciary information technology resources, noticing of judiciary employees, and protection of the judiciary's communications infrastructure. These recommendations were approved by the Judicial Conference, as follows:

That the Judicial Conference—

•        Pending the completion of a review of the system architecture in 2002

43

*Judicial Conference of the United States*

that will be completed under the Committee's direction, with a view toward possible decentralization of Internet access to individual courts in a manner consistent with the security of the entire judiciary network, agree to reaffirm (a) that computers connected to the data communications network (DCN) shall access the Internet only through national gateways; and (b) that operations and security at those gateways are under the administrative, managerial, and logistical control of the Administrative Office, subject to the direction of the Conference or, where appropriate, Conference committees;

· Agree to adopt immediately, on an interim basis, the model use policy developed by the federal Chief Information Officers Council (except for Section F, "Privacy Expectations," which the Committee determined to reconsider), as ultimately revised by the Committee or its Subcommittee on IT Architecture and Infrastructure to tailor it to the judiciary, as a national minimum standard defining appropriate Internet use, subject to the right of each court unit to impose or maintain more restrictive policies. Further agree that in carrying out routine administrative, operational, and maintenance responsibilities, should instances of possibly inappropriate use of government resources come to the attention of the management of a court unit or the Administrative Office, established Judicial Conference notification policy will be followed;

· Reaffirm that individual courts have responsibility to enforce appropriate Internet use policies and direct the Administrative Office, as part of its regular audit process, to examine and comment upon the adequacy of the courts' enforcement methods;

· Agree to recommit to the Committee on Automation and Technology a recommendation on providing notice to judiciary employees of Internet use policies, in light of developments in technology and recent concerns raised on privacy; and

· Having discerned no material business use for Gnutella, Napster, Glacier, and Quake, all of which raise immediate and continuing security vulnerabilities, agree to (a) direct the Administrative Office to take appropriate steps to block such traffic involving computers connected to the DCN; and (b) delegate to the Committee the authority to block other tunneling protocols that may cause security breaches.

### COMMITTEE ACTIVITIES

The Committee on Automation and Technology reported that it had approved priorities for implementing the recommendations of a comprehensive, independent study of the judiciary's national information technology program and approved resource requirements and priorities for the five programs under its jurisdiction: automation, telecommunications, court automation support reimbursable, library services, and electronic public access. The Committee discussed a revised information technology vision to be included in the next update to the *Long Range Plan for Information Technology* and received briefings on a number of information technology projects. The Committee also endorsed the continuation of an implementation strategy for installation of the replacement electronic mail system.

## COMMITTEE ON THE ADMINISTRATION OF THE BANKRUPTCY SYSTEM

### TRUSTEE RETENTION OF PROFESSIONALS

Section 327(d) of the Bankruptcy Code (11 U.S.C. § 327(d)) allows courts to authorize trustees to hire themselves or their firms as attorneys or accountants for an estate if it is "in the best interest of the estate." This practice has been defended on the grounds of economy and efficiency to the estate, but has also raised concerns about possible conflicts of interest as well as a public perception of impropriety. In March 1994, the Judicial Conference agreed to support amendments to section 327(d) to address such concerns (JCUS-MAR 94, p. 11), but for a variety of reasons, such legislation has not been pursued. Upon reconsideration, the Committee determined to recommend that the Conference rescind its March 1994 position, noting that courts are aware of the dangers inherent in the practice of trustees employing themselves or their firms and have not encountered any difficulty in supervising the practice, or in applying the "best interest of the estate" standard that presently exists in section 327(d). The Conference adopted the Committee's recommendation.

### CHAPTER 11 QUARTERLY FEES

Bankruptcy administrators are independent non-judicial officers within the judicial branch who by statute perform the same bankruptcy estate administration oversight functions in the six districts in Alabama and North Carolina that the United States trustees perform in the other districts. Section 105 of the Federal Courts Improvement Act of 2000, Public Law No. 106-518, proposed by the Judicial Conference in March 1996 (JCUS-MAR 96, p. 10)

*Judicial Conference of the United States*

and enacted on November 13, 2000, authorizes the Conference to impose quarterly fees in chapter 11 cases in bankruptcy administrator districts comparable to those already being charged in United States trustee districts. To implement this statute, the Conference approved a Bankruptcy Committee recommendation that such fees be imposed in bankruptcy administrator districts in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time.

## COMMITTEE ACTIVITIES

The Bankruptcy Committee reported that it has established a subcommittee to study venue-related issues in bankruptcy cases, including effective procedures for handling large chapter 11 cases.[5] It also authorized its chair, at an appropriate time, to create a subcommittee to help coordinate the judiciary's implementation of bankruptcy reform legislation. The Committee further unanimously endorsed the recommendations of the Court Administration and Case Management Committee regarding privacy and public access to court case files (*see infra*, "Privacy and Public Access to Electronic Case Files," pp. 48-50) and of the Budget Committee regarding the designation of certifying officers (*see infra,* "Certifying Officers," p. 47).

# COMMITTEE ON THE BUDGET

## FISCAL YEAR 2003 BUDGET REQUEST

The Judicial Conference approved the Budget Committee's proposed budget request for fiscal year 2003, subject to amendments necessary as a result of new legislation, actions of the Judicial Conference, or any other reason the Executive Committee considers necessary and appropriate.

## CERTIFYING OFFICERS

---

[5]Prior to this Judicial Conference session, the Bankruptcy Committee withdrew for further consideration certain recommendations it had made proposing amendments to statutory and rule provisions governing venue in bankruptcy cases and proceedings.

46

The Federal Courts Improvement Act of 2000 included a Conference-sought provision authorizing the Director of the Administrative Office to designate certifying officers in the judiciary.  In anticipation of such legislation, at its September 1998 session, the Judicial Conference adopted an implementation strategy stating that the Director should consult with the chief judge before designating additional certifying officers in a district court (JCUS-SEP 98, p. 59).  At this session, the Judicial Conference approved a recommendation of the Budget Committee, made in consultation with the Committees on Court Administration and Case Management, Bankruptcy, Criminal Law, and Defender Services, that the September 1998 Conference policy be amended so that the appropriate chief judge maintains oversight of operations within his or her court unit.  Under the amended policy, the Director of the Administrative Office will designate certifying officers in appellate, district, and bankruptcy courts with the concurrence of the respective chief judges of those courts.  In those courts in which the clerk's office functions of the district and bankruptcy units are consolidated, certifying officer responsibilities also will be consolidated, and concurrence of the chief district judge will be required.  Certifying officers in the bankruptcy administrator and bankruptcy appellate panel programs will be designated with the concurrence of the circuit chief judge, and federal public defenders will be designated without chief judge concurrence.

---

## COMMITTEE ACTIVITIES

The Budget Committee and chairs of the program committees discussed news articles that reported the apparent use of the Internet by court employees for non-official purposes including substantial downloading of inappropriate material.  The Budget Committee believes that the judiciary must employ adequate safeguards over the use of its property and facilities; that past success in acquiring the necessary appropriations for the operations of the courts is due largely to the trusting relationship that the judiciary enjoys with the Congress and the confidence Congress has that the judiciary will use its resources wisely; and that all reasonable steps must be taken to retain Congress' confidence in the courts' stewardship of the taxpayers' dollars.  Therefore, the Committee unanimously resolved that, in formulating an information resources use policy, the Committee on Automation and Technology should ensure that judiciary

*Judicial Conference of the United States*

automation property and facilities are used for official purposes. The Budget Committee encouraged the Conference to embrace policies and administrative procedures for judiciary programs that will promote reasonable safeguards over the use of judiciary assets. *See also, supra,* "Use of the Internet," pp. 43-44.

## COMMITTEE ON CODES OF CONDUCT

### COMMITTEE ACTIVITIES

Since its last report to the Judicial Conference in March 2001, the Committee on Codes of Conduct received 31 new written inquiries and issued 31 written advisory responses. During this period, the average response time for these requests was 18 days. The Chairman received and responded to 17 telephonic inquiries. In addition, individual committee members responded to 126 inquiries from their colleagues.

## COMMITTEE ON COURT ADMINISTRATION AND CASE MANAGEMENT

### PRIVACY AND PUBLIC ACCESS TO ELECTRONIC CASE FILES

After extensive study and opportunity for public comment, the Committee on Court Administration and Case Management, with substantial input from the Committees on Criminal Law, the Administration of the Bankruptcy System, Rules of Practice and Procedure, and Automation and Technology, endorsed the "Report on Privacy and Public Access to Electronic Case Files" (the Privacy Report) and recommended its adoption by the Judicial Conference. The Privacy Report establishes a judiciary-wide policy governing electronic availability of case file information. The Judicial Conference approved the following general principles and specific recommendations contained in the Report regarding access to different types of case files:

### GENERAL PRINCIPLES

•   There should be consistent, nationwide policies in federal courts in order to ensure that similar privacy protections and access presumptions apply regardless of which federal court is the custodian of a particular case file.

48

- Notice of these nationwide policies should be given to all litigants in federal court so that they will be aware of the fact that materials which they submit in a federal court proceeding could become available on the Internet.

- Members of the bar must be educated about the policies and the fact that they must protect their clients by carefully examining the documents that they file in federal court for sensitive, private information and by making the appropriate motions to protect documents from electronic access when necessary.

- Except where otherwise noted, the policies apply to both paper and electronic files.

- Electronic access to docket sheets through PACERNet and court opinions through court websites will not be affected by these policies.

- The availability of case files at the courthouse will not be affected or limited by these policies.

- Nothing in these recommendations is intended to create a private right of action or to limit the application of Rule 11 of the Federal Rules of Civil Procedure.

### SPECIFIC RECOMMENDATIONS

- Civil Case Files.  Documents in civil case files should be made available electronically to the same extent that they are available at the courthouse with one exception (that Social Security cases should be excluded from electronic access) and one change in policy (that certain "personal data identifiers" should be modified or partially redacted by the litigants; these identifiers are Social Security numbers, dates of birth, financial account numbers and names of minor children).

- Criminal Case Files.  Public remote electronic access to documents in criminal cases should not be available at this time, with the understanding that this policy will be reexamined within two years of adoption by the Judicial Conference.

- Bankruptcy Case Files.  Documents in bankruptcy case files should be made generally available electronically to the same extent that they are available at the courthouse, with a similar policy change for personal identifiers as in civil cases; section 107(b)(2) of the Bankruptcy Code

should be amended to establish privacy and security concerns as a basis for the sealing of a document; and the Bankruptcy Code and Rules should be amended as necessary to allow the court to collect a debtor's full Social Security number but display only the last four digits.

•    Appellate Case Files.  Appellate case files should be treated at the appellate level the same way in which they are treated at the lower level.

## MODEL LOCAL RULES FOR ELECTRONIC CASE FILING

On recommendation of the Committee, the Conference adopted model local rules for district and bankruptcy courts to assist those courts in implementing the electronic case filing (ECF) program.[6]  The rules were developed with the assistance of the Committee on Automation and Technology and the Committee on Rules of Practice and Procedure.  Courts may adopt the rules in full or in part, and courts may also opt to promulgate them through standing orders.

## MISCELLANEOUS FEES

Judicial Panel on Multidistrict Litigation.  In September 1996, the Judicial Conference approved increases to certain fees in the miscellaneous fee schedules for appellate, district, and bankruptcy courts and the Court of Federal Claims to account for inflation.  These fee increases were made contingent on the enactment of legislation to permit the judiciary to retain the resulting increased amounts (JCUS-SEP 96, p. 54).  The Conference's 1996 action did not extend to the Judicial Panel on Multidistrict Litigation because its fee schedule was not established until March 1997 (JCUS-MAR 97, p. 20).  Legislation permitting the judiciary to retain miscellaneous fee increases was enacted in section 102 of the Federal Courts Improvement Act of 2000 and includes the Multidistrict Litigation Panel with the other court types for which such fee increases may be retained.  In order to maintain uniformity among the fee schedules of the different court types, the Judicial Conference approved a Committee recommendation that the Miscellaneous Fee Schedule for the Judicial Panel on Multidistrict Litigation be amended to include the fee increases set forth below:

---

[6]No courts of appeals have yet instituted ECF.  Therefore, no rules are proposed for those courts at this time.

| Fee | Current Amount | Increased Amount |
| --- | --- | --- |
| Search of Records | $15 | $20 |
| Certification of Documents | $ 5 | $ 7 |
| Returned Check | $25 | $35 |

Federal Agency Exemption in the Courts of Appeals.  On recommendation of the Committee, the Judicial Conference agreed to amend Items 2 and 4 of the Court of Appeals Miscellaneous Fee Schedule to add language concerning limitations on federal agency exemption from fees.  This language, which is similar to that found in the district and bankruptcy court fee schedules, had been inadvertently omitted when the appellate fee schedule was amended to reflect the application of electronic access fees (*see* JCUS-SEP 93, pp. 44-45).  As amended, Items 2 and 4 read as follows (new language in italics) :

(2) For every search of the records of the court and certifying the results thereof, $20.  *This fee shall apply to services rendered on behalf of the United States if the information requested is available through electronic access.*

\* \* \* \* \*

(4) For reproducing any record or paper, 50 cents per page.  This fee shall apply to paper copies made from either: (1) original documents; or (2) microfiche or microfilm reproductions of the original records.  *This fee shall apply to services rendered on behalf of the United States if the record or paper requested is available through electronic access.*

Appeal Fee in Bankruptcy.  The Conference adopted the recommendation of the Committee on Court Administration and Case Management, as endorsed by the Committee on the Administration of the Bankruptcy System, to amend Items 15 and 21 of the Bankruptcy Court Miscellaneous Fee Schedule to provide that fees for appeals or cross-appeals by bankruptcy trustees (and debtors in possession in chapter 11 cases) be payable only from the estate and to the extent that an estate is realized in order to encourage trustees to pursue estate assets.  A similar provision has already been included in Item 6 of the Bankruptcy Court Miscellaneous Fee Schedule pertaining to the obligation of trustees and debtors in possession to pay adversary proceeding filing fees.

*Judicial Conference of the United States*

## JUROR ATTENDANCE FEE

Pursuant to the Jury Selection and Service Act, 28 U.S.C. § 1871, jurors are entitled to receive a fee of $40 per day for attendance at a place of trial or hearing. While this fee is not intended to support or replace salaries, it is intended to provide a minimal level of compensation for jurors fulfilling their civic responsibility. However, this fee has not been increased in over ten years.[7] On recommendation of the Committee on Court Administration and Case Management, the Judicial Conference agreed to seek legislation to amend 28 U.S.C. § 1871(b)(1) to increase from $40 to $50 the fee paid to a juror per day of actual attendance, subject to congressional funding.

## E-GOVERNMENT ACT OF 2001

The proposed E-Government Act of 2001 (S. 803 and H.R. 2458, 107th Congress) is intended to improve the use of information technology by the federal government. Section 205 of both bills would require appellate, district and bankruptcy courts to establish official websites containing information or links to information such as local rules, written opinions and electronically filed documents. It would permit the Judicial Conference to promulgate rules to address privacy concerns, and includes an "opt out" provision. The bills also address the conditions under which fees may be charged for court information. Since an extensive effort is already underway in the judiciary both to expand public access through technology (*e.g.*, the case management/electronic case files system) and to address privacy issues related to public access (*see supra*, "Report on Privacy and Public Access to Electronic Case Files," pp. 48-50), it was the Committee's view that the judiciary is better equipped to address these issues. On recommendation of the Committee, the Judicial Conference agreed to ask Congress to strike section 205 and replace it with a provision giving the judiciary six months to study the use of information technology in providing court-related information to the public and provide the Senate Governmental Affairs and the House Government Reform Committees with language more tailored to the objectives and needs of the judiciary and its users.

---

[7]In March 1998, the Judicial Conference approved seeking legislation to reduce from 30 to five the number of days jurors are required to serve before they are eligible to receive an additional fee (JCUS-MAR 98, p. 9), but this proposal has not yet been enacted.

