1            IN THE UNITED STATES BANKRUPTCY COURT
2              EASTERN DISTRICT OF VIRGINIA (RICHMOND)

     In Re:                              )   Case No. 08-35653-KRH
3                                        )   Richmond, Virginia
     CIRCUIT CITY STORES, INC., ET       )
4    AL.,                                )
                                         )   June 12, 2019
5            Debtors.                    )   1:59 PM
                                         )
6    ------------------------------- )

7
                        TRANSCRIPT OF HEARING ON
8    #1 MOTION FOR SUMMARY JUDGMENT (UNITED STATES TRUSTEE'S MOTION
     FOR SUMMARY JUDGMENT ON THE MOTION OF THE LIQUIDATING TRUSTEE
9       TO DETERMINE EXTENT OF LIABILITY FOR POST-CONFIRMATION
     QUARTERLY FEES PAYABLE TO THE UNITED STATES TRUSTEE PURSUANT TO
10     28 U.S.C. SECTION 1930(A)(6) AND MEMORANDUM IN SUPPORT) WITH
     NOTICE OF HEARING, FILED BY ROBERT B. VAN ARSDALE OF OFFICE OF
11   THE U.S. TRUSTEE ON BEHALF OF JOHN P. FITZGERALD.   (DOCKET NO.
                              14202)
12      #2 MOTION TO DETERMINE (MOTION OF THE LIQUIDATING TRUSTEE TO
     DETERMINE EXTENT OF LIABILITY FOR POST-CONFIRMATION QUARTERLY
13   FEES PAYABLE TO THE UNITED STATES TRUSTEE PURSUANT TO 28 U.S.C.
     SECTION 1930(A)(6) AND MEMORANDUM IN SUPPORT) FILED BY PAULA S.
14   BERAN OF TAVENNER & BERN, PLC ON BEHALF OF CIRCUIT CITY STORES,
                INC. LIQUIDATING TRUST (DOCKET NO. 14197)

15
                  BEFORE THE HONORABLE KEVIN R. HUENNEKENS
16                  UNITED STATES BANKRUPTCY JUDGE

17   APPEARANCES:
     For the Plaintiff:                  ANDREW W. CAINE, ESQ.
18                                       PACHULSKI STANG ZIEHL & JONES
                                         LLP
19                                       10100 Santa Monica Boulevard
                                         Los Angeles, CA 90067
20
                                         LYNN L. TAVENNER, ESQ.
21                                       TAVENNER & BERAN, PLC
                                         20 North Eighth Street
22                                       Second Floor
                                         Richmond, VA 23219
23

24

25

```
 1   For United States Trustee:        ROBERT B. VAN ARSDALE, AUST
                                       UNITED STATES DEPARTMENT OF
 2                                     JUSTICE
                                       OFFICE OF THE U.S. TRUSTEE -
 3                                     REGION 4
                                       701 East Broad Street
 4                                     Suite 4304
                                       Richmond, VA 23219
 5
                                       BETH A. LEVENE, ESQ.
 6                                     DEPARTMENT OF JUSTICE
                                       EXECUTIVE OFFICE FOR THE
 7                                     UNITED STATES TRUSTEE
                                       441 G Street, N.W.
 8                                     Suite 6150
                                       Washington, DC 20530
 9

10   ALSO PRESENT:                     KATIE W. BRADSHAW, CPA
                                       Trust General Manager, Circuit
11                                     City Stores, Inc. Liquidating
                                       Trust
12

13

14

15

16

17

18

19

20   Transcription Services:          eScribers, LLC
                                       7227 North 16th Street
21                                     Suite #207
                                       Phoenix, AZ 85020
22                                     (973) 406-2250

23   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

24   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

25
```

1          THE CLERK:  Circuit City Stores, Incorporated, items 1

2    and 2 on the agenda.

3          THE COURT:  Good afternoon, Mr. Van Arsdale.

4          MR. VAN ARSDALE:  Good afternoon, Your Honor.  Robert

5    Van Arsdale for the U.S. Trustee.

6          I rise in order to introduce to the Court Beth Levene.

7    She comes down from our Office of General Counsel out of the

8    Executive Office of the U.S. Trustee, and she will be

9    presenting the argument for the U.S. Trustee today.

10         THE COURT:  Okay.  Thank you very much, Mr. Van

11   Arsdale.

12         Ms. Levene, welcome to the court.

13         All right.  So what have you done to me?

14         MR. CAINE:  That's a loaded question.

15         THE COURT:  I know.

16         MR. CAINE:  Andrew Caine, Pachulski Stang Ziehl &

17   Jones, for the Circuit City Liquidating Trust.  With me is Ms.

18   Tavenner, my cocounsel, and Katie -- and Katie -- Katie

19   Bradshaw, the general manager of the Trust.

20         THE COURT:  She's only been here for ten years.  I

21   mean, this case has gone on forever and ever.

22         MR. CAINE:  I turned sixty, Your Honor.  I don't know.

23   It's one of those moments.

24         The general manager of the Trust.  We are here on the

25   Trust's motion to challenge the constitutionality of the U.S.

1  Trustee's fees, but as a preliminary matter, the U.S. Trustee

2  has filed a motion for summary judgment challenging the

3  procedure, and it appeared appropriate that that should go

4  first, so we put it that way on the agenda.

5       THE COURT:  All right.  So Ms. Levene, you wish to be

6  heard on your motion for summary judgment?

7       MS. LEVENE:  Thank you, Your Honor.  Beth Levene with

8  the Department of Justice for the United States.  And Your

9  Honor, I just have a few points that I'd like to add to the

10 arguments we raised in our papers.

11      The first is that we had filed our motion because we

12 truly think this is what the rules require.  We think it's the

13 right answer.

14      We recognize that the Court and counsel have been

15 generous in agreeing on a schedule for the briefing, but this

16 has also become a systemic issue coming up in other cases.  And

17 what happens is --

18      THE COURT:  All of which have been brought by motion,

19 I noticed.

20      MS. LEVENE:  Exactly, and they point to the one case

21 as having proceeded by a motion, and as precedent -- so we've

22 learned our lesson that we can't let that happen.  And the

23 reason for the rules is they provide standards and

24 predictability where we don't have to rely on the grace of the

25 Court and counsel for agreeing on these schedules.

1        So we had one case where it was set for a hearing on

2   ex parte notice for just a week later.  Again, we were able to

3   agree on a schedule there.  But in another case, the Court gave

4   us only two weeks to respond.  So we think this is the right

5   answer, and it is a systemic issue where we feel like we need

6   to assert the rules just to respond to a couple points raised

7   in their brief.

8        They assert Rule 2020 governs, but that rule is

9   regarding challenges to acts or failures to act of the United

10   States Trustee.  What's being challenged --

11        THE COURT:  Sending a bill is not an act?

12        MS. LEVENE:  Well, Your Honor, the fees are due

13   regardless of what the United States Trustee does or doesn't

14   do, whether a bill is sent or not, and what they're challenging

15   is what they owe under the statute.

16        So what they're challenging is the statute, not any

17   act or failure to act of the United States Trustee.

18        We also think that Rule 5.1 really doesn't bear on

19   this at all.  That provides a mechanism for notice to the

20   federal government for any situation in which a constitutional

21   argument may come up.  It refers to pleadings, motions, and

22   other papers.

23        So for example, you may have a private civil lawsuit

24   resting on a federal statute where the defense may come up and

25   as a motion to dismiss that the statute is unconstitutional; it

1    guarantees notice to the federal government, but it does not,

2    in any way, authorize constitutional claims to be asserted in

3    one way or another, and it doesn't, in any way, override Rule

4    7001.

5          THE COURT:  Let me ask the ultimate question here, and

6    this is the one that I've been struggling with.  It kept me

7    awake most of last night.  What difference does it make?

8          MS. LEVENE:  Your Honor, here, we have had ample time.

9    So I'll agree; it probably makes somewhat less difference here,

10    another case.

11          THE COURT:  Because --

12          MS. LEVENE:  We think that it is what the Rules

13    require.  I will say that the arguments, I think, would be more

14    developed if we had a complaint and a motion to dismiss and

15    then a response to that.  And there is -- we've already seen

16    some lack of clarity.

17          They wrote in their motion, on their conclusion --

18          THE COURT:  Wait, let's back up just a little bit.

19          We start with Rule -- this was filed as a contested

20    matter under Rule 9014.  Rule 9014 says almost all of the rules

21    under Part 7 apply, okay.  There are a couple that don't, okay?

22    And you just brought up one of them, which is Rule 12, okay?

23    But I can make any rule applicable, so it doesn't make any

24    difference.  And then, we have exactly the same thing.  We're

25    just calling it different.  We're calling it a contested matter

1    instead of an adversary proceeding, but we can have all the

2    rules apply.  And so I'm trying to figure out what are we

3    really trying to accomplish other than just delaying this?

4            I mean, this case, when I try to -- see, I can forget

5    his name.  No, I could never forget Mr. Caine.  But the point

6    being that this case has been around for a long, long time.

7    I'm hopefully -- I'm hoping it ends in my lifetime, and all

8    we're going to be doing is prolonging things, and I don't want

9    to prolong things.  I like to get things resolved.

10            And we're in the rocket docket, which means it's going

11   to be resolved.  It's going to be resolved very shortly.  And I

12   really don't care what kind of a label we put on it, because

13   I'm going to resolve it within the same time frame.  And if

14   it's inconvenient to argue the ultimate motion today, I can

15   hear you on that.  We can set down for a special time.  We can

16   take a day, if we need.  I don't care.  But it's going to be

17   done, and it's going to be done very quickly, okay?

18            And I could convert this immediately to an adversary

19   proceeding just by saying, okay, now, it's an adversary

20   proceeding and giving you the number.  It doesn't give you any

21   more rights.  You're going to get every right you possibly

22   could want, okay?  I will give you that, all right?  But I just

23   don't want it to be delayed.  I want to go forward.  I want to

24   get this resolved one way or the other, because it's -- it is,

25   as you say, an important issue, but it's more important to me

1   because I want to end this case, okay.

2           MS. LEVENE:  I understand, Your Honor, and we are not

3   trying to delay.  We are prepared to go forward on the merits

4   today.

5           THE COURT:  Okay.  Excellent.  All right.  So what do

6   you want to call it; an adversary or a contested matter?

7           MS. LEVENE:  We would like to call it an adversary,

8   Your Honor, because as --

9           THE COURT:  Because I'm not dismissing it, because

10  Judge Tice said back in the Fas Mart case, you don't get to

11  dismiss a case just because it's not the right thing.  What you

12  have to do -- and what he did is he did sua sponte said okay,

13  we'll call it an adversary, and -- which I thought was

14  ingenious, but that was Judge Tice.  It says --

15  MS. LEVENE:  Your Honor, granted, as I said, we're the

16  Government.  We're trying to make sure the rules are followed,

17  and this is a systemic issue.  We do think there should be

18  something saying these -- they really should be adversary

19  proceedings, and that affects future cases.  And there's some

20  copycats here.  So -- and I'm not just talking about this case,

21  but we are ready to proceed on the merits, Your Honor.

22          THE COURT:  Okay.  So here's what I would suggest we

23  do.  Could we just treat, then, these as cross-motions for

24  summary judgment and go straight to the merits?

25          MS. LEVENE:  I suppose we could do that, Your Honor.

1  I think of our motion as being more like a motion to dismiss

2  the complaint, but I don't know that there's any material

3  facts --

4           THE COURT:  That's what I was --

5           MS. LEVENE:  -- here that we need evidence on.

6           THE COURT:  That's where I was going next, because you

7  need to develop some sort of facts.  You need to take Mr.

8  Seigel's deposition, or does he need to take Mr. White's (ph.)

9  deposition, or -- I can't see that.  I don't see that there are

10 facts here that anybody's disputing.  We've got a statute, and

11 the question is does it apply.

12          MS. LEVENE:  And that's why I think of it more as

13 motion to dismiss.  We don't see any facts here.  I can't speak

14 for the liquidating trustee.

15          THE COURT:  Okay.  Well, Mr. Caine can certainly speak

16 for himself, and I don't intend to put words in his mouth, but

17 I was just wondering why we couldn't just get right to it and

18 get the matter resolved one way or the other.

19          But I mean, I've read all of your papers.  I've read

20 all of Mr. Caine's papers.  I know what they say, and I'm much

21 more interested in the underlying argument than I am in calling

22 it either a dog or a cat or an adversary or a contested.  It

23 just doesn't make any difference to me.  And we can call it

24 whatever everybody wants to.  I think we ought to get to it.

25          MS. LEVENE:  Okay.  Thank you, Your Honor.

Colloquy                                                              10

1          THE COURT:  Okay.

2          MS. LEVENE:  I assume that the liquidating trustee

3    would like to present first on his motion.

4          THE COURT:  Okay.  Thank you.

5          First, Mr. Caine, do you want to go forward today, or

6    do you want to put this off to a special time?  What needs to

7    be done?  I don't want to ambush anybody.  I want to give

8    everybody their full rights.

9          MR. CAINE:  We would like to go forward today, Your

10   Honor.

11         THE COURT:  That would be my preference, too.  Okay.

12         MR. CAINE:  And if you wish to call it an adversary

13   proceeding, that's acceptable to us.  These can be --

14         THE COURT:  It's now an adversary proceeding.

15         MR. CAINE:  Okay.

16         THE COURT:  All right.

17         MR. CAINE:  Maybe cross --

18         THE COURT:  The fee is waived.

19         MR. CAINE:  -- cross-dispositive motions, however they

20   want to be labeled we --

21         THE COURT:  Okay.

22         MR. CAINE:  -- would like to go forward without delay.

23         THE COURT:  All right.  Very good.

24         So why don't we proceed, then, on the underlying

25   issues.

1        MR. CAINE:  Thank you, Your Honor.  The glasses are

2   also evidence of advancing age.

3        THE COURT:  Glad to see that you're catching up.

4   Okay.

5        MR. CAINE:  I'm happy to see Ms. Bradshaw sitting

6   here.

7        Your Honor, the statute about which we are arguing

8   today has raised a lot of attention throughout the bankruptcy

9   community not because it is an increase in a fee by the United

10  States Trustee's Office, because we would concede that those

11  fees are likely to increase over time, but because of the size

12  of the increase and the attempt by the United States Trustee's

13  Office to apply that exponential increase, that 833 percent

14  increase, to cases in which plans have already been confirmed

15  and the party's rights have already been agreed to and

16  adjudicated and in which parties are proceeding in accordance

17  with those confirmed plans in an attempt to return as much as

18  possible to creditors.

19       The argument that the U.S. Trustee makes is that,

20  first of all, it was intended to be replied (sic)

21  retroactively -- I'll get back to that in a minute -- but also

22  that even if there is some infringement of the parties' rights

23  through this retroactivity, that's acceptable because the

24  legislation is rational in order to fund a program that has a

25  deficit.

1          And the problem with that argument, Your Honor, which

2    is at the very heart of what the United States Trustee is

3    arguing today, is that, taken to its logical conclusion, you

4    get an absurd result.

5          If the rationale comes from the size of the deficit,

6    then an increase of thousands of percent would still be

7    justified by the same rationale.  And Your Honor, that

8    clearly --

9          THE COURT:  Now, why can't Congress do that?

10         MR. CAINE:  Because it's unconstitutional.

11         THE COURT:  Okay.  Where?  I mean, if I buy a car

12   tomorrow and the Government decides it's going to tax the car

13   at one rate today, and tomorrow, it changes the rate, why can't

14   it do that?