*September/October 2001*

In addition, on recommendation of the Committee, the Conference adopted the following specific fallback positions in the event Congress declines to strike section 205:

That the Judicial Conference—

a.    take no position with regard to the meaning of the term "written opinion" as used in the legislation;

b.    take no position on the amendment of the fee language in the Judiciary Appropriations Act of 1991;

c.    make Congress aware of the fact that there are significant costs associated with the maintenance of written opinions online for an indefinite period of time;

d.    make Congress aware of any inconsistencies between any privacy and access policy the Conference may adopt and the provisions of the legislation;

e.    make Congress aware that the "opt out" provision of the bill is contrary to the establishment of a nationwide access policy and should be viewed as merely a short-term solution to initial noncompliance;

f.    seek an amendment to the legislation to allow chief bankruptcy judges to create the websites of bankruptcy courts; and

g.    seek an amendment to the legislation to extend the time requirement for compliance with both the operation of court websites and the availability of electronic documents to five years after the effective date of the Act.

---

## COMMITTEE ACTIVITIES

The Committee on Court Administration and Case Management reported that, among other things, it received a briefing on the Criminal Justice Act supervisory attorney pilot project, which will be evaluated by the Committee at its next meeting; an update on videoconferencing in the federal courts; an update on the case management/electronic case files project; and a briefing on the Federal Judicial Center's ongoing district case weighting study.

*Judicial Conference of the United States*

## COMMITTEE ON CRIMINAL LAW

### DNA AND COMPETENCY OF COUNSEL LEGISLATION

Legislation pending in the 107th Congress on improving the availability of post-conviction forensic DNA testing in federal and state criminal justice systems and on ensuring competent counsel in state capital cases was considered by the Committees on Criminal Law, Defender Services, and Federal-State Jurisdiction, each with regard to those provisions falling within its jurisdiction. The recommendations of those committees were presented to the Conference in one consolidated report and are discussed *infra,* "Consolidated Report on DNA and Competency of Counsel Legislation," pp. 72-75.

### COMMITTEE ACTIVITIES

The Committee reported on its recommendation to the AO Director that the Regulations of the Director of the Administrative Office Concerning the Carrying and Use of Firearms by U.S. Probation and Pretrial Services Officers be revised to authorize probation and pretrial services officers to carry judiciary-issued, double-action only, semiautomatic firearms in the performance of their official duties. The regulations, adopted by the Conference at its March 1997 session (JCUS-MAR 97, p. 22), delegate to the AO Director, in consultation with the Committee, the authority to determine which firearms and ammunition are authorized for use by the officers. The Committee was briefed on the activities of an ad hoc working group that is reviewing and revising pretrial services and post-conviction supervision monographs.

## COMMITTEE ON DEFENDER SERVICES

### MALPRACTICE CLAIMS AGAINST PANEL ATTORNEYS

The Federal Courts Improvement Act of 2000 amended subsection (d) of the Criminal Justice Act (CJA), 18 U.S.C. § 3006A(d), to authorize courts to reimburse panel attorneys for expenses reasonably incurred by them in defending against actions alleging their malpractice in furnishing representational service under the CJA. On recommendation of the Committee

54

on Defender Services, the Judicial Conference approved a proposed revision of paragraph 2.27 of the Guidelines for the Administration of the Criminal Justice Act and Related Statutes, Volume VII, *Guide to Judiciary Policies and Procedures,* to add a new subparagraph (D) to advise courts and panel attorneys regarding implementation of this legislation.  (The previous subparagraph (D) is redesignated as (E).)  The new guideline sets a monetary ceiling for reimbursement, the deductible amount of the attorney's professional liability insurance or $5,000, whichever is less; precludes reimbursement for the value of the attorney's *own* services in defending against the action; and, as specified in the statute, prohibits reimbursement if a judgment of malpractice is rendered against the panel attorney.  Expenses incurred on or after November 13, 2000 are eligible for reimbursement.

## DNA AND COMPETENCY OF COUNSEL LEGISLATION

Legislation pending in the 107th Congress on improving the availability of post-conviction forensic DNA testing in federal and state criminal justice systems and on ensuring competent counsel in state capital cases was considered by the Committees on Criminal Law, Defender Services, and Federal-State Jurisdiction, each with regard to those provisions falling within its jurisdiction.  The recommendations of those committees were presented to the Conference in one consolidated report and are discussed *infra*, "Consolidated Report on DNA and Competency of Counsel Legislation," pp. 72-75.

## COMMITTEE ACTIVITIES

Under its delegated authority from the Judicial Conference (JCUS-MAR 89, pp. 16-17), the Committee on Defender Services approved fiscal year 2002 budgets and grants for 73 federal defender organizations, totaling $272,123,700.

The Committee reported that it reviewed the continuing development and implementation of the Outline of the Defender Services Program Strategic Plan, and supported the concept of convening a joint state and federal defender conference on quality of representation.  The Committee endorsed establishment of two capital resource counsel positions to be used to train and consult with federal defender organization staffs on federal death penalty representation, and, as their availability permits, provide support and training to Criminal Justice Act panel attorneys on such matters.  Efforts by the

Committee and other components of the judiciary to obtain an increase in the compensation rate for Criminal Justice Act panel attorneys appear to be yielding positive results, in that Congress approved FY 2002 funding for an hourly rate of $90 for in-court and out-of-court work.  The Committee also received a report on federal defender and panel attorney training events.

## COMMITTEE ON FEDERAL-STATE JURISDICTION

### DIVERSITY JURISDICTION

Section 1332(c) of title 28, United States Code, currently "deems" a corporation to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business, for purposes of diversity of citizenship and removal jurisdiction.  The provision was originally adopted to expand the number of states in which a corporation will be deemed a citizen, thus restricting the scope of diversity jurisdiction.  However, some courts have interpreted the word "State" in section 1332(c)(1) as not including foreign states, resulting in the expansion of the availability of diversity jurisdiction for corporations with foreign contacts.  In response to this situation, the Committee on Federal-State Jurisdiction recommended that the Judicial Conference endorse enactment of a proposal of the American Law Institute to amend 28 U.S.C. § 1332(c) to deem a corporation to be a citizen of every state and foreign state by which it has been incorporated and of the state or foreign state in which it has its principal place of business.  The Conference adopted the Committee's recommendation, which would have the effect of restricting the availability of diversity jurisdiction for corporations with foreign contacts.

### PATIENTS' RIGHTS LEGISLATION

During the first session of the 107th Congress, both the Senate and the House of Representatives passed differing versions of the "Bipartisan Patient Protection Act" as S. 1052 and H.R. 2563, respectively.  These bills would establish new federal standards governing the provision of medical benefits in health insurance plans.  Both bills would also provide legal recourse for damage claims for injuries resulting from the denial by a health plan of a

medical benefit.  They differ, however, in their allocation of jurisdiction to the state and federal courts and in the type of action permitted.[8]

S. 1052 would create a new federal cause of action, with exclusive federal court jurisdiction, for personal injuries arising from a failure to exercise ordinary care in making a decision regarding an individual's coverage under a health benefit plan.  S. 1052 would also lift the preemption bar in the Employee Retirement Income Security Act of 1974 (ERISA) to permit suits for personal injuries arising from "medically reviewable determinations" (*e.g.*, decisions based on the necessity or appropriateness of a treatment) to go forward in state courts in accordance with otherwise applicable state law.  H.R. 2563 would create a single federal cause of action for damages that result from negligent coverage decisions, as well as medically reviewable decisions.  State and federal courts would be given concurrent jurisdiction.  Although H.R. 2563 precludes removal of claims arising from a medically reviewable determination, it permits removal if the action is against certain parties.  The two bills would also provide for access to a court when a benefit has been denied and the patient believes that exhaustion of internal and external review processes would result in irreparable injury to the patient's health.  S. 1052 would make federal court the exclusive forum for the adjudication of such exigent benefit claims, while H.R. 2563 would provide for concurrent jurisdiction in the state and federal courts and would make no provision to bar removal.

In February 2000, during the 106th Congress, the Executive Committee, on behalf of the Judicial Conference, adopted a recommendation of the Committee on Federal-State Jurisdiction urging Congress to provide that in any managed care legislation, the state courts be the primary fora for the resolution of personal injury claims arising from the denial of health care benefits, should Congress determine that such legal recourse is warranted.  The Executive Committee recognized that personal injury claims arising from the provision or denial of medical treatment have historically been governed by state tort law, and suits on such claims have traditionally and satisfactorily been resolved primarily in the state court system.  JCUS-MAR 00, pp. 7-8.  After reviewing the legal recourse provisions of S. 1052 and H.R. 2563, and in light of

---

[8]Presently, suits for personal injury damages against health insurance plans governed by the Employee Retirement Income Security Act of 1974 are generally barred, and only a claim for the actual benefit or service is permitted in federal, as well as state, court.  29 U.S.C. § 1132(a).

*Judicial Conference of the United States*

previous Conference action, the Committee on Federal-State Jurisdiction recommended that the Conference—

a. Continue to recognize that state courts should be the primary fora for the resolution of personal injury claims arising from the denial of health care benefits;

b. Express concern with any provision in patients' rights legislation that would create a new cause of action in federal court for personal injury claims arising from medically reviewable (*e.g.*, necessity of treatment) benefit decisions; and

c. Encourage Congress, in any such legislation, to provide state courts with jurisdiction (concurrent or otherwise) over any suits to compel insurance plans to provide interim medical benefits on an emergency basis and to bar removal of such suits.

By mail ballot concluded on October 1, 2001, the Conference adopted the Committee's recommendations.

## DNA AND COMPETENCY OF COUNSEL LEGISLATION

Legislation pending in the 107th Congress on improving the availability of post-conviction forensic DNA testing in federal and state criminal justice systems and on ensuring competent counsel in state capital cases was considered by the Committees on Criminal Law, Defender Services, and Federal-State Jurisdiction, each with regard to those provisions falling within its jurisdiction.  The recommendations of those committees were presented to the Conference in one consolidated report and are discussed *infra,* "Consolidated Report on DNA and Competency of Counsel Legislation," pp. 72-75.

## COMMITTEE ACTIVITIES

The Committee on Federal-State Jurisdiction reported that it was briefed on a number of issues related to mass torts and class actions, including proposed amendments to Rule 23 of the Federal Rules of Civil Procedure regarding duplicative and competing class actions.   In addition, the Committee formed a Subcommittee on Federal-State Interaction, which is tasked with

making suggestions as to how the Committee can better foster state-federal relations and educational initiatives.  Other topics discussed by the Committee included the work of the Ninth Circuit's Pacific Islands Committee, the status of asbestos litigation, legislative language to make orders of the National Labor Relations Board self-enforcing, and a proposal by administrative law judges to restructure the appellate administrative review of Social Security claims.

## COMMITTEE ON FINANCIAL DISCLOSURE

### FINANCIAL DISCLOSURE REPORT PREPARATION

On recommendation of the Committee on Financial Disclosure, the Judicial Conference agreed (by mail ballot concluded on October 1, 2001) to authorize the reimbursement of judges and judiciary employees for the cost of professional fees, not to exceed $1000, for the preparation of annual financial disclosure reports.  Reimbursement of this expense is appropriate because preparation of a financial disclosure report is a part of a filer's official duties and imparts no personal benefit; rather it satisfies an official government need.

### COMMITTEE ACTIVITIES

As of July 1, 2001, the Committee had received 3,231 financial disclosure reports and certifications for the calendar year 2000, including 1,174 reports and certifications from Supreme Court justices, Article III judges, and judicial officers of special courts; 320 from bankruptcy judges; 488 from magistrate judges; and 1,249 from judicial employees.

## COMMITTEE ON INTERCIRCUIT ASSIGNMENTS

### COMMITTEE ACTIVITIES

The Committee on Intercircuit Assignments reported that during the period from January 1, 2001, to June 30, 2001, a total of 90 intercircuit assignments, undertaken by 58 Article III judges, were processed and recommended by the Committee on Intercircuit Assignments and approved by the Chief Justice.  In addition, the Committee aided courts requesting assistance by both identifying and obtaining judges willing to take assignments.

*Judicial Conference of the United States*

## COMMITTEE ON INTERNATIONAL JUDICIAL RELATIONS

### COMMITTEE ACTIVITIES

The Committee on International Judicial Relations reported that seven delegations of Russian judges have participated in a Library of Congress Russian Leadership Program rule-of-law component that has been established with Committee assistance.  The program includes visits to the federal and state courts in a local community in the United States.  The Committee also reported on its involvement in rule-of-law and judicial reform activities relating to Africa, Asia, Europe, and Latin America, including work with the Russian and Venezuelan judiciaries funded through the United States Agency for International Development.

## COMMITTEE ON THE JUDICIAL BRANCH

### GOVERNMENT MANAGEMENT REFORM ACT OF 1994

Section 101 of the Government Management Reform Act of 1994, Public Law No. 103-356, amended the Ethics Reform Act of 1989 to provide that an annual Employment Cost Index (ECI) adjustment for judges, members of Congress, and Executive Schedule officials can be no higher than a comparable pay adjustment for General Schedule employees.  The effect of this provision has been that judges and other high-level federal officials have lost 2.8 percent of their annual ECI adjustments cumulatively, resulting in a loss of about $4,000 annually.  After considering the legislative histories of the Ethics Reform Act and section 101 of the Government Management Reform Act, the Committee concluded that section 101 is contrary to the intent of Congress and the President in enacting the Ethics Reform Act (which was to make annual pay adjustments for high-level officials independent of those for other federal employees) and is unfair in its application to judges.  On recommendation of the Judicial Branch Committee, the Judicial Conference agreed to seek repeal of section 101 of the Government Management Reform Act of 1994, as it operates on judges, members of Congress, and Executive Schedule officials.

## TRAVEL REGULATIONS FOR UNITED STATES JUSTICES AND JUDGES

On recommendation of the Judicial Branch Committee, the Judicial Conference agreed to amend the Travel Regulations for United States Justices and Judges to clarify the Director's authority with regard to reimbursement for travel and subsistence expenses for judges with special needs.  The amendments provide that (a) the Director may authorize a judge with a special need (*e.g.*, physical disability) transportation and per diem expenses incurred by a family member or other attendant who must travel with the judge to make the trip possible;  (b) a judge with a special need is authorized services (*e.g.*, renting and/or transporting a wheelchair) to enable the judge to accomplish successfully the purpose of the travel; and (c) the Director may authorize an actual subsistence expense reimbursement not to exceed 300 percent of the applicable maximum per diem rate, where the daily subsistence allowance for judges who itemize is inadequate to cover the cost of a hotel room that is accessible or otherwise equipped for physically disabled persons.

## COMMITTEE ACTIVITIES

The Committee on the Judicial Branch reported that it has continued to give high priority to the problem of judicial compensation.  The Committee also devoted considerable time and attention to benefits matters and received an update on the status of two cases raising issues concerning taxation of judicial compensation.

# COMMITTEE ON JUDICIAL RESOURCES

## COURT INTERPRETER POSITIONS

Based on established criteria, the Committee on Judicial Resources recommended, and the Judicial Conference approved, ten additional court interpreter positions for fiscal year 2003:  six positions for the District of Arizona, including the conversion of three temporary positions to permanent; three positions for the Southern District of California; and one position for the Northern District of California.  Four of these positions (three in the District of Arizona and one in the Southern District of California) were approved for accelerated funding in fiscal year 2002.  On recommendation of the Committee,

the Conference declined to approve additional court interpreter positions for the Districts of Massachusetts, Nebraska, New Jersey, and Puerto Rico.

## BANKRUPTCY ADMINISTRATOR STAFF

The bankruptcy administrator for the Northern District of Alabama requested authority to have a "type II" chief deputy bankruptcy administrator position, citing the size, geographic distribution and level of responsibilities of that office.  This request was supported by the chief judge of the Eleventh Circuit Court of Appeals, and the chief judges of the district and bankruptcy courts of the Northern District of Alabama.  On recommendation of the Committee, which determined that the bankruptcy administrator for that district would use a second-in-command type II chief deputy in a manner consistent with the position description set forth in the Judiciary Salary Plan, the Conference approved the bankruptcy administrator's request.

## PHYSICAL FITNESS CENTERS

Physical fitness programs have been promoted by both the private and federal sectors as a means to improve employee productivity, reduce absenteeism, lessen employee turnover, and decrease health care costs.  Judiciary staff have used on-site and shared fitness centers for several years.  At the request of the Committee on Security and Facilities, the Committee on Judicial Resources developed a judiciary policy on physical fitness centers to give guidance on such matters as liability, safety, and space concerns, and recommended its adoption by the Conference.  Among other things, the policy authorizes local funds to be expended to allow court staff to participate in fitness center activities.  The Conference adopted the policy on physical fitness centers proposed by the Committee.