15         MR. CAINE:  Well, your decision to buy the car -- in

16   making your decision to buy the car, you know that the rate for

17   your registration is X, right.  At that point, as soon as you

18   learn that there is going to be a much higher rate for the car,

19   then you have various options.  You're not required to keep

20   that car.  You can sell the car and choose to buy a car of a

21   lower value because you don't want to have to pay as much of a

22   tax.  You could buy a used car.  You could take a bus.  You

23   have a lot of other options because your rights are not frozen.

24   You're not required to drive that car until it doesn't run

25   anymore.  But essentially, in a plan confirmation context,

Colloquy                                                              13

1  particularly here, where the plan is confirmed in 2010 and many

2  decisions are made in order to take actions that are long-term

3  actions to the benefit of creditors, and now there is a

4  decision by the United States Trustee, by Congress, to impose a

5  much higher cost, much higher than this trust paid in the seven

6  years from confirmation through 2017; we paid 833,000 dollars

7  in U.S. Trustee's fees.  In the first three quarters of 2018,

8  we paid 632,000.  We're driving that car until it's done.

9  And --

10        THE COURT:  Hopefully faster so we finish the case.

11        MR. CAINE:  We're almost there, Your Honor, and you'll

12  see when I see you next month, we've settled with Old Republic,

13  which I'm happy to say.

14        But we made decisions in this case to pursue anti-

15  trust litigation and other litigation that came before Your

16  Honor, business litigation that were long-term investments, and

17  those long-term investments generated substantial revenues.  So

18  that now, after the distribution we made last week, we paid

19  fifty-four percent to creditors.

20        If you're --

21        THE COURT:  Which by the way, Mr. Siegel should be --

22  and counsel should be congratulated for.

23        MR. CAINE:  Thank you, Your Honor.

24        When the plan was confirmed, it predicted sixteen

25  percent.  If the debtors had known prior confirmation that the

 1    U.S. Trustee's fees were going to be a million dollars a year,

 2    there might have been different decisions made in confirmation

 3    and how the case was going to proceed thereafter.  But once the

 4    plan is confirmed, those rights are already fixed.  Those

 5    decisions are made.

 6              THE COURT:  And I saw that argument.  So I went back

 7    and looked at the confirmation order, and the confirmation

 8    order says that you're going to continue to pay the U.S.

 9    Trustee fees, period.  It doesn't say at the rate of whatever

10    or at the current rate or anything else.  It just says you're

11    going to continue to pay it.  Why isn't the debtor or the Trust

12    stuck with that same order?

13              MR. CAINE:  Well, we are stuck with the order to pay

14    the U.S. Trustee fee, but we are not precluded from challenging

15    the constitutionality of an exponential increase in the U.S.

16    Trustee fee.

17              THE COURT:  Okay.  So we'll get to that next.  So it's

18    not a matter of interpretation of the order -- and so when we

19    challenge, then, the fee, are you challenging the

20    interpretation of the statute by the Office of the U.S.

21    Trustee, or are you -- and I think I know -- and I'm reasonably

22    confident I know the answer to the question, but I'm going to

23    ask it anyway -- or are you challenging Congress' right to be

24    able to implement a law like it did?

25              MR. CAINE:  I think it's both, Your Honor, and I'll

1   walk through the arguments now.

2           THE COURT:  Okay.

3           MR. CAINE:  I'm not going to go through them in any

4   particular detail.  I know that Your Honor has read all the

5   materials and is familiar with all the materials.  The same

6   issues were briefed in the Buffets (ph.) case.

7           THE COURT:  And I've read that opinion and the

8   pleadings there, as well.

9           MR. CAINE:  So it boils down to a couple of things,

10  Your Honor, and I'll deal first with uniformity since that's

11  first in order in the briefs.

12          Clearly, there is not uniformity between the fee

13  structure in the bankruptcy administrator districts and the

14  United States Trustee district.  Now, there are a lot of side

15  arguments that the United States Trustee makes, but prior to

16  the 2017 Bankruptcy Judgeship Act, there was a different fee

17  schedule.  And actually, as Buffets points out, until the

18  judicial conference of the United States made a fix later in

19  2017, were the amounts brought to the same level.

20          Now, they weren't required to be charged the same

21  amount.  There's a shall and there's a may that changed, but as

22  Buffets points out, when the initial 2017 legislation was

23  passed, the fee schedules were different.  That was later fixed

24  so that as of October 1st, 2018 the amounts of those fee

25  schedules were the same in the bankruptcy administrator

1  districts of North Carolina and Alabama, as they were

2  everywhere else.

3          So even if uniformity becomes a reality on October 1,

4  2018, that's the earliest that the Trust could be required to

5  pay under the new fee schedule, and we paid substantial amounts

6  prior to that time period.

7          THE COURT:  Okay.  But as I understand it, what you're

8  asking me today -- well, I guess -- never mind.  Go forward.

9          MR. CAINE:  Okay.  But Your Honor, even now, they are

10  not uniform.  If we look carefully at the notices sent in those

11  bankruptcy administrator districts, you will see that they do

12  not apply the new fee schedule to cases that were already in

13  existence.

14          If we look at page 149 of the motion filed by the

15  United States Trustee -- and here, we're in the appendices,

16  where it talks about the discussion of the legislation -- I'll

17  give you a moment if you want to get to that --

18          THE COURT:  I'm --

19          MR. CAINE:  -- page.

20          THE COURT:  -- turning my pages as fast as I can.

21          MR. CAINE:  On my docket entry, it's 149 of 154.

22          THE COURT:  Okay.  I'm there.

23          MR. CAINE:  So at the very top of the page, it says,

24  "the committee agreed the quarterly fee calculation should

25  apply in VA districts beginning in the first quarter of fiscal

Colloquy                                                                    17

1    year 2019".  That is for any Chapter 11 case filed on or after

2    October 1, 2018 and not for cases then pending.

3           I have, Your Honor, the actual notices that were sent

4    in North Carolina and in Alabama, and I have extra copies that

5    I can present to Your Honor and to counsel that are consistent

6    with the reference on page 149, that these new fees are not to

7    apply in cases then in existence.  They only apply to cases

8    going forward.

9           If you'd like, Your Honor, I can go through that.

10          THE COURT:  Provide a copy to Ms. Levene first, and

11   then -- if you would hand it to Ms. Levene first and then --

12          MR. CAINE:  Yes.

13          THE COURT:  I can get --

14      (Pause)

15          THE COURT:  All right.  I've read this.

16          MR. CAINE:  So Your Honor, even today we don't have

17   uniformity in the fee schedule.  If you file a case now in

18   Northern District of Alabama or Western District of North

19   Carolina, you are subject to the new fee schedule, but if you

20   filed a case prior to October 1, 2018, you're on the old

21   schedule.  So it is not uniform and clearly could affect --

22   could have affected the decisions of debtors as to where to

23   file their cases, particularly when the fee is raised by 833

24   percent.

25          One argument raised by the United States Trustee that

Colloquy                                                                                 18

1    we want to address briefly, Your Honor, is that this is --

2    these are not laws that need to be uniform, and they refer to

3    Local Rules as another example of rules that may be different

4    that are still constitutional.  But we note, Your Honor, that

5    the Fourth Circuit has drawn attention to the constitutionality

6    of Local Rules, and that differentiation in the Local Rules

7    does raise constitutional issues as mentioned in the No case

8    that the Fourth Circuit decided in 2018.

9           So if substantive rights are affected, then there's

10   got to be some uniformity, and the cost of filing a case and

11   what that means to creditors, potentially, for their return, is

12   clearly a substantive issue in a bankruptcy case.

13          For lack of uniformity, Your Honor, the Trust suggests

14   that this fee schedule is unconstitutionally applied in this

15   case where the Circuit City plan was already confirmed, and the

16   rights of the parties have been frozen in the plan and

17   proceeding forward since 2010.

18          Independently, Your Honor, the fee structure is

19   unconstitutional because it is inappropriately retroactive to a

20   case where a plan has already been confirmed.

21          The Supreme Court's Landgraf case is the benchmark

22   here.  Landgraf holds that there is a presumption against

23   retroactive application of statutes unless there is clear

24   congressional intent, express language providing that the

25   statute is to apply retroactively.  We don't have that here.

1  The language of this section says only that "during the years

2  2018 to 2022, the fees shall be" and then sets forth the fees.

3       It doesn't say that it's only for newly filed cases.

4  It doesn't say that it applies to old cases.  It just doesn't

5  say.

6       We do know that Congress knew how to apply it to prior

7  cases if it wanted, because the 1997 act specifically said,

8  "The increase applies regardless of the confirmation status of

9  the debtor's reorganization plan."  So you can read as you wish

10  out of the current statute, but we do clearly know that if

11  Congress intended it to apply to cases that were already

12  pending, it knew how to say that, and it did not here.   In

13  fact, Landgraf says that just a statement of the effective date

14  of a statute does not even arguably suggest application to

15  prior conduct.  So expressly, there is no retroactive

16  application.  That's the first step.

17       There's an argument by the United States Trustee that

18  there's legislative history suggests that they intended it to

19  apply to cases that were already pending, but what they really

20  rely on is a congressional budget office estimate that shows,

21  historically, what existing cases had paid, but there is

22  nothing in any of the Congress reports that say this is to

23  apply to pending cases.

24       So according to Landgraf, if Congress did not

25  expressly provide for retroactive reach, you have to take the

1  next step.  Does it have a retroactive effect?  Does it impair

2  existing rights?  Does it increase liability for past conduct?

3  Does it impose new duties on transactions already completed?

4        The common sense answer here is, clearly, yes; it does

5  all of those things, because all of the rights were agreed and

6  ordered in the plan of confirmation, and all of the conduct

7  that the new fee schedule is attempting to raise revenue from

8  occurred over the last several years since the plan was

9  confirmed.  Now, the fee only applies to quarters in 2018, but

10 the Trust made decisions that led to disbursements made in

11 those quarters much earlier than that, including, as I've

12 mentioned, decisions to engage in litigation that led to

13 hundreds of millions of dollars of revenue for creditors for

14 which professional fees then came due and were paid.  So

15 there's no question that it has a retroactive effect in this

16 case.

17        So then, the next step is, as stated in Landgraf and

18 in Buffet, does it substantially increase the monetary

19 liability of a private party to apply to conduct occurring

20 before the statute's enactment?  The answer is, certainly, yes.

21        Now, if they want to increase fees and to do so in a

22 prospective fashion, then a party has all the information in

23 front of it in order to guide its conduct.

24        If I'm looking to file a case and I know that the U.S.

25 Trustee fee is going to be substantially higher than it was in

1    the past, I might decide to file a prepack.  I might decide to

2    negotiate a case up front before filing so I can get in and out

3    in a quarter rather than negotiating after the filing, which

4    might take years.  In this case, it took almost two years to

5    get to confirmation from the time of the filing, because during

6    that time period, I might incur millions of dollars in United

7    States Trustee fees, or a party might decide to use an

8    assignment for the benefit of creditors and not come into the

9    bankruptcy process at all.  Or as I mentioned with respect to

10   the Circuit City case, if you know that the U.S. Trustee's fees

11   are insubstantial, averaged 25,000 a quarter or so that the

12   Trust has paid, then you can take risks for the benefit of

13   creditors to engage in certain litigation the way the Trust has

14   here, not -- knowing that if you incur professional fees that

15   have to be paid and you do come up with a lot of money that

16   you're not going to have to pay large U.S. Trustee fees as a

17   result of those disbursements.

18          So Your Honor, there's no question that the statute

19   has the retroactive effect that Landgraf warned about.  And the

20   cases that are cited by the United States Trustee are

21   consistent with this analysis.  Cases like CF&I and McAndrews,

22   which state that it's not acceptable for Congress to upset

23   reasonable expectations of parties whose rights are already

24   fixed.

25          For example, in the McAndrews case, which dealt with

1    FIRREA, and where a landlord had an existing lease with a

2    financial institution and the landlord wanted to terminate the

3    lease using the ipso facto clause, the legislation precluded

4    that.  And what the court said was the landlord's reasonable

5    expectation was to provide the space and to get paid rent,

6    which is exactly what it was getting.  Its reasonable

7    expectation wasn't to go ahead and kick out this financial

8    institution to rent to somebody else.

9            Here, the reasonable expectations of the debtor and

10   all of its creditors and the trustee was not that its

11   obligation for U.S. Trustee's fees was going to be raised by

12   833 percent.  That's inconsistent with the party's

13   expectations.  Inconsistent with the expectations to pay United

14   States Trustee's fees, which, as Your Honor noted earlier, are

15   part of the obligation of the trust under the plan

16   confirmation.

17           Again, Your Honor, the justification offered by the

18   United States Trustee is it's okay to affect these reasonable

19   expectations, it's okay to infringe on their rights because we

20   need to pay for the costs of the United States Trustee program.

21   And Your Honor, that argument cannot be accepted as proposed

22   because its logical conclusion is a blank check.  And if the

23   trustee had past legis -- or Congress had past legislation

24   increasing the trustee's fees by ten percent, twenty percent,

25   nobody would say that it interfered with their reasonable

1    expectations.  But here, the increase is so large that the

2    trust can say to Your Honor that in three quarters, under this

3    new fee schedule, we paid almost as much as we paid from 2008

4    through 2017.  This was not our reasonable expectation.  We did

5    not guide our conduct based on the expectation that we were

6    going to have to pay such large fees.

7              As a result, Your Honor, the Trust submits that the

8    U.S. Trustee fee schedule under this Section 1930 is

9    unconstitutionally retroactive.

10             There's one more argument, Your Honor, and that is due

11   process.

12             Again, that's an independent argument to find this

13   unconstitutional.  The trustee relies on the Sperry case from

14   the Supreme Court which provides that user fees are okay if

15   they are a fair approximation of the use, not, and I quote, "so

16   clearly excessive as to belie its role as a user fee".

17             The United States Trustee characterizes the fees it's

18   charging here as a user fee.  If you want to be in bankruptcy,

19   you got to pay into the system.  In Sperry, it was a Federal

20   Arbitration Program that it provided for a fee.

21             The Trust is not challenging the right to charge a

22   fee, Your Honor.  It's the amount of the fee; is it a fair

23   approximation of use?  The Cranberry Growers case said it a

24   different way, it must bear a reasonable relationship to the

25   work performed.

1          The question is whether or not the new schedule

2     applies to post-confirmation cases.  And here, to apply an 833

3     percent increase to a post-confirmation case is clearly

4     excessive under the language of Sperry because the United

5     States Trustee is not involved in the case post-confirmation.

6     Other than the assessment and collection of fees, there is

7     rarely any involvement whatsoever.  That's because a

8     liquidating trust has been created and the rules of the game

9     are set in a plan of confirmation.  So the fee is not

10    reasonably related to the work performed.

11         And the United States Trustee admits that the lion's

12    share of the burden under this new fee schedule falls on the

13    large cases, many of which are already confirmed.

14         So the cases in which the United States Trustee is not

15    involved are the cases that are supposed to pay for all of it.

16         Your Honor, this is clearly a taking of money, of

17    property, of rights that nobody expected and is not a fair

18    approximation of the value that comes from participating in the

19    bankruptcy system in a post-confirmation context.

20         So because we don't have a uniform set of rules for

21    what fees are paid, because the legislation is

22    unconstitutionally retroactive to a case where a plan has been

23    confirmed, and because it infringes on the due process rights

24    of the Trust, we ask that Your Honor find that the new fee

25    schedule does not apply to the Circuit City Liquidating Trust.

Colloquy                                                     25

1            THE COURT:  Wouldn't your last argument on due process

2     apply to even cases filed after the fees had been implemented?

3     In other words, cases filed after 2017, because it would --

4     again, once the plan has been confirmed and you have a

5     liquidating trust, if anybody's going to ever set up their

6     vehicle that way again, they would have to -- they would know

7     they'd have to pay those fees, but yet the U.S. Trustee

8     wouldn't be involved in the case anymore.