## BANKRUPTCY APPELLATE PANEL LAW CLERKS

In order to develop a methodology for allocating bankruptcy appellate panel law clerks, the Judicial Resources Committee considered the caseloads and resources of bankruptcy appellate panel judges, recommendations made by chief bankruptcy appellate panel judges and bankruptcy appellate panel clerks, and other detailed alternatives.  On recommendation of the Committee, the Conference agreed to take the following actions:

*September/October 2001*

a.   Adopt a national staffing allocation formula for bankruptcy appellate panel law clerks of one law clerk for every 100 bankruptcy appellate panel annual case participations on a circuit-wide basis, not to exceed one law clerk per bankruptcy appellate panel judge;

b.   Define bankruptcy appellate panel case participations for the bankruptcy appellate panel law clerk formula as including (1) case terminations on the merits following oral hearing or submission on the briefs and (2) case procedural terminations ruled on by a judge;

c.   Approve a rounding factor of 75 bankruptcy appellate panel case participations for all filings above the initial base of 100 case participations for receiving a second or subsequent law clerk;

d.   Approve a stability factor that would reduce the number of allocated positions only if the bankruptcy appellate panel does not meet the formula standard with the rounding factor for two years in a row; and

e.   Authorize the Director of the Administrative Office to approve requests for bankruptcy appellate panel law clerk extensions for compelling reasons.

## DISTRICT CLERKS' OFFICES STAFFING FORMULA

In September 2000, the Judicial Conference approved a new staffing formula for the district clerks' offices (JCUS-SEP 00, pp. 56-57). Subsequently, in order to take into consideration the impact of new technologies, the Committee recommended that the Conference revise the formula to include a new "automation" factor and to remove the automation component from the existing "organizational" factor. In addition, the Committee recommended a technical amendment to the "judge support" staffing factor to reflect that this factor was intended to be based on "judges authorized," not "judges present," since the former is a more accurate indicator of workload. The Conference adopted the proposed automation, organizational, and judge support staffing factors as part of the staffing formula for the United States district court clerks' offices to be implemented in fiscal year 2002.

*Judicial Conference of the United States*

## ALTERNATIVE DISPUTE RESOLUTION STAFFING FACTOR

In March 1998, the Judicial Conference approved a "basic" and a "robust" staffing factor for clerk's office positions performing duties related to alternative dispute resolution (JCUS-MAR 98, pp. 20-21).  The basic staffing factor was intended to apply to most district courts' alternate dispute resolution (ADR) programs, while the robust factor was intended for a limited number of courts with extensive ADR programs.  The District of South Carolina, heretofore funded using the basic staffing factor, requested application of the robust factor, citing significant growth in its program.  Based on the number of cases reported as participating in the District of South Carolina's ADR program, and the number of hours spent processing those cases for the 12-month reporting period ending June 2000, the Committee on Judicial Resources recommended that the Judicial Conference approve that district's request.  The Conference adopted the Committee's recommendation.

## QUALIFICATIONS STANDARDS FOR CHIEF PROBATION AND CHIEF PRETRIAL SERVICES OFFICERS

The Judicial Conference approved a recommendation of the Committee on Judicial Resources that it adopt revised qualifications standards for chief probation officers and chief pretrial services officers in order to modernize and enhance those standards.  The new standards retain requirements for a bachelor's degree before specialized experience is credited and for three years of technical experience for continued law enforcement officer retirement system coverage, but they eliminate credit for graduate-level education and allow substitution of three years of successful experience as a supervisor or a manager for the requirement of a year at the next lower level of specialized experience.

## COMMITTEE ACTIVITIES

The Committee on Judicial Resources reported that it encouraged the Director of the Administrative Office to increase the health care flexible spending account cap from $5,000 to a maximum of $10,000.  The Committee took no action on special rates proposed by the Office of Personnel Management for information technology personnel because a survey of all

64

court units conducted by the Administrative Office in March 2001 showed no apparent nationwide problem with information technology recruitment and retention in the judiciary (although the data indicated problems in certain locality pay areas).  The Committee asked the Administrative Office to provide an update if the situation changes and to develop educational materials that encourage courts to use the full range of Court Personnel System flexibilities and monetary and non-monetary incentives to attract and retain information technology employees.

## COMMITTEE ON THE ADMINISTRATION OF THE MAGISTRATE JUDGES SYSTEM

### SELECTION AND APPOINTMENT REGULATIONS

On recommendation of the Committee on the Administration of the Magistrate Judges System, the Judicial Conference approved technical and clarifying changes to the Regulations of the Judicial Conference of the United States Establishing Standards and Procedures for the Appointment and Reappointment of United States Magistrate Judges.  Among other things, the changes add the Territory of Guam and the Commonwealth of the Northern Mariana Islands as locations where a person may be a member of the bar to be qualified for appointment as a magistrate judge, and clarify that any additional qualification standard that a court may wish to impose, beyond those in the selection and appointment regulations, may not be inconsistent with the court's policy as an equal opportunity employer.

### CHANGES IN MAGISTRATE JUDGE POSITIONS

After consideration of the report of the Committee and the recommendations of the Director of the Administrative Office, the district courts, and the judicial councils of the circuits, the Judicial Conference approved the following changes in positions, locations, salaries, and arrangements for full-time and part-time magistrate judge positions.  Changes with a budgetary impact are to be effective when appropriated funds are available.

*Judicial Conference of the United States*

### THIRD CIRCUIT

Eastern District of Pennsylvania

> Made no change in the number, locations, or arrangements of the
> magistrate judge positions in the district.

Middle District of Pennsylvania

> Increased the salary of the part-time magistrate judge position at
> Williamsport from Level 7 ($5,605 per annum) to Level 6 ($11,211 per
> annum).

### FOURTH CIRCUIT

District of South Carolina

1.   Authorized an additional full-time magistrate judge position in
     Charleston; and

2.   Made no change in the number, locations, salaries, or arrangements of
     the other magistrate judge positions in the district.

### FIFTH CIRCUIT

Middle District of Louisiana

> Made no change in the number or arrangements of the magistrate judge
> positions in the district.

Northern District of Texas

> Increased the salary of the part-time magistrate judge position at
> Abilene from Level 5 ($22,422 per annum) to Level 4 ($33,633 per
> annum).

Western District of Texas

> Redesignated the full-time magistrate judge position currently
> designated as Austin or Waco as Austin.

*September/October 2001*

## SIXTH CIRCUIT

Eastern District of Michigan

> Made no change in the number, locations, or arrangements of the magistrate judge positions in the district.

## NINTH CIRCUIT

District of Idaho

> Made no change in the number, location, or arrangements of the magistrate judge positions in the district.

District of Oregon

> Made no change in the number, locations, salaries, or arrangements of the magistrate judge positions in the district.

## ELEVENTH CIRCUIT

Northern District of Alabama

> Made no change in the number, locations, or arrangements of the magistrate judge positions in the district.

---

## ACCELERATED FUNDING

On recommendation of the Committee, the Judicial Conference agreed to designate the new full-time magistrate judge position at Charleston, South Carolina, for accelerated funding in fiscal year 2002.

---

## COMMITTEE ACTIVITIES

The Committee considered two issues concerning the selection and appointment regulations for magistrate judge positions. First, the Committee discussed a judge's suggestion that the regulations be amended to provide that if an applicant for a magistrate judge position is a member of the same law firm as a member of the merit selection panel, the panel member must step down.

The Committee determined not to seek a change to the regulations to address the issue, but instead to add language to the selection and appointment pamphlet that each panel member must disclose to all other panel members any personal or professional relationships with any applicants for the position. The Committee also declined to adopt a judge's suggestion that the regulations be modified to allow career law clerks with at least five years of clerkship experience to have that clerkship time considered in computing the five-year active practice of law requirement.

# COMMITTEE TO REVIEW CIRCUIT COUNCIL CONDUCT AND DISABILITY ORDERS

## COMMITTEE ACTIVITIES

The Committee to Review Circuit Council Conduct and Disability Orders reported that it met in August 2001 to consider a petition for review of an order entered by the Judicial Council of the District of Columbia Circuit in proceedings conducted under the Judicial Conduct and Disability Act, 28 U.S.C. § 372(c). The petition, filed in April 2001, was taken under advisement.

# COMMITTEE ON RULES OF PRACTICE AND PROCEDURE

## FEDERAL RULES OF APPELLATE PROCEDURE

The Committee on Rules of Practice and Procedure submitted to the Judicial Conference proposed amendments to Appellate Rules 1 (Scope of Rules; Title), 4 (Appeal as of Right -- When Taken), 5 (Appeal by Permission), 21 (Writs of Mandamus and Prohibition, and Other Extraordinary Writs), 24 (Proceeding in Forma Pauperis), 25 (Filing and Service), 26 (Computing and Extending Time), 26.1 (Corporate Disclosure Statement), 27 (Motions), 28 (Briefs), 31 (Serving and Filing Briefs), 32 (Form of Briefs, Appendices, and Other Papers), 36 (Entry of Judgment; Notice), 41 (Mandate: Contents; Issuance and Effective Date; Stay), 44 (Case Involving a Constitutional Question When the United States Is Not a Party) and 45 (Clerk's Duties), and new Form 6 (Certificate of Compliance With Rule 32(a)), together with Committee notes explaining their purpose and intent. The Judicial Conference approved the amendments and new form and authorized their transmittal to the

68

*September/October 2001*

Supreme Court for its consideration with the recommendation that they be adopted by the Court and transmitted to Congress in accordance with the law.

## FEDERAL RULES OF BANKRUPTCY PROCEDURE

The Committee on Rules of Practice and Procedure submitted to the Judicial Conference proposed amendments to Bankruptcy Rules 1004 (Partnership Petition), 2004 (Examination), 2015 (Duty to Keep Records, Make Reports, and Give Notice of Case), 4004 (Grant or Denial of Discharge), 9014 (Contested Matters), and 9027 (Removal), and new Rule 1004.1 (Petition for an Infant or Incompetent Person), together with Committee notes explaining their purpose and intent.[9]  The Judicial Conference approved the amendments and the new rule and authorized their transmittal to the Supreme Court for its consideration with the recommendation that they be adopted by the Court and transmitted to Congress in accordance with the law. The Committee also proposed, and the Conference approved, amendments to Official Forms 1 (Voluntary Petition) and 15 (Order Confirming Plan).  The revisions to the forms will take effect December 1, 2001.

## FEDERAL RULES OF CIVIL PROCEDURE

The Committee on Rules of Practice and Procedure submitted to the Judicial Conference proposed amendments to Civil Rules 54 (Judgments; Costs), 58 (Entry of Judgment), and 81 (Applicability in General), and to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims (In Rem Actions: Special Provisions), as well as a new Civil Rule 7.1 (Disclosure Statement), together with Committee notes explaining their purpose and intent. The Judicial Conference approved the amendments and the new rule and authorized their transmittal to the Supreme Court for its consideration with the recommendation that they be adopted by the Court and transmitted to Congress in accordance with the law.

---

[9]The proposed amendments originally included revisions to Bankruptcy Rule 2014 (Employment of a Professional Person); however, prior to the Conference session, this proposal was withdrawn by the Committee for further consideration.

*Judicial Conference of the United States*

## FEDERAL RULES OF CRIMINAL PROCEDURE

The Committee on Rules of Practice and Procedure submitted to the Conference a comprehensive "style" revision of Criminal Rules 1-60. This revision is part of a larger effort to clarify, simplify, and standardize the language of the procedural rules.[10]  The Committee also submitted to the Conference proposed "substantive" revisions to Criminal Rules 5 (Initial Appearance Before the Magistrate Judge), 5.1 (Preliminary Examination), 10 (Arraignment), 12.2 (Notice of Insanity Defense or Expert Testimony of Defendant's Mental Condition), 26 (Taking of Testimony), 30 (Instructions), 35 (Correction or Reduction of Sentence), and 43 (Presence of the Defendant), and a proposed new Rule 12.4 (Disclosure Statement).  These revisions had been under consideration apart from the "style" project.  The Conference first approved the style amendments, then the substantive amendments,[11] and then directed that the substantive amendments be substituted for the corresponding rules contained in the style amendments, inserting new Rule 12.4 as well.  The Conference agreed to transmit these changes as a single set of proposals to the Supreme Court for its consideration with the recommendation that they be adopted by the Court and transmitted to Congress in accordance with the law.

## COMMITTEE ACTIVITIES

The Committee on Rules of Practice and Procedure approved the recommendations of its advisory committees to publish for public comment proposed amendments to the Bankruptcy, Civil, Criminal, and Evidence Rules. The Committee was advised of the status of its local rules project, which entails reviewing all local rules of courts for consistency and duplication.   An extensive report on this project will be presented at the Committee's January 2002 meeting and will be shared with the courts.

---

[10]The Federal Rules of Appellate Procedure were similarly revised in 1997 (JCUS-SEP 97, p. 82).

[11]The substantive amendments to Criminal Rules 5, 10, and 43 were approved by mail ballot concluded on October 1, 2001.

70

*September/October 2001*

## COMMITTEE ON SECURITY AND FACILITIES

### *U.S. COURTS DESIGN GUIDE*

In order to accommodate the unique space requirements of individual courts, the *U.S. Courts Design Guide* includes a provision allowing for "departures" from the *Design Guide*, which must be approved by the appropriate circuit judicial council.  (Such "departures" have also been referred to at various times as "exceptions," "deviations," and "waivers.")  To reflect more accurately that the *Design Guide* contemplates that some courts would have special needs, the Committee on Security and Facilities recommended, and the Conference agreed, that the word "departures" should be replaced with the words "special requirements" throughout the *Design Guide.*  The approval process for such "special requirements" will not change.  (Grammatical revisions necessitated by this action may be made without further Conference approval.)

### DELEGATION OF CONSTRUCTION AUTHORITY

Section 614 of title 40, United States Code, authorizes General Services Administration (GSA) delegation of construction authority to executive branch agencies.  Prompted by experience that shows higher costs for the judiciary when it obtains alterations services through GSA than when it contracts directly with commercial vendors, the Committee recommended that the Judicial Conference seek legislation that would expressly permit GSA to delegate construction and alteration authority to the judiciary to the same extent that it may do so to executive branch agencies.  The Conference adopted the Committee's recommendation.

### CONGRESSIONAL REVIEW OF COURTHOUSE CONSTRUCTION

On recommendation of the Committee, the Judicial Conference agreed to oppose legislation pending before the 107th Congress (H.R. 254) that would provide for more detailed congressional review of all court alteration and construction projects.  The bill would require the AO to submit all planned projects in court space to Congress and would allow 30 days for any member of Congress to disapprove a project.  Currently, Congress only considers

71

*Judicial Conference of the United States*

individual prospectus-level (exceeding $1.99 million) court construction and repair and alteration projects for authorization and appropriations. H.R. 254 could require time-consuming documentation of even a small project.

## COURTROOM INFORMATION PROJECT

On recommendation of the Committee, the Judicial Conference endorsed voluntary participation by federal courts in the "Courtroom Information Project" of the National Center for State Courts, a program to share information with members of the bar about the size, shape, lighting, wiring, and lines of sight in federal and state courtrooms. The Committee determined that participation would cause minimal risk to the security of a court, and cooperative projects with state courts are worthwhile.

## COMMITTEE ACTIVITIES

The Committee on Security and Facilities reported that in response to questions about firearms standards for court security officers, it resolved that the United States Marshals Service is best qualified to determine the types of weapons necessary to protect the judiciary.[12] The Committee made technical revisions to update the Space Acquisition Guidelines, which had been approved by the Judicial Conference in March 1997 (JCUS-MAR 97, p. 41) and last updated February 25, 1999. The Guidelines provide a process for managing and evaluating non-prospectus space projects. The Committee referred the updated Guidelines to the Administrative Office Director for implementation.

## COMMITTEES ON CRIMINAL LAW, DEFENDER SERVICES, AND FEDERAL-STATE JURISDICTION

### CONSOLIDATED REPORT ON DNA AND COMPETENCY OF COUNSEL LEGISLATION

Three bills pending in the 107th Congress, the "Innocence Protection Act of 2001" (S. 486 and H.R. 912) and the "Criminal Justice Integrity and

---

[12]A Conference member identified this matter for the discussion calendar, but when the Conference session was canceled, the item was deferred.