9            MR. CAINE:  Well, they -- it would, Your Honor, but

10    they could guide their plans accordingly.  They would know

11    going into the case that the fee schedule applied, and so they

12    would determine how to structure a plan if it went through a

13    Chapter 11 to get in and out, prepack, confirm, pay everybody,

14    close the case.  They can plan accordingly or use some other

15    vehicle.

16           Does Your Honor have any other questions?

17           THE COURT:  No.  That was my question.  Thank you very

18    much.

19           MR. CAINE:  Thank you.

20           THE COURT:  Ms. Levene?

21           MS. LEVENE:  Your Honor.  Your Honor, the liquidating

22    trustee, as you know, challenges the 2017 amendment that

23    temporarily increased the fees in Chapter 11 cases for the

24    largest cases, and what's clear from the argument and from

25    pleadings is the liquidating trustee really has a disagreement

1   with the congressional judgment regarding the amount of these

2   fees.

3          It was Congress' judgment that the users of the

4   bankruptcy system should pay for it, not the taxpayers, and

5   there's a lengthy history of Congress evaluating and

6   reevaluating how much these fees should be, including in this

7   case, where it has a very careful evaluation of what the budget

8   needs are and what is necessary with a calibration that

9   includes a cap on the fees, a sunset date, an expiration if the

10  fund reaches a certain point, and liquidating trustee offers no

11  valid reason to undermine Congress' policy judgment regarding

12  these issues or to undermine its authority regarding these

13  kinds of budget and revenue determinations.

14         I'll get to uniformity and retroactivity arguments in

15  a bit more detail, but two points up front.

16         The first is it was Congressional judgment after the

17  Victoria Farms case that the fees -- any fees in the bankruptcy

18  administrative districts should be the same as the rest of the

19  country.  So that is what the statute requires, and the statute

20  does not lack uniformity.

21         The second is that it was the Congressional judgment

22  with the 2017 amendment that these increased fees should apply

23  to all disbursements in the qualifying Chapter 11 cases.  It

24  made no exception for cases that were filed prior to the

25  enactment date.

1          Your Honor, turning to the uniformity argument, the

2   statute, even assuming it's a law on the subject bankruptcies,

3   which as we argue in our papers, we don't think it is, but even

4   assuming it is, it is uniform.  The law itself, (a)(6) and

5   (a)(7) together, require the same fees throughout the country.

6   There is no dispute that if (a)(7) is complied with, there is

7   no lack of uniformity.

8          The difference here that is being complained about is

9   a difference in the -- because of the failure to collect the

10  fees contrary to the requirements of subsection (a)(7), and it

11  is also, by the way, contrary to the 2001 judicial conference

12  directive that any fee should match the fee set forth in (a)(6)

13  as those fees are amended from time to time.

14         And so for example, in 2007, when the fees went up,

15  the fees went up in bankruptcy administrator districts, too.

16  But the different application of law, of the ultra vires

17  failure to enforce the law, does not make that law itself

18  unconstitutional.  That's what the Peony Park and the Rosenberg

19  (ph.) cases stand for that we cited in our briefs, and of

20  course, that makes sense.

21         You can't have a rogue employee who doesn't do what

22  he's supposed to do, whether it's collection of taxes for

23  someone who, in a bankruptcy administrator district, who falls

24  down on the job and fails to collect these fees, unilaterally

25  render a statute unconstitutional.  And to suggest that the

1   judicial conference's failure to collect fees renders the

2   statute itself unconstitutional would be akin to saying,

3   because courts are split regarding how to apply a particular

4   provision in the Bankruptcy Code, because that Code is applied

5   differently in two different areas of the country, renders that

6   Code provision unconstitutional, and that's happened.  In fact,

7   just this past term the Supreme Court resolved a circuit split

8   regarding the application of Section 365 to the rejection of

9   trademark license agreements.

10           Until the court resolved that circuit split, 365 was

11  applied differently in different parts of the country, but that

12  doesn't render Section 365 unconstitutionally nonuniform.

13           Your Honor, I was going to turn to retroactivity

14  unless you have questions on the uniformity argument.

15           THE COURT:  Well, on the uniformity argument, so what

16  you're saying is that the districts of North Carolina and

17  Alabama are simply not charging what they should be charging?

18           MS. LEVENE:  Exactly, Your Honor.  Exactly.

19           THE COURT:  Okay.

20           MS. LEVENE:  And I will add that one of the things

21  that Victoria Farms demonstrates is that the solution is not

22  necessarily to -- if there is a perceived lack of uniformity,

23  the remedy is not necessarily to say you're out of the fees.

24  What Victoria's Farms did is looked to what was going on in

25  North Carolina and Alabama.

1        Here, this statute itself, now that we have (a)(7), it

2   is uniform, and the problem is misapplication or the failure to

3   apply that statute in those districts.

4        THE COURT:  All right.  Is that because there's a

5   misinterpretation, you think, in what the law says, that

6   Congress passed, that U.S. Trustee's interpreting it one way,

7   and the administrative system is interpreting it a different

8   way?

9        MS. LEVENE:  Your Honor, it's hard for me to get into

10  their heads, and it's possible that that's one explanation.

11  It's possible they weren't immediately aware of the law.  I

12  mean, it's certainly -- they do seem to be applying it

13  differently and not inconsistently with what subsection (a)(7)

14  requires.

15       THE COURT:  Well, I mean, it probably gets into what's

16  going to be your next argument, which really is the

17  retroactivity provision.  So why don't you go into that, and

18  then, I can follow up with additional questions there.

19       MS. LEVENE:  Sure, Your Honor.

20       THE COURT:  Thank you.

21       MS. LEVENE:  Your Honor, as counsel pointed out, the

22  first question on the Supreme Court's decision in Landgraf is

23  what does the statute say.  You don't get to any presumptions

24  if you have a statute that is clear, if you have a clear

25  legislative intent using normal rules of statutory

1  construction.  And here, we think the statute is clear.  We

2  also think it is prospective, not retroactive, because it

3  applies to disbursements in open cases only after the date of

4  enactment.  And with your indulgence, I'd like to go through

5  the statute with some specificity.

6          The amended statute in subsection (a)(6)(A) says that

7  except as provided in subparagraph (B), in addition to the

8  filing fee paid to the clerkb a quarterly fee shall be paid "in

9  each case under Chapter 11 of Title 11" for each quarter until

10 the case is converted or dismissed.

11         And then in the new subparagraph (B), it says, "During

12 each of fiscal years 2018 through 2022", and then it goes on to

13 describe the increased quarterly fee, how much it is, for what

14 cases that it will only apply if the fund is below a certain

15 threshold.  And the natural reading of this statute is that, as

16 it says, in each case, during those years, the fees for a

17 Chapter 11 case with disbursements above the threshold in any

18 quarter during that period will be increased.

19         It certainly isn't meant to say that the fees are

20 increased only for cases filed in those fiscal years, 2018

21 through 2022.  That would fundamentally change the meaning of

22 the statute because it would mean the fees continue till the

23 cases end, and it would -- when instead what it means is that

24 there's a sunset in 2022.

25         THE COURT:  But it doesn't say that it does apply to

1  those cases that were filed back then.  It doesn't say one way

2  or the other.

3        MS. LEVENE:  Your Honor, the statute itself says in

4  each case, but you're right, it doesn't specifically say this

5  applies to all cases or this applies to only pending cases, but

6  does it not carve out cases that were filed prior to the date

7  of the amendment, and the uncodified law has an additional

8  provision regarding the applicability of the amendments, and it

9  says the amendments made by this section shall apply to

10 quarterly fees payable under Section 1930(a)(6), "for

11 disbursements made in any calendar quarter that begins on or

12 after the date of enactment."

13       So this is not just sort of a general effective date

14 like you had in Landsgraf (sic).  This was very specific

15 language with a triggering event being the disbursements and

16 when they were made being a quarter -- beginning on or after

17 January 1st, 2018.

18       And it's important to remember that this was not the

19 only amendment to which this language applies.  There was also

20 an amendment which said that, during this period, 2018 to 2022,

21 two percent of the fees that would normally go to the system

22 fund are being carved out to go to the general fund of the

23 treasury to fund these bankruptcy judgeships.  And there's no

24 way to read the statute to say that that two percent carveout

25 is going to apply to all fees under (a)(6), but the new

Colloquy                                                        32

1    increased fees are only going to apply to cases filed after the

2    effective date, and it really would become very logistically

3    difficult.

4              You think if Congress intended that -- something like

5    that, it would be more explicit.  And the legis --

6              THE COURT:  And yet the administrator systems have

7    interpreted it that way, that it does not apply, which goes

8    back to the question I was asking a few minutes ago that the

9    statute can be read both ways.

10             MS. LEVENE:  Your Honor, we think that is wrong, and

11   we don't know what analysis they did.  We don't know -- they

12   certainly were not sitting in a position of a court receiving

13   briefing on these issues, and they may not have focused on the

14   fact that there was also this two-percent provision.  They have

15   to make sense of that.  There's also the legislative history,

16   which we think is relevant and, again, distinguishes the case

17   from Landsgraf (sic).  And Landsgraf (sic) the -- a prior bill

18   had specifically included a provision saying this applies to

19   pending cases and -- but the President vetoed that, so the new

20   bill took that out.  Here, we have something very different.

21             We have a history where the fees from when they were

22   first enacted in 1986 through every increase thereafter had

23   always been applied to cases regardless of whether the cases

24   had been filed before or after the effective date of those

25   fees.  And we discussed this in our briefs regarding when the

Colloquy                                                                          33

1   statute was first enacted in 1986, and that's discussed in the

2   In re Primes case.  In 1996, there were two amendments to the

3   fee statute, and it's a little bit complicated because, in

4   January, Congress amended the statute to take out the word

5   "confirmation", and that generated a lot of litigation.

6          That statute just had an enactment date, and then, in

7   September, there was litigation about that, does this apply to

8   cases with confirmed plans prior to the enactment date.  And

9   Congress came back in September of 1996 and said, we meant for

10  this to apply to all cases with just the enactment date, no

11  different from in 1986.  And at the same time, it increased the

12  fees again.  And that 1996 increase also applied to all cases.

13  No one litigated that, really.  I was not able to find a case

14  where it was litigated.  I have found a case which it just

15  reflects the fact that those new fees were applying as of the

16  date of the increase, and I can provide the Court with the

17  cite.  I had not found that to put in the papers.  It's the In

18  re P.J. Keating 205 B.R. 663.  It's a bankruptcy case from the

19  District of Massachusetts.

20         And then, in 2007, the fees went up again, and I was

21  not able to find any cases on that.  I did find some historical

22  websites showing that those fees also applied like any other

23  fees, any other court fees, like fees under 1930(b) for a new

24  fee to amend schedules or to file a lift stay motion.  Those

25  fees always apply to all cases regardless of when the case was

Colloquy                                                                        34

1   filed.

2        That's true generally of court fees, and that has

3   always been the case with these quarterly fees.  And Congress

4   had no reason to think it would be different here.  If it

5   thought it -- if it wanted something different, you would have

6   expected it to say so.

7        And of course, you've got this CBO report; CBO being

8   charged to analyze the budget impact of the increase in direct

9   spending for the judgeships as against the increase in revenue

10  from the new fees.  And CBO read the bill as increasing the

11  fees for cases that were already filed, and it said this

12  multiple times.  It said it would -- the fees would apply to

13  cases "currently in Chapter 11" to "ongoing cases" and to cases

14  "that are already in bankruptcy".

15       If Congress thought that the CBO was reading its

16  language wrong it would have either changed that language or

17  sent the CBO back to the drawing board.

18       Keep in mind, this was in May.  The final bill didn't

19  go forward until October.  And there was not a lot of wiggle

20  room with the CBO's analysis.  It estimated twenty-one million

21  dollars in increased direct spending and twenty-one million

22  dollars in additional revenue.

23       So if that calculation was based on an incorrect

24  reading of the statute, that was pretty significant, but

25  Congress did not send it back.  And to read the statute or

1   rewrite the statute so it doesn't apply to cases that were

2   filed prior to its effective date would really undermine

3   Congress' funding goals.

4          So Your Honor, we think the statute, particularly when

5   considering legislative history, is clear that it does apply to

6   all cases including cases filed prior to its enactment date.

7   This application is prospective; it is not retroactive.

8          THE COURT:  Well, how do you get around Mr. Caine's

9   argument that the rights were already fixed at the confirmation

10  hearing and that they have made decisions based on what was in

11  existence there, which are now just coming out because now

12  they're paying the attorneys' fees because that's what's

13  triggering the amounts of these costs that they've incurred and

14  that they would have planned completely or could have had the

15  opportunity to plan, at least, completely differently if it had

16  been -- if the law was different.

17         MS. LEVENE:  Sure.  Your Honor, plan confirmation has

18  never been a guarantee of financial stability or financial

19  certainty, and it certainly --

20         THE COURT:  Believe me, I know.

21         MS. LEVENE:  -- not -- and certainly it does not

22  immunize debtors from new governmental fees.  It never has.

23  And that was an argument that was raised a number of times

24  when -- in 1996 and then it was litigated, and it was soundly

25  rejected.  It was rejected by the Third Circuit in the Gryphon

Colloquy                                                                36

1   Stone Mansion case; it was rejected by the Tenth Circuit in In

2   re CF&I Fabricators, and it was also rejected by the Supreme

3   Court in a different context in the Holywell case saying that

4   confirmation plans don't bond the United States for post-

5   confirmation claims.

6            This is a post-confirmation obligation that came up

7   later, just like a new tax or any other kind of new

8   governmental fee.  And of course, when it comes to planning,

9   the liquidating trustee here, as I understand it, was

10  originally supposed to end in 2015, was extended three times.

11  A lot of things that are unforeseen can happen after

12  confirmation.

13           But one thing that a plan does not do is vest a debtor

14  with a right to be immunized from new government fees.  And

15  Your Honor, this does not -- it's not retroactive because it

16  does not impair any vested rights.  And even if it were,

17  though, we don't think it would violate due process.

18           We think the slippery slope argument that the

19  liquidating trustee made here today is not appropriate, because

20  when you look at what Congress did here, it didn't just pick a

21  number out of a hat.  It made a rational decision.  It looked

22  at the data, and it calibrated what it thought the new fees

23  needed to be.  It set a cap on them; it set a sunset date that

24  fees could go back to their old levels even sooner if the

25  system fund reaches a certain level.  This is not, by any

Colloquy                                                             37

1    means, arbitrary or irrational action.

2            As the Supreme Court said in the Landgraf case, a

3    potential unfairness of a statute is not a reason not to give

4    the statute its intended scope.  This is a judgment of

5    Congress, and the complaint they had is really a complaint that

6    should be addressed to Congress.

7            Your Honor, they did mention the Takings Clause.  They

8    did not make that argument in their briefs, but it -- there's a

9    Supreme Court case that post-dates Sperry regarding takings

10   called Koontz, K-O-O-N-T-Z.  I don't have that citation with me

11   because it was not something that was raised in the pleadings,

12   that says that takings claims can't be based on fees or taxes.

13           So it's the Sperry case, in addressing a takings

14   argument, came before that case, but the Sperry case, we think,

15   supports us.  It says it's fair to charge user fees even if the

16   user doesn't use the system.  If you recall, in Sperry, the

17   litigant, Sperry, didn't want to use the tribunal at all, and

18   the court said --

19           THE COURT:  That was an arbitration case.

20           MS. LEVENE:  It was an arbitration, and I ran U.S.

21   arbitration case, and actually, what happened was Sperry filed

22   its claim, and then, out of necessity, because it had to go

23   through this tribu -- they had a tribunal.  They had a

24   settlement; they wanted to get the award entered, so Sperry

25   filed the claim in February.  In July, the award is entered.