*September/October 2001*

Innocence Protection Act of 2001" (S. 800), have the dual goals of improving the availability of post-conviction forensic DNA testing in federal and state criminal justice systems and ensuring competent counsel in state capital cases. Responsibility for considering these legislative proposals was divided among three Conference committees.  The Committee on Defender Services reviewed those sections addressing the assignment of counsel, the Committee on Criminal Law examined provisions directed to DNA testing in the federal criminal justice system, and the Committee on Federal-State Jurisdiction reviewed those provisions affecting state criminal justice systems.  At the request of the Executive Committee, the three committees submitted their recommendations in one consolidated report.  These recommendations were approved by the Judicial Conference by mail ballot concluded on October 1, 2001, as follows:

With respect to legislation pending in the 107th Congress to enhance the availability of post-conviction DNA testing in federal and state criminal justice systems and to ensure competent counsel in state capital proceedings (*e.g.,* S. 486 and H.R. 912, "The Innocence Protection Act of 2001," and S. 800, the "Criminal Justice Integrity and Innocence Protection Act of 2001"), and similar legislation that might be introduced in the future, that the Judicial Conference:

a.   Support the goal of establishing fair and uniform standards for post-conviction forensic DNA testing in the federal criminal justice system. *(Committee on Criminal Law)*

b.   Support the goal of affording innocent people wrongly convicted the opportunity to obtain DNA testing relevant to their claim of innocence, but oppose provisions that would entitle a person convicted of a non-capital federal crime the right to apply to the sentencing court for DNA testing in connection with an offense used for sentencing purposes. *(Committee on Defender Services)*

c.   Support provisions that would give federal courts discretion to appoint counsel for a financially eligible person who is convicted of a federal crime and is applying to the federal court for DNA testing in connection with that conviction. *(Committee on Defender Services)*

d.   Support the goal of ensuring that capital defendants have competent legal representation in both state and federal capital proceedings at every stage of their cases.  *(Committee on Defender Services)*

73

*Judicial Conference of the United States*

e.  Support giving the Judicial Conference the opportunity to provide input to any national commission established to set standards specifying the elements of an effective system for providing adequate representation to indigent persons facing the death penalty, but oppose requiring members of the federal judiciary to serve as members of the commission.  *(Committee on Defender Services)*

f.  Support the award of grants for the purpose of providing defense services in connection with representation both in state capital trials and appeals and in state and federal post-conviction proceedings, except that, with regard to funds to be used in state court, support the federal judiciary's providing input into, but oppose the federal judiciary's being responsible for, the administration of such funds.  *(Committee on Defender Services)*

g.  With regard to provisions affecting state criminal justice systems that raise issues of federalism and resources burdens:

1.  Oppose provisions that would entitle individuals not in custody to seek post-conviction DNA testing to challenge a state criminal conviction;

2.  Express concerns with provisions that would displace state time limits and procedural default rules as applicable to individuals convicted after DNA testing became a routine feature of the state's criminal justice system;

3.  Encourage Congress, to the extent it conditions the receipt of federal funds on a state's certification that it will provide DNA testing, to limit such conditions to those grants that relate directly to developing or improving a state's DNA analysis capability or to collecting, analyzing, or indexing DNA material for law enforcement identification purposes;

4.  Oppose provisions that would permit the routine naming of state judges as defendants in any new federal cause of action to obtain DNA testing or evidence;

74

*September/October 2001*

5.　　Encourage Congress, in addressing the consequences of a state's failure to provide appropriate post-conviction DNA testing, to consider making any federal judicial remedy available only where the state judicial system fails to provide an adequate and effective remedy;

6.　　Oppose provisions that would require the Attorney General to withhold certain prison funding to a state if that state permits the death penalty but does not meet the national standards specifying the elements of an effective system for providing adequate representation in state capital cases as established by a national commission described above; and

7.　　Oppose provisions that would require states to certify that, as a condition for receiving certain federal grants, juries having a role in determining the sentence in a capital proceeding are instructed as to all statutorily authorized sentencing options, including parole eligibility rules, if a defendant so requests. *(Committee on Federal-State Jurisdiction)*

h.　　Authorize the Director of the Administrative Office of the U.S. Courts to work with chairs of the respective Judicial Conference committees to suggest to Congress modifications of the relevant legislation that address the concerns of the Conference. *(Committees on Criminal Law, Defender Services, and Federal-State Jurisdiction)*

## FUNDING

All of the foregoing recommendations that require the expenditure of funds for implementation were approved by the Judicial Conference subject to the availability of funds and to whatever priorities the Conference might establish for the use of available resources.

Chief Justice of the United States
Presiding

# INDEX

**Administrative Office, Committee on the**, 41-42

**Administrative Office of the United States Courts**
    bankruptcy appellate panel law clerks, 63
    certifying officers, 47
    changes in magistrate judge positions, 65
    cost control monitoring system, 40-41
    courthouse construction projects, 71-72
    data communications network, 41-42, 43-44
    DNA/competency of counsel legislation, 75
    Federal Law Clerk Information System, 41
    financial plans, FY 2002, 40
    firearms, probation and pretrial services officers, 54
    frequent flier mileage, 40
    funding court positions, 40-41
    information technology security, 39-40, 41, 43-44
    Internet usage, 39-40, 41, 43-44
    prisoner reentry programs, 41
    reports required by law, 41

**ADR** (*see* alternative dispute resolution)

**Alternative dispute resolution**
    staffing factor, 64

**American Law Institute**, 56

**Amon, Carol Bagley**, 38

**Appellate rules** (*see* rules of practice and procedure)

**Appropriations**
    budget request, FY 2003, 46
    Court Security account, 40
    Criminal Justice Act panel attorney compensation, 55-56
    defender organization funding, 55
    Defender Services account, 40
    Fees of Jurors and Commissioners account, 40
    financial plans, interim, FY 2002, 40
    Salaries and Expenses account, 40

*Judicial Conference of the United States*

**Attorney General of the United States**, 75

**Automation** (*see* information technology)

**Automation and Technology, Committee on,** 39-40, 42-45, 47, 48, 50

**Bankruptcy administrators**
    certifying officers, 47
    chapter 11 quarterly fees, 45-46,
    chief deputy position, 62

**Bankruptcy appellate panels**
    certifying officers, 47
    law clerk allocation, 62-63

**Bankruptcy judges** (*see* judges, bankruptcy)

**Bankruptcy rules** (*see* rules of practice and procedure)

**Bankruptcy system** (*see also* judges, bankruptcy)
    bankruptcy administrator program, 45-46, 47, 62
    bankruptcy appellate panel law clerk allocation, 62-63
    bankruptcy appellate panels, 47, 62-63
    bankruptcy court miscellaneous fee schedule, 51
    certifying officers, 46, 47
    chapter 11 quarterly fees, 45-46
    chief deputy bankruptcy administrator, 62
    electronic case filing, model local rules, 50
    fees
        appeals, 51
        chapter 11 quarterly, 45-46
    privacy/public access to electronic case files, 41, 46, 48-50, 52-53
    public access to court information, 48-50, 50, 52-53
    trustee retention of professionals, 45
    venue, 46
    websites, court, 52-53

**Bankruptcy System, Committee on the Administration
of the**, 45-46, 47, 48, 51

**Budget** (*see* appropriations)

ii

*September/October 2001*

**Budget, Committee on the**, 40-41, 46, 46-48

**Case management** (*see* court administration)

**Case management/electronic case files (CM/ECF)**, 52

**Certifying officers**, 47

**Chief Information Officers Council**, 44

**Chief judges** (*see* judges, chief)

**Circuit councils** (*see* circuit judicial councils)

**Circuit judges** (*see* judges, circuit)

**Circuit judicial councils**
  changes in magistrate judge positions, 65
  information technology security, 39-40
  *U. S. Courts Design Guide*, 71

**Civil rules** (*see* rules of practice and procedure)

**Clerks of court**
  district staffing formula, 63, 64

**CM/ECF** (*see* case management/electronic case files)

**Codes of Conduct, Committee on**, 40, 48

**Community defender organizations** (*see* defender services)

**Compensation**
  Criminal Justice Act panel attorneys, 55-56
  Employment Cost Index adjustments, 60
  judicial, 60

**Competency of counsel, capital cases**, 54, 55, 58, 72-75

**Conduct and Disability Orders, Committee to Review Circuit Council**, 68

iii

*Judicial Conference of the United States*

**Congress** (*see also* legislation, pending)
    courthouse construction oversight, 71-72
    DNA/competency of counsel legislation, 54, 55, 58, 72-75
    E-Government Act of 2001, proposed, 52-53
    Employment Cost Index (ECI) pay adjustments, 60
    House Government Reform Committee, 52
    judicial compensation, 60
    managed care legislation, 56-58
    patients' rights legislation, 56-58
    prisoner reentry programs, 41
    relationship with the judiciary, 47
    Senate Governmental Affairs Committee, 52

**Consolidated Report on DNA and Competency of Counsel Legislation**, 54, 55, 58, 72-75

**Cost control monitoring system**, 40-41

**Court administration**
    case management/electronic case files systems, 52
    certifying officers, 47
    E-Government Act of 2001, proposed, 52-53
    electronic case filing, model local rules, 50
    electronic public access, 41, 46, 48-50, 50, 52-53
    fees
        access to court information, 52-53
        chapter 11 quarterly, 45-46
        courtroom technologies, 40
        juror attendance, 52
        miscellaneous, 50-51
    information technology security, 39-40, 43-44
    Internet, appropriate use, 39-40, 43-44, 47-48
    miscellaneous fees, 50-51
    privacy
        electronic access to case files, 41, 46, 48-50, 52-53
        Internet use, 39-40, 43-44
        judicial communication/work product, 39-40, 43-44
        Report on Privacy and Access to Electronic Case Files, 41, 46, 48-50, 52-53
    websites, court, 52-53

**Court Administration and Case Management, Committee on**, 40, 41, 46, 47, 48-53

iv

**Court interpreters**, 61

**Courthouses** (*see* space and facilities)

**Courtroom Information Project**, 72

**Courtrooms** (*see* space and facilities)

**Courts of appeals** (*see also* court administration)
    certifying officers, 47
    court of appeals miscellaneous fee schedule, 51
    electronic public access to court information, 48-50, 50, 52-53
    fees, federal agency exemption, 51
    rules of practice and procedure, 68-69, 70
    websites, court, 52-53

**Criminal Justice Act (CJA)** (*see also* defender services; federal defenders)
    Guidelines for the Administration of the Criminal Justice Act, 55
    panel attorneys
        compensation, 55-56
        malpractice claims, 54-55
        support/training, 55

**Criminal law** (*see also* probation and pretrial services system)
    competency of counsel, capital cases, 54, 55, 58, 72-85
    DNA testing, 72-75
    DNA/competency of counsel legislation, 54, 55, 58, 72-75
    electronic public access to court information, 48-50, 50, 52-53
    prisoner reentry programs, 41
    privacy, electronic case files, 41, 46, 48-50, 52-53
    rules of practice and procedure, 70

**Criminal Law, Committee on**, 41, 47, 48, 54, 55, 58, 72-75

**Criminal rules** (*see* rules of practice and procedure)

**Data communications network (DCN),** 41-42, 43-44

**Davis, W. Eugene**, 38

*Judicial Conference of the United States*

**Defender services** *(see also* Criminal Justice Act; federal defenders)
 capital resource counsel positions, 55
 certifying officers, 47
 competency of counsel, capital cases, 55, 72-75
 defender organization funding, 55
 DNA testing, 55, 72-75
 grant awards for defense services, capital cases, 74
 panel attorney reimbursement, malpractice claims, 54-55

**Defender Services, Committee on**, 47, 54, 54-56, 58, 72-75

**Department of Justice**
 Attorney General of the United States, 75
 United States Marshals Service, 72
 United States trustees, 46

***Design Guide*** (*see U. S. Courts Design Guide*)

**District courts** (*see also* bankruptcy system; court administration; magistrate judges system; probation and pretrial services system)
 alternative dispute resolution staffing factor, 64
 certifying officers, 47
 changes in magistrate judge positions, 65-67
 clerks' offices staffing formula, 63, 64
 court interpreter positions, 61
 Courtroom Information Project, 72
 electronic case filing, model local rules, 50
 electronic public access to court information, 48-50, 50, 52-53
 fees
  court information, 52-53
  juror attendance, 52
 websites, 52-53

**District judges** (*see* judges, district)

**Diversity jurisdiction**, 56

**DNA testing**, 54, 55, 58, 72-75

**DNA/competency of counsel legislation**, 54, 55, 58, 72-75

**Electronic case filing** (*see also* electronic public access

model local rules, 50

**Electronic public access (EPA)** (*see also* Internet)
    access to case files, 48-50, 50, 52-53
    access to court information, official websites, 52-53
    case management/electronic case files (CM/ECF), 52
    fees, 52-53
    privacy, 41, 46, 48-50, 52-53
    Report on Privacy and Public Access to Electronic Case Files, 41, 46, 48-50, 52

**Employee Retirement Income Security Act of 1974 (ERISA)**, 57

**Employment Cost Index (ECI) pay adjustment**, 60

**Ethics Reform Act of 1989**, 60

**Executive branch**
    Department of Justice
        Attorney General of the United States, 75
        United States Marshals Service, 72
        United States trustees, 46
    Employment Cost Index pay adjustment, 60
    General Services Administration, 71
    President of the United States, 60
    United States Agency for International Development, 60

**Executive Committee**, 37-41, 42, 43, 46, 57, 73

**Federal Courts Improvement Act of 2000**, 46, 47, 50, 54-55

**Federal defenders** (*see also* Criminal Justice Act, defender services)
    certifying officers, 47

**Federal Law Clerk Information System**, 41

**Federal public defender organizations** (*see* defender services)

**Federal rules** (*see* rules of practice and procedure)

**Federalization**
    denial of health benefits, personal injury claims, 56-58

*Judicial Conference of the United States*

**Federal-State Jurisdiction, Committee on**, 54, 55, 56-59, 72-75

**Federal-state relations**
 Courtroom Information Project, 72
 denial of health benefits, personal injury claims, 56-58
 DNA/competency of counsel legislation, 72-75
 patients' rights legislation, 56-58
 Subcommittee on Federal-State Interaction, 58-59

**Fees**
 bankruptcy appeals, 51
 courtroom technologies, 40
 electronic access, 51, 52-53
 federal agency exemption, 51
 juror attendance, 52
 miscellaneous fee schedules
  bankruptcy, 51
  court of appeals, 51
  Judicial Panel on Multidistrict Litigation, 50-51

**Financial Disclosure, Committee on**, 59

**Financial disclosure reports**
 filed, 59
 reimbursement of preparation fees, 59

**Firearms**
 court security officers, 72
 probation and pretrial services officers, 54
 regulations, 54

**Garwood, Will L.**, 38

**General Services Administration**
 delegation of construction authority, 71

**Government Management Reform Act of 1994**, 60

**Guam, Territory of**, 65

*September/October 2001*

**Guide to Judiciary Policies and Procedures**, 55

**Guidelines for the Administration of the Criminal
Justice Act and Related Statutes**, 54-55

**Hansen, David R**., 38

*In re Aguinda*, 40

**Information technology** (*see also* Internet)
     access to court information, official websites, 52-53
     appropriate use, 39-40, 41-42, 43-44, 47-48
     E-Government Act of 2001, proposed, 52-53
     Federal Law Clerk Information System, 41
     fees
         courtroom technologies, 40
         electronic access, 51, 52-53
     lawbooks and library program, study, 42-43
     security, 39-40, 43-44
     websites, official court, 52-53

**Intercircuit assignments**, 59

**Intercircuit Assignments, Committee on**, 59

**International Judicial Relations, Committee on**, 60

**Internet** (*see also* information technology)
     appropriate use policies, 39-40, 41-42, 43-44, 47-48
     case management/electronic case files systems, 52
     intrusion detection software, 39-40
     model use policy, 43-44
     privacy, 41, 43-44, 46, 48-50, 52-53
     public access to court information, 48-50, 52-53
     security, 39-40, 43-44
     usage, 39-40, 41-42, 43-44

**Judges, Article III** (*see also* judges, federal)
     intercircuit assignments, 59

**Judges, bankruptcy** (*see also* bankruptcy system; judges, chief; judges, federal)
     bankruptcy appellate panel law clerk allocation, 62-63

*Judicial Conference of the United States*

chief, court websites, 53

**Judges, chief**
    bankruptcy, court websites, 52-53
    certifying officers, 47
    Internet, inappropriate use, 39, 43