Colloquy                                                                      38

1  Years later, Congress passes this statute with a retroactive

2  date to June.

3         So the date was before the award, but it was after the

4  case was filed.  The retroactivity argument there had nothing

5  to do with the filing date.  It had everything to do with award

6  date, what triggered the fee.  Just like here, what triggers

7  the fee is the disbursements, but here, the disbursements come

8  after the enactment date, and there is no retroactivity in that

9  situation.

10         Your Honor, for those reasons that we've -- I'm happy

11  to answer any further questions, but we would ask that the

12  Court deny the motion.

13         THE COURT:  All right.  Let me check one thing.

14         So what you're saying is that it doesn't make any

15  difference under the Koontz case -- and I have not yet read the

16  Koontz case.  I'm going to have to go read that, okay -- that

17  whether you call this a fee or a tax, it's going to be

18  determined as a tax so that we no longer -- if it's a fee or a

19  tax that we're talking about, we no longer look at the fair

20  application of the use.

21         MS. LEVENE:  Your Honor, my understanding is you can't

22  base a takings claim on a fee or a tax because it's not -- it's

23  just money; it's nothing that is akin to real property, which

24  is sort of the origins of the Takings Clause and eminent

25  domain; although, that's been expanded to regulatory takings.

1    So you just can't base a Takings Clause -- it's really just the

2    rational basis test of due process that should apply here.

3            But if you are to look at fair approximation, what

4    Sperry says is it's a fair approximation of the cost of

5    providing the services, not of the benefit.

6            THE COURT:  All right.  So does that -- it doesn't

7    have to be a fair approximation of the use of this particular

8    fee payer to that; it's just whether or not it has general

9    application to the overall program?

10           MS. LEVENE:  Absolutely.  And Sperry makes that clear

11   that these sort of decisions in bulk are what Congress has to

12   do.  You can't try and calibrate each fee to each user.

13           THE COURT:  All right.  Very good.  No, that was the

14   question I had.  Thank you.

15           MS. LEVENE:  Thank you, Your Honor.

16           THE COURT:  All right.  Mr. Caine?

17           MR. CAINE:  Thank you, Your Honor.

18           This all boils down to the interpretation offered by

19   the United States Trustee's Office that the 2017 legislation

20   must be interpreted to apply to cases where the case already

21   existed or a subset of that, also where cases where a plan had

22   been confirmed.

23           THE COURT:  But wasn't that the very first question I

24   asked you, and you said, well, no both, and then you started

25   talking about constitutionality because, as I went through

Colloquy                                                                40

1   this -- and I can't use the line of what keeps me up anymore

2   all night because I've already used that once today -- but was

3   the fact that it seemed to be an interpretation of what

4   Congress said, not what Congress said, that made this

5   problematic in your view -- not their view, but in your view.

6        MR. CAINE:  Well, that's right.  I mean, we do have

7   the uniformity argument, and that's separate from whether it

8   applies retroactively or not in one set of analysis, but if

9   you're looking at retroactivity, then the question is what

10  cases does it apply to, and the statute is not clear.

11       With all due respect to counsel, "in each case"

12  doesn't tell me whether it applies to each case that is filed

13  after the effective date or all the cases that already exist.

14  And as Your Honor pointed out, the bankruptcy administrator

15  districts interpreted the statute so as to apply only to new

16  cases.  And so it's clearly a reasonable interpretation that it

17  only applies to new cases, and the statute does not have the

18  express Congressional intent, that's clearly expressed

19  Congressional intent, and so there's got to be a use of the

20  presumption against the retroactivity.

21       THE COURT:  Well, I mean, again, assuming that the

22  judges always get interpretation exactly right, but we have

23  different -- and Ms. Levene pointed this out -- that we have

24  different circuits in the country where there's a split of

25  authority.  That doesn't make the Bankruptcy Code ununiform;

1  otherwise, we'd be getting these arguments every single time

2  that you're not applying the law of the First Circuit or the

3  Third.  It's different there.  But we did hear a little bit

4  about that -- about exemptions way back in the beginning of

5  time.  But it's a -- that doesn't make it unconstitutional.

6          Now, how do you respond to that?

7          MR. CAINE:  Well, certainly bankruptcy courts and

8  higher courts are going to make different interpretations of

9  what it says in the statute.

10          THE COURT:  And the administrator districts have made

11  a different interpretation.  That doesn't mean that the statute

12  is necessarily unconstitutional.

13          MR. CAINE:  What it means to us, Your Honor, is that

14  the statute is not clear on its face to be interpreted the way

15  that the United States Trustee has suggested.  And so if there

16  are districts --

17          THE COURT:  So any statute that can be interpreted in

18  different ways would then -- rationally interpreted in

19  different ways would be unconstitutional?

20          MR. CAINE:  Well, to the extent that it applies to the

21  substantive rights of parties that are considering filing

22  bankruptcy or that are in bankruptcy, that is a vital

23  difference.  That is where the uniformity -- the lack of

24  uniformity between the administrator districts and the U.S.

25  Trustee districts makes a difference to entities that are

 1 | filing their bankruptcy cases.

 2 |         THE COURT:  Because you're saying you can't now unring

 3 | the bell.

 4 |         MR. CAINE:  You can't.  Right.

 5 |         When I file a case, I know what decisions have been

 6 | made up to now by bankruptcy judges, and if I file in a

 7 | district, maybe I hope I get a certain judge rather than

 8 | another, but I can't control that, but I know the decisions

 9 | that have been made.

10 |         THE COURT:  You got stuck with me, right?

11 |         MR. CAINE:  No, I'm very happy to have.  But that is a

12 | different animal, entirely, from getting the fees or any other

13 | rule changed on you in the middle of a game.  And so we do have

14 | a lack of uniformity between the administrator districts and

15 | the U.S. Trustee districts, and the fact that they -- the

16 | administrator districts believe that these only applied to new

17 | cases shows that it wasn't clear what Congress was doing,

18 | right.  And so when we're looking at the -- not the uniformity

19 | piece, but the retroactivity piece, you have, essentially, the

20 | other side, the United States, on one hand, saying it only

21 | applies to cases filed after October 1, 2018, while the other

22 | hand is saying something different.  And Your Honor, that is

23 | going to mess with the reasonable expectations of parties.

24 |         And counsel mentioned that confirmation doesn't

25 | guarantee that they're not going to be future government fees;

Colloquy                                                              43

1   of course.  We said that from the beginning.  Increases that

2   are in line with reasonable expectations, nobody's going to

3   complain about, but the CF&I case, which counsel mentioned, is

4   exactly on point here.  You have to have reasonable

5   expectations honored, and that's not what's going on here.

6          THE COURT:  Well, who gets to decide whether it's a

7   reasonable expectation?

8          MR. CAINE:  You do.  The courts get to decide, right?

9          THE COURT:  Well, I was hoping that you'd have an

10  objective standard, because why is it me?  Why isn't it

11  Congress?  Congress has decided that 833 percent is a

12  reasonable expectation.  Why do I get to say, no, Congress,

13  you're wrong?

14         MR. CAINE:  Because the role of the judicial branch,

15  going back to Marbury v. Madison, is to decide whether the

16  legislature has overstepped its bounds.  And we're not

17  disagreeing with congressional judgment on how it's going to

18  raise money to pay for the U.S. Trustee system; what we're

19  disagreeing with is that it can apply that judgment

20  constitutionally in order to affect the rights in cases that

21  already existed, and particularly, in cases where plans were

22  already confirmed.

23         And --

24         THE COURT:  Ms. Levene says, well, wait a second; it

25  only applies prospectively because the fees only get charged

Colloquy                                                                44

 1   from 2018 forward.

 2           MR. CAINE:  Well, Your Honor, we got a notice in

 3   December of 2017 that, on January 1st, the fee was going to go

 4   up.  Now, how are we supposed to plan around that?  We already

 5   had all of these substantive decisions on the efforts of the

 6   Trust that were already in place.

 7           And so the lack of notice is something we were

 8   perturbed about, but it is also a reflection of the fact that

 9   Congress didn't care about the reasonable expectations of the

10   parties.

11           So to say that it's prospective is really a stretch.

12   Yes, it only applies to disbursements after this date, but it

13   affects -- it required disbursements based on conduct that was

14   already planned well before the effective date and well before

15   any notice of when the fee statute was going to apply, and

16   that's really what we're complaining about, Your Honor.

17           We had a confirmed plan; we put in process all of

18   these efforts in order to raise money, returned as much

19   recovery as we could for creditors, and now, we're having to

20   pay fees that are so much higher than anybody could ever have

21   reasonably expected in the amounts that I related to you

22   earlier.

23           And it's interesting that counsel mentioned the 1996

24   legislation and said there was no litigation around it, and

25   that is because --

1          THE COURT:  I knew you were going to bring that up.

2          MR. CAINE:  -- that is because the amendment was clear

3   that it applied to cases regardless of their confirmation

4   status.  So it was clear, then, that it applied to cases that

5   were existing, but the new legislation does not, Your Honor.

6          THE COURT:  All right.

7          MR. CAINE:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MS. LEVENE:  If I may clarify?

10         THE COURT:  I always give him the last word, but yes,

11  you can.

12         MS. LEVENE:  I just wanted to quickly clear up on the

13  '96 amendment.  There was two.  There was January, and there

14  was September.

15         The September amendment that increased fees for which

16  I said there was not much litigation, that just had a general

17  enactment date.  The language, the clarifying language saying

18  that it applies -- to clarify that it applied to pending cases

19  was clarifying the January amendment, which also only had an

20  enactment date.  I just wanted to clarify that, Your Honor.

21         THE COURT:  All right.  So the September enactment did

22  not, is what you're saying?

23         MS. LEVENE:  So the September bill did two things.

24  First of all, it clarified that the January amendment, which

25  took the word "confirmation" out --

Colloquy                                                46

1              THE COURT:  Right.

2              MS. LEVENE:  -- did apply to all cases.

3              And then, secondly, it increased the fees.

4              THE COURT:  Right.

5              MS. LEVENE:  And that September bill itself only had

6    an enactment date.

7              So that specific clarifying language was only as to

8    the January amendment.  It's a rather complicated year.

9              THE COURT:  It's rather complicated because I was

10   thinking that that September also applied to that particular

11   one, too.  But I need to go back and look at that --

12             MS. LEVENE:  Yeah.

13             THE COURT:  -- that specific statute and the language

14   there.

15             MS. LEVENE:  What it does is it amends the section of

16   the January bill to add that language regarding the effective

17   date --

18             THE COURT:  And then it omitted it for its own bill.

19             MS. LEVENE:  -- and then it separately increases fees.

20             THE COURT:  Okay.

21             MS. LEVENE:  And that is it's a complex statute, so I

22   just wanted to clarify that.

23             THE COURT:  Maybe we can ignore that one quickly.

24             MS. LEVENE:  Thank you, Your Honor.

25             THE COURT:  All right.  Mr. Caine, anything further?

1    I said I would give you the last word.

2              MR. CAINE:  Thank you, Your Honor.

3              I'm looking at the In re Richardson Services Corp.

4    (ph.) case, and in that decision, it talks about the

5    amendments, and it says, "Whatever doubt existed regarding"

6    reach -- "Congress' intended reach of the amendment was

7    rectified on September 30th, 1996 when the President signed the

8    Omnibus Appropriations Law which further amended Section 2.1 to

9    provide, notwithstanding any other provision of law, the fees

10   under 1930(a)(6) shall accrue and be payable from and after

11   January 27, 1996 in all cases regardless of confirmation status

12   of their plan."

13             So I'm looking at Richardson Service Corp. which

14   suggests that it was a September amendment that added that

15   language.

16             THE COURT:  I'm going to have to go look at the

17   amendment.  I, quite frankly, don't remember how that worked.

18   And I thought I knew how that worked, but I will go back and

19   look at that.

20             MR. CAINE:  It was over twenty years ago, Your Honor.

21             THE COURT:  That's no excuse.

22             All right.  So what -- obviously, I need to look at

23   this Koontz case, and I need to look at that statute among some

24   other things, so I'm not going to make any kind of ruling here

25   from the bench, which is always a scary thing to do, especially

1    when I have something of this moment.  So I'm going to take

2    this matter under advisement, and I will issue an order along

3    with an opinion that will go with it, because no doubt whatever

4    I do it's not going to be decided here.

5           So -- rightfully so, but -- so let the parties take it

6    wherever it needs to be.  And I -- but I'm aware that this is

7    something that is -- has come up elsewhere; it will continue to

8    come up, and so there's going to need to be some resolution of

9    this at some point in time.

10          So it's a shame that the administrator system and the

11   trustee system couldn't get their act together and -- but so it

12   goes.

13          All right.  Any other business in Circuit City that I

14   need to take up?

15          MS. LEVENE:  No, Your Honor.

16          THE COURT:  Okay.  And you said I'm going to get good

17   news next month.

18          MR. CAINE:  Yes, Your Honor.

19          THE COURT:  Okay.

20          MR. CAINE:  We have settled with --

21          THE COURT:  Don't spoil it.

22          MR. CAINE:  Yes.

23          THE COURT:  I'll wait till next month.  Okay.

24          Thank you very much for coming down.  It was good to

25   see you, and like I said, I'll get something out shortly.

1          All right.  Thank you to everybody.

2          THE CLERK:  All rise.

3       (Whereupon these proceedings were concluded at 3:11 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T I O N

2

3          I, Ellen S. Kolman, the court-approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the proceedings

6    in the above-entitled matter.