**Judges, circuit** (*see* judges, Article III; judges, chief; judges, federal)

**Judges, Court of Federal Claims** (*see* judges, federal)

**Judges, district** (*see* judges, Article III; judges, chief; judges, federal)

**Judges, federal** (*see also* judges, Article III; judges, bankruptcy; judges, chief; judges, magistrate)
    compensation, 60
    Employment Cost Index pay adjustments, 60
    Federal Law Clerk Information System, 41
    financial disclosure reports
      filed, 59
      reimbursement of preparation fees, 59
    frequent flier mileage, 40
    private educational seminars, 40
    travel reimbursement, judges with special needs, 61

**Judges, magistrate** (*see also* judges, federal; magistrate judges system)
    accelerated funding, 67
    changes in positions, 65-67
    Guam, Territory of, 65
    Northern Mariana Islands, Commonwealth of the, 65
    qualifications for appointment, 65
    selection and appointment regulations, 65

**Judicial Branch, Committee on the**, 40, 60-61

**Judicial Conference of the United States**
    funding of actions, 75
    mail ballots, 37, 58, 59, 70, 73

**Judicial Panel on Multidistrict Litigation**
    fees, miscellaneous, 50-51

*September/October 2001*

**Judicial Resources, Committee on**, 61-65

**Judicial space emergency**, 41

**Judiciary Salary Plan** (*see* personnel, judiciary)

**Jurisdiction**,
diversity, 56
patients' rights legislation, 56-58

**Jury administration**
juror attendance fee, 52

**Jury Selection and Service Act**, 52

**Law clerks**
bankruptcy appellate panel, 62-63
Federal Law Clerk Information System, 41

**Lawbooks** (*see* library program)

**Lawbooks and Libraries Study Report**, 42-43

**Legislation, pending (107th Congress)**
Bipartisan Patient Protection Act (S. 1052 and H.R. 2563), 56-58
congressional review of courthouse construction (H.R. 254), 71-72
Criminal Justice Integrity and Innocence Protection Act of 2001 (S. 800), 72-75
DNA/ competency of counsel legislation (S. 486 and H.R. 912; S. 800), 54, 55,
58, 72-75
E-Government Act of 2001 (S. 803 and H.R. 2458), 52-53
Innocence Protection Act of 2001 (S. 486 and H.R. 912), 72-75

**Legislative branch** (*see* Congress)

**Library of Congress Russian Leadership Program**, 60

**Library program**, 42-43

**Local rules**, **model electronic public access**, 50
**Magistrate judges** (*see* judges, magistrate)

xi

*Judicial Conference of the United States*

**Magistrate judges system** (*see also* judges, magistrate)
    accelerated funding, 67
    changes in positions, 65-67
    qualifications for appointment, 65
    selection and appointment regulations, 65

**Magistrate Judges System, Committee on the Administration
of the**, 65-68

**Mail ballots of the Judicial Conference**, 37, 58, 59, 70, 73

**Miscellaneous fee schedules** (*see* fees)

**National Center for State Courts**, 72

**PACERNet**, 49

**Panel attorneys** (*see* Criminal Justice Act)

**Patients' rights legislation**, 56-58

**Personnel, judiciary** (*see also* staffing resources)
    chief deputy bankruptcy administrator, 62
    Federal Law Clerk Information System, 41
    financial disclosure reports
        filed, 59
        reimbursement of preparation fees, 59
    frequent flier mileage, 40
    Internet usage, 39-40, 43-44
    Judiciary Salary Plan, 62, 64
    physical fitness centers, 62
    qualification standards, chief probation and chief pretrial services officers, 64

**Physical fitness centers**, 62

**President of the United States**, 60

**Pretrial services system** (*see* probation and pretrial services system)

**Privacy**
    access to electronic case files, 41, 46, 48-50, 52-53

court websites, 52-53
E-Government Act of 2001, proposed, 52-53
Internet use, 39-40, 43-44
judicial communications/work product, 39-40, 43-44
Report on Privacy and Access to Electronic Case Files, 41, 46, 48-50, 52

**Probation and pretrial services officers** (*see also* personnel, judiciary)
chief, qualification standards, 64
firearms, 54

**Probation and pretrial services system** (*see* probation and pretrial services officers)

**Public Access to Court Electronic Records (PACER)**, 49

**Records**
access to electronic, 48-50
electronic filing, model local rules, 50
electronic, privacy, 41, 46, 48-50, 52-53

**Regulations of the Director of the Administrative Office Concerning the Carrying and Use of Firearms by U.S. Probation and Pretrial Services Officers**, 54

**Regulations of the Judicial Conference of the United States Establishing Standards and Procedures for the Appointment and Reappointment of United States Magistrate Judges**, 65

**Report on Privacy and Public Access to Electronic Case Files**, 41, 46,  48-50, 52

**Resolutions**
Amon, Carol Bagley, 37-38
Davis, W. Eugene, 37-38
Garwood, Will L., 37-38
Hansen, David R., 37-38
Stapleton, Walter K., 37-38
Zloch, William J., 37-38

**Rule of law programs**, 60

*Judicial Conference of the United States*

**Rules of practice and procedure**
    appellate rules, 68-69, 70
    bankruptcy rules, 69, 70
    civil rules, 69, 70
    criminal rules, 70
    evidence rules, 70
    model local rules, electronic case filing, 50

**Rules of Practice and Procedure, Committee on**, 48, 50, 68-70

**Salaries** (*see* compensation)

**Security**
    courtroom information sharing, 72
    information technology, 39-40, 43-44

**Security and Facilities, Committee on**, 41, 42, 62, 71-72

**Space Acquisition Guidelines**, 72

**Space and facilities**
    construction authority, 71
    courthouse construction, congressional review, 71-72
    Courtroom Information Project, 72
    judicial space emergency, 41
    physical fitness centers, 62
    Space Acquisition Guidelines, 72
    *U. S. Courts Design Guide*, special requirements, 71

**Staffing formulae** (*see* staffing resources)

**Staffing resources** (*see also* personnel, judiciary)
    alternative dispute resolution staffing factor, 64
    bankruptcy administrator chief deputy position, 62
    bankruptcy appellate panel law clerks, 62-63
    cost control monitoring system, 40-41
    court interpreter positions, 61
    district clerks' offices staffing formula, 63, 64
    funding court positions, 40-41

**Stapleton, Walter K.**, 38

**Supporting personnel** (*see* personnel, judiciary)

**Technology** (*see* information technology)

**Travel, judges'**
      frequent flier mileage, 40
      judges with special needs, 61

**Travel Regulations for United States Justices and Judges**, 61

**United States Agency for International Development**, 60

**United States Marshals Service**, 72

**United States Sentencing Commission**, 39

**United States trustees**, 46

***U. S. Courts Design Guide***, 71

**Zloch, William J.**, 38



**ADMINISTRATIVE OFFICE OF THE U.S. COURTS**
THURGOOD MARSHALL FEDERAL JUDICIARY BUILDING
WASHINGTON, D.C. 20544



# CONGRESSIONAL BUDGET OFFICE
# COST ESTIMATE

May 18, 2017

## H.R. 2266
### Bankruptcy Judgeship Act of 2017

*As passed by the House of Representatives on May 17, 2017*

## SUMMARY

H.R. 2266 would authorize 18 permanent bankruptcy judgeships—4 judgeships would be new and 14 temporary judgeships would become permanent. Under current law, any vacancies that occur among those temporary judgeships after May 25, 2017, cannot be filled. Under the act, such vacancies could be filled at any time in the future. The act also would adjust the formula used to set certain quarterly fees paid by businesses involved in ongoing Chapter 11 bankruptcy cases and would change the budgetary treatment of a portion of those fees.

CBO estimates that enacting H.R. 2266 would increase direct spending by about $21 million and would increase revenues by about $21 million over the 2018-2027 period. CBO also estimates that implementing the act would reduce net discretionary spending by about $1 billion over the 2018-2027 period.

Because enacting H.R. 2266 would affect direct spending and revenues, pay-as-you-go procedures apply.

CBO estimates that enacting H.R. 2266 would not increase net direct spending or on-budget deficits in any of the four consecutive 10-year periods beginning in 2028.

H.R. 2266 contains no intergovernmental mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would impose no costs on state, local, or tribal governments.

H.R. 2266 would impose a new mandate, as defined in UMRA, by increasing fees paid to DOJ by entities that are currently in Chapter 11 bankruptcy and that have disbursements of more than $1 million per quarter. CBO estimates that the cost of the mandates would fall below the annual threshold established in UMRA for private-sector mandates ($156 million in 2017, adjusted annually for inflation).

## ESTIMATED COST TO THE FEDERAL GOVERNMENT

The estimated budgetary impact of H.R. 2266 is shown in the following table. The costs of this legislation fall within budget function 750 (administration of justice).

| | By Fiscal Year, in Millions of Dollars | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2017-2022 | 2017-2027 |
| **INCREASES IN DIRECT SPENDING** | | | | | | | | | | | | | |
| Judicial Salaries and Benefits | | | | | | | | | | | | | |
| Estimated Budget Authority | 0 | * | 1 | 1 | 1 | 2 | 3 | 3 | 3 | 3 | 3 | 6 | 21 |
| Estimated Outlays | 0 | * | 1 | 1 | 1 | 2 | 3 | 3 | 3 | 3 | 3 | 6 | 21 |
| **INCREASES IN REVENUES** | | | | | | | | | | | | | |
| Chapter 11 Bankruptcy Quarterly Fees | | | | | | | | | | | | | |
| Estimated Revenues | 0 | 5 | 5 | 4 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 21 | 21 |
| **NET INCREASE OR DECREASE (-) IN THE DEFICIT FROM INCREASES IN DIRECT SPENDING AND REVENUES** | | | | | | | | | | | | | |
| Impact on Deficit | 0 | -5 | -4 | -3 | -3 | -2 | 3 | 3 | 3 | 3 | 3 | -15 | 0 |
| **INCREASES OR DECREASES (-) IN SPENDING SUBJECT TO APPROPRIATION** | | | | | | | | | | | | | |
| Judicial Administrative Costs | | | | | | | | | | | | | |
| Estimated Authorization Level | 0 | 1 | 3 | 3 | 4 | 6 | 8 | 8 | 8 | 8 | 8 | 16 | 56 |
| Estimated Outlays | 0 | 1 | 3 | 3 | 4 | 6 | 8 | 8 | 8 | 8 | 8 | 16 | 56 |
| Chapter 11 Bankruptcy Quarterly Fees | | | | | | | | | | | | | |
| Estimated Authorization Level | 0 | -144 | -135 | -126 | -117 | -109 | -106 | -99 | -93 | -86 | -81 | -631 | -1,096 |
| Estimated Outlays | 0 | -144 | -135 | -126 | -117 | -109 | -106 | -99 | -93 | -86 | -81 | -631 | -1,096 |
| Net Changes | | | | | | | | | | | | | |
| Estimated Authorization Level | 0 | -143 | -132 | -123 | -113 | -103 | -99 | -91 | -85 | -78 | -72 | -614 | -1,039 |
| Estimated Outlays | 0 | -143 | -132 | -123 | -113 | -103 | -99 | -91 | -85 | -78 | -72 | -614 | -1,039 |

Notes:   Amounts may not sum to totals because of rounding; * = between zero and $500,000.

## BASIS OF ESTIMATE

For this estimate, CBO assumes that H.R. 2266 will be enacted near the end of fiscal year 2017 and that the necessary amounts will be appropriated each year.

**Judicial Salaries and Benefits**

The salaries and benefits for bankruptcy judges—about $232,000 in 2017 for each judge—are considered direct spending.

**New Bankruptcy Judgeships.** H.R. 2266 would authorize four new permanent bankruptcy judgeships. Incorporating the effects of anticipated inflation, CBO estimates that the salaries and benefits for those judges would increase direct spending by $11 million over the 2018-2027 period.

**Temporary Bankruptcy Judgeships Converted to Permanent Judgeships.** H.R. 2266 would convert 14 temporary bankruptcy judgeships to permanent judgeships. Under current law, those 14 judgeships expire on May 25, 2017. After that date, all judges currently serving in the districts where those temporary judgeships are assigned can continue to serve until their term expires, they retire, or they die. After May 25, 2017, if any bankruptcy judge currently serving in such a district vacates a seat that vacancy cannot be filled if the number of remaining judges in that district equals or exceeds the number of permanent judgeships authorized for that district. Under H.R. 2266, any vacancies after May 25, 2017, could be filled because those judgeships would be extended indefinitely.

CBO cannot predict the timing of vacancies among judgeships in the affected districts; however, based on an analysis of information from the Administrative Office of the U.S. Courts (AOUSC) about the age of the relevant judges, the amount of time remaining in the judges' terms, and the judges' likelihood of reappointment, we expect that six vacancies (from more than 50 sitting judges) will probably occur during the ten years following the enactment of H.R. 2266. Those vacancies will occur at different points over the next 10 years. CBO estimates that filling those six vacancies would increase direct spending for salaries and benefits by $10 million over the 2018-2027 period.

**Judicial Administrative Costs**

Implementing H.R. 2266 would increase administrative expenses for each judge appointed. Such expenses include supporting personnel, security costs, and court operations and maintenance. According to the AOUSC, expenses in 2017 are about $700,000 per judge. Based on that information and adjusting for anticipated inflation, CBO estimates that administrative costs associated with the 10 additional judges would be $56 million over the 2018-2027 period; subject to the availability of appropriated funds.

**Chapter 11 Bankruptcy Quarterly Fees**

H.R. 2266 would change the formula that determines the amount of quarterly fees paid by debtors in Chapter 11 bankruptcy cases. Chapter 11 of the Bankruptcy Code is typically used to reorganize a business that is in bankruptcy. Once a business owner or corporation files for bankruptcy under Chapter 11 they are required to pay a fee to the Department of Justice (DOJ) at the end of each quarter until their case is closed or dismissed. The quarterly fee is set in accordance with a formula that takes account of the amount of funds disbursed by the debtor for salaries, operating expenses, and other expenses in a given quarter. In 2016, DOJ collected $91 million from such quarterly fees. H.R. 2266 would increase the quarterly fee for debtors with disbursements over $1 million in a quarter.

Under current law, those quarterly fees are deposited into the U.S. Trustee System Fund and recorded as offsets to the annual appropriation to the U.S. Trustee Program (USTP). The fees are collected under permanent law thus their collection is not subject to appropriation action. (The USTP oversees the administration of bankruptcy cases.) Based on historic trends in bankruptcy filings and on an analysis of information from DOJ about the amounts collected from the quarterly fees, CBO estimates that enacting H.R. 2266 would increase collections by about $1.1 billion over the 2018-2027 period.

Under H.R. 2266, 2.5 percent of those quarterly fees would be deposited into the general fund of the Treasury during fiscal years 2018 through 2022 and would not be available to be spent. Those amounts would be recorded in the budget as additional revenues. The gross increase in revenues would be $26 million over the 2018-2027 period. Because excise taxes and other indirect business taxes (such as bankruptcy quarterly fees) reduce the base of income and payroll taxes for individuals employed by or serviced by the affected businesses, higher amounts of those indirect business taxes would lead to reductions in revenues from income and payroll taxes. As a result, the increase in fees would be partially offset by a loss of revenues of about 26 percent each year.

That 26 percent offset would normally apply to all of the increase in the bankruptcy fees (the estimated $1.1 billion), but the underlying law directs that those bankruptcy fees be treated as offsetting collections. Long-standing conventions dictate that CBO not score any foregone revenues to fees that are recorded as offsetting collections. The loss in revenues from increasing the bankruptcy fees would total about $0.3 billion over the 2018-2027 period. Thus, only the offsetting effects to the fees that would be treated as revenues are subject to the offset. CBO estimates that enacting the fee provisions would increase net revenues by $21 million over the 2018-2027 period.

4

## PAY-AS-YOU-GO CONSIDERATIONS

The Statutory Pay-As-You-Go Act of 2010 establishes budget-reporting and enforcement procedures for legislation affecting direct spending or revenues. The net changes in outlays and revenues that are subject to those pay-as-you-go procedures are shown in the following table.