7

8

9                                    June 19, 2019

10   _____    _____

11   ELLEN S. KOLMAN                     DATE

12   AAERT Certified Electronic Transcriber CET-568

13

14

15

16

17

18

19

20

21

22

23

24

25

## A

**a6 (3)**
27:4,12;31:25
**a6A (1)**
30:6
**a7 (5)**
27:5,6,10;29:1,13
**able (4)**
5:2;14:24;33:13,
21
**above (1)**
30:17
**Absolutely (1)**
39:10
**absurd (1)**
12:4
**acceptable (3)**
10:13;11:23;21:22
**accepted (1)**
22:21
**accomplish (1)**
7:3
**accordance (1)**
11:16
**according (1)**
19:24
**accordingly (2)**
25:10,14
**accrue (1)**
47:10
**act (7)**
5:9,11,17,17;
15:16;19:7;48:11
**action (1)**
37:1
**actions (2)**
13:2,3
**acts (1)**
5:9
**actual (1)**
17:3
**actually (2)**
15:17;37:21
**add (3)**
4:9;28:20;46:16
**added (1)**
47:14
**addition (1)**
30:7
**additional (3)**
29:18;31:7;34:22
**address (1)**
18:1
**addressed (1)**
37:6
**addressing (1)**
37:13
**adjudicated (1)**
11:16
**administrative (2)**
26:18;29:7

**administrator (12)**
15:13,25;16:11;
27:15,23;32:6;
40:14;41:10,24;
42:14,16;48:10
**admits (1)**
24:11
**advancing (1)**
11:2
**adversary (10)**
7:1,18,19;8:6,7,13,
18;9:22;10:12,14
**advisement (1)**
48:2
**affect (3)**
17:21;22:18;43:20
**affected (2)**
17:22;18:9
**affects (2)**
8:19;44:13
**afternoon (2)**
3:3,4
**Again (9)**
5:2;22:17;23:12;
25:4,6;32:16;33:12,
20;40:21
**against (3)**
18:22;34:9;40:20
**age (1)**
11:2
**agenda (2)**
3:2;4:4
**ago (2)**
32:8;47:20
**agree (2)**
5:3;6:9
**agreed (3)**
11:15;16:24;20:5
**agreeing (2)**
4:15,25
**agreements (1)**
28:9
**ahead (1)**
22:7
**akin (2)**
28:2;38:23
**Alabama (5)**
16:1;17:4,18;
28:17,25
**almost (4)**
6:20;13:11;21:4;
23:3
**along (1)**
48:2
**although (1)**
38:25
**always (6)**
32:23;33:25;34:3;
40:22;45:10;47:25
**ambush (1)**
10:7
**amend (1)**
33:24

**amended (4)**
27:13;30:6;33:4;
47:8
**amendment (14)**
25:22;26:22;31:7,
19,20;45:2,13,15,19,
24;46:8;47:6,14,17
**amendments (4)**
31:8,9;33:2;47:5
**amends (1)**
46:15
**among (1)**
47:23
**amount (3)**
15:21;23:22;26:1
**amounts (5)**
15:19,24;16:5;
35:13;44:21
**ample (1)**
6:8
**analysis (4)**
21:21;32:11;
34:20;40:8
**analyze (1)**
34:8
**Andrew (1)**
3:16
**animal (1)**
42:12
**anti- (1)**
13:14
**anymore (3)**
12:25;25:8;40:1
**appeared (1)**
4:3
**appendices (1)**
16:15
**applicability (1)**
31:8
**applicable (1)**
6:23
**application (8)**
18:23;19:14,16;
27:16;28:8;35:7;
38:20;39:9
**applied (12)**
18:14;25:11;28:4,
11,32:23;33:12,22;
42:16;45:3,4,18;
46:10
**applies (17)**
19:4,8;20:9;24:2;
30:3;31:5,5,19;
32:18;40:8,12,17;
41:20;42:21;43:25;
44:12;45:18
**apply (39)**
6:21;7:2;9:11;
11:13;16:12,25;17:7,
7;18:25;19:6,11,19,
23;20:19;24:2,25;
25:2;26:22;28:3;
29:3;30:14,25;31:9,

**25;32:1,7;33:7,10,
25;34:12;35:1,5;
39:2,20;40:10,15;
43:19;44:15;46:2**
**applying (3)**
29:12;33:15;41:2
**appropriate (2)**
4:3;36:19
**Appropriations (1)**
47:8
**approximation (6)**
23:15,23;24:18;
39:3,4,7
**arbitrary (1)**
37:1
**Arbitration (4)**
23:20;37:19,20,21
**areas (1)**
28:5
**arguably (1)**
19:14
**argue (2)**
7:14;27:3
**arguing (2)**
11:7;12:3
**argument (24)**
3:9;5:21;9:21;
11:19;12:1;14:6;
17:25;19:17;22:21;
23:10,12;25:1,24;
27:1;28:14,15;
29:16;35:9,23;
36:18;37:8,14;38:4;
40:7
**arguments (6)**
4:10;6:13;15:1,15;
26:14;41:1
**around (4)**
7:6;35:8;44:4,24
**Arsdale (4)**
3:3,4,5,11
**assert (2)**
5:6,8
**asserted (1)**
6:2
**assessment (1)**
24:6
**assignment (1)**
21:8
**assume (1)**
10:2
**assuming (3)**
27:2,4;40:21
**attempt (2)**
11:12,17
**attempting (1)**
20:7
**attention (2)**
11:8;18:5
**attorneys' (1)**
35:12
**authority (2)**
26:12;40:25

**authorize (1)**
6:2
**averaged (1)**
21:11
**awake (1)**
6:7
**award (4)**
37:24,25;38:3,5
**aware (2)**
29:11;48:6

## B

**back (14)**
6:18;8:10;11:21;
14:6;31:1;32:8;33:9;
34:17,25;36:24;
41:4;43:15;46:11;
47:18
**bankruptcies (1)**
27:2
**bankruptcy (24)**
11:8;15:13,16,25;
16:11;18:12;21:9;
23:18;24:19;26:4,
17;27:15,23;28:4;
31:23;33:18;34:14;
40:14,25;41:7,22,22;
42:1,6
**base (2)**
38:22;39:1
**based (5)**
23:5;34:23;35:10;
37:12;44:13
**basis (1)**
39:2
**bear (2)**
5:18;23:24
**become (2)**
4:16;32:2
**becomes (1)**
16:3
**beginning (4)**
16:25;31:16;41:4;
43:1
**begins (1)**
31:11
**belie (1)**
23:16
**bell (1)**
42:3
**below (1)**
30:14
**bench (1)**
47:25
**benchmark (1)**
18:21
**benefit (4)**
13:3;21:8,12;39:5
**Beth (2)**
3:6;4:7
**bill (10)**
5:11,14;32:17,20;

34:10,18;45:23;46:5,
16,18
**bit (4)**
6:18;26:15;33:3;
41:3
**blank (1)**
22:22
**board (1)**
34:17
**boils (2)**
15:9;39:18
**bond (1)**
36:4
**both (3)**
14:25;32:9;39:24
**bounds (1)**
43:16
**BR (1)**
33:18
**Bradshaw (2)**
3:19;11:5
**branch (1)**
43:14
**brief (1)**
5:7
**briefed (1)**
15:6
**briefing (2)**
4:15;32:13
**briefly (1)**
18:1
**briefs (4)**
15:11;27:19;
32:25;37:8
**bring (1)**
45:1
**brought (3)**
4:18;6:22;15:19
**budget (4)**
19:20;26:7,13;
34:8
**Buffet (1)**
20:18
**Buffets (3)**
15:6,17,22
**bulk (1)**
39:11
**burden (1)**
24:12
**bus (1)**
12:22
**business (2)**
13:16;48:13
**buy (5)**
12:11,15,16,20,22

**C**

**CAINE (50)**
3:14,16,16,22;7:5;
9:15;10:5,9,12,15,
17,19,22;11:1,5;
12:10,15;13:11,23;

14:13,25;15:3,9;
16:9,19,21,23;17:12,
16;25:9,19;39:16,17;
40:6;41:7,13,20;
42:4,11;43:8,14;
44:2;45:2,7;46:25;
47:2,20;48:18,20,22
**Caine's (2)**
9:20;35:8
**calculation (2)**
16:24;34:23
**calendar (1)**
31:11
**calibrate (1)**
39:12
**calibrated (1)**
36:22
**calibration (1)**
26:8
**call (6)**
8:6,7,13;9:23;
10:12;38:17
**called (1)**
37:10
**calling (3)**
6:25,25;9:21
**came (5)**
13:15;20:14;33:9;
36:6;37:14
**can (27)**
6:23;7:1,4,14,15,
15;9:15,23;10:13;
12:20;16:20;17:5,9,
13;19:9;21:2,12;
23:2;25:14;29:18;
32:9;33:16;36:11;
41:17;43:19;45:11;
46:23
**cap (2)**
26:9;36:23
**car (11)**
12:11,12,15,16,18,
20,20,20,22,24;13:8
**care (3)**
7:12,16;44:9
**careful (1)**
26:7
**carefully (1)**
16:10
**Carolina (5)**
16:1;17:4,19;
28:16,25
**carve (1)**
31:6
**carved (1)**
31:22
**carveout (1)**
31:24
**case (71)**
3:21;4:20;5:1,3;
6:10;7:4,6;8:1,10,11,
20;13:10,14;14:3;
15:6;17:1,17,20;

18:7,10,12,15,20,21;
20:16,24;21:2,4,10,
25;23:13,23;24:3,5,
22;25:8,11,14;26:7,
17;30:9,10,16,17;
31:4;32:16;33:2,13,
14,18,25;34:3;36:1,
3;37:2,9,13,14,14,19,
21;38:4,15,16;39:20;
40:11,12;42:5;43:3;
47:4,23
**cases (68)**
4:16;8:19;11:14;
16:12;17:2,7,7,23;
19:3,4,7,11,19,21,23;
21:20,21;24:2,13,14,
15;25:2,3,23,24;
26:23,24;27:19;30:3,
14,20,23;31:1,5,5,6;
32:1,19,23,23;33:8,
10,12,21,25;34:11,
13,13,13;35:1,6,6;
39:20,21;40:10,13,
16,17;42:1,17,21;
43:20,21;45:3,4,18;
46:2;47:11
**cat (1)**
9:22
**catching (1)**
11:3
**CBO (5)**
34:7,7,10,15,17
**CBO's (1)**
34:20
**certain (5)**
21:13;26:10;
30:14;36:25;42:7
**certainly (8)**
9:15;20:20;29:12;
30:19;32:12;35:19,
21;41:7
**certainty (1)**
35:19
**CF&I (3)**
21:21;36:2;43:3
**challenge (2)**
3:25;14:19
**challenged (1)**
5:10
**challenges (2)**
5:9;25:22
**challenging (7)**
4:2;5:14,16;14:14,
19,23;23:21
**change (1)**
30:21
**changed (3)**
15:21;34:16;42:13
**changes (1)**
12:13
**Chapter (7)**
17:1;25:13,23;
26:23;30:9,17;34:13

**characterizes (1)**
23:17
**charge (2)**
23:21;37:15
**charged (3)**
15:20;34:8;43:25
**charging (3)**
23:18;28:17,17
**check (2)**
22:22;38:13
**choose (1)**
12:20
**Circuit (13)**
3:1,17;18:5,8,15;
21:10;24:25;28:7,
10;35:25;36:1;41:2;
48:13
**circuits (1)**
40:24
**citation (1)**
37:10
**cite (1)**
33:17
**cited (2)**
21:20;27:19
**City (6)**
3:1,17;18:15;
21:10;24:25;48:13
**civil (1)**
5:23
**claim (1)**
37:22,25;38:22
**claims (3)**
6:2;36:5;37:12
**clarified (1)**
45:24
**clarify (4)**
45:9,18,20;46:22
**clarifying (3)**
45:17,19;46:7
**clarity (1)**
6:16
**clause (4)**
22:3;37:7;38:24;
39:1
**clear (13)**
18:23;25:24;
29:24,24;30:1;35:5;
39:10;40:10;41:14;
42:17;45:2,4,12
**clearly (11)**
12:8;15:12;17:21;
18:12;19:10;20:4;
23:16;24:3,16;40:16,
18
**CLERK (2)**
3:1;49:2
**clerkb (1)**
30:8
**close (1)**
25:14
**cocounsel (1)**
3:18

**Code (4)**
28:4,4,6;40:25
**collect (3)**
27:9,24;28:1
**collection (2)**
24:6;27:22
**coming (1)**
4:16;35:11;48:24
**committee (1)**
16:24
**common (1)**
20:4
**community (1)**
11:9
**complain (1)**
43:3
**complained (1)**
27:8
**complaining (1)**
44:16
**complaint (4)**
6:14;9:2;37:5,5
**completed (1)**
20:3
**completely (2)**
35:14,15
**complex (1)**
46:21
**complicated (3)**
33:3;46:8,9
**complied (1)**
27:6
**concede (1)**
11:10
**concluded (1)**
49:3
**conclusion (3)**
6:17;12:3;22:22
**conduct (7)**
19:15;20:2,6,19,
23;23:5;44:13
**conference (2)**
15:18;27:11
**conference's (1)**
28:1
**confident (1)**
14:22
**confirm (1)**
25:13
**confirmation (21)**
12:25;13:6,25;
14:2,7,7;19:8;20:6;
21:5;22:16;24:9;
33:5;35:9,17;36:4,5,
12;42:24;45:3,25;
47:11
**confirmed (15)**
11:14,17;13:1,24;
14:4;18:15,20;20:9;
24:13,23;25:4;33:8;
39:22;43:22;44:17
**congratulated (1)**
13:22

**Congress (28)**
12:9;13:4;19:6,11,
22,24;21:22;22:23;
26:5;29:6;32:4;33:4,
9;34:3,15,25;36:20;
37:5,6;38:1;39:11;
40:4,4;42:17;43:11,
11,12;44:9
**Congress' (5)**
14:23;26:3,11;
35:3;47:6
**congressional (8)**
18:24;19:20;26:1,
16,21;40:18,19;
43:17
**considering (2)**
35:5;41:21
**consistent (2)**
17:5;21:21
**constitutional (4)**
5:20;6:2;18:4,7
**constitutionality (4)**
3:25;14:15;18:5;
39:25
**constitutionally (1)**
43:20
**construction (1)**
30:1
**contested (4)**
6:19,25;8:6;9:22
**context (3)**
12:25;24:19;36:3
**continue (4)**
14:8,11;30:22;
48:7
**contrary (2)**
27:10,11
**control (1)**
42:8
**convert (1)**
7:18
**converted (1)**
30:10
**copies (1)**
17:4
**copy (1)**
17:10
**copycats (1)**
8:20
**Corp (2)**
47:3,13
**cost (3)**
13:5;18:10;39:4
**costs (2)**
22:20;35:13
**Counsel (10)**
3:7;4:14,25;13:22;
17:5;29:21;40:11;
42:24;43:3;44:23
**country (5)**
26:19;27:5;28:5,
11;40:24
**couple (3)**

5:6;6:21;15:9
**course (4)**
27:20;34:7;36:8;
43:1
**COURT (103)**
3:3,6,10,12,15,20;
4:5,14,18,25;5:3,11;
6:5,11,18;8:5,9,22;
9:4,6,15;10:1,4,11,
14,16,18,21,23;11:3;
12:9,11;13:10,21;
14:6,17;15:2,7;16:7,
18,20,22;17:10,13,
15;22:4;23:14;25:1,
17,20;28:7,10,15,19;
29:4,15,20;30:5;
32:6,12;33:16,23;
34:2;35:8,20;36:3;
37:2,9,18,19;38:12,
13;39:6,13,16,23;
40:21;41:10,17;42:2,
10;43:6,9,24;45:1,6,
8,10,21;46:1,4,9,13,
18,20,23,25;47:16,
21;48:16,19,21,23
**courts (4)**
28:3;41:7,8;43:8
**Court's (2)**
18:21;29:22
**Cranberry (1)**
23:23
**created (1)**
24:8
**creditors (9)**
11:18;13:3,19;
18:11;20:13;21:8,
13;22:10;44:19
**cross (1)**
10:17
**cross-dispositive (1)**
10:19
**cross-motions (1)**
8:23
**current (2)**
14:10;19:10
**currently (1)**
34:13

**D**

**data (1)**
36:22
**date (28)**
19:13;26:9,25;
30:3;31:6,12,13;
32:2,24;33:6,8,10,
16;35:2,6;36:23;
38:2,3,5,6,8;40:13;
44:12,14;45:17,20;
46:6,17
**day (1)**
7:16
**deal (1)**

15:10
**dealt (1)**
21:25
**debtor (3)**
14:11;22:9;36:13
**debtors (3)**
13:25;17:22;35:22
**debtor's (1)**
19:9
**December (1)**
44:3
**decide (6)**
21:1,1,7;43:6,8,15
**decided (3)**
18:8;43:11;48:4
**decides (1)**
12:12
**decision (6)**
12:15,16;13:4;
29:22;36:21;47:4
**decisions (12)**
13:2,14;14:2,5;
17:22;20:10,12;
35:10;39:11;42:5,8;
44:5
**defense (1)**
5:24
**deficit (2)**
11:25;12:5
**delay (2)**
8:3;10:22
**delayed (1)**
7:23
**delaying (1)**
7:3
**demonstrates (1)**
28:21
**deny (1)**
38:12
**Department (1)**
4:8
**deposition (2)**
9:8,9
**describe (1)**
30:13
**detail (2)**
15:4;26:15
**determinations (1)**
26:13
**determine (1)**
25:12
**determined (1)**
38:18
**develop (1)**
9:7
**developed (1)**
6:14
**difference (9)**
6:7,9,24;9:23;
27:8,9;38:15;41:23,
25
**different (25)**
6:25;14:2;15:16,