**CBO Estimate of Pay-As-You-Go Effects for H.R. 2266 as ordered reported by the House Committee on the Judiciary on May 3, 2017**

| | By Fiscal Year, in Millions of Dollars | | | | | | | | | | | | |
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2017-2022 | 2017-2027 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **NET INCREASE OR DECREASE (-) IN THE DEFICIT** | | | | | | | | | | | | | |
| Statutory Pay-As-You-Go Impact | 0 | -5 | -4 | -3 | -3 | -2 | 3 | 3 | 3 | 3 | 3 | -15 | 0 |
| Memorandum: | | | | | | | | | | | | | |
| Changes in Outlays | 0 | 0 | 1 | 1 | 1 | 2 | 3 | 3 | 3 | 3 | 3 | 6 | 21 |
| Changes in Revenues | 0 | 5 | 5 | 4 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 21 | 21 |

## INCREASE IN LONG-TERM DIRECT SPENDING AND DEFICITS

CBO estimates that enacting H.R. 2266 would not increase net direct spending or on-budget deficits in any of the four consecutive 10-year periods beginning in 2028.

## ESTIMATED IMPACT ON STATE, LOCAL, AND TRIBAL GOVERNMENTS

H.R. 2266 contains no intergovernmental mandates as defined in UMRA and would impose no costs on state, local, or tribal governments.

## ESTIMATED IMPACT ON THE PRIVATE SECTOR

H.R. 2266 would impose a new mandate, as defined in UMRA, by increasing the amount of fees paid to the DOJ by entities that are already in bankruptcy and that have disbursements (salaries, operating expenses, etc. paid by the entity) of more than $1 million per quarter. Once an entity files for bankruptcy under Chapter 11, they must pay a fee to DOJ at the end of each quarter until their case is closed or dismissed. As noted above, CBO estimates that new fee collections would total $144 million in the first year

after enactment and decline to $109 million by the fifth year. Some portion of those collections would be from entities already in bankruptcy that have quarterly disbursements of more than $1 million, and those are the entities that would face a mandate under the act. In total, CBO estimates that the cost of the mandate would fall below the annual threshold established in UMRA for private-sector mandates ($156 million in 2017, adjusted annually for inflation).

## ESTIMATE PREPARED BY:

Federal Costs: Robert Reese
Impact on State, Local, and Tribal Governments: Rachel Austin
Impact on the Private Sector: Paige Piper/Bach

## ESTIMATE APPROVED BY:

H. Samuel Papenfuss
Deputy Assistant Director for Budget Analysis

(Rev. 8/23/18)

**Agenda E-3 (Summary)**
**Bankruptcy Administration**
**September 2018**

SUMMARY OF THE

REPORT OF THE JUDICIAL CONFERENCE

COMMITTEE ON THE ADMINISTRATION OF THE BANKRUPTCY SYSTEM

The Committee on the Administration of the Bankruptcy System recommends that the Judicial Conference:

1.  a.  Recommend to Congress that no existing bankruptcy judgeship be statutorily eliminated, and

    b.  Advise the appropriate circuit judicial councils to consider not filling vacancies that currently exist or may occur because of resignation, retirement, removal, or death, until there is a demonstrated need to do so in the following districts: Alaska, South Dakota, Iowa-Northern, California-Northern, Maine, Oklahoma-Northern, Oregon, California-Central, New York-Western, Iowa-Southern, Ohio-Southern, Illinois-Central, California-Eastern, Oklahoma-Western, Ohio-Northern, California-Southern, Virginia-Western, Michigan-Western, Washington-Western, Pennsylvania-Eastern, and Texas-Western ............... pp. 3-6

2.  a.  Approve a request from the Third Circuit Judicial Council to designate Wilmington as the official bankruptcy judge duty station for the two new temporary judgeships in the District of Delaware, and

    b.  Approve a request from the Sixth Circuit Judicial Council to designate Flint as the official bankruptcy judge duty station for the new bankruptcy judgeship in the Eastern District of Michigan ........................................................................ pp. 7-9

3.  Approve a request from the Seventh Circuit Judicial Council to redesignate the official bankruptcy judge duty station in the Central District of Illinois from Urbana to Rock Island, in accordance with 28 U.S.C. § 152(b)(1), and designate Urbana as a place of holding court .......................................................................................................... pp. 9-10

4.  Approve the proposed revisions to the ad hoc and extended service bankruptcy judge recall regulations regarding authorization of chambers staff for recalled judges, as set forth in the Appendix ............................................................................................ pp. 10-12

5.  Approve expanding the bankruptcy judgeship vacancy pilot project to allow up to five long-standing vacancies to be filled and the judge lent to a district that has an emergency need for an additional judgeship through the use of an intercircuit assignment designation and an agreement between participating circuit councils ..................................... pp. 20-22

---

**NOTICE**
NO RECOMMENDATIONS PRESENTED HEREIN REPRESENT THE POLICY OF THE JUDICIAL CONFERENCE
UNLESS APPROVED BY THE CONFERENCE ITSELF.

---

(Rev. 8/23/18)

      The remainder of the Report is submitted for the record and includes the following items
for the information of the Judicial Conference:

- Funding for Fiscal Year 2020 ................................................................................p. 2
- Bankruptcy Judgeships ............................................................................ pp. 3, 6-7
- Cost-Containment .................................................................................. pp. 12-14
- Bankruptcy Administrator Matters ........................................................ pp. 14-16
- Judiciary Strategic Planning ........................................................................p. 16
- Bankruptcy Judge Quarterly Reporting of Matters Under Advisement ............... pp. 16-17
- Revised Preliminary Application and Disclosure Statement for Bankruptcy Judge
  Nominees ..................................................................................... pp. 17-18
- Quarterly Fees in Large Chapter 11 Cases in Bankruptcy Administrator
  Districts.......................................................................................... pp. 18-20
- Other Matters ...................................................................................... pp. 22-23

**Supp. App.023**

**Agenda E-3**
**Bankruptcy Administration**
**September 2018**

## REPORT OF THE JUDICIAL CONFERENCE

## COMMITTEE ON THE ADMINISTRATION OF THE BANKRUPTCY SYSTEM

## TO THE CHIEF JUSTICE OF THE UNITED STATES AND MEMBERS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES:

The Committee on the Administration of the Bankruptcy System met on June 14-15, 2018.  All members participated except Judge John E. Waites (Bankr. D.S.C.).  Judge Leslie Joyce Abrams (M.D. Ga.) participated by telephone.  At the invitation of the Chair, the following individuals also attended the meeting:  Judge Stuart M. Bernstein (Bankr. S.D.N.Y.), representing the Advisory Committee on Bankruptcy Rules; Chief Judge Michael E. Romero (Bankr. D. Colo.), President of the National Conference of Bankruptcy Judges (NCBJ); Judge Thomas J. Catliota (Bankr. D. Md.), Chair of the Administrative Office's (AO) Bankruptcy Judges Advisory Group (BJAG); Judge Catherine Peek McEwen (Bankr. M.D. Fla.), Bankruptcy Judge Observer to the Judicial Conference; Bill Miller (Bankr. M.D.N.C.), Bankruptcy Administrator Committee Liaison; and JC Guerrero (Bankr. M.D. Ala.), Bankruptcy Clerk of Court Committee Liaison.

Administrative Office support for the meeting was provided by Michele Reed, Chief of the Judicial Services Office (JSO); Daniel J. Isaacs-Smith and Dana Y. Elliott, JSO Senior Attorneys; and William T. Rule, JSO Senior Economist.  Also attending the meeting from the AO were Gary E. McCaffrey, Chief of the Court Operations Division of the Court Services Office; and Kevin A. Lee, Deputy Budget Officer.  Other AO staff participated in certain

**NOTICE**
NO RECOMMENDATIONS PRESENTED HEREIN REPRESENT THE POLICY OF THE JUDICIAL CONFERENCE
UNLESS APPROVED BY THE CONFERENCE ITSELF.

portions of the meeting.  Elizabeth C. Wiggins, Senior Research Associate, represented the

Federal Judicial Center (FJC).

## FUNDING FOR FISCAL YEAR 2020

The Committee considered and agreed to recommend to the Committee on the Budget the

following fiscal year (FY) 2020 budget request for bankruptcy judgeship resources and the

Bankruptcy Administrator (BA) program:  (a) $1.7 million for up to 30 recalled bankruptcy

judges and their staffs; (b) $3.5 million for temporary bankruptcy law clerks; (c) $6.3 million for

48.2 authorized work units for the BA program, based on application of the Conference-

approved staffing formula (JCUS-SEP 14, pp. 21-22); (d) $80.6 million for salaries and benefits

for 351 authorized bankruptcy judgeships; and (e) $89.7 million for salaries and benefits for

chambers staff for bankruptcy judges.  These recommendations reflect the following changes

from the FY 2019 assumed level:  an increase of $1.0 million for recalled bankruptcy judges and

their staffs, a reduction of $0.2 million for the BA program, a reduction of $4.1 million for

bankruptcy judges salaries and benefits, and a reduction of $6.3 million for chambers staff for

bankruptcy judges salaries and benefits.[1]  The temporary bankruptcy law clerk request is the

same as the FY 2019 request.

The total budget request by the Bankruptcy Committee (mandatory and discretionary) for

FY 2020 is $181,825,000, which includes funding for active bankruptcy judges and chambers

staff.  The total budget request is an increase of 2.6 percent over the FY 2019 assumed funding

level, and thus does not exceed the Budget Committee's guidance for FY 2020 that budgets not

increase by more than 3.0 percent over the FY assumed level.

---

[1] The reduction in bankruptcy judge and chambers staff salaries and benefits results from a greater number of vacancies due to declines in bankruptcy filings.

**Supp. App.025**

## BANKRUPTCY JUDGESHIPS

The Committee was briefed on the number of authorized bankruptcy judgeships, recalled bankruptcy judges, intercircuit and intracircuit assignments, bankruptcy judgeship vacancies, and existing temporary bankruptcy judgeships. The Committee also discussed the continuing need survey process and procedures. As of March 31, 2018, there were 351 authorized bankruptcy judgeships, 35 of which were temporary judgeships; 30 recalled bankruptcy judges; and 29 bankruptcy judgeship vacancies.

### *Temporary Judgeships, Vacancies, and Related Matters*

Of the 35 temporary judgeships, seven judgeships have not been filled and are not currently at risk of lapsing because lapse dates occur five years from the appointment date of the judge named to fill the positions. This includes four new temporary judgeships authorized by the Bankruptcy Judgeship Act of 2017, Pub. L. No. 115-72. One temporary judgeship passed its lapse date on May 1, 2011, and will be lost when the next vacancy occurs in that court. Thirteen temporary judgeships passed their lapse dates on May 25, 2017, and will be lost when the next vacancies occur in those courts. The remaining 14 temporary judgeships were extended by the Bankruptcy Judgeship Act of 2017 for a period of five years from the date of enactment of that bill, October 26, 2017, and thus have lapse dates of October 26, 2022. The four new temporary judgeships and 14 extensions are in the same districts that the Judicial Conference recommended for new judgeships and conversion to permanent status, respectively, in its 2017 bankruptcy judgeship request. JCUS-MAR 17, p. 6.

### *Continuing Judgeship Need Survey*

Under 28 U.S.C. § 152(b)(3), the Judicial Conference must assess the continuing need for all authorized bankruptcy judgeships every two years and report its recommendations to Congress regarding "any authorized position which can be eliminated when a vacancy exists by reason of resignation, retirement, removal, or death" by December 31 of each even-numbered

**Supp. App.026**

year.  Since 1994, after each of the previous continuing judgeship need surveys, the Conference

has approved the Bankruptcy Committee's recommendation that no bankruptcy judgeship be

statutorily eliminated.  The Conference has also advised several circuit judicial councils to

consider not filling bankruptcy judgeship vacancies occurring in districts by reason of

resignation, retirement, removal, or death, unless there is a demonstrated need to do so,

particularly if filling the vacancy would result in a weighted caseload per remaining judgeship(s)

of fewer than 1,000 weighted filings.  JCUS-SEP 94, pp. 44-45; JCUS-SEP 96, pp. 50-51; JCUS-

SEP 98, pp. 44-45; JCUS-SEP 00, pp. 42-43; JCUS-SEP 02, pp. 39-40; JCUS-SEP 04, pp. 8-9;

JCUS-SEP 06, p. 8; JCUS-MAR 09, p. 5; JCUS-SEP 10, p. 8; JCUS-SEP 12, p. 8; JCUS-SEP

14, pp. 6-7; and JCUS-SEP 16, p. 7.

       In accordance with the statute and the schedule and procedures approved by the

Committee at its December 2017 meeting, staff identified districts where the elimination of a

bankruptcy judgeship would result in fewer than 1,000 weighted filings per judgeship for the

remaining positions, based on data for calendar year 2017.[2]  The chair of the Committee sent a

letter to the chief bankruptcy judges for each affected district and their respective chief circuit

judge offering an opportunity to submit additional information for consideration by the

Committee.  Five circuit chief judges with affected districts submitted information related to the

nature and mix of the district's case types, historical caseload data and filing trends, geographic

issues, current economic data, and specific demographics.

       Using updated weighted caseload data for the twelve-month period ending March 31,

2018, the following 27 districts (listed from lowest to highest weighted filings per authorized

judgeship) had weighted caseloads lower than the 1,000-per judgeship threshold after the

caseloads were recalculated based on one less bankruptcy judgeship in the district:

---

[2] Districts with one authorized judgeship are not included in the continuing need survey.

| 1. Alaska | 10. Iowa-Southern | 19. Michigan-Western |
|-----------|-------------------|----------------------|
| 2. South Dakota | 11. Ohio-Southern | 20. New York-Northern |
| 3. Iowa-Northern | 12. Illinois-Central | 21. Washington-Eastern |
| 4. California-Northern | 13. California-Eastern | 22. Washington-Western |
| 5. Maine | 14. Oklahoma-Western | 23. Pennsylvania-Eastern |
| 6. Oklahoma-Northern | 15. Ohio-Northern | 24. New Mexico |
| 7. Oregon | 16. California-Southern | 25. Pennsylvania-Middle |
| 8. California-Central | 17. Virginia-Western | 26. Massachusetts |
| 9. New York-Western | 18. North Carolina-Middle | 27. Texas-Western |

Based on information provided on behalf of the affected districts and by AO staff, the Committee recommended that the Judicial Conference recommend to Congress that no existing bankruptcy judgeship be statutorily eliminated. The Committee also recommended that the Conference should advise the appropriate circuit judicial councils with respect to 21 districts identified by the judgeships subcommittee to consider not filling vacancies that currently exist or may occur because of resignation, retirement, removal, or death, until there is a demonstrated need to do so.

The Committee did not include three districts in its final recommendation—the Middle District of North Carolina, the Northern District of New York, and the Middle District of Pennsylvania—because the next vacancy occurring in those districts will result in the lapse of a temporary judgeship (and thus there will be no vacancy to recommend holding open) and the resulting weighted caseload calculation does not fall below the 1,000-per-judgeship threshold. Three districts—the Eastern District of Washington, the District of New Mexico, and the District of Massachusetts—submitted additional information that led the Committee to conclude that filling the next vacancy in those districts would be justified, at the discretion of the relevant court of appeals.

**Recommendations:** That the Judicial Conference—

a.      Recommend to Congress that no existing bankruptcy judgeship be statutorily eliminated, and

b. Advise the appropriate circuit judicial councils to consider not filling vacancies that currently exist or may occur because of resignation, retirement, removal, or death, until there is a demonstrated need to do so in the following districts:  Alaska, South Dakota, Iowa-Northern, California-Northern, Maine, Oklahoma-Northern, Oregon, California-Central, New York-Western, Iowa-Southern, Ohio-Southern, Illinois-Central, California-Eastern, Oklahoma-Western, Ohio-Northern, California-Southern, Virginia-Western, Michigan-Western, Washington-Western, Pennsylvania-Eastern, and Texas-Western.

### *Additional Judgeship Need Survey Process*

Along with the continuing need survey, the Judicial Conference is tasked with assessing the need for additional bankruptcy judgeships.  This requirement is contained in 28 U.S.C. § 152(b)(2), which states:

> The Judicial Conference shall, from time to time, submit recommendations to the Congress regarding the number of bankruptcy judges needed and the districts in which such judges are needed.

In 1991, the Judicial Conference determined that additional judgeship surveys would be conducted biennially.  JCUS-MAR 91, pp. 12-13.  At its September 1996 session, the Conference approved a change in the schedule for completing the biennial surveys so that recommendations for additional bankruptcy judgeships would be considered by the Conference in March, rather than September, of odd-numbered years.  JCUS-SEP 96, p. 50.  This schedule permits the judiciary to advocate, when appropriate, for additional bankruptcy judgeships throughout the full two-year congressional term.