23;18:3;23:24;
27:16;28:5,11;29:7;
32:20;33:11;34:4,5;
35:16;36:3;40:23,
24;41:3,8,11,18,19;
42:12,22
**differentiation (1)**
18:6
**differently (4)**
28:5,11;29:13;
35:15
**difficult (1)**
32:3
**direct (2)**
34:8,21
**directive (1)**
27:12
**disagreeing (2)**
43:17,19
**disagreement (1)**
25:25
**disbursements (11)**
20:10;21:17;
26:23;30:3,17;31:11,
15;38:7,7;44:12,13
**discussed (2)**
32:25;33:1
**discussion (1)**
16:16
**dismiss (5)**
5:25;6:14;8:11;
9:1,13
**dismissed (1)**
30:10
**dismissing (1)**
8:9
**dispute (1)**
27:6
**disputing (1)**
9:10
**distinguishes (1)**
32:16
**distribution (1)**
13:18
**district (6)**
15:14;17:18,18;
27:23;33:19;42:7
**districts (16)**
15:13;16:1,11,25;
26:18;27:15;28:16;
29:3;40:15;41:10,16,
24,25;42:14,15,16
**docket (2)**
7:10;16:21
**dog (1)**
9:22
**dollars (6)**
13:6;14:1;20:13;
21:6;34:21,22
**domain (1)**
38:25
**done (5)**
3:13;7:17,17;10:7;

13:8
**doubt (2)**
47:5;48:3
**down (6)**
3:7;7:15;15:9;
27:24;39:18;48:24
**drawing (1)**
34:17
**drawn (1)**
18:5
**drive (1)**
12:24
**driving (1)**
13:8
**due (8)**
5:12;20:14;23:10;
24:23;25:1;36:17;
39:2;40:11
**during (6)**
19:1;21:5;30:11,
16,18;31:20
**duties (1)**
20:3

**E**

**earlier (3)**
20:11;22:14;44:22
**earliest (1)**
16:4
**effect (3)**
20:1,15;21:19
**effective (8)**
19:13;31:13;32:2,
24;35:2;40:13;
44:14;46:16
**efforts (2)**
44:5,18
**either (2)**
9:22;34:16
**else (3)**
14:10;16:2;22:8
**elsewhere (1)**
48:7
**eminent (1)**
38:24
**employee (1)**
27:21
**enacted (2)**
32:22;33:1
**enactment (13)**
20:20;26:25;30:4;
31:12;33:6,8,10;
35:6;38:8;45:17,20,
21;46:6
**end (3)**
8:1;30:23;36:10
**ends (1)**
7:7
**enforce (1)**
27:17
**engage (2)**
20:12;21:13

**entered (2)**
37:24,25
**entirely (1)**
42:12
**entities (1)**
41:25
**entry (1)**
16:21
**especially (1)**
47:25
**essentially (2)**
12:25;42:19
**estimate (1)**
19:20
**estimated (1)**
34:20
**evaluating (1)**
26:5
**evaluation (1)**
26:7
**even (11)**
11:22;16:3,9;
17:16;19:14;25:2;
27:2,3;36:16,24;
37:15
**event (1)**
31:15
**everybody (4)**
9:24;10:8;25:13;
49:1
**everywhere (1)**
16:2
**evidence (2)**
9:5;11:2
**ex (1)**
5:2
**Exactly (7)**
4:20;6:24;22:6;
28:18,18;40:22;43:4
**example (4)**
5:23;18:3;21:25;
27:14
**Excellent (1)**
8:5
**except (1)**
30:7
**exception (1)**
26:24
**excessive (2)**
23:16;24:4
**excuse (1)**
47:21
**Executive (1)**
3:8
**exemptions (1)**
41:4
**exist (1)**
40:13
**existed (3)**
39:21;43:21;47:5
**existence (1)**
16:13;17:7;35:11
**existing (4)**

19:21;20:2;22:1;
45:5
**expanded (1)**
38:25
**expectation (6)**
22:5,7;23:4,5;
43:7,12
**expectations (10)**
21:23;22:9,13,13,
19;23:1;42:23;43:2,
5;44:9
**expected (3)**
24:17;34:6;44:21
**expiration (1)**
26:9
**explanation (1)**
29:10
**explicit (1)**
32:5
**exponential (2)**
11:13;14:15
**express (2)**
18:24;40:18
**expressed (1)**
40:18
**expressly (2)**
19:15,25
**extended (1)**
36:10
**extent (1)**
41:20
**extra (1)**
17:4

**F**

**Fabricators (1)**
36:2
**face (1)**
41:14
**fact (7)**
19:13;28:6;32:14;
33:15;40:3;42:15;
44:8
**facto (1)**
22:3
**facts (4)**
9:3,7,10,13
**fails (1)**
27:24
**failure (5)**
5:17;27:9,17;28:1;
29:2
**failures (1)**
5:9
**fair (8)**
23:15,22;24:17;
37:15;38:19;39:3,4,7
**falls (2)**
24:12;27:23
**familiar (1)**
15:5
**Farms (3)**

26:17;28:21,24
**Fas (1)**
8:10
**fashion (1)**
20:22
**fast (1)**
16:20
**faster (1)**
13:10
**February (1)**
37:25
**federal (4)**
5:20,24;6:1;23:19
**fee (48)**
10:18;11:9;14:14,
16,19;15:12,16,23,
24;16:5,12,24;17:17,
19,23;18:14,18;20:7,
9,25;23:3,8,16,18,20,
22,22;24:9,12,24;
25:11;27:12,12;30:8,
8,13;33:3,24;36:8;
38:6,7,17,18,22;
39:8,12;44:3,15
**feel (1)**
5:5
**fees (77)**
4:1;5:12;11:11;
13:7;14:1,9;17:6;
19:2,2;20:14,21;
21:7,10,14,16;22:11,
14,24;23:6,14,17;
24:6,21;25:2,7,23;
26:2,6,9,17,17,22;
27:5,10,13,14,15,24;
28:1,23;30:16,19,22;
31:10,21,25;32:1,21,
25;33:12,15,20,22,
23,23,23,25;34:2,3,
10,11,12;35:12,22;
36:14,22,24;37:12,
15;42:12,25;43:25;
44:20;45:15;46:3,
19;47:9
**few (2)**
4:9;32:8
**fifty-four (1)**
13:19
**figure (1)**
7:2
**file (7)**
17:17,23;20:24;
21:1;33:24;42:5,6
**filed (24)**
4:2,11;6:19;16:14;
17:1,20;19:3;25:2,3;
26:24;30:20;31:1,6;
32:1,24;34:1,11;
35:2,6;37:21,25;
38:4;40:12;42:21
**filing (8)**
18:10;21:2,3,5;
30:8;38:5;41:21;

42:1
**final (1)**
34:18
**financial (4)**
22:2,7;35:18,18
**find (5)**
23:12;24:24;
33:13,21,21
**finish (1)**
13:10
**FIRREA (1)**
22:1
**first (19)**
4:4,11;10:3,5;
11:20;13:7;15:10,
11;16:25;17:10,11;
19:16;26:16;29:22;
32:22;33:1;39:23;
41:2;45:24
**fiscal (3)**
16:25;30:12,20
**fix (1)**
15:18
**fixed (4)**
14:4;15:23;21:24;
35:9
**focused (1)**
32:13
**follow (1)**
29:18
**followed (1)**
8:16
**forever (1)**
3:21
**forget (2)**
7:4,5
**forth (2)**
19:2;27:12
**forward (10)**
7:23;8:3;10:5,9,
22;16:8;17:8;18:17;
34:19;44:1
**found (2)**
33:14,17
**Fourth (2)**
18:5,8
**frame (1)**
7:13
**frankly (1)**
47:17
**front (3)**
20:23;21:2;26:15
**frozen (2)**
12:23;18:16
**full (1)**
10:8
**fund (7)**
11:24;26:10;
30:14;31:22,22,23;
36:25
**fundamentally (1)**
30:21
**funding (1)**

35:3
**further (3)**
38:11;46:25;47:8
**future (2)**
8:19;42:25

**G**

**game (2)**
24:8;42:13
**gave (1)**
5:3
**General (7)**
3:7,19,24;31:13,
22;39:8;45:16
**generally (1)**
34:2
**generated (2)**
13:17;33:5
**generous (1)**
4:15
**gets (2)**
29:15;43:6
**giving (1)**
7:20
**Glad (1)**
11:3
**glasses (1)**
11:1
**goals (1)**
35:3
**goes (3)**
30:12;32:7;48:12
**Good (6)**
3:3,4;10:23;39:13;
48:16,24
**government (6)**
5:20;6:1;8:16;
12:12;36:14;42:25
**governmental (2)**
35:22;36:8
**governs (1)**
5:8
**grace (1)**
4:24
**granted (1)**
8:15
**Growers (1)**
23:23
**Gryphon (1)**
35:25
**guarantee (2)**
35:18;42:25
**guarantees (1)**
6:1
**guess (1)**
16:8
**guide (3)**
20:23;23:5;25:10

**H**

**hand (3)**

17:11;42:20,22
**happen (2)**
4:22;36:11
**happened (2)**
28:6;37:21
**happens (1)**
4:17
**happy (4)**
11:5;13:13;38:10;
42:11
**hard (1)**
29:9
**hat (1)**
36:21
**heads (1)**
29:10
**hear (2)**
7:15;41:3
**heard (1)**
4:6
**hearing (2)**
5:1;35:10
**heart (1)**
12:2
**here's (1)**
8:22
**higher (6)**
12:18;13:5,5;
20:25;41:8;44:20
**himself (1)**
9:16
**historical (1)**
33:21
**historically (1)**
19:21
**history (5)**
19:18;26:5;32:15,
21;35:5
**holds (1)**
18:22
**Holywell (1)**
36:3
**Honor (75)**
3:4,22;4:7,9;5:12;
6:8;8:2,8,15,21,25;
9:25;10:10;11:1,7;
12:1,7;13:11,16,23;
14:25;15:4,10;16:9;
17:3,5,9,16;18:1,4,
13,18;21:18;22:14,
17,21;23:2,7,10,22;
24:16,24;25:9,16,21,
21;27:1;28:13,18;
29:9,19,21;31:3;
32:10;35:4,17;
36:15;37:7;38:10,
21;39:15,17;40:14;
41:13;42:22;44:2,
16;45:5,7,20;46:24;
47:2,20;48:15,18
**honored (1)**
43:5
**hope (1)**

42:7
**hopefully (2)**
7:7;13:10
**hoping (2)**
7:7;43:9
**hundreds (1)**
20:13

## I

**ignore (1)**
46:23
**immediately (2)**
7:18;29:11
**immunize (1)**
35:22
**immunized (1)**
36:14
**impact (1)**
34:8
**impair (2)**
20:1;36:16
**implement (1)**
14:24
**implemented (1)**
25:2
**important (3)**
7:25,25;31:18
**impose (2)**
13:4;20:3
**inappropriately (1)**
18:19
**included (1)**
32:18
**includes (1)**
26:9
**including (3)**
20:11;26:6;35:6
**inconsistent (2)**
22:12,13
**inconsistently (1)**
29:13
**inconvenient (1)**
7:14
**Incorporated (1)**
3:1
**incorrect (1)**
34:23
**increase (18)**
11:9,11,12,13,14;
12:6;14:15;19:8;
20:2,18,21;23:1;
24:3;32:22;33:12,
16;34:8,9
**increased (10)**
25:23;26:22;
30:13,18,20;32:1;
33:11;34:21;45:15;
46:3
**Increases (2)**
43:1;46:19
**increasing (2)**
22:24;34:10

**incur (2)**
21:6,14
**incurred (1)**
35:13
**independent (1)**
23:12
**Independently (1)**
18:18
**indulgence (1)**
30:4
**information (1)**
20:22
**infringe (1)**
22:19
**infringement (1)**
11:22
**infringes (1)**
24:23
**ingenious (1)**
8:14
**initial (1)**
15:22
**instead (2)**
7:1;30:23
**institution (2)**
22:2,8
**insubstantial (1)**
21:11
**intend (1)**
9:16
**intended (6)**
11:20;19:11,18;
32:4;37:4;47:6
**intent (4)**
18:24;29:25;
40:18,19
**interested (1)**
9:21
**interesting (1)**
44:23
**interfered (1)**
22:25
**interpretation (7)**
14:18,20;39:18;
40:3,16,22;41:11
**interpretations (1)**
41:8
**interpreted (6)**
32:7;39:20;40:15;
41:14,17,18
**interpreting (2)**
29:6,7
**into (6)**
21:8;23:19;25:11;
29:9,15,17
**introduce (1)**
3:6
**investments (2)**
13:16,17
**involved (3)**
24:5,15;25:8
**involvement (1)**
24:7

**ipso (1)**
22:3
**irrational (1)**
37:1
**issue (6)**
4:16;5:5;7:25;
8:17;18:12;48:2
**issues (5)**
10:25;15:6;18:7;
26:12;32:13
**items (1)**
3:1

## J

**January (9)**
31:17;33:4;44:3;
45:13,19,24;46:8,16;
47:11
**job (1)**
27:24
**Jones (1)**
3:17
**Judge (3)**
8:10,14;42:7
**judges (2)**
40:22;42:6
**Judgeship (1)**
15:16
**judgeships (2)**
31:23;34:9
**judgment (11)**
4:2,6;8:24;26:1,3,
11,16,21;37:4;43:17,
19
**judicial (4)**
15:18;27:11;28:1;
43:14
**July (1)**
37:25
**June (1)**
38:2
**Justice (1)**
4:8
**justification (1)**
22:17
**justified (1)**
12:7

## K

**Katie (3)**
3:18,18,18
**Keating (1)**
33:18
**keep (2)**
12:19;34:18
**keeps (1)**
40:1
**kept (1)**
6:6
**kick (1)**
22:7

**kind (3)**
7:12;36:7;47:24
**kinds (1)**
26:13
**knew (4)**
19:6,12;45:1;
47:18
**knowing (1)**
21:14
**known (1)**
13:25
**Koontz (4)**
37:10;38:15,16;
47:23
**K-O-O-N-T-Z (1)**
37:10

## L

**label (1)**
7:12
**labeled (1)**
10:20
**lack (8)**
6:16;18:13;26:20;
27:7;28:22;41:23;
42:14;44:7
**Landgraf (8)**
18:21,22;19:13,
24;20:17;21:19;
29:22;37:2
**landlord (2)**
22:1,2
**landlord's (1)**
22:4
**Landsgraf (3)**
31:14;32:17,17
**language (13)**
18:24;19:1;24:4;
31:15,19;34:16,16;
45:17,17;46:7,13,16;
47:15
**large (4)**
21:16;23:1,6;
24:13
**largest (1)**
25:24
**last (6)**
6:7;13:18;20:8;
25:1;45:10;47:1
**later (5)**
5:2;15:18,23;36:7;
38:1
**law (13)**
14:24;27:2,4,16,
17,17;29:5,11;31:7;
35:16;41:2;47:8,9
**laws (1)**
18:2
**lawsuit (1)**
5:23
**learn (1)**
12:18