The Committee approved the schedule and procedures for the 2019 additional judgeship need survey process.  Any on-site surveys needed to examine the judgeship needs for a district will be conducted in September-November 2018.  The Committee will consider requests for additional judgeships at its December 2018 meeting and make recommendations to the Conference for consideration at its March 2019 session.

**Supp. App.029**

### *Judicial Resources Surveys*

At its December 2015 meeting, the Committee approved a process for selecting districts to receive on-site surveys, based in part on anticipation of the district's need for judicial resources. The intent was to minimize the need to survey multiple districts within the short time frame available to complete the biennial additional judgeship needs review. These surveys provide the Committee with information beyond raw caseload and weighted caseload data that may be relevant to Committee decisions, including geographic, population, and other relevant economic data. At its June 2017 meeting, the Committee selected six districts to survey before its June 2018 meeting. Two of these surveys were completed prior to the Committee's December 2017 meeting, and the remaining four were completed prior to the Committee's June 2018 meeting. The Committee selected two additional districts to survey before its June 2019 meeting.

## DUTY STATIONS AND PLACES OF
## HOLDING COURT FOR BANKRUPTCY JUDGES

### *Designation of Duty Stations for New Temporary Judgeships*

In addition to extending the authorization of 14 existing temporary judgeships, the Bankruptcy Judgeships Act of 2017, Pub. L. No. 115-72, §§ 1002-03, 131 Stat. 1224, 1229-32, authorized four new temporary judgeships: two in the District of Delaware, one in the Eastern District of Michigan, and one in the Middle District of Florida. Of those, the Committee considered requests to designate duty stations for three of those positions. The Middle District of Florida indicated that it does not intend to request that this position be filled at this time, and prefers to maintain the flexibility to designate the duty station in the future when it intends to fill the position.

The Committee considered a request from the Third Circuit Judicial Council that the Judicial Conference designate Wilmington as the duty station for the two new temporary

judgeships in the District of Delaware.  With the two new temporary judgeships, the District of

Delaware has eight authorized bankruptcy judgeships.  The six existing judgeships are all

designated to Wilmington, the district's only duty station and place of holding court.  The

Committee noted the size and nature of the district with respect to its sole duty station and place

of holding court and that any adjustments to accommodate the two new judgeships will be made

within the circuit's existing space footprint, so there will be no impact on the Judicial Conference

"No Net New" policy that requires any increase in square footage within a circuit be offset by an

equivalent reduction in square footage within the same fiscal year.  JCUS-MAR 18, p. 11; *Guide

to Judiciary Policy* (*Guide*), Vol. 3, Ch. 15, §§ 1520.30(b)(2)(B), (D), (E), and (F).  It thus

recommended that the Conference approve the request.

The Committee also considered a request from the Sixth Circuit Judicial Council that the

Judicial Conference designate Flint as the duty station for the new temporary judgeship in the

Eastern District of Michigan.  With the new temporary judgeship, the Eastern District of

Michigan has six authorized bankruptcy judgeships.  The duty stations of the existing judgeships

are follows:  three in Detroit, one in Bay City, and one in "Flint or Detroit" (the current occupant

is sitting in Detroit).  There is a fifth judge currently serving in Detroit on a five-year intercircuit

assignment from the Northern District of Iowa through the Committee's Bankruptcy Judgeship

Vacancy Pilot program.  The Committee noted that the bankruptcy court already has chambers

and courtroom space in Flint, so there is no cost associated with this request; that Flint has the

caseload to support a resident judge; and that approving this request will result in a more even

distribution of cases among the judges in the district.  JCUS-MAR 18, p. 11; *Guide*, Vol. 3, Ch.

15, §§ 1520.30(b)(2)(B), (D), (E), and (F).  It thus recommended that the Conference approve the

request.

**Supp. App.031**

**Recommendations:** That the Judicial Conference—

a.   Approve a request from the Third Circuit Judicial Council to designate
     Wilmington as the official bankruptcy judge duty station for the two new
     temporary judgeships in the District of Delaware, and

b.   Approve a request from the Sixth Circuit Judicial Council to designate
     Flint as the official bankruptcy judge duty station for the new bankruptcy
     judgeship in the Eastern District of Michigan.

### *Redesignation of Duty Station in the Central District of Illinois*

The Committee considered a request from the Seventh Circuit Judicial Council that the

duty station for the vacant judgeship in the Central District of Illinois be redesignated from

Urbana to Rock Island.  The Seventh Circuit Judicial Council requested the change due to space

concerns.  Neither Urbana or Rock Island has adequate chambers or courtroom space to

accommodate a bankruptcy judge.  The General Services Administration is in the process of

seeking replacement leased space for the court in Rock Island.  The existing Rock Island court

space is located in a building owned by the U.S. Post Office, and the building suffers from

significant building, maintenance and management, and security deficiencies.  In the current

facility, visiting judges use a hearing room or share the district judge's courtroom when holding

proceedings in Rock Island.  The Asset Management Planning business rules—the guidelines

adopted by the Judicial Conference when building a program of requirements for new space—do

not allow the court to seek space equivalent to the hearing room in the replacement lease as it is

not tied to a resident judge.  JCUS-MAR 08, p. 26.

Moving the duty station from Urbana to Rock Island will allow the new leased space in

Rock Island to include chambers and a courtroom for a bankruptcy judge.  Absent this

redesignation, the new courthouse in Rock Island would only have one courtroom that would be

shared by the resident district judge, visiting district judges, the visiting magistrate judge, and the

visiting bankruptcy judge.  Changing the designation of the bankruptcy judge duty station from

Urbana to Rock Island would allow the new facility to include an additional courtroom and

**Supp. App.032**

provide flexibility for not only the bankruptcy court, but for visiting district and magistrate

judges as well.  Ensuring that chambers and courtroom space are available now will save the

judiciary the cost of having to find or construct chambers space in the future if bankruptcy filings

increase and the circuit council elects to fill the current vacancy.  It thus recommended that the

Conference approve the request.  If this request is approved, it is also recommended that the

Conference designate Urbana as a place of holding court.

> **Recommendation:**  That the Judicial Conference approve a request from the
> Seventh Circuit Judicial Council to redesignate the official bankruptcy judge duty
> station in the Central District of Illinois from Urbana to Rock Island, in
> accordance with 28 U.S.C. § 152(b)(1), and designate Urbana as a place of
> holding court.

## BANKRUPTCY JUDGE RECALL REGULATIONS

AO staff periodically review the *Guide* to ensure that Judicial Conference regulations and

guidelines are clear, complete, accurate, and up-to-date.  Recently, staff identified portions of the

bankruptcy judge recall regulations that should be revised to achieve this goal.  The changes

concern the regulations for ad hoc (*Guide*, Vol. 3, Ch. 9) and extended service (*Guide*, Vol. 3,

Ch. 10) recall of bankruptcy judges.

The proposed revisions (a) specify the caseload standards for authorizing staff for a

recalled bankruptcy judge; (b) make it clear that a circuit judicial council and the Committee

may authorize a greater or lesser number of chambers staff for a recalled bankruptcy judge than

provided for in the caseload standards after consideration of all relevant factors (but no more

than two full-time chambers staff per recalled bankruptcy judge); and (c) require that the

Committee authorize chambers staff annually for recall appointments that are longer than one

year and one day (extended service recall regulations only).

With respect to the proposed revision to specify the caseload standards for authorizing

staff for a recalled bankruptcy judge, the regulations currently use percentages of a full-time

bankruptcy judge workload to determine the appropriate number of chambers staff positions

(75 percent of a full-time bankruptcy judge workload for authorizing two chambers staff positions, and 40 percent of a full-time bankruptcy judge workload for authorizing one chambers staff position).  However, the regulations do not specify how a full-time bankruptcy judge workload is defined, or how that figure is determined.

A full-time bankruptcy judge workload of 1,100 weighted filings was established following the FJC's 1988-1989 case weights study.  Although there have been subsequent case weights studies, the Committee has consistently applied the 1,100 weighted filings standard.  The proposed revised regulations specify the weighted filings level to determine the appropriate number of chambers staff positions—825 weighted filings for authorizing two full-time chambers staff positions, and 440 weighted filings for authorizing one full-time chambers staff position.  These numbers represent 75 percent and 40 percent of a full-time bankruptcy judge workload.  The workload percentages are the same as in the current regulations but are expressed in raw figures instead of percentages.  This specific guidance will assist bankruptcy judges and circuit judicial councils when considering staffing requests for recalled bankruptcy judges.  Because all relevant factors may be considered along with the workload standards, there remains flexibility for the circuit judicial councils and the Committee to address unique staffing needs.

Additionally, the proposed revisions make it clear that the Committee may approve a greater or lesser number of (but no more than two total) chambers staff than specified under the caseload standards after considering factors other than weighted filings.  This proposed revision would provide flexibility for circuits to certify, and the Committee to approve, a greater or lesser number of chambers staff in appropriate circumstances.

Finally, under the proposed revisions, the Committee would be required to authorize staff annually for recall appointments that are longer than one year and one day.  Previously, the Committee authorized chambers staff for the entire term of recall regardless of the length of the

**Supp. App.034**

recall term.  This proposed revision would enable the Committee to provide greater oversight

regarding the costs of the bankruptcy judge recall program.

The Committee reviewed the proposed revisions to the regulations and recommended that

the Conference approve the revisions, as set forth in the Appendix.

> **Recommendation:**  That the Judicial Conference approve the proposed revisions
> to the ad hoc and extended service bankruptcy judge recall regulations regarding
> authorization of chambers staff for recalled judges, as set forth in the Appendix.

## COST-CONTAINMENT

### *CACM Cost-Containment Subcommittee*

At the request of the Budget Committee, the Committee on Court Administration and

Case Management (CACM) is leading a multi-committee initiative to evaluate alternative

organizational models that might contain administrative costs.  To carry out this initiative, the

CACM Committee established the CACM Subcommittee on Cost-Containment (CACM

Subcommittee), which includes members from six Judicial Conference committees, including the

Bankruptcy Committee.

The CACM Subcommittee has worked over the past three years to analyze organizational

concepts for managing the administrative functions of courts.  An initial report, which was

presented to the Budget Committee in July 2017, as well as to the September 2017 Judicial

Conference, emphasized a need for additional data and analysis before conclusions could be

drawn about cost savings and the efficacy of the different shared services models, and included

recommendations for longer-term analysis and investigation.  The Budget Committee discussed

the initial report at its July 2017 meeting and expressed appreciation for the subcommittee's

work to date.  It provided its views to the CACM Committee, including the belief that it is sound

to assume that some savings will occur with alternative shared services models, and the CACM

Committee should therefore focus its efforts on providing assistance and resources to courts

interested in moving to alternative organizational models, including identifying the practical mechanisms for, and obstacles to, implementing the models.

At its September 2017 meeting, the CACM Subcommittee discussed the Budget Committee's suggestions, and drafted a second report documenting its progress and findings. The second report includes a revised action plan focused on providing feasible alternative organizational models for the courts to consider while incorporating more limited cost-benefit analyses. *See* Report of the Committee on Court Administration and Case Management at Agenda E-6 for additional information on the work of the subcommittee. After this Committee's December 2017 meeting, the chair sent a letter to the chair of the CACM Committee setting forth the Committee's comments on the report, agreeing with the subcommittee's revised approach, but disagreeing with the Budget Committee's suggestion that the subcommittee should presume savings.

At its March 2018 meeting, the CACM Subcommittee considered and endorsed a completed draft of its report on vertical consolidation of district and bankruptcy clerks' offices, and endorsed several revisions to the report. The CACM Subcommittee asked that the report be presented to each of the involved Conference committees for discussion. The Committee endorsed the revised draft of the vertical consolidation report with no comments or proposed substantive changes. After the vertical consolidation report is finalized, it will be provided to the Budget Committee and the Executive Committee, and appended to the CACM Committee's report to the Judicial Conference at its September 2018 session.

### *Horizontal Consolidation Pilot*

The Bankruptcy Committee is proceeding with implementing the horizontal consolidation pilot program approved by the Conference in March 2016. Two courts (the Bankruptcy Courts for the Northern and Southern Districts of Iowa) entered into a memorandum of understanding in 2016 and the pilot period formally began following the retirement of one of

**Supp. App.036**

the two clerks of court in July 2017.  Two additional courts (the Bankruptcy Courts for the

Districts of North Dakota and South Dakota) entered into a memorandum of understanding to

participate in the pilot in April 2018 and the pilot period formally began following the retirement

of one of the two clerks of court in May 2018.  The Committee continues to work to identify an

additional pair of courts to fulfill the goal of having up to three court pairs.  The FJC, in

consultation with the Committee's subcommittee on resource sharing, has also developed a

detailed protocol for evaluating the pilot project and plans to host a meeting in September 2018

to bring together administrative staff from the four participating courts to assist with its study of

the pilot.

## BANKRUPTCY ADMINISTRATOR MATTERS

### *Bankruptcy Administrator Program Review and Executive Committee Inquiry*

In January 2014, the Director of the AO requested a comprehensive review of the BA

program.  Several factors led to this review—no review of the program had been performed since

its establishment in 1986; AO staff support of the program changed in 2013 to the newly

established Court Services Office; and negative audit findings in some BA districts had raised

concerns.  The goal of the review was to ensure the BA program was being effectively supported

and managed and that the program served the needs of the public.  Later, in August 2014, the

Executive Committee asked the Committee to examine and recommend, in consultation with

other Conference committees, whether the BA program should continue to exist as a judiciary

responsibility.  The Committee deferred action on the Executive Committee's request pending

completion of the program review.

The program review has been completed and the final report was referred by the AO

Director to the Committee for consideration at its December 2017 meeting.  The Committee

reviewed the report and recommended that the Director provide the report to the chief judges of

the bankruptcy courts and BAs in Alabama and North Carolina to give them an opportunity to

provide feedback to the Committee.  The responses from five of the six bankruptcy courts, as well as the BA Advisory Group, indicate the unanimous belief that the BA program should continue to exist as a judiciary responsibility.  The responses highlighted many of the positive findings in the report, including cleaner audits than those of U.S. trustee districts; overwhelming support from local attorneys; the efficiency and flexibility of the BA program as compared to its U.S. trustee counterparts relating to the BAs themselves, caseload, staff, and supervision; and the overall experience and preference of judges, attorneys, and trustees for the BA program over the United States Trustee Program (USTP).

The Committee's Estate Administration Subcommittee considered the report and the responses from the bankruptcy courts and the BA Advisory Group and, in addition to echoing many of the findings in the report discussed above, noted the efficiency of the BA program and the lower cost of the BA program relative to the USTP in recommending that the BA program continue to exist as a judiciary responsibility.  Consistent with the Executive Committee's request, before making its final recommendation, the Committee is seeking the views of the Committees on Audits and AO Accountability, the Budget, and Judicial Resources regarding whether the BA program should continue to exist as a judiciary responsibility.  Subject to the feedback received from those committees, a draft response will be considered by the Committee at its December 2018 meeting and transmitted to the Executive Committee in early 2019.

### *Horizontal Restructuring of Bankruptcy Administrator Offices*

During the Bankruptcy Committee's 2017 meeting with the Economy Subcommittee of the Budget Committee, there was discussion about exploring the possibility of horizontally restructuring BA offices.  At its December 2017 meeting, the Committee divided its analysis of the areas where horizontal restructuring of BA offices may result in cost savings into two categories: (1) management and oversight and (2) other operational and administrative roles/functions.  The Committee referred this matter to its Estate Administration Subcommittee

to develop, in consultation with its BA liaison, a report on whether there may be areas where restructuring or further sharing within BA offices may result in cost savings.  Following the Committee's December 2017 meeting, the Committee's BA liaison provided the Estate Administration Subcommittee with information related to the BA program and existing levels of sharing done by the BAs with one another and with other court units.

The Committee agreed with the Estate Administration Subcommittee's conclusion that the BA offices within the judiciary are already sharing many of their administrative functions with one another and other court units, and therefore, formal consolidation would not produce additional cost savings.  The chair sent letters to the CACM and Judicial Resources Committees seeking their views.