**learned (1)**
  4:22
**lease (2)**
  22:1,3
**least (1)**
  35:15
**led (2)**
  20:10,12
**legis (2)**
  22:23;32:5
**legislation (9)**
  11:24;15:22;
  16:16;22:3,23;
  24:21;39:19;44:24;
  45:5
**legislative (4)**
  19:18;29:25;
  32:15;35:5
**legislature (1)**
  43:16
**lengthy (1)**
  26:5
**less (1)**
  6:9
**lesson (1)**
  4:22
**level (2)**
  15:19;36:25
**levels (1)**
  36:24
**Levene (47)**
  3:6,12;4:5,7,7,20;
  5:12;6:8,12;8:2,7,15,
  25;9:5,12,25;10:2;
  17:10,11;25:20,21;
  28:18,20;29:9,19,21;
  31:3;32:10;35:17,
  21;37:20;38:21;
  39:10,15;40:23;
  43:24;45:9,12,23;
  46:2,5,12,15,19,21,
  24;48:15
**liability (2)**
  20:2,19
**license (1)**
  28:9
**lifetime (1)**
  7:7
**lift (1)**
  33:24
**likely (1)**
  11:11
**line (2)**
  40:1;43:2
**lion's (1)**
  24:11
**Liquidating (11)**
  3:17;9:14;10:2;
  24:8,25;25:5,21,25;
  26:10;36:9,19
**litigant (1)**
  37:17
**litigated (3)**

  33:13,14;35:24
**litigation (9)**
  13:15,15,16;
  20:12;21:13;33:5,7;
  44:24;45:16
**little (3)**
  6:18;33:3;41:3
**loaded (1)**
  3:14
**Local (3)**
  18:3,6,6
**logical (2)**
  12:3;22:22
**logistically (1)**
  32:2
**long (2)**
  7:6,6
**longer (2)**
  38:18,19
**long-term (3)**
  13:2,16,17
**look (10)**
  16:10,14;36:20;
  38:19;39:3;46:11;
  47:16,19,22,23
**looked (3)**
  14:7;28:24;36:21
**looking (5)**
  20:24;40:9;42:18;
  47:3,13
**lot (7)**
  11:8;12:23;15:14;
  21:15;33:5;34:19;
  36:11
**lower (1)**
  12:21

**M**

**Madison (1)**
  43:15
**makes (6)**
  6:9;11:19;15:15;
  27:20;39:10;41:25
**making (1)**
  12:16
**manager (2)**
  3:19,24
**Mansion (1)**
  36:1
**many (2)**
  13:1;24:13
**Marbury (1)**
  43:15
**Mart (1)**
  8:10
**Massachusetts (1)**
  33:19
**match (1)**
  27:12
**material (1)**
  9:2
**materials (2)**

  15:5,5
**matter (7)**
  4:1;6:20,25;8:6;
  9:18;14:18;48:2
**may (8)**
  5:21,23,24;15:21;
  18:3;32:13;34:18;
  45:9
**Maybe (3)**
  10:17;42:7;46:23
**McAndrews (2)**
  21:21,25
**mean (10)**
  3:21;7:4;9:19;
  12:11;29:12,15;
  30:22;40:6,21;41:11
**meaning (1)**
  30:21
**means (5)**
  7:10;18:11;30:23;
  37:1;41:13
**meant (2)**
  30:19;33:9
**mechanism (1)**
  5:19
**mention (1)**
  37:7
**mentioned (6)**
  18:7;20:12;21:9;
  42:24;43:3;44:23
**merits (3)**
  8:3,21,24
**mess (1)**
  42:23
**middle (1)**
  42:13
**might (6)**
  14:2;21:1,1,4,6,7
**million (3)**
  14:1;34:20,21
**millions (2)**
  20:13;21:6
**mind (2)**
  16:8;34:18
**minute (1)**
  11:21
**minutes (1)**
  32:8
**misapplication (1)**
  29:2
**misinterpretation (1)**
  29:5
**moment (2)**
  16:17;48:1
**moments (1)**
  3:23
**monetary (1)**
  20:18
**money (5)**
  21:15;24:16;
  38:23;43:18;44:18
**month (3)**
  13:12;48:17,23

**more (9)**
  6:13;7:21,25;9:1,
  12,21;23:10;26:15;
  32:5
**most (1)**
  6:7
**motion (17)**
  3:25;4:2,6,11,18,
  21;5:25;6:14,17;
  7:14;9:1,1,13;10:3;
  16:14;33:24;38:12
**motions (2)**
  5:21;10:19
**mouth (1)**
  9:16
**much (16)**
  3:10;9:20;11:17;
  12:18,21;13:5,5;
  20:11;23:3;25:18;
  26:6;30:13;44:18,
  20;45:16;48:24
**multiple (1)**
  34:12
**must (2)**
  23:24;39:20

**N**

**name (1)**
  7:5
**natural (1)**
  30:15
**necessarily (3)**
  28:22,23;41:12
**necessary (1)**
  26:8
**necessity (1)**
  37:22
**need (13)**
  5:5;7:16;9:5,7,7,8;
  18:2;22:20;46:11;
  47:22,23;48:8,14
**needed (1)**
  36:23
**needs (3)**
  10:6;26:8;48:6
**negotiate (1)**
  21:2
**negotiating (1)**
  21:3
**new (25)**
  16:5,12;17:6,19;
  20:3,7;23:3;24:1,12,
  24;30:11;31:25;
  32:19;33:15,23;
  34:10;35:22;36:7,7,
  14,22;40:15,17;
  42:16;45:5
**newly (1)**
  19:3
**news (1)**
  48:17
**next (8)**

  9:6;13:12;14:17;
  20:1,17;29:16;48:17,
  23
**night (2)**
  6:7;40:2
**nobody (2)**
  22:25;24:17
**nobody's (1)**
  43:2
**nonuniform (1)**
  28:12
**normal (1)**
  29:25
**normally (1)**
  31:21
**North (5)**
  16:1;17:4,18;
  28:16,25
**Northern (1)**
  17:18
**note (1)**
  18:4
**noted (1)**
  22:14
**notice (6)**
  5:2;19:6;1;44:2,7,
  15
**noticed (1)**
  4:19
**notices (2)**
  16:10;17:3
**notwithstanding (1)**
  47:9
**number (3)**
  7:20;35:23;36:21

**O**

**objective (1)**
  43:10
**obligation (3)**
  22:11,15;36:6
**obviously (1)**
  47:22
**occurred (1)**
  20:8
**occurring (1)**
  20:19
**October (6)**
  15:24;16:3;17:2,
  20;34:19;42:21
**off (1)**
  10:6
**offered (2)**
  22:17;39:18
**offers (1)**
  26:10
**Office (7)**
  3:7,8;11:10,13;
  14:20;19:20;39:19
**Old (4)**
  13:12;17:20;19:4;
  36:24

**omitted (1)**
  46:18
**Omnibus (1)**
  47:8
**once (3)**
  14:3;25:4;40:2
**one (22)**
  3:23;4:20;5:1;6:3,
  6,22;7:24;9:18;
  12:13;17:25;23:10;
  28:20;29:6,10;31:1;
  33:13;36:13;38:13;
  40:8;42:20;46:11,23
**ongoing (1)**
  34:13
**only (22)**
  3:20;5:4;17:7;
  19:1,3;20:9;30:3,14,
  20;31:5,19;32:1;
  40:15,17;42:16,20;
  43:25,25;44:12;
  45:19;46:5,7
**open (1)**
  30:3
**opinion (2)**
  15:7;48:3
**opportunity (1)**
  35:15
**options (2)**
  12:19,23
**order (13)**
  3:6;11:24;13:2;
  14:7,8,12,13,18;
  15:11;20:23;43:20;
  44:18;48:2
**ordered (1)**
  20:6
**originally (1)**
  36:10
**origins (1)**
  38:24
**otherwise (1)**
  41:1
**ought (1)**
  9:24
**out (21)**
  3:7;7:2;15:17,22;
  19:10;21:2;22:7;
  25:13;28:23;29:21;
  31:6,22;32:20;33:4;
  35:11;36:21;37:22;
  40:14,23;45:25;
  48:25
**over (3)**
  11:11;20:8;47:20
**overall (1)**
  39:9
**override (1)**
  6:3
**overstepped (1)**
  43:16
**owe (1)**
  5:15

**own (1)**
  46:18

**P**

**Pachulski (1)**
  3:16
**page (4)**
  16:14,19,23;17:6
**pages (1)**
  16:20
**paid (15)**
  13:5,6,8,18;16:5;
  19:21;20:14;21:12,
  15;22:5;23:3,3;
  24:21;30:8,8
**papers (6)**
  4:10;5:22;9:19,20;
  27:3;33:17
**Park (1)**
  27:18
**Part (2)**
  6:21;22:15
**parte (1)**
  5:2
**participating (1)**
  24:18
**particular (4)**
  15:4;28:3;39:7;
  46:10
**particularly (4)**
  13:1;17:23;35:4;
  43:21
**parties (7)**
  11:16;18:16;
  21:23;41:21;42:23;
  44:10;48:5
**parties' (1)**
  11:22
**parts (1)**
  28:11
**party (3)**
  20:19,22;21:7
**party's (2)**
  11:15;22:12
**passed (2)**
  15:23;29:6
**passes (1)**
  38:1
**past (5)**
  20:2;21:1;22:23,
  23;28:7
**Pause (1)**
  17:14
**pay (16)**
  12:21;14:8,11,13;
  16:5;21:16;22:13,
  20;23:6,19;24:15;
  25:7,13;26:4;43:18;
  44:20
**payable (2)**
  31:10;47:10
**payer (1)**

39:8
**paying (1)**
  35:12
**pending (7)**
  17:2;19:12,19,23;
  31:5;32:19;45:18
**Peony (1)**
  27:18
**perceived (1)**
  28:22
**percent (12)**
  11:13;12:6;13:19,
  25;17:24;22:12,24,
  24;24:3;31:21,24;
  43:11
**performed (2)**
  23:25;24:10
**period (5)**
  14:9;16:6;21:6;
  30:18;31:20
**perturbed (1)**
  44:8
**ph (4)**
  9:8;15:6;27:19;
  47:4
**pick (1)**
  36:20
**piece (2)**
  42:19,19
**PJ (1)**
  33:18
**place (1)**
  44:6
**plan (23)**
  12:25;13:1,24;
  14:4;18:15,16,20;
  19:9;20:6,8;22:15;
  24:9,22;25:4,12,14;
  35:15,17;36:13;
  39:21;44:4,17;47:12
**planned (2)**
  35:14;44:14
**planning (1)**
  36:8
**plans (6)**
  11:14,17;25:10;
  33:8;36:4;43:21
**pleadings (4)**
  5:21;15:8;25:25;
  37:11
**PM (1)**
  49:3
**point (6)**
  4:20;7:5;12:17;
  26:10;43:4;48:9
**pointed (3)**
  29:21;40:14,23
**points (5)**
  4:9;5:6;15:17,22;
  26:15
**policy (1)**
  26:11
**position (1)**

32:12
**possible (3)**
  11:18;29:10,11
**possibly (1)**
  7:21
**post- (1)**
  36:4
**post-confirmation (5)**
  24:2,3,5,19;36:6
**post-dates (1)**
  37:9
**potential (1)**
  37:3
**potentially (1)**
  18:11
**precedent (1)**
  4:21
**precluded (2)**
  14:14;22:3
**predictability (1)**
  4:24
**predicted (1)**
  13:24
**preference (1)**
  10:11
**preliminary (1)**
  4:1
**prepack (2)**
  21:1;25:13
**prepared (1)**
  8:3
**present (2)**
  10:3;17:5
**presenting (1)**
  3:9
**President (2)**
  32:19;47:7
**presumption (2)**
  12:22;40:20
**presumptions (1)**
  29:23
**pretty (1)**
  34:24
**Primes (1)**
  33:2
**prior (12)**
  13:25;15:15;16:6;
  17:20;19:6,15;
  26:24;31:6;32:17;
  33:8;35:2,6
**private (2)**
  5:23;20:19
**probably (2)**
  6:9;29:15
**problem (2)**
  12:1;29:2
**problematic (1)**
  40:5
**procedure (1)**
  4:3
**proceed (3)**
  8:21;10:24;14:3
**proceeded (1)**

4:21
**proceeding (7)**
  7:1,9,20;10:13,
  14;11:16;18:17
**proceedings (2)**
  8:19;49:3
**process (7)**
  21:9;23:11;24:23;
  25:1;36:17;39:2;
  44:17
**professional (2)**
  20:14;21:14
**program (4)**
  11:24;22:20;
  23:20;39:9
**prolong (1)**
  7:9
**prolonging (1)**
  7:8
**property (2)**
  24:17;38:23
**proposed (1)**
  22:21
**prospective (4)**
  20:22;30:2;35:7;
  44:11
**prospectively (1)**
  43:25
**provide (6)**
  4:23;17:10;19:25;
  22:5;33:16;47:9
**provided (2)**
  23:20;30:7
**provides (2)**
  5:19;23:14
**providing (2)**
  18:24;39:5
**provision (7)**
  28:4,6;29:17;31:8;
  32:14,18;47:9
**pursue (1)**
  13:14
**put (6)**
  4:4;7:12;9:16;
  10:6;33:17;44:17

**Q**

**qualifying (1)**
  26:23
**quarter (7)**
  16:25;21:3,11;
  30:9,18;31:11,16
**quarterly (5)**
  16:24;30:8,13;
  31:10;34:3
**quarters (4)**
  13:7;20:9,11;23:2
**quickly (3)**
  7:17;45:12;46:23
**quite (1)**
  47:17
**quote (1)**

23:15

## R

**raise (4)**
18:7;20:7;43:18;
44:18
**raised (8)**
4:10;5:6;11:8;
17:23,25;22:11;
35:23;37:11
**ran (1)**
37:20
**rarely (1)**
24:7
**rate (6)**
12:13,13,16,18;
14:9,10
**rather (4)**
21:3;42:7;46:8,9
**rational (3)**
11:24;36:21;39:2
**rationale (2)**
12:5,7
**rationally (1)**
41:18
**re (4)**
33:2,18;36:2;47:3
**reach (3)**
19:25;47:6,6
**reaches (2)**
26:10;36:25
**read (12)**
9:19,19;15:4,7;
17:15;19:9;31:24;
32:9;34:10,25;38:15,
16
**reading (3)**
30:15;34:15,24
**ready (1)**
8:21
**real (1)**
38:23
**reality (1)**
16:3
**really (14)**
5:18;7:3,12;8:18;
19:19;25:25;29:16;
32:2;33:13;35:2;
37:5;39:1;44:11,16
**reason (4)**
4:23;26:11;34:4;
37:3
**reasonable (15)**
21:23;22:4,6,9,18;
25:23:4,24;40:16;
42:23;43:2,4,7,12;
44:9
**reasonably (3)**
14:21;24:10;44:21
**reasons (1)**
38:10
**recall (1)**

37:16
**receiving (1)**
32:12
**recognize (1)**
4:14
**recovery (1)**
44:19
**rectified (1)**
47:7
**reevaluating (1)**
26:6
**refer (1)**
18:2
**reference (1)**
17:6
**refers (1)**
5:21
**reflection (1)**
44:8
**reflects (1)**
33:15
**regarding (11)**
5:9;26:1,11,12;
28:3,8;31:8;32:25;
37:9;46:16;47:5
**regardless (6)**
5:13;19:8;32:23;
33:25;45:3;47:11
**registration (1)**
12:17
**regulatory (1)**
38:25
**rejected (4)**
35:25,25;36:1,2
**rejection (1)**
28:8
**related (2)**
24:10;44:21
**relationship (1)**
23:24
**relevant (1)**
32:16
**relies (1)**
23:13
**rely (2)**
4:24;19:20
**remedy (1)**
28:23
**remember (2)**
31:18;47:17
**render (2)**
27:25;28:12
**renders (2)**
28:1,5
**rent (2)**
22:5,8
**reorganization (1)**
19:9
**replied (1)**
11:20
**report (1)**
34:7
**reports (1)**

19:22
**Republic (1)**
13:12
**require (3)**
4:12;6:13;27:5
**required (5)**
12:19,24;15:20;
16:4;44:13
**requirements (1)**
27:10
**requires (2)**
26:19;29:14
**resolution (1)**
48:8
**resolve (1)**
7:13
**resolved (7)**
7:9,11,11,24;9:18;
28:7,10
**respect (2)**
21:9;40:11
**respond (3)**
5:4,6;41:6
**response (1)**
6:15
**rest (1)**
26:18
**resting (1)**
5:24
**result (3)**
12:4;21:17;23:7
**retroactive (13)**
18:19,23;19:15,
25;20:1,15;21:19;
23:9;24:22;30:2;
35:7;36:15;38:1
**retroactively (3)**
11:21;18:25;40:8
**retroactivity (9)**
11:23;26:14;
28:13;29:17;38:4,8;
40:9,20;42:19
**return (2)**
11:17;18:11
**returned (1)**
44:18
**revenue (5)**
20:7,13;26:13;
34:9,22
**revenues (1)**
13:17
**rewrite (1)**
35:1
**Richardson (2)**
47:3,13
**right (36)**
3:13;4:5,13;5:4;
7:21,22;8:5,11;9:17;
10:16,23;12:17;
14:23;17:15;23:21;
29:4;31:4;36:14;
38:13;39:6,13,16;
40:6,22;42:4,10,18;

43:8;45:6,21;46:1,4,
25;47:22;48:13;49:1
**rightfully (1)**
48:5
**rights (18)**
7:21;10:8;11:15,
22;12:23;14:4;18:9,
16;20:2,5;21:23;
22:19;24:17,23;
35:9;36:16;41:21;
43:20
**rise (2)**
3:6;49:2
**risks (1)**
21:12
**Robert (1)**
3:4
**rocket (1)**
7:10
**rogue (1)**
27:21
**role (2)**
23:16;43:14
**room (1)**
34:20
**Rosenberg (1)**
27:18
**rule (10)**
5:8,8,18;6:3,19,20,
20,22,23;42:13
**rules (14)**
4:12,23;5:6;6:12,
20;7:2;8:16;18:3,3,6,
6;24:8,20;29:25
**ruling (1)**
47:24
**run (1)**
12:24

## S

**same (11)**
6:24;7:13;12:7;
14:12;15:5,19,20,25;
26:18;27:5;33:11
**saw (1)**
14:6
**saying (12)**
7:19;8:18;28:2,16;
32:18;36:3;38:14;
42:2,20,22;45:17,22
**scary (1)**
47:25
**schedule (16)**
4:15;5:3;15:17;
16:5,12;17:17,19,21;
18:14;20:7;23:3,8;
24:1,12,25;25:11
**schedules (4)**
4:25;15:23,25;
33:24
**scope (1)**
37:4

**second (2)**
26:21;43:24
**secondly (1)**
46:3
**section (8)**
19:1;23:8;28:8,12;
31:9,10;46:15;47:8
**seem (1)**
29:12
**seemed (1)**
40:3
**Seigel's (1)**
9:8
**sell (1)**
12:20
**send (1)**
34:25
**Sending (1)**
5:11
**sense (3)**
20:4;27:20;32:15
**sent (4)**
5:14;16:10;17:3;
34:17
**separate (1)**
40:7
**separately (1)**
46:19
**September (10)**
33:7;9;45:14,15,
21,23;46:5,10;47:7,
14
**Service (1)**
47:13
**services (2)**
39:5;47:3
**set (9)**
5:1;7:15;24:9,20;
25:5;27:12;36:23,
23;40:8
**sets (1)**
19:2
**settled (2)**
13:12;48:20
**settlement (1)**
37:24
**seven (1)**
13:5
**several (1)**
20:8
**shall (5)**
15:21;19:2;30:8;
31:9;47:10
**shame (1)**
48:10
**share (1)**
24:12
**shortly (2)**
7:11;48:25
**showing (1)**
33:22
**shows (2)**
19:20;42:17

sic (4)
   11:20;31:14;
   32:17,17
side (2)
   15:14;42:20
Siegel (1)
   13:21
signed (1)
   47:7
significant (1)
   34:24
simply (1)
   28:17
single (1)
   41:1
sitting (2)
   11:5;32:12
situation (2)
   5:20;38:9
sixteen (1)
   13:24
sixty (1)
   3:22
size (2)
   11:11;12:5
slippery (1)
   36:18
slope (1)
   36:18
solution (1)
   28:21
somebody (1)
   22:8
someone (1)
   27:23
somewhat (1)
   6:9
soon (1)
   12:17
sooner (1)
   36:24
sort (4)
   9:7;31:13;38:24;
   39:11
soundly (1)
   35:24
space (1)
   22:5
speak (2)
   9:13,15
special (2)
   7:15;10:6
specific (3)
   31:14;46:7,13
specifically (3)
   19:7;31:4;32:18
specificity (1)
   30:5
spending (2)
   34:9,21
Sperry (12)
   23:13,19;24:4;
   37:9,13,14,16,17,21,

24;39:4,10
split (4)
   28:3,7,10;40:24
spoil (1)
   48:21
sponte (1)
   8:12
stability (1)
   35:18
stand (1)
   27:19
standard (1)
   43:10
standards (1)
   4:23
Stang (1)
   3:16
start (1)
   6:19
started (1)
   39:24
state (1)
   21:22
stated (1)
   20:17
statement (1)
   19:13
States (27)
   4:8;5:10,13,17;
   11:10,12;12:2;13:4;
   15:14,15,18;16:15;
   17:25;19:17;21:7,
   20;22:14,18,20;
   23:17;24:5,11,14;
   36:4;39:19;41:15;
   42:20
status (3)
   19:8;45:4;47:11
statute (50)
   5:15,16,24,25;
   9:10;11:7;14:20;
   18:25;19:10,14;
   21:18;26:19,19;27:2,
   25;28:2;29:1,3,23,
   24;30:1,5,6,15,22;
   31:3,24;32:9;33:1,3,
   4,6;34:24,25;35:1,4;
   37:3,4;38:1;40:10,
   15,17;41:9,11,14,17;
   44:15;46:13,21;
   47:23
statutes (1)
   18:23
statute's (1)
   20:20
statutory (1)
   29:25
stay (1)
   33:24
step (3)
   19:16;20:1,17
still (2)
   12:6;18:4

Stone (1)
   36:1
Stores (1)
   3:1
straight (1)
   8:24
stretch (1)
   44:11
structure (3)
   15:13;18:18;25:12
struggling (1)
   6:6
stuck (3)
   14:12,13;42:10
sua (1)
   8:12
subject (2)
   17:19;27:2
submits (1)
   23:7
subparagraph (2)
   30:7,11
subsection (3)
   27:10;29:13;30:6
subset (1)
   39:21
substantial (2)
   13:17;16:5
substantially (2)
   20:18,25
substantive (4)
   18:9,12;41:21;
   44:5
suggest (3)
   8:22;19:14;27:25
suggested (1)
   41:15
suggests (3)
   18:13;19:18;47:14
summary (3)
   4:2,6;8:24
sunset (3)
   26:9;30:24;36:23
supports (1)
   37:15
suppose (1)
   8:25
supposed (4)
   24:15;27:22;
   36:10;44:4
Supreme (7)
   18:21;23:14;28:7;
   29:22;36:2;37:2,9
sure (3)
   8:16;29:19;35:17
system (10)
   23:19;24:19;26:4;
   29:7;31:21;36:25;
   37:16;43:18;48:10,
   11
systemic (3)
   4:16;5:5;8:17
systems (1)

32:6

**T**

Takings (8)
   37:7,9,12,13;
   38:22,24,25;39:1
talking (3)
   8:20;38:19;39:25
talks (2)
   16:16;47:4
Tavenner (1)
   3:18
tax (7)
   12:12,22;36:7;
   38:17,18,19,22
taxes (2)
   27:22;37:12
taxpayers (1)
   26:4
temporarily (1)
   25:23
ten (2)
   3:20;22:24
Tenth (1)
   36:1
term (1)
   28:7
terminate (1)
   22:2
test (1)
   39:2
thereafter (2)
   14:3;32:22
thinking (1)
   46:10
Third (2)
   35:25;41:3
though (1)
   36:17
thought (5)
   8:13;34:5,15;
   36:22;47:18
thousands (1)
   12:6
three (3)
   13:7;23:2;36:10
threshold (2)
   30:15,17
throughout (2)
   11:8;27:5
Tice (2)
   8:10,14
till (2)
   30:22;48:23
times (3)
   34:12;35:23;36:10
Title (1)
   30:9
today (12)
   3:9;7:14;8:4;10:5,
   9;11:8;12:3,13;16:8;
   17:16;36:19;40:2

together (2)
   27:5;48:11
tomorrow (2)
   12:12,13
took (3)
   21:4;32:20;45:25
top (1)
   16:23
trademark (1)
   28:9
transactions (1)
   20:3
treasury (1)
   31:23
treat (1)
   8:23
tribu (1)
   37:23
tribunal (2)
   37:17,23
triggered (1)
   38:6
triggering (2)
   31:15;35:13
triggers (1)
   38:6
true (1)
   34:2
truly (1)
   4:12
Trust (20)
   3:17,19,24;13:5,
   15;14:11;16:4;
   18:13;20:10;21:12,
   13;22:15;23:2,7,21;
   24:8,24,25;25:5;44:6
Trustee (46)
   3:5,8,9;4:1;5:10,
   13,17;9:14;10:2;
   11:19;12:2;13:4;
   14:9,14,16,21;15:14,
   15;16:15;17:25;
   19:17;20:25;21:7,16,
   20;22:10,18,20,23;
   23:8,13,17;24:5,11,
   14;25:7,22,25;26:10;
   36:9,19;41:15,25;
   42:15;43:18;48:11
Trustee's (11)
   4:1;11:10,12;13:7;
   14:1;21:10;22:11,14,
   24;29:6;39:19
Trust's (1)
   3:25
try (2)
   7:4;39:12
trying (4)
   7:2,3;8:3,16
turn (1)
   28:13
turned (1)
   3:22
turning (2)

16:20;27:1
**twenty (2)**
22:24;47:20
**twenty-one (2)**
34:20,21
**two (9)**
5:4;21:4;26:15;
28:5;31:21,24;33:2;
45:13,23
**two-percent (1)**
32:14

**U**

**ultimate (2)**
6:5;7:14
**ultra (1)**
27:16
**uncodified (1)**
31:7
**unconstitutional (11)**
5:25;12:10;18:19;
23:13;27:18,25;28:2,
6;41:5,12,19
**unconstitutionally (4)**
18:14;23:9;24:22;
28:12
**under (16)**
5:15;6:20,21;16:5;
22:15;23:2,8;24:4,
12;30:9;31:10,25;
33:23;38:15;47:10;
48:2
**underlying (2)**
9:21;10:24
**undermine (2)**
26:11,12;35:2
**unfairness (1)**
37:3
**unforeseen (1)**
36:11
**uniform (6)**
16:10;17:21;18:2;
24:20;27:4;29:2
**uniformity (18)**
15:10,12;16:3;
17:17;18:10,13;
26:14,20;27:1,7;
28:14,15,22;40:7;
41:23,24;42:14,18
**unilaterally (1)**
27:24
**United (27)**
4:8;5:9,13,17;
11:9,12;12:2;13:4;
15:14,15,18;16:15;
17:25;19:17;21:6,
20;22:13,18,20;
23:17;24:4,11,14;
36:4;39:19;41:15;
42:20
**unless (2)**
18:23;28:14

**unring (1)**
42:2
**ununiform (1)**
40:25
**up (23)**
4:16;5:21,24;6:18,
22;11:3;21:2,15;
25:5;26:15;27:14,
15;29:18;33:20;
36:6;40:1;42:6;44:4;
45:1,12;48:7,8,14
**upset (1)**
21:22
**use (10)**
21:7;23:15,23;
25:14;37:16,17;
38:20;39:7;40:1,19
**used (2)**
12:22;40:2
**user (6)**
23:14,16,18;37:15,
16;39:12
**users (1)**
26:3
**using (2)**
22:3;29:25

**V**

**VA (1)**
16:25
**valid (1)**
26:11
**value (2)**
12:21;24:18
**Van (4)**
3:3,4,5,10
**various (1)**
12:19
**vehicle (2)**
25:6,15
**vest (1)**
36:13
**vested (1)**
36:16
**vetoed (1)**
32:19
**Victoria (2)**
26:17;28:21
**Victoria's (1)**
28:24
**view (3)**
40:5,5,5
**violate (1)**
36:17
**vires (1)**
27:16
**vital (1)**
41:22

**W**

**Wait (3)**

6:18;43:24;48:23
**waived (1)**
10:18
**walk (1)**
15:1
**wants (1)**
9:24
**warned (1)**
21:19
**way (18)**
4:4;6:2,3,3;7:24;
9:18;13:21;21:13;
23:24;25:6;27:11;
29:6,8;31:1,24;32:7;
41:4,14
**ways (3)**
32:9;41:18,19
**websites (1)**
33:22
**week (2)**
5:2;13:18
**weeks (1)**
5:4
**welcome (1)**
3:12
**weren't (2)**
15:20;29:11
**Western (1)**
17:18
**What's (5)**
5:10;25:24;29:15;
35:12;43:5
**whatsoever (1)**
24:7
**Whereupon (1)**
49:3
**wherever (1)**
48:6
**White's (1)**
9:8
**whose (1)**
21:23
**wiggle (1)**
34:19
**wish (3)**
4:5;10:12;19:9
**within (1)**
7:13
**without (1)**
10:22
**wondering (1)**
9:17
**word (4)**
33:4;45:10,25;
47:1
**words (2)**
9:16;25:3
**work (2)**
23:25;24:10
**worked (2)**
47:17,18
**wrong (3)**
32:10;34:16;43:13

**wrote (1)**
6:17

**Y**

**year (3)**
14:1;17:1;46:8
**years (11)**
3:20;13:6;19:1;
20:8;21:4,4;30:12,
16,20;38:1;47:20

**Z**

**Ziehl (1)**
3:16

**1**

**1 (5)**
3:1;16:3;17:2,20;
42:21
**11 (8)**
17:1;25:13,23;
26:23;30:9,9,17;
34:13
**12 (1)**
6:22
**149 (3)**
16:14,21;17:6
**154 (1)**
16:21
**1930 (1)**
23:8
**1930a6 (2)**
31:10;47:10
**1930b (1)**
33:23
**1986 (3)**
32:22;33:1,11
**1996 (7)**
33:2,9,12;35:24;
44:23;47:7,11
**1997 (1)**
19:7
**1st (3)**
15:24;31:17;44:3

**2**

**2 (1)**
3:2
**2.1 (1)**
47:8
**2001 (1)**
27:11
**2007 (2)**
27:14;33:20
**2008 (1)**
23:3
**2010 (2)**
13:1;18:17
**2015 (1)**

36:10
**2017 (10)**
13:6;15:16,19,22;
23:4;25:3,22;26:22;
39:19;44:3
**2018 (14)**
13:7;15:24;16:4;
17:2,20;18:8;19:2;
20:9;30:12,20;31:17,
20;42:21;44:1
**2019 (1)**
17:1
**2020 (1)**
5:8
**2022 (5)**
19:2;30:12,21,24;
31:20
**205 (1)**
33:18
**25,000 (1)**
21:11
**27 (1)**
47:11

**3**

**3:11 (1)**
49:3
**30th (1)**
47:7
**365 (3)**
28:8,10,12

**5**

**5.1 (1)**
5:18

**6**

**632,000 (1)**
13:8
**663 (1)**
33:18

**7**

**7 (1)**
6:21
**7001 (1)**
6:4

**8**

**833 (5)**
11:13;17:23;
22:12;24:2;43:11
**833,000 (1)**
13:6

**9**

**9014 (2)**

6:20,20
**96 (1)**
45:13