## JUDICIARY STRATEGIC PLANNING

The Committee was asked by Chief Judge Carl E. Stewart, the judiciary's planning coordinator, to provide an update on the strategic initiatives that it is pursuing to implement the *Strategic Plan for the Federal Judiciary*.  The Committee was also asked to consider whether any changes to its strategic initiatives were warranted, based on strategic planning priorities or other judiciary initiatives.  Following the June 2018 meeting, the chair provided a report to Chief Judge Stewart on the information requested.

## BANKRUPTCY JUDGE QUARTERLY
## REPORTING OF MATTERS UNDER ADVISEMENT

In March 1985, the Judicial Conference adopted a policy requiring circuit executives to collect quarterly reports from bankruptcy (as well as district and magistrate) judges on matters held under advisement for over 60 days.  JCUS-MAR 85, pp. 11-12; *Guide*, Vol. 18, Ch. 5, § 560.  Subsequently, the Civil Justice Reform Act of 1990 (CJRA), Pub. L. No. 101-650, was enacted imposing reporting requirements on pending matters for district and magistrate judges (the CJRA did not apply to bankruptcy judges) but only required semiannual reporting.  The

Conference determined that the CJRA reporting requirements were sufficiently similar to its previously adopted requirements and agreed to adopt the semiannual reporting for district and magistrate judges, but did not change the bankruptcy judge reporting requirement.  JCUS-SEP 91, pp. 45-46.

On November 15, 2017, all circuit executives in circuits with bankruptcy judges agreed to request a change to the reporting requirements for bankruptcy matters held under advisement for over 60 days from quarterly to semiannually to bring bankruptcy judge reporting requirements in line with the reporting requirement for other judge types.  The Bankruptcy Judges Advisory Group unanimously agreed that the Committee should recommend approval of the change.  The proposed changes are not intended to prevent circuit executives from requiring more frequent reporting.  Volume 18, Ch. 5, § 560 of the *Guide* and the reporting form, AO-413, would need to be modified to reflect semiannual instead of quarterly reporting.

The Committee requested that the CACM Committee recommend that the Judicial Conference approve changing the frequency of the reporting requirements for bankruptcy matters held under advisement for over 60 days.  The CACM Committee has recommended the change to the September 2018 Judicial Conference, to begin with the reporting period ending March 31, 2019.  *See* Report of the Committee on Court Administration and Case Management at Agenda E-6.

## REVISED PRELIMINARY APPLICATION AND
## DISCLOSURE STATEMENT FOR BANKRUPTCY JUDGE NOMINEES

At their March 2018 semiannual meeting held immediately after the Judicial Conference session, the chief circuit judges and circuit executives discussed the effect of the current sample application and disclosure statement for bankruptcy judge positions.  Some chief judges and circuit executives expressed concern that the current sample application and disclosure statement

do not elicit enough information early enough in the process to allow proper consideration prior to the background investigations required for appointment.

To address the concerns, at its June 2018 meeting, the Committee discussed proposed revisions to the sample bankruptcy judgeship application and disclosure statement, the sample vacancy notices, and the *Regulations for the Selection, Appointment, and Reappointment of Bankruptcy Judges*.  The Committee will seek the views of the chief circuit judges and circuit executives on proposed revisions at their September 2018 meeting.  The changes will then be considered by the Committee and the Judicial Conference, as appropriate.

### QUARTERLY FEES IN LARGE CHAPTER 11
### CASES IN BANKRUPTCY ADMINISTRATOR DISTRICTS

The application of chapter 11 quarterly fees in districts under the USTP is set forth in 28 U.S.C. § 1930(a)(6).  The fee does not apply to chapter 11 cases in BA districts.

In 1994, the Ninth Circuit issued an opinion in *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525 (9th Cir. 1994), holding that excluding the BA districts from the fees charged in USTP districts was unconstitutional under the Uniformity Clause of the Constitution.  The Ninth Circuit found that the chapter 11 quarterly fees required in courts served by the USTP but not assessed in BA districts resulted in a non-uniform application of bankruptcy law and unequal treatment of creditors.  As a result, in March 1996, the Judicial Conference adopted a recommendation from the Committee to seek legislation providing authority to collect chapter 11 quarterly fees in BA districts.  JCUS-MAR 96, p. 10.  On November 13, 2000, the Federal Courts Improvement Act of 2000, Pub. L. No. 105-518, § 105, 114 Stat. 2410, 2412, was signed into law, and 28 U.S.C. § 1930 was amended to add subsection (a)(7), permitting the Judicial Conference to impose fees in BA districts in amounts equal to those listed in 28 U.S.C. § 1930(a)(6).  Subsection (a)(7) further requires the judiciary to deposit all chapter 11 quarterly fees collected in BA districts as offsetting receipts to the fund established under 28 U.S.C. § 1931.

In September 2001, the Judicial Conference approved the Committee's recommendation that quarterly fees for chapter 11 cases in BA districts be imposed "in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time."  JCUS-SEP/OCT 01, pp. 45-46.

The Bankruptcy Judgeship Act of 2017 revised subsection (a)(6) to add a new subsection (B), which provides that, during each of fiscal years 2018 through 2022, if the balance in the United States Trustee System Fund (Fund) as of September 30 of the most recent full fiscal year is less than $200 million, the quarterly fee payable for a calendar quarter in which disbursements equal or exceed $1 million shall be the lesser of one percent of such disbursements or $250,000. This would be a substantial increase over the fees currently charged, which range from $6,500 to $30,000 for disbursements exceeding $1 million.  The Fund is used for the operation of the USTP, and it does not apply to the BA districts.  *See* 28 U.S.C. § 589a.

To ensure nationwide uniformity, the BAs requested that the Committee recommend that the Conference approve similar fees in BA districts.  The Committee noted the following issues with the quarterly fees generally, and the possibility that increasing the fees would exacerbate such problems: (1) whether imposing the quarterly fee has had a chilling effect on large chapter 11 case filings and (2) whether imposing the quarterly fee has precluded certain large chapter 11 debtors from successfully reorganizing (and compelling those debtors to instead dismiss or convert to chapter 7).[3]  The Committee will further consider these issues and consider whether the Conference should make a recommendation to Congress regarding whether to reenact revised subsection (a)(6)(B).

---

[3] The Committee also noted the following issues with interpreting the relevant statutes: (1) whether certain payments constitute "disbursements" for purposes of calculating the quarterly fee (specifically payments made by a chapter 11 debtor to its post-petition lender in connection with a revolving line of credit) and (2) whether a chapter 11 debtor is obligated to pay the quarterly fee after confirmation of a chapter 11 plan.

**Supp. App.042**

Case: 18-3289     Document: 28     RESTRICTED   Filed: 03/25/2019     Pages: 89
(Rev. 8/23/18)

Notwithstanding the concerns outlined above, the Committee agreed that the quarterly fee calculation changes in 28 U.S.C. § 1930(a)(6)(B) should apply in BA districts beginning in the first quarter of fiscal year 2019 (that is, for any chapter 11 case filed on or after October 1, 2018, and not for cases then pending). The Committee additionally endorsed ensuring that debtors receive proper notice before imposing a higher fee on them. To allow the BAs and bankruptcy courts in Alabama and North Carolina time to provide sufficient notice, the Committee asked the Executive Committee to act on an expedited basis on behalf of the Conference. The Executive Committee approved the Committee's request at its August 9-10, 2018, meeting. *See* Agenda E-1.

### BANKRUPTCY JUDGESHIP VACANCY PILOT

At its June 2014 meeting, the Committee recommended that the Judicial Conference approve a pilot project that would allow no more than two districts with long-standing bankruptcy judgeship vacancies to be filled and the selected judges to be assigned to districts with emergency needs for additional bankruptcy judgeship resources through an intercircuit assignment. On September 16, 2014, the Judicial Conference approved the bankruptcy judgeship vacancy pilot. JCUS-SEP 14, p. 7. The pilot was implemented with the United States Bankruptcy Courts for the Middle District of Florida and the Eastern District of Michigan as the initial borrowing districts, and the District of South Dakota and Northern District of Iowa as the lending districts. The participating courts and circuit judicial councils negotiated memoranda of understanding (MOU) implementing the pilot and, in 2016, the selected judges were appointed.

Shortly after the Committee's December 2017 meeting, a vacancy occurred in the Middle District of Florida that was subsequently filled by the pilot judge from the District of South Dakota, Judge Roberta Colton. The Bankruptcy Court for the Middle District of Florida advised that it no longer needed the additional bankruptcy judgeship, and as a result, the lending arrangement between the District of South Dakota and the Middle District of Florida terminated

**Supp. App.043**

when Judge Colton began her new 14-year term in December 2017.  The FJC's study of the

lending agreement between the District of South Dakota and the Middle District of Florida will

continue until a final report is presented to the Committee.

The District of South Dakota, with the support of the Eighth Circuit Judicial Council,

agreed to continue to participate as a lending district for another round of the pilot, with the

Northern District of Mississippi, with the approval of the Fifth Circuit Judicial Council, as the

next borrowing district.  The Fifth and Eighth Circuit Judicial Councils entered into an MOU in

December 2017 to govern their participation in the pilot program.  The Eighth Circuit sought

applications for a bankruptcy judge in the District of South Dakota with a duty station in Sioux

Falls, South Dakota, but who will serve in Aberdeen in the Northern District of Mississippi for

the first five years of the fourteen-year appointment via a long-term intercircuit assignment.

Interviews were conducted and an initial selection made in accordance with the agreement

between the circuit councils.  The candidate is undergoing the FBI and IRS background

investigations.

The Committee noted the positive feedback received to date about the pilot and the

existence of other long-standing bankruptcy judgeship vacancies that could be utilized to better

manage existing judgeship resources across the country.  The Committee further noted that the

FJC's study would benefit from additional participation in the pilot, particularly from courts in

different circuits participating as the lending districts.  Subject to Judicial Conference approval of

the expansion of the pilot and the approval of the appropriate circuit judicial councils, the

Committee has identified at least one other vacancy that it believes may be a good candidate for

participation in the program.  It thus recommended that the Judicial Conference approve

expanding the pilot to allow up to five long-standing bankruptcy judgeship vacancies to be filled

and the judges lent through the use of intercircuit assignments and agreements between volunteer

circuits, to districts that have emergency needs for additional bankruptcy judgeships.

**Supp. App.044**

**Recommendation**: That the Judicial Conference approve expanding the bankruptcy judgeship vacancy pilot project to allow up to five long-standing vacancies to be filled and the judge lent to a district that has an emergency need for an additional judgeship through the use of an intercircuit assignment designation and an agreement between participating circuit councils.

## OTHER MATTERS

Staff updated the Committee on the work of a task force established at its December 2017 meeting to explore options for improving the judiciary's management of unclaimed funds attributable to bankruptcy courts. The task force is comprised of judges, clerks of court, a bankruptcy administrator, and AO staff, as well as representation from the Department of Justice Executive Office for United States Trustees. The task force considered a number of proposals related to (1) improving trustee efforts to locate creditors prior to depositing unclaimed funds with the bankruptcy court, (2) improving the database that consolidates unclaimed funds data, (3) improving bankruptcy court management of unclaimed funds, and (4) various proposals related to escheatment, fees, the *cy pres* doctrine, and the possibility of creditors disclaiming their interests in unclaimed funds. The task force discussed and agreed on proposals (both short- and long-term) to develop and further research.

The Committee received a report from its working group on diversity in bankruptcy practice and discussed an event the working group organized with the University of San Diego Law School, which was held the day before the Committee meeting. Law students from the University of San Diego, externs with federal judges, and local federal judges were invited to attend. The event included roundtable discussions among judges and law students. Law students had the opportunity to learn and ask questions about bankruptcy practice, judicial clerkships, and judicial service.

The Committee received a report from its working group on interpreting services in bankruptcy courts regarding progress made on identifying strategies for making interpreting services available in courts in need of such services, and identifying potential funding sources.

**Supp. App.045**

The Committee is waiting for a legal opinion from the AO's Office of General Counsel regarding payments to providers of interpreting services before proceeding.

The Committee received a report from FJC staff regarding the FJC's ongoing projects for the Committee, including evaluations of the Committee's vacancy and horizontal consolidation pilots and its study of bankruptcy judge time usage to aid development of new bankruptcy case weights, as well as work relating to various educational initiatives.

The Committee received status reports from the Bankruptcy Clerk of Court Committee Liaison, the Bankruptcy Administrator Committee Liaison, the Advisory Committee on Bankruptcy Rules Liaison, the Chair of the Bankruptcy Judges Advisory Group, and the President of the National Conference of Bankruptcy Judges.  The Committee also received briefings from several AO offices.

Respectfully Submitted,

Karen E. Schreier, Chair

| | |
|---|---|
| Leslie J. Abrams | Barbara J. Houser |
| Christine M. Arguello | Thomas L. Ludington |
| John P. Bailey | Eduardo C. Robreno |
| Sara Darrow | Brendan L. Shannon |
| Pedro A. Delgado Hernandez | Erithe A. Smith |
| Paul Engelmayer | N. Randy Smith |
| Mary P. Gorman | John E. Waites |
| Catharina Haynes | |

Appendix - Proposed Revisions to the Ad Hoc and Extended Service Bankruptcy Judge Recall Regulations

**Supp. App.046**

# Guide to Judiciary Policy

Vol. 3: Judges

<span style="color:red">*Redlined Version*</span>

## Ch. 9: Ad Hoc Recall of Retired Bankruptcy Judges

[. . .]

**§ 920 Judicial Conference Regulations**

[. . .]

**§ 920.40 Staff**

[. . .]

(b)    A recalled bankruptcy judge may be authorized two full-time chambers staff members if the bankruptcy judge ~~performs~~handles or is expected to ~~perform~~handle at least ~~75 percent of a full-time workload.~~825 weighted filings. One full-time chambers staff member may be authorized if the judge ~~performs~~handles or is expected to ~~perform~~handle at least ~~a 40 percent workload~~440 weighted filings, and no chambers staff may be authorized if the recalled judge ~~performs~~handles or is expected to ~~perform~~handle a workload of less than ~~40 percent~~440 weighted filings.  Workload will be based upon statistics compiled by the AO.

[. . .]

(d)    ~~Notwithstanding paragraph (b), a~~A recalled bankruptcy judge may be authorized ~~one~~a greater or ~~two full-time~~lesser number of chambers staff members than provided for in paragraph (b) upon certification by the circuit judicial council, and approval by the Committee, that the number of staff is ~~necessary~~appropriate after considering the following factors, provided that a recalled bankruptcy judge may be authorized no more than two full-time chambers staff members:

- the costs associated with the staff;
- the nature and mix of the district's caseload;
- historical caseload data and filing trends;
- geographic, economic, and demographic factors in the district;
- the lack of alternative solutions and resources for handling the district's workload; and
- any other pertinent factors.

[. . .]

# Guide to Judiciary Policy

*Redlined Version*

Vol. 3: Judges

## Ch. 10: Extended Service Recall of Retired Bankruptcy Judges

[. . .]

**§ 1020 Judicial Conference Regulations**

[. . .]

**§ 1020.40 Staff**

(a)     Chambers staff may be authorized for a recalled bankruptcy judge only with the approval of the judicial council of the circuit in which the judge will be serving and the Committee.  For recall appointments longer than one year and one day, the Committee must reauthorize chambers staff every 12 months from the start of the recall term.  The authority to approve the staff may be delegated by the Committee to its chair or an appropriate subcommittee.

(b)     A recalled bankruptcy judge may be authorized two full-time chambers staff members if the bankruptcy judge performshandles or is expected to performhandle at least 75 percent of a full-time workload.825 weighted filings.  One full-time chambers staff member may be authorized if the judge performshandles or is expected to performhandle at least a 40 percent workload440 weighted filings, and no chambers staff may be authorized if the recalled judge performshandles or is expected to performhandle a workload of less than 40 percent.440 weighted filings.  Workload will be based upon statistics compiled by the AO.

[. . .]

(d)     Notwithstanding paragraph (b), aA recalled bankruptcy judge may be authorized onea greater or two full-timelesser number of chambers staff members than provided for in paragraph (b) upon certification by the circuit judicial council, and approval by the Committee, that the number of staff is necessaryappropriate after considering the following factors, provided that a recalled bankruptcy judge may be authorized no more than two full-time chambers staff members:

- the costs associated with the staff;
- the nature and mix of the district's caseload;
- historical caseload data and filing trends;
- geographic, economic, and demographic factors in the district;
- the lack of alternative solutions and resources for handling the district's workload; and
- any other pertinent factors.

[. . .]

**Bankruptcy Administration Appendix - 2